# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ERICK RODERICO PIVARAL GONZALEZ, Individually and as Special Administrator of the Estate of NEHEMIAS R. PIVARAL SANTOS, DECEASED, ERICK SANTOS and EVELYN MORENO | § § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. 3:22-CV-02714-K |
| v. | § § | |
| CAYLEE ERIN SMITH and EASTMAN CHEMICAL COMPANY, | § § | |
| *Defendants.* | § § § | |

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...........................................................................................3

I.      Plaintiffs' Trip ......................................................................................................3

II.     The Flat Tire .........................................................................................................4

III.    The Accident .........................................................................................................5

IV.     Caylee Smith's Actions ......................................................................................6

V.      Smith's Employment .........................................................................................10

LEGAL STANDARD .....................................................................................................13

ARGUMENT ...................................................................................................................14

I.      Negligent Employment .....................................................................................14

        A.      The evidence does not create a genuine dispute regarding Smith's competence. .15

        B.      Plaintiffs' negligent-hiring claim also fails because Eastman had no knowledge of any purported incompetence. ...............................................16

        C.      Plaintiffs' negligent-supervision claim also fails from lack of any evidence that Eastman should have provided more supervision. ..................18

        D.      Plaintiffs' negligent-training claim fails because Eastman had no duty to train and because Plaintiffs have no evidence that additional training should have been given. ..............................................................20

II.     Gross Negligence ...............................................................................................21

        A.      Legal Standard ......................................................................................22

        B.      Plaintiffs cannot show that Smith was grossly negligent. ......................23

        C.      Plaintiffs cannot show that Eastman was grossly negligent. ..................32

                1.      Plaintiffs cannot recover exemplary damages from Eastman for Smith's alleged negligence. ..............................32

                2.      Plaintiffs cannot show a genuine dispute regarding Eastman's gross negligence. .............................................32

III.    The Admission Rule ..........................................................................................35

IV.     Unavailable Damages ........................................................................................37

CONCLUSION ................................................................................................................38

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aleman v. Ben E. Keith Co.*,
227 S.W.3d 304 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ..........................................21

*Almanzar v. Eaglestar*,
2021 WL 7184209 (W.D. Tex. Dec. 21, 2021) ....................................................................20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................13, 14, 22

*Austin v. Kroger Tex., L.P.*,
864 F.3d 326 (5th Cir. 2017) ...............................................................................................13

*Baird v. Shagdarsuren*,
2020 WL 208815 (N.D. Tex. Jan. 14, 2020) .......................................3, 17, 20, 21, 22, 32, 35

*Bradford v. Noel*,
2020 WL 13411940 (S.D. Tex. Apr. 8, 2020) ..................................................................1, 15

*Butler v. Juno Therapeutics, Inc.*,
2019 WL 2568477 (S.D. Tex. June 21, 2019) ......................................................................37

*Castaneda v. Aetna Health Inc.*,
2009 WL 2988761 (E.D. Tex. Sept. 15, 2009) .....................................................................33

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).............................................................................................................13

*City of Dalhart v. Lathem*,
476 S.W.3d 103 (Tex. App.—Amarillo 2015, pet. denied)..................2, 22, 23, 25, 26, 28, 30

*Cobos v. Bluefin Water Sols., LLC*,
2022 WL 847235 (W.D. Tex. Mar. 22, 2022) ................................................................17, 19

*Cornejo v. EMJB, Inc.*,
2021 WL 4526703 (W.D. Tex. Oct. 4, 2021) .......................................................................36

*Cristo v. C.R. England, Inc.*,
2021 WL 801340 (W.D. Tex. Jan. 7, 2021) .........................................................................37

*Dangerfield v. Ormsby*,
264 S.W.3d 904 (Tex. App.—Fort Worth 2008, no pet.)..................................2, 14, 17, 19, 21

*DeHaven v. Singh*,
   2022 WL 1793523 (W.D. Tex. Mar. 21, 2022) ................................................33, 34

*Doe v. YUM! Brands, Inc.*,
   639 S.W.3d 214 (Tex. App.—Houston [1st Dist.] 2021, no pet.) ..........................18

*Elliott v. Hollingshead*,
   327 S.W.3d 824 (Tex. App.—Eastland 2010, no pet.) ..........................................38

*Finley v. Vermeer Mfg. Co.*,
   2019 WL 5058901 (W.D. Tex. July 11, 2019) ......................................................28

*Ford Motor Co. v. Ridgway*,
   135 S.W.3d 598 (Tex. 2004)..................................................................................29

*Frank v. Xerox Corp.*,
   347 F.3d 130 (5th Cir. 2003) .................................................................................14

*Funches v. Progressive Tractor & Implement Co.*,
   905 F.3d 846 (5th Cir. 2005) .................................................................................14

*Gonzalez v. Jouett*,
   2021 WL 4925380 (S.D. Tex. Oct. 21, 2021)........................................................36

*Goodyear Tire & Rubber Co. v. Mayes*,
   236 S.W.3d 754 (Tex. 2007)..................................................................................16

*Graham v. Lewis*,
   2023 WL 2429484 (N.D. Tex. Mar. 9, 2023) ........................................................36

*Greene v. W&W Energy Servs., Inc.*,
   2021 WL 5155675 (S.D. Tex. Feb. 5, 2021) .........................................................25

*Hanan v. Crete Carrier Corp.*,
   2021 WL 1237105 (N.D. Tex. Apr. 2, 2021) ....................................................3, 34

*Johnson v. Cont. Freighters, Inc.*,
   2022 WL 12097254 (S.D. Tex. July 26, 2022).......................................................15

*Knight v. City Streets, LLC*,
   167 S.W.3d 580 (Tex. App.—Houston [14th Dist.] 2005, no pet.).......................18

*Kroger Co. v. Elwood*,
   197 S.W.3d 793 (Tex. 2006)..................................................................................20

*Kuss v. Ulmer*,
   2021 WL 1433062 (W.D. Tex. Mar. 17, 2021) .....................................................31

*Lane v. Element Fleet Corp.*,
   2020 WL 1897365 (S.D. Tex. Mar. 17, 2020) .......................................................16

*Luna v. Macy's S., Inc.*,
   2018 WL 4110422 (S.D. Tex. July 23, 2018) ........................................................32

*Machado v. Dyer*,
   2021 WL 1840916 (W.D. Tex. May 7, 2021) ............................................2, 22, 23

*Magee v. G&H Towing Co.*,
   388 S.W.3d 711 (Tex. App.—Houston [1st Dist.] 2012, no pet.) .........................18

*Martinez v. Valdez*,
   2023 WL 1928870 (S.D. Tex. Feb. 10, 2023) .......................................................18

*Medina v. Zuniga*,
   593 S.W.3d 238 (Tex. 2019) ...........................................2, 22, 23, 27, 30, 31, 35

*Moerbe v. Adcock*,
   2022 WL 5568119 (W.D. Tex. Aug. 3, 2022) .......................................................17

*Monroe v. Grider*,
   884 S.W.2d 811 (Tex. App.—Dallas 1994, pet. denied) .......................................16

*Morris v. JTM Materials, Inc.*,
   78 S.W.3d 28 (Tex. App.—Fort Worth 2002, no pet.) .........................................17

*Najera v. Recana Sols., LLC*,
   2015 WL 4985085 (Tex. App.—Houston [14th Dist.] Aug. 20, 2015, no pet.)....................18

*Nat'l Convenience Stores, Inc. v. Matherne*,
   987 S.W.2d 145 (Tex. App.—Houston [14th Dist.] 1999, no pet.).......................20

*Ochoa v. Mercer Transp. Co.*,
   2018 WL 7505640 (W.D. Tex. Dec. 10, 2018) .....................................................36

*Ochoa v. P.A.M. Cartage Carriers, LLC*,
   2019 WL 360528 (W.D. Tex. Jan. 29, 2019) .......................................................28

*Ordonez v. Ausby*,
   2023 WL 310442 (W.D. Tex. Jan. 18, 2023) .......................................................37

*Orthopedic & Sports Inj. Clinic v. Wang Labs., Inc.*,
   922 F.2d 220 (5th Cir. 1991) ...............................................................................28

*Padilla v. Wal-Mart Stores Tex., LLC*,
   2020 WL 1902535 (W.D. Tex. Jan. 31, 2020) .....................................................15

*Patino v. Complete Tire, Inc.*,
    158 S.W.3d 655 (Tex. App.—Dallas 2005, pet. denied) ......................................................19

*Perez v. U.S. Xpress, Inc.*,
    2023 WL 3681714 (W.D. Tex. Mar. 10, 2023) .........................................................3, 35, 36

*Phillips v. Super Servs. Holdings, LLC*,
    189 F. Supp. 3d 640 (S.D. Tex. 2016) .................................1, 2, 3, 15, 16, 18, 28, 33

*Raines v. GT Express, Inc.*,
    2024 WL 233494 (W.D. Tex. Jan. 2, 2024) .........................................................2, 14, 22

*Rayner v. Claxton*,
    659 S.W.3d 223 (Tex. App.—El Paso 2022, no pet.)..................................................23, 30, 31

*Rivas v. Preston*,
    2012 WL 13136453 (W.D. Tex. Apr. 25, 2012)................................................................21

*Ruelas v. W. Truck & Trailer Maint. Inc.*,
    2019 WL 4060891 (W.D. Tex. June 6, 2019) ..................................................23, 26

*Saldana v. Selvera*,
    2023 WL 3705813 (S.D. Tex. Mar. 8, 2023)............................................................2, 15, 20

*Sanchez v. Swift Transp. Co. of Ariz., LLC*,
    2016 WL 10587126 (W.D. Tex. June 14, 2016) ..................................................16

*Stanford v. McLean Trucking Co.*,
    506 F. Supp. 1252 (E.D. Tex. 1981)........................................................................38

*Suarez v. Helvie*,
    2023 WL 8531791 (W.D. Tex. Dec. 8, 2023) ..................................................33, 34

*Travelhost, Inc. v. Blandford*,
    68 F.3d 958 (5th Cir. 1995) ...........................................................22, 23, 27

*Trinh v. Hunter*,
    2022 WL 6813293 (W.D. Tex. Oct. 11, 2022) ..................................................24, 30

*Velasquez v. EAN Holdings, LLC*,
    2018 WL 5924037 (N.D. Tex. Nov. 13, 2018)........................................................27

*Villegas v. M.G. Dyess, Inc.*,
    2021 WL 2593633 (W.D. Tex. June 23, 2021) ........................................................20

**Statutes**

Tex. Civ. Prac. & Rem. Code § 41.003(a).........................................................21, 22, 27

Tex. Civ. Prac. & Rem. Code § 41.003(b)...................................................................14

Tex. Civ. Prac. & Rem. Code § 71.004 ......................................................................37

**Other Authorities**

Fed. R. Civ. P. 56(a) ...................................................................................................13

Texas Constitution Article XVI, § 26 .........................................................................37

Defendants Eastman Chemical Company and Caylee Erin Smith move for partial summary judgment on Plaintiffs' negligent-employment claims against Eastman, their gross-negligence claims against both Defendants, and for certain categories of damages.

## INTRODUCTION

This fatal car accident happened on Interstate 45 near Angus, Texas on April 30, 2022. A few minutes before the accident, Nehemias Santos was riding in a Toyota Camry that suffered a blowout of the front, driver-side tire. The driver, Evelyn Moreno, pulled the Camry partly onto the left shoulder toward the concrete median wall, leaving enough room for cars to pass the Camry in the left lane.

Santos and Moreno got out of the Camry and tried to change the tire. Just before the accident, Moreno and Santos were standing at the trunk, looking for a part inside. Around that time, a "tool had fallen . . . and Nehemias was looking for it on the ground." Appx_0156. Moreno felt Santos step away from the trunk, and "the accident happen[ed] very quickly after he stepped back." Appx_0377. Just then, Caylee Smith—an Eastman employee—was driving past the Camry in the left lane. Smith had moved over in the left lane to avoid hitting the Camry, but as she was passing, Santos suddenly moved out from behind the Camry and was hit directly in the head by the left headlight of Smith's car. Santos died immediately.

Defendants are entitled to summary judgment on four grounds.

First, Plaintiffs' evidence fails to raise a genuine dispute of material fact over Eastman's hiring, supervision, retention, or training of Smith. To begin with, the hiring, supervision, and retention claims require a showing that Smith was "incompetent." *Bradford v. Noel*, 2020 WL 13411940, at *2 (S.D. Tex. Apr. 8, 2020). In that regard, "the Texas courts have set the bar high," and Plaintiffs' evidence falls well short. *Phillips v. Super Servs. Holdings, LLC*, 189 F. Supp. 3d

1

640, 653 (S.D. Tex. 2016).  Smith got one speeding ticket almost four years before she was hired, and she was in one minor fender-bender during her employment.  But under Texas law, incompetence requires "convictions and violations that are related to the accident, frequent, and recent."  *Id.*  On that basis alone, Plaintiffs have failed to raise a genuine dispute over negligent hiring, supervision, or retention.

Plaintiffs' negligent-training claim fails for the simple fact that "[e]mployers have no duty to train their employees regarding commonly known dangers of driving."  *Saldana v. Selvera*, 2023 WL 3705813, at *3 (S.D. Tex. Mar. 8, 2023).  This claim also fails because Plaintiffs have no evidence "that a reasonably prudent employer would have provided training beyond that which was given."  *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912-13 (Tex. App.—Fort Worth 2008, no pet.).

Second, Defendants are entitled to summary judgment on Plaintiffs' claims for exemplary damages based on gross negligence.  Those damages "are proper only in the most exceptional cases."  *Machado v. Dyer*, 2021 WL 1840916, at *4 (W.D. Tex. May 7, 2021).  And Plaintiffs cannot meet their burden to present "evidence that would allow a reasonable juror to find, by clear and convincing evidence, gross negligence."  *Raines v. GT Express, Inc.*, 2024 WL 233494, at *4 (W.D. Tex. Jan. 2, 2024).

As for Smith, none of her actions involved "a known or obvious risk that was so great as to make it highly probable that harm would follow."  *City of Dalhart v. Lathem*, 476 S.W.3d 103, 108 (Tex. App.—Amarillo 2015, pet. denied).  Nor do Plaintiffs have any evidence that Smith showed "conscious indifference" to any risk.  *Medina v. Zuniga*, 593 S.W.3d 238, 247 (Tex. 2019).  Indeed, Plaintiffs' own human-factors expert described Smith's driving at the time of the accident as exhibiting "steering precision and near-constant visual attention."  Appx_1839.  As Smith

2

approached the Camry, she acted reasonably to avoid that hazard. She had no reason to expect that, at the last moment, Santos would lunge into her path.

Plaintiffs' gross-negligence allegations against Eastman are just as deficient. Indeed, Plaintiffs' evidence does not even create a triable issue on Eastman's ordinary negligence. On gross negligence, Plaintiffs come nowhere near establishing that Smith's driving record was "egregious." *Phillips*, 189 F. Supp. 3d at 658. Nor could the evidence support a finding that Eastman "did not care" about any risk. *Hanan v. Crete Carrier Corp.*, 2021 WL 1237105, at *4 (N.D. Tex. Apr. 2, 2021). Eastman investigated Smith's driving record before she was hired, it provided several safety policies about driving, and Smith's supervisors visited her frequently to evaluate her driving. Thus, there is no evidence of Eastman "consciously disregard[ing] a risk in employing [Smith]." *Baird v. Shagdarsuren*, 2020 WL 208815, at *6 (N.D. Tex. Jan. 14, 2020).

Third, Plaintiffs' negligent-employment claims also fail based on the Texas "admission rule." Eastman admits that Smith was within the course and scope of her employment at the time of the accident. And that admission renders Plaintiffs' "direct negligence claims . . . irrelevant." *Perez v. U.S. Xpress, Inc.*, 2023 WL 3681714, at *5 (W.D. Tex. Mar. 10, 2023).

Finally, the Court should grant summary judgment on two categories of damages that Plaintiff Gonzalez cannot recover as a matter of law. As Santos's father, Gonzalez cannot recover exemplary damages under the Texas Wrongful Death Statute. Gonzalez also cannot recover for Santos's pain and suffering because Plaintiffs admit that Santos died immediately on impact.

## **FACTUAL BACKGROUND**

### I.    **Plaintiffs' Trip**

This accident happened as Plaintiffs were on the back half of an overnight, roundtrip drive from Springdale, Arkansas to Houston, Texas. Santos, Moreno, and Dina Regalado left Springdale

in the Camry very late on April 29, 2022.  Appx_0325.  On the drive down, Moreno was cited for speeding in Savanna, Oklahoma on April 30, 2022 at 2:53 a.m.  Appx_0051.  Savanna is about 180 miles from Springdale, indicating that the party's drive began around midnight.

The purpose of this trip was to retrieve Erick Santos (Nehemias's brother) and Melvin Diaz (Regalado's boyfriend) in Houston and bring them to Springdale.  Appx_0326.  Citing the Fifth Amendment, Moreno, Diaz, Regalado, and Erick Santos all refused to answer questions about where Diaz and Erick Santos were living on or before April 30, 2022.  Appx_0326.  Moreno's counsel explained that "if she were to admit to transporting individuals who are illegally in the country, that is a federal felony, hypothetically."  Appx_0326.  Moreno confirmed that she is a U.S. citizen, Appx_0286, but the other witnesses refused to answer questions about their immigration status, Appx_0468; Appx_0201-0203; Appx_0067-0068.

Moreno and the others arrived in Houston around 9 a.m. on April 30, 2022, "rested a little bit," and then began the 580-mile drive back to Springdale, now joined by Diaz and Erick Santos.  Appx_0333.  Moreno was the only one in the group with a license, and she drove the entire time.  Appx_0340.

## II.   **The Flat Tire**

Around 3:40 p.m., Moreno was driving north on Interstate 45 near Angus, Texas when the Camry's front-left tire blew out.  Accounts differ on whether Moreno was driving in the middle or left lane when the tire failed.  Appx_0223; Appx_0347.  Either way, Moreno pulled the Camry over to the left.  Appx_0350.

In that area, Interstate 45 is a six-lane highway with the northbound and southbound lanes separated by a concrete median wall.  Appx_1016.  The speed limit is 75 miles per hour.  Appx_1015.  The three northbound lanes are each 11 to 12 feet wide.  Appx_1016.  The right

shoulder comprises a 10- to 11-foot-wide paved section abutted by a 50-foot-wide traversable grass area. Appx_1016. The left shoulder is only 7- to 8-feet-wide. Appx_1016.

Moreno stopped the Camry so it was straddling the left shoulder and the left lane. Appx_0355. The Camry was sticking out 2.1 feet into the 11.6-foot-wide left lane, leaving about 9.5 feet of remaining space in that lane. Appx_1019. Moreno explained that she did not pull all the way onto the left shoulder because she thought she "needed space to change the tire" and "want[ed] to allow enough clearance between the car and the concrete barrier." Appx_0355-0356.

After stopping the Camry, Moreno and Santos decided they "need[ed] to change the tire quickly." Appx_0349. They were especially "trying to hurry" because the Camry was partly blocking the left travel lane. Appx_0356. During this time, cars "kept passing by" in the left lane and would "move a little bit" to avoid hitting the Camry. Appx_0241. Still, the traffic was "going by close enough" to "present a danger to . . . [Santos] or anyone else outside the car." Appx_0241. Tire marks on the road indicate that, before the accident, "one or more vehicles ma[de] evasive swerving maneuver[s] from left to right at the location of the parked [Camry]." Appx_1013. According to both sides' experts, the Camry would be classified as a "potential hazard" in the accident-reconstruction field based on its partial obstruction of the left lane. Appx_2133; Appx_2200-2201. Those experts also agree that the typical driver response to a potential hazard like this one is to slow down by 1-3 miles per hour or to move over within one's lane. Appx_2134; Appx_2205-2206.

## III.   The Accident

By 3:48 p.m., the Camry had been pulled over for about five to ten minutes. Appx_0260. In the preceding minutes, the Camry was put up on a jack and the donut spare had been removed from the trunk. Appx_0367; Appx_0372. Progress then stalled because Moreno could not find

the lug wrench to remove the nuts on the flat tire.  Appx_0361.  As a result, Santos and Moreno began looking in the trunk for the lug wrench, which they never found.  Appx_0363; Appx_0372.  Moreno was "so angry" that she "couldn't find the tool."  Appx_0371.

While Santos and Moreno were both looking in the trunk, Santos was standing "right next to" Moreno on her "right side."  Appx_0370-0371; Appx_0373.  Just before the accident, a "tool had fallen to the ground and Nehemias was looking for it on the ground."  Appx_0146.  At that point, Santos "stepped back" from the trunk and was hit by Smith's passing Explorer.  Appx_0377.  The accident "happen[ed] very quickly after [Santos] stepped back," Appx_0377, with the Explorer hitting "Santos's head while he was actively bending over . . . inside the northbound travel lane," Appx_1013.

Moreno never saw the Explorer approaching and did not witness the accident.  Appx_0378.  Every witness agrees that the Explorer did not contact the Camry.  Appx_250; Appx_0380.

Santos did not make any noise either before or after the accident.  Appx_0395.  He suffered an open skull fracture to the right occipital and temporal region with exposed brain matter.  Appx_1123.  Santos' body came to rest in the left travel lane, and Erick Santos quickly dragged it onto the shoulder behind the Camry's trunk.  Appx_0508; Appx_0509.  As soon as Santos's body was pulled behind the trunk, Moreno confirmed that he did not have a pulse and that there were no signs of breathing.  Appx_0382-0383.  When paramedics arrived, they determined that Santos had been deceased "for quite sometime" and did not attempt resuscitation.  Appx_1119.

## IV.    <u>Caylee Smith's Actions</u>

At the time of the accident, Caylee Smith was living in Livingston, Texas.  Appx_0549.  She left her home on the morning of Saturday, April 30, 2022 to drive to Dallas, Texas.  Appx_0780-0781.  Smith was driving a Ford Explorer provided by her employer, Eastman

6

Chemical Company.  Appx_0625.  Smith had plans to see a friend that evening near Dallas, and she was going to a concert with the same friend on Sunday night.  Appx_0790.  Smith also had a work conference in Fort Worth that began on Monday, May 2, 2022.  Appx_0804.

Smith was driving in the left lane as she approached the disabled Camry.  Appx_0842.  As Smith was approaching the Camry, she "spotted a vehicle up in the near distance."  Appx_0838. As she "got a little bit closer," she "noticed that the black vehicle was partially in [her] lane." Appx_0838.  Smith "stay[ed] in her lane" but "scoot[ed] over enough to miss the vehicle." Appx_0842.  Smith also reduced her speed from 90 miles per hour to 86 miles per hour. Appx_1021.  As Smith was "about to pass" the Camry, she "glanced over at [her] GPS," which was displayed on the Explorer's infotainment screen.  Appx_0843.  When Smith looked back from her GPS, she saw Santos "in the middle of the lane."  Appx_0858.  Smith did not see how Santos got in front of her vehicle; he seemed to "suddenly appear[] right before [she] struck him." Appx_0858; Appx_0860.

Smith immediately pulled over and called 911.  Appx_2453.  Smith told 911 that she hit someone "in the road" after she "looked at [her] GPS real quick."  Appx_2453 at 1:50-2:00.  When the operator asked for more information, Smith explained that Santos looked to be "changing a tire" or "bent over at the tire."  Appx_2453 at 3:20-3:35.  Smith told Trooper Otis White of the Texas Highway Patrol that the Camry's passengers "were parked in the road changing the tire." Smith also explained that, as she was approaching the Camry, she "saw the car but . . . didn't see the person until it was too late."  Appx_2454 at 6:20-6:40.  Smith also confirmed to Officer Danielle Lee-Winston of the Richland Police Department that Santos was "in the road" when she hit him.  Appx_2456 at 4:10-4:20.

In the ten seconds before the accident, Smith's speed ranged from 84 to 90 miles per hour. Appx_1096.  In the last second before the accident, her speed was 86 miles per hour.  Appx_1096. Smith also sent a text message to a friend—"They don't do walkins though"—around 8 to 9 seconds before the accident.  Appx_1014.  When Smith sent this text message, she was 1,022 to 1,146 feet from the accident location.  Appx_1014.  Smith testified that she often uses voice command to send text messages while driving, and she believes she used that method to send the last text message before the accident.  Appx_0666; Appx_0835.

Plaintiffs' human factors expert, Christine Yager, agrees that once Smith sent the last text message "any distraction from text messaging ended."  Appx_1825.  Yager also explained that, given when the last text message was sent, from a human-factors perspective Smith was not texting at the time of the accident.  According to the criteria used in Yager's own research, Smith would "no longer be considered to be engaged in texting" at the time of the accident.  Appx_1828.  And Yager agreed that based on the methods used in the "gold standard" of driving studies, text messaging "would not even be listed as a secondary task" with respect to this accident. Appx_1828-1829.

Yager also confirmed that Smith's actions indicated she was not distracted at the time of the accident.  Appx_1844.  Yager agreed that Smith "did stay in the left lane and did avoid hitting the Camry."  Appx_1839.  And in Yager's opinion, "somebody could not stay in their lane and avoid hitting the Camry unless they exercised steering precision and near-constant visual attention."  Appx_1841.

At the scene of the accident, Diaz and Erick Santos told a Spanish-speaking paramedic that they were inside the Camry at the time of the accident, and that information was relayed to law enforcement.  Appx_1137-1138.  As a result, neither individual gave a statement to police.  But at

8

their depositions more than a year later, Diaz and Erick Santos claimed that they were actually outside the Camry when the accident happened.  Appx_0491; Appx_0232.  They also claimed that Santos was standing in the shoulder when he was hit.  Appx_0506; Appx_0248.  According to their testimony, Smith had "gotten all the way into that security lane to run [Santos] over," "struck him," and then "turn[ed] to the right" to avoid hitting the other Camry passengers and the Camry itself.  Appx_0248; Appx_0504.

Plaintiffs' accident reconstruction expert, Orlando Carreon, effectively confirmed that Diaz's and Erick Santos's testimony could not be true.  Carreon acknowledged that if Santos was hit while standing in the shoulder, then, "to avoid the Camry, the Explorer must have swerved at least 3.3 feet" to the right after hitting Santos.  Appx_2071.  Carreon also acknowledged that there is "accident reconstruction research about how long it takes drivers in emergency situations to swerve a certain distance."  Appx_2072.  Indeed, Carreon often uses a computer program that "can easily calculate . . . how long it takes a driver to make an emergency swerve of 3.3 feet," but he chose to skip that analysis here.  Appx_2073; Appx_2093.  In any event, Carreon admitted that, according to the same research he has relied on in the past, Smith would have traveled 133.5 feet in the time it would have taken her to swerve 3.3 feet to the right.  Appx_2084.  Thus, for Smith to have hit Santos in the shoulder and still swerved to avoid the Camry, Santos needed to have been hit at least 133.5 feet behind the Camry.  Yet Erick Santos testified that he was standing at the trunk when the accident happened and Santos was standing "right behind" him.  Appx_0247; Appx_0238.  Based on the same research and analysis, Defendants' accident-reconstruction expert confirmed that it would have been "physically impossible" for Santos to have been standing in the shoulder when he was hit.  Appx_2440.

## V.     Smith's Employment

### A.     Hiring

At the time of the accident, Smith worked for Eastman Chemical Company as a sales representative within its Performance Films division.  Appx_1224.  Eastman hired Smith in March 2021.  Appx_0610.  Before she was hired, Eastman obtained a background check and a motor vehicle report for Smith through a third-party provider.  Appx_0035.  The motor vehicle report confirmed that Smith had a valid Texas driver's license, which was originally issued in 2013.  Appx_0045.  It also disclosed one moving violation, a misdemeanor speeding ticket in June 2017 for driving 80 miles per hour in a 65 miles per hour zone.  Appx_0039.  Eastman's corporate representative explained that a moving violation like this is "pretty common" for applicants and was not considered "a reason to dismiss [Smith] from being a potential candidate for employment." Appx_1499-1500.

In October 2018 and February 2019—while Smith was in college—she posted on Twitter about narrowly avoiding a car accident.  Appx_0001-0002.  Eastman was unaware of these tweets when it hired Smith in 2021.  Appx_1513.  Eastman does not review an applicant's social media history as part of the hiring process.  Appx_1513.

### B.     Eastman's Safety Policies

Safety is a "top priority" at Eastman and "part of [the] company's core values." Appx_1232.  "[F]rom the very beginning" of the onboarding process for new employees, "safety is brought up . . . in terms of the expectation of that being the first priority."  Appx_1522.  As part of that emphasis, safety is the first subject on every employee's performance review, and safety performance can affect employee compensation.  Appx_1522.

Eastman maintains two written safety policies related to driving. The "Defensive/Distracted Driving Policy" applies to all employees. Appx_0060. And the "SOP - Plan for Automobile Lease" specifically governs employee use of Eastman-leased vehicles. Appx_0003.

Eastman provides its Distracted Driving Policy to new employees during the onboarding process. Appx_1401. The policy was "established to reinforce the importance of defensive driving and to promote the reduction of distractions while driving, with particular emphasis on cell phone use." Appx_0060. Eastman prohibits the "[u]se of hand-held cell phone[s] . . . for the conduct of company business while driving," which includes "answering or making calls, engaging in phone conversations, texting, reading or responding to emails." Appx_0060. At the same time, Eastman permits the "[u]se of voice-activated, hands-free devices" at times, such as when the "[u]se allows the driver to keep the hands on the steering wheel and eyes on the road" and "is in accordance with applicable laws and regulations." Appx_0060. Eastman specifically prohibits the use of hands-free devices for conference calls. Appx_0060.

Eastman provides its Vehicle SOP to employees when they are issued an Eastman-leased car. Appx_1312-1313. The Vehicle SOP prescribes the permitted uses of company cars and driver responsibilities. Appx_0003-0004. Those responsibilities include "compl[iance] with all company policies," "maintain[ing a] valid state driver's license," and reporting all accidents and moving violations. Appx_0004; Appx_0006; Appx_0009. The Vehicle SOP also reinforces that "[a]ll drivers are expected to observe speed limits and to drive within the law." Appx_0009.

The Vehicle SOP includes a table matching various "safety concerns" with a corresponding "management response." Appx_0014. For example, if an Eastman employee is involved in two avoidable accidents within a 24-month period, "the employee will be required to attend an

approved defensive driving class." Appx_0014. Alternatively, a violation of Eastman's cell phone policy triggers a management "[r]eview of overall safety/employment record," with possible actions including loss of company-vehicle privileges or termination. Appx_0014.

### C.   Eastman's Supervision of Smith

Along with Eastman's written safety policies, its "teams have frequent . . . discussions around safety elements of their job." Appx_1243. Within Smith's organization, "at the start of [all team meetings] there's a safety topic that's reviewed." Appx_1245. "[O]ften for sales representatives, driving is one of those [topics]." Appx_1245. Safe driving is also reinforced "in the one-on-one interaction between the individual . . . and their supervisor or others in management." Appx_1245.

Eastman also supervises an employee's driving through management visits to the employee's sales territory. For Smith, her immediate supervisor—who was based in a different state—visited her "four to five times within the first . . . six months or four months" of her employment. Appx_1234. Each of those visits lasted between two and four days and were spent on the road with Smith. Appx_1234. Smith's boss's boss also visited her "at least twice" during her first six months with Eastman, again for "two to three days" at a time. Appx_1256. During those visits, Smith's supervisors observed her driving and found nothing of concern. Appx_1256-1257. The supervisors also used these ride-alongs as an opportunity to reinforce the importance of safe driving. Appx_1256-1257.[1]

---

[1] Eastman requires its employees to complete computer-based training modules on certain subjects like antitrust, sales software, or Eastman's drug and alcohol policy. Appx_1325. There is no computer-based "driver safety training module" that employees are required to complete. Appx_1324.

Smith was in one accident between her hiring and the accident here.  On June 1, 2021, Smith was driving in heavy highway traffic at about 10 miles per hour and struck the car in front of her.  Appx_0683; Appx_0048.  There were no injuries, and Smith was not using her cell phone at the time.  Appx_0684.  After pulling over with the other car, Smith called the police, but they said they were not going to respond to a minor fender bender.  Appx_0683-0684.  Smith notified Eastman and Eastman's leasing company (Donlen) about the accident.  Appx_0682; Appx_0048-0050.  Smith's boss and his boss both counseled her on the accident.   Appx_1419-1420; Appx_1432.  The accident was also reflected on Smith's mid-year and end-of-year performance review.  Appx_1420; Appx_0018; Appx_0022.

## LEGAL STANDARD

The purpose of summary judgment "is to isolate and dispose of factually unsupported claims."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  The Court must grant a motion for summary judgment on a showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party meets its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  In the alternative, "when the nonmovant has the burden of proof at trial, the moving party may make a proper summary judgment motion, thereby shifting the summary judgment burden to the nonmovant, with an allegation that the nonmovant has failed to establish an element essential to that party's case."  *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).  In that case, "the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a

13

genuine issue for trial." *Frank v. Xerox Corp.*, 347 F.3d 130, 135 (5th Cir. 2003).  The Court "draw[s] all reasonable inferences in favor of the nonmovant," but "a mere 'scintilla of evidence' in support of plaintiff's position will not do, nor will 'some metaphysical doubt as to the material facts.'" *Funches v. Progressive Tractor & Implement Co.*, 905 F.3d 846, 849 (5th Cir. 2005).

On summary judgment, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255.  Thus, when the "clear and convincing" evidence requirement applies to a nonmovant's claim, the summary judgment inquiry is "whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find" for the nonmovant. *Id.*

Plaintiffs seek exemplary damages based on Defendants' alleged gross negligence.  And under Texas law, "[t]he claimant must prove by clear and convincing evidence the elements of exemplary damages." Tex. Civ. Prac. & Rem. Code § 41.003(b).  So "the question at the summary judgment stage is whether the plaintiff has evidence that would allow a reasonable juror to find, by clear and convincing evidence, gross negligence." *Raines*, 2024 WL 233494, at *4.

## ARGUMENT

### I.   Negligent Employment

Eastman is entitled to summary judgment on Plaintiffs' four negligent-employment claims: hiring, supervision, retention, and training.  The first three "require[] that the employer's failure to investigate, screen, or supervise its employees proximately cause the injuries the plaintiff alleges." *Dangerfield*, 264 S.W.3d at 912-13.  To make that showing, Plaintiffs must prove that Smith was an incompetent driver, but their evidence comes nowhere near that standard.  And even setting aside that evidentiary deficit, the claims fail on other independent grounds.

14

Plaintiffs' negligent-training claim fails just as easily.  As a matter of law, "[e]mployers have no duty to train their employees regarding commonly known dangers of driving."  *Saldana*, 2023 WL 3705813, at *3.  And even assuming such a duty, to establish negligent training "a plaintiff must prove that a reasonably prudent employer would have provided training beyond that which was given."  *Padilla v. Wal-Mart Stores Tex., LLC*, 2020 WL 1902535, at *9 (W.D. Tex. Jan. 31, 2020).  Yet Plaintiff cannot present any evidence of what training a reasonable employer in Eastman's position would have provided Smith, much less evidence that Eastman's training was deficient.

### A.    The evidence does not create a genuine dispute regarding Smith's competence.

Plaintiffs' claims for negligent hiring, retention, and supervision all require a threshold showing that Smith was an incompetent driver.  But the evidence does not come close to establishing that Smith was incompetent, either at the time she was hired or at the time of this accident.[2]  And "[a]bsent evidence of incompetence, plaintiffs cannot support their claims for negligent hiring, retention, and supervision."  *Bradford*, 2020 WL 13411940, at *2 (granting summary judgment on all three claims).

"[T]he Texas Supreme Court has emphasized an important distinction between an operator who is 'incompetent or reckless' and one who is merely 'negligent.'"  *Johnson v. Cont. Freighters, Inc.*, 2022 WL 12097254, at *2 (S.D. Tex. July 26, 2022).  And when it comes to the evidence needed to prove a driver's incompetence, "the Texas courts have set the bar high."  *Phillips*, 189 F. Supp. 3d at 653 (granting summary judgment).  "Proof of one ticket—even if recent—is 'grossly

---

[2] In terms of incompetence, the claims differ slightly because for negligent hiring the question is whether Smith was incompetent when hired, but for negligent retention and supervision the question is whether Smith was incompetent at the time of the incident.  That distinction makes no difference here because even when evaluated at the time of the accident, Plaintiffs' evidence does not raise a genuine dispute over Smith's competence.

inadequate' to make this showing." *Id.*  Nor does "[i]nvolvement in a previous collision alone . . .

create an inference or conclusion that a driver is incompetent or reckless." *Monroe v. Grider*, 884

S.W.2d 811, 815 (Tex. App.—Dallas 1994, pet. denied).  Indeed, three traffic tickets in four years

(including a citation for rear-ending a vehicle) "does not raise a genuine issue of material fact as

to whether [a driver] was . . . incompetent." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d

754, 758 (Tex. 2007).  Rather, proving incompetence requires "convictions and violations that are

related to the accident, frequent, and recent." *Phillips*, 189 F. Supp. 3d at 653.

Given that standard, the evidence fails to raise a genuine dispute over Smith's competence

at any relevant point.  Smith received one speeding ticket almost four years before Eastman hired

her.  Appx_0039.[3]  After Eastman hired her, she was in a low-speed, minor accident about 11

months before this accident.  Appx_0683; Appx_0048.  The earlier accident resulted in no injuries,

and Smith did not receive a citation.  Appx_0683; Appx_0048.  This record lacks evidence of

"convictions and violations that are related to the accident, frequent, and recent." *Phillips*, 189 F.

Supp. 3d at 653.  Thus, Plaintiffs "fail[] to establish a genuine dispute of material fact as to whether

[Smith] was an incompetent or reckless driver." *Lane v. Element Fleet Corp.*, 2020 WL 1897365,

at *3 (S.D. Tex. Mar. 17, 2020).  And on that basis alone, Eastman is entitled to summary judgment

on Counts III (negligent hiring), V (negligent supervision), and VI (negligent retention).

### B. Plaintiffs' negligent-hiring claim also fails because Eastman had no knowledge of any purported incompetence.

Aside from the lack of a genuine dispute over Smith's incompetence, Plaintiffs' negligent-

hiring claim fails because there is no evidence that Eastman knew or should have known of any

---

[3] Smith disclosed in her deposition that she received a citation for following to closely around 2019, but the charge was dismissed.  Appx_0561; Appx_0617.  That citation is irrelevant to Smith's incompetence because "citations alone are insufficient to establish that a driver is incompetent or reckless." *Sanchez v. Swift Transp. Co. of Ariz., LLC*, 2016 WL 10587126, at *8 (W.D. Tex. June 14, 2016).

purported incompetence when it hired Smith.  An employer is liable for negligent hiring if it "hires an incompetent or unfit employee whom it *knows*, or by the exercise of reasonable care *should have known*, was incompetent or unfit."  *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 49 (Tex. App.—Fort Worth 2002, no pet.) (emphases added).

As part of the hiring process, Eastman confirmed that Smith had a valid Texas driver's license.  Appx_0045.  And "[i]n Texas, a driver possessing a valid driver's license is presumed to be a competent driver."  *Cobos v. Bluefin Water Sols., LLC*, 2022 WL 847235, at *4 (W.D. Tex. Mar. 22, 2022).  For that reason, "[i]f a driver owns a valid, unrestricted driver's license, an [employer] has no duty to further investigate h[er] driving history."  *Moerbe v. Adcock*, 2022 WL 5568119, at *5 (W.D. Tex. Aug. 3, 2022).  Eastman did more than was required by investigating Smith's driving record, which disclosed a single speeding ticket from 2017.  Appx_0039.  But because nothing in Smith's driving record would have put Eastman on notice that she was an incompetent driver, there is no "genuine issue of material fact as to whether [Eastman] knew or should have known that [Smith] was an incompetent employee."  *Baird*, 2020 WL 208815, at *9; *see also Dangerfield*, 264 S.W.3d at 912 ("An employer is not negligent when there is nothing in the employee's background that would cause a reasonable employer not to hire or retain the employee.").

The same authority confirms the irrelevance of the tweets Smith sent more than two years before Eastman hired her.  Eastman had no actual knowledge of the tweets.  Appx_1513.  And there is no basis for imputing such knowledge to Eastman.  Smith "had a valid driver's license," so Eastman had no "affirmative duty to investigate [her] background."  *Cobos*, 2022 WL 847235, *5.  And if Eastman had no duty to even review Smith's driving record, it cannot have been required to search through Smith's social-media history.  Indeed, even when employers *are*

17

required to perform a background check, "no authority . . . suggest[s] an employer has a duty to go beyond performing a background check to examine a prospective employee's social media accounts." *Doe v. YUM! Brands, Inc.*, 639 S.W.3d 214, 228 (Tex. App.—Houston [1st Dist.] 2021, no pet.).

In short, even pretending that Smith was an incompetent driver, there is no genuine dispute over whether Eastman knew or should have known that she was.   Even though Texas law does not "impose a legal duty on employers to investigate the driving record of an employee that holds a valid driver's license," Eastman did just that.  *Magee v. G&H Towing Co*., 388 S.W.3d 711, 719 (Tex. App.—Houston [1st Dist.] 2012, no pet.).  That investigation disclosed a single speeding ticket in 2017, which was "grossly inadequate" to put Eastman on notice of Smith's purported incompetence as a driver.  *Phillips*, 189 F. Supp. 3d at 653.  On that independent basis, Eastman is entitled to summary judgment on Plaintiff's negligent-hiring claim.

### C.    Plaintiffs' negligent-supervision claim also fails from lack of any evidence that Eastman should have provided more supervision.

To establish a claim for negligent supervision, a plaintiff must show that "(1) [an employer] owed him a legal duty to supervise its employees; (2) [the employer] breached that duty; and (3) that breach proximately caused his injuries."  *Knight v. City Streets, LLC*, 167 S.W.3d 580, 584 (Tex. App.—Houston [14th Dist.] 2005, no pet.).  "The breach component requires proof that a reasonably prudent employer would have provided supervision . . . beyond that which was given." *Najera v. Recana Sols., LLC*, 2015 WL 4985085, at *7 (Tex. App.—Houston [14th Dist.] Aug. 20, 2015, no pet.).

In simplest terms, Plaintiffs' negligent-supervision claim fails because they "offer no evidence . . . that [Eastman] had a duty to supervise [Smith's] driving." *Martinez v. Valdez*, 2023 WL 1928870, at *4 (S.D. Tex. Feb. 10, 2023) (granting summary judgment).

18

Even assuming there was such a duty, Plaintiffs have produced no evidence of breach. Texas courts routinely grant summary judgment on negligent-supervision claims when a plaintiff presents "no evidence showing that . . . supervision beyond that given by [an employer] would be necessary or proper by a reasonably prudent employer." *Patino v. Complete Tire, Inc.*, 158 S.W.3d 655, 661 (Tex. App.—Dallas 2005, pet. denied); *see also Dangerfield*, 264 S.W.3d at 913 (affirming summary judgment for employer when "there is no evidence that [defendant] should have provided more . . . supervision beyond that which was given"). And Plaintiffs' evidence suffers from that exact defect. Thus, even assuming Eastman had a duty to supervise Smith, Plaintiffs have presented no evidence of "how much supervision is typical" for someone in Smith's position, "let alone whether [Smith] . . . required any given degree of supervision." *Cobos*, 2022 WL 847235, at *9.

Plaintiffs' failure to provide any evidence on typical supervision contrasts with the ample evidence that Smith was, in fact, robustly supervised. Even though Smith's job required her to work in a different state than her supervisors, they visited her frequently to observe her job performance, including driving. Appx_1234. During Smith's first six months on the job, her manager visited her four to five times, each visit lasting several days. Appx_1234. Smith's manager's manager also visited her at least twice during the same period with trips of equal length. Appx_1256. During each of those visits, Smith's supervisors specifically observed her driving and found no concerns. Appx_1256-1257. They also used the trips as an opportunity to reinforce the importance of safe driving. Appx_1256-1257. Eastman also provided appropriate supervision when Smith was in a minor fender-bender in June 2021. Smith's manager and his manager each counseled her on the incident. Appx_1419-1420; Appx_1432. And the accident was reflected on Smith's mid-year and end-of-year performance review. Appx_1420; Appx_0018; Appx_0022.

19

Plaintiffs have offered no evidence that this level of supervision was unreasonable. And because "there is no evidence that a reasonable employer would have . . . supervised [Smith] more carefully or extensively than [Eastman] did, summary judgment is appropriate on this claim." *Almanzar v. Eaglestar*, 2021 WL 7184209, at *11 (W.D. Tex. Dec. 21, 2021).

> ### D. Plaintiffs' negligent-training claim fails because Eastman had no duty to train and because Plaintiffs have no evidence that additional training should have been given.

Unlike Plaintiffs' other negligent-employment claims, "incompetence of an employee is not an essential element of a negligent training claim." *Baird*, 2020 WL 208815, at *10. Still, Defendants are entitled to summary judgment on this claim for two reasons. First, Plaintiffs cannot establish that Eastman had a duty to train Smith. Second, Plaintiffs have no evidence that a reasonable employer would have provided more training than Eastman did.

"Whether a duty exists is a threshold inquiry and a question of law." *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006). So "[t]he nonexistence of a duty ends the inquiry into whether negligence liability may be imposed." *Nat'l Convenience Stores, Inc. v. Matherne*, 987 S.W.2d 145, 148 (Tex. App.—Houston [14th Dist.] 1999, no pet.). Plaintiffs' negligent-training claim fails because Eastman had no duty to train Smith. Under Texas law, "[e]mployers have no duty to train their employees regarding commonly known dangers of driving." *Saldana*, 2023 WL 3705813, at *3 (granting summary judgment). In other words, there is no duty to train "with regard to dangers that are ordinarily incident to driving a vehicle and require no special skills or knowledge other than that expected of all licensed drivers." *Matherne*, 987 S.W.2d at 149.

Plaintiffs allege that Eastman failed to train Smith on "distracted driving." Second Am. Compl. ¶ 60. But just like "obeying speed limits and stop signs or not driving while under the influence of intoxicants," avoiding distractions is a "commonly known rule[] of the road." *Villegas v. M.G. Dyess, Inc.*, 2021 WL 2593633, at *7 (W.D. Tex. June 23, 2021). Contrary to Plaintiffs'

allegations, Eastman had no duty to train Smith on such a commonly known danger of driving. And given the lack of any training duty, Eastman is entitled to summary judgment on Plaintiffs' negligent-training claim.

The negligent-training claim also fails because Plaintiffs have offered no evidence that a reasonable employer would have provided Smith with more or different training.  To establish negligent training, "a plaintiff must prove that a reasonably prudent employer would have provided training beyond that which was given and that failure to do so caused his injuries." *Dangerfield*, 264 S.W.3d at 912-13.  Yet Plaintiffs have "produced no evidence showing that training or instruction beyond that given by [Eastman] would be necessary or proper by a reasonably prudent employer." *Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 312 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (affirming summary judgment).

Plaintiffs have not "provide[d] any evidence or authority to establish a reasonably prudent employer would have provided training beyond the training provided by [Eastman]." *Rivas v. Preston*, 2012 WL 13136453, at *4 (W.D. Tex. Apr. 25, 2012).  So by definition, there is an "absence of a genuine issue of material fact as to the negligent training claim," and Eastman "is entitled to summary judgment." *Id.*

## II.   Gross Negligence

Defendants Smith and Eastman are also entitled to summary judgment on Plaintiffs' claims for exemplary damages.  Under Texas law, exemplary damages are recoverable for injuries resulting from fraud, malice, or gross negligence.  Tex. Civ. Prac. & Rem. Code § 41.003(a).  But here, Plaintiffs base their request for exemplary damages on gross negligence alone.  The Court should grant summary judgment because there is no "genuine dispute of material fact with respect to [these] gross negligence claim[s]" against either Defendant. *Baird*, 2020 WL 208815, at *5.

### A.        Legal Standard

Because "punitive damages are proper only in the most exceptional cases," there is a "high burden to find gross negligence." *Machado*, 2021 WL 1840916, at *4. The high burden relates both to what a plaintiff must prove and how convincingly they must prove it. For that reason, "courts routinely grant summary judgment on gross negligence claims." *Baird*, 2020 WL 208815, at *3 n.5.

As for the burden of proof, a plaintiff must prove gross negligence by clear and convincing evidence. Tex. Civ. Prac. & Rem. Code § 41.003(a). This standard requires "evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995).

On summary judgment, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. So the inquiry here is whether Plaintiffs have "evidence that would allow a reasonable juror to find, by clear and convincing evidence, gross negligence." *Raines*, 2024 WL 233494, at *4.

As for what Plaintiffs must prove by clear and convincing evidence, "[g]ross negligence has both an objective and a subjective component." *Medina*, 593 S.W.3d at 247.

"First, viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk." *Id.* This component requires "a known or obvious risk that was so great as to make it highly probable that harm would follow." *Lathem*, 476 S.W.3d at 108. "There is a difference between 'not very safe' and a risk so great as to make it highly probable that harm would follow." *Id.* at 109. And evaluating the degree of risk "requires an examination

22

of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight." *Id.* at 108.

"Second, the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others." *Medina*, 593 S.W.3d at 247. For this component, "the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care." *Id.* at 248. In other words, the plaintiff must prove that the defendant "proceeded with knowledge that harm was a 'highly probable' consequence, and nevertheless undertook the negligent action." *Rayner v. Claxton*, 659 S.W.3d 223, 260 (Tex. App.—El Paso 2022, no pet.).

Taken together, these principles illustrate why there is a "high burden to find gross negligence." *Machado*, 2021 WL 1840916, at *4. "Evidence of ordinary negligence is not enough to establish either the objective or subjective elements." *Ruelas v. W. Truck & Trailer Maint. Inc.*, 2019 WL 4060891, at *7 (W.D. Tex. June 6, 2019). A plaintiff must prove not only that a party's conduct involved such an objectively extreme risk that harm was highly probable, but also that the party subjectively *knew* that harm was highly probable and proceeded anyway. And the evidence for each component must be "so clear, direct and weighty and convincing" that a reasonable juror could find "without hesitancy" that both elements are satisfied. *Travelhost*, 68 F.3d at 961.

**B.    Plaintiffs cannot show that Smith was grossly negligent.**

Following the proper legal standard, the Court's gross-negligence analysis must focus on what can be proven by clear and convincing evidence. That rule carries special importance here because some of Plaintiffs' allegations are preposterous. For example, Erick Santos and Diaz testified that Smith "got off the road" and "all the way into th[e] security lane to run [Santos] over." Appx_0498; Appx_0248. As discussed below, that testimony not only contradicts these witnesses'

23

own statements at the scene, Appx_1137-1138, but it contradicts every other piece of evidence as well.  Thus, under the clear-and-convincing standard, these witnesses' bare claim that Smith was driving in the left shoulder at impact does not raise "a genuine dispute of material fact whether [Smith] committed gross negligence."  *Trinh v. Hunter*, 2022 WL 6813293, at *4 (W.D. Tex. Oct. 11, 2022).

### 1.    Accident Circumstances

As for what can be clearly and convincing proven about this accident, the evidence is straightforward.  At the scene, Moreno told police that, just before he was hit, Santos was standing immediately to her right and looking into the Camry's trunk.  Appx_0053.  Moreno did not see Santos move out from behind the trunk and further into the left lane, Appx_2455 at 2:35-3:00, but there is no genuine dispute that he must have done so.  The police and both sides' experts all agree that Smith did not hit the Camry.  Appx_0057; Appx_2026; Appx_1840-1841; Appx_1013.  So it would have been impossible for Santos to have been standing behind the Camry at impact.  Appx_1022-1023.  For that reason, the police concluded that Santos was "standing in the roadway near the back right tire" when he was hit.  Appx_0057.

Moreno's statements at the scene also illuminate how soon before impact Santos moved out from behind the Camry and into Smith's path.  Defendants' human-factors expert agrees that, based on Moreno not noticing Santos's movement into the left lane, "[h]e would have only been there for a brief moment" before the accident.  Appx_1813.  That conclusion aligns with Moreno's testimony that the accident "happen[ed] very quickly after [Santos] stepped back from [her]."  Appx_0377.  It aligns with Smith's testimony that Santos "appeared suddenly" in her lane.  Appx_0697.  And it also aligns with testimony that, just before the accident, a "tool had fallen to the ground and [Santos] was looking for it on the ground."  Appx_0156.

These facts are essential to the gross-negligence inquiry, which "requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred." *Lathem*, 476 S.W.3d at 108.  The evidence shows that as Smith was passing a vehicle stopped partly on the shoulder and partly in her lane, Santos suddenly entered her path "for a brief moment in time" before she hit him.  Appx_1813.  And considering that context, Plaintiffs' evidence fails to establish the objective or subjective elements of gross negligence.

### 2.    Lane Change

In depositions, Plaintiffs have asserted that Smith was negligent for failing to vacate the left lane when she identified the stopped Camry.  At the same time, Plaintiffs' expert concedes that he does not know when it would have been possible for Smith to even see the Camry because other vehicles "could [have] completely obstructed her view" on approach.  Appx_2153-2155.  Yet even setting that issue aside, Plaintiffs cannot show that Smith's failure to change lanes "deviated so far from the ordinary standard of care as to create an extreme risk."  *Greene v. W&W Energy Servs., Inc.*, 2021 WL 5155675, at *2 (S.D. Tex. Feb. 5, 2021).  Rather, the evidence uniformly shows that Smith's response to the stopped Camry mirrored that of a typical, attentive driver.

As both sides' experts confirm, the Camry presented Smith with what is termed a "potential hazard."  Appx_2133; Appx_2200-2201.  Those experts also agree that the typical driver response to a potential hazard is to slow down by 1-3 miles per hour or to move *within* one's lane.  Appx_2134; Appx_2205-2206.  And Smith "did exactly what the literature says the average attentive driver does."  Appx_2206.  The data from her vehicle shows that she reduced her speed by about 4 miles per hour as she approached the Camry.  Appx_1021.  And in addition to Smith's testimony that she "scoot[ed] over enough [in her lane] to miss the vehicle," Appx_0842, Plaintiffs' expert confirmed that, had Smith not moved over in her lane, "it's likely" that "she would have hit the Camry."  Appx_2136.  Smith's response to the stopped Camry conformed

25

precisely to that of an average, attentive driver, so the fact that she did not change lanes does not create a genuine dispute over gross negligence.

### 3.    Cell Phone Distraction

Plaintiffs' assertion that Smith was distracted by her phone at the time of the accident also fails to create a genuine dispute on gross negligence.  For starters, even if Smith "failed to keep a proper lookout" or "was distracted," that conduct does not "involve[] an extreme degree of risk" needed for gross negligence.  *Ruelas*, 2019 WL 4060891, at *8.  In addition, testimony from Plaintiffs' own human-factors expert eliminates any chance of them proving by clear and convincing evidence that Smith was distracted by her phone or anything else.  Yager agreed that Smith "did stay in the left lane and did avoid hitting the Camry."  Appx_1839.  And Yager also confirmed that "somebody could not stay in their lane and avoid hitting the Camry unless they exercised *steering precision* and *near-constant visual attention*."  Appx_1841 (emphases added). For that reason, Yager agreed that Smith's "ability to maintain such a precise lane position is inconsistent with her having been looking at her phone."  Appx_1844.  In fact, Yager admitted that she "wouldn't expect anyone doing anything with their phone to be able to pass the Camry without hitting it."  Appx_1845.[4]

That same evidence defeats any effort by Plaintiffs to rest gross negligence on the fact that Smith sent a text message around 8 to 9 seconds before the accident and when she was more than

---

[4] As Smith told the 911 operator and police at the scene, she "looked at [her] GPS real quick" before she passed the Camry.  Appx_2453 at 1:50-2:00.  There was nothing negligent, much less grossly negligent, about that action.  Smith looking at her GPS did not affect her ability to avoid the Camry.  Appx_1850-1851.  And as Plaintiffs' expert confirmed, even if a driver observes pedestrians standing on the side of the highway, "it would not be reasonable . . . to anticipate that an adult is going to run further into the highway."  Appx_1891.  Thus, there is no evidence that Smith's quick glance at her GPS created "a known or obvious risk that was so great as to make it highly probable that harm would follow."  *Lathem*, 476 S.W.3d at 108.

1,000 feet from the scene.  Appx_1014.  As Yager explained, however Smith sent this message, once it was sent "any distraction from text messaging ended."  Appx_1825.  And consistent with that opinion, Yager observed that Smith's driving as she passed the Camry did not indicate distraction so much as "steering precision and near-constant visual attention."  Appx_1841.  Indeed, Yager explained that, from a human-factors perspective, the text message Smith sent 8 to 9 seconds earlier was irrelevant for analyzing this accident.  According to Yager's own research, Smith would "no longer be considered to be engaged in texting" at the time of the accident.  Appx_1828.  And based on the criteria used in the "gold standard" driving study, the text message was sent long enough before the accident that it would not even count as a "secondary task."  Appx_1828-1829.

As with ordinary negligence, gross negligence requires "evidence of causation."  *Velasquez v. EAN Holdings, LLC*, 2018 WL 5924037, at *11 (N.D. Tex. Nov. 13, 2018).  Thus, Plaintiffs must "prove[] by clear and convincing evidence that the[ir] harm . . . *results from* . . . gross negligence."  Tex. Civ. Prac. & Rem. Code § 41.003(a) (emphasis added).  Even assuming that texting while driving could involve "an extreme degree of risk" in some contexts, Plaintiffs cannot prove by clear and convincing evidence that their injuries resulted from the text message Smith sent 8 to 9 seconds before the accident.  *Medina*, 593 S.W.3d at 247.  As confirmed by Plaintiffs' own expert, human-factors researchers—herself included—would not even consider that text message relevant when analyzing this accident.  Appx_1828-1829.  So at a minimum, it would be impossible for a reasonable juror to find "without hesitancy" that Plaintiffs' injuries resulted from the text message.  *Travelhost*, 68 F.3d at 961.

### 4.    Driving Speed

Smith's driving speed also fails to create a genuine dispute over gross negligence.  The posted speed limit at the accident site was 75 miles per hour.  Appx_1015.  In the ten seconds before the accident, Smith's speed ranged from 84 to 90 miles per hour.  Appx_1096.  And her last reported speed before the accident was 86 miles per hour.  Appx_1021.  Texas law makes clear that acts "support[ing] a finding of ordinary negligence, such as a party's failure to obey traffic laws, will not support a finding of gross negligence."  *Phillips*, 189 F. Supp. 3d at 656.  Under that standard, "[h]igh and excessive speed is mere ordinary negligence and not gross negligence."  *Ochoa v. P.A.M. Cartage Carriers, LLC*, 2019 WL 360528, at *4 (W.D. Tex. Jan. 29, 2019).  Indeed, "[i]t is well established in Texas that allegations like driving at an excessive rate of speed, failure to keep a proper lookout, driving on the left-hand side of the road, failure to apply the brakes and failure to slacken the speed, are all acts of ordinary negligence that do not alone constitute a reckless disregard for the rights of others."  *Finley v. Vermeer Mfg. Co*., 2019 WL 5058901, at *3 (W.D. Tex. July 11, 2019).

Plaintiffs can point to no evidence establishing that Smith's speed created "a known or obvious risk that was so great as to make it highly probable that harm would follow."  *Lathem*, 476 S.W.3d at 108.  Even if her speed was "not very safe," *id.* at 109, "[g]ross negligence is substantially and appreciably higher in magnitude than ordinary negligence," *Orthopedic & Sports Inj. Clinic v. Wang Labs., Inc.*, 922 F.2d 220, 223 n.3 (5th Cir. 1991).  Thus, Smith driving over the speed limit does not create a material dispute over gross negligence.

### 5.    Driving on Highway Shoulder

As noted above, the allegation that Smith was driving on the shoulder carries no weight on the gross-negligence issue.  Even viewed in the light most favorable to Plaintiffs, the evidence

supporting this allegation "is so weak as to do no more than create a mere surmise or suspicion of its existence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). Thus, under the clear-and-convincing standard, the claim that Smith was driving on the shoulder when she hit Santos does not create a genuine issue on gross negligence.

At the accident scene, Diaz and Erick Santos told a Spanish-speaking paramedic that they were inside the Camry at the time of the accident. Appx_1137-1138. Based on that information, the police report noted that both were "inside the vehicle" at the time of the accident. Appx_0054. Yet at their depositions, Diaz and Erick Santos testified that they were outside the Camry at the time of the accident and witnessed Smith "got off the road" and "all the way into th[e] security lane to run [Santos] over." Appx_0498; Appx_0248. Standing alone, the direct contradiction between these witnesses' on-scene statements and their deposition testimony would preclude any reasonable juror from finding by clear and convincing evidence that Smith was driving on the shoulder. But inconsistency is not the only basis for rejecting their testimony.

Smith's vehicle reported her GPS location and bearing once per second. "Th[is] data was consistent with a parallel orientation with the roadway leading up to the collision location, followed by a 3-degree swerve to the right around the location of impact." Appx_1021. Nothing in the GPS or bearing data indicated that Smith "drifted to the left shoulder prior to the incident." Appx_1021. And Plaintiffs' accident-reconstruction expert confirmed both that the bearing data is "not consistent" with Smith "drift[ing] onto the left shoulder" and that "there is no . . . GPS data that indicates that she drifted into the shoulder." Appx_2062; Appx_2041.

Plaintiffs' expert also confirmed that, if Santos was standing anywhere near the Camry, it would have been impossible for Smith to have hit Santos in the shoulder and still avoided the Camry. As Carreon acknowledged, there is "accident reconstruction research about how long it

takes drivers in emergency situations to swerve a certain distance." Appx_2072. And according to that research, for Smith to have hit Santos in the shoulder and had enough time to swerve around the Camry, Santos would need to have been standing *at least* 133.5 feet behind the Camry. Appx_2084. Yet police concluded that Santos was "standing in the roadway near the [Camry's] back right tire." Appx_0057. And Moreno testified that Santos was standing "right next to her" at the trunk until the moment before he was hit. Appx_0374.

In analyzing gross negligence, the Court should disregard Diaz's and Erick Santos's allegation that Smith was driving in the shoulder when she hit Santos. This allegation contradicts those witnesses' statements at the time of the accident. And the allegation is refuted both by the location data from Smith's car and uncontested principles of accident reconstruction. In short, the evidence supporting this allegation is so weak that it does not create "a genuine dispute of material fact whether [Smith] committed gross negligence." *Trinh*, 2022 WL 6813293, at *4.

### 6. Subjective Component

For the reasons already discussed, Plaintiffs cannot prove by clear and convincing evidence that Smith's acts or omissions objectively involved "a known or obvious risk that was so great as to make it highly probable that harm would follow." *Lathem*, 476 S.W.3d at 108. Plaintiffs also cannot establish the subjective component of gross negligence—that Smith "proceeded with knowledge that harm was a 'highly probable' consequence, and nevertheless undertook the negligent action." *Rayner*, 659 S.W.3d at 260.

There is no evidence—much less clear and convincing evidence—that Smith had "actual, subjective awareness of the risk involved, but nevertheless proceed[ed] in conscious indifference to the rights, safety, or welfare of others." *Medina*, 593 S.W.3d at 247. As Smith approached the accident scene, she "spotted a vehicle up in the near distance." Appx_0838. As she "got a little

30

bit closer, [Smith] noticed that the [Camry] was partially in [her] lane." Appx_0838. At that point, Smith "made the adjustment to scoot over enough to miss the vehicle and not collide but stay in [her] lane." Appx_0842. And Smith's in-lane adjustment allowed her to avoid hitting the Camry. Appx_1013.

This evidence makes clear that Smith had "actual, subjective awareness" of a single risk: the Camry partly blocking her lane. *Medina*, 593 S.W.3d at 247. Far from showing "conscious indifference" to that risk, Smith made appropriate adjustments to avoid hitting the Camry. *Id.* Indeed, Plaintiffs' own human-factors expert acknowledged that Smith's successful avoidance of the Camry "require[d] steering precision and near-constant visual attention." Appx_1839. And the same expert confirmed that, even if Smith had seen pedestrians standing in the shoulder, "it would not be reasonable . . . to anticipate that an adult is going to run further into the highway." Appx_1891. That common-sense admission negates any claim that Smith proceeded down the road knowing that harm "was a 'highly probable' consequence" of her actions. *Rayner*, 659 S.W.3d at 260. Smith took reasonable steps to avoid the only risk of which she was subjectively aware. Santos's last-second intrusion into Smith's path, while tragic, was also unexpected and improbable.

"[A] party cannot be liable for gross negligence when it actually and subjectively believes that circumstances pose no risk to the injured party, even if he or she is wrong." *Kuss v. Ulmer*, 2021 WL 1433062, at *3 (W.D. Tex. Mar. 17, 2021). Having acted to avoid hitting the Camry, Smith reasonably believed that she "pose[d] no risk" to any individuals standing off the road. *Id.* As a result, Plaintiffs cannot satisfy the subjective component of gross negligence.

### C.     Plaintiffs cannot show that Eastman was grossly negligent.

The Court should also grant summary judgment on Plaintiffs' gross-negligence claims against Eastman.  First, there is no basis under Texas law for Plaintiffs to recover exemplary damages from Eastman for Smith's alleged negligence.  Second, and as already discussed in Part I, Plaintiffs' evidence does not present a genuine dispute over whether Eastman's hiring, supervision, retention, or training of Smith was even negligent.  Thus, it is even more obvious that Eastman's employment of Smith was not grossly negligent.

### 1.     Plaintiffs cannot recover exemplary damages from Eastman for Smith's alleged negligence.

Count II of Plaintiffs' Second Amended Complaint is labeled "Respondeat Superior Liability Against Eastman Chemical Company."  Second Am. Compl. at 7.  In Count II's lone paragraph, Plaintiffs allege that because Smith was "acting within the course and scope of her authority, employment, or agency . . . all acts of negligence by Smith are imputed to her employer, . . . . including punitive damages."  *Id.* ¶ 44.  This claim fails because Texas law does not permit recovery of exemplary damages based on respondeat superior.

"Under Texas law, a corporation cannot be liable for punitive damages based on the conduct of its employees or agents under *respondeat superior*."  *Luna v. Macy's S., Inc*., 2018 WL 4110422, at *1 (S.D. Tex. July 23, 2018).  Thus, Plaintiffs' attempt to recover exemplary damages from Eastman based on respondeat superior fails as a matter of law.

### 2.     Plaintiffs cannot show a genuine dispute regarding Eastman's gross negligence.

For many reasons already discussed, Plaintiffs' evidence does not create a "genuine dispute of material fact with respect to [their] gross negligence claim[s]" against Eastman.  *Baird*, 2020 WL 208815, at *5.  As explained in Part I, Plaintiffs' evidence does not create a genuine dispute over whether Eastman was even negligent in hiring, supervising, retaining, or training Smith.  So

it is even more clear that Plaintiffs cannot present clear and convincing evidence that Eastman was grossly negligent in any of those areas.

If the Court finds that Eastman is entitled to summary judgment on Plaintiffs' negligent-employment claims, then any related claim based on gross negligence also fails. When a party is entitled to summary judgment on a negligence claim, "any request for exemplary damages is also precluded as a matter of law." *Castaneda v. Aetna Health Inc*., 2009 WL 2988761, at *5 (E.D. Tex. Sept. 15, 2009).

Even if the Court finds more than a scintilla of evidence to support any of Plaintiffs' negligent-employment claims, Eastman would still have a right to summary judgment on gross negligence. "[C]ourts that find sufficient evidence of gross negligence are faced with egregious driving records of which the employer was aware and took no action to address." *Phillips*, 189 F. Supp. 3d at 658. "An example of a driving record that might allow a jury to find gross negligence on the part of the employer is when the employee 'had been involved in three wrecks in less than six months and had accumulated numerous traffic convictions in recent years.'" *Suarez v. Helvie*, 2023 WL 8531791, at *3 (W.D. Tex. Dec. 8, 2023). Nothing in Smith's record approaches that standard. She received one speeding ticket in 2017 and was in a minor fender-bender in 2021. Yet for Plaintiffs to establish gross negligence, they "require evidence that [Smith] was in fact incompetent or habitually reckless, and [that Eastman] knew or should have known that [Smith] was incompetent or reckless." *Phillips*, 189 F. Supp. 3d at 658.

On this point, the recent Western District of Texas ruling in *DeHaven v. Singh*, 2022 WL 1793523 (W.D. Tex. Mar. 21, 2022), is also instructive. There, the employee received five traffic violations and was in two accidents during his employment. *Id.* at *4. Despite that history, the court granted summary judgment on gross negligence. *Id.* at *5. It observed that the employer's

"hiring, training, supervising, and otherwise dealing with [the employee], while perhaps not exemplary, d[id] not rise to the level of gross negligence." *Id.* at *3. And the employer's driving record, "while not perfect," was not "egregious" and "was not such that a prudent person, considering the safety of others on the highways, would deny the driver the access to an automobile." *Id.* at *4. Here, there is no "evidence that [Smith] had an egregious driving record at the time of the accident." *Suarez*, 2023 WL 8531791, at *4. Thus, Eastman is entitled to summary judgment on gross negligence.

Plaintiffs' evidence also fails on the subjective component of gross negligence because they cannot show that Eastman had "actual, subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others." *Hanan*, 2021 WL 1237105, at *3-4. In *Hanan*, the employer knew about its driver's "past accidents, log violations, driver's-license suspension, termination of employment, and false statements on a previous employment application." *Id.* at *2. Still, the court found that this evidence failed to raise even a triable issue on the employer's gross negligence. *Id.* at *4. The evidence showed that the employer "knew or should have known about the risk of . . . ordinary negligence," but it "did not permit the jury to find by clear and convincing evidence that [the employer] 'did not care' about any extreme risk." *Id.*

Other evidence further negates the possibility of a reasonable juror finding "conscious indifference" on Eastman's part. *Id.* Before hiring Smith, Eastman investigated her driving record, even though it had no duty to do so. Appx_0035. Eastman also maintains safety policies on distracted driving and employee use of Eastman-leased vehicles, which are provided to employees during the onboarding process. Appx_0060-0061; Appx_0003-0017; Appx_1401. The Distracted Driving Policy "reinforce[s] the importance of defensive driving," "promote[s] the reduction of

34

distractions while driving," and places a "particular emphasis on cell phone use."  Appx_0060.
The Vehicle SOP requires reporting of all accidents and moving violations and prescribes
management responses to such incidents.  Appx_0009; Appx_0014.

Eastman's interactions with Smith also confirm that it was not indifferent to safety
concerns, much less any "extreme degree of risk."  *Medina*, 593 S.W.3d at 247.  Smith's manager
and manager's manager visited her about a half dozen times in the year before the accident.
Appx_1234; Appx_1256.  Those managers specifically observed Smith's driving and found no
concerns.  Appx_1256-1257.  They also used their visits to reinforce expectations around safe
driving.  Appx_1256-1257.  When Smith was in a minor fender-bender in June 2021, multiple
managers counseled her on the event.  Appx_1419-1420; Appx_1432.  The accident was also
reflected on Smith's mid-year and end-of-year performance review.  Appx_1420; Appx_0018;
Appx_0022.

In short, the evidence "does not demonstrate that [Eastman] consciously disregarded a risk
in employing [Smith]."  *Baird*, 2020 WL 208815, at *6.  And Eastman is entitled to summary
judgment on Plaintiffs' gross-negligence claims.

## III.   <u>The Admission Rule</u>

Depending on how the Court resolves the issues in Parts I and II, Eastman could also have
a right to summary judgment under the Texas "admission rule."  If it applies, the admission rule
would independently bar Plaintiffs' negligent-employment claims.

Under the admission rule, when an employer admits to vicarious liability, that stipulation
forecloses direct-liability claims for negligent employment.  The rule's premise is that "causes of
action for vicarious liability and direct liability for negligent hiring, supervision, retention, and
training are mutual[ly] exclusive."  *Perez*, 2023 WL 3681714, at *5.  Thus, if an employer "admits

35

vicarious liability, the direct negligence claims are irrelevant." *Id.* And an admission of vicarious liability "is sufficient to warrant granting summary judgment . . . on the issue of the direct negligence claims asserted against [an employer]." *Graham v. Lewis*, 2023 WL 2429484, at *2 (N.D. Tex. Mar. 9, 2023).

In general, the admission rule is limited to "where a plaintiff alleges ordinary (rather than gross) negligence." *Cornejo v. EMJB, Inc.*, 2021 WL 4526703, at *8 (W.D. Tex. Oct. 4, 2021). If there is a claim of "gross negligence against the employer," that claim supplies "an independent ground of recovery" and the admission rule does not apply. *Perez*, 2023 WL 3681714, at *5. At the same time, only a live gross-negligence claim preempts the admission rule. Allegations aside, if "no *viable* gross negligence claims remain," then the admission rule applies. *Ochoa v. Mercer Transp. Co.*, 2018 WL 7505640, at *3 (W.D. Tex. Dec. 10, 2018) (emphasis added); *see also Gonzalez v. Jouett*, 2021 WL 4925380, at *4 (S.D. Tex. Oct. 21, 2021) (same).

Given those parameters, the admission rule applies here only if the Court rejects Eastman's arguments in Part I but accepts Eastman's arguments in Part II. If Eastman's Part I arguments succeed, then Eastman would already obtain summary judgment on Plaintiffs' negligent-employment claims, and there would be no work for the admission rule to do. If Eastman's Part II arguments do not succeed, then Plaintiffs' gross-negligence claims against Eastman would remain viable and avoid the admission rule. If, however, the Court finds that there is a genuine dispute over whether Eastman was negligent but no genuine dispute over Eastman's gross negligence, then the admission rule would entitle Eastman to summary judgment on Plaintiffs' negligent-employment claims.

On account of not yet answering Plaintiffs' complaint, Eastman has not formally admitted that Smith was acting within the course and scope of her employment. But Eastman now stipulates

to that fact.  *See Ordonez v. Ausby*, 2023 WL 310442, at *5 (W.D. Tex. Jan. 18, 2023) (applying

the admission rule when an employer "unilaterally stipulate[s]" to course and scope).  In light of

that admission—and assuming Plaintiffs no longer have a viable gross-negligence claim against

Eastman—"any genuine issues regarding [Plaintiffs'] claims for direct liability from [Eastman's]

hiring, retention, supervision, and control of [Smith] are immaterial."  *Cristo v. C.R. England, Inc.*,

2021 WL 801340, at *6 (W.D. Tex. Jan. 7, 2021).   Thus, Eastman "is entitled to summary

judgment on [Plaintiffs'] direct negligence claims . . . because they fail as a matter of law."

*Ordonez*, 2023 WL 310442, at *5.

## IV.    **Unavailable Damages**

The Court should also grant summary judgment on two categories of damages that are

legally unavailable.  Plaintiff Gonzalez—Santos's father—brings claims in his individual capacity

and also as the special administrator of Santos's estate.  Second Am. Compl. at 1.  Gonzalez seeks

"exemplary" damages under the Texas Wrongful Death Statute.  *Id.* ¶ 97.  He also seeks to recover

for Santos's "great pain, suffering, [and] mental anguish."  *Id.* ¶¶ 92-93.  Neither category is

recoverable under Texas law.

Starting with exemplary damages, the Wrongful Death Statute prescribes that recovery "is

for the exclusive benefit of the surviving spouse, children, and parents of the deceased."  Tex. Civ.

Prac. & Rem. Code § 71.004.  Santos was unmarried and had no children, so Gonzalez is the only

wrongful-death beneficiary.  But "under Article XVI, § 26 of the Texas Constitution, parents of a

deceased child are not entitled to recover exemplary damages."  *Butler v. Juno Therapeutics, Inc.*,

2019 WL 2568477, at *28 (S.D. Tex. June 21, 2019).   Thus, Gonzalez's claim for exemplary

damages fails as a matter of law.

37

Gonzalez's attempt to recover for Santos's own "pain, suffering, [and] mental anguish" also fails. Second Am. Compl. ¶ 92. The Texas Survival Statute allows recovery for "the physical pain, suffering, and property damage sustained by the decedent before death." *Elliott v. Hollingshead*, 327 S.W.3d 824, 833 (Tex. App.—Eastland 2010, no pet.). But "only pain consciously suffered and experienced by the decedent is compensable." *Id.* at 833-34. As a result, if "the deceased was *immediately* rendered unconscious as a result of the injuries," there can be "no award for pain and suffering." *Stanford v. McLean Trucking Co.*, 506 F. Supp. 1252, 1255 (E.D. Tex. 1981) (emphasis added). Plaintiffs admit that Santos being hit by Smith's vehicle "kill[ed] him *immediately*." Second Am. Compl. ¶ 17 (emphasis added). Thus, Gonzalez cannot recover for Santos's alleged pain and suffering.

The Court should grant summary judgment because Gonzalez cannot personally recover exemplary damages, nor does he have any claim for pain and suffering on Santos's behalf.

## CONCLUSION

The Court should grant this partial motion for summary judgment on Plaintiffs' negligent-employment claims against Eastman and their gross-negligence claims against both Defendants. The Court should also grant summary judgment on Plaintiff Gonzalez's request for exemplary damages and his request to recover for Santos's pain and suffering.

Respectfully submitted,


By:    */s/ Brian L. Bunt*_____
          BRIAN L. BUNT
          STATE BAR NO. 03350025
          bbunt@freemanmillspc.com

          FREEMAN MILLS PC
          2020 Bill Owens Parkway, Suite 200
          Longview, Texas 75604
          Telephone: (903)295-7200

38

Facsimile: (903)295-7201

_____ /s/Roger W. Anderson _____
ROGER W. ANDERSON
STATE BAR NO. 01213500
randerson@freemanmillspc.com

FREEMAN MILLS PC
12222 Merit Drive, Suite 1400
Dallas, TX 75251
Telephone: 214-800-5191
Facsimile: 214-800-5190

_____ /s/ Graham K. Simms _____
GRAHAM K. SIMMS
STATE BAR NO. 24060610
GSimms@freemanmillspc.com

FREEMAN MILLS PC
117 @ 7th Street, Suite 1225
Fort Worth, Texas 76102
Telephone:  682+316-1677
Facsimile:  682-316-1676

GREGORY J. DUBOFF
gduboff@mcguirewoods.com

MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
Telephone: 804-775-1154
Facsimile: 804-698-2054


ATTORNEYS FOR DEFENDANTS
  EASTMAN CHEMICAL COMPANY AND
  CAYLEE ERIN SMITH

39

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was served upon all parties or their counsel of record in accordance with the Federal Rules of Civil Procedure on this the 29th day of January 2024.

*Via Electronic Mail*
Grant K. Schmidt
Texas Bar No. 24084579
HILGERS GRABEN PLLC
7859 Walnut Hill Lane, Suite 335
Dallas, TX 75230
Telephone: 469.751.2819
Fax: 402.413.1880
Email: gschmidt@hilgersgraben.com

Jacob White
Taylor King Law
410 N. Thompson St., Suite B
Springdale, AR 72764
Telephone: 479.935.1761
Fax: 479.334.5069
Email: jacobwhite@taylorkinglaw.com

**Attorneys for Plaintiffs**

_____*/s/Brian L. Bunt*
BRIAN L. BUNT

40