## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| ERICK RODERICO PIVARAL GONZALEZ, Individually and as Special Administrator of the Estate of NEHEMIAS R. PIVARAL SANTOS, DECEASED, ERICK SANTOS and EVELYN MORENO | § § § § § § | |
| *Plaintiffs,* | § § | Civil Action No. 3:22-CV-02714-K |
| v. | § § | |
| CAYLEE ERIN SMITH and EASTMAN CHEMICAL COMPANY, | § § § | |
| *Defendants.* | § § | |

## APPENDIX TO DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**Exhibit A -** Tweets from Caylee Erin Smith .......................................................... Appx_0001-0002

**Exhibit B -** Company Automobile Policy SOP ...................................................... Appx_0003-0017

**Exhibit C -** 2021 Performance Assessment for Caylee Smith ............................. Appx_0018-0034

**Exhibit D -** 2021 Background Report ...................................................................... Appx_0035-0047

**Exhibit E -** June 1, 2021 Donlen Report ................................................................ Appx_0048-0050

**Exhibit F -** April 29, 2022 Moreno Speeding Ticket ............................................. Appx_0051

**Exhibit G -** April 30, 2022 Incident Report .......................................................... Appx_0052-0054

**Exhibit H -** May 16, 2022 Crash Report ................................................................ Appx_0055-0059

**Exhibit I -** November 4, 2022 Eastman Distracted Driving Policy .................... Appx_0060-0061

**Exhibit J -** August 1, 2023 Deposition Transcript of Dina Soto Regalado ......... Appx_0062-0107

**Exhibit K -** August 1, 2023 Deposition Transcript of Erick Gonzalez ............... Appx_0108-0193

**Exhibit L -** August 1, 2023 Deposition Transcript of Erick Pivaral Santos ........ Appx_0194-0276

**Exhibit M -** August 2, 2023 Deposition Transcript of Evelyn Moreno ............... Appx_0277-0461

**Exhibit N -** August 2, 2023 Deposition Transcript of Melvin Diaz .................... Appx_0462-0530

**Exhibit O -** August 8, 2023 Deposition Transcript of Caylee Erin Smith .......... Appx_0531-1009

**Exhibit P -** September 28, 2023 Report of Paul Montalbano ............................. Appx_1010-1102

**Exhibit Q -** October 31, 2023 Deposition Transcript of Julio Bonilla ................. Appx_1103-1206

**Exhibit R -** November 9, 2023 Deposition Transcript of Erin Bernhardt............ Appx_1207-1669

**Exhibit S -** December 11, 2023 Deposition Transcript of Christine Yager ......... Appx_1670-1893

**Exhibit T -** December 20, 2023 Deposition Transcript of Orlando Carreon ....... Appx_1894-2170

**Exhibit U -** January 4, 2024 Deposition Transcript of Paul Montalbano,
    Volume I ...................................................................................... Appx_2171-2423

**Exhibit V -** January 4, 2024 Deposition Transcript of Paul Montalbano,
    Volume II ..................................................................................... Appx_2424-2452


**<u>Non-Documentary Video Exhibits (Produced in Native Format)</u>**

**Exhibit W -** 911 Tape...................................................................................Appx_2453

**Exhibit X -** Otis White Bodycam Footage ....................................................Appx_2454

**Exhibit Y -** Danielle Lee-Winston Bodycam Footage 161348 ......................Appx_2455

**Exhibit Z -** Danielle Lee-Winston Bodycam Footage 162348 ......................Appx_2456


Respectfully submitted,


By:___*/s/ Brian L. Bunt*_____
    BRIAN L. BUNT
    STATE BAR NO. 03350025
    bbunt@freemanmillspc.com

    FREEMAN MILLS PC
    2020 Bill Owens Parkway, Suite 200
    Longview, Texas 75604
    Telephone: (903)295-7200
    Facsimile: (903)295-7201


    ___*/s/Roger W. Anderson*___
    ROGER W. ANDERSON
    STATE BAR NO. 01213500
    randerson@freemanmillspc.com

    FREEMAN MILLS PC
    12222 Merit Drive, Suite 1400
    Dallas, TX 75251
    Telephone: 214-800-5191
    Facsimile: 214-800-5190

*/s/ Graham K. Simms*

GRAHAM K. SIMMS
STATE BAR NO. 24060610
GSimms@freemanmillspc.com

FREEMAN MILLS PC
117 @ 7th Street, Suite 1225
Fort Worth, Texas 76102
Telephone:  682+316-1677
Facsimile:  682-316-1676

GREGORY J. DUBOFF
gduboff@mcguirewoods.com

MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
Telephone: 804-775-1154
Facsimile: 804-698-2054


ATTORNEYS FOR DEFENDANTS
 EASTMAN CHEMICAL COMPANY AND
 CAYLEE ERIN SMITH

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was served upon all parties or their counsel of record in accordance with the Federal Rules of Civil Procedure on this the 29th day of January 2024.

*Via Electronic Mail*
Grant K. Schmidt
Texas Bar No. 24084579
HILGERS GRABEN PLLC
7859 Walnut Hill Lane, Suite 335
Dallas, TX 75230
Telephone: 469.751.2819
Fax: 402.413.1880
Email: gschmidt@hilgersgraben.com


Jacob White
Taylor King Law
410 N. Thompson St., Suite B
Springdale, AR 72764
Telephone: 479.935.1761
Fax: 479.334.5069
Email: jacobwhite@taylorkinglaw.com

***Attorneys for Plaintiffs***


　　　　　*/s/Brian L. Bunt*
　　　　　BRIAN L. BUNT

 **Caylee Smith** ⛵
@CayleeErin12

    ···

just almost hit two girls while they were walking across the road to the point where they had to jump out of the way... how's your week going 🙃 😭 if you see this, i'm sorry!!

3:41 PM · Oct 4, 2018

**2 Likes**

        ♡    

SANTOS 3356

**EXHIBIT**
**A**

Appx_0001

 **Caylee Smith** ⛵
@CayleeErin12

just almost wrecked ordering @ChickfilA on my phone while driving... but the grace of God stopped my car just in time 🙃

7:10 PM · Feb 26, 2019

5 Likes

This Tweet was deleted by the Tweet author. Learn more

SANTOS 3357

Appx_0002

**EASTMAN**

# STANDARD OPERATING PROCEDURE

| | |
|---|---|
| **Title:** SOP - Plan for Automobile Lease | |
| **Initial Publication Date:** 1/17/2014 | **Last Reviewed Date:** 10/22/2019 |
| This Standard Operating Procedure supports Administrative Policy Plan for Automobile Lease, Reference #1135. | |

## Procedure

### 1.   ELIGIBILITY

Eastman will furnish a vehicle to eligible employees to facilitate company business in a manner which allows for safety, economy and a positive company image.  The driver must, AT ALL TIMES, comply with company policies and procedures, manufacturer's recommendations, and all applicable government laws and regulations with regard to operating a company vehicle.  Authorization for a vehicle will be made ONLY when the duties of an individual employee require regular use of a vehicle.

These vehicles are NOT to be used as departmental vehicles. This program is designed for the individual driver.

Department vehicles fall under SOP - Requisitioning, Purchasing and Maintaining Automotive and Industrial Lift Truck Fleets.  Contact the Plant Fleet Coordinator for more information at 423-229-5492.

The Plan for Automobile Lease (PAL) is a lease car program set up for any full-time employee of Eastman Chemical Company, employed in the U.S. that management has determined that automotive travel is the most economical means of transportation.  Business driving must be associated with direct sales or service account responsibility.  The employee must have a valid driver's license for the state in which they reside as is detailed in Section 15 (Safety).

Business mileage will be monitored periodically for a 12-month cycle to ensure the need of a leased car continues to be appropriate.  Management also reserves the right to revoke an employee's privilege to drive a company vehicle because of excessive moving violations, driving under the influence of alcohol or drugs, frequent involvement in what may be considered avoidable accidents or excessive damage to the vehicle due to driver neglect.

Eastman Chemical Company employees employed outside the U.S. may also qualify for a company car. Business driving must be associated with direct sales or service account responsibility.  The employee must have a valid driver's license for that country or area of residence, where applicable.  These employees are reviewed on an individual basis due to variables in vehicle availability, laws, costs, etc., associated with where they are located.

**a.**     **Other Authorized Drivers**

-     Other Eastman Chemical Company employees with a valid driver's license may operate company lease vehicles for isolated or rare business reasons.
-     As the vehicle's custodian, you and your legal spouse (with a valid driver's license) may use the company automobile for personal use, but must report the mileage and be taxed on the benefit as imputed income.
-     You may permit your fully licensed children to operate company vehicles **ONLY** when you are in the car, and other fully licensed family members in the case of an emergency.
-     No other persons may operate your business vehicle except when the vehicle is being serviced or inspected.

Unrestricted Internal Use Only.
These documents are maintained in an electronic format.
Printed documents may not reflect current revisions.

**EXHIBIT**

**B**

00476.118000406



# STANDARD OPERATING PROCEDURE

**When you are assigned a vehicle for business and personal use, you are responsible for advising your spouse and other family members of the provisions of corporate fleet and safety policies.**

## 2.   DRIVER RESPONSIBILITIES

The vehicle you possess has been carefully selected to provide convenience, comfort and safety for you while conducting business.

Your vehicle was issued to you with the expectation that you will abide by company policy and procedures. Failure to do so can result in a disciplinary review.

- Read, understand and comply with all company policies.
- Maintain valid state driver's license where you reside.
- Notify Donlen (800-323-1483) of name and address changes within 48 hours of change date.
- Call Donlen (800-323-1483) immediately when an accident occurs, regardless of severity or circumstances.  Also, notification of Eastman's Risk Management & Insurance Department of any accident within 48 hours is required (423-229-2755).
- Furnish complete and accurate accident reports to the company from which your car is leased.
- Furnish the police reports to the leasing company immediately upon availability.
- Maintain current state vehicle licensing.
- Ensure current insurance certification is in vehicle at all times.  Check expiration date annually.
- Complete mileage information must be reported prior to the 15th of each month using the Donlen smart phone application.

## 3.   AUTHORIZED COMPANY VEHICLES AND VEHICLE REPLACEMENT

All vehicles are leased by Eastman Chemical Company from Donlen.  Eastman Chemical Company car selections are based on field needs, interchangeability, availability, lifetime costs to lease and operate, and general management approval.  Selection and replacement decisions will change with the change of vehicle designs, fuel availability, government mandates and economic conditions.

Replacement of company cars is approximately 70,000 miles or 36 months.  Company cars are replaced in the spring and fall of each calendar year to take advantage of the two strongest used car selling markets.  The only exceptions in terminating a vehicle earlier will be due to extensive maintenance needs, or if the vehicle receives excessive damage from an automobile accident.  Excessively high mileage vehicles become more susceptible to costly maintenance repairs and unplanned downtime for the driver.  Later replacement could occur if other factors which affect operating cost patterns come into play.  It takes approximately 8-12 weeks for a replacement vehicle to arrive.  **It is the Employee's responsibility to contact your Fleet Coordinator at (423-229-5492) if they have 65,000 miles on their odometer and have not received re-order forms from Donlen.**

## 4.   SPECIAL EQUIPMENT OR CAR SIZE VARIANCE

Vehicles will be of a make, model, color and price in accordance with conservative business standards.  A company provided vehicle must be suitable for the performance of company duties.  Trailer hitches are not allowed.  Non-company provided options may be purchased at the employee's expense.  The employee relinquishes all title to the amounts paid personally.  Payment for the options must be made upon ordering.

If a driver is exceptionally large (or petite), special seating or car size other than the models offered may be requested.  In order to accomplish this, the "special" circumstances must be reported to the Eastman's Fleet Coordinator (423-229-5492) by the employee's management for evaluation, and possibly further review with senior management.  Such exceptions will only be made on factory ordered cars.  Exceptions cannot be made when the vehicle must be obtained from dealer inventory.

**Unrestricted Internal Use Only.**
**These documents are maintained in an electronic format.**
**Printed documents may not reflect current revisions.**

00476.118000407
Appx_0004



# STANDARD OPERATING PROCEDURE

5.   <u>**NEW VEHICLE DELIVERY**</u>

Donlen are on line with the vehicle manufacturers.  When the vehicle is assigned a Vehicle Identification Number (VIN), they will send out a Manufacturers Statement of Origin (MSO) paperwork to the dealership that will receive the car for delivery.

The lease companies will also send a shipping notice to the driver which includes the name and address of the dealership where the vehicle is to be picked up.  The dealer will notify the driver within a couple of weeks that the vehicle has arrived and is ready to be picked up.  The employee can call the dealer direct if he/she has not heard from them within the time frame mentioned above.

If the vehicle is not exactly as you ordered it, or if the vehicle is damaged in any way, **DO NOT** sign any papers and **DO NOT** take delivery of the vehicle.  As long as you have not taken delivery of the vehicle, we can work with the dealer and the manufacturer to get any problems corrected.

If the employee takes delivery and absorbs additional costs, the employee's management will absorb all costs associated with rectifying the situation.

6.   <u>**USED VEHICLE MARKETING**</u>

Approximately six weeks before your new company car will be delivered to the dealer; you should contact your fleet coordinator (423-229-5492) to request a purchase offer/quote by mail or email for your current company car through the Donlen Employee Lease/Buy program.  The price of your car, which will be determined by criteria established jointly by Eastman Chemical Company and the lease companies, will be based on the make, model, and mileage.  Prices are firm and not negotiable.

Alternatively, each Department has the option to contact the Eastman's Marketing Fleet Coordinator (423-229-5492) if there is another employee in the area interested in purchasing the used vehicle, provided the driver is not interested.  The company lease vehicle can ONLY be sold to an Eastman employee, due to liability issues involved.  No exceptions will be made (i.e. family members).

If there is no interest in purchasing your used vehicle, please contact your Fleet Coordinator (423-229-5492) when you take delivery of your new vehicle.  Donlen will make arrangements to have the used vehicle picked up from the dealer and sold.

When the vehicle is sold, usually at auction, the amount received will pay off any amount owed on the vehicle.  If they are able to make a profit, then that amount will be credited back to the employee's cost center.  In the same respect, if the amount the vehicle is sold for is less than what is owed, the employee's cost center will be charged for the difference that is still owed on the vehicle.  One of the following situations may cause the latter to take place:

-   Employee did not take care of the vehicle (i.e. normal, routine maintenance such as oil changes, washing, etc.)
-   Employee did not report or repair minor accidents to the vehicle (i.e. dents, other than minor door dings, or scrapes).

These are just a couple of examples why the resale might be lower than expected, and also why the company stresses the importance of care and maintenance to company cars.  If repairs are due to neglect, (e.g., body work not reported or repaired, damage to interior of vehicle, neglect caused through not having regular tune-ups, oil changes, etc.), the Marketing Fleet Coordinator will report this information to the director of the lease car driver's business organization.

Unrestricted Internal Use Only.

These documents are maintained in an electronic format.

Printed documents may not reflect current revisions.

**EASTMAN**

# STANDARD OPERATING PROCEDURE

**7.**   **PERSONAL USE OF COMPANY VEHICLE**

Personal use of a company vehicle is defined as:
- Driving from home to office
- Driving from home to first business appointment of day unless your home meets IRS qualifications as a home office
- Driving on the weekend or on vacation
- Use of company vehicle by spouse
- Home to a second job

Internal Revenue Service regulations and related court decisions indicate that if an automobile is used for both business and personal use, expenses must be apportioned between business and personal travel.  Eastman Chemical Company employees must report personal mileage. Using the IRS' General Valuation Rule the resulting benefit will be added to the employee's wages and taxed accordingly.

As the custodian of the vehicle, you must report all personal mileage via Donlen's smart phone application.

**Prior approval MUST be obtained by the employee from his/her Management to use the company vehicle for vacation.**

When driving the car on personal business or for pleasure, the employee must pay all parking charges, toll fees, washing, storage, etc., and not include such charges or fees on the Electronic Expense Statement.

If the vehicle should become non-drivable due to mechanical failure or accident damage while being used for a personal reason, the expense of alternate transportation or any related expenses (motel bills, meals, etc.) is **NOT** the responsibility of Eastman Chemical Company.  You, as the driver, must pay for these expenses.  **ONLY** vehicle repairs will be paid by Eastman Chemical Company, provided the employee obtained prior approval from his/her management to use the vehicle for a personal (i.e. vacation) trip.

**8.**   **INSURANCE**

The Eastman Chemical Company insurance program includes liability coverage only.  Eastman is self-insured for collision, fire, theft, hail damage, etc.  Questions concerning insurance matters should be directed to the Donlen's Accident Management area, or Eastman's Risk Management & Insurance Department (423-229-2755).

Insurance cards will be issued for all vehicles and must be kept in the vehicle at all times.  Cards will be reissued annually when the policy is renewed and also reissued when vehicles are replaced.

**IT IS MANDATORY THAT SEAT BELTS BE WORN IN COMPANY VEHICLES.**

**a.**   **Accidents**

You must report all accidents, regardless of severity or circumstances, by phone to Donlen and the Marketing Fleet Coordinator (423-229-2755) as quickly as possible. You will be given complete instructions regarding the procedures you must follow.  Also, notify Eastman's Risk Management & Insurance Department of **any** accident within 48 hours (423-229-2755).

At the accident scene, you should exchange insurance, registration and factual information if there is another party or parties involved.  Some of the factual information should be:  year, make, license plate number of vehicle, owner name and address if different from the driver, and driver's license number.

**Call the police.**  Explain that our corporate policy requires that a police report be made.  Try to obtain a copy of the police report and forward to the Donlen Accident Management.

Unrestricted Internal Use Only.
These documents are maintained in an electronic format.
Printed documents may not reflect current revisions.

00476.118000409

Appx_0006

**EASTMAN**

# STANDARD OPERATING PROCEDURE

Questions regarding insurance matters should be directed to Eastman's Risk Management & Insurance Department (423-229-2755).

EMPLOYEE IS NOT AUTHORIZED TO AND SHALL NOT EXPRESS OPINION IN THE EVENT OF AN ACCIDENT AS TO THE FAULT OR LIABILITY, AGREE TO ANY SETTLEMENT ON BEHALF OF EASTMAN CHEMICAL, OR SIGN ANY STATEMENT OTHER THAN DOCUMENTS REQUIRED BY POLICE AUTHORITIES.  FAILURE TO ABIDE BY THIS POLICY MAY CAUSE EASTMAN CHEMICAL TO LOOK TO THE EMPLOYEE FOR PAYMENT OF DAMAGES AND EXPENSES, INCLUDING ATTORNEY FEES.

**b.**    **Theft of Vehicle or Items in Vehicle**

All theft or attempted theft resulting in damage to vehicle must be reported to the local police precinct, and telephone the company from which your car is leased or your Marketing Fleet Coordinator for further instructions.

If the damage is extensive, a police officer should be requested to appear at the scene of the theft.  The employee should request the name of the officer, badge number and a copy of the report.  There is generally a small fee charged for such a report.  This fee is refundable to the employee and should be submitted for reimbursement.

A full written report giving details of all thefts or attempted thefts resulting in damage to the vehicle should be made by the employee and sent to the Risk Management & Insurance Department, Eastman Chemical Company, P.O. Box 511, Kingsport, TN  37662.

-       Any company property, or items in the company vehicle which are damaged or stolen, are absorbed directly by the employee's business organization.  Where company products may have been stolen from the company vehicle, it is important that the employee promptly make a full report to his/her immediate supervisor.  The supervisor would then make the determination as to whether or not to replace the item(s).  Whenever the vehicle is left unattended, all windows should be closed and doors locked.  If possible, samples, luggage and all personal items should be locked in the trunk.

-       The corporate coverage does not provide coverage on any loss of personal articles (IPODs, IPADs, laptop computers, cellular phones, cameras, etc.) that may be stolen from a company car.  The employee's own department may choose to pay for the loss; therefore, the director in that division would make the determination as to whether or not to replace the item(s).  For further information, related to personal losses, please refer to Plant Protection Safety Guideline PP-310-5-1.

**9.**    **USE OF PERSONAL VEHICLE ON COMPANY BUSINESS**

An employee may drive a personal vehicle on company business if company transportation is unavailable and only if the employee has effective motor vehicle insurance coverage in at least the minimum amount required by the state(s) in which the personal vehicle is driven.  It is up to the department head or manager of the employee's company unit to receive assurance from the employee that such insurance coverage is, in fact, in effect.

The employee should be advised that any accident involving a personal vehicle while it is being used on company business should be reported to the Eastman Chemical Company's Risk Management & Insurance Department (423-229-2755).

If your company vehicle is inoperable, you may use your personal vehicle for company business and be reimbursed the standard casual mileage rate for expenses.  This rate is determined and reviewed annually by the I.R.S.  Expenses that would be considered part of this rate would be gas, tolls, insurance, parking, maintenance, etc.  To obtain the current standard personal mileage rate, contact Eastman's Marketing Fleet Coordinator (423-229-5492).

Unrestricted Internal Use Only.
These documents are maintained in an electronic format.
Printed documents may not reflect current revisions.

00476.118000410

Appx_0007

**EASTMAN**

# STANDARD OPERATING PROCEDURE

If an employee is involved in an accident in his personal vehicle while on company business and the accident is the employee's fault, the employee's personal insurance would be responsible for the damages.  For further details, refer to Plant Protection Safety Guideline PP-310-5-1.

10.    <u>**KEEPING A CAR LEGALLY DRIVEABLE**</u>

One important objective of Donlen is to assist drivers in keeping vehicles legally drivable, but the **ultimate responsibility is that of the driver**.

Registration renewal notices are forwarded to the drivers.  Insurance cards are sent to the drivers annually by Donlen for most states, Donlen automatically pays any personal property taxes, which are prerequisites to registration of leased cars.  However, in some states, personal property taxes will be sent directly to the driver even though the vehicle is leased.  The driver should forward the personal property tax notice to their lease company.

Drivers must see that the vehicle is inspected when required in those states which have inspection laws and must follow up on lost or misplaced insurance cards.  In addition, if parking tickets are not paid, the vehicle often cannot be re-registered.  In some states, Donlen may be prevented from re-registering or selling <u>ANY</u> leased vehicle.  Drivers are to take care of tickets before they are sent to Donlen.  If not, Eastman's Marketing Fleet Coordinator will be contacted by the lease company and the information will be passed on to the driver's management.  Payment of any traffic fines issued to company vehicles shall be the total responsibility of the driver involved.  This includes additional administration fees for non-payment of these traffic fines.  Employees cannot charge them to the company as expense items.  They must be settled immediately since the police can trace ownership of the car through the license plates.  Violations left pending can result in a summons issued to the driver, causing the employee to lose valuable time by going to court, or cause an increase in the fine.

11.    <u>**MAINTENANCE AND REPAIRS**</u>

The Maintenance Assistance Program (MAP) is designed to optimize up-time while, at the same time, maximize cost-effective operation.

A Service Specialist will direct you to the best repair facility to meet your needs.  You will avoid:

-        Having to pay for services and repairs yourself.
-        Any chance that Eastman Chemical Company will refuse to pay for unauthorized work.
-        Unnecessary or inadequate work.
-        Over-priced replacement parts and service.

Be sure that you understand the service limits of your Company Lease Vehicle.  If you have questions, contact your Marketing Fleet Coordinator.

Use your passport for service or repairs on your assigned company vehicle <u>only</u>.  Do not use it for your personal vehicle or other company vehicles.

If you do not use one of the national service suppliers listed in the passport, you must call MAP (800-937-8163) for authorization.

12.    <u>**EXPENSE OF OPERATION**</u>

    a.    Mileage: Donlen's smart phone application should be accessed by the 15th of each month to report personal mileage usage.

        The smart phone application requires correct odometer readings.  All mileage is to be recorded; miles not included as business usage will be counted as personal miles.

Unrestricted Internal Use Only.
These documents are maintained in an electronic format.
Printed documents may not reflect current revisions.

00476.118000411

Appx_0008

**EASTMAN**

# STANDARD OPERATING PROCEDURE

b. Maintenance: All maintenance and repair work over $50 is to be arranged prior to taking the car in through the Maintenance Assistance Program (MAP).  Receipts are required for maintenance and repair bills under $50.  Any such charges not purchased on the credit cart are to be reported on the electronic expense statement.

c. Residence Expenses: All parking fees associated with an employee's residence are not eligible for reimbursement by Eastman. These expenses are the responsibility of the employee.

**13.** **COMPANY VEHICLES DRIVEN INTO MEXICO**

Company cars are NOT covered by insurance and are NOT authorized to be driven into Mexico for any reason.

**14.** **SAFETY**

It is the driver's responsibility to operate the automobile in such a manner to prevent injuries and property damage.  All drivers are expected to observe speed limits and to drive within the law.

Use of headlights, turn indicators and horn, where appropriate, as well as maintaining ample space cushions from other automobiles, is expected.  Speed is to be adjusted to meet adverse weather conditions.  It is mandatory that seat belts be worn in company vehicles.

The use of a company vehicle while under the influence of intoxicants and other drugs is forbidden and is sufficient cause for dismissal. Refer to Eastman Drug & Alcohol Policy for additional information.

Employees who have a company-provided vehicle are required to have a valid driver's license for the state in which they reside and are expected to drive in a safe and defensive manner.

1. Current employees with company-provided vehicles should complete a Driver Record Request Form and attach a copy of your current valid driver's license.  This information will be placed in your personnel folder.  The Driver Request Form will be updated annually at the Performance Management session.  This information will not be used for a DMV check unless an employee's driving record comes into question.

2. While driving a company vehicle, any moving violations, both accident-related and non-accident-related, should be reported to your immediate supervisor within 48 hours.

3. The attached guidelines will be used as company policy to help ensure that Eastman employees who drive a company car will do so in a safe and defensive manner.  Each of the guidelines includes a management response.  The intent of these responses is to assist the employee in being a safe and defensive driver.

Our goal, with these guidelines, is to raise awareness and confirm personal accountability for safety in our jobs.

Please review Attachments 1, 2, 3 and 4.  These are examples of the forms and information discussed in this section.

**15.** **"DRIVE OTHER CAR" COVERAGE**

"Drive Other Car" Coverage is not part of the Eastman Auto Insurance Policy

"Drive other car" coverage allows an owner's personal auto policy to extend to a borrowed or rental car. This coverage is typically covered by a personal lines auto liability policy but is not normally part of a commercial auto policy, unless added by endorsement. Eastman's fronted commercial auto liability policy does not have the "drive other car" endorsement.

**Unrestricted Internal Use Only.**

**These documents are maintained in an electronic format.**

**Printed documents may not reflect current revisions.**

00476.118000412

Appx_0009

**EASTMAN**

# STANDARD OPERATING PROCEDURE

If you need to rent a vehicle for business purposes in the US, insurance is included in the daily rental rate when renting from Eastman's approved rental agencies. See guidelines under Travel Services policies for accepting and rejecting insurance.

If you are renting a vehicle for personal use, insurance may be provided by other means. Those may include purchasing insurance from the rental agency, through an auto insurance policy you may have on another personal vehicle, or through coverage afforded by your credit card company.

If you are borrowing someone's car for personal use, insurance may be provided by that owner's auto insurance policy or through an auto insurance policy you may have on another personal vehicle.

16.    **ACCIDENT CLAIMS INVOLVING AN EASTMAN LEASED VEHICLE AND AN UNINSURED OR UNDERINSURED MOTORIST WHO IS AT FAULT**

As part of its commercial auto liability policy, Eastman either rejects uninsured motorist / underinsured motorist (UM/UIM) coverage or accepts the minimum UM/UIM coverage required by each state's law. Because of this, injuries to passengers in the Eastman leased vehicle are not covered by the auto insurance policy as they would be if UM/UIM coverage was included.

If on company business when the accident occurs, the employee's medical and indemnity expenses are paid by worker's compensation. Normally, an employee's spouse or children should not be traveling with an employee when he/she is driving a leased vehicle on business. For a family member to travel in a leased vehicle with an employee on company business, the employee's management must be aware that the employee's spouse and/or children will be traveling with him/her and must give prior approval (prior approval is not needed for an employee's spouse to travel in a lease car for legitimate business purposes such as entertaining). If a dependent family member is injured in an accident with an uninsured or underinsured motorist who is at fault and prior approval was obtained, Eastman will pay out-of-pocket medical deductibles and co-pays for that injured family member.

If on personal business and mileage is imputed as income to the employee when an accident occurs with an uninsured or underinsured motorist who is at fault, Eastman will pay out-of-pocket medical deductibles and co-pays for an injured driver or passenger.

It has been a longstanding policy to strongly discourage children traveling with employees on business since it adds a level of liability to which Eastman would prefer to not be exposed. That said, if a spouse or children accompany an employee on a business trip, the prioritized vehicle travel choices are:

A.    Own vehicle (insurance is covered by employee's personal insurance supplemented for the business travel by the mileage allocation).
B.    Rental vehicle (insurance up to $150,000 is covered by rental agreement). Non-employee spouse, per the rental agreement, may drive rental car.
C.    Company leased vehicle (Eastman self-insurance).

17.    **EMPLOYEE TERMINATION**

In the event an employee terminates or is terminated from the company, his/her company-provided vehicle should be retrieved within 48 hours of termination.  Eastman's Marketing Fleet Coordinator (423-229-5492) is to be notified of all terminated employees who are assigned vehicles.  It is the responsibility of the terminated employee's immediate supervisor to ensure that there is a plan in place to retrieve the vehicle according to Fleet Management policy.

**Purpose**
The purpose of this procedure is to assist employees in a general understanding of the Eastman Chemical Company car lease program, outline company guidelines for this program and provide guidance in correctly

Unrestricted Internal Use Only.
These documents are maintained in an electronic format.
Printed documents may not reflect current revisions.

00476.118000413

Appx_0010

**EASTMAN**

# STANDARD OPERATING PROCEDURE

handling the paperwork relating to the needs of the drivers and the company.  Donlen Corporation administers fleet operations with input and guidance from Eastman's Marketing Fleet Administrator.  All drivers also receive a "Maintenance Assistance Program" Driver Passport that they keep with them to serve as a quick reference guide for any questions concerning the program.  This passport contains instructions for maintenance of the vehicle and emergency service.  If you still have questions **after** referring to this passport, you should contact Donlen Corporation (800-323-1483) or Eastman's Marketing Fleet Administrator (423-229-5492).

## Scope
This procedure should be followed by all Eastman Chemical Company employees who drive company automobiles.  Any exceptions to this procedure should be approved by the Comptroller.

## Definitions
Moving Violation:  As defined by state law.

Accident:  Any incident in which a Company provided vehicle is involved (whether moving or not) that results in personal injury and/or property damage.

Avoidable Accident:  An accident (as defined above) where the driver did not use reasonable care to prevent its occurrence.

Serious Driving Offense:  Includes but not limited to:

- Failure to stop when involved in an accident
- Accident with gross negligence
- Failure to submit to a chemical test when required
- Driving under the influence of alcohol and/or drugs
- Vehicular manslaughter

Depending upon the state, these offenses remain on the driver's record for 5 to 7 years.

## Information Resources
(The Information Resources lists other documents that support this Standard Operating Procedure and have relevance to this topic.)

## Reference Number:  1279

Unrestricted Internal Use Only.

These documents are maintained in an electronic format.

Printed documents may not reflect current revisions.

00476.118000414

Appx_0011



# STANDARD OPERATING PROCEDURE

EASTMAN CHEMICAL COMPANY

**Driver Record Request Form**
**To Be Completed on an Annual**
**Basis During Performance Management Session**

As stated in Eastman Chemical Company's Statement of Corporate Policy, each employee driving a company-provided vehicle must have a valid driver's license and maintain a safe driving record.  The implementation guidelines of that policy require that the following information be completed:

(Please type or print)

Driver's Name:   _____
                                        Last                              First                              M.I.

Eastman 6-Digit Insurance Number:   _____

Do you currently hold a valid driver's license?     Yes _____     No _____

Driver's License Number:          _____

Issuing State:   _____     Expiration Date (mm/dd/yyyy):   ___/___/___

Do all family members who are potential drivers of your company provided vehicle (spouse, driving age children) have valid licenses? Yes ____     No ____

REMINDER:    The only authorized drivers of your company-provided vehicle are other Eastman Chemical Company employees or your legal spouse (with valid licenses in either case).  Your fully licensed children may drive ONLY when you, the employee, are in the vehicle with them.

Copy of driver's license should be attached.

Signed:   _____     Date:   _____

Upon completion, this form and copy of valid drivers will be placed in employee's personnel folder.

Falsification of information on this document could result in disciplinary action including termination from the company.

**Unrestricted Internal Use Only.**

**These documents are maintained in an electronic format.**

**Printed documents may not reflect current revisions.**

00476.118000415

Appx_0012

EASTMAN

# STANDARD OPERATING PROCEDURE

**ATTACHMENT NO. 1**

DEFINITIONS

Moving Violation:       As defined by state law.

Accident:       Any incident in which a Company provided vehicle is involved (whether moving or not) that results in personal injury and/or property damage.

Avoidable Accident:       An accident (as defined above) where the driver did not use reasonable care to prevent its occurrence.

Serious Driving Offense:  Includes but not limited to:

Π       Failure to stop when involved in an accident
Π       Accident with gross negligence
Π       Failure to submit to a chemical test when required
Π       Driving under the influence of alcohol and/or drugs
Π       Vehicular manslaughter

Depending upon the state, these offenses remain on the driver's record for 5 to 7 years.

**Unrestricted Internal Use Only.**
**These documents are maintained in an electronic format.**
**Printed documents may not reflect current revisions.**

00476.118000416

Appx_0013

**EASTMAN**

# STANDARD OPERATING PROCEDURE

## ATTACHMENT NO. 2

## U.S. FLEET AUTO POLICY GUIDELINES

| SAFETY CONCERNS | MANAGEMENT RESPONSE |
|---|---|
| **Level 1** | |
| 1.1     A total of two (2) avoidable accidents within a 24-month period. | Review of overall safety/employment record – at a minimum the employee will be required to attend an approved defensive driving class. Other restrictions, if applied, will be documented in an action plan by employee's supervisor. |
| **Level 2** | |
| 2.1     A avoidable accident or moving violation within one (1) year of having attended a mandatory defensive driving course (which was required as a result of unsafe driving described in Level 1)   or<br><br>2.2     Failure to report an accident or<br><br>2.3     Other Driving Offense that is deemed, by employee's management, to be a serious offense or<br><br>2.4     Violation of Eastman Cell Phone policy or<br><br>2.5     A summons/arrest for DUI, DWI, or other serious unsafe driving offense, as defined<br><br><br><br>. | Review of overall safety/employment record – possible actions include:<br><br>1.     Limitation of use of Company vehicle<br>2.     Withdrawal of privilege to operate Company vehicle, or personal vehicle on Company business.<br>3.     Referral to EAP – as appropriate.<br>4.     Other disciplinary action (including appropriate documentation e.g., awareness warning).<br>5.     Limitation of the use of a company or personal car, whether initiated upon the individual by Eastman or the state, may prevent the employee from meeting the minimum job expectations for their role.  For this reason, other disciplinary action may include termination.<br>6.     Mandatory documented event<br>7.     Mandatory placement on Company Awareness<br>8.     May include termination. |

Unrestricted Internal Use Only.

These documents are maintained in an electronic format.

Printed documents may not reflect current revisions.

00476.118000417

Appx_0014



# STANDARD OPERATING PROCEDURE

**ATTACHMENT NO. 2**

**FLEET AUTO POLICY GUIDELINES (Continued)**

| SAFETY CONCERNS | MANAGEMENT RESPONSE |
|---|---|
| **Level 3** | |
| 3.1 Continued disregard of concerns addressed in Level 2 after having received documented disciplinary action. | Review of overall safety/employment record: place on final warning or possible termination. |
| 3.2 A first conviction or "No lo contendere" for driving under the influence of alcohol or drugs. | **Mandatory suspension of privilege to operate Company or other vehicle while on Company business – place on FW.**<br><br>(1-month min. w/o pay/with supervisor ok., some vac. may be used).  In some cases, where DMV mandates a longer suspension, non-driving duties may be assigned after 30-day suspension has been served - if appropriate and available. If the employee's job expectation requires them to drive, then such suspended privileges may result in termination. |
| **Level 4** | |
| 4.1. A second conviction for driving under the influence of alcohol or drugs. | Termination |

**Unrestricted Internal Use Only.**

**These documents are maintained in an electronic format.**

**Printed documents may not reflect current revisions.**

00476.118000418

Appx_0015

# EASTMAN

## STANDARD OPERATING PROCEDURE

### ATTACHMENT NO. 3

Eastman Chemical Company - Procedure for Handling Accidents Involving Leased Vehicles



Unrestricted Internal Use Only.
These documents are maintained in an electronic format.
Printed documents may not reflect current revisions.

00476.118000419

Appx_0016

**EASTMAN**

## STANDARD OPERATING PROCEDURE

REVIEWED BY:        Phil Begley

Cheryl Smith

Cheryl Harmon

George Moody

**Unrestricted Internal Use Only.**
**These documents are maintained in an electronic format.**
**Printed documents may not reflect current revisions.**

00476.118000420

Appx_0017



# 2021 Performance Assessment for Caylee Smith

## Employee Information

| | | | |
|---|---|---|---|
| Last Name | Smith | First Name | Caylee |
| Position Title | Sale Representative | Department | PF-SALES-NA-AUTOMOTIVE-EAST COAST (50116800) |
| Job Code | Sales Representative (50121237) | Division | FILMS-CH (50091589) |

## Goals

Please expand goals to view full details

This section is for evaluating the accomplishments of my 2021 goals.

Please utilize the comments boxes below to to add any additional notes

---

**Safety, Wellness & Environment**

**All In For Safety-Zero Incident Safety Culture**

Provide a safe working environment and prevent potential accidents. Achieve 0 incidents throughout the year

| | | | |
|---|---|---|---|
| Employee Mid-year comments: | Needs improvement based on previous events that have already occurred this year. Will continue to strive for a safe work environment. | Supervisor Mid-year comments: | |
| Matrix Mid-year comments: | | Employee Final comments: | Continuing to be safe on the road and avoid potential accidents by staying aware of my surroundings while driving. |
| Supervisor Final comments: | | Matrix Final comments: | |

Not Started

Rating

EXHIBIT C

Delivering

**EBIT**

## 2021 Tier New Business

Not Started

0-79% of your target - Improve
80%-109% of your target - Delivering
>110% of your target - Outperforming

| | |
|---|---|
| Employee Mid-year comments: | Supervisor Mid-year comments: |
| Matrix Mid-year comments: | Employee Final comments: I believe I am right on par for Delivering this year. I have finally got the hang of things and have my own way of approaching prospect accounts. I am interested to to see and learn other strategies from my teammates these upcoming months. Overall, I feel I have jumped right into the position with a full stride. I believe I may need to work on prioritizing the correct prospect accounts, and staying persistent with those specific ones. I need to get better at evaluating the situation at the dealership and determine if our in-house program could work there. |
| Supervisor Final comments: | Matrix Final comments: |

Rating



Unable to Rate

**EBIT**

## Achieve 2021 Territory Budget

Not Started

0-79% of your target - Improve
80%-109% of your target - Delivering
>110% of your target - Outperforming

| | |
|---|---|
| Employee Mid-year comments: | Supervisor Mid-year comments: |

| | | |
|---|---|---|
| Matrix Mid-year comments: | Employee Final comments: | I believe I am right on track to be delivering for my territory budget for 2021. |
| Supervisor Final comments: | Matrix Final comments: | |

Rating

●●●
Unable to Rate

**Long-term Growth/Innovation**                                    Not Started

## Identify and Onboard PPF Extended Training and Support Program Candidates in 2021

Each setup will include a clear executable process for selling PPF. The seller will completely understand how PPF is getting sold through the dealership and the profit each department is making from each package sold. The seller will identify any red flags associated with this process before the program is implemented, and work with the customer to lift those barriers. The seller will work with 4S Sales and Training Leadership to help with any challenges, and will create SOR's on these if we run into situations where we as a team need to consider a couple different choices.

| | | |
|---|---|---|
| Employee Mid-year comments: | Supervisor Mid-year comments: | |
| Matrix Mid-year comments: | Employee Final comments: | Me and Mike have started 2 ppf programs so far this year, with a 3rd coming in November. |
| Supervisor Final comments: | Matrix Final comments: | |

Rating

●●●
Unable to Rate

**Capability Development**                                    Not Started

## Account Manager to outline an opportunity related to S(ituation)O(ptions)R(ecommendation) for accounts and situations >$10,000 for accounts, and any business operating situation/process that you or your customer need support on.

Capability Development: Account Manager to enter SOR >$10,000 or any business operation situation/process that you need support on. Examples: Patterns, Marketing, Collateral, etc... Measured on quality, problem solving, strategic thinking, and recommendations

Improving: Misses opportunities to present an SOR, lacks quality, limited recommendations, options are not well defined
Demonstrating: Understands when to initiate SOR, discusses SOR with Manager, detailed information with solid recommendations and path forward

Outperforms: Initiates SORs and moves at a high pace, accelerates business choice quality to exceptional regarding situation, options, recommendations, utilizes strategic thinking and knows all the details

| Employee Mid-year comments: | | Supervisor Mid-year comments: | |
| --- | --- | --- | --- |
| Matrix Mid-year comments: | | Employee Final comments: | I have not submitted any SORs, but I am aware of issues/strategies in my territory that could use improvement in which I have passively brought up with my manager and trainer. I need to get in the habit of putting these recommended improvements in writing and following through for a change. |
| Supervisor Final comments: | | Matrix Final comments: | |

Rating



Unable to Rate

---

**Capability Development**                                                      [ Not Started ]

## Execute Core Cut-Over - Sales Team

This goal will ensure Eastman has industry-leading cutting software that exceeds the needs of our customers. This will also enable our customers to have a positive experience when utilizing Core and adopting the new software. You will be measured by your clear understanding of the software, and your ability to transition and support your region in using Core.

| Employee Mid-year comments: | Am continuing to travel on a weekly basis to each of my accounts to get them acclimated to our new software. | Supervisor Mid-year comments: | |
| --- | --- | --- | --- |
| Matrix Mid-year comments: | | Employee Final comments: | My trainer and I have traveled to each account and installed Core. We have followed up with some and continue to reach out to the rest to ensure they are adjusting smoothly with the issues. |
| Supervisor Final comments: | | Matrix Final comments: | |

Rating

Appx_0021


Delivering

**Capability Development**

**Account Manager participate and present Monthly TMP Call with Sales Manager**

Not Started

Scoring System:

| Employee Mid-year comments: | I believe that I have been involved with my accounts and am striving to execute my TMP goals. I will continue to interact and get to know my customers. | Supervisor Mid-year comments: | |
|---|---|---|---|
| Matrix Mid-year comments: | | Employee Final comments: | I am continuing to strive for my goals that have been set in place for myself. I am engaged and involved in my territory and know what is happening within it. I feel as though I am prepared and ready for my TMP calls. |
| Supervisor Final comments: | | Matrix Final comments: | |

Rating

Delivering

## Overall Mid-year comments on Goals

| Employee: | I will always feel as though I can do better, hence the "Delivering" self assessment I gave myself. |
|---|---|
| Matrix: | |
| Supervisor: | Caylee has done an excellent learning the Core software platform and has been aggressively converting her accounts to this software.  She has quickly learned the ins and outs of her territory, and as such, she is spending her time with accounts that bring the most value for her territory.  She wants to be a top performer and has been eager to do an excellent job in this role from day 1.  She has a firm understanding of the All in for Safety mindset and despite a minor incident earlier this year, she continues to strive to deliver on this goal. |

Appx_0022

## Overall Final comments on Goals

| | |
|---|---|
| Employee: | I will continue to strive for my goals and work on the things that need improvement. |
| Matrix: | |
| Supervisor: | Caylee has done a great job during her first year of employment with the company.  She quickly learned our software and began developing relationships with customers from day 1.  She has gained the understanding of how important relationships are in this business, and as such, she has started landing new accounts in her territory.  San Marcos Toyota and Bluebonnet Motors were both won as a result of Caylee's persistence and relationship building abilities.  Although she is not being evaluated this year for NB acquisition or overall 2021 territory budget, she is on track to deliver in both categories.  She has done an excellent job converting all customers over to Core and overcoming any obstacles in the way.  Finally, she quickly learned her territory and is routing her travel at the appropriate frequency with little to no direction needed. |

## Eastman Behaviors

This section is for evaluating the accomplishments of the Eastman Behaviors.

### ADAPTABILITY

**What it is**

- Review, learn, and adjust to change.

**Why it matters**

- In a volatile, uncertain, complex, and ambiguous world, we must review and adjust, as an organization, to deliver superior outcomes

| Employee Mid-year comments: | I feel I joined onboard at a weird time and think that I have jumped right into things to get the ball rolling. | Supervisor Mid-year comments: | |
|---|---|---|---|
| Matrix Mid-year comments: | | Employee Final comments: | |
| Supervisor Final comments: | | Matrix Final comments: | |

Appx_0023

Rating



Demonstrating

# BIAS FOR ACTION

**What it is**

- Move with speed toward the right outcomes.

**Why it matters**

- We must all act with decisiveness and urgency, prioritizing issues and acting despite uncertainty or risk to remain competitive.

| | | | |
|---|---|---|---|
| Employee Mid-year comments: | When presented with issues, I have taken action immediately to ensure that things are resolved in a timely manner. | Supervisor Mid-year comments: | |
| Matrix Mid-year comments: | | Employee Final comments: | |
| Supervisor Final comments: | | Matrix Final comments: | |

Rating



Demonstrating

# COURAGEOUS LEADERSHIP

**What it is**

- Step up to address difficult issues and say what needs to be said.

**Why it matters**

- Innovation and growth in an ambiguous and fast-paced environment requires that we all fully bring our diverse knowledge, skills, and perspectives together.

| | | | |
|---|---|---|---|
| Employee Mid-year comments: | I feel as though I have taken a lead in ensuring the accounts in my territory are being properly taken care of and getting proper training on Core. | Supervisor Mid-year comments: | |

| Matrix Mid-year comments: | | Employee Final comments: |
| Supervisor Final comments: | | Matrix Final comments: |

Rating



Demonstrating

## EMPOWERMENT AND ACCOUNTABILITY

**What it is**

- Be empowered and responsible for making good choices that lead to our collective success.

**Why it matters**

- We will only achieve our long-term business results if everyone takes accountability for our collective success

| Employee Mid-year comments: | Have had to make some difficult decisions regarding a few of my accounts and training. I believe the decisions were necessary to the success of my territory. | Supervisor Mid-year comments: |
| Matrix Mid-year comments: | | Employee Final comments: |
| Supervisor Final comments: | | Matrix Final comments: |

Rating



Demonstrating

## OPTIMISM

**What it is**

- Inspire self and others to realize our future.

**Why it matters**

- Optimism creates energy and motivation to identify new, creative possibilities, embrace change, and enthusiastically move toward the future

Appx_0025

| Employee Mid-year comments: | Always looking forward to my next challenge and opportunity in this company! Excited to see the development in the coming years of our products, and continue to work with and for such a great group of people! | Supervisor Mid-year comments: | |
| Matrix Mid-year comments: | | Employee Final comments: | |
| Supervisor Final comments: | | Matrix Final comments: | |

Rating

●●●
Demonstrating

## Overall Mid-year comments on Behaviors

Employee:

Matrix:

Supervisor:          Caylee is currently demonstrating on all necessary Eastman behaviors. Her "Bias for Action" is strong and has executed Core cutovers and learned her territory from a very early stage.  She is eager to do a great job in her role and holds herself accountable for positives/negatives happening in her territory.  Caylee also has proven to be extremely adaptable with her scheduling and is willing to go above and beyond to take care of her customers, often at very short notice.

## Overall Final comments on Behaviors

Employee:

Matrix:

Supervisor:          Caylee continues to demonstrate all behaviors needed for a successful role as an Account Manager in Performance Films.  She has been eager to learn and act from the start of her employment and requires little direction while doing so.  She has proven to be extremely adaptable by taking care of customers at a moments notice and is accountable for her actions and the performance of her territory.  She is very competitive and this is shown through interactions with other team members as well as her willingness and desire to win.

# Role Specific Competencies

This section is for evaluating the accomplishments of Role Specific Competencies.

Users have the ability to add competencies by selecting '+ Competency'

## Sales Representative - Data Driven Approach

Identifies and utilizes technology, including SAP Commissions, SalesForce, Anaplan, PowerBI, Tableau CRM, to make informed decisions in customer engagement strategies. Maintains a commitment to clean data

| Employee Mid-year comments: | | Supervisor Mid-year comments: |
|---|---|---|
| Matrix Mid-year comments: | | Employee Final comments: |
| Supervisor Final comments: | | Matrix Final comments: |

Rating

Demonstrating

## Sales Representative - Opportunity Management

Effectively manages the portfolio of opportunities through the funnel, advancing through the various stages based on the customer buying process. Utilizes additional resources and engages partner functions when necessary to remove barriers and progress opportunities to commercialization. Leverages SalesForce to drive progress and reflect status. Provides clear understanding on "why" an opportunity was won or lost. Understands when to utilize SOR and elevate to WWCAR to request additional resources or decisions.

| Employee Mid-year comments: | Have been working on this aspect of my position, Carrie has helped me a lot to understand it! | Supervisor Mid-year comments: |
|---|---|---|
| Matrix Mid-year comments: | | Employee Final comments: |
| Supervisor Final comments: | | Matrix Final comments: |

Rating



Demonstrating

## Sales Representative - Pre-call Planning

Follows the pre-call planning process in SalesForce for driving rich customer engagement, insights, and solutions. Ensures successful customer interaction by assessing priorities and leveraging insights for each customer discussion leading to desired outcomes.

| Employee Mid-year comments: | I always like to be prepared when walking into an account or prospect account. I like to gather information and have it already written down before entering. You can never be too prepared! | Supervisor Mid-year comments: |

| Matrix Mid-year comments: | | Employee Final comments: |

| Supervisor Final comments: | | Matrix Final comments: |

Rating



Demonstrating

## Sales Representative - Territory Management Planning

Understands how to manage resources across customers, segments, and geographies, optimizing for the most impactful activities for both protecting existing business and new business growth, prioritizing market development & innovation opportunities as appropriate. Sales Representative understands their territory (accounts and offerings) and activities needed to meet customer and market segment objectives/product line objectives. Achieve quotas assigned for their Territory. Reviews assigned Sales Territory to ensure alignment with the market segment strategies/product line strategies with Sales Leader during monthly TMP Reviews.

| Employee Mid-year comments: | I feel like I have been maintaining and getting to know my accounts in these first couple months in the position, can always improve though! | Supervisor Mid-year comments: |

| Matrix Mid-year comments: | | Employee Final comments: |

| Supervisor Final | | Matrix Final comments: |

comments:

Rating



Demonstrating

## Sales Representative - Value Proposition Development, Negotiation, and Reinforcement

Maintains expertise in both products and services. Tailors the market offering of the segment to meet specific account needs. Communicates the value proposition in a compelling way that resonates with the customer and addresses their value drivers of the customer stakeholders in the customer's buying process. The Sales Representative is a thought leader in the negotiation strategy, considering the total value of the offer and the lifetime value of the customer. Proof of value to Eastman is attained through meeting or exceeding quotas and targets.

| Employee Mid-year comments: | Over the last couple months, I have been studying and learning all about our products and feel that I can effectively negotiate and inform accounts on each product we offer. | Supervisor Mid-year comments: |
|---|---|---|
| Matrix Mid-year comments: | | Employee Final comments: |
| Supervisor Final comments: | | Matrix Final comments: |

Rating



Demonstrating

## Sales Representatives - Account Planning

Manages each customer account with a clear and specific strategy consistent with the market segment strategy/product line strategy. Demonstrates the ability to navigate broadly and deeply within the customer's organization to gain critical insights into unmet needs and the customer's buying process. Utilizes Account Plan in SFDC to drive execution of Account objectives.

| Employee Mid-year comments: | I feel as though I have effectively been managing my accounts in a way where I am present within them and involved. Got a lot to live up to when Rick used to be in charge of this territory! | Supervisor Mid-year comments: |
|---|---|---|
| Matrix Mid-year | | Employee Final |

comments:                                    comments:

Supervisor                                   Matrix Final
Final                                        comments:
comments:

Rating

● ● ●
Demonstrating

## Overall Mid-year comments on Competencies

Employee:              I feel like I have jumped right into the position and taken things head
                       on. I am always looking for my next opportunity and will continue to
                       work towards it!

Matrix:

Supervisor:            Caylee is delivering on all Eastman competencies so far in 2021.  She
                       has learned the top players in her territory and is becoming more
                       familiar with what her territory is doing by using the proper analytics
                       tools that Eastman has in place.  She is prepared for calls before she
                       walks in and has quickly learned how to effectively manage her
                       territory.  She is spending the right time at the right place and is
                       building great rapport and relationships with her accounts.

## Overall Final comments on Competencies

Employee:

Matrix:

Supervisor:            Caylee has demonstrated all competencies in her role.  She has quickly
                       learned the larger accounts in her territory and is spending the
                       appropriate amount of time with each account.  She is prepared prior to
                       sales calls and has learned the appropriate decision makers to speak to
                       during her calls.  Caylee understands the value proposition of our
                       products and program, and she can have effective conversations with
                       both prospects and current customers.

## Overall comments on Performance

| | |
|---|---|
| Employee Mid-year: | I have only been in this position for about 4 months, and have more that I need to learn. Although I have only been in this position for a short amount of time, I have learned so much and am eager to continue to try and grow my accounts and new business! |
| Matrix Mid-year: | |
| Supervisor Mid-year: | Caylee is currently delivering on performance YTD . In a territory that was underserviced, she quickly took action and started building relationships from day 1 to prevent any possible issues or erosion with accounts. She has also started building relationships with previously lost accounts in an attempt at winning back this business. She exudes a tremendous amount of confidence while prospecting or visiting with existing accounts despite being new to this business and industry. As Caylee continues to learn her territory and this role, she will become a top performer on this team. |
| Employee Final: | I am continuing to strive for new business and to make a footprint in my territory and on this team. I have goals that are important for me to reach, and will take each day and conversation with accounts as one day and conversation closer to achieving those. I will continue to improve on some of my sales tactics by observing and learning from other team members and what works best for them. |
| Matrix Final: | |
| Supervisor Final: | Caylee's performance in the first year of employment has been excellent. She quickly learned the value of spending the proper time and providing appropriate support to her existing customers. In addition, she learned the value and need for acquiring new business and prospecting accounts to achieve territory growth targets. She learned Core quickly and began converting customers to this new software early on in her employment. She has a can-do attitude and exudes confidence when pitching our program to customers and prospects. I look for Caylee to continue building on her success in 2022. One improvement area for Caylee is around learning and understanding the opportunity in front of her and ensuring that our program will work for both the customer and Eastman. This will come with more time on the job. |

# Results, Behaviors & Competencies Summary

Results            2.0 - Delivering

| Name | Rating | Weight |
|---|---|---|
| **Goals** | 2.0 | |
| All In For Safety-Zero Incident Safety Culture | 2.0 - Delivering | |
| 2021 Tier New Business | Unable to Rate | |
| Achieve 2021 Territory Budget | Unable to Rate | |

Appx_0031

| | |
|---|---|
| Identify and Onboard PPF Extended Training and Support Program Candidates in 2021 | Unable to Rate |
| Account Manager to outline an opportunity related to S(ituation)O(ptions)R(ecommendation) for accounts and situations >$10,000 for accounts, and any business operating situation/process that you or your customer need support on. | Unable to Rate |
| Execute Core Cut-Over - Sales Team | 2.0 - Delivering |
| Account Manager participate and present Monthly TMP Call with Sales Manager | 2.0 - Delivering |

**Behaviors & Competencies** 2.0 - Demonstrating

| Name | Rating | Weight |
|---|---|---|
| **Eastman Behaviors** | 2.0 | |
| ADAPTABILITY | 2.0 - Demonstrating | |
| BIAS FOR ACTION | 2.0 - Demonstrating | |
| COURAGEOUS LEADERSHIP | 2.0 - Demonstrating | |
| EMPOWERMENT AND ACCOUNTABILITY | 2.0 - Demonstrating | |
| OPTIMISM | 2.0 - Demonstrating | |
| **Name** | **Rating** | **Weight** |
| **Role Specific Competencies** | 2.0 | |
| Sales Representative - Data Driven Approach | 2.0 - Demonstrating | |
| Sales Representative - Opportunity Management | 2.0 - Demonstrating | |
| Sales Representative - Pre-call Planning | 2.0 - Demonstrating | |
| Sales Representative - Territory Management Planning | 2.0 - Demonstrating | |
| Sales Representative - Value Proposition Development, Negotiation, and Reinforcement | 2.0 - Demonstrating | |
| Sales Representatives - Account Planning | 2.0 - Demonstrating | |

Appx_0032



## Position on 9-box (Optional)

Indicates manager's view of the employee trending positioning within a box to better assist in ongoing coaching and career discussions

**\*\*Please note this section will not be displayed to the employee at any point during the process\*\***

Results

Behaviors & Competencies

Mid-year comments on Position

Final comments on Position

## HR Comments at Calibration

HR:

## Acknowledgement

Acknowledgement indicates that the Performance Assessment discussion has been held.

Employee:    Caylee Smith                                                01/04/2022



This report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report.

An investigative consumer reporting agency shall provide a consumer seeking to obtain a copy of a report or making a request to review a file, a written notice in simple, plain English and Spanish setting for the terms and conditions of his or her right to receive all disclosures, as provided in CA Civil Code Section 1786.26. The written notice can be found at [LINK].

Este informe no garantiza la exactitud ni la veracidad de la información respecto del tema de la investigación, sino solo que se la ha copiado fielmente de los registros públicos y que la información generada como resultado del robo de identidad, incluida la evidencia de actividad delictiva, podría asociarse erróneamente con el consumidor que es objeto del informe.

La agencia de informes de investigación sobre consumidores deberá proporcionar al consumidor que procura obtener la copia de un informe o solicita la revisión de un archivo, una notificación por escrito, redactada en inglés y español claro y sencillo, en la que se establezcan los términos y condiciones de su derecho a recibir todas las divulgaciones en virtud de lo dispuesto por el artículo 1786.26 del Código Civil de California. La notificación escrita se puede encontrar en [ENLACE].

## Smith, Caylee Erin
Background Report

**Meets Requirements**
ordered on 02/18/2021
updated on 02/22/2021

### CANDIDATE INFORMATION PROVIDED

| | |
|---|---|
| NAME: | Smith, Caylee Erin |
| EMAIL: | cxxxxxxxxx@xxxxx.xxx |
| DOB: | |
| SSN: | |
| PHONE: | 1 xxxxxxx6471 |
| ADDRESS: | 13339 Hidden Manor Ct |
| | Willis, TX, 77840 United |
| | States |

**EXHIBIT D**

00476.118000004

Appx_0035

REQUESTED BY

| REQUESTOR: | Mallory Hubbard |
|---|---|
| REF: | ECC: 242204 |
| PACKAGE: | Standard + MVR |

| COUNTRY: | United States |
|---|---|
| POSITION LOCATION: | Willis, BRAZOS, TX, US |

**CLIENT NOTE:**

> Search back where readily available in a public index.

**RESULT NOTE:**

> Digital Disclosure & Authorization In-House.

## SEARCHES

EXPAND ALL

| SSN TRACE & ADDRESS HISTORY | COMPLETED |
|---|---|
| COUNTY CRIMINAL - BRAZOS COUNTY, TX | NO RECORD FOUND |
| COUNTY CRIMINAL - FRANKLIN COUNTY, OH | NO RECORD FOUND |
| COUNTY CRIMINAL - DENTON COUNTY, TX | NO RECORD FOUND |
| COUNTY CRIMINAL - MONTGOMERY COUNTY, TX | NO RECORD FOUND |
| COUNTY CRIMINAL - COLLIN COUNTY, TX | **RECORD FOUND** |
| FEDERAL CRIMINAL - SOUTHERN DISTRICT | NO RECORD FOUND |
| FEDERAL CRIMINAL - SOUTHERN DISTRICT | NO RECORD FOUND |
| FEDERAL CRIMINAL - EASTERN DISTRICT | NO RECORD FOUND |
| EMPLOYMENT - EMERGENT PROFESSIONAL RESOURCES | **COMPLETED - Discrepancy Found** |
| EMPLOYMENT - PARK WEST APARTMENTS | **COMPLETED - Discrepancy Found** |
| EMPLOYMENT - REVEILLE RANCH APARTMENTS | **COMPLETED - Unable to Verify** |
| EDUCATION - TEXAS A&M UNIVERSITY | **COMPLETED - Discrepancy Found** |
| MOTOR VEHICLE REPORT - TX | COMPLETED |
| ELECTRONIC SUBJECT NOTIFICATION | COMPLETED - |
| ELECTRONIC SUBJECT NOTIFICATION | COMPLETED - |
| ADJUDICATION | COMPLETED |
| NATIONAL CRIMINAL DATABASE SEARCH | COMPLETED |
| GLOBAL WATCH | NO RECORD FOUND |
| EMPLOYMENT DOCUMENT COLLECTION | COMPLETED - Stopped - Info Not Received |

## SSN TRACE & ADDRESS HISTORY

COMPLETED

00476.118000005

Appx_0036

**SEARCH ID:** 197342404

**SEARCH TYPE:** ADDRESS MOVER

**STATUS/RESULT:** COMPLETED

**COMPLETION DATE:** 2021-02-18

---

**COUNTY CRIMINAL** - BRAZOS COUNTY, TX
NO RECORD FOUND

**SEARCH ID:** 197363882

**SEARCH TYPE:** FELONY/MISDEMEANOR

**STATUS/RESULT:** NO RECORD FOUND

**STATE/COUNTY:** TX / BRAZOS

**COMPLETION DATE:** 2021-02-18

**NAME(S) SEARCHED:**

| Last Name | First Name | Middle Name |
|-----------|------------|-------------|
| Smith | Caylee | Erin |

**RESULT NOTE:**

```
37 YEARS SEARCHED BACK
```

---

**COUNTY CRIMINAL** - FRANKLIN COUNTY, OH
NO RECORD FOUND

**SEARCH ID:** 197363884

**SEARCH TYPE:** FELONY/MISDEMEANOR

**STATUS/RESULT:** NO RECORD FOUND

**STATE/COUNTY:** OH / FRANKLIN

**COMPLETION DATE:** 2021-02-18

**NAME(S) SEARCHED:**

| Last Name | First Name | Middle Name |
|-----------|------------|-------------|
| Smith | Caylee | Erin |

**RESULT NOTE:**

```
33 YEARS SEARCHED
```

---

**COUNTY CRIMINAL** - DENTON COUNTY, TX
NO RECORD FOUND

**SEARCH ID:** 197363886

**SEARCH TYPE:** FELONY/MISDEMEANOR

**STATUS/RESULT:** NO RECORD FOUND

**STATE/COUNTY:** TX / DENTON

**COMPLETION DATE:** 2021-02-18

**NAME(S) SEARCHED:**

| Last Name | First Name | Middle Name |
|-----------|------------|-------------|
| Smith | Caylee | Erin |

**RESULT NOTE:**

```
28 - No of Years Searched / 28 - No of Years Requested
```

## COUNTY CRIMINAL - MONTGOMERY COUNTY, TX

NO RECORD FOUND

**SEARCH ID:** 197363887

**SEARCH TYPE:** FELONY/MISDEMEANOR

**STATUS/RESULT:** NO RECORD FOUND

**STATE/COUNTY:** TX / MONTGOMERY

**COMPLETION DATE:** 2021-02-18

**NAME(S) SEARCHED:**

| Last Name | First Name | Middle Name |
|-----------|------------|-------------|
| Smith | Caylee | Erin |

**RESULT NOTE:**

```
41 years searched back
```

## COUNTY CRIMINAL - COLLIN COUNTY, TX

RECORD FOUND

**SEARCH ID:** 197363968

**SEARCH TYPE:** FELONY/MISDEMEANOR

**STATUS/RESULT:** RECORD FOUND

**STATE/COUNTY:** TX / COLLIN

**COMPLETION DATE:** 2021-02-18

**NAME(S) SEARCHED:**

| Last Name | First Name | Middle Name |
|-----------|------------|-------------|
| Smith | Caylee | Erin |

**RESULT NOTE:**

# CASE FILE: 1

| CASE NUMBER: | 02-TR-17-01480 | FILING DATE: | 06/30/2017 |
|---|---|---|---|

| IDENTIFIED BY: | ☑ NAME: | SMITH, CAYLEE ERIN | OTHER: | MEETS IDENTIFIER POLICY |
|---|---|---|---|---|

| CHARGES: | NUMBER | DESCRIPTION | LEVEL | DISPOSITION |
|---|---|---|---|---|
| | #1 | SPEEDING 80 IN A 65 ZONE | TRAFFIC MISDEMEANOR | GUILTY |
| | | | | |

| CASE DISPOSITION: | DATE: | 08/23/2018 | DISPOSITION: | GUILTY |
|---|---|---|---|---|

| CASE SENTENCING: | OTHER: | $335 FINES/FEES/COSTS; PAID IN FULL |
|---|---|---|

# CASE FILE: 2

| CASE NUMBER: | 02-TR-18-00272 | FILING DATE: | 07/10/2017 |
|---|---|---|---|

| IDENTIFIED BY: | ☑ NAME: | SMITH, CAYLEE ERIN | OTHER: | MEETS IDENTIFIER POLICY |
|---|---|---|---|---|

| CHARGES: | NUMBER | DESCRIPTION | LEVEL | DISPOSITION |
|---|---|---|---|---|
| | #1 | VIOLATE PROMISE TO APPEAR | TRAFFIC MISDEMEANOR | GUILTY |
| | | | | |

| CASE DISPOSITION: | DATE: | 12/20/2018 | DISPOSITION: | GUILTY |
|---|---|---|---|---|

| CASE SENTENCING: | OTHER: | $250 FINES/FEES/COSTS; PAID IN FULL |
|---|---|---|

**FEDERAL CRIMINAL** - SOUTHERN DISTRICT

00476.118000008
NO RECORD FOUND

Appx_0039

| **SEARCH ID:** | 197363881 | | |
| --- | --- | --- | --- |
| **SEARCH TYPE:** | FEDERAL CRIMINAL | | |
| **STATUS/RESULT:** | NO RECORD FOUND | | |
| **STATE/COUNTY:** | TX / SOUTHERN DISTRICT | | |
| **COMPLETION DATE:** | 2021-02-18 | | |
| **NAME(S) SEARCHED:** | **Last Name** | **First Name** | **Middle Name** |
| | Smith | Caylee | Erin |

**RESULT NOTE:**

```
32 - No of Years Searched / 32 - No of Years Requested
```

## FEDERAL CRIMINAL - SOUTHERN DISTRICT

NO RECORD FOUND

| **SEARCH ID:** | 197363883 | | |
| --- | --- | --- | --- |
| **SEARCH TYPE:** | FEDERAL CRIMINAL | | |
| **STATUS/RESULT:** | NO RECORD FOUND | | |
| **STATE/COUNTY:** | OH / SOUTHERN DISTRICT | | |
| **COMPLETION DATE:** | 2021-02-18 | | |
| **NAME(S) SEARCHED:** | **Last Name** | **First Name** | **Middle Name** |
| | Smith | Caylee | Erin |

**RESULT NOTE:**

```
33 - No of Years Searched / 33 - No of Years Requested
```

## FEDERAL CRIMINAL - EASTERN DISTRICT

NO RECORD FOUND

| **SEARCH ID:** | 197363885 | | |
| --- | --- | --- | --- |
| **SEARCH TYPE:** | FEDERAL CRIMINAL | | |
| **STATUS/RESULT:** | NO RECORD FOUND | | |
| **STATE/COUNTY:** | TX / EASTERN DISTRICT | | |
| **COMPLETION DATE:** | 2021-02-18 | | |
| **NAME(S) SEARCHED:** | **Last Name** | **First Name** | **Middle Name** |
| | Smith | Caylee | Erin |

00476.118000009

Appx_0040

```
36 - No of Years Searched / 36 - No of Years Requested
```

## EMPLOYMENT - EMERGENT PROFESSIONAL RESOURCES                    **COMPLETED - DISCREPANCY FOUND**

| | |
|---|---|
| **SEARCH ID:** | 197342401 |
| **SEARCH TYPE:** | EMPLOYMENT VERIFICATION |
| **STATUS/RESULT:** | COMPLETED |
| **COMPLETION DATE:** | 2021-02-22 |

### RESULT NOTE:

```
Digital Disclosure & Authorization In-House.
```

| **Provided by Candidate/Employee:** | | **Employer Response:** | |
|---|---|---|---|
| **Employer:** | EMERGENT PROFESSIONAL RESOURCES | Verified. | EMERGENT PROFESSIONAL RESOURCES |
| **Supervisor:** | Not Given | Unable To Verify. | |
| **Phone:** | +12818546000 | - | |
| **Address:** | 11767 Katy fwy #411, Houston, TX 77079 | - | |
| **Duration:** | From 01/2020 To 07/2020 | **Discrepancy Found:** | From 01/2020 to 06/2020 |
| **Position:** | ASSOCIATE RECRUITER | Verified. | Associate Recruiter |
| **Reason For Leaving:** | Not Given | Unable To Verify. | |
| **Name While Employed:** | | Caylee Smith | |
| **Is this person eligible for rehire?** | | Unknown | |

### HISTORY OF ATTEMPTS:

| # | Date | Method | Type | Number/Email | Contact | Comments |
|---|---|---|---|---|---|---|
| 1 | 02/19/21 09:41 | CALL | PHONE | 1 281-854-6000 | GENERAL<br><br>GENERAL VOICEMAIL | Left message, Contact is unavailable/Out of Office |
| 2 | 02/22/21 12:50 | CALL | PHONE | (281) 854-6001 | TRACI SALCIDO<br><br>OFFICE MANAGER | Closing request, Received Result |

**00476.118000010**

**EMPLOYMENT** - PARK WEST APARTMENTS    `COMPLETED - DISCREPANCY FOUND`

| | |
|---|---|
| **SEARCH ID:** | 197342402 |
| **SEARCH TYPE:** | EMPLOYMENT VERIFICATION |
| **STATUS/RESULT:** | COMPLETED |
| **COMPLETION DATE:** | 2021-02-22 |

**RESULT NOTE:**

Digital Disclosure & Authorization In-House.

| **Provided by Candidate/Employee:** | | **Employer Response:** | |
|---|---|---|---|
| **Employer:** | PARK WEST APARTMENTS | **Developed Information:** | SERVITAS |
| **Supervisor:** | Not Given | Unable To Verify. | |
| **Phone:** | +19793530042 | - | |
| **Address:** | 503 George bush dr, College Station, TX 77840 | - | |
| **Duration:** | From 06/2017 To 08/2019 | **Discrepancy Found:** | From 07/2017 to 01/2019 |
| **Position:** | LEASING AGENT | Verified. | Leasing Agent |
| **Reason For Leaving:** | Not Given | Unable To Verify. | |
| **Name While Employed:** | | Caylee Smith | |
| **Is this person eligible for rehire?** | | Unknown | |

**HISTORY OF ATTEMPTS:**

| # | Date | Method | Type | Number/Email | Contact | Comments |
|---|---|---|---|---|---|---|
| 1 | 02/19/21 09:16 | CALL | PHONE | 1 979-353-0042 | JAY COMMUNITY ASSISTANT | Spoke To, Contact requested follow-up phone call |
| 2 | 02/19/21 10:34 | CALL | PHONE | 1 979-353-0042 | DAVID DIRECTOR | Spoke To, Gave alternative contact number |
| 3 | 02/19/21 10:34 | CALL | PHONE | 1 972 759 1600 | GENERAL GENERAL VOICEMAIL | Left message, Contact is unavailable/Out of Office |
| 4 | 02/22/21 10:40 | CALL | PHONE | (972) 759-1643 | DIANA DIAZ DIRECTOR OF HUMAN | Closing request, Received Result |

**00476.118000011**

Appx_0042

## EMPLOYMENT - REVEILLE RANCH APARTMENTS

**COMPLETED - UNABLE TO VERIFY**

| | |
|---|---|
| **SEARCH ID:** | 197342403 |
| **SEARCH TYPE:** | EMPLOYMENT VERIFICATION |
| **STATUS/RESULT:** | COMPLETED |
| **COMPLETION DATE:** | 2021-02-22 |

### RESULT NOTE:

```
02/22/2021 11:16:20 [System]: Employment documents requested for verification.

Digital Disclosure & Authorization In-House.
```

| **Provided by Candidate/Employee:** | | **Employer Response:** | |
|---|---|---|---|
| **Employer:** | REVEILLE RANCH APARTMENTS | Unable To Verify. | REVEILLE RANCH APARTMENTS |
| **Supervisor:** | Not Given | Unable To Verify. | |
| **Phone:** | +19796916400 | - | |
| **Address:** | 3645 wellborn rd, Bryan, TX 77801 | - | |
| **Duration:** | From 01/2016 To 03/2017 | Unable To Verify. | |
| **Position:** | LEASING AGENT | Unable To Verify. | |
| **Reason For Leaving:** | Not Given | Unable To Verify. | |
| **Name While Employed:** | | Caylee Smith | |
| **Is this person eligible for rehire?** | | Unknown | |

### HISTORY OF ATTEMPTS:

| # | Date | Method | Type | Number/Email | Contact | Comments |
|---|---|---|---|---|---|---|
| 2 | 02/19/21 12:06 | CALL | PHONE | 979-691-6400 | NOT PROVIDED NOT PROVIDED | Spoke To, Contact requested follow-up phone call |
| 3 | 02/22/21 13:16 | CALL | PHONE | 979-691-6400 | WHITNEY COMMUNITY MANAGER | Closing Request, Unable to verify |

## EDUCATION - TEXAS A&M UNIVERSITY

**COMPLETED - DISCREPANCY FOUND**

| | |
|---|---|
| **SEARCH ID:** | 197342400 |

**00476.118000012**

Appx_0043

**SEARCH TYPE:** EDUCATION VERIFICATION

**STATUS/RESULT:** COMPLETED

**COMPLETION DATE:** 2021-02-19

---

**RESULT NOTE:**

Digital Disclosure & Authorization In-House.

---

| Provided by Candidate/Employee: | | School/InstitutionResponse: | |
|---|---|---|---|
| **School Name:** | TEXAS A&M UNIVERSITY | Verified. | |
| **Address:** | College Station, TX, US | - | |
| **Start Date:** | 08/2015 | **Discrepancy Found:** | 05/2017 |
| **End Date:** | 12/2019 | Verified. | |
| **Graduated?** | Yes | Verified. | YES |
| **Graduation Date:** | 12/2019 | Verified. | |
| **Degree Earned:** | Bachelors | Verified. | |
| **Major:** | Human Resource Development | Verified. | |
| **Name While Attended:** | | Caylee Smith | |

---

**NOTE:**

Subject's verification was performed through an automated system utilized by the school. No further information is available.

---

**HISTORY OF ATTEMPTS:**

| # | Date | Method | Type | Number/Email | Contact | Comments |
|---|---|---|---|---|---|---|
| 1 | 02/19/21 11:52 | EXTERNAL | Closing Request | EXTERNAL | | Received results via automated system |

---

**MOTOR VEHICLE REPORT** - TX                                    COMPLETED

**SEARCH ID:** 197363219

**SEARCH TYPE:** MOTOR VEHICLE REPORT

**STATUS/RESULT:** COMPLETED

**STATE/COUNTY:** TX / NONE

**COMPLETION DATE:** 2021-02-18

**DRIVERS REPORT :**

| Provided Information: | **00476.118000013** |
|---|---|

| | |
|---|---|
| **Name:** SMITH, CAYLEE ERIN | |
| **Date of Birth:** 05/17/1998 | |
| **DL#:** 37922703 | |
| **State Issue:** TX | |

**Returned Information:**

| | |
|---|---|
| **Name:** SMITH, CAYLEE ERIN | **Personal License Status:** VALID |
| **Date of Birth:** 05/17/1998 | **License Type:** PERSONAL |
| **Class Type:** C | **Commercial License Status:** NA / NONE |
| **Year Issued:** NA / NONE | **Motorcycle License Status:** NA / NONE |
| **Expiration Date:** 05/17/2022 | **Identification Status:** NA / NONE |
| **Original Issue Date:** 11/21/2013 | **Total State Points:** NA / NONE |

**Messages:**

```
THIS TYPE OF RECORD WILL NOT REFLECT COMPLETION OF A DRIVING
SAFETY COURSE.
THIS RECORD REFLECTS CONVICTIONS AND CRASH INVOLVEMENTS THAT
ARE ALLOWED TO BE DISPLAYED BY LAW.
EXPIRATION DATES IN THIS DOCUMENT MAY HAVE BEEN EXTENDED PURSUANT TO EXECUTIVE
OR LEGISLATIVE ACTION OF THE ISSUING JURISDICTION RELATED TO COVID-19.
PLEASE CONSULT WITH THE JURISDICTION FOR FURTHER DETAILS.
```

**ELECTRONIC SUBJECT NOTIFICATION**   COMPLETED

| | |
|---|---|
| **SEARCH ID:** | 197626351 |
| **SEARCH TYPE:** | Electronic SUBJECT NOTIFICATION |
| **STATUS/RESULT:** | COMPLETED |
| **COMPLETION DATE:** | 2021-02-23 |

**ELECTRONIC SUBJECT NOTIFICATION**   COMPLETED

| | |
|---|---|
| **SEARCH ID:** | 197626365 |
| **SEARCH TYPE:** | Electronic SUBJECT NOTIFICATION |
| **STATUS/RESULT:** | COMPLETED |
| **COMPLETION DATE:** | 2021-02-23 |

## ADJUDICATION                                    COMPLETED

**SEARCH ID:**            197342399

**SEARCH TYPE:**          ADJUDICATION

**STATUS/RESULT:**        COMPLETED

**COMPLETION DATE:**      2021-02-22

| Review Date | Grid Used | Reviewer | Result |
|---|---|---|---|
| 02/23/2021 12:00:00 PST | Client ADJ with Meets Req | Mallory Hubbard | Meets Requirements |

## NATIONAL CRIMINAL DATABASE SEARCH              COMPLETED

**SEARCH ID:**            197342405

**SEARCH TYPE:**          NATIONAL CRIMINAL DATABASE SEARCH

**STATUS/RESULT:**        COMPLETED

**COMPLETION DATE:**      2021-02-18

**NAME(S) SEARCHED:**

| Last Name | First Name | Middle Name |
|---|---|---|
| Smith | Caylee | Erin |

**RESULT NOTE:**

The National Criminal search has been processed. The results, if any, are reflected in the applicable search(es). A new a la carte search has been added to this candidate's package.

## GLOBAL WATCH                                    NO RECORD FOUND

**SEARCH ID:**            197342406

**SEARCH TYPE:**          GLOBAL WATCH

**STATUS/RESULT:**        NO RECORD FOUND

**COMPLETION DATE:**      2021-02-18

**NAME(S) SEARCHED:**

| Last Name | First Name | Middle Name |
|---|---|---|
| Smith | Caylee | Erin |

## EMPLOYMENT DOCUMENT COLLECTION          COMPLETED - STOPPED - INFO NOT RECEIVED

00476.118000015

Appx_0046

**SEARCH ID:** 197544529

**SEARCH TYPE:** EMPLOYMENT DOCUMENT COLLECTION

**STATUS/RESULT:** COMPLETED

**COMPLETION DATE:** 2021-02-22

---

**RESULT NOTE:**

```
02/22/21 11:22Other Information Needed  email sent to requestor mmhubbard@eastman.com.
02/22/21 11:22Other Information Needed  email sent to candidate caylee3435@gmail.com.
W2 for EMP Search ID: 197342403, employer: REVEILLE RANCH APARTMENTS, duration: From 01/2016
To 03/2017.
```

---

**Common Terms Used on a Background Report**

If you have any questions or concerns regarding the terms and/or court included above, please visit the following website and click on Glossary of Terms:

https://get.accurate.com/glossary-of-terms.html

This report is provided to users with the understanding that the tenets of the Fair Credit Reporting Act and corresponding state laws are to be strictly observed. Although this information is obtained from reliable sources, accuracy of the information provided is not guaranteed. This report is confidential and intended only for the above mentioned requestor.

Accurate Background
7515 Irvine Center Dr.
Irvine, CA 92618
Phone: 800-216-8024
Fax: 800-784-3593

## AUTOMOBILE LOSS NOTICE

| | |
|---|---|
| **PRODUCER:** The CEI Group<br>Bucks County Technology Park<br>4850 Street Road Tower 1 Building<br>Trevose, PA 19053<br>USA | **REPORT DATE:** 6/1/2021 5:21 PM<br>**DATE/TIME OF LOSS:** 6/1/2021 4:06 PM<br>**WEEKDAY OF LOSS:** Tuesday<br>**EMPLOYEE :** Smith, Caylee<br>**DRIVER:** Smith, Caylee (Employee) |
| **CLIENT:** Eastman Chemical Company - 2196<br>**BRANCH:** Account: 14200-Eastman Chemical Marketing | **CLAIM CONTACT:**<br>**PHONE:**<br>**CLIENT CLAIM #:**<br>**COST CENTER:** |

## LOSS NOTICE INFORMATION

| LOCATION OF ACCIDENT | |
|---|---|
| **STREET:** Mopac 1 Highway | **AUTHORITY CONTACTED:** |
| **INTERSECTION:** exit 237a | **POLICE PHONE #:** |
| **CITY, STATE/PROVINCE:** Austin, TX | **REPORT #:** |
| **COUNTY:** Travis | **OFFICER'S NAME:** |

| WEATHER | ROAD CONDITIONS | TRAFFIC CONTROLS | SPEED LIMIT | TRAVELING SPEED | DIRECTION OF TRAVEL |
|---|---|---|---|---|---|
| Clear | Dry | None | 65 | 10 | North |

### DESCRIPTION OF ACCIDENT

I was traveling North on Mopac 1 Highway in Austin Tx when the vehicle in front of me slammed on their brakes. I was not able to stop in time and I struck the rear of that vehicle.

| VIOLATIONS / CITATIONS ISSUED | DUI | INS VEH / OTHER VEH | VEHICLE DRIVER |
|---|---|---|---|
| *No Items Recorded.* | *No Items Recorded.* | *No Items Recorded.* | *No Items Recorded.* |

| ACCIDENT CODE | ACCIDENT TYPE |
|---|---|
| Our Driver Hit Other Vehicle | Rear Ended Other Vehicle |

## INSURED VEHICLE

| **VEH#** 1 **YEAR** 2021 | **MAKE:** Ford<br>**MODEL:** Explorer<br>**COLOR:** White | **BODY TYPE:** SUV<br>**VIN: 1FMSK7DH7MGB01430**<br>**MILEAGE/KM:** 8,500 Miles | **PLATE:** PKP6954<br>**STATE/PROVINCE:** TX<br>**Unit Number:** E22212 |
|---|---|---|---|

| **EMPLOYEE**<br>Smith, Caylee<br>13339 Hidden Manor Ct<br>Willis, TX 773185820 | **PHONE**<br>(W-Cell): (512) 202-5811<br>(W): (936) 232-6471<br>(Email): | **DRIVER'S LICENSE #:** xxxxx<br>**DRIVER'S LICENSE STATE/PROVINCE:** xx<br>**DATE OF BIRTH:** xxxxx<br>**HIRE DATE:** xxxxx |
|---|---|---|

| **DRIVER**<br>Smith, Caylee<br>13339 Hidden Manor Ct<br>Willis, TX 773185820 | **PHONE**<br>(W-Cell): (512) 202-5811<br>(W): (936) 232-6471<br>(Email): | **RELATIONSHIP:** Employee<br>**DRIVER IN VEHICLE:** YES<br>**DRIVER'S LICENSE #:** xxxxxx<br>**DRIVER'S LICENSE STATE/PROVINCE:** xx<br>**WEARING SEATBELT?** YES<br>**USING CELL PHONE?** NO<br>**HANDS FREE CELL PHONE?** N/A<br>**DID AIRBAG DEPLOY?** NO<br>**PURPOSE OF USE:** Company |
|---|---|---|

| **PRIMARY IMPACT:** Front<br>**ADDITIONAL DAMAGE:** Passenger Side | **DRIVER DISPOSITION:** Unknown<br>**SUBROGATION:** NO |
|---|---|

**EXHIBIT E**

Appx_0048

| **OTHER ITEMS DAMAGED OR STOLEN** | | | |
|---|---|---|---|
| **Damaged Item(s)** | **Item Stolen?** | | **Damaged Amount(s)** |
| *No Items Recorded.* | | | |

| **PROPERTY DAMAGED/OTHER VEHICLES** | | | |
|---|---|---|---|
| **VEH# YEAR**<br>2    2014 | **MAKE:** HONDA<br>**MODEL:** CIVIC<br>**PLATE:** 29133DV | **INSURED:** YES<br>**INSURANCE COMPANY:** United Services<br>**INSURANCE AGENT:**<br>**INSURANCE PHONE:**<br>**POLICY #:** 013727183u 7114 9 | **ADJUSTER NAME:**<br>**ADDRESS:**<br>**FAX #:**<br>**INSURANCE CLAIM #:** |

| **OWNER   PHONE** | **OTHER DRIVER         PHONE** |
|---|---|
| Sister's<br>Car | Acosta, Hector          (W): (512) 905-9044<br>508 Caddolake Drive<br>Georgetown, TX<br>78628 |
| **PRIMARY IMPACT:**    Rear<br>**ADDITIONAL DAMAGE:** Drivers Side | **DIRECTION OF TRAVEL:** North |

| **THIRD PARTY PROPERTY** | | | |
|---|---|---|---|
| **NAME & ADDRESS** | **PHONE** | **OWNER ORGANIZATION** | **DESCRIPTION** |
| *No Items Recorded.* | | | |

| **INJURIES** | | | | | | | |
|---|---|---|---|---|---|---|---|
| **NAME & ADDRESS** | **PHONE** | **PED/VEH** | **VEHICLE OWNER** | **AGE** | **INJURY** | **AMBULANCE** | **EXTENT OF INJURY** |

| **PEDESTRIANS** | |
|---|---|
| **NAME & ADDRESS** | **PHONE** |
| *No Items Recorded.* | |

| **WITNESSES** | |
|---|---|
| **NAME & ADDRESS** | **PHONE** |
| *No Items Recorded.* | |

| **PASSENGERS** | | | |
|---|---|---|---|
| **NAME & ADDRESS** | **PHONE** | **INS VEH/OTHER VEH** | **VEHICLE OWNER** |
| *No Items Recorded.* | | | |

| | CLIENT REQUESTED DATA | DRIVER RESPONSE |
|---|---|---|
| 1. | CVN | |
| 2. | Customer Defined 1 | |
| 3. | Customer Defined 2 | 16559 |
| 4. | Customer Defined 3 | |
| 5. | Customer Defined 4 | |
| 6. | Supervisor Name | Alan Davis |
| 7. | Supervisor Contact Info | 8658985058 |
| 8. | Drivers Office Location | remote |
| 9. | Preventable | 2 |
| 10. | DRIVER | Smith, Caylee |
| 11. | Reported from Accident Scene | Yes |

*This is the extent of the information available at this time. For further information, please contact the driver/custodian of the insured vehicle.*

Copyright 2021, The CEI Group, Inc. Legally Privileged and Confidential. Any unauthorized use or distribution is prohibited.

Appx_0050

**State of Oklahoma**
MUNICIPAL COURT

## COUNTY OF PITTSBURG
## CITY OF SAVANNA, OK

D52175

**COMPLAINT - INFORMATION**

The undersigned, being duly sworn, upon his oath deposes and says that:

| on or about (date) | at (24 hour time) | at or near (location) |
|---|---|---|
| 4/20/2022 | 02:53 | U.S. HWY 69 SB AND HARRIS ST |

| County Number | 61 | 65 | East Control-Int. | | | North Location | |
|---|---|---|---|---|---|---|---|

within the city, county, and state aforesaid:

| Name (last, first, middle) | Phone Number |
|---|---|
| MORENO, EVELYN E. | (479) 313-3951 |

| Address |
|---|
| 614 CRYSTAL ST |

| City | State | Zip Code |
|---|---|---|
| LOWELL | AR | 72745 |

| Birthdate (mo.,day,yr.) | Height | Weight | Race | Sex | Class | Endorsements | CDL |
|---|---|---|---|---|---|---|---|

| Driver License Number | | Restrictions | Month / Year | State |
|---|---|---|---|---|
| | | | 10 / 2023 | AR |

| Employer | Did Unlawfully: | Operate | Park. | Other |
|---|---|---|---|---|
| | X | | | |

| Vehicle Make-Model | Year | Body Style-Color | Tag Number | Mo / Yr | State |
|---|---|---|---|---|---|
| TOYOTA - CAMRY | 2011 | 4D - BLK | 162ZNR | 9 / 2022 | AR |

| VIN | Commercial Vehicle | ACCIDENT: | | |
|---|---|---|---|---|
| | Haz. Mat. Placard | PI | PD | FATALITY |

and did then and there commit the following offense:

| SPEEDING | | | | | Pace | Radar | Lidar | Other |
|---|---|---|---|---|---|---|---|---|
| 56 MPH in 40 MPH Zone | Actual 62 MPH | | | | | X | | |

Other Violation:

D52175 - Statute/Ordinance # 47-11-801 B, C, E          Fine $: 196.00
SPEEDING (16-20 MPH OVER LMT) 11-801 B, C, E

**Contrary to Statute/Ordinance:**

I, the undersigned issuing officer, hereby certify and swear that I have read the foregoing information and know the facts and contents thereof and that the facts supporting the criminal charge stated therein are true.

| Signature of Officer | MORGAN | 904 |
|---|---|---|
| | Officer Last Name | Badge No. |

Sworn to and subscribed before me this _____ day of _____ , _____

My Commission Expires _____

Name and Title

Court Appearance: 6/15/2022 at 2:00 PM          (DPS USE)

**MUNICIPAL COURT**

| | Phone: | (918) 548-3332 |
|---|---|---|
| Address of Court: | Mail. Addr: | P.O. BOX 402 SAVANNA OK 74565 |
| | Phys. Addr: | 10 SOUTH MAIN ST SAVANNA OK 74565 |

Online Phone: (877) 591-8768
Pay online at: WWW.MYFINEPAYMENT.COM

NOTICE: Release upon personal recognizance based on a signed written promise to appear for arraignment is conditional and failure to timely appear for arraignment shall result in the suspension of the arrested person's driver license in Oklahoma, or in the nonresident's home state pursuant to the Nonresident Violator Compact.

WITHOUT ADMITTING GUILT, I promise to appear in said court and said time and place,

SIGNATURE: _____

(CHECK ONLY ONE BOX)

| Signed Personal Recognizance | Jail | Bond Attached | X Other |
|---|---|---|---|

| JUVENILE | Name of Parent Or Guardian | Phone |
|---|---|---|
| | Address | |

Officer's Remarks
NICE

| AREA: | X business | school | residential | rural | other |
|---|---|---|---|---|---|

| HIGHWAY TYPE: | 1 lane | 2 lane | 3 lane | X undivided | divided | 4 or more on/off ramp | 4 or more other |
|---|---|---|---|---|---|---|---|

---

*Right margin vertical text:* NAME: MORENO Last    EVELYN First    E Middle    Zip Code 72745    Home Phone # (479) 313-3951    D52175

---

## ABSTRACT OF COURT RECORD

**FORWARD TO ACCIDENT RECORDS, DEPARTMENT OF PUBLIC SAFETY**
P.O. Box 11415, Oklahoma City, OK 73136-0415

Case No. _____ Docket No. _____ Page No. _____

Arraignment Continued to: _____

### ENTRY OF APPEARANCE AND PLEA

I, the undersigned, do hereby enter my appearance on the complaint of the offense charged on the other side of this summons. I have been informed of my right to trial as provided by law.

☐ I do hereby waive my rights to a hearing by court or jury and PLEAD GUILTY to said offense as charged. I further agree to pay the penalty prescribed for my offense.

☐ I do hereby waive my rights to a hearing by court or jury and PLEAD NOLO CONTENDERE (No Contest) to said offenses as charged. I further agree to pay the penalty prescribed for my offense.

☐ I do hereby PLEAD NOT GUILTY to said offense as charged, posting amount designated below as my bond for appearance in court on: _____

Signature of Defendant: _____

Amount: $ _____ Date: _____

### PROSECUTOR'S ENDORSEMENT

The within complaint has been examined and there is probable cause for filing the same. Complaint filed:

Signature (Prosecuting Attorney: D.A.;   A.D.A.   )          Date

### COURT ORDERS

On (Date): _____

☐ Charge Amended to _____

Non Conviction Based Upon:

☐ Court (Jury) Acquittal          ☐ Court Dismissal No Fine/Costs

☐ Deferred to Date _____          ☐ Court Dismissal With Fine/Costs

Date of Order _____

Conviction Based Upon:

☐ Bond Forfeiture          ☐ Plea of Guilty

☐ Plea of Nolo Contendere          ☐ Court (Jury) Conviction

Conviction Date _____

The Court, therefore, enters the following order:

Fine: $ _____ Costs: $ _____

Jailed _____ days in _____

School _____ days; Probation _____ days; Defendant notified of his rights _____

Appeal Bond of $ _____ filed _____

Appeal to _____ Court.

I Certify This To Be A True And Correct Abstract Of Court Record

_____
Signature of:

☐ Judge   ☐ Clerk   ☐ Deputy Clerk

---

## EXHIBIT F

# Incident Report #2200089

**RICHLAND POLICE DEPARTMENT**
103 W. MAIN ST.
PO BOX 179
RICHLAND, TX 76681
(430)360-1109

## Event Info

| Date Reported | Time Reported | | Time Dispatched | | Time Arrived | | Time Completed |
|---|---|---|---|---|---|---|---|
| 04/30/2022 | 15:51 | | 15:53 | | 15:55 | | 18:02 |

| Addr. of Occ. | City | Zipcode | Mile Post | District | Grid | | How Reported |
|---|---|---|---|---|---|---|---|
| S IH-45 SB | ANGUS | 76681 | 223 | ANGUS | CITY OF ANGUS | | 911 |

| Dispatch Disposition |
|---|
| RPT |

## Classification

| Class | Subclass |
|---|---|
| TRAFFIC ACCIDENT | Traffic Accident, Fatal |

## Deceased

| Name Type | Name | | Address | City |
|---|---|---|---|---|
| DECEASED | PIVARAL-SANTOS, NEHEMIAS RODERICO | | | FAYETTEVILLE |

| State | Zip | Sex | Race | EO | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|
| AR | | M | WHITE | HISPANIC | 505 | 130 | BLK | BRO |

## Witness

| Name Type | Name | Address | City | State | Zip | Sex |
|---|---|---|---|---|---|---|
| WITNESS | MORENO, EVELYN | | | AR | | F |

| Race | EO | Height | Weight | Hair | Eyes | Cell Phone |
|---|---|---|---|---|---|---|
| WHITE | HISPANIC | 411 | 170 | BLK | BRO | |

| Marital Status |
|---|
| MARRIED |

## Witness

| Name Type | Name |
|---|---|
| WITNESS | DIAZ, MELVIN |

## Witness

| Name Type | Name | Cell Phone |
|---|---|---|
| WITNESS | REGALADO, DINA | |

## Witness

| Name Type | Name | Cell Phone |
|---|---|---|
| WITNESS | PIVARAL, ERIC | |

## Driver

| Name Type | Name | Address | City | | State | Zip |
|---|---|---|---|---|---|---|
| DRIVER | SMITH, CAYLEE ERIN | | | | TX | |

| Sex | Race | EO | Height | Weight | Hair | Eyes | Cell Phone |
|---|---|---|---|---|---|---|---|
| F | WHITE | NON-HISPANIC | 505 | 130 | BLN | HAZ | |

## Vehicle

**EXHIBIT G**

00476.118000463

Appx_0052

1/3

| Record Type | Date Reported | Status | Year | Make | Model |
|---|---|---|---|---|---|
| TYPE LOSS-UNKNOWN | 04/30/2022 | RELEASED | 2011 | TOYT | CAMRY |

| Style | Color | Vehicle Classification | Release Date |
|---|---|---|---|
| 4 DOOR SEDAN AUTOMOBILE | BLK | TRAFFIC ACCIDENT - Traffic Accident, Fatal | 04/30/2022 |

| Vehicle Owner |
|---|
| MORENO, EVELYN (WITNESS) |

## Vehicle

| Record Type | Date Reported | Status | Year | Make |
|---|---|---|---|---|
| TYPE LOSS-UNKNOWN | 04/30/2022 | POLICE TOW | 2021 | FORD |

| Model | Style | Color | Vehicle Classification |
|---|---|---|---|
| EXPLORER | SUV | WHI | TRAFFIC ACCIDENT - Traffic Accident, Fatal |

| Vehicle Owner |
|---|
| SMITH, CAYLEE ERIN (DRIVER) |

## Narrative

| Written By | Date Written |
|---|---|
| LEE-WINSTON, DANIELLE | 05/02/2022 |

On Saturday, April 30, 2022, I Corporal Lee-Winston #102, with the Richland Police Department was dispatched at approximately 1553 hours, to a major traffic accident that happened near the 223-224 North Interstate 45, Angus, Navarro County, Texas, 75110. Dispatch initially advised that a person was ejected.

Upon my arrival on scene, I contacted unidentified Hispanic and white males who advised that the victim, later identified as Nehemias Pivaral-Santos (H/M DOB          ) had been hit by a vehicle.  The witnesses left the scene prior to being identified. I asked everyone that was currently on scene if they had seen the vehicle, and everyone stated they did not. The unidentified males stated they did not see the incident happen they had just come up after things happened. The car was partially in the roadway belonged to the victim and his family. The car was later identified as a black 2011 Toyota Camry bearing Arkansas plate          . While speaking to dispatch the family covered the body so that it was not visible to passing motorist.

I saw the victim, Nehemias, laying on the ground likely deceased.  I could see brain matter spread around the victim with pooled blood at his head surrounding him. The victim's right leg was obviously broken and both shoes were knocked off.  The shoes bad been 100-150 yards away from the body. Nehemias was lying flat on his back with his right arm laying across his stomach.  Someone had put something, that looked like a towel to absorb the blood, coming from Nehemias' head in attempt to stop the bleeding from his head.

I relayed to Dispatch that the male was hit while changing a tire on his vehicle and advised that the other driver left the scene. Dispatch then advised that the other vehicle was a white Ford Explorer and the driver was waiting inside her vehicle just north of the accident. Dispatchers advised the person that hit the victim, had not left the scene she remaining in her car.

I made contact with a woman identified as Evelyn Moreno (H/F DOB          ), who was the wife of the deceased.  She stated that she and her husband were attempting to change their tire when a car came out of nowhere and hit her husband. Evelyn was unable to identify the vehicle. Evelyn explained that her husband was bent over inside the truck of the vehicle taking items out in preparation for the tire change when he was struck. Evelyn was standing to the left of her husband as she explained she could feel the impact as he was hit. She explained that after her husband was struck he fell onto her where they both fell to the ground.

I was getting the information from Evelyn of who the victim was and who was all involved when I heard the sirens of the fire department and Trooper White #1A502 arriving on scene. I directed the fire truck to an area near my patrol car that would hide the body from being seem by cars as they were passing by. Trooper White went to make contact the other party involved in the incident.

00476.118000464

Appx_0053

I went back to speak to Evelyn who stated that her husband, brother in law, identified as Eric Pivaral (H/M DOB _____ ), and two friends Dina Regalado (H/F DOB _____ ), and Melvin Diaz (H/M DOB _____ ) were all on vacation. They went to Houston and were headed back home, to Arkansas when the driver's side front tire on their vehicle popped as she was driving. Evelyn explained that she was in the left lane and could not switch lanes, the vehicle came to a stop and her and her husband got out of the vehicle to fix the tire as the others stayed inside the vehicle.

The driver that hit Nehemias, later identified as Caylee Smith (W/F DOB _____ ) told Trooper White that she was driving in the left lane and, when she looked over at her gps and looked back, she observed Nehemias in the roadway but, by then, it was too late to avoid the impact, she swerved but still hit the man. She was driving was a 2021 white Ford Explorer bearing Texas License Plate _____ .

Caylee stated to me that she was driving in the left lane when she saw a car that partially in the roadway, the victim was kneeling near the vehicle also in the roadway. She advised that she attempted to swerve but it was too late she had already hit the victim. She asked if the victim would be okay? When I told Caylee that the victim was not likely to survive, she said was sorry and repeated that she hadn't seen him in the roadway. I asked about what she had previously told Trooper White that she took her eyes from the roadway looking at her GPS. Caylee stated that she had momentarily looked at her GPS to see how far away she was, to get to her family. Caylee stated that when she looked back at the roadway she saw the vehicle sitting in the lane she was currently in when she went to swerve it was too late she had already struck the victim.

Based on witness interviews and my on-scene investigation, I concluded that a criminal offense had not occurred. There is reason to believe that Nehemias' presence in the roadway rendered a collision difficult to avoid. However, Caylee had possibly failed to control her speed and was distracted by her GPS. I observed no skid marks in the roadway indicating that Caylee attempted to stop the vehicle prior to impact. Caylee's vehicle struck Nehemias, causing him to become airborne where he his body hit his vehicle. Later falling onto his wife, where they both fell to the ground where his body was found upon my arrival. Caylee immediately called 911 after the incident took place. She stayed on scene until Trooper White contacted her and identified who she was. Nehemias and his vehicle was partially in the roadway when he was struck.

I obtained a written statement from Evelyn on scene and Caylee later provided hers via e-mail. Judge Jordan arrived on scene and pronounced a time of death at approximately 1606 hours. Griffin-Roughton Funeral Home arrived and removed the body from the roadway. The victim's wife was provided with funeral home information.

I filed a Texas Peace Officer's Crash Report (CR-3).

Caylee represented that she was not in a position to drive her vehicle. Troopers on scene escorted Caylee and the vehicle she was driving off the Interstate. B&W Towing were summoned to the location to remove the Explorer to their impound lot in Corsicana for safekeeping.

I further documented this investigation on my body-worn camera and the patrol unit's in-car camera system. I can confirm that this narrative accurately details those captured events.

Corporal Lee-Winston

## Case Management

| Initial Investigator | Report Status | Approved By | Date Approved |
|---|---|---|---|
| LEE-WINSTON, DANIELLE | Approved | LEE-WINSTON, DANIELLE | 05/04/2022 15:18 |



**Texas Department of Transportation**

125 EAST 11TH STREET, AUSTIN, TEXAS 78701-2483 | 512.463.8588 | WWW.TXDOT.GOV

Mon, 16 May 2022

STATE OF TEXAS §

This is to certify that I, Jim Hollis, am employed by the Texas Department of Transportation (Department); that I am the Custodian of Motor Vehicle Crash Records for such Department; that the attached is a true and correct copy of the peace officer's report filed with the Department referred to in the attached request with the crash date of Sat, 30 April 2022, which occurred in Navarro County; that the investigations of motor vehicle crashes by peace officers are authorized by law; that this Texas Peace Officer's Crash Report is required by law to be completed and filed with this Department; that this report sets forth matters observed pursuant to duty imposed by law as to which matters there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law.



Jim Hollis
Director, Crash Data & Analysis Section
125 East 11th Street
Austin, TX 78701-2483
1-844-274-7457

OUR VALUES: *People • Accountability • Trust • Honesty*
OUR MISSION: *Connecting You With Texas*

An Equal Opportunity Employer

**EXHIBIT**

**H**

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 60 of 2460   PageID 352

☒ FATAL ☐ CMV ☐ SCHOOL BUS ☐ RAILROAD ☐ MAB ☐ SUPPLEMENT ☐ ACTIVE SCHOOL ZONE

| Total Num. Units | 3 | Total Num. Prsns. | 5 | TxDOT Crash ID | 18887599.1 /2022202671 |

## Texas Peace Officer's Crash Report (Form CR-3 1/1/2018)

Mail to: Texas Department of Transportation, Crash Data and Analysis, P.O. Box 149349, Austin, TX 78714.  Questions? Call 844/274-7457
Refer to Attached Code Sheet for Numbered Fields
*=These fields are required on all additional sheets submitted for this crash (ex.: additional vehicles, occupants, injured, etc.).

Page 1 of 4

**IDENTIFICATION & LOCATION**

*Crash Date (MM/DD/YYYY) 04 / 30 / 2022   *Crash Time (24HRMM) 1 5 5 1   Case ID 2200089   Local Use NCSP CFS C22-09791

*County Name NAVARRO   *City Name ANGUS   ☐ Outside City Limit

In your opinion, did this crash result in at least $1,000 damage to any one person's property? ☒ Yes ☐ No   Latitude (decimal degrees) .   Longitude — (decimal degrees) .

**ROAD ON WHICH CRASH OCCURRED**

*1 Rdwy. Sys. IH   *Hwy. Num. 45   2 Rdwy. Part 1   Block Num. 223   3 Street Prefix N   *Street Name IH-45   4 Street Suffix

☐ Crash Occurred on a Private Drive or Road/Private Property/Parking Lot   ☐ Toll Road/ Toll Lane   Speed Limit 75   Const. Zone ☐ Yes ☒ No   Workers Present ☐ Yes ☒ No   Street Desc. 223 Mile Marker

**INTERSECTING ROAD, OR IF CRASH NOT AT INTERSECTION, NEAREST INTERSECTING ROAD OR REFERENCE MARKER**

At Int. ☐ Yes ☒ No   1 Rdwy. Sys. IH   Hwy. Num. 45   2. Rdwy. Part 1   Block Num. 100   3 Street Prefix   Street Name Story   4 Street Suffix LN

Distance from Int. or Ref. Marker 0.2   ☐ FT ☒ MI   3 Dir. from Int. or Ref. Marker N   Reference Marker   Street Desc.   RRX Num.

**VEHICLE, DRIVER, & PERSONS**

Unit Num. 1   5 Unit Desc. 1   ☐ Parked Vehicle   ☐ Hit and Run   LP State TX   LP Num. PKP6954   VIN 1 F M S K 7 D H 7 M G B 0 3 5

Veh. Year 2 0 2 1   6. Veh. Color WHI   Veh. Make FORD   Veh. Model EXPLORER   7 Body Style SV   ☐ Pol, Fire, EMS on Emergency (Explain in Narrative if checked)

8 DL/ID Type 1   DL/ID State TX   DL/ID Num. 37922703   9 DL Class C   10 CDL End.   11 DL Rest. 96   DOB (MM/DD/YYYY) 0 5 / 1 7 / 1 9 8

Address (Street, City, State, ZIP) 151 Wood Hvn  Livingston, TX 77351

| Person Num. | 12 Prsn. Type | 13 Seat Position | Name: Last, First, Middle — Enter Driver or Primary Person for this Unit on first line | 14 Injury Severity | Age | 15 Ethnicity | 16 Sex | 17 Eject. | 18 Restr. | 19 Airbag | 20 Helmet | 21 Sol. | 22 Alc. Spec. | Alc. Result | 23 Drug Spec. | 24 Drug Result | 25 Drug Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | Smith, Caylee Erin | N | 23 | W | 2 | 1 | 1 | 1 | 97 | N | 96 | | 96 | 97 | 97 |
| | | | | | | | | | | | | | Not Applicable - Alcohol and Drug Results are only reported for Driver/Primary Person for each Unit. | | | | |

☒ Owner ☐ Lessee   Owner/Lessee Name & Address Donlen Trust, 3000 Lakeside Dr STE 2  Bannockburn, IL 77318

Proof of Fin. Resp. ☒ Yes ☐ No   ☐ Expired ☐ Exempt   26 Fin. Resp. Type 2   Fin. Resp. Name Ace American Insurance Company   Fin. Resp. Num. ISA H25313847

Fin. Resp. Phone Num. 877-945-7378   27 Vehicle Damage Rating 1 1 1 - F C - 3   27 Vehicle Damage Rating 2 -   Vehicle Inventoried ☒ Yes ☐ No

Towed By B&W Towing   Towed To B&W Towing

Unit Num. 2   5 Unit Desc. 4   ☐ Parked Vehicle   ☐ Hit and Run   LP State   LP Num.   VIN

Veh. Year   6. Veh. Color   Veh. Make   Veh. Model   7 Body Style   ☐ Pol, Fire, EMS on Emergency (Explain in Narrative if checked)

8 DL/ID Type 1   DL/ID State AR   DL/ID Num. 944814277   9 DL Class 98   10 CDL End. 96   11 DL Rest. 98   DOB (MM/DD/YYYY) 0 8 / 1 1 / 2 0 0 2

Address (Street, City, State, ZIP) 1324 E Fairline ST Fayetteville, AR 72701

| Person Num. | 12 Prsn. Type | 13 Seat Position | Name: Last, First, Middle — Enter Driver or Primary Person for this Unit on first line | 14 Injury Severity | Age | 15 Ethnicity | 16 Sex | 17 Eject. | 18 Restr. | 19 Airbag | 20 Helmet | 21 Sol. | 22 Alc. Spec. | Alc. Result | 23 Drug Spec. | 24 Drug Result | 25 Drug Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 4 | 16 | Pivarl-Santos, Nehemias Roderico | K | 19 | H | 1 | 97 | 97 | 97 | 97 | Y | 96 | | | | |
| | | | | | | | | | | | | | Not Applicable - Alcohol and Drug Results are only reported for Driver/Primary Person for each Unit. | | | | |

☐ Owner ☐ Lessee   Owner/Lessee Name & Address

Proof of Fin. Resp. ☐ Yes ☐ No   ☐ Expired ☐ Exempt   26 Fin. Resp. Type   Fin. Resp. Name   Fin. Resp. Num.

Fin. Resp. Phone Num.   27 Vehicle Damage Rating 1 -   27 Vehicle Damage Rating 2 -   Vehicle Inventoried ☐ Yes ☐ No

Towed By   Towed To

Copy from Custodial File

0047L110000469
Appx 0056

Case ID 2200089

Case 3:22-cv-02714-K  Document 49  Filed  Page ID 353
Page 61 of 2460

TxDOT Crash ID 18887599.1/2022202671

## DISPOSITION OF INJURED/KILLED

| Unit Num. | Prsn. Num. | Taken To | Taken By | Date of Death (MM/DD/YYYY) | Time of Death (24HR:MM) |
|---|---|---|---|---|---|
| 2 | 1 | Griffin- Roughton Funeral Home | Griffin- Roughton Funeral Home | 04/30/2022 | 1 6 0 6 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## CHARGES

| Unit Num. | Prsn. Num. | Charge | Citation/Reference Num. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

## DAMAGE

| Damaged Property Other Than Vehicles | Owner's Name | Owner's Address |
|---|---|---|
| | | |
| | | |

## CMV

| Unit Num. | □ 10,001+ LBS. | □ TRANSPORTING HAZARDOUS MATERIAL | □ 9+ CAPACITY | CMV Disabling Damage? □ Yes □ No | 28 Veh. Oper. | 29 Carrier ID Type | Carrier ID Num. | |
|---|---|---|---|---|---|---|---|---|

| Carrier's Corp. Name | | Carrier's Primary Addr. | | | | | 30 Veh. Type |
|---|---|---|---|---|---|---|---|

| 31 Bus Type | □ RGVW □ GVWR | HazMat Released □ Yes □ No | 32 HazMat Class Num. | HazMat ID Num. | | 32 HazMat Class Num. | HazMat ID Num. | 33 Cargo Body Type |
|---|---|---|---|---|---|---|---|---|

| Unit Num. | □ RGVW □ GVWR | 34 Trlr. Type | CMV Disabling Damage? □ Yes □ No | Unit Num. | □ RGVW □ GVWR | 34 Trlr. Type | CMV Disabling Damage? □ Yes □ No |
|---|---|---|---|---|---|---|---|

| Sequence Of Events | 35 Seq. 1 | 35 Seq. 2 | 35 Seq. 3 | 35 Seq. 4 | Intermodal Shipping Container Permit □ Yes □ No | Actual Gross Weight | Total Num. Axles |
|---|---|---|---|---|---|---|---|

## FACTORS & CONDITIONS

| | 36 Contributing Factors (Investigator's Opinion) | | | 37 Vehicle Defects (Investigator's Opinion) | | Environmental and Roadway Conditions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit # | Contributing | May Have Contrib. | | Contributing | May Have Contrib. | 38 Weather Cond. | 39 Light Cond. | 40 Entering Roads | 41 Roadway Type | 42 Roadway Alignment | 43 Surface Condition | 44 Traffic Control |
| 1 | 20 | 22 | | | | 1 | 1 | 97 | 3 | 1 | 1 | 11 |
| 2 | 55 | 98 | | | | | | | | | | |

## NARRATIVE AND DIAGRAM

**Investigator's Narrative Opinion of What Happened**
**(Attach Additional Sheets if Necessary)**

U1 NB IH-45 at the 223 inside lane. U3 was disabled in the inside lane ahead of U1. U2 standing in the roadway near the back right tire. U1, possibly distracted by GPS use, struck U2 with U1 FL. The impact threw U2 into the BR of U3, causing damage. U2 came to rest in the roadway. U1 stopped ahead of the crash site and called 911. Photographs and witness information available.

Field Diagram - Not to Scale

Copy from Custodial File

## INVESTIGATOR

| Time Notified (24HR:MM) 1 5 5 3 | How Notified Dispatch Center | Time Arrived (24HR:MM) 1 5 5 5 | Report Date (MM/DD/YYYY) 05/02/2022 |
|---|---|---|---|

| Invest. Comp. ☒ Yes □ No | Investigator Name (Printed) Lee-Winston, Danielle | | ID Num. 102 |
|---|---|---|---|

| ORI Num. T X 1 7 1 7 1 0 0 | *Agency RICHLAND POLICE DEPARTMENT | | Service/Region/DA 0 1 |
|---|---|---|---|

☒ FATAL ☐ CMV ☐ SCHOOL BUS ☐ RAILROAD ☐ MAB ☐ SUPPLEMENT ☐ ACTIVE SCHOOL ZONE

Case 3:22-cv-02714-K Document 49 Filed 01/29/24 Page 62 of 2460 PageID 354

| Total Num. Units | 3 | Total Num. Prsns. | 5 | TxDOT Crash ID | 18887599.1 /2022202671 |

### Texas Peace Officer's Crash Report (Form CR-3 1/1/2018)

Mail to: Texas Department of Transportation, Crash Data and Analysis, P.O. Box 149349, Austin, TX 78714. Questions? Call 844/274-7457
Refer to Attached Code Sheet for Numbered Fields
*=These fields are required on all additional sheets submitted for this crash (ex.: additional vehicles, occupants, injured, etc.).

**IDENTIFICATION & LOCATION**

*Crash Date (MM/DD/YYYY) 0 4 / 3 0 / 2 0 2 2    *Crash Time (24HRMM) 1 5 5 1    Case ID 2200089    Local Use NCSP CFS C22-09791

*County Name NAVARRO    *City Name ANGUS    ☐ Outside City Limit

In your opinion, did this crash result in at least $1,000 damage to any one person's property? ☒ Yes ☐ No    Latitude (decimal degrees) __.__ *    Longitude — (decimal degrees) __.__ *

**ROAD ON WHICH CRASH OCCURRED**

*1 Rdwy. Sys. IH    *Hwy. Num. 45    2 Rdwy. Part 1    Block Num. 223    3 Street Prefix N    *Street Name IH-45    4 Street Suffix

☐ Crash Occurred on a Private Drive or Road/Private Property/Parking Lot    ☐ Toll Road/ Toll Lane    Speed Limit 75    Const. Zone ☐ Yes ☒ No    Workers Present ☐ Yes ☒ No    Street Desc. 223 Mile Marker

**INTERSECTING ROAD, OR IF CRASH NOT AT INTERSECTION, NEAREST INTERSECTING ROAD OR REFERENCE MARKER**

At Int. ☐ Yes ☒ No    1 Rdwy. Sys. IH    Hwy. Num. 45    2. Rdwy. Part 1    Block Num. 100    3 Street Prefix    Street Name Story    4 Street Suffix LN

Distance from Int. or Ref. Marker 0.2    ☐ FT ☒ MI    3 Dir. from Int. or Ref. Marker N    Reference Marker    Street Desc.    RRX Num.

**VEHICLE, DRIVER, & PERSONS**

Unit Num. 3    5 Unit Desc. 1    ☒ Parked Vehicle    ☐ Hit and Run    LP State AR    LP Num. 162ZNR    VIN 4 T 1 B F 3 E K 8 B R 2 1 2 3

Veh. Year 2 0 1 1    6. Veh. Color BLK    Veh. Make TOYOTA    Veh. Model CAMRY    7 Body Style P4    ☐ Pol, Fire, EMS on Emergency (Explain in Narrative if checked)

8 DL/ID Type    DL/ID State    DL/ID Num.    9 DL Class    10 CDL End.    11 DL Rest.    DOB (MM/DD/YYYY) __/__/__

Address (Street, City, State, ZIP)

| Person Num. | 12 Prsn. Type | 13 Seat Position | Name: Last, First, Middle / Enter Driver or Primary Person for this Unit on first line | 14 Injury Severity | Age | 15 Ethnicity | 16 Sex | 17 Eject. | 18 Restr. | 19 Airbag | 20 Helmet | 21 Sol. | 22 Alc. Spec. | Alc. Result | 23 Drug Spec. | 24 Drug Result | 25 Drug Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 4 | Regalado, Dina | N | 23 | H | 2 | 1 | 1 | 1 | 97 | N | | | | | |
| 2 | 2 | 5 | Diaz, Melvin | N | 21 | H | 1 | 1 | 1 | 1 | 97 | N | | | | | |
| 3 | 2 | 6 | Pivarl, Eric | N | 21 | H | 1 | 1 | 1 | 1 | 97 | N | | | | | |

*Not Applicable - Alcohol and Drug Results are only reported for Driver/Primary Person for each Unit.*

☒ Owner ☐ Lessee    Owner/Lessee Name & Address Sandoval, Gladis, 614 Crystal ST Lowell, AR 72745

Proof of Fin. Resp. ☒ Yes ☐ No    ☐ Expired ☐ Exempt    26 Fin. Resp. Type 2    Fin. Resp. Name PROGRESSIVE (COUNTY MUTUAL) INS. CO.    Fin. Resp. Num. 957252470

Fin. Resp. Phone Num. (800) 776-4737    27 Vehicle Damage Rating 1 5 - B R - 1    27 Vehicle Damage Rating 2    Vehicle Inventoried ☐ Yes ☒ No

Towed By Vehicle Released    Towed To Driven by occupants

---

Unit Num.    5 Unit Desc.    ☐ Parked Vehicle    ☐ Hit and Run    LP State    LP Num.    VIN

Veh. Year    6. Veh. Color    Veh. Make    Veh. Model    7 Body Style    ☐ Pol, Fire, EMS on Emergency (Explain in Narrative if checked)

8 DL/ID Type    DL/ID State    DL/ID Num.    9 DL Class    10 CDL End.    11 DL Rest.    DOB (MM/DD/YYYY)

Address (Street, City, State, ZIP)

| Person Num. | 12 Prsn. Type | 13 Seat Position | Name: Last, First, Middle / Enter Driver or Primary Person for this Unit on first line | 14 Injury Severity | Age | 15 Ethnicity | 16 Sex | 17 Eject. | 18 Restr. | 19 Airbag | 20 Helmet | 21 Sol. | 22 Alc. Spec. | Alc. Result | 23 Drug Spec. | 24 Drug Result | 25 Drug Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | |

*Not Applicable - Alcohol and Drug Results are only reported for Driver/Primary Person for each Unit.*

☐ Owner ☐ Lessee    Owner/Lessee Name & Address

Proof of Fin. Resp. ☐ Yes ☐ No    ☐ Expired ☐ Exempt    26 Fin. Resp. Type    Fin. Resp. Name    Fin. Resp. Num.

Fin. Resp. Phone Num.    27 Vehicle Damage Rating 1 - -    27 Vehicle Damage Rating 2    Vehicle Inventoried ☐ Yes ☐ No

Towed By    Towed To

Copy from Custodial File

0047IL118000471
Appx 0058

Case ID 2200089

TxDOT Crash ID 18887599.1/2022202671

Case 3:22-cv-02714-K Document 49 Filed 03/04/25 Page 63 of 2460 PageID 355

## DISPOSITION OF INJURED/KILLED

| Unit Num. | Prsn. Num. | Taken To | Taken By | Date of Death (MM/DD/YYYY) | Time of Death (24HR:MM) |
|-----------|-----------|----------|----------|---------------------------|------------------------|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## CHARGES

| Unit Num. | Prsn. Num. | Charge | Citation/Reference Num. |
|-----------|-----------|--------|-------------------------|
| | | | |
| | | | |
| | | | |

## DAMAGE

| Damaged Property Other Than Vehicles | Owner's Name | Owner's Address |
|--------------------------------------|--------------|-----------------|
| | | |
| | | |

## CMV

| Unit Num. | ☐ 10,001+ LBS. | ☐ TRANSPORTING HAZARDOUS MATERIAL | ☐ 9+ CAPACITY | CMV Disabling Damage? ☐ Yes ☐ No | 28 Veh. Oper. | 29 Carrier ID Type | Carrier ID Num. |

Carrier's Corp. Name | Carrier's Primary Addr. | 30 Veh. Type

31 Bus Type | ☐ RGVW ☐ GVWR | HazMat Released ☐ Yes ☐ No | 32 HazMat Class Num. | HazMat ID Num. | 32 HazMat Class Num. | HazMat ID Num. | 33 Cargo Body Type

Unit Num. | ☐ RGVW ☐ GVWR | 34 Trlr. Type | CMV Disabling Damage? ☐ Yes ☐ No | Unit Num. | ☐ RGVW ☐ GVWR | 34 Trlr. Type | CMV Disabling Damage? ☐ Yes ☐ No

Sequence Of Events | 35 Seq. 1 | 35 Seq. 2 | 35 Seq. 3 | 35 Seq. 4 | Intermodal Shipping Container Permit ☐ Yes ☐ No | Actual Gross Weight | Total Num. Axles

## FACTORS & CONDITIONS

| 36 Contributing Factors (Investigator's Opinion) | | | 37 Vehicle Defects (Investigator's Opinion) | | Environmental and Roadway Conditions | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit # | Contributing | May Have Contrib. | Contributing | May Have Contrib. | 38 Weather Cond. | 39 Light Cond. | 40 Entering Roads | 41 Roadway Type | 42 Roadway Alignment | 43 Surface Condition | 44 Traffic Control |
| | | | | | | | | | | | |

## NARRATIVE AND DIAGRAM

Investigator's Narrative Opinion of What Happened
(Attach Additional Sheets if Necessary)

Field Diagram - Not to Scale

Copy from Custodial File

## INVESTIGATOR

| Time Notified (24HR:MM) 1 5 5 3 | How Notified Dispatch Center | Time Arrived (24HRMM) 1 5 5 5 | Report Date (MM/DD/YYYY) 05/02/2022 |
|---|---|---|---|

Invest. Comp. ☒ Yes ☐ No | Investigator Name (Printed) Lee-Winston, Danielle | ID Num. 102

ORI Num. T X 1 7 1 7 0 0 | *Agency RICHLAND POLICE DEPARTMENT | Service/ Region/DA 0 1

00476.18890472
A68A_0059

**EASTMAN**

# STANDARD OPERATING PROCEDURE

| **Title:** SOP - GHSES - 01 - 09 - Defensive/Distracted Driving Policy | |
|---|---|
| **Initial Publication Date:** 11/12/2013 | **Last Reviewed Date:** 11/04/2022 |
| This Standard Operating Procedure supports AP – Employee Health and Safety Policy (700-01), Reference #1117. | |
| **Optional Reference:** 700-01-09 | |

## Purpose

Eastman Chemical Company is committed to promoting and protecting the health and safety of Eastman Team Members who are required to drive motor vehicles on public roadways in the conduct of company business. This policy has been established to reinforce the importance of defensive driving and to promote the reduction of distractions while driving, with particular emphasis on cell phone use.

Employees should be aware of common causes of distractions while driving and seek to minimize those distractions. Distractions include, but are not limited to: using mobile devices, computers, eating, drinking, talking with passengers, grooming, reading, using a navigation system, watching videos, adjusting vehicle equipment such as vehicle infotainment systems and climate controls.

## Scope

Except when explicitly prohibited by applicable federal, state or local law or collective bargaining agreements, this policy applies to all employees of Eastman Chemical Company and its subsidiaries who are engaged in driving motor vehicles (lease vehicle, company car, rental car, personal vehicle) on public roadways for the conduct of business for the company.

## Procedure
### Cell Phone Use While Driving

In recognition of particular hazards associated with cell phone use while driving, Eastman has adopted the following policy:

1. Use of a hand-held cell phone (including smart phones, tablets, or similar devices) for the conduct of company business while driving a motor vehicle is prohibited. This includes, but is not limited to, answering or making calls, engaging in phone conversations, texting, reading or responding to emails.

2. Use of voice-activated, hands-free devices is permissible provided that:
   - Use allows the driver to keep hands on the steering wheel and eyes on the road.
   - Use is limited to necessary calls and the duration of necessary calls is minimized. A driver should use sound judgment to make distraction-free, safe driving a priority at all times.
   - Teleconference calls are prohibited.
   - Use is curtailed when heavy traffic, hazardous road conditions or adverse weather is encountered.
   - The driver refrains from engaging in emotional or stressful conversations while driving.
   - Use is in accordance with applicable laws and regulations.

**Unrestricted Internal Use Only.**

**These documents are maintained in an electronic format.**

**Printed documents may not reflect current revisions.**

EXHIBIT
**I**

00476.118000848

Appx_0060

**EASTMAN**

# STANDARD OPERATING PROCEDURE

**Definitions**

None.

**Information Resources**

None.

**Reference Number:  1226**

| Changes from Previous Version: |
| --- |
| |

**Unrestricted Internal Use Only.**
**These documents are maintained in an electronic format.**
**Printed documents may not reflect current revisions.**   00476.118000849

Appx_0061

1              IN UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF TEXAS

ERICK RODERICO PIUARA           )
3  GONZALEZ, Individually        )
   and as Special                )
4  Administrator of the          )
   Estate of NEHEMIAS R.         )
5  PIVARAL SANTOS,               )
   DECEASED,                     )
6                                )
                 PLAINTIFFS,     )
7                                )
   VS.                           ) CASE NO.:
8                                ) 3:22-CV-02714-K
   CAYLEE ERIN SMITH and         )
9  EASTMAN CHEMICAL COMPANY,     )
                                 )
10               DEFENDANTS.     )

11

12        ----------------------------------

13        ORAL AND VIDEOTAPED DEPOSITION OF

14          DINA YAMILETH REGALADO SOTO

15                AUGUST 1, 2023

16        ----------------------------------

17     ORAL AND VIDEOTAPED DEPOSITION OF

18  DINA YAMILETH REGALADO SOTO, produced as a witness at

19  the instance of the DEFENDANTS, and duly sworn, was

20  taken in the above-styled and numbered cause on the

21  1st of August, 2023, from 4:43 p.m. to 6:04 p.m.,

22  before Jennifer Norman, CCR in and for the State of

23  Arkansas, reported by machine shorthand, at 410 North

24  Thompson Street, Suite B, Springdale, Arkansas 72764,

25  pursuant to the Federal Rules of Civil Procedure.





www.ArkansasRealtimeReporting.com

EXHIBIT
J

Appx_0062

PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
REGALADO SOTO, DINA on 08/01/2023
Case 3:23-cv-03211-TLB Document 49 Filed 03/29/24 Page 67 of 2460 PageID 359

2

```
1                    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3       Mr. Jacob White
        Taylor King Law, P.A.
4       410 North Thompson Street, Suite B
        Springdale, Arkansas 72764
5       (479) 935-8682
        Jacobwhite@taylorkinglaw.com
6
     FOR THE DEFENDANTS:
7
        Mr. Brian L. Bunt
8       FREEMAN MILLS PC
        2020 Bill Owens Parkway, Suite 200
9       Longview, Texas 75604
        (903) 295-7200
10      Bbunt@freemanmillspc.com

11   FOR THE WITNESS:

12      Ms. Morgan Woelke
        CJD LAW FIRM
13      111 West Emma Avenue
        Springdale, Arkansas 72764
14      (479) 717-2278

15
     THE INTERPRETER:
16      Ms. Ines Fernandez

17   ALSO PRESENT:
        Mrs. Stacey Bunt, CP, FREEMAN MILLS, PC
18

19

20

21

22

23

24

25
```



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0063

1                           **INDEX**

2                                               **PAGE**

3

4   Appearances......................................3

5   Stipulations....................................2

6

    Witness:  DINA YAMILETH REGALADO SOTO

7        Examination by Mr. Bunt...................4

8        Examination by Mr. White................35

9        Further Examination by Mr. Bunt.........38

10

11  Reporter's Certificate..................40-41

12

13                      **EXHIBITS**

    NO.            DESCRIPTION                    PAGE

14
    Exhibit 1      Notice of Deposition; Subpoena
15                 Duces Tecum......................18

16  Exhibit 2      Scene Photograph.................22

17  Exhibit 3      Photograph front of Camry.......22

18  Exhibit 4      Photograph trunk of Camry.......22

19  Exhibit 5      Photograph of Camry tire........22

20  Exhibit 6      Scene Photograph.................22

21  Exhibit 12     Marked-up diagram...............18

22

23

24

25



www.ArkansasRealtimeReporting.com

```
 1              * * * * * PROCEEDINGS * * * * *
 2              THE VIDEOGRAPHER:  We are now on the
 3         record.  Today's date is August 1st, 2023,
 4         and the time is 4:43.  This deposition is
 5         taking place at the Taylor King Law Firm in
 6         Springdale, Arkansas.  The deponent is
 7         Dina Regalado.  And if Counsel will
 8         introduce themselves, the interpreter and
 9         then the witness will then be sworn.
10              MR. WHITE:  Jacob White, counsel for
11         Plaintiff is present.
12              MR. BUNT:  Brian Bunt, counsel for
13         Defendants Caylee Smith and Eastman
14         Chemical.
15              MS. WOELKE:  Morgan Woelke, counsel for
16         Dina.
17              MS. FERNANDEZ:  Ines Fernandez,
18         certified Spanish interpreter.
19      (Whereupon, the interpreter was duly sworn.)
20          (Whereupon, the witness was duly sworn.)
21         DINA YAMILETH REGALADO SOTO,
22 having been first duly sworn, testified through the
23 duly sworn interpreter as follows:
24                    EXAMINATION
25 BY MR. BUNT:
```



1   Q.  Good afternoon, Ms. Regalado.  Would you please

2   state your full name -- full legal name for us?

3   A.  Dina Yamileth Regalado Soto.

4   Q.  For your last name, do you prefer to be called

5   Soto or Regalado?

6   A.  Soto.

7   Q.  Soto.  And, Ms. Soto, do you normally go by "Dina"

8   or "Yami"?

9   A.  Dina.

10  Q.  Dina.  And I have an address for you from the

11  interrogatories.  Tell us if this is correct:

12  1500 Backus Avenue, Springdale, Arkansas.

13  A.  Yes.

14  Q.  And were you living there in April of last year,

15  April 2022?

16  A.  Yes.  Yes.

17  Q.  Do others live with you at that address?

18  A.  Yes.

19  Q.  Who lives with you there?

20  A.  My sisters and my mother.

21  Q.  Is it a house or an apartment?

22  A.  House.

23  Q.  Does your mother own the house?

24  A.  No.

25  Q.  Does she rent the house?



```
 1  A.  No.  It's my sister's.

 2  Q.  Okay.  Okay.  What is your date of birth?

 3  A.  It is February 1st, '99.

 4  Q.  And where were you born?

 5  A.  In El Salvador.

 6  Q.  How long have you lived in the United States?

 7  A.  I don't remember.

 8  Q.  How old were you when you came to the United

 9  States?

10  A.  I don't remember very well.

11  Q.  Is it that you don't remember or you would just

12  prefer not to tell me?

13  A.  I don't remember very well.

14  Q.  Are you a United States citizen?

15            MS. WOLKE:  I'm going to object to that

16         on Fifth Amendment privilege grounds, and

17         I'm going to instruct Dina not to answer

18         that question.

19  Q.  Are you still a citizen of El Salvador?

20  A.  Yes.

21  Q.  Have you applied for residency in the United

22  States?

23            MS. WOLKE:  I'm going to -- sorry.

24         Could you repeat that question for me?

25            MR. BUNT:  I was asking if she had
```



```
 1                    applied for residency in the United States.
 2                    MS. WOLKE:  I'm going to object to that
 3              question, as well, on Fifth Amendment
 4              grounds.  And, Dina, I'm going to instruct
 5              you not to answer that.
 6                    THE WITNESS:  Okay.
 7   Q.  Ms. Regalado, are you married?
 8   A.  No.
 9   Q.  Do you have any children?
10   A.  Yes.
11   Q.  How many children do you have and their ages?
12   A.  One; three years old.
13   Q.  One; three years.  Okay.
14                    THE INTERPRETER:  May the interpreter
15              clarify?
16                    (Clarification in Spanish.)
17                    THE INTERPRETER:  Okay.
18   A.  I have one.  A three-year-old.
19   Q.  I understand.  What is your relationship with
20   Melvin Alexander Diaz?
21   A.  We live together.
22   Q.  Okay.  Is he the father of your child?
23   A.  Yes.
24   Q.  Okay.  Does he live there at Backus Avenue in
25   Springdale, also?
```



1  A.  Yes.

2  Q.  And can you tell me what school you have attended,

3  how many grades, how far you attended school?

4  A.  I would rather not talk about that.

5  Q.  All right.  Are you instructing her not to answer

6  that question, too?

7            MS. WOLKE:  Dina, I'm not instructing

8        you not to answer questions about school.

9            THE WITNESS:  But I would rather not.  I

10       don't want to talk about it.

11 Q.  Okay.  So I'm just trying to get an idea of your

12 education level, but are you refusing to tell me how

13 many years of school you have completed?

14 A.  No.

15 Q.  Then are you -- are you willing to tell me how

16 many years of school you've attended?

17 A.  Only to high school.  I don't remember anything

18 else.

19 Q.  Are you currently employed?

20 A.  No.

21 Q.  Did you previously work for Mr. Gonzalez?

22 A.  Yes.

23 Q.  And what kind of work did you do for Mr. Gonzalez?

24 A.  Painting.

25 Q.  And when did you last work for Mr. Gonzalez?



1   A.   So Friday.  Just this week I did.

2   Q.   Did you -- you quit working for him last Friday?

3   A.   I just asked him for some time off.

4   Q.   Okay.

5               MR. BUNT:  Give me one second.  We can

6          go off.  Okay.

7   Q.   Ms. Soto, do you have a Social Security number in

8   the United States?

9               MS. WOLKE:  I'm going to object to that

10          on Fifth Amendment grounds.  And, Dina, I'm

11          going to instruct you not to answer that

12          question.

13              MR. BUNT:  Okay.  I'm going to ask one

14          more question about it and you can object to

15          it if you wish.

16  Q.   I show a number of 119-65, beginning with those

17  six numbers.  Are you willing to tell me if those

18  numbers are correct?

19              MS. WOLKE:  Yeah, and I'm going to

20          object to that question, as well, on Fifth

21          Amendment grounds.  And, Dina, I would

22          advise you not to answer it.

23  Q.   Ms. Soto, did you have a cell phone in April of

24  2022?

25  A.   Yes.

1  Q.  Was that the number (479) 379-2615?

2  A.  Yes.

3  Q.  Who is the cell phone carrier for your phone?

4  A.  I did not understand your question.

5  Q.  On your phone, do you get a bill each month that

6  you have to pay?

7  A.  Yes.

8  Q.  Who do you get the bill from?

9  A.  My sister, or Cricket.

10  Q.  Cricket, okay.

11          All right.  Let's go to the day or so

12  before the accident.  Can you tell -- I'll tell you

13  what.  Let's go to the day of the accident.  Can you

14  tell us where the day began for you, Melvin Diaz,

15  Evelyn, Erick, and Nehemias?

16  A.  I would rather not talk about that.

17          MR. BUNT:  I mean, anything about the

18          trip is going to be admissible.  And, you

19          know, I really hate to have to go through

20          the Court to get an instruction for her to

21          answer that.  Do you want to talk with her

22          about it?

23          MS. WOLKE:  So, Dina, when we're talking

24          about, you know, what you were doing during

25          the day, when we're asking those questions,



```
 1              you are going to have to answer those

 2              questions.  I think what might be helpful as

 3              far as the form of the question goes, if we

 4              start with what she was doing specifically

 5              rather than the entire group.

 6                   So again, Dina, you are going to have to

 7              answer questions, but I will step in if need

 8              be.

 9                   THE WITNESS:  Okay.

10  Q.  Let me try it this way:  On the day that the

11  accident happened, what were you doing; where were you

12  going?

13    (Witness answered in Spanish.  The interpreter not

14         given opportunity to interpret answer.)

15                   MS. WOLKE:  So I am going to object to

16              that again on Fifth Amendment grounds, and I

17              would advise you not to answer that

18              question.

19                   MR. BUNT:  All right.  If we're not

20              going to be able to talk about the trip and

21              where we were going and all of that, I

22              guess, you know, we're going to have to --

23                   MR. WHITE:  Can we go off the record for

24              a second?

25                   MR. BUNT:  Yeah.
```



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
REGALADO SOTO, DINA on 08/01/2023
Case 3:23-cv-02711-K Document 49 Filed 03/29/24 Page 77 of 2460 PageID 369
12

```
 1                    THE VIDEOGRAPHER:  The time is four --
 2           5:00.  We're now off the record.
 3                    (Recess from 5:00 p.m. to 5:02 p.m.)
 4                    THE VIDEOGRAPHER:  The time is 5:02.
 5           We're now on the record.
 6  Q.  Ms. Soto, in April of 2022, you were living in
 7  Springdale, Arkansas; correct?
 8  A.  Yes.
 9  Q.  All right.  On the day of the accident, others
10  have testified that you and the others in Ms. Moreno's
11  car, the Toyota Camry, were traveling from Houston
12  back to Springdale; is that correct?
13  A.  Yes.
14  Q.  How had you gotten from Springdale down to
15  Houston?
16  A.  I don't remember.
17  Q.  When had you traveled from Springdale to Houston?
18  A.  Friday.
19  Q.  With whom did you travel from Springdale to
20  Houston?
21  A.  From Springdale to Houston?
22  Q.  Yes.
23  A.  Nehemias and Evelyn.
24  Q.  And what was your purpose for traveling from
25  Springdale to Houston?
```

1   A.   To pick up Melvin and Erick.

2   Q.   Okay.   How did you know Evelyn Moreno?

3   A.   We worked together.

4   Q.   Did Ms. Moreno also work for Mr. Santos, his

5   painting company?

6   A.   Yes.

7   Q.   Did Evelyn do painting also?

8   A.   Yes.

9   Q.   How long had you known Evelyn?

10  A.   I don't remember.

11  Q.   Does Evelyn speak English?

12  A.   Yes.

13  Q.   Does she speak English well?

14  A.   Yes.

15  Q.   Did Nehemias speak English?

16  A.   A little.

17  Q.   A little.   Were Nehemias and Evelyn boyfriend and

18  girlfriend?

19  A.   Yes.

20  Q.   Okay.   To your knowledge, they had never been

21  married?

22  A.   No.

23  Q.   Do you recall approximately what time the five of

24  you left Houston that day?

25  A.   I don't remember.



```
 1  Q.  Do you recall stopping anywhere at any time after
 2  you left Houston that day?
 3  A.  No, I don't remember.
 4  Q.  Who was driving the car?
 5  A.  Evelyn.
 6  Q.  Was she the only one that drove the car?
 7  A.  Yes.
 8  Q.  Ms. Soto, to your knowledge, had Evelyn at any
 9  time that day consumed any alcohol?
10  A.  No.
11  Q.  Was there any alcohol in the car?
12  A.  No.
13  Q.  To your knowledge, that day, had Evelyn used any
14  drugs, illegal drugs or prescription drugs, that
15  you're aware of?
16  A.  No.
17  Q.  To your knowledge, had Nehemias used any drugs
18  that day, either illegal drugs or prescription drugs
19  or over-the-counter drugs?
20  A.  No.
21  Q.  When you were traveling in the car, where were you
22  sitting?
23  A.  On the left side behind Evelyn.
24  Q.  Where was Nehemias sitting?
25  A.  Next to Evelyn.
```



1  Q.  In the front?

2  A.  Yes.

3  Q.  What do you remember, if anything, about the

4  traffic on the road that day?  Was it busy?  Light?

5  A.  Normal.

6  Q.  Did you pay any attention to the speed that Evelyn

7  was traveling?

8  A.  No.

9  Q.  Was she generally driving with the flow of the

10  cars around?

11  A.  I don't remember.

12  Q.  How long have you known Melvin Diaz?

13  A.  About six years.

14  Q.  Have the two of you -- how long have the two of

15  you been together as a couple?

16  A.  About five years.

17  Q.  By what name do you call him?

18  A.  Melvin.

19  Q.  Does he ever go by Alexander or Alex?

20  A.  Yes.

21  Q.  Which one of those?

22  A.  Alex.

23  Q.  Does he ever go by Alex Diaz or Alex Fuentes?

24  A.  Both.

25  Q.  Both.  When does he use Alex versus Melvin?



```
 1   A.  Well, with his friends.
 2   Q.  Okay.  Which one -- is one of the names more of a
 3   casual name that he uses with his friends; and if so,
 4   which one, Melvin or Alex?
 5   A.  Well, both.
 6   Q.  Okay.  Is there a name that he prefers between the
 7   two?
 8   A.  Melvin.
 9   Q.  Does Melvin speak English?
10   A.  No.
11   Q.  Ms. Soto, tell me what you remember about whenever
12   the tire failed on the car.  Tell us what you heard or
13   what you felt.
14   A.  I just felt the ring to hit the road.
15   Q.  Did you realize that a tire had blown out?
16   A.  Yes.
17   Q.  Had you ever been in a car before when a tire blew
18   out?
19   A.  No.
20   Q.  As soon as the tire blew out, tell us what
21   happened.  Did anybody in the car mention it or talk
22   about it or say, "We need to stop"?
23   A.  I don't remember.
24   Q.  What did Evelyn do?
25   A.  I don't remember.
```



1  Q.  Did she attempt to pull the car off the road?

2  A.  Yes.

3  Q.  Okay.  Do you know, which side of the road did she

4  pull the car?

5  A.  The left.

6  Q.  Do you know why she pulled to the left?

7  A.  She didn't have any other option.

8  Q.  Why do you say that?

9  A.  Because the tire blew up.  I mean, the car wasn't

10  giving her anything else to do.

11  Q.  I guess my question is:  Do you know why -- well,

12  let me back up.

13           Do you know what lane the car was in when

14  the tire blew out?

15  A.  Yes.

16  Q.  Which one?

17  A.  On the left lane, the one that is next to the

18  emergency lane.

19  Q.  Okay.  If Erick Santos testified that the car was

20  in the center lane when the tire blew out, do you know

21  if he's wrong, or is it possible that you're uncertain

22  which lane the car was in?

23  A.  Well, I am not for certain.

24  Q.  Okay.  I will ask you more questions about this in

25  a minute, but let me just show you what's been marked



1  Exhibit Number 12; and that's because we already have

2  some other exhibits, 1 through 11, marked.

3           But do you remember how many lanes of

4  travel there were at the location where the accident

5  happened?

6           (Exhibit 12 marked for identification.)

7  A.  I don't remember.

8           (Exhibit 1 marked for identification.)

9  Q.  Ms. Soto, let me go back and show you what's been

10 marked Exhibit Number 1.

11          MR. BUNT:  Morgan, this is just her

12          notice of deposition with subpoena duces

13          tecum.  So you've seen this before; right?

14          If you want to look at it, go ahead.

15          MS. WOLKE:  Okay.  Thank you.

16 Q.  Ms. Soto, do you remember seeing this?  Has anyone

17 showed this to you yet?

18 A.  Yes.

19 Q.  On the last page -- well, the notice of deposition

20 asks you to bring to the deposition any photographs or

21 documents that you may have which meet the description

22 here.

23          Have you had an opportunity to look

24 through this list to determine if you have any of

25 those things?



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
REGALADO SOTO, DINA on 08/01/2023
Case 3:21-cv-0271-K-K Document 49 Filed 02/29/24 Page 84 of 2460 PageID 376
19

1  A.  Yes.  But I don't have any.

2  Q.  Okay.  And just to make certain, it asks for

3  things like photographs taken by you of the car or the

4  accident scene.  Am I correct in understanding you

5  didn't take any photographs there at the scene?

6  A.  Yes, you're correct about that.

7  Q.  Did you send any text messages, Snapchat messages,

8  Instagram photos or messages or anything like that to

9  anyone, reporting that the accident had happened?

10  A.  No.

11  Q.  Did you make any personal notes or drawings

12  showing the accident scene?

13  A.  No.

14  Q.  And at any time, have you given any statement to

15  anyone whether you wrote that statement out or gave it

16  orally and it was recorded?

17  A.  Yes.

18  Q.  Okay.  To whom have you given a statement?

19  A.  To the attorney.

20  Q.  To the attorney.  Other than to your attorney,

21  have you given a statement to anyone?

22  A.  No.

23  Q.  All right.  And the attorney that you gave the

24  statement to, is that Mr. White?

25  A.  Yes.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
REGALADO SOTO, DINA on 08/01/2023
Case 3:23-cv-04211-K Document 49 Filed 02/29/24 Page 85 of 2460 PageID 377
20

1   Q.   Okay.  Did you give him a statement in writing?

2   A.   Yes.

3   Q.   Okay.  Do you have a copy of that statement?

4   A.   Oh, I'm sorry.  I didn't understand.  You mean

5   that I had written something?  No, I didn't.

6   Q.   Okay.  Did you just talk with him about what you

7   remember about the accident?

8   A.   Yes.

9   Q.   Okay.  Do you know if a recording was made of it?

10  A.   I don't know.

11  Q.   After the tire had blown out, do you know whether

12  Evelyn Moreno made any attempt to move the car over to

13  the right side of the road?

14  A.   No.

15  Q.   Do you know whether she turned on a -- her turn

16  signal to indicate that she would be moving right or

17  be moving left?

18  A.   I don't remember.

19  Q.   Do you remember any discussion in the car between

20  Evelyn and Nehemias about whether they should stop the

21  car?

22  A.   I don't remember.

23  Q.   Do you remember any discussion by Evelyn or

24  Nehemias about where they should stop the car?

25  A.   No, I don't remember.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
REGALADO SOTO, DINA on 08/01/2023
Case 3:19-cv-02711-K Document 49 Filed 02/29/24 Page 86 of 2460 PageID 378
21

1  Q.  Do you remember if there were still cars around --

2  around you, the car that you were in, at the time the

3  tire blew out?

4  A.  I don't remember.

5  Q.  Do you know why Evelyn stopped on the left side of

6  the highway instead of the right side of the highway?

7  A.  She didn't have any other option.

8  Q.  And why do you say she didn't have any other

9  option?

10  A.  Because the car gave up.  It wouldn't go any

11  further.

12  Q.  Did the car die?  Did the engine die?

13  A.  No.

14  Q.  So if she wanted to continue driving forward, even

15  though there's a blown-out tire, could she have

16  continued driving forward?

17  A.  No.

18  Q.  Why do you say that the car couldn't have

19  continued moving forward?

20  A.  Because where the tire blew up, I mean, the car

21  itself took that direction.  It, itself, stopped

22  there.

23  Q.  So you're saying Evelyn Moreno had no control over

24  the car after the tire blew out, the car just took

25  itself over to the side of the road and stopped?



1  A.  Yes.

2  Q.  And you don't believe it would have been possible

3  for her to move the car to the right and go off to the

4  right side of the road?

5  A.  No.

6  Q.  And you think that's because the car just stopped

7  on its own?

8  A.  Yes.

9            (Exhibit 2, Exhibit 3, Exhibit 4,

10        Exhibit 5, Exhibit 6 marked for

11        identification.)

12  Q.  Ms. Soto, let me show you what's been marked

13  Exhibits 2 and 3 and 4, 5, and 6.  These are some

14  photographs of the car.  If you would, just take a

15  look at those for a second.  I just want to ask you if

16  they appear to show where the car came to a stop.

17  A.  Okay.

18  Q.  Do they show where the car came to a stop based on

19  what you remember?

20  A.  Yes.

21  Q.  Okay.  Were you aware, Ms. Soto, that the car was

22  stopped partly still in the lane of travel?

23  A.  No.

24  Q.  Okay.  Was there -- was there any discussion in

25  the car about whether it was okay to stop there, still



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
REGALADO SOTO, DINA on 08/01/2023
Case 3:23-cv-03711-K   Document 49   Filed 10/29/24   Page 88 of 2460   PageID 380
23

1  being partly in the travel lane, not completely over

2  on the shoulder of the road?

3  A.  I don't remember.

4  Q.  You agree with me, though, do you not, that these

5  photographs show that the car was still partly in the

6  travel lane?

7  A.  (Nods head up and down).

8  Q.  Is that a "yes"?

9  A.  Yes.

10 Q.  After the car came to a stop, tell me what

11 happened next.  What did you do?

12 A.  We got out of the car.

13 Q.  You got out of the car?

14 A.  Yes.

15 Q.  Which door of the car did you get out of?

16 A.  Through the left.

17 Q.  You talking about the back left door?

18 A.  Yeah.

19 Q.  Okay.  Did Evelyn get out of the car?

20 A.  Yes.

21 Q.  Did Nehemias get out of the car?

22 A.  Yes.

23 Q.  Do you know which door Nehemias got out of the car

24 through?

25 A.  Through the right.



1  Q.  Through the passenger side, the right side?

2  A.  Yes.

3  Q.  Okay.  What about Erick and Melvin; did they get

4  out of the car?

5  A.  Yes.

6  Q.  Do you know which doors they got out of?

7  A.  Through this one, as well.

8  Q.  Okay.  All three of you in the backseat got out on

9  the driver's side?

10  A.  Yes.

11  Q.  What happened next after you got out of the car?

12  A.  I don't remember.

13  Q.  Did you participate in any way in the work to try

14  to change the tire?

15  A.  No.

16  Q.  Do you know who did help to try to change the

17  tire?

18  A.  Erick and Melvin.

19  Q.  Was it just the two of them?

20  A.  Yes.

21  Q.  Okay.  Did you watch them when they were changing

22  the tire?

23  A.  I don't remember.

24  Q.  Do you remember how far they got in trying to

25  change the tire before Nehemias was hit by the car?



```
 1   A.   No, I don't remember.
 2   Q.   Were you paying any attention to what they were
 3   doing?
 4   A.   No.
 5   Q.   When -- where did you go to after you got out of
 6   the car?
 7   A.   (Indicating) over here to the side.
 8   Q.   Do you know where -- where was Melvin?
 9   A.   He was with me.
10   Q.   Okay.  Do you know where -- were you paying
11   attention at all to where Erick and Nehemias and
12   Evelyn were?
13   A.   No.
14   Q.   Were there a lot of cars passing by while you
15   were -- you and Melvin were along the -- beside the
16   barrier there?
17   A.   I don't remember.
18   Q.   Were you at any time afraid or worried about the
19   cars that were passing by being so close to the
20   highway?
21   A.   Yes.
22   Q.   Did anyone at any time try to go back and motion
23   for the cars to move over or slow down or anything?
24   A.   I don't remember.
25   Q.   Where was Nehemias when you -- if you remember,
```



1  where was Nehemias when you last saw him before the

2  accident happened?

3  A.  I don't remember.

4  Q.  I assume you did not see the accident happen?

5  A.  No.

6  Q.  Did you see the car that hit him?

7  A.  No.

8  Q.  Are you able to tell us in any way how the

9  accident happened?

10  A.  No.

11  Q.  And just to make sure that I understand, do you

12  know where Nehemias Santos was when he was struck by

13  the car?

14  A.  I don't remember.

15  Q.  You don't remember or you weren't -- let me make

16  sure.  Do you think you know where he was?

17  A.  No.  I don't remember.

18  Q.  You were not looking his direction at the time the

19  accident happened, were you?

20  A.  (Shakes head side to side.)

21  Q.  Okay.  Ms. Soto, can you take this red pen and

22  just show us, assuming that this is -- I guess it

23  would be kind of turned like this, that this is

24  Evelyn's car (indicating); these are the lanes of the

25  highway; this line over here is this barrier.



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0087

 1                    Can you draw me a circle where you were

 2    standing at the time the accident happened, as best

 3    you remember?

 4    A.   (Indicating).

 5    Q.   Okay.  Would you write your initials, "DS," for

 6    Dina Soto, there by the dot so we'll know that that

 7    dot is showing where you were?

 8    A.   (Indicating).

 9    Q.   Okay.  Can you draw us a circle or a dot showing

10    where Melvin was?

11    A.   (Indicating).

12    Q.   Right -- right there with you?

13    A.   Yes.

14    Q.   Okay.  Can you write "MD" for Melvin Diaz so we'll

15    know that's where he was?

16    A.   Could I put it over here (indicating)?

17    Q.   That's fine, yes.

18                    Okay.  And as to where Evelyn was at the

19    time of the accident, do you know?

20    A.   I don't remember.

21    Q.   And Nehemias, you've already told us you don't

22    know where he was; correct?

23    A.   No, I don't remember.

24    Q.   And Erick, do you know where he was at the time?

25    A.   No, I don't remember.



Appx_0088

1  Q.  When did you become aware that he had been struck

2  by the car?

3  A.  When I heard the impact.

4  Q.  Okay.  Did you -- after hearing the impact, were

5  you able to look in time to see anything happen?

6  A.  No, no.  Only when he was on the street.

7  Q.  Did you hear anyone warn Nehemias that a car was

8  coming, or say "watch out, be careful," anything like

9  that?

10  A.  I don't remember.

11  Q.  Did you hear Melvin say anything?

12  A.  I don't remember, to be honest.

13  Q.  So if anyone did say, "There's a car" or "watch

14  out," you don't remember hearing anything like that?

15  A.  No.

16  Q.  Did you see where Mr. Pivaral's -- where

17  Nehemias's body came to rest after the accident?

18  A.  I don't remember.

19  Q.  Okay.  If I ask you -- did you see his body on the

20  ground after the accident?

21  A.  Yes.

22  Q.  And was this before his body was moved or after

23  his body was moved?

24  A.  After.

25  Q.  Okay.  As far as where it was before it was moved,



```
 1  are you able to -- if I asked you to take the red pen
 2  and mark where you saw the body on the ground, would
 3  you be able to do that?
 4  A.  (Indicating).
 5  Q.  Now, is this after he was moved there?
 6  A.  Yes.
 7  Q.  Okay.  As far as where it was before he was moved,
 8  you don't know?
 9  A.  No.
10  Q.  Ms. Soto, did you speak to any of the police at
11  the accident afterwards?
12  A.  About the accident?
13  Q.  Yes.
14  A.  No.  They just asked for my information.
15  Q.  Do you remember anyone at the accident scene
16  there, police or fire -- firemen or paramedics who
17  spoke English -- I'm sorry, who spoke Spanish?
18  A.  I don't remember.
19  Q.  And you may give the same answer, but do you
20  recall speaking with a paramedic who spoke Spanish at
21  the scene?
22  A.  I don't remember.
23  Q.  Did you tell anyone that you saw the accident
24  happen?
25  A.  No.
```



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
REGALADO SOTO, DINA on 08/01/2023
Case 3:23-cv-03211-K   Document 49   Filed 03/29/24   Page 95 of 2460   PageID 387

30

1  Q.  Did you tell anyone that you did not see the

2  accident happen?

3  A.  Neither that -- or that neither.

4  Q.  Do you know who moved Nehemias's body after the

5  accident?

6  A.  I don't remember.

7  Q.  Ms. Soto, at any time after the accident, did you

8  tell anyone there at the scene, any of the police or

9  firefighters or paramedics, that you were in the car

10 at the time the accident happened?

11 A.  No.

12 Q.  You don't recall speaking to anyone there at the

13 scene of the accident about the accident?

14 A.  No.

15 Q.  And you said they asked for your information.  And

16 you're talking about did they ask for your name and

17 date of birth, phone number, that type thing?

18 A.  Yes.

19 Q.  Do you know whether Melvin spoke to any of the

20 police officers?

21 A.  I don't remember.

22 Q.  Do you know whether he spoke to any of the

23 paramedics?

24 A.  I don't remember.

25 Q.  I know you've said you did not see the accident;



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
REGALADO SOTO, DINA on 08/01/2023
Case 3:23-cv-04211-X   Document 49   Filed 02/09/24   Page 96 of 2460   PageID 388

31

1   and so I assume your answers will be "no," but is

2   there anything else -- is there anything you can tell

3   me about how the accident happened that you have not?

4   A.   No.

5   Q.   Okay.  So -- and you did not see the car that hit

6   him; correct?

7   A.   No.

8   Q.   So you wouldn't -- you don't know, then, how fast

9   the car was going?

10   A.   No.

11   Q.   And as far as where the car was located, whether

12   it was in this travel lane or partly over here

13   (indicating), you wouldn't be able to tell us one way

14   or the other, would you?

15   A.   No.

16   Q.   Where did you go after the accident?  I understand

17   that maybe you and the others stayed with a family

18   that was nearby for a while; is that correct?

19   A.   Yes.

20   Q.   And do you know how long you stayed with that

21   family?

22   A.   From the time the accident happened until about

23   8:00, 10:00 o'clock in the evening.

24   Q.   Okay.  And did Nehemias's father come down and

25   meet the rest of you there?



```
 1   A.   Yes.

 2   Q.   Do you know the names of any of the people with

 3   whom you stayed?

 4   A.   No.

 5   Q.   Do you know whether or not Melvin saw the accident

 6   happen?

 7   A.   Yes.

 8   Q.   Did he say he did see the accident?

 9   A.   Yes.

10   Q.   What has Melvin told you about what he saw?

11   A.   That she was outside the lane, the car.

12   Q.   Did he tell you where Nehemias was?

13   A.   No.

14   Q.   After the accident, did you use your phone to call

15   anyone to tell them what had happened?

16   A.   Yes.

17   Q.   Who did you call?

18   A.   Erick and my sister.

19   Q.   Okay.  Did you send any texts to tell anyone what

20   had happened?

21   A.   No.

22   Q.   I may have asked you this earlier.  I think I did.

23   But you didn't take any photographs at the scene, did

24   you?

25   A.   No.
```



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:23-cv-04711-X Document 49 Filed 00/29/24 Page 98 of 2460 PageID 390
REGALADO SOTO, DINA on 08/01/2023

33

1  Q.  Do you have any texts or messages of any kind

2  using any kind of app on your phone that relate to the

3  accident or talk about the accident?

4  A.  No.

5  Q.  When you traveled down to Houston, where did you

6  stay the night before the accident?

7  A.  The night before?

8  Q.  Yes.

9  A.  I don't remember.

10  Q.  Did you take some clothes with you for the trip?

11  A.  No.

12  Q.  Did you take any kind of bag with toiletries,

13  anything at all since you would be staying overnight?

14  A.  Yes.

15  Q.  What kind of bag or luggage did you take?

16  A.  A small one.

17  Q.  Where was it in the car?

18  A.  On the seat.

19  Q.  Did Evelyn or Nehemias take any bags?

20  A.  I don't remember.

21  Q.  Did Melvin take a bag or any luggage?

22  A.  I don't remember.

23  Q.  Did he take any clothes with him?

24  A.  I don't remember.

25  Q.  Do you know whether Erick had a bag with him?



Appx_0094

1   A.   I don't remember.

2   Q.   Were there any suitcases or bags other than your

3   bag in the car at the time?

4   A.   I don't remember.

5   Q.   Ms. Soto, I assume since you didn't see the

6   accident and do not know where Nehemias was or where

7   the car was or exactly how this happened, you're not

8   really able to tell us personally, from what you know,

9   whose fault the accident is, are you?

10  A.   No.

11  Q.   As far as you know, the other car did not hit

12  Ms. Moreno's car, the Toyota Camry, did it?

13  A.   No.

14  Q.   I'm going to read some names to you; and these are

15  persons that Mr. White has identified may have some

16  knowledge of the accident or knowledge related to the

17  lawsuit.  I just want you to tell me if you know who

18  these people are.

19  A.   Okay.

20  Q.   José Aguilar?

21  A.   No.

22  Q.   Stephanie Mitchell?

23  A.   No.

24  Q.   Rosemary Ricny?

25  A.   No.



1  Q.  Manuel Yoli Medrano?

2  A.  No.

3  Q.  And, Ms. Soto, I ask this of everyone, but have

4  you ever been convicted of a crime?

5  A.  No.

6  Q.  Have you ever been arrested?

7  A.  No.

8  Q.  And at this time, to your knowledge, you don't

9  have any charges pending against you or indictments

10  pending against you for anything?

11  A.  No.

12         MR. BUNT:  Give me just a moment.  I'm

13     about finished.

14         Ms. Soto, thank you for your patience

15     and for staying a little bit later than we

16     had expected.  At this time, I'll pass you

17     to Mr. White.

18              EXAMINATION

19  BY MR. WHITE:

20  Q.  All right, Dina.  We're almost done.  I just have

21  a couple of questions.

22  A.  Okay (in English).

23  Q.  So after the car had been pulled over on the left

24  side of the interstate and everyone had gotten out,

25  were you aware that it was a dangerous situation?



```
 1   A.   Yes.

 2   Q.   To the best of your knowledge, did everybody that

 3   was getting out of the car, did everyone understand it

 4   was a dangerous situation?

 5   A.   Yes.

 6   Q.   How long was the car -- well, strike that.

 7              Prior to Nehemias being hit by the white

 8   Ford Explorer, how long were you guys on the side of

 9   the road?

10   A.   I don't remember.

11   Q.   Do you think it was more than three minutes?

12   A.   I don't remember.

13   Q.   Approximately how many cars do you think passed

14   you guys before the accident happened?

15              MR. BUNT:  Objection to form.

16   A.   I don't remember.

17   Q.   Do you remember what the weather was like that

18   day?

19   A.   Yes.

20   Q.   Can you describe it?

21   A.   It was hot.

22   Q.   Was it sunny?

23   A.   Yes.

24   Q.   Was the road straight?

25   A.   Yes.
```


ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0097

1  Q.  Was the road level?

2  A.  I didn't understand that question.

3  Q.  Was the road flat?

4  A.  You mean straight?

5  Q.  Straight, yes.  Straight is fine.

6  A.  Yes.

7  Q.  Was there any reason someone coming down the road

8  from the direction y'all had been traveling wouldn't

9  have been able to see the broken-down car well in

10  advance?

11          MR. BUNT:  Objection to form.

12  A.  Could you repeat the question?

13  Q.  It was a bad question.  For someone traveling down

14  the road towards you guys as you were stopped on the

15  side of the road, were there any obstacles that would

16  have prevented someone traveling on that path from

17  seeing y'all well in advance?

18          MR. BUNT:  Same objection.

19  A.  No.

20  Q.  Did any of the police officers speak Spanish?

21  A.  I don't remember.

22  Q.  Do you remember a police officer asking you to

23  write down a statement about what happened?

24  A.  Yes -- no.  What had happened, no.

25  Q.  If a police officer had asked you to write down a



1   statement, would you have?

2   A.   No, because I didn't see the accident.

3   Q.   Well, would you have written a statement down

4   saying that?

5   A.   No.

6   Q.   But no police officer did ask you to write

7   anything down, did they?

8   A.   No.

9   Q.   This entire process frightens you very badly, does

10  it not?

11  A.   A little bit.

12  Q.   And that explains why you're nervous about asking

13  some of these questions -- answering some of these

14  questions; right?

15  A.   I didn't understand your question.

16  Q.   So is your nervousness about this litigation

17  process one of the reasons you're nervous about

18  answering some of the questions here today?

19  A.   No.

20          MR. WHITE:   Okay.  All right.  Nothing

21      else for now.

22                  FURTHER EXAMINATION

23  BY MR. BUNT:

24  Q.   Ms. Santos, just one more question or a couple of

25  questions.



Appx_0099

1          Did Evelyn speak to the police there at

2    the scene?

3    A.   Yes.

4    Q.   As far as you know, was she telling them what had

5    happened?

6    A.   I guess so.

7    Q.   Okay.

8               MR. BUNT:  Nothing further.

9               MS. WOELKE:  I have no questions for

10          you, Dina.

11              THE VIDEOGRAPHER:  This concludes the

12          video deposition of Dina Soto.  The time is

13          6:04.  We're now off the record.

14          (Proceedings concluded at 6:04 p.m.)

15

16

17

18

19

20

21

22

23

24

25



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
REGALADO SOTO, DINA on 08/01/2023
Case 3:23-cv-02734-K Document 49 Filed 04/09/24 Page 105 of 2460 PageID 397

40

```
 1              REPORTER CERTIFICATION
 2         I, JENNIFER NORMAN, Certified Court Reporter
 3    for the State of Arkansas, do hereby certify to the
 4    following:
 5         1) that on August 1, 2023, the witness,
 6    DINA YAMILETH REGALADO SOTO, was duly sworn by me
 7    prior to the taking of testimony as to the truth of
 8    the matters attested to and contained therein;
 9         2) that the foregoing pages contain and are a
10    true and correct transcription of the proceedings as
11    reported verbatim by me via realtime stenography to
12    the best of my ability and transcribed at or under my
13    direction and supervision, and subject to appropriate
14    changes submitted by witness, if any, during his/her
15    requested reading and signing of this deposition
16    according to the Arkansas Rules of Civil Procedure;
17         3) that I am neither counsel for, related to,
18    nor employed by any of the parties to the action in
19    which this proceeding was taken; and that I am not a
20    relative or employee of any attorney employed by the
21    parties hereto;
22         4) that I am not financially interested or
23    otherwise interested in the outcome of this action
24    that affects or has substantial tendency to affect
25    impartiality or requires me to relinquish control of
```



1  an original or copies of a deposition transcript

2  before it is certified, or that requires me to provide

3  any service not made available to all parties to the

4  action; and

5       5) that I have no contract with the parties,

6  attorneys, or persons with an interest in the action;

7  and that I am not knowingly identified on a preferred

8  provider list, whether written or oral, for any

9  litigant, insurance company, or third-party

10 administrator involved in this matter;

11      6) that signature of the witness is waived.

12 This transcript is prepared at request of counsel for

13 DEFENDANTS, and all fees are billed directly to them

14 in compliance with Arkansas Board of Court Reporter

15 Examiners Regulations Section 19.

16      Witness my hand and seal this 15th of

17 August, 2023.

18

19                         _____

20    ARKANSAS            JENNIFER NORMAN, CCR
      SUPREME             LS Certificate #768, State of Arkansas
      COURT               Arkansas Realtime Reporting
21    No. 768             1130 E Millsap Rd
22                        Fayetteville AR 72703
                          479-301-2040
23                        www.ArkansasRealtimeReporting.com

24

25



Case 3:23-cv-02724-K Document 49 filed 03/29/24 Page 107 of 2460 PageID 399

**Exhibits**

**Regalado Exhibit 1**
  3:14 18:8,10
**Exhibit 2** 3:16 22:9
**Exhibit 3** 3:17 22:9
**Exhibit 4** 3:18 22:9
**Exhibit 5** 3:19 22:10
**Exhibit 6** 3:20 22:10
**Exhibit 12** 3:21 18:1,6

**1**

**1** 18:2,8,10
**10:00** 31:23
**11** 18:2
**119-65** 9:16
**12** 18:1,6
**1500** 5:12
**1st** 4:3 6:3

**2**

**2** 22:9,13
**2022** 5:15 9:24 12:6
**2023** 4:3

**3**

**3** 22:9,13

**4**

**4** 22:9,13
**479 379-2615** 10:1
**4:43** 4:4

**5**

**5** 22:10,13
**5:00** 12:2,3

**5:02** 12:3,4

**6**

**6** 22:10,13
**6:04** 39:13,14

**8**

**8:00** 31:23

**9**

**99** 6:3

**A**

**accident** 10:12,13 11:11
  12:9 18:4 19:4,9,12 20:7
  26:2,4,9,19 27:2,19
  28:17,20 29:11,12,15,23
  30:2,5,7,10,13,25 31:3,
  16,22 32:5,8,14 33:3,6
  34:6,9,16 36:14 38:2
**address** 5:10,17
**admissible** 10:18
**advance** 37:10,17
**advise** 9:22 11:17
**afraid** 25:18
**afternoon** 5:1
**ages** 7:11
**agree** 23:4
**Aguilar** 34:20
**ahead** 18:14
**alcohol** 14:9,11
**Alex** 15:19,22,23,25
  16:4
**Alexander** 7:20 15:19
**Amendment** 6:16 7:3
  9:10,21 11:16
**answering** 38:13,18
**answers** 31:1

**apartment** 5:21
**app** 33:2
**applied** 6:21 7:1
**approximately** 13:23
  36:13
**April** 5:14,15 9:23 12:6
**Arkansas** 4:6 5:12 12:7
**arrested** 35:6
**asks** 18:20 19:2
**assume** 26:4 31:1 34:5
**assuming** 26:22
**attempt** 17:1 20:12
**attended** 8:2,3,16
**attention** 15:6 25:2,11
**attorney** 19:19,20,23
**August** 4:3
**Avenue** 5:12 7:24
**aware** 14:15 22:21 28:1
  35:25

**B**

**back** 12:12 17:12 18:9
  23:17 25:22
**backseat** 24:8
**Backus** 5:12 7:24
**bad** 37:13
**badly** 38:9
**bag** 33:12,15,21,25 34:3
**bags** 33:19 34:2
**barrier** 25:16 26:25
**based** 22:18
**began** 10:14
**beginning** 9:16
**bill** 10:5,8
**birth** 6:2 30:17
**bit** 35:15 38:11
**blew** 16:17,20 17:9,14,
  20 21:3,20,24

**blown** 16:15 20:11
**blown-out** 21:15
**body** 28:17,19,22,23
  29:2 30:4
**born** 6:4
**boyfriend** 13:17
**Brian** 4:12
**bring** 18:20
**broken-down** 37:9
**Bunt** 4:12,25 6:25 9:5,13
  10:17 11:19,25 18:11
  35:12 36:15 37:11,18
  38:23 39:8
**busy** 15:4

**C**

**call** 15:17 32:14,17
**called** 5:4
**Camry** 12:11 34:12
**car** 12:11 14:4,6,11,21
  16:12,17,21 17:1,4,9,13,
  19,22 19:3 20:12,19,21,
  24 21:2,10,12,18,20,24
  22:3,6,14,16,18,21,25
  23:5,10,12,13,15,19,21,
  23 24:4,11,25 25:6 26:6,
  13,24 28:2,7,13 30:9
  31:5,9,11 32:11 33:17
  34:3,7,11,12 35:23 36:3,
  6 37:9
**careful** 28:8
**carrier** 10:3
**cars** 15:10 21:1 25:14,
  19,23 36:13
**casual** 16:3
**Caylee** 4:13
**cell** 9:23 10:3
**center** 17:20
**certified** 4:18
**change** 24:14,16,25
**changing** 24:21
**charges** 35:9



**ARKANSAS**
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0103

PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
REGALADO SOTO, DINA on 08/01/2023
Case 3:23-cv-02734-K   Document 49   Filed 06/20/24   Page 108 of 2460   PageID 400
Index: Chemical..heard

Chemical 4:14

child 7:22

children 7:9,11

circle 27:1,9

citizen 6:14,19

clarification 7:16

clarify 7:15

close 25:19

clothes 33:10,23

company 13:5

completed 8:13

completely 23:1

concluded 39:14

concludes 39:11

consumed 14:9

continue 21:14

continued 21:16,19

control 21:23

convicted 35:4

copy 20:3

correct 5:11 9:18 12:7, 12 19:4,6 27:22 31:6,18

counsel 4:7,10,12,15

couple 15:15 35:21 38:24

Court 10:20

Cricket 10:9,10

crime 35:4

**D**

dangerous 35:25 36:4

date 4:3 6:2 30:17

day 10:11,13,14,25 11:10 12:9 13:24 14:2,9, 13,18 15:4 36:18

Defendants 4:13

deponent 4:6

deposition 4:4 18:12,

19,20 39:12

describe 36:20

description 18:21

determine 18:24

Diaz 7:20 10:14 15:12,23 27:14

die 21:12

Dina 4:7,16,21 5:3,7,9, 10 6:17 7:4 8:7 9:10,21 10:23 11:6 27:6 35:20 39:10,12

direction 21:21 26:18 37:8

discussion 20:19,23 22:24

documents 18:21

door 23:15,17,23

doors 24:6

dot 27:6,7,9

draw 27:1,9

drawings 19:11

driver's 24:9

driving 14:4 15:9 21:14, 16

drove 14:6

drugs 14:14,17,18,19

DS 27:5

duces 18:12

duly 4:19,20,22,23

**E**

earlier 32:22

Eastman 4:13

education 8:12

El 6:5,19

emergency 17:18

employed 8:19

engine 21:12

English 13:11,13,15

16:9 29:17 35:22

entire 11:5 38:9

Erick 10:15 13:1 17:19 24:3,18 25:11 27:24 32:18 33:25

Evelyn 10:15 12:23 13:2,7,9,11,17 14:5,8,13, 23,25 15:6 16:24 20:12, 20,23 21:5,23 23:19 25:12 27:18 33:19 39:1

Evelyn's 26:24

evening 31:23

EXAMINATION 4:24 35:18 38:22

exhibit 18:1,6,8,10 22:9, 10

exhibits 18:2 22:13

expected 35:16

explains 38:12

Explorer 36:8

**F**

failed 16:12

family 31:17,21

fast 31:8

father 7:22 31:24

fault 34:9

February 6:3

felt 16:13,14

Fernandez 4:17

fine 27:17 37:5

finished 35:13

fire 29:16

firefighters 30:9

firemen 29:16

Firm 4:5

flat 37:3

flow 15:9

Ford 36:8

form 11:3 36:15 37:11

forward 21:14,16,19

Friday 9:1,2 12:18

friends 16:1,3

frightens 38:9

front 15:1

Fuentes 15:23

full 5:2

**G**

gave 19:15,23 21:10

generally 15:9

girlfriend 13:18

give 9:5 20:1 29:19 35:12

giving 17:10

Gonzalez 8:21,23,25

Good 5:1

grades 8:3

ground 28:20 29:2

grounds 6:16 7:4 9:10, 21 11:16

group 11:5

guess 11:22 17:11 26:22 39:6

guys 36:8,14 37:14

**H**

happen 26:4 28:5 29:24 30:2 32:6

happened 11:11 16:21 18:5 19:9 23:11 24:11 26:2,9,19 27:2 30:10 31:3,22 32:15,20 34:7 36:14 37:23,24 39:5

hate 10:19

head 23:7 26:20

hear 28:7,11

heard 16:12 28:3



ARKANSAS
REALTIME REPORTING
www.ArkansasRealtimeReporting.com

**hearing** 28:4,14

**helpful** 11:2

**high** 8:17

**highway** 21:6 25:20
26:25

**hit** 16:14 24:25 26:6 31:5
34:11 36:7

**honest** 28:12

**hot** 36:21

**house** 5:21,22,23,25

**Houston** 12:11,15,17,
20,21,25 13:24 14:2 33:5

---

**I**

**idea** 8:11

**identification** 18:6,8
22:11

**identified** 34:15

**illegal** 14:14,18

**impact** 28:3,4

**indicating** 25:7 26:24
27:4,8,11,16 29:4 31:13

**indictments** 35:9

**Ines** 4:17

**information** 29:14
30:15

**initials** 27:5

**Instagram** 19:8

**instruct** 6:17 7:4 9:11

**instructing** 8:5,7

**instruction** 10:20

**interpret** 11:14

**interpreter** 4:8,18,19,23
7:14,17 11:13

**interrogatories** 5:11

**interstate** 35:24

**introduce** 4:8

---

**J**

**Jacob** 4:10

**José** 34:20

---

**K**

**kind** 8:23 26:23 33:1,2,
12,15

**King** 4:5

**knowledge** 13:20 14:8,
13,17 34:16 35:8 36:2

---

**L**

**lane** 17:13,17,18,20,22
22:22 23:1,6 31:12 32:11

**lanes** 18:3 26:24

**Law** 4:5

**lawsuit** 34:17

**left** 13:24 14:2,23 17:5,6,
17 20:17 21:5 23:16,17
35:23

**legal** 5:2

**level** 8:12 37:1

**Light** 15:4

**list** 18:24

**litigation** 38:16

**live** 5:17 7:21,24

**lived** 6:6

**lives** 5:19

**living** 5:14 12:6

**located** 31:11

**location** 18:4

**long** 6:6 13:9 15:12,14
31:20 36:6,8

**lot** 25:14

**luggage** 33:15,21

---

**M**

**made** 20:9,12

**make** 19:2,11 26:11,15

**Manuel** 35:1

**mark** 29:2

**marked** 17:25 18:2,6,8,
10 22:10,12

**married** 7:7 13:21

**MD** 27:14

**Medrano** 35:1

**meet** 18:21 31:25

**Melvin** 7:20 10:14 13:1
15:12,18,25 16:4,8,9
24:3,18 25:8,15 27:10,14
28:11 30:19 32:5,10
33:21

**mention** 16:21

**messages** 19:7,8 33:1

**minute** 17:25

**minutes** 36:11

**Mitchell** 34:22

**moment** 35:12

**month** 10:5

**Moreno** 13:2,4 20:12
21:23

**Moreno's** 12:10 34:12

**Morgan** 4:15 18:11

**mother** 5:20,23

**motion** 25:22

**move** 20:12 22:3 25:23

**moved** 28:22,23,25
29:5,7 30:4

**moving** 20:16,17 21:19

---

**N**

**names** 16:2 32:2 34:14

**nearby** 31:18

**Nehemias** 10:15 12:23

---

13:15,17 14:17,24 20:20,
24 23:21,23 24:25 25:11,
25 26:1,12 27:21 28:7
32:12 33:19 34:6 36:7

**Nehemias's** 28:17 30:4
31:24

**nervous** 38:12,17

**nervousness** 38:16

**night** 33:6,7

**nods** 23:7

**Normal** 15:5

**notes** 19:11

**notice** 18:12,19

**number** 9:7,16 10:1
18:1,10 30:17

**numbers** 9:17,18

---

**O**

**object** 6:15 7:2 9:9,14,
20 11:15

**objection** 36:15 37:11,
18

**obstacles** 37:15

**officer** 37:22,25 38:6

**officers** 30:20 37:20

**opportunity** 11:14
18:23

**option** 17:7 21:7,9

**orally** 19:16

**over-the-counter**
14:19

**overnight** 33:13

---

**P**

**p.m.** 12:3 39:14

**painting** 8:24 13:5,7

**paramedic** 29:20

**paramedics** 29:16 30:9,
23

**participate** 24:13

---



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

**partly** 22:22 23:1,5 31:12

**pass** 35:16

**passed** 36:13

**passenger** 24:1

**passing** 25:14,19

**path** 37:16

**patience** 35:14

**pay** 10:6 15:6

**paying** 25:2,10

**pen** 26:21 29:1

**pending** 35:9,10

**people** 32:2 34:18

**personal** 19:11

**personally** 34:8

**persons** 34:15

**phone** 9:23 10:3,5 30:17 32:14 33:2

**photographs** 18:20 19:3,5 22:14 23:5 32:23

**photos** 19:8

**pick** 13:1

**Pivaral's** 28:16

**place** 4:5

**Plaintiff** 4:11

**police** 29:10,16 30:8,20 37:20,22,25 38:6 39:1

**prefer** 5:4 6:12

**prefers** 16:6

**prescription** 14:14,18

**present** 4:11

**prevented** 37:16

**previously** 8:21

**Prior** 36:7

**privilege** 6:16

**proceedings** 4:1 39:14

**process** 38:9,17

**pull** 17:1,4

**pulled** 17:6 35:23

**purpose** 12:24

**put** 27:16

---

**Q**

**question** 6:18,24 7:3 8:6 9:12,14,20 10:4 11:3, 18 17:11 37:2,12,13 38:15,24

**questions** 8:8 10:25 11:2,7 17:24 35:21 38:13,14,18,25 39:9

**quit** 9:2

---

**R**

**read** 34:14

**realize** 16:15

**reason** 37:7

**reasons** 38:17

**recall** 13:23 14:1 29:20 30:12

**recess** 12:3

**record** 4:3 11:23 12:2,5 39:13

**recorded** 19:16

**recording** 20:9

**red** 26:21 29:1

**refusing** 8:12

**Regalado** 4:7,21 5:1,3,5 7:7

**relate** 33:2

**related** 34:16

**relationship** 7:19

**remember** 6:7,10,11,13 8:17 12:16 13:10,25 14:3 15:3,11 16:11,23,25 18:3,7,16 20:7,18,19,22, 23,25 21:1,4 22:19 23:3 24:12,23,24 25:1,17,24, 25 26:3,14,15,17 27:3, 20,23,25 28:10,12,14,18 29:15,18,22 30:6,21,24

33:9,20,22,24 34:1,4 36:10,12,16,17 37:21,22

**rent** 5:25

**repeat** 6:24 37:12

**reporting** 19:9

**residency** 6:21 7:1

**rest** 28:17 31:25

**Ricny** 34:24

**ring** 16:14

**road** 15:4 16:14 17:1,3 20:13 21:25 22:4 23:2 36:9,24 37:1,3,7,14,15

**Rosemary** 34:24

---

**S**

**Salvador** 6:5,19

**Santos** 13:4 17:19 26:12 38:24

**scene** 19:4,5,12 29:15, 21 30:8,13 32:23 39:2

**school** 8:2,3,8,13,16,17

**seat** 33:18

**Security** 9:7

**send** 19:7 32:19

**shakes** 26:20

**shoulder** 23:2

**show** 9:16 17:25 18:9 22:12,16,18 23:5 26:22

**showed** 18:17

**showing** 19:12 27:7,9

**side** 14:23 17:3 20:13 21:5,6,25 22:4 24:1,9 25:7 26:20 35:24 36:8 37:15

**signal** 20:16

**sister** 10:9 32:18

**sister's** 6:1

**sisters** 5:20

**sitting** 14:22,24

---

**situation** 35:25 36:4

**slow** 25:23

**small** 33:16

**Smith** 4:13

**Snapchat** 19:7

**Social** 9:7

**Soto** 4:21 5:3,5,6,7 9:7, 23 12:6 14:8 16:11 18:9, 16 22:12,21 26:21 27:6 29:10 30:7 34:5 35:3,14 39:12

**Spanish** 4:18 7:16 11:13 29:17,20 37:20

**speak** 13:11,13,15 16:9 29:10 37:20 39:1

**speaking** 29:20 30:12

**specifically** 11:4

**speed** 15:6

**spoke** 29:17,20 30:19, 22

**Springdale** 4:6 5:12 7:25 12:7,12,14,17,19, 21,25

**standing** 27:2

**start** 11:4

**state** 5:2

**statement** 19:14,15,18, 21,24 20:1,3 37:23 38:1, 3

**States** 6:6,9,14,22 7:1 9:8

**stay** 33:6

**stayed** 31:17,20 32:3

**staying** 33:13 35:15

**step** 11:7

**Stephanie** 34:22

**stop** 16:22 20:20,24 22:16,18,25 23:10

**stopped** 21:5,21,25 22:6,22 37:14

**stopping** 14:1



www.ArkansasRealtimeReporting.com

Appx_0106

straight  36:24 37:4,5

street  28:6

strike  36:6

struck  26:12 28:1

subpoena  18:12

suitcases  34:2

sunny  36:22

sworn  4:9,19,20,22,23

---

### T

taking  4:5

talk  8:4,10 10:16,21 11:20 16:21 20:6 33:3

talking  10:23 23:17 30:16

Taylor  4:5

tecum  18:13

telling  39:4

testified  4:22 12:10 17:19

text  19:7

texts  32:19 33:1

thing  30:17

things  18:25 19:3

three-year-old  7:18

time  4:4 9:3 12:1,4 13:23 14:1,9 19:14 21:2 25:18, 22 26:18 27:2,19,24 28:5 30:7,10 31:22 34:3 35:8, 16 39:12

tire  16:12,15,17,20 17:9, 14,20 20:11 21:3,15,20, 24 24:14,17,22,25

today  38:18

Today's  4:3

toiletries  33:12

told  27:21 32:10

Toyota  12:11 34:12

traffic  15:4

---

travel  12:19 18:4 22:22 23:1,6 31:12

traveled  12:17 33:5

traveling  12:11,24 14:21 15:7 37:8,13,16

trip  10:18 11:20 33:10

turn  20:15

turned  20:15 26:23

type  30:17

---

### U

uncertain  17:21

understand  7:19 10:4 20:4 26:11 31:16 36:3 37:2 38:15

understanding  19:4

United  6:6,8,14,21 7:1 9:8

---

### V

versus  15:25

video  39:12

---

### W

wanted  21:14

warn  28:7

watch  24:21 28:8,13

weather  36:17

week  9:1

white  4:10 11:23 19:24 34:15 35:17,19 36:7 38:20

Woelke  4:15 39:9

WOLKE  6:15,23 7:2 8:7 9:9,19 10:23 11:15 18:15

work  8:21,23,25 13:4 24:13

worked  13:3

working  9:2

---

worried  25:18

write  27:5,14 37:23,25 38:6

writing  20:1

written  20:5 38:3

wrong  17:21

wrote  19:15

---

### Y

y'all  37:8,17

Yami  5:8

Yamileth  4:21 5:3

year  5:14

years  7:12,13 8:13,16 15:13,16

Yoli  35:1

---



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0107

PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:22-cv-02714-K Document 40 Filed 01/29/24 Page 112 of 2460 PageID 404
PIVARAL GONZALEZ, ERICK on 08/01/2023

1              IN UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2
ERICK RODERICO PIUARA        )
3 GONZALEZ, Individually      )
and as Special               )
4 Administrator of the        )
Estate of NEHEMIAS R.        )
5 PIVARAL SANTOS,             )
DECEASED,                    )
6                             )
              PLAINTIFFS,     )
7                             )
VS.                          ) CASE NO.:
8                            ) 3:22-CV-02714-K
CAYLEE ERIN SMITH and        )
9 EASTMAN CHEMICAL COMPANY,   )
                             )
10            DEFENDANTS.      )

11

12      -----------------------------------

13      ORAL AND VIDEOTAPED DEPOSITION OF

14      ERICK RODERICO PIVARAL GONZALEZ

15              AUGUST 1, 2023

16      -----------------------------------

17    ORAL AND VIDEOTAPED DEPOSITION OF

18 ERICK RODERICO PIVARAL GONZALEZ, produced as a witness

19 at the instance of the DEFENDANTS, and duly sworn, was

20 taken in the above-styled and numbered cause on the

21 1st of August, 2023, from 9:04 a.m. to 12:14 p.m.,

22 before Jennifer Norman, CCR in and for the State of

23 Arkansas, reported by machine shorthand, at 410 North

24 Thompson Street, Suite B, Springdale, Arkansas 72764,

25 pursuant to the Federal Rules of Civil Procedure.

**EXHIBIT K**



www.ArkansasRealtimeReporting.com

```
1                    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3        Mr. Jacob White

4        Taylor King Law, P.A.

5        410 North Thompson Street, Suite B

6        Springdale, Arkansas 72764

7        (479) 935-8682

8        Jacobwhite@taylorkinglaw.com

9

10   FOR THE DEFENDANTS:

11       Mr. Brian L. Bunt

12       FREEMAN MILLS PC

13       2020 Bill Owens Parkway, Suite 200

14       Longview, Texas 75604

15       (903) 295-7200

16       Bbunt@freemanmillspc.com

17

18   THE INTERPRETER:

19       Ms. Ines Fernandez

20

21   ALSO PRESENT:

22       Mrs. Stacey Bunt, CP, FREEMAN MILLS, PC

23

24

25
```



ARKANSAS
REALTIME REPORTING

PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:23-cv-00214-N Document 40 Filed 04/29/24 Page 114 of 2460 PageID 406
PIVARAL GONZALEZ, ERICK on 08/01/2023                                          3

1                          **INDEX**

2                                                    **PAGE**

3

4   Appearances.....................................3

5   Stipulations....................................2

6

    Witness:  ERICK RODERICO PIVARAL GONZALEZ

7       Examination by Mr. Bunt...................5

8       Examination by Mr. White................68

9       Further Examination by Mr. Bunt.........73

10

11  Reporter's Certificate........................75-76

12                          **EXHIBITS**

13

14  NO.             DESCRIPTION                    PAGE

    Exhibit 1       Notice of Deposition; Subpoena
15                  Duces Tecum...........................8

16  Exhibit 4       Photograph of back of Camry..........53

17  Exhibit 13      Texas Peace Officer's Crash Report...63

18  Exhibit 14      Nehemias Pivaral Santos Social
                    Security Card........................25
19
    Exhibit 15      Nehemias Pivaral Santos Social
20                  Identification Card..................25

21  Exhibit 16      Nehemias Pivaral Santos Social
                    Employment Authorization.............26
22
    Exhibit 17      Sisco Funeral statement..............67
23
    Exhibit 18      Certificate of Lot Ownership
24                  Restrictions of Use..................67

25



www.ArkansasRealtimeReporting.com

```
 1              * * * * * PROCEEDINGS * * * * *

 2              THE VIDEOGRAPHER:  We are now on the

 3        record.  Today's date is August 1st, 2023,

 4        and the time is 9:04.  This deposition is

 5        taking place at the Taylor King Law Firm in

 6        Springdale, Arkansas, in the matter of the

 7        estate of Nehemias Pivaral Santos versus

 8        Eastman Chemical Company, et al., Case

 9        Number 3:22-CV-02714-K in the United States

10        District Court for the Northern District of

11        Texas, Dallas Division.

12              The deponent is Erick Gonzalez.  And if

13        Counsel will introduce themselves, the

14        interpreter and then the witness will then

15        be sworn.

16              MR. WHITE:  Jacob White, counsel for

17        Plaintiff.

18              MR. BUNT:  Brian Bunt, counsel for

19        Caylee Smith and Eastman Chemical Company.

20              THE INTERPRETER:  Ines Fernandez,

21        certified Spanish interpreter.

22   (Whereupon, the interpreter was duly sworn.)

23    (Whereupon, the witness was duly sworn.)

24              MR. BUNT:  And, Jacob, I think you and I

25        said we were agreeing we will just take
```



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:22-cv-00214-K Document 49 Filed 04/29/24 Page 116 of 2460 PageID 408
5

```
 1              these pursuant to The Rules and we'll
 2              reserve our objections other than to form of
 3              the question or responsiveness of the
 4              answer.
 5                   MR. WHITE:  Or privilege.
 6                   MR. BUNT:  Or privilege.  That's fine.
 7                   MR. WHITE:  Okay.  Yes, sir.
 8                   MR. BUNT:  Okay.
 9              ERICK RODERICO PIVARAL GONZALEZ,
10    having been first duly sworn, testified through the
11    duly sworn interpreter as follows:
12                        EXAMINATION
13    BY MR. BUNT:
14    Q.  Good morning, Mr. Gonzalez.
15    A.  Good morning.
16    Q.  Thank you.  Mr. Gonzalez, would you please state
17    your full legal name for the record.
18    A.  Erick Roderico Pivaral Gonzalez, yes.
19    Q.  Thank you.  Is it okay if I address you as
20    "Mr. Gonzalez" this morning?
21    A.  Yes, that's fine.
22    Q.  Okay.  Mr. Gonzalez, as I mentioned on the record
23    a moment ago, my name is Brian Bunt.  I represent the
24    defendants in this lawsuit; those are the persons
25    against whom the lawsuit has been brought, and that is
```

1  Ms. Caylee Smith and her employer, Eastman Chemical.
2  A.  Yes.
3  Q.  Mr. Gonzalez, have you ever given a deposition
4  before?
5  A.  No.
6  Q.  I don't know exactly how long this will take.  It
7  might be a few hours.  It won't be a very, very long
8  time.  But if we -- if you need to take a break at
9  some point -- we will stop for breaks periodically;
10 but if you need to take a break, please let us know.
11 A.  That's fine.
12 Q.  And if there is a question that I still need an
13 answer to, I might ask that you give me the answer
14 before we break, but then I'll be happy to accommodate
15 you and we take a break.
16 A.  That's fine.
17 Q.  And I think Ms. Fernandez will help us
18 considerably with doing this, but I just ask for a
19 couple of agreements with you.  The first would be if
20 I ask a question that can be answered with a "yes" or
21 "no," that you state the answer out loud as opposed to
22 just nodding your head or, you know, giving some
23 nonverbal indication.
24 A.  That's fine.
25 Q.  Also, if you do not feel like you understand any



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00074-DPM Document 42 Filed 04/29/24 Page 118 of 2460 PageID 410
PIVARAL GONZALEZ, ERICK on 08/01/2023
7

1  of the questions that I ask you, please feel free to

2  stop me and ask me to repeat the question or rephrase

3  the question until I've made myself clear to you in

4  what I'm asking.

5  A.   That's fine.

6  Q.   And let me begin, Mr. Gonzalez, by saying please

7  accept my sympathies for the loss of your son,

8  Nehemias.  I know that some of the things we're going

9  to be talking about this morning are a bit unpleasant

10  for you; and I'm sensitive to that.  But I just simply

11  ask that you understand, since a lawsuit has been

12  filed, I will need to ask you some questions about

13  things.

14  A.   That's fine.

15  Q.   Mr. Gonzalez, other than speaking with Mr. White,

16  is there -- your attorney -- I don't want to know

17  anything that you and your attorney discussed, but is

18  there anyone else you have spoken to to prepare

19  yourself for the deposition today?

20  A.   No.

21  Q.   Thank you.  Mr. Gonzalez, are there any particular

22  documents that you have read or reviewed to prepare

23  yourself for your deposition today?

24  A.   No.

25  Q.   Mr. Gonzalez, we served upon your attorney a



1  notice of deposition with what is called a subpoena

2  duces tecum; and it simply asks you to bring certain

3  documents to the deposition if you have these

4  documents.  And we'll mark that notice of deposition

5  with subpoena duces tecum as Exhibit Number 1.

6              And let me show this to you.  Have you

7  seen this document before?

8              (Exhibit 1 marked for identification.)

9  A.  Could you please repeat the question?

10 Q.  Yes.  I'm just asking if you have -- if Mr. White

11 or anyone has shown you this document before.  And let

12 me go ahead and turn back to Page 4; it contains a

13 list of documents or evidence that you were asked to

14 bring to the deposition today if you have these

15 things.

16 A.  My attorney has those.

17 Q.  Okay.

18              MR. BUNT:  Is there anything that you

19          have that's been brought that hasn't already

20          been provided --

21              MR. WHITE:  No.

22              MR. BUNT:  -- in discovery disclosures?

23              MR. WHITE:  No, there's not.  And he has

24          seen that prior to the deposition.

25              MR. BUNT:  All right.



1  Q.  I'm going to just go through a few of these and

2  ask you some questions about them, but I understand

3  you may not have any of these things.

4          Mr. Gonzalez, did anyone ever give you

5  any photographs taken of the black Toyota Camry that

6  was being driven by Ms. Moreno on or around the day of

7  the accident?

8  A.  No.

9  Q.  Mr. Gonzalez, did anyone ever give you any

10 photographs of the accident scene or the highway or

11 the general area of the location where the accident

12 with Nehemias occurred?

13 A.  No.

14 Q.  Okay.  Thank you.  I may ask you some other

15 questions about these later, but we'll go on and talk

16 about other things.

17 A.  That's fine.

18 Q.  Mr. Gonzalez, you said that your name was

19 Erick Roderico.  Is it Pivaral?

20 A.  Pivaral, uh-huh.  Pivaral, yes.

21 Q.  Is Pivaral spelled P-i-v-a-r-a-l?

22 A.  Yes.

23 Q.  Thank you.

24          I have seen some spellings of the name

25 that -- a little differently.  It's like Piuara; it's



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-02714-X Document 40 Filed 01/29/21 Page 121 of 2460 PageID 413
PIVARAL GONZALEZ, ERICK on 08/01/2023

10

1  P-i-u-a-r-a.  Is that a variation of the spelling, or

2  is that just an incorrect spelling?

3  A.  It's a mistake.  You spell it the way that we

4  initially did.

5  Q.  Okay.  Thank you.  Mr. Gonzalez, other than Erick

6  Roderico Pivaral Gonzalez, are there any other names

7  you've gone by in your lifetime?

8  A.  No.

9  Q.  Are there any common nicknames that persons have

10  called you by?

11  A.  No.

12  Q.  What is your date of birth?

13  A.  It is November 17th, the year '76.

14  Q.  And, Mr. Gonzalez, where were you born, what city

15  or village and country?

16  A.  The village is Aldea La Cuchilla, San Rafael Las

17  Flores, Santa Rosa, Guatemala.

18              MR. BUNT:  Ms. Court Reporter, did you

19          get all of this?

20              THE COURT REPORTER:  I will ask for the

21          village name.

22              MR. BUNT:  Names, okay.

23              THE COURT REPORTER:  Yeah.  We can do

24          that on a break.

25              THE WITNESS:  That's fine.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:21-cv-02714-N Document 48 Filed 04/29/24 Page 122 of 2460 PageID 414
11

1  Q.  Mr. Gonzalez, are you -- are you a citizen of

2  Guatemala?

3              MR. WHITE:  Objection.  We're going to

4          invoke the fifth amendment privilege to any

5          questions that get to his immigration

6          status.  And I'm instructing my client not

7          to answer that question.

8              MR. BUNT:  Okay.

9  Q.  Is it your decision not to answer that question?

10  A.  No.

11  Q.  What are the names of your parents?

12  A.  Heliodoro de la Santos Pivaral Sandoval.

13  Q.  Is that your father?

14  A.  Yes.

15  Q.  Okay.  What was the first name again?

16  A.  Heliodoro.

17  Q.  And what is your mother's name?

18  A.  Maria Vitalina Gonzalez de Pivaral.

19  Q.  What is your current address, Mr. Gonzalez?

20  A.  Springdale, Arkansas.  It's 607 -- it's

21  S. Cleveland Street, Apartment B, Springdale,

22  Arkansas.

23  Q.  Thank you.  How long have you lived at the

24  Cleveland Street address in Springdale?

25  A.  Two years.



```
 1   Q.   And were you living there at the time Nehemias --

 2   Nehemias passed away on April 30, 2022?

 3   A.   Yes.

 4   Q.   Who lives with you there?

 5   A.   All my family.

 6   Q.   Can you tell me who that would include?

 7   A.   Yes.

 8   Q.   And who would it be?

 9   A.   Erick, yes, Jeremias Pivaral Santos.

10   Q.   And that's your son; right?

11   A.   Yes.

12              Ivan Isaias Pivaral Santos.

13   Q.   And is Ivan another son?

14   A.   Yes.  That's my family.

15   Q.   Okay.  Are you married?

16   A.   No.

17   Q.   How long have you lived in Springdale?

18   A.   In Springdale, eight years.

19   Q.   Eight years?

20   A.   Yes.

21   Q.   How long in the United States?

22   A.   13 years.

23   Q.   Okay.  Mr. Gonzalez, you said you're not married

24   now.  Have you been married previously?

25   A.   No.
```



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00714-L Document 48 Filed 04/29/24 Page 124 of 2460 PageID 416
PIVARAL GONZALEZ, ERICK on 08/01/2023                                    13

```
 1                    MR. BUNT:  And, Jacob, just to go off
 2            the record for a second.
 3                    THE VIDEOGRAPHER:  The time is 9:25.
 4            We're now off the record.
 5                    (Brief recess.)
 6                    THE VIDEOGRAPHER:  The time is 9:25.
 7            We're now on the record.
 8  Q.  Mr. Gonzalez -- and we talked about this just a
 9  moment ago, as well -- at this time, I would have
10  asked you some questions just about, like, when you
11  came to the U.S., and what your immigration status is,
12  whether you've applied for a visa or received a visa
13  or a temporary residence card or work permit of some
14  kind.
15                    Your attorney has instructed me that he
16  has instructed you not to answer those questions.  I
17  understand, from your previous answer, you're inclined
18  to follow your attorney's direction on that, so we'll
19  move on to some other things.
20  A.  That's fine.
21  Q.  Mr. Gonzalez, if I'm counting correctly, are you
22  about 36 -- 36, 37 years old?  I'm sorry.  It would be
23  46 -- 46 or 47 years.
24  A.  47.
25  Q.  47.  There we go.
```

PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00214-DPM Document 46 Filed 01/29/24 Page 125 of 2460 PageID 417
PIVARAL GONZALEZ, ERICK on 08/01/2023
14

```
 1              All right.  I'm going to ask you just a
 2   little bit about your background.  We won't go too
 3   deeply into it.  Did you attend school in Guatemala?
 4   A.  Yes.
 5   Q.  And can you tell me about what grade you would
 6   have completed in school, how many years?
 7   A.  Yes, six.  Six.  It's number six.
 8   Q.  Gracias (in Spanish).
 9              THE INTERPRETER:  Thank you.
10   Q.  Since finishing the sixth grade, have you
11   undergone any further schooling or training to learn a
12   trade or taken any other type classes of any kind?
13   A.  No.
14   Q.  What is your -- what type of work do you do now?
15   A.  Painting.
16   Q.  Okay.  Do you do commercial painting?
17   A.  Yes.
18   Q.  Do you do residential painting?
19   A.  Yes.
20   Q.  How long have you worked in painting?
21   A.  All the time that I have been here.
22   Q.  So at least 13 years now?
23   A.  Yes.
24   Q.  Do you work for someone, or do you have your own
25   business?
```



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00714-X Document 49 Filed 01/29/24 Page 126 of 2460 PageID 418
PIVARAL GONZALEZ, ERICK on 08/01/2023
15

1  A.  I get jobs.

2  Q.  But when you get the jobs, you're working directly

3  for the person whose business or whose home you're

4  painting?

5  A.  Yes.

6            MR. BUNT:  All right.  This next

7        question may get into things you don't want

8        him to answer.  I'm going to ask it, and

9        then you can decide.

10  Q.  Mr. Gonzalez, have you ever obtained a Social

11  Security number in the United States?

12            MR. WHITE:  He can go ahead and answer

13        that question.

14  A.  No.

15  Q.  Okay.  It may be the same with the next question,

16  but I'll ask:  Do you annually report your income

17  through the filing of a tax return?

18  A.  Yes.

19            MR. WHITE:  He can answer that.

20            THE WITNESS:  I'm sorry.

21  Q.  Mr. Gonzalez, do you have a driver's license?

22  A.  No.

23  Q.  Have you ever had a driver's license in any

24  country?

25  A.  In Guatemala.



1   Q.   In Guatemala, okay.

2   A.   Yes.

3   Q.   Would the license that you held in Guatemala now

4   be expired?

5   A.   Yes.   Yes.   It is with me, but it has expired.

6   Q.   Okay.   Have you ever applied for a driver's

7   license in the United States?

8   A.   No, no.

9   Q.   Mr. Gonzalez, are you the father of

10   Nehemias Santos Pivaral?

11   A.   Yes.

12   Q.   And is Nehemias's middle name also Roderico?

13   A.   Yes.

14   Q.   What is Nehemias's date of birth?

15   A.   It's August 24th, 2002.

16   Q.   What is Nehemias's mother's name?

17   A.   Johana Patricia Santos Lucas.

18   Q.   Johana Patricia Santos Lucas?

19   A.   Yes.

20   Q.   And you were never married to Ms. Santos; correct?

21   A.   No.

22   Q.   Where does Ms. Santos live now?

23   A.   Aldea Village Pajapa, Pajapita, San Marcos,

24   Guatemala.

25   Q.   Mr. Gonzalez, I assume she's been made aware of



1  Nehemias's death.  Have you spoken with her about

2  that, or has someone else?

3  A.  Yes.

4  Q.  Is she aware of this lawsuit that has been filed?

5  A.  Yes.

6  Q.  Okay.  Are you representing her also as part of

7  Nehemias's family in this lawsuit, if you know?

8  A.  Yes.

9  Q.  If money is received in the lawsuit through a

10  settlement or a verdict in judgment, would she receive

11  a portion of that?

12  A.  Yes.

13  Q.  If the lawsuit -- I know we had a mediation a few

14  weeks ago.  Although we didn't settle the lawsuit that

15  day, if the lawsuit were settled later in the months

16  to come, do you believe that Nehemias's mother would

17  be available to agree to the settlement if she were

18  asked to do so?

19  A.  I am the one representing everyone.

20  Q.  Okay.

21            MR. BUNT:  And, Jacob, that may not be

22       necessary, but I know that's just something

23       we were curious about.  So we can --

24            MR. WHITE:  We'll talk about it off the

25       record.



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0124

```
 1                    MR. BUNT:  Sure.
 2                    MR. WHITE:  But I think I have a
 3            satisfactory answer to that.
 4                    MR. BUNT:  Okay.
 5   Q.  Mr. Gonzalez, you are also the representative of
 6   Nehemias's estate.  Were you appointed by a judge or
 7   the Court as a representative of his estate?
 8   A.  No.  Well, let me see.  Would you repeat the
 9   question?
10   Q.  Yes.  And this may be something that you might not
11   have a full understanding of.  But I think it's my
12   understanding that there was some type of estate
13   proceeding brought by your attorney, Mr. White, to
14   have you named as the personal representative of
15   Nehemias's estate; that's essentially to represent him
16   and his business interests following his -- his death.
17   And I'm just asking if it's your understanding that
18   you were appointed as that representative?
19   A.  Yes.
20                    MR. BUNT:  And, Ms. Fernandez, I'm sorry
21            that question was so long.  I'll shorten
22            them.
23   Q.  Mr. Gonzalez, was Nehemias ever married?
24   A.  No.
25   Q.  What was his relationship to Evelyn Moreno?
```



 1   A.  Boyfriend and girlfriend.

 2   Q.  Okay.  At the scene of the accident, some of the

 3   police officers interviewed Ms. Moreno; and on the

 4   video, a time or two, she stated that Nehemias was her

 5   husband.  But it's your understanding that they were

 6   never actually married?

 7   A.  They were not married, no.  She -- she was taking

 8   that as if they were living together; but they were

 9   not.  They were never married.

10   Q.  Okay.  Do you know whether they were ever formally

11   engaged to be married?

12   A.  No.

13   Q.  To your knowledge, did either of them wear an

14   engagement ring of any kind or wedding ring of any

15   kind?

16   A.  No, no.

17   Q.  Okay.  You mentioned that they were living

18   together at the time.  Where -- where were they living

19   together, at what address?

20   A.  I don't know the address.  It had been a few days

21   since my son had gotten that apartment.

22   Q.  Mr. Gonzalez, is it your understanding they

23   were -- they had their own apartment that they were

24   living in?

25   A.  It wasn't -- it didn't belong to them.  My son had



 1  gotten that apartment because they were moving there.

 2  Q.  Okay.  So -- but this was an apartment that

 3  Nehemias had gotten.  Did he and Evelyn Moreno live

 4  there for a while before the family planned to move

 5  in?

 6  A.  No, no, no.

 7  Q.  Was Evelyn living -- ever living at your home?

 8  A.  No, no.

 9  Q.  Do you know whether Evelyn was living with her

10  mother at her mother's home?

11  A.  Yes.

12  Q.  Okay.  Was Nehemias then living with you at your

13  home?

14  A.  Yes.

15  Q.  And that's the apartment on Cleveland Street?

16  A.  Yes, yes.

17  Q.  How long had Nehemias lived with you?

18  A.  Ever since he arrived until the moment this

19  happened.

20  Q.  Was Nehemias also born in Guatemala?

21  A.  Yes.

22  Q.  Was he born in the same village and city that you

23  had mentioned before?

24  A.  Yes.  Pajapa, Pajapita, San Marcos.

25  Q.  Okay.  When did Nehemias first come to the U.S.?



```
 1   A.   I don't know the exact date.

 2   Q.   Do you know about how old he was at the time?

 3   A.   Yes.

 4   Q.   And how old was he?

 5   A.   16 years old.

 6   Q.   He had lived in the United States for about three

 7   years before he passed away?

 8   A.   Yes.

 9   Q.   How did he come to the United States?

10   A.   Through immigration.

11   Q.   Did he come with other family members?

12   A.   With Ivan.

13   Q.   With?

14   A.   Ivan.

15   Q.   With Ivan, his brother?

16   A.   Yes.

17   Q.   Okay.  How old is Ivan?

18   A.   Ivan is 14 years old.

19   Q.   What about your son Erick, when did he come to the

20   United States?

21   A.   It's been three years.

22   Q.   Did he come at the same time that Nehemias and

23   Ivan came?

24   A.   Yes, but he went back and then he came back here

25   again.
```



**www.ArkansasRealtimeReporting.com**

1  Q.  Okay.  After Nehemias came to the United States

2  when he was 16, which, I guess, was -- has that been

3  over four years ago now?

4  A.  Yes.

5  Q.  Did he ever go back to Guatemala during that time?

6  A.  No.  He was in Casa Hogar, yes.

7  Q.  He was where?

8  A.  He was in Casa Hogar.  I think it was in New York.

9  Q.  He was in New York, living there?

10 A.  No.  He was there because the immigration people

11 moved him there.

12 Q.  Okay.  Was he in some kind of detainment facility

13 in New York?

14 A.  Yes.

15 Q.  Okay.  At the time that Nehemias passed away, was

16 he a citizen of Guatemala?

17 A.  No.  He already had his Social Security number and

18 his permit and an ID here.

19 Q.  Do you know if he applied -- I -- I'm assuming he

20 was not yet a citizen of the United States just

21 because of the length of time it takes after applying,

22 but do you know whether he had applied for citizenship

23 in the United States yet?

24 A.  They had the full packet.

25 Q.  Mr. Gonzalez, before I show you some of these



1 things and ask you further about them, explain to me,

2 as best you understand, what Nehemias's immigration

3 status was in the United States at the time of his

4 death.

5 A.  His immigration status, well, at that time, he had

6 his permit.  Then he was going to get the green card.

7 He had his permit.  And they had approved, in

8 immigration, the full packet.  I mean, they had, you

9 know, completed everything, they had their juvenile

10 visa and everything else.

11 Q.  Do you have a copy of his juvenile visa document?

12 A.  It's at home.

13 Q.  Okay.  Is that something you could provide to your

14 attorney, Mr. White, so that he could provide it to

15 us?

16 A.  Well, I need to -- you see, the thing is I already

17 went with my lady attorney so that she will cancel all

18 of that.  And I honestly don't want to talk about

19 those things.

20          MR. BUNT:  Okay.  I think it's an area

21          we are entitled to inquire about in the

22          lawsuit.

23          MR. WHITE:  I think their immigration

24          attorney has it.  And she's not given me

25          those documents, but they have said that she



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:22-cv-00271-KGB  Document 46  Filed 04/29/24  Page 135 of 2460  PageID 427

24

```
 1              should be able to make them available.  She
 2              has not given them to me yet, but I think
 3              she is the correct avenue.  And I agree
 4              y'all are entitled to those if you can get
 5              them from her.
 6                   MR. BUNT:  Okay.
 7                   THE WITNESS:  That's perfect.
 8                   MR. BUNT:  I assume that probably
 9              Mr. Gonzalez is going to have to give his
10              consent for her to release those, and she
11              may have to give her consent too.
12   Q.  But, Mr. Gonzalez, if Mr. White advises you that
13   it is okay to ask the immigration attorney to release
14   those documents to Mr. White, are you willing to give
15   the immigration attorney that consent to do so?
16   A.  Yes.
17   Q.  Thank you.  Mr. Gonzalez, let me just quickly show
18   you what we'll mark as Exhibit Number 2.  These are --
19                   MRS. BUNT:  Can that be 14?  Yes, with
20              our list, that will be 14.
21                   MR. BUNT:  Oh, Mr. Gonzalez, let me have
22              that back.  I forgot we have some other
23              exhibits that are premarked, so we need to
24              go to -- need to go to 14.
25                   (Exhibit 14 marked for identification.)
```



1  Q.  Okay.  Mr. Gonzalez, these are simply some

2  documents that your attorney has given us.  And this

3  appears to be a Social Security card that's valid

4  for -- it says "valid for work only with DHS" -- which

5  I believe is Department of Homeland Security --

6  "authorization."  And then it gives a Social Security

7  number for Nehemias.  And it's dated April 12, 2022.

8  Does that appear to be a copy of the card that

9  Nehemias was issued, if you know?

10  A.  Yes.

11  Q.  And it appears that the date is really just a

12  couple of weeks before his death.  Had he just

13  recently received that before he passed away?

14  A.  Yes, yes.

15  Q.  And I'm going to show you two exhibits at the same

16  time.  These are identification cards.  The first

17  appears to be issued by -- Exhibit Number 15 appears

18  to be issued by the State of Arkansas as an

19  identification card.  And it was issued, I believe,

20  also within just a few days before Nehemias passed

21  away, and it's good for two years.

22          Is that something that he received around

23  the same time as the -- as Exhibit Number 14?

24          (Exhibit 15 marked for identification.)

25  A.  This is the ID.  Yes, he had just gotten it.



1  Q.  Okay.  Let me show you also Exhibit Number 16.

2  And this is -- appears to be an employment

3  authorization issued by the United States government.

4  It, too, was issued on, I believe, the same day as the

5  Social Security card, April 12, 2022.

6            Do you understand this to be the card

7  that he had just received authorizing him to work for

8  two years in the United States?

9            (Exhibit 16 marked for identification.)

10  A.  Yes.

11  Q.  All right.  And it's your understanding that any

12  other documents that he may have received showing his

13  immigration status in the U.S. would be with the

14  immigration attorney still?

15  A.  No, there is no other document.

16  Q.  You don't think the attorney -- the immigration

17  attorney has any other documents besides those?

18  A.  That they would have something, that's possible.

19  But that I have received any other document, no, I

20  have not gotten any other document other than those.

21  Q.  Okay.  I will still have you -- or I still would

22  ask that you work with Mr. White on just checking with

23  the attorney to see if she has anything else and --

24  A.  That's fine.

25  Q.  Mr. Gonzalez, was -- do you know whether Nehemias



**www.ArkansasRealtimeReporting.com**

1 had ever been subject to a deportation proceeding in

2 the past?

3 A.  No.

4 Q.  Okay.  There was some documentation that your

5 attorney, Mr. White, provided that, at least looking

6 at it, it appeared that maybe for a time, the United

7 States was possibly planning to deport him back to

8 Guatemala or that some sort of proceeding along those

9 lines had begun.

10           Do you know anything about that at all?

11 A.  Well, I'm not very good with English.  So I

12 wouldn't know.

13 Q.  Okay.  Let me ask you about Nehemias's education.

14 Did he attend school in Guatemala before he came to

15 the United States?

16 A.  Yes.

17 Q.  And do you know what grade or grades he completed?

18 A.  Yes.

19 Q.  What would they be?

20 A.  And he kept studying here, as well.

21 Q.  Okay.  What was the -- if you know, what was the

22 last grade he completed in Guatemala before --

23 A.  It was tenth grade.  So, you know, when we spoke

24 about sixth grade, and theirs is from 1 to 10.  So

25 sixth grade.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-03214-TLB Document 19 Filed 04/29/24 Page 139 of 2460 PageID 431
PIVARAL GONZALEZ, ERICK on 08/01/2023

28

1  Q.  He went through the sixth grade in Guatemala?

2  A.  Sixth, the same grade I got to.

3  Q.  Okay.  When he came to the United States, was he

4  enrolled in school here?

5  A.  Yes.

6  Q.  Was that here in Springdale?

7  A.  Yes.

8  Q.  What was the name of the high school?

9  A.  He studied at Har-Ber; Fayetteville High School.

10  Q.  Say that name again?

11  A.  High school, Fayetteville.  Fayetteville High

12  School.  Fayetteville, yeah.

13  Q.  Fayetteville?

14  A.  Uh-huh.

15  Q.  Gotcha.  Okay.  Did he graduate from high school?

16  A.  No.

17  Q.  What was the last grade he completed at

18  Fayetteville High School?

19  A.  In Fayetteville, in Fayetteville was tenth.

20  Q.  Okay.  After leaving school at Fayetteville High

21  School, did Nehemias take any college courses or any

22  courses to try to complete high school even if he

23  wasn't attending?

24  A.  No.

25  Q.  Did he take any work training courses, any



1 technical classes?

2 A.  No.

3 Q.  Did he go to work after he finished school?

4 A.  Yes.

5 Q.  Where did he work?

6 A.  With me in painting.

7 Q.  Okay.  Mr. Gonzalez, other than Nehemias Roderico

8 Santos Pivaral -- or is it Pivaral Santos?

9 A.  Pivaral Santos.

10 Q.  Pivaral is the name he received from you; correct?

11 A.  Yes.

12 Q.  And Santos from his mother?

13 A.  Yes.

14 Q.  Other than Nehemias Pivaral Santos, are there any

15 other names that he used in his lifetime?

16 A.  No.

17 Q.  Are there any common nicknames that he used or

18 that others called him by?

19 A.  Yes, yes.

20 Q.  And what was the nickname?

21 A.  Gato.

22 Q.  Gato, like "cat"?

23 A.  Yes.

24 Q.  Okay.  Going back to his employment, did he work

25 with you full time painting?



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:24-cv-02714-K  Document 49  Filed 04/29/24  Page 141 of 2460  PageID 433
PIVARAL GONZALEZ, ERICK on 08/01/2023

30

1  A.  Yes.

2  Q.  Do you have -- how many persons do you have

3  working for you?

4  A.  Eight.

5  Q.  Do you have separate crews?

6  A.  Two groups.

7  Q.  Two groups, okay.

8            Was he in one of the -- was he just in

9  one of those groups, or did he leave one of those

10  groups?

11  A.  Well, right now, I have two crews.  But he was,

12  like, set aside.  But he's not here anymore.

13  Q.  I understand.  And I was meaning to ask at the

14  time he was still working for you.

15  A.  It was three -- there were three groups.

16  Q.  How did you pay Nehemias?

17  A.  I pay him cash.

18  Q.  Did you pay him an hourly wage, or did you pay him

19  a certain amount by -- for each job?

20  A.  It was by the house.

21  Q.  So for each house, would you just decide, based on

22  what the total amount you were going to receive, how

23  much each of your painters working on that house would

24  receive?

25  A.  Yes.



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0137

1  Q.  And was it at all based on the number of hours

2  they worked or the number of days they worked?

3  A.  Well, this was based on -- it didn't matter how

4  much time it took him.  It was based on a salary I was

5  giving him.

6  Q.  Did you give him a set salary that was the same

7  each week, or each month?

8  A.  No.  Every time he would finish with a house, I

9  would pay him.

10 Q.  Okay.  Did you -- Mr. Gonzalez, did you keep

11 records of the amounts that you would pay Nehemias?

12 A.  Yes.

13 Q.  What kind of records did you keep?

14 A.  I have a book where I would write down what I pay

15 him.

16 Q.  So you would write down the amounts in a written

17 ledger book?

18 A.  Yes.

19 Q.  Do you still have a copy of the book that you were

20 using when Nehemias was living?

21 A.  No.

22 Q.  What has happened -- what became of that book?

23 A.  Well, since we didn't want to deal with things

24 that reminded us of him, we actually put it in his

25 truck and the animals got to it, and it was destroyed.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:...-cv-00714-L Document 48 Filed 04/29/24 Page 143 of 2460 PageID 435
PIVARAL GONZALEZ, ERICK on 08/01/2023
32

1  Q.  So nothing of that book exists anymore?  Is it all

2  gone?

3  A.  No.  What we did is we took everything that

4  belonged to him and put it in that little truck that

5  he used to use, and even machinery and little things

6  like machines we put in there, all the documentation

7  and stuff; and the animals got to it, they started

8  messing in it and stuff.  And, you know, now I'm using

9  some of the machines, but all the documents are

10  completely destroyed.

11  Q.  And just to be -- so I can be clear, other than

12  that ledger, did you keep a record anywhere else of

13  the amounts that you would pay to Nehemias whether

14  written or in a computer or anything like that?

15  A.  No, no.

16  Q.  Whenever you paid Nehemias, did you just pay him

17  in cash, or did you hold back any part of the money to

18  pay taxes or anything?

19  A.  Yes.

20  Q.  What would you hold back from his -- his payment?

21  A.  I would -- I would take away 300, 200, for

22  taxes -- tax purposes.

23  Q.  Okay.  The -- the monies that you held back for

24  tax purposes, did you use that to pay -- to pay taxes

25  for Nehemias later?



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-02714-L Document 49 Filed 04/28/24 Page 144 of 2460 PageID 436
PIVARAL GONZALEZ, ERICK on 08/01/2023

33

1 A.   Yes.

2 Q.   All right.  Did Nehemias file his own income tax

3 returns, or did you file income tax returns for him?

4 A.   I -- I did include him in my tax returns.

5 Q.   Mr. Gonzalez, do you still have copies of those

6 tax returns that you filed which included Nehemias?

7 A.   I don't have any of that at home.

8 Q.   Who did you use to prepare the tax returns?

9 A.   For -- you mean, tax returns for him?

10 Q.   Well, you said you included Nehemias in the tax

11 returns that you filed.  And I'm just asking:  Did you

12 have someone at a business prepare those tax returns

13 and send them in?

14 A.   Yes, yes.

15 Q.   Who was the person or the business that you used?

16 A.   Her name is -- it's this lady.  Her name is

17 Madeleine.  Madeleine.

18 Q.   Do you know Madeleine's last name?

19 A.   No.

20 Q.   Where is Madeleine located?

21 A.   Here in Springdale.  Springdale.

22 Q.   Do you know what street?  Does she have an office?

23 A.   Yes.

24 Q.   What street, if you know?

25 A.   71.



1   Q.   Is she a bookkeeper or prepares tax returns for

2   people?

3   A.   She is a bookkeeper and she is also a tax

4   preparer.

5   Q.   Okay.  Do you -- if you don't -- I know you don't

6   know her last name right now.  Do you know -- does she

7   just do business under her name, or does her business

8   have its own name?

9   A.   She has a business.

10  Q.   Okay.  Do you know the name of the business?

11  A.   Well, it's at her office.  I mean, she not only

12  does, like, tax stuff.  I mean, she does all kinds of

13  things.

14  Q.   Okay.  I'm just -- the reason I'm asking you about

15  this is to see whether, perhaps, we might be able to

16  obtain the tax returns that would have had Nehemias's

17  income on them from her.  You said you don't have them

18  at your home.  Would she, perhaps, have copies of

19  these?

20  A.   It would be a matter of asking her.  To be honest

21  with you, I wouldn't know.

22  Q.   Okay.  Mr. Gonzalez, would you be able to -- would

23  you be willing to get her -- her name and office

24  address for us so we could request those records?

25  A.   Yes.



1  Q.  And can you just provide that to Mr. White for us?

2  A.  Yes.

3  Q.  Mr. Gonzalez, do you know -- would you be able to

4  give me some -- it wouldn't have to be an exact

5  amount, but an estimate of how much money Nehemias

6  earned in 2021?

7  A.  Well, the little homes, it was variable.  I mean,

8  sometimes it would be $2,000.  Sometimes it would be

9  $1,500.

10  Q.  And that's the total pay received for those homes?

11  A.  Yes.

12  Q.  So do you have any idea for, let's say, the whole

13  year of 2021, how much Nehemias would have received,

14  just him, as payment for the work he did on those

15  homes?

16  A.  During the year?

17  Q.  Yes.

18              THE INTERPRETER:  I'm sorry.  The

19          interpreter needs a clarification.

20        (Interpreter clarification in Spanish.)

21              THE INTERPRETER:  What the interpreter

22          originally heard was it could be anywhere

23          between 75 and 175.  So the interpreter

24          stated, "Mr. Gonzalez, there is a big

25          difference between 75,000 and 175,000."  He



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:22-cv-00274-N Document 49 Filed 04/29/24 Page 147 of 2460 PageID 439
36

```
 1                    said, "Well, it's variable.  It could say --
 2                    I could say that it was something like, if
 3                    we think about it and we do a calculation of
 4                    about, let's say approximately eight months,
 5                    it would be about $75,000."
 6   Q.  Is the $75,000 the total that you received from
 7   the homeowners, or is the $75,000 just what you paid
 8   to Nehemias?
 9   A.  I would pay him.
10   Q.  Can you give me an estimate of how much you
11   believe Nehemias would have earned from you, received
12   from you during 2022 up until the date he passed away?
13   A.  In 2022, he received almost 100 -- $100,000.
14   Q.  And Madeleine should have records that would show
15   this; correct?
16   A.  Well, she would not have records of this because,
17   you see, that had to do with money that I had saved up
18   from little odd jobs that he was doing.  And I had
19   given him that money before this tragedy happened, and
20   he had purchased machinery, vacuums, tools.
21                    That money, I reported it on my taxes.  I
22   didn't include him on any of that anymore.
23   Q.  And is that just for 2022 that you did not report
24   any for him?
25   A.  Yes.  I did everything under my name.  Everything
```



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:21-cv-00274-DPM Document 49 Filed 04/29/24 Page 148 of 2460 PageID 440
37

1  was under my name.

2  Q.  In 2020 and 2021, would Nehemias have had a

3  separate tax return during those years?

4  A.  No, no.

5  Q.  Maybe I misunderstood what you said earlier.  Are

6  you saying that -- let me go back and ask again.

7           I asked you if Nehemias filed income tax

8  returns; and I think you said you included him in your

9  tax returns.  Was his name put on your tax return?

10 A.  Okay.  May I ask a question?

11 Q.  Yes.

12 A.  Okay.  Okay.  Maybe I didn't understand the

13 question.  But everything that I would pay to him, I

14 would report it as my income.

15 Q.  Okay.  So there wouldn't be separate income tax

16 returns for Nehemias; but whatever money you earned

17 and took a portion and paid to Nehemias would be

18 reported on your tax returns in your name; is that

19 correct?

20 A.  Yes.  So all the money that I would pay him, the

21 way that I did my income tax was as if I was earning

22 that money.

23 Q.  I understand.  And Madeleine should have copies of

24 those tax returns that you filed in your name?

25 A.  Yes, yes.  That should be perfectly fine.  She



1  would have everything.

2  Q.  Okay.

3          MR. BUNT:  Do y'all want to take a

4      little break, or --

5          MR. WHITE:  Yeah, let's take a little

6      bathroom break.

7          THE VIDEOGRAPHER:  The time is 10:28.

8      We're now off the record.

9          (Recess from 10:28 a.m. to 10:42 a.m.)

10          THE VIDEOGRAPHER:  The time is 10:42.

11      We're now on the record.

12  Q.  Good morning, again, Mr. Gonzalez.  We just took a

13  brief break.  So I will resume my questions.

14  A.  That's fine.

15  Q.  Mr. Gonzalez, the trip that Nehemias and Evelyn

16  and the others were on at the time of the accident,

17  what did you know about that trip, where they were

18  going, what they were doing, and so forth?

19  A.  No, I don't know anything.

20  Q.  Did you even know they were taking a trip to

21  Texas?

22  A.  Yes.

23  Q.  Do you know where in Texas they went?

24  A.  They were just going for a trip.

25  Q.  Do you know to what city or what part of Texas

 1  they were going?
 2  A.  No.
 3  Q.  No one ever told you where they were going?
 4  A.  No.
 5  Q.  Do you know where they stayed when they were on
 6  their trip?
 7  A.  No.
 8  Q.  So as to whether they stayed at a hotel or hotels
 9  or with friends, you don't have any idea?
10  A.  No.
11  Q.  So do I understand that you did know they were
12  taking a trip to Texas, but beyond that, you didn't
13  know any more about it?
14  A.  No.
15  Q.  Do you know how many days they were gone on the
16  trip?
17  A.  Yes.
18  Q.  How many days had they been gone?
19  A.  Three days.
20  Q.  Okay.  The accident happened on a Saturday.  Had
21  they been -- had they been gone since Wednesday of
22  that week?
23  A.  Yes.
24  Q.  Did you know that Erick was going on the trip
25  also?



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00714-L Document 49 Filed 04/29/24 Page 151 of 2460 PageID 443
PIVARAL GONZALEZ, ERICK on 08/01/2023
40

```
 1   A.  Yes.

 2   Q.  What is Erick's date of birth?

 3   A.  I don't know it.  I know it's September in 2000,

 4   but I don't know the exact date.

 5   Q.  Okay.  And Erick, was he living with you at the

 6   time of the trip they took, also?

 7   A.  Yes, yes, he was living with me.

 8   Q.  Okay.  Did you know Dina Regalado Soto?

 9   A.  Yes.

10   Q.  How did you know Dina?

11   A.  They worked with me.  And we have this friendship

12   like family.

13   Q.  Okay.  What kind of work does Dina do for you?

14   A.  She -- painting, preparing the paint.

15                 THE INTERPRETER:  Or "prepping."  It

16           could be either way.  The interpreter is

17           guessing.  Would you like for me to inquire?

18                 MR. BUNT:  You may ask.

19   Q.  Does she do the preparation work for the painting?

20   A.  When I say "prepping," I meant, you know, covering

21   all the holes, so do all the caulking, stuff like

22   that.

23   Q.  Yes.  Okay.

24                 How long has Dina Regalado worked for

25   you?
```



**www.ArkansasRealtimeReporting.com**

1  A.  Ever since -- like, the entire time they have been

2  living here, almost.

3  Q.  And that's about eight years?

4  A.  No.  They have been here for about three years.

5  Q.  Three years.  Okay.

6  A.  Yeah.

7  Q.  Did you know Melvin Alexander Diaz?

8  A.  That's her husband.

9  Q.  Does Mr. Diaz work for you also?

10  A.  Yes.

11  Q.  And has he worked for you for the same period of

12  time as Dina?

13  A.  Yes, yes.

14  Q.  What name does Mr. -- what first name does

15  Mr. Diaz usually go by?

16  A.  Melvin.

17  Q.  Melvin.  Have you ever heard him go by "Alex"?

18  A.  No.  He only likes to be called Melvin.

19  Q.  Okay.  Mr. Gonzalez, how did you learn of the

20  accident involving Nehemias?

21  A.  I got a call.

22  Q.  Do you remember who called you?

23  A.  Evelyn called me.

24  Q.  Okay.  And had the accident just very recently

25  happened when she called you?



**PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL**
**PIVARAL GONZALEZ, ERICK on 08/01/2023**
Case 3:22-cv-00214-L Document 49 Filed 04/29/24 Page 153 of 2460 PageID 445
42

 1   A.  Yes.

 2   Q.  Did she call you from the accident scene, as far

 3   as you know?

 4   A.  Yes.

 5   Q.  What do you remember her telling you happened?

 6   A.  I don't want to talk about that.

 7   Q.  I understand.  But I need to ask you some of these

 8   questions.  And I will -- I will try to be as

 9   sensitive and understanding as I can.  And I'm not

10   going to press too much, but I would kind of like to

11   know the details of what she said.

12   A.  Okay.

13   Q.  Mr. Gonzalez, as best you can remember, how did

14   Evelyn describe how the accident happened?

15   A.  She just told me that a person had gone off her

16   lane.  And at the same time, she saw that she was

17   going to impact the entire group, but she corrected

18   and tilt the wheel, and at that time she only impacted

19   Nehemias.

20   Q.  Do you recall anything else she told you about

21   what the other driver -- the driver of the other car

22   did?

23   A.  No.

24   Q.  Did she tell you where Nehemias was standing at

25   the time the car struck him?



**PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL**
Case 3:22-cv-00714-L Document 42 Filed 04/29/24 Page 154 of 2460 PageID 446
**PIVARAL GONZALEZ, ERICK on 08/01/2023**

43

1  A.  No.

2  Q.  Did any of the other passengers of the car call

3  you from the scene?  Did Erick call you at any time to

4  talk to you about it?

5  A.  No, no.

6  Q.  Did anyone send you a text on your phone about

7  what had happened?

8  A.  No.

9  Q.  At any time after the accident, do you remember

10  anyone sending you a text describing what had

11  happened?

12  A.  No.

13  Q.  And I know you've answered an interrogatory about

14  this, but do you still have the phone that you were

15  using at that time in April 2022?

16  A.  The same number, yes.  The phone, the device, no.

17  It just got damaged.

18  Q.  Okay.  What happened to that phone?

19  A.  It fell.  I was on one of the ladders; and it

20  shattered.  I mean, I've already gone through two

21  phones, but I keep the same phone number.

22  Q.  Do you still have the broken phone?

23  A.  No.  It was useless.

24  Q.  Was it thrown away?

25  A.  Yeah.  It was -- I was on the ladder.  It fell on



1  concrete.  That was it for it.

2  Q.  Okay.  Were you able to obtain any pictures or

3  anything off of that phone before it was damaged?

4  A.  One question.  Pictures?  What kind of pictures?

5  Q.  Well, did any -- I was going to ask you this in a

6  minute.  But did anyone send you any photographs of

7  anything there at the accident scene, of Evelyn's car

8  or of the other car, anything like that?

9  A.  No.

10  Q.  Mr. Gonzalez, after Evelyn told you about the

11  accident, at any time, did you go to Texas to where it

12  happened?

13  A.  Yes.

14  Q.  Did you travel there immediately?

15  A.  Yes.  I just looked for someone to take me

16  because, at that time, I was in no condition to.

17  Q.  And did someone drive you there to the location in

18  Texas where the accident happened?

19  A.  Yes.  But they were no longer there.

20  Q.  Okay.  When you were there at the scene, did you

21  take any photographs at all with your phone?

22  A.  I didn't go to the place where the accident

23  occurred.  I went to the place where the police

24  officer told me that they were going to be staying

25  until I got there.



**PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL**
Case 3:21-cv-02714-L Document 48 Filed 04/29/24 Page 156 of 2460 PageID 448
**PIVARAL GONZALEZ, ERICK on 08/01/2023**

45

1  Q.  Okay.  Where were Evelyn and Erick and the others

2  staying when you got there?

3  A.  I don't know my way around there, but they were

4  with these Hispanic people at a farm.

5  Q.  Okay.  As far as the name of the family, do you

6  have any idea what their name was?

7  A.  No, no.

8  Q.  Okay.  The persons with whom they were staying, do

9  you know if they were friends of Evelyn or Dina or

10  Melvin?

11  A.  No.  These were people that the police officer

12  took them there, and they just offered to help.

13  Q.  Okay.  Mr. Gonzalez, did you get a chance to speak

14  to any of the police officers, yourself, about the

15  accident?

16  A.  No.

17  Q.  Since then, are you aware of anyone who has taken

18  photographs or who took photographs there at the

19  accident scene other than the police?

20  A.  No.

21  Q.  Did you know anything about the car in which they

22  were riding, the 2011 Toyota Camry?

23  A.  At that time, I didn't know anything until they

24  told me what happened.

25  Q.  Who do you understand was the owner of the car?



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:21-cv-00714-L Document 49 Filed 04/29/24 Page 157 of 2460 PageID 449
46

1  A.  Evelyn's mother.

2  Q.  Do you know anything about what kind of condition

3  the car was in?

4  A.  I didn't know anything until I got there.  And

5  they told me that one of the tires had blown up, the

6  front one.

7  Q.  Did they tell you who fixed the tire, who repaired

8  the tire?

9  A.  They told me that the fire fighters had helped

10  them replace the tire so that they could go to the

11  place where they were at.

12  Q.  Do you -- today, do you know about the condition

13  of the tires, how old they were, how much tread they

14  had on them?

15  A.  No.

16  Q.  Who do you understand was driving the car prior to

17  the accident?

18  A.  Evelyn.

19  Q.  Have you -- did you -- other than the phone

20  conversation you had with Evelyn when she called you

21  from the scene, did you speak to her later further

22  about how the accident happened?

23  A.  No.  Not at that time, no.

24  Q.  Have you ever spoken with Evelyn further about how

25  the accident happened?



**www.ArkansasRealtimeReporting.com**

1   A.  No.

2   Q.  So the only conversation you've had with her about

3   it was just the one by telephone the day that it

4   happened?

5   A.  Yes, because she wasn't available any longer to

6   speak to me.

7   Q.  Okay.  When you spoke with her on the telephone,

8   did she at any time describe to you where Nehemias was

9   standing when he was struck by the car?

10  A.  No, no.

11  Q.  Did Evelyn ever tell you where she was standing at

12  the time?

13  A.  No.

14  Q.  Did she tell you what they were doing at the time

15  the accident happened?

16  A.  They told me that they were just going to replace

17  the tire.  That's it.

18  Q.  Did she tell you who was inside the car and who

19  was outside the car?

20  A.  She just told me that all of them were outside.

21  Q.  Mr. Gonzalez, did you ever later speak to Erick

22  about how the accident happened?

23  A.  Yes.

24  Q.  Did he say that he saw the accident, that he saw

25  when Nehemias was struck?



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:...cv-02714-K Document 48 Filed 04/29/24 Page 159 of 2460 PageID 451
PIVARAL GONZALEZ, ERICK on 08/01/2023
48

1  A.  He just told me that he was helping to replace the

2  tire, but they had taken it out, and that Nehemias was

3  squatting down, looking for a tool, but that he only

4  heard the impact.  It was just like when he turned to

5  see, he had already been impacted.

6           THE INTERPRETER:  The interpreter's

7           correction.  The interpreter used "squatting

8           down"; and I believe the word that the

9           witness used was he was, like, "down" or

10          "bowing down" or "bent."

11          MR. BUNT:  Okay.

12          THE INTERPRETER:  Would you like for the

13          interpreter --

14          MR. BUNT:  Maybe ask for clarification

15          on that.

16          THE INTERPRETER:  (Clarification in

17          Spanish.)

18  A.  It was like he was on his knees, looking for a

19  tool.

20  Q.  Okay.  Mr. Gonzalez, do you know what specific

21  tool he was looking for?

22  A.  No.

23  Q.  And do you know where he was -- did Erick say

24  where the tool was or should be?  Are we talking was

25  the tool on the ground, or was the tool still in the

**PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL**
**PIVARAL GONZALEZ, ERICK on 08/01/2023**
Case 3:21-cv-00714-L Document 40 Filed 04/29/24 Page 160 of 2460 PageID 452

49

1 car, or do you know?

2 A. He just told me that Nehemias was about a meter or

3 a meter and a half behind, like the tool had fallen

4 and he was looking for it.

5 Q. A meter or a meter and a half behind the car?

6 A. Yes.

7 Q. And did I understand you to say that he thought

8 the tool had fallen to the ground and Nehemias was

9 looking for it on the ground?

10 A. Yes.

11 Q. And did Erick ever say specifically what tool it

12 was?

13 A. No, no.

14 Q. And at the moment that Nehemias was struck, Erick

15 was looking another direction, so he only heard the

16 impact?

17 A. Yes.

18 Q. Did Erick tell you anything about the other car,

19 about the car that struck Nehemias?

20 A. Yes.

21 Q. What did he say about the car?

22 A. That he had, like, turned around like that, he had

23 just looked around like that; and when he saw that the

24 car was coming onto them, and then she just, like,

25 barely corrected herself and tried to -- and then he



1  heard the -- he heard the impact, and then she tried

2  to go into the lane again -- or into the other lane

3  again.

4  Q.  So Erick told you he saw the car approaching?

5  A.  He said that he saw when the car was coming onto

6  them, but he said it was like in the blink of an eye.

7  There wasn't time for anything.  He only saw whenever,

8  like...

9  Q.  He said he saw the car coming, but, yet, he did

10  not see the car strike Nehemias; correct?

11  A.  No.  He just heard the noise or the impact.  Well,

12  he just told me that it was like the sound when

13  somebody gets off, but it's like there is no time for

14  anything.

15  Q.  Did Erick -- what, if anything, did Erick say he

16  did after the accident happened?

17  A.  Yes.

18        THE INTERPRETER:  I'm sorry.  May the

19     interpreter ask for a repetition?

20        MR. BUNT:  Yes.

21        THE INTERPRETER:  (Clarification in

22     Spanish.)

23  A.  He just told me that whenever the impact occurred,

24  whenever this person -- whoever this person was that

25  was driving the car impacted him, as she corrected,



**PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL**
Case 3:21-cv-00214-1 Document 19 Filed 04/29/21 Page 162 of 2460 PageID 454
PIVARAL GONZALEZ, ERICK on 08/01/2023

51

1  she threw him off to the speed lane, and he just told

2  me that at that time, he pulled the body so that the

3  other cars would not smash it up.

4  Q.  He told you that Nehemias's body came to rest in

5  the travel lane; is that what is meant by "speed

6  lane"?

7  A.  Yes.

8  Q.  And did I correctly understand that he -- Erick

9  said he then pulled his body out of the travel lane?

10  A.  So that the other cars would not go over it.

11  Q.  Did Erick say whether anyone else helped him?

12  A.  No.  By himself.

13  Q.  Okay.  Did you ever speak with Dina Regalado about

14  the accident?

15  A.  No.

16  Q.  You've never had a conversation with her where she

17  explained what she saw?

18  A.  She -- I asked her, but she didn't see anything

19  because she was laying down on her husband's legs.

20  She said that she -- that they were, like, standing

21  towards the barrier and that she was just leaning on

22  him.

23  Q.  Did you ever have a conversation with Melvin and

24  ask what he saw?

25  A.  Yes.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00214-X Document 48 Filed 04/29/24 Page 163 of 2460 PageID 455
PIVARAL GONZALEZ, ERICK on 08/01/2023
52

1 Q. What, if anything, did Melvin tell you that he

2 saw?

3 A. "What I saw is that this lady was on her phone;

4 and I saw her when she left her lane and when she

5 impacted Nehemias." He told me the same thing that

6 Erick told me in the sense that there wasn't time for

7 anything, that it happened in the blink of an eye.

8 Q. Melvin Diaz told you that he saw the car

9 approaching?

10 A. Yes, but he -- he said that he saw all of that.

11 He saw her whenever she left her lane and then went

12 back to her lane. It was like going in and going out.

13 Q. When you say "left her lane," are you

14 understanding Melvin to say she left the left travel

15 lane and came into the shoulder, and then went back to

16 the travel lane?

17        MR. BUNT: Can you ask him if he can

18        clarify that?

19 A. Okay. So the lady was coming on the travel lane.

20 And at some moment in time, she went into the

21 shoulder, you know, after the yellow line. And then

22 whenever she impacted my son, that's when she was

23 trying to correct it and then got into her lane again.

24 Q. And Melvin told you that he saw all of this?

25 A. Yes.



1  Q.  Did Melvin tell you where Nehemias was at the time

2  he was struck?

3  A.  Yes.

4  Q.  What did he say?

5  A.  That he was about a meter to a meter and a half

6  behind the car.

7  Q.  Did Melvin say whether he was in -- whether

8  Nehemias was in the travel lane behind the car, or on

9  the shoulder out of the travel lane?

10  A.  He was on the --

11          THE INTERPRETER:  And the deponent is

12          calling it the "emergency lane."

13  A.  -- the shoulder, the emergency lane, where you see

14  the yellow line, from the yellow line to the barrier.

15  Q.  Okay.  Mr. Gonzalez, let me show you what's been

16  marked -- these are premarked, so I'll just use these

17  numbers.  I'm going to show you what's been marked

18  Exhibit Number 4.

19          And I know it's a little hard to see, but

20  this yellow line, is this the line that you're talking

21  about that Melvin said he was between this yellow line

22  and this barrier over here?

23          (Exhibit 4 marked for identification.)

24  A.  Yes.  This is the barrier (indicating); right?

25  And this is the yellow line, supposedly.  So Nehemias



1  was (indicating)...

2  Q.  And just to go to a picture of the front of the

3  car -- and this is Exhibit Number 2 -- we're still

4  talking about this yellow line and this barrier over

5  here (indicating)?

6  A.  Yes, on the inside; but, of course, on the back

7  side -- on the back side.

8  Q.  On the back side, correct.

9          Did you ever have any conversation with

10  Evelyn Moreno about why she stopped her car on the

11  left side of the road as opposed to the right side of

12  the road?

13  A.  Yes.

14  Q.  And what was said?

15  A.  She said that, at the moment that the tire blew

16  up, that at that same time, the car had just pulled

17  them into that area.

18  Q.  Did you ever have a conversation with Evelyn about

19  why she stopped where the car was only partly on the

20  shoulder but still partly in the travel lane?

21  A.  No.

22  Q.  Okay.  Mr. Gonzalez, did Nehemias ever have a

23  driver's license?

24  A.  No.

25  Q.  You mentioned a truck that he drove around, a



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-02714-N Document 40 Filed 04/29/24 Page 166 of 2460 PageID 458
PIVARAL GONZALEZ, ERICK on 08/01/2023

55

1  little truck.  What kind of truck did he have?
2  A.  It was a Nissan Infiniti QX4.  QX4.  It was under
3  my name.  He would just use it to go to work.  That's
4  it.
5  Q.  So it was your truck, but you let Nehemias use it
6  to go to and from work?
7  A.  Yes.  I had already given it to him.  The only
8  thing, we didn't get to do the transfer.
9  Q.  Did Nehemias ever take any kind of driving course?
10 A.  He was practicing to get his driver's license.
11 Q.  And when you say "practicing," was he just
12 practicing with you?
13 A.  He had already gotten the booklet, you know,
14 because they give them a booklet.  Then he was already
15 studying it.
16 Q.  Did he ever take an actual class on driving at
17 school or anything?
18 A.  No, no, no, no.
19 Q.  And I believe you've already answered this,
20 Mr. Gonzalez, but you never had a conversation with
21 Corporal Winston?  This was the police officer that
22 prepared the accident report.  Am I correct?
23 A.  No.
24 Q.  And you never spoke to any of the Texas state
25 troopers who were there at the scene of the accident,



1 either; is that correct?

2 A.  No.

3 Q.  Other than Evelyn, Erick, Dina, and Melvin, have

4 you spoken with anyone else who told you they saw the

5 accident happen?

6 A.  No.

7 Q.  Have you -- even if you've not spoken with them

8 personally, have you become aware of any other persons

9 who say they witnessed the accident, persons other

10 than Evelyn, Erick, Dina, and Melvin?

11 A.  No.

12 Q.  In your interrogatory answers, the names of some

13 witnesses were listed.  And I just want to ask you if

14 you know anything about these persons.  Do you know

15 who José Aguilar is?

16 A.  José, no.

17 Q.  Do you have any idea what he would know about the

18 accident?

19 A.  No.

20 Q.  Do you know who Stephanie Mitchell is?  I think

21 she lives in Corsicana.  That would be near the

22 accident.

23 A.  Stephanie?

24 Q.  Si (in Spanish).

25          THE INTERPRETER:  Yes.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-02714-L Document 42 Filed 04/29/24 Page 168 of 2460 PageID 460
PIVARAL GONZALEZ, ERICK on 08/01/2023
57

1   A.  I believe that's where they were at.  I don't know

2   her name, per se, but I believe that's where the

3   police officer took them, where they were at.

4   Q.  Okay.  Rosemary Ricny, if I'm saying that right,

5   R-i-c-n-y, do you know who that person is?

6   A.  No.  I don't know.

7   Q.  Manuel Yoli Medrano?  And I think he lives in New

8   Mexico.  Do you know who that is?

9   A.  No.

10  Q.  Any idea what Stephanie or Rosemary or Manuel

11  would know?

12  A.  Rosemary, no, I don't know.

13  Q.  Okay.  Mr. Gonzalez, is there anything else that

14  you have heard about how the accident has happened

15  that you haven't told me about?  I know I've tried to

16  ask you questions about what you may have heard or

17  been told.  But is there anything else that's coming

18  to mind that you've been told about how the accident

19  happened that we haven't talked about?

20  A.  No.

21  Q.  Mr. Gonzalez, other than this lawsuit, have you

22  personally ever been a party to a lawsuit, either in

23  the United States or Guatemala?

24  A.  No, no.

25  Q.  To your knowledge , has Nehemias -- before his



1  death, was he ever a party to a lawsuit either in

2  Guatemala or the United States?

3  A.  No, no.

4  Q.  Mr. Gonzalez, I ask this of every witness.  Have

5  you ever been arrested or convicted of a crime?

6              THE INTERPRETER:  I'm sorry.  Would you

7          repeat the question for the interpreter?

8              MR. BUNT:  Let me -- let me start.  Let

9          me break that down into two questions to

10          make it easier.

11  Q.  Mr. Gonzalez, have you ever been convicted of a

12  crime?

13  A.  Would you please explain that question, how that

14  goes?

15  Q.  Yes.  Have you ever been charged with a crime and

16  had to serve time in jail or pay a fine?

17  A.  No.

18  Q.  Okay.  And can I assume you don't have any

19  criminal charges pending against you right now or

20  you're not being investigated for anything that you're

21  aware of?

22  A.  No.  I don't have any problems.

23  Q.  That's --

24  A.  As a matter of fact, my number -- immigration has

25  my number.  Everybody has my number.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00214-JM Document 49 Filed 04/29/24 Page 170 of 2460 PageID 462
PIVARAL GONZALEZ, ERICK on 08/01/2023

59

1  Q.  Mr. Gonzalez, was Nehemias ever arrested or

2  convicted of a crime that you're aware of?

3  A.  Inside or outside?

4  Q.  Well, let's start with in Guatemala.

5  A.  No, no.

6  Q.  Okay.  Now, I know -- we know he was detained at

7  some point while he was in the United States in New

8  York, I think; and that, I assume, was because of his

9  immigration to the United States.

10          Other than that, has he ever, to your

11  knowledge, spent any time in jail or prison?

12  A.  No, no.  Only immigration.

13  Q.  Okay.  Mr. Gonzalez, you've never spoken to

14  Caylee Smith, the lady who was driving the other car

15  involved in the accident, have you?

16  A.  No.

17  Q.  Would it be accurate, then, to say that you don't

18  know -- other than that she was involved in this

19  accident, you wouldn't know anything else about her

20  driving history, would you?

21  A.  No.

22  Q.  Or whether she's had accidents before?

23  A.  No.

24  Q.  Or whether she's had any driving violations or

25  traffic tickets before?



1   A.   No.

2   Q.   Other than this particular accident, you wouldn't

3   have any knowledge about whether she's a good driver

4   or a bad driver, would you?

5   A.   No.

6   Q.   Can I also assume that you don't know anything

7   about her employment?

8   A.   No.

9   Q.   Beyond what you may have been told by your

10  attorney, you wouldn't have any knowledge about

11  whether or not she was working on the day of the

12  accident, would you?

13  A.   No.

14  Q.   Whether she was acting as an employee at the time

15  of the accident?

16  A.   No.

17  Q.   And I think I know the answers to these questions,

18  too, but I will ask them.  Mr. Gonzalez, are you aware

19  of any facts that would show Eastman Chemical Company,

20  her employer, was negligent when it hired Mrs. Smith?

21  A.   No, I don't.

22  Q.   You wouldn't know anything about her hiring, would

23  you?

24  A.   No.

25  Q.   Mr. Gonzalez, are you aware of any facts that



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00214-X Document 48 Filed 04/28/21 Page 172 of 2460 PageID 464
PIVARAL GONZALEZ, ERICK on 08/01/2023

61

1    would show Eastman was negligent in the way it trained

2    Mrs. Smith as an employee?

3    A.  No.

4    Q.  Mr. Gonzalez, are you aware of any facts that

5    would show Eastman was negligent in the way it went

6    about supervising Mrs. Smith as an employee?

7    A.  No.

8    Q.  Mr. Gonzalez, are you aware of any facts that

9    would show that Eastman was negligent in retaining or

10   keeping Mrs. Smith as an employee?

11   A.  Could you explain that a little bit further?

12   Q.  In your complaint that Mr. White has filed, there

13   is an allegation that Eastman was negligent for

14   keeping Mrs. Smith as an employee; presumably the

15   allegation is that it knew or should have known she

16   was not a good driver and therefore should not have

17   kept her as an employee.

18              Do you know anything about that at all?

19   A.  No.  May I -- may I --

20   Q.  Yes.

21   A.  May I say something?  Me, me, when it comes to me

22   as an employer, when I hire seven, eight, ten people,

23   when I am offering work to these people, I have to be

24   sure, as an employer, what type of a person I am

25   employing.



```
 1              THE INTERPRETER:  Continue.
 2   A.  Because I have to be sure that that person is a
 3   good worker, whether a lady or a man.  Because I have
 4   to make sure that this person is not going to bring
 5   trouble to my work.  Uh-huh.
 6   Q.  I understand.  Regarding Eastman's decision-making
 7   process in hiring or keeping Mrs. Smith as an
 8   employee, you wouldn't personally know anything about
 9   that, though, would you?
10   A.  No.
11   Q.  As far as how this accident happened and whose
12   fault it was, obviously you were not there; you didn't
13   see what happened.  I know you're relying upon what
14   you were told by others.  But since you are the
15   plaintiff in the lawsuit, tell me, Mr. Gonzalez, what
16   you understand about how the accident happened and who
17   was at fault for it.
18   A.  The driver is at fault.  I have been a driver for
19   30 years.  Everything, cars, trailers, I have driven
20   just about anything.  And in the entire time that I
21   have been a driver, a person needs to be paying
22   attention, on the wheel.  I was driver -- I was a
23   driver in Guatemala.  I was also a driver in Mexico.
24   I even drove a double trailer.  And I never had an
25   accident.  Because when one is driving, you have to be
```



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-02714-L Document 46 Filed 01/29/24 Page 174 of 2460 PageID 466
PIVARAL GONZALEZ, ERICK on 08/01/2023
63

```
 1   constant, you have to be paying attention at the
 2   wheel.  And that's when you, you know, are aware of
 3   what's happening in your surroundings.  Like, if you
 4   see a car that is stopped in front of you, you have to
 5   kind of, like, come to a stop yourself.  That's what
 6   we all do.  If we see a car that is having an
 7   emergency stop, I mean, what do we all do?  We either
 8   come to a stop or we slow down and go into the other
 9   lane.
10               MR. BUNT:  Object to the nonresponsive
11          portion.
12               THE WITNESS:  Okay.
13               THE INTERPRETER:  Okay.
14   Q.  Mr. Gonzalez, have you ever read the accident
15   report that was prepared by the police officers that
16   investigated the accident?
17   A.  No.
18   Q.  You've never -- never looked at this document
19   before?
20   A.  No, no, no.
21               (Exhibit 13 marked for identification.)
22   Q.  Okay.  Let me show you what's been marked
23   Exhibit 13.  This is titled:  Texas Peace Officer's
24   Crash Report.
25               And I'm not going to go through the whole
```



1  thing, because I know you're not familiar with it.
2  But I just wanted you to take a look at the diagram
3  that the police officer drew on the accident report.
4  And whether you agree with it or not, would you agree
5  that the car driven by Mrs. Smith is shown to be in
6  the -- in the travel lane as opposed to being on the
7  shoulder of the road?
8  A.  I don't agree with this.  What Melvin saw --
9          MR. BUNT:  Object to the
10         nonresponsive --
11  A.  -- confirms to me that what happened is what
12  really happened.
13         MR. BUNT:  Okay.  Object to the
14         nonresponsive portion.
15  Q.  I understand -- I understand that you disagree
16  with it.  What I'm just asking you is do you agree
17  that at least it was the conclusion of the police
18  officer that Mrs. Smith's car was in the travel lane
19  and not on the emergency shoulder?
20  A.  No, no, no, I don't agree.
21  Q.  You don't agree, but you do see -- do you
22  understand that Mrs. Smith's car is shown on the
23  diagram to be in the travel lane, even if you disagree
24  with it being accurate?
25  A.  Yeah, you can see the picture where you can see



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-02714-K Document 48 Filed 04/29/24 Page 176 of 2460 PageID 468
PIVARAL GONZALEZ, ERICK on 08/01/2023
65

1   that her car is actually on the lane.

2   Q.  Okay.  Mr. Gonzalez, I'm almost finished.  I'm

3   going to ask you a few questions, and I know these are

4   hard questions to answer.  But can you tell us how the

5   death of your son, Nehemias, has affected you?

6   A.  A lot.

7   Q.  What are the most difficult things about not still

8   having him alive with you?

9   A.  To me, it's as if life was no longer worth living.

10   Q.  What things do you miss most about him?

11   A.  His hugs; the way he joked around; games; when we

12   spent time together; when we went fishing, yeah.

13   Q.  Can you tell me how it has affected the rest of

14   the family?

15   A.  A lot.  I mean, for me, it's like I have to be

16   taking care of everything, work; everything, it's on

17   me.

18            THE WITNESS:  Yeah, everything, yeah,

19       (in English).

20   A.  And same with the family.

21   Q.  Was your relationship with Nehemias a good one?

22   A.  A whole lot.

23   Q.  I know you were working full time and providing

24   work to Nehemias and you were paying him for that

25   work.  Did you depend upon him any financially?



Appx_0172

PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:21-cv-00274-JM  Document 49  Filed 04/29/24  Page 177 of 2460  PageID 469
66

1  A.  No, no.  I was providing everything for them.

2  Q.  Okay.  I know you had some out-of-pocket expenses

3  for his funeral and so forth.  And I think your

4  attorney has indicated that the total expenses were

5  about $15,000.  Do you know whether or not that's

6  correct?

7  A.  There are some other expenses.  I asked Evelyn

8  that as a favor, you know, it has to do with, you

9  know, the tombstone and stuff like that to be placed,

10  yeah.

11  Q.  Did Evelyn pay for the tombstone that was placed?

12  A.  I gave her the money.  I asked her to please go

13  pay for it.  She paid for it in cash.

14  Q.  Okay.  Did you pay all of the funeral and burial

15  expenses?

16  A.  Yes.

17  Q.  Other than paying the funeral home Sisco Funeral

18  Chapel, is that where -- is that the funeral home that

19  conducted the funeral of Nehemias?

20  A.  Could you please explain that to me?

21  Q.  Yes.  Let me just --

22          MR. BUNT:  Do you know what our next

23     number would be?

24          THE COURT REPORTER:  17.

25  Q.  Let me just show you what we'll mark as Exhibit



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:21-cv-00274-L Document 45 Filed 01/29/24 Page 178 of 2460 PageID 470
67

1   Number 17.  This was provided to us by Mr. White.  And

2   this is a bill from Sisco Funeral Chapel.  It says

3   statement of funeral goods and services selected.

4   And I think it shows a total charge of $8,265, 5,000

5   of which is paid.  It does show a balance due of

6   3,000.  Does that sound accurate to you?

7               (Exhibit 17 marked for identification.)

8   A.  Yes, this 3,000, I already paid for all of that.

9   Q.  Okay.

10  A.  The funeral home, they took charge of, you know,

11  transporting the body, all the way from Texas to here.

12  I pay for all of that.  I already paid for that.

13  You're saying that I still owe 3,000; right?

14  Q.  No, I'm not saying that it's still owed.  I'm

15  really just asking whether any part of that is still

16  owed.

17  A.  Not at this time.  I paid the whole thing.

18              (Exhibit 18 marked for identification.)

19  Q.  Okay.  And I think Exhibit Number 18 shows payment

20  of $500 for the burial stone, for the tombstone.  And

21  is that the money you gave Evelyn to pay for that?

22  A.  No, no, no.  At that time, when she told me, she

23  said that they will charge $6,000.  You see, I had --

24  my mind wasn't there for everything, but that's the

25  money that I gave her.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:23-cv-02714-L Document 48 Filed 04/29/24 Page 179 of 2460 PageID 471
PIVARAL GONZALEZ, ERICK on 08/01/2023                68

1  Q.  $6,000?

2  A.  Yes.

3  Q.  Okay.  In the disclosures that your attorney has

4  filed in the case -- this is a document that he gives

5  us that explains the types of damages that are being

6  sought.  I just wanted to ask you, there is an amount

7  listed for the lost earning capacity of Nehemias in

8  the amount of $1 million.  Do you know how that number

9  was calculated?

10 A.  No.

11 Q.  Okay.  That number didn't come from you?

12 A.  No.

13              MR. BUNT:  Give me just one second to

14         look over my notes.  I think we're done.

15              Mr. Gonzalez, thank you for your

16         patience and understanding while I ask you

17         these questions today.  I know this is an

18         unpleasant subject for you, but thank you

19         for your time this morning.

20              THE WITNESS:  Thank you.

21                   EXAMINATION

22 BY MR. WHITE:

23 Q.  Okay.  I have some questions.  You have not

24 intentionally destroyed any records relating to this

25 case, have you?



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:...-cv-...714-...-... Document 49 Filed 04/29/24 Page 180 of 2460 PageID 472
PIVARAL GONZALEZ, ERICK on 08/01/2023
69

```
 1   A.   No.
 2   Q.   Any records related to how much you paid Nehemias
 3   that were destroyed by animals, you did not intend for
 4   that to happen; correct?
 5   A.   No.
 6   Q.   And you paid Nehemias based on how many houses he
 7   could paint; correct?
 8   A.   Yes.
 9   Q.   And the amount of money that he got paid in a
10   given year depended on how many projects you had;
11   correct?
12   A.   Yes.
13   Q.   So it's difficult to estimate precisely how much
14   he made in any given year or week or month; correct?
15   A.   Yes.
16   Q.   But painting is a good job in Northwest Arkansas;
17   correct?
18   A.   Yes.
19   Q.   You run a busy business?
20   A.   Yes.
21   Q.   And Nehemias was a busy painter?
22   A.   Yes.
23               MR. BUNT:  Objection to form.
24   Q.   And if he had continued to paint in your business,
25   he probably would have participated in the expansion
```



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:22-cv-03214-TLB Document 48 Filed 04/29/24 Page 181 of 2460 PageID 473          70

1  of your business?

2  A.  Yes.

3             MR. BUNT:  Objection to form.

4  Q.  And do you anticipate that, in fact, your business

5  would have expanded if Nehemias had been alive, had

6  lived past April 2022?

7  A.  Yes.

8  Q.  All right.  Can you explain why it was a good

9  thing that Nehemias had got his work visa?

10 A.  Yes, yes.  Because we were so happy.  We were very

11 happy about this happening because we were thinking

12 about expanding and putting the business under his

13 name.  Apart from that, he had plans on becoming or

14 taking work as an electrician because that's the part

15 that he knew about.

16 Q.  And I believe that he was also trained as an

17 electrician dealing with HVAC systems in Guatemala --

18 Guatemala; correct?

19            MR. BUNT:  Objection to form.

20 A.  In Guatemala, yes.  Yes, that's what he learned.

21 Q.  Did he have any plans to do the same work here in

22 Northwest Arkansas?

23 A.  Yes.  As a matter of fact, he was already -- you

24 know, already helping some friends with fixing

25 washers, dryers.



1  Q.  Is it fair to describe Nehemias as being
2  mechanically inclined?
3  A.  Yes, he did know.  He did know.  But it wasn't
4  like, you know, he would, like, get these classes
5  where you, like, go study and, you know, get a trade.
6  But the thing was that he would go with friends of
7  mine, and then he would work on it, and then he would
8  learn about it.
9           Here -- here, he would also help me.
10  Like, for example, when the vehicles broke down, he
11  would help me fix the vehicles, because I know very
12  little about mechanics.
13  Q.  And so he was good at working on cars as well?
14  A.  Yes.  Yes.
15  Q.  Okay.  Did you have any plans for him to help you
16  in your old age?
17  A.  He had already told me that from the moment that
18  we would put the company under his name, he said, "I
19  don't want you to work anymore."
20  Q.  And did his death have a financial impact on your
21  business?
22  A.  Yes.
23  Q.  Now, you weren't there at the accident; right?
24  A.  No.
25  Q.  So all the information you have about who saw



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:...cv-02714-x   Document 10   Filed 01/29/24   Page 183 of 2460   PageID 475
PIVARAL GONZALEZ, ERICK on 08/01/2023
72

1  what, who was standing where, who was on what side of

2  what line, that all comes from what other people have

3  told you; correct?

4  A.  Yes.

5  Q.  And anything that you were told on the day that it

6  happened, your memory is not super reliable from that

7  date; is that correct?

8  A.  At that time, I had -- it was like I was closed up

9  memory-wise.

10  Q.  Is that because you were dealing with the death of

11  your son?

12  A.  Yes.

13  Q.  Do you have any reason to think that Nehemias was

14  suicidal?

15  A.  No, no.

16  Q.  You do not speak or read or write English;

17  correct?

18  A.  No.

19  Q.  And you've not been provided any Spanish-language

20  copies of any of the police reports that were

21  generated in relation to this case, have you?

22  A.  No, no.

23          MR. WHITE:  All right.  Reserve the

24      remainder for trial.

25              FURTHER EXAMINATION



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:21-cv-03214-TLB Document 48 Filed 04/29/24 Page 184 of 2460 PageID 476
PIVARAL GONZALEZ, ERICK on 08/01/2023
73

1  BY MR. BUNT:

2  Q.  I want to ask just a few follow-ups.

3  A.  Okay.

4  Q.  Mr. Gonzalez, what -- did you say Nehemias had

5  received some training as an electrician in Guatemala?

6  A.  Yes, but it wasn't like, per se, like studies

7  where he got a diploma or anything like that.  Let me

8  give you an example.  It's, like, say, for example, if

9  I know about mechanic, about being a mechanic -- and

10  say, like, my son Erick, he doesn't know anything

11  about mechanic or being a mechanic, but then because

12  Erick is with me, I'm teaching him how to do or how to

13  be a mechanic.  That's the same thing that happened to

14  my son there; he learned with several friends of mine

15  where he would go and work with them.

16  Q.  So he would help friends in Guatemala who did

17  electrical work?

18  A.  Yes.  And they would do, like, a lot of mechanical

19  work for automobiles.  They would also repair washers,

20  dryers, refrigerators.  They would also do automobile

21  air-conditioning, all of that.

22  Q.  Did he do the same thing here in Springdale?

23  A.  Yes.  Like I explained to you, when his friends

24  learned that he knew about that stuff, there were

25  friends that would take him out and ask him to do, you



1   know, repairs for washers or dryers or refrigerators;

2   and he would do that, but he didn't charge anything.

3   Q.  Okay.

4   A.  That -- he did that as to not lose any practice on

5   it.

6   Q.  But he had not -- so he had informal training by

7   working with others, but he had not taken any classes

8   in electrical work either in Guatemala or the U.S.?

9   A.  Yes.

10  Q.  And at the time that he passed away, he didn't yet

11  hold any electrical license or certification, did he?

12  A.  No, no.  He only had the plans to, you know, go do

13  the training or the testing after we had put the

14  company under his name.

15              MR. BUNT:  Okay.  Thank you,

16          Mr. Gonzalez.  I think that's all I have.

17              MR. WHITE:  No further questions at this

18          time.

19              THE VIDEOGRAPHER:  This concludes the

20          video deposition of Erick Gonzalez.  The

21          time is 12:14.  We're now off the record.

22              (Proceedings concluded at 12:14 p.m.)

23

24

25



1             REPORTER CERTIFICATION

2        I, JENNIFER NORMAN, Certified Court Reporter

3 for the State of Arkansas, do hereby certify to the

4 following:

5        1) that on August 1, 2023, the witness,

6 ERICK RODERICO PIVARAL GONZALEZ, was duly sworn by me

7 prior to the taking of testimony as to the truth of

8 the matters attested to and contained therein;

9        2) that the foregoing pages contain and are a

10 true and correct transcription of the proceedings as

11 reported verbatim by me via realtime stenography to

12 the best of my ability and transcribed at or under my

13 direction and supervision, and subject to appropriate

14 changes submitted by witness, if any, during his/her

15 requested reading and signing of this deposition

16 according to the Arkansas Rules of Civil Procedure;

17        3) that I am neither counsel for, related to,

18 nor employed by any of the parties to the action in

19 which this proceeding was taken; and that I am not a

20 relative or employee of any attorney employed by the

21 parties hereto;

22        4) that I am not financially interested or

23 otherwise interested in the outcome of this action

24 that affects or has substantial tendency to affect

25 impartiality or requires me to relinquish control of



1  an original or copies of a deposition transcript

2  before it is certified, or that requires me to provide

3  any service not made available to all parties to the

4  action; and

5        5) that I have no contract with the parties,

6  attorneys, or persons with an interest in the action;

7  and that I am not knowingly identified on a preferred

8  provider list, whether written or oral, for any

9  litigant, insurance company, or third-party

10  administrator involved in this matter;

11       6) that signature of the witness is waived.

12  This transcript is prepared at request of counsel for

13  DEFENDANTS, and all fees are billed directly to them

14  in compliance with Arkansas Board of Court Reporter

15  Examiners Regulations Section 19.

16       Witness my hand and seal this 15th of

17  August, 2023.

18

19

20  JENNIFER NORMAN, CCR
    LS Certificate #768, State of Arkansas
21  Arkansas Realtime Reporting
    1130 E Millsap Rd
22  Fayetteville AR 72703
    479-301-2040
23  www.ArkansasRealtimeReporting.com

24

25



www.ArkansasRealtimeReporting.com

Appx_0183

**Exhibits**

**Gonzalez Exhibit 1**
3:14 8:5,8

**Exhibit 4** 3:16 53:18,23

**Gonzalez Exhibit 14**
3:18 24:25 25:23

**Gonzalez Exhibit 15**
3:19 25:17,24

**Gonzalez Exhibit 16**
3:21 26:1,9

**Gonzalez Exhibit 17**
3:22 66:25 67:1,7

**Gonzalez Exhibit 18**
3:23 67:18,19

---

**$**

**$1** 68:8

**$1,500** 35:9

**$100,000** 36:13

**$15,000** 66:5

**$2,000** 35:8

**$500** 67:20

**$6,000** 67:23 68:1

**$75,000** 36:5,6,7

**$8,265** 67:4

---

**1**

**1** 8:5,8 27:24

**10** 27:24

**100** 36:13

**10:28** 38:7,9

**10:42** 38:9,10

**12** 25:7 26:5

**12:14** 74:21,22

**13** 12:22 14:22 63:21,23

**14** 21:18 24:19,20,24,25
25:23

**15** 25:17,24

**16** 21:5 22:2 26:1,9

**17** 66:24 67:1,7

**175** 35:23

**175,000** 35:25

**17th** 10:13

**18** 67:18,19

**1st** 4:3

---

**2**

**2** 24:18 54:3

**200** 32:21

**2000** 40:3

**2002** 16:15

**2011** 45:22

**2020** 37:2

**2021** 35:6,13 37:2

**2022** 12:2 25:7 26:5
36:12,13,23 43:15 70:6

**2023** 4:3

**24th** 16:15

---

**3**

**3,000** 67:6,8,13

**30** 12:2 62:19

**300** 32:21

**36** 13:22

**37** 13:22

**3:22-CV-02714-K** 4:9

---

**4**

**4** 8:12 53:18,23

**46** 13:23

**47** 13:23,24,25

---

**5**

**5,000** 67:4

---

**6**

**607** 11:20

---

**7**

**71** 33:25

**75** 35:23

**75,000** 35:25

**76** 10:13

---

**9**

**9:04** 4:4

**9:25** 13:3,6

---

**A**

**a.m.** 38:9

**accept** 7:7

**accident** 9:7,10,11 19:2
38:16 39:20 41:20,24
42:2,14 43:9 44:7,11,18,
22 45:15,19 46:17,22,25
47:15,22,24 50:16 51:14
55:22,25 56:5,9,18,22
57:14,18 59:15,19 60:2,
12,15 62:11,16,25 63:14,
16 64:3 71:23

**accidents** 59:22

**accommodate** 6:14

**accurate** 59:17 64:24
67:6

**acting** 60:14

**actual** 55:16

**address** 5:19 11:19,24
19:19,20 34:24

**advises** 24:12

**affected** 65:5,13

---

**age** 71:16

**agree** 17:17 24:3 64:4,8,
16,20,21

**agreeing** 4:25

**agreements** 6:19

**Aguilar** 56:15

**ahead** 8:12 15:12

**air-conditioning** 73:21

**Aldea** 10:16 16:23

**Alex** 41:17

**Alexander** 41:7

**alive** 65:8 70:5

**allegation** 61:13,15

**amendment** 11:4

**amount** 30:19,22 35:5
68:6,8 69:9

**amounts** 31:11,16
32:13

**animals** 31:25 32:7 69:3

**annually** 15:16

**answers** 56:12 60:17

**anticipate** 70:4

**anymore** 30:12 32:1
36:22 71:19

**apartment** 11:21 19:21,
23 20:1,2,15

**appeared** 27:6

**appears** 25:3,11,17 26:2

**applied** 13:12 16:6
22:19,22

**applying** 22:21

**appointed** 18:6,18

**approaching** 50:4 52:9

**approved** 23:7

**approximately** 36:4

**April** 12:2 25:7 26:5
43:15 70:6

**area** 9:11 23:20 54:17

**Arkansas** 4:6 11:20,22
25:18 69:16 70:22



**arrested** 58:5 59:1

**arrived** 20:18

**asks** 8:2

**assume** 16:25 24:8 58:18 59:8 60:6

**assuming** 22:19

**attend** 14:3 27:14

**attending** 28:23

**attention** 62:22 63:1

**attorney** 7:16,17,25 8:16 13:15 18:13 23:14, 17,24 24:13,15 25:2 26:14,16,17,23 27:5 60:10 66:4 68:3

**attorney's** 13:18

**August** 4:3 16:15

**authorization** 25:6 26:3

**authorizing** 26:7

**automobile** 73:20

**automobiles** 73:19

**avenue** 24:3

**aware** 16:25 17:4 45:17 56:8 58:21 59:2 60:18,25 61:4,8 63:2

## B

**back** 8:12 21:24 22:5 24:22 27:7 29:24 32:17, 20,23 37:6 52:12,15 54:6,7,8

**background** 14:2

**bad** 60:4

**balance** 67:5

**barely** 49:25

**barrier** 51:21 53:14,22, 24 54:4

**based** 30:21 31:1,3,4 69:6

**bathroom** 38:6

**begin** 7:6

**begun** 27:9

**belong** 19:25

**belonged** 32:4

**bent** 48:10

**big** 35:24

**bill** 67:2

**birth** 10:12 16:14 40:2

**bit** 7:9 14:2 61:11

**black** 9:5

**blew** 54:15

**blink** 50:6 52:7

**blown** 46:5

**body** 51:2,4,9 67:11

**book** 31:14,17,19,22 32:1

**bookkeeper** 34:1,3

**booklet** 55:13,14

**born** 10:14 20:20,22

**bowing** 48:10

**Boyfriend** 19:1

**break** 6:8,10,14,15 10:24 38:4,6,13 58:9

**breaks** 6:9

**Brian** 4:18 5:23

**bring** 8:2,14 62:4

**broke** 71:10

**broken** 43:22

**brother** 21:15

**brought** 5:25 8:19 18:13

**Bunt** 4:18,24 5:6,8,13,23 8:18,22,25 10:18,22 11:8 13:1 15:6 17:21 18:1,4, 20 23:20 24:6,8,19,21 38:3 40:18 48:11,14 50:20 52:17 58:8 63:10 64:9,13 66:22 68:13 69:23 70:3,19 73:1 74:15

**burial** 66:14 67:20

**business** 14:25 15:3 18:16 33:12,15 34:7,9,10 69:19,24 70:1,4,12 71:21

**busy** 69:19,21

## C

**calculated** 68:9

**calculation** 36:3

**call** 41:21 42:2 43:2,3

**called** 8:1 10:10 29:18 41:18,22,23,25 46:20

**calling** 53:12

**Camry** 9:5 45:22

**cancel** 23:17

**capacity** 68:7

**car** 42:21,25 43:2 44:7,8 45:21,25 46:3,16 47:9, 18,19 49:1,5,18,19,21,24 50:4,5,9,10,25 52:8 53:6, 8 54:3,10,16,19 59:14 63:4,6 64:5,18,22 65:1

**card** 13:13 23:6 25:3,8, 19 26:5,6

**cards** 25:16

**care** 65:16

**cars** 51:3,10 62:19 71:13

**Casa** 22:6,8

**case** 4:8 68:4,25 72:21

**cash** 30:17 32:17 66:13

**cat** 29:22

**caulking** 40:21

**Caylee** 4:19 6:1 59:14

**certification** 74:11

**certified** 4:21

**chance** 45:13

**Chapel** 66:18 67:2

**charge** 67:4,10,23 74:2

**charged** 58:15

**charges** 58:19

**checking** 26:22

**Chemical** 4:8,19 6:1 60:19

**citizen** 11:1 22:16,20

**citizenship** 22:22

**city** 10:14 20:22 38:25

**clarification** 35:19,20 48:14,16 50:21

**clarify** 52:18

**class** 55:16

**classes** 14:12 29:1 71:4 74:7

**clear** 7:3 32:11

**Cleveland** 11:21,24 20:15

**client** 11:6

**closed** 72:8

**college** 28:21

**commercial** 14:16

**common** 10:9 29:17

**company** 4:8,19 60:19 71:18 74:14

**complaint** 61:12

**complete** 28:22

**completed** 14:6 23:9 27:17,22 28:17

**completely** 32:10

**computer** 32:14

**concluded** 74:22

**concludes** 74:19

**conclusion** 64:17

**concrete** 44:1

**condition** 44:16 46:2,12

**conducted** 66:19

**confirms** 64:11

**consent** 24:10,11,15

**considerably** 6:18

**constant** 63:1

**Continue** 62:1

**continued** 69:24

**conversation** 46:20 47:2 51:16,23 54:9,18



www.ArkansasRealtimeReporting.com

55:20

**convicted** 58:5,11 59:2

**copies** 33:5 34:18 37:23 72:20

**copy** 23:11 25:8 31:19

**Corporal** 55:21

**correct** 16:20 24:3 29:10 36:15 37:19 50:10 52:23 54:8 55:22 56:1 66:6 69:4,7,11,14,17 70:18 72:3,7,17

**corrected** 42:17 49:25 50:25

**correction** 48:7

**correctly** 13:21 51:8

**Corsicana** 56:21

**counsel** 4:13,16,18

**counting** 13:21

**country** 10:15 15:24

**couple** 6:19 25:12

**courses** 28:21,22,25

**Court** 4:10 10:18,20,23 18:7 66:24

**covering** 40:20

**Crash** 63:24

**crews** 30:5,11

**crime** 58:5,12,15 59:2

**criminal** 58:19

**Cuchilla** 10:16

**curious** 17:23

**current** 11:19

---

**D**

**Dallas** 4:11

**damaged** 43:17 44:3

**damages** 68:5

**date** 4:3 10:12 16:14 21:1 25:11 36:12 40:2,4 72:7

**dated** 25:7

**day** 9:6 17:15 26:4 47:3 60:11 72:5

**days** 19:20 25:20 31:2 39:15,18,19

**de** 11:12,18

**deal** 31:23

**dealing** 70:17 72:10

**death** 17:1 18:16 23:4 25:12 58:1 65:5 71:20 72:10

**decide** 15:9 30:21

**decision** 11:9

**decision-making** 62:6

**deeply** 14:3

**defendants** 5:24

**Department** 25:5

**depend** 65:25

**depended** 69:10

**deponent** 4:12 53:11

**deport** 27:7

**deportation** 27:1

**deposition** 4:4 6:3 7:19, 23 8:1,3,4,14,24 74:20

**describe** 42:14 47:8 71:1

**describing** 43:10

**destroyed** 31:25 32:10 68:24 69:3

**details** 42:11

**detained** 59:6

**detainment** 22:12

**device** 43:16

**DHS** 25:4

**diagram** 64:2,23

**Diaz** 41:7,9,15 52:8

**difference** 35:25

**differently** 9:25

**difficult** 65:7 69:13

**Dina** 40:8,10,13,24 41:12 45:9 51:13 56:3,10

**diploma** 73:7

**direction** 13:18 49:15

**directly** 15:2

**disagree** 64:15,23

**disclosures** 8:22 68:3

**discovery** 8:22

**discussed** 7:17

**District** 4:10

**Division** 4:11

**document** 8:7,11 23:11 26:15,19,20 63:18 68:4

**documentation** 27:4 32:6

**documents** 7:22 8:3,4, 13 23:25 24:14 25:2 26:12,17 32:9

**double** 62:24

**drew** 64:3

**drive** 44:17

**driven** 9:6 62:19 64:5

**driver** 42:21 60:3,4 61:16 62:18,21,22,23

**driver's** 15:21,23 16:6 54:23 55:10

**driving** 46:16 50:25 55:9,16 59:14,20,24 62:25

**drove** 54:25 62:24

**dryers** 70:25 73:20 74:1

**duces** 8:2,5

**due** 67:5

**duly** 4:22,23 5:10,11

---

**E**

**earlier** 37:5

**earned** 35:6 36:11 37:16

**earning** 37:21 68:7

**easier** 58:10

**Eastman** 4:8,19 6:1 60:19 61:1,5,9,13

**Eastman's** 62:6

**education** 27:13

**electrical** 73:17 74:8,11

**electrician** 70:14,17 73:5

**emergency** 53:12,13 63:7 64:19

**employee** 60:14 61:2,6, 10,14,17 62:8

**employer** 6:1 60:20 61:22,24

**employing** 61:25

**employment** 26:2 29:24 60:7

**engaged** 19:11

**engagement** 19:14

**English** 27:11 65:19 72:16

**enrolled** 28:4

**entire** 41:1 42:17 62:20

**entitled** 23:21 24:4

**Erick** 4:12 5:9,18 9:19 10:5 12:9 21:19 39:24 40:5 43:3 45:1 47:21 48:23 49:11,14,18 50:4, 15 51:8,11 52:6 56:3,10 73:10,12 74:20

**Erick's** 40:2

**essentially** 18:15

**estate** 4:7 18:6,7,12,15

**estimate** 35:5 36:10 69:13

**et al** 4:8

**Evelyn** 18:25 20:3,7,9 38:15 41:23 42:14 44:10 45:1,9 46:18,20,24 47:11 54:10,18 56:3,10 66:7,11 67:21

**Evelyn's** 44:7 46:1



**PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL**
**PIVARAL GONZALEZ, ERICK on 08/01/2023**
Case 3:21-cv-00214-J Document 43 Filed 04/29/24 Page 191 of 2460 PageID #: 483
Index: evidence..home

**evidence** 8:13

**exact** 21:1 35:4 40:4

**EXAMINATION** 5:12 68:21 72:25

**exhibit** 8:5,8 24:18,25 25:17,23,24 26:1,9 53:18,23 54:3 63:21,23 66:25 67:7,18,19

**exhibits** 24:23 25:15

**exists** 32:1

**expanded** 70:5

**expanding** 70:12

**expansion** 69:25

**expenses** 66:2,4,7,15

**expired** 16:4,5

**explain** 23:1 58:13 61:11 66:20 70:8

**explained** 51:17 73:23

**explains** 68:5

**eye** 50:6 52:7

---

### F

**facility** 22:12

**fact** 58:24 70:4,23

**facts** 60:19,25 61:4,8

**fair** 71:1

**fallen** 49:3,8

**familiar** 64:1

**family** 12:5,14 17:7 20:4 21:11 40:12 45:5 65:14, 20

**farm** 45:4

**father** 11:13 16:9

**fault** 62:12,17,18

**favor** 66:8

**Fayetteville** 28:9,11,12, 13,18,19,20

**feel** 6:25 7:1

**fell** 43:19,25

---

**Fernandez** 4:20 6:17 18:20

**fighters** 46:9

**file** 33:2,3

**filed** 7:12 17:4 33:6,11 37:7,24 61:12 68:4

**filing** 15:17

**financial** 71:20

**financially** 65:25

**fine** 5:6,21 6:11,16,24 7:5,14 9:17 10:25 13:20 26:24 37:25 38:14 58:16

**finish** 31:8

**finished** 29:3 65:2

**finishing** 14:10

**fire** 46:9

**Firm** 4:5

**fishing** 65:12

**fix** 71:11

**fixed** 46:7

**fixing** 70:24

**Flores** 10:17

**follow** 13:18

**follow-ups** 73:2

**forgot** 24:22

**form** 5:2 69:23 70:3,19

**formally** 19:10

**free** 7:1

**friends** 39:9 45:9 70:24 71:6 73:14,16,23,25

**friendship** 40:11

**front** 46:6 54:2 63:4

**full** 5:17 18:11 22:24 23:8 29:25 65:23

**funeral** 66:3,14,17,18,19 67:2,3,10

---

### G

**games** 65:11

---

**Gato** 29:21,22

**gave** 66:12 67:21,25

**general** 9:11

**generated** 72:21

**get all** 10:19

**girlfriend** 19:1

**give** 6:13 9:4,9 24:9,11, 14 31:6 35:4 36:10 55:14 68:13 73:8

**giving** 6:22 31:5

**Gonzalez** 4:12 5:9,14, 16,18,20,22 6:3 7:6,15, 21,25 9:4,9,18 10:5,6,14 11:1,18,19 12:23 13:8,21 15:10,21 16:9,25 18:5,23 19:22 22:25 24:9,12,17, 21 25:1 26:25 29:7 31:10 33:5 34:22 35:3,24 38:12,15 41:19 42:13 44:10 45:13 47:21 48:20 53:15 54:22 55:20 57:13, 21 58:4,11 59:1,13 60:18,25 61:4,8 62:15 63:14 65:2 68:15 73:4 74:16,20

**good** 5:14,15 25:21 27:11 38:12 60:3 61:16 62:3 65:21 69:16 70:8 71:13

**goods** 67:3

**Gotcha** 28:15

**government** 26:3

**Gracias** 14:8

**grade** 14:5,10 27:17,22, 23,24,25 28:1,2,17

**grades** 27:17

**graduate** 28:15

**green** 23:6

**ground** 48:25 49:8,9

**group** 42:17

**groups** 30:6,7,9,10,15

**Guatemala** 10:17 11:2 14:3 15:25 16:1,3,24 20:20 22:5,16 27:8,14,22 28:1 57:23 58:2 59:4

---

62:23 70:17,18,20 73:5, 16 74:8

**guess** 22:2

**guessing** 40:17

---

### H

**half** 49:3,5 53:5

**happen** 56:5 69:4

**happened** 20:19 31:22 36:19 39:20 41:25 42:5, 14 43:7,11,18 44:12,18 45:24 46:22,25 47:4,15, 22 50:16 52:7 57:14,19 62:11,13,16 64:11,12 72:6 73:13

**happening** 63:3 70:11

**happy** 6:14 70:10,11

**Har-ber** 28:9

**hard** 53:19 65:4

**head** 6:22

**heard** 35:22 41:17 48:4 49:15 50:1,11 57:14,16

**held** 16:3 32:23

**Heliodoro** 11:12,16

**helped** 46:9 51:11

**helping** 48:1 70:24

**high** 28:8,9,11,15,18,20, 22

**highway** 9:10

**hire** 61:22

**hired** 60:20

**hiring** 60:22 62:7

**Hispanic** 45:4

**history** 59:20

**Hogar** 22:6,8

**hold** 32:17,20 74:11

**holes** 40:21

**home** 15:3 20:7,10,13 23:12 33:7 34:18 66:17, 18 67:10



**Homeland** 25:5

**homeowners** 36:7

**homes** 35:7,10,15

**honest** 34:20

**honestly** 23:18

**hotel** 39:8

**hotels** 39:8

**hourly** 30:18

**hours** 6:7 31:1

**house** 30:20,21,23 31:8

**houses** 69:6

**hugs** 65:11

**husband** 19:5 41:8

**husband's** 51:19

**HVAC** 70:17

---

**I**

**ID** 22:18 25:25

**idea** 35:12 39:9 45:6 56:17 57:10

**identification** 8:8 24:25 25:16,19,24 26:9 53:23 63:21 67:7,18

**immediately** 44:14

**immigration** 11:5 13:11 21:10 22:10 23:2,5,8,23 24:13,15 26:13,14,16 58:24 59:9,12

**impact** 42:17 48:4 49:16 50:1,11,23 71:20

**impacted** 42:18 48:5 50:25 52:5,22

**inclined** 13:17 71:2

**include** 12:6 33:4 36:22

**included** 33:6,10 37:8

**income** 15:16 33:2,3 34:17 37:7,14,15,21

**incorrect** 10:2

**indicating** 53:24 54:1,5

**indication** 6:23

**lnes** 4:20

**Infiniti** 55:2

**informal** 74:6

**information** 71:25

**initially** 10:4

**inquire** 23:21 40:17

**inside** 47:18 54:6 59:3

**instructed** 13:15,16

**instructing** 11:6

**intend** 69:3

**intentionally** 68:24

**interests** 18:16

**interpreter** 4:14,20,21, 22 5:11 14:9 35:18,19, 20,21,23 40:15,16 48:6, 7,12,13,16 50:18,19,21 53:11 56:25 58:6,7 62:1 63:13

**interpreter's** 48:6

**interrogatory** 43:13 56:12

**interviewed** 19:3

**introduce** 4:13

**investigated** 58:20 63:16

**invoke** 11:4

**involved** 59:15,18

**involving** 41:20

**Isaias** 12:12

**issued** 25:9,17,18,19 26:3,4

**lvan** 12:12,13 21:12,14, 15,17,18,23

---

**J**

**Jacob** 4:16,24 13:1 17:21

**jail** 58:16 59:11

**Jeremias** 12:9

**job** 30:19 69:16

**jobs** 15:1,2 36:18

**Johana** 16:17,18

**joked** 65:11

**José** 56:15,16

**judge** 18:6

**judgment** 17:10

**juvenile** 23:9,11

---

**K**

**keeping** 61:10,14 62:7

**kind** 13:14 14:12 19:14, 15 22:12 31:13 40:13 42:10 44:4 46:2 55:1,9 63:5

**kinds** 34:12

**King** 4:5

**knees** 48:18

**knew** 61:15 70:15 73:24

**knowledge** 19:13 57:25 59:11 60:3,10

---

**L**

**la** 10:16 11:12

**ladder** 43:25

**ladders** 43:19

**lady** 23:17 33:16 52:3,19 59:14 62:3

**lane** 42:16 50:2 51:1,5,6, 9 52:4,11,12,13,15,16, 19,23 53:8,9,12,13 54:20 63:9 64:6,18,23 65:1

**Las** 10:16

**Law** 4:5

**lawsuit** 5:24,25 7:11 17:4,7,9,13,14,15 23:22 57:21,22 58:1 62:15

**laying** 51:19

**leaning** 51:21

**learn** 14:11 41:19 71:8

**learned** 70:20 73:14,24

**leave** 30:9

**leaving** 28:20

**ledger** 31:17 32:12

**left** 52:4,11,13,14 54:11

**legal** 5:17

**legs** 51:19

**length** 22:21

**license** 15:21,23 16:3,7 54:23 55:10 74:11

**life** 65:9

**lifetime** 10:7 29:15

**likes** 41:18

**lines** 27:9

**list** 8:13 24:20

**listed** 56:13 68:7

**live** 16:22 20:3

**lived** 11:23 12:17 20:17 21:6 70:6

**lives** 12:4 56:21 57:7

**living** 12:1 19:8,17,18, 24 20:7,9,12 22:9 31:20 40:5,7 41:2 65:9

**located** 33:20

**location** 9:11 44:17

**long** 6:6,7 11:23 12:17, 21 14:20 18:21 20:17 40:24

**longer** 44:19 47:5 65:9

**looked** 44:15 49:23 63:18

**lose** 74:4

**loss** 7:7

**lost** 68:7

**lot** 65:6,15,22 73:18

**loud** 6:21

**Lucas** 16:17,18


ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

## M

**machinery** 32:5 36:20

**machines** 32:6,9

**made** 7:3 16:25 69:14

**Madeleine** 33:17,20 36:14 37:23

**Madeleine's** 33:18

**make** 24:1 58:10 62:4

**man** 62:3

**Manuel** 57:7,10

**Marcos** 16:23 20:24

**Maria** 11:18

**mark** 8:4 24:18 66:25

**marked** 8:8 24:25 25:24 26:9 53:16,17,23 63:21, 22 67:7,18

**married** 12:15,23,24 16:20 18:23 19:6,7,9,11

**matter** 4:6 31:3 34:20 58:24 70:23

**meaning** 30:13

**meant** 40:20 51:5

**mechanic** 73:9,11,13

**mechanical** 73:18

**mechanically** 71:2

**mechanics** 71:12

**mediation** 17:13

**Medrano** 57:7

**Melvin** 41:7,16,17,18 45:10 51:23 52:1,8,14,24 53:1,7,21 56:3,10 64:8

**members** 21:11

**memory** 72:6

**memory-wise** 72:9

**mentioned** 5:22 19:17 20:23 54:25

**messing** 32:8

**meter** 49:2,3,5 53:5

**Mexico** 57:8 62:23

**middle** 16:12

**million** 68:8

**mind** 57:18 67:24

**mine** 71:7 73:14

**minute** 44:6

**mistake** 10:3

**misunderstood** 37:5

**Mitchell** 56:20

**moment** 5:23 13:9 20:18 49:14 52:20 54:15 71:17

**money** 17:9 32:17 35:5 36:17,19,21 37:16,20,22 66:12 67:21,25 69:9

**monies** 32:23

**month** 31:7 69:14

**months** 17:15 36:4

**Moreno** 9:6 18:25 19:3 20:3 54:10

**morning** 5:14,15,20 7:9 38:12 68:19

**mother** 17:16 20:10 29:12 46:1

**mother's** 11:17 16:16 20:10

**move** 13:19 20:4

**moved** 22:11

**moving** 20:1

## N

**named** 18:14

**names** 10:6,22 11:11 29:15 56:12

**negligent** 60:20 61:1,5, 9,13

**Nehemias** 4:7 7:8 9:12 12:1,2 16:10 18:23 19:4 20:3,12,17,20,25 21:22 22:1,15 25:7,9,20 26:25 28:21 29:7,14 30:16 31:11,20 32:13,16,25 33:2,6,10 35:5,13 36:8, 11 37:2,7,16,17 38:15 41:20 42:19,24 47:8,25 48:2 49:2,8,14,19 50:10 52:5 53:1,8,25 54:22 55:5,9 57:25 59:1 65:5, 21,24 66:19 68:7 69:2,6, 21 70:5,9 71:1 72:13 73:4

**Nehemias's** 16:12,14, 16 17:1,7,16 18:6,15 23:2 27:13 34:16 51:4

**nickname** 29:20

**nicknames** 10:9 29:17

**Nissan** 55:2

**nodding** 6:22

**noise** 50:11

**nonresponsive** 63:10 64:10,14

**nonverbal** 6:23

**Northern** 4:10

**Northwest** 69:16 70:22

**notes** 68:14

**notice** 8:1,4

**November** 10:13

**number** 4:9 8:5 14:7 15:11 22:17 24:18 25:7, 17,23 26:1 31:1,2 43:16, 21 53:18 54:3 58:24,25 66:23 67:1,19 68:8,11

**numbers** 53:17

## O

**Object** 63:10 64:9,13

**Objection** 11:3 69:23 70:3,19

**objections** 5:2

**obtain** 34:16 44:2

**obtained** 15:10

**occurred** 9:12 44:23 50:23

**odd** 36:18

**offered** 45:12

**offering** 61:23

**office** 33:22 34:11,23

**officer** 44:24 45:11 55:21 57:3 64:3,18

**Officer's** 63:23

**officers** 19:3 45:14 63:15

**opposed** 6:21 54:11 64:6

**originally** 35:22

**out-of-pocket** 66:2

**owe** 67:13

**owed** 67:14,16

**owner** 45:25

## P

**P-I-U-A-R-A** 10:1

**P-I-V-A-R-A-L** 9:21

**p.m.** 74:22

**packet** 22:24 23:8

**paid** 32:16 36:7 37:17 66:13 67:5,8,12,17 69:2, 6,9

**paint** 40:14 69:7,24

**painter** 69:21

**painters** 30:23

**painting** 14:15,16,18,20 15:4 29:6,25 40:14,19 69:16

**Pajapa** 16:23 20:24

**Pajapita** 16:23 20:24

**parents** 11:11

**part** 17:6 32:17 38:25 67:15 70:14

**participated** 69:25

**partly** 54:19,20

**party** 57:22 58:1

**passed** 12:2 21:7 22:15 25:13,20 36:12 74:10



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:21-cv-00214-JM Document 48 Filed 04/29/24 Page 194 of 2460 PageID 486
Index: passengers..resume

passengers 43:2

past 27:2 70:6

patience 68:16

Patricia 16:17,18

pay 30:16,17,18 31:9,11, 14 32:13,16,18,24 35:10 36:9 37:13,20 58:16 66:11,13,14 67:12,21

paying 62:21 63:1 65:24 66:17

payment 32:20 35:14 67:19

Peace 63:23

pending 58:19

people 22:10 34:2 45:4, 11 61:22,23 72:2

perfect 24:7

perfectly 37:25

period 41:11

periodically 6:9

permit 13:13 22:18 23:6, 7

person 15:3 33:15 42:15 50:24 57:5 61:24 62:2,4, 21

personal 18:14

personally 56:8 57:22 62:8

persons 5:24 10:9 30:2 45:8 56:8,9,14

phone 43:6,14,16,18,21, 22 44:3,21 46:19 52:3

phones 43:21

photographs 9:5,10 44:6,21 45:18

picture 54:2 64:25

pictures 44:2,4

Piuara 9:25

Pivaral 4:7 5:9,18 9:19, 20,21 10:6 11:12,18 12:9,12 16:10 29:8,9,10, 14

place 4:5 44:22,23 46:11

plaintiff 4:17 62:15

planned 20:4

planning 27:7

plans 70:13,21 71:15 74:12

point 6:9 59:7

police 19:3 44:23 45:11, 14,19 55:21 57:3 63:15 64:3,17 72:20

portion 17:11 37:17 63:11 64:14

possibly 27:7

practice 74:4

practicing 55:10,11,12

precisely 69:13

premarked 24:23 53:16

preparation 40:19

prepare 7:18,22 33:8,12

prepared 55:22 63:15

preparer 34:4

prepares 34:1

preparing 40:14

prepping 40:15,20

press 42:10

previous 13:17

previously 12:24

prior 8:24 46:16

prison 59:11

privilege 5:5,6 11:4

problems 58:22

proceeding 18:13 27:1, 8

proceedings 4:1 74:22

process 62:7

projects 69:10

provide 23:13,14 35:1

provided 8:20 27:5 67:1 72:19

providing 65:23 66:1

pulled 51:2,9 54:16

purchased 36:20

purposes 32:22,24

pursuant 5:1

put 31:24 32:4,6 37:9 71:18 74:13

putting 70:12

## Q

question 5:3 6:12,20 7:2,3 8:9 11:7,9 15:7,13, 15 18:9,21 37:10,13 44:4 58:7,13

questions 7:1,12 9:2,15 11:5 13:10,16 38:13 42:8 57:16 58:9 60:17 65:3,4 68:17,23 74:17

quickly 24:17

QX4 55:2

## R

R-I-C-N-Y 57:5

Rafael 10:16

read 7:22 63:14 72:16

reason 34:14 72:13

recall 42:20

receive 17:10 30:22,24

received 13:12 17:9 25:13,22 26:7,12,19 29:10 35:10,13 36:6,11, 13 73:5

recently 25:13 41:24

recess 13:5 38:9

record 4:3 5:17,22 13:2, 4,7 17:25 32:12 38:8,11 74:21

records 31:11,13 34:24 36:14,16 68:24 69:2

refrigerators 73:20 74:1

Regalado 40:8,24 51:13

related 69:2

relating 68:24

relation 72:21

relationship 18:25 65:21

release 24:10,13

reliable 72:6

relying 62:13

remainder 72:24

remember 41:22 42:5, 13 43:9

reminded 31:24

repair 73:19

repaired 46:7

repairs 74:1

repeat 7:2 8:9 18:8 58:7

repetition 50:19

rephrase 7:2

replace 46:10 47:16 48:1

report 15:16 36:23 37:14 55:22 63:15,24 64:3

reported 36:21 37:18

Reporter 10:18,20,23 66:24

reports 72:20

represent 5:23 18:15

representative 18:5,7, 14,18

representing 17:6,19

request 34:24

reserve 5:2 72:23

residence 13:13

residential 14:18

responsiveness 5:3

rest 51:4 65:13

resume 38:13



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL GONZALEZ, ERICK on 08/01/2023
Case 3:21-cv-00174-L Document 42 Filed 01/29/24 Page 195 of 2460 PageID 487
Index: retaining..tax

**retaining** 61:9

**return** 15:17 37:3,9

**returns** 33:3,4,6,8,9,11, 12 34:1,16 37:8,9,16,18, 24

**reviewed** 7:22

**Ricny** 57:4

**riding** 45:22

**ring** 19:14

**road** 54:11,12 64:7

**Roderico** 5:9,18 9:19 10:6 16:12 29:7

**Rosa** 10:17

**Rosemary** 57:4,10,12

**Rules** 5:1

**run** 69:19

**S**

**salary** 31:4,6

**San** 10:16 16:23 20:24

**Sandoval** 11:12

**Santa** 10:17

**Santos** 4:7 11:12 12:9, 12 16:10,17,18,20,22 29:8,9,12,14

**satisfactory** 18:3

**Saturday** 39:20

**saved** 36:17

**scene** 9:10 19:2 42:2 43:3 44:7,20 45:19 46:21 55:25

**school** 14:3,6 27:14 28:4,8,9,11,12,15,18,20, 21,22 29:3 55:17

**schooling** 14:11

**Security** 15:11 22:17 25:3,5,6 26:5

**selected** 67:3

**send** 33:13 43:6 44:6

**sending** 43:10

**sense** 52:6

**sensitive** 7:10 42:9

**separate** 30:5 37:3,15

**September** 40:3

**serve** 58:16

**served** 7:25

**services** 67:3

**set** 30:12 31:6

**settle** 17:14

**settled** 17:15

**settlement** 17:10,17

**shattered** 43:20

**shorten** 18:21

**shoulder** 52:15,21 53:9, 13 54:20 64:7,19

**show** 8:6 22:25 24:17 25:15 26:1 36:14 53:15, 17 60:19 61:1,5,9 63:22 66:25 67:5

**showing** 26:12

**shown** 8:11 64:5,22

**shows** 67:4,19

**Si** 56:24

**side** 54:7,8,11 72:1

**simply** 7:10 8:2 25:1

**sir** 5:7

**Sisco** 66:17 67:2

**sixth** 14:10 27:24,25 28:1,2

**slow** 63:8

**smash** 51:3

**Smith** 4:19 6:1 59:14 60:20 61:2,6,10,14 62:7 64:5

**Smith's** 64:18,22

**Social** 15:10 22:17 25:3, 6 26:5

**son** 7:7 12:10,13 19:21, 25 21:19 52:22 65:5 72:11 73:10,14

**sort** 27:8

**Soto** 40:8

**sought** 68:6

**sound** 50:12 67:6

**Spanish** 4:21 14:8 35:20 48:17 50:22 56:24

**Spanish-language** 72:19

**speak** 45:13 46:21 47:6, 21 51:13 72:16

**speaking** 7:15

**specific** 48:20

**specifically** 49:11

**speed** 51:1,5

**spell** 10:3

**spelled** 9:21

**spelling** 10:1,2

**spellings** 9:24

**spent** 59:11 65:12

**spoke** 27:23 47:7 55:24

**spoken** 7:18 17:1 46:24 56:4,7 59:13

**Springdale** 4:6 11:20, 21,24 12:17,18 28:6 33:21 73:22

**squatting** 48:3,7

**standing** 42:24 47:9,11 51:20 72:1

**start** 58:8 59:4

**started** 32:7

**state** 5:16 6:21 25:18 55:24

**stated** 19:4 35:24

**statement** 67:3

**States** 4:9 12:21 15:11 16:7 21:6,9,20 22:1,20, 23 23:3 26:3,8 27:7,15 28:3 57:23 58:2 59:7,9

**status** 11:6 13:11 23:3,5 26:13

**stayed** 39:5,8

**staying** 44:24 45:2,8

**Stephanie** 56:20,23 57:10

**stone** 67:20

**stop** 6:9 7:2 63:5,7,8

**stopped** 54:10,19 63:4

**street** 11:21,24 20:15 33:22,24

**strike** 50:10

**struck** 42:25 47:9,25 49:14,19 53:2

**studied** 28:9

**studies** 73:6

**study** 71:5

**studying** 27:20 55:15

**stuff** 32:7,8 34:12 40:21 66:9 73:24

**subject** 27:1 68:18

**subpoena** 8:1,5

**suicidal** 72:14

**super** 72:6

**supervising** 61:6

**supposedly** 53:25

**surroundings** 63:3

**sworn** 4:15,22,23 5:10, 11

**sympathies** 7:7

**systems** 70:17

**T**

**takes** 22:21

**taking** 4:5 19:7 38:20 39:12 65:16 70:14

**talk** 9:15 17:24 23:18 42:6 43:4

**talked** 13:8 57:19

**talking** 7:9 48:24 53:20 54:4

**tax** 15:17 32:22,24 33:2, 3,4,6,8,9,10,12 34:1,3,



www.ArkansasRealtimeReporting.com

Appx_0191

12,16 37:3,7,9,15,18,21, 24

**taxes** 32:18,22,24 36:21

**Taylor** 4:5

**teaching** 73:12

**technical** 29:1

**tecum** 8:2,5

**telephone** 47:3,7

**telling** 42:5

**temporary** 13:13

**ten** 61:22

**tenth** 27:23 28:19

**testified** 5:10

**testing** 74:13

**Texas** 4:11 38:21,23,25 39:12 44:11,18 55:24 63:23 67:11

**text** 43:6,10

**thing** 23:16 52:5 55:8 64:1 67:17 70:9 71:6 73:13,22

**things** 7:8,13 8:15 9:3, 16 13:19 15:7 23:1,19 31:23 32:5 34:13 65:7,10

**thinking** 70:11

**thought** 49:7

**threw** 51:1

**thrown** 43:24

**tickets** 59:25

**tilt** 42:18

**time** 4:4 6:8 12:1 13:3,6, 9 14:21 19:4,18 21:2,22 22:5,15,21 23:3,5 25:16, 23 27:6 29:25 30:14 31:4,8 38:7,10,16 40:6 41:1,12 42:16,18,25 43:3,9,15 44:11,16 45:23 46:23 47:8,12,14 50:7,13 51:2 52:6,20 53:1 54:16 58:16 59:11 60:14 62:20 65:12,23 67:17,22 68:19 72:8 74:10,18,21

**tire** 46:7,8,10 47:17 48:2

54:15

**tires** 46:5,13

**titled** 63:23

**today** 7:19,23 8:14 46:12 68:17

**Today's** 4:3

**told** 39:3 42:15,20 44:10, 24 45:24 46:5,9 47:16,20 48:1 49:2 50:4,12,23 51:1,4 52:5,6,8,24 56:4 57:15,17,18 60:9 62:14 67:22 71:17 72:3,5

**tombstone** 66:9,11 67:20

**tool** 48:3,19,21,24,25 49:3,8,11

**tools** 36:20

**total** 30:22 35:10 36:6 66:4 67:4

**Toyota** 9:5 45:22

**trade** 14:12 71:5

**traffic** 59:25

**tragedy** 36:19

**trailer** 62:24

**trailers** 62:19

**trained** 61:1 70:16

**training** 14:11 28:25 73:5 74:6,13

**transfer** 55:8

**transporting** 67:11

**travel** 44:14 51:5,9 52:14,16,19 53:8,9 54:20 64:6,18,23

**tread** 46:13

**trial** 72:24

**trip** 38:15,17,20,24 39:6, 12,16,24 40:6

**troopers** 55:25

**trouble** 62:5

**truck** 31:25 32:4 54:25 55:1,5

**turn** 8:12

**turned** 48:4 49:22

**type** 14:12,14 18:12 61:24

**types** 68:5

## U

**U.S.** 13:11 20:25 26:13 74:8

**uh-huh** 9:20 28:14 62:5

**undergone** 14:11

**understand** 6:25 7:11 9:2 13:17 23:2 26:6 30:13 37:12,23 39:11 42:7 45:25 46:16 49:7 51:8 62:6,16 64:15,22

**understanding** 18:11, 12,17 19:5,22 26:11 42:9 52:14 68:16

**United** 4:9 12:21 15:11 16:7 21:6,9,20 22:1,20, 23 23:3 26:3,8 27:6,15 28:3 57:23 58:2 59:7,9

**unpleasant** 7:9 68:18

**useless** 43:23

## V

**vacuums** 36:20

**valid** 25:3,4

**variable** 35:7 36:1

**variation** 10:1

**vehicles** 71:10,11

**verdict** 17:10

**versus** 4:7

**video** 19:4 74:20

**village** 10:15,16,21 16:23 20:22

**violations** 59:24

**visa** 13:12 23:10,11 70:9

**Vitalina** 11:18

## W

**wage** 30:18

**wanted** 64:2 68:6

**washers** 70:25 73:19 74:1

**wear** 19:13

**wedding** 19:14

**Wednesday** 39:21

**week** 31:7 39:22 69:14

**weeks** 17:14 25:12

**wheel** 42:18 62:22 63:2

**White** 4:16 5:5,7 7:15 8:10,21,23 11:3 15:12,19 17:24 18:2,13 23:14,23 24:12,14 26:22 27:5 35:1 38:5 61:12 67:1 68:22 72:23 74:17

**Winston** 55:21

**witnessed** 56:9

**witnesses** 56:13

**word** 48:8

**work** 13:13 14:14,24 25:4 26:7,22 28:25 29:3, 5,24 35:14 40:13,19 41:9 55:3,6 61:23 62:5 65:16, 24,25 70:9,14,21 71:7,19 73:15,17,19 74:8

**worked** 14:20 31:2 40:11,24 41:11

**worker** 62:3

**working** 15:2 30:3,14,23 60:11 65:23 71:13 74:7

**worth** 65:9

**write** 31:14,16 72:16

**written** 31:16 32:14

## Y

**y'all** 24:4 38:3

**year** 10:13 35:13,16 69:10,14



**ARKANSAS** REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0192

**years** 11:25 12:18,19,22
13:22,23 14:6,22 21:5,7,
18,21 22:3 25:21 26:8
37:3 41:3,4,5 62:19

**yellow** 52:21 53:14,20,
21,25 54:4

**Yoli** 57:7

**York** 22:8,9,13 59:8



www.ArkansasRealtimeReporting.com

Appx_0193

PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL SANTOS, ERICK on 08/01/2023
Case 3:22-cv-02714-K   Document 49   Filed 09/20/24   Page 198 of 2460   PageID 490

```
 1              IN UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2
    ERICK RODERICO PIUARA        )
 3  GONZALEZ, Individually       )
    and as Special               )
 4  Administrator of the         )
    Estate of NEHEMIAS R.        )
 5  PIVARAL SANTOS,              )
    DECEASED,                    )
 6                               )
                  PLAINTIFFS,    )
 7                               )
    VS.                          ) CASE NO.:
 8                               ) 3:22-CV-02714-K
    CAYLEE ERIN SMITH and        )
 9  EASTMAN CHEMICAL COMPANY,    )
                                 )
10               DEFENDANTS.     )

11

12        -----------------------------------

13        ORAL AND VIDEOTAPED DEPOSITION OF

14            ERICK JEREMIAS PIVARAL SANTOS

15                 AUGUST 1, 2023

16        -----------------------------------

17     ORAL AND VIDEOTAPED DEPOSITION OF ERICK JEREMIAS

18  PIVARAL SANTOS, produced as a witness at the instance

19  of the DEFENDANTS, and duly sworn, was taken in the

20  above-styled and numbered cause on the 1st of August,

21  2023, from 1:32 p.m. to 4:35 p.m., before Jennifer

22  Norman, CCR in and for the State of Arkansas, reported

23  by machine shorthand, at 410 North Thompson Street,

24  Suite B, Springdale, Arkansas 72764, pursuant to the

25  Federal Rules of Civil Procedure.
```

**EXHIBIT L**




www.ArkansasRealtimeReporting.com

Appx_0194

PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL SANTOS, ERICK on 08/01/2023
Case 3:23-cv-03214-X   Document 49   Filed 03/22/24   Page 199 of 2460   PageID 491
2

```
 1                  A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3       Mr. Jacob White

 4       Taylor King Law, P.A.

 5       410 North Thompson Street, Suite B

 6       Springdale, Arkansas 72764

 7       (479) 935-8682

 8       Jacobwhite@taylorkinglaw.com

 9

10   FOR THE DEFENDANTS:

11       Mr. Brian L. Bunt

12       FREEMAN MILLS PC

13       2020 Bill Owens Parkway, Suite 200

14       Longview, Texas 75604

15       (903) 295-7200

16       Bbunt@freemanmillspc.com

17

18   THE INTERPRETER:

19       Ms. Ines Fernandez

20

21   ALSO PRESENT:

22       Mrs. Stacey Bunt, CP, FREEMAN MILLS, PC

23

24

25
```



1                              INDEX

2                                              PAGE

3

4    Appearances...................................3

5    Stipulations..................................2

6

     Witness:  ERICK JEREMIAS PIVARAL SANTOS

7
         Examination by Mr. Bunt.....................4
8
         Examination by Mr. White...................67
9
         Further Examination by Mr. Bunt............70
10

11   Reporter's Certificate........................74-75

12

13                          EXHIBITS

     NO.           DESCRIPTION                      PAGE
14
     Exhibit 1     Notice of Deposition; Subpoena
15                 Duces Tecum........................37

16   Exhibit 2     Scene photograph...................37

17   Exhibit 3     Photo of front of Camry............37

18   Exhibit 4     Photo of back of Camry.............37

19   Exhibit 6     Scene Photograph...................37

20   Exhibit 12    Marked-up diagram..................49

21

22

23

24

25



```
 1              * * * * * PROCEEDINGS * * * * *

 2              THE VIDEOGRAPHER:  We're now on the

 3         record.  Today's date is August 1st, 2023,

 4         and the time is 1:32.  This deposition is

 5         taking place at the Taylor King Law Firm in

 6         Springdale, Arkansas.

 7              The deponent is Erick Pivaral Santos.

 8         And if Counsel will introduce themselves,

 9         the interpreter and then the witness will

10         then be sworn.

11              MR. WHITE:  Jacob White, attorney for

12         plaintiff.

13              MR. BUNT:  Brian Bunt, attorney for

14         Defendants Caylee Smith and Eastman Chemical

15         Company.

16              THE INTERPRETER:  Ines Fernandez,

17         certified Spanish interpreter.

18      (Whereupon, the interpreter was duly sworn.)

19              (Whereupon, the witness was duly sworn.)

20         ERICK JEREMIAS PIVARAL SANTOS,

21   having been first duly sworn, testified through the

22   duly sworn interpreter as follows:

23                      EXAMINATION

24   BY MR. BUNT:

25   Q.  Good afternoon, Mr. Santos.  Could you please
```



1   state your full legal name for us.

2   A.   Erick Jeremias Pivaral Santos.

3   Q.   And, Erick, do you commonly go by "Erick Santos"?

4   A.   Yes.

5   Q.   If I call you, then, by "Mr. Santos," will that be

6   okay?

7   A.   Yes.

8   Q.   Mr. Santos, have you ever done this before, given

9   a deposition?

10  A.   No.

11  Q.   I'm sure that Mr. White has had an opportunity to

12  kind of explain to you what we will be doing.  As I

13  indicated on the record earlier, my name is

14  Brian Bunt.  I represent the parties against whom the

15  lawsuit has been brought; that is Caylee Smith, the

16  lady who was driving the Ford Explorer vehicle, as

17  well as her employer, Eastman Chemical Company.

18          Mr. Santos, please accept my sympathies

19  for the loss of your brother.  I understand that some

20  of the things I will be asking you about are

21  unpleasant to talk about, but since a lawsuit has been

22  filed against Mrs. Smith, I hope you'll understand

23  that I need to ask you questions about some of these

24  things.

25  A.   I understand.



1   Q.  Mr. Santos, Mr. White has indicated -- I think I

2 understand that he has indicated that he is also your

3 personal attorney with respect to any claims that you

4 might assert as a result of this accident. Is that

5 also your understanding that Mr. White represents you?

6   A.  Yes.

7   Q.  Thank you. Mr. Santos, other than Mr. White or

8 someone here at his law firm, have you spoken with

9 anyone to prepare for your deposition today?

10   A.  I've only spoken to my attorney about everything.

11   Q.  Okay. Have you reviewed any documents, any papers

12 of any kind to refresh your memory about the --

13   A.  Could you be more specific in your question?

14   Q.  Have you looked at, for instance, the accident

15 report or any photographs or any records of any kind

16 in preparation for the deposition?

17           THE INTERPRETER: Sorry.

18   Q.  In preparation for the deposition.

19   A.  Yes.

20   Q.  Can you explain to me what you've looked at.

21   A.  Pictures of my brother's accident; the accident

22 report from the police officer.

23   Q.  Anything else?

24   A.  Yes. And the lady's report, literally speaking.

25   Q.  When you say "the lady's report ," which lady are



```
1  you talking about?
2  A.  Caylee.  I don't know what her full name is.
3  Q.  You're talking about the lady who was driving the
4  Ford Explorer?
5  A.  Uh-huh.  Yes.
6  Q.  Okay.  I should have mentioned this probably at
7  the beginning, but I will be asking you some questions
8  today.  Mr. White may ask you some questions as well.
9  Do you understand that you are under oath and required
10  to tell the truth in everything you tell us just as if
11  you were testifying in the courtroom itself?
12  A.  I understand that.
13  Q.  And you're doing a great job so far.  I would like
14  to ask a couple -- to have a couple of agreements with
15  you; one would just be that if I ask you a question
16  that can be answered with a "yes" or a "no," that you
17  would state the answer out loud as opposed to just
18  nodding your head, that type of thing.  Would you
19  agree to do that?
20  A.  I understand.
21  Q.  Also, Mr. Santos, if I don't make myself clear to
22  you in any of my questions, would you please just stop
23  me and ask me to repeat the question or rephrase the
24  question until I've made myself clear?
25  A.  I understand.  That's fine.
```



www.ArkansasRealtimeReporting.com

1   Q.   Thank you.  Mr. Santos, what is your current

2   address?

3   A.   607 Cleveland Street, Springdale, Arkansas.

4   Q.   And do you live there at that apartment with your

5   father?

6   A.   That's right.

7   Q.   Is your father Erick Pivaral Gonzalez?

8   A.   Yes, he is my father.

9   Q.   How long have you lived with your father?

10  A.   Here, currently I've been living with him for

11  about two years approximately.

12  Q.   Okay.  Did you live with him previously in

13  Guatemala?

14  A.   In Guatemala, no.

15  Q.   Were you born in Guatemala?

16  A.   That's right.

17  Q.   What is your date of birth?

18  A.   It's September 08, 2000.

19  Q.   Thank you.  And were you born in Guatemala?

20  A.   Yes.

21  Q.   Are you still a citizen of Guatemala?

22              MR. WHITE:  Objection.  I'm going to

23        advise my client not to answer that question

24        and invoke the Fifth Amendment privilege.

25  Q.   All right.  Your attorney has advised you not to



www.ArkansasRealtimeReporting.com

1  answer that question.  Is that your decision not to

2  answer that question?

3  A.  I have made a decision of not answering the

4  question.

5  Q.  Thank you.  Are you a citizen of the United

6  States?

7           MR. WHITE:  Objection.  Same objection

8           and same advice to the client to not answer

9           that question.

10  Q.  Mr. Santos, what is your current immigration

11  status with regard to the United States?

12           MR. WHITE:  Same objection.  Same

13           advice.

14           MR. BUNT:  Okay.  And I'm going to keep

15           asking a few, and we'll just go through

16           this.

17  Q.  Mr. Santos, have you, since arriving in the United

18  States, obtained a visa, a residence card -- temporary

19  residence card, or work permit, any type of document

20  like that?

21           MR. WHITE:  Same objection and same

22           advice.

23  Q.  Mr. Santos, I understand you said you have been

24  living in the United States for approximately two

25  years.  When you came to the United States, did

1  Nehemias, your brother, come with you at that time?

2          MR. WHITE:  Same objection.  Same

3      advice.

4  Q.  Do you know, Mr. Santos, anything about Nehemias's

5  immigration status in the United States as of the day

6  he passed away?

7          MR. WHITE:  He can answer that question.

8  A.  Could you please repeat the question?

9  Q.  Yes.  I'm not asking about your immigration status

10  anymore, but asking if you -- what you knew about

11  Nehemias's immigration status as of the time he died.

12  A.  Okay (in English).

13          Yes, yes, literally speaking, Nehemias was

14  in the process of, you know, getting his papers.  He

15  was doing that.

16  Q.  Mr. Santos, do you know specifically what he had

17  applied for?

18  A.  The green card.  He was just waiting for it.

19  Q.  Okay.  So he had applied for a temporary residence

20  card and was just waiting to receive that from the

21  government?

22  A.  Yes.

23  Q.  Was Nehemias living with you also at the home

24  there on Cleveland Street?

25  A.  He was already living separately.



1  Q.  Where did he live at the time?

2  A.  In Rogers, Arkansas.  I don't remember the exact

3  address.

4            MR. BUNT:  Which one has the residence

5       card?

6            THE COURT REPORTER:  Was it these?

7            MR. BUNT:  Let me see if it's in here.

8  Q.  Let me show you what's been marked as Exhibit

9  Number 15, which appears to be an Arkansas

10  identification card.  And it has an address 1324 East

11  Fairlane Street, Fayetteville, Arkansas.

12            Would that be the address at which

13  Nehemias was living at the time of the accident?

14  A.  Yes, that was his prior address.  Because he had

15  just moved to Rogers.

16  Q.  Okay.  Thank you.  Mr. Santos, what is your

17  mother's name?

18  A.  Johana Patricia Santos Lucas.

19  Q.  Do you also have a brother named Ivan?

20  A.  That's right.

21  Q.  Is Ivan also the son of Johana Patricia Santos

22  Lucas?

23  A.  That's right.

24  Q.  Do you have other brothers or sisters?

25  A.  Yes.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL SANTOS, ERICK on 08/01/2023
Case 3:23-cv-03214-TLB   Document 49   Filed 01/22/24   Page 209 of 2460   PageID 501
12

```
 1   Q.   What are their names?
 2   A.   Elena --
 3                THE INTERPRETER:  Allow me to repeat.
 4   A.   Elena.  Elena Patricia Pivaral Santos.
 5   Q.   Where does Elena live?
 6   A.   In Guatemala.
 7   Q.   Any other brothers or sisters?
 8   A.   From Mom and Dad, they are the only ones.
 9   Q.   Okay.  Was Nehemias ever married, to your
10   knowledge?
11   A.   He was never married.
12   Q.   Have you ever been married?
13   A.   No.
14   Q.   Did Nehemias have any children?
15   A.   No.
16   Q.   Mr. Santos, tell me what school you attended when
17   you were living in Guatemala and the last grade you
18   would have completed there.
19   A.   The name of the school is Inbacopa.  And I only
20   got to the second grade from high school.
21   Q.   So tenth grade?
22   A.   No.  It would be eighth grade.
23   Q.   Eighth grade, okay.
24                Did you attend school here in the United
25   States after you arrived?
```



```
 1   A.   No.
 2   Q.   Are you currently employed?
 3   A.   Yes.
 4   Q.   For whom do you work?
 5   A.   I work with my father.  I help him.  I'm a
 6   painter.
 7   Q.   Have you worked with your father always since you
 8   came to the United States?
 9   A.   That's right.
10   Q.   Did Nehemias do the same work as you working for
11   your father?
12   A.   Yes.
13   Q.   Mr. Santos, since you've arrived in the United
14   States, have you obtained a Social Security number?
15               MR. WHITE:  I'm going to advise my
16          client to invoke the Fifth Amendment
17          privilege and not answer that question.
18   Q.   On the advice of your attorney, are you refusing
19   to answer the question?
20   A.   Yes, I refuse to answer the question.
21   Q.   Okay.  Mr. Santos, do you currently have a cell
22   phone?
23   A.   Yes.
24   Q.   Did you have a cell phone in April of 2022?
25   A.   No.
```



1 Q. So on the day the accident happened, you didn't

2 have your own cell phone at all?

3 A. It had broken down.

4 Q. Let me ask for some clarification on that.

5 Are you saying you had a cell phone on

6 the day of the accident, but you no longer have it?

7 A. I didn't have one with me. Literally speaking,

8 the day of the accident, I didn't have it with me

9 because days prior to that, it had broken down.

10 THE INTERPRETER: Or interpreter's

11 correction. "It had gotten damaged."

12 Q. I think I recall seeing on some of the police

13 videos there at the scene a shot of you talking on a

14 telephone. Would you have been using -- is there any

15 chance that was your telephone, or were you using

16 someone else's telephone?

17 A. They had lent it to me so that I could place a

18 call.

19 Q. Okay. Do you know whose phone you borrowed to

20 place the call?

21 A. I don't remember. Literally speaking, the person

22 that lent -- lent it to me.

23 Q. Would it have been Evelyn Moreno or Dina Regalado

24 or Melvin Diaz?

25 A. It wasn't any of them.



1  Q.  Okay.  Just someone else who was there at the

2  scene?

3  A.  That's right.

4  Q.  Mr. Santos, what was the purpose of the trip that

5  you and Nehemias and Evelyn and the others were on at

6  the time of the accident?

7            THE INTERPRETER:  I'm sorry.  May the

8          interpreter ask for a repetition?

9            MR. BUNT:  Yes.

10        (Interpreter clarification in Spanish.)

11  A.  We were going back to Arkansas to rest at home.

12  Q.  You were traveling to Springdale, Arkansas, at the

13  time?

14  A.  That's right.

15  Q.  Where did you start the day driving?

16  A.  Where did I start my day?  From Houston, that's

17  where our day started.  I mean, from there, we

18  started, you know, approximately driving around noon.

19  We were driving here.

20  Q.  From where in Houston?  Were you staying with

21  someone there?  We'll just stop with that question

22  first.

23  A.  With a friend.  I don't remember the place.

24  Q.  Was this a friend of yours or a friend of someone

25  else's?



```
 1    A.   It was a friend of mine.

 2    Q.   And what is this friend's name?

 3    A.   Oscar.

 4    Q.   And Oscar lives in Houston?

 5    A.   At this time, I don't know if he still lives

 6    there.   I lost communication with him.

 7    Q.   At the time, did he live in Houston?

 8    A.   Yes.

 9    Q.   What is Oscar's last name?

10    A.   Zamora, yes.

11    Q.   Z-a-m-o-r-a?

12    A.   It's Z at the beginning.

13    Q.   Zamora, okay.

14              Had you stayed at Oscar Zamora's house

15    the night before?

16    A.   That's right.

17    Q.   How many days had you been at Mr. Zamora's house?

18    A.   Two or three days.   Something like that.   I don't

19    remember.

20    Q.   And what was the purpose of visiting Mr. Zamora?

21    A.   I hadn't seen him in a while.   I wanted to see him

22    again.

23    Q.   Did Nehemias know Mr. Zamora also?

24    A.   Yes.

25    Q.   Was he a friend of your family?
```



1  A.  No.  Only the two of us.

2  Q.  Did Dina Regalado or Melvin Diaz know Mr. Zamora?

3  A.  No.

4  Q.  Why had they gone on the trip?

5  A.  Oh, because they had gone back and they were

6  coming back to pick us up.  I can repeat my answer.

7  Q.  Did -- let me -- I'll get back to it.

8              Whenever you traveled from Springdale

9  down to Houston, who traveled in the car on the trip

10  down?

11  A.  Melvin; me.  That was it.

12  Q.  So only Melvin and you traveled down to Houston?

13  A.  That's right.

14  Q.  And how did you get -- how did you and Melvin get

15  to Houston?

16  A.  A friend from -- a friend of Oscar's came to pick

17  us up.

18  Q.  So a friend of -- did a friend of Oscar's drive

19  from Houston to Springdale to pick you up?

20  A.  Well, I'm feeling like you're asking too many

21  questions about that.

22  Q.  Well, I want to know the reason for the trip that

23  you were [sic] taking place, and I'm trying to find

24  out who was traveling when and where.

25  A.  Well, it was just Melvin and I that were traveling



Appx_0210

1  from Springdale to Houston just to go see my friend.

2  Q.  Okay.  And you had gone down two or three -- had

3  you gone down to Houston two or three days earlier?

4  A.  Yes.

5  Q.  When did you meet up with Evelyn and Nehemias?

6  A.  The day that Nehemias passed away, I believe that

7  that morning we got together.

8  Q.  Do you know where Nehemias and Evelyn had been

9  before they picked you up in Houston?

10  A.  No.

11  Q.  Were they both living in Springdale at the time?

12  A.  They were already living together in Rogers.

13  Q.  Had they driven down from Rogers just to pick you

14  and Melvin up?

15  A.  Yes.

16  Q.  Do you know what day they left Rogers to come down

17  and pick you up?

18  A.  The exact date, no.  But they were -- they left a

19  few hours earlier before he passed away.

20  Q.  Left Rogers a few hours before, or are you saying

21  Houston?  Left from where?

22  A.  The 29th, the day before, they left.

23  Q.  Okay.  So they left on the day before on Friday,

24  the 29th of April, and then they apparently stopped

25  and spent the night somewhere else?



```
 1   A.   I don't know.
 2   Q.   Okay.  What about Dina Regalado; when and how did
 3   she join the group?
 4   A.   She was with them.
 5   Q.   Okay.  So she traveled down with Nehemias and
 6   Evelyn?
 7   A.   Yes.
 8   Q.   As far as you know, she was with them the whole
 9   trip down?
10   A.   Uh-huh.  Yes.
11   Q.   Mr. Santos, how much English do you know?
12   A.   I don't speak much English.
13   Q.   Did Nehemias speak much English?
14   A.   He spoke it perfectly.
15   Q.   Did he learn it before coming to the United
16   States?
17   A.   No.  He learned here.
18   Q.   Okay.  What about Evelyn; does she speak good
19   English?
20   A.   Yes.
21   Q.   What about Dina Regalado; does she speak English?
22   A.   No.
23   Q.   Melvin Diaz?
24   A.   No.
25   Q.   Was Evelyn Moreno Nehemias's girlfriend?
```



1  A.  That's right.

2  Q.  How long had they been together, if you know?

3  A.  I don't remember the exact time, but I believe

4  they were together for a little over a year.

5  Q.  Okay.  Did he meet Evelyn here in the United

6  States?

7  A.  That's right.

8  Q.  Do you know what kind of work Evelyn Moreno did?

9  A.  No.

10  Q.  How long had Evelyn and Nehemias been living in

11  the apartment or living together either in Rogers or

12  Fayetteville?

13  A.  I don't remember the time -- the time frame that

14  they were living together because they never spoke

15  about that.

16  Q.  How did you know Dina Regalado?

17  A.  She used to work -- she works with us.

18  Q.  Has she worked for your father as long as you have

19  worked for your father?

20  A.  Most of the time she's worked for him.

21  Q.  Does Melvin Diaz also work with your father?

22  A.  He still works with us.

23  Q.  Do you know how long Melvin has worked for your

24  father?

25  A.  A year and a half.



1  Q.  Did Dina normally call herself Dina?

2  A.  Yes.

3  Q.  Okay.  I think her name is Dinita, but she

4  normally goes by Dina?

5  A.  Dina or Yami.

6  Q.  Okay.  Is Yami a -- do you know if that's a given

7  name for her or a nickname?

8  A.  It's like as if you were saying "little Yamileth."

9  Q.  Saying "little"?

10              THE INTERPRETER:  "Little Yamileth."

11              MR. BUNT:  What is that last word?

12              THE INTERPRETER:  It's like a nickname.

13         This is the interpreter speaking.  Terms of

14         endearment.  Usually the way that it works

15         in certain Spanish or Latin-American

16         countries is if you have a name, for

17         example, Yamileth, like "Yami," like a

18         shorten of the name, or a -- the words

19         "little Yamileth" which it actually works

20         towards the end of the name, that's how it

21         comes about.  It varies depending on the

22         name.

23              MR. BUNT:  Okay.

24  Q.  And how is -- say the name again.  And how is that

25  spelled?



```
 1   A.  You mean the name or the nickname?

 2   Q.  The name.

 3   A.  It is Y-a-m-i-l-e-t-h.

 4   Q.  Yamileth?

 5   A.  That's right.

 6   Q.  And "Yami" for short?

 7   A.  That's right.

 8   Q.  Mr. Diaz, by what name did you usually call him?

 9   A.  Yami.

10   Q.  So you called Mr. Diaz Yami also?

11   A.  Oh, you're talking about her husband?

12   Q.  Yes.  Melvin Alexander Diaz.

13   A.  Melvin.

14   Q.  Melvin, okay.

15            Mr. Santos, on the day of the accident,

16   April 30, 2022, was it everyone's plan to drive all

17   the way back to Springdale that day?

18   A.  That's right.

19   Q.  Do you know what time Evelyn and Nehemias and Dina

20   had picked you up from Mr. Zamora's home?

21   A.   It was approximately between 9:00 a.m., and noon.

22   Q.  Did your group stop anywhere after leaving Houston

23   before you arrived at the location where the accident

24   occurred?

25   A.  We did not make any stops.
```



1  Q.  You and Melvin had gone down -- this friend of

2  yours and Melvin had picked you up and had taken you

3  down, you said, two or three days earlier.  Are we

4  talking, like, Wednesday or Thursday of that week?

5            MR. WHITE:  Objection to form.  You can

6        answer.

7  A.  I will not answer that.

8            MR. WHITE:  You can go ahead and answer

9        when you got to Houston.

10 A.  The thing is I don't remember the date.  I don't

11 remember the exact date.

12 Q.  Okay.  Even if you don't remember the exact date,

13 about how many days before Saturday do you think it

14 was approximately?

15 A.  That we had arrived to this place?

16 Q.  Well, did you travel from -- when the friend

17 picked you up in Springdale, did you drive -- did he

18 drive you from Springdale to Houston all in one day?

19 A.  Yes.

20 Q.  Okay.  And so approximately how many days had that

21 trip from Springdale to Houston taken place?

22 A.  I don't remember the exact date.

23 Q.  I know you don't remember the exact date, but do

24 you -- do you know approximately how many days?  Are

25 we talking three days?  Two days?  Five days?



1   A.   Before getting to Houston, what I remember, the

2   day before.

3   Q.   You're saying you traveled from Springdale, down

4   to Houston, on Friday, the 29th?

5   A.   Well, I remember traveling from Springdale to

6   Houston approximately -- it was, like, either a

7   Tuesday or a Wednesday.  I don't remember any longer.

8   Q.   When you traveled down approximately on Tuesday or

9   Wednesday, did you bring clothes with you for a trip?

10  A.   Yes.

11  Q.   Did you have luggage, a suitcase?

12  A.   No.  I just had a change in my hands.

13  Q.   What did you carry your change of clothes in?

14  A.   When I was coming back?

15  Q.   When you were going down.

16  A.   Oh, oh, I just had them on my legs.

17  Q.   Okay.  Did Melvin Diaz have a bag, a suitcase, or

18  a bag of any kind?

19  A.   No.  It was the same thing.  He only had a change

20  of clothes.

21  Q.   Did he carry it in anything?

22  A.   I don't remember.

23  Q.   So as best you recall, no one had any kind of bag

24  or backpack or suitcase?

25  A.   That I remember, no.



1  Q.  When Evelyn and Nehemias and Dina picked you up in

2  Houston, did they -- do you recall if they had any

3  bags or luggage?

4  A.  I don't remember.

5  Q.  Is it your testimony that you don't recall seeing

6  any luggage or bags in the car at all?

7  A.  I don't remember seeing any.

8  Q.  And as far as you know, they -- they traveled down

9  from Rogers on the day before the accident?

10  A.  Yes.

11  Q.  And after leaving Houston, you don't recall any

12  stops for lunch or gas or anything like that?

13  A.  We didn't make any stops because the tank was

14  completely full.

15  Q.  Okay.  Did anyone in the car consume any alcohol

16  that day?

17  A.  No.

18  Q.  Was there any alcohol in the car?

19  A.  No.

20  Q.  Had anyone in the car used any illegal drugs that

21  you're aware of that day?

22  A.  No.

23  Q.  When you were picked up in Houston, who was

24  driving the car?

25  A.  Evelyn Moreno.



1  Q.  And was Evelyn driving the car the whole time

2  until the tire blew out?

3  A.  Yes.

4  Q.  Did Nehemias or anyone else at any time drive the

5  car?

6  A.  Nobody else drove.

7  Q.  Mr. Santos, do you know whether Nehemias used any

8  prescription drugs regularly at that time?

9  A.  No, I don't know.

10  Q.  Are you aware of any over-the-counter medicines

11  that he used regularly at that time?

12  A.  I'm not aware of anything, but he hardly ever got

13  sick.

14  Q.  Okay.  Do you know -- and you may not, but I'm

15  just going to ask.  Do you know whether or not

16  Evelyn Moreno used any kind of prescription drugs

17  regularly at that time?

18  A.  I don't know.

19  Q.  And would that also be the same for any just

20  over-the-counter medicines?

21  A.  Literally speaking, I don't know.  I would give

22  you the same answer.

23  Q.  When you were traveling prior to the accident, who

24  was sitting where in the car?

25  A.  Evelyn was driving.  Nehemias was on the right



1  side.  Melvin, Dina, and I were in the back side.

2  Q.  What was the traffic like on Highway Interstate 45

3  that day?  What do you remember?

4  A.  Normal.

5  Q.  Normal?

6  A.  That's right.

7  Q.  By "normal," do you mean -- I guess -- since I

8  guess "normal" could mean different things, did you

9  see quite a few other cars around?

10  A.  Yes, one or two vehicles around us.  That's it.

11  Q.  Mr. Santos, do you have any idea how fast the cars

12  around you were traveling?

13  A.  We were all doing the speed limit.

14  Q.  Okay.  You may have answered this, but do you know

15  how fast Evelyn was driving?

16  A.  I don't remember the speed limit at that highway,

17  but we were a little below the speed limit.

18  Q.  Was Evelyn driving similar speed to the other cars

19  around?

20  A.  No.  We were going under the speed limit or their

21  speed limit.

22  Q.  Was there a particular lane that Evelyn was

23  primarily traveling in?  I know there were three lanes

24  in the same direction there where the accident

25  occurred.  There isn't necessarily three lanes all the



1 way between Houston and Dallas.  Do you know whether

2 or not she was driving more in the right lane or the

3 left lane or the center lane?  Do you recall?

4                    MR. WHITE:  Objection to form.  Go

5           ahead.

6 A.  The accident didn't happen in Dallas.  And I don't

7 really know how to answer your question the way that

8 you're asking your question.  I don't know if you're

9 talking about Dallas or if you're talking about

10 Houston.

11 Q.  Well, between Houston and Dallas, do you recall

12 whether Evelyn was driving mostly in any particular

13 lane?

14 A.  In the middle lane most of the time.

15 Q.  Whenever the tire failure occurred on the car,

16 what -- what happened?

17 A.  So the car was shaking.  And we parked towards the

18 left.

19 Q.  Did you realize that a tire had blown out?

20 A.  We heard when it happened.

21 Q.  Have you been in a car before whenever a tire went

22 flat?

23 A.  No.

24 Q.  That was your first time?

25 A.  Yes.  Because we always had, you know, taken a



1  tire out whenever we knew that there was something

2  wrong with it.

3  Q.  How did you know that it was a tire that had blown

4  out?

5  A.  The way the car was moving at the time it

6  happened.

7  Q.  Okay.  Was there -- Mr. Santos, was there

8  discussion in the car between Evelyn and Nehemias

9  about what the noise was, what had happened?

10  A.  No.

11  Q.  Did anyone say, "I think a tire has blown out"?

12  Was there any mention of that by anyone in the car

13  that you recall?

14  A.  It was just a reaction from all of us.

15  Q.  And you say "just a reaction," but does that mean

16  no, no mention or discussion?

17  A.  No.

18  Q.  What did Evelyn do?

19  A.  Well, she reacted to what was happening to the

20  vehicle, and then she actually parked towards the left

21  side.  That's where we were sort of taken.

22  Q.  Did she immediately pull off the road?

23  A.  To the left side.

24  Q.  Okay.  And my question was:  Did she immediately

25  react?  And I guess what I'm asking is:  Did she



1  immediately pull off the road, or did she continue

2  driving the car for any distance before pulling off?

3  A.  She immediately pulled off.

4  Q.  Before pulling off the road, did she at any time

5  try to move the car -- well, let me stop for a second.

6              Was the car still traveling in the

7  middle lane whenever the tire blew out?

8  A.  We were in the middle lane when it blew up.

9  Q.  Okay.

10             THE INTERPRETER:  And interpreter's

11         correction.

12  A.  We were in the middle of the lane when the tire

13  blew up.

14             (Clarification in Spanish.)

15  A.  That is correct.

16  Q.  There were three travel lanes going north.  You

17  had earlier said that she usually -- between Houston

18  and Dallas, she usually was traveling in the middle

19  lane.  And by that, do you mean the lane in between

20  the left lane and the right lane?

21  A.  That's right.

22  Q.  Okay.  And whenever the tire blew out, was the car

23  in the middle of the three lanes?

24  A.  That is correct.

25  Q.  Did Evelyn, at any time, try to move to the right,



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL SANTOS, ERICK on 08/01/2023
Case 3:23-cv-02714-X Document 45 Filed 02/29/24    Page 228 of 2460    PageID 520
31

1  to the right lane?

2  A.  There was no reaction to go towards the right lane

3  because the left front tire is the one that had blown

4  out.

5            THE INTERPRETER:  In interpreter's

6           opinion, the deponent is using the word

7           "reaction."  From the context, the

8           interpreter feels like maybe a better

9           interpretation will be "inclination," but if

10          the interpreter may inquire?

11          MR. BUNT:  Yes.  Go ahead.

12          THE INTERPRETER:  (Clarification in

13          Spanish.)

14          The interpreter is correct.

15  A.  The vehicle pulled towards -- it was -- we were

16  all inclined to go towards because the vehicle was

17  pulling to the left.

18  Q.  How is it that you know the vehicle was pulling to

19  the left?

20  A.  Because when the tire blew up, immediately the

21  vehicle started pulling towards that direction.

22  Q.  Okay.  And obviously your hands are not on the

23  wheel; correct?  Is it just your perception that the

24  vehicle is pulling that direction?

25  A.  When the tire blew up, you could see that the car

 1  was tilting, like, almost, like, lower -- lower to the

 2  left.

 3  Q.  Did Evelyn -- well, let me back up and ask:  Was

 4  there any discussion at all from Evelyn or between

 5  Evelyn and Nehemias about whether to stop the car?

 6  A.  There was no conversation.

 7  Q.  From what you observed, Mr. Santos, did Evelyn

 8  make any attempt to move to the right, to change from

 9  the middle lane over into the right lane?

10  A.  She didn't try to move to the right because,

11  literally speaking, when the tire blew up, the vehicle

12  was pulling to the right -- to the left side.

13          MR. BUNT:  Object to the nonresponsive

14          portion.

15  Q.  Did she ever turn on a turn signal either to the

16  right or to the left that you recall?

17  A.  Yes.

18  Q.  Which turn signal did she activate?

19  A.  Intermittent, or emergency.

20  Q.  Okay.  Emergency flashers?

21  A.  Yes.

22  Q.  Okay.  I understand she activated the emergency

23  flashers.  But did she ever turn on a turn signal or a

24  blinker to indicate that she would be moving to the

25  left or moving to the right?



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL SANTOS, ERICK on 08/01/2023
Case 3: [illegible] Document 49 Filed [illegible]/24 Page 230 of 2460 PageID 522
33

1  A.  It was just the emergency flashers, the emergency
2  lights.
3  Q.  At the time the tire blew out, Mr. Santos, do you
4  recall whether there were cars in the lane to the
5  right?
6  A.  There were a few cars to the right side.
7  Q.  Okay.
8              THE INTERPRETER:  "On the right side."
9         Interpreter's correction.
10 Q.  Were there cars to the left side?
11 A.  I don't remember.
12 Q.  Were there still quite a few cars around?
13 A.  That's right.
14 Q.  By the time the tire blew out, was traffic heavier
15 in any way?
16 A.  It was normal traffic, but we did have several
17 vehicles around us.
18 Q.  Okay.  I know you've explained that the car was
19 kind of tilting to the left, maybe pulling to the
20 left.  Do you know -- other than that, do you know why
21 Ms. Moreno stopped on the left side of the highway as
22 opposed to the right side of the highway?
23 A.  That was the only option she had.
24 Q.  And why do you say that was the only option she
25 had?



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL SANTOS, ERICK on 08/01/2023
Case 3:23-cv-03114-x Document 43 Filed 02/02/24 Page 231 of 2460 PageID 523
34

1   A.  Because the vehicle was pulling -- the vehicle

2   pulled to the left side.

3   Q.  Are you, Mr. Santos, assuming that she physically

4   would not have been able to steer the car to the

5   right?

6   A.  It's not being able to.  It was due to the

7   vehicle.

8   Q.  Okay.  And I guess to get back to my question, you

9   were not driving.  You were sitting in the backseat;

10  so you were observing.  Your hands were not on the

11  wheel feeling any of that.  How are you able to tell

12  us that she had no ability to steer the car to the

13  right?

14                  MR. WHITE:  Objection; form.  Go ahead

15          and answer.

16  A.  I'm a driver.  I have seen or experienced

17  instances or watched videos when a tire blows such as

18  this.  So the reaction or the tendency is to pull

19  towards that direction.

20  Q.  Okay.  You testified earlier, though, you haven't

21  been in a car when you were driving when a tire blew

22  out; correct?

23  A.  Well, I know.  But I have seen videos.  And as a

24  driver, I have experience.  I have had the experiences

25  where I know how it feels.



**www.ArkansasRealtimeReporting.com**

```
 1   Q.   Mr. Diaz, do you have a driver's license?

 2   A.   That's not my last name.

 3   Q.   I'm sorry, Mr. Santos.  Excuse me.

 4              Mr. Santos, do you have a driver's

 5   license?

 6   A.   No.

 7   Q.   Have you ever held a driver's license?

 8   A.   No.

 9   Q.   Have you ever taken a driver training class?

10   A.   No.  I learn on my own.

11   Q.   Do you have a car or truck?

12   A.   Yes.

13   Q.   How long have you been driving?

14   A.   Ever since I was in Guatemala.  It's been four

15   years since I've been driving.

16   Q.   And so you've driven four years without a driver's

17   license number?

18   A.   Yes.

19   Q.   Have you ever been stopped or cited for doing

20   that?

21   A.   Yes.

22   Q.   Okay.  I guess they gave you a ticket of some kind

23   for -- did you get a ticket for driving without a

24   license?

25   A.   Yes.
```



1  Q.  Did you have to pay a fine?

2  A.  That's right.

3  Q.  How many times has that happened?

4  A.  Twice for not having a driver's license.

5  Q.  Okay.  Did Nehemias ever have a driver's license

6  that you know of?

7  A.  I don't know if he had one.  I don't know.

8                    MR. BUNT:  Do you want to take a break?

9                    MR. WHITE:  Sure.

10                    MR. BUNT:  We've been going about an

11         hour.

12                    THE VIDEOGRAPHER:  The time is 2:50.

13         We're now off the record.

14                    (Recess from 2:50 p.m. to 3:05 p.m.)

15                    THE VIDEOGRAPHER:  The time is 3:05.

16         We're now on the record.

17  Q.  Mr. Santos, we took a quick break there.  And I'm

18  going to go ahead and show you what we'll mark as

19  Deposition Exhibit Number 1.  This is titled:

20  Defendant's First Amended Notice of Deposition, for

21  you, Erick Pivaral Santos, with subpoena duces tecum.

22  And at the back of it, it asks you to bring documents

23  to your deposition or photographs or evidence if you

24  have any of these things.

25                    Have you had an opportunity to look at

```
 1  this before?  Has Mr. White showed it to you or gone
 2  over it with you?
 3                  (Exhibit 1 marked for identification.)
 4  A.  I have knowledge of this.  And everything that is
 5  asked of me there, my attorney has that.
 6  Q.  Okay.
 7                  MR. BUNT:  Anything that's been brought
 8           today other than what's been previously --
 9                  MR. WHITE:  No, sir.
10                  MR. BUNT:  -- produced?
11                  MR. WHITE:  I can represent both Ericks
12           brought me everything.
13                  MR. BUNT:  Okay.
14                  MR. WHITE:  You know, when discovery and
15           the initial disclosure obligations happened,
16           I turned it all over then.
17  Q.  Mr. Santos, I'm going to show you a few
18  photographs and ask you some questions about them.  I
19  will tell you that I've tried to be sensitive in that
20  I'm not including any photographs that have Nehemias
21  in the picture or anything, but they do show
22  Ms. Moreno's car.
23  A.  That's fine.
24                  (Exhibit 2, Exhibit 3, Exhibit 4,
25           Exhibit 6 marked for identification.)
```



1  Q.  Let me show you a few exhibits here first, a
2  photograph marked Exhibit 2, which is kind of a front
3  view of the car; Exhibit Number 3, which is a closer
4  view of the front; Number 4, which is a close view of
5  the rear of the car; and for now, Number 6, this is
6  another view from the front of the car.
7            Mr. Santos, do these exhibits appear to
8  accurately indicate where the car was located whenever
9  it was stopped by Ms. Moreno on the highway?
10  A.  Yes.
11  Q.  Would you agree with me, looking at Exhibit
12  Number 2 and Exhibit Number 3, that the car is stopped
13  or parked partially on the left shoulder but also
14  partially in the travel lane?
15  A.  I agree with what I see.
16  Q.  Okay.  Does that mean you agree that the car is
17  not completely out of the travel lane over in the
18  shoulder, but is still partly in the travel lane?
19  A.  Yes.  The vehicle was parked in such a way because
20  we also needed space to change the tire.
21  Q.  All right.  And that was going to be my next
22  question, is:  Do you know why Ms. Moreno stopped the
23  car where it was still partly in the travel lane?
24  A.  I don't know why she stopped or she parked in such
25  a way.



1  Q.  Okay.  After the car had come to a stop and after
2  she had stopped, did you know that the car was still
3  partly in the travel lane?
4  A.  I don't know why she did it in such a way.
5  Q.  Mr. Santos, what I'm asking is whether, after the
6  car had come to the stop you -- and you were sitting
7  in the backseat -- whether you could tell that the car
8  was stopped partly in the travel lane?
9  A.  Yes, I understood that.
10 Q.  Okay.  Do you know whether Nehemias was aware of
11 that?
12 A.  We were aware of that.
13 Q.  Was there any discussion in the car about the fact
14 that it was partly in the travel lane?
15 A.  We were not -- we didn't have any conversation
16 because all of us got out of the car very quickly
17 because of the danger.
18 Q.  All right.  After the car came to a stop, tell us
19 what happened next.
20 A.  We got out of the car and we got into the security
21 lane.
22 Q.  Did everyone get out of the car?
23 A.  All of us got out of the car.
24 Q.  No one stayed in the car?
25 A.  No one.



1  Q.  And there was no discussion about this before

2  everyone got out?

3  A.  There was no discussion.

4  Q.  Okay.  After exiting out of the car, tell me what

5  happened next.

6  A.  So we got up, we got towards the security lane.

7  So we opened the trunk so that we could get the tools

8  so that we could change the tire at that time.

9  Q.  When everyone was exiting the car, which door did

10 you go out of?

11 A.  Me?  This one (indicating), on the security lane.

12 Q.  You're talking about the back door on the left

13 side of the car?

14 A.  That's correct.

15 Q.  Which door did Evelyn Moreno get out of?

16 A.  On the driver's side, through that door.

17 Q.  Which door did Nehemias get out of?

18 A.  Also through the driver's door side because we

19 knew that it was dangerous on the other side.

20 Q.  All right.  Did anyone get out of the

21 passenger-side doors?

22 A.  No one.

23 Q.  What, if any, discussion was there about changing

24 the tire?

25 A.  That we needed to change this tire very quickly



1  because of the danger that we were exposing ourself to

2  because we were on the highway.

3  Q.  Who in particular said that?

4  A.  Evelyn.  That I remember, Evelyn.

5  Q.  Okay.  Did -- did Evelyn say whether she had ever

6  changed a tire on this vehicle before?

7  A.  Yes, she had changed the tire on this vehicle.

8  She had said something about that.

9  Q.  So Evelyn said she had done this before and knew

10  how to do it?

11  A.  Yes.

12  Q.  Do you know whether Nehemias had ever changed a

13  tire before?

14  A.  Yes.  He had done this before because he knew

15  about that and he knew about being a mechanic.

16  Q.  Did someone take the lead on changing the tire?

17  A.  Nehemias and I.

18  Q.  Okay.  All right.  Go back and kind of walk me

19  through step by step what was done to try to change

20  this tire.  I think you had earlier said that the

21  trunk was opened.  Maybe start there and tell me what

22  was done next.

23  A.  We opened the trunk and Nehemias got the tool to

24  kind of like lift the car so that we could change the

25  tire.



1  Q.  The jack to lift the car up?

2  A.  That's right.

3  Q.  Go ahead.

4  A.  So then he loosed the tire so that he could get

5  the tire off.

6  Q.  Nehemias took the spare tire out?

7  A.  Not yet.

8  Q.  Not yet, okay.  When you're saying "he loosened,"

9  you're talking about he unscrewed the -- well, did --

10  were the -- the tire that was blown, let's go to that

11  picture so we can talk about it better.

12  A.  No, no.  As far as I remember, he had not finished

13  unscrewing all of them.  As far as I remember, that he

14  had only taken one out.

15  Q.  Okay.  So Nehemias took one of the lug nuts out

16  from the wheel -- off the wheel?

17  A.  Yes, but he had not taken it out completely.

18  Q.  Okay.  What did he use to unscrew the lug nuts?

19  A.  The cross tool that we all use.

20  Q.  What were you doing when he was installing the

21  jack?

22  A.  He was trying to get the spare tire on the

23  trunk -- in the trunk -- from the trunk.

24          THE INTERPRETER:  Interpreter's

25      correction.



1  Q.  You were trying to get the spare tire?

2  A.  The spare tire in the trunk.

3  Q.  Okay.  Were you able to get the spare tire out of

4  the car?

5  A.  When he was trying to get the tire off, no, I had

6  not gotten it out.  Because he was trying to find the

7  tool so that he can take off the security nut for the

8  spare tire.  Because some vehicles, they have this nut

9  that you have to take off to get the spare.

10 Q.  Right.  Let me ask you:  Did the -- this front

11 left wheel, were any of the nuts on it a lock nut that

12 takes a special tool to remove?

13 A.  I don't remember if that's the case.

14 Q.  The spare tire that was in the trunk of the car,

15 was there a lock on it?

16 A.  Yes.

17 Q.  What -- what did you have to use to get the nut

18 off of the spare tire that was in the trunk?

19            THE INTERPRETER:  And the interpreter

20        needs to clarify.

21            MR. BUNT:  Okay.

22            THE INTERPRETER:  (Clarification in

23        Spanish.)

24 A.  It's a special wrench or tool that you use.  It

25 has a specific number so that you can get a specific



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL SANTOS, ERICK on 08/01/2023
Case 3:23-cv-03214-x Document 49 Filed 09/20/24 Page 241 of 2460 PageID 533
44

1  nut.

2  Q.  Were you the one looking for that tool?

3  A.  Oh, that was inside the trunk.  It was right

4  there.

5  Q.  Okay.  So you found the tool; correct?

6  A.  To loosen the tire?

7  Q.  Yes.

8  A.  You're talking about the spare or the one that

9  blew up?

10 Q.  The spare.

11 A.  Oh, yeah, I found it inside so that I could take

12 it out.

13 Q.  All right.  Did you take the spare tire out of the

14 trunk?

15 A.  I had just gotten it out when she ran him over.

16 Q.  Okay.  Looking at Exhibit Number 6, we can see

17 what appears to be a spare tire over here propped up

18 against the concrete wall.  Is that the spare tire

19 that was in the trunk?

20 A.  Yes, that is the spare tire.  Moments later, it

21 was put there, because when the accident happened, I

22 had dropped it off.

23 Q.  Okay.  Are you saying you put it -- you put it

24 there or someone else put it there?

25 A.  Melvin picked it up and put it there.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL SANTOS, ERICK on 08/01/2023
Case 3:23-cv-03214-x   Document 49   Filed 09/30/24   Page 242 of 2460   PageID 534
45

1  Q.  How far did you and Nehemias get in changing the

2  tire before he was struck by the car?

3  A.  He was -- he was positioned right behind me.

4  Q.  Okay.  Let me back up a little bit.  What I really

5  want to know is just how far in the process of

6  changing the tire had you and Nehemias gotten before

7  the accident.

8  A.  We used the tool to lift the car.

9  Q.  Okay.

10  A.  We tried to also loosen the lug nuts, but since we

11  didn't have the exact measurement -- or tool

12  measurement, and that's where we went back to look in

13  the trunk.  And I kept trying to get the tire out.

14  Q.  Okay.  So you had -- you had placed the jack under

15  the car?

16  A.  Nehemias had done that.

17  Q.  Okay.  Had the car been -- had the wheel -- or had

18  the car been lifted up yet?

19  A.  Yes, we had already lifted the car a little bit

20  up.  But at that time, you can see that it had fallen

21  off because of the impact of the accident.

22  Q.  All right.  The lug nuts on this wheel, I think

23  you said Nehemias had gotten maybe one of them off?

24  A.  He had loosened one of them.

25  Q.  He had loosened one, okay.



**www.ArkansasRealtimeReporting.com**

1        Was another tool -- you said to loosen

2    the one, he had used a lug wrench that's in a cross;

3    right?

4    A.  Yes.

5    Q.  Okay.  Was that the tool needed to loosen all four

6    of these lug nuts, or was something else needed?  And

7    it might be more than four.  I can't -- but whatever

8    the number.

9    A.  Yes, that was the tool that we needed to get all

10   four out.

11   Q.  Okay.  Why did Nehemias stop loosening the lugs on

12   the wheel?

13   A.  Because we had two wrenches, and one of them was

14   the wrong one.  It didn't -- it wasn't the right

15   measurement.

16   Q.  Two wrenches or two -- two different size nuts?

17   A.  No, no, no.  There were two wrenches.  But each

18   one of them -- two tools, each one of them had

19   different measurements.

20   Q.  Okay.  But one of them was the correct measurement

21   for the lug nuts; right?

22   A.  No.  He had forced it into it.  And all he was

23   able to achieve was for it to get loosened up a bit.

24   Q.  Okay.  So the wrench that Nehemias was using, are

25   you saying it did not really fit the lug nuts on the



1  wheel?

2  A.  It didn't fit.  And all he was able to do was

3  loosen it up.

4  Q.  Okay.  So it didn't fit; but even though it didn't

5  fit, he was able to get one of them loose a little

6  bit?

7  A.  Yes, but it had -- yes, but it had run, it was --

8  it was --

9            MR. WHITE:  Stripped.

10  A.  It was stripped.  He was trying to loosen it up.

11  Q.  Okay.

12  A.  But -- but, so you see, when he was trying to do

13  that, he noticed that he was stripping it, and then he

14  thought by the time I have to put this back on, there

15  was no way of, you know, getting that screw to screw

16  right.

17  Q.  I understand.  So what did Nehemias then decide to

18  do about that problem?

19  A.  So he went to help me get the spare tire.  And as

20  we get -- as we were getting the spare tire out,

21  underneath you could find the other tools.

22  Q.  And this would be another wrench?

23  A.  Yes, the one that was placed underneath the spare.

24  Q.  Okay.  So this one -- this one that he needed was

25  located underneath the spare tire, so you had to get



1  the spare tire out before you could access that

2  wrench?

3  A.  And as I was trying to get the spare, I think

4  he -- he had dropped something, something had dropped,

5  and that's where he went behind me.

6  Q.  While the two of you were getting these tires and

7  trying to -- I'm sorry, getting these tools and trying

8  to get the spare tire out, was traffic passing by in

9  the left lane?

10  A.  They kept passing by.

11  Q.  Were the cars close?

12  A.  They would, like, move a little bit.  They -- they

13  kept a certain distance.

14  Q.  Were they still close enough to concern you that

15  there was a danger from the traffic?

16  A.  I don't understand the question.

17  Q.  What I'm asking is:  Were you concerned at all

18  that the traffic -- that there was still enough

19  traffic going by close enough that it might present a

20  danger to you or Nehemias or anyone else outside the

21  car?

22  A.  Yes.

23  Q.  Did anyone try to do anything to warn the traffic

24  or walk down the highway and flag the traffic to move

25  over and keep a greater distance?



 1   A.  Neither of us wanted to do that because of the

 2   danger we were exposed to there.

 3                   MR. BUNT:  Object to the nonresponsive

 4           portion.

 5   Q.  While you and Nehemias were working to change the

 6   tire, did anyone ever get back in the car?

 7   A.  None of us.

 8                   MR. BUNT:  Let me see that diagram.

 9           What is our next exhibit number?

10                   THE COURT REPORTER:  I believe 19.

11                   MR. BUNT:  Oh, this is part of the

12           premarked.  Okay.

13                   (Exhibit 12 marked for identification.)

14   Q.  Mr. Santos, let me show you what we'll mark

15   Exhibit Number 12.  I'm just going to ask you to kind

16   of tell me where you were, where everyone was in

17   relation to things.  And I think it's a little easier

18   for us.  And if you want to write, you can use that --

19   you can use that pen.

20                   But when you and Nehemias were getting

21   the -- are trying to get the tire and the other tool

22   out of the trunk, can you tell me where you were

23   standing at the time?

24                   And I would also say you can look at

25   Exhibit Number 4 which shows the back of the car.  And

1   kind of use your finger or something to kind of

2   demonstrate where you were.

3   A.  You want to know at the time of the accident or

4   before the accident?

5   Q.  Before the accident.

6   A.  Nehemias was on this side (indicating).  So he was

7   on this side before the incident.  Seconds later, he

8   moved to the back here (indicating).

9              I was still here, trying to get the spare

10  tire.  Evelyn Moreno was on this side.

11  Q.  So where you were, can you draw -- and let me go

12  ahead and say this:  At the time you believe that

13  Nehemias was struck, were you at this location at the

14  back side of the car?

15  (Witness gives answer in Spanish.  The interpreter was

16       not given opportunity to translate answer.)

17  Q.  Stop just for a minute so that we will know who

18  you're talking about.  For each person, can you just

19  put a little circle?  And then, like, for yourself,

20  maybe write Erick -- "ES" for "Erick Santos," and then

21  were Evelyn was.

22  A.  (Indicating).

23  Q.  Okay.  So just so this is clear -- and I want us

24  to be able to see on the video camera, too.

25             Where you have written this "E" right



1  here, Mr. Santos, is that where you were standing?

2  A.  Yes, this is me.

3  Q.  Okay.

4  A.  Evelyn Moreno; Nehemias -- Nehemias Santos

5  (indicating).

6  Q.  Okay.  Can you just maybe write an "S" by your

7  name also for "Santos"?

8  A.  (Indicating).

9  Q.  Okay.  At that time, where was Melvin Diaz?

10  A.  (Indicating.)

11  Q.  All right.  And then where was Dina Regalado?

12  A.  Melvin and Dina (indicating).

13  Q.  Okay.  Did you -- before the accident, did you get

14  the -- well, I think you said you were just getting

15  the tire out of the trunk; is that correct?

16  A.  Yes.

17  Q.  Had you lifted it out of the trunk itself?

18  A.  Not yet.

19  Q.  Was the -- was the nut off of it where you could

20  pick it up?

21  A.  I was already taking it off.  I was taking it off.

22  Q.  Okay.  Had you picked the tire up yet, the spare

23  tire?

24  A.  I was just finishing up on taking the nut.

25  Q.  Okay.  I assume, then -- excuse me -- no one had



1   been able to get to the wrench that was underneath it

2   yet; is that correct?

3   A.  We had not gotten to it yet.

4   Q.  Okay.  When you were working on this, were you --

5   I assume you were facing the direction of the car,

6   looking into the trunk where you were working on the

7   tire?

8   A.  That's right.

9   Q.  All right.  What was Evelyn Moreno doing at the

10  time?

11  A.  She was trying to lift the spare tire.

12  Q.  What was Melvin Diaz doing?

13  A.  He was hugging his wife because she was very

14  nervous.

15  Q.  Okay.  What -- when you -- I guess before I ask

16  you that question, you said Nehemias was behind the

17  car back here where you drew the little "X"?

18  A.  He was a certain distance behind me, an

19  approximate distance.  I don't know how far.

20  Q.  Do you know why Nehemias was back behind you a

21  certain distance?

22  A.  He was looking for something.  I don't know.

23  Q.  What was Nehemias doing when you last saw him

24  before the accident?

25  A.  I don't know what he was doing, to be honest with



**www.ArkansasRealtimeReporting.com**

1  you.

2  Q.  Okay.  Do you know whether he was standing

3  straight up or bent over or on his knees, if you know?

4  A.  To be honest with you, I don't know his exact

5  position at the moment of the impact.

6  Q.  When did you realize that Nehemias had been struck

7  by a car?

8  A.  Because just for a second, when I turn around to

9  see him, he already had that vehicle behind him.

10  Q.  So you were working in the trunk of the car, but

11  before he was struck, you turned around and looked at

12  Nehemias?

13  A.  Yes, because I was getting the spare tire.  I had

14  just gotten the spare tire down and I was putting it

15  down, and I just turned around to see him.

16  Q.  And when you say "putting it down," are you

17  talking about putting it down outside the car or

18  inside the car?

19  A.  I had just gotten the tire outside of the car.

20  Q.  I thought a moment ago you said you were still

21  loosening the nut, trying to get it off so you could

22  pick it up?

23  A.  Yes.  Because I had already loosened the -- the

24  screw.  I was just getting the last of the screw.

25  Q.  So I want to make sure I'm clear on exactly what



1  you were doing.  Was the screw on top of the tire?

2  A.  Yes.

3  Q.  And is the screw on a bolt that sticks up through

4  the middle of the tire so that you have to unscrew it

5  from the top?

6  A.  That's right.

7  Q.  All right.  And had you gotten that screw

8  completely off?

9  A.  I had just taken the screw off.  I was lifting the

10 tire up and out when I turn around and I saw the

11 accident.

12 Q.  Mr. Santos, is it your testimony that you saw

13 Nehemias get struck by the car?

14 A.  Yes.  When the vehicle was about a second away

15 from hitting him.

16 Q.  Did you only see him just before he was hit, or

17 did you see him at the time he was hit?

18 A.  At the time that he was hit.

19 Q.  At the scene of the accident, did you have an

20 opportunity to speak to the police that were there?

21 A.  Neither one of us spoke to the police officers.

22 Only Evelyn said a few words.

23 Q.  All right.  Did you speak to anyone else there at

24 the scene?

25 A.  No.



1  Q.  Did you speak to any paramedics?

2  A.  No.

3  Q.  All right.  Did anyone there at the scene -- was

4  anyone there at the scene able to speak to you in

5  Spanish?

6  A.  At that time, I didn't want to speak to anyone

7  because I was just going through a big trauma, because

8  I wouldn't stop crying.

9  Q.  When you say "the car behind him," tell me what

10  you remember about the car.

11  A.  That it had gotten all the way into that security

12  lane to run him over, and then it departed from it

13  after running him over.  After it struck him, there

14  was, like, this small attempt to turn to the right so

15  that it will avoid running us over as well.  But she,

16  at the time of the impact, was looking down as if she

17  was looking to a cell phone.

18          THE INTERPRETER:  "Looking at a cell

19       phone."  Interpreter's correction.

20  Q.  Is it your testimony you could see her cell phone?

21  A.  It was as if she was looking at a cell phone.

22  Q.  Did you see a cell phone?

23  A.  No, because this vehicle is high up.  But you

24  could see that she was looking down.

25  Q.  Mr. Santos, is it your testimony that her car was



1  driving inside the emergency shoulder here?

2  A.  Almost half of her car was inside the security

3  lane.

4          THE INTERPRETER:  "Or the security

5          line."  Interpreter's correction.

6  Q.  You're saying almost half of her car was over this

7  yellow line?

8  A.  She got in like this, run him over, and went like

9  that (indicating).

10  Q.  She came from the travel lane and then moved over

11  partially over this line here; and is that where her

12  car was located when she struck him?

13  A.  The speed that she was going through, she got in,

14  she run him over, and then she reacted and went off.

15          There was also a swipe of the two vehicles

16  because he just went through a certain distance -- a

17  certain distance from the Corolla [sic].

18  Q.  Let me ask you to look at Exhibit 12 again.

19  You're saying that Mrs. Smith's vehicle was over far

20  enough to where almost half of it was across this

21  yellow line?

22  A.  Yes.  She was already in it.  She was already in

23  this emergency lane.  And as she was departing from

24  it, she run him over and got out.

25  Q.  All right.  So you're saying she was already



1 | moving back this way when she struck him?

2 | A.   (Nods head up and down.)

3 | Q.   And did her car strike Ms. Moreno's car, the

4 | Toyota Camry?

5 | A.   There was not a swipe or a hit.   It was like a

6 | distance such as this that happened.   About --

7 | (indicating) about this.

8 | Q.   You're saying she missed the car by about a foot

9 | or a third of a meter?

10 | A.   15, 20 centimeters, something like that.

11 | Q.   Okay.

12 | A.   Because if she wouldn't have managed to sway when

13 | she did, at the speed that she was going, she was

14 | going to cut us -- Evelyn and I, were going to be cut

15 | in half.

16 |                 MR. BUNT:   Object to the nonresponsive

17 |         portion.

18 | Q.   Mrs. Smith's car did not strike you; correct?

19 | A.   No.

20 | Q.   Mrs. Smith's car did not strike Evelyn Moreno;

21 | correct?

22 | A.   No.

23 | Q.   When you realized that Nehemias had been hit, what

24 | did you do next?

25 | A.   I was in shock for about three to five seconds.



**PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL**
**PIVARAL SANTOS, ERICK on 08/01/2023**
Case 3:23-cv-03214-TLB Document 49 Filed 02/09/24 Page 255 of 2460 PageID 547
58

1   And then without thinking about it, I went and got the

2   body out because I didn't want the cars to run him

3   over, other cars.

4   Q.  Mr. Santos, where did Mr. -- where did Nehemias's

5   body land after he was struck?  Where did it come to

6   rest?

7   A.  His head hit this part (indicating).  And then his

8   body came to rest here next to the car, next to the

9   car.

10  Q.  Can you draw me a circle where his body came to

11  rest?

12  A.  Close to the car.  It wasn't much of a distance

13  from the car.  Close to the car.

14  Q.  Okay.  Can you write "NS" for Nehemias Santos

15  there, also?

16  A.  (Indicating).

17  Q.  Thank you.

18              MR. WHITE:  Brian, do we have something

19        with a lighter background?

20  A.  It is very dark.  You can hardly see it.

21              MR. WHITE:  I mean, if not, that's fine.

22        But...

23              MRS. BUNT:  Will the highlighter show

24        up?

25              MR. BUNT:  I don't know if the



```
 1                    highlighter is going to really work on it.
 2                    MR. WHITE:  Maybe we can go off the
 3              record for a second and find a Sharpie.
 4                    THE VIDEOGRAPHER:  The time is 4:04.
 5                         (Brief recess.)
 6                    THE VIDEOGRAPHER:  The time is 4:04.
 7              We're now on the record.
 8  Q.  Since this blue pen mark is hard to see here, can
 9  you go back over the circle and the "N" and the "S"
10  with the red pen?
11  A.  (Indicating).
12  Q.  Okay.
13                    MR. BUNT:  It's a little -- a little
14              better.  I don't know if the camera can pick
15              that up.
16                    THE VIDEOGRAPHER:  I can see it.
17                    MR. BUNT:  Okay.
18  Q.  Mr. Santos, you said you were kind of stunned for
19  a little while, and then you just sort of reacted by
20  going over and moving his body?
21  A.  That's right.
22  Q.  All right.  And using the red pen maybe, can you
23  show us one more time where you placed his body after
24  he -- after you moved it?
25  A.  That's right.
```

1  Q.  And just so we'll know the order of these, would

2  you write a number one -- numero uno -- by this one,

3  and numero dos and numero tres, so we can just show

4  the sequence?

5  A.  Under his name?

6  Q.  Yes.  Thank you.  Did anyone assist you with

7  moving Nehemias out of the lane?

8  A.  No one.

9  Q.  After you moved him to this location, did you do

10 anything else to try to help him?

11 A.  I thought that he was still alive.  And I found a

12 T-shirt and I put it underneath his head thinking that

13 he was still alive.

14 Q.  And I -- Mr. Santos, I know this is unpleasant to

15 talk about.  You don't have to give us any great

16 detail.  But were you able to see wounds on him?

17 A.  (Nods head up and down.)

18 Q.  Can you just kind of point on your body --

19 A.  He lost part of his brain with the impact.

20 Q.  Do you know which side of his head was injured?

21 A.  I don't remember very well, but I think it was on

22 the right side here on -- of his head.  His brain was

23 broken up.

24 Q.  Okay.

25              THE INTERPRETER:  Interpreter's



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0253

1              correction.  When the interpreter said the
2              word "brain," she meant to say "skull."
3  Q.  If you remember, what happened to Evelyn after the
4  accident?
5  A.  She was crying like a crazy woman.  And I don't
6  know what else she was doing.
7  Q.  Do you know whether Evelyn was struck by
8  Nehemias's body?
9  A.  Yes.  She was hit on her back side.
10              THE INTERPRETER:  May the interpreter
11          ask for a clarification?
12              MR. BUNT:  Yes.
13              THE INTERPRETER:  Just to be sure.
14          (Clarification in Spanish.)
15              So the interpreter asked:  When you said
16          "back," did you mean the back side or just
17          part of the back or what?
18              And the deponent said:  It was just that
19          lower back from the waist, from the column,
20          all that part where she was injured.
21  Q.  Mr. Santos, when you looked back just before
22  Nehemias was struck and you saw the car approaching
23  him, did you give him any kind of warning, holler for
24  him to move or anything like that?
25  A.  There was no time to do that because of the speed

1  that she was going to -- going through and because of

2  the way she was already right behind him.

3              MR. BUNT:  Object to the non-responsive

4       portion.

5  Q.  Did anyone holler out a warning that you remember?

6  A.  No one.

7  Q.  Okay.  There at the scene of the accident, you

8  don't recall personally speaking to any of the police

9  officers?

10  A.  I don't remember.

11  Q.  Was that you don't recall or you did not?

12  A.  To be honest with you, I did not understand the

13  question.

14  Q.  Okay.  Do you remember personally speaking to

15  the -- any of the policemen or the policewoman there

16  at the scene of the accident?

17  A.  I did not speak to any of the police.

18  Q.  Did you tell anyone there at the scene that you

19  had seen this car approaching in the shoulder of the

20  highway?

21  A.  I don't remember, to be honest with you, no.

22  Q.  Did you ever tell anyone that you did not see what

23  happened?

24  A.  To be honest with you, I don't remember that.  I

25  don't remember that.



1  Q.  Do you remember telling anyone that you were in

2  the car when it happened?

3  A.  At no time did I say to anyone that I was inside

4  the car.

5  Q.  Did you recall -- did you tell anyone that you

6  were looking the other direction and you didn't see

7  exactly what happened?

8  A.  I don't remember.

9  Q.  Okay.  Do you have any recollection of

10  specifically telling anyone there at the scene, "I saw

11  what happened; I saw this car hit my brother"?

12  A.  I don't remember.  To be honest, I don't.

13  Q.  Do you recall a paramedic there who spoke Spanish?

14  A.  Yes, there was one that spoke Spanish.  I heard

15  him from the distance that he was speaking Spanish.

16  Q.  Do you remember speaking to him?

17  A.  I didn't speak to him.

18  Q.  Did he speak to some of the other passengers?

19  A.  He was just tending to Evelyn because of the

20  impact she sustained.

21  Q.  Okay.  Mr. Santos, other than Melvin or Dina or

22  Evelyn, are you aware of anyone else who witnessed the

23  accident?

24  A.  There was no one around.

25  Q.  And since the accident, you've not learned of



1  another person who has said, "Yes, I saw what

2  happened," have you?

3  A.  I haven't learned about that.

4  Q.  I'm going to mention some names that were given by

5  your attorney in written discovery responses.  These

6  are persons who may know something about the accident.

7  I'm not sure exactly.  But let me ask you if you know

8  these persons.  José Aguilar?

9  A.  I don't remember that name, to be honest with you.

10  But it seems familiar that I've heard about him

11  before.

12  Q.  Stephanie Mitchell of Corsicana, do you remember

13  that name?

14  A.  I don't remember that well, but I believe so.

15  Q.  Rosemary Ricny, or "Ricny"?

16  A.  No.  That one I don't remember.

17  Q.  Okay.  Manuel Yoli Medrano?

18  A.  No, I don't remember.

19  Q.  When you left the accident -- first of all, I

20  guess let me ask:  How did you and Evelyn, Melvin, and

21  Dina leave the accident scene?  Did you leave in this

22  car?

23  A.  What I remember is that this family that lives on

24  the side of the road and nearby location, they had us

25  stay there for a few hours.



1  Q.  Did you stay there at that house until your father

2  came to the location?

3  A.  That's right.

4  Q.  Okay.  Did you spend the night there in that area,

5  or did you go home to Arkansas that same day?

6  A.  That same day when my father arrived, we went back

7  to Arkansas.

8  Q.  I know you said you borrowed a phone -- someone's

9  phone to make a call.  Who did you call?

10  A.  My father.

11  Q.  Did you use that phone to take any photographs at

12  the scene?

13  A.  No.

14  Q.  Or to send any texts?

15  A.  No.

16  Q.  Mr. Santos, is there anything else you remember

17  about the accident or the car you saw that you haven't

18  told me about yet?

19  A.  This is very difficult for me to speak about this.

20  This is very difficult.

21  Q.  I understand.  I'm sorry.

22  A.  I really don't want to talk about this anymore

23  because it affects me.  I -- I'm still traumatized by

24  this.

25  Q.  I'm almost finished.  Let me ask you just a few



1   more questions.

2   A.   That's fine.

3   Q.   When you saw the car, do you remember -- do you

4   remember what the car looked like?

5   A.   It was a white truck.  I don't remember.  I just

6   remember that it was white.

7   Q.   Okay.  Mr. Santos, are you seeking damages in

8   this -- for this accident as well, money?

9   A.   To be honest with you, I don't know if this is

10  something -- I mean, I don't know if it can be done,

11  but I am so traumatized by this and I just don't want

12  to talk about this.  I don't want to say anything

13  about it.

14  Q.   Mr. Santos, I ask this of everyone.  I'm not

15  assuming any answer.  But have you ever been arrested

16  or convicted for a crime?

17  A.   I've never been convicted of anything.

18  Q.   Are there any kind of charges currently being

19  brought against you or are you under indictment for

20  anything?

21  A.   No, no.  I'm clean.

22  Q.   Mr. Santos, I'm sorry that we had to talk about

23  such an unpleasant subject today.  Thank you for your

24  patience and understanding and answering my questions,

25  and I pass the witness.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:23-cv-03714-x Document 49 Filed 02/22/24 Page 264 of 2460 PageID 556
PIVARAL SANTOS, ERICK on 08/01/2023

67

1   A.  Okay (in English).

2                THE INTERPRETER:  Okay.

3                         EXAMINATION

4   BY MR. WHITE:

5   Q.  Okay.  Can you describe the interstate as it

6   approached, where the Toyota ended up stopping?

7   A.  The number of the highway?

8   Q.  No.  I mean was it a straight road, a curvy road,

9   flat, hilly?

10  A.  It was a completely flat area where any person

11  could see that there was a vehicle that was parked and

12  that there were people around it.

13  Q.  So the road was straight?

14  A.  Yes.

15  Q.  Can you describe the weather that day?  And when I

16  say "that day," I mean April 30th of 2022.

17  A.  It was sunny.

18  Q.  No clouds in the sky?

19  A.  None.

20  Q.  How long were y'all pulled over on the left side

21  of the road that day?

22  A.  It was approximately five, ten minutes, more or

23  less.

24  Q.  And that's before Nehemias was struck?

25  A.  Yes.



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
Case 3:... Document 49 Filed 02/23/24 Page 265 of 2460 PageID 557
PIVARAL SANTOS, ERICK on 08/01/2023

68

1  Q.  If you had to guess, how many cars passed y'all

2  while you were pulled over before Nehemias was struck?

3  A.  The exact amount, I don't remember.  But, yes,

4  about, you know, seven or eight cars passed us by

5  while we were there; and all of them kept a certain

6  distance.

7  Q.  Do you remember if the cars that passed you while

8  you were pulled over got all the way in the middle

9  lane, or did they stay somewhat in the left lane?  Or

10  can you describe how much distance they gave y'all?

11  A.  All of them tried to go to the center, to the

12  center lane.

13  Q.  So no one passed you so close, until Caylee Smith,

14  that it frightened you?

15          MR. BUNT:  Objection to form.

16  A.  Yes.  Literally speaking, all of them went to the

17  center lane.

18  Q.  Okay.  And, to the best of your knowledge, Evelyn

19  did turn on the emergency flashers on the Toyota when

20  y'all were pulled over on the left-hand side; right?

21  A.  All the time the emergency lights were on.

22  Q.  Did any of the police officers that showed up

23  after the accident speak to you personally?

24  A.  None of -- none of them personally spoke to me

25  after the accident.



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL SANTOS, ERICK on 08/01/2023
Case 3:23-cv-03714-L Document 49 Filed 01/22/24 Page 266 of 2460 PageID 558
69

1  Q.  And how long were you at or near the scene of the

2  accident?

3  A.  After the accident took place, about five minutes

4  after when the officer got there, he took us all and

5  he got us to some place that was outside of the

6  interstate.

7  Q.  And you guys went to the home of the person that

8  lived near the interstate; right?

9  A.  That's right.

10 Q.  And y'all were at that house for a couple of

11 hours?

12 A.  That's right, until my father arrived.

13 Q.  And, presumably, the police knew you were at that

14 house; correct?

15 A.  Yes, they knew.

16 Q.  But they never sent a Spanish-speaking officer to

17 take a statement from you?

18 A.  None of the officers spoke Spanish; so I didn't

19 speak to them because they were not going to be able

20 to understand me.

21 Q.  And would you have given them a statement if

22 someone had spoken Spanish?

23 A.  Of course I would have.

24 Q.  Do you think the police that responded to the

25 accident did a good job?



1                MR. BUNT:  Objection to form.

2  A.  They did a good job.

3  Q.  But you do disagree with the police report?

4  A.  That's right.

5  Q.  And is that because they accepted Caylee Smith's

6  version of events?

7  A.  All the time they were talking to her, and they

8  didn't even attempt to take a report from us.

9  Q.  Did Caylee Smith get out of her car and say

10  anything to you?

11  A.  At no time.

12  Q.  Did she get out of her car at all and say anything

13  to anyone?

14  A.  She never got out of her car.

15                MR. WHITE:  All right.  I reserve the

16            rest of my questions for trial.

17                FURTHER EXAMINATION

18  BY MR. BUNT:

19  Q.  Just a very few follow-up questions, Mr. Santos.

20            As to whether the police officers may

21  have told Caylee Smith not to get out of her car for

22  any reason, you wouldn't know about that one way or

23  the other, would you?

24  A.  She stopped at a certain distance far away from

25  us.  And it was pretty evident that she was very



1   visible to us because the road was straight.

2   Q.  My question is, though:  If she didn't get out of

3   her car and come back and talk to you at some point

4   because a police officer told her, "Don't get out of

5   your car, just stay in your car," would you know one

6   way or the other whether that's correct?

7   A.  She stayed in her car.  At the moment of the

8   incident, there were two police officers that arrived

9   pretty soon, and one of them stayed with us and one of

10  them followed her.

11  Q.  If the police officers' body cam videos actually

12  show them telling her to stay in her car, you wouldn't

13  have any reason to disagree with that, would you?

14  A.  I don't know.

15  Q.  You were not actually counting the cars that were

16  going past, were you?

17  A.  Yes.  But I could have an idea about how many cars

18  went by because I was looking around.

19  Q.  You were busy at times, though, looking at the

20  wheel that had the blowout and looking inside the

21  trunk of the car; correct?

22  A.  Yes; but I -- yes; but I was always looking around

23  myself, both sides, because I was aware that I was in

24  a dangerous road.

25  Q.  But you can't really say that you know it was



1  seven or eight cars for certain, can you?

2  A.  They asked me for an approximate, and that's what

3  I gave, an approximate.

4              MR. BUNT:  Thank you, Mr. Santos.

5              MR. WHITE:  No questions at this time.

6              THE VIDEOGRAPHER:  This concludes the

7          video deposition of Erick Pivaral Santos.

8          The time is 4:35.  We're now off the record.

9          (Proceedings concluded at 4:35 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



PIVARAL GONZALEZ vs CAYLEE ERIN SMITH and EASTMAN CHEMICAL
PIVARAL SANTOS, ERICK on 08/01/2023
Case 3:23-cv-03274-TLB Document 49 Filed 02/02/24   Page 270 of 2460   PageID 562

73

```
 1                    REPORTER CERTIFICATION

 2            I, JENNIFER NORMAN, Certified Court Reporter

 3   for the State of Arkansas, do hereby certify to the

 4   following:

 5            1) that on August 1, 2023, the witness,

 6   ERICK JEREMIAS PIVARAL SANTOS, was duly sworn by me

 7   prior to the taking of testimony as to the truth of

 8   the matters attested to and contained therein;

 9            2) that the foregoing pages contain and are a

10   true and correct transcription of the proceedings as

11   reported verbatim by me via realtime stenography to

12   the best of my ability and transcribed at or under my

13   direction and supervision, and subject to appropriate

14   changes submitted by witness, if any, during his/her

15   requested reading and signing of this deposition

16   according to the Arkansas Rules of Civil Procedure;

17            3) that I am neither counsel for, related to,

18   nor employed by any of the parties to the action in

19   which this proceeding was taken; and that I am not a

20   relative or employee of any attorney employed by the

21   parties hereto;

22            4) that I am not financially interested or

23   otherwise interested in the outcome of this action

24   that affects or has substantial tendency to affect

25   impartiality or requires me to relinquish control of
```



1  an original or copies of a deposition transcript

2  before it is certified, or that requires me to provide

3  any service not made available to all parties to the

4  action; and

5       5) that I have no contract with the parties,

6  attorneys, or persons with an interest in the action;

7  and that I am not knowingly identified on a preferred

8  provider list, whether written or oral, for any

9  litigant, insurance company, or third-party

10  administrator involved in this matter;

11      6) that signature of the witness is waived.

12  This transcript is prepared at request of counsel for

13  DEFENDANTS, and all fees are billed directly to them

14  in compliance with Arkansas Board of Court Reporter

15  Examiners Regulations Section 19.

16      Witness my hand and seal this 15th of

17  August, 2023.

18

19

20  JENNIFER NORMAN, CCR
    LS Certificate #768, State of Arkansas
21  Arkansas Realtime Reporting
    1130 E Millsap Rd
22  Fayetteville AR 72703
    479-301-2040
23  www.ArkansasRealtimeReporting.com

24

25



www.ArkansasRealtimeReporting.com

Appx_0267

**Exhibits**

Santos Exhibit 1 3:14 36:19 37:3

Exhibit 2 3:16 37:24 38:2,11,12

Exhibit 3 3:17 37:24 38:3,12

Exhibit 4 3:18 37:24 49:25

Exhibit 6 3:19 37:25 44:16

Exhibit 12 3:20 49:13, 15 56:18

**0**

08 8:18

**1**

1 36:19 37:3

12 49:13,15 56:18

1324 11:10

15 11:9 57:10

19 49:10

1:32 4:4

1st 4:3

**2**

2 37:24 38:2,12

20 57:10

2000 8:18

2022 13:24 22:16 67:16

2023 4:3

29th 18:22,24 24:4

2:50 36:12,14

**3**

3 37:24 38:3,12

30 22:16

30th 67:16

3:05 36:14,15

**4**

4 37:24 38:4 49:25

45 27:2

4:04 59:4,6

4:35 72:8,9

**6**

6 37:25 38:5 44:16

607 8:3

**9**

9:00 22:21

**A**

a.m. 22:21

ability 34:12

accept 5:18

accepted 70:5

access 48:1

accident 6:4,14,21 11:13 14:1,6,8 15:6 22:15,23 25:9 26:23 27:24 28:6 44:21 45:7,21 50:3,4,5 51:13 52:24 54:11,19 61:4 62:7,16 63:23,25 64:6,19,21 65:17 66:8 68:23,25 69:2,3,25

accurately 38:8

achieve 46:23

activate 32:18

activated 32:22

address 8:2 11:3,10,12, 14

advice 9:8,13,22 10:3 13:18

advise 8:23 13:15

advised 8:25

affects 65:23

afternoon 4:25

agree 7:19 38:11,15,16

agreements 7:14

Aguilar 64:8

ahead 23:8 28:5 31:11 34:14 36:18 42:3 50:12

alcohol 25:15,18

Alexander 22:12

alive 60:11,13

Amended 36:20

Amendment 8:24 13:16

amount 68:3

answering 9:3 66:24

anymore 10:10 65:22

apartment 8:4 20:11

apparently 18:24

appears 11:9 44:17

applied 10:17,19

approached 67:6

approaching 61:22 62:19

approximate 52:19 72:2,3

approximately 8:11 9:24 15:18 22:21 23:14, 20,24 24:6,8 67:22

April 13:24 18:24 22:16 67:16

area 65:4 67:10

Arkansas 4:6 8:3 11:2, 9,11 15:11,12 65:5,7

arrested 66:15

arrived 12:25 13:13 22:23 23:15 65:6 69:12 71:8

arriving 9:17

asks 36:22

assert 6:4

assist 60:6

assume 51:25 52:5

assuming 34:3 66:15

attempt 32:8 55:14 70:8

attend 12:24

attended 12:16

attorney 4:11,13 6:3,10 8:25 13:18 37:5 64:5

August 4:3

avoid 55:15

aware 25:21 26:10,12 39:10,12 63:22 71:23

**B**

back 15:11 17:5,6,7 22:17 24:14 27:1 32:3 34:8 36:22 40:12 41:18 45:4,12 47:14 49:6,25 50:8,14 52:17,20 57:1 59:9 61:9,16,17,19,21 65:6 71:3

background 58:19

backpack 24:24

backseat 34:9 39:7

bag 24:17,18,23

bags 25:3,6

beginning 7:7 16:12

bent 53:3

big 55:7

birth 8:17

bit 45:4,19 46:23 47:6 48:12

blew 26:2 30:7,8,13,22 31:20,25 32:11 33:3,14 34:21 44:9

blinker 32:24

blown 28:19 29:3,11 31:3 42:10

blowout 71:20



**blows** 34:17

**blue** 59:8

**body** 58:2,5,8,10 59:20, 23 60:18 61:8 71:11

**bolt** 54:3

**born** 8:15,19

**borrowed** 14:19 65:8

**brain** 60:19,22 61:2

**break** 36:8,17

**Brian** 4:13 5:14 58:18

**bring** 24:9 36:22

**broken** 14:3,9 60:23

**brother** 5:19 10:1 11:19 63:11

**brother's** 6:21

**brothers** 11:24 12:7

**brought** 5:15 37:7,12 66:19

**Bunt** 4:13,24 5:14 9:14 11:4,7 15:9 21:11,23 31:11 32:13 36:8,10 37:7,10,13 43:21 49:3,8, 11 57:16 58:23,25 59:13, 17 61:12 62:3 68:15 70:1,18 72:4

**busy** 71:19

---

**C**

**call** 5:5 14:18,20 21:1 22:8 65:9

**called** 22:10

**cam** 71:11

**camera** 50:24 59:14

**Camry** 57:4

**car** 17:9 25:6,15,18,20, 24 26:1,5,24 28:15,17,21 29:5,8,12 30:2,5,6,22 31:25 32:5 33:18 34:4, 12,21 35:11 37:22 38:3, 5,6,8,12,16,23 39:1,2,6, 7,13,16,18,20,22,23,24 40:4,9,13 41:24 42:1 43:4,14 45:2,8,15,17,18,

19 48:21 49:6,25 50:14 52:5,17 53:7,10,17,18,19 54:13 55:9,10,25 56:2,6, 12 57:3,8,18,20 58:8,9, 12,13 61:22 62:19 63:2, 4,11 64:22 65:17 66:3,4 70:9,12,14,21 71:3,5,7, 12,21

**card** 9:18,19 10:18,20 11:5,10

**carry** 24:13,21

**cars** 27:9,11,18 33:4,6, 10,12 48:11 58:2,3 68:1, 4,7 71:15,17 72:1

**case** 43:13

**Caylee** 4:14 5:15 7:2 68:13 70:5,9,21

**cell** 13:21,24 14:2,5 55:17,18,20,21,22

**center** 28:3 68:11,12,17

**centimeters** 57:10

**certified** 4:17

**chance** 14:15

**change** 24:12,13,19 32:8 38:20 40:8,25 41:19,24 49:5

**changed** 41:6,7,12

**changing** 40:23 41:16 45:1,6

**charges** 66:18

**Chemical** 4:14 5:17

**children** 12:14

**circle** 50:19 58:10 59:9

**cited** 35:19

**citizen** 8:21 9:5

**claims** 6:3

**clarification** 14:4 15:10 30:14 31:12 43:22 61:11, 14

**clarify** 43:20

**class** 35:9

**clean** 66:21

**clear** 7:21,24 50:23 53:25

**Cleveland** 8:3 10:24

**client** 8:23 9:8 13:16

**close** 38:4 48:11,14,19 58:12,13 68:13

**closer** 38:3

**clothes** 24:9,13,20

**clouds** 67:18

**column** 61:19

**commonly** 5:3

**communication** 16:6

**Company** 4:15 5:17

**completed** 12:18

**completely** 25:14 38:17 42:17 54:8 67:10

**concern** 48:14

**concerned** 48:17

**concluded** 72:9

**concludes** 72:6

**concrete** 44:18

**consume** 25:15

**context** 31:7

**continue** 30:1

**conversation** 32:6 39:15

**convicted** 66:16,17

**Corolla** 56:17

**correct** 30:15,24 31:14, 23 34:22 40:14 44:5 46:20 51:15 52:2 57:18, 21 69:14 71:6,21

**correction** 14:11 30:11 33:9 42:25 55:19 56:5 61:1

**Corsicana** 64:12

**Counsel** 4:8

**counting** 71:15

**countries** 21:16

**couple** 7:14 69:10

**COURT** 11:6 49:10

**courtroom** 7:11

**crazy** 61:5

**crime** 66:16

**cross** 42:19 46:2

**crying** 55:8 61:5

**current** 8:1 9:10

**curvy** 67:8

**cut** 57:14

---

**D**

**Dad** 12:8

**Dallas** 28:1,6,9,11 30:18

**damaged** 14:11

**damages** 66:7

**danger** 39:17 41:1 48:15,20 49:2

**dangerous** 40:19 71:24

**dark** 58:20

**date** 4:3 8:17 18:18 23:10,11,12,22,23

**day** 10:5 14:1,6,8 15:15, 16,17 18:6,16,22,23 22:15,17 23:18 24:2 25:9,16,21 27:3 65:5,6 67:15,16,21

**days** 14:9 16:17,18 18:3 23:3,13,20,24,25

**decide** 47:17

**decision** 9:1,3

**Defendant's** 36:20

**Defendants** 4:14

**demonstrate** 50:2

**departed** 55:12

**departing** 56:23

**depending** 21:21

**deponent** 4:7 31:6 61:18

**deposition** 4:4 5:9 6:9, 16,18 36:19,20,23 72:7



describe 67:5,15 68:10

detail 60:16

diagram 49:8

Diaz 14:24 17:2 19:23 20:21 22:8,10,12 24:17 35:1 51:9 52:12

died 10:11

difficult 65:19,20

Dina 14:23 17:2 19:2,21 20:16 21:1,4,5 22:19 25:1 27:1 51:11,12 63:21 64:21

Dinita 21:3

direction 27:24 31:21, 24 34:19 52:5 63:6

disagree 70:3 71:13

disclosure 37:15

discovery 37:14 64:5

discussion 29:8,16 32:4 39:13 40:1,3,23

distance 30:2 48:13,25 52:18,19,21 56:16,17 57:6 58:12 63:15 68:6,10 70:24

document 9:19

documents 6:11 36:22

door 40:9,12,15,16,17, 18

doors 40:21

dos 60:3

draw 50:11 58:10

drew 52:17

drive 17:18 22:16 23:17, 18 26:4

driven 18:13 35:16

driver 34:16,24 35:9

driver's 35:1,4,7,16 36:4,5 40:16,18

driving 5:16 7:3 15:15, 18,19 25:24 26:1,25 27:15,18 28:2,12 30:2 34:9,21 35:13,15,23 56:1

dropped 44:22 48:4

drove 26:6

drugs 25:20 26:8,16

duces 36:21

due 34:6

duly 4:18,19,21,22

## E

earlier 5:13 18:3,19 23:3 30:17 34:20 41:20

easier 49:17

East 11:10

Eastman 4:14 5:17

eighth 12:22,23

Elena 12:2,4,5

else's 14:16 15:25

emergency 32:19,20,22 33:1 56:1,23 68:19,21

employed 13:2

employer 5:17

end 21:20

endearment 21:14

ended 67:6

English 10:12 19:11,12, 13,19,21 67:1

Erick 4:7,20 5:2,3 8:7 36:21 50:20 72:7

Ericks 37:11

ES 50:20

Evelyn 14:23 15:5 18:5, 8 19:6,18,25 20:5,8,10 22:19 25:1,25 26:1,16,25 27:15,18,22 28:12 29:8, 18 30:25 32:3,4,5,7 40:15 41:4,5,9 50:10,21 51:4 52:9 54:22 57:14,20 61:3,7 63:19,22 64:20 68:18

events 70:6

everyone's 22:16

evidence 36:23

evident 70:25

exact 11:2 18:18 20:3 23:11,12,22,23 45:11 53:4 68:3

EXAMINATION 4:23 67:3 70:17

excuse 35:3 51:25

exhibit 11:8 36:19 37:3, 24,25 38:2,3,11,12 44:16 49:9,13,15,25 56:18

exhibits 38:1,7

exiting 40:4,9

experience 34:24

experienced 34:16

experiences 34:24

explain 5:12 6:20

explained 33:18

Explorer 5:16 7:4

exposed 49:2

exposing 41:1

## F

facing 52:5

fact 39:13

failure 28:15

Fairlane 11:11

fallen 45:20

familiar 64:10

family 16:25 64:23

fast 27:11,15

father 8:5,7,8,9 13:5,7, 11 20:18,19,21,24 65:1, 6,10 69:12

Fayetteville 11:11 20:12

feeling 17:20 34:11

feels 31:8 34:25

Fernandez 4:16

filed 5:22

find 17:23 43:6 47:21 59:3

fine 7:25 36:1 37:23 58:21 66:2

finger 50:1

finished 42:12 65:25

finishing 51:24

firm 4:5 6:8

fit 46:25 47:2,4,5

flag 48:24

flashers 32:20,23 33:1 68:19

flat 28:22 67:9,10

follow-up 70:19

foot 57:8

forced 46:22

Ford 5:16 7:4

form 23:5 28:4 34:14 68:15 70:1

found 44:5,11 60:11

frame 20:13

Friday 18:23 24:4

friend 15:23,24 16:1,25 17:16,18 18:1 23:1,16

friend's 16:2

frightened 68:14

front 31:3 38:2,4,6 43:10

full 5:1 7:2 25:14

## G

gas 25:12

gave 35:22 68:10 72:3

get all 46:9

girlfriend 19:25

give 26:21 60:15 61:23

Gonzalez 8:7

good 4:25 19:18 69:25 70:2



**government** 10:21

**grade** 12:17,20,21,22,23

**great** 7:13 60:15

**greater** 48:25

**green** 10:18

**group** 19:3 22:22

**Guatemala** 8:13,14,15, 19,21 12:6,17 35:14

**guess** 27:7,8 29:25 34:8 35:22 52:15 64:20 68:1

**guys** 69:7

---

**H**

**half** 20:25 56:2,6,20 57:15

**hands** 24:12 31:22 34:10

**happen** 28:6

**happened** 14:1 28:16, 20 29:6,9 36:3 37:15 39:19 40:5 44:21 57:6 61:3 62:23 63:2,7,11 64:2

**happening** 29:19

**hard** 59:8

**head** 7:18 57:2 58:7 60:12,17,20,22

**heard** 28:20 63:14 64:10

**heavier** 33:14

**held** 35:7

**high** 12:20 55:23

**highlighter** 58:23 59:1

**highway** 27:2,16 33:21, 22 38:9 41:2 48:24 62:20 67:7

**hilly** 67:9

**hit** 54:16,17,18 57:5,23 58:7 61:9 63:11

**hitting** 54:15

**holler** 61:23 62:5

---

**home** 10:23 15:11 22:20 65:5 69:7

**honest** 52:25 53:4 62:12,21,24 63:12 64:9 66:9

**hope** 5:22

**hour** 36:11

**hours** 18:19,20 64:25 69:11

**house** 16:14,17 65:1 69:10,14

**Houston** 15:16,20 16:4, 7 17:9,12,15,19 18:1,3,9, 21 22:22 23:9,18,21 24:1,4,6 25:2,11,23 28:1, 10,11 30:17

**hugging** 52:13

**husband** 22:11

---

**I**

**idea** 27:11 71:17

**identification** 11:10 37:3,25 49:13

**illegal** 25:20

**immediately** 29:22,24 30:1,3 31:20

**immigration** 9:10 10:5, 9,11

**impact** 45:21 53:5 55:16 60:19 63:20

**Inbacopa** 12:19

**incident** 50:7 71:8

**inclination** 31:9

**inclined** 31:16

**including** 37:20

**indicating** 40:11 50:6,8, 22 51:5,8,10,12 56:9 57:7 58:7,16 59:11

**indictment** 66:19

**Ines** 4:16

**initial** 37:15

**injured** 60:20 61:20

---

**inquire** 31:10

**inside** 44:3,11 53:18 56:1,2 63:3 71:20

**installing** 42:20

**instance** 6:14

**instances** 34:17

**Intermittent** 32:19

**interpretation** 31:9

**interpreter** 4:9,16,17, 18,22 6:17 12:3 14:10 15:7,8,10 21:10,12,13 30:10 31:5,8,10,12,14 33:8 42:24 43:19,22 50:15 55:18 56:4 60:25 61:1,10,13,15 67:2

**interpreter's** 14:10 30:10 31:5 33:9 42:24 55:19 56:5 60:25

**interstate** 27:2 67:5 69:6,8

**introduce** 4:8

**invoke** 8:24 13:16

**Ivan** 11:19,21

---

**J**

**jack** 42:1,21 45:14

**Jacob** 4:11

**Jeremias** 4:20 5:2

**job** 7:13 69:25 70:2

**Johana** 11:18,21

**join** 19:3

**José** 64:8

---

**K**

**kind** 5:12 6:12,15 20:8 24:18,23 26:16 33:19 35:22 38:2 41:18,24 49:15 50:1 59:18 60:18 61:23 66:18

**King** 4:5

**knees** 53:3

---

**knew** 10:10 29:1 40:19 41:9,14,15 69:13,15

**knowledge** 12:10 37:4 68:18

---

**L**

**lady** 5:16 6:25 7:3

**lady's** 6:24,25

**land** 58:5

**lane** 27:22 28:2,3,13,14 30:7,8,12,19,20 31:1,2 32:9 33:4 38:14,17,18,23 39:3,8,14,21 40:6,11 48:9 55:12 56:3,10,23 60:7 68:9,12,17

**lanes** 27:23,25 30:16,23

**Latin-american** 21:15

**law** 4:5 6:8

**lawsuit** 5:15,21

**lead** 41:16

**learn** 19:15 35:10

**learned** 19:17 63:25 64:3

**leave** 64:21

**leaving** 22:22 25:11

**left** 18:16,18,20,21,22,23 28:3,18 29:20,23 30:20 31:3,17,19 32:2,12,16,25 33:10,19,20,21 34:2 38:13 40:12 43:11 48:9 64:19 67:20 68:9

**left-hand** 68:20

**legal** 5:1

**legs** 24:16

**lent** 14:17,22

**license** 35:1,5,7,17,24 36:4,5

**lift** 41:24 42:1 45:8 52:11

**lifted** 45:18,19 51:17

**lifting** 54:9

**lighter** 58:19



**lights** 33:2 68:21

**limit** 27:13,16,17,20,21

**literally** 6:24 10:13 14:7, 21 26:21 32:11 68:16

**live** 8:4,12 11:1 12:5 16:7

**lived** 8:9 69:8

**lives** 16:4,5 64:23

**living** 8:10 9:24 10:23, 25 11:13 12:17 18:11,12 20:10,11,14

**located** 38:8 47:25 56:12

**location** 22:23 50:13 60:9 64:24 65:2

**lock** 43:11,15

**long** 8:9 20:2,10,18,23 35:13 67:20 69:1

**longer** 14:6 24:7

**looked** 6:14,20 53:11 61:21 66:4

**loose** 47:5

**loosed** 42:4

**loosen** 44:6 45:10 46:1, 5 47:3,10

**loosened** 42:8 45:24,25 46:23 53:23

**loosening** 46:11 53:21

**loss** 5:19

**lost** 16:6 60:19

**loud** 7:17

**lower** 32:1 61:19

**Lucas** 11:18,22

**lug** 42:15,18 45:10,22 46:2,6,21,25

**luggage** 24:11 25:3,6

**lugs** 46:11

**lunch** 25:12

**M**

**made** 7:24 9:3

**make** 7:21 22:25 25:13 32:8 53:25 65:9

**managed** 57:12

**Manuel** 64:17

**mark** 36:18 49:14 59:8

**marked** 11:8 37:3,25 38:2 49:13

**married** 12:9,11,12

**meant** 61:2

**measurement** 45:11,12 46:15,20

**measurements** 46:19

**mechanic** 41:15

**medicines** 26:10,20

**Medrano** 64:17

**meet** 18:5 20:5

**Melvin** 14:24 17:2,11, 12,14,25 18:14 19:23 20:21,23 22:12,13,14 23:1,2 24:17 27:1 44:25 51:9,12 52:12 63:21 64:20

**memory** 6:12

**mention** 29:12,16 64:4

**mentioned** 7:6

**meter** 57:9

**middle** 28:14 30:7,8,12, 18,23 32:9 54:4 68:8

**mine** 16:1

**minute** 50:17

**minutes** 67:22 69:3

**missed** 57:8

**Mitchell** 64:12

**Mom** 12:8

**moment** 53:5,20 71:7

**Moments** 44:20

**money** 66:8

**Moreno** 14:23 19:25 20:8 25:25 26:16 33:21 38:9,22 40:15 50:10 51:4 52:9 57:20

**Moreno's** 37:22 57:3

**morning** 18:7

**mother's** 11:17

**move** 30:5,25 32:8,10 48:12,24 61:24

**moved** 11:15 50:8 56:10 59:24 60:9

**moving** 29:5 32:24,25 57:1 59:20 60:7

**N**

**named** 11:19

**names** 12:1 64:4

**nearby** 64:24

**necessarily** 27:25

**needed** 38:20 40:25 46:5,6,9 47:24

**Nehemias** 10:1,13,23 11:13 12:9,14 13:10 15:5 16:23 18:5,6,8 19:5,13 20:10 22:19 25:1 26:4,7, 25 29:8 32:5 36:5 37:20 39:10 40:17 41:12,17,23 42:6,15 45:1,6,16,23 46:11,24 47:17 48:20 49:5,20 50:6,13 51:4 52:16,20,23 53:6,12 54:13 57:23 58:14 60:7 61:22 67:24 68:2

**Nehemias's** 10:4,11 19:25 58:4 61:8

**nervous** 52:14

**nickname** 21:7,12 22:1

**night** 16:15 18:25 65:4

**nodding** 7:18

**nods** 57:2 60:17

**noise** 29:9

**non-responsive** 62:3

**nonresponsive** 32:13 49:3 57:16

**noon** 15:18 22:21

**normal** 27:4,5,7,8 33:16

**north** 30:16

**Notice** 36:20

**noticed** 47:13

**NS** 58:14

**number** 11:9 13:14 35:17 36:19 38:3,4,5,12 43:25 44:16 46:8 49:9, 15,25 60:2 67:7

**numero** 60:2,3

**nut** 43:7,8,11,17 44:1 51:19,24 53:21

**nuts** 42:15,18 43:11 45:10,22 46:6,16,21,25

**O**

**oath** 7:9

**Object** 32:13 49:3 57:16 62:3

**objection** 8:22 9:7,12, 21 10:2 23:5 28:4 34:14 68:15 70:1

**obligations** 37:15

**observed** 32:7

**observing** 34:10

**obtained** 9:18 13:14

**occurred** 22:24 27:25 28:15

**officer** 6:22 69:4,16 71:4

**officers** 54:21 62:9 68:22 69:18 70:20 71:8

**officers'** 71:11

**opened** 40:7 41:21,23

**opinion** 31:6

**opportunity** 5:11 36:25 50:16 54:20

**opposed** 7:17 33:22

**option** 33:23,24

**order** 60:1

**Oscar** 16:3,4,14

**Oscar's** 16:9 17:16,18



**ourself** 41:1

**over-the-counter** 26:10,20

---

**P**

**p.m.** 36:14 72:9

**painter** 13:6

**papers** 6:11 10:14

**paramedic** 63:13

**paramedics** 55:1

**parked** 28:17 29:20 38:13,19,24 67:11

**part** 49:11 58:7 60:19 61:17,20

**partially** 38:13,14 56:11

**parties** 5:14

**partly** 38:18,23 39:3,8, 14

**pass** 66:25

**passed** 10:6 18:6,19 68:1,4,7,13

**passenger-side** 40:21

**passengers** 63:18

**passing** 48:8,10

**past** 71:16

**patience** 66:24

**Patricia** 11:18,21 12:4

**pay** 36:1

**pen** 49:19 59:8,10,22

**people** 67:12

**perception** 31:23

**perfectly** 19:14

**permit** 9:19

**person** 14:21 50:18 64:1 67:10 69:7

**personal** 6:3

**personally** 62:8,14 68:23,24

**persons** 64:6,8

**phone** 13:22,24 14:2,5, 19 55:17,19,20,21,22 65:8,9,11

**photograph** 38:2

**photographs** 6:15 36:23 37:18,20 65:11

**physically** 34:3

**pick** 17:6,16,19 18:13,17 51:20 53:22 59:14

**picked** 18:9 22:20 23:2, 17 25:1,23 44:25 51:22

**picture** 37:21 42:11

**Pictures** 6:21

**Pivaral** 4:7,20 5:2 8:7 12:4 36:21 72:7

**place** 4:5 14:17,20 15:23 17:23 23:15,21 69:3,5

**plaintiff** 4:12

**plan** 22:16

**point** 60:18 71:3

**police** 6:22 14:12 54:20, 21 62:8,17 68:22 69:13, 24 70:3,20 71:4,8,11

**policemen** 62:15

**policewoman** 62:15

**portion** 32:14 49:4 57:17 62:4

**position** 53:5

**positioned** 45:3

**premarked** 49:12

**preparation** 6:16,18

**prepare** 6:9

**prescription** 26:8,16

**present** 48:19

**pretty** 70:25 71:9

**previously** 8:12 37:8

**primarily** 27:23

**prior** 11:14 14:9 26:23

**privilege** 8:24 13:17

**problem** 47:18

**proceedings** 4:1 72:9

**process** 10:14 45:5

**produced** 37:10

**propped** 44:17

**pull** 29:22 30:1 34:18

**pulled** 30:3 31:15 34:2 67:20 68:2,8,20

**pulling** 30:2,4 31:17,18, 21,24 32:12 33:19 34:1

**purpose** 15:4 16:20

**put** 44:21,23,24,25 47:14 50:19 60:12

**putting** 53:14,16,17

---

**Q**

**question** 6:13 7:15,23, 24 8:23 9:1,2,4,9 10:7,8 13:17,19,20 15:21 28:7,8 29:24 34:8 38:22 48:16 52:16 62:13 71:2

**questions** 5:23 7:7,8,22 17:21 37:18 66:1,24 70:16,19 72:5

**quick** 36:17

**quickly** 39:16 40:25

---

**R**

**ran** 44:15

**react** 29:25

**reacted** 29:19 56:14 59:19

**reaction** 29:14,15 31:2, 7 34:18

**realize** 28:19 53:6

**realized** 57:23

**rear** 38:5

**reason** 17:22 70:22 71:13

**recall** 14:12 24:23 25:2, 5,11 28:3,11 29:13 32:16 33:4 62:8,11 63:5,13

**receive** 10:20

**recess** 36:14 59:5

**recollection** 63:9

**record** 4:3 5:13 36:13, 16 59:3,7 72:8

**records** 6:15

**red** 59:10,22

**refresh** 6:12

**refuse** 13:20

**refusing** 13:18

**Regalado** 14:23 17:2 19:2,21 20:16 51:11

**regard** 9:11

**regularly** 26:8,11,17

**relation** 49:17

**remember** 11:2 14:21 15:23 16:19 20:3,13 23:10,11,12,22,23 24:1, 5,7,22,25 25:4,7 27:3,16 33:11 41:4 42:12,13 43:13 55:10 60:21 61:3 62:5,10,14,21,24,25 63:1,8,12,16 64:9,12,14, 16,18,23 65:16 66:3,4,5, 6 68:3,7

**remove** 43:12

**repeat** 7:23 10:8 12:3 17:6

**repetition** 15:8

**rephrase** 7:23

**report** 6:15,22,24,25 70:3,8

**REPORTER** 11:6 49:10

**represent** 5:14 37:11

**represents** 6:5

**required** 7:9

**reserve** 70:15

**residence** 9:18,19 10:19 11:4

**respect** 6:3

**responded** 69:24



**responses** 64:5

**rest** 15:11 58:6,8,11 70:16

**result** 6:4

**reviewed** 6:11

**Ricny** 64:15

**road** 29:22 30:1,4 64:24 67:8,13,21 71:1,24

**Rogers** 11:2,15 18:12, 13,16,20 20:11 25:9

**Rosemary** 64:15

**run** 47:7 55:12 56:8,14, 24 58:2

**running** 55:13,15

---

**S**

**Santos** 4:7,20,25 5:2,3, 5,8,18 6:1,7 7:21 8:1 9:10,17,23 10:4,16 11:16,18,21 12:4,16 13:13,21 15:4 19:11 22:15 26:7 27:11 29:7 32:7 33:3 34:3 35:3,4 36:17,21 37:17 38:7 39:5 49:14 50:20 51:1,4,7 54:12 55:25 58:4,14 59:18 60:14 61:21 63:21 65:16 66:7,14,22 70:19 72:4,7

**Saturday** 23:13

**scene** 14:13 15:2 54:19, 24 55:3,4 62:7,16,18 63:10 64:21 65:12 69:1

**school** 12:16,19,20,24

**screw** 47:15 53:24 54:1, 3,7,9

**seconds** 50:7 57:25

**security** 13:14 39:20 40:6,11 43:7 55:11 56:2, 4

**seeking** 66:7

**send** 65:14

**sensitive** 37:19

**separately** 10:25

**September** 8:18

**sequence** 60:4

**shaking** 28:17

**Sharpie** 59:3

**shock** 57:25

**short** 22:6

**shorten** 21:18

**shot** 14:13

**shoulder** 38:13,18 56:1 62:19

**show** 11:8 36:18 37:17, 21 38:1 49:14 58:23 59:23 60:3 71:12

**showed** 37:1 68:22

**shows** 49:25

**sic** 17:23 56:17

**sick** 26:13

**side** 27:1 29:21,23 32:12 33:6,8,10,21,22 34:2 40:13,16,18,19 50:6,7, 10,14 60:20,22 61:9,16 64:24 67:20 68:20

**sides** 71:23

**signal** 32:15,18,23

**similar** 27:18

**sir** 37:9

**sisters** 11:24 12:7

**sitting** 26:24 34:9 39:6

**size** 46:16

**skull** 61:2

**sky** 67:18

**small** 55:14

**Smith** 4:14 5:15,22 68:13 70:9,21

**Smith's** 56:19 57:18,20 70:5

**Social** 13:14

**someone's** 65:8

**son** 11:21

**sort** 29:21 59:19

**space** 38:20

**Spanish** 4:17 15:10 21:15 30:14 31:13 43:23 50:15 55:5 61:14 63:13, 14,15 69:18,22

**Spanish-speaking** 69:16

**spare** 42:6,22 43:1,2,3, 8,9,14,18 44:8,10,13,17, 18,20 47:19,20,23,25 48:1,3,8 50:9 51:22 52:11 53:13,14

**speak** 19:12,13,18,21 54:20,23 55:1,4,6 62:17 63:17,18 65:19 68:23 69:19

**speaking** 6:24 10:13 14:7,21 21:13 26:21 32:11 62:8,14 63:15,16 68:16

**special** 43:12,24

**specific** 6:13 43:25

**specifically** 10:16 63:10

**speed** 27:13,16,17,18, 20,21 56:13 57:13 61:25

**spelled** 21:25

**spend** 65:4

**spent** 18:25

**spoke** 19:14 20:14 54:21 63:13,14 68:24 69:18

**spoken** 6:8,10 69:22

**Springdale** 4:6 8:3 15:12 17:8,19 18:1,11 22:17 23:17,18,21 24:3,5

**standing** 49:23 51:1 53:2

**start** 15:15,16 41:21

**started** 15:17,18 31:21

**state** 5:1 7:17

**statement** 69:17,21

**States** 9:6,11,18,24,25 10:5 12:25 13:8,14 19:16 20:6

**status** 9:11 10:5,9,11

**stay** 64:25 65:1 68:9 71:5,12

**stayed** 16:14 39:24 71:7,9

**staying** 15:20

**steer** 34:4,12

**step** 41:19

**Stephanie** 64:12

**sticks** 54:3

**stop** 7:22 15:21 22:22 30:5 32:5 39:1,6,18 46:11 50:17 55:8

**stopped** 18:24 33:21 35:19 38:9,12,22,24 39:2,8 70:24

**stopping** 67:6

**stops** 22:25 25:12,13

**straight** 53:3 67:8,13 71:1

**Street** 8:3 10:24 11:11

**strike** 57:3,18,20

**stripped** 47:9,10

**stripping** 47:13

**struck** 45:2 50:13 53:6, 11 54:13 55:13 56:12 57:1 58:5 61:7,22 67:24 68:2

**stunned** 59:18

**subject** 66:23

**subpoena** 36:21

**suitcase** 24:11,17,24

**sunny** 67:17

**sustained** 63:20

**sway** 57:12

**swipe** 56:15 57:5

**sworn** 4:10,18,19,21,22

**sympathies** 5:18





www.ArkansasRealtimeReporting.com

Appx_0274

## T

**T-SHIRT** 60:12

**takes** 43:12

**taking** 4:5 17:23 51:21, 24

**talk** 5:21 42:11 60:15 65:22 66:12,22 71:3

**talking** 7:1,3 14:13 22:11 23:4,25 28:9 40:12 42:9 44:8 50:18 53:17 70:7

**tank** 25:13

**Taylor** 4:5

**tecum** 36:21

**telephone** 14:14,15,16

**telling** 63:1,10 71:12

**temporary** 9:18 10:19

**ten** 67:22

**tendency** 34:18

**tending** 63:19

**tenth** 12:21

**Terms** 21:13

**testified** 4:21 34:20

**testifying** 7:11

**testimony** 25:5 54:12 55:20,25

**texts** 65:14

**thing** 7:18 23:10 24:19

**things** 5:20,24 27:8 36:24 49:17

**thinking** 58:1 60:12

**thought** 47:14 53:20 60:11

**Thursday** 23:4

**ticket** 35:22,23

**tilting** 32:1 33:19

**time** 4:4 10:1,11 11:1,13 15:6,13 16:5,7 18:11 20:3,13,20 22:19 26:1,4, 8,11,17 28:14,24 29:5 30:4,25 33:3,14 36:12,15 40:8 45:20 47:14 49:23 50:3,12 51:9 52:10 54:17,18 55:6,16 59:4,6, 23 61:25 63:3 68:21 70:7,11 72:5,8

**times** 36:3 71:19

**tire** 26:2 28:15,19,21 29:1,3,11 30:7,12,22 31:3,20,25 32:11 33:3,14 34:17,21 38:20 40:8,24, 25 41:6,7,13,16,20,25 42:4,5,6,10,22 43:1,2,3, 5,8,14,18 44:6,13,17,18, 20 45:2,6,13 47:19,20,25 48:1,8 49:6,21 50:10 51:15,22,23 52:7,11 53:13,14,19 54:1,4,10

**tires** 48:6

**titled** 36:19

**today** 6:9 7:8 37:8 66:23

**Today's** 4:3

**told** 65:18 70:21 71:4

**tool** 41:23 42:19 43:7,12, 24 44:2,5 45:8,11 46:1,5, 9 49:21

**tools** 40:7 46:18 47:21 48:7

**top** 54:1,5

**Toyota** 57:4 67:6 68:19

**traffic** 27:2 33:14,16 48:8,15,18,19,23,24

**training** 35:9

**translate** 50:16

**trauma** 55:7

**traumatized** 65:23 66:11

**travel** 23:16 30:16 38:14,17,18,23 39:3,8,14 56:10

**traveled** 17:8,9,12 19:5 24:3,8 25:8

**traveling** 15:12 17:24, 25 24:5 26:23 27:12,23 30:6,18

**tres** 60:3

**trial** 70:16

**trip** 15:4 17:4,9,22 19:9 23:21 24:9

**truck** 35:11 66:5

**trunk** 40:7 41:21,23 42:23 43:2,14,18 44:3, 14,19 45:13 49:22 51:15, 17 52:6 53:10 71:21

**truth** 7:10

**Tuesday** 24:7,8

**turn** 32:15,18,23 53:8 54:10 55:14 68:19

**turned** 37:16 53:11,15

**type** 7:18 9:19

## U

**Uh-huh** 7:5 19:10

**underneath** 47:21,23, 25 52:1 60:12

**understand** 5:19,22,25 6:2 7:9,12,20,25 9:23 32:22 47:17 48:16 62:12 65:21 69:20

**understanding** 6:5 66:24

**understood** 39:9

**United** 9:5,11,17,24,25 10:5 12:24 13:8,13 19:15 20:5

**uno** 60:2

**unpleasant** 5:21 60:14 66:23

**unscrew** 42:18 54:4

**unscrewed** 42:9

**unscrewing** 42:13

## V

**varies** 21:21

**vehicle** 5:16 29:20 31:15,16,18,21,24 32:11 34:1,7 38:19 41:6,7 53:9

**54:14 55:23 56:19 67:11**

**vehicles** 27:10 33:17 43:8 56:15

**version** 70:6

**video** 50:24 72:7

**videos** 14:13 34:17,23 71:11

**view** 38:3,4,6

**visa** 9:18

**visible** 71:1

**visiting** 16:20

## W

**waist** 61:19

**waiting** 10:18,20

**walk** 41:18 48:24

**wall** 44:18

**wanted** 16:21 49:1

**warn** 48:23

**warning** 61:23 62:5

**watched** 34:17

**weather** 67:15

**Wednesday** 23:4 24:7,9

**week** 23:4

**wheel** 31:23 34:11 42:13 43:11 45:17,22 46:12 47:1 71:20

**white** 4:11 5:11 6:1,5,7 7:8 8:22 9:7,12,21 10:2,7 13:15 23:5,8 28:4 34:14 36:9 37:1,9,11,14 47:9 58:18,21 59:2 66:5,6 67:4 70:15 72:5

**wife** 52:13

**witnessed** 63:22

**woman** 61:5

**word** 21:11 31:6 61:2

**words** 21:18 54:22

**work** 9:19 13:4,5,10 20:8,17,21 59:1



**A**RKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0275

**worked** 13:7 20:18,19, 20,23

**working** 13:10 49:5 52:4,6 53:10

**works** 20:17,22 21:14, 19

**wounds** 60:16

**wrench** 43:24 46:2,24 47:22 48:2 52:1

**wrenches** 46:13,16,17

**write** 49:18 50:20 51:6 58:14 60:2

**written** 50:25 64:5

**wrong** 29:2 46:14

---

### Y

**y'all** 67:20 68:1,10,20 69:10

**Y-A-M-I-L-E-T-H** 22:3

**Yami** 21:5,6,17 22:6,9, 10

**Yamileth** 21:8,10,17,19 22:4

**year** 20:4,25

**years** 8:11 9:25 35:15, 16

**yellow** 56:7,21

**Yoli** 64:17

---

### Z

**Z-A-M-O-R-A** 16:11

**Zamora** 16:10,13,20,23 17:2

**Zamora's** 16:14,17 22:20



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:22-cv-02714-K   Document 62   Filed 01/29/24   Page 281 of 2460   PageID 573

```
 1                IN UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2
   ERICK RODERICO PIUARA        )
 3 GONZALEZ, Individually       )
   and as Special               )
 4 Administrator of the         )
   Estate of NEHEMIAS R.        )
 5 PIVARAL SANTOS,              )
   DECEASED,                    )
 6                              )
                  PLAINTIFFS,   )
 7                              )
   VS.                         ) CASE NO.:
 8                             ) 3:22-CV-02714-K
   CAYLEE ERIN SMITH and        )
 9 EASTMAN CHEMICAL COMPANY,    )
                               )
10             DEFENDANTS.     )

11       ---------------------------------

12       ORAL AND VIDEOTAPED DEPOSITION OF

13                  EVELYN MORENO

14                AUGUST 2, 2023

15       ---------------------------------

16      ORAL AND VIDEOTAPED DEPOSITION OF EVELYN MORENO,

17  produced as a witness at the instance of the

18  DEFENDANTS, and duly sworn, was taken in the

19  above-styled and numbered cause on the 2nd of August,

20  2023, from 9:36 p.m. to 5:37 p.m., before Jennifer

21  Norman, CCR in and for the State of Arkansas, reported

22  by machine shorthand, at 410 North Thompson Street,

23  Suite B, Springdale, Arkansas 72764, pursuant to the

24  Federal Rules of Civil Procedure.

25
```





www.ArkansasRealtimeReporting.com

EXHIBIT
M

Appx_0277

```
 1               A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3      Mr. Jacob White
        Taylor King Law, P.A.
 4      410 North Thompson Street, Suite B
        Springdale, Arkansas 72764
 5      (479) 935-8682
        Jacobwhite@taylorkinglaw.com
 6
     FOR THE DEFENDANTS:
 7
        Mr. Brian L. Bunt
 8      FREEMAN MILLS PC
        2020 Bill Owens Parkway, Suite 200
 9      Longview, Texas 75604
        (903) 295-7200
10      Bbunt@freemanmillspc.com

11

12   ALSO PRESENT:

13      Mrs. Stacey Bunt, CP
        FREEMAN MILLS, PC
14
        Ms. Terrika Seal
15      EASTMAN CHEMICAL - (via videoconference)

16

17

18

19

20

21

22

23

24

25
```



1                              INDEX

2                                                PAGE

3

4     Appearances...................................3

5     Stipulations..................................2

6

      Witness:   EVELYN MORENO

7
           Examination by Mr. Bunt..................6
8
           Examination by Mr. White..............141
9
           Further Examination by Mr. Bunt........158
10
           Further Examination by Mr. White.......164
11
           Further Examination by Mr. Bunt........165
12
           Further Examination by Mr. White.......166
13

14
      Reporter's Certificate...............167-168
15

16                            EXHIBITS

17    NO.            DESCRIPTION                     PAGE

18    Exhibit 1      Notice of Deposition; Subpoena
                     Duces Tecum.......................24
19
      Exhibit 2      Scene Photograph..................78
20
      Exhibit 3      Photograph front of Camry.........78
21
      Exhibit 4      Photograph trunk of Camry.........78
22
      Exhibit 5      Photograph of Camry tire..........78
23
      Exhibit 6      Scene Photograph..................78
24
      Exhibit 7      Scene Photograph..................78
25



```
 1                      EXHIBITS (continued)

 2    NO.            DESCRIPTION                          PAGE

 3    Exhibit 8      Scene Photograph...................78

 4    Exhibit 9      Scene Photograph...................78

 5
      Exhibit 10     Scene Photograph...................78
 6
      Exhibit 12     Marked-up diagram.................93
 7
      Exhibit 14     Arkansas Driver's License
 8                   Study Guide.......................135

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Appx_0280

```
1         * * * * * PROCEEDINGS * * * * *
2            THE VIDEOGRAPHER:  Okay.  We are on the
3         record.  Today's date is August 2nd, 2023,
4         the time is 1336.  I'm Douglas Riggs.  I'll
5         be your videographer today.  This deposition
6         is taking place at Taylor King Law Firm, PA,
7         410 North Thompson Street, Springdale,
8         Arkansas 72764.
9            The Case Number is 3:22-CV-02714-K
10        entitled:  Erick Roderico Piuara [sic]
11        Gonzalez and others versus Caylee Erin Smith
12        and others.  This deposition is being taken
13        on behalf of the Defendant.  The witness is
14        Evelyn Moreno.  The court reporter is
15        Jennifer Norman.
16           If Counsel will please introduce
17        themselves, the witness will be sworn.
18           MR. WHITE:  Jacob White, counsel for
19        Evelyn Moreno and the Estate of Nehemias
20        Pivaral Santos.
21           MR. BUNT:  Brian Bunt, counsel for
22        Defendants Caylee Smith and Eastman Chemical
23        Company.
24      (Whereupon, the witness was duly sworn.)
25               EVELYN MORENO,
```



1  having been first duly sworn, testified as follows:

2                        EXAMINATION

3  BY MR. BUNT:

4  Q.  Good afternoon.  Ms. Moreno, as I mentioned, I'm

5  Brian Bunt.  I represent the parties who -- against

6  whom the lawsuit has been brought.  Caylee Smith was

7  the young lady driving the other vehicle, the Ford

8  Explorer.  Her employer, Eastman Chemical, has also

9  been named in the lawsuit.  You understand which

10 parties I represent, do you not?

11 A.  Yes.

12 Q.  Okay.  Have you ever given a deposition before?

13 A.  No, I haven't.

14 Q.  Okay.  You understand -- I'm assuming Mr. White

15 has had an opportunity to kind of speak to you about

16 what we will be doing this afternoon; I'll be asking

17 you questions.  He may ask you some questions.  The

18 answer -- the answers that you give us are under oath

19 just as if you were testifying live at trial.  Do you

20 understand that?

21 A.  Yes, sir.

22 Q.  And in fact, your deposition, either the videotape

23 or the -- Mrs. Norman, our court reporter, is taking

24 down everything, will transcribe that into a booklet;

25 and either the booklet can be read from at trial or



1  the videotape can be played at trial.  It's just as if

2  you're there live at trial testifying.  Do you

3  understand that?

4  A.  Yes.

5  Q.  Okay.  The same penalties of perjury apply.

6  You're under oath, you're required to tell the truth,

7  which means not giving any answers that you know not

8  to be incorrect, as well as not failing to give an

9  answer -- except for privilege reasons, failing to

10  give an answer when you know an answer such as saying,

11  "Well, I don't know" or, "I don't remember," but if,

12  in fact, you do know or do remember.  Do you

13  understand that?

14  A.  Yes.

15  Q.  And I would like to have just a few agreements

16  with you.  One might be, if you would, just speak up a

17  little bit louder whenever you're talking so that we

18  can all hear you.

19          You're doing a good job so far, but would

20  you agree that if I ask you a question that can be

21  answered with a "yes" or a "no" that you would just

22  state those out loud as opposed to just nodding your

23  head or maybe saying "uh-huh," those types things?

24  A.  Yes.

25  Q.  Thank you.  Also, if -- sometimes we lawyers ask



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:23-cv-00274-LC Document 49 Filed 01/29/24 Page 288 of 2460 PageID 580
MORENO, EVELYN on 08/02/2023

8

1  questions that might be a little bit confusing.  If I
2  ask you a question or if your own attorney asks you a
3  question that you don't understand, you're not sure
4  you understand it, would you please ask us to repeat
5  it or rephrase it as many times as necessary until
6  we've made ourselves clear to you?
7  A.  Yes, sir.
8  Q.  And if I ask a question and you do give me an
9  answer, can I assume that you did understand what I
10  was asking?
11  A.  Yes.
12  Q.  I don't know exactly how long we will take today.
13  It's going to be a few hours.  But it's not an
14  endurance contest, and so we will take breaks
15  periodically throughout the deposition.  If at some
16  point you need a break but we haven't called for one,
17  let us know.  If there's a question on the table that
18  I need an answer from you, I probably will want you to
19  answer the question first, and then I'll be happy to
20  take a break, and we can all stretch our legs or do
21  whatever we want to.
22  A.  Yes, that's fine.
23  Q.  Ms. Moreno, prior to the deposition today, is
24  there anyone that you've spoken with to go over things
25  to prepare yourself for the deposition other than



1  Mr. White or someone in his office?

2  A.  No.

3  Q.  Have you reviewed any -- any documents or

4  photographs or videos or anything of that nature to

5  prepare yourself for the deposition?

6  A.  No.  Oh, well, I just spoke with my attorney,

7  everything.  But that's been all.

8  Q.  Okay.  But you've not really watched videos or

9  looked at pictures or read reports?

10 A.  I've just seen the pictures of where Nehemias is

11 covered up, but that's been it.

12 Q.  Okay.  And I will tell you in advance that, during

13 the deposition, I will show you a few photographs.

14 They are primarily just photographs of your car.

15 Mr. White and I have kind of worked with each other

16 agreeing that we're going to try not to show

17 photographs that are very graphic and so forth.

18 Because there were some images captured of Nehemias.

19 And mostly these photographs just show the car, where

20 the car was located and so forth.

21 A.  Okay.  That's fine.

22 Q.  Would you please state your full legal name for

23 the record.

24 A.  Evelyn Elizabeth Moreno.

25 Q.  And what is your date of birth, Ms. Moreno?



1   A.   September 26th of 2002.

2   Q.   Where were you born?

3   A.   Here in Arkansas.

4   Q.   Were you born here in the Springdale area?

5   A.   Up in Johnson.

6   Q.   Johnson?

7   A.   Yes.

8   Q.   Okay.  Have you lived in Arkansas your entire

9   life?

10  A.   Yes.

11  Q.   And I have a street address for you, but tell me

12  if this is correct.  614 Crystal Street, Lowell,

13  Arkansas?

14  A.   Yes.

15  Q.   And Lowell is a community, I believe, that's just

16  a little bit north of us here; is that correct?

17  A.   Yes, sir.

18  Q.   Okay.  How long have you lived at the 614 Crystal

19  Street address?

20  A.   Four or five years almost.

21  Q.   So you would have been living there in April of

22  last year when the accident happened; correct?

23  A.   That's always been my address, yes.

24  Q.   Okay.  With whom do you live on Crystal Street?

25  A.   My mom and my brother.



**www.ArkansasRealtimeReporting.com**

1  Q.  Is it your mother's home?

2  A.  Yes, sir.

3  Q.  And your mother is Gladys Sandoval?

4  A.  Yes.

5  Q.  Ms. Moreno, are you currently married?

6  A.  No, sir.

7  Q.  Have you ever been married?

8  A.  Yes, I have.

9  Q.  All right.  When were you married and to whom?

10 A.  I was married in 2021 to Juan Orellana.

11 Q.  And his name was Juan.  What was the last name?

12 A.  Orellana.

13 Q.  Can you spell that for us?

14 A.  O-r-e- -- can I write it out?

15 Q.  Sure.

16 A.  I don't know how to spell it just on the top of my

17 head.

18 Q.  "Orellana," is that how it's pronounced?

19 A.  Yes.

20 Q.  Okay.  Okay.  Thank you.

21            So you were married to Mr. Orellana in

22 2021?

23 A.  Yes.

24 Q.  But are you no longer married to him?

25 A.  Yes, we're no longer together.



1  Q.  Okay.  Are you -- are you divorced?

2  A.  Yes.

3  Q.  And when were you divorced?

4  A.  Just a few months after.  It didn't last very

5  long.

6  Q.  And have you gone through an official court

7  proceeding to obtain the divorce?

8  A.  Yes, I did.

9  Q.  Okay.  Do you know when the divorce decree was

10 signed?

11 A.  I can't remember.  I'm sorry.

12 Q.  Okay.

13 A.  I just know it's done, yes.

14             MR. WHITE:  I can give you a copy of it

15       if you need it.

16             MR. BUNT:  Okay.

17 Q.  Was it before April of 2022?

18 A.  Yes, it had been done before April.

19 Q.  Okay.  Ms. Moreno, do you have any children?

20 A.  No, not currently.

21 Q.  Are you expecting any children?

22 A.  Yes, sir.

23 Q.  When are you due?

24 A.  December.

25 Q.  Congratulations.  Do you have any plans to get



1  married in the future?

2  A.  Hopefully, yes.

3  Q.  Hopefully, okay.

4         Can you tell me a little bit about your

5  education, where you attended school, what grade you

6  completed?

7  A.  I completed all of my normal grades here in

8  Arkansas.  I graduated from Rogers High School.

9  Q.  What year did you graduate?

10 A.  In 2021.

11 Q.  Okay.  Since graduating in 2021, had you attended

12 any further college courses or trade school courses,

13 anything like that?

14 A.  I haven't completed, sir.  I'm currently working

15 on training in the dental office.

16 Q.  Okay.  So you're training in a dental office?

17 A.  Yes, sir.

18 Q.  And what type of position are you planning to hold

19 after you've completed your training?

20 A.  Dental assistant.

21 Q.  Are you currently working at that dental office?

22 A.  Yes, sir.

23 Q.  Okay.  What's the name of your current employer?

24 A.  Half Moon Oral Surgery.

25 Q.  And how long do you expect your training to take



1  place there?

2  A.  Up until I can get my dental license.  It's to be

3  able to monitor your patients while they're under

4  general anesthesia.

5  Q.  Okay.  Do you have any idea how long that normally

6  takes a person?

7  A.  It's all up to the person on when the tests are.

8  They're usually in September.  I started in April of

9  this year.

10  Q.  Do you plan to test this September?

11  A.  No, sir.  Next year.

12  Q.  Okay.  I have a partial Social Security number for

13  you.  I don't know that I really need the entire one.

14  But does yours begin 679-03?

15  A.  Yes.

16  Q.  Okay.  Do you have a driver's license?

17  A.  Yes, sir.

18  Q.  Is it an Arkansas license?

19  A.  Yes, sir.

20  Q.  When did you obtain your driver's license?

21  A.  I must have been around, like, 16 when I got off

22  my permits.

23  Q.  And you say "your permit."  Was that originally

24  like a --

25  A.  Driver's permit.



1  Q.  -- like a driver's permit?

2  A.  Yes.

3  Q.  And then did it become --

4  A.  A driver's license.

5  Q.  -- a driver's license?

6  A.  Yes.

7  Q.  And was that when you turned 16?

8  A.  Yes.

9  Q.  Okay.  Do you have a copy of your license with you

10  today?

11  A.  I have my license.

12  Q.  Okay.  Would you be okay with letting the court

13  reporter make a copy of it and we make it an exhibit

14  to the deposition at some point --

15  A.  Yes.

16  Q.  -- on a break?  All right.  Thank you.

17         While we're on that subject, though, can

18  you tell us your driver's license number?

19  A.  939753783.

20  Q.  And what is the expiration date?

21  A.  The 26th of October in this year.

22  Q.  Okay.  It would have been the same license you

23  would have had in April of last year; correct?

24  A.  Correct.

25  Q.  Before getting the license, did you take a



```
 1  driver -- driver's ed course, driver's training
 2  course?
 3  A.  I just took the test and studied the booklet.
 4  Q.  Okay.  Did you -- I guess, to take the test, did
 5  you study the booklet?
 6  A.  Yes, sir.
 7  Q.  Did you have a copy of the booklet?
 8  A.  No.  Since you can get the booklet online --
 9  Q.  Okay.
10  A.  -- I just studied it on my computer.
11  Q.  All right.  So you looked at the booklet online or
12  read the booklet online --
13  A.  Yes, sir.
14  Q.  -- and learned the things there?
15  A.  Uh-huh.
16  Q.  Okay.  Did you ever have any kind of driver
17  training either with a teacher or parent where they
18  rode with you for a certain number of hours and
19  observed you driving and kind of taught you to drive?
20  A.  Yes.  Mostly my mother and my stepfather at the
21  time.
22  Q.  Okay.  I know in Texas -- and I don't remember how
23  many hours one is required to have, but there was,
24  like, a certain number of hours that you have to drive
25  with a parent or a teacher in the front seat with you.
```



1  Is there a similar requirement like that in Arkansas?

2  A.  Not that I know of.

3  Q.  Okay.  So whenever you would go out with your

4  mother or your stepfather and drive, was there any --

5  do you know if they were having to record a certain

6  number of miles or a number of hours or make any

7  record that you were doing the driving?

8  A.  No, sir.

9  Q.  Okay.  Since you received your license, have you

10 ever taken any additional driving course like a

11 defensive driving class or anything of that nature?

12 A.  No, sir.

13 Q.  Has your license ever been suspended or revoked

14 for anything?

15 A.  It has.  Just a failed paid ticket.  But I fixed

16 that with Rogers and Lowell.

17 Q.  What kind of ticket was that?

18 A.  I think it was -- I'm sorry.  I don't remember

19 what type of ticket.  It was a couple years ago.

20 Q.  Okay.  Do you know if it was a speeding ticket, or

21 was it some kind of traffic violation?

22 A.  Yeah, it was a traffic violation.  But that's all

23 I can remember.

24 Q.  Don't remember?

25 A.  I have the document at home.



1  Q.  Okay.  Okay.  So you got that ticket, and then, I

2  guess, you were supposed to make a court appearance

3  for it.  And did you miss that court appearance?

4  A.  Yes, I did.

5  Q.  And then what happened?

6  A.  They suspended my license.

7  Q.  And how did you find out your license was

8  suspended?

9  A.  I got pulled over.  And I didn't know it was

10 suspended.  And he gave me the ticket for the

11 suspended license.

12 Q.  At the time you got pulled over and were given a

13 ticket for the suspended license, were you ticketed

14 for anything else?

15 A.  No, sir.

16 Q.  What did you then do after getting the ticket for

17 the suspended license?

18 A.  I paid my fines to get it off.

19 Q.  Okay.  Did you have to make an appearance before a

20 judge or --

21 A.  Yes, sir.

22 Q.  -- justice of the peace or something?

23 A.  Yes.

24 Q.  Was your license reinstated?

25 A.  Yes, sir.



1  Q.  Other than that one instance -- and approximately
2  when was that?
3  A.  Maybe in January in 2021.
4  Q.  Okay.  Are you currently 20 years old, about to be
5  21?
6  A.  Yes, sir.
7  Q.  Okay.  Other than whatever that traffic violation
8  was and then getting pulled over and ticketed for the
9  suspended license, do you recall any other traffic
10 tickets you've received over the years since you've
11 had a license?
12 A.  Just a speeding ticket that I'm aware of.
13 Q.  Okay.  Do you remember when that speeding ticket
14 was?
15 A.  It was in April.
16 Q.  April of this year?
17 A.  No, sir.  2022.
18 Q.  Okay.  Where did you receive that ticket?
19 A.  In -- on my way to Houston somewhere.  I think
20 Savannah.
21 Q.  What was the town?
22 A.  Savannah.
23 Q.  Savannah?
24 A.  Uh-huh.
25 Q.  Was that in Arkansas or Texas?



1  A.  I think it's in Texas.

2  Q.  Okay.  Was this the trip from Springdale down to

3  Houston the day before the accident?

4  A.  Yes, sir.

5  Q.  And what did you have to do on that ticket?

6  A.  Oh, I paid it.

7  Q.  And do you remember -- did you have to go live to

8  a court anywhere, or did you just mail in a payment?

9  A.  No.  The officer just said just pay it online; and

10 that's what I did.

11 Q.  Okay.  Do you remember who you made the payment

12 to?

13 A.  Paymyfines.com.

14 Q.  Paymyfines.com, really, was that it?

15 A.  Yeah, it was.

16 Q.  Okay.  So the name of the -- thinking back, you're

17 saying you believe the ticket was in Texas?

18 A.  It's -- I was on my way.  I know it's a small,

19 little town on your way there.

20 Q.  Okay.

21 A.  But I'm not 100 percent sure if it was, like,

22 through Oklahoma or through Texas.  I just know it's

23 called Savannah.  And I know if I look at my record it

24 would show exactly where it is.

25 Q.  Okay.  When you traveled down from Springdale to



1  Houston, did you take -- did you go down, I guess,

2  I-49 first to Fort Smith?

3  A.  I believe so, yes.

4  Q.  And was it -- Fort Smith, did you get on the

5  interstate there and go west over into Oklahoma?

6  A.  I think so.  All I know is the ticket said

7  Savannah, Oklahoma.  And then remembered it because my

8  dog's name was Savannah.

9  Q.  Savannah, okay.

10  A.  Because it was just easy to remember.

11  Q.  And I'm just trying to figure out the route.  So

12  on the way down to Houston, going down, did you go

13  through Dallas on the way?

14  A.  I think so, yes.

15  Q.  Okay.  And then do you believe you took I-45 from

16  Dallas, the interstate highway from Dallas on down to

17  Houston, which would be the same roadway that

18  apparently y'all were coming back on on the return

19  trip?

20  A.  I was just following the GPS.  I wouldn't remember

21  Texas on the back of my hand or anything.

22  Q.  Okay.  Any other moving violations, speeding

23  tickets that you remember?

24  A.  No, not that I remember.

25  Q.  And no other suspensions or revocations of your



1   license; correct?

2   A.  No, sir.

3   Q.  Have you been involved in an automobile accident

4   before as a driver or a passenger?  And I'm not

5   including the accident with Nehemias Santos that we're

6   going to talk about today.  But apart from that, have

7   you been involved in any accidents?

8   A.  Yes.  When I was, like, 12, my mom -- someone

9   crashed my mom from the back.  And we had to go to a

10  chiropractor to get back together again.

11              And then when I was around, I think, 16 or

12  17, I -- I got -- I crashed or I got hit, too.  I

13  don't exactly remember how the accident happened.

14  Q.  Where did the one happen when you were 16 or 17?

15  A.  Here in Springdale.

16  Q.  And as best you remember, how did the accident

17  happen?

18  A.  I was coming from a stop, and I guess the guy just

19  didn't do his stop and he just -- he just wrecked in

20  front of me, hit me, like, in the right side front.

21  Q.  Okay.  Did it damage your car pretty good?

22  A.  Yes.

23  Q.  Did it total the car?

24  A.  It didn't total the car.

25  Q.  Was anyone given a ticket for that accident?



```
 1   A.  No, sir.
 2   Q.  Okay.  As far as you know, neither you nor the
 3   other person?
 4   A.  No.
 5   Q.  Do you still have a copy of the report of that
 6   accident?
 7   A.  No, sir.
 8   Q.  Do you know if there was a written report?
 9   A.  I can't remember, sir.
10   Q.  Was that inside the city of Springdale?
11   A.  Yes, sir.
12   Q.  Okay.  Any other accidents that you've been
13   involved in as either a driver or passenger?
14   A.  No, sir.
15          MR. BUNT:  I think -- and you may have
16       to help us, Stacey.
17   Q.  I think we have sent to you a copy of a form for
18   the State of Arkansas that allows us to obtain a copy
19   of the driving record.
20          MR. WHITE:  It was mentioned on there.
21       It wasn't attached.  We're happy to execute
22       it.
23          MR. BUNT:  Okay.
24          MR. WHITE:  But it might have -- I don't
25       want to impede Stacey.  That may have been
```



```
 1                    in a different email.
 2                    MR. BUNT:  I don't think so.  I think we
 3              have to have -- I think we either have to
 4              have the form or she has to do it.
 5                    MRS. BUNT:  Okay.
 6                    MR. BUNT:  Okay.
 7  Q.  If we can provide that form, Ms. Moreno, would you
 8  be willing to sign it?  That would just allow us to
 9  obtain a copy of your driving record.
10  A.  Yeah, that's fine.
11  Q.  Okay.  And we can just work through your attorney
12  to do that?
13  A.  Okay.
14                    (Exhibit 1 marked for identification.)
15  Q.  Ms. Moreno, let me show you what's been marked
16  Deposition Exhibit Number 1.  I know that we
17  originally subpoenaed you to give a deposition, I
18  guess it may have even been back in late June of this
19  year.  And at that point in time, we thought we were
20  going to be able to take a number of depositions kind
21  of at that time.  We later decided for various reasons
22  that we needed to postpone them.  I know you did
23  appear at the court reporter's office that day.  I
24  think that's correct; right?
25  A.  Yes, sir.
```

1  Q.  Okay.  And you did bring in some -- some papers or

2  some documents and gave them to the court reporter?

3  A.  Yes, sir.

4  Q.  And we -- we took those and we looked at those.

5  We also gave them to Mr. White.  I don't think at that

6  time Mr. White was your attorney, but since that time,

7  you have hired him as your attorney; is that correct?

8  A.  Yes, sir.

9  Q.  All right.  You had an attorney for a little while

10 named George McManus; is that right?

11 A.  Yes.

12 Q.  But do I understand correctly he's no longer

13 representing you at all?

14 A.  He couldn't represent me for this case.

15 Q.  Okay.  Although you probably saw the same list

16 before, if you don't mind, on Exhibit Number 1, look

17 back to the fourth page.

18 A.  Okay.

19 Q.  That should be probably about the same list of

20 documents that we had attached to your subpoena the

21 first time.  And it asks for things like whether you

22 have any photographs of your car or the accident scene

23 or of Nehemias or any of the other passengers in the

24 car that were taken the day of the accident, whether

25 before the accident or after the accident.  Do you



1  have any such photographs?

2  A.  No, sir.  My phone was dead at the time of the

3  accident.

4  Q.  Okay.  Did you, at any time, borrow anyone else's

5  phone or use anyone else's phone to take any

6  photographs?

7  A.  No, sir.

8  Q.  Do you know whether any of the other persons who

9  were traveling with you took any photographs there

10  that day?

11  A.  I wouldn't think they would.

12  Q.  You're not aware of any being taken?

13  A.  I was put in the ambulance after the accident.

14  Q.  Okay.  But, I mean, no one has -- is it accurate

15  to say that no one has told you, "Yeah, I took some

16  photographs of the cars and so forth and have them on

17  my phone"?

18  A.  Yeah, I mean, nobody has told me any of that.

19  So...

20  Q.  I understand.

21  A.  Yes, sir.

22  Q.  At the accident scene, did you send any -- did you

23  make any phone calls to family members to let them

24  know that the accident had happened?

25  A.  I had borrowed the lady's phone to call my mom to



1  come pick me up.  I had just told her we were in an
2  accident.  And that was all that I had told her, to
3  just come pick me up.
4  Q.  Do you know whose phone you borrowed?
5  A.  I don't remember the lady's name.
6  Q.  Was this anybody in your group?  Or this is not
7  Dina you're talking about?
8  A.  Not Dina.
9  Q.  Okay.  Just somebody else that was there at the
10 scene?
11 A.  Yes.
12 Q.  And she just loaned you a phone for a moment to
13 make a call?
14 A.  Yes.
15 Q.  Okay.  Did you call any -- you called your mother.
16 Did you call anyone else?
17 A.  No, sir.  I don't memorize people's phone numbers.
18 Q.  Okay.  Did you use that phone or any other phone
19 to send any texts to anyone --
20 A.  No, sir.
21 Q.  -- or messages to just let them know an accident
22 had happened or what had happened?
23 A.  No, sir.
24 Q.  The phone that you had at the time, you said it
25 was dead?



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

1  A.  Yes, sir.

2  Q.  Is it the same phone that you still have today?

3  A.  No, sir.

4  Q.  What happened to the phone that you had on

5  April 30, 2022?

6  A.  The phone, I worked in painting at the time and --

7  Q.  In banking?

8  A.  In painting.

9  Q.  Painting, okay.

10 A.  So with all the stuff that goes into the phone, it

11 just damaged it, and my phone stopped working

12 eventually.

13 Q.  About how long after the accident did it stop

14 working?

15 A.  Like two or three weeks.

16 Q.  And what did you do with the phone?

17 A.  I threw it away.  I mean, it stopped working.  I

18 tried taking it to somebody to fix it.  They couldn't

19 fix it.

20 Q.  So you just threw it in the trash?

21 A.  Yeah.  I mean, it fell apart.  So...

22 Q.  You didn't try to -- or you didn't keep it at home

23 in a drawer or just toss it in a box or anything like

24 that?

25 A.  No, sir.



1  Q.  So as we sit here today, you don't have any idea

2  where that phone is?

3  A.  No.

4  Q.  What your -- what was the number for that phone?

5  A.  (479) 313-3951.

6  Q.  And what was the carrier for the phone?

7  A.  Cricket.  I think it's Cricket, yeah.

8  Q.  Were you on a plan of your own, or were you on a

9  plan with your mom, or other family members?

10  A.  For a little bit, I was on my own plan, and then

11  my mom had added it to hers.

12  Q.  Do you know which it was in April of 2022?

13  A.  Just mine.

14  Q.  Okay.  And had you gotten that phone at a store

15  here in Springdale?

16  A.  I had bought it used with Nehemias.  He had gotten

17  a phone and I got a phone.

18  Q.  You say -- did you say you bought it used from

19  Nehemias, or you both --

20  A.  No.

21  Q.  -- bought phones at the same time?

22  A.  We bought phones.  My mom had lent us some money.

23  Q.  Okay.

24  A.  And we went to a shop to buy.  With that money, we

25  split it, and he got the phone that he had at the time



**PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL**
Case 3:23-cv-00714-Liv Document 49 Filed 01/29/24 Page 310 of 2460 PageID 602
**MORENO, EVELYN on 08/02/2023**

30

1  and the phone that I had.

2  Q.  And where were they bought?

3  A.  What was that?

4  Q.  Where were they purchased?

5  A.  Rogers Cellular down here on Sunset.

6  Q.  Rogers Cellular?

7  A.  Uh-huh.

8  Q.  Okay.  Tell me about your relationship to

9  Nehemias Santos.  What was the nature of the

10  relationship?

11  A.  I mean, we had been together and we did everything

12  together.  There was not a moment that we were apart.

13  Q.  How long had the two of you been together?

14  A.  Since 2021.  I would say by the time I maybe

15  graduated.

16  Q.  From high school?

17  A.  Yes.

18  Q.  Okay.  And I guess before I leave the subject,

19  just so I don't forget, that list of things there in

20  front of you, since we have scheduled this deposition,

21  have you had an opportunity to look at that list and

22  just see again if there's anything on the list that

23  you have?

24  A.  I've gone over the list many, many times.  And I

25  wouldn't have anything --



1   Q.   Okay.

2   A.   -- that I could bring to show.

3   Q.   So every -- all of the things that are described

4   on the list, you don't have anything that would be

5   responsive to those?

6   A.   Yeah, that's exactly right, sir.

7   Q.   Okay.  Thank you.  By what name did you usually

8   call Nehemias?

9   A.   Gatio.

10  Q.   Say again?

11  A.   Gatio.

12  Q.   Can you spell that for us?

13  A.   G-a-t-i-o.

14  Q.   G-a-t-i-o?

15  A.   Uh-huh.  It's like "kitty."

16  Q.   Okay.

17  A.   But in Spanish.

18  Q.   It's like Gato, but "Gatio" is like a kitten?

19  A.   It's like, "With love."  (Speaks Spanish).

20  Q.   Okay.  Was that a nickname you gave him, or was

21  that one --

22  A.   Only I called him that.

23  Q.   To others, did Nehemias normally go by his first

24  name, Nehemias?

25  A.   Sometimes.  Or he would mostly be referred to



1  "Gato."

2  Q.  Gato, okay.

3              And I know his surnames were Pivaral

4  Santos.  Did he typically go by just Pivaral, or go by

5  Santos?

6  A.  Mostly just Pivaral.

7  Q.  Okay.  You and Nehemias were never married, were

8  you?

9  A.  Not legally, no.

10  Q.  Do you remember at the scene of the accident

11  there, when the police officer was speaking with you,

12  the lady police officer, there was a time or two when

13  you described him as your husband?  Do you remember

14  saying that?

15  A.  Yes.  We always considered ourselves married.

16  Q.  Okay.  Is that why you told her that?

17  A.  Yes, sir.

18  Q.  But as far as actually getting married in a formal

19  ceremony, you had never done that, had you?

20  A.  No, sir.

21  Q.  You had never obtained a marriage license, had

22  you?

23  A.  No.  We were waiting for his legal documents to

24  come through.

25  Q.  Okay.  Did you have plans to get married once that



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:23-cv-03214-TLB   Document 42   Filed 01/29/24   Page 313 of 2460   PageID 605
33

1    happened?

2    A.  Yes, sir.  He had gotten them, like, two days

3    before the accident.

4    Q.  Do you -- what was your understanding of the

5    documents that he had received a few days before the

6    accident?

7    A.  He got his work permit.  He got his Social

8    Security.  And he finally went to the DMV to get his

9    ID, so he had an Arkansas ID.

10                   MR. BUNT:  Are those in here?

11                   MRS. BUNT:  (Tenders document.)

12   Q.  Let me just show you what has already been marked

13   Exhibit 14 for Erick Gonzalez, 15, and 16.  I know

14   this is his Social Security card at least valid for

15   work purposes, an Arkansas identification card, and

16   then an employment authorization card.

17                   Are those -- if you would, look at those,

18   Ms. Moreno.  Are those the documents that you're

19   speaking of today?

20   A.  Yes, sir.

21   Q.  Do you know of any other cards or documents that

22   he had received as of the time that he passed away?

23   A.  They just said that everything in his case was

24   going good, that he was going to get everything.

25   Q.  Thank you.  And I understand he was maybe waiting



1   on receiving a green card or an actual temporary

2   residency card.  Had he received that yet?

3   A.  I know that he was just -- he was allowed to be in

4   here.  Before I met him, or at least the story that he

5   told me, he was in foster care.  And they just said

6   that they had permitted him to be in here along with

7   his brother, Ivan.

8   Q.  I think he came to the United States with Ivan; is

9   that correct?

10  A.  Yeah, with his little brother, yes.

11  Q.  With his little brother.  And at some point, I

12  believe there was a proceeding where his father,

13  Erick, gained custody over them --

14  A.  Yes.

15  Q.  -- in the U.S.?

16  A.  Yes, sir.

17  Q.  And they were allowed to stay provided they lived

18  with him?

19  A.  Yes, sir.

20  Q.  Okay.  Do you know anything -- it appeared from

21  some of the immigration documents that Mr. White

22  produced that there was at least a time when he may

23  have been the subject of a deportation proceeding.  Do

24  you know anything about that?

25  A.  From him, no.



1  Q.  Okay.

2  A.  He never mentioned any of that.

3  Q.  Never talked about that?

4  A.  No.

5  Q.  Or whether there was a deportation proceeding but

6  it was ended at some point and he was allowed to stay?

7  A.  He was allowed to stay.  And I know that his --

8  his mom signed this paper stating that she gave up her

9  right -- parental rights for both of them.  So they --

10 that's what they said.  He said they needed for them

11 to stay with his dad here.

12 Q.  To stay with his dad here in the U.S.?

13 A.  Yes, sir.

14 Q.  Okay.  Do you know how old Nehemias was when he

15 came to the U.S.?

16 A.  I wouldn't know exactly.

17 Q.  Do you know his date of birth?

18 A.  Yes.  It's August 24th of 2002.

19 Q.  Do you know whether his brother Erick was already

20 in the U.S. whenever he came?

21 A.  I wouldn't know where Erick was at the time.  He

22 always mentioned that he -- he had been in here around

23 the same time, that they had came together.  So that's

24 as far as I know about how long he's been in here.

25 Q.  Okay.  Do you know if at some point Erick went



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0311

1  back to Guatemala while Nehemias and Ivan were still
2  here?
3  A.  I don't know.
4  Q.  Okay.  What do you know about how many years of
5  school Nehemias attended?
6  A.  I know he went to school.  I remember seeing his
7  high school ID.  I know he went for a little bit.  I
8  don't know exactly how long.
9  Q.  Okay.  And I believe his father said he did not --
10  although he did go to school for a time after coming
11  to the United States, he did not finish and graduate
12  from high school here.  Is that your understanding?
13  A.  Yes, sir.
14  Q.  Okay.  And you kind of smiled when you said that.
15  Did his father not allow him to finish?
16  A.  He was made to work.  That's why.
17  Q.  His father wanted him to go to work --
18  A.  To work.
19  Q.  -- in painting?
20  A.  Yes.
21              THE WITNESS:  Can I take a break?
22              MR. BUNT:  Yes.
23              THE VIDEOGRAPHER:  We will go off the
24        record.  The time is 1420.
25              (Recess from 2:20 p.m. to 2:24 p.m.)



Appx_0312

PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:22-cv-00214-KGB Document 42 Filed 01/29/24 Page 317 of 2460 PageID 609          37

```
 1              THE VIDEOGRAPHER:  We are back on the
 2              record.  The time is 1424.
 3  Q.  Ms. Moreno, are you ready to continue?
 4  A.  Yes, sir.
 5  Q.  You mentioned that Nehemias's father expected him
 6  to work, and that was the reason that Nehemias dropped
 7  out of high school.
 8  A.  Yes, sir.
 9  Q.  Did Nehemias object to his father's decision?
10  A.  It was more like pushed onto him and pressured,
11  from what I know.
12  Q.  Do you know whether he ever told his father, "I
13  don't want to drop out of school; I want to finish
14  first"?
15  A.  He said he -- well, at least to me, he said he at
16  least wanted his high school diploma.
17  Q.  Okay.  As to whether he ever told his father that,
18  do you know one way or the other?
19  A.  No, sir.  I never got in the middle of their
20  conversations.
21  Q.  Okay.  Did you -- were you -- when you began
22  dating Nehemias, were you divorced at that point?
23  A.  No, sir.  I had told Nehemias about -- that it was
24  proceeding into a divorce.  So --
25  Q.  Okay.
```



1   A.  -- he understood.

2   Q.  Were you and your husband separated --

3   A.  Yes, sir.

4   Q.  -- at that time?

5                   Okay.  You said you hoped to get

6   married.  Is this -- I'm assuming -- is this the

7   person that is the father of your child?

8   A.  Yes, sir.

9   Q.  Okay.  Do y'all have any specific plans yet to be

10  married, or just something you're hoping for?

11  A.  We have a plan, but just not a date.  That's all.

12  Q.  What is your hoped-for fiancé's name?

13  A.  His name?

14  Q.  Yes.

15  A.  Ricardo Maen.

16  Q.  What's the last name?

17  A.  Maen, M-a-e-n.

18  Q.  M-a-e-n?

19  A.  Yeah.

20  Q.  Okay.  Does he live here in Springdale, also?

21  A.  He lives in Rogers.

22  Q.  Rogers, okay.  And how long have you known

23  Mr. Maen?

24  A.  I met him in June or July of last year.

25  Q.  Okay.  You mentioned also Nehemias being in foster



1  care.  Was he in foster care for a while here in the

2  United States?

3  A.  Yes.  He said it was up in New York.

4  Q.  In New York?

5  A.  Yes.

6  Q.  Did he -- and when he was in New York, did he stay

7  with a family in New York?

8  A.  Yes.  He said that she was a Puerto Rican lady.

9  Q.  And do you know how long he was in foster care?

10  A.  I wouldn't know.

11  Q.  Okay.

12  A.  I just know he said just a few things.

13  Q.  Is it your understanding that he went straight

14  from being in foster care to living with his father?

15  A.  Yes, I believe that's how it went.

16  Q.  Okay.  And do you know whether it was because he

17  was living in foster care that they made whatever

18  effort was necessary to have his mother give up her

19  parental rights so that custody could be granted to

20  his father?

21  A.  I'm not exactly sure how that happened.  I just

22  know it did happen.  I just don't know the order.

23  Q.  Okay.  As far as you know, did Nehemias want to

24  get back down here where his father was rather than

25  living in New York?



1  A.  Yes, he did want to come here with his father.

2  Q.  Okay.  When your license was suspended, do you

3  remember at all how long -- for how long it was

4  suspended?

5  A.  Not very long.  I know it was between -- since I

6  wasn't working full time at the time of it.  I worked

7  part time with my mom.  So I did pay them off within a

8  couple of weeks.

9  Q.  Within a couple of weeks?

10  A.  Yes, sir.

11  Q.  Okay.  Were you able to drive at all during that

12  time?

13  A.  No, sir.

14  Q.  Did your mom drive you around wherever you needed

15  to go?

16  A.  Yes.

17  Q.  I know that Nehemias has one brother Ivan, a

18  brother Erick, and a sister, I think, named Elena?

19  A.  Elena, yes.

20  Q.  Are you aware of any other siblings that he has?

21  A.  By the same dad, no.

22  Q.  Well, let's say maybe beginning by the same father

23  and mother?

24  A.  Oh, no.  Between the same parents, that would be

25  it.



1  Q.  Okay.  And what about -- does he have some

2  stepbrothers or sisters?

3  A.  Yes.  Until -- they count up around eight from his

4  father.

5  Q.  Around eight.  And is that both with his mom, some

6  of them -- are some of them --

7  A.  Eight.

8  Q.  -- he shares a mother and some of them he shares a

9  dad?

10  A.  In total -- so in total, it's eight kids that his

11  dad has.  And I know his mom has one more other than

12  the three -- no, four that she has.  I'm sorry.

13  Q.  Thank you.  To your knowledge, has Nehemias ever

14  had any children?

15  A.  No, sir.

16  Q.  Was he working for his father at the time of the

17  accident?

18  A.  Yes, sir.

19  Q.  Were you -- did you work for his father also?

20  A.  Yes, sir.

21  Q.  What kind of work did you do?

22  A.  The same with Nehemias.  We worked together.

23  Q.  Were you a painter?

24  A.  Yes, sir.

25  Q.  Okay.  How -- well, are you still working for



1   Mr. Gonzalez?

2   A.   No, sir.

3   Q.   When did you last work for him?

4   A.   I think my last employment day was the day of the

5   accident.

6   Q.   Okay.  Is the oral surgery clinic the only job

7   that you have right now?

8   A.   Yes, sir.

9   Q.   Okay.  When you were working for Mr. Gonzalez as a

10  painter, tell me how you were paid.  Were you paid by

11  the hour?  Were you paid by the job?

12  A.   By the hour.

13  Q.   Do you remember how much per hour you were paid?

14  A.   12.50 an hour.  Something like that.

15  Q.   Did you ever work -- did you ever get overtime

16  hours?

17  A.   Yes, sir.  We worked a lot.

18  Q.   And for overtime hours, were you ever paid time

19  and a half?

20  A.   We were paid the same amount depending on how many

21  hours.

22  Q.   Paid the same $12.50?

23  A.   Yes, sir.

24  Q.   Even if you worked over 40 hours in a week?

25  A.   Yes, sir.



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:21-cv-00274-KGB   Document 49   Filed 01/29/24   Page 323 of 2460   PageID 615
43

1  Q.   Okay.  On average, how many hours a week might you

2  work?

3  A.   I would need a calculator real quick.

4  Q.   Let's see.

5          MRS. BUNT:  Here's your phone if that's

6       what you're looking for.

7  Q.   Here is the only calculator I have.

8  A.   Is it per week that you want?

9  Q.   Yes.

10  A.   Okay.  So we would work sometimes 9 to 10 hours a

11  day.  So let's say we worked six -- that's about

12  54 hours a week.

13  Q.   About 54 hours a week, okay.  Thank you.

14          The rings that I see on your fingers, are

15  either of those an engagement ring?

16  A.   No.  This is my 15 ring.  And this is my planning

17  ring --

18  Q.   Okay.

19  A.   -- I guess.

20  Q.   Kind of like a promise ring?

21  A.   Yes.

22  Q.   Okay.  The work that Nehemias did for his father,

23  was it the same type work?

24  A.   We did almost everything the same, except he

25  was -- he knew how to spray, so that was the only



1  thing I was learning when I was on the job but I

2  wasn't allowed to do yet.

3  Q.  How was Nehemias paid, if you know?

4  A.  Same.  We were paid by the hour.  And at the end

5  of the week, we would get paid in cash.

6  Q.  Do you know how much he was paid per hour?

7  A.  Around 14 an hour.

8  Q.  And was he usually -- was he also working

9  approximately 54 hours a week?

10 A.  We also worked together, so we always worked the

11 same hours.

12 Q.  And is 54 hours, is that -- I mean, do you think

13 you got 54 hours every single week, or is that kind of

14 an average, sometimes more, sometimes less?

15 A.  So that would be the total day.  If -- we would

16 mostly not even take our lunch.  We would have, like,

17 a quick little snack, ten minutes, and then go right

18 back into work.  And that's how me and him always

19 tried to maintain it because we liked to do our things

20 with our own money.  And that's how we worked.

21 Q.  Okay.  Was Nehemias allowed to keep his own money?

22 A.  Yes.  We always -- well, at the end, we always put

23 everything together.  But I didn't put exactly what he

24 would spend.  He wouldn't put exactly what I spend.

25 But our, like -- what's it called?  Our totals were



1  never hidden from each other.

2  Q.  I understand.  Did y'all ever open a bank account

3  together?

4  A.  No.  I was the only one with a bank account.

5  Q.  Okay.  But you would kind of pool your monies

6  together, and some things that y'all would do together

7  would come from that?

8  A.  Yes, sir.

9  Q.  But each of you would keep a little bit of your

10  money for separate needs?

11  A.  Yes.

12  Q.  Okay.  The $14 per hour, working an average of

13  around 54 hours per week, do you think that would be

14  pretty accurate for the months -- the weeks and months

15  in 2022 that Nehemias worked up until the time of the

16  accident?

17  A.  Yes, those would be a good average.

18  Q.  Would they be accurate for the year before that,

19  2021?

20  A.  Yes.  I know he worked -- my mom knew him a little

21  longer than I did.  And she would always say that he

22  would come sometimes still in work clothes very late

23  to the store, and she would see how tired he would be.

24  Q.  Okay.  And he had done that work -- had he done

25  that work full time since he finished -- since I guess


Appx_0321

1  he went through tenth grade, after he finished tenth

2  grade in high school?

3  A.  I would guess so.  I don't know.  I wouldn't know

4  when he ended up not going back to school, but I know

5  he worked in that for a while.

6  Q.  All right.  How did you and Nehemias meet?  Was it

7  through work, or did you meet before that?

8  A.  I was just always working in my mom's store; and

9  he lived close to there.  And that's how we met, one

10  Sunday.

11  Q.  Would he come into the store?

12  A.  Yes, sir.

13  Q.  What kind of store does your mom have?

14  A.  It's a Hispanic little grocery store.

15  Q.  So you would work there and he would just come in

16  to buy things, and then y'all would talk?

17  A.  Yes, sir.

18  Q.  Okay.  At some point, did he eventually ask you to

19  date him?

20  A.  We had first become friends.  And just on the

21  first date, we kind of hit it off really good.

22  Q.  Okay.  As for whether there was anything else

23  Nehemias was waiting on for the government officials,

24  is it -- from the immigration officials, I guess, is

25  it your understanding he was still waiting to receive



1   his green card?

2   A.   I don't know when he --

3   Q.   Don't know?

4   A.   -- would get his green card.

5   Q.   Okay.  Do you recall whether there was anything

6   else he was still expecting to receive soon?

7                    MR. WHITE:  Objection to form.  Go ahead

8            and answer.

9                    THE WITNESS:  Oh, okay.

10  A.   I just know he was expecting these (indicating).

11  That was all I knew from that.

12  Q.   Okay.  Did Nehemias ever discuss with you any

13  plans between he and his father to turn the painting

14  business over to Nehemias to where he would operate it

15  after he received documentation?

16  A.   No.  His plan was to start his own, and his dad

17  has his own.

18  Q.   Okay.

19  A.   He never planned to merge them together.

20  Q.   All right.

21  A.   And that's when him and me were going to start our

22  own thing.

23  Q.   Okay.  Did Nehemias ever discuss with you plans to

24  become an electrician or obtain an electrician's

25  license?



1  A.  Not an electrician's license.  I knew he was

2  really good with refrigerators, dryers, washers.  He

3  knew how to fix all of that.  That's also something he

4  learned and he lived off while he worked in Guatemala.

5  Q.  Okay.  Do you know whether he had plans to go into

6  that line of work, open a place for repairing washers,

7  dryers, refrigerators, those type things?

8  A.  That's why he wanted his high school diploma, so

9  he could go to -- not NWACC.  It's the one here by the

10 rodeo.  What do you call that?  I don't remember the

11 name.

12 Q.  Is it like --

13 A.  It's like a trade school.

14 Q.  Is it like a vocational technical school?

15 A.  Yes, sir.

16 Q.  Okay.  He wanted to get his high school diploma

17 and then continue his education at the vocational

18 trade school?

19 A.  Yes, because he knew the job already and he knew

20 he would --

21 Q.  All right.

22 A.  -- excel in it.

23 Q.  Did his father making him quit school kind of

24 derail those plans some?

25 A.  Yes, sir.



**ARKANSAS**
REALTIME REPORTING

**www.ArkansasRealtimeReporting.com**

Appx_0324

```
 1  Q.  Okay.  And then his plan afterwards became that

 2  he -- he or you and he were going to open your own

 3  painting business at some point?

 4  A.  Yes, sir, that was the plan.

 5  Q.  Ms. Moreno, what was the purpose of the trip to

 6  Houston?  I know you told us already that you had

 7  traveled down from Springfield [sic] -- let me just

 8  start there.

 9           As best you remember, on what day did you

10  travel from Springfield down to Houston?

11              MRS. BUNT:  Springdale.

12  A.  Springdale.

13  Q.  I'm sorry.  Springdale, yes.

14              MR. WHITE:  We'll forgive you.

15  A.  It's -- I know it was Friday night --

16  Q.  Okay.

17  A.  -- the day before the accident.

18  Q.  Friday the day before?

19  A.  Yes.

20  Q.  So that would be April 29th?

21  A.  Uh-huh.

22  Q.  And I understand Nehemias and Dina Soto traveled

23  with you; is that correct?

24  A.  Yes, sir.

25  Q.  All right.  What was the purpose of the trip?
```



1  A.  It was just to pick them up.  They were moving

2  here.

3  Q.  Say again?

4  A.  They were moving here to Arkansas.

5  Q.  Okay.  Who was -- who was moving to Arkansas?

6  A.  Melvin and Erick.

7  Q.  All right.  Where were they living at the time?

8            MR. WHITE:  Objection.  I'm going to

9        advise my client not to answer that question

10        and invoke her Fifth Amendment privilege.

11            MR. BUNT:  All right.  She's a United

12        States citizen.  This is not going to

13        jeopardize her --

14            MR. WHITE:  I think that's incorrect.

15            MR. BUNT:  -- her situation.

16            MR. WHITE:  Hypothetically, if she were

17        to admit to transporting individuals who are

18        illegally in the country, that is a federal

19        felony, hypothetically.

20            MR. BUNT:  Okay.

21  Q.  The purpose of your trip was to travel down to

22  Houston to pick up Melvin and Erick; right?

23  A.  Yes, sir.

24  Q.  Okay.  And you've already told us they were

25  traveling or they were moving to Arkansas; is that

1   correct?

2   A.  Yes.

3   Q.  All right.  And I've asked you where they were

4   living prior to that time, and your attorney has

5   instructed you not to answer that question.  Are you

6   willing to answer that question, or are you going to

7   not answer it on your attorney's advice?

8   A.  I'm not going to answer that.

9              MR. BUNT:  All right.  I've got a few

10             more questions, and you can decide, I guess,

11             whether --

12             MR. WHITE:  Uh-huh.

13   Q.  Do you know how long Melvin and Erick had been in

14   Houston?

15   A.  I don't know.

16   Q.  If they testified they had been in Houston since

17   approximately Tuesday or Wednesday or Thursday of the

18   same week, do you know whether that's correct?

19             MR. WHITE:  You can answer that

20             question.

21   A.  Like I said, I had only met them the day that --

22   the day of the accident.  I didn't know where they

23   were living before or where they had been.  I just

24   knew they were moving to Arkansas, that Erick was

25   Nehemias's brother.  And that's all I knew.



1    Q.   Okay.  You first met Melvin and Erick on the day

2    of the accident?

3    A.   Yes, sir.

4    Q.   Okay.  And as to what day they had gone to

5    Houston, you don't know that one way or the other?

6    A.   No.  Nehemias had talked to him -- his brother

7    before, and he said that they were just moving to

8    Arkansas.  And that's all that he ever told me.  And

9    that's all --

10   Q.   Okay.

11   A.   -- whatever.  Like in person, I met Erick that

12   day.  We had all talked on the phone just joking or

13   normal conversation on the phone.

14   Q.   So you had spoken with Erick on the phone

15   before --

16   A.   Yes.

17   Q.   -- at times, but you had not met him face to face

18   until April 30, 2022?

19   A.   Yes, sir.

20   Q.   Okay.  And had you met Melvin at all before?

21   A.   No.  Because Dina was friends with Nehemias.  I

22   wasn't really close to Dina or any of -- any of Dina's

23   friends much less.  So I knew Dina just working with

24   her a few times, but that was all.

25   Q.   Did you know enough about Dina to know that she



1  and Melvin were a couple?

2  A.  That was my understanding.

3  Q.  Okay.

4  A.  Or at least my assumption.

5  Q.  Were you working with Dina in Springdale at the

6  time in April of 2022?

7  A.  We didn't just work in Springdale.  I mean, our

8  jobs would vary where we would work.

9  Q.  Okay.  And, I guess, let me rephrase that.

10          Mr. Gonzalez's home is in Springdale;

11  correct?

12  A.  Yes, sir.

13  Q.  All right.  Does he have a shop or anything where

14  he keeps his paint or supplies, or does he just keep

15  that at his home?

16  A.  He just keeps it at his house.

17  Q.  Okay.  But when you say you would work in other

18  locations, you're meaning you would travel to homes or

19  businesses in a wider area to paint; correct?

20  A.  Yes, sir.

21  Q.  All right.  How long had you been working with

22  Dina Soto?

23  A.  I didn't really see her a lot, but I knew she

24  worked for Nehemias's dad.

25  Q.  And did you -- did you know her well enough to



1  know her by first name?

2  A.  Yes, sir.

3  Q.  Okay.  Did you call her Dina?

4  A.  Well, yes, I believe I would.  I mean...

5  Q.  Okay.  I know that there is also a nickname that

6  some called her by, Yami?

7  A.  Yes.

8  Q.  Did you ever call her by that?

9  A.  Yeah.  Yes.  She would prefer her little nickname.

10  Q.  Okay.

11  A.  But it's just like her sister, just a nickname.

12  Q.  Was Dina living in the United States, or was she

13  living in the Springdale area at that time?

14  A.  Yes, sir.

15  Q.  Do you know how long she had been living --

16  A.  No, sir.

17  Q.  -- in Arkansas?

18  A.  No.  I wouldn't know that.

19  Q.  Do you have any idea how long she had been

20  employed by Mr. Gonzalez?

21  A.  No, sir.

22  Q.  Do you know whether she and Melvin were married?

23  A.  I don't know any of their relationship, sir.

24  Q.  Do you know how long Erick Santos had be living in

25  the U.S.?



1  A.  I don't know.  He would often FaceTime with

2  Nehemias or call.  And, like I said, that was -- the

3  day of the accident was the first day I had met him in

4  person.

5  Q.  Was he also employed as a painter by his father?

6  A.  Now he is, yes.

7  Q.  Okay.  Had you ever spoken with Melvin by phone or

8  FaceTime or anything before April 22nd -- April 30,

9  2022?

10  A.  No, sir.

11  Q.  Okay.  The very first day you met Melvin was that

12  day?

13  A.  Yes.

14  Q.  The day of the accident; correct?

15  A.  Yes, sir.

16  Q.  All right.  And as far as how long he had been

17  living in the United States, do you know?

18  A.  No, sir.

19  Q.  Do you know where he was employed at the time?

20  A.  I don't know anything about him, sir.

21  Q.  And if he said he worked as a painter for

22  Mr. Gonzalez, do you know of him working as a painter

23  for Mr. Gonzalez at any time prior to the accident?

24  A.  I wouldn't know, sir.

25  Q.  Okay.  You didn't see him there working, though;



1  correct?

2  A.  No.  We would all work in different houses.

3  That's how I tell you I saw Dina just a couple times.

4  And Nehemias and I were always together.  You usually

5  send two people per house.

6  Q.  I understand.  And you never worked in a crew with

7  Melvin?

8  A.  No, sir.

9  Q.  And you're not aware of him working in crews with

10 other persons?

11 A.  No, sir.

12 Q.  At least at that time; correct?

13 A.  I wouldn't know anything about him, sir.

14 Q.  I assume -- but you can confirm for me -- that the

15 reason that Nehemias traveled down with you to Houston

16 was to meet and bring back his brother Erick; is that

17 correct?

18 A.  We had picked him up at his friend's house where I

19 assume they were staying and they lived.  So, I mean,

20 I didn't object to anything.  Like I said, I didn't

21 know where he lived before or anything.

22 Q.  Did you -- did you know, Ms. Moreno, when you and

23 Nehemias and Dina made the trip down to Houston, that

24 you would be bringing back Erick and Melvin?

25 A.  That was the plan, to pick them up.



1  Q.  That was the plan?

2  A.  Yes, just to bring them here.

3  Q.  Okay.  And it was just to be a down-and-back trip,

4  you traveled down on Friday and come back on Saturday;

5  correct?

6  A.  Yes, sir.

7  Q.  All right.  Did y'all spend the night anywhere?

8  A.  No, sir.

9  Q.  Did you just drive all night and --

10  A.  Yes.  I eventually was able to sleep a little bit

11  whenever we got to the -- to Erick's friend's house.

12  So --

13  Q.  Okay.

14  A.  I rested a little bit, and then we just made our

15  way back.

16  Q.  So you drove pretty much all day, late into the

17  night, and then slept a little bit at Erick's friend's

18  house before you all turned around and headed back?

19  A.  Yes, sir.

20  Q.  Did you take with you, Ms. Moreno, a bag, a

21  backpack, a suitcase or anything with a change of

22  clothes or toiletries?

23  A.  No.  I mean, it was a pretty simple trip that it

24  was, so I just -- I didn't bring anything.

25  Q.  Didn't bring any clothes at all or anything to



1  change into?

2  A.   I -- we -- we had just stopped at gas stations.

3  And everything we needed was in gas stations, the

4  bathroom.   We never thought of anything else.

5  Q.   Okay.   Do you know whether Nehemias or Dina

6  brought any kind of bag with a change of clothes or

7  toiletries, toothbrushes, et cetera?

8  A.   No.   Just, you know, like a woman, Dina carried

9  her purse, like, I imagine her personal wallet and

10 everything.

11 Q.   Do you remember, after picking up Erick and

12 Melvin, whether they had suitcases or bags of clothes?

13 A.   Just, yeah, the bags of clothes that they had.   I

14 mean, they were living with their friend, or at least

15 I would assume they lived with their friend.   So....

16 Q.   Do you remember what they were carrying them in?

17 A.   No, I don't remember.

18 Q.   Do you know whether it was like a suitcase or a

19 backpack or just a plastic bag or anything?

20         MR. WHITE:   Objection.   Asked and

21         answered.   Go ahead and answer.

22 A.   Probably just a backpack that I remember Erick

23 having, a small backpack.

24 Q.   Do you know where in the car they placed -- where

25 in the car Erick placed his backpack?



1   A.   I wouldn't remember.

2   Q.   Okay.  Do you remember anyone putting any clothes,

3   any bags or backpacks or anything in the trunk of the

4   car?

5   A.   Not that I remember, sir.

6   Q.   So, Ms. Moreno, the car that you were driving that

7   day was -- if I understand, is a 2011 Toyota Corolla?

8   A.   Camry.

9   Q.   Camry, you're right.  It's a Camry.  I think I

10  knew that.  And it's a four-door sedan; correct?

11  A.   Yes, sir.

12  Q.   Okay.  And is your mother, Gladys Sandoval, the

13  owner of the car?

14  A.   Yes, sir.

15  Q.   Was that a car that you normally used, or was it

16  your mom's car and you were just borrowing it?  What

17  was the --

18  A.   I normally used that car.  It was for me to get

19  anywhere.  It was my 18th-birthday gift.

20  Q.   Okay.  Was it still titled in your mother's name

21  even if she had given it to you?

22  A.   Yes, sir.

23  Q.   Okay.  But she actually gave it to you for your

24  18th birthday?

25  A.   Yes, sir.



1   Q.   Do you -- do you know how long your mother had
2   owned the car?
3   A.   She got the car just for me.  So --
4   Q.   When you turned 18?
5   A.   Yeah.  It would be -- I remember her getting it
6   that summer for me.  And we never used it.  We had it
7   parked in front of our house --
8   Q.   Okay.
9   A.   -- until I turned 18.
10  Q.   So she got it the summer before your 18th
11  birthday?
12  A.   Yes, sir.
13  Q.   Okay.  The wheels that were on the Toyota Camry,
14  as far as you know, were those the same wheels that
15  were on the car the entire time that your mother owned
16  it and after she gave it to you?
17  A.   No, sir.  You change out the tires.  So equipment,
18  something would be damaged, I would change it right
19  away.
20  Q.   Okay.  And let me stop you there for a moment.
21  Because I'm not quite talking about the tires yet, but
22  I will ask you about the tires.  The actual wheels
23  that the tires go on, as far as you know, were those
24  the original wheels that the car had?
25  A.   Oh, like the tire rim?



1  Q.  The rims, yes.

2  A.  Yes, they were always with the car.

3  Q.  Okay.  And since your mother had purchased the

4  car, would that have been 2021 when she purchased the

5  car for you?

6  A.  No.  It would have been --

7  Q.  2020?

8  A.  -- 2020.

9  Q.  Okay.

10  A.  Yes.

11  Q.  Summer of 2020?

12  A.  Yes.

13  Q.  Since the summer of 2020, had you ever changed --

14  replaced the tires on the car?

15  A.  The actual tires, yes.

16  Q.  Okay.  Do you know if the tires had been replaced

17  only one time, or more than one time?

18  A.  I couldn't keep -- I wouldn't be able to keep

19  count of all the times I changed the tires.

20  Q.  All right.  Whenever the tires would be changed,

21  would they be replaced with new tires, or were they

22  sometimes replaced with used tires?

23  A.  Normally new tires.  We -- they get worn out,

24  really quickly used.

25  Q.  Do you think you changed the tires more than one



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:23-cv-00271-LC Document 42 Filed 01/29/24 Page 342 of 2460 PageID 634
62

1   time between the summer of 2020 -- summer of 2020 and

2   April of 2022?

3   A.  I changed about one or two.  And it's because I

4   worked in construction.  You weren't -- you never know

5   where you drive over a nail or something and pop a

6   tire.

7   Q.  Okay.

8   A.  Or just (indicating).

9   Q.  Are you saying you just changed one or two tires,

10  or are you thinking you changed all the tires one or

11  two times?

12  A.  No, just the ones that would be damaged at the

13  time.

14  Q.  Okay.  The one that ultimately blew out, which was

15  on the front left corner, the driver's-side corner, do

16  you know if it had ever gone flat before?

17  A.  No.  We always tried to keep -- well, we tried to

18  keep maintenance of our tires.

19  Q.  My question, though, is:  Do you know whether that

20  one had ever gone flat before?

21  A.  I don't think so, sir.

22  Q.  Okay.  Ms. Moreno, let's go to the day of the

23  accident.  As best you remember, what time of the

24  morning -- or what time that day did all of you leave

25  Erick's friend's home in Houston?



1   A.  I couldn't remember the time exactly.  I know it

2   was just hot.  I mean, maybe around the middle of the

3   day --

4   Q.  Middle of the day?

5   A.  -- would be my best assumption.

6          MR. BUNT:  Let's go off the record for

7        just a second.  We're picking up some --

8          THE VIDEOGRAPHER:  Off the record.  The

9        time is 1501.

10        (Recess from 3:01 p.m. to 3:03 p.m.)

11         THE VIDEOGRAPHER:  We are back on the

12        record.  The time is 1503.

13   Q.  Ms. Moreno, I think before we took that really

14   brief break you were telling us that you sort of

15   thought maybe that you left Houston kind of in the

16   middle of the day?

17   A.  Yes, sir.

18   Q.  Okay.  And did you drive anywhere else other than

19   just leaving Houston and getting on the interstate and

20   heading towards Dallas?

21   A.  We just got tacos to eat.  That was it.

22   Q.  Okay.  So you made a little stop for lunch

23   somewhere for tacos?

24   A.  Yeah.

25   Q.  Do you remember where that was or in what town?



1   A.  I wouldn't remember, sir.

2   Q.  Okay.  The friends in Houston, the name that

3   Melvin and Erick have given us is a man named

4   Oscar Zamora.  Do you remember if that's the name of

5   the man's home at which you picked him up?

6   A.  I didn't know the guy.  I just knew he was Erick's

7   friend.

8   Q.  Okay.  So you don't know who Mr. Zamora is?

9   A.  No, sir.

10  Q.  Were you the one that was driving?

11  A.  Yes, sir.

12  Q.  And as far as the route that you were taking, were

13  you just following the way the GPS suggested you

14  should go?

15  A.  Yes, sir.

16  Q.  As far as you know, was it the same route that you

17  had taken to come down to Houston the day before?

18  A.  I believe so.  I mean, it would have been.

19  Q.  And you were the only driver; no one else drove

20  your car; correct?

21  A.  Yes, sir.  I'm the only one with a license.

22  Q.  Had you ever -- had you ever taken that route

23  before?  I know you possibly took it the day before

24  coming down.  But other than that, had you ever driven

25  that route from Houston back to Springdale before?



1  A.  I had never gone to Texas at all, sir, before.

2  Q.  Okay.  Ms. Moreno, I think the answers to these

3  are "no," but I have to ask you anyway.  Either before

4  the drive that day or at any time during the drive

5  that day, had you consumed any alcoholic beverages?

6  A.  No, sir.

7  Q.  Had anyone else in the car done so?

8  A.  No, sir.

9  Q.  Had you taken any kind of drugs or medication that

10 would in any way affect your driving that day?

11 A.  No, sir.

12 Q.  To your knowledge, had Nehemias consumed any

13 alcoholic beverages that day?

14 A.  No, sir.

15 Q.  Had he taken any kind of drugs, whether illegal

16 drugs, prescription drugs, or over-the-counter that

17 day that you're aware of?

18 A.  No, sir.

19 Q.  All right.  I'm going to ask you about the

20 accident in just a moment.  But whenever you were

21 still working for Nehemias's father, did you ever

22 receive a -- like a W-2 that would tell what your

23 wages had been the previous year?

24 A.  He never sent that to me.

25 Q.  Okay.  Were you always just paid in cash?



1    A.  Yes, sir.

2    Q.  To your knowledge, was there any withholding from

3    your paycheck for taxes or any kind of other

4    withholdings like Social Security or Medicare,

5    anything like that?

6    A.  I didn't work for him very long.  So maybe just

7    end of December to that very last day in April.

8    Q.  So you only worked for him from end of

9    December 2021 --

10   A.  Uh-huh.

11   Q.  -- through April 2022?

12   A.  Yes, sir.

13   Q.  Okay.  But, to your knowledge, you were just paid

14   cash, and no withholding was made from that --

15   A.  Yes, sir.

16   Q.  -- from the payments; correct?

17   A.  Yes.

18   Q.  Okay.  When you were traveling on the highway back

19   on your way back, what was the weather like that day?

20   A.  Bright.  Sunny.

21   Q.  Okay.

22   A.  Hot.

23   Q.  How was the traffic?

24   A.  It was very light.

25   Q.  Light traffic?



Appx_0342

1  A.  Yes, sir.

2  Q.  So when you say "light traffic," meaning not

3  seeing that many cars around you?

4  A.  Yes, sir.

5  Q.  The highway, at least at the location where the

6  accident occurred, has three lanes going the same

7  direction, and I think three lanes across the concrete

8  barrier going back south.  But of the three northbound

9  lanes, was there a lane that you were normally

10  traveling in that day?

11  A.  Just mostly the middle and the left lane.

12  Q.  Mostly in the middle or left lane?

13  A.  Yes, sir.

14  Q.  Do you know or recall approximately what speed you

15  were driving that day?

16  A.  I couldn't remember.

17  Q.  Do you have -- does that car have cruise control?

18  A.  Yes, it does, sir.

19  Q.  Do you ever use it?

20  A.  Yes.  Whenever it's like a light road like that, I

21  usually turn it on.

22  Q.  Do you think you would have been using cruise

23  control that day?

24  A.  I might have used it throughout the day, just to

25  relax my feet a little bit.



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

1  Q.  Whenever you used cruise control on an interstate

2  highway like that, especially if there's not so much

3  traffic that you have to be stopping a lot but you can

4  kind of continue moving, where would you normally set

5  the speed of the cruise control?

6  A.  Around 65 or 70, at least -- well, at least here,

7  on the speed, that's what it is.

8  Q.  Okay.  I think the speed limit in that area was

9  75 miles per hour.  Would you have set it closer to

10  whatever the speed limit was?

11  A.  I would have probably put it 70 then.

12  Q.  You would have probably put it at 70?

13  A.  Yes.  I just try to -- at least from all my

14  tickets that I try to stay under.

15  Q.  Okay.  The cars around you, were you all going,

16  for the most part, around the same speed, or were a

17  lot of cars passing you?  Were you passing a lot of

18  cars?  What do you remember about that?

19  A.  Not that many cars were speeding.  We were all

20  kind of in the same travel-buddy-type situation.

21  Q.  So kind of going with the flow?

22  A.  Yes, sir.

23  Q.  Okay.  Were you planning to drive all the way back

24  to Springdale that day?

25  A.  Yes, sir.  It was the initial plan.  I mean, we



Appx_0344

1  didn't want to spend that much money staying anywhere
2  else.
3  Q.  Okay.  So your plan was not to stop in Dallas or
4  anywhere in Oklahoma, but just get all the way on home
5  that night?
6  A.  Yes, sir.
7  Q.  Okay.  Did you end up spending -- I know after the
8  accident happened you were detained there.  But did
9  you end up spending the night anywhere at any point
10  later that day?
11  A.  No, sir.  I was picked up by my stepdad and my
12  mom, and they drove me.  I couldn't drive my car back.
13  Q.  Okay.  And you had driven down the day before;
14  correct?
15  A.  Yes, sir.
16  Q.  Do you know approximately what time you had left
17  the day before -- had left Springdale or Rogers the
18  day before to come down?
19  A.  I don't remember, sir.
20  Q.  Is this a trip that y'all had been planning to
21  make?
22  A.  Yes, sir.  Once we were told that they were ready
23  to come -- or at least come up here, that that's when
24  we would go.  But Nehemias and I were on a date that
25  night, and he just told him, "Come pick me up; I'm



Appx_0345

1  ready to go with you now."  And that's what we did.

2  Q.  Are you saying Erick called and said, "I'm ready

3  to be picked up"?

4  A.  Yes.

5  Q.  He called Nehemias?

6  A.  Yes.  He said he had packed everything.

7  Q.  Approximately how many days before you actually

8  left to go pick him up did he call?

9  A.  He knew in just those few days that he would be

10  ready when -- in those days.

11  Q.  And so when you say "a few days," are we

12  talking --

13  A.  In the days that he would pack up his things and

14  come.

15  Q.  Okay.  And you say "a few days."  Are we talking

16  more than a week, less than a week?

17  A.  No, sir.  Just that week.

18  Q.  That week?

19  A.  Yes.

20  Q.  So it was sometime earlier that week --

21  A.  Yes, sir.

22  Q.  -- that he had called?  Okay.  But you don't

23  remember exactly how many days?

24  A.  No, sir.

25  Q.  Tell me about the tire failure.  What did you --



1   what happened?  What did you feel when that occurred?
2   A.  I was -- I was just driving normally.  And I just
3   felt something -- something, like, shook the car, and
4   I got the alert that something was wrong with the
5   tire.  And I felt just the shaking of the car.  I
6   couldn't really move it.  I just tried to get it to
7   the near -- the nearest I could to be able to change
8   the tire as quickly as I could.
9   Q.  Were you traveling in the middle lane whenever the
10  tire blew out?
11  A.  No, sir.  I was in the left lane.
12  Q.  In the left lane.  Do you know what your speed was
13  approximately at the time?
14  A.  No, sir.
15  Q.  Would the cruise control probably have been on at
16  the time?
17  A.  I didn't have it on at that time.
18  Q.  Are you sure of that?
19  A.  Yes, sir.
20  Q.  Okay.  How are you sure that you didn't have it
21  on?
22  A.  I had wanted to drive.  I had just taken it off
23  prior to the last stop that we had made at a gas
24  station.  So I was just mostly wanting to drive.
25  Q.  Okay.  So whenever -- first of all, had you ever



1  been in a car before, as a driver, whenever a tire

2  blew out?

3  A.  No, sir.

4  Q.  That was the first time?

5  A.  That was my first time.

6  Q.  Okay.  So tell me exactly what you did once you

7  realized that -- did you know right away that it was a

8  tire?

9  A.  No, sir.

10 Q.  Okay.  What did you think it was?

11 A.  I didn't know what it was exactly.  I just knew my

12 car alerted that something was wrong with the tire.

13 Q.  Okay.

14 A.  I know the highway has, like, a whole bunch of

15 little holes sometimes.  I didn't know if I had, like,

16 hit that, or if it was just a reaction to the car like

17 that.  So I just tried to -- the car was shaking.

18 Q.  The car was shaking?

19 A.  Yes.

20 Q.  Okay.  At that point in time, did you make a

21 decision that you needed to get the car off the road?

22 A.  I tried to get it as near off the road as I could.

23 Q.  Okay.  Did you have any discussion at all with

24 Nehemias or anyone else about whether you should pull

25 the car off the road?



1   A.  To change the tire, yes, that -- once we realized

2   it was the tire.

3   Q.  Okay.  What was said, as best you remember?

4   A.  We need to change the tire quickly.

5   Q.  Okay.  Is this while you're still in the car

6   before you had pulled off the road?

7   A.  No.  It was -- well, yeah, it was once I was like

8   that (indicating) with the car.  And we all stepped

9   out and saw that the car --

10  Q.  Okay.

11  A.  -- was on the floor.

12  Q.  But before you stopped and before everyone got

13  out, and you're still in the car and on the road but

14  you're feeling the car shaking and something has

15  happened, was there some communication between you and

16  Nehemias about -- did you say, "I need to get the car

17  off the road"?  Did he say, "You need to get the car

18  off the road"?  Anything like that?

19  A.  I just told him there was something wrong with the

20  car.

21  Q.  Okay.

22  A.  That was it.

23  Q.  Was there any discussion at all about whether you

24  should pull the car off the road to the left side or

25  to the right side?



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0349

1  A.  No, sir.

2  Q.  What went through your mind about where you should

3  stop the car?  I guess I'm assuming at this point you

4  realized, "I need to stop the car and try to get it

5  off of the road."  Am I right?

6  A.  Yes, sir.

7  Q.  All right.  What, then, did you decide about where

8  you would try to stop the car?

9  A.  To the nearest area I could.  So my instinctive

10 thought was just try to get to the left.  Because I

11 was already on the left.  I wouldn't have made it to

12 the right.

13 Q.  Did you -- do you recall activating a turn signal

14 at any time to show that you would be going left or

15 right?

16 A.  Yes, sir.  I turned my emergency lights on.

17 Q.  You turned your emergency lights?

18 A.  Yes, sir.

19 Q.  Okay.  Other than your emergency lights, did you

20 turn on a turn signal?

21 A.  No, sir.  There was not cars behind me.

22 Q.  No cars behind you?

23 A.  No.  Exactly behind me, no.

24 Q.  Okay.  Were there any cars to your right?

25 A.  I wouldn't remember exactly.  But I'm --



1 Q.  Not sure?

2 A.  Yes.

3 Q.  Okay.  Don't remember any specifically being

4 there, though?

5 A.  No.

6 Q.  Ms. Moreno, did you think at all about pulling the

7 car off to the right side of the roadway as opposed to

8 the left side?

9 A.  I probably would have if I was more on the right.

10 But I didn't think I would have made it with the car

11 -- with it being on the floor.

12 Q.  So you made -- because you thought the left was

13 better, you didn't make an attempt to move over to the

14 right; correct?

15 A.  Yes, sir.

16 Q.  Did not engage your turn signal to show that you

17 might be changing lanes going over to the right?

18 A.  I didn't turn any turn signal on, sir.

19 Q.  When you were studying for your driver's license

20 and you read the book that was online and were

21 preparing for the test, did you remember anything that

22 you were taught about what you should do if you

23 experienced a flat tire while driving down the road?

24 A.  I wouldn't remember, sir.

25 Q.  Okay.  So at the time this happened, nothing



1  specific came to mind other than just try to get off
2  the road as quickly as possible?
3  A.  Yes, sir.
4  Q.  Would you agree with me that the safest thing to
5  do is to try to get the car off of the roadway?
6  A.  Yes, sir.  This accident has taught me that, no
7  matter what, just go to the right.
8  Q.  You mentioned -- and Ms. Moreno, I know this is
9  hard to talk about, and I'm not trying to make it
10  difficult.  Do you want to take a break --
11  A.  Yes, sir.
12  Q.  -- right now?  Okay.  Sure.
13          THE VIDEOGRAPHER:  We'll go off the
14       record.  The time is 1522.
15          (Recess from 3:22 p.m. to 3:25 p.m.)
16          THE VIDEOGRAPHER:  We are back on the
17       record.  The time is 1525.
18  Q.  Ms. Moreno, are you ready to proceed?
19  A.  Yes, sir.
20  Q.  If at any time like that you need to take a break
21  or want to take a break, you just let us know.  Okay?
22  A.  Okay.
23  Q.  I know this is a difficult subject.  You made the
24  comment that if anything this accident has taught you,
25  it is next time just to try to get all the way off the



1 road to the right; is that what you said?

2 A. Yes, sir.

3 Q. Looking back now, do you believe that that's

4 something you might have been able to do if you had

5 just simply thought to do it and made an attempt to do

6 it?

7 A. I just did what I felt, which was my first

8 instinct just to get as off as I could and the

9 nearest, as I understood something was wrong with the

10 car. I didn't know exactly. I knew it had something

11 to do with the tires.

12 Q. Right. But if you now know or have learned to try

13 to get the car off to the right side of the road, I'm

14 just asking you: Looking back, do you think perhaps

15 maybe you would have been able to do that if you had

16 thought to do it at the time?

17 A. Yes, sir. And I mostly now drive on the right

18 side of the road. So I don't even try to go to the

19 left.

20 Q. Okay. When the tire blew out, the engine itself

21 didn't die or anything; correct?

22 A. No. Just the car started shaking.

23 Q. The car was shaking?

24 A. And I didn't -- I didn't know what was wrong with

25 the car. I just pulled it over.



1  Q.  Okay.  I'm going to show you some photographs.

2            MR. BUNT:  We can take these back;

3       right?

4            MRS. BUNT:  Uh-huh.

5  Q.  And let me tell you in advance I am not going to

6  show you any photographs of Nehemias.

7  A.  Okay.

8  Q.  There are some photographs taken, but I just sort

9  of want to ask you about the car and where the car was

10 located.  And we will talk about the accident, but I

11 didn't include any photographs that showed Nehemias in

12 here.  But they do kind of show where the car was

13 positioned and so forth.  And specifically, I'm

14 referring to Exhibits 3 through 8, which I believe

15 were taken there at the scene.  And then I think

16 Exhibit 9 and Exhibit 10 may have been taken later --

17            (Exhibit 3, Exhibit 4, Exhibit 5,

18       Exhibit 6, Exhibit 7, Exhibit 8, Exhibit 9,

19       Exhibit 10 marked for identification.)

20 A.  Yeah.

21 Q.  This one may have been taken there at the scene,

22 though.

23 A.  Yes, sir.

24 Q.  But I think 9 and 10 were taken when the car was

25 inspected at the court reporter's office here a month

1  or so ago.

2  A.  Yes, sir.

3  Q.  Okay.  After you had gotten the car to a complete

4  stop, as best you remember, what happened next?

5  A.  We were just trying to look for the tools to

6  change the tires.  And we had pulled out the spare

7  tire.  And we were just mostly just looking for one

8  part.

9              (Exhibit 2 marked for identification.)

10 Q.  And let me stop you for just a moment.  Before we

11 get too further along on those things, let me just ask

12 you:  Would you agree with me, looking at these

13 photographs, Exhibit 2 -- we'll start looking at 2 and

14 3 which are a frontward view, and then 4 which is a

15 rearward view -- that when the car came to a complete

16 stop, it was partly on the left emergency shoulder but

17 also partly in the lane of travel?

18 A.  Yes, sir.

19 Q.  Were you aware of that at the time the car was

20 stopped?

21 A.  Yes, sir.  But we were trying to move everything

22 quickly.

23 Q.  Okay.  Did you intentionally stop the car in that

24 position for a particular reason?

25 A.  We just -- we needed space to change the tire.



1  Q.  Okay.  So you were wanting to allow enough

2  clearance between the car and the concrete barrier

3  over here to change the tire?

4  A.  Yes, sir.

5  Q.  All right.  And so when you made the decision to

6  go ahead and stop, you were aware, then, that the car

7  was at least partly in the travel lane?

8  A.  Yes, sir.

9  Q.  Okay.

10  A.  But we were trying to hurry.

11  Q.  Did you and Nehemias discuss that at all, anything

12  said about, "Hey, we're a little bit in the lane of

13  travel, so we need to hurry," or, "We need to be

14  careful," or anything like that?

15  A.  Yes, sir.  We were -- that's why we were trying to

16  hurry.

17  Q.  Tell me what you remember being said.

18  A.  He just said to stay out.  He was telling

19  everybody to stay out of the road and just to -- for

20  his brother to help him change the tire quickly so we

21  could move along.

22  Q.  Did you exit the car as soon as it came to a stop?

23  A.  Yes, sir.

24  Q.  All right.  Did you exit through the

25  driver's-side --



```
 1   A.   Yes, sir.

 2   Q.   -- door in the front seat?

 3   A.   Yes.

 4   Q.   Okay.  And I believe I understand that Nehemias

 5   was sitting in the front seat with you --

 6   A.   Yes, sir.

 7   Q.   -- on the passenger side?

 8   A.   Yes, sir.

 9   Q.   Do you know which door he exited the car from?

10   A.   The same door.  The passenger door.

11   Q.   Okay.  The passenger-side door on this side?

12   A.   Yes, sir.

13   Q.   Do you know if, when he exited the door, he looked

14   to see whether traffic was coming?

15   A.   Yes, sir.

16   Q.   Okay.  As best you could tell, did he make certain

17   it was safe for him to exit before he opened the door

18   and got out?

19   A.   Yes, sir.

20   Q.   All right.  The other three passengers in the

21   backseat, Erick and Melvin and Dina, did they get out

22   of the car at that time?

23   A.   I don't remember, sir.  I just remember him and I

24   got out and checked which tire it was.

25   Q.   Okay.  You were out of the car, Nehemias was out
```



1  of the car; correct?

2  A.  Yes, sir.

3  Q.  Was Erick out of the car?

4  A.  Eventually, yes, everybody got out of the car.  I

5  don't know --

6  Q.  Okay.

7  A.  -- exactly at what time.

8  Q.  All right.  At first, was it just you and

9  Nehemias?

10  A.  Yes, sir.

11  Q.  And did y'all --

12  A.  And then Erick.

13  Q.  Did y'all look to see which tire it was and what

14  was wrong with it?

15  A.  Yes, sir.

16  Q.  Okay.  And then tell me what you remember after

17  that.

18  A.  Just Nehemias telling Erick to help him change the

19  tire quickly.

20  Q.  Okay.  And at that point in time, did Erick get

21  out of the car?

22  A.  Yes, sir.  Erick and Dina and Melvin had gotten

23  out.

24  Q.  Okay.  Are you certain at that point in time that

25  everybody had gotten out of the car?



```
 1   A.  Yes.  They had stepped out near the concrete
 2   barrier.
 3   Q.  Okay.  Did y'all -- before starting trying to
 4   change the tire, did you call anybody who might be
 5   able to come and help?
 6                    MR. WHITE:  I think your Zoom may have
 7              just disconnected.  I'm sorry to interrupt.
 8                    THE VIDEOGRAPHER:  No, no, it's still
 9              there.  A pop-up came up.
10                    MR. WHITE:  My apologies.
11   Q.  Just out of curiosity, did anybody try to call
12   anyone to come and help?
13   A.  We didn't know anybody in the area to come to call
14   help.
15   Q.  Okay.  Did -- who made the decision to change the
16   tire?
17   A.  Nehemias did.
18   Q.  Okay.  And did Nehemias take the lead in getting
19   the tire changed?
20   A.  Yes.  He always was assured -- if something
21   happened with the car, he always took charge of it.
22   Q.  Had -- had you ever changed a tire on this car
23   before?
24   A.  No, sir.  But I know all the tools that the car
25   carries to change the tire.
```



**PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL**
Case 3:23-cv-00271-DPM Document 42 Filed 01/29/24 Page 364 of 2460 PageID 656
**MORENO, EVELYN on 08/02/2023**

84

1 Q. Okay. Have you changed a tire on any other car

2 before?

3 A. No, sir.

4 Q. But you knew the tools that this car had?

5 A. Yes, sir.

6 Q. And tell me, how did you know about the tools in

7 the car?

8 A. I had seen -- I had told Nehemias to change my

9 tires before, or at least one so I could learn. And,

10 well, I just never was able to do it.

11 Q. Okay. So you had had him change the tires on your

12 car before?

13 A. On, like, if I had gotten a flat, yes, we

14 always -- he was the one who always changed it.

15 Q. So he had changed a tire on this car before?

16 A. Yes, he had.

17 Q. Okay. And you had watched him do that?

18 A. Yes, sir.

19 Q. Okay. Had you helped him any?

20 A. Pull out the tools.

21 Q. Pull out the tools?

22 A. Yes, sir.

23 Q. Do you remember what tools are needed to change a

24 tire on this car?

25 A. Yes. You need the thing that lifts up the car.



1 Q.  And I think we probably can call that a jack?

2 A.  Yes.

3 Q.  And are you talking about -- let's see -- talking

4 about this tool here?

5 A.  Yeah, the jack.  And then that --

6 Q.  And then the little extension rod that goes into

7 the jack?

8 A.  You turn it so you could lift it.

9 Q.  Kind of crank it like that?

10 A.  Uh-huh.

11 Q.  Okay.

12 A.  But the part that we were looking for was the

13 actual little lock that unlocks the nugs [sic] to the

14 tires.

15 Q.  And what did you call it?

16 A.  It's like a little nug thing, it's like an L.

17 Q.  It's an L-shaped tool?

18 A.  L-shaped.

19 Q.  Is it -- is it like a lug wrench?

20 A.  Yeah, it has, like, a little circle tube, and you

21 stick it on the nugs and turn it to unlock the nugs.

22 Q.  Did this car, to your knowledge, have any lock

23 nuts?  And by that, meaning -- when I'm talking about

24 the lock nuts, I'm talking about the nuts that hold

25 the wheel onto the bolts there when you put the wheel



1  on.  Are you familiar with the bolts that stick out --

2  A.  Uh-huh.

3  Q.  -- from the wheel?  And then the nuts screw on to

4  hold the wheel tight on the rim?

5  A.  Uh-huh.

6  Q.  Or not the rim, but the -- can't think of what

7  that's called at the moment.

8  A.  (Speaking Spanish.)

9  Q.  Excuse me?

10  A.  (Speaking Spanish.)  Like the nails --

11  Q.  Okay.

12  A.  -- that put it together.

13  Q.  Did this car have any nuts that require a -- like

14  a key?  Sometimes there will be five lug nuts, but one

15  of those lug nuts is locked on there and you have to

16  have a special key to get it off.  Do you know if

17  anything like that was on this wheel?

18  A.  I just know it has the little tool to uncrank

19  them.

20  Q.  Okay.  And the tool that you're talking about that

21  fits onto the lug nuts and then you crank it to

22  unscrew them, I think is called a lug wrench.  Does

23  that sound right?

24  A.  That, yes.

25  Q.  All right.  Erick Santos discussed the fact that



1  Nehemias attempted to remove this wheel with some

2  wrench, but that it didn't really fit onto the lug

3  nuts.  Do you remember anything about that?

4  A.  The car only has one.

5  Q.  It only has one?

6  A.  And we couldn't find it.  That's what we were in

7  the trunk looking for.

8  Q.  Okay.  So the tools that are needed, then -- let

9  me just ask you if we're on the same page here.

10  You'll need the jack to go up underneath the car;

11  right?

12  A.  Yes, sir.

13  Q.  And then you'll need this -- this extension rod

14  here or extension wrench, whatever you want to call

15  it; and it kind of fits up in the jack and lets you --

16  A.  Turn it.

17  Q.  -- crank it -- turn it to crank the jack up or

18  down; right?

19  A.  Yes, sir.

20  Q.  Okay.  Besides those two, there will be a lug

21  wrench that will fit onto the lug nuts to take the

22  wheel off?

23  A.  Yes, sir.

24  Q.  Okay.  And is it your testimony that, as best you

25  remember, there's only one that is needed on this car?



1  A.  Yes, sir.

2  Q.  Okay.  And once that wrench is located, you can

3  get all of the lug nuts off and then take the wheel

4  and tire off?

5  A.  Yes, sir.

6  Q.  Okay.  Do you know where -- first of all, the jack

7  and the jack wrench or rod, do you know where that was

8  stored?

9  A.  In the trunk.

10  Q.  Okay.  Was it stored -- do you know where in

11  relation -- let me ask you this:  Where was the spare

12  tire stored?

13  A.  It's under, like, the carpet.

14  Q.  Okay.  You have to lift up some carpet, and it's

15  down there?

16  A.  Yes, sir.

17  Q.  So the jack and this extension rod for the jack,

18  where in the trunk is it located?

19  A.  It would be -- it's also under the carpet, but

20  it's in this little compartment.

21  Q.  Okay.

22  A.  Can I show you?

23  Q.  I know we have -- let's see -- a picture of the

24  truck.

25  A.  It's, like, the little compartment down here.



1   Q.   So it's sort of off to the side?

2   A.   Yes, sir.

3   Q.   And the tire, it's completely inside the trunk

4   under the carpet; right?

5   A.   It's right under here.

6   Q.   Not one of those that you sometimes see that's

7   stored up underneath a car and you have to crank and

8   lower it down?  You just lift up the --

9   A.   The carpet.

10   Q.   -- the carpet?

11              Is there a nut or something on top like a

12   wing nut that has to be unscrewed to loosen it?

13   A.   Yes, sir.

14   Q.   And do you know, this lug wrench, then, that would

15   have been needed to remove the wheels from the car --

16   I guess we need to go back this way -- do you know

17   where that is stored in the car?

18   A.   In the same compartment with the -- with all the

19   rest of the tools.

20   Q.   Okay.  When these tools were taken out of that

21   compartment, did you see that wrench there?

22   A.   We didn't see it.  That's why we were in the back

23   looking.

24   Q.   Okay.  Did you ever find it, to your knowledge?

25   A.   To my knowledge, I don't know.  Right after the --



1  like I said, I was put in the ambulance, so I didn't

2  see how they changed the tire at the end.

3  Q.  As of the time the accident happened, had you

4  found the wrench, or were y'all still looking for that

5  at the time the accident happened?

6  A.  We were still looking for it.

7  Q.  Okay.  Who did the work to try to change the tire?

8  A.  Nehemias.  And Erick was trying to help.

9  Q.  Okay.  Did -- at any time, did Melvin or Dina get

10  involved in that?

11  A.  No, sir.

12  Q.  Okay.  What were Melvin and Dina doing after they

13  got out of the car, as far as you know?

14  A.  They were just kind of watching us.

15  Q.  Okay.  What was the traffic like while this work

16  was being done?

17  A.  It was still the same, except all the cars --

18  well, they would see the car, and everybody seemed to

19  just go to the right or towards the middle, in the

20  middle.

21  Q.  And when you say "the same," I think earlier you

22  had described it as light?

23  A.  Yes.

24  Q.  Was it still light?  Had it gotten any busier?

25  A.  No.  It was still pretty light.



1  Q.  At any time, did you feel worried or threatened by
2  the cars passing by?
3  A.  No, sir.  They -- there was not even cars that
4  were passing even too close to the car.  And, like I
5  said, everybody just seemed to go to the right or in
6  the middle.
7  Q.  Okay.  But you had realized when -- you knew that
8  -- you and Nehemias, I guess, both realized, when you
9  knew the car was stopped partially in the lane, that
10  there was at least a potential hazard from the other
11  cars; correct?
12  A.  Yes, sir.  That's why we were trying to hurry.
13  Q.  And that's why -- that's why you discussed that
14  you needed to try to get the tire changed quickly;
15  correct?
16  A.  Yes, sir.
17  Q.  Okay.  As best you remember, Ms. Moreno, how far
18  along did Nehemias and Erick get in attempting to
19  change the tire before the accident?
20  A.  I think they had placed the jack under the car.
21  And that would be as most as I remember.  I think they
22  had already cranked it up, too.
23  Q.  They had raised the car?
24  A.  Some, yes.
25  Q.  Okay.



```
 1   A.  But that's all I remember.
 2   Q.  Had they made any attempt to remove any of the lug
 3   nuts here that you're aware of?
 4   A.  You can't remove them without the --
 5   Q.  Without that tool?
 6   A.  That tool, yes.
 7   Q.  This dark thing that I'm seeing here, do you know
 8   if that's just a valve stem from the tire?
 9   A.  Yes, sir.
10   Q.  Is that what that is?
11   A.  It's a little dice.
12   Q.  Okay.  It's a valve stem in the shape of a dice?
13   A.  Yes, sir.
14   Q.  Okay.  Is that something you put on the car, or
15   did it come with that?
16   A.  No.  I put it on.
17   Q.  Okay.  A little decoration?
18   A.  Yes, sir.
19   Q.  So before the accident happened, it had been
20   determined that the lug wrench was needed to loosen
21   the lug nuts on the wheel; correct?
22   A.  Yes, sir.
23   Q.  Okay.  Who was looking -- were y'all -- and I
24   think you said y'all were looking for that.  Who was
25   looking for the lug wrench?
```



1  A.  Just Nehemias and I since we knew where in the car

2  it would be.

3  Q.  What was the last part you said?

4  A.  Since Nehemias and I would be the only ones in our

5  whole group of people that we would know where it

6  would be.

7              (Exhibit 12 marked for identification.)

8  Q.  Okay.  All right.  Let me show you what is marked

9  Exhibit Number 12.  And it has your name on it because

10 we've -- we've asked everyone kind of the same

11 questions and let them make some markings.

12              And, Ms. Moreno, this is just intended to

13 be a diagram that kind of portrays, hopefully

14 generally accurately, where your car was in relation

15 to the lanes of travel on the interstate and the

16 emergency shoulder.

17              Looking at the diagram and then looking

18 back at the photographs, do you believe it generally

19 accurately depicts kind of how the car was stopped,

20 being mostly on the shoulder but partially in the

21 travel lane?

22 A.  Yes, sir.

23 Q.  Okay.  Is there anything about this diagram that

24 you think is incorrect or is misleading?

25 A.  No, sir.


ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0369

```
 1              MR. BUNT:  All right.  Do we have a red
 2         marker?
 3  Q.  I want to go, Ms. Moreno, to the time just before
 4  the accident happened.  Can you take the red marker
 5  and show us as best you recall -- and if you don't
 6  recall, that's fine.  But to the extent that you know
 7  and recall, show us where you believe everyone was.
 8              And let's start with you.  And if you
 9  would, maybe, just for each person, maybe just draw a
10  little circle and then put their initials in.  And so
11  for you, if you could just draw a little circle and
12  put "EM" in there, we'll know where you were.
13              MR. WHITE:  Objection to form.  But go
14         ahead.
15  A.  I wouldn't remember.  Well, I know I was --
16  Q.  You know, as best you remember.
17  A.  I can give you a general.
18  Q.  Okay.
19  A.  I was here (indicating).  And I know Nehemias --
20  Q.  And if you can kind of draw a circle for him and
21  then put his --
22  A.  I know Dina and Melvin, they were --
23  Q.  That's Dina and Melvin there?
24  A.  Uh-huh.
25  Q.  Okay.  Now, for Nehemias have you drawn a circle
```

ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

1   as best -- or if you know just prior to where he was

2   prior to the accident.  And if you're uncertain,

3   that's fine; you can tell me, but if you know.

4   A.  I just know he was, like-- he was, like, near me

5   on my right side.  I wouldn't know exactly.

6   Q.  Where he was?

7   A.  I wouldn't want to draw it and be wrong --

8   Q.  Okay.

9   A.  -- and you say I'm lying.  I just don't remember

10  exactly.  I just know he wouldn't have left, like,

11  that area (indicating).

12  Q.  What about Erick?  Do you know where Erick was at

13  the time?

14  A.  I don't remember where.

15  Q.  You don't remember?

16  A.  I didn't pay attention to Erick, where he was.  I

17  was just mostly --

18  Q.  Okay.

19  A.  And I feel bad.  I was so angry I couldn't find

20  the tool.  So I just -- I didn't pay attention to

21  where Erick was or -- and then I couldn't...

22  Q.  That's fine.  I understand.  And I'm just asking

23  you to just go on things as best you remember it.

24  But, in fact, if you're not certain, I don't want you

25  to just make anything up.



```
 1   A.  Yes, sir.
 2   Q.  So just before the accident happened, tell us what
 3   you were doing, as best you remember.
 4   A.  Just before the accident?
 5   Q.  Yes.
 6   A.  I was looking into the trunk, just looking in
 7   areas where that tool would be.
 8   Q.  So you were looking for the lug wrench that would
 9   be used to take the lug nuts off of the wheel?
10   A.  Yes, sir.
11   Q.  All right.  Was anyone assisting you, looking in
12   the truck -- in the trunk, rather, for the lug wrench?
13   A.  Nehemias was.
14   Q.  Nehemias -- Nehemias was?
15   A.  Yes, sir.
16   Q.  Okay.  Did you ever find it anywhere?
17   A.  No, sir.
18   Q.  Okay.
19   A.  I didn't find it.
20   Q.  All right.  At this point in time, do you know
21   whether or not the tire -- the spare tire was still in
22   the trunk?
23   A.  No, sir.  I believe they took it out.
24   Q.  You believe it had already been taken out?
25   A.  Yes, sir.
```



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:22-cv-00214-KGB Document 82 Filed 01/29/24 Page 377 of 2460 PageID 669
97

1  Q.   Okay.  Do you know who took the spare tire out?

2  A.   Either Erick or Nehemias.

3  Q.   Okay.  And when -- and you don't have to draw

4  anything, if you don't wish to.  But if you can just

5  kind of take this pen and maybe point -- when Nehemias

6  was assisting you with looking in the trunk, can you

7  kind of point to where he was located in relation to

8  you when he was helping you?

9  A.   He would have been near me right here (indicating)

10 since he was, like -- like I say, he was right next to

11 me.

12 Q.   Okay.

13 A.   So he would have been here, near me here

14 (indicating) in this general area.

15 Q.   All right.  And looking at picture Exhibit

16 Number 4, if you don't mind, can you just kind of

17 point to the back of your car and, again, sort of tell

18 us, sort of show us where you would have been and

19 where you remember Nehemias being?

20 A.   I would have been somewhere here in the middle

21 (indicating), and he would have been first right here.

22 Q.   Okay.  At that moment in time, did you and

23 Nehemias have any conversation about the tool, or, you

24 know, "Can't find the tool, not sure where it is,

25 could it be somewhere else," anything else -- anything



www.ArkansasRealtimeReporting.com

Appx_0373

1  like that that you recall?

2  A.  Like I said, we had discussed it, and I just told

3  him, "It can't be anywhere else.  We never put it

4  anywhere else.  It has to be in the car."

5  Q.  Okay.  But you were a little frustrated or upset

6  that you couldn't find it?

7  A.  Yes, sir.

8  Q.  All right.  Now, at some point, did Nehemias move

9  back out of your view?

10  A.  I don't know, sir.  The most he would have gone

11  back is, like, arm's length behind me.  He wouldn't

12  have been far.

13  Q.  Okay.  But -- and I understand that.  But it

14  sounds like you're kind of telling me what you believe

15  he would have done or what you assume he would have

16  done.  At the moment that he was struck by the

17  vehicle, were you still looking in the trunk at that

18  moment?

19  A.  I blacked out, sir.  I don't remember.

20  Q.  Okay.  But you did not actually see the car strike

21  him; correct?

22  A.  I was looking in the trunk.  I didn't even know

23  what hit us.

24  Q.  Okay.  So you do not know exactly what had

25  happened at that moment?



1   A.  No, sir.  I just -- I woke up, I got myself out of

2   the trunk, and I just remember seeing Erick pull back

3   Nehemias's body.

4   Q.  Okay.

5              THE WITNESS:  Can I take a break,

6        please?

7              MR. BUNT:  Yes.

8              THE VIDEOGRAPHER:  We will go off the

9        record.  The time is 1556.

10             (Recess from 3:56 p.m. to 4:04 p.m.)

11             THE VIDEOGRAPHER:  Back on the record.

12        The time is 1604.

13  Q.  Ms. Moreno, we're back on the record after taking

14  a short break.  I know this subject is unpleasant to

15  talk about, and I ask that you just bear with me a

16  little bit longer as we kind of talk about what

17  happened, and then we'll be finished before too much

18  longer.

19             Going back to the diagram that you have

20  made for us, you've indicated that you were standing,

21  looking in the trunk, kind of at the very back of your

22  car; correct?

23  A.  Yes, sir.

24  Q.  And I think you sort of showed us it would be

25  somewhere in this area here on the car?



1   A.  Yes, sir.

2   Q.  And were your eyes and your focus and attention

3   kind of inside the trunk at the time?

4   A.  Yes, sir.

5   Q.  Okay.  Were you aware that Nehemias had stepped

6   back from you a little bit?

7   A.  I can't remember, sir.

8   Q.  You don't remember?

9   A.  But I -- I just know he -- it wouldn't make sense

10  of him to go into the road or just go all the way

11  behind me.  He would have been somewhere near me.

12              MR. BUNT:  I object to the nonresponsive

13         portion.

14  Q.  You're telling us that he had -- he had made some

15  movement, at least, back from being right beside you;

16  correct?

17  A.  Like I said, he would have been an arm's reach at

18  most.  And that's -- that's what I remember.

19  Q.  Okay.  He was right beside you earlier; correct?

20  You kind of pointed in this direction here

21  (indicating)?

22  A.  That's why I said it was kind of in the general

23  area.  Because I don't know if he was, like I said,

24  arm's reach or --

25  Q.  Okay.



www.ArkansasRealtimeReporting.com

Appx_0376

```
 1   A.  -- or somewhere there.
 2   Q.  When you showed us earlier, you said he was right
 3   beside you, kind of in this area here; correct?
 4   A.  Yes, sir.
 5   Q.  All right.
 6   A.  When we were looking in the trunk.
 7   Q.  You would agree he -- he may have been standing
 8   either on or just on the other side of the yellow
 9   line; correct?
10   A.  Yes, sir.
11   Q.  Okay.  And then what you do know for certain is
12   that, at some point, he stepped back from that
13   location; correct?
14   A.  (Nods head up and down).
15   Q.  And how far back?  I know you said you didn't
16   think he would have been that far back; he would have
17   been very close to you.  But you were not actually
18   looking at where he was; correct?
19   A.  Yes, sir.
20   Q.  All right.  Did the accident happen very quickly
21   after he stepped back from you?
22   A.  Yes, sir.
23   Q.  And I'm not trying to put words or anything in
24   your mouth on that.  Was it just a moment after he
25   stepped back, was it a second or two seconds, or do
```



1  you know?

2  A.  I wouldn't know exactly how long.

3  Q.  Okay.  Do you know what Nehemias was doing just

4  before he was struck by the car?

5  A.  We were looking for the tool.

6  Q.  Okay.  Since he had stepped back from being right

7  beside you, do you know whether he was looking for the

8  tool anywhere else other than in the trunk?

9  A.  I wouldn't know if he did, sir.

10  Q.  Okay.

11  A.  I can't remember.

12  Q.  Do you know whether he could have been looking

13  underneath the car for it or anywhere else for it?

14  A.  I don't know, sir.

15  Q.  All right.  You never saw the car approaching;

16  correct?

17  A.  No, sir.

18  Q.  All right.  You weren't even aware that a car was

19  approaching?

20  A.  No, sir.

21  Q.  And you had no -- because you didn't see it, you

22  had no opportunity to warn Nehemias that there was a

23  car approaching, did you?

24  A.  No, sir.

25  Q.  To your knowledge, did anyone call out any kind of



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

1  warning, "Watch out," or, "Look out, there's a car

2  coming," anything like that?  Did you hear anything

3  like that?

4  A.  No, sir.

5  Q.  All right.  As to whether or not anyone else was

6  looking in the direction of the car, you wouldn't

7  really know about that one way or the other, would

8  you?

9  A.  No, sir.

10  Q.  Okay.  Tell me what happened then, what you

11  remember happening when you realized that there had

12  been an accident that something had occurred?

13  A.  I was looking right into the trunk, and I just

14  felt something -- something hit us.  And everything

15  just went black.  That's how I landed, like, kind of

16  hanging in the trunk.

17  Q.  Were you hit from behind?

18  A.  Yes, sir.

19  Q.  Were you sort of knocked off your feet over into

20  the trunk?

21  A.  I landed inside of the trunk, just my feet out.

22  Q.  With your feet out?

23  A.  Okay.

24  Q.  What did you do next?

25  A.  I just -- I was trying to kind of get back and, I



1  guess, just awake.  And I felt like -- like -- I

2  just -- I felt like something was all over me; and it

3  was what -- and then I saw it was blood.  And that's

4  when I -- I saw that Erick was pulling back Nehemias's

5  body.

6  Q.  Ms. Moreno, as far as you know, the car itself did

7  not strike you, did it?

8  A.  I wouldn't know.

9  Q.  Okay.  As far as you know, the other car did not

10  strike your car, did it?

11  A.  What was that?

12  Q.  The car that hit Nehemias, as far as you know,

13  that car did not strike your car itself, did it?

14  A.  I don't think it did, sir.

15  Q.  Okay.  There was a little bit of damage to the

16  rear brake light area; correct?

17  A.  Yes, sir.  This little part right here

18  (indicating).  Do you see how it kind of edges on?

19  Q.  Right.

20  A.  This had come up.  So it didn't let the trunk shut

21  anymore.  And then this light eventually just fell

22  out, and it just wouldn't close.

23  Q.  Do you believe that this damage to the tail light

24  was actually caused by the force of Nehemias's body?

25  A.  Yes, sir.



1  Q.  Okay.  Did you see where his body came to rest
2  after the accident?
3  A.  I think there's, like -- it shows in the picture
4  kind of where the blood is.
5  Q.  Okay.
6  A.  Unless that's just where Erick ended up pulling
7  his body.  Because, I mean, it was -- there was --
8  there was a lot of blood.
9  Q.  The photographs do show some blood kind of in the
10  lane over here beside the car.  Is that the area that
11  you're talking about?
12  A.  Yes, sir, that's -- I think that's where he ended
13  up after he was hit.
14  Q.  Okay.  Did you actually see his body on the ground
15  in this area before Erick moved him?
16  A.  That's where I -- I woke up, and I just saw Erick
17  pulling back his body.
18  Q.  Okay.
19  A.  That's all I remember.  That's the first thing I
20  remember seeing.
21  Q.  When you first saw Erick moving his body, where
22  was his body, as best you recall?
23  A.  I don't -- I don't remember where it was before
24  Erick had moved it.
25  Q.  So did you actually see Erick in the process of



1  moving his body, or did you just see where his body
2  was after Erick had finished moving him?
3  A.  No.  I just saw Erick dragging his body back.
4  Q.  Okay.  And as to exactly where it came to rest,
5  wherever that was, you're not really able to tell us
6  for sure?
7  A.  Where -- where Erick had put him was behind the
8  car.
9  Q.  Okay.  But from where Erick started pulling his
10 body, are you able to tell us that?
11 A.  I wouldn't know.
12 Q.  And when the accident happened, were all persons
13 outside of the car?
14 A.  Yes, sir.
15 Q.  At any time, had anybody gone back into the car
16 for any reason?
17 A.  No, sir.
18 Q.  Did you give any assistance to Nehemias or help
19 Erick in trying to give any assistance to Nehemias, do
20 anything after Erick had -- had placed his body where
21 he did?
22 A.  Yes, sir.  I -- I checked Nehemias's body, if
23 there was a pulse, if anywhere he had a pulse; and he
24 didn't.
25 Q.  Where did you check for the pulse?



1  A.  I checked on his neck, on his hands -- or his

2  wrists.  I checked for any sign of breathing, or at

3  least attempting to breathe; and nothing.

4  Q.  Were you able to see wounds on his body?

5  A.  Yes, sir.

6  Q.  Tell me what you remember.  And just brief

7  descriptions are fine.

8  A.  It was mostly on his head.  He had -- he just had

9  a hole in his head.

10  Q.  Ms. Moreno, do you remember approximately where on

11  his head the wound was?

12  A.  I -- I'm sorry.  I don't remember exactly.

13  Q.  Don't recall?

14  A.  I -- I remember just him on the floor.  I don't...

15  Q.  Okay.  Was it more to the rear portion of his

16  head?

17  A.  I believe it would have been this side

18  (indicating).

19  Q.  You think it would have been on the right side?

20  A.  Yes, sir.

21  Q.  Okay.  As to whether Nehemias was on this side of

22  the yellow line or on that side of the yellow line at

23  the moment of impact, that's something you're not

24  really able to tell us for certain; correct?

25  A.  I couldn't tell you exactly where he was, sir.



1  Q.  Okay.  But just a moment before, he had been in

2  this area here right beside you?

3  A.  Yes, sir.

4  Q.  Did you ever see the car that struck him?

5  A.  No, sir.  Not even after the accident.  Not -- I

6  didn't even know what car hit us up until a couple

7  weeks ago that my attorney had told me what type of

8  car it was.

9  Q.  Okay.  So what the car looked like, at least from

10  your eyewitness knowledge, you wouldn't be able to

11  tell us what the car looked like?

12  A.  No.  Only Erick and Dina and Melvin --

13  Q.  Okay.

14  A.  -- said it was -- I just remember them saying it

15  was a white car.  But I didn't even know.  I couldn't

16  remember for anything.

17          MR. BUNT:  Object to the nonresponsive

18      portion.

19  Q.  But you can't really say for certain other than

20  just what you've heard; correct?

21  A.  Just from that day, sir.

22  Q.  And as to how far -- as to how fast the car may

23  have been traveling, you wouldn't really know one way

24  or the other, would you?

25  A.  No, sir.



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:22-cv-00274-kac Document 42 Filed 01/29/24   Page 389 of 2460   PageID 681   109

1  Q.  You never found any paint from another car on your

2  car, did you?

3  A.  No, sir.

4  Q.  Is that a "no"?

5  A.  "No, sir," yes.

6  Q.  Ms. Moreno, there are expert persons, persons who

7  are experts in accident reconstruction who are looking

8  at this accident, I believe one who is working with

9  Mr. White and one who is working with my client.  If

10  they were to ultimately give the opinion that

11  Mr. Santos was on this side of the yellow line

12  somewhere in the travel lane, you could not

13  specifically disagree with that, could you?

14           MR. WHITE:  Object to form.  Go ahead.

15  A.  Can -- can you repeat that?

16  Q.  If -- if accident work -- accident reconstructions

17  who are -- accident reconstruction experts who are

18  working for either your attorney, Mr. White, or for --

19  for me and my clients, just assume with me if they

20  should give the opinion that Mr. Santos was on this

21  side (indicating) of the line at the time that he was

22  struck, nothing that you're telling us necessarily

23  disagrees with that; right, because you weren't really

24  able to see exactly where he was at that moment?

25           MR. WHITE:  Same objection.  Go ahead.



1  A.  I would -- I would believe so.  I mean, like I
2  said, I don't -- I can't -- I can't give you the
3  specific spot.  I could just tell you the general of
4  what I last remember.
5  Q.  Of what you think?
6  A.  Yes, sir.
7  Q.  Okay.  I believe you said -- do you remember there
8  at the accident scene speaking with a female -- black
9  female police officer, Corporal Winston?
10 A.  Yes, sir.
11 Q.  Kind of describing to her what happened?
12 A.  Yes, sir.
13 Q.  All right.  And I think you told her that you
14 didn't see what happened, that the car just was sort
15 of suddenly there and must have hit him.  Does that
16 sound generally similar to what you recall telling
17 her?
18 A.  I don't remember exactly everything I said to the
19 officer, sir.
20 Q.  At one point, you -- you told her that he would
21 have never gone out over into this area (indicating).
22 Do you recall saying that to her?
23            MR. WHITE:  Object to form.  Go ahead.
24 A.  Yes.  I know Nehemias wouldn't have gone to the
25 road at all.



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:22-cv-00274-DPM Document 42 Filed 01/29/24 Page 391 of 2460 PageID 683 111
MORENO, EVELYN on 08/02/2023

1  Q.  Okay.  And I'm just asking, tell me why you

2  believe that is the case.

3  A.  He was telling all of us not to go near the road.

4  If he was telling us that, he wouldn't have done it

5  himself.

6  Q.  You believe he was aware of the potential hazard

7  of cars passing by?

8  A.  Yes, sir.

9  Q.  Okay.  And he actually voiced that to the rest of

10 you to stay -- stay back away from the traffic?

11 A.  Yes, especially to his brother.

12 Q.  Okay.  Do you believe that Corporal Winston, the

13 lady police officer at the scene, made an effort to

14 find out from you how the accident happened?

15 A.  I was the only one she could talk to.  I was the

16 only one who could speak English.

17 Q.  Do you remember there being a paramedic at the

18 scene who could speak Spanish?

19 A.  Yes, sir.  He --

20 Q.  What did he do, if you remember?

21 A.  They just took me in the ambulance.  And it

22 was fuck -- I'm sorry.  It was so rude that he had

23 said to the other paramedic that I couldn't speak

24 English.  And they were talking whatever they were

25 talking.  So that's when I decided to come out of the



1  ambulance.

2  Q.  The Spanish-speaking --

3  A.  Yes, sir.

4  Q.  -- paramedic told the other paramedic that you

5  could not speak English?

6  A.  Yes.

7  Q.  Okay.  Did he ever try to speak to you in Spanish?

8  A.  He only spoke to me in Spanish because everybody

9  else spoke in Spanish.

10  Q.  Okay.  He just assumed you only spoke Spanish?

11  A.  Yes.

12  Q.  Do you know if he spoke to any of the other

13  persons, Erick or Melvin or Dina?

14  A.  I don't -- I don't think so.  I don't -- I

15  wouldn't know.

16  Q.  Do you know for sure --

17  A.  No, sir.

18  Q.  -- one way or the other?  Okay.

19          What did -- tell us what they did for you

20  there at the ambulance.

21  A.  They stuck some sticky things on me, and they were

22  checking that.  And they -- that's when they said --

23  Q.  Like checking for your heart rhythm or your

24  heartbeat?

25  A.  I think so, yeah.  That would be the machine



1  that -- yeah.

2  Q.  Okay.  Did they physically assess you in any other

3  way?

4  A.  They checked, I think, seeing if I could see well,

5  like...

6  Q.  Do you know how long you were in the ambulance?

7  A.  I don't know.

8  Q.  Okay.  At some point, did you say you decided to

9  get out of the ambulance yourself?

10  A.  Yes, because of the comment he had made.  I just

11  thought it was pointless for me to be in there if they

12  thought they couldn't even understand me.

13  Q.  Did you tell him at any time, "I speak English;

14  I" --

15  A.  Yes.

16  Q.  -- "you can speak to me in English"?

17  A.  Yeah, I did after his comment.

18  Q.  Okay.  What did he -- did he say anything in

19  response?

20  A.  He didn't say anything.

21  Q.  Do you remember speaking to any others there at

22  the scene other than Corporal Winston, this paramedic?

23  A.  No, sir.  I just talked to the officer and the

24  paramedic.

25  Q.  Did any of the state troopers speak to you?



1  A.  No, sir.

2  Q.  Did anyone, Ms. Moreno, come up to you there at

3  the scene, a stranger or just anybody else in a

4  passing car, stop and tell you that they had witnessed

5  the accident?

6  A.  No, sir.

7  Q.  Are you aware of anyone else that witnessed the

8  accident outside of those in your group that say they

9  did?

10  A.  I wouldn't -- I don't know.  I don't think

11  anybody.

12  Q.  Okay.  Since then, you've not learned of someone

13  else who claims they were a witness to the accident,

14  have you?

15  A.  No, sir.

16  Q.  I know that you stayed -- I think all of you

17  stayed for a time with a family that lived nearby --

18  A.  Yes, sir.

19  Q.  -- on the side of the road?

20          Did you kind of stay there until parents

21  were able to come down and get you?

22  A.  Yes, sir.

23  Q.  And you said your mother and stepfather came down

24  and picked you up?

25  A.  Yes, sir.



1   Q.   Okay.  Do you know how long you waited before they

2   got there?

3   A.   It was -- it was a couple hours.

4   Q.   Okay.  Only a couple of hours?  Did they have to

5   come from Springdale, or...

6   A.   Yes, sir, they came from Springdale --

7   Q.   Okay.

8   A.   -- to pick us all up.

9   Q.   So however long it takes to drive from Springdale

10  down to that location?

11  A.   Yes, sir.

12  Q.   Okay.  Do you know the names of any of the people

13  that you stayed there with?

14  A.   No, sir.

15  Q.   There's some names your attorney has given us of

16  folks that may know some facts about the accident.

17  Let me just read you these names, and you tell me if

18  you recognize any of these folks.  José Aguilar?

19  A.   No, sir.

20  Q.   Not familiar?

21  A.   No.

22  Q.   Stephanie Mitchell?

23  A.   No, sir.

24  Q.   Rosemary Ricny, or "Ricny"?

25  A.   No, sir.



1  Q.  And Manuel Yoli Medrano?

2  A.  I don't know, no.

3  Q.  Don't recognize any of those?

4  A.  No, sir.  I didn't --

5  Q.  Okay.

6  A.  I didn't get anybody's name.  They were just some

7  kind people that helped us out after the accident.

8  Q.  Since the accident, Ms. Moreno, have you learned

9  of anyone else that took photographs of the scene

10  other than the police or state troopers?

11  A.  No, sir.

12  Q.  Are you aware of anyone in your traveling group

13  that sent any texts or messages reporting that the

14  accident had happened?

15  A.  Not that I know of, sir.

16  Q.  Okay.  Is there anything else about the

17  accident -- and I know you didn't actually see him

18  getting struck, but is there anything else you just

19  remember about the moment of the accident that you

20  haven't told me about?  And I'm not trying to trick

21  you in any sort of way, but it's just that I would

22  like to know today pretty much everything you know and

23  remember about it.

24            If this should go to trial, I don't want

25  to find out later at trial that you're going to say



1   something new and different.

2            So is there anything more that you can

3   remember about it right now that I haven't asked you

4   about?

5   A.   No, sir.

6   Q.   Do you know how the Camry vehicle was taken away

7   from the scene?  Did someone drive it?

8   A.   Dina drove it to -- to the -- the people that

9   helped us, in front of their house.

10  Q.   To the house, okay.

11  A.   Yes.  We -- they helped me clean the car from all

12  the blood.

13  Q.   Do you know how the tire ended up getting

14  replaced?

15  A.   The police officer had told me that the

16  firefighters had eventually changed it.

17  Q.   Do you know if they found the tire tool, or just

18  used one of their own?

19  A.   I wouldn't know, sir.

20  Q.   Okay.  And when your stepfather and mother picked

21  you up, did y'all drive all the way back to Springdale

22  that night?

23  A.   Yes, sir.

24  Q.   If you're standing here (indicating), do you think

25  if Nehemias had gone out into the travel lane, you



1  would have -- you would have noticed that?

2  A.  Yes, sir.  If he would have gone in front of

3  the -- or at least tried to go, like, near the road

4  right there.

5  Q.  At least if he's over in this area, you would have

6  been able to see him; correct?

7  A.  Yes.  But he -- he wouldn't have gone out to the

8  road.

9  Q.  Okay.

10  A.  I know him.

11  Q.  If just hypothetically he was back in this area

12  over here (indicating), I presume he could have -- and

13  we don't know -- I know you don't know for certain

14  whether he was or was not.  I know -- I know you think

15  he probably was not, but if it's determined that he

16  was, he would have only been there just for a -- just

17  a very brief moment; right, because he had just been

18  standing right beside you?

19            MR. WHITE:  Object to form.  Go ahead.

20  A.  I don't -- I don't think he would have gone out

21  there.  And I'm sorry, but I don't think he would have

22  gone out there.

23  Q.  I understand.  And I understand you're -- you

24  don't think that he went out there.  All I'm saying is

25  that if he went into this area here, he would have



1   done it pretty quickly; right, because he had -- he

2   had just been right beside you; correct?

3   A.  But he had no reason to -- to be over there.  And

4   he wouldn't have -- like I said, we would have been

5   looking for the tool.

6   Q.  Did you hear any sound at all from Nehemias before

7   he was struck, any vocal reaction or anything like

8   that?

9   A.  No, sir.

10  Q.  Okay.  How -- how soon after the accident did you

11  check for a pulse and breathing?  Was this pretty

12  quickly?

13  A.  Yes.  As soon as I -- as his body had gotten over

14  here (indicating), like I said, I woke up right when

15  he was being dragged.  So as soon as he got over here,

16  I -- I checked for him immediately.  They had -- in

17  high school, they gave you CPR classes; and -- and so

18  you just kind of learn to memorize what you look for.

19  Q.  Do you believe that he probably died instantly

20  from the impact?

21  A.  Yes, sir.

22  Q.  On the video of Corporal Winston's body -- body

23  cam video, you mentioned that you felt Nehemias's

24  body -- or you felt something strike you and you think

25  that it was him striking you, and then that his body



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:22-cv-00274-KGB Document 42 Filed 01/29/24    Page 400 of 2460   PageID 692    120
MORENO, EVELYN on 08/02/2023

1  fell, and you kind of motioned as if he just fell
2  right there beside where you were standing.  Do you
3  remember saying that?
4  A.  I don't -- I'm sorry.  I don't remember exactly
5  everything I told the officer.  I tried to explain the
6  accident as best I could, but...
7  Q.  If you said that to her, is it true that you would
8  not have meant that his body came to rest right --
9  right there beside you right after the accident?
10  A.  His body wouldn't have -- didn't end up there.
11  Q.  It wouldn't have been there until Erick moved him
12  there; correct?
13  A.  Yes, sir.
14  Q.  Okay.  Have you spoken with Nehemias's father any
15  about this lawsuit?
16  A.  No, sir.
17  Q.  Okay.  There hasn't been any -- I just want to
18  make sure, there hasn't -- there hasn't been any
19  promise that you would receive part of the money if
20  there's a recovery in the lawsuit --
21  A.  No, sir.
22  Q.  -- is that correct?
23           MR. WHITE:  Object to form.  Go ahead.
24  A.  (Shakes head side to side.)
25  Q.  Is that a "no"?



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:22-cv-03014-TLB   Document 42   Filed 01/29/24   Page 401 of 2460   PageID 693
121

1   A.  No, sir.

2   Q.  Okay.  The other -- some of the other witnesses

3   said -- I think Erick testified that he recalled that

4   you and Nehemias were living together in an apartment

5   in Rogers, Arkansas, at the time of the accident; is

6   that correct?

7   A.  Yes, sir.

8   Q.  How long had the two of you been living at that

9   location?

10   A.  We had lived there since July.  So --

11   Q.  Of the previous year?

12   A.  Yes, sir.  I helped him.  Everything was always

13   under his name.  So I just -- I helped him fill out

14   everything he needed to get his apartment.

15   Q.  Okay.  And I think he had lived in Fayetteville

16   earlier than that; is that correct?

17   A.  Yes, sir.

18   Q.  Do you ever live with him at that address in

19   Fayetteville?

20   A.  No, sir.

21   Q.  Was that -- did he just live there by himself?

22   Did he have a roommate?

23   A.  He lived there with his dad and his dad's wife and

24   his little brother.

25   Q.  Okay.  So the whole family had moved from that



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:23-cv-03074-TLB   Document 49   Filed 01/29/24   Page 402 of 2460   PageID 694   **122**

1   apartment in Fayetteville to the one in Springdale?

2   A.  Nehemias never lived in the apartment with them in

3   Springdale.

4   Q.  Okay.

5   A.  So once they moved to Fayetteville, he had gotten

6   his own place.

7   Q.  I understand.  And that first place that he got,

8   was it the place with you in Rogers?

9   A.  No, sir.  He -- the apartment he had was

10  under --the apartment he had was under his father's

11  name; so he just put it to him.  And then he was just

12  tired of -- of a lot of things.  And he -- once the

13  lease ended, we moved to Rogers.

14  Q.  Okay.  So when his -- when his father and the rest

15  of the family moved from Fayetteville, am I

16  understanding you to say that Nehemias just took over

17  that lease for a while --

18  A.  Yes, sir.

19  Q.  -- and stayed there himself?

20  A.  Yes, sir.

21  Q.  How did he and his dad get along?

22  A.  They had a normal relationship.

23  Q.  Okay.

24  A.  It was normal son and dad.

25  Q.  Was it -- and by "normal," was it kind of rocky at



1  times?

2  A.  Yeah.  I mean, everybody has their rocky moments,

3  but they always patched their things up.

4  Q.  Okay.  Did he like working for his dad?

5  A.  Yes, sir.

6  Q.  But he -- he hoped to move on out away from his

7  dad at some point, as soon as he was able, and kind of

8  do his own thing?

9  A.  Yes, sir.

10  Q.  Ms. Moreno, as best you can, describe what damage

11  you understand was received by the car there at the

12  scene.  I know you mentioned this taillight and the

13  part above it.  Was there damage in any other places?

14  A.  No, sir.  It was just mostly that that was from

15  the accident.

16  Q.  Okay.  And you said the trunk wouldn't quite

17  close; correct?

18  A.  It wouldn't close.  They gave me a -- I don't even

19  know what it's called.  It had, like, two hooks, and I

20  would have to hook it together for it to just stay.

21  But it wouldn't close normally.

22  Q.  Has all of that now been repaired?

23  A.  Yes, sir.

24  Q.  Okay.  Are you still driving the Camry?

25  A.  Yes, sir.



1    Q.   That's a "yes"?

2    A.   Yes, sir.

3    Q.   Okay.  And I think these pictures back here were

4    taken about a month ago.  Is that how the Camry looks

5    now after the repairs?

6    A.   Yes, sir.

7    Q.   And where were the repairs made?

8    A.   My -- I think they were turned in to -- in the

9    piece of paper with the -- with the rest of the copies

10   that I had turned in.

11   Q.   Okay.

12   A.   So it should all be there about where the car was

13   fixed.

14   Q.   All right.  But it was a local repair company that

15   did it?

16   A.   It's somewhere around here.  My mom took it so I

17   wouldn't have to.

18   Q.   I understand.  And I know you've given us some

19   things, and I've looked at them, but I probably just

20   have forgotten some of what is in there.

21   A.   Okay.

22   Q.   On the -- on the day of the accident when y'all

23   were looking in the trunk, was there anything stored

24   in the trunk other than, you know, just the tire and

25   the tools that go with it?



www.ArkansasRealtimeReporting.com

Appx_0400

1  A.  I think probably just our work things.  Like,

2  they're just tools you need to work on things.

3  Q.  Okay.  So some work tools and so forth?

4  A.  That's all I ever kept in the back.

5  Q.  Okay.  You didn't have to take any bags or any

6  luggage or suitcase or any of those type things out,

7  did you?

8  A.  No, sir.

9  Q.  And as far as what folks may have been carrying

10  with them, do you know where they were keeping those?

11  A.  Probably in the front with them just by their

12  feet.

13  Q.  Okay.  The person that inspected this vehicle

14  about a month ago said that they had detected that the

15  car had been in a couple of accidents, but where the

16  car was bumped on the front end, not the back end, and

17  they were not at the same time as this one.

18         Do you know, would either one of those be

19  the accidents that you had described for us?

20  A.  No, sir.  I -- I've never been in another car

21  accident with this car.

22  Q.  Okay.  If this car has been in other accidents,

23  are you aware of any accidents that have occurred to

24  this car other than the one we've talked about today,

25  April 30, 2022, to the extent that the car was



1   involved, that have occurred since then?

2   A.   No, sir.  I wouldn't --

3   Q.   Or before then?

4   A.   I wouldn't be aware of the other ones.

5   Q.   Okay.  And when your mom bought the car, it was a

6   used car; correct?

7   A.   Yes, sir.

8   Q.   So I guess what may have happened with the car

9   before your mom bought it, you wouldn't really know

10  one way or the other; right?

11  A.   Yeah.  Yes, sir.

12  Q.   And the State of Arkansas does not require you to

13  take the car for an annual inspection, do you -- does

14  it?

15  A.   I -- I wouldn't know, sir.

16  Q.   Okay.

17  A.   I've never been --

18  Q.   Have you ever had to take the car down to someone

19  where they look at the tires and drive it to check the

20  brakes and look to see if the turn signals light up or

21  the brake lights light up?

22  A.   Well, I usually always had someone do the

23  maintenance for it, but it's -- Nehemias used to do

24  it.  Now I take it to the shop down the street here.

25  And if I need to have brakes changed, they change it.



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

```
 1  If it needs to be aligned, they do it.
 2  Q.  But you don't have to go get a formal inspection
 3  that the government requires, and put a sticker
 4  somewhere on the car, do you?
 5  A.  I don't believe so.
 6  Q.  Okay.  Who does the maintenance on this car?
 7  A.  I do.
 8            MR. WHITE:  Objection; asked and
 9        answered.  Go ahead.
10            MR. BUNT:  Well, she said "the shop down
11        the street."  And I'm just trying to get a
12        more specific answer.
13  A.  I do know.  Like, recently I changed the brakes on
14  the car.  They had worn out.  I just took it down the
15  street.
16  Q.  But who -- what's the name of the business down
17  the street, if you know?
18  A.  I don't know.  My dad tells me to get my car
19  checked there.  So...
20  Q.  Okay.  Is it, like, a garage?  Is there a mechanic
21  there?
22  A.  Yeah.  It's a -- it's a -- I just don't remember
23  the name.
24  Q.  You just don't remember the name?
25  A.  Yeah.
```



www.ArkansasRealtimeReporting.com

1  Q.   Okay.  Since the accident, have the tires -- I
2  know that tire that blew out was replaced, I assume --
3  A.   Yes.
4  Q.   -- is that correct?
5  A.   They've all been replaced.
6  Q.   They've all been replaced, okay.
7            Do you know where the new tires were
8  bought?
9  A.   In the -- in -- so Ricardo's dad owns a tire shop.
10  He put new tires on all of them.  He does the tire
11  checks on them.
12  Q.   Ricardo's dad?
13  A.   Yes.
14  Q.   And who is Ricardo?
15  A.   My fiancé.
16  Q.   Okay.  I'm sure I have it, but --
17  A.   It's on the --
18  Q.   -- I can't find it.  Tell me --
19  A.   It's on the yellow piece of paper that you have.
20  Q.   Thank you.  Okay.  Almost finished.
21            I know you have -- were you injured
22  somewhat by the accident?
23  A.   Yes.  I -- I messed up my knee from it.  And after
24  the accident, I couldn't really walk very well.  I
25  was -- because of how I landed in the trunk, I hit my



1  -- my abdominal area.  And then I just -- I hit my

2  head, I'm guessing, somewhere in the trunk.  And I

3  think those were all that I had from that day.

4  Q.  Okay.  So your knee, which knee is it?

5  A.  It's my right knee.

6  Q.  Okay.  And did it bang into the back of the car or

7  something?

8  A.  I was -- I just remember after being sore --

9  Q.  Okay.

10  A.  -- and limping after.

11  Q.  Have you had treatment to the knee?

12  A.  No, sir.  I went to the doctor.  They said it was

13  just -- it must have just been trauma from the impact,

14  but mostly just bruising.

15  Q.  Did you see bruising there?

16  A.  Yes, sir, after.

17  Q.  Did it eventually get better on its own?

18  A.  It's been okay.  I can't stand for very long.  It

19  just -- it hurts.  But besides that, I mean, I think

20  everything is --

21  Q.  Okay.  And then you said you kind of hit your

22  abdominal area?

23  A.  Uh-huh.

24  Q.  Did you have that area examined?  You went to the

25  hospital -- you didn't go to a hospital in Texas;



1  correct?

2  A.  No, sir.

3  Q.  But a day or so later, you went to a hospital in

4  Arkansas?

5  A.  The day I got here, I went to Northwest right

6  here.

7  Q.  Okay.  Just right down 71 here?

8  A.  Yes, sir.

9  Q.  Okay.  Tell me what they did there.  Did you go to

10  the ER?

11  A.  Yes, sir.  They put me in the trauma room.  They

12  did scans and x-rays.  And, yeah, they did scans on my

13  knee and all over my -- my main torso and my head.

14  Q.  Were there any broken bones that you're aware of?

15  A.  No, sir.

16  Q.  What do you recall -- what, if anything, do you

17  recall about them telling you about what the scans and

18  x-rays revealed?

19  A.  They just said it was mostly bruising and swelling

20  for right now.  But they didn't say anything had been

21  too bad.  But I just -- I try to do the exercises to

22  keep my knee from getting any worse than it does.

23  Q.  Have you had -- have you had any further treatment

24  to the knee after going to the hospital?

25  A.  No, sir.



1    Q.  Have you had any further treatment to any other
2    part of your body since going to the hospital?
3    A.  No, sir.
4    Q.  Do you have any doctors' appointments scheduled
5    right now?
6    A.  Not related to my injuries.
7    Q.  Right.  And I'm just asking about being related to
8    the injuries.
9    A.  Okay.  Yeah.
10   Q.  Okay.  Do you have any doctors' appointments
11   planned solely for injuries from this accident?
12   A.  No, sir.
13   Q.  Were you prescribed any prescription medication
14   there at the hospital?
15   A.  I don't -- I don't remember, sir.
16   Q.  Okay.  Do you have any other specific treatment
17   planned at this point in time for injuries received in
18   this accident?
19   A.  No, sir.
20   Q.  And the bills that you have received, I think
21   those were included in what you brought to us last
22   time; correct?
23   A.  Yes, sir.
24   Q.  Have you received any other bills since that time?
25   A.  It's just the x-ray company that keeps doing their



1  thing.

2  Q.  X-ray keeps --

3  A.  Trying to charge me.

4  Q.  Okay.  Have -- have any of your bills been paid

5  yet?

6  A.  No, sir.

7  Q.  Have you -- prior to this accident, had you ever

8  injured your right knee previously?

9  A.  No, sir.

10 Q.  Ever had any pain or problems from it?

11 A.  No.

12 Q.  Okay.  The automobile accident that you were

13 involved in when you were younger, I think you said

14 you went to a chiropractor for a while --

15 A.  Uh-huh.

16 Q.  -- for that?

17                 Did you eventually heal --

18 A.  Yes.

19 Q.  -- from that?

20 A.  Just a disc had rotated from my spinal cord.  And

21 that was all that -- they fixed it.

22 Q.  Okay.

23 A.  Yeah.

24 Q.  You don't still go to that chiropractor for any

25 other reason, do you?



1   A.  No, sir.

2   Q.  Ms. Moreno, have you ever been a party to a

3   lawsuit other than -- than this one?  And I know

4   you're not a party in this lawsuit, at least right

5   now, though it's possible you may become a party.  But

6   I'm talking about in the past.  I know there was a

7   divorce, and that's kind of a lawsuit proceeding as

8   well; but other than that, have you ever been a party

9   to any other lawsuit?

10  A.  No, sir.

11  Q.  To your knowledge, had Nehemias ever been a party

12  to another lawsuit?

13  A.  No, sir.

14  Q.  Have you ever been convicted of any crime?

15  A.  No, sir.

16  Q.  Have you ever been arrested?

17  A.  No, sir.

18  Q.  And there's not any kind of charge or indictment

19  or anything pending?

20  A.  No, sir.

21  Q.  Okay.  To your knowledge, had Nehemias ever been

22  convicted of a crime?

23  A.  No, sir.

24  Q.  Or arrested for anything?

25  A.  No, sir.



 1  Q.   You've never met Caylee Smith; correct?

 2  A.   No.

 3  Q.   And you didn't speak to her at the accident scene?

 4  A.   No, sir.

 5  Q.   Would it be fair to say that you don't know

 6  anything about her driving history?

 7  A.   No, I don't know anything about her.

 8  Q.   Okay.  Whether she's been involved in other

 9  accidents or had other moving violations, you wouldn't

10  know about that one way or the other, would you?

11  A.   I wouldn't know.

12  Q.   Okay.  Other than what opinions you may or may not

13  have on this particular accident, other than that, you

14  don't have any knowledge about whether she's a good

15  driver or a bad driver, do you?

16  A.   I don't know.

17  Q.   Okay.  And I would assume you don't know anything

18  about her employment?

19  A.   No, sir.

20  Q.   And whether she was working that day or not

21  working that day, you wouldn't know one way or the

22  other, would you?

23  A.   No, sir.

24  Q.   As to whether her employer proper- -- made proper

25  decisions when it hired her as an employee or when it



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:22-cv-00274-KGB Document 82 Filed 01/29/24 Page 415 of 2460 PageID 707
135

1    decided to keep her as an employee, you wouldn't know

2    anything about that one way or the other, would you?

3    A.  No, sir.

4    Q.  And as to whether it properly trained her while

5    she was an employee or properly supervised her while

6    she was an employee, you wouldn't have any knowledge

7    about that one way or the other, would you?

8    A.  No, sir.

9    Q.  We're getting very close to the end.  I want to

10   ask you just a few more questions.  And let me show

11   you what we will mark as -- or what's been marked as

12   Exhibit Number 14.

13              I want to ask you, Ms. Moreno, is this --

14   you said whenever you studied for your driver's

15   license, you went online and looked at a study guide

16   that was online.  Do you know if this looks like the

17   guide you may have used whenever you were studying?

18              (Exhibit 14 marked for identification.)

19   A.  Yes, sir, it kind of looks...

20   Q.  It's just the standard Arkansas Driver's License

21   Study Guide, I guess, effective January 2018 through

22   the -- through the present.

23              I'm not going to go over everything in

24   here, but let me just ask you about a few things.  If

25   you would, skip forward with me to page 34.  And over



 1   on Page 34, I kind of have a sticky note and I have a

 2   highlight.  And this is talking about just some

 3   general driving rules.  And I would like for you to

 4   just sort of follow along with me there if you would.

 5              The Bullet Point Number 2 in General

 6   Driving says:  Never stop in travel lanes for any

 7   reason.

 8        And then it gives potential reasons:

 9   Confusion; breakdown; passenger drop-off, et cetera.

10   Keep moving until you can safely pull off the road.

11              Do you -- do you see that?

12   A.  Yes, sir.

13   Q.  Do you remember, when you were studying for your

14   -- your driver's license, seeing information like

15   that?

16   A.  Yes, sir.

17   Q.  Okay.  You would agree with me that on the day

18   this accident happened, you did come to a stop at

19   least potentially in a -- in a travel lane; correct?

20   A.  Yes, sir.

21   Q.  If you would, move over to Page 42.  And, again,

22   there's a little sticky Post-It note and some

23   highlighting.  And this talks about parking a vehicle.

24   If you would, just follow along as I read the

25   paragraph at the top there.



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
137
Case 3:22-cv-00274-EK Document 45 Filed 01/29/24   Page 417 of 2460   PageID 709

```
 1                    When parking a vehicle, drivers need to
 2  make sure their vehicle doesn't become a hazard.  You
 3  should always park your vehicle in a place that is,
 4  one, far enough from the street or highway to avoid
 5  interfering with traffic, and, two, visible to cars
 6  approaching from either direction.
 7                    Would you generally agree with that
 8  statement?
 9  A.  Yes, sir.
10  Q.  Okay.  And then there's a similar statement under
11  "Parking Tips" below it.  The fifth bullet point down
12  says:  If you park on the roadway, park your vehicle
13  as far away from traffic as possible.
14                    And is that a statement you would agree
15  with also?
16  A.  Yes, sir.
17  Q.  If you would, turn to Page 56.  And this is under
18  a section talking about using emergency flashers or
19  hazard lights, but it also talks about stopping your
20  vehicle if there is an emergency.
21                    When your tire blew out, did you engage
22  your emergency flashers?
23  A.  Yes.  I turned them right on.
24  Q.  And do you know whether they were on after your
25  vehicle came to a stop?
```



1   A.   As soon as I had an emergency in the car, I turned

2   them on.

3   Q.   Okay.  If you would, just follow along with me in

4   the part that I have highlighted.

5              What should you do if your vehicle breaks

6   down and you need to stop?  One, get your vehicle off

7   the roadway and away from traffic if possible.

8         And you would agree with that, correct?

9   A.   Yes, sir.

10  Q.   The fifth bullet point down:  In case you don't

11  have emergency flares or other warning devices, use a

12  white cloth to alert other drivers of your emergency

13  situation.  Stand by your car where it is safe and

14  wave the cloth to direct traffic away from your

15  vehicle.

16             I don't know whether you had a white

17  cloth or anything in the car, but did anyone try to do

18  anything that you recall to notify cars that y'all

19  were stopped or warn them?

20  A.   I turned on my emergency lights, sir.

21  Q.   Okay.  But as far as waving a cloth, did anybody

22  try to do anything like that?

23  A.   No, sir.

24  Q.   And then the last bullet point there says:  Never

25  stand in the roadway.



1     And you would agree with that, would you

2  not?

3  A.  Yes, yes, sir.

4  Q.  Okay.  Flip on back to Page 82, if you would.

5  Let's see.  Maybe one more page over.

6     Okay.  And this goes over some potential

7  emergencies that might happen.  The second emergency

8  covered there is blowouts, if a tire suddenly goes

9  flat.  Do you see that section?

10  A.  Yes, sir.

11  Q.  And let me just read what's stated there, and

12  follow along with me:  Hold the steering wheel tightly

13  and keep the vehicle going straight.

14     Would you agree that that's good advice?

15  A.  Yes, sir.

16  Q.  Slow gradually, take your foot off of the gas

17  pedal, and use the brakes lightly.

18     Would you agree with that?

19  A.  Yes, sir.

20  Q.  The third one says:  Do not stop on the road if at

21  all possible.  Pull off the road in a safe place.

22     Would you agree with that?

23  A.  Yes, sir.

24  Q.  Ms. Moreno, as you look back today, if you were to

25  do this -- if this were to happen over again, would



1  you try to get the vehicle completely off of the

2  roadway where no part of it is in the lane?

3  A.  I answered that before, sir.

4  Q.  Okay.

5  A.  And I told you yes, I would.

6           MR. BUNT:  All right.  Give me just one

7           moment.  I think we're about finished here.

8           THE VIDEOGRAPHER:  Did you want to go

9           off, or just take a second?

10          MR. BUNT:  Yeah, let's take about a

11          one-minute break.

12          THE VIDEOGRAPHER:  Okay.  We'll go off

13          the record.  The time is 1704.

14          (Recess from 5:04 p.m. to 5:06 p.m.)

15          THE VIDEOGRAPHER:  Okay.  We are back on

16          the record.  The time is 1706.

17          MR. BUNT:  Ms. Moreno, I know this has

18          been a difficult subject to talk about.  I

19          thank you for your patience with me today as

20          I've asked you about -- these questions.

21          And at this time, I will pass the witness to

22          -- over to Mr. White, your attorney.

23          THE WITNESS:  Can I say something,

24          Mr. White?

25          MR. WHITE:  Well, let's wait.  Let's



Appx_0416

```
 1              wait.  Probably best to only give statements
 2              in response to questions; okay?
 3                   THE WITNESS:  It's a -- it's a question.
 4              Or --
 5                   MR. WHITE:  You ask the question, and
 6              I'll decide if we should say anything more
 7              than that.
 8                   THE WITNESS:  I just want -- want to say
 9              that there's also something in the book that
10              says don't use your phone while you're
11              driving.  So you make sure Caylee knows that
12              and reads every single page she needs to.
13                   MR. WHITE:  Fair enough, right.  And
14              Caylee is getting deposed next week, so
15              we'll have an opportunity to convey that
16              message.
17                   MR. BUNT:  And to the -- that wasn't
18              really a response to any question of mine, I
19              don't think.  But I guess, to the extent
20              anybody might argue that it was, I would
21              object to the nonresponsive portion.  But I
22              understand your -- your viewpoint.
23                              EXAMINATION
24   BY MR. WHITE:
25   Q.  Okay.  And do you remember the police officer
```



1  that's called Officer Winston; right, the black police

2  officer that met you at the scene?

3  A.  Uh-huh.

4  Q.  Do you remember her asking you to demonstrate

5  where you and Nehemias were standing?

6  A.  Yes.  I told her she had -- he had been near me or

7  right next to me.  I don't remember exactly.

8  Q.  Did she ever ask you to go back to your Toyota and

9  show specifically where you and Nehemias had been

10  standing, though?

11  A.  Not exactly.

12  Q.  Okay.  Do you remember her ever asking you if

13  everyone had gotten out of the vehicle?

14  A.  Yes, she had.

15  Q.  And do you remember what you told her?

16  A.  I think I had told her that we had stayed in the

17  car.  And I think I messed up on my wording with that.

18  Because, yes, we were all in the car at some point;

19  but, I mean, we all got out and tried to change the

20  tire.

21  Q.  So, to your knowledge, at the point Nehemias was

22  hit, everyone was out of the vehicle?

23  A.  Yes, sir.

24  Q.  And so to the extent the police officer thought

25  everyone was in the vehicle, that is the result of a



```
 1  miscommunication?
 2  A.  Yes, sir.
 3  Q.  Okay.  Do you remember giving any statement at all
 4  about what happened in the accident to the paramedic
 5  that spoke Spanish?
 6  A.  I don't remember, sir.
 7  Q.  Okay.  So when we talk about you pulling over to
 8  the left -- and I know you've gone over this.  You
 9  don't think you could have pulled over to the right on
10  the right-hand side shoulder, do you?
11              MR. BUNT:  Objection to form.
12  A.  I don't think I could have.
13  Q.  Okay.  And is that because you essentially lost
14  control of the vehicle?
15  A.  Yes.  Everything in the car was shaking.  And I --
16  I didn't feel I could move the car anymore.
17  Q.  And when you were looking when -- strike that.
18              When Mr. Bunt was showing you portions of
19  the Arkansas Driving Manual, do you notice where it
20  said "if possible, get your car out of the lane" or
21  "if possible, get all the way on the shoulder"?  Did
22  you notice that?
23  A.  Yes, sir.
24  Q.  And do you agree that, in your situation, it was
25  not possible to get your car all the way in the
```



1  left-hand shoulder and still leave room to change the

2  tire?

3  A.  Yes.

4              MR. BUNT:  Objection to form.

5  Q.  You do agree with that?

6  A.  Yes, sir.

7  Q.  Okay.  Do you remember Evelyn -- no, strike that.

8              Do you remember Dina, Melvin, or Erick

9  ever telling anyone at the scene that they didn't see

10  anything?

11  A.  What was that?

12  Q.  Do you remember Erick, Melvin, or Dina telling

13  anyone, including the paramedics or police officers,

14  that they didn't see anything about what happened to

15  Nehemias?

16  A.  I don't -- I don't -- I don't think so.  I

17  don't -- I wouldn't remember exactly what they said.

18  Q.  Do you have any reason to think they would have

19  said that?

20  A.  No, sir.

21  Q.  So if the police officer thought they said that,

22  she would have been mistaken, to the best of your

23  knowledge?

24  A.  Yes, sir.

25  Q.  Do you remember telling Officer Winston that



1   Nehemias was inside the left-hand shoulder with you?

2   A.  Yes.  I tried to tell her that she -- that

3   Nehemias was just in the line where -- not passing

4   where the car was.

5   Q.  So you remember telling her he wasn't in the road?

6   A.  Yes, sir.

7   Q.  You recall somewhat getting hit with his body, or

8   do you just remember blacking out?

9   A.  I remember something hitting me.  I don't -- at

10   the end, I don't know if it was -- I didn't know if it

11   was a car or him or anything.

12   Q.  And do you have a strong recollection of whether

13   his body hit you in the -- in, like, the middle of

14   your back or to the right of your back?  Do you have

15   any sense of that at all?

16   A.  No, sir.

17   Q.  But do you think, from what you saw where his body

18   landed, that he hit you, also hit the back right

19   light, and then fell into the road; is that right?

20   A.  Yes, sir.

21   Q.  To the right of the car is where his body ended up

22   lying; correct?

23   A.  Yes, sir.

24   Q.  Did anyone from the Richland Police Department or

25   the Texas State Police ever contact you after the



1  accident to request an additional statement?

2  A.  No, sir.  We -- the police just started arriving.

3  I don't know who called it.

4  Q.  Sorry.  Let me -- I know that was a bad question.

5           In the days following the accident, did

6  anyone from the police reach out to you?

7  A.  Oh, no, sir.

8  Q.  At any point, has anyone from the police reached

9  out to you following the accident --

10  A.  No.

11  Q.  -- not including the day of?

12  A.  No, sir.

13  Q.  Okay.  Now, you told Mr. Bunt that you were not

14  looking at Nehemias, but you're certain he would not

15  have been in the road; correct?

16  A.  Correct.

17  Q.  Can you expand on your certainty, why you're so

18  certain?

19  A.  He -- we were looking for something in the trunk.

20  And it wouldn't make sense for him to be looking for

21  something in the road.  It would just -- to me, it

22  wouldn't make sense.  If what we're doing -- if what

23  we're doing is inside the trunk, or at least near it,

24  he wouldn't be out in the road looking for something

25  that's not there.



```
 1  Q.  When did Nehemias plan to graduate from high
 2  school?
 3  A.  In 2023.
 4              MR. BUNT:  I'm sorry.  Can you say that
 5          just a little bit louder?
 6              THE WITNESS:  In 2023.
 7              MR. BUNT:  Okay.
 8  Q.  And was that -- did he plan on going back to high
 9  school or getting his GED or something like that?
10  A.  That's what his ID said.  On his Fayetteville High
11  School ID, it said "class of 2023."
12  Q.  Okay.  So he -- and he did want to go back and
13  finish his high school degree?
14  A.  Yes, he did.
15  Q.  What is the speed limit in Arkansas on interstate
16  roads?
17  A.  It's 70.
18  Q.  And your general practice is to go approximately
19  70 miles an hour?
20  A.  Yes, sir.
21  Q.  Do you think you would have changed to go faster
22  since the speed limit is a little bit higher in Texas?
23  A.  You have, like, muscle memory that you just
24  instantly don't want to speed because you're so used
25  to going on a certain speed where you're from.  So I
```



**PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL**
Case 3:22-cv-00274-LC Document 42 Filed 01/29/24 Page 428 of 2460 PageID 720
**MORENO, EVELYN on 08/02/2023**

148

1 didn't want to speed in Arkan- -- I mean, in Texas.

2 Q. When you pulled over on the left, would you say

3 you chose to pull over on the left or you were forced

4 to pull over on the left?

5             MRS. BUNT: Objection to form.

6 A. I felt like I was more forced to.

7 Q. So you said that you've learned, as a result of

8 this accident, no matter what to try to get over to

9 the right. Is that what you told Mr. Bunt?

10 A. Yes, sir.

11 Q. But on the day of the accident, you couldn't get

12 over to the right, could you?

13 A. No, sir.

14 Q. And why is that?

15 A. I couldn't move the car.

16 Q. Why did Nehemias take the lead on changing the

17 tire?

18 A. He had changed the tire prior on my car before

19 when I have had a -- like an accident like that when

20 my tire has popped.

21 Q. And to the best of your recollection, what did

22 Nehemias say to everyone about staying out of the

23 road?

24 A. To not get in the road at all because it was

25 dangerous.



1   Q.   So let's look at what's marked as Exhibit

2   Number 12 here.  Do you recognize this one where you

3   made some red marks on it?

4   A.   Yes, sir.

5   Q.   Okay.  So I know you said that it looks like a

6   fair portrayal of the way the car was sitting; is that

7   right?

8   A.   Yes, sir.

9   Q.   Okay.  But when you look hard at that, looking at

10  that car, does that car look a little bit larger than

11  the blacked-out lanes?

12  A.   A little bit, yes.

13  Q.   So would you say it's not a perfect portrayal of

14  reality; right?

15  A.   Yes, sir.

16  Q.   And is that because the lanes are a little thin?

17  A.   Yes, sir.

18  Q.   And does it look like the shoulder is a little

19  thin, as well?

20  A.   Yes, sir.

21  Q.   And you'd agree that the circle that you drew of

22  everybody, that's certainly not a life-like

23  representation of how big or small everyone was and

24  where they were standing?

25  A.   Yes, sir.



1  Q.  Okay.  Other than saying that you couldn't speak
2  English, did the paramedic say anything else that
3  upset you?
4  A.  That was it.  I just -- I had been the one
5  translating for everybody, translating for the --
6  telling everything to the officer.  So I didn't
7  understand when he said that when I had spoke in
8  English and Spanish the whole time.
9  Q.  Do you remember Caylee Smith getting out of her
10 vehicle at any point during the accident?
11 A.  No, sir.
12 Q.  Did she ever say anything to you?
13 A.  No, sir.  I -- no.
14 Q.  What is your practice when you're driving down the
15 road and you see someone pulled over with their
16 emergency lights on?  What do you do?
17 A.  You merge to the other lane.
18 Q.  Why?
19 A.  Because even if they're on the railings, like if
20 you see somebody pulled over by a cop and they're on
21 this side (indicating), you pull over to the other
22 lane.
23 Q.  And, just for the record, you pointed down at the
24 right lane.  So if a cop was pulled over -- someone
25 was pulled over in the right lane, you pull over into



1   the left lane to stay away from the police officer; is

2   that right?

3   A.  Yes, sir, so they're a little bit more safe in the

4   middle of a highway.

5   Q.  So if you saw a police officer standing in the

6   lane of the interstate, pulling someone over, you get

7   out of that lane; is that right?

8   A.  Yes, sir.

9   Q.  Why would you do that?

10  A.  So that there's no risk of you hitting them.

11  Q.  Do you think that's an important rule?

12  A.  Yes, sir.

13  Q.  Okay.  Do you think that same rule applies if

14  someone is pulled over on the left as well as the

15  right?

16  A.  Yes, sir.  I've seen it done with the semis.

17  Anybody pulled over with their emergency lights.  And

18  sadly, that's the first thing I think about is that

19  somebody could get out of the car and someone could

20  get hit.

21  Q.  Was there any damage to the inside of your

22  vehicle?

23  A.  No, sir, not the inside.

24  Q.  Okay.  Just one second.  Let me see that booklet.

25  Thank you.



1            So to the best of your recollection,
2  Evelyn, what is the rule on texting and driving in
3  Arkansas?
4  A.  I mean, you can't be on your phone at all.  Even
5  three seconds on your phone, you can drive up to a
6  football field blindly without knowing what's there.
7  Q.  Where'd you pick -- where'd you pick that line up
8  about you can drive the length of a football field?
9  A.  It's on commercials, and they teach you in school.
10  Q.  Just to make sure, you got -- I want to make sure
11  I got that.  That's on commercials?
12  A.  Commercials on TV.  They teach you in school not
13  to text and drive along with don't drink and drive.
14  Q.  So let's look at Page 41 here of this exhibit.  Do
15  you see that highlighted language on Page 41?
16  A.  Yes.
17  Q.  Can you read that for us?
18  A.  Drivers passing at stopped school bus with red
19  lights flashing upon conviction will be charged as a
20  Class A misdemeanor, a fine of a minimum of 500, not
21  exceeded to 2,500, up to one year in -- up to a year
22  in jail or both [as read].
23  Q.  So okay.  That's the rule.  Explain in your own
24  words what the rule is when you see a school bus with
25  lights on.



1  A.  You stop behind the bus and let the little kids

2  come out or in into the bus, and you don't go until

3  the bus goes.

4  Q.  And do you worry about precisely where the bus is

5  at when you follow that rule?

6  A.  No, sir.

7  Q.  Why not?

8  A.  Because buses stop either -- wherever they need to

9  stop, if that's on crossroads, on -- I mean, yeah, in

10  the crossroads where they're dropping off or picking

11  up.  I mean...

12  Q.  Okay.  So let's look at Page 42 here.  So do you

13  see where it says:  When parking a vehicle, drivers

14  need to make sure their vehicle doesn't become a

15  hazard.  You should always park your vehicle in a

16  place that is, one, far enough from the street or

17  highway to avoid interfering with traffic, and, two,

18  visible to cars approaching from either direction.

19              Do you see where it says that?

20  A.  Yes, sir.

21  Q.  Was your car visible to oncoming traffic?

22  A.  Yes, sir.

23  Q.  I'm sorry.  Was your car visible to oncoming

24  traffic on April 30th, 2022?

25  A.  Yes, sir.



1  Q.  Why do you think it was visible to oncoming

2  traffic?

3  A.  It was in a very straight road.  I mean, it was

4  broad daylight with emergency lights on.

5  Q.  And with five people standing around it?

6  A.  Yes, sir.

7  Q.  And everybody else that had passed you that day

8  merged over to the right and didn't get close to

9  hitting you; is that right?

10 A.  Yes, sir.

11 Q.  Okay.  Now, below on "Parking Tips," it says:  If

12 you park on the roadway, park your vehicle as far away

13 from traffic as possible.

14         Do you see where it says that?

15 A.  Yes, sir.

16 Q.  What do you take "as possible" to mean?

17 A.  That if it's a possibility, do it; but it won't

18 always happen.

19 Q.  Now, look at Page 56.  Go ahead and read this

20 again, the highlighted language at the top.  Can you

21 just read those first two highlighted lines?

22 A.  This?  Which one?

23 Q.  The first two highlighted lines on the top of

24 Page 56.

25 A.  What should you do if your vehicle breaks down and



Appx_0430

1  you need to stop?  Get your vehicle off the road and

2  away from traffic if possible.

3  Q.  So, again, there's that language "if possible";

4  what do you take that to mean?

5  A.  If you can do it or if it's -- if you're able to.

6  Q.  When you read that, does it make you think there

7  may be some circumstances it won't be possible?

8  A.  Yes, sir.

9  Q.  Okay.  So let's look at Page 82.  Could you please

10  read the third highlighted bullet point under

11  "Blowouts"?

12  A.  Okay.

13          Do not stop on the road.  At all -- if at

14  all possible, pull off the road in a safe place [as

15  read].

16  Q.  So there's that "if at all possible" language

17  again.  What do you take that to mean?

18  A.  If you're able to or if it can be done.

19  Q.  Were you able to on April 30th, 2022?

20  A.  No, sir.

21  Q.  So did you look at the next page, Page 83, where

22  it talks about avoiding collisions?  Did Mr. Bunt

23  highlight any of that for you?

24  A.  No, sir.

25  Q.  If you could just read this first paragraph on



1  Page 83.

2  A.  Avoiding collisions.  When it looks as if a

3  collision may happen, many drivers panic and fail to

4  act.  In some cases, they do not -- they do act, but

5  do something that does not help to reduce the chance

6  of the collision.  There is something you can do to

7  avoid the crash or reduce the results of the crash.

8  In avoiding a collision, drivers -- drivers have three

9  options:  One, stop; two, turn; and three, speed up

10  [as read].

11  Q.  So on April 30, 2022, what do you think Caylee

12  could have done to avoid a collision?

13           MR. BUNT:  Objection to form.

14  A.  She could have looked up.  She could have stopped.

15  I don't know.

16  Q.  Or she could have got in the middle lane; is that

17  right?

18  A.  Yes, sir.

19  Q.  Now, I know that this manual is Arkansas and

20  Caylee was taught in Texas, presumably.  But can you

21  read from "did you know" to the bottom of Page 48?

22           MR. BUNT:  Objection to form.

23  A.  Did you know use of an electronic device while

24  driving can distract drivers from approximately

25  thinking about the driving task, watching the road,



 1  and surrounding environments, and keeping their hands

 2  on the steering wheel.  Writing or reading a text

 3  takes your eyes off the road for an average -- average

 4  of 4.6 seconds.  At 55 miles per hour, that's like

 5  driving the length of a football field blindfolded [as

 6  read].

 7  Q.  So there's that football field thing again.  You

 8  said you learned that either from this manual or just

 9  from TV; is that right?

10  A.  Yes, sir.

11  Q.  Okay.  And you believe that's common knowledge

12  with people your age?

13  A.  Yes, sir.  They teach it in schools.

14  Q.  Do you think it would have mattered -- strike

15  that.

16          Do you think Nehemias still would have

17  been hit even if you would have been pulled further

18  over to the left?

19          MR. BUNT:  Objection to form.

20  A.  Yes.

21  Q.  Why do you think that?

22  A.  If you're not looking at the road and you're on

23  your phone, a lot of people swerve back and forth from

24  the road.

25          MR. WHITE:  I reserve the rest of my



```
 1                    questions for trial.
 2                         FURTHER EXAMINATION
 3    BY MR. BUNT:
 4    Q.  Ms. Moreno, you testified a little while earlier
 5    that you never saw Caylee Smith's car.
 6    A.  No, sir.
 7    Q.  You never saw Caylee Smith?
 8    A.  No, sir.
 9    Q.  You can't tell us whether she was looking up or
10    whether she was looking down from what you saw, can
11    you?
12    A.  No.  But if you're not looking at the road --
13    Q.  Well --
14    A.  -- and you see somebody --
15               MR. BUNT:  Objection.  Objection;
16          nonresponsive.
17    Q.  You were not looking at her; you did not see her;
18    correct?
19    A.  No, sir.
20    Q.  So you don't know whether she was looking at the
21    road or whether she was looking down, do you?
22    A.  No, sir.
23    Q.  Okay.  You don't know whether she was looking at
24    her phone or whether she was looking at the road, do
25    you?
```



**www.ArkansasRealtimeReporting.com**

PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:22-cv-00274-BRW   Document 42   Filed 01/29/24   Page 439 of 2460   PageID 731    159

1  A.  No, sir.

2  Q.  The answers you've given Mr. White are just

3  opinions, but they're not based upon what you actually

4  know as an eyewitness to the accident; correct?

5  A.  No, sir.

6  Q.  That's "no"?

7  A.  I was hit, and I blacked out.

8  Q.  What I'm saying is, when you said she could have

9  looked up, she could have not been using her phone,

10  you're assuming she was doing those things, but you

11  don't personally know, do you?

12  A.  No, sir.

13  Q.  Okay.  You also testified earlier that the reason

14  you pulled over to the left side of the road was

15  because you were already in the left lane; correct?

16  Do you remember telling me that?

17  A.  Yes, sir.

18  Q.  And that was the closest lane?

19  A.  Yes, sir.

20  Q.  Do you remember telling me that?

21          And it was sort of your instinct just to

22  go off the road at the closest point.  Do you remember

23  saying that?

24  A.  Yes, sir.

25  Q.  All right.  In response to Mr. White's questions,



1  you said that -- or you agreed that it was impossible

2  for you to try to drive off to the right side of the

3  road.  How was it impossible for you to do that?

4  A.  My car was on the floor, sir.

5  Q.  Say again?

6  A.  The tire had completely blown out and was on the

7  floor.

8  Q.  You could have continued driving on a flat tire

9  until you got over to the middle lane and then over to

10  the right lane, and then eventually off the road,

11  couldn't you?

12          MR. WHITE:  Objection to form.

13  Q.  You can go ahead and answer.

14  A.  I don't feel like I could have pulled over to the

15  right, sir.  That's why I pulled to the left.

16  Q.  But you never tried to go over to the right, did

17  you?

18  A.  I don't think I could've.

19  Q.  That's not my question.

20          My question is:  You never tried to go

21  over to the right, did you?

22  A.  No.  I would have ended up in the middle of the

23  road.  The car was on the floor.

24  Q.  What do you mean "the car was on the floor"?

25  A.  The tire was on the floor.  Like, I couldn't --



1  Q.  On the road?

2  A.  Yes.  While I was driving and the car started

3  shaking.  That's why I thought I could pull over only

4  to the left.

5  Q.  All right.  Have you ever -- other than this one

6  time, have you ever driven a car with a flat tire?

7  A.  No, sir.

8  Q.  Okay.  So you wouldn't know, then, how far you

9  could drive on a flat tire, would you?

10 A.  No, sir.

11 Q.  Okay.  Do you think that the Arkansas Driver's

12 License Study Guide Manual says numerous times to try

13 to get completely off the road, that it would give

14 that vice -- that advice if it knew -- if they knew

15 that it's impossible for someone to continue driving

16 on a flat tire?

17 A.  What?  What was that?

18 Q.  Do you think that the Arkansas Driver's License

19 Study Guide would instruct drivers to try to get

20 completely off the road if they knew it was impossible

21 for drivers to drive on a flat tire?

22 A.  I just tried to get off the tire -- the road as I

23 could, sir.

24        MR. BUNT:  Objection; nonresponsive.

25 Q.  You never turned -- you never engaged your right



1  turn signal, did you?

2  A.  No, sir.  I -- I don't think I could have made it

3  to the right.

4          MR. BUNT:  Objection to the

5          nonresponsive portion.

6  Q.  You never attempted to move from the left lane

7  into the center lane, did you?

8  A.  No, sir.

9  Q.  You never attempted to signal again and move from

10  the center lane on to the right -- into the right

11  lane?

12  A.  No, sir.

13  Q.  And you never attempted to signal and try to move

14  from the right lane off the highway on the right side?

15  A.  No, sir.

16  Q.  Instead, you assumed that's something that you

17  would not have been able to do and you chose to go to

18  the left side instead; correct?

19  A.  Yes, sir.

20  Q.  Okay.  Ms. Moreno, was there -- did you think

21  about trying to move -- if you're going to go over to

22  the left shoulder, did you think about trying to go

23  all the way over onto the left shoulder so that no

24  part of the car would be across the yellow line?

25  A.  I tried to move the car as far left as I could.



1   Q.  And you're saying that you just couldn't have gone
2   any further to the left?
3   A.  That's where I had stopped the car to change the
4   tire, sir.
5   Q.  Okay.  And I know that's where you stopped the
6   car.  And I'm just asking:  Did you ever think about
7   stopping even further left, pulling further left so
8   that no part of your car would be on the road?
9   A.  We were just trying to do everything as quickly as
10  possible, sir.
11  Q.  Okay.  You stopped where you did because you
12  wanted to allow room on that side to change the tire?
13  A.  Yes, sir.
14  Q.  Do you think the car -- had you ever given thought
15  to pulling completely off on the left side and then
16  maybe just stopping and calling someone to come and
17  help like police or roadside assistance?
18  A.  If I had known, I -- I would have thought about
19  those options.  But I didn't think about it, honestly.
20  And Nehemias knew how to change the tire, so that's
21  what we decided to do.
22  Q.  Okay.  You would agree with me, would you not,
23  that you were able to control your car well enough to
24  get it from the left lane over to where it was at
25  least partially out of the left lane, mostly out of



```
 1   the left lane?
 2   A.  I was just trying to move it as close as I could,
 3   like I said.
 4              MR. BUNT:  Okay.  Pass the witness.
 5              MR. WHITE:  Okay.
 6                   FURTHER EXAMINATION
 7   BY MR. WHITE:
 8   Q.  Evelyn, please hand me that book one more time.
 9              So just for the record, Mr. Bunt had you
10   look at some highlighted language on pages -- this one
11   doesn't have a page -- so let's see, the first one
12   with a page number is Page Number 34, Page Number 42,
13   Page Number 56, Page Number 57, Page Number 82 on
14   what's marked as exhibit number --
15              MR. WHITE:  What are we calling this,
16         Brian?
17              MR. BUNT:  14.
18              MR. WHITE:  Yeah.
19              MR. BUNT:  Yeah.  Didn't ask about
20         anything on 57.
21              MR. WHITE:  57.  Sorry.  It was
22         highlighted, so my bad.
23              MR. BUNT:  Yeah.
24              MR. WHITE:  My bad.
25   Q.  Did you see anything in here that said you have to
```

1  pull over on the right-hand side?

2  A.  No, sir.

3  Q.  Everything that's been highlighted is about doing

4  your best to get your vehicle out of traffic; is that

5  right?

6  A.  Yes, sir.

7            MR. WHITE:  No further questions at this

8       time.

9                 FURTHER EXAMINATION

10 BY MR. BUNT:

11 Q.  Ms. Moreno, you would agree with me that you have

12 been taught that if a police officer is pulling you

13 over that you're to pull off the road on the right

14 side, would you?

15 A.  I mean, you pull over where you can.  But I've--

16 yes, I understand now that you pull over to the right

17 side because it's off road, it's safe.  So, yes,

18 that's what I've -- yes, that's...

19 Q.  And I know you weren't being pulled over by a

20 police officer.  That's not what your situation was.

21 But if you look at the instructions in the booklet

22 that you studied, number one, if -- what to do if

23 you're stopped by law enforcement officer, it does say

24 pull over to the right side of the road; correct?

25 A.  Yes, sir.



Appx_0441

```
 1                    MR. BUNT:  All right.  No more
 2           questions.
 3                    MR. WHITE:  One more.  One more.
 4                    MR. BUNT:  Okay.
 5                    FURTHER EXAMINATION
 6   BY MR. WHITE:
 7   Q.  Presumably, if you're being pulled over by the
 8   police, you have control of your vehicle; correct?
 9   A.  Yes, sir.
10                    MR. WHITE:  Okay.  I'm done for now.
11                    MR. BUNT:  No more.
12                    THE VIDEOGRAPHER:  Okay.
13                    MR. BUNT:  Thank you, Mrs. Moreno.
14                    THE VIDEOGRAPHER:  We'll go off the
15           record.  The time is 1737.
16           (Proceedings concluded at 5:37 p.m.)
17
18
19
20
21
22
23
24
25
```



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:23-cv-00214-KGB Document 49 Filed 01/29/24 Page 447 of 2460 PageID 739
167

```
 1                REPORTER CERTIFICATION
 2        I, JENNIFER NORMAN, Certified Court Reporter
 3   for the State of Arkansas, do hereby certify to the
 4   following:
 5        1) that on August 2, 2023, the witness,
 6   EVELYN MORENO, was duly sworn by me prior to the
 7   taking of testimony as to the truth of the matters
 8   attested to and contained therein;
 9        2) that the foregoing pages contain and are a
10   true and correct transcription of the proceedings as
11   reported verbatim by me via realtime stenography to
12   the best of my ability and transcribed at or under my
13   direction and supervision, and subject to appropriate
14   changes submitted by witness, if any, during his/her
15   requested reading and signing of this deposition
16   according to the Arkansas Rules of Civil Procedure;
17        3) that I am neither counsel for, related to,
18   nor employed by any of the parties to the action in
19   which this proceeding was taken; and that I am not a
20   relative or employee of any attorney employed by the
21   parties hereto;
22        4) that I am not financially interested or
23   otherwise interested in the outcome of this action
24   that affects or has substantial tendency to affect
25   impartiality or requires me to relinquish control of
```



1    an original or copies of a deposition transcript

2    before it is certified, or that requires me to provide

3    any service not made available to all parties to the

4    action; and

5         5) that I have no contract with the parties,

6    attorneys, or persons with an interest in the action;

7    and that I am not knowingly identified on a preferred

8    provider list, whether written or oral, for any

9    litigant, insurance company, or third-party

10   administrator involved in this matter;

11        6) that signature of the witness is waived.

12   This transcript is prepared at request of counsel for

13   DEFENDANTS, and all fees are billed directly to them

14   in compliance with Arkansas Board of Court Reporter

15   Examiners Regulations Section 19.

16        Witness my hand and seal this 15th of

17   August, 2023.

18

19   _____

20   JENNIFER NORMAN, CCR
     LS Certificate #768, State of Arkansas
21   Arkansas Realtime Reporting
     1130 E Millsap Rd
22   Fayetteville AR 72703
     479-301-2040
23   www.ArkansasRealtimeReporting.com

24

25



**Exhibits**

**Moreno Exhibit 1** 3:18 24:14,16 25:16

**Exhibit 2** 3:19 79:9,13

**Exhibit 3** 3:20 78:17

**Exhibit 4** 3:21 78:17 97:15,16

**Exhibit 5** 3:22 78:17

**Exhibit 6** 3:23 78:18

**Exhibit 7** 3:24 78:18

**Exhibit 8** 4:3 78:18

**Exhibit 9** 4:4 78:16,18

**Exhibit 10** 4:5 78:16,19

**Exhibit 12** 4:6 93:7,9 149:1,2

**Exhibit 14** 4:7 33:13 135:12,18

**$**

**$12.50** 42:22

**$14** 45:12

**-**

**--the** 122:10

**1**

**1** 24:14,16 25:16

**10** 43:10 78:16,19,24

**100** 20:21

**12** 22:8 93:7,9 149:2

**12.50** 42:14

**1336** 5:4

**14** 33:13 44:7 135:12,18 164:17

**1420** 36:24

**1424** 37:2

**15** 33:13 43:16

**1501** 63:9

**1503** 63:12

**1522** 76:14

**1525** 76:17

**1556** 99:9

**16** 14:21 15:7 22:11,14 33:13

**1604** 99:12

**17** 22:12,14

**1704** 140:13

**1706** 140:16

**1737** 166:15

**18** 60:4,9

**18th** 59:24 60:10

**18th-birthday** 59:19

**2**

**2** 79:9,13 136:5

**2,500** 152:21

**20** 19:4

**2002** 10:1 35:18

**2011** 59:7

**2018** 135:21

**2020** 61:7,8,11,13 62:1

**2021** 11:10,22 13:10,11 19:3 30:14 45:19 61:4 66:9

**2022** 12:17 19:17 28:5 29:12 45:15 52:18 53:6 55:9 62:2 66:11 125:25 153:24 155:19 156:11

**2023** 5:3 147:3,6,11

**21** 19:5

**22nd** 55:8

**24th** 35:18

**26th** 10:1 15:21

**29th** 49:20

**2:20** 36:25

**2:24** 36:25

**2nd** 5:3

**3**

**3** 78:14,17 79:14

**30** 28:5 52:18 55:8 125:25 156:11

**30th** 153:24 155:19

**34** 135:25 136:1 164:12

**3:01** 63:10

**3:03** 63:10

**3:22** 76:15

**3:22-CV-02714-K** 5:9

**3:25** 76:15

**3:56** 99:10

**4**

**4** 78:17 79:14 97:16

**4.6** 157:4

**40** 42:24

**41** 152:14,15

**410** 5:7

**42** 136:21 153:12 164:12

**479 313-3951** 29:5

**48** 156:21

**4:04** 99:10

**5**

**5** 78:17

**500** 152:20

**54** 43:12,13 44:9,12,13 45:13

**55** 157:4

**56** 137:17 154:19,24 164:13

**57** 164:13,20,21

**5:04** 140:14

**5:06** 140:14

**5:37** 166:16

**6**

**6** 78:18

**614** 10:12,18

**65** 68:6

**679-03** 14:14

**7**

**7** 78:18

**70** 68:6,11,12 147:17,19

**71** 130:7

**72764** 5:8

**75** 68:9

**8**

**8** 78:14,18

**82** 139:4 155:9 164:13

**83** 155:21 156:1

**9**

**9** 43:10 78:16,18,24

**939753783** 15:19

**A**

**abdominal** 129:1,22

**accident** 10:22 20:3 22:3,5,13,16,25 23:6 25:22,24,25 26:3,13,22, 24 27:2,21 28:13 32:10 33:3,6 41:17 42:5 45:16 49:17 51:22 52:2 55:3, 14,23 62:23 65:20 67:6 69:8 76:6,24 78:10 90:3, 5 91:19 92:19 94:4 95:2 96:2,4 101:20 103:12 105:2 106:12 108:5 109:7,8,16,17 110:8



111:14 114:5,8,13 115:16 116:7,8,14,17,19 119:10 120:6,9 121:5 123:15 124:22 125:21 128:1,22,24 131:11,18 132:7,12 134:3,13 136:18 143:4 146:1,5,9 148:8,11,19 150:10 159:4

**accidents** 22:7 23:12 125:15,19,22,23 134:9

**account** 45:2,4

**accurate** 26:14 45:14, 18

**accurately** 93:14,19

**act** 156:4

**activating** 74:13

**actual** 34:1 60:22 61:15 85:13

**added** 29:11

**additional** 17:10 146:1

**address** 10:11,19,23 121:18

**admit** 50:17

**advance** 9:12 78:5

**advice** 51:7 139:14 161:14

**advise** 50:9

**affect** 65:10

**afternoon** 6:4,16

**age** 157:12

**agree** 7:20 76:4 79:12 101:7 136:17 137:7,14 138:8 139:1,14,18,22 143:24 144:5 149:21 163:22 165:11

**agreed** 160:1

**agreeing** 9:16

**agreements** 7:15

**Aguilar** 115:18

**ahead** 47:7 58:21 80:6 94:14 109:14,25 110:23 118:19 120:23 127:9 154:19 160:13

**alcoholic** 65:5,13

**alert** 71:4 138:12

**alerted** 72:12

**aligned** 127:1

**allowed** 34:3,17 35:6,7 44:2,21

**ambulance** 26:13 90:1 111:21 112:1,20 113:6,9

**Amendment** 50:10

**amount** 42:20

**anesthesia** 14:4

**angry** 95:19

**annual** 126:13

**answers** 6:18 7:7 65:2 159:2

**anybody's** 116:6

**anymore** 104:21 143:16

**apartment** 121:4,14 122:1,2,9,10

**apologies** 83:10

**apparently** 21:18

**appearance** 18:2,3,19

**appeared** 34:20

**applies** 151:13

**apply** 7:5

**appointments** 131:4,10

**approaching** 102:15, 19,23 137:6 153:18

**approximately** 19:1 44:9 51:17 67:14 69:16 70:7 71:13 107:10 147:18 156:24

**April** 10:21 12:17,18 14:8 15:23 19:15,16 28:5 29:12 49:20 52:18 53:6 55:8 62:2 66:7,11 125:25 153:24 155:19 156:11

**area** 10:4 53:19 54:13 68:8 74:9 83:13 95:11 97:14 99:25 100:23 101:3 104:16 105:10,15 108:2 110:21 118:5,11, 25 129:1,22,24

**areas** 96:7

**argue** 141:20

**Arkan-** 148:1

**Arkansas** 5:8 10:3,8,13 13:8 14:18 17:1 19:25 23:18 33:9,15 50:4,5,25 51:24 52:8 54:17 121:5 126:12 130:4 135:20 143:19 147:15 152:3 156:19 161:11,18

**arm's** 98:11 100:17,24

**arrested** 133:16,24

**arriving** 146:2

**asks** 8:2 25:21

**assess** 113:2

**assistance** 106:18,19 163:17

**assistant** 13:20

**assisting** 96:11 97:6

**assume** 8:9 56:14,19 58:15 98:15 109:19 128:2 134:17

**assumed** 112:10 162:16

**assuming** 6:14 38:6 74:3 159:10

**assumption** 53:4 63:5

**assured** 83:20

**attached** 23:21 25:20

**attempt** 75:13 77:5 92:2

**attempted** 87:1 162:6,9, 13

**attempting** 91:18 107:3

**attended** 13:5,11 36:5

**attention** 95:16,20 100:2

**attorney** 8:2 9:6 24:11 25:6,7,9 51:4 108:7 109:18 115:15 140:22

**attorney's** 51:7

**August** 5:3 35:18

**authorization** 33:16

**automobile** 22:3 132:12

**average** 43:1 44:14 45:12,17 157:3

**avoid** 137:4 153:17 156:7,12

**avoiding** 155:22 156:2, 8

**awake** 104:1

**aware** 19:12 26:12 40:20 56:9 65:17 79:19 80:6 92:3 100:5 102:18 111:6 114:7 116:12 125:23 126:4 130:14

---

**B**

**back** 20:16 21:18,21 22:9,10 24:18 25:17 36:1 37:1 39:24 44:18 46:4 56:16,24 57:4,15,18 63:11 64:25 66:18,19 67:8 68:23 69:12 76:16 77:3,14 78:2 89:16,22 93:18 97:17 98:9,11 99:2,11,13,19,21 100:6, 15 101:12,15,16,21,25 102:6 103:25 104:4 105:17 106:3,15 111:10 117:21 118:11 124:3 125:4,16 129:6 139:4,24 140:15 142:8 145:14,18 147:8,12 157:23

**backpack** 57:21 58:19, 22,23,25

**backpacks** 59:3

**backseat** 81:21

**bad** 95:19 130:21 134:15 146:4 164:22,24

**bag** 57:20 58:6,19

**bags** 58:12,13 59:3 125:5

**bang** 129:6

**bank** 45:2,4

**banking** 28:7

**barrier** 67:8 80:2 83:2

**based** 159:3



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:23-cv-03214-TLB   Document 162   Filed 01/29/24   Page 451 of 2460   PageID 743

Index: bathroom..cetera

**bathroom** 58:4

**bear** 99:15

**began** 37:21

**begin** 14:14

**beginning** 40:22

**behalf** 5:13

**beverages** 65:5,13

**big** 149:23

**bills** 131:20,24 132:4

**birth** 9:25 35:17

**birthday** 59:24 60:11

**bit** 7:17 8:1 10:16 13:4 29:10 36:7 45:9 57:10, 14,17 67:25 80:12 99:16 100:6 104:15 147:5,22 149:10,12 151:3

**black** 103:15 110:8 142:1

**blacked** 98:19 159:7

**blacked-out** 149:11

**blacking** 145:8

**blew** 62:14 71:10 72:2 77:20 128:2 137:21

**blindfolded** 157:5

**blindly** 152:6

**blood** 104:3 105:4,8,9 117:12

**blown** 160:6

**blowouts** 139:8 155:11

**body** 99:3 104:5,24 105:1,7,14,17,21,22 106:1,3,10,20,22 107:4 119:13,22,24,25 120:8, 10 131:2 145:7,13,17,21

**bolts** 85:25 86:1

**bones** 130:14

**book** 75:20 141:9 164:8

**booklet** 6:24,25 16:3,5, 7,8,11,12 151:24 165:21

**born** 10:2,4

**borrow** 26:4

**borrowed** 26:25 27:4

**borrowing** 59:16

**bottom** 156:21

**bought** 29:16,18,21,22 30:2 126:5,9 128:8

**box** 28:23

**brake** 104:16 126:21

**brakes** 126:20,25 127:13 139:17

**break** 8:16,20 15:16 36:21 63:14 76:10,20,21 99:5,14 140:11

**breakdown** 136:9

**breaks** 8:14 138:5 154:25

**breathe** 107:3

**breathing** 107:2 119:11

**Brian** 5:21 6:5 164:16

**Bright** 66:20

**bring** 25:1 31:2 56:16 57:2,24,25

**bringing** 56:24

**broad** 154:4

**broken** 130:14

**brother** 10:25 34:7,10, 11 35:19 40:17,18 51:25 52:6 56:16 80:20 111:11 121:24

**brought** 6:6 58:6 131:21

**bruising** 129:14,15 130:19

**bullet** 136:5 137:11 138:10,24 155:10

**bumped** 125:16

**bunch** 72:14

**Bunt** 5:21 6:3,5 12:16 23:15,23 24:2,5,6 33:10, 11 36:22 43:5 49:11 50:11,15,20 51:9 63:6 78:2,4 94:1 99:7 100:12 108:17 127:10 140:6,10, 17 141:17 143:11,18 144:4 146:13 147:4,7

148:5,9 155:22 156:13, 22 157:19 158:3,15 161:24 162:4 164:4,9,17, 19,23 165:10 166:1,4,11, 13

**bus** 152:18,24 153:1,2,3, 4

**buses** 153:8

**busier** 90:24

**business** 47:14 49:3 127:16

**businesses** 53:19

**buy** 29:24 46:16

## C

**calculator** 43:3,7

**call** 26:25 27:13,15,16 31:8 48:10 54:3,8 55:2 70:8 83:4,11,13 85:1,15 87:14 102:25

**called** 8:16 20:23 27:15 31:22 44:25 54:6 70:2,5, 22 86:7,22 123:19 142:1 146:3

**calling** 163:16 164:15

**calls** 26:23

**cam** 119:23

**Camry** 59:8,9 60:13 117:6 123:24 124:4

**captured** 9:18

**car** 9:14,19,20 22:21,23, 24 25:22,24 58:24,25 59:4,6,13,15,16,18 60:2, 3,15,24 61:2,4,5,14 64:20 65:7 67:17 69:12 71:3,5 72:1,12,16,17,18, 21,25 73:5,8,9,13,14,16, 17,20,24 74:3,4,8 75:7, 10 76:5 77:10,13,22,23, 25 78:9,12,24 79:3,15, 19,23 80:2,6,22 81:9,22, 25 82:1,3,4,21,25 83:21, 22,24 84:1,4,7,12,15,24, 25 85:22 86:13 87:4,10, 25 89:7,15,17 90:13,18 91:4,9,20,23 92:14 93:1, 14,19 97:17 98:4,20

99:22,25 102:4,13,15,18, 23 103:1,6 104:6,9,10, 12,13 105:10 106:8,13, 15 108:4,6,8,9,11,15,22 109:1,2 110:14 114:4 117:11 123:11 124:12 125:15,16,20,21,22,24, 25 126:5,6,8,13,18 127:4,6,14,18 129:6 138:1,13,17 142:17,18 143:15,16,20,25 145:4, 11,21 148:15,18 149:6, 10 151:19 153:21,23 158:5 160:4,23,24 161:2, 6 162:24,25 163:3,6,8, 14,23

**card** 33:14,15,16 34:1,2 47:1,4

**cards** 33:21

**care** 34:5 39:1,9,14,17

**careful** 80:14

**carpet** 88:13,14,19 89:4, 9,10

**carried** 58:8

**carrier** 29:6

**carries** 83:25

**carrying** 58:16 125:9

**cars** 26:16 67:3 68:15, 17,18,19 74:21,22,24 90:17 91:2,3,11 111:7 137:5 138:18 153:18

**case** 5:9 25:14 33:23 111:2 138:10

**cases** 156:4

**cash** 44:5 65:25 66:14

**caused** 104:24

**Caylee** 5:11,22 6:6 134:1 141:11,14 150:9 156:11,20 158:5,7

**Cellular** 30:5,6

**center** 162:7,10

**ceremony** 32:19

**certainty** 146:17

**cetera** 58:7 136:9



Case 3:23-cv-03714-TLB   Document 62   Filed 01/29/24   Page 452 of 2460   PageID 744
PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023                                    Index: chance..dangerous

**chance** 156:5

**change** 57:21 58:1,6
60:17,18 71:7 73:1,4
79:6,25 80:3,20 82:18
83:4,15,25 84:8,11,23
90:7 91:19 126:25
142:19 144:1 163:3,12,
20

**changed** 61:13,19,20,
25 62:3,9,10 83:19,22
84:1,14,15 90:2 91:14
117:16 126:25 127:13
147:21 148:18

**changing** 75:17 148:16

**charge** 83:21 132:3
133:18

**charged** 152:19

**check** 106:25 119:11
126:19

**checked** 81:24 106:22
107:1,2 113:4 119:16
127:19

**checking** 112:22,23

**checks** 128:11

**Chemical** 5:22 6:8

**child** 38:7

**children** 12:19,21 41:14

**chiropractor** 22:10
132:14,24

**chose** 148:3 162:17

**circle** 85:20 94:10,11,
20,25 149:21

**circumstances** 155:7

**citizen** 50:12

**city** 23:10

**claims** 114:13

**class** 17:11 147:11
152:20

**classes** 119:17

**clean** 117:11

**clear** 8:6

**clearance** 80:2

**client** 50:9 109:9

**clients** 109:19

**clinic** 42:6

**close** 46:9 52:22 91:4
101:17 104:22 123:17,
18,21 135:9 154:8 164:2

**closer** 68:9

**closest** 159:18,22

**cloth** 138:12,14,17,21

**clothes** 45:22 57:22,25
58:6,12,13 59:2

**college** 13:12

**collision** 156:3,6,8,12

**collisions** 155:22 156:2

**comment** 76:24 113:10,
17

**commercials** 152:9,11,
12

**common** 157:11

**communication** 73:15

**community** 10:15

**company** 5:23 124:14
131:25

**compartment** 88:20,25
89:18,21

**complete** 79:3,15

**completed** 13:6,7,14,19

**completely** 89:3 140:1
160:6 161:13,20 163:15

**computer** 16:10

**concluded** 166:16

**concrete** 67:7 80:2 83:1

**confirm** 56:14

**confusing** 8:1

**Confusion** 136:9

**Congratulations** 12:25

**considered** 32:15

**construction** 62:4

**consumed** 65:5,12

**contact** 145:25

**contest** 8:14

**continue** 37:3 48:17
68:4 161:15

**continued** 160:8

**control** 67:17,23 68:1,5
71:15 143:14 163:23
166:8

**conversation** 52:13
97:23

**conversations** 37:20

**convey** 141:15

**convicted** 133:14,22

**conviction** 152:19

**cop** 150:20,24

**copies** 124:9

**copy** 12:14 15:9,13 16:7
23:5,17,18 24:9

**cord** 132:20

**corner** 62:15

**Corolla** 59:7

**Corporal** 110:9 111:12
113:22 119:22

**correct** 10:12,16,22
15:23,24 22:1 24:24 25:7
34:9 49:23 51:1,18
53:11,19 55:14 56:1,12,
17 57:5 59:10 64:20
66:16 69:14 75:14 77:21
82:1 91:11,15 92:21
98:21 99:22 100:16,19
101:3,9,13,18 102:16
104:16 107:24 108:20
118:6 119:2 120:12,22
121:6,16 123:17 126:6
128:4 130:1 131:22
134:1 136:19 138:8
145:22 146:15,16 158:18
159:4,15 162:18 165:24
166:8

**correctly** 25:12

**could've** 160:18

**counsel** 5:16,18,21

**count** 41:3 61:19

**country** 50:18

**couple** 17:19 40:8,9
53:1 56:3 108:6 115:3,4
125:15

**courses** 13:12

**court** 5:14 6:23 12:6
15:12 18:2,3 20:8 24:23
25:2 78:25

**covered** 9:11 139:8

**CPR** 119:17

**crank** 85:9 86:21 87:17
89:7

**cranked** 91:22

**crash** 156:7

**crashed** 22:9,12

**crew** 56:6

**crews** 56:9

**Cricket** 29:7

**crime** 133:14,22

**crossroads** 153:9,10

**cruise** 67:17,22 68:1,5
71:15

**Crystal** 10:12,18,24

**curiosity** 83:11

**current** 13:23

**custody** 34:13 39:19

---

**D**

**dad** 35:11,12 40:21 41:9,
11 47:16 53:24 121:23
122:21,24 123:4,7
127:18 128:9,12

**dad's** 121:23

**Dallas** 21:13,16 63:20
69:3

**damage** 22:21 104:15,
23 123:10,13 151:21

**damaged** 28:11 60:18
62:12

**dangerous** 148:25



**dark** 92:7

**date** 5:3 9:25 15:20 35:17 38:11 46:19,21 69:24

**dating** 37:22

**day** 20:3 24:23 25:24 26:10 42:4 43:11 44:15 49:9,17,18 51:21,22 52:1,4,12 55:3,11,12,14 57:16 59:7 62:22,24 63:3,4,16 64:17,23 65:4, 5,10,13,17 66:7,19 67:10,15,23,24 68:24 69:10,13,17,18 108:21 124:22 129:3 130:3,5 134:20,21 136:17 146:11 148:11 154:7

**daylight** 154:4

**days** 33:2,5 70:7,9,10, 11,13,15,23 146:5

**dead** 26:2 27:25

**December** 12:24 66:7,9

**decide** 51:10 74:7 141:6

**decided** 24:21 111:25 113:8 135:1 163:21

**decision** 37:9 72:21 80:5 83:15

**decisions** 134:25

**decoration** 92:17

**decree** 12:9

**Defendant** 5:13

**Defendants** 5:22

**defensive** 17:11

**degree** 147:13

**demonstrate** 142:4

**dental** 13:15,16,20,21 14:2

**Department** 145:24

**depending** 42:20

**depicts** 93:19

**deportation** 34:23 35:5

**deposed** 141:14

**deposition** 5:5,12 6:12, 22 8:15,23,25 9:5,13 15:14 24:16,17 30:20

**depositions** 24:20

**derail** 48:24

**describe** 123:10

**describing** 110:11

**descriptions** 107:7

**detained** 69:8

**detected** 125:14

**determined** 92:20 118:15

**device** 156:23

**devices** 138:11

**diagram** 93:13,17,23 99:19

**dice** 92:11,12

**die** 77:21

**died** 119:19

**difficult** 76:10,23 140:18

**Dina** 27:7,8 49:22 52:21, 22,23,25 53:5,22 54:3,12 56:3,23 58:5,8 81:21 82:22 90:9,12 94:22,23 108:12 112:13 117:8 144:8,12

**Dina's** 52:22

**diploma** 37:16 48:8,16

**direct** 138:14

**direction** 67:7 100:20 103:6 137:6 153:18

**disagree** 109:13

**disagrees** 109:23

**disc** 132:20

**disconnected** 83:7

**discuss** 47:12,23 80:11

**discussed** 86:25 91:13 98:2

**discussion** 72:23 73:23

**distract** 156:24

**divorce** 12:7,9 37:24 133:7

**divorced** 12:1,3 37:22

**DMV** 33:8

**doctor** 129:12

**doctors'** 131:4,10

**document** 17:25 33:11

**documentation** 47:15

**documents** 9:3 25:2,20 32:23 33:5,18,21 34:21

**dog's** 21:8

**door** 81:2,9,10,11,13,17

**Douglas** 5:4

**down-and-back** 57:3

**dragged** 119:15

**dragging** 106:3

**draw** 94:9,11,20 95:7 97:3

**drawer** 28:23

**drawn** 94:25

**drew** 149:21

**drink** 152:13

**drive** 16:19,24 17:4 40:11,14 57:9 62:5 63:18 65:4 68:23 69:12 71:22, 24 77:17 115:9 117:7,21 126:19 152:5,8,13 160:2 161:9,21

**driven** 64:24 69:13 161:6

**driver** 16:1,16 22:4 23:13 64:19 72:1 134:15

**driver's** 14:16,20,25 15:1,4,5,18 16:1 75:19 135:14,20 136:14 161:11,18

**driver's-side** 62:15 80:25

**drivers** 137:1 138:12 152:18 153:13 156:3,8, 24 161:19,21

**driving** 6:7 16:19 17:7, 10,11 23:19 24:9 59:6

64:10 65:10 67:15 71:2 75:23 123:24 134:6 136:3,6 141:11 143:19 150:14 152:2 156:24,25 157:5 160:8 161:2,15

**drop** 37:13

**drop-off** 136:9

**dropped** 37:6

**dropping** 153:10

**drove** 57:16 64:19 69:12 117:8

**drugs** 65:9,15,16

**dryers** 48:2,7

**due** 12:23

**duly** 5:24 6:1

---

**E**

**earlier** 70:20 90:21 100:19 101:2 121:16 158:4 159:13

**Eastman** 5:22 6:8

**easy** 21:10

**eat** 63:21

**ed** 16:1

**edges** 104:18

**education** 13:5 48:17

**effective** 135:21

**effort** 39:18 111:13

**electrician** 47:24

**electrician's** 47:24 48:1

**electronic** 156:23

**Elena** 40:18,19

**Elizabeth** 9:24

**else's** 26:4,5

**EM** 94:12

**email** 24:1

**emergencies** 139:7

**emergency** 74:16,17,19 79:16 93:16 137:18,20, 22 138:1,11,12,20 139:7



www.ArkansasRealtimeReporting.com

Appx_0449

150:16 151:17 154:4

**employed** 54:20 55:5, 19

**employee** 134:25 135:1,5,6

**employer** 6:8 13:23 134:24

**employment** 33:16 42:4 134:18

**end** 44:4,22 66:7,8 69:7, 9 90:2 120:10 125:16 135:9 145:10

**ended** 35:6 46:4 105:6, 12 117:13 122:13 145:21 160:22

**endurance** 8:14

**enforcement** 165:23

**engage** 75:16 137:21

**engaged** 161:25

**engagement** 43:15

**engine** 77:20

**English** 111:16,24 112:5 113:13,16 150:2,8

**entire** 10:8 14:13 60:15

**entitled** 5:10

**environments** 157:1

**equipment** 60:17

**ER** 130:10

**Erick** 5:10 33:13 34:13 35:19,21,25 40:18 50:6, 22 51:13,24 52:1,11,14 54:24 56:16,24 58:11,22, 25 64:3 70:2 81:21 82:3, 12,18,20,22 86:25 90:8 91:18 95:12,16,21 97:2 99:2 104:4 105:6,15,16, 21,24,25 106:2,3,7,9,19, 20 108:12 112:13 120:11 121:3 144:8,12

**Erick's** 57:11,17 62:25 64:6

**Erin** 5:11

**essentially** 143:13

**Estate** 5:19

**Evelyn** 5:14,19,25 9:24 144:7 152:2 164:8

**eventually** 28:12 46:18 57:10 82:4 104:21 117:16 129:17 132:17 160:10

**EXAMINATION** 6:2 141:23 158:2 164:6 165:9 166:5

**examined** 129:24

**exceeded** 152:21

**excel** 48:22

**Excuse** 86:9

**execute** 23:21

**exercises** 130:21

**exhibit** 15:13 24:14,16 25:16 33:13 78:16,17,18, 19 79:9,13 93:7,9 97:15 135:12,18 149:1 152:14 164:14

**Exhibits** 78:14

**exit** 80:22,24 81:17

**exited** 81:9,13

**expand** 146:17

**expect** 13:25

**expected** 37:5

**expecting** 12:21 47:6, 10

**experienced** 75:23

**expert** 109:6

**experts** 109:7,17

**expiration** 15:20

**explain** 120:5 152:23

**Explorer** 6:8

**extension** 85:6 87:13, 14 88:17

**extent** 94:6 125:25 141:19 142:24

**eyes** 100:2 157:3

**eyewitness** 108:10 159:4

F

**face** 52:17

**Facetime** 55:1,8

**fact** 6:22 7:12 86:25 95:24

**facts** 115:16

**fail** 156:3

**failed** 17:15

**failing** 7:8,9

**failure** 70:25

**fair** 134:5 141:13 149:6

**familiar** 86:1 115:20

**family** 26:23 29:9 39:7 114:17 121:25 122:15

**fast** 108:22

**faster** 147:21

**father** 34:12 36:9,15,17 37:5,12,17 38:7 39:14, 20,24 40:1,22 41:4,16,19 43:22 47:13 48:23 55:5 65:21 120:14 122:14

**father's** 37:9 122:10

**Fayetteville** 121:15,19 122:1,5,15 147:10

**federal** 50:18

**feel** 71:1 91:1 95:19 143:16 160:14

**feeling** 73:14

**feet** 67:25 103:19,21,22 125:12

**fell** 28:21 104:21 120:1 145:19

**felony** 50:19

**felt** 71:3,5 77:7 103:14 104:1,2 119:23,24 148:6

**female** 110:8,9

**fiancé** 128:15

**fiancé's** 38:12

**field** 152:6,8 157:5,7

**figure** 21:11

**fill** 121:13

**finally** 33:8

**find** 18:7 87:6 89:24 95:19 96:16,19 97:24 98:6 111:14 116:25 128:18

**fine** 8:22 9:21 24:10 94:6 95:3,22 107:7 152:20

**fines** 18:18

**fingers** 43:14

**finish** 36:11,15 37:13 147:13

**finished** 45:25 46:1 99:17 106:2 128:20 140:7

**firefighters** 117:16

**Firm** 5:6

**fit** 87:2,21

**fits** 86:21 87:15

**fix** 28:18,19 48:3

**fixed** 17:15 124:13 132:21

**flares** 138:11

**flashers** 137:18,22

**flashing** 152:19

**flat** 62:16,20 75:23 84:13 139:9 160:8 161:6,9,16, 21

**Flip** 139:4

**floor** 73:11 75:11 107:14 160:4,7,23,24,25

**flow** 68:21

**focus** 100:2

**folks** 115:16,18 125:9

**follow** 136:4,24 138:3 139:12 153:5

**foot** 139:16

**football** 152:6,8 157:5,7

**force** 104:24

**forced** 148:3,6



**Ford** 6:7

**forget** 30:19

**forgive** 49:14

**forgotten** 124:20

**form** 23:17 24:4,7 47:7 94:13 109:14 110:23 118:19 120:23 143:11 144:4 148:5 156:13,22 157:19 160:12

**formal** 32:18 127:2

**Fort** 21:2,4

**forward** 135:25

**foster** 34:5 38:25 39:1,9, 14,17

**found** 90:4 109:1 117:17

**four-door** 59:10

**fourth** 25:17

**Friday** 49:15,18 57:4

**friend** 58:14,15 64:7

**friend's** 56:18 57:11,17 62:25

**friends** 46:20 52:21,23 64:2

**front** 16:25 22:20 30:20 60:7 62:15 81:2,5 117:9 118:2 125:11,16

**frontward** 79:14

**frustrated** 98:5

**fuck** 111:22

**full** 9:22 40:6 45:25

**future** 13:1

---

### G

**G-A-T-I-O** 31:13,14

**gained** 34:13

**garage** 127:20

**gas** 58:2,3 71:23 139:16

**Gatio** 31:9,11,18

**Gato** 31:18 32:1,2

**gave** 18:10 25:2,5 31:20 35:8 59:23 60:16 119:17 123:18

**GED** 147:9

**general** 14:4 94:17 97:14 100:22 110:3 136:3,5 147:18

**generally** 93:14,18 110:16 137:7

**George** 25:10

**get all** 69:4 76:25 88:3 143:21

**get along** 122:21

**gift** 59:19

**give** 6:18 7:8,10 8:8 12:14 24:17 39:18 94:17 106:18,19 109:10,20 110:2 140:6 141:1 161:13

**giving** 7:7 143:3

**Gladys** 11:3 59:12

**Gonzalez** 5:11 33:13 42:1,9 54:20 55:22,23

**Gonzalez's** 53:10

**good** 6:4 7:19 22:21 33:24 45:17 46:21 48:2 134:14 139:14

**government** 46:23 127:3

**GPS** 21:20 64:13

**grade** 13:5 46:1,2

**grades** 13:7

**gradually** 139:16

**graduate** 13:9 36:11 147:1

**graduated** 13:8 30:15

**graduating** 13:11

**granted** 39:19

**graphic** 9:17

**green** 34:1 47:1,4

**grocery** 46:14

**ground** 105:14

**group** 27:6 93:5 114:8 116:12

**Guatemala** 36:1 48:4

**guess** 16:4 18:2 21:1 22:18 24:18 30:18 43:19 45:25 46:3,24 51:10 53:9 74:3 89:16 91:8 104:1 126:8 135:21 141:19

**guessing** 129:2

**guide** 135:15,17,21 161:12,19

**guy** 22:18 64:6

---

### H

**half** 13:24 42:19

**hand** 21:21 164:8

**hands** 107:1 157:1

**hanging** 103:16

**happen** 22:14,17 39:22 101:20 139:7,25 154:18 156:3

**happened** 10:22 18:5 22:13 26:24 27:22 28:4 33:1 39:21 69:8 71:1 73:15 75:25 79:4 83:21 90:3,5 92:19 94:4 96:2 98:25 99:17 103:10 106:12 110:11,14 111:14 116:14 126:8 136:18 143:4 144:14

**happening** 103:11

**happy** 8:19 23:21

**hard** 76:9 149:9

**hazard** 91:10 111:6 137:2,19 153:15

**head** 7:23 11:17 101:14 107:8,9,11,16 120:24 129:2 130:13

**headed** 57:18

**heading** 63:20

**heal** 132:17

**hear** 7:18 103:2 119:6

**heard** 108:20

**heart** 112:23

**heartbeat** 112:24

**helped** 84:19 116:7 117:9,11 121:12,13

**helping** 97:8

**Hey** 80:12

**hidden** 45:1

**high** 13:8 30:16 36:7,12 37:7,16 46:2 48:8,16 119:17 147:1,8,10,13

**higher** 147:22

**highlight** 136:2 155:23

**highlighted** 138:4 152:15 154:20,21,23 155:10 164:10,22 165:3

**highlighting** 136:23

**highway** 21:16 66:18 67:5 68:2 72:14 137:4 151:4 153:17 162:14

**hired** 25:7 134:25

**Hispanic** 46:14

**history** 134:6

**hit** 22:12,20 46:21 72:16 98:23 103:14,17 104:12 105:13 108:6 110:15 128:25 129:1,21 142:22 145:7,13,18 151:20 157:17 159:7

**hitting** 145:9 151:10 154:9

**hold** 13:18 85:24 86:4 139:12

**hole** 107:9

**holes** 72:15

**home** 11:1 17:25 28:22 53:10,15 62:25 64:5 69:4

**homes** 53:18

**honestly** 163:19

**hook** 123:20

**hooks** 123:19

**hoped** 38:5 123:6

**hoped-for** 38:12



www.ArkansasRealtimeReporting.com

Appx_0451

**hoping** 38:10

**hospital** 129:25 130:3, 24 131:2,14

**hot** 63:2 66:22

**hour** 42:11,12,13,14 44:4,6,7 45:12 68:9 147:19 157:4

**hours** 8:13 16:18,23,24 17:6 42:16,18,21,24 43:1,10,12,13 44:9,11, 12,13 45:13 115:3,4

**house** 53:16 56:5,18 57:11,18 60:7 117:9,10

**houses** 56:2

**Houston** 19:19 20:3 21:1,12,17 49:6,10 50:22 51:14,16 52:5 56:15,23 62:25 63:15,19 64:2,17, 25

**hurry** 80:10,13,16 91:12

**hurts** 129:19

**husband** 32:13 38:2

**hypothetically** 50:16, 19 118:11

---

## I

**I'VE--** 165:15

**I-45** 21:15

**I-49** 21:2

**ID** 33:9 36:7 147:10,11

**idea** 14:5 29:1 54:19

**identification** 24:14 33:15 78:19 79:9 93:7 135:18

**illegal** 65:15

**illegally** 50:18

**images** 9:18

**imagine** 58:9

**immediately** 119:16

**immigration** 34:21 46:24

**impact** 107:23 119:20

**129**:13

**impede** 23:25

**important** 151:11

**impossible** 160:1,3 161:15,20

**include** 78:11

**included** 131:21

**including** 22:5 144:13 146:11

**incorrect** 7:8 50:14 93:24

**indicating** 47:10 62:8 73:8 94:19 95:11 97:9, 14,21 100:21 104:18 107:18 109:21 110:21 117:24 118:12 119:14 150:21

**indictment** 133:18

**individuals** 50:17

**information** 136:14

**initial** 68:25

**initials** 94:10

**injured** 128:21 132:8

**injuries** 131:6,8,11,17

**inside** 23:10 89:3 100:3 103:21 145:1 146:23 151:21,23

**inspected** 78:25 125:13

**inspection** 126:13 127:2

**instance** 19:1

**instantly** 119:19 147:24

**instinct** 77:8 159:21

**instinctive** 74:9

**instruct** 161:19

**instructed** 51:5

**instructions** 165:21

**intended** 93:12

**intentionally** 79:23

**interfering** 137:5 153:17

**interrupt** 83:7

**interstate** 21:5,16 63:19 68:1 93:15 147:15 151:6

**introduce** 5:16

**invoke** 50:10

**involved** 22:3,7 23:13 90:10 126:1 132:13 134:8

**Ivan** 34:7,8 36:1 40:17

---

## J

**jack** 85:1,5,7 87:10,15, 17 88:6,7,17 91:20

**Jacob** 5:18

**jail** 152:22

**January** 19:3 135:21

**Jennifer** 5:15

**jeopardize** 50:13

**job** 7:19 42:6,11 44:1 48:19

**jobs** 53:8

**Johnson** 10:5,6

**joking** 52:12

**José** 115:18

**Juan** 11:10,11

**judge** 18:20

**July** 38:24 121:10

**June** 24:18 38:24

**justice** 18:22

---

## K

**keeping** 125:10 157:1

**key** 86:14,16

**kids** 41:10 153:1

**kind** 6:15 9:15 16:16,19 17:17,21 24:20 36:14 41:21 43:20 44:13 45:5 46:13,21 48:23 58:6 63:15 65:9,15 66:3 68:4, 20,21 78:12 85:9 87:15

**90**:14 93:10,13,19 94:20 97:5,7,16 98:14 99:16,21 100:3,20,22 101:3 102:25 103:15,25 104:18 105:4,9 110:11 114:20 116:7 119:18 120:1 122:25 123:7 129:21 133:7,18 135:19 136:1

**King** 5:6

**kitten** 31:18

**kitty** 31:15

**knee** 128:23 129:4,5,11 130:13,22,24 132:8

**knew** 43:25 45:20 47:11 48:1,3,19 51:24,25 52:23 53:23 59:10 64:6 70:9 72:11 77:10 84:4 91:7,9 93:1 161:14,20 163:20

**knocked** 103:19

**knowing** 152:6

**knowledge** 41:13 65:12 66:2,13 85:22 89:24,25 102:25 108:10 133:11,21 134:14 135:6 142:21 144:23 157:11

---

## L

**L-SHAPED** 85:17,18

**lady** 6:7 32:12 39:8 111:13

**lady's** 26:25 27:5

**landed** 103:15,21 128:25 145:18

**lane** 67:9,11,12 71:9,11, 12 79:17 80:7,12 91:9 93:21 105:10 109:12 117:25 136:19 140:2 143:20 150:17,22,24,25 151:1,6,7 156:16 159:15, 18 160:9,10 162:6,7,10, 11,14 163:24,25 164:1

**lanes** 67:6,7,9 75:17 93:15 136:6 149:11,16

**language** 152:15 154:20 155:3,16 164:10

**larger** 149:10

---



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0452

**late** 24:18 45:22 57:16

**law** 5:6 165:23

**lawsuit** 6:6,9 120:15,20 133:3,4,7,9,12

**lawyers** 7:25

**lead** 83:18 148:16

**learn** 84:9 119:18

**learned** 16:14 48:4 77:12 114:12 116:8 148:7 157:8

**learning** 44:1

**lease** 122:13,17

**leave** 30:18 62:24 144:1

**leaving** 63:19

**left** 62:15 63:15 67:11,12 69:16,17 70:8 71:11,12 73:24 74:10,11,14 75:8, 12 77:19 79:16 95:10 143:8 148:2,3,4 151:1,14 157:18 159:14,15 160:15 161:4 162:6,18,22,23,25 163:2,7,15,24,25 164:1

**left-hand** 144:1 145:1

**legal** 9:22 32:23

**legally** 32:9

**legs** 8:20

**length** 98:11 152:8 157:5

**lent** 29:22

**lets** 87:15

**letting** 15:12

**license** 14:2,16,18,20 15:4,5,9,11,18,22,25 17:9,13 18:6,7,11,13,17, 24 19:9,11 22:1 32:21 40:2 47:25 48:1 64:21 75:19 135:15,20 136:14 161:12,18

**life** 10:9

**life-like** 149:22

**lift** 85:8 88:14 89:8

**lifts** 84:25

**light** 66:24,25 67:2,20 90:22,24,25 104:16,21, 23 126:20,21 145:19

**lightly** 139:17

**lights** 74:16,17,19 126:21 137:19 138:20 150:16 151:17 152:19,25 154:4

**like--** 95:4

**limit** 68:8,10 147:15,22

**limping** 129:10

**lines** 154:21,23

**list** 25:15,19 30:19,21, 22,24 31:4

**live** 6:19 7:2 10:24 20:7 38:20 121:18,21

**lived** 10:8,18 34:17 46:9 48:4 56:19,21 58:15 114:17 121:10,15,23 122:2

**lives** 38:21

**living** 10:21 39:14,17,25 50:7 51:4,23 54:12,13, 15,24 55:17 58:14 121:4, 8

**loaned** 27:12

**local** 124:14

**located** 9:20 78:10 88:2, 18 97:7

**location** 67:5 101:13 115:10 121:9

**locations** 53:18

**lock** 85:13,22,24

**locked** 86:15

**long** 8:12 10:18 12:5 13:25 14:5 28:13 30:13 35:24 36:8 38:22 39:9 40:3,5 51:13 53:21 54:15,19,24 55:16 60:1 66:6 102:2 113:6 115:1,9 121:8 129:18

**longer** 11:24,25 25:12 45:21 99:16,18

**looked** 9:9 16:11 25:4 81:13 108:9,11 124:19

135:15 156:14 159:9

**loosen** 89:12 92:20

**lost** 143:13

**lot** 42:17 53:23 68:3,17 105:8 122:12 157:23

**loud** 7:22

**louder** 7:17 147:5

**love** 31:19

**Lowell** 10:12,15 17:16

**lower** 89:8

**lug** 85:19 86:14,15,21,22 87:2,20,21 88:3 89:14 92:2,20,21,25 96:8,9,12

**luggage** 125:6

**lunch** 44:16 63:22

**lying** 95:9 145:22

---

## M

**M-A-E-N** 38:17,18

**machine** 112:25

**made** 8:6 20:11 36:16 39:17 56:23 57:14 63:22 66:14 71:23 74:11 75:10, 12 76:23 77:5 80:5 83:15 92:2 99:20 100:14 111:13 113:10 124:7 134:24 149:3 162:2

**Maen** 38:15,17,23

**mail** 20:8

**main** 130:13

**maintain** 44:19

**maintenance** 62:18 126:23 127:6

**make** 15:13 17:6 18:2,19 26:23 27:13 69:21 72:20 75:13 76:9 81:16 93:11 95:25 100:9 120:18 137:2 141:11 146:20,22 152:10 153:14 155:6

**making** 48:23

**man** 64:3

**man's** 64:5

**manual** 143:19 156:19 157:8 161:12

**Manuel** 116:1

**mark** 135:11

**marked** 24:14,15 33:12 78:19 79:9 93:7,8 135:11,18 149:1 164:14

**marker** 94:2,4

**markings** 93:11

**marks** 149:3

**marriage** 32:21

**married** 11:5,7,9,10,21, 24 13:1 32:7,15,18,25 38:6,10 54:22

**matter** 76:7 148:8

**mattered** 157:14

**Mcmanus** 25:10

**meaning** 53:18 67:2 85:23

**means** 7:7

**meant** 120:8

**mechanic** 127:20

**Medicare** 66:4

**medication** 65:9 131:13

**Medrano** 116:1

**meet** 46:6,7 56:16

**Melvin** 50:6,22 51:13 52:1,20 53:1 54:22 55:7, 11 56:7,24 58:12 64:3 81:21 82:22 90:9,12 94:22,23 108:12 112:13 144:8,12

**members** 26:23 29:9

**memorize** 27:17 119:18

**memory** 147:23

**mentioned** 6:4 23:20 35:2,22 37:5 38:25 76:8 119:23 123:12

**merge** 47:19 150:17

**merged** 154:8

**message** 141:16



Appx_0453

**PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL**
Case 3:2~~MORENO, EVELYN on 08/02/2023~~ Filed 01/29/24    Page 458 of 2460    PageID 750
**Index: messages..officers**

**messages** 27:21 116:13

**messed** 128:23 142:17

**met** 34:4 38:24 46:9 51:21 52:1,11,17,20 55:3,11 134:1 142:2

**middle** 37:19 63:2,4,16 67:11,12 71:9 90:19,20 91:6 97:20 145:13 151:4 156:16 160:9,22

**miles** 17:6 68:9 147:19 157:4

**mind** 25:16 74:2 76:1 97:16

**mine** 29:13 141:18

**minimum** 152:20

**minutes** 44:17

**miscommunication** 143:1

**misdemeanor** 152:20

**misleading** 93:24

**mistaken** 144:22

**Mitchell** 115:22

**mom** 10:25 22:8,9 26:25 29:9,11,22 35:8 40:7,14 41:5,11 45:20 46:13 69:12 124:16 126:5,9

**mom's** 46:8 59:16

**moment** 27:12 30:12 60:20 65:20 79:10 86:7 97:22 98:16,18,25 101:24 107:23 108:1 109:24 116:19 118:17 140:7

**moments** 123:2

**money** 29:22,24 44:20, 21 45:10 69:1 120:19

**monies** 45:5

**monitor** 14:3

**month** 78:25 124:4 125:14

**months** 12:4 45:14

**Moon** 13:24

**Moreno** 5:14,19,25 6:4

8:23 9:24,25 11:5 12:19 24:7,15 33:18 37:3 49:5 56:22 57:20 59:6 62:22 63:13 65:2 75:6 76:8,18 91:17 93:12 94:3 99:13 104:6 107:10 109:6 114:2 116:8 123:10 133:2 135:13 139:24 140:17 158:4 162:20 165:11 166:13

**morning** 62:24

**mother** 11:3 16:20 17:4 27:15 39:18 40:23 41:8 59:12 60:1,15 61:3 114:23 117:20

**mother's** 11:1 59:20

**motioned** 120:1

**mouth** 101:24

**move** 71:6 75:13 79:21 80:21 98:8 123:6 136:21 143:16 148:15 162:6,9, 13,21,25 164:2

**moved** 105:15,24 120:11 121:25 122:5,13, 15

**movement** 100:15

**moving** 21:22 50:1,4,5, 25 51:24 52:7 68:4 105:21 106:1,2 134:9 136:10

**muscle** 147:23

---

**N**

**nail** 62:5

**nails** 86:10

**named** 6:9 25:10 40:18 64:3

**names** 115:12,15,17

**nature** 9:4 17:11 30:9

**nearby** 114:17

**nearest** 71:7 74:9 77:9

**necessarily** 109:22

**neck** 107:1

**needed** 24:22 35:10

40:14 58:3 72:21 79:25 84:23 87:8,25 89:15 91:14 92:20 121:14

**Nehemias** 5:19 9:10,18 22:5 25:23 29:16,19 30:9 31:8,23,24 32:7 35:14 36:1,5 37:6,9,22,23 38:25 39:23 40:17 41:13, 22 43:22 44:3,21 45:15 46:6,23 47:12,14,23 49:22 52:6,21 55:2 56:4, 15,23 58:5 65:12 69:24 70:5 72:24 73:16 78:6,11 80:11 81:4,25 82:9,18 83:17,18 84:8 87:1 90:8 91:8,18 93:1,4 94:19,25 96:13,14 97:2,5,19,23 98:8 100:5 102:3,22 104:12 106:18,19 107:21 110:24 117:25 119:6 121:4 122:2,16 126:23 133:11,21 142:5,9,21 144:15 145:1,3 146:14 147:1 148:16,22 157:16 163:20

**Nehemias's** 37:5 51:25 53:24 65:21 99:3 104:4, 24 106:22 119:23 120:14

**nickname** 31:20 54:5,9, 11

**night** 49:15 57:7,9,17 69:5,9,25 117:22

**nodding** 7:22

**nods** 101:14

**nonresponsive** 100:12 108:17 141:21 158:16 161:24 162:5

**normal** 13:7 52:13 122:22,24,25

**Norman** 5:15 6:23

**north** 5:7 10:16

**northbound** 67:8

**Northwest** 130:5

**note** 136:1,22

**notice** 143:19,22

**noticed** 118:1

**notify** 138:18

**nug** 85:16

**nugs** 85:13,21

**number** 5:9 14:12 15:18 16:18,24 17:6 24:16,20 25:16 29:4 93:9 97:16 135:12 136:5 149:2 164:12,13,14 165:22

**numbers** 27:17

**numerous** 161:12

**nut** 89:11,12

**nuts** 85:23,24 86:3,13, 14,15,21 87:3,21 88:3 92:3,21 96:9

**NWACC** 48:9

---

**O**

**O-R-E-** 11:14

**oath** 6:18 7:6

**object** 37:9 56:20 100:12 108:17 109:14 110:23 118:19 120:23 141:21

**objection** 47:7 50:8 58:20 94:13 109:25 127:8 143:11 144:4 148:5 156:13,22 157:19 158:15 160:12 161:24 162:4

**observed** 16:19

**obtain** 12:7 14:20 23:18 24:9 47:24

**obtained** 32:21

**occurred** 67:6 71:1 103:12 125:23 126:1

**October** 15:21

**office** 9:1 13:15,16,21 24:23 78:25

**officer** 20:9 32:11,12 110:9,19 111:13 113:23 117:15 120:5 141:25 142:1,2,24 144:21,25 150:6 151:1,5 165:12,20, 23

**officers** 144:13



**ARKANSAS**
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:24-cv-03074-TLB   Document 8-2   Filed 01/29/24   Page 459 of 2460   PageID 751
Index: official..point

**official** 12:6

**officials** 46:23,24

**Oklahoma** 20:22 21:5,7 69:4

**oncoming** 153:21,23 154:1

**one-minute** 140:11

**online** 16:8,11,12 20:9 75:20 135:15,16

**open** 45:2 48:6 49:2

**opened** 81:17

**operate** 47:14

**opinion** 109:10,20

**opinions** 134:12 159:3

**opportunity** 6:15 30:21 102:22 141:15

**opposed** 7:22 75:7

**options** 156:9 163:19

**oral** 13:24 42:6

**order** 39:22

**Orellana** 11:10,12,18,21

**original** 60:24

**originally** 14:23 24:17

**Oscar** 64:4

**over-the-counter** 65:16

**overtime** 42:15,18

**owned** 60:2,15

**owner** 59:13

**owns** 128:9

---

**P**

**p.m.** 36:25 63:10 76:15 99:16 140:14 166:16

**PA** 16:9

**pack** 70:13

**packed** 70:6

**pages** 164:10

**paid** 17:15 18:18 20:6 42:10,11,13,18,20,22 44:3,4,5,6 65:25 66:13 132:4

**pain** 132:10

**paint** 53:14,19 109:1

**painter** 41:23 42:10 55:5,21,22

**painting** 28:6,8,9 36:19 47:13 49:3

**panic** 156:3

**paper** 35:8 124:9 128:19

**papers** 25:1

**paragraph** 136:25 155:25

**paramedic** 111:17,23 112:4 113:22,24 143:4 150:2

**paramedics** 144:13

**parent** 16:17,25

**parental** 35:9 39:19

**parents** 40:24 114:20

**park** 137:3,12 153:15 154:12

**parked** 60:7

**parking** 136:23 137:1, 11 153:13 154:11

**part** 40:7 68:16 79:8 85:12 93:3 104:17 120:19 123:13 131:2 138:4 140:2 162:24 163:8

**partial** 14:12

**partially** 91:9 93:20 163:25

**parties** 6:5,10

**partly** 79:16,17 80:7

**party** 133:2,4,5,8,11

**pass** 140:21 164:4

**passed** 33:22 154:7

**passenger** 22:4 23:13 81:7,10 136:9

**passenger-side** 81:11

**passengers** 25:23 81:20

**passing** 68:17 91:2,4 111:7 114:4 145:3 152:18

**past** 133:6

**patched** 123:3

**patience** 140:19

**patients** 14:3

**pay** 20:9 40:7 95:16,20

**paycheck** 66:3

**payment** 20:8,11

**payments** 66:16

**Paymyfines.com** 20:14

**Paymyfines.com.** 20:13

**peace** 18:22

**pedal** 139:17

**pen** 97:5

**penalties** 7:5

**pending** 133:19

**people** 56:5 93:5 115:12 116:7 117:8 154:5 157:12,23

**people's** 27:17

**percent** 20:21

**perfect** 149:13

**periodically** 8:15

**perjury** 7:5

**permit** 14:23,25 15:1 33:7

**permits** 14:22

**permitted** 34:6

**person** 14:6,7 23:3 38:7 52:11 55:4 94:9 125:13

**personal** 58:9

**personally** 159:11

**persons** 26:8 56:10

**phone** 26:2,5,17,23,25 27:4,12,17,18,24 28:2,4, 6,10,11,16 29:2,4,6,14, 17,25 30:1 43:5 52:12, 13,14 55:7 141:10 152:4, 5 157:23 158:24 159:9

**phones** 29:21,22

**photographs** 9:4,13, 14,17,19 25:22 26:1,6,9, 16 78:1,6,8,11 79:13 93:18 105:9 116:9

**physically** 113:2

**pick** 27:1,3 50:1,22 56:25 69:25 70:8 115:8 152:7

**picked** 56:18 64:5 69:11 70:3 114:24 117:20

**picking** 58:11 63:7 153:10

**picture** 88:23 97:15 105:3

**pictures** 9:9,10 124:3

**piece** 124:9 128:19

**Piuara** 5:10

**Pivaral** 5:20 32:3,4,6

**place** 5:6 14:1 48:6 122:6,7,8 137:3 139:21 153:16 155:14

**places** 123:13

**plan** 14:10 29:8,9,10 38:11 47:16 49:1,4 56:25 57:1 68:25 69:3 147:1,8

**planned** 47:19 131:11, 17

**planning** 13:18 43:16 68:23 69:20

**plans** 12:25 32:25 38:9 47:13,23 48:5,24

**plastic** 58:19

**played** 7:1

**point** 8:16 15:14 24:19 34:11 35:6,25 37:22 46:18 49:3 69:9 72:20 74:3 82:20,24 96:20

106:12 109:6 112:13



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:23-cv-00274 Document 6/3 Filed 01/29/24    Page 460 of 2460    PageID 752
Index: pointed..referred

97:5,7,17 98:8 101:12
110:20 113:8 123:7
131:17 136:5 137:11
138:10,24 142:18,21
146:8 150:10 155:10
159:22

**pointed** 100:20 150:23

**pointless** 113:11

**police** 32:11,12 110:9
111:13 116:10 117:15
141:25 142:1,24 144:13,
21 145:24,25 146:2,6,8
151:1,5 163:17 165:12,
20 166:8

**pool** 45:5

**pop** 62:5

**pop-up** 83:9

**popped** 148:20

**portion** 100:13 107:15
108:18 141:21 162:5

**portions** 143:18

**portrayal** 149:6,13

**portrays** 93:13

**position** 13:18 79:24

**positioned** 78:13

**possibility** 154:17

**possibly** 64:23

**Post-it** 136:22

**postpone** 24:22

**potential** 91:10 111:6
136:8 139:6

**potentially** 136:19

**practice** 147:18 150:14

**precisely** 153:4

**prefer** 54:9

**prepare** 8:25 9:5

**preparing** 75:21

**prescribed** 131:13

**prescription** 65:16
131:13

**present** 135:22

**pressured** 37:10

**presume** 118:12

**pretty** 22:21 45:14
57:16,23 90:25 116:22
119:1,11

**previous** 65:23 121:11

**previously** 132:8

**primarily** 9:14

**prior** 8:23 51:4 55:23
71:23 95:1,2 132:7
148:18

**privilege** 7:9 50:10

**problems** 132:10

**proceed** 76:18

**proceeding** 12:7 34:12,
23 35:5 37:24 133:7

**proceedings** 5:1
166:16

**process** 105:25

**produced** 34:22

**promise** 43:20 120:19

**pronounced** 11:18

**proper** 134:24

**proper-** 134:24

**properly** 135:4,5

**provide** 24:7

**provided** 34:17

**Puerto** 39:8

**pull** 72:24 73:24 84:20,
21 99:2 136:10 139:21
148:3,4 150:21,25
155:14 161:3 165:1,13,
15,16,24

**pulled** 18:9,12 19:8 73:6
77:25 79:6 143:9 148:2
150:15,20,24,25 151:14,
17 157:17 159:14
160:14,15 165:19 166:7

**pulling** 75:6 104:4
105:6,17 106:9 143:7
151:6 163:7,15 165:12

**pulse** 106:23,25 119:11

**purchased** 30:4 61:3,4

**purpose** 49:5,25 50:21

**purposes** 33:15

**purse** 58:9

**pushed** 37:10

**put** 26:13 44:22,23,24
68:11,12 85:25 86:12
90:1 92:14,16 94:10,12,
21 98:3 101:23 106:7
122:11 127:3 128:10
130:11

**putting** 59:2

## Q

**question** 7:20 8:2,3,8,
17,19 50:9 51:5,6,20
62:19 141:3,5,18 146:4
160:19,20

**questions** 6:17 8:1
51:10 93:11 135:10
140:20 141:2 158:1
159:25 165:7 166:2

**quick** 43:3 44:17

**quickly** 61:24 71:8 73:4
76:2 79:22 80:20 82:19
91:14 101:20 119:1,12
163:9

**quit** 48:23

## R

**railings** 150:19

**raised** 91:23

**reach** 100:17,24 146:6

**reached** 146:8

**reaction** 72:16 119:7

**read** 6:25 9:9 16:12
75:20 115:17 136:24
139:11 152:17,22
154:19,21 155:6,10,15,
25 156:10,21 157:6

**reading** 157:2

**reads** 141:12

**ready** 37:3 69:22 70:1,2,
10 76:18

**real** 43:3

**reality** 149:14

**realized** 72:7 73:1 74:4
91:7,8 103:11

**rear** 104:16 107:15

**rearward** 79:15

**reason** 37:6 56:15 79:24
106:16 119:3 132:25
136:7 144:18 159:13

**reasons** 7:9 24:21 136:8

**recall** 19:9 47:5 67:14
74:13 94:5,6,7 98:1
105:22 107:13 110:16,22
130:16,17 138:18 145:7

**recalled** 121:3

**receive** 19:18 46:25
47:6 65:22 120:19

**received** 17:9 19:10
33:5,22 34:2 47:15
123:11 131:17,20,24

**receiving** 34:1

**recently** 127:13

**recess** 36:25 63:10
76:15 99:10 140:14

**recognize** 115:18 116:3
149:2

**recollection** 145:12
148:21 152:1

**reconstruction** 109:7,
17

**reconstructions**
109:16

**record** 5:3 9:23 17:5,7
20:23 23:19 24:9 36:24
37:2 63:6,8,12 76:14,17
99:9,11,13 140:13,16
150:23 164:9 166:15

**recovery** 120:20

**red** 94:1,4 149:3 152:18

**reduce** 156:5,7

**referred** 31:25



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
MORENO, EVELYN on 08/02/2023
Case 3:23-cv-00014-LC Document 63 Filed 01/29/24 Page 461 of 2460 PageID 753
Index: referring..separated

referring 78:14

refrigerators 48:2,7

reinstated 18:24

related 131:6,7

relation 88:11 93:14
97:7

relationship 30:8,10
54:23 122:22

relax 67:25

remember 7:11,12
12:11 16:22 17:18,23,24
19:13 20:7,11 21:10,20,
23,24 22:13,16 23:9 27:5
32:10,13 36:6 40:3 42:13
48:10 49:9 58:11,16,17,
22 59:1,2,5 60:5 62:23
63:1,25 64:1,4 67:16
68:18 69:19 70:23 73:3
74:25 75:3,21,24 79:4
80:17 81:23 82:16 84:23
87:3,25 91:17,21 92:1
94:15,16 95:9,14,15,23
96:3 97:19 98:19 99:2
100:7,8,18 102:11
103:11 105:19,20,23
107:6,10,12,14 108:14,
16 110:4,7,18 111:17,20
113:21 116:19,23 117:3
120:3,4 127:22,24 129:8
131:15 136:13 141:25
142:4,7,12,15 143:3,6
144:7,8,12,17,25 145:5,
8,9 150:9 159:16,20,22

remembered 21:7

remove 87:1 89:15 92:2,
4

repair 124:14

repaired 123:22

repairing 48:6

repairs 124:5,7

repeat 8:4 109:15

rephrase 8:5 53:9

replaced 61:14,16,21,
22 117:14 128:2,5,6

report 23:5,8

reporter 5:14 6:23 15:13
25:2

reporter's 24:23 78:25

reporting 116:13

reports 9:9

represent 6:5,10 25:14

representation 149:23

representing 25:13

request 146:1

require 86:13 126:12

required 7:6 16:23

requirement 17:1

requires 127:3

reserve 157:25

residency 34:2

response 113:19 141:2,
18 159:25

responsive 31:5

rest 89:19 105:1 106:4
111:9 120:8 122:14
124:9 157:25

rested 57:14

result 142:25 148:7

results 156:7

return 21:18

revealed 130:18

reviewed 9:3

revocations 21:25

revoked 17:13

rhythm 112:23

Rican 39:8

Ricardo 38:15 128:14

Ricardo's 128:9,12

Richland 145:24

Ricny 115:24

Riggs 5:4

right-hand 143:10
165:1

rights 35:9 39:19

rim 60:25 86:4,6

rims 61:1

ring 43:15,16,17,20

rings 43:14

risk 151:10

road 67:20 72:21,22,25
73:6,13,17,18,24 74:5
75:23 76:2 77:1,13,18
80:19 100:10 110:25
111:3 114:19 118:3,8
136:10 139:20,21 145:5,
19 146:15,21,24 148:23,
24 150:15 154:3 155:1,
13,14 156:25 157:3,22,
24 158:12,21,24 159:14,
22 160:3,10,23 161:1,13,
20,22 163:8 165:13,17,
24

roads 147:16

roadside 163:17

roadway 21:17 75:7
76:5 137:12 138:7,25
140:2 154:12

rocky 122:25 123:2

rod 85:6 87:13 88:7,17

rode 16:18

rodeo 48:10

Roderico 5:10

Rogers 13:8 17:16 30:5,
6 38:21,22 69:17 121:5
122:8,13

room 130:11 144:1
163:12

roommate 121:22

Rosemary 115:24

rotated 132:20

route 21:11 64:12,16,22,
25

rude 111:22

rule 151:11,13 152:2,23,
24 153:5

rules 136:3

## S

sadly 151:18

safe 81:17 138:13
139:21 151:3 155:14
165:17

safely 136:10

safest 76:4

Sandoval 11:3 59:12

Santos 5:20 22:5 30:9
32:4,5 54:24 86:25
109:11,20

Saturday 57:4

Savannah 19:20,22,23
20:23 21:7,8,9

scans 130:12,17

scene 25:22 26:22 27:10
32:10 78:15,21 110:8
111:13,18 113:22 114:3
116:9 117:7 123:12
134:3 142:2 144:9

scheduled 30:20 131:4

school 13:5,8,12 30:16
36:5,6,7,10,12 37:7,13,
16 46:2,4 48:8,13,14,16,
18,23 119:17 147:2,9,11,
13 152:9,12,18,24

schools 157:13

screw 86:3

seat 16:25 81:2,5

seconds 101:25 152:5
157:4

section 137:18 139:9

Security 14:12 33:8,14
66:4

sedan 59:10

semis 151:16

send 26:22 27:19 56:5

sense 100:9 145:15
146:20,22

separate 45:10

separated 38:2



www.ArkansasRealtimeReporting.com

Appx_0457

**September** 10:1 14:8, 10

**set** 68:4,9

**shakes** 120:24

**shaking** 71:5 72:17,18 73:14 77:22,23 143:15 161:3

**shape** 92:12

**shares** 41:8

**shook** 71:3

**shop** 29:24 53:13 126:24 127:10 128:9

**short** 99:14

**shoulder** 79:16 93:16, 20 143:10,21 144:1 145:1 149:18 162:22,23

**show** 9:13,16,19 20:24 24:15 31:2 33:12 74:14 75:16 78:1,6,12 88:22 93:8 94:5,7 97:18 105:9 135:10 142:9

**showed** 78:11 99:24 101:2

**showing** 143:18

**shows** 105:3

**shut** 104:20

**siblings** 40:20

**sic** 5:10 49:7 85:13

**side** 22:20 73:24,25 75:7,8 77:13,18 81:7,11 89:1 95:5 101:8 107:17, 19,21,22 109:11,21 114:19 120:24 143:10 150:21 159:14 160:2 162:14,18 163:12,15 165:1,14,17,24

**sign** 24:8 107:2

**signal** 74:13,20 75:16, 18 162:1,9,13

**signals** 126:20

**signed** 12:10 35:8

**similar** 17:1 110:16 137:10

**simple** 57:23

**simply** 77:5

**single** 44:13 141:12

**sir** 6:21 8:7 10:17 11:2,6 12:22 13:14,17,22 14:11, 17,19 16:6,13 17:8,12 18:15,21,25 19:6,17 20:4 22:2 23:1,7,9,11,14 24:25 25:3,8 26:2,7,21 27:17,20,23 28:1,3,25 31:6 32:17,20 33:2,20 34:16,19 35:13 36:13 37:4,8,19,23 38:3,8 40:10,13 41:15,18,20,24 42:2,8,17,23,25 45:8 46:12,17 48:15,25 49:4, 24 50:23 52:3,19 53:12, 20 54:2,14,16,21,23 55:10,15,18,20,24 56:8, 11,13 57:6,8,19 59:5,11, 14,22,25 60:12,17 62:21 63:17 64:1,9,11,15,21 65:1,6,8,11,14,18 66:1, 12,15 67:1,4,13,18 68:22,25 69:6,11,15,19, 22 70:17,21,24 71:11,14, 19 72:3,9 74:1,6,16,18, 21 75:15,18,24 76:3,6, 11,19 77:2,17 78:23 79:2,18,21 80:4,8,15,23 81:1,6,8,12,15,19,23 82:2,10,15,22 83:24 84:3,5,18,22 87:12,19,23 88:1,5,16 89:2,13 90:11 91:3,12,16 92:9,13,18,22 93:22,25 96:1,10,15,17, 23,25 98:7,10,19 99:1,23 100:1,4,7 101:4,10,19,22 102:9,14,17,20,24 103:4, 9,18 104:14,17,25 105:12 106:14,17,22 107:5,20,25 108:3,5,21, 25 109:3,5 110:6,10,12, 19 111:8,19 112:3,17 113:23 114:1,6,15,18,22, 25 115:6,11,14,19,23,25 116:4,11,15 117:5,19,23 118:2 119:9,21 120:13, 16,21 121:1,7,12,17,20 122:9,18,20 123:5,9,14, 23,25 124:2,6 125:8,20 126:2,7,11,15 129:12,16 130:2,8,11,15,25 131:3, 12,15,19,23 132:6,9

**sister** 40:18 54:11

**sisters** 41:2

**sit** 29:1

**sitting** 81:5 149:6

**situation** 50:15 68:20 138:13 143:24 165:20

**skip** 135:25

**sleep** 57:10

**slept** 57:17

**Slow** 139:16

**small** 20:18 58:23 149:23

**smiled** 36:14

**Smith** 5:11,22 6:6 21:2,4 134:1 150:9 158:7

**Smith's** 158:5

**snack** 44:17

**Social** 14:12 33:7,14 66:4

**solely** 131:11

**son** 122:24

**sore** 129:8

**sort** 63:14 78:8 89:1 97:17,18 99:24 103:19 110:14 116:21 136:4 159:21

**Soto** 49:22 53:22

133:1,10,13,15,17,20,23, 25 134:4,19,23 135:3,8, 19 136:12,16,20 137:9, 16 138:9,20,23 139:3,10, 15,19,23 140:3 142:23 143:2,6,23 144:6,20,24 145:6,16,20,23 146:2,7, 12 147:20 148:10,13 149:4,8,15,17,20,25 150:11,13 151:3,8,12,16, 23 153:6,20,22,25 154:6, 10,15 155:8,20,24 156:18 157:10,13 158:6, 8,19,22 159:1,5,12,17, 19,24 160:4,15 161:7,10, 23 162:2,8,12,15,19 163:4,10,13 165:2,6,25 166:9

**sister** 40:18 54:11

**sisters** 41:2

**sit** 29:1

**sitting** 81:5 149:6

**situation** 50:15 68:20 138:13 143:24 165:20

**skip** 135:25

**sleep** 57:10

**slept** 57:17

**Slow** 139:16

**small** 20:18 58:23 149:23

**smiled** 36:14

**Smith** 5:11,22 6:6 21:2,4 134:1 150:9 158:7

**Smith's** 158:5

**snack** 44:17

**Social** 14:12 33:7,14 66:4

**solely** 131:11

**son** 122:24

**sore** 129:8

**sort** 63:14 78:8 89:1 97:17,18 99:24 103:19 110:14 116:21 136:4 159:21

**Soto** 49:22 53:22

**sound** 86:23 110:16 119:6

**sounds** 98:14

**south** 67:8

**space** 79:25

**Spanish** 31:17,19 86:8, 10 111:18 112:7,8,9,10 143:5 150:8

**Spanish-speaking** 112:2

**spare** 79:6 88:11 96:21 97:1

**speak** 6:15 7:16 111:16, 18,23 112:5,7 113:13,16, 25 134:3 150:1

**speaking** 32:11 33:19 86:8,10 110:8 113:21

**speaks** 31:19

**special** 86:16

**specific** 38:9 76:1 110:3 127:12 131:16

**specifically** 75:3 78:13 109:13 142:9

**speed** 67:14 68:5,7,8, 10,16 71:12 147:15,22, 24,25 148:1 156:9

**speeding** 17:20 19:12, 13 21:22 68:19

**spell** 11:13,16 31:12

**spend** 44:24 57:7 69:1

**spending** 69:7,9

**spinal** 132:20

**split** 29:25

**spoke** 9:6 112:8,9,10,12 143:5 150:7

**spoken** 8:24 52:14 55:7 120:14

**spot** 110:3

**spray** 43:25

**Springdale** 5:7 10:4 20:2,25 22:15 23:10 29:15 38:20 49:11,12,13 53:5,7,10 54:13 64:25



www.ArkansasRealtimeReporting.com

Appx_0458

68:24 69:17 115:5,6,9
117:21 122:1,3

**Springfield** 49:7,10

**Stacey** 23:16,25

**stand** 129:18 138:13,25

**standard** 135:20

**standing** 99:20 101:7
117:24 118:18 120:2
142:5,10 149:24 151:5
154:5

**start** 47:16,21 49:8
79:13 94:8

**started** 14:8 77:22 106:9
146:2 161:2

**starting** 83:3

**state** 7:22 9:22 23:18
113:25 116:10 126:12
145:25

**stated** 139:11

**statement** 137:8,10,14
143:3 146:1

**statements** 141:1

**States** 34:8 36:11 39:2
50:12 54:12 55:17

**stating** 35:8

**station** 71:24

**stations** 58:2,3

**stay** 34:17 35:6,7,11,12
39:6 68:14 80:18,19
111:10 114:20 123:20
151:1

**stayed** 114:16,17
115:13 122:19 142:16

**staying** 56:19 69:1
148:22

**steering** 139:12 157:2

**stem** 92:8,12

**stepbrothers** 41:2

**stepdad** 69:11

**stepfather** 16:20 17:4
114:23 117:20

**Stephanie** 115:22

**stepped** 73:8 83:1 100:5
101:12,21,25 102:6

**stick** 85:21 86:1

**sticker** 127:3

**sticky** 112:21 136:1,22

**stop** 22:18,19 28:13
60:20 63:22 69:3 71:23
74:3,4,8 79:4,10,16,23
80:6,22 114:4 136:6,18
137:25 138:6 139:20
153:1,8,9 155:1,13 156:9

**stopped** 28:11,17 58:2
73:12 79:20 91:9 93:19
138:19 152:18 156:14
163:3,5,11 165:23

**stopping** 68:3 137:19
163:7,16

**store** 29:14 45:23 46:8,
11,13,14

**stored** 88:8,10,12 89:7,
17 124:23

**story** 34:4

**straight** 39:13 139:13
154:3

**stranger** 114:3

**street** 5:7 10:11,12,19,
24 126:24 127:11,15,17
137:4 153:16

**stretch** 8:20

**strike** 98:20 104:7,10,13
119:24 143:17 144:7
157:14

**striking** 119:25

**strong** 145:12

**struck** 98:16 102:4
108:4 109:22 116:18
119:7

**stuck** 112:21

**studied** 16:3,10 135:14
165:22

**study** 16:5 135:15,21
161:12,19

**studying** 75:19 135:17
136:13

**stuff** 28:10

**subject** 15:17 30:18
34:23 76:23 99:14
140:18

**subpoena** 25:20

**subpoenaed** 24:17

**suddenly** 110:15 139:8

**suggested** 64:13

**suitcase** 57:21 58:18
125:6

**suitcases** 58:12

**summer** 60:6,10 61:11,
13 62:1

**Sunday** 46:10

**Sunny** 66:20

**Sunset** 30:5

**supervised** 135:5

**supplies** 53:14

**supposed** 18:2

**surgery** 13:24 42:6

**surnames** 32:3

**surrounding** 157:1

**suspended** 17:13 18:6,
8,10,11,13,17 19:9 40:2,
4

**suspensions** 21:25

**swelling** 130:19

**swerve** 157:23

**sworn** 5:17,24 6:1

---

**T**

**table** 8:17

**tacos** 63:21,23

**tail** 104:23

**taillight** 123:12

**takes** 14:6 115:9 157:3

**taking** 5:6 6:23 28:18
64:12 99:13

**talk** 22:6 46:16 76:9

78:10 99:15,16 111:15
140:18 143:7

**talked** 35:3 52:6,12
113:23 125:24

**talking** 7:17 27:7 60:21
70:12,15 85:3,23,24
86:20 105:11 111:24,25
133:6 136:2 137:18

**talks** 136:23 137:19
155:22

**task** 156:25

**taught** 16:19 75:22 76:6,
24 156:20 165:12

**taxes** 66:3

**Taylor** 5:6

**teach** 152:9,12 157:13

**teacher** 16:17,25

**technical** 48:14

**telling** 63:14 80:18
82:18 98:14 100:14
109:22 110:16 111:3,4
130:17 144:9,12,25
145:5 150:6 159:16,20

**tells** 127:18

**temporary** 34:1

**ten** 44:17

**tenders** 33:11

**tenth** 46:1

**test** 14:10 16:3,4 75:21

**testified** 6:1 51:16 121:3
158:4 159:13

**testifying** 6:19 7:2

**testimony** 87:24

**tests** 14:7

**Texas** 16:22 19:25 20:1,
17,22 21:21 65:1 129:25
145:25 147:22 148:1
156:20

**text** 152:13 157:2

**texting** 152:2

**texts** 27:19 116:13

**thin** 149:16,19



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0459

**thing** 44:1 47:22 76:4 84:25 85:16 92:7 105:19 123:8 132:1 151:18 157:7

**things** 7:23 8:24 16:14 25:21 30:19 31:3 39:12 44:19 45:6 46:16 48:7 70:13 79:11 95:23 112:21 122:12 123:3 124:19 125:1,2,6 135:24 159:10

**thinking** 20:16 62:10 156:25

**Thompson** 5:7

**thought** 24:19 58:4 63:15 74:10 75:12 77:5, 16 113:11,12 142:24 144:21 161:3 163:14,18

**threatened** 91:1

**threw** 28:17,20

**Thursday** 51:17

**ticket** 17:15,17,19,20 18:1,10,13,16 19:12,13, 18 20:5,17 21:6 22:25

**ticketed** 18:13 19:8

**tickets** 19:10 21:23 68:14

**tight** 86:4

**tightly** 139:12

**time** 5:4 16:21 18:12 24:19,21 25:6,21 26:2,4 27:24 28:6 29:21,25 30:14 32:12 33:22 34:22 35:21,23 36:10,24 37:2 38:4 40:6,7,12 41:16 42:18 45:15,25 50:7 51:4 53:6 54:13 55:19,23 56:12 60:15 61:17 62:1, 13,23,24 63:1,9,12 65:4 69:16 71:13,16,17 72:4, 5,20 74:14 75:25 76:14, 17,20,25 77:16 79:19 81:22 82:7,20,24 90:3,5, 9 91:1 94:3 95:13 96:20 97:22 99:9,12 100:3 106:15 109:21 113:13 114:17 121:5 125:17 131:17,22,24 140:13,16, 21 150:8 161:6 164:8

**times** 8:5 30:24 52:17, 24 56:3 61:19 62:11 123:1 161:12

**Tips** 137:11 154:11

**tire** 60:25 62:6 70:25 71:5,8,10 72:1,8,12 73:1, 2,4 75:23 77:20 79:7,25 80:3,20 81:24 82:13,19 83:4,16,19,22,25 84:1, 15,24 88:4,12 89:3 90:2, 7 91:14,19 92:8 96:21 97:1 117:13,17 124:24 128:2,9,10 137:21 139:8 142:20 144:2 148:17,18, 20 160:6,8,25 161:6,9, 16,21,22 163:4,12,20

**tired** 45:23 122:12

**tires** 60:17,21,22,23 61:14,15,16,19,20,21,22, 23,25 62:9,10,18 77:11 79:6 84:9,11 85:14 126:19 128:1,7,10

**titled** 59:20

**today** 5:5 8:12,23 15:10 22:6 28:2 29:1 33:19 116:22 125:24 139:24 140:19

**Today's** 5:3

**toiletries** 57:22 58:7

**told** 26:15,18 27:1,2 32:16 34:5 37:12,17,23 49:6 50:24 52:8 69:22,25 73:19 84:8 98:2 108:7 110:13,20 112:4 116:20 117:15 120:5 140:5 142:6,15,16 146:13 148:9

**tool** 85:4,17 86:18,20 92:5,6 95:20 96:7 97:23, 24 102:5,8 117:17 119:5

**tools** 79:5 83:24 84:4,6, 20,21,23 87:8 89:19,20 124:25 125:2,3

**toothbrushes** 58:7

**top** 11:16 89:11 136:25 154:20,23

**torso** 130:13

**toss** 28:23

**total** 22:23,24 41:10 44:15

**totals** 44:25

**town** 19:21 20:19 63:25

**Toyota** 59:7 60:13 142:8

**trade** 13:12 48:13,18

**traffic** 17:21,22 19:7,9 66:23,25 67:2 68:3 81:14 90:15 111:10 137:5,13 138:7,14 153:17,21,24 154:2,13 155:2 165:4

**trained** 135:4

**training** 13:15,16,19,25 16:1,17

**transcribe** 6:24

**translating** 150:5

**transporting** 50:17

**trash** 28:20

**trauma** 129:13 130:11

**travel** 49:10 50:21 53:18 79:17 80:7,13 93:15,21 109:12 117:25 136:6,19

**travel-buddy-type** 68:20

**traveled** 20:25 49:7,22 56:15 57:4

**traveling** 26:9 50:25 66:18 67:10 71:9 108:23 116:12

**treatment** 129:11 130:23 131:1,16

**trial** 6:19,25 7:1,2 116:24,25 158:1

**trick** 116:20

**trip** 20:2 21:19 49:5,25 50:21 56:23 57:3,23 69:20

**troopers** 113:25 116:10

**truck** 88:24 96:12

**true** 120:7

**trunk** 59:3 87:7 88:9,18 89:3 96:6,12,22 97:6

**truth** 7:6

**tube** 85:20

**Tuesday** 51:17

**turn** 47:13 67:21 74:13, 20 75:16,18 85:8,21 87:16,17 126:20 137:17 156:9 162:1

**turned** 15:7 57:18 60:4, 9 74:16,17 124:8,10 137:23 138:1,20 161:25

**TV** 152:12 157:9

**type** 13:18 17:19 43:23 48:7 108:7 125:6

**types** 7:23

**typically** 32:4

## U

**U.S.** 34:15 35:12,15,20 54:25

**uh-huh** 7:23 16:15 19:24 30:7 31:15 49:21 51:12 66:10 78:4 85:10 86:2,5 94:24 129:23 132:15 142:3

**ultimately** 62:14 109:10

**uncertain** 95:2

**uncrank** 86:18

**underneath** 87:10 89:7 102:13

**understand** 6:9,14,20 7:3,13 8:3,4,9 25:12 26:20 33:25 45:2 49:22 56:6 59:7 81:4 95:22 98:13 113:12 118:23 122:7 123:11 124:18 141:22 150:7 165:16

**understanding** 33:4 36:12 39:13 46:25 53:2 122:16

**understood** 38:1 77:9

---



**United** 34:8 36:11 39:2 50:11 54:12 55:17

**unlock** 85:21

**unlocks** 85:13

**unpleasant** 99:14

**unscrew** 86:22

**unscrewed** 89:12

**upset** 98:5 150:3

---

## V

**valid** 33:14

**valve** 92:8,12

**vary** 53:8

**vehicle** 6:7 98:17 117:6 125:13 136:23 137:1,2,3, 12,20,25 138:5,6,15 139:13 140:1 142:13,22, 25 143:14 150:10 151:22 153:13,14,15 154:12,25 155:1 165:4 166:8

**versus** 5:11

**vice** 161:14

**video** 119:22,23

**videos** 9:4,8

**videotape** 6:22 7:1

**view** 79:14,15 98:9

**viewpoint** 141:22

**violation** 17:21,22 19:7

**violations** 21:22 134:9

**visible** 137:5 153:18,21, 23 154:1

**vocal** 119:7

**vocational** 48:14,17

**voiced** 111:9

---

## W

**W-2** 65:22

**wages** 65:23

**wait** 140:25 141:1

**waited** 115:1

**waiting** 32:23 33:25 46:23,25

**walk** 128:24

**wallet** 58:9

**wanted** 36:17 37:16 48:8,16 71:22 163:12

**wanting** 71:24 80:1

**warn** 102:22 138:19

**warning** 103:1 138:11

**washers** 48:2,6

**Watch** 103:1

**watched** 9:8 84:17

**watching** 90:14 156:25

**wave** 138:14

**waving** 138:21

**weather** 66:19

**Wednesday** 51:17

**week** 42:24 43:1,8,12,13 44:5,9,13 45:13 51:18 70:16,17,18,20 141:14

**weeks** 28:15 40:8,9 45:14 108:7

**west** 21:5

**wheel** 85:25 86:3,4,17 87:1,22 88:3 92:21 96:9 139:12 157:2

**wheels** 60:13,14,22,24 89:15

**where'd** 152:7

**white** 5:18 6:14 9:1,15 12:14 23:20,24 25:5,6 34:21 47:7 49:14 50:8, 14,16 51:12,19 58:20 83:6,10 94:13 108:15 109:9,14,18,25 110:23 118:19 120:23 127:8 138:12,16 140:22,24,25 141:5,13,24 157:25 159:2 160:12 164:5,7,15, 18,21,24 165:7 166:3,6, 10

**White's** 159:25

**wider** 53:19

**wife** 121:23

**wing** 89:12

**Winston** 110:9 111:12 113:22 142:1 144:25

**Winston's** 119:22

**withholding** 66:2,14

**withholdings** 66:4

**witnessed** 114:4,7

**witnesses** 121:2

**woke** 99:1 105:16 119:14

**woman** 58:8

**wording** 142:17

**words** 101:23 152:24

**work** 24:11 33:7,15 36:16,17,18 37:6 41:19, 21 42:3,15 43:2,10,22,23 44:18 45:22,24,25 46:7, 15 48:6 53:7,8,17 56:2 66:6 90:7,15 109:16 125:1,2,3

**worked** 9:15 28:6 40:6 41:22 42:17,24 43:11 44:10,20 45:15,20 46:5 48:4 53:24 55:21 56:6 62:4 66:8

**working** 13:14,21 28:11, 14,17 40:6 41:16,25 42:9 44:8 45:12 46:8 52:23 53:5,21 55:22,25 56:9 65:21 109:8,9,18 123:4 134:20,21

**worn** 61:23 127:14

**worried** 91:1

**worry** 153:4

**worse** 130:22

**wound** 107:11

**wounds** 107:4

**wrecked** 22:19

**wrench** 85:19 86:22 87:2,14,21 88:2,7 89:14, 21 90:4 92:20,25 96:8,12

**wrists** 107:2

**write** 11:14

**Writing** 157:2

**written** 23:8

**wrong** 71:4 72:12 73:19 77:9,24 82:14 95:7

---

## X

**x-ray** 131:25 132:2

**x-rays** 130:12,18

---

## Y

**y'all** 21:18 38:9 45:2,6 46:16 57:7 69:20 82:11, 13 83:3 90:4 92:23,24 117:21 124:22 138:18

**Yami** 54:6

**year** 10:22 13:9 14:9,11 15:21,23 19:16 24:19 38:24 45:18 65:23 121:11 152:21

**years** 10:20 17:19 19:4, 10 36:4

**yellow** 101:8 107:22 109:11 128:19 162:24

**Yoli** 116:1

**York** 39:3,4,6,7,25

**young** 6:7

**younger** 132:13

---

## Z

**Zamora** 64:4,8

**Zoom** 83:6



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:22-cv-02714-K   Document 40   Filed 01/29/24   Page 466 of 2460   PageID 758

1                    IN UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
2
ERICK RODERICO PIUARA          )
3  GONZALEZ, Individually      )
and as Special                 )
4  Administrator of the        )
Estate of NEHEMIAS R.          )
5  PIVARAL SANTOS,             )
DECEASED,                      )
6                              )
                PLAINTIFFS,    )
7                              )
VS.                            ) CASE NO.:
8                              ) 3:22-CV-02714-K
CAYLEE ERIN SMITH and          )
9  EASTMAN CHEMICAL COMPANY,   )
                               )
10               DEFENDANTS.   )
                               )
11

12        -----------------------------------

13        ORAL AND VIDEOTAPED DEPOSITION OF

14        MELVIN ALEXANDER DIAZ FUENTES

15              AUGUST 2, 2023

16        -----------------------------------

17     ORAL AND VIDEOTAPED DEPOSITION OF MELVIN ALEXANDER

18  DIAZ FUENTES, produced as a witness at the instance of

19  the DEFENDANTS, and duly sworn, was taken in the

20  above-styled and numbered cause on the 2nd of August,

21  2023, from 9:40 a.m. to 12:02 p.m., before Jennifer

22  Norman, CCR in and for the State of Arkansas, reported

23  by machine shorthand, at 410 North Thompson Street,

24  Suite B, Springdale, Arkansas 72764, pursuant to the

25  Federal Rules of Civil Procedure.

EXHIBIT
N


ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0462

PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:21-cv-00214-N Document 40 Filed 01/29/24 Page 467 of 2460 PageID 759
2

```
 1                 A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3      Mr. Jacob White
        Taylor King Law, P.A.
 4      410 North Thompson Street, Suite B
        Springdale, Arkansas 72764
 5      (479) 935-8682
        Jacobwhite@taylorkinglaw.com
 6
     FOR THE DEFENDANTS:
 7
        Mr. Brian L. Bunt
 8      FREEMAN MILLS PC
        2020 Bill Owens Parkway, Suite 200
 9      Longview, Texas 75604
        (903) 295-7200
10      Bbunt@freemanmillspc.com

11   FOR THE WITNESS:

12      Ms. Morgan Woelke
        CJD LAW FIRM
13      111 West Emma Avenue
        Springdale, Arkansas 72764
14      (479) 717-2278

15
     THE INTERPRETER:
16      Ms. Ines Fernandez

17   ALSO PRESENT:
        Mrs. Stacey Bunt, CP, FREEMAN MILLS, PC
18

19

20

21

22

23

24

25
```



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:23-cv-02214-N   Document 48   Filed 01/29/24   Page 468 of 2460   PageID 760
3

1                          INDEX

2                                              PAGE

3

4   Appearances.....................................3

5   Stipulations....................................2

6

    Witness:  MELVIN ALEXANDER DIAZ FUENTES
7
         Examination by Mr. Bunt.....................5
8
         Examination by Mr. White..................57
9
         Further Examination by Mr. Bunt...........59
10

11  Reporter's Certificate.................61-62

12

13                        EXHIBITS

    NO.           DESCRIPTION                      PAGE
14
    Exhibit 1     Notice of Deposition; Subpoena
15                Duces Tecum.......................13

16  Exhibit 2     Scene Photograph...................30

17  Exhibit 5     Photograph of Camry tire..........36

18  Exhibit 6     Scene Photograph...................36

19  Exhibit 12    Marked-up diagram.................22

20

21

22

23

24

25



www.ArkansasRealtimeReporting.com

```
 1     * * * * * PROCEEDINGS * * * * *

 2         THE VIDEOGRAPHER:  Okay.  We are on the

 3     record.  Today's date is August 2nd, 2023.

 4     The time is 9:40.  I'm Douglas Riggs.  I'll

 5     be your videographer today.

 6         This deposition is taking place at the

 7     Taylor King Law Firm, PA, 410 North Thompson

 8     Street, Springdale, Arkansas 72764.  The

 9     Case Number is 3:22-CV-02714-K entitled:

10     Erick Roderico Piuara [sic] Gonzalez and

11     others versus Caylee Erin Smith and others.

12         This deposition is being taken on behalf

13     of the Defendant.  The witness is

14     Melvin Diaz.  The court reporter is

15     Jennifer Norman.  If Counsel will please

16     introduce themselves, the witness will be

17     sworn in.

18         MR. WHITE:  Jacob White, counsel for

19     Plaintiffs, present.

20         MS. WOELKE:  Morgan Woelke, counsel for

21     Melvin Diaz.

22         MR. BUNT:  Brian Bunt, counsel for

23     Caylee Smith and Eastman Chemical.

24         MS. FERNANDEZ:  Ines Fernandez,

25     certified Spanish interpreter.
```



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

```
 1              (Whereupon, the interpreter was duly sworn.)

 2               (Whereupon, the witness was duly sworn.)

 3                  MELVIN ALEXANDER DIAZ FUENTES,

 4    having been first duly sworn, testified through the

 5    duly sworn interpreter as follows:

 6                          EXAMINATION

 7    BY MR. BUNT:

 8    Q.  Good morning, Mr. Diaz.  My name is Brian Bunt.  I

 9    represent Caylee Smith and Eastman Chemical Company

10    who was the employer.  And Caylee was the lady driving

11    the other car.

12    A.  (Nods head up and down.)

13    Q.  Mr. Diaz, would you please state your full, legal

14    name for the record.

15    A.  Melvin Alexander Diaz Fuentes.

16    Q.  Mr. Diaz, do you usually call yourself your first

17    name?  Do you go by "Melvin"?

18    A.  Yes.

19    Q.  Okay.  Do you sometimes go by "Alex" with some

20    friends?

21    A.  No, not normally.

22    Q.  Okay.

23    A.  No.

24    Q.  Mr. Diaz, what is your date of birth?

25    A.  It's April 15, 2001.
```



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:21-cv-00214-JM Document 40 Filed 01/29/24 Page 471 of 2460 PageID 763
6

```
 1  Q.  And what is your street address?
 2  A.  It's 1500 Backus.
 3  Q.  And is that the same home at which Dina Soto also
 4  lives?
 5  A.  Yes.
 6  Q.  She testified that her sister owns the home.  Is
 7  that your understanding?
 8  A.  Yes.  That's exactly right.
 9  Q.  Mr. Diaz, are you married?
10  A.  No.  "Married-married," no.
11  Q.  Have you ever been married?
12  A.  No, never.
13  Q.  All right.  And I believe Ms. Soto testified that
14  you and her have a son; is that correct?
15  A.  That we share a what?
16  Q.  A child.
17  A.  Oh, yes.
18  Q.  Okay.  I believe she said a boy who was three
19  years old; is that correct?
20  A.  Yes.
21  Q.  Okay.  Mr. Diaz, where were you born?
22  A.  In El Salvador.
23  Q.  And when did you come to the United States?
24  A.  I don't remember exactly, but it was around three
25  years ago.  Something like that.
```



```
 1  Q.  Are you still a citizen of El Salvador?
 2  A.  Yes.
 3  Q.  Have you applied for residency in the United
 4  States?
 5               MS. WOELKE:  I'm going to object on
 6          Fifth Amendment grounds.  Melvin, don't
 7          answer that question, please.
 8               THE WITNESS:  (Nods head up and down.)
 9  Q.  Since you came to the United States, have you
10  lived here continuously?
11  A.  Yes.
12  Q.  What is your father's name?
13  A.  Carlos Manuel Diaz Posados, yes.
14  Q.  What is your mother's name?
15  A.  It's Nora Alicia Fuentes Mejia.
16  Q.  Do they still live in El Salvador?
17  A.  My father passed away before I came here.
18  Q.  I'm sorry.  Does your mother -- is your mother
19  living?
20  A.  Yes.
21  Q.  Is she in El Salvador?
22  A.  Uh-huh.  Yes.
23  Q.  Mr. Diaz, can you just tell us quickly what school
24  you attended while in El Salvador before you came
25  here, whether you went to grade school and how many
```



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0468

PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00214 Document 40 Filed 01/29/24 Page 473 of 2460 PageID 765
DIAZ, MELVIN on 08/02/2023

8

1  grades you would have completed?

2          THE INTERPRETER:  I'm sorry.  May the

3      interpreter ask for a repetition?

4          MR. BUNT:  Yes.

5      (Interpreter clarification in Spanish.)

6  A.  Yes, I only got up to sixth grade, and the school

7  name is Jesús Corleto Valiente.

8  Q.  Mr. Diaz, have you ever given a deposition like

9  this before, what we're doing today?

10 A.  No.

11 Q.  Have you had an opportunity to speak with

12 Ms. Woelke, your attorney, just kind of about what we

13 will be doing this morning, that you'll be asked

14 questions, your answers must be under oath, and so

15 forth?

16 A.  Yes.

17 Q.  And do you understand that even though we're not

18 in a courtroom today -- we're in a private office --

19 you've been sworn to tell the truth by the court

20 reporter, and the testimony that you give must be

21 truthful under oath just as if you were in the

22 courtroom testifying?

23 A.  That's fine.

24 Q.  Do you understand that being truthful requires

25 you, of course, to give honest answers to questions if

PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:21-cv-00214-JM   Document 40   Filed 01/29/24   Page 474 of 2460   PageID 766

9

1  I ask them or your attorney asks them or Mr. White

2  asks them; but also if you are asked about something

3  that you know an answer to and you instead say, "Well,

4  I don't know," or, "I forgot," that that also is a

5  dishonest answer?

6  A.  Yes.

7  Q.  And you're doing well so far.  I would like to

8  have a couple of agreements with you; first of all,

9  that if I ask you a question that you can answer with

10  a yes or a no, that you state that orally as opposed

11  to just nodding your head up and down or shaking your

12  head side to side.  Would you agree to do that?

13  A.  Yes, that's fine.

14  Q.  Also, if at any time you do not understand the

15  question that I have asked you, would you please stop

16  me and ask the interpreter to have me repeat my

17  question or rephrase my question until you understand

18  what I'm asking?

19  A.  That's fine.

20  Q.  Mr. Diaz, do you speak English at all?

21  A.  No.

22  Q.  Okay.  Mr. Diaz, since coming to the United

23  States, did you at any time enroll in school to

24  continue your education?

25  A.  No.



1  Q.  Have you worked full time since coming to the

2  United States?

3  A.  Yes.

4  Q.  Who is your current employer?

5  A.  For Mr. Erick.

6  Q.  Erick Garcia?  I'm sorry.  Erick Gonzalez?

7  A.  Yes, Don Erick.  He is the father of the deceased.

8  Q.  And Mr. Gonzalez owns a painting company; is that

9  correct?  Do you work for him as a painter?

10  A.  Yes.  Yes, I am one of his workers.

11  Q.  How long have you worked for Mr. Gonzalez?

12  A.  I don't remember exactly, but it's been

13  approximately about one to two years.

14  Q.  How are you paid as a painter by Mr. Gonzalez?

15  A.  How am I paid?  What -- I don't understand.

16  Q.  Let me ask a better question, then, perhaps.

17         Does he pay you a certain amount per hour

18  for the number of hours that you work?

19  A.  Yes, by the hour.

20  Q.  How much does he pay you per hour?

21  A.  14.

22  Q.  Do you know if that's how he pays the other

23  persons that work for him?

24  A.  No, I don't know.

25  Q.  Okay.  Do you know at all how he paid Nehemias?



1   A.  I don't remember, to be honest.

2   Q.  Did Nehemias do the same type work that you do?

3   A.  Yes.

4   Q.  Mr. Gonzalez [sic], do you have -- can you tell us

5   some sort of estimate how much you normally make per

6   week working for Mr. Gonzalez?

7   A.  Why are you calling me "Mr. Gonzalez" in the

8   beginning?

9   Q.  What was the question?

10  A.  No, I don't know.

11  Q.  So do we need to repeat the question?

12  A.  Yes.

13  Q.  I think the question was:  Can you tell us an

14  estimate of how much you were paid per week working as

15  a painter?

16  A.  Me?

17  Q.  Yes.

18  A.  Around 500, 600.  Something like that, you know.

19  Q.  Okay.  Mr. Diaz, have you obtained a Social

20  Security number since you've been in the United

21  States?

22          MS. WOELKE:  I'm going to object on

23      Fifth Amendment grounds and instruct you not

24      to answer that question.

25  Q.  And I may know the answer to this or to what the



1  response is going to be, but have you applied for any

2  work permit or temporary residence card since coming

3  to the United States?

4          MS. WOELKE:  And I'm going to object to

5             that question on Fifth Amendment grounds and

6             instruct you not to answer.

7          THE WITNESS:  That's fine.

8  Q.  Mr. Diaz, did you have -- did you own a cell phone

9  on April 30, 2022?  That was the date of

10 Mr. Nehemias Pivaral's accident.

11 A.  I don't remember.

12 Q.  You don't remember whether you owned or were

13 using -- regularly using a cell phone at that time?

14 A.  No.

15 Q.  Do you have a cell phone now?

16 A.  Yes.

17 Q.  All right.  Is the number for your cell phone

18 (479) 231-2049?

19 A.  Yes.

20 Q.  When did you obtain that cell phone?

21 A.  No, I don't remember exactly when.

22 Q.  Who is the carrier that operates the cell phone?

23 A.  It is Metro "b" [sic] T-Mobile, I think.

24 Q.  Metro?

25 A.  Metro "b" T-Mobile.



1  Q.  Metro "b" T-Mobile.  Do they have an office here

2  in Springdale?

3  A.  Yes.

4  Q.  Is that where you got the phone, here in

5  Springdale?

6  A.  Yes.

7             (Exhibit 1 marked for identification.)

8  Q.  Mr. Diaz, the reason I'm asking you that question

9  -- let me show you what we'll go ahead and mark as

10  Exhibit Number 1.  This is just our announcement that

11  we would be taking your deposition, and it includes a

12  request that you bring with you to the deposition

13  certain documents or photographs or items of evidence

14  if you have any of these things.

15             Have you seen this before?

16  A.  Yes.

17  Q.  Have you had an opportunity to look over the list

18  either on your own or with your attorney, Ms. Woelke,

19  to determine whether you have any of the things that

20  were listed here?

21  A.  Yes, I've already seen this.  But what is required

22  of me there, I don't have any of that.

23  Q.  Okay.  I'm going to just ask you about a few of

24  these things just to make certain.  And you may not

25  have any of these.



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:21-cv-00214-in Document 40 Filed 01/29/24 Page 479 of 2460 PageID 771
14

1               Did you, Mr. Diaz, ever take any

2    photographs of Ms. Moreno's car there at the accident

3    scene or any damage to the car after the accident?

4    A.  At no time.

5    Q.  Any pictures of the other car that was involved in

6    the accident or the highway or the area around the

7    accident?

8    A.  No.

9    Q.  Did you at any time send any text messages or

10   Snapchat messages, Instagram photos, emails, any kind

11   of messages with your phone or anyone else's phone to

12   someone telling them about the accident and what had

13   happened?

14   A.  No, no.  I don't remember.

15   Q.  At any time have you ever written down a

16   statement, either in your handwriting or typing it

17   out, explaining what you remember happening at the

18   accident?

19   A.  No.

20   Q.  Have you ever given an oral statement, a speaking

21   statement to someone other than one of your attorneys

22   telling them what you remember about what happened at

23   the accident?

24   A.  No.

25   Q.  The phone that you now have with Metro "b"



1  T-Mobile, is it possible that you had that phone at

2  the time of the accident in April of 2022?

3  A.  No.

4  Q.  Do you remember making a call or sending a text on

5  anyone's phone from the scene of the accident?

6  A.  No.  I don't remember.

7  Q.  Mr. Diaz, what was the reason for the trip that

8  you and Mr. Pivaral, Erick Santos, Evelyn Moreno, and

9  Dina Soto were making on the day of the accident?

10  Where were you going?  Where had you come from?

11  A.  We were going from Springdale to Houston to visit

12  a friend.

13  Q.  Who made the trip down with you?  Who made the

14  trip with you down from Springdale to Houston?

15  A.  A friend -- a friend from -- Oscar Moreno -- I'm

16  sorry.  The last name -- the last name is Zamora.

17  Excuse me.

18  Q.  Was Oscar Zamora a friend of yours?

19  A.  Yes, he is our friend.  He is a friend of mine and

20  also with Erick Santos.

21  Q.  And how did you get from Springdale to Houston?

22  A.  How?  I don't understand you.

23  Q.  Yes.  Who drove you down from Springdale to

24  Houston to visit Mr. Zamora?

25  A.  Oh, a friend of Mr. Oscar.



1  Q.  Do you remember that friend's name?

2  A.  No, I don't remember.

3  Q.  Did you go straight from Springdale to Houston?

4  A.  Yes.

5  Q.  And approximately when did you make that trip from

6  Springdale down to Houston?

7  A.  I don't remember.  I think it was Wednesday or

8  Thursday.  Something like that.

9  Q.  Where did you stay in Houston?

10  A.  At Oscar's house.

11  Q.  And was this just a trip to visit with Mr. Zamora,

12  just a friendly visit?

13  A.  Yes, just to pay him a visit.

14  Q.  Did you take with you some changes of clothes for

15  the visit?

16  A.  Yes, just one.

17  Q.  Did you have a bag or a suitcase or anything like

18  that that you had your clothes in?

19  A.  A bag.

20  Q.  What kind of bag?

21  A.  It was just a bag, one of those, what do you call

22  them?

23  Q.  Like a backpack?

24  A.  That's right.

25  Q.  Okay.  Do you recall whether or not Erick Santos



```
 1  had a similar bag with a change of clothes?
 2  A.  Yes, he had one.
 3  Q.  When you were traveling down from Springdale to
 4  Houston, where did you keep the bags?
 5  A.  We had them inside.
 6  Q.  Inside the car?
 7  A.  Uh-huh.
 8  Q.  On which day did you meet up with Evelyn Moreno,
 9  Nehemias Pivaral, and Dina Soto?
10  A.  On Saturday.
11  Q.  Did they come and pick you up from Oscar's house?
12  A.  Yes.
13  Q.  Do you remember at all, Mr. Diaz, at what time of
14  day they picked you up?
15  A.  I don't remember specifically, but it was anywhere
16  between 9:00 and noon.
17  Q.  Mr. Diaz, I'm going to come back to that in just a
18  moment, but I wanted to ask you a question.  Preparing
19  for your deposition today, did you speak to anyone to
20  talk about your testimony other than your attorney,
21  Ms. Woelke?
22  A.  No.
23  Q.  Have you spoken -- since Mr. Erick Santos gave his
24  deposition yesterday, have you spoken with
25  Erick Santos?
```



1   A.  No.

2   Q.  Before giving your depositions, did the two of you

3   talk about the depositions, discuss what you might be

4   asked, or what you might say in the depositions?

5   A.  No.

6   Q.  In preparation for today's deposition, did you

7   review any pictures or videos or paper records of any

8   kind?

9   A.  No.

10  Q.  And you said that you left sometime between

11  9:00 o'clock and noon.  Can you be any more specific?

12  Since that's a three-hour period, can you be any more

13  specific as to whether it was closer to 9:00, 10:00,

14  11:00, or 12:00?

15  A.  It was around 11:00.

16  Q.  And to where were you traveling?

17  A.  Towards Springdale.

18  Q.  Did you or anyone in the group have any plans to

19  stop anywhere along the way?

20  A.  No.

21  Q.  And between leaving Mr. Zamora's house in Houston

22  and when the car ended up stopping on the interstate,

23  do you remember making any stops for lunch or for gas

24  or anything like that?

25  A.  No, no.  The car was completely filled with gas.



1   There was no need for that.

2   Q.  Who was in the car when you and Erick Santos were

3   picked up?

4   A.  There were -- there was Evelyn, Nehemias, and

5   Dina.

6   Q.  And do you know where Evelyn, Nehemias, and Dina

7   had been before they picked you up?

8   A.  No, I don't know.

9   Q.  Did you know they were coming to pick you up?

10   A.  Yes.

11   Q.  Do you know where they had stayed the night before

12   they picked you up?

13   A.  No, I don't know.

14   Q.  Were you surprised at all that they appeared to

15   pick you up?

16   A.  No.

17   Q.  Okay.  You were expecting them?

18   A.  Yes.

19   Q.  How did you know Evelyn Moreno?

20   A.  Through Nehemias.

21   Q.  Were she and Nehemias boyfriend and girlfriend?

22   A.  Yeah.  They were -- they lived together.  I mean,

23   they were living together.  They were, yeah, like

24   boyfriend -- well, I don't know what to tell you.

25   Q.  Okay.  To your knowledge, Mr. Diaz, they were



1  never married to each other, were they?

2  A.   No.

3  Q.   Do you know where Evelyn worked?

4  A.   She would work with Nehemias.

5  Q.   Okay.  Did she work for Nehemias's father doing

6  painting also?

7  A.   Yes.  We all worked together.

8  Q.   And was it at work that you met Nehemias?

9  A.   Yes.

10 Q.   Had you known him in any way before you began

11 working with him?

12 A.   I met him because I worked with him for a few

13 days.  And then I didn't work with him again.  And

14 then after a while, I started working with him, and

15 then I got to know him.

16 Q.   Did Nehemias speak English?

17 A.   A little.  Not much.

18 Q.   How long had you been in a relationship with

19 Dina Soto?

20 A.   I don't remember very well.  But I would say that

21 I have known her for six years.  And we've been

22 together for five years.

23 Q.   Did you meet her in the United States or in

24 El Salvador?

25 A.   In El Salvador.



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00212-xx Document 4b Filed 01/29/24 Page 486 of 2460 PageID 778
DIAZ, MELVIN on 08/02/2023
21

1   Q.  Did you come to the United States together?

2   A.  I don't want to talk about that.

3              MR. BUNT:  All right.  Are you

4         instructing him not to talk about that?

5              MS. WOELKE:  No.  Melvin, you can answer

6         whether or not you guys came to the U.S.

7         together.

8   A.  Yes.

9   Q.  Mr. Diaz, during the trip from Houston, going back

10  to Springdale that day, was Evelyn the only one who

11  drove the car?

12  A.  Yes.

13  Q.  To your knowledge, had Evelyn consumed any

14  alcoholic beverages that day or, to your knowledge,

15  the night before?

16  A.  No, I don't know.

17  Q.  To your knowledge, had she used any drugs that

18  day, whether illegal drugs, prescription drugs,

19  over-the-counter drugs, anything that might affect her

20  driving ability?

21  A.  No, I don't know.

22  Q.  Mr. Diaz, to your knowledge, had Nehemias consumed

23  any alcoholic beverages the day of the accident?

24  A.  Not that I know of, no.

25  Q.  And to your knowledge, was he under the influence



1  of any kind of drugs or medication, whether illegal

2  drugs, prescription drugs, over-the-counter drugs, on

3  the day of the accident?

4  A.  I don't know.

5  Q.  Do you know whether Nehemias used any drugs

6  regularly, meaning that he had a prescription that he

7  had to take regularly?

8  A.  No, I don't know.

9  Q.  When you were traveling, tell me where you were

10  sitting in the car.

11  A.  When we were traveling from there to here?  Or...

12  Q.  From Houston to Springdale.

13  A.  I was on the left side.

14  Q.  Were you in the front or the back?

15  A.  In the back.

16          MR. BUNT:  Can you pull me the diagram?

17          (Exhibit 12 marked for identification.)

18  Q.  Okay.  Mr. Diaz, let me show you what's been

19  marked Exhibit Number 12.  And can you just write your

20  initials, "MD," in the location of the car where you

21  were sitting while the car was still going down the

22  road?

23  A.  When we were outside of the vehicle?

24  Q.  No.  When you were still inside the vehicle and it

25  was going down the road.



1   A.  Oh.  (Indicating).

2   Q.  Okay.  And can you tell me -- or can you show me

3   where Dina Soto was sitting?

4   A.  Do I have to use her initials?

5   Q.  Yes, please.

6              Okay.  And using the initials again, can

7   you show me where Erick Santos was sitting?

8   A.  (Indicating.)

9   Q.  And then you said Evelyn was the one driving the

10  car?

11  A.  Yes, she was driving.

12  Q.  Okay.  Can you just show which seat she was

13  sitting in driving the car?

14  A.  Here (indicating).

15  Q.  And do you mind putting "EM" for her initials?

16  A.  (Indicating).

17  Q.  And then using his initials, would you show us

18  where Nehemias Pivaral was sitting?

19  A.  (Indicating).

20  Q.  Okay.  Just a question that came to mind:  The son

21  that you and Dina had together, when you had gone to

22  Houston and then Dina came down with Nehemias and

23  Evelyn to pick you up, with whom did the child stay?

24  A.  With my mother-in-law.

25  Q.  Okay.  With Dina's mother?



1  A.  Yes.

2  Q.  During the trip from Houston to Springdale, what

3  do you remember the traffic on Interstate 45 being

4  like?

5  A.  Normal.

6  Q.  What do you mean by "normal"?

7  A.  Well, like, I don't know.  I mean, the traffic was

8  flowing.

9  Q.  Were you seeing cars pretty regularly around?

10  A.  Yes.

11  Q.  But was the traffic moving down the road okay?

12  A.  Yeah, normally speaking.

13  Q.  Do you have any idea how fast Evelyn was driving

14  the car in which you were riding?

15  A.  No, I don't remember.

16  Q.  Do you have any estimate as to how fast the cars

17  around you were going?

18  A.  No.

19  Q.  Was Evelyn driving generally with the flow of the

20  traffic, or -- and by that, I mean was her car, for

21  the most part, going a similar speed to the cars

22  around as opposed to passing a lot of the cars?

23  A.  I don't remember.

24  Q.  Tell me what you remember happening whenever the

25  tire failed.  And show me by, I guess, pointing to



1 this diagram here where the tire was that blew out.

2 A.  We were going in this lane (indicating).

3 Q.  Okay.

4 A.  When the tire blew up, I mean, she tried to go in

5 there, but after that, she didn't have any other

6 option.

7 Q.  Are you certain that the car was traveling in the

8 left lane as opposed to the center lane?

9 A.  Yes.  Yes.  We were going in this lane, the left

10 one.

11 Q.  The reason I'm asking that is because Erick Santos

12 had testified that the car was traveling in the center

13 lane at the time the tire blew out.  Do you think

14 that's incorrect?

15 A.  I don't know.  I don't remember very well.

16 Q.  Okay.  Well, is it possible that the car was in

17 this lane instead of this lane?

18 A.  I don't remember.

19 Q.  Mr. Santos -- sorry.  Mr. Diaz, how long had you

20 known Evelyn Moreno, the one who was driving?

21 A.  I don't remember very well.

22 Q.  Had you known -- you knew her through Nehemias;

23 correct?

24 A.  Yes.

25 Q.  Do you know how long her and Nehemias had been



```
 1  together as a couple?
 2  A.  No, I don't know that.
 3  Q.  Okay.  Did she know you?
 4  A.  Yes.
 5  Q.  Did she know your name?
 6  A.  Yes.
 7  Q.  Had you had conversations with her in the past?
 8  A.  No.
 9  Q.  All right.  Go back to when the tire blew out.
10  You were sitting in the backseat.  Did you realize
11  that it was a tire that had punctured or gone flat?
12  A.  Well, yes.  All -- all of us realized that it had
13  blown up.
14  Q.  Had you been in a car before whenever a tire
15  punctured while going down the road?
16  A.  No.
17  Q.  Was there any discussion in the car about the
18  tire?  Did anyone say, "Oh, I think a tire blew out,
19  we need to pull off the road," anything like that?
20  A.  No, I don't remember.
21  Q.  Mr. Diaz, do you remember any discussion
22  specifically about whether Evelyn should stop the car?
23  A.  No, I don't remember.
24  Q.  Do you remember any specific discussion about
25  where Evelyn should stop the car, whether on the left
```



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:21-cv-00214 Document 40 Filed 01/29/24 Page 492 of 2460 PageID 784
27

1  side of the road or on the right side of the road?

2  A.  I don't remember, no.

3  Q.  From what you observed, did Ms. Moreno make any

4  attempt to drive the car over to the right side of the

5  road to get completely off the highway?

6  A.  No, because she didn't have any other option.

7  Q.  Why do you say she didn't have any other option?

8  A.  The car was unstable.  How could she move it in

9  that condition?

10  Q.  Have you ever driven a car that has a flat tire?

11  A.  No.

12  Q.  Would you agree with me that a car, even if it has

13  a flat tire, can be driven, at least for a short

14  distance?

15  A.  I don't know because I've never done that.  I

16  don't know.

17  Q.  Okay.  And that's my point.  You've not ever

18  driven a car that has a flat tire before, so how do

19  you know that she had no option but to immediately

20  stop the car on the left side of the road?

21  A.  Well, I don't know.  I don't know what she -- what

22  was going through her head at that time.

23  Q.  Would you agree, though, that it may have been

24  possible for her to continue driving the car until she

25  could change lanes and move over completely off the



1 road on the right side?

2 A. Well, no. Would she be able to move all through

3 the lanes like that?

4 Q. Are you disagreeing with me that she could have

5 turned on her right blinker, indicated to the traffic

6 that she was changing lanes, and then slowly made a

7 change from this lane into this lane, and then from

8 this lane into that lane, and then pulled off the

9 roadway?

10 A. Well, she couldn't. She couldn't with all the

11 vehicles. I mean, how could she -- how could she get

12 off that way? That was a really wide road.

13 Q. Would you agree with me, Mr. Diaz, that you don't

14 really know what she possibly could have done since

15 you've never driven a car in that situation before?

16 A. Well, I do not agree. I mean, evidently, how

17 could she have gone -- you know, tried to get off in

18 such a way with all the other cars? I mean, going

19 through the risk that the other cars would have hit

20 her, no, I don't think she could have done that.

21                 THE INTERPRETER: Interpreter's

22         correction. "I don't think she could have

23         done such a thing."

24 Q. What we do know is that she did not activate her

25 right turn signal and attempt to move to the right;



```
 1  correct?
 2  A.  I don't remember that.  I don't know.
 3  Q.  Okay.  You didn't see her do that, though?
 4  A.  You mean start her blinkers at the moment that she
 5  was pulling off?  Or I don't understand you.
 6  Q.  I'm asking -- I'm asking:  What we can agree on,
 7  then, is that we do know she did not turn on her right
 8  blinker to signal to traffic to her right that she was
 9  intending to move to the right?
10  A.  I don't remember that.  I don't know.
11  Q.  You're saying you don't know whether she made any
12  attempt to go to the right?
13  A.  No, I don't remember.
14  Q.  Do you remember that she stopped the car on the
15  left side of the road?
16  A.  Yes.  She stopped because she couldn't move it any
17  further.
18  Q.  Okay.  Why could she not move the car any further?
19  A.  I don't know.  I don't know.
20  Q.  All right.  If you don't know, why are you saying
21  that you know she couldn't move the car any further?
22  A.  I've never driven a car like that.  I don't know.
23  I don't know.
24  Q.  So how, then, do you know she could not have moved
25  the car any further down the road?
```



1  A.  Well, I don't know.  Maybe she's the only one that

2  knows.  Maybe she's the only one that knows why she

3  did what she did, if she could do it or if she

4  couldn't do it.

5  Q.  Okay.  When she stopped the car, were there --

6  there were cars passing by on the highway?

7  A.  Yes.

8  Q.  Were there a lot of cars going by?

9  A.  Yeah, more or less.

10            (Exhibit 2 marked for identification.)

11  Q.  Mr. Diaz, let me show you a few photographs of her

12  car.  I'll show you Exhibit Number 2, which is sort of

13  from the front of the car.

14            Does this appear to be the location where

15  Ms. Moreno stopped the car when it came to a stop?

16  A.  I don't remember.

17  Q.  When -- when the car came to a stop, what did you

18  do?

19  A.  Well, we get out of -- we got out of the car, all

20  of us.

21  Q.  Did you immediately get out of the car?

22  A.  Yes.

23  Q.  Who got out of the car?

24  A.  All of us.

25  Q.  All right.  Looking at the car, can you tell me,



1  what door did you exit the car?

2  A.  Through the left side.

3  Q.  Okay.  Through which door did Dina exit the car?

4  A.  The same door.

5  Q.  Through which door did Erick Santos exit the car?

6  A.  The same also.

7  Q.  All right.  Through which door did Evelyn exit the

8  car?

9  A.  Through the door, you know, that gets to the

10  driver's side.

11  Q.  Through the driver's side front door?

12  A.  Yes, next to where she's driving.

13  Q.  Through which door did Nehemias exit the car?

14  A.  He went out through the right door.  He did it

15  with certain, you know, caution.  He was looking to

16  make sure no car was coming, and then he did very

17  quickly.

18  Q.  Exited through this door over here (indicating)?

19  A.  Yes.

20  Q.  All right.  Looking back at the pictures of the

21  front of the car, after you got out of the car, where

22  did you go and what did you do?

23  A.  Well, I just -- I just stood there to the side of

24  the car when I got out.

25  Q.  All right.  Can you kind of just point to where



1  you stood?  If this is the concrete barrier and this

2  is the car, can you kind of point to where you were

3  standing after you got out?

4  A.  Look, I don't remember exactly, but I stood to the

5  side, something around here (indicating) -- somewhere

6  around here.

7  Q.  Okay.  Where was Dina Soto standing or where was

8  she -- wherever she was?

9  A.  With me.

10  Q.  The same location?

11  A.  Yes.

12  Q.  Okay.  Mr. Diaz, looking back at these pictures,

13  assuming these pictures were taken of the car after

14  where it came to a stop on the highway, would you

15  agree with me that the car is stopped partly on the

16  left shoulder but still partly in the travel lane of

17  the highway?

18  A.  It was here (indicating).  Yes, it was on the

19  emergency lane.

20  Q.  Well, it's partly on the emergency lane, but would

21  you agree with me that it's also partly in the travel

22  lane?

23  A.  Well, of course you can see it there.

24  Q.  Is that a "yes"?

25  A.  Yes.



1  Q.  Okay.  You would agree that everything from this

2  yellow line over is actually in the lane of the

3  travel; correct?

4  A.  Yes.

5  Q.  It's a little harder to see from the rear view,

6  but I think this (indicating) is the yellow line that

7  we're talking about as well.  And this -- would you

8  agree this (indicating) portion of the car is in the

9  travel lane?

10  A.  Yes.

11  Q.  Do you know why Evelyn stopped the car where it

12  was still partly in the travel lane as opposed to

13  being all the way over on the emergency shoulder?

14  A.  I don't know.

15  Q.  And as far as why she stopped on the left side of

16  the highway over here instead of stopping over there

17  (indicating) it's just your belief that she wouldn't

18  have been able to get the car over to the other side?

19  A.  I don't know.  She didn't have any other option.

20  Q.  When the car had come to a stop where it is

21  depicted in the pictures here, were you aware, as a

22  passenger in the backseat, that the car was stopped

23  partly in the shoulder but partly in the travel lane?

24  A.  I'm sorry.  I'm not understanding you very well.

25  Could you repeat that?



1  Q.  Yes.  You were sitting in the backseat when the

2  car came to a stop.  Did you realize that the car had

3  been stopped partly in the travel lane of the highway?

4  A.  No.  I mean, no, I don't remember.

5  Q.  Okay.  At what point did you become aware that the

6  car was partly in the travel lane?

7  A.  I don't know.  When I got out of it.

8  Q.  Okay.  When you got out, is that when you realized

9  that the car is partly in the travel lane?

10 A.  Yes.

11 Q.  Did anyone -- do you recall anyone saying,

12 "Evelyn, the car is still partly in the travel lane;

13 why don't you pull it up a little -- a little more to

14 get it over -- more over onto the shoulder"?

15 A.  No, I don't remember.

16 Q.  After you got out of the car and you realized it

17 was partly in the travel lane, were you concerned at

18 all about passing traffic, that passing traffic might

19 hit the car?

20 A.  Well, no.  I don't know.  I never imagined such,

21 anything.

22 Q.  Were you concerned at all about the passing cars

23 -- since this is a big interstate highway and usually

24 pretty busy, were you concerned for your safety or the

25 safety of any of your group due to the passing cars?



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:23-cv-00214-jm   Document 48   Filed 01/29/24   Page 500 of 2460   PageID 792
DIAZ, MELVIN on 08/02/2023                                                    35

1    A.  Well, that's exactly right.  But, you know,

2    whenever the other vehicles saw the car that was

3    stopped there, I mean, they would, you know, go around

4    the car so that they will avoid the car.

5    Q.  Did -- Mr. Diaz, did anyone walk back behind the

6    car to motion traffic to slow down or to move around

7    the car, get over further from the car?

8    A.  No, I don't remember.

9    Q.  After the five of you had gotten out of the car,

10   tell me what happened -- what you remember happening

11   next.

12   A.  Well, nothing.  I mean, they were going to change

13   the tire.  That's it.

14   Q.  Who decided to change the tire?

15   A.  Nehemias.

16   Q.  Did Nehemias take the lead in doing the work to

17   change the tire?

18   A.  Yes.  Erick was going to help him.

19   Q.  Did anyone else help Erick and Nehemias in

20   changing the tire?

21   A.  No.

22   Q.  Were you observing them, watching what they were

23   doing when they were working to change the tire?

24   A.  Yes.

25   Q.  Did -- at any point in time, Mr. Diaz, did anyone



1  get back in the car while the tire was being changed?

2  A.  No.

3  Q.  What do you remember seeing that they accomplished

4  in getting the tire changed before the accident

5  happened?

6  A.  Well, I don't remember anything.

7              (Exhibit 5 and Exhibit 6 marked for

8          identification.)

9  Q.  Let me show you Exhibits 4 -- or 6, I guess, and

10  5.  This front left driver's-side tire, is that the

11  tire that had the flat?

12  A.  Yes.

13  Q.  And it looks like they have placed a jack

14  underneath the car.  Might be able to see it a little

15  closer in this picture.  Were you watching them when

16  they were putting the jack under the car?

17  A.  No, I don't remember.

18  Q.  Okay.  You were not assisting them in any way?

19  The two of them were doing it; correct?

20  A.  Yes.  At the beginning, I did say, "Do you want

21  any help?"  And they said, "No, no, we've got it."

22  Q.  Okay.  Do you remember at all, Mr. Diaz, whether

23  they took any -- or were able to take any of the lug

24  nuts off of the wheel that was still on the car?

25  A.  No, I don't remember.  I don't know.



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

1   Q.   Okay.   I see a spare tire placed against the
2   concrete barrier here.   Do you know who put the spare
3   tire there?
4   A.   I did.   I did.
5   Q.   Okay.   So if you placed the tire there, where did
6   you pick it up to move it there from?
7   A.   It was when Erick was getting it out of the trunk
8   and he was lifting it up.   When the impact occurred,
9   he let go of it, and I went and got it and pulled it
10  out of there so that it wouldn't go into the lane.
11  Q.   All right.   Mr. Diaz, were you watching Nehemias
12  and Erick just before the accident happened?
13  A.   No, no.   I wasn't watching them all of the time.
14  There are things that I don't remember, that I didn't
15  see.
16  Q.   Did you actually see Nehemias when he was struck
17  by the car?
18  A.   I only saw when the car got off the road.   And at
19  the moment of the impact, I just saw whenever she --
20  she was going to run all of us over, but she only
21  impacted him; and that's when she veered to the road.
22  Q.   So is that a "yes," you did see the moment when
23  the car struck Nehemias?
24  A.   Yes.
25  Q.   Did you give a warning to Nehemias, tell him,



1   "Watch out" or, "There's a car coming; move out of the
2   way," anything like that?
3   A.  No.  Everything happened in the blink of an eye.
4   There was no time for anything.
5   Q.  Did you see the car approaching him before it got
6   to him?
7   A.  Yes.
8   Q.  All right.  And yet you're saying that you didn't
9   yell or say anything to ask him to move to avoid the
10  car?
11  A.  The thing is, there wasn't any time for anything.
12  You see, I wasn't watching or keeping my eyes on him
13  the whole time.  I was, like, looking around, seeing
14  other things.  And all of a sudden, when I turned my
15  head and I saw him, the car was already coming towards
16  him.  There wasn't time for anything.
17  Q.  When you first saw the car, it had not yet hit
18  him; correct?
19  A.  It was almost when it was about to impact him,
20  almost.
21  Q.  What did the car look like?
22  A.  In which way?  I don't understand you.
23  Q.  What type of car was it?
24  A.  I don't remember very well.  I don't remember.
25  Q.  Do you remember what color it was?



```
 1   A.  I think it was white.  I don't know.  I don't
 2   remember.
 3   Q.  Do you remember whether it was a car or a truck?
 4   A.  No.  I just don't remember.
 5   Q.  Did you only see it for just a brief second?
 6   A.  Yes, almost to the point of impact.  That's it.
 7   Q.  Were you able to see who was driving the car or
 8   what kind of person was driving the car?
 9              THE INTERPRETER:  I'm sorry.  Would you
10         repeat that for the interpreter?
11              MR. BUNT:  Yes.
12   Q.  Were you able to see anything about the person who
13   was driving the car?
14   A.  Just that the person was, like, looking down, like
15   bending down.  Like, I don't know what they were
16   doing.  I don't know.
17   Q.  Could you tell whether it was a male or a female
18   at that time?
19   A.  I don't know.  I don't remember.  No.
20   Q.  Could you tell anything about their physical
21   characteristics, skin color, hair color?
22   A.  No, I don't know.  No.
23   Q.  But it's your testimony that it was a person, and
24   you believe the person was looking down?
25   A.  Yes.
```



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00214-JM   Document 40   Filed 01/29/24   Page 505 of 2460   PageID 797
DIAZ, MELVIN on 08/02/2023                                                    40

1  Q.  Mr. Diaz, if you would, take this red pen.  And it
2  may be the same location.  But can you -- can you mark
3  on here exactly where you were standing at the time
4  you saw the impact between the car and Mr. Santos?  Is
5  it this spot?  And if it is, maybe just mark back over
6  it and put your initials, "MD," by that.
7  A.  I mark where I was or everyone was?
8  Q.  I'm going to ask you to mark where the others were
9  to the extent that you remember, but let's start with
10 you, marking where you were.
11 A.  More or less around here (indicating).
12 Q.  All right.  Will you write your initials, "MD,"
13 beside that also?
14 A.  I'm sorry.
15 Q.  Gracias (in Spanish).
16             THE INTERPRETER:  Thank you.
17 Q.  And was Dina also standing by you or next to you?
18 A.  She was with me, yeah.
19 Q.  Can you write her initials where you remember her
20 being?
21 A.  (Indicating).
22 Q.  All right.
23 A.  We were together.
24 Q.  Those are a little hard to see.  They're kind of
25 small.  Do you mind just drawing a line here and



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:21-cv-00214-JM Document 41 Filed 01/29/24 Page 506 of 2460 PageID 798
41

1 making maybe an "MD" a little bigger, and a line here

2 and making a "DS" that's a little bit larger so we can

3 make out the letters?

4 A.  Let's -- let's -- so let's suppose that these

5 little dots, it's us.  So there are -- you can see my

6 initials and her initials.

7 Q.  That's good.  Thank you.

8          Mr. Diaz, can you take the red pen and

9 maybe draw a little circle where Nehemias Pivaral was

10 standing or was located whenever he was struck by the

11 car, as best you remember?

12 A.  He was around here (indicating).  Something like

13 that.  I don't remember the distance.

14 Q.  Okay.  And could you take that pen and just write

15 "NP" for Nehemias Pivaral?

16          Did you call him by Nehemias Pivaral or

17 Nehemias Santos?

18 A.  Just Nehemias.

19 Q.  Okay.  Well, maybe just put an "N" by Nehemias

20 there so we know that that's who that person is at the

21 red circle.

22 A.  (Indicating).

23 Q.  Mr. Diaz, do you know where -- at the time that

24 you saw Nehemias being struck, do you know where

25 Erick Santos was?



```
 1   A.  Yes.

 2   Q.  Can you draw a circle where he was?

 3   A.  He was around this side (indicating), getting the

 4   tire out.

 5   Q.  All right.  Do you know where Evelyn Moreno was?

 6   A.  I'm trying to remember.  I think she was around

 7   here (indicating).  I don't know the distance,

 8   specifically speaking, but more or less.

 9   Q.  Okay.  Again, since the red kind of bleeds

10   together, would you mind just drawing a line out and

11   then putting an "ES" for Erick Santos and an "EM" for

12   Evelyn Moreno so that we know for certain which

13   persons those are?

14   A.  (Indicating).

15   Q.  Gracias (in Spanish).

16            THE INTERPRETER:  Thank you.

17   Q.  Where was the car whenever you saw it?  And if you

18   want to take the pen and kind of draw where the car

19   was located.  But when you saw the car just at the

20   moment that it struck Nehemias, where was that car

21   located?

22   A.  The vehicle that impacted him?

23   Q.  Yes.  The white car that you saw.

24   A.  (Indicating).

25   Q.  Okay.  So you put it down here.  So this would be
```



1  before it impacted him.  And you're saying then it
2  went straight and impacted him there (indicating)?
3  A.  Well, I mean, I don't know exactly.  You know, I
4  don't know the distances.  I don't remember everything
5  very well.  But what I can say is, like, it was -- it
6  departed from the yellow line, and then it impacted
7  him.  And when it -- the person realized that it had
8  impacted him, to avoid the rest of us, then it reacted
9  and went back to the lane.
10  Q.  Okay.  But if Mr. -- if Nehemias was in this
11  location, the car had to travel up and hit him where
12  he was; correct?
13  A.  Well, I don't remember.  And I'm not saying to you
14  that I know the distances or anything exactly.  But
15  all I can remember is that whenever she was about to
16  impact him, I mean, she had come off the road from the
17  yellow line, and when she impacted him, I imagine that
18  whenever she just, like, went like this and realized
19  that she was going to hit us, but she corrected
20  herself and, you know, only impacted him and then went
21  back in the lane again.
22  Q.  Was this car able to avoid hitting Evelyn 's car?
23  A.  Yes.  It was just a swipe.
24  Q.  Well, when you say "just a swipe," did it touch
25  Evelyn's car?  Do you think it touched the car or



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00714-VM Document 40 Filed 01/29/24 Page 509 of 2460 PageID 801
DIAZ, MELVIN on 08/02/2023

44

1  missed it altogether?

2  A.  To be honest, I'm not sure of that.

3  Q.  Okay.  Do you -- you said you only saw the car for

4  just a split second.  Do you then have any idea what

5  the speed of the car was?

6  A.  No, I have no idea.

7  Q.  What was Nehemias doing back at this location, if

8  you know?

9  A.  I don't know.  I don't know.  I don't remember.

10  Q.  Do you remember what position his body was in?

11  Was he standing up?  Was he crouched over, bent down?

12  A.  I remember that he was crouched over.

13  Q.  Do you have any idea whether he was looking for

14  something?

15  A.  I don't know.  I don't remember.  I don't know.

16  Q.  Or whether he had dropped anything?

17  A.  I don't remember.  I don't remember any of that.

18  Q.  When you say he was crouched over, was he down on

19  his knees, or still on his feet?

20  A.  I don't remember.  I don't remember very well.  I

21  don't remember.

22  Q.  Do you know what direction his face was facing?

23  A.  What do you mean?  I don't understand.

24  Q.  Whenever you looked back and you saw the car about

25  to impact him, was he -- was he looking back at you;



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

1  was he turned toward the roadway; was he looking back
2  behind?  Do you remember what direction he was facing?
3  A.  Let's say that he was in the direction of, like,
4  facing forward, towards where I was.
5  Q.  So he was crouched over, but facing back the
6  direction of the car?
7  A.  Yeah, something like that.
8  Q.  Do you -- Mr. Diaz, do you have any idea the
9  amount of distance behind the bumper of the car he was
10  located, how many meters?
11  A.  I am not for sure.  To be honest, I don't
12  remember.
13  Q.  Mr. Diaz, are you certain that he was on the
14  shoulder on this side of the yellow line as opposed to
15  being on the yellow line or even across the yellow
16  line?
17  A.  Yes.  Yes.  I am for sure that he was here
18  (indicating) from the yellow line, towards the inside,
19  in the emergency lane.
20  Q.  To your knowledge, were any other persons looking
21  back in the direction of Nehemias at the time he was
22  hit?
23  A.  I don't know.  I don't remember.
24  Q.  Dina Soto testified yesterday that she was not
25  looking in that direction, and so she does not know



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00214-JM   Document 48   Filed 01/29/24   Page 511 of 2460   PageID 803
DIAZ, MELVIN on 08/02/2023
46

1  what happened.  Do you believe that's an honest answer
2  by Dina?
3  A.  Yes, of course, because she was almost, like --
4  her back was towards that way (indicating).  She
5  didn't see anything.
6  Q.  Do you know what direction Erick Santos was facing
7  at the time of the impact?
8  A.  Well, since he was getting -- since he was getting
9  the tire out, he was, like -- his back was -- you
10  know, he was facing forward.  I mean, I don't
11  remember.
12  Q.  Was he facing the trunk?  Was the tire in the
13  trunk?
14  A.  Yes, he was getting the tire out, looking for it.
15  Q.  Evelyn Moreno, do you know what direction she was
16  facing?
17  A.  I don't remember.
18  Q.  Was she helping Erick to get the tire out of the
19  trunk?
20  A.  No, I don't remember.
21  Q.  Okay.  You don't remember one way or the other
22  whether she was or was not?
23  A.  I don't think she was doing that.
24  Q.  Okay.  So if Erick testified that she was helping
25  him to lift the tire out, you didn't necessarily see



1   that?

2   A.   No, I didn't see that.  I don't know.  I don't

3   remember.

4   Q.   Mr. Diaz, after Nehemias was struck by the car,

5   were you able to see where his body came to land

6   afterwards, where it came to rest?

7   A.   I don't remember exactly in which lane it, you

8   know, fell, but I just know that it went towards the

9   inside, in the lanes, but I don't remember.

10   Q.   Okay.  If I were to ask you to take the red pen

11   and draw maybe a big circle, would you be able to

12   cover the general area where the body was, even if you

13   don't know the exact location?

14   A.   When he had already been impacted, where the body

15   fell, something like that, or what do you mean?

16   Q.   Where the body fell on the roadway.

17   A.   I don't remember very well, but I think it was

18   around here (indicating).

19   Q.   Approximately there?

20   A.   I don't know.  I don't remember.  I just know that

21   it was in the inside.

22   Q.   Okay.  Will you write an "N" for Nehemias's name

23   here so that we'll know that's the general area where

24   the body came to rest, what the circle is?

25   A.   Okay.  (Indicating).



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00214-JM   Document 48   Filed 01/29/24   Page 513 of 2460   PageID 805
DIAZ, MELVIN on 08/02/2023
48

1  Q.  Okay.  And maybe back here where Nehemias was at

2  the time he was struck, can you just write a number

3  one, numero uno, and here where his body came to rest

4  a number two, numero dos, so we can know this is where

5  he was at first and that's where his body ended up

6  being?

7  A.  (Indicating).  I don't remember very well.

8  Q.  Thank you.  After Nehemias's body -- I'm just

9  checking our time.  Do y'all want to push on through,

10  or do you want to take a short break?

11          MR. WHITE:  How much longer do you think

12      you have?  If it's not that long, we might

13      just push through.

14          MR. BUNT:  We're most -- we're mostly

15      done.

16          THE WITNESS:  Let's finish this.

17  Q.  Okay.  Mr. Diaz, after the body came to rest, what

18  do you remember happening next?

19  A.  I just remember that Erick pulled it towards the

20  emergency lane so that the other cars would not go

21  over it.

22  Q.  Okay.  Was Erick the only one that actually moved

23  Nehemias's body?

24  A.  I believe so.  I don't remember very well.

25  Q.  Did you see Erick or anyone else do anything else



1  with Nehemias's body after Erick had moved it over
2  onto the shoulder?
3  A.  No.  He just pulled it over.  He kneeled down,
4  started crying.  He was saying a few words, "My
5  brother, don't you die."  It was really bad.
6  Q.  Mr. Diaz, after the police officers arrived at the
7  scene, did you have any conversation with the police
8  officers there?
9  A.  No.
10  Q.  I know that -- did you see the police officers
11  speaking with Evelyn?
12  A.  I don't remember.
13  Q.  Okay.  Do you know whether Evelyn explained to
14  them or gave them a statement about what happened, how
15  it happened?
16  A.  No.  I don't know.  I don't remember.  I don't
17  know.
18  Q.  Do you have any recollection of one of the police
19  officers asking for your name, asking who you were and
20  what your date of birth was?
21  A.  No.  I don't remember.
22  Q.  Do you remember anyone there at the scene speaking
23  to you in Spanish?
24  A.  No.  Only the paramedic, when this person arrived.
25  I mean, he was just there, taking our information, and



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:21-cv-00714-JM   Document 40   Filed 01/29/24   Page 515 of 2460   PageID 807
DIAZ, MELVIN on 08/02/2023                                                    50

 1  giving us water.

 2  Q.  Was there a paramedic that was able to speak

 3  Spanish?

 4  A.  Well, I don't think he was speaking Spanish very

 5  well.  I don't know.  I mean, he just asked for our

 6  names.  And I don't know, no.

 7  Q.  Do you recall -- Mr. Diaz, do you recall telling

 8  anyone there at the scene, any of the police officers

 9  or the paramedics, that you did not see the accident

10  happen?

11  A.  I don't remember.

12  Q.  Did you tell anyone there at the scene, any of the

13  police officers or paramedics, that you were in the

14  car at the time the accident happened?

15  A.  No, at no time did I speak with them.

16  Q.  Did you tell any of the police officers or the

17  paramedics that you were not in a position to see what

18  happened and, therefore, that you didn't know what

19  happened?

20  A.  The thing is I never spoke to anyone, no.

21  Q.  Did you ever -- Mr. Diaz, did you ever tell anyone

22  there at the scene that you had seen a car approaching

23  Nehemias in the emergency shoulder?

24  A.  No, no.  I don't remember.

25  Q.  All right.  Did you try to communicate through



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:21-cv-00714-... Document 40 Filed 01/29/24 Page 516 of 2460 PageID 808
51

1  Evelyn -- if Evelyn was speaking to the police, did
2  you try to communicate through Evelyn that you had
3  seen a car approaching Nehemias, driving partially on
4  the emergency shoulder?
5  A.  No, no.  Not at any time, I didn't.
6  Q.  Other than yourself, do you know whether any of
7  the other persons there claimed to have actually seen
8  the impact between the car and Nehemias?
9  A.  No, I don't remember.
10  Q.  While you were there at the scene, did any
11  strangers, any other persons who were not involved in
12  the accident come up and tell you that they saw what
13  happened?
14  A.  No, I don't remember.  No, no one.
15  Q.  Since the accident, have you -- not there at the
16  scene, but later have you learned of anyone that says
17  they witnessed the accident also?
18  A.  No.
19  Q.  Did you ever give any kind of written statement to
20  anyone about what you remember seeing about the
21  accident?
22  A.  I don't remember.
23  Q.  Were you ever asked to give a written statement?
24  A.  No.
25  Q.  Did you ever create any notes or drawings of your



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:21-cv-00714 Document 48 Filed 01/29/24 Page 517 of 2460 PageID 809
52

1  own about the accident just to help you remember what

2  happened?

3  A.  No.

4  Q.  You never gave a statement to the police about how

5  the accident happened, did you?

6  A.  No, never.

7  Q.  Did you ever try to contact the police later to

8  tell them you had seen the accident and how it

9  happened?

10 A.  No.

11 Q.  Or to see whether you could give a statement to

12 someone, perhaps someone who could speak Spanish?

13 A.  No.

14 Q.  Mr. Diaz, I know this is an unpleasant topic, but

15 I just want to ask you a couple of questions.

16          After Nehemias's body was moved over onto

17 the shoulder, did you observe his body to see if you

18 could tell where any wounds might be?

19 A.  Yes.  The head thing.

20 Q.  Do you know which side of his head was injured,

21 whether it was the left side or whether it was the

22 right side?

23 A.  I don't remember very well.  I just know it was

24 toward -- to his head, but I don't remember which

25 side.



1  Q.  Okay.  I believe the answer is, of course, no, but

2  I just want to make certain.  You were not struck --

3  neither you nor Dina were struck any at all by the car

4  that was driven by the person that struck Mr. Santos;

5  correct?

6  A.  No.

7  Q.  And to your knowledge, Erick Santos and

8  Evelyn Moreno, neither of them were actually struck by

9  the car, either, were they?

10 A.  I don't know, no.

11 Q.  Okay.  Do you know one way or the other whether

12 Evelyn Moreno was struck by Nehemias's body after it

13 had been struck by the car?

14 A.  I'm not sure of that.  I don't know.  I don't

15 know.

16 Q.  Mr. Diaz, other than getting the -- trying to get

17 the spare tire out of the trunk, do you know whether

18 there was anything else that Erick was trying to get

19 out of the trunk at the time the accident happened?

20 A.  No, I don't know.

21 Q.  Mr. Diaz, I understand that after the accident,

22 there was a family that lived close to the highway

23 that sort of took you and the others in for a few

24 hours until Nehemias's father could drive down from

25 Arkansas and that you stayed there; is that correct?



1  A.  Yeah.  We waited there.

2  Q.  Do you know the names of any of those persons?

3  A.  No, I don't remember.

4  Q.  Let me read some names to you that were given to

5  us by Mr. White as persons who may have some

6  knowledge.  And just tell me if you recognize any of

7  these persons.  José Aguilar?

8  A.  I don't know.

9  Q.  Stephanie Mitchell from Corsicana?

10  A.  I don't remember.

11  Q.  Rosemary Ricny, or "Ricny"?

12  A.  No, I don't remember anything.

13  Q.  Manuel Yoli Medrano?

14  A.  No.

15  Q.  Thank you.  Mr. Diaz, I'm almost finished.  Is

16  there anything else that you remember about how the

17  accident happened that we haven't talked about?

18  A.  No.  I don't remember anything.

19  Q.  Anything else that you remember about what

20  Nehemias might have been doing at the time that he was

21  struck by the car?

22  A.  No.  I don't remember -- you see that it's been

23  while.  It's difficult to remember.

24  Q.  I understand.  Anything else that you remember

25  about the white car or the driver of the car that you



1  haven't told me about?

2  A.  No.

3  Q.  Mr. Diaz, based on what you remember and what you

4  saw, who do you believe is at fault for this accident?

5  A.  She, the driver of the other vehicle.

6  Q.  And is that because it's your testimony that she

7  was driving on the shoulder of the road?

8  A.  Yes, because she left her lane because she was

9  distracted.

10  Q.  And you say she was distracted because she

11  appeared to you to be looking down?

12  A.  Yes.  In the few seconds that I saw her, I saw her

13  when she did this (indicating).

14  Q.  Okay.  You were not able to see exactly what she

15  was looking at; correct?

16  A.  No, I don't remember seeing anything.  I just know

17  that she was, like, bent down.  I don't remember.  She

18  was looking at something, but I don't know what.

19  Q.  Mr. Diaz, looking back on the accident now, do

20  you -- do you wish that Ms. Moreno would have stopped

21  the car more over onto the shoulder rather than partly

22  on the shoulder but partly in the travel lane?

23  A.  Well, of course.  But I guess that she couldn't do

24  it.  I don't know.  I don't know.

25  Q.  Do you believe that Nehemias could have done more



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
Case 3:23-cv-00214-JM  Document 40  Filed 01/29/24  Page 521 of 2460  PageID 813
DIAZ, MELVIN on 08/02/2023

56

1   to watch for approaching traffic or avoid approaching

2   cars?

3   A.  No, I don't know.

4   Q.  Mr. Diaz, do you think it's possible at all that

5   Nehemias could have, at some point, moved across this

6   yellow line over into the lane of travel over here?

7   A.  No.

8   Q.  Mr. Diaz, I'm almost finished, and -- but I ask

9   this question of every witness.  Have you ever been

10  convicted of a crime?

11  A.  Never.

12  Q.  Have you ever been arrested and put in jail for

13  anything?

14  A.  No.

15  Q.  And I assume there are no charges currently

16  pending against you or you're not under indictment for

17  anything?

18  A.  No.

19          MR. BUNT:  Mr. Diaz, I'm sorry we had to

20          talk about an unpleasant subject this

21          morning.  Thank you for your patience in

22          answering my questions.  At this time, I

23          will pass you over to either Mr. White or

24          your attorney, Ms. Woelke.

25          THE WITNESS:  Okay.



```
 1                    EXAMINATION
 2  BY MR. WHITE:
 3  Q.  Melvin, we've met before.  This is Jacob White,
 4  the attorney for Nehemias's family.
 5  A.  Yes, of course.
 6  Q.  You testified that you and Evelyn were not close
 7  at the time the accident happened; correct?
 8  A.  Close?  What do you mean?
 9  Q.  Well, you said you and her had never had a
10  conversation before; right?
11  A.  No, no.
12  Q.  Okay.  And can you describe what the Toyota felt
13  like after the tire had blown out but before it had
14  come to a stop on the side of the road?
15  A.  It was shaking and unstable.
16  Q.  Would you describe the shaking as violent?
17  A.  The moment that the tire had blown out or before?
18  Q.  Let's say the moment that it blew out.
19  A.  Oh, yes.
20  Q.  And then immediately after it blew out, would you
21  describe the shaking in the car as violent?
22  A.  Yes.
23  Q.  Was it frightening?
24  A.  Well, yes.
25  Q.  So you testified that you've not spoken to Erick
```



```
 1   about this case; correct?
 2   A.  Yes.
 3   Q.  But you probably did have to speak to Erick this
 4   morning when he told you to come in 30 minutes early?
 5   I just want to make sure.
 6   A.  Yeah, he called me.
 7   Q.  Okay.  So are you aware that the Spanish-speaking
 8   paramedic on the scene of the accident told the police
 9   officer that you had stayed in the Toyota when the
10   accident happened?
11   A.  I don't know.
12   Q.  But you never told the paramedic that; is that
13   correct?
14   A.  No, no, no, no, we never talked.  It was just
15   getting our information, our names, and that was it.
16   Q.  So if the paramedic told the police officer that
17   you were in the Toyota when the accident happened, the
18   paramedic would be mistaken; correct?
19   A.  Well, of course, because we were all outside.
20   Q.  Did anyone from the Richland Police Department or
21   the Texas State Police ever contact you and ask you
22   for a statement, either the day of the accident or
23   afterwards?
24   A.  No.
25   Q.  To your knowledge, did they ever reach out to Dina
```



1  and ask for a statement?

2  A.  That I know of, no.

3  Q.  What about do you know if they reached out to

4  Evelyn?

5  A.  No, much less.

6  Q.  You were not looking at Erick when Nehemias was

7  hit by the white vehicle, were you?

8  A.  I don't remember.

9  Q.  But you do remember seeing Nehemias get hit by the

10 vehicle?  You were looking at Nehemias when that

11 contact happened?

12 A.  Practically speaking, at the moment of the impact

13 is when I saw him.

14 Q.  So at the moment of impact, you're looking at

15 Nehemias, not at Erick; right?

16 A.  Yes.

17         MR. WHITE:  No further questions at this

18      time.

19         MS. WOELKE:  And then I have no

20      questions for you, Melvin.  Thank you.

21              FURTHER EXAMINATION

22 BY MR. BUNT:

23 Q.  Mr. Diaz, just another question or two.  The

24 backpack that you took with you on the trip to carry

25 your clothes, where did you keep it in the car?



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:21-cv-00714-K   Document 40   Filed 01/29/24   Page 525 of 2460   PageID 817
60

1   A.   In the middle of my legs.

2   Q.   Okay.   The backpack that -- or the bag that Erick

3   had carried with him, do you remember where he was

4   keeping it in the car?

5   A.   I don't remember.

6   Q.   Do you know whether anyone had put any of their

7   bags in the trunk?

8   A.   No, I don't know.   I don't remember.

9               MR. BUNT:   That's all I have.   Thank

10          you.

11              THE VIDEOGRAPHER:   We will go off the

12          record.   The time is 12:02.

13          (Proceedings concluded at 12:02 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                  REPORTER CERTIFICATION

 2           I, JENNIFER NORMAN, Certified Court Reporter

 3   for the State of Arkansas, do hereby certify to the

 4   following:

 5           1) that on August 2, 2023, the witness,

 6   MELVIN ALEXANDER DIAZ FUENTES, was duly sworn by me

 7   prior to the taking of testimony as to the truth of

 8   the matters attested to and contained therein;

 9           2) that the foregoing pages contain and are a

10   true and correct transcription of the proceedings as

11   reported verbatim by me via realtime stenography to

12   the best of my ability and transcribed at or under my

13   direction and supervision, and subject to appropriate

14   changes submitted by witness, if any, during his/her

15   requested reading and signing of this deposition

16   according to the Arkansas Rules of Civil Procedure;

17           3) that I am neither counsel for, related to,

18   nor employed by any of the parties to the action in

19   which this proceeding was taken; and that I am not a

20   relative or employee of any attorney employed by the

21   parties hereto;

22           4) that I am not financially interested or

23   otherwise interested in the outcome of this action

24   that affects or has substantial tendency to affect

25   impartiality or requires me to relinquish control of
```



1  an original or copies of a deposition transcript

2  before it is certified, or that requires me to provide

3  any service not made available to all parties to the

4  action; and

5      5) that I have no contract with the parties,

6  attorneys, or persons with an interest in the action;

7  and that I am not knowingly identified on a preferred

8  provider list, whether written or oral, for any

9  litigant, insurance company, or third-party

10 administrator involved in this matter;

11     6) that signature of the witness is waived.

12 This transcript is prepared at request of counsel for

13 DEFENDANTS, and all fees are billed directly to them

14 in compliance with Arkansas Board of Court Reporter

15 Examiners Regulations Section 19.

16     Witness my hand and seal this 16th of

17 August, 2023.

18

19 _____

20 JENNIFER NORMAN, CCR
   LS Certificate #768, State of Arkansas
21 Arkansas Realtime Reporting
   1130 E Millsap Rd
22 Fayetteville AR 72703
   479-301-2040
23 www.ArkansasRealtimeReporting.com

24

25



www.ArkansasRealtimeReporting.com

Appx_0523

### Exhibits

**Diaz Exhibit 1** 3:14
13:7,10

**Exhibit 2** 3:16 30:10,12

**Exhibit 5** 3:17 36:7

**Exhibit 6** 3:18 36:7

**Exhibit 12** 3:19 22:17,
19

### 1

**1** 13:7,10

**10:00** 18:13

**11:00** 18:14,15

**12** 22:17,19

**12:00** 18:14

**12:02** 60:12,13

**14** 10:21

**15** 5:25

**1500** 6:2

### 2

**2** 30:10,12

**2001** 5:25

**2022** 12:9 15:2

**2023** 4:3

**2nd** 4:3

### 3

**30** 12:9 58:4

**3:22-CV-02714-K** 4:9

### 4

**4** 36:9

**410** 4:7

**45** 24:3

**479 231-2049** 12:18

### 5

**5** 36:7,10

**500** 11:18

### 6

**6** 36:7,9

**600** 11:18

### 7

**72764** 4:8

### 9

**9:00** 17:16 18:11,13

**9:40** 4:4

### A

**ability** 21:20

**accident** 12:10 14:2,3,6,
7,12,18,23 15:2,5,9
21:23 22:3 36:4 37:12
50:9,14 51:12,15,17,21
52:1,5,8 53:19,21 54:17
55:4,19 57:7 58:8,10,17,
22

**accomplished** 36:3

**activate** 28:24

**address** 6:1

**affect** 21:19

**agree** 9:12 27:12,23
28:13,16 29:6 32:15,21
33:1,8

**agreements** 9:8

**Aguilar** 54:7

**ahead** 13:9

**alcoholic** 21:14,23

**Alex** 5:19

**Alexander** 5:3,15

**Alicia** 7:15

**altogether** 44:1

**Amendment** 7:6 11:23
12:5

**amount** 10:17 45:9

**announcement** 13:10

**answering** 56:22

**answers** 8:14,25

**anyone's** 15:5

**appeared** 19:14 55:11

**applied** 7:3 12:1

**approaching** 38:5
50:22 51:3 56:1

**approximately** 10:13
16:5 47:19

**April** 5:25 12:9 15:2

**area** 14:6 47:12,23

**Arkansas** 4:8 53:25

**arrested** 56:12

**arrived** 49:6,24

**asks** 9:1,2

**assisting** 36:18

**assume** 56:15

**assuming** 32:13

**attempt** 27:4 28:25
29:12

**attended** 7:24

**attorney** 8:12 9:1 13:18
17:20 56:24 57:4

**attorneys** 14:21

**August** 4:3

**avoid** 35:4 38:9 43:8,22
56:1

**aware** 33:21 34:5 58:7

### B

**back** 17:17 21:9 22:14,
15 26:9 31:20 32:12 35:5

36:1 40:5 43:9,21 44:7,
24,25 45:1,5,21 46:4,9
48:1 55:19

**backpack** 16:23 59:24
60:2

**backseat** 26:10 33:22
34:1

**Backus** 6:2

**bad** 49:5

**bag** 16:17,19,20,21 17:1
60:2

**bags** 17:4 60:7

**barrier** 32:1 37:2

**based** 55:3

**began** 20:10

**beginning** 11:8 36:20

**behalf** 4:12

**belief** 33:17

**bending** 39:15

**bent** 44:11 55:17

**beverages** 21:14,23

**big** 34:23 47:11

**bigger** 41:1

**birth** 5:24 49:20

**bit** 41:2

**bleeds** 42:9

**blew** 25:1,4,13 26:9,18
57:18,20

**blink** 38:3

**blinker** 28:5 29:8

**blinkers** 29:4

**blown** 26:13 57:13,17

**body** 44:10 47:5,12,14,
16,24 48:3,5,8,17,23
49:1 52:16,17 53:12

**born** 6:21

**boy** 6:18

**boyfriend** 19:21,24

**break** 48:10



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:22-cv-00214 Document 44 Filed 01/29/24 Page 529 of 2460 PageID 821
Index: Brian..driven

**Brian** 4:22 5:8

**bring** 13:12

**brother** 49:5

**bumper** 45:9

**Bunt** 4:22 5:7,8 8:4 21:3 22:16 39:11 48:14 56:19 59:22 60:9

**busy** 34:24

**C**

**call** 5:16 15:4 16:21 41:16

**called** 58:6

**calling** 11:7

**car** 5:11 14:2,3,5 17:6 18:22,25 19:2 21:11 22:10,20,21 23:10,13 24:14,20 25:7,12,16 26:14,17,22,25 27:4,8, 10,12,18,20,24 28:15 29:14,18,21,22,25 30:5, 12,13,15,17,19,21,23,25 31:1,3,5,8,13,16,21,24 32:2,13,15 33:8,11,18, 20,22 34:2,6,9,12,16,19 35:2,4,6,7,9 36:1,14,16, 24 37:17,18,23 38:1,5, 10,15,17,21,23 39:3,7,8, 13 40:4 41:11 42:17,18, 19,20,23 43:11,22,25 44:3,5,24 45:6,9 47:4 50:14,22 51:3,8 53:3,9, 13 54:21,25 55:21 57:21 59:25 60:4

**card** 12:2

**Carlos** 7:13

**carried** 60:3

**carrier** 12:22

**carry** 59:24

**cars** 24:9,16,21,22 28:18,19 30:6,8 34:22,25 48:20 56:2

**case** 4:9 58:1

**caution** 31:15

**Caylee** 4:11,23 5:9,10

**cell** 12:8,13,15,17,20,22

**center** 25:8,12

**certified** 4:25

**change** 17:1 27:25 28:7 35:12,14,17,23

**changed** 36:1,4

**changing** 28:6 35:20

**characteristics** 39:21

**charges** 56:15

**checking** 48:9

**Chemical** 4:23 5:9

**child** 6:16 23:23

**circle** 41:9,21 42:2 47:11,24

**citizen** 7:1

**claimed** 51:7

**clarification** 8:5

**close** 53:22 57:6,8

**closer** 18:13 36:15

**clothes** 16:14,18 17:1 59:25

**color** 38:25 39:21

**communicate** 50:25 51:2

**company** 5:9 10:8

**completed** 8:1

**completely** 18:25 27:5, 25

**concerned** 34:17,22,24

**concluded** 60:13

**concrete** 32:1 37:2

**condition** 27:9

**consumed** 21:13,22

**contact** 52:7 58:21 59:11

**continue** 9:24 27:24

**continuously** 7:10

**conversation** 49:7 57:10

**conversations** 26:7

**convicted** 56:10

**Corleto** 8:7

**correct** 6:14,19 10:9 25:23 29:1 33:3 36:19 38:18 43:12 53:5,25 55:15 57:7 58:1,13,18

**corrected** 43:19

**correction** 28:22

**Corsicana** 54:9

**counsel** 4:15,18,20,22

**couple** 9:8 26:1 52:15

**court** 4:14 8:19

**courtroom** 8:18,22

**cover** 47:12

**create** 51:25

**crime** 56:10

**crouched** 44:11,12,18 45:5

**crying** 49:4

**current** 10:4

**D**

**damage** 14:3

**date** 4:3 5:24 12:9 49:20

**day** 15:9 17:8,14 21:10, 14,18,23 22:3 58:22

**days** 20:13

**deceased** 10:7

**decided** 35:14

**Defendant** 4:13

**departed** 43:6

**Department** 58:20

**depicted** 33:21

**deposition** 4:6,12 8:8 13:11,12 17:19,24 18:6

**depositions** 18:2,3,4

**describe** 57:12,16,21

**determine** 13:19

**diagram** 22:16 25:1

**Diaz** 4:14,21 5:3,8,13,15, 16,24 6:9,21 7:13,23 8:8 9:20,22 11:19 12:8 13:8 14:1 15:7 17:13,17 19:25 21:9,22 22:18 25:19 26:21 28:13 30:11 32:12 35:5,25 36:22 37:11 40:1 41:8,23 45:8,13 47:4 48:17 49:6 50:7,21 52:14 53:16,21 54:15 55:3,19 56:4,8,19 59:23

**die** 49:5

**difficult** 54:23

**Dina** 6:3 15:9 17:9 19:5, 6 20:19 23:3,21,22 31:3 32:7 40:17 45:24 46:2 53:3 58:25

**Dina's** 23:25

**direction** 44:22 45:2,3, 6,21,25 46:6,15

**disagreeing** 28:4

**discuss** 18:3

**discussion** 26:17,21,24

**dishonest** 9:5

**distance** 27:14 41:13 42:7 45:9

**distances** 43:4,14

**distracted** 55:9,10

**documents** 13:13

**Don** 10:7

**door** 31:1,3,4,5,7,9,11, 13,14,18

**dos** 48:4

**dots** 41:5

**Douglas** 4:4

**draw** 41:9 42:2,18 47:11

**drawing** 40:25 42:10

**drawings** 51:25

**drive** 27:4 53:24

**driven** 27:10,13,18 28:15 29:22 53:4



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:23-cv-00214 Document 40 Filed 01/29/24 Page 530 of 2460 PageID 822
Index: driver..Houston

**driver** 54:25 55:5

**driver's** 31:10,11

**driver's-side** 36:10

**driving** 5:10 21:20 23:9, 11,13 24:13,19 25:20 27:24 31:12 39:7,8,13 51:3 55:7

**dropped** 44:16

**drove** 15:23 21:11

**drugs** 21:17,18,19 22:1, 2,5

**DS** 41:2

**due** 34:25

**duly** 5:1,2,4,5

---

**E**

**early** 58:4

**Eastman** 4:23 5:9

**education** 9:24

**EI** 6:22 7:1,16,21,24 20:24,25

**else's** 14:11

**EM** 23:15 42:11

**emails** 14:10

**emergency** 32:19,20 33:13 45:19 48:20 50:23 51:4

**employer** 5:10 10:4

**ended** 18:22 48:5

**English** 9:20 20:16

**enroll** 9:23

**entitled** 4:9

**Erick** 4:10 10:5,6,7 15:8, 20 16:25 17:23,25 19:2 23:7 25:11 31:5 35:18,19 37:7,12 41:25 42:11 46:6,18,24 48:19,22,25 49:1 53:7,18 57:25 58:3 59:6,15 60:2

**Erin** 4:11

**ES** 42:11

---

**estimate** 11:5,14 24:16

**Evelyn** 15:8 17:8 19:4,6, 19 20:3 21:10,13 23:9,23 24:13,19 25:20 26:22,25 31:7 33:11 34:12 42:5,12 43:22 46:15 49:11,13 51:1,2 53:8,12 57:6 59:4

**Evelyn's** 43:25

**evidence** 13:13

**evidently** 28:16

**exact** 47:13

**EXAMINATION** 5:6 57:1 59:21

**Excuse** 15:17

**exhibit** 13:7,10 22:17,19 30:10,12 36:7

**Exhibits** 36:9

**exit** 31:1,3,5,7,13

**Exited** 31:18

**expecting** 19:17

**explained** 49:13

**explaining** 14:17

**extent** 40:9

**eye** 38:3

**eyes** 38:12

---

**F**

**face** 44:22

**facing** 44:22 45:2,4,5 46:6,10,12,16

**failed** 24:25

**family** 53:22 57:4

**fast** 24:13,16

**father** 7:17 10:7 20:5 53:24

**father's** 7:12

**fault** 55:4

**feet** 44:19

**fell** 47:8,15,16

---

**felt** 57:12

**female** 39:17

**Fernandez** 4:24

**filled** 18:25

**fine** 8:23 9:13,19 12:7

**finish** 48:16

**finished** 54:15 56:8

**Firm** 4:7

**flat** 26:11 27:10,13,18 36:11

**flow** 24:19

**flowing** 24:8

**forgot** 9:4

**forward** 45:4 46:10

**friend** 15:12,15,18,19,25

**friend's** 16:1

**friendly** 16:12

**friends** 5:20

**frightening** 57:23

**front** 22:14 30:13 31:11, 21 36:10

**Fuentes** 5:3,15 7:15

**full** 5:13 10:1

---

**G**

**Garcia** 10:6

**gas** 18:23,25

**gave** 17:23 49:14 52:4

**general** 47:12,23

**generally** 24:19

**girlfriend** 19:21

**give** 8:20,25 37:25 51:19,23 52:11

**giving** 18:2 50:1

**Gonzalez** 4:10 10:6,8, 11,14 11:4,6,7

**good** 5:8 41:7

**Gracias** 40:15 42:15

---

**grade** 7:25 8:6

**grades** 8:1

**grounds** 7:6 11:23 12:5

**group** 18:18 34:25

**guess** 24:25 36:9 55:23

**guys** 21:6

---

**H**

**hair** 39:21

**handwriting** 14:16

**happen** 50:10

**happened** 14:13,22 35:10 36:5 37:12 38:3 46:1 49:14,15 50:14,18, 19 51:13 52:2,5,9 53:19 54:17 57:7 58:10,17 59:11

**happening** 14:17 24:24 35:10 48:18

**hard** 40:24

**harder** 33:5

**head** 5:12 7:8 9:11,12 27:22 38:15 52:19,20,24

**helping** 46:18,24

**highway** 14:6 27:5 30:6 32:14,17 33:16 34:3,23 53:22

**hit** 28:19 34:19 38:17 43:11,19 45:22 59:7,9

**hitting** 43:22

**home** 6:3,6

**honest** 8:25 11:1 44:2 45:11 46:1

**hour** 10:17,19,20

**hours** 10:18 53:24

**house** 16:10 17:11 18:21

**Houston** 15:11,14,21,24 16:3,6,9 17:4 18:21 21:9 22:12 23:22 24:2

---



PIVARAL GONZALEZ vs SMITH and EASTMAN CHEMICAL
DIAZ, MELVIN on 08/02/2023
Case 3:21-cv-00214 Document 40 Filed 01/29/24 Page 531 of 2460. PageID 823
Index: idea..mother-in-law

## I

**idea** 24:13 44:4,6,13 45:8

**identification** 13:7 22:17 30:10 36:8

**illegal** 21:18 22:1

**imagine** 43:17

**imagined** 34:20

**immediately** 27:19 30:21 57:20

**impact** 37:8,19 38:19 39:6 40:4 43:16 44:25 46:7 51:8 59:12,14

**impacted** 37:21 42:22 43:1,2,6,8,17,20 47:14

**includes** 13:11

**incorrect** 25:14

**indicating** 23:1,8,14,16, 19 25:2 31:18 32:5,18 33:6,8,17 40:11,21 41:12,22 42:3,7,14,24 43:2 45:18 46:4 47:18,25 48:7 55:13

**indictment** 56:16

**Ines** 4:24

**influence** 21:25

**information** 49:25 58:15

**initials** 22:20 23:4,6,15, 17 40:6,12,19 41:6

**injured** 52:20

**inside** 17:5,6 22:24 45:18 47:9,21

**Instagram** 14:10

**instruct** 11:23 12:6

**instructing** 21:4

**intending** 29:9

**interpreter** 4:25 5:1,5 8:2,3,5 9:16 28:21 39:9, 10 40:16 42:16

**Interpreter's** 28:21

**interstate** 18:22 24:3 34:23

**introduce** 4:16

**involved** 14:5 51:11

**items** 13:13

## J

**jack** 36:13,16

**Jacob** 4:18 57:3

**jail** 56:12

**Jennifer** 4:15

**Jesús** 8:7

**José** 54:7

## K

**keeping** 38:12 60:4

**kind** 8:12 14:10 16:20 18:8 22:1 31:25 32:2 39:8 40:24 42:9,18 51:19

**King** 4:7

**kneeled** 49:3

**knees** 44:19

**knew** 25:22

**knowledge** 19:25 21:13,14,17,22,25 45:20 53:7 54:6 58:25

## L

**lady** 5:10

**land** 47:5

**lane** 25:2,8,9,13,17 28:7, 8 32:16,19,20,22 33:2,9, 12,23 34:3,6,9,12,17 37:10 43:9,21 45:19 47:7 48:20 55:8,22 56:6

**lanes** 27:25 28:3,6 47:9

**larger** 41:2

**Law** 4:7

**lead** 35:16

**learned** 51:16

**leaving** 18:21

**left** 18:10 22:13 25:8,9 26:25 27:20 29:15 31:2 32:16 33:15 36:10 52:21 55:8

**legal** 5:13

**legs** 60:1

**letters** 41:3

**lift** 46:25

**lifting** 37:8

**list** 13:17

**listed** 13:20

**live** 7:16

**lived** 7:10 19:22 53:22

**lives** 6:4

**living** 7:19 19:23

**located** 41:10 42:19,21 45:10

**location** 22:20 30:14 32:10 40:2 43:11 44:7 47:13

**long** 10:11 20:18 25:19, 25 48:12

**longer** 48:11

**looked** 44:24

**lot** 24:22 30:8

**lug** 36:23

**lunch** 18:23

## M

**made** 15:13 28:6 29:11

**make** 11:5 13:24 16:5 27:3 31:16 41:3 53:2 58:5

**making** 15:4,9 18:23 41:1,2

**male** 39:17

**Manuel** 7:13 54:13

**mark** 13:9 40:2,5,7,8

**marked** 13:7 22:17,19 30:10 36:7

**marking** 40:10

**married** 6:9,11 20:1

**Married-married** 6:10

**MD** 22:20 40:6,12 41:1

**meaning** 22:6

**medication** 22:1

**Medrano** 54:13

**meet** 17:8 20:23

**Mejia** 7:15

**Melvin** 4:14,21 5:3,15, 17 7:6 21:5 57:3 59:20

**messages** 14:9,10,11

**met** 20:8,12 57:3

**meters** 45:10

**Metro** 12:23,24,25 13:1 14:25

**middle** 60:1

**mind** 23:15,20 40:25 42:10

**mine** 15:19

**minutes** 58:4

**missed** 44:1

**mistaken** 58:18

**Mitchell** 54:9

**moment** 17:18 29:4 37:19,22 42:20 57:17,18 59:12,14

**Moreno** 15:8,15 17:8 19:19 25:20 27:3 30:15 42:5,12 46:15 53:8,12 55:20

**Moreno's** 14:2

**Morgan** 4:20

**morning** 5:8 8:13 56:21 58:4

**mother** 7:18 23:25

**mother's** 7:14

**mother-in-law** 23:24



**motion** 35:6

**move** 27:8,25 28:2,25 29:9,16,18,21 35:6 37:6 38:1,9

**moved** 29:24 48:22 49:1 52:16 56:5

**moving** 24:11

---

## N

**names** 50:6 54:2,4 58:15

**necessarily** 46:25

**Nehemias** 10:25 11:2 12:10 17:9 19:4,6,20,21 20:4,8,16 21:22 22:5 23:18,22 25:22,25 31:13 35:15,16,19 37:11,16,23, 25 41:9,15,16,17,18,19, 24 42:20 43:10 44:7 45:21 47:4 48:1 50:23 51:3,8 54:20 55:25 56:5 59:6,9,10,15

**Nehemias's** 20:5 47:22 48:8,23 49:1 52:16 53:12,24 57:4

**night** 19:11 21:15

**nodding** 9:11

**nods** 5:12 7:8

**noon** 17:16 18:11

**Nora** 7:15

**normal** 24:5,6

**Norman** 4:15

**North** 4:7

**notes** 51:25

**NP** 41:15

**number** 4:9 10:18 11:20 12:17 13:10 22:19 30:12 48:2,4

**numero** 48:3,4

**nuts** 36:24

---

## O

**oath** 8:14,21

**object** 7:5 11:22 12:4

**observe** 52:17

**observed** 27:3

**observing** 35:22

**obtain** 12:20

**obtained** 11:19

**occurred** 37:8

**office** 8:18 13:1

**officer** 58:9,16

**officers** 49:6,8,10,19 50:8,13,16

**operates** 12:22

**opportunity** 8:11 13:17

**opposed** 9:10 24:22 25:8 33:12 45:14

**option** 25:6 27:6,7,19 33:19

**oral** 14:20

**orally** 9:10

**Oscar** 15:15,18,25

**Oscar's** 16:10 17:11

**over-the-counter** 21:19 22:2

**owned** 12:12

**owns** 6:6 10:8

---

## P

**p.m.** 60:13

**PA** 4:7

**paid** 10:14,15,25 11:14

**painter** 10:9,14 11:15

**painting** 10:8 20:6

**paper** 18:7

**paramedic** 49:24 50:2 58:8,12,16,18

**paramedics** 50:9,13,17

**part** 24:21

**partially** 51:3

**partly** 32:15,16,20,21 33:12,23 34:3,6,9,12,17 55:21,22

**pass** 56:23

**passed** 7:17

**passenger** 33:22

**passing** 24:22 30:6 34:18,22,25

**past** 26:7

**patience** 56:21

**pay** 10:17,20 16:13

**pays** 10:22

**pen** 40:1 41:8,14 42:18 47:10

**pending** 56:16

**period** 18:12

**permit** 12:2

**person** 39:8,12,14,23,24 41:20 43:7 49:24 53:4

**persons** 10:23 42:13 45:20 51:7,11 54:2,5,7

**phone** 12:8,13,15,17,20, 22 13:4 14:11,25 15:1,5

**photographs** 13:13 14:2 30:11

**photos** 14:10

**physical** 39:20

**pick** 17:11 19:9,15 23:23 37:6

**picked** 17:14 19:3,7,12

**picture** 36:15

**pictures** 14:5 18:7 31:20 32:12,13 33:21

**Piuara** 4:10

**Pivaral** 15:8 17:9 23:18 41:9,15,16

**Pivaral's** 12:10

**paramedics** 50:9,13,17

**place** 4:6

**Plaintiffs** 4:19

**plans** 18:18

**point** 27:17 31:25 32:2 34:5 35:25 39:6 56:5

**pointing** 24:25

**police** 49:6,7,10,18 50:8,13,16 51:1 52:4,7 58:8,16,20,21

**portion** 33:8

**Posados** 7:13

**position** 44:10 50:17

**possibly** 28:14

**Practically** 59:12

**preparation** 18:6

**Preparing** 17:18

**prescription** 21:18 22:2,6

**present** 4:19

**pretty** 24:9 34:24

**private** 8:18

**proceedings** 4:1 60:13

**pull** 22:16 26:19 34:13

**pulled** 28:8 37:9 48:19 49:3

**pulling** 29:5

**punctured** 26:11,15

**push** 48:9,13

**put** 37:2 40:6 41:19 42:25 56:12 60:6

**putting** 23:15 36:16 42:11

---

## Q

**question** 7:7 9:9,15,17 10:16 11:9,11,13,24 12:5 13:8 17:18 23:20 56:9 59:23

**questions** 8:14,25 52:15 56:22 59:17,20


ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

**quickly** 7:23 31:17

---

**R**

**reach** 58:25

**reached** 59:3

**reacted** 43:8

**read** 54:4

**realize** 26:10 34:2

**realized** 26:12 34:8,16 43:7,18

**rear** 33:5

**reason** 13:8 15:7 25:11

**recall** 16:25 34:11 50:7

**recognize** 54:6

**recollection** 49:18

**record** 4:3 5:14 60:12

**records** 18:7

**red** 40:1 41:8,21 42:9 47:10

**regularly** 12:13 22:6,7 24:9

**relationship** 20:18

**remember** 6:24 10:12 11:1 12:11,12,21 14:14, 17,22 15:4,6 16:1,2,7 17:13,15 18:23 20:20 24:3,15,23,24 25:15,18, 21 26:20,21,23,24 27:2 29:2,10,13,14 30:16 32:4 34:4,15 35:8,10 36:3,6, 17,22,25 37:14 38:24,25 39:2,3,4,19 40:9,19 41:11,13 42:6 43:4,13,15 44:9,10,12,15,17,20,21 45:2,12,23 46:11,17,20, 21 47:3,7,9,17,20 48:7, 18,19,24 49:12,16,21,22 50:11,24 51:9,14,20,22 52:1,23,24 54:3,10,12, 16,18,19,22,23,24 55:3, 16,17 59:8,9 60:3,5,8

**repeat** 9:16 11:11 33:25 39:10

**repetition** 8:3

**rephrase** 9:17

**reporter** 4:14 8:20

**represent** 5:9

**request** 13:12

**required** 13:21

**requires** 8:24

**residence** 12:2

**residency** 7:3

**response** 12:1

**rest** 43:8 47:6,24 48:3,17

**review** 18:7

**Richland** 58:20

**Ricny** 54:11

**riding** 24:14

**Riggs** 4:4

**risk** 28:19

**road** 22:22,25 24:11 26:15,19 27:1,5,20 28:1, 12 29:15,25 37:18,21 43:16 55:7 57:14

**roadway** 28:9 45:1 47:16

**Roderico** 4:10

**Rosemary** 54:11

**run** 37:20

---

**S**

**safety** 34:24,25

**Salvador** 6:22 7:1,16, 21,24 20:24,25

**Santos** 15:8,20 16:25 17:23,25 19:2 23:7 25:11,19 31:5 40:4 41:17,25 42:11 46:6 53:4,7

**Saturday** 17:10

**scene** 14:3 15:5 49:7,22 50:8,12,22 51:10,16 58:8

**school** 7:23,25 8:6 9:23

**seat** 23:12

**seconds** 55:12

**Security** 11:20

**send** 14:9

**sending** 15:4

**shaking** 9:11 57:15,16, 21

**share** 6:15

**short** 27:13 48:10

**shoulder** 32:16 33:13, 23 34:14 45:14 49:2 50:23 51:4 52:17 55:7, 21,22

**show** 13:9 22:18 23:2,7, 12,17 24:25 30:11,12 36:9

**sic** 4:10 11:4 12:23

**side** 9:12 22:13 27:1,4, 20 28:1 29:15 31:2,10, 11,23 32:5 33:15,18 42:3 45:14 52:20,21,22,25 57:14

**signal** 28:25 29:8

**similar** 17:1 24:21

**sister** 6:6

**sitting** 22:10,21 23:3,7, 13,18 26:10 34:1

**situation** 28:15

**sixth** 8:6

**skin** 39:21

**slow** 35:6

**slowly** 28:6

**small** 40:25

**Smith** 4:11,23 5:9

**Snapchat** 14:10

**Social** 11:19

**son** 6:14 23:20

**sort** 11:5 30:12 53:23

**Soto** 6:3,13 15:9 17:9 20:19 23:3 32:7 45:24

**Spanish** 4:25 8:5 40:15 42:15 49:23 50:3,4 52:12

**Spanish-speaking** 58:7

**spare** 37:1,2 53:17

**speak** 8:11 9:20 17:19 20:16 50:2,15 52:12 58:3

**speaking** 14:20 24:12 42:8 49:11,22 50:4 51:1 59:12

**specific** 18:11,13 26:24

**specifically** 17:15 26:22 42:8

**speed** 24:21 44:5

**split** 44:4

**spoke** 50:20

**spoken** 17:23,24 57:25

**spot** 40:5

**Springdale** 4:8 13:2,5 15:11,14,21,23 16:3,6 17:3 18:17 21:10 22:12 24:2

**standing** 32:3,7 40:3,17 41:10 44:11

**start** 29:4 40:9

**started** 20:14 49:4

**state** 5:13 9:10 58:21

**statement** 14:16,20,21 49:14 51:19,23 52:4,11 58:22 59:1

**States** 6:23 7:4,9 9:23 10:2 11:21 12:3 20:23 21:1

**stay** 16:9 23:23

**stayed** 19:11 53:25 58:9

**Stephanie** 54:9

**stood** 31:23 32:1,4

**stop** 9:15 18:19 26:22, 25 27:20 30:15,17 32:14 33:20 34:2 57:14

**stopped** 29:14,16 30:5, 15 32:15 33:11,15,22 34:3 35:3 55:20

**stopping** 18:22 33:16



**www.ArkansasRealtimeReporting.com**

Appx_0529

**stops** 18:23

**straight** 16:3 43:2

**strangers** 51:11

**street** 4:8 6:1

**struck** 37:16,23 41:10,
24 42:20 47:4 48:2 53:2,
3,4,8,12,13 54:21

**subject** 56:20

**sudden** 38:14

**suitcase** 16:17

**suppose** 41:4

**surprised** 19:14

**swipe** 43:23,24

**sworn** 4:17 5:1,2,4,5
8:19

---

**T**

**T-MOBILE** 12:23,25
13:1 15:1

**taking** 4:6 13:11 49:25

**talk** 17:20 18:3 21:2,4
56:20

**talked** 54:17 58:14

**talking** 33:7

**Taylor** 4:7

**telling** 14:12,22 50:7

**temporary** 12:2

**testified** 5:4 6:6,13
25:12 45:24 46:24 57:6,
25

**testifying** 8:22

**testimony** 8:20 17:20
39:23 55:6

**Texas** 58:21

**text** 14:9 15:4

**thing** 28:23 38:11 50:20
52:19

**things** 13:14,19,24
37:14 38:14

**Thompson** 4:7

**three-hour** 18:12

**Thursday** 16:8

**time** 4:9 9:14,23 10:1
12:13 14:4,9,15 15:2
17:13 25:13 27:22 35:25
37:13 38:4,11,13,16
39:18 40:3 41:23 45:21
46:7 48:2,9 50:14,15
51:5 53:19 54:20 56:22
57:7 59:18 60:12

**tire** 24:25 25:1,4,13 26:9,
11,14,18 27:10,13,18
35:13,14,17,20,23 36:1,
4,10,11 37:1,3,5 42:4
46:9,12,14,18,25 53:17
57:13,17

**today** 4:5 8:9,18 17:19

**today's** 4:3 18:6

**told** 55:1 58:4,8,12,16

**topic** 52:14

**touch** 43:24

**touched** 43:25

**Toyota** 57:12 58:9,17

**traffic** 24:3,7,11,20 28:5
29:8 34:18 35:6 56:1

**travel** 32:16,21 33:3,9,
12,23 34:3,6,9,12,17
43:11 55:22 56:6

**traveling** 17:3 18:16
22:9,11 25:7,12

**trip** 15:7,13,14 16:5,11
21:9 24:2 59:24

**truck** 39:3

**trunk** 37:7 46:12,13,19
53:17,19 60:7

**truth** 8:19

**truthful** 8:21,24

**turn** 28:25 29:7

**turned** 28:5 38:14 45:1

**type** 11:2 38:23

**typing** 14:16

---

**U**

**U.S.** 21:6

**Uh-huh** 7:22 17:7

**underneath** 36:14

**understand** 8:17,24
9:14,17 10:15 15:22 29:5
38:22 44:23 53:21 54:24

**understanding** 6:7
33:24

**United** 6:23 7:3,9 9:22
10:2 11:20 12:3 20:23
21:1

**uno** 48:3

**unpleasant** 52:14 56:20

**unstable** 27:8 57:15

---

**V**

**Valiente** 8:7

**veered** 37:21

**vehicle** 22:23,24 42:22
55:5 59:7,10

**vehicles** 28:11 35:2

**versus** 4:11

**videos** 18:7

**view** 33:5

**violent** 57:16,21

**visit** 15:11,24 16:11,12,
13,15

---

**W**

**waited** 54:1

**walk** 35:5

**wanted** 17:18

**warning** 37:25

**watch** 38:1 56:1

**watching** 35:22 36:15
37:11,13 38:12

**water** 50:1

**Wednesday** 16:7

**week** 11:6,14

**wheel** 36:24

**white** 4:18 9:1 39:1
42:23 48:11 54:5,25
56:23 57:2,3 59:7,17

**wide** 28:12

**witnessed** 51:17

**Woelke** 4:20 7:5 8:12
11:22 12:4 13:18 17:21
21:5 56:24 59:19

**words** 49:4

**work** 10:9,18,23 11:2
12:2 20:4,5,8,13 35:16

**worked** 10:1,11 20:3,7,
12

**workers** 10:10

**working** 11:6,14 20:11,
14 35:23

**wounds** 52:18

**write** 22:19 40:12,19
41:14 47:22 48:2

**written** 14:15 51:19,23

---

**Y**

**y'all** 48:9

**years** 6:19,25 10:13
20:21,22

**yell** 38:9

**yellow** 33:2,6 43:6,17
45:14,15,18 56:6

**yesterday** 17:24 45:24

**Yoli** 54:13

---

**Z**

**Zamora** 15:16,18,24
16:11

**Zamora's** 18:21



ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

Appx_0530

1                UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF TEXAS

3      _____

4      ERICK RODERICO PIUARA GONZALEZ,

5      Individually and as Special

6      Administrator of the Estate of

7      NEHEMIAS R. PIVARAL SANTOS,

8      DECEASED,

9             Plaintiff,

10        v.                              Civil Action

11     CAYLEE ERIN SMITH and EASTMAN       No. 3:22-CV-02

12     CHEMICAL COMPANY,                   714-K

13            Defendants.

14     _____

15             VIDEOTAPED DEPOSITION OF

16               CAYLEE ERIN SMITH

17     DATE:        Tuesday, August 8, 2023

18     TIME:        9:19 a.m.

19     LOCATION:    McGuire Woods LLP

20                  845 Texas Ave, Suite 2400

21                  Houston, TX 77002

22     REPORTED BY:  Kimberly Holton, Notary Public

23     JOB NO.:     6038373

24

25

                                              Page 1

EXHIBIT
O


Appx_0531

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF ERICK RODERICO PIUARA GONZALEZ,
 3    INDIVIDUALLY AND AS SPECIAL ADMINISTRATOR OF THE
 4    ESTATE OF NEHEMIAS R. PIVARAL SANTOS, DECEASED:
 5         JACOB WHITE, ESQUIRE
 6         Taylor King & Associates, P.A.
 7         320 Main Street
 8         Arkadelphia, AR 71923
 9         jacobwhite@taylorkinglaw.com
10         (870) 246-0505
11
12         GRANT SCHMIDT, ESQUIRE
13         Hilgers Graben
14         7859 Walnut Hill Lane, Suite 335
15         Dallas, TX 75230
16         gschmidt@hilgersgraben.com
17         (469) 751-2819
18
19
20
21
22
23
24
25
                                             Page  2
```

Appx_0532

```
1              A P P E A R A N C E S  (Cont'd)

2    ON BEHALF OF DEFENDANTS CAYLEE ERIN SMITH AND EASTMAN

3    CHEMICAL COMPANY:

4         GREGORY J. DUBOFF, ESQUIRE

5         McGuire Woods LLC

6         800 East Canal Street

7         Richmond, VA 23219

8         gdbuoff@mcguirewoods.com

9         (804) 775-1154

10

11        BRIAN L. BUNT, ESQUIRE

12        Freeman Mills PC

13        2020 Bill Owens Parkway, Suite 200

14        Longview, TX 75604

15        bbunt@freemanmillspc.com

16        (903) 295-7200

17

18   ALSO PRESENT:

19        Terrika Seal, Litigation Paralegal, Freeman Mills

20        PC

21        Dennis Beard, Videographer

22

23

24

25

                                              Page  3
```

Appx_0533

```
  1                        I N D E X

  2   EXAMINATION:                                PAGE

  3         By Mr. White                             9

  4         By Mr. Blunt                           383

  5         By Mr. White                           385

  6

  7                    E X H I B I T S

  8   NO.             DESCRIPTION                 PAGE

  9   Exhibit 1       Facebook Account             47

 10   Exhibit 2       Snapchat Account             47

 11   Exhibit 3       Tik Tok Account              47

 12   Exhibit 4       Instagram Account            48

 13   Exhibit 5       Twitter Account              48

 14   Exhibit 6       Resume                       63

 15   Exhibit 7       Job Description              69

 16   Exhibit 8       Outside Sales Representative

 17                   Job Description              74

 18   Exhibit 9       Application                  76

 19   Exhibit 10      Background Report            82

 20   Exhibit 11      Twitter Tweet               85

 21   Exhibit 12      LinkedIn                     88

 22   Exhibit 13      Eastman Offer Letter        90

 23   Exhibit 14      Employment Agreement        96

 24   Exhibit 15      Eastman SOP                 156

 25   Exhibit 16      Auto Loss Notice            162

                                          Page  4
```

Appx_0534

```
 1                           E X H I B I T S (Cont'd)
 2      Exhibit 17      Evaluation                        177
 3      Exhibit 18      Eastman Code of Business
 4                      Conduct                           185
 5      Exhibit 19      Eastman SOP - Social Networking   192
 6      Exhibit 20      Twitter Tweet 2/26/19             196
 7      Exhibit 21      Twitter Tweet 10/4/18             198
 8      Exhibit 22      Eastman SOP - Smartphones
 9                      and Tablets                       207
10      Exhibit 23      Eastman SOP - Defensive
11                      Distracted Driving Policy         215
12      Exhibit 24      Video - Eastman Distracted
13                      Driving                           238
14      Exhibit 25      Text Messages - Gracie            271
15      Exhibit 26      Emails to Tammy Jones - 05/17/22  277
16      Exhibit 27      Email - Carrie Rice               279
17      Exhibit 28      Smith Calendar                    280
18      Exhibit 29      Video                             317
19      Exhibit 30      Photo - Steering Wheel            334
20      Exhibit 31      Audio - 911 Call                  345
21      Exhibit 32      Video                             349
22      Exhibit 33      Video 5:32                        351
23      Exhibit 34      Video Corporal Winston            354
24      Exhibit 35      Email - Tammy Jones 5/16/22       358
25      Exhibit 36      Richland Police Report            360

                                              Page 5
```

Appx_0535

```
 1                    E X H I B I T S (Cont'd)

 2    Exhibit 37      Caylee Smith Statement           365

 3    Exhibit 38      Text Msg - Brother Christian      371

 4    Exhibit 39      Instagram Story                   372

 5    Exhibit 40      Text Message - Sarah              374

 6    Exhibit 41      Instagram Photo -

 7                    Infotainment Center               379

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
800-336-4000

Appx_0536

```
 1                  P R O C E E D I N G S
 2               THE VIDEOGRAPHER:  This is the
 3      beginning of file number 1 of the deposition of Caylee
 4      Smith.  Time is 9:19, and we're on the record.  Will
 5      the court reporter please swear in the witness?
 6               THE REPORTER:  Good morning.  My name
 7      is Kimberly Holton; I am the reporter assigned by
 8      Veritext to take the record of this proceeding.
 9               This is the deposition of Caylee Erin
10      Smith taken in the matter of Erick Roderico Piuara
11      Gonzalez, individually and as Special Administrator of
12      the Estate of Nehemias R. Pivaral Santos, Deceased vs.
13      Caylee Erin Smith and Eastman Chemical Company.
14               This case is in the United States
15      District Court for the Northern District of Texas,
16      Civil Action No. 3:22-CV-02714-K.  This proceeding is
17      being held at McGuire Woods LLP, 845 Texas Avenue,
18      Suite 2400, Houston, Texas, 77002.
19               This proceeding will also be video
20      recorded by Dennis Beard, also with Veritext.
21               I am a notary authorized to take
22      acknowledgments and administer oaths in the state of
23      Texas.
24               Additionally, absent an objection on
25      the record before the witness is sworn, all parties
```

Page 7

Appx_0537

1    and the witness understand and agree that any

2    certified transcript produced from the recording of

3    this proceeding:

4                         - is intended for all uses permitted

5                           under applicable procedural and

6                           evidentiary rules and laws in the

7                           same manner as a deposition recorded

8                           by stenographic means; and

9                         - shall constitute written stipulation

10                          of such.

11                   At this time will everyone in

12   attendance please identify yourself for the record,

13   beginning with the noticing attorney.

14                   MR. WHITE:  Jacob White, counsel for

15   plaintiff.

16                   MR. SCHMIDT:  Grant Schmidt of Hilgers

17   Graben, also counsel for plaintiff.

18                   MR. BLUNT:  Brian Blunt, counsel for

19   defendants Caylee Smith and Eastman Chemical.

20                   MR. DUBOFF:  Gregory DuBoff, counsel

21   for defendants.

22                   THE REPORTER:  Thank you.  After

23   hearing no objections, I will now swear in the

24   witness.

25                   Ms. Smith, will you please raise your

                                              Page  8

Appx_0538

1    right hand?

2    WHEREUPON,

3                        CAYLEE ERIN SMITH,

4    called as a witness and having been first duly sworn

5    to tell the truth, the whole truth, and nothing but

6    the truth, was examined and testified as follows:

7                        THE REPORTER:  Thank you.  Counsel, you

8    may proceed with your examination.

9                        MR. SMITH:  Thank you, Kimberly.

10                       EXAMINATION

11   BY MR. WHITE:

12        Q    Can you state your name for the record?

13        A    Caylee Erin Smith.

14        Q    It's good to meet you.  I know we spoke a

15   little bit before we went on the record.  I'm Jacob

16   White.  I represent the family of the young man that

17   was killed on April 30 of 2022.  Have you been

18   explained what this deposition is?

19        A    Yes.  I have.

20        Q    Okay.  So you understand that the number one

21   job today is we're trying to find out what happened;

22   right?

23        A    Yes.

24        Q    It's going to be a tough day.  All right?

25   You understand that?

                                                    Page  9

Appx_0539

1      A    Yes.

2      Q    But I'm not going to needlessly prolong this

3    experience for you, and I'm not going to try and show

4    you overly graphic stuff more than is absolutely

5    necessary.  You understand that?

6      A    Yes.

7      Q    And that's because I mean, first off, we

8    understand that you're pregnant; right?

9    Congratulations.  But also just because, you know,

10   this is tough stuff.

11           So we just want to make sure that it's not,

12   you know, too bad for you, but you do understand why

13   this is necessary?

14     A    Yes.  I do.

15     Q    Okay.  So let's get some of the

16   autobiographical stuff on the record.  When were you

17   born?

18     A    May 17, 1998.

19     Q    And where were you born?

20     A    I was born in Dallas, Texas.

21     Q    Okay.  So, you know, I want to manage

22   expectations.  This could go for a while.  I expect

23   it's going to go to mid to late afternoon.  I expect

24   you've been told to expect that; right?

25     A    Yes.

Page 10

1          Q    But you know if at any point you need a

2     break, just let us know.  And we're happy to give you

3     as many breaks as you need.

4               But one rule, hopefully an agreement you and

5     I can come to, is that if I ask you a question and you

6     need a break, that you answer the question before you

7     take a break.  Can we agree to that?

8          A    Yes.  I understand.

9          Q    Okay.  Have you ever been deposed before or

10    is this your first rodeo?

11         A    No.  This is the first.

12         Q    Okay.  Okay.  So I've got sort of this

13    boring, like, deposition 101 stuff I'm going to tell

14    you; right?  You've probably heard it before.  Just

15    bear with me because I just want to make sure it's on

16    the record.

17         A    Okay.

18         Q    Okay?  So a deposition and -- well this is

19    really a conversation between you and I; right?  But

20    it's a weird conversation because I ask questions and

21    you answer them; right?  So it's sort of one-sided and

22    strange; right?

23              But it's also weird because we've got folks

24    in the room that are videotaping it; right?  And we've

25    got folks in the room that are taking it all down to

                                              Page 11

Appx_0541

1    make a transcript.  And you understand all that?

2         A    Yes.  I do understand.

3         Q    And you understand the purpose of that is so

4    that if this goes to court or if there are motions

5    filed, your version of events is in black and white;

6    right?

7         A    Yes.

8         Q    Okay.  And since, you know, I know it's on

9    videotape; right?  But there is also a transcript

10   being made.  So your answers need to be oral; right?

11   Yes, no's.  "Uh-huhs," "uh-uhs," or any, you know,

12   sort of onomatopoeia words; right?

13           Not great; right?  So try your best to do

14   yes's and no's.  I'm as guilty of it as anybody else;

15   right?  I'm a hands guy.  I'll talk with my hands

16   some, but Grant over here will manage me; right?

17           For your part and trying to keep your

18   answers "yes," "no's," or spoken words.  Okay?

19        A    Yes.

20        Q    Okay.  Now also obviously all this is under

21   oath.  It's like you're in a court room today; right?

22   So you understand that?

23        A    Yes.  I understand.

24        Q    Okay.  So then obviously we don't expect you

25   to lie; right?  Or anything like that, but just know

                                              Page 12

1   you're not supposed to; right?  Just like you're in

2   court room.  I could put your hand on the bible.  You

3   understand all that?

4        A    Yes.  I understand.

5        Q    Okay.  Okay.  Now we understand you're

6   pregnant; right?  Is there any other condition, right,

7   that would make you unable to understand my questions

8   or give full and complete answers to my questions?

9        A    No.  There's nothing.

10       Q    Okay.  Okay.  Now I'm going to ask bad

11  questions.  I can tell you this right now; right?  So

12  if at any point you need to repeat a question or

13  rephrase a question, just say, "Hey, man.  I didn't

14  understand your question.  Can you say it back to me?"

15  Do you understand that?

16       A    I understand.

17       Q    Okay.  I guarantee you it's going to happen;

18  right?  The other thing is can we agree that if I ask

19  a question and you answer it, we're all going to

20  presume that you understood my question.  Okay?

21       A    Yes.

22       Q    Okay.  So the point of this agreement is so

23  you can't go back and say, "Yeah.  I gave an answer,

24  but I didn't really understand what that guy was

25  asking."  Right?  The burden is on you to say, "Hey,

                                        Page 13

Appx_0543

1    idiot.  I didn't understand the question you're asking

2    me."  Okay?

3         A    I understand.

4         Q    Okay.  Obviously, when you need

5    clarification of any of my questions, just tell me;

6    right?  You're not supposed to ask your lawyers for

7    clarification of the question.  Say, "Hey, Jacob," you

8    know, "what did you mean by that?"  Is that okay?

9         A    Sounds good.

10        Q    And I don't know this answer.  Is it okay if

11   I call you Caylee?

12        A    Yes.  That's okay.

13        Q    Okay.  You can call me Jacob; right?  No one

14   calls me Mr. White, and so that's fine.  Okay.  So

15   sometimes I'm going to ask questions, and you're not

16   going to have a full knowledge of the answer; right?

17             So an example of this would be if I asked

18   you what's the temperature in here; right?  So you

19   might not know if it's 73 degrees or 75 degrees;

20   right?

21        A    Yes.

22        Q    Okay.  But you probably could give me a

23   range; right?

24        A    Not an accurate one.

25        Q    Okay.  All right.  And that's fine.  If

                                             Page 14

Appx_0544

1    you're not sure, right, go ahead, "Dude, I don't

2    know."  Right?  That's a fine answer.  But if you

3    could give a range, give a range rather than saying I

4    don't know.  You understand?

5         A    Yes.

6         Q    So if for example if I ask you how much your

7    Uber ride cost coming over here, assuming you took an

8    Uber ride; right?  I'm not sure.  Or how much your gas

9    cost to come down here.  You probably don't know the

10   exact amount; right?

11        A    No.

12        Q    But you could probably give me an

13   approximation; right?

14        A    I could try.

15        Q    Okay.  Yeah.  Perfect.  That's all I ask is

16   that you try for questions like that.  Okay?

17        A    I understand.

18        Q    All right.  So sometimes I'm going to ask

19   you questions and you're not sure if you know the

20   answer.  Maybe you don't know the answer, but you

21   think that if you saw a certain document that you

22   would know the answer.

23            For example, if I asked you how much money

24   you had in your bank account, you'd say, "Well I don't

25   know."  I assume; right?  Is that right?

Veritext Legal Solutions
800-336-4000

Appx_0545

1        A    Yes.

2        Q    You wouldn't know, but you might say, "Hey.

3    If I could see my bank statement, I would know how

4    much money I had in my bank account."  Right?

5        A    Yes.

6        Q    Or a -- you know, an online app or, you

7    know?  That's how I would do it; right?  So you could

8    tell me, "I don't know the answer, but if I could see

9    this document, I would know the answer."  So will you

10   do that for me?

11       A    I will try, yes.

12       Q    Okay.  Perfect.  So the other thing, I'm

13   entitled to what are called complete answers; right?

14            So if you tell me somethings that you know

15   in response to an answer but not all the things that

16   you know that would've answered the question, that's

17   not a proper answer.  So that's sort of abstract;

18   right?

19            As an example, say you had cereal and a

20   banana for breakfast; right?  And I say, "What'd you

21   have for breakfast?"  And you just say, "Cereal."

22   Right?  That's not a full and complete answer; right?

23            Because you should of said, "Cereal and a

24   banana."  Right?  That is sort of a childish example,

25   but you understand what I'm getting at?

Page 16

```
 1        A    Yes.  I understand.
 2        Q    Okay.  Perfect.  And you understand you've
 3   got to give me complete answers?
 4        A    Yes.
 5        Q    Okay.
 6              THE REPORTER:  Mr. White?
 7              MR. WHITE:  Yes?
 8              THE REPORTER:  I'm sorry.  Do you have
 9   that additional mic on?  Could you -- you do?
10              MR. WHITE:  I do.
11              THE REPORTER:  Okay.  I'll just turn up
12   my volume.  I'm just having a little hard time hearing
13   you.  Maybe you just have a little softer voice, but
14   that's okay.  I'll crank it up over here.
15              MR. WHITE:  I'll move it closer too.
16              THE REPORTER:  Okay.
17              MR. WHITE:  I am soft-spoken.
18              THE REPORTER:  Thank you.
19   BY MR. WHITE:
20        Q    Caylee, you understand me okay?
21        A    Yes.
22        Q    Okay.
23              THE REPORTER:  Better.  Thank you.
24              MR. WHITE:  Perfect.  Okay.
25   //
```

Page 17

Appx_0547

1    BY MR. WHITE:

2        Q    So we've already talked about how this is

3    under oath, but you understand that the transcript and

4    videotape from this deposition can be used in other

5    contexts; right?

6        A    Yes.

7        Q    Like this is a civil case.  This is just a

8    case where, you know, we have been hired by the family

9    of the young man that was killed to, you know, get him

10   justice, but there's no -- this is not a criminal

11   case.  You understand that; right?

12       A    Yes.  I understand.

13       Q    Okay.  Perfect.  Okay.  So you do

14   understand -- and I'm not a criminal attorney, so I

15   don't want to give you advice on it.  There could be,

16   and I'm not sure.  There could be criminal

17   consequences to some of the things that you say today.

18   I don't know; right?  But you understand that?

19       A    Yes.

20       Q    Okay.  All right.  So enough of the

21   interesting stuff.  All right.  We'll get down to it.

22   What's your current address?

23       A    Currently temporarily it's 21755 Blue Goose

24   Drive, Montgomery, Texas.

25       Q    Okay.  So why temporarily?

                                          Page 18

Appx_0548

 1         A      We just sold my house.

 2         Q      And where was the house that you sold?

 3         A      In Livingston, Texas.

 4         Q      And how long had you been at the house in

 5    Livingston?

 6         A      I closed on the house January 2022.

 7         Q      And when did you move into it?

 8         A      January of 2022.

 9         Q      Okay.  So when did you move to this -- well,

10    strike that.

11                Where did you go after you left the

12    Livingston property?  To this Montgomery property?

13         A      Yes.

14         Q      Okay.  When did that happen?

15         A      About March of 2023 this year.

16         Q      So you've lived at the Montgomery address

17    for about five months; is that right?

18         A      Yes.  About five months.

19         Q      And you said temporarily, so are you

20    expecting to move soon?

21         A      Yes.

22         Q      Any idea where?

23         A      Yes.

24         Q      Where?

25         A      In Montgomery, Texas still.

Page 19

Appx_0549

1        Q    Okay.  So just a different house in

2    Montgomery, Texas?

3        A    Yes.

4        Q    Okay.  Got it.  So let's talk about -- we

5    know you lived in Livingston.  Can I just -- give me

6    the bullet points on where all you've lived, say, in

7    the last five years.

8        A    I moved to Conroe area in 2019 for my

9    internship in college.

10        Q    Okay.  What about after that?

11        A    I've been in the Conroe area since 2019.

12        Q    Okay.  And so you moved to Conroe for an

13    internship.  Where was the internship at?

14        A    Counseling Center in Montgomery, Texas.

15        Q    Okay.  So in your time in the Conroe area,

16    has anyone ever lived with you or have you always

17    lived by yourself?

18        A    I've always rented a room from someone.

19        Q    Okay.  So you had roommates?

20        A    Yes.

21        Q    Okay.  Can you give me very quickly the

22    names of your roommates?

23        A    Sarah Wilgers and Ryan Wilgers.

24        Q    Is that W-I-L-G-E-R-S?

25        A    Yes.  That's correct.

Page 20

```
 1          Q     Okay.  Any others?
 2          A     Gus Antonio.  That was in one household.
 3          Q     Okay.  Anybody else?
 4          A     Payton Ghoulston.
 5          Q     Okay.  Anybody else?
 6          A     And Josh Collazo.  That was one household as
 7     well.
 8          Q     So when you say one household, like with
 9     Payton and Josh?
10          A     Yes.
11          Q     Okay.  All right.  And you were just --
12     where these friends of yours or you're just splitting
13     the rent, you know, just so you can produce the rent?
14          A     Those are friends.
15          Q     Friends.  Okay.  So other than the child
16     you're expecting, do you have any other children?
17          A     No.
18          Q     Okay.  Are you married?
19          A     No.
20          Q     Any plans to be?
21          A     Not in the near future.
22          Q     Okay.  Are your parents living?
23          A     One.
24          Q     Okay.  Who?
25          A     My father.
```

Page 21

Appx_0551

1        Q    And what's his name?

2        A    Christopher Smith.

3        Q    Okay.  Where does he live at?

4        A    In Farmersville, Texas.

5        Q    And help an Arkansans way out.  Where is

6   Farmersville approximately?

7        A    Northeast Dallas.

8        Q    Okay.  And I take from your answer your

9   mother's not with us anymore?

10       A    She is not.

11       Q    Okay.  And I take it -- did she die prior to

12   all of this before April 2022?

13       A    Yes.

14       Q    Okay.  Do you have any other family other

15   than your father in the Dallas area?

16       A    I do.

17       Q    Okay.  Tell me about them.  Names and their

18   relationship to you specifically.

19       A    My uncle and aunt, Jason and Jesse Smith.

20       Q    And which one of those is -- like what's

21   their -- like kind of give me like the lineage.  Like

22   who's -- who is whose brother there?

23       A    My uncle Jason Smith is the brother of my

24   father.

25       Q    Okay.  Any cousins in the Dallas area?

Page 22

```
 1          A     Two cousins from my Uncle Jason and Jesse.

 2          Q     Okay.  What are their names?

 3          A     Noah Smith and Jacob Smith.

 4          Q     And do they actually still live in the

 5    Dallas area?

 6          A     Yes.

 7          Q     Okay.  And I know this is invasive.  This is

 8    just if there's a jury pool, we want to make sure that

 9    we know who the family members are; right?  So we can

10    -- the jury.

11                Any other cousins, aunts, uncles, brothers,

12    sisters, anything like that in the Dallas area?

13          A     My brother.

14          Q     Okay.  What's his name?

15          A     Christian Smith.

16          Q     Okay.  Anybody else?

17          A     My other brother.

18          Q     Other brother.  Okay.

19          A     Trevor Smith.

20          Q     Okay.  Anybody else?

21          A     My other siblings are under 18, so --

22          Q     Okay.  Okay.  Would anybody turn 18 in the

23    next year or so?

24          A     No.

25          Q     Okay.  Got it.  Just for the record, what
```

Page 23

Appx_0553

1    are their names very quickly?

2         A    Carter and Charlie.

3         Q    Okay.  And would you mind giving me their

4    ages?

5         A    Ten and seven.

6         Q    Ten for Carter, seven for Charlie?

7         A    Yes.

8         Q    All right.  Thank you.  Where did you attend

9    school?

10        A    High school I attended The Colony High

11   School.

12        Q    Where is that?

13        A    In The Colony, Texas.

14        Q    So there's a town called Colony, Texas.

15        A    Yes.

16        Q    Okay.  And I think you got a high school

17   degree from there?

18        A    Yes.

19        Q    Okay.  Where did you go to college?

20        A    I went to Blinn College for a year, and --

21        Q    Can you say it again?  Where?

22        A    Blinn.

23        Q    Blinn.  Okay.  And where's that?

24        A    In Bryan, Texas.

25        Q    Okay.  And then where'd you go after that?

                                        Page 24

1        A    I transferred to Texas A&M.

2        Q    In what year did you transfer?  When I say

3   year, I don't mean the calendar year.  I mean what

4   year?  Freshman, sophomore?

5        A    It would have been my sophomore year.

6        Q    Okay.  So you transferred from Blinn to

7   Texas A&M your sophomore year; correct?

8        A    Yes.

9        Q    And you just liked College Station a little

10   bit better or any particular reason?

11        A    I had always wanted to be an Aggie.

12        Q    Okay.  And so in what calendar year did you

13   do the transfer?

14        A    I believe it was technically 2017.

15        Q    Okay.  All right.  So did you finish at

16   Texas A&M?  You got a degree?

17        A    Yes.  I did.

18        Q    Okay.  What kind of degree?

19        A    Human resource development.  Bachelor's

20   degree.

21        Q    Okay.  And what year did you get that

22   degree?

23        A    In 2019.

24        Q    Okay.  And we'll talk about your employment

25   in a little bit.  All right?  Have you ever been

Page 25

Appx_0555

1    arrested?

2        A    No.

3        Q    Okay.  Ever been convicted of a crime?

4        A    No.

5        Q    Have you ever been involved in any other

6    legal claims or lawsuits?  Not necessarily one just

7    like this, but one where there's like a civil case

8    where there's a plaintiff and a defendant?

9        A    No.

10       Q    Any domestic relation cases involving you?

11       A    No.

12       Q    Okay.  How did you prepare for this

13   deposition?  And let me preface that.  I don't want to

14   hear about anything you talked about with your

15   attorneys; right?  So other than speaking with Brian

16   or Greg; right?  With Terrika, how have you prepared?

17       A    Just practicing to keep calm and going over

18   what I remember from the accident.

19       Q    Okay.  So how did you go over what you

20   remember from the accident?

21       A    Talked about it.

22       Q    With whom?

23       A    With my lawyers.

24       Q    With nobody else?

25       A    No.

Page 26

Appx_0556

1      Q    Okay.  Would you say you've got a decent

2  recollection or what you believe happened in the

3  accident?

4      A    Yes.

5      Q    Okay.  But other than your counsel, you

6  haven't talked to anybody else about this deposition?

7      A    Not the specifics of the deposition, no.

8      Q    Okay.  Have you talked to anybody else other

9  than your counsel about this case in general?

10     A    Just about when the deposition would be, not

11  specifics or details.

12     Q    Okay.  Well who did you talk to about those

13  things?

14     A    My employer.

15     Q    Eastman, I take it?

16     A    Yes.

17     Q    Okay.  And are you employed by Eastman

18  Chemical Company or is there some other subsidiary

19  that actually write your checks?

20     A    No.  Eastman Chemical Company.

21     Q    Now when I asked if you talked to anybody

22  else other than your counsel about this case, so going

23  all the way back to April of 2022.  Who do you think

24  you talked to about this case other than your counsel?

25     A    There's been a few friends that I spoke to

Page 27

Appx_0557

1    right after the accident.

2        Q    So you know my next question is which

3    friends?

4        A    Sarah Wilgers.

5        Q    Your former roommate, I take it?

6        A    Yes.

7        Q    Okay.  Who else?

8        A    My brother.

9        Q    Which brother?

10       A    Christian Smith.

11       Q    But not Trevor Smith?

12       A    No.

13       Q    Okay.  Anybody besides Sarah and Christian?

14       A    Gracie Roberts.

15       Q    And who is Gracie Roberts?

16       A    A friend.

17       Q    Okay.  Anybody else?

18       A    And my uncle.

19       Q    Jason?

20       A    Yes.

21       Q    Okay.  Have you spoken with your father

22   about this?

23       A    Not much.

24       Q    How much?  Maybe a little?

25       A    Not details.

Page 28

Appx_0558

1    Q    Okay.  So you'd say maybe you talked to him

2    about it in general, but not the nitty gritty?

3    A    Yes.

4    Q    Okay.  Anybody else besides Sarah,

5    Christian, Gracie, your Uncle Jason, and your dad?

6    A    That's all I can remember right now.

7    Q    Okay.  And if you -- I should have said this

8    earlier.  If you remember something later and you want

9    to amend an answer, just say it and I'm happy to let

10   you do that.  Okay?

11   A    Okay.

12   Q    Now have you reviewed any documents related

13   to this case to prepare for this deposition?

14   A    I've looked at a few documents.

15   Q    Okay.  What were they?

16   A    Photographs.

17   Q    Okay.  What kind of photographs?

18   A    Of where the vehicle was positioned when the

19   accident occurred.

20   Q    Okay.  Were those actual photographs or

21   diagrams that sort of abstractly represent where stuff

22   was?

23   A    I've looked at both.

24   Q    Okay.  So other than actual photographs, you

25   looked at some diagrams.  Anything other than photos

Page 29

1    and diagrams?

2         A    Just the answers from the questions.  The

3    interrogatory questions.

4         Q    So you looked at your answers to your

5    interrogatories?

6         A    Yes.

7         Q    Okay.  Anything else that -- any other

8    documents you've looked at to prepare for this

9    deposition?

10        A    Not that I can think of right now.

11        Q    Okay.  Now how many times in your life have

12   you been pulled over?

13        A    I don't know the exact number.

14        Q    Okay.  Well here.  Give me an approximation.

15        A    Maybe four to five.

16        Q    Okay.  Tell me what you were pulled over

17   those four to five times.

18        A    One was for rolling through a stop sign.

19        Q    Do you remember when and where you got that?

20        A    That was in Bryan, Texas.  I don't know the

21   exact date.

22        Q    Approximately, are we talking about ten

23   years ago, five years ago?

24        A    It was during college.

25        Q    Okay.  Which would have been what?  2015 to

                                        Page 30

1    2019?

2         A    Yes.

3         Q    Okay.  So a stop sign violation.  What other

4    tickets do you remember?

5         A    I did have one speeding ticket while in

6    college that I remember.

7         Q    Okay.  Where did you get that one?

8         A    Collin County.

9         Q    Okay.  And what do you remember about the

10   circumstances surrounding that speeding ticket?

11        A    I don't remember the exact reason, but I got

12   pulled over for speeding late at night just driving my

13   friends home.

14        Q    Any other tickets?

15        A    I did get one for following too closely to a

16   vehicle in Montgomery, Texas.

17        Q    And when did that happen?

18        A    I can't say for sure, but I believe 2019.

19        Q    So and -- well do you remember any others

20   other than the stop sign violation, the speeding

21   ticket in college, and the following too closely?

22        A    Not that I can remember.

23        Q    Okay.  And those are all tickets that you

24   received; right?

25        A    Yes.  A citation.

Page 31

Appx_0561

1      Q     Okay.  Have you ever been pulled over and

2  not gotten a ticket?

3      A     No.

4      Q     Really?  Okay.  Ever got a failure to

5  appear?

6      A     Yes.

7      Q     Okay.  Tell me about that.

8      A     I don't know the specifics.  I think I may

9  have missed the deadline to pay the fine and went up

10  immediately after I found out about it to pay.

11      Q     Do you remember which of these tickets you

12  failed to pay that led to the failure to appear?

13      A     I don't remember.

14      Q     Any idea about the timing on the failure to

15  appear.  What year?

16      A     I couldn't say for sure.

17      Q     I take it you don't remember the county

18  where that happened?

19      A     No.

20      Q     Okay.  Okay.  When did you get your driver's

21  license?

22      A     2014.

23      Q     Okay.  In Texas, I take it?

24      A     Yes.

25      Q     Okay.  Have you ever had your license

                                           Page 32

1    suspended?

2          A    I don't know for sure.

3          Q    Okay.  So tell me about that.

4          A    There was an instance possibly last year,

5    whenever I needed to renew my license.  And there may

6    have been like a two-day gap.

7          Q    Do you remember, was that before or after

8    the accident?

9          A    I believe it was after.

10         Q    And what makes you think it might have been

11   suspended?

12         A    I had to make a call to transportation

13   services.

14         Q    And did you make that call because somebody

15   had called you up and said, "Hey.  Your license is

16   suspended.  You need to take care of it"?

17         A    No.  Not necessarily.

18         Q    So why would you make a call?

19         A    I tried to renew it at the Livingston DMV,

20   and they told me that there was a block.

21         Q    Okay.  Okay.  And you think -- why do you

22   think there was a block?

23         A    I believe there was an unpaid fine.

24         Q    Okay.  An unpaid fine for what?

25         A    I think I was told it was from College

                                        Page 33

1    Station or Bryan, Texas.

2         Q    And do you know what that was related to?

3    Like what that fine was related to?

4         A    From what I think it was -- they couldn't

5    give me an exact answer.  I think it was from -- I

6    think it was five years ago, six years ago.  From a

7    parking violation.

8         Q    So are there any other sort of not traffic,

9    not moving violations, but traffic tickets, citations,

10   anything like that that we haven't already covered

11   that you ever got?

12        A    Not that I can remember.

13        Q    Okay.  So that was a surprise to you to find

14   out you had an unpaid parking violation?

15        A    Yes.

16        Q    Okay.  So we talked about times you got

17   tickets, we talked about times you got pulled over but

18   not actually gotten a ticket.  Are there any times you

19   remember having close calls with other cars?  As in

20   like -- well let me prep that up.

21             Do you ever recall almost hitting another

22   vehicle other than the time that we're all here to

23   discuss today?

24        A    Not that I can pinpoint.

25        Q    Okay.  So nothing pops up in memory?

Page 34

1        A    Not that I've almost hit a vehicle.

2        Q    Okay.  So would you say you've never almost

3   hit a vehicle?

4        A    I wouldn't say never.

5        Q    Okay.  But you don't specifically recall any

6   instance where you have almost hit another vehicle?

7        A    Not any exact moments.

8        Q    Okay.  How about pedestrians?  Any

9   recollections of times where you almost hit other

10  pedestrians?

11       A    No.

12       Q    Okay.  So that's never -- I mean you never

13  hit another pedestrian before.  Have you?  Other than

14  Nehemias Santos?

15       A    No.

16       Q    Have you ever almost hit a pedestrian

17  before?

18       A    No.

19       Q    Okay.  When did you first get a cell phone?

20       A    I was in second grade.

21       Q    Okay.  Remember what kind of cell phone you

22  got?

23       A    It was a flip phone.

24       Q    So for you second grade would have been

25  what?  2008, something like that?

Page 35

1       A    2006.

2       Q    2006.  When you go to law school you get

3   good at math.  So tell me about to the extent you

4   remember cell phone numbers that you ever had?

5       A    There's been way too many.

6       Q    Okay.  All right.  So you're not of these

7   people that's always had the same number forever.

8       A    No.

9       Q    Okay.  So why is that?  Do you switch

10  carriers a lot?

11      A    My father would switch carriers.

12      Q    Okay.  Okay.  So you were always on your

13  Dad's plan, I take it, before you moved out?

14      A    Up until college.

15      Q    Until college.  Give it your best shot.

16  Tell me the cell phone numbers you remember and the

17  carriers for those numbers.

18      A    I have my most recent one.

19      Q    Okay.  All right.  We'll start with the most

20  recent and work our way back.

21      A    936-232-6471.

22      Q    Okay.  Was that the phone number you had

23  when the accident happened?

24      A    Yes.

25      Q    Okay.  Who's your carrier for that number?

                                        Page 36

Appx_0566

1        A      T-Mobile.

2        Q      Has T-Mobile always been the carrier for

3    that number?

4        A      Yes.

5        Q      Okay.  All right.  And then the one before

6    that, do you remember that cell phone number?

7        A      Not in entirety.

8        Q      Okay.  Give it your best shot.

9        A      I only know the first six digits.

10       Q      Give me them.

11       A      214-783.

12       Q      Now I should've looked this up.  936, what

13   is the area code for?  I know 214 is Dallas, but I

14   don't know 936.

15       A      It's for Conroe.

16       Q      Conroe.  Okay.  Okay.  So for the 214

17   number, do you remember what carrier that was?

18       A      Not for sure.

19       Q      Okay.  Would it have been maybe T-Mobile,

20   AT&T, no recollection at all?

21       A      No.

22       Q      Any guess?

23       A      No.  I didn't pay the bill, so I wasn't

24   sure.

25       Q      Okay.  Who paid the bill on that phone?

Page 37

Appx_0567

1          A     My father.

2          Q     Who pays the bill on the 936 number?

3          A     I do.

4          Q     Okay.  Well when did you switch from the 214

5     number to the 936 number?

6          A     Summer of 2019.

7          Q     So that probably coincides with graduating

8     from college?

9          A     It's part of it, yes.

10         Q     Okay.  What's the rest of it?

11         A     I just decided to get a different plan from

12    my dad.

13         Q     Okay.  So have you always had iPhones?

14         A     Since the iPhone 4 came out.

15         Q     All right.  Help an older millennial out.

16    When did the iPhone 4 come out?

17         A     I don't know the exact date.

18         Q     Okay.  So you've always had an iPhone since

19    the iPhone 4 came out; right?

20         A     Yes.

21         Q     Do you remember what you had before iPhones?

22         A     Flip phones.

23         Q     Okay.  Do you use iCloud with your iPhone?

24         A     It is on there.

25         Q     Okay.  Do you, like, pay for extra storage

                                              Page 38

1    or anything like that?

2           A    I don't know for sure.

3           Q    Okay.  Do your photos back up to the cloud?

4           A    I don't know if they do it automatically.

5           Q    Now, I was told this will age me:  do you

6    use iTunes as well?

7           A    I use Apple Music.

8           Q    See?  Told you this thing was old.  Okay.

9    Do you have any email accounts?

10          A    Yes.

11          Q    Okay.  List them for me if you could.

12          A    Caylee 3435 at Gmail.

13          Q    Okay.  How long have you had that?

14          A    I don't know exactly how long.

15          Q    Since college or maybe after college?

16          A    Beforehand.

17          Q    So before 2015?

18          A    Yes.

19          Q    All right.  What other email accounts do you

20   have?

21          A    I have one from my childhood.

22          Q    Okay.  All right.  It's hush, you know,

23   we're not here to embarrass you, but does it have an

24   embarrassing name?  Like is it --

25          A    It's soccer chick 3435 at Yahoo.

                                              Page 39

Appx_0569

```
 1        Q    You still have access to it?

 2        A    I could probably log in.

 3        Q    So what's with the 3435 thing?  Is that just

 4   you just always use that number combination?

 5        A    Lucky numbers.

 6        Q    Lucky numbers.  Okay.  Any other email

 7   accounts that you have access to?

 8        A    My work email.

 9        Q    Okay.  And is that -- well you tell me what

10   it is.

11        A    Caylee dot smith at Eastman dot com.

12        Q    Okay.  Any other email accounts?

13        A    I think I have some junk emails.

14        Q    Okay.  What are those?

15        A    I don't know for sure, but I think it's

16   Caylee Smith 34 at Gmail.

17        Q    Caylee Smith spelled like your name; right?

18        A    Yes.

19        Q    And why do you call those junk emails?  Are

20   they sort of like throw away?

21        A    It's where I'll put my email in for

22   promotions and deals.

23        Q    Got you.  Got you.  All right.  Any other

24   emails you can think of?

25        A    Not that are active.
```

Page 40

1        Q     Okay.  So you probably had a college email;

2    is that right?

3        A     Yes.

4        Q     But you don't have access to it anymore?

5        A     No.

6        Q     What was that email address?

7        A     I believe it was Caylee Smith at TAMU dot --

8    I don't remember if it was dot net or dot com.

9        Q     And I'm not going to complain to the judge

10   about that, so that's all; right?  Do you have access

11   to your Eastman email on your personal phone?

12       A     No.

13       Q     Okay.  Why not?

14       A     There are certain security measures that

15   Eastman takes that doesn't allow me to open it on my

16   personal phone.

17       Q     Like what?

18       A     A domain that you have to access through.

19       Q     Like a server of some sort?

20       A     An Eastman server.

21       Q     Okay.  You cannot connect to that on your

22   personal phone?

23       A     I've attempted in the past and wasn't able

24   to.

25       Q     Okay.  Is your Eastman email through

Page 41

Appx_0571

1    Outlook?

2         A    Yes.

3         Q    Okay.  But you can't just log on to the

4    Outlook app on your personal phone and open your

5    Eastman email?

6         A    No.

7         Q    Okay.  They prevent you from doing that.

8         A    For security measures.

9         Q    Okay.  That's why they say they prevent you

10   from doing it?  For security reasons?

11        A    That's what I would say, yes.

12        Q    Had they ever offered an explanation for why

13   they won't let you put your work email on your

14   personal phone?

15        A    We have modules that we do that suggest not

16   to versus --

17        Q    What are modules?

18        A    Learning modules that we're required to do.

19        Q    So you said they suggest not putting it on

20   your personal phone?

21        A    Yes.  You have to request if you would like

22   to put it on any other phone.

23        Q    Have you ever made such request?

24        A    No.

25        Q    And why not?

Page 42

Appx_0572

1           A     I have two separate phones to keep it

2     separate.

3           Q     Okay.  So you say keep it separate.  What do

4     you mean?

5           A     My work and personal one.

6           Q     Okay.  so you don't want your work emails

7     being on your personal phone?

8           A     Yes.

9           Q     Okay.  Why not?

10          A     Because I like to check out at 5 p.m.

11          Q     Okay.  Okay.  I'm going to ask you a

12    question I'm sure no one in this room could completely

13    answer.  Tell me all the applications on your personal

14    phone.

15          A     Okay.

16          Q     I know.  Right?  Give me your best shot.

17          A     Apple Music, Text messages, Instagram,

18    Facebook, TikTok, Snapchat, Target, Pinterest,

19    Starbucks, Apple Maps, Waze --

20          Q     Sorry to interrupt.  Waze, the mapping app?

21          A     Yes.

22          Q     Okay.  Sorry.  Continue.

23          A     I don't know why that's all I can think of

24    right now.

25          Q     What -- I should have asked you this

                                            Page 43

Appx_0573

```
 1    earlier.  What model iPhone did you have when the
 2    accident happened?
 3         A    I believe iPhone 12.
 4         Q    And what do you have now?
 5         A    iPhone 14.
 6         Q    And how long were you able to keep your
 7    iPhone after the accident before Eastman took
 8    possession of it?
 9         A    I don't remember how long.
10         Q    Would you say months or was it pretty quick?
11         A    I was notified pretty quickly to preserve
12    all messages and photos.
13         Q    Okay.  How were you notified?  Obviously
14    don't tell me about conversations with your attorneys,
15    but if you got an email or something like that.
16         A    Possibly email.
17         Q    Are there any apps on your personal phone
18    that Eastman asked you to have on there for security
19    reasons?
20         A    Not on my personal.
21         Q    Any other apps that Eastman has you put on
22    your personal phone?  Maybe they're not security
23    reasons.
24         A    No.
25         Q    Okay.  Are there apps -- well let me ask
```

Page 44

Appx_0574

1    you.  What apps do you have on your work phone?

2         A    The apps that come with the factory setting,

3    and Outlook --

4         Q    Let me stop you there.  Is it like a

5    separate Outlook app, or is it like the mail app is

6    synced with Outlook and you just click on the big mail

7    app?

8         A    It's a separate Outlook app.

9         Q    Okay.  Sorry.  Continue.

10        A    There's a couple Eastman-specific apps on

11   there as well.

12        Q    Okay.  What are those?

13        A    I don't know exactly what they are.

14        Q    What are their purposes?

15        A    Two-step authentication.

16        Q    Okay.  Anything else?

17        A    There's an app specific to our team.

18        Q    Is that the My Eastman app?

19        A    No.

20        Q    Okay.  Well you have any idea what it's

21   called?

22        A    PF Tools, I believe.

23        Q    And what does that do?

24        A    It has all of our marketing material and

25   pricing sheets.

Page 45

 1      Q    So you use that when you're actually trying
 2   to make sales?
 3      A    Yes.
 4                MR. WHITE:  We good Brian or you need
 5   to take it?  Okay.
 6   BY MR. WHITE:
 7      Q    Any other apps that Eastman has you can put
 8   on your work phone?
 9      A    Not that I can recall right now.
10      Q    Okay.  So when you're using your work phone,
11   which apps do you typically access for work purposes?
12      A    Outlook and texts and phone.
13      Q    Is that how you get most of your
14   communications at work?  Via text, email, or phone
15   calls?
16      A    Yes.
17      Q    Okay.  Okay.  So we're in the same vein.  I
18   need you to list every social media account you've
19   ever had.  So try to tell me if you know your username
20   and the platform.  If you don't know your usernames,
21   tell me the platform.
22      A    Okay.  Instagram, Caylee 3435; TikTok, I
23   believe, is Caylee 3435.  I used to have a Twitter
24   account which is Caylee Aaron 12.  And an old one I
25   got locked out of, Caylee 3435.

Page 46

Appx_0576

1          Q     An old Twitter account?

2          A     Yes.  And Snapchat, Caylee 3435.

3          Q     Okay.  So let's go ahead and make this

4     Exhibit 1.  So this is just a screenshot of your

5     Facebook account.  Does that look like your Facebook

6     account?

7                     (Exhibit 1 was marked for

8                     identification.)

9                     THE WITNESS:  Yes.  It does.

10    BY MR. WHITE:

11         Q     So I'm going to show you what I'll mark as

12    Exhibit 2, and you just make sure to tell me if this

13    is in fact what looks like your Snapchat account.

14                    (Exhibit 2 was marked for

15                    identification.)

16                    THE WITNESS:  Yes.  It does.

17    BY MR. WHITE:

18         Q     Okay.  I'm going to show you what I'm going

19    to mark as Exhibit 3.  Can you confirm that that is

20    what looks like your TikTok account?

21                    (Exhibit 3 was marked for

22                    identification.)

23                    THE WITNESS:  Yes.  It does.

24    BY MR. WHITE:

25         Q     Different one here.  All right.  I'm going

Page 47

Appx_0577

```
 1    to show you your Instagram.  So I'm going to show you
 2    what I've marked as Exhibit 4.  Does that look like
 3    your Instagram account?
 4                    (Exhibit 4 was marked for
 5                    identification.)
 6                    THE WITNESS:  Yes.  It does.
 7    BY MR. WHITE:
 8        Q    I'm going to show you what I'm marking as
 9    Exhibit 5.  And tell me, does that look like your
10    Twitter account?
11                    (Exhibit 5 was marked for
12                    identification.)
13                    THE WITNESS:  Yes.  It does.
14    BY MR. WHITE:
15        Q    Okay.  Have you ever had access to any other
16    Facebook, Snapchat, TikTok, Instagram or Twitter
17    accounts other than the ones that I've shown you?
18        A    There was an old Twitter account that I had
19    in high school that I don't have access to now.
20        Q    And that's one you mentioned earlier?
21        A    Yes.
22        Q    Okay.  Does anybody else other than you have
23    access to these social media accounts that I've shown
24    you?
25        A    Not that I'm aware of.
```

Veritext Legal Solutions
800-336-4000

Appx_0578

1          Q     Okay.  Do you use My Eastman?

2          A     Yes.

3          Q     Okay.  What is My Eastman?

4          A     It's just a company log in for -- kind of

5     like a home page for Eastman employees.

6          Q     So when you log in, is it like a personal

7     page for you or is it just sort of a landing -- like

8     is it not personalized to you?

9          A     Not necessarily.  Everyone has the same home

10    page.

11         Q     Okay.  But are there links you can then

12    follow that are specific to you?

13         A     Yes.

14         Q     What are these links?

15         A     I don't recall all of them.  My Career.

16         Q     What is that?

17         A     It has learning modules, learning

18    development, and interaction plans.

19         Q     What are interaction plans?

20         A     Basically just a plan of action for your

21    year or your quarter.

22         Q     Like relating to your sales job?

23         A     Yes.

24         Q     So is it like sales goals?  That sort of

25    thing?

Page 49

Appx_0579

1      A      Yes.

2      Q      Why is it called interaction plan?  Are you
3    interacting with people?

4      A      Interacting with my customers.

5      Q      Okay.  Okay.  So if we wanted to look up all
6    the training modules that you've ever had to sit
7    through, right, is the My Career tab where that would
8    be at?

9      A    I don't know if all of them are listed from
10   previous that I've done, but that's where we go to
11   complete them.

12     Q     Okay.  And so when you say that's where you
13   go to complete them, tell me about that.

14     A      When they're assigned to us, we get a
15   notification.  And we log into our My Eastman and
16   complete the module by a specified date.

17     Q      And are they typically Zoom, are they like
18   little webinars, or what are they?

19     A      They're interactive modules that have
20   questionnaires at the end of them.

21     Q      Well help me -- what does an interactive
22   module mean?

23     A      It will have you read over examples, read
24   articles, and answer questions after about it.

25     Q      So there's sort of an educational component

Page 50

1    and then tests at the end; is that right?

2          A    Yes.  For most of them.

3          Q    Do you get graded on the test or -- well

4    what happens with your answers?

5          A    There is a grade at the end of it.

6          Q    Okay.  How many times do you get to -- do

7    you just get to take it once, or is there -- like you

8    got to get so many right and you can go back and try

9    it again?

10         A    I'm not sure.  I've never had to go back and

11   do it again.

12         Q    So you've always got a high enough grade, I

13   guess?

14         A    Yes.

15         Q    Okay.  How hard are the interactive modules?

16         A    You definitely have to read the material in

17   order to answer correctly.

18         Q    But are they hard?

19         A    Without reading the articles or the

20   examples, it's a case by case scenario.  So you have

21   to actually read the article to accurately answer the

22   questions they ask you.

23         Q    But it's -- it's not like calculus; right?

24         A    No.

25         Q    Okay.  Like if you read the article or watch

Page 51

1    the educational module, that's all the information you
2    need to correctly answer the questions; right?
3         A    Yes.
4         Q    Are they normally multiple choice or you
5    like type out answers to them?
6         A    Normally multiple choice.
7         Q    Okay.  Now what sort of scenarios do they
8    cover?
9         A    Workplace accidents, security measures,
10   avoiding scams.
11        Q    How frequently does Eastman have you do new
12   modules?
13        A    There's quite a few throughout the year that
14   we're required to do.
15        Q    Is quite a few half a dozen, maybe one a
16   month, or more frequent than that?
17        A    I couldn't say exactly.
18        Q    Yeah.  I mean, it's probably more than one a
19   year; right?
20        A    Yes.
21        Q    Okay.  Maybe one a month?
22        A    There's times that multiple come in one
23   month.
24        Q    Okay.  How long does it take to complete
25   these modules on average?

Page 52

Appx_0582

1          A     They vary.

2          Q     Okay.

3          A     Some are half an hour, some are two hours.

4          Q     Okay.  What happens if you don't complete

5     them?

6          A     We get a very strong worded email from our

7     managers.

8          Q     What happens if you fail the interactive

9     module?

10         A     I'm not sure.

11         Q     Okay.  So that's the My Career app.  Is

12    there anything else on the My Career app -- not app.

13    My Career tab on My Eastman other than the modules?

14         A     Not that I can remember.

15         Q     Okay.  So what else is on the My Eastman app

16    other than the My Career tab?

17         A     There's a tab called, like, My Time.

18         Q     Okay.  What is that?

19         A     It's where you request off if you have

20    vacation days.

21         Q     Okay.  Do you do anything else with the My

22    Time tab?

23         A     Not that I can remember exactly.

24         Q     All right.  So other than My Career and My

25    Time, are there any other functions on My Eastman?

                                        Page 53

Appx_0583

```
1        A     There's other functions, but I can't
2   remember exactly.
3        Q     Do you ever use the other functions?
4        A     Not frequently.
5        Q     Not frequently enough to remember?
6        A     Yes.
7        Q     Okay.  Do you use Stream?  I think that's
8   some sort of app.
9        A     Not that I'm aware of.
10       Q     Yammer?  Have you ever heard of that app?
11       A     No.
12       Q     Okay.  So you've never used Yammer to the
13  best of your knowledge?
14       A     To the best of my knowledge, no.
15       Q     Okay.  You ever use Skype for work purposes?
16       A     Possibly.
17       Q     Okay.  When?
18       A     I believe it was with my employer before
19  Eastman.
20       Q     Okay.  But you don't remember using Skype
21  with Eastman?
22       A     No.
23       Q     Okay.  What about Microsoft Teams?
24       A     We do use teams.
25       Q     Okay.  Presently?
```

Page 54

```
 1        A     Yes
 2        Q     Did you use teams before the accident at
 3   Eastman?
 4        A     Yes.
 5        Q     You always use teams in your employment with
 6   Eastman?
 7        A     That is typically our app that we use for
 8   meetings.
 9        Q     So you don't you Slack or anything like
10   that?
11        A     No.
12        Q     Okay.  So what do you use Teams for?
13        A     Calendar invites, meetings, sometimes chats
14   through Teams.
15        Q     And who would you chat with on Teams?
16        A     Customer service sometimes.
17        Q     As in your customer service?  Like to make
18   sure your computer works or what do you mean?
19        A     Our ordering customer service.  Where we
20   place our orders for product for our customers.
21        Q     Okay.  So well we'll get into all that, but
22   so there's actually a business function that occurs on
23   Teams?
24        A     Yes.
25        Q     Okay.  Are your customer service folks, are
```

Page 55

1    they within Eastman?

2        A    Yes.

3        Q    Okay.  Okay.  All right.  So now I'm going

4    to read off a whole list of social media accounts;

5    right?  And the whole idea is just to make sure we're

6    not missing any social media accounts that you may or

7    may not have had; right?

8             It's not a trick question.  I'm just trying

9    to be thorough.  Okay?

10       A    Okay.

11       Q    All right.  So do you or have you ever used

12   any social media platforms such as Tumblr, LinkedIn,

13   Nextdoor, Tinder, Bumble, WhatsApp, Twitch, Discord,

14   Reddit, Marco Polo, Vine, or any other social media

15   platform to make, send, or see electronic messages?

16       A    Yes.

17       Q    Okay.  Hit me.

18       A    That was a lot.

19       Q    I know.  I can read the list again.  I know.

20   There's some old apps in there.

21       A    LinkedIn.

22       Q    Okay.

23       A    Could you --

24       Q    You want me to read it again?  Yeah.

25   Tumblr?

Page 56

```
 1          A     No.

 2          Q     Nextdoor?

 3          A     No.

 4          Q     Tinder?

 5          A     Yes.

 6          Q     Bumble?

 7          A     Yes.

 8          Q     WhatsApp?

 9          A     Possibly.

10          Q     Twitch?

11          A     No.

12          Q     Discord?

13          A     No.

14          Q     Reddit?

15          A     No.

16          Q     Marco Polo?

17          A     No.

18          Q     Vine?

19          A     Yes.

20          Q     Okay.  Any others that maybe I've missed?

21          A     Not that I can think of.

22          Q     Okay.  So I think we've got your LinkedIn,

23     so I'm not worried about that.  Oh.  Nextdoor?

24          A     No.

25          Q     Okay.  Do you know your Tinder account?
```

Page 57

Appx_0587

```
 1          A     No.

 2          Q     Okay.  Bumble?

 3          A     No.

 4          Q     Okay.  WhatsApp?

 5          A     No.  Not for sure.

 6          Q     Vine?

 7          A     No.

 8          Q     Did you post on Vine?

 9          A     I don't think so.

10          Q     Okay.  You just had an account?

11          A     Yes.

12          Q     Okay.  Does anyone else have access to the

13    social media accounts you told me about?

14          A     No.  Not that I'm aware of.

15          Q     Okay.  Do you have a Google Drive that you

16    can or have ever been able to access?

17          A     Yes.

18          Q     Is that associated with your Caylee Smith

19    3435 Gmail account?

20          A     No.

21          Q     What would it be associated with?

22          A     I believe it's associated with my Caylee

23    3435 at Gmail.

24          Q     Okay.  Do you have or have you ever had,

25    like, Dropbox or any other file sharing platform
```

Page 58

Appx_0588

1    access?

2         A    Yes.

3         Q    Okay.  Which ones?

4         A    Dropbox.

5         Q    Okay.  When did you have Dropbox?

6         A    I can't say exactly.

7         Q    Did you use it for college?

8         A    No.  It was for modeling.  They would send

9    the pictures to that Dropbox.

10        Q    Okay.  So that's a good tie in.  Let me ask

11   you about the Google Drive.  Do you still have access

12   to it?

13        A    I could probably get access to it.

14        Q    Okay.  Have you accessed it in the last year

15   or so?

16        A    Not that I'm aware of.

17        Q    Okay.  All right.  So I'll try and make this

18   snappy.  I need to know everywhere you've worked,

19   either in a paid or unpaid capacity; right?  When?

20   Right?

21             Not exact; right?  But sort of generally

22   speaking and whether you are quit, fired, or the job

23   just ended --

24        A    Okay.

25        Q    Like an internship or something.  So give

                                              Page 59

Appx_0589

```
 1     your best shot.
 2          A    My first job was the RoughRiders Ballpark in
 3     high school.
 4          Q    Okay.  I take it you quit?
 5          A    Yes.
 6          Q    Okay.  What next?
 7          A    Texas Roadhouse in high school.
 8          Q    Were you a waitress or you work in the back?
 9          A    I was a host.
10          Q    Quit or fired or job ended?
11          A    Quit.
12          Q    Okay.  All right.  Next.
13          A    Rockfish Seafood and Grill.
14          Q    Okay.  When?
15          A    In high school.
16          Q    Quit, fired?  What happened?
17          A    Quit.
18          Q    Okay.  What next?
19          A    Reveille Ranch.
20          Q    Okay.  When?
21          A    College.
22          Q    All right.  Quit or fired?
23          A    Quit.
24          Q    Okay.  What next?
25          A    Park West.
```

Page 60

Appx_0590

```
1           Q     Okay.  Quit or fired?

2           A     Mutual leaving.

3           Q     So what's that?  What does mutual leaving

4     mean?

5           A     Quit, essentially.

6           Q     Is it like sort of blended with a little bit

7     of fired?  Like you didn't want to be there, and they

8     didn't want you to be there anymore?

9           A     It was more me wanting to leave.

10          Q     Okay.  Well what happened there?

11          A     Disagreements with management.

12          Q     Okay.  What kind of job is Park West?

13          A     A leasing agent.

14          Q     Okay.  I'm not sure we have leasing agents

15     in Arkansas.  Tell me what a leasing agent does?

16          A     They lease apartments.

17          Q     So it's for like a real estate agent, but

18     you just signed people up to lease apartments?

19          A     Essentially, yes.

20          Q     Okay.  All right.  When did you leave that

21     job?

22          A     I don't know the exact time.

23          Q     All right.  Where did you go after Park

24     West?

25          A     I don't remember if I went to my internship
```

                                        Page 61

Appx_0591

```
 1    next.
 2         Q    Well just let tell me the internship first.
 3         A    Counseling Center of Montgomery County.
 4         Q    Okay.  And was that quit, fired, or was it
 5    like a time limited internship?
 6         A    It was completed.
 7         Q    Okay.  What did you do there?
 8         A    Office manager.
 9         Q    Okay.  Where next?
10         A    I had a brief internship at the Sheriff's
11    Office of Harris County.
12         Q    Okay.  Quit, complete, fired?
13         A    Complete.
14         Q    Okay.  What next?
15         A    Emergent.
16         Q    Okay.  Quit, complete, or fired?
17         A    Quit.  Well laid off slash quit.  It was
18    during COVID.
19         Q    Okay.  What kind of job was that?
20         A    A recruiting job.
21         Q    What kind of people would y'all recruit?
22         A    IT and accounting, finance.
23         Q    Okay.  All right.  So I'm going to
24    introduce -- are we on 6, I believe?  Yeah.
25         A    Yes.
```

Page 62

Appx_0592

1          Q     What I'm going to mark as Exhibit Number 6.

2     So this is a document that we received from your

3     attorney.  I think that's your resume.  Do you

4     recognize this document?

5                    (Exhibit 6 was marked for

6                    identification.)

7                    THE WITNESS:  Yes.  I do.

8     BY MR. WHITE:

9          Q     Okay.  So let's see here.  So is this the

10    resume you used to apply with Eastman?

11         A     I believe so.

12         Q     Okay.  So let's take a look at it.  Just,

13    you know, review it for yourself.  Tell me if there's

14    anything missing on there.

15         A     Yes.

16         Q     Okay.  What's missing?

17         A     There's a few jobs and internships.

18         Q     You probably weren't hiding those jobs;

19    right?  They just didn't fit on one page?

20         A     Yes.

21         Q     Or two pages, I guess.

22         A     I was just trying to concise -- put

23    general -- most recent jobs.

24         Q     Okay.  And on any of the jobs that you told

25    me about or that are on this resume, did you ever

Page 63

Appx_0593

1    drive in your -- for work purposes?

2         A    No.

3         Q    Okay.  So is Eastman the first job you've

4    ever had to drive around for work purposes?

5         A    For the majority of it, yes.

6         Q    Well what do you mean by the majority of it?

7         A    As a leasing agent, we were required to run

8    errands sometimes.

9         Q    Okay.  Okay.  And was that with -- what is

10   it called, Park West?

11        A    Essentially, all of the apartment complexes

12   I worked for.

13        Q    Okay.  So Park West and was the same kind of

14   job at the Reveille Ranch?

15        A    Yes.

16        Q    Okay.  So would you drive around for the

17   Ranch apartments as well as Park West Apartments?

18        A    On occasion.

19        Q    Okay.  But not frequently?

20        A    No.

21        Q    Did you drive around in your vehicle, or

22   would they give you a work vehicle at those

23   apartments?

24        A    My vehicle.

25        Q    Okay.  What sort of things would they have

                                        Page 64

1    you drive around for?

2         A    Marketing purposes, to drive to campus, or

3    pick up snacks for the office.

4         Q    Did you ever get training on driving from

5    either of those employers?

6         A    No.

7         Q    Okay.  Okay.  So looking at your resume

8    here, did you have any automotive industry or, you

9    know, film product experience when you applied with

10   Eastman?

11        A    No.

12        Q    Oaky.  Why did you apply with Eastman?

13        A    I had networked with some people who worked

14   with Eastman.

15        Q    All right.  Who?

16        A    Rick Hutchins.

17        Q    Who is that?

18        A    He's an employee in our division.

19        Q    Okay.  Is he like a supervisor or are you

20   and him sort of the same position now?

21        A    Not necessarily the same position, but he's

22   not in charge of me.

23        Q    And when you say network, what do you mean?

24        A    I met him at a restaurant.

25        Q    Had like a networking event or just out

Page 65

1    socially?

2         A    Just out.

3         Q    Okay.  And what did Rick tell you about

4    working with Eastman?

5         A    That it was a good company, and they were

6    looking for a Houston rep.

7         Q    Okay.  He told you that the first time you

8    met him or you'd kind of --

9         A    We had talked for an hour or so.

10        Q    Okay.  Okay.  But you didn't have any

11   automotive industry experience; right?

12        A    No.

13        Q    So do you think he put in a good word for

14   you?

15        A    I'm not sure.

16        Q    Okay.  Why do you think he thought you'd be

17   good at the job you have?

18        A    I'm not sure.

19        Q    Okay.  So let's look at the -- you see on

20   your resume here under associate recruiter, do you see

21   the fourth bullet point down?

22        A    Yes.

23        Q    All right.  Can you read all that?

24        A    "Utilized advanced search techniques,

25   including Boolean search on LinkedIn, social media,

Page 66

Appx_0596

1   job boards, participation in networking events, and
2   employee referrals to uncover high quality talent
3   pools."
4        Q    Okay.  So tell me about sort of what does
5   that mean exactly?
6        A    We would use different search techniques in
7   LinkedIn -- recruiter side of LinkedIn to find
8   candidates.
9        Q    And what would you do once you found
10  candidates?
11       A    Normally reach out and message them.
12       Q    Okay.  Did you ever not reach out to certain
13  candidates based on what you saw?
14       A    They would have to be qualified.
15       Q    Okay.  So what does that mean?
16       A    For whatever position we were currently
17  trying to fill, they would have to meet the
18  requirements for that position.
19       Q    Would there ever be any sort of like soft
20  requirements?
21            Like maybe they didn't -- not like you don't
22  have a certain degree or certification, but maybe
23  there's something on their social media that is
24  unsavory, and you wouldn't pass anything along.  That
25  ever happened?

Page 67

1          A       Not to me.

2          Q       Okay.  But did you ever hear about it

3    happening to other people?

4          A       Not that I remember.

5          Q       Okay.  So how would you use -- or you say

6    social media on there.  How would y'all use potential

7    referral -- or for the people that you're looking to

8    send on their information, how would you use their

9    social media?

10         A       Occasionally, we would just check their

11   social media.

12         Q       For what?

13         A       Red flags.

14         Q       What kind of red flags?

15         A       Bad mouthing their company.

16         Q       Okay.  Okay.  Why would that be a red flag?

17         A       Just shows that maybe they're not happy in

18   their position.

19         Q       Which will make them a bad candidate for the

20   future position, I take it?

21         A       Sort of.

22         Q       Okay.  Well what do you disagree with?

23         A       It would just be a conversation that we

24   would bring up to them and ask.

25         Q       So you would ask that applicant, "Hey.  Why

                                          Page 68

Appx_0598

1    are you badmouthing your employer on --" whatever

2    social media site it is?

3         A    Yes.

4         Q    Were there any other kind of red flags that

5    you can think of?

6         A    Not that I can think of.

7         Q    So there's not anything else somebody could

8    put on social media that maybe they're not a good

9    candidate?

10        A    Not that I've come across.

11        Q    Okay.  None that you can think of?

12        A    Not at this moment.

13        Q    All right.  So let's go to what I'll mark as

14   Exhibit Number 7.  So this is a job description that

15   your counsel has provided me.

16             Go ahead and take a look at that, and tell

17   me is this the job description or listing that you

18   responded to when you applied for a job at Eastman?

19                  (Exhibit 7 was marked for

20                  identification.)

21                  THE WITNESS:  Yes.  It looks like it.

22   BY MR. WHITE:

23        Q    Okay.  So where did you see this job

24   listing?

25        A    I was told about it.

Veritext Legal Solutions
800-336-4000

1        Q    Okay.  By -- who is it that you told me
2    about?  Rick Hutchins?
3        A    Yes.
4        Q    Okay.  So when you were told about it, where
5    did you go to, like, pull this up?  This job
6    description or job listing up.
7        A    I believe I went to Eastman dot com.
8        Q    Okay.  So you would have seen this on
9    Eastman's website?  By this I mean --
10       A    Yes.
11       Q    -- the assignment.
12       A    Yes.
13       Q    Okay.  Did you understand that it was a
14   work-from-home position?
15       A    Yes.
16       Q    Okay.  Why do you think it was a work-from-
17   home position?
18       A    I was told that it was -- there was no
19   office that I would directly report to on a day-to-day
20   basis.
21       Q    Okay.  So what did that mean for how you
22   were going to work then?  Were you going to be working
23   out of a home office?
24       A    Yes.
25       Q    All right.  And Eastman doesn't have a local

                                        Page 70

```
 1    office around Houston?
 2        A    Not an office, no.
 3        Q    What do you have?
 4        A    They have manufacturer plants.
 5        Q    Could you get an office at one of those?
 6        A    No.
 7        Q    Okay.  Why not?
 8        A    I'm not sure why.
 9        Q    But they just didn't want you working out of
10    a manufacturing facility?
11        A    I guess.
12        Q    Okay.  So what did you know about this job
13    after you read this job listing that you were applying
14    for?
15        A    I knew it was a sales position.
16        Q    Okay.  Well sort of expand on that.  What do
17    you mean?
18        A    I knew that I would be traveling to
19    different customers to sell a product.
20        Q    Okay.  Do you know what kind of customers?
21        A    I was told before applying.
22        Q    Okay.  And what were you told?
23        A    That it was in the automotive industry
24    directly dealing with dealerships.
25        Q    So you'd like be driving around to
```

Page 71

1    dealerships?

2         A    Yes.

3         Q    Okay.  Did you understand that you were

4    going to be given a work vehicle?

5         A    Eventually, yes.

6         Q    But not immediately?

7         A    That wasn't what was discussed first when we

8    talked about the job.

9         Q    What was discussed?

10        A    Just the description of the job and the

11   product that they sell.

12        Q    So when did the conversation take place

13   about getting a company vehicle?

14        A    I'm not sure.

15        Q    Do you remember who talked to you about

16   getting a company vehicle?

17        A    Not exactly, no.

18        Q    Did you get a company vehicle immediately

19   after you accepted the job?

20        A    Not immediately.

21        Q    Okay.  Then when?

22        A    I believe it was a short time after.

23        Q    Just put some meat on the bones there.  You

24   think it's like a month after or a week after?

25        A    I believe my vehicle was on back order, so

                                         Page 72

```
 1    it took a couple weeks.
 2         Q    Is that because you started working sort of
 3    in the middle of COVID?
 4         A    Possibly.
 5         Q    Okay.  How much driving did you understand
 6    that this job, the outside sales account manager
 7    position, was going to involve?
 8         A    I knew it would be a significant amount.
 9         Q    Okay.  What do you mean by significant
10    amount?
11         A    At least 50 percent of the time.
12         Q    Okay.  Does that mean in a 40 hour work week
13    you expected to spend 20 hours on the road?
14         A    Sometimes more, yes.
15         Q    Okay.  But you were okay with that?  That's
16    what you expected?
17         A    Yes.
18         Q    Okay.  Why did you want a sales job?
19         A    I had wanted to get into sales just because
20    I thought it would be a good field for myself and my
21    assets that I could offer.
22         Q    Okay.  Well what do you mean your assets you
23    can offer?
24         A    Just skills.
25         Q    Like what?
```

Page 73

1          A     Relationship building, upselling, building

2     customer accounts, talking to people.  Just some of

3     the skills I've gained over my work career.

4          Q     Okay.  So when you say "relationship

5     building and upselling," what do you mean?

6          A     Just building a relationship with the

7     client.

8          Q     Okay.  How?

9          A     Checking up on them, asking them about their

10    family, just building relationships in general with

11    them.

12         Q     Okay.  So let's go to -- I found -- let's

13    call this Exhibit 8.  So this is an outside sales rep

14    description I found on the Eastman website.  Take a

15    look at that.

16                    THE REPORTER:  Counsel, I just want to

17    clarify.  Did I hear you say "the Indeed website"?

18                    (Exhibit 8 was marked for

19                    identification.)

20                    MR. WHITE:  LinkedIn.  Sorry.

21                    THE REPORTER:  LinkedIn.  Thank you.

22    Sorry.

23    BY MR. WHITE:

24         Q     Is this outside sales representative job

25    different than the one that you have?

Veritext Legal Solutions
800-336-4000

1          A     I believe this was posted after I was hired.

2          Q     Okay.  But -- and that's fair.  I don't mean

3     to say that this is the one that you applied for.  I

4     just mean generally speaking, is this the same sort of

5     job that you have for a different market in a

6     different place?

7          A     It looks like it.

8          Q     Okay.  Okay.  Now on this one, on the second

9     page at the bottom of the second page, it says

10    "Responsible for customer visits throughout the

11    territory, 50 to 75 percent travel."  Does that sound

12    about right to you?

13         A     Yes.

14         Q     Okay.  So in your job, where did you expect

15    to be driving to?

16         A     All of South Texas.

17         Q     Okay.  And which income -- like we're

18    talking Houston, Corpus Christi, El Paso, or is there

19    like a boundary that --

20         A     Wacco down to Brownsville.

21         Q     So on the first page here it says that

22    Eastman employs approximately 14,000 people.  Does

23    that sound right to you?

24         A     That's what this says, so I would assume so.

25         Q     Okay.  It says Eastman has revenues of

Page 75

1    approximately 1.5 billion, and has headquarters in

2    Kingsville, Tennessee.  Does that sound right to you?

3         A    It seems to be, yes.

4         Q    Okay.  All right.  So I introduce what we're

5    going to mark as Exhibit Number 9 here.  So I received

6    this from your counsel, and it's some sort of job

7    application document.  Do you remember how you applied

8    to Eastman?

9               (Exhibit 9 was marked for

10              identification.)

11              THE WITNESS:  Just that it was online.

12    BY MR. WHITE:

13         Q    So there's some sort of link that you go to

14    and fill out a bunch of questions?

15         A    Yes.

16         Q    Okay.  How were you interviewed?

17         A    It was either Skype or Teams.

18         Q    Do you remember how long that interview was?

19         A    No.  I don't remember.

20         Q    Do you remember who interviewed you?

21         A    Yes.

22         Q    Who?

23         A    Eric Holmes and Alan Davis.

24         Q    And I think if you go to the second page of

25    this document, you see sort of in the top right hand

Page 76

Appx_0606

1    corner it says "Alan C. Davis says can you schedule a
2    one hour video interview with myself and Eric Holmes
3    later this week?"  Does that sound right?
4         A    Yes.
5         Q    Okay.  What did you talk about in that
6    interview?
7         A    A number of things.
8         Q    Like what?
9         A    I don't know the exact specifics, but job
10   history, school, goals, and the position itself.
11        Q    Okay.  What goals were you talking about?
12        A    I can't remember exactly.
13        Q    Okay.  Well what do you think your career
14   goals were when you applied to Eastman?
15        A    I wanted to be in a sales position.
16        Q    Okay.  How come?  Other than what we talked
17   about, about using your assets to actually build
18   relationships.
19        A    That was just a field of work I wanted to
20   get into.
21        Q    Is that for compensation reasons?
22        A    No.
23        Q    Okay.  You didn't want to do HR stuff like
24   you've gone to school for?
25        A    No.

Veritext Legal Solutions
800-336-4000

1    Q    And how come?

2    A    I didn't want to be stuck behind a desk.

3    Q    Okay.  Okay.  Had you had HR jobs before?

4    A    Yes.  Kind of.

5    Q    Okay.  Where at?

6    A    The Counseling Center of Montgomery County

7    and Emergent.

8    Q    Okay.  And you said you didn't want to be

9    stuck behind a desk.  Tell me more about that.

10    A    Every position I had been in previously was

11    majority behind a desk.

12    Q    Okay.

13    A    And that's just not what I wanted to do a

14    career with.

15    Q    So you wanted a job where you were kind of

16    out and about a little bit more?

17    A    Being able to talk to people more.

18    Q    Okay.  And you talked to people over the

19    phone at the desk; right?  But you want to be in

20    person with people?

21    A    Yes.

22    Q    Okay.  But you did apply for a home office

23    position in order to, you know, satisfy that goal;

24    correct?

25    A    No.

Page 78

1        Q     How do you mean?

2        A     This position wasn't specifically at home.

3        Q     You did have a home office; right?

4        A     Yes.

5        Q     Okay.  So how much driving were you told to

6    expect during that job interview with Eric and Alan?

7        A     I don't remember.  I don't think they gave a

8    specific amount.

9        Q     What else did they tell you about the role

10   that driving was going to play in your job?

11       A     That I would be expected to visit customers.

12       Q     Okay.  Did they say with what frequency

13   you'd be expected to visit customers?

14       A     They didn't give an exact frequency.

15       Q     But you expected it to be at least half your

16   time was going to be on the road; right?

17       A     Yes.

18       Q     Okay.  How much time went between when you

19   were interviewed and when you were hired?

20       A     I don't know the exact specifics.  I got

21   COVID in between.

22       Q     I don't need the exact answer.  Just sort

23   of -- you think it was a month in between?  Something

24   like that?

25       A     Possibly, yeah.  About a month.

Page 79

Appx_0609

1        Q    So when did you start?

2        A    I believe it was sometime in March.

3        Q    Of 2021?

4        A    Of 2021.

5        Q    Now after you got hired by Eastman, have you

6   ever helped hire anyone else?

7        A    No.

8        Q    You ever done interviews with potential

9   applicants?

10       A    No.

11       Q    Do you know what kind of background check

12   Eastman did on you when they were looking into hiring

13   you?

14       A    I have vague knowledge.

15       Q    All right.  Well tell me about your vague

16   knowledge.

17       A    Just that they looked into previous tickets

18   and to see if there was any criminal background.

19       Q    And why do you think they did that?

20       A    As a Eastman employee, you have to meet

21   certain expectations to be hired.

22       Q    When you say certain expectations, tell me

23   more about that.

24       A    Just that they require you to not have a

25   background -- a criminal background beforehand.

Appx_0610

1          Q     Okay.  How come?

2          A     I'm not sure.

3          Q     But they don't want a criminal background.

4     That's a no go.  You don't get hired if you have a

5     criminal background?

6          A     With certain convictions or felonies or

7     whatnot, they don't allow that.

8          Q     Do you know what those are specifically?

9          A     I don't.

10         Q     And is there a list somewhere?

11         A     I don't know.

12         Q     Have you ever reviewed anyone else's

13    applications?

14         A     No.

15         Q     Okay.  So I do want to show you the

16    background check.  Believe we're on Exhibit Number 10,

17    which is what I'll mark this as.  A copy.  Oh.  I

18    think I may have given you a little too much.  Sorry.

19    Let's make sure I got it; right?

20              No.  I think that was it.  Sorry.  I took

21    your stack.  So let's take a look at what you got

22    here.  Let's just take a look at your background check

23    here.  So is the information here on the bottom of the

24    first page, is that correct when you applied?

25    //

Page 81

1          (Exhibit 10 was marked for

2          identification.)

3          THE WITNESS:  When I applied, yes.

4     BY MR. WHITE:

5          Q    Okay.  What information did you expect the

6     background check to find?

7          A    I don't know.

8          Q    Did you expect to find all of your speeding

9     and moving violations?

10         A    I don't -- I don't know.  I didn't -- didn't

11    know what to expect.  I didn't have anything to hide.

12         Q    So you expected it to come back -- you

13    didn't think the background check was going to keep

14    you from getting the job?

15         A    Yes.

16         Q    Okay.  So let's sort of skip onto -- it's

17    the -- there's a number in the bottom right hand

18    corner says 008.  Skip to that page.  Okay.  So you

19    see this speeding ticket in sort of the top third of

20    this page?

21         A    Yes.  I see it.

22         Q    Is this the speeding ticket you told me

23    about earlier?

24         A    Yes.  It is.

25         Q    Okay.  So how did you get that speeding

                                        Page 82

Appx_0612

1    ticket?

2         A    I got pulled over at night driving my

3    friends home.

4         Q    Okay.  Do you remember where you were

5    driving home from?

6         A    Another friend's house.

7         Q    Okay.  Did you end up pleading guilty to

8    that ticket?

9         A    I don't remember exactly.

10        Q    Okay.  Did you make any social media posts

11   about the time that you got this speeding ticket?

12        A    I don't remember.

13        Q    Okay.  This says it was in -- actually, I'm

14   not sure.  Did you say this one is in Collin

15   County -- yeah.  Does it sound right that this was in

16   Collin County?

17        A    That sounds correct.

18        Q    Okay.  So you do admit that you were pulled

19   over and ticketed for going 80 in 65?

20        A    That's what this says, so I -- that could be

21   correct.

22        Q    You don't have any reason to contest that.

23   Do you?

24        A    I -- I don't recall how fast I was going

25   because what this says.

Page 83

1      Q    Okay.  Did Eastman ask you any questions
2   about the speeding ticket?
3      A    No.
4      Q    Okay.  Keep going.  Sort of same page.  So
5   below that "violate promise to appear."  So that said
6   it was in July of 2017.  That ring a bell?
7      A    Yes.
8      Q    All right.  How did you get that one?  The
9   ticket?
10     A    I had waited too long to pay the ticket from
11  above.
12     Q    Okay.  Okay.  Did you make any social media
13  posts about getting this failure to appear?
14     A    I don't remember.
15     Q    Okay.  Do you think you would have ever made
16  social media posts about any of these tickets that
17  you've ever received?
18     A    It's possible, but I don't remember.
19     Q    Okay.  When you say "it's possible," why is
20  it possible?
21     A    I -- I was frequently on social media.
22     Q    Okay.  All right.  So let's set that one
23  aside.  Okay.  So I'm going to mark this as --
24               MR. WHITE:  Are we on Exhibit 11?
25               THE REPORTER:  Yes, sir.

Page 84

Appx_0614

```
 1                  (Exhibit 11 was marked for
 2                  identification.)
 3    BY MR. WHITE:
 4         Q    Exhibit 11.  So you see that you can see
 5    this marked as Exhibit Number 11?
 6         A    Yes.
 7         Q    Okay.  Do you see the date on this tweet?
 8         A    I do, yes.
 9         Q    Okay.  What date is that?
10         A    August 25, 2020.
11         Q    And just for the record, can you read sort
12    of in chronological order the tweets here?
13         A    "Tell me how a court can just lose your
14    paperwork.  I went into court on July 27th for a
15    traffic ticket, talked to the prosecutor, accepted my
16    deal, signed papers, turned them in, and now they're
17    saying they have no proof of me showing up to court.
18              "The only reason I figured this out is
19    because they sent me a notice of a warrant for failure
20    to appear saying that I had a new court date in
21    October now.  Montgomery County Precinct 3, get your
22    stuff together."
23         Q    And there's an emoji on that third tweet.
24    What is that?
25         A    A smiley face with a halo above it.
```

Veritext Legal Solutions
800-336-4000

Appx_0615

1        Q    And what does that mean?

2        A    Just -- I don't know what I was meaning it

3    to mean, but annoyed kind of.

4        Q    So sort of like a sarcastic use of the

5    angel?

6        A    Could be.

7        Q    Okay.  Okay.  Do you know what ticket you

8    appeared for on July 27, 2020, that you referenced in

9    that second tweet?

10       A    I don't remember.

11       Q    So it sounds like it was in Montgomery

12   County; right?

13       A    Yes.

14       Q    But you don't remember what that ticket was

15   for in mid-2020?

16       A    No.  I do not.

17       Q    Okay.  Do you remember how this failure to

18   appear got resolved?

19       A    Yes.

20       Q    How?

21       A    I reached -- I went back up to the precinct

22   and talked to them and showed them that I had shown up

23   to court, and they dismissed it.

24       Q    Okay.  And did Eastman ask you about this

25   2020 traffic ticket and failure to appear when you

                                              Page 86

Appx_0616

1     applied?

2          A     No.

3          Q     You don't ever remember anyone at Eastman

4     asking you about this?

5          A     Not that I remember.

6          Q     Okay.  Are there any other traffic incidents

7     or accidents that Eastman's background check missed?

8     And you take a look at the background check if you

9     want to look at it first before you answer that.

10                    MR. BLUNT:  Objection, form.

11         A     Could you repeat the question?

12         Q     Yeah.  Are there any traffic incidents or

13    motor vehicle accidents that that background check

14    that you have right there missed?

15                    MR. BLUNT:  Same objection.

16         A     Other than the ones I've already mentioned

17    to you?

18         Q     Did it miss the ones that you and I have

19    already spoken about?

20         A     I'm not sure.

21         Q     But you don't see a following too closely

22    ticket on there.  Do you?

23         A     No.  It was dismissed.

24         Q     Okay.  Okay.  So they wouldn't have caught

25    that because you didn't plead guilty to that ticket?

Page 87

Appx_0617

 1          A     I guess.  I don't know.

 2          Q     Okay.  All right.  Going to introduce what

 3     we're calling Exhibit Number -- we were on 12 now.

 4     There you go.  Okay.  Do you recognize this?

 5                     (Exhibit 12 was marked for

 6                     identification.)

 7                     THE WITNESS:  Yes.  I do.

 8     BY MR. WHITE:

 9          Q     Okay.  So can you read this above paragraph

10     for the record?

11          A     Yes.  "Eastman Performance Films LLC is the

12     world's leading manufacturer and marketer of high

13     performance window films and tents that are used in

14     automotive, residential, and commercial applications.

15              "We don't tolerate anything less than true

16     color, optimal durability, and optical clarity.  We

17     also believe in putting our products in the dealers'

18     hands who will do them justice."

19          Q     Did you write that?

20          A     It is from Eastman's website.

21          Q     Okay.  So you copy and pasted it onto you're

22     about part of LinkedIn?

23          A     Yes.  When I was hired.

24          Q     Okay.  But these are Eastman's words; right?

25          A     Yes.

                                          Page 88

Appx_0618

1     Q    Okay.  So can you tell me what optical

2   clarity means?

3                    MR. BLUNT:  Objection, form.

4                    MR. WHITE:  What's the basis?

5                    MR. BLUNT:  She's already admitted that

6   these are Eastman's words, so as to what Eastman meant

7   when they said it, I mean, if she knows she can

8   answer, but I think it calls for her to speculate.

9   BY MR. WHITE:

10    Q    I'm not asking you what Eastman means about

11  optical clarity.  I'm asking what you think optical

12  clarity means?

13    A    It's referencing to our product because it's

14  speaking about the window film and tent.  So it's just

15  referring to a clear, not foggy, or hazy film.

16    Q    Why are foggy and hazy film not optimal?

17    A    It's just common problems that we've seen

18  across competitors with film.

19    Q    So why don't customers like foggy or hazy

20  film?

21    A    Because you can see the discrepancy in it

22  while looking at your window.

23    Q    And why don't they like that?

24    A    Because it's not clear.

25    Q    Okay.  Why do customers want clear windows?

Page 89

Appx_0619

```
 1         A     Because that's what they're paying for.
 2         Q     Okay.  All right.  I want to introduce what
 3    we're going to call Exhibit Number 13.  Okay.  Caylee,
 4    do you recognize that document?
 5                    (Exhibit 13 was marked for
 6                    identification.)
 7                    THE WITNESS:  Yes.  I do.
 8    BY MR. WHITE:
 9         Q     Okay.  What is this?
10         A     This is my offer letter.
11         Q     Okay.  And can you tell me who made the
12    decision to hire you if you know?
13         A     I do not know.
14         Q     Okay.  Is there any additional updated offer
15    letter anywhere else or this is the offer you
16    accepted?
17         A     This is the offer I accepted.
18         Q     Okay.  How is your commission calculated?
19         A     I'm not sure on the exact specifics.
20         Q     Well let's look here; right?  Because I
21    just -- no trick questions here.  I'm just trying to
22    understand; right?  So this says that you have a sales
23    variable compensation at 25 percent.  What does that
24    mean?
25         A     There's a one-time compensation that you get
```

Page 90

1    for the performance that you had in the previous year.

2         Q    Okay.  Has that happened like the end of

3    year, in a quarter, or something like that?

4         A    Typically around March of each year.

5         Q    Okay.  And is that 25 percent of your sales

6    that you get, or 25 percent of your salary?

7         A    The basis starts of 25 percent of your

8    salary.

9         Q    Okay.  So where does -- that's what the

10   basis starts at.  Can you add to the basis?

11        A    Yes.

12        Q    How do you add to the basis?

13        A    I'm not sure on the specifics, but there's

14   multipliers based upon how you did in the market.

15        Q    So when you say multipliers, what do you

16   mean?

17        A    If you reach your goal that they set for you

18   at the beginning of the year, 100 to 110 percent of

19   the goal you get a certain multiplier that you times

20   that basis by.

21             And if you go above 110 percent in your

22   goal, you have a different multiplier to that basis.

23   And then also how the company did overall there's a

24   multiplier for it.  There's a lot of different

25   multipliers that could be added to that.

Page 91

1      Q    So you've got a basis and then you have

2   different multipliers; is that right?

3      A    Yes.

4      Q    And can the basis change as well as the

5   multipliers?

6      A    I don't know.

7      Q    So is the basis your salary?

8      A    No.  The basis would be 25 percent of the

9   salary.

10     Q    So and then 25 percent of your salary gets

11  multiplied by a particular multiplier based on your

12  performance?

13     A    Your performance and the team's performance

14  and the company's performance.

15     Q    So let's say you made $100,000 a year to

16  keep it simple; right?  What would the basis be on

17  $100,000?  Would it be $25,000?

18     A    If we are on a good year, yes.

19     Q    Okay.  What would make it a good year or a

20  bad year?

21     A    We just had some company restrictions, I

22  guess.  We were taken back on our bonuses this year --

23  last year.

24     Q    What's that?

25     A    Just based on company performance, we

                                              Page 92

Appx_0622

1    weren't able to give full bonuses this past year.

2         Q    Okay.  Well -- all right.  I don't really

3    want -- you know, I'm not worried about Eastmans 2023

4    performance or anything like that.  What I want to

5    know is are you paid on a salary?

6              Is that what this is saying?  Like you make

7    $70,000 a year divided by 12 --

8         A    That's my minimum.

9         Q    That's your minimum.  Okay.

10        A    That's where I start base.

11        Q    So if you don't make any sales, you're going

12   to get $70,000 a year until they fire you, I guess;

13   right?

14        A    I would assume so, yes.

15        Q    Okay.  Yeah.  All right.  So but then how is

16   your commission calculated at that point?

17        A    Just based upon performance from the

18   previous year.

19        Q    You have to beat performance from the

20   previous year; is that right?

21        A    You are given a goal at the beginning of the

22   year, and you are -- you work throughout the year to

23   reach that goal of sales.

24        Q    And if you hit that goal or do a certain

25   amount over that goal, you get a certain bonus.

Page 93

Appx_0623

1        A    Yes.

2        Q    Okay.  And that bonus is some percentage of

3    your salary?  Is that what I'm understanding?

4        A    I believe so.

5        Q    Okay.  What about -- like give me sort of an

6    approximation of what the percentage of your salary

7    you get in the bonus?

8        A    So if my salary is 70 percent, the base of

9    the commission would be 25 percent of my salary

10   which --

11       Q    Okay.

12       A    -- on this document it says 17,500 and

13   that's with a one multiplier.  So my first year with

14   Eastman, I wasn't eligible for --

15       Q    Increased multipliers.

16       A    -- increase multipliers.

17       Q    Okay.  Okay.  This is good.  Keep going,

18   keep going.

19       A    And then after my first year, I'm given a

20   goal to reach, and if I reach that goal or if I exceed

21   that goal, I get certain multipliers.

22       Q    Okay.  So just stick --

23       A    To that 17,500.

24       Q    Okay.  Okay.  So is that what the multiplier

25   would apply to?  Is take 25 percent of your salary

Page 94

Appx_0624

1    times instead of just one, it might be 1.5 or it might
2    be two.  Is that right?
3          A    Yes.
4          Q    Okay.  Can you give me a range of the
5    multipliers?
6          A    I have no clue.
7          Q    Is it -- I mean here this is times one;
8    right?  Have you ever got a multiplier times two?
9          A    I've only been with the company for two
10   years, so --
11         Q    Okay.
12         A    -- the first year I didn't have any
13   multipliers, and last year they were affected due to
14   our numbers.
15         Q    Okay.  Okay.  All right.  Thank you for
16   that.  I just want to get to the bottom of how all
17   this works.  So did you sign -- no.  Sorry, sorry.
18   What kind of company vehicle did Eastman give you?
19         A    It was a Ford Explorer.
20         Q    And we're talking about the same 2021 Ford
21   Explorer that was in the accident?
22         A    Yes.
23         Q    I should say, when I say the accident, we
24   agree we're talking about the April 30, 2022 accident;
25   right?

Page 95

Appx_0625

1          A    Yes.  That's correct.

2          Q    Okay.  Okay.  All right.  Let's go to the

3     next document.  Calling this Exhibit Number 14.  Do

4     you recognize this document?

5                    (Exhibit 14 was marked for

6                    identification.)

7                    THE WITNESS:  Yes.  I do.

8     BY MR. WHITE:

9          Q    Okay.  I take it that's your signature at

10    the bottom?

11         A    Yes.  That's my signature.

12         Q    Okay.  Now at some point, I take it you read

13    this document; right?  I'm not saying you remember all

14    of it right now; right?  But at some point, you read

15    this because you signed it; right?

16         A    Yes.

17         Q    So you see down here it says under laws and

18    policies, about halfway down.  Can you read those two

19    sentences under laws and policies?

20         A    "I agree to comply with Eastman's policies,

21    including the code of business conduct at all times

22    during my employment.  I also agree to comply with all

23    applicable laws."

24         Q    What is Eastman's business code of conduct

25    if you know?

Veritext Legal Solutions
800-336-4000

Appx_0626

1      A    I don't know the specifics.  I mean there's
2    a -- it's a handbook.
3      Q    Okay.  But you've seen the handbook?
4      A    I've gone over it before.
5      Q    Okay.  How have you gone over it?
6      A    I've read it previously.
7      Q    Okay.  By yourself or with others?
8      A    By myself.
9      Q    Okay.  Now you see where it says that you
10   agree to comply with all applicable laws, have you
11   been trained on what laws you were being asked to
12   comply with?
13     A    I don't remember.
14     Q    You don't remember what laws you've been
15   trained to comply with?
16     A    Other than my driver safety or driver course
17   when I got my license.
18     Q    Okay.  Okay.  So but you didn't get any
19   additional training on which laws to follow by
20   Eastman?
21     A    They have a general laws to follow in our
22   agreement and modules and training that I had to do to
23   onboard.
24     Q    So when you say general agreement to follow
25   laws, you mean this line right here?

Page 97

Appx_0627

1      A    Could you repeat that?

2      Q    Yeah.  So you said that you have general

3   training from Eastman to follow the laws; right?  Do

4   you mean that agreement right there on this document,

5   Exhibit Number 14?

6      A    There were other things we went over as well

7   other than just this document.

8      Q    Okay.  So when you were hired by Eastman,

9   tell me what sort of training you did get.

10      A    There were multiple modules, learning

11   development modules, that we had to go over.

12      Q    Okay.  Which ones if you remember?

13      A    I don't remember exactly the specifics.

14      Q    So kind of walk me through how that training

15   occurred.  You have like an onboarding day where you

16   watch a bunch of modules, or is this something that

17   happened over an extended period of time?

18      A    When I was originally onboarded, I did the

19   modules at home.

20      Q    Okay.

21      A    On a computer.

22      Q    But you don't remember what those modules

23   were about?

24      A    I don't know the specifics.

25      Q    How long did it take you to do those

Page 98

Appx_0628

1    modules?

2         A    I don't know exact.

3         Q    You think it took a couple of days to do the

4    modules or was it you --

5         A    Possibly.

6         Q    Okay.  Remember how many modules?

7         A    No.  I do not.

8         Q    Okay.  Were there any modules about driver

9    safety?

10        A    Possibly.  I don't know.

11        Q    You don't recall any module you received on

12   driver safety?

13        A    I don't remember the modules.  What the

14   information contained exactly.

15        Q    But do you remember getting a driver safety

16   module even if you don't remember the specifics?

17        A    I don't know.

18        Q    So you don't remember?

19        A    I don't remember.

20        Q    Okay.  Do you remember at any point after

21   getting onboarding getting a driver safety module?

22        A    We have safety modules.

23        Q    Okay.  But driver safety modules, do you

24   have those?

25        A    I don't think specifically.

Veritext Legal Solutions
800-336-4000

Appx_0629

1      Q    Okay.  So you say you do have safety
2    modules.  Tell me about those.
3      A    I don't know the specifics, but we are
4    required to do safety modules once a year
5    periodically.
6      Q    So you said once a year, but then you said
7    periodically.  So is it once a year, is it --
8      A    I don't know when exactly.  They come
9    throughout the year, so I don't know if it's an exact
10   year apart, but --
11     Q    Is there like a safety director that sends
12   them out?
13     A    I don't know if that's their actual title.
14     Q    Okay.  Well what do you think their title
15   is?
16     A    I don't know.
17     Q    But there is some person that you would
18   expect to receive this sort of stuff from?
19     A    To receive an email from.
20     Q    Okay.  With training modules or an
21   instruction to take a training module; right?
22     A    Yes.  And to updates on our safety for the
23   year progress.
24     Q    Who is that person?
25     A    I don't know exactly.  I don't remember.

Page 100

Appx_0630

```
 1          Q    Do you think you have emails with their
 2    name?
 3          A    It's possible.
 4          Q    Man, woman, anything?  Any recollection at
 5    all who sends those notifications when it's time for a
 6    new training module?
 7          A    No.  I don't remember.
 8          Q    How would I confirm what modules you've
 9    completed?
10          A    I'm not sure.
11          Q    Do they keep track of them in any way that
12    you're aware of?
13          A    Not that -- I mean, I assume they keep track
14    of them, but I'm not sure how they do.
15          Q    So you don't have access to some list, "Here
16    are all the modules I've completed"?
17          A    It's possible, but I'm not for sure.
18          Q    Okay.  You think that would be on the My
19    Eastman app or website?
20          A    I'm not sure.
21          Q    Okay.  Okay.  Have you received any training
22    modules on distracted driving?
23          A    I don't remember.
24          Q    You don't remember -- do you remember
25    anything about the safe use of a cell phone?
```

Page 101

Appx_0631

1          A     I don't remember exactly.

2          Q     What about cybersecurity?  Anything like

3     that?

4          A     Possibly.

5          Q     Possibly on cybersecurity?

6          A     Possibly, yes.

7          Q     So are these training modules specific to

8     outside sales reps or are they, you know, everybody in

9     the company gets the same training modules?

10         A     I don't know.

11         Q     Have you ever talked with your sales team

12    about the training modules?

13         A     I know my sales team gets the same modules

14    as I do.

15         Q     Okay.  How do you know that?

16         A     We discuss it.

17         Q     So in those discussions -- and I'll make a

18    representation to you.  When attorneys talked about

19    our CLE; right?  Sometimes it's kind of a joke; right?

20    How do you guys talk about your training modules?

21         A     Just that we've got a notification that

22    there's a new training module to complete.

23         Q     So is it sort of like, "Hey.  FYI, make sure

24    to do this."  Right?  Is it sort of like just watching

25    your other sales team members' backs?

                                        Page 102

1        A    Essentially, yes.  Just reminding them.

2        Q    And any idea what the consequences are for

3   not doing the modules?

4        A    No.  I don't know.

5        Q    You said earlier you might get a nasty email

6   about it; right?

7        A    A reminder.

8        Q    Okay.  Do you remember who had sent the

9   reminder?

10        A    Our manager.

11        Q    Who's that?

12        A    Currently it is Chris Lerardi.

13        Q    Was he your manager when you got hired?

14        A    No.

15        Q    Okay.  Can you give me a list of your

16   managers?

17        A    The first manager was Alan Davis.

18        Q    Does he still work at Eastman?

19        A    Yes.

20        Q    Okay.  But he's not your manager anymore?

21        A    No.

22        Q    Okay.  So did he get promoted or something?

23        A    No.

24        Q    Okay.  All right.  So then he got replaced

25   by somebody, I guess?

Page 103

Appx_0633

```
 1        A    No.
 2        Q    Okay.  What happened?
 3        A    They switched my territory over to the west
 4   coast instead of east coast.
 5        Q    Okay.  So you mean who manages you?
 6        A    Yes.
 7        Q    So west coast manages you now; is that
 8   right?
 9        A    Yes.
10        Q    Okay.  When did that switch happen?
11        A    I don't remember the exact date.
12        Q    It was before or after this accident?
13        A    I don't remember.
14        Q    Okay.  But when you started, you had an east
15   coast manager and that was Alan Davis?
16        A    Yes.
17        Q    Okay.  And then you switched over to west
18   coast management.  And has that always been Chris
19   Lerardi?
20        A    Yes.  For the meantime.  He got promoted.
21        Q    So does that mean he won't be your manager
22   anymore?
23        A    He's still currently right now.
24        Q    Okay.  Where did you make your home office
25   at?
```

Page 104

Appx_0634

1       A     When I got hired, the address that was given

2    on my application.

3       Q     Okay.  So is there somebody who's like in

4    charge of your training?

5       A     I don't know.

6       Q     Do you think it's your manager or you just

7    don't know who's monitoring the training?

8       A     There is a few people that I spoke to during

9    onboarding.

10      Q     Okay.  Do you remember who they are?

11      A     I don't remember specifics.

12      Q     Do you remember any of them?

13      A     I know Alan Davis was one of them.

14      Q     Okay.  And would he have been sort of

15   choosing what training you're getting, or is he just

16   making sure that you completed these modules?

17      A     I don't know.

18      Q     Okay.  And you said that when you started,

19   the safety modules were -- you just watched them at

20   your house; is that right?

21      A     Yes.

22      Q     Do you watch most of them at your house?

23      A     No.  Not necessarily.

24      Q     Where else would you do that?

25      A     When I'm on the road, I'll do them at my

Page 105

Appx_0635

```
 1    hotel that night.
 2         Q    Okay.
 3         A    After I get off the road.
 4         Q    Okay.  On your laptop?
 5         A    Yes.
 6         Q    Okay.  And I take it you just watch the
 7    educational bit and then take the test; right?
 8         A    There's articles and stuff to read as well.
 9         Q    Okay.  Okay.
10              THE VIDEOGRAPHER:  It's 11:15.  We're
11    off the record.
12              (Off the record.)
13              THE VIDEOGRAPHER:  This is the
14    beginning of file number 2, the deposition of Caylee
15    Smith. Time is 11:35.  On the record.
16    BY MR. WHITE:
17         Q    Okay.  Caylee, we're coming back after a
18    little break.  I want to ask you a little bit more
19    about your training modules.  You said earlier you
20    don't remember getting any training modules on
21    driving; is that right?
22         A    You know, I don't remember.
23         Q    So you just don't remember if you did or you
24    did not?
25         A    Yes.
```

Page 106

1      Q    Okay.  Do you remember anything about

2    getting distracted driving modules?

3      A    I don't remember.

4      Q    You don't remember of any scenarios they

5    presented to you involved distracted driving?  When I

6    say "they" I mean Eastman.

7      A    I don't remember.

8      Q    Okay.  Do you remember any sort of training

9    regarding distracted driving from Eastman?

10      A    I don't know.  I don't remember.

11      Q    So you just don't recall?

12      A    I just don't remember, yeah.

13      Q    Okay.  After the accident, were you given

14    any additional training related to distracted driving?

15      A    Not that I can recall.

16      Q    Any additional training regarding driving a

17    company vehicle?

18      A    Not that I can recall.

19      Q    If you did get such training, would it have

20    been in a module form?

21      A    I don't know.

22      Q    How else would you have received it?  When I

23    say "it" I mean training.

24      A    I don't know.

25      Q    Just no recollection at all?

Page 107

1        A    I don't remember.

2        Q    So do you think you'd agree that Eastman

3   should give you training on distracted driving?

4        A    I don't know.

5        Q    Why don't you think that -- I mean, why do

6   you think they shouldn't?

7                   MR. BLUNT:  Objection, form.

8        A    I don't -- I don't know.

9        Q    So you don't have any idea whether or not

10  it's proper for somebody to give someone else a

11  vehicle for company purposes and train them on how to

12  drive it?

13       A    No.  I don't know.

14       Q    You don't know, or you don't have an

15  opinion?

16       A    I don't know.

17       Q    So you just don't know what's proper for a

18  company that gives someone a vehicle.

19       A    No.  I don't know what's proper.

20       Q    Do you think you would have benefited from

21  some training regarding distracted driving?

22       A    I don't know.

23       Q    You don't think you would have benefited?

24       A    I don't know.

25       Q    You think it would have helped at all?

Page 108

1        A    I don't know.

2        Q    So when you say, "I don't know," are you

3    saying that you just never thought about this before?

4        A    I guess you could say that.  I don't know.

5    Yeah.  I never thought about it.

6        Q    You just never thought about whether or not

7    you could use some training on distracted driving?

8        A    Yeah.  I don't know.

9        Q    Yeah.  You've never thought about that?

10       A    I don't know.  I mean, no.  I didn't think

11   about it.

12       Q    You haven't thought about that as of sitting

13   here today?

14       A    No.

15       Q    Okay.  So if someone's going to be in their

16   vehicle for work purposes for half of their work week

17   every work week, you think it would make sense for the

18   company to train you on how to drive that car?

19       A    I don't know.  I mean, we have safety

20   modules.

21       Q    But you don't remember if those safety

22   modules deal with driving?

23       A    No.  I don't.

24       Q    So you don't recall being trained on driving

25   by Eastman?

Page 109

Appx_0639

1      A    I just don't remember.

2      Q    Is it possible you were?

3      A    It's possible I was, it's possible I wasn't.

4   I don't know.

5      Q    So if you don't remember the training, how

6   would you remember what to do?  Like in the sense like

7   what they trained you to do.  Are you saying that

8   you've forgotten your training?

9      A    No.  I follow my driving course and my

10  license that I know.

11     Q    That you received when you were 16?

12     A    Yes.

13     Q    But you don't recall receiving any training

14  since then on how to operate a vehicle?

15     A    I just don't remember --

16     Q    You just don't remember.

17     A    -- what the specifics of the modules were.

18     Q    If it was an effective training, do you

19  think you'd remember it better?

20     A    I don't think that has anything to do with

21  it.

22     Q    You don't think that training that is a

23  little more relevant would be a little bit easier for

24  you to remember having received that training?

25     A    I don't think that's the case.

Page 110

1       Q    Do you think that training on distracted

2   driving would have stood out to you as being

3   particularly important?

4       A    I don't know.  I don't think so.  I mean,

5   it's all training.  It's all safety.

6       Q    It all kind of blends together?

7       A    It's safety modules, yes.

8       Q    So do the safety modules blend together?

9       A    I don't remember them, so potentially.

10      Q    So yeah.  You don't remember the training.

11  It all kind of blends together?

12      A    Not that I don't remember the training, I

13  just don't remember the specifics.

14      Q    Well so you said you don't remember the

15  specifics, but you do remember the training.  That's

16  what you just said; right?

17      A    I know there was a training -- like

18  trainings -- safety trainings.  I don't remember what

19  the specifics or what the content was.

20      Q    So you remember "I have been trained,"  you

21  just don't know what you've been trained on?

22      A    I know I have had training modules.

23      Q    You just don't remember about what?

24      A    I don't remember the specifics, no.

25      Q    What do you remember about the training

Veritext Legal Solutions
800-336-4000

Appx_0641

```
 1    modules?
 2         A    Just that they were required.
 3         Q    So they're a requirement, but you don't
 4    remember what they contained?
 5         A    Not all of them, no.
 6         Q    Which ones do you remember?
 7         A    I remember there's spam trainings that we
 8    are trained on for phishing emails and stuff like
 9    that.
10         Q    Do you remember any others?
11         A    Not that I remember, no.
12         Q    So other than spam training, you forgot the
13    rest of your training?
14                   MR. BLUNT:  Objection, form.
15         A    Not that I've forgotten.
16         Q    Well what do you remember then?
17         A    I know that there's safety modules.  I just
18    don't remember the specifics of the exact modules of
19    when I did them.
20         Q    I'm not asking when you did them.  I'm
21    asking what they contained.  So other than the spam
22    module, what training do you remember?  Like the
23    content of that training?
24         A    I can't think of it right now.
25         Q    So you can't remember any except the spam
```

Page 112

1    training?

2         A    Right now, yes.

3         Q    So in your opinion, if Eastman knew that you

4    did not remember your safety training, would that be

5    concerning to them in your view?

6                   MR. BLUNT:  Objection, form.

7         A    I don't know.

8         Q    You think they should be concerned that you

9    don't remember your training?

10                   MR. BLUNT:  Objection, form.

11        A    I don't know.

12        Q    You think it's okay that you don't remember

13   your training?

14                   MR. BLUNT:  Same objection.

15        A    I don't know.

16        Q    Do you think people should be well trained

17   in their jobs?

18        A    Potentially, yes.

19        Q    Okay.  Why potentially?

20        A    They should be trained, yes.

21        Q    Do you think, like, if someone has a job

22   that doesn't pose a lot of risks to others, their

23   training is maybe not as important as someone whose

24   job does pose a lot of risk to others.  Do you agree

25   with that?

Page 113

1          A     Not necessarily.

2          Q     Okay.  So tell me why you disagree?

3          A     Everyone should be trained, no matter the

4     position.

5          Q     Okay.  So no matter how much risk you

6     create, everyone should be trained in a way that

7     prevents needless harm to others?

8                    MR. BLUNT:  Objection, form.

9     BY MR. WHITE:

10         Q     That's what you just said; right?

11         A     Can you repeat the question?

12         Q     So you think that no matter how much risk

13    someone's job causes to others, everyone should be

14    trained not to cause needless harm to others; right?

15         A     They should have training on what the

16    position entails.

17         Q     Do you think everybody's training should be

18    the same?

19         A     If it's a general training for the company,

20    yes.

21         Q     Do you think people should be trained on the

22    specifics of that position as well, as well as the

23    dangers that their position creates or deals with?

24         A     I don't know.

25         Q     Okay.  Where did you make your home office?

                                              Page 114

1          A     At that address I had on my application.

2          Q     All right.  How often would you work from

3     home?  And when I say when, I mean from when you

4     started working at Eastman up to the accident, how

5     often did you work from home?

6          A     Typically we have one office day every week.

7          Q     So that's one day when you're at your home

8     office?

9          A     Yes.

10          Q     So then the other four days of the week.  Am

11     I right?  You take the weekends off, so the other four

12     days of the week you're out on the road?

13          A     For the most part, yes.

14          Q     Okay.  Generally -- maybe, you know, not

15     exactly.  But maybe sort of as a general average,

16     that's one day at the home office, four days on the

17     road?

18          A     For the most part, yes.

19          Q     Okay.  What did Eastman pay for in your home

20     office?

21          A     They gave me an allowance for any equipment

22     that I needed.

23          Q     Do you remember how much that allowance was?

24          A     I don't.

25          Q     What was the equipment that you bought with

                                        Page 115

Appx_0645

1    that allowance?

2          A    A printer.

3          Q    Anything else?

4          A    I don't remember what else I bought.

5          Q    Desktop, laptop, desk?

6          A    No.  Possibly office supplies.

7          Q    Like paper?

8          A    I don't remember exactly what I bought.

9          Q    How much was the allowance?

10         A    I don't remember.

11         Q    Was it -- I think the offer letter says that

12   there's an allowance, but it doesn't specify.

13         A    I would have to check.

14         Q    Go for it.  I think you went by --

15         A    Did I?  Oh.  This one?  It says "Eastman

16   provider set up, allowance of 2800."

17         Q    Okay.  Do you think that's how much they

18   gave you?

19         A    It's possible if that's what this says.

20         Q    Okay.  Describe your home office.  Is it in

21   a separate room in your house?

22         A    Yes.  It was in a separate room.

23         Q    So was.  Tell me when it was in a separate

24   room?

25         A    For that specific location when I started

Page 116

1    the job.

2         Q    Okay.  So when this accident occurred that

3    we're here for today, you were still living in that

4    same address; right?

5         A    At the Livingston address, yes.

6         Q    So you had a separate room for your office.

7    Did you claim the home office exemption on your

8    federal taxes?

9         A    No.

10        Q    Did you pay your taxes or someone else?

11        A    TurboTax.

12        Q    Okay.  Do you have copies of your 2021 and

13   2022 tax returns?

14        A    Possibly.  I don't know where.

15        Q    But you made them through TurboTax; is that

16   right?

17        A    I did my taxes through TurboTax.

18        Q    You didn't hire an accountant or something

19   like that?

20        A    No.

21        Q    Okay.  Do you have a TurboTax account?

22        A    Yes.  I think I still have it.

23        Q    Okay.  When the accident happened, did

24   anyone else live with you at the Livingston address?

25        A    No.

                                    Page 117

```
 1          Q     Okay.  So on your four days a week when that
 2     were non-office days, you were driving to locations
 3     throughout your territory; right?
 4          A     Yes.
 5          Q     And you said your territory was from Wacco
 6     to Brownsville; right?
 7          A     Yes.
 8          Q     And does that remain your territory?
 9          A     No.
10          Q     How has it changed?
11          A     The San Antonio hub is no longer mine.
12          Q     Okay.  When did that change occur?
13          A     This month.
14          Q     So do you know why that changed?
15          A     Kind of, yes.
16          Q     Tell me why.
17          A     We had a rep moving from California to Texas
18     and she took over the North Dallas rep territory, but
19     she needed to live in San Antonio for family.  So our
20     team divided -- divvied up the San Antonio area for
21     her.
22          Q     Did you get any additional -- I take it that
23     means your territory shrunk a little bit; right?
24          A     Yes.
25          Q     Okay.  Did you they give you some extra to
```

Page 118

Appx_0648

1    make up for it?

2         A    No.

3         Q    Okay.  When you were driving on your four

4    workdays a week, where are you driving to?

5         A    It varies.

6         Q    Okay.  Tell me.

7         A    Just depending on where I plan out my week.

8         Q    Okay.  How would you plan out your week?

9         A    Based upon the different city.

10        Q    So well kind of walk me through that.  Like

11   say it's Sunday night, and you're trying to figure out

12   how to schedule your next upcoming week.  How would

13   you do it?

14        A    I would see which accounts I need to make a

15   new visit to that I hadn't in a while.  Say Austin

16   area, and plan around Austin area for my accounts.

17        Q    Okay.  So when you say a new visit, is that

18   an existing account or that's someone you're trying to

19   bring them on -- you're trying to get their business,

20   you don't already have their business?

21        A    An existing account.

22        Q    Okay.  So you would say, "I haven't met

23   with" -- let's call him Jerry, "at the Austin

24   dealership."  Right?  And so you know you're going to

25   be in Austin on Monday; right?

                                        Page 119

Appx_0649

1              Are you going to stay in Austin for the next

2    three days, or are you going to -- what are you going

3    to do?

4         A    I typically don't book my hotel until that

5    date because I don't know where I'm going to end up.

6         Q    Okay.  Why don't you know where you're going

7    to end up?

8         A    I get calls that -- plotter issues or

9    software issues that sometimes I just have to drive

10   to.

11        Q    Okay.  What is a plotter?

12        A    A plotter is what cuts our film.

13        Q    It's a big machine, I guess?

14        A    Yes.

15        Q    Okay.  So why would you be getting calls

16   about a machine problem?

17        A    Because we set the program up for them.

18        Q    Okay.  So is it an Eastman machine on site

19   for your client?

20        A    It is our machine.

21        Q    It's your machine.  All right.  So are you

22   who they call when they have problems with it, or they

23   call a technician?

24        A    They call me or our territory trainer.

25        Q    Why would they call you over a territory

                                         Page 120

1   trainer?

2         A    Because I'm equipped to fix it.

3         Q    Okay.  So I don't mean be insulting, I

4   assumed that y'all divvied it up.  So you know how to

5   work the plotter machine?

6         A    I know how to do the basics.

7         Q    You know how to troubleshoot it if it's not

8   working right?

9         A    For some issues, yes.

10        Q    Okay.  So when you talk about doing a new

11  visit, say in Austin, you're not going to troubleshoot

12  something, you're just going to see your client to

13  sort of maintain that relationship?

14        A    Yes.

15        Q    Okay.  Why would you do that?

16        A    To maintain the relationship.

17        Q    Is there a risk that they're going to, you

18  know, get a competitor's plotter or something like

19  that?  What's going to happen?

20        A    We have competitors in the area.

21        Q    Who are your competitors?

22        A    A few are Expel, 3M.

23        Q    Okay.  Any others?

24        A    There's multiple.

25        Q    So would you say most of your time was spent

                                        Page 121

Appx_0651

1    doing sort of these visits to existing clients just to

2    maintain their relationships, or were they

3    troubleshooting calls, you know, kind of an emergency

4    call?  Well how would you divvy that up, like, how you

5    work, when?

6        A    Most of my calls are to maintain

7    relationships and try and get same store sales growth.

8        Q    Okay.  How do you do that?

9        A    Introducing new products to them that

10   they're not already using or trying to upsell them on

11   a better product.

12       Q    Okay.  What other products would y'all have?

13       A    We have window film and paint protection

14   film.

15       Q    Okay.  And you're a film salesperson; right?

16       A    Yes.

17       Q    So you work under the film division, I

18   guess?

19       A    Yes.

20       Q    Okay.  So when somebody's got a problem with

21   their plotter, how do you find out about it?

22       A    Typically I'll get a call or a text.

23       Q    Okay.  From who?

24       A    It depends.

25       Q    Okay.  Well like would it come from the

                                        Page 122

1    client or would it come from someone at Eastman?

2         A    Normally, the client.

3         Q    Okay.  So the clients have your phone

4    number?

5         A    They have my work number.

6         Q    Your work number.  They don't have your

7    personal number?

8         A    No.

9         Q    You ever give any clients your personal

10   number?

11        A    No.

12        Q    Okay.  Why not?

13        A    Because I like to keep work and personal

14   life separate.

15        Q    Okay.  So normally it's the client reaching

16   out to you on your work phone?

17        A    Yes.

18        Q    Okay.  So normally a call or text or an

19   email?  Is that what you said?

20        A    It could be any of the three.

21        Q    Okay.  And is that how Eastman would expect

22   you to be communicating with them?

23        A    I would assume so, yes.

24        Q    Okay.  How often would you get calls, texts,

25   or emails from your clients on any given day?

Page 123

1        A    That could vary.

2        Q    Okay.  Tell me the bottom end and the low

3    end.

4        A    Some days I don't get any calls, some days I

5    get 20 calls.

6        Q    What about texts?

7        A    Some days I get zero texts, some days I get

8    20 texts.  It really varies.

9        Q    Okay.  And would you respond to all of them

10   immediately?

11       A    Not all of them immediately.

12       Q    Well sure.  But when you get one in, if you

13   don't have one you're already working on, would you

14   respond immediately?

15       A    If I'm not in an account.

16       Q    What does that mean?

17       A    If I'm not visiting with a client already.

18       Q    Okay.  Yeah.  Which makes sense; right?  If

19   you're visiting with one client, you don't want to,

20   you know, talk to your other client; right?

21       A    Exactly, yes.

22       Q    But if you're not visiting with a client,

23   you're not with an account, and you get a text from

24   another client, you're going to respond immediately?

25       A    Not necessarily.

                                    Page 124

Appx_0654

1        Q     Okay.  What do you mean?

2        A     Situational.

3        Q     How so?

4        A     If I'm at lunch or I'm on another call.

5    There's a couple of scenarios that I wouldn't be able

6    to answer immediately.

7        Q     Okay.  So lunch, you're on another call;

8    right?  Anything else?

9        A     I just didn't see it.

10       Q     Would you get in trouble if you didn't

11   respond immediately to clients?

12       A     As long as it's in a timely manner.

13       Q     What would qualify as a timely manner?

14       A     Twenty-four hours.

15       Q     Did you ever have clients complain to your

16   bosses about you not responding quickly enough?

17       A     I don't remember.

18       Q     You ever get in trouble for not responding

19   to clients quickly enough?

20       A     Not that I remember.  I don't know.

21       Q     Okay.  So you think generally speaking you

22   were diligent returning your clients texts, calls,

23   emails?

24       A     Yeah.  I'm pretty good about answering

25   clients.

Page 125

Appx_0655

1     Q     Okay.  Okay.  You do describe yourself as a

2   responsive salesperson?

3     A     I try to be, yes.

4     Q     Do you think it's important to be responsive

5   salesperson?

6     A     I think it's important to take care of your

7   client.

8     Q     You say take care of your client.  What do

9   you mean?

10    A     By responding and taking care of them if

11  they have questions or need an order placed.

12    Q     And do you think you risk losing the client

13  if you don't respond quickly to them?

14    A     Not necessarily.

15    Q     But with some maybe, is that a risk?

16    A     It could be.  Maybe.

17    Q     Okay.  But you try to keep it within 24

18  hours and hopefully sooner you try to respond to them;

19  right?

20    A     That's the goal, yeah.

21    Q     Okay.  What were your hours?

22    A     I don't have any set hours.  I'm on the road

23  a lot.

24    Q     When you say on the road a lot, how do you

25  mean?

Page 126

Appx_0656

```
1        A    So a lot of the hours I'm on the road is my
2    office time.  Is -- takes up my workday.
3        Q    Okay.  So you say it takes up your workday.
4    Do you mean to say that you're on the road after 5
5    p.m. sometimes?
6        A    I have been before, yeah.
7        Q    Yeah.  Was it frequent or do you normally go
8    back to the hotel or back to your home by 5?
9        A    I try to be, yes.
10       Q    Okay.  So does that mean on, say, a road
11   day; right?  You're not going to leave before eight,
12   but you're going to try and get to your client
13   sometime in the middle of the day and then have time
14   to return about five in the afternoon; is that right?
15       A    Kind of, yes.
16       Q    Okay.  Okay.  So when you say sort of your
17   office hours are when you're driving, what do you
18   mean?
19       A    Driving to clients, if it's a long commute,
20   two to three hour drive, that's part of my workday.
21       Q    Okay.  And the drive back to?
22       A    Yeah.
23       Q    Okay.  So when you're at the clients
24   location, you don't take phone calls or texts from
25   other clients; right?
```

Page 127

```
 1          A    I try not to.
 2          Q    Okay.  Why not?  Can you expand on that a
 3     little bit?
 4          A    Just respect.
 5          Q    Okay.  And so probably would look bad if
 6     you're talking to other clients while you're at one
 7     clients location; is that right?
 8          A    It could be perceived that way to some
 9     people.
10          Q    Okay.  So you just avoid doing that to avoid
11     the perception?
12          A    I just try to as a courtesy.
13          Q    Okay.  Do you think you successfully
14     accomplish that?
15          A    Not always.  Some calls are pretty urgent,
16     so I take them.
17          Q    Yeah?  But generally speaking, you wouldn't
18     take other calls, texts, or emails when you're with
19     one client.
20          A    I try not to.
21          Q    Okay.  How many clients have you seen in a
22     day?
23          A    That varies.
24          Q    Okay.  Give me the low end and the high end.
25          A    Sometimes one a day, sometimes --
```

                                             Page 128

1      Q    I'm going to stop you there.  If it's one a
2   day, is that because they were kind of far off and
3   maybe not near other clients?
4      A    Yes.  Or it was a travel day.
5      Q    Okay.  What do you mean by travel day?
6      A    It took me two to three hours to get there.
7      Q    Why do you call it a travel day if it takes
8   you two to three hours to get there?  Because you
9   still meet them on that day; right?
10     A    Yes.  I see them that day.
11     Q    Okay.  You call it travel day just because
12  you got to travel far?
13     A    Out of my home territory.
14     Q    Okay.  You have clients outside of your home
15  territory?
16     A    My home territory is Houston area.
17     Q    Okay.  Okay.  So when you say -- you have
18  other territories that are not in the Houston area?
19     A    Yes.
20     Q    You share those territories with anybody?
21     A    No.
22     Q    So you are the only Eastman outside sales
23  rep for the film department -- correct me if it's not
24  a department if it's called something different.  But
25  you're the only outside sales rep for the films

Page 129

1    department from Wacco to Brownsville?

2         A    For dealership only.

3         Q    For dealership only.  So you cover all of

4    the dealerships in that Wacco to Brownsville

5    territory?

6         A    Yes.

7         Q    With the exception of San Antonio, and

8    that's very recent?

9         A    Now, yes.

10        Q    Okay.  So who's your best customer?

11        A    I -- that's a loaded question.  It depends

12   on how you're ranking them as a best.

13        Q    I just mean your -- who is your best --

14   let's say tell me today.  Who's your best customer?

15        A    I would have a few different answers.

16        Q    Okay.  Tell me.

17        A    Best as in loyal, there's one.  And then

18   best as in highest amount of sales is one.  Best

19   installation team, so there's probably a couple of

20   different best.

21        Q    Okay.  Now when you're driving around, would

22   you ever take phone calls for work purposes?

23        A    I try not to.

24        Q    But you do?

25        A    I have in the past.

                                    Page 130

1     Q    Okay.  Why have you taken those phone calls?

2     A    If it's urgent.

3     Q    Okay.  How do you know it's urgent?

4     A    If I get multiple calls in a row.

5     Q    From the same person?

6     A    Yes.

7     Q    And so if you're driving around, you get

8   multiple phone calls from a client, you know they

9   really want you to answer the phone; right?

10    A    That they need me to, yes.

11    Q    Okay.  And you would?

12    A    I would put it on speaker, yes.

13    Q    Okay.  While you're driving on the road?

14    A    I would -- yeah.  On speaker.

15    Q    Okay.  You wouldn't pull over?

16    A    Sometimes I do.

17    Q    How often?

18    A    I couldn't give an exact number.

19    Q    Okay.  But generally speaking, you put them

20   on speaker and just keep driving.

21    A    I'll put it on speaker or yes, pull over.

22    Q    Okay.  What percentage of your day would you

23   say you're on the phone while you're driving around?

24    A    I couldn't -- I don't know that.  I don't

25   know.

Page 131

1      Q    But you know, it sounds like you do a lot of

2  driving; right?  Half your time is spent driving.

3      A    Yes.

4      Q    So are you telling us that you can do your

5  sales job without taking phone calls on the road when

6  you're on the road half the day, every day?

7      A    Like I said, some days I don't get that many

8  phone calls.

9      Q    But some days you do?

10     A    Some days I do.

11     Q    And you take them all on the road?

12     A    Not all of them on the road.

13     Q    How many on the road?

14     A    I don't know.  I couldn't put a number on

15  it.

16     Q    Do you take as many as you can while you're

17  driving on the road?

18     A    No.  Not necessarily.

19     Q    Why not?

20     A    I just try to not take the phone calls while

21  driving.

22     Q    Why?

23     A    I can give them better attention whenever

24  I'm talking to them off the road.

25     Q    Okay.  Why?

Page 132

1       A    My full attention would be on their phone
2    call.
3       Q    Okay.  Why wouldn't your full attention be
4    on the phone call if you take the phone call while
5    you're driving?
6       A    Because they may need something fixed or
7    need my attention to help solve a software issue, and
8    I can't help them whenever I'm driving.
9       Q    Why can't you help them while you're
10   driving?
11                MR. BLUNT:  Objection, form.
12      A    I don't know.  It'd be a case by case
13   scenario.
14      Q    Why can't you give your full attention to a
15   phone call when you're driving?
16      A    They don't have my full attention.
17      Q    Why not?
18      A    It could be distracting.
19      Q    So when you take a phone call and you're
20   driving, you split your attention?
21      A    Could be, yeah.
22      Q    Do you think there's ever a case where you
23   don't split your attention when you're taking a phone
24   call and you're driving?
25      A    If it's hands free.

                                          Page 133

1      Q    So you think hands-free driving doesn't

2    affect the attention that you're paying to the road?

3      A    It could potentially.

4      Q    It could what?

5      A    It could potentially take your attention.

6      Q    Off the road?

7      A    Off the road potentially.  Maybe.

8      Q    Do you think hands-free driving while on the

9    phone -- or hands-free phone use while you're driving

10   is as safe as not being on the phone at all?

11     A    Could you repeat that?

12     Q    Do you think driving while using a phone in

13   a hands-free mode is as safe and as undistracted as

14   driving down the road without using your phone?

15     A    I think hands free is less distracting and

16   it's more safe than using your phone.

17     Q    Okay.  So do you think that it's as safe as

18   not using your phone?

19     A    No.  Not necessarily.

20     Q    Why?

21     A    I mean, it could be distracting.

22     Q    Why?

23     A    I don't know.

24     Q    You don't know why it could be distracting

25   to be on the phone?

Page 134

1     A     Hands-free, it's distracting, I mean you're
2  having conversations.
3     Q     Why are conversations distracting?
4     A     I don't know.  They -- you're having a
5  conversation with someone, so --
6     Q     You want to give them your full attention?
7     A     Or at least some attention.
8     Q     And sometimes your clients are asking you
9  detailed questions; right?
10     A     Sometimes.
11     Q     And you want to give them enough attention
12  to give them good service; right?
13     A     Sometimes, yes.
14     Q     So that's why talking to them while you're
15  driving could pose a distraction to you; right?
16     A     It could, yes.
17     Q     Okay.  Has it ever posed a distraction to
18  you?
19     A     I don't remember exactly when or if it did.
20     Q     You think Eastman understood that you'd be
21  taking phone calls on the road?
22     A     I don't know.
23     Q     Did you ever receive training from Eastman
24  about taking phone calls while you're driving?
25     A     I don't remember.

Page 135

Appx_0665

1          Q    Do you respond to texts while you're

2     driving?

3          A    I have.

4          Q    While you're driving for Eastman?

5          A    I have.

6          Q    Okay.  Why?

7          A    Sometimes it's not safe to pull over in some

8     of the cities that I'm driving through.

9          Q    So you text back instead of pulling over?

10         A    I use my voice command a lot.

11         Q    Okay.  How do you do that?

12         A    Talking into the phone.

13         Q    Okay.  But walk me through it.  Like how

14    would you text using your voice?

15         A    You click the microphone and speak into it

16    to send.

17         Q    Okay.  Where do you click the microphone?

18         A    On the phone.

19         Q    Okay.  Where is that at?

20         A    In -- I mean it's -- like where is the phone

21    sitting?

22         Q    No.  Where on the phone?  Like on which app

23    do you have to have open to hit the microphone button?

24         A    You have to have the text app open.

25         Q    You have the text app open.  So if you want

Page 136

Appx_0666

1    to dictate a message you have to hit the microphone

2    button on the text app; is that right?

3         A    Yes.  That is correct.

4         Q    Okay.  And then what do you do?

5         A    And then push send once the -- you dictate

6    the message.

7         Q    Well once you press the microphone button,

8    what do you do?

9         A    You speak into it.

10        Q    Okay.  And then what do you do?

11        A    And then you push send.

12        Q    Do you ever look at the text message before

13   you hit send?

14        A    I don't know.  I don't remember.  Sometimes

15   maybe.

16        Q    Why would you look at the text message

17   before you hit send?

18        A    To make sure it was read or heard correctly.

19        Q    What do you mean by that?

20        A    Speaking into it, make sure it was typed out

21   correctly.

22        Q    Does the voice dictation sometimes have

23   errors?

24        A    It can sometimes.

25        Q    Is that why you look at it before you send

Page 137

1    it?

2         A    Possibly, yes.

3         Q    And then you hit the send button?

4         A    Yes.

5         Q    Okay.  When you receive a text message, how

6    do you understand what you've been texted?

7         A    Sometimes I read it and sometimes I let it

8    be read to me.

9         Q    How do you get it read to you?

10        A    It's attached to my Apple CarPlay. so it

11   will read it out loud.

12        Q    Okay.  So tell me how that happens.

13        A    If an incoming text comes in, it can notify

14   you and it'll read it out loud.

15        Q    Okay.  So how do you know you received one?

16   A text.

17        A    A text?

18        Q    How do you know you received a text over

19   Apple CarPlay?

20        A    It will pop up on the screen.

21        Q    Which screen?

22        A    The infotainment screen.

23        Q    Okay.  Then what do you do?

24        A    Then sometimes it's read out loud, or

25   sometimes I ignore it.

Page 138

1      Q    How does it decide whether it gets ignored
2   or to read it out loud?
3      A    I don't know.
4      Q    Do you have to press a button?
5      A    No.
6      Q    Do you tell it, "Read me that text," or
7   "Ignore that text"?
8      A    I guess it has to be set up with the
9   infotainment center to read it out loud or --
10   previously beforehand.
11     Q    Okay.  So is that what your infotainment was
12   set up to do on April 30, 2022?
13     A    I don't know exactly.
14     Q    Okay.  You don't remember?
15     A    I don't remember.
16     Q    So you don't remember if you had any text
17   messages read to you by the car on April 30, 2022?
18     A    I don't remember.
19     Q    Have you ever copy or pasted texts from
20   websites or emails into a text message?
21     A    I imagine I probably have in the past.
22     Q    Okay.  Can you do that using voice to text?
23     A    I don't know.
24     Q    Do you know how to do that?
25     A    I don't know how.

Page 139

Appx_0669

1       Q      Okay.  So you couldn't do that?

2       A      I don't know.

3       Q      Okay.  How frequently do you text in your

4    vehicle in the Ford Explorer that was in the wreck

5    when you're driving around?

6       A      I don't know.

7       Q      You don't have any idea how frequently?

8       A      I don't know how frequently, no.

9       Q      Would you say it's uncommon?

10      A      No.

11      Q      Okay.  Would you say it's common?

12      A      I mean, sometimes I do it, sometimes I

13   don't.  I don't know how frequent I do it.

14      Q      But you wouldn't say it's uncommon.

15      A      I've definitely done it before, yes.  But I

16   wouldn't say it's common.

17      Q      Does Eastman approve of you texting while

18   driving when you're driving the Ford Explorer?

19      A      I don't know.

20      Q      You don't remember any training they've

21   given you on texting and driving?

22      A      I don't recall the training exactly that

23   they gave me.

24      Q      Do you ever request special seating or a

25   different car size?

Page 140

Appx_0670

1         A    No.

2         Q    Okay.  So what training did you receive from

3    Eastman about the 2021 Ford Explorer that they gave

4    you?

5         A    I don't remember the training they gave me.

6         Q    Okay.  So you don't remember when you

7    received training about the Ford Explorer?

8         A    No.

9         Q    You don't remember them going over rules

10   with you about how to use the Ford Explorer?

11        A    I don't remember, no.

12        Q    Do you remember them telling you any rules

13   about your use of the Ford Explorer?

14        A    I don't know.

15        Q    And now of course I'm talking about the time

16   period before the accident; right?  So you don't

17   remember any training about your use of the Ford

18   Explorer before April 30, 2022?

19        A    I just don't remember.

20        Q    You just don't remember?  What about

21   training on the infotainment module?

22        A    I don't remember.

23        Q    So you weren't trained how to use the

24   infotainment module on the Ford Explorer by Eastman?

25        A    I don't know --

                                        Page 141

Appx_0671

1          Q     You just don't --

2          A     Remember.

3          Q     Okay.  What rules, if any, govern your use

4     of the Ford Explorer from Eastman?

5          A     I'm sorry.  Could you repeat that?

6          Q     What rules did Eastman give you about the

7     use of the Ford Explorer?

8          A     I don't know specifics.

9          Q     Tell me what you remember.

10         A     I would have to look at the code of conduct.

11         Q     So -- well we'll get to that.  But sitting

12    here right now, you don't remember any rules about the

13    Ford Explorer given to you by Eastman?

14         A     I don't know exact specifics right now, no.

15    Not off the top of my head.

16         Q     So -- but above exact specifics, do you

17    remember any general rules?

18         A     No drinking and driving.

19         Q     Okay.  Why?

20         A     It could pose a risk.

21         Q     Okay.  And you think it's important not to

22    drink and drive.

23         A     Yeah.

24         Q     Why?

25         A     Because it could pose a risk.

                                        Page 142

1      Q    And you think it'd be wrong to drink and

2    drive?

3      A    Yes.

4      Q    Do you remember them telling you not to

5    drink and drive?  When I say "them," I mean Eastman.

6      A    I remember reading it.

7      Q    Do you remember where you read it?

8      A    In the code of conduct, I believe.

9      Q    Okay.  But you don't remember any other

10   rules they gave you?

11     A    Not that I can think of right now.

12     Q    Did they really emphasize don't drink and

13   drive?

14     A    Not necessarily.  It just stuck out to me.

15     Q    Okay.  Stuck out to you.  Do you have

16   another vehicle in your name or -- and let's keep this

17   to April 30, 2022.  On April 30, 2022, did you have

18   any other vehicle other than the Ford Explorer?

19     A    I don't remember when I got rid of the other

20   car.

21     Q    Okay.  So you did have a different car?

22     A    At one time, yes.

23     Q    Okay.  Tell me about the other car.

24     A    A Nissan Altima.

25     Q    Whose name was is titled in?

Page 143

Appx_0673

1        A      Mine.

2        Q      Okay.  But you don't remember when you got

3   rid of it?

4        A      Yeah.

5        Q      Would --

6        A      I had it when they hired me.

7        Q      You remember who paid for the fuel in the

8   Ford Explorer?

9        A      Eastman pays for the fuel.

10       Q      Okay.

11       A      In the Ford Explorer.

12       Q      In the Ford Explorer.  How?

13       A      I have a gas card.

14       Q      Okay.  And did you ever pay for the fuel in

15   the Ford Explorer?

16       A      The Ford Explorer was used with the gas card

17   always.

18       Q      Always?

19       A      Yes.

20       Q      So -- and it's not a trick question, but

21   like at no point Caylee Smith didn't take her -- you

22   didn't take your own card to pay for gas to put into

23   that Ford Explorer?

24       A      No.

25       Q      Okay.  Who paid for the insurance on the

                                        Page 144

Appx_0674

1    Ford Explorer?

2         A    Eastman.

3         Q    Okay.  Who paid for maintenance on the Ford

4    Explorer?

5         A    Eastman.

6         Q    Was the Ford Explorer titled in your name?

7         A    I don't know.

8         Q    How did Eastman supervise your use of the

9    Ford Explorer?

10        A    I don't know.

11        Q    So were there ever any calls about, "Hey.

12   Time to take it to the oil change," or something like

13   that?

14        A    No.

15        Q    So they didn't monitor how you maintained

16   the Ford Explorer?

17        A    We would get notifications from the fleet

18   company.

19        Q    Okay.  Which was who?

20        A    Donlen.

21        Q    Okay.  But Eastman never said, "Hey.  You're

22   putting too many miles on the car"?

23        A    No.

24        Q    Okay.  Did they ever say you're not putting

25   enough miles on the car?

                                        Page 145

Appx_0675

1        A      No.

2        Q      They ever get on to you about, "Hey.   It's

3    too messy in the Ford Explorer"?

4        A      No.

5        Q      To the best of your knowledge, did anybody

6    from Eastman other than you ever inspect the interior

7    of the Ford Explorer before the accident?

8        A      Not that I'm aware of.

9        Q      Did anybody at Eastman check in on you about

10   how you were driving the Ford Explorer?

11       A      Not that I recall.

12       Q      Okay.   When would you drive your Nissan

13   Altima versus the Ford Explorer?

14       A      I never really drive it.

15       Q      Drove the Nissan?

16       A      The Nissan.

17       Q      So basically, once you got the Ford

18   Explorer, you set the Nissan aside.

19       A      For emergency uses.

20       Q      But 99 percent of the time you're driving

21   the Ford Explorer?

22       A      For the most part, yes.

23       Q      What am I wrong about 99 percent of the

24   time?

25       A      I wouldn't put an exact percentage like that

Page 146

Appx_0676

1    on it.

2         Q    Okay.  What about vacation?

3         A    I don't know if I took any vacation with the

4    vehicle.

5         Q    With the Ford Explorer?

6         A    Yeah.

7         Q    What about, you know, just like going out on

8    the weekend.  Would you drive the Ford Explorer or the

9    Nissan?

10        A    I would take the Ford Explorer.

11        Q    Okay.  Why?

12        A    Eastman paid for gas.

13        Q    Okay.  So --

14        A    We were allowed to use it for personal use.

15        Q    Okay.  Okay.  Did you have to report your

16   mileage?

17        A    Yes.

18        Q    Okay.  Tell me about that.

19        A    We have a Donlen app.  That is another app

20   that we have.

21        Q    Don't worry.  It's not a trick question.  I

22   knew about the Donlen app, so I wasn't going to get on

23   to you about it. Tell me how the Donlen app works.

24        A    It allows you to record mileage per month.

25        Q    Okay.  Help me out.  Like, you know, I've

Page 147

1    never seen it, don't know how it works; right?
2    There's very few YouTube videos on it.  So just kind
3    of walk me through how you use it.
4         A    Per month you're required to record your
5    business miles and your personal miles.
6         Q    Okay.  And how would you do that?
7         A    I -- if I had a trip, I would note how
8    many -- about how many miles that trip is, and you
9    submit it in the app.
10        Q    When you say trip, you mean work trip?
11        A    Or personal trip.
12        Q    Or a personal trip.  Right.  Would you
13   record like going out on the weekend, or would you
14   just record like the big trips?
15        A    That's still personal, so I would add in
16   miles for weekend trips if I used it.
17        Q    So you'd report all of your mileage?
18        A    You report all mileage.
19        Q    Okay.  And then do you tell them which of
20   those miles are business or just personal?
21        A    Yes.  There's a business one you answer and
22   a personal miles you answer.
23        Q    Okay.  How are you ever reimbursed for your
24   mileage?  I mean, if Eastman's paying for gas, did you
25   get mileage reimbursements?

Page 148

Appx_0678

1        A    There's no reimbursement.

2        Q    Do they ever reimburse you for personal

3   mileage?

4        A    No.

5        Q    Okay.  Is there a cap on your personal use

6   of the Ford Explorer?

7        A    No.

8        Q    Okay.  So it was your car, essentially.  You

9   said you use it for business and personal.

10       A    Yes.

11       Q    Okay.  Do you know how many business miles

12  you put on the Ford Explorer before the accident?

13       A    I don't know.

14       Q    Do you remember how many miles the Ford

15  Explorer had when you originally got it?

16       A    How many miles were on the vehicle?

17       Q    When you originally got it.

18       A    I don't know exact, but not much.

19       Q    Okay.  Maybe less than 10,000?

20       A    It was under 10,000.

21       Q    Maybe under 5000?

22       A    It was a new car.

23       Q    Okay.  How many business miles have you put

24  on the Ford Explorer by the time the accident

25  happened?

                                        Page 149

```
 1          A     I don't know.  I'm not sure.
 2          Q     And do you know where I would look to find
 3     out?
 4          A     Maybe Donlen.  I don't know.
 5          Q     You think the Donlen app?  So in your
 6     opinion, did Eastman's rules about driving apply to
 7     you even when you were driving for personal purposes?
 8          A     I don't know.  Maybe.
 9          Q     Okay.  It was their vehicle; right?
10          A     Yes.  It's their vehicle.
11          Q     Okay.  So you think their rules apply to you
12     even like when you're going out on the weekend?
13          A     Potentially, yes.
14          Q     Okay.  Do you ever drive for work purposes
15     on the weekends or evenings?
16          A     No.
17          Q     Never?
18          A     Not normally.  I don't think I had.
19          Q     Even for travel?  Like coming back home
20     or --
21          A     No.  I would leave early Mondays.
22          Q     You said you'd leave early on Mondays?
23          A     Monday mornings if I had to travel.
24          Q     Is Monday typically one of the travel days?
25          A     Yes.
```

Page 150

Appx_0680

1   Q Why?

2   A Beginning of the week.

3   Q You just want to get it out of the way?

4   A Well I would travel to my location that day

5 and stay in that area.

6   Q Okay.  Would you opt to stay at a hotel,

7 like, overnight?

8   A Yes.

9   Q Okay.  How often?

10   A Frequently.

11   Q Okay.  Every week?

12   A Not every week.

13   Q Every other week?

14   A Potentially, yeah.

15   Q Okay.  What were you supposed to do in the

16 case of a car accident when you're driving the Ford

17 Explorer?

18   A First, do what you would do in a normal

19 accident.  Pull over, get their information, and

20 notify someone with Eastman.

21   Q Okay.  All right.  So call someone at

22 Eastman?

23   A Yes.  Notify them.

24   Q Did you ever receive training on that?

25   A I don't know exactly.

Page 151

Appx_0681

1          Q     Were there any rules about contacting

2     Donlen?

3          A     Possibly.

4          Q     Okay.  What do you think those rules were?

5          A     I think we had to reach out to our rep with

6     Donlen possibly.

7          Q     Okay.  Why?

8          A     To notify them.

9          Q     How many times have you been in an accident

10    in that Ford Explorer?  The one that was in the

11    accident on April 30, 2022.

12         A     I had a fender bender the year before.

13         Q     Okay.  Where did that happen at?

14         A     In Austin, Texas.

15         Q     And what happened in that fender bender?

16         A     I rear-ended someone.  Bumped into them.

17         Q     Do you remember when that happened?

18         A     I believe it was around June 2021.

19         Q     You reported that to Eastman?

20         A     I did, yes.

21         Q     Did you report it to Donlen?

22         A     I did, yes.

23         Q     Did you get any additional training

24    following the rear-end incident?

25         A     I don't remember.

                                        Page 152

Appx_0682

1        Q    You don't remember it now?

2        A    I don't remember.

3        Q    Do you think it's possible that you did get

4    some additional training after you rear-ended

5    somebody?

6        A    I don't know.

7        Q    Tell me about the damage to your vehicle in

8    that fender bender in June of 2021.

9        A    It was minor damage.

10       Q    Okay.  To where on the Ford Explorer?

11       A    The front right.

12       Q    And what about the other car?

13       A    It was their back left.

14       Q    Tell me about the circumstances where it

15   happened.

16       A    It was on Mopac 1 Highway.

17       Q    Tell me more about that.  Again, Arkansas

18   boy.  That means nothing to me.

19       A    Mopac is very congested.  Bumper to bumper

20   traffic often.

21       Q    Okay.  So how did the collision occur?

22       A    The car in front of me was speeding up and

23   then slammed on the brakes.

24       Q    Okay.  Did you call the police?

25       A    I did.

                                        Page 153

1          Q      Okay.   What did the police say?

2          A      They said they were not coming to the scene

3     for a fender bender, and to pull over and get their

4     information.

5          Q      Did you get the other person's information?

6          A      I did.

7          Q      All right.   Did you make a police report

8     after that?

9          A      No.   They would not make one.

10         Q      Did you notify your insurance company?

11         A      I notified Donlen.

12         Q      And what ended up happening on all that?

13         A      The car went into a shop.   I was on a rental

14    for a little bit, and I got -- well then I got the car

15    back after it was repaired.

16         Q      Okay.   But the other person that you hit

17    never made a claim that you're aware of?

18         A      I don't know.

19         Q      Was anybody hurt?

20         A      No.

21         Q      How do you know?

22         A      I spoke to the individual.

23         Q      Were you on your phone when that happened?

24         A      No.

25         Q      How do you know?

                                              Page 154

```
 1        A    I wasn't on my phone during the accident.
 2   It was bumper to bumper traffic.
 3        Q    Okay.  Why weren't you on your phone in
 4   bumper to bumper traffic?
 5        A    Frequent stops.
 6        Q    So why does the necessity frequent stops
 7   mean don't -- you wouldn't be on your phone?
 8        A    You're frequently stopping, so you have to
 9   be able to see the stops.
10        Q    So you agree that in traffic where there are
11   frequent stops, it's unsafe to be on your cell phone?
12        A    It could be.
13        Q    But not always?
14        A    I mean, yes.  It could be unsafe.
15        Q    Do you think it's always unsafe to be on
16   your cell phone in stop and go traffic?
17        A    Possibly.
18        Q    Well that's sort of a yes or no question;
19   right?  Do you think it's always unsafe to be on your
20   phone in stop and go traffic?
21        A    Always?  I feel like it's a case by case
22   scenario.  If it's an emergency, then that's kind of a
23   different scenario, but it could be deemed unsafe.
24        Q    Well I'm just asking your opinion if it's
25   unsafe.
```

Page 155

```
 1        A     Yeah.

 2        Q     Always?

 3        A     Yes.

 4        Q     All right.  I want to introduce -- which one

 5   are we on?  Fifteen?

 6        A     Yes, sir.

 7        Q     I'm going to introduce what's called the

 8   standard operating procedure plan for automobile

 9   lease.  Okay.  There you go.  Have you ever seen this

10   document before?

11                    (Exhibit 15 was marked for

12                    identification.)

13                    THE WITNESS:  I have, yes.

14   BY MR. WHITE:

15        Q     Okay.  When's the last time you saw it?

16        A     Recently.

17        Q     Okay.  Is that the first time you've seen it

18   recently?

19        A     The first time I've seen it recently?

20        Q     Well have you seen this more than once?

21        A     I mean I -- I signed it, so yes.

22        Q     So where's your signature on this document?

23        A     I did sign a copy of this when I was

24   onboarded or a similar document.

25        Q     Okay.  Did you read it before you signed it?
```

Page 156

1          A    Yes.  I did.

2          Q    Okay.  What do you remember about what it

3     says?

4          A    I don't remember.

5          Q    Okay.  Were you trained on this document?

6          A    I don't remember.

7          Q    Okay.  Now take a look at it.  Right.  So is

8     there anything in here that pops out at you that you

9     do remember being trained on?  And I'll draw your

10    attention to the page that has a 412 in the bottom

11    right hand corner.  See the heading number 14 for

12    safety?

13         A    Yes.  I see the safety.

14         Q    Okay.  Can you read that first little

15    paragraph?

16         A    "It is the driver's responsibility to

17    operate the automobile in such a manner to prevent

18    injuries and property damage.  All drivers are

19    expected to observe speed limits and to drive within

20    the law."

21         Q    Okay.  Were you trained on that?

22         A    I don't remember exactly what training was

23    given.

24         Q    Okay.  Let's go down to the next paragraph

25    right below that.  Can you read that one?  Just the

Page 157

Appx_0687

1    first and second sentences is fine.

2         A    Number 15?

3         Q    No, no, no.  Sorry.  The paragraph right

4    under the one you just read.

5         A    Oh.  "Use of headlights, turn indicators,

6    and horn where appropriate, as well as maintaining

7    ample space cushions from other automobiles is

8    expected.

9              "Speed is to be adjusted to meet adverse

10   weather conditions.  It is mandatory that seatbelts be

11   worn in company vehicles."

12        Q    Okay.  Now what do you think it means by

13   ample space cushions?

14        A    Just enough room between the vehicle in

15   front of you.

16        Q    Okay.  Why do you think Eastman wants you to

17   maintain ample space cushions?

18        A    To try to be safe.

19        Q    Okay.  Why do you think it's not safe to not

20   maintain ample space cushions?

21        A    Your reaction time.  You don't have a lot of

22   reaction time.

23        Q    So why is reaction time important?

24        A    I mean, it could be unsafe.

25        Q    Well why do you think reaction time is

Page 158

Appx_0688

1    important to a driver?

2         A    To avoid things.

3         Q    Okay.  You think if you have more reaction

4    time, you're going to be more able to avoid obstacles?

5         A    Possibly, yes.

6         Q    Okay.  Now let's go down.  Read -- it's

7    aligned; right?  It's like two paragraphs above the

8    number 15 heading.  Can you read that?  Starts with

9    "our goal."

10        A    "Our goal with these guidelines is to raise

11   awareness and confirm personal accountability for

12   safety in our jobs."

13        Q    Okay.  What does personal accountability

14   mean to you?

15        A    I don't know.  Taking account for your

16   actions.

17        Q    Okay.  Why do you think that's important?

18        A    Just -- in this regard, just being -- I

19   don't know.  I don't know.

20        Q    Okay.  So you don't know why Eastman is

21   concerned about personal accountability?

22        A    I -- I don't know what their outlook on that

23   is.

24        Q    Do you think it's important to maintain

25   personal accountability for safety?

                                          Page 159

Appx_0689

1        A     Yes.

2        Q     But you don't know what personal

3    accountability means?

4        A     Taking accountable for your actions being --

5        Q     Go ahead.

6        A     Being accountable for your actions.

7        Q     Okay.  And why is that a good thing?

8        A     I don't know.

9        Q     You think that personal accountability means

10   that if you make a mistake, you should acknowledge it?

11       A     You could say that, yes.

12       Q     But is that one way that you understand

13   personal accountability?

14       A     Yes.

15       Q     Okay.  So following the collision with

16   Nehemias, did you follow the standard operating

17   procedure?

18       A     I notified personnel, yes.

19       Q     Who'd you notify?

20       A     My manager.

21       Q     Which manager?

22       A     I don't remember who I notified first.

23       Q     You think it was Alan Davis, maybe?

24       A     I don't remember.

25       Q     Okay.  If it wasn't Alan Davis, who would it

                                           Page 160

Appx_0690

1    be?

2         A    Eric.

3         Q    Okay.  Eric Holmes?

4         A    Eric Holmes.

5         Q    So is it either Alan or Eric, or is there

6    maybe a third option?

7         A    It could have been Chris.

8         Q    How do you think you would have notified

9    them?

10        A    I think I texted them.

11        Q    You think you did that with your work or

12   your personal phone?

13        A    My work phone.

14        Q    Do you remember when you did that?

15        A    When I was in the car with my uncle.

16        Q    So pretty soon after the accident?

17        A    It was when we were driving back to

18   McKinney.

19        Q    Okay.  So the same day, April 30th?

20        A    Yes.

21        Q    Okay.  So when -- did you notify Donlen?

22        A    I don't remember.

23        Q    Do you remember -- I mean, the SOP says you

24   need to notify Donlen; right?

25        A    It does say that.

Page 161

Appx_0691

1       Q    Do you think you did notify Dolen?

2       A    I don't remember.

3       Q    Do you remember talking to somebody at

4    Donlen?

5       A    I don't remember who all I talked to.

6       Q    Okay.  But if Donlen has a statement from

7    you, would you agree that you gave it to them?

8       A    If they had a statement from me, then yes.

9       Q    Okay.  Do you remember -- I know you said

10   you don't, so this isn't a trick question.  If you did

11   talk to Donlen, and you did; right? Do you think it

12   was over the phone or on zoom or something like that?

13      A    I don't remember.

14      Q    Okay.  All right.  I'm going to introduce

15   what we're going to call Exhibit Number 16.  Okay.

16   There you go, Caylee.

17               (Exhibit 16 was marked for

18               identification.)

19               THE WITNESS:  Thank you.

20   BY MR. WHITE:

21      Q    Have you ever seen this document before?

22      A    I don't remember.

23      Q    Okay.  Do you have any reason to believe

24   Donlen inaccurately recorded their interview with you?

25      A    I don't know.

Page 162

Appx_0692

1          Q    But they wouldn't have a reason to put words

2      in your mouth that you didn't give them.  Would they?

3          A    I don't think so.

4          Q    Okay.  So look here.  Right?  This is their

5      report from the statement that you gave.  So is the

6      information on the top correct?  Name, date, time of

7      loss, report date?

8          A    I think those are estimates.

9          Q    Which ones?

10         A    The report date and the date time of loss.

11         Q    Okay.  That's fair enough.  Fair enough.  So

12     about in the middle, you see where it says "weather"?

13         A    Yes.

14         Q    Do you agree that you told Donlen that the

15     weather was clear?

16         A    Yes.

17         Q    And do you agree that you told Donlen that

18     the road conditions were dry?

19         A    Yes.

20         Q    Okay.  So keep going to the right.  Do you

21     agree that you told Donlen that the speed limit was

22     75?

23         A    If that's what this says, then I guess, yes.

24         Q    Yeah.  Do you agree that you told Donlen

25     that you were traveling 70 miles an hour?

Page 163

Appx_0693

1      A     If that's what this says, then possibly.

2   Yes.

3      Q     I mean, do you think that's what you told

4   them?

5      A     I don't remember exactly what I told them.

6      Q     Fair enough.  But you don't have any reason

7   to think that they were putting words in your mouth

8   here; right?

9      A     I guess not, no.

10      Q     Okay.  Can you read the statement under

11   description of accident that you gave them?

12      A     "I was traveling north on I-45 when a

13   pedestrian halfway on the left lane of the highway

14   stepped out of their vehicle and I swerved to try to

15   avoid the pedestrian, and hit them with the vehicle,

16   causing damage.

17      Q     You agree that you gave Donlen that

18   statement?

19      A     I don't know if those are my exact words.

20      Q     But you think they're close?

21      A     Potentially, yeah.

22      Q     It doesn't misrepresent your statement to

23   Donlen.  Does it?

24      A     No.  I just don't think those were the exact

25   words.

Page 164

Appx_0694

1      Q    Okay.  Now let's go down to the bottom.  And

2   do you disagree with any part of that statement under

3   description of accident?

4      A    The "stepped out of their vehicle."

5      Q    Okay.  Why do you disagree with that?

6      A    I don't know if he had stepped out.  I don't

7   know what he was doing.  He had just appeared.

8      Q    Okay.  Do you think you told Donlen that he

9   stepped out of the vehicle?

10     A    I don't remember.

11     Q    Okay.  But Donlen wouldn't have made that

12  up; right?

13     A    No.  But they could have summarized or tried

14  to summarize.

15     Q    So do you think Donlen maybe incorrectly

16  wrote down your statement?

17     A    I don't know.

18     Q    To the best of your knowledge, there's not

19  another version of your statement to Donlen out there;

20  is there?

21     A    Not that I'm aware of

22     Q    Okay.  Now go down to the bottom right hand

23  corner here.  See where it says "Using cell phone"?

24  See where it says "No"?

25     A    Yes.

Page 165

Appx_0695

1        Q    Do you agree you told them you were not

2    using your cell phone?

3        A    If that's what this says, then yes.

4        Q    Okay.  So if it says it's on this report,

5    it's what you told Donlen.

6        A    Okay.  Then yes.  If that's what this says.

7    'Cause I -- like I said, I don't remember the exact

8    conversation.

9        Q    Okay.  So is it your view now that Nehemias

10   did not step out in front of your vehicle?

11       A    I don't know --

12                 MR. BLUNT:  Objection, form.

13                 MR. WHITE:  What's the basis?

14                 MR. BLUNT:  Well if you're implying

15   that she said that she hasn't said that.  So I think

16   it kind of assumes facts that are not on the record.

17   BY MR. WHITE:

18       Q    So do you agree that Nehemias stepped out in

19   front of your vehicle at the last moment like you said

20   on the statement?

21       A    This statement says that he stepped out of

22   their vehicle.

23       Q    Correct, correct.  Do you agree with that

24   statement, or do you think that's not what happened?

25       A    I don't know what he was doing before.

Page 166

Appx_0696

1          Q     So you don't know if he stepped out?

2          A     I know I -- he appeared suddenly in front of

3     me.

4          Q     Okay.  And when you say -- but you don't

5     know if he appeared as a result of him taking a step

6     in front of your car?

7          A     Could you repeat that?

8          Q     So do you disagree that he appeared in front

9     of your car because he stepped in front of your car?

10          A     I don't know.

11          Q     Or is it because you just saw him at the

12     last minute?

13          A     I don't know.  He was in the middle of my

14     lane.

15          Q     So you saw him in the middle of the lane.

16     You remember seeing that?

17          A     Yes.

18          Q     But you don't remember what he did

19     immediately before you saw him?

20          A     No.  It was very quick.

21          Q     Okay.  You don't remember if he'd just taken

22     a step out into the lane?

23          A     I don't know what he was doing before.

24          Q     Do you know if he took a step out of his

25     car, like this statement says?

                                        Page 167

Appx_0697

1        A    I don't know.

2        Q    Okay.  But you agree that Donlen got it

3   right when they said you weren't using a cell phone?

4        A    Yes.  At the time of the collision, I was

5   not using a cell phone.

6        Q    And you told Donlen no in answer to that

7   question?

8        A    If that's what this says, then yes.

9        Q    Okay.  Because this is an accurate

10  statement?

11       A    For the most part, yes.

12       Q    Okay.  What isn't accurate?

13       A    Like we discussed before, the date and times

14  and report times were estimate.

15       Q    Anything else inaccurate?

16       A    And I don't know if he stepped out of the

17  vehicle in the description of the accident.

18       Q    Anything else on here inaccurate?

19       A    It doesn't look like my address was updated.

20       Q    Okay.  Anything else?

21       A    I don't know.  Not that I see.

22       Q    Okay.  So when it says "Hands-free cell

23  phone use" and it says "NA," do you agree that's not

24  inaccurate?

25       A    I don't remember.  I don't remember the

                                        Page 168

1    conversation.

2        Q    Okay.  How does Eastman supervise your

3    behavior when you're on the job?

4        A    My manager's responsible for me.

5        Q    Okay.  How?

6        A    We talk frequently.

7        Q    Okay.  So is that how most of your

8    supervision occurs?  He calls you and you talk?

9        A    Part of it, yes.

10       Q    Is there anything else he does to supervise

11   you?

12       A    He'll make visits every now and then.

13       Q    Okay.  And tell me about those.

14       A    He'll come and spend some time in my

15   territory with me.

16       Q    Okay.  When was the last time he did that

17   before your accident?

18       A    No.  I don't remember.

19       Q    Got a guess?  Was it in 2022 or is it maybe

20   back in 2021?

21       A    It's possible 2022, but I don't remember.

22       Q    Okay.  So how many times since you got hired

23   to when the accident happened did your manager come to

24   visit?

25       A    I don't know.

Page 169

```
 1        Q    I mean, we're talking like a dozen times
 2   or --
 3        A    Less than a dozen.
 4        Q    Maybe half a dozen?
 5        A    I don't know exactly how many times.
 6        Q    So it wasn't frequent?
 7        A    No.  He lives in Colorado.
 8        Q    Okay.  Okay.  Was anybody else around?  Any
 9   other salesperson that could supervise you or shadow
10   you?
11        A    No.
12        Q    So -- and who's the manager in Colorado that
13   we're talking about?
14        A    This is Chris.
15        Q    Chris.  Okay.  So from the time you got
16   hired to when the accident happened, Chris was your
17   manager?
18        A    No.
19        Q    Okay.  Then fill me in.  Make sure I got it
20   right.
21        A    When I first got hired, Alan.
22        Q    Alan.  Okay.
23        A    Was my manager.
24        Q    Okay.  And then it switched over to Chris?
25        A    Yes.
```

                                    Page 170

Appx_0700

1          Q     So did Alan ever come visit you?

2          A     I don't remember exactly.

3          Q     Okay.  So then other than visits from Chris

4     from when you got hired to when the accident happened,

5     nobody else came to supervise you in person?

6          A     I had ride-alongs with two reps.

7          Q     Okay.  Who?

8          A     Katie Frank.  She's no longer with Eastman.

9          Q     Okay.  And who else?

10         A     And Corey Kooman.

11         Q     Can you spell his last name?

12         A     K-O-O-M-A-N.

13         Q     Okay.  When did those ride-alongs occur?

14         A     Sometime after I got hired.  I don't

15    remember exactly when.

16         Q     Okay.  So were there only two ride-alongs?

17         A     I had two ride-alongs.

18         Q     Okay.  Tell me about the first one.

19         A     Was with Katie Frank.

20         Q     Okay.  And what happened on that ride-along?

21         A     I just visited her accounts with her to

22    learn the ropes.

23         Q     Okay.  And how did that go?

24                    MR. BLUNT:  When you get to a stopping

25    point, let's go ahead and take lunch.

Page 171

```
 1                    MR. WHITE:  Okay.  Okay.  We'll take
 2     just a couple more questions and then take a lunch.
 3                    THE WITNESS:  Okay.
 4     BY MR. WHITE:
 5          Q    So tell me about how that ride along with
 6     Katie went?
 7          A    Good.
 8          Q    Okay.  Where did you do it at?
 9          A    In Florida.
10          Q    Okay.  Where in Florida?
11          A    We were on the east coast for a bit, and
12     then we went to the west coast.
13          Q    Okay.  Why Florida?
14          A    That was her territory.
15          Q    Okay.  So why did you train with her in
16     particular?  Do you have any idea?
17          A    No.  I don't know.
18          Q    Okay.  About how old was Katie when she
19     trained you?
20          A    Mid 20s, I think.  I don't know exactly.
21          Q    And what did she tell you about the job?
22          A    She just showed me the ropes on how to do it
23     and taught me about the product.
24          Q    Okay.  How long were you with Katie?
25          A    I believe it was about a week.
```

Page 172

1        Q    Okay.  Where's Katie at now?

2        A    I don't know.

3        Q    She's not in Florida, you think?

4        A    I don't know.

5        Q    All right.  Anything else jump out at you

6   about that ride-along experience, what you learned?

7        A    No.

8        Q    Do you remember what Katie told you about

9   using your phone while driving?

10        A    I don't know.

11        Q    What about you ride-along with Corey Kooman?

12   When did that happen?

13        A    I don't remember exactly.  I believe

14   possibly 2021.

15        Q    Okay.  Was that about a week with Corey?

16        A    About a week.

17        Q    Where at?

18        A    In Colorado.

19        Q    All right.  And what did you learn from

20   Corey?

21        A    Just about the product and selling the

22   product.

23        Q    All right.  And about how to do the job in

24   general?

25        A    You could say that, yes.

Page 173

```
 1          Q    So was it sort of like you were shadowing
 2    Corey and Katie just to kind of see how it's done?
 3          A    Yes.
 4          Q    Okay.  And do you remember when the ride
 5    along with Katie was?
 6          A    It wasn't long after I was hired.
 7          Q    Okay.  So earlyish 2021?
 8          A    Yes.
 9          Q    Okay.  So that was an in person with Katie,
10    in person with Corey.  You had a couple in-person
11    visits from Chris.  Any other in-person experiences
12    with other people from Eastman?
13          A    I can't remember exactly.
14          Q    Okay.
15                    MR. WHITE:  All right.  Y'all want to
16    take a break?
17                    MR. BLUNT:  Sure.
18                    MR. DUBOFF:  Sure.
19                    THE VIDEOGRAPHER:  12:45, we're off the
20    record.
21                    (Off the record.)
22                    THE VIDEOGRAPHER:  This is the
23    beginning of file number 3, the deposition of Caylee
24    Smith.  Time is 1:38, we're on the record.
25    //
```

Page 174

Appx_0704

1    BY MR. WHITE:

2         Q    All right, Caylee.  We're back.  I think we

3    were talking about your supervision by Eastman.  Do

4    you remember that?

5         A    Could you refresh me?

6         Q    Sure.  Do you remember any convos with your

7    supervisors following the accident?

8         A    Not specifics.

9         Q    Okay.  What do you remember?

10        A    I just remember reaching out to my

11   supervisor Eric after the accident.

12        Q    And that's in those text messages you told

13   me about earlier; is that right?

14        A    I believe, yes.  I texted him.

15        Q    Okay.  Do you remember any other follow on

16   conversations with Eric or whomever your manager was

17   at that time?

18        A    I know there were people I was in

19   communication with with Eastman, but I don't remember

20   exactly who it was.

21        Q    Do you remember how you communicated with

22   them?

23        A    There was multiple different ways.

24        Q    Do you think it was email, call, and text

25   with these other people at Eastman?

                                        Page 175

```
 1          A     I believe so, yes.
 2          Q     Okay.  We were also talking about how you
 3    were supervised before the accident; right?  You told
 4    us about some ride-alongs, you told us about some
 5    visits from Chris and Alan.  Any other in-person
 6    supervision that you have received?
 7          A     We had a conference as well.
 8          Q     Okay.  Tell me about the conference.
 9          A     Actually, I think that was after the
10    accident.  I don't remember when the conference was.
11          Q     Okay.  How many Eastman conferences have you
12    been to sitting here today?
13          A     This one was not an Eastman conference.
14          Q     Okay.  What conference?
15          A     It was for a window film revolution
16    conference.
17          Q     Okay.  So which conference are we talking
18    about?  The one --
19          A     It was located in San Antonio.
20          Q     -- around the time of the accident?
21          A     No.  This is a different conference.
22          Q     Okay.  Okay.  Okay.  So other than Chris and
23    Alan coming to visit you a couple of times, and Katie
24    and Corey doing the ride-alongs with you, who else do
25    you remember meeting in person that was supervising or
```

Page 176

Appx_0706

1    training you from Eastman?

2         A    I don't remember.

3         Q    Okay.  So let's move on.  If an evaluator at

4    Eastman told you that you were doing a good job

5    planning your routes and territory, what do you think

6    they meant?

7         A    Who are you referring to as evaluator?

8         Q    Well I've got an evaluation for you.  So

9    let's just go ahead and put that on the record here.

10   Marked as Exhibit Number 17.  There you go.  Okay.  So

11   have you ever seen this before?  What's marked as

12   Exhibit 17?

13                   (Exhibit 17 was marked for

14                   identification.)

15                   THE WITNESS:  I believe I have, yes.

16   BY MR. WHITE:

17        Q    Okay.  So the part that I'm wondering about

18   is where it says -- okay.  So you see on the second

19   page, it's the third paragraph on communication?

20        A    Yes.  I see the communication.

21        Q    Okay.  So when your evaluator says "She

22   communicates issues or questions with me when needed

23   and communicates with her other teammates daily,

24   weekly," what does that mean?

25        A    When I have questions about the position, I

                                        Page 177

1    would reach out to either my manager or team members.

2         Q    How often would you do that?

3         A    I don't know how frequent.  Just whenever a

4    question came up.

5         Q    Okay.  And would you send those questions

6    via email, text, phone calls?  How would you do it?

7         A    Typically a phone call.

8         Q    Okay.  Phone call from your work phone or

9    your personal phone?

10        A    Work phone.

11        Q    Okay.  Now go down here to the very bottom

12   of that page you're looking at.  You see under

13   planning and organization that first line where it

14   says "Caylee's done a good job"?  Can you read that?

15        A    Caylee has done a great job planning her

16   routes and territory.

17        Q    Okay.  So what does that mean?

18        A    Just that I'm staying up to date on

19   customers and visiting them frequently.

20        Q    Okay.  And is that a necessary part of your

21   job?

22        A    Yes.  To take care of the customer.

23        Q    Okay.  And you think that doing a good job

24   planning your routes and territory and visiting with

25   your clients frequently in person, you needed to do

Page 178

1    that to do a good job for Eastman?

2         A    I believe so, yes.

3         Q    Okay.  Have you been trained that that's

4    sort of what you need to do to do the job for Eastman?

5         A    I don't know if you would -- like training.

6         Q    Well how did you know that you need to

7    constantly be interacting with your clients?

8         A    I learned that with the ride-alongs.

9         Q    Okay.  So that was the training you received

10   on how to do the job?

11        A    That and just common courtesy of staying up

12   to date with your customers.

13        Q    Okay.  So up here, I think it's under

14   teamwork.  Can you read the second sentence of the

15   evaluation under teamwork on Exhibit Number 17?  This

16   is the page that begins with 837.

17        A    Yes.  "She works extremely well with

18   adjacent territory reps and has constant communication

19   with much of the team."

20        Q    Okay.  What do you think they mean by

21   "constant communication"?

22        A    Questions about the territory, questions

23   about the product, staying up to date on new products

24   coming out.

25        Q    So do you agree that the way this is

Page 179

1    written, the fact that you were in constant

2    communication with your team is a good thing; right?

3         A    Yes.

4         Q    Okay.  So you think that you're being

5    evaluated positively on your constant communication

6    skills?

7         A    Yes.

8         Q    Okay.  Okay.  Who all is on your team when

9    it says you constantly communicate with your team?

10        A    I don't know if that was referring to my

11   east coast team or west coast team.

12        Q    Okay.  Let's say -- so that evaluation was

13   completed on -- let's see.  It says your supervisor is

14   Alan Davis.  Does that -- and the review period is

15   from December 2021 to March 2022.  That give you an

16   idea of which team?

17        A    I really think that was in between like the

18   switchover.

19        Q    Okay.

20        A    So he's probably talking previously about

21   the east coast team.

22        Q    Okay.  So who was on your east coast team?

23        A    That would be Murray Douglas, Tim Jones, at

24   the time Katie Frank, myself, and then Alan at that

25   time.

Page 180

1      Q    And you said you communicate with them text,
2    phone calls, and emails?
3      A    Yes.
4      Q    What about Microsoft Teams?
5      A    In team meetings.
6      Q    But you wouldn't normally like IM each other
7    on Teams?
8      A    Not usually.
9      Q    Oaky.  So just -- I'm trying to figure out
10   if I got to snoop around in y'all's Teams stuff.  And
11   would there be a lot of teams messages or probably
12   not?
13     A    No.
14     Q    Okay.  How would Eastman react if you didn't
15   have constant communication with your teammates and
16   customers?
17              MR. BLUNT:  Objection form.
18     A    I don't know how they would react.
19     Q    Okay.  So if you just didn't answer your
20   phone for a couple of days, what do you think would
21   have happened?
22     A    They may be concerned.
23     Q    Okay.  How would they express that concern?
24     A    By reaching out to me.
25     Q    So they would notice if you weren't engaged

Page 181

```
 1    in constant communication?

 2         A    If I wasn't answering my phone, they may be

 3    concerned.

 4         Q    Okay.  What do you understand Eastman's

 5    safety philosophy to be?

 6         A    I don't know.

 7         Q    You don't know it?

 8         A    I don't know how I perceive it.  I don't

 9    know how to put it in words right now.

10         Q    Do they have a motto?

11         A    I don't know.

12         Q    So if there is a motto, you don't know it?

13         A    I don't remember it.

14         Q    Okay.  You ever been trained on their safety

15    philosophy?

16         A    I don't remember.

17         Q    Okay.  What is quote "all in for safety"

18    mean to you?

19         A    Trying to stay safe.

20         Q    Okay.  So why would a company want to be all

21    in for safety?

22         A    To keep their employees safe.

23         Q    Okay.  Just their employees?

24         A    No.

25         Q    Who else?
```

Page 182

```
 1          A     Others around them.

 2          Q     Such as?

 3          A     Just other people around them.

 4          Q     Like the public?

 5          A     Yeah.  You could say the public.

 6          Q     You think Eastman cares about public safety?

 7          A     I think they care about their employee's

 8     safety.

 9          Q     You're not sure if they care about public

10     safety?

11          A     I don't know.

12          Q     Okay.  Do you remember ever being trained on

13     Eastman's safety policies?

14          A     I don't remember.

15          Q     Okay.  How are you evaluated by your

16     supervisors on your safety?

17          A     We have a mid-year review.

18          Q     Okay.  Is that --

19          A     And end of year review.

20          Q     So how many reviews do you get a year?

21          A     Two.

22          Q     So you get one every six months?

23          A     About, yes.

24          Q     How many reviews have you had since you've

25     been employed by Eastman?
```

Page 183

Appx_0713

1        A    I don't know.  I'd have to calculate that.

2        Q    But it's more than two probably; right?

3        A    More than two, yes.

4        Q    And what are their -- as far as your safety

5    evaluations go in those reviews, what have you been

6    told about your safety performance?

7        A    Just encouraged to stay safe on the job.

8        Q    How?  How are you encouraged to stay safe?

9        A    I don't remember what the exact words were

10   of what they said.

11       Q    How do you think you stay safe on the job?

12       A    I -- I don't know.

13       Q    You don't know how to stay safe on the job?

14       A    No.  That's not what I was saying.  I don't

15   know what words to put it in right now.

16       Q    Well I mean just trying to change it up.  So

17   when you're driving, how do you stay safe?

18       A    Trying to stay aware.

19       Q    Okay.  Why?

20       A    To minimize risk.

21       Q    To whom?

22       A    Myself.

23       Q    Anyone else?

24       A    Around me.  Everyone around me.

25       Q    Okay.  So do you think Eastman has evaluated

                                        Page 184

1    you on the safety of your driving before?

2         A    I don't remember.

3         Q    Do you remember Eastman ever evaluating your

4    safety after the rear-end accident in June 2021?

5         A    I don't remember.

6         Q    Do you remember your supervisors talking to

7    you about the accident in June of 2021?

8         A    Not that I can recall right now.  I don't

9    remember.

10        Q    You remember any adverse consequences after

11   the car accident in June 2021 from Eastman?

12        A    I don't remember.

13        Q    Okay.  So are you familiar with Eastman's

14   code of business conduct?

15        A    I've seen it before.

16        Q    Look like this multi-colored PDF?

17                  (Exhibit 18 was marked for

18                  identification.)

19                  THE WITNESS:  Yes.

20   BY MR. WHITE:

21        Q    Okay.  All right.  So going to introduce

22   this as Exhibit Number 18.

23                  THE REPORTER:  Eighteen.

24   BY MR. WHITE:

25        Q    Have you seen this document before?

                                        Page 185

1       A    I've seen this, yes.

2       Q    Okay.  Tell me about how you've seen it, why

3    you recognize it.

4       A    I believe I was sent this when I was first

5    hired.

6       Q    Do you remember reviewing it?

7       A    I believe so.

8       Q    Okay.  Do you think there's a signed copy

9    acknowledging that you read it somewhere?

10      A    I don't know.

11      Q    Okay.  You don't remember signing it?

12      A    I don't remember if there was.

13      Q    Okay.  So let's go to the second page or the

14   one right after the cover page.  Says 854 on the

15   bottom right hand corner.  Second paragraph, second

16   sentence.  Can you read that for us, please?

17      A    "I encourage each of you to read it and

18   become familiar with its content so that you will be

19   equipped to make the right choice."

20      Q    And when it says "it," it means this code of

21   business conduct; right?

22      A    Yes.  I believe so.

23      Q    Okay.  Then read the next sentence.

24      A    "If you are ever in doubt as to what you

25   should do or are unclear about Eastman's expectations,

                                    Page 186

1    please contact the office of global business conduct,

2    your manager, human resources, or the law department."

3         Q    Do you ever remember contacting any of those

4    individuals or offices?  The office of global business

5    conduct, your manager, human resources, or the law

6    department about your training?

7         A    I don't remember.

8         Q    Do you ever remember asking them any

9    questions about what rules govern you as you sold

10   stuff for Eastman?

11        A    I don't remember.

12        Q    So you don't remember any contact in any of

13   those departments?

14        A    I don't remember if I did or if I didn't.

15        Q    Okay.  And we got to flip through here. Do

16   you remember what this code of business conduct says

17   about social media?

18        A    Not exactly.

19        Q    Okay.  Well tell me what you think you

20   remember?

21        A    I honestly don't remember much.  I don't

22   remember it.

23        Q    Okay.  Well how do you think you're supposed

24   to handle social media while employed with Eastman?

25        A    As professional as possible.

                                        Page 187

1          Q     Okay.  Why?

2          A     You're representing your company.

3          Q     Okay.  Do you think Eastman cares what you

4     post on social media?

5          A     I don't know.

6          Q     You think they monitor what you post on

7     social media?

8          A     I don't know.

9          Q     So it's on page 29.  That's the one ends in

10    885.  Just go to that.  Okay. So go down and look at

11    the second to last bullet point; right?  And read

12    those first two sentences.

13         A     "Do be aware of your association with

14    Eastman and online social networks.  If you identify

15    yourself as an Eastman team member, ensure your

16    profile and related content are consistent with how

17    you wish to present yourself to colleagues and or

18    stakeholders."

19         Q     Okay.  Then read the next sentence.

20         A     "Eastman's brand is best represented by its

21    team members, so what you publish may reflect on

22    Eastman's brand."

23         Q     Do you agree with that?

24         A     I could say yes.

25         Q     So you do agree?

                                        Page 188

Appx_0718

1        A     For the most part, yes.

2        Q     What do you disagree with?

3        A     I agree with the statement.

4        Q     Okay.  So why do you think it is Eastman

5   thinks your social media posts reflect on their brand?

6        A     I don't know.

7        Q     But do you think -- I mean, you agree with

8   the statement; right?  So you must understand the

9   logic of it; right?

10       A     It's just a moral respect thing for me, I

11  think.

12       Q     So what do you mean by that?

13       A     I am representing their brand, so I

14  personally would like to represent them well.

15       Q     Okay.  So do you take care to watch what you

16  post on social media.

17       A     For the most part, yes.

18       Q     Do you ever look at what you posted in the

19  past?

20       A     I don't look back on it frequently, no.

21       Q     Do you think you should?

22       A     Maybe.  I don't know.

23       Q     You think you should because you represent

24  Eastman's brand?

25       A     I don't know.

                                    Page 189

Appx_0719

1        Q    But you agree, Eastman, you know -- what you

2   post online as an Eastman employee reflects on

3   Eastman's brand?

4        A    It could be perceived that way.

5        Q    Well that's what they say here; right?

6        A    That's what they say, yes.

7        Q    And you agree with that?

8        A    I believe it could be perceived that way,

9   yes.

10       Q    Okay.  So what training has Eastman given

11  you on social media use?

12       A    I don't remember.

13       Q    Do you remember watching any modules on

14  social media use?

15       A    I don't remember.

16       Q    Do you remember ever being instructed on

17  what not to post on social media?

18       A    Don't remember.

19       Q    Do you ever remember being told to clean up

20  your social media?

21       A    I don't remember.

22       Q    Do you remember ever being told rules for

23  best conduct on social media?

24       A    I don't remember.

25       Q    Okay.  So if Eastman did train you on how to

                                        Page 190

```
 1    handle social media, it was not a very memorable
 2    training?
 3                  MR. BLUNT:  Objection, form.
 4         A    Not necessarily.
 5         Q    You just -- so it might have been memorable,
 6    but you have forgotten it?
 7         A    I just don't remember.
 8         Q    Okay.  So you don't know how Eastman
 9    supervises your social media use?
10         A    I don't know.
11         Q    What kind of consequences do you think
12    Eastman would have for you if you posted something
13    highly offensive on social media?
14         A    I don't know.
15         Q    You don't have any idea?
16         A    I don't know what Eastman would do.
17         Q    Do you have a guess?
18                  MR. BLUNT:  Objection, form.
19         A    I don't.  I don't know.
20         Q    Has anyone that you know of at Eastman ever
21    been punished for their social media posts?
22         A    I don't know.
23         Q    You never heard of anybody being punished
24    for social media posts?
25         A    Not directly from my team.
```

Page 191

```
1          Q    Have you heard about it from somebody that's
2     not on your team?
3          A    No.
4          Q    So you've never heard of somebody at Eastman
5     being punished for their social media posts?
6          A    Not that I'm aware of, no.
7          Q    Let's mark this as Exhibit Number 19.  Have
8     you ever seen that before?
9                    (Exhibit 19 was marked for
10                   identification.)
11                   THE WITNESS:  I believe I've seen this
12    before.
13    BY MR. WHITE:
14         Q    Okay.  What is it?
15         A    Just operating procedures for social
16    networking.
17         Q    Okay.  And what does it say about how to use
18    social networks?
19         A    I don't know.  I'd have to review it.
20         Q    Okay.  Go ahead and review it.  So let's
21    look at that second paragraph under procedure on the
22    first page of what we marked here as Exhibit 19.  What
23    does that paragraph say?
24         A    "The intent of this document is to define
25    appropriate use of social media being used for
```

Page 192

1    internal facing" --

2        Q    Sorry.  The paragraph below that.  Sorry.

3        A    "Eastman seeks to make use of social media

4    venues when there is a business purpose.  Eastman also

5    recognizes that social media plays an important role

6    in personal lives, including networking with other

7    professionals."

8        Q    Okay.  Is there a signed copy of this

9    somewhere that you have signed?

10       A    I don't remember.

11       Q    Do you remember ever reviewing this before?

12       A    I have seen this before.

13       Q    Do you remember being trained on it?

14       A    I don't remember.

15       Q    Have you received any training modules that

16   relate to the topics raised in this document?

17       A    I don't remember.

18       Q    So let's go to the page that ends in 912 at

19   the bottom right hand corner.  See where it says "best

20   practices"?  You see the second black bullet point

21   "Let's think twice before posting"?

22       A    Yes.  I see that.

23       Q    Can you read the bullet points beneath that?

24       A    "Privacy does not exist in the world of

25   social media.  Consider the impact a post can have on

                                          Page 193

Appx_0723

1    you and Eastman if it becomes widely known.  Be aware

2    that search engines can turn up post years after they

3    are created, and comments can be forwarded or copied."

4         Q    Do you remember being trained on this?

5         A    I don't remember.

6         Q    But you are aware of these facts

7    independently of any training; right?

8         A    Could you repeat the question, please?

9         Q    You are aware that social media posts exist

10   on the Internet, you know, in public regardless of any

11   training you've received from Eastman; right?

12        A    I'm aware of this, yes.

13        Q    Okay.  And you understand why Eastman might

14   be concerned about that; right?

15        A    I guess so.

16        Q    Okay.  So let's see.  Okay.  You agree that

17   Eastman can punish you for what you post online?

18        A    I don't know.

19        Q    Does that standard operating procedure say

20   they can punish you for what you post online?

21        A    I would have to review it.

22        Q    So you think you can post anything online

23   and Eastman -- there will be no consequences from

24   Eastman?

25                  MR. BLUNT:  Objection, form.

                                        Page 194

Appx_0724

1      A     I don't know.  I don't know.

2      Q     Never been trained on that?

3      A     I don't remember.

4      Q     So let's look at page 192.  Flip to the next

5   page.  So you see the third bullet point from the top.

6   Can you read that, please?

7      A     Which document are you talking about?

8      Q     Sorry.  The social networking SOP.  It's the

9   page that ends in 912 in the bottom right hand corner.

10  And then it's the third bullet point from the top.

11  Can you read that for us?

12     A     "Inappropriate social media use or comments

13  on both internal and external social media sites can

14  result in severe consequences, including disciplinary

15  action and termination of employment."

16     Q     Okay.  So what do you understand that to

17  mean?

18     A     Severe posts to social media could cause

19  disciplinary action.

20     Q     Including what?

21     A     Or termination.

22     Q     Okay.  So you agree that Eastman can punish

23  you for what you have posted?

24     A     That's what this says.

25     Q     Okay.  And you agree with that?

Page 195

```
 1          A     I agree, yes.  That's what this says.
 2          Q     Okay.  So you remember earlier when I asked
 3    you if you ever had any close calls with other
 4    vehicles or pedestrians?
 5          A     Yes.
 6          Q     Do you remember telling me no?
 7                    MR. BLUNT:  Objection, form.
 8          A     Could you repeat, please?
 9          Q     If you did almost hit somebody, you think
10    you would joke about it on social media?
11          A     I don't know.
12          Q     You're not sure?
13          A     I don't remember.
14          Q     You think you might?
15          A     I don't know.
16          Q     You think it's funny to almost hit people
17    and joke about it on social media?
18          A     No.
19          Q     Then why would you do it?
20          A     I don't know.
21          Q     I'm going to mark this as Exhibit
22    Number -- on 20?
23                    (Exhibit 20 was marked for
24                    identification.)
25                    THE REPORTER:  Yes, sir.
```

Page 196

Appx_0726

```
 1                    MR. BLUNT:  You got a copy for us?

 2                    MR. WHITE:  Yes, sir.  Buried in here

 3     somewhere.

 4     BY MR. WHITE:

 5          Q    Okay.  Take a look at that.  Is that your

 6     Twitter account?

 7                    MR. SCHMIDT:  Hold on.  Let's wait

 8     until we get a copy.

 9                    MR. WHITE:  Sure.

10     BY MR. WHITE:

11          Q    Is that your Twitter account?

12          A    It seems to be, yes.

13          Q    Can you read that for the camera?

14          A    Yes.  "Just almost wrecked ordering Chick-

15     fil-A on my phone while driving.  With the grace of

16     God, stopped my car just in time."

17          Q    What's the upside down smiley face mean?

18          A    I don't know.  Maybe embarrassed or -- I

19     don't know.

20          Q    What is this tweet about?

21          A    I don't remember.

22          Q    You don't remember almost hitting someone

23     because you were on your phone?

24          A    I don't think that says I almost hit a

25     person.  It says I almost hit a car.
```

Page 197

Appx_0727

1      Q    You almost wrecked.  So you do remember what

2   you almost wrecked into?

3      A    I don't remember.

4      Q    You don't remember if you almost wrecked

5   into a person or a car?

6      A    No.  I'm just going based off what it says.

7      Q    Okay.  So what do you take it to mean?

8      A    Just says I almost wrecked.

9      Q    Okay.  And what were you doing that caused

10  you to almost wreck?

11     A    It says that I was ordering Chick-fil-A.

12     Q    Not it.  Right?  You wrote this; right?

13     A    Yes.  But I do not remember.

14     Q    Okay.  So you don't remember a time when you

15  were on your phone, and you almost caused a wreck?

16     A    I don't remember this, no.

17     Q    Let's mark this as Exhibit Number 21.  Take

18  a look at that.  Is that your Twitter account?

19              (Exhibit 21 was marked for

20              identification.)

21              THE WITNESS:  That is my Twitter

22  account, yes.

23  BY MR. WHITE:

24     Q    Can you read that tweet for the camera?

25     A    "Just almost hit two girls while they were

                                            Page 198

1    walking across the road to the point where they had to

2    jump out of the way.  How's your week going?  If you

3    see this, I'm sorry.

4         Q    What are the emojis?

5         A    An upside down face and a crying face.

6         Q    What is this tweet about?

7         A    I don't remember.

8         Q    Well I mean it's in English.  So tell us

9    what it's about.

10        A    It just says that I almost hit two girls

11   while they were walking across the road.

12        Q    Okay.  And when did this happen?

13        A    This says 2018.

14        Q    Okay.  Were you in college when that

15   happened?

16        A    Yes.  I believe so.

17        Q    So where did this occur?

18        A    I don't know.

19        Q    When did it occur?

20        A    It says October.

21        Q    But you don't have any specific recollection

22   of this?

23        A    No.  Not that I remember.

24        Q    So why don't you remember almost running

25   over two people walking across the road?

Page 199

```
 1        A    I don't know.
 2        Q    Didn't make much of an impression on you?
 3        A    I don't know.  I don't remember this.
 4        Q    So it must not have been very memorable;
 5   right?
 6        A    I don't know.
 7        Q    It is memorable enough to tweet about, but
 8   not memorable enough to actually recollect.
 9        A    I don't know.
10        Q    So why would you post this on Twitter?
11        A    I don't know.
12        Q    How do you think those two girls would feel
13   about that if they knew that you joked about it on
14   Twitter?
15        A    I don't know.
16        Q    How would you feel about it if someone joked
17   about almost hitting you and joked about it on
18   Twitter?
19        A    I don't necessarily think that this is
20   joking.
21        Q    Okay.  How do you interpret the tone of this
22   tweet?
23        A    Just stating what happened.
24        Q    Is that what the upside down smiley face is
25   for?
```

Page 200

```
 1        A    It's like, "Oh.  Goodness."  Like this
 2    happened, type of thing.  It's not a joking matter.
 3        Q    So do you think nearly hitting two people
 4    with a car is a serious matter?
 5        A    I guess you could say that, yes.
 6        Q    How many other times have you almost hit
 7    people walking across the street?
 8        A    I don't know.
 9        Q    You just don't remember?
10        A    I don't know.
11        Q    So do you want to change your earlier answer
12    about having close calls with pedestrians?
13                   MR. BLUNT:  Objection, form.
14        A    I told you I don't remember.
15        Q    I think you told me no earlier this morning.
16                   MR. BLUNT:  Objection, form.  She told
17    you she didn't remember.
18                   THE WITNESS:  I don't remember.
19    BY MR. WHITE:
20        Q    So do you remember doing this now?
21        A    I don't remember the exact incident, no.
22        Q    Do you think you were on your phone when you
23    almost hit these two girls?
24        A    I don't know.
25        Q    Well how would you almost hit two people
```

                                        Page 201

Appx_0731

```
 1    walking across the road?

 2         A    I don't know.

 3         Q    You know, are there any -- I mean, do you

 4    normally hit people walking across the road when

 5    you've got your hands on ten and two and are looking

 6    straight ahead?

 7         A    I don't know.

 8         Q    I mean, does that happen so often for you

 9    that you just can't remember how often it's happened?

10         A    I don't know.

11         Q    Tell me about your thought process before

12    posting something on social media.

13         A    I feel like it's changed over the years.

14         Q    Okay.  How so?

15         A    I was still a kid in college.  I think I --

16         Q    And you were able to vote when you sent this

17    tweet.  Didn't you?

18         A    Still a kid, yes.  But --

19         Q    You could sign up for the military when you

20    sent this tweet; right?

21         A    I was over 18, yes.

22         Q    Okay.  You had a driver's license when you

23    sent this tweet; right?

24         A    Yes.  I had a driver's license.

25         Q    So what have you learned about posting on
```

Page 202

```
 1    social media since you sent this tweet?
 2         A    I'm going to -- I don't give a day by day
 3    synopsis of my day on social media.
 4         Q    So you've learned maybe don't post bad
 5    things that you've done on social?
 6                   MR. BLUNT:  Objection, form.
 7         A    I would say just anything happening.
 8         Q    So you don't post frequently on social media
 9    now?
10         A    Not as often as I used to.
11         Q    So before your current age, we're more
12    likely to get a good historical record of your day
13    public in your social media than we would now.  Is
14    that right?
15         A    No.  Not necessarily.
16         Q    Well isn't that just what you said?  You
17    post less frequently now than you used to; right?
18         A    Yes.  I said that.
19         Q    Okay.  When did Eastman give you a work
20    phone?
21         A    When I was hired.
22         Q    Okay.  In March of 2021?
23         A    Yes.
24         Q    How often do you use your work phone versus
25    your personal phone?
```

Page 203

```
 1          A     I don't have exact specifics.
 2          Q     Give me an approximation.
 3          A     I don't know.  I -- maybe 60/40?
 4          Q     In favor of personal or work phone?
 5          A     In favor of personal.
 6          Q     Okay.
 7          A     About.
 8          Q     Fair we call it 50/50?
 9          A     I'd say I use my personal phone a bit more.
10          Q     But because there's more apps on it?
11          A     I just have it on me more days.
12          Q     Okay.  Do you ever use your personal phone
13     for work purposes?
14          A     No.
15          Q     Ever call the customer on your personal
16     phone?
17          A     No.
18          Q     Ever text a customer on your personal phone?
19          A     No.
20          Q     Ever got a call or text from any of your
21     coworkers on your personal phone?
22          A     I do have my coworkers numbers.  Some of
23     them on my personal phone.
24          Q     They ever text you or call you on your
25     personal phone?
```

Page 204

Appx_0734

```
 1          A    I don't remember exactly.
 2          Q    Okay.  What training did you receive on the
 3     use of your work phone?
 4          A    I don't remember.
 5          Q    None at all?
 6          A    No.  I just don't remember.
 7          Q    Okay.  So you don't remember when you were
 8     trained on the use of your work phone?
 9          A    I don't remember when or what was trained.
10     I don't remember exactly what was taught.
11          Q    So when was the last time you received
12     training from Eastman on how to use your work phone?
13          A    I don't remember.
14          Q    Okay.  So it's not very memorable?
15          A    No.  I just -- I don't remember.
16          Q    Do you remember -- I mean tell me how you're
17     supposed to use your work phone?
18          A    To make business calls and business
19     relationships.  To answer calls.
20          Q    Any restrictions on how to use your work
21     phone?
22          A    I don't know.
23          Q    I mean surely there's some things you can't
24     do with it; right?
25          A    I try not to use social media on my work
```

Page 205

```
 1    phone.
 2         Q    Okay.  Why?
 3         A    Separate personal and work life.
 4         Q    Did you ever use social media on your work
 5    phone.
 6         A    I don't remember.
 7         Q    If you had, how would that happen?
 8         A    I don't know.  I don't have any apps
 9    downloaded.
10         Q    On your work phone?
11         A    Yes.
12         Q    Okay.  Do you send direct messages on any of
13    your social media platforms that we talked about
14    earlier?
15         A    I have before, yes.
16         Q    Okay.  Which ones?
17         A    Personal or work?  Are we --
18         Q    Either.
19         A    I've used Instagram direct messages before.
20         Q    Okay.  What about Snapchat?
21         A    I've used Snapchat messages before.
22         Q    Okay.  Have you ever Instagram messaged with
23    any customers?
24         A    There are some people that follow me on
25    Instagram from work.
```

Page 206

```
 1          Q     Do they ever send you messages?

 2          A     They have, yes.

 3          Q     Okay.  Do you ever reply to them?

 4          A     With my customers?

 5          Q     Yes.

 6          A     Yes.  I've responded to them.

 7          Q     Okay.  All right.  On your personal

 8    Instagram account?  That's the only one you have

 9    access to; right?

10          A     It's on my personal Instagram account.

11          Q     Okay.  What about on Snapchat?

12          A     I don't have customers on my Snapchat.

13          Q     Okay.  How often do you use Snapchat?

14          A     I don't know.  Frequently.

15          Q     Okay.  Let's see here.  Introduce what's

16    called Exhibit Number 21 [sic].

17                      (Exhibit 22 was marked for

18                      identification.)

19                      THE REPORTER:  Counsel, I think we're

20    on 22.

21                      MR. WHITE:  Twenty-two.  Sorry about

22    that.  Twenty-two.  Okay.  Copy.

23    BY MR. WHITE:

24          Q     Have you ever seen this before?

25          A     I believe I've seen this before.
```

Page 207

Appx_0737

1    Q    Have you been trained on this policy?

2    A    I don't remember.

3    Q    Is there a signed copy of this somewhere?

4    A    I don't remember.

5    Q    Do you remember signing it at all?

6    A    I don't remember.

7    Q    Okay.  So let's look at the first page here.

8    It says 850 at the bottom right hand corner.  There's

9    a paragraph under the word "procedure and overview."

10   Can you read the first sentence of that?

11   A    "Eastman recognizes that cell phones and

12   tablets enable significant productivity and increases

13   the speed at which decisions can be made."

14   Q    Okay.  What does significant productivity

15   mean to you?

16   A    Can make things quicker.

17   Q    Okay.  Like what?

18   A    I don't know what they're referring to

19   exactly, but it can make things quicker.

20   Q    Well in your job, what would it mean if your

21   productivity had increased?

22   A    Being able to communicate with customers.

23   Q    Okay.  What do you mean communicate with

24   customers?  You mean faster?

25   A    Yes.

Page 208

1   Q Okay.  So increased productivity to you

2 means faster, more frequent communications with

3 customers; right?

4   A Yes.

5   Q Okay.  So why did Eastman give you a work

6 phone?

7   A To communicate with customers.

8   Q Okay.  And you agree that it's in Eastman's

9 best interest for you to be communicating with your

10 customers via your work phone?

11   A You could say that, yes.

12   Q Okay.  Do you agree that Eastman has the

13 right to monitor your work phone?

14   A Yes.

15   Q Okay.  Do you agree they have the right to

16 monitor your personal phone?

17   A I don't know.

18   Q Have they ever put an app on your work phone

19 that monitors it?

20   A There is an app on my work phone, yes.

21   Q Okay.  What is it?

22   A I don't remember what it's called.

23   Q What does it do?

24   A It's the two-step authentication security.

25   Q Does it do anything else besides two-factor

Page 209

Appx_0739

1    authentication?

2         A    I don't know what else it does.

3         Q    Do you know anything else about that app?

4    Like, you know, what it's called or anything like

5    that?

6         A    No.  I don't.

7         Q    Okay.

8         A    I don't know.

9         Q    Has Eastman ever asked you to put an app on

10   your personal phone?

11        A    No.  Not that I remember.

12        Q    So to the best of your knowledge, Eastman

13   does not monitor what you do with your personal phone?

14        A    I don't know.

15        Q    Well to the best of your knowledge.

16        A    I don't know.

17        Q    I mean do you have some reason to think that

18   they are monitoring your personal phone?

19        A    No.

20        Q    Okay.  You don't use their email on your

21   personal phone; right?

22        A    No.

23        Q    So what reason do you have to think that

24   they are monitoring your personal phone?

25        A    I don't.

                                        Page 210

1      Q    Okay.  Like you said, you have never synced

2  up your personal phone with Eastman's email exchange;

3  right?

4      A    No.

5      Q    Could you?

6      A    I don't know.

7      Q    Do you have to ask permission to do that?

8      A    I think -- I don't know for sure.  I think

9  so.

10      Q    Okay.  And do you know anybody else that

11  works there that has done that?  Synced up their

12  personal phone with Eastman's email?

13      A    I've never asked.

14      Q    Okay.  What training has Eastman given you

15  about the distracted driving?

16      A    I don't remember.

17      Q    You don't remember anything?

18      A    I just don't remember.

19      Q    What do you think distracted driving means?

20      A    I don't know.  Anything that could distract

21  from driving.

22      Q    Okay.  Well that's, you know, basically,

23  repeating back distracted driving; right?  I mean is

24  there any sort of behavior you think that leads to

25  distracted driving?

Page 211

1          A    There could be a number of reasons that
2     could distract from driving.
3          Q    Tell me what you can think of.
4          A    Emergency vehicles, traffic, I mean,
5     cellular devices.  That's all I can think of right
6     now.
7          Q    Do you remember Eastman training you on
8     potential distractions?
9          A    I don't remember.
10         Q    So do you think it would concern you if all
11    Eastman salespeople did not remember they've been
12    trained on distracted driving?
13         A    I don't know.
14         Q    You wouldn't be concerned knowing that
15    you're on the road with people that don't know what
16    distracted driving is?
17         A    I don't know.
18         Q    Do distracted drivers concern you
19    personally?
20         A    I haven't thought about it.
21         Q    Okay.  Why not?
22         A    Just haven't thought about it.  I don't
23    know.
24         Q    It's not something you're concerned about?
25         A    I just haven't thought about it.

Page 212

1       Q     Okay.  So you don't remember when or where
2   you got distracted driving training from Eastman?
3       A     I just don't remember.
4       Q     Does Eastman try to keep you from texting
5   and driving?
6       A     I don't know.
7       Q     Okay.  Were you not thinking about texting
8   and driving or distracted driving on April 30, 2022?
9       A     I don't know.
10      Q     Were you unconcerned about it?  Distracted
11  driving on April 30, 2022?
12      A     I don't know.  I don't remember.
13      Q     So you're unconcerned now, but you can't
14  remember what you thought on April 30, 2022?
15      A     I don't remember what I thought on April
16  30th.
17      Q     Following the accident, you still have not
18  thought about distracted driving?
19      A     I don't know.
20      Q     Is it your testimony under oath that you
21  have not thought about distracted driving since the
22  accident on April 30, 2022?
23      A     I don't know.  I don't think about it on a
24  daily basis.
25      Q     Have you ever thought about it since the

                                        Page 213

1    accident?

2         A    I don't remember.

3         Q    So nothing?  You just -- this has not

4    occupied any of your mind since April 30, 2022?  The

5    issue of distracted driving?

6         A    No.  That's not what I said.

7         Q    Okay.  Well what --

8         A    I don't remember.

9         Q    You don't remember what you thought about?

10        A    I don't remember what I thought about.

11        Q    Okay.  Well what do you believe the

12   consequences to you would be if Eastman caught you

13   texting and driving?

14        A    I don't know.

15        Q    Do you think they'd be good?

16        A    I don't know.

17        Q    Do you think Eastman would care if you were

18   texting and driving?

19        A    I don't know.

20        Q    You think your supervisors would care if you

21   were texting and driving?

22        A    I don't know.

23        Q    When you get those ride-alongs, did you

24   watch Katie or -- who was the other guy, Corey?  Did

25   you watch them text and drive?

                                        Page 214

Appx_0744

```
 1        A    I don't remember.

 2        Q    Do you think they text and drive?

 3        A    I don't know.

 4        Q    Do -- all right.  Let's call this Exhibit

 5    Number 23.  All right.  Have you ever seen this

 6    document before?

 7                  (Exhibit 23 was marked for

 8                  identification.)

 9                  THE WITNESS:  I believe I've seen this.

10    BY MR. WHITE:

11        Q    Do you think you've ever signed it?

12        A    I don't remember.

13        Q    You think you've ever been trained on it?

14        A    I don't remember.

15        Q    Do you agree that this standard operating

16    procedure on distracted driving applied to you on

17    April 30, 2022?

18        A    Could you repeat that, please?

19        Q    Do you think that this policy applied to you

20    on April 30, 2022?

21        A    Yes.

22        Q    Okay.  Can you read the second paragraph

23    that starts with "employees" on the first page of this

24    exhibit?

25        A    I'm sorry.  Where was it again?
```

Page 215

1          Q     It's the paragraph that starts with

2     "Employees should be aware of."

3          A     Under purpose.  "Employees should be aware

4     of common causes of distractions while driving and

5     seek to minimize those distractions.

6                "Distractions include, but are not limited

7     to, using mobile devices, computers, eating, drinking,

8     talking with passengers, grooming, reading, using a

9     navigation system, watching videos, adjusting vehicle

10    equipment such as vehicle infotainment systems, and

11    climate controls."

12         Q     Okay.  So you agree that all of those are

13    distractions?

14         A     Potential distractions.

15         Q     Okay.  So you agree you need to minimize

16    those distractions?

17         A     When you can, yes.

18         Q     Is that what the policy here says?

19         A     It says to seek to minimize distractions.

20         Q     Okay.  Do you remember being trained on

21    this?

22         A     I don't remember.

23         Q     Remember doing any training modules on

24    distracted driving?

25         A     I don't remember.

                                   Page 216

1      Q    So let's go down to cell phone use while

2   driving below the procedure.  Can you read number one,

3   the paragraph right by the number one?

4      A    "Use of a handheld cell phone, including

5   smartphones, tablets, or similar devices for the

6   conduct -- conduct of company business while driving a

7   motor vehicle is prohibited.

8           "This includes, but is not limited to,

9   answering or making calls, engaging in phone

10  conversations, texting, reading, or responding to

11  emails."

12     Q    So do you think Eastman's okay with you

13  using your phone while driving for personal purposes?

14     A    I don't know.

15     Q    Do you have any idea how they feel about

16  that?

17     A    I don't know.

18     Q    Is that cause they didn't train you on how

19  to use your personal phone while driving the company

20  car?

21     A    No.  That's not what I said.  I don't know

22  how they respond --

23     Q    You just don't know?  Okay.  You agree this

24  doesn't actually talk about what to do with your

25  personal phone or for personal purposes when driving.

                                        Page 217

1   Does it?

2       A    No.  This states the conduct of company

3   business.

4       Q    Okay.  All right.  So have you ever been

5   trained on whether to use your personal phone while

6   driving a company provided vehicle?

7       A    I don't remember.

8       Q    So let's go down to number two here, and

9   start with "Use of voice activated hands-free devices

10  is permissible provided that," and you read that first

11  bullet point.

12      A    "Use allows the driver to keep hands on the

13  steering wheel and eyes on the road."

14      Q    Okay.  Now do you see where it says "Use is

15  curtailed when heavy traffic, hazardous road

16  conditions, or adverse weather is encountered"?

17      A    I do see that, yes.

18      Q    Okay.  Why do you think Eastman wants you

19  not to use a hands-free device depending on traffic

20  conditions?

21      A    I don't know.

22      Q    Why do you think whether or not you should

23  use a hands-free device changes depending on traffic

24  conditions?

25      A    It could be a distraction.

Page 218

Appx_0748

```
 1          Q    Okay.  Why do you think a hands-free device
 2     can be a distraction in certain traffic conditions?
 3          A    I don't know.  I feel like anything could be
 4     a distraction while driving.
 5          Q    Okay.  Why?
 6          A    I don't know.
 7          Q    Well I mean, you just said anything can be a
 8     distraction when driving; right?
 9          A    Yes.
10          Q    Okay.  So how is it that anything can be a
11     distraction while driving?
12          A    It takes away some attention from the road.
13          Q    So you agree you need to keep your full
14     attention on the road when you're driving?
15          A    Try to, yes.
16          Q    But you should; right?  You should try to
17     keep your full attention on the road; right?
18          A    You should try, yes.
19          Q    Okay.  Who at Eastman is responsible for
20     making sure you are not engaging in distracted
21     driving?
22          A    I don't know.
23          Q    Do you think anybody is responsible for
24     that?
25          A    I don't know.
```

Page 219

1     Q    Do you think anybody was checking on whether
2  or not you are engaged in distracted driving at
3  Eastman?
4     A    I don't know.
5     Q    When was the last time a supervisor talked
6  to you about distracted driving before the accident on
7  April 30, 2022?
8     A    I don't remember.
9     Q    Are you still driving for Eastman?
10    A    I still drive, yes.
11    Q    Are you still an outside sales
12 representative?
13    A    I am still an outside sales representative.
14    Q    And you still work in the whole territory
15 from Wacco to Brownsville?
16    A    I work in Wacco down to Brownsville,
17 excluding San Antonio.
18    Q    And you have a company car for that purpose
19 presently?
20    A    I have a rental currently.
21    Q    Okay.  Why do you have a rental?
22    A    We're waiting on a company vehicle that was
23 ordered.
24    Q    Have you been waiting since the accident on
25 April 30, 2022?

Page 220

Appx_0750

 1          A    No.

 2          Q    Okay.  Tell me about that.  What happened to

 3     the -- did you get another vehicle after the accident

 4     on April 30th?

 5          A    No.

 6          Q    Okay.  So well explain to me how you ended

 7     up in a rental now?

 8          A    I had a rental after the accident.  We

 9     didn't order the vehicle until September.

10          Q    And that's the one you're still waiting on?

11          A    Yes.

12          Q    Okay.  So you've been in the rental ever

13     since the accident?

14          A    Not the same rental, but a rental.

15          Q    Okay.  But that's a rental provided to you

16     paid for by Eastman?

17          A    Yes.

18          Q    That you use for work purposes?

19          A    Yes.

20          Q    And you also drive it for personal purposes?

21          A    Yes.

22          Q    Okay.  Have you been in any accidents since

23     the April 30, 2022, accident?

24          A    I don't remember.

25          Q    Well I mean, did something happen?

                                        Page 221

```
 1        A    I don't remember.  I don't remember if -- if
 2   I'm thinking of the one from before the accident or
 3   after.  If there was one after.
 4        Q    So you're talking about the Austin rear-end
 5   case?
 6        A    Yes.
 7        Q    Right?  So you told me earlier that was in
 8   June of 2021; right?  About 3 months after you were
 9   hired in your original Ford Explorer.
10        A    Yes.  That was June 2021.
11        Q    Okay.  But you're thinking maybe there was
12   another one since April 30, 2022, in one of these
13   rentals?
14        A    I did get hit.
15        Q    Okay.  Where did that happen at?
16        A    On 105.
17        Q    Okay.  When did that happen?
18        A    I don't know the exact date.
19        Q    Okay.  Well what happened?
20        A    They pulled out in front of me and hit me.
21        Q    So somebody -- kind of draw me a diagram
22   here.  Like you're on 105.  Was that a divided highway
23   or is it a two-lane highway?
24        A    It's not a highway.
25        Q    Okay.  What is 105?
```

Page 222

1        A     It's a road that goes through Conroe.

2        Q     Okay.  So how many lanes are on that road?

3        A     Three on each side.

4        Q     Three on each side.  Okay.  So can somebody

5   that's perpendicular to the lanes going to pull out

6   into the lane?

7        A     There's turn lanes in the middle of the six

8   lanes.

9        Q     Okay.  So what you're saying is -- correct

10  me if I'm wrong.  Somebody was in the turning lane,

11  and they turned in front of you.  Is that right?  Like

12  they were turning left from their perspective across

13  your lane of traffic?

14       A     Yes.

15       Q     Okay.  Where did they hit you?

16       A     They pulled in front of me.

17       Q     Okay.  So where did you hit them?

18       A     On their right side.

19       Q     Did you get a ticket?

20       A     No.  They did.

21       Q     All right.  What has been the outcome of

22  that wreck?

23       A     That was with Hertz rental, so I notified

24  Hertz and my manager.

25       Q     Was anybody hurt in that accident?

Page 223

```
 1          A     No.

 2          Q     You weren't hurt?

 3          A     No.

 4          Q     And do you have a sense of whether this

 5     happened early this year or was this later in 2022?

 6          A     I don't remember.

 7          Q     Happened in Conroe, you said?

 8          A     Conroe.

 9          Q     What county is that?

10          A     Montgomery County.

11          Q     Okay.

12                     MR. BLUNT:  You good or you need to

13     take a break?

14                     THE WITNESS:  I think I need to pee.

15                     MR. WHITE:  Okay.  Let's go off the

16     record.  Let's take a five-minute break.

17                     THE VIDEOGRAPHER:  2:34, we're off the

18     record.

19                     (Off the record.)

20                     THE VIDEOGRAPHER:  This is the

21     beginning of file number 4, the deposition of Caylee

22     Smith.  Time is 2:47.  We're on record.

23     BY MR. WHITE:

24          Q     Okay.  Caylee, we were just talking about

25     your accident on 105 in the Conroe area.  Do you
```

                                        Page 224

1    recall that?

2         A    Yes.

3         Q    Was there a police report made about that?

4         A    There was, yes.

5         Q    Okay.  Did the police make a fault

6    determination?

7         A    Yes.

8         Q    And who did they hold at fault?

9         A    The other driver.

10        Q    Okay.  Did you have to give that police

11   report to Eastman?

12        A    I don't remember.

13        Q    Do you remember who you gave it to if

14   anyone?

15        A    I don't remember.

16        Q    Do you remember, you know -- well okay.  Let

17   me take a step back.  You got a rental after the

18   accident on April 30, 2022.  What was that vehicle?

19        A    I don't remember.  I've been in about five

20   different vehicles.

21        Q    Okay.  So what happened with the first of

22   the rentals following the accident?

23        A    It was just time for an oil change.

24        Q    And so they swapped you into a new one?

25        A    Switched it out.

Page 225

1      Q    Did you have any accidents in the first
2   rental?
3      A    No.
4      Q    So in the second rental, what kind of
5   vehicle is that?
6      A    I don't remember which one was in what
7   order.
8      Q    Did you get any accidents in the second
9   rental?
10     A    It was -- no.  An oil change.  Just switch
11  out.
12     Q    So in a third one, do you remember what kind
13  of rental that was?
14     A    No.
15     Q    Do you remember why it got switched to the
16  next one?
17     A    No.  I don't remember.
18     Q    Did you get in an accident in that rental?
19     A    I think it was just the oil change again.
20     Q    So then on the fourth rental, was that the
21  one you got in an accident in?
22     A    I believe so.
23     Q    Okay.  And then was it because of the
24  accident they switched you to a new rental?
25     A    Yes.

                                    Page 226

1        Q    Okay.  So what rental are you in now?
2    Because I take it you're in the fifth rental now;
3    right?
4        A    I don't know exactly what number.
5        Q    Okay.
6        A    But I am in a Chevy Traverse.
7        Q    Okay.  Any accidents in the Chevy Traverse?
8        A    No.
9        Q    Any close calls in the Chevy Traverse?
10       A    Not that I can remember.
11       Q    Okay.  Do you agree that it's needlessly
12   dangerous to text and drive?
13       A    Could you repeat that, please?
14       Q    Do you agree that it's needlessly dangerous
15   to text and drive?
16       A    Yes.  It can be dangerous.
17       Q    But do you agree it's needlessly dangerous
18   to text and drive?
19       A    It can be dangerous.
20       Q    Well I'll ask you one more time.  Is it
21   needlessly dangerous?
22       A    It can be unsafe.  I don't know if it'd be
23   needlessly dangerous.
24       Q    Was there any reason to ever take the risk
25   of texting and driving?

                                          Page 227

Appx_0757

```
 1          A    I don't know.
 2          Q    I mean shouldn't you always pull over and
 3     then send or read a text?
 4          A    You should definitely try to.
 5          Q    Okay.  Why would you ever not pull over to
 6     send a text message?
 7          A    I don't know.
 8          Q    Okay.  Is it important to not text and
 9     drive?
10          A    To try not to.
11          Q    Okay.  Why?
12          A    It could be a distraction.
13          Q    Would it be wrong to text and drive?
14          A    Some people may say so.
15          Q    Do you say so?
16          A    It could be a distraction.
17          Q    Do you think that makes it wrong?
18          A    It could be frowned upon.
19          Q    But do you frown upon it?
20          A    I think you should try and avoid it.
21          Q    Okay.  Why?
22          A    It could be a distraction.
23          Q    You think distractions while you're driving
24     are bad?
25          A    It's a distraction from driving.
```

Page 228

Appx_0758

1      Q    Do you think a person of ordinary prudence
2  would not text and drive?
3      A    I don't know.
4           MR. BLUNT:  Objection, form.
5  BY MR. WHITE:
6      Q    What do you think an ordinarily character
7  person would do when they get a text message on their
8  phone?
9      A    I don't know.  I mean I think everyone tries
10 to avoid texting and driving.
11     Q    And you think that's what a reasonably
12 careful person would do?
13     A    I guess so.  Maybe.
14     Q    Guess so, maybe?  Is that a yes or is that a
15 maybe?
16     A    I can't speak on behalf of anyone else, but
17 I think it's unsafe or it could be deemed unsafe.
18 So -- a distraction, so you try not to.
19     Q    Okay.  You think it's needlessly dangerous
20 to take your eyes off the road when you're driving?
21     A    It could be a distraction.
22     Q    Well now I'm asking if you take your eyes
23 off the road.  Do you think that's needlessly
24 dangerous?
25     A    It could be.

Page 229

Appx_0759

1          Q      Okay.  Why?

2          A      Because you're not fully focused on the

3     road.

4          Q      Is it important to keep your eyes on the

5     road when driving?

6          A      To try to, yes.

7          Q      Okay.  Do you think a person of ordinary

8     prudence would try to keep their eyes on the road?

9                    MR. BLUNT:  Objection, form.

10         A      I don't know.

11         Q      Now you don't think people driving down the

12    road are supposed to keep their eyes on the road?

13         A      I think they are.

14         Q      Okay.  You think that's what most normal,

15    careful people do?

16         A      They should try to.

17         Q      So why do you think careful people try to

18    keep their eyes on the road?

19         A      To stay focused.

20         Q      Because it's safe for everybody?

21         A      Because it could be safer, yes.

22         Q      Do you think that it's dangerous for people

23    to keep their eyes off the road?

24         A      It could be.

25         Q      Okay.  Can you think of any situation where

Page 230

1    not having your eyes on the road driving around is not

2    dangerous?

3         A    No.

4         Q    Okay.  Do you think it's needlessly

5    dangerous to speed over the speeding limit?

6         A    It could be.

7         Q    Okay.  Is it important not to speed?

8         A    To try not to.

9         Q    Okay.  Why?

10        A    Just to try and obey the speed limit that's

11   posted.

12        Q    So you would follow speed limits just

13   because that's the law, not because you think that's

14   safe?  Is that right?

15        A    Well I feel like the speed limit is set for

16   a reason.

17        Q    Okay.  What reason?

18        A    To try and keep drivers safe.

19        Q    So you think the speed limit tells

20   everybody, "Hey.  If you're driving faster than this,

21   you're not being safe to other people on the road"?

22        A    I mean it's set for a reason.  I don't know

23   their reasoning, but that could be, yes.

24        Q    But you think it's probably safety?

25        A    It could be, yes.

Page 231

1      Q     Do you think it's safe to go over the speed

2   limit?

3      A     In some instances, maybe.

4      Q     Okay.  When?

5      A     In the flow of traffic.

6      Q     Okay.  Tell me more.

7      A     Sometimes traveling in the flow of traffic

8   could be safer than going slower than the flow of

9   traffic.

10      Q     Okay.  Like what?

11      A     Just traveling on the highway.

12      Q     Okay.  So can you think of instances where

13   you think it's safer to speed than not speed?

14      A     I don't know any exact scenarios.

15      Q     When you're talking about flow of traffic,

16   you mean like being on the interstate; right?

17      A     Not just the interstate.

18      Q     Okay.  So do you think that someone driving

19   above the speed limit is maybe making everybody safer?

20      A     No.  Not necessarily.

21      Q     Okay.  When do you think -- I mean, you did

22   just say you think sometimes you have to go faster to

23   stay with the flow of traffic; right?

24      A     Yes.

25      Q     Okay.  How often is it that you have to stay

Page 232

```
1    with the flow of traffic rather than get over to a
2    slower lane?
3         A    I don't know how often.
4         Q    Okay.  But it sounds like in your
5    experience, you would go with the flow of the -- or
6    the speed in the lane that you're in rather than
7    switch to a slower lane.
8         A    Not always, no.
9         Q    Okay.  But how often do you drive in the
10   fast lane?
11        A    I don't know how often.
12        Q    So if you saw people in the fast lane going
13   over the speed limit, but there was a slower lane to
14   your right, what would you do?  Would you stay in the
15   flow of traffic in the left lane, or would you get to
16   the right?
17        A    I don't know.
18        Q    What do you think's safer?  Staying in the
19   speed limit in the slower lane or staying above the
20   speed limit in the fast lane?
21        A    I guess you could say slowing down --
22   staying in the slower lane.
23        Q    Okay.  Is that what you think?
24        A    I guess that could be deemed safer.
25        Q    But do you think it's safer?
```

Page 233

Appx_0763

1      A     Yeah.  It could be safer.

2      Q     Okay.  So do you agree that when going 85

3  miles an hour or over, it's even more needlessly

4  dangerous to text and drive?

5      A     It could be perceived that way, yes.

6      Q     Perceived by whom as dangerous?

7      A     Anyone.

8      Q     So does that include you?

9      A     Yes.

10     Q     So you think that it is -- even more so than

11  just speeding or just texting and driving, going over

12  85 miles an hour and texting and driving is even more

13  dangerous, needlessly dangerous, than doing either of

14  those two things separately?

15     A     It could be perceived more dangerous, yes.

16     Q     By you?

17     A     Yes.

18     Q     So you do think it's more dangerous.

19     A     I believe it could be dangerous, yes.

20     Q     Do you believe there's instances where it's

21  not dangerous?

22     A     No.  Not necessarily.

23     Q     You think it's important to not text and

24  drive while you're going over 85 miles an hour?

25     A     To try not to.

Page 234

1          Q     Okay.  Why?

2          A     Because it's a distraction.

3          Q     And it would be wrong for someone to drive

4    over 85 miles an hour and text and drive?

5          A     It could be perceived that way, yes.

6          Q     Perceived by whom?

7          A     Anyone.

8          Q     Do you think it's wrong to text and drive

9    while going over 85 miles an hour?

10         A     Yes.

11         Q     Okay.  Do you think that texting and driving

12   while going over 85 miles an hour is extremely risky?

13         A     It could be perceived that way.

14         Q     Okay.  So you keep saying that.  Like it

15   could be perceived that way, but I'm asking you.  Do

16   you think that it is dangerous or that it's wrong to

17   drive over 85 miles an hour and to text and drive.

18         A     It shouldn't be done, no.

19         Q     Okay.  Because it's dangerous; right?

20         A     Yes.  It could be dangerous.

21         Q     You agree it's extremely dangerous to go

22   over 85 miles an hour and text and drive?

23         A     I agree that it could be dangerous, yes.

24         Q     Okay.  Well you just -- you agreed it was

25   dangerous, but you don't seem to agree that it's

Page 235

Appx_0765

1    extremely dangerous.  You think it's not extremely

2    dangerous to text and drive while going over 85 miles

3    an hour?

4        A    I don't know what you would refer to as

5    extremely compared to just dangerous.

6        Q    Okay.  So you don't see a large increase in

7    risk from it just being dangerous to being extremely

8    dangerous?

9        A    I would in my own words say that yes, it is

10   dangerous to text while driving when over 85.

11       Q    You mean it's very dangerous?

12       A    I would say it's dangerous.

13       Q    Okay.  But you won't say it's very

14   dangerous?

15       A    I think it is dangerous to text and drive

16   going over 85.

17       Q    Okay.  Would you say it's as dangerous as

18   walking down a sidewalk?

19       A    I don't -- I don't know.

20       Q    So why is it worse to ignore the rule

21   against texting and driving when going 85 miles an

22   hour?

23       A    Could you repeat that, please?

24       Q    Why is it worse to ignore the rule against

25   texting and driving when you're going 85 miles an hour

Page 236

```
 1    as opposed to when you're not speeding?
 2         A    Did you say worse to ignore the rule?
 3         Q    Worse to ignore the rule, yes.
 4         A    I don't know.
 5         Q    Do you agree that texting while driving is
 6    as dangerous as drinking and driving?
 7         A    In my personal opinion, no.
 8         Q    Okay.  Have you ever heard anyone at Eastman
 9    compare texting and driving to -- excuse me.  Compare
10    texting while driving to drinking and driving?
11         A    I don't remember.
12         Q    So no one at Eastman has ever made that
13    comparison to you?
14         A    I don't remember.
15         Q    Okay.  How much experience do you have with
16    drinking and driving?
17         A    I don't know.  Experience?
18         Q    I mean, have you ever done it?
19         A    Not that I'm aware of, no.
20         Q    Okay.  So you wouldn't -- through first-hand
21    experience, you wouldn't know what's more dangerous,
22    texting and driving or drinking and driving.  Would
23    you?
24         A    From observation I would.
25         Q    So do you observe people drinking and
```

Page 237

```
 1    driving often?

 2         A    Not often.

 3         Q    When have you observed people drinking and

 4    driving?

 5         A    My father.

 6         Q    Okay.  So you got first-hand experience of

 7    people that are intoxicated while driving?

 8         A    Yes.

 9         Q    Okay.  Have you ever been in a car with

10    someone who's texting and driving?

11         A    Yes.

12         Q    Okay.  So would you agree that it is unsafe

13    to be in a car with someone that's texting and

14    driving?

15         A    Yes.  It could be.

16         Q    Okay.  Let's pull up -- we're going to call

17    Exhibit Number 24.  Video.  Don't worry.  This is not

18    a gory video or anything like that.  Okay.  So I'm

19    going to play a video that looks like Eastman was

20    partially sponsored in.

21                    (Exhibit 24 was marked for

22                    identification.)

23                    (Video played.)

24    BY MR. WHITE:

25         Q    All right.  So I want you to go back.  Let's
```

                                        Page 238

Appx_0768

```
 1     go back to minute 40 or 39 here.  So you're going to
 2     see a glimpse of a distracted driving simulation on
 3     this laptop here.  I want you to tell me what you see.
 4                    (Video played.)
 5     BY MR. WHITE:
 6         Q     Okay.  What do you see on that little laptop
 7     down there?
 8         A     A red car.
 9         Q     Okay.  Where is that red car located in the
10     lane?
11         A     Left tires are over the white line.
12         Q     Okay.  So they're partially on the shoulder,
13     partially in the lane; right?
14         A     Yes.
15         Q     All right.  Let's keep watching.
16                    (Video played.)
17     BY MR. WHITE:
18         Q     All right.  I'm going to skip forward to
19     about the two minute mark.  Okay?
20         A     Okay.
21                    (Video played.)
22     BY MR. WHITE:
23         Q     Is that Eastman's logo?
24         A     It looks to be, yes.
25         Q     Okay.
```

Page 239

```
 1                    (Video played.)
 2    BY MR. WHITE:
 3         Q    What does that T-shirt say there at the 2:20
 4    mark on this exhibit?
 5         A    I can't quite read the last word, but it
 6    says driving while D-I-S-T.
 7         Q    All right.  Well we'll go back a little bit
 8    so you can read it.
 9                    (Video played.)
10    BY MR. WHITE:
11         Q    Can you read any of it?
12         A    I think it's just driving while -- I don't
13    know if it's distracted or distracting.
14         Q    Okay.  What does it say below that in red
15    font?
16         A    The new DUI.
17         Q    Have you ever been offered one of those
18    shirts by your employer?
19         A    No.
20         Q    So tell me about the day before the
21    accident, Friday, April 29th?
22         A    The day before the accident?
23         Q    Where did you go to work that day?
24         A    I worked from home.
25         Q    Okay.  Where did you go other than your home
```

Page 240

1    that day?

2         A    I was babysitting.

3         Q    Okay.  When and where, and for whom?

4         A    It was at the 13339 Hidden Manor Court

5    address.

6         Q    Is that where you were living at?

7         A    Yes.

8         Q    Okay.  So you were babysitting someone at

9    your house?

10        A    It was my roommate's kid.

11        Q    Okay.  You said earlier that you lived

12   alone.  Did I get that wrong?

13        A    13339.  When was this?

14        Q    April 29th.  The day before the --

15        A    Oh.  2022, not 2021.

16        Q    Yeah.

17        A    I was living in Livingston at this time.  I

18   was not living there.

19        Q    Okay.  So what did you do the day before --

20   or what did you do April 29, 2022?

21        A    I worked from my computer, my office day.

22   Worked from my phone, and I babysitted.

23        Q    Okay.  Who were you babysitting?

24        A    My friend Sarah Wilger's kid.

25        Q    Was Sarah your roommate at the time?

Page 241

1       A     Not at the time.

2       Q     Okay.  How old was the kid that you were

3    babysitting?

4       A     That was April.  She was almost one.

5       Q     Okay.  So walk me through the beginning of

6    that day.  Did you wake up at your Livingston house?

7       A     Yes.

8       Q     Okay.  And we're talking about the 29th, the

9    Friday before the accident; right?

10      A     Yes.

11      Q     So you get up and then what?

12      A     I don't remember exactly what I did that

13   day.

14      Q     Yeah.  But when did you start babysitting

15   the kid?

16      A     I don't remember what time.

17      Q     Okay.

18      A     Sometime during that day.

19      Q     Okay.  So were you able to work and babysit

20   at the same time?

21      A     I was able to answer emails and texts, yes.

22      Q     Okay.  So how long did you babysit the

23   child?

24      A     A handful of hours.

25      Q     Okay.  And did Sarah come to pick up the

                                          Page 242

```
1    child?
2         A    No.  It was at her house.
3         Q    Oh.  It was at -- so you were at her house?
4    You were working from her house?
5         A    At 13339.  That's where it was, yes.
6         Q    Okay.  Okay.
7         A    I just was not living there.
8         Q    Okay.  So did you wake up at 13339 Friday?
9         A    No.
10        Q    So you woke up at your house?
11        A    Yes.
12        Q    Started working?
13        A    I would answer emails, answer calls, answer
14   texts.
15        Q    And then you went over to Sarah's house?
16        A    Yes.
17        Q    Okay.  And that's when you started
18   babysitting at her house?
19        A    Yes.
20        Q    Sarah went somewhere?
21        A    Yes.
22        Q    Where did she go?
23        A    To get her hair done.
24        Q    Okay.  And so you were babysitting while she
25   got her hair done.  How long do you think you were
```

Page 243

1    over at Sarah's house?

2         A    I don't know exactly.

3         Q    Okay.  Were you driving the 2021 Ford

4    Explorer to and from your house to Sarah's house?

5         A    Yes.

6         Q    Okay.  So what did you do after you were

7    done babysitting at Sarah's?

8         A    I went home.

9         Q    Okay.  To the home at Livingston?

10        A    Yes.  I believe so.

11        Q    Okay.  When did you do that?

12        A    I don't remember.

13        Q    You said you believe so.  You think there's

14   a reason you have gone somewhere else in between?

15        A    I don't think there is.  I just don't

16   remember exactly.

17        Q    Okay.  When you got home, you remember what

18   time it was?

19        A    I don't remember.

20        Q    What did you do when you got home?

21        A    I don't know.  I went home alone.  I was

22   home by myself.

23        Q    Okay.  Did you do anything to prepare for

24   your work conference that following Monday?

25        A    It's possible I packed maybe.

                                      Page 244

1          Q     Okay.  What do you think you would have
2     packed?
3          A     Work clothes, computer, iPad.
4          Q     Okay.  So you have an iPad?
5          A     Yes.
6          Q     Okay.  Is that yours or is that provided by
7     Eastman?
8          A     That's Eastman's.
9          Q     Okay.  Any other electronics provided by
10    Eastman at the time of the accident?
11         A     No.
12         Q     So all my questions about apps and what on
13    the phone.  Are there any -- what sort of apps you
14    have on that iPad?
15         A     Anything that's on the phone is on the iPad.
16    I don't use the iPad very often.
17         Q     Okay.  What do you do with it?
18         A     Same measures as the phone.
19         Q     Okay.  So where did you eat the evening of
20    April 29, 2022?
21         A     I don't remember.
22         Q     Do you remember who you hung out with that
23    evening?
24         A     No.  I don't remember.  I don't remember if
25    I did or didn't.

                                        Page 245

Appx_0775

1      Q    Okay.  Do you remember how late you stayed

2   out April 29, 2022?

3      A    I don't know exactly, but I -- I don't think

4   I stayed out late.

5      Q    Any reason to think you took any drugs or

6   consumed any alcohol on the 29th?

7      A    Definitely not.

8      Q    Okay.  Now are you on any prescription

9   drugs?

10      A    I am on a prescription medication.  Not

11   currently.

12      Q    Were you on one at the time of the accident?

13      A    I was on a prescription, yes.

14      Q    Okay.  What was the prescription?

15      A    Desvenlafaxine.

16      Q    Not try to spell that, but what's that for?

17      A    Depression and anxiety.

18      Q    When were you diagnosed with depression

19   and/or anxiety respectively?

20      A    It was not diagnosed by a professional until

21   2019 or 2020.  I can't remember exactly.

22      Q    And you were diagnosed with both depression

23   and anxiety at the same time?

24      A    Yes.

25      Q    Okay.  By whom?

Page 246

```
 1        A    I can't remember the doctor's name.
 2        Q    Is he in Livingston?
 3        A    No.
 4        Q    Okay.  So you sort of made it sound like
 5   maybe you had these conditions before you were
 6   diagnosed.  Does that sound right?
 7        A    Yes.
 8        Q    And what makes you think that?
 9        A    I struggled with depression in college.
10        Q    Okay.  But you didn't get pharmaceutical
11   intervention until 2019 or 2020?
12        A    Yes.  That's correct.
13        Q    And that drug, what was like the frequency
14   of the dosage that you take that?
15        A    You take it once a day.
16        Q    Okay.  What were the side effects?
17        A    I didn't have any side effects.
18        Q    Okay.  Was there anything that you couldn't
19   take with it?  It would cause like weird interaction
20   that you were aware of?
21        A    No.
22        Q    Okay.  Why was there lidocaine in your Ford
23   Explorer?
24        A    I get ulcers on my mouth sometimes.
25        Q    Okay.  So you just kind of kept it in there
```

Page 247

Appx_0777

1    just in case you had an ulcer?

2         A    Yes.

3         Q    Okay.  So do you remember when you went to

4    sleep on April 29, 2022?

5         A    No.  I don't remember.

6         Q    Okay.  Do you remember how much sleep you

7    got that night?

8         A    I know that I sleep a lot as a person, so --

9         Q    Okay.

10        A    I don't remember when exactly I went to

11   sleep, but --

12        Q    Okay.  Do you remember when you woke up on

13   April 30, 2022?

14        A    I don't remember the exact time, no.

15        Q    Do you know where you woke up?

16        A    At my home in Livingston.

17        Q    All right.  Anybody with you?

18        A    No.

19        Q    All right.  How did you feel when you woke

20   up that morning?

21        A    Normal.

22        Q    Okay.  Did you take your prescription that

23   Saturday as well?

24        A    I did, yes.

25        Q    Okay.  What did you do that Saturday morning

Page 248

1    before you headed north for Dallas?

2         A    I was at my home.

3         Q    Okay.  Anything else?

4         A    Not that I can remember.

5         Q    Do you remember communicating with anyone on

6    your team or with Eastman that morning?

7         A    I don't remember.

8         Q    Do you remember having to go anywhere for

9    work purposes that morning?

10        A    On Saturday?  No.

11        Q    None.  So do you remember who all you

12   communicated with at all Saturday morning, April 30th?

13        A    I know I had spoke with Gracie.

14        Q    Okay.  Do you remember your supervisor

15   texting you the morning of April 30th?

16        A    I don't remember.

17        Q    If I told you that that did happen; right?

18   I'm quite certain of it.  Who would it be?

19        A    Possibly Chris if it did.

20        Q    What would he have been texting you about?

21        A    I don't know.  Possibly the conference.

22        Q    Do you think he would have had you go get

23   anything before you left for Dallas?

24        A    I don't remember.

25        Q    Okay.  So walk me through the morning to the

Page 249

1    best of your recollection.  You wake up, then what?

2         A    I typically make a cup of coffee and hang

3    out at the house.

4         Q    Okay.

5         A    If I don't have anything planned, lay around

6    in bed.

7         Q    Sure.  Hey.  God Bless America; right?  So

8    when do you think that you decided to leave for

9    Dallas?

10        A    I don't know.

11        Q    Do you remember when you left?  Like when

12   you got on I-45 to head north for Dallas?

13        A    No.  I don't remember the exact time.

14        Q    So we say that the accident happened

15   approximately around three o'clock in the afternoon;

16   right?  How long does it typically take you to get

17   from Houston to Dallas -- or from your home in Houston

18   to Dallas?

19        A    I would say it takes about three and a half

20   hours.

21        Q    Okay.  So say roughly, you were halfway

22   there; right?  So does it sound about right that you

23   left the Houston area around one that afternoon?

24        A    I don't know exactly.  I don't remember.

25        Q    Okay.  So do you think before you headed

Page 250

1    north for Dallas, do you have any recollection at all

2    about what you did in Houston area?

3        A    I just remember I left from my home that

4    morning.

5        Q    Okay.  So I'm going to tell you.  Right?

6    We've downloaded the module on the vehicle; right?

7    We've downloaded what Brian will give me of your cell

8    phone; right?

9        A    Yes.

10       Q    And it's got GPS coordinates; right?  And we

11   don't know some things, but I know that you started

12   driving your Ford Explorer at 10:30 that morning.  Do

13   you remember where you went at 10:30 that morning?

14       A    No.

15       Q    Does that sound crazy that you went

16   somewhere at 10:30 in the morning?

17       A    No.

18       Q    Okay.  You just don't remember?

19       A    I don't remember, no.

20       Q    Okay.  I mean that's a pretty big gap;

21   right?  So you left approximately at noon or one

22   o'clock to head to Dallas.  And 10:30 or so you're

23   doing something, and you don't remember?

24       A    I don't remember.  It's possible I may have

25   gone to the gym.

Page 251

Appx_0781

```
 1        Q    Okay.  Do you know which gym?

 2        A    It was called Sweat Shop.

 3        Q    Okay.  Where is that at?

 4        A    In Livingston.

 5        Q    Do you remember which phone your supervisor

 6    texted the morning of April 30, 2022?

 7        A    I feel like it would have to be my work

 8    phone, but I'm not for sure.

 9        Q    Okay.  You think it's possible he texted

10    your personal phone?

11        A    I don't know that he has my personal number.

12        Q    But you're not sure which supervisor it was;

13    right?

14        A    I don't know who.

15        Q    Okay.

16        A    I don't remember.

17        Q    Did anybody else text, call or email you the

18    morning before noon on April 30, 2022?

19        A    I don't remember.  I'd have to go back and

20    check.

21        Q    Okay.  If you had it all in front of you,

22    what would you check?

23        A    My texts in my phone.

24        Q    What about your email?

25        A    I would have to check my email on my work
```

Page 252

1    phone.

2        Q    Do you remember anyone accompanying you that

3    morning on April 30, 2022?

4        A    No.

5        Q    How many times have you driven from Dallas

6    to Houston on I-45?

7        A    I don't know how many times.

8        Q    You know, you said that in a way it's

9    like -- is it too many times to count or it's just

10   hard to say?

11       A    I make that trip frequently.

12       Q    Okay.  How frequently?

13       A    I don't know frequently.  I mean, I go up

14   for special events and birthdays and holidays.

15       Q    Okay.  Is that because most of your family

16   is in the Dallas area?

17       A    Yes.

18       Q    Okay.  When you said special events, what do

19   you mean?

20       A    Graduations, of that nature.

21       Q    Okay.  So like you said, you do that drive

22   frequently.  So you know, we also when we downloaded

23   the module, we know to the extent we have it how fast

24   you were going basically every second or like the last

25   two hours of your trip.  You understand that?

Page 253

```
 1          A     Yes.
 2          Q     Okay.  So what that means is that, you know,
 3     your answers -- if you don't remember, that's fine
 4     because we've got data on it.  But you know your
 5     answers will be compared to that data at some point;
 6     right?  Do you understand that?
 7          A     Yes.  I understand that.
 8          Q     Okay.  Okay.  So on your personal iPhone, do
 9     you have like facial recognition lock on it?
10          A     Yes.
11          Q     Okay.  So tell us how that works.
12          A     If the screen is in front of you and it
13     recognizes a face, it will unlock.
14          Q     Okay.  About how close does your face have
15     to be to unlock it?
16          A     I don't know.
17          Q     Fair enough.  I didn't know either until I
18     started thinking about it; right?  But you do keep
19     that on your personal phone; right?
20          A     Yes.
21          Q     Do you keep it on your work phone too?
22          A     I don't know.
23          Q     Okay.  Do you use the same passcode for both
24     phones?
25          A     No.
```

Page 254

```
1        Q     Okay.  So but you just can't remember if you
2    use the facial unlock on your work phone?
3        A     Yeah.  I can't remember.
4        Q     Okay.  And when I say your work phone -- do
5    you have the same work phone now that you did at the
6    accident?
7        A     No.
8        Q     Okay.  So when I say -- my questions from
9    here on out unless I specify otherwise are about the
10   phones in your possession on April 30, 2022.  Okay?
11       A     I understand.
12       Q     Okay.  So you don't leave your phone
13   unlocked I take it; right?
14       A     No.
15       Q     Okay.  Tell me who Gracie Roberts is.
16       A     She's a friend.
17       Q     Okay.  How do you know her?
18       A     I met her in high school.
19       Q     So you've known her for a long time?
20       A     There was a period of time where we didn't
21   speak.  Just distance friends, and then we rekindled.
22       Q     Not a falling out, just didn't stay in
23   touch?
24       A     Just distance, yeah.  Just didn't stay in
25   touch.
```

Page 255

1      Q    Okay.  So did she not go to college with

2   you?

3      A    No.

4      Q    Okay.  So what's your relationship like with

5   Gracie as of April 30, 2022?

6      A    Very close.

7      Q    Okay. How so?

8      A    We would speak on a pretty frequent basis.

9      Q    Okay.  About what?

10     A    Everything.

11     Q    Yeah?  Did y'all hang out frequently?

12     A    Yes.

13     Q    Okay.  Did you text and email frequently?

14     A    We didn't email.

15     Q    Sure.  Right.  What about Snapchat?

16     A    I don't remember if she has Snapchat or not.

17     Q    Okay.  Facebook Messenger?

18     A    No.

19     Q    So mostly sending messages back and forth on

20   your iPod?

21     A    Mostly text messages.

22     Q    Mostly text messages.  On April 30, 2022,

23   she lived in Prosper, Texas; right?

24     A    That's where her mother's address was.

25     Q    Okay.  Okay.  And was her mother's address

Page 256

```
 1    1240 Vista Run Drive?

 2         A    I would have to confirm.  I don't remember

 3    her exact address.

 4         Q    Okay.  But you've been at her mother's house

 5    before?

 6         A    Yes.  I have been.

 7         Q    How many times?

 8         A    A handful.

 9         Q    Does Gracie live with her mom?

10         A    At the time, partially.

11         Q    Okay.  So if Gracie said, "Hey.  Come hang

12    out," would you have known to go to Gracie's mom's

13    house, or would you have thought maybe there's a

14    different place to go hang out?

15         A    There could have been a different place too.

16         Q    Okay.  Okay.  So was Gracie kind of

17    unstable, or she was trying to get her housing figured

18    out?

19         A    No.  She had her own house as well or condo,

20    but she was at her mom's a lot.

21         Q    How come?

22         A    Just to help with her kids.

23         Q    So Gracie has kids?

24         A    Yes.

25         Q    On April 30th, how many kids did Gracie
```

Page 257

Appx_0787

```
 1   have?

 2        A    She has two.

 3        Q    Two?  She had two at that time?

 4        A    She had two at that time.

 5        Q    Okay.  Well what are their ages if you know?

 6        A    Three and two.

 7        Q    Okay.  Now do you know if you were texting

 8   Gracie on April 30, 2022?

 9        A    I did, yes.

10        Q    Okay.  Why do you recall that?

11        A    We were planning on a trip.  My trip going

12   up there.

13        Q    Okay.  Okay.  So how'd you read your text

14   messages to her on April 30, 2022?

15        A    How did I read text messages?

16             MR. BLUNT:  Objection, form.  You said

17   to her.  Do you mean from her?

18             MR. WHITE:  No.  To her.

19   BY MR. WHITE:

20        Q    How'd you read the text messages to you from

21   Gracie on April 30, 2022?

22        A    I don't know if I understand.

23        Q    Well they come to your phone; right?  Your

24   personal phone?

25        A    Yes.
```

                                        Page 258

Appx_0788

1        Q    Okay.  So are they showing up on your phone?

2        A    Yes.

3        Q    Okay.  So how do you read them?

4        A    If I'm not in my vehicle, at home

5   beforehand, I would just read them off of the phone.

6        Q    Okay.  So if your phone is sitting there and

7   you hear it -- I take it you get a notification ding

8   when they arrive?

9        A    I don't know if my sound was on.  I think it

10   vibrated.

11        Q    Okay.  Okay.  So then once you got a

12   notification of some kind, you hold the phone up to

13   your face, and would you see it on the lock screen?

14   The message?

15        A    You could.

16        Q    Okay.  But how would you do it?

17        A    If I unlocked it, I -- if I was going to

18   reply immediately, I would open it up to the text

19   messages.

20        Q    Okay.  So if you hold it up to your phone,

21   your face to your phone -- or if you hold your phone

22   up to your face, it would unlock the phone; right?

23        A    Yes.  You would have to slide up after.

24        Q    Slide up after with your finger; right?

25        A    Yes.

Page 259

```
 1          Q    And then will the message just be there, or
 2      you have to click on the message app?
 3          A    It depends if the message app was already
 4      opened or not.
 5          Q    Okay.  Okay.  So do you remember texting her
 6      as you drove north on Interstate 45 on April 30, 2022?
 7          A    I believe I did.
 8          Q    Okay.  What were you texting her about?
 9          A    I -- I believe there was a couple things.
10          Q    What do you remember?
11          A    I know I was supposed to go to a concert
12      with her on Sunday.
13          Q    Okay.  What concert?
14          A    Justin Bieber.
15          Q    Okay.  So you're talking about a Justin
16      Bieber concert?
17          A    Yes.
18          Q    What else are you talking about?
19          A    Tattoos.
20          Q    Okay.  What about tattoos?
21          A    About getting a tattoo.
22          Q    Okay.  What kind of tattoo were y'all
23      talking about getting?
24          A    I don't remember what she wanted, but I
25      wanted something in memory of my mom.
```

Page 260

```
 1          Q     Okay.  Like what?
 2          A     It's a half butterfly, half an angel wing.
 3          Q     Have you actually gotten that tattoo since
 4     then?
 5          A     I did, yes.
 6          Q     Okay.  Is that the one on your left arm?
 7          A     The back of my left arm, yes.
 8          Q     Can you show it for the camera?  Just so --
 9                MR. WHITE:  You got it?  Okay.  Thank
10     you.
11     BY MR. WHITE:
12          Q     Did you guys have tickets to the Justin
13     Bieber concert?
14          A     Yes.
15          Q     I saw something in there about a suite.
16     Like did somebody have suite tickets?
17          A     Her stepdad.
18          Q     Okay.  What's her stepdad do?
19          A     I don't know what his job position is.
20          Q     How'd he get suite tickets to a Justin
21     Bieber concert?
22          A     He had suite tickets -- season tickets for
23     the Stars, and that's where the concert was being
24     held.
25          Q     Okay.  So he just had extra tickets to the
```

Page 261

1    suite that you guys could go use?

2         A    He gets first dibs on concert tickets since

3    he has season suite tickets.

4         Q    Okay.  And do you remember when you and

5    Gracie made the plan to go see Justin Bieber?

6         A    I don't remember exactly, no.

7         Q    You remember how far in advance it was of

8    the trip on April 30th?

9         A    No.  I don't remember.

10        Q    Do you have any sense of how far in advance

11   she knew that her dad had some spare tickets?

12        A    I don't know.

13        Q    Okay.  Who else did you text on April 30,

14   2022?

15        A    I believe I texted my brother.

16        Q    Okay.  Anybody else?

17        A    I know I texted some people after.

18        Q    After the accident?

19        A    Yes.

20        Q    We'll get to that.  I mean, you already told

21   me about sending something to your supervisor; right?

22        A    Yes.

23        Q    Anything else before the accident?  Anyone

24   else you would have sent text to?

25        A    It's possible, but I don't remember.

Page 262

1    Q    Okay.  Do you think you sent any messages
2   over social media platforms?  Snapchat, Facebook,
3   Instagram, any of the ones we talked about earlier?
4    A    I don't remember.
5    Q    Have you checked your social media platforms
6   to see?
7    A    I believe I checked before this, yes.
8    Q    Okay.  And you haven't found anything?
9    A    I don't think so.
10   Q    Have you downloaded your Snapchat archive?
11   A    I don't know how to do that.
12   Q    Only way to do it.  Right.  So you ever got
13   on the settings to save all of your prior sent snaps?
14   A    No.
15   Q    Okay.  So if we ask you to do that, though,
16   will you do it?
17   A    I -- I believe so if I can.
18   Q    Is there any reason for you to think that
19   any of your snapchats have been deleted?
20   A    No.
21   Q    Okay.  Or to any other of your social media
22   messages?
23   A    No.
24   Q    Okay.  Did you send any emails on April 30,
25   2022?

Page 263

```
 1        A    I don't remember.

 2        Q    Would you have sent any from your Gmail,

 3   from your Yahoo, or from your Eastman email?

 4        A    I don't remember.  I'd have to check.

 5        Q    Have you checked?

 6        A    I believe so, but I don't remember if there

 7   was or wasn't anything.

 8        Q    Have you done anything to preserve your

 9   emails?

10        A    I have not deleted anything.

11        Q    Okay.  But have you done anything to stop

12   any background deletion that might be happening?

13        A    I don't know.

14        Q    So you haven't?

15        A    I don't know how.

16        Q    Okay.  So you told us you don't think there

17   were any direct -- like direct messages on any of your

18   social media platforms on April 30th.  Can you say

19   that definitively that there weren't any messages on

20   your social media platforms?

21        A    I can't say 100 percent.  I don't know.

22        Q    Okay.  How fast were you driving on

23   Interstate 45 on April 30, 2022?

24        A    I don't remember exactly.

25        Q    Give me a range.
```

Page 264

1        A     I don't -- I mean I was going the speed

2    limit or above.

3        Q     Okay.  You think you ever went below the

4    speed limit?

5        A     It's possible.

6        Q     So but you're pretty certain you were going

7    above the speed limit?

8        A     I believe so.

9        Q     Why?

10       A     I don't know.  I just would either go the

11   speed limit or a couple miles over normally.

12       Q     So it's your habit to go over the speed

13   limit?

14       A     I don't make a habit of it.

15       Q     But you expect that you probably were that

16   day?

17       A     It's possible.

18       Q     Okay.  So if I showed you the range of your

19   speeds, what do you think the bottom end would be and

20   the top end would be for your trip on Interstate 45

21   that day?

22       A     I don't know.

23       Q     No idea?  No recollection at all how fast

24   you were going?

25       A     I don't know how fast I was going, no.  I

                                              Page 265

1    don't remember.

2         Q    Any guess about what your lowest speed would

3    be that day?

4         A    No.

5         Q    No guess about your highest speed that day?

6         A    I don't remember.

7         Q    I mean, you think you went over 100?

8         A    I don't think so.

9         Q    Could you tell me definitively you never

10   went over 100?

11        A    No.  'Cause I don't remember.

12        Q    I mean, most people don't go over 100 very

13   often; right?  Would you agree with that?

14        A    Yes.

15        Q    So you're not sure if you went over 100 that

16   day?

17        A    I don't remember.

18        Q    But you can't tell me no?

19        A    I can't tell you yes or no.

20        Q    What's the speed limit on Interstate 45?

21        A    I think it changes.

22        Q    Okay.  Where?

23        A    I don't know where.  I just know that it's

24   75 where I was.

25        Q    So how do you know that?

                                        Page 266

1          A      The speed limit sign.

2          Q      Okay.  So you do remember the speed limit

3    sign?

4          A      For the majority of that drive, it is 75.

5          Q      But where the accident happened, you knew

6    the speed limit was 75?

7          A      Yes.

8          Q      Okay.  So if we have data saying that you

9    were doing over 90 for parts of that trip, do you have

10    any reason to dispute that?

11          A      I don't remember doing it, but if that's

12    what the data says, then it's possible.

13          Q      So that's not totally outside your character

14    to go over 90 on Interstate 45?

15          A      I don't normally do that, no.

16          Q      Okay.  Why do you think you're doing it in

17    this situation?

18          A      I don't know.  I can't say.  I don't

19    remember.

20          Q      Were you in a rush to get to Gracie's house?

21          A      No.

22          Q      Then why were you going over 90?

23          A      I don't know.  Possibly with the flow of

24    traffic.

25          Q      So the flow of traffic on I-45 in all three

                                             Page 267

Appx_0797

1   lanes northbound was over 90?

2        A    No.  Not necessarily.

3        Q    Okay.  So then why would you go over 90 on

4   Interstate 45?

5        A    I can't say why I did.  I don't -- I don't

6   know.

7        Q    Is it possible you were distracted and

8   weren't paying attention to your speed?

9        A    I don't know.

10       Q    Well how else would you forget if you were

11  over 90?

12       A    I don't -- I don't know.

13       Q    Okay.  A lot of your answers are I don't

14  know; right?  You understand that?

15       A    Yes.  I understand.

16       Q    And obviously, you're entitled to say, "I

17  don't know."

18       A    Yes.

19       Q    But you're going to get to a point where you

20  going to start saying that you do remember certain

21  things; right?

22       A    Yes.

23       Q    You understand how it looks if only the

24  things that you remember are things that are good for

25  you.  You don't seem to remember anything --

                                        Page 268

Appx_0798

```
 1                    MR. DUBOFF:  Jacob, are you giving her
 2     advice or is there a question somewhere in her future?
 3                    MR. BLUNT:  Yes.  Objection, form.  If
 4     you want to ask a question, ask a question, but don't
 5     lecture her.
 6     BY MR. WHITE:
 7        Q    You understand that; right?
 8                    MR. DUBOFF:  She doesn't have to answer
 9     a question about you giving her advice about how her
10     answers are going to be perceived.
11                    You know that's inappropriate.  You
12     know you should stop, so we don't need to have a
13     stupid fight about you advising our client.
14                    MR. SCHMIDT:  First, I think Brian's
15     defending the depo, respectfully.
16     BY MR. WHITE:
17        Q    So you don't remember how fast you were
18     going that day.
19        A    I don't remember exactly how fast I was
20     going.
21        Q    Do you remember approximately how fast you
22     were going?
23        A    No.
24        Q    Okay.  Do you use cruise control on that
25     Ford that you were driving that day?
```

Page 269

```
 1        A    I've used it before.

 2        Q    Were you using it on that trip?

 3        A    I don't think I was.  I don't remember.

 4        Q    Why not?

 5        A    I don't know.  Sometimes I choose to use it,

 6   sometimes I don't.

 7        Q    It's a long trip though; right?

 8        A    It's a normal trip for me, so I wouldn't

 9   necessarily consider it long.

10        Q    So you wouldn't use cruise control on a

11   three and a half hour interstate trip?

12        A    Sometimes, maybe.  Yes.

13        Q    Okay.  But not on April 30, 2022?

14        A    I don't remember if I did or not.

15        Q    Do you remember texting Gracie and telling

16   her that you were running behind because your boss

17   asked you to do something in Houston?

18        A    I don't remember.

19        Q    Do you remember how fast you were driving

20   when you sent Gracie that text?

21        A    No.  I don't.

22        Q    And you don't remember what your boss texted

23   you to do in Houston?

24        A    No.  I don't remember.

25        Q    Okay.  You don't remember which boss sent
```

Page 270

1    you that text?

2         A    No.  I don't remember who texted me that

3    day.

4         Q    Okay.  Let's introduce what we're going to

5    call Exhibit Number --

6                   MR. WHITE:  Help me out, Court

7    Reporter.

8                   (Exhibit 25 was marked for

9                   identification.)

10                   THE REPORTER:  Twenty-five.

11                   MR. WHITE:  Twenty-five.

12                   THE WITNESS:  Is it 25?

13                   MR. DUBOFF:  Yeah.  The video was 24.

14                   MR. BLUNT:  Oh.  Kimberly, do you have

15    more stickers?

16                   THE REPORTER:  Yes, sir.

17                   MR. BLUNT:  Thank you.

18                   THE REPORTER:  You're welcome.

19    BY MR. WHITE:

20         Q    Okay.  So have you seen these before?

21    What's marked as Exhibit 25?

22         A    Yes.  I've seen this.

23         Q    Okay.  What are these?

24         A    Text messages between me and Gracie.

25         Q    Okay.  So what is the date in these text

                                        Page 271

1    messages?

2          A      April 30, 2022.

3          Q      You agree that you -- at least the ones that

4    are in blue, you sent to Gracie on April 30, 2022?

5          A      Yes.  That's what this is.

6          Q      And you agree that the ones that are in gray

7    are ones that Gracie sent to you on April 30, 2022?

8          A      Yes.

9          Q      Okay.  So do you know how many text messages

10   there are in total in this text thread?

11         A      I don't know how many there are, no.

12         Q      Okay.  Do you think there's over ten?

13         A      Are you referring to outgoing or ingoing?

14         Q      Both.

15         A      Yes.  More than ten.

16         Q      You think there's more than 20?

17         A      I would have to count.  It seems yes.

18         Q      And more than 30?

19         A      It looks like it, yes.

20         Q      Do you think there are more than 40?

21         A      Possibly.  I don't know.

22         Q      You think there are more than 50?

23         A      I don't know.  I haven't counted it.

24         Q      Do you think you could have sent and

25   received over 60 text messages with Gracie on your

                                        Page 272

```
1    drive up on Interstate 45 on April 30, 2022?

2         A    That I sent?

3         Q    That you sent and received.

4         A    It's possible.

5         Q    Okay.  Do you have any reason to think there

6    are any text messages missing from this?

7         A    Not that I'm aware of.

8         Q    Do you see any photos in this text thread?

9         A    No.  There's no photos.

10        Q    Do you see any movies?

11        A    No.  There's none.

12        Q    Do you see any pins sent or received by you?

13        A    Pins?  Could you --

14        Q    Like locational pins?

15        A    No.

16        Q    Okay.  So do you think if those exist,

17   they're just not in this group of text messages that

18   you're looking at; right?

19        A    If -- yeah.  I guess that's possible.

20        Q    So let's flip to the second page here.  Can

21   you read the first full text message from you to

22   Gracie?  Starts "about to leave Houston."

23        A    "About to leave Houston.  Had to pick

24   something up for my work conference next week.  My

25   boss texted me this morning about it."
```

Page 273

Appx_0803

1        Q     So you had a work conference in the Dallas
2    area on Monday following April 30, 2022; right?
3        A     That is correct.
4        Q     Where?
5        A     In Fort Worth.
6        Q     Okay.  What was the purpose of that
7    conference?
8        A     I think it was a team's meeting to get
9    everyone together since we're all in different
10   locations.
11       Q     Okay.  So which team?
12       A     Performance films.
13       Q     Okay.  So how many people were attending
14   that sales conference?
15       A     I would have to give a rough estimate.  I
16   don't know.
17       Q     That's fine.
18       A     Maybe twenty-five, thirty.
19       Q     Coming from all over the United States?
20       A     Yes.
21       Q     Where were they flying into?
22       A     Dallas Fort Worth airport.
23       Q     Okay.  Do you remember how many people other
24   than salespeople, or was it just salespeople?
25       A     No.  There was other people as well.

Page 274

1        Q    Okay.  Who else?

2        A    I don't know exactly, but I think marketing,

3    some marketing people.

4        Q    And were they part of that 25 people that

5    were showing up, or were there more than 25 people?

6        A    No.  That was part of --

7        Q    Okay.  Okay.  So you're thinking

8    approximately 25 Eastman employees were coming for a

9    conference in Fort Worth?

10       A    Somewhere around there.

11       Q    Okay.  Where were they coming from?

12       A    All over.

13       Q    Okay.  So northern United States, eastern,

14   western, everywhere?

15       A    Yes.

16       Q    Okay.  But where were they all going to

17   stay?

18       A    I don't remember exactly the hotel name, but

19   a hotel in Fort Worth.

20       Q    Okay.  Who was paying for the hotel?

21       A    Eastman.

22       Q    Okay.  Were you going to stay at the hotel?

23       A    Yes.

24       Q    Okay.  Who -- were you going to eat at the

25   hotel?

Page 275

1      A    I don't know what dinner plans or lunch

2    plans were.  I think we had scheduled dinner

3    reservation somewhere.

4      Q    Okay.  So do you remember being assigned to

5    pick up some people from the airport on Monday?

6      A    Yes.  I remember that.

7      Q    Tell me what you remember about that.

8      A    I can't remember exactly the specific names,

9    but I was scheduled to pick up people from the airport

10   because I was driving in and had a vehicle.

11     Q    Okay.  So you were going to pick people up

12   from the airport on Monday; right?

13     A    Yes.

14     Q    And then drive them to the hotel Fort Worth?

15     A    Yes.  I believe that was the plan.

16     Q    Okay.  Was your attendance required at this

17   conference?

18     A    Yes.  You had to have a very good reason to

19   miss.

20     Q    Okay.  Why was that?

21     A    It was just asked of us to show up.

22     Q    So because you guys got together so

23   infrequently, you know, it was like, "Hey.  You got to

24   come to this"?

25     A    Not necessarily.

Page 276

Appx_0806

1       Q    Okay.  Well how come?  They just sort of --
2    tell me.
3       A    They just had a curriculum and stuff they
4    wanted us all to go over in here.
5       Q    Do you know what that curriculum was?
6       A    It was emailed to me, but I don't remember
7    it all.
8       Q    Was it safety stuff or was it sales stuff or
9    marketing stuff?
10      A    I don't remember exactly.
11      Q    Any reason to think there was safety stuff
12   involved?
13      A    I don't remember.
14      Q    Okay.  Any reason to think you would do some
15   training modules at this conference?
16      A    I don't know.
17      Q    Okay.  Let's -- don't put this up yet, but
18   let's set it to the side.  On to Exhibit Number --
19               THE REPORTER:  Twenty-six.
20               MR. WHITE:  Twenty-six.
21               (Exhibit 26 was marked for
22               identification.)
23   BY MR. WHITE:
24      Q    Do you remember sending this email marked as
25   Exhibit Number 26?

                                          Page 277

```
 1        A    I don't remember the exact moment of sending
 2   this, but yes.  I remember being in contact with Tammy
 3   Jones.
 4        Q    Okay.  Can you read your email to Tammy
 5   Jones?
 6        A    Yes.  "I was heading up to Dallas for the
 7   conference on Monday morning."
 8        Q    And was that in response to asking you why
 9   you were driving north on Interstate 45 on April 30,
10   2022?
11        A    Could you repeat that?  Sorry.
12        Q    Was your email in response to Tammy asking
13   you why you were driving north on Interstate 45 on
14   April 30, 2022?
15        A    She asked if I was working during the time
16   of the incident -- or was I -- during my time off.
17        Q    All right.  And your response was that you
18   were headed north for the work conference on Monday
19   morning; right?
20        A    That was my response, yes.
21        Q    Okay.  Did you tell her about any other
22   purpose you had?
23        A    I did not.
24        Q    Okay.  Why not?
25        A    I don't remember.
```

Page 278

1    Q    Okay.  Let's introduce -- we're going to

2    call it Exhibit Number 27.  It's a email from Carrie

3    Rice.  Who is Carrie rice?

4              (Exhibit 27 was marked for

5              identification.)

6              THE WITNESS:  Our inside sales rep.

7    BY MR. WHITE:

8    Q    Okay.  So what is the difference between an

9    inside sales rep and an outside sales rep?

10   A    She takes care of the day-to-day account

11   management with documents, new account forms,

12   sometimes takes orders from us.

13   Q    Okay.  So it looks like she's the one

14   organizing pick up times.  Is that what you gather

15   from this email?

16   A    Yes.  That's what this looks like, yes.

17   Q    Okay.  So if you go to the second page, and

18   the bottom right hand corner is 829, do you see where

19   it has your name at the top of the page?

20   A    Yes.

21   Q    What does it say?

22   A    "Caylee driving.  Coordinate to pick up at

23   airport at 12 noon.

24   Q    Okay.  So you were going to be picking up

25   Alan, Drew Berry [ph], and Mark Schaub [ph]?

Page 279

Appx_0809

```
 1          A     Yes.   That's what I was supposed to do.
 2          Q     Okay.   So they needed you to be at the
 3     Dallas -- Eastman needed you to be at the Dallas
 4     airport Monday morning?
 5          A     At noon.
 6          Q     At noon.   Okay.   Did you have any other
 7     reason to drive up to Dallas on Saturday, April 30,
 8     2020?
 9          A     I was going up to visit family and go to the
10     Justin Bieber concert.
11          Q     Okay.   Let's introduce what we'll call
12     Exhibit Number 28.   Okay.   Do you recognize this?
13                     (Exhibit 28 was marked for
14                      identification.)
15                     THE WITNESS:   Yes.
16     BY MR. WHITE:
17          Q     All right.   What is this?
18          A     It looks like my team's calendar.
19          Q     Okay.   So on the first page here, what does
20     that show on April 26th of 2022?
21          A     It's a core monthly release sales meeting.
22          Q     What is that?
23          A     Just going over our software and any updates
24     to it.
25          Q     Okay.   And what is this Friday, April 29th?
```

Page 280

Appx_0810

1      A     Four S west region team meeting.

2      Q     Okay.  Is that the region that you work in?

3      A     Yes.

4      Q     Okay.  So what was going on at 10 a.m. on

5   that Friday the 29th?

6      A     We have a meeting scheduled every two weeks

7   to just get up to date and go over any news.

8      Q     So you think you did that at Sarah's house

9   on Friday the 29th?

10      A     I don't remember exactly what time I got to

11   Sarah's.

12      Q     Okay.  So it's possible you did this meeting

13   at home and then went to Sarah's afterwards?

14      A     It's possible.  I just don't remember.

15      Q     Okay.  Let's go to the second page here.

16   Now you'll notice that there's nothing here for

17   Saturday, April 30th between the first or second page.

18   You see that?

19      A     Yes.

20      Q     Do you think there would have been any

21   scheduled dates?

22      A     No.  This is my work phone.

23      Q     Okay.  So do you have a personal calendar on

24   your personal phone?

25      A     Not that I use.

Page 281

```
 1          Q    Okay.  Do you use any calendaring apps?

 2          A    Not really, no.

 3          Q    Do you keep, like, a hand calendar?

 4          A    No.

 5          Q    How do you keep track of your dates?

 6          A    I guess occasionally I'll put them in my

 7     calendar if I do have it -- an event.

 8          Q    So when you say your calendar, you mean your

 9     personal work calendar?

10          A    My personal --

11          Q    Personal phone calendar.  Sorry.

12          A    Yes.

13          Q    Okay.  Do you still have it on your phone?

14          A    I have my calendar on my phone.

15          Q    Okay.  Any reason to think that would have

16     been deleted or anything like that?

17          A    No.

18          Q    Okay.  So on this work calendar here, for

19     May 2nd and 3rd and 4th, this shows that you've got

20     the national four S team meeting.  Is that right?

21          A    Yes.  That is correct.

22          Q    When was that scheduled?

23          A    I don't remember exactly when it was

24     scheduled.

25          Q    So it must have been before this email from
```

Page 282

Appx_0812

1    Carrie Rice on April 22, 2022; right?

2         A    Yes.  We were notified there would be a team

3    meeting.

4         Q    Okay.  Like a big conference?

5         A    The national team meeting.

6         Q    Okay.  So any -- do they tell you that in

7    March, tell you that in February?

8         A    I don't remember.

9         Q    Do you have any guess?  I mean, how would

10   they have told you?

11        A    They may have gone over it on a team call.

12        Q    Okay.  You think there was an email

13   somewhere?

14        A    I couldn't say for sure, yes or no.

15        Q    Do y'all keep minutes from your team

16   meetings?

17        A    Minutes as in?

18        Q    Like a record of what's discussed.

19        A    I'm not sure if they're recorded or not.

20        Q    Okay.  Does anyone like circulate like,

21   "Hey.  Here's what we talked about, here's what we

22   decided," and circulated to everybody after a team

23   meeting?

24        A    Not usually.

25        Q    Okay.  But maybe sometimes?

                                    Page 283

1          A     It's possible.

2          Q     Okay.  But you don't remember when you were

3     sent these Team's calendar invites for the national

4     conference?

5          A     No.  I don't remember exactly.

6          Q     Okay.  So what is the Four S COVID house

7     arrest group.  What does that mean?

8          A     That was a group that was created before I

9     was hired.

10         Q     Okay.  But you're a member of that group?

11         A     They added me to the group.

12         Q     Okay.  So who's in that group?

13         A     There's a number of employees.

14         Q     Are they all salespeople at Eastman?

15         A     I think there's a few trainers as well.

16         Q     Okay.  How many people would you say is in

17    that group thread?

18         A     Approximately around ten to twelve maybe.

19         Q     Okay.  And what do you all talk about in

20    that thread?

21         A     Work, mainly things that come up at work.

22         Q     Okay.  Any time people share memes or

23    anything like that?  Is it also a funny thread?

24         A     Yes.

25         Q     Okay.  Like what sort of stuff will people

                                        Page 284

```
1     put on there?
2          A     Just things that maybe that irked them that
3     day or --
4          Q     That what that day?
5          A     Irked them.
6          Q     Irked them.  Okay.
7          A     Sorry.
8          Q     No.  You're fine.  So it's not purely work?
9          A     No.  Not purely work.
10         Q     Okay.  So what is the text message
11    "Cardboard Craig is taking a nap now," what does that
12    mean?
13         A     There was a cardboard cutout of one of our
14    trainers at our training facility.
15         Q     Okay.  And say, people like put it on the
16    ground and make jokes about it or something?
17         A     Yes.  I assume that's what they were
18    referring to.
19         Q     What training facility?
20         A     There's a training facility for window film
21    and paint protection film in Houston.
22         Q     All right.  Where's that at?
23         A     I think it's roughly around Jersey Village
24    area.
25         Q     Had you ever been there before?
```

Page 285

Appx_0815

1        A    I have been there before, yes.

2        Q    So is it Eastman's training facility?

3        A    Eastman performance films', yes.

4        Q    Okay.  So -- now is Eastman performance

5    film, do you have an office there at the training

6    facility?

7        A    No.

8        Q    Okay.  So a lot of these questions I've been

9    talking to Eastman, Eastman, Eastman.  At any point

10   you give me an answer distinguishing between Eastman

11   Chemical Company and Eastman Performance Films?

12       A    Eastman Performance Films is just our team

13   name.

14       Q    Okay.

15       A    Our division, our film -- window film and

16   paint protection film that's sold.

17       Q    Okay.  But at no point in this deposition

18   have you answered a question based on a kind of

19   distinction between Eastman the company and Eastman

20   performance film?

21       A    No.

22       Q    Okay.  So how often have you been at this

23   training facility?

24       A    I've been a few times.

25       Q    Okay.  Do you remember when?

Page 286

1          A     No.  I don't remember when exactly.

2          Q     What would you have been trained on there?

3          A     I don't know that I was trained

4    specifically.  It's for candidates that are going to

5    be an installer.

6          Q     Okay.  So this is a facility to teach

7    installers how to install those films?

8          A     Yes.

9          Q     Did you go there to learn how to install the

10   film so you could work on the plotters?

11         A     No.

12         Q     So -- and who is this -- so Craig is one of

13   the trainers?

14         A     Yes.

15         Q     Okay.  How many people work at this training

16   facility?

17         A     I'm not sure.  It's a new development.

18         Q     Okay.  Well I mean, it was around when you

19   were hired I take it; right?

20         A     I don't think it was open to candidates yet.

21   It was just our trainers being trained on the film

22   again.

23         Q     Okay.  We'll come back to that.  So on April

24   30, 2022, do you remember Gracie sending you a pin

25   with the location where to meet her?

                                        Page 287

Appx_0817

1        A    It's possible.  I don't know.

2        Q    Where do you think she would sent that pin

3   to -- what do you think your destination for that pin

4   would have been?

5        A    It would have either been her mom's house or

6   her house.

7        Q    Okay.  And you've been to both your mom's

8   house and her house before?

9        A    Yes.

10       Q    Okay.  Before April 30, 2022?

11       A    Yes.

12       Q    Okay.  How many times for each?

13       A    A handful.

14       Q    Are they close together?

15       A    They're probably around 15 minutes from each

16   other.

17       Q    So they're both in the Prosper, Texas area?

18       A    Prosper and Celina.

19       Q    Celina.  Okay.  So how do you use pins that

20   are sent to somebody or sent to you via text message?

21       A    By clicking on it and it opens Apple Maps.

22       Q    Okay.  And then what happens when it opens

23   Apple Maps?

24       A    It'll have the directions for you.

25       Q    Okay.  Does it show anything else?

Page 288

Appx_0818

1          A     It shows the map.

2          Q     Okay.  Does it also show the ETA?

3          A     I don't think when you first click it, it

4     does.

5          Q     When you first click the pin?

6          A     Yes.

7          Q     Well after you click the pin and it opens on

8     Apple Maps, Apple Map shows you the ETA; right?

9          A     Yes.

10         Q     Okay.  So did Gracie send you videos or

11    photos while you were driving on April 30, 2022?

12         A     Possibly.

13         Q     Okay.  What do you do when she sends you a

14    photo or a video on April 30, 2022?

15         A     I look at it.

16         Q     Okay.  How do you do that?

17         A     Open the text thread and look at it.

18         Q     Okay.  So if your phone is locked, how do

19    you go from a locked phone to looking at a photo that

20    Gracie sent you?

21         A     Unlocking it and looking at the text thread.

22         Q     So you grab the phone, put it in front of

23    your face, and then either the text threads already

24    open or then you got to click into the text thread;

25    right?

                                        Page 289

```
 1          A     Well I do have a magnetic mount.  So a lot
 2     of times it can just pick up your face without having
 3     to take it off --
 4          Q     Okay.  So --
 5          A     -- and unlocking it.
 6          Q     Well we'll get to that; right?  But you
 7     think the facial unlock recognizes your face from the
 8     mount?
 9          A     It could, yes.
10          Q     Okay.  Do you think it does that easily or
11     do you think you have to move your head for it to see
12     your face?
13          A     The mount is in the vent, so I don't think
14     it obstructs the view of my face to unlock.
15          Q     Okay.  So it automatically unlocks, and then
16     you click into the thread and then you can -- would
17     you click on the photo to make it bigger?
18          A     Sometimes.  I don't know.
19          Q     Okay.  What about a video?
20          A     It's possible I could have watched it.
21          Q     Okay.  But if you open the text thread to
22     watch the video, you have to click on the video;
23     right?
24          A     Yes.
25          Q     Okay.  And then it fills up the whole screen
```

Page 290

1    on your phone; right?

2         A    I think there's two ways you can watch it.

3         Q    Okay.  What are the two ways?

4         A    I think you can watch the video without

5    opening it bigger in the text thread.

6         Q    Okay.  How do you do that?

7         A    I think you just push the play button.

8         Q    Just once?

9         A    I think so.

10        Q    If you want to make it big, how do you do

11   it?

12        A    Click around the whole picture.  Not just

13   the play button.

14        Q    Okay.  Okay.  Did you ever pull over to look

15   at the photos and video she sent you on April 30,

16   2022?

17        A    Not that I remember.

18        Q    Okay.  So you probably looked at them as you

19   were driving down the road; right?

20        A    It's possible.

21        Q    Would you say it's likely?

22        A    It is possible, yes.

23        Q    But not likely?

24        A    I feel like possible and likely are very

25   similar, yes.

Page 291

1      Q    They're not.  Possible and probable are

2  different.  So do you think it's probable that you

3  pulled over or do you think it's probable that you

4  looked at the text messages as you drove down the

5  road?

6      A    It's probable that I opened it while

7  driving, yes.

8      Q    Okay.  So why were you texting her about

9  getting tattoos?

10     A    It was something spontaneous we wanted to

11  do.

12     Q    All right.  So there wasn't a big plan to

13  drive to Dallas to get tattoos like a week before this

14  accident happened?

15     A    It wasn't part of the original plan, no.

16     Q    Okay.  So why did you guys come up with

17  this?

18     A    I wanted to get mine because the anniversary

19  of my mom's death was on that Wednesday.

20     Q    Okay.  I'm sorry to hear that.  And so you

21  just sort of -- you all kind of thought this up while

22  you were texting each other on the drive up Interstate

23  45?

24     A    Yes.

25     Q    Okay.  And you recall telling her that you

Page 292

Appx_0822

```
 1    should both get tattoos that evening?

 2         A    I believe that's what I told her, yes.

 3         Q    Yeah.  Well the text messages are there, so

 4    you can look at them if you want to be certain.

 5         A    Yes.  It was discussed on the way there.

 6         Q    Okay.  So do you remember Gracie asking you

 7    what your estimated time of arrival was?  I think she

 8    calls it ETA.

 9         A    I know it says here she asked if I had left

10    yet.

11         Q    And what did you say in response to her

12    asking if you've left yet?

13         A    About to leave Houston.

14         Q    Okay.  I think it's on the fourth page at

15    the bottom where she texts you about your ETA.

16         A    "Okay.  What's your ETA?"

17         Q    Okay.  And what did you say to her?

18         A    I asked her if I was going to her house or

19    her mom's.

20         Q    Okay.  And what'd she say back to you?

21         A    That she would meet me at her mom's.

22         Q    Okay.  Now you see there's a -- you don't --

23    you can't really tell what the next thing is there;

24    right?  I'm going to represent to you that she sent a

25    pin at that point.  Does that sound right?
```

Page 293

Appx_0823

1      A    I don't know if that was a pin or not.

2      Q    Well is it crazy to you if that is a pin?

3      A    It wouldn't be unusual.

4      Q    Okay.  So if she sent you a pin there, you

5   would've clicked on it and opened it and Apple Maps;

6   right?

7      A    If that was a pin, yes.

8      Q    Okay.  So at this point, do you think your

9   phone is hooked up to Apple CarPlay?

10     A    If I'm already driving, then yes.

11     Q    Okay.  So what does Apple CarPlay do to your

12  phone?

13     A    I don't know what the question really is.

14     Q    So you've got your phone on your mount is

15  what you're telling us; right?

16     A    Yes.

17     Q    And then you've got a cord from your phone

18  into the car; right?

19     A    Yes.

20     Q    So what does that enable you to do on the

21  screen attached to the car?

22     A    It pulls up a map and music and directions.

23     Q    Okay.  Were you listening to music?

24     A    I don't remember.

25     Q    Were you listening to podcasts?

Veritext Legal Solutions
800-336-4000

1        A     It wouldn't be unlikely.

2        Q     Okay.  But if -- you think it's more like

3    the music or podcasts?

4        A     I listen to both.

5        Q     Okay.  But you don't remember what you were

6    listening to that day if anything?

7        A     No.

8        Q     Okay.  So when you receive text messages, do

9    they show up on the Apple CarPlay screen when your

10   phone's connected?

11       A     It shows up that someone has texted me.

12       Q     Okay.  So what does it say then?  Like it

13   just says "Alert.  You got a text"?

14       A     It'll show up on the bottom of the screen

15   the name of the person with a text emoji.

16       Q     Okay.  So on the Apple CarPlay screen it

17   will say -- and that's the big infotainment screen

18   attached to the car.  It will say you got a text from

19   this person, but won't tell you the text content?

20       A     Yes.  Normally.

21       Q     Does it make noise?

22       A     I don't remember if I had the noise turned

23   on.

24       Q     Okay.  So if there's not a noise turned on,

25   would you just see the notification pop up on Apple

                                          Page 295

1    CarPlay?

2         A    Yes.

3         Q    Okay.  So that's how you know you're getting

4    a text message?

5         A    I believe my phone would vibrate as well.

6         Q    Okay.  You think your phone was on vibrate

7    or you think it was making a noise?

8         A    It's more likely it was vibrated.

9         Q    Okay.  How much noise would it make

10   vibrating on the mount?

11        A    I don't know.

12        Q    Loud enough for you to hear it and notice?

13        A    Possibly.

14        Q    So anytime you got a text message, two

15   things were happening simultaneously.  At least your

16   phones buzzing, and the Apple CarPlay thing is going,

17   "Hey.  You got a message."  Right?

18        A    Yes.  Possible.

19        Q    Well I mean is that what would happen?

20        A    I believe so.

21        Q    Okay.

22              MR. BLUNT:  Do you need to take a

23   break?

24              THE WITNESS:  Yeah.  Just quick one.

25   Walk.

                              Page 296

```
 1                          MR. BLUNT:  Can we take --
 2                          MR. WHITE:  Take five.
 3                          THE WITNESS:  Get my blood circulating.
 4                          THE VIDEOGRAPHER:  3:58, we're off the
 5     record.
 6                          (Off the record.)
 7                          THE VIDEOGRAPHER:  This is the
 8     beginning of file number 5, the deposition of Caylee
 9     Smith.  Time is 4:19.  We're on the record.
10     BY MR. WHITE:
11          Q    All right, Caylee.  I think we were just
12     talking about some of your text messages with Gracie
13     on April 30, 2022.  Does that sound right?
14          A    Yes.
15          Q    Okay.  Now do you remember that you and her
16     were trying to find out what tattoo shop to go get
17     tattoos at the night of April 30, 2022?
18          A    Yes.
19          Q    Okay.  So who all did you reach out to to
20     get recommendations for tattoo shops?
21          A    I know I reached out to my brother
22     Christian, and I think I possibly reached out to my
23     brother Trevor.
24          Q    Is that Trevor Redwine?
25          A    Yes.
```

Page 297

1        Q    Okay.  Is that his actual last name?

2        A    Yes.

3        Q    Okay.  Not Smith?

4        A    No.

5        Q    Okay.  Okay.  And what did they tell you?

6   Where did they recommend that you go?

7        A    I remember Saints & Sinners was a

8   recommendation.

9        Q    Do you remember who recommended that to you?

10       A    I don't remember if it was Christian or

11  Trevor.

12       Q    So it's someone noted as "Da Brother" in

13  your phone.  So which one is "Da Brother"?

14       A    That would be Christian.

15       Q    Okay.  So do you remember having a phone

16  conversation with Christian?

17       A    I think I tried to call him.

18       Q    Do you -- do you actually remember speaking

19  with him?

20       A    I don't remember if we actually had a

21  conversation.

22       Q    So if I tell you, and I won't keep holding

23  out on you.  I can show you the data, but it looks

24  like y'all had about a ten minute phone conversation.

25  Does that sounds about right?

                                        Page 298

1        A    That could be possible, yeah.

2        Q    Okay.  Do you remember what he told you in

3   that phone conversation?

4        A    No.  I don't remember.

5        Q    But do you remember texting Gracie that your

6   brother said to go to Saints & Sinners in Carrolton?

7        A    Yes.  That's what this is.

8        Q    Okay.  And do you think you were driving

9   when you sent that text message?

10       A    Yes.  That's possible, yeah.

11       Q    Okay.  How did you reach out to Saints &

12   Sinners?

13       A    I may have tried calling first.

14       Q    Okay.  How did you get the number for Saints

15   & Sinners?

16       A    I don't remember.  I could have asked Siri

17   for it.

18       Q    Okay.  How would you do that if you asked

19   Siri for the phone number?

20       A    Find the number for Saints & Sinners.

21       Q    Okay.  So would you press a button on your

22   phone and tell Siri to do that?

23       A    If I was going to do it, you would hold the

24   side of the phone.  The lock button down.

25       Q    Okay.  And then what would you say while you

Page 299

1    hold the lock button down on your phone?

2         A    Well you hold the lock button down and then

3    let go.  And Siri pops up on the infotainment center.

4         Q    And what would you say to Siri?

5         A    "What is the number to Saints & Sinners in

6    Carrolton" for example.

7         Q    And if it found the number, what would

8    happen?

9         A    They would ask if you would want to call it.

10        Q    Okay.  So do you know if you used Siri to do

11   that?

12        A    I don't remember exactly.

13        Q    Do you think it's possible that you just

14   googled Saints & Sinners on your phone?

15        A    It's possible.

16        Q    Okay.  So somehow you got Saints & Sinners'

17   number.  Do you remember calling them?

18        A    I don't remember if I called them or sent a

19   text.

20        Q    Do you remember sending them a text at any

21   point?

22        A    I believe I did.

23        Q    Do you remember what the content of that

24   text was?

25        A    I think I was asking about appointments or

Page 300

1   if they had availability possibly.

2        Q    And do you remember them responding at all?

3        A    I think they responded.

4        Q    Okay.  Do you remember when they responded?

5        A    No.  I don't remember.

6        Q    So how fast were you going when you were

7   texting Saints & Sinners?

8        A    I don't know.

9        Q    Okay.  Do you know what lane you were in as

10   you texted Saint and Sinners?

11        A    I don't remember.

12        Q    Do you remember going over 90 miles an hour

13   when you were calling Saints & Sinners?

14        A    I don't remember.

15        Q    Okay.  If you were going 90 miles an hour,

16   why would you be going that fast?

17        A    I don't know.

18        Q    Okay.  You think there's a good reason for

19   you to go that fast?

20        A    I don't know.  I guess no.

21        Q    Do you remember telling Gracie that your

22   brother said to go to Saints & Sinners in Carrolton?

23        A    I believe that's what was said, yes.

24        Q    Okay.  Do you remember reading her text

25   message in response to you bringing up Saints &

Page 301

1    Sinners?

2         A    She said "Okay.  Cool.  We can do that."

3         Q    And what do you think she's referring to?

4         A    Going to Saints & Sinners.

5         Q    Okay.  And you remember how fast you were

6    going when you read that text message from her?

7         A    No.  I don't remember.

8         Q    Do you remember how you read that text

9    message?

10        A    No.  I don't remember.

11        Q    Can -- you had Siri read off text messages

12   to you?

13        A    When an incoming message comes in, it can be

14   read over infotainment center.

15        Q    Okay.  How?

16        A    If it's clicked on the -- when the message

17   pops up and you click on it, it will automatically

18   read it to you.

19        Q    Do think you did that?

20        A    I don't remember if I did or not.

21        Q    Do you do that very often?

22        A    I do it sometimes.

23        Q    But often?

24        A    A handful of times.

25        Q    Okay.  So when you want the infotainment

                                          Page 302

1    center system to read off a text message, you have to

2    know that you got a text message, and then click on

3    the infotainment center screen?

4         A    Yes.

5         Q    Okay.  And do you remember where your phone

6    was when you received that text message from Gracie,

7    "Okay.  Cool.  We can do that"?

8         A    I don't remember exactly, but it's very

9    common for me to have it on the magnetic mount.

10        Q    So it's common for you to have it on the

11   mount, but it's possible you had the phone somewhere

12   else?

13        A    It's possible.  There's two spots I normally

14   have the phone.

15        Q    Where's the other spot?

16        A    There's a compartment right under the

17   infotainment center that it could've gone in.

18        Q    Okay.  But if it was there, you couldn't

19   have read the text message on your phone?

20        A    Not on my phone.

21        Q    Okay.  So you said "They don't do walk-ins

22   though" in response; is that right?

23        A    I did.

24        Q    How'd you know they didn't do walk-ins?

25        A    Because they said in a text that there was

Page 303

Appx_0833

1   appointments available.

2       Q    Okay.  So does that mean that you knew they

3   didn't take walk-ins?

4       A    All I mentioned was the appointments when I

5   texted them.

6       Q    Okay.  So do you remember what the Saints &

7   Sinners' text message to you said?

8       A    I don't remember exactly what it said, no.

9       Q    Do you remember -- you think that they

10  mentioned appointments though?

11      A    I believe so.

12      Q    Okay.  And do you remember what you told

13  Saints & Sinners?

14      A    No.  I don't remember.

15      Q    Okay.  Any idea what you were told Saints &

16  Sinners via text?

17      A    No.  I don't remember.

18      Q    Okay.  So why couldn't you just wait until

19  Sunday to get a tattoo?

20      A    I don't know.  We just spontaneously wanted

21  to do it.

22      Q    So you just -- you all decided we're going

23  to do it Saturday night, period.

24      A    We just decided on the way up that we wanted

25  to.

Page 304

1          Q    Okay.  So when you said "They don't do walk-
2     ins though," do you know how fast you were going when
3     you sent that text message?
4          A    No.  I don't remember.
5          Q    Do you remember where your phone was when
6     you sent that text message?
7          A    I don't remember exactly, but my usual spot
8     is on the mount.
9          Q    On the mount; right?  Do you remember
10    sending that via voice to text, or did you type it in?
11         A    I believe that one was voice to text.
12         Q    Why do you think that?
13         A    It doesn't have any punctuation and -- or it
14    does have the punctuation on don't, and a lot of times
15    I don't put punctuation if I'm typing it.
16         Q    So you think any of these text messages with
17    punctuation means you used voice to text?
18         A    Not necessarily all of them.
19         Q    So then why that one in particular?  "They
20    don't do walk-ins though"?
21                   MR. BLUNT:  Objection, form.
22                   MR. WHITE:  What's the basis?
23                   MR. BLUNT:  You just asked her that and
24    she answered it.
25                   MR. WHITE:  Well I'm asking her to

                                        Page 305

Appx_0835

1    distinguish between why she thinks punctuation and

2    "They don't do walk-ins, though."

3                    MR. BLUNT:  Yeah.  I think she gave

4    that in her last answer but go ahead.

5    BY MR. WHITE:

6         Q    So Caylee, you have punctuation in many of

7    these texts that you sent; right?

8         A    Yes.

9         Q    So then why do you think "They don't do

10   walk-ins, though," that text in particular, you used

11   voice to text?

12        A    With walk-in specifically, I probably would

13   have typed it with a space in between it or a hyphen.

14        Q    So do you think auto correct wouldn't change

15   that?

16        A    I don't think I had auto correct on.  I

17   don't remember.

18        Q    You don't remember if you had auto-correct?

19        A    I don't remember if I had auto correct on.

20        Q    So you remember the way you typed walk-ins,

21   but you don't remember how fast you were going when

22   you sent walk-ins.  Is that right?

23        A    That's correct.  I don't remember how fast I

24   was going at the time.

25        Q    Okay.  But you do remember how you type

                                        Page 306

Appx_0836

1    walk-ins?

2         A    I'm just going based upon how I would

3    normally text it now.

4         Q    Okay.  So if you did voice to text, how

5    would you have sent that text?

6         A    I would have pushed the microphone, talk

7    into my phone, and push the send button.

8         Q    Okay.  So are you saying your phone was on

9    your mount when you sent that text message?

10        A    It's most common that it would have been on

11   my mount, yes.

12        Q    Okay.  So you would have opened the lock

13   screen; right?

14        A    Yes.

15        Q    Would you have to swipe up to do that?

16        A    Sometimes the phone stays unlocked when it's

17   connected to Apple Play, but sometimes yes.  You would

18   have to swipe up to unlock.

19        Q    So you may have had to swipe up to unlock?

20        A    It's possible, yes.

21        Q    Okay.  So you swipe up to unlock, and then

22   you would have seen the message that Gracie said to

23   you.  "Okay.  Cool.  We can do that."  Right?

24        A    Yes.

25        Q    And then you would have hit the microphone

Page 307

Appx_0837

1    button on your phone.

2         A    Yes.

3         Q    And then you would have spoken "They don't

4    do walk-ins, though."  Right?

5         A    Yes.

6         Q    Would you look to your phone to make sure

7    that the voice translation was correct?

8         A    After speaking, yes.

9         Q    Okay.  And then you would have hit the send

10   button?

11        A    Yes.

12        Q    Okay.  What did you do immediately after

13   sending that text message "They don't do walk-ins,

14   though"?

15        A    I remember looking back up to the road

16   after.

17        Q    Okay.  Okay.  What did you see?

18        A    I spotted a vehicle up in the near distance.

19        Q    Okay.  All right.  What else did you see?

20        A    I saw as I got a little bit closer, I

21   noticed that the black vehicle was partially in my

22   lane.

23        Q    Okay.  So you're saying immediately after

24   sending the text message "They don't do walk-ins,

25   though," you looked up and you saw the vehicle my

                                        Page 308

Appx_0838

1   client was trying to get a flat tire fixed on.  You

2   saw that halfway in your lane?

3        A    I don't know if it was immediately after.

4        Q    Okay.  So do you know how much time passed

5   between when you sent "They don't do walk-ins,

6   though," and when you saw the car?

7        A    I don't know exact, no.

8        Q    Okay.  So do you remember what you did on

9   your phone next after sending "They don't do walk-ins,

10  though"?

11       A    I don't remember exactly.  I believe I

12  locked it.

13       Q    Okay.  You would've locked your phone.

14  Okay.  How would you do that?

15       A    I would normally push the side button.

16       Q    Okay.  So after you send the text message to

17  Gracie "They don't do walk-ins, though," you also hit

18  the side button on the side of the phone?

19       A    Click.

20       Q    Lock it.  Why would you do that?

21       A    Just habit.

22       Q    Okay.  Okay.  Do you think you looked at

23  your phone for anything else immediately after sending

24  that text message?

25       A    Not that I remember right after.

Page 309

```
 1          Q     Okay.  Do you remember looking at Apple
 2     CarPlay for anything immediately after sending that
 3     text message?
 4          A     Not that I remember right after.
 5          Q     Okay.  Do you recall how soon after you sent
 6     "They don't be walk-ins, though," that Gracie
 7     responded?
 8          A     I don't remember how soon after.
 9          Q     Okay.  Do you remember what you said to
10     Gracie after the accident happened?
11          A     After reading this again, yes.
12          Q     Okay.  What did you say?
13          A     I won't be making it.  I just got in a wreck
14     and hit a person on the side of the road.
15          Q     You agree that you sent that text to Gracie
16     about 15 minutes after the collision?
17          A     If that's what it says, then possibly, yes.
18          Q     Okay.  So you didn't say "I hit a person in
19     the middle of the road."  Did you?
20          A     That's not what I said at the time, but I
21     was in a state of shock.
22          Q     Right.  You changed your statement since you
23     sent that text message; right?
24          A     I clarified.
25          Q     Changed it, clarified, sure.  You didn't say
```

Page 310

Appx_0840

1    in that text message to Gracie "I hit a person who

2    stepped out in front of the car."  Did you?

3         A    I wasn't in a state of mind to talk to

4    Gracie at the time.

5         Q    But you did send her that text message;

6    right?

7         A    Yes.  I did.

8         Q    Okay.

9         A    Because she kept texting me.

10         Q    Do you think -- so that text message "I

11    won't be making it.  I just got in a wreck and hit a

12    person on the side of the road," do you think you sent

13    that with voice to text?  It has punctuation.

14         A    No.  I believe I typed that out.

15         Q    Okay.  Why do think that?

16         A    I was stopped at that time.

17         Q    So if you're stopped, you never use voice to

18    text?

19         A    No.  Not necessarily.

20         Q    How do you know you weren't stopped when you

21    sent "They don't do walk-ins, though"?

22         A    I don't.

23         Q    So you might have sent that texting it out

24    rather than voice to text; right?

25         A    From my recollection, I believe it was

                                        Page 311

1    dictation.

2        Q    Okay.  So you dictated the text "They don't

3    do walk-ins, though," then you hit the lock button,

4    then you look up, and you see the black Toyota in the

5    lane.  Is that right?

6        A    As I'm approaching, I can see the black

7    vehicle partially in my lane.

8        Q    Okay.  Now what did you do when you first

9    saw the black vehicle partially in your lane?

10       A    I made the adjustment to scoot over enough

11   to miss the vehicle and not collide but stay in my

12   lane.

13       Q    Okay.  Okay.  Okay.  So you're sort of like

14   halfway in the lane then I guess?  Is that your

15   testimony?

16       A    Not halfway, but I scooted over enough in my

17   own lane to miss the vehicle.

18       Q    So how close did you think you were going to

19   get to hitting the Toyota with the adjustment?

20       A    I don't know how close.

21       Q    So but you didn't get in the middle lane?

22       A    No.

23       Q    Okay.  So you just sort of kind of glided

24   over in the left lane a little to the right?

25       A    Yes.

                                        Page 312

Appx_0842

1      Q    Okay.  So that's how you're moving forward;
2  right?
3      A    Yes.
4      Q    Okay.  Do you remember how close you were to
5  the black Toyota when you made that adjustment?
6      A    I don't know how close I was.
7      Q    Okay.  When would you look at your GPS?
8      A    As I was getting closer about to pass, I
9  glanced over at my GPS.
10      Q    It's a GPS on your phone or GPS on the
11  infotainment screen?
12      A    On the infotainment screen.
13      Q    So what did they show on the infotainment
14  screen?
15      A    I was looking at the maps to determine my
16  ETA.
17      Q    Okay.  Why?
18      A    Just to see how much further I had of my
19  drive.
20      Q    Okay.  Your destination hadn't changed.  Did
21  it?
22      A    No.
23      Q    You just wanted to know how much more time
24  you had?
25      A    Yes.

                                      Page 313

Appx_0843

1      Q    Okay.  So why did you think it was a good
2   idea to look at your GPS when you were about to pass a
3   car partially in your lane?
4      A    I felt that I had made the necessary
5   adjustment to miss the vehicle, so I glanced at my
6   GPS.
7      Q    You didn't get in the middle line.  Did you?
8      A    No.
9      Q    Okay.  Did you reduce your speed?
10      A    I don't remember.
11      Q    Do you remember seeing emergency lights on?
12      A    I don't remember.
13      Q    So you remember text -- you remember voice
14   texting "They don't do walk-ins, though," but you
15   don't remember if you saw emergency lights ahead of
16   you?
17      A    That's correct.
18      Q    Okay.  Now did you see anyone standing
19   around that vehicle?
20      A    I don't remember.
21      Q    So that's a no?
22      A    I don't remember.
23      Q    But you don't remember seeing emergency
24   lights, you don't remember seeing anyone standing
25   around it, but you do remember sending voice to text

                                        Page 314

```
 1    rather than texting now "They don't do walk-ins,

 2    though"?

 3         A    Yes.  That's correct.

 4         Q    Okay.  You don't remember if you reduced

 5    your speed?

 6         A    I believe I took my foot off the gas

 7    possibly, but I don't remember exactly.

 8         Q    Okay.  Now of course we have all that data;

 9    right?

10         A    Yes.

11         Q    So you understand that; right.  We know what

12    you did with your speed; right?

13         A    Yes.

14         Q    You understand that?

15         A    Yes.  I do.

16         Q    So I take it you made the adjustment.  Were

17    you kind of partially in the right hand -- in the

18    middle lane?

19         A    I don't know.

20         Q    You think you were close?

21         A    Potentially maybe.

22         Q    Would you have done that if there was anyone

23    in the middle lane by you?

24         A    I don't know.

25         Q    Would it have been safe to sort of make the
```

Page 315

Appx_0845

1    adjustment that you made if there was someone in the

2    middle lane by you?

3        A    I feel like I had enough room to get by

4    without causing any danger to the car if there was a

5    car next to me.

6        Q    So before you hit Nehemias, but after you

7    made the adjustment, if you'd moved anymore to the

8    right, you would have been in the middle lane; right?

9    Maybe you were already in the middle lane after your

10    adjustment somewhat.  Is that right?

11        A    Not necessarily.

12        Q    So the left hand lane was big enough for you

13    to adjust to avoid the car that was partially in the

14    lane, but not have any part of your vehicle in the

15    middle lane?

16        A    I don't know.

17        Q    You don't know?  Okay.  All right.  I'm

18    going to play a video.  There's no blood and guts in

19    it, so that's not this part; right?  I'm trying to be

20    respectful.  Right?  I don't -- you know, he's -- I

21    know his family.

22        I'm not trying to prey his, you know, broken

23    body on the TV.  But we do have to have you watch a

24    video of the approach; right?  Answer some questions.

25    Okay?

Page 316

Appx_0846

1                    (Exhibit 29 was marked for

2                    identification.)

3                    THE REPORTER:  Exhibit 29?

4                    MR. WHITE:  I believe that's right,

5     yeah.

6                    THE REPORTER:  Okay.

7                    (Video played.)

8     BY MR. WHITE:

9         Q    Now I want to stop you here.  Looking at --

10    what are we on?  Second four of this video marked as

11    Exhibit 29.  Would you agree that this video is a

12    little grainy?

13        A    Maybe somewhat.

14        Q    So you see that sign on second number four

15    here.  Can you read that sign?

16        A    No.

17        Q    You think human eyesight is better than this

18    video?

19        A    Possibly, yes.

20        Q    Yeah?  Probably.  Right?

21        A    Probably, yes.

22        Q    If that's how you see signs, you should

23    probably go get glasses; right?

24        A    Yes.

25        Q    Okay.  No trick questions; right?  That's

                                        Page 317

Appx_0847

1   not a trick.  Was there any problem with your eyesight
2   on April 30, 2022?
3        A     I was wearing my glasses.
4        Q     Okay.  You were wearing glasses.  Are they
5   prescription?
6        A     They are, yes.
7        Q     Are you nearsighted or wear farsighted?
8        A     I can't see far away.
9        Q     You can't see far away.  Nearsighted; right?
10  What's your prescription if you know?
11       A     I would have to estimate.  I think it's
12  negative 1.25 in one eye and then negative 1 in the
13  other.
14       Q     Is it safe for you to drive without your
15  glasses?
16       A     I can still see without glasses.
17       Q     Okay.
18       A     It's safer to drive with them.
19       Q     Okay.  So you had your -- your testimony is
20  you had your glasses on this whole drive?
21       A     I did, yes.
22       Q     Okay.  All right.  So I'm going to play it
23  through; right?  And I'm going to ask you -- I'll stop
24  it and ask some questions.  All right?
25                 (Video played.)

                                        Page 318

Appx_0848

1    BY MR. WHITE:

2         Q    Now Caylee, how would you describe the

3    weather?

4                   (Video played.)

5    BY MR. WHITE:

6         Q    How would you describe the weather in this

7    video?

8         A    Clear.

9         Q    Okay.  How would you describe the traffic?

10        A    Moderate flowing.

11        Q    How would you describe how many lanes there

12   are?

13        A    There's three lanes.

14        Q    Okay.  How fast do you think this officer is

15   going?

16                   (Video played.)

17                   THE WITNESS:  I don't know.

18   BY MR. WHITE:

19        Q    Do you think she's going faster than normal?

20        A    Possibly.

21                   (Video played.)

22   BY MR. WHITE:

23        Q    Okay.  Did you see what this dark vehicle

24   did?

25        A    I wasn't paying attention.

                                    Page 319

Appx_0849

1          Q     We'll scoot it back just a second.

2                      (Video played.)

3     BY MR. WHITE:

4          Q     Did you see what that dark vehicle did at

5     about the 2:47 mark?

6          A     It looks like they got over.

7          Q     Okay.  Why do you think they did that?

8          A     My assumption would be that there's a police

9     car coming behind you.

10         Q     Okay.  So you agree that drivers have an

11    obligation to keep a good lookout as they're going

12    down the road; right?

13         A     Yeah.  Yes.

14         Q     All right.  You agree that's an important

15    role?

16         A     It's good to follow, yes.

17         Q     It's good -- all right.  It's important;

18    right?

19         A     It's important to follow, yes.

20         Q     Okay.  Why?

21         A     For safety.

22         Q     Okay.  Would it be wrong for drivers not to

23    keep a good lookout?

24         A     I wouldn't say it's wrong.

25         Q     Okay.  Now that driver did a good job of --

                                        Page 320

Appx_0850

```
 1    and I'm talking about this dark vehicle at the 2:47
 2    mark.  That driver did a good job of keeping a good
 3    lookout; right?
 4         A    I guess so.
 5         Q    And they got over into the slower lane;
 6    right?
 7         A    Yes.
 8               (Video played.)
 9    BY MR. WHITE:
10         Q    All right.  So before I play the rest of the
11    video, I want to get you on the record.  Your story is
12    you sent a text message to Gracie voice to text, then
13    locked your phone, saw the vehicle, edged over, then
14    looked at your GPS; right?
15         A    I sent the text, locked my phone, or looked
16    away from my phone, looked back on the road, had
17    identified the vehicle.  Once I got a little bit
18    closer, I realized it was partially in my lane, and
19    then as I got closer, I glanced at my GPS.
20         Q    Okay.
21               (Video played.)
22    BY MR. WHITE:
23         Q    Now all that traffic we saw on the two right
24    lanes, that wasn't there when you passed this vehicle.
25    Was it?
```

Page 321

Appx_0851

1          A     I don't remember.

2          Q     You don't remember?

3          A     I don't remember, no.

4          Q     You don't remember how busy the right hand

5     lanes were?

6          A     No.  I don't remember.

7          Q     Okay.  Back this up just a little bit.

8                     (Video played.)

9     BY MR. WHITE:

10         Q     Okay.  So on this video can you see this

11    black mark there?  Center of the leftmost line?

12         A     I can identify there's something there.

13         Q     Okay.  So when you saw that -- did you see

14    the vehicle when you were at this point on the road?

15         A     I don't know when exactly I identified the

16    vehicle.

17         Q     Okay.  So what were you doing in your car at

18    this point?

19         A     I don't remember exactly.

20         Q     Okay.  What did you see when you were at

21    this point on the road?

22         A     I don't remember when I identified the

23    vehicle.

24         Q     Okay.  Well it sounds like you identified

25    the vehicle after you sent the text message; right?

                                          Page 322

Appx_0852

```
1          A     It was after the text, yes.

2          Q     So you looked up from sending the text

3    message and then you saw the vehicle; right?

4          A     And I saw the vehicle, yes.

5          Q     Okay.  So at this point, did you see any

6    emergency flashers?

7          A     I don't remember.

8          Q     Do you remember seeing anybody standing

9    around the vehicle?

10         A     I don't remember.

11         Q     You remember seeing any other traffic

12   merging to the right?

13         A     I don't remember.

14         Q     Okay.

15               (Video played.)

16   BY MR. WHITE:

17         Q     At this point, did you see the Toyota parked

18   partially in the leftmost lane?  So we're at the 3:06

19   moment for the record.

20         A     I don't remember if it was at this time that

21   I noticed it was in the road.

22         Q     Okay.  Do you remember what you saw when

23   you're at this point on the road?

24         A     I don't remember.

25         Q     You don't remember seeing emergency
```

                                        Page 323

1    flashers?

2         A    I don't remember if there was or wasn't.

3         Q    You don't remember seeing anyone standing in

4    the road?

5         A    I don't remember.

6         Q    Do you remember what you were doing with

7    your phone right here?

8         A    I don't remember, no.

9         Q    You think you were sending a text message

10   right here?

11        A    I don't know.

12        Q    If you were sending a text message right

13   here, do you think that was a bad idea?

14        A    I -- I don't know.

15        Q    You don't know if it's a bad idea to send a

16   text message in the fast lane on the interstate?

17        A    I guess that could be wrong or bad.

18        Q    So you agree if you sent a text message

19   right here, that was wrong or bad?

20        A    At this moment, it could be bad.

21                   (Video played.)

22   BY MR. WHITE:

23        Q    So now we're at the 3:10 mark.  Did you see

24   the Toyota when you're at this point?

25        A    I don't remember exactly when I spotted the

Page 324

1    Toyota.

2         Q    Okay.  So what were you doing in your car at

3    this point?

4         A    I don't remember exactly what I was doing.

5         Q    Okay.  What did you see at this point?

6         A    What am I looking at right now or what did I

7    see on that day?

8         Q    What did you see on that day when you were

9    at this point?  This far away from the Toyota.

10        A    I don't remember exactly how far I was when

11   I noticed it was in the lane.

12        Q    You think you were closer than this?

13        A    I don't remember.

14        Q    You think you were further than this?

15        A    I don't remember.

16        Q    You see anyone stand around the car at this

17   point?

18        A    Right now?

19        Q    No.  When you were this close to the car in

20   real life?

21        A    I don't remember if I saw anyone.

22        Q    You don't?  At this point or ever?

23        A    I don't remember.

24        Q    Okay.  What were you doing with your phone

25   at this point?

Page 325

1       A    I don't know what I was doing at that point.

2       Q    Do you remember looking at your GPS at this

3  point?

4       A    I don't remember.

5       Q    Okay.

6                  (Video played.)

7  BY MR. WHITE:

8       Q    Did you see the black Toyota at this point

9  as represented by 3:14 on Exhibit 29?

10      A    I can see the black Toyota in this video

11  right now, yes.

12      Q    Okay.  But when you were this close to the

13  black Toyota in real life, did you see the black

14  Toyota?

15      A    At this point, I had already spotted the

16  vehicle.

17      Q    Okay.  So you're telling us at this point

18  you had made the adjustment to the right that you were

19  telling us about?

20      A    Not necessarily right at this point, no.

21      Q    Okay.  So you think maybe you made that

22  adjustment as you got a little bit closer?

23      A    No.

24      Q    Did you make the adjustment earlier?

25      A    I don't remember exactly when I made the

                                        Page 326

Appx_0856

1    adjustment.

2        Q    So you don't know when you made the

3    adjustment?

4        A    I just know I spotted the vehicle and made

5    the adjustment.

6        Q    But you don't know how far away you were

7    from the vehicle when you made the adjustment?

8        A    I do not know how far I was.

9        Q    Okay.  So when you were this close to the

10   vehicle, do you remember seeing emergency flashers?

11       A    I don't remember.

12       Q    Do you remember seeing anyone standing

13   around the vehicle?

14       A    I don't remember.

15       Q    Do you remember what you were doing with

16   your phone when you were this close to the vehicle in

17   real life?

18       A    I don't remember.

19       Q    Okay.  Were you looking at your GPS?

20       A    I don't remember.

21       Q    Okay.  So you don't remember seeing this car

22   partially in the lane at any point up to this 3:14

23   time stamp.  Is that right?

24                    MR. BLUNT:  Objection.

25                    THE REPORTER:  I'm sorry.  Was that an

                                        Page 327

Appx_0857

1    objection?

2                        MR. BLUNT:  Yes.  Form.

3                        THE REPORTER:  Thank you, sir.

4                        THE WITNESS:  I remember spotting the

5    vehicle.  I don't know exactly what time or place I

6    spotted the vehicle, but I had spotted it was

7    partially in my lane and I made the adjustment to get

8    over to not hit the vehicle.

9    BY MR. WHITE:

10       Q    Okay.  So at what point did Nehemias step in

11   front of your vehicle?  That's your testimony; right?

12   He stepped in front of your vehicle?

13       A    I don't know how he got in front of my

14   vehicle.  It was suddenly.

15       Q    Okay.  So you never saw him until right

16   before you hit him?

17       A    That is correct.

18       Q    You don't know what he was doing right

19   before you saw him?

20       A    I do not know what he was doing.

21       Q    So you look up, and he's standing in front

22   of your car?

23       A    And he's in the middle of the lane.

24       Q    Okay.  So what were you looking at before he

25   appeared in front of you?

                                        Page 328

Appx_0858

1        A    That's when I had glanced over at my GPS.

2        Q    Okay.  So do you remember what happened to

3    Nehemias's shoes?

4        A    I don't know.

5        Q    All right.  Do you know that they were found

6    like scores of yards further down the road?

7        A    I don't know.

8        Q    So in this video at this point, you see

9    you've got the black Toyota stopped on the left hand

10   side.  You see that?

11       A    I see it's partially in the road, yes.

12       Q    Okay.  Do you see there's sort of a truck in

13   the middle of the left lane and kind of to the right?

14       A    I see it's in the left lane, yes.

15       Q    Okay.  If someone rammed into that white

16   truck now, would that be wrong if they were coming

17   from the police officers perspective?

18       A    Could you repeat that?

19       Q    Yes.  If someone was in the police officer's

20   position and hit that white truck, that's one that's

21   partially in the left hand lane, would that be wrong?

22   Would it be the white truck's fault?

23       A    No.  Not necessarily.

24       Q    Okay.  Why not?

25       A    Depending on the scenario.

Page 329

Appx_0859

1      Q     Okay.  So what scenario would make hitting

2  the white truck the person that hits the white truck's

3  fault?

4      A     By law, I actually think it would be the

5  person that hit them from behind.

6      Q     Okay.  Yeah.  Sure.  Right?  Why?

7      A     Because they are in a lane of travel.

8      Q     Okay.  But I mean this white truck -- let's

9  pull up a little further here.

10              (Video played.)

11  BY MR. WHITE:

12      Q     See that white truck backing up into the

13  left line?

14      A     Yes.  I see.

15      Q     Probably not allowed to do that; right?

16      A     No.  It's unsafe.

17      Q     Okay.  So if somebody hit the white truck,

18  probably half the white truck's fault; right?

19      A     They're in a lane of traffic.

20      Q     Okay.  Okay.  So when you say Nehemias was

21  in the middle of the left lane, that's where you say

22  that he was at; right?  Right before you hit him?

23      A     That's where he suddenly appeared right

24  before I struck him, yes.

25      Q     Okay.  So was he that far from the black

Page 330

Appx_0860

```
 1    Toyota?  Since the black Toyota was partially in the
 2    left lane; right?
 3         A    He was -- the car was partially in left
 4    lane.  He was further out.  He was in the middle of
 5    the lane.
 6         Q    How much further out?
 7         A    I can't say exactly how far.
 8         Q    A foot?
 9         A    I don't know.
10         Q    Two feet?
11         A    He was in the middle of the lane.
12         Q    The middle of the lane; right?  So why
13    didn't you see a guy standing in the middle of the
14    lane?
15         A    I hadn't.  He appeared suddenly.
16         Q    Okay.  So do you think he stepped out in
17    front of you?  That's what you told Donlen.
18         A    I don't know what he did before.
19         Q    Okay.  Because you were looking somewhere
20    else?
21         A    I had glanced at my GPS and didn't have
22    enough reaction time to miss someone in the middle of
23    the lane.
24         Q    Okay.  So your reaction time is diminished?
25         A    He suddenly appeared in the lane.
```

Page 331

Appx_0861

```
 1         Q     That's not what I asked.  Your reaction time
 2    was diminished; right?  Because of you not paying
 3    attention to the road; right?
 4         A     Yes.
 5         Q     Okay.  So I want to know tell me when you
 6    started looking at your GPS?  Just tell me to stop.
 7                   (Video played.)
 8                   THE WITNESS:  I don't remember when I
 9    exactly looked at my GPS.
10    BY MR. WHITE:
11         Q     Keep watching.
12                   MR. DUBOFF:  You can't force her to
13    answer a question on a premise when she just told you
14    that she doesn't know.  You're just playing games
15    right now.
16                   MR. WHITE:  I just want to know when
17    she looked at the GPS.
18                   MR. DUBOFF:  Right.  But don't prompt
19    her to keep rolling the video after she's already
20    answered your question and said she doesn't know the
21    exact distance.
22    BY MR. WHITE:
23         Q     So you don't know when you were looking at
24    the GPS?
25         A     I knew as I was approaching the vehicle, I
```

Page 332

```
 1    glanced at my GPS and looked back and there was
 2    suddenly someone in the middle of the road.
 3         Q    Do you think it was wise to look at your GPS
 4    after you knew there was a car partially parked in the
 5    lane in front of you?
 6                   MR. BLUNT:  Objection, form.
 7         A    Maybe not.
 8         Q    Okay.  If you go back in time, would you not
 9    look at your GPS?
10         A    I don't know.  Maybe.
11         Q    You think it would have been safer to not
12    look at your GPS when you knew there was a car parked
13    in the lane in front of you on the interstate?
14         A    It could be safer.
15         Q    So you said your reaction time was
16    diminished.  Do you remember how fast you were going?
17         A    I don't recall exactly how fast I was going.
18         Q    So you don't know where you were when you
19    first saw the black Toyota; right?
20         A    I don't know exact location, no.
21         Q    Okay.  Do you remember your location, how
22    close you were when you saw finally saw Nehemias?
23         A    I knew I had approached the vehicle.
24         Q    Okay.  Well help me out with that.  Like
25    approach the vehicle?  Like were you very close to the
```

Page 333

Appx_0863

1   vehicle?

2       A   I was close to the vehicle when he suddenly

3   stepped out.

4       Q   Like one car length -- well okay.  So you

5   said he suddenly stepped out; right?  Okay.

6       A   Suddenly appeared.

7       Q   Okay.  Well you just said stepped out;

8   right?  So you're about a car length away when he

9   stepped out?

10           MR. BLUNT:  Objection, form.

11      A   I'm going to clarify that I --

12      Q   No.  You've clarified enough, thank you.  So

13   I'm going to play a different -- oh.  No, no.  Not

14   yet, not yet.  So I'm going to show you a photo of the

15   steering wheel.  I'll mark this as -- Exhibit 30?

16           (Exhibit 30 was marked for

17           identification.)

18           THE REPORTER:  Yes, sir.

19           MR. WHITE:  All right.

20   BY MR. WHITE:

21      Q   Does this look familiar to you?

22      A   That looks like the -- my vehicle at that

23   time.

24      Q   Okay.  So as you approach the Toyota, was

25   your iPhone on that magnetic mount between the

                  Page 334

Appx_0864

```
 1    steering wheel and the infotainment screen?
 2         A    That is my common practice, yes.
 3         Q    But you don't remember precisely where it
 4    was?
 5         A    I don't remember exactly if it was there,
 6    but most of the time it is on the magnet.
 7         Q    So it kind of looks like it's a little bit
 8    behind the steering wheel.
 9         A    I think that's just from the angle.
10         Q    Okay.  Does it not look like that when
11    you're sitting in the steering wheel -- or when you're
12    sitting in the front seat?
13         A    It's next to the steering wheel.
14         Q    Okay.  All right.  So now I am going to play
15    a video that's going to be hard for all.  All right?
16    I'm going to try and keep it as brief as possible.
17    All right?  So --
18                   (Video played.)
19    BY MR. WHITE:
20         Q    Okay.  Do you remember seeing where Nehemias
21    was standing when you were this close to the vehicle?
22         A    I don't remember.
23         Q    Do you remember seeing the emergency lights
24    on?
25         A    I don't remember.
```

Page 335

1          Q    Do you remember seeing anyone else standing
2    around the vehicle?
3          A    I don't remember.
4          Q    Well I'm going to start over, and you just
5    tell me if you see those emergency lights on.
6                    (Video played.)
7    BY MR. WHITE:
8          Q    The emergency lights on?
9          A    I'm sorry.
10                   MR. WHITE:  Can we take a break?
11                   THE WITNESS:  Can we take a break,
12   please?
13                   THE VIDEOGRAPHER:  Yes.  4:58, we're
14   off the record.
15                   (Off the record.)
16                   THE VIDEOGRAPHER:  This is the
17   beginning of file number 6, the deposition of Caylee
18   Smith.  Time is 5:08, we're on the record.
19   BY MR. WHITE:
20         Q    Okay.  We just took a little break and I
21   totally understand; right?  This is a graphic video;
22   right?
23         A    Yes.
24         Q    And I'm certainly not showing it to you to
25   torture you; right?  I've had to watch this with the

                                        Page 336

Appx_0866

1    family.  I know how hard this is.  You understand

2    that?

3         A    Yes.

4         Q    Okay.  So what I'm going to do is I'm going

5    to play it again.  All I want you to pay attention to

6    is are the emergency lights on on the black Toyota.

7    Can you do that for me?

8         A    Yes.

9         Q    Okay.

10              (Video played.)

11   BY MR. WHITE:

12        Q    Did you see them?

13        A    Yes.  It looks like they were on in that

14   video.

15        Q    Okay.  Now when you were that close to the

16   black Toyota from the perspective of that police

17   officer's body cam, do you remember how fast you were

18   going?

19        A    No.  I don't remember.

20        Q    Do you remember where your hands were?

21        A    I don't remember exactly, but they would

22   have been on the steering wheel.

23        Q    Do you think they were maybe touching the

24   GPS?

25        A    I don't believe I touched the GPS, no.

                                    Page 337

1        Q    Okay.  Where was your phone when you were

2    that close?  As close as the police officer was in

3    that body cam video.

4        A    I believe it was on the mount.

5        Q    Okay.  Were you looking at your GPS when you

6    were that close to the black Toyota?

7        A    I don't remember exactly when I looked at

8    the GPS.

9        Q    Okay.  How did you react immediately after

10   you hit Nehemias?

11       A    I immediately tried to pull over.

12       Q    Did you swerve to the right to try to avoid

13   him?

14       A    I jerked the steering wheel to the right.

15       Q    Okay.  Do you remember what happened to

16   Nehemias's body after you hit him?

17       A    I don't know.

18       Q    Do you know where his body landed?

19       A    I don't know.

20       Q    So you do admit that you hit and struck

21   Nehemias; correct?

22       A    I struck a pedestrian, yes.

23       Q    With your Ford Explorer?

24       A    With the vehicle, yes.

25       Q    And you admit that the contact you had with

Page 338

1    Nehemias killed him?

2         A    Yes.  I know that now.

3         Q    Okay.  You didn't know it at the time?

4         A    No.

5         Q    Okay.  And this is not -- I'm not trying to

6    be mean.  He wasn't dead before you hit him; right?

7         A    He -- no.  He suddenly appeared in the lane.

8         Q    Okay.  So what do you think you did wrong on

9    April 30, 2022?

10        A    I don't think I necessarily did anything

11   wrong.  I could have maybe been aware.

12        Q    Okay.  You think you were not totally aware

13   of the road?

14        A    I was aware of the vehicle and getting out

15   of the way of the vehicle.

16        Q    But you could have been more aware of what

17   was going on in the road in front of you?

18        A    Potentially, yes.

19        Q    Okay.  Is there anything today you want to

20   take personal responsibility for?

21        A    No.  I don't think I did anything wrong.

22        Q    Is there anything you'd do differently?

23        A    Sorry.  My nose is running.  Could you

24   repeat the question, please?

25        Q    Is there anything you wish you had done

Page 339

Appx_0869

1    differently on April 30, 2022?

2         A    I don't think there was anything I could

3    have done at the time.

4         Q    So if you go back in time and talk to Caylee

5    Smith, you know, a minute before this collision

6    happened, you wouldn't give her any advice?

7         A    Maybe my speed?

8         Q    Nothing else?

9         A    I don't think looking or glancing over at

10   your GPS is necessarily wrong.

11        Q    Do you think you'd tell Caylee Smith, you

12   know, a minute before this accident maybe stop sending

13   text messages to Gracie?

14        A    Possibly, maybe.

15        Q    Now why would you do that?

16        A    Just to not text and drive maybe.

17        Q    Do you think it had anything to do with the

18   collision that killed Nehemias?

19        A    I don't think this text message had anything

20   to do with this accident, no.  I don't think it was

21   avoidable.

22        Q    So you think no matter what you'd been doing

23   in the car, Nehemias was going to die?

24        A    He suddenly appeared in my lane with little

25   to no reaction time.

Page 340

Appx_0870

1       Q    Little to no reaction time for you?

2       A    For me, yes.

3       Q    Given your speed?

4       A    Just given the scenario.

5       Q    Okay.  Given the scenario where you were

6  kind of over but not totally in the middle lane?

7       A    That I was over enough to miss the vehicle,

8  and then suddenly someone appeared in my lane.

9       Q    And you didn't see him.  You didn't see what

10  he was doing before he appeared on the lane?

11       A    No.  I don't remember, but I don't remember

12  seeing him.

13       Q    And is that because you were looking at your

14  GPS?

15       A    No.  I just don't remember.

16       Q    So you don't know why you didn't see?  You

17  don't remember why you didn't Nehemias step into the

18  road.

19       A    He just appeared so suddenly.

20       Q    Have you ever changed a tire before?

21       A    I have changed a tire.

22       Q    Okay.  How do you do it?

23       A    Get the axle, the stand, place it on the

24  metal piece underneath the vehicle, lift the vehicle.

25  Take off the lug nuts with the wrench in the car, take

Page 341

```
 1    the tire off, put the tire on.  Put the lug nuts on
 2    and take the jack down.
 3         Q    How many times have you changed a tire?
 4         A    A handful.
 5         Q    Have you ever had a blowout?
 6         A    No.
 7         Q    If you had a blowout while you were
 8    traveling down the interstate, what would you do?
 9         A    I would try to get off the interstate.
10         Q    Okay.  Then what would you do?
11         A    Change the tire.
12         Q    Okay.  And what if you couldn't get off the
13    interstate?
14         A    Try to get to a safe location as fast as
15    possible.
16         Q    Okay.  So if you were in the left lane and
17    you had a blowout, what would you do?
18         A    My first instinct would be to try to get
19    off.
20         Q    Okay.  Get out of the way?
21         A    Get over to the right lane or the right side
22    of the road or off the road.
23         Q    If you couldn't get to the right side of the
24    lane, you try to get to the left side as much as
25    possible?
```

Page 342

Appx_0872

1        A    Not as much as possible, but that would be

2    my next resort.

3        Q    So you're saying if you had a blowout in the

4    left lane, you try your hardest to get over to the

5    right?

6        A    Yes.

7        Q    Is that because you think the right is the

8    safest -- the right shoulder is the safest place to

9    stop in an emergency?

10       A    No shoulder is safe to stop, but it's safer.

11       Q    Okay.  So after you hit Nehemias, did you

12   have full steering control of your Ford Explorer?

13       A    Could you define full control of?

14       Q    I mean, you could still maneuver the

15   vehicle; right?  You could go left or right or -- is

16   that right?

17       A    Yes.  I believe so.

18       Q    And you know, we know it had fine steering

19   control because a police officer drove it later on;

20   right?

21       A    Yes.

22       Q    So there wasn't anything screwed up with the

23   steering?

24       A    I believe there was some damage to the front

25   left that was scraping the wheel partially, but it was

                                          Page 343

1    still drivable.

2        Q    Okay.  Where'd you pull over after you hit

3    Nehemias?

4        A    I pulled over to the left.

5        Q    Okay.  Why?

6        A    It was just instinct.  Quickest thing so

7    that I could get over to call 911.

8        Q    Okay.  How far did you pull over to the

9    left?

10       A    As far as I could or thought needed to.

11       Q    How much of your vehicle was still sticking

12   out the lane?

13       A    I don't know how much.

14       Q    Do you think any of it was sticking out the

15   lane?

16       A    It's possible.

17       Q    Okay.  Did you turn on your emergency

18   lights?

19       A    I don't remember.

20       Q    Did you do anything else to let -- other

21   than maybe turning on the emergency lights, did you do

22   anything else to let other people on the road know

23   that you were having an emergency?

24       A    I don't remember.

25       Q    Did you put a flag out on your antenna or

Page 344

Appx_0874

1    anything like that?

2        A    No.

3        Q    Okay.  Why not?

4        A    I just immediately tried to call 911.

5        Q    Sounds sort of ridiculous to put a flag on

6    your antenna; right?

7        A    I guess.

8        Q    Okay.  When did you call 911?

9        A    After the accident.

10       Q    So I'm going to play the 911 recording.

11   Okay?  And I'm going to stop it periodically just to

12   make sure we understand what you said on the 911 call.

13   Okay?

14                    (Exhibit 31 was marked for

15                    identification.)

16                    THE WITNESS:  Yes.

17                    MR. WHITE:  Ms. Kimberly, if we could

18   call this Exhibit Number --

19                    THE REPORTER:  Thirty-one?

20                    MR. WHITE:  Thirty-one.

21                    (Video played.)

22   BY MR. WHITE:

23       Q    So what did you say there in that part of

24   the recording?

25       A    That I had hit someone.

                                        Page 345

```
 1          Q    Where did you say you hit someone?

 2          A    I said on the side on the road.

 3          Q    Okay.  Let's continue.

 4               (Video played.)

 5     BY MR. WHITE:

 6          Q    So could you hear what you said there?

 7          A    It sounded like I said I was looking at my

 8     GPS.

 9          Q    Okay.  And that's at about the 28 second

10     mark?

11          A    Yes.

12          Q    Okay.

13               (Video played.)

14     BY MR. WHITE:

15          Q    So what did you say right there?

16          A    I looked at my GPS real quick.

17               (Video played.)

18     BY MR. WHITE:

19          Q    What'd you say there at about the 1:28 mark?

20          A    I believe it was "I didn't mean to."

21               (Video played.)

22     BY MR. WHITE:

23          Q    Do you know what you said there at about the

24     1:42 mark?

25          A    I'm sorry.
```

Page 346

```
 1          Q    We can take a break if you need it.

 2          A    No.  I don't.  I didn't hear it.

 3          Q    I'll just go back a second.

 4                    (Video played.)

 5     BY MR. WHITE:

 6          Q    Could you hear it there about 1:42?

 7          A    I just know that it's --  I'm sorry.  I'm

 8     having trouble hearing it.

 9          Q    That's okay.  That's okay.  We'll keep

10     going.

11                    (Video played.)

12     BY MR. WHITE:

13          Q    So what did you say right there at the 2:07

14     mark?

15          A    I believe it was, "Oh, my God.  What if I

16     hurt someone?"

17                    (Video played.)

18     BY MR. WHITE:

19          Q    Can you understand what you said there?

20          A    I couldn't understand.

21                    (Video played.)

22     BY MR. WHITE:

23          Q    So what did you say there?

24          A    I looked at my GPA real quick to look at my

25     ETA 'cause I was going up to Dallas to see family.
```

Page 347

1        Q    And that's about the 3:23 mark?

2        A    Yes.

3                  (Video played.)

4    BY MR. WHITE:

5        Q    Well that might be all we got guys.  Let's

6    see.  For the record, there seems to be some sort of

7    issue with the recording so I'm going to pull it up on

8    a different device so we can finish it.

9                  Yeah.  All right.  Let's go off of this

10   laptop.  All right.  Caylee, can you hear this?  It's

11   good to go.

12                 (Video played.)

13   BY MR. WHITE:

14       Q    Okay.  So what did you say there?

15       A    That he seemed to be bent over at the tire.

16       Q    All right.  You mean the back right tire?

17       A    Yes.  Where the incident happened.

18       Q    Okay.  Is that where you think he was when

19   you hit him?  Bent over at the back right tire?

20       A    I believe that when I made contact with him,

21   yes.  He was somewhere in that general area.

22       Q    You think he was looking at the back right

23   tire to change it?

24       A    I don't know exactly what he was doing.

25       Q    So my question is locational.  Do you think

                                              Page 348

Appx_0878

```
1    he was like -- if you were looking at the right hand
2    side of that black Toyota, is he's standing in front
3    of the back right tire?  Like looking at the lug nuts?
4    Is that where you think he was?
5         A    I believe he was in front of the -- by the
6    back right tire looking at the tire.  I don't know
7    what he was doing with it.
8         Q    Okay so -- I just -- it's important; right?
9    If he's looking straight at the tire; right?  If he's
10   to the side of the car looking down, like kneeling
11   down at the tire.  Is that where you think he was?
12        A    I -- I don't know.  I know he was in that
13   general area when I struck him.
14        Q    Okay.  So I'm going to show you a photo.
15   The body's covered.  There is some blood; right?  So I
16   just need you to mark where you think he was standing.
17   Okay?
18                    (Exhibit 32 was marked for
19                    identification.)
20                    THE WITNESS:  Okay.
21                    MR. WHITE:  Ms. Court reporter, where
22   are we at?
23                    THE REPORTER:  Thirty-two, sir.
24                    MR. WHITE:  All right.  We'll mark this
25   as Exhibit Number 32.  Okay.
```

Page 349

Appx_0879

1    BY MR. WHITE:

2         Q    So I want you to take this and tell me where

3    you think Nehemias was kneeling down at the back right

4    tire.  Just make an X.

5         A    I don't know exactly.  I would have to give

6    a general area.

7         Q    That's fine.  You can draw a circle if

8    you're not sure.  Okay.  Would you mind writing your

9    initials sort of in one of the lighter colored places

10   so we can see them?  Thank you.

11             So you think he might have been up front by

12   the tire but maybe a little bit back by the -- by the

13   truck.  You're not sure?

14        A    He was in the middle of the lane in the back

15   general area of the back right tire.

16        Q    But you think we was knelt down?

17        A    He was bent over.

18        Q    Okay.  Keep this over here by you.  Since

19   it's the marked exhibit.  So when you were talking on

20   911, you said they were changing a tire; right?

21        A    That's just what I came to the conclusion at

22   the time.

23        Q    How or why?

24        A    He was looking at a tire and they were

25   pulled over.

Page 350

1      Q    So you think he was looking down at that
2   back right tire?
3      A    That's what I came to the conclusion.
4      Q    Well I'm less concerned about the
5   conclusion.  But you remember seeing him looking down
6   at that back right tire?
7      A    He was at that back tire, yes.  Looking at
8   it.
9      Q    The back right tire?
10      A    The back right tire.
11      Q    Okay.  So you told us that you think he was
12   in the middle of the lane, but there on the 911 call,
13   you said the side of the road.  What's the difference?
14      A    I later clarified in that same call that it
15   was the middle of the road.
16      Q    Okay.  Do you remember the first police
17   officer that you spoke with?
18      A    I don't remember his name.  I believe he was
19   a state trooper.
20      Q    Okay.  So I'm going to play the video of
21   your conversation with him.  Okay?
22                  (Exhibit 33 was marked for
23                  identification.)
24                  THE WITNESS:  Okay.
25                  MR. WHITE:  All right.  Let's see.  Ms.

                                        Page 351

Appx_0881

```
 1    Court reporter, is this Exhibit 33?

 2                    THE REPORTER:  It is, sir.

 3                    MR. WHITE:  All right.

 4    BY MR. WHITE:

 5         Q    We're going to play it.  We're going to

 6    start it at the five minute thirty-second mark.

 7                    (Video played.)

 8    BY MR. WHITE:

 9         Q    So you did tell -- this is Officer Otis

10    White.  You told Trooper White that you were looking

11    at your GPS; right?

12         A    That I glanced at my GPS, yes.

13         Q    Okay.  What did you mean when you told him I

14    didn't see the person until it was too late?

15         A    That he just suddenly appeared.

16         Q    Okay.  So you didn't see -- that's what

17    you're trying to convey to Trooper White?  Is Nehemias

18    just appeared in front of you?

19         A    Suddenly, yes.

20         Q    Okay.  You didn't tell him about your text

21    message to Gracie; right?

22         A    I didn't think it was relevant.

23         Q    Okay.  You didn't tell him you were going

24    nearly 90 miles an hour.  Did you?

25                    MR. BLUNT:  Objection, form.
```

                                                  Page 352

Appx_0882

```
 1         A    That wasn't on my mind at the time.
 2         Q    You didn't think it was relevant to tell
 3    them about your speed or what you were looking at?
 4         A    I don't think that was relevant at the time.
 5         Q    So why did you tell them that you'd seen the
 6    car and gotten over and Nehemias hopped out in front
 7    of you the last minute?
 8         A    Because that's how it happened.  He just
 9    suddenly appeared in the road.
10         Q    But you didn't tell the Trooper White that
11    you'd seen the car in advance and gotten over.  Did
12    you?
13         A    I was very emotionally disturbed at the
14    time.
15         Q    In fact, today is the first time you've
16    given a statement saying that you saw the car in
17    advance and got over to the right a little bit; right?
18         A    No.  I don't believe that's accurate.
19         Q    Who else have you given a statement to
20    that's consistent with the story you're telling today?
21         A    I've told Corporal Winston my statement.
22         Q    Okay.  Well we will look at Corporal
23    Winston's statement here in a second.  So I want to
24    play Corporal Winston's body cam video.  We're going
25    to start at minute 3:08.
```

Page 353

```
 1                    (Exhibit 34 was marked for

 2                    identification.)

 3                    MR. WHITE:  Ms. Kimberly, I think

 4   that's going to be Exhibit 34.

 5                    THE REPORTER:  Thirty-four, yes sir.

 6                    (Video played.)

 7   BY MR. WHITE:

 8       Q    So we're stopped at minute 3:58 seconds in.

 9   You see your cell phone mounted on -- I think that's

10   your magnetic mount to the right of your steering

11   wheel?

12       A    Yes.  I see it.

13       Q    Is that your personal phone or your work

14   phone?

15       A    It's my personal phone.

16       Q    Okay.  Let's continue.

17                    (Video played.)

18   BY MR. WHITE:

19       Q    So I want to go back and watch that bit

20   where she asked you if he was on the road.  I want you

21   to watch your head, which you can partially see here.

22   Okay?

23       A    Yes.

24                    (Video played.)

25   //
```

Page 354

```
 1   BY MR. WHITE:
 2        Q    So it looks like you shake your head "no."
 3   Is that right?
 4                  MR. BLUNT:  Objection, form.
 5        A    Incorrect.
 6        Q    What do you think it looks like?
 7        A    I shake my head "yes."
 8        Q    Okay.  But we don't know.  Do we?  Because
 9   it's kind of cut off.
10        A    I remember telling Corporal Winston yes,
11   that he was in the middle of the road.
12        Q    Okay.  Do you remember telling Corporal
13   Winston that he was knelt down at the back right tire?
14        A    I'd have to watch it to remember.
15                  (Video played.)
16   BY MR. WHITE:
17        Q    So you see where she asks you if there's
18   anything else you think you need to tell her about?
19        A    Yes.
20        Q    And you didn't tell her anything else;
21   right?
22        A    At the time, I didn't think anything else
23   was relevant.
24        Q    So did you think your speed at the time you
25   hit Nehemias was relevant?
```

                                        Page 355

1      A    I wasn't thinking about that at that time.

2      Q    You think maybe you should have told Officer

3   Winston-Lee that?

4      A    I don't know.  Maybe.

5      Q    Why?

6      A    I don't know.  I didn't think it was

7   relevant at the time.

8      Q    You don't think your speed goes to your

9   reaction time?

10     A    I just don't think I was thinking about it

11  at that moment.

12     Q    So you told her about the GPS; right?

13     A    Yes.

14     Q    You told them that the car was partially in

15  the road; right?

16     A    Yes.

17     Q    You told her that you say that he was

18  partially in the road.  He was on the road; right?

19     A    That he was in the middle of the road.

20     Q    Right.  But you didn't tell her that you'd

21  sent a text message eight seconds before.  Did you?

22     A    Not that I remember, no.

23     Q    Okay.  You didn't tell her that you didn't

24  see him -- so you did tell them you didn't see him

25  until the last minute; right?

Page 356

```
 1        A    That I didn't see him in time.
 2        Q    Okay.
 3                  (Video played.)
 4   BY MR. WHITE:
 5        Q    So did the police officers or any of the
 6   officers on scene ever breathalyze you or drug test
 7   you?
 8        A    No.
 9        Q    Did you ever get out and check to see if
10   Nehemias was okay?
11        A    I did not leave my vehicle.
12        Q    Who came to pick you up from the scene?
13        A    My Uncle Jason and Aunt Jesse.
14        Q    Did you call your Uncle Jason from the
15   scene?
16        A    I think I tried calling him, yes.
17        Q    What did he say?
18        A    I don't remember him answering.
19        Q    If you did speak to him, do you remember
20   what y'all talked about?
21        A    No.  I don't remember.
22        Q    Who did you first report the accident to
23   other than 911?
24        A    I don't remember who was after 911.
25        Q    Okay.  You said you do think you texted some
```

Page 357

Appx_0887

```
1    of your supervisors at work about it?
2         A    While I was in the car with my uncle.
3         Q    Okay.  Anybody -- did you let Donlen know?
4    Did you let somebody higher up at corporate know?
5         A    Not at that exact moment.
6         Q    Okay.  Do you remember telling Tammy that
7    you did tell Donlen?  About the accident, I mean.
8         A    I don't remember.
9         Q    Okay.  Do you know when Donlen completed
10   their report?
11        A    I don't know the exact date, no.
12        Q    I'll call this Exhibit Number 35.  Okay.
13               (Exhibit 35 was marked for
14               identification.)
15               MR. WHITE:  Can I ask the videographer
16   how much time we have on the record?
17               THE VIDEOGRAPHER:  We've been going --
18               THE REPORTER:  I've got six hours and
19   29 minutes.
20               THE VIDEOGRAPHER:  Right.  That's
21   close.
22               MR. WHITE:  Thank you.  All right.
23   BY MR. WHITE:
24        Q    All right.  So we're going to call this
25   Exhibit 35.  Flip to the second page, would you?  Do
```

Page 358

Appx_0888

1    you see where Donlen sent the accident report to Lee

2    Ward?

3                    MR. BLUNT:   Thank you.

4    BY MR. WHITE:

5        Q    Do you see where Donlen sent the accident

6    report, meaning their report, to Lee Ward on May 13,

7    2022?

8        A    Yes.  I see that.

9        Q    Okay.  When did Eastman risk management

10   reach out to you?

11       A    I don't remember exactly, but it was pretty

12   soon after.

13       Q    What did they say?

14       A    I don't remember exactly.  Just asking if I

15   was okay and about the accident.

16       Q    Who at risk management reached out to you?

17       A    I don't remember who it was.

18       Q    So why is your statement to Donlen different

19   than what you've told us here today?

20       A    I believe it is a summary.  I don't know if

21   they took my exact wording.  I don't remember exactly

22   when I gave that statement to Donlen.

23       Q    So -- okay.  What did you tell Tammy Jones

24   about the accident?  The crash?

25       A    I don't remember exactly.

                                          Page 359

Appx_0889

1        Q    Who is Tammy Jones?

2        A    Assistant risk manager is what it says.

3        Q    I'm going to introduce what we're going to

4    call Exhibit 36.  This is the Richland Police report.

5    Have you seen a copy of this before?

6                    (Exhibit 36 was marked for

7                    identification.)

8                    THE WITNESS:  Yes.  I have.

9    BY MR. WHITE:

10       Q    Okay.  So why did you tell Officer Winston

11   you didn't see Nehemias?

12       A    I told Officer Winston that I didn't see him

13   in time.

14       Q    So when you go to the third page, it has

15   Officer Winston-Lee's version of what you told her.

16   So looks to me, now you tell me if I'm wrong here.

17   That you said it was too late to avoid the impact, but

18   you swerved and still hit the man.  Is that right?

19       A    I tried to swerve.

20       Q    Okay.  Did you swerve?

21       A    I don't recall if it was a full swerve, but

22   I remember trying to jerk the steering wheel.

23       Q    Have you seen in this police report where it

24   said there were no skid marks in the roadway,

25   indicating that Caylee attempted to stop the vehicle

                                        Page 360

1    prior to impact?

2         A    Yes.  I see that.

3         Q    Is that in fact true that you didn't apply

4    your brakes before you hit Nehemias?

5         A    I don't remember hitting the brakes or not.

6         Q    Does it strike you as strange if there are

7    no skid marks?

8         A    No.

9         Q    Because you probably you -- you don't think

10   you had enough time to apply the brakes?

11        A    I think the reaction time wasn't enough time

12   to press the brakes.

13        Q    Okay.  Why were you looking at your GPS when

14   you hit Nehemias?

15        A    I was trying to look at my ETA.

16        Q    Why?

17        A    Just to see when I was arriving.

18        Q    You think maybe you've been going so fast

19   that you thought you'd exceeded the prior ETA?

20        A    No.  Not necessarily.

21        Q    Okay.  Well why look at your ETA then?

22        A    Just periodically just look at my ETA to see

23   what time.

24        Q    How long does it take you to look at your

25   ETA on the info -- were you looking at the

                                   Page 361

Appx_0891

1    infotainment center or your cell phone?

2          A     The infotainment center.

3          Q     Okay.  So you're looking at the screen in

4    the middle of the car; right?

5          A     To the right, yes.

6          Q     Okay.

7          A     Of the steering wheel.

8          Q     So is the ETA just up?  You just glance at

9    it and you see the ETA?

10         A     I glanced at the ETA and was trying to

11   determine how long of the drive I still had, yes.

12         Q     Okay.  So ETA is just on the screen; right?

13   You didn't have to press anything to make it visible?

14         A     No.

15         Q     So you didn't have to fiddle with the

16   infotainment center to look at the ETA?

17         A     No.

18         Q     So how long did it take to look from the

19   road to the ETA?

20         A     I don't know exactly how long.

21         Q     I mean you think it was more than a second

22   to glance over at it?

23         A     It was probably around a second or two.

24         Q     So then you look at your ETA, you look back

25   at the road, and that's when Nehemias is where you had

Page 362

1   not seen him before?  That's your testimony today?

2       A   I looked at my GPS for a second or two, and

3   I glanced back, and he was suddenly in the middle of

4   the road.

5       Q   So you think you looked at the GPS for two

6   seconds?

7       A   I don't know how long exactly I looked.  I

8   glanced at it.

9       Q   You glanced at it; right?  So maybe five

10   seconds?

11       A   No.  I don't think it was five seconds long.

12       Q   Your testimony is that when you were looking

13   down the road, didn't see Nehemias.  He wasn't in the

14   road; right?  That's before you looked at the GPS.

15   That's what you're saying?

16       A   Before I looked at the GPS, there was no one

17   in the road?

18       Q   No one was in the road.  Was anybody on the

19   right hand side of the yellow line?

20       A   I don't know.  I was -- I was looking at the

21   road.

22       Q   You were looking at the road.  You were

23   looking ahead though; right?

24       A   At my lane.

25       Q   Okay.  Which the car was in?

Page 363

Appx_0893

```
 1          A    The car was partially in my lane.

 2          Q    Okay.  So you saw that, got over, and then

 3     you glanced at your GPS?

 4          A    Glanced at my GPS as I was approaching, yes.

 5          Q    After you had sent a text message to Gracie?

 6          A    Before -- previously, yes.

 7          Q    But you looked at GPS before you sent the

 8     text message to Gracie?

 9          A    No.

10          Q    So you sent the text message to Gracie, and

11     then you looked forward, saw the car, got over, then

12     looked at your GPS?

13          A    Yes.  I sent the text, I was looking at the

14     road, identified the vehicle, and as I was approaching

15     and had already made the adjustment to miss the

16     vehicle, I glanced at my GPS.  And when I looked back,

17     he was suddenly in the middle of the road.

18          Q    So you made the adjustment after you sent

19     the text message to Gracie?

20          A    I had identified the vehicle after the text

21     messages.

22          Q    And that's when you made the adjustment?

23          A    I had scooted over enough to miss the

24     vehicle.

25          Q    Right.  After the text message?
```

Page 364

1        A       After the text message, yes.

2        Q       But not before the text messages?

3        A       I'm confused.

4        Q       So you sent a text message eight seconds

5    before you hit Nehemias.  So I'm trying to figure out

6    when you adjusted to the right.  Did you do that

7    before you sent the text message, or did you do that

8    after you sent the text message?

9        A       I identified the vehicle after the text

10   message and made the adjustment after the text

11   message.

12       Q       Okay.  Thank you.  So when you say he was in

13   the middle of the road, you mean he was knelt down by

14   the back right tire; right?

15       A       He was bent over in the middle of the lane

16   in that general area of the back right tire.

17       Q       Okay.  So let's go to next -- do you

18   remember providing an email statement to Officer

19   Winston-Lee?

20                    (Exhibit 37 was marked for

21                    identification.)

22                    THE WITNESS:  Yes.  I do.

23   BY MR. WHITE:

24       Q       Okay.  Who did you speak to before sending

25   that email statement to Officer Winston-Lee?

Page 365

```
 1        A    I spoke to a few people.

 2        Q    Who?

 3        A    I had just notified my managers that there

 4   was an accident.

 5        Q    Anybody give you any advice on what to put

 6   into this email statement to Officer Winston-Lee?

 7        A    No.

 8        Q    Did you think that you needed to provide a

 9   complete statement to Officer Winston-Lee?

10        A    Yes.  I needed to give a full complete

11   statement.

12        Q    Okay.  Did your Uncle Jason offer you any

13   advice about this email statement?

14        A    No.

15        Q    I'm just showing you what I've marked as

16   Exhibit Number 37.  Okay.

17                 MR. BLUNT:  Thank you.

18                 MR. WHITE:  Oh.  Sorry.  Brian --

19                 MR. SCHMIDT:  I marked on that Brian.

20   Use this one.

21                 MR. BLUNT:  Thanks.

22   BY MR. WHITE:

23        Q    Okay.  Can you look into the camera and read

24   your email statement to Officer Lee-Winston?

25        A    You want me to do that right now?
```

Page 366

Appx_0896

1          Q     Yes, ma'am.

2          A     "Corporal Lee-Winston, I have written my

3     statement for you, and it is below.  I was traveling

4     north on 45 in the left lane to go home and visit

5     friends and family.

6                "I glanced over at my GPS to see how much

7     longer I had of my drive, and then I quickly

8     approached a black vehicle partially in the left lane.

9                "By the time I saw that there was a person

10    halfway in the lane knelt down at the tire, I tried to

11    swerve to avoid hitting them, but it was too late.  I

12    pulled over immediately and called 911.

13               "Please let me know if you needed any other

14    information for me or if I can do anything else.

15    Caylee Smith."

16         Q     So you don't mention him stepping out in

17    front of you at the last minute here.  Do you?

18         A     He just appeared suddenly in the lane.

19         Q     That's not my question.  You didn't mention

20    him stepping out in front of you in this email

21    statement.  Did you?

22         A     I did not say stepping out in this email.

23         Q     And you sent this email two days after the

24    accident.  Is that right?

25         A     I believe it was Monday after the accident.

Page 367

1        Q    Okay.  Do you think people that are kneeling

2    are likely to move quickly?

3        A    I don't know.

4        Q    You think people that kneel, can they move

5    quickly?

6        A    I don't know.

7        Q    Okay.  Did you mention here that you were

8    going nearly 90 miles an hour when you hit Nehemias?

9        A    I didn't know what speed I was going at that

10   time.

11       Q    Did you mention that you had been texting

12   your friend Gracie about tattoos when you could see

13   Nehemias?

14       A    I did not mention that --

15              MR. BLUNT:  Objection, form.

16   BY MR. WHITE:

17       Q    Did you mention in this email statement that

18   you had seen the car in advance and made an

19   adjustment?

20       A    I did not say that in the statement.

21       Q    Okay.  So have you ever before today told

22   anyone in written or recorded form that you saw the

23   car in advance, and made an adjustment and then

24   checked your GPS?

25       A    I would have to look over documentation of

                                        Page 368

Appx_0898

1    video or writing.

2         Q    I'm happy to tell you, we've looked at all

3    of them.  So today's the first day you're saying that.

4    Is that right?

5         A    Incorrect.

6         Q    Who else have you told?

7         A    I've had a few text convos.

8         Q    With who?

9         A    I believe I told Sarah about the accident.

10        Q    Okay.  What was Sarah's reaction when you

11   told her about the accident?

12        A    She was confused.

13        Q    About what?

14        A    And surprised about what happened.

15        Q    Did she ask you how light it was outside?

16        A    I don't remember.  I'd have to look.

17        Q    If you could change this email that you sent

18   to Corporal Lee-Winston today, how would you change

19   it?

20        A    I think what I said was concise and

21   explained the situation as best as possible at the

22   time.

23        Q    You think this email is a complete statement

24   about what happened on April 30, 2022?

25        A    Maybe not complete, but from -- at the time

Page 369

Appx_0899

1    from what I remembered.

2         Q    You just happen to forget your speed and

3    your text messages?

4         A    No.  I just don't remember my speed at the

5    time.

6         Q    But you do remember -- I mean, you remember

7    sending a voice text to Gracie; right?  That's your

8    testimony here today.

9         A    I do remember sending the voice text, yes.

10        Q    You didn't think you needed to put that in

11   this email statement?

12        A    I didn't think it had a factor in how the

13   accident happened.

14        Q    Were you afraid of admitting that you killed

15   someone eight seconds after you were texting and

16   driving?

17                  MR. BLUNT:  Objection, form.

18        A    No.

19        Q    That didn't bug you at all?

20        A    I didn't think that had any impact on how

21   the accident -- if it would have been avoidable.

22        Q    Okay.  How has this crash affected you?

23        A    I'm more anxious.

24        Q    Okay.  Do you have trouble sleeping?

25        A    Sometimes.

                                    Page 370

Appx_0900

```
 1        Q    You feel guilty?
 2        A    I wouldn't say guilt necessarily.
 3        Q    All right.  Okay.  Going to introduce what
 4   we're going to call Exhibit 38.  This is a text
 5   message between you and your brother Christian, I
 6   believe.  You ever seen that before?
 7                   (Exhibit 38 was marked for
 8                   identification.)
 9                   THE WITNESS:  I have seen this, yes.
10   BY MR. WHITE:
11        Q    Okay.  Can you read your text message?
12        A    Which one?
13        Q    The top one.
14        A    "One of my favorite songs came on while
15   we're on the boat.  It's a great day to be alive and I
16   feel guilty that I get to still live and be on a boat
17   right now and I take that man's life.
18        Q    So you have felt guilty about Nehemias's
19   death before?
20        A    In regards to living while this man is no
21   longer.
22        Q    You still feel guilty?
23        A    I just wish that yes, he got to live.
24        Q    So what did you mean when you said you took
25   that man's life?
```

Page 371

```
 1        A    That I was involved in the accident.

 2        Q    You think you caused the accident?

 3        A    No.  Not necessarily.

 4        Q    Just yes or no.  Not --

 5        A    No.

 6        Q    Okay.  Do you remember making social media

 7   posts about this crash and how it's affected you?

 8        A    I have made a social post about it, yes.

 9        Q    Okay.  Tell me about it.

10        A    I don't remember exactly when it was, but I

11   made a post about being thankful for the people around

12   me.

13        Q    Okay.  On what social media platform?

14        A    I believe it was Instagram.

15        Q    Okay.  When did you make that post?

16        A    I think it was around Thanksgiving.

17        Q    Okay.  So going to introduce what we're

18   going to call Exhibit 39, which I think is that

19   Instagram story.

20                    (Exhibit 39 was marked for

21                     identification.)

22                    (Video played.)

23   BY MR. WHITE:

24        Q    Can you read the text, the caption, that you

25   put on this Instagram story?
```

Page 372

Appx_0902

1       A    It's a little small.

2       Q    Sure.

3       A    "I decided to show what I was thankful and

4    grateful for a little early this year.  Some of you

5    may or may not know -- may not have known, but I was

6    involved in a very serious accident in April that

7    affected another family more than mine.

8            "And overall has weighed very heavy on my

9    heart, and I wish there was more I could do.  I've

10   suffered with mental illness long before this

11   accident, but it definitely tested my strength.

12           "Every single one of these people have

13   knowingly or unknowingly been my why.  My reason to

14   keep going.  So thank you for continuously being my

15   backbone when I can't seem to stand on my own."

16      Q    So why did you make this Instagram story?

17      A    I was feeling sad and just grateful for the

18   people around me.

19      Q    How do you think Nehemias's family thinks

20   when they see that story?

21      A    I don't know.

22      Q    Do you remember what all you told Sarah

23   about the accident?

24      A    Not exactly, no.

25      Q    Introduce what we'll call Exhibit --

                                        Page 373

```
 1                    MR. WHITE:  Ms. Kimberly, is it 40?
 2                    THE REPORTER:  It is 40, sir.
 3                    (Exhibit 40 was marked for
 4                    identification.)
 5     BY MR. WHITE:
 6          Q    So these are text messages between you and
 7     Sarah.  Have you seen these before?
 8          A    Yes.  I believe I've seen these.
 9          Q    Okay.  Why do you think Sarah asked you "Was
10     it dark"?
11          A    She was curious.  She didn't have any
12     context of when it happened.
13          Q    So you don't think there was any other
14     reason she asked you was it dark when you hit someone
15     in the road?
16          A    I don't know why.  I mean, it's just a
17     question that I guess she had.
18          Q    Okay.  Do you think a lot of people might
19     wonder how it is you hit someone in the middle of the
20     road?
21          A    Maybe their first initial question.
22          Q    Was it what was the light like?
23          A    Was it day or night?
24          Q    Okay.  Did you tell her it was sunny?
25          A    I don't remember.  I don't think I said one
```

Page 374

1    or the other.

2         Q    What did you tell Sarah about how you were

3    getting back to Houston?

4         A    I don't remember what I told her.

5         Q    Who was going to pay for your flight back to

6    Houston?

7         A    Eastman.

8         Q    Okay.  Why?

9         A    I'm not sure why they decided that.

10        Q    Did Eastman in fact pay for your flight back

11   to Houston?

12        A    Yes.  I would assume it was just because it

13   was during that conference time that I was supposed to

14   be at the conference that week.

15        Q    Okay.  Who offered to pay for your mental

16   health counseling related to the crash?

17        A    Eastman offers mental health counseling free

18   of charge through them.

19        Q    And they offered that to you?

20        A    Yes.

21        Q    Had you ever used it before the crash?

22        A    I've been to counselors, yes.

23        Q    With Eastman?

24        A    Not with Eastman.

25        Q    Okay.  Do you deny that you were texting and

                                            Page 375

1    driving when Nehemias was in plain sight of your

2    vehicle?

3        A    I was not texting and driving when I

4    suddenly saw him.

5        Q    Okay.  But do you deny that you were texting

6    and driving when you could see the black Toyota?

7        A    I don't know how far I was whenever I sent

8    that text.  Exact location.

9        Q    Okay.  So you agree that your destination

10   had not changed right before that you hit Nehemias, so

11   there's no reason to check your GPS; right?

12       A    I was checking to see how long I had left.

13       Q    To get to Gracie's house?

14       A    The ETA, yes.

15       Q    Okay.  Were you watching for Gracie's text?

16       A    No.

17       Q    How quickly do you think you responded to

18   Gracie's texts throughout your conversation with her?

19       A    I'm not sure.

20       Q    Do you think you responded quickly?

21       A    It's possible.

22       Q    You know your cell phone records both when

23   you receive a text message and when you read it;

24   right?

25       A    Yes.

Page 376

Appx_0906

1       Q     That's how the read receipts work on the

2     text messages?

3       A     Yes.

4       Q     So we know how soon you were reacting to

5     every text message Gracie sent you.

6       A     Yes.

7       Q     Do you think you were responding to text

8     messages almost instantaneously?

9       A     It's possible.  I don't know for sure.

10      Q     How have you changed your behavior following

11    the crash that killed Nehemias?

12      A     I've just tried to find ways to manage my

13    anxiety.

14      Q     You've done -- have you changed your driving

15    habits?

16      A     I just try to stay safe while driving.

17      Q     Have you changed your habits at all?

18      A     I just try to avoid distractions.

19      Q     Okay.  So is that a change?

20      A     I've always tried to avoid distractions, but

21    I guess not necessarily it's changed, but --

22      Q     Would you say you've made an increased

23    effort not to use your phone in your car following the

24    accident?

25      A     I try to make it a point not to use my phone

Page 377

1    now, yes.

2         Q     Okay.  Why?

3         A     Just because it could be a distraction.

4         Q     Okay.  So you feel like you've maybe learned

5    something from this incident?  To avoid using your

6    phone in your car; right?

7         A     Just to avoid any distraction.

8         Q     Any distraction including -- you've learned

9    from this lesson to avoid any distraction, including,

10   but maybe not limited to, using your phone in your

11   car?

12        A     Yes.  That's one distraction.

13        Q     Okay.  But you feel like that's a lesson

14   you've learned?

15        A     I feel like, yes.  That's something that I

16   try to avoid.

17        Q     Okay.  So if I were to check your iCloud and

18   social media, would I find any videos or photos taken

19   by you from your vehicle since the accident?

20        A     I don't know.

21        Q     Do you think it's possible?

22        A     I don't know.  I haven't looked.

23        Q     But I mean, surely after killing someone in

24   the middle of the road while being on your phone,

25   you've decided not to use your phone while in your

                                        Page 378

Appx_0908

1    car; right?

2                    MR. BLUNT:  Objection, form.

3        A    I try not to.

4        Q    Okay.  I'm going to introduce what's called

5    Exhibit 41, I believe.  Do you recognize this?

6                    (Exhibit 41 was marked for

7                    identification.)

8                    THE WITNESS:  Yes.  I see this.

9    BY MR. WHITE:

10       Q    All right.  What is that?

11       A    It's a picture of the infotainment center.

12       Q    Okay.  Is that infotainment center in your

13   Eastman provided car?

14       A    I believe so.

15       Q    Okay.  When did you post that Instagram

16   story?

17       A    I don't know when that was posted.

18       Q    You think you posted it a month ago?

19       A    I mean it's possible.  I don't know when

20   this was posted.

21       Q    So are you still using your phone in your

22   Eastman provided vehicle as of the summer of 2023?

23       A    I use it while I'm in the car, yes.

24       Q    Okay.

25       A    Not always driving.

Page 379

Appx_0909

1      Q    In the summer of 2023, you posted that
2    Instagram photo; right?
3      A    Yes.  I'm not sure if I was driving during
4    this though, but yes.  I do use it while I'm in the
5    vehicle.
6      Q    You do use your phone while you're in the
7    Eastman provided vehicle in the summer of 2023?  Just
8    to get that on the record.
9      A    Yes.  I have used my phone, the year 2023,
10   while in a vehicle.
11     Q    In your Eastman provided vehicle?
12     A    Yes.  In the Eastman provided vehicle.
13     Q    Has Eastman trained you since the collision
14   with Nehemias?
15     A    I don't remember any specific training.
16     Q    Since the accident, you don't remember any?
17     A    I don't remember what training we have
18   gotten.
19     Q    Okay.  But you have received some training?
20     A    We get yearly modules sent to us.
21     Q    But you haven't received --
22     A    I don't remember the specifics.
23     Q    Sorry.  You haven't received any
24   individualized training since the accident?
25     A    Not that I remember, no.

Page 380

Appx_0910

1        Q    Do you think you're addicted to your

2   smartphone?

3        A    No.

4        Q    Okay.  Would you agree that you more than

5   most people should understand the risks of using your

6   phone while in your car, yet you continue to do so?

7        A    I don't know why I'd be singled out in that.

8        Q    You don't have any idea why you'd be singled

9   out as someone that should be aware of the risks of

10  distracted driving?

11       A    You said texting or on my phone.

12       Q    Okay.  So you don't know why you of

13  everybody should have a special understanding of the

14  risk of distracted driving?

15       A    I do have a very good understanding of

16  distracted driving, yes.

17       Q    But not enough to quit doing it; right?

18       A    I don't know if this was distracting driving

19  if I was driving at this time.

20       Q    So you're not sure if taking photos in your

21  Eastman provided vehicle constitutes distracted

22  driving a year after you ran over Nehemias Santos?

23       A    I don't know if I was driving in this photo.

24       Q    You think it's okay if you're sitting still

25  to take that photo?

Page 381

1          A     If I'm in a parking lot or at home, or if I

2     haven't left, yes.

3          Q     How many videos or photos have you taken

4     from your phone since the accident happened?

5          A     I have no clue.

6          Q     Will they all be on your phone, or would

7     they be on social media sites as well?

8          A     I don't know.

9          Q     To your knowledge before or after this

10    crash, has Eastman put any software on you or any

11    other Eastman employees phones to prevent distracted

12    driving?

13         A     I don't know.

14                THE REPORTER:  Seven minutes.

15    BY MR. WHITE:

16         Q     What would you tell Nehemias's family if you

17    had the opportunity?

18         A     I don't know what I would say at this

19    moment.  I would have to really think about it on what

20    I would say to them.

21         Q     If Nehemias was alive, what would you say to

22    him?

23         A     I just wish this accident wouldn't have

24    happened.

25         Q     If you could go back, what would you do

                                          Page 382

Appx_0912

1    differently if anything on April 30, 2022?

2         A    I don't know.  I may try to avoid

3    distractions.

4                   MR. WHITE:  Reserve the remainder of my

5    questions for trial.

6                   MR. BLUNT:  I have just a few.

7                        EXAMINATION

8    BY MR. BLUNT:

9         Q    Caylee, was Nehemias Santos on the right

10   side of the Toyota Camry when you first saw him?

11        A    When he suddenly appeared, yes.

12        Q    Was he in your lane of travel?

13        A    Yes.

14        Q    In the whole of your conversation with the

15   911 operator, did you tell the operator that he was in

16   the lane?

17        A    Yes.

18        Q    When you spoke to Officer White, did you

19   tell Officer White in the whole of your conversation

20   with him that Nehemias was in the lane?

21        A    I believe so.

22        Q    What about when you spoke with Officer

23   Winston -- Corporal Winston?  Did you tell her that he

24   was in your travel lane?

25        A    I believe so, yes.

Page 383

Appx_0913

1       Q   So if at times you said you hit someone on

2  the side of the road, what did you mean by that?

3       A    Just in that general area.  The left.  The

4  right side of the road, the left side of the road,

5  just on the left lane.

6       Q   Is there any question in your mind about

7  whether he was in the travel lane versus across the

8  yellow line on the shoulder?

9       A   No.  He was in the middle of the lane.

10      Q  Do you think your speed was the cause of the

11  accident?

12      A   I don't think I had enough reaction time no

13  matter what speed I was going to avoid the collision.

14      Q  Do you believe if you'd been driving 75

15  miles an hour that you could have avoided hitting him?

16      A   I think he appeared so suddenly that I

17  didn't have the reaction time.

18      Q  Do you believe the text you sent to Gracie

19  prior to the accident was the cause of the accident?

20      A   I don't think it was.

21      Q  Were you in the middle of sending that text

22  when the impact occurred?

23      A   No.

24      Q  Were you in the middle of reading a text

25  when that impact occurred?

Page 384

1        A    No.

2        Q    Did you have your phone in your hand when

3   the impact occurred?

4        A    Not that I remember.

5        Q    Do you believe you did anything wrong by

6   glancing over at your GPS for a moment to check your

7   ETA?

8        A    No.

9        Q    When you glanced over at your GPS, did you

10  have open space in your lane of travel sufficient to

11  allow you to pass the Toyota Camry?

12       A    I concluded yes.

13       Q    Do you believe that glancing over at your

14  GPS was a cause of the accident with Mr. Santos?

15       A    I don't think so.

16            MR. BLUNT:  Pass.

17            MR. WHITE:  Just a couple.

18                    EXAMINATION

19  BY MR. WHITE:

20       Q    So if you had not looked at the GPS, do you

21  think Nehemias would be dead today?

22       A    I don't know.  He suddenly just appeared in

23  the lane.

24       Q    So when you say he suddenly appeared in the

25  middle of the road, you mean that he was knelt down by

                                      Page 385

1    the back right tire; right?

2        A    He suddenly appeared in the back right tire

3    in the middle of the lane in that general area, yes.

4        Q    Okay.  So the tire hadn't moved from when

5    you had last seen it; right?

6        A    What tire?

7        Q    The back right tire.

8        A    I don't know.

9        Q    So how is it exactly that you can say he

10   appeared out of nowhere when the tire hadn't moved,

11   and he hadn't changed anything.

12       A    I don't know.  I remember approaching the

13   vehicle, glancing at the GPS, and when I looked back,

14   he was in the middle of my lane.  And bent over at the

15   tire.  The back right tire.

16       Q    And you agree that to a distracted driver

17   when an obstacle comes within their cognition, that

18   it's going to seem sudden to the distracted driver,

19   even if in fact the obstacle did not arise suddenly?

20              MR. BLUNT:  Objection, form.

21       A    Could you rephrase that, please?

22       Q    So to a distracted driver, do you think it's

23   possible that if an obstacle in the road appears, that

24   to the distracted driver it's going to seem like that

25   obstacle showed up suddenly, when in fact it did not?

                                    Page 386

Appx_0916

1          A     I guess that's possible.

2                     MR. WHITE:  Pass.

3                     MR. BLUNT:  I have no further

4     questions.

5                     MR. WHITE:  Caylee, thank you.

6                     MR. BLUNT:  Thank you guys for getting

7     it into seven hours.

8                     THE VIDEOGRAPHER:  6:10, we're off the

9     record.

10

11                     (Whereupon, at 6:10 p.m., the

12                     proceeding was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                                         Page 387

Appx_0917

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2              I, KIMBERLY HOLTON, the officer before whom
 3      the foregoing proceedings were taken, do hereby
 4      certify that any witness(es) in the foregoing
 5      proceedings, prior to testifying, were duly sworn;
 6      that the proceedings were recorded by me and
 7      thereafter reduced to typewriting by a qualified
 8      transcriptionist; that said digital audio recording of
 9      said proceedings are a true and accurate record to the
10      best of my knowledge, skills, and ability; that I am
11      neither counsel for, related to, nor employed by any
12      of the parties to the action in which this was taken;
13      and, further, that I am not a relative or employee of
14      any counsel or attorney employed by the parties
15      hereto, nor financially or otherwise interested in the
16      outcome of this action.

17                              KIMBERLY HOLTON
18                      Notary Public in and for the
19                              State of Texas
20
21
22
23
24
25
                                          Page 388
```

Appx_0918

```
 1                    CERTIFICATE OF TRANSCRIBER

 2            I, EBELIN MORALES, do hereby certify that

 3     this transcript was prepared from the digital audio

 4     recording of the foregoing proceeding, that said

 5     transcript is a true and accurate record of the

 6     proceedings to the best of my knowledge, skills, and

 7     ability; that I am neither counsel for, related to,

 8     nor employed by any of the parties to the action in

 9     which this was taken; and, further, that I am not a

10     relative or employee of any counsel or attorney

11     employed by the parties hereto, nor financially or

12     otherwise interested in the outcome of this action.

13

14

15                                       EBELIN MORALES

16

17

18

19

20

21

22

23

24

25

                                              Page 389
```

Appx_0919

```
 1   Gonzalez, Erika, Et Al. v. Smith, Caylee Erin, Et Al.

 2   Caylee Erin Smith Job No. 6038373

 3                    E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Caylee Erin Smith                        Date

25
```

Page 390

Appx_0920

```
 1    Gonzalez, Erika, Et Al. v. Smith, Caylee Erin, Et Al.

 2    Caylee Erin Smith 6038373

 3                   ACKNOWLEDGEMENT OF DEPONENT

 4       I, Caylee Erin Smith, do hereby declare that I

 5    have read the foregoing transcript, I have made any

 6    corrections, additions, or changes I deemed necessary as

 7    noted above to be appended hereto, and that the same is

 8    a true, correct and complete transcript of the testimony

 9    given by me.

10

11    _____    _____

12    Caylee Erin Smith                         Date

13    *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20____.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

                                              Page 391
```

Appx_0921

**[& - 2022]**

| & |
|---|
| **&**   2:6 298:7 |
| 299:6,11,15,20 |
| 300:5,14,16 |
| 301:7,13,22,25 |
| 302:4 304:6,13 |
| 304:15 |

| 0 |
|---|
| **008**   82:18 |
| **02**   1:11 |
| **02714**   7:16 |
| **05/17/22**   5:15 |

| 1 |
|---|
| **1**   4:9 7:3 47:4,7 |
| 153:16 318:12 |
| **1.25**   318:12 |
| **1.5**   76:1 95:1 |
| **10**   4:19 81:16 |
| 82:1 281:4 |
| **10,000**   149:19 |
| 149:20 |
| **10/4/18**   5:7 |
| **100**   91:18 |
| 264:21 266:7 |
| 266:10,12,15 |
| **100,000**   92:15 |
| 92:17 |
| **101**   11:13 |
| **105**   222:16,22 |
| 222:25 224:25 |
| **10:30**   251:12 |
| 251:13,16,22 |
| **11**   4:20 84:24 |
| 85:1,4,5 |

**110**   91:18,21
**11:15**   106:10
**11:35**   106:15
**12**   4:21 44:3
46:24 88:3,5
93:7 279:23
**1240**   257:1
**12:45**   174:19
**13**   4:22 90:3,5
359:6
**13339**   241:4,13
243:5,8
**14**   4:23 44:5
96:3,5 98:5
157:11
**14,000**   75:22
**15**   4:24 156:11
158:2 159:8
288:15 310:16
**156**   4:24
**16**   4:25 110:11
162:15,17
**162**   4:25
**17**   5:2 10:18
177:10,12,13
179:15
**17,500**   94:12,23
**177**   5:2
**18**   5:3 23:21,22
185:17,22
202:21
**185**   5:4
**19**   5:5 192:7,9
192:22

**192**   5:5 195:4
**196**   5:6
**198**   5:7
**1998**   10:18
**1:28**   346:19
**1:38**   174:24
**1:42**   346:24
347:6

| 2 |
|---|
| **2**   4:10 47:12,14 |
| 106:14 |
| **2/26/19**   5:6 |
| **20**   5:6 73:13 |
| 124:5,8 196:22 |
| 196:23 272:16 |
| 391:15 |
| **200**   3:13 |
| **2006**   36:1,2 |
| **2008**   35:25 |
| **2014**   32:22 |
| **2015**   30:25 |
| 39:17 |
| **2017**   25:14 |
| 84:6 |
| **2018**   199:13 |
| **2019**   20:8,11 |
| 25:23 31:1,18 |
| 38:6 246:21 |
| 247:11 |
| **2020**   3:13 |
| 85:10 86:8,15 |
| 86:25 246:21 |
| 247:11 280:8 |
| **2021**   80:3,4 |
| 95:20 117:12 |

141:3 152:18
153:8 169:20
173:14 174:7
180:15 185:4,7
185:11 203:22
222:8,10
241:15 244:3
**2022**   9:17 19:6
19:8 22:12
27:23 95:24
117:13 139:12
139:17 141:18
143:17,17
152:11 169:19
169:21 180:15
213:8,11,14,22
214:4 215:17
215:20 220:7
220:25 221:23
222:12 224:5
225:18 241:15
241:20 245:20
246:2 248:4,13
252:6,18 253:3
255:10 256:5
256:22 258:8
258:14,21
260:6 262:14
263:25 264:23
270:13 272:2,4
272:7 273:1
274:2 278:10
278:14 280:20
283:1 287:24
288:10 289:11

Page 1

Appx_0922

**[2022 - 3:22]**

289:14 291:16
297:13,17
318:2 339:9
340:1 359:7
369:24 383:1
**2023** 1:17
19:15 93:3
379:22 380:1,7
380:9
**207** 5:9
**20s** 172:20
**21** 5:7 198:17
198:19 207:16
**214** 37:13,16
38:4
**214-783** 37:11
**215** 5:11
**21755** 18:23
**22** 5:8 207:17
207:20 283:1
**23** 5:10 215:5,7
**23219** 3:7
**238** 5:13
**24** 5:12 126:17
238:17,21
271:13
**2400** 1:20 7:18
**246-0505** 2:10
**24944** 388:16
**25** 5:14 85:10
90:23 91:5,6,7
92:8,10 94:9
94:25 271:8,12
271:21 275:4,5
275:8

**25,000** 92:17
**26** 5:15 277:21
277:25
**26th** 280:20
**27** 5:16 86:8
279:2,4
**271** 5:14
**277** 5:15
**279** 5:16
**27th** 85:14
**28** 5:17 280:12
280:13 346:9
**280** 5:17
**2800** 116:16
**29** 5:18 188:9
241:20 245:20
246:2 248:4
317:1,3,11
326:9 358:19
**295-7200** 3:16
**29th** 240:21
241:14 242:8
246:6 280:25
281:5,9
**2:34** 224:17
**2nd** 282:19

**3**

**3** 4:11 47:19,21
85:21 174:23
222:8
**30** 5:19 9:17
95:24 139:12
139:17 141:18
143:17,17
152:11 213:8

213:11,14,22
214:4 215:17
215:20 220:7
220:25 221:23
222:12 225:18
248:13 252:6
252:18 253:3
255:10 256:5
256:22 258:8
258:14,21
260:6 262:13
263:24 264:23
270:13 272:2,4
272:7,18 273:1
274:2 278:9,14
280:7 287:24
288:10 289:11
289:14 291:15
297:13,17
318:2 334:15
334:16 339:9
340:1 369:24
383:1
**30207** 389:14
**30th** 161:19
213:16 221:4
249:12,15
257:25 262:8
264:18 281:17
**31** 5:20 345:14
**317** 5:18
**32** 5:21 349:18
349:25
**320** 2:7

**33** 5:22 351:22
352:1
**334** 5:19
**335** 2:14
**34** 5:23 40:16
354:1,4
**3435** 39:12,25
40:3 46:22,23
46:25 47:2
58:19,23
**345** 5:20
**349** 5:21
**35** 5:24 358:12
358:13,25
**351** 5:22
**354** 5:23
**358** 5:24
**36** 5:25 360:4,6
**360** 5:25
**365** 6:2
**37** 6:2 365:20
366:16
**371** 6:3
**372** 6:4
**374** 6:5
**379** 6:7
**38** 6:3 371:4,7
**383** 4:4
**385** 4:5
**39** 6:4 239:1
372:18,20
**3:08** 353:25
**3:10** 324:23
**3:22** 1:11 7:16

[3:23 - abstractly]

**3:23** 348:1
**3:58** 297:4
354:8
**3m** 121:22
**3rd** 282:19

**4**

**4** 4:12 38:14,16
38:19 48:2,4
224:21
**40** 6:5 73:12
239:1 272:20
374:1,2,3
**41** 6:6 379:5,6
**412** 157:10
**45** 164:12
250:12 253:6
260:6 264:23
265:20 266:20
267:14,25
268:4 273:1
278:9,13
292:23 367:4
**469** 2:17
**47** 4:9,10,11
**48** 4:12,13
**4:19** 297:9
**4:58** 336:13
**4th** 282:19

**5**

**5** 4:13 43:10
48:9,11 127:4
127:8 297:8
**5/16/22** 5:24

**50** 73:11 75:11
272:22
**50/50** 204:8
**5000** 149:21
**5:08** 336:18
**5:32** 5:22

**6**

**6** 4:14 62:24
63:1,5 336:17
**60** 272:25
**60/40** 204:3
**6038373** 1:23
390:2 391:2
**63** 4:14
**65** 83:19
**69** 4:15
**6:10** 387:8,11

**7**

**7** 4:15 69:14,19
**70** 94:8 163:25
**70,000** 93:7,12
**714** 1:12
**71923** 2:8
**73** 14:19
**74** 4:17
**75** 14:19 75:11
163:22 266:24
267:4,6 384:14
**751-2819** 2:17
**75230** 2:15
**75604** 3:14
**76** 4:18
**77002** 1:21
7:18

**775-1154** 3:9
**7859** 2:14

**8**

**8** 1:17 4:16
74:13,18
**80** 83:19
**800** 3:6
**804** 3:9
**82** 4:19
**829** 279:18
**837** 179:16
**845** 1:20 7:17
**85** 4:20 234:2
234:12,24
235:4,9,12,17
235:22 236:2
236:10,16,21
236:25
**850** 208:8
**854** 186:14
**870** 2:10
**88** 4:21
**885** 188:10

**9**

**9** 4:3,18 76:5,9
**90** 4:22 267:9
267:14,22
268:1,3,11
301:12,15
352:24 368:8
**903** 3:16
**911** 5:20 344:7
345:4,8,10,12
350:20 351:12

357:23,24
367:12 383:15
**912** 193:18
195:9
**936** 37:12,14
38:2,5
**936-232-6471**
36:21
**96** 4:23
**99** 146:20,23
**9:19** 1:18 7:4

**a**

**a&m** 25:1,7,16
**a.m.** 1:18 281:4
**aaron** 46:24
**ability** 388:10
389:7
**able** 41:23 44:6
58:16 78:17
93:1 125:5
155:9 159:4
202:16 208:22
242:19,21
**above** 84:11
85:25 88:9
91:21 142:16
159:7 232:19
233:19 265:2,7
391:7
**absent** 7:24
**absolutely** 10:4
**abstract** 16:17
**abstractly**
29:21

Page 3

Appx_0924

**[accepted - additions]**

**accepted**  72:19
85:15 90:16,17
**access**  40:1,7
41:4,10,18
46:11 48:15,19
48:23 58:12,16
59:1,11,13
101:15 207:9
**accessed**  59:14
**accident**  26:18
26:20 27:3
28:1 29:19
33:8 36:23
44:2,7 55:2
95:21,23,24
104:12 107:13
115:4 117:2,23
141:16 146:7
149:12,24
151:16,19
152:9,11 155:1
161:16 164:11
165:3 168:17
169:17,23
170:16 171:4
175:7,11 176:3
176:10,20
185:4,7,11
213:17,22
214:1 220:6,24
221:3,8,13,23
222:2 223:25
224:25 225:18
225:22 226:18
226:21,24

240:21,22
242:9 245:10
246:12 250:14
255:6 262:18
262:23 267:5
292:14 310:10
340:12,20
345:9 357:22
358:7 359:1,5
359:15,24
366:4 367:24
367:25 369:9
369:11 370:13
370:21 372:1,2
373:6,11,23
377:24 378:19
380:16,24
382:4,23
384:11,19,19
385:14
**accidents**  52:9
87:7,13 221:22
226:1,8 227:7
**accompanying**
253:2
**accomplish**
128:14
**account**  4:9,10
4:11,12,13
15:24 16:4
46:18,24 47:1
47:5,6,13,20
48:3,10,18
57:25 58:10,19
73:6 117:21

119:18,21
124:15,23
159:15 197:6
197:11 198:18
198:22 207:8
207:10 279:10
279:11
**accountability**
159:11,13,21
159:25 160:3,9
160:13
**accountable**
160:4,6
**accountant**
117:18
**accounting**
62:22
**accounts**  39:9
39:19 40:7,12
48:17,23 56:4
56:6 58:13
74:2 119:14,16
171:21
**accurate**  14:24
168:9,12
353:18 388:9
389:5
**accurately**
51:21
**acknowledge**
160:10
**acknowledge...**
391:3
**acknowledging**
186:9

**acknowledg...**
7:22
**action**  1:10
7:16 49:20
195:15,19
388:12,16
389:8,12
**actions**  159:16
160:4,6
**activated**  218:9
**active**  40:25
**actual**  29:20,24
100:13 298:1
**actually**  23:4
27:19 34:18
46:1 51:21
55:22 77:17
83:13 176:9
200:8 217:24
261:3 298:18
298:20 330:4
**add**  91:10,12
148:15
**added**  91:25
284:11
**addicted**  381:1
**additional**  17:9
90:14 97:19
107:14,16
118:22 152:23
153:4
**additionally**
7:24
**additions**  391:6

**[address - ample]**

| | | | |
|---|---|---|---|
| **address** 18:22 | 353:17 368:18 | 168:2,23 | 104:15 105:13 |
| 19:16 41:6 | 368:23 | 179:25 188:23 | 160:23,25 |
| 105:1 115:1 | **advanced** | 188:25 189:3,7 | 161:5 170:21 |
| 117:4,5,24 | 66:24 | 190:1,7 194:16 | 170:22 171:1 |
| 168:19 241:5 | **adverse** 158:9 | 195:22,25 | 176:5,23 |
| 256:24,25 | 185:10 218:16 | 196:1 209:8,12 | 180:14,24 |
| 257:3 | **advice** 18:15 | 209:15 215:15 | 279:25 |
| **adjacent** | 269:2,9 340:6 | 216:12,15 | **alcohol** 246:6 |
| 179:18 | 366:5,13 | 217:23 219:13 | **alert** 295:13 |
| **adjust** 316:13 | **advising** | 227:11,14,17 | **aligned** 159:7 |
| **adjusted** 158:9 | 269:13 | 234:2 235:21 | **alive** 371:15 |
| 365:6 | **affect** 134:2 | 235:23,25 | 382:21 |
| **adjusting** 216:9 | **affected** 95:13 | 237:5 238:12 | **allow** 41:15 |
| **adjustment** | 370:22 372:7 | 266:13 272:3,6 | 81:7 385:11 |
| 312:10,19 | 373:7 | 310:15 317:11 | **allowance** |
| 313:5 314:5 | **afraid** 370:14 | 320:10,14 | 115:21,23 |
| 315:16 316:1,7 | **afternoon** | 324:18 376:9 | 116:1,9,12,16 |
| 316:10 326:18 | 10:23 127:14 | 381:4 386:16 | **allowed** 147:14 |
| 326:22,24 | 250:15,23 | **agreed** 235:24 | 330:15 |
| 327:1,3,5,7 | **age** 39:5 203:11 | **agreement** 4:23 | **allows** 147:24 |
| 328:7 364:15 | **agent** 61:13,15 | 11:4 13:22 | 218:12 |
| 364:18,22 | 61:17 64:7 | 97:22,24 98:4 | **alongs** 171:6,13 |
| 365:10 368:19 | **agents** 61:14 | **ahead** 15:1 | 171:16,17 |
| 368:23 | **ages** 24:4 258:5 | 47:3 69:16 | 176:4,24 179:8 |
| **administer** | **aggie** 25:11 | 160:5 171:25 | 214:23 |
| 7:22 | **ago** 30:23,23 | 177:9 192:20 | **altima** 143:24 |
| **administrator** | 34:6,6 379:18 | 202:6 306:4 | 146:13 |
| 1:6 2:3 7:11 | **agree** 8:1 11:7 | 314:15 363:23 | **amend** 29:9 |
| **admit** 83:18 | 13:18 95:24 | **airport** 274:22 | **america** 250:7 |
| 338:20,25 | 96:20,22 97:10 | 276:5,9,12 | **amount** 15:10 |
| **admitted** 89:5 | 108:2 113:24 | 279:23 280:4 | 73:8,10 79:8 |
| **admitting** | 155:10 162:7 | **al** 390:1,1 | 93:25 130:18 |
| 370:14 | 163:14,17,21 | 391:1,1 | **ample** 158:7,13 |
| **advance** 262:7 | 163:24 164:17 | **alan** 76:23 77:1 | 158:17,20 |
| 262:10 353:11 | 166:1,18,23 | 79:6 103:17 | |

**[angel - approach]**

**angel** 86:5
  261:2
**angle** 335:9
**anniversary**
  292:18
**annoyed** 86:3
**answer** 11:6,21
  13:19,23 14:10
  14:16 15:2,20
  15:20,22 16:8
  16:9,15,17,22
  22:8 29:9 34:5
  43:13 50:24
  51:17,21 52:2
  79:22 87:9
  89:8 125:6
  131:9 148:21
  148:22 168:6
  181:19 201:11
  205:19 242:21
  243:13,13,13
  269:8 286:10
  306:4 316:24
  332:13
**answered**
  16:16 286:18
  305:24 332:20
**answering**
  125:24 182:2
  217:9 357:18
**answers** 12:10
  12:18 13:8
  16:13 17:3
  30:2,4 51:4
  52:5 130:15

  254:3,5 268:13
  269:10
**antenna** 344:25
  345:6
**antonio** 21:2
  118:11,19,20
  130:7 176:19
  220:17
**anxiety** 246:17
  246:19,23
  377:13
**anxious** 370:23
**anybody** 12:14
  21:3,5 23:16
  23:20,22 27:6
  27:8,21 28:13
  28:17 29:4
  48:22 129:20
  146:5,9 154:19
  170:8 191:23
  211:10 219:23
  220:1 223:25
  248:17 252:17
  262:16 323:8
  358:3 363:18
  366:5
**anymore** 22:9
  41:4 61:8
  103:20 104:22
  316:7
**anytime** 296:14
**apart** 100:10
**apartment**
  64:11

**apartments**
  61:16,18 64:17
  64:17,23
**app** 16:6 42:4
  43:20 45:5,5,7
  45:8,17,18
  53:11,12,12,15
  54:8,10 55:7
  101:19 136:22
  136:24,25
  137:2 147:19
  147:19,22,23
  148:9 150:5
  209:18,20
  210:3,9 260:2
  260:3
**appear** 32:5,12
  32:15 84:5,13
  85:20 86:18,25
**appeared** 86:8
  165:7 167:2,5
  167:8 328:25
  330:23 331:15
  331:25 334:6
  339:7 340:24
  341:8,10,19
  352:15,18
  353:9 367:18
  383:11 384:16
  385:22,24
  386:2,10
**appears** 386:23
**appended**
  391:7

**apple** 39:7
  43:17,19
  138:10,19
  288:21,23
  289:8,8 294:5
  294:9,11 295:9
  295:16,25
  296:16 307:17
  310:1
**applicable** 8:5
  96:23 97:10
**applicant** 68:25
**applicants** 80:9
**application**
  4:18 76:7
  105:2 115:1
**applications**
  43:13 81:13
  88:14
**applied** 65:9
  69:18 75:3
  76:7 77:14
  81:24 82:3
  87:1 215:16,19
**apply** 63:10
  65:12 78:22
  94:25 150:6,11
  361:3,10
**applying** 71:13
  71:21
**appointments**
  300:25 304:1,4
  304:10
**approach**
  316:24 333:25

Page 6

**[approach - attached]**

334:24
**approached**
333:23 367:8
**approaching**
312:6 332:25
364:4,14
386:12
**appropriate**
158:6 192:25
**approve**  140:17
**approximately**
22:6 30:22
75:22 76:1
250:15 251:21
269:21 275:8
284:18
**approximation**
15:13 30:14
94:6 204:2
**apps**  44:17,21
44:25 45:1,2
45:10 46:7,11
56:20 204:10
206:8 245:12
245:13 282:1
**april**  9:17
22:12 27:23
95:24 139:12
139:17 141:18
143:17,17
152:11 161:19
213:8,11,14,15
213:22 214:4
215:17,20
220:7,25 221:4

221:23 222:12
225:18 240:21
241:14,20
242:4 245:20
246:2 248:4,13
249:12,15
252:6,18 253:3
255:10 256:5
256:22 257:25
258:8,14,21
260:6 262:8,13
263:24 264:18
264:23 270:13
272:2,4,7
273:1 274:2
278:9,14 280:7
280:20,25
281:17 283:1
287:23 288:10
289:11,14
291:15 297:13
297:17 318:2
339:9 340:1
369:24 373:6
383:1
**ar**  2:8
**archive**  263:10
**area**  20:8,11,15
22:15,25 23:5
23:12 37:13
118:20 119:16
119:16 121:20
129:16,18
151:5 224:25
250:23 251:2

253:16 274:2
285:24 288:17
348:21 349:13
350:6,15
365:16 384:3
386:3
**arkadelphia**
2:8
**arkansans**  22:5
**arkansas**  61:15
153:17
**arm**  261:6,7
**arrest**  284:7
**arrested**  26:1
**arrival**  293:7
**arrive**  259:8
**arriving**  361:17
**article**  51:21,25
**articles**  50:24
51:19 106:8
**aside**  84:23
146:18
**asked**  14:17
15:23 27:21
43:25 44:18
97:11 196:2
210:9 211:13
270:17 276:21
278:15 293:9
293:18 299:16
299:18 305:23
332:1 354:20
374:9,14
**asking**  13:25
14:1 74:9 87:4

89:10,11
112:20,21
135:8 155:24
187:8 229:22
235:15 278:8
278:12 293:6
293:12 300:25
305:25 359:14
**asks**  355:17
**assets**  73:21,22
77:17
**assigned**  7:7
50:14 276:4
**assignment**
70:11
**assistant**  360:2
**associate**  66:20
**associated**
58:18,21,22
**associates**  2:6
**association**
188:13
**assume**  15:25
75:24 93:14
101:13 123:23
285:17 375:12
**assumed**  121:4
**assumes**  166:16
**assuming**  15:7
**assumption**
320:8
**at&t**  37:20
**attached**
138:10 294:21
295:18

Veritext Legal Solutions
800-336-4000

**[attempted - background]**

**attempted**
41:23 360:25
**attend** 24:8
**attendance**
8:12 276:16
**attended** 24:10
**attending**
274:13
**attention**
132:23 133:1,3
133:7,14,16,20
133:23 134:2,5
135:6,7,11
157:10 219:12
219:14,17
268:8 319:25
332:3 337:5
**attorney** 8:13
18:14 63:3
388:14 389:10
**attorneys** 26:15
44:14 102:18
**audio** 5:20
388:8 389:3
**august** 1:17
85:10
**aunt** 22:19
357:13
**aunts** 23:11
**austin** 119:15
119:16,23,25
120:1 121:11
152:14 222:4
**authentication**
45:15 209:24

210:1
**authorized**
7:21
**auto** 4:25
306:14,16,18
306:19
**autobiograph...**
10:16
**automatically**
39:4 290:15
302:17
**automobile**
156:8 157:17
**automobiles**
158:7
**automotive**
65:8 66:11
71:23 88:14
**availability**
301:1
**available** 304:1
**ave** 1:20
**avenue** 7:17
**average** 52:25
115:15
**avoid** 128:10
128:10 159:2,4
164:15 228:20
229:10 316:13
338:12 360:17
367:11 377:18
377:20 378:5,7
378:9,16 383:2
384:13

**avoidable**
340:21 370:21
**avoided** 384:15
**avoiding** 52:10
**aware** 48:25
54:9 58:14
59:16 101:12
146:8 154:17
165:21 184:18
188:13 192:6
194:1,6,9,12
216:2,3 237:19
247:20 273:7
339:11,12,14
339:16 381:9
**awareness**
159:11
**axle** 341:23

**b**

**b** 4:7 5:1 6:1
**babysit** 242:19
242:22
**babysitted**
241:22
**babysitting**
241:2,8,23
242:3,14
243:18,24
244:7
**bachelor's**
25:19
**back** 13:14,23
27:23 36:20
39:3 51:8,10
60:8 72:25

82:12 86:21
92:22 106:17
127:8,8,21
136:9 150:19
153:13 154:15
161:17 169:20
175:2 189:20
211:23 225:17
238:25 239:1
240:7 252:19
256:19 261:7
287:23 293:20
308:15 320:1
321:16 322:7
333:1,8 340:4
347:3 348:16
348:19,22
349:3,6 350:3
350:12,14,15
351:2,6,7,9,10
354:19 355:13
362:24 363:3
364:16 365:14
365:16 375:3,5
375:10 382:25
386:1,2,7,13,15
**backbone**
373:15
**background**
4:19 80:11,18
80:25,25 81:3
81:5,16,22
82:6,13 87:7,8
87:13 264:12

Appx_0929

**[backing - bit]**

| | | | |
|---|---|---|---|
| **backing** 330:12 | **beat** 93:19 | 263:7,17 264:6 | 130:18,18,20 |
| **backs** 102:25 | **bed** 250:6 | 265:8 276:15 | 146:5 165:18 |
| **bad** 10:12 | **beginning** 7:3 | 293:2 296:5,20 | 188:20 190:23 |
| 13:10 68:15,19 | 8:13 91:18 | 300:22 301:23 | 193:19 209:9 |
| 92:20 128:5 | 93:21 106:14 | 304:11 305:11 | 210:12,15 |
| 203:4 228:24 | 151:2 174:23 | 309:11 311:14 | 250:1 369:21 |
| 324:13,15,17 | 224:21 242:5 | 311:25 315:6 | 388:10 389:6 |
| 324:19,20 | 297:8 336:17 | 317:4 337:25 | **better** 17:23 |
| **badmouthing** | **begins** 179:16 | 338:4 343:17 | 25:10 110:19 |
| 69:1 | **behalf** 2:2 3:2 | 343:24 346:20 | 122:11 132:23 |
| **ballpark** 60:2 | 229:16 | 347:15 348:20 | 317:17 |
| **banana** 16:20 | **behavior** 169:3 | 349:5 351:18 | **bible** 13:2 |
| 16:24 | 211:24 377:10 | 353:18 359:20 | **bieber** 260:14 |
| **bank** 15:24 | **believe** 25:14 | 367:25 369:9 | 260:16 261:13 |
| 16:3,4 | 27:2 31:18 | 371:6 372:14 | 261:21 262:5 |
| **base** 93:10 94:8 | 33:9,23 41:7 | 374:8 379:5,14 | 280:10 |
| **based** 67:13 | 44:3 45:22 | 383:21,25 | **big** 45:6 120:13 |
| 91:14 92:11,25 | 46:23 54:18 | 384:14,18 | 148:14 251:20 |
| 93:17 119:9 | 58:22 62:24 | 385:5,13 | 283:4 291:10 |
| 198:6 286:18 | 63:11 70:7 | **bell** 84:6 | 292:12 295:17 |
| 307:2 | 72:22,25 75:1 | **bender** 152:12 | 316:12 |
| **basically** 49:20 | 80:2 81:16 | 152:15 153:8 | **bigger** 290:17 |
| 146:17 211:22 | 88:17 94:4 | 154:3 | 291:5 |
| 253:24 | 143:8 152:18 | **beneath** 193:23 | **bill** 3:13 37:23 |
| **basics** 121:6 | 162:23 172:25 | **benefited** | 37:25 38:2 |
| **basis** 70:20 | 173:13 175:14 | 108:20,23 | **billion** 76:1 |
| 89:4 91:7,10 | 176:1 177:15 | **bent** 348:15,19 | **birthdays** |
| 91:10,12,20,22 | 179:2 186:4,7 | 350:17 365:15 | 253:14 |
| 92:1,4,7,8,16 | 186:22 190:8 | 386:14 | **bit** 9:15 25:10 |
| 166:13 213:24 | 192:11 199:16 | **berry** 279:25 | 25:25 61:6 |
| 256:8 305:22 | 207:25 214:11 | **best** 12:13 | 78:16 106:7,18 |
| **bbunt** 3:15 | 215:9 226:22 | 36:15 37:8 | 110:23 118:23 |
| **bear** 11:15 | 234:19,20 | 43:16 54:13,14 | 128:3 154:14 |
| **beard** 3:21 7:20 | 244:10,13 | 60:1 130:10,12 | 172:11 204:9 |
| | 260:7,9 262:15 | 130:13,14,17 | 240:7 308:20 |

Veritext Legal Solutions
800-336-4000

Appx_0930

**[bit - building]**

321:17 322:7
326:22 335:7
350:12 353:17
354:19
**black** 12:5
193:20 308:21
312:4,6,9
313:5 322:11
326:8,10,13,13
329:9 330:25
331:1 333:19
337:6,16 338:6
349:2 367:8
376:6
**blend** 111:8
**blended** 61:6
**blends** 111:6
111:11
**bless** 250:7
**blinn** 24:20,22
24:23 25:6
**block** 33:20,22
**blood** 297:3
316:18 349:15
**blowout** 342:5
342:7,17 343:3
**blue** 18:23
272:4
**blunt** 4:4 8:18
8:18 87:10,15
89:3,5 108:7
112:14 113:6
113:10,14
114:8 133:11
166:12,14

171:24 174:17
181:17 191:3
191:18 194:25
196:7 197:1
201:13,16
203:6 224:12
229:4 230:9
258:16 269:3
271:14,17
296:22 297:1
305:21,23
306:3 327:24
328:2 333:6
334:10 352:25
355:4 359:3
366:17,21
368:15 370:17
379:2 383:6,8
385:16 386:20
387:3,6
**boards** 67:1
**boat** 371:15,16
**body** 316:23
337:17 338:3
338:16,18
353:24
**body's** 349:15
**bones** 72:23
**bonus** 93:25
94:2,7
**bonuses** 92:22
93:1
**book** 120:4
**boolean** 66:25

**boring** 11:13
**born** 10:17,19
10:20
**boss** 270:16,22
270:25 273:25
**bosses** 125:16
**bottom** 75:9
81:23 82:17
95:16 96:10
124:2 157:10
165:1,22
178:11 186:15
193:19 195:9
208:8 265:19
279:18 293:15
295:14
**bought** 115:25
116:4,8
**boundary**
75:19
**boy** 153:18
**brakes** 153:23
361:4,5,10,12
**brand** 188:20
188:22 189:5
189:13,24
190:3
**break** 11:2,6,7
106:18 174:16
224:13,16
296:23 336:10
336:11,20
347:1
**breakfast**
16:20,21

**breaks** 11:3
**breathalyze**
357:6
**brian** 3:11 8:18
26:15 46:4
251:7 366:18
366:19
**brian's** 269:14
**brief** 62:10
335:16
**bring** 68:24
119:19
**bringing**
301:25
**broken** 316:22
**brother** 6:3
22:22,23 23:13
23:17,18 28:8
28:9 262:15
297:21,23
298:12,13
299:6 301:22
371:5
**brothers** 23:11
**brownsville**
75:20 118:6
130:1,4 220:15
220:16
**bryan** 24:24
30:20 34:1
**bug** 370:19
**build** 77:17
**building** 74:1,1
74:5,6,10

Page 10

Appx_0931

[bullet - car]

**bullet**  20:6
66:21 188:11
193:20,23
195:5,10
218:11
**bumble**  56:13
57:6 58:2
**bumped**  152:16
**bumper**  153:19
153:19 155:2,2
155:4,4
**bunch**  76:14
98:16
**bunt**  3:11
**burden**  13:25
**buried**  197:2
**business**  5:3
55:22 96:21,24
119:19,20
148:5,20,21
149:9,11,23
185:14 186:21
187:1,4,16
193:4 205:18
205:18 217:6
218:3
**busy**  322:4
**butterfly**  261:2
**button**  136:23
137:2,7 138:3
139:4 291:7,13
299:21,24
300:1,2 307:7
308:1,10
309:15,18

312:3
**buzzing**  296:16

**c**

**c**  2:1 3:1 7:1
77:1
**calculate**  184:1
**calculated**
90:18 93:16
**calculus**  51:23
**calendar**  5:17
25:3,12 55:13
280:18 281:23
282:3,7,8,9,11
282:14,18
284:3
**calendaring**
282:1
**california**
118:17
**call**  5:20 14:11
14:13 33:12,14
33:18 40:19
74:13 90:3
119:23 120:22
120:23,24,25
122:4,22
123:18 125:4,7
129:7,11 133:2
133:4,4,15,19
133:24 151:21
153:24 162:15
175:24 178:7,8
204:8,15,20,24
215:4 238:16
252:17 271:5

279:2 280:11
283:11 298:17
300:9 344:7
345:4,8,12,18
351:12,14
357:14 358:12
358:24 360:4
371:4 372:18
373:25
**called**  9:4 16:13
24:14 33:15
45:21 50:2
53:17 64:10
129:24 156:7
207:16 209:22
210:4 252:2
300:18 367:12
379:4
**calling**  88:3
96:3 299:13
300:17 301:13
357:16
**calls**  14:14
34:19 46:15
89:8 120:8,15
122:3,6 123:24
124:4,5 125:22
127:24 128:15
128:18 130:22
131:1,4,8
132:5,8,20
135:21,24
145:11 169:8
178:6 181:2
196:3 201:12

205:18,19
217:9 227:9
243:13 293:8
**calm**  26:17
**cam**  337:17
338:3 353:24
**camera**  197:13
198:24 261:8
366:23
**campus**  65:2
**camry**  383:10
385:11
**canal**  3:6
**candidate**
68:19 69:9
**candidates**
67:8,10,13
287:4,20
**cap**  149:5
**capacity**  59:19
**caption**  372:24
**car**  109:18
139:17 140:25
143:20,21,23
145:22,25
149:8,22
151:16 153:12
153:22 154:13
154:14 161:15
167:6,9,9,25
185:11 197:16
197:25 198:5
201:4 217:20
220:18 238:9
238:13 239:8,9

Appx_0932

**[car - change]**

294:18,21
295:18 309:6
311:2 314:3
316:4,5,13
320:9 322:17
325:2,16,19
327:21 328:22
331:3 333:4,12
334:4,8 340:23
341:25 349:10
353:6,11,16
356:14 358:2
362:4 363:25
364:1,11
368:18,23
377:23 378:6
378:11 379:1
379:13,23
381:6
**card**  144:13,16
144:22
**cardboard**
285:11,13
**care**  33:16
126:6,8,10
178:22 183:7,9
189:15 214:17
214:20 279:10
**career**  49:15
50:7 53:11,12
53:13,16,24
74:3 77:13
78:14
**careful**  229:12
230:15,17

**cares**  183:6
188:3
**carplay**  138:10
138:19 294:9
294:11 295:9
295:16 296:1
296:16 310:2
**carrie**  5:16
279:2,3 283:1
**carrier**  36:25
37:2,17
**carriers**  36:10
36:11,17
**carrolton**  299:6
300:6 301:22
**cars**  34:19
**carter**  24:2,6
**case**  7:14 18:7
18:8,11 26:7
27:9,22,24
29:13 51:20,20
110:25 133:12
133:12,22
151:16 155:21
155:21 222:5
248:1
**cases**  26:10
**caught**  87:24
214:12
**cause**  114:14
166:7 195:18
217:18 247:19
266:11 347:25
384:10,19
385:14

**caused**  198:9
198:15 372:2
**causes**  114:13
216:4
**causing**  164:16
316:4
**caylee**  1:11,16
3:2 6:2 7:3,9
7:13 8:19 9:3
9:13 14:11
17:20 39:12
40:11,16,17
41:7 46:22,23
46:24,25 47:2
58:18,22 90:3
106:14,17
144:21 162:16
174:23 175:2
178:15 224:21
224:24 279:22
297:8,11 306:6
319:2 336:17
340:4,11
348:10 360:25
367:15 383:9
387:5 390:1,2
390:24 391:1,2
391:4,12
**caylee's**  178:14
**celina**  288:18
288:19
**cell**  35:19,21
36:4,16 37:6
101:25 155:11
155:16 165:23

166:2 168:3,5
168:22 208:11
217:1,4 251:7
354:9 362:1
376:22
**cellular**  212:5
**center**  6:7
20:14 62:3
78:6 139:9
300:3 302:14
303:1,3,17
322:11 362:1,2
362:16 379:11
379:12
**cereal**  16:19,21
16:23
**certain**  15:21
41:14 67:12,22
80:21,22 81:6
91:19 93:24,25
94:21 219:2
249:18 265:6
268:20 293:4
**certainly**
336:24
**certificate**
388:1 389:1
**certification**
67:22
**certified**  8:2
**certify**  388:4
389:2
**change**  92:4
118:12 145:12
184:16 201:11

Appx_0933

**[change - close]**

225:23 226:10
226:19 306:14
342:11 348:23
369:17,18
377:19 390:4,7
390:10,13,16
390:19
**changed**
118:10,14
202:13 310:22
310:25 313:20
341:20,21
342:3 376:10
377:10,14,17
377:21 386:11
**changes** 218:23
266:21 391:6
**changing**
350:20
**character**
229:6 267:13
**charge** 65:22
105:4 375:18
**charlie** 24:2,6
**chat** 55:15
**chats** 55:13
**check** 43:10
68:10 80:11
81:16,22 82:6
82:13 87:7,8
87:13 116:13
146:9 252:20
252:22,25
264:4 357:9
376:11 378:17

385:6
**checked** 263:5
263:7 264:5
368:24
**checking** 74:9
220:1 376:12
**checks** 27:19
**chemical** 1:12
3:3 7:13 8:19
27:18,20
286:11
**chevy** 227:6,7,9
**chick** 39:25
197:14 198:11
**child** 21:15
242:23 243:1
**childhood**
39:21
**childish** 16:24
**children** 21:16
**choice** 52:4,6
186:19
**choose** 270:5
**choosing**
105:15
**chris** 103:12
104:18 161:7
170:14,15,16
170:24 171:3
174:11 176:5
176:22 249:19
**christi** 75:18
**christian** 6:3
23:15 28:10,13
29:5 297:22

298:10,14,16
371:5
**christopher**
22:2
**chronological**
85:12
**circle** 350:7
**circulate**
283:20
**circulated**
283:22
**circulating**
297:3
**circumstances**
31:10 153:14
**citation** 31:25
**citations** 34:9
**cities** 136:8
**city** 119:9
**civil** 1:10 7:16
18:7 26:7
**claim** 117:7
154:17
**claims** 26:6
**clarification**
14:5,7
**clarified**
310:24,25
334:12 351:14
**clarify** 74:17
334:11
**clarity** 88:16
89:2,11,12
**cle** 102:19

**clean** 190:19
**clear** 89:15,24
89:25 163:15
319:8
**click** 45:6
136:15,17
260:2 289:3,5
289:7,24
290:16,17,22
291:12 302:17
303:2 309:19
**clicked** 294:5
302:16
**clicking** 288:21
**client** 74:7
120:19 121:12
123:1,2,15
124:17,19,20
124:22,24
126:7,8,12
127:12 128:19
131:8 269:13
309:1
**clients** 122:1
123:3,9,25
125:11,15,19
125:22,25
127:19,23,25
128:6,7,21
129:3,14 135:8
178:25 179:7
**climate** 216:11
**close** 34:19
164:20 196:3
201:12 227:9

Appx_0934

**[close - company's]**

254:14 256:6
288:14 312:18
312:20 313:4,6
315:20 325:19
326:12 327:9
327:16 333:22
333:25 334:2
335:21 337:15
338:2,2,6
358:21
**closed** 19:6
**closely** 31:15
31:21 87:21
**closer** 17:15
308:20 313:8
321:18,19
325:12 326:22
**clothes** 245:3
**cloud** 39:3
**clue** 95:6 382:5
**coast** 104:4,4,7
104:15,18
172:11,12
180:11,11,21
180:22
**code** 5:3 37:13
96:21,24
142:10 143:8
185:14 186:20
187:16
**coffee** 250:2
**cognition**
386:17
**coincides** 38:7

**collazo** 21:6
**colleagues**
188:17
**college** 20:9
24:19,20 25:9
30:24 31:6,21
33:25 36:14,15
38:8 39:15,15
41:1 59:7
60:21 199:14
202:15 247:9
256:1
**collide** 312:11
**collin** 31:8
83:14,16
**collision** 153:21
160:15 168:4
310:16 340:5
340:18 380:13
384:13
**colony** 24:10
24:13,14
**color** 88:16
**colorado** 170:7
170:12 173:18
**colored** 185:16
350:9
**com** 40:11 41:8
70:7
**combination**
40:4
**come** 11:5 15:9
38:16 45:2
52:22 69:10
77:16 78:1

81:1 82:12
100:8 122:25
123:1 169:14
169:23 171:1
242:25 257:11
257:21 258:23
276:24 277:1
284:21 287:23
292:16
**comes** 138:13
302:13 386:17
**coming** 15:7
106:17 150:19
154:2 176:23
179:24 274:19
275:8,11 320:9
329:16
**command**
136:10
**comments**
194:3 195:12
**commercial**
88:14
**commission**
90:18 93:16
94:9
**common** 89:17
140:11,16
179:11 216:4
303:9,10
307:10 335:2
**communicate**
180:9 181:1
208:22,23
209:7

**communicated**
175:21 249:12
**communicates**
177:22,23
**communicating**
123:22 209:9
249:5
**communication**
175:19 177:19
177:20 179:18
179:21 180:2,5
181:15 182:1
**communicati...**
46:14 209:2
**commute**
127:19
**company** 1:12
3:3 7:13 27:18
27:20 49:4
66:5 68:15
72:13,16,18
91:23 92:21,25
95:9,18 102:9
107:17 108:11
108:18 109:18
114:19 145:18
154:10 158:11
182:20 188:2
217:6,19 218:2
218:6 220:18
220:22 286:11
286:19
**company's**
92:14

Page 14

Appx_0935

**[compare - contest]**

| | | | |
|---|---|---|---|
| **compare** 237:9 | 97:15 | 142:10 143:8 | **consequences** |
| 237:9 | **component** | 185:14 186:21 | 18:17 103:2 |
| **compared** | 50:25 | 187:1,5,16 | 185:10 191:11 |
| 236:5 254:5 | **computer** | 190:23 217:6,6 | 194:23 195:14 |
| **comparison** | 55:18 98:21 | 218:2 | 214:12 |
| 237:13 | 241:21 245:3 | **conference** | **consider** |
| **compartment** | **computers** | 176:7,8,10,13 | 193:25 270:9 |
| 303:16 | 216:7 | 176:14,16,17 | **consistent** |
| **compensation** | **concern** 181:23 | 176:21 244:24 | 188:16 353:20 |
| 77:21 90:23,25 | 212:10,18 | 249:21 273:24 | **constant** |
| **competitor's** | **concerned** | 274:1,7,14 | 179:18,21 |
| 121:18 | 113:8 159:21 | 275:9 276:17 | 180:1,5 181:15 |
| **competitors** | 181:22 182:3 | 277:15 278:7 | 182:1 |
| 89:18 121:20 | 194:14 212:14 | 278:18 283:4 | **constantly** |
| 121:21 | 212:24 351:4 | 284:4 375:13 | 179:7 180:9 |
| **complain** 41:9 | **concerning** | 375:14 | **constitute** 8:9 |
| 125:15 | 113:5 | **conferences** | **constitutes** |
| **complete** 13:8 | **concert** 260:11 | 176:11 | 381:21 |
| 16:13,22 17:3 | 260:13,16 | **confirm** 47:19 | **consumed** |
| 50:11,13,16 | 261:13,21,23 | 101:8 159:11 | 246:6 |
| 52:24 53:4 | 262:2 280:10 | 257:2 | **cont'd** 3:1 5:1 |
| 62:12,13,16 | **concise** 63:22 | **confused** 365:3 | 6:1 |
| 102:22 366:9 | 369:20 | 369:12 | **contact** 187:1 |
| 366:10 369:23 | **concluded** | **congested** | 187:12 278:2 |
| 369:25 391:8 | 385:12 387:12 | 153:19 | 338:25 348:20 |
| **completed** 62:6 | **conclusion** | **congratulations** | **contacting** |
| 101:9,16 | 350:21 351:3,5 | 10:9 | 152:1 187:3 |
| 105:16 180:13 | **condition** 13:6 | **connect** 41:21 | **contained** |
| 358:9 | **conditions** | **connected** | 99:14 112:4,21 |
| **completely** | 158:10 163:18 | 295:10 307:17 | **content** 111:19 |
| 43:12 | 218:16,20,24 | **conroe** 20:8,11 | 112:23 186:18 |
| **complexes** | 219:2 247:5 | 20:12,15 37:15 | 188:16 295:19 |
| 64:11 | **condo** 257:19 | 37:16 223:1 | 300:23 |
| **comply** 96:20 | **conduct** 5:4 | 224:7,8,25 | **contest** 83:22 |
| 96:22 97:10,12 | 96:21,24 | | |

Veritext Legal Solutions
800-336-4000

Appx_0936

**[context - crazy]**

**context** 374:12
**contexts** 18:5
**continue** 43:22
  45:9 346:3
  354:16 381:6
**continuously**
  373:14
**control** 269:24
  270:10 343:12
  343:13,19
**controls** 216:11
**conversation**
  11:19,20 68:23
  72:12 135:5
  166:8 169:1
  298:16,21,24
  299:3 351:21
  376:18 383:14
  383:19
**conversations**
  44:14 135:2,3
  175:16 217:10
**convey** 352:17
**convicted** 26:3
**convictions**
  81:6
**convos** 175:6
  369:7
**cool** 302:2
  303:7 307:23
**coordinate**
  279:22
**coordinates**
  251:10

**copied** 194:3
**copies** 117:12
**copy** 81:17
  88:21 139:19
  156:23 186:8
  193:8 197:1,8
  207:22 208:3
  360:5
**cord** 294:17
**core** 280:21
**corey** 171:10
  173:11,15,20
  174:2,10
  176:24 214:24
**corner** 77:1
  82:18 157:11
  165:23 186:15
  193:19 195:9
  208:8 279:18
**corporal** 5:23
  353:21,22,24
  355:10,12
  367:2 369:18
  383:23
**corporate**
  358:4
**corpus** 75:18
**correct** 20:25
  25:7 78:24
  81:24 83:17,21
  96:1 129:23
  137:3 163:6
  166:23,23
  223:9 247:12
  274:3 282:21

306:14,16,18
306:19,23
308:7 314:17
315:3 328:17
338:21 391:8
**corrections**
  391:6
**correctly** 51:17
  52:2 137:18,21
**cost** 15:7,9
**could've**
  303:17
**counsel** 8:14,17
  8:18,20 9:7
  27:5,9,22,24
  69:15 74:16
  76:6 207:19
  388:11,14
  389:7,10
**counseling**
  20:14 62:3
  78:6 375:16,17
**counselors**
  375:22
**count** 253:9
  272:17
**counted** 272:23
**county** 31:8
  32:17 62:3,11
  78:6 83:15,16
  85:21 86:12
  224:9,10
**couple** 45:10
  73:1 99:3
  125:5 130:19

172:2 174:10
176:23 181:20
260:9 265:11
385:17
**course** 97:16
  110:9 141:15
  315:8
**court** 1:1 7:5
  7:15 12:4,21
  13:2 85:13,14
  85:17,20 86:23
  241:4 271:6
  349:21 352:1
**courtesy**
  128:12 179:11
**cousins** 22:25
  23:1,11
**cover** 52:8
  130:3 186:14
**covered** 34:10
  349:15
**covid** 62:18
  73:3 79:21
  284:6
**coworkers**
  204:21,22
**craig** 285:11
  287:12
**crank** 17:14
**crash** 359:24
  370:22 372:7
  375:16,21
  377:11 382:10
**crazy** 251:15
  294:2

Page 16

Appx_0937

**[create - dead]**

**create** 114:6
**created** 194:3
  284:8
**creates** 114:23
**crime** 26:3
**criminal** 18:10
  18:14,16 80:18
  80:25 81:3,5
**cruise** 269:24
  270:10
**crying** 199:5
**cup** 250:2
**curious** 374:11
**current** 18:22
  203:11
**currently** 18:23
  67:16 103:12
  104:23 220:20
  246:11
**curriculum**
  277:3,5
**curtailed**
  218:15
**cushions** 158:7
  158:13,17,20
**customer** 55:16
  55:17,19,25
  74:2 75:10
  130:10,14
  178:22 204:15
  204:18
**customers** 50:4
  55:20 71:19,20
  79:11,13 89:19
  89:25 178:19

  179:12 181:16
  206:23 207:4
  207:12 208:22
  208:24 209:3,7
  209:10
**cut** 355:9
**cutout** 285:13
**cuts** 120:12
**cv** 1:11 7:16
**cybersecurity**
  102:2,5

**d**

**d** 4:1 7:1 240:6
**da** 298:12,13
**dad** 29:5 38:12
  262:11
**dad's** 36:13
**daily** 177:23
  213:24
**dallas** 2:15
  10:20 22:7,15
  22:25 23:5,12
  37:13 118:18
  249:1,23 250:9
  250:12,17,18
  251:1,22 253:5
  253:16 274:1
  274:22 278:6
  280:3,3,7
  292:13 347:25
**damage** 153:7
  153:9 157:18
  164:16 343:24
**danger** 316:4

**dangerous**
  227:12,14,16
  227:17,19,21
  227:23 229:19
  229:24 230:22
  231:2,5 234:4
  234:6,13,13,15
  234:18,19,21
  235:16,19,20
  235:21,23,25
  236:1,2,5,7,8
  236:10,11,12
  236:14,15,17
  237:6,21
**dangers** 114:23
**dark** 319:23
  320:4 321:1
  374:10,14
**data** 254:4,5
  267:8,12
  298:23 315:8
**date** 1:17 30:21
  38:17 50:16
  85:7,9,20
  104:11 120:5
  163:6,7,10,10
  168:13 178:18
  179:12,23
  222:18 271:25
  281:7 358:11
  390:24 391:12
**dates** 281:21
  282:5
**davis** 76:23
  77:1 103:17

  104:15 105:13
  160:23,25
  180:14
**day** 9:24 33:6
  70:19,19 98:15
  115:6,7,16
  123:25 127:11
  127:13 128:22
  128:25 129:2,4
  129:5,7,9,10,11
  131:22 132:6,6
  151:4 161:19
  203:2,2,3,12
  240:20,22,23
  241:1,14,19,21
  242:6,13,18
  247:15 265:16
  265:21 266:3,5
  266:16 269:18
  269:25 271:3
  279:10,10
  285:3,4 295:6
  325:7,8 369:3
  371:15 374:23
  391:15
**days** 53:20 99:3
  115:10,12,16
  118:1,2 120:2
  124:4,4,7,7
  132:7,9,10
  150:24 181:20
  204:11 367:23
**dead** 339:6
  385:21

Page 17

Appx_0938

**[deadline - different]**

**deadline** 32:9
**deal** 85:16
    109:22
**dealers** 88:17
**dealership**
    119:24 130:2,3
**dealerships**
    71:24 72:1
    130:4
**dealing** 71:24
**deals** 40:22
    114:23
**death** 292:19
    371:19
**deceased** 1:8
    2:4 7:12
**december**
    180:15
**decent** 27:1
**decide** 139:1
**decided** 38:11
    250:8 283:22
    304:22,24
    373:3 375:9
    378:25
**decision** 90:12
**decisions**
    208:13
**declare** 391:4
**deemed** 155:23
    229:17 233:24
    391:6
**defendant** 26:8
**defendants**
    1:13 3:2 8:19

8:21
**defending**
    269:15
**defensive** 5:10
**define** 192:24
    343:13
**definitely** 51:16
    140:15 228:4
    246:7 373:11
**definitively**
    264:19 266:9
**degree** 24:17
    25:16,18,20,22
    67:22
**degrees** 14:19
    14:19
**deleted** 263:19
    264:10 282:16
**deletion** 264:12
**dennis** 3:21
    7:20
**deny** 375:25
    376:5
**department**
    129:23,24
    130:1 187:2,6
**departments**
    187:13
**depending**
    119:7 218:19
    218:23 329:25
**depends** 122:24
    130:11 260:3
**depo** 269:15

**deponent** 391:3
**deposed** 11:9
**deposition** 1:15
    7:3,9 8:7 9:18
    11:13,18 18:4
    26:13 27:6,7
    27:10 29:13
    30:9 106:14
    174:23 224:21
    286:17 297:8
    336:17 388:1
**depression**
    246:17,18,22
    247:9
**describe**
    116:20 126:1
    319:2,6,9,11
**description** 4:8
    4:15,17 69:14
    69:17 70:6
    72:10 74:14
    164:11 165:3
    168:17
**desk** 78:2,9,11
    78:19 116:5
**desktop** 116:5
**destination**
    288:3 313:20
    376:9
**desvenlafaxine**
    246:15
**detailed** 135:9
**details** 27:11
    28:25

**determination**
    225:6
**determine**
    313:15 362:11
**development**
    25:19 49:18
    98:11 287:17
**device** 218:19
    218:23 219:1
    348:8
**devices** 212:5
    216:7 217:5
    218:9
**diagnosed**
    246:18,20,22
    247:6
**diagram**
    222:21
**diagrams** 29:21
    29:25 30:1
**dibs** 262:2
**dictate** 137:1,5
**dictated** 312:2
**dictation**
    137:22 312:1
**die** 22:11
    340:23
**difference**
    279:8 351:13
**different** 20:1
    38:11 47:25
    67:6 71:19
    74:25 75:5,6
    91:22,24 92:2
    119:9 129:24

Page 18

Appx_0939

**[different - doing]**

130:15,20
140:25 143:21
155:23 175:23
176:21 225:20
257:14,15
274:9 292:2
334:13 348:8
359:18
**differently**
339:22 340:1
383:1
**digital** 388:8
389:3
**digits** 37:9
**diligent** 125:22
**diminished**
331:24 332:2
333:16
**ding** 259:7
**dinner** 276:1,2
**direct** 206:12
206:19 264:17
264:17
**directions**
288:24 294:22
**directly** 70:19
71:24 191:25
**director** 100:11
**disagree** 68:22
114:2 165:2,5
167:8 189:2
**disagreements**
61:11
**disciplinary**
195:14,19

**discord** 56:13
57:12
**discrepancy**
89:21
**discuss** 34:23
102:16
**discussed** 72:7
72:9 168:13
283:18 293:5
**discussions**
102:17
**dismissed**
86:23 87:23
**dispute** 267:10
**distance** 255:21
255:24 308:18
332:21
**distinction**
286:19
**distinguish**
306:1
**distinguishing**
286:10
**distract** 211:20
212:2
**distracted** 5:11
5:12 101:22
107:2,5,9,14
108:3,21 109:7
111:1 211:15
211:19,23,25
212:12,16,18
213:2,8,10,18
213:21 214:5
215:16 216:24

219:20 220:2,6
239:2 240:13
268:7 381:10
381:14,16,21
382:11 386:16
386:18,22,24
**distracting**
133:18 134:15
134:21,24
135:1,3 240:13
381:18
**distraction**
135:15,17
218:25 219:2,4
219:8,11
228:12,16,22
228:25 229:18
229:21 235:2
378:3,7,8,9,12
**distractions**
212:8 216:4,5
216:6,13,14,16
216:19 228:23
377:18,20
383:3
**district** 1:1,2
7:15,15
**disturbed**
353:13
**divided** 93:7
118:20 222:22
**division** 65:18
122:17 286:15
**divvied** 118:20
121:4

**divvy** 122:4
**dmv** 33:19
**doctor's** 247:1
**document**
15:21 16:9
63:2,4 76:7,25
90:4 94:12
96:3,4,13 98:4
98:7 156:10,22
156:24 157:5
162:21 185:25
192:24 193:16
195:7 215:6
**documentation**
368:25
**documents**
29:12,14 30:8
279:11
**doing** 42:7,10
103:3 121:10
122:1 128:10
165:7 166:25
167:23 176:24
177:4 178:23
198:9 201:20
216:23 234:13
251:23 267:9
267:11,16
322:17 324:6
325:2,4,24
326:1 327:15
328:18,20
340:22 341:10
348:24 349:7
381:17

Page 19

Appx_0940

**[dolen - driving]**

| | | | |
|---|---|---|---|
| **dolen** 162:1 | 237:6,10,16,22 | 386:24 | 212:2,12,16 |
| **domain** 41:18 | 237:25 238:3 | **driver's** 32:20 | 213:2,5,8,8,11 |
| **domestic** 26:10 | **drivable** 344:1 | 157:16 202:22 | 213:18,21 |
| **donlen** 145:20 | **drive** 18:24 | 202:24 | 214:5,13,18,21 |
| 147:19,22,23 | 58:15 59:11 | **drivers** 157:18 | 215:16 216:4 |
| 150:4,5 152:2 | 64:1,4,16,21 | 212:18 231:18 | 216:24 217:2,6 |
| 152:6,21 | 65:1,2 108:12 | 320:10,22 | 217:13,19,25 |
| 154:11 161:21 | 109:18 120:9 | **driving** 5:11,13 | 218:6 219:4,8 |
| 161:24 162:4,6 | 127:20,21 | 31:12 65:4 | 219:11,14,21 |
| 162:11,24 | 142:22 143:2,5 | 71:25 73:5 | 220:2,6,9 |
| 163:14,17,21 | 143:13 146:12 | 75:15 79:5,10 | 227:25 228:23 |
| 163:24 164:17 | 146:14 147:8 | 83:2,5 101:22 | 228:25 229:10 |
| 164:23 165:8 | 150:14 157:19 | 106:21 107:2,5 | 229:20 230:5 |
| 165:11,15,19 | 214:25 215:2 | 107:9,14,16 | 230:11 231:1 |
| 166:5 168:2,6 | 220:10 221:20 | 108:3,21 109:7 | 231:20 232:18 |
| 331:17 358:3,7 | 227:12,15,18 | 109:22,24 | 234:11,12 |
| 358:9 359:1,5 | 228:9,13 229:2 | 110:9 111:2 | 235:11 236:10 |
| 359:18,22 | 233:9 234:4,24 | 118:2 119:3,4 | 236:21,25 |
| **dosage** 247:14 | 235:3,4,8,17,17 | 127:17,19 | 237:5,6,9,10,10 |
| **dot** 40:11,11 | 235:22 236:2 | 130:21 131:7 | 237:16,22,22 |
| 41:7,8,8 70:7 | 236:15 253:21 | 131:13,20,23 | 238:1,4,7,10,14 |
| **doubt** 186:24 | 257:1 267:4 | 132:2,2,17,21 | 239:2 240:6,12 |
| **douglas** 180:23 | 273:1 276:14 | 133:5,8,10,15 | 244:3 251:12 |
| **downloaded** | 280:7 292:13 | 133:20,24 | 264:22 269:25 |
| 206:9 251:6,7 | 292:22 313:19 | 134:1,8,9,12,14 | 270:19 276:10 |
| 253:22 263:10 | 318:14,18,20 | 135:15,24 | 278:9,13 |
| **dozen** 52:15 | 340:16 362:11 | 136:2,4,8 | 279:22 289:11 |
| 170:1,3,4 | 367:7 | 140:5,18,18,21 | 291:19 292:7 |
| **draw** 157:9 | **driven** 253:5 | 142:18 146:10 | 294:10 299:8 |
| 222:21 350:7 | **driver** 97:16,16 | 146:20 150:6,7 | 370:16 376:1,3 |
| **drew** 279:25 | 99:8,12,15,21 | 151:16 161:17 | 376:6 377:14 |
| **drink** 142:22 | 99:23 159:1 | 173:9 184:17 | 377:16 379:25 |
| 143:1,5,12 | 218:12 225:9 | 185:1 197:15 | 380:3 381:10 |
| **drinking** | 320:25 321:2 | 211:15,19,21 | 381:14,16,18 |
| 142:18 216:7 | 386:16,18,22 | 211:23,25 | 381:19,22,23 |

Page 20

Appx_0941

**[driving - edged]**

382:12 384:14
**dropbox** 58:25
59:4,5,9
**drove** 146:15
260:6 292:4
343:19
**drug** 247:13
357:6
**drugs** 246:5,9
**dry** 163:18
**duboff** 3:4 8:20
8:20 174:18
269:1,8 271:13
332:12,18
**dude** 15:1
**due** 95:13
**dui** 240:16
**duly** 9:4 388:5
**durability**
88:16

**e**

**e** 2:1,1 3:1,1 4:1
4:7 5:1 6:1 7:1
7:1 20:24
390:3,3,3
**earlier** 29:8
44:1 48:20
82:23 103:5
106:19 175:13
196:2 201:11
201:15 206:14
222:7 241:11
263:3 326:24
**early** 150:21,22
224:5 373:4

**earlyish** 174:7
**easier** 110:23
**easily** 290:10
**east** 3:6 104:4
104:14 172:11
180:11,21,22
**eastern** 275:13
**eastman** 1:11
3:2 4:22,24 5:3
5:5,8,10,12
7:13 8:19
27:15,17,20
40:11 41:11,15
41:20,25 42:5
44:7,18,21
45:10,18 46:7
49:1,3,5 50:15
52:11 53:13,15
53:25 54:19,21
55:3,6 56:1
63:10 64:3
65:10,12,14
66:4 69:18
70:7,25 74:14
75:22,25 76:8
77:14 80:5,12
80:20 84:1
86:24 87:3
88:11 89:6,10
94:14 95:18
97:20 98:3,8
101:19 103:18
107:6,9 108:2
109:25 113:3
115:4,19

116:15 120:18
123:1,21
129:22 135:20
135:23 136:4
140:17 141:3
141:24 142:4,6
142:13 143:5
144:9 145:2,5
145:8,21 146:6
146:9 147:12
151:20,22
152:19 158:16
159:20 169:2
171:8 174:12
175:3,19,25
176:11,13
177:1,4 179:1
179:4 181:14
183:6,25
184:25 185:3
185:11 187:10
187:24 188:3
188:14,15
189:4 190:1,2
190:10,25
191:8,12,16,20
192:4 193:3,4
194:1,11,13,17
194:23,24
195:22 203:19
205:12 208:11
209:5,12 210:9
210:12 211:14
212:7,11 213:2
213:4 214:12

214:17 218:18
219:19 220:3,9
221:16 225:11
237:8,12
238:19 245:7
245:10 249:6
264:3 275:8,21
280:3 284:14
286:3,4,9,9,9
286:10,11,12
286:19,19
359:9 375:7,10
375:17,23,24
379:13,22
380:7,11,12,13
381:21 382:10
382:11
**eastman's** 70:9
87:7 88:20,24
89:6 96:20,24
148:24 150:6
182:4 183:13
185:13 186:25
188:20,22
189:24 190:3
209:8 211:2,12
217:12 239:23
245:8 286:2
**eastmans** 93:3
**eat** 245:19
275:24
**eating** 216:7
**ebelin** 389:2,15
**edged** 321:13

Page 21

Appx_0942

**[educational - eric]**

**educational**
50:25 52:1
106:7
**effective**
110:18
**effects** 247:16
247:17
**effort** 377:23
**eight** 127:11
356:21 365:4
370:15
**eighteen**
185:23
**either** 59:19
65:5 76:17
161:5 178:1
206:18 234:13
254:17 265:10
288:5 289:23
**el** 75:18
**electronic**
56:15
**electronics**
245:9
**eligible** 94:14
**else's** 81:12
**email** 5:16,24
39:9,19 40:6,8
40:12,21 41:1
41:6,11,25
42:5,13 44:15
44:16 46:14
53:6 100:19
103:5 123:19
175:24 178:6

210:20 211:2
211:12 252:17
252:24,25
256:13,14
264:3 277:24
278:4,12 279:2
279:15 282:25
283:12 365:18
365:25 366:6
366:13,24
367:20,22,23
368:17 369:17
369:23 370:11
**emailed** 277:6
**emails** 5:15
40:13,19,24
43:6 101:1
112:8 123:25
125:23 128:18
139:20 181:2
217:11 242:21
243:13 263:24
264:9
**embarrass**
39:23
**embarrassed**
197:18
**embarrassing**
39:24
**emergency**
122:3 146:19
155:22 212:4
314:11,15,23
323:6,25
327:10 335:23

336:5,8 337:6
343:9 344:17
344:21,23
**emergent** 62:15
78:7
**emoji** 85:23
295:15
**emojis** 199:4
**emotionally**
353:13
**emphasize**
143:12
**employed**
27:17 183:25
187:24 388:11
388:14 389:8
389:11
**employee** 65:18
67:2 80:20
190:2 388:13
389:10
**employee's**
183:7
**employees** 49:5
182:22,23
215:23 216:2,3
275:8 284:13
382:11
**employer** 27:14
54:18 69:1
240:18
**employers** 65:5
**employment**
4:23 25:24
55:5 96:22

195:15
**employs** 75:22
**enable** 208:12
294:20
**encountered**
218:16
**encourage**
186:17
**encouraged**
184:7,8
**ended** 59:23
60:10 152:16
153:4 154:12
221:6
**ends** 188:9
193:18 195:9
**engaged** 181:25
220:2
**engaging** 217:9
219:20
**engines** 194:2
**english** 199:8
**ensure** 188:15
**entails** 114:16
**entirety** 37:7
**entitled** 16:13
268:16
**equipment**
115:21,25
216:10
**equipped** 121:2
186:19
**eric** 76:23 77:2
79:6 161:2,3,4
161:5 175:11

Page 22

**[eric - exception]**

175:16
erick   1:4 2:2
    7:10
erika   390:1
    391:1
erin   1:11,16 3:2
    7:9,13 9:3,13
    390:1,2,24
    391:1,2,4,12
errands   64:8
errors   137:23
es   388:4
esquire   2:5,12
    3:4,11
essentially   61:5
    61:19 64:11
    103:1 149:8
estate   1:6 2:4
    7:12 61:17
estimate
    168:14 274:15
    318:11
estimated
    293:7
estimates   163:8
et   390:1,1
    391:1,1
eta   289:2,8
    293:8,15,16
    313:16 347:25
    361:15,19,21
    361:22,25
    362:8,9,10,12
    362:16,19,24
    376:14 385:7

evaluated
    180:5 183:15
    184:25
evaluating
    185:3
evaluation   5:2
    177:8 179:15
    180:12
evaluations
    184:5
evaluator
    177:3,7,21
evening   245:19
    245:23 293:1
evenings
    150:15
event   65:25
    282:7
events   12:5
    67:1 253:14,18
eventually   72:5
everybody
    102:8 230:20
    231:20 232:19
    283:22 381:13
everybody's
    114:17
evidentiary   8:6
exact   15:10
    30:13,21 31:11
    34:5 35:7
    38:17 59:21
    61:22 77:9
    79:14,20,22
    90:19 99:2

100:9 104:11
112:18 131:18
142:14,16
146:25 149:18
164:19,24
166:7 184:9
201:21 204:1
222:18 232:14
248:14 250:13
257:3 278:1
309:7 332:21
333:20 358:5
358:11 359:21
376:8
exactly   39:14
    45:13 52:17
    53:23 54:2
    59:6 67:5
    72:17 77:12
    83:9 98:13
    99:14 100:8,25
    102:1 115:15
    116:8 124:21
    135:19 139:13
    140:22 151:25
    157:22 164:5
    170:5 171:2,15
    172:20 173:13
    174:13 175:20
    187:18 205:1
    205:10 208:19
    227:4 242:12
    244:2,16 246:3
    246:21 248:10
    250:24 262:6

264:24 269:19
275:2,18 276:8
277:10 281:10
282:23 284:5
287:1 300:12
303:8 304:8
305:7 309:11
315:7 322:15
322:19 324:25
325:4,10
326:25 328:5
331:7 332:9
333:17 335:5
337:21 338:7
348:24 350:5
359:11,14,21
359:25 362:20
363:7 372:10
373:24 386:9
examination
    4:2 9:8,10
    383:7 385:18
examined   9:6
example   14:17
    15:6,23 16:19
    16:24 300:6
examples   50:23
    51:20
exceed   94:20
exceeded
    361:19
except   112:25
exception
    130:7

Veritext Legal Solutions
800-336-4000

Appx_0944

**[exchange - facility]**

**exchange** 211:2
**excluding**
220:17
**excuse** 237:9
**exemption**
117:7
**exhibit** 4:9,10
4:11,12,13,14
4:15,16,18,19
4:20,21,22,23
4:24,25 5:2,3,5
5:6,7,8,10,12
5:14,15,16,17
5:18,19,20,21
5:22,23,24,25
6:2,3,4,5,6 47:4
47:7,12,14,19
47:21 48:2,4,9
48:11 63:1,5
69:14,19 74:13
74:18 76:5,9
81:16 82:1
84:24 85:1,4,5
88:3,5 90:3,5
96:3,5 98:5
156:11 162:15
162:17 177:10
177:12,13
179:15 185:17
185:22 192:7,9
192:22 196:21
196:23 198:17
198:19 207:16
207:17 215:4,7
215:24 238:17

238:21 240:4
271:5,8,21
277:18,21,25
279:2,4 280:12
280:13 317:1,3
317:11 326:9
334:15,16
345:14,18
349:18,25
350:19 351:22
352:1 354:1,4
358:12,13,25
360:4,6 365:20
366:16 371:4,7
372:18,20
373:25 374:3
379:5,6
**exist** 193:24
194:9 273:16
**existing** 119:18
119:21 122:1
**expand** 71:16
128:2
**expect** 10:22,23
10:24 12:24
75:14 79:6
82:5,8,11
100:18 123:21
265:15
**expectations**
10:22 80:21,22
186:25
**expected** 73:13
73:16 79:11,13
79:15 82:12

157:19 158:8
**expecting**
19:20 21:16
**expel** 121:22
**experience** 10:3
65:9 66:11
173:6 233:5
237:15,17,21
238:6
**experiences**
174:11
**explain** 221:6
**explained** 9:18
369:21
**explanation**
42:12
**explorer** 95:19
95:21 140:4,18
141:3,7,10,13
141:18,24
142:4,7,13
143:18 144:8
144:11,12,15
144:16,23
145:1,4,6,9,16
146:3,7,10,13
146:18,21
147:5,8,10
149:6,12,15,24
151:17 152:10
153:10 222:9
244:4 247:23
251:12 338:23
343:12

**express** 181:23
**extended** 98:17
**extent** 36:3
253:23
**external** 195:13
**extra** 38:25
118:25 261:25
**extremely**
179:17 235:12
235:21 236:1,1
236:5,7
**eye** 318:12
**eyes** 218:13
229:20,22
230:4,8,12,18
230:23 231:1
**eyesight** 317:17
318:1

**f**

**face** 85:25
197:17 199:5,5
200:24 254:13
254:14 259:13
259:21,22
289:23 290:2,7
290:12,14
**facebook** 4:9
43:18 47:5,5
48:16 256:17
263:2
**facial** 254:9
255:2 290:7
**facility** 71:10
285:14,19,20
286:2,6,23

Page 24

Appx_0945

**[facility - fired]**

287:6,16
**facing** 193:1
**fact** 47:13
180:1 353:15
361:3 375:10
386:19,25
**factor** 209:25
370:12
**factory** 45:2
**facts** 166:16
194:6
**fail** 53:8
**failed** 32:12
**failure** 32:4,12
32:14 84:13
85:19 86:17,25
**fair** 75:2
163:11,11
164:6 204:8
254:17
**falling** 255:22
**familiar** 185:13
186:18 334:21
**family** 9:16
18:8 22:14
23:9 74:10
118:19 253:15
280:9 316:21
337:1 347:25
367:5 373:7,19
382:16
**far** 129:2,12
184:4 262:7,10
318:8,9 325:9
325:10 327:6,8

330:25 331:7
344:8,10 376:7
**farmersville**
22:4,6
**farsighted**
318:7
**fast** 83:24
233:10,12,20
253:23 264:22
265:23,25
269:17,19,21
270:19 301:6
301:16,19
302:5 305:2
306:21,23
319:14 324:16
333:16,17
337:17 342:14
361:18
**faster** 208:24
209:2 231:20
232:22 319:19
**father** 21:25
22:15,24 28:21
36:11 38:1
238:5
**fault** 225:5,8
329:22 330:3
330:18
**favor** 204:4,5
**favorite** 371:14
**february** 283:7
**federal** 117:8
**feel** 155:21
200:12,16

202:13 217:15
219:3 231:15
248:19 252:7
291:24 316:3
371:1,16,22
378:4,13,15
**feeling** 373:17
**feet** 331:10
**felonies** 81:6
**felt** 314:4
371:18
**fender** 152:12
152:15 153:8
154:3
**fiddle** 362:15
**field** 73:20
77:19
**fifteen** 156:5
**fifth** 227:2
**fight** 269:13
**figure** 119:11
181:9 365:5
**figured** 85:18
257:17
**fil** 197:15
198:11
**file** 7:3 58:25
106:14 174:23
224:21 297:8
336:17
**filed** 12:5
**fill** 67:17 76:14
170:19
**fills** 290:25

**film** 65:9 89:14
89:15,16,18,20
120:12 122:13
122:14,15,17
129:23 176:15
285:20,21
286:5,15,15,16
286:20 287:10
287:21
**films** 88:11,13
129:25 274:12
286:3,11,12
287:7
**finally** 333:22
**finance** 62:22
**financially**
388:15 389:11
**find** 9:21 34:13
67:7 82:6,8
122:21 150:2
297:16 299:20
377:12 378:18
**fine** 14:14,25
15:2 32:9
33:23,24 34:3
158:1 254:3
274:17 285:8
343:18 350:7
**finger** 259:24
**finish** 25:15
348:8
**fire** 93:12
**fired** 59:22
60:10,16,22
61:1,7 62:4,12

Page 25

Appx_0946

**[fired - found]**

| | | | |
|---|---|---|---|
| 62:16 | **fix** 121:2 | 320:16,19 | **forget** 268:10 |
| **first** 9:4 10:7 | **fixed** 133:6 | **following** 31:15 | 370:2 |
| 11:10,11 35:19 | 309:1 | 31:21 87:21 | **forgot** 112:12 |
| 37:9 60:2 62:2 | **flag** 68:16 | 152:24 160:15 | **forgotten** 110:8 |
| 64:3 66:7 72:7 | 344:25 345:5 | 175:7 213:17 | 112:15 191:6 |
| 75:21 81:24 | **flags** 68:13,14 | 225:22 244:24 | **form** 87:10 |
| 87:9 94:13,19 | 69:4 | 274:2 377:10 | 89:3 107:20 |
| 95:12 103:17 | **flashers** 323:6 | 377:23 | 108:7 112:14 |
| 151:18 156:17 | 324:1 327:10 | **follows** 9:6 | 113:6,10 114:8 |
| 156:19 157:14 | **flat** 309:1 | **font** 240:15 | 133:11 166:12 |
| 158:1 160:22 | **fleet** 145:17 | **foot** 315:6 | 181:17 191:3 |
| 170:21 171:18 | **flight** 375:5,10 | 331:8 | 191:18 194:25 |
| 178:13 186:4 | **flip** 35:23 38:22 | **force** 332:12 | 196:7 201:13 |
| 188:12 192:22 | 187:15 195:4 | **ford** 95:19,20 | 201:16 203:6 |
| 208:7,10 | 273:20 358:25 | 140:4,18 141:3 | 229:4 230:9 |
| 215:23 218:10 | **florida** 172:9 | 141:7,10,13,17 | 258:16 269:3 |
| 225:21 226:1 | 172:10,13 | 141:24 142:4,7 | 305:21 328:2 |
| 237:20 238:6 | 173:3 | 142:13 143:18 | 333:6 334:10 |
| 262:2 269:14 | **flow** 232:5,7,8 | 144:8,11,12,15 | 352:25 355:4 |
| 273:21 280:19 | 232:15,23 | 144:16,23 | 368:15,22 |
| 281:17 289:3,5 | 233:1,5,15 | 145:1,3,6,9,16 | 370:17 379:2 |
| 299:13 312:8 | 267:23,25 | 146:3,7,10,13 | 386:20 |
| 333:19 342:18 | **flowing** 319:10 | 146:17,21 | **former** 28:5 |
| 351:16 353:15 | **flying** 274:21 | 147:5,8,10 | **forms** 279:11 |
| 357:22 369:3 | **focused** 230:2 | 149:6,12,14,24 | **fort** 274:5,22 |
| 374:21 383:10 | 230:19 | 151:16 152:10 | 275:9,19 |
| **fit** 63:19 | **foggy** 89:15,16 | 153:10 222:9 | 276:14 |
| **five** 19:17,18 | 89:19 | 244:3 247:22 | **forth** 256:19 |
| 20:7 30:15,17 | **folks** 11:23,25 | 251:12 269:25 | **forward** 239:18 |
| 30:23 34:6 | 55:25 | 338:23 343:12 | 313:1 364:11 |
| 127:14 224:16 | **follow** 49:12 | **foregoing** | **forwarded** |
| 225:19 271:10 | 97:19,21,24 | 388:3,4 389:4 | 194:3 |
| 271:11 274:18 | 98:3 110:9 | 391:5 | **found** 32:10 |
| 297:2 352:6 | 160:16 175:15 | **forever** 36:7 | 67:9 74:12,14 |
| 363:9,11 | 206:24 231:12 | | 263:8 300:7 |

**[found - give]**

329:5

**four** 30:15,17
115:10,11,16
118:1 119:3
125:14 281:1
282:20 284:6
317:10,14
354:5

**fourth** 66:21
226:20 293:14

**frank** 171:8,19
180:24

**free** 133:25
134:1,8,9,13,15
135:1 168:22
218:9,19,23
219:1 375:17

**freeman** 3:12
3:19

**freemanmills...**
3:15

**frequency**
79:12,14
247:13

**frequent** 52:16
127:7 140:13
155:5,6,11
170:6 178:3
209:2 256:8

**frequently**
52:11 54:4,5
64:19 84:21
140:3,7,8
151:10 155:8
169:6 178:19

178:25 189:20
203:8,17
207:14 253:11
253:12,13,22
256:11,13

**freshman** 25:4

**friday** 240:21
242:9 243:8
280:25 281:5,9

**friend** 28:16
241:24 255:16
368:12

**friend's** 83:6

**friends** 21:12
21:14,15 27:25
28:3 31:13
83:3 255:21
367:5

**front** 153:11,22
158:15 166:10
166:19 167:2,6
167:8,9 222:20
223:11,16
252:21 254:12
289:22 311:2
328:11,12,13
328:21,25
331:17 333:5
333:13 335:12
339:17 343:24
349:2,5 350:11
352:18 353:6
367:17,20

**frown** 228:19

**frowned**
228:18

**fuel** 144:7,9,14

**full** 13:8 14:16
16:22 93:1
133:1,3,14,16
135:6 219:13
219:17 273:21
343:12,13
360:21 366:10

**fully** 230:2

**function** 55:22

**functions** 53:25
54:1,3

**funny** 196:16
284:23

**further** 313:18
325:14 329:6
330:9 331:4,6
387:3 388:13
389:9

**future** 21:21
68:20 269:2

**fyi** 102:23

**g**

**g** 7:1 20:24

**gained** 74:3

**games** 332:14

**gap** 33:6
251:20

**gas** 15:8 144:13
144:16,22
147:12 148:24
315:6

**gather** 279:14

**gdbuoff** 3:8

**general** 27:9
29:2 63:23
74:10 97:21,24
98:2 114:19
115:15 142:17
173:24 348:21
349:13 350:6
350:15 365:16
384:3 386:3

**generally** 59:21
75:4 115:14
125:21 128:17
131:19

**getting** 16:25
72:13,16 82:14
84:13 99:15,21
99:21 105:15
106:20 107:2
120:15 260:21
260:23 292:9
296:3 313:8
339:14 375:3
387:6

**ghoulston** 21:4

**girls** 198:25
199:10 200:12
201:23

**give** 11:2 13:8
14:22 15:3,3
15:12 17:3
18:15 20:5,21
22:21 30:14
34:5 36:15

Page 27

Appx_0948

**[give - going]**

37:8,10 43:16
59:25 64:22
79:14 93:1
94:5 95:4,18
103:15 108:3
108:10 118:25
123:9 128:24
131:18 132:23
133:14 135:6
135:11,12
142:6 163:2
180:15 203:2
203:19 204:2
209:5 225:10
251:7 264:25
274:15 286:10
340:6 350:5
366:5,10
**given**   72:4
81:18 93:21
94:19 105:1
107:13 123:25
140:21 142:13
157:23 190:10
211:14 341:3,4
341:5 353:16
353:19 391:9
**gives**   108:18
**giving**   24:3
269:1,9
**glance**   362:8,22
**glanced**   313:9
314:5 321:19
329:1 331:21
333:1 352:12

362:10 363:3,8
363:9 364:3,4
364:16 367:6
385:9
**glancing**   340:9
385:6,13
386:13
**glasses**   317:23
318:3,4,15,16
318:20
**glided**   312:23
**glimpse**   239:2
**global**   187:1,4
**gmail**   39:12
40:16 58:19,23
264:2
**go**   10:22,23
13:23 15:1
19:11 24:19,25
26:19 36:2
47:3 50:10,13
51:8,10 61:23
69:13,16 70:5
74:12 76:13,24
81:4 88:4
91:21 96:2
98:11 116:14
127:7 155:16
155:20 156:9
157:24 159:6
160:5 162:16
165:1,22
171:23,25
177:9,10
178:11 184:5

186:13 188:10
188:10 192:20
193:18 217:1
218:8 224:15
232:1,22 233:5
235:21 238:25
239:1 240:7,23
240:25 243:22
249:8,22
252:19 253:13
256:1 257:12
257:14 260:11
262:1,5 265:10
265:12 266:12
267:14 268:3
277:4 279:17
280:9 281:7,15
287:9 289:19
297:16 298:6
299:6 300:3
301:19,22
306:4 317:23
333:8 340:4
343:15 347:3
348:9,11
354:19 360:14
365:17 367:4
382:25
**goal**   78:23
91:17,19,22
93:21,23,24,25
94:20,20,21
126:20 159:9
159:10

**goals**   49:24
77:10,11,14
**god**   197:16
250:7 347:15
**goes**   12:4 223:1
356:8
**going**   9:24 10:2
10:3,23 11:13
13:10,17,19
14:15,16 15:18
26:17 27:22
41:9 43:11
47:11,18,18,25
48:1,8 56:3
62:23 63:1
70:22,22 72:4
73:7 76:5
79:10,16 82:13
83:19,24 84:4
84:23 88:2
90:3 93:11
94:17,18
109:15 119:24
120:1,2,2,5,6
121:11,12,17
121:19 124:24
127:11,12
129:1 141:9
147:7,22
148:13 150:12
156:7 159:4
162:14,15
163:20 185:21
196:21 198:6
199:2 203:2

Page 28

**[going - grant]**

| | | | |
|---|---|---|---|
| 223:5 232:8 | 345:11 347:10 | **google** 58:15 | **grace** 197:15 |
| 233:12 234:2 | 347:25 348:7 | 59:11 | **gracie** 5:14 |
| 234:11,24 | 349:14 351:20 | **googled** 300:14 | 28:14,15 29:5 |
| 235:9,12 236:2 | 352:5,5,23 | **goose** 18:23 | 249:13 255:15 |
| 236:16,21,25 | 353:24 354:4 | **gory** 238:18 | 256:5 257:9,11 |
| 238:16,19 | 358:17,24 | **gotten** 32:2 | 257:16,23,25 |
| 239:1,18 251:5 | 360:3,3 361:18 | 34:18 261:3 | 258:8,21 262:5 |
| 253:24 258:11 | 368:8,9 371:3 | 353:6,11 | 270:15,20 |
| 259:17 265:1,6 | 371:4 372:17 | 380:18 | 271:24 272:4,7 |
| 265:24,25 | 372:18 373:14 | **govern** 142:3 | 272:25 273:22 |
| 267:22 268:19 | 375:5 379:4 | 187:9 | 287:24 289:10 |
| 268:20 269:10 | 384:13 386:18 | **gpa** 347:24 | 289:20 293:6 |
| 269:18,20,22 | 386:24 | **gps** 251:10 | 297:12 299:5 |
| 271:4 275:16 | **gonzalez** 1:4 | 313:7,9,10,10 | 301:21 303:6 |
| 275:22,24 | 2:2 7:11 390:1 | 314:2,6 321:14 | 307:22 309:17 |
| 276:11 279:1 | 391:1 | 321:19 326:2 | 310:6,10,15 |
| 279:24 280:9 | **good** 7:6 9:14 | 327:19 329:1 | 311:1,4 321:12 |
| 280:23 281:4 | 14:9 36:3 46:4 | 331:21 332:6,9 | 340:13 352:21 |
| 287:4 293:18 | 59:10 66:5,13 | 332:17,24 | 364:5,8,10,19 |
| 293:24 296:16 | 66:17 69:8 | 333:1,3,9,12 | 368:12 370:7 |
| 299:23 301:6 | 73:20 92:18,19 | 337:24,25 | 377:5 384:18 |
| 301:12,15,16 | 94:17 125:24 | 338:5,8 340:10 | **gracie's** 257:12 |
| 302:4,6 304:22 | 135:12 160:7 | 341:14 346:8 | 267:20 376:13 |
| 305:2 306:21 | 172:7 177:4 | 346:16 352:11 | 376:15,18 |
| 306:24 307:2 | 178:14,23 | 352:12 356:12 | **grade** 35:20,24 |
| 312:18 316:18 | 179:1 180:2 | 361:13 363:2,5 | 51:5,12 |
| 318:22,23 | 203:12 214:15 | 363:14,16 | **graded** 51:3 |
| 319:15,19 | 224:12 268:24 | 364:3,4,7,12,16 | **graduating** |
| 320:11 333:16 | 276:18 301:18 | 367:6 368:24 | 38:7 |
| 333:17 334:11 | 314:1 320:11 | 376:11 385:6,9 | **graduations** |
| 334:13,14 | 320:16,17,23 | 385:14,20 | 253:20 |
| 335:14,15,16 | 320:25 321:2,2 | 386:13 | **grainy** 317:12 |
| 336:4 337:4,4 | 348:11 381:15 | **grab** 289:22 | **grant** 2:12 8:16 |
| 337:18 339:17 | **goodness** 201:1 | **graben** 2:13 | 12:16 |
| 340:23 345:10 | | 8:17 | |

Veritext Legal Solutions
800-336-4000

Appx_0950

[graphic - happening]

**graphic**  10:4
  336:21
**grateful**  373:4
  373:17
**gray**  272:6
**great**  12:13
  178:15 371:15
**greg**  26:16
**gregory**  3:4
  8:20
**grill**  60:13
**gritty**  29:2
**grooming**
  216:8
**ground**  285:16
**group**  273:17
  284:7,8,10,11
  284:12,17
**growth**  122:7
**gschmidt**  2:16
**guarantee**
  13:17
**guess**  37:22
  51:13 63:21
  71:11 88:1
  92:22 93:12
  103:25 109:4
  120:13 122:18
  139:8 163:23
  164:9 169:19
  191:17 194:15
  201:5 229:13
  229:14 233:21
  233:24 266:2,5
  273:19 282:6

283:9 301:20
312:14 321:4
324:17 345:7
374:17 377:21
387:1
**guidelines**
  159:10
**guilt**  371:2
**guilty**  12:14
  83:7 87:25
  371:1,16,18,22
**gus**  21:2
**guts**  316:18
**guy**  12:15
  13:24 214:24
  331:13
**guys**  102:20
  261:12 262:1
  276:22 292:16
  348:5 387:6
**gym**  251:25
  252:1

**h**

**h**  4:7 5:1 6:1
  390:3
**habit**  265:12,14
  309:21
**habits**  377:15
  377:17
**hair**  243:23,25
**half**  52:15 53:3
  79:15 109:16
  132:2,6 170:4
  250:19 261:2,2
  270:11 330:18

**halfway**  96:18
  164:13 250:21
  309:2 312:14
  312:16 367:10
**halo**  85:25
**hand**  9:1 13:2
  76:25 82:17
  157:11 165:22
  186:15 193:19
  195:9 208:8
  237:20 238:6
  279:18 282:3
  315:17 316:12
  322:4 329:9,21
  349:1 363:19
  385:2
**handbook**  97:2
  97:3
**handful**  242:24
  257:8 288:13
  302:24 342:4
**handheld**  217:4
**handle**  187:24
  191:1
**hands**  12:15,15
  88:18 133:25
  134:1,8,9,13,15
  135:1 168:22
  202:5 218:9,12
  218:19,23
  219:1 337:20
**hang**  250:2
  256:11 257:11
  257:14

**happen**  13:17
  19:14 31:17
  104:10 121:19
  152:13 173:12
  199:12 202:8
  206:7 221:25
  222:15,17
  249:17 296:19
  300:8 370:2
**happened**  9:21
  27:2 32:18
  36:23 44:2
  60:16 61:10
  67:25 91:2
  98:17 104:2
  117:23 149:25
  152:15,17
  153:15 154:23
  166:24 169:23
  170:16 171:4
  171:20 181:21
  199:15 200:23
  201:2 202:9
  221:2 222:19
  224:5,7 225:21
  250:14 267:5
  292:14 310:10
  329:2 338:15
  340:6 348:17
  353:8 369:14
  369:24 370:13
  374:12 382:4
  382:24
**happening**  68:3
  154:12 203:7

Veritext Legal Solutions
800-336-4000

Appx_0951

**[happening - hitting]**

| | | | |
|---|---|---|---|
| 264:12 296:15 | 292:20 296:12 | **hiding** 63:18 | **historical** |
| **happens** 51:4 | 346:6 347:2,6 | **high** 24:10,10 | 203:12 |
| 53:4,8 138:12 | 348:10 | 24:16 48:19 | **history** 77:10 |
| 288:22 | **heard** 11:14 | 51:12 60:3,7 | **hit** 35:1,3,6,9 |
| **happy** 11:2 | 54:10 137:18 | 60:15 67:2 | 35:13,16 56:17 |
| 29:9 68:17 | 191:23 192:1,4 | 88:12 128:24 | 93:24 136:23 |
| 369:2 | 237:8 | 255:18 | 137:1,13,17 |
| **hard** 17:12 | **hearing** 8:23 | **higher** 358:4 | 138:3 154:16 |
| 51:15,18 | 17:12 347:8 | **highest** 130:18 | 164:15 196:9 |
| 253:10 335:15 | **heart** 373:9 | 266:5 | 196:16 197:24 |
| 337:1 | **heavy** 218:15 | **highly** 191:13 | 197:25 198:25 |
| **hardest** 343:4 | 373:8 | **highway** | 199:10 201:6 |
| **harm** 114:7,14 | **held** 7:17 | 153:16 164:13 | 201:23,25 |
| **harris** 62:11 | 261:24 | 222:22,23,24 | 202:4 222:14 |
| **hazardous** | **help** 22:5 38:15 | 232:11 | 222:20 223:15 |
| 218:15 | 50:21 133:7,8 | **hilgers** 2:13 | 223:17 307:25 |
| **hazy** 89:15,16 | 133:9 147:25 | 8:16 | 308:9 309:17 |
| 89:19 | 257:22 271:6 | **hilgersgraben...** | 310:14,18 |
| **he'll** 169:12,14 | 333:24 | 2:16 | 311:1,11 312:3 |
| **head** 142:15 | **helped** 80:6 | **hill** 2:14 | 316:6 328:8,16 |
| 250:12 251:22 | 108:25 | **hire** 80:6 90:12 | 329:20 330:5 |
| 290:11 354:21 | **hereto** 388:15 | 117:18 | 330:17,22 |
| 355:2,7 | 389:11 391:7 | **hired** 18:8 75:1 | 338:10,16,20 |
| **headed** 249:1 | **hertz** 223:23,24 | 79:19 80:5,21 | 339:6 343:11 |
| 250:25 278:18 | **hey** 13:13,25 | 81:4 88:23 | 344:2 345:25 |
| **heading** 157:11 | 14:7 16:2 | 98:8 103:13 | 346:1 348:19 |
| 159:8 278:6 | 33:15 68:25 | 105:1 144:6 | 355:25 360:18 |
| **headlights** | 102:23 145:11 | 169:22 170:16 | 361:4,14 365:5 |
| 158:5 | 145:21 146:2 | 170:21 171:4 | 368:8 374:14 |
| **headquarters** | 231:20 250:7 | 171:14 174:6 | 374:19 376:10 |
| 76:1 | 257:11 276:23 | 186:5 203:21 | 384:1 |
| **health** 375:16 | 283:21 296:17 | 222:9 284:9 | **hits** 330:2 |
| 375:17 | **hidden** 241:4 | 287:19 | **hitting** 34:21 |
| **hear** 26:14 68:2 | **hide** 82:11 | **hiring** 80:12 | 197:22 200:17 |
| 74:17 259:7 | | | 201:3 312:19 |

Page 31

Appx_0952

**[hitting - identified]**

330:1 361:5
367:11 384:15
**hold**  197:7
225:8 259:12
259:20,21
299:23 300:1,2
**holding**  298:22
**holidays**
253:14
**holmes**  76:23
77:2 161:3,4
**holton**  1:22 7:7
388:2,17
**home**  31:13
49:5,9 70:14
70:17,23 78:22
79:2,3 83:3,5
98:19 104:24
114:25 115:3,5
115:7,16,19
116:20 117:7
127:8 129:13
129:14,16
150:19 240:24
240:25 244:8,9
244:17,20,21
244:22 248:16
249:2 250:17
251:3 259:4
281:13 367:4
382:1
**honestly**
187:21
**hooked**  294:9

**hopefully**  11:4
126:18
**hopped**  353:6
**horn**  158:6
**host**  60:9
**hotel**  106:1
120:4 127:8
151:6 275:18
275:19,20,22
275:25 276:14
**hour**  53:3 66:9
73:12 77:2
127:20 163:25
234:3,12,24
235:4,9,12,17
235:22 236:3
236:22,25
270:11 301:12
301:15 352:24
368:8 384:15
**hours**  53:3
73:13 125:14
126:18,21,22
127:1,17 129:6
129:8 242:24
250:20 253:25
358:18 387:7
**house**  19:1,2,4
19:6 20:1 83:6
105:20,22
116:21 241:9
242:6 243:2,3
243:4,10,15,18
244:1,4,4
250:3 257:4,13

257:19 267:20
281:8 284:6
288:5,6,8,8
293:18 376:13
**household**  21:2
21:6,8
**housing**  257:17
**houston**  1:21
7:18 66:6 71:1
75:18 129:16
129:18 250:17
250:17,23
251:2 253:6
270:17,23
273:22,23
285:21 293:13
375:3,6,11
**how'd**  258:13
258:20 261:20
303:24
**how's**  199:2
**hr**  77:23 78:3
**hub**  118:11
**huhs**  12:11
**human**  25:19
187:2,5 317:17
**hung**  245:22
**hurt**  154:19
223:25 224:2
347:16
**hush**  39:22
**hutchins**  65:16
70:2
**hyphen**  306:13

**i**

**icloud**  38:23
378:17
**idea**  19:22
32:14 45:20
56:5 103:2
108:9 140:7
172:16 180:16
191:15 217:15
265:23 304:15
314:2 324:13
324:15 381:8
**identification**
47:8,15,22
48:5,12 63:6
69:20 74:19
76:10 82:2
85:2 88:6 90:6
96:6 156:12
162:18 177:14
185:18 192:10
196:24 198:20
207:18 215:8
238:22 271:9
277:22 279:5
280:14 317:2
334:17 345:15
349:19 351:23
354:2 358:14
360:7 365:21
371:8 372:21
374:4 379:7
**identified**
321:17 322:15
322:22,24

Veritext Legal Solutions
800-336-4000

Appx_0953

**[identified - instance]**

364:14,20
365:9
**identify**  8:12
188:14 322:12
**idiot**  14:1
**ignore**  138:25
139:7 236:20
236:24 237:2,3
**ignored**  139:1
**illness**  373:10
**imagine**  139:21
**immediately**
32:10 72:6,18
72:20 124:10
124:11,14,24
125:6,11
167:19 259:18
308:12,23
309:3,23 310:2
338:9,11 345:4
367:12
**impact**  193:25
360:17 361:1
370:20 384:22
384:25 385:3
**implying**
166:14
**important**
111:3 113:23
126:4,6 142:21
158:23 159:1
159:17,24
193:5 228:8
230:4 231:7
234:23 320:14

320:17,19
349:8
**impression**
200:2
**inaccurate**
168:15,18,24
**inaccurately**
162:24
**inappropriate**
195:12 269:11
**incident**  152:24
201:21 278:16
348:17 378:5
**incidents**  87:6
87:12
**include**  216:6
234:8
**includes**  217:8
**including**  66:25
96:21 193:6
195:14,20
217:4 378:8,9
**income**  75:17
**incoming**
138:13 302:13
**incorrect**  355:5
369:5
**incorrectly**
165:15
**increase**  94:16
236:6
**increased**
94:15 208:21
209:1 377:22

**increases**
208:12
**independently**
194:7
**indicating**
360:25
**indicators**
158:5
**individual**
154:22
**individualized**
380:24
**individually**
1:5 2:3 7:11
**individuals**
187:4
**industry**  65:8
66:11 71:23
**info**  361:25
**information**
52:1 68:8
81:23 82:5
99:14 151:19
154:4,5 163:6
367:14
**infotainment**
6:7 138:22
139:9,11
141:21,24
216:10 295:17
300:3 302:14
302:25 303:3
303:17 313:11
313:12,13
335:1 362:1,2

362:16 379:11
379:12
**infrequently**
276:23
**ingoing**  272:13
**initial**  374:21
**initials**  350:9
**injuries**  157:18
**ins**  303:21,24
304:3 305:2,20
306:2,10,20,22
307:1 308:4,13
308:24 309:5,9
309:17 310:6
311:21 312:3
314:14 315:1
**inside**  279:6,9
**inspect**  146:6
**instagram**  4:12
6:4,6 43:17
46:22 48:1,3
48:16 206:19
206:22,25
207:8,10 263:3
372:14,19,25
373:16 379:15
380:2
**install**  287:7,9
**installation**
130:19
**installer**  287:5
**installers**  287:7
**instance**  33:4
35:6

**[instances - job]**

| | | | |
|---|---|---|---|

instances  232:3
232:12 234:20
instantaneous...
377:8
instinct  342:18
344:6
instructed
190:16
instruction
100:21
insulting  121:3
insurance
144:25 154:10
intended  8:4
intent  192:24
interacting
50:3,4 179:7
interaction
49:18,19 50:2
247:19
interactive
50:19,21 51:15
53:8
interest  209:9
interested
388:15 389:12
interesting
18:21
interior  146:6
internal  193:1
195:13
internet  194:10
internship  20:9
20:13,13 59:25
61:25 62:2,5

62:10
internships
63:17
interpret
200:21
interrogatories
30:5
interrogatory
30:3
interrupt  43:20
interstate
232:16,17
260:6 264:23
265:20 266:20
267:14 268:4
270:11 273:1
278:9,13
292:22 324:16
333:13 342:8,9
342:13
intervention
247:11
interview  76:18
77:2,6 79:6
162:24
interviewed
76:16,20 79:19
interviews  80:8
intoxicated
238:7
introduce
62:24 76:4
88:2 90:2
156:4,7 162:14
185:21 207:15

271:4 279:1
280:11 360:3
371:3 372:17
373:25 379:4
introducing
122:9
invasive  23:7
invites  55:13
284:3
involve  73:7
involved  26:5
107:5 277:12
372:1 373:6
involving  26:10
ipad  245:3,4,14
245:15,16
iphone  38:14
38:16,18,19,23
44:1,3,5,7
254:8 334:25
iphones  38:13
38:21
ipod  256:20
irked  285:2,5,6
issue  133:7
214:5 348:7
issues  120:8,9
121:9 177:22
it'd  133:12
143:1 227:22
it'll  138:14
288:24 295:14
itunes  39:6

**j**

j  3:4
jack  342:2
jacob  2:5 8:14
9:15 14:7,13
23:3 269:1
jacobwhite  2:9
january  19:6,8
jason  22:19,23
23:1 28:19
29:5 357:13,14
366:12
jerk  360:22
jerked  338:14
jerry  119:23
jersey  285:23
jesse  22:19 23:1
357:13
job  1:23 4:15
4:17 9:21
49:22 59:22
60:2,10 61:12
61:21 62:19,20
64:3,14 66:17
67:1 69:14,17
69:18,23 70:5
70:6 71:12,13
72:8,10,19
73:6,18 74:24
75:5,14 76:6
77:9 78:15
79:6,10 82:14
113:21,24
114:13 117:1
132:5 169:3

Page 34

Appx_0955

**[job - know]**

172:21 173:23
177:4 178:14
178:15,21,23
179:1,4,10
184:7,11,13
208:20 261:19
320:25 321:2
390:2
**jobs** 63:17,18
63:23,24 78:3
113:17 159:12
**joke** 102:19
196:10,17
**joked** 200:13
200:16,17
**jokes** 285:16
**joking** 200:20
201:2
**jones** 5:15,24
180:23 278:3,5
359:23 360:1
**josh** 21:6,9
**judge** 41:9
**july** 84:6 85:14
86:8
**jump** 173:5
199:2
**june** 152:18
153:8 185:4,7
185:11 222:8
222:10
**junk** 40:13,19
**jury** 23:8,10
**justice** 18:10
88:18

**justin** 260:14
260:15 261:12
261:20 262:5
280:10

**k**

**k** 1:12 7:16
171:12
**katie** 171:8,19
172:6,18,24
173:1,8 174:2
174:5,9 176:23
180:24 214:24
**keep** 12:17
26:17 43:1,3
44:6 82:13
84:4 92:16
94:17,18
101:11,13
123:13 126:17
131:20 143:16
163:20 182:22
213:4 218:12
219:13,17
230:4,8,12,18
230:23 231:18
235:14 239:15
254:18,21
282:3,5 283:15
298:22 320:11
320:23 332:11
332:19 335:16
347:9 350:18
373:14
**keeping** 321:2

**kept** 247:25
311:9
**kid** 202:15,18
241:10,24
242:2,15
**kids** 257:22,23
257:25
**killed** 9:17 18:9
339:1 340:18
370:14 377:11
**killing** 378:23
**kimberly** 1:22
7:7 9:9 271:14
345:17 354:3
374:1 388:2,17
**kind** 22:21
25:18 29:17
35:21 49:4
61:12 62:19,21
64:13 66:8
68:14 69:4
71:20 78:4,15
80:11 86:3
95:18 98:14
102:19 111:6
111:11 118:15
119:10 122:3
127:15 129:2
148:2 155:22
166:16 174:2
191:11 222:21
226:4,12
247:25 257:16
259:12 260:22
286:18 292:21

312:23 315:17
329:13 335:7
341:6 355:9
**king** 2:6
**kingsville** 76:2
**kneel** 368:4
**kneeling**
349:10 350:3
368:1
**knelt** 350:16
355:13 365:13
367:10 385:25
**knew** 71:15,18
73:8 113:3
147:22 200:13
262:11 267:5
304:2 332:25
333:4,12,23
**know** 9:14 10:9
10:12,21 11:1
11:2 12:8,8,11
12:25 14:8,10
14:19 15:2,4,9
15:19,20,22,25
16:2,3,6,7,8,9
16:14,16 18:8
18:9,18 20:5
21:13 23:7,9
28:2 30:13,20
32:8 33:2 34:2
37:9,13,14
38:17 39:2,4
39:14,22 40:15
43:16,23 45:13
46:19,20 50:9

Veritext Legal Solutions
800-336-4000

Appx_0956

**[know - know]**

| | | | |
|---|---|---|---|
| 56:19,19 57:25 | 132:1,14 | 189:6,22,25 | 244:21 246:3 |
| 59:18 61:22 | 133:12 134:23 | 190:1 191:8,10 | 248:8,15 |
| 63:13 65:9 | 134:24 135:4 | 191:14,16,19 | 249:13,21 |
| 71:12,20 77:9 | 135:22 137:14 | 191:20,22 | 250:10,24 |
| 78:23 79:20 | 138:15,18 | 192:19 194:10 | 251:11,11 |
| 80:11 81:8,11 | 139:3,13,23,24 | 194:18 195:1,1 | 252:1,11,14 |
| 82:7,10,11 | 139:25 140:2,6 | 196:11,15,20 | 253:7,8,13,22 |
| 86:2,7 88:1 | 140:8,13,19 | 197:18,19 | 253:23 254:2,4 |
| 90:12,13 92:6 | 141:14,25 | 199:18 200:1,3 | 254:16,17,22 |
| 93:3,5 96:25 | 142:8,14 145:7 | 200:6,9,11,15 | 255:17 258:5,7 |
| 97:1 98:24 | 145:10 147:3,7 | 201:8,10,24 | 258:22 259:9 |
| 99:2,10,17 | 147:25 148:1 | 202:2,3,7,10 | 260:11 261:19 |
| 100:3,8,9,13,16 | 149:11,13,18 | 204:3 205:22 | 262:12,17 |
| 100:25 102:8 | 150:1,2,4,8 | 206:8 207:14 | 263:11 264:13 |
| 102:10,13,15 | 151:25 153:6 | 208:18 209:17 | 264:15,21 |
| 103:4 105:5,7 | 154:18,21,25 | 210:2,3,4,8,14 | 265:10,22,25 |
| 105:13,17 | 159:15,19,19 | 210:16 211:6,8 | 266:23,23,25 |
| 106:22 107:10 | 159:20,22 | 211:10,20,22 | 267:18,23 |
| 107:21,24 | 160:2,8 162:9 | 212:13,15,17 | 268:6,9,12,14 |
| 108:4,8,13,14 | 162:25 164:19 | 212:23 213:6,9 | 268:17 269:11 |
| 108:16,17,19 | 165:6,7,17 | 213:12,19,23 | 269:12 270:5 |
| 108:22,24 | 166:11,25 | 214:14,16,19 | 272:9,11,21,23 |
| 109:1,2,4,8,10 | 167:1,2,5,10,13 | 214:22 215:3 | 274:16 275:2 |
| 109:19 110:4 | 167:23,24 | 217:14,17,21 | 276:1,23 277:5 |
| 110:10 111:4 | 168:1,16,21 | 217:23 218:21 | 277:16 287:3 |
| 111:17,21,22 | 169:25 170:5 | 219:3,6,22,25 | 288:1 290:18 |
| 112:17 113:7 | 172:17,20 | 220:4 222:18 | 293:9 294:1,13 |
| 113:11,15 | 173:2,4,10 | 225:16 227:4 | 296:3,11 |
| 114:24 115:14 | 175:18 178:3 | 227:22 228:1,7 | 297:21 300:10 |
| 117:14 118:14 | 179:5,6 180:10 | 229:3,9 230:10 | 301:8,9,17,20 |
| 119:24 120:5,6 | 181:18 182:6,7 | 231:22 232:14 | 303:2,24 |
| 121:4,6,7,18 | 182:8,9,11,12 | 233:3,11,17 | 304:20 305:2 |
| 122:3 124:20 | 183:11 184:1 | 236:4,19 237:4 | 309:3,4,7 |
| 125:20 131:3,8 | 184:12,13,15 | 237:17,21 | 311:20 312:20 |
| 131:24,25 | 186:10 188:5,8 | 240:13 244:2 | 313:6,23 |

Page 36

Appx_0957

**[know - leave]**

315:11,19,24
316:16,17,20
316:21,22
318:10 319:17
322:15 324:11
324:14,15
326:1 327:2,4
327:6,8 328:5
328:13,18,20
329:4,5,7
331:9,18 332:5
332:14,16,20
332:23 333:10
333:18,20
337:1 338:17
338:18,19
339:2,3 340:5
340:12 341:16
343:18,18
344:13,22
346:23 347:7
348:24 349:6
349:12,12
350:5 355:8
356:4,6 358:3
358:4,9,11
359:20 362:20
363:7,20
367:13 368:3,6
368:9 373:5,21
374:16 376:7
376:22 377:4,9
378:20,22
379:17,19
381:7,12,18,23

382:8,13,18
383:2 385:22
386:8,12
**knowing**
212:14
**knowingly**
373:13
**knowledge**
14:16 54:13,14
80:14,16 146:5
165:18 210:12
210:15 382:9
388:10 389:6
**known** 194:1
255:19 257:12
373:5
**knows** 89:7
**kooman** 171:10
173:11

**l**

**l** 3:11 20:24
**laid** 62:17
**landed** 338:18
**landing** 49:7
**lane** 2:14
164:13 167:14
167:15,22
222:23 223:6
223:10,13
233:2,6,7,10,12
233:13,15,19
233:20,22
239:10,13
301:9 308:22
309:2 312:5,7

312:9,12,14,17
312:21,24
314:3 315:18
315:23 316:2,8
316:9,12,14,15
321:5,18
323:18 324:16
325:11 327:22
328:7,23
329:13,14,21
330:7,19,21
331:2,4,5,11,12
331:14,23,25
333:5,13 339:7
340:24 341:6,8
341:10 342:16
342:21,24
343:4 344:12
344:15 350:14
351:12 363:24
364:1 365:15
367:4,8,10,18
383:12,16,20
383:24 384:5,7
384:9 385:10
385:23 386:3
386:14
**lanes** 223:2,5,7
223:8 268:1
319:11,13
321:24 322:5
**laptop** 106:4
116:5 239:3,6
348:10

**large** 236:6
**late** 10:23
31:12 246:1,4
352:14 360:17
367:11
**law** 36:2
157:20 187:2,5
231:13 330:4
**laws** 8:6 96:17
96:19,23 97:10
97:11,14,19,21
97:25 98:3
**lawsuits** 26:6
**lawyers** 14:6
26:23
**lay** 250:5
**leading** 88:12
**leads** 211:24
**learn** 171:22
173:19 287:9
**learned** 173:6
179:8 202:25
203:4 378:4,8
378:14
**learning** 42:18
49:17,17 98:10
**lease** 61:16,18
156:9
**leasing** 61:13
61:14,15 64:7
**leave** 61:9,20
127:11 150:21
150:22 250:8
255:12 273:22
273:23 293:13

Page 37

Appx_0958

**[leave - loaded]**

357:11
**leaving**  61:2,3
**lecture**  269:5
**led**  32:12
**lee**  356:3 359:1
359:6 365:19
365:25 366:6,9
366:24 367:2
369:18
**lee's**  360:15
**left**  19:11
153:13 164:13
223:12 233:15
239:11 249:23
250:11,23
251:3,21 261:6
261:7 293:9,12
312:24 316:12
329:9,13,14,21
330:13,21
331:2,3 342:16
342:24 343:4
343:15,25
344:4,9 367:4
367:8 376:12
382:2 384:3,4
384:5
**leftmost**  322:11
323:18
**legal**  26:6
**length**  334:4,8
**lerardi**  103:12
104:19
**lesson**  378:9,13

**letter**  4:22
90:10,15
116:11
**license**  32:21
32:25 33:5,15
97:17 110:10
202:22,24
**lidocaine**
247:22
**lie**  12:25
**life**  30:11
123:14 206:3
325:20 326:13
327:17 371:17
371:25
**lift**  341:24
**light**  369:15
374:22
**lighter**  350:9
**lights**  314:11
314:15,24
335:23 336:5,8
337:6 344:18
344:21
**liked**  25:9
**likely**  203:12
291:21,23,24
296:8 368:2
**limit**  163:21
231:5,10,15,19
232:2,19
233:13,19,20
265:2,4,7,11,13
266:20 267:1,2
267:6

**limited**  62:5
216:6 217:8
378:10
**limits**  157:19
231:12
**line**  97:25
178:13 239:11
314:7 322:11
330:13 363:19
384:8 390:4,7
390:10,13,16
390:19
**lineage**  22:21
**link**  76:13
**linkedin**  4:21
56:12,21 57:22
66:25 67:7,7
74:20,21 88:22
**links**  49:11,14
**list**  39:11 46:18
56:4,19 81:10
101:15 103:15
**listed**  50:9
**listen**  295:4
**listening**
294:23,25
295:6
**listing**  69:17,24
70:6 71:13
**litigation**  3:19
**little**  9:15 17:12
17:13 25:9,25
28:24 50:18
61:6 78:16
81:18 106:18

106:18 110:23
110:23 118:23
128:3 154:14
157:14 239:6
240:7 308:20
312:24 317:12
321:17 322:7
326:22 330:9
335:7 336:20
340:24 341:1
350:12 353:17
373:1,4
**live**  22:3 23:4
117:24 118:19
257:9 371:16
371:23
**lived**  19:16
20:5,6,16,17
241:11 256:23
**lives**  170:7
193:6
**living**  21:22
117:3 241:6,17
241:18 243:7
371:20
**livingston**  19:3
19:5,12 20:5
33:19 117:5,24
241:17 242:6
244:9 247:2
248:16 252:4
**llc**  3:5 88:11
**llp**  1:19 7:17
**loaded**  130:11

**[local - lunch]**

**local**   70:25
**located**   176:19
239:9
**location**   1:19
116:25 127:24
128:7 151:4
287:25 333:20
333:21 342:14
376:8
**locational**
273:14 348:25
**locations**   118:2
274:10
**lock**   254:9
259:13 299:24
300:1,2 307:12
309:20 312:3
**locked**   46:25
289:18,19
309:12,13
321:13,15
**log**   40:2 42:3
49:4,6 50:15
**logic**   189:9
**logo**   239:23
**long**   19:4 39:13
39:14 44:6,9
52:24 76:18
84:10 98:25
125:12 127:19
172:24 174:6
242:22 243:25
250:16 255:19
270:7,9 361:24
362:11,18,20

363:7,11
373:10 376:12
**longer**   118:11
171:8 367:7
371:21
**longview**   3:14
**look**   47:5 48:2
48:9 50:5
63:12 66:19
69:16 74:15
81:21,22 87:8
87:9 90:20
128:5 137:12
137:16,25
142:10 150:2
157:7 163:4
168:19 185:16
188:10 189:18
189:20 192:21
195:4 197:5
198:18 208:7
289:15,17
291:14 293:4
308:6 312:4
313:7 314:2
328:21 333:3,9
333:12 334:21
335:10 347:24
353:22 361:15
361:21,22,24
362:16,18,24
362:24 366:23
368:25 369:16
**looked**   29:14
29:23,25 30:4

30:8 37:12
80:17 291:18
292:4 308:25
309:22 321:14
321:15,16
323:2 332:9,17
333:1 338:7
346:16 347:24
363:2,5,7,14,16
364:7,11,12,16
369:2 378:22
385:20 386:13
**looking**   65:7
66:6 68:7
80:12 89:22
178:12 202:5
273:18 289:19
289:21 308:15
310:1 313:15
317:9 325:6
326:2 327:19
328:24 331:19
332:6,23 338:5
340:9 341:13
346:7 348:22
349:1,3,6,9,10
350:24 351:1,5
351:7 352:10
353:3 361:13
361:25 362:3
363:12,20,22
363:23 364:13
**lookout**   320:11
320:23 321:3

**looks**   47:13,20
69:21 75:7
238:19 239:24
268:23 272:19
279:13,16
280:18 298:23
320:6 334:22
335:7 337:13
355:2,6 360:16
**lose**   85:13
**losing**   126:12
**loss**   4:25 163:7
163:10
**lot**   36:10 56:18
91:24 113:22
113:24 126:23
126:24 127:1
132:1 136:10
158:21 181:11
248:8 257:20
268:13 286:8
290:1 305:14
374:18 382:1
**loud**   138:11,14
138:24 139:2,9
296:12
**low**   124:2
128:24
**lowest**   266:2
**loyal**   130:17
**lucky**   40:5,6
**lug**   341:25
342:1 349:3
**lunch**   125:4,7
171:25 172:2

Page 39

Appx_0960

[lunch - mark]

276:1

**m**

**m** 171:12
**ma'am** 367:1
**machine**
120:13,16,18
120:20,21
121:5
**made** 12:10
42:23 84:15
90:11 92:15
117:15 154:17
165:11 208:13
225:3 237:12
247:4 262:5
312:10 313:5
314:4 315:16
316:1,7 326:18
326:21,25
327:2,4,7
328:7 348:20
364:15,18,22
365:10 368:18
368:23 372:8
372:11 377:22
391:5
**magnet** 335:6
**magnetic** 290:1
303:9 334:25
354:10
**mail** 45:5,6
**main** 2:7
**maintain**
121:13,16
122:2,6 158:17

158:20 159:24
**maintained**
145:15
**maintaining**
158:6
**maintenance**
145:3
**majority** 64:5,6
78:11 267:4
**make** 10:11
11:15 12:1
13:7 23:8
33:12,14,18
46:2 47:3,12
55:17 56:5,15
59:17 68:19
81:19 83:10
84:12 92:19
93:6,11 102:17
102:23 104:24
109:17 114:25
119:1,14
137:18,20
154:7,9 160:10
169:12 170:19
186:19 193:3
200:2 205:18
208:16,19
225:5 250:2
253:11 265:14
285:16 290:17
291:10 295:21
296:9 308:6
315:25 326:24
330:1 345:12

350:4 362:13
372:15 373:16
377:25
**makes** 33:10
124:18 228:17
247:8
**making** 105:16
217:9 219:20
232:19 296:7
310:13 311:11
372:6
**man** 9:16 13:13
18:9 101:4
360:18 371:20
**man's** 371:17
371:25
**manage** 10:21
12:16 377:12
**management**
61:11 104:18
279:11 359:9
359:16
**manager** 62:8
73:6 103:10,13
103:17,20
104:15,21
105:6 160:20
160:21 169:23
170:12,17,23
175:16 178:1
187:2,5 223:24
360:2
**manager's**
169:4

**managers** 53:7
103:16 366:3
**manages** 104:5
104:7
**mandatory**
158:10
**maneuver**
343:14
**manner** 8:7
125:12,13
157:17
**manor** 241:4
**manufacturer**
71:4 88:12
**manufacturing**
71:10
**map** 289:1,8
294:22
**mapping** 43:20
**maps** 43:19
288:21,23
289:8 294:5
313:15
**march** 19:15
80:2 91:4
180:15 203:22
283:7
**marco** 56:14
57:16
**mark** 47:11,19
63:1 69:13
76:5 81:17
84:23 192:7
196:21 198:17
239:19 240:4

Page 40

Appx_0961

279:25 320:5
321:2 322:11
324:23 334:15
346:10,19,24
347:14 348:1
349:16,24
352:6
**marked**  47:7
47:14,21 48:2
48:4,11 63:5
69:19 74:18
76:9 82:1 85:1
85:5 88:5 90:5
96:5 156:11
162:17 177:10
177:11,13
185:17 192:9
192:22 196:23
198:19 207:17
215:7 238:21
271:8,21
277:21,24
279:4 280:13
317:1,10
334:16 345:14
349:18 350:19
351:22 354:1
358:13 360:6
365:20 366:15
366:19 371:7
372:20 374:3
379:6
**market**  75:5
91:14

**marketer**  88:12
**marketing**
45:24 65:2
275:2,3 277:9
**marking**  48:8
**marks**  360:24
361:7
**married**  21:18
**material**  45:24
51:16
**math**  36:3
**matter**  7:10
114:3,5,12
201:2,4 340:22
384:13
**mcguire**  1:19
3:5 7:17
**mcguirewoo...**
3:8
**mckinney**
161:18
**mean**  10:7 14:8
25:3,3 35:12
43:4 50:22
52:18 55:18
61:4 64:6
65:23 67:5,15
70:9,21 71:17
73:9,12,22
74:5 75:2,4
79:1 86:1,3
89:7 90:24
91:16 95:7
97:1,25 98:4
101:13 104:5

104:21 107:6
107:23 108:5
109:10,19
111:4 115:3
121:3 124:16
125:1 126:9,25
127:4,10,18
129:5 130:13
134:21 135:1
136:20 137:19
140:12 143:5
148:10,24
155:7,14
156:21 158:24
159:14 161:23
164:3 170:1
177:24 178:17
179:20 182:18
184:16 189:7
189:12 195:17
197:17 198:7
199:8 202:3,8
205:16,23
208:15,20,23
208:24 210:17
211:23 212:4
219:7 221:25
228:2 229:9
231:22 232:16
232:21 236:11
237:18 251:20
253:13,19
258:17 262:20
265:1 266:7,12
282:8 283:9

284:7 285:12
287:18 296:19
304:2 330:8
339:6 343:14
346:20 348:16
352:13 358:7
362:21 365:13
370:6 371:24
374:16 378:23
379:19 384:2
385:25
**meaning**  86:2
359:6
**means**  8:8 89:2
89:10,12
118:23 153:18
158:12 160:3,9
186:20 209:2
211:19 254:2
305:17
**meant**  89:6
177:6
**measures**  41:14
42:8 52:9
245:18
**meat**  72:23
**media**  46:18
48:23 56:4,6
56:12,14 58:13
66:25 67:23
68:6,9,11 69:2
69:8 83:10
84:12,16,21
187:17,24
188:4,7 189:5

**[media - mileage]**

189:16 190:11
190:14,17,20
190:23 191:1,9
191:13,21,24
192:5,25 193:3
193:5,25 194:9
195:12,13,18
196:10,17
202:12 203:1,3
203:8,13
205:25 206:4
206:13 263:2,5
263:21 264:18
264:20 372:6
372:13 378:18
382:7
**medication**
246:10
**meet** 9:14
67:17 80:20
129:9 158:9
287:25 293:21
**meeting** 176:25
274:8 280:21
281:1,6,12
282:20 283:3,5
283:23
**meetings** 55:8
55:13 181:5
283:16
**member** 188:15
284:10
**members** 23:9
102:25 178:1
188:21

**memes** 284:22
**memorable**
191:1,5 200:4
200:7,8 205:14
**memory** 34:25
260:25
**mental** 373:10
375:15,17
**mention** 367:16
367:19 368:7
368:11,14,17
**mentioned**
48:20 87:16
304:4,10
**merging**
323:12
**message** 6:5
67:11 137:1,6
137:12,16
138:5 139:20
228:6 229:7
259:14 260:1,2
260:3 273:21
285:10 288:20
296:4,14,17
299:9 301:25
302:6,9,13,16
303:1,2,6,19
304:7 305:3,6
307:9,22
308:13,24
309:16,24
310:3,23 311:1
311:5,10
321:12 322:25

323:3 324:9,12
324:16,18
340:19 352:21
356:21 364:5,8
364:10,19,25
365:1,4,7,8,10
365:11 371:5
371:11 376:23
377:5
**messaged**
206:22
**messages** 5:14
43:17 44:12
56:15 139:17
175:12 181:11
206:12,19,21
207:1 256:19
256:21,22
258:14,15,20
259:19 263:1
263:22 264:17
264:19 271:24
272:1,9,25
273:6,17 292:4
293:3 295:8
297:12 302:11
305:16 340:13
364:21 365:2
370:3 374:6
377:2,8
**messenger**
256:17
**messy** 146:3
**met** 65:24 66:8
119:22 255:18

**metal** 341:24
**mic** 17:9
**microphone**
136:15,17,23
137:1,7 307:6
307:25
**microsoft**
54:23 181:4
**mid** 10:23
86:15 172:20
183:17
**middle** 73:3
127:13 163:12
167:13,15
223:7 310:19
312:21 314:7
315:18,23
316:2,8,9,15
328:23 329:13
330:21 331:4
331:11,12,13
331:22 333:2
341:6 350:14
351:12,15
355:11 356:19
362:4 363:3
364:17 365:13
365:15 374:19
378:24 384:9
384:21,24
385:25 386:3
386:14
**mileage** 147:16
147:24 148:17
148:18,24,25

Page 42

Appx_0963

**[mileage - morning]**

| | | | |
|---|---|---|---|
| 149:3 | 356:25 367:17 | 100:4,20 101:8 | **monitor** 145:15 |
| **miles** 145:22,25 | **minutes** 283:15 | 101:16,22 | 188:6 209:13 |
| 148:5,5,8,16,20 | 283:17 288:15 | 102:7,9,12,13 | 209:16 210:13 |
| 148:22 149:11 | 310:16 358:19 | 102:20 103:3 | **monitoring** |
| 149:14,16,23 | 382:14 | 105:16,19 | 105:7 210:18 |
| 163:25 234:3 | **misrepresent** | 106:19,20 | 210:24 |
| 234:12,24 | 164:22 | 107:2 109:20 | **monitors** |
| 235:4,9,12,17 | **missed** 32:9 | 109:22 110:17 | 209:19 |
| 235:22 236:2 | 57:20 87:7,14 | 111:7,8,22 | **montgomery** |
| 236:21,25 | **missing** 56:6 | 112:1,17,18 | 18:24 19:12,16 |
| 265:11 301:12 | 63:14,16 273:6 | 190:13 193:15 | 19:25 20:2,14 |
| 301:15 352:24 | **mistake** 160:10 | 216:23 277:15 | 31:16 62:3 |
| 368:8 384:15 | **mobile** 37:1,2 | 380:20 | 78:6 85:21 |
| **military** 202:19 | 37:19 216:7 | **mom** 257:9 | 86:11 224:10 |
| **millennial** | **mode** 134:13 | 260:25 | **month** 52:16,21 |
| 38:15 | **model** 44:1 | **mom's** 257:12 | 52:23 72:24 |
| **mills** 3:12,19 | **modeling** 59:8 | 257:20 288:5,7 | 79:23,25 |
| **mind** 24:3 | **moderate** | 292:19 293:19 | 118:13 147:24 |
| 214:4 311:3 | 319:10 | 293:21 | 148:4 379:18 |
| 350:8 353:1 | **module** 50:16 | **moment** 69:12 | **monthly** |
| 384:6 | 50:22 52:1 | 166:19 278:1 | 280:21 |
| **mine** 118:11 | 53:9 99:11,16 | 323:19 324:20 | **months** 19:17 |
| 144:1 292:18 | 99:21 100:21 | 356:11 358:5 | 19:18 44:10 |
| 373:7 | 101:6 102:22 | 382:19 385:6 | 183:22 222:8 |
| **minimize** | 107:20 112:22 | **moments** 35:7 | **mopac** 153:16 |
| 184:20 216:5 | 141:21,24 | **monday** 119:25 | 153:19 |
| 216:15,19 | 251:6 253:23 | 150:23,24 | **moral** 189:10 |
| **minimum** 93:8 | **modules** 42:15 | 244:24 274:2 | **morales** 389:2 |
| 93:9 | 42:17,18 49:17 | 276:5,12 278:7 | 389:15 |
| **minor** 153:9 | 50:6,19 51:15 | 278:18 280:4 | **morning** 7:6 |
| **minute** 167:12 | 52:12,25 53:13 | 367:25 | 201:15 248:20 |
| 224:16 239:1 | 97:22 98:10,11 | **mondays** | 248:25 249:6,9 |
| 239:19 298:24 | 98:16,19,22 | 150:21,22 | 249:12,15,25 |
| 340:5,12 352:6 | 99:1,4,6,8,13 | **money** 15:23 | 251:4,12,13,16 |
| 353:7,25 354:8 | 99:22,23 100:2 | 16:4 | 252:6,18 253:3 |

Veritext Legal Solutions
800-336-4000

Appx_0964

**[morning - nehemias]**

273:25 278:7
278:19 280:4
**mornings**
150:23
**mother's** 22:9
256:24,25
257:4
**motions** 12:4
**motor** 87:13
217:7
**motto** 182:10
182:12
**mount** 290:1,8
290:13 294:14
296:10 303:9
303:11 305:8,9
307:9,11
334:25 338:4
354:10
**mounted** 354:9
**mouth** 163:2
164:7 247:24
**mouthing**
68:15
**move** 17:15
19:7,9,20
177:3 290:11
368:2,4
**moved** 20:8,12
36:13 316:7
386:4,10
**movies** 273:10
**moving** 34:9
82:9 118:17
313:1

**msg** 6:3
**multi** 185:16
**multiple** 52:4,6
52:22 98:10
121:24 131:4,8
175:23
**multiplied**
92:11
**multiplier**
91:19,22,24
92:11 94:13,24
95:8
**multipliers**
91:14,15,25
92:2,5 94:15
94:16,21 95:5
95:13
**murray** 180:23
**music** 39:7
43:17 294:22
294:23 295:3
**mutual** 61:2,3

**n**

**n** 2:1 3:1 4:1
7:1 171:12
**name** 7:6 9:12
22:1 23:14
39:24 40:17
101:2 143:16
143:25 145:6
163:6 171:11
247:1 275:18
279:19 286:13
295:15 298:1
351:18

**names** 20:22
22:17 23:2
24:1 276:8
**nap** 285:11
**nasty** 103:5
**national** 282:20
283:5 284:3
**nature** 253:20
**navigation**
216:9
**near** 21:21
129:3 308:18
**nearly** 201:3
352:24 368:8
**nearsighted**
318:7,9
**necessarily**
26:6 33:17
49:9 65:21
105:23 114:1
124:25 126:14
132:18 134:19
143:14 191:4
200:19 203:15
232:20 234:22
268:2 270:9
276:25 305:18
311:19 316:11
326:20 329:23
339:10 340:10
361:20 371:2
372:3 377:21
**necessary** 10:5
10:13 178:20
314:4 391:6

**necessity** 155:6
**need** 11:1,3,6
12:10 13:12
14:4 33:16
46:4,18 52:2
59:18 79:22
119:14 126:11
131:10 133:6,7
161:24 179:4,6
216:15 219:13
224:12,14
269:12 296:22
347:1 349:16
355:18
**needed** 33:5
115:22 118:19
177:22 178:25
280:2,3 344:10
366:8,10
367:13 370:10
**needless** 114:7
114:14
**needlessly** 10:2
227:11,14,17
227:21,23
229:19,23
231:4 234:3,13
**negative**
318:12,12
**nehemias** 1:7
2:4 7:12 35:14
160:16 166:9
166:18 316:6
328:10 330:20
333:22 335:20

Appx_0965

338:10,21
339:1 340:18
340:23 341:17
343:11 344:3
350:3 352:17
353:6 355:25
357:10 360:11
361:4,14
362:25 363:13
365:5 368:8,13
376:1,10
377:11 380:14
381:22 382:21
383:9,20
385:21
**nehemias's**
329:3 338:16
371:18 373:19
382:16
**neither** 388:11
389:7
**net** 41:8
**network** 65:23
**networked**
65:13
**networking** 5:5
65:25 67:1
192:16 193:6
195:8
**networks**
188:14 192:18
**never** 35:2,4,12
35:12 51:10
54:12 109:3,5
109:6,9 145:21

146:14 148:1
150:17 154:17
191:23 192:4
195:2 211:1,13
266:9 311:17
328:15
**new** 52:11
85:20 101:6
102:22 119:15
119:17 121:10
122:9 149:22
179:23 225:24
226:24 240:16
279:11 287:17
**news** 281:7
**nextdoor** 56:13
57:2,23
**night** 31:12
83:2 106:1
119:11 248:7
297:17 304:23
374:23
**nissan** 143:24
146:12,15,16
146:18 147:9
**nitty** 29:2
**no's** 12:11,14
12:18
**noah** 23:3
**noise** 295:21,22
295:24 296:7,9
**non** 118:2
**noon** 251:21
252:18 279:23
280:5,6

**normal** 151:18
230:14 248:21
270:8 319:19
**normally** 52:4
52:6 67:11
123:2,15,18
127:7 150:18
181:6 202:4
265:11 267:15
295:20 303:13
307:3 309:15
**north** 118:18
164:12 249:1
250:12 251:1
260:6 278:9,13
278:18 367:4
**northbound**
268:1
**northeast** 22:7
**northern** 1:2
7:15 275:13
**nose** 339:23
**notary** 1:22
7:21 388:18
391:13,19
**note** 148:7
**noted** 298:12
391:7
**notice** 4:25
85:19 181:25
281:16 296:12
**noticed** 308:21
323:21 325:11
**noticing** 8:13

**notification**
50:15 102:21
259:7,12
295:25
**notifications**
101:5 145:17
**notified** 44:11
44:13 154:11
160:18,22
161:8 223:23
283:2 366:3
**notify** 138:13
151:20,23
152:8 154:10
160:19 161:21
161:24 162:1
**number** 7:3
9:20 30:13
36:7,22,25
37:3,6,17 38:2
38:5,5 40:4
63:1 69:14
76:5 77:7
81:16 82:17
85:5 88:3 90:3
96:3 98:5
106:14 123:4,5
123:6,7,10
131:18 132:14
157:11 158:2
159:8 162:15
174:23 177:10
179:15 185:22
192:7 196:22
198:17 207:16

**[number - okay]**

212:1 215:5
217:2,3 218:8
224:21 227:4
238:17 252:11
271:5 277:18
277:25 279:2
280:12 284:13
297:8 299:14
299:19,20
300:5,7,17
317:14 336:17
345:18 349:25
358:12 366:16
**numbers** 36:4
36:16,17 40:5
40:6 95:14
204:22
**nuts** 341:25
342:1 349:3

**o**

**o** 7:1 171:12,12
**o'clock** 250:15
251:22
**oaky** 65:12
181:9
**oath** 12:21 18:3
213:20
**oaths** 7:22
**obey** 231:10
**objection** 7:24
87:10,15 89:3
108:7 112:14
113:6,10,14
114:8 133:11
166:12 181:17

191:3,18
194:25 196:7
201:13,16
203:6 229:4
230:9 258:16
269:3 305:21
327:24 328:1
333:6 334:10
352:25 355:4
368:15 370:17
379:2 386:20
**objections** 8:23
**obligation**
320:11
**observation**
237:24
**observe** 157:19
237:25
**observed** 238:3
**obstacle** 386:17
386:19,23,25
**obstacles** 159:4
**obstructs**
290:14
**obviously**
12:20,24 14:4
44:13 268:16
**occasion** 64:18
**occasionally**
68:10 282:6
**occupied** 214:4
**occur** 118:12
153:21 171:13
199:17,19

**occurred** 29:19
98:15 117:2
384:22,25
385:3
**occurs** 55:22
169:8
**october** 85:21
199:20
**offensive**
191:13
**offer** 4:22
73:21,23 90:10
90:14,15,17
116:11 366:12
**offered** 42:12
240:17 375:15
375:19
**offers** 375:17
**office** 62:8,11
65:3 70:19,23
71:1,2,5 78:22
79:3 104:24
114:25 115:6,8
115:16,20
116:6,20 117:6
117:7 118:2
127:2,17 187:1
187:4 241:21
286:5
**officer** 319:14
338:2 343:19
351:17 352:9
356:2 360:10
360:12,15
365:18,25

366:6,9,24
383:18,19,22
388:1,2
**officer's** 329:19
337:17
**officers** 329:17
357:5,6
**offices** 187:4
**oh** 57:23 81:17
116:15 158:5
201:1 241:15
243:3 271:14
334:13 347:15
366:18
**oil** 145:12
225:23 226:10
226:19
**okay** 9:20
10:15,21 11:9
11:12,12,17,18
12:8,18,20,24
13:5,5,10,10,17
13:20,22 14:2
14:4,8,10,12,13
14:14,22,25
15:15,16 16:12
17:2,5,11,14,16
17:20,22,24
18:13,13,20,25
19:9,14 20:1,4
20:10,12,15,19
20:21 21:1,3,5
21:11,15,18,22
21:24 22:3,8
22:11,14,17,25

Appx_0967

**[okay - okay]**

| | | | |
|---|---|---|---|
| 23:2,7,14,16,18 | 51:25 52:7,21 | 78:18,22 79:5 | 114:2,5,25 |
| 23:20,22,22,25 | 52:24 53:2,4 | 79:12,18 81:1 | 115:14,19 |
| 24:3,16,19,23 | 53:11,15,18,21 | 81:15 82:5,16 | 116:17,20 |
| 24:25 25:6,12 | 54:7,12,15,17 | 82:18,25 83:4 | 117:2,12,21,23 |
| 25:15,18,21,24 | 54:20,23,25 | 83:7,10,13,18 | 118:1,12,25 |
| 26:3,12,19 | 55:12,21,25 | 84:1,4,12,12,15 | 119:3,6,8,17,22 |
| 27:1,5,8,12,17 | 56:3,3,9,10,17 | 84:19,22,23 | 120:6,11,15,18 |
| 28:7,13,17,21 | 56:22 57:20,22 | 85:7,9 86:7,7 | 121:3,10,15,23 |
| 29:1,4,7,10,11 | 57:25 58:2,4 | 86:17,24 87:6 | 122:8,12,15,20 |
| 29:15,17,20,24 | 58:10,12,15,24 | 87:24,24 88:2 | 122:23,25 |
| 30:7,11,14,16 | 59:3,5,10,14,17 | 88:4,9,21,24 | 123:3,12,15,18 |
| 30:25 31:3,7,9 | 59:24 60:4,6 | 89:1,25 90:2,3 | 123:21,24 |
| 31:23 32:1,4,7 | 60:12,14,18,20 | 90:9,11,14,18 | 124:2,9,18 |
| 32:20,20,23,25 | 60:24 61:1,10 | 91:2,5,9 92:19 | 125:1,7,21 |
| 33:3,21,21,24 | 61:12,14,20 | 93:2,9,15 94:2 | 126:1,1,17,21 |
| 34:13,16,25 | 62:4,7,9,12,14 | 94:5,11,17,17 | 127:3,10,16,16 |
| 35:2,5,8,12,19 | 62:16,19,23 | 94:22,24,24 | 127:21,23 |
| 35:21 36:6,9 | 63:9,12,16,24 | 95:4,11,15,15 | 128:2,5,10,13 |
| 36:12,12,19,22 | 64:3,9,9,13,16 | 96:2,2,9,12 | 128:21,24 |
| 36:25 37:5,8 | 64:19,25 65:7 | 97:3,5,7,9,18 | 129:5,11,14,17 |
| 37:16,16,19,25 | 65:7,19 66:3,7 | 97:18 98:8,12 | 129:17 130:10 |
| 38:4,10,13,18 | 66:10,10,16,19 | 98:20 99:6,8 | 130:16,21 |
| 38:23,25 39:3 | 67:4,12,15 | 99:20,23 100:1 | 131:1,3,11,13 |
| 39:8,11,13,22 | 68:2,5,16,16,22 | 100:14,20 | 131:15,19,22 |
| 40:6,9,12,14 | 69:11,23 70:1 | 101:18,21,21 | 132:25 133:3 |
| 41:1,13,21,25 | 70:4,8,13,16,21 | 102:15 103:8 | 134:17 135:17 |
| 42:3,7,9 43:3,6 | 71:7,12,16,20 | 103:15,20,22 | 136:6,11,13,17 |
| 43:9,11,11,15 | 71:22 72:3,21 | 103:24 104:2,5 | 136:19 137:4 |
| 43:22 44:13,25 | 73:5,9,12,15,15 | 104:10,14,17 | 137:10 138:5 |
| 45:9,12,16,20 | 73:18,22 74:4 | 104:24 105:3 | 138:12,15,23 |
| 46:5,10,17,17 | 74:8,12 75:2,8 | 105:10,14,18 | 139:11,14,22 |
| 46:22 47:3,18 | 75:8,14,17,25 | 106:2,4,6,9,9 | 140:1,3,11 |
| 48:15,22 49:1 | 76:4,16 77:5 | 106:17 107:1,8 | 141:2,6 142:3 |
| 49:3,11 50:5,5 | 77:11,13,16,23 | 107:13 109:15 | 142:19,21 |
| 50:12 51:6,15 | 78:3,3,5,8,12 | 113:12,19 | 143:9,15,21,23 |

Veritext Legal Solutions
800-336-4000

Appx_0968

[okay - okay]

| | | | |
|---|---|---|---|
| 144:2,10,14,25 | 171:20,23 | 199:12,14 | 232:4,6,10,12 |
| 145:3,19,21,24 | 172:1,1,3,8,10 | 200:21 202:14 | 232:18,21,25 |
| 146:12 147:2 | 172:13,15,18 | 202:22 203:19 | 233:4,9,23 |
| 147:11,13,15 | 172:24 173:1 | 203:22 204:6 | 234:2 235:1,11 |
| 147:15,18,25 | 173:15 174:4,7 | 204:12 205:2,7 | 235:14,19,24 |
| 148:6,19,23 | 174:9,14 175:9 | 205:14 206:2 | 236:6,13,17 |
| 149:5,8,11,19 | 175:15 176:2,8 | 206:12,16,20 | 237:8,15,20 |
| 149:23 150:9 | 176:11,14,17 | 206:22 207:3,7 | 238:6,9,12,16 |
| 150:11,14 | 176:22,22,22 | 207:11,13,15 | 238:18 239:6,9 |
| 151:6,9,11,15 | 177:3,10,17,18 | 207:22 208:7 | 239:12,19,20 |
| 151:21 152:4,7 | 177:21 178:5,8 | 208:14,17,23 | 239:25 240:14 |
| 152:13 153:10 | 178:11,17,20 | 209:1,5,8,12,15 | 240:25 241:3,8 |
| 153:21,24 | 178:23 179:3,9 | 209:21 210:7 | 241:11,19,23 |
| 154:1,16 155:3 | 179:13,20 | 210:20 211:1 | 242:2,5,8,17,19 |
| 156:9,15,17,25 | 180:4,8,8,12,19 | 211:10,14,22 | 242:22,25 |
| 157:2,5,7,14,21 | 180:22 181:14 | 212:21 213:1,7 | 243:6,6,8,17,24 |
| 157:24 158:12 | 181:19,23 | 214:7,11 | 244:3,6,9,11,17 |
| 158:16,19 | 182:4,14,17,20 | 215:22 216:12 | 244:23 245:1,4 |
| 159:3,6,13,17 | 182:23 183:12 | 216:15,20 | 245:6,9,17,19 |
| 159:20 160:7 | 183:15,18 | 217:12,23 | 246:1,8,14,25 |
| 160:15,25 | 184:19,25 | 218:4,14,18 | 247:4,10,16,18 |
| 161:3,19,21 | 185:13,21 | 219:1,5,10,19 | 247:22,25 |
| 162:6,9,14,15 | 186:2,8,11,13 | 220:21 221:2,6 | 248:3,6,9,12,22 |
| 162:23 163:4 | 186:23 187:15 | 221:12,15,22 | 248:25 249:3 |
| 163:11,20 | 187:19,23 | 222:11,15,17 | 249:14,25 |
| 164:10 165:1,5 | 188:1,3,10,19 | 222:19,25 | 250:4,21,25 |
| 165:8,11,22 | 189:4,15 | 223:2,4,9,15,17 | 251:5,18,20 |
| 166:4,6,9 | 190:10,25 | 224:11,15,24 | 252:1,3,9,15,21 |
| 167:4,21 168:2 | 191:8 192:14 | 225:5,10,16,21 | 253:12,15,18 |
| 168:9,12,20,22 | 192:17,20 | 226:23 227:1,5 | 253:21 254:2,8 |
| 169:2,5,7,13,16 | 193:8 194:13 | 227:7,11 228:5 | 254:8,11,14,23 |
| 169:22 170:8,8 | 194:16,16 | 228:8,11,21 | 255:1,4,8,10,12 |
| 170:15,19,22 | 195:16,22,25 | 229:19 230:1,7 | 255:15,17 |
| 170:24 171:3,7 | 196:2 197:5 | 230:14,25 | 256:1,4,7,9,13 |
| 171:9,13,16,18 | 198:7,9,14 | 231:4,7,9,17 | 256:17,25,25 |

Page 48

Appx_0969

[okay - okay]

| | | | |
|---|---|---|---|
| 257:4,11,16,16 | 284:10,12,16 | 308:19,23 | 341:5,22 |
| 258:5,7,10,13 | 284:19,22,25 | 309:4,8,13,14 | 342:10,12,16 |
| 258:13 259:1,3 | 285:6,10,15 | 309:16,22,22 | 342:20 343:11 |
| 259:6,11,11,16 | 286:4,8,14,17 | 310:1,5,9,12,18 | 344:2,5,8,17 |
| 259:20 260:5,5 | 286:22,25 | 311:8,15 312:2 | 345:3,8,11,13 |
| 260:8,13,15,20 | 287:6,15,18,23 | 312:8,13,13,13 | 346:3,9,12 |
| 260:22 261:1,6 | 288:7,10,12,19 | 312:23 313:1,4 | 347:9,9 348:14 |
| 261:9,18,25 | 288:22,25 | 313:7,17,20 | 348:18 349:8 |
| 262:4,13,16 | 289:2,10,13,16 | 314:1,9,18 | 349:14,17,20 |
| 263:1,8,15,21 | 289:18 290:4 | 315:4,8 316:17 | 349:25 350:8 |
| 263:24 264:11 | 290:10,15,19 | 316:25 317:6 | 350:18 351:11 |
| 264:16,22 | 290:21,25 | 317:25 318:4 | 351:16,20,21 |
| 265:3,18 | 291:3,6,14,14 | 318:17,19,22 | 351:24 352:13 |
| 266:22 267:2,8 | 291:18 292:8 | 319:9,14,23 | 352:16,20,23 |
| 267:16 268:3 | 292:16,20,25 | 320:7,10,20,22 | 353:22 354:16 |
| 268:13 269:24 | 293:6,14,16,17 | 320:25 321:20 | 354:22 355:8 |
| 270:13,25 | 293:20,22 | 322:7,10,13,17 | 355:12 356:23 |
| 271:4,20,23,25 | 294:4,8,11,23 | 322:20,24 | 357:2,10,25 |
| 272:9,12 273:5 | 295:2,5,8,12,16 | 323:5,14,22 | 358:3,6,9,12 |
| 273:16 274:6 | 295:24 296:3,6 | 325:2,5,24 | 359:9,15,23 |
| 274:11,13,23 | 296:9,21 | 326:5,12,17,21 | 360:10,20 |
| 275:1,7,7,11,13 | 297:15,19 | 327:9,19,21 | 361:13,21 |
| 275:16,20,22 | 298:1,3,5,5,15 | 328:10,15,24 | 362:3,6,12 |
| 275:24 276:4 | 299:2,8,11,14 | 329:2,12,15,24 | 363:25 364:2 |
| 276:11,16,20 | 299:18,21,25 | 330:1,6,8,17,20 | 365:12,17,24 |
| 277:1,14,17 | 300:10,16 | 330:20,25 | 366:12,16,23 |
| 278:4,21,24 | 301:4,9,15,18 | 331:16,19,24 | 368:1,7,21 |
| 279:1,8,13,17 | 301:24 302:2,5 | 332:5 333:8,21 | 369:10 370:22 |
| 279:24 280:2,6 | 302:15,25 | 333:24 334:4,5 | 370:24 371:3 |
| 280:11,12,19 | 303:5,7,18,21 | 334:7,24 | 371:11 372:6,9 |
| 280:25 281:2,4 | 304:2,6,12,15 | 335:10,14,20 | 372:13,15,17 |
| 281:12,15,23 | 304:18 305:1 | 336:20 337:4,9 | 374:9,18,24 |
| 282:1,13,15,18 | 306:25 307:4,8 | 337:15 338:1,5 | 375:8,15,25 |
| 283:4,6,12,20 | 307:12,21,23 | 338:9,15 339:3 | 376:5,9,15 |
| 283:25 284:2,6 | 308:9,12,17,17 | 339:5,8,12,19 | 377:19 378:2,4 |

Page 49

Appx_0970

**[okay - page]**

378:13,17
379:4,12,15,24
380:19 381:4
381:12,24
386:4
**old**  39:8 46:24
47:1 48:18
56:20 172:18
242:2
**older**  38:15
**onboard**  97:23
**onboarded**
98:18 156:24
**onboarding**
98:15 99:21
105:9
**once**  51:7 67:9
100:4,6,7
137:5,7 146:17
156:20 247:15
259:11 291:8
321:17
**ones**  48:17 59:3
87:16,18 98:12
112:6 163:9
206:16 263:3
272:3,6,7
**online**  16:6
76:11 188:14
190:2 194:17
194:20,22
**onomatopoeia**
12:12
**open**  41:15
42:4 136:23,24

136:25 259:18
287:20 289:17
289:24 290:21
385:10
**opened**  260:4
292:6 294:5
307:12
**opening**  291:5
**opens**  288:21
288:22 289:7
**operate**  110:14
157:17
**operating**
156:8 160:16
192:15 194:19
215:15
**operator**
383:15,15
**opinion**  108:15
113:3 150:6
155:24 237:7
**opportunity**
382:17
**opposed**  237:1
**opt**  151:6
**optical**  88:16
89:1,11,11
**optimal**  88:16
89:16
**option**  161:6
**oral**  12:10
**order**  51:17
72:25 78:23
85:12 126:11
221:9 226:7

**ordered**  220:23
**ordering**  55:19
197:14 198:11
**orders**  55:20
279:12
**ordinarily**
229:6
**ordinary**  229:1
230:7
**organization**
178:13
**organizing**
279:14
**original**  222:9
292:15
**originally**
98:18 149:15
149:17
**otis**  352:9
**outcome**
223:21 388:16
389:12
**outgoing**
272:13
**outlook**  42:1,4
45:3,5,6,8
46:12 159:22
**outside**  4:16
73:6 74:13,24
102:8 129:14
129:22,25
220:11,13
267:13 279:9
369:15

**overall**  91:23
373:8
**overly**  10:4
**overnight**
151:7
**overview**  208:9
**owens**  3:13
**own**  144:22
236:9 257:19
312:17 373:15

**p**

**p**  2:1,1 3:1,1
7:1
**p.a.**  2:6
**p.m.**  43:10
127:5 387:11
**packed**  244:25
245:2
**page**  4:2,8 49:5
49:7,10 63:19
75:9,9,21
76:24 81:24
82:18,20 84:4
157:10 177:19
178:12 179:16
186:13,14
188:9 192:22
193:18 195:4,5
195:9 208:7
215:23 273:20
279:17,19
280:19 281:15
281:17 293:14
358:25 360:14
390:4,7,10,13

Veritext Legal Solutions
800-336-4000

**[page - percent]**

390:16,19

**pages**  63:21

**paid**  37:25

59:19 93:5

144:7,25 145:3

147:12 221:16

**paint**  122:13

285:21 286:16

**paper**  116:7

**papers**  85:16

**paperwork**

85:14

**paragraph**

88:9 157:15,24

158:3 177:19

186:15 192:21

192:23 193:2

208:9 215:22

216:1 217:3

**paragraphs**

159:7

**paralegal**  3:19

**parents**  21:22

**park**  60:25

61:12,23 64:10

64:13,17

**parked**  323:17

333:4,12

**parking**  34:7

34:14 382:1

**parkway**  3:13

**part**  12:17 38:9

88:22 115:13

115:18 127:20

146:22 165:2

168:11 169:9

177:17 178:20

189:1,17 275:4

275:6 292:15

316:14,19

345:23

**partially**

238:20 239:12

239:13 257:10

308:21 312:7,9

314:3 315:17

316:13 321:18

323:18 327:22

328:7 329:11

329:21 331:1,3

333:4 343:25

354:21 356:14

356:18 364:1

367:8

**participation**

67:1

**particular**

25:10 92:11

172:16 305:19

306:10

**particularly**

111:3

**parties**  7:25

388:12,14

389:8,11

**parts**  267:9

**paso**  75:18

**pass**  67:24

313:8 314:2

385:11,16

387:2

**passcode**

254:23

**passed**  309:4

321:24

**passengers**

216:8

**past**  41:23 93:1

130:25 139:21

189:19

**pasted**  88:21

139:19

**pay**  32:9,10,12

37:23 38:25

84:10 115:19

117:10 144:14

144:22 337:5

375:5,10,15

**paying**  90:1

134:2 148:24

268:8 275:20

319:25 332:2

**pays**  38:2 144:9

**payton**  21:4,9

**pc**  3:12,20

**pdf**  185:16

**pedestrian**

35:13,16

164:13,15

338:22

**pedestrians**

35:8,10 196:4

201:12

**pee**  224:14

**people**  36:7

50:3 61:18

62:21 65:13

68:3,7 74:2

75:22 78:17,18

78:20 105:8

113:16 114:21

128:9 174:12

175:18,25

183:3 196:16

199:25 201:3,7

201:25 202:4

206:24 212:15

228:14 230:11

230:15,17,22

231:21 233:12

237:25 238:3,7

262:17 266:12

274:13,23,25

275:3,4,5

276:5,9,11

284:16,22,25

285:15 287:15

344:22 366:1

368:1,4 372:11

373:12,18

374:18 381:5

**perceive**  182:8

**perceived**

128:8 190:4,8

234:5,6,15

235:5,6,13,15

269:10

**percent**  73:11

75:11 90:23

Page 51

Appx_0972

**[percent - phone]**

| | | | |
|---|---|---|---|
| 91:5,6,7,18,21 | 171:5 174:9,10 | 217:13,19,25 | 123:3,16 |
| 92:8,10 94:8,9 | 174:10,11 | 217:25 218:5 | 127:24 130:22 |
| 94:25 146:20 | 176:5,25 | 221:20 237:7 | 131:1,8,9,23 |
| 146:23 264:21 | 178:25 197:25 | 252:10,11 | 132:5,8,20 |
| **percentage** | 198:5 229:1,7 | 254:8,19 | 133:1,4,4,15,19 |
| 94:2,6 131:22 | 229:12 230:7 | 258:24 281:23 | 133:23 134:9,9 |
| 146:25 | 248:8 295:15 | 281:24 282:9 | 134:10,12,14 |
| **perception** | 295:19 310:14 | 282:10,11 | 134:16,18,25 |
| 128:11 | 310:18 311:1 | 339:20 354:13 | 135:21,24 |
| **perfect**  15:15 | 311:12 330:2,5 | 354:15 | 136:12,18,20 |
| 16:12 17:2,24 | 352:14 367:9 | **personalized** | 136:22 154:23 |
| 18:13 | **person's**  154:5 | 49:8 | 155:1,3,7,11,16 |
| **performance** | **personal**  41:11 | **personally** | 155:20 161:12 |
| 88:11,13 91:1 | 41:16,22 42:4 | 189:14 212:19 | 161:13 162:12 |
| 92:12,13,13,14 | 42:14,20 43:5 | **personnel** | 165:23 166:2 |
| 92:25 93:4,17 | 43:7,13 44:17 | 160:18 | 168:3,5,23 |
| 93:19 184:6 | 44:20,22 49:6 | **perspective** | 173:9 178:6,7 |
| 274:12 286:3,4 | 123:7,9,13 | 223:12 329:17 | 178:8,8,9,10 |
| 286:11,12,20 | 147:14 148:5 | 337:16 | 181:2,20 182:2 |
| **period**  98:17 | 148:11,12,15 | **pf**  45:22 | 197:15,23 |
| 141:16 180:14 | 148:20,22 | **ph**  279:25,25 | 198:15 201:22 |
| 255:20 304:23 | 149:2,5,9 | **pharmaceutical** | 203:20,24,25 |
| **periodically** | 150:7 159:11 | 247:10 | 204:4,9,12,16 |
| 100:5,7 345:11 | 159:13,21,25 | **philosophy** | 204:18,21,23 |
| 361:22 | 160:2,9,13 | 182:5,15 | 204:25 205:3,8 |
| **permissible** | 161:12 178:9 | **phishing**  112:8 | 205:12,17,21 |
| 218:10 | 193:6 203:25 | **phone**  35:19,21 | 206:1,5,10 |
| **permission** | 204:4,5,9,12,15 | 35:23 36:4,16 | 209:6,10,13,16 |
| 211:7 | 204:18,21,23 | 36:22 37:6,25 | 209:18,20 |
| **permitted**  8:4 | 204:25 206:3 | 41:11,16,22 | 210:10,13,18 |
| **perpendicular** | 206:17 207:7 | 42:4,14,20,22 | 210:21,24 |
| 223:5 | 207:10 209:16 | 43:7,14 44:17 | 211:2,12 217:1 |
| **person**  78:20 | 210:10,13,18 | 44:22 45:1 | 217:4,9,13,19 |
| 100:17,24 | 210:21,24 | 46:8,10,12,14 | 217:25 218:5 |
| 131:5 154:16 | 211:2,12 | 78:19 101:25 | 229:8 241:22 |

Veritext Legal Solutions
800-336-4000

Appx_0973

**[phone - please]**

| | | | |
|---|---|---|---|
| 245:13,15,18 | **phone's** 295:10 | **pinterest** 43:18 | 264:20 |
| 251:8 252:5,8 | **phones** 38:22 | **piuara** 1:4 2:2 | **play** 79:10 |
| 252:10,23 | 43:1 208:11 | 7:10 | 238:19 291:7 |
| 253:1 254:19 | 254:24 255:10 | **pivaral** 1:7 2:4 | 291:13 307:17 |
| 254:21 255:2,4 | 296:16 382:11 | 7:12 | 316:18 318:22 |
| 255:5,12 | **photo** 5:19 6:6 | **place** 55:20 | 321:10 334:13 |
| 258:23,24 | 289:14,19 | 72:12 75:6 | 335:14 337:5 |
| 259:1,5,6,12,20 | 290:17 334:14 | 257:14,15 | 345:10 351:20 |
| 259:21,21,22 | 349:14 380:2 | 328:5 341:23 | 352:5 353:24 |
| 281:22,24 | 381:23,25 | 343:8 | **played** 238:23 |
| 282:11,13,14 | **photographs** | **placed** 126:11 | 239:4,16,21 |
| 289:18,19,22 | 29:16,17,20,24 | **places** 350:9 | 240:1,9 317:7 |
| 291:1 294:9,12 | **photos** 29:25 | **plain** 376:1 | 318:25 319:4 |
| 294:14,17 | 39:3 44:12 | **plaintiff** 1:9 2:2 | 319:16,21 |
| 296:5,6 298:13 | 273:8,9 289:11 | 8:15,17 26:8 | 320:2 321:8,21 |
| 298:15,24 | 291:15 378:18 | **plan** 36:13 | 322:8 323:15 |
| 299:3,19,22,24 | 381:20 382:3 | 38:11 49:20 | 324:21 326:6 |
| 300:1,14 303:5 | **pick** 65:3 | 50:2 119:7,8 | 330:10 332:7 |
| 303:11,14,19 | 242:25 273:23 | 119:16 156:8 | 335:18 336:6 |
| 303:20 305:5 | 276:5,9,11 | 262:5 276:15 | 337:10 345:21 |
| 307:7,8,16 | 279:14,22 | 292:12,15 | 346:4,13,17,21 |
| 308:1,6 309:9 | 290:2 357:12 | **planned** 250:5 | 347:4,11,17,21 |
| 309:13,18,23 | **picking** 279:24 | **planning** 177:5 | 348:3,12 352:7 |
| 313:10 321:13 | **picture** 291:12 | 178:13,15,24 | 354:6,17,24 |
| 321:15,16 | 379:11 | 258:11 | 355:15 357:3 |
| 324:7 325:24 | **pictures** 59:9 | **plans** 21:20 | 372:22 |
| 327:16 338:1 | **piece** 341:24 | 49:18,19 276:1 | **playing** 332:14 |
| 354:9,13,14,15 | **pin** 287:24 | 276:2 | **plays** 193:5 |
| 362:1 376:22 | 288:2,3 289:5 | **plants** 71:4 | **plead** 87:25 |
| 377:23,25 | 289:7 293:25 | **platform** 46:20 | **pleading** 83:7 |
| 378:6,10,24,25 | 294:1,2,4,7 | 46:21 56:15 | **please** 7:5 8:12 |
| 379:21 380:6,9 | **pinpoint** 34:24 | 58:25 372:13 | 8:25 186:16 |
| 381:6,11 382:4 | **pins** 273:12,13 | **platforms** | 187:1 194:8 |
| 382:6 385:2 | 273:14 288:19 | 56:12 206:13 | 195:6 196:8 |
| | | 263:2,5 264:18 | 215:18 227:13 |

Appx_0974

**[please - potential]**

236:23 336:12
339:24 367:13
386:21
**plotter** 120:8
120:11,12
121:5,18
122:21
**plotters** 287:10
**podcasts**
294:25 295:3
**point** 11:1
13:12,22 66:21
93:16 96:12,14
99:20 144:21
171:25 188:11
193:20 195:5
195:10 199:1
218:11 254:5
268:19 286:9
286:17 293:25
294:8 300:21
322:14,18,21
323:5,17,23
324:24 325:3,5
325:9,17,22,25
326:1,3,8,15,17
326:20 327:22
328:10 329:8
377:25
**points** 20:6
193:23
**police** 5:25
153:24 154:1,7
225:3,5,10
320:8 329:17

329:19 337:16
338:2 343:19
351:16 357:5
360:4,23
**policies** 96:18
96:19,20
183:13
**policy** 5:11
208:1 215:19
216:18
**polo** 56:14
57:16
**pool** 23:8
**pools** 67:3
**pop** 138:20
295:25
**pops** 34:25
157:8 300:3
302:17
**pose** 113:22,24
135:15 142:20
142:25
**posed** 135:17
**position** 65:20
65:21 67:16,18
68:18,20 70:14
70:17 71:15
73:7 77:10,15
78:10,23 79:2
114:4,16,22,23
177:25 261:19
329:20
**positioned**
29:18

**positively**
180:5
**possession** 44:8
255:10
**possible** 84:18
84:19,20 101:3
101:17 110:2,3
110:3 116:19
153:3 169:21
187:25 244:25
251:24 252:9
262:25 265:5
265:17 267:12
268:7 273:4,19
281:12,14
284:1 288:1
290:20 291:20
291:22,24
292:1 296:18
299:1,10
300:13,15
303:11,13
307:20 335:16
342:15,25
343:1 344:16
369:21 376:21
377:9 378:21
379:19 386:23
387:1
**possibly** 33:4
44:16 54:16
57:9 73:4
79:25 99:5,10
102:4,5,6
116:6 117:14

138:2 152:3,6
155:17 159:5
164:1 173:14
249:19,21
267:23 272:21
289:12 296:13
297:22 301:1
310:17 315:7
317:19 319:20
340:14
**post** 58:8 188:4
188:6 189:16
190:2,17
193:25 194:2
194:17,20,22
200:10 203:4,8
203:17 372:8
372:11,15
379:15
**posted** 75:1
189:18 191:12
195:23 231:11
379:17,18,20
380:1
**posting** 193:21
202:12,25
**posts** 83:10
84:13,16 189:5
191:21,24
192:5 194:9
195:18 372:7
**potential** 68:6
80:8 212:8
216:14

Page 54

Appx_0975

**[potentially - prosecutor]**

**potentially**
111:9 113:18
113:19 134:3,5
134:7 150:13
151:14 164:21
315:21 339:18
**practice** 335:2
**practices**
193:20
**practicing**
26:17
**precinct** 85:21
86:21
**precisely** 335:3
**preface** 26:13
**pregnant** 10:8
13:6
**premise** 332:13
**prep** 34:20
**prepare** 26:12
29:13 30:8
244:23
**prepared** 26:16
389:3
**prescription**
246:8,10,13,14
248:22 318:5
318:10
**present** 3:18
188:17
**presented**
107:5
**presently** 54:25
220:19

**preserve** 44:11
264:8
**press** 137:7
139:4 299:21
361:12 362:13
**presume** 13:20
**pretty** 44:10,11
125:24 128:15
161:16 251:20
256:8 265:6
359:11
**prevent** 42:7,9
157:17 382:11
**prevents** 114:7
**previous** 50:10
80:17 91:1
93:18,20
**previously**
78:10 97:6
139:10 180:20
364:6
**prey** 316:22
**pricing** 45:25
**printer** 116:2
**prior** 22:11
263:13 361:1
361:19 384:19
388:5
**privacy** 193:24
**probable** 292:1
292:2,3,6
**probably** 11:14
14:22 15:9,12
38:7 40:2 41:1
52:18 59:13

63:18 128:5
130:19 139:21
180:20 181:11
184:2 231:24
265:15 288:15
291:18 306:12
317:20,21,23
330:15,18
361:9 362:23
**problem**
120:16 122:20
318:1
**problems** 89:17
120:22
**procedural** 8:5
**procedure**
156:8 160:17
192:21 194:19
208:9 215:16
217:2
**procedures**
192:15
**proceed** 9:8
**proceeding** 7:8
7:16,19 8:3
387:12 389:4
**proceedings**
388:3,5,6,9
389:6
**process** 202:11
**produce** 21:13
**produced** 8:2
**product** 55:20
65:9 71:19
72:11 89:13

122:11 172:23
173:21,22
179:23
**productivity**
208:12,14,21
209:1
**products** 88:17
122:9,12
179:23
**professional**
187:25 246:20
**professionals**
193:7
**profile** 188:16
**program**
120:17
**progress**
100:23
**prohibited**
217:7
**prolong** 10:2
**promise** 84:5
**promoted**
103:22 104:20
**promotions**
40:22
**prompt** 332:18
**proof** 85:17
**proper** 16:17
108:10,17,19
**property** 19:12
19:12 157:18
**prosecutor**
85:15

Page 55

Appx_0976

**[prosper - quickly]**

**prosper** 256:23 288:17,18
**protection** 122:13 285:21 286:16
**provide** 366:8
**provided** 69:15 218:6,10 221:15 245:6,9 379:13,22 380:7,11,12 381:21
**provider** 116:16
**providing** 365:18
**prudence** 229:1 230:8
**public** 1:22 183:4,5,6,9 194:10 203:13 388:18 391:19
**publish** 188:21
**pull** 70:5 131:15,21 136:7 151:19 154:3 223:5 228:2,5 238:16 291:14 330:9 338:11 344:2,8 348:7
**pulled** 30:12,16 31:12 32:1 34:17 83:2,18 222:20 223:16

292:3 344:4 350:25 367:12
**pulling** 136:9
**pulls** 294:22
**punctuation** 305:13,14,15 305:17 306:1,6 311:13
**punish** 194:17 194:20 195:22
**punished** 191:21,23 192:5
**purely** 285:8,9
**purpose** 12:3 193:4 216:3 220:18 274:6 278:22
**purposes** 45:14 46:11 54:15 64:1,4 65:2 108:11 109:16 130:22 150:7 150:14 204:13 217:13,25 221:18,20 249:9
**push** 137:5,11 291:7 307:7 309:15
**pushed** 307:6
**put** 13:2 40:21 42:13,22 44:21 46:7 63:22 66:13 69:8

72:23 131:12 131:19,21 132:14 144:22 146:25 149:12 149:23 163:1 177:9 182:9 184:15 209:18 210:9 277:17 282:6 285:1,15 289:22 305:15 342:1,1 344:25 345:5 366:5 370:10 372:25 382:10
**putting** 42:19 88:17 145:22 145:24 164:7

**q**

**qualified** 67:14 388:7
**qualify** 125:13
**quality** 67:2
**quarter** 49:21 91:3
**question** 11:5,6 13:12,13,14,19 13:20 14:1,7 16:16 28:2 43:12 56:8 87:11 114:11 130:11 144:20 147:21 155:18 162:10 168:7 178:4 194:8 269:2,4,4,9

286:18 294:13 332:13,20 339:24 348:25 367:19 374:17 374:21 384:6
**questionnaires** 50:20
**questions** 11:20 13:7,8,11 14:5 14:15 15:16,19 30:2,3 50:24 51:22 52:2 76:14 84:1 90:21 126:11 135:9 172:2 177:22,25 178:5 179:22 179:22 187:9 245:12 255:8 286:8 316:24 317:25 318:24 383:5 387:4
**quick** 44:10 167:20 296:24 346:16 347:24
**quicker** 208:16 208:19
**quickest** 344:6
**quickly** 20:21 24:1 44:11 125:16,19 126:13 367:7 368:2,5 376:17 376:20

Page 56

Appx_0977

**[quit - receive]**

**quit**  59:22 60:4
60:10,11,16,17
60:22,23 61:1
61:5 62:4,12
62:16,17,17
381:17
**quite**  52:13,15
240:5 249:18
**quote**  182:17

**r**

**r**  1:7 2:1,4 3:1
7:1,12 20:24
390:3,3
**raise**  8:25
159:10
**raised**  193:16
**rammed**
329:15
**ran**  381:22
**ranch**  60:19
64:14,17
**range**  14:23
15:3,3 95:4
264:25 265:18
**ranking**  130:12
**rather**  15:3
233:1,6 311:24
315:1
**reach**  67:11,12
91:17 93:23
94:20,20 152:5
178:1 297:19
299:11 359:10
**reached**  86:21
297:21,22

359:16
**reaching**
123:15 175:10
181:24
**react**  181:14,18
338:9
**reacting**  377:4
**reaction**  158:21
158:22,23,25
159:3 331:22
331:24 332:1
333:15 340:25
341:1 356:9
361:11 369:10
384:12,17
**read**  50:23,23
51:16,21,25
56:4,19,24
66:23 71:13
85:11 88:9
96:12,14,18
97:6 106:8
137:18 138:7,8
138:9,11,14,24
139:2,6,9,17
143:7 156:25
157:14,25
158:4 159:6,8
164:10 178:14
179:14 186:9
186:16,17,23
188:11,19
193:23 195:6
195:11 197:13
198:24 208:10

215:22 217:2
218:10 228:3
240:5,8,11
258:13,15,20
259:3,5 273:21
278:4 302:6,8
302:11,14,18
303:1,19
317:15 366:23
371:11 372:24
376:23 377:1
391:5
**reading**  51:19
143:6 216:8
217:10 301:24
310:11 384:24
**real**  61:17
325:20 326:13
327:17 346:16
347:24
**realized**  321:18
**really**  11:19
13:24 32:4
93:2 124:8
131:9 143:12
146:14 180:17
282:2 293:23
294:13 382:19
**rear**  152:16,24
153:4 185:4
222:4
**reason**  25:10
31:11 83:22
85:18 162:23
163:1 164:6

210:17,23
227:24 231:16
231:17,22
244:14 246:5
263:18 267:10
273:5 276:18
277:11,14
280:7 282:15
301:18 373:13
374:14 376:11
390:6,9,12,15
390:18,21
**reasonably**
229:11
**reasoning**
231:23
**reasons**  42:10
44:19,23 77:21
212:1
**recall**  34:21
35:5 46:9
49:15 83:24
99:11 107:11
107:15,18
109:24 110:13
140:22 146:11
185:8 225:1
258:10 292:25
310:5 333:17
360:21
**receipts**  377:1
**receive**  100:18
100:19 135:23
138:5 141:2
151:24 205:2

Page 57

**[receive - relevant]**

295:8 376:23
**received** 31:24
63:2 76:5
84:17 99:11
101:21 107:22
110:11,24
138:15,18
141:7 176:6
179:9 193:15
194:11 205:11
272:25 273:3
273:12 303:6
380:19,21,23
**receiving**
110:13
**recent** 36:18,20
63:23 130:8
**recently** 156:16
156:18,19
**recognition**
254:9
**recognize** 63:4
88:4 90:4 96:4
186:3 280:12
379:5
**recognizes**
193:5 208:11
254:13 290:7
**recollect** 200:8
**recollection**
27:2 37:20
101:4 107:25
199:21 250:1
251:1 265:23
311:25

**recollections**
35:9
**recommend**
298:6
**recommendat...**
298:8
**recommendat...**
297:20
**recommended**
298:9
**record** 7:4,8,25
8:12 9:12,15
10:16 11:16
23:25 85:11
88:10 106:11
106:12,15
147:24 148:4
148:13,14
166:16 174:20
174:21,24
177:9 203:12
224:16,18,19
224:22 283:18
297:5,6,9
321:11 323:19
336:14,15,18
348:6 358:16
380:8 387:9
388:9 389:5
**recorded** 7:20
8:7 162:24
283:19 368:22
388:6
**recording** 8:2
345:10,24

348:7 388:8
389:4
**records** 376:22
**recruit** 62:21
**recruiter** 66:20
67:7
**recruiting**
62:20
**red** 68:13,14,16
69:4 239:8,9
240:14
**reddit** 56:14
57:14
**reduce** 314:9
**reduced** 315:4
388:7
**redwine** 297:24
**refer** 236:4
**referenced** 86:8
**referencing**
89:13
**referral** 68:7
**referrals** 67:2
**referring** 89:15
177:7 180:10
208:18 272:13
285:18 302:3
**reflect** 188:21
189:5
**reflects** 190:2
**refresh** 175:5
**regard** 159:18
**regarding**
107:9,16
108:21

**regardless**
194:10
**regards** 371:20
**region** 281:1,2
**reimburse**
149:2
**reimbursed**
148:23
**reimbursement**
149:1
**reimburseme...**
148:25
**rekindled**
255:21
**relate** 193:16
**related** 29:12
34:2,3 107:14
188:16 375:16
388:11 389:7
**relating** 49:22
**relation** 26:10
**relationship**
22:18 74:1,4,6
121:13,16
256:4
**relationships**
74:10 77:18
122:2,7 205:19
**relative** 388:13
389:10
**release** 280:21
**relevant** 110:23
352:22 353:2,4
355:23,25
356:7

Page 58

Appx_0979

**[remain - remember]**

| | | | |
|---|---|---|---|
| **remain**   118:8 | 110:1,5,6,15,16 | 175:9,10,15,19 | 215:12,14 |
| **remainder** | 110:19,24 | 175:21 176:10 | 216:20,22,23 |
| 383:4 | 111:9,10,12,13 | 176:25 177:2 | 216:25 218:7 |
| **remember** | 111:14,15,18 | 182:13,16 | 220:8 221:24 |
| 26:18,20 29:6 | 111:20,23,24 | 183:12,14 | 222:1,1 224:6 |
| 29:8 30:19 | 111:25 112:4,6 | 184:9 185:2,3 | 225:12,13,15 |
| 31:4,6,9,11,19 | 112:7,10,11,16 | 185:5,6,9,10,12 | 225:16,19 |
| 31:22 32:11,13 | 112:18,22,25 | 186:6,11,12 | 226:6,12,15,17 |
| 32:17 33:7 | 113:4,9,12 | 187:3,7,8,11,12 | 227:10 237:11 |
| 34:12,19 35:21 | 115:23 116:4,8 | 187:14,16,20 | 237:14 242:12 |
| 36:4,16 37:6 | 116:10 125:17 | 187:21,22 | 242:16 244:12 |
| 37:17 38:21 | 125:20 135:19 | 190:12,13,15 | 244:16,17,19 |
| 41:8 44:9 | 135:25 137:14 | 190:16,18,19 | 245:21,22,24 |
| 53:14,23 54:2 | 139:14,15,16 | 190:21,22,24 | 245:24 246:1 |
| 54:5,20 61:25 | 139:18 140:20 | 191:7 193:10 | 246:21 247:1 |
| 68:4 72:15 | 141:5,6,9,11,12 | 193:11,13,14 | 248:3,5,6,10,12 |
| 76:7,18,19,20 | 141:17,19,20 | 193:17 194:4,5 | 248:14 249:4,5 |
| 77:12 79:7 | 141:22 142:2,9 | 195:3 196:2,6 | 249:7,8,11,14 |
| 83:4,9,12 | 142:12,17 | 196:13 197:21 | 249:16,24 |
| 84:14,18 86:10 | 143:4,6,7,9,19 | 197:22 198:1,3 | 250:11,13,24 |
| 86:14,17 87:3 | 144:2,7 149:14 | 198:4,13,14,16 | 251:3,13,18,19 |
| 87:5 96:13 | 152:17,25 | 199:7,23,24 | 251:23,24 |
| 97:13,14 98:12 | 153:1,2 157:2 | 200:3 201:9,14 | 252:5,16,19 |
| 98:13,22 99:6 | 157:4,6,9,22 | 201:17,18,20 | 253:2 254:3 |
| 99:13,15,16,18 | 160:22,24 | 201:21 202:9 | 255:1,3 256:16 |
| 99:19,20 | 161:14,22,23 | 205:1,4,6,7,9 | 257:2 260:5,10 |
| 100:25 101:7 | 162:2,3,5,9,13 | 205:10,13,15 | 260:24 262:4,6 |
| 101:23,24,24 | 162:22 164:5 | 205:16 206:6 | 262:7,9,25 |
| 102:1 103:8 | 165:10 166:7 | 208:2,4,5,6 | 263:4 264:1,4 |
| 104:11,13 | 167:16,18,21 | 209:22 210:11 | 264:6,24 266:1 |
| 105:10,11,12 | 168:25,25 | 211:16,17,18 | 266:6,11,17 |
| 106:20,22,23 | 169:18,21 | 212:7,9,11 | 267:2,11,19 |
| 107:1,3,4,7,8 | 171:2,15 173:8 | 213:1,3,12,14 | 268:20,24,25 |
| 107:10,12 | 173:13 174:4 | 213:15 214:2,8 | 269:17,19,21 |
| 108:1 109:21 | 174:13 175:4,6 | 214:9,10 215:1 | 270:3,14,15,18 |

Page 59

Appx_0980

**[remember - reporter]**

| | | | |
|---|---|---|---|
| 270:19,22,24 | 322:1,2,3,4,6 | 380:15,16,17 | 236:23 278:11 |
| 270:25 271:2 | 322:19,22 | 380:22,25 | 329:18 339:24 |
| 274:23 275:18 | 323:7,8,10,11 | 385:4 386:12 | **repeating** |
| 276:4,6,7,8 | 323:13,20,22 | **remembered** | 211:23 |
| 277:6,10,13,24 | 323:24,25 | 370:1 | **rephrase**  13:13 |
| 278:1,2,25 | 324:2,3,5,6,8 | **reminder**  103:7 | 386:21 |
| 281:10,14 | 324:25 325:4 | 103:9 | **replaced** |
| 282:23 283:8 | 325:10,13,15 | **reminding** | 103:24 |
| 284:2,5 286:25 | 325:21,23 | 103:1 | **reply**  207:3 |
| 287:1,24 | 326:2,4,25 | **renew**  33:5,19 | 259:18 |
| 291:17 293:6 | 327:10,11,12 | **rent**  21:13,13 | **report**  4:19 |
| 294:24 295:5 | 327:14,15,18 | **rental**  154:13 | 5:25 70:19 |
| 295:22 297:15 | 327:20,21 | 220:20,21 | 147:15 148:17 |
| 298:7,9,10,15 | 328:4 329:2 | 221:7,8,12,14 | 148:18 152:21 |
| 298:18,20 | 332:8 333:16 | 221:14,15 | 154:7 163:5,7 |
| 299:2,4,5,16 | 333:21 335:3,5 | 223:23 225:17 | 163:10 166:4 |
| 300:12,17,18 | 335:20,22,23 | 226:2,4,9,13,18 | 168:14 225:3 |
| 300:20,23 | 335:25 336:1,3 | 226:20,24 | 225:11 357:22 |
| 301:2,4,5,11,12 | 337:17,19,20 | 227:1,2 | 358:10 359:1,6 |
| 301:14,21,24 | 337:21 338:7 | **rentals**  222:13 | 359:6 360:4,23 |
| 302:5,7,8,10,20 | 338:15 341:11 | 225:22 | **reported**  1:22 |
| 303:5,8 304:6 | 341:11,15,17 | **rented**  20:18 | 152:19 |
| 304:8,9,12,14 | 344:19,24 | **rep**  66:6 74:13 | **reporter**  7:5,6 |
| 304:17 305:4,5 | 351:5,16,18 | 118:17,18 | 7:7 8:22 9:7 |
| 305:7,9 306:17 | 355:10,12,14 | 129:23,25 | 17:6,8,11,16,18 |
| 306:18,19,20 | 356:22 357:18 | 152:5 279:6,9 | 17:23 74:16,21 |
| 306:21,23,25 | 357:19,21,24 | 279:9 | 84:25 185:23 |
| 308:15 309:8 | 358:6,8 359:11 | **repaired** | 196:25 207:19 |
| 309:11,25 | 359:14,17,21 | 154:15 | 271:7,10,16,18 |
| 310:1,4,8,9 | 359:25 360:22 | **repeat**  13:12 | 277:19 317:3,6 |
| 313:4 314:10 | 361:5 365:18 | 87:11 98:1 | 327:25 328:3 |
| 314:11,12,13 | 369:16 370:4,6 | 114:11 134:11 | 334:18 345:19 |
| 314:13,15,20 | 370:6,9 372:6 | 142:5 167:7 | 349:21,23 |
| 314:22,23,24 | 372:10 373:22 | 194:8 196:8 | 352:1,2 354:5 |
| 314:25 315:4,7 | 374:25 375:4 | 215:18 227:13 | 358:18 374:2 |

Page 60

Appx_0981

**[reporter - right]**

382:14
**represent**  9:16
29:21 189:14
189:23 293:24
**representation**
102:18
**representative**
4:16 74:24
220:12,13
**represented**
188:20 326:9
**representing**
188:2 189:13
**reps**  102:8
171:6 179:18
**request**  42:21
42:23 53:19
140:24
**require**  80:24
**required**  42:18
52:14 64:7
100:4 112:2
148:4 276:16
391:13
**requirement**
112:3
**requirements**
67:18,20
**reservation**
276:3
**reserve**  383:4
**residential**
88:14
**resolved**  86:18

**resort**  343:2
**resource**  25:19
**resources**
187:2,5
**respect**  128:4
189:10
**respectful**
316:20
**respectfully**
269:15
**respectively**
246:19
**respond**  124:9
124:14,24
125:11 126:13
126:18 136:1
217:22
**responded**
69:18 207:6
301:3,4 310:7
376:17,20
**responding**
125:16,18
126:10 217:10
301:2 377:7
**response**  16:15
278:8,12,17,20
293:11 301:25
303:22
**responsibility**
157:16 339:20
**responsible**
75:10 169:4
219:19,23

**responsive**
126:2,4
**rest**  38:10
112:13 321:10
**restaurant**
65:24
**restrictions**
92:21 205:20
**result**  167:5
195:14
**resume**  4:14
63:3,10,25
65:7 66:20
**return**  127:14
**returning**
125:22
**returns**  117:13
**reveille**  60:19
64:14
**revenues**  75:25
**review**  63:13
180:14 183:17
183:19 192:19
192:20 194:21
**reviewed**  29:12
81:12
**reviewing**
186:6 193:11
**reviews**  183:20
183:24 184:5
**revolution**
176:15
**rice**  5:16 279:3
279:3 283:1

**richland**  5:25
360:4
**richmond**  3:7
**rick**  65:16 66:3
70:2
**rid**  143:19
144:3
**ride**  15:7,8
171:6,13,16,17
171:20 172:5
173:6,11 174:4
176:4,24 179:8
214:23
**ridiculous**
345:5
**right**  9:1,22,24
10:8,24 11:14
11:19,21,22,24
12:6,9,10,12,13
12:15,16,21,25
13:1,6,6,11,11
13:18,25 14:6
14:13,16,18,20
14:23,25 15:1
15:2,8,10,13,18
15:25,25 16:4
16:7,13,18,20
16:22,22,24
18:5,11,18,20
18:21 19:17
21:11 23:9
24:8 25:15,25
26:15,16 28:1
29:6 30:10
31:24 36:6,19

Appx_0982

**[right - right]**

| | | | |
|---|---|---|---|
| 37:5 38:15,19 | 117:16 118:3,6 | 202:20,23 | 290:23 291:1 |
| 39:19,22 40:17 | 118:23 119:24 | 203:14,17 | 291:19 292:12 |
| 40:23 41:2,10 | 119:25 120:21 | 205:24 207:7,9 | 293:24,25 |
| 43:16,24 46:9 | 121:8 122:15 | 208:8 209:3,13 | 294:6,15,18 |
| 47:25 50:7 | 124:18,20 | 209:15 210:21 | 296:17 297:11 |
| 51:1,8,23 52:2 | 125:8 126:19 | 211:3,23 212:5 | 297:13 298:25 |
| 52:19 53:24 | 127:11,14,25 | 215:4,5 217:3 | 303:16,22 |
| 56:3,5,7,11 | 128:7 129:9 | 218:4 219:8,16 | 305:9 306:7,22 |
| 59:17,19,20,21 | 131:9 132:2 | 219:17 222:7,8 | 307:13,23 |
| 60:12,22 61:20 | 135:9,12,15 | 223:11,18,21 | 308:4,19 |
| 61:23 62:23 | 137:2 141:16 | 227:3 231:14 | 309:25 310:4 |
| 63:19 65:15 | 142:12,14 | 232:16,23 | 310:22,23 |
| 66:11,23 69:13 | 143:11 148:1 | 233:14,16 | 311:6,24 312:5 |
| 70:25 75:12,23 | 148:12 150:9 | 235:19 238:25 | 312:24 313:2 |
| 76:2,4,25 77:3 | 151:21 153:11 | 239:13,15,18 | 315:9,11,12,17 |
| 78:19 79:3,16 | 154:7 155:19 | 240:7 242:9 | 316:8,8,10,17 |
| 80:15 81:19 | 156:4 157:7,11 | 247:6 248:17 | 316:19,20,24 |
| 82:17 83:15 | 157:25 158:3 | 248:19 249:17 | 317:4,20,23,25 |
| 84:8,22 86:12 | 159:7 161:24 | 250:7,16,22,22 | 318:9,22,23,24 |
| 87:14 88:2,24 | 162:11,14 | 251:5,6,8,10,21 | 320:12,14,17 |
| 90:2,20,22 | 163:4,20 164:8 | 252:13 254:6 | 320:18 321:3,6 |
| 92:2,16 93:2 | 165:12,22 | 254:18,19 | 321:10,14,23 |
| 93:13,15,20 | 168:3 170:20 | 255:13 256:15 | 322:4,25 323:3 |
| 95:2,8,15,25 | 173:5,19,23 | 256:23 258:23 | 323:12 324:7 |
| 96:2,13,14,14 | 174:15 175:2 | 259:22,24 | 324:10,12,19 |
| 96:15 97:25 | 175:13 176:3 | 262:21 263:12 | 325:6,18 |
| 98:3,4 100:21 | 180:2 182:9 | 266:13 268:14 | 326:11,18,20 |
| 102:19,19,24 | 184:2,15 185:8 | 268:21 269:7 | 327:23 328:11 |
| 103:6,24 104:8 | 185:21 186:14 | 270:7 273:18 | 328:15,18 |
| 104:23 105:20 | 186:15,19,21 | 274:2 276:12 | 329:5,13 330:6 |
| 106:7,21 | 188:11 189:8,9 | 278:17,19 | 330:15,18,22 |
| 111:16 112:24 | 190:5 193:19 | 279:18 280:17 | 330:22,23 |
| 113:2 114:10 | 194:7,11,14 | 282:20 283:1 | 331:2,12 332:2 |
| 114:14 115:2 | 195:9 198:12 | 285:22 287:19 | 332:3,15,18 |
| 115:11 117:4 | 198:12 200:5 | 289:8,25 290:6 | 333:19 334:5,8 |

Page 62

Appx_0983

**[right - running]**

| | | | |
|---|---|---|---|
| 334:19 335:14 | 386:1,1,2,5,7 | 311:12 320:12 | **room**  11:24,25 |
| 335:15,17 | 386:15 | 321:16 322:14 | 12:21 13:2 |
| 336:21,22,25 | **ring**  84:6 | 322:21 323:21 | 20:18 43:12 |
| 338:12,14 | **risk**  113:24 | 323:23 324:4 | 116:21,22,24 |
| 339:6 342:21 | 114:5,12 | 329:6,11 332:3 | 117:6 158:14 |
| 342:21,23 | 121:17 126:12 | 333:2 339:13 | 316:3 |
| 343:5,7,8,15,15 | 126:15 142:20 | 339:17 341:18 | **roommate**  28:5 |
| 343:16,20 | 142:25 184:20 | 342:22,22 | 241:25 |
| 345:6 346:15 | 227:24 236:7 | 344:22 346:2 | **roommate's** |
| 347:13 348:9 | 359:9,16 360:2 | 351:13,15 | 241:10 |
| 348:10,16,16 | 381:14 | 353:9 354:20 | **roommates** |
| 348:19,22 | **risks**  113:22 | 355:11 356:15 | 20:19,22 |
| 349:1,3,6,8,9 | 381:5,9 | 356:18,18,19 | **ropes**  171:22 |
| 349:15,24 | **risky**  235:12 | 362:19,25 | 172:22 |
| 350:3,15,20 | **road**  73:13 | 363:4,13,14,17 | **rough**  274:15 |
| 351:2,6,9,10,25 | 79:16 105:25 | 363:18,21,22 | **roughly**  250:21 |
| 352:3,11,21 | 106:3 115:12 | 364:14,17 | 285:23 |
| 353:17,17 | 115:17 126:22 | 365:13 374:15 | **roughriders** |
| 354:10 355:3 | 126:24 127:1,4 | 374:20 378:24 | 60:2 |
| 355:13,21 | 127:10 131:13 | 384:2,4,4 | **routes**  177:5 |
| 356:12,15,18 | 132:5,6,11,12 | 385:25 386:23 | 178:16,24 |
| 356:20,25 | 132:13,17,24 | **roadhouse**  60:7 | **row**  131:4 |
| 358:20,22,24 | 134:2,6,7,14 | **roadway** | **rule**  11:4 |
| 360:18 362:4,5 | 135:21 163:18 | 360:24 | 236:20,24 |
| 362:12 363:9 | 199:1,11,25 | **roberts**  28:14 | 237:2,3 |
| 363:14,19,23 | 202:1,4 212:15 | 28:15 255:15 | **rules**  8:6 141:9 |
| 364:25 365:6 | 218:13,15 | **rockfish**  60:13 | 141:12 142:3,6 |
| 365:14,14,16 | 219:12,14,17 | **rodeo**  11:10 | 142:12,17 |
| 366:25 367:24 | 223:1,2 229:20 | **roderico**  1:4 | 143:10 150:6 |
| 369:4 370:7 | 229:23 230:3,5 | 2:2 7:10 | 150:11 152:1,4 |
| 371:3,17 | 230:8,12,12,18 | **role**  79:9 193:5 | 187:9 190:22 |
| 376:10,11,24 | 230:23 231:1 | 320:15 | **run**  64:7 257:1 |
| 378:6 379:1,10 | 231:21 291:19 | **rolling**  30:18 | **running**  199:24 |
| 380:2 381:17 | 292:5 308:15 | 332:19 | 270:16 339:23 |
| 383:9 384:4 | 310:14,19 | | |

[rush - says]

| | | | |
|---|---|---|---|
| **rush** 267:20 | 157:12,13 | **salesperson** | 321:23 322:13 |
| **ryan** 20:23 | 159:12,25 | 122:15 126:2,5 | 323:3,4,22 |
| **s** | 182:5,14,17,21 | 170:9 | 325:21 328:15 |
| **s** 2:1 3:1 4:7 5:1 | 183:6,8,10,13 | **san** 118:11,19 | 328:19 333:19 |
| 6:1 7:1 20:24 | 183:16 184:4,6 | 118:20 130:7 | 333:22,22 |
| 240:6 281:1 | 185:1,4 231:24 | 176:19 220:17 | 353:16 364:2 |
| 282:20 284:6 | 277:8,11 | **santos** 1:7 2:4 | 364:11 367:9 |
| 390:3 | 320:21 | 7:12 35:14 | 368:22 376:4 |
| **sad** 373:17 | **saint** 301:10 | 381:22 383:9 | 383:10 |
| **safe** 101:25 | **saints** 298:7 | 385:14 | **saying** 15:3 |
| 134:10,13,16 | 299:6,11,14,20 | **sarah** 6:5 20:23 | 85:17,20 93:6 |
| 134:17 136:7 | 300:5,14,16 | 28:4,13 29:4 | 96:13 109:3 |
| 158:18,19 | 301:7,13,22,25 | 241:24,25 | 110:7 184:14 |
| 182:19,22 | 302:4 304:6,13 | 242:25 243:20 | 223:9 235:14 |
| 184:7,8,11,13 | 304:15 | 369:9 373:22 | 267:8 268:20 |
| 184:17 230:20 | **salary** 91:6,8 | 374:7,9 375:2 | 307:8 308:23 |
| 231:14,18,21 | 92:7,9,10 93:5 | **sarah's** 243:15 | 343:3 353:16 |
| 232:1 315:25 | 94:3,6,8,9,25 | 244:1,4,7 | 363:15 369:3 |
| 318:14 342:14 | **sales** 4:16 46:2 | 281:8,11,13 | **says** 75:9,21,24 |
| 343:10 377:16 | 49:22,24 71:15 | 369:10 | 75:25 77:1,1 |
| **safer** 230:21 | 73:6,18,19 | **sarcastic** 86:4 | 82:18 83:13,20 |
| 232:8,13,19 | 74:13,24 77:15 | **satisfy** 78:23 | 83:25 90:22 |
| 233:18,24,25 | 90:22 91:5 | **saturday** | 94:12 96:17 |
| 234:1 318:18 | 93:11,23 102:8 | 248:23,25 | 97:9 116:11,15 |
| 333:11,14 | 102:11,13,25 | 249:10,12 | 116:19 157:3 |
| 343:10 | 122:7 129:22 | 280:7 281:17 | 161:23 163:12 |
| **safest** 343:8,8 | 129:25 130:18 | 304:23 | 163:23 164:1 |
| **safety** 97:16 | 132:5 220:11 | **save** 263:13 | 165:23,24 |
| 99:9,12,15,21 | 220:13 274:14 | **saw** 15:21 | 166:3,4,6,21 |
| 99:22,23 100:1 | 277:8 279:6,9 | 67:13 156:15 | 167:25 168:8 |
| 100:4,11,22 | 279:9 280:21 | 167:11,15,19 | 168:22,23 |
| 105:19 109:19 | **salespeople** | 233:12 261:15 | 177:18,21 |
| 109:21 111:5,7 | 212:11 274:24 | 308:20,25 | 178:14 180:9 |
| 111:8,18 | 274:24 284:14 | 309:2,6 312:9 | 180:13 186:14 |
| 112:17 113:4 | | 314:15 321:13 | 186:20 187:16 |

Appx_0985

**[says - see]**

193:19 195:24
196:1 197:24
197:25 198:6,8
198:11 199:10
199:13,20
208:8 216:18
216:19 218:14
240:6 267:12
293:9 295:13
310:17 360:2
**scams** 52:10
**scenario** 51:20
133:13 155:22
155:23 329:25
330:1 341:4,5
**scenarios** 52:7
107:4 125:5
232:14
**scene** 154:2
357:6,12,15
**schaub** 279:25
**schedule** 77:1
119:12
**scheduled**
276:2,9 281:6
281:21 282:22
282:24
**schmidt** 2:12
8:16,16 197:7
269:14 366:19
**school** 24:9,10
24:11,16 36:2
48:19 60:3,7
60:15 77:10,24
255:18

**scoot** 312:10
320:1
**scooted** 312:16
364:23
**scores** 329:6
**scraping**
343:25
**screen** 138:20
138:21,22
254:12 259:13
290:25 294:21
295:9,14,16,17
303:3 307:13
313:11,12,14
335:1 362:3,12
**screenshot** 47:4
**screwed** 343:22
**seafood** 60:13
**seal** 3:19
**search** 66:24,25
67:6 194:2
**season** 261:22
262:3
**seat** 335:12
**seatbelts**
158:10
**seating** 140:24
**second** 35:20
35:24 75:8,9
76:24 86:9
158:1 177:18
179:14 186:13
186:15,15
188:11 192:21
193:20 215:22

226:4,8 253:24
273:20 279:17
281:15,17
317:10,14
320:1 346:9
347:3 352:6
353:23 358:25
362:21,23
363:2
**seconds** 354:8
356:21 363:6
363:10,11
365:4 370:15
**security** 41:14
42:8,10 44:18
44:22 52:9
209:24
**see** 16:3,8 39:8
56:15 63:9
66:19,20 69:23
76:25 80:18
82:19,21 85:4
85:4,7 87:21
89:21 96:17
97:9 119:14
121:12 125:9
129:10 155:9
157:11,13
163:12 165:23
165:24 168:21
174:2 177:18
177:20 178:12
180:13 193:19
193:20,22
194:16 195:5

199:3 207:15
218:14,17
236:6 239:2,3
239:6 259:13
262:5 263:6
273:8,10,12
279:18 281:18
290:11 293:22
295:25 308:17
308:19 312:4,6
313:18 314:18
317:14,22
318:8,9,16
319:23 320:4
322:10,13,20
323:5,17
324:23 325:5,7
325:8,16 326:8
326:10,13
329:8,10,11,12
329:14 330:12
330:14 331:13
336:5 337:12
341:9,9,16
347:25 348:6
350:10 351:25
352:14,16
354:9,12,21
355:17 356:24
356:24 357:1,9
359:1,5,8
360:11,12
361:2,17,22
362:9 363:13
367:6 368:12

Page 65

Appx_0986

**[see - short]**

373:20 376:6
376:12 379:8
**seeing**  167:16
314:11,23,24
323:8,11,25
324:3 327:10
327:12,21
335:20,23
336:1 341:12
351:5
**seek**  216:5,19
**seeks**  193:3
**seem**  235:25
268:25 373:15
386:18,24
**seemed**  348:15
**seems**  76:3
197:12 272:17
348:6
**seen**  70:8 89:17
97:3 128:21
148:1 156:9,17
156:19,20
162:21 177:11
185:15,25
186:1,2 192:8
192:11 193:12
207:24,25
215:5,9 271:20
271:22 307:22
353:5,11 360:5
360:23 363:1
368:18 371:6,9
374:7,8 386:5

**sell**  71:19 72:11
**selling**  173:21
**send**  56:15 59:8
68:8 136:16
137:5,11,13,17
137:25 138:3
178:5 206:12
207:1 228:3,6
263:24 289:10
307:7 308:9
309:16 311:5
324:15
**sending**  256:19
262:21 277:24
278:1 287:24
300:20 305:10
308:13,24
309:9,23 310:2
314:25 323:2
324:9,12
340:12 365:24
370:7,9 384:21
**sends**  100:11
101:5 289:13
**sense**  109:17
110:6 124:18
224:4 262:10
**sent**  85:19
103:8 186:4
202:16,20,23
203:1 262:24
263:1,13 264:2
270:20,25
272:4,7,24
273:2,3,12

284:3 288:2,20
288:20 289:20
291:15 293:24
294:4 299:9
300:18 305:3,6
306:7,22 307:5
307:9 309:5
310:5,15,23
311:12,21,23
321:12,15
322:25 324:18
356:21 359:1,5
364:5,7,10,13
364:18 365:4,7
365:8 367:23
369:17 376:7
377:5 380:20
384:18
**sentence**
179:14 186:16
186:23 188:19
208:10
**sentences**  96:19
158:1 188:12
**separate**  43:1,2
43:3 45:5,8
116:21,22,23
117:6 123:14
206:3
**separately**
234:14
**september**
221:9
**serious**  201:4
373:6

**server**  41:19,20
**service**  55:16
55:17,19,25
135:12
**services**  33:13
**set**  84:22 91:17
116:16 120:17
126:22 139:8
139:12 146:18
231:15,22
277:18
**setting**  45:2
**settings**  263:13
**seven**  24:5,6
382:14 387:7
**severe**  195:14
195:18
**shadow**  170:9
**shadowing**
174:1
**shake**  355:2,7
**share**  129:20
284:22
**sharing**  58:25
**sheets**  45:25
**sheriff's**  62:10
**shirt**  240:3
**shirts**  240:18
**shock**  310:21
**shoes**  329:3
**shop**  154:13
252:2 297:16
**shops**  297:20
**short**  72:22

Page 66

Appx_0987

**[shot - smith]**

shot   36:15 37:8
  43:16 60:1
should've
  37:12
shoulder
  239:12 343:8
  343:10 384:8
show   10:3
  47:11,18 48:1
  48:1,8 81:15
  261:8 276:21
  280:20 288:25
  289:2 295:9,14
  298:23 313:13
  334:14 349:14
  373:3
showed   86:22
  172:22 265:18
  386:25
showing   85:17
  259:1 275:5
  336:24 366:15
shown   48:17,23
  86:22
shows   68:17
  282:19 289:1,8
  295:11
shrunk   118:23
siblings   23:21
sic   207:16
side   67:7 223:3
  223:4,18
  247:16,17
  277:18 299:24
  309:15,18,18

310:14 311:12
329:10 342:21
342:23,24
346:2 349:2,10
351:13 363:19
383:10 384:2,4
384:4
sided   11:21
sidewalk
  236:18
sight   376:1
sign   30:18 31:3
  31:20 95:17
  156:23 202:19
  267:1,3 317:14
  317:15
signature   96:9
  96:11 156:22
  388:16 389:14
signed   61:18
  85:16 96:15
  156:21,25
  186:8 193:8,9
  208:3 215:11
significant   73:8
  73:9 208:12,14
signing   186:11
  208:5
signs   317:22
similar   156:24
  217:5 291:25
simple   92:16
simulation
  239:2

simultaneously
  296:15
single   373:12
singled   381:7,8
sinners   298:7
  299:6,12,15,20
  300:5,14,16
  301:7,10,13,22
  302:1,4 304:7
  304:13,16
sir   84:25 156:6
  196:25 197:2
  271:16 328:3
  334:18 349:23
  352:2 354:5
  374:2
siri   299:16,19
  299:22 300:3,4
  300:10 302:11
sisters   23:12
sit   50:6
site   69:2 120:18
sites   195:13
  382:7
sitting   109:12
  136:21 142:11
  176:12 259:6
  335:11,12
  381:24
situation
  230:25 267:17
  369:21
situational
  125:2

six   34:6 37:9
  183:22 223:7
  277:19,20
  358:18
size   140:25
skid   360:24
  361:7
skills   73:24
  74:3 180:6
  388:10 389:6
skip   82:16,18
  239:18
skype   54:15,20
  76:17
slack   55:9
slammed
  153:23
slash   62:17
sleep   248:4,6,8
  248:11
sleeping   370:24
slide   259:23,24
slower   232:8
  233:2,7,13,19
  233:22 321:5
slowing   233:21
small   373:1
smartphone
  381:2
smartphones
  5:8 217:5
smiley   85:25
  197:17 200:24
smith   1:11,16
  3:2 5:17 6:2

**[smith - sound]**

7:4,10,13 8:19
8:25 9:3,9,13
22:2,19,23
23:3,3,15,19
28:10,11 40:11
40:16,17 41:7
58:18 106:15
144:21 174:24
224:22 297:9
298:3 336:18
340:5,11
367:15 390:1,2
390:24 391:1,2
391:4,12
**snacks**  65:3
**snapchat**  4:10
43:18 47:2,13
48:16 206:20
206:21 207:11
207:12,13
256:15,16
263:2,10
**snapchats**
263:19
**snappy**  59:18
**snaps**  263:13
**snoop**  181:10
**soccer**  39:25
**social**  5:5 46:18
48:23 56:4,6
56:12,14 58:13
66:25 67:23
68:6,9,11 69:2
69:8 83:10
84:12,16,21

187:17,24
188:4,7,14
189:5,16
190:11,14,17
190:20,23
191:1,9,13,21
191:24 192:5
192:15,18,25
193:3,5,25
194:9 195:8,12
195:13,18
196:10,17
202:12 203:1,3
203:5,8,13
205:25 206:4
206:13 263:2,5
263:21 264:18
264:20 372:6,8
372:13 378:18
382:7
**socially**  66:1
**soft**  17:17
67:19
**softer**  17:13
**software**  120:9
133:7 280:23
382:10
**sold**  19:1,2
187:9 286:16
**solve**  133:7
**somebody**
33:14 69:7
103:25 105:3
108:10 153:5
162:3 192:1,4

196:9 222:21
223:4,10
261:16 288:20
330:17 358:4
**somebody's**
122:20
**someone's**
109:15 114:13
**somethings**
16:14
**somewhat**
316:10 317:13
**songs**  371:14
**soon**  19:20
161:16 310:5,8
359:12 377:4
**sooner**  126:18
**sop**  4:24 5:5,8
5:10 161:23
195:8
**sophomore**
25:4,5,7
**sorry**  17:8
43:20,22 45:9
74:20,22 81:18
81:20 95:17,17
142:5 158:3
193:2,2 195:8
199:3 207:21
215:25 278:11
282:11 285:7
292:20 327:25
336:9 339:23
346:25 347:7
366:18 380:23

**sort**  11:12,21
12:12 16:17,24
29:21 34:8
40:20 41:19
49:7,24 50:25
52:7 54:8
59:21 61:6
64:25 65:20
67:4,19 68:21
71:16 73:2
75:4 76:6,13
76:25 79:22
82:16,19 84:4
85:11 86:4
94:5 98:9
100:18 102:23
102:24 105:14
107:8 115:15
121:13 122:1
127:16 155:18
174:1 179:4
211:24 245:13
247:4 277:1
284:25 292:21
312:13,23
315:25 329:12
345:5 348:6
350:9
**sound**  75:11,23
76:2 77:3
83:15 247:4,6
250:22 251:15
259:9 293:25
297:13

Veritext Legal Solutions
800-336-4000

Appx_0989

**[sounded - started]**

**sounded**  346:7
**sounds**  14:9
  83:17 86:11
  132:1 233:4
  298:25 322:24
  345:5
**south**  75:16
**space**  158:7,13
  158:17,20
  306:13 385:10
**spam**  112:7,12
  112:21,25
**spare**  262:11
**speak**  136:15
  137:9 229:16
  255:21 256:8
  357:19 365:24
**speaker**  131:12
  131:14,20,21
**speaking**  26:15
  59:22 75:4
  89:14 125:21
  128:17 131:19
  137:20 298:18
  308:8
**special**  1:5 2:3
  7:11 140:24
  253:14,18
  381:13
**specific**  45:10
  45:17 49:12
  79:8 102:7
  116:25 199:21
  276:8 380:15

**specifically**
  22:18 35:5
  79:2 81:8
  99:25 287:4
  306:12
**specifics**  27:7
  27:11 32:8
  77:9 79:20
  90:19 91:13
  97:1 98:13,24
  99:16 100:3
  105:11 110:17
  111:13,15,19
  111:24 112:18
  114:22 142:8
  142:14,16
  175:8 204:1
  380:22
**specified**  50:16
**specify**  116:12
  255:9
**speculate**  89:8
**speed**  157:19
  158:9 163:21
  208:13 231:5,7
  231:10,12,15
  231:19 232:1
  232:13,13,19
  233:6,13,19,20
  265:1,4,7,11,12
  266:2,5,20
  267:1,2,6
  268:8 314:9
  315:5,12 340:7
  341:3 353:3

  355:24 356:8
  368:9 370:2,4
  384:10,13
**speeding**  31:5
  31:10,12,20
  82:8,19,22,25
  83:11 84:2
  153:22 231:5
  234:11 237:1
**speeds**  265:19
**spell**  171:11
  246:16
**spelled**  40:17
**spend**  73:13
  169:14
**spent**  121:25
  132:2
**split**  133:20,23
**splitting**  21:12
**spoke**  9:14
  27:25 105:8
  154:22 249:13
  351:17 366:1
  383:18,22
**spoken**  12:18
  17:17 28:21
  87:19 308:3
**sponsored**
  238:20
**spontaneous**
  292:10
**spontaneously**
  304:20
**spot**  303:15
  305:7

**spots**  303:13
**spotted**  308:18
  324:25 326:15
  327:4 328:6,6
**spotting**  328:4
**stack**  81:21
**stakeholders**
  188:18
**stamp**  327:23
**stand**  325:16
  341:23 373:15
**standard**  156:8
  160:16 194:19
  215:15
**standing**
  314:18,24
  323:8 324:3
  327:12 328:21
  331:13 335:21
  336:1 349:2,16
**starbucks**
  43:19
**stars**  261:23
**start**  36:19
  80:1 93:10
  218:9 242:14
  268:20 336:4
  352:6 353:25
**started**  73:2
  104:14 105:18
  115:4 116:25
  243:12,17
  251:11 254:18
  332:6

Veritext Legal Solutions
800-336-4000

**[starts - suddenly]**

**starts** 91:7,10
159:8 215:23
216:1 273:22
**state** 7:22 9:12
310:21 311:3
351:19 388:19
**statement** 6:2
16:3 162:6,8
163:5 164:10
164:18,22
165:2,16,19
166:20,21,24
167:25 168:10
189:3,8 310:22
353:16,19,21
353:23 359:18
359:22 365:18
365:25 366:6,9
366:11,13,24
367:3,21
368:17,20
369:23 370:11
**states** 1:1 7:14
218:2 274:19
275:13
**stating** 200:23
**station** 25:9
34:1
**stay** 120:1
151:5,6 182:19
184:7,8,11,13
184:17,18
230:19 232:23
232:25 233:14
255:22,24

275:17,22
312:11 377:16
**stayed** 246:1,4
**staying** 178:18
179:11,23
233:18,19,22
**stays** 307:16
**steering** 5:19
218:13 334:15
335:1,8,11,13
337:22 338:14
343:12,18,23
354:10 360:22
362:7
**stenographic**
8:8
**step** 45:15
166:10 167:5
167:22,24
209:24 225:17
328:10 341:17
**stepdad** 261:17
261:18
**stepped** 164:14
165:4,6,9
166:18,21
167:1,9 168:16
311:2 328:12
331:16 334:3,5
334:7,9
**stepping**
367:16,20,22
**stick** 94:22
**stickers** 271:15

**sticking** 344:11
344:14
**stipulation** 8:9
**stood** 111:2
**stop** 30:18 31:3
31:20 45:4
129:1 155:16
155:20 264:11
269:12 317:9
318:23 332:6
340:12 343:9
343:10 345:11
360:25
**stopped** 197:16
311:16,17,20
329:9 354:8
**stopping** 155:8
171:24
**stops** 155:5,6,9
155:11
**storage** 38:25
**store** 122:7
**story** 6:4
321:11 353:20
372:19,25
373:16,20
379:16
**straight** 202:6
349:9
**strange** 11:22
361:6
**stream** 54:7
**street** 2:7 3:6
201:7

**strength**
373:11
**strike** 19:10
361:6
**strong** 53:6
**struck** 330:24
338:20,22
349:13
**struggled** 247:9
**stuck** 78:2,9
143:14,15
**stuff** 10:4,10,16
11:13 18:21
29:21 77:23
85:22 100:18
106:8 112:8
181:10 187:10
277:3,8,8,9,11
284:25
**stupid** 269:13
**submit** 148:9
**subscribed**
391:14
**subsidiary**
27:18
**successfully**
128:13
**sudden** 386:18
**suddenly** 167:2
328:14 330:23
331:15,25
333:2 334:2,5
334:6 339:7
340:24 341:8
341:19 352:15

Page 70

Appx_0991

**[suddenly - take]**

352:19 353:9
363:3 364:17
367:18 376:4
383:11 384:16
385:22,24
386:2,19,25
**suffered**   373:10
**sufficient**
385:10
**suggest**   42:15
42:19
**suite**   1:20 2:14
3:13 7:18
261:15,16,20
261:22 262:1,3
**summarize**
165:14
**summarized**
165:13
**summary**
359:20
**summer**   38:6
379:22 380:1,7
**sunday**   119:11
260:12 304:19
**sunny**   374:24
**supervise**   145:8
169:2,10 170:9
171:5
**supervised**
176:3
**supervises**
191:9
**supervising**
176:25

**supervision**
169:8 175:3
176:6
**supervisor**
65:19 175:11
180:13 220:5
249:14 252:5
252:12 262:21
**supervisors**
175:7 183:16
185:6 214:20
358:1
**supplies**   116:6
**supposed**   13:1
14:6 151:15
187:23 205:17
230:12 260:11
280:1 375:13
**sure**   10:11
11:15 15:1,8
15:19 18:16
23:8 31:18
32:16 33:2
37:18,24 39:2
40:15 43:12
47:12 51:10
53:10 55:18
56:5 58:5
61:14 66:15,18
71:8 72:14
81:2,19 83:14
87:20 90:19
91:13 101:10
101:14,17,20
102:23 105:16

124:12 137:18
137:20 150:1
170:19 174:17
174:18 175:6
183:9 196:12
197:9 211:8
219:20 250:7
252:8,12
256:15 266:15
283:14,19
287:17 308:6
310:25 330:6
345:12 350:8
350:13 373:2
375:9 376:19
377:9 380:3
381:20
**surely**   205:23
378:23
**surprise**   34:13
**surprised**
369:14
**surrounding**
31:10
**suspended**   33:1
33:11,16
**swapped**
225:24
**swear**   7:5 8:23
**sweat**   252:2
**swerve**   338:12
360:19,20,21
367:11
**swerved**   164:14
360:18

**swipe**   307:15
307:18,19,21
**switch**   36:9,11
38:4 104:10
226:10 233:7
**switched**   104:3
104:17 170:24
225:25 226:15
226:24
**switchover**
180:18
**sworn**   7:25 9:4
388:5 391:14
**synced**   45:6
211:1,11
**synopsis**   203:3
**system**   216:9
303:1
**systems**   216:10

---

**t**

**t**   4:7 5:1 6:1
37:1,2,19
240:3,6 390:3
390:3
**tab**   50:7 53:13
53:16,17,22
**tablets**   5:9
208:12 217:5
**take**   7:8,21
11:7 22:8,11
27:15 28:5
32:17,23 33:16
36:13 46:5
51:7 52:24
60:4 63:12

Page 71

Appx_0992

**[take - tell]**

| | | | |
|---|---|---|---|
| 68:20 69:16 | 167:21 378:18 | 180:20 185:6 | 180:16,21,22 |
| 72:12 74:14 | 382:3 388:3,12 | 195:7 216:8 | 181:5 188:15 |
| 81:21,22 87:8 | 389:9 | 222:4 224:24 | 188:21 191:25 |
| 94:25 96:9,12 | **takes**  41:15 | 232:15 242:8 | 192:2 249:6 |
| 98:25 100:21 | 127:2,3 129:7 | 260:15,18,23 | 274:11 281:1 |
| 106:6,7 115:11 | 219:12 250:19 | 286:9 297:12 | 282:20 283:2,5 |
| 118:22 126:6,8 | 279:10,12 | 321:1 350:19 | 283:11,15,22 |
| 127:24 128:16 | **talent**  67:2 | **tammy**  5:15,24 | 286:12 |
| 128:18 130:22 | **talk**   12:15 20:4 | 278:2,4,12 | **team's**  92:13 |
| 132:11,16,20 | 25:24 27:12 | 358:6 359:23 | 274:8 280:18 |
| 133:4,19 134:5 | 77:5 78:17 | 360:1 | 284:3 |
| 144:21,22 | 102:20 121:10 | **tamu**  41:7 | **teammates** |
| 145:12 147:10 | 124:20 162:11 | **target**  43:18 | 177:23 181:15 |
| 157:7 171:25 | 169:6,8 217:24 | **tattoo**  260:21 | **teams**   54:23,24 |
| 172:1,2 174:16 | 284:19 307:6 | 260:22 261:3 | 55:2,5,12,14,15 |
| 178:22 189:15 | 311:3 340:4 | 297:16,20 | 55:23 76:17 |
| 197:5 198:7,17 | **talked**   18:2 | 304:19 | 181:4,7,10,11 |
| 224:13,16 | 26:14,21 27:6 | **tattoos**   260:19 | **teamwork** |
| 225:17 227:2 | 27:8,21,24 | 260:20 292:9 | 179:14,15 |
| 227:24 229:20 | 29:1 34:16,17 | 292:13 293:1 | **technically** |
| 229:22 247:14 | 66:9 72:8,15 | 297:17 368:12 | 25:14 |
| 247:15,19 | 77:16 78:18 | **taught**   172:23 | **technician** |
| 248:22 250:16 | 85:15 86:22 | 205:10 | 120:23 |
| 255:13 259:7 | 102:11,18 | **tax**   117:13 | **techniques** |
| 287:19 290:3 | 162:5 206:13 | **taxes**   117:8,10 | 66:24 67:6 |
| 296:22 297:1,2 | 220:5 263:3 | 117:17 | **tell**   9:5 11:13 |
| 304:3 315:16 | 283:21 357:20 | **taylor**  2:6 | 13:11 14:5 |
| 336:10,11 | **talking**   30:22 | **taylorkingla...** | 16:8,14 22:17 |
| 339:20 341:25 | 74:2 75:18 | 2:9 | 30:16 32:7 |
| 341:25 342:2 | 77:11 95:20,24 | **teach**   287:6 | 33:3 36:3,16 |
| 347:1 350:2 | 128:6 132:24 | **team**   45:17 | 40:9 43:13 |
| 361:24 362:18 | 135:14 136:12 | 102:11,13,25 | 44:14 46:19,21 |
| 371:17 381:25 | 141:15 162:3 | 118:20 130:19 | 47:12 48:9 |
| **taken**   7:10 | 170:1,13 175:3 | 178:1 179:19 | 50:13 61:15 |
| 92:22 131:1 | 176:2,17 | 180:2,8,9,11,11 | 62:2 63:13 |

Veritext Legal Solutions
800-336-4000

Appx_0993

**[tell - text]**

66:3 67:4
69:16 78:9
79:9 80:15,22
85:13 89:1
90:11 98:9
100:2 114:2
116:23 118:16
119:6 124:2
130:14,16
138:12 139:6
142:9 143:23
147:18,23
148:19 153:7
153:14,17
169:13 171:18
172:5,21 176:8
186:2 187:19
199:8 202:11
205:16 212:3
221:2 232:6
239:3 240:20
251:5 254:11
255:15 266:9
266:18,19
276:7 277:2
278:21 283:6,7
293:23 295:19
298:5,22
299:22 332:5,6
336:5 340:11
350:2 352:9,20
352:23 353:2,5
353:10 355:18
355:20 356:20
356:23,24

358:7 359:23
360:10,16
369:2 372:9
374:24 375:2
382:16 383:15
383:19,23
**telling**  132:4
141:12 143:4
196:6 270:15
292:25 294:15
301:21 326:17
326:19 353:20
355:10,12
358:6
**tells**  231:19
**temperature**
14:18
**temporarily**
18:23,25 19:19
**ten**  24:5,6
30:22 202:5
272:12,15
284:18 298:24
**tennessee**  76:2
**tent**  89:14
**tents**  88:13
**termination**
195:15,21
**terrika**  3:19
26:16
**territories**
129:18,20
**territory**  75:11
104:3 118:3,5
118:8,18,23

120:24,25
129:13,15,16
130:5 169:15
172:14 177:5
178:16,24
179:18,22
220:14
**test**  51:3 106:7
357:6
**tested**  373:11
**testified**  9:6
**testifying**  388:5
**testimony**
213:20 312:15
318:19 328:11
363:1,12 370:8
391:8
**tests**  51:1
**texas**  1:2,20
7:15,17,18,23
10:20 18:24
19:3,25 20:2
20:14 22:4
24:13,14,24
25:1,7,16
30:20 31:16
32:23 34:1
60:7 75:16
118:17 152:14
256:23 288:17
388:19
**text**  5:14 6:3,5
43:17 46:14
122:22 123:18
124:23 136:9

136:14,24,25
137:2,12,16
138:5,13,16,17
138:18 139:6,7
139:16,20,22
140:3 175:12
175:24 178:6
181:1 204:18
204:20,24
214:25 215:2
227:12,15,18
228:3,6,8,13
229:2,7 234:4
234:23 235:4,8
235:17,22
236:2,10,15
252:17 256:13
256:21,22
258:13,15,20
259:18 262:13
262:24 270:20
271:1,24,25
272:9,10,25
273:6,8,17,21
285:10 288:20
289:17,21,23
289:24 290:21
291:5 292:4
293:3 295:8,13
295:15,18,19
296:4,14
297:12 299:9
300:19,20,24
301:24 302:6,8
302:11 303:1,2

Veritext Legal Solutions
800-336-4000

Appx_0994

**[text - think]**

| | | | |
|---|---|---|---|
| 303:6,19,25 | **texting** 140:17 | 387:5,6 | 77:13 79:7,23 |
| 304:7,16 305:3 | 140:21 213:4,7 | **thankful** | 80:19 81:18,20 |
| 305:6,10,11,16 | 214:13,18,21 | 372:11 373:3 | 82:13 84:15 |
| 305:17 306:10 | 217:10 227:25 | **thanks** 366:21 | 89:8,11 99:3 |
| 306:11 307:3,4 | 229:10 234:11 | **thanksgiving** | 99:25 100:14 |
| 307:5,9 308:13 | 234:12 235:11 | 372:16 | 101:1,18 105:6 |
| 308:24 309:16 | 236:21,25 | **thing** 13:18 | 108:2,5,6,20,23 |
| 309:24 310:3 | 237:5,9,10,22 | 16:12 39:8 | 108:25 109:10 |
| 310:15,23 | 238:10,13 | 40:3 49:25 | 109:17 110:19 |
| 311:1,5,10,13 | 249:15,20 | 160:7 180:2 | 110:20,22,25 |
| 311:18,24 | 258:7 260:5,8 | 189:10 201:2 | 111:1,4 112:24 |
| 312:2 314:13 | 270:15 292:8 | 293:23 296:16 | 113:8,12,16,21 |
| 314:25 321:12 | 292:22 299:5 | 344:6 | 114:12,17,21 |
| 321:12,15 | 301:7 311:9,23 | **things** 16:15 | 116:11,14,17 |
| 322:25 323:1,2 | 314:14 315:1 | 18:17 27:13 | 117:22 125:21 |
| 324:9,12,16,18 | 368:11 370:15 | 64:25 77:7 | 126:4,6,12 |
| 340:13,16,19 | 375:25 376:3,5 | 98:6 159:2 | 128:13 133:22 |
| 352:20 356:21 | 381:11 | 203:5 205:23 | 134:1,8,12,15 |
| 364:5,8,10,13 | **texts** 46:12 | 208:16,19 | 134:17 135:20 |
| 364:19,20,25 | 123:24 124:6,7 | 234:14 251:11 | 142:21 143:1 |
| 365:1,2,4,7,8,9 | 124:8 125:22 | 260:9 268:21 | 143:11 150:5 |
| 365:10 369:7 | 127:24 128:18 | 268:24,24 | 150:11,18 |
| 370:3,7,9 | 136:1 139:19 | 284:21 285:2 | 152:4,5 153:3 |
| 371:4,11 | 242:21 243:14 | 296:15 | 155:15,19 |
| 372:24 374:6 | 252:23 293:15 | **think** 15:21 | 158:12,16,19 |
| 376:8,15,23 | 306:7 376:18 | 24:16 27:23 | 158:25 159:3 |
| 377:2,5,7 | **thank** 8:22 9:7 | 30:10 32:8 | 159:17,24 |
| 384:18,21,24 | 9:9 17:18,23 | 33:10,21,22,25 | 160:9,23 161:8 |
| **texted** 138:6 | 24:8 74:21 | 34:4,5,6 40:13 | 161:10,11 |
| 161:10 175:14 | 95:15 162:19 | 40:15,24 43:23 | 162:1,11 163:3 |
| 252:6,9 262:15 | 261:9 271:17 | 54:7 57:21,22 | 163:8 164:3,7 |
| 262:17 270:22 | 328:3 334:12 | 58:9 63:3 | 164:20,24 |
| 271:2 273:25 | 350:10 358:22 | 66:13,16 69:5 | 165:8,15 |
| 295:11 301:10 | 359:3 365:12 | 69:6,11 70:16 | 166:15,24 |
| 304:5 357:25 | 366:17 373:14 | 72:24 76:24 | 172:20 173:3 |

Page 74

Appx_0995

**[think - thought]**

| | | | |
|---|---|---|---|
| 175:2,24 176:9 | 234:10,18,23 | 306:3,9,14,16 | 376:17,20 |
| 177:5 178:23 | 235:8,11,16 | 309:22 311:10 | 377:7 378:21 |
| 179:13,20 | 236:1,15 | 311:12,15 | 379:18 381:1 |
| 180:4,17 | 240:12 243:25 | 312:18 314:1 | 381:24 382:19 |
| 181:20 183:6,7 | 244:13,15 | 315:20 317:17 | 384:10,12,16 |
| 184:11,25 | 245:1 246:3,5 | 318:11 319:14 | 384:20 385:15 |
| 186:8 187:19 | 247:8 249:22 | 319:19 320:7 | 385:21 386:22 |
| 187:23 188:3,6 | 250:8,25 252:9 | 324:9,13 | **think's**   233:18 |
| 189:4,7,11,21 | 259:9 263:1,9 | 325:12,14 | **thinking**   213:7 |
| 189:23 191:11 | 263:18 264:16 | 326:21 330:4 | 222:2,11 |
| 193:21 194:22 | 265:3,19 266:7 | 331:16 333:3 | 254:18 275:7 |
| 196:9,14,16 | 266:8,21 | 333:11 335:9 | 356:1,10 |
| 197:24 200:12 | 267:16 269:14 | 337:23 339:8 | **thinks**   189:5 |
| 200:19 201:3 | 270:3 272:12 | 339:10,12,21 | 306:1 373:19 |
| 201:15,22 | 272:16,20,22 | 340:2,9,11,17 | **third**   82:19 |
| 202:15 207:19 | 272:24 273:5 | 340:19,20,22 | 85:23 161:6 |
| 210:17,23 | 273:16 274:8 | 343:7 344:14 | 177:19 195:5 |
| 211:8,8,19,24 | 275:2 276:2 | 348:18,22,25 | 195:10 226:12 |
| 212:3,5,10 | 277:11,14 | 349:4,11,16 | 360:14 |
| 213:23 214:15 | 281:8,20 | 350:3,11,16 | **thirty**   274:18 |
| 214:17,20 | 282:15 283:12 | 351:1,11 | 345:19,20 |
| 215:2,11,13,19 | 284:15 285:23 | 352:22 353:2,4 | 349:23 352:6 |
| 217:12 218:18 | 287:20 288:2,3 | 354:3,9 355:6 | 354:5 |
| 218:22 219:1 | 289:3 290:7,10 | 355:18,22,24 | **thorough**   56:9 |
| 219:23 220:1 | 290:11,13 | 356:2,6,8,10 | **thought**   66:16 |
| 224:14 226:19 | 291:2,4,7,9 | 357:16,25 | 73:20 109:3,5 |
| 228:17,20,23 | 292:2,3 293:7 | 361:9,11,18 | 109:6,9,12 |
| 229:1,6,9,11,17 | 293:14 294:8 | 362:21 363:5 | 202:11 212:20 |
| 229:19,23 | 295:2 296:6,7 | 363:11 366:8 | 212:22,25 |
| 230:7,11,13,14 | 297:11,22 | 368:1,4 369:20 | 213:14,15,18 |
| 230:17,22,25 | 298:17 299:8 | 369:23 370:10 | 213:21,25 |
| 231:4,13,19,24 | 300:13,25 | 370:12,20 | 214:9,10 |
| 232:1,12,13,18 | 301:3,18 302:3 | 372:2,16,18 | 257:13 292:21 |
| 232:21,22 | 302:19 304:9 | 373:19 374:9 | 344:10 361:19 |
| 233:23,25 | 305:12,16 | 374:13,18,25 | |

Appx_0996

**[thread - today]**

**thread**  272:10
273:8 284:17
284:20,23
289:17,21,24
290:16,21
291:5
**threads**  289:23
**three**  120:2
123:20 127:20
129:6,8 223:3
223:4 250:15
250:19 258:6
267:25 270:11
319:13
**throw**  40:20
**ticket**  31:5,10
31:21 32:2
34:18 82:19,22
83:1,8,11 84:2
84:9,10 85:15
86:7,14,25
87:22,25
223:19
**ticketed**  83:19
**tickets**  31:4,14
31:23 32:11
34:9,17 80:17
84:16 261:12
261:16,20,22
261:22,25
262:2,3,11
**tie**  59:10
**tik**  4:11
**tiktok**  43:18
46:22 47:20

48:16
**tim**  180:23
**time**  1:18 7:4
8:11 17:12
20:15 34:22
53:17,22,25
61:22 62:5
66:7 72:22
73:11 79:16,18
83:11 90:25
98:17 101:5
106:15 121:25
127:2,13 132:2
141:15 143:22
145:12 146:20
146:24 149:24
156:15,17,19
158:21,22,23
158:25 159:4
163:6,10 168:4
169:14,16
170:15 174:24
175:17 176:20
180:24,25
197:16 198:14
205:11 220:5
224:22 225:23
227:20 241:17
241:25 242:1
242:16,20
244:18 245:10
246:12,23
248:14 250:13
255:19,20
257:10 258:3,4

278:15,16
281:10 284:22
293:7 297:9
306:24 309:4
310:20 311:4
311:16 313:23
323:20 327:23
328:5 331:22
331:24 332:1
333:8,15
334:23 335:6
336:18 339:3
340:3,4,25
341:1 350:22
353:1,4,14,15
355:22,24
356:1,7,9
357:1 358:16
360:13 361:10
361:11,11,23
367:9 368:10
369:22,25
370:5 375:13
381:19 384:12
384:17
**timely**  125:12
125:13
**times**  30:11,17
34:16,17,18
35:9 51:6
52:22 91:19
95:1,7,8 96:21
152:9 168:13
168:14 169:22
170:1,5 176:23

201:6 253:5,7
253:9 257:7
279:14 286:24
288:12 290:2
302:24 305:14
342:3 384:1
**timing**  32:14
**tinder**  56:13
57:4,25
**tire**  309:1
341:20,21
342:1,1,3,11
348:15,16,19
348:23 349:3,6
349:6,9,11
350:4,12,15,20
350:24 351:2,6
351:7,9,10
355:13 365:14
365:16 367:10
386:1,2,4,6,7
386:10,15,15
**tires**  239:11
**title**  100:13,14
**titled**  143:25
145:6
**today**  9:21
12:21 18:17
34:23 109:13
117:3 130:14
176:12 339:19
353:15,20
359:19 363:1
368:21 369:18
370:8 385:21

**[today's - training]**

| | | | |
|---|---|---|---|
| **today's** 369:3 | **tolerate** 88:15 | 337:6,16 338:6 | 380:13 |
| **together** 85:22 | **tone** 200:21 | 349:2 376:6 | **trainer** 120:24 |
| 111:6,8,11 | **took** 15:7 44:7 | 383:10 385:11 | 121:1 |
| 274:9 276:22 | 73:1 81:20 | **track** 101:11,13 | **trainers** 284:15 |
| 288:14 | 99:3 118:18 | 282:5 | 285:14 287:13 |
| **tok** 4:11 | 129:6 147:3 | **traffic** 34:8,9 | 287:21 |
| **told** 10:24 | 167:24 246:5 | 85:15 86:25 | **training** 50:6 |
| 33:20,25 39:5 | 315:6 336:20 | 87:6,12 153:20 | 65:4 97:19,22 |
| 39:8 58:13 | 359:21 371:24 | 155:2,4,10,16 | 98:3,9,14 |
| 63:24 66:7 | **tools** 45:22 | 155:20 212:4 | 100:20,21 |
| 69:25 70:1,4 | **top** 76:25 82:19 | 218:15,19,23 | 101:6,21 102:7 |
| 70:18 71:21,22 | 142:15 163:6 | 219:2 223:13 | 102:9,12,20,22 |
| 79:5 82:22 | 195:5,10 | 232:5,7,9,15,23 | 105:4,7,15 |
| 163:14,17,21 | 265:20 279:19 | 233:1,15 | 106:19,20 |
| 163:24 164:3,5 | 371:13 | 267:24,25 | 107:8,14,16,19 |
| 165:8 166:1,5 | **topics** 193:16 | 319:9 321:23 | 107:23 108:3 |
| 168:6 173:8 | **torture** 336:25 | 323:11 330:19 | 108:21 109:7 |
| 175:12 176:3,4 | **total** 272:10 | **train** 108:11 | 110:5,8,13,18 |
| 177:4 184:6 | **totally** 267:13 | 109:18 172:15 | 110:22,24 |
| 190:19,22 | 336:21 339:12 | 190:25 217:18 | 111:1,5,10,12 |
| 201:14,15,16 | 341:6 | **trained** 97:11 | 111:15,17,22 |
| 222:7 249:17 | **touch** 255:23 | 97:15 109:24 | 111:25 112:12 |
| 262:20 264:16 | 255:25 | 110:7 111:20 | 112:13,22,23 |
| 283:10 293:2 | **touched** 337:25 | 111:21 112:8 | 113:1,4,9,13,23 |
| 299:2 304:12 | **touching** | 113:16,20 | 114:15,17,19 |
| 304:15 331:17 | 337:23 | 114:3,6,14,21 | 135:23 140:20 |
| 332:13 351:11 | **tough** 9:24 | 141:23 157:5,9 | 140:22 141:2,5 |
| 352:10,13 | 10:10 | 157:21 172:19 | 141:7,17,21 |
| 353:21 356:2 | **town** 24:14 | 179:3 182:14 | 151:24 152:23 |
| 356:12,14,17 | **toyota** 312:4,19 | 183:12 193:13 | 153:4 157:22 |
| 359:19 360:12 | 313:5 323:17 | 194:4 195:2 | 177:1 179:5,9 |
| 360:15 368:21 | 324:24 325:1,9 | 205:8,9 208:1 | 187:6 190:10 |
| 369:6,9,11 | 326:8,10,13,14 | 212:12 215:13 | 191:2 193:15 |
| 373:22 375:4 | 329:9 331:1,1 | 216:20 218:5 | 194:7,11 205:2 |
| | 333:19 334:24 | 287:2,3,21 | 205:12 211:14 |

Veritext Legal Solutions
800-336-4000

**[training - tweets]**

| | | | |
|---|---|---|---|
| 212:7 213:2 | **traverse** 227:6 | **truck** 329:12 | 67:17 90:21 |
| 216:23 277:15 | 227:7,9 | 329:16,20 | 119:11,18,19 |
| 285:14,19,20 | **trevor** 23:19 | 330:2,8,12,17 | 122:10 181:9 |
| 286:2,5,23 | 28:11 297:23 | 350:13 | 182:19 184:16 |
| 287:15 380:15 | 297:24 298:11 | **truck's** 329:22 | 184:18 257:17 |
| 380:17,19,24 | **trial** 383:5 | 330:2,18 | 297:16 309:1 |
| **trainings** | **trick** 56:8 | **true** 88:15 | 316:19,22 |
| 111:18,18 | 90:21 144:20 | 361:3 388:9 | 339:5 352:17 |
| 112:7 | 147:21 162:10 | 389:5 391:8 | 360:22 361:15 |
| **transcriber** | 317:25 318:1 | **truth** 9:5,5,6 | 362:10 365:5 |
| 389:1 | **tried** 33:19 | **try** 10:3 12:13 | **tuesday** 1:17 |
| **transcript** 8:2 | 165:13 298:17 | 15:14,16 16:11 | **tumblr** 56:12 |
| 12:1,9 18:3 | 299:13 338:11 | 46:19 51:8 | 56:25 |
| 389:3,5 391:5 | 345:4 357:16 | 59:17 122:7 | **turbotax** |
| 391:8 | 360:19 367:10 | 126:3,17,18 | 117:11,15,17 |
| **transcriptionist** | 377:12,20 | 127:9,12 128:1 | 117:21 |
| 388:8 | **tries** 229:9 | 128:12,20 | **turn** 17:11 |
| **transfer** 25:2 | **trip** 148:7,8,10 | 130:23 132:20 | 23:22 158:5 |
| 25:13 | 148:10,11,12 | 158:18 164:14 | 194:2 223:7 |
| **transferred** | 253:11,25 | 205:25 213:4 | 344:17 |
| 25:1,6 | 258:11,11 | 219:15,16,18 | **turned** 85:16 |
| **translation** | 262:8 265:20 | 228:4,10,20 | 223:11 295:22 |
| 308:7 | 267:9 270:2,7 | 229:18 230:6,8 | 295:24 |
| **transportation** | 270:8,11 | 230:16,17 | **turning** 223:10 |
| 33:12 | **trips** 148:14,16 | 231:8,10,18 | 223:12 344:21 |
| **travel** 75:11 | **trooper** 351:19 | 234:25 246:16 | **tv** 316:23 |
| 129:4,5,7,11,12 | 352:10,17 | 335:16 338:12 | **tweet** 4:20 5:6 |
| 150:19,23,24 | 353:10 | 342:9,14,18,24 | 5:7 85:7,23 |
| 151:4 330:7 | **trouble** 125:10 | 343:4 377:16 | 86:9 197:20 |
| 383:12,24 | 125:18 347:8 | 377:18,25 | 198:24 199:6 |
| 384:7 385:10 | 370:24 | 378:16 379:3 | 200:7,22 |
| **traveling** 71:18 | **troubleshoot** | 383:2 | 202:17,20,23 |
| 163:25 164:12 | 121:7,11 | **trying** 9:21 | 203:1 |
| 232:7,11 342:8 | **troubleshooti...** | 12:17 46:1 | **tweets** 85:12 |
| 367:3 | 122:3 | 56:8 63:22 | |

Veritext Legal Solutions
800-336-4000

**[twelve - unsafe]**

**twelve** 284:18
**twenty** 125:14
207:21,22
271:10,11
274:18 277:19
277:20
**twice** 193:21
**twitch** 56:13
57:10
**twitter** 4:13,20
5:6,7 46:23
47:1 48:10,16
48:18 197:6,11
198:18,21
200:10,14,18
**two** 23:1 33:6
43:1 45:15
53:3 63:21
95:2,8,9 96:18
127:20 129:6,8
159:7 171:6,16
171:17 183:21
184:2,3 188:12
198:25 199:10
199:25 200:12
201:3,23,25
202:5 207:21
207:22 209:24
209:25 218:8
222:23 234:14
239:19 253:25
258:2,3,3,4,6
281:6 291:2,3
296:14 303:13
321:23 331:10

349:23 362:23
363:2,5 367:23
**tx** 1:21 2:15
3:14
**type** 52:5 201:2
305:10 306:25
**typed** 137:20
306:13,20
311:14
**typewriting**
388:7
**typically** 46:11
50:17 55:7
91:4 115:6
120:4 122:22
150:24 178:7
250:2,16
**typing** 305:15

**u**

**uber** 15:7,8
**uh** 12:11,11
**uhs** 12:11
**ulcer** 248:1
**ulcers** 247:24
**unable** 13:7
**uncle** 22:19,23
23:1 28:18
29:5 161:15
357:13,14
358:2 366:12
**unclear** 186:25
**uncles** 23:11
**uncommon**
140:9,14

**unconcerned**
213:10,13
**uncover** 67:2
**under** 8:5
12:20 18:3
23:21 66:20
96:17,19
122:17 149:20
149:21 158:4
164:10 165:2
178:12 179:13
179:15 192:21
208:9 213:20
216:3 303:16
**underneath**
341:24
**understand** 8:1
9:20,25 10:5,8
10:12 11:8
12:1,2,3,22,23
13:3,4,5,7,14
13:15,16,24
14:1,3 15:4,17
16:25 17:1,2
17:20 18:3,11
18:12,14,18
70:13 72:3
73:5 90:22
138:6 160:12
182:4 189:8
194:13 195:16
253:25 254:6,7
255:11 258:22
268:14,15,23
269:7 315:11

315:14 336:21
337:1 345:12
347:19,20
381:5
**understanding**
94:3 381:13,15
**understood**
13:20 135:20
**undistracted**
134:13
**united** 1:1 7:14
274:19 275:13
**unknowingly**
373:13
**unlock** 254:13
254:15 255:2
259:22 290:7
290:14 307:18
307:19,21
**unlocked**
255:13 259:17
307:16
**unlocking**
289:21 290:5
**unlocks** 290:15
**unpaid** 33:23
33:24 34:14
59:19
**unsafe** 155:11
155:14,15,19
155:23,25
158:24 227:22
229:17,17
238:12 330:16

Veritext Legal Solutions
800-336-4000

Appx_1000

**[unsavory - vehicle]**

unsavory   67:24
unstable
  257:17
unusual   294:3
upcoming
  119:12
updated   90:14
  168:19
updates   100:22
  280:23
upsell   122:10
upselling   74:1
  74:5
upside   197:17
  199:5 200:24
urgent   128:15
  131:2,3
use   38:23 39:6
  39:7 40:4 46:1
  49:1 54:3,7,15
  54:24 55:2,5,7
  55:12 59:7
  67:6 68:5,6,8
  86:4 101:25
  109:7 134:9
  136:10 141:10
  141:13,17,23
  142:3,7 145:8
  147:14,14
  148:3 149:5,9
  158:5 168:23
  190:11,14
  191:9 192:17
  192:25 193:3
  195:12 203:24

204:9,12 205:3
205:8,12,17,20
205:25 206:4
207:13 210:20
217:1,4,19
218:5,9,12,14
218:19,23
221:18 245:16
254:23 255:2
262:1 269:24
270:5,10
281:25 282:1
288:19 311:17
366:20 377:23
377:25 378:25
379:23 380:4,6
used   18:4 46:23
  54:12 56:11
  63:10 88:13
  144:16 148:16
  192:25 203:10
  203:17 206:19
  206:21 270:1
  300:10 305:17
  306:10 375:21
  380:9
username
  46:19
usernames
  46:20
uses   8:4 146:19
using   46:10
  54:20 77:17
  122:10 134:12
  134:14,16,18

136:14 139:22
165:23 166:2
168:3,5 173:9
216:7,8 217:13
270:2 378:5,10
379:21 381:5
usual   305:7
usually   181:8
  283:24
utilized   66:24

**v**

v   1:10 390:1
  391:1
va   3:7
vacation   53:20
  147:2,3
vague   80:14,15
variable   90:23
varies   119:5
  124:8 128:23
vary   53:1 124:1
vehicle   29:18
  31:16 34:22
  35:1,3,6 64:21
  64:22,24 72:4
  72:13,16,18,25
  87:13 95:18
  107:17 108:11
  108:18 109:16
  110:14 140:4
  143:16,18
  147:4 149:16
  150:9,10 153:7
  158:14 164:14
  164:15 165:4,9

166:10,19,22
168:17 216:9
216:10 217:7
218:6 220:22
221:3,9 225:18
226:5 251:6
259:4 276:10
308:18,21,25
312:7,9,11,17
314:5,19
316:14 319:23
320:4 321:1,13
321:17,24
322:14,16,23
322:25 323:3,4
323:9 326:16
327:4,7,10,13
327:16 328:5,6
328:8,11,12,14
332:25 333:23
333:25 334:1,2
334:22 335:21
336:2 338:24
339:14,15
341:7,24,24
343:15 344:11
357:11 360:25
364:14,16,20
364:24 365:9
367:8 376:2
378:19 379:22
380:5,7,10,11
380:12 381:21
386:13

**[vehicles - want]**

**vehicles** 158:11 196:4 212:4 225:20
**vein** 46:17
**vent** 290:13
**venues** 193:4
**veritext** 7:8,20
**version** 12:5 165:19 360:15
**versus** 42:16 146:13 203:24 384:7
**vibrate** 296:5,6
**vibrated** 259:10 296:8
**vibrating** 296:10
**video** 5:12,18 5:21,22,23 7:19 77:2 238:17,18,19 238:23 239:4 239:16,21 240:1,9 271:13 289:14 290:19 290:22,22 291:4,15 316:18,24 317:7,10,11,18 318:25 319:4,7 319:16,21 320:2 321:8,11 321:21 322:8 322:10 323:15 324:21 326:6

326:10 329:8 330:10 332:7 332:19 335:15 335:18 336:6 336:21 337:10 337:14 338:3 345:21 346:4 346:13,17,21 347:4,11,17,21 348:3,12 351:20 352:7 353:24 354:6 354:17,24 355:15 357:3 369:1 372:22
**videographer** 3:21 7:2 106:10,13 174:19,22 224:17,20 297:4,7 336:13 336:16 358:15 358:17,20 387:8
**videos** 148:2 216:9 289:10 378:18 382:3
**videotape** 12:9 18:4
**videotaped** 1:15
**videotaping** 11:24
**view** 113:5 166:9 290:14

**village** 285:23
**vine** 56:14 57:18 58:6,8
**violate** 84:5
**violation** 31:3 31:20 34:7,14
**violations** 34:9 82:9
**visible** 362:13
**visit** 79:11,13 119:15,17 121:11 169:24 171:1 176:23 280:9 367:4
**visited** 171:21
**visiting** 124:17 124:19,22 178:19,24
**visits** 75:10 122:1 169:12 171:3 174:11 176:5
**vista** 257:1
**voice** 17:13 136:10,14 137:22 139:22 218:9 305:10 305:11,17 306:11 307:4 308:7 311:13 311:17,24 314:13,25 321:12 370:7,9
**volume** 17:12

**vote** 202:16
**vs** 7:12

**w**

**w** 20:24
**wacco** 75:20 118:5 130:1,4 220:15,16
**wait** 197:7 304:18
**waited** 84:10
**waiting** 220:22 220:24 221:10
**waitress** 60:8
**wake** 242:6 243:8 250:1
**walk** 98:14 119:10 136:13 148:3 242:5 249:25 296:25 303:21,24 304:3 305:1,20 306:2,10,12,20 306:22 307:1 308:4,13,24 309:5,9,17 310:6 311:21 312:3 314:14 315:1
**walking** 199:1 199:11,25 201:7 202:1,4 236:18
**walnut** 2:14
**want** 10:11,21 11:15 18:15

**[want - wheel]**

23:8 26:13
29:8 43:6
56:24 61:7,8
71:9 73:18
74:16 77:23
78:2,8,19 81:3
81:15 87:9
89:25 90:2
93:3,4 95:16
106:18 124:19
131:9 135:6,11
136:25 151:3
156:4 174:15
182:20 201:11
238:25 239:3
269:4 291:10
293:4 300:9
302:25 317:9
321:11 332:5
332:16 337:5
339:19 350:2
353:23 354:19
354:20 366:25
**wanted**   25:11
50:5 73:19
77:15,19 78:13
78:15 260:24
260:25 277:4
292:10,18
304:20,24
313:23
**wanting**   61:9
**wants**   158:16
218:18

**ward**   359:2,6
**warrant**   85:19
**watch**   51:25
98:16 105:22
106:6 189:15
214:24,25
290:22 291:2,4
316:23 336:25
354:19,21
355:14
**watched**
105:19 290:20
**watching**
102:24 190:13
216:9 239:15
332:11 376:15
**way**   22:5 27:23
36:5,20 101:11
114:6 128:8
151:3 160:12
179:25 190:4,8
199:2 234:5
235:5,13,15
253:8 263:12
293:5 304:24
306:20 339:15
342:20
**ways**   175:23
291:2,3 377:12
**waze**   43:19,20
**we've**   11:23,24
18:2 57:22
89:17 102:21
251:6,7 254:4
358:17 369:2

**wear**   318:7
**wearing**   318:3
318:4
**weather**   158:10
163:12,15
218:16 319:3,6
**webinars**   50:18
**website**   70:9
74:14,17 88:20
101:19
**websites**
139:20
**wednesday**
292:19
**week**   72:24
73:12 77:3
109:16,17
115:6,10,12
118:1 119:4,7
119:8,12 151:2
151:11,12,13
172:25 173:15
173:16 199:2
273:24 292:13
375:14
**weekend**   147:8
148:13,16
150:12
**weekends**
115:11 150:15
**weekly**   177:24
**weeks**   73:1
281:6
**weighed**   373:8

**weird**   11:20,23
247:19
**welcome**
271:18
**went**   9:15
24:20 32:9
61:25 70:7
79:18 85:14
86:21 98:6
116:14 154:13
172:6,12
243:15,20
244:8,21 248:3
248:10 251:13
251:15 265:3
266:7,10,15
281:13
**west**   60:25
61:12,24 64:10
64:13,17 104:3
104:7,17
172:12 180:11
281:1
**western**   275:14
**what'd**   16:20
293:20 346:19
**whatnot**   81:7
**whatsapp**
56:13 57:8
58:4
**wheel**   5:19
218:13 334:15
335:1,8,11,13
337:22 338:14
343:25 354:11

**[wheel - work]**

| | | | |
|---|---|---|---|
| 360:22 362:7 | 269:16 271:6 | 374:1,5 379:9 | 96:7 156:13 |
| **when's**  156:15 | 271:11,19 | 382:15 383:4 | 162:19 172:3 |
| **where'd**  24:25 | 277:20,23 | 383:18,19 | 177:15 185:19 |
| 344:2 | 279:7 280:16 | 385:17,19 | 192:11 198:21 |
| **white**  2:5 4:3,5 | 297:2,10 | 387:2,5 | 201:18 215:9 |
| 8:14,14 9:11 | 305:22,25 | **widely**  194:1 | 224:14 271:12 |
| 9:16 12:5 | 306:5 317:4,8 | **wilger's**  241:24 | 279:6 280:15 |
| 14:14 17:6,7 | 319:1,5,18,22 | **wilgers**  20:23 | 296:24 297:3 |
| 17:10,15,17,19 | 320:3 321:9,22 | 20:23 28:4 | 319:17 328:4 |
| 17:24 18:1 | 322:9 323:16 | **window**  88:13 | 332:8 336:11 |
| 46:4,6 47:10 | 324:22 326:7 | 89:14,22 | 345:16 349:20 |
| 47:17,24 48:7 | 328:9 329:15 | 122:13 176:15 | 351:24 360:8 |
| 48:14 63:8 | 329:20,22 | 285:20 286:15 | 365:22 371:9 |
| 69:22 74:20,23 | 330:2,2,8,11,12 | **windows**  89:25 | 379:8 388:4 |
| 76:12 82:4 | 330:17,18 | **wing**  261:2 | **woke**  243:10 |
| 84:24 85:3 | 332:10,16,22 | **winston**  5:23 | 248:12,15,19 |
| 88:8 89:4,9 | 334:19,20 | 353:21 355:10 | **woman**  101:4 |
| 90:8 96:8 | 335:19 336:7 | 355:13 356:3 | **wonder**  374:19 |
| 106:16 114:9 | 336:10,19 | 360:10,12,15 | **wondering** |
| 156:14 162:20 | 337:11 345:17 | 365:19,25 | 177:17 |
| 166:13,17 | 345:20,22 | 366:6,9,24 | **woods**  1:19 3:5 |
| 172:1,4 174:15 | 346:5,14,18,22 | 367:2 369:18 | 7:17 |
| 175:1 177:16 | 347:5,12,18,22 | 383:23,23 | **word**  66:13 |
| 185:20,24 | 348:4,13 | **winston's** | 208:9 240:5 |
| 192:13 197:2,4 | 349:21,24 | 353:23,24 | **worded**  53:6 |
| 197:9,10 | 350:1 351:25 | **wise**  333:3 | **wording** |
| 198:23 201:19 | 352:3,4,8,10,10 | **wish**  188:17 | 359:21 |
| 207:21,23 | 352:17 353:10 | 339:25 371:23 | **words**  12:12,18 |
| 215:10 224:15 | 354:3,7,18 | 373:9 382:23 | 88:24 89:6 |
| 224:23 229:5 | 355:1,16 357:4 | **witness**  7:5,25 | 163:1 164:7,19 |
| 238:24 239:5 | 358:15,22,23 | 8:1,24 9:4 47:9 | 164:25 182:9 |
| 239:11,17,22 | 359:4 360:9 | 47:16,23 48:6 | 184:9,15 236:9 |
| 240:2,10 | 365:23 366:18 | 48:13 63:7 | **work**  36:20 |
| 258:18,19 | 366:22 368:16 | 69:21 76:11 | 40:8 42:13 |
| 261:9,11 269:6 | 371:10 372:23 | 82:3 88:7 90:7 | 43:5,6 45:1 |

Appx_1004

**[work - year]**

| | | | |
|---|---|---|---|
| 46:8,10,11,14 | **workday**  127:2 | 223:22 310:13 | 298:24 357:20 |
| 54:15 60:8 | 127:3,20 | 311:11 | **y'all's**  181:10 |
| 64:1,4,22 | **workdays** | **wrecked** | **yahoo**  39:25 |
| 70:14,16,22 | 119:4 | 197:14 198:1,2 | 264:3 |
| 72:4 73:12 | **worked**  59:18 | 198:4,8 | **yammer**  54:10 |
| 74:3 77:19 | 64:12 65:13 | **wrench**  341:25 | 54:12 |
| 93:22 103:18 | 240:24 241:21 | **write**  27:19 | **yards**  329:6 |
| 109:16,16,17 | 241:22 | 88:19 | **yeah**  13:23 |
| 115:2,5 121:5 | **working**  66:4 | **writing**  350:8 | 15:15 52:18 |
| 122:5,17 123:5 | 70:22 71:9 | 369:1 | 56:24 62:24 |
| 123:6,13,16 | 73:2 115:4 | **written**  8:9 | 79:25 83:15 |
| 130:22 148:10 | 121:8 124:13 | 180:1 367:2 | 87:12 93:15 |
| 150:14 161:11 | 243:4,12 | 368:22 | 98:2 107:12 |
| 161:13 178:8 | 278:15 | **wrong**  143:1 | 109:5,8,9 |
| 178:10 203:19 | **workplace**  52:9 | 146:23 223:10 | 111:10 124:18 |
| 203:24 204:4 | **works**  55:18 | 228:13,17 | 125:24 126:20 |
| 204:13 205:3,8 | 95:17 147:23 | 235:3,8,16 | 127:6,7,22 |
| 205:12,17,20 | 148:1 179:17 | 241:12 320:22 | 128:17 131:14 |
| 205:25 206:3,4 | 211:11 254:11 | 320:24 324:17 | 133:21 142:23 |
| 206:10,17,25 | **world**  193:24 | 324:19 329:16 | 144:4 147:6 |
| 209:5,10,13,18 | **world's**  88:12 | 329:21 339:8 | 151:14 156:1 |
| 209:20 220:14 | **worn**  158:11 | 339:11,21 | 163:24 164:21 |
| 220:16 221:18 | **worried**  57:23 | 340:10 360:16 | 183:5 234:1 |
| 240:23 242:19 | 93:3 | 385:5 | 241:16 242:14 |
| 244:24 245:3 | **worry**  147:21 | **wrote**  165:16 | 255:3,24 |
| 249:9 252:7,25 | 238:17 | 198:12 | 256:11 271:13 |
| 254:21 255:2,4 | **worse**  236:20 | **x** | 273:19 293:3 |
| 255:5 273:24 | 236:24 237:2,3 | **x**  4:1,7 5:1 6:1 | 296:24 299:1 |
| 274:1 278:18 | **worth**  274:5,22 | 350:4 | 299:10 306:3 |
| 281:2,22 282:9 | 275:9,19 | **y** | 317:5,20 |
| 282:18 284:21 | 276:14 | **y'all**  62:21 68:6 | 320:13 330:6 |
| 284:21 285:8,9 | **would've**  16:16 | 121:4 122:12 | 348:9 |
| 287:10,15 | 294:5 309:13 | 174:15 256:11 | **year**  19:15 |
| 354:13 358:1 | **wreck**  140:4 | 260:22 283:15 | 23:23 24:20 |
| 377:1 | 198:10,15 | | 25:2,3,3,4,5,7 |

Appx_1005

**[year - zoom]**

25:12,21 32:15
33:4 49:21
52:13,19 59:14
91:1,3,4,18
92:15,18,19,20
92:22,23 93:1
93:7,12,18,20
93:22,22 94:13
94:19 95:12,13
100:4,6,7,9,10
100:23 152:12
183:17,19,20
224:5 373:4
380:9 381:22
**yearly**   380:20
**years**   20:7
30:23,23 34:6
34:6 95:10
194:2 202:13
**yellow**   363:19
384:8
**yes's**   12:14
**young**   9:16
18:9
**youtube**   148:2

**z**

**zero**   124:7
**zoom**   50:17
162:12

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.



**F O C U S**
F O R E N S I C S

# COLLISION RECONSTRUCTION
# ENGINEERING REPORT

Regarding:

The Estate of Nehemias Roderico Pivaral Santos v. Caylee Erin Smith and Eastman Chemical
Company
In United States District Court for the Northern District of Texas
Case No.: 3:22-CV-02714-K
Our File Number: 36-13811

Prepared for:
Eastman Chemical Company and Caylee Erin Smith

Prepared by:
Paul J. Montalbano, P.E.
Focus Forensics, LLC
1826 Henley Street
St. Cloud, FL 34771

September 28th, 2023

_____
Paul J. Montalbano, P.E.
ACTAR #2727
Certified Accident Reconstructionist - SAE

> **EXHIBIT**
>
> **P**



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 3

OPINIONS AND CONCLUSIONS ................................................................................ 4

DISCUSSION ................................................................................................................ 6
    Police Report ......................................................................................................... 6
    Location .................................................................................................................. 6
    Scene Evidence ...................................................................................................... 7
    2021 Ford Explorer ................................................................................................ 8
    2011 Toyota Camry ............................................................................................... 9

ANALYSIS ................................................................................................................... 9
    Flat Tire Response ................................................................................................. 9
    Tire Mark Analysis ................................................................................................ 9
    Photogrammetric Analysis ................................................................................... 10
    Relevancy of Tire Marks ...................................................................................... 10
    Diagrams .............................................................................................................. 10
    Impact Alignment ................................................................................................. 11
    Toyota Camry Tire Replacement ......................................................................... 12
    Ford Digital Data ................................................................................................. 12
    Cell Phone Data ................................................................................................... 13
    Lateral Impact Location ....................................................................................... 13
    Plaintiff Theory of Impact Location ..................................................................... 13
    Defense Theory of Impact Location ..................................................................... 14
    Avoidance ............................................................................................................ 14

CITATIONS ................................................................................................................ 15

BASIS OF REPORT ................................................................................................... 17

ATTACHMENTS ........................................................................................................ 19

Appx_1011

**FOCUS FORENSICS**

## INTRODUCTION

On Saturday, April 30th, 2022, at approximately 3:48 p.m., a single vehicle versus pedestrian collision occurred on northbound Interstate 45, just south of Bonner Avenue, in Angus, Navarro County, Texas. A 2011 Toyota Camry was parked, partially in the inside travel lane of northbound Interstate 45 due to a left front flat tire. The Toyota occupants were Ms. Evelyn Moreno (age 19), Mr. Nehemias Pivaral Santos (age 19), Ms. Dina Yamileth Regalado Soto (age 23), Mr. Melvin Alexander Diaz Fuentes (age 21), and Mr. Erick Jeremias Pivaral Santos (age 21). A 2021 Ford Explorer, driven by Ms. Caylee Erin Smith (age 23), was traveling northbound on Interstate 45 when it struck Mr. Nehemias Pivaral Santos, resulting in fatal injuries.

Paul J. Montalbano, P.E. of Focus Forensics was retained by Eastman Chemical Company on April 26th, 2023, to perform an independent collision reconstruction engineering analysis. This report will express the opinions and conclusions reached during the course of the collision reconstruction analysis, and the basis for these opinions and conclusions.

All opinions are expressed to a reasonable degree of engineering certainty based on the evidence in this case and the relevant application of reliable methods accepted within the collision reconstruction engineering community.  This report is based on the information available to us at this time, as described in the Basis of Report section.  Should additional information become available, we reserve the right to determine the impact, if any, of the new information on our opinions and conclusions.

Appx_1012



## OPINIONS AND CONCLUSIONS

1. The subject Toyota, originally driven by Ms. Evelyn Moreno, experienced a left front tire failure while traveling northbound on Interstate 45.

2. While a flat tire reduces the handling characteristics of a vehicle, it does not eliminate the ability to steer the vehicle off of the roadway, as evidenced by Ms. Evelyn Moreno's ability to come to a controlled final rest on the left side of the roadway. Steering to the right was equally possible.

3. There was more than sufficient space to fully vacate the travel lanes and park the 6-foot-wide Toyota either on the 7 to 8-foot wide inside paved shoulder, the 10 to 11 foot-wide outside paved shoulder, or the 50-foot-wide traversable grass shoulder.

4. Rather, Ms. Evelyn Moreno parked the Toyota still partially within the left travel lane, occupying approximately 2.1 feet (not accounting for the side mirror) of the 11.6-foot-wide inside northbound travel lane, providing approximately 9.5 feet of remaining available space for northbound traffic to pass the Toyota.

5. Given the Ford's width of approximately 6.6 feet, there was sufficient room for the Ford to pass the Toyota within the remaining available 9.5-foot width of the left lane. It was not necessary for the Ford to change lanes in order to pass the parked Toyota.

6. The Ford did not contact the Toyota.

7. The Ford contacted Mr. Nehemias Roderico Pivaral Santos's head while he was actively bending over, with his head extending beyond the parked Toyota, and into the inside northbound travel lane, approximately 1 foot into the path of the Ford.

8. The two tire marks photographed next to, or swerving away from the Toyota were *not* from the subject Ford Explorer, rather from a vehicle with smaller, thinner tires. The location and characteristics of these tire marks were indicative of one or more vehicles making an evasive swerving maneuver from left to right at the location of the parked Toyota.

9. There was no physical evidence or indication in the GPS data or the bearing data that the Ford was traveling or steered on or towards the left shoulder leading up to the incident location, as suggested by the plaintiff.

10. Regardless of the lateral position of the Ford at impact, Mr. Santos's head was extending *at least* 3.2 feet into the 11.6-foot-wide inside northbound travel lane, or *at least* 1.1 feet outboard of the right face of the parked Toyota, and directly into the path of northbound traffic; had Mr. Santos simply not bent over into the northbound travel lane, the incident would not have occurred.

Appx_1013



11. Impact occurred between 3:48:51 to 3:48:52 p.m. Central Daylight Time (CDT). The last text message Ms. Smith sent was at 3:48:43 CDT, or approximately 8 to 9 seconds prior to the collision. At that point in time, Ms. Smith was between 1,022 to 1,146 feet from impact.

Appx_1014



## DISCUSSION

**Police Report**

According to the Texas Traffic Crash Report prepared by Officer Danielle Lee-Winston of the Richland Police Department, the collision occurred on northbound Interstate 45 near mile marker 223, in Angus, Navarro County, Texas, on April 30th, 2022, at approximately 3:51 p.m. Conditions were reported as daylight, clear and dry. The posted speed limit was listed as 75 mph. There was no construction or workers in the area at the time of the crash and the roadway was described as straight and level.

The VIN number for the 2021 Ford Explorer was listed as 1FMSK7DH7MGB01430 and was operated by Ms. Caylee Erin Smith (age 23). The VIN number for the 2011 Toyota Camry was listed as 4T4BF3EK8BR212323, with the following listed occupants:

1.  Mr. Nehemias Roderico Pivaral Santos (age 19) – listed as pedestrian
2.  Ms. Dina Yamileth Regalado Soto (age 23) – listed as back left seat occupant
3.  Mr. Melvin Alexander Diaz Fuentes (age 21) – listed as back center seat occupant
4.  Mr. Erick Jeremias Pivaral Santos (age 21) – listed as back right seat occupant

A not-to-scale police diagram generally documented the collision location (Figure 1).

**Location**

Astronomical records indicated that the sun was in the southwestern sky at an altitude of approximately 52 degrees, and an azimuth angle of approximately 252 degrees clockwise from due north (Figure 2). Historical weather reports indicated that there was no precipitation around the time of the collision, clear skies and approximately 86 degrees Fahrenheit. Sun and weather were not contributing factors to this collision event.

Interstate 45 in the area of the crash was a 6-lane divided highway generally running north and south, serving as a major thoroughfare between Houston and Dallas (Figure 3 to Figure 16). The incident occurred approximately 1.1 miles south of exit 225 (Bonner Avenue). Northbound Interstate 45 in the area of the incident was flat and level. The northbound approach was straight for approximately 0.33 miles prior to the incident. Approximately 0.5 miles prior to the incident, the northbound direction curved to the left by approximately 13 degrees over the course of approximately 0.17 miles (Figure 17), providing a straightaway to the accident location for approximately 1/3rd of a mile, or over 1500 feet. The speed limit was 75 mph for the area of the collision (Figure 18).

Appx_1015



CAC Forensics, LLC photographed, measured and drone-mapped the scene of the collision on April 26, 2023, or approximately 1 year after the crash (Figure 19 to Figure 21). Based on historical Google aerials (Figure 22 to Figure 23), historical aerial flyover images (Figure 24) and historical Google Street View images (Figure 25 to Figure 41), the roadway was unchanged from the time of the collision to CAC's site inspection and mapping. Each direction consisted of three 11 to 12-foot-wide travel lanes, one 7 to 8-foot wide inside paved shoulder, and one 10 to 11-foot-wide outside paved shoulder with 50-foot-wide traversable grass shoulders. Each direction was separated by a 3.5-foot-tall median barrier wall. Because of the median barrier wall and curvature of the roadway to the left on the northbound approach, an unlimited sightline was not established for the inside northbound travel lane approach until approximately 1742 ft, or 0.33 miles prior to the incident location, or approximately 16 seconds at the speed limit of 75 mph, or approximately 13 seconds at a speed of approximately 90 mph.

**Scene Evidence**

Roadway physical evidence, final rest positions and body fluid was extensively documented from photographs taken on scene, body camera videos, post-incident investigation and historical aerial and street view documentation.

- At final rest, Mr. Nehemias Roderico Pivaral Santos's body was on top of the solid yellow line dividing the inside northbound through lane and left shoulder, with his head and torso on the inside shoulder, and his legs from the knees down within the inside northbound travel lane (Figure 42 to Figure 43). A blood trail from the right side of the inside northbound travel lane leading towards the shoulder and Mr. Nehemias Roderico Pivaral Santos's final rest indicated that Mr. Nehemias Roderico Pivaral Santos was moved from an initial rest position from within the inside northbound travel lane towards the shoulder, consistent with witness testimony. It was uncertain as to the exact orientation or position of Mr. Nehemias Roderico Pivaral Santos's initial rest position within the inside travel lane prior to being moved, however, it was generally located on the right half of the inside northbound travel lane, directly adjacent to the rear axle of the Toyota, or on top of the most northeastern blood mark.

- The Toyota had a flat left front tire, with the factory jack extended and located underneath the driver's door rocker panel (Figure 44 to Figure 45). The Toyota appeared to have been lunged forward by a few inches, tilting the extended jack forward. There was no lateral movement of the Toyota based on this evidence.

Appx_1016



- A tire marking, consistent with rolling on a flat tire, was seen leading up to the Toyota's left front tire and was photographed to have originated from the inside northbound travel lane (Figure 46 to Figure 51). The tire mark continued from the inside northbound travel lane to the Toyota's rest position, with the Toyota partially on the shoulder and partially within the northbound travel lane. There was no lateral offset from the final rest position of the Toyota and the flat tire mark, indicating no lateral movement of the Toyota from impact.

- A faint swerving mark was visible, starting in the inside northbound travel lane, swerving to the right prior to the Toyota's rest position (Figure 52 to Figure 55).

- A secondary parallel swerving tire mark appeared, starting at the Toyota's right rear, located approximately 1 foot to the shoulder-side of the previously discussed swerve mark (Figure 56 to Figure 63).

- The tire mark closest to the shoulder consisted of *three* distinct tread grooves within the marking (Figure 64).

- The tire mark to the right of the 3-groove tire mark did not display distinct tread groove patterns within the mark but was of similar width.

- The Ford came to a controlled final rest approximately 520 feet north of the Toyota's parked position.

**2021 Ford Explorer**

Manufacturer specifications for the 2021 Ford Explorer (VIN: 1FMSK7DH7MGB01430) indicated an XLT trim with four doors, a 4-cylinder turbo-boosted gasoline engine and rear wheel drive. The overall length was 16.6 feet, overall width was 6.6 feet, overall height was 5.8 feet and wheelbase was 9.9 feet. The Ford's door-jam sticker indicated the standard tire size was 255/65R18, indicating 10-inch-wide tires. All four of the Ford's installed tires were 265/65R18, indicating the actual tire widths were approximately 10.4-inches wide.

The Ford Explorer had localized and distinct contact damage to its left front corner and left side. All contact damage to the Ford was less than 4 feet in elevation.

- The only damage to the front face of the Ford was at the Ford's left front headlight, spanning in height from 3 to 3.5 feet from the ground (Figure 65). There was no front-face contact damage below 3 feet from the ground.

Appx_1017



- There was a small, localized, and circular contact area to the left front corner of the hood of the Ford, just at and above the left front headlight (Figure 66 to Figure 69). The direct contact damage extended approximately 1 foot inboard from the left side of the Ford.

- The left front sheet metal fender was peeled out and crumpled rearward with visible blood and body matter on the inside and outside of the fender (Figure 70 to Figure 72).

- There was a gap of approximately 9.0 feet in contact evidence from the left front corner of the Ford to the left rear quarter panel of the Ford (Figure 73 to Figure 74). The left rear quarter panel of the Ford exhibited direct contact in the form of dents, scuffing and body matter transfer (Figure 75 to Figure 81).

- All tires of the Ford Explorer had *four* tread grooves within their tread width (Figure 82).

**2011 Toyota Camry**

Manufacturer specifications for the 2011 Toyota Camry indicated a base model, four-door, 4-cylinder gasoline engine and front wheel drive. The overall length was 15.8 feet, overall width was 6.0 feet, overall height was 4.8 feet and wheelbase was 9.1 feet.

The Toyota Camry had damage and body matter transfer on the rear bumper, rear trunk lid, right rear taillight, right rear quarter panel and right C-pillar, consistent with post-impact contact with from Mr. Nehemias Pivaral Santos's body (Figure 83 to Figure 87).

**ANALYSIS**

**Flat Tire Response**

The subject Toyota, originally driven by Ms. Evelyn Moreno, experienced a left front tire failure while traveling northbound on Interstate 45. While a flat tire reduces the handling characteristics of a vehicle, it does not eliminate the ability to steer the vehicle off of the roadway, as evidenced by Ms. Evelyn Moreno's ability to come to a controlled final rest on the left side of the roadway. Steering to the right was equally possible. There was more than sufficient space to fully vacate the travel lanes and park the 6-foot-wide Toyota either on the 7 to 8-foot wide inside paved shoulder, the 10 to 11 foot-wide outside paved shoulder, or the 50-foot-wide traversable grass shoulder.

**Tire Mark Analysis**

The subject Ford Explorer's tires consisted of *four* tread grooves (Figure 88), conclusively indicating the tire mark closest to the shoulder with *three* tread grooves was unrelated to the Ford's

Appx_1018



movements. However, the tire mark to the right of the 3-groove tire mark did not display distinct tread groove patterns within the mark, requiring further analysis of its relevancy to the Ford's movements.

## Photogrammetric Analysis

Photogrammetry is a well-known, peer-reviewed, highly validated engineering methodology used to reconstruct positional and measurement data from photographs and videos. There are various types of photogrammetric analysis, including graphical methods, scaling methods, photo-overlay or reverse projection, rectification and standard or traditional photogrammetry [1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17].

Based on four different types of photogrammetric analysis performed (Figure 89 to Figure 113):

- The Toyota was occupying approximately 2.1 feet (not accounting for the side mirror) of the 11.6-foot-wide inside northbound travel lane, providing approximately 9.5 feet of remaining available space for northbound traffic to pass the Toyota.
- The tire mark with no discernable tread grooves was approximately 6.7 inches wide, with a known tolerance / accuracy of plus or minus 0.25 inches.

## Relevancy of Tire Marks

The Ford was photo-scanned by CAC, LLC, providing a 3-dimensional point cloud with an average residual, or accuracy, of plus or minus 1/8th of an inch [18,19,20,21,22,23]. The width of the tread patch of the left side tires that physically contact the ground was measured to be approximately 8.4 inches wide (Figure 114 to Figure 117), or approximately 1.7 inches *wider* than the physical tire marks on the roadway. Therefore, the two tire marks photographed next to, or swerving away from, the Toyota were *not* from the subject Ford Explorer, rather from a vehicle with smaller, thinner tires. The location and characteristics of these tire marks were indicative of one or more vehicles making an evasive swerving maneuver from left to right at the location of the parked Toyota.

## Diagrams

2-dimensional overhead diagrams were constructed, demonstrating the final rest positions and relevant physical evidence on the roadway reconstructed from Photogrammetry analysis (Figure 118 to Figure 121).

Appx_1019

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

## Impact Alignment

Contact matching is a critical component of accident reconstruction, whether it is aligning the damage of two vehicles, or aligning the damage between a vehicle and a human body, in order to determine the relative positions and/or orientations of the two objects at impact. The Ford exhibited localized circular contact damage to its left front headlight at elevation ranging from 3.0 to 3.5 feet from the ground and an inboard depth of approximately 1 foot, with no underlying elevated contact damage directly below it. The contact damage was circular in nature, with a contact radius consistent with the size of a head. There was blood and body fluids / matter within the round contact damage, specifically to the pointed leading edge of the left front fender of the Ford. There were pieces of skull and brain matter found on the roadway from Mr. Nehemias Roderico Pivaral Santos, consistent with the testimonial evidence that Mr. Nehemias Roderico Pivaral Santos was struck on the right side of the head by the Ford. Because all frontal contact damage to the Ford was exclusive to an elevation between 3.0 to 3.5 feet from the ground, with a lateral intrusion of approximately 1 foot, with no underlying damage to the front bumper below 3 feet in elevation, and because of the corresponding transfer onto the Ford's contact area, it was concluded that Mr. Nehemias Roderico Pivaral Santos was actively bending over at the time of impact, with *only* his head sticking out in front of the approaching Ford, with the right side of his head exposed to the oncoming Ford, and his body, torso and legs outside of the Ford's path. Had Mr. Nehemias Roderico Pivaral Santos been kneeling with his head vertically in line with his body, there would have been body to front bumper contact and resulting contact damage to the front bumper of the Ford below 3 feet in elevation. Additionally, Mr. Nehemias Roderico Pivaral Santos would have been thrown forward and likely been run over by the left side tires of the Ford if his body was inboard of the Ford's path. Instead, Mr. Nehemias Roderico Pivaral Santos was rotated and thrown diagonally away from the Ford, and subsequently struck the back right corner of the parked Toyota. Therefore, at impact, Mr. Nehemias Roderico Pivaral Santos was actively bending over with his head extended beyond his center of gravity, and his head extending outward of the parked Toyota, into the northbound travel lane, breaching the path of the Ford by approximately 1 foot. (Figure 122 to Figure 132). This was consistent with the testimony of Caylee Erin Smith and Erick Jeremias Pivaral Santos, both stating that Mr. Nehemias Roderico Pivaral Santos was in the process of bending over or picking something up at the time of impact.

Appx_1020

**FOCUS**
F O R E N S I C S

**Toyota Camry Tire Replacement**

The owner's manual of the Toyota Camry indicated the removal of 3 items before getting access to the spare tire (Figure 133 to Figure 134):

1. Loosen and remove the retaining nut holding down the spare tire cover (carpeted pad).
2. Remove spare tire cover (carpeted pad covering spare tire).
   a. The jack handle and wheel nut wrench are located on the underside of the spare tire cover.
   b. The jack is located on the right side of the spare tire.
3. Loosen and remove bolt and spacer holding down spare tire.
4. Lift and remove spare tire.

**Ford Digital Data**

The airbag control module (ACM) of the Ford was imaged, however, because the contact with Mr. Nehemias Roderico Pivaral Santos did not meet the minimum change in speed requirement of 5 mph within a 150 millisecond time frame, it did not record any data, further corroborating that there was no contact with the Toyota.

The infotainment system of the Ford was imaged, providing gear shift data, call log data, track points and speed data for the day of the collision. The track point data contained GPS position and speed data at 1-second intervals, providing data for just shy of 40 miles of travel prior to impact (Figure 135 to Figure 139). The data indicated that the Ford was traveling up to approximately 90 mph leading up to impact, with a recorded speed reduction down to approximately 86 mph just prior to impact. Impact occurred between 2:48:51 to 2:48:52 p.m. Central Standard Time (CST) (Figure 140 to Figure 141), or between 3:48:51 to 3:48:52 p.m. Central Daylight Time (CDT).

The track point data from the infotainment system consisted of bearing data, providing the relative angle counterclockwise from due north in degrees (Figure 142 to Figure 146). The data was consistent with a parallel orientation with the roadway leading up to the collision location, followed by a 3-degree swerve to the right around the location of impact. There was no indication within the bearing data that the Ford drifted to the left shoulder prior to the incident. Additionally, there was no documented positional deviation from the left northbound travel lane towards the left shoulder in the GPS track point coordinates. While infotainment GPS data has been validated to be accurate within 3.5 to 7.5 feet [24,25,26], there was no observed lateral deviation in any of the data points prior to the incident location.

FOCUS
FORENSICS

There was no physical evidence or indication in the GPS data or the bearing data that the Ford was traveling or steered on or towards the left shoulder leading up to the incident location, as suggested by the plaintiff.

## Cell Phone Data

Ms. Smith's cell phone data was imaged, providing text records for the time leading up to the collision. The last text message Ms. Smith sent was at 3:48:43 CDT, or approximately 8 to 9 seconds prior to the collision. At that point in time, Ms. Smith was between 1,022 to 1,146 feet from impact.

## Lateral Impact Location

Because the two visible swerve tire marks photographed were concluded to be unrelated to the subject Ford's movements, and because GPS track point data can have a tolerance of 3.5 to 7.5 feet, it was indeterminate as to the *precise* lateral location of the Ford and Mr. Santos at the time of impact. However, two versions were presented within the testimony and both were incorporated into the analysis framework to assist the jury in determining which version was more probable.

## Plaintiff Theory of Impact Location

Plaintiff's theory indicated that the Ford drifted onto the left shoulder leading up to the impact location and implemented a swerve to the right, missing the Toyota by approximately "15 to 20 centimeters" [testimony of Mr. Erick Jeremias Pivaral Santos] or approximately 6 to 8 inches. Therefore, because the Toyota was approximately 2.1 feet into the travel lane, the left side of the Ford was no closer than approximately 2.6 feet from the yellow line when factoring in a 6-inch clearance, and Mr. Santos's head was at least 3.6 feet from the yellow line (given the 1-foot contact overlap). However, to be the most conservative and in favor for the plaintiff, the swerve angle away from the Toyota was accounted for when determining Mr. Santos's lateral head position at impact in order to allow for a 6-inch clearance between the Ford and the Toyota by the time the Ford reached the Toyota's position, after striking Mr. Santos's head, and accounting for the continued lateral movement of the Ford from its swerving movement from left to right. Implementing an emergency swerve from the left side shoulder at 86 to 90 mph would result in a maximum clockwise heading angle change of approximately 3.1 degrees clockwise from straight for the Ford [27,28]. When factoring in a 3.1-degree heading angle for the Ford from Mr. Santos's head contact to the right rear corner of the Toyota, the left front corner of the Ford could have been no closer than

Appx_1022



approximately 2.2 feet from the solid yellow line at impact in order to provide at least 6 inches of clearance by the time in reached the parked position of the Toyota (accounting for its 3.1-degree swerve to the right). Therefore, Mr. Santos's head was *at least* 3.2 feet into the northbound travel lane (Figure 147), or *at least* 1.1 feet outboard of the right face of the parked Toyota at impact, based on plaintiff's theory of impact location. Even under plaintiff's theory, had Mr. Santos not bent over into the travel lanes outboard of the parked position of the Toyota, the collision would not have occurred.

**Defense Theory of Impact Location**

Ms. Smith testified, "…I scooted over enough in my own lane to miss the vehicle", but she did not think she entered the middle travel lane. Modeling her lateral position to the right side of her travel lane, consistent with the GPS-indicated lateral position of the Ford, placed the left side of the Ford approximately 4.0 feet away from the yellow line (Figure 148). Because Mr. Santos's head was located approximately 1 foot inboard from the left side of the Ford at contact, then under this scenario, Mr. Santos's head was located approximately 5.0 feet into the 11.6-foot wide inside travel lane at impact, or approximately 2.9 feet beyond the right side of the parked Toyota. Had Mr. Santos not bent over into the travel lanes outboard of the parked position of the Toyota, the collision would not have occurred.

**Avoidance**

Contact overlap was only approximately 1 foot inboard of the Ford's path, so had either party moved laterally away from one another by 1 foot, the collision would have been avoided. Therefore, had the Ford driver swerved a foot farther to the right, the collision would have been avoided, however, it was indeterminate as to how much advanced notice Ms. Smith was provided of Mr. Nehemias Roderico Pivaral Santos actively bending over into her path. Conversely, had Mr. Nehemias Roderico Pivaral Santos simply not bent over with his head outboard of the parked Toyota's right side, then the collision would not have occurred, regardless of where the Ford was. In other words, regardless of the lateral position of the Ford at impact, had Mr. Santos simply not bent over into the northbound travel lane, the incident would not have occurred.



## CITATIONS

1) Kerkhoff, J., "Photographic Techniques for Accident Reconstruction," SAE Technical Paper #850248, 1985.

2) Smith, G., Allsop, D., "A Case Comparison of Single-Image Photogrammetry Methods," SAE Technical Paper Series # 890737, 1989.

3) Cliff, W., MacInnis, D., and Switzer, D., "An Evaluation of Rectified Bitmap 2D Photogrammetry with PC-Rect," SAE Technical Paper 970952, 1997

4) Fenton S., Kerr, R., "Accident Scene Diagramming Using New Photogrammetric Technique," SAE Technical Series #970944, 1997.

5) Hovey, C. and Toglia, A., "Four-Point Planar Homography Algorithm for Rectification Photogrammetry: Development and Applications," SAE Technical Paper 2013-01-0780, 201

6) Neale, W., Marr, J., and Hessel, D., "Video Projection Mapping Photogrammetry through Video Tracking," SAE Technical Paper 2013-01-0788, 2013

7) Pepe, M., Grayson, E., and McClary, A., "Digital Rectification of Reconstruction Photographs," SAE Technical Paper 961049, 1996

8) Breen, K.C., Anderson, C.E., "The Application of Photogrammetry to Accident Reconstruction," SAE Technical Series #861422, 1986.

9) Callahan, M., LeBlanc, B., Vreeland, R., and Bretting, G., "Close-Range Photogrammetry with Laser Scan Point Clouds," SAE Technical Paper 2012-01-0607, 2012

10) Fenton S., Kerr, R., "Accident Scene Diagramming Using New Photogrammetric Technique," SAE Technical Series #970944, 1997.

11) Manuel, E., Mink, R., and Kruger, D., "Videogrammetry in Vehicle Crash Reconstruction with a Moving Video Camera," SAE Technical Paper 2018-01-0532, 2018

12) Melcher, D., Rush, T., Przybyla, J., Keller, R., Montalbano, P. "Photogrammetric Reconstruction Methodology and Engineering Validation for Video-Captured Pedestrian Collisions," Proceedings of the 24th Annual Congress of the European Association for Accident Research and Analysis (EVU), 2015.

13) Pepe, M.D., et al., "Three Dimensional Computerized Photogrammetry and its Application to Accident Reconstruction," SAE Technical Series #890739, 1989.

14) Switzer, D. and Candrlic, T., "Factors Affecting the Accuracy of Non-Metric Analytical 3-D Photogrammetry, Using PhotoModeler," SAE Technical Paper 1999-01-0451, 1999.

15) Terpstra, T., Voitel, T., and Hashemian, A., "A Survey of Multi-View Photogrammetry Software for Documenting Vehicle Crush," SAE Technical Paper 2016-01-1475, 2016

16) Tumbas, N.S., et al., "Photogrammetry and Accident Reconstruction: Experimental Results," SAE Technical Series #940925, 1994.

17) Woolley, R.L., et al., "Determination of a Vehicle Crush from Two Photographs and the Use of 3D Displacement Vectors in Accident Reconstruction," SAE Technical Series #910118, 1991.

18) Carter, N., Hashemian, A., Rose, N., and Neale, W., "Evaluation of the Accuracy of Image Based Scanning as a Basis for Photogrammetric Reconstruction of Physical Evidence," SAE Technical Paper 2016-01-1467, 2016.

Appx_1024



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

19) Grimes, C., Roescher, T., Suway, J., Welcher, J., "Comparing the Accuracy of Image Based Scanning Techniques to Laser Scanners," SAE Technical Paper 2018-01-0525, 2018.

20) Miller, S., Hashemian, A., Gillihan, R., Helms, E., "A Comparison of Mobile Phone LiDAR Capture and Established Ground based 3D Scanning Methodologies," SAE Technical Paper 2022-01-0832, 2022.

21) Miller, S., Hashemian, A., Gillihan, R., Benes, S., "Accuracy and Repeatability of Mobile Phone LiDAR Capture," SAE Technical Paper 2023-01-0614, 2023.

22) Terpstra, T., Voitel, T., and Hashemian, A., "A Survey of Multi-View Photogrammetry Software for Documenting Vehicle Crush," SAE Technical Paper 2016-01-1475, 2016

23) Vinje, M., "Evaluating Apple's Integrated LiDAR devise for Indoor 3D Modelling," Master's Thesis in Ingeniørvitenskap & IKT, 2021.

24) Bortles, W., McDonough, S., Smith, C., Stogsdill, M., "An Introduction to the Forensic Acquisition of Passenger Vehicle Infotainment and Telematics Systems Data." SAE Technical Paper 2017-01-1437, 2017.

25) Vandiver, W., Anderson, R., "Analysis of Berla iVe Acquisitions of Vehicle Speed Data from Ford Sync Systems," SAE Technical Paper 2018-01-1442, 2018.

26) Vandiver, W., Anderson, R., "Analysis of Vehicle GPS and Derived Speed Data from Ford Sync Generation 3, Version 2 Systems Acquired with Berla iVe," SAE Technical Paper 2021-01-0903, 2021.

27) Muttart, J., "Influence of Age, Secondary Task and Other Factors on Drivers' Swerving Responses before Crash or Near-Crash Events," SAE Technical Paper 2015-01-1417, 2015.

28) Leakkaw, P., Panichpapiboon, S., "Real-Time Vehicle Maneuvering Detection with Digital Compass," IEEE Access 2021.3097752, 2021.

29) Muttart, J., "Development and Evaluation of Driver Response Time Predictors Based upon Meta Analysis," SAE Technical Paper 2003-01-0885, 2003.

30) Muttart, J., "Quantifying Driver Response Times Based Upon Research and Real Life Data," Proceedings in the Third International Driving Symposium on Human Factors in Driver Assessment, Training and Vehicle Design, 2005.

31) Toxopeus, R., Atalla, S., Kodsi, S., Oliver, M., "Driver Response Time to Midblock Crossing Pedestrians," SAE Technical Paper 2018-01-0514, 2018.

Appx_1025



## BASIS OF REPORT

1. Texas Crash Report 2200089, Texas Incident Report 2200089, emailed witness statement from Caylee Smith to Corporal Lee-Winston and five 911 calls.

2. Police photographs and videos
   a. 57 scene photographs
   b. 10 Ford Explorer photographs
   c. 18 body camera / dash camera videos of first responders

3. Inspection photographs and videos
   a. 297 Ford Explorer photographs from Axiom taken on 09/06/2022
   b. 401 Ford Explorer photographs from CAC taken on 09/06/2022
   c. 461 site inspection photographs and 4 drive through videos from CAC taken on 04/26/2023
   d. 476 Toyota Camry photographs from CAC taken on 06/22/2023

4. Miscellaneous photographs
   a. 13 photographs of Mr. Nehemias Pivaral Santos.

5. CDR and Infotainment system download data for the Ford Explorer.

6. Ms. Smith cell phone text records.

7. CDR download data for the Toyota Camry.

8. Aperture report dated July 10th, 2023.

9. Deposition transcripts:
   a. Dina Yamileth Regalado Soto
   b. Erick Jeremias Pivaral Santos
   c. Erick Jeremias Pivaral Santos
   d. Evelyn Moreno
   e. Melvin Alexander Diaz Fuentes
   f. Caylee Erin Smith

10. Published historical maps, satellite aerial, flyover aerial and street view images of the incident location.

11. Published astronomical and meteorological data for the day of the crash.

12. Manufacturer specifications and dimensional data for the 2021 Ford Explorer and 2011 Toyota Camry.

Appx_1026



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

13.  Owner's manual for the 2011 Toyota Camry.

14.  Publications listed under Citation section of this report.

Appx_1027



## ATTACHMENTS

1.  Police Diagram, not-to-scale (Figure 1)

2.  Scene / Location Images (Figure 2 to Figure 64)

3.  Ford Explorer (Figure 65 to Figure 82).

4.  Toyota Camry (Figure 83 to Figure 87).

5.  Analysis and diagrams (Figure 88 to Figure 148).

6.  Curriculum Vitae and Testimony History List for Paul J. Montalbano. P.E.

Appx_1028

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

FOCUS FORENSICS



Figure 1: Not-to-scale police diagram.



Figure 2: Sun position at time of collision.

Appx_1029

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS FORENSICS**



Figure 3: Google map.



Figure 4: Google map.

Appx_1030

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**F O C U S**
**F O R E N S I C S**



Figure 5: Google map.



Figure 6: Google map.

Appx_1031



Figure 7: Google map.



Figure 8: Google map.

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

# FOCUS
## FORENSICS



Figure 9: Google map.



Figure 10: Google aerial.

Appx_1033

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 11: Google aerial.



Figure 12: Google aerial.

Appx_1034

**FOCUS** FORENSICS



Figure 13: Google aerial.



Figure 14: Google aerial.

Appx_1035

**FOCUS** FORENSICS



Figure 15: Google aerial.



Figure 16: Google aerial.

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 17: Roadway curvature.



Figure 18: Speed limit 75 mph.

Appx_1037

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 19: CAC site inspection photograph taken on 04/26/2023.



Figure 20: CAC site inspection photograph taken on 04/26/2023.

Appx_1038

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 21: CAC site inspection drone mapping performed on 04/26/2023.



Figure 22: Historical Google Aerial dated January of 2022.

Appx_1039

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 23: Historical Google Aerial dated June of 2022.



Figure 24: Historical aerial flyover image taken on 11/28/2022.

Appx_1040

FOCUS FORENSICS



Figure 25: Historical Google Street View taken 1 month after crash.



Figure 26: Historical Google Street View taken 1 month after crash.

Appx_1041

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 27: Historical Google Street View taken 1 month after crash.



Figure 28: Historical Google Street View taken 1 month after crash.

Appx_1042

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 29: Historical Google Street View taken 1 month after crash.



Figure 30: Historical Google Street View taken 1 month after crash.

Appx_1043

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

FOCUS
FORENSICS



Figure 31: Historical Google Street View taken 1 month after crash.



Figure 32: Historical Google Street View taken 1 month after crash.

Appx_1044

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 33: Historical Google Street View taken 1 month after crash.



Figure 34: Historical Google Street View taken 1 month after crash.

Appx_1045

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 35: Historical Google Street View taken 1 month after crash.



Figure 36: Historical Google Street View taken 1 month after crash.

Appx_1046

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 37: Historical Google Street View taken 1 month after crash.



Figure 38: Historical Google Street View taken 1 month after crash.

Appx_1047

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 39: Historical Google Street View taken 1 month after crash.



Figure 40: Historical Google Street View taken 1 month after crash.

Appx_1048

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 41: Historical Google Street View taken 1 month after crash.

Figure 42: Body camera snips.

Appx_1049

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 43: Body camera snips.



Figure 44: Police photographs.

Appx_1050

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS**
F O R E N S I C S



Figure 45: Police photographs.



Figure 46: Police photographs.

Appx_1051

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 47: Police photographs.



Figure 48: Police photographs.

Appx_1052

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 49: Start of officer marked Toyota left front tire mark.



Figure 50: Police photographs.

Appx_1053

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 51: Police photographs.



Figure 52: Police photographs.

Appx_1054

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 53: Police photographs.



Figure 54: Police photographs.

Appx_1055

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 55: Police photographs.



Figure 56: Police photographs.

Appx_1056

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

FOCUS FORENSICS



Figure 57: Police photographs.



Figure 58: Police photographs.

Appx_1057

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 59: Police photographs.



Figure 60: Police photographs.

Appx_1058

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 61: Police photographs.



Figure 62: Police photographs.

Appx_1059

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 63: Police photographs – enhanced contrast.



Figure 64: Police photographs.

Appx_1060



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 65: Ford damage.



Figure 66: Ford damage.

Appx_1061

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 67: Ford damage.



Figure 68: Contact depth = 1 foot from the left side of the Ford.

Appx_1062

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 69: Ford damage.



Figure 70: Ford damage.

Appx_1063



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 71: Ford damage.



Figure 72: Ford damage.

Appx_1064

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 73: Ford damage.



Figure 74: Ford damage – Gap in damage of approximately 9.0 feet.

Appx_1065

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 75: Ford damage.



Figure 76: Ford damage.

Appx_1066



Figure 77: Ford damage.



Figure 78: Ford damage.

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS FORENSICS**



Figure 79: Ford damage.



Figure 80: Ford damage.

Appx_1068

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

# FOCUS
## F O R E N S I C S



Figure 81: Ford damage.



Figure 82: Ford tread pattern.

Appx_1069

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS

## Scene Photographs



Figure 83: Body material onto Toyota.

## Scene Photographs



Figure 84: Body material onto Toyota.

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

## Scene Photographs



Figure 85: Body material onto Toyota.

## Scene Photographs



Figure 86: Body material onto Toyota.

Appx_1071

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 87: Body material onto Toyota.



Figure 88: Police photographs comparing tread pattern.

Appx_1072

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 89: Graphical Photogrammetry.



Figure 90: Scalar Photogrammetry.

Appx_1073

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

FOCUS FORENSICS



Figure 91: Tire mark width with scalar photogrammetry.



Figure 92: Rectification Photogrammetry.

Appx_1074

FOCUS FORENSICS

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 93: Rectification Photogrammetry.



Figure 94: Rectification Photogrammetry.

Appx_1075

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 95: Rectification Photogrammetry.



Figure 96: Tire mark width with rectification photogrammetry.

Appx_1076

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**F O C U S**
F O R E N S I C S



Figure 97: Tire mark width with rectification photogrammetry.



Figure 98: Traditional Photogrammetry.

Appx_1077

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 99: Traditional Photogrammetry.



Figure 100: Traditional Photogrammetry.

Appx_1078

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 101: Traditional Photogrammetry.



Figure 102: Traditional Photogrammetry.

Appx_1079

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 103: Traditional Photogrammetry.



Figure 104: Traditional Photogrammetry.

Appx_1080

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

FOCUS
FORENSICS



Figure 105: Traditional Photogrammetry.



Figure 106: Traditional Photogrammetry.

Appx_1081

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 107: Traditional Photogrammetry.



Figure 108: Traditional Photogrammetry.

Appx_1082

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 109: Traditional Photogrammetry.



Figure 110: Traditional Photogrammetry.

Appx_1083

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

FOCUS FORENSICS



Figure 111: Tire mark width with traditional photogrammetry.



Figure 112: Tire mark width with traditional photogrammetry.

Appx_1084

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

FOCUS FORENSICS



Figure 113: Tire mark width with traditional photogrammetry.



Figure 114: 3D scan of Ford and tread width.

Appx_1085



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 115: 3D scan of Ford and tread width.



Figure 116: 3D scan of Ford and tread width.

Appx_1086

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023





Figure 117: 3D scan of Ford and tread width.



Figure 118: Scene evidence diagram.

Appx_1087

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023





Figure 119: Scene evidence diagram.



Figure 120: Scene evidence diagram measurements.

Appx_1088

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 121: Approximate initial rest of Mr. Santos.



Figure 122: Impact model match.

Appx_1089

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 123: Impact model match.



Figure 124: Impact model match.

Appx_1090



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 125: Impact model match.



Figure 126: Impact model match.

Appx_1091



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 127: Impact model match.



Figure 128: Impact model match.

Appx_1092

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

FOCUS FORENSICS



Figure 129: Impact model match.



Figure 130: Impact model match.

Appx_1093

F O C U S
F O R E N S I C S

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 131: Impact model match.



Figure 132: Impact model match.

Appx_1094



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



❶ Jack handle
❷ Wheel nut wrench
❸ Jack
❹ Spare tire

Figure 133: Toyota owner's manual instructions on replacing spare tire.



(1) Loosen and remove the nut.
(2) Remove the spare tire cover.
(3) Loosen and remove the bolt.
(4) Remove the spacer (with aluminum wheels).

Refer to the *Owner's Manual* for tire changing and jack positioning procedures.

Figure 134: Toyota owner's manual instructions on replacing spare tire.

Page 86 of 93

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 135: Berla track point data.



Figure 136: Berla track point data.

Appx_1096

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 137: Berla track point data.



Figure 138: Berla track point data.

Appx_1097

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 139: Berla track point data.



Figure 140: Time stamp just before collision.

Appx_1098

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 141: Time stamp just after collision.



Figure 142: Ford bearing data in degrees CCW from due north.

Appx_1099

Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**FOCUS** FORENSICS



Figure 143: Ford bearing data in degrees CCW from due north.



Figure 144: Ford bearing data in degrees CCW from due north.

Appx_1100



Figure 145: Ford bearing data in degrees CCW from due north.



Figure 146: Ford bearing data in degrees CCW from due north.



Figure 147: Plaintiff version.



Figure 148: Defendant version.

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
 2
            CIVIL ACTION NO. 3:22-CV-02714-K
 3

 4  ERICK RODERICO PIUARA GONZALEZ,        )
    Individually and as Special            )
 5  Administrator of the Estate of         )
    NEHEMIAS R. PIVARAL SANTOS, DECEASED,  )
 6  ERICK SANTOS and EVELYN MORENO         )
                                           )
 7  VS.                                    )
                                           )
 8  CAYLEE ERIN SMITH and EASTMAN CHEMICAL )
    COMPANY                                )
 9

10

11      -------------------------------------------

12          ORAL AND VIDEOTAPED DEPOSITION OF

13                   JULIO BONILLA

14                  OCTOBER 31, 2023

15      -------------------------------------------

16              ORAL AND VIDEOTAPED DEPOSITION OF JULIO

17  BONILLA, produced as a witness at the instance of the

18  Defendants, and duly sworn, was taken in the

19  above-styled and -numbered cause on the 31st day of

20  October, 2023, from 1:00 p.m. to 2:53 p.m., before

21  Natasha Duckworth, a CSR in and for the State of Texas,

22  reported by machine shorthand at the offices of Freeman

23  Mills, PC, 12222 Merit Drive, Suite 1400, Dallas, Texas,

24  pursuant to the Federal Rules of Civil Procedure and the

25  provisions stated on the record or attached hereto.
```

**EXHIBIT Q**

```
 1                      A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4       MR. JACOB D. WHITE
         TAYLOR KING & ASSOCIATES, P.A.
 5       410 N. Thompson Street
         Suite B
 6       Springdale, Arkansas 72764
         Telephone:  479.935.1761
 7       Facsimile:
         E-mail:  Jacobwhite@taylorkinglaw.com
 8

 9
     FOR THE DEFENDANTS:
10
         MR. BRIAN L. BUNT
11       FREEMAN MILLS, P.C.
         2020 Bill Owens Parkway
12       Suite 200
         Longview, Texas 75604
13       Telephone:  903.295.7200
         Facsimile:  903.295.7201
14       E-mail:  Bbunt@freemanmillspc.com

15

16   ALSO PRESENT:

17       Kevin Dill, video technician

18

19

20

21

22

23

24

25
```

```
1                       I N D E X

2
  PROCEEDINGS                                          PAGE
3
  Appearances.....................................  2
4 Stipulations....................................  4

5 JULIO BONILLA
        Examination by Mr. Bunt.....................  4
6       Examination by Mr. White.................... 38
        Further Examination by Mr. Bunt............. 72
7
  Signature and Changes........................... 79
8 Reporter's Certificate.......................... 82

9

10          PREVIOUSLY MARKED DEFENDANTS' EXHIBITS

11 NO.  DESCRIPTION                                  PAGE

12 1    Defendants' Notice of Deposition............. --
   2    Defendants' Subpoena to Julio Bonilla........ --
13 3    Photographs.................................. --
   4    Allegiance Mobile Health Medical Records of
14      Nehemias Santos.............................. --
   5    Allegiance Mobile Health Medical Records of
15      Evelyn Santos................................ --
   6    Video clip................................... --

16

17

18              DEFENDANTS' EXHIBITS

19 NO.  DESCRIPTION                                  PAGE

20 7    Photo of scene looking from rear of Camry.... 76
   8    Photo of scene looking from left of Camry.... 77

21

22              PLAINTIFFS' EXHIBITS

23 NO.  DESCRIPTION                                  PAGE

24 1    Photo of scene looking from of Camry......... 60

25
```

```
 1                     P R O C E E D I N G S
 2                     THE VIDEOGRAPHER:  We are now on the
 3   record.  Today is October 31st is 2023.  The time is
 4   1:00 p.m. in the Central time zone.
 5                     And now the counsel will please state their
 6   appearances for the record after which the court
 7   reporter will swear in the witness.
 8                     MR. BUNT:  Brian Bunt on behalf of
 9   defendants Caylee Smith and the Eastman Chemical
10   Company.
11                     MR. WHITE:  Jacob White on behalf of
12   plaintiffs.
13                     MR. BUNT:  Jacob, we can just take these
14   pursuant to the Federal rules and procedures, I assume.
15                     MR. WHITE:  Yes.
16                     (The witness was sworn by court reporter.)
17                           JULIO BONILLA,
18   having been first duly sworn, testified as follows:
19                           EXAMINATION
20   BY MR. BUNT:
21      Q.   Good afternoon, Mr. Bonilla.  And please
22   correct me if I should mispronounce your name.
23   Hopefully I got it right that time.  My name is Brian
24   Bunt.  As I mentioned a moment ago, I represent a couple
25   of parties in this lawsuit:  Caylee Smith, who was
```

1  driving one of the vehicles involved in the accident

2  that we're going to talk about today and then her

3  employer, which is Eastman Chemical Company.  They've

4  been made a defendant to the lawsuit as well by the

5  plaintiffs.  And so I represent both of them.  And can

6  we start by would you just please state your full, legal

7  name for the record?

8       A.   My name is Julio Cesar Bonilla.

9       Q.   And that middle name, can you say that again?

10      A.   Cesar.  Cesar.

11      Q.   C-e-s-a-r?

12      A.   Yeah.

13      Q.   Thank you.  And Mr. Bonilla, have you ever

14  given a deposition before?

15      A.   No.  This will be my first time.

16      Q.   Okay.  And that's fine.  This will -- and this

17  will go smoothly.  I'm going to ask you some questions.

18  Mr. White may also ask you some questions.  You're under

19  oath.  Of course, you know you were sworn in.  You're

20  under oath just as if you were testifying live at trial.

21  And, of course, all of our questions as well as your

22  answers are being taken down by the court reporter.

23  Also recorded by our videographer, and your deposition

24  could be either read at trial from the transcript or the

25  video could be played.  So you understand all of that.

Julio Bonilla
October 31, 2023                                                6

```
 1    Correct?

 2        A.   Yes.

 3        Q.   And I'd like to have just a few simple

 4    agreements with you.  You're doing wonderful so far.

 5    But if I ask you a question that can be answered with a

 6    yes or a no, please go ahead and state that out loud as

 7    opposed to saying "uh-huh" or "huh-uh" or just nodding

 8    your head.  Sometimes it's a little hard for the answer

 9    to be properly understood unless you verbalize it, but

10    you're doing a wonderful job so far.

11              My next request would be that if I ask you

12    a question or if Mr. White asks you a question that you

13    do not understand or we just haven't made ourselves

14    clear -- sometimes lawyers ask confusing questions.  We

15    don't mean to, but we do sometimes.  Please just say

16    would you repeat that question for me, sir, or could you

17    rephrase that question and make sure you understand what

18    we're asking even if you have to ask us to repeat it or

19    rephrase it a couple of times or more before you give

20    your answer.  But, now, if you do answer a question, I

21    or Mr. White will assume that you understood the

22    question we were asking you.  Is that fair enough?

23        A.   That's fair.

24        Q.   And this deposition should not take a long time

25    at all today.  But if we go for more than an hour or
```

Julio Bonilla
October 31, 2023

```
 1   something, we will happily take a break and let anyone

 2   go to the restroom or whatever.  If you need at any

 3   point to take a break and we haven't called one, just

 4   let us know.  We might want to just finish getting the

 5   answer to the current question and then we'll be happy

 6   to take a break.

 7                 Mr. Bonilla, you are appearing here today

 8   pursuant to a subpoena that our office served upon you.

 9   Correct?

10   A.   Yes.

11   Q.   All right.  And I spoke to you briefly a few

12   weeks ago on the telephone asking you if you would be

13   willing to give a deposition.  Correct?

14   A.   Yes.

15   Q.   All right.  I placed before you a notebook, and

16   it contains all of the exhibits that I'm going to use

17   today.  And I'll just refer to Exhibits 1 and 2

18   together.  The first one is your Notice of Deposition.

19   The second is the subpoena that we served upon you.  And

20   you've seen these before.  You received these.  Correct?

21   A.   Yes.

22   Q.   All right.  Mr. Bonilla, how old are you?

23   A.   I am 24 years old.

24   Q.   What is your date of birth?

25   A.   July 29th, 1999.
```

Appx_1109

1     Q.    And what is your current residence address?

2     A.    4013 Salem Drive, Garland, Texas 75043.

3     Q.    How long have you lived at the Garland, Texas

4  address?

5     A.    I lived there for 14 years.  I briefly left for

6  a year and came back.

7     Q.    With whom do you live at that address?

8     A.    I live there with my parents, my wife, two

9  brothers.  And my baby girl.

10    Q.    Okay.  And can you just briefly tell us your

11 educational background, where you went to high school,

12 if you've had any college or vocational school since

13 then?

14    A.    I went to high school at Lakeview College in

15 Garland, Texas, and the only I guess -- what's the word

16 -- certifications I've obtained since there would just

17 be my paramedic classes with some college courses mixed

18 here and there.

19    Q.    Okay.  Are you still going to school right now?

20    A.    Not at the moment.  I am planning in the future

21 to pursue another degree, but not at the moment.

22    Q.    Okay.  And what certifications do you have?

23    A.    Currently, I have my paramedic license.  In

24 Texas, I hold a BLS certification, ACLS.  I recently

25 renewed by B -- my PAL certification, CEVO, and I think

1  that's it for the moment.

2      Q.   Okay.  Now, the BLS and the ACLS and the CEVO

3  and there was another one in there, are those all

4  related to paramedic certifications --

5      A.   Yes.

6      Q.   -- or EMT certifications?

7      A.   Yes.

8      Q.   Okay.  In April of 2022, which would be last

9  year, were you working as a paramedic in the Corsicana,

10 Texas and Richland/Angus, Texas area?

11     A.   Yes.

12     Q.   And by whom were you employed at that time?

13     A.   Allegiance Mobile Health.

14     Q.   When did you begin working for Allegiance

15 Mobile Health?

16     A.   I think it was November 2021.

17     Q.   And how long did you continue working for them?

18     A.   I worked there I think up until October of

19 2023.

20     Q.   October '23?

21     A.   '22.  Sorry.

22     Q.   '22.  Okay.  Have you worked as a paramedic

23 since leaving Allegiance Mobile Health?

24     A.   Yes.

25     Q.   With whom have you worked?

Appx_1111

1      A.   I worked as a paramedic for Medstar Mobile

2   Health, for Medical City Las Colinas, and North Texas

3   Regional EMS.

4      Q.   Okay.  Are you still doing that work?

5      A.   I am still working at Medical City Las Colinas

6   and North Texas Regional.

7      Q.   Okay.  On April 30, 2022, which would be April

8   of last year, I believe you were part of a paramedic

9   crew that was dispatched to an automobile accident that

10  had occurred on I-45 in Navarro County near Angus,

11  Texas.  Does that --

12     A.   Yes, I was.

13     Q.   -- sound familiar to you?  Okay.  There were --

14  I guess at the scene, there would have been a couple of

15  vehicles, a black Toyota Camry and a white Ford Explorer

16  and the drivers of those vehicles as well as some

17  occupants of the Toyota Camry.  And then there was a

18  young man named Nehemias Santos who had been struck by

19  the Explorer.  Do you remember --

20     A.   Yes, I remember.

21     Q.   That accident and I guess event and call

22  familiar to you?

23     A.   Yes.

24     Q.   Okay.  And you did respond to it.  Correct?

25     A.   Yes.

1      Q.    Were there any other paramedics that went with

2  you to that call?

3      A.    There should have been a couple of

4  dual-certified paramedics, firemen on scene, but none

5  that were I would say actually working the patient side

6  of things.  It was -- it was just mostly just one

7  ambulance on the scene for the majority of the time.

8  One showed up later on.  But by the time that one showed

9  up, I was already leaving.

10      Q.    The first ambulance that arrived, was that --

11      A.    That was mine.

12      Q.    -- the one you were on?

13            Okay.  Did you have another paramedic with

14  you?

15      A.    I had an EMT partner at the time, yeah.

16      Q.    Okay.  And I guess just to clarify for me, is

17  there a difference between EMT and paramedic?

18      A.    Yes.

19      Q.    Okay.

20      A.    So EMT is really more -- it's more of a basic

21  certification.  It takes a lot longer to get your

22  paramedic license.  So, essentially, I was the one in

23  charge that day of any patient care that took place.

24      Q.    Gotcha.  Okay.  Upon arrival there at the

25  scene -- and let me see.  To keep things in order, let

1    me just go ahead and refer you to Exhibit 3.  And

2    Exhibit 3, I'll represent, is four photographs.  And

3    these were just photographs, Mr. Bonilla, that were

4    captured by still shots off of some of the police

5    officer's body cameras.  But the gentleman in blue in

6    each of the four pictures, is that you?

7        A.   Yes.

8        Q.   Okay.  And that -- is that you there at the

9    scene of the accident that we're talking about on

10   April 30, 2022?

11       A.   Yes.

12       Q.   Thank you.  When you arrived, I guess just sort

13   of walk us through what you did.  And maybe if you began

14   with Mr. Santos, tell us about assessing his condition

15   and whether -- determining if you could provide him care

16   and so forth.

17       A.   Okay.  So when I arrived on scene, we were the

18   first ambulance on scene.  I believe Rich- -- Richland

19   Volunteer Fire Department was already on scene.  They

20   had blocked off traffic for us.  I saw that there was

21   somebody under just a cloth to cover them up of whatever

22   bodily injuries they had or sustained.  I saw that there

23   was four other people walking around on scene.  I walked

24   up to, of course, him because his older brother started

25   asking me to do something for him.

1      Q.   And when you say "him," are you referring to

2   the -- to -- to the person that was covered --

3      A.   Yes --

4      Q.   -- by the cloth?

5      A.   -- yes.

6      Q.   Okay.

7      A.   And we removed the sheet.  I took a couple of

8   minutes to assess him, checked his pupils, checked a --

9   I'll say checked for a palpable pulse, and we couldn't

10  find anything.  We took a electrocardiogram to confirm

11  that there was no -- at least electrical activity in the

12  heart to go with not being able to find a mechanical

13  pulse.  We also took note of the massive head injury

14  that he had as well as the bodily fluids on the concrete

15  next to him.

16     Q.   You first checked for a pulse and did not --

17  you were not able to feel or determine any pulse.  Is

18  that correct?

19     A.   Yes.

20     Q.   And you said you, however, performed an EKG.

21  Is that an electrocardiogram?

22     A.   Yes.

23     Q.   Is that to check for electrical activity from

24  the heart?

25     A.   Yes.

1     Q.   And did I understand you to say that there was

2   no reading of electrical activity from the heart?

3     A.   No reading.

4     Q.   Okay.  You also made note of a massive head

5   injury.  Without going into, you know, a great, great

6   amount of detail, but kind of tell us where the head

7   injury were -- where the head injury was, how it

8   appeared and so forth?

9     A.   So for the most part, his face was intact.  But

10   if you -- if you looked over to his -- I believe it was

11   his left temporal, as the side of your head.  Occipital

12   is the back of your head.  You could clearly see that if

13   was -- I'd say it was definitely missing, you know, some

14   bone there, open-skull injuries.  And I looked over to

15   continue to the left side and saw a trail of what looked

16   like brain matter on the side of the road.

17     Q.   And let me ask you.  If the records or some of

18   the photographs indicate that it was kind of on the

19   right temporal side, is it possible that it was on that

20   side of his head?

21     A.   It could have been possible that it stretched

22   all the way around but --

23     Q.   Okay.

24     A.   But for the sake of kind of taking care of

25   things quickly after we determined that there was -- he

```
 1   was going to be a deceased without resuscitations, we

 2   noted what we saw and we moved on to the rest of the

 3   people on scene because we were -- there was only one

 4   ambulance, and I had to decide how I was going to divide

 5   my resources.

 6        Q.   Sure.  Okay.  Before we move on to the other

 7   persons, let me ask you to refer to Defendants' Exhibit

 8   Number 4 in your notebook.  Mr. Bonilla, I'll represent

 9   to you that these are some medical records that we

10   obtained from -- I know it says here at the top Lonestar

11   Ambulance, LLC, and I know elsewhere I think it's stated

12   Allegiance Mobile Health, but are those the same

13   company --

14        A.   I don't -- I believe Lonestar is its own

15   company.  I don't know if that was the case at the time,

16   but I do see Allegiance Mobile Health on the bottom --

17        Q.   Okay.

18        A.   -- of my records.

19        Q.   All right.  So in the first couple of pages are

20   just some deposition questions that are asked in writing

21   and then they're responded to in writing.  And they were

22   responded to a Marissa Mayfield, who says she was the

23   billing director for Allegiance Mobile Health.  Do you

24   know Ms. Mayfield at all or --

25        A.   I do not, no.
```

1    Q.   Okay.  If you would, move on back behind the

2  deposition questions.  I guess it would be about the

3  fourth page going back the other way I think where the

4  records start.

5    A.   Is it 5 or 4?

6    Q.   Four.  So turn one more page I think.

7    A.   Okay.

8    Q.   All right.  And let me just ask you to look at

9  these.  It appears to be a total of about four pages of

10  records, including this what I think is an EKG reading

11  but I'll have you tell us.  This would appear to be a

12  report prepared following your work or activities

13  assessing Mr. Santos there at the scene.  I think on the

14  third page of those, there are a couple of signatures.

15    A.   Yes.

16    Q.   And one of those I believe is yours, but take a

17  look at that.  Is that your signature -- go back the

18  other direction one more page.

19    A.   Yes.

20    Q.   Okay.  And then there's another gentleman there

21  Michael Schuette --

22    A.   Yes.

23    Q.   -- if I said that right.  Is he the EMT that

24  accompanied you that day?

25    A.   Yes.

1      Q.   All right.  And are these records, Exhibit

2   Number 4, records that you would have prepared following

3   what you did at the scene that day?

4      A.   Yes.

5      Q.   Okay.  Let me just go through some things in

6   here.  I won't try to cover everything.  On the first

7   page there, I notice under Destination, it says,

8   "Incident or Patient Disposition:  Patient dead at

9   scene.  No resuscitation attempted (without transport)."

10  Can you tell us what that means?

11     A.   So that means that the patient was not

12  transported by us to a hospital.  It was -- the body was

13  left there on scene with the Richland Police Department

14  assumed care.

15     Q.   Was your assessment of Mr. Santos that he was

16  deceased by the time you arrived there to check on him?

17     A.   Yeah, for quite sometime it seemed.

18     Q.   Okay.  And I know you've indicated that you

19  weren't able to find a pulse.  You weren't able to find

20  any electrical activity.  Is there -- are there other

21  things that suggested to you that he had been dead for

22  sometime?

23     A.   The main thing was his pupils.  They were fixed

24  and dilated at 10 millimeters at the time, which is a --

25  without going into too much detail, it's a pretty good

Julio Bonilla
October 31, 2023                                                    18

1   indication of no brain activity.

2        Q.   Okay.  Anything else?

3        A.   Also as well, the amount of body fluids that we

4   saw beside him.  They weren't just -- at least the

5   sidewalk wasn't just, you know, slick.  It was dry

6   almost by the time we got there as well.

7        Q.   Okay.  Do you have any idea, perhaps, how long

8   Mr. Santos had been dead by the time you arrived?

9        A.   I would have suspected at least ten minutes.

10       Q.   And the record says no resuscitation attempted.

11  Is that because you determined that it would have been

12  futile to attempt resuscitation?

13       A.   Yes.  Not also just because it was futile or at

14  least I -- like I said, there was other patients on

15  scene and we tried to -- we try to perform triage in

16  those kind of circumstances where we only have one

17  provider on scene.  And so we -- so we decided just to

18  make sure that he was indeed deceased.  We did

19  everything that we could to document and move on to

20  whoever presented themselves as a patient.

21       Q.   Understand.  On the right side of the page

22  where it says Vital Signs -- and I've guess you kind of

23  talked about this, but it says, "no ECG 4 lead."  Is

24  that reference to the electrocardiogram not receiving

25  any signals?

1       A.    Yeah.  So we -- at the time we did not have a

2    way to electrically upload the ICD vitals directly from

3    the monitor.  So what we did is we would print out a

4    sheet from I'd say the call that we had from the monitor

5    basically setting -- I'd say what the monitor detected.

6       Q.    If we flip over to the last page of these

7    records, is that the printout you're referring to?

8       A.    Yes.

9       Q.    And its indication of pretty much a flat line,

10   is that -- do I correctly interpret that as --

11      A.    Yeah --

12      Q.    -- letting you know no heart activity?

13      A.    -- indicative of asystole, yes.

14      Q.    And then under Vitals, it also says, "BP."  I

15   assume that's blood pressure?

16      A.    Yes.

17      Q.    "Finding not present."  The pulse, I assume --

18   or P, I assume that's pulse.  Is that correct?

19      A.    Yes.

20      Q.    And not present, I assume that means you didn't

21   find any indication of blood pressure or pulse.

22      A.    Yeah.  We did not find anything.

23      Q.    And then under respira- -- or REPS, I assume

24   that's respirations and it just says zero.  That does

25   that mean there was no respiratory activity?

Appx_1121

Julio Bonilla
October 31, 2023                                                    20

```
 1        A.   Yes, that's what that means.

 2        Q.   And then under Cardio/Defib, under

 3   Resuscitation Attempted by EMS, it says, "Not

 4   attempted-considered futile."  I guess is that what you

 5   were discussing a moment ago?

 6        A.   Yes.

 7        Q.   All right.  Mr. Bonilla, based upon the

 8   injuries that you observed, the lack of vital signs, and

 9   I guess maybe what you concluded about the length of

10   time that it appeared Mr. Santos had been deceased, do

11   you believe he probably died instantly after being

12   struck by the vehicle?

13             MR. WHITE:  Objection.

14        Q.   (BY MR. BUNT)  And I'm just asking your

15   opinion, just your professional opinion I guess based

16   on, you know, what you observed there.

17             MR. WHITE:  Redirect my objection; form for

18   the record.  You may answer.

19             THE WITNESS:  Okay.

20        Q.   (BY MR. BUNT)  Go ahead.

21        A.   I can't say for sure it happened

22   instantaneously, but he -- he didn't really have chance

23   of survival, in my opinion.  That's all I can say.

24        Q.   If not instantaneously, you think very --

25        A.   Very --
```

Appx_1122

1      Q.   -- soon after?

2      A.   I'd say very quickly, yes, for sure.  It was

3   very quickly.

4      Q.   Down at the bottom of the third page there

5   where it says Narrative and Head, it says, "Open skull

6   fracture on the right occipital and temporal region with

7   exposed brain matter."  Again, that's just what it says,

8   but would that suggest that maybe it was open on the

9   right side as well?

10     A.   Yeah, yeah.  Let me -- let me correct myself.

11  I meant to say the right side, not the left side --

12     Q.   Okay.

13     A.   -- as I stated prior.  Yeah, that's -- that's

14  what I wrote down as my findings that day.

15     Q.   Mr. Bonilla -- all right.  You indicated that

16  after you had assessed Mr. Santos and determined that

17  there wasn't going to be an ability to give any care to

18  him and resuscitate him and then you turned your

19  attention to other folks, at some point were you told

20  that Ms. Evelyn Moreno wished to be seen?

21     A.   Yes.

22     Q.   Okay.  Do you remember who told you that?

23     A.   She told me herself at one point that she

24  wanted to be seen.

25     Q.   Okay.  And did you understand that Ms. Moreno,

1  I guess, was a young Hispanic female and she was the

2  person who had been standing near Mr. Santos at the time

3  he was struck?

4       A.   Yes.

5       Q.   All right.  Did you know she was also the

6  driver of the Camry car at that time?

7       A.   I don't think I knew she was the driver at the

8  time.  All I knew was that she was -- excuse me -- was

9  at the back of the vehicle with Mr. Santos at the time

10  of the events.

11      Q.   Thank you.  So after she asked to see you, did

12  you see her?  Did you examine her?

13      A.   Yes.

14      Q.   All right.  And I'm going to just go ahead and

15  have you look at Defendants' Exhibit 5.  This may be

16  more efficient.  As I ask you questions, feel free to

17  refer to those records as you wish.  But maybe just walk

18  us through what you remember about speaking with her,

19  examining her and so forth.

20      A.   So she was in the -- she was next to Mr. Santos

21  when we got there on scene.  She -- she -- as we were

22  examining Mr. Santos, her and the rest of the passengers

23  of the car were brought to the sidewalk -- the service

24  road of the freeway there.  And after we were done

25  examining Mr. Santos, I walked over and I asked if --

Appx_1124

1  you know, if anybody else was injured or would like to

2  be assessed, and she presented herself saying that she

3  was in the back of the vehicle with her [sic], but she

4  was not struck herself.  But she felt like she was

5  struck but something, either Mr. Santos or maybe one of

6  his body parts.

7      Q.   Okay.

8      A.   She could not definitively tell me either or.

9  So I took her to the back of our ambulance and did a

10 brief assessment on her, asked her if she wanted to go

11 to the hospital, and she refused further treatment.

12     Q.   When she was, I guess, telling you that she

13 felt she had been struck by something, did she have any

14 complaints of pain?

15     A.   She said she felt some minor pain.  I can't

16 remember for sure where she --

17     Q.   And you're welcome to review the records before

18 you answer.  Don't let me rush you.

19     A.   I don't think I have a copy of hers.  I just

20 have Mr. Santos' records.

21     Q.   Okay.  Go on back to 5, Section 5.  And hers

22 should start there.

23     A.   Oh, there it is.

24     Q.   And if I mistakenly call that 4, this is

25 Exhibit 5.  I don't remember, but yes.  And just go

1   ahead and take a moment to look at that.  I don't want

2   to rush you.

3       A.   Okay.  She complained of right flank pain as

4   well as right knee pain.  She believed that her

5   husband's body fell -- that she believed that her

6   husband's body might have fell on her after he was

7   struck and that's where -- at least that's what she was

8   complaining about, just right-sided flank pain.

9       Q.   All right.  So did you examine the areas of her

10  body that she was --

11      A.   Yes.

12      Q.   -- complaining of pain?

13           Were you able to visually see any injuries?

14      A.   Not visually.  There was -- let's make sure

15  here.  There was a small contusion, a bruise on the

16  right flank region, but that's -- that's about it.  No

17  other obvious injuries that I could tell at the time.

18      Q.   And when you say the small bruise, is that the

19  4 centimeter --

20      A.   Yes.

21      Q.   -- contusion that you refer to in the report?

22      A.   Yes.

23      Q.   Are you able to show us approximately where --

24  when you say the right flank, I'm assuming you kind of

25  mean the right side.  But maybe show us on camera kind

Appx_1126

```
 1   of --

 2        A.   Okay.

 3        Q.   -- approximately where.

 4        A.   So right flank would be --

 5        Q.   And maybe you're talking about --

 6        A.   Do I have to hold it?

 7        Q.   Yeah.  Go ahead and maybe hold that up just to

 8   make sure it picks you up.

 9        A.   So right flank would be around this area right

10   here.  (Indicating.)  Kind of a -- well, what we refer

11   as the flank area is kind of like the in between the

12   obliques area.  Usually it's a good indicator of, you

13   know, a kidney stone or things like that.  But in her

14   case, I think maybe she might have been struck by

15   something in this area.  And it was a little bit up

16   higher so I think she might have maybe bruised a rib.  I

17   don't know.  That's probably what her --

18        Q.   Go ahead now that you're sitting back down clip

19   that mic back on just to make sure we get you.  For

20   those jurors that may not be as familiar with the metric

21   system measurements as others might be, can you kind of

22   show us approximately what 4 centimeters is?

23        A.   Not very big.  It's about 2 inches -- 2 to

24   3 inches.

25        Q.   Okay.  And was that, like, a red spot or a spot
```

```
 1   that kind of looked like --
 2       A.   It just looked like a very -- like a bruise.
 3       Q.   Okay.  Like a recent --
 4       A.   Recent bruise.
 5       Q.   --bruise.  Not like a bruise that was from
 6   earlier.  Correct?
 7       A.   Right.
 8       Q.   I mean, when I say earlier, meaning that it's
 9   previous days or something.
10       A.   No.  It seemed pretty recent.
11       Q.   Okay.  Was there any other part of her body,
12   flank, or her right arm, her right hip, her right leg?
13   Were you able to see any other areas of bruising?
14       A.   No, not anything else.  She -- we did not
15   disrobe her or anything like that.  We just saw the --
16   when she lifted up her shirt, she showed me the small
17   bruise on her right flank.  And then as far as knee pain
18   went, she -- she didn't show that she had any -- what's
19   the word?
20       Q.   Okay.  So there was no large pattern of
21   bruising that you could visually see.
22       A.   Not -- not at the time but it was -- everything
23   was still pretty recent, so it could have grown over
24   time maybe later on.  That's why we asked her if she
25   wanted to receive further medical treatment at a
```

Appx_1128

1   hospital.  Because given that there was a fatality on

2   scene, it would have been best for her to get examined

3   by, you know, a doctor, X-rays, and all that good stuff.

4        Q.   And did she agree to do that?

5        A.   No, she did not.  She refused on scene.

6        Q.   If you would, flip back to the last couple of

7   pages of the records.  And I'll represent to you that

8   the very last page is just a -- kind of an enlarged and

9   highlighted copy of the -- what we see on the

10  third-to-the-last page so that it can be read.  If you

11  would, take a look at that.  It's titled Allegiance

12  Ambulance.  Appears to have under patient name Moreno

13  and then written up at the top there -- I think that

14  says Evelyn.  Is that --

15       A.   Yeah.  Yes --

16       Q.   -- what's wrote there?

17       A.   -- yes.

18       Q.   And then the date there, 4/30/22, April 30,

19  2022, "This form is being provided to me because I

20  have:" and then there are a couple of boxes checked

21  "Refused treatment, refused transport."

22            Do I understand correctly that you offered

23  to allow her to be further examined and/or treated, but

24  she stated she did not wish to be?

25       A.   Yeah.  She stated that she didn't wish to be

1  further examined.  She wanted to stay on scene with the

2  rest of her family at the time.

3      Q.   And so she refused any transport to the

4  hospital as well.

5      A.   Correct.

6      Q.   Okay.  Is that her signature there where she

7  signed this document?

8      A.   Yeah.  She accidentally signed on the witness

9  signature.  So I made sure that I check marked the

10 signature of the patient box right on top.

11     Q.   Okay.  But it's your testimony that's her

12 signature there in the witness box?

13     A.   Yes.

14     Q.   And you, I assume, would have witnessed her

15 sign that document.

16     A.   Yes.

17     Q.   Just based on what you were able to observe,

18 did you see any visual evidence that you believe

19 definitely indicated that she had been struck by

20 Mr. Santos' full body?

21              MR. WHITE:  Objection; form.  Go ahead.

22     Q.   (BY MR. BUNT)  Go ahead.

23     A.   I don't -- there was no, like, I guess you

24 would say blunt -- usually when you're looking, you

25 know, for -- to see if -- to identify a specific

1    mechanism of injury as in, you know, what caused the

2    injury of Ms. Moreno, I couldn't tell for sure.  It did

3    look like she was struck by something, but it didn't --

4    I wouldn't say it was -- do you understand what I'm

5    saying?  You -- I didn't see like, you know, maybe,

6    like, a circle or a hand print or something that

7    would -- something definitive to go based off of.

8        Q.    Okay.  I think she stated to you that she

9    believed her husband's body, when it fell, it hit her on

10   the way down and knocked her off of her feet.

11       A.    Correct.

12       Q.    Did she say -- do you remember whether she said

13   she landed on the ground or in the trunk of the car?  Do

14   you remember one way or the other?

15       A.    Not off the top of my head.  I mean, from her

16   statement, I assume that's what she meant that she fell

17   on the concrete.

18       Q.    Based on what you observed, did you see any

19   indications that indicated to you that she had

20   experienced a hard fall onto pavement or concrete?

21              MR. WHITE:  Objection; form.  Go ahead and

22   answer.

23              THE WITNESS:  I -- I don't really -- there

24   was no real way for me to assess that at the time.  It

25   was -- all I remember is that she was -- you know, she

Appx_1131

1   was still answering questions correctly.  She seemed

2   that, you know -- that she was still functioning

3   correctly so I don't -- like I said, there's a

4   possibility.  But, like I said, I can't confirm.

5        Q.   (BY MR. BUNT)  And I guess maybe what I was

6   more thinking about, depending on how hard a person

7   might fall and maybe in what position they are in when

8   they fall, they might experience a scrape or a bruise on

9   their hands or arms or knees or flank or something or

10  hips when they strike the pavement.  Did you see any of

11  those types of injuries on her?

12                 MR. WHITE:  Objection; form.

13                 THE WITNESS:  Like I said, all I saw was

14  the bruise on her right flank at the time.

15       Q.   (BY MR. BUNT)  In her deposition, Ms. Moreno

16  testified that she was knocked into the trunk of her

17  car.

18       A.   Okay.

19       Q.   And let me just ask you.  First of all, do you

20  have any recollection of her telling you that?

21       A.   She -- I do remember her kind of going back and

22  forth on scene as far as what her official answer was

23  because I asked her if she -- I'd say where -- where she

24  land, and she said she was just knocked off her feet.

25       Q.   Okay.  She didn't really specify whether that

1    was onto the ground or whether that was into the trunk

2    of the car?

3         A.    No.

4         Q.    Did you see any scrapes or bruising on her

5    abdomen or arms or knees or anything that would clearly

6    tell you that maybe one had gotten knocked over into a

7    trunk and, you know, maybe made contact with the bumper

8    and the --

9                    MR. WHITE:  Objection; form.  Go ahead and

10   answer.

11                   THE WITNESS:  I'm sure she might have

12   sustained other minor things that I didn't see.  But as

13   far as anything significantly leading me to think that

14   something could be either, you know, injured I'd say

15   seriously that wasn't superficial was just the bruising

16   on the flank.

17        Q.    (BY MR. BUNT)  Okay.  So she didn't at least

18   point out anything like that to you.

19        A.    Just that, like I say, she felt some pain on

20   the right flank and her right knee was hurting.

21        Q.    I know that we know from the photographs of Ms.

22   Moreno at the scene that she did -- she was struck with

23   bodily fluid spatter.  It's possible she was also struck

24   with some tissue from the body.  Is it -- is it -- based

25   on what you observed, do you think it's possible that

```
 1   what caused the contusion may have been some of the

 2   spatter of fluid or tissue?

 3              MR. WHITE:  Objection; form.

 4              THE WITNESS:  Yeah.  That's what I -- yes.

 5   That's what I initially I'd say believed because, you

 6   know, I don't know how fast that vehicle was going at

 7   the time.  But, I mean, if it was, you know, fast enough

 8   to kill him, I was amazed that she did not sustain any

 9   further injuries.

10        Q.   (BY MR. BUNT)  Mr. Bonilla, after I guess Ms.

11   Moreno refused further treatment there, did she -- first

12   of all, where did you examine her?

13        A.   I examined her in the back of the ambulance to

14   try to provide her a little more privacy.

15        Q.   Okay.  After she refused further treatment, did

16   she, I guess, leave the ambulance?

17        A.   Yes.

18        Q.   All right.  Did you then move on to speaking to

19   the other occupants --

20        A.   Yes.

21        Q.   -- there at the scene?  And I think there would

22   have been three more persons who were occupants of the

23   car.  There is an Erick Santos, who is Mr. Nehemias

24   Santos' older brother, another gentleman -- young

25   gentleman Melvin Diaz, and a young lady Dena Regulato.
```

1   Do you recall speaking to those three persons?

2       A.    Yes, very briefly.  They -- they didn't really

3   present themselves as patients --

4       Q.    Okay.

5       A.    -- that day.

6       Q.    And by that, do you mean they weren't

7   complaining of any injuries or need for medical care?

8       A.    No.

9       Q.    Okay.  At some point, were you asked to get

10  some additional information from them because they were

11  Spanish-speaking individuals and you were also fluent in

12  Spanish?

13      A.    Yes.  Just PHI for the most part, just personal

14  information to have some sort of record of who they

15  were.

16      Q.    Okay.  Look back, if you would, at Exhibit

17  Number 3.  These are photographs that were taken there

18  at the scene, but I guess Exhibit 3A, that's you in the

19  blue shirt.  Correct?

20      A.    That is correct.

21      Q.    And I believe the young lady that's visible

22  there but she's got her back to the camera is Dena

23  Regulato.  Do you believe that's accurate?

24      A.    Yes.

25      Q.    And then you can see a young man's head on her

```
 1   left shoulder.  I think that's Mr. Diaz.

 2        A.   Yeah.  I don't remember the names so much of

 3   them.  I only spoke with them very briefly.

 4        Q.   Understand.  Turn maybe two pictures forwards.

 5   You can see faces a little bit better --

 6        A.   Yeah.

 7        Q.   -- there even if you don't recall names.  But

 8   does that appear to be the three persons that you spoke

 9   with --

10        A.   Yes.

11        Q.   -- there that were occupants?

12        A.   Uh-huh.

13        Q.   And then you can see just a little bit of a

14   person on the far left.  Her face is not in the picture,

15   but you can kind of see an arm -- a couple of arms.  I

16   guess one kind of turned up and the other sort of across

17   her abdomen.  Do you know who that person was?

18        A.   I believe that was Ms. Evelyn.

19        Q.   And if you turn one more page to 3D, is that a

20   better view --

21        A.   Yes.

22        Q.   -- of Ms. Evelyn Moreno?

23             Okay.  When you were speaking to Erick

24   Santos and Melvin Diaz and Dena Regulato here, did it

25   appear to you that they only spoke Spanish?  No English?
```

1    A.   Yeah, that became pretty apparent pretty early

2  on.  I started asking questions in English, and they

3  were asking me if I knew any Spanish and went from

4  there.

5    Q.   Okay.  At some point during your discussion

6  with them -- and I'm talking about Mr. Santos, Erick,

7  the brother, Mr. Diaz and Ms. Regulato, did you ask them

8  where they were located when Mr. Santos was struck?

9    A.   So at least the story that I got pretty

10  consistently on scene, at least from the officers on

11  scene and what -- I say what Ms. Evelyn told me with was

12  that there was two people in the back trying to get the

13  tire changed at the time of the incident and the other

14  three occupants were in the car.

15    Q.   Okay.  Did you understand the two people to be

16  a reference to Ms. Evelyn Moreno and Nehemias Santos,

17  the one --

18    A.   Correct.

19    Q.   -- who was killed?

20         And you understood that the other three

21  were in the car at the time he was struck?

22    A.   That was my understanding.

23    Q.   Now, was that your understanding based on what

24  Evelyn told you?

25    A.   Based off of what she told me, correct.

1      Q.    Was that your understanding at all based on

2  what the other three occupants told you?

3      A.    They all kind of concurred with them that --

4      Q.    Okay.  I just want to make sure I'm clear.

5  When you say "kind of concurred," do you have

6  recollection of any of the three of them saying yes, I

7  was in the car or --

8      A.    Yes.  Like I say, the three of them were in the

9  car when the events took place, and they ran out to the

10  back to see what happened.

11      Q.    Okay.  And is that also because that's what

12  they told you?

13      A.    Yes.

14      Q.    Okay.  If Mr. Erick Santos testified at

15  deposition that he was actually outside of the car and

16  was standing back there beside Evelyn and Nehemias

17  Santos whenever Nehemias was struck, would you agree

18  that would be different than what he told you there at

19  the scene of the accident that day?

20      A.    Yes, that would be different.

21      Q.    And Mr. Diaz, if Mr. Diaz testified that he was

22  standing kind of beside the car but looking back in the

23  direction and near Evelyn and Nehemias and Erick at the

24  time that Nehemias was struck, would you agree that

25  would be different than what Mr. Diaz told you there at

1   the scene that day?

2       A.   I would agree with that.

3       Q.   Mr. Diaz [sic], I'm going to just play a short

4   video, and I think you'll be able to watch it on the

5   monitor that's facing you.  And then the court reporter

6   will have it playing.

7                 MR. BUNT:  We'll just -- why don't we just

8   go off the record and pause for a second.

9                 THE VIDEOGRAPHER:  We're off at 1:55.

10                (Break taken from 1:55 p.m. to 1:58 p.m.)

11                THE VIDEOGRAPHER:  Back on at 1:58.

12      Q.   (BY MR. BUNT)  Mr. Bonilla, we took a short

13  break there.  And I was just mentioning that I'd like

14  for you to watch a brief video.  And I'll just tell you

15  this was a video -- it's a clip from a video taken from

16  I believe Officer Winston's body camera.  And if you

17  would just listen, and I may have a few questions for

18  you.

19      A.   Okay.

20                (The video was played.)

21      Q.   Okay.  That's it.  It's just a really short

22  video.  But the persons that are kind of standing around

23  you there, are they the same individuals we were talking

24  about, Ms. Regulato, Erick Santos, and Mr. Diaz?

25      A.   Yes.

1    Q.   Okay.  And the person walking up and asking you

2  that question I believe is Officer Winston, or Daniel

3  Lee Winston with the Richland Police Department.  Do you

4  know if that's correct?

5    A.   Yes, yes.

6    Q.   And the voice that we heard responding to her

7  question stating who was in the car and who was not in

8  the car --

9    A.   That was me.

10    Q.   Was that you?  Okay.  And the answer you gave

11  then, is it consistent with what you've told us in your

12  testimony here today?

13    A.   I believe so.

14    Q.   That's still what you recall is accurate?

15    A.   Yes.

16    Q.   Okay.  Thank you, Mr. Bonilla.  At this time

17  I'm going to pass you over to Mr. White.

18                          EXAMINATION

19  BY MR. WHITE:

20    Q.   I've got some questions for you.  I'm trying to

21  do this fast.  Okay?  So I am the attorney that

22  represents the family of the young man, Nehemias Santos,

23  that was killed on April 30 of 2022.  Do you understand

24  that we're suing the driver of the Ford Explorer and the

25  company that she worked for?  You understand that's

```
 1   what -- that's why we're here today?

 2       A.   I do believe so, yes.

 3       Q.   Okay.  Okay.  Do you have any idea why your

 4   testimony might be relevant?

 5       A.   The only thing that would make me think that

 6   it's relevant was because I was Spanish -- the only

 7   Spanish-speaking person there that wasn't related to

 8   them.

 9       Q.   Is there anything that you heard that day that

10   maybe you've already talked about that you think would

11   be relevant to this case?

12               MR. BUNT:  Object to the form.

13               THE WITNESS:  Just -- I think just pretty

14   much what we've covered today.

15       Q.   (BY MR. WHITE)  So are you aware that one of

16   the critical issues in this case is where Nehemias

17   Santos was standing when he was struck by the Ford

18   Explorer?

19               MR. BUNT:  Objection; form.  Go ahead.

20               THE WITNESS:  Hmm, I don't know for sure.

21       Q.   (BY MR. WHITE)  Okay.  So do you think it's

22   important where he was standing?

23       A.   I believe so, yes.

24       Q.   How come?

25       A.   I mean, he was at least -- I don't know for
```

1   sure if -- they -- I never really got that information

2   for sure.  But when we got on scene, he was on the left

3   lane.  He was lying on the left lane.

4        Q.   So when you say -- where his body was draped in

5   the blue sheet --

6        A.   Yes.

7        Q.   -- that you saw, it was in the left lane.

8        A.   Yes.

9        Q.   Okay.  And why do you think that's important?

10       A.   I think that's important just because that's

11  just not where you're supposed to be in the road.

12       Q.   So do you think where his body -- from what you

13  saw, do you think where his body ended up is where he

14  was standing when he was struck?

15       A.   There was nothing to indicate otherwise.

16       Q.   So did you speak with any of the witnesses

17  about had the body been moved or anything like that?

18       A.   I did not.

19       Q.   Okay.  So what -- well, so who have you spoken

20  to about this case prior to today?

21       A.   Just the people that were there that day on

22  scene.

23       Q.   Have you spoken with any of your supervisors

24  about the case prior to today?

25       A.   No.

Appx_1142

Julio Bonilla

1    Q.    Have you spoken with Mr. Bunt or myself about

2  this case prior to today?

3    A.    Just with Mr. Bunt asking if I could be a

4  witness for the case.

5    Q.    And what else did that conversation entail?

6    A.    And told them -- telling me where it was going

7  to be.  He was getting -- he was calling me to set an

8  exact date.  He emailed me a clip of the video to see if

9  I could maybe translate a little bit because there was a

10  bit of me speaking Spanish with them on the tape.

11    Q.    Okay.  And did you -- so you reviewed a video.

12  Was that the video that you just saw in this deposition?

13    A.    I believe so, yes.

14    Q.    Okay.  Did you review any other documents to

15  prepare for the deposition today?

16    A.    No.

17    Q.    Okay.  So sum total of what you looked at to

18  prepare for this deposition was talking with Mr. Bunt

19  about the logistics of the deposition and the video clip

20  where you were speaking the brother and Evelyn.  Is that

21  right?

22    A.    Correct.

23    Q.    Okay.  So can you describe your training as a

24  paramedic as of April 30, 2022?

25    A.    So I -- I got my paramedic certification.  Went

1    through a paramedic program in 2020.  Worked a couple of

2    months as an EMT until I finally gained my national

3    registry.  And by the time the incident happened, I

4    think I was pushing somewhere around six to eight months

5    as a paramedic.

6        Q.   How many fatalities have you worked by -- at

7    the time this happened, not counting the April 30th

8    incident?

9        A.   Navarro County was definitely not kind to me my

10   first year.  I worked quite a few.

11       Q.   So when you say "not kind," can you expound on

12   that?

13       A.   You know, just -- just as far as the severity

14   of the calls that we got and just -- I definitely saw,

15   you know, gruesome things more often than I thought I

16   was going to my first year working.

17       Q.   What stands out to you?

18       A.   Just, you know, fatalities that happened here

19   and there.

20       Q.   Any others on I-45?

21       A.   Not that I can think of off the top of my head.

22       Q.   Okay.  When you're talking about fatalities,

23   does that include pedestrians or is it mostly car-on-car

24   accidents?

25       A.   Car-on-car and pedestrian.

1      Q.   Okay.  Had you ever dealt with another

2   pedestrian, you know, in an emergency situation getting

3   struck by somebody else on the road?

4      A.   Yes.

5      Q.   Okay.  Can you describe that, the other

6   situation?

7      A.   The other situation?

8      Q.   Uh-huh, yes, sir.

9      A.   Is that something I can do?

10      Q.   Yes.  I mean, you don't have to disclose

11   HIPAA-protected information or anything.  I'm just

12   asking for the general situation of the other -- you

13   know, was it on an interstate, was it on a county road,

14   how many people were involved, that sort of thing.

15      A.   I think it was on a highway -- none other that

16   I've done completely by myself.  Other times I've had a

17   lot of responders by my side to help me out.  I think I

18   had two -- a three-vehicle collision on the east side of

19   Navarro County on Highway 31.

20      Q.   Okay.  So was it weird that when you responded

21   on April 30, 2022 to this accident that you were, like,

22   the lead paramedic?  Was it -- that was the first time

23   that had happened to you?

24      A.   No, no.  I was -- that's what my job

25   description was at the time.

Appx_1145

Julio Bonilla
October 31, 2023                                                        44

1     Q.   Okay.  Was it strange that it was just one

2  ambulance for the incident or was that normal given that

3  it was just a fatality on scene?

4     A.   It was normal given that that was the only

5  information that was given to the dispatchers at the

6  time.  Usually if there's multiple patients, they

7  usually try to dispatch another ambulance.

8     Q.   Okay.  Okay.  As of April 30, 2022, had you

9  ever received training on interpreting in Spanish in

10  emergency situations?

11     A.   Training interpreting in Spanish?

12     Q.   Yes, sir.

13     A.   Not any official training, no.

14     Q.   Okay.  Any unofficial training?

15     A.   Just -- I'd say just the Spanish I grew up

16  with.

17     Q.   Okay.  Can you describe that to us?  Like, what

18  sort of Spanish did you grow up with?  How did you learn

19  Spanish, in general?

20     A.   So I'm from El Salvador.  If I am not mistaken,

21  they are also from El Salvador.  So we understood each

22  other pretty well at the scene and what they were trying

23  to get across to me.

24     Q.   So would you describe yourself as bilingual?

25     A.   Yes.

1        Q.    Okay.  So you're fluent in Spanish?

2        A.    Yes.

3        Q.    Okay.  Do you have any formal certifications or

4    testing in Spanish?

5        A.    Just maybe some high school credits I got

6    confirming that I have some proficiency in Spanish.  But

7    other than that, that's it.

8        Q.    How -- how often in your career as a paramedic

9    are you asked to do Spanish interpretations?

10       A.    Usually quite often, especially in Texas.

11       Q.    How come?

12       A.    Mainly because there's usually not that many

13   people around that can speak it.  And then at least

14   official interpreter lines, they also -- you know,

15   they're usually clogged up.  They don't have -- you

16   know, either -- you know, the personnel that they need

17   or what's it called?  Or the -- just the audio

18   equipment, really.

19       Q.    And I take it it's kind of hard to set up an

20   official translator when you're talking about, like, an

21   emergency situation on the side of the road.

22       A.    Very hard.

23       Q.    Okay.  Right?  So how -- if you had to ballpark

24   it as of April 30, 2022, how many times have you had to

25   play unofficial translator in these emergency

Appx_1147

```
 1   situations?

 2       A.    Quite a few times.

 3       Q.    Ever on a fatality before?

 4       A.    No.

 5       Q.    Had you ever been asked by the police to take

 6   witness statements from people and then tell the police,

 7   you know, to translate in Spanish?  Had that ever

 8   happened before?

 9       A.    In this case, they asked me to translate their

10   PHI information.

11       Q.    Okay.  Okay.  So -- but before this case, had

12   you ever had the police ask you to do interpretations

13   either for PHI or for witness statements?

14       A.    A couple of times, yeah, to -- to help them I

15   guess -- for them to arrive at some conclusion.

16       Q.    Do you think -- strike that.

17             In the past, had you ever seen the police

18   follow up after your translation and get an official

19   translator or a Spanish-speaking police officer to take

20   a witness statement?

21       A.    Not that I'm aware of, no.

22       Q.    All right.  So can you tell us just in your own

23   words when you arrived, what did you see at the

24   April 30, 2022 scene?

25       A.    So I saw the road being blocked off.  I saw
```

1    Mr. Santos underneath the sheet on the left lane.  I

2    can't remember for sure if Ms. Evelyn was still standing

3    over him or not, but I do remember that very briefly we

4    walked over to him to see what we could do for him and

5    quickly came to the conclusion that that wasn't going to

6    be a possibility that day.  And we got -- we tried to

7    clear everyone to a safer area of the service road

8    across that little ditch that you can see on the video,

9    and we went from there.

10       Q.   Okay.  So in earlier questioning, first you

11   said it looked like there was injury to the left side of

12   his head, and then I know record said it was the right

13   side of the head.

14       A.   The right -- the right side is what I meant to

15   say.  I just --

16       Q.   So you did say the face was fine.  Is that

17   right?

18       A.   Uh-huh.  The face seemed to be intact.

19       Q.   Okay.  So just for the camera, can you describe

20   where the head injury was then?

21       A.   It's going to be right side right here

22   (indicating).

23       Q.   So towards the back of the head?

24       A.   Yeah, towards the back of the head.

25       Q.   And would you say most of the back of the head,

1    the skull was blown away?

2        A.   Correct.

3        Q.   And based on what you saw, do you think you'd

4    know to a certainty where his head was struck?

5        A.   No.

6        Q.   Okay.  Do you remember any other injuries on

7    his body?

8        A.   Just I'd say the head injury was what was most

9    significant to me.

10       Q.   Would you say -- did you do a thorough look at

11   his body after that for other injuries, or was it sort

12   of you just focused on the head because it was obviously

13   the worst part?

14       A.   That was primarily what we -- what I would have

15   focused on.

16       Q.   So you didn't strip his body and look for other

17   --

18       A.   No --

19       Q.   -- contusions or breaks or anything like that?

20       A.   In a public place, we try to be discreet.

21       Q.   And you didn't do that afterwards in the

22   ambulance with his body, did you?

23       A.   No.  We never moved his body from where we

24   found it from.

25       Q.   So can you say definitively whether or not

Appx_1150

1  there were any breaks or contusions, a knot on his head?

2       A.   I can't definitively say anything besides what

3  we -- what was visually apparent.

4       Q.   And, again, just for the record, you didn't do

5  a more thorough search because the young man was dead

6  clearly from a head injury.  Right?

7       A.   Yes.

8       Q.   Okay.  Do you know if an autopsy occurred?

9       A.   I have no idea.

10      Q.   Okay.  So were you -- you were directed to

11  speak with the witnesses by one of the police officers.

12  Is that right?

13      A.   Yes.

14      Q.   Okay.  Do you remember which of the witnesses

15  you spoke with?

16      A.   I spoke to the occupants of the car and Ms.

17  Evelyn.

18      Q.   Okay.  Did you speak with all of them

19  individually?

20      A.   I spoke to them together in a group as you see

21  in the video.

22      Q.   So in the exhibit that Mr. Bunt played for you,

23  was that the sum total of your conversation with those

24  four or were there conversations that didn't occur on

25  the camera?

 1      A.   That's really about it.  The only other -- the

 2   only other conversation that happened off camera was his

 3   brother acknowledging himself as his brother, asking me

 4   what steps we were going to be taken after that.  And I

 5   gave him the police officer's card.

 6      Q.   So what did you take him to mean when he said

 7   next steps?

 8      A.   So he was asking me like -- from what I

 9   understood, he wanted to know, like, you know, where

10   possibly, you know, his brother's body was going to end

11   up and how to be in contact with the people in charge of

12   all of that.

13      Q.   How would you describe the emotional state of

14   the brother?

15      A.   It was -- I mean, it was -- it was crushing.  I

16   mean, I felt really bad for him.

17      Q.   So when you say "crushing," can you elaborate?

18      A.   He -- he collapsed at one point.  I remember

19   that just from the emotional disturbance, but that's

20   really about it.  He was just very hurt and very -- very

21   saddened by his brother's passing.

22      Q.   Would you say he was distraught?

23      A.   Yes, I would say that.

24      Q.   What about Evelyn?  How would you describe her

25   emotional state?

 1     A.   She was very I'd say -- I could tell she was

 2  also very distraught, but she was definitely a lot more

 3  focused in the situation.

 4     Q.   How do you mean focused?

 5     A.   She -- she was very quick to answer all her

 6  questions and she was very consistent with everything

 7  that I asked her.  So as far as what I really took from

 8  that day was what she said because she just -- sorry.

 9     Q.   No, no, no, take your time.

10     A.   Like I said, she just seemed like she was just

11  more in tune with what I was asking her.

12     Q.   So did you have any reason to disbelieve what

13  she was telling you?

14     A.   No, no, I don't think so.

15     Q.   Did you get the sense that she was lying to you

16  or telling a story for any particular reason?

17     A.   No.

18     Q.   Okay.  So when she told you that she got hit by

19  something, you believed her.

20     A.   Yes.

21     Q.   Okay.  And you testified earlier, you're not

22  sure what he got hit by.  Correct?

23     A.   I'm not sure, yes.

24     Q.   But you do believe she was hit by something.

25  Right?

1       A.   Yes.

2       Q.   So can you describe the various things that you

3  think she could have been hit by even though you can't

4  know for certain which of those things that hit her?

5       A.   There was -- there was multiple parts to that

6  scene.  So I don't know.  Maybe she might have gotten

7  hit with maybe one of the tools that they were getting

8  out of the car at the time.  Or, like I said, because it

9  seemed like such a high-velocity strike, you know,

10  anything that would have came off of Mr. Santos could

11  have struck her.  But she just said that it was strong

12  enough whatever hit her that -- to knock her off her

13  feet.

14       Q.   And did you believe her when she said that?

15       A.   I did believe her.

16       Q.   Do you think it's possible that she was hit by

17  his body?

18       A.   I do think it's possible.

19       Q.   But you don't if it was his hand that hit her

20  or his foot or his knee or his head or whatever.  Right?

21       A.   I wasn't there to see it so I can't be certain.

22       Q.   Okay.  You're not a biomechanical expert.

23  Correct?

24       A.   No, I'm not.

25       Q.   Okay.  You're not an accident

1    reconstructionist.  Correct?

2         A.   No.

3         Q.   Okay.  So you never spoke with any of the

4    witnesses by themselves.  Is that right?

5         A.   Just with the brother for a brief moment

6    telling me that he was the brother, and they all kind of

7    regrouped and spoke to me together.

8         Q.   Okay.  So to the best of your recollection, can

9    you describe specifically what you spoke about with each

10   of the witnesses?

11        A.   Just asking their names, where they're from,

12   birthdays.  That's really about it.

13        Q.   Okay.  How did who was in the car and who was

14   standing behind the car come up?

15        A.   It came up with Ms. Evelyn.  I asked her, you

16   know, like, who could have potentially been hurt besides

17   him.  And, like I say, at the time it just -- I looked

18   at her and I asked her was it just you two.  She said it

19   was just me and him and the other three were in the car.

20   I turned to the other three, and this was in Spanish,

21   and they all, you know, nodded yes they were all in the

22   car.  So that's what I based off of my --

23        Q.   So when Evelyn said they were all three in the

24   car to you, she said that in Spanish?

25        A.   She said it in both English and Spanish, I

Appx_1155

Julio Bonilla
October 31, 2023                                                          54

1    believe.

2         Q.    Okay.

3         A.    She was proficient in both.  But for the sake

4    of the other three understanding what I was saying, I

5    asked her in Spanish.

6         Q.    Okay.  So when you asked her in Spanish, she

7    said yes in Spanish and they all three shook their head

8    yes?

9         A.    Yes.

10        Q.    Did you question them individually, hey, y'all

11   were all in the car when this happened?

12        A.    Yes.  When I was gathering their phone numbers,

13   like I said their private information, double-checking

14   that.  They themselves didn't get injured or claim to be

15   injured.

16        Q.    Do you think -- would that conversation have

17   been captured on body cam?  Was a police officer nearby?

18        A.    I believe so.  I think in this particular

19   video.

20        Q.    So if that -- if -- if the three individuals

21   who you say were in the car don't say that on the video,

22   do you think they actually didn't tell you that on --

23   like that conversation didn't happen or do you think

24   maybe you're misremembering that?

25        A.    I think either they later changed what they

1  were trying to say or maybe they said one thing and

2  meant another.

3      Q.   So tell me what -- do you think that's -- why

4  do you think that's a possibility that they said one

5  thing and meant another?

6              MR. BUNT:  Objection; form.

7              THE WITNESS:  I mean, just as far as just

8  getting the facts straight.  They were all pretty

9  distraught.  They were in a high-stress situation, so

10  that's the only thing I can think about.  But as far as

11  when they were asked first and when I asked and when the

12  officer asked, they all -- they all said there was two

13  people in the back and three occupants in the car.

14      Q.   (BY MR. WHITE)  Now when the officer asked you

15  to tell the officer where they were at, that

16  conversation occurred in English.  Right?

17      A.   Yes.

18      Q.   Okay.  So do you think the non-English speakers

19  there understood that exchange between you and the

20  officer?

21      A.   Just when I was speaking.  So I don't believe

22  that they understood that part.

23      Q.   Okay.  So given the seriousness of the

24  situation, did you do anything in particular to sort of

25  navigate the ambiguities in your translation?

```
 1                MR. BUNT:  Objection; form.
 2                THE WITNESS:  Like I said, I just asked
 3     them as clearly as possible as I could what -- what your
 4     location was at the time of the accident, are you hurt,
 5     and what is your name and birthday and all of that.
 6     That's something that I want -- that's something that I
 7     asked all of them.
 8         Q.   (BY MR. WHITE)  Do you think it's possible --
 9     strike that.  Strike that.
10                So when you were speaking with Officer
11     Winston as portrayed in this clip that you looked at
12     earlier, did she ever ask you for clarifications later
13     on or extra details?  Were there any other conversations
14     between you and the officer?
15         A.   I think honestly our entire -- the only thing
16     that was not in the video that I remember was just
17     asking her for a card for the Richland Fire Department
18     for the family.
19         Q.   Did you make a written record of any of the
20     statements that the witnesses made?
21         A.   Just the refusals that I obtained from the --
22     what they stated, where their position was in the car at
23     the time and that was it.
24         Q.   But -- is there a copy of, like, where you've
25     wrote down, like, what Erick Santos, the brother, for
```

1  example, where he said he was standing?

2       A.   There was -- for each one of those -- for each

3  one of the occupants, there was a refusal form that was

4  obtained from them.  And they should state what the --

5  what location they told me that they were in at the time

6  in the vehicle.

7       Q.   So you think that those refusal forms like the

8  one we have for Evelyn for the other occupants should

9  show -- or should have their statements about where they

10 were standing?

11      A.   As far as -- like I say, from what I can

12 interpret, yes.

13      Q.   Okay.  Are there any aspects of the exchange

14 with the witnesses on April 30, 2022 that you'd do

15 differently if you could go back in time?

16                MR. BUNT:  Objection; form.

17                THE WITNESS:  I don't really think so.

18      Q.   (BY MR. WHITE)  Okay.  Have you ever received

19 feedback, negative or positive, about your translations

20 in emergency situations?

21      A.   No, never anything negative.

22      Q.   So are you aware of any standard protocols or

23 best practices for translating in emergency situations?

24 Have you been trained on anything like that?

25      A.   Not officially.

 1      Q.   Okay.  Have you ever had to stand in a roadway

 2   in an emergency situation?

 3      A.   Yes.

 4      Q.   Okay.  Is it dangerous when you do that?

 5      A.   Yes.

 6      Q.   Okay.  Why?

 7      A.   I mean, anytime you're somewhere where there

 8   could be, you know, motor vehicles operating, it's

 9   dangerous.

10      Q.   Okay.  So what do you do to reduce the

11   dangerousness of that situation when you're in an

12   emergency situation?

13      A.   Like, just, you know, the officers did in this

14   case.  Try to move them somewhere where there's less

15   congestion like the service road.

16      Q.   Okay.  If you can't do that or can't remove

17   yours from the roadway, what else do you do yourself to

18   reduce the dangerousness of the roadway?

19      A.   We usually try to either get them in the back

20   of the ambulance or get them somewhere where they're

21   shielded by the fire truck.

22      Q.   Are you talking about preventing, you know,

23   preventing, like, bystanders from seeing a body?

24      A.   No.  I mean, like -- as far as, like,

25   protecting them, having some sort of shield so, you

```
 1   know, we're not worried so much about the danger as far
 2   as getting information and --
 3       Q.   Okay.
 4       A.   -- trying to conduct, you know, things as
 5   safely as possible.
 6       Q.   So what about -- what things do you think alert
 7   onlookers or oncoming traffic that hey, there's
 8   emergency up here, we need to slow down?  Like, what do
 9   y'all do to do that?
10            MR. BUNT:  Objection; form.
11            THE WITNESS:  It usually happens as a team
12   usually.  We -- like I said, there's a fire truck that
13   responds to -- especially to anything on the roadway or
14   highway.  They're usually try to either block two to
15   three lanes of, you know, freeway or road, and the
16   ambulance goes in front of them.  So any -- so if
17   there's any patients or anything like that in that
18   specific area, we can take care of them with some sort
19   of shielding.
20       Q.   (BY MR. WHITE)  So do you think the emergency
21   lights let oncoming traffic know that something's going
22   on?
23       A.   That's their intent, I believe.
24       Q.   So what are -- to the best of your knowledge,
25   what are oncoming traffic -- what is oncoming traffic
```

```
1   supposed to do when they see those emergency lights in

2   some sort of emergency situation in the road ahead?

3                    MR. BUNT:  Objection; form.

4                    THE WITNESS:  I believe that there's a

5   pullover law.  You have to be -- here in Texas, you have

6   to least go one lane over from whatever emergency

7   vehicle is flashing their lights to avoid any incidents.

8        Q.   (BY MR. WHITE)  Why do you think that is?

9        A.   For the safety of the general public.

10       Q.   And emergency personnel --

11       A.   Yes, uh-huh.

12       Q.   -- I assumed?

13            Have you ever had people buzz you, like,

14   less than one lane away when you're responding to an

15   emergency?

16       A.   Thankfully not.

17       Q.   If -- if that did happen, what would you expect

18   to happen to that driver?

19       A.   I'm not sure.  I'm not a police officer.  I

20   don't know if they can be charged with anything.

21       Q.   Okay.  So I want to show you a photo here.

22                    MR. WHITE:  Can we mark this as Plaintiff's

23   Exhibit 1?

24                    THE REPORTER:  Yeah.

25                    (Plaintiffs' Exhibit 1 marked.)
```

```
 1        Q.    (BY MR. WHITE)  Does this accurately represent

 2   where Nehemias Santos' body was when you arrived on the

 3   scene?

 4        A.    I do believe so, yes.

 5        Q.    Okay.  So when you were talking earlier about

 6   blood on the pavement, you're talking about -- we see

 7   blood behind the Toyota here.  Right?

 8        A.    Right.

 9        Q.    There's blood both on the left shoulder and in

10   the left-most lane.  Right?

11        A.    Uh-huh.

12        Q.    And do you see what looks like a dried puddle

13   of something sort of in the middle of the left-most

14   lane?

15        A.    Yes.

16        Q.    Did you understand that that was blood that had

17   evaporated?

18        A.    I interpreted it as bodily fluids more

19   towards -- it was closer to his head.  I interpreted it

20   as being more as blood.

21        Q.    So just to clarify, you interpreted that as

22   blood or not blood?

23        A.    As blood.

24        Q.    As blood.  Okay.  That had just dried, I

25   assume?
```

1      A.   Uh-huh.

2      Q.   Okay.  So did you ask anybody about if his body

3   landed where it was lying in his photo or if it had

4   landed in the middle of the lane?

5      A.   I asked them where he was when he was struck at

6   the time of the incident, and it seemed like he was on

7   the Camry's right rear bumper at the time of --

8      Q.   What makes you say that?

9      A.   Just from -- I would say from what I talked

10  over with the person in the back, Evelyn.  They were

11  getting things out of her car to change her tire.  So I

12  would -- assuming that being that -- I think it was

13  either the -- I can't remember for sure, but I think it

14  was either the right rear or right front tire that went

15  flat, but they were -- I'd say that they were trying to

16  head over -- do maintenance on it.

17     Q.   So I'll represent to you that it was the front

18  left tire, the front --

19     A.   Front left tire?  Okay.

20     Q.   -- that was blown out.  Did you -- did Evelyn

21  say anything that made you think that Nehemias was in

22  the middle of the lane to the right of the Toyota?

23     A.   No.

24     Q.   Okay.  So you understood that he was behind the

25  Toyota trying to get stuff out of the trunk --

1     A.    Correct.

2     Q.    -- to change a tire?

3     A.    Correct.  That was the only thing.

4     Q.    And that's what Evelyn told you.

5     A.    Uh-huh.  Uh-huh.

6     Q.    Did you talk with any of the other witnesses

7  about Nehemias' location when he was struck?

8     A.    No, just her.

9     Q.    Do you have any knowledge or opinion about

10 where Nehemias Santos was standing when he was struck?

11    A.    I mean, just judging by the blood trail, it

12 seemed like he was just kind of somewhere, you know,

13 either on the left shoulder or in the lane because

14 there's -- if -- like I'd say, there was -- there was

15 parts of him on both sides.

16    Q.    So do you mind sort of drawing a circle

17 where -- and you don't have to, right, but where --

18 based on your opinion and knowledge where you think he

19 was standing when he was struck?

20            MR. BUNT:  Objection; form.

21            THE WITNESS:  I mean, I can't really draw

22 where.

23    Q.    (BY MR. WHITE)  If you feel like you can't,

24 that's a fine answer as well.

25    A.    Okay.

1      Q.    But we want to get you on the record what your

2   opinion is if you have one.

3      A.    I mean, to me, it just -- I think I would

4   honestly just assume that he was just right in the

5   middle where he handed.

6      Q.    Okay.

7      A.    That's where I --

8      Q.    Okay.  You can draw an X or a circle on there

9   or you can state it on the camera.  That's fine.

10     A.    Probably in this general area.  (Indicating.)

11     Q.    Okay.  Will you initial that just so --

12     A.    (Witness complies.)

13     Q.    -- they know I didn't draw that on there for

14  you?

15     A.    Okay.

16     Q.    And hand that to the court reporter.  So do you

17  agree it was clear and sunny on April 30, 2022?

18     A.    It was hot, yes.

19     Q.    It was hot.  Okay.  So you remember the

20  temperature.

21     A.    Uh-huh.

22     Q.    Do you agree it was a straight stretch of road

23  where Nehemias Santos was struck?

24     A.    Yes.

25     Q.    Okay.  Do you frequently drive northbound on

Julio Bonilla
October 31, 2023                                        65

```
 1   I-45?

 2       A.   No.

 3       Q.   Okay.  Do you agree that the Toyota Camry that

 4   he was in was a dark color?

 5       A.   Yes.

 6       Q.   Do you agree that the Toyota Camry was easily

 7   visible to oncoming traffic?

 8                 MR. WHITE:  Objection; form.

 9                 THE WITNESS:  Yeah.  I mean, should have

10   been.

11       Q.   (BY MR. WHITE)  Okay.  Do you remember seeing

12   if the emergency lights were on on the Toyota when you

13   were around it?

14       A.   No.  I don't remember that.

15       Q.   Okay.  So -- so why do you remember this

16   incident in particular?  Is it because you prepared or

17   did you have an independent recollection of this

18   accident all on your own before you got a subpoena?

19       A.   Can you ask that question one more time?

20       Q.   Yeah.  Why do you remember this accident?  I'm

21   sure you've seen a bunch.  Right?  So does this one

22   stand out to you for any particular reason?

23       A.   I think it stood out to me just because, you

24   know, the people that were there that day -- like I

25   said, like, we were -- I would say we were both from El
```

Appx_1167

1   Salvador.  So, I mean, I wanted to do the best I could

2   to kind of help them get the answers that they needed.

3   You know, to see their brother's body again and things

4   like that.  You know, like, we do this job to -- you

5   know, to help people.  And in this case, you know, it's

6   sad when we can't.  So that's probably what I remember

7   more than anything because I was sad that day that I

8   couldn't do much for them.

9       Q.   And I take it you're about Nehemias's age and

10  his brother's age.  So did you sort of kind of see

11  yourself in them?

12      A.   Yeah, definitely.  Yeah.  No, I feel really bad

13  for them.  Because from what I understand, they were

14  very recently here.  So they didn't really have much of

15  an understanding of, you know, the road, laws, and

16  things like that so --

17      Q.   Did you have some reason to think that Nehemias

18  was recently in the United States?

19      A.   Really the only thing leading me to believe

20  that is that the majority of the occupants are

21  Spanish-speaking.  And usually they take it upon

22  themselves to try to be a little more English-speaking

23  when they're here.

24      Q.   Okay.  Okay.  Do you remember when you filled

25  out the medical records?  Did you do that on the scene

Julio Bonilla
October 31, 2023                                                    67

```
 1   or would you have done that afterwards?

 2       A.    I would have done that afterwards.

 3       Q.    Okay.  Do you remember how long afterwards you

 4   would have generated those medical records?

 5       A.    Usually within the hour.

 6       Q.    Okay.  So you talked earlier about her

 7   bruising, her being Evelyn Moreno, could have grown.

 8   Can you sort of elaborate on that?

 9       A.    I mean, you know, injuries aren't stagnant.

10   They can change.  They can get better.  They can get

11   worse.

12       Q.    So let's look at -- I think it's Exhibit

13   Number 4.  It's Evelyn Moreno's medical records.  Can

14   you flip to that page where she signed the refusal for

15   treatment?

16       A.    Uh-huh.

17       Q.    Okay.  Can you read that first paragraph that

18   she checked -- she checked?

19       A.    The "I understand" statements?

20       Q.    That's correct.  The first one.

21       A.    "I understand that the EMS personnel are not

22   physicians and are not qualified or authorized to make a

23   diagnosis and that their care is not a substitute for

24   that of a physician.  And I -- and I may have a serious

25   injury or illness which could get worse without medical
```

1    attention."

2        Q.   Okay.  That's enough.  That's fine.  Perfect.

3    So why do you guys make people sign that if they're

4    refusing medical treatment?

5        A.   For one, as the statement says, I can't legally

6    diagnose anything.  All we can -- all we know is, you

7    know, signs of potential, you know, serious injuries.

8    And we are trained to have a high index, a suspicion,

9    meaning that if there is a sign of something that could

10   be wrong, it could be very -- you know, it could lead to

11   something life-threatening.

12       Q.   Okay.  Why do y'all have a high index of

13   suspicion?  That's an interesting phrase.  I've never

14   heard that.  Can you explain why a paramedic would have

15   that high index of suspicion?

16       A.   Just mainly for the same reason like I just

17   said earlier.  You know, injuries can change.  You know,

18   some things seemingly, you know, benign can -- you know,

19   can turn into something serious for them down the line.

20       Q.   Is that because you're responding so quickly to

21   an injury that the symptoms of the injury may not

22   manifest until later?

23       A.   Correct.

24       Q.   Okay.  So did it strike you as unreasonable

25   that Evelyn didn't want to leave her family after

1   Nehemias had been killed?

2       A.   Not unreasonable, but I did -- I did make it,

3   you know, clear to her, you know, that it might have

4   been a better decision to seek medical treatment

5   considering the findings that we had on scene.

6       Q.   And when you say findings that you had on

7   scene, what do you mean?

8       A.   Mr. Santos' findings.

9       Q.   Okay.  Not necessarily Evelyn's finding on

10  scene.

11      A.   Right, right.  Whenever there is a fatality on

12  scene, in general we take it that, you know, everybody

13  else was exposed to something similar unless they say

14  otherwise.

15      Q.   Okay.  So you talked about how Evelyn's answers

16  about exactly where she landed after she was hit kind of

17  varied.  Do you remember that testimony?

18      A.   Yes.

19      Q.   Did you think it was weird that she said that,

20  that she couldn't remember exactly or that her story

21  varied a little bit or did that seem normal given the

22  circumstances?

23      A.   It's normal given the circumstances.  It seemed

24  like she was going back and forth from where she was

25  standing and where everybody else that she knew was

Julio Bonilla
October 31, 2023                                                          70

1   standing almost as far as, you know, to keep the whole

2   scene -- you know, she was trying to -- looked like she

3   was trying to keep track of everybody.

4       Q.   Okay.  Okay.  You mean after the scene or,

5   like, when it happened she was trying to keep track of

6   them?

7       A.   I mean, when it happened, when we were all on

8   scene.

9       Q.   Okay.  Okay.  Have you ever worked a wreck

10  caused by a distracted driver?

11      A.   I can't say that I have.

12      Q.   Why do you think that is?

13      A.   Just luck of the draw.

14      Q.   So do you agree it's needlessly dangerous to

15  text and drive?

16              MR. BUNT:  Objection; form.

17              THE WITNESS:  Yes.

18      Q.   (BY MR. WHITE)  Why?

19      A.   You have to have -- well, I mean, for one, it's

20  illegal, and two, you would want to have control of your

21  motor vehicle, you know, especially when you can cause

22  injuries like this.

23      Q.   Do you think it's needlessly dangerous to take

24  your eyes off the road when you're driving?

25      A.   Yes.

Appx_1172

Julio Bonilla
October 31, 2023                                           71

1     Q.   Do you think any of the accidents you've ever

2   worked have been a result of either people being

3   distracted or texting or taking their eyes off the road?

4     A.   Yes.

5     Q.   Okay.  You agree going over 85 miles an hour,

6   it's even more important not to text and drive?

7             MR. BUNT:  Objection; form.

8             THE WITNESS:  I can agree with that

9   statement, yeah.

10    Q.   (BY MR. WHITE)  So you think somebody that

11  texts and drives while going over 85 miles an hour is

12  needlessly disregarding the safety of others?

13            MR. BUNT:  Same objection.

14            THE WITNESS:  Maybe so, yes.

15    Q.   (BY MR. WHITE)  Well, why maybe?

16    A.   I mean, I can't speak on their behalf.  But I

17  do believe that it does -- I'd say it does bring a

18  safety risk.

19    Q.   So everybody texts and drives.  Right?  We're

20  being honest.

21    A.   I don't know.

22            MR. BUNT:  Objection; form.

23    Q.   (BY MR. WHITE)  You don't.

24    A.   I don't know.

25    Q.   Okay.  Do you text and drive?

Appx_1173

1    A.   No -- I would say not -- I would say not -- I

2  mean, if I have, not intentionally.

3    Q.   Okay.  If you were going over 85 miles an hour,

4  would you take special care enough not to text and

5  drive?

6    A.   Probably, yes.

7    Q.   How come?

8    A.   Because it's -- you're going at a pretty

9  significant speed that could cause pretty serious bodily

10  injuries.

11    Q.   Did you see anything on I-45 that day on the

12  scene that made you think there would have been some

13  good reason why someone traveling north on that road

14  wouldn't have seen a car stopped with their emergency

15  lights on and the trunk up?

16    A.   No.

17    Q.   I'll reserve the remainder of questions for

18  trial.

19                    FURTHER EXAMINATION

20  BY MR. BUNT:

21    Q.   Mr. Bonilla, just a few follow-up questions.

22  Is that section of I-45 in Navarro County a busy

23  interstate highway?

24    A.   Yes.  I believe that's -- that's the only

25  highway between us and Houston at that point in a direct

1  pass.  So yeah, I mean, it's pretty busy.

2      Q.   Does the traffic on I-45 passing through

3  Navarro County there travel at a pretty high rate of

4  speed?

5      A.   Yes.

6      Q.   Do you believe, similar to what Mr. White asked

7  you, that it would be needlessly dangerous for someone

8  to stand in the -- one of the travel lanes of I-45 in

9  that vicinity?

10     A.   Yes, that is very dangerous.

11     Q.   Or to walk into one of the travel lanes --

12     A.   Yes.

13     Q.   -- on I-45 there?  Is that a yes?

14     A.   Yes.

15     Q.   Okay.  Did you have any trouble communicating

16  with Mr. Erick Santos, Mr. Diaz, or Ms. Regulato?

17     A.   Not in particular, no.

18     Q.   Did you believe that you were understanding

19  their responses to you?

20     A.   Yes.

21     Q.   Did they appear to you to be understanding your

22  questions to them?

23     A.   Yes.

24     Q.   In your mind, do you think there's any chance

25  that they told you that they were standing -- or, I'm

Appx_1175

1   sorry.  That they told you they were inside the car

2   whenever Mr. Santos was struck, but you misunderstood

3   them to say -- you misunderstood them -- let me --

4   strike that one.  Let me ask it a little bit clearer.

5              First of all, in your mind, do you think

6   there's any chance that you asked them were you in the

7   car or where were you at the time that he was struck and

8   they told you that they were in the car, but that you

9   misunderstood them and they actually told you they were

10  outside the car?

11      A.   Not particular.  Because on scene, Ms. Evelyn

12  said it both in English and in Spanish that there was

13  two in the back and three occupants at the time.  So, I

14  mean, at least from what I recall that day, that's --

15  that's what pretty much most everybody agreed upon on

16  the scene.

17      Q.   Okay.  And you don't think it's likely that

18  they told you, oh, no, we were standing outside of the

19  car when the accident happened and we saw the accident

20  and you just misunderstood them?

21      A.   I think it's highly unlikely, like I say, given

22  the amount of times that they reiterated that statement.

23  But, I mean, there's also a possibility.  I mean -- I

24  mean, it was a high-stress situation.

25      Q.   But not -- but not likely there was a

1   misunderstanding.  Right?

2      A.   Not when that many people are saying the same

3   thing, I would assume not.

4      Q.   Did they appear to be speaking the truth when

5   they were talking to you?

6      A.   Yes.

7      Q.   Was there -- did they in any way give you an

8   impression they were lying to you?

9      A.   No.

10     Q.   Mr. White asked you a question, and I tried to

11  write it down just as he asked it.  I hope I got it

12  right.  I think what he said was did you do anything to

13  navigate the ambiguities in your translation.

14            So let me ask you.  When you were asking

15  them where they were at the time of the accident, do you

16  think your questions to them were ambiguous?

17     A.   I don't -- I don't think so.  I think they were

18  pretty straightforward.  Given the high-stress situation

19  that they were in, I didn't want to make that situation

20  worse for them.  So I asked them, hey, you know, were

21  you inside the car, were you outside of the car and so

22  on and so forth.

23     Q.   Do you think you asked them that clearly?

24     A.   Yes.

25     Q.   Let me show you Plaintiff's Exhibit Number 1.

Julio Bonilla
October 31, 2023                                                              76

 1   And I believe I understood your testimony to be that

 2   that depicts the location of Mr. Santos' body whenever

 3   you arrived there on the scene.  Is that correct?

 4       A.   That's correct.

 5       Q.   And it appears to show that his body is partly

 6   I guess in the travel lane, but part of it is over

 7   across the yellow line on the shoulder.  Am I correct?

 8       A.   Yes, that was correct.

 9       Q.   Were you aware that his body had been moved to

10   that location before you arrived on scene?

11       A.   No, I was not aware.

12       Q.   Let me show you another picture.  Give me just

13   a moment.  I'm going to come around to you there so

14   everyone can see it.  We're done with this one.  Right?

15   Okay.  Are you able to see the photograph there?

16       A.   Yes.

17       Q.   Mr. Bonilla, Plaintiff's Exhibit 1 kind of

18   shows some of the staining in the lane, but it doesn't

19   maybe go quite as far into the lane as is visible in

20   this picture here.  We'll make this Defendants'

21   Exhibit -- I think it will be 6.  The video -- I think

22   we'll mark that video as 6.  We'll make this Defendants'

23   Exhibit 7.

24            (Defendants' Exhibit 7 marked.)

25       Q.   (BY MR. BUNT)  If you would, just look.  Do you

Appx_1178

 1   see that there's some -- quite a bit of blood that has
 2   pooled out here much further in the lane?
 3       A.   Yes.  That does seem to look like blood
 4   splatter.
 5       Q.   There's kind of a spot there and then there's
 6   another area right around there?
 7       A.   Yeah.
 8       Q.   Okay.  If Mr. Erick Santos at his deposition
 9   testified that Nehemias Santos' body came to rest
10   further out here in the traffic lane after he was struck
11   and then he drug that body over to where it's located,
12   would you have any reason to disagree with that or
13   disbelieve that?
14       A.   No.
15            (Defendants' Exhibit 8 marked.)
16       Q.   (BY MR. BUNT)  Let me show you what we'll mark
17   Defendants' Exhibit -- we'll mark this one Defendants'
18   Exhibit Number 8, and I'll represent to you this is just
19   a picture taken.  It appears to be kind of on the west
20   side of the rear of the Camry there.  I think this would
21   be the blue cloth covering Mr. Santos' body.  And there
22   are some bloodstains that almost appear to be drag
23   marks.  And you may or may not be able to tell.  But I
24   just wanted to ask.
25            Looking at this, does it appear possible

1    that his body was dragged from the location we saw in

2    Defendants' Exhibit 7 more over to where it rested when

3    you arrived on scene?

4        A.   I mean, I do -- I do believe so.  I mean,

5    that -- from this angle, it definitely looks like a drag

6    mark to me.

7        Q.   Okay.  So if his -- have you had an

8    opportunity -- was I in the way on the other one?

9                 THE VIDEOGRAPHER:  No, you're good.

10       Q.   (BY MR. BUNT)  Okay.  And I won't belabor that.

11   But if there was evidence and testimony that his body

12   was moved over to that spot but had originally been

13   further out in the northbound travel lane, you wouldn't

14   necessarily disagree with that, would you?

15       A.   No.

16       Q.   Unless Mr. White has follow-up, I don't have

17   any more questions.

18                 MR. BUNT:  But I'll pass him to you.

19                 MR. WHITE:  None at this time.

20                 THE VIDEOGRAPHER:  That leads us off the

21   record at 2:53.

22

23                 (End of proceedings.)

24

25

```
 1                    CHANGES AND SIGNATURE

 2

 3    WITNESS NAME:  JULIO BONILLA
      DATE OF DEPOSITION:  OCTOBER 31, 2023
 4

 5    PAGE  LINE        CHANGE            REASON

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

1           I, JULIO BONILLA, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4

5                    _____

6                    JULIO BONILLA

7    THE STATE OF _____ )

8    COUNTY OF _____ )

9            Before me, _____, on this day

10   personally appeared JULIO BONILLA known to me (or proved

11   to me under oath of through _____ (description

12   of identity card or other document) to be the person

13   whose name is subscribed to the foregoing instrument and

14   acknowledged to me that they executed the same for the

15   purposes and consideration therein expressed.

16           Given under my hand and seal of office this

17   _____ day of _____, _____.

18

19

20

21                  _____

22                  NOTARY PUBLIC IN AND FOR
                     THE STATE OF _____

23

24

25

Appx_1182

```
 1  STATE OF TEXAS       )

 2  COUNTY OF TARRANT    )

 3

 4

 5              I, Natasha Duckworth, a Certified Shorthand

 6  Reporter duly commissioned and qualified in and for the

 7  State of Texas, do hereby certify that there came before

 8  me on the 31st day of October, 2023, at Freeman Mills,

 9  PC, located at 12222 Merit Drive, Suite 1400, Dallas,

10  Texas, the following named person, to-wit:  JULIO

11  BONILLA, who was duly sworn to testify the truth, the

12  whole truth, and nothing but the truth of knowledge

13  touching and concerning the matters in controversy in

14  this cause; and that he was thereupon examined upon oath

15  and his examination reduced to typewriting under my

16  supervision; that the deposition is a true record of the

17  testimony given by the witness.

18              I further certify that pursuant to FRCP

19  Rule 30(e)(1) that the signature of the deponent:

20              _X_ was requested by the deponent or a

21  party before the completion of the deposition, and that

22  signature is to be before any notary public and returned

23  within 30 days from date of receipt of the transcript;

24              ___ was not requested by the deponent or a

25  party before the completion of the deposition.
```

1          I further certify that I am neither

2    attorney or counsel for, nor related to or employed by

3    any of the parties to the action in which this

4    deposition is taken, and further that I am not a

5    relative or employee of any attorney or counsel employed

6    by the parties hereto, or financially interested in the

7    action.

8          CERTIFIED TO BY ME on this the 8th day of

9    November 2023.

10

11

12

13

14

15

16    _____
      NATASHA DUCKWORTH, CSR
17    Texas CSR 8410
      Expiration Date:  11/30/23
18    US Legal Support, Inc.
      CRCB Registration No. 122
19    16825 Northchase Drive
      Suite 900
20    Houston, Texas 77060
      Tel:  (214) 741-6001

21

22

23

24    Taxable cost of original charged to Defendants $ _____

25    Attorney:  Mr. Brian Bunt

Appx_1184

Julio Bonilla
October 31, 2023

1

| Exhibits | 1 |
|---|---|

**EX DEF-0001** Julio Bonilla 103123
3:12
**EX DEF-0002** Julio Bonilla 103123
3:12
**EX DEF-0003** Julio Bonilla 103123
3:13
**EX DEF-0004** Julio Bonilla 103123
3:13,14
**EX DEF-0005** Julio Bonilla 103123
3:14,15
**EX DEF-0006** Julio Bonilla 103123
3:15
**EX DEF-0007** Julio Bonilla 103123
3:19
**EX DEF-0008** Julio Bonilla 103123
3:20
**EX PLF-0001** Julio Bonilla 103123
3:24

**-**

**--bruise**
26:5

**1**
7:17 60:23,
25 75:25
76:17
**10**
17:24
**14**
8:5
**1999**
7:25
**1:00**
4:4
**1:55**
37:9,10
**1:58**
37:10,11

| 2 |
|---|

**2**
7:17 25:23
**2020**
42:1
**2021**
9:16
**2022**
9:8 10:7
12:10 27:19
38:23 41:24
43:21 44:8
45:24 46:24
57:14 64:17
**2023**
4:3 9:19
**22**
9:21,22
**23**
9:20
**24**
7:23
**29th**
7:25

**2:53**
78:21

| 3 |
|---|

**3**
12:1,2 25:24
33:17
**30**
10:7 12:10
27:18 38:23
41:24 43:21
44:8 45:24
46:24 57:14
64:17
**30th**
42:7
**31**
43:19
**31st**
4:3
**3A**
33:18
**3D**
34:19

| 4 |
|---|

**4**
15:8 16:5
17:2 18:23
23:24 24:19
25:22 67:13
**4/30/22**
27:18
**4013**
8:2

| 5 |
|---|

**5**
16:5 22:15
23:21,25

| 6 |
|---|

**6**
76:21,22

| 7 |
|---|

**7**
76:23,24
78:2
**75043**
8:2

| 8 |
|---|

**8**
77:15,18
**85**
71:5,11 72:3

| A |
|---|

**abdomen**
31:5 34:17
**ability**
21:17
**able**
13:12,17
17:19 24:13,
23 26:13
28:17 37:4
76:15 77:23
**accident**
5:1 10:9,21
12:9 36:19
43:21 52:25
56:4 65:18,
20 74:19
75:15
**accidentally**
28:8
**accidents**
42:24 71:1
**accompanied**
16:24

Julio Bonilla
October 31, 2023

accurate
33:23 38:14

accurately
61:1

acknowledging
50:3

ACLS
8:24 9:2

across
34:16 44:23
47:8 76:7

activities
16:12

activity
13:11,23
14:2 17:20
18:1 19:12,
25

additional
33:10

address
8:1,4,7

afternoon
4:21

afterwards
48:21 67:1,
2,3

age
66:9,10

ago
4:24 7:12
20:5

agree
27:4 36:17,
24 37:2
64:17,22
65:3,6 70:14
71:5,8

agreed
74:15

agreements
6:4

ahead
6:6 12:1
20:20 22:14
24:1 25:7,18
28:21,22

29:21 31:9
39:19 60:2

alert
59:6

Allegiance
9:13,14,23
15:12,16,23
27:11

allow
27:23

amazed
32:8

ambiguities
55:25 75:13

ambiguous
75:16

ambulance
11:7,10
12:18 15:4,
11 23:9
27:12 32:13,
16 44:2,7
48:22 58:20
59:16

amount
14:6 18:3
74:22

and/or
27:23

angle
78:5

Angus
10:10

answer
6:8,20 7:5
20:18 23:18
29:22 30:22
31:10 38:10
51:5 63:24

answered
6:5

answering
30:1

answers
5:22 66:2
69:15

anybody
23:1 62:2

anyone
7:1

anytime
58:7

apparent
35:1 49:3

appearances
4:6

appeared
14:8 20:10

appearing
7:7

appears
16:9 27:12
76:5 77:19

approximately
24:23 25:3,
22

April
9:8 10:7
12:10 27:18
38:23 41:24
42:7 43:21
44:8 45:24
46:24 57:14
64:17

area
9:10 25:9,
11,12,15
47:7 59:18
64:10 77:6

areas
24:9 26:13

arm
26:12 34:15

arms
30:9 31:5
34:15

around
12:23 14:22
25:9 37:22
42:4 45:13
65:13 76:13
77:6

arrival
11:24

arrive
46:15

arrived
11:10 12:12,
17 17:16
18:8 46:23
61:2 76:3,10
78:3

asked
15:20 22:11,
25 23:10
26:24 30:23
33:9 45:9
46:5,9 51:7
53:15,18
54:5,6
55:11,12,14
56:2,7 62:5
73:6 74:6
75:10,11,20,
23

asking
6:18,22 7:12
12:25 20:14
35:2,3 38:1
41:3 43:12
50:3,8 51:11
53:11 56:17
75:14

asks
6:12

aspects
57:13

assess
13:8 29:24

assessed
21:16 23:2

assessing
12:14 16:13

assessment
17:15 23:10

assume
4:14 6:21
19:15,17,18,
20,23 28:14

Appx_1186

29:16 61:25
64:4 75:3
**assumed**
17:14 60:12
**assuming**
24:24 62:12
**asystole**
19:13
**attempt**
18:12
**attempted**
17:9 18:10
20:3
**attempted-
considered**
20:4
**attention**
21:19 68:1
**attorney**
38:21
**audio**
45:17
**authorized**
67:22
**automobile**
10:9
**autopsy**
49:8
**avoid**
60:7
**aware**
39:15 46:21
57:22 76:9,
11

————————

**B**

————————

**baby**
8:9
**back**
8:6 14:12
16:1,3,17
22:9 23:3,9,
21 25:18,19
27:6 30:21
32:13 33:16,
22 35:12

36:10,16,22
37:11 47:23,
24,25 55:13
57:15 58:19
62:10 69:24
74:13
**background**
8:11
**bad**
50:16 66:12
**ballpark**
45:23
**based**
20:7,15
28:17 29:7,
18 31:24
35:23,25
36:1 48:3
53:22 63:18
**basic**
11:20
**basically**
19:5
**began**
12:13
**begin**
9:14
**behalf**
4:8,11 71:16
**behind**
16:1 53:14
61:7 62:24
**belabor**
78:10
**believe**
10:8 12:18
14:10 15:14
16:16 20:11
28:18 33:21,
23 34:18
37:16 38:2,
13 39:2,23
41:13 51:24
52:14,15
54:1,18
55:21 59:23
60:4 61:4

66:19 71:17
72:24 73:6,
18 76:1 78:4
**believed**
24:4,5 29:9
32:5 51:19
**benign**
68:18
**beside**
18:4 36:16,
22
**besides**
49:2 53:16
**best**
27:2 53:8
57:23 59:24
66:1
**better**
34:5,20
67:10 69:4
**big**
25:23
**bilingual**
44:24
**billing**
15:23
**biomechanical**
52:22
**birth**
7:24
**birthday**
56:5
**birthdays**
53:12
**bit**
25:15 34:5,
13 41:9,10
69:21 74:4
77:1
**black**
10:15
**block**
59:14
**blocked**
12:20 46:25
**blood**
19:15,21

61:6,7,9,16,
20,22,23,24
63:11 77:1,3
**bloodstains**
77:22
**blown**
48:1 62:20
**BLS**
8:24 9:2
**blue**
12:5 33:19
40:5 77:21
**blunt**
28:24
**bodily**
12:22 13:14
31:23 61:18
72:9
**body**
12:5 17:12
18:3 23:6
24:5,6,10
26:11 28:20
29:9 31:24
37:16 40:4,
12,13,17
48:7,11,16,
22,23 50:10
52:17 54:17
58:23 61:2
62:2 66:3
76:2,5,9
77:9,11,21
78:1,11
**bone**
14:14
**Bonilla**
4:17,21 5:8,
13 7:7,22
12:3 15:8
20:7 21:15
32:10 37:12
38:16 72:21
76:17
**bottom**
15:16 21:4
**box**

28:10,12

**boxes**
27:20

**BP**
19:14

**brain**
14:16 18:1
21:7

**break**
7:1,3,6
37:10,13

**breaks**
48:19 49:1

**Brian**
4:8,23

**brief**
23:10 37:14
53:5

**briefly**
7:11 8:5,10
33:2 34:3
47:3

**bring**
71:17

**brother**
12:24 32:24
35:7 41:20
50:3,14
53:5,6 56:25

**brother's**
50:10,21
66:3,10

**brothers**
8:9

**brought**
22:23

**bruise**
24:15,18
26:2,4,5,17
30:8,14

**bruised**
25:16

**bruising**
26:13,21
31:4,15 67:7

**bumper**
31:7 62:7

**bunch**
65:21

**Bunt**
4:8,13,20,24
20:14,20
28:22 30:5,
15 31:17
32:10 37:7,
12 39:12,19
41:1,3,18
49:22 55:6
56:1 57:16
59:10 60:3
63:20 70:16
71:7,13,22
72:20 76:25
77:16 78:10,
18

**busy**
72:22 73:1

**buzz**
60:13

**bystanders**
58:23

---

### C

**C-E-S-A-R**
5:11

**call**
10:21 11:2
19:4 23:24

**called**
7:3 45:17

**calling**
41:7

**calls**
42:14

**cam**
54:17

**camera**
24:25 33:22
37:16 47:19
49:25 50:2
64:9

**cameras**
12:5

**Camry**
10:15,17
22:6 65:3,6
77:20

**Camry's**
62:7

**captured**
12:4 54:17

**car**
22:6,23
29:13 30:17
31:2 32:23
35:14,21
36:7,9,15,22
38:7,8 49:16
52:8 53:13,
14,19,22,24
54:11,21
55:13 56:22
62:11 72:14
74:1,7,8,10,
19 75:21

**car-on-car**
42:23,25

**card**
50:5 56:17

**Cardio/defib**
20:2

**care**
11:23 12:15
14:24 17:14
21:17 33:7
59:18 67:23
72:4

**career**
45:8

**case**
15:15 25:14
39:11,16
40:20,24
41:2,4 46:9,
11 58:14
66:5

**caused**
29:1 32:1
70:10

**Caylee**

4:9,25

**centimeter**
24:19

**centimeters**
25:22

**Central**
4:4

**certain**
52:4,21

**certainty**
48:4

**certification**
8:24,25
11:21 41:25

**certification
s**
8:16,22 9:4,
6 45:3

**Cesar**
5:8,10

**CEVO**
8:25 9:2

**chance**
20:22 73:24
74:6

**change**
62:11 63:2
67:10 68:17

**changed**
35:13 54:25

**charge**
11:23 50:11

**charged**
60:20

**check**
13:23 17:16
28:9

**checked**
13:8,9,16
27:20 67:18

**Chemical**
4:9 5:3

**circle**
29:6 63:16
64:8

**circumstances**
18:16 69:22,

23
**City**
  10:2,5
**claim**
  54:14
**clarifications**
  56:12
**clarify**
  11:16 61:21
**classes**
  8:17
**clear**
  6:14 36:4
  47:7 64:17
  69:3
**clearer**
  74:4
**clearly**
  14:12 31:5
  49:6 56:3
  75:23
**clip**
  25:18 37:15
  41:8,19
  56:11
**clogged**
  45:15
**closer**
  61:19
**cloth**
  12:21 13:4
  77:21
**Colinas**
  10:2,5
**collapsed**
  50:18
**college**
  8:12,14,17
**collision**
  43:18
**color**
  65:4
**come**
  39:24 45:11
  53:14 72:7
  76:13

**communicating**
  73:15
**company**
  4:10 5:3
  15:13,15
  38:25
**complained**
  24:3
**complaining**
  24:8,12 33:7
**complaints**
  23:14
**completely**
  43:16
**complies**
  64:12
**concluded**
  20:9
**conclusion**
  46:15 47:5
**concrete**
  13:14 29:17,
  20
**concurred**
  36:3,5
**condition**
  12:14
**conduct**
  59:4
**confirm**
  13:10 30:4
**confirming**
  45:6
**confusing**
  6:14
**congestion**
  58:15
**considering**
  69:5
**consistent**
  38:11 51:6
**consistently**
  35:10
**contact**
  31:7 50:11
**contains**

  7:16
**continue**
  9:17 14:15
**control**
  70:20
**contusion**
  24:15,21
  32:1
**contusions**
  48:19 49:1
**conversation**
  41:5 49:23
  50:2 54:16,
  23 55:16
**conversations**
  49:24 56:13
**copy**
  23:19 27:9
  56:24
**correct**
  4:22 6:1
  7:9,13,20
  10:24 13:18
  19:18 21:10
  26:6 28:5
  29:11 33:19,
  20 35:18,25
  38:4 41:22
  48:2 51:22
  52:23 53:1
  63:1,3 67:20
  68:23 76:3,
  4,7,8
**correctly**
  19:10 27:22
  30:1,3
**Corsicana**
  9:9
**counsel**
  4:5
**counting**
  42:7
**county**
  10:10 42:9
  43:13,19
  72:22 73:3

**couple**
  4:24 6:19
  10:14 11:3
  13:7 15:19
  16:14 27:6,
  20 34:15
  42:1 46:14
**course**
  5:19,21
  12:24
**courses**
  8:17
**court**
  4:6,16 5:22
  37:5 64:16
**cover**
  12:21 17:6
**covered**
  13:2 39:14
**covering**
  77:21
**credits**
  45:5
**crew**
  10:9
**critical**
  39:16
**crushing**
  50:15,17
**current**
  7:5 8:1

D

**danger**
  59:1
**dangerous**
  58:4,9
  70:14,23
  73:7,10
**dangerousness**
  58:11,18
**Daniel**
  38:2
**dark**
  65:4

date
  7:24 27:18
  41:8
day
  11:23 16:24
  17:3 21:14
  33:5 36:19
  37:1 39:9
  40:21 47:6
  51:8 65:24
  66:7 72:11
  74:14
days
  26:9
dead
  17:8,21 18:8
  49:5
dealt
  43:1
deceased
  15:1 17:16
  18:18 20:10
decide
  15:4
decided
  18:17
decision
  69:4
defendant
  5:4
defendants
  4:9
defendants'
  15:7 22:15
  76:20,22,24
  77:15,17
  78:2
definitely
  14:13 28:19
  42:9,14 51:2
  66:12 78:5
definitive
  29:7
definitively
  23:8 48:25
  49:2

degree
  8:21
Dena
  32:25 33:22
  34:24
Department
  12:19 17:13
  38:3 56:17
depending
  30:6
depicts
  76:2
deposition
  5:14,23 6:24
  7:13,18
  15:20 16:2
  30:15 36:15
  41:12,15,18,
  19 77:8
describe
  41:23 43:5
  44:17,24
  47:19 50:13,
  24 52:2 53:9
description
  43:25
Destination
  17:7
detail
  14:6 17:25
details
  56:13
detected
  19:5
determine
  13:17
determined
  14:25 18:11
  21:16
determining
  12:15
diagnose
  68:6
diagnosis
  67:23
Diaz
  32:25 34:1,

24 35:7
  36:21,25
  37:3,24
  73:16
died
  20:11
difference
  11:17
different
  36:18,20,25
differently
  57:15
dilated
  17:24
direct
  72:25
directed
  49:10
direction
  16:18 36:23
directly
  19:2
director
  15:23
disagree
  77:12 78:14
disbelieve
  51:12 77:13
disclose
  43:10
discreet
  48:20
discussing
  20:5
discussion
  35:5
dispatch
  44:7
dispatched
  10:9
dispatchers
  44:5
Disposition
  17:8
disregarding
  71:12

disrobe
  26:15
distracted
  70:10 71:3
distraught
  50:22 51:2
  55:9
disturbance
  50:19
ditch
  47:8
divide
  15:4
doctor
  27:3
document
  18:19 28:7,
  15
documents
  41:14
doing
  6:4,10 10:4
double-
checking
  54:13
drag
  77:22 78:5
dragged
  78:1
draped
  40:4
draw
  63:21 64:8,
  13 70:13
drawing
  63:16
dried
  61:12,24
drive
  8:2 64:25
  70:15 71:6,
  25 72:5
driver
  22:6,7 38:24
  60:18 70:10
drivers
  10:16

Julio Bonilla
October 31, 2023

drives
71:11,19
driving
5:1 70:24
drug
77:11
dry
18:5
dual-
certified
11:4
duly
4:18

---

**E**

---

earlier
26:6,8 47:10
51:21 56:12
61:5 67:6
68:17
early
35:1
easily
65:6
east
43:18
Eastman
4:9 5:3
ECG
18:23
educational
8:11
efficient
22:16
eight
42:4
either
5:24 23:5,8
31:14 45:16
46:13 54:25
58:19 59:14
62:13,14
63:13 71:2
EKG
13:20 16:10

El
44:20,21
65:25
elaborate
50:17 67:8
electrical
13:11,23
14:2 17:20
electrically
19:2
electrocardio
gram
13:10,21
18:24
emailed
41:8
emergency
43:2 44:10
45:21,25
57:20,23
58:2,12
59:8,20
60:1,2,6,10,
15 65:12
72:14
emotional
50:13,19,25
employed
9:12
employer
5:3
EMS
10:3 20:3
67:21
EMT
9:6 11:15,
17,20 16:23
42:2
end
50:10 78:23
ended
40:13
English
34:25 35:2
53:25 55:16
74:12

English-
speaking
66:22
enlarged
27:8
entail
41:5
entire
56:15
equipment
45:18
Erick
32:23 34:23
35:6 36:14,
23 37:24
56:25 73:16
77:8
essentially
11:22
evaporated
61:17
Evelyn
21:20 27:14
34:18,22
35:11,16,24
36:16,23
41:20 47:2
49:17 50:24
53:15,23
57:8 62:10,
20 63:4
67:7,13
68:25 74:11
Evelyn's
69:9,15
event
10:21
events
22:10 36:9
everybody
69:12,25
70:3 71:19
74:15
everyone
47:7 76:14
evidence
28:18 78:11

exact
41:8
exactly
69:16,20
EXAMINATION
4:19 38:18
72:19
examine
22:12 24:9
32:12
examined
27:2,23 28:1
32:13
examining
22:19,22,25
exchange
55:19 57:13
excuse
22:8
exhibit
12:1,2 15:7
17:1 22:15
23:25 33:16,
18 49:22
60:23,25
67:12 75:25
76:17,21,23,
24 77:15,17,
18 78:2
exhibits
7:16,17
expect
60:17
experience
30:8
experienced
29:20
expert
52:22
explain
68:14
Explorer
10:15,19
38:24 39:18
exposed
21:7 69:13

Appx_1191

| | | | |
|---|---|---|---|
| **expound** | **feel** | 20 74:5 | 57:3,16 |
| 42:11 | 13:17 22:16 | **fixed** | 59:10 60:3 |
| **extra** | 63:23 66:12 | 17:23 | 63:20 65:8 |
| 56:13 | **feet** | **flank** | 70:16 71:7, |
| **eyes** | 29:10 30:24 | 24:3,8,16,24 | 22 |
| 70:24 71:3 | 52:13 | 25:4,9,11 | **formal** |
| | **fell** | 26:12,17 | 45:3 |
| | 24:5,6 29:9, | 30:9,14 | **forms** |
| **F** | 16 | 31:16,20 | 57:7 |
| | **felt** | **flashing** | **forth** |
| **face** | 23:4,13,15 | 60:7 | 12:16 14:8 |
| 14:9 34:14 | 31:19 50:16 | **flat** | 22:19 30:22 |
| 47:16,18 | **female** | 19:9 62:15 | 69:24 75:22 |
| **faces** | 22:1 | **flip** | **forwards** |
| 34:5 | **filled** | 19:6 27:6 | 34:4 |
| **facing** | 66:24 | 67:14 | **found** |
| 37:5 | **finally** | **fluent** | 48:24 |
| **facts** | 42:2 | 33:11 45:1 | **four** |
| 55:8 | **find** | **fluid** | 12:2,6,23 |
| **fair** | 13:10,12 | 31:23 32:2 | 16:6,9 49:24 |
| 6:22,23 | 17:19 19:21, | **fluids** | **fourth** |
| **fall** | 22 | 13:14 18:3 | 16:3 |
| 29:20 30:7,8 | **finding** | 61:18 | **fracture** |
| **familiar** | 19:17 69:9 | **focused** | 21:6 |
| 10:13,22 | **findings** | 48:12,15 | **free** |
| 25:20 | 21:14 69:5, | 51:3,4 | 22:16 |
| **family** | 6,8 | **folks** | **freeway** |
| 28:2 38:22 | **fine** | 21:19 | 22:24 59:15 |
| 56:18 68:25 | 5:16 47:16 | **follow** | **frequently** |
| **far** | 63:24 64:9 | 46:18 | 64:25 |
| 6:4,10 26:17 | 68:2 | **follow-up** | **front** |
| 30:22 31:13 | **finish** | 72:21 78:16 | 59:16 62:14, |
| 34:14 42:13 | 7:4 | **following** | 17,18,19 |
| 51:7 55:7,10 | **fire** | 16:12 17:2 | **full** |
| 57:11 58:24 | 12:19 56:17 | **follows** | 5:6 28:20 |
| 59:1 70:1 | 58:21 59:12 | 4:18 | **functioning** |
| 76:19 | **firemen** | **foot** | 30:2 |
| **fast** | 11:4 | 52:20 | **futile** |
| 32:6,7 38:21 | **first** | **Ford** | 18:12,13 |
| **fatalities** | 4:18 5:15 | 10:15 38:24 | 20:4 |
| 42:6,18,22 | 7:18 11:10 | 39:17 | **future** |
| **fatality** | 12:18 13:16 | **form** | 8:20 |
| 27:1 44:3 | 15:19 17:6 | 20:17 27:19 | |
| 46:3 69:11 | 30:19 32:11 | 28:21 29:21 | **G** |
| **Federal** | 42:10,16 | 30:12 31:9 | |
| 4:14 | 43:22 47:10 | 32:3 39:12, | **gained** |
| **feedback** | 55:11 67:17, | 19 55:6 56:1 | 42:2 |
| 57:19 | | | |

**Garland**
8:2,3,15
**gathering**
54:12
**gave**
38:10 50:5
**general**
43:12 44:19
60:9 64:10
69:12
**generated**
67:4
**gentleman**
12:5 16:20
32:24,25
**getting**
7:4 41:7
43:2 52:7
55:8 59:2
62:11
**girl**
8:9
**give**
6:19 7:13
21:17 75:7
76:12
**given**
5:14 27:1
44:2,4,5
55:23 69:21,
23 74:21
75:18
**goes**
59:16
**going**
5:2,17 7:16
8:19 14:5
15:1,4 16:3
17:25 21:17
22:14 30:21
32:6 37:3
38:17 41:6
42:16 47:5,
21 50:4,10
59:21 69:24
71:5,11
72:3,8 76:13

**good**
4:21 17:25
25:12 27:3
72:13 78:9
**Gotcha**
11:24
**great**
14:5
**grew**
44:15
**ground**
29:13 31:1
**group**
49:20
**grow**
44:18
**grown**
26:23 67:7
**gruesome**
42:15
**guess**
8:15 10:14,
21 11:16
12:12 16:2
18:22 20:4,
9,15 22:1
23:12 28:23
30:5 32:10,
16 33:18
34:16 46:15
76:6
**guys**
68:3

_____

_____
**H**

**hand**
29:6 52:19
64:16
**handed**
64:5
**hands**
30:9
**happen**
54:23 60:17,
18

**happened**
20:21 36:10
42:3,7,18
43:23 46:8
50:2 54:11
70:5,7 74:19
**happily**
7:1
**happy**
7:5
**hard**
6:8 29:20
30:6 45:19,
22
**head**
6:8 13:13
14:4,6,7,11,
12,20 21:5
29:15 33:25
42:21 47:12,
13,20,23,24,
25 48:4,8,12
49:1,6 52:20
54:7 61:19
62:16
**Health**
9:13,15,23
10:2 15:12,
16,23
**heard**
38:6 39:9
68:14
**heart**
13:12,24
14:2 19:12
**help**
43:17 46:14
66:2,5
**hey**
54:10 59:7
75:20
**high**
8:11,14 45:5
68:8,12,15
73:3
**high-stress**
55:9 74:24

**happened**
75:18
**high-velocity**
52:9
**higher**
25:16
**highlighted**
27:9
**highly**
74:21
**highway**
43:15,19
59:14 72:23,
25
**hip**
26:12
**HIPAA-
PROTECTED**
43:11
**hips**
30:10
**Hispanic**
22:1
**hit**
29:9 51:18,
22,24 52:3,
4,7,12,16,19
69:16
**Hmm**
39:20
**hold**
8:24 25:6,7
**honest**
71:20
**honestly**
56:15 64:4
**hope**
75:11
**hospital**
17:12 23:11
27:1 28:4
**hot**
64:18,19
**hour**
6:25 67:5
71:5,11 72:3
**Houston**
72:25

huh-uh
  6:7
hurt
  50:20 53:16
  56:4
hurting
  31:20
husband's
  24:5,6 29:9

_____

**I**

I-45
  10:10 42:20
  65:1 72:11,
  22 73:2,8,13
ICD
  19:2
idea
  18:7 39:3
  49:9
identify
  28:25
illegal
  70:20
illness
  67:25
important
  39:22 40:9,
  10 71:6
impression
  75:8
inches
  25:23,24
incident
  17:8 35:13
  42:3,8 44:2
  62:6 65:16
incidents
  60:7
include
  42:23
including
  16:10
indeed
  18:18

independent
  65:17
index
  68:8,12,15
indicate
  14:18 40:15
indicated
  17:18 21:15
  28:19 29:19
indicating
  25:10 47:22
  64:10
indication
  18:1 19:9,21
indications
  29:19
indicative
  19:13
indicator
  25:12
individually
  49:19 54:10
individuals
  33:11 37:23
  54:20
information
  33:10,14
  40:1 43:11
  44:5 46:10
  54:13 59:2
initial
  64:11
initially
  32:5
injured
  23:1 31:14
  54:14,15
injuries
  12:22 14:14
  20:8 24:13,
  17 30:11
  32:9 33:7
  48:6,11 67:9
  68:7,17
  70:22 72:10
injury
  13:13 14:5,7

29:1,2
  47:11,20
  48:8 49:6
  67:25 68:21
inside
  74:1 75:21
instantaneous
ly
  20:22,24
instantly
  20:11
intact
  14:9 47:18
intent
  59:23
intentionally
  72:2
interesting
  68:13
interpret
  19:10 57:12
interpretatio
ns
  45:9 46:12
interpreted
  61:18,19,21
interpreter
  45:14
interpreting
  44:9,11
interstate
  43:13 72:23
involved
  5:1 43:14
issues
  39:16

_____

**J**

Jacob
  4:11,13
job
  6:10 43:24
  66:4
judging
  63:11

Julio
  4:17 5:8
July
  7:25
jurors
  25:20

_____

**K**

keep
  11:25 70:1,
  3,5
kidney
  25:13
kill
  32:8
killed
  35:19 38:23
  69:1
kind
  14:6,18,24
  18:16,22
  24:24,25
  25:10,11,21
  26:1 27:8
  30:21 34:15,
  16 36:3,5,22
  37:22 42:9,
  11 45:19
  53:6 63:12
  66:2,10
  69:16 76:17
  77:5,19
knee
  24:4 26:17
  31:20 52:20
knees
  30:9 31:5
knew
  22:7,8 35:3
  69:25
knock
  52:12
knocked
  29:10 30:16,
  24 31:6

knot
  49:1
know
  5:19 7:4
  14:5,13
  15:10,11,15,
  24 17:18
  18:5 19:12
  20:16 22:5
  23:1 25:13,
  17 27:3
  28:25 29:1,
  5,25 30:2
  31:7,14,21
  32:6,7 34:17
  38:4 39:20,
  25 42:13,15,
  18 43:2,13
  45:14,16
  46:7 47:12
  48:4 49:8
  50:9,10
  52:4,6,9
  53:16,21
  58:8,13,22
  59:1,4,15,21
  60:20 63:12
  64:13 65:24
  66:3,4,5,15
  67:9 68:6,7,
  10,17,18
  69:3,12
  70:1,2,21
  71:21,24
  75:20
knowledge
  59:24 63:9,
  18

———————————

L

———————————

lack
  20:8
lady
  32:25 33:21
Lakeview
  8:14

land
  30:24
landed
  29:13 62:3,4
  69:16
lane
  40:3,7 47:1
  60:6,14
  61:10,14
  62:4,22
  63:13 76:6,
  18,19 77:2,
  10 78:13
lanes
  59:15 73:8,
  11
large
  26:20
Las
  10:2,5
law
  60:5
laws
  66:15
lawsuit
  4:25 5:4
lawyers
  6:14
lead
  18:23 43:22
  68:10
leading
  31:13 66:19
leads
  78:20
learn
  44:18
leave
  32:16 68:25
leaving
  9:23 11:9
Lee
  38:3
left
  8:5 14:11,15
  17:13 21:11
  34:1,14

40:2,3,7
  47:1,11 61:9
  62:18,19
  63:13
left-most
  61:10,13
leg
  26:12
legal
  5:6
legally
  68:5
length
  20:9
letting
  19:12
license
  8:23 11:22
life-
threatening
  68:11
lifted
  26:16
lights
  59:21 60:1,7
  65:12 72:15
line
  19:9 68:19
  76:7
lines
  45:14
listen
  37:17
little
  6:8 25:15
  32:14 34:5,
  13 41:9 47:8
  66:22 69:21
  74:4
live
  5:20 8:7,8
lived
  8:3,5
LLC
  15:11
located
  35:8 77:11

location
  56:4 57:5
  63:7 76:2,10
  78:1
logistics
  41:19
Lonestar
  15:10,14
long
  6:24 8:3
  9:17 18:7
  67:3
longer
  11:21
look
  16:8,17
  22:15 24:1
  27:11 29:3
  33:16 48:10,
  16 67:12
  76:25 77:3
looked
  14:10,14,15
  26:1,2 41:17
  47:11 53:17
  56:11 70:2
looking
  28:24 36:22
  77:25
looks
  61:12 78:5
lot
  11:21 43:17
  51:2
loud
  6:6
luck
  70:13
lying
  40:3 51:15
  62:3 75:8

———————————

M

———————————

made
  5:4 6:13
  14:4 28:9

31:7 56:20
62:21 72:12
**main**
17:23
**maintenance**
62:16
**majority**
11:7 66:20
**make**
6:17 18:18
24:14 25:8,
19 36:4 39:5
56:19 67:22
68:3 69:2
75:19 76:20,
22
**makes**
62:8
**man**
10:18 38:22
49:5
**man's**
33:25
**manifest**
68:22
**Marissa**
15:22
**mark**
60:22 76:22
77:16,17
78:6
**marked**
28:9 60:25
76:24 77:15
**marks**
77:23
**massive**
13:13 14:4
**matter**
14:16 21:7
**Mayfield**
15:22,24
**mean**
6:15 19:25
24:25 26:8
29:15 32:7
33:6 39:25

43:10 50:6,
15,16 51:4
55:7 58:7,24
63:11,21
64:3 65:9
66:1 67:9
69:7 70:4,7,
19 71:16
72:2 73:1
74:14,23,24
78:4
**meaning**
26:8 68:9
**means**
17:10,11
19:20 20:1
**meant**
21:11 29:16
47:14 55:2,5
**measurements**
25:21
**mechanical**
13:12
**mechanism**
29:1
**medical**
10:2,5 15:9
26:25 33:7
66:25 67:4,
13,25 68:4
69:4
**Medstar**
10:1
**Melvin**
32:25 34:24
**mentioned**
4:24
**mentioning**
37:13
**metric**
25:20
**mic**
25:19
**Michael**
16:21
**middle**
5:9 61:13

62:4,22 64:5
**miles**
71:5,11 72:3
**millimeters**
17:24
**mind**
63:16 73:24
74:5
**mine**
11:11
**minor**
23:15 31:12
**minutes**
13:8 18:9
**mispronounce**
4:22
**misremembering**
54:24
**missing**
14:13
**mistaken**
44:20
**mistakenly**
23:24
**misunderstanding**
75:1
**misunderstood**
74:2,3,9,20
**mixed**
8:17
**Mobile**
9:13,15,23
10:1 15:12,
16,23
**moment**
4:24 8:20,21
9:1 20:5
24:1 53:5
76:13
**monitor**
19:3,4,5
37:5
**months**
42:2,4

**Moreno**
21:20,25
27:12 29:2
30:15 31:22
32:11 34:22
35:16 67:7
**Moreno's**
67:13
**motor**
58:8 70:21
**move**
15:6 16:1
18:19 32:18
58:14
**moved**
15:2 40:17
48:23 76:9
78:12
**multiple**
44:6 52:5

**N**

**name**
4:22,23 5:7,
8,9 27:12
56:5
**named**
10:18
**names**
34:2,7 53:11
**Narrative**
21:5
**national**
42:2
**Navarro**
10:10 42:9
43:19 72:22
73:3
**navigate**
55:25 75:13
**nearby**
54:17
**necessarily**
69:9 78:14
**need**
7:2 33:7

45:16 59:8

**needed**
66:2

**needlessly**
70:14,23
71:12 73:7

**negative**
57:19,21

**Nehemias**
10:18 32:23
35:16 36:16,
17,23,24
38:22 39:16
61:2 62:21
63:10 64:23
66:17 69:1
77:9

**Nehemias'**
63:7

**Nehemias's**
66:9

**never**
40:1 48:23
53:3 57:21
68:13

**nodded**
53:21

**nodding**
6:7

**non-english**
55:18

**normal**
44:2,4
69:21,23

**north**
10:2,6 72:13

**northbound**
64:25 78:13

**note**
13:13 14:4

**notebook**
7:15 15:8

**noted**
15:2

**notice**
7:18 17:7

**November**
9:16

**Number**
15:8 17:2
33:17 67:13
75:25 77:18

**numbers**
54:12

---

**O**

---

**oath**
5:19,20

**Object**
39:12

**objection**
20:13,17
28:21 29:21
30:12 31:9
32:3 39:19
55:6 56:1
57:16 59:10
60:3 63:20
65:8 70:16
71:7,13,22

**obliques**
25:12

**observe**
28:17

**observed**
20:8,16
29:18 31:25

**obtained**
8:16 15:10
56:21 57:4

**obvious**
24:17

**obviously**
48:12

**occipital**
14:11 21:6

**occupants**
10:17 32:19,
22 34:11
35:14 36:2
49:16 55:13
57:3,8 66:20

**74:13**

**occur**
49:24

**occurred**
10:10 49:8
55:16

**October**
4:3 9:18,20

**offered**
27:22

**office**
7:8

**officer**
37:16 38:2
46:19 54:17
55:12,14,15,
20 56:10,14
60:19

**officer's**
12:5 50:5

**officers**
35:10 49:11
58:13

**official**
30:22 44:13
45:14,20
46:18

**officially**
57:25

**Okay**
5:16 8:10,
19,22 9:2,8,
22 10:4,7,
13,24 11:13,
16,19,24
12:8,17 13:6
14:4,23
15:6,17
16:1,7,20
17:5,18
18:2,7 20:19
21:12,22,25
23:7,21 24:3
25:2,25
26:3,11,20
28:6,11 29:8
30:18,25

**31:17 32:15**
33:4,9,16
34:23 35:5,
15 36:4,11,
14 37:19,21
38:1,10,16,
21 39:3,21
40:9,19
41:11,14,17,
23 42:22
43:1,5,20
44:1,8,14,17
45:1,3,23
46:11 47:10,
19 48:6
49:8,10,14,
18 51:18,21
52:22,25
53:3,8,13
54:2,6
55:18,23
57:13,18
58:1,4,6,10,
16 59:3
60:21 61:5,
24 62:2,19,
24 63:25
64:6,8,11,
15,19,25
65:3,11,15
66:24 67:3,
6,17 68:2,
12,24 69:9,
15 70:4,9
71:5,25 72:3
73:15 74:17
76:15 77:8
78:7,10

**older**
12:24 32:24

**oncoming**
59:7,21,25
65:7

**one**
5:1 7:3,18
9:3 11:6,8,
12,22 15:3
16:6,16,18

18:16 21:23
23:5 29:14
31:6 34:16,
19 35:17
39:15 44:1
49:11 50:18
52:7 55:1,4
57:2,3,8
60:6,14 64:2
65:19,21
67:20 68:5
70:19 73:8,
11 74:4
76:14 77:17
78:8

**onlookers**
59:7

**open**
21:5,8

**open-skull**
14:14

**operating**
58:8

**opinion**
20:15,23
63:9,18 64:2

**opportunity**
78:8

**opposed**
6:7

**order**
11:25

**originally**
78:12

**outside**
36:15 74:10,
18 75:21

────────────

**P**

────────────

**p.m.**
4:4 37:10

**page**
16:3,6,14,18
17:7 18:21
19:6 21:4
27:8,10

34:19 67:14

**pages**
15:19 16:9
27:7

**pain**
23:14,15
24:3,4,8,12
26:17 31:19

**PAL**
8:25

**palpable**
13:9

**paragraph**
67:17

**paramedic**
8:17,23 9:4,
9,22 10:1,8
11:13,17,22
41:24,25
42:1,5 43:22
45:8 68:14

**paramedics**
11:1,4

**parents**
8:8

**part**
10:8 14:9
26:11 33:13
48:13 55:22
76:6

**particular**
51:16 54:18
55:24 65:16,
22 73:17
74:11

**parties**
4:25

**partly**
76:5

**partner**
11:15

**parts**
23:6 52:5
63:15

**pass**
38:17 73:1
78:18

**passengers**
22:22

**passing**
50:21 73:2

**past**
46:17

**patient**
11:5,23
17:8,11
18:20 27:12
28:10

**patients**
18:14 33:3
44:6 59:17

**pattern**
26:20

**pause**
37:8

**pavement**
29:20 30:10
61:6

**pedestrian**
42:25 43:2

**pedestrians**
42:23

**people**
12:23 15:3
35:12,15
40:21 43:14
45:13 46:6
50:11 55:13
60:13 65:24
66:5 68:3
71:2 75:2

**Perfect**
68:2

**perform**
18:15

**performed**
13:20

**person**
13:2 22:2
30:6 34:14,
17 38:1 39:7
62:10

**personal**
33:13

**personnel**
45:16 60:10
67:21

**persons**
15:7 32:22
33:1 34:8
37:22

**PHI**
33:13 46:10,
13

**phone**
54:12

**photo**
60:21 62:3

**photograph**
76:15

**photographs**
12:2,3 14:18
31:21 33:17

**phrase**
68:13

**physician**
67:24

**physicians**
67:22

**picks**
25:8

**picture**
34:14 76:12,
20 77:19

**pictures**
12:6 34:4

**place**
11:23 36:9
48:20

**Plaintiff's**
60:22 75:25
76:17

**plaintiffs**
4:12 5:5

**plaintiffs'**
60:25

**planning**
8:20

**play**
37:3 45:25

played
 5:25 37:20
 49:22
playing
 37:6
please
 4:5,21 5:6
 6:6,15
point
 7:3 21:19,23
 31:18 33:9
 35:5 50:18
 72:25
police
 12:4 17:13
 38:3 46:5,6,
 12,17,19
 49:11 50:5
 54:17 60:19
pooled
 77:2
portrayed
 56:11
position
 30:7 56:22
positive
 57:19
possibility
 30:4 47:6
 55:4 74:23
possible
 14:19,21
 31:23,25
 52:16,18
 56:3,8 59:5
 77:25
possibly
 50:10
potential
 68:7
potentially
 53:16
practices
 57:23
prepare
 41:15,18

prepared
 16:12 17:2
 65:16
present
 19:17,20
 33:3
presented
 18:20 23:2
pressure
 19:15,21
pretty
 17:25 19:9
 26:10,23
 35:1,9 39:13
 44:22 55:8
 72:8,9 73:1,
 3 74:15
 75:18
preventing
 58:22,23
previous
 26:9
primarily
 48:14
print
 19:3 29:6
printout
 19:7
prior
 21:13 40:20,
 24 41:2
privacy
 32:14
private
 54:13
probably
 20:11 25:17
 64:10 66:6
 72:6
procedures
 4:14
proceedings
 78:23
professional
 20:15
proficiency
 45:6

proficient
 54:3
program
 42:1
properly
 6:9
protecting
 58:25
protocols
 57:22
provide
 12:15 32:14
provided
 27:19
provider
 18:17
public
 48:20 60:9
puddle
 61:12
pullover
 60:5
pulse
 13:9,13,16,
 17 17:19
 19:17,18,21
pupils
 13:8 17:23
pursuant
 4:14 7:8
pursue
 8:21
pushing
 42:4

---

**Q**

qualified
 67:22
question
 6:5,12,16,
 17,20,22 7:5
 38:2,7 54:10
 65:19 75:10
questioning
 47:10

questions
 5:17,18,21
 6:14 15:20
 16:2 22:16
 30:1 35:2
 37:17 38:20
 51:6 72:17,
 21 73:22
 75:16 78:17
quick
 51:5
quickly
 14:25 21:2,3
 47:5 68:20
quite
 17:17 42:10
 45:10 46:2
 76:19 77:1

---

**R**

ran
 36:9
rate
 73:3
read
 5:24 27:10
 67:17
reading
 14:2,3 16:10
real
 29:24
rear
 62:7,14
 77:20
reason
 51:12,16
 65:22 66:17
 68:16 72:13
 77:12
recall
 33:1 34:7
 38:14 74:14
receive
 26:25
received
 7:20 44:9

57:18

**receiving**
18:24

**recent**
26:3,4,10,23

**recently**
8:24 66:14,
18

**recollection**
30:20 36:6
53:8 65:17

**reconstructio
nist**
53:1

**record**
4:3,6 5:7
18:10 20:18
33:14 37:8
47:12 49:4
56:19 64:1
78:21

**recorded**
5:23

**records**
14:17 15:9,
18 16:4,10
17:1,2 19:7
22:17 23:17,
20 27:7
66:25 67:4,
13

**red**
25:25

**Redirect**
20:17

**reduce**
58:10,18

**refer**
7:17 12:1
15:7 22:17
24:21 25:10

**reference**
18:24 35:16

**referring**
13:1 19:7

**refusal**
57:3,7 67:14

**refusals**
56:21

**refused**
23:11 27:5,
21 28:3
32:11,15

**refusing**
68:4

**region**
21:6 24:16

**Regional**
10:3,6

**registry**
42:3

**regrouped**
53:7

**Regulato**
32:25 33:23
34:24 35:7
37:24 73:16

**reiterated**
74:22

**related**
9:4 39:7

**relevant**
39:4,6,11

**remainder**
72:17

**remember**
10:19,20
21:22 22:18
23:16,25
29:12,14,25
30:21 34:2
47:2,3 48:6
49:14 50:18
56:16 62:13
64:19 65:11,
14,15,20
66:6,24 67:3
69:17,20

**remove**
58:16

**removed**
13:7

**renewed**
8:25

**repeat**
6:16,18

**rephrase**
6:17,19

**report**
16:12 24:21

**reporter**
4:7,16 5:22
37:5 60:24
64:16

**represent**
4:24 5:5
12:2 15:8
27:7 61:1
62:17 77:18

**represents**
38:22

**REPS**
19:23

**request**
6:11

**reserve**
72:17

**residence**
8:1

**resources**
15:5

**respira-**
19:23

**respirations**
19:24

**respiratory**
19:25

**respond**
10:24

**responded**
15:21,22
43:20

**responders**
43:17

**responding**
38:6 60:14
68:20

**responds**
59:13

**responses**
73:19

**rest**
15:2 22:22
28:2 77:9

**rested**
78:2

**restroom**
7:2

**result**
71:2

**resuscitate**
21:18

**resuscitation**
17:9 18:10,
12 20:3

**resuscitation
s**
15:1

**review**
23:17 41:14

**reviewed**
41:11

**rib**
25:16

**Rich-**
12:18

**Richland**
12:18 17:13
38:3 56:17

**Richland/
angus**
9:10

**right**
4:23 7:11,
15,22 8:19
14:19 15:19
16:8,23 17:1
18:21 20:7
21:6,9,11,15
22:5,14
24:3,4,9,16,
24,25 25:4,9
26:7,12,17
28:10 30:14
31:20 32:18
41:21 45:23
46:22 47:12,
14,17,21

Appx_1200

49:6,12
51:25 52:20
53:4 55:16
61:7,8,10
62:7,14,22
63:17 64:4
65:21 69:11
71:19 75:1,
12 76:14
77:6
**right-sided**
24:8
**risk**
71:18
**road**
14:16 22:24
40:11 43:3,
13 45:21
46:25 47:7
58:15 59:15
60:2 64:22
66:15 70:24
71:3 72:13
**roadway**
58:1,17,18
59:13
**rules**
4:14
**rush**
23:18 24:2

_____

S

_____

**sad**
66:6,7
**saddened**
50:21
**safely**
59:5
**safer**
47:7
**safety**
60:9 71:12,
18
**sake**
14:24 54:3

**Salem**
8:2
**Salvador**
44:20,21
66:1
**Santos**
10:18 12:14
16:13 17:15
18:8 20:10
21:16 22:2,
9,20,22,25
23:5 32:23
34:24 35:6,
8,16 36:14,
17 37:24
38:22 39:17
47:1 52:10
56:25 63:10
64:23 73:16
74:2 77:8
**Santos'**
23:20 28:20
32:24 61:2
69:8 76:2
77:9,21
**saying**
6:7 23:2
29:5 36:6
54:4 75:2
**says**
15:10,22
17:7 18:10,
22,23 19:14,
24 20:3
21:5,7 27:14
68:5
**scene**
10:14 11:4,
7,25 12:9,
17,18,19,23
15:3 16:13
17:3,9,13
18:15,17
22:21 27:2,5
28:1 30:22
31:22 32:21
33:18 35:10,
11 36:19

37:1 40:2,22
44:3,22
46:24 52:6
61:3 66:25
69:5,7,10,12
70:2,4,8
72:12 74:11,
16 76:3,10
78:3
**school**
8:11,12,14,
19 45:5
**Schuette**
16:21
**scrape**
30:8
**scrapes**
31:4
**search**
49:5
**second**
7:19 37:8
**section**
23:21 72:22
**see**
11:25 14:12
15:16 22:11,
12 24:13
26:13,21
27:9 28:18,
25 29:5,18
30:10 31:4,
12 33:25
34:5,13,15
36:10 41:8
46:23 47:4,8
49:20 52:21
60:1 61:6,12
66:3,10
72:11 76:14,
15 77:1
**seeing**
58:23 65:11
**seek**
69:4
**seemingly**
68:18

**sense**
51:15
**serious**
67:24 68:7,
19 72:9
**seriously**
31:15
**seriousness**
55:23
**served**
7:8,19
**service**
22:23 47:7
58:15
**set**
41:7 45:19
**setting**
19:5
**severity**
42:13
**sheet**
13:7 19:4
40:5 47:1
**shield**
58:25
**shielded**
58:21
**shielding**
59:19
**shirt**
26:16 33:19
**shook**
54:7
**short**
37:3,12,21
**shots**
12:4
**shoulder**
34:1 61:9
63:13 76:7
**show**
24:23,25
25:22 26:18
57:9 60:21
75:25 76:5,
12 77:16

Appx_1201

showed
11:8 26:16
shows
76:18
sic
23:3 37:3
side
11:5 14:11,
15,16,19,20
18:21 21:9,
11 24:25
43:17,18
45:21 47:11,
13,14,21
77:20
sides
63:15
sidewalk
18:5 22:23
sign
28:15 68:3,9
signals
18:25
signature
16:17 28:6,
9,10,12
signatures
16:14
signed
28:7,8 67:14
significant
48:9 72:9
significantly
31:13
signs
18:22 20:8
68:7
similar
69:13 73:6
simple
6:3
sir
6:16 43:8
44:12
sitting
25:18

situation
43:2,6,7,12
45:21 51:3
55:9,24
58:2,11,12
60:2 74:24
75:18,19
situations
44:10 46:1
57:20,23
skull
21:5 48:1
slick
18:5
slow
59:8
small
24:15,18
26:16
Smith
4:9,25
smoothly
5:17
something's
59:21
sort
12:12 33:14
34:16 43:14
44:18 48:11
55:24 58:25
59:18 60:2
61:13 63:16
66:10 67:8
sound
10:13
Spanish
33:12 34:25
35:3 39:6
41:10 44:9,
11,15,18,19
45:1,4,6,9
46:7 53:20,
24,25 54:5,
6,7 74:12
Spanish-
speaking
33:11 39:7

46:19 66:21
spatter
31:23 32:2
speak
40:16 45:13
49:11,18
71:16
speakers
55:18
speaking
22:18 32:18
33:1 34:23
41:10,20
55:21 56:10
75:4
special
72:4
specific
28:25 59:18
specifically
53:9
specify
30:25
speed
72:9 73:4
splatter
77:4
spoke
7:11 34:3,8,
25 49:15,16,
20 53:3,7,9
spoken
40:19,23
41:1
spot
25:25 77:5
78:12
stagnant
67:9
staining
76:18
stand
58:1 65:22
73:8
standard
57:22

standing
22:2 36:16,
22 37:22
39:17,22
40:14 47:2
53:14 57:1,
10 63:10,19
69:25 70:1
73:25 74:18
stands
42:17
start
5:6 16:4
23:22
started
12:24 35:2
state
4:5 5:6 6:6
50:13,25
57:4 64:9
stated
15:11 21:13
27:24,25
29:8 56:22
statement
29:16 46:20
68:5 71:9
74:22
statements
46:6,13
56:20 57:9
67:19
States
66:18
stating
38:7
stay
28:1
steps
50:4,7
stone
25:13
stood
65:23
stopped
72:14

story
35:9 51:16
69:20
straight
55:8 64:22
straightforwa
rd
75:18
strange
44:1
stretch
64:22
stretched
14:21
strike
30:10 46:16
52:9 56:9
68:24 74:4
strip
48:16
strong
52:11
struck
10:18 20:12
22:3 23:4,5,
13 24:7
25:14 28:19
29:3 31:22,
23 35:8,21
36:17,24
39:17 40:14
43:3 48:4
52:11 62:5
63:7,10,19
64:23 74:2,7
77:10
stuff
27:3 62:25
subpoena
7:8,19 65:18
substitute
67:23
suggest
21:8
suggested
17:21

suing
38:24
sum
41:17 49:23
sunny
64:17
superficial
31:15
supervisors
40:23
supposed
40:11 60:1
sure
6:17 15:6
18:18 20:21
21:2 23:16
24:14 25:8,
19 28:9 29:2
31:11 36:4
39:20 40:1,2
47:2 51:22,
23 60:19
62:13 65:21
survival
20:23
suspected
18:9
suspicion
68:8,13,15
sustain
32:8
sustained
12:22 31:12
swear
4:7
sworn
4:16,18 5:19
symptoms
68:21
system
25:21

—————————
              T
—————————

take
4:13 6:24
7:1,3,6

16:16 24:1
27:11 45:19
46:5,19 50:6
51:9 59:18
66:9,21
69:12 70:23
72:4
taken
5:22 33:17
37:10,15
50:4 77:19
takes
11:21
taking
14:24 71:3
talk
5:2 63:6
talked
18:23 39:10
62:9 67:6
69:15
talking
12:9 25:5
35:6 37:23
41:18 42:22
45:20 58:22
61:5,6 75:5
tape
41:10
team
59:11
telephone
7:12
tell
8:10 12:14
14:6 16:11
17:10 23:8
24:17 29:2
31:6 37:14
46:6,22 51:1
54:22 55:3,
15 77:23
telling
23:12 30:20
41:6 51:13,
16 53:6

temperature
64:20
temporal
14:11,19
21:6
ten
18:9
testified
4:18 30:16
36:14,21
51:21 77:9
testifying
5:20
testimony
28:11 38:12
39:4 69:17
76:1 78:11
testing
45:4
Texas
8:2,3,15,24
9:10 10:2,6,
11 45:10
60:5
text
70:15 71:6,
25 72:4
texting
71:3
texts
71:11,19
Thank
5:13 12:12
22:11 38:16
Thankfully
60:16
thing
17:23 39:5
43:14 55:1,
5,10 56:15
63:3 66:19
75:3
things
11:6,25
14:25 17:5,
21 25:13
31:12 42:15

52:2,4 59:4,
6 62:11
66:3,16
68:18
**think**
8:25 9:16,18
15:11 16:3,
6,10,13
20:24 22:7
23:19 25:14,
16 27:13
29:8 31:13,
25 32:21
34:1 37:4
39:5,10,13,
21 40:9,10,
12,13 42:4,
21 43:15,17
46:16 48:3
51:14 52:3,
16,18 54:16,
18,22,23,25
55:3,4,10,18
56:8,15
57:7,17
59:6,20 60:8
62:12,13,21
63:18 64:3
65:23 66:17
67:12 69:19
70:12,23
71:1,10
72:12 73:24
74:5,17,21
75:12,16,17,
23 76:21
77:20
**thinking**
30:6
**third**
16:14 21:4
**third-to-the-
last**
27:10
**thorough**
48:10 49:5
**thought**
42:15

**three**
32:22 33:1
34:8 35:14,
20 36:2,6,8
53:19,20,23
54:4,7,20
55:13 59:15
74:13
**three-vehicle**
43:18
**time**
4:3,4,23
5:15 6:24
9:12 11:7,8,
15 15:15
17:16,24
18:6,8 19:1
20:10 22:2,
6,8,9 24:17
26:22,24
28:2 29:24
30:14 32:7
35:13,21
36:24 38:16
42:3,7
43:22,25
44:6 51:9
52:8 53:17
56:4,23
57:5,15
62:6,7 65:19
74:7,13
75:15 78:19
**times**
6:19 43:16
45:24 46:2,
14 74:22
**tire**
35:13 62:11,
14,18,19
63:2
**tissue**
31:24 32:2
**titled**
27:11
**today**
4:3 5:2 6:25
7:7,17 38:12

39:1,14
40:20,24
41:2,15
**told**
21:19,22,23
35:11,24,25
36:2,12,18,
25 38:11
41:6 51:18
57:5 63:4
73:25 74:1,
8,9,18
**tools**
52:7
**top**
15:10 27:13
28:10 29:15
42:21
**total**
16:9 41:17
49:23
**Toyota**
10:15,17
61:7 62:22,
25 65:3,6,12
**track**
70:3,5
**traffic**
12:20 59:7,
21,25 65:7
73:2 77:10
**trail**
14:15 63:11
**trained**
57:24 68:8
**training**
41:23 44:9,
11,13,14
**transcript**
5:24
**translate**
41:9 46:7,9
**translating**
57:23
**translation**
46:18 55:25
75:13

**translations**
57:19
**translator**
45:20,25
46:19
**transport**
17:9 27:21
28:3
**transported**
17:12
**travel**
73:3,8,11
76:6 78:13
**traveling**
72:13
**treated**
27:23
**treatment**
23:11 26:25
27:21 32:11,
15 67:15
68:4 69:4
**triage**
18:15
**trial**
5:20,24
72:18
**trouble**
73:15
**truck**
58:21 59:12
**trunk**
29:13 30:16
31:1,7 62:25
72:15
**truth**
75:4
**try**
17:6 18:15
32:14 44:7
48:20 58:14,
19 59:14
66:22
**trying**
35:12 38:20
44:22 55:1
59:4 62:15,

25 70:2,3,5

**tune**
  51:11

**turn**
  16:6 34:4,19
  68:19

**turned**
  21:18 34:16
  53:20

**two**
  8:8 34:4
  35:12,15
  43:18 53:18
  55:12 59:14
  70:20 74:13

**types**
  30:11

---

**U**

**uh-huh**
  6:7 34:12
  43:8 47:18
  60:11 61:11
  62:1 63:5
  64:21 67:16

**underneath**
  47:1

**understand**
  5:25 6:13,17
  14:1 18:21
  21:25 27:22
  29:4 34:4
  35:15 38:23,
  25 61:16
  66:13 67:19,
  21

**understanding**
  35:22,23
  36:1 54:4
  66:15 73:18,
  21

**understood**
  6:9,21 35:20
  44:21 50:9
  55:19,22
  62:24 76:1

**United**
  66:18

**unofficial**
  44:14 45:25

**unreasonable**
  68:24 69:2

**upload**
  19:2

---

**V**

**varied**
  69:17,21

**various**
  52:2

**vehicle**
  20:12 22:9
  23:3 32:6
  57:6 60:7
  70:21

**vehicles**
  5:1 10:15,16
  58:8

**verbalize**
  6:9

**vicinity**
  73:9

**video**
  5:25 37:4,
  14,15,20,22
  41:8,11,12,
  19 47:8
  49:21 54:19,
  21 56:16
  76:21,22

**videographer**
  4:2 5:23
  37:9,11
  78:9,20

**view**
  34:20

**visible**
  33:21 65:7
  76:19

**visual**
  28:18

**visually**
  24:13,14
  26:21 49:3

**vital**
  18:22 20:8

**vitals**
  19:2,14

**vocational**
  8:12

**voice**
  38:6

**Volunteer**
  12:19

---

**W**

**walk**
  12:13 22:17
  73:11

**walked**
  12:23 22:25
  47:4

**walking**
  12:23 38:1

**want**
  7:4 24:1
  36:4 56:6
  60:21 64:1
  68:25 70:20
  75:19

**wanted**
  21:24 23:10
  26:25 28:1
  50:9 66:1
  77:24

**watch**
  37:4,14

**way**
  14:22 16:3
  19:2 29:10,
  14,24 75:7
  78:8

**weeks**
  7:12

**weird**
  43:20 69:19

**went**
  8:11,14 11:1
  26:18 35:3
  41:25 47:9
  62:14

**west**
  77:19

**white**
  4:11,15 5:18
  6:12,21
  10:15 20:13,
  17 28:21
  29:21 30:12
  31:9 32:3
  38:17,19
  39:15,21
  55:14 56:8
  57:18 59:20
  60:8,22 61:1
  63:23 65:8,
  11 70:18
  71:10,15,23
  73:6 75:10
  78:16,19

**wife**
  8:8

**Winston**
  38:2,3 56:11

**Winston's**
  37:16

**wished**
  21:20

**witness**
  4:7,16 20:19
  28:8,12
  29:23 30:13
  31:11 32:4
  39:13,20
  41:4 46:6,
  13,20 55:7
  56:2 57:17
  59:11 60:4
  63:21 64:12
  65:9 70:17
  71:8,14

**witnessed**
  28:14

Appx_1205

witnesses
  40:16 49:11,
  14 53:4,10
  56:20 57:14
  63:6
wonderful
  6:4,10
word
  8:15 26:19
words
  46:23
work
  10:4 16:12
worked
  9:18,22,25
  10:1 38:25
  42:1,6,10
  70:9 71:2
working
  9:9,14,17
  10:5 11:5
  42:16
worried
  59:1
worse
  67:11,25
  75:20
worst
  48:13
wreck
  70:9
write
  75:11
writing
  15:20,21
written
  27:13 56:19
wrong
  68:10
wrote
  21:14 27:16
  56:25

---
X
---

X-RAYS
  27:3

---
Y
---

y'all
  54:10 59:9
  68:12
yeah
  5:12 11:15
  17:17 19:1,
  11,22 21:10,
  13 25:7
  27:15,25
  28:8 32:4
  34:2,6 35:1
  46:14 47:24
  60:24 65:9,
  20 66:12
  71:9 73:1
  77:7
year
  8:6 9:9 10:8
  42:10,16
years
  7:23 8:5
yellow
  76:7
young
  10:18 22:1
  32:24,25
  33:21,25
  38:22 49:5

---
Z
---

zero
  19:24
zone
  4:4

Appx_1206

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                       NORTHERN DISTRICT OF TEXAS
 2

         ERICK RODERICO PIVARAL GONZALEZ,     )
 3       Individually and as Special          )
         Administrator of the Estate of       )
 4       NEHEMIAS R. PIVARAL SANTOS,           )
         DECEASED, ERICK SANTOS and           )
 5       EVELYN MORENO,                        )
 6                                             )
 7          Plaintiffs,                        )
 8                                             ) Civil Action
 9                                             ) No.:
10       vs.                                   ) 3:22-CV-02714-
11                                             ) K
12       CAYLEE ERIN SMITH & EASTMAN           )
13       CHEMICAL COMPANY,                     )
14                                             )
15          Defendants.                        )
16
17             VIDEO DEPOSITION OF 30(b)(6) CORPORATE
18               REPRESENTATIVE ERIN BERNHARDT
19             Taken on behalf of the Plaintiffs
20                    November 9, 2023
21
22               Sheryl A. Pautler, RPR,
23             MO-CCR 871, IL-CSR 084-004585
24
25          (The proceedings began at 9:08 a.m.)
```

Page 1



EXHIBIT
R

Appx_1207

```
 1    QUESTIONS BY:                         PAGE NO.
 2    Mr. White                                8
 3
 4
 5
 6                  INDEX OF EXHIBITS
 7    NO.                               PAGE MKD.
 8    Exhibit 1   (Notice of deposition.)     15
 9    Exhibit 2   (Portions of Caylee Smith's
                   deposition transcript.)    76
10
      Exhibit 3   (Defensive/distracted driving
11                 policy.)                   156
12    Exhibit 4   (Donlen report.)           210
13    Exhibit 5   (SOP - plan for automobile
                   lease.)                    218
14
      Exhibit 6   (DENR report.)             233
15
      Exhibit 7   (2021 performance
16                 assessment.)              237
17    Exhibit 8   (2022 performance
                   assessment.)              247
18
      Exhibit 9   (2023 performance
19                 assessment.)              268
20    Exhibit 10  (Portion of background
                   check.)                   293
21
      Exhibit 11  (Use of social networking
22                 tools SOP.)               301
23    Exhibit 12  (February 26, 2019 tweet.) 306
24    Exhibit 13  (October 4, 2018 tweet.)   307
25    Exhibit 14  (Instagram post.)          311


                                       Page 2
```

Appx_1208

```
 1                  INDEX OF EXHIBITS CONTINUED

 2     NO.                                    PAGE MKD.

 3     Exhibit 15  (Donlen report.)              355

 4     Exhibit 16  (Video.)                      192

 5     Exhibit 17  (Dash cam video.)             337

 6

 7

 8

 9

10                        (Whereupon the Exhibits 1

11                        through 15 were attached to the

12                        original and copies.  Exhibits

13                        16 and 17 were attached to the

14                        original only.)

15

16

17

18

19

20

21

22

23

24

25

                                          Page  3
```

Appx_1209

```
 1                    A P P E A R A N C E S
 2            For the Plaintiffs:
 3                    Mr. Jacob White
                      Taylor King Law
 4                    410 North Thompson Street, Suite B
                      Springdale, Arkansas  72764
 5                    479-935-1761
                      Jacobwhite@taylorkinglaw.com
 6
 7            For the Defendants:
 8                    Mr. Gregory J. DuBoff
                      McGuire Woods, LLP
 9                    800 East Canal Street
                      Richmond, Virginia  23219
10                    Gduboff@mcquirewoods.com
                      804-775-1154
11
12            For the Defendants:
13                    Mr. Brian L. Bunt
                      Freeman Mills, P.C.
14                    2020 Bill Owens Parkway, Suite 200
                      Longview, Texas  75604
15                    903-295-7200
                      Bbunt@freemanmillspc.com
16
17            The Court Reporter:
18                    Ms. Sheryl Pautler
                      Veritext Legal Solutions
19                    701 Market Street, Suite 310
                      St. Louis, Missouri  63101
20                    314-241-6750
21            The Videographer:
22                    Mr. Ramon Salinas
                      Veritext Legal Solutions
23                    701 Market Street, Suite 310
                      St. Louis, Missouri  63101
24                    314-241-6750
25            Also Present:  Ms. Terrika Seal
```

                                                    Page 4

Appx_1210

```
 1              IT IS HEREBY STIPULATED AND AGREED, by and
 2         between counsel for Plaintiffs and counsel for
 3         Defendant, that the deposition of ERIN
 4         BERNHARDT may be taken in shorthand by Sheryl
 5         A. Pautler, shorthand reporter, and afterwards
 6         transcribed into typewriting; and the signature
 7         of the witness is expressly reserved.
 8                          *  *  *  *  *
 9                  ERIN BERNHARDT,
10    of lawful age, being produced, sworn and examined on
11    behalf of the Plaintiffs, deposes and says:
12              THE VIDEOGRAPHER:  Good morning.  We are
13         going on the record at 5 -- sorry -- 9:08 a.m.
14         on Thursday, November 9, 2023.  Please mute
15         your phones at this time.  Audio and video
16         recording will continue to take place unless
17         all parties agree to go off the record.  This
18         is Media Unit 1 in the video-recorded
19         deposition of the corporate representative of
20         Eastman Chemical Company taken by counsel for
21         Plaintiff in the matter of Erick Roderico
22         Pivaral Gonzalez versus Caylee Erin Smith and
23         Eastman Chemical Company filed in the United
24         States District Court for the Northern District
25         of Texas, Case No. 3:22-CV-02714-K.
```

Page 5

```
 1          The location of this deposition is the
 2     offices of Armstrong Teasdale which is at 7700
 3     Forsyth Boulevard, Suite 1800 in St. Louis,
 4     Missouri.  My name a Ramon Salinas representing
 5     Veritext Legal Solutions.  And I am the
 6     videographer.  The court reporter is Sheryl
 7     Pautler also with the firm Veritext Legal
 8     Solutions.
 9          I am not authorized to administer an oath,
10     I am not related to any party in this action,
11     nor am I financially interested in the outcome.
12     If there are any objections to proceeding,
13     please state them at the time of your
14     appearance.
15          Counsel will now state their appearance
16     and affiliations for the record beginning with
17     the noticing attorney.
18          MR. WHITE:  Jacob White, counsel for
19     Plaintiffs.
20          MR. DuBOFF:  Gregory DuBoff on behalf of
21     Defendants.
22          MR. BUNT:  Brian Bunt also on behalf of
23     Defendants Eastman and Caylee Smith.
24          THE VIDEOGRAPHER:  Will the court reporter
25     please swear in the witness.
```

                                                    Page  6

1                          (Whereupon the witness responded

2                          "I do" to the oath administered

3                          by the court reporter.)

4              THE VIDEOGRAPHER:  Thank you.  You may

5          proceed.

6                      [EXAMINATION]

7      QUESTIONS BY MR. WHITE:

8          Q.   Okay.  I know we met just a second ago,

9      but can you state your full name for the record?

10         A.   Yes.  Erin Bernhardt.

11         Q.   Erin Bernhardt.  Can you spell that.

12         A.   E-R-I-N.  Last name is Bernhardt,

13     B-E-R-N-H-A-R-D-T.

14         Q.   Thank you.  So before we get started, I

15     want to say some stuff for the record.  This is a

16     30(b)(6) deposition.  You recognize that you have

17     been appointed as Eastman's designee for this

18     deposition, correct?

19         A.   Yes.

20              MR. WHITE:  Okay.  So we served our notice

21          of deposition with topics on September 21,

22          2023.  Mr. Bunt served me objections on

23          October 28 of 2023.  We have met and conferred.

24          I've been told that the defending attorney,

25          Greg DuBoff, is in the loop on that.  So he's

                                        Page 7

Appx_1213

```
 1            aware of those conversations.
 2                 For the record, those conversations were
 3            with Brian.  So, Greg, let me know if anything
 4            I say is incorrect or you're not aware of.  We
 5            met and conferred on many of those topics and
 6            we resolved some of the objections and we did
 7            not resolve others.  But Brian and I agreed to
 8            proceed today with the understanding that we
 9            may have to hold the deposition open for some
10            of those objections to be resolved by the
11            Court.  And then potentially, depending on what
12            the Court rules, have a second deposition.
13                 Did I misstate anything for the record?
14                 MR. BUNT:  No.
15                 MR. WHITE:  Okay.  And for the record,
16            that is, in fact, our agreement, right.
17                 MR. DuBOFF:  Correct.
18                 MR. BUNT:  Yes.
19                 MR. WHITE:  Okay.  Thank you.
20       Q.  (By Mr. White)  So what is your official
21     title, Ms. Bernhardt?
22                 Should I call you Ms. Bernhardt,
23     Erin; do you have a preference?
24       A.   No preference.  Either's fine.
25       Q.   Okay.  I'll probably stick with -- I'm a
```

                                            Page 8

1    little less formal.  So I'll probably call you Erin.

2         A.   Okay.

3         Q.   If that annoys you at some point, just

4    tell me to stop.  Okay?

5         A.   All right.

6         Q.   So what's your official title?

7         A.   General manager for the Eastman

8    Performance Films Business.

9         Q.   And Eastman Performance Films is -- that's

10   the department that Caylee Smith is employed by; is

11   that right?

12        A.   That's right.  The business unit.

13        Q.   Okay.  It's not a -- it's not a subsidiary

14   of Eastman; is that right?

15        A.   It's a wholly owned subsidiary -- and I'm

16   not a lawyer -- but Eastman is her employer.

17        Q.   Okay.

18        A.   But when we make acquisitions, when we

19   grow, there's multiple entities depending on the

20   state, the country of where they're operating.  So

21   it's a wholly owned subsidiary.  It's an LLC.  But

22   she's an employee of Eastman Chemical.

23        Q.   And you said your title is a general

24   manager of the performance films department?

25        A.   That's correct.

                                        Page  9

Appx_1215

1      Q.   What does general manager mean?

2      A.   It means I have responsibility for the

3   full business related to the growth of the

4   organization, sales, marketing, product management.

5   So I have a global team within those organizations.

6   And then I lead a cross-functional business team

7   that includes manufacturing technology.  And I have

8   accountability to help this business grow and help

9   to ensure we've got the capabilities and the

10  personnel to -- to be successful.

11     Q.   Who do you report to if I was looking at

12  an org chart?

13     A.   Sure.  I report to Sabine Ketsman.  She is

14  our division president for films.

15     Q.   Okay.  Okay.  So you're not the tiptop of

16  the films department, but -- you know, I guess would

17  I call you a VP if I was looking at a different

18  organization?

19     A.   Sure, yes.

20     Q.   Or maybe a senior VP?

21     A.   Not senior VP.  I'd be a vice president,

22  yeah.

23     Q.   Are there other general managers?

24     A.   Yes.  Across the company.

25     Q.   Any other general managers in the

                                    Page 10

Appx_1216

1    performance films department?

2         A.   No, sir.

3         Q.   Okay.  Okay.  Thank you.

4              So have you ever been deposed before?

5         A.   No, I have not.

6         Q.   Okay.  So this is your first rodeo?

7         A.   Yes.

8         Q.   Okay.  All right.  So I'm sure Greg has

9    prepared you and told you the rules.  I'm going to

10   state them again for the record and try to get your

11   agreement about some of the baseline rules.  There

12   are no trick questions here.  Okay?  So this is a

13   good example.  We need oral answers.  All right?

14   Although a video is being made, we're also making a

15   transcript.  So it'll feel a little stilted

16   sometimes.  You know, you'll say "uh-huh" or shake

17   your head like you're doing right now.  What I need

18   is a yes or a no or something verbal so the court

19   reporter can get it down.  Okay?

20        A.   Okay.

21        Q.   Perfect.

22             Sometimes I'll ask a bad question.

23   All right?  That happens.  But when I do that, just

24   tell me to rephrase it, tell me you didn't

25   understand.  I'll be happy to do that.  Okay?

Veritext Legal Solutions
800-336-4000

1        A.    Yes.

2        Q.    If you do answer my question though, I'm

3   going to presume that you understood it.  That's not

4   really a trick.  But it's just something to be aware

5   of.  If you answer, we're all going to assume you

6   understood my question.  Okay?

7        A.    Okay.

8        Q.    I'm entitled to what are called complete

9   answers.  So the example I always use is if I ask

10  you what you had for breakfast and you had toast and

11  a banana and you just tell me I had toast, all

12  right, you have omitted the banana.  Right?  So you

13  have given me an incomplete answer.  Right?  I'm

14  entitled to complete answers.  Do you understand

15  that?

16       A.    I do.

17       Q.    Okay.  Perfect.

18              So sometimes, I might interrupt you

19  if I think we're talking over one another.  I don't

20  do it to be rude.  I just want to make sure we're

21  getting a good -- good record.  Sometimes I ramble

22  on these things.  Just go with it, right?  If I'm

23  talking too much, your attorney will object.  And

24  when he does object, unless he directs you not to

25  answer, you do still have to answer my question.

Veritext Legal Solutions
800-336-4000

1    Okay?

2         A.   Okay.

3         Q.   So if I ask you a question and you don't

4    know the answer, but you think you might know the

5    answer if you could look at a document, please ask

6    me to see what document that you think would help

7    you provide a full answer.  Okay?

8         A.   Okay.

9         Q.   So sometimes I'll ask you questions that

10   you may not know the precise answer to, but you

11   might know an approximate answer to.  For example,

12   if I asked you what the temperature is outside, you

13   may not how know what degree Fahrenheit or Celsius

14   it is outside, but you might know it's chilly

15   outside.  So when you can, can you agree to give me

16   an approximation, rather than say I don't know in a

17   situation like that?

18        A.   Yes.  I can try to do that.

19        Q.   Very good.  Very good.  Okay.

20             So what we'll do, we'll probably go

21   for an hour and a half.  If you need a break, say

22   you need a break at any point.  All right?

23        A.   Okay.

24        Q.   I don't know how long this is it going to

25   go today.  I suspect it will not go as long as

Page 13

```
 1      Caylee's.  So I'm not expecting a full-seven hour
 2      deposition, God willing.  But --
 3              MR. DuBOFF:  It's not going to go longer
 4          than Caylee's.
 5              MR. WHITE:  It won't go longer.
 6              THE WITNESS:  We're sure of that.
 7              MR. WHITE:  Right.  Right.
 8              But if you need a break, just let me know.
 9      A.   Okay.
10              MR. WHITE:  All right.  So I've got an
11          exhibit binder in front of you there.  Go ahead
12          and open it up, please.  So can you just flip
13          to Tab No. 1, what's been marked as Plaintiff's
14          Exhibit 1.
15                      (Whereupon Exhibit 1 was
16                       introduced for identification.)
17      Q.   (By Mr. White)  This is what's called a
18      notice of deposition.  This is what was served on
19      your attorneys in September.  Have you seen this
20      document before?
21      A.   Yes, I've seen this document.
22              MR. WHITE:  Okay.  Oh, I have a binder for
23          you guys if you want to follow along in order.
24              MR. DuBOFF:  Thank you.
25      Q.   (By Mr. White)  So if you'll flip towards
```

Page 14

Appx_1220

```
 1    the end of it, of this exhibit, you'll see a list of
 2    topics.  Have you reviewed these topics?
 3         A.   Yes, I have reviewed them.
 4         Q.   Okay.  So you agree this is the list of
 5    topics that we asked that you be prepared for,
 6    correct?
 7         A.   Yes.  You asked that.  I know there are
 8    some objections.
 9         Q.   That's fine.  That's fine.
10         A.   So subject to that.
11         Q.   Subject to those objections, have you
12    prepared for this deposition?
13         A.   Yes, I have.
14         Q.   Okay.  And are you the person at Eastman
15    most knowledgeable to speak on the topics that we've
16    agreed that you would speak on today?
17         A.   I believe in whole, I am the best person,
18    yes.
19         Q.   Okay.  Okay.  So -- and you think because
20    on whole, you're the right person, that's why you've
21    been designated today?
22         A.   I believe so.
23         Q.   Okay.  It's not a punishment or something
24    like that?
25         A.   I'll have to check.
```

Page 15

1          Q.   Okay.

2               MR. DuBOFF:  Jacob, just to be clear,

3          we're -- Eastman is not asserting that

4          Ms. Bernhardt is the most knowledgeable person.

5          We're just representing --

6               MR. WHITE:  She's prepared.

7               MR. DuBOFF:  -- she's been designated and

8          she has conducted a reasonable inquiry to be

9          prepared to testify on the noticed topics.

10              MR. WHITE:  Fair enough.  Fair enough.

11              THE WITNESS:  That's a good clarification.

12         Q.   (By Mr. White)  So you understand -- this a

13    good segue to this -- that today your answers are to

14    be taken as the answers of the Eastman Corporation;

15    that's what you've been designated to do?

16         A.   Yes, sir.

17         Q.   So when you say an answer, what we're

18    going to say to the Court is, this is what Eastman's

19    answer is.  Do you understand that?

20         A.   I do.  Does that mean you will ask me

21    questions if they're separate, my opinion versus the

22    company's opinion.

23         Q.   So unless I specify, I'm always asking you

24    in your capacity as the corporate designee.

25         A.   Okay.

                                         Page 16

1          Q.   So if at any point you don't know the

2     answer, right, we're going to take that as Eastman

3     doesn't know.  Okay?

4          A.   Okay.

5          Q.   So -- now you said that your official

6     title is general manager.  Can you tell me how many

7     people report to you?

8          A.   Yes.  I have six or seven people that

9     report directly to me.  Directly in my whole

10     organization, approximately 340, 350.

11          Q.   Okay.  So is that -- if we're looking at

12     an org chart, you've got six or seven direct

13     reports.  But if we're looking at the pyramid of

14     below you, it's about 350?

15          A.   That's correct.  Last time I looked, we've

16     been -- but yes.

17          Q.   That's a good example of an

18     approximation --

19          A.   Approximation, yeah.

20          Q.   If it's 371.

21               MR. WHITE:  Sorry, Court Reporter.  We're

22          talking over each other again, right?

23          Q.   (By Mr. White)  Who's the CEO of Eastman

24     Chemical?

25          A.   Mark Costa is the CEO.

Page 17

Appx_1223

1        Q.    Okay.  What a Caylee's role at the Eastman

2    Chemical Company as of April 30, 2022?

3        A.    Caylee Smith is a sales representative for

4    our performance films business.

5        Q.    Okay.  And is her role on April 30,

6    2022 -- which in lieu of saying April 30, 2022, I'm

7    just going to say the accident.  Can we agree we all

8    know what accident I'm talking about?

9        A.    Okay.

10       Q.    Okay.  When I say the accident or the

11   incident, we're -- you can agree we're talking about

12   the April 30, 2022 incident that led to the death of

13   my client?

14       A.    Yes.

15       Q.    Okay.

16       A.    And then I will ask or if you can clarify

17   if it's not.

18       Q.    Sure, sure, sure.

19             Has Caylee's role, position, been the

20   same since the accident to today?

21       A.    Yes, it has been the same.

22       Q.    Okay.  So you called her a sales -- my

23   documents have called her an outside sales

24   representative.  You used a different phrase?

25       A.    I said sales representative.  It is an

                                              Page 18

Appx_1224

```
 1    outside sales representative, yes.
 2         Q.   Okay.  And what's the difference between
 3    an inside and outside sales representative?
 4         A.   Our inside sales representatives are in
 5    office 90 percent of their role.  And so they will
 6    typically support and work with customer service and
 7    take backup calls and will have a set of customers
 8    that they engage with.  Our outside sales also have
 9    a territory that they're responsible to be
10    physically in our customers' locations from time to
11    time.
12         Q.   Okay.  So would you describe the outside
13    sales role as primarily outside of the office,
14    outside of an Eastman office position?
15         A.   Yes.  They are -- frequently have a home
16    office and they will work from there, as well as go
17    see customers.
18         Q.   Okay.  So we've got -- we've heard some
19    testimony and some documents that I've seen that
20    outside sales representatives are on the road almost
21    half of their working hours.  Does that sound right?
22         A.   So when we say "on the road," I don't
23    think they're on the road that full time.  I think
24    they are in the field.
25         Q.   Okay.
```

Page 19

Appx_1225

1          A.   So at customers, outside of their home

2    office, yes, definitely.  I think there's a

3    delineation of how much time they're driving on the

4    road versus expected to be in the -- visiting the

5    customers.

6          Q.   So when we say they're on the road, let's

7    say 50 percent of the time, we just -- you guys just

8    really mean they're not in the office -- they're not

9    in the home office?

10         A.   That's correct.  That's correct.

11         Q.   So they could either be on the road or

12   with the customer, but they're not in the home

13   office?

14         A.   Yes, that is correct.

15         Q.   Okay.  I just want to make sure I've got

16   that right.

17              So why do outside sales

18   representatives go to the customers?

19         A.   So we're in the business to try to help

20   our customers be successful, to help enable them to

21   solve problems.  And so it's important for our sales

22   representatives, our technical service, members of

23   our team, to understand and be there to help our

24   customers in the nature of their business, what they

25   need.  So it's that relationship part of the

                                        Page 20

```
 1    business that's very important.
 2          Q.   Okay.  So they need to be -- the outside
 3    sales representatives need to meet your clients in
 4    person in order to foster relationships, right?
 5          A.   Yes.  We believe there is a nature of
 6    being together in person from time to time.
 7          Q.   Okay.  So you can't do this all via Zoom,
 8    I take it?  Or outside sales reps can't do it all
 9    via zoom?
10          A.   You know, COVID challenged us on that.
11          Q.   Okay.
12          A.   So during -- sometimes there is a Zoom
13    interaction in some frequency there.  But the
14    natural part of being a salesperson for I think any
15    business is being there with your customers as well.
16          Q.   Okay.  So I'll represent to you that
17    Caylee said that in some situations, she'll help
18    customers troubleshoot issues with some machines
19    that you guys provide clients.  Does that sound
20    correct?
21          A.   So our business, we don't really provide
22    machines.  We provide computers, software and
23    plotters.
24          Q.   Plotters.  That's the word, yes.  Okay.
25          A.   Yeah.  So she will sometimes help
```

Page 21

 1     troubleshoot their use of that equipment and that

 2     software.

 3          Q.   And sometimes she might have to be in

 4     person to do that troubleshooting?

 5          A.   Yes, I believe so.

 6          Q.   Okay.  So you mentioned territories.  How

 7     many territories are there in the performance film

 8     department?

 9          A.   Goodness.  So I have a global business.

10          Q.   Okay.

11          A.   And it spans a hundred countries and many

12     territories.  I don't know that exact answer.

13          Q.   Okay.  So would you say that for most

14     places on earth, it's part of a certain territory

15     for of the performance films department or are you

16     guys primarily European and North America?

17          A.   Sorry.  Can you repeat the question?

18          Q.   Yeah, yeah.

19               I guess you said it's a global

20     business, right?

21          A.   Yes.

22          Q.   And when you say "it," you mean the

23     performance films department?

24          A.   Yes.  Our performance films is global.

25          Q.   Okay.

                                        Page 22

Appx_1228

1    A.   And in the United States, there will be --
2    sometimes multiple -- multiple states that will be a
3    territory, sometimes part of a state would be a
4    territory depending on how condensed the customers
5    are.
6    Q.   Well, we'll stick to Texas.  It's where
7    the accident happened.  So how many territories are
8    there in Texas for the performance film department?
9    A.   I don't know.  Less than ten.
10   Q.   Less than ten.
11        More than a dozen, do you think?
12   A.   No, no.  Less than ten.
13   Q.   Sorry.  More than half a dozen?
14        MR. DuBOFF:  We're not supposed to be
15        doing math here.
16   A.   I think it would be less than a half a
17   dozen.  I do not know.
18   Q.   (By Mr. White)  Okay.  Maybe one for every
19   major metropolitan area, say Dallas, Houston,
20   Austin; does that sound right?
21   A.   No, sir.  I think a territory would
22   include multiple major metropolitan areas.
23   Q.   Okay.  So we heard some testimony from
24   Caylee about how she's no longer over the San
25   Antonio region; does that sound right to you?

Page 23

Appx_1229

1          A.    Yes, sir.

2          Q.    Do you know which regions Caylee has

3     responsibility for?

4          A.    Yes.  So she has responsibility for, I

5     believe from kind of the Houston, Austin, maybe

6     through Waco, kind of the -- that territory.

7          Q.    So is it fair to call it like the central

8     Texas region?

9          A.    My geography is not great.

10         Q.    Fair enough.  Fair enough.

11               How many clients are in the

12    territories that -- Sorry.  Strike that.

13               How many clients of the performance

14    film department are within Caylee's territory, if

15    you know?

16         A.    I do not know.

17         Q.    Any approximation?

18         A.    I truly do not know how many clients she

19    has.  It changes depending on customers coming in

20    and out.  So I do not know.

21         Q.    How -- how many outside sales

22    representatives for the performance film department

23    are within a given territory?  Is it just one

24    outside sales rep per territory?

25         A.    Typically it is one representative who

                                           Page 24

1    has -- that is -- one outside sales rep for a

2    territory.  We have trainers and technical service

3    and other support, including customer service who

4    will help support those as well.

5         Q.   Okay.  Okay.  Do you know in Caylee's

6    territories, the territories she has responsibility

7    for, if she is the only outside sales rep or?

8         A.   I believe that she is the only outside

9    sales rep.

10        Q.   Okay.  So tell me a little bit about what

11   you expect Caylee's typical duties and

12   responsibilities as an outside sales rep are.

13        A.   Caylee's role, like other sales

14   representatives, are to represent the company in a

15   safe and highly integrity manner.  So her roles

16   would involve understanding our products,

17   understanding our services, engaging with the

18   customers to help them use our products and

19   services, and then depend on other resources within

20   the company.  So a lot of her job is also engaging

21   in pulling in other parts of the company where she

22   needs help.

23        Q.   Okay.  What might she need help with?

24        A.   Oh, typical from a sales role, they would

25   depend on the customer service partners who are in

Page 25

Appx_1231

1     the office.  They would depend on their technical

2     service trainers.  You know, they depend on their

3     supervision and bosses to help them problem solve or

4     meet with customers as well.

5         Q.   Okay.  So you guys don't just put the

6     outside sales rep sort of on an icefloe and tell

7     them to handle it.  They're in constant contact with

8     their supervisors and their team; is that right?

9         A.   Not constant certainly.

10        Q.   Okay.

11        A.   But they are in frequent interaction with

12    the team for support.

13        Q.   Okay.  So you said it's important for --

14    or that part of Caylee's responsibilities are to

15    represent Eastman in a safe manner; is that right?

16        A.   Yes, that is correct.

17        Q.   Okay.  So why is that important?

18        A.   Our whole -- Eastman's -- well, like any,

19    our business is around -- our vision and mission is

20    around enhancing the quality of life in a material

21    way.  Safety is top priority for us, for our team

22    members and for those they may interact it.  And so,

23    yes, it's an important part of our company's core

24    values.

25        Q.   So who is Caylee's direct supervisor; who

                                              Page 26

 1    does she report to?  Both -- and let's -- let's talk

 2    from the entire -- I guess I want to make that

 3    question from the point she was employed, to the

 4    present.  You know, if something's changed, let me

 5    know.

 6          A.   Okay.  So at the point of hiring, Alan

 7    Davis was Caylee's supervisor.  And I believe up

 8    until early 2022, he was her supervisor.  And then

 9    that changed to Chris Ierardi.

10          Q.   And where was Alan Davis located, if you

11    know?

12          A.   I do not recall.

13          Q.   Okay.  Do you think he was in Texas?

14          A.   No, I don't believe so.

15          Q.   Okay.  And I'll butcher the name.  Did you

16    say Chris Ierardi was her subsequent supervisor?

17          A.   That is correct.

18               MR. DuBOFF:  I-E-R-A-R-D-I, I'm pretty

19          sure.

20               MR. WHITE:  Can you say that one more

21          time?

22               MR. DuBOFF:  I-E-R-A-R-D-I.

23               MR. WHITE:  Ierardi.  Okay.  Thank you.

24          Q.   (By Mr. White)  Where is Chris Ierardi

25    located?

                                        Page 27

Appx_1233

1          A.   I don't recall where Chris is located.

2          Q.   Do you think it's in Texas?

3          A.   I do not know.  I do not think so.

4          Q.   Okay.  Okay.  So who -- who in Eastman

5     would Caylee have interacted with face to face in

6     her role as an outside sales rep in Texas?

7          A.   There are other outside sales within

8     Texas.  But it's important to recognize that both

9     Alan and Chris and different members of management

10    would travel to Texas to go on customer visits with

11    her on some frequency, to help train her, help on

12    board her and coach her.

13         Q.   Do you know how often those sort of

14    side-by-side ride-alongs occurred?

15         A.   Yeah.  What I understand from the team is

16    that Alan had traveled with Caylee out in the field

17    four to five times within the first -- I think

18    within the first several -- I don't know if it was

19    six months or four months.  And in those visits,

20    it's often usually between two and four days or two

21    to three days of travel in which the sales

22    representative is with their, you know, manager on

23    customer calls and coaching and development.

24         Q.   Okay.  So do you think approximately four

25    to five times Chris -- excuse me -- Alan --

                                          Page 28

Appx_1234

1          A.    Sorry.  Yes.

2          Q.    -- all went on ride-alongs with Caylee

3     that were about two to three days in length?

4          A.    Yes, that's correct.

5          Q.    Okay.  Would there be any documentation or

6     notes from those ride-alongs?

7          A.    I do not know.  I would expect there would

8     be maybe some e-mails referenced, but I do not know.

9          Q.    But there's not like -- there's not a

10    formal process where the supervisor would be taking

11    notes that would have been added to her personnel

12    file or something like that during those

13    ride-alongs?

14         A.    No, sir.

15         Q.    Okay.  So -- and we're getting a little

16    bit ahead of ourselves here.  But you've got -- you

17    are adequately prepared.  This is all very

18    interesting.  This is good stuff.

19              So how does Eastman Chemical or

20    Eastman monitor the driving times of its outside

21    representatives, make sure people aren't, for

22    example, driving too much?

23         A.    We do not monitor the driving times.  We

24    have direction and policies on how we want them to

25    be engaging when they're out, but we do not monitor

Page 29

1    the -- the specifics.

2         Q.   Okay.  And I've got some of those

3    policies.  But which policies are you thinking of

4    when you say there are policies out there that guide

5    them on their driving?

6         A.   I may not, you know, state them all here.

7    But certainly the policy on distracted driving.  We

8    have other policies that are provided to the

9    individual when they -- and do -- an individual that

10   has a leased vehicle, that has a lot of details

11   around the expectations of the individuals when they

12   are using an Eastman leased vehicle.

13        Q.   Okay.  How do individuals that are using

14   leased vehicle, how do they report their mileage?

15        A.   They're provided a gas card.  And so I

16   don't know if they report their mileage.  When I or

17   when others -- sorry -- if we are driving a personal

18   vehicle and it is on work business, we will report

19   it through an expense statement.

20        Q.   But if you're driving -- if someone's

21   driving a leased vehicle -- Strike that.

22             If, for example, an outside sales

23   representative is driving a vehicle that is leased

24   that is given to them, they're just given a gas

25   card, they're not going to report their personal or

                                        Page 30

Appx_1236

1   business mileage to anyone?

2       A.   That is to the best of my understanding.

3       Q.   Okay.  So if I've got some documents that

4   Donlen wants breakdowns of personal versus business

5   miles filed via an app, does that -- are you aware

6   of any of that?

7       A.   I looked at several.  And I'm aware of

8   some things, but I don't recall for certain what

9   Donlen is expecting to be provided.

10      Q.   Do you think the outside sales

11  representatives are expected to report their mileage

12  to Donlen?

13      A.   I guess that probably is addressed in one

14  of our documents, certainly.

15      Q.   Okay.  But have you reviewed those mileage

16  statements that are given to Donlen?

17      A.   I have not reviewed mileage statements,

18  no.

19      Q.   Okay.  So why are outside sales

20  representatives given work phones?

21      A.   Certainly not just -- so Eastman provides

22  work phones for anyone who we think that it will

23  help in the effectiveness of their role.  So I

24  have -- I have a personal -- sorry.  I have a

25  company provided work phone.  And it is to be used

Page 31

1    to do their jobs effectively, safely.  And it helps

2    with efficiency.  In today's age, it's hard to

3    manage work without some of the things like iPads,

4    phones, those elements.

5         Q.   So you said it a couple times,

6    "effectiveness."  What do you mean, these phones

7    help the effectiveness of the role?

8         A.   So when individuals are traveling, there's

9    a need, of course, for them to be in contact with

10   their family members, with parts of the company.  We

11   make it very clear that any use of it is to only be

12   used when they're stopped in terms of, you know,

13   using contact.  But there's a rule for phones to

14   play in the effective efficient work so that they're

15   not having to work all hours from their computer.

16   They can take that with them with when they're

17   stopped at the hotel that night to be able to use

18   the phone.

19        Q.   Now, y'all expect them to have personal

20   phones as well, right?

21        A.   I don't think it's an expectation to have

22   a personal phone.  They may have a personal phone.

23        Q.   And I just mean sort of -- it's 2023.  You

24   expect most people to have their personal cell

25   phone, right?

Page 32

Appx_1238

1   A. It's possible that some and -- yes.  I do

2 not have a personal phone.  I have a work phone.

3   Q. Okay.  All right.  So do you expect that

4 that's -- is it probable that most people,

5 especially people Caylee's age, in their 20s,

6 probably have their own personal phone in addition

7 to their work phone provided by Eastman?

8   A. I think -- I think it's likely people have

9 personal phones.

10   Q. Okay.  Okay.  So, now, you said that

11 Eastman makes it clear that the expectation is that

12 the work -- the work phones are not to be used while

13 driving around; is that right?

14   A. Well, to be clear, Eastman makes the

15 expectation that no phone is to be used.  In terms

16 is of any hands, texting, replying on e-mails, we

17 make it very clear in one of our -- in your policy,

18 no computer use.  So we make it very clear, whether

19 it's a personal phone or the company's phone, our

20 employees are to be focused on the road, focused on,

21 you know, the attention of their driving.  That's

22 for the purpose of having the safety for our

23 employees and those around them.

24   Q. Okay.  So Eastman's policy is that no

25 phone should be touched while the car is moving; is

Page 33

Appx_1239

```
 1      that right?
 2           A.    No, sir.
 3           Q.    All right.  Please clarify.
 4           A.    Okay.  We have a policy that highlights
 5      the expectation that there's no -- we have a
 6      hands-free, that's what we call it.  A hands-free
 7      policy in terms of making sure that we're not
 8      distracted by the interaction with our phone from
 9      texting, from e-mailing.  That is not allowable with
10      your hands.
11                 There is also reasonable recognition
12      that if you have to touch your GPS, if you have to
13      touch your phone to, you know, take -- pick up a
14      phone call that is through Airplay, through CarPlay,
15      that is part of the reasonableness of the job and of
16      what's needed.
17           Q.    So would you say that the focus of the
18      policy is that your employees should keep their eyes
19      and focus on the road in order to avoid hazards to
20      themselves and other people on the road?
21           A.    That's the principle.  I mean, that's the
22      intent, is to try to make sure our employees are
23      always -- whether it's driving or anything, that
24      they're focused on the job at hand, which is the
25      most important thing they're doing at the time.  So
```

Page 34

1    if they're driving, yes, the intention is to be

2    aware of your surroundings, keeping your eyes on the

3    road.

4         Q.   Okay.  How important is being in

5    communication with clients for outside sales

6    representatives; is that their primary role?

7         A.   Not their primary.  Well, it is a primary

8    role for them to be in contact with their clients.

9    But it is within reason, right?  So there's no

10   expectation that they are always available.  In

11   fact, many times, we encourage our teams -- or

12   highly encourage, there's many safety discussions

13   about this.  When they're traveling, to put their

14   phone on do not disturb or have an automatic

15   response if there is a text or if there is an e-mail

16   that comes across.

17        Q.   Okay.  And so why is that?  Why is that

18   training given?

19        A.   I'm sorry.  Why is the?

20        Q.   Sorry.  Why, as part of safety training,

21   do you all talk about managing the responsiveness of

22   outside sales representatives?

23        A.   Well, I believe team members want --

24   there's a lot of -- you know, there's a lot -- I

25   believe the reason we do that is to set an

Page 35

```
 1    expectation that safety comes first, and that it's
 2    the most important thing in everything we do, all
 3    the jobs.  And we give people that recognition of
 4    you should not ever feel obligated or responsible to
 5    have to pick up a customer's call or to, you know,
 6    respond.  And so within reason, we want them to
 7    respond to their customers within a day, within a
 8    couple days.
 9         Q.   Okay.  So you talked about putting your
10    phone on do not disturb.  What do you mean by that?
11         A.   I might be using the words incorrectly.
12    But we didn't have this technology a while ago.  But
13    now you can set your car -- your phone to the --
14    recognize when you're driving and so to be able to
15    have an automated response.
16         Q.   Okay.  Tell me about the automated
17    response.  I think that's different from do not
18    disturb.
19         A.   Yeah, it is.  So I'm probably beyond my
20    knowledge here technically.
21         Q.   That's okay.
22         A.   Yeah.
23         Q.   Well, so -- but to the best of your
24    knowledge, right, Eastman's knowledge, what's the
25    automatic reply function?
```

Page 36

Appx_1242

1        A.    You know, I don't -- so within -- I don't

2    know exactly.  So I know I've got an opportunity on

3    my phone to set it to where when it's tied in with

4    the GPS, that it can recognize and you can have it

5    to where it's automatically replying or sending a

6    response to an incoming phone call or text.

7        Q.    Okay.  And is that a function of your

8    phone or is that Apple CarPlay on the -- in the

9    vehicle; do you have any idea?

10       A.    I do not.  I do not.

11       Q.    Okay.  Have you ever used the automatic

12   reply function?

13       A.    I have, yes.

14       Q.    Okay.  Is that part of y'all's training to

15   outside sales rep, is to activate the automatic

16   replies?

17       A.    Yes.  So our -- you know, just something

18   about the -- our teams have frequent and often

19   discussions around safety elements of their job.

20   So, you know, I know and I've seen and I've been in

21   some of these meetings at the start of the meeting

22   where a topic will be related to driving.  And

23   that's a common part of a best practice that's

24   shared with the teams in terms of doing that.

25       Q.    When you say best practice, what do you

Page 37

1      mean?

2          A.   I mean a recommended approach.  We don't

3      mandate it.  We don't require that they do it.  But

4      we do, you know, set that as a sharing that's

5      best -- in their best interest to try to do so.

6          Q.   So if you went into an outside sales

7      rep -- their leased vehicle and they didn't have

8      automatic messaging turning on in their vehicle,

9      they wouldn't be disciplined?

10         A.   That is correct.

11         Q.   Okay.  But they should have received some

12     training that that is preferred, that they would

13     turn that on that phone, the automatic response

14     function?

15         A.   Yes, that is correct.

16         Q.   How would they receive that training?

17             MR. DuBOFF:  Jacob, I'm just going to

18         object to form on the training, as to what you

19         mean by that exactly.

20         Q.  (By Mr. White)  Let me clarify that.

21                 How -- how would Eastman have

22     communicated to outside sales reps that the best

23     practice is to use automatic responses?

24         A.   That training -- that training or

25     communication and coaching can come through a number

Page 38

Appx_1244

1     of sources.  A very common and frequent, is that in

2     all the sales meetings or all the team meetings,

3     there's a -- at the start of it, there's a safety

4     topic that's reviewed.  Not always, but often for

5     sales representatives, driving is one of those.

6     There could be a number of other topics.

7              So it would come through that

8     mechanism, where an individual will route across and

9     set the expectation also that the team share their

10    safety topics.  So it will come through that.

11    Another means is in the one-on-one interaction

12    between the individual and the coach -- or sorry --

13    their supervisor or others in management, when they

14    talk through it, that the frequency of, you know,

15    how are things going, how are you driving safely,

16    how are you -- and talking through the coaching and

17    expectations of that.

18             Another is just, again, when they're

19    in the field together.  So the encouragement from or

20    the expectation from the supervisor on, you know,

21    hey, I noticed, you know, you got distracted here or

22    you got -- you know, how can you avoid that or --

23    those sort of discussions happen in the field.

24        Q.   Okay.  So you said that it's a frequent

25    and common -- I don't want to misrepresent your

                                          Page 39

Appx_1245

```
 1    testimony.  But I think you said it's frequent that
 2    outside sales reps and your sales teams will train
 3    or communicate about the risks of driving; is that
 4    right?
 5         A.   Yes, that is correct.
 6         Q.   So was that frequent training occurring
 7    before the incident that occurred or is that -- or
 8    is your testimony about after the accident?
 9         A.   No.  My -- that that -- those
10    interactions, that counsel, that coaching is
11    happening frequently.  It happened before the
12    incident.
13         Q.   Okay.  Do you think there's any notes from
14    the sales meetings documenting that, the safety
15    topics that you discussed?
16         A.   I do not know.  We can check.  We have a
17    fairly rigid reports -- or sorry -- records also
18    kind of management with different things.  So I
19    don't know for sure.
20         Q.   Do you think people -- are there like
21    formal note taking functions at these sales
22    meetings?
23         A.   There is not.
24         Q.   So no one's taking minutes or anything
25    like that?
```

Page 40

1         A.   Not necessarily, no.

2         Q.   Are these on Zoom?  Are they recorded?

3         A.   They are not recorded usually.

4         Q.   Okay.  But are they on Zoom?

5         A.   No.  They would not be on Zoom.  Sometimes

6    we would use Teams.

7         Q.   Okay.  Teams.

8         A.   That would be more frequent.

9         Q.   So the sales meetings where people --

10   where driving is a frequent safety topic, are those

11   sales meetings typically on Teams or some sort of

12   videoconferencing technology?

13        A.   They would either be in person or on

14   Teams.  They could be on -- in the past also on just

15   a tele -- teleconference.

16        Q.   Okay.  Okay.  Do clients ever complain

17   about lack of communication with outside sales

18   representatives?

19        A.   Yes.  Sometimes clients do complain.

20        Q.   Yes.  I think we're familiar with clients

21   complaining about things.

22        A.   Yes.

23        Q.   But is communication one of the reasons

24   for the complaints?

25        A.   I would say not so much communication.  It

                                        Page 41

1    could be responsiveness to a problem they have or

2    a -- how fast we resolve a quality issue that

3    they -- you know, might be something we need to fix.

4         Q.   Okay.  So in general, right, how do

5    clients communicate with outside sales

6    representatives?  I mean technologically.  Phone,

7    e-mail, text message, is there a portal?

8         A.   I think the communication between

9    customers and their outside sales representative

10   comes through a lot of means.  It can come through a

11   phone, it can come through text, it can come through

12   e-mail.  That's probably the primary -- those are

13   the primary sources.

14        Q.   Okay.  Is there a preference amongst

15   those?  Do y'all -- I mean, does Eastman have a

16   policy, like here's the preferred way that -- that

17   outside sales reps communicate with clients?

18        A.   No, we do not.

19        Q.   Okay.  So is it y'all's -- is it Eastman's

20   preference that those communications happen on the

21   work phone versus the personal phone?

22        A.   Yes.  I would expect that the work phone

23   is the contacting information that our customers

24   get.

25        Q.   Okay.  And do you guys -- does Eastman use

Page 42

Appx_1248

```
 1      some sort of CRM to keep track of everything, like
 2      Salesforce or one of the other ones?
 3          A.   Yes.  We use Salesforce.
 4          Q.   Okay.  So how do outside sales
 5      representatives use Salesforce?
 6          A.   The outside sales reps use it for
 7      capturing their call reports.  They use it for
 8      capturing new opportunities, a new account, a
 9      prospect --
10          Q.   Okay.
11          A.   -- the details of it.  They will use it to
12      forecast their territories and set their goals.  And
13      they will use it to communicate with the internal
14      parts of the company to --
15          Q.   Okay.
16          A.   -- help close new business or --
17          Q.   Okay.
18          A.   -- protect business.
19          Q.   So -- and I know Salesforce is sort of
20      infinitely malleable, right?  But is there -- is
21      there like a messaging system in Salesforce that
22      outside sales reps can talk with members of their
23      team with?
24          A.   Yes.  Within Salesforce, there is a -- I
25      think Salesforce calls it Chatter, in which there's
```

Page 43

Appx_1249

1    ability to have a line of communications that are

2    tied to a certain account.

3         Q.   Okay.

4         A.   So it links the data, which is useful.

5         Q.   Okay.  So Caylee has access to Salesforce?

6         A.   Yes.  To my -- best of my knowledge.  She

7    better.

8         Q.   Okay.  Okay.  So would there be anything

9    on Eastman's Salesforce relating to this accident?

10        A.   I do not know.  I do not know if there's

11   anything on Salesforce.  I would be surprised if

12   there was.

13        Q.   Okay.  How come?

14        A.   Unless it was to indicate, you know,

15   Caylee will not be at this sales event because of an

16   incident.  That would be the extent.  I would be

17   surprised, honestly, if there's anything on

18   Salesforce, but I do not know.

19        Q.   Okay.  Okay.  So I think you already told

20   me about Eastman's official policy on how quickly

21   outside sales reps should respond to clients.  And I

22   think you said 24 hours?

23        A.   Sorry.  No, sir.  I don't think there's an

24   official.

25        Q.   Okay.  Is there a preference, something

                                        Page 44

Appx_1250

1    they're trained on?

2         A.   I don't -- I think it depends.  I think it

3    depends on which business it is.  I think it depends

4    on the nature of the need from the customer.  So,

5    no.  There's a lot of judgment.  We want to prepare

6    our sales team members to use good judgment and to

7    be in contact with the customers, but within reason.

8    Several days.  So, no, we do not have a hard fast

9    expectation on how frequent or how fast they respond

10   to a customer.

11        Q.   So if I recall right, it's your testimony

12   you don't remember how many clients Caylee has in

13   her territory?

14        A.   I do not.  You know, typical North America

15   sales representatives could have hundreds of

16   clients.

17        Q.   Okay.  Do you think that's --

18        A.   I don't know -- I'm sorry.  I don't know

19   for Caylee specifically.

20        Q.   Okay.  Does around a hundred sound maybe

21   approximately right?

22        A.   It -- yes, I would say that sounds

23   approximately right.

24        Q.   Okay.  And are those clients, are they all

25   sort of window film installers, dealerships; who

Page 45

1    would the clients be?

2        A.    Okay.   Caylee is in our 4S automotive

3    group part of the Salesforce.   So, yes, her clients

4    and perspective clients would be mostly automotive

5    dealerships, either individual -- individually owned

6    or as part of a group.

7        Q.    Okay.   And is she expected to generate new

8    business or, when she's hired, is she given a set of

9    clients and she maintains those relationships; how

10   does that work?

11       A.    So, again, it depends on what we've hired

12   the individual for and where they're coming in.   But

13   I believe with Caylee, she came into an existing

14   territory, there were some clients.   We do hope and

15   expect that our teams are also looking for new

16   business.

17              And something that we make sure is

18   that to help really for that development and

19   onboarding period, is that within the first year,

20   first six months to a year of a new employee,

21   they're kind of assigned a territory or not -- and

22   are not held to the accountability of driving a

23   new -- a new business goal to the same extent we

24   would more experienced sales personnel.

25       Q.    I think I understand why.   But in your own

Page 46

Appx_1252

1   words, why is that?

2       A.   We recognize there's a -- there's a

3   learning curve.  We recognize that sales and anybody

4   coming into a role need to come in and understand

5   the foundations, gets comfortable.  They need more

6   time on the training.  They need more time with

7   their, you know, peers to understand.  So it's --

8   it's to help them get equipped with the right

9   foundation before they're just out trying to drive

10  for certain metrics.

11      Q.   Okay.  So did Caylee replace an existing

12  outside sales rep when she was hired?

13      A.   I do not recall.

14      Q.   Okay.  I guess I'm just wondering would

15  there be some -- another outside sales rep that she

16  was learning under in her territory when she was

17  hired?

18      A.   There were several outside sales reps that

19  I think she went and did a few ride-alongs with.

20  And then there are other sales reps.  I think she

21  was close to like a Steve Sala, who was one of the

22  northern -- it would be the north Texas

23  representative.  So we do try to connect and help

24  bring peer mentoring.  So, yes.

25      Q.   So who was -- you said Steve Sala was an

Page 47

Appx_1253

```
 1    outside -- is perhaps an outside sales rep --
 2         A.   He is.
 3         Q.   -- in northern Texas?
 4         A.   He is an outside sales rep in Texas.
 5         Q.   Some part of Texas?
 6         A.   Yes, sir.
 7         Q.   Okay.  So what -- other than the
 8    ride-alongs with other outside sales reps who -- I
 9    believe Caylee testified about those.  Do you know
10    if she did anything else to prepare and get trained
11    as an outside sales rep when she was hired?
12         A.   I believe -- well, I know there's a lot of
13    training and time, both verbally through calls or
14    through the computers.  So as you can imagine, a new
15    sales rep needs to understand our products, they
16    need to understand the services we provide.  They
17    will have frequent conversations and calls.
18              Our leadership, her supervisor would
19    have probably daily or frequently multiple calls
20    through that week just to talk about different
21    topics.  So there's different topics that they would
22    go through to help Caylee be prepared and learn the
23    job, not all at once, before over a course of a
24    period.
25         Q.   When was Caylee hired, if you remember?
```

Page 48

Appx_1254

1        A.    I believe Caylee was hired in March of

2   2021.

3        Q.    So given it was March of 2021, is it

4   possible that a lot of her training occurred via

5   Zoom or some videoconferencing due to the COVID

6   pandemic?

7        A.    I think with COVID, it definitely caused

8   and enabled us to learn how to use Teams and Zoom

9   more effectively, yes.

10       Q.    So do you think that most of her training

11  was over Zoom or -- and when I say Zoom, can we just

12  agree that covers any sort of videoconferencing

13  technology?

14       A.    Yes, I can agree to that.

15       Q.    So to rephrase, do you think most of

16  Caylee's initial training happened over Zoom?

17           MR. DuBOFF:  I'm just going to object

18       again on the training and just not being

19       totally clear on specifically what you mean.

20           MR. WHITE:  Sure.

21       A.    I think -- so the coaching, training,

22  supervisor-to-employee counseling, meetings, etc.,

23  yes, a lot of that is done on computer or on

24  telephone or through videoconference, while a lot of

25  it also is done through these various visits between

Page 49

Appx_1255

1    the supervisor and the representative.

2         Q.   (By Mr. White)   Okay.   And do you know if

3    any other visits, other -- I know you testified

4    earlier that Alan Davis probably did four to five

5    visits, ride-alongs with her.   Are you aware of any

6    other visits or ride-alongs or in-person

7    interactions with supervisors and Caylee Smith?

8         A.   Yes.   In addition to Alan's multiple trips

9    and visits with her, Eric Holmes, who is the sales

10   manager for that part of the business.   He -- he

11   traveled with Caylee.   I believe he said at least

12   twice during that first set of period.   And, again,

13   those would be, you know, with her for a good at

14   least two to three days.   Going to see a couple of

15   customers during each of those days.

16        Q.   And so did you speak with Eric Holmes to

17   prepare for this deposition?

18        A.   Yes, I did.

19        Q.   Okay.   So what was his review of Caylee's

20   driving?

21        A.   Eric's review was -- was -- he said he saw

22   nothing that gave him pause about her driving.   They

23   spoke about it.   She was operating hands free in

24   terms of with her GPS.   She put it in before they

25   would begin the route.   And he saw that she was --

Page 50

1    she was aware and cognizant of her surroundings.

2        Q.   Okay.  I guess same question for Alan

3    Davis.  Did you speak with Alan Davis to prepare for

4    this deposition?

5        A.   Yes, I did.

6        Q.   And did you speak with him about his

7    ride-alongs with Caylee?

8        A.   Yes.

9        Q.   And what was his review?

10       A.   Yeah, I asked him that as well.  And his

11   review was that she -- there was nothing that made

12   him see during any of his visits that there was any

13   concern with her driving.  Same thing.  They would

14   talk about -- you know, he observed.  They

15   purposefully do observe to see how the individual is

16   preparing before they start.  How aware they are of

17   where they're going.  You know, a lot of times

18   they're going to customers that they may or may not

19   have been to see in a while.  And then -- and they

20   talk through just some things they're observing.

21   That's a purposeful part of the time together.

22       Q.   Okay.  So is -- is it Eastman's preference

23   for example that GPS coordinance be entered in at

24   the beginning of the trip so that you're not

25   fiddling with the GPS as you're driving along?

                                          Page 51

Appx_1257

1     A.    Yes.

2     Q.    Okay.  And is that some training that

3     Caylee would have specifically received from

4     somebody at Eastman?

5     A.    Yes.  I believe that is part of the

6     training or the communication that comes from the

7     sales leadership.

8     Q.    Okay.  And do you think that guidance is

9     written down anywhere or is that just a spoken

10    communication?

11    A.    I don't know if it's written in any

12    policies.  I believe it is -- I'd have to maybe

13    refresh my memory of the couple of these.  But I

14    believe it's consistently spoken through our

15    management and the interactions with the team.

16    Q.    Do you think it would be important to

17    write down that guidance?

18    A.    I can't speak to that, whether it's

19    important or not.  I think it kind of depends.

20    Q.    Well, I mean, do you think it makes it

21    easier for managers or trainers to remember to give

22    that guidance for that guidance to be written down?

23    A.    I would expect so.

24    Q.    Okay.  So would you expect that guidance

25    to be written down somewhere in some policy that

Page 52

Appx_1258

1    Eastman has on -- on driving safety?

2        A.   You know, I don't know if I've seen that

3    in any of the policies.

4        Q.   Okay.  Do you wish that it was?

5        A.   I can't -- I wouldn't say that I wish that

6    it was.  I think it depends.  You know, recognizing

7    some technology continues to change, and we try to

8    make sure our policies are both with the intent of

9    practicality and common sense and making sure that

10    people are wholly prepared before they start

11    driving, to do the best.

12             But there are certain potential

13    distractions that we know naturally happen while

14    you're driving.  So there is the need to change your

15    GPS or reroute your GPS or things that might occur.

16    And so we talk through those and how people can

17    avoid those.  But there are potential distractions

18    that do take place in just the nature of the course.

19        Q.   So you said common sense.  How do you

20    mean?

21          THE WITNESS:  Can you read back what I

22        said common sense referred to?

23        Q.  (By Mr. White)  Well, let me -- so you said

24    that -- I believe you said something about we expect

25    them to use their common sense.  I just want to know

Veritext Legal Solutions
800-336-4000

```
 1    what you mean by that.
 2         A.   Okay.  There's judgment every individual
 3    has to take when they're doing a job.  When I was
 4    driving here this morning, I had to take my eyes off
 5    the road to look to my left, look to my right, to
 6    check my mirrors.  You know, I changed something on
 7    the radio station.  And that is, I believe, still in
 8    line with our policy.  While I was making sure that
 9    I was fully aware of my surroundings, doing the best
10    I could to avoid risks and hazards while I was
11    driving.
12         Q.   And correct me if I'm wrong.  I think what
13    you're saying is Eastman expects their drivers to
14    take -- to act appropriately given all the
15    circumstances around them on the road.
16         A.   Yes, that's correct.
17         Q.   Okay.  So is there any -- you've already
18    talked about Salesforce.  So I don't think you have
19    to tell me about that.  Any tools or technologies
20    that Eastman Chemical provides to its outside sales
21    representatives to manage communications with
22    clients?
23         A.   We have certain apps on iPads.
24         Q.   Okay.
25         A.   And so when you say manage communications,
```

Page 54

```
 1        I even think what we try to do more is -- is to
 2        enable them to have the tools when they're there
 3        visiting the customer in person.
 4             Q.   Okay.
 5             A.   And so we spend a lot of time trying to
 6        make sure they have really effective -- the
 7        information, like Salesforce, they have dashboard
 8        tablets, things that will pull up, so they can sit
 9        down with their customer right in front of them.
10        It's more about equipping them in that moment and
11        interaction or when they're sitting at their
12        computer talking to customers, than to try to change
13        how they're communicating.
14                  We try to limit just the
15        communication that's taking place through a text or
16        through an e-mail.  It's more about the time with
17        the customer and preparing ahead of the meeting with
18        the customers that we really spend for equipping
19        them.
20             Q.   Okay.  So you mentioned apps.  So what are
21        the apps that an outside sales representative would
22        use in their interactions with the client, whether
23        those are communications with the client or an app
24        they're going to use while they're talking with the
25        client to help them manage that interaction.
```

Page 55

1        A.    Okay.  Our sales team would use

2    Salesforce.  So they would pull up a customer

3    specific dashboard.  Our sales team would also

4    use -- we have Tableau, which is a business

5    analytics that helps them share how they're doing,

6    versus on -- on an anonymity, but how the rest of

7    the market across the country is doing in terms of

8    thinking about different sales metrics or -- and so

9    they can use those and pull those up in front of the

10   customer.

11       Q.    Okay.  What about -- we heard something

12   about -- Well, strike that.

13             Any other apps?  Salesforce, Tableau.

14   Any other apps that outside sales reps are given to

15   use in their job?

16       A.    I believe there are other apps, but a lot

17   of times different teams will make specific apps to

18   help.  So I don't know if I'm stating all of them

19   here.  We do have a -- I'm drawing a blank of the

20   name of it.  It's essentially a sales tool on their

21   iPads that has product information.  It has probably

22   access to technical data sheets.  It has access -- I

23   don't remember the name of that app, though.

24       Q.    Caylee testified about an app called My

25   Eastman.  Are you aware of that?

Page 56

Appx_1262

1          A.    Oh.   That is our Eastman website.

2          Q.    Okay.

3          A.    Yes.   And I -- I recall another app also.

4    But My Eastman is an Eastman website that is fully

5    accessible to our -- all employees, not just sales

6    representatives.   But, yes, all employees.   And it

7    has information that they can access.

8          Q.    So you say -- you make it sound like it's

9    sort of a freestanding website.   Is it an app as

10   well that you can put on her phone or an iPad or

11   what is it exactly?

12         A.    I'm not an IT personnel.   I don't think

13   it's an app.   I think it is web -- I'm sorry.   I

14   think there's mobile access from your devices and

15   there's also web access in some...

16         Q.    Okay.   Okay.   Caylee had mentioned

17   something about double-factor authentication on her

18   work phone and there perhaps being an app to enable

19   that.   Does that ring a bell?

20         A.    Yes.

21         Q.    Okay.   Do you know what that is?

22         A.    I do.   So when you're trying -- this is my

23   understanding.   When you're trying to access into

24   Eastman proprietary information through a computer

25   or an iPad, we use double-factor authentication that

                                        Page 57

1   often comes through your phone, to confirm it's you

2   and not somebody else that is fraudulently, you

3   know, acting on your behalf.

4        Q.   So would that double-factor authentication

5   app be on, like for example in Caylee's situation,

6   on her work phone or her personal phone, both?

7        A.   It should only be on her work phone, not

8   her personal phone.

9        Q.   Okay.  Why is that?

10        A.   Well, it's confirming the Eastman

11   designated routing.  And so we don't monitor

12   personal phones.  We don't manage an individual's or

13   an employee's personal phone.  But the work phone is

14   an asset of the company.  And that's the way we make

15   sure and we expect them to do their business, with

16   the work phone.

17        Q.   Okay.  Caylee had said something about she

18   doesn't use her e-mail on her personal phone.  Does

19   that sound consistent with Eastman's policies?

20             MR. DuBOFF:  Do you mean work e-mail on

21        her...

22             MR. WHITE:  Excuse me.  Yes.  Sorry.

23             MR. DuBOFF:  Okay.

24             MR. WHITE:  Let me rephrase.

25        Q.   (By Mr. White)  Caylee testified that she

Page 58

Appx_1264

1     does not access her work e-mail, her Eastman e-mail

2     on her personal phone.  Is that consistent with

3     Eastman's policies?

4          A.   I believe that is consistent with our

5     policies.  There is a way for an individual to

6     access work e-mail through a personal device, I

7     think more of a computer.  I don't know if they can

8     do it through a phone.  But you have to go through

9     the Eastman authorized website.  To me, it's

10    difficult so I don't do it.

11         Q.   Okay.

12         A.   But you can.  But that then triggers

13    probably -- but I would say I don't know of anyone

14    that would access their work e-mail through a

15    personal device.

16         Q.   Okay.  Okay.  And to the best of your

17    knowledge, Caylee doesn't access her work e-mail

18    through her personal devices?

19         A.   To the best of my knowledge, she does not.

20         Q.   Okay.  So does Eastman monitor the

21    responsiveness of outside sales representatives to

22    client requests or would that only -- well, I guess

23    I'll just leave it at that.  Does Eastman monitor

24    the responsiveness?

25         A.   What Eastman monitors are responsiveness

                                              Page 59

```
 1       of -- not through our sales reps -- orders that get
 2       entered through our customer service
 3       representatives.  We do monitor the time of order,
 4       receipt of order.  And I'm saying the names wrong
 5       probably, but.  And the -- and then also
 6       acknowledgment of order and then delivery.  So we --
 7       it's very important to Eastman that once we take an
 8       order and have commitment on it, that we understand
 9       our service.  Because we also tell our customers
10       there's a certain lead time.
11                    If you're going to make an order,
12       expect that, you know, depending on the product,
13       there might be a two-week lead time.  So we try to
14       track to the commitments we have for the customers.
15       That is no obligation on the sales rep.
16            Q.   Okay.
17            A.   It's -- just to be clear, that's not on
18       the sales rep.  That's on our customer service, our
19       supply chain.  The other thing that we do track,
20       another metric, would be if there's a complaint that
21       comes from a customer on, hey, I got the wrong
22       product.
23            Q.   Okay.
24            A.   We track those customer -- we call that
25       customer feedback.  And that goes into Salesforce.
```

Page 60

Appx_1266

1    And then really, it's the collective responsibility,

2    not just the sales rep, but whoever's also involved

3    in that, to provide resolution.  And so we track how

4    long those take to resolve.

5         Q.   Okay.  So I guess -- and this may be a

6    pretty broad question.  You're talking about metrics

7    that you guys follow.  Do you call those KPIs?

8         A.   We do sometimes, yes.

9         Q.   Okay.  What KPIs do y'all follow that

10   would be attributable to Caylee?  I guess that's not

11   the world's best question.  Let's -- if you

12   understand that, try that.

13        A.   Okay.  So -- so we have key result areas.

14   And then we have metrics and KPIs.  And not just

15   Caylee, but for every employee, we have where they

16   set at the beginning of the year certain goals.  And

17   these key result areas are safety and wellness --

18   actually safety, health and wellness and

19   environment.  Kind of your financial targets, cash

20   targets, capability, learning development

21   capabilities.  And then kind of growth and

22   innovation.

23             Specific to Caylee, there's then

24   elements across those.  The safety and wellness,

25   there's expectations for, you know, her following

                                        Page 61

1    all of her training that's required online.  For her

2    to -- so KPIs and related to each one of these.  Her

3    other KPIs would include how she is performing

4    versus her goals for the revenue for the -- for the

5    year.

6         Q.   Okay.  Any other KPIs for Caylee?

7         A.   There also would be KPIs related to, you

8    know, new business goals, but those are not set.

9    Those are determined between the individual and the

10   supervisor kind of through the -- through the year

11   or at the beginning of the year.

12             And then I know for Caylee, we were

13   trying to roll out a new -- I don't know what you --

14   but essentially a new program with our dealership

15   groups to get them to adopt CORE, which is a

16   software we have.  And to -- so there was a couple

17   other things around -- you know, they wanted her to

18   win one new lead program for paint protection film

19   and the use of CORE.

20        Q.   Okay.  So -- and I saw some paperwork on

21   that.  So CORE is a software?

22        A.   Correct.

23        Q.   Okay.  And PPF is some new film, I guess?

24        A.   It is paint protection film for

25   automobiles.

Veritext Legal Solutions
800-336-4000

Appx_1268

```
 1              Q.   Okay.  Okay.  We'll get back to that.

 2                   You mentioned key result areas,

 3      metrics and KPIs, right?  And you told us about some

 4      key result areas for Caylee and some KPIs for

 5      Caylee.  What about metrics for Caylee; are they --

 6      is that different?

 7              A.   No.  I was referring to those really.

 8              Q.   Okay.  Okay.  So metrics is not what --

 9              A.   Sorry.

10              Q.   It's like a proper pronoun.  You just mean

11      metrics in the generic?

12              A.   Yes.

13              Q.   Okay.  So you talk about key result areas

14      for Caylee, including safety, financial and

15      capabilities; is that right?

16              A.   Uh-huh.

17              Q.   How are these measured?

18              A.   They're measured both qualitatively and

19      some quantitive where you can.  But a lot of it is

20      based on the observations and results for the

21      individual.  All right.

22                   So at the beginning of the year or at

23      the end of the prior year, the teams will look at

24      what we do in this territory on financials from the

25      prior year.  We believe the market's growing a
```

Page 63

Appx_1269

```
 1    certain percent.  We want to be able to maintain
 2    with that market.  So, you know, your goal should be
 3    to also maintain and protect your share in the
 4    market.  So that's the way those are set.  And then
 5    they'd be measured based on that.
 6         Q.   Okay.  Well, tell me a little bit about
 7    safety.  Does it measure quantitatively and
 8    qualitatively as well?
 9         A.   Yes.  I believe that the expectation is
10    that there's -- so we -- we track incidents from,
11    you know, injuries.  So we want to track and make
12    sure there's no avoidable injuries.  And that there
13    also is for her safe driving.  I'm sure all of the
14    sales -- I shouldn't say I'm sure.  I believe that
15    the sales, a very common expectation and measure is
16    a safe driving record for individuals.
17              We also ensure that that safe driving
18    record is held up by, you know, having a driver's
19    license.  And, you know, there should be no
20    moving -- you know, the goal is to have no moving
21    violations.
22         Q.   Okay.  So, you know, if we were to show a
23    jury some of this testimony, no one's going to
24    understand what qualitative versus quantitative
25    means.  So can you talk about what a -- well, when
```

Page 64

1    we say a quantitative measure of safety, right, in

2    Caylee's case, what does that mean?

3         A.   I'd say no moving violations, no tickets.

4         Q.   Okay.

5         A.   Sorry.  Did you say quantitative?

6         Q.   Quantitative, yes, ma'am.

7         A.   Okay.

8         Q.   Are there any other -- and can we agree

9    that quantitative means like things that we can

10   distinctly measure?

11        A.   Correct.

12        Q.   As opposed to qualitative, which means

13   sort of subjective, maybe somewhat fuzzy

14   measurements?

15        A.   Yes.

16        Q.   Okay.  Are there any other quantitative

17   safety measurements that Caylee would be tracked on

18   by Eastman?

19        A.   Not that I know of.

20        Q.   Okay.  So just moving violations; that's

21   all you guys track?

22        A.   No.  Certainly we track if an individual

23   has had an incident or an injury.

24        Q.   Okay.  So where would that information be

25   stored?

Page 65

Appx_1271

1         A.   We have an HSE, so health safety and

2    environmental.  You know, I don't know that it's

3    stored necessarily.  It is provided -- if an

4    individual has an injury on the job, certainly they

5    are to report it to their supervisor.  Usually

6    it's -- and this whole thing is with the nature of

7    trying to make sure the health and well being, they

8    get the right support, medical care and everything.

9    So that's the first and foremost priority.

10              But if there's an injury or an

11   incident on a job, they're supposed to report it

12   to -- first of all, if there's an issue, call 911.

13              THE COURT REPORTER:  I'm sorry.

14        A.   Call 911 and then get medical help.  If

15   they're fine, if they're safe, to report to their

16   supervisor as soon as they can.  And so those -- the

17   documentation for an incident like that would be

18   tracked within our Eastman records.

19        Q.   (By Mr. White)  Okay.  So that's what I'm

20   getting at.  You say it's tracked in the Eastman

21   records.  What do you mean?  Is there some database

22   or a personnel file of some sort?

23        A.   It would go both into the personnel file

24   if it was -- if it was something that was kind of

25   found to be avoidable or at fault.  And I probably

Page 66

1    need to separate because it totally depends on what

2    the incident is.

3         Q.   Okay.  How so?

4         A.   So per the -- per the policy for driving,

5    if we use that as an example, if -- first would be

6    if an individual has a moving violation, whether

7    it's a ticket, citation, etc., they are to contact

8    their supervisor and provide that report.  Okay.

9    Then that gets stored into -- I don't know the name

10   of our database for it.  If --

11        Q.   But there is a database?

12        A.   We store information.  I don't know where

13   it is stored.

14        Q.   Okay.

15        A.   Then if -- secondly, if there's an

16   incident that involved a leased vehicle, a company

17   leased vehicle, that involves a wreck, the

18   individual is to communicate to Donlen, our

19   insurance company.  Communicate to the fleet

20   manager, the fleet responsible.  And then also

21   engage risk management, contact, as well as contact

22   a supervisor.  So they follow that.

23             We get the police reports or the --

24   as long as they're able to, the individual gets a

25   police report if one is such filed.  That would then

Page 67

Appx_1273

1    flow in.  And, yes, that's stored through our

2    Eastman records.  I don't know where it's stored.

3         Q.   Okay.  Okay.  So then what happens, right?

4    So a police report is filed or not filed.  What's

5    the next step in the process?

6         A.   Let's see.  So the HR, legal, kind of the

7    insurance, they would evaluate and review the

8    authority's findings for the report, determine if

9    any further action is needed.  And document it

10   within, I think our system within Eastman, the fleet

11   and where they have the records from Donlen on the

12   report.  And then, yeah, it's really a legal and HR

13   and a supervision decision on what takes place next.

14        Q.   So when you say decision, is there a

15   document generated about what the decision is

16   following an accident, like no decision, some

17   disciplinary action; you know, is there a document

18   of some sort?

19        A.   So I believe that there is -- so within

20   the SOP around operating and running a leased

21   vehicle, there is a certain set.  So it highly

22   depends on -- sorry.  It depends on the police

23   records, what the findings were for the individual.

24   And then there is a flowchart that indicates, you

25   know, if they were found -- if they had certain

Page 68

```
 1    violations or if they had been in a certain number
 2    of accidents within a period of time that were
 3    unavoidable.  You know, they would go to a -- I
 4    don't know if it's distracted driver or driving
 5    training.  So there is a direct -- if it's
 6    specifically to those -- to those incidents.
 7         Q.    Okay.  So -- and we'll talk about those in
 8    more detail in a little bit.
 9         A.    Okay.
10         Q.    But I guess what I'm asking is, to the
11    extent any decision is made, is that decision
12    documented.  So whether it's following a flowchart
13    or not, say legal, risk management, whomever gets
14    the police report or doesn't get the police report,
15    how is the decision to do whatever they decide to
16    do, how is that decision documented?
17         A.    That is not necessarily documented.
18         Q.    Okay.  So it's possible, it sounds like,
19    correct me if I'm wrong, that if the decision is to
20    do nothing, there's not going to be a document
21    saying we're not going to do nothing, just nothing's
22    going to happen, right?
23         A.    That is correct.
24         Q.    Okay.  And we'll get into it in more
25    detail in a little bit.  But the decision -- what
```

Page 69

Appx_1275

1    the decision is depends upon the team that looks at

2    the report and the facts of the accident and then

3    following that flowchart that you referenced; is

4    that right?

5         A.   Yes.  And the team that looks at it is our

6    members that are outside of the -- outside of the

7    direct management.

8         Q.   Okay.  Why's that?

9         A.   You know, it is important -- to get the

10   subject matter expertise --

11        Q.   Okay.

12        A.   -- from legal, from human resources, those

13   that understand these policies the best.  We have

14   also what we call HSE managers, so the health safety

15   and environmental.  They understand best how to --

16   how to navigate and how to manage and evaluate.  And

17   then they're also trained in doing the

18   investigations on the team's behalf.  It's a way for

19   us to make sure that we're doing it appropriately.

20        Q.   Okay.  So -- all right.  That's good.  So

21   I want you to go ahead and open to Tab 2 here.

22             MR. DuBOFF:  Jake, can we take a break?

23             MR. WHITE:  Yeah, that's fine.

24             MR. DuBOFF:  We've been going for 80

25        minutes or so.

Page 70

```
 1              THE VIDEOGRAPHER:  Stand by, please.  The
 2         time is 10:21 a.m. and we are off the record.
 3                        (Whereupon there was a short
 4                        break.)
 5              THE VIDEOGRAPHER:  All right.  The time is
 6         10:38 a.m. and we are on the record.  10:39.
 7         Correction.  10:39.
 8         Q.   (By Mr. White)  So, Ms. Bernhardt -- is
 9    that -- have I got the last name right?
10         A.   Yes.
11         Q.   Okay.  Perfect.  Erin.  We just took a
12    little break just to -- so we could all stretch our
13    legs a little bit.  And we were talking a little bit
14    about how Eastman follows, monitors accidents
15    amongst outside sales representatives.  Do you
16    recall that conversation that we were having?
17         A.   Yes.
18         Q.   Okay.  So it sounds to me like there's
19    probably not like a dashboard that a supervisor at
20    Eastman can check to easily see how many accidents
21    an outside sales representative has been in; is that
22    right?
23         A.   That is correct.
24         Q.   Okay.  So to find out how many accidents
25    an outside sales rep has been in, a supervisor would
```

Page 71

Appx_1277

1    probably have to dig into the personnel file; is

2    that right?

3         A.    That is correct.

4         Q.    Okay.  Is there a reason that there's not

5    a dashboard or is that just kind of how it's

6    evolved?

7         A.    There's certainly a reason why.  I mean,

8    we're not in the driving business.  We're not in the

9    fleet or in the transportation business.  We're in

10   the business of making products for our customers,

11   serving them, manufacturing.  So what is important

12   is trying to ensure that our customers -- our sales

13   members and all of our team members are operating

14   safely and are -- and are, you know, learning

15   continually and always thinking about what are the

16   right things they need to be doing.

17              But just to put it in perspective,

18   you know, I've talked to Lee Ward who's over our

19   fleet, he knows of no other fatal incidents in the

20   last 20 years for our company, at least.  I know of

21   nothing.  And so -- and the frequency of accidents

22   is very infrequent.  And so we have a policy and we

23   have a procedure in the event.  But it's just an

24   infrequent occurrence.

25              And so what we try to ensure is that

Page 72

 1     there's a line of communication and then that the

 2     right group of individuals are communicated and we

 3     get the police records and we follow through what we

 4     think is the right thing from there.

 5         Q.    So you used the word "infrequent" a couple

 6     of times.  How do you mean?

 7         A.    You know, I know of no -- I mentioned

 8     the -- the -- the flow diagram, the decision tree on

 9     paper.  I know of no incident or no time when I've

10     been pulled into where anyone's had multiple

11     unavoidable wrecks or situations.  And so I don't

12     know if in my organization -- and I've been in the

13     company for almost 30 years.  This is not something

14     that happens.

15                We have -- we try to ensure that our

16     teams are operating well, safely.  And so it's not

17     something we have to go through very often.  This

18     has been something that's been very unique for

19     Eastman to have to -- to need to understand and

20     learn from.

21         Q.    All right.

22                THE VIDEOGRAPHER:  I'm sorry.  Real quick.

23     Make sure the cord is underneath your hand.

24                THE WITNESS:  Yes.

25                THE VIDEOGRAPHER:  Got it.  Okay.

Page 73

1     Q.   (By Mr. White)  So when you say that this

2  has been a unique experience, do you mean responding

3  to a fatality accident or do you mean something

4  different?

5     A.   Responding to a fatality accident like

6  this.

7     Q.   Okay.  And that's because it sounds like

8  what you're saying in your experience, Eastman does

9  not have a lot of experience with drivers who have

10  multiple avoidable accidents; is that right?

11     A.   That is correct.

12     Q.   Is that because Eastman would typically

13  terminate somebody if they had multiple avoidable

14  accidents or it just doesn't happen?

15     A.   It hasn't gotten to that.  But, you know,

16  we haven't -- we believe that our employees

17  typically have good -- and are trying to abide by

18  the law, trying to do well.  So we haven't had the

19  experience of having the nature of that multiple

20  avoidable -- unavoidable accidents.  Excuse me.

21     Q.   Okay.  So I think you're using sort of a

22  technical term, "unavoidable accidents," right?  Do

23  you mean something different by unavoidable

24  accidents versus just an accident?

25     A.   We -- we need to be notified of all -- any

Page 74

1    accident for our leased vehicles.  An individual

2    who's an employee of the company does not need to

3    provide -- they can if there's -- if it impacts

4    their work.  But so we don't become aware if, you

5    know, our employees are in their own vehicles and

6    have an accident.

7         Q.   Sure.  I guess what I'm -- well, let me

8    ask you this:  Does Eastman have experience dealing

9    with employees who are multiple accidents?  I use

10   that phrase instead of unavoidable accidents.

11        A.   Okay.  Yes.  I would say from time to

12   time, there are situations where we have

13   fender-benders or we have the -- you know,

14   accidents.  And we have a large -- again, I have 400

15   people, 350 people in my organization.  So

16   there's -- there's different incidents and accidents

17   that happen.

18        Q.   Okay.  We'll get -- we'll get into all

19   that in a little bit.  I don't want to jump the gun

20   too much.

21             So can you open up to Tab 2 here?  It

22   looks like you've already got it open.

23        A.   Yes.

24             (Whereupon Exhibit 2 was

25                  introduced for identification.)

                                        Page 75

Appx_1281

```
 1            Q.   (By Mr. White)  Can you flip to Page 135.
 2       This is Ms. Smith's deposition transcript.
 3            A.   Okay.
 4            Q.   Okay.  So if you can go down to Line 23,
 5       can you see my question to her?  Do you mind
 6       reading --
 7                 MR. BUNT:  Can you give us a page?
 8                 MR. WHITE:  Oh, Page 135, Line 23.
 9            Q.   (By Mr. White)  Erin, do you see where I'm
10       talking about?
11            A.   Yes.
12            Q.   Can you read the question and then the
13       answer at that position?
14            A.   Yes.  Question is:  Did you ever receive
15       training from Eastman about taking phone calls while
16       you're driving?
17            Q.   And what was Caylee's answer?
18            A.   Her answer was:  I don't remember.
19            Q.   Okay.  So do you agree that Caylee --
20       Well, strike that.
21                 Should Caylee have remembered her
22       training about taking phone calls while driving?
23            A.   So I don't know how she was interpreting
24       training, just first.  But, yes, we would -- I would
25       want my team members and want our employees to
```

Page 76

1    recall conversations or -- I don't know how she was
2    interpretating the question as -- I don't know
3    how -- or why she answered it that way.
4        Q.   Okay.  But what -- what answer would you
5    expect one of your employees to give if I asked --
6    if they're asked what training have you received on
7    taking phone calls while driving?
8            MR. DuBOFF:  I'm going to object to the
9        ambiguity of the term "training."
10       A.   So I would -- I would expect our employees
11   would be able to say we are not supposed to be using
12   our phones with hands when we're driving.  And, you
13   know, if they were asked, do you regularly discuss
14   with your supervisor or do you have -- have you had
15   conversations about expectations related to driving
16   and use of phones while you're driving, I would
17   expect them to say yes.
18       Q.   (By Mr. White)  Okay.  So does it concern
19   you at all that she says that she can't recall her
20   training on talking while driving?
21       A.   I don't -- again, I can't say how she was
22   interpreting the discussion.  And I don't know the
23   circumstances of, you know, where she was in her
24   mind in terms of being able to respond to that.
25       Q.   Well, I mean, it was a sworn deposition,

Page 77

1    right?  So you would expect her to remember,

2    especially in a deposition for a case where she

3    killed somebody, right, would you expect your

4    employee to remember if she had been communicated

5    with about Eastman's expectations for talking on the

6    phone while driving?

7              MR. DuBOFF:  I'm going to object because

8         that's not the question that she was asked in

9         her deposition.

10             THE WITNESS:  Yeah.  It's not the question

11        she was asked.  So, again, I don't know why she

12        would answer that way.

13        Q.  (By Mr. White)  Okay.  So can you go to

14   Page 136?

15        A.  Yes.

16        Q.  Okay.  So can you read -- you don't have

17   to for the record, but can you read the

18   back-and-forth conversation here about texting and

19   driving?

20        A.  Starting with one?

21        Q.  Sure.

22        A.  Okay.  Do you respond to texts while

23   you're driving?

24             I have.

25             While you're driving for Eastman?

                                        Page 78

```
1                        I have.

2                        Okay.  Why?

3                        Sometimes it's not safe to pull over

4      in some of the cities that I'm driving through.

5                        So text back instead of -- so you

6      text back instead of pulling over?

7                        I use my voice command a lot.

8                        Okay.  How do you do that?

9                        Talking into the phone.

10                       Okay.  But walk me through it.  Like

11     how did you text using your voice?

12                       You click the microphone and speak

13     into it to send.

14                       Okay.  Where do you click the

15     microphone?

16                       On the phone.

17                       Okay.  Where is that at?

18                       In -- I mean it's -- like where's the

19     phone -- oh.  I mean, where's the phone sitting?

20                       No.  Where on the phone?  Like on

21     which app do you have to have open to hit the

22     microphone button?

23                       You have to have the text app open.

24          Q.   All right.  That's good enough, right?

25          A.   Okay.
```

Page 79

Appx_1285

1          Q.    So her testimony there about texting and

2     driving, do you consider her testimony to be

3     admitting to violating Eastman's policies about

4     texting while driving?

5          A.    No, not necessarily.

6          Q.    And why?

7          A.    What I understand from her statements

8     here, is that she was using the voice command to

9     text.

10          Q.    I think she said she uses it a lot, right?

11          A.    I don't know how she's measuring a lot.

12     But, okay.

13          Q.    But that's what she says, right?

14          A.    Okay.

15          Q.    Okay.  So does that concern you?

16          A.    Let's see.  Your question was:  So you

17     text back instead of pulling over?

18                    I don't know that that concerns me.

19     She says she uses her voice command.

20          Q.    Okay.  Does it concern you that she talks

21     about having to touch the phone to send voice

22     command text messages?

23          A.    I think that is a practical element of

24     being in a vehicle, needing to touch things within

25     your vehicle.  So, no, I think that's within the

Page 80

1    norm.

2        Q.    Okay.  So your testimony is that it

3    doesn't violate Eastman's testimony [sic] for her to

4    touch the microphone button to then dictate a text?

5        A.    That is correct.

6        Q.    Okay.  Would it violate Eastman's policies

7    if she has to look at the phone, review whether or

8    not the phone accurately dictated her message and

9    then hit the send button while she's driving?

10       A.    I think it depends.  What we try to ensure

11   is that they are not -- that they are not, again,

12   using hands held, in your hands, working and doing

13   anything like that or pulling it in and out.  But

14   the need to look from time to time at something

15   within or outside of your vehicle is, I think,

16   within the norm of most people's driving.  And also

17   within the norm of some of what states and laws

18   expect.

19       Q.    Okay.  But I'm asking if Caylee's

20   testimony is that she was -- for a phone that's

21   mounted on her dashboard, she's hitting a microphone

22   button, speaking into it for a text message and then

23   looking at the phone to make sure the dictation's

24   correct and then hitting the send button, does that

25   violate Eastman's policies?

Page 81

Appx_1287

1          A.    No, I do not believe it does.

2          Q.    Okay.   Why?

3          A.    Because there's a -- so there's a

4    practicality of how -- whenever we're putting things

5    on the policy, there's both the purpose and intent

6    and then there's also clear expectations.   So

7    purpose and intent is keep your eyes on the road,

8    keep your hands on the wheel.   We know that if you

9    actually do that, you may create more hazards.

10              You have to be able to use your

11   judgment to adjust your GPS, to take something -- so

12   within that norm of safe driving, I do think and I

13   believe the company recognizes that drivers have to

14   make that choice and sometimes be evaluating as

15   long -- you know, the expectation is that they do it

16   safely and that they're not doing it in a way that

17   is taking your eyes off the road for long periods of

18   time.   It's the part of -- I think the nature of

19   being a driver that has to come with that.

20         Q.    Okay.   So do you think it creates more

21   distractions to not respond to a text message while

22   driving?

23         A.    Oh, I don't know.   I couldn't say if

24   that's...

25         Q.    So I'm just trying to get your testimony

                                        Page 82

```
1    right here.  So Eastman thinks that the practicality
2    of sending a text message is sometimes more
3    important than keeping your eyes completely on the
4    road?
5         A.   I don't think we have a specific opinion
6    on that.  I think Eastman recognizes that there are
7    conditions, whether it's an emergency, whether it's
8    also other things, that an individual will move
9    while they're operating a vehicle.
10        Q.   Okay.  So you said in an emergency, right,
11   as a possible example?
12        A.   As an example.
13        Q.   Are there other situations when it might
14   be acceptable to send a text message while driving
15   in Eastman's opinion?
16        A.   Well, our policy says with hands free --
17        Q.   So any --
18        A.   -- devices.
19        Q.   So any use of hands-free devices is
20   acceptable --
21        A.   Oh, gosh, I don't know if that's what that
22   means.
23        Q.   -- in Eastman's opinion?
24        A.   I don't know what you mean by any hands
25   free.  It says to use hands-free devices and to
```

Page 83

Appx_1289

1    use -- to avoid -- so our policy states, no physical

2    texting.  No physical reply to e-mail, no computers,

3    no use of your hands that would take your hands away

4    from the wheel for a long period of time.  Okay?  It

5    states, no conference calls.

6                    There is the acknowledgement that you

7    can use a hands-free device while -- and have

8    Airplay and things while you are operating a vehicle

9    to take phone calls if you can do it short and

10   quick.  I shouldn't say short and quick.  Excuse me.

11   It says, you know, if you believe you can do that

12   safely and the same thing for verbally taking texts.

13       Q.   Okay.  So why the caveat for when you can

14   use hands free; why does that have to be done in a

15   safe manner?

16       A.   It's guidance to our team.  We want them

17   to be safe.

18       Q.   Okay.  So do you think Caylee was ever

19   trained on precisely how much she can touch her

20   phone when driving?

21       A.   No, I do not think that's a part of a

22   specific training.

23       Q.   Okay.  Why not?

24       A.   We're not in the business of -- we're not

25   in the business of telling an individual everything

Page 84

Appx_1290

1      they do at every moment.  I mean, just from -- it
2      seems impractical to give every explicit detail of
3      how someone does their job.  And there's state --
4      there's other guidance that individuals go through
5      to make sure they have a valid employee -- valid
6      driver's license and safety, the expectations for
7      them.
8            Q.   You said other guidance.  Do you mean like
9      state laws?
10           A.   Sure.
11           Q.   Okay.  Any other guidance you're thinking
12     of?
13           A.   No, not at this time.
14           Q.   So Eastman sort of relies on that their
15     drivers are going to follow state law.  So they
16     avoid -- so Eastman avoids training on every
17     specific situation their employee might find
18     themselves in?
19           A.   We don't avoid it.  We find it impractical
20     to be able to train on every situation there can be.
21           Q.   Okay.  So explain those impracticalities
22     to me.
23           A.   I'm not following the question.
24           Q.   Why is it impractical to train employees
25     on whether or not they can touch their phone while

                                          Page 85

Appx_1291

```
 1      driving?
 2              MR. DuBOFF:  Objection, form, misstates
 3          testimony.  It's nonresponsive to what she
 4          said, which is your question was training on
 5          everything having to do with driving and then
 6          why that was impractical.
 7      A.   We try to do our very best to ensure that
 8   we -- and I think we do.  I'm very confident that we
 9   do, with frequent communications, frequent
10   discussions, frequent training, lessons learned,
11   things like that to reinforce with our teams to make
12   good judgment, what they have to avoid, so make that
13   very clear.
14              We can't anticipate everything they
15   will come across.  And so it's in the nature of
16   trying to make sure they're equipped for the safety,
17   they understand that we desire and value their
18   safety first above everything else.  And that
19   nothing, you know, that they feel from us, should be
20   getting in their way of driving as safely and
21   performing a job as well as they can.
22      Q.   (By Mr. White)  Okay.  So I guess just --
23   you know, I want to make sure I'm getting your
24   testimony right.  If Caylee was dictating those
25   messages to her phone and then reviewing the text
```

Page 86

Appx_1292

1    message and then sending them, you're saying that's

2    not necessarily a violation of Eastman's policies

3    and training?

4         A.   Again, if she's not -- so not necessarily.

5    I don't know if it's -- I would expect dictation

6    back or a lot of times those play back their --

7    their responses.  So I don't know the situation

8    of -- of what she was doing.

9         Q.   Okay.  So would your answer whether or not

10   it's a violation depend on what's going on on the

11   road at the same time?

12        A.   I don't -- no, I don't think there can be

13   a statement that the conditions specifically

14   influence whether it's a violation.

15        Q.   Okay.  Could there be any roadside -- or

16   road conditions that would make it a violation for

17   her to dictate her message?

18        A.   No, sir.  There's judgment.  So, no.

19        Q.   Okay.  So what role does driving play in

20   the overall evaluation of an outside sales

21   representative's performance?

22        A.   It is a part of it.  But it's certainly

23   not the primary consideration --

24        Q.   Okay.

25        A.   -- for how effective our team members are

Page 87

Appx_1293

1    doing the job --

2        Q.   Okay.

3        A.   -- or for their position.

4        Q.   So what is the important performance

5    metric that goes into measuring an outside sales

6    representative?

7        A.   Their communication overall within the

8    team, with their customers from an effectiveness of

9    that, not timeliness necessarily, but effectiveness

10   of that.  Their learning curve for learning the

11   nature of the business and being able to represent

12   the company well.  Being able to represent the

13   company with our values, which involve integrity and

14   responsibility.  You know, those would be the most

15   important things.

16       Q.   Okay.  So have you ever had to

17   discipline -- has Eastman ever had to discipline

18   outside sales representatives regarding their

19   driving?

20            MR. DuBOFF:  I think this is running into

21            one of the objections --

22       A.   I do not know.

23            MR. DuBOFF:  -- that we had with regard to

24            discipline of people that are not Ms. Smith.

25            So I'm happy to have Mrs. Bernhardt answer,

                                        Page 88

```
 1              but --
 2                   MR. WHITE:  I think we were -- and correct
 3              me if I'm wrong.  I think that the objection
 4              was -- and I think we're on topic -- let's
 5              see -- 25, I guess.
 6                   MR. DuBOFF:  28 is historical data and
 7              vehicle accidents.
 8                   MR. WHITE:  I think what I'm interested in
 9              here is discipline of outside sales
10              representatives for driving.
11                   MR. DuBOFF:  So why don't you -- if you
12              can tell me what topic it is that would fall
13              under.
14                   MR. WHITE:  So I think this would be No.
15              18.
16                   MR. DuBOFF:  That asks about the policies
17              and the procedures, not exhaustive historical
18              data on prior incidents.
19              Q.   (By Mr. White)  Well, to the extent that
20         you know about disciplining outside sales
21         representatives regarding their driving habits.
22              A.   I'm not aware.  I do not know.
23              Q.   Okay.  Have -- all right.  So do you agree
24         that Eastman has a duty to train and supervise its
25         outside sales representatives to ensure they're not
```

Page 89

Appx_1295

```
 1     contacting clients while they're driving?
 2         A.   No.  Again, it's -- you have an obligation
 3     to train and supervise that they're making the
 4     right -- they're following our policies, they're
 5     making the right choices.  I know we set
 6     expectations they should feel no obligation and they
 7     shouldn't be, you know, doing work or doing things
 8     that are -- but, no.  I don't think that's something
 9     that we specifically do.
10         Q.   Do you think that Eastman has an
11     obligation to ensure that it's outside sales
12     representatives aren't violating the defensive or
13     distracted driving policy that Eastman has?
14             MR. DuBOFF:  Can you -- do you mean a
15         legal obligation, a moral obligation?  What
16         kind of -- I'm not sure what you mean.
17             MR. WHITE:  Well, the question is to her.
18         I'm asking that you quit making speaking
19         objections.
20             MR. DuBOFF:  Okay.  Objection, ambiguous.
21         A.   Okay.  I do not say there's an obligation
22     for us.  I think, so no.
23         Q.   (By Mr. White)  Okay.  Have clients ever
24     complained about Caylee Smith, Eastman's clients to
25     be specific?
```

Page 90

Appx_1296

```
 1            A.   I believe in 2023, there is a
 2     documentation that I saw from -- I heard from her
 3     supervisor that one of the clients had complained
 4     about the pace or the frequency or pace of her
 5     communicating with them.
 6            Q.   Okay.  Who did you communicate with at
 7     Eastman to find out about that?
 8            A.   I think it was her supervisor Chris
 9     Ierardi.
10            Q.   Okay.  What was the substance of that
11     complaint?
12            A.   You know, I don't even know that it was a
13     major infraction.  Or it was not.  It was through
14     coaching and through what they're hearing, is that
15     the client expected -- you know, wanted more
16     follow-up, wanted to have her help them with more
17     contact and more things.  And so I think he was
18     coaching and helping figure out how to support her
19     and ensuring she knows, you know, what sort of needs
20     the customer has.
21            Q.   Okay.  Has anyone, including clients, but
22     also anybody else outside the company ever
23     complained about Caylee Smith?
24            A.   Not to my knowledge.  And we do have the
25     opportunity for people to communicate into the
```

Page 91

Appx_1297

1      company with -- anonymous or stated complaints about

2      any kind of -- anything associated with our

3      employees.

4          Q.   And if --

5          A.   So, no, not to my knowledge, there has

6      been nothing.

7          Q.   Okay.

8          A.   Actually, I've investigated and there's

9      been no complaints of Caylee.

10         Q.   Is there a process to document such

11     complaints if they did come in?

12         A.   Yes, definitely.

13         Q.   Okay.  What's that process?

14         A.   The process is that it comes in through

15     a -- either a phone number or an e-mail.  We have

16     a -- part of our global business compliance that

17     ensures that they follow up and documents and checks

18     into those.  But there have been no complaints

19     for -- related to Caylee.

20         Q.   So how would the public know about this

21     phone number?  Is it like on the back of her vehicle

22     or is it just online?

23         A.   It's just online.

24         Q.   Okay.  So there's -- there's nothing on

25     Caylee's leased vehicle that would indicate like

Page 92

Appx_1298

```
 1    this is an Eastman vehicle and here's the number you
 2    call to complain, right?
 3         A.   That's correct.  There's nothing on a
 4    vehicle.  And keep in mind, this is not a commercial
 5    vehicle by the definition at all.  This is a
 6    provided company vehicle so that she doesn't put the
 7    mileage and wear and tear on her vehicle.
 8         Q.   Okay.  Okay.  So I saw in one of the
 9    performance evaluations that was disclosed, an
10    amount of sales attributed to Caylee Smith, right?
11         A.   Okay.
12         Q.   So I want to ask you not amount, because
13    I've got that.  But how are sales attributed to
14    Caylee Smith?
15         A.   What do you mean attributed to Caylee --
16         Q.   How does she get credit for sales that
17    happen in her territory?  Do they just happen?  Help
18    me understand that.
19         A.   So within her territory, there's a whole
20    list of customers that are hers.  And if there's a
21    new prospect, that prospect would get into a hopper
22    or get documented through Salesforce.  Any time an
23    order is placed and shipped to that customer,
24    automatically flows -- it's records.  So we have a
25    system called ITAS, Individual Territory Assignment
```

Page 93

Appx_1299

1    System, that she doesn't have to do anything to have

2    that recognition for the sales that she has

3    responsibility for.

4         Q.   Okay.  So during her deposition, she

5    explained to me sort of her -- how she's paid, the

6    commission situation.  And it's a little confusing,

7    right, but it sounds like she's got a base and then

8    she gets a salary -- or she gets a commission that's

9    sort of a bonus that's a multiple of her base.  Is

10   that about right?

11        A.   Yes, that's correct.

12        Q.   Okay.  And who sets the multiplier?

13        A.   The company has a sales variable

14   compensation that is at 25 percent of a sale --

15   outside sales representative's base pay.  That's

16   their bonus potential.

17        Q.   So is that flat across the country.  So an

18   outside -- all outside sales reps can expect if they

19   hit their target, to get 25 percent of their base

20   pay as a bonus?

21        A.   That is correct.

22        Q.   Okay.  Does the 25 percent change ever?

23        A.   Yes.  So the individual's compensation and

24   their benefits and everything is based on that

25   25 percent.

Page 94

Appx_1300

1          Q.   Okay.

2          A.   If they out perform, if they pick up more

3     business, if they do -- they can have a -- that can

4     be higher than 25 percent.

5          Q.   Okay.  How high can it go?

6          A.   Gosh, I think two to three -- you know, it

7     can be multiples.

8          Q.   So it could be, say, 28 percent or

9     30 percent or could it be -- I guess I'm trying to

10    figure out what's -- what's the range if 25 is the

11    minimum, it sounds like?

12         A.   Yes.  So, no, it could go up even two to

13    three times that if I remember right, so --

14    approximately.  It could be 75 percent of their base

15    potentially.  That's very rare.

16         Q.   Okay.

17         A.   And not expected.

18         Q.   Okay.  And is that -- that's not -- that

19    would depend on the outside sales rep -- a

20    particular outside sales rep's performance; is that

21    right?

22         A.   Sure.  Yes.

23         Q.   So you get -- so an outside sales rep in

24    Texas that does very well, their multipliers could

25    be different than, say, an underperforming outside

                                          Page 95

1    sales rep in Louisiana?

2         A.   That is correct.

3         Q.   Okay.  Okay.  But Caylee also testified

4    the multipliers had been reduced due to, I guess,

5    economic conditions.  Can that happen across the

6    board?

7         A.   Okay.  So it cannot happen without an

8    approval all the way through the board of directors.

9    So our compensations are -- you know, we try to make

10   sure they are fair, equitable and aligned with what

11   the business is trying to accomplish.  And so what I

12   think -- what I expect Caylee's referencing is the

13   company overall did not hit our targets in 2022.

14             And so Caylee still was -- the sales

15   reps were still paid out on a portion.  Within that

16   25 percent, 75 percent is tied to their territory

17   performance and their other behaviors.  And then

18   25 percent is associated with how the company does

19   with some discretion also on the individual then

20   related to business or company performance.  That

21   25 percent, we did not hit the goals and objectives

22   for that portion of it across the company.

23        Q.   Okay.

24        A.   So that might be what she's referencing.

25        Q.   Okay.  Okay.  I appreciate the

                                        Page 96

Appx_1302

```
 1    elaboration.  So the record will get confusing here.
 2    So there's a 25 percent potential bonus that every
 3    outside sales rep can get.  Three-fourths of that
 4    25 percent are based upon performance in that
 5    outside sales rep's territory, and the other quarter
 6    of that 25 percent potential bonus is set by
 7    Eastman's entire performance; is that right?
 8         A.   You have -- yes, that is correct.  The
 9    25 percent, though, is set by both the business
10    performance and the company performance.
11         Q.   Okay.  Okay.
12         A.   Yes.
13         Q.   So -- and when you say the business
14    performance, you mean Eastman performance?
15         A.   Eastman performance, yes.
16         Q.   Okay.  Okay.  So let's talk about the 75,
17    the three-fourths of the 25 percent bonus.  What
18    goes into determining whether or not some sales rep
19    gets that?
20         A.    So that is -- so the sales variable part
21    of their compensation, that 75 percent, is
22    associated with -- there can be different equations.
23    But predominantly, the business and the team that
24    Caylee's in, we have an equation that is essentially
25    looking at a target for the revenue that's derived,
```

Page 97

Appx_1303

1    that she's able to derive in her territory, versus

2    the goal for the revenue.

3                    And our objective is to make sure the

4    goal is attainable.  You know, it's not a walk in

5    the park.  You know, they have to get out, they have

6    to do their jobs, but their goal is very attainable.

7    And then there's more upside above that if

8    there's -- they're able to bring in new business and

9    do other things.

10        Q.   Okay.  So who would have set Caylee

11   Smith's goals?

12        A.   That would have come from her supervisor

13   and her supervisor's manager.  So that would be

14   either Alan Davis and Chris Ierardi, along with Eric

15   Holmes.

16        Q.   Okay.  And has she met her performance or

17   sales variable goals during her employment?

18        A.   I don't recall what payout she has gotten

19   each year.  But I will also --

20        Q.   I guess my question is, do you know if

21   she's met the goals?  I'm not so concerned about her

22   payout.  We'll get to that later.

23        A.   You know, I don't know if she met her

24   goals.  There is one more thing.  When there's a new

25   sales rep to the territory, we -- I think I

Page 98

1    mentioned that's the period where their equation is

2    essentially 1X.  They get -- they get the

3    75 percent.  As long as they are meeting

4    expectations of the role and they're doing their job

5    and they're learning, coming up, they get that

6    first -- but I -- so I don't know if she has met her

7    goals.

8         Q.   So but for Caylee Smith specifically, do

9    you have any reason to believe that she didn't get

10   the 1X on the 75 percent her first year?  I think

11   you said it was her first year.

12        A.   In her first year, I believe she would

13   have gotten it.

14        Q.   What would keep an outside sales rep from

15   getting that 1X on the 75 percent of their

16   commission?

17        A.   If any employee goes on a warning, they

18   may or may -- that might exclude them from getting

19   their bonuses.

20        Q.   What does it mean, go on warning?

21        A.   Have a documented warning.  But, no,

22   there's no reason that I would otherwise know of

23   somebody not getting that 1X in their initial time

24   of performance.

25        Q.   So what are documented warnings?

Veritext Legal Solutions
800-336-4000

1          A.   Could be a violation, could be

2    disciplinary action, things like that.

3          Q.   Are you aware of any documented warnings

4    for Caylee Smith?

5          A.   No.

6          Q.   Okay.  And you checked her file on those?

7          A.   I did.  I checked, absolutely.

8          Q.   Okay.  So do you know what Caylee Smith's

9    payouts have been on her bonuses?

10         A.   I do not.

11         Q.   Okay.  So does -- can you describe

12   policies that Eastman Chemical has on monitoring the

13   speed of their drivers, anyone driving on behalf of

14   Eastman Chemical?

15         A.   Again -- sorry.  Sorry, Mr. White.  We do

16   not monitor our employees' speeds.  We don't monitor

17   the vehicles.

18         Q.   Okay.  Do you guys monitor -- and I think

19   you answered this one.  Make sure I get it right.

20         A.   Okay.

21         Q.   Do y'all monitor in real time the location

22   of any Eastman driven vehicles?

23         A.   No, we do not track, that I'm aware of,

24   our vehicles.

25         Q.   Okay.  And that -- your counsel has told

Page 100

Appx_1306

1    me, so I think I know the answer to this.  Eastman

2    does not have a large fleet of vehicles, right?

3    Like over-the-road trucking?

4         A.    Correct.  We are not in the business of

5    transportation and delivery and hiring drivers for

6    drivers.  That's very, very rare.  We have large

7    manufacturing facilities.  So we do from time -- we

8    do have some people that have commercial licenses,

9    but they are for unique and very rare.  That is not

10   a large part of our employment base or business.

11        Q.    So when shipping goods, does Eastman

12   typically hire a carrier to move goods from Point A

13   to Point B?

14        A.    That is correct.

15        Q.    Okay.  So would you say that the majority

16   of the individuals driving in a work capacity for

17   Eastman, are outside sales representatives?

18             MR. DuBOFF:  Object as ambiguous.

19             THE WITNESS:  I'm not sure I follow.  I

20        mean, we have thousands of employees and they

21        have to get to work each day.  They drive

22        themselves to work.

23        Q.   (By Mr. White)  Okay.  All right.  Fair

24   enough.  I mean, you know, driving in -- Well,

25   strike that.

Page 101

```
 1                    Do you have any idea other than
 2    outside sales representatives, who employed by
 3    Eastman drives for, say, half their working hours?
 4         A.   Well, this is rare, but -- I shouldn't say
 5    it's rare.  It's maybe unique to Eastman.  We have
 6    trains operated on our manufacturing facilities
 7    where they're transporting.  We have intercompany
 8    [sic].  So there is some of those.  I am not
 9    intimate in understanding the nature of those roles,
10    but I know we do have some.
11         Q.   So when you say intercompany, do you
12    mean --
13         A.   Sorry.  Intra.
14         Q.   Intra.  Within facilities, you have
15    drivers.
16         A.   Yes.
17         Q.   Do y'all have -- you said it was rare, but
18    are there individual CDLs that drive facility to
19    facility, from Eastman facility to Eastman facility?
20         A.   I do not know.
21         Q.   Okay.  Okay.  Does Eastman have any
22    specific technologies or systems that it uses to
23    monitor its drivers?
24         A.   Not that I'm aware.
25         Q.   Okay.  So what, if anything, does Eastman
```

Page 102

Appx_1308

1    do to monitor compliance with its policies that

2    govern folks that are driving for Eastman?

3         A.   We -- to monitor.  Well, we -- an

4    individual, if they have had any violations, they

5    need to notify us of those.  We depend on frequent

6    interaction, discussion, communication between our

7    employees and their supervisors.  And, of course, we

8    require a valid driver's license.  And if any of

9    those things change -- if that changes such that it

10   influences or impacts the ability for them to do

11   their job, you know, we follow the appropriate

12   actions that's needed then.

13        Q.   So does Eastman have a policy about

14   ramping up monitoring of some -- for example, of an

15   outside sales rep that has an unavoidable -- or an

16   avoidable accident?

17        A.   No, not that I'm aware of.

18        Q.   Okay.  So can you -- can you detail the

19   procedures that are followed when an Eastman

20   employee is -- is found to have been driving

21   unsafely?

22        A.   Sorry.  Can you repeat the question?

23        Q.   Yeah, yeah.

24             Can you detail the procedures that

25   Eastman follows when Eastman determines that one of

                                        Page 103

Appx_1309

1      its employees has been driving unsafely?

2           A.   I guess it really depends.  So if there

3      is -- if Eastman determines that employee's found to

4      be driving unsafely, it would come from two

5      different sources.  One from an authorized or an

6      official, you know, motor vehicle from police or

7      from some sort of incident, right?  So that could be

8      one source.

9                     Another source is if there's

10     observation.  And if there's observation, we would

11     expect our leased leadership to document it.

12     Document it as a -- and then again, we're not in the

13     business for driving.  So our job is not to only

14     monitor driving, but, you know, if I compare it to

15     manufacturing or something else, if there's -- if

16     it's observed, if it's seen, it can go through a

17     full route of documented discussion, to, you know,

18     warning, to -- so there's different courses of

19     action that are put in place to document within

20     their file.

21                     And as you probably saw, there's also

22     the performance reviews.  So it comes through a

23     number of that nature, depending on what's observed

24     or what is known.

25          Q.   So walk me through -- you sort of -- you

                                        Page 104

Appx_1310

1    kind of made a motion there's sort of a document and
2    then maybe talk with the employees.  Is that a
3    written policy a way to react when an employee is
4    found to be driving unsafely?
5          A.   No.  So not to do with driving unsafely.
6    This is again, the nature -- this is one of our HR,
7    so our human resources, of how do we evaluate and
8    understand and then make sure that corrective
9    measures are put in place.  And so it can be
10   anything from -- the first would be coaching and
11   guiding if somebody was doing something.
12              If they violated a policy and/or --
13   yeah.  So if they violated a policy or not
14   demonstrating, not meeting their requirements of the
15   job, there could be as much as documented discussion
16   that would go then into the person's personnel file.
17         Q.   Okay.  And what would a documented
18   discussion be?  Does that mean it would actually be
19   written down?
20         A.   It would be, they both sign.  They would
21   document the situation and there's usually a course
22   of plan of what the -- you know, what action would
23   be taken.
24         Q.   And have you found any documented
25   discussions in Caylee's file?

                                        Page 105

```
 1            A.    No.

 2            Q.    Okay.

 3            A.    No, sir.

 4            Q.    So no real-time monitoring on any leased

 5      Eastman vehicles, right?

 6            A.    No, we do not.

 7            Q.    Okay.  No use of dash cams on Eastman

 8      leased vehicles?

 9            A.    No.  There's no dash cams.

10            Q.    Okay.  In some of my trucking cases, we

11      call them Qualcomms.  No use of Qualcomms?

12            A.    I'm not familiar with that technology.  I

13      expect we don't use it.

14            Q.    Okay.  Okay.  So has Eastman ever made any

15      changes to how it monitors drivers, if at all?

16            A.    Not that I'm aware of.  You know, we

17      update procedures, documents things.  But, no, I'm

18      not aware of that.

19            Q.    Okay.  But from a monitoring standpoint,

20      an electronic monitoring standpoint, your testimony

21      is that Eastman does not do that and has never done

22      that for its -- for the drivers of Eastman leased

23      vehicles?

24            A.    That is correct.

25            Q.    Okay.  So -- okay.  So can you tell me
```

Page 106

Appx_1312

1     about the specific policies Eastman has regarding

2     the use of company provided vehicles by its

3     employees?

4         A.   Yes.   There is a pretty extensive S&OP

5     [sic] -- sorry -- standard operating procedure or

6     policy related to leased vehicles.  It goes to

7     individuals when they receive -- or before they

8     receive their vehicle.  And it -- it lays out

9     things.

10              First and foremost, you know, the

11    individual is expected to have read and understand

12    all policies.  It outlines what to do in the event

13    of an accident or a moving violation, as I

14    mentioned, notifications and the proper protocols.

15              And I do need to correct something.

16    I think in that, it also references the tracking of

17    mileage personally and -- and as the -- on business

18    mileage.  So I understand that goes to Donlen.  But

19    those are the sort of key elements of it.

20        Q.   Okay.  And would an employee sign that

21    when they first review it?  Does Eastman require

22    anything like that?

23        A.   I do not know.  I don't think they sign

24    it.

25        Q.   So is there any documentation that would

                                        Page 107

Appx_1313

```
 1    show that Caylee had reviewed this policy?
 2         A.   There's documentation that she received
 3    it.
 4         Q.   Okay.  What would that documentation be?
 5         A.   It would come from the fleet manager to
 6    her.
 7         Q.   So when you say fleet manager, do you mean
 8    Donlen?
 9         A.   No.  I mean it's an Eastman employee.  So
10    he provides the -- the policies to her.
11         Q.   And who's the fleet manager?
12         A.   Lee Ward.
13         Q.   And was Lee Ward the fleet manager that
14    would have performed that task when Caylee was given
15    a vehicle?
16         A.   Yes.
17         Q.   Okay.  So how would he have done this?
18    Would he have e-mailed her the policy and then added
19    some acknowledgement to her file?
20         A.   That's right.  He e-mails the policy and
21    then tracks it in the file.
22         Q.   So there should be an e-mail from Lee Ward
23    to Caylee Smith with a copy of the -- the leased
24    vehicle policy?
25         A.   That's correct.
```

Page 108

1        Q.   Have you seen a copy of that e-mail?

2        A.   I have, yes.

3        Q.   Okay.  I'm not sure --

4        A.   Yeah, I checked on that.

5        MR. DuBOFF:  I think you have it.

6        MR. BUNT:  You do have it.

7        MR. WHITE:  Okay.

8        Q.  (By Mr. White)  So when Eastman updates the

9  policies, if they update them, how do they

10  communicate those updates to -- and when I say

11  policies, I mean let's stick with this doc- -- this

12  policy that governs leased vehicles.  If Eastman

13  updates it, how do they communicate those updates to

14  employees?

15        A.   Gosh, it really depends.  There usually is

16  a notification.  So it's updated to where anybody

17  can access it.  People know where they can access

18  any policies.  It's clearly marked when things have

19  been updated and revised in terms of what's the

20  latest date.  But it depends on, I guess, the nature

21  of the policy, how it's communicated out to

22  individuals.

23        Q.   Okay.  Are there any restrictions on the

24  personal use of Eastman provided vehicles?

25        A.   Restrictions.  I do not believe there are

Page 109

Appx_1315

1      any restrictions on personal use of vehicles.  To

2      the extent that if -- so we -- the distracted

3      driving is a guidance to all of our employees.  It

4      is not a -- it is not telling them how and what they

5      do with their vehicles or anything.  So there's

6      no -- there's not a restriction or an expectation on

7      how -- you know, the nature of people's individual

8      vehicles.

9          Q.   Okay.  So it's expected that employees

10     might use their Eastman provided vehicle for their

11     personal use?

12         A.   Oh, forgive me.  I -- I misunderstood.

13         Q.   Okay.

14         A.   I thought you were talking about an

15     individual's personal vehicle.

16         Q.   No.  No, no, no.

17         A.   Okay.

18         Q.   I'm talking about the use of the Eastman

19     provided vehicle.  Does Eastman restrict whether or

20     not an Eastman employee can use the vehicle for

21     personal uses?

22         A.   No.  I believe that there are limitations

23     on it.  There's limitations on the -- you know, we

24     understand they would use it on weekends and on

25     vacation days.  They're expected to notify and have

                                    Page 110

1     that discussion with the supervisors so the

2     supervisor knows how they're using it.  And I

3     believe it also indicates that in the absence of

4     high necessity and infrequently should anyone else

5     to be able to drive the Eastman leased vehicle.

6          Q.   Okay.

7          A.   But I think those -- those are the main

8     ones.

9          Q.   Okay.  Do you agree that the policy -- and

10    there's a copy in here.

11         A.   Okay.

12         Q.   We'll go into it in detail later.

13              But you agree that it does require

14    that personal mileage be reported to Donlen?

15         A.   Yes, I do.  I stood corrected -- stand

16    corrected on that.

17         Q.   Okay.  No, that's fine.  That's fine.

18              So how does Eastman track and enforce

19    compliance with the rules governing Eastman provided

20    vehicles?  Do you guys just wait for a violation to

21    occur and then correct it?

22         A.   Well, I would expect if that they don't

23    provide their mileage, that they get notified and

24    are required to do so.

25         Q.   Okay.  Any other efforts that Eastman

                                        Page 111

Appx_1317

1    takes to make sure that their employees are

2    complying with the leased auto policy?

3         A.   I think it's -- so not that I specifically

4    know of, other than reminders, interaction from the

5    supervision with the sales team on, you know, more

6    just general kind of safety and expectations.  I

7    don't know that there's -- you know, we don't track

8    has your spouse driven your vehicle.

9         Q.   Okay.

10        A.   Those are not things that I -- I don't

11   think that would be -- we don't try to monitor and

12   control that.

13        Q.   Okay.  So it sounds like the primary mode

14   of enforcing compliance is communication by the team

15   reminding Eastman employees about the rules that

16   govern the use of the Eastman provided vehicles; is

17   that right?

18        A.   That and -- yes.  And the nature that

19   we're all having to comply by the -- the road and

20   legal laws of driving every day.  Expect them -- you

21   know, that's...

22        Q.   Would you agree that Eastman's policies

23   expect more than just compliance with the law,

24   right?

25        A.   Yes.  Ours is -- I don't know every state

Page 112

Appx_1318

```
 1    law.  But I would say it's probably in some states
 2    more, maybe the same in some states.
 3         Q.   Okay.  But so to make -- you don't just
 4    rely on employees complying with the law to make
 5    sure that they're complying with Eastman's policies,
 6    right?
 7         A.   Right.  We expect them to also operate by
 8    our standards.
 9              THE COURT REPORTER:  I'm sorry.  To what?
10              THE WITNESS:  To operate and to -- sorry.
11         To operate by our standards and goals of the
12         company.
13         Q.  (By Mr. White)  For example, Texas doesn't
14    have a rule on whether or not a spouse can drive a
15    car for example, right?
16         A.   Right.
17         Q.   Okay.  So for you guys to -- I just want
18    to make sure we have the testimony right.  You
19    understand that Eastman's standards in some cases
20    are greater than what state law might require?
21         A.   That's correct.
22         Q.   Okay.  So can you go to Page 80 -- excuse
23    me -- 99 on Tab 2.  This is Caylee's testimony.
24              MR. BUNT:  Page number?
25              MR. WHITE:  This would be Page 99.
```

Page 113

1          Q.   (By Mr. White)  So let's go down to Line 11
2     here.  Do you see my question where I said:  You
3     don't recall any module you received on driver
4     safety?
5                    Line 13, her answer:  I don't
6     remember the modules.  What the information
7     contained exactly.
8                    My question:  Do you remember getting
9     a driver safety module even if you don't remember
10    the specifics?
11                   Her answer:  I don't know.
12                   All right.  Do you understand her
13    testimony?
14         A.   I do.
15         Q.   Okay.  And do you understand that here,
16    we're talking about training modules?
17         A.   I do.
18         Q.   Okay.  Do you know what training modules
19    are?
20         A.   Do you want to define them for me, what
21    you mean here?
22         Q.   So that was the phrase -- so training
23    modules is the phrase that Caylee used to describe
24    some form of training she --
25         A.   She did, okay.

                                        Page 114

1          Q.   -- receives from -- from Eastman.  Does

2     training modules mean anything to you, given that

3     Caylee used that phrase?

4          A.   We don't use that term officially as a

5     company.  I can guess that she means sitting in

6     front of a computer, doing an online training.  I

7     only guess that because we do have -- we have some

8     training that is delivered over the computer.

9          Q.   Okay.  So what do y'all call those

10    trainings when you y'all deliver training over the

11    computer?

12         A.   We don't have a specific term.  I guess I

13    don't know.  I'm sorry.  There's a learning lab.

14         Q.   Okay.

15         A.   It's -- I think it is called Learning Lab.

16    It's in their career online access.  And there's

17    training courses or modules that are assigned to

18    people from time to time.

19         Q.   Okay.

20         A.   Or that they can -- you can also self

21    select.  And there's a lot of access to different

22    training.

23         Q.   Okay.  So in -- in her deposition, Caylee

24    described receiving things on her computer where she

25    would watch some educational content and take

                                        Page 115

1 multiple-choice quizzes.  Does that ring a bell?

2   A. Yes.

3   Q. Okay.  So let's talk about those.  Can I

4 call those training modules; is that incorrect?

5   A. Sure.  No.  That's okay.

6   Q. Okay.  Okay.  Let's call those training

7 modules.  She says that she never got a training

8 module on driver safety.  Does that sound right to

9 you?

10   A. That's possible.

11   Q. Okay.  Why is that possible?

12   A. I believe we have training modules and

13 videos.  They are used.  I don't know that it is

14 required -- actually, I know it's not required.

15   Q. Okay.  How do you know they're not

16 required?

17   A. I went and looked for this.

18   Q. Okay.  Fair enough.  Fair enough.

19    So what does it -- when you say it's

20 required, does that mean like does everybody have a

21 list of trainings they have to complete and that's

22 not one of them?

23   A. Yes.  So different role groups or

24 different -- they will have different trainings that

25 are assigned through the year for them to do their

Page 116

Appx_1322

```
 1      job.
 2           Q.   Okay.  So is there a way to find out every
 3      training that Caylee Smith was assigned or supposed
 4      to complete?
 5           A.   Yes.  There should be, yes.
 6           Q.   Okay.  How --
 7           A.   And we have record of what ones she did
 8      complete.
 9           Q.   Okay.  And where are those records at?  Is
10      it this My Training Lab thing that you were talking
11      about?
12           A.   Yes.
13           Q.   Okay.
14               MR. DuBOFF:  I think you have throws,
15          Jacob.
16               MR. WHITE:  I think I have some of them.
17               MR. DuBOFF:  Okay.  It might have been
18          recent production.
19               MR. WHITE:  That -- that's possible.
20          That's very possible.
21               MR. DuBOFF:  Okay.
22           Q.  (By Mr. White)  So for those trainings,
23      would they have -- would they be printed like --
24      strike that.
25                    For trainings that are sent to Caylee
```

                                        Page 117

Appx_1323

```
 1          over the computer, are all of -- those are saved,
 2          the materials that she's sent to review; is that
 3          right?
 4              A.   I believe that it should capture if she
 5          completed the training.
 6              Q.   Okay.  And would it show if there was a
 7          quiz, how she did on the quiz?
 8              A.   I think it is the type -- it's a
 9          pass/fail.  And it is that you don't get to complete
10          it until you pass it.
11              Q.   Okay.  Okay.  So you had to keep trying
12          until you pass it?
13              A.   Yes.  Yes.
14              Q.   Okay.  Now, you said that you don't think
15          driver safety was one of the modules that she was
16          required to complete; is that right?
17              A.   That's right.  That's right.
18              Q.   Okay.  So are there any roles at Eastman
19          where you have to complete a driver safety training
20          module?
21              A.   I do not know.
22              Q.   Okay.  Do you know what training modules
23          outside sales representative do have to complete?
24              A.   It does vary by their role and some
25          different -- so I don't have a list of those.
```

Page 118

1     They're at the discretion at times from their

2     supervisor and HR of that organization.

3          Q.   Okay.  So for a new hire like Caylee, what

4     training modules are required?

5          A.   I don't have that.  I don't know exactly.

6          Q.   Okay.  Do you know what training modules

7     she had completed?

8          A.   I can reference them.

9          Q.   Okay.

10         A.   I don't know offhand.

11         Q.   Sure.  Whichever ones -- reference them

12    however you think you can remember them.

13         A.   So I believe antitrust.  Certainly one

14    related to our drug and alcohol policy.  I think

15    there's training related to Salesforce on using

16    your, you know -- and I don't recall some of the

17    others.

18         Q.   Okay.  Any training modules on distracted

19    driving?

20         A.   No.

21         Q.   Okay.  Any training modules on distracted

22    driving at any level for outside sales

23    representatives?

24              MR. DuBOFF:  Objection, ambiguous.

25         Q.   (By Mr. White)  So let me strike that.

Page 119

Appx_1325

1              If -- are there training modules on

2    distracted driving for more experienced outside

3    sales representatives?  And when I say more

4    experienced, I mean more experienced than Caylee

5    Smith is.

6         A.   No.  No.  And there's -- while there's not

7    training modules, again, I'll just reinforce, every

8    start of the sales meetings, every start of every

9    discussion that they have on performance involves

10   discussions on -- and expectations on safety and

11   driving because that's such a significant topic for

12   the sales team.

13        Q.   Okay.  So specifically what is said at any

14   of these sales meetings referencing driving?

15        A.   It could be that topic or it could be

16   others.  It's around how do they -- you know, these

17   are reminders of both the policies and reminders of

18   the, you know, good practice to keep yourself safe

19   if you're in this sort of environment.  So we rotate

20   that through the -- through the organization or

21   through the teams that are in that.  And they will

22   bring a topic.  But those are often, you know,

23   related to safe driving, could be other topics as

24   well.  You know, awareness when you're on somebody's

25   else facility that they may not have the same safety

Page 120

Appx_1326

1   environment or safe protocols and hygiene that you

2   do.  They may use different ones.

3       Q.   How often do these sales teams meetings

4   occur?

5       A.   On Teams or Zoom, I think roughly

6   biweekly.

7       Q.   Okay.  So -- and I think you understand

8   your testimony is that they discuss safety at the

9   beginning of each one of these meetings, but the

10  topic changes per meeting?

11      A.   That's correct.  That's correct.

12      Q.   So they don't discuss driving safety every

13  team meeting?

14      A.   That is correct.

15      Q.   All right.  Do you know how many team

16  meetings driver safety has been discussed on -- when

17  Caylee was present?

18      A.   No, I do not.

19      Q.   Is there any way to find a record of that?

20      A.   I don't think so.

21      Q.   So there's not like a list that we talked

22  about driver safety with Caylee on X, Y, Z date?

23      A.   No.  We don't keep that documentation.

24      Q.   Okay.  And there's no minutes for these

25  sales meetings where --

                                        Page 121

Appx_1327

1        A.   No, often no.

2        Q.   So often no or never?

3        A.   I don't have any record of any meeting

4    minutes.

5        Q.   Okay.  So how does Eastman Chemical ensure

6    that employees have driver -- valid driver's license

7    on an ongoing basis, so after y'all hire them?

8        A.   After they're hired, we depend on the

9    employee to be notifying us.

10        Q.   Okay.

11        A.   And I think that we -- I believe there's

12    an annual check on that as well.

13        Q.   Okay.  And so you think there is an annual

14    check?

15        A.   Yes.

16        Q.   Do you know who performs the annual check?

17        A.   It is a document within our leasing.  And

18    I think it is intended to be with HR or the

19    supervisor in HR and the individual.

20        Q.   Okay.  And does that -- does that annual

21    check only include a check on whether or not a valid

22    driver's license exists or does it --

23        A.   I believe so.

24        Q.   Okay.  So there's not an annual check on

25    ongoing moving violations or accidents; is that

                                        Page 122

Appx_1328

1    right?

2         A.    That is right.  We do not go out and

3    continue to do background checks.

4         Q.    Okay.

5         A.    We don't monitor.  We expect full

6    disclosure and we expect our employees to, yeah,

7    disclose something to us if something's happened.

8         Q.    Okay.  So sort of the -- oh, the phrase

9    escapes me.  But you guys expect your clients [sic]

10   to be not just honest, but to let you know

11   affirmatively if something's gone wrong with their

12   driving?

13        A.    Our employees, yes, we expect our

14   employees to do that.  And, frankly, we haven't seen

15   that's a problem.  They do.  Our teams are honest.

16   And we expect them to continue.  I don't know of

17   any -- I don't know of, you know, issues where that

18   has not occurred.

19        Q.    But the only way you'd know is if

20   something happened and then you were forced to check

21   and you found out --

22        A.    Right.  We found out that -- yes.

23        Q.    Okay.  Which is not -- that's not

24   happening automatically?

25              MR. DuBOFF:  Objection, ambiguous.

                                        Page 123

Appx_1329

1      Q.   (By Mr. White)  You guys are not

2   checking -- sorry.  Let me strike the prior

3   question.

4                    Y'all are not actively checking

5   folks' driving records just automatically every --

6   for example, every year?

7      A.   No, we do not.

8      Q.   Okay.  So can you just describe in

9   general, Eastman's policy on distracted driving?

10     A.   Yes.  I think we have a couple records on

11  this.  So our policy on distracted driving touches

12  on or sets the expectation that there should be no

13  hand texting, no e-mail, no use of computers.  It

14  even speaks to avoiding potential distractions when

15  we can.  There's not to be on any teleconference

16  call.

17                    It does indicate that when the driver

18  feels it's safe and that they are in a condition

19  they can do it, that they can use the voice

20  activation and take -- take or receive calls as long

21  as it limits their distraction.

22     Q.   So why the prohibition on

23  teleconferencing?

24     A.   It's a more complex -- I think it's a gray

25  zone.  But it's because, I believe, I don't know for

                                          Page 124

1    certain.  I think Eastman -- Eastman tries to ensure

2    that, number one, we're setting the right practices

3    as the leaders.  We don't want others to see our

4    individuals or hear individuals on a call for a

5    teleconference because of the nature that that

6    suggests that it's okay.  Number one.  It's not.

7              Number two, you know, those can be a

8    little more complex.  We want people to be in front

9    of their notes, be able to look at the screen, look

10   at the content.  And we don't want that distraction.

11       Q.   Okay.  So for the record, teleconference

12   means a phone call with multiple individuals at the

13   same time?

14       A.   Yes.  Like a scheduled meeting that has

15   content and multiple people, yes.

16       Q.   Okay.  Okay.  So other than these safety

17   meetings that we were talking about and -- how is

18   the distracted driving policy communicated to

19   outside sales representatives?

20       A.   So it's accessible through the My Eastman

21   that Caylee mentioned.  I think as we mentioned when

22   they receive the lease, there's an expectation in

23   the lease -- sorry, not the lease -- the lease

24   documentation, the expectation of a driver of a

25   leased vehicle to have read the policies.  Okay?

Page 125

Appx_1331

1    And then it is something that comes up through these
2    trainings, the round tables on safety practice, safe
3    moments, safe practice for the individual.
4         Q.   Okay.
5         A.    Individuals.
6         Q.   So would Lee Clark or any other Eastman
7    employee have e-mailed a copy of the defensive
8    driving policy to Caylee at any point?
9         A.   I think you mean Lee Ward.
10        Q.   Lee Ward.  Sorry.
11        A.   It's okay.
12                  I do not know if he did.  I don't
13   have record that he did.
14        Q.   Okay.  Is it Eastman policy that she
15   should have signed a copy of the defensive driving
16   policy?
17        A.   No, it is not.
18        Q.   Okay.  Do -- do you know whether Caylee
19   Smith ever reviewed Eastman's defensive driving
20   policy?
21        A.   I believe she did.  I don't have record.
22        Q.   Why do you believe that she did?
23        A.   Because I believe she was in meetings.
24   I've -- where it would have been discussed and
25   brought up.

                                        Page 126

1    Q.   Okay.

2    A.   What happens in those meetings is people

3    will clip and copy and paste onto a PowerPoint, that

4    content.  So I don't know if she recognizes always

5    that this is called an SOP and -- so I believe she

6    has seen it, yes.

7    Q.   Okay.  So you think she may have been

8    shown a PowerPoint containing parts of the defensive

9    driving policy?

10   A.   That's possible.  Or, yes, that's likely.

11   I'm sorry.

12   Q.   Okay.  Do you know where she would have or

13   who she would have listened to a presentation on

14   that from?

15   A.   It would have been one of her sales

16   leaders or one of the sales peers.

17   Q.   So do you think that that PowerPoint would

18   have been shown over a videoconference, one of these

19   biweekly sales team trainings?

20   A.   That's where I think it would come.

21   Q.   Okay.  If those PowerPoints were shown, do

22   you know if those PowerPoints still exist?

23   A.   I don't know.

24   Q.   Okay.  Who would have possession of those

25   PowerPoints if they did exist?

Page 127

1              A.   There would not be any central repository

2      on there.

3                        (Simultaneous speakers.)

4              Q.   (By Mr. White)  So it would be whoever was

5      running the meeting.

6              A.   Right.  Sorry.

7                   THE COURT REPORTER:  You were talking at

8              the same time.

9              Q.   (By Mr. White)  So just to be clear, what

10     specific training do outside sales representatives

11     receive about using cell phones while driving?

12             A.   An e-mail about it you say?

13             Q.   No.  What train -- training do they

14     receive about using cell phones while driving,

15     outside sales representatives I mean?

16             A.   I don't know that there's a specific

17     training.

18             Q.   Okay.  So would you say that, just

19     consistent with your prior testimony, that if she

20     did receive training on the use of cell phones while

21     driving, it would have been in these biweekly sales

22     meetings?

23             A.   I believe that's the most likely place.

24             Q.   Okay.  Are there less likely places?

25             A.   There would be equally likely places for

                                            Page 128

1     when her supervision is in the vehicle with her.

2     She would see something, we'd want her eyes on the

3     road, want her -- the -- the conversation regarding

4     that would take place in those occurrences also.

5          Q.   Okay.  So it would have been in person if

6     she received training on the use of cell phone while

7     driving?

8          A.   That's one means, yes.

9          Q.   Okay.  The other means being these

10    biweekly sales meetings?

11         A.   That's right.

12         Q.   Any others?  Any other way she could

13    receive that training?

14         A.   I don't know.

15         Q.   Okay.  If you can go to Page 101 on

16    Exhibit 2 there.  So look down here on Lines 21 to

17    23.  My question was:  Okay.  Have you received any

18    training modules on distracted driving?

19              Her answer is:  I don't remember.

20              I'll caveat my question with our

21    discussion earlier about what she meant by training

22    module and what I understand that to be.

23         A.   Uh-huh.

24         Q.   Do -- do you think she ever received the

25    training module on distracted driving?

Page 129

```
 1          A.   I don't think she had an online training
 2     module for distracted driving.  I don't have any
 3     records of that.
 4          Q.   Okay.  Okay.  Do you have any written
 5     records of her receiving a training on distracted
 6     driving in any -- in any method?
 7          A.   What I have is discussions with my team
 8     members on the topics and discussions they've had
 9     with their team.  I've been present in some of
10     those.  I was in the sales meeting, but I have no
11     documentation.
12          Q.   So you yourself have been present when
13     Caylee was receiving training on distracted driving?
14          A.   No.  I've -- I've not been in any meetings
15     with Caylee.
16          Q.   Okay.  Who did you speak with that
17     recalled providing her training on distracted
18     driving?
19          A.   That would be Eric, Eric Holmes and her
20     supervisor.  I believe it was Alan at the time.  It
21     was more their recollection of the frequency of the
22     topic.
23          Q.   Okay.
24          A.   Than a specific -- or of having had those
25     conversations, than being able to provide specifics.
```

Page 130

1          Q.   So they didn't have -- "they" being Eric

2    Holmes and Alan Davis -- did not have a specific

3    recollection of having trained Caylee on distracted

4    driving?

5          A.   No.  They do.  They said they talked

6    through that with her.

7          Q.   Okay.  With her by herself or her as a

8    member of the sales team?

9          A.   Both.

10         Q.   Okay.  Did they tell you when they

11   specifically spoke to her about distracted driving?

12         A.   No, sir.

13         Q.   And there's no record of documenter --

14   like documents of that training; is that right?

15         A.   There are no records.

16         Q.   Okay.  So when she says, I don't remember

17   any training modules on distracted driving, do you

18   think it would have been correct for her to say she

19   had never received a training module on distracted

20   driving?

21              MR. DuBOFF:  I'm going to object to the

22         form of that question.  You're asking the

23         witness to speculate.

24         A.   No, I don't think so.  Did you ask her

25   if -- if she had discussions on it or if they had

                                        Page 131

Appx_1337

```
 1     coached her or was there any other way that you
 2     asked her that question.
 3          Q.  (By Mr. White)  Probably.  But I'm just --
 4     I'm trying to find documents evidence.
 5          A.   Okay.
 6          Q.   So when she says there's no document --
 7     there's no training module shown -- excuse me.
 8                When she says that she doesn't
 9     remember receiving a training module on distracted
10     driving, do you have any reason to think that she
11     should remember one?
12          A.   No.  And, again, I'm going to -- sorry --
13     just reinforce that we're not in the business of
14     fleet.  We're not in the business of commercial
15     vehicles, of driving.  We're in the business of
16     trying to help our employees be safe, effective at
17     their roles working with customers.  So, no, we do
18     not, and I don't think it's an industry practice for
19     all companies to have that.
20          Q.   Okay.  Let's go to Page 10 -- well, we're
21     on Page 101.  Let's go to Page 102.  You'll have to
22     look at Page 101 as well here.
23          A.   Okay.
24          Q.   So at the end of Page 101, I ask:  You
25     don't remember -- do you remember anything about the
```

Page 132

1    safe use of a cell phone?

2              She says on Page 102 Line 1:  I don't

3    remember exactly.

4              So is your answer the same, that she

5    probably would not have received any training

6    modules on using cell phones in Eastman's vehicles?

7    A.   So the -- if I'm recalling correctly, the

8    main place where it references cell phones and use

9    is in that distracted driving.  There's historical

10   videos and other things that people will speak to

11   it.  But I don't know if the cell phone document

12   first -- so just -- I don't recall if there's a

13   different place where it references cell phone use.

14   Q.   Okay.  Where are the historical videos

15   that you just mentioned?

16   A.   Oh, there's been from time to time

17   training -- I'm sorry.  Strike that.

18              From time to time, again, different

19   parts of the company that will speak to safe

20   practices.  So there's -- there's some old

21   training -- old videos on that.

22   Q.   Okay.  Where would those old training

23   videos be?

24   A.   Those are in the learning lab.

25   Q.   In the learning lab?

Page 133

```
 1              A.    Yes.
 2              Q.    Okay.  So would Caylee have access to
 3       those vehicles?
 4              A.    Yes.
 5              Q.    Excuse me.  Those training videos?
 6              A.    Yes.
 7              Q.    Okay.  But she wouldn't have been required
 8       to watch them by Eastman?
 9              A.    That's right.  That's right.
10              Q.    Okay.  Do we have a record -- or is there
11       a way to find out everything that she reviewed in
12       the learning lab?
13              A.    I don't know.  I don't know what triggers
14       the access.  I think that we have record of what
15       she's completed.  I don't know if we have record of
16       everything she's viewed in it.
17              Q.    Okay.  So let's go to Page 107 in this
18       Exhibit 2.  So let's go down to Line 13 -- excuse
19       me -- Line 8.  The question that I asked was:  Okay.
20       Do you remember any sort of training regarding --
21       regarding distracted driving from Eastman?
22                         Line 10:  I don't know.  I don't
23       remember.
24                         Okay.  So do you understand her
25       testimony is that she does not remember any training
```

Page 134

1      on distracted driving from Eastman?

2           A.   Okay.

3           Q.   Okay.  Does that concern you at all?

4                MR. DuBOFF:  Object as ambiguous.

5           A.   It surprises me.

6           Q.  (By Mr. White)  Why?

7           A.   I don't -- again, I don't know how she was

8      interpreting the questions.  I don't know her state

9      of mind at the time.  I know she was very pregnant.

10     I don't know exactly what she was thinking.  And I

11     do feel confident that there's frequency of

12     discussion and of topics discussed related to -- we

13     call them zero incident, we call them all in for

14     safety.  I don't know if she recognized those as

15     training.

16          Q.   So you think that she may have thought

17     when I said training, that I meant something very

18     specific and she just didn't remember going to like

19     a seminar on distracted driving?

20          A.   That's right.

21          Q.   Okay.  So these other conversations that

22     were had with her on distracted driving, how would

23     they have been phrased -- you know, would they have

24     referenced distracted driving?  Is that the phrase

25     that would have been used in these conversations

                                        Page 135

```
 1      that were --
 2           A.   Safe driving.
 3           Q.   Safe driving?
 4           A.   Or distracted driving.  You know, avoiding
 5      distraction.
 6           Q.   Okay.  Okay.  So your testimony is that
 7      she has been trained by Eastman to be aware of
 8      distracted driving and to minimize it?
 9           A.   She has been guided, counseled, coached,
10      yes.
11           Q.   Okay.  In these one-on-one conversations
12      and in these sales teams meetings that you've been
13      talking about?
14           A.   And in the one-on-one individual -- yes,
15      yes.
16           Q.   Okay.  So you're surprised that she didn't
17      remember receiving any training, but you think it's
18      because she just misunderstood the word "training"?
19           A.   I -- I don't know.  I can only speculate
20      that it might be because she was taking that too
21      literally or misinterpreting the word.
22           Q.   Okay.  Well, I mean, do you see where on
23      here where she asked me to clarify that question?
24           A.   No.  Which line is that?
25           Q.   Line 13 through 15.  No.  Excuse me.  Line
```

Page 136

Appx_1342

1    8 through 10.

2         A.   I don't see the clarification.  Am I on

3    the right?

4         Q.   You don't see where she asks for

5    clarification of my question, do you?

6         A.   I don't think so.  I don't see that.

7         Q.   Okay.  So does her answer make you think

8    that her training on distracted driving was

9    ineffective?

10        A.   No.

11        Q.   Why?

12        A.   I can't suppose just from what her

13   response is here.

14        Q.   Okay.  So is it Eastman's goal that its

15   employees remember their trainings?

16             MR. DuBOFF:  I'm going to object as

17        ambiguous.

18        Q.   (By Mr. White)  Strike that.

19             Is it Eastman's goal that its

20   employees remember their training on distracted

21   driving?

22             MR. DuBOFF:  Still object as ambiguous.

23        A.   So our goal is that our team members are

24   aware and are making good decisions in the moment.

25   It is not our goal that they remember each and every

Page 137

Appx_1343

1    word on a piece of paper.  We're trying to equip

2    them to do their jobs well, to have the right set of

3    judgment, to understand the expectations.  That's --

4    I want them to behave that way, I want them to --

5    not to remember if and when what was on paper.

6         Q.  (By Mr. White)  So you said -- and correct

7    me if -- I don't want to misstate your testimony.

8    It's your testimony that it's Eastman's goal to make

9    sure that employees are aware and are making good

10   decisions; is that right?

11        A.   Yes.

12        Q.   Okay.  What do you mean by "aware"?

13        A.   Aware of the expectations around how we

14   want them to behave when they're on -- you know, as

15   a representative of the company, as well as for

16   their job.  And to make, you know, to be aware of

17   the -- the conditions and to be able to take those

18   into account as they're making decisions.

19        Q.   So your testimony is that you want your

20   employees to be aware of Eastman's expectations,

21   right?

22        A.   Yes.

23        Q.   Would you agree that if they don't

24   remember the expectations, it's hard for them to be

25   aware of them?

Page 138

1          A.    Yes.

2          Q.    Okay.  So let's go to Line 16, same page,

3     107.  Excuse me -- Line 13, where I asked:  After

4     the accident, were you given any additional training

5     related to distracted driving.

6                     Her answer:  Not that I can recall.

7                     So do you remember or are you aware

8     if she received any additional training or guidance,

9     communication, coaching, following the April 30,

10    2022 accident?

11         A.    There was discussion.  So I'm -- feel like

12    the team discussed.  I don't know for sure.  I know

13    we did not try to send her for training.  We did not

14    try to take her through a formal module.  And Caylee

15    had been through a lot.  What we were -- the

16    information we had at hand was that she was not

17    cited with any violation.  That there were

18    conditions that contributed to this incident, this

19    accident.

20                     And that, again, there was police

21    there.  There was a very formal investigation they

22    did.  There was no citation provided by the police.

23    There was no violation identified to her by the

24    police.  And she had been through a lot.  So our

25    priority was her health, her mindset, her

Page 139

1    psychological state.

2              You know, she took time off.  We

3    encouraged her to take time off to avoid things that

4    would be troublesome for her.  But, no, we did not

5    try to follow up with a training that would take her

6    back into that moment.  We felt like she was getting

7    a lot of personal reflection and just going through

8    a lot.

9         Q.   So what did Caylee tell Eastman about the

10   accident?

11        A.   Okay.  So to my understanding, she first

12   and foremost pulled over and called 911.

13        Q.   So I just want to step back.  Is that what

14   Caylee told Eastman or -- I want to separate out

15   what Eastman may have learned from other means --

16        A.   Okay.

17        Q.   -- versus what Caylee told Eastman.

18        A.   Okay.  She first, I believe, either made

19   the call -- and I don't know who it was to first.

20   If it was to Chris Ierardi or Eric Holmes.  I think

21   it was Eric.  And she told him that she had been in

22   a wreck.  She told him she was driving north on 45.

23   And it was that Saturday afternoon.  She informed

24   him -- he asked her, he said, Are you okay?  She

25   told him she was okay.

Page 140

Appx_1346

```
 1                        He [sic] had told her [sic] that
 2        there was someone in the middle of the road and that
 3        she had struck the individual she thinks.  I don't
 4        think she knew the state of the situation then when
 5        she called him.  I don't recall.  And he asked her
 6        if she was safe, if she had notified the police.
 7                        And then I believe he, either in that
 8        conversation or in a different conversation, asked
 9        if -- you know, if she knows any other details.  And
10        I think at that time, she did not know any other
11        details.
12             Q.    Okay.  So did Caylee tell anyone at
13        Eastman that she was speeding on approach to
14        Nehemias Santos?
15             A.    No.
16             Q.    Did she tell anyone at Eastman that she
17        sent or received somewhere around 50 to 60 text
18        messages in her drive north on I-45 that day?
19             A.    No, she did not.
20             Q.    Okay.  So Eastman's reaction was based on
21        the limited information that she gave Chris Ierardi
22        and -- and other reviewed documents; is that right?
23             A.    That's correct.
24             Q.    And when I say other documents --
25             A.    Well --
```

Page 141

1        Q.   Go ahead.   Go ahead.   Sorry.

2        A.   I mean, through the other documents, there

3    was the discussion from the police report.

4        Q.   Okay.   So Eastman reviewed the police

5    report?

6        A.   Yes.

7        Q.   Okay.   Did Eastman review the statement

8    Caylee made to Donlen?

9        A.   I have reviewed the statement made to

10   Donlen.   I believe our HR reviewed the statement she

11   made to Donlen.   I don't know if her supervisor did.

12   I think the supervisor requested and asked that --

13   just with the nature of it, that HR and legal did.

14       Q.   Okay.   So as of today, Caylee has not

15   received any additional training from Eastman

16   regarding distracted driving?

17       A.   There has about been no formal or a change

18   of that interaction, no.

19       Q.   Have there been since the accident,

20   informal discussions with Caylee regarding

21   distracted driving?

22       A.   Yes.

23       Q.   Okay.   With whom?

24       A.   With her supervisor.

25       Q.   With Chris Ierardi?

Page 142

1       A.   Yes.

2       Q.   Okay.  So when Caylee says on Page 107 of

3  her deposition, Lines 13 through 15 where she said,

4  "Not that I can recall," after I asked her if she

5  was given additional training related to distracted

6  driving, would you agree that she had forgotten --

7  or she forgot to relay those conversations with

8  Chris Ierardi to me?

9       MR. DuBOFF:  Objection to the form.

10      A.   I don't know how she's interpreting the

11  question.

12      Q.   (By Mr. White)  Okay.  So you think maybe

13  she just -- she heard training and didn't think that

14  conversations with her supervisor include training?

15      A.   That is right.

16      Q.   Okay.  So if I had asked her -- well, all

17  right.  So your testimony is that she did have

18  communications with Chris Ierardi about distracted

19  driving following the accident?

20      A.   Yes.

21      Q.   Do you know what the substance of those

22  conversations were?

23      A.   No.  And to clarify, I don't know after

24  the accident, how soon it was.  I expect it was not

25  for the point of anything to do with that accident.

Page 143

Appx_1349

1        It was for the point of when he was next engaging

2        with her, talking with her, how are things going,

3        how do you feel about driving.  It was through that

4        nature.  Not as a result of the accident, not as a

5        disciplinary action in any means.

6                    That was not our -- our understanding

7        is that, again, she was not found with any

8        violations from the police, there was no citation.

9        And so our interest was in her health and wellness

10       and safety and making sure that before she drove

11       again, she was also of sound mind and feeling okay.

12                   And so the interaction that I'm

13       referring to would have been back into the normal

14       course of Chris meeting with her on some frequency,

15       going through the list of topics.

16       Q.   So following the accident on April 30,

17       2022, Eastman didn't feel like there was a need to

18       give Caylee additional training on distracted

19       driving?

20       A.   That is correct.

21       Q.   Okay.  Is that because, in fact, Eastman

22       did not believe that distracted driving contributed

23       to the accident?

24       A.    It is because we didn't have reason to

25       believe that she was, you know, found at fault for

Page 144

1   it, and we knew she was going through a lot.  So the

2   discussions around it, I'm sure was a lot as they

3   were drawing everything out, trying to check, see

4   how she was doing.

5        Q.   Well, my question was, did Eastman not

6   provide additional training because Eastman did not

7   believe the distracted driving contributed to the

8   accident?

9        A.   I don't know.  I don't know that I can say

10  what we thought after the event.  I was -- we were

11  trying to get information to understand it.

12       Q.   Okay.  At any point in that investigation,

13  did Eastman conclude that distracted driving

14  contributed to the accident?

15       A.   You know, what occurred was through this

16  time, our lawyers were -- and our counsel was

17  engaging with her throughout.  That was really our

18  primary source.

19       Q.   Obviously I don't want to hear about your

20  conversations with your lawyers, right?

21       A.   Yeah.  That was the primary source of --

22  also discussion with her about the incident, as well

23  as getting her employee assistance kind of for the

24  incident.

25       Q.   Okay.  And did Caylee Smith inform Eastman

Page 145

Appx_1351

1    that she alleges that she was looking at her GPS

2    immediately prior to hitting Nehemias Santos?

3         A.   I saw that in the report.

4         Q.   Okay.  Did Caylee Smith tell anyone that

5    she had actually seen the Toyota in the lane a

6    couple of seconds before she struck Nehemias Santos?

7         A.   I don't know if that's -- I don't know

8    exactly if that's what she said.

9         Q.   Okay.  So let's go to Page 112 and 113 of

10   Exhibit 2 here.  So I asked her on Line 6:  Which

11   ones do you remember?

12                 Line 7, her answer:  I remember

13   there's training that we are trained on for phishing

14   e-mails and stuff like that.

15                 My follow-up question:  Do you

16   remember any others?

17                 Her answer:  Not that I remember, no.

18                 My question:  So other than spam

19   training, you forgot the rest of your training?

20                 Mr. Bunt objected.

21                 And then she answered:  Not that I've

22   forgotten.

23                 My question:  Well, what do you

24   remember then?

25                 Her answer:  I know there's safety

                                        Page 146

Appx_1352

```
 1    modules.  I just don't remember the specifics of the
 2    exact modules when I did them.
 3                    And my response:  I'm not asking when
 4    you did them.  I'm asking what they contained.  So
 5    other spam modules, what trainings do you remember,
 6    like the content of that training?
 7                    Her answer:  I can't think of it
 8    right now.
 9                    So does it concern you that she seems
10    to only remember the content of her spam training?
11                    MR. DuBOFF:  I'm going to object to the
12         form as misstating the testimony.
13         A.   Again, I don't know what she was going
14    through, why that would be what is on the surface of
15    her mind.
16         Q.   (By Mr. White)  Okay.  So she obviously
17    remembered receiving some training on spam, right?
18         A.    (The witness nods head.)
19         Q.   We need oral answers.  Sorry.
20         A.   Based on her testimony or based on her
21    deposition, yes, she remembered that training.
22         Q.   Okay.  But it appears from this testimony,
23    that she doesn't remember the content of any other
24    safety modules that she received.  Do you disagree
25    with that?
```

Page 147

Appx_1353

```
 1          A.    You're right.  She says she does not
 2    recall the specifics.
 3          Q.    Does that make you think that she should
 4    receive more training, follow-up training?
 5          A.    I don't know if it's -- again, I don't
 6    know if it's the term of the way the questions were
 7    asked.  So there is always more that a company that
 8    we can do on training.  And there's always more that
 9    we can learn from in terms of, you know, striving
10    for safety.  I don't have a specific position right
11    now on whether that in and of itself suggests we
12    should do more.
13          Q.    So do you think she should remember more
14    training than her spam training?
15                MR. DuBOFF:  I'm going to object.  The
16          testimony asked about training --
17          computer-based training modules.  And then
18          you're shifting and asking about training
19          globally.  So I'm going to object as ambiguous.
20          A.    I want her to remember conversations, the
21    expectations that are taking place when she's with
22    her supervision as well.  And I'd like her to
23    recognize that as training.  But not everyone's
24    going to recognize that as training.
25          Q.    (By Mr. White)  Okay.  But you would like
```

Page 148

1    her to retain what she learns when she's either

2    receiving computer module training or conversations

3    with her supervisors, right?

4         A.   Yes.  The goal is to have her retain it.

5         Q.   Okay.  How is she tested for retention?

6         A.   We don't -- I wouldn't say that's a formal

7    process that we have in terms of retesting for

8    retention.

9         Q.   Okay.  So Eastman doesn't have a method of

10   making sure the training, right, communication,

11   guidance, coaching that employees receive sticks in

12   the employee's head?

13        A.   No, we do not.  It comes through

14   observation and interaction with them.

15        Q.   Okay.  The so let's go to Tab No. 3 here.

16             THE VIDEOGRAPHER:  Mr. White, can we stop

17        so I can change this?

18             MR. WHITE:  Yeah.  Let's take a breather.

19             THE VIDEOGRAPHER:  Stand by.  The time is

20        12:09 p.m. and we are off the record.

21                       (Whereupon there was a lunch

22                        break.)

23             THE VIDEOGRAPHER:  All right.  The time is

24        12:53 and we're back on the record.

25             MR. WHITE:  All right.  This is Jacob

                                        Page 149

```
1              White for Plaintiff's counsel.  We just took a

2         lunch break.

3              Q.  (By Mr. White)  So, Erin, we were talking

4    earlier somewhat about Caylee's testimony in her

5    deposition.  Do you recall some of those

6    conversations?

7              A.  Yes.

8              Q.  Did you review Caylee's deposition?

9              A.  I did in parts.  I did not review the full

10   thing, but I did in parts.

11             Q.  Okay.  Did you -- parts, I guess that

12   makes sense.  It was a pretty long deposition.  Did

13   you watch a video of it at all?

14             A.  No, sir.

15             Q.  Okay.  So we talked about what Caylee

16   meant or maybe didn't mean when we talked about her

17   defining training.  Do you recall parts of that

18   conversation?

19             A.  Yes.

20             Q.  Okay.  So how does Eastman define

21   training?

22             A.  Goodness.  I don't know if we have an

23   official definition for it.  But I think it's

24   probably broad.  I think Eastman defines training

25   both on -- on computer with kind of a traditional
```

Page 150

1    training.  I think we do training also in -- in

2    practice when you're in the field.  And then also

3    kind of the coaching and development and training

4    that takes place through the frequency of job

5    reviews and performance reviews and things.  So it's

6    a pretty broad term that we tend to think of.

7         Q.   Okay.  Okay.

8         A.   I don't know if everyone if has that same

9    definition.

10        Q.   Sure, sure.

11             So if I was to go ask an Eastman

12   outside sales representative that's not Caylee, you

13   know, what sort of training they received from

14   Eastman, what do you think they will say?

15             MR. DuBOFF:  Objection to form, calls for

16        speculation.

17        A.   Yeah, I don't know.  I don't know.

18        Q.   (By Mr. White)  Okay.  Do you think outside

19   sales representatives would understand that they're

20   being coached when they're being talked to by their

21   supervisors?

22             MR. DuBOFF:  Same objection.

23        A.   I would -- I think that -- well, yes and

24   no.  I think that sometimes they would recognize

25   that as coaching.  I think many times they might

                                        Page 151

Appx_1357

```
 1    recognize it as a, you know, support.  So I don't
 2    know that everyone recognizes those sort of terms in
 3    the same way.
 4         Q.  (By Mr. White)  Okay.  Do you think that
 5    PowerPoints being shown to people, that outside
 6    sales representatives would understand that those
 7    are training?
 8         A.   Not necessarily.
 9         Q.   Why not?
10              MR. DuBOFF:  Same -- same objection.
11         A.   Sorry.  Because we use PowerPoint for many
12    purposes.
13         Q.  (By Mr. White)  Okay.
14         A.   Sometimes it's to provide information.
15    Sometimes it is for the purpose of calling people to
16    action.  So not necessarily.
17         Q.   Okay.  Well, what about educational
18    materials provided to outside sales representatives,
19    do you think they'd understand that those are
20    training?
21              MR. DuBOFF:  Same objection.
22         A.   I don't know if I have a definition.  So I
23    don't have a definition on educational materials.
24         Q.  (By Mr. White)  Okay.  Well, like being
25    handed a policy, let's -- you know, an Eastman
```

Page 152

Appx_1358

1    policy.  Do you think that when an outside sales
2    representative is given a policy from Eastman, that
3    the outside sales representative understands that's
4    training?
5              MR. DuBOFF:  Objection, speculation.
6         A.   What I expect is that they understand and
7    abide by the policy.  Not necessarily that they
8    define it as training.
9         Q.   Okay.
10        A.   And so when they receive that, I -- you
11   know, we do expect that they become familiar with
12   the policies and that they, you know, abide by them
13   and manage them.
14        Q.  (By Mr. White)  So Eastman does expect
15   their employees to recall the content of the
16   training, even if the employee doesn't understand
17   that they're being trained?
18        A.   We expect that in their actions, that
19   their are consistent with those.
20        Q.   Okay.  So would you describe those as
21   training or rules that they're being given?
22        A.   They're considered policies, considered
23   procedures.  These are considered -- yeah, so
24   policies and procedures.
25        Q.   Okay.  So in your opinion -- Eastman's

                              Page 153

1    opinion, coaching does equal training, right?

2              MR. DuBOFF:  Objection to the form.

3         A.   In my opinion, I think in Eastman's broad

4    definition, we do see coaching as a form of

5    training.

6         Q.  (By Mr. White)  Okay.  So I asked about

7    this earlier.  I just want to make sure I've got all

8    of it.  We talked about how training modules that

9    Caylee completed, we could find those at the

10   learning tab on her My Eastman account; is that

11   right?

12        A.   Yes, I believe so.

13        Q.   Are there any other databases that would

14   document what training she's received?

15        A.   That's the one that I'm aware of.  I don't

16   know if there's like a recording format that might

17   be different as an app, but I think that -- it's

18   predominantly that.

19        Q.   Okay.

20        A.   Eastman Learning Lab through the careers.

21        Q.   Is it possible that there's some reporting

22   capacity or some database that you could run a

23   report off of to show the training that she

24   received?

25        A.   Oh, it's possible, certainly.

Page 154

```
 1              Q.   You just don't know?

 2              A.   That's right.

 3              Q.   Okay.

 4              A.   They've changed -- we change software

 5         systems on quite a frequency.

 6              Q.   Okay.  When's the last time you changed

 7         the software systems that might have that relevant

 8         training information on Caylee?

 9              A.   Oh, I don't know.

10              Q.   Okay.  So are we on Plaintiff's Exhibit

11         No. 3?  So do you recognize this document?

12              A.   Yes, I do.

13                         (Whereupon Exhibit 3 was

14                          introduced for identification.)

15              Q.  (By Mr. White)  What is it?

16              A.   This is our standard operating procedure

17         for defensive/distracted driving policy.

18              Q.   Okay.  And I wondered why

19         defensive/distracted, any idea?

20              A.   I do not.  I think maybe it's because the

21         way these are referred to in the industry, we're

22         trying to make sure people recognize it as both.

23         That's my speculation.

24              Q.   All right.  Fair enough.

25                         Did -- I guess did and does that
```

Page 155

1    policy apply to Caylee in her role as an outside

2    sales representative?

3         A.   Yes, it does.

4         Q.   And I think you testified earlier that she

5    had access to this policy before and after the

6    accident, right?

7         A.   Yes.

8         Q.   But you're unaware of whether or not she

9    had actually signed a copy of this policy?

10        A.   That is correct.

11        Q.   Okay.  So what actions does this standard

12   operating procedure specifically identify as

13   distractions?

14             MR. DuBOFF:  Objection to the form.

15             THE WITNESS:  Are you fine if I refer to

16        it directly it?

17        Q.   (By Mr. White)  Oh, yes.  Absolutely.

18   Absolutely.

19        A.   Okay.  It refers to common causes of

20   distractions, that distractions could include using

21   mobile devices, computers, eating, drinking, talking

22   with passengers, grooming, reading, using a

23   navigation system, watching videos or adjusting

24   vehicle equipment such as vehicle infotainment

25   systems and climate controls.

                                   Page 156

Appx_1362

```
 1            Q.   Okay.  And what does Eastman's standard
 2      operating procedure, this Plaintiff's Exhibit No. 3,
 3      instruct drivers to do regarding those distractions?
 4            A.   It says that they are to -- to reduce the
 5      distractions of these while driving, with particular
 6      emphasis on these.
 7            Q.   Okay.  And where does that say that in
 8      here?
 9            A.   I'm looking at the top paragraph where it
10      says that it's the intention to reduce the
11      distractions while driving.  There's other
12      specifics.
13            Q.   What -- but let's stay with that first
14      paragraph.
15            A.   Okay.
16            Q.   Is there any particular emphasis of the
17      policy?
18            A.   I'm sorry.  Can you expand the...
19            Q.   Well, does it say in the first paragraph
20      if the standard operating procedure has any
21      distractions particularly trying to reduce?
22            A.   Oh, so it says:  Promote the reduction of
23      distractions while driving with particular emphasis
24      on cellular -- cell phone use, yes.
25            Q.   Okay.  And then in the next paragraph, I
```

Page 157

```
 1        think you just read it, it describes a couple of
 2        potential distractions, correct?
 3             A.    That's correct.
 4             Q.    And do you see in the second paragraph
 5        where it says:  Employees should be aware of common
 6        causes of distractions while driving and seek to
 7        minimize those distractions?
 8             A.    That is correct.
 9             Q.    Okay.  All right.  Why minimize?
10             A.    Because we believe and I think common
11        practice is trying to reduce distractions whether
12        you're driving or other things, operating equipment,
13        etc.  It's good to have that focus on what you're
14        doing.  It's good to reduce it.
15             Q.    Okay.  Why not try to eliminate
16        distractions?
17             A.    Well, I think trying to eliminate or
18        trying to minimize has some similarities.  I think
19        result -- I think having the elimination, you know,
20        complete avoidance is not practical from a normal
21        course of operating a vehicle.
22             Q.    Okay.  So it's Eastman's opinion that you
23        just can't eliminate all distractions while driving
24        a vehicle?
25             A.    That is our opinion, Yes.
```

Page 158

Appx_1364

```
 1              Q.   Okay.  Are there certain distractions that
 2       could be eliminated, though?
 3              A.   I suppose so.
 4              Q.   Okay.  Which ones?
 5              A.   I don't know.
 6              Q.   Well, you said I suppose so.  So what were
 7       you thinking when you said that?
 8              A.   I could avoid having my dog in the front
 9       seat with me.  You know, I can try to eliminate --
10       no talking with somebody, those sort of things.
11              Q.   Okay.  So why -- why did a dog being in
12       the front see sort of pop out in your mind?
13              A.   Because I have dogs that try to climb over
14       the seats.  Sorry.
15              Q.   Is that particularly distracting if
16       there's a dog in the front seat?
17              A.   It's an example of, yes, I think that
18       could be a distraction.
19              Q.   Okay.  It would be a good idea not to have
20       your dog in your front seat, particularly when
21       you're driving your company provided car, right?
22              A.   Or my personal car.
23              Q.   Or your personal car.  Sure.
24              A.   Yes.
25              Q.   But, you know, I guess what I'm trying to
```

Page 159

```
 1    figure out is obviously people have to check their
 2    odometer or their speed and they have to look down
 3    when they're driving, right?
 4         A.   I'm sorry.  Repeat.  They're going to have
 5    to do that?
 6         Q.   Right.  Any driver, including Eastman
 7    drivers driving Eastman vehicles are going to have
 8    to occasionally look at their gauges or -- let's
 9    stick with gauges.  Check your speed and your
10    odometer, right?
11         A.   Yes, I believe so.
12         Q.   Okay.  And you think that's sort of a
13    common -- it is a distraction, it is taking the eyes
14    off the road, right?
15         A.   Yes.
16         Q.   But it's just part and parcel of driving,
17    right?
18         A.   Yes, I believe so.
19         Q.   Okay.  So does Eastman think that that
20    sort of distraction is as impractical to eliminate
21    as, say, texting while driving?
22         A.   Oh, certainly.  I mean, I think that
23    Eastman, we absolutely recognize that cell phones
24    bring an added distraction.  And, you know, that's
25    why we made that call out here in terms of the
```

                                        Page 160

Appx_1366

1    specificity of in particular, you know, emphasis on

2    cell phone use.  Those do add additional

3    distractions to a driver.

4         Q.   Okay.  But they're in particular -- like,

5    it's not just -- Strike that.

6              So why focus on cell phone caused

7    distractions and eliminating those or minimizing

8    those?

9         A.   Maybe because of the broad use or the

10   broad usage of cell phones these days that require

11   some of the -- for us to believe that we need to set

12   expectations for the employees.  The more and

13   more -- like we don't tell them how they need to

14   operate the front of their vehicle.

15             But, yeah, so it's the broad use and

16   that there's not really a standard any -- there

17   historically has not been a standard on how, you

18   know, people use cell phones.

19        Q.   So you think that the background behavior

20   in the public, use of cell phones, is that Eastman

21   has to correct that amongst its employees?

22        A.   No.  I think I wouldn't use the word

23   "correct."

24        Q.   Okay.

25        A.   I think the nature of cell phone use in

                                            Page 161

Appx_1367

1  public is -- it's become every day, every frequency.

2  And people operate their lives with it.  So, yes, we

3  felt that it was incumbent upon us to make sure that

4  we are setting some expectations, setting some very

5  clear dos and don'ts in terms of the use of those

6  while they're doing company business or while

7  they're operating, you know, a leased vehicle.

8       Q.   So I just -- I want to make sure the

9  testimony is clear about Eastman's understanding of

10  how people use cell phones, right?  Eastman's belief

11  is that in the modern age, people use cell phones

12  while they're driving more than they ought to,

13  including their employees, and so they've got to

14  make rules to make sure everyone understands they

15  shouldn't be doing that?

16            MR. DuBOFF:  I'm going to object to the

17       form and being outside the scope of the

18       deposition topics.

19            THE WITNESS:  Can you repeat the question

20       or state it in a way...

21       Q.  (By Mr. White)  So Eastman -- is it

22  Eastman's belief that there are certain incumbent

23  bad behaviors among drivers involving cell phones,

24  that Eastman needs to make sure Eastman's drivers

25  are not doing; is that right?

Page 162

Appx_1368

```
 1            A.   I'll tell you, I don't -- I don't think we
 2      have a belief about society.  I mean, I try not to
 3      have necessarily corporate beliefs.  I think what we
 4      know is there's practices in the absence of some
 5      guidance.  But we want our -- we want our team
 6      members and we hope those -- we want our team
 7      members to have some clear guidance on what they
 8      should and shouldn't do with cell phones.  Because
 9      in the absence, yeah, they can be used
10      inappropriately or they can cause -- you know, just
11      be used inappropriately.
12            Q.   And Eastman's aware that texting and
13      driving is something that there have been a lot of
14      public hazard or public awareness from the
15      authorities on trying to reduce it, right?
16            A.   Yes.  Yeah.
17            Q.   And Eastman agrees about trying to reduce
18      texting while driving and cell phone use while
19      driving?
20            A.   Yes.  Trying to reduce any of the handheld
21      distractions or any other distractions while
22      driving, yes.
23            Q.   Okay.  So would you agree Eastman has a
24      duty to try to reduce distracted driving amongst its
25      employees?
```

Page 163

Appx_1369

1          MR. DuBOFF:  Objection to form, asks for a

2       legal conclusion.

3          THE WITNESS:  I don't know I can speak to

4       what duty we have.

5       Q.  (By Mr. White)  Okay.  Eastman --

6       A.   We want our employees to be safe.

7       Q.   Okay.

8       A.   We want them to be driving safely.  We

9    have expectations.  And it's why we've written this

10   policy on distracted driving that sets the

11   expectation that they should not be hand texting or,

12   you know, doing it.  There's certain obligations we

13   have of our team members.

14      Q.   So Eastman defines safe driving as not

15   using hands-on activity on the phone; is that right?

16      A.   No, we do not define safe driving by that

17   alone.  There's many things that...

18      Q.   Okay.  So does Eastman think that using a

19   hands-on cell phone while driving is unsafe driving?

20      A.   I think it could be an aspect that could

21   contribute towards unsafe driving.

22      Q.   By but itself, is using a cell phone in

23   your hands while driving, does Eastman define that

24   as unsafe driving?

25      A.   Yeah.  Let me be clear.  That's not

                                        Page 164

Appx_1370

1    allowed.  So using --

2         Q.   Because it's unsafe?

3         A.   Yeah.  Yes.  Because it's presumedly

4    unsafe, yes.

5         Q.   Okay.  So it's important to Eastman to try

6    to eliminate hands-on use of phones while driving

7    amongst its employees?

8         A.   Yes.

9         Q.   Okay.  How come?

10        A.   Because using hands on on your -- would be

11   unsafe.

12        Q.   Okay.  So can we look at this policy -- we

13   agree that Eastman does define using a navigation

14   system as a potential distraction, right?

15        A.   Using -- Yes.

16        Q.   Okay.

17        A.   As a potential distraction, yes.

18        Q.   I mean, it says distractions include, but

19   are not limited to and then --

20        A.   Okay.

21        Q.   -- it has a colon and then lists using the

22   navigation system, right?

23        A.   Okay.

24        Q.   Does it say anywhere in there, in that

25   paragraph about how the navigation system is used?

Page 165

1          A.    No, I do not think it does.

2          Q.    Okay.  So it doesn't say anything about

3    hands free or hands-on use of navigation systems,

4    right?

5          A.    Correct.

6          Q.    Okay.  Now, if we go -- if we go below, we

7    agree that the policy says that hands-free use of

8    devices is permissible provided that it allows the

9    employee to keep their eyes on the road, right?

10   We're still on Page 1.  It says -- it's Page 844,

11   the Bates label.

12         A.    Yeah.  No.  I'm reviewing it.  I'm looking

13   down underneath the procedure.  Is that where you're

14   referring, that first paragraph under procedure?

15         Q.    Well, it's actually the first -- it's

16   No. 2 and then the first bullet point.

17         A.    Okay.  Use of hands activated, yes, is

18   permissible provided that it allows the driver to

19   keep hands on the steering wheel and eyes on the

20   road.

21         Q.    And eyes on the road.  Why is it important

22   to keep eyes on the road and hands on the steering

23   wheel even while using hands-free technology?

24         A.    So it is important to make that your

25   primary and to make that the purpose in everything

                                        Page 166

```
 1     you're doing.  You know, how -- how -- I think as
 2     you asked earlier, there's practicalities and
 3     there's the ability to -- but, yes, we expect that
 4     the use of a device should not be something that,
 5     you know, draws attention away for a long period of
 6     time or that creates -- you know, creates the
 7     inability to watch the road.
 8          Q.   Okay.  So like you said, the primary
 9     activity of a driver should be driving, right?
10          A.   Definitely.  Absolutely.
11          Q.   Okay.  How come?
12          A.   For the safety of themselves and for those
13     around them.
14          Q.   Okay.  And we agree that if that -- if
15     your primary activity when you're driving is not
16     paying attention to driving, you are creating risk
17     to others, right?
18          A.   It could be, yes.
19          Q.   Well, it could be or it is?
20          A.   So creating the risk to others, yeah.  I
21     would say yes.
22          Q.   Okay.  Now, down here still under No. 2,
23     it says that, quote, use is curtailed when heavy
24     traffic, hazardous road conditions or adverse
25     weather is encountered.
```

Page 167

1               Did I read that correctly?

2          A.   Yes.

3          Q.   Okay.  Why -- why is hands-free use

4     allowed except in situations where, say, traffic or

5     weather are adverse?

6          A.   Again, we're trying to put enough out here

7     as a guidance and an expectation to our team that if

8     there's -- if there are other contributors to risk

9     and hazard, that should be something that causes you

10    to reduce anything else that might also amplify

11    that.

12         Q.   Okay.  Okay.  So that's Eastman's policy

13    and that's what y'all try to train your employees

14    on?

15         A.   Certainly.  To be first and foremost aware

16    of your surroundings; knowing that and putting that

17    first.

18         Q.   Okay.  And so surroundings including

19    traffic, road conditions.  Anything else that the

20    driver might -- should be aware of that could

21    contribute to risk, right?

22         A.   Yes.  Yes.

23         Q.   So hands-free use of -- I want to make

24    sure this is Eastman's policy.  Hands-free use of

25    electronic devices is not allowed in any situation,

                                        Page 168

Appx_1374

1    right?

2         A.   No --

3              MR. DuBOFF:   Object to the form.

4         Q.   (By Mr. White)   It's not?

5         A.   Hands free is allowed in certain -- it

6    basically is allowed and permissible in certain

7    situations.   And then we state that it needs to be

8    curtailed when there's heavy traffic, when there's

9    hazardous road conditions or adverse weather.

10        Q.   Okay.

11        A.   As examples.   I mean, you know, but yes.

12        Q.   Okay.   So that's not an all-inclusive list

13   of situations where hands-free use should be

14   curtailed, right?

15        A.   It's what our policy states.

16        Q.   Okay.   But you said those are just

17   examples, right?

18        A.   Those are the ones that we identified in

19   the policy as -- as -- that should be, you know,

20   areas of focus.

21        Q.   So do you think there are other situations

22   that should be on there that are not?

23        A.   No, I can't say.   I don't know.

24        Q.   Okay.   So do you think this policy

25   provides complete and full guidance to Eastman

Page 169

1      employees about when hands-free technology should or

2      shouldn't be used?

3              A.   I think it is a -- I think it's a good

4      robust policy that's clear, yes.

5              Q.   Okay.   Now -- okay.   Can we go back to Tab

6      2, Page 133.

7              A.   Okay.

8              Q.   So let's go down to Line 22.   I asked:   Do

9      you think there's ever a case where you don't split

10     your attention when you're taking a phone call and

11     you're driving?

12                       Her answer, Line 25:   If it's hands

13     free.

14                       Do you understand her testimony

15     there?

16             A.   I think so.   Let's see.   Do you think -- I

17     think so, Yes.

18             Q.   Okay.   And what do you understand her

19     testimony to mean?

20             A.   Well, you've asked her:   Do you think

21     there's ever a case where you don't split your

22     attention when you're taking a phone call and when

23     you're driving?

24                       And she says:   If it's hands free.

25                       I think she is -- I think she's

                                        Page 170

```
 1      indicating that she feels that that is a means to
 2      have sufficient attention on the driving or that she
 3      can do it.
 4           Q.   Okay.  So would you say that her answer
 5      is -- describes a violation or following Eastman's
 6      distracted policy?
 7           A.   Oh, I don't know.  I'm not going to
 8      interpret this.
 9                MR. DuBOFF:  I'm going to object to this
10           because you only included 133.  And then in the
11           exhibit, you've skipped over the answer that
12           follows on 134 where she clearly acknowledges
13           that speaking on a hands-free device could
14           still be a distraction.
15           Q.   (By Mr. White)  Okay.  It's not a trick
16      question.  I'm just trying to figure out -- you
17      know, Eastman's policy is that she can take
18      hands-free phone calls, right?
19           A.   Correct.
20           Q.   And she can take -- she can respond to
21      text messages or read text messages as long as she's
22      doing it in a hands-free manner; is that Eastman's
23      policy?
24           A.   And it doesn't contribute to -- I mean,
25      no.  There's other guidance along with it related to
```

Page 171

1    curtailing it.  If there's, you know, other

2    conditions around that would contribute to hazards.

3    You know, it indicates that teleconferences are

4    prohibited.  So there's other conditions with that.

5         Q.   Okay.

6         A.   But it allows for the -- it allows for the

7    recognition that from time to time, an individual

8    does need to and will take -- receive a call.  And

9    it provides for those.

10        Q.   So is the policy that practically

11   speaking, you're going to have to take calls.  So if

12   you have to, they're hands free.  Or is the policy

13   that hands free in circumstance -- certain

14   circumstance is sufficiently safe?

15        A.   I don't know if I have an opinion on that.

16   You know, I can't interpret completely whether we're

17   saying it's sufficiently safe.

18        Q.   So you don't know if Eastman has a policy

19   about whether or not hands-free calls are

20   sufficiently safe?

21        A.   I know what we have in our policy.

22   They're the guidelines.  I don't know there's an

23   official opinion behind it, is what I would say.

24        Q.   Okay.  So now, can we agree when you're

25   looking at a navigation system such as a GPS,

Page 172

1   pursuant to this policy, the distracted driving

2   policy, that if it requires a driver to take their

3   eyes off the road, that would violate Eastman's

4   policy?

5              MR. DuBOFF:  Objection to the form.

6              THE WITNESS:  No.  I'm not following that.

7       If they look at their navigation system?

8       Q.  (By Mr. White)  So I guess I'll rephrase

9   the question.

10              If an Eastman employee looks at their

11  navigation system and, you know, sort of -- I guess

12  it's implied, but I'll make it explicit -- takes

13  their eyes off the road to look at the navigation

14  system, is that a violation of Eastman's policy?

15      A.  No, I believe it is not.

16      Q.  Okay.  Why not?

17      A.  Because we acknowledge that that might be

18  a necessary part of driving.

19      Q.  Okay.  How long -- like, is there a

20  certain cut off like at which point, like a length

21  someone looks at their navigation system --

22      A.  There is not.

23      Q.  -- where it would go from not a violation

24  to a violation?

25      A.  No, there is not.

Page 173

Appx_1379

1          Q.    Okay.   So an Eastman employee could look

2     at the GPS navigation system for any length of time

3     and it would not violate the policy?

4               MR. DuBOFF:   Objection to the form.

5          A.    What we expect is that they drive safely,

6     that they follow these guidelines and that they have

7     a good driving record.   And that they are, you know,

8     making good, healthy decisions to protect themselves

9     and others while driving.

10         Q.    (By Mr. White)   So there's -- is there a

11    length of time that an Eastman employee would look

12    at, for example a navigation system, and take their

13    eyes off the road that would turn what wasn't a

14    violation, in your words, into a violation?

15         A.    Not that I've ever seen documented.   I

16    think it's probably through the coaching, the

17    discussion, the recognition of, hey, don't do

18    something that's going to take your eyes off the

19    road for a long period of time.   I doubt it's a

20    measurement or explicit time.

21         Q.    Well, can you think of any situation, like

22    length of time someone could look at a navigation

23    system that would turn --

24         A.    I prefer not to speculate on that.

25         Q.    So you just don't know if that would be a

Page 174

1     violation if someone looked at the GPS for an

2     extended period of time?

3               MR. DuBOFF:  I'm going to object to the

4          form.

5          A.   We clearly say that the principle and the

6     intent is to have your eyes on the road and your

7     hands on the wheel.  That's the priority.  If you

8     drift from that or if you have to look at something,

9     I would say in my view, this is an Erin opinion.

10    There's nothing documented about this.  My opinion

11    would be that it should be a second, two seconds.  I

12    don't know if that's too long.  So it would be a

13    glance, maybe looking and then you're back to the

14    road.

15         Q.   (By Mr. White)  Okay.  So you think one to

16    two seconds looking, taking your eyes off the road

17    is not a violation of Eastman's distracted driving

18    policy?

19              MR. DuBOFF:  I'm going to object to the

20         form.

21         A.   That's not something I can tell.  I don't

22    know.

23         Q.   (By Mr. White)  Okay.  Well, I just -- as

24    Eastman's corporate rep, I'm just trying to figure

25    out what is and isn't a violation of the defensive

                                        Page 175

1      driving policy.

2              MR. DuBOFF:  She's already answered the

3          question.  The policy does not have an inherent

4          time limit.  She's answered the question.

5              MR. WHITE:  Okay.  Again, speaking

6          objections.

7              MR. DuBOFF:  Yes.  Speaking objections.

8          She's answered the question.

9          Q.  (By Mr. White)  So is there a circumstance

10     not -- is there a circumstance looking at the GPS

11     and other circumstances going on in the road where

12     it would make looking at the GPS a violation of the

13     Eastman policy?

14         A.   No, not that I know of.

15         Q.   What about, you know, looking at that

16     policy where it talks about heavy traffic hazardous

17     road conditions or adverse weather, would -- now, I

18     know where it says that, it's talking about

19     hands-free use.  But would heavy traffic, for

20     example, be a time when looking at a GPS would turn

21     looking at a GPS a violation of the Eastman policy?

22         A.   Not necessarily.

23         Q.   Okay.  Why not?

24         A.   Because there's conditions.  It might be

25     that you have to figure out do I have to avoid an

Page 176

Appx_1382

1    accident, do I have to re -- reroute.  So, no.  I
2    can't say for certain.  It has to be taken into
3    account.  But in terms of a violation of the policy,
4    I don't think so.
5        Q.  Okay.  So is it possible like that looking
6    at the GPS could be a violation of Eastman's
7    distracted driving policy?
8            MR. DuBOFF:  Objection to form.
9        A.  I guess it's possible.  I don't know how
10   to define what you're asking, though.
11       Q.  (By Mr. White)  Okay.  Would it depend on
12   all the other circumstances on the roadway at the
13   time?
14       A.  I don't know, sir.
15       Q.  Okay.  Would it depend on the driver's
16   state of mind and whatever else is going on in her
17   vehicle?
18       A.  I don't know how that would influence.
19       Q.  Okay.  So does Eastman's training to its
20   employees discuss when an employee can look at their
21   GPS?
22       A.  No, it certainly does not.
23       Q.  Okay.  Any of the coaching or one-on-ones
24   or discussions that we talked about as what
25   Eastman's defines as training, any of that involve

                                   Page 177

1    telling outside sales reps when they can look at a

2    GPS?

3              MR. DuBOFF:  Object to form and outside of

4         the noticed deposition topics.

5         A.   So in terms of any discussion, coaching, I

6    don't know.  I'm not in those -- those sessions

7    often.  Those are done within teams when they're

8    trying to train on safety practices, on

9    expectations.  So I don't know if they ever discuss

10   that.  So I don't know if that's discussed.

11        Q.  (By Mr. White)  Okay.

12             THE VIDEOGRAPHER:  Mr. White, I have to

13        fix a technical issue.

14             MR. WHITE:  Okay.  Let's go off the record

15        for a second.

16             THE VIDEOGRAPHER:  All right.  The time is

17        1:24 p.m. and we're off the record.

18                        (Whereupon there was a short

19                        break.)

20             THE VIDEOGRAPHER:  The time is 1:29 p.m.

21        We are back on the record.

22             MR. WHITE:  Okay.  This is Jacob White,

23        Plaintiff's counsel, just took a small break

24        for technical issues.

25        Q.  (By Mr. White)  We were talking a little

                                      Page 178

Appx_1384

1    bit about Eastman's defensive/distracted driving

2    policy.  How does Eastman monitor its employees

3    compliance with this distracted driving policy?

4        A.   So I've said we don't monitor our

5    employees' driving per se through any specific

6    software or, you know.  We monitor it through having

7    our sales leadership ride along with them, talking

8    through, observing how they're driving.  And then we

9    have conversations and frequency of expectations for

10   it.

11              We also monitor through their, you

12   know, ongoing disclosure to us around whether they

13   have any moving violations or not.

14       Q.   Okay.  Any other efforts to monitor their

15   compliance with this driving policy or any others?

16       A.   Well, that's very broad.  This driving

17   policy.

18       Q.   Yeah.  Sorry.  We'll stick with just the

19   defensive driving policy.

20       A.   It's through -- it's through

21   communication.  It's through observation, the

22   primary ways.  And then, again, through the

23   expectations of needing to disclose if they have any

24   driving violations.

25       Q.   Okay.  Do you -- do you know the most

                                    Page 179

1    recent ride-along that occurred with Caylee prior to

2    the April 30, 2022 accident?

3         A.   I do not.

4         Q.   Do you know who that ride-along would have

5    been with?

6         A.   I do not.

7         Q.   Okay.  Do you think her supervisor might

8    know that?

9         A.   I don't know.  I talked to them.  I talked

10   to them more about the frequency and kind of when

11   they were -- I don't -- I don't think that they have

12   specific records of when and who was with her on

13   the -- on the travel.

14        Q.   And do you think they have specific

15   records, even if they don't know who, but when the

16   ride-alongs occurred?

17        A.   No.

18        Q.   Okay.  So other than Caylee's recollection

19   or one of the other person in the ride-alongs

20   recollection, there's not going to be any record of

21   when these ride-alongs occurred?

22        A.   There's not.

23        Q.   Okay.  So do you know of any instances

24   where outside sales representatives were disciplined

25   for violating Eastman's distracted driving policy?

                                        Page 180

```
 1              MR. DuBOFF:  I think we -- object as both
 2         asked and answered and subject to the
 3         objections of the deposition topics.
 4         A.   Yeah, I am not aware of any violations.
 5         Q.   (By Mr. White)  So how does Eastman enforce
 6    its distracted driving policy in states that have
 7    varying laws on cell phones usage while driving?
 8         A.   Well, I think we expect them to follow our
 9    guidelines and policy or procedure, regardless of
10    where they are in the states.
11         Q.   Okay.  So there are no specific policies,
12    like there's not like an Alabama addendum to this
13    policy, this defensive driving policy?
14         A.   No, sir.
15         Q.   Any state specific addendums or anything
16    like that?
17         A.   Not that I'm aware of.
18         Q.   Okay.  So does that mean Eastman expects
19    that its policy is either as stringent or more
20    stringent than every state law on distracted
21    driving?
22         A.   We have a statement.  I don't know if it's
23    in this one or if it's in the policy around driving
24    a vehicle.  I know there's a statement in one of the
25    policies I read that says:  And subject to the laws
```

                              Page 181

1    and requirements of the state --

2          Q.   Okay?

3          A.   -- in which you're driving.

4               So we do reference that.  And I think

5    we don't know since those would change from time to

6    time, we can't always follow whether ours are more

7    rigid or whether there's something that changes.

8          Q.   Okay.  So this policy doesn't incorporate

9    specific rules and regs from other states?

10         A.   That is correct.

11         Q.   Okay.  Has Eastman's policy on distracted

12   driving changed over the years?

13         A.   You know, I believe it has.  I don't have

14   documentation of that with me that I've seen, but

15   you can tell on it, it shows an initial publication

16   date and the last reviewed date.  So it's at least

17   reviewed on a frequency.  I don't know what that

18   change record has been.

19         Q.   So -- okay.  So you -- I think it's your

20   testimony there may have been changes, there may not

21   have been changes since this policy was initially

22   promulgated, you don't know?

23         A.   That is correct.

24         Q.   Okay.  Do you think if there are prior

25   versions of this defensive driving policy, would

                                        Page 182

Appx_1388

1   those exist somewhere in documentary form?

2        A.   There's a -- it's only possible.  It's not

3   a requirement.  Because the amount of records we

4   have, we tend to try to keep the most recent and

5   then there might be -- might have the last version

6   or something.  So I don't know for sure that it

7   would have all the version.

8        Q.   Okay.  So I think you testified about

9   this.  Eastman does not require the use of any

10  technology that restricts or limits cell phone usage

11  in Eastman provided vehicles, right?

12       A.   Can you repeat what type of technology?

13       Q.   So Eastman doesn't use any sort of

14  software apps on employee phones that restrict or

15  limit the use of those phones while the employee is

16  in an Eastman provided vehicle; is that right?

17       A.   That is correct.  We do not.

18       Q.   Okay.  You did talk earlier, there's been

19  some training, guidance, mentoring, coaching about

20  using auto responses or do not disturb, right?

21       A.   Yes, I believe so.

22       Q.   But Eastman doesn't put those technologies

23  on anybody's phones, right?

24       A.   No, we do not.

25       Q.   Okay.  So is -- under Eastman's policies,

Page 183

Appx_1389

1    how does Eastman investigate whether distracted

2    driving played a role or a contributing factor in an

3    accident involving one of their employees?

4         A.   Our first and foremost is to depend on the

5    authorities that are involved in any accident.  And

6    so that -- that's what takes place.  We get the

7    documentation on that.  And often again, since we're

8    not in this is our business, it's not that we try to

9    second guess or go after other information outside

10   of what is from the -- from the public traffic

11   record.

12        Q.   Okay.  So --

13        A.   If there's question -- we'll take all the

14   information into account.  And if there's a question

15   from that, they would, you know, presumably follow

16   up in some other discussions or questions if we

17   needed to be.

18        Q.   Okay.  So it sounds like you guys would go

19   off of what the responding officers would, for

20   example, put in a police report?

21        A.   That is right.

22        Q.   What's in the Donlen accident report,

23   would y'all look at that too?

24        A.   Yes.

25        Q.   Okay.  So what -- what would you be

                                        Page 184

1  looking for in those documents that would cause

2  Eastman to then continue investigating whether or

3  not distracted driving or cell phone usage played a

4  part in an accident?

5       A.   I don't know exactly.  Look for a

6  citation.

7       Q.   Okay.

8       A.   Look for a violation related to that.  We

9  would look for -- that's probably the predominant.

10  Because we don't have a vast -- well, we don't have

11  other expertise in this area.  This is not our

12  subject matter expertise.  We're depending on those

13  at the scene of the crime -- or scene of the

14  investigation or scene of things that are taking

15  place.

16       Q.   Okay.  So your testimony is if there was a

17  citation, Eastman would continue its investigation,

18  right?

19       A.   No, not necessarily.

20       Q.   Okay.  All right.  So help me understand

21  that.  So if there was a citation from a police

22  officer to an Eastman driver that, say, ticketed the

23  driver for texting while driving, would Eastman

24  investigate further at that point?

25       A.   We would document that and we would follow

Page 185

 1    procedure on whether there's anything that needed to

 2    be done.  There would certainly be conversations and

 3    some disciplinary -- not disciplinary, but capturing

 4    of that in their performance review.

 5         Q.   Okay.  Why -- why in that circumstance?

 6              MR. DuBOFF:  Objection, vague.

 7              MR. WHITE:  Fair.  That's fair.

 8         Q.   (By Mr. White)  Why would Eastman follow up

 9    and document it in the employee's file in a

10    situation where the employee had been ticketed

11    for -- for example, using a cell phone while

12    driving?

13         A.   If they've been ticketed for using a cell

14    phone, because our policy reinforces you've got to

15    follow the local laws -- laws and regulations.

16         Q.   Okay.

17         A.   And I want to clarify.  We wouldn't do

18    that if it was -- we wouldn't know all individuals.

19    All -- it is -- this is related to our expectations

20    of how our employees.  So if an individual that is

21    an employee of the company, we may or may not know

22    if they've gotten a ticket.  They likely would not

23    report that to us.  Our sales reps when they're

24    using Eastman provided vehicles do need to provide

25    that information to us.

                                          Page 186

1          Q.   Okay.  And so -- but you acknowledge if
2    someone, say, an Eastman employee gets ticketed and
3    they're not in an Eastman provided vehicle, they're
4    probably not going to -- the employee is probably
5    not going to tell Eastman about that ticket, right?
6          A.   They're not required to.
7          Q.   Okay.  Eastman doesn't expect them to?
8          A.   Sorry.  If it's an individual employee on
9    their own time?
10          Q.   In their own car.
11          A.   In their own vehicle.  No, we do not
12    expect they would provide us this information.
13          Q.   Okay.  And Eastman's not, you testified
14    earlier, isn't continuing running background checks
15    on its employees for that sort of thing, right?
16          A.   No.  That's right.
17          Q.   Okay.  So in circumstances where someone's
18    driving an Eastman provided vehicle and they get
19    into an accident, if -- what threshold less than a
20    citation exists at which point Eastman will do an
21    ongoing investigation into whether or not distracted
22    driving played a role?
23          A.   I don't think we have any documented
24    procedure on it.  I think it depends.
25          Q.   Okay.  Is there an informal procedure --

                                          Page 187

Appx_1393

1        A.   No.

2        Q.   -- in that circumstance?

3        A.   In terms of investigation, no, there's

4  not.

5        Q.   Okay.  Who would be doing the

6  investigation in that circumstance?  And when I say

7  that circumstance, I mean someone -- some incident

8  occurs with an Eastman driver in an Eastman provided

9  vehicle and it looks like maybe cell phone use or

10  distracted driving played a part.

11        A.   I think it would be -- our risk management

12  flows through our fleet risk management.  So

13  whenever there's a moving vehicle citation or

14  violation, you have to communicate to your

15  supervisor.  You have to communicate to the -- our

16  risk management and our kind of legal, as well as HR

17  and the fleet.  Within that, I am not sure which one

18  of those or how they would follow up.  But it would

19  be followed up if it was, you know, something that

20  needed further -- further evaluation.

21        Q.   Okay.  Can you tell me about specific

22  efforts Eastman has made to discourage distracted

23  driving amongst its employees, other than

24  promulgating this distracted driving policy?

25        A.   Mainly the ones that I referred to in

Page 188

1      terms of, you know, being topics and safety, being

2      topics and expectations and doing observations

3      during ride-alongs.

4          Q.   Okay.  Okay.  And I just -- when you say

5      mainly, are you thinking of anything else or are

6      those ride-alongs and the safety meetings that

7      you're talking about, are those the only ways that

8      distracted driving is talked about with employees?

9          A.   So recognize this as a company, safety is

10     always on top of mind.  We have -- our head of HSE

11     sends probably every quarter, every six months,

12     notes around how we're doing as a company in terms

13     of operating safely in terms of -- so it's a

14     communication that is frequent.  I, within my

15     business teams, my sales leaders, others, we review

16     our safety performance, on the whole, monthly in our

17     business reviews.

18              And so there's many places now.

19     There's so many topics that are associated.  As a

20     manufacturing firm and a company that is striving to

21     have our employees be safe, have them come to work

22     healthy, have them leave from work and being healthy

23     and safe.  So many topics we cover as it relates to

24     the safe operation and safe environment for our

25     teams.

Page 189

1           So I -- through those, different

2    topics come up.  It might be that, you know, the

3    expectations through that safe -- to have that

4    cascaded to certain parts of the organization.  They

5    then reemphasize, hey, guys, in our part of the

6    world, these are common errors for safe -- for risk.

7    That's how then that kind of flows or, you know,

8    that frequency of communication as well.

9           Q.   So would you agree that for outside sales

10   representatives, one of the primary risk issues that

11   they face is risk associated with driving?

12          A.   Driving is certainly a common risk, yes.

13          Q.   Okay.  For -- particularly for outside

14   sales reps?

15          A.   And all of our employees.

16          Q.   Okay.

17          A.   So it comes up in other topics too.

18          Q.   Okay.  So are there any ongoing campaigns

19   or programs at Eastman that specifically address

20   distracted driving, other than this distracted

21   driving policy?

22          A.   Not that I know of.

23          Q.   Okay.  So I'm going to show you what we're

24   going to call plaintiff's Exhibit 16.  It's just a

25   video that we found.  And let me pull it up here

                                            Page 190

1    real quick.  Just a second.  Put this in front of

2    you.  Do you see that okay?

3         A.   Yes.

4                        (Whereupon Exhibit 16 was

5                        introduced for identification.)

6         Q.   (By Mr. White)  Okay.  So I'm just going to

7    hit play here.  I probably have to turn up the

8    volume, don't I?  Okay.  But so at minute two, 19

9    seconds, it looks like some sort of shirt with a

10   slogan on it.  Can you read that?

11        A.   It says -- it's a Hanes shirt, DWD,

12   driving while distracted.  I think it says

13   distracted or just distracted.  And then underneath

14   it, the new DUI.

15        Q.   Okay.  So does Eastman have any sort of

16   company-wide policy of referring to distracted

17   driving as the new DUI?

18        A.   No, we do not.

19        Q.   Okay.  So to the -- you know, assuming

20   that that's a shirt made by a local Eastman

21   facility, would that have just occurred locally

22   amongst that Eastman facility?

23        A.   Yes.  So our -- our business teams -- our

24   business teams, our manufacturing sites, you know,

25   they are encouraged to try to make safety a part of

                                        Page 191

```
 1    the role.  They also encourage for community
 2    outreach.  They take it then upon themselves
 3    sometimes to take on certain topics and areas.  So I
 4    don't think that's an official statement from the
 5    company.  That's some of our sites that will be
 6    trying to do something in good intent, with very
 7    good intent.
 8         Q.   So Eastman doesn't disapprove of their
 9    local facilities --
10         A.   We don't disapprove of our local
11    facilities taking on safety topics as a way to, you
12    know, keep it at top of mind all the time.
13         Q.   Does Eastman disapprove of a local
14    facility calling a distracted driving the new DUI?
15         A.   Well, I don't know exactly what I'm
16    looking at.  There's nothing with Eastman on this
17    right here.  So it could have been another vendor
18    there.  It could have been a community -- so I don't
19    have a comment.  But I don't -- I don't see Eastman
20    associated like with this as a statement.  I don't
21    think it's an Eastman statement.  I think it's -- I
22    have no idea.
23         Q.   Would Eastman disapprove if a local
24    facility put out a shirt saying --
25                   MR. DuBOFF:  I'm going to object to -- I'm
```

Page 192

Appx_1398

```
 1              going to object as --

 2                   MR. WHITE:  Let me finish the question.

 3                   MR. DuBOFF:  Sure.

 4                   MR. WHITE:  I understand what the

 5              objection will be.

 6         Q.  (By Mr. White)  Would Eastman disapprove of

 7    a local facility putting out a shirt that says

 8    distracted driving is the new DUI?

 9                   MR. DuBOFF:  I'm going to object -- object

10              to the question as well outside the scope of

11              any deposition topic.

12         A.   Yeah, I really don't know.  I'd probably

13    seek guidance before making -- I have no -- I don't

14    know.

15         Q.  (By Mr. White)  Okay.  So does Eastman take

16    any efforts to measure the effectiveness of its

17    efforts to discourage distracted driving?

18         A.   We do not have a way to measure.  No, we

19    do not have a specific measure.

20         Q.   Okay.  So is it your testimony that

21    there's not any documentary training or educational

22    materials sent to outside sales representatives

23    regarding distracted driving?

24         A.   Can you repeat the statement again, the

25    question?
```

                                        Page 193

Appx_1399

1        Q.   Yeah.

2             Is it your testimony that there is no

3     training or educational material that Eastman has

4     sent to outside sales representatives regarding

5     distracted driving?

6        A.   We have provided policies, procedures.  I

7     don't know that it's sent to them specifically

8     and -- yeah.

9        Q.   So other than this distracted driving

10    policy that I've got labeled here as Plaintiff's

11    Exhibit 3, there -- is it your testimony there's no

12    other documentary training or educational materials

13    sent to outside sales representatives by Eastman?

14       A.   No.  I -- if I'm understanding.  I think

15    as I said, there's often -- there's often coaching,

16    safety topics.

17       Q.   I mean documents, like black and white --

18       A.   Oh, Eastman official documents?

19       Q.   -- documents sent by Eastman to outside

20    sales representatives regarding distracted driving.

21    Is this distracted driving policy the only thing

22    that would be in documentary form?

23       A.   This is the policy.  There's other driving

24    and other policies.  But, yes, this is -- this is

25    the policy.

                                    Page 194

1      Q.   Okay.  So there's not going to be training

2   modules or PowerPoints that I might find that deal

3   with distracted driving that Eastman has provided to

4   outside sales reps?

5      A.   So, again, there are PowerPoints that our

6   teams use to talk about safety and safe practices.

7   So, yes, those are some things that would go to our

8   employees.

9      Q.   Okay.  Okay.  Thank you.

10          So specifically for Caylee Smith, do

11   you know how the distracted driving policy was

12   communicated to her?

13      A.   I do not specifically.  You know, I was

14   not in -- I have not had conversations with Caylee

15   Smith.  What I do know is that it's a part of

16   onboarding and it's a part of the discussion.  I

17   believe it is.  When she gets also her leased

18   vehicle, she gets the -- another SOP.  And then it

19   references the expectations to -- to understand

20   these -- these policies.

21      Q.   Okay.  So how frequently does Eastman

22   conduct performance reviews for Caylee Smith?

23      A.   Official performance reviews are

24   documented in the system twice a year.  But we

25   highly encourage and we even reflect through upward

Page 195

Appx_1401

1      feedback -- through feedback with managers and

2      with -- that that's not sufficient.  It should be

3      very frequent, ongoing engagement.  And then in fact

4      when there's a new employee, we have a DENR, which

5      is essentially kind of onboarding in which I think

6      every four -- maybe three to four months, there's

7      a -- there's capturing and reviewing that with them.

8           Q.   So what is DENR?  Did I pronounce that

9      correctly?  Spell that right?

10          A.   You did.  I don't recall exactly what it

11     stands for.  It's an HR -- it's a human resources

12     form for capturing the successful onboarding and how

13     the individual is doing their first -- first year of

14     employment.

15          Q.   Okay.  Did that process occur for Caylee

16     Smith?

17          A.   It did.

18          Q.   Okay.  Would that have happened in 2021?

19          A.   Yes.

20          Q.   Okay.  I want to make sure.  She was hired

21     in March of 2021, right?

22          A.   Yes.

23          Q.   So is it possible that her D -- DENR

24     occurred in like early 2022?

25          A.   It is possible.  I think they would have

                                              Page 196

1    done one in 2021, but it's possible it was '22.

2         Q.    Okay.  Do you know what the substance of

3    that DENR -- again, I'm sorry.  I don't know --

4         A.    Sorry.

5         Q.    -- if I've got that acronym right.

6               Do you know what the substance of

7    that would have been?

8         A.    Yes.  It would be around how well she's

9    learning her role.  You know, there's several

10   different factors on it.  Communication, there's

11   definitely a factor also on safety and expectations

12   with the all in for safety.  So there's -- there's

13   multiple elements on it.

14        Q.    Okay.  Okay.  I take it she

15   successfully -- is it a pass/fail process?  I guess

16   I should ask that.

17        A.    It is.

18        Q.    Okay.  So I take it she passed the DENR

19   process?

20        A.    Yes, she did.

21        Q.    Okay.  But you don't remember exactly when

22   that happened?

23        A.    No, I do not.

24        Q.    Okay.  So can you talk about the

25   criteria -- well, let me take a step back.  You said

                                        Page 197

1    that the official performance reviews happen twice a

2    year, but supervisors are told that that alone is

3    insufficient, right?

4        A.   For the coaching and engagement and the

5    feedback, yes.  Correct.

6        Q.   Okay.  Why is that insufficient?  Why is

7    two times a year insufficient?

8        A.   Well, we expect that -- you know, I'm a

9    manager.  And as a leader we expect that we're

10   frequently with the teams giving feedback, observing

11   and helping them continue their -- be successful in

12   their jobs.

13       Q.   Okay.  Why is frequent feedback important

14   for success at Eastman?

15       A.   It gives the chance for questions.  It

16   gives the chance for the opportunity for the

17   employees to ask the leaders, hey, here's what I'm

18   trying to do.  How am I doing in this area?  They

19   have development, areas of development.  So you get

20   that, that frequent interaction.

21       Q.   So are official -- so the twice-a-year

22   reviews, are those documented?

23       A.   Yes.

24       Q.   Are the unofficial reviews documented?

25       A.   No, they are not.

Page 198

1      Q.   So how do the unofficial reviews occur?

2      A.   In many forms.

3      Q.   Okay.  Like what?

4      A.   Usually verbal.

5      Q.   Like a phone call?

6      A.   Could be, yes.

7      Q.   Do you guys prefer that they occur in

8   person or over the phone, does it matter?

9      A.   We don't -- we don't give that indication.

10      Q.   Okay.

11      A.   It's really the two, twice per year at

12   least that needs to be documented.

13      Q.   Okay.  But whether or not these unofficial

14   reviews are in person, over the phone or on Zoom,

15   Eastman doesn't have a preference?

16      A.   We want good judgment and a balance of

17   those.

18      Q.   Okay.

19      A.   We don't have -- we don't specify.

20      Q.   Should some of the unofficial reviews

21   occur in person?

22      A.   Yes, we believe so.

23      Q.   Okay.  Any idea how many a year should

24   occur in person?

25      A.   No.  But to, you know, give an example,

                                        Page 199

1    again, her supervisor had gone to see her four to

2    five times within the realm of the first several

3    months, I would say six months at least.  And so for

4    him to be there with her in that amount of time for

5    several days on each of those, it's the opportunity

6    for her to learn, for the coach and for him to give

7    her some feedback.

8              So an example would be they go in to

9    see a customer, first preparing what do you want to

10   accomplish, how do you feel about the meeting, what

11   questions are on your mind.  Afterwards, he'd be

12   asking her, how do you feel, how did it go.  That's

13   what we mean by that constant feedback loop.  And

14   then saying, hey, that was great.  You know, have

15   you thought about bringing this part of the topic or

16   part of the data into the conversation.  Those sort

17   of frequencies.

18        Q.   Okay.  So you think that the first couple

19   of ride-alongs between, I guess it would be Alan

20   Davis and Caylee Smith, happened within the first

21   six months of her employment; is that right?  Is

22   that what you said?

23        A.   Yes.

24        Q.   Okay.  Do you -- would that have meant

25   that those ride-alongs with Alan Davis occurred on

Page 200

1    or before September of 2021?

2         A.   Some of them certainly.   I don't know how

3    many.

4         Q.   Do you know how many ride-alongs happened

5    between October 2021 and April 2022 with Caylee?

6         A.   I do not.

7         Q.   Okay.   Is there any way to get a record of

8    that?   Would those be written down?

9         A.   I do not know.

10        Q.   Okay.   Alan Davis didn't tell you about

11   the October 2021 period through April 2022, how many

12   ride-alongs he did with Caylee?

13        A.   No.   You know, when I -- so our teams are

14   expected to be engaged with their teams.   We expect

15   them to manage kind of their -- and be the experts

16   in this.   I try to make sure at least that the

17   expectations in terms of -- you know, but not

18   necessarily having to check in and tell us how

19   frequent or what they do.

20        Q.   Okay.   But in preparing for this

21   deposition, I mean, you --

22        A.   No, I didn't ask him --

23        Q.   Okay.

24        A.   -- when exactly.

25        Q.   Okay.   Do you have any details on how

                                        Page 201

1      these ride-alongs with Caylee Smith went, like what
2      happened during them, what feedback was provided?
3            A.   To the extent -- so we didn't talk
4      specifically about which customers or which -- I
5      asked him what was the -- you know, what did you
6      observe, how did you, you know, feel about the
7      nature of her in her role.  And then also through
8      this, asked, you know what else did you talk to her
9      about what were the -- you know, so -- so a little
10     bit of content.
11           Q.   Okay.  Anything about, you know, where
12     she -- how she used her phone while driving or where
13     she mounted her phone or potential distractions in
14     the vehicle as she's driving?
15           A.   Yeah, I did ask him about that.  And what
16     he highlighted was that what he observed, you know,
17     is that she was using her phone mount and she was
18     setting GPS and that he didn't observe any concerns
19     with -- with distraction.
20           Q.   Okay.  And was it your testimony earlier
21     that Alan observed her setting the GPS before
22     starting driving; is that right?
23           A.   I believe so.
24           Q.   Okay.  Now, Alan is Caylee's supervisor,
25     right?

                                        Page 202

Appx_1408

```
1              A.    Right.
2              Q.    Okay.  So during the ride-alongs, Caylee
3        was driving and Alan was a passenger; is that right?
4              A.    Yes, that's correct.
5              Q.    Okay.  And is the purpose of that so he
6        can observe her driving habits?
7              A.    Yes.
8              Q.    Okay.  But Alan is Caylee's direct
9        report -- excuse me.  Caylee is Alan's direct
10       report, right?
11             A.    That is correct.
12             Q.    Okay.  So Alan can discipline Caylee,
13       correct, or could back when he was her supervisor,
14       right?
15             A.    Yes.
16             Q.    Okay.  Could he terminate her or recommend
17       her for termination?
18             A.    He could recommend her for termination,
19       certainly.
20             Q.    Would his recommendation of termination be
21       dispositive or do you know?  Like if Alan says, hey,
22       we need to fire Caylee, would Caylee be fired or is
23       there some additional conversation that happens?
24             A.    We always try to ensure that in the
25       situation of termination, we have given -- we have
```

Page 203

```
 1    documented kind of the cause.  We've also made sure
 2    that there was ample coaching, expectation and
 3    ability to correct, unless it's something egregious,
 4    breaking the law, the ability to correct that.  And
 5    then that's where, like that could can be an example
 6    where there'd be a documented discussion, that says
 7    you're falling short on -- you know, this is why you
 8    need to be terminated or by document.
 9             So we believe -- we believe that we
10    need to give right justification of cause as much as
11    we can and the ability for our team members to then,
12    you know, correct.  So it doesn't happen immediately
13    unless there's something that is a gross violation
14    or breaking the law or things like that.
15        Q.   Okay.  But breaking the law would lead to
16    immediate termination or, you know, are there
17    exceptions?  I'm just trying to figure out --
18        A.   It totally depends.
19        Q.   Depends on which law?
20        A.   Probably.
21        Q.   Okay.  Are there any -- what laws would
22    not lead -- if you broke -- what laws, if broken by
23    an Eastman employee, wouldn't lead to immediate
24    termination?
25             MR. DuBOFF:  Objection to the form.
```

Page 204

Appx_1410

```
 1              THE WITNESS:  I'd be speculating.
 2         Q.  (By Mr. White)  Go ahead.
 3         A.   Crosswalking.  If I were in the city and I
 4    crosswalk, I would not expect that to result in
 5    violation or termination.
 6         Q.   Okay.  So I think you testified to this
 7    earlier.  Caylee Smith never received any warnings
 8    or reprimands from Eastman about her driving prior
 9    to the accident, right?
10         A.   She -- she did not receive any warnings or
11    reprimands undocumented at all.
12         Q.   Any undocumented --
13         A.   No.
14         Q.   -- warnings or reprimands that you've
15    learned about?
16         A.   No.
17         Q.   Okay.  So was there any instance where
18    Caylee Smith's driving behavior was a topic of
19    concern amongst her supervisors?
20         A.   Yeah.  So there's some documentation of --
21    of -- let's see.  So Caylee Smith in 2021, I think
22    it was in June, was in -- was in -- was in a minor
23    fender-bender, had an accident.  And so there was
24    conversation post that.  She notified, she
25    communicated the incident.  And so through that,
```

Page 205

1      yes, there were conversations.  And then also

2      there's some documentation of those in her

3      performance review.

4           Q.   Okay.  Well, and that's -- I was going to

5      hit that a little bit later, but let's -- we can

6      talk about that right now.

7                So would Eastman -- I mean, what did

8      Eastman do following the report of the June 2021

9      accident involving Caylee?

10          A.   So my understanding is that she reported

11     it.  She had -- they had made the call to the

12     police.  The police actually said, is anybody

13     injured, do you guys know what occurred, did you

14     exchange insurance.  And the police told them to --

15     to move out of the way of traffic essentially, go,

16     and that they were not going to come out.  So

17     there's not a police report.

18               We got information from Caylee.  She

19     communicated also through to Donlen and followed the

20     procedure.  And through that, as you can see in the

21     performance reviews and discussion, she even says

22     that she did not -- she was not -- I think she rated

23     herself as not fully performing where she needed to

24     be because of that incident in terms of incidents or

25     safety.

Page 206

1          Q.    Okay.  So you talked a little bit about

2     how the police told them to get off the road, didn't

3     make a police report --

4          A.    And I was spec- -- this is that I was told

5     from them in terms of the police not coming out.  I

6     don't know if they told them to get off the road.

7     I'm sorry.

8          Q.    Yeah.  No, but when -- when you say that,

9     who -- who told you that?

10               MR. DuBOFF:  I'm going to object as to

11          who -- who you mean by "who."

12          Q.  (By Mr. White)  Okay.  Who -- who told you

13     the substance of what happened at the June 2021

14     accident?

15               MR. DuBOFF:  Sorry.  Do you mean in

16          preparation for today or back in --

17          Q.  (By Mr. White)  Sorry.  Yes.  Yeah, yeah,

18     yeah.

19                    So having prepared for this

20     deposition, right, who, if anyone, have -- has given

21     you the details about what happened in the June 2021

22     accident involving Caylee?

23          A.    I believe that was the recollection of her

24     boss at that time.

25          Q.    Which would be Alan Davis?

Page 207

1          A.   Yes.  And I don't recall, but I know there

2     was -- I believe there was a Donlen report.  And I

3     don't remember if it indicated that specifically or

4     not, but it did provide the report.

5          Q.   So -- and if you don't know, you don't

6     know.  What Alan Davis knows about the accident

7     would either have been derived from the Donlen

8     report or what Caylee told him, right?

9          A.   Yes, that would be right.

10          Q.   Would there be -- would Alan have reached

11     out to the police independently?

12          A.   No, I do not believe so.

13          Q.   Okay.  So since there's no police report,

14     the only documentary evidence of the June 2021

15     accident is the Donlen report, right?

16          A.   I believe that is right, yes.

17          Q.   Okay.  How is the Donlen report generated?

18          A.   Those are typically generated from the

19     employee calling verbally communicating what

20     happened and someone dictating and writing down what

21     happened from Donlen into their report.

22          Q.   Okay.  Is that -- that's your

23     understanding of how those Donlen reports are

24     generated?

25          A.   It is.  In the event that the individual's

Page 208

```
 1    not able or needs some help, sometimes the --
 2    sometimes their supervisor or someone else will try
 3    to transcribe it.  But, no, typically it is the
 4    individual that does that.
 5         Q.   Okay.  Okay.  And do you have any reason
 6    to think that the June 2021 Donlen report was made
 7    by anybody but Caylee?
 8         A.   No, I do not.
 9         Q.   Okay.  Okay.  So everything that Eastman
10    knows about the June 2021 accident comes from
11    Caylee?
12         A.   Right.
13                        (Whereupon Exhibit 4 was
14                         introduced for identification.)
15         Q.   (By Mr. White)  Okay.  So let's go to Tab
16    4, right.  So this is the Donlen report -- well, I
17    guess do you recognize this document?
18         A.   Yes.
19         Q.   Okay.  So what is this, Plaintiff's
20    Exhibit 4?  In your own words, tell me what you
21    think it is.
22         A.   Oh, this is a report of -- from our
23    company called Donlen who produces reports and CEI
24    Group produces reports of moving incident -- or
25    vehicle incident.
```

Page 209

Appx_1415

1    Q.   So if you'll look down sort of in the

2    middle of the page it says, description of the

3    report, what is the description of the accident?

4    A.   Yes.  So it says:  I was traveling north

5    of Mopac 1 Highway in Austin, Texas, when a vehicle

6    in front of me slammed on their brakes.  Was not

7    able to stop in time and I struck the rear end of

8    the vehicle.

9             Yeah.  It shows above it, the

10   conditions and the speed limit, and traveling speed

11   being 10 miles an hour.

12   Q.   Okay.  Now, if you go to the second page

13   of this report, there's a phone number for Hector

14   Acosta, the other driver.  Do you see that?

15   A.   Yes.

16   Q.   Okay.  Would Eastman have called Hector

17   and got his version of events?

18   A.   I do not believe Eastman would.  I believe

19   that we would expect Donlen or the insurance.  I

20   don't know if our risk manager does.  I do not

21   believe we do.

22   Q.   Okay.  But you're not aware of any

23   statement taken by Donlen or its agents of Hector --

24   from Hector Acosta?

25   A.   I am not.

Page 210

1     Q.   Okay.  Do you think someone should have or

2   was it -- was it fine not to call him on this case?

3     A.   I believe it was not something that was

4   necessary to do.

5     Q.   Okay.  How come?

6     A.   I don't know -- I don't know there was

7   anything in dispute.  There was -- you know, there

8   was the documentation taken.  And I shouldn't, but I

9   assume, they got information around insurance and

10  needs and things.  I don't know.

11    Q.   Was there an insurance claim made arising

12  out of this accident?

13    A.   I don't even know.

14    Q.   Okay.  If there was one, would Eastman

15  have a record of that or does that all go through

16  Donlen?

17    A.   I would think that if there was one, we

18  should be able to get it, but I don't recall.

19    Q.   Okay.  So if -- as Caylee says here, can

20  we agree Caylee says she rear-ended this Hector

21  gentleman?

22         MR. DuBOFF:  Objection to form.

23    A.   This captures that Caylee said that.  I

24  think later in -- I think there's -- you know,

25  whether or not she said this explicitly, but it does

Page 211

1    say that I struck the rear of that vehicle.

2         Q.  (By Mr. White)  Well, so what else are you

3    thinking about?  Your answer -- you seem like you're

4    contemplating some further statement by her?

5         A.   No, no, no.  I just don't know if that was

6    exactly what she said or whether it was summarized.

7         Q.   Okay.  Fair enough.

8              But it does -- I mean, do you have

9    any reason to dispute --

10        A.   I do not.

11        Q.   -- that this is her version of events?

12        A.   No, I do not.

13        Q.   So based on the description of the

14   accident, would you say that Caylee's taken

15   responsibility for this wreck?

16        A.   Based on what I'm reading, I do.

17        Q.   Okay.  How come?

18        A.   Well, if she stated --

19             THE COURT REPORTER:  I'm sorry.  Speak up

20        and slow down.

21        A.   Sorry.

22              If she stated that she wasn't able to

23   stop in time after the vehicle in front of her

24   slammed on their breaks, then, yes, I think she's

25   taking some accountability.

                                        Page 212

1      Q.   (By Mr. White)   Okay.   Do you think by

2  saying the vehicle in front of her slammed on their

3  brakes, she's saying she didn't have enough time to

4  react?

5      A.    Possibly.   I don't know.

6      Q.   Okay.   Does that -- you know, as an

7  Eastman manager, does that cause you any concern

8  regarding her acceptance of responsibility?

9      A.   No, not necessarily.

10      Q.   Okay.   How come?

11      A.   Well, she followed the process.   She

12  provided her -- it doesn't seem that she is avoiding

13  any acknowledgement that in this situation, she

14  hit -- you know, she hit the rear end of the

15  vehicle.

16      Q.   Okay.   So what did Eastman do in response

17  to learning about this June 2021 accident?

18      A.   So I know that her and her supervisors

19  talked through it.   They talked through the -- the

20  nature of it.   You know, as -- as it says, there was

21  interstate traffic that was going, you know,

22  10 miles an hour.   There was no reason to doubt that

23  based on the other information that, you know, we

24  had.

25                 And so they spoke through, you know,

                                      Page 213

Appx_1419

1    how she was going to continue to improve and make

2    sure -- just not necessarily improve, but focus on,

3    you know, could you have avoided it, could you be

4    doing something different.  So I believe they had

5    those sort of conversations.  I don't have anything

6    documented on it.

7         Q.   Okay.  Do you know any -- anything more

8    specific about those conversations with Caylee

9    following the June 2021 accident?

10        A.   Yeah.  What -- what I see is the

11   documentation of it both midyear review and then

12   also the end-of-the-year review where there was a

13   clear statement from her and her supervisor that in

14   that part of her responsibility, she was a needs

15   improvement.

16        Q.   Okay.  Okay.  Did -- are you aware of any

17   additional training, coaching, mentoring that

18   Eastman gave to Caylee as a result of the June 2021

19   accident?

20        A.   I know there were ongoing conversations in

21   frequency, but I don't know of any specific

22   training.

23        Q.   Okay.

24        A.   Or there was not any specific.

25        Q.   So no one forwarded her the -- forwarded

Page 214

1    her the distracted driving policy following this --
2    the June 2021 accident, nothing like that, right?
3         A.   I do not know if they did.
4         Q.   Okay.  Do you think they should have or
5    just based on this report, do you think the reaction
6    was appropriate?
7         A.   I don't know.  You know, could be a
8    good -- good next step.  But I don't know what they
9    did.  They might have.  I don't know if they did or
10   not.
11        Q.   Okay.  You just don't know?
12        A.   That's right.
13        Q.   Okay.  So go back to Exhibit 2, Page 107,
14   if you don't mind.  Okay.  So I think we talked
15   about this earlier, just want to make sure.  Line 13
16   I said:  After the accident, were you given any
17   additional training related to distracted driving?
18                    Answer:  Not that I can recall.
19                    Do you understand her testimony
20   there?
21        A.   Is this the same one we looked at earlier?
22        Q.   Yes, ma'am.
23        A.   So I thought when you were talking about
24   accident -- it's fine.  I thought when you were
25   talking about the accident, you were talking about

                                        Page 215

1    the one we -- that was in March.  But now, was this

2    one related to --

3         Q.   This would have been the June 20 -- or

4    this would be the -- excuse me -- April of 2022

5    accident that we're discussing on Page 107.

6         A.   Okay.

7              MR. DuBOFF:  So what's the question?

8         Sorry.

9         Q.  (By Mr. White)  Yeah, yeah, I just want to

10   make sure if you understand that testimony, right?

11   She says she didn't get any additional training on

12   distracted driving following the April 2022

13   accident.  She says she doesn't remember.

14        A.   Okay.  So this is a -- this is a different

15   accident than we were just talking about?

16        Q.   Correct.  Correct.

17        A.   Okay.

18        Q.   Yes.

19        A.   Yes.

20        Q.   She's been in enough accidents.  It gets a

21   little confusing, right?

22                   So was -- what additional supervision

23   did Eastman give Caylee after the June 2021

24   accident?

25        A.   So, look, this was her first -- it was a

                                          Page  216

1    slow moving violation.  Not even a violation.  There

2    was no police record of it.  She disclosed -- so we

3    did not add to additional supervision.  There was

4    certainly discussions, documentation and

5    expectation.

6                Now, what -- what her management said

7    is that, you know, they had multiple and they

8    documented some conversations around how they were

9    going to be focusing on, you know, continued

10   improvements.  And not just this, but other parts

11   of, you know, her area.  So there was no specific

12   additional training or supervision provided.

13       Q.   Okay.  After the -- just to be clear,

14   after the June 2021 accident, right?

15       A.   After the bumper, the fender-bender, yes,

16   that's right.

17            MR. WHITE:  Okay.  Okay.  So let's go to

18       Exhibit 5.

19                      (Whereupon Exhibit 5 was

20                       introduced for identification.)

21       Q.   (By Mr. White)  Do you recognize this

22   document?  I think we've discussed it for a little

23   bit.

24       A.   Yes.

25       Q.   Just for the record, what is this

                                        Page 217

Appx_1423

1        document?

2            A.    This is a plan for automobile lease.  It's

3        an operating procedure for -- plan for automobile

4        lease.

5            Q.    Okay.  So in here, I think we talked

6        earlier about how it does talk about -- this SOP

7        does talk about how Caylee needs to report her

8        personal business mileage.  Do you agree with that?

9            A.    I do, yes.

10           Q.    Does Eastman have access to those reports

11       or are those reports with Donlen?

12           A.    I think the reports are with Donlen.  I do

13       not know if we have access.  I would guess we do.

14           Q.    Okay.  But you've never seen those mileage

15       reports before?

16           A.    I have not.  I've had not -- no need to

17       see those.

18           Q.    Okay.  If you can, I want to go to Section

19       14 of this policy.  So that's on Bates No. 412.

20           A.    Okay.

21           Q.    So can you read this first paragraph under

22       safety?

23           A.    Uh-huh.  It is the driver's responsibility

24       to operate the automobile in such a manner to

25       prevent injuries and property damage.  All drivers

                                          Page 218

1     are expected to observe speed limits and to drive

2     within the law.

3          Q.   Okay.  So why is it important that drivers

4     observe speed limits and drive within the law?

5          A.   For their safety and those around them.

6          Q.   Okay.  And so that is, in fact, Eastman's

7     expectation that that's what its drivers should be

8     doing, correct?

9          A.   Yes.

10         Q.   Okay.  Now, Eastman doesn't have any

11    ongoing method of enforcement to enforce that

12    folks -- that its drivers are following the speed

13    limits and driving within the law, right?

14         A.   That's correct.  Not other than what the

15    normal course of roadside is.

16         Q.   What do you mean by that?

17         A.   Well, I mean the obligations of

18    individuals as they're driving.  But, no, there's

19    nothing we monitor.

20         Q.   Okay.  So you agree that Eastman has an

21    obligation to try to get its employees to observe

22    speed limits and other traffic laws, right?

23              MR. DuBOFF:  Object to the form, calls for

24         a legal conclusion.

25         A.   Yeah, I'm not a legal -- I don't think

Page 219

Appx_1425

```
 1    Eastman has an obligation.  So, no, I don't know

 2    that it's an obligation.  I think we take it upon

 3    ourselves to make sure we try to reinforce policies

 4    and guidance that keep our employees safe and those

 5    around them.

 6         Q.  (By Mr. White)  But Eastman's guidance to

 7    its employees is that they should be following

 8    traffic laws, right?

 9         A.  Sure, yes.

10         Q.  And if Eastman discovers that its

11    employees are not, for example, observing speed

12    limits, is it possible that there might be

13    disciplinary actions against that employee?

14         A.  It is possible, yes.

15         Q.  Okay.  Is it probable?

16         MR. DuBOFF:  Objection to the form.

17         A.  You know, I cannot say that I have had an

18    employee come after -- or I cannot say that -- that

19    it is a cause for an employment disciplinary action

20    or that -- if an individual gets a ticket.

21         Q.  (By Mr. White)  Okay.  Okay.  It would just

22    have to depend on what the ticket was, right?

23         A.  Yes.

24         Q.  Okay.  And it would have to depend on

25    Eastman knowing about the ticket, right?
```

Page 220

Appx_1426

1        A.    That's correct.

2        Q.    Okay.  And y'all are -- Eastman is not

3    going to get a Donlen report if somebody just gets a

4    ticket, right?

5        A.    That is correct.

6        Q.    Donlen only gets involved when some sort

7    of two-vehicle accident or some sort of insurance

8    claim is being made, right?

9        A.    That is correct.  The expectation of all

10   sales employees driving in an Eastman vehicle,

11   Eastman leased vehicle is that if they have a moving

12   violation of any -- that they report that.

13       Q.    Okay.  But there's no way to enforce that,

14   right, because you guys are not doing active

15   monitoring of folks driving?

16       A.    Probably right, in practicality.

17       Q.    So -- okay.  Do you see on this exhibit,

18   the auto lease standard operating procedure -- we're

19   still on Bates 412.  Do you see the line, beneath

20   numbered Paragraph 3 that starts with "our goal"?

21       A.    Yes.

22       Q.    All right.  Can you read that?

23       A.    Excuse me.  Our goal with these guidelines

24   is to raise awareness and confirm personal

25   accountability for safety in our jobs.

Page 221

1      Q.   Okay.  So why is personal accountability

2    for safety important to Eastman?

3      A.   Because we cannot be there with

4    individuals when they're doing their jobs.  Personal

5    accountability is important to us because you can't

6    monitor everything everyone does.

7      Q.   Okay.  So because it's impossible for

8    Eastman to be everywhere all at once, they have to,

9    I guess, imbue their employees with a sense of

10   personal responsibility for safety; is that your

11   testimony?

12     A.   I think that is the goal.  But also,

13   because we care about them and because we care about

14   the employee base and our -- we want -- you know,

15   there's been different mantras of because we care,

16   we choose to act.  Because we -- you know, all in

17   for safety.  These are very important for us.  So,

18   yes, we want -- we want this to be top of mind and

19   that each of our team members take accountability

20   for their own safety and recognize the safety of

21   those around them.

22     Q.   So you used a phrase, it sounds like it

23   was probably a safety slogan.  "Because we care, we

24   choose to act."

25     A.   Yeah.  It's been a slogan we've used in

Page 222

1    the past.

2         Q.   Okay.  So what's that mean?

3         A.   If we see somebody doing something

4    dangerous in the manufacturing plant or we see them,

5    you know, jumping over something, we choose to say,

6    hey, you know, that's probably not the safest.  If

7    someone's going down the stairs without holding the

8    handrail, it's embarrassing sometimes to say, hey,

9    dude, grab the handrail.  But because we care, we

10   choose to act and might suggest that.  So it's a --

11   it is really around caring about those around you.

12        Q.   So that's a big part of Eastman culture,

13   correct?

14        A.   It is.

15        Q.   And is it, in fact, the case that Eastman

16   employees are encouraged that if they saw someone

17   walking down the stairs without holding the

18   handrail, they'd say something?

19        A.   We do encourage them to do that, yes.

20        Q.   Okay.  So -- and I'm not making fun.  I

21   think that's great, right?  But that's -- that's how

22   important safety is to Eastman?

23        A.   Yes.

24        Q.   Okay.  So if you can flip to Bates label

25   416 on this same exhibit.  So can you tell us what

Page 223

Appx_1429

```
 1    this document is?
 2         A.   So this is the Attachment 1 from the same
 3    standard operating procedure.  It defines -- it's
 4    Attachment 1.  It's got definitions.  But a moving
 5    violation is defined.  Different accidents,
 6    avoidable accident.  It has definitions on it.
 7         Q.   Okay.  All right.  So are these the
 8    definitions that then feed into what looks like a
 9    rubric on Page 417?
10         A.   Yes.
11         Q.   Okay.  So would Caylee's June -- yeah --
12    June 2021 accident, what -- Sorry.  Strike that.
13              Caylee's June 2021 accident, which of
14    these categories would it have fallen into as
15    defined on Page 416 of this policy?
16         A.   I believe that as through the
17    conversations that I've had with her supervisor and
18    I've have seen this, it could have fallen into and
19    it did fall into an avoidable accident.
20         Q.   Okay.  So was it officially -- sorry.  Let
21    me be specific.
22              Was the June 2021 accident officially
23    categorized as an avoidable accident in Caylee's
24    personnel file or anywhere?
25         A.   You know, I didn't see it documented in
```

Page 224

Appx_1430

1    her personnel file.  Through the conversations I've

2    had with the team or with her leadership, yes, that

3    was the discussion of how could you have avoided

4    this, you know, how might you have avoided this.

5    And they did discuss it, she and them, about this

6    being an avoidable potential accident.  Recognizing.

7        Q.   Okay.  So were any policies violated or

8    overlooked in not documenting that she had been in

9    an avoidable accident, other than, you know, the

10   performance reviews and the Donlen report; should

11   there have been a different document generated?

12       A.   No, not that I'm aware.

13       Q.   Okay.  So what is the policy after an

14   employee's -- excuse me.  Strike that.

15                 What is Eastman's policy and response

16   when an employee's in their first avoidable

17   accident?

18       A.   We don't.  We capture, per the

19   documentation within the Donlen report.  There is

20   the discussion between the individual and their

21   supervisor and the continued coaching.  There's

22   not -- there's not a specific policy on -- on a --

23       Q.   Okay.  So --

24       A.   -- on a minor accident.

25       Q.   Okay.  Well, I didn't ask about a minor

Page 225

1    accident, right?  Is it that it was her first

2    avoidable accident; is that why there was no

3    response?

4        A.    That's not why.  It's just that there --

5    and there was response.  So I -- but there's not a

6    documentation other than the Donlen report for it.

7        Q.    Okay.  Now, when you say there was

8    response, you mean the coaching that she received

9    from Alan Davis following her first accident, right?

10       A.    Right.

11       Q.    Okay.

12       A.    As well as, I think, next supervisor up,

13   Eric Holmes, he said he had talked with her about it

14   as well.

15       Q.    So Eric and Alan spoke with her following

16   the June 2021 accident?

17       A.    That's my understanding, yes.

18       Q.    And both those conversations involved

19   coaching?

20       A.    Yes.

21       Q.    Do you know what kind of coaching?

22       A.    I think it was probably exploring and

23   trying to draw out of her what she -- I do not.  But

24   I think it was probably reminders of the policy, as

25   well as -- and just, you know, good practice, as

Page 226

Appx_1432

1    well as asking questions of her.

2         Q.   But you're -- but you're speculating --

3         A.   That's right.

4         Q.   -- you don't actually know what the

5    substance of the conversations with Caylee with her

6    supervisors following the June 2021 accident were?

7         A.   Correct.

8         Q.   Okay.  So I just want to go to Page 417 on

9    this exhibit, Exhibit 5.  So I see here that it says

10   Level 1 -- correct me if I'm wrong -- a total of two

11   avoidable accidents within a 24-month period.  And

12   then there's a management response.  Can you read

13   what the management response is if an employee is in

14   a total of two avoidable accidents within a 24-month

15   period?

16        A.   The management response is a review of

17   overall safety/employment record.  At a minimum, the

18   employee will be required to attend an approved

19   defensive driving class.  And then other

20   restrictions, if applied, would be documented in an

21   action plan by the employee's supervisor.

22        Q.   Okay.  Why -- is there anything on this

23   rubric that requires a management response after one

24   avoidable accident?

25        A.   There is not documentation.

Page 227

1        Q.   Okay.  Do you know why?

2        A.   No, I do not.

3        Q.   Okay.  Do you think there should be a

4    management response following one avoidable

5    accident?

6        A.   I don't know if it needs to be a change to

7    the procedure, no, I don't.

8        Q.   Okay.  So you think that it should be up

9    to -- well, I don't want to put words in your mouth.

10   What do you think the management response should be

11   following an employee's first avoidable accident?

12            MR. DuBOFF:  Objection to the form.

13       A.   I think it's a case by case.  I do think

14   it is, you know, the supervision having to evaluate,

15   having to discuss, understanding the situation.

16   Again, this was a 10-mile-an-hour move.  No

17   injuries, no -- no hurt.  She was very forthcoming

18   in terms of what she, you know, disclosed about it

19   happening.  And so I think it depends on the

20   situation.

21       Q.   (By Mr. White)  Now, what you know about

22   the June 2021 accident and you're -- the discussion

23   you just gave about the reaction to it that's

24   appropriate, that's all based on what Caylee said

25   happened in the June 2021 accident, right?

Page 228

```
 1              A.    Right.
 2              Q.    And East- -- Eastman made no independent
 3       investigation of the facts of that accident, other
 4       than getting Caylee's statement from Donlen, right?
 5              A.    I do not know what other conversations
 6       Donlen had or if Donlen spoke to the other
 7       insurance.
 8              Q.    Okay.  So you're just unaware if there was
 9       any additional investigation?
10              A.    That's right.
11              Q.    Okay.  So I want to go back to 416 on
12       this.  Would Eastman define the April 30, 2022 crash
13       as an avoidable accident or just an accident or a
14       serious driving offense?
15              A.    So I believe it is an accident.  I
16       don't -- we don't know and based on the information
17       that was provided, we certainly weren't aware and
18       couldn't evaluate whether or not it was avoidable or
19       not.  There was an individual standing in the middle
20       of the road.
21              Q.    Okay.  And now, that's -- the information
22       you have regarding the facts of the case are -- from
23       Eastman's perspective, were from the police report
24       and what Caylee told Eastman, right?
25              A.    Yes.  And I think there's probably been
```

Page 229

Appx_1435

1      other, you know, work to try to understand around

2      it, yes.

3           Q.   Okay.  So if Caylee was speeding when she

4      struck Nehemias Santos, does that change what sort

5      of accident under this definition, how Eastman would

6      describe this accident?

7           A.   You know, it could.  It could.  Again,

8      we -- we want our employees to be following the

9      speed -- the speed limits and, you know, following

10     our policy or following, you know, non-distraction.

11     So it could.

12          Q.   Okay.  So what would -- if she was

13     speeding, what type of accident would the June --

14     the April 30, 2022 accident be categorized as?

15               MR. DuBOFF:  Objection to the form.

16          A.   It could be potentially avoidable, but I

17     do not know.  I think there's -- yeah.  I mean,

18     there's -- it says avoidable is an accident where

19     the driver did not use reasonable care to prevent

20     the occurrence.  I don't know whether reasonable

21     care was taken or not, to be honest with you.  I

22     believe -- I believe there was.  But I don't know

23     all the incidents of the situation itself.

24          Q.   (By Mr. White)  Okay.  But you did review

25     Caylee's deposition, parts of it at least, before

Page 230

Appx_1436

 1    coming here today?

 2         A.    Parts of hers, yes.

 3         Q.    Did you review the parts of her deposition

 4    where she described what she was doing on approach

 5    to the vehicle that was carrying Nehemias Santos?

 6         A.    Yes.

 7         Q.    Okay.  So based on your review of her

 8    testimony, you're still not sure if she used

 9    reasonable care to prevent an accident?

10         A.    Well, again, what occurred in that

11    accident, the moment of time when she sees

12    Mr. Santos in her driving pathway, I can't make a

13    statement of whether she used sufficient reasonable

14    care at that time.

15         Q.    Okay.  All right.  So according to

16    Eastman, did Caylee violate Eastman's distracted

17    driving policy on April 30, 2022?

18         A.    I'm sorry.  Can you repeat it?

19         Q.    Yeah.

20               According to Eastman, right, in your

21    investigation and review of -- everything that you

22    reviewed to get ready for today, did Caylee violate

23    Eastman's distracted driving policy on April 30,

24    2022?

25         A.    You know, I'm not sure.  Because since --

                                          Page 231

Appx_1437

```
 1      since and during that much of the discussion has
 2      taken place with our HR, our legal, attorneys.  So
 3      as I've engaged with -- now, you know, I can't say
 4      that she was -- that she was violating that.  What I
 5      saw, from what I heard a reference was that she was
 6      activating with her finger maybe a text or
 7      activating.  So I've not seen definitive violation.
 8      But there's certainly things that, you know --
 9      that -- that might have -- I just don't know if she
10      was or not.
11                   MR. WHITE:  Okay.  So let's go to
12           Exhibit 6.
13                   MR. DuBOFF:  Can we take a break, Jacob?
14                   MR. WHITE:  Sure, sure.
15                   MR. DuBOFF:  We've been going for a good
16           bit.
17                   THE VIDEOGRAPHER:  Stand by.  The time is
18           2:29 p.m. and we are off the record.
19                            (Whereupon there was a short
20                            break.)
21                   THE VIDEOGRAPHER:  The time is 2:48 and we
22           are back on the record.
23                            (Whereupon Exhibit 6 was
24                            introduced for identification.)
25                   MR. WHITE:  This is Jacob White, counsel
```

                                    Page 232

Appx_1438

```
 1              for Plaintiff.
 2         Q.   (By Mr. White)   Erin, I think right before
 3    the break, I asked you to look at Exhibit 6 in
 4    the -- in this binder.  Do you see that in front of
 5    you?
 6         A.   Yes.
 7         Q.   What is this document, if you know?
 8         A.   This is the DENR report I was referring
 9    to.  So it's development and evaluation review for a
10    new employee.
11         Q.   Perfect.  Okay.  So we talked a little bit
12    about how she success -- Caylee successfully passed
13    her DENR, right?
14         A.   Yes.
15         Q.   Okay.  So do you see on here, do you have
16    any idea when this created, this document was
17    created?
18         A.   This looks like the final review.  So it
19    is -- let's see.  Last time -- it looks like 3/7/22.
20    I don't know.  It was signed in April, early April
21    of 2022.  But I think it is intended to be the
22    review of her 12-month, first-year employment.
23         Q.   Okay.  So take a second to look at this.
24    But my question is, does this document anywhere
25    reference Caylee's June 2021 crash?
```

Page 233

1        A.    Let's see.  No, I do not see reference to

2    that.

3        Q.    Okay.  If you know, why is that crash not

4    referenced in the DENR document?

5        A.    I do not know.

6        Q.    Okay.  Should it have been?

7        A.    Not necessarily.  I saw it referenced in

8    her documented annual performance reviews which

9    were, I think, probably in June of -- sorry -- July

10   of the prior year.

11       Q.    You mean July of 2021?

12       A.    Yes.

13       Q.    Okay.

14       A.    And then it was also documented in her

15   year-end review, because that carries into it.  And

16   they -- so I believe -- which was we usually finish

17   those December or January.  So this would have come

18   after that.  I don't know why.  The leader may have

19   felt that he had documented it and that she was

20   sufficiently responding to it based on his

21   observations and...

22       Q.    Okay.  So if you can turn to the page

23   that's Bates labeled 838 in this document.  Just let

24   me know when you're there.

25       A.    Yes.

                                          Page 234

1         Q.   Okay.  So under safety and environmental

2    awareness, can you read what it appears Alan Davis

3    wrote in there?  And correct me if it's not Alan

4    Davis that would have written it.

5         A.   Yes.  It says:  Caylee understands

6    Eastman's stance on all in for safety.  And she

7    continually conducts her job in a safe manner.

8    She's aware of surroundings, does not put her

9    personal safety at risk.

10        Q.   If -- okay.  Thank you.

11             If the wreck was -- the June 2021

12   wreck was going to be referenced in this DENR, is

13   that -- it should have gone under the safety and

14   environmental awareness section?

15        A.   Let me check here.  It could go there.  It

16   could go there.  Just recognizing that it was

17   captured and documented elsewhere, it's not

18   necessary even, again, if this was after they had

19   already officially documented it in the year-end

20   close.  But it would go there -- but it could go

21   there.

22        Q.   Is there a different spot on this DENR

23   form where it should have been referenced or is --

24        A.   No.

25        Q.   -- the safety and environmental awareness

Page 235

```
 1    the best spot if it was going to be put in here?
 2         A.   That would be the logical place to put it.
 3              MR. WHITE:  Okay.  So let's go to Exhibit
 4         No. 7, if you'll flip to that.
 5                        (Whereupon Exhibit 7 was
 6                        introduced for identification.)
 7         Q.  (By Mr. White)  Can you tell me what this
 8    document is?
 9         A.   Okay.  This is the 2021 performance
10    assessment for Caylee.
11         Q.   Okay.  So not a trick question.  I just
12    want to make sure I understand it.  When was this
13    document generated?
14         A.   This document has a continuation of
15    comments that probably started at the very beginning
16    or when she became an employee to set her targets.
17    Then it captures some comments in the middle of the
18    year where it's June or July.  And then it continues
19    to capture comments at the end of the year.  So it's
20    a running capture.
21         Q.   So this is an evolving document over the
22    year?
23         A.   Yes.
24         Q.   Okay.  So if you go to the last page of
25    it, I think it's Bates labeled 2424.  It appears
```

Page 236

Appx_1442

```
 1    that Caylee Smith acknowledged this on January 4,

 2    2022, but I just want to make sure I understand this

 3    document correctly.

 4         A.   Okay.  Sorry for that.

 5         Q.   You're fine.

 6         A.   Oh, yes.  Okay.

 7         Q.   Is that right?

 8         A.   Yes.  On January 4, 2022.

 9         Q.   So should there be a signature here or is

10    this some sort of E signature situation?

11         A.   It looks like an E signature.  There's --

12    these are normally not printed out.

13         Q.   Okay.  Okay.  So let's see here.  On the

14    very first page of this exhibit, it has employee

15    midyear comments.  Can you read her midyear comment

16    under all in for safety, zero incident safety

17    culture?

18         A.   Yes.  On Page 8, on the 08 reference, the

19    first one?

20         Q.   Yes, that's correct.  Page 2408, I guess.

21         A.   Okay.  Yes.  Her comment is:  Needs

22    improvement based on previous events that have

23    occurred this year, will continue to strive for safe

24    work environment.

25         Q.   Do you know which incidents she's
```

Page 237

1    referring to?

2         A.    I asked.  In my understanding and what

3    we've concluded from that is the -- is the accident

4    in June where she had a fender-bender.

5         Q.    Okay.  You know, I read that and I saw

6    that she said plural events.  So do you understand

7    that she's just referring to the June 2021 incident?

8         A.    That -- that's my understanding.

9         Q.    Okay.  You don't have any reason to think

10   there was another event that she's referring to in

11   this paragraph?

12        A.    I do not, no.

13        Q.    Okay.  So then if you could read her final

14   comments under the same section.

15        A.    Continuing to be safe on the road and

16   avoid potential accidents by staying aware of my

17   surroundings while driving.

18        Q.    Okay.  So this is Caylee's comment?

19        A.    It is.

20        Q.    So how does she add comments to this

21   document?

22        A.    Yeah.  So often times the process is the

23   employee adds comments.  And the supervisor will

24   either add comments themselves or will review those.

25   And they can edit.  They will have in real time,

Page 238

1    editing with the individual during those reviews.
2    And so, you know, in talking with Alan, he said he
3    communicated and talked through those with her.  But
4    she's the one that's actually doing the editing in
5    the system.
6        Q.   Okay.  So would -- is it possible to see
7    what she initially put in there and then her final
8    version or is -- does this document just capture the
9    final --
10       A.   It cap- -- it captures the final version.
11       Q.   Did Alan tell you about what her prior
12   statements said on this or if any edits were made?
13       A.   No, he didn't indicate that any edits were
14   made.
15       Q.   Okay.  So you don't know if edits were
16   made or not made; you just don't know?
17       A.   Correct.
18       Q.   Okay.  If we can go to the page it's Bates
19   2411 in the same document.
20       A.   Okay.
21       Q.   So under Executive CORE Cut-Over Sales
22   Team, there's a section, employee final comments
23   where Caylee says:  My trainer and I have traveled
24   to each account and installed CORE.
25            Do you know who her trainer was?

                        Page 239

Appx_1445

1      A.   I believe she is referring to her -- I

2   don't know for sure.  I believe she's referring to

3   one of her technical services trainers that supports

4   her in the territory.

5      Q.   Okay.  Do you know that person's name?

6      A.   I do not.

7      Q.   Would it be more than one person

8   potentially or is there only one tech services

9   trainer in her region?

10     A.   It could be more than one, but it's likely

11  one.

12     Q.   Okay.

13     A.   Usually they try to...

14     Q.   Do you know who that likely one is?

15     A.   I do not.

16     Q.   Okay.  Okay.  So let's go to 2412, one

17  page over.  All right.  So if you'll go down to the

18  bottom of this page where it says, supervisor.  Can

19  you read the last sentence of his comment?

20     A.   Yes.  So she has a firm understanding of

21  all-in-for-safety mindset and despite a minor

22  accident earlier this year, she continues to strive

23  to deliver on this goal.

24     Q.   Okay.  So to your knowledge, what does

25  firm understanding of the all-in-for-safety mindset

Page 240

Appx_1446

```
 1    mean?
 2         A.   I cannot say what he means by that.
 3         Q.   Okay.  So you don't know?
 4         A.   No.
 5         Q.   Okay.  Do you think that this comment by
 6    the supervisor is -- sufficiently addresses the
 7    safety concerns known to him at that time?
 8         A.   I think the safety concerns known to him
 9    at that time, it might -- it probably does.  I
10    don't -- I don't know what else he knew.  But if
11    it's in reference to the slow moving rear-end, I
12    don't have reason to believe that he should not have
13    said this.
14         Q.   Okay.  So if we can go to Page 2421.
15         A.   Sorry.  Which page?
16         Q.   2421.
17         A.   Okay.
18         Q.   So near the bottom of this page, do you
19    see where it says, all in for safety, zero incident
20    safety culture and then a rating next to it?
21         A.   Yes.
22         Q.   What is that rating?
23         A.   He's rated her as a 2.0 which is
24    delivering.
25         Q.   And so you anticipated my next question.
```

                                        Page 241

Appx_1447

1    Did Caylee's supervisor give her this rating or is

2    that a self-selected rating?

3        A.   It is -- first, it's self selected.  But

4    what it indicates here is that they both agreed upon

5    that rating.

6        Q.   Okay.  So does the supervisor get the

7    final say in what the rating is?

8        A.   Yes.

9        Q.   Okay.  So what does -- help us understand

10   sort of the scale of ratings.  So is there one and

11   then a two and three; what -- what's the range here?

12       A.   It is -- it's between one, two, three.

13       Q.   Okay.  Help us understand what one would

14   mean.

15       A.   One would mean needs improvement.  Two

16   would mean delivering.  And three is outperforming

17   or above expectations.

18       Q.   Okay.  So what, if anything, is the

19   management response if somebody has a two rating on

20   the all in for safety, safety culture metric?

21            MR. DuBOFF:  Objection to the form.

22            THE WITNESS:  Sorry.  Can you repeat the

23       question?

24       Q.  (By Mr. White)  Sure.

25                What is -- I guess, what is Eastman's

                                      Page 242

Appx_1448

1    policy on how to train or manage an employee that

2    has a 2 rating on the incident safety culture?

3            A.   It's the continued -- just the continued

4    observation, continued expectation of following

5    policy, as well as demonstrating your commitment to

6    personal safety and that around you.  So it's --

7    it's an on-track, continue -- continue to observe

8    and follow, you know, expectations or meet

9    expectations.

10           Q.   All right.  So same question, but for

11   three.

12           A.   Probably the same exact thing.  So in

13   safety or in any of these, a record and a safe

14   performance is only as good until that one day or

15   something that happens.  And so we try to make sure

16   that you don't get a sense of complacency ever.  So

17   between a two and three, we would expect you don't

18   want to sit back and rest on your laurels, it really

19   is -- you know, this is important, continue to be

20   deliberate to follow our safe practices and policies

21   and the expectations.

22           Q.   Okay.  And same question but for a one.

23           A.   Then I think it would involve -- so I

24   don't know.  I don't have explicit documentation on

25   what we do for one.

Page 243

1        Q.   Okay.  Okay.  So let's -- let's flip to

2    Page 2423.  So there's two pages forward.  So I'm

3    going to call this nine square box a matrix, right?

4        A.   Okay.

5        Q.   My word, not yours.

6             So can you explain this matrix on

7    Page 2423.

8        A.   Yeah.  So we -- we try to measure and

9    evaluate and help people grow in both their results

10   and in their behaviors and competencies.  So the Y

11   axis is the behaviors and competencies that an

12   individual demonstrates.  The X axis are the

13   results.  And then across, there's nine boxes.  And

14   you evaluate jointly with the individual where and

15   how they are distributed across this in terms of

16   their results and their behaviors and competencies.

17       Q.   Okay.  So where is Caylee in this matrix

18   on this performance review?

19       A.   So it shows that she is demonstrating on

20   behaviors and competencies and she's delivering on

21   results.  So she's right in the middle of the nine

22   box.

23       Q.   And being in the middle of the matrix, is

24   that where Eastman wants employees to be or do they

25   want them in some other part of the box?

Page 244

```
 1              A.    You know, that's a solid performance.
 2       That's where we want them to be.  There's a bell
 3       curve.  And these are also -- there's ultimately
 4       some relativity that's applied when we think about
 5       this relative to your peers, relative to the
 6       challenge of your role.
 7                    And so, yes, we'd like to see
 8       people -- and people, individuals want to strive to
 9       be in the outperforming.  But a large part of our
10       distribution is in the demonstrating and delivering.
11              Q.    Okay.  All right.  So this was -- is there
12       any Eastman policy on a management response when an
13       employee is in the middle of the box or in the
14       middle of the matrix or?
15              A.    No.  That's a solid performance.  That's a
16       good --
17              Q.    So this would --
18              A.    Sorry.  No management response --
19              Q.    No management response.
20              A.    -- specific to that.
21              Q.    This is a good review, I take it?
22              A.    Yes.
23              Q.    All right.  So an employee is not going to
24       get fired after getting this review?
25              A.    No.  Not for cause for this.
```

Page 245

```
 1                    MR. WHITE:  Okay.  So if we can go to

 2         Exhibit No. 8.

 3                         (Whereupon Exhibit 8 was

 4                         introduced for identification.)

 5         Q.  (By Mr. White)  And can you tell me what

 6    this is, what this document is?

 7         A.   This is Caylee's 2022 year performance

 8    assessment.

 9         Q.   Okay.  So do you know when this document

10    was generated?

11         A.   Same thing.  It kind of starts with her

12    setting her goals at the beginning of the year.  And

13    then there's midyear comments captured by her and

14    her supervisor.  And then end-of-year capture.  So

15    it's throughout the year.

16         Q.   Okay.  So if you go to the last page of

17    this exhibit, so I think it's Bates labeled 2446.  I

18    just -- I need to understand.  It's got an

19    acknowledgment --

20         A.   Okay.

21         Q.   -- it says -- it says Caylee Smith by Davi

22    Goncalves Pereira.  Do you know why that is?

23         A.   I do not why.

24         Q.   Do you know who Davi Goncalves Pereira is?

25         A.   I actually do not.
```

Page 246

1      Q.   Is that an Eastman employee?

2      A.   I presume it must be.  I believe it's an

3   Eastman employee.

4      Q.   Okay.  Is there some reason --

5      A.   If Caylee is out during this period of

6   time either for person -- personal health or mental

7   leave or for a -- or for her pregnancy -- I don't

8   think she would be -- but that could be a reason why

9   either someone within her line of management, which

10  I don't recognize his name, or within HR will

11  acknowledge and push it on.  It doesn't mean he's

12  signing on her behalf, I don't think.

13     Q.   Okay.

14     A.   She could have been out of -- this might

15  have been just closing and documenting so that it

16  routes up to the next reviewer in the chain of

17  command.

18     Q.   But that's just speculation, you don't

19  know?

20     A.   It is.  It is.

21     Q.   And January 21, 2023, Caylee wouldn't have

22  been out for maternity leave then, right?

23     A.   No.

24     Q.   Right.  Okay.

25     A.   No.

Page  247

1    Q.   So let's go back to the first page of this
2    exhibit.  Can you read Caylee's midyear comment.
3    A.   I'm sorry.  Yeah.  No, I don't know why
4    that's still showing January, since we're later than
5    January as well.  It might be that she has not -- I
6    don't know when she went out for midyear.  But these
7    are her comments that would be put in, I believe,
8    not somebody else's.
9    Q.   Okay.  So on -- yeah.  And that's kind of
10   what I'm trying to get at here.  Page 1 of this
11   exhibit or it's Bates labeled 2425, employee midyear
12   comments, do you think Caylee wrote this midyear
13   comment?
14   A.   I do.  To the best of my knowledge, I
15   believe Caylee wrote that.
16   Q.   Okay.  So Caylee said she was not at fault
17   in this midyear comment, right?
18   A.   That is correct.
19   Q.   Okay.  So what does her supervisor say in
20   response in the supervisor's midyear comment?
21   A.   He says:  Caylee was involved in a car
22   accident in Q2 of this year which was serious in
23   nature.  Will continue to focus on safety and
24   appropriate behaviors to try to minimize these
25   events in the future.  This is her second acc --

Page 248

```
 1    accident since being hired in 2021 so this is a
 2    priority to prevent from happening in the future.
 3         Q.   Do you have any idea when the midyear
 4    comment was made by the supervisor?
 5         A.   I don't think we have a time stamp on
 6    that.
 7         Q.   Okay.  Any like approximation?  It says
 8    midyear.  Are we talking June, July, or is midyear a
 9    vague time frame?
10         A.   No.  It should be finished before the end
11    of July and maybe even a little bit -- yeah, before
12    the end of July, I believe.
13         Q.   What are matrix midyear comments?  It's
14    blank here on 2425.
15         A.   That is if she -- that's if an individual
16    has kind of multiple supervisors.
17         Q.   Okay.  Okay.  So what are Caylee's final
18    comments on -- on this first page?
19         A.   It says:  After coming back from my
20    accident in Q2, it has been a priority of mine to
21    focus on the safety measures necessary traveling to
22    and from my accounts.  I feel the second half of the
23    year has been focused on minimizing the potential
24    for another accident in the future and feel I have
25    delivered on that respect.
```

Page 249

```
 1                    Can I add a clarifying statement?  So
 2      these comments are truly specific to the safety,
 3      wellness and environment, that all-in-for-safety
 4      part.  There's other comments she would also have
 5      related to other elements of her job.
 6           Q.   Sure.  There's other sections of this
 7      review, right?
 8           A.   Yes.
 9           Q.   Okay.  So do you know when, A, did Caylee
10      write that final comment?
11           A.   To the best of my knowledge, that would be
12      Caylee writing that.
13           Q.   Okay.  So on the next page where she says
14      she feels like she's delivered on that aspect,
15      Caylee was in another accident in 2022, was she not?
16           A.   That's what I understand, yes.
17           Q.   Okay.  Do you know when in 2022 following
18      the April 30 accident?
19           A.   I don't -- I'm trying -- I don't -- I
20      don't know the date.  It was in a rental vehicle
21      and -- so I don't know the date of it.
22           Q.   Okay.  But it was a rental provided by
23      Eastman, right?
24           A.   Yes.
25           Q.   Okay.
```

Page 250

1      A.   Or paid for by Eastman.

2      Q.   Do you feel like Caylee should have

3  brought that up here in her final year comments?

4      A.   Not necessarily.

5      Q.   Why not?

6      A.   I don't know the nature of that incident.

7  And we don't -- you know, we don't expect if there

8  was a -- again, if there was something that occurred

9  that was outside that was deemed as preventable,

10  which I don't know.  Or if it wasn't deemed as a

11  situation that was something that, you know, has

12  impacted her ability to do the job, etc., I don't

13  know that we would have.

14      Q.   Okay.  So I mean, she did get in an

15  accident April of 2022 that killed somebody, right?

16  That's not a trick question.  Right?

17      A.   So there was an accident that was -- that

18  she was not found at fault.  There was not a

19  violation or citation.  And there were multiple

20  contributing factors.  But, yes, there was an

21  accident, a serious accident, yes.

22      Q.   So when you say she wasn't found at fault,

23  is it your belief that the police, the responding

24  officers affirmatively found that she was not at

25  fault for the accident in April of 2022?

Page 251

Appx_1457

1           A.   I think she didn't receive a citation or a
2      violation.
3           Q.   Okay.  So she was not held -- the police
4      officers did not believe there was probable cause to
5      issue her a criminal citation?
6           A.   Okay.
7                MR. DuBOFF:  Object to the form of the
8                question as requiring legal issues.
9           Q.   (By Mr. White)  Okay.  All right.  But you
10     did say earlier it was your belief that she was not
11     found at fault when, in fact -- I just want to make
12     sure I understand.  What you really mean is she
13     didn't receive a citation?
14          A.   That is correct.
15          Q.   Okay.  So given the seriousness -- and we
16     agree the April 30, 2022 accident was serious,
17     right?
18          A.   Yes.
19          Q.   Okay.  So given the seriousness of that
20     accident, do you think the fact that she was in
21     another subsequent accident the same year should
22     have been brought up on her performance review?
23          A.   I don't know.  The nature of the
24     following -- again, from a performance review --
25          Q.   Well, the safety aspect of her performance

                                      Page 252

Appx_1458

```
 1      review.
 2           A.   It could have been, certainly.  I don't
 3      know to the extent they, you know, discussed through
 4      it.  But I think they viewed it as not necessary in
 5      terms of evaluating her performance.
 6           Q.   Okay.  Do you know why they viewed it as
 7      not necessary in evaluating in terms of her
 8      performance?
 9           A.   I believe because there was not cause for
10      it.
11           Q.   So do you know why her supervisor thought
12      that the subsequent, the second accident in 2022
13      wasn't her fault?
14           A.   No, I don't.
15           Q.   Was there an investigation by Eastman of
16      the later 2022 accident?
17                MR. DuBOFF:  I'm just going to note that
18           our -- one of our objections was as to
19           accidents subsequent to the April 2022
20           accident.  So Mrs. Bernhardt did not -- based
21           on that objection, Mrs. Bernhardt did not do
22           investigation into that.
23                MR. WHITE:  I thought we -- correct me if
24           I'm wrong.  I thought we discussed that she was
25           going to be prepared on all accidents even if
```

Page 253

Appx_1459

1          we discussed how it might not be admissible.

2                MR. BUNT:  Well, I said you could ask her

3          about all accidents.  And I think she's

4          familiar that there was a third accident, you

5          know.

6                MR. WHITE:  I guess the question is, is

7          she -- did she prepare to discuss that or did

8          she not prepare based on the objection?

9                MR. BUNT:  Yeah.  I mean, I think she

10         prepared to discuss it to the extent we have

11         information on it.

12               MR. WHITE:  Okay.  Okay.  Thanks.

13         Q.  (By Mr. White)  So do you know what

14    investigation occurred on the second accident in

15    2022 by Eastman?

16         A.  I reached out.  I don't -- so I think

17    there's very little information that we have because

18    there's not been -- there was no Donlen report.  We

19    searched.  I looked into that.  Per policy, it

20    wasn't necessary.

21         Q.  Why is that?

22         A.  It was not an Eastman vehicle or Eastman

23    leased vehicle.

24         Q.  It wasn't a vehicle that Donlen leased to

25    Eastman, right?

                                        Page 254

Appx_1460

1        A.   Correct.

2        Q.   So Donlen -- why would Donlen write a

3    report on someone's else vehicle, right?

4        A.   Correct.

5        Q.   So does Eastman have a policy for

6    circumstances like that on doing an investigation

7    when it's not a Donlen vehicle?

8        A.   We try to get -- again, there has to be a

9    communication to your supervisor of any sort of

10   incident.  And that discussion takes place between

11   the supervisor and the individual.  And if there's a

12   traffic violation citation, then there's more

13   information and more reason to pursue it.

14       Q.   Okay.  Was there -- is Eastman aware of a

15   police report arising out of the second 2022

16   accident?

17       A.   I'm trying to remember if there was or

18   not.  I believe that there's a police report.  But

19   it was -- to be honest, I don't recall.

20       Q.   Has -- did Eastman review that police

21   report?

22       A.   I know I reviewed a lot of documents.  I

23   reviewed -- tried to review and look into this.  But

24   I just right now don't recall if there was a report

25   on it.

                                      Page 255

1          Q.    Okay.  Do you remember who was the other

2     individual in that accident, driving the other

3     vehicle, not Caylee Smith?

4          A.    No.  No.

5          Q.    Do you know if Caylee Smith's supervisor

6     has reviewed -- or reviewed that police report to

7     prepare her 2022 performance evaluation?

8          A.    He may not have reviewed.

9          Q.    Was he aware of the subsequent --

10         A.    Yes.

11         Q.    -- 2022 accident?

12         A.    Yes.

13         Q.    Okay.  So I may have made you read this

14    before.  But on the first page of the 2022

15    performance evaluation, do you see where the

16    supervisor says:  This is a priority to prevent this

17    from happening in the future?

18              MR. DuBOFF:  That's not 2425?

19              MR. WHITE:  2425.  Sorry.

20              MR. DuBOFF:  Okay.

21         A.    Yes.

22         Q.   (By Mr. White)  Okay.  Why, if you know,

23    did the supervisor add that?

24         A.    I don't know.  I think he cares about her

25    safety and wanting ideally to help, you know, in any

                                        Page 256

```
 1    way to make sure that there's not additional
 2    accidents or injuries or things that happen.
 3         Q.   Okay.  So and below that where it says
 4    employee final comments, do you see where -- I
 5    assume Caylee wrote:  It has been a priority of mine
 6    to focus on the safety measures necessary traveling
 7    to and from my accounts?
 8         A.   Yes.
 9         Q.   Okay.  So both the supervisor and the
10    employee Caylee have used the word "priority,"
11    right?  So what -- what does that mean to Eastman in
12    this context, "priority"?
13              MR. DuBOFF:  Objection to form.
14         A.   Yeah.  I don't think Eastman has a
15    definition for that.
16         Q.   (By Mr. White)  Okay.  So I guess I'm just
17    trying to figure out in the hierarchy of things that
18    Caylee needs to be focused on based on this review,
19    where is prevention of future accidents and focus on
20    safety?
21         A.    It's always a priority and a focus.  I
22    think them documenting it notes and acknowledges
23    that she's been in a lot.  So how -- you know, one
24    of the things that he does document they worked on
25    was strategies for -- you know, and the discussions
```

Page 257

1    around do you feel safe driving, do you feel

2    comfortable to be driving and we had different

3    employee assistance to help support her in that.

4              She was away from work for a period

5    of time.  To try to help to ensure she was feeling

6    safe to be able to do her job.  They also made

7    choices to narrow down parts of her territory.  And

8    he even encouraged her, I believe, to, you know,

9    spend a good portion of her territory within

10   Houston, closer to her home.

11             So I think that is the sort of the

12   thing that he was trying to figure out how to ensure

13   she and -- that she feels and that we evaluate that

14   she is able to do her job safely and not feel, you

15   know, distracted or having trouble while she's

16   driving.

17   Q.   So -- so one of the things that the

18   supervisor -- and I want to be clear.  The

19   supervisor that wrote this report is Chris Ierardi?

20   A.    Ierardi, yes.

21   Q.    Ierardi.  Right.

22             So one of the things that he thought

23   about doing to help Caylee was reducing the size of

24   her territory; is that right?

25   A.    Yes.  He told me that in the document,

Page 258

Appx_1464

 1     yes.

 2          Q.   Okay.  And she does live in Houston or the

 3     Houston area, right?

 4          A.   That is correct.

 5          Q.   Caylee I mean, right?

 6          A.   Yes.

 7          Q.   What rating did I think Chris and Caylee

 8     agree she should get on safety in this performance

 9     review?

10          A.   I think it is improve.

11          Q.   I think it's on the next page, 2426?

12          A.   Yes.  It was an improve.

13          Q.   Okay.  So is that an agreed rating or is

14     that one that Chris gave her; do you know?

15          A.   I don't know.  It's one that Chris has

16     determined.  I don't know if she also put that in

17     there or if they changed it.

18          Q.   I gotcha.  I gotcha.

19               Okay.  So do you think based on

20     Caylee's comment earlier where she said it's been a

21     priority of mine to focus on safety measures

22     necessary traveling to and from my accounts, do you

23     think Caylee did a good job of focusing on safety

24     measures necessary traveling to and from my

25     accounts?

                                        Page 259

Appx_1465

```
 1              MR. DuBOFF:  I'm going to object to the
 2         form of the question.  Also as being outside of
 3         any deposition -- notice deposition topic.
 4         A.   I don't know.  I've not spoken with
 5    Caylee.
 6         Q.  (By Mr. White)  Well, I mean based on the
 7    fact that she did get into another accident
 8    following providing this comment, right?
 9              MR. DuBOFF:  Hold on one second.
10         Objection.  It's still outside the -- any of
11         the noticed deposition topics and it calls for
12         speculation.
13         A.   There's nothing that gives us a view that
14    it was something that was unavoidable.  I mean, so
15    I...
16         Q.  (By Mr. White)  We're talking about the
17    second accident in 2022, right?
18         A.   That's correct.
19         Q.   So I guess, you know, my question is, you
20    don't remember if there's a police report or if
21    Eastman's reviewed a police report on the second
22    2022 accident, right?
23         A.   I'm sorry.  That it was avoidable.  I'm
24    getting my words messed up.  I apologize.
25         Q.   But so you don't remember if Eastman has
```

Page 260

Appx_1466

 1    reviewed a police report of the second 2022 accident

 2    by Caylee, right?

 3         A.   If there is one, and I believe there is, I

 4    know we've reviewed it.  I don't recall the details

 5    of it.

 6         Q.   Okay.  Do you know what investigation

 7    besides reviewing that police report on the second

 8    2022 accident that Eastman conducted?

 9         A.   We would depend on the police report.

10         Q.   Okay.  Well, I guess, you know, you said

11    if it exists, Eastman would have reviewed it.  So do

12    you remember what subsequent investigation after

13    reviewing it, Eastman conducted?

14         A.   It was found that there was not a -- that

15    she was not cited or a violation.  So, no, there was

16    no other subsequent investigation.

17         Q.   Okay.  So --

18         A.   And we don't have -- again, this is not in

19    our business to have people that do investigations.

20    We really depend on the authorities who work in this

21    area.

22         Q.   So is it common for outside sales reps to

23    have multiple accidents a year?

24         A.   No, I would say it's not.

25         Q.   Okay.  Is it -- well, so let's go to Page

                                            Page 261

Appx_1467

1    2443 of this exhibit.

2        A.   Okay.

3        Q.   Okay.  So can you just read the first

4    sentence of the supervisor's final comment?

5        A.   Let's see.  Supervisor's final.  Okay.  It

6    was a unique year for Caylee and her territory.

7        Q.   Okay.  So what did the supervisor mean

8    when he wrote it was a unique year for Caylee?

9            MR. DuBOFF:  Objection to the form,

10        outside the scope of any deposition topic,

11        calls for speculation.

12        A.   I do not know.

13        Q.  (By Mr. White)  Okay.  Do you think it was

14    a unique -- 2022 was a unique year for Caylee?

15        A.   If I were to choose my words, I'd probably

16    say a very tough year.

17        Q.   Okay.

18        A.   Don't know.

19        Q.   So if you go down towards, oh, two-thirds

20    of the way in what -- the supervisor's final

21    comments.  Do you see the sentence that starts with

22    "we will continue to focus on"?

23        A.   Yes.

24        Q.   Okay.  Will you start reading from there,

25    through, I guess, the next three sentences?

Page 262

1          A.    Yeah.  We will continue to focus on safety

2     and appropriate behavior to minimize these events in

3     the future.  She's been involved in three accidents

4     since being hired in 2021.  So this is a priority to

5     prevent this from happening in the future.  We

6     really need to focus on her safety overall and

7     especially when she's driving.

8          Q.    Okay.  So what, if you know, did her

9     supervisor mean when she wrote -- when he wrote that

10     portion of her review?

11               MR. DuBOFF:  I'm going to -- well, if you

12          know.

13          A.    I don't know what he meant.  Again, I'd be

14     speculating.

15          Q.    (By Mr. White)  Okay.  Well, why did he say

16     we really need to focus on her safety overall and

17     especially when she is driving?

18               MR. DuBOFF:  I'm going to object as

19          calling for speculation.

20          A.    So, you know, I can put myself in this

21     individual's shoes.  It's the end of 2022, he has

22     been trying to help Caylee through a very traumatic

23     situation.  She's been away from work a lot.  He's

24     trying to work through how to help her reenter.  If

25     that is her decision and if that's also our employee

Page 263

Appx_1469

```
 1        assistance deems she can reenter the work.

 2                  So I think as he's -- he's writing

 3        this, he's trying to help reinforce the continued

 4        focus of the discussions they're having around

 5        asking how are you -- you know, what are your

 6        strategies.  He highlights some strategies around

 7        safe driving.  I think he even referenced working

 8        around, you know, her -- her work hours during the

 9        day and when to be out in public, more just because

10        he's trying to anticipate, I think how she's -- how

11        she's doing, how she's feeling and trying to help

12        partner with her on it.

13            Q.   (By Mr. White)  Okay.  Now, he did

14        acknowledge here that she'd been in three accidents

15        since being hired in 2021, right?

16            A.    That is right.

17            Q.    Did Caylee acknowledge a total of three

18        accidents in any of her comments?

19            A.    Let me look.  I don't see it.  But I might

20        be missing if she did or not.

21            Q.    Okay.  If she didn't acknowledge all of

22        these accidents, do you think that she's taking

23        personal responsibility for her safety performance?

24                  MR. DuBOFF:  Objection to the form, calls

25            for speculation, outside the scope of any
```

Page 264

Appx_1470

1          noticed deposition topic.

2          A.   I think she's acknowledging the accidents.

3     I don't know that she's taking personal -- I don't

4     think she's taking personal responsibility for the

5     cause of the accidents in some of these.  So if that

6     is what you are referring to.

7          Q.  (By Mr. White)   Okay.  So we go to page --

8     let's see here -- 2444.  Just let me know when

9     you're there.

10         A.   Yes.

11         Q.   Okay.  So on goals -- where it shows goals

12    here, it shows a 1.43 rating.  Is that a good

13    rating, bad rating; how would you describe that?

14         A.   That is the weighted average of the

15    ratings underneath.  So that's a less than

16    demonstrating and delivering rating.

17         Q.   So you said it's a weighted average.  What

18    are the weights based upon these different variables

19    or different ratings?

20         A.   I believe it's the average of each of the

21    six elements underneath it that are in her goals.

22         Q.   Okay.

23         A.   Per year.

24         Q.   So each one is weighted the same so --

25         A.   I believe it's weighted the same, yes.  It

Page 265

Appx_1471

1    should be.

2         Q.   Okay.  So 1.43, not good, right?

3         A.   Yeah.  Not -- not real good.  It's -- that

4    is common.  That will -- it's not uncommon.  But,

5    yes, not good.

6         Q.   What's the management response, if any,

7    that Eastman's policy is when someone has a rating

8    like that?

9         A.   It is not a specific documented response.

10   But if you can see on the next page of 2445 where

11   she lands in the matrix, as you mentioned, is that

12   it shows that she has improved on her behaviors and

13   competencies and so -- and then delivering results.

14   And that is a place that no employee really wants to

15   be.  It does impact probably the 25 percent of their

16   discretionary part of their bonus and then -- yeah.

17        Q.   And how much would it affect their bonus,

18   if at all?

19        A.   So 25 percent of their -- I don't know

20   exactly.

21        Q.   Okay.  You sound -- sounds like you were

22   starting to say that 25 percent of their bonus could

23   be affected; is that right?

24        A.   Yes.

25        Q.   Okay.  You just don't know by how much?

Page 266

1          A.    That's right.  There's discretion in that.

2          Q.    Okay.  Is that up to her supervisor's

3    discretion how much her bonus will be affected?

4          A.    They have a lot of input, but it's

5    actually up to the directors usually.

6          Q.    Do you know how much Caylee's bonus was

7    for 2022?

8          A.    I do not.

9                MR. WHITE:  Okay.  Let's go to Exhibit 9.

10               (Whereupon Exhibit 9 was

11               introduced for identification.)

12         Q.    (By Mr. White)  So do you recognize this

13   document and what is it?

14         A.    This is Caylee's 2023 performance

15   assessment.

16         Q.    Okay.  And I take it that this is not

17   complete as of today, right?

18         A.    That is correct.

19         Q.    There would only be midyear comments in

20   this review, correct?

21         A.    That is correct.

22         Q.    So on the first page of this Bates labeled

23   2447, what is -- what is Caylee's comment?

24         A.    Her comment is for the all in for safety:

25   Is staying alert on the road and eliminating

                                        Page 267

Appx_1473

```
 1    distractions has been one of my main goals this
 2    year, to try and to avoid accidents and ensure my
 3    safety.
 4         Q.   Okay.  And it looks like her supervisor's
 5    comment on -- this is again we're all in for safety,
 6    that subject.  Her supervisor's comment is, quote,
 7    Caylee is meeting expectations with respect to
 8    safety, right?
 9         A.   That is correct.
10         Q.   Okay.  So is that comment only about the
11    first half of 2023?
12         A.   Yes.
13         Q.   Okay.  Was Caylee in any accidents in
14    2023?
15         A.   No.
16         Q.   Okay.  Do you know when Caylee took
17    maternity leave?
18         A.   Late summer, I believe.  I do not know
19    exactly.
20         Q.   Okay.  But she's working full time
21    otherwise in 2023.
22         A.   I don't know if she took any leave or not.
23         Q.   Okay.
24         A.   It may reference in here.  I know one of
25    the documents reference some type of leave certainly
```

                                        Page 268

Appx_1474

1    last year.  And I don't recall or don't know how

2    much time each year.

3              Q.   Okay.  Yeah.  If you go to 2453.

4                   MR. DuBOFF:  53?

5                   MR. WHITE:  2453, yes.

6              Q.  (By Mr. White)  So it looks like this is

7    what we were talking about earlier.  The supervisor

8    wrote that prior to 2023, we agreed that the

9    majority of her time was to be spent in growing the

10   Houston market.  Do you see where it says that?

11             A.   Uh-huh.  Sorry.  Yes.

12             Q.   Okay.  So is that what you were talking

13   about earlier that her supervisor said that she

14   should reduce her territory to focus on the Houston

15   area?

16             A.   Yes, that was what I was referring to.

17             Q.   Okay.  So below that, it looks like the

18   supervisor says that we had several new

19   opportunities that arose in San Antonio which

20   required a reallocation of her time.  Do you see

21   that?

22             A.   I do.

23             Q.   Okay.  So what does he say her response to

24   the San Antonio opportunities was?

25             A.   She struggled with that decision as she

Page 269

1    advocated to spend more time in Houston like we

2    decided.   Yeah.

3         Q.   So it sounds -- am I correct in

4    understanding that Eastman decided they did want her

5    to start spending more time in San Antonio in

6    response to certain opportunities?

7         A.   It sounds like it.   That was originally

8    part of her territory.   He had scoped it down.   And

9    it sounds like and from what I understand from this

10   and from Chris is that at the beginning of the year,

11   there were additional accounts that we felt like a

12   sales rep at her level would normally be able to

13   take on.   And so that was what he was trying to get

14   back to include in her territory.

15        Q.   Okay.   Do you know how much her territory

16   was reduced by when Chris decided to reduce her

17   territory?

18        A.   I do not exactly.

19        Q.   Any idea like what towns or cities used to

20   be in her territory that got removed?

21        A.   We talked through it.   And I don't know if

22   I recall exactly what -- what areas.   I think that

23   they had taken San Antonio out.   And now it looks

24   like this is where they were trying to add it back

25   into it.

Page 270

Appx_1476

1      Q.    Okay.  So during Caylee's deposition, she
2    made it sound like San Antonio was taken out of her
3    territory because another sales rep had relocated to
4    Texas.  Does that sound right to you?
5      A.    Whether that was the cause or the effect
6    of her ability to handle that territory is -- I
7    don't know which it was.  But if she said that,
8    that's maybe what her understanding was.
9      Q.    Sure, sure.
10           Do you think it's possible that her
11    territory was reduced and San Antonio was taken out
12    of her territory and Eastman put somebody else on
13    that territory because Caylee wasn't going to be
14    able to handle San Antonio?
15      A.    Yes.  I mean, in fact, even through 2022
16    on some frequency, I would ask, you know, my team,
17    Eric and them, you know, how's the team doing, how
18    are you -- so we'd have interactions.  And I know
19    from time to time, her territory came up and we
20    purposefully had -- reduced some of the size.  And
21    so, yes, we probably did bring and add someone to
22    cover that because we had customers that needed to
23    be served.
24      Q.    Sure, sure.
25           So the conversation about reducing

Page 271

1    her territory, was that about -- was that about her

2    comfort on the road?  Was she not as comfortable

3    driving as extensively as she had been?

4         A.   It wasn't as much that, but it was the

5    capacity of her even just to do the normal course of

6    the job for a period -- for an amount of time.  We

7    were trying to find ways to help her reconcile, help

8    her get better, help her work through this.  And I

9    think it was about trying to reduce the load from

10   her.

11        Q.   Okay.  So if we go towards the end of this

12   performance review, so let's -- I think that's Page

13   2460.  What rating does she have now on all in for

14   safety, zero incidents safety culture?

15        A.   Okay.  2460?

16        Q.   Yes.

17        A.   So this is still in her 2023 midyear.  It

18   shows a 2.0 delivering.

19        Q.   Okay.  So it's gone up from her final 2022

20   rating, right?

21        A.   That is correct.

22        Q.   Okay.  Is that appropriate?

23        A.   I don't know.  Based on the information

24   that I have from the team, it seems appropriate.

25        Q.   Okay.  So if you go to the next page, it's

Page 272

1    another one of these matrixes.

2         A.   Uh-huh.

3         Q.   And it -- is it fair for me to

4    characterize this as it appears to be the same as

5    her final 2022 review?

6         A.   It does.

7         Q.   Okay.  And should her rate -- should that

8    have changed?  Why is she still sort of at the

9    bottom part of this matrix?

10        A.   I think what I can tell from the results

11   and the behaviors and competencies, they're

12   reflecting, again, it's that weighted average of all

13   the Eastman behaviors and her performance, she's

14   demonstrated an improved relative to the job

15   expectations.

16        Q.   Okay.  Okay.  But this is -- this is not a

17   good review, midyear review, right?

18        A.   No.  Again, not great.

19        Q.   Okay.  But so if you've got an end-of-year

20   review that shows you at this -- you know, let's

21   call it the bottom part of the matrix and you get

22   another midyear review immediately after where

23   you're at the bottom part of the matrix, is there a

24   possibility of a management response at this point

25   or what happens?

Page 273

Appx_1479

```
 1            A.    In terms of a management response, we set

 2       expectations that are -- management, again, is

 3       making assessments on where any individuals are in

 4       their growth and their development.  And so it

 5       really does depend.  Now, if she continues to

 6       demonstrate at this level, there's a high likelihood

 7       that we will exit her from the company.  I mean, an

 8       individual that continues and they don't -- but

 9       there can be a number of reasons why somebody would

10       be an improve for a year and a half.

11                 If you go into -- if you get promoted

12       and move into a new set of expectations in a role,

13       they often are in the improving area of the

14       competencies for that role.  So I can't say

15       definitively if there's a specific management

16       response.  But the expectation is that that

17       individual is able to work to the obligations of the

18       role.

19                 And that if they stay in that level,

20       we have reductions in force, that that does then

21       take in account their performance reviews and we

22       will make changes or also through the documentation,

23       through multiple rounds of documentation and showing

24       that they're still not moving into the delivering,

25       that would be cause and reason for us to be able to
```

Page 274

Appx_1480

```
 1    exit them from the role.
 2         Q.   Okay.  So that's -- I guess my question
 3    is, how long do you have to be in the improve
 4    behaviors and competence and delivering results area
 5    before you get fired?
 6         A.   It depends.  We do not have a set
 7    standard.
 8         Q.   Okay.  For someone in her situation, she's
 9    been with the company now over two years and she's
10    gotten two reviews like this.  I know you gave an
11    example of somebody starting in a new position,
12    maybe, you know, needing to improve.  For someone in
13    her position, does that mean that it's likely that
14    she -- unless she improves, she's going to be fired
15    or?
16         A.   I think it's important for her to
17    demonstrate at a different level.
18         Q.   Okay.  So do you know where the second
19    2022 accident occurred?
20         A.   I do not recall.
21         Q.   Okay.  So all right.  Do you know how it
22    happened, like what the facts were of the second
23    2022 accident?
24         A.   I recall from -- again, I think I saw a
25    report.  I don't recall.  There was an individual
```

Page 275

1     that pulled out into her in the line of traffic.

2          Q.   So you say pulled out into her.  Do you

3     have any idea where the body damage on Caylee's

4     vehicle is on this second accident -- third accident

5     I guess?

6          A.   I don't think we have that from the rental

7     company.  So, no, I do not.

8          Q.   Okay.  So if Caylee said that she T-boned

9     someone because they pulled out in front of her, you

10    don't know whether that's right or not, right?

11         A.   No.

12         Q.   Okay.  So we just don't know the exact

13    facts.  You don't know the exact facts of the second

14    2022 accident?

15         A.   That is correct.

16         Q.   Okay.  So is she still in a rental vehicle

17    provided by Eastman?

18         A.   I do not know.

19         Q.   You don't know if she's in a leased

20    vehicle provided by Eastman?

21         A.   I do not.

22         Q.   Okay.  What did Caylee say about whether

23    the second 2022 accident was her fault?

24         A.   I believe she indicated that it was not

25    her fault.

                                        Page 276

Appx_1482

```
 1          Q.   Okay.  So all -- every accident that she's
 2     been in in an Eastman vehicle, she has told Eastman
 3     they're not her fault, right?
 4          MR. DuBOFF:  Objection, misstates prior
 5          testimony.
 6          Q.  (By Mr. White)  Sorry.  I didn't mean to.
 7     So let me -- let me dial it back.
 8               Is it your testimony that for every
 9     accident that Caylee has been in while driving an
10     Eastman provided vehicle, Caylee has told Eastman
11     those accidents were not her fault?
12          A.   No, I don't think that's the testimony or
13     what she had said.  I think the -- is it June
14     accident?
15          Q.   Of 2021?
16          A.   Right.  Where they were on the interstate,
17     heavy traffic, slow speed.  I think she didn't claim
18     fault or not.  She definitely said she rear-ended
19     someone in the back.  She clipped kind of the back
20     because they hit their brakes in front of her.
21          Q.   Okay.  Okay.
22          A.   So I don't -- that's what I know of that.
23          Q.   Okay.  Now, I mean, you saw a performance
24     review earlier where Caylee said the April 2022
25     accident, she was not at fault, right?
```

Page 277

Appx_1483

1      A.   Correct.

2      Q.   Okay.  So -- and it's your belief that for

3    the second 2022 accident, the one that happened

4    after the one where my client was killed, Caylee has

5    told Eastman that one was not her fault?

6      A.   That's my understanding, yes.

7      Q.   Okay.  Has she been reprimanded at all

8    following the second 2022 accident, by Eastman?

9      A.   No.  She has not been reprimanded.

10      Q.   Okay.  Did she receive any additional

11    training from Eastman following the second 2022

12    accident?

13      A.   There has been counseling, discussion.

14    And as you can see, I think there was a reference to

15    improve.

16      Q.   Okay.  But she hadn't been sent any new

17    performance -- or excuse me -- any training modules

18    or sent to defensive driving class or anything like

19    that by Eastman?

20      A.   Correct.  Correct.

21      Q.   Okay.  Has she been placed any time on --

22    some people call it a performance improvement plan.

23    I don't know if Eastman has a different name for,

24    you know, a plan to improve.

25      A.   She has not been put on a performance

Page 278

Appx_1484

```
 1      improvement plan.
 2          Q.   Okay.  Is that a thing?  Does Eastman use
 3      performance improvement plans?
 4          A.   Yes.  And, in fact, when I was referring
 5      to a documented discussion, those are sometimes
 6      referred to as a PIP.
 7          Q.   Okay.  So given the reviews that you've
 8      seen, do you think she should be put on a
 9      performance improvement plan?
10          MR. DuBOFF:  Let me object as outside the
11          scope of any noticed deposition topic.
12          A.   Yeah, I -- I'm -- I don't know.  I would
13      not say that based on what I've seen in terms of
14      needing a performance improvement plan.  I think
15      multiple cycles of improve could warrant that.
16          Q.   (By Mr. White)  So when you say multiple,
17      do you mean three, four, five; is there a number?
18          A.   Well, as you can see, just being captured
19      as improve, is a documentation.  And then what will
20      happen is that she and her supervisor will have the
21      conversation of what do I need to do to get back
22      into delivering.  What do I need to do.  So those --
23      those conversations take place.  I don't have a
24      belief that she needs to be on a documented
25      performance improvement plan.
```

Page 279

Appx_1485

1          Q.    Okay.  So documented performance

2     improvement plans are an additional process that a

3     supervisor can go through with an Eastman employee,

4     right?

5          A.    That is correct.

6          Q.    Okay.  Is it the -- is it up to a

7     supervisor whether to engage in a performance

8     improvement plan with an employee?

9          A.    They'll get counsel from their management

10    or from others, like HR as well.

11         Q.    Okay.  So how does kind of -- there may

12    not be a way this always happens.  But does that

13    normally happen because a supervisor alerts higher

14    up management or HR that there's an issue and then

15    there's a decision made to initiate a performance

16    improvement plan or does HR decide on their own and

17    just tell a supervisor?

18         A.    It's certainly usually, because the

19    supervisor, they're the ones that understand and

20    see.  It can come from other sources if we have

21    information, it can come -- but often, it's from the

22    individual or from the supervisor.

23         Q.    Okay.  And to the best of your knowledge,

24    Caylee has never been on a performance improvement

25    plan?

Page 280

```
 1          A.    Correct.
 2          Q.    Okay.  To the best of your knowledge, none
 3    of her supervisors have ever suggested, either up
 4    the chain of command or down, that she needs a kind
 5    of performance improvement plan?
 6          A.    I don't know if they have.  To the best of
 7    my knowledge, they haven't.  The documentation of
 8    the comments continues to kind of reinforce an
 9    ongoing discussion and/or a -- feedback is getting
10    received in terms of where she's standing and the
11    expectation of the role.  But, no, I don't know if
12    they've suggested doing something different.
13          Q.    But so being put on a performance
14    improvement plan would be something additional to
15    the feedback that you're receiving in these
16    performance reviews, right?
17          A.    Correct.
18          Q.    Okay.  And that just hasn't happened ever
19    for Caylee, right?
20          A.    That is correct.
21          Q.    So how many wrecks do you have to be in as
22    an employee -- an Eastman employee in order to be
23    removed from a driving position?
24          A.    What I can speak to is that it -- there's
25    within the SOP that we talked earlier, it has
```

Page 281

Appx_1487

1    definitions of accidents and -- avoidable accidents,

2    sorry, and others.  And so there's some clarity on

3    that.  But it's not a set -- you know, there's

4    circumstances and situations.

5         Q.   Well, we talked about how if there are two

6    or more avoidable accidents in a 24 -- I think it

7    was a 24-month period, whatever the SOP said -- then

8    there's a management response, right?

9         A.   Yes.

10        Q.   But there's no threshold for how many just

11   accidents you get into, leads to a management

12   response, right?

13        A.   That is correct.

14        Q.   So I'm not trying to be ridiculous.  But

15   it's possible you could be in a very large number of

16   accidents, right, and Eastman's not going to have a

17   management response, right?

18        A.   I don't -- it is possible.  I don't think

19   it's likely.  I will come back to this is a really

20   pretty -- well, we've never had an accident of this

21   kind within our company that I'm aware of, in over

22   20 years.  And, you know, it is not a frequent event

23   that our employees are in accidents.  And so we try

24   to take the best position, try to evaluate and try

25   to make sure that we have policies that are in place

Page 282

Appx_1488

1    to kind of get the clear delineation.  Then we have

2    to evaluate the situation and understanding of an

3    individual.

4              But I do think that a pattern and a

5    repetition does warrant, you know, evaluation and,

6    you know, reviews from the company.

7    Q.   Okay.  So it sounds like Eastman has not

8    been put in this position before -- sorry.  Strike

9    that.

10              Eastman has not had to deal with a

11    fatality based on facts similar to the ones that

12    occurred on April 30, 2022?

13    A.   That is correct.  We have not had a

14    situation like this occur.

15    Q.   Okay.  So this is new for y'all

16    essentially?

17    A.   Yes.  A traffic fatality, yes.

18    Q.   Okay.  And I'm not -- I don't want to

19    know -- we had this fight.  I don't need to know

20    like specifics.  Has Eastman ever had to deal with

21    an Eastman driver being involved in a fatality

22    before, not counting April 30, 2022?

23    A.   No, not that I'm aware of.

24    Q.   Okay.  Okay.

25    A.   And, in fact, we would have the records.

Page 283

```
 1      I talked to Lee.  We have no records of our
 2      employees being involved in any accident that
 3      involves any fatalities.
 4           Q.   Okay.  So I've got more questions about
 5      training, but I think we've covered most of that.  I
 6      just want to make sure I've got your testimony
 7      right, that Caylee's testimony regarding -- excuse
 8      me.  Caylee's training from Eastman regarding
 9      driving, distracted driving, that is -- the complete
10      universe of that is her with her supervisors, her
11      safety team meet- -- or team meetings with her sales
12      group where they talk about safety topics and the
13      policies she's been provided; is that right?
14           A.   To my knowledge, yes.  And the one-on-ones
15      are both verbal and discussion, as well as
16      observation in the field.
17           Q.   Okay.
18           A.   And, yeah, I think you've covered it.  And
19      then there is online training for instance.  But
20      related to this specific, yes, that covers it.
21           Q.   Okay.  So do you know if she ever failed a
22      training module such that she just didn't complete
23      it?
24           A.   I do not know that.  No, I do not know
25      that.
```

Page 284

Appx_1490

1      Q.   Okay.  Okay.  So I think you testified

2    about this earlier, but Eastman Chemical relies upon

3    employee reporting or Donlen reporting to know when

4    Eastman's employees have been in accidents, correct?

5              MR. DuBOFF:  Objection to form.

6              THE WITNESS:  Can you repeat it?

7      Q.   (By Mr. White)  Sure, sure. I can do better

8    than that.

9              So in order -- I guess I'll back it

10   up.

11             How does Eastman track accidents or

12   moving violations that its employees or in in

13   Eastman provided vehicles?

14     A.   Yeah.  We -- we set the standard

15   expectation that the employee notifies us of those.

16     Q.   Okay.  And we talked earlier y'all are not

17   doing ongoing background checks or anything like

18   that?

19     A.   That is correct.

20     Q.   Okay.  Does Eastman Chemical have a policy

21   for communicating with law enforcement or insurance

22   companies following one of its employees being in a

23   motor vehicle accident?

24     A.   We do not have a policy on that --

25     Q.   Okay.

Page 285

1          A.     -- that I know.

2          Q.     Is it common for whoever does the

3     investigation to let an insurance company know or

4     does Donlen do that?

5          A.     Good question.  I believe it either is

6     through Donlen or our risk management person.  I can

7     reference probably in here, if I could, on it.  I

8     don't think it's a separate call to the insurance

9     company.  I think it is -- occurs through the Donlen

10    and/or our risk management team.

11         Q.     Okay.  Okay.  So do you agree that Eastman

12    has responsibility to take actions to protect their

13    employees and the public?

14             MR. DuBOFF:  Objection to the form, calls

15         for a legal conclusion.

16             THE WITNESS:  Yeah, I don't feel

17         comfortable making a conclusion on that.

18         Q.   (By Mr. White)  Well, based on Eastman's

19    safety policy, Eastman tries to eliminate or

20    minimize at least, safety incidents, right?

21         A.     Yes, Eastman tries to reduce, minimize

22    safety incidents and keep our employees safe.

23         Q.     All right.  And Eastman does that both to

24    comply with the law -- right?

25             MR. DuBOFF:  Objection to the form.

Page 286

Appx_1492

```
 1          A.   No, I wouldn't say that's the primary
 2     cause.
 3          Q.   (By Mr. White)   Okay.   Is the primary cause
 4     like a moral obligation to keep their employees and
 5     the public safe?
 6          A.   I don't -- I don't -- so we talk about
 7     moral purpose of a company.   And, yes, there is a
 8     desire for our company.   I think it is good to want
 9     your employees to be safe and to have a good
10     livelihood and to go home safe each day.
11          Q.   Sure.   Why?
12          A.   Because we care.
13          Q.   Okay.   And so Eastman cares about the
14     safety of its employees, right?
15          A.   Yes.   Very much, yes.
16          Q.   And Eastman cares about the safety of the
17     public?
18          A.   Eastman does, yes.
19          Q.   So it's important for Eastman and its
20     employees to protect themselves and the public,
21     right?
22          A.   It's important for people to protect
23     themselves, be aware of their surroundings and to
24     try to make sure, yes, you don't do something that
25     harms other individuals.
```

Page 287

Appx_1493

1          Q.   Okay.  So Eastman tries to the best of its

2     ability, right, to keep the public as safe as

3     possible, right?

4          A.   So I'm -- when you say public, so that's a

5     very broad term for me.  Can you restate it?

6          Q.   Sure, sure.

7               So Eastman feels like it has

8     responsibility to keep nonemployees as safe as

9     possible to the extent Eastman has any control over

10    that, right?

11         A.   So Eastman has an obligation -- well, so

12    it has a desire to be a good steward in our

13    communities, be a good steward in the people who

14    come in interaction around us.  So, yes, it's our

15    absolute desire that -- that we are being positive

16    in the environment and the, you know, the public or

17    the areas where we operate and that we do no harm to

18    the environment or the individuals around us.

19         Q.   Okay.  So Eastman is -- hopefully, at

20    least, doing no harm, right?  I think that's what

21    you just said.

22              MR. DuBOFF:  Objection to the form.

23         A.   Yes.  Those are my words.  But, yes.

24         Q.   (By Mr. White)  Sure.

25              So you agree here, Eastman's taken no

                                        Page 288

1    actions to discipline Caylee following any of the

2    wrecks that she's been in in Eastman provided

3    vehicles, right?

4         A.   I believe we have thoroughly reviewed each

5    of the incidents.  We depended on the -- the police

6    records, the authority records where they are.  And,

7    again, that -- so through that, no, we have not

8    deemed it necessary to take disciplinary action.

9         Q.   So with regard to the police investigation

10   of the -- of the crash that killed my client,

11   Eastman didn't feel like there was any need to

12   conduct an additional investigation; is that right?

13        A.   I don't know.  What we did evaluate was

14   looking at the details of what the police -- police

15   officers deemed that were contributing factors, with

16   contributing factors being the individual in the

17   road and the vehicle in front of Caylee's pathway in

18   the road and their full assessment.

19             So in terms of an investigation, I

20   think through the nature of this case, there may be

21   further investigation -- or there has been further

22   investigation that we've been doing probably from

23   that.  But at the time, no, it was not deemed

24   necessary.

25        Q.   So are you -- you've reviewed the police

Page 289

Appx_1495

1    report prepared by Officer Lee Winston, right?

2         A.   I don't know if that was the officer's

3    name.  But, yes, I read the report.

4         Q.   Did you review the contributing factors

5    that she listed as contributing to the acc- -- to

6    the crash?

7         A.   I did.

8         Q.   Okay.  Do you remember what those were?

9         A.   I do.

10        Q.   Okay.  What were they?

11        A.   One was -- so U -- I think U1 is Caylee's

12   reference.  U2 might have been the other -- anyway,

13   it referenced that contributing factors were

14   inattention.  And then there were two additional

15   contributing factors.  One which is the vehicle

16   being several feet -- or being in the road of the

17   left-hand, as well as the individual who was struck

18   being in the middle of the road.

19        Q.   Okay.  So Eastman didn't feel the need at

20   the time the accident happened or immediately after

21   the accident happened when they received the police

22   report, to conduct an additional investigation based

23   on the fact that the police report did flag

24   inattention?

25        A.   You know, through that timing, we handed

Page 290

1    and we wanted to make sure we understood.  I believe

2    that our, of course, legal, as well as our probably

3    insurance, they did follow up with, you know,

4    further information.  I, as a supervisor or a

5    manager, no, I did not.

6         Q.   Okay.  Why not?

7         A.   Because the nature of it was not one that

8    indicated that it needed to be further investigated

9    from a -- and I don't have the expertise at hand.

10   I'm depending on police reports and depending on

11   the -- the definition of those.

12        Q.   So in the course of the investigation, did

13   Eastman get Caylee's cell phones records?

14        A.   In the course of -- excuse me?

15        Q.   In the course -- in Eastman's -- in the

16   course of Eastman's investigation of the

17   contributing factors to the April 30, 2022 accident,

18   before this lawsuit, did Eastman review Caylee's

19   text message records?

20        A.   I don't know the timing at which we did,

21   but we do have those, yes.

22        Q.   Sure.  You have them now, right?

23        A.   Right.

24        Q.   But before a lawsuit was filed or, you

25   know, anticipated, did Eastman conduct a review of

                                        Page 291

Appx_1497

 1      Caylee's text messages, the timing of her text

 2      messages or anything like that?

 3           A.   I don't know the timing.  My primary and I

 4      know the teams direct supervision's primary area of

 5      focus was understanding the -- the assessment of the

 6      police at the time and then really Caylee's well

 7      being.  She was -- had gone through a lot.  And our

 8      focus were on those two things.

 9           Q.   Okay.  So at no point, did Eastman think

10      that maybe this was Caylee's fault?

11           A.   I can't say whether that was speculated or

12      what.  But I know we've certainly been getting

13      information as a part of this.

14                MR. WHITE:  Okay.  So let's go to Exhibit

15           No. 10.

16                          (Whereupon Exhibit 10 was

17                           introduced for identification.)

18           Q.  (By Mr. White)  Then go to Page 8, I

19      believe.

20           A.   Okay.

21           Q.   Do you know what this document is?

22           A.   Yes.  This looks like a -- it's not the

23      full thing, but part of a background search ahead of

24      employment.  Yep.

25           Q.   Okay.  So Page 8 here, is this the result

                                          Page 292

1      of a background check on Caylee?

2              A.    It is.  I believe it is, yes.

3              Q.    Okay.  So what are the -- what, if any,

4      violations did the background check find?

5              A.    Let's see.  It found a traffic

6      misdemeanor, speeding, 80 in a 65.

7              Q.    Okay.  And when does it say that that

8      misdemeanor occurred?

9              A.    Yeah.  That happened in June of 2017.  So

10     almost four years prior to her application to

11     Eastman.

12             Q.    Okay.  And below that, what was the -- was

13     there another misdemeanor that was found?

14             A.    Yes.  It looks like it says that the

15     violation to the promise to appear in court for

16     that, which was in July.  So, yes.

17             Q.    So and --

18             A.    And there's a fine.

19             Q.    And what was the disposition of those two

20     charges?

21             A.    They were guilty.

22             Q.    Okay.  So in the hiring process, what's

23     the management response to getting these types of,

24     let's just call it results back on the background

25     check?

Page 293

Appx_1499

1          A.   So our -- well, so we'd make sure we look

2     at all information that's provided and that we get

3     through the background checks.  Unfortunately, this

4     is pretty common.  Unfortunately or fortunately.

5     Strike that, please.  It is -- you know, traffic

6     tickets are not necessarily uncommon for people

7     across their full background.  This is four years or

8     three and a half years prior.  It was not in and of

9     itself a reason to dismiss her from being a

10    potential candidate for employment.

11         Q.   Okay.  So are there any driving -- Strike

12    that.

13              Are there any traffic tickets someone

14    could have that would disqualify them from being

15    hired by Eastman?

16         A.   I think we depend on our human resources,

17    our -- our work in evaluating these.  So there's

18    certain things and there's requirements of the job.

19    You have to be a U.S. citizen.  I mean, there's

20    certain requirements of course.  And, you know, I

21    know we have certainly things related to -- if

22    there's certain felonies and other elements that

23    have not been, you know, served in time, then that

24    would likely be dismissed or those would be

25    dismissed from...

Page 294

Appx_1500

1      Q.   But I guess my question is about traffic

2  misdemeanors.  Are there any traffic misdemeanors on

3  someone's record that would disqualify them from

4  being hired?

5      A.   Again, I think we've taken all the

6  information.  I don't think there's one that in and

7  of itself would dismiss them.

8      Q.   Okay.

9      A.   It would be taken into account.

10     Q.   So taken into account with what?

11     A.   I mean how many, what the nature of it

12  was.

13     Q.   Okay.  Is there a cut off, like five

14  tickets in two years?  Is there a policy about what

15  disqualifies somebody?

16     A.   No.  We would expect our HR and our team

17  to be using some screening and judgment on that.

18     Q.   Okay.  Is that -- is there a written

19  policy that HR uses?

20     A.   I -- no.  In talking to Amanda Bowman

21  (phonetic) and to others within our HR, there's not

22  a specific limitation on traffic tickets.

23     Q.   Okay.  So do you know who the manager for

24  the region that Caylee was hired for was when she

25  was hired?

Page 295

1          MR. DuBOFF:  Objection to the form.

2     Q.  (By Mr. White)  Yeah.  I can do better.

3              Who was the manager of the Houston

4     region when Caylee was hired.

5          MR. DuBOFF:  Do you mean like her boss'

6          boss or her immediate?

7          MR. WHITE:  Yes.  Yes, yes, yes.

8          MR. DuBOFF:  Okay.

9          MR. WHITE:  Not the supervisor, but.

10    A.  So I would expect that would be Eric

11    Holmes.

12    Q.  (By Mr. White)  Okay.  So Eric Holmes has

13    been the manager for that region since she was

14    hired, until the present?

15    A.  Yes.

16    Q.  So only her supervisor has changed?

17    A.  That is correct.

18    Q.  Okay.  So who would have made the final

19    call on hiring her?

20    A.  The combination between the manager and

21    the supervisor, with approval on this background

22    check that comes from our human resources and the

23    legal review, the labor legal review.

24    Q.  Okay.  So you said earlier, traffic

25    tickets are pretty uncommon -- or pretty common, so

                                        Page 296

Appx_1502

1      Eastman would not be concerned about these sort of

2      results on a background check?

3              MR. DuBOFF:  Objection to the form.

4          A.   You know, all information, anything is

5      appropriate to take into account and -- but it

6      wouldn't -- this would not eliminate her from being

7      an employee, potential candidate.

8          Q.   (By Mr. White)  Okay.  Do you think that

9      based on this background check, HR should have

10     conducted an additional review of her record?

11         A.   No, I do not necessarily.

12         Q.   Okay.  So can you discuss any training or

13     orientation regarding driving safety that an outside

14     sales representative receives, other than getting

15     the auto standard -- the auto lease standard

16     operating procedure?

17         A.   I feel like we've covered this a couple

18     times in terms of what the definition of training

19     is.  But it can be expansive.  So, you know, the

20     training, there's online training.  There's policies

21     that they would receive.  But more important is --

22     or equally important is the frequency of interaction

23     between the sales and their supervisor about safe

24     driving and as they're engaging while on the road.

25         Q.   Okay.  So go to Exhibit 2, Page 98,

                                        Page 297

Appx_1503

1      please.   Okay.   So can you read Lines 8 to 13?

2           A.   Yes.

3                    Okay.   So when you were hired by

4      Eastman, tell me what sort of training you did get.

5                    There were multiple modules, learning

6      development modules that we had to go over.

7                    Okay.   Which ones -- which ones, if

8      you remember?

9                    I don't remember exactly the

10     specifics.

11          Q.   Okay.   So is it concerning that Caylee

12     doesn't remember -- remember the specifics of her

13     onboarding training?

14          A.   We would like our team members to know the

15     content.

16          Q.   Sure.   Do you think she misunderstood my

17     question there?

18          A.   That is possible.

19          Q.   Okay.   How so?

20          A.   It may have been very broad.   She may not

21     have been able to get her mind on a specific set of

22     training.   I don't -- I don't really know.

23          Q.   Okay.   Do you think onboarding training

24     can be effective if an employee doesn't remember it?

25          A.   I think that if they behave in the way we

                                        Page 298

Appx_1504

1    want them to behave, through conversations, through

2    engagement, whether they cull it out as training is

3    maybe secondary.

4         Q.   So Eastman's not concerned if employees

5    consciously remember their training, as long as they

6    unconsciously exhibit their training; is that right?

7         A.   Well, certainly unconsciously exhibiting

8    the training would be very good.  We want them to

9    exhibit it.  But, no.  I mean, our goal is that the

10   team members do remember their training.

11        Q.   Okay.  So would you agree that Eastman

12   shouldn't hire individuals in the outside sales

13   representative role if they're dangerous drivers?

14        A.   We would not want to knowingly hire

15   dangerous drivers.

16        Q.   Okay.  How come?

17        A.   Because it puts them, us and, you know,

18   those around them in danger.  It's no -- we would

19   not want to do that.

20        Q.   Okay.  So we'll go through this quickly.

21   What is Eastman's official policy on employee use of

22   social media?

23        A.   Our policy, I think it's more focused

24   within our code of conduct.  So as part of our code

25   of conduct, the expectation -- actually, we do have

Page 299

Appx_1505

```
 1      a policy on it also, I believe, but --
 2           Q.   Yeah.  You can flip to Exhibit 11.
 3           A.   Okay.
 4                     (Whereupon Exhibit 11 was
 5                      introduced for identification.)
 6           A.   Okay.  Yeah.  So it comes across in our
 7      code of connect of how we expect individuals to
 8      carry themselves as a member of the company.  And we
 9      have guidelines that if they are -- you know, you
10      have to be trained and have certain -- if you're
11      speaking on behalf of the company.
12           Q.   (By Mr. White)  Okay.  So why is this
13      standard operating procedure, what's marked as
14      Exhibit 11, why is it necessary?
15           A.   Well, for -- so it's necessary for a
16      couple reasons.  We do, in some cases, want our
17      teams speaking on behalf of the company.  There's
18      public forums and industry forums that we do ask our
19      teams to be mon- -- you know, to be engaged in.  But
20      then there's also just the personal use.  And for
21      good practice, I don't know that it's explicit.
22      Again, we don't monitor, but we try to also, you
23      know, identify and indicate that, you know, as
24      you're speaking on, you know, as an individual,
25      good -- good social reminders.  We try to also help
```

Page 300

1    our teams and our team members behave as they should

2    and consistent with our business conduct.

3         Q.   Okay.  So how do you guys enforce this

4    social media SOP?

5         A.   It is probably more reactive, if we see

6    there's something that an individual does that's

7    inconsistent with the code of conduct.

8         Q.   Okay.  So, for example, somebody said

9    something terrible that went viral, that's how

10   Eastman would find out about it?

11        A.   That would definitely be one -- one way,

12   yes.

13        Q.   Sure, sure.

14             Is that -- but that's not the only

15   way, I take it.  There's -- is there some level of

16   active management of employee social media?

17        A.   Not the individual's personal social

18   media, no.

19        Q.   You guys just give them rules to abide by

20   and say, break these and you're in trouble?

21             MR. DuBOFF:  Objection to the form.

22        A.   We give them guidelines and expectations

23   as an Eastman employee of how -- you know, how to

24   come across.  We don't say break these and you're in

25   trouble.  There's not a -- I'll be honest.  I doubt

                                          Page 301

```
1     there's a document and management response, but
2     these are things that would be taken into account
3     into their -- if we see them not using the judgment
4     that's aligned with our Eastman core -- core values
5     or this policy or procedure.
6          Q.   (By Mr. White)  Why did you say that
7     it's -- you'd be surprised if there was a mandated
8     management response?
9          A.   Because there's so much that depends on
10    it.  And we don't -- we don't -- like I said, we
11    don't monitor, that I know of, our employee's
12    personal social media.
13         Q.   Okay.
14         A.   We -- we choose not to do that.
15         Q.   Okay.  So it's an affirmative choice not
16    to actively surveil their -- your employees' social
17    media?
18         A.   That is right.  I don't know that that --
19    that would be received very well.
20         Q.   Okay.  So does Eastman's social media
21    policy apply to social media activity on an
22    employee's personal phone or just their work phone
23    or does it matter?
24         A.   Sorry.  Can you repeat that?
25         Q.   Yeah.
```

Page 302

1          Does this social media SOP apply to

2     an employee's social media activity on their

3     personal phone or on their work phone or does it not

4     matter which phone they use?

5          A.   It doesn't matter.  So it's a broad -- so

6     first off, there's guidelines in this SOP.  Well,

7     I'll slow down.  There's guidelines that are more

8     explicit if they're -- of who can speak on behalf of

9     Eastman.  Then there's additional guidelines for

10    speaking on behalf of Eastman on external social

11    platforms.  There's guidance about speaking as a

12    private citizen.  And then there's guidance that are

13    even -- that, you know, reflects best practices.

14          So as technology and the world has

15    continued to evolve, we found that there's value in

16    us trying to set out and set some expectations so

17    that people know how and what our standards are in

18    terms of some of the -- the, you know, expectations

19    related to being part of Eastman.

20          Q.   So I know this is labeled a standard

21    operating procedure, but is it fair to call these

22    more like guidelines than rules?  I'm just trying to

23    get a sense of what you're telling me.

24          A.   Well, this one has both.  It has some

25    rules and guidelines in here.

Page 303

1        Q.   Okay.  And how -- so how do you -- how do
2    you know what's a guideline and what's a rule in
3    this SOP?
4        A.   Well, sorry.  Forgive me.  These -- these
5    do say guidelines throughout.  I don't know that it
6    says rule anywhere.  It says guidelines.
7        Q.   Okay.  Are all SOPs from Eastman like
8    that, some parts of them are guidelines, some parts
9    are rules or does it just depend on the specific
10   wording of the SOP?
11           MR. DuBOFF:  I'm going to object as well
12       outside the scope of any noticed deposition
13       topic.
14       Q.  (By Mr. White)  Sorry.  I'll -- I'll amend
15   that question to talk about the SOPs we've looked at
16   today.
17       A.   I guess to the extent these apply here, so
18   guidelines, you could interpret also as rules.  We
19   don't use the term "rules."  We use the term
20   "guidelines" more often.
21       Q.   Okay.  So a -- but I mean --
22       A.   Sorry.
23       Q.   -- if you violate a guideline as an
24   employee --
25       A.   Yes.

                                        Page 304

Appx_1510

1      Q.   -- you might get trouble?

2      A.   Yes, that is correct.

3           MR. WHITE:  Okay.  Can you go to

4      Exhibit 12.

5                     (Whereupon Exhibit 12 was

6                     introduced for identification.)

7           THE WITNESS:  Okay.

8      Q.  (By Mr. White)  So do you recognize this

9  document?

10     A.   I do, yes.  I think this was put in front

11 of me.

12     Q.   Okay.  So what is it?

13     A.   This is a tweet from Caylee, it looks

14 like, in 2019.

15     Q.   And what does the tweet say?

16     A.   So this is before her employment by a

17 couple years.  It says:  Just almost wrecked

18 ordering Chick-fil-A on my phone while driving, but

19 the grace of God stopped my car just in time.

20     Q.   Okay.  And so what's the emoji?

21     A.   It's an upside down smile face.

22     Q.   So what do you take this tweet to mean?

23          MR. DuBOFF:  Objection to the form.

24     A.   I don't know.

25          MR. DuBOFF:  Sorry.  One second.

                                        Page 305

 1          Objection to the form, very much outside any

 2          noticed deposition topic.

 3          A.   I don't -- I can't interpret this.

 4     Unfortunately in college at these ages, I think

 5     people are very expressive and expansive and putting

 6     their lives out.

 7          Q.   (By Mr. White)  Is this like reading

 8     Sanskrit to you, is it meaningless?

 9          A.   No.  I mean, she's saying she was ordering

10     Chick-fil-A and she almost wrecked.

11          Q.   Okay.  So would you -- is it fair to

12     describe this as Caylee saying she almost caused a

13     wreck because she was on her phone while she was

14     driving?

15          A.   It does.

16               MR. WHITE:  Okay.  If you look at

17          Exhibit 14.

18                        (Whereupon Exhibit 13 was

19                         introduced for identification.)

20               MR. DuBOFF:  14 or 13?

21               MR. WHITE:  Excuse me.  13.

22               THE WITNESS:  Okay.

23          Q.   (By Mr. White)  Do you recognize this

24     document?

25          A.   Yes.

                                        Page 306

Appx_1512

1         Q.   Okay.  Can you read it?

2         A.   This one is from October 4, 2018.  So

3    again several years before she came to our

4    employment.  It says:  Just almost hit two girls

5    while they were walking across the road, to the

6    point where they had to jump out of the way.  How's

7    week going?  If you see this, I'm sorry.

8         Q.   And what are the emojis on this one?

9         A.   Both an upside down face and then a -- I

10   don't know.  I don't recognize that, if it's tears

11   or hands up to her face.  I'm not sure.

12        Q.   And what do you understand this tweet to

13   mean, if anything?

14        A.   My interpretation is Caylee expressing

15   something that happened that day that she either

16   regrets or, you know, is responsive to.

17        Q.   Okay.  So if Eastman had known about these

18   tweets, would Eastman have hired her?

19             MR. DuBOFF:  Objection to the form, calls

20        for speculation, outside the area of any

21        noticed deposition topic.

22        A.   You know, again, we were not aware of

23   these.  We do not do social media.  We don't look

24   for social media in part of what we do in our

25   recruiting.  But, again, these were over two years,

Page 307

Appx_1513

1      two, three years prior.  She's in college, you know.

2      I think we -- we take all information into hand.

3      And I don't know if it would affect whether or not

4      we hired her, but we would take it into account.

5          Q.  (By Mr. White)  So you can't tell today

6      whether or not these tweets would have dis- -- if

7      Eastman had known, would have disqualified Caylee

8      from being hired as an outside sales rep?

9              MR. DuBOFF:  Objection to the form and the

10             ambiguity of the term "disqualified."

11         A.   This alone, again several years before and

12     people change a lot between -- as they grow from

13     college into the career.  We would -- we would not

14     necessarily disqualify with this information alone.

15         Q.  (By Mr. White)  Okay.  And you think those

16     are appropriate statements for social media?

17             MR. DuBOFF:  Objection to the form,

18             ambiguous, outside -- remarkably outside the

19             scope of any deposition topic.

20         A.   I find a lot of statements made on social

21     media are inappropriate or just not necessary.  So,

22     no.  It doesn't show great judgment, you know, for

23     her at the time in college, doing that.  But it's --

24     you know, comments are made a lot.  People are --

25     you know, they embellish, they talk through and

                                            Page 308

Appx_1514

1    they're expressing their lives constantly on social

2    media it seems.

3         Q.   (By Mr. White)  So what, if any, social

4    activity -- social media activity by a perspective

5    employee, if found by Eastman, would disqualify that

6    employee from being hired?

7         A.   So if -- if found or brought to our

8    attention, I believe that strong racial comments.  I

9    believe that strong -- so I don't know exactly.  But

10   I know that there are certain ones related to

11   breaking laws.  Again, not every law, but certain

12   laws.  Or an act of mal intent.  And I don't see mal

13   intent in these.  I see, you know, poor judgment

14   possibly.

15        Q.   Okay.  So if you'll go to -- Well, strike

16   that.

17             Do you think it's foreseeable to

18   someone who that would make these tweets could be a

19   dangerous driver?

20             MR. DuBOFF:  Objection to the form, calls

21        for speculation, also a legal conclusion and

22        well outside the scope of any deposition topic.

23             THE WITNESS:  Yeah, I'm not going to

24        speculate on that.  I don't know.

25             MR. WHITE:  Okay.  So if you go to

                                        Page 309

Appx_1515

```
 1              Exhibit 14.

 2                        (Whereupon Exhibit 14 was

 3                        introduced for identification.)

 4              THE WITNESS:  Okay.

 5         Q.  (By Mr. White)  So have you seen this

 6    document before?

 7         A.  I don't recall this document.

 8         Q.  Okay.  So are you aware that Caylee Smith

 9    in her deposition admitted to posting an Instagram

10    story from her Eastman provided vehicle in June of

11    2023?

12         A.  I don't think so.

13         Q.  Okay.  So you didn't review that part of

14    her deposition?

15         A.  Can you repeat what she said because I

16    don't -- it doesn't stand out to me.

17         Q.  Yeah, sure.  Sure, sure.

18                   Are you aware Caylee Smith admitted

19    to posting an Instagram story as captured by

20    Exhibit 14 from her Eastman provided vehicle in June

21    of 2023?

22         A.  I don't recall that.

23         Q.  Okay.  Do you think that's appropriate?

24              MR. DuBOFF:  Objection to the form.

25         A.  Are there more details?  So she posted an
```

Page 310

```
 1        Instagram?
 2             Q.   (By Mr. White)   That's what she told us.
 3             A.   Can you tell me more of the details?
 4             Q.   That's all we know, right?   This is the
 5        Instagram story, Exhibit 14.
 6             A.   Do we know if her vehicle was moving.
 7             Q.   We do not.
 8             A.   So I don't know.   I would say if we knew
 9        this, I would want to understand more.
10             Q.   Okay.   Do you think -- is seeing that she
11        posted something on Instagram from her Eastman
12        provided vehicle in June of 2023 after she's had
13        three accidents in an Eastman provided vehicle, is
14        that cause for concern enough to engage in
15        additional investigation by Eastman?
16             A.   So if this came to, you know, my team's
17        attention.   I'd want them to talk to her about it
18        and just find out, hey, you know, what were the
19        circumstances.   Were you sitting there, parked
20        vehicle.   What were -- you know, so I want them to
21        talk to her about this, yes.
22             Q.   I mean, obviously she's not going to admit
23        to sending this while driving, right?
24             A.   I don't know.   She's not -- I have not
25        seen anything that suggests she is not an honest
```

Page 311

Appx_1517

1    person.  If anything, she discloses everything that

2    I could tell.  I'm not...

3         Q.   So have you reviewed all of her statements

4    related to April 30 of 2022?

5         A.   I don't know about all of her statements.

6    But I believe I've reviewed them.  I don't know.

7         Q.   Did she tell Eastman she had been texting

8    Gracie Roberts on her drive north on I-45 on

9    April 30 of 2022 before the lawsuit was filed.

10        A.   I don't know that we got to that detail in

11   terms of asking what she was doing earlier in the

12   day.

13        Q.   So you don't know if she told Eastman?

14        A.   No, I don't think she did.

15        Q.   Okay.  So --

16        A.   Or I know she did not.

17        Q.   You know she did not?

18        A.   Yeah.  We didn't know that.

19        Q.   Okay.  So would you agree that as of

20   June 2023, Caylee Smith in particular should

21   understand the dangers in using her phone in the

22   Eastman provided vehicle?

23             MR. DuBOFF:  Objection to the form,

24        ambiguous.

25        A.   She should be aware of our expectations,

Page 312

Appx_1518

1    our policy that not using a hands-on phone while

2    she's driving.  She would absolutely know that, yes.

3        Q.  (By Mr. White)  Okay.  But her in

4    particular, should she be aware given her history?

5        A.   I would expect all of my team to be aware.

6    But, yeah, she should have full awareness and be

7    conscientious and cognizant of it.

8        Q.   Okay.  So -- so would you agree that based

9    on the fact that Caylee Smith is still using her

10   phone in her work vehicle as demonstrated by

11   Exhibit 14, she's not been adequately trained or

12   supervised on the dangers of using her phone in her

13   work vehicle?

14        MR. DuBOFF:  Objection to the form.

15        A.   No, I would not.  Again, if -- if they --

16   so there's a great and a clear expectation if

17   they're going to use their phone, for them to

18   attempt to try to pull over and be in a parking lot.

19   She may be in a parking lot just having gotten off a

20   quick call with her boss.  I don't know what

21   happened with -- you know, why -- I don't know any

22   circumstances around this.

23        Q.  (By Mr. White)  Sure, sure.  I understand.

24             And neither do I, other than it got

25   posted, right?  All we have is Caylee's word to go

Page 313

Appx_1519

1        on, right?  Right?

2            A.   Yes.

3            Q.   Okay.  So can -- very quickly, Eastman's

4        safety slogan is All In For Safety, right?

5            A.   Yes.

6            Q.   Can you tell us just a little bit about

7        what that means and how that gets executed?

8            A.   It's a reminder.  It's trying -- so how it

9        gets executed is a hard thing for me to answer.

10       There's many, many practices behind safety.  But it

11       is a way to keep it at front.  We start meetings

12       with safety topics.  We set our very first measure

13       on things we have as a business.  My first measure

14       on my business and my business scorecard and my

15       teams is our safety records.

16                    We have -- every time I visit a

17       manufacturing plant, I purposefully take time out in

18       the field with them in the plant or if I'm traveling

19       with a sales rep, I take the time to talk to them

20       about the environment.  What's the -- what's the

21       skill that you, you know, that worries you most.

22       Not skill, but what's an activity that's taking

23       place that you feel -- don't feel fully comfortable

24       with operating.  Is there something we can change

25       about it.

                                            Page 314

1                    And so it's intended to be that every

2      part it's inherent in our job.  That it's not an

3      SOP, but it's in every conversation or every part of

4      our engagement with our team members that safety is

5      the way we operate first and foremost.  And we'll

6      stop jobs, with no questions, if there's -- if

7      there's -- if it needed to be done in terms of

8      safety.

9                    THE VIDEOGRAPHER:  I'm sorry.  We have to

10            change for a minute.

11                    MR. WHITE:  Let's go off the record and

12            take a break.

13                    THE VIDEOGRAPHER:  All right.  The time is

14            4:29 p.m. and we're off the record.

15                          (Whereupon there was a short

16                          break.)

17                    THE VIDEOGRAPHER:  The time is 4:41 and we

18            are back on the record.

19                    MR. WHITE:  This is Jacob White,

20            Plaintiff's counsel.

21            Q.   (By Mr. White)  Erin, we were just

22      discussing a variety of things, but I believe we

23      were talking about Eastman's safety policy or safety

24      philosophy, right?

25            A.   Yes.

                                                Page 315

1        Q.   Okay.  And I can't remember if I asked

2   this before the break, so I'm sorry if I'm repeating

3   myself.  How does Eastman execute its safety policy

4   with regard to outside sales representatives?

5        A.   So safety is brought up from the very

6   beginning in terms of the expectation of that being

7   the first priority.  One way we do that is by making

8   sure in their performance goals or their goals every

9   year and then also their reviews, that it's the

10  first one on the list.

11       Q.   Okay.

12       A.   Another way that Eastman does that is

13  through a series of both -- as a part of onboarding

14  and a part of frequency of interaction between the

15  sales member and their leader.  The expectation that

16  that's part of their biweekly conversations and

17  discussions.  Talking about topics at hand, how

18  they're -- you know, what are they doing to

19  demonstrate, how -- you know, have they had any

20  incidents, have they had anything.  That's a

21  frequent conversation.

22                We send safety updates to populations

23  across the company.  We are measured as a company in

24  our bonuses.  And our pay is partially affected by

25  how the safety performance is.  And so that's --

Page 316

Appx_1522

 1     there's a number of various ways in which we try to

 2     make sure that it's material, but also that it's

 3     more engrained in everything we do.  So it's a

 4     common part of the conversation in the reinforcement

 5     of the culture.

 6          Q.   Okay.  Do you know if Caylee's pay in 2022

 7     was affected by her safety rating for that year?

 8          A.   Let's see.  2022, I believe she had and

 9     improve on her pay.  So, yes, I believe it would

10     have been.

11          Q.   Okay.  And so --

12          A.   Her bonus.

13          Q.   You believe it would have decreased her

14     bonus?

15          A.   I do believe so.

16          Q.   Okay.  Was Eastman aware on April 30,

17     2022, Caylee was taking prescription drugs?

18               MR. DuBOFF:  I'm going to object as

19          outside the scope of any noticed deposition

20          topic.

21          A.   There's a policy that certainly any

22     prescription medicines, the individual has to

23     disclose those.  So either her management or HR were

24     aware that she was on -- I believe, on medicines

25     related to any sort of health or medical, mental

                                        Page 317

Appx_1523

 1    situation.

 2         Q.   (By Mr. White)  Okay.  So is it your

 3    testimony that they should have known or that they

 4    did, in fact, know that she was on prescription

 5    drugs on that day?

 6         A.   I do not know about that day.

 7         Q.   Okay.  Was Eastman aware that Caylee wore

 8    prescription glasses?

 9         A.   I do not know.

10         Q.   Okay.  Was she required to disclose that

11    to Eastman?

12         A.   I don't think so.  I certainly haven't

13    disclosed that I wear contacts.

14         Q.   Okay.  Is it potentially different for

15    outside sales reps, that they have to disclose that?

16         A.   Not related to vision, I don't think so.

17         Q.   Okay.  Is -- is there any other sort of

18    medical requirements for an outside sales rep?

19         A.   I don't think they'd be any different than

20    other employees.

21         Q.   Okay.  Okay.  So we talked a little bit

22    about this, but I want to dig deep.  The

23    investigation that Eastman conducted following the

24    April 30, 2022 investigation [sic], do you remember

25    who was in charge of that investigation?

Page 318

Appx_1524

```
 1            A.    I would expect Edwin Williamson, along
 2     with -- when you refer to it as an investigation, I
 3     think the follow-up to any incident like that, Tammy
 4     Jones in our risk management.  I know that Lee Ward
 5     is a part of it more from the interaction with
 6     Donlen and with information that's brought in.  It
 7     would be those -- those individuals.
 8            Q.    Okay.  Edwin Williamson, is that y'all's
 9     inside counsel?
10            A.    That is correct.
11            Q.    Okay.  All right.  Tammy Jones, I think
12     you said she's on your risk management team?
13            A.    Yes.
14            Q.    Okay.  Is she a lawyer by training, do you
15     know?
16            A.    I do not know.
17            Q.    Okay.  What -- I think I know the answer
18     to this, but what precisely is the risk management
19     team at Eastman?
20            A.    They are part of either a cross between
21     our human relation -- or human -- HR and our legal
22     organization to try to -- they manage policies, they
23     manage kind of compliance, things like that.
24            Q.    Okay.  Is she -- is she like a direct
25     report to Edwin or are they separate departments?
```

                                          Page 319

Appx_1525

1      A.   I do not know.

2      Q.   Okay.  Between Edwin, Tammy and Lee, do

3  you know who precisely was leading the investigation

4  or is it -- is there a hierarchy to that?

5      A.   There's not usually a hierarchy to it.

6      Q.   Okay.  Do you know what documents,

7  electronic communications or data they collected as

8  part of their investigation?

9      A.   They certainly collected, you know, the

10  documented report from the police.  They collected

11  the documented report from Donlen.  And then

12  subsequent -- I don't know what they did

13  immediately, versus as they continued to evaluate.

14  I don't think that our HR, you know -- I don't think

15  we drove further investigation once we saw the

16  police report.

17      Q.   Okay.  So you think that the investigative

18  team, once they reviewed the police report, that was

19  the end of the investigation?

20      A.   For our standard, like business HR team,

21  yes.

22      Q.   Okay.  Was there another team that maybe

23  did additional investigation?

24      A.   That's where Edwin would come in.

25      Q.   Okay.  Do you know if anyone at Eastman

Page 320

```
 1    got a statement from Caylee following the April of

 2    20 -- April 30 of 2022 accident?

 3         A.   I believe so through our -- through that

 4    team.

 5         Q.   Okay.  Do you know if that's documented,

 6    like is that a written down statement or recorded?

 7         A.   I think it comes through with the Donlen

 8    report.  And I don't know -- I don't know if they

 9    have other statements.

10         Q.   Okay.  So when you're thinking of a

11    statement by Caylee, are you just thinking of the

12    Donlen report?

13         A.   Probably any other with between Edwin --

14    yes, that's all I've -- that's all I've seen.

15         Q.   Okay.

16         A.   Other than parts of her deposition that I

17    saw, yes.

18         Q.   Okay.  All right.  So you think it's

19    possible that Edwin took a written statement from

20    her?

21         A.   I do not know.

22         Q.   Okay.  As part of the investigation, did

23    anybody look into Caylee's cell phone usage during

24    the trip that resulted in the accident?

25         A.   I was not aware of doing, nor did I ask
```

Page 321

Appx_1527

1    for it during that time.

2         Q.   Okay.  So there were no disciplinary

3    actions taken against Caylee as a result of the 2022

4    crash, the April 2022 crash?

5         A.   No, there were not.  As I mentioned, this

6    was an incident that was clearly traumatic for her.

7    It was an incident in which the police didn't cite

8    her for any violation.  And so we were taking those

9    into account.

10             What we did is we pulled in employee

11   assistance, some psychological, mental health kind

12   of help.  That is a standard part of our, you know,

13   support and resources as a company.  And that was my

14   and the team's first priority.

15        Q.   Okay.  So I want to ask you about employee

16   assistance.  Is that -- you know, is that like

17   mental health therapy for Caylee, is it some sort of

18   doctor; do you know what that entails?

19        A.   So in general, many, many things.

20        Q.   Okay.

21        A.   It could be helping find, you know,

22   opportunities for your spouse if you've just

23   recently relocated.  So there's many things.  In

24   this case, what I recall was for her and also for

25   the team, the sales team that she was going to see,

                                        Page 322

```
 1    we had a kind of expert part of employee assistance.
 2    So I think they were trained in, you know, how to
 3    deal with difficult and traumatic situations.  But
 4    also, yes, probably trained in some mental health
 5    support.
 6         Q.   Do you remember exactly what the character
 7    of the assistance she received was?
 8         A.   I do not.
 9         Q.   Okay.  Was that assistance paid for by
10    Eastman?
11         A.   I believe it is.  That's part of the
12    benefits as an employee.  And, you know, she had --
13    so she wanted to work and to come.  As part of this,
14    our senior, you know, medical staff and, you know,
15    we said no.  This is traumatic, you need to take
16    time.  So she had to be cleared before she came back
17    to work.
18         Q.   Okay.  And what was that clearance
19    process?
20         A.   I don't know exactly details.
21         Q.   Okay.  Was that internal medical staff
22    cleared her or was it some doctor she saw outside of
23    Eastman said, hey, she's good to work again; do you
24    know any of that?
25         A.   I think it's a combination.
```

Page 323

Appx_1529

```
 1              Q.   Okay.  Do you know what the name of the

 2       internal medical staff at Eastman is?

 3              A.   Dr. Heba (phonetic).  He's head of the

 4       staff.

 5              Q.   Okay.  And did Dr. Heba, in fact, clear

 6       her to return to work?

 7              A.   Yes.  At some point, he did.

 8              Q.   Did Eastman hire any third parties for the

 9       investigation of the April 30, 2022 accident, like

10       private investigators, anything like that?

11              A.   I think we did hire -- I think that

12       counsel hired a reconstructive firm to reconstruct

13       the -- the incident.

14              Q.   Did they -- to your knowledge, did that

15       happen before or after this litigation commenced?

16              A.   I do not know that.

17              Q.   Okay.  Are you aware of any accident

18       reconstruction by Eastman that occurred before this

19       litigation began?

20              A.   No.  I don't know the time that they did

21       it.

22              Q.   Okay.  Did Eastman interview any witnesses

23       to the accident other than Caylee?

24                   MR. DuBOFF:  You mean?

25                   MR. WHITE:  Before this litigation, yes.
```

Page 324

Appx_1530

1       A.   I do not know.  I think Eastman was

2  depending on the police report and whether they

3  interviewed any witnesses.  I do not think, but I do

4  not know if we sought other witnesses.  I...

5       Q.  (By Mr. White)  Okay.  Do you have any

6  reason to believe that before this litigation,

7  Eastman spoke with any of the state troopers or

8  police personnel or emergency personnel that

9  responded to the accident?

10      A.   I don't know.  I don't think it would be

11  Eastman direct employees, but I'm not sure.

12      Q.   Okay.  Do you think Eastman hired anybody

13  to have those conversations with those emergency

14  personnel?

15      A.   It's possible.

16      Q.   Do you think there's any written

17  statements that Eastman or its agents took from the

18  emergency personnel prior to this litigation

19  beginning?

20      A.   I do not know.

21      Q.   Okay.  You're not -- you're just not aware

22  of any such statements being taken by Eastman or its

23  agents?

24      A.   No, I'm not.  I mean, I think as I've

25  discussed with Edwin who said -- no, I do not.  It

Page 325

Appx_1531

1    didn't come up in our conversations.

2        Q.   Okay.  So if you go to Exhibit 2, Pages

3    312 and 313.  Okay.  So have you reviewed this

4    portion of Caylee's testimony on Pages 312 and 313

5    of her deposition?

6        A.   Yes, I recall reviewing this.

7        Q.   Before today, right?

8        A.   Yes.

9        Q.   So I'm not going to make you read if for

10   the record; you're familiar with it, right?

11       A.   I've -- I've reviewed it.

12       Q.   Okay.  You can take a second to look at

13   it.

14       A.   I can relook at it.  Yes.

15       Q.   Yeah.

16       A.   Okay.

17       Q.   Okay.  So would you agree that Caylee's

18   testimony is that she sent a text message to Gracie

19   Roberts eight to nine seconds before she struck and

20   killed Nehemias Santos with her Ford Explorer?

21       A.   I do not know the timing of that.  I don't

22   see that it references here the timing.  But she

23   does say that she dictated a text, yes.  So the

24   question is -- so she acknowledges that she dictated

25   a text.

Page 326

1        Q.   Okay.  Do you have any reason to disagree

2   that in another part of her deposition, not a trick

3   question, that she says eight to nine seconds before

4   she hit Nehemias Santos is when she dictated this

5   text message?

6           MR. DuBOFF:  This is outside the scope of

7       this deposition of any noticed topic.  And I

8       don't know what -- I don't know what the

9       relevance is asking her to adopt what another

10      witness has said.

11       A.   I think she's indicated that she had

12   dictated a text.  I don't know the timing for it.

13   But if that's what you documented.

14       Q.  (By Mr. White)  Okay.  So have you reviewed

15   the cell phone records with the time stamps to

16   prepare for this deposition?

17       A.   I have reviewed them.  I did not do a

18   comparison of time stamps exactly.

19       Q.   Okay.  Right.

20       A.   Yes.

21       Q.   So I'm not going to put words in your

22   mouth about the timing of it, right?

23       A.   Okay.

24       Q.   But do you understand that she send a text

25   message to Gracie Roberts on approach to the black

Page 327

Appx_1533

1       Toyota on I-45?

2              A.    Yes.  Yes.

3              Q.    Okay.  Right.

4                    And you agree from this testimony,

5       she says that after she sent that text message, she

6       saw the black Toyota partially in the left most

7       northbound lane?

8              A.    Yes.

9              Q.    Okay.  Do you agree that her testimony is

10      that after seeing that, she -- her testimony is that

11      she adjusted to the right, but did not get in the

12      middle lane?

13             A.    Yeah.  I misunderstood the middle.  Yes,

14      that is her testimony.

15             Q.    Okay.  Right.

16                    Do you agree that her testimony is --

17      and I think it's on the next page -- is that after

18      she made that adjustment to the right, that's when

19      she -- she says she checked her GPS?

20             A.    That is what she says, Yes.

21             Q.    Okay.  And do you finally agree that her

22      testimony is that either as she's looking at the GPS

23      or immediately after she looks at the GPS, that's

24      when she says Nehemias Santos suddenly appeared in

25      front of the Ford Explorer?

                                        Page 328

```
 1           A.    Let me look.  So I don't know if I got
 2      that far, but -- I didn't get to where she saw
 3      Mr. Santos.
 4           Q.    That's my bad.  I probably didn't give you
 5      the page.
 6                      But do you have any reason to
 7      disagree with that?  I mean --
 8           A.    No.
 9           Q.    And I'm not taking it that you --
10           A.    From my --
11           THE COURT REPORTER:  Stop.
12           A.    Sorry.  From reading the deposition and
13      seeing it, it sounds like she glanced at her GPS,
14      looked up and saw an individual in the middle of her
15      road.
16           Q.  (By Mr. White)  Okay.  And do you have any
17      reason to disagree with her statement where she says
18      she doesn't remember if she saw emergency lights or
19      anyone standing around the vehicle?
20                 MR. DuBOFF:  I'm going to object to the
21            form of this question and just the entire line
22            of inquiry which is just prompting the witness
23            with your account of what the testimony was.
24                 THE WITNESS:  Can you repeat the question?
25           Q.  (By Mr. White)  Sure.
```

Page 329

```
 1                    Do you have any reason to contest
 2     when Caylee says that she doesn't remember seeing
 3     emergency lights or anyone standing around the
 4     vehicle?
 5               MR. DuBOFF:  Are you asking if she has a
 6          reason to contest your account of what Caylee
 7          said or does she have a reason to contest what
 8          Caylee said, if what she said is what you're
 9          saying?
10               MR. WHITE:  Speaking objection, one.
11               MR. DuBOFF:  It sure was.
12          Q.  (By Mr. White)  Two, no.  My question is,
13     do you have a reason to contest Caylee's rec- --
14     where Caylee says she doesn't remember seeing
15     emergency lights or anyone standing around the
16     vehicle, do you have a reason to contest that?
17               MR. DuBOFF:  Objection to the form of the
18          question.
19          A.  I was not there.  So I have no reason to
20     contest to what she said to that regard.  I don't
21     know what she saw.
22          Q.  (By Mr. White)  Caylee's not made any
23     separate statements to Eastman about whether or not
24     she saw the emergency lights on prior to hitting
25     Nehemias Santos?
```

Page 330

Appx_1536

```
 1              MR. DuBOFF:  Objection as outside of the
 2         scope of noticed deposition topic.
 3         A.   Not that I'm aware of.
 4         Q.  (By Mr. White)  Okay.  She hasn't made any
 5    statements to Eastman about whether or not she saw
 6    anyone standing around the vehicle prior to hitting
 7    Nehemias Santos?
 8              MR. DuBOFF:  Same objection.
 9         A.   No.  In fact, my understanding from what I
10    looked into and seen, is that she did not see people
11    standing at the vehicle.
12         Q.  (By Mr. White)  Okay.
13         A.   She was surprised to see him in the middle
14    of her lane on such short awareness.
15         Q.   Okay.  So that's -- that's what Caylee has
16    told you or that's what you reviewed from her
17    deposition?
18         A.   I have not spoken to Caylee.  So it is
19    from reviewing the deposition.
20         Q.   Okay.  Okay.  So do you agree that in the
21    deposition, Caylee admitted to sending and receiving
22    approximately 60 text messages with her friend
23    Gracie Roberts on April 30, 2022?
24         A.   Yes.  She -- I don't know how many.  I
25    don't recall the number.  But she clearly
```

Page 331

1    acknowledges that on her personal phone and while --
2    while she's -- before she leaves as well as through
3    transition, she's verbally dictating messages.
4        Q.   Do you recall if she said she testified
5    she verbally dictated all those messages or just one
6    or any number of them?
7        A.   I don't recall.
8        Q.   Okay.  Do you have any independent basis
9    to know whether or not she sent those text messages
10   by manually texting them or by verbally dictating
11   them?
12           MR. DuBOFF:  Objection, outside the scope
13       of any noticed deposition topic.
14       A.   I do not.  I don't know how to determine
15   that.
16       Q.   (By Mr. White)  Okay.  And in the course of
17   Eastman's investigation, Eastman doesn't have any
18   basis to know whether or not those text messages
19   were dictated or manually typed down?
20       A.   Not that we know.  I know -- I don't know
21   that the technology shows that.
22       Q.   Okay.  So if she did send and receive
23   those text messages using a hands-free method, does
24   that mean she was not violating Eastman's distracted
25   driving policy on April 30, 2022?

                                    Page 332

Appx_1538

1          A.    Possibly, yeah.

2          Q.    Okay.  So why is that?

3          A.    As we indicated, there's certain

4     requirements for hands free.  There's requirements

5     for what to not partake in related to business while

6     you're traveling.  But there's also provisions for

7     being able to operate with a hands-free unit while

8     you're driving.

9          Q.    Okay.  So do you know what Caylee Smith

10    was texting about with Gracie Roberts on April 30,

11    2022?

12         A.    Only because of reading through this to be

13    prepared.

14         Q.    Sure, sure.

15               Do you think that conversation was

16    necessary for that trip?

17               MR. DuBOFF:  I'm going to object to the

18         form.  Improper question, improper opinion,

19         it's outside the scope of any noticed

20         deposition topic.

21         A.    I can't say from -- necessary, probably

22    not, but.

23         Q.    (By Mr. White)  Well, we talked earlier

24    about how sometimes it's a practical necessity to

25    take your eyes off the road while you're driving,

                                        Page 333

Appx_1539

1      right?

2            A.   Yes.

3            Q.   We talked about checking gauges, right, as

4      an example --

5            A.   Yes.

6            Q.   -- right?

7            A.   Yes.

8            Q.   Is texting your friend about which tattoo

9      shops are open a practical necessity while driving

10     down the road?

11           MR. DuBOFF:  Same objection, calls for

12           improper opinion, outside the scope of any

13           noticed deposition topic.

14           A.   From what -- I don't think that's

15     necessary.

16           Q.   (By Mr. White)  Okay.  Why not?

17           MR. DuBOFF:  Same objections.

18           A.   I don't know the nature of how important

19     or what they were doing.  But I would not deem that

20     as being necessary, more important than driving.

21           Q.   (By Mr. White)  Okay.  So do you have any

22     reason to contest due to Eastman's investigation of

23     the accident, that Caylee was driving at certain

24     points more than 95 miles an hour on Interstate 45

25     that day?

Page 334

1          A.   I have not seen records of her driving.
2     So I don't know that detail.
3          Q.   So you've not reviewed the speed logs from
4     her Ford Explorer for April 30 of 2022?
5          A.   I discussed those with counsel, but I
6     don't --
7          Q.   And I don't want to know about that.  But
8     you have not reviewed those?
9          A.   No, I have not.
10         Q.   Okay.  You're aware they exist, though,
11    right?
12         A.   Yes.
13         Q.   Okay.  So if she was driving in excess of
14    95 miles an hour in the Ford Explorer, would that
15    have violated any Eastman policies?
16         A.   Our policy clearly states we want -- that
17    they're expected to follow the speed limits.
18         Q.   Okay.  And 95 is definitely over the speed
19    limit, right?
20         A.   It would be.  If that was the resulting
21    speed, absolutely.
22         Q.   Did Caylee tell anybody at Eastman about
23    her speeds while driving on April 30 of 2022?
24         A.   No, she did not.
25         Q.   Okay.  Do you wish that she had?

                                        Page 335

 1          MR. DuBOFF:  Objection to the form, calls
 2     for an improper opinion, outside the scope of
 3     any noticed deposition topic.
 4          A.   I don't have a wish.  I wish if that was
 5     what she was driving, you know, I wish she wasn't
 6     driving that.
 7          Q.   (By Mr. White)  Okay.  Is that just because
 8     it violates the law?
 9          A.   Certainly.
10          Q.   Is it also because it's just unsafe?
11          A.   Yes.
12          Q.   Okay.  So I'm going to show you a dash cam
13     video from Officer Winston, Lee Winston's cruiser as
14     she approached the scene.  Have you seen this video
15     before?
16          A.   No, sir.
17          MR. WHITE:  I guess we're going to call
18     this Exhibit 17 I believe.
19               (Whereupon Exhibit 17 was
20               introduced for identification.)
21          Q.   (By Mr. White)  I'm going to start it at as
22     close as possible at the three-minute mark.  I don't
23     want you to have to watch the whole thing.  Just a
24     second.  Okay.  All right.
25               So I'm going to start this video at

                                          Page 336

Appx_1542

1    the two-minute and 37-second mark.  So can you see

2    this okay?

3          A.   Yes.

4          Q.   Okay.

5                    (Video playing.)

6          Q.   (By Mr. White)  I'm going to pause it here

7    at the two-minute and 46-second mark.  Can you

8    describe the traffic as shown on this video?

9          A.   I see three vehicles in front of the

10   police car.

11         Q.   Okay.

12         A.   If I can tell right.

13         Q.   Okay.  Have you ever been on this

14   interstate before?

15         A.   I do not think so.

16         Q.   Okay.  How many lanes do you see?

17         A.   There's three lanes in the northbound, if

18   she's going northbound.

19         Q.   Sure.  I'll stipulate that she's

20   approaching the scene going northbound.

21         A.   Okay.

22         Q.   How would you describe the traffic --

23              MR. DuBOFF:  I'm going to object --

24         Q.   (By Mr. White)  Excuse me -- the weather.

25              MR. DuBOFF:  It's still going to call for

                                        Page 337

Appx_1543

```
 1              improper opinion and outside the scope of any
 2              noticed deposition topic.
 3              A.   The weather looks clear.
 4              Q.  (By Mr. White)  Okay.
 5              A.   And dry.
 6              Q.   And dry, right.
 7                        Would you agree that the resolution
 8         of the video is grainier than human sight?
 9              A.   Prob -- yes.
10              Q.   Okay.  That's not a gotcha.  We'll play it
11         more and you think about that.
12              A.   Okay.
13              Q.   I'm going to play it to about the
14         three-minute mark.
15                        (Video is playing.)
16              Q.  (By Mr. White)  I'm going to pause this at
17         the three-minute and three-second mark, right?
18         After having watched it for a couple seconds, can we
19         agree this video is grainier than human sight?
20              A.   Yes.
21              Q.   Okay.  Sure.
22                        Do you see anything stopped in the
23         left most lane at this point in the video?
24              A.   I cannot say.  I don't know if anything's
25         stopped up there.
```

Page 338

```
 1          Q.   Okay.  Okay.  So let's go forward a little
 2    bit.  Let's stop it at the three-minute and
 3    nine-second mark.  Can you see anything stopped in
 4    the left most lane?
 5          A.   Not necessarily.  I see people -- I see
 6    vehicles passing that are clearly slow and I see
 7    vehicles within the lane up ahead.
 8          Q.   Okay.  So let's keep going.
 9                    (Video is playing.)
10          Q.   (By Mr. White)  So I'm stopping it at the
11    three-minute and 14-second mark.  Can you see
12    anything stopped in the left most lane?
13          A.   It appears it is something stopped, yes.
14    There's multiple vehicles stopped and there's a dark
15    vehicle that's partially on the shoulder, partially
16    into the lane.
17          Q.   Okay.  Right.
18               You can then -- does that appear to
19    be the black Toyota involved in the accident that my
20    client was in?
21          A.   Yes, it does.
22          Q.   Okay.  Have you ever seen this video
23    before?
24          A.   No.
25          Q.   Okay.  Do you have any reason to contest
```

Page 339

```
 1      that this is the dash cam video of the police
 2      officer that first arrived on scene?
 3              A.    No.
 4              Q.    Okay.  So now that you've seen a video of
 5      the approach to the -- to the stopped Toyota, would
 6      it have violated Eastman's policies for Caylee to
 7      have sent a text message on approach?
 8                   MR. DuBOFF:  Well, I'm going to object.
 9              This is going to take a while.  I'm going to
10              object, outside of the scope of any noticed
11              deposition topic.  Object for calls for an
12              improper opinion based on a video of the
13              accident after there was the accident there and
14              asking the witness to give her opinion about
15              something having to do with a completely
16              unrelated situation with multiple emergency
17              vehicles stopped in a lane and two lanes of
18              completely stopped traffic.
19                   If you understand the question, go ahead
20              and answer.
21              A.    Our policy says that -- I'm trying to get
22      the exact words.  But essentially try to avoid
23      potential extractions when there are other things
24      around.  So looking at the traffic, looking at
25      others, it says try to avoid potential distractions.
```

Page 340

1      But I would not definitively say it's a violation of

2      the policy.

3          Q.   (By Mr. White)   Okay.   So can we agree that

4      the traffic that you can see in this video in the

5      right -- two right most lanes is likely backed up as

6      a result of the accident that occurred?

7          A.   Yes.

8          Q.   Okay.

9              MR. DuBOFF:   What topic are we even -- I

10             mean, are you asking Eastman's opinion?

11             MR. WHITE:   This is Eastman's

12             investigation, right?

13             MR. DuBOFF:   No, no.   This is not any

14             questions about an investigation.   You're

15             asking her opinion after watching a video that

16             she said she's never seen.

17             MR. WHITE:   It's part of the

18             investigation.

19             MR. DuBOFF:   This is the investigation?

20             MR. WHITE:   She's Eastman's rep.

21             MR. DuBOFF:   No.   Are you saying what's

22             happening in this room is the investigation?

23             MR. WHITE:   It's part of the

24             investigation, yes.

25             MR. DuBOFF:   No, it's not.   No.   Hold on a

                                          Page 341

```
 1          second.  What is your basis for asking this
 2          witness for her opinion about a video that
 3          she's just seen?  Are you asking for Eastman's
 4          opinion on this video?
 5               MR. WHITE:  Yes.
 6               MR. DuBOFF:  Okay.  She's not going to
 7          answer that question because it's not within
 8          any noticed deposition topic and she hasn't
 9          seen it.
10               So don't answer this question.
11          Q.  (By Mr. White)  Okay.  So I'm going to
12     restate it.
13                    Has -- in your role as the corporate
14     designee, had you reviewed this video?
15          A.   No, I had not reviewed this video.
16          Q.   So in the course of Eastman's
17     investigation of the accident, did Eastman review
18     this video?
19          A.   I believe our legal counsel reviewed the
20     video.
21          Q.   Okay.  Did --
22               MR. DuBOFF:  I'm going to object as
23          ambiguous as to time frame with regard to
24          relative to the lawsuit.
25          Q.  (By Mr. White)  Fair enough.
```

                                        Page 342

```
 1                     Do you know when Eastman's
 2     investigation team reviewed this video?
 3          A.   I do not.
 4          Q.   Do you know if that review occurred before
 5     this litigation or after?
 6          A.   I do not.
 7          Q.   Okay.  So is it possible that Eastman was
 8     unaware of this video when it conducted its initial
 9     investigation of the accident?
10          A.   That's possible.
11          Q.   Okay.  Does this video raise any issues
12     about the veracity of Caylee's statements that would
13     have caused Eastman to conduct an additional
14     investigation if Eastman had seen this video
15     initially?
16               MR. DuBOFF:  Hold on.  Don't answer that
17          question.
18               That's completely outside the scope of any
19          deposition topic.  It's asking -- I don't know
20          what you're asking or whose opinion you're
21          asking for.
22               But don't answer that question.
23          Q.   (By Mr. White)  Okay.  So my question, just
24     to try and repeat, is, does this video as you've
25     seen it lead you to believe that if -- because you
```

Page 343

1    don't know if Eastman saw this in its official

2    investigation, right?

3         A.   Correct.

4         Q.   So since you don't know if Eastman had

5    seen this initially, is it your belief that if

6    Eastman had seen it, they would have conducted more

7    investigation, particularly into the veracity of

8    Caylee Smith's statement?

9              MR. DuBOFF:  Are you asking for her

10        personal opinion or for Eastman's?

11             MR. WHITE:  I'm asking for Eastman's

12        opinion.

13             MR. DuBOFF:  Eastman's opinion about a

14        video that --

15             MR. WHITE:  She doesn't know if Eastman

16        saw.

17             MR. DuBOFF:  If you know -- if you know

18        Eastman's opinion on that, you can answer.

19             THE WITNESS:  I do not know Eastman's

20        opinion on that.

21        Q.   (By Mr. White)  Okay.  So does -- was

22   Eastman told by Caylee Smith or anyone how soon

23   before the accident she -- excuse me.

24             Does Eastman know via Caylee's

25   testimony or some other source, when Caylee sent her

                                        Page 344

1    last text message on approach to the black Toyota?

2         A.   I believe through information, they

3    estimated when it was or we have estimated with the

4    data.

5         Q.   Okay.  So prior to this litigation, was

6    Eastman aware that Caylee had texted Gracie Robert

7    on approach to the black Toyota?

8         A.   I was not aware, and I don't know when

9    Eastman became aware.

10        Q.   So you personally were not aware?  Sorry.

11   I just got to make sure.

12        A.   That is correct.

13        Q.   Okay.  And you don't know when Eastman

14   became aware?

15        A.   That is correct.  In my interactions,

16   questions, I didn't ask the time stamps of when

17   we -- I didn't ask when we became aware of certain

18   information.

19        Q.   Okay.  Okay.  But you are aware of that

20   now, right?

21        A.   I'm sorry.  What am I aware of?

22        Q.   Yeah, yeah.

23             You are aware that Caylee was texting

24   on approach to the black Toyota?

25             MR. DuBOFF:  And hold on.  If you're aware

Page 345

```
1              of that, such information from a source other
2              than your legal counsel, you can answer the
3              question.  If the only source of your knowledge
4              of that, Mrs. Bernhardt, is from legal counsel,
5              I will instruct you to not answer the question.
6                   MR. WHITE:  That's fair.
7                   THE WITNESS:  So my only source of
8              knowledge on this is from legal counsel.
9         Q.  (By Mr. White)  Okay.  Okay.  So based on
10   Eastman's policies, is there any point on that
11   approach to the black Toyota when Caylee Smith would
12   have been -- it would have been permissible for
13   Caylee Smith to dictate or manually text out a text
14   message to Gracie Roberts?
15                  MR. DuBOFF:  And I'm going to make the
16             same objection based on the fact that what's in
17             the video is not necessarily any sort of
18             approximation of the situation that Caylee
19             would have encountered on her approach.
20                  But if you know the answer, you may
21             answer.
22        A.   I don't know the answer.  There was a long
23   time in that video that I didn't see the black --
24   anything obstructing the roadway.  So I don't know.
25   So I would say yes, there are -- so I can't say she
```

Page 346

Appx_1552

1    was in any violation of -- or misconduct in terms of

2    her decision on that.

3         Q.   (By Mr. White)  So was there any violation

4    of Eastman policy after Caylee had seen the black

5    Toyota, as she acknowledges, and then decided to

6    check her GPS as she passed the black Toyota?

7         A.   No, I would not say that is.

8         Q.   Why?

9         A.   That is normal course of operation.  From

10   time to time, you have to scan and glance through

11   different periphery, through different things.

12        Q.   Okay.  So it's your testimony that as she

13   remained in the left most lane to try to pass this

14   black Toyota going over 85 miles an hour, that is

15   not a violation of Eastman's policy to look at her

16   GPS at that moment?

17        A.   I don't know her speed.  I don't know if

18   she knew her speed at that time or not.  So, no, I

19   would not say -- I wasn't there.  I don't know the

20   details.  So I -- you know, no, I would not.

21        Q.   Okay.  So let's switch to the conference

22   real fast, right?  Do you know the agenda of the

23   sales conference that was happening, I think in Fort

24   Worth, I think it was May 1, 2022, that Caylee was

25   scheduled to attend?

Page 347

1          A.   I do.  Roughly, I do.

2          Q.   All right.  Rough, what was the agenda?

3          A.   The agenda was going to involve kickoff,

4     introduction, a little bit of team building and

5     safety kind of engagement.  The -- a lot of it was

6     related to some content on how do our customers run

7     their businesses as it relates to accessories.  So

8     there was some education on that from financing and

9     that.

10              There was content around new software

11    with CORE that was going to help educate and bring

12    value to our customers.  So they were training the

13    teams on that.  And then there was a lot of, I

14    believe, content related to how do we equip our

15    teams to understand the value proposition or why

16    there's value of some of our products to our

17    customers.

18              MR. WHITE:  Okay.  Videographer, how much

19         time do I have?

20              THE VIDEOGRAPHER:  25 minutes.

21              MR. WHITE:  Thank you.

22         Q.   (By Mr. White)  Okay.  So you said

23    something about accessories for clients.  What do

24    you mean by accessories.

25          A.   Automotive accessories.  So window film

                                        Page 348

1    and paint protection film are considered

2    accessories.

3         Q.   (By Mr. White)   Okay.

4         A.   Sorry.   Part of the sales process.

5         Q.   Yeah.   Inside baseball.   Sure, sure.

6              What -- do you know what the safety

7    topics were that were scheduled to be discussed,

8    roughly, at the conference?

9         A.   I do not.   And I -- if I recall correctly,

10   it shifted given the situation, and we spoke about

11   mental health, how do we need -- I shouldn't say --

12   it wasn't mental health.   A lot of it was the team

13   absorbing that their -- their co-worker had been in

14   an accident, that there was a fatality.   And

15   absorbing and thinking about if you were Caylee, how

16   would you want someone to engage you.   It shifted to

17   how to be there as -- for psychological for health

18   and safety our team member.   And --

19        Q.   Was there -- go ahead.

20        A.   Sorry.   And just for the individuals as

21   managers, since they never dealt with anything like

22   this, how to deal with it.

23        Q.   Okay.   So before the accident happened, do

24   you know what the safety topics were that were on

25   the agenda?

                                          Page 349

1        A.   I do not.

2        Q.   Sure.  All right.

3             Would there be documents showing

4    that, like a PowerPoint or something?

5        A.   Not necessarily.  No, not necessarily.

6        Q.   Okay.  After the accident happened and

7    everyone became aware of it, was driving safety a

8    topic that was discussed amongst the conference

9    attendees?

10       A.   Not for a specific purpose.  It was -- it

11   was a recognition, I think, of, wow, there's hazards

12   out there, there's risks.  But, no, there was not --

13   we did not choose to take that moment to try to

14   train our teams in that.  It was absorbing the

15   situation, how to be there for Caylee.  And how to,

16   I guess, work as a team kind of through the

17   information that they had just received.

18       Q.   Okay.  And were these discussions about

19   how to -- reacting to the accident, were those

20   recorded or were these just sort of the round

21   tables?

22       A.   They were not recorded.

23       Q.   Okay.  And was any part of the conference

24   recorded?

25       A.   No.  No, sir, not that I know of.

                                    Page 350

1        Q.   Were there any materials generated, either

2    before the conference, for the conference or during

3    the conference?

4        A.   Yes.   There was some PowerPoint

5    presentations shown.

6        Q.   Okay.   Do you know what's on those

7    PowerPoint presentations?

8        A.   The ones I remember are related to what I

9    recall, an update on -- and a training on how our

10    customers sell, what matters to them.   An update on

11    some of the new products to be sold into the market.

12    So it was that content.

13        Q.   Okay.   Okay.   Do you remember when the

14    conference was initially scheduled?

15        A.   I believe they started planning the

16    conference, or at least notifying people, several

17    months, a few months ahead of time.   And then the

18    details of it and the dates probably got secured

19    within three to four weeks ahead of the conference,

20    something like that.

21        Q.   Okay.   Was attendance mandatory for, let's

22    just say Caylee Smith?

23        A.   It is not mandatory.   Attendance is

24    encouraged if they're able to.   And, honestly, it's

25    something the team was excited about doing because

Page 351

```
 1    it's the first time they were getting together, I
 2    think, through -- since COVID.
 3          Q.   Okay.  All right.  Was Caylee scheduled to
 4    pick up some people from the airport; are you aware
 5    of that?
 6          A.   That's my understanding now.
 7          Q.   Okay.  And do you remember when she was
 8    scheduled to pick up people from the airport?
 9          A.   I believe Monday before the meeting
10    started.
11          Q.   Okay.  Do you know what Caylee's hotel
12    arrangements were Saturday, Sunday, Monday, Tuesday,
13    Wednesday of that week before the accident?
14          A.   What I understand, and only afterwards
15    because of this, was that she was going to be
16    staying -- I think she was going to stay with us at
17    the hotel during the work portion of the trip,
18    during the work from Monday on.  But that she was
19    going to use the time also to visit family and
20    friends and to go to a concert and to do some things
21    on her personal time through the weekend.
22          Q.   Okay.  So Eastman was not paying for her
23    lodging Saturday, April 30, right?
24          A.   No.  Well, I don't believe so.
25          Q.   Okay.  Sunday night, do you know, the day
```

Page 352

Appx_1558

```
 1    after the accident happened?
 2             MR. DuBOFF:  Do you mean --
 3             MR. WHITE:  Sorry.
 4        Q.  (By Mr. White)  Before the accident
 5    happened --
 6             MR. DuBOFF:  They were intending to.
 7        Q.  (By Mr. White)  -- was Eastman intending to
 8    pay for her lodging Sunday night?
 9        A.  That's possible.
10        Q.  Okay.  After the accident happened,
11    Caylee, correct me if I'm wrong, got flown back to
12    Houston, right?
13        A.  I believe Caylee stayed with her uncle or
14    with family for several days.  Caylee was actually
15    asking and hoping to come to the conference.  And as
16    her supervision and HR talked to her, tried to
17    really encourage her, no, you're going to need this
18    time.  You may think you're ready, but.  And so I
19    believe, yes.  She flew back, and we flew her back.
20    Covered the cost for her to fly, return home from
21    it.
22        Q.  Okay.  So did Caylee speak with her
23    supervisors and tell them she wanted to go to the
24    conference?
25        A.  My recollection is she did.
```

Page 353

Appx_1559

1        Q.   Okay.  And Eastman did pay for her flight

2    back to Houston, right?

3        A.   We did.

4        Q.   Okay.  On April 30, 2022, can you tell me

5    very briefly, what the relationship between Eastman

6    and Donlen was?

7        A.   Donlen is the fleet insurance company or

8    fleet leaser.

9        Q.   Okay.  So let's look at Exhibit No. 15.

10       A.   Okay.

11                     (Whereupon Exhibit 15 was

12                      introduced for identification.)

13       Q.  (By Mr. White)  So here -- is this the

14   document that you're talking about when we've been

15   referencing the Donlen report for the April 30, 2022

16   accident?

17       A.   This is.

18       Q.   Okay.  And do you -- is it your

19   understanding that the facts in this report were

20   given by Caylee to Donlen?

21       A.   That would be my understanding.  And I

22   think that is what we confirmed through follow-up.

23   There was a question of whether she gave the actual

24   or whether through questioning, the first call was

25   from her supervisor.  I believe in talking, that she

                                          Page 354

Appx_1560

 1     gave the information directly to Donlen.

 2          Q.   So you don't think one of her supervisors

 3     spoke with Donlen and gave them the information

 4     that's recorded on this report?

 5          A.   I don't think so.  But when I talked to

 6     them, in fact, they were even trying to remember.

 7     They were talking on behalf of each other and trying

 8     to -- so I believe, to the best of my knowledge, it

 9     was Caylee that gave the information.

10          Q.   Okay.  So there's not an amended Donlen

11     report out there; Caylee hasn't given an amended

12     statement to Donlen, right?

13          A.   No.  Not that I know of, no.

14          Q.   All right.  So has Eastman ever asked

15     Donlen to revise this report?

16          A.   No, we have not.  And just real quick.

17     There is an e-mail I thought that there -- I guess

18     it was the e-mail from Caylee to Lee Ward maybe.

19          Q.   I think there's one from Lee Ward to

20     Tammy.  But I'll -- I digressed.

21          A.   Okay.  Okay.

22          Q.   So can you read the description of the

23     accident in the middle of Exhibit 15.

24               MR. DuBOFF:  We have a hole punch issue.

25               MR. WHITE:  Sorry.  Sorry.

                                        Page 355

```
 1                 THE WITNESS:  Does it say "I was"?

 2                 MR. DuBOFF:  Probably I was.

 3                 MR. BUNT:  It is.

 4                 THE WITNESS:  It is?  Okay.

 5                 MR. BUNT:  I was.

 6            A.   I was traveling north on I-45 when a

 7      pedestrian halfway on the left lane of the highway

 8      stepped out of their vehicle and I swerved to try to

 9      avoid the pedestrian and hit them with the vehicle,

10      causing damage.

11            Q.   (By Mr. White)  Okay.  Now, what speed did

12      Caylee tell Donlen she was traveling?

13                 MR. DuBOFF:  Object to the form of the

14            questions -- of the question.

15            A.   Yeah.  I don't know if she told them this

16      or if they asked the question or not.  But it says

17      here on the form, the documentation says 70 was the

18      traveling speed.

19            Q.   (By Mr. White)  So do you have some reason

20      to think that Donlen just picked a number to put for

21      the traveling speed there?

22            A.   No, I don't.

23            Q.   Okay.  So do you have any reason to think

24      that that traveling speed -- Strike that.

25                      Do you think that Caylee said a
```

Page 356

```
 1    different traveling speed to Donlen than what is
 2    reflected on this report?
 3              MR. DuBOFF:  Objection to the form of the
 4         question, calls for speculation.
 5         A.   I don't know.  The information we have is
 6    what's on this report.  I don't -- you know, it
 7    should be coming directly from the individual.  I
 8    don't know if that was the situation here or not.
 9         Q.  (By Mr. White)  Okay.  So down in the
10    bottom left-hand corner, it's got Caylee marked as
11    the driver and the employee, right.
12         A.   Yes.
13         Q.   Okay.  And if you look to the right, do
14    you see where it says, hands-free cell phone use --
15    hands-free cell phone, I guess; do you see that?
16         A.   Yeah, but it's covered up from the
17    exhibit.
18         Q.   Here.  I'll give you mine.  Rookie
19    mistake.  There you go.
20         A.   Thank you.  Yes, hands-free cell phone.
21         Q.   Okay.  And what does it say on the
22    right-hand column?
23         A.   N/A.
24         Q.   What, to the best of your knowledge, does
25    that mean?
```

Page 357

Appx_1563

```
 1            A.    Not applicable.

 2            Q.    Okay.  All right.  I'll take that back.

 3     Thank you.

 4            A.    Yes.

 5            Q.    Okay.  If you can go back to Exhibit 2,

 6     Page 382.  Okay.  So if you can start by reading

 7     from Line 23 on Page 313 -- excuse me.  No, no.

 8     Line 23 on Page 382, on to Line 3 of Page 383.

 9            A.    Okay.  Answer is:  I just wish this

10     accident wouldn't have happened.

11                  And the question is:  If you could go

12     back, would you do it -- sorry -- if you could go

13     back, what would you do differently, if anything, on

14     April 30, 2023?

15                  Answer is:  I don't know.  I may try

16     to avoid distractions.

17            Q.    All right.  Do you agree that Caylee

18     should have tried to avoid distractions on April 30,

19     2022?

20            MR. DuBOFF:  Object to the form of the

21            question.  Are you asking for her personal

22            opinion?

23            MR. WHITE:  No.  I'm talking about

24            Eastman's opinion.

25            A.    Our opinion is try to minimize
```

Page 358

1    distractions.

2         Q.  (By Mr. White)  All right.  So do you have

3    a theory about what happened on April 30, 2022?

4              MR. DuBOFF:  Objection.  Are you calling

5         for personal opinion?

6              MR. WHITE:  I'll take both.

7              MR. DuBOFF:  Well, which are you asking

8         for?

9              MR. WHITE:  Eastman or Ms. Bernhardt's.

10             MR. DuBOFF:  What topic is that in

11        relation to?

12             MR. WHITE:  It's investigation, results of

13        investigation.

14             MR. DuBOFF:  No.  You can ask if an

15        investigation concluded with a theory.

16             MR. WHITE:  Yes.

17             MR. DuBOFF:  Okay.  So if you're aware of

18        a theory of the accident that Eastman's initial

19        investigation prior to this lawsuit landed on,

20        you may provide that theory.

21             A.   Yeah.  Our understanding and theory prior

22    to the lawsuit, is that there were contributing

23    factors to the accident of which two were cited as a

24    vehicle being in the middle of the road and an

25    individual stepping out and being in the middle of

Page 359

 1    the left-hand lane of traffic right in front of

 2    Caylee's car.

 3              There was also -- you know, the

 4    inattention was called out.  But there were multiple

 5    contributing factors.  And no citation, no violation

 6    identified.

 7       Q.   (By Mr. White)  Okay.  So in Eastman's

 8    initial investigation, Eastman was unaware of

 9    Caylee's speed on approach; is that right?

10       A.   Oh, certainly.  We didn't know what she

11    was driving.

12       Q.   Okay.  No, no.  Sorry.  Her speed as she

13    was driving; Eastman was unaware of that?

14       A.   Correct.

15       Q.   Okay.  And in the initial investigation,

16    Eastman was unaware of how many text messages Caylee

17    had sent on the drive?

18       A.   That is correct.

19       Q.   And where she had sent those text

20    messages?

21       A.   That's correct.  We were unaware.

22              MR. WHITE:  Okay.  All right.  I would

23         like -- that's the end of my questions.  We've

24         obviously got some disagreements about scope

25         and objections.  I'm going to hold open the

                                        Page 360

Appx_1566

```
 1              deposition so we can get those resolved by the
 2              court.  But I defer -- or preserve the rest of
 3              my time right now to the extent any remains.
 4                   MR. DuBOFF:  Okay.  What are you wanting
 5              to ask about that?
 6                   MR. WHITE:  Well, so we've got a fight
 7              about miles driven, right?
 8                   MR. DuBOFF:  Collectively by everyone?
 9                   MR. WHITE:  Collectively or just Caylee,
10              right?  Sales numbers for Caylee.
11                   MR. BUNT:  Are we wanting this on the
12              record?  And if you want it on the record,
13              that's fine.  Or we can go off if you think
14              you're done with --
15                   MR. WHITE:  I'd like that bit on the
16              record obviously if you want to retort to that.
17                   MR. DuBOFF:  So the two issues right now
18              you're identifying are either miles driven
19              collectively by anybody in an Eastman provided
20              vehicle or just Caylee's miles driven?
21                   MR. WHITE:  Well, I'm not going to give an
22              exhaustive list because we've got like 34
23              topics.
24                   MR. DuBOFF:  Oh, okay.  I thought that's
25              what you said you want it on.
```

Page 361

Appx_1567

```
 1                MR. WHITE:  I'll reserve the objections
 2          that Brian and I had left unresolved in our
 3          meet and confer and hold open the deposition
 4          assuming the Court let's us.
 5                MR. DuBOFF:  Okay.
 6                THE VIDEOGRAPHER:  Signature?
 7                MR. DuBOFF:  Yes, we'll read.
 8                THE VIDEOGRAPHER:  Stand by for the read
 9          off.  All right.  The time is 5:33 -- 5:34 p.m.
10          and this concludes today's testimony given by
11          Erin Bernhardt as corporate representative of
12          the Eastman Chemical Company.  The total number
13          of media units used was five and will be
14          retained by Veritext Legal Solutions.
15                          (Whereupon signature was
16                           reserved.)
17                          (Off the record at 5:34 p.m.)
18
19
20
21
22
23
24
25
```

                                        Page 362

Appx_1568

```
 1                  CERTIFICATE OF REPORTER
 2              I, Sheryl A. Pautler, RPR, Certified Court
 3         Reporter (MO), Certified Shorthand Reporter
 4         (IL), do hereby certify that the witness whose
 5         testimony appears in the foregoing deposition
 6         was duly sworn by me; the testimony of said
 7         witness was taken by me to the best of my
 8         ability and thereafter reduced to typewriting
 9         under my direction; that I am neither counsel
10         for, related to, nor employed by any of the
11         parties to the action in which this deposition
12         was taken, and further that I am not a relative
13         or employee of any attorney or counsel employed
14         by the parties thereto, nor financially or
15         otherwise interested in the outcome of the
16         action.
17     December 4, 2023
18
19
20           Registered Professional Reporter
21           Certified Court Reporter (MO)
22          Certified Shorthand Reporter (IL)
23
24
25

                                           Page  363
```

Appx_1569

1    Mr. Gregory J. DuBoff

2    Gduboff@mcquirewoods.com

3                    December 4, 2023

4    RE:    Gonzalez, Erick Roderico Piuara v. Simpson, Caylee

     Erin & Eastman Chemical Company, USDC North District Of Texas

5        11/9/2023, Erin Bernhardt (#6292543)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   errata-tx@veritext.com.

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19      If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22              Yours,

23              Veritext Legal Solutions

24

25

                                        Page 364

1    Gonzalez, Erick Roderico Piuara v. Simpson, Caylee Erin &

     Eastman Chemical Company, USDC North District Of Texas

2    Erin Bernhardt (#6292543)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Erin Bernhardt                               Date

25

                                              Page 365

Appx_1571

1    Gonzalez, Erick Roderico Piuara v. Simpson, Caylee Erin &

     Eastman Chemical Company, USDC North District Of Texas

2    Erin Bernhardt (#6292543)

3                   ACKNOWLEDGEMENT OF DEPONENT

4        I, Erin Bernhardt, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Erin Bernhardt                          Date

13   *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20___.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

                                        Page 366

**[& - 2022]**

**&**

**&**   1:12 364:4
5:25
365:1 366:1

**0**

**02714**   1:10
5:25
**08**   237:18
**084-004585**
1:23

**1**

**1**   2:8 3:10 5:18
14:13,14,15
133:2 166:10
210:5 224:2,4
227:10 248:10
347:24
**1.43**   265:12
266:2
**10**   2:20 132:20
134:22 137:1
210:11 213:22
228:16 292:15
292:16
**101**   129:15
132:21,22,24
**102**   132:21
133:2
**107**   134:17
139:3 143:2
215:13 216:5
**10:21**   71:2
**10:38**   71:6
**10:39**   71:6,7

**11**   2:21 114:1
300:2,4,14
**11/9/2023**
364:5
**112**   146:9
**113**   146:9
**12**   2:23 233:22
305:4,5
**12:09**   149:20
**12:53**   149:24
**13**   2:24 114:5
134:18 136:25
139:3 143:3
215:15 298:1
306:18,20,21
**133**   170:6
171:10
**134**   171:12
**135**   76:1,8
**136**   78:14
**14**   2:25 218:19
306:17,20
310:1,2,20
311:5 313:11
339:11
**15**   2:8 3:3,11
136:25 143:3
354:9,11
355:23
**156**   2:11
**16**   3:4,13 139:2
190:24 191:4
**17**   3:5,13
336:18,19

**18**   89:15
**1800**   6:3
**18606**   363:19
**19**   191:8
**192**   3:4
**1:24**   178:17
**1:29**   178:20
**1x**   99:2,10,15
99:23

**2**

**2**   2:9 70:21
75:21,24
113:23 129:16
134:18 146:10
166:16 167:22
170:6 215:13
243:2 297:25
326:2 358:5
**2.0**   241:23
272:18
**20**   72:20 216:3
282:22 321:2
366:15
**200**   4:14
**2017**   293:9
**2018**   2:24
307:2
**2019**   2:23
305:14
**2020**   4:14
**2021**   2:15 49:2
49:3 196:18,21
197:1 201:1,5
201:11 205:21
206:8 207:13

207:21 208:14
209:6,10
213:17 214:9
214:18 215:2
216:23 217:14
224:12,13,22
226:16 227:6
228:22,25
233:25 234:11
235:11 236:9
238:7 249:1
263:4 264:15
277:15
**2022**   2:17 18:2
18:6,6,12 27:8
96:13 139:10
144:17 180:2
196:24 201:5
201:11 216:4
216:12 229:12
230:14 231:17
231:24 233:21
237:2,8 246:7
250:15,17
251:15,25
252:16 253:12
253:16,19
254:15 255:15
256:7,11,14
260:17,22
261:1,8 262:14
263:21 267:7
271:15 272:19
273:5 275:19
275:23 276:14

**[2022 - 4s]**

276:23 277:24
278:3,8,11
283:12,22
291:17 312:4,9
317:6,8,17
318:24 321:2
322:3,4 324:9
331:23 332:25
333:11 335:4
335:23 347:24
354:4,15
358:19 359:3
**2023**   1:20 2:18
5:14 7:22,23
32:23 91:1
247:21 267:14
268:11,14,21
269:8 272:17
310:11,21
311:12 312:20
358:14 363:17
364:3
**20s**   33:5
**21**   7:21 129:16
247:21
**210**   2:12
**218**   2:13
**22**   170:8 197:1
**23**   76:4,8
129:17 358:7,8
**23219**   4:9
**233**   2:14
**237**   2:16
**24**   44:22
227:11,14

282:6,7
**2408**   237:20
**2411**   239:19
**2412**   240:16
**2421**   241:14,16
**2423**   244:2,7
**2424**   236:25
**2425**   248:11
249:14 256:18
256:19
**2426**   259:11
**2443**   262:1
**2444**   265:8
**2445**   266:10
**2446**   246:17
**2447**   267:23
**2453**   269:3,5
**2460**   272:13,15
**247**   2:17
**25**   89:5 94:14
94:19,22,25
95:4,10 96:16
96:18,21 97:2
97:4,6,9,17
170:12 266:15
266:19,22
348:20
**26**   2:23
**268**   2:19
**28**   7:23 89:6
95:8
**293**   2:20
**2:29**   232:18
**2:48**   232:21

**3**

**3**   2:10 149:15
155:11,13
157:2 194:11
221:20 358:8
**3/7/22**   233:19
**30**   1:17 7:16
18:2,5,6,12
73:13 95:9
139:9 144:16
180:2 229:12
230:14 231:17
231:23 250:18
252:16 283:12
283:22 291:17
312:4,9 317:16
318:24 321:2
324:9 331:23
332:25 333:10
335:4,23
352:23 354:4
354:15 358:14
358:18 359:3
364:17
**301**   2:22
**306**   2:23
**307**   2:24
**310**   4:19,23
**311**   2:25
**312**   326:3,4
**313**   326:3,4
358:7
**314-241-6750**
4:20,24

**337**   3:5
**34**   361:22
**340**   17:10
**350**   17:10,14
75:15
**355**   3:3
**37**   337:1
**371**   17:20
**382**   358:6,8
**383**   358:8
**3:22**   1:10 5:25

**4**

**4**   2:12,24
209:13,16,20
237:1,8 307:2
363:17 364:3
**400**   75:14
**410**   4:4
**412**   218:19
221:19
**416**   223:25
224:15 229:11
**417**   224:9
227:8
**45**   140:22
141:18 312:8
328:1 334:24
356:6
**46**   337:7
**479-935-1761**
4:5
**4:29**   315:14
**4:41**   315:17
**4s**   46:2

Page 2

Appx_1574

[5 - accident]

**5**

**5** 2:13 5:13
  217:18,19
  227:9
**50** 20:7 141:17
**53** 269:4
**5:33** 362:9
**5:34** 362:9,17

**6**

**6** 1:17 2:14
  7:16 146:10
  232:12,23
  233:3
**60** 141:17
  331:22
**6292543** 364:5
  365:2 366:2
**63101** 4:19,23
**65** 293:6

**7**

**7** 2:15 146:12
  236:4,5
**70** 356:17
**701** 4:19,23
**72764** 4:4
**75** 95:14 96:16
  97:16,21 99:3
  99:10,15
**75604** 4:14
**76** 2:9
**7700** 6:2

**8**

**8** 2:2,17 134:19
  137:1 237:18
  246:2,3 292:18
  292:25 298:1
**80** 70:24
  113:22 293:6
**800** 4:9
**804-775-1154**
  4:10
**838** 234:23
**844** 166:10
**85** 347:14
**871** 1:23

**9**

**9** 1:20 2:18
  5:14 267:9,10
**90** 19:5
**903-295-7200**
  4:15
**911** 66:12,14
  140:12
**95** 334:24
  335:14,18
**98** 297:25
**99** 113:23,25
**9:08** 1:25 5:13

**a**

**a.m.** 1:25 5:13
  71:2,6
**abide** 74:17
  153:7,12
  301:19

**ability** 44:1
  103:10 167:3
  204:3,4,11
  251:12 271:6
  288:2 363:8
**able** 32:17
  36:14 64:1
  67:24 77:11,24
  82:10 85:20
  88:11,12 98:1
  98:8 111:5
  125:9 130:25
  138:17 209:1
  210:7 211:18
  212:22 258:6
  258:14 270:12
  271:14 274:17
  274:25 298:21
  333:7 351:24
**above** 86:18
  98:7 210:9
  242:17 364:6
  366:7
**absence** 111:3
  163:4,9
**absolute**
  288:15
**absolutely**
  100:7 156:17
  156:18 160:23
  167:10 313:2
  335:21
**absorbing**
  349:13,15
  350:14

**acc** 248:25
  290:5
**acceptable**
  83:14,20
**acceptance**
  213:8
**access** 44:5
  56:22,22 57:7
  57:14,15,23
  59:1,6,14,17
  109:17,17
  115:16,21
  134:2,14 156:5
  218:10,13
**accessible** 57:5
  125:20
**accessories**
  348:7,23,24,25
  349:2
**accident** 18:7,8
  18:10,20 23:7
  40:8 44:9
  68:16 70:2
  74:3,5,24 75:1
  75:6 103:16
  107:13 139:4
  139:10,19
  140:10 142:19
  143:19,24,25
  144:4,16,23
  145:8,14 156:6
  177:1 180:2
  184:3,5,22
  185:4 187:19
  205:9,23 206:9

Page 3

Appx_1575

**[accident - active]**

207:14,22
208:6,15
209:10 210:3
211:12 212:14
213:17 214:9
214:19 215:2
215:16,24,25
216:5,13,15,24
217:14 221:7
224:6,12,13,19
224:22,23
225:6,9,17,24
226:1,2,9,16
227:6,24 228:5
228:11,22,25
229:3,13,13,15
230:5,6,13,14
230:18 231:9
231:11 238:3
240:22 248:22
249:1,20,24
250:15,18
251:15,17,21
251:21,25
252:16,20,21
253:12,16,20
254:4,14
255:16 256:2
256:11 260:7
260:17,22
261:1,8 275:19
275:23 276:4,4
276:14,23
277:1,9,14,25
278:3,8,12

282:20 284:2
285:23 290:20
290:21 291:17
321:2,24 324:9
324:17,23
325:9 334:23
339:19 340:13
340:13 341:6
342:17 343:9
344:23 349:14
349:23 350:6
350:19 352:13
353:1,4,10
354:16 355:23
358:10 359:18
359:23
**accidents** 69:2
71:14,20,24
72:21 74:10,14
74:20,22,24
75:9,10,14,16
89:7 122:25
216:20 224:5
227:11,14
238:16 253:19
253:25 254:3
257:2,19
261:23 263:3
264:14,18,22
265:2,5 268:2
268:13 277:11
282:1,1,6,11,16
282:23 285:4
285:11 311:13

**accomplish**
96:11 200:10
**account** 43:8
44:2 138:18
154:10 177:3
184:14 239:24
274:21 295:9
295:10 297:5
302:2 308:4
322:9 329:23
330:6
**accountability**
10:8 46:22
212:25 221:25
222:1,5,19
**accounts**
249:22 257:7
259:22,25
270:11
**accuracy** 364:9
**accurately** 81:8
**acknowledge**
173:17 187:1
247:11 264:14
264:17,21
**acknowledged**
237:1
**acknowledge...**
84:6 108:19
213:13 366:3
**acknowledges**
171:12 257:22
326:24 332:1
347:5

**acknowledging**
265:2
**acknowledg...**
60:6 246:19
364:12
**acosta** 210:14
210:24
**acquisitions**
9:18
**acronym** 197:5
**act** 54:14
222:16,24
223:10 309:12
**acting** 58:3
**action** 1:8 6:10
68:9,17 100:2
104:19 105:22
144:5 152:16
220:19 227:21
289:8 363:11
363:16
**actions** 103:12
153:18 156:11
220:13 286:12
289:1 322:3
**activate** 37:15
**activated**
166:17
**activating**
232:6,7
**activation**
124:20
**active** 221:14
301:16

**[actively - alan]**

| | | | |
|---|---|---|---|
| **actively** 124:4 | 217:12 229:9 | **admitting** 80:3 | 112:22 138:23 |
| 302:16 | 257:1 270:11 | **adopt** 62:15 | 143:6 163:23 |
| **activity** 164:15 | 278:10 280:2 | 327:9 | 165:13 166:7 |
| 167:9,15 | 281:14 289:12 | **adverse** 167:24 | 167:14 172:24 |
| 302:21 303:2 | 290:14,22 | 168:5 169:9 | 190:9 211:20 |
| 309:4,4 314:22 | 297:10 303:9 | 176:17 | 218:8 219:20 |
| **actual** 354:23 | 311:15 320:23 | **advocated** | 252:16 259:8 |
| **actually** 61:18 | 343:13 | 270:1 | 286:11 288:25 |
| 82:9 92:8 | **additions** 366:6 | **affect** 266:17 | 299:11 312:19 |
| 105:18 116:14 | **address** 190:19 | 308:3 | 313:8 326:17 |
| 146:5 156:9 | **addressed** | **affected** 266:23 | 328:4,9,16,21 |
| 166:15 206:12 | 31:13 | 267:3 316:24 | 331:20 338:7 |
| 227:4 239:4 | **addresses** | 317:7 | 338:19 341:3 |
| 246:25 267:5 | 241:6 | **affiliations** | 358:17 |
| 299:25 353:14 | **adds** 238:23 | 6:16 | **agreed** 5:1 8:7 |
| **add** 161:2 | **adequately** | **affirmative** | 15:16 242:4 |
| 217:3 238:20 | 29:17 313:11 | 302:15 | 259:13 269:8 |
| 238:24 250:1 | **adjust** 82:11 | **affirmatively** | **agreement** 8:16 |
| 256:23 270:24 | **adjusted** | 123:11 251:24 | 11:11 |
| 271:21 | 328:11 | **afternoon** | **agrees** 163:17 |
| **added** 29:11 | **adjusting** | 140:23 | **ahead** 14:11 |
| 108:18 160:24 | 156:23 | **age** 5:10 32:2 | 29:16 55:17 |
| **addendum** | **adjustment** | 33:5 162:11 | 70:21 142:1,1 |
| 181:12 | 328:18 | **agenda** 347:22 | 205:2 292:23 |
| **addendums** | **administer** 6:9 | 348:2,3 349:25 | 339:7 340:19 |
| 181:15 | **administered** | **agents** 210:23 | 349:19 351:17 |
| **addition** 33:6 | 7:2 | 325:17,23 | 351:19 |
| 50:8 | **administrator** | **ages** 306:4 | **airplay** 34:14 |
| **additional** | 1:3 | **ago** 7:8 36:12 | 84:8 |
| 139:4,8 142:15 | **admissible** | **agree** 5:17 | **airport** 352:4,8 |
| 143:5 144:18 | 254:1 | 13:15 15:4 | **alabama** |
| 145:6 161:2 | **admit** 311:22 | 18:7,11 49:12 | 181:12 |
| 203:23 214:17 | **admitted** 310:9 | 49:14 65:8 | **alan** 27:6,10 |
| 215:17 216:11 | 310:18 331:21 | 76:19 89:23 | 28:9,16,25 |
| 216:22 217:3 | | 111:9,13 | 50:4 51:2,3 |

**[alan - apply]**

98:14 130:20
131:2 200:19
200:25 201:10
202:21,24
203:3,8,12,21
207:25 208:6
208:10 226:9
226:15 235:2,3
239:2,11
**alan's** 50:8
203:9
**alcohol** 119:14
**alert** 267:25
**alerts** 280:13
**aligned** 96:10
302:4
**alleges** 146:1
**allotted** 364:20
**allowable** 34:9
**allowed** 165:1
168:4,25 169:5
169:6
**allows** 166:8,18
172:6,6
**alongs** 28:14
29:2,6,13
47:19 48:8
50:5,6 51:7
180:16,19,21
189:3,6 200:19
200:25 201:4
201:12 202:1
203:2
**amanda** 295:20

**ambiguity** 77:9
308:10
**ambiguous**
90:20 101:18
119:24 123:25
135:4 137:17
137:22 148:19
308:18 312:24
342:23
**amend** 304:14
**amended**
355:10,11
**america** 22:16
45:14
**amount** 93:10
93:12 183:3
200:4 272:6
**ample** 204:2
**amplify** 168:10
**analytics** 56:5
**annoys** 9:3
**annual** 122:12
122:13,16,20
122:24 234:8
**anonymity**
56:6
**anonymous**
92:1
**answer** 12:2,5
12:13,25,25
13:4,5,7,10,11
16:17,19 17:2
22:12 76:13,17
76:18 77:4
78:12 87:9

88:25 101:1
114:5,11
129:19 133:4
137:7 139:6
146:12,17,25
147:7 170:12
171:4,11 212:3
215:18 314:9
319:17 340:20
342:7,10
343:16,22
344:18 346:2,5
346:20,21,22
358:9,15
**answered** 77:3
100:19 146:21
176:2,4,8
181:2
**answers** 11:13
12:9,14 16:13
16:14 147:19
**anticipate**
86:14 264:10
**anticipated**
241:25 291:25
**antitrust**
119:13
**antonio** 23:25
269:19,24
270:5,23 271:2
271:11,14
**anybody** 47:3
91:22 109:16
206:12 209:7
321:23 325:12

335:22 361:19
**anybody's**
183:23
**anyone's** 73:10
**anything's**
338:24
**anyway** 290:12
**apologize**
260:24
**app** 31:5 55:23
56:23,24 57:3
57:9,13,18
58:5 79:21,23
154:17
**appear** 293:15
339:18
**appearance**
6:14,15
**appeared**
328:24
**appears** 147:22
235:2 236:25
273:4 339:13
363:5
**appended**
366:7
**apple** 37:8
**applicable**
358:1 364:8
**application**
293:10
**applied** 227:20
245:4
**apply** 156:1
302:21 303:1

Veritext Legal Solutions
800-336-4000

**[apply - assuming]**

304:17
**appointed**  7:17
**appreciate**
96:25
**approach**  38:2
141:13 231:4
327:25 340:5,7
345:1,7,24
346:11,19
360:9
**approached**
336:14
**approaching**
337:20
**appropriate**
103:11 215:6
228:24 248:24
263:2 272:22
272:24 297:5
308:16 310:23
**appropriately**
54:14 70:19
**approval**  96:8
296:21
**approved**
227:18
**approximate**
13:11
**approximately**
17:10 28:24
45:21,23 95:14
331:22
**approximation**
13:16 17:18,19
24:17 249:7

346:18
**apps**  54:23
55:20,21 56:13
56:14,16,17
183:14
**april**  18:2,5,6
18:12 139:9
144:16 180:2
201:5,11 216:4
216:12 229:12
230:14 231:17
231:23 233:20
233:20 250:18
251:15,25
252:16 253:19
277:24 283:12
283:22 291:17
312:4,9 317:16
318:24 321:1,2
322:4 324:9
331:23 332:25
333:10 335:4
335:23 352:23
354:4,15
358:14,18
359:3
**area**  23:19
185:11 198:18
217:11 259:3
261:21 269:15
274:13 275:4
292:4 307:20
**areas**  23:22
61:13,17 63:2
63:4,13 169:20

192:3 198:19
270:22 288:17
**arising**  211:11
255:15
**arkansas**  4:4
**armstrong**  6:2
**arose**  269:19
**arrangements**
352:12
**arrived**  340:2
**asked**  13:12
15:5,7 51:10
77:5,6,13 78:8
78:11 132:2
134:19 136:23
139:3 140:24
141:5,8 142:12
143:4,16
146:10 148:7
148:16 154:6
167:2 170:8,20
181:2 202:5,8
233:3 238:2
316:1 355:14
356:16
**asking**  16:23
69:10 81:19
90:18 131:22
147:3,4 148:18
177:10 200:12
227:1 264:5
312:11 327:9
330:5 340:14
341:10,15
342:1,3 343:19

343:20,21
344:9,11
353:15 358:21
359:7
**asks**  89:16
137:4 164:1
**aspect**  164:20
250:14 252:25
**asserting**  16:3
**assessment**
2:16,17,19
236:10 246:8
267:15 289:18
292:5
**assessments**
274:3
**asset**  58:14
**assigned**  46:21
115:17 116:25
117:3
**assignment**
93:25
**assistance**
145:23 258:3
264:1 322:11
322:16 323:1,7
323:9
**associated**  92:2
96:18 97:22
189:19 190:11
192:20
**assume**  12:5
211:9 257:5
**assuming**
191:19 362:4

**[attached - back]**

**attached**  3:11
  3:13 364:11
**attachment**
  224:2,4
**attainable**  98:4
  98:6
**attempt**  313:18
**attend**  227:18
  347:25
**attendance**
  351:21,23
**attendees**  350:9
**attention**  33:21
  167:5,16
  170:10,22
  171:2 309:8
  311:17
**attorney**  6:17
  7:24 12:23
  363:13 364:13
**attorneys**  14:19
  232:2
**attributable**
  61:10
**attributed**
  93:10,13,15
**audio**  5:15
**austin**  23:20
  24:5 210:5
**authentication**
  57:17,25 58:4
**authorities**
  163:15 184:5
  261:20

**authority**  289:6
**authority's**
  68:8
**authorized**  6:9
  59:9 104:5
**auto**  112:2
  183:20 221:18
  297:15,15
**automated**
  36:15,16
**automatic**
  35:14 36:25
  37:11,15 38:8
  38:13,23
**automatically**
  37:5 93:24
  123:24 124:5
**automobile**
  2:13 218:2,3
  218:24
**automobiles**
  62:25
**automotive**
  46:2,4 348:25
**available**  35:10
  364:6
**average**  265:14
  265:17,20
  273:12
**avoid**  34:19
  39:22 53:17
  54:10 84:1
  85:16,19 86:12
  140:3 159:8
  176:25 238:16

268:2 340:22
  340:25 356:9
  358:16,18
**avoidable**
  64:12 66:25
  74:10,13,20
  103:16 224:6
  224:19,23
  225:6,9,16
  226:2 227:11
  227:14,24
  228:4,11
  229:13,18
  230:16,18
  260:23 282:1,6
**avoidance**
  158:20
**avoided**  214:3
  225:3,4
**avoiding**
  124:14 136:4
  213:12
**avoids**  85:16
**aware**  8:1,4
  12:4 31:5,7
  35:2 50:5 51:1
  51:16 54:9
  56:25 75:4
  89:22 100:3,23
  102:24 103:17
  106:16,18
  136:7 137:24
  138:9,12,13,16
  138:20,25
  139:7 154:15

158:5 163:12
  168:15,20
  181:4,17
  210:22 214:16
  225:12 229:17
  235:8 238:16
  255:14 256:9
  282:21 283:23
  287:23 307:22
  310:8,18
  312:25 313:4,5
  317:16,24
  318:7 321:25
  324:17 325:21
  331:3 335:10
  345:6,8,9,10,14
  345:17,19,21
  345:23,25
  350:7 352:4
  359:17
**awareness**
  120:24 163:14
  221:24 235:2
  235:14,25
  313:6 331:14
**axis**  244:11,12

**b**

**b**  1:17 4:4 7:13
  7:16 101:13
**back**  53:21
  63:1 78:18
  79:5,6 80:17
  87:6,6 92:21
  140:6,13
  144:13 149:24

**[back - believe]**

170:5 175:13
178:21 197:25
203:13 207:16
215:13 229:11
232:22 243:18
248:1 249:19
270:14,24
277:7,19,19
279:21 282:19
285:9 293:24
315:18 323:16
353:11,19,19
354:2 358:2,5
358:12,13
**backed** 341:5
**background**
2:20 123:3
161:19 187:14
285:17 292:23
293:1,4,24
294:3,7 296:21
297:2,9
**backup** 19:7
**bad** 11:22
162:23 265:13
329:4
**balance** 199:16
**banana** 12:11
12:12
**base** 94:7,9,15
94:19 95:14
101:10 222:14
**baseball** 349:5
**based** 63:20
64:5 94:24

97:4 141:20
147:20,20
148:17 212:13
212:16 213:23
215:5 228:24
229:16 231:7
234:20 237:22
253:20 254:8
257:18 259:19
260:6 265:18
272:23 279:13
283:11 286:18
290:22 297:9
313:8 340:12
346:9,16
**baseline** 11:11
**basically** 169:6
**basis** 122:7
332:8,18 342:1
**bates** 166:11
218:19 221:19
223:24 234:23
236:25 239:18
246:17 248:11
267:22
**bbunt** 4:15
**began** 1:25
324:19
**beginning** 6:16
51:24 61:16
62:11 63:22
121:9 236:15
246:12 270:10
316:6 325:19

**behalf** 1:19
5:11 6:20,22
58:3 70:18
100:13 247:12
300:11,17
303:8,10 355:7
**behave** 138:4
138:14 298:25
299:1 301:1
**behavior**
161:19 205:18
263:2
**behaviors**
96:17 162:23
244:10,11,16
244:20 248:24
266:12 273:11
273:13 275:4
**belief** 162:10
162:22 163:2
251:23 252:10
278:2 279:24
344:5
**beliefs** 163:3
**believe** 15:17
15:22 21:5
22:5 24:5 25:8
27:7,14 35:23
35:25 46:13
48:9,12 49:1
50:11 52:5,12
52:14 53:24
54:7 56:16
59:4 63:25
64:9,14 68:19

74:16 82:1,13
84:11 91:1
99:9,12 109:25
110:22 111:3
116:12 118:4
119:13 122:11
122:23 124:25
126:21,22,23
127:5 128:23
130:20 140:18
141:7 142:10
144:22,25
145:7 154:12
158:10 160:11
160:18 161:11
173:15 182:13
183:21 195:17
199:22 202:23
204:9,9 207:23
208:2,12,16
210:18,18,21
211:3 214:4
224:16 229:15
230:22,22
234:16 240:1,2
241:12 247:2
248:7,15
249:12 252:4
253:9 255:18
258:8 261:3
265:20,25
268:18 276:24
286:5 289:4
291:1 292:19
293:2 300:1

**[believe - brought]**

309:8,9 312:6
315:22 317:8,9
317:13,15,24
321:3 323:11
325:6 336:18
342:19 343:25
345:2 348:14
351:15 352:9
352:24 353:13
353:19 354:25
355:8
**bell**  57:19
116:1 245:2
**bender**  205:23
217:15 238:4
**benders**  75:13
**beneath**  221:19
**benefits**  94:24
323:12
**bernhardt**  1:18
5:4,9 7:10,11
7:12 8:21,22
16:4 71:8
88:25 253:20
253:21 346:4
362:11 364:5
365:2,24 366:2
366:4,12
**bernhardt's**
359:9
**best**  15:17 31:2
36:23 37:23,25
38:5,5,22 44:6
53:11 54:9
59:16,19 61:11

70:13,15 86:7
236:1 248:14
250:11 280:23
281:2,6 282:24
288:1 303:13
355:8 357:24
363:7
**better**  44:7
272:8 285:7
296:2
**beyond**  36:19
**big**  223:12
**bill**  4:14
**binder**  14:11
14:22 233:4
**bit**  25:10 29:16
64:6 69:8,25
71:13,13 75:19
179:1 202:10
206:5 207:1
217:23 232:16
233:11 249:11
314:6 318:21
339:2 348:4
361:15
**biweekly**  121:6
127:19 128:21
129:10 316:16
**black**  194:17
327:25 328:6
339:19 345:1,7
345:24 346:11
346:23 347:4,6
347:14

**blank**  56:19
249:14
**board**  28:12
96:6,8
**body**  276:3
**boned**  276:8
**bonus**  94:9,16
94:20 97:2,6
97:17 266:16
266:17,22
267:3,6 317:12
317:14
**bonuses**  99:19
100:9 316:24
**boss**  207:24
296:5,6 313:20
**bosses**  26:3
**bottom**  240:18
241:18 273:9
273:21,23
357:10
**boulevard**  6:3
**bowman**
295:20
**box**  244:3,22
244:25 245:13
**boxes**  244:13
**brakes**  210:6
213:3 277:20
**break**  13:21,22
14:8 70:22
71:4,12 149:22
150:2 178:19
178:23 232:13
232:20 233:3

301:20,24
315:12,16
316:2
**breakdowns**
31:4
**breakfast**
12:10
**breaking**  204:4
204:14,15
309:11
**breaks**  212:24
**breather**
149:18
**brian**  4:13 6:22
8:3,7 362:2
**briefly**  354:5
**bring**  47:24
98:8 120:22
160:24 271:21
348:11
**bringing**
200:15
**broad**  61:6
150:24 151:6
154:3 161:9,10
161:15 179:16
288:5 298:20
303:5
**broke**  204:22
**broken**  204:22
**brought**  126:25
251:3 252:22
309:7 316:5
319:6

Appx_1582

**[building - carry]**

**building**  348:4
**bullet**  166:16
**bumper**  217:15
**bunt**  4:13 6:22
6:22 7:22 8:14
8:18 76:7
109:6 113:24
146:20 254:2,9
356:3,5 361:11
**business**  9:8,12
10:3,6,8 18:4
20:19,24 21:1
21:15,21 22:9
22:20 26:19
30:18 31:1,4
43:16,18 45:3
46:8,16,23
50:10 56:4
58:15 62:8
72:8,9,10
84:24,25 88:11
92:16 95:3
96:11,20 97:9
97:13,23 98:8
101:4,10
104:13 107:17
132:13,14,15
162:6 184:8
189:15,17
191:23,24
218:8 261:19
301:2 314:13
314:14,14
320:20 333:5

**businesses**
348:7
**butcher**  27:15
**button**  79:22
81:4,9,22,24

**c**

**c**  4:1
**call**  8:22 9:1
10:17 24:7
34:6,14 36:5
37:6 43:7
60:24 61:7
66:12,14 70:14
93:2 106:11
115:9 116:4,6
124:16 125:4
125:12 135:13
135:13 140:19
160:25 170:10
170:22 172:8
190:24 199:5
206:11 211:2
244:3 273:21
278:22 286:8
293:24 296:19
303:21 313:20
336:17 337:25
354:24
**called**  12:8
14:17 18:22,23
56:24 93:25
115:15 127:5
140:12 141:5
209:23 210:16
360:4

**calling**  152:15
192:14 208:19
263:19 359:4
**calls**  19:7 28:23
43:25 48:13,17
48:19 76:15,22
77:7 84:5,9
124:20 151:15
171:18 172:11
172:19 219:23
260:11 262:11
264:24 286:14
307:19 309:20
334:11 336:1
340:11 357:4
**cam**  3:5 336:12
340:1
**campaigns**
190:18
**cams**  106:7,9
**canal**  4:9
**candidate**
294:10 297:7
**cap**  239:10
**capabilities**
10:9 61:21
63:15
**capability**
61:20
**capacity**  16:24
101:16 154:22
272:5
**capture**  118:4
225:18 236:19
236:20 239:8

246:14
**captured**
235:17 246:13
279:18 310:19
**captures**
211:23 236:17
239:10
**capturing**  43:7
43:8 186:3
196:7,12
**car**  33:25 36:13
113:15 159:21
159:22,23
187:10 248:21
305:19 337:10
360:2
**card**  30:15,25
**care**  66:8
222:13,13,15
222:23 223:9
230:19,21
231:9,14
287:12
**career**  115:16
308:13
**careers**  154:20
**cares**  256:24
287:13,16
**caring**  223:11
**carplay**  34:14
37:8
**carrier**  101:12
**carries**  234:15
**carry**  300:8

Appx_1583

**[carrying - caylee's]**

| | | | |
|---|---|---|---|
| **carrying** 231:5 | 44:5,15 45:12 | 195:10,14,22 | 293:1 295:24 |
| **cascaded** 190:4 | 45:19 46:2,13 | 196:15 200:20 | 296:4 298:11 |
| **case** 5:25 65:2 | 47:11 48:9,22 | 201:5,12 202:1 | 305:13 306:12 |
| 78:2 170:9,21 | 48:25 49:1 | 203:2,9,12,22 | 307:14 308:7 |
| 211:2 223:15 | 50:7,11 51:7 | 203:22 205:7 | 310:8,18 |
| 228:13,13 | 52:3 56:24 | 205:18,21 | 312:20 313:9 |
| 229:22 289:20 | 57:16 58:17,25 | 206:9,18 | 317:17 318:7 |
| 322:24 | 59:17 61:10,15 | 207:22 208:8 | 321:1,11 322:3 |
| **cases** 106:10 | 61:23 62:6,12 | 209:7,11 | 322:17 324:23 |
| 113:19 300:16 | 63:4,5,5,14 | 211:19,20,23 | 330:2,6,8,14 |
| **cash** 61:19 | 65:17 76:19,21 | 214:8,18 | 331:15,18,21 |
| **categories** | 84:18 86:24 | 216:23 218:7 | 333:9 334:23 |
| 224:14 | 90:24 91:23 | 227:5 228:24 | 335:22 340:6 |
| **categorized** | 92:9,19 93:10 | 229:24 230:3 | 344:8,22,25 |
| 224:23 230:14 | 93:14,15 96:3 | 231:16,22 | 345:6,23 |
| **cause** 163:10 | 96:14 98:10 | 233:12 235:5 | 346:11,13,18 |
| 185:1 204:1,10 | 99:8 100:4,8 | 236:10 237:1 | 347:4,24 |
| 213:7 220:19 | 108:1,14,23 | 239:23 244:17 | 349:15 350:15 |
| 245:25 252:4 | 114:23 115:3 | 246:21 247:5 | 351:22 352:3 |
| 253:9 265:5 | 115:23 117:3 | 247:21 248:12 | 353:11,13,14 |
| 271:5 274:25 | 117:25 119:3 | 248:15,16,21 | 353:22 354:20 |
| 287:2,3 311:14 | 120:4 121:17 | 250:9,12,15 | 355:9,11,18 |
| **caused** 49:7 | 121:22 125:21 | 251:2 256:3,5 | 356:12,25 |
| 161:6 306:12 | 126:8,18 | 257:5,10,18 | 357:10 358:17 |
| 343:13 | 130:13,15 | 258:23 259:5,7 | 360:16 361:9 |
| **causes** 156:19 | 131:3 134:2 | 259:23 260:5 | 361:10 364:4 |
| 158:6 168:9 | 139:14 140:9 | 261:2 262:6,8 | 365:1 366:1 |
| **causing** 356:10 | 140:14,17 | 262:14 263:22 | **caylee's** 14:1,4 |
| **caveat** 84:13 | 141:12 142:8 | 264:17 268:7 | 18:1,19 24:14 |
| 129:20 | 142:14,20 | 268:13,16 | 25:5,11,13 |
| **caylee** 1:12 2:9 | 143:2 144:18 | 271:13 276:8 | 26:14,25 27:7 |
| 5:22 6:23 9:10 | 145:25 146:4 | 276:22 277:9 | 33:5 49:16 |
| 18:3 21:17 | 150:15 151:12 | 277:10,24 | 50:19 58:5 |
| 23:24 24:2 | 154:9 155:8 | 278:4 280:24 | 65:2 76:17 |
| 28:5,16 29:2 | 156:1 180:1 | 281:19 289:1 | 81:19 92:25 |

Veritext Legal Solutions
800-336-4000

**[caylee's - chemical]**

96:12 97:24
105:25 113:23
150:4,8 180:18
202:24 203:8
212:14 224:11
224:13,23
229:4 230:25
233:25 238:18
242:1 246:7
248:2 249:17
259:20 267:6
267:14,23
271:1 276:3
284:7,8 289:17
290:11 291:13
291:18 292:1,6
292:10 313:25
317:6 321:23
326:4,17
330:13,22
343:12 344:24
352:11 360:2,9
361:20
**ccr** 1:23
**cdls** 102:18
**cei** 209:23
**cell** 32:24
128:11,14,20
129:6 133:1,6
133:8,11,13
157:24 160:23
161:2,6,10,18
161:20,25
162:10,11,23
163:8,18

164:19,22
181:7 183:10
185:3 186:11
186:13 188:9
291:13 321:23
327:15 357:14
357:15,20
**cellular** 157:24
**celsius** 13:13
**central** 24:7
128:1
**ceo** 17:23,25
**certain** 22:14
31:8 44:2
47:10 53:12
54:23 60:10
61:16 64:1
68:21,25 69:1
125:1 159:1
162:22 164:12
169:5,6 172:13
173:20 177:2
190:4 192:3
270:6 294:18
294:20,22
300:10 309:10
309:11 333:3
334:23 345:17
**certainly** 26:9
30:7 31:14,21
65:22 66:4
72:7 87:22
119:13 154:25
160:22 168:15
177:22 186:2

190:12 201:2
203:19 217:4
229:17 232:8
253:2 268:25
280:18 292:12
294:21 299:7
317:21 318:12
320:9 336:9
360:10
**certificate**
363:1
**certified** 363:2
363:3,21,22
**certify** 363:4
**chain** 60:19
247:16 281:4
**challenge** 245:6
**challenged**
21:10
**chance** 198:15
198:16
**change** 53:7,14
55:12 94:22
103:9 142:17
149:17 155:4
182:5,18 228:6
230:4 308:12
314:24 315:10
365:4,7,10,13
365:16,19
**changed** 27:4,9
54:6 155:4,6
182:12 259:17
273:8 296:16

**changes** 24:19
103:9 106:15
121:10 182:7
182:20,21
274:22 364:10
366:6
**character**
323:6
**characterize**
273:4
**charge** 318:25
**charges** 293:20
**chart** 10:12
17:12
**chatter** 43:25
**check** 2:20
15:25 40:16
54:6 71:20
122:12,14,16
122:21,21,24
123:20 145:3
160:1,9 201:18
235:15 293:1,4
293:25 296:22
297:2,9 347:6
**checked** 100:6
100:7 109:4
328:19
**checking** 124:2
124:4 334:3
**checks** 92:17
123:3 187:14
285:17 294:3
**chemical** 1:13
5:20,23 9:22

**[chemical - college]**

17:24 18:2
29:19 54:20
100:12,14
122:5 285:2,20
362:12 364:4
365:1 366:1
**chick** 305:18
306:10
**chilly** 13:14
**choice** 82:14
116:1 302:15
**choices** 90:5
258:7
**choose** 222:16
222:24 223:5
223:10 262:15
302:14 350:13
**chris** 27:9,16
27:24 28:1,9
28:25 91:8
98:14 140:20
141:21 142:25
143:8,18
144:14 258:19
259:7,14,15
270:10,16
**circumstance**
172:13,14
176:9,10 186:5
188:2,6,7
**circumstances**
54:15 77:23
176:11 177:12
187:17 255:6
282:4 311:19

313:22
**citation** 67:7
139:22 144:8
185:6,17,21
187:20 188:13
251:19 252:1,5
252:13 255:12
360:5
**cite** 322:7
**cited** 139:17
261:15 359:23
**cities** 79:4
270:19
**citizen** 294:19
303:12
**city** 205:3
**civil** 1:8
**claim** 211:11
221:8 277:17
**clarification**
16:11 137:2,5
**clarify** 18:16
34:3 38:20
136:23 143:23
186:17
**clarifying**
250:1
**clarity** 282:2
**clark** 126:6
**class** 227:19
278:18
**clear** 16:2
32:11 33:11,14
33:17,18 49:19
60:17 82:6

86:13 128:9
162:5,9 163:7
164:25 170:4
214:13 217:13
258:18 283:1
313:16 324:5
338:3
**clearance**
323:18
**cleared** 323:16
323:22
**clearly** 109:18
171:12 175:5
322:6 331:25
335:16 339:6
**click** 79:12,14
**client** 18:13
55:22,23,25
59:22 91:15
278:4 289:10
339:20
**clients** 21:3,19
24:11,13,18
35:5,8 41:16
41:19,20 42:5
42:17 44:21
45:12,16,24
46:1,3,4,9,14
54:22 90:1,23
90:24 91:3,21
123:9 348:23
**climate** 156:25
**climb** 159:13
**clip** 127:3

**clipped** 277:19
**close** 43:16
47:21 235:20
336:22
**closer** 258:10
**closing** 247:15
**coach** 28:12
39:12 200:6
**coached** 132:1
136:9 151:20
**coaching** 28:23
38:25 39:16
40:10 49:21
91:14,18
105:10 139:9
149:11 151:3
151:25 154:1,4
174:16 177:23
178:5 183:19
194:15 198:4
204:2 214:17
225:21 226:8
226:19,21
**code** 299:24,24
300:7 301:7
**cognizant** 51:1
313:7
**collected** 320:7
320:9,10
**collective** 61:1
**collectively**
361:8,9,19
**college** 306:4
308:1,13,23

Appx_1586

**[colon - company]**

| | | | |
|---|---|---|---|
| **colon** 165:21 | **coming** 24:19 | **commission** | 55:15 73:1 |
| **column** 357:22 | 46:12 47:4 | 94:6,8 99:16 | 88:7 103:6 |
| **combination** | 99:5 207:5 | **commitment** | 112:14 139:9 |
| 296:20 323:25 | 231:1 249:19 | 60:8 243:5 | 149:10 179:21 |
| **come** 38:25 | 357:7 | **commitments** | 189:14 190:8 |
| 39:7,10 42:10 | **command** 79:7 | 60:14 | 197:10 255:9 |
| 42:11,11 44:13 | 80:8,19,22 | **common** 37:23 | **communicati...** |
| 47:4 82:19 | 247:17 281:4 | 39:1,25 53:9 | 42:20 44:1 |
| 86:15 92:11 | **commenced** | 53:19,22,25 | 54:21,25 55:23 |
| 98:12 104:4 | 324:15 | 64:15 156:19 | 86:9 143:18 |
| 108:5 127:20 | **comment** | 158:5,10 | 320:7 |
| 165:9 167:11 | 192:19 237:15 | 160:13 190:6 | **communities** |
| 189:21 190:2 | 237:21 238:18 | 190:12 261:22 | 288:13 |
| 206:16 211:5 | 240:19 241:5 | 266:4 286:2 | **community** |
| 212:17 213:10 | 248:2,13,17,20 | 294:4 296:25 | 192:1,18 |
| 220:18 234:17 | 249:4 250:10 | 317:4 | **companies** |
| 280:20,21 | 259:20 260:8 | **communicate** | 132:19 285:22 |
| 282:19 288:14 | 262:4 267:23 | 40:3 42:5,17 | **company** 1:13 |
| 299:16 301:24 | 267:24 268:5,6 | 43:13 67:18,19 | 5:20,23 10:24 |
| 320:24 323:13 | 268:10 | 91:6,25 109:10 | 18:2 25:14,20 |
| 326:1 353:15 | **comments** | 109:13 188:14 | 25:21 31:25 |
| **comes** 35:16 | 236:15,17,19 | 188:15 | 32:10 43:14 |
| 36:1 42:10 | 237:15 238:14 | **communicated** | 58:14 67:16,19 |
| 52:6 58:1 | 238:20,23,24 | 38:22 73:2 | 72:20 73:13 |
| 60:21 92:14 | 239:22 246:13 | 78:4 109:21 | 75:2 82:13 |
| 104:22 126:1 | 248:7,12 | 125:18 195:12 | 88:12,13 91:22 |
| 149:13 190:17 | 249:13,18 | 205:25 206:19 | 92:1 93:6 |
| 209:10 296:22 | 250:2,4 251:3 | 239:3 | 94:13 96:13,18 |
| 300:6 321:7 | 257:4 262:21 | **communicating** | 96:20,22 97:10 |
| **comfort** 272:2 | 264:18 267:19 | 55:13 91:5 | 107:2 113:12 |
| **comfortable** | 281:8 308:24 | 208:19 285:21 | 115:5 133:19 |
| 47:5 258:2 | 309:8 | **communication** | 138:15 148:7 |
| 272:2 286:17 | **commercial** | 35:5 38:25 | 159:21 162:6 |
| 314:23 | 93:4 101:8 | 41:17,23,25 | 186:21 189:9 |
| | 132:14 | 42:8 52:6,10 | 189:12,20 |

Veritext Legal Solutions
800-336-4000

**[company - confirming]**

191:16 192:5
209:23 274:7
275:9 276:7
282:21 283:6
286:3,9 287:7
287:8 300:8,11
300:17 316:23
316:23 322:13
354:7 362:12
364:4 365:1
366:1
**company's**
16:22 26:23
33:19
**compare**
104:14
**comparison**
327:18
**compensation**
94:14,23 97:21
**compensations**
96:9
**competence**
275:4
**competencies**
244:10,11,16
244:20 266:13
273:11 274:14
**complacency**
243:16
**complain**   41:16
41:19 93:2
**complained**
90:24 91:3,23

**complaining**
41:21
**complaint**
60:20 91:11
**complaints**
41:24 92:1,9
92:11,18
**complete**   12:8
12:14 116:21
117:4,8 118:9
118:16,19,23
158:20 169:25
267:17 284:9
284:22 366:8
**completed**
118:5 119:7
134:15 154:9
364:17
**completely**
83:3 172:16
340:15,18
343:18
**complex**
124:24 125:8
**compliance**
92:16 103:1
111:19 112:14
112:23 179:3
179:15 319:23
**comply**   112:19
286:24
**complying**
112:2 113:4,5
**computer**
32:15 33:18

49:23 55:12
57:24 59:7
115:6,8,11,24
118:1 148:17
149:2 150:25
**computers**
21:22 48:14
84:2 124:13
156:21
**concern**   51:13
77:18 80:15,20
135:3 147:9
205:19 213:7
311:14
**concerned**
98:21 297:1
299:4
**concerning**
298:11
**concerns**   80:18
202:18 241:7,8
**concert**   352:20
**conclude**
145:13
**concluded**
238:3 359:15
**concludes**
362:10
**conclusion**
164:2 219:24
286:15,17
309:21
**condensed**   23:4
**condition**
124:18

**conditions**   83:7
87:13,16 96:5
138:17 139:18
167:24 168:19
169:9 172:2,4
176:17,24
210:10
**conduct**   195:22
289:12 290:22
291:25 299:24
299:25 301:2,7
343:13
**conducted**   16:8
261:8,13
297:10 318:23
343:8 344:6
**conducts**   235:7
**confer**   362:3
**conference**
84:5 347:21,23
349:8 350:8,23
351:2,2,3,14,16
351:19 353:15
353:24
**conferred**   7:23
8:5
**confident**   86:8
135:11
**confirm**   58:1
221:24
**confirmed**
354:22
**confirming**
58:10

Page 16

**[confusing - correct]**

**confusing** 94:6
97:1 216:21
**connect** 47:23
300:7
**conscientious**
313:7
**consciously**
299:5
**consider** 80:2
**consideration**
87:23
**considered**
153:22,22,23
349:1
**consistent**
58:19 59:2,4
128:19 153:19
301:2
**consistently**
52:14
**constant** 26:7,9
200:13
**constantly**
309:1
**contact** 26:7
32:9,13 35:8
45:7 67:7,21
67:21 91:17
**contacting**
42:23 90:1
**contacts** 318:13
**contained**
114:7 147:4
**containing**
127:8

**contemplating**
212:4
**content** 115:25
125:10,15
127:4 147:6,10
147:23 153:15
202:10 298:15
348:6,10,14
351:12
**contest** 330:1,6
330:7,13,16,20
334:22 339:25
**context** 257:12
**continually**
72:15 235:7
**continuation**
236:14
**continue** 5:16
123:3,16 185:2
185:17 198:11
214:1 237:23
243:7,7,19
248:23 262:22
263:1
**continued** 3:1
217:9 225:21
243:3,3,4
264:3 303:15
320:13
**continues** 53:7
236:18 240:22
274:5,8 281:8
**continuing**
187:14 238:15

**contribute**
164:21 168:21
171:24 172:2
**contributed**
139:18 144:22
145:7,14
**contributing**
184:2 251:20
289:15,16
290:4,5,13,15
291:17 359:22
360:5
**contributors**
168:8
**control** 112:12
288:9
**controls** 156:25
**conversation**
71:16 78:18
129:3 141:8,8
150:18 200:16
203:23 205:24
271:25 279:21
315:3 316:21
317:4 333:15
**conversations**
8:1,2 48:17
77:1,15 130:25
135:21,25
136:11 143:7
143:14,22
145:20 148:20
149:2 150:6
179:9 186:2
195:14 206:1

214:5,8,20
217:8 224:17
225:1 226:18
227:5 229:5
279:23 299:1
316:16 325:13
326:1
**coordinance**
51:23
**copies** 3:12
364:14
**copy** 108:23
109:1 111:10
126:7,15 127:3
156:9
**cord** 73:23
**core** 26:23
62:15,19,21
239:21,24
302:4,4 348:11
**corner** 357:10
**corporate** 1:17
5:19 16:24
163:3 175:24
342:13 362:11
**corporation**
16:14
**correct** 7:18
8:17 9:25 15:6
17:15 20:10,10
20:14 21:20
26:16 27:17
29:4 38:10,15
40:5 54:12,16
62:22 65:11

Page 17

**[correct - culture]**

| | | | |
|---|---|---|---|
| 69:19,23 71:23 | 285:19 296:17 | **countries** 22:11 | 353:20 357:16 |
| 72:3 74:11 | 305:2 319:10 | **country** 9:20 | **covers** 49:12 |
| 81:5,24 89:2 | 344:3 345:12 | 56:7 94:17 | 284:20 |
| 93:3 94:11,21 | 345:15 353:11 | **couple** 32:5 | **covid** 21:10 |
| 96:2 97:8 | 360:14,18,21 | 36:8 50:14 | 49:5,7 352:2 |
| 101:4,14 | 366:8 | 52:13 62:16 | **crash** 229:12 |
| 106:24 107:15 | **corrected** | 73:5 124:10 | 233:25 234:3 |
| 108:25 111:21 | 111:15,16 | 146:6 158:1 | 289:10 290:6 |
| 113:21 121:11 | **correction** 71:7 | 200:18 297:17 | 322:4,4 |
| 121:11,14 | **corrections** | 300:16 305:17 | **create** 82:9 |
| 131:18 138:6 | 366:6 | 338:18 | **created** 233:16 |
| 141:23 144:20 | **corrective** | **course** 32:9 | 233:17 |
| 156:10 158:2,3 | 105:8 | 48:23 53:18 | **creates** 82:20 |
| 158:8 161:21 | **correctly** 133:7 | 103:7 105:21 | 167:6,6 |
| 161:23 166:5 | 168:1 196:9 | 144:14 158:21 | **creating** 167:16 |
| 171:19 182:10 | 237:3 349:9 | 219:15 272:5 | 167:20 |
| 182:23 183:17 | **cost** 353:20 | 291:2,12,14,15 | **credit** 93:16 |
| 198:5 203:4,11 | **costa** 17:25 | 291:16 294:20 | **crime** 185:13 |
| 203:13 204:3,4 | **counsel** 5:2,2 | 332:16 342:16 | **criminal** 252:5 |
| 204:12 216:16 | 5:20 6:15,18 | 347:9 | **criteria** 197:25 |
| 216:16 219:8 | 40:10 100:25 | **courses** 104:18 | **crm** 43:1 |
| 219:14 221:1,5 | 145:16 150:1 | 115:17 | **cross** 10:6 |
| 221:9 223:13 | 178:23 232:25 | **court** 1:1 4:17 | 319:20 |
| 227:7,10 235:3 | 280:9 315:20 | 5:24 6:6,24 7:3 | **crosswalk** |
| 237:20 239:17 | 319:9 324:12 | 8:11,12 11:18 | 205:4 |
| 248:18 252:14 | 335:5 342:19 | 16:18 17:21 | **crosswalking** |
| 253:23 255:1,4 | 346:2,4,8 | 66:13 113:9 | 205:3 |
| 259:4 260:18 | 363:9,13 | 128:7 212:19 | **cruiser** 336:13 |
| 267:18,20,21 | 364:14 | 293:15 329:11 | **csr** 1:23 |
| 268:9 270:3 | **counseled** | 361:2 362:4 | **cull** 299:2 |
| 272:21 276:15 | 136:9 | 363:2,21 | **culture** 223:12 |
| 278:1,20,20 | **counseling** | **cover** 189:23 | 237:17 241:20 |
| 280:5 281:1,17 | 49:22 278:13 | 271:22 | 242:20 243:2 |
| 281:20 282:13 | **counting** | **covered** 284:5 | 272:14 317:5 |
| 283:13 285:4 | 283:22 | 284:18 297:17 | |

Veritext Legal Solutions
800-336-4000

**[curtailed - defensive]**

**curtailed**
167:23 169:8
169:14
**curtailing**
172:1
**curve** 47:3
88:10 245:3
**customer** 19:6
20:12 25:3,25
28:10,23 45:4
45:10 55:3,9
55:17 56:2,10
60:2,18,21,24
60:25 91:20
93:23 200:9
**customer's**
36:5
**customers** 19:7
19:10,17 20:1
20:5,18,20,24
21:15,18 23:4
24:19 25:18
26:4 36:7 42:9
42:23 45:7
50:15 51:18
55:12,18 60:9
60:14 72:10,12
88:8 93:20
132:17 202:4
271:22 348:6
348:12,17
351:10
**cut** 173:20
239:21 295:13

**cv** 1:10 5:25
**cycles** 279:15

**d**

**d** 7:13 27:18,22
196:23
**daily** 48:19
**dallas** 23:19
**damage** 218:25
276:3 356:10
**danger** 299:18
**dangerous**
223:4 299:13
299:15 309:19
**dangers** 312:21
313:12
**dark** 339:14
**dash** 3:5 106:7
106:9 336:12
340:1
**dashboard**
55:7 56:3
71:19 72:5
81:21
**data** 44:4 56:22
89:6,18 200:16
320:7 345:4
**database** 66:21
67:10,11
154:22
**databases**
154:13
**date** 109:20
121:22 182:16
182:16 250:20
250:21 365:24

366:12
**dates** 351:18
**davi** 246:21,24
**davis** 27:7,10
50:4 51:3,3
98:14 131:2
200:20,25
201:10 207:25
208:6 226:9
235:2,4
**day** 36:7
101:21 112:20
141:18 162:1
243:14 264:9
287:10 307:15
312:12 318:5,6
334:25 352:25
366:15
**days** 28:20,21
29:3 36:8 45:8
50:14,15
110:25 161:10
200:5 353:14
364:17
**deal** 195:2
283:10,20
323:3 349:22
**dealership**
62:14
**dealerships**
45:25 46:5
**dealing** 75:8
**dealt** 349:21
**death** 18:12

**deceased** 1:4
**december**
234:17 363:17
364:3
**decide** 69:15
280:16
**decided** 270:2,4
270:16 347:5
**decision** 68:13
68:14,15,16
69:11,11,15,16
69:19,25 70:1
73:8 263:25
269:25 280:15
347:2
**decisions**
137:24 138:10
138:18 174:8
**declare** 366:4
**decreased**
317:13
**deem** 334:19
**deemed** 251:9
251:10 289:8
289:15,23
366:6
**deems** 264:1
**deep** 318:22
**defendant** 5:3
**defendants**
1:15 4:7,12
6:21,23
**defending** 7:24
**defensive** 2:10
90:12 126:7,15

**[defensive - deposition]**

126:19 127:8
155:17,19
175:25 179:1
179:19 181:13
182:25 227:19
278:18
**defer** 361:2
**define** 114:20
150:20 153:8
164:16,23
165:13 177:10
229:12
**defined** 224:5
224:15
**defines** 150:24
164:14 177:25
224:3
**defining** 150:17
**definitely** 20:2
49:7 92:12
167:10 197:11
277:18 301:11
335:18
**definition** 93:5
150:23 151:9
152:22,23
154:4 230:5
257:15 291:11
297:18
**definitions**
224:4,6,8
282:1
**definitive** 232:7
**definitively**
274:15 341:1

**degree** 13:13
**deliberate**
243:20
**delineation**
20:3 283:1
**deliver** 115:10
240:23
**delivered** 115:8
249:25 250:14
**delivering**
241:24 242:16
244:20 245:10
265:16 266:13
272:18 274:24
275:4 279:22
**delivery** 60:6
101:5
**demonstrate**
274:6 275:17
316:19
**demonstrated**
273:14 313:10
**demonstrates**
244:12
**demonstrating**
105:14 243:5
244:19 245:10
265:16
**denr** 2:14 196:4
196:8,23 197:3
197:18 233:8
233:13 234:4
235:12,22
**department**
9:10,24 10:16

11:1 22:8,15
22:23 23:8
24:14,22
**departments**
319:25
**depend** 25:19
25:25 26:1,2
87:10 95:19
103:5 122:8
177:11,15
184:4 220:22
220:24 261:9
261:20 274:5
294:16 304:9
**depended**
289:5
**depending** 8:11
9:19 23:4
24:19 60:12
104:23 185:12
291:10,10
325:2
**depends** 45:2,3
45:3 46:11
52:19 53:6
67:1 68:22,22
70:1 81:10
104:2 109:15
109:20 187:24
204:18,19
228:19 275:6
302:9
**deponent**
364:13 366:3

**deposed** 11:4
**deposes** 5:11
**deposing**
364:13
**deposition** 1:17
2:8,9 5:3,19
6:1 7:16,18,21
8:9,12 14:2,18
15:12 50:17
51:4 76:2
77:25 78:2,9
94:4 115:23
143:3 147:21
150:5,8,12
162:18 178:4
181:3 193:11
201:21 207:20
230:25 231:3
260:3,3,11
262:10 265:1
271:1 279:11
304:12 306:2
307:21 308:19
309:22 310:9
310:14 317:19
321:16 326:5
327:2,7,16
329:12 331:2
331:17,19,21
332:13 333:20
334:13 336:3
338:2 340:11
342:8 343:19
361:1 362:3
363:5,11

**[derive - disclose]**

**derive** 98:1
**derived** 97:25
  208:7
**describe** 19:12
  100:11 114:23
  124:8 153:20
  230:6 265:13
  306:12 337:8
  337:22
**described**
  115:24 231:4
**describes** 158:1
  171:5
**description**
  210:2,3 212:13
  355:22
**designated**
  15:21 16:7,15
  58:11
**designee** 7:17
  16:24 342:14
**desire** 86:17
  287:8 288:12
  288:15
**despite** 240:21
**detail** 69:8,25
  85:2 103:18,24
  111:12 312:10
  335:2
**details** 30:10
  43:11 141:9,11
  201:25 207:21
  261:4 289:14
  310:25 311:3
  323:20 347:20

351:18
**determine** 68:8
  332:14
**determined**
  62:9 259:16
**determines**
  103:25 104:3
**determining**
  97:18
**development**
  28:23 46:18
  61:20 151:3
  198:19,19
  233:9 274:4
  298:6
**device** 59:6,15
  84:7 167:4
  171:13
**devices** 57:14
  59:18 83:18,19
  83:25 156:21
  166:8 168:25
**diagram** 73:8
**dial** 277:7
**dictate** 81:4
  87:17 346:13
**dictated** 81:8
  326:23,24
  327:4,12 332:5
  332:19
**dictating** 86:24
  208:20 332:3
  332:10
**dictation** 87:5

**dictation's**
  81:23
**difference** 19:2
**different** 10:17
  18:24 28:9
  36:17 40:18
  48:20,21 56:8
  56:17 63:6
  74:4,23 75:16
  95:25 97:22
  104:5,18
  115:21 116:23
  116:24,24
  118:25 121:2
  133:13,18
  141:8 154:17
  190:1 197:10
  214:4 216:14
  222:15 224:5
  225:11 235:22
  258:2 265:18
  265:19 275:17
  278:23 281:12
  318:14,19
  347:11,11
  357:1
**differently**
  358:13
**difficult** 59:10
  323:3
**dig** 72:1 318:22
**digressed**
  355:20
**direct** 17:12
  26:25 69:5

70:7 203:8,9
  292:4 319:24
  325:11
**direction** 29:24
  363:9
**directly** 17:9,9
  156:16 355:1
  357:7
**directors** 96:8
  267:5
**directs** 12:24
**dis** 308:6
**disagree**
  147:24 327:1
  329:7,17
**disagreements**
  360:24
**disapprove**
  192:8,10,13,23
  193:6
**disciplinary**
  68:17 100:2
  144:5 186:3,3
  220:13,19
  289:8 322:2
**discipline**
  88:17,17,24
  89:9 203:12
  289:1
**disciplined**
  38:9 180:24
**disciplining**
  89:20
**disclose** 123:7
  179:23 317:23

Page 21

Appx_1593

**[disclose - distribution]**

318:10,15
**disclosed** 93:9
217:2 228:18
318:13
**discloses** 312:1
**disclosure**
123:6 179:12
**discourage**
188:22 193:17
**discovers**
220:10
**discretion**
96:19 119:1
267:1,3
**discretionary**
266:16
**discuss** 77:13
121:8,12
177:20 178:9
225:5 228:15
254:7,10
297:12
**discussed** 40:15
121:16 126:24
135:12 139:12
178:10 217:22
253:3,24 254:1
325:25 335:5
349:7 350:8
**discussing**
216:5 315:22
**discussion**
77:22 103:6
104:17 105:15
105:18 111:1

120:9 129:21
135:12 139:11
142:3 145:22
174:17 178:5
195:16 204:6
206:21 225:3
225:20 228:22
232:1 255:10
278:13 279:5
281:9 284:15
**discussions**
35:12 37:19
39:23 86:10
105:25 120:10
130:7,8 131:25
142:20 145:2
177:24 184:16
217:4 257:25
264:4 316:17
350:18
**dismiss** 294:9
295:7
**dismissed**
294:24,25
**disposition**
293:19
**dispositive**
203:21
**dispute** 211:7
212:9
**disqualified**
308:7,10
**disqualifies**
295:15

**disqualify**
294:14 295:3
308:14 309:5
**distinctly** 65:10
**distracted** 2:10
30:7 34:8
39:21 69:4
90:13 110:2
119:18,21
120:2 124:9,11
125:18 129:18
129:25 130:2,5
130:13,17
131:3,11,17,19
132:9 133:9
134:21 135:1
135:19,22,24
136:4,8 137:8
137:20 139:5
142:16,21
143:5,18
144:18,22
145:7,13
155:17,19
163:24 164:10
171:6 173:1
175:17 177:7
179:1,3 180:25
181:6,20
182:11 184:1
185:3 187:21
188:10,22,24
189:8 190:20
190:20 191:12
191:13,13,16

192:14 193:8
193:17,23
194:5,9,20,21
195:3,11 215:1
215:17 216:12
231:16,23
258:15 284:9
332:24
**distracting**
159:15
**distraction**
124:21 125:10
136:5 159:18
160:13,20,24
165:14,17
171:14 202:19
230:10
**distractions**
53:13,17 82:21
124:14 156:13
156:20,20
157:3,5,11,21
157:23 158:2,6
158:7,11,16,23
159:1 161:3,7
163:21,21
165:18 202:13
268:1 340:25
358:16,18
359:1
**distributed**
244:15
**distribution**
245:10

**[district - dos]**

**district** 1:1,1
5:24,24 364:4
365:1 366:1
**disturb** 35:14
36:10,18
183:20
**division** 10:14
**doc** 109:11
**doctor** 322:18
323:22
**document** 13:5
13:6 14:20,21
68:9,15,17
69:20 92:10
104:11,12,19
105:1,21
122:17 132:6
133:11 154:14
155:11 185:25
186:9 204:8
209:17 217:22
218:1 224:1
225:11 233:7
233:16,24
234:4,23 236:8
236:13,14,21
237:3 238:21
239:8,19 246:6
246:9 257:24
258:25 267:13
292:21 302:1
305:9 306:24
310:6,7 354:14
**documentary**
183:1 193:21

194:12,22
208:14
**documentation**
29:5 66:17
91:2 107:25
108:2,4 121:23
125:24 130:11
182:14 184:7
205:20 206:2
211:8 214:11
217:4 225:19
226:6 227:25
243:24 274:22
274:23 279:19
281:7 356:17
**documented**
69:12,16,17
93:22 99:21,25
100:3 104:17
105:15,17,24
174:15 175:10
187:23 195:24
198:22,24
199:12 204:1,6
214:6 217:8
224:25 227:20
234:8,14,19
235:17,19
266:9 279:5,24
280:1 320:10
320:11 321:5
327:13
**documenter**
131:13

**documenting**
40:14 225:8
247:15 257:22
**documents**
18:23 19:19
31:3,14 92:17
106:17 131:14
132:4 141:22
141:24 142:2
185:1 194:17
194:18,19
255:22 268:25
320:6 350:3
**dog** 159:8,11
159:16,20
**dogs** 159:13
**doing** 11:17
23:15 34:25
37:24 54:3,9
56:5,7 70:17
70:19 72:16
81:12 82:16
87:8 88:1 90:7
90:7 99:4
105:11 115:6
145:4 158:14
162:6,15,25
164:12 167:1
171:22 188:5
189:2,12
196:13 198:18
214:4 219:8
221:14 222:4
223:3 231:4
239:4 255:6

258:23 264:11
271:17 281:12
285:17 288:20
289:22 308:23
312:11 316:18
321:25 334:19
351:25
**don'ts** 162:5
**donlen** 2:12 3:3
31:4,9,12,16
67:18 68:11
107:18 108:8
111:14 142:8
142:10,11
184:22 206:19
208:2,7,15,17
208:21,23
209:6,16,23
210:19,23
211:16 218:11
218:12 221:3,6
225:10,19
226:6 229:4,6
229:6 254:18
254:24 255:2,2
255:7 285:3
286:4,6,9
319:6 320:11
321:7,12 354:6
354:7,15,20
355:1,3,10,12
355:15 356:12
356:20 357:1
**dos** 162:5

**[double - driving]**

| | | | |
|---|---|---|---|
| **double** 57:17 | 309:19 357:11 | 82:22 83:14 | 160:16,21 |
| 57:25 58:4 | **driver's** 64:18 | 84:20 86:1,5 | 162:12 163:13 |
| **doubt** 174:19 | 85:6 103:8 | 86:20 87:19 | 163:18,19,22 |
| 213:22 301:25 | 122:6,22 | 88:19 89:10,21 | 163:24 164:8 |
| **dozen** 23:11,13 | 177:15 218:23 | 90:1,13 100:13 | 164:10,14,16 |
| 23:17 | **drivers** 54:13 | 101:16,24 | 164:19,19,21 |
| **dr** 324:3,5 | 74:9 82:13 | 103:2,20 104:1 | 164:23,24 |
| **draw** 226:23 | 85:15 100:13 | 104:4,13,14 | 165:6 167:9,15 |
| **drawing** 56:19 | 101:5,6 102:15 | 105:4,5 110:3 | 167:16 170:11 |
| 145:3 | 102:23 106:15 | 112:20 119:19 | 170:23 171:2 |
| **draws** 167:5 | 106:22 157:3 | 119:22 120:2 | 173:1,18 174:7 |
| **drift** 175:8 | 160:7 162:23 | 120:11,14,23 | 174:9 175:17 |
| **drinking** | 162:24 218:25 | 121:12 123:12 | 176:1 177:7 |
| 156:21 | 219:3,7,12 | 124:5,9,11 | 179:1,3,5,8,15 |
| **drive** 47:9 | 299:13,15 | 125:18 126:8 | 179:16,19,24 |
| 101:21 102:18 | **drives** 102:3 | 126:15,19 | 180:25 181:6,7 |
| 111:5 113:14 | **driving** 2:10 | 127:9 128:11 | 181:13,21,23 |
| 141:18 174:5 | 20:3 29:20,22 | 128:14,21 | 182:3,12,25 |
| 219:1,4 312:8 | 29:23 30:5,7 | 129:7,18,25 | 184:2 185:3,23 |
| 360:17 | 30:17,20,21,23 | 130:2,6,13,18 | 186:12 187:18 |
| **driven** 100:22 | 33:13,21 34:23 | 131:4,11,17,20 | 187:22 188:10 |
| 112:8 361:7,18 | 35:1 36:14 | 132:10,15 | 188:23,24 |
| 361:20 | 37:22 39:5,15 | 133:9 134:21 | 189:8 190:11 |
| **driver** 69:4 | 40:3 41:10 | 135:1,19,22,24 | 190:12,20,21 |
| 82:19 114:3,9 | 46:22 50:20,22 | 136:2,3,4,8 | 191:12,17 |
| 116:8 118:15 | 51:13,25 53:1 | 137:8,21 139:5 | 192:14 193:8 |
| 118:19 121:16 | 53:11,14 54:4 | 140:22 142:16 | 193:17,23 |
| 121:22 122:6 | 54:11 64:13,16 | 142:21 143:6 | 194:5,9,20,21 |
| 124:17 125:24 | 64:17 67:4 | 143:19 144:3 | 194:23 195:3 |
| 160:6 161:3 | 69:4 72:8 | 144:19,22 | 195:11 202:12 |
| 166:18 167:9 | 76:16,22 77:7 | 145:7,13 | 202:14,22 |
| 168:20 173:2 | 77:12,15,16,20 | 155:17 157:5 | 203:3,6 205:8 |
| 185:22,23 | 78:6,19,23,25 | 157:11,23 | 205:18 215:1 |
| 188:8 210:14 | 79:4 80:2,4 | 158:6,12,23 | 215:17 216:12 |
| 230:19 283:21 | 81:9,16 82:12 | 159:21 160:3,7 | 219:13,18 |

Page 24

Appx_1596

**[driving - east]**

| | | | e |
|---|---|---|---|
| 221:10,15 | 109:5 117:14 | 305:25 306:20 | **e**  4:1,1 7:12,13 |
| 227:19 229:14 | 117:17,21 | 307:19 308:9 | 27:18,22 29:8 |
| 231:12,17,23 | 119:24 123:25 | 308:17 309:20 | 33:16 34:9 |
| 238:17 256:2 | 131:21 135:4 | 310:24 312:23 | 35:15 42:7,12 |
| 258:1,2,16 | 137:16,22 | 313:14 317:18 | 55:16 58:18,20 |
| 263:7,17 264:7 | 143:9 147:11 | 324:24 327:6 | 59:1,1,6,14,17 |
| 272:3 277:9 | 148:15 151:15 | 329:20 330:5 | 84:2 92:15 |
| 278:18 281:23 | 151:22 152:10 | 330:11,17 | 108:18,20,22 |
| 284:9,9 294:11 | 152:21 153:5 | 331:1,8 332:12 | 109:1 124:13 |
| 297:13,24 | 154:2 156:14 | 333:17 334:11 | 126:7 128:12 |
| 305:18 306:14 | 162:16 164:1 | 334:17 336:1 | 146:14 237:10 |
| 311:23 313:2 | 169:3 171:9 | 337:23,25 | 237:11 355:17 |
| 332:25 333:8 | 173:5 174:4 | 340:8 341:9,13 | 355:18 365:3,3 |
| 333:25 334:9 | 175:3,19 176:2 | 341:19,21,25 | 365:3 |
| 334:20,23 | 176:7 177:8 | 342:6,22 | **earlier**  50:4 |
| 335:1,13,23 | 178:3 181:1 | 343:16 344:9 | 129:21 150:4 |
| 336:5,6 350:7 | 186:6 192:25 | 344:13,17 | 154:7 156:4 |
| 360:11,13 | 193:3,9 204:25 | 345:25 346:15 | 167:2 183:18 |
| **drove**  144:10 | 207:10,15 | 353:2,6 355:24 | 187:14 202:20 |
| 320:15 | 211:22 216:7 | 356:2,13 357:3 | 205:7 215:15 |
| **drug**  119:14 | 219:23 220:16 | 358:20 359:4,7 | 215:21 218:6 |
| **drugs**  317:17 | 228:12 230:15 | 359:10,14,17 | 240:22 252:10 |
| 318:5 | 232:13,15 | 361:4,8,17,24 | 259:20 269:7 |
| **dry**  338:5,6 | 242:21 252:7 | 362:5,7 364:1 | 269:13 277:24 |
| **duboff**  4:8 6:20 | 253:17 256:18 | **dude**  223:9 | 281:25 285:2 |
| 6:20 7:25 8:17 | 256:20 257:13 | **due**  49:5 96:4 | 285:16 296:24 |
| 14:3,24 16:2,7 | 260:1,9 262:9 | 334:22 | 312:11 333:23 |
| 23:14 27:18,22 | 263:11,18 | **dui**  191:14,17 | **early**  27:8 |
| 38:17 49:17 | 264:24 269:4 | 192:14 193:8 | 196:24 233:20 |
| 58:20,23 70:22 | 277:4 279:10 | **duly**  363:6 | **earth**  22:14 |
| 70:24 77:8 | 285:5 286:14 | **duties**  25:11 | **easier**  52:21 |
| 78:7 86:2 | 286:25 288:22 | **duty**  89:24 | **easily**  71:20 |
| 88:20,23 89:6 | 296:1,5,8 | 163:24 164:4 | **east**  4:9 229:2 |
| 89:11,16 90:14 | 297:3 301:21 | **dwd**  191:11 | |
| 90:20 101:18 | 304:11 305:23 | | |

[eastman - eastman]

| | | | |
|---|---|---|---|
| **eastman**  1:12 | 110:10,18,19 | 187:3,5,7,18,20 | 277:10,10 |
| 5:20,23 6:23 | 110:20 111:5 | 188:8,8,22 | 278:5,8,11,19 |
| 9:7,9,14,16,22 | 111:18,19,25 | 190:19 191:15 | 278:23 279:2 |
| 15:14 16:3,14 | 112:15,16 | 191:20,22 | 280:3 281:22 |
| 17:2,23 18:1 | 115:1 118:18 | 192:8,13,16,19 | 283:7,10,20,21 |
| 19:14 26:15 | 122:5 125:1,1 | 192:21,23 | 284:8 285:2,11 |
| 28:4 29:19,20 | 125:20 126:6 | 193:6,15 194:3 | 285:13,20 |
| 30:12 31:21 | 126:14 134:8 | 194:13,18,19 | 286:11,19,21 |
| 33:7,11,14 | 134:21 135:1 | 195:3,21 | 286:23 287:13 |
| 38:21 42:15,25 | 136:7 140:9,14 | 198:14 199:15 | 287:16,18,19 |
| 52:4 53:1 | 140:15,17 | 204:23 205:8 | 288:1,7,9,11,19 |
| 54:13,20 56:25 | 141:13,16 | 206:7,8 209:9 | 289:2,11 |
| 57:1,4,4,24 | 142:4,7,15 | 210:16,18 | 290:19 291:13 |
| 58:10 59:1,9 | 144:17,21 | 211:14 213:7 | 291:18,25 |
| 59:20,23,25 | 145:5,6,13,25 | 213:16 214:18 | 292:9 293:11 |
| 60:7 65:18 | 149:9 150:20 | 216:23 218:10 | 294:15 297:1 |
| 66:18,20 68:2 | 150:24 151:11 | 219:10,20 | 298:4 299:11 |
| 68:10 71:14,20 | 151:14 152:25 | 220:1,10,25 | 301:10,23 |
| 73:19 74:8,12 | 153:2,14 | 221:2,10,11 | 302:4 303:9,10 |
| 75:8 76:15 | 154:10,20 | 222:2,8 223:12 | 303:19 304:7 |
| 78:25 83:1,6 | 160:6,7,19,23 | 223:15,22 | 307:17,18 |
| 85:14,16 88:17 | 161:20 162:21 | 229:2,12,24 | 308:7 309:5 |
| 89:24 90:10,13 | 162:24 163:17 | 230:5 231:16 | 310:10,20 |
| 91:7 93:1 | 163:23 164:5 | 231:20 244:24 | 311:11,13,15 |
| 97:14,15 | 164:14,18,23 | 245:12 247:1,3 | 312:7,13,22 |
| 100:12,14,22 | 165:5,13 | 250:23 251:1 | 316:3,12 |
| 101:1,11,17 | 169:25 172:18 | 253:15 254:15 | 317:16 318:7 |
| 102:3,5,19,19 | 173:10 174:1 | 254:22,22,25 | 318:11,23 |
| 102:21,25 | 174:11 176:13 | 255:5,14,20 | 319:19 320:25 |
| 103:2,13,19,25 | 176:21 179:2 | 257:11,14 | 323:10,23 |
| 103:25 104:3 | 181:5,18 183:9 | 260:25 261:8 | 324:2,8,18,22 |
| 106:5,7,14,21 | 183:11,13,16 | 261:11,13 | 325:1,7,11,12 |
| 106:22 107:1 | 183:22 184:1 | 270:4 271:12 | 325:17,22 |
| 107:21 108:9 | 185:2,17,22,23 | 273:13 276:17 | 330:23 331:5 |
| 109:8,12,24 | 186:8,24 187:2 | 276:20 277:2,2 | 332:17 335:15 |

Veritext Legal Solutions
800-336-4000

**[eastman - emoji]**

335:22 342:17
343:7,13,14
344:1,4,6,15,22
344:24 345:6,9
345:13 347:4
352:22 353:7
354:1,5 355:14
359:9 360:8,13
360:16 361:19
362:12 364:4
365:1 366:1
**eastman's** 7:17
16:18 26:18
33:24 36:24
42:19 44:9,20
51:22 58:19
59:3 78:5 80:3
81:3,6,25
83:15,23 87:2
90:24 97:7
112:22 113:5
113:19 124:9
126:19 133:6
137:14,19
138:8,20
141:20 153:25
154:3 157:1
158:22 162:9
162:10,22,24
163:12 168:12
168:24 171:5
171:17,22
173:3,14
175:17,24
177:6,19,25

179:1 180:25
182:11 183:25
187:13 219:6
220:6 225:15
229:23 231:16
231:23 235:6
242:25 260:21
266:7 282:16
285:4 286:18
288:25 291:15
291:16 299:4
299:21 302:20
314:3 315:23
332:17,24
334:22 340:6
341:10,11,20
342:3,16 343:1
344:10,11,13
344:18,19
346:10 347:15
358:24 359:18
360:7
**eating** 156:21
**economic** 96:5
**edit** 238:25
**editing** 239:1,4
**edits** 239:12,13
239:15
**educate** 348:11
**education**
348:8
**educational**
115:25 152:17
152:23 193:21
194:3,12

**edwin** 319:1,8
319:25 320:2
320:24 321:13
321:19 325:25
**effect** 271:5
**effective** 32:14
55:6 87:25
132:16 298:24
**effectively** 32:1
49:9
**effectiveness**
31:23 32:6,7
88:8,9 193:16
**efficiency** 32:2
**efficient** 32:14
**efforts** 111:25
179:14 188:22
193:16,17
**egregious**
204:3
**eight** 326:19
327:3
**either** 20:11
41:13 46:5
92:15 98:14
140:18 141:7
149:1 181:19
208:7 238:24
247:6,9 281:3
286:5 307:15
317:23 319:20
328:22 351:1
361:18
**either's** 8:24

**elaboration**
97:1
**electronic**
106:20 168:25
320:7
**element** 80:23
**elements** 32:4
37:19 61:24
107:19 197:13
250:5 265:21
294:22
**eliminate**
158:15,17,23
159:9 160:20
165:6 286:19
297:6
**eliminated**
159:2
**eliminating**
161:7 267:25
**elimination**
158:19
**else's** 248:8
**embarrassing**
223:8
**embellish**
308:25
**emergency**
83:7,10 325:8
325:13,18
329:18 330:3
330:15,24
340:16
**emoji** 305:20

Page 27

Appx_1599

**[emojis - ensure]**

| | | | |
|---|---|---|---|
| **emojis** 307:8 | 285:15 297:7 | 179:2,5 184:3 | 351:24 |
| **emphasis** 157:6 | 298:24 299:21 | 186:20 187:15 | **encouragement** |
| 157:16,23 | 301:16,23 | 188:23 189:8 | 39:19 |
| 161:1 | 304:24 309:5,6 | 189:21 190:15 | **ended** 211:20 |
| **employed** 9:10 | 322:10,15 | 195:8 198:17 | 277:18 |
| 27:3 102:2 | 323:1,12 | 219:21 220:4,7 | **enforce** 111:18 |
| 363:10,13 | 357:11 363:13 | 220:11 221:10 | 181:5 219:11 |
| **employee** 9:22 | **employee's** | 222:9 223:16 | 221:13 301:3 |
| 46:20 49:22 | 58:13 104:3 | 230:8 244:24 | **enforcement** |
| 61:15 75:2 | 149:12 186:9 | 282:23 284:2 | 219:11 285:21 |
| 78:4 85:5,17 | 225:14,16 | 285:4,12,22 | **enforcing** |
| 99:17 103:20 | 227:21 228:11 | 286:13,22 | 112:14 |
| 105:3 107:20 | 302:11,22 | 287:4,9,14,20 | **engage** 19:8 |
| 108:9 110:20 | 303:2 | 299:4 302:16 | 67:21 280:7 |
| 122:9 126:7 | **employees** | 318:20 325:11 | 311:14 349:16 |
| 145:23 153:16 | 33:20,23 34:18 | **employer** 9:16 | **engaged** 201:14 |
| 166:9 173:10 | 34:22 57:5,6 | **employment** | 232:3 300:19 |
| 174:1,11 | 74:16 75:5,9 | 98:17 101:10 | **engagement** |
| 177:20 183:14 | 76:25 77:5,10 | 196:14 200:21 | 196:3 198:4 |
| 183:15 186:10 | 85:24 92:3 | 220:19 227:17 | 299:2 315:4 |
| 186:21 187:2,4 | 100:16 101:20 | 233:22 292:24 | 348:5 |
| 187:8 196:4 | 103:7 104:1 | 294:10 305:16 | **engaging** 25:17 |
| 204:23 208:19 | 105:2 107:3 | 307:4 | 25:20 29:25 |
| 220:13,18 | 109:14 110:3,9 | **enable** 20:20 | 144:1 145:17 |
| 222:14 227:13 | 112:1,15 113:4 | 55:2 57:18 | 297:24 |
| 227:18 233:10 | 122:6 123:6,13 | **enabled** 49:8 | **engrained** |
| 236:16 237:14 | 123:14 132:16 | **encountered** | 317:3 |
| 238:23 239:22 | 137:15,20 | 167:25 346:19 | **enhancing** |
| 243:1 245:13 | 138:9,20 | **encourage** | 26:20 |
| 245:23 247:1,3 | 149:11 153:15 | 35:11,12 192:1 | **ensure** 10:9 |
| 248:11 257:4 | 158:5 161:12 | 195:25 223:19 | 64:17 72:12,25 |
| 257:10 258:3 | 161:21 162:13 | 353:17 | 73:15 81:10 |
| 263:25 266:14 | 163:25 164:6 | **encouraged** | 86:7 89:25 |
| 280:3,8 281:22 | 165:7 168:13 | 140:3 191:25 | 90:11 122:5 |
| 281:22 285:3 | 170:1 177:20 | 223:16 258:8 | 125:1 203:24 |

**[ensure - example]**

258:5,12 268:2

**ensures** 92:17

**ensuring** 91:19

**entails** 322:18

**entered** 51:23
60:2

**entire** 27:2 97:7
329:21

**entities** 9:19

**entitled** 12:8,14

**environment**
61:19 120:19
121:1 189:24
237:24 250:3
288:16,18
314:20

**environmental**
66:2 70:15
235:1,14,25

**equal** 154:1

**equally** 128:25
297:22

**equation** 97:24
99:1

**equations**
97:22

**equip** 138:1
348:14

**equipment**
22:1 156:24
158:12

**equipped** 47:8
86:16

**equipping**
55:10,18

**equitable** 96:10

**eric** 50:9,16
98:14 130:19
130:19 131:1
140:20,21
226:13,15
271:17 296:10
296:12

**eric's** 50:21

**erick** 1:2,4 5:21
364:4 365:1
366:1

**erin** 1:12,18 5:3
5:9,22 7:10,11
8:23 9:1 71:11
76:9 150:3
175:9 233:2
315:21 362:11
364:4,5 365:1
365:2,24 366:1
366:2,4,12

**errata** 364:11
364:13,15,17

**errors** 190:6

**escapes** 123:9

**especially** 33:5
78:2 263:7,17

**essentially**
56:20 62:14
97:24 99:2
196:5 206:15
283:16 340:22

**estate** 1:3

**estimated**
345:3,3

**european** 22:16

**evaluate** 68:7
70:16 105:7
228:14 229:18
244:9,14
258:13 282:24
283:2 289:13
320:13

**evaluating**
82:14 253:5,7
294:17

**evaluation**
87:20 188:20
233:9 256:7,15
283:5

**evaluations**
93:9

**evelyn** 1:5

**event** 44:15
72:23 107:12
145:10 208:25
238:10 282:22

**events** 210:17
212:11 237:22
238:6 248:25
263:2

**everybody**
116:20

**everyone's**
148:23

**evidence** 132:4
208:14

**evolve** 303:15

**evolved** 72:6

**evolving**
236:21

**exact** 22:12
147:2 243:12
276:12,13
340:22

**exactly** 37:2
38:19 57:11
114:7 119:5
133:3 135:10
146:8 185:5
192:15 196:10
197:21 201:24
212:6 266:20
268:19 270:18
270:22 298:9
309:9 323:6,20
327:18

**examination**
7:6

**examined** 5:10

**example** 11:13
12:9 13:11
17:17 29:22
30:22 51:23
58:5 67:5
83:11,12
103:14 113:13
113:15 124:6
159:17 174:12
176:20 184:20
186:11 199:25
200:8 204:5
220:11 275:11
301:8 334:4

**[examples - expecting]**

| | | | |
|---|---|---|---|
| **examples** | 134:18 146:10 | **exit** 274:7 | 125:24 164:11 |
| 169:11,17 | 155:10,13 | 275:1 | 168:7 204:2 |
| **except** 168:4 | 157:2 171:11 | **expand** 157:18 | 217:5 219:7 |
| **exceptions** | 190:24 191:4 | **expansive** | 221:9 243:4 |
| 204:17 | 194:11 209:13 | 297:19 306:5 | 274:16 281:11 |
| **excess** 335:13 | 209:20 215:13 | **expect** 25:11 | 285:15 299:25 |
| **exchange** | 217:18,19 | 29:7 32:19,24 | 313:16 316:6 |
| 206:14 | 221:17 223:25 | 33:3 42:22 | 316:15 |
| **excited** 351:25 | 227:9,9 232:12 | 46:15 52:23,24 | **expectations** |
| **exclude** 99:18 | 232:23 233:3 | 53:24 58:15 | 30:11 39:17 |
| **excuse** 28:25 | 236:3,5 237:14 | 60:12 77:5,10 | 61:25 77:15 |
| 58:22 74:20 | 246:2,3,17 | 77:17 78:1,3 | 78:5 82:6 85:6 |
| 84:10 113:22 | 248:2,11 262:1 | 81:18 87:5 | 90:6 99:4 |
| 132:7 134:5,18 | 267:9,10 | 94:18 96:12 | 112:6 120:10 |
| 136:25 139:3 | 292:14,16 | 104:11 106:13 | 138:3,13,20,24 |
| 203:9 216:4 | 297:25 299:6,9 | 111:22 112:20 | 148:21 161:12 |
| 221:23 225:14 | 300:2,4,14 | 112:23 113:7 | 162:4 164:9 |
| 278:17 284:7 | 305:4,5 306:17 | 123:5,6,9,13,16 | 178:9 179:9,23 |
| 291:14 306:21 | 306:18 310:1,2 | 143:24 153:6 | 186:19 189:2 |
| 337:24 344:23 | 310:20 311:5 | 153:11,14,18 | 190:3 195:19 |
| 358:7 | 313:11 326:2 | 167:3 174:5 | 197:11 201:17 |
| **execute** 316:3 | 336:18,19 | 181:8 187:7,12 | 242:17 243:8,9 |
| **executed** 314:7 | 354:9,11 | 198:8,9 201:14 | 243:21 268:7 |
| 314:9 | 355:23 357:17 | 205:4 210:19 | 273:15 274:2 |
| **executive** | 358:5 | 243:17 251:7 | 274:12 301:22 |
| 239:21 | **exhibiting** | 295:16 296:10 | 303:16,18 |
| **exhaustive** | 299:7 | 300:7 313:5 | 312:25 |
| 89:17 361:22 | **exhibits** 2:6 3:1 | 319:1 | **expected** 20:4 |
| **exhibit** 2:8,9,10 | 3:10,12 | **expectation** | 31:11 46:7 |
| 2:12,13,14,15 | **exist** 127:22,25 | 32:21 33:11,15 | 91:15 95:17 |
| 2:17,18,20,21 | 183:1 335:10 | 34:5 35:10 | 107:11 110:9 |
| 2:23,24,25 3:3 | **existing** 46:13 | 36:1 39:9,20 | 110:25 201:14 |
| 3:4,5 14:11,14 | 47:11 | 45:9 64:9,15 | 219:1 335:17 |
| 14:15 15:1 | **exists** 122:22 | 82:15 110:6 | **expecting** 14:1 |
| 75:24 129:16 | 187:20 261:11 | 124:12 125:22 | 31:9 |

**[expects - feel]**

| | | | |
|---|---|---|---|
| **expects** 54:13 181:18 | **extensively** 272:3 | 252:11,20 260:7 271:15 | **fairly** 40:17 |
| **expense** 30:19 | **extent** 44:16 | 279:4 283:25 | **fall** 89:12 224:19 |
| **experience** 74:2 74:8,9,19 75:8 | 46:23 69:11 89:19 110:2 | 290:23 313:9 318:4 324:5 | **fallen** 224:14 224:18 |
| **experienced** 46:24 120:2,4 120:4 | 202:3 253:3 254:10 288:9 304:17 361:3 | 331:9 346:16 355:6 | **falling** 204:7 |
| **expert** 323:1 | **external** 303:10 | **factor** 57:17,25 58:4 184:2 197:11 | **familiar** 41:20 106:12 153:11 254:4 326:10 |
| **expertise** 70:10 185:11,12 291:9 | **extractions** 340:23 | **factors** 197:10 251:20 289:15 | **family** 32:10 352:19 353:14 |
| **experts** 201:15 | **eyes** 34:18 35:2 54:4 82:7,17 83:3 129:2 | 289:16 290:4 290:13,15 291:17 359:23 | **far** 329:2 |
| **explain** 85:21 244:6 | 160:13 166:9 166:19,21,22 | 360:5 | **fast** 42:2 45:8,9 347:22 |
| **explained** 94:5 | 173:3,13 174:13,18 | **facts** 70:2 229:3,22 | **fatal** 72:19 |
| **explicit** 85:2 173:12 174:20 243:24 300:21 303:8 | 175:6,16 333:25 | 275:22 276:13 276:13 283:11 354:19 | **fatalities** 284:3 |
| | **f** | **fahrenheit** 13:13 | **fatality** 74:3,5 283:11,17,21 349:14 |
| **explicitly** 211:25 | **face** 28:5,5 190:11 305:21 307:9,11 | **fail** 118:9 197:15 | **fault** 66:25 144:25 248:16 251:18,22,25 |
| **explorer** 326:20 328:25 335:4,14 | **facilities** 101:7 102:6,14 192:9 192:11 | **failed** 284:21 | 252:11 253:13 276:23,25 277:3,11,18,25 |
| **exploring** 226:22 | **facility** 102:18 102:19,19,19 120:25 191:21 191:22 192:14 192:24 193:7 | **fails** 364:19 | 278:5 292:10 |
| **expressing** 307:14 309:1 | | **fair** 16:10,10 24:7,10,10 96:10 101:23 | **february** 2:23 |
| **expressive** 306:5 | | 116:18,18 155:24 186:7,7 212:7 273:3 | **feed** 224:8 |
| **expressly** 5:7 | **fact** 8:16 35:11 144:21 196:3 219:6 223:15 | 303:21 306:11 342:25 346:6 | **feedback** 60:25 196:1,1 198:5 198:10,13 200:7,13 202:2 281:9,15 |
| **extended** 175:2 | | | **feel** 11:15 36:4 86:19 90:6 |
| **extensive** 107:4 | | | |

Veritext Legal Solutions
800-336-4000

**[feel - flight]**

135:11 139:11
144:3,17
200:10,12
202:6 249:22
249:24 251:2
258:1,1,14
286:16 289:11
290:19 297:17
314:23,23
**feeling** 144:11
258:5 264:11
**feels** 124:18
171:1 250:14
258:13 288:7
**feet** 290:16
**felonies** 294:22
**felt** 140:6 162:3
234:19 270:11
**fender** 75:13
205:23 217:15
238:4
**fiddling** 51:25
**field** 19:24
28:16 39:19,23
151:2 284:16
314:18
**fight** 283:19
361:6
**figure** 91:18
95:10 160:1
171:16 175:24
176:25 204:17
257:17 258:12
**fil** 305:18
306:10

**file** 29:12 66:22
66:23 72:1
100:6 104:20
105:16,25
108:19,21
186:9 224:24
225:1
**filed** 5:23 31:5
67:25 68:4,4
291:24 312:9
**film** 22:7 23:8
24:14,22 45:25
62:18,23,24
348:25 349:1
**films** 9:8,9,24
10:14,16 11:1
18:4 22:15,23
22:24
**final** 233:18
238:13 239:7,9
239:10,22
242:7 249:17
250:10 251:3
257:4 262:4,5
262:20 272:19
273:5 296:18
**finally** 328:21
**financial** 61:19
63:14
**financially** 6:11
363:14
**financials**
63:24
**financing** 348:8

**find** 71:24
85:17,19 91:7
117:2 121:19
132:4 134:11
154:9 195:2
272:7 293:4
301:10 308:20
311:18 322:21
**findings** 68:8
68:23
**fine** 8:24 15:9,9
66:15 70:23
111:17,17
156:15 211:2
215:24 237:5
293:18 361:13
**finger** 232:6
**finish** 193:2
234:16
**finished** 249:10
**fire** 203:22
**fired** 203:22
245:24 275:5
275:14
**firm** 6:7 189:20
240:20,25
324:12
**first** 11:6 28:17
28:18 36:1
46:19,20 50:12
66:9,12 67:5
76:24 86:18
99:6,10,11,12
105:10 107:10
107:21 133:12

140:11,18,19
157:13,19
166:14,15,16
168:15,17
184:4 196:13
196:13 200:2,9
200:18,20
216:25 218:21
225:16 226:1,9
228:11 233:22
237:14,19
242:3 248:1
249:18 256:14
262:3 267:22
268:11 303:6
314:12,13
315:5 316:7,10
322:14 340:2
352:1 354:24
**five** 28:17,25
50:4 200:2
279:17 295:13
362:13
**fix** 42:3 178:13
**flag** 290:23
**flat** 94:17
**fleet** 67:19,20
68:10 72:9,19
101:2 108:5,7
108:11,13
132:14 188:12
188:17 354:7,8
**flew** 353:19,19
**flight** 354:1

[flip - found]

**flip**   14:12,25
76:1 223:24
236:4 244:1
300:2
**flow**   68:1 73:8
**flowchart**
68:24 69:12
70:3
**flown**   353:11
**flows**   93:24
188:12 190:7
**fly**   353:20
**focus**   34:17,19
158:13 161:6
169:20 214:2
248:23 249:21
257:6,19,21
259:21 262:22
263:1,6,16
264:4 269:14
292:5,8
**focused**   33:20
33:20 34:24
249:23 257:18
299:23
**focusing**   217:9
259:23
**folks**   103:2
124:5 219:12
221:15
**follow**   14:23
61:7,9 67:22
73:3 85:15
91:16 92:17
101:19 103:11

140:5 146:15
148:4 174:6
181:8 182:6
184:15 185:25
186:8,15
188:18 243:8
243:20 291:3
319:3 335:17
354:22
**followed**
103:19 188:19
206:19 213:11
**following**   61:25
68:16 69:12
70:3 85:23
90:4 139:9
143:19 144:16
171:5 173:6
206:8 214:9
215:1 216:12
219:12 220:7
226:9,15 227:6
228:4,11 230:8
230:9,10 243:4
250:17 252:24
260:8 278:8,11
285:22 289:1
318:23 321:1
**follows**   71:14
103:25 171:12
**force**   274:20
**forced**   123:20
**ford**   326:20
328:25 335:4
335:14

**forecast**   43:12
**foregoing**
363:5 366:5
**foremost**   66:9
107:10 140:12
168:15 184:4
315:5
**foreseeable**
309:17
**forgive**   110:12
304:4
**forgot**   143:7
146:19
**forgotten**   143:6
146:22
**form**   38:18
86:2 114:24
131:22 143:9
147:12 151:15
154:2,4 156:14
162:17 164:1
169:3 173:5
174:4 175:4,20
177:8 178:3
183:1 194:22
196:12 204:25
211:22 219:23
220:16 228:12
230:15 235:23
242:21 252:7
257:13 260:2
262:9 264:24
285:5 286:14
286:25 288:22
296:1 297:3

301:21 305:23
306:1 307:19
308:9,17
309:20 310:24
312:23 313:14
329:21 330:17
333:18 336:1
356:13,17
357:3 358:20
**formal**   9:1
29:10 40:21
139:14,21
142:17 149:6
**format**   154:16
**forms**   199:2
**forsyth**   6:3
**fort**   347:23
**forth**   78:18
**forthcoming**
228:17
**fortunately**
294:4
**forums**   300:18
300:18
**forward**   244:2
339:1
**forwarded**
214:25,25
**foster**   21:4
**found**   66:25
68:25 103:20
104:3 105:4,24
123:21,22
144:7,25
190:25 251:18

Appx_1605

**[found - give]**

251:22,24
252:11 261:14
293:5,13
303:15 309:5,7
**foundation**
47:9
**foundations**
47:5
**four** 28:17,19
28:20,24 50:4
196:6,6 200:1
279:17 293:10
294:7 351:19
**fourths** 97:3,17
**frame** 249:9
342:23
**frankly** 123:14
**fraudulently**
58:2
**free** 34:6,6
50:23 83:16,19
83:25,25 84:7
84:14 166:3,7
166:23 168:3
168:23,24
169:5,13 170:1
170:13,24
171:13,18,22
172:12,13,19
176:19 332:23
333:4,7 357:14
357:15,20
**freeman** 4:13
**freemanmills...**
4:15

**freestanding**
57:9
**frequencies**
200:17
**frequency**
21:13 28:11
39:14 72:21
91:4 130:21
135:11 144:14
151:4 155:5
162:1 179:9
180:10 182:17
190:8 214:21
271:16 297:22
316:14
**frequent** 26:11
37:18 39:1,24
40:1,6 41:8,10
45:9 48:17
86:9,9,10
103:5 189:14
196:3 198:13
198:20 201:19
282:22 316:21
**frequently**
19:15 40:11
48:19 195:21
198:10
**friend** 331:22
334:8
**friends** 352:20
**front** 14:11
55:9 56:9
115:6 125:8
159:8,12,16,20

161:14 191:1
210:6 212:23
213:2 233:4
276:9 277:20
289:17 305:10
314:11 328:25
337:9 360:1
**full** 7:9 10:3
13:7 14:1
19:23 104:17
123:5 150:9
169:25 268:20
289:18 292:23
294:7 313:6
**fully** 54:9 57:4
206:23 314:23
**fun** 223:20
**function** 36:25
37:7,12 38:14
**functional** 10:6
**functions** 40:21
**further** 68:9
185:24 188:20
188:20 212:4
289:21,21
291:4,8 320:15
363:12
**future** 248:25
249:2,24
256:17 257:19
263:3,5
**fuzzy** 65:13

| **g** |
| --- |

**gas** 30:15,24
**gauges** 160:8,9
334:3
**gduboff** 4:10
364:2
**general** 9:7,23
10:1,23,25
17:6 42:4
112:6 124:9
322:19
**generate** 46:7
**generated**
68:15 208:17
208:18,24
225:11 236:13
246:10 351:1
**generic** 63:11
**gentleman**
211:21
**geography** 24:9
**getting** 12:21
29:15 66:20
86:20,23 99:15
99:18,23 114:8
140:6 145:23
229:4 245:24
260:24 281:9
292:12 293:23
297:14 352:1
**girls** 307:4
**give** 13:15 36:3
52:21 76:7
77:5 85:2
144:18 199:9

Veritext Legal Solutions
800-336-4000

**[give - going]**

|  |  |  |  |
|---|---|---|---|
| 199:25 200:6 | 28:10 48:22 | 292:14,18 | 39:15 49:17 |
| 204:10 216:23 | 59:8 66:23 | 297:25 298:6 | 50:14 51:17,18 |
| 242:1 301:19 | 69:3 70:21 | 299:20 305:3 | 55:24 60:11 |
| 301:22 329:4 | 73:17 76:4 | 309:15,25 | 64:23 69:20,21 |
| 340:14 357:18 | 78:13 85:4 | 313:25 315:11 | 69:22 70:24 |
| 361:21 | 95:5,12 99:20 | 326:2 339:1 | 77:8 78:7 |
| **given**  12:13 | 104:16 105:16 | 340:19 349:19 | 85:15 87:10 |
| 24:23 30:24,24 | 111:12 113:22 | 352:20 353:23 | 131:21 132:12 |
| 31:16,20 35:18 | 114:1 123:2 | 357:19 358:5 | 135:18 137:16 |
| 46:8 49:3 | 129:15 132:20 | 358:11,12 | 140:7 144:2,15 |
| 54:14 56:14 | 132:21 134:17 | 361:13 | 145:1 147:11 |
| 108:14 115:2 | 134:18 139:2 | **goal**  46:23 64:2 | 147:13 148:15 |
| 139:4 143:5 | 142:1,1 146:9 | 64:20 98:2,4,6 | 148:19,24 |
| 153:2,21 | 149:15 151:11 | 137:14,19,23 | 160:4,7 162:16 |
| 203:25 207:20 | 166:6,6 170:5 | 137:25 138:8 | 171:7,9 172:11 |
| 215:16 252:15 | 170:8 173:23 | 149:4 221:20 | 174:18 175:3 |
| 252:19 279:7 | 178:14 184:9 | 221:23 222:12 | 175:19 176:11 |
| 313:4 349:10 | 184:18 195:7 | 240:23 299:9 | 177:16 180:20 |
| 354:20 355:11 | 200:8,12 205:2 | **goals**  43:12 | 187:4,5 190:23 |
| 362:10 366:9 | 206:15 209:15 | 61:16 62:4,8 | 190:24 191:6 |
| **gives**  198:15,16 | 210:12 211:15 | 96:21 98:11,17 | 192:25 193:1,9 |
| 260:13 | 215:13 217:17 | 98:21,24 99:7 | 195:1 206:4,16 |
| **giving**  198:10 | 218:18 227:8 | 113:11 246:12 | 207:10 213:21 |
| **glance**  175:13 | 229:11 232:11 | 265:11,11,21 | 214:1 217:9 |
| 347:10 | 235:15,16,20 | 268:1 316:8,8 | 221:3 223:7 |
| **glanced**  329:13 | 235:20 236:3 | **god**  14:2 | 232:15 235:12 |
| **glasses**  318:8 | 236:24 239:18 | 305:19 | 236:1 244:3 |
| **global**  10:5 | 240:16,17 | **goes**  60:25 88:5 | 245:23 253:17 |
| 22:9,19,24 | 241:14 246:1 | 97:18 99:17 | 253:25 260:1 |
| 92:16 | 246:16 248:1 | 107:6,18 | 263:11,18 |
| **globally**  148:19 | 261:25 262:19 | **going**  5:13 11:9 | 271:13 275:14 |
| **go**  5:17 12:22 | 265:7 267:9 | 12:3,5 13:24 | 282:16 304:11 |
| 13:20,25,25 | 269:3 272:11 | 14:3 16:18 | 307:7 309:23 |
| 14:3,5,11 | 272:25 274:11 | 17:2 18:7 | 311:22 313:17 |
| 19:16 20:18 | 280:3 287:10 | 30:25 38:17 | 317:18 322:25 |

Veritext Legal Solutions
800-336-4000

Appx_1607

**[going - guidance]**

326:9 327:21
329:20 333:17
336:12,17,21
336:25 337:6
337:18,20,23
337:25 338:13
338:16 339:8
340:8,9,9
342:6,11,22
346:15 347:14
348:3,11
352:15,16,19
353:17 360:25
361:21
**goncalves**
246:22,24
**gonzalez**   1:2
5:22 364:4
365:1 366:1
**good**   5:12
11:13 12:21,21
13:19,19 16:11
16:13 17:17
29:18 45:6
50:13 70:20
74:17 79:24
86:12 120:18
137:24 138:9
158:13,14
159:19 170:3
174:7,8 192:6
192:7 199:16
215:8,8 226:25
232:15 243:14
245:16,21

258:9 259:23
265:12 266:2,3
266:5 273:17
286:5 287:8,9
288:12,13
299:8 300:21
300:25,25
323:23
**goodness**   22:9
150:22
**goods**   101:11
101:12
**gosh**   83:21 95:6
109:15
**gotcha**   259:18
259:18 338:10
**gotten**   74:15
98:18 99:13
186:22 275:10
313:19
**govern**   103:2
112:16
**governing**
111:19
**governs**   109:12
**gps**   34:12 37:4
50:24 51:23,25
53:15,15 82:11
146:1 172:25
174:2 175:1
176:10,12,20
176:21 177:6
177:21 178:2
202:18,21
328:19,22,23

329:13 347:6
347:16
**grab**   223:9
**grace**   305:19
**gracie**   312:8
326:18 327:25
331:23 333:10
345:6 346:14
**grainier**   338:8
338:19
**gray**   124:24
**great**   24:9
200:14 223:21
273:18 308:22
313:16
**greater**   113:20
**greg**   7:25 8:3
11:8
**gregory**   4:8
6:20 364:1
**grooming**
156:22
**gross**   204:13
**group**   46:3,6
73:2 209:24
284:12
**groups**   62:15
116:23
**grow**   9:19 10:8
244:9 308:12
**growing**   63:25
269:9
**growth**   10:3
61:21 274:4

**guess**   10:16
22:19 27:2
31:13 47:14
51:2 59:22
61:5,10 62:23
69:10 75:7
86:22 89:5
95:9 96:4
98:20 104:2
109:20 115:5,7
115:12 150:11
155:25 159:25
173:8,11 177:9
184:9 197:15
200:19 209:17
218:13 222:9
237:20 242:25
254:6 257:16
260:19 261:10
262:25 275:2
276:5 285:9
295:1 304:17
336:17 350:16
355:17 357:15
**guidance**   52:8
52:17,22,22,24
84:16 85:4,8
85:11 110:3
139:8 149:11
163:5,7 168:7
169:25 171:25
183:19 193:13
220:4,6 303:11
303:12

Page 36

Appx_1608

**[guide - heba]**

| | | | |
|---|---|---|---|
| **guide** 30:4 | 139:16 164:11 | 69:22 74:14 | **harm** 288:17 |
| **guided** 136:9 | 290:17 291:9 | 75:17 93:17,17 | 288:20 |
| **guideline** 304:2 | 308:2 316:17 | 96:5,7 198:1 | **harms** 287:25 |
| 304:23 | 357:10,22 | 204:12 257:2 | **hazard** 163:14 |
| **guidelines** | 360:1 | 279:20 280:13 | 168:9 |
| 172:22 174:6 | **handed** 152:25 | 324:15 | **hazardous** |
| 181:9 221:23 | 290:25 | **happened** 23:7 | 167:24 169:9 |
| 300:9 301:22 | **handheld** | 40:11 49:16 | 176:16 |
| 303:6,7,9,22,25 | 163:20 | 123:7,20 | **hazards** 34:19 |
| 304:5,6,8,18,20 | **handle** 26:7 | 196:18 197:22 | 54:10 82:9 |
| **guiding** 105:11 | 271:6,14 | 200:20 201:4 | 172:2 350:11 |
| **guilty** 293:21 | **handrail** 223:8 | 202:2 207:13 | **head** 11:17 |
| **gun** 75:19 | 223:9,18 | 207:21 208:20 | 147:18 149:12 |
| **guys** 14:23 20:7 | **hands** 33:16 | 208:21 228:25 | 189:10 324:3 |
| 21:19 22:16 | 34:6,6,10 | 275:22 278:3 | **health** 61:18 |
| 26:5 42:25 | 50:23 77:12 | 281:18 290:20 | 66:1,7 70:14 |
| 61:7 65:21 | 81:12,12 82:8 | 290:21 293:9 | 139:25 144:9 |
| 100:18 111:20 | 83:16,19,24,25 | 307:15 313:21 | 247:6 317:25 |
| 113:17 123:9 | 84:3,3,7,14 | 349:23 350:6 | 322:11,17 |
| 124:1 184:18 | 164:15,19,23 | 353:1,5,10 | 323:4 349:11 |
| 190:5 199:7 | 165:6,10 166:3 | 358:10 359:3 | 349:12,17 |
| 206:13 221:14 | 166:3,7,17,19 | **happening** | **healthy** 174:8 |
| 301:3,19 | 166:22,23 | 40:11 123:24 | 189:22,22 |
| | 168:3,23,24 | 228:19 249:2 | **hear** 125:4 |
| **h** | 169:5,13 170:1 | 256:17 263:5 | 145:19 |
| | 170:12,24 | 341:22 347:23 | **heard** 19:18 |
| **h** 7:13 365:3 | 171:13,18,22 | **happens** 11:23 | 23:23 56:11 |
| **habits** 89:21 | 172:12,13,19 | 68:3 73:14 | 91:2 143:13 |
| 203:6 | 175:7 176:19 | 127:2 203:23 | 232:5 |
| **half** 13:21 | 307:11 313:1 | 243:15 273:25 | **hearing** 91:14 |
| 19:21 23:13,16 | 332:23 333:4,7 | 280:12 | **heavy** 167:23 |
| 102:3 249:22 | 357:14,15,20 | **happy** 11:25 | 169:8 176:16 |
| 268:11 274:10 | **hanes** 191:11 | 88:25 | 176:19 277:17 |
| 294:8 | **happen** 39:23 | **hard** 32:2 45:8 | **heba** 324:3,5 |
| **halfway** 356:7 | 42:20 53:13 | 138:24 314:9 | |
| **hand** 34:24 | | | |
| 73:23 124:13 | | | |

[hector - hr]

**hector** 210:13
  210:16,23,24
  211:20
**held** 46:22
  64:18 81:12
  252:3
**help** 10:8,8
  13:6 20:19,20
  20:23 21:17,25
  25:4,18,22,23
  26:3 28:11,11
  31:23 32:7
  43:16 46:18
  47:8,23 48:22
  55:25 56:18
  66:14 91:16
  93:17 132:16
  185:20 209:1
  242:9,13 244:9
  256:25 258:3,5
  258:23 263:22
  263:24 264:3
  264:11 272:7,7
  272:8 300:25
  322:12 348:11
**helping** 91:18
  198:11 322:21
**helps** 32:1 56:5
**hereto** 366:7
**hey** 39:21
  60:21 174:17
  190:5 198:17
  200:14 203:21
  223:6,8 311:18
  323:23

**hierarchy** 257:17 320:4,5
**high** 95:5 111:4
  274:6
**higher** 95:4
  280:13
**highlighted** 202:16
**highlights** 34:4
  264:6
**highly** 25:15
  35:12 68:21
  195:25
**highway** 210:5
  356:7
**hire** 101:12
  119:3 122:7
  299:12,14
  324:8,11
**hired** 46:8,11
  47:12,17 48:11
  48:25 49:1
  122:8 196:20
  249:1 263:4
  264:15 294:15
  295:4,24,25
  296:4,14 298:3
  307:18 308:4,8
  309:6 324:12
  325:12
**hiring** 27:6
  101:5 293:22
  296:19
**historical** 89:6
  89:17 133:9,14

**historically** 161:17
**history** 313:4
**hit** 79:21 81:9
  94:19 96:13,21
  191:7 206:5
  213:14,14
  277:20 307:4
  327:4 356:9
**hitting** 81:21
  81:24 146:2
  330:24 331:6
**hold** 8:9 260:9
  341:25 343:16
  345:25 360:25
  362:3
**holding** 223:7
  223:17
**hole** 355:24
**holmes** 50:9,16
  98:15 130:19
  131:2 140:20
  226:13 296:11
  296:12
**home** 19:15
  20:1,9,12
  258:10 287:10
  353:20
**honest** 123:10
  123:15 230:21
  255:19 301:25
  311:25
**honestly** 44:17
  351:24

**hope** 46:14
  163:6
**hopefully** 288:19
**hoping** 353:15
**hopper** 93:21
**hotel** 32:17
  352:11,17
**hour** 13:21
  14:1 210:11
  213:22 228:16
  334:24 335:14
  347:14
**hours** 19:21
  32:15 44:22
  102:3 264:8
**houston** 23:19
  24:5 258:10
  259:2,3 269:10
  269:14 270:1
  296:3 353:12
  354:2
**how's** 271:17
  307:6
**hr** 68:6,12
  105:6 119:2
  122:18,19
  142:10,13
  188:16 196:11
  232:2 247:10
  280:10,14,16
  295:16,19,21
  297:9 317:23
  319:21 320:14
  320:20 353:16

[hse - incidents]

**hse**  66:1 70:14
  189:10
**huh**  11:16
  63:16 129:23
  218:23 269:11
  273:2
**human**  70:12
  105:7 196:11
  294:16 296:22
  319:21,21
  338:8,19
**hundred**  22:11
  45:20
**hundreds**
  45:15
**hurt**  228:17
**hygiene**  121:1

**i**

**icefloe**  26:6
**idea**  37:9 102:1
  155:19 159:19
  192:22 199:23
  233:16 249:3
  270:19 276:3
**ideally**  256:25
**identification**
  14:16 75:25
  155:14 191:5
  209:14 217:20
  232:24 236:6
  246:4 267:11
  292:17 300:5
  305:6 306:19
  310:3 336:20
  354:12

**identified**
  139:23 169:18
  360:6
**identify**  156:12
  300:23
**identifying**
  361:18
**ierardi**  27:9,16
  27:23,24 91:9
  98:14 140:20
  141:21 142:25
  143:8,18
  258:19,20,21
**il**  1:23 363:4,22
**imagine**  48:14
**imbue**  222:9
**immediate**
  204:16,23
  296:6
**immediately**
  146:2 204:12
  273:22 290:20
  320:13 328:23
**impact**  266:15
**impacted**
  251:12
**impacts**  75:3
  103:10
**implied**  173:12
**important**
  20:21 21:1
  26:13,17,23
  28:8 34:25
  35:4 36:2
  52:16,19 60:7

  70:9 72:11
  83:3 88:4,15
  165:5 166:21
  166:24 198:13
  219:3 222:2,5
  222:17 223:22
  243:19 275:16
  287:19,22
  297:21,22
  334:18,20
**impossible**
  222:7
**impractical**
  85:2,19,24
  86:6 160:20
**impracticalities**
  85:21
**improper**
  333:18,18
  334:12 336:2
  338:1 340:12
**improve**  214:1
  214:2 259:10
  259:12 274:10
  275:3,12
  278:15,24
  279:15,19
  317:9
**improved**
  266:12 273:14
**improvement**
  214:15 237:22
  242:15 278:22
  279:1,3,9,14,25
  280:2,8,16,24

  281:5,14
**improvements**
  217:10
**improves**
  275:14
**improving**
  274:13
**inability**  167:7
**inappropriate**
  308:21
**inappropriately**
  163:10,11
**inattention**
  290:14,24
  360:4
**incident**  18:11
  18:12 40:7,12
  44:16 65:23
  66:11,17 67:2
  67:16 73:9
  104:7 135:13
  139:18 145:22
  145:24 188:7
  205:25 206:24
  209:24,25
  237:16 238:7
  241:19 243:2
  251:6 255:10
  319:3 322:6,7
  324:13
**incidents**  64:10
  69:6 72:19
  75:16 89:18
  206:24 230:23
  237:25 272:14

**[incidents - initial]**

286:20,22
289:5 316:20
**include**   23:22
62:3 122:21
143:14 156:20
165:18 270:14
**included**
171:10
**includes**   10:7
**including**   25:3
63:14 91:21
160:6 162:13
168:18
**inclusive**
169:12
**incoming**   37:6
**incomplete**
12:13
**inconsistent**
301:7
**incorporate**
182:8
**incorrect**   8:4
116:4
**incorrectly**
36:11
**incumbent**
162:3,22
**independent**
229:2 332:8
**independently**
208:11
**index**   2:6 3:1
**indicate**   44:14
92:25 124:17

239:13 300:23
**indicated**   208:3
276:24 291:8
327:11 333:3
**indicates**   68:24
111:3 172:3
242:4
**indicating**
171:1
**indication**
199:9
**individual**   30:9
30:9 39:8,12
46:5,12 51:15
54:2 59:5 62:9
63:21 65:22
66:4 67:6,18
67:24 68:23
75:1 83:8
84:25 93:25
96:19 102:18
103:4 107:11
110:7 122:19
126:3 136:14
141:3 172:7
186:20 187:8
196:13 209:4
220:20 225:20
229:19 239:1
244:12,14
249:15 255:11
256:2 274:8,17
275:25 280:22
283:3 289:16
290:17 300:24

301:6 317:22
329:14 357:7
359:25
**individual's**
58:12 94:23
110:15 208:25
263:21 301:17
**individually**
1:3 46:5
**individuals**
30:11,13 32:8
64:16 73:2
85:4 101:16
107:7 109:22
125:4,4,12
126:5 186:18
219:18 222:4
245:8 274:3
287:25 288:18
299:12 300:7
319:7 349:20
**industry**
132:18 155:21
300:18
**ineffective**
137:9
**infinitely**   43:20
**influence**   87:14
177:18
**influences**
103:10
**inform**   145:25
**informal**
142:20 187:25

**information**
42:23 55:7
56:21 57:7,24
65:24 67:12
114:6 139:16
141:21 145:11
152:14 155:8
184:9,14
186:25 187:12
206:18 211:9
213:23 229:16
229:21 254:11
254:17 255:13
272:23 280:21
291:4 292:13
294:2 295:6
297:4 308:2,14
319:6 345:2,18
346:1 350:17
355:1,3,9
357:5
**informed**
140:23
**infotainment**
156:24
**infraction**
91:13
**infrequent**
72:22,24 73:5
**infrequently**
111:4
**inherent**   176:3
315:2
**initial**   49:16
99:23 182:15

Page 40

**[initial - investigation]**

343:8 359:18
360:8,15
**initially** 182:21
239:7 343:15
344:5 351:14
**initiate** 280:15
**injured** 206:13
**injuries** 64:11
64:12 218:25
228:17 257:2
**injury** 65:23
66:4,10
**innovation**
61:22
**input** 267:4
**inquiry** 16:8
329:22
**inside** 19:3,4
319:9 349:5
**instagram** 2:25
310:9,19 311:1
311:5,11
**installed**
239:24
**installers** 45:25
**instance** 205:17
284:19
**instances**
180:23
**instruct** 157:3
346:5
**insufficient**
198:3,6,7
**insurance**
67:19 68:7

206:14 210:19
211:9,11 221:7
229:7 285:21
286:3,8 291:3
354:7
**integrity** 25:15
88:13
**intended**
122:18 233:21
315:1
**intending**
353:6,7
**intent** 34:22
53:8 82:5,7
175:6 192:6,7
309:12,13
**intention** 35:1
157:10
**interact** 26:22
**interacted** 28:5
**interaction**
21:13 26:11
34:8 39:11
55:11,25 103:6
112:4 142:18
144:12 149:14
198:20 288:14
297:22 316:14
319:5
**interactions**
40:10 50:7
52:15 55:22
271:18 345:15
**intercompany**
102:7,11

**interest** 38:5
144:9
**interested** 6:11
89:8 363:15
**interesting**
29:18
**internal** 43:13
323:21 324:2
**interpret** 171:8
172:16 304:18
306:3
**interpretating**
77:2
**interpretation**
307:14
**interpreting**
76:23 77:22
135:8 143:10
**interrupt** 12:18
**interstate**
213:21 277:16
334:24 337:14
**interview**
324:22
**interviewed**
325:3
**intimate** 102:9
**intra** 102:13,14
**introduced**
14:16 75:25
155:14 191:5
209:14 217:20
232:24 236:6
246:4 267:11
292:17 300:5

305:6 306:19
310:3 336:20
354:12
**introduction**
348:4
**investigate**
184:1 185:24
**investigated**
92:8 291:8
**investigating**
185:2
**investigation**
139:21 145:12
185:14,17
187:21 188:3,6
229:3,9 231:21
253:15,22
254:14 255:6
261:6,12,16
286:3 289:9,12
289:19,21,22
290:22 291:12
291:16 311:15
318:23,24,25
319:2 320:3,8
320:15,19,23
321:22 324:9
332:17 334:22
341:12,14,18
341:19,22,24
342:17 343:2,9
343:14 344:2,7
359:12,13,15
359:19 360:8
360:15

Veritext Legal Solutions
800-336-4000

[investigations - kind]

**investigations**
70:18 261:19
**investigative**
320:17
**investigators**
324:10
**involve** 25:16
88:13 177:25
243:23 348:3
**involved** 61:2
67:16 184:5
221:6 226:18
248:21 263:3
283:21 284:2
339:19
**involves** 67:17
120:9 284:3
**involving**
162:23 184:3
206:9 207:22
**ipad** 57:10,25
**ipads** 32:3
54:23 56:21
**issue** 42:2
66:12 178:13
252:5 280:14
355:24
**issues** 21:18
123:17 178:24
190:10 252:8
343:11 361:17
**it'll** 11:15
**itas** 93:25

**j**

**j** 4:8 364:1
**jacob** 4:3 6:18
16:2 38:17
117:15 149:25
178:22 232:13
232:25 315:19
**jacobwhite** 4:5
**jake** 70:22
**january** 234:17
237:1,8 247:21
248:4,5
**job** 25:20 34:15
34:24 37:19
48:23 54:3
56:15 66:4,11
85:3 86:21
88:1 99:4
103:11 104:13
105:15 117:1
138:16 151:4
235:7 250:5
251:12 258:6
258:14 259:23
272:6 273:14
294:18 315:2
**jobs** 32:1 36:3
98:6 138:2
198:12 221:25
222:4 315:6
**jointly** 244:14
**jones** 319:4,11
**judgment** 45:5
45:6 54:2
82:11 86:12

87:18 138:3
199:16 295:17
302:3 308:22
309:13
**july** 234:9,11
236:18 249:8
249:11,12
293:16
**jump** 75:19
307:6
**jumping** 223:5
**june** 205:22
206:8 207:13
207:21 208:14
209:6,10
213:17 214:9
214:18 215:2
216:3,23
217:14 224:11
224:12,13,22
226:16 227:6
228:22,25
230:13 233:25
234:9 235:11
236:18 238:4,7
249:8 277:13
293:9 310:10
310:20 311:12
312:20
**jury** 64:23
**justification**
204:10

**k**

**k** 1:11 5:25
**keep** 34:18 43:1
82:7,8 93:4
99:14 118:11
120:18 121:23
166:9,19,22
183:4 192:12
220:4 286:22
287:4 288:2,8
314:11 339:8
**keeping** 35:2
83:3
**ketsman** 10:13
**key** 61:13,17
63:2,4,13
107:19
**kickoff** 348:3
**killed** 78:3
251:15 278:4
289:10 326:20
**kind** 24:5,6
40:18 46:21
52:19 61:19,21
62:10 66:24
68:6 72:5
90:16 92:2
105:1 112:6
145:23 150:25
151:3 180:10
188:16 190:7
196:5 201:15
204:1 226:21
246:11 248:9
249:16 277:19

Page 42

Appx_1614

**[kind - know]**

| | | | |
|---|---|---|---|
| 280:11 281:4,8 | 53:13,25 54:6 | 114:11,18 | 161:1,18 162:7 |
| 282:21 283:1 | 56:18 57:21 | 115:13 116:13 | 163:4,10 164:3 |
| 319:23 322:11 | 58:3 59:7,13 | 116:14,15 | 164:12 167:1,5 |
| 323:1 348:5 | 60:12 61:25 | 118:21,22 | 167:6 169:11 |
| 350:16 | 62:8,12,13,17 | 119:5,6,10,16 | 169:19,23 |
| **king**   4:3 | 64:2,11,18,19 | 120:16,18,22 | 171:7,17 172:1 |
| **knew**   141:4 | 64:20,22 65:19 | 120:24 121:15 | 172:3,15,16,18 |
| 145:1 241:10 | 66:2,2 67:9,12 | 122:16 123:10 | 172:21,22 |
| 311:8 347:18 | 68:2,17,25 | 123:16,17,17 | 173:11 174:7 |
| **know**   7:8 8:3 | 69:3,4 70:9 | 123:19 124:25 | 174:25 175:12 |
| 10:16 11:16 | 72:14,18,20 | 125:7 126:12 | 175:22 176:14 |
| 13:4,4,10,11,13 | 73:7,7,9,12 | 126:18 127:4 | 176:15,18 |
| 13:14,16,24 | 74:15 75:5,13 | 127:12,22,23 | 177:9,14,18 |
| 14:8 15:7 17:1 | 76:23 77:1,2 | 128:16 129:14 | 178:6,9,10 |
| 17:3 18:8 | 77:13,22,23 | 133:11 134:13 | 179:6,12,25 |
| 21:10 22:12 | 78:11 80:11,18 | 134:13,15,22 | 180:4,8,9,15,23 |
| 23:9,17 24:2 | 82:8,15,23 | 135:7,8,9,10,14 | 181:22,24 |
| 24:15,16,18,20 | 83:21,24 84:11 | 135:23 136:4 | 182:5,13,17,22 |
| 25:5 26:2 27:4 | 86:19,23 87:5 | 136:19 138:14 | 183:6 184:15 |
| 27:5,11 28:3 | 87:7 88:14,22 | 138:16 139:12 | 185:5 186:18 |
| 28:13,18,22 | 89:20,22 90:5 | 139:12 140:2 | 186:21 188:19 |
| 29:7,8 30:6,16 | 90:7 91:12,12 | 140:19 141:9 | 189:1 190:2,7 |
| 32:12 33:21 | 91:15,19 92:20 | 141:10 142:11 | 190:22 191:19 |
| 34:13 35:24 | 95:6 96:9 98:4 | 143:10,21,23 | 191:24 192:12 |
| 36:5 37:1,2,2 | 98:5,20,23,23 | 144:25 145:9,9 | 192:15 193:12 |
| 37:17,20,20 | 99:6,22 100:8 | 145:15 146:7,7 | 193:14 194:7 |
| 38:4 39:14,20 | 101:1,24 | 146:25 147:13 | 195:11,13,15 |
| 39:21,22 40:16 | 102:10,20 | 148:5,6,9 | 197:2,3,6,9 |
| 40:19 42:3 | 103:11 104:6 | 150:22 151:8 | 198:8 199:25 |
| 43:19 44:10,10 | 104:14,17 | 151:13,17,17 | 200:14 201:2,4 |
| 44:14,18 45:14 | 105:22 106:16 | 152:1,2,22,25 | 201:9,13,17 |
| 45:18,18 47:7 | 107:10,23 | 153:11,12 | 202:5,6,8,9,11 |
| 48:9,12 50:2,3 | 109:17 110:7 | 154:16 155:1,9 | 202:16 203:21 |
| 50:13 51:14,17 | 110:23 112:4,5 | 158:19 159:5,9 | 204:7,12,16 |
| 52:11 53:2,2,6 | 112:7,7,21,25 | 159:25 160:24 | 206:13 207:6 |

**[know - known]**

| | | | |
|---|---|---|---|
| 208:1,5,6 | 254:5,13 | 297:19 298:14 | 333:9 334:18 |
| 210:20 211:6,6 | 255:22 256:5 | 298:22 299:17 | 335:2,7 336:5 |
| 211:7,10,13,24 | 256:22,24,25 | 300:9,19,21,23 | 338:24 343:1,4 |
| 212:5 213:5,6 | 257:23,25 | 300:23,24 | 343:19 344:1,4 |
| 213:14,18,20 | 258:8,15 | 301:23 302:11 | 344:15,17,17 |
| 213:21,23,25 | 259:14,15,16 | 302:18 303:13 | 344:19,24 |
| 214:3,7,20,21 | 260:4,19 261:4 | 303:17,18,20 | 345:8,13 |
| 215:3,7,7,8,9 | 261:6,10 | 304:2,5 305:24 | 346:20,22,24 |
| 215:11 217:7,9 | 262:12,18 | 307:10,16,22 | 347:17,17,19 |
| 217:11 218:13 | 263:8,12,13,20 | 308:1,3,22,24 | 347:20,22 |
| 220:1,17 | 264:5,8 265:3 | 308:25 309:9 | 349:6,24 |
| 222:14,16 | 265:8 266:19 | 309:10,13,24 | 350:25 351:6 |
| 223:5,6 224:25 | 266:25 267:6 | 311:4,6,8,16,18 | 352:11,25 |
| 225:4,9 226:21 | 268:16,18,22 | 311:20,24 | 355:13 356:15 |
| 226:25 227:4 | 268:24 269:1 | 312:5,6,10,13 | 357:5,6,8 |
| 228:1,6,14,18 | 270:15,21 | 312:16,17,18 | 358:15 360:3 |
| 228:21 229:5 | 271:7,16,17,18 | 313:2,20,21,21 | 360:10 |
| 229:16 230:1,7 | 272:23 273:20 | 314:21 316:18 | **knowing** |
| 230:9,10,17,20 | 275:10,12,18 | 316:19 317:6 | 168:16 220:25 |
| 230:22 231:25 | 275:21 276:10 | 318:4,6,9 | **knowingly** |
| 232:3,8,9 | 276:12,13,18 | 319:4,15,16,17 | 299:14 |
| 233:7,20 234:3 | 276:19 277:22 | 320:1,3,6,9,12 | **knowledge** |
| 234:5,18,24 | 278:23,24 | 320:14,25 | 36:20,24,24 |
| 237:25 238:5 | 279:12 281:6 | 321:5,8,8,21 | 44:6 59:17,19 |
| 239:2,15,16,25 | 281:11 282:3 | 322:12,16,18 | 91:24 92:5 |
| 240:2,5,14 | 282:22 283:5,6 | 322:21 323:2 | 240:24 248:14 |
| 241:3,10 243:8 | 283:19,19 | 323:12,14,14 | 250:11 280:23 |
| 243:19,24 | 284:21,24,24 | 323:20,24 | 281:2,7 284:14 |
| 245:1 246:9,22 | 285:3 286:1,3 | 324:1,16,20 | 324:14 346:3,8 |
| 246:24 247:19 | 288:16 289:13 | 325:1,4,10,20 | 355:8 357:24 |
| 248:3,6 250:9 | 290:2,25 291:3 | 326:21 327:8,8 | **knowledgeable** |
| 250:17,20,21 | 291:20,25 | 327:12 329:1 | 15:15 16:4 |
| 251:6,7,10,11 | 292:3,4,12,21 | 330:21 331:24 | **known**   104:24 |
| 251:13 252:23 | 294:5,20,21,23 | 332:9,14,18,20 | 241:7,8 307:17 |
| 253:3,3,6,11 | 295:23 297:4 | 332:20,20 | 308:7 318:3 |

Page 44

Appx_1616

**[knows - legal]**

**knows** 72:19
91:19 111:2
141:9 208:6
209:10
**kpis** 61:7,9,14
62:2,3,6,7 63:3
63:4

**l**

**l** 4:13
**lab** 115:13,15
117:10 133:24
133:25 134:12
154:20
**label** 166:11
223:24
**labeled** 194:10
234:23 236:25
246:17 248:11
267:22 303:20
**labor** 296:23
**lack** 41:17
**landed** 359:19
**lands** 266:11
**lane** 146:5
328:7,12
331:14 338:23
339:4,7,12,16
340:17 347:13
356:7 360:1
**lanes** 337:16,17
340:17 341:5
**large** 75:14
101:2,6,10
245:9 282:15

**late** 268:18
**latest** 109:20
**laurels** 243:18
**law** 4:3 74:18
85:15 112:23
113:1,4,20
181:20 204:4
204:14,15,19
219:2,4,13
285:21 286:24
309:11 336:8
**lawful** 5:10
**laws** 81:17 85:9
112:20 181:7
181:25 186:15
186:15 204:21
204:22 219:22
220:8 309:11
309:12
**lawsuit** 291:18
291:24 312:9
342:24 359:19
359:22
**lawyer** 9:16
319:14
**lawyers** 145:16
145:20
**lays** 107:8
**lead** 10:6 60:10
60:13 62:18
204:15,22,23
343:25
**leader** 198:9
234:18 316:15

**leaders** 125:3
127:16 189:15
198:17
**leadership**
48:18 52:7
104:11 179:7
225:2
**leading** 320:3
**leads** 282:11
**learn** 48:22
49:8 73:20
148:9 200:6
**learned** 86:10
140:15 205:15
**learning** 47:3
47:16 61:20
72:14 88:10,10
99:5 115:13,15
133:24,25
134:12 154:10
154:20 197:9
213:17 298:5
**learns** 149:1
**lease** 2:13
125:22,23,23
125:23 218:2,4
221:18 297:15
**leased** 30:10,12
30:14,21,23
38:7 67:16,17
68:20 75:1
92:25 104:11
106:4,8,22
107:6 108:23
109:12 111:5

**112:2 125:25**
162:7 195:17
221:11 254:23
254:24 276:19
**leaser** 354:8
**leasing** 122:17
**leave** 59:23
189:22 247:7
247:22 268:17
268:22,25
**leaves** 332:2
**led** 18:12
**lee** 72:18
108:12,13,22
126:6,9,10
284:1 290:1
319:4 320:2
336:13 355:18
355:19
**left** 54:5 290:17
328:6 338:23
339:4,12
347:13 356:7
357:10 360:1
362:2
**legal** 4:18,22
6:5,7 68:6,12
69:13 70:12
90:15 112:20
142:13 164:2
188:16 219:24
219:25 232:2
252:8 286:15
291:2 296:23
296:23 309:21

Appx_1617

**[legal - look]**

319:21 342:19
346:2,4,8
362:14 364:23
**legs** 71:13
**length** 29:3
173:20 174:2
174:11,22
**lessons** 86:10
**level** 119:22
227:10 270:12
274:6,19
275:17 301:15
**license** 64:19
85:6 103:8
122:6,22
**licenses** 101:8
**lieu** 18:6
**life** 26:20
**lights** 329:18
330:3,15,24
**likelihood**
274:6
**likely** 33:8
127:10 128:23
128:24,25
186:22 240:10
240:14 275:13
282:19 294:24
341:5
**limit** 55:14
176:4 183:15
210:10 335:19
**limitation**
295:22

**limitations**
110:22,23
**limited** 141:21
165:19
**limits** 124:21
183:10 219:1,4
219:13,22
220:12 230:9
335:17
**line** 44:1 54:8
73:1 76:4,8
114:1,5 133:2
134:18,19,22
136:24,25,25
139:2,3 146:10
146:12 170:8
170:12 215:15
221:19 247:9
276:1 329:21
358:7,8,8
365:4,7,10,13
365:16,19
**lines** 129:16
143:3 298:1
**links** 44:4
**list** 15:1,4
93:20 116:21
118:25 121:21
144:15 169:12
316:10 361:22
**listed** 290:5
**listened** 127:13
**lists** 165:21
**literally** 136:21

**litigation**
324:15,19,25
325:6,18 343:5
345:5
**little** 9:1 11:15
25:10 29:15
64:6 69:8,25
71:12,13,13
75:19 94:6
125:8 178:25
202:9 206:5
207:1 216:21
217:22 233:11
249:11 254:17
314:6 318:21
339:1 348:4
**live** 259:2
**livelihood**
287:10
**lives** 162:2
306:6 309:1
**llc** 9:21
**llp** 4:8
**load** 272:9
**local** 186:15
191:20 192:9
192:10,13,23
193:7
**locally** 191:21
**located** 27:10
27:25 28:1
**location** 6:1
100:21
**locations** 19:10

**lodging** 352:23
353:8
**logical** 236:2
**logs** 335:3
**long** 13:24,25
61:4 67:24
82:15,17 84:4
99:3 124:20
150:12 167:5
171:21 173:19
174:19 175:12
275:3 299:5
346:22
**longer** 14:3,5
23:24
**longview** 4:14
**look** 13:5 54:5
54:5 63:23
81:7,14 125:9
125:9 129:16
132:22 160:2,8
165:12 173:7
173:13 174:1
174:11,22
175:8 177:20
178:1 184:23
185:5,8,9
210:1 216:25
233:3,23
255:23 264:19
294:1 306:16
307:23 321:23
326:12 329:1
347:15 354:9
357:13

Veritext Legal Solutions
800-336-4000

**[looked - making]**

**looked** 17:15
31:7 116:17
175:1 215:21
254:19 304:15
329:14 331:10
**looking** 10:11
10:17 17:11,13
46:15 81:23
97:25 146:1
157:9 166:12
172:25 175:13
175:16 176:10
176:12,15,20
176:21 177:5
185:1 192:16
289:14 328:22
340:24,24
**looks** 70:1,5
75:22 173:10
173:21 188:9
191:9 224:8
233:18,19
237:11 268:4
269:6,17
270:23 292:22
293:14 305:13
328:23 338:3
**loop** 7:25
200:13
**lot** 25:20 30:10
35:24,24 42:10
45:5 48:12
49:4,23,24
51:17 55:5
56:16 63:19

74:9 79:7
80:10,11 87:6
115:21 139:15
139:24 140:7,8
145:1,2 163:13
255:22 257:23
263:23 267:4
292:7 308:12
308:20,24
313:18,19
348:5,13
349:12
**louis** 4:19,23
6:3
**louisiana** 96:1
**lunch** 149:21
150:2

**m**

**ma'am** 65:6
215:22
**machines** 21:18
21:22
**made** 11:14
51:11 69:11
105:1 106:14
140:18 142:8,9
142:11 160:25
188:22 191:20
204:1 206:11
209:6 211:11
221:8 229:2
239:12,14,16
239:16 249:4
256:13 258:6
271:2 280:15

296:18 308:20
308:24 328:18
330:22 331:4
366:5
**mail** 35:15 42:7
42:12 55:16
58:18,20 59:1
59:1,6,14,17
84:2 92:15
108:22 109:1
124:13 128:12
355:17,18
**mailed** 108:18
126:7
**mailing** 34:9
**mails** 29:8
33:16 108:20
146:14
**main** 111:7
133:8 268:1
**maintain** 64:1
64:3
**maintains** 46:9
**major** 23:19,22
91:13
**majority**
101:15 269:9
**make** 9:18
12:20 20:15
27:2 29:21
32:11 33:17,18
34:22 46:17
53:8 55:6
56:17 57:8
58:14 60:11

64:11 66:7
70:19 73:23
81:23 82:14
85:5 86:11,12
86:16,23 87:16
96:9 98:3
100:19 105:8
112:1 113:3,4
113:18 137:7
138:8,16 148:3
154:7 155:22
162:3,8,14,14
162:24 166:24
166:25 168:23
173:12 176:12
191:25 196:20
201:16 207:3
214:1 215:15
216:10 220:3
231:12 236:12
237:2 243:15
252:11 257:1
274:22 282:25
284:6 287:24
291:1 294:1
309:18 317:2
326:9 345:11
346:15
**makes** 33:11,14
52:20 150:12
**making** 11:14
34:7 53:9 54:8
72:10 90:3,5
90:18 137:24
138:9,18

Appx_1619

**[making - mean]**

144:10 149:10
174:8 193:13
223:20 274:3
286:17 316:7
**mal** 309:12,12
**malleable**
43:20
**manage** 32:3
54:21,25 55:25
58:12 70:16
153:13 201:15
243:1 319:22
319:23
**management**
10:4 28:9
39:13 40:18
52:15 67:21
69:13 70:7
188:11,12,16
217:6 227:12
227:13,16,23
228:4,10
242:19 245:12
245:18,19
247:9 266:6
273:24 274:1,2
274:15 280:9
280:14 282:8
282:11,17
286:6,10
293:23 301:16
302:1,8 317:23
319:4,12,18
**manager** 9:7,24
10:1 17:6

28:22 50:10
67:20 98:13
108:5,7,11,13
198:9 210:20
213:7 291:5
295:23 296:3
296:13,20
**managers**
10:23,25 52:21
70:14 196:1
349:21
**managing**
35:21
**mandate** 38:3
**mandated**
302:7
**mandatory**
351:21,23
**manner** 25:15
26:15 84:15
171:22 218:24
235:7
**mantras**
222:15
**manually**
332:10,19
346:13
**manufacturing**
10:7 72:11
101:7 102:6
104:15 189:20
191:24 223:4
314:17
**march** 49:1,3
196:21 216:1

**mark** 17:25
336:22 337:1,7
338:14,17
339:3,11
**marked** 14:13
109:18 300:13
357:10
**market** 4:19,23
56:7 64:2,4
269:10 351:11
**market's** 63:25
**marketing** 10:4
**material** 26:20
194:3 317:2
**materials** 118:2
152:18,23
193:22 194:12
351:1
**maternity**
247:22 268:17
**math** 23:15
**matrix** 244:3,6
244:17,23
245:14 249:13
266:11 273:9
273:21,23
**matrixes** 273:1
**matter** 5:21
70:10 185:12
199:8 302:23
303:4,5
**matters** 351:10
**mcguire** 4:8
**mcquirewoo...**
4:10 364:2

**mean** 10:1
16:20 20:8
22:22 32:6,23
34:21 36:10
38:1,2,19 42:6
42:15 49:19
52:20 53:20
54:1 58:20
63:10 65:2
66:21 72:7
73:6 74:2,3,23
77:25 79:18,19
83:24 85:1,8
90:14,16 93:15
97:14 99:20
101:20,24
102:12 105:18
108:7,9 109:11
114:21 115:2
116:20 120:4
126:9 128:15
136:22 138:12
142:2 150:16
160:22 163:2
165:18 169:11
170:19 171:24
181:18 188:7
194:17 200:13
201:21 206:7
207:11,15
212:8 219:16
219:17 223:2
226:8 230:17
234:11 241:1
242:14,15,16

**[mean - metrics]**

247:11 251:14
252:12 254:9
257:11 259:5
260:6,14 262:7
263:9 271:15
274:7 275:13
277:6,23
279:17 294:19
295:11 296:5
299:9 304:21
305:22 306:9
307:13 311:22
324:24 325:24
329:7 332:24
341:10 348:24
353:2 357:25
**meaningless**
306:8
**means**   10:2
39:11 42:10
64:25 65:9,12
83:22 115:5
125:12 129:8,9
140:15 144:5
171:1 241:2
314:7
**meant**   129:21
135:17 150:16
200:24 263:13
**measure**   64:7
64:15 65:1,10
193:16,18,19
244:8 314:12
314:13

**measured**
63:17,18 64:5
316:23
**measurement**
174:20
**measurements**
65:14,17
**measures**   105:9
249:21 257:6
259:21,24
**measuring**
80:11 88:5
**mechanism**
39:8
**media**   5:18
299:22 301:4
301:16,18
302:12,17,20
302:21 303:1,2
307:23,24
308:16,21
309:2,4 362:13
**medical**   66:8
66:14 317:25
318:18 323:14
323:21 324:2
**medicines**
317:22,24
**meet**   21:3 26:4
243:8 284:11
362:3
**meeting**   37:21
55:17 99:3
105:14 121:10
121:13 122:3

125:14 128:5
130:10 144:14
200:10 268:7
352:9
**meetings**   37:21
39:2,2 40:14
40:22 41:9,11
49:22 120:8,14
121:3,9,16,25
125:17 126:23
127:2 128:22
129:10 130:14
136:12 189:6
284:11 314:11
**member**   131:8
300:8 316:15
349:18
**members**   20:22
26:22 28:9
32:10 35:23
43:22 45:6
70:6 72:13,13
76:25 87:25
130:8 137:23
163:6,7 164:13
204:11 222:19
298:14 299:10
301:1 315:4
**memory**   52:13
**mental**   247:6
317:25 322:11
322:17 323:4
349:11,12
**mentioned**   22:6
55:20 57:16

63:2 73:7 99:1
107:14 125:21
125:21 133:15
266:11 322:5
**mentoring**
47:24 183:19
214:17
**message**   42:7
81:8,22 82:21
83:2,14 87:1
87:17 291:19
326:18 327:5
327:25 328:5
340:7 345:1
346:14
**messages**   80:22
86:25 141:18
171:21,21
292:1,2 331:22
332:3,5,9,18,23
360:16,20
**messaging**   38:8
43:21
**messed**   260:24
**met**   7:8,23 8:5
98:16,21,23
99:6
**method**   130:6
149:9 219:11
332:23
**metric**   60:20
88:5 242:20
**metrics**   47:10
56:8 61:6,14
63:3,5,8,11

Veritext Legal Solutions
800-336-4000

**[metropolitan - monitoring]**

| | | | |
|---|---|---|---|
| **metropolitan** 23:19,22 | **mills** 4:13 | **mirrors** 54:6 | 130:2 131:19 |
| **microphone** | **mind** 76:5 | **misconduct** | 132:7,9 139:14 |
| 79:12,15,22 | 77:24 93:4 | 347:1 | 149:2 284:22 |
| 81:4,21 | 135:9 144:11 | **misdemeanor** | **modules** 114:6 |
| **middle** 141:2 | 147:15 159:12 | 293:6,8,13 | 114:16,18,23 |
| 210:2 229:19 | 177:16 189:10 | **misdemeanors** | 115:2,17 116:4 |
| 236:17 244:21 | 192:12 200:11 | 295:2,2 | 116:7,12 |
| 244:23 245:13 | 215:14 222:18 | **misinterpreting** | 118:15,22 |
| 245:14 290:18 | 298:21 | 136:21 | 119:4,6,18,21 |
| 328:12,13 | **mindset** 139:25 | **misrepresent** | 120:1,7 129:18 |
| 329:14 331:13 | 240:21,25 | 39:25 | 131:17 133:6 |
| 355:23 359:24 | **mine** 249:20 | **missing** 264:20 | 147:1,2,5,24 |
| 359:25 | 257:5 259:21 | **mission** 26:19 | 148:17 154:8 |
| **midyear** | 357:18 | **missouri** 4:19 | 195:2 278:17 |
| 214:11 237:15 | **minimize** 136:8 | 4:23 6:4 | 298:5,6 |
| 237:15 246:13 | 158:7,9,18 | **misstate** 8:13 | **moment** 55:10 |
| 248:2,6,11,12 | 248:24 263:2 | 138:7 | 85:1 137:24 |
| 248:17,20 | 286:20,21 | **misstates** 86:2 | 140:6 231:11 |
| 249:3,8,8,13 | 358:25 | 277:4 | 347:16 350:13 |
| 267:19 272:17 | **minimizing** | **misstating** | **moments** 126:3 |
| 273:17,22 | 161:7 249:23 | 147:12 | **mon** 300:19 |
| **mile** 228:16 | **minimum** | **mistake** 357:19 | **monday** 352:9 |
| **mileage** 30:14 | 95:11 227:17 | **misunderstood** | 352:12,18 |
| 30:16 31:1,11 | **minor** 205:22 | 110:12 136:18 | **monitor** 29:20 |
| 31:15,17 93:7 | 225:24,25 | 298:16 328:13 | 29:23,25 58:11 |
| 107:17,18 | 240:21 | **mkd** 2:7 3:2 | 59:20,23 60:3 |
| 111:14,23 | **minute** 191:8 | **mo** 1:23 363:3 | 100:16,16,18 |
| 218:8,14 | 315:10 336:22 | 363:21 | 100:21 102:23 |
| **miles** 31:5 | 337:1,7 338:14 | **mobile** 57:14 | 103:1,3 104:14 |
| 210:11 213:22 | 338:17 339:2 | 156:21 | 112:11 123:5 |
| 334:24 335:14 | 339:11 | **mode** 112:13 | 179:2,4,6,11,14 |
| 347:14 361:7 | **minutes** 40:24 | **modern** 162:11 | 219:19 222:6 |
| 361:18,20 | 70:25 121:24 | **module** 114:3,9 | 300:22 302:11 |
| | 122:4 348:20 | 116:8 118:20 | **monitoring** |
| | | 129:22,25 | 100:12 103:14 |

**[monitoring - need]**

106:4,19,20
221:15
**monitors** 59:25
71:14 106:15
**month** 227:11
227:14 233:22
282:7
**monthly**
189:16
**months** 28:19
28:19 46:20
189:11 196:6
200:3,3,21
351:17,17
**mopac** 210:5
**moral** 90:15
287:4,7
**moreno** 1:5
**morning** 5:12
54:4
**motion** 105:1
**motor** 104:6
285:23
**mount** 202:17
**mounted** 81:21
202:13
**mouth** 228:9
327:22
**move** 83:8
101:12 206:15
228:16 274:12
**moving** 33:25
64:20,20 65:3
65:20 67:6
107:13 122:25

179:13 188:13
209:24 217:1
221:11 224:4
241:11 274:24
285:12 311:6
**multiple** 9:19
23:2,2,22
48:19 50:8
73:10 74:10,13
74:19 75:9
94:9 116:1
125:12,15
197:13 217:7
249:16 251:19
261:23 274:23
279:15,16
298:5 339:14
340:16 360:4
**multiples** 95:7
**multiplier**
94:12
**multipliers**
95:24 96:4
**mute** 5:14

**n**

**n** 4:1 7:12,13
357:23
**name** 6:4 7:9
7:12 27:15
56:20,23 67:9
71:9 240:5
247:10 278:23
290:3 324:1
**names** 60:4

**narrow** 258:7
**natural** 21:14
**naturally** 53:13
**nature** 20:24
21:5 45:4
53:18 66:6
74:19 82:18
86:15 88:11
102:9 104:23
105:6 109:20
110:7 112:18
125:5 142:13
144:4 161:25
202:7 213:20
248:23 251:6
252:23 289:20
291:7 295:11
334:18
**navigate** 70:16
**navigation**
156:23 165:13
165:22,25
166:3 172:25
173:7,11,13,21
174:2,12,22
**near** 241:18
**necessarily**
41:1 66:3
69:17 80:5
87:2,4 88:9
152:8,16 153:7
163:3 176:22
185:19 201:18
213:9 214:2
234:7 251:4

294:6 297:11
308:14 339:5
346:17 350:5,5
**necessary**
173:18 211:4
235:18 249:21
253:4,7 254:20
257:6 259:22
259:24 289:8
289:24 300:14
300:15 308:21
333:16,21
334:15,20
366:6
**necessity** 111:4
333:24 334:9
**need** 11:13,17
13:21,22 14:8
20:25 21:2,3
25:23 32:9
42:3 45:4 47:4
47:5,6 48:16
53:14 67:1
72:16 73:19
74:25 75:2
81:14 103:5
107:15 144:17
147:19 161:11
161:13 172:8
186:24 203:22
204:8,10
218:16 246:18
263:6,16
279:21,22
283:19 289:11

Veritext Legal Solutions
800-336-4000

**[need - object]**

290:19 323:15
349:11 353:17
**needed**  34:16
68:9 103:12
184:17 186:1
188:20 206:23
271:22 291:8
315:7
**needing**  80:24
179:23 275:12
279:14
**needs**  25:22
48:15 91:19
162:24 169:7
199:12 209:1
211:10 214:14
218:7 228:6
237:21 242:15
257:18 279:24
281:4
**nehemias**  1:4
141:14 146:2,6
230:4 231:5
326:20 327:4
328:24 330:25
331:7
**neither**  313:24
363:9
**networking**
2:21
**never**  106:21
116:7 122:2
131:19 205:7
218:14 280:24
282:20 341:16

349:21
**new**  43:8,8,16
46:7,15,20,23
46:23 48:14
62:8,13,14,18
62:23 93:21
98:8,24 119:3
191:14,17
192:14 193:8
196:4 233:10
269:18 274:12
275:11 278:16
283:15 348:10
351:11
**night**  32:17
352:25 353:8
**nine**  244:3,13
244:21 326:19
327:3 339:3
**nods**  147:18
**non**  230:10
**nonemployees**
288:8
**nonresponsive**
86:3
**norm**  81:1,16
81:17 82:12
**normal**  144:13
158:20 219:15
272:5 347:9
**normally**
237:12 270:12
280:13
**north**  4:4 22:16
45:14 47:22

140:22 141:18
210:4 312:8
356:6 364:4
365:1 366:1
**northbound**
328:7 337:17
337:18,20
**northern**  1:1
5:24 47:22
48:3
**notary**  366:13
366:19
**note**  40:21
253:17 364:10
**noted**  366:7
**notes**  29:6,11
40:13 125:9
189:12 257:22
**nothing's**  69:21
**notice**  2:8 7:20
14:18 260:3
**noticed**  16:9
39:21 178:4
260:11 265:1
279:11 304:12
306:2 307:21
317:19 327:7
331:2 332:13
333:19 334:13
336:3 338:2
340:10 342:8
**noticing**  6:17
**notification**
109:16

**notifications**
107:14
**notified**  74:25
111:23 141:6
205:24
**notifies**  285:15
**notify**  103:5
110:25
**notifying**  122:9
351:16
**november**  1:20
5:14
**number**  38:25
39:6 69:1
92:15,21 93:1
104:23 113:24
125:2,6,7
210:13 274:9
279:17 282:15
317:1 331:25
332:6 356:20
362:12
**numbered**
221:20
**numbers**
361:10

**o**

**oath**  6:9 7:2
**object**  12:23,24
38:18 49:17
77:8 78:7
101:18 131:21
135:4 137:16
137:22 147:11
148:15,19

Page 52

Appx_1624

**[object - officially]**

162:16 169:3
171:9 175:3,19
178:3 181:1
192:25 193:1,9
193:9 207:10
219:23 252:7
260:1 263:18
279:10 304:11
317:18 329:20
333:17 337:23
340:8,10,11
342:22 356:13
358:20
**objected**
146:20
**objection**   86:2
89:3 90:20
119:24 123:25
143:9 151:15
151:22 152:10
152:21 153:5
154:2 156:14
164:1 173:5
174:4 177:8
186:6 193:5
204:25 211:22
220:16 228:12
230:15 242:21
253:21 254:8
257:13 260:10
262:9 264:24
277:4 285:5
286:14,25
288:22 296:1
297:3 301:21

305:23 306:1
307:19 308:9
308:17 309:20
310:24 312:23
313:14 330:10
330:17 331:1,8
332:12 334:11
336:1 346:16
357:3 359:4
**objections**   6:12
7:22 8:6,10
15:8,11 88:21
90:19 176:6,7
181:3 253:18
334:17 360:25
362:1
**objective**   98:3
**objectives**
96:21
**obligated**   36:4
**obligation**
60:15 90:2,6
90:11,15,15,21
219:21 220:1,2
287:4 288:11
**obligations**
164:12 219:17
274:17
**observation**
104:10,10
149:14 179:21
243:4 284:16
**observations**
63:20 189:2
234:21

**observe**   51:15
202:6,18 203:6
219:1,4,21
243:7
**observed**   51:14
104:16,23
202:16,21
**observing**
51:20 179:8
198:10 220:11
**obstructing**
346:24
**obviously**
145:19 147:16
160:1 311:22
360:24 361:16
**occasionally**
160:8
**occur**   53:15
111:21 121:4
196:15 199:1,7
199:21,24
283:14
**occurred**   28:14
40:7 49:4
123:18 145:15
180:1,16,21
191:21 196:24
200:25 206:13
231:10 237:23
251:8 254:14
275:19 283:12
293:8 324:18
341:6 343:4

**occurrence**
72:24 230:20
**occurrences**
129:4
**occurring**   40:6
**occurs**   188:8
286:9
**october**   2:24
7:23 201:5,11
307:2
**odometer**   160:2
160:10
**offense**   229:14
**offhand**   119:10
**office**   19:5,13
19:14,16 20:2
20:8,9,13 26:1
**officer**   185:22
290:1 336:13
340:2
**officer's**   290:2
**officers**   184:19
251:24 252:4
289:15
**offices**   6:2
**official**   8:20 9:6
17:5 44:20,24
104:6 150:23
172:23 192:4
194:18 195:23
198:1,21
299:21 344:1
**officially**   115:4
224:20,22
235:19

Page 53

Appx_1625

**[oh - okay]**

| | | | |
|---|---|---|---|
| **oh**  14:22 25:24 | 33:3,10,10,24 | 74:7,21 75:11 | 111:25 112:9 |
| 57:1 76:8 | 34:4 35:4,17 | 75:18 76:3,4 | 112:13 113:3 |
| 79:19 82:23 | 36:9,16,21 | 76:19 77:4,18 | 113:17,22 |
| 83:21 110:12 | 37:7,11,14 | 78:13,16,22 | 114:15,18,25 |
| 123:8 133:16 | 38:11 39:24 | 79:2,8,10,14,17 | 115:9,14,19,23 |
| 154:25 155:9 | 40:13 41:4,7 | 79:25 80:12,14 | 116:3,5,6,6,11 |
| 156:17 157:22 | 41:16,16 42:4 | 80:15,20 81:2 | 116:15,18 |
| 160:22 171:7 | 42:14,19,25 | 81:6,19 82:2 | 117:2,6,9,13,17 |
| 194:18 209:22 | 43:4,10,15,17 | 82:20 83:10 | 117:21 118:6 |
| 237:6 262:19 | 44:3,5,8,8,13 | 84:4,13,18,23 | 118:11,11,14 |
| 360:10 361:24 | 44:19,19,25 | 85:11,21 86:22 | 118:18,22 |
| **okay**  7:8,20 | 45:17,20,24 | 87:9,15,19,24 | 119:3,6,9,18,21 |
| 8:15,19,25 9:2 | 46:2,7 47:11 | 88:2,16 89:23 | 120:13 121:7 |
| 9:4,13,17 | 47:14 48:7 | 90:20,21,23 | 121:24 122:5 |
| 10:15,15 11:3 | 50:2,19 51:2 | 91:6,10,21 | 122:10,13,20 |
| 11:3,6,8,12,19 | 51:22 52:2,8 | 92:7,13,24 | 122:24 123:4,8 |
| 11:20,25 12:6 | 52:24 53:4 | 93:8,8,11 94:4 | 123:23 124:8 |
| 12:7,17 13:1,2 | 54:2,17,24 | 94:12,22 95:1 | 125:6,11,16,16 |
| 13:7,8,19,23 | 55:4,20 56:1 | 95:5,16,18 | 125:25 126:4 |
| 14:9,22 15:4 | 56:11 57:2,16 | 96:3,3,7,23,25 | 126:11,14,18 |
| 15:14,19,19,23 | 57:16,21 58:9 | 96:25 97:11,11 | 127:1,7,12,21 |
| 16:1,25 17:3,4 | 58:17,23 59:11 | 97:16,16 98:10 | 127:24 128:18 |
| 17:11 18:1,5,9 | 59:16,16,20 | 98:16 100:6,8 | 128:24 129:5,9 |
| 18:10,15,22 | 60:16,23 61:5 | 100:11,18,20 | 129:15,17 |
| 19:2,12,18,25 | 61:9,13 62:6 | 100:25 101:15 | 130:4,4,16,23 |
| 20:15 21:2,7 | 62:20,23 63:1 | 101:23 102:21 | 131:7,10,16 |
| 21:11,16,24 | 63:1,8,8,13 | 102:21,25 | 132:5,20,23 |
| 22:6,10,13,25 | 64:6,22 65:4,7 | 103:18 105:17 | 133:14,22 |
| 23:18,23 25:5 | 65:16,20,24 | 106:2,7,10,14 | 134:2,7,10,17 |
| 25:5,10,23 | 66:19 67:3,8 | 106:14,19,25 | 134:19,24 |
| 26:5,10,13,17 | 67:14 68:3,3 | 106:25 107:20 | 135:2,3,21 |
| 27:6,13,15,23 | 69:7,9,18,24 | 108:4,17 109:3 | 136:6,6,11,16 |
| 28:4,4,24 29:5 | 70:8,11,20 | 109:7,23 110:9 | 136:22 137:7 |
| 29:15 30:2,13 | 71:11,18,24 | 110:13,17 | 137:14 138:12 |
| 31:3,15,19 | 72:4 73:25 | 111:6,9,11,17 | 139:2 140:11 |

Page 54

Appx_1626

**[okay - okay]**

| | | | |
|---|---|---|---|
| 140:16,18,24 | 175:15,23 | 208:13,17,22 | 240:5,12,16,16 |
| 140:25 141:12 | 176:5,23 177:5 | 209:5,5,9,9,15 | 240:24 241:3,5 |
| 141:20 142:4,7 | 177:11,15,19 | 209:19 210:12 | 241:14,17 |
| 142:14,23 | 177:23 178:11 | 210:16,22 | 242:6,9,13,18 |
| 143:2,12,16 | 178:14,22 | 211:1,5,14,19 | 243:22 244:1,1 |
| 144:11,21 | 179:14,25 | 212:7,17 213:1 | 244:4,17 |
| 145:12,25 | 180:7,18,23 | 213:6,10,16 | 245:11 246:1,9 |
| 146:4,9 147:16 | 181:11,18 | 214:7,16,16,23 | 246:16,20 |
| 147:22 148:25 | 182:2,8,11,19 | 215:4,11,13,14 | 247:4,13,24 |
| 149:5,9,15 | 182:24 183:8 | 216:6,14,17 | 248:9,16,19 |
| 150:11,15,20 | 183:18,25 | 217:13,17,17 | 249:7,17,17 |
| 151:7,7,18 | 184:12,18,25 | 218:5,14,18,20 | 250:9,13,17,22 |
| 152:4,13,17,24 | 185:7,16,20 | 219:3,6,10,20 | 250:25 251:14 |
| 153:9,20,25 | 186:5,16 187:1 | 220:15,21,21 | 252:3,6,9,15,19 |
| 154:6,19 155:3 | 187:7,13,17,25 | 220:24 221:2 | 253:6 254:12 |
| 155:6,10,18 | 188:5,21 189:4 | 221:13,17 | 254:12 255:14 |
| 156:11,19 | 189:4 190:13 | 222:1,7 223:2 | 256:1,13,20,22 |
| 157:1,7,15,25 | 190:16,18,23 | 223:20,24 | 257:3,9,16 |
| 158:9,15,22 | 191:2,6,8,15,19 | 224:7,11,20 | 259:2,13,19 |
| 159:1,4,11,19 | 193:15,20 | 225:7,13,23,25 | 261:6,10,17,25 |
| 160:12,19 | 195:1,9,9,21 | 226:7,11 227:8 | 262:2,3,5,7,13 |
| 161:4,24 | 196:15,18,20 | 227:22 228:1,3 | 262:17,24 |
| 163:23 164:5,7 | 197:2,14,14,18 | 228:8 229:8,11 | 263:8,15 |
| 164:18 165:5,9 | 197:21,24 | 229:21 230:3 | 264:13,21 |
| 165:12,16,20 | 198:6,13 199:3 | 230:12,24 | 265:7,11,22 |
| 165:23 166:2,6 | 199:10,13,18 | 231:7,15 | 266:2,21,25 |
| 166:17 167:8 | 199:23 200:18 | 232:11 233:11 | 267:2,9,16 |
| 167:11,14,22 | 200:24 201:7 | 233:15,23 | 268:4,10,13,16 |
| 168:3,12,12,18 | 201:10,20,23 | 234:3,6,13,22 | 268:20,23 |
| 169:10,12,16 | 201:25 202:11 | 235:1,10 236:3 | 269:3,12,17,23 |
| 169:24 170:5,5 | 202:20,24 | 236:9,11,24 | 270:15 271:1 |
| 170:7,18 171:4 | 203:2,5,8,12,16 | 237:4,6,13,13 | 272:11,15,19 |
| 171:15 172:5 | 204:15,21 | 237:21 238:5,9 | 272:22,25 |
| 172:24 173:16 | 205:6,17 206:4 | 238:13,18 | 273:7,16,16,19 |
| 173:19 174:1 | 207:1,12 | 239:6,15,18,20 | 275:2,8,18,21 |

Page 55

**[okay - operating]**

| | | | |
|---|---|---|---|
| 276:8,12,16,22 | 311:10 312:15 | 344:21 345:5 | 159:4 169:18 |
| 277:1,21,21,23 | 312:19 313:3,8 | 345:13,19,19 | 177:23 188:25 |
| 278:2,7,10,16 | 314:3 316:1,11 | 346:9,9 347:12 | 280:19 283:11 |
| 278:21 279:2,7 | 317:6,11,16 | 347:21 348:18 | 284:14 298:7,7 |
| 280:1,6,11,23 | 318:2,7,10,14 | 348:22 349:3 | 309:10 351:8 |
| 281:2,18 283:7 | 318:17,21,21 | 349:23 350:6 | **ongoing** 122:7 |
| 283:15,18,24 | 319:8,11,14,17 | 350:18,23 | 122:25 179:12 |
| 283:24 284:4 | 319:24 320:2,6 | 351:6,13,13,21 | 187:21 190:18 |
| 284:17,21 | 320:17,22,25 | 352:3,7,11,22 | 196:3 214:20 |
| 285:1,1,16,20 | 321:5,10,15,18 | 352:25 353:10 | 219:11 281:9 |
| 285:25 286:11 | 321:22 322:2 | 353:22 354:1,4 | 285:17 |
| 286:11 287:3 | 322:15,20 | 354:9,10,18 | **online** 62:1 |
| 287:13 288:1 | 323:9,18,21 | 355:10,21,21 | 92:22,23 115:6 |
| 288:19 290:8 | 324:1,5,17,22 | 356:4,11,23 | 115:16 130:1 |
| 290:10,19 | 325:5,12,21 | 357:9,13,21 | 284:19 297:20 |
| 291:6 292:9,14 | 326:2,3,12,16 | 358:2,5,6,9 | **open** 8:9 14:12 |
| 292:20,25 | 326:17 327:1 | 359:17 360:7 | 70:21 75:21,22 |
| 293:3,7,12,22 | 327:14,19,23 | 360:12,15,22 | 79:21,23 334:9 |
| 294:11 295:8 | 328:3,9,15,21 | 361:4,24 362:5 | 360:25 362:3 |
| 295:13,18,23 | 329:16 331:4 | **old** 133:20,21 | **operate** 113:7 |
| 296:8,12,18,24 | 331:12,15,20 | 133:22 | 113:10,11 |
| 297:8,12,25 | 331:20 332:8 | **omitted** 12:12 | 161:14 162:2 |
| 298:1,3,7,11,19 | 332:16,22 | **onboarding** | 218:24 288:17 |
| 298:23 299:11 | 333:2,9 334:16 | 46:19 195:16 | 315:5 333:7 |
| 299:16,20 | 334:21 335:10 | 196:5,12 | **operated** 102:6 |
| 300:3,6,12 | 335:13,18,25 | 298:13,23 | **operating** 9:20 |
| 301:3,8 302:13 | 336:7,12,24 | 316:13 | 50:23 68:20 |
| 302:15,20 | 337:2,4,11,13 | **once** 48:23 60:7 | 72:13 73:16 |
| 304:1,7,21 | 337:16,21 | 222:8 320:15 | 83:9 84:8 |
| 305:3,7,12,20 | 338:4,10,12,21 | 320:18 | 107:5 155:16 |
| 306:11,16,22 | 339:1,1,8,17,22 | **one's** 40:24 | 156:12 157:2 |
| 307:1,17 | 339:25 340:4 | 64:23 | 157:20 158:12 |
| 308:15 309:15 | 341:3,8 342:6 | **ones** 43:2 111:8 | 158:21 162:7 |
| 309:25 310:4,8 | 342:11,21 | 117:7 119:11 | 189:13 218:3 |
| 310:13,23 | 343:7,11,23 | 121:2 146:11 | 221:18 224:3 |

**[operating - page]**

| | | | |
|---|---|---|---|
| 297:16 300:13 | **ordering** | 41:17 42:5,9 | 309:22 316:4 |
| 303:21 314:24 | 305:18 306:9 | 42:17 43:4,6 | 317:19 318:15 |
| **operation** | **orders**  60:1 | 43:22 44:21 | 318:18 323:22 |
| 189:24 347:9 | **org**  10:12 17:12 | 47:12,15,18 | 327:6 331:1 |
| **opinion**  16:21 | **organization** | 48:1,1,4,8,11 | 332:12 333:19 |
| 16:22 83:5,15 | 10:4,18 17:10 | 54:20 55:21 | 334:12 336:2 |
| 83:23 153:25 | 73:12 75:15 | 56:14 59:21 | 338:1 340:10 |
| 154:1,3 158:22 | 119:2 120:20 | 70:6,6 71:15 | 343:18 |
| 158:25 172:15 | 190:4 319:22 | 71:21,25 81:15 | **overall**  87:20 |
| 172:23 175:9 | **organizations** | 87:20 88:5,18 | 88:7 96:13 |
| 175:10 333:18 | 10:5 | 89:9,20,25 | 227:17 263:6 |
| 334:12 336:2 | **orientation** | 90:11 91:22 | 263:16 |
| 338:1 340:12 | 297:13 | 94:15,18,18 | **overlooked** |
| 340:14 341:10 | **original**  3:12 | 95:19,20,23,25 | 225:8 |
| 341:15 342:2,4 | 3:14 | 97:3,5 99:14 | **owens**  4:14 |
| 343:20 344:10 | **originally** | 101:17 102:2 | **own**  33:6 46:25 |
| 344:12,13,18 | 270:7 | 103:15 118:23 | 75:5 187:9,10 |
| 344:20 358:22 | **ought**  162:12 | 119:22 120:2 | 187:11 209:20 |
| 358:24,25 | **outcome**  6:11 | 125:19 128:10 | 222:20 280:16 |
| 359:5 | 363:15 | 128:15 151:12 | **owned**  9:15,21 |
| **opportunities** | **outlines**  107:12 | 151:18 152:5 | 46:5 |
| 43:8 269:19,24 | **outperforming** | 152:18 153:1,3 | |
| 270:6 322:22 | 242:16 245:9 | 156:1 162:17 | **p** |
| **opportunity** | **outreach**  192:2 | 178:1,3 180:24 | **p**  4:1,1 |
| 37:2 91:25 | **outside**  13:12 | 184:9 190:9,13 | **p.c.**  4:13 |
| 198:16 200:5 | 13:14,15 18:23 | 193:10,22 | **p.m.**  149:20 |
| **opposed**  65:12 | 19:1,3,8,12,13 | 194:4,13,19 | 178:17,20 |
| **oral**  11:13 | 19:14,20 20:1 | 195:4 251:9 | 232:18 315:14 |
| 147:19 | 20:17 21:2,8 | 260:2,10 | 362:9,17 |
| **order**  14:23 | 24:21,24 25:1 | 261:22 262:10 | **pace**  91:4,4 |
| 21:4 34:19 | 25:7,8,12 26:6 | 264:25 279:10 | **page**  2:1,7 3:2 |
| 60:3,4,6,8,11 | 28:6,7 29:20 | 297:13 299:12 | 76:1,7,8 78:14 |
| 93:23 281:22 | 30:22 31:10,19 | 304:12 306:1 | 113:22,24,25 |
| 285:9 | 35:5,22 37:15 | 307:20 308:8 | 129:15 132:20 |
| | 38:6,22 40:2 | 308:18,18 | 132:21,21,22 |
| | | | 132:24 133:2 |

Veritext Legal Solutions
800-336-4000

**[page - peers]**

134:17 139:2
143:2 146:9
166:10,10
170:6 210:2,12
215:13 216:5
224:9,15 227:8
234:22 236:24
237:14,18,20
239:18 240:17
240:18 241:14
241:15,18
244:2,7 246:16
248:1,10
249:18 250:13
256:14 259:11
261:25 265:7
266:10 267:22
272:12,25
292:18,25
297:25 328:17
329:5 358:6,7
358:8,8 365:4
365:7,10,13,16
365:19
**pages** 244:2
326:2,4
**paid** 94:5 96:15
251:1 323:9
**paint** 62:18,24
349:1
**pandemic** 49:6
**paper** 73:9
138:1,5
**paperwork**
62:20

**paragraph**
157:9,14,19,25
158:4 165:25
166:14 218:21
221:20 238:11
**parcel** 160:16
**park** 98:5
**parked** 311:19
**parking** 313:18
313:19
**parkway** 4:14
**part** 20:25
21:14 22:14
23:3 26:14,23
34:15 35:20
37:14,23 46:3
46:6 48:5
50:10 51:21
52:5 82:18
84:21 87:22
92:16 97:20
101:10 160:16
173:18 185:4
188:10 190:5
191:25 195:15
195:16 200:15
200:16 214:14
223:12 244:25
245:9 250:4
266:16 270:8
273:9,21,23
292:13,23
299:24 303:19
307:24 310:13
315:2,3 316:13

316:14,16
317:4 319:5,20
320:8 321:22
322:12 323:1
323:11,13
327:2 341:17
341:23 349:4
350:23
**partake** 333:5
**partially**
316:24 328:6
339:15,15
**particular**
95:20 157:5,16
157:23 161:1,4
312:20 313:4
**particularly**
157:21 159:15
159:20 190:13
344:7
**parties** 5:17
324:8 363:11
363:14
**partner** 264:12
**partners** 25:25
**parts** 25:21
32:10 43:14
127:8 133:19
150:9,10,11,17
190:4 217:10
230:25 231:2,3
258:7 304:8,8
321:16
**party** 6:10

**pass** 118:9,10
118:12 197:15
347:13
**passed** 197:18
233:12 347:6
**passenger**
203:3
**passengers**
156:22
**passing** 339:6
**past** 41:14
223:1
**paste** 127:3
**pathway**
231:12 289:17
**pattern** 283:4
**pause** 50:22
337:6 338:16
**pautler** 1:22
4:18 5:5 6:7
363:2
**pay** 94:15,20
316:24 317:6,9
353:8 354:1
**paying** 167:16
352:22
**payout** 98:18
98:22
**payouts** 100:9
**pedestrian**
356:7,9
**peer** 47:24
**peers** 47:7
127:16 245:5

**[people - phishing]**

**people**  17:7,8
29:21 32:24
33:4,5,8 34:20
36:3 40:20
41:9 53:10,16
75:15,15 88:24
91:25 101:8
109:17 115:18
125:8,15 127:2
133:10 152:5
152:15 155:22
160:1 161:18
162:2,10,11
244:9 245:8,8
261:19 278:22
287:22 288:13
294:6 303:17
306:5 308:12
308:24 331:10
339:5 351:16
352:4,8
**people's**  81:16
110:7
**percent**  19:5
20:7 64:1
94:14,19,22,25
95:4,8,9,14
96:16,16,18,21
97:2,4,6,9,17
97:21 99:3,10
99:15 266:15
266:19,22
**pereira**  246:22
246:24

**perfect**  11:21
12:17 71:11
233:11
**perform**  95:2
**performance**
2:15,17,18 9:8
9:9,24 11:1
18:4 22:7,15
22:23,24 23:8
24:13,22 87:21
88:4 93:9
95:20 96:17,20
97:4,7,10,10,14
97:14,15 98:16
99:24 104:22
120:9 151:5
186:4 189:16
195:22,23
198:1 206:3,21
225:10 234:8
236:9 243:14
244:18 245:1
245:15 246:7
252:22,24,25
253:5,8 256:7
256:15 259:8
264:23 267:14
272:12 273:13
274:21 277:23
278:17,22,25
279:3,9,14,25
280:1,7,15,24
281:5,13,16
316:8,25

**performed**
108:14
**performing**
62:3 86:21
206:23
**performs**
122:16
**period**  46:19
48:24 50:12
69:2 84:4 99:1
167:5 174:19
175:2 201:11
227:11,15
247:5 258:4
272:6 282:7
**periods**  82:17
**periphery**
347:11
**permissible**
166:8,18 169:6
346:12
**person**  15:14
15:17,20 16:4
21:4,6 22:4
41:13 50:6
55:3 129:5
180:19 199:8
199:14,21,24
240:7 247:6
286:6 312:1
**person's**
105:16 240:5
**personal**  30:17
30:25 31:4,24
32:19,22,22,24

33:2,6,9,19
42:21 58:6,8
58:12,13,18
59:2,6,15,18
109:24 110:1
110:11,15,21
111:14 140:7
159:22,23
218:8 221:24
222:1,4,10
235:9 243:6
247:6 264:23
265:3,4 300:20
301:17 302:12
302:22 303:3
332:1 344:10
352:21 358:21
359:5
**personally**
107:17 345:10
**personnel**
10:10 29:11
46:24 57:12
66:22,23 72:1
105:16 224:24
225:1 325:8,8
325:14,18
**perspective**
46:4 72:17
229:23 309:4
**philosophy**
315:24
**phishing**
146:13

**[phone - point]**

**phone** 31:25
32:18,22,22,25
33:2,2,6,7,15
33:19,19,25
34:8,13,14
35:14 36:10,13
37:3,6,8 38:13
42:6,11,21,21
42:22 57:10,18
58:1,6,6,7,8,13
58:13,16,18
59:2,8 76:15
76:22 77:7
78:6 79:9,16
79:19,19,20
80:21 81:7,8
81:20,23 84:9
84:20 85:25
86:25 92:15,21
125:12 129:6
133:1,11,13
157:24 161:2,6
161:25 163:18
164:15,19,22
170:10,22
171:18 183:10
185:3 186:11
186:14 188:9
199:5,8,14
202:12,13,17
210:13 302:22
302:22 303:3,3
303:4 305:18
306:13 312:21
313:1,10,12,17

321:23 327:15
332:1 357:14
357:15,20
**phones** 5:15
31:20,22 32:4
32:6,13,20
33:9,12 58:12
77:12,16
128:11,14,20
133:6,8 160:23
161:10,18,20
162:10,11,23
163:8 165:6
181:7 183:14
183:15,23
291:13
**phonetic**
295:21 324:3
**phrase** 18:24
75:10 114:22
114:23 115:3
123:8 135:24
222:22
**phrased** 135:23
**physical** 84:1,2
**physically**
19:10
**pick** 34:13 36:5
95:2 352:4,8
**picked** 356:20
**piece** 138:1
**pip** 279:6
**piuara** 364:4
365:1 366:1

**pivaral** 1:2,4
5:22
**place** 5:16
53:18 55:15
68:13 104:19
105:9 128:23
129:4 133:8,13
148:21 151:4
184:6 185:15
232:2 236:2
255:10 266:14
279:23 282:25
314:23
**placed** 93:23
278:21
**places** 22:14
128:24,25
189:18
**plaintiff** 5:21
233:1
**plaintiff's**
14:13 150:1
155:10 157:2
178:23 190:24
194:10 209:19
315:20
**plaintiffs** 1:7
1:19 4:2 5:2,11
6:19
**plan** 2:13
105:22 218:2,3
227:21 278:22
278:24 279:1,9
279:14,25
280:8,16,25

281:5,14
**planning**
351:15
**plans** 279:3
280:2
**plant** 223:4
314:17,18
**platforms**
303:11
**play** 32:14 87:6
87:19 191:7
338:10,13
**played** 184:2
185:3 187:22
188:10
**playing** 337:5
338:15 339:9
**please** 5:14
6:13,25 13:5
14:12 34:3
71:1 294:5
298:1
**plotters** 21:23
21:24
**plural** 238:6
**point** 9:3 13:22
17:1 27:3,6
101:12,13
126:8 143:25
144:1 145:12
166:16 173:20
185:24 187:20
273:24 292:9
307:6 324:7
338:23 346:10

Veritext Legal Solutions
800-336-4000

[points - possible]

| | | | |
|---|---|---|---|
| **points**   334:24 | 112:22 113:5 | 169:19,24 | **poor**   309:13 |
| **police**   67:23,25 | 120:17 125:25 | 170:4 171:6,17 | **pop**   159:12 |
| 68:4,22 69:14 | 153:12,22,24 | 171:23 172:10 | **populations** |
| 69:14 73:3 | 181:11,25 | 172:12,18,21 | 316:22 |
| 104:6 139:20 | 183:25 194:6 | 173:1,2,4,14 | **portal**   42:7 |
| 139:22,24 | 194:24 195:20 | 174:3 175:18 | **portion**   2:20 |
| 141:6 142:3,4 | 220:3 225:7 | 176:1,3,13,16 | 96:15,22 258:9 |
| 144:8 184:20 | 243:20 282:25 | 176:21 177:3,7 | 263:10 326:4 |
| 185:21 206:12 | 284:13 297:20 | 179:2,3,15,17 | 352:17 |
| 206:12,14,17 | 319:22 335:15 | 179:19 180:25 | **portions**   2:9 |
| 207:2,3,5 | 340:6 346:10 | 181:6,9,13,13 | **position**   18:19 |
| 208:11,13 | **policy**   2:11 | 181:19,23 | 19:14 76:13 |
| 217:2 229:23 | 30:7 33:17,24 | 182:8,11,21,25 | 88:3 148:10 |
| 251:23 252:3 | 34:4,7,18 | 186:14 188:24 | 275:11,13 |
| 255:15,18,20 | 42:16 44:20 | 190:21 191:16 | 281:23 282:24 |
| 256:6 260:20 | 52:25 54:8 | 194:10,21,23 | 283:8 |
| 260:21 261:1,7 | 67:4 72:22 | 194:25 195:11 | **positive**   288:15 |
| 261:9 289:5,9 | 82:5 83:16 | 215:1 218:19 | **possession** |
| 289:14,14,25 | 84:1 90:13 | 224:15 225:13 | 127:24 |
| 290:21,23 | 103:13 105:3 | 225:15,22 | **possibility** |
| 291:10 292:6 | 105:12,13 | 226:24 230:10 | 273:24 |
| 320:10,16,18 | 107:6 108:1,18 | 231:17,23 | **possible**   33:1 |
| 322:7 325:2,8 | 108:20,24 | 243:1,5 245:12 | 49:4 69:18 |
| 337:10 340:1 | 109:12,21 | 254:19 255:5 | 83:11 116:10 |
| **policies**   29:24 | 111:9 112:2 | 266:7 285:20 | 116:11 117:19 |
| 30:3,3,4,8 | 119:14 124:9 | 285:24 286:19 | 117:20 127:10 |
| 52:12 53:3,8 | 124:11 125:18 | 295:14,19 | 154:21,25 |
| 58:19 59:3,5 | 126:8,14,16,20 | 299:21,23 | 177:5,9 183:2 |
| 70:13 80:3 | 127:9 152:25 | 300:1 302:5,21 | 196:23,25 |
| 81:6,25 87:2 | 153:1,2,7 | 313:1 315:23 | 197:1 220:12 |
| 89:16 90:4 | 155:17 156:1,5 | 316:3 317:21 | 220:14 239:6 |
| 100:12 103:1 | 156:9 157:17 | 332:25 335:16 | 271:10 282:15 |
| 107:1,12 | 164:10 165:12 | 340:21 341:2 | 282:18 288:3,9 |
| 108:10 109:9 | 166:7 168:12 | 347:4,15 | 298:18 321:19 |
| 109:11,18 | 168:24 169:15 | | 325:15 336:22 |

Veritext Legal Solutions
800-336-4000

**[possible - prior]**

343:7,10 353:9
**possibly**  213:5
309:14 333:1
**post**  2:25
205:24
**posted**  310:25
311:11 313:25
**posting**  310:9
310:19
**potential**  53:12
53:17 94:16
97:2,6 124:14
158:2 165:14
165:17 202:13
225:6 238:16
249:23 294:10
297:7 340:23
340:25
**potentially**
8:11 95:15
230:16 240:8
318:14
**powerpoint**
127:3,8,17
152:11 350:4
351:4,7
**powerpoints**
127:21,22,25
152:5 195:2,5
**ppf**  62:23
**practical**  80:23
158:20 333:24
334:9
**practicalities**
167:2

**practicality**
53:9 82:4 83:1
221:16
**practically**
172:10
**practice**  37:23
37:25 38:23
120:18 126:2,3
132:18 151:2
158:11 226:25
300:21
**practices**  125:2
133:20 163:4
178:8 195:6
243:20 303:13
314:10
**precise**  13:10
**precisely**  84:19
319:18 320:3
**predominant**
185:9
**predominantly**
97:23 154:18
**prefer**  174:24
199:7
**preference**  8:23
8:24 42:14,20
44:25 51:22
199:15
**preferred**
38:12 42:16
**pregnancy**
247:7
**pregnant**  135:9

**preparation**
207:16
**prepare**  45:5
48:10 50:17
51:3 254:7,8
256:7 327:16
**prepared**  11:9
15:5,12 16:6,9
29:17 48:22
53:10 207:19
253:25 254:10
290:1 333:13
**preparing**
51:16 55:17
200:9 201:20
**prescription**
317:17,22
318:4,8
**present**  4:25
27:4 121:17
130:9,12
296:14
**presentation**
127:13
**presentations**
351:5,7
**preserve**  361:2
**president**  10:14
10:21
**presumably**
184:15
**presume**  12:3
247:2
**presumedly**
165:3

**pretty**  27:18
61:6 107:4
150:12 151:6
282:20 294:4
296:25,25
**prevent**  218:25
230:19 231:9
249:2 256:16
263:5
**preventable**
251:9
**prevention**
257:19
**previous**
237:22
**primarily**
19:13 22:16
**primary**  35:6,7
35:7 42:12,13
87:23 112:13
145:18,21
166:25 167:8
167:15 179:22
190:10 287:1,3
292:3,4
**principle**  34:21
175:5
**printed**  117:23
237:12
**prior**  63:23,25
89:18 124:2
128:19 146:2
180:1 182:24
205:8 234:10
239:11 269:8

**[prior - provided]**

277:4 293:10
294:8 308:1
325:18 330:24
331:6 345:5
359:19,21
**priority** 26:21
66:9 139:25
175:7 249:2,20
256:16 257:5
257:10,12,21
259:21 263:4
316:7 322:14
**private** 303:12
324:10
**prob** 338:9
**probable** 33:4
220:15 252:4
**probably** 8:25
9:1 13:20
31:13 33:6
36:19 42:12
48:19 50:4
56:21 59:13
60:5 66:25
71:19 72:1
104:21 113:1
132:3 133:5
150:24 174:16
185:9 187:4,4
189:11 191:7
193:12 204:20
221:16 222:23
223:6 226:22
226:24 229:25
234:9 236:15

241:9 243:12
262:15 266:15
271:21 286:7
289:22 291:2
301:5 321:13
323:4 329:4
333:21 351:18
356:2
**problem** 26:3
42:1 123:15
**problems** 20:21
**procedure**
72:23 107:5
155:16 156:12
157:2,20
166:13,14
181:9 186:1
187:24,25
206:20 218:3
221:18 224:3
228:7 297:16
300:13 302:5
303:21
**procedures**
89:17 103:19
103:24 106:17
153:23,24
194:6
**proceed** 7:5 8:8
**proceeding**
6:12
**proceedings**
1:25
**process** 29:10
68:5 92:10,13

92:14 149:7
196:15 197:15
197:19 213:11
238:22 280:2
293:22 323:19
349:4
**produced** 5:10
**produces**
209:23,24
**product** 10:4
56:21 60:12,22
**production**
117:18
**products** 25:16
25:18 48:15
72:10 348:16
351:11
**professional**
363:20
**program** 62:14
62:18
**programs**
190:19
**prohibited**
172:4
**prohibition**
124:22
**promise** 293:15
**promote**
157:22
**promoted**
274:11
**prompting**
329:22

**promulgated**
182:22
**promulgating**
188:24
**pronoun** 63:10
**pronounce**
196:8
**proper** 63:10
107:14
**property**
218:25
**proposition**
348:15
**proprietary**
57:24
**prospect** 43:9
93:21,21
**protect** 43:18
64:3 174:8
286:12 287:20
287:22
**protection**
62:18,24 349:1
**protocols**
107:14 121:1
**provide** 13:7
21:19,21,22
48:16 61:3
67:8 75:3
111:23 130:25
145:6 152:14
186:24 187:12
208:4 359:20
**provided** 30:8
30:15 31:9,25

Page 63

**[provided - question]**

33:7 66:3 93:6
107:2 109:24
110:10,19
111:19 112:16
139:22 152:18
159:21 166:8
166:18 183:11
183:16 186:24
187:3,18 188:8
194:6 195:3
202:2 213:12
217:12 229:17
250:22 276:17
276:20 277:10
284:13 285:13
289:2 294:2
310:10,20
311:12,13
312:22 361:19
**provides**   31:21
54:20 108:10
169:25 172:9
**providing**
130:17 260:8
**provisions**
333:6
**psychological**
140:1 322:11
349:17
**public**   92:20
161:20 162:1
163:14,14
184:10 264:9
286:13 287:5
287:17,20

288:2,4,16
300:18 366:19
**publication**
182:15
**pull**   55:8 56:2,9
79:3 190:25
313:18
**pulled**   73:10
140:12 276:1,2
276:9 322:10
**pulling**   25:21
79:6 80:17
81:13
**punch**   355:24
**punishment**
15:23
**purpose**   33:22
82:5,7 152:15
166:25 203:5
287:7 350:10
**purposeful**
51:21
**purposefully**
51:15 271:20
314:17
**purposes**
152:12
**pursuant**   173:1
**pursue**   255:13
**push**   247:11
**put**   26:5 35:13
50:24 57:10
72:17 93:6
104:19 105:9
168:6 183:22

184:20 191:1
192:24 228:9
235:8 236:1,2
239:7 248:7
259:16 263:20
271:12 278:25
279:8 281:13
283:8 305:10
327:21 356:20
**puts**   299:17
**putting**   36:9
82:4 168:16
193:7 306:5
**pyramid**   17:13

| q |
| --- |

**q2**   248:22
249:20
**qualcomms**
106:11,11
**qualitative**
64:24 65:12
**qualitatively**
63:18 64:8
**quality**   26:20
42:2
**quantitative**
64:24 65:1,5,6
65:9,16
**quantitatively**
64:7
**quantitive**
63:19
**quarter**   97:5
189:11

**question**   11:22
12:2,6,25 13:3
22:17 27:3
51:2 61:6,11
76:5,12,14
77:2 78:8,10
80:16 85:23
86:4 90:17
98:20 103:22
114:2,8 124:3
129:17,20
131:22 132:2
134:19 136:23
137:5 143:11
145:5 146:15
146:18,23
162:19 171:16
173:9 176:3,4
176:8 184:13
184:14 193:2
193:10,25
216:7 233:24
236:11 241:25
242:23 243:10
243:22 251:16
252:8 254:6
260:2,19 275:2
286:5 295:1
298:17 304:15
326:24 327:3
329:21,24
330:12,18
333:18 340:19
342:7,10
343:17,22,23

Appx_1636

**[question - recall]**

346:3,5 354:23
356:14,16
357:4 358:11
358:21
**questioning**
354:24
**questions**  2:1
7:7 11:12 13:9
16:21 135:8
148:6 184:16
198:15 200:11
227:1 284:4
315:6 341:14
345:16 356:14
360:23
**quick**  73:22
84:10,10 191:1
313:20 355:16
**quickly**  44:20
299:20 314:3
**quit**  90:18
**quite**  155:5
**quiz**  118:7,7
**quizzes**  116:1
**quote**  167:23
268:6

---

**r**

**r**  1:4 4:1 7:12
7:13,13 27:18
27:18,22,22
365:3,3
**racial**  309:8
**radio**  54:7
**raise**  221:24
343:11

**ramble**  12:21
**ramon**  4:22 6:4
**ramping**
103:14
**range**  95:10
242:11
**rare**  95:15
101:6,9 102:4
102:5,17
**rate**  273:7
**rated**  206:22
241:23
**rather**  13:16
**rating**  241:20
241:22 242:1,2
242:5,7,19
243:2 259:7,13
265:12,13,13
265:16 266:7
272:13,20
317:7
**ratings**  242:10
265:15,19
**reached**  208:10
254:16
**react**  105:3
213:4
**reacting**  350:19
**reaction**  141:20
215:5 228:23
**reactive**  301:5
**read**  53:21
76:12 78:16,17
107:11 125:25
158:1 168:1

171:21 181:25
191:10 218:21
221:22 227:12
235:2 237:15
238:5,13
240:19 248:2
256:13 262:3
290:3 298:1
307:1 326:9
355:22 362:7,8
364:9 366:5
**reading**  76:6
156:22 212:16
262:24 306:7
329:12 333:12
358:6
**ready**  231:22
353:18
**real**  73:22
100:21 106:4
191:1 238:25
266:3 347:22
355:16
**reallocation**
269:20
**really**  12:4 20:8
21:21 46:18
55:6,18 61:1
63:7 68:12
104:2 109:15
145:17 161:16
193:12 199:11
223:11 243:18
252:12 261:20
263:6,16

266:14 274:5
282:19 292:6
298:22 353:17
**realm**  200:2
**rear**  210:7
211:20 212:1
213:14 241:11
277:18
**reason**  35:9,25
36:6 45:7 72:4
72:7 99:9,22
132:10 144:24
209:5 212:9
213:22 238:9
241:12 247:4,8
255:13 274:25
294:9 325:6
327:1 329:6,17
330:1,6,7,13,16
330:19 334:22
339:25 356:19
356:23 364:11
365:6,9,12,15
365:18,21
**reasonable**
16:8 34:11
230:19,20
231:9,13
**reasonableness**
34:15
**reasons**  41:23
274:9 300:16
**rec**  330:13
**recall**  27:12
28:1 31:8

Page 65

Appx_1637

**[recall - recruiting]**

45:11 47:13
57:3 71:16
77:1,19 98:18
114:3 119:16
133:12 139:6
141:5 143:4
148:2 150:5,17
153:15 196:10
208:1 211:18
215:18 255:19
255:24 261:4
269:1 270:22
275:20,24,25
310:7,22
322:24 326:6
331:25 332:4,7
349:9 351:9
**recalled**   130:17
**recalling**   133:7
**receipt**   60:4
364:18
**receive**   38:16
76:14 107:7,8
124:20 125:22
128:11,14,20
129:13 148:4
149:11 153:10
172:8 205:10
252:1,13
278:10 297:21
332:22
**received**   38:11
52:3 77:6
108:2 114:3
129:6,17,24

131:19 133:5
139:8 141:17
142:15 147:24
151:13 154:14
154:24 205:7
226:8 281:10
290:21 302:19
323:7 350:17
**receives**   115:1
297:14
**receiving**
115:24 130:5
130:13 132:9
136:17 147:17
149:2 281:15
331:21
**recent**   117:18
180:1 183:4
**recently**   322:23
**recognition**
34:11 36:3
94:2 172:7
174:17 350:11
**recognize**   7:16
28:8 36:14
37:4 47:2,3
148:23,24
151:24 152:1
155:11,22
160:23 189:9
209:17 217:21
222:20 247:10
267:12 305:8
306:23 307:10

**recognized**
135:14
**recognizes**
82:13 83:6
127:4 152:2
**recognizing**
53:6 225:6
235:16
**recollection**
130:21 131:3
180:18,20
207:23 353:25
**recommend**
203:16,18
**recommendat...**
203:20
**recommended**
38:2
**reconcile**   272:7
**reconstruct**
324:12
**reconstruction**
324:18
**reconstructive**
324:12
**record**   5:13,17
6:16 7:9,15 8:2
8:13,15 11:10
12:21 64:16,18
71:2,6 78:17
97:1 117:7
121:19 122:3
125:11 126:13
126:21 131:13
134:10,14,15

149:20,24
174:7 178:14
178:17,21
180:20 182:18
184:11 201:7
211:15 217:2
217:25 227:17
232:18,22
243:13 295:3
297:10 315:11
315:14,18
326:10 361:12
361:12,16
362:17
**recorded**   5:18
41:2,3 321:6
350:20,22,24
355:4
**recording**   5:16
154:16
**records**   40:17
66:18,21 68:2
68:11,23 73:3
93:24 117:9
124:5,10 130:3
130:5 131:15
180:12,15
183:3 283:25
284:1 289:6,6
291:13,19
314:15 327:15
335:1
**recruiting**
307:25

Appx_1638

**[reduce - remember]**

**reduce**  157:4
  157:10,21
  158:11,14
  163:15,17,20
  163:24 168:10
  269:14 270:16
  272:9 286:21
**reduced**  96:4
  270:16 271:11
  271:20 363:8
**reducing**
  258:23 271:25
**reduction**
  157:22
**reductions**
  274:20
**reemphasize**
  190:5
**reenter**  263:24
  264:1
**refer**  156:15
  319:2
**reference**  119:8
  119:11 182:4
  232:5 233:25
  234:1 237:18
  241:11 268:24
  268:25 278:14
  286:7 290:12
**referenced**  29:8
  70:3 135:24
  234:4,7 235:12
  235:23 264:7
  290:13 364:6

**references**
  107:16 133:8
  133:13 195:19
  326:22
**referencing**
  96:12,24
  120:14 354:15
**referred**  53:22
  155:21 188:25
  279:6
**referring**  63:7
  144:13 166:14
  191:16 233:8
  238:1,7,10
  240:1,2 265:6
  269:16 279:4
**refers**  156:19
**reflect**  195:25
**reflected**  357:2
**reflecting**
  273:12
**reflection**
  140:7
**reflects**  303:13
**refresh**  52:13
**regard**  88:23
  289:9 316:4
  330:20 342:23
**regarding**
  88:18 89:21
  107:1 129:3
  134:20,21
  142:16,20
  157:3 193:23
  194:4,20 213:8

229:22 284:7,8
  297:13
**regardless**
  181:9
**region**  23:25
  24:8 240:9
  295:24 296:4
  296:13
**regions**  24:2
**registered**
  363:20
**regrets**  307:16
**regs**  182:9
**regularly**  77:13
**regulations**
  186:15
**reinforce**  86:11
  120:7 132:13
  220:3 264:3
  281:8
**reinforcement**
  317:4
**reinforces**
  186:14
**related**  6:10
  10:3 37:22
  62:2,7 77:15
  92:19 96:20
  107:6 119:14
  119:15 120:23
  135:12 139:5
  143:5 171:25
  185:8 186:19
  215:17 216:2
  250:5 284:20

294:21 303:19
  309:10 312:4
  317:25 318:16
  333:5 348:6,14
  351:8 363:10
**relates**  189:23
  348:7
**relating**  44:9
**relation**  319:21
  359:11
**relationship**
  20:25 354:5
**relationships**
  21:4 46:9
**relative**  245:5,5
  273:14 342:24
  363:12
**relativity**  245:4
**relay**  143:7
**relevance**
  327:9
**relevant**  155:7
**relies**  85:14
  285:2
**relocated**  271:3
  322:23
**relook**  326:14
**rely**  113:4
**remained**
  347:13
**remains**  361:3
**remarkably**
  308:18
**remember**
  45:12 48:25

**[remember - representative]**

| | | | |
|---|---|---|---|
| 52:21 56:23 | **reminding** | 173:8 | 320:11,16,18 |
| 76:18 78:1,4 | 112:15 | **replace**  47:11 | 321:8,12 325:2 |
| 95:13 114:6,8 | **removed** | **replies**  37:16 | 354:15,19 |
| 114:9 119:12 | 270:20 281:23 | **reply**  36:25 | 355:4,11,15 |
| 129:19 131:16 | **rental**  250:20 | 37:12 84:2 | 357:2,6 |
| 132:9,11,25,25 | 250:22 276:6 | **replying**  33:16 | **reported** |
| 133:3 134:20 | 276:16 | 37:5 | 111:14 206:10 |
| 134:23,25 | **rep**  24:24 25:1 | **report**  2:12,14 | **reporter**  4:17 |
| 135:18 136:17 | 25:7,9,12 26:6 | 3:3 10:11,13 | 5:5 6:6,24 7:3 |
| 137:15,20,25 | 28:6 37:15 | 17:7,9 27:1 | 11:19 17:21 |
| 138:5,24 139:7 | 38:7 47:12,15 | 30:14,16,18,25 | 66:13 113:9 |
| 146:11,12,16 | 48:1,4,11,15 | 31:11 66:5,11 | 128:7 212:19 |
| 146:17,24 | 60:15,18 61:2 | 66:15 67:8,25 | 329:11 363:1,3 |
| 147:1,5,10,23 | 71:25 95:19,23 | 68:4,8,12 | 363:3,20,21,22 |
| 148:13,20 | 96:1 97:3,18 | 69:14,14 70:2 | **reporting** |
| 197:21 208:3 | 98:25 99:14 | 142:3,5 146:3 | 154:21 285:3,3 |
| 216:13 255:17 | 103:15 175:24 | 154:23 184:20 | **reports**  17:13 |
| 256:1 260:20 | 270:12 271:3 | 184:22 186:23 | 40:17 43:7 |
| 260:25 261:12 | 308:8 314:19 | 203:9,10 206:8 | 67:23 208:23 |
| 290:8 298:8,9 | 318:18 341:20 | 206:17 207:3 | 209:23,24 |
| 298:12,12,24 | **rep's**  95:20 | 208:2,4,8,13,15 | 218:10,11,12 |
| 299:5,10 316:1 | 97:5 | 208:17,21 | 218:15 291:10 |
| 318:24 323:6 | **repeat**  22:17 | 209:6,16,22 | **repository** |
| 329:18 330:2 | 103:22 160:4 | 210:3,13 215:5 | 128:1 |
| 330:14 351:8 | 162:19 183:12 | 218:7 221:3,12 | **represent** |
| 351:13 352:7 | 193:24 231:18 | 225:10,19 | 21:16 25:14 |
| 355:6 | 242:22 285:6 | 226:6 229:23 | 26:15 88:11,12 |
| **remembered** | 302:24 310:15 | 233:8 254:18 | **representative** |
| 76:21 147:17 | 329:24 343:24 | 255:3,15,18,21 | 1:18 5:19 18:3 |
| 147:21 | **repeating** | 255:24 256:6 | 18:24,25 19:1 |
| **reminder**  314:8 | 316:2 | 258:19 260:20 | 19:3 24:25 |
| **reminders** | **repetition** | 260:21 261:1,7 | 28:22 30:23 |
| 112:4 120:17 | 283:5 | 261:9 275:25 | 42:9 47:23 |
| 120:17 226:24 | **rephrase**  11:24 | 290:1,3,22,23 | 50:1 55:21 |
| 300:25 | 49:15 58:24 | 319:25 320:10 | 71:21 88:6 |

Veritext Legal Solutions
800-336-4000

Appx_1640

**[representative - restrict]**

118:23 138:15
151:12 153:2,3
156:2 297:14
299:13 362:11
**representative's**
87:21 94:15
**representatives**
19:4,20 20:18
20:22 21:3
24:22 25:14
29:21 31:11,20
35:6,22 39:5
41:18 42:6
43:5 45:15
54:21 57:6
59:21 60:3
71:15 88:18
89:10,21,25
90:12 101:17
102:2 119:23
120:3 125:19
128:10,15
151:19 152:6
152:18 180:24
190:10 193:22
194:4,13,20
316:4
**representing**
6:4 16:5
**reprimanded**
278:7,9
**reprimands**
205:8,11,14
**reps**   21:8 38:22
40:2 42:17

43:6,22 44:21
47:18,20 48:8
56:14 60:1
94:18 96:15
178:1 186:23
190:14 195:4
261:22 318:15
**requested**
142:12
**requests**   59:22
**require**   38:3
103:8 107:21
111:13 113:20
161:10 183:9
**required**   62:1
111:24 116:14
116:14,16,20
118:16 119:4
134:7 187:6
227:18 269:20
318:10 366:13
**requirement**
183:3
**requirements**
105:14 182:1
294:18,20
318:18 333:4,4
**requires**   173:2
227:23
**requiring**
252:8
**reroute**   53:15
177:1
**reserve**   362:1

**reserved**   5:7
362:16
**resolution**   61:3
338:7
**resolve**   8:7 42:2
61:4
**resolved**   8:6,10
361:1
**resources**
25:19 70:12
105:7 196:11
294:16 296:22
322:13
**respect**   249:25
268:7
**respond**   36:6,7
44:21 45:9
77:24 78:22
82:21 171:20
**responded**   7:1
325:9
**responding**
74:2,5 184:19
234:20 251:23
**response**   35:15
36:15,17 37:6
38:13 137:13
147:3 213:16
225:15 226:3,5
226:8 227:12
227:13,16,23
228:4,10
242:19 245:12
245:18,19
248:20 266:6,9

269:23 270:6
273:24 274:1
274:16 282:8
282:12,17
293:23 302:1,8
**responses**
38:23 87:7
183:20
**responsibilities**
25:12 26:14
**responsibility**
10:2 24:3,4
25:6 61:1
88:14 94:3
212:15 213:8
214:14 218:23
222:10 264:23
265:4 286:12
288:8
**responsible**
19:9 36:4
67:20
**responsive**
307:16
**responsiveness**
35:21 42:1
59:21,24,25
**rest**   56:6
146:19 243:18
361:2
**restate**   288:5
342:12
**restrict**   110:19
183:14

Veritext Legal Solutions
800-336-4000

Appx_1641

**[restriction - right]**

| | | | |
|---|---|---|---|
| **restriction** | 107:21 118:2 | 320:18 326:3 | **ridiculous** |
| 110:6 | 142:7 150:8,9 | 326:11 327:14 | 282:14 |
| **restrictions** | 186:4 189:15 | 327:17 331:16 | **right**   8:16 9:5 |
| 109:23,25 | 206:3 214:11 | 335:3,8 342:14 | 9:11,12,14 |
| 110:1 227:20 | 214:12 227:16 | 342:15,19 | 11:8,13,17,23 |
| **restricts**   183:10 | 230:24 231:3,7 | 343:2 | 12:12,12,13,22 |
| **result**   61:13,17 | 231:21 233:9 | **reviewer** | 13:22 14:7,7 |
| 63:2,4,13 | 233:18,22 | 247:16 | 14:10 15:20 |
| 144:4 158:19 | 234:15 238:24 | **reviewing** | 17:2,22 19:21 |
| 205:4 214:18 | 244:18 245:21 | 86:25 166:12 | 20:16 21:4 |
| 292:25 322:3 | 245:24 250:7 | 196:7 261:7,13 | 22:20 23:20,25 |
| 341:6 | 252:22,24 | 326:6 331:19 | 26:8,15 32:20 |
| **resulted**   321:24 | 253:1 255:20 | **reviews**   104:22 | 32:25 33:3,13 |
| **resulting** | 255:23 257:18 | 151:5,5 189:17 | 34:1,3 35:9 |
| 335:20 | 259:9 263:10 | 195:22,23 | 36:24 40:4 |
| **results**   63:20 | 267:20 272:12 | 198:1,22,24 | 42:4 43:20 |
| 244:9,13,16,21 | 273:5,17,17,20 | 199:1,14,20 | 45:11,21,23 |
| 266:13 273:10 | 273:22 277:24 | 206:21 225:10 | 47:8 54:5 55:9 |
| 275:4 293:24 | 290:4 291:18 | 234:8 239:1 | 63:3,15,21 |
| 297:2 359:12 | 291:25 296:23 | 274:21 275:10 | 65:1 66:8 68:3 |
| **retain**   149:1,4 | 296:23 297:10 | 279:7 281:16 | 69:22 70:4,20 |
| **retained** | 310:13 342:17 | 283:6 316:9 | 71:5,9,22 72:2 |
| 362:14 | 343:4 364:7 | **revise**   355:15 | 72:16 73:2,4 |
| **retention**   149:5 | **reviewed**   15:2 | **revised**   109:19 | 73:21 74:10,22 |
| 149:8 | 15:3 31:15,17 | **richmond**   4:9 | 78:1,3 79:24 |
| **retesting**   149:7 | 39:4 108:1 | **ride**   28:14 29:2 | 79:24 80:10,13 |
| **retort**   361:16 | 126:19 134:11 | 29:6,13 47:19 | 83:1,10 86:24 |
| **return**   324:6 | 141:22 142:4,9 | 48:8 50:5,6 | 89:23 90:4,5 |
| 353:20 364:13 | 142:10 182:16 | 51:7 179:7 | 93:2,10 94:7 |
| 364:17 | 182:17 231:22 | 180:1,4,16,19 | 94:10 95:13,21 |
| **revenue**   62:4 | 255:22,23 | 180:21 189:3,6 | 97:7 100:19 |
| 97:25 98:2 | 256:6,6,8 | 200:19,25 | 101:2,23 104:7 |
| **review**   50:19 | 260:21 261:1,4 | 201:4,12 202:1 | 106:5 108:20 |
| 50:21 51:9,11 | 261:11 289:4 | 203:2 | 112:17,24 |
| 68:7 81:7 | 289:25 312:3,6 | | 113:6,7,15,16 |

**[right - road]**

| | | | |
|---|---|---|---|
| 113:18 114:12 | 204:10 205:9 | 276:10,10 | 362:9 |
| 116:8 118:3,16 | 206:6 207:20 | 277:3,16,25 | **rigid** 40:17 |
| 118:17,17 | 208:8,9,15,16 | 280:4 281:16 | 182:7 |
| 121:15 123:1,2 | 209:12,16 | 281:19 282:8 | **ring** 57:19 |
| 123:22 125:2 | 215:2,12 | 282:12,16,17 | 116:1 |
| 128:6 129:11 | 216:10,21 | 284:7,13 | **risk** 67:21 |
| 131:14 134:9,9 | 217:14,16 | 286:20,23,24 | 69:13 167:16 |
| 135:20 137:3 | 219:13,22 | 287:14,21 | 167:20 168:8 |
| 138:2,10,21 | 220:8,22,25 | 288:2,3,10,20 | 168:21 188:11 |
| 141:22 143:15 | 221:4,8,14,16 | 289:3,12 290:1 | 188:12,16 |
| 143:17 145:20 | 221:22 223:21 | 291:22,23 | 190:6,10,11,12 |
| 147:8,17 148:1 | 224:7 226:1,9 | 299:6 302:18 | 210:20 235:9 |
| 148:10 149:3 | 226:10 227:3 | 311:4,23 | 286:6,10 319:4 |
| 149:10,23,25 | 228:25 229:1,4 | 313:25 314:1,1 | 319:12,18 |
| 154:1,11 155:2 | 229:10,24 | 314:4 315:13 | **risks** 40:3 |
| 155:24 156:6 | 231:15,20 | 315:24 319:11 | 54:10 350:12 |
| 158:9 159:21 | 233:2,13 237:7 | 321:18 326:7 | **road** 19:20,22 |
| 160:3,6,10,14 | 240:17 243:10 | 326:10 327:19 | 19:23 20:4,6 |
| 160:17 162:10 | 244:3,21 | 327:22 328:3 | 20:11 33:20 |
| 162:25 163:15 | 245:11,23 | 328:11,15,18 | 34:19,20 35:3 |
| 164:15 165:14 | 247:22,24 | 334:1,3,6 | 54:5,15 82:7 |
| 165:22 166:4,9 | 248:17 250:7 | 335:11,19 | 82:17 83:4 |
| 167:9,17 | 250:23 251:15 | 336:24 337:12 | 87:11,16 101:3 |
| 168:21 169:1 | 251:16 252:9 | 338:6,17 | 112:19 129:3 |
| 169:14,17 | 252:17 254:25 | 339:17 341:5,5 | 141:2 160:14 |
| 171:18 178:16 | 255:3,24 | 341:12 344:2 | 166:9,20,21,22 |
| 183:11,16,20 | 257:11 258:21 | 345:20 347:22 | 167:7,24 |
| 183:23 184:21 | 258:24 259:3,5 | 348:2 350:2 | 168:19 169:9 |
| 185:18,20 | 260:8,17,22 | 352:3,23 | 173:3,13 |
| 187:5,15,16 | 261:2 264:15 | 353:12 354:2 | 174:13,19 |
| 192:17 196:9 | 264:16 266:2 | 355:12,14 | 175:6,14,16 |
| 196:21 197:5 | 266:23 267:1 | 357:11,13,22 | 176:11,17 |
| 198:3 200:21 | 267:17 268:8 | 358:2,17 359:2 | 207:2,6 229:20 |
| 202:22,25 | 271:4 272:20 | 360:1,9,22 | 238:15 267:25 |
| 203:1,3,10,14 | 273:17 275:21 | 361:3,7,10,17 | 272:2 289:17 |

Page 71

Appx_1643

**[road - safety]**

289:18 290:16
290:18 297:24
307:5 329:15
333:25 334:10
359:24
**roadside** 87:15
219:15
**roadway**
177:12 346:24
**robert** 345:6
**roberts** 312:8
326:19 327:25
331:23 333:10
346:14
**robust** 170:4
**rodeo** 11:6
**roderico** 1:2
5:21 364:4
365:1 366:1
**role** 18:1,5,19
19:5,13 25:13
25:24 28:6
31:23 32:7
35:6,8 47:4
87:19 99:4
116:23 118:24
156:1 184:2
187:22 192:1
197:9 202:7
245:6 274:12
274:14,18
275:1 281:11
299:13 342:13
**roles** 25:15
102:9 118:18

132:17
**roll** 62:13
**rookie** 357:18
**room** 341:22
**rotate** 120:19
**rough** 348:2
**roughly** 121:5
348:1 349:8
**round** 126:2
350:20
**rounds** 274:23
**route** 39:8
50:25 104:17
**routes** 247:16
**routing** 58:11
**rpr** 1:22 363:2
**rubric** 224:9
227:23
**rude** 12:20
**rule** 32:13
113:14 304:2,6
**rules** 8:12 11:9
11:11 111:19
112:15 153:21
162:14 182:9
301:19 303:22
303:25 304:9
304:18,19
**run** 154:22
348:6
**running** 68:20
88:20 128:5
187:14 236:20

**s**

**s** 4:1 365:3
**s&op** 107:4
**sabine** 10:13
**safe** 25:15
26:15 64:13,16
64:17 66:15
79:3 82:12
84:15,17
120:18,23
121:1 124:18
126:2,3 132:16
133:1,19 136:2
136:3 141:6
164:6,14,16
172:14,17,20
189:21,23,24
189:24 190:3,6
195:6 220:4
235:7 237:23
238:15 243:13
243:20 258:1,6
264:7 286:22
287:5,9,10
288:2,8 297:23
**safely** 32:1
39:15 72:14
73:16 82:16
84:12 86:20
164:8 174:5
189:13 258:14
**safest** 223:6
**safety** 26:21
33:22 35:12,20
36:1 37:19

39:3,10 40:14
41:10 53:1
61:17,18,24
63:14 64:7
65:1,17 66:1
70:14 85:6
86:16,18 112:6
114:4,9 116:8
118:15,19
120:10,25
121:8,12,16,22
125:16 126:2
135:14 144:10
146:25 147:24
148:10 167:12
178:8 189:1,6
189:9,16
191:25 192:11
194:16 195:6
197:11,12
206:25 218:22
219:5 221:25
222:2,10,17,20
222:20,23
223:22 227:17
235:1,6,9,13,25
237:16,16
240:21,25
241:7,8,19,20
242:20,20
243:2,6,13
248:23 249:21
250:2,3 252:25
256:25 257:6
257:20 259:8

**[safety - says]**

| | | | |
|---|---|---|---|
| 259:21,23 | 47:15,18,20 | 194:4,13,20 | **saved**  118:1 |
| 263:1,6,16 | 48:1,4,8,11,15 | 195:4 221:10 | **saw**  50:21,25 |
| 264:23 267:24 | 50:9 52:7 | 239:21 261:22 | 62:20 91:2 |
| 268:3,5,8 | 54:20 55:21 | 270:12 271:3 | 93:8 104:21 |
| 272:14,14 | 56:1,3,8,14,20 | 284:11 297:14 | 146:3 223:16 |
| 284:11,12 | 57:5 59:21 | 297:23 299:12 | 232:5 234:7 |
| 286:19,20,22 | 60:1,15,18 | 308:8 314:19 | 238:5 275:24 |
| 287:14,16 | 61:2 64:14,15 | 316:4,15 | 277:23 320:15 |
| 297:13 314:4,4 | 71:15,21,25 | 318:15,18 | 321:17 323:22 |
| 314:10,12,15 | 72:12 87:20 | 322:25 347:23 | 328:6 329:2,14 |
| 315:4,8,23,23 | 88:5,18 89:9 | 349:4 361:10 | 329:18 330:21 |
| 316:3,5,22,25 | 89:20,25 90:11 | **salesforce**  43:2 | 330:24 331:5 |
| 317:7 348:5 | 93:10,13,16 | 43:3,5,19,21,24 | 344:1,16 |
| 349:6,18,24 | 94:2,13,15,18 | 43:25 44:5,9 | **saying**  18:6 |
| 350:7 | 95:19,20,23 | 44:11,18 46:3 | 54:13 60:4 |
| **sala**  47:21,25 | 96:1,14 97:3,5 | 54:18 55:7 | 69:21 74:8 |
| **salary**  94:8 | 97:18,20 98:17 | 56:2,13 60:25 | 87:1 172:17 |
| **sale**  94:14 | 98:25 99:14 | 93:22 119:15 | 192:24 200:14 |
| **sales**  10:4 18:3 | 101:17 102:2 | **salesperson** | 213:2,3 306:9 |
| 18:22,23,25 | 103:15 112:5 | 21:14 | 306:12 330:9 |
| 19:1,3,4,8,13 | 118:23 119:22 | **salinas**  4:22 6:4 | 341:21 |
| 19:20 20:17,21 | 120:3,8,12,14 | **san**  23:24 | **says**  5:11 77:19 |
| 21:3,8 24:21 | 121:3,25 | 269:19,24 | 80:13,19 83:16 |
| 24:24 25:1,7,9 | 125:19 127:15 | 270:5,23 271:2 | 83:25 84:11 |
| 25:12,13,24 | 127:16,19 | 271:11,14 | 116:7 131:16 |
| 26:6 28:6,7,21 | 128:10,15,21 | **sanskrit**  306:8 | 132:6,8 133:2 |
| 30:22 31:10,19 | 129:10 130:10 | **santos**  1:4,4 | 143:2 148:1 |
| 35:5,22 37:15 | 131:8 136:12 | 141:14 146:2,6 | 157:4,10,22 |
| 38:6,22 39:2,5 | 151:12,19 | 230:4 231:5,12 | 158:5 165:18 |
| 40:2,2,14,21 | 152:6,18 153:1 | 326:20 327:4 | 166:7,10 |
| 41:9,11,17 | 153:3 156:2 | 328:24 329:3 | 167:23 170:24 |
| 42:5,9,17 43:4 | 178:1 179:7 | 330:25 331:7 | 176:18 181:25 |
| 43:6,22 44:15 | 180:24 186:23 | **saturday** | 191:11,12 |
| 44:21 45:6,15 | 189:15 190:9 | 140:23 352:12 | 193:7 203:21 |
| 46:24 47:3,12 | 190:14 193:22 | 352:23 | 204:6 206:21 |

Veritext Legal Solutions
800-336-4000

Appx_1645

**[says - seen]**

210:2,4 211:19
211:20 213:20
216:11,13
227:9 230:18
235:5 239:23
240:18 241:19
246:21,21
248:21 249:7
249:19 250:13
256:16 257:3
269:10,18
293:14 304:6,6
305:17 307:4
327:3 328:5,19
328:20,24
329:17 330:2
330:14 340:21
340:25 356:16
356:17 357:14
**scale**   242:10
**scan**   347:10
**scene**   185:13,13
185:14 336:14
337:20 340:2
**scheduled**
125:14 347:25
349:7 351:14
352:3,8
**scope**   162:17
193:10 262:10
264:25 279:11
304:12 308:19
309:22 317:19
327:6 331:2
332:12 333:19

334:12 336:2
338:1 340:10
343:18 360:24
**scoped**   270:8
**scorecard**
314:14
**screen**   125:9
**screening**
295:17
**se**   179:5
**seal**   4:25
**search**   292:23
**searched**
254:19
**seat**   159:9,16
159:20
**seats**   159:14
**second**   7:8 8:12
158:4 175:11
178:15 184:9
191:1 210:12
233:23 248:25
249:22 253:12
254:14 255:15
260:9,17,21
261:1,7 275:18
275:22 276:4
276:13,23
278:3,8,11
305:25 326:12
336:24 337:1,7
338:17 339:3
339:11 342:1
**secondary**
299:3

**secondly**   67:15
**seconds**   146:6
175:11,16
191:9 326:19
327:3 338:18
**section**   218:18
235:14 238:14
239:22
**sections**   250:6
**secured**   351:18
**see**   13:6 15:1
19:17 50:14
51:12,15,19
68:6 71:20
76:5,9 80:16
89:5 114:2
125:3 129:2
136:22 137:2,4
137:6 145:3
154:4 158:4
159:12 170:16
191:2 192:19
200:1,9 205:21
206:20 210:14
214:10 218:17
221:17,19
223:3,4 224:25
227:9 233:4,15
233:19 234:1,1
237:13 239:6
241:19 245:7
256:15 257:4
262:5,21
264:19 265:8
266:10 269:10

269:20 278:14
279:18 280:20
293:5 301:5
302:3 307:7
309:12,13
317:8 322:25
326:22 331:10
331:13 337:1,9
337:16 338:22
339:3,5,5,6,11
341:4 346:23
357:14,15
**seeing**   311:10
328:10 329:13
330:2,14
**seek**   158:6
193:13
**seem**   212:3
213:12
**seems**   85:2
147:9 272:24
309:2
**seen**   14:19,21
19:19 37:20
53:2 104:16
109:1 123:14
127:6 146:5
174:15 182:14
218:14 224:18
232:7 279:8,13
310:5 311:25
321:14 331:10
335:1 336:14
339:22 340:4
341:16 342:3,9

Page 74

Appx_1646

**[seen - shows]**

343:14,25
344:5,6 347:4
**sees** 231:11
**segue** 16:13
**select** 115:21
**selected** 242:2
242:3
**self** 115:20
242:2,3
**sell** 351:10
**seminar** 135:19
**send** 79:13
80:21 81:9,24
83:14 139:13
316:22 327:24
332:22
**sending** 37:5
83:2 87:1
311:23 331:21
**sends** 189:11
**senior** 10:20,21
323:14
**sense** 53:9,19
53:22,25
150:12 222:9
243:16 303:23
**sent** 117:25
118:2 141:17
193:22 194:4,7
194:13,19
278:16,18
326:18 328:5
332:9 340:7
344:25 360:17
360:19 364:14

**sentence** 240:19 262:4
262:21
**sentences** 262:25
**separate** 16:21
67:1 140:14
286:8 319:25
330:23
**september** 7:21
14:19 201:1
**series** 316:13
**serious** 229:14
248:22 251:21
252:16
**seriousness** 252:15,19
**served** 7:20,22
14:18 271:23
294:23
**service** 19:6
20:22 25:2,3
25:25 26:2
60:2,9,18
**services** 25:17
25:19 48:16
240:3,8
**serving** 72:11
**sessions** 178:6
**set** 19:7 35:25
36:13 37:3
38:4 39:9
43:12 46:8
50:12 61:16
62:8 64:4

68:21 90:5
97:6,9 98:10
138:2 161:11
236:16 274:1
274:12 275:6
282:3 285:14
298:21 303:16
303:16 314:12
**sets** 94:12
124:12 164:10
**setting** 125:2
162:4,4 202:18
202:21 246:12
**seven** 14:1 17:8
17:12
**several** 28:18
31:7 45:8
47:18 197:9
200:2,5 269:18
290:16 307:3
308:11 351:16
353:14
**shake** 11:16
**share** 39:9 56:5
64:3
**shared** 37:24
**sharing** 38:4
**she'd** 264:14
**she'll** 21:17
**sheet** 364:11
**sheets** 56:22
**sheryl** 1:22
4:18 5:4 6:6
363:2

**shifted** 349:10
349:16
**shifting** 148:18
**shipped** 93:23
**shipping** 101:11
**shirt** 191:9,11
191:20 192:24
193:7
**shoes** 263:21
**shops** 334:9
**short** 71:3 84:9
84:10 178:18
204:7 232:19
315:15 331:14
**shorthand** 5:4
5:5 363:3,22
**shoulder** 339:15
**show** 64:22
108:1 118:6
154:23 190:23
308:22 336:12
**showing** 248:4
274:23 350:3
**shown** 127:8,18
127:21 132:7
152:5 337:8
351:5
**shows** 182:15
210:9 244:19
265:11,12
266:12 272:18
273:20 332:21

Page 75

Appx_1647

**[sic - something's]**

| | | | |
|---|---|---|---|
| **sic** 81:3 102:8 | **sites** 191:24 | **slogan** 191:10 | 302:21 303:1,2 |
| 107:5 123:9 | 192:5 | 222:23,25 | 303:10 307:23 |
| 141:1,1 318:24 | **sitting** 55:11 | 314:4 | 307:24 308:16 |
| **side** 28:14,14 | 79:19 115:5 | **slow** 212:20 | 308:20 309:1,3 |
| **sight** 338:8,19 | 311:19 | 217:1 241:11 | 309:4 |
| **sign** 105:20 | **situation** 13:17 | 277:17 303:7 | **society** 163:2 |
| 107:20,23 | 58:5 85:17,20 | 339:6 | **software** 21:22 |
| 364:12 | 87:7 94:6 | **small** 178:23 | 22:2 62:16,21 |
| **signature** 5:6 | 105:21 141:4 | **smile** 305:21 | 155:4,7 179:6 |
| 237:9,10,11 | 168:25 174:21 | **smith** 1:12 5:22 | 183:14 348:10 |
| 362:6,15 | 186:10 203:25 | 6:23 9:10 18:3 | **sold** 351:11 |
| 363:19 | 213:13 228:15 | 50:7 88:24 | **solid** 245:1,15 |
| **signed** 126:15 | 228:20 230:23 | 90:24 91:23 | **solutions** 4:18 |
| 156:9 233:20 | 237:10 251:11 | 93:10,14 99:8 | 4:22 6:5,8 |
| 364:20 | 263:23 275:8 | 100:4 108:23 | 362:14 364:23 |
| **significant** | 283:2,14 318:1 | 117:3 120:5 | **solve** 20:21 |
| 120:11 | 340:16 346:18 | 126:19 145:25 | 26:3 |
| **signing** 247:12 | 349:10 350:15 | 146:4 195:10 | **somebody** 52:4 |
| **similar** 283:11 | 357:8 | 195:15,22 | 58:2 74:13 |
| **similarities** | **situations** | 196:16 200:20 | 78:3 99:23 |
| 158:18 | 21:17 73:11 | 202:1 205:7,21 | 105:11 159:10 |
| **simpson** 364:4 | 75:12 83:13 | 237:1 246:21 | 221:3 223:3 |
| 365:1 366:1 | 168:4 169:7,13 | 256:3 310:8,18 | 242:19 248:8 |
| **simultaneous** | 169:21 282:4 | 312:20 313:9 | 251:15 271:12 |
| 128:3 | 323:3 | 333:9 344:22 | 274:9 275:11 |
| **sir** 11:2 16:16 | **six** 17:8,12 | 346:11,13 | 295:15 301:8 |
| 23:21 24:1 | 28:19 46:20 | 351:22 | **somebody's** |
| 29:14 34:2 | 189:11 200:3 | **smith's** 2:9 | 120:24 |
| 44:23 48:6 | 200:21 265:21 | 76:2 98:11 | **someone's** |
| 87:18 106:3 | **size** 258:23 | 100:8 205:18 | 30:20 187:17 |
| 131:12 150:14 | 271:20 | 256:5 344:8 | 223:7 255:3 |
| 177:14 181:14 | **skill** 314:21,22 | **social** 2:21 | 295:3 |
| 336:16 350:25 | **skipped** 171:11 | 299:22 300:25 | **something's** |
| **sit** 55:8 243:18 | **slammed** 210:6 | 301:4,16,17 | 27:4 123:7,11 |
| | 212:24 213:2 | 302:12,16,20 | |

Veritext Legal Solutions
800-336-4000

**[somewhat - specific]**

**somewhat**
65:13 150:4
**soon** 66:16
143:24 344:22
**sop** 2:13,22
68:20 127:5
195:18 218:6
281:25 282:7
301:4 303:1,6
304:3,10 315:3
**sops** 304:7,15
**sorry** 5:13
17:21 22:17
23:13 24:12
29:1 30:17
31:24 35:19,20
39:12 40:17
44:23 45:18
57:13 58:22
63:9 65:5
66:13 68:22
73:22 100:15
100:15 102:13
103:22 107:5
113:9,10
115:13 124:2
125:23 126:10
127:11 128:6
132:12 133:17
142:1 147:19
152:11 157:18
159:14 160:4
179:18 187:8
197:3,4 207:7
207:15,17

212:19,21
216:8 224:12
224:20 231:18
234:9 237:4
241:15 242:22
245:18 248:3
256:19 260:23
269:11 277:6
282:2 283:8
302:24 304:4
304:14,22
305:25 307:7
315:9 316:2
329:12 345:10
345:21 349:4
349:20 353:3
355:25,25
358:12 360:12
**sort** 26:6 28:13
32:23 39:23
41:11 43:1,19
45:25 49:12
57:9 65:13
66:22 68:18
74:21 85:14
91:19 94:5,9
104:7,25 105:1
107:19 120:19
123:8 134:20
151:13 152:2
159:10,12
160:12,20
173:11 183:13
187:15 191:9
191:15 200:16

210:1 214:5
221:6,7 230:4
237:10 242:10
255:9 258:11
273:8 297:1
298:4 317:25
318:17 322:17
346:17 350:20
**sought** 325:4
**sound** 19:21
21:19 23:20,25
45:20 57:8
58:19 116:8
144:11 266:21
271:2,4
**sounds** 45:22
69:18 71:18
74:7 94:7
95:11 112:13
184:18 222:22
266:21 270:3,7
270:9 283:7
329:13
**source** 104:8,9
145:18,21
344:25 346:1,3
346:7
**sources** 39:1
42:13 104:5
280:20
**spam** 146:18
147:5,10,17
148:14
**spans** 22:11

**speak** 15:15,16
50:16 51:3,6
52:18 79:12
130:16 133:10
133:19 164:3
212:19 281:24
303:8 353:22
**speakers** 128:3
**speaking** 81:22
90:18 171:13
172:11 176:5,7
300:11,17,24
303:10,11
330:10
**speaks** 124:14
**spec** 207:4
**special** 1:3
**specific** 56:3,17
61:23 83:5
84:22 85:17
90:25 102:22
107:1 115:12
128:10,16
130:24 131:2
135:18 148:10
179:5 180:12
180:14 181:11
181:15 182:9
188:21 193:19
214:8,21,24
217:11 224:21
225:22 245:20
250:2 266:9
274:15 284:20
295:22 298:21

Page 77

**[specific - statement]**

304:9 350:10
**specifically**
45:19 49:19
52:3 69:6
87:13 90:9
99:8 112:3
120:13 131:11
156:12 190:19
194:7 195:10
195:13 202:4
208:3
**specificity**
161:1
**specifics** 30:1
114:10 130:25
147:1 148:2
157:12 283:20
298:10,12
**specify** 16:23
199:19
**speculate**
131:23 136:19
174:24 309:24
**speculated**
292:11
**speculating**
205:1 227:2
263:14
**speculation**
151:16 153:5
155:23 247:18
260:12 262:11
263:19 264:25
307:20 309:21
357:4

**speed** 100:13
160:2,9 210:10
210:10 219:1,4
219:12,22
220:11 230:9,9
277:17 335:3
335:17,18,21
347:17,18
356:11,18,21
356:24 357:1
360:9,12
**speeding**
141:13 230:3
230:13 293:6
**speeds** 100:16
335:23
**spell** 7:11 196:9
**spend** 55:5,18
258:9 270:1
**spending** 270:5
**spent** 269:9
**split** 170:9,21
**spoke** 50:23
131:11 213:25
226:15 229:6
325:7 349:10
355:3
**spoken** 52:9,14
260:4 331:18
**spot** 235:22
236:1
**spouse** 112:8
113:14 322:22
**springdale** 4:4

**square** 244:3
**st** 4:19,23 6:3
**staff** 323:14,21
324:2,4
**stairs** 223:7,17
**stamp** 249:5
**stamps** 327:15
327:18 345:16
**stance** 235:6
**stand** 71:1
111:15 149:19
232:17 310:16
362:8
**standard** 107:5
155:16 156:11
157:1,20
161:16,17
221:18 224:3
275:7 285:14
297:15,15
300:13 303:20
320:20 322:12
**standards**
113:8,11,19
303:17
**standing**
229:19 281:10
329:19 330:3
330:15 331:6
331:11
**standpoint**
106:19,20
**stands** 196:11
**start** 37:21
39:3 51:16

53:10 120:8,8
262:24 270:5
314:11 336:21
336:25 358:6
**started** 7:14
236:15 351:15
352:10
**starting** 78:20
202:22 266:22
275:11
**starts** 221:20
246:11 262:21
**state** 6:13,15
7:9 9:20 11:10
23:3 30:6 85:3
85:9,15 112:25
113:20 135:8
140:1 141:4
162:20 169:7
177:16 181:15
181:20 182:1
325:7
**stated** 92:1
212:18,22
**statement**
30:19 87:13
142:7,9,10
181:22,24
192:4,20,21
193:24 210:23
212:4 214:13
229:4 231:13
250:1 321:1,6
321:11,19
329:17 344:8

Page 78

Appx_1650

**[statement - supervision]**

355:12
**statements**
31:16,17 80:7
239:12 308:16
308:20 312:3,5
321:9 325:17
325:22 330:23
331:5 343:12
**states** 1:1 5:24
23:1,2 81:17
84:1,5 113:1,2
169:15 181:6
181:10 182:9
335:16
**stating** 56:18
**station** 54:7
**stay** 157:13
274:19 352:16
**stayed** 353:13
**staying** 238:16
267:25 352:16
**steering** 166:19
166:22
**step** 68:5
140:13 197:25
215:8
**stepped** 356:8
**stepping**
359:25
**steve** 47:21,25
**steward** 288:12
288:13
**stick** 8:25 23:6
109:11 160:9
179:18

**sticks** 149:11
**stilted** 11:15
**stipulate**
337:19
**stipulated** 5:1
**stood** 111:15
**stop** 9:4 149:16
210:7 212:23
315:6 329:11
339:2
**stopped** 32:12
32:17 305:19
338:22,25
339:3,12,13,14
340:5,17,18
**stopping**
339:10
**store** 67:12
**stored** 65:25
66:3 67:9,13
68:1,2
**story** 310:10,19
311:5
**strategies**
257:25 264:6,6
**street** 4:4,9,19
4:23
**stretch** 71:12
**strike** 24:12
30:21 56:12
76:20 101:25
117:24 119:25
124:2 133:17
137:18 161:5
224:12 225:14

283:8 294:5,11
309:15 356:24
**stringent**
181:19,20
**strive** 237:23
240:22 245:8
**striving** 148:9
189:20
**strong** 309:8,9
**struck** 141:3
146:6 210:7
212:1 230:4
290:17 326:19
**struggled**
269:25
**stuff** 7:15 29:18
146:14
**subject** 15:10
15:11 70:10
181:2,25
185:12 268:6
**subjective**
65:13
**subscribed**
366:14
**subsequent**
27:16 252:21
253:12,19
256:9 261:12
261:16 320:12
**subsidiary** 9:13
9:15,21
**substance**
91:10 143:21
197:2,6 207:13

227:5
**success** 198:14
233:12
**successful**
10:10 20:20
196:12 198:11
**successfully**
197:15 233:12
**suddenly**
328:24
**sufficient** 171:2
196:2 231:13
**sufficiently**
172:14,17,20
234:20 241:6
**suggest** 223:10
**suggested**
281:3,12
**suggests** 125:6
148:11 311:25
**suite** 4:4,14,19
4:23 6:3
**summarized**
212:6
**summer** 268:18
**sunday** 352:12
352:25 353:8
**supervise** 89:24
90:3
**supervised**
313:12
**supervision**
26:3 68:13
112:5 129:1
148:22 216:22

Page 79

Appx_1651

**[supervision - system]**

| | | | |
|---|---|---|---|
| 217:3,12 | 296:21 297:23 | 55:6 58:15 | 288:24 291:1 |
| 228:14 353:16 | 354:25 | 64:12,13,14 | 291:22 294:1 |
| **supervision's** | **supervisor's** | 66:7 70:19 | 298:16 301:13 |
| 292:4 | 98:13 248:20 | 73:23 75:7 | 301:13 307:11 |
| **supervisor** | 262:4,5,20 | 78:21 81:23 | 310:17,17,17 |
| 26:25 27:7,8 | 267:2 268:4,6 | 85:5,10 86:16 | 313:23,23 |
| 27:16 29:10 | **supervisors** | 86:23 90:16 | 316:8 317:2 |
| 39:13,20 48:18 | 26:8 50:7 | 95:22 96:10 | 325:11 329:25 |
| 49:22 50:1 | 103:7 111:1 | 98:3 100:19 | 330:11 333:14 |
| 62:10 66:5,16 | 149:3 151:21 | 101:19 105:8 | 333:14 337:19 |
| 67:8,22 71:19 | 198:2 205:19 | 109:3 112:1 | 338:21 345:11 |
| 71:25 77:14 | 213:18 227:6 | 113:5,18 116:5 | 349:5,5 350:2 |
| 91:3,8 98:12 | 249:16 281:3 | 119:11 138:9 | **surface**   147:14 |
| 111:2 119:2 | 284:10 353:23 | 139:12 144:10 | **surprised** |
| 122:19 130:20 | 355:2 | 145:2 149:10 | 44:11,17 |
| 142:11,12,24 | **supply**   60:19 | 151:10,10 | 136:16 302:7 |
| 143:14 180:7 | **support**   19:6 | 154:7 155:22 | 331:13 |
| 188:15 200:1 | 25:3,4 26:12 | 159:23 162:3,8 | **surprises**   135:5 |
| 202:24 203:13 | 66:8 91:18 | 162:14,24 | **surroundings** |
| 209:2 214:13 | 152:1 258:3 | 168:24 183:6 | 35:2 51:1 54:9 |
| 224:17 225:21 | 322:13 323:5 | 188:17 193:3 | 168:16,18 |
| 226:12 227:21 | **supports**   240:3 | 196:20 201:16 | 235:8 238:17 |
| 238:23 240:18 | **suppose**   137:12 | 204:1 214:2 | 287:23 |
| 241:6 242:1,6 | 159:3,6 | 215:15 216:10 | **surveil**   302:16 |
| 246:14 248:19 | **supposed**   23:14 | 220:3,9 231:8 | **suspect**   13:25 |
| 249:4 253:11 | 66:11 77:11 | 231:25 232:14 | **swear**   6:25 |
| 255:9,11 256:5 | 117:3 | 232:14 236:12 | **swerved**   356:8 |
| 256:16,23 | **sure**   10:13,19 | 237:2 240:2 | **switch**   347:21 |
| 257:9 258:18 | 11:8 12:20 | 242:24 243:15 | **sworn**   5:10 |
| 258:19 262:7 | 14:6 18:18,18 | 250:6 252:12 | 77:25 363:6 |
| 263:9 269:7,13 | 18:18 20:15 | 257:1 271:9,9 | 366:14 |
| 269:18 279:20 | 27:19 29:21 | 271:24,24 | **system**   43:21 |
| 280:3,7,13,17 | 34:7,22 40:19 | 282:25 284:6 | 68:10 93:25 |
| 280:19,22 | 46:17 49:20 | 285:7,7 287:11 | 94:1 156:23 |
| 291:4 296:9,16 | 53:8,9 54:8 | 287:24 288:6,6 | 165:14,22,25 |

**[system - team]**

172:25 173:7
173:11,14,21
174:2,12,23
195:24 239:5
**systems** 102:22
155:5,7 156:25
166:3

**t**

**t** 7:13 276:8
365:3,3
**tab** 14:13 70:21
75:21 113:23
149:15 154:10
170:5 209:15
**tableau** 56:4,13
**tables** 126:2
350:21
**tablets** 55:8
**take** 5:16 17:2
19:7 21:8
32:16 34:13
53:18 54:3,4
54:14 60:7
61:4 70:22
82:11 84:3,9
115:25 124:20
124:20 129:4
138:17 139:14
140:3,5 149:18
171:17,20
172:8,11 173:2
174:12,18
184:13 192:2,3
193:15 197:14
197:18,25

220:2 222:19
232:13 233:23
245:21 267:16
270:13 274:21
279:23 282:24
286:12 289:8
297:5 301:15
305:22 308:2,4
314:17,19
315:12 323:15
326:12 333:25
340:9 350:13
358:2 359:6
**taken** 1:19 5:4
5:20 16:14
105:23 177:2
210:23 211:8
212:14 230:21
232:2 270:23
271:2,11
288:25 295:5,9
295:10 302:2
322:3 325:22
363:7,12
**takes** 68:13
112:1 151:4
173:12 184:6
255:10
**talk** 27:1 35:21
39:14 43:22
48:20 51:14,20
53:16 63:13
64:25 69:7
97:16 105:2
116:3 183:18

195:6 197:24
202:3,8 206:6
218:6,7 284:12
287:6 304:15
308:25 311:17
311:21 314:19
**talked** 36:9
54:18 72:18
121:21 131:5
150:15,16
151:20 154:8
177:24 180:9,9
189:8 207:1
213:19,19
215:14 218:5
226:13 233:11
239:3 270:21
281:25 282:5
284:1 285:16
318:21 333:23
334:3 353:16
355:5
**talking** 12:19
12:23 17:22
18:8,11 39:16
55:12,24 61:6
71:13 76:10
77:20 78:5
79:9 110:14,18
114:16 117:10
125:17 128:7
136:13 144:2
150:3 156:21
159:10 176:18
178:25 179:7

189:7 215:23
215:25,25
216:15 239:2
249:8 260:16
269:7,12
295:20 315:23
316:17 354:14
354:25 355:7
358:23
**talks** 80:20
176:16
**tammy** 319:3
319:11 320:2
355:20
**target** 94:19
97:25
**targets** 61:19
61:20 96:13
236:16
**task** 108:14
**tattoo** 334:8
**taylor** 4:3
**taylorkingla...**
4:5
**team** 10:5,6
20:23 26:8,12
26:21 28:15
35:23 39:2,9
43:23 45:6
52:15 56:1,3
70:1,5 72:13
76:25 84:16
87:25 88:8
97:23 112:5,14
120:12 121:13

**[team - territories]**

121:15 127:19
130:7,9 131:8
137:23 139:12
163:5,6 164:13
168:7 204:11
222:19 225:2
239:22 271:16
271:17 272:24
284:11,11
286:10 295:16
298:14 299:10
301:1 313:5
315:4 319:12
319:19 320:18
320:20,22
321:4 322:25
322:25 343:2
348:4 349:12
349:18 350:16
351:25
**team's**   70:18
311:16 322:14
**teams**   35:11
37:18,24 40:2
41:6,7,11,14
46:15 49:8
56:17 63:23
73:16 86:11
120:21 121:3,5
123:15 136:12
178:7 189:15
189:25 191:23
191:24 195:6
198:10 201:13
201:14 292:4

300:17,19
301:1 314:15
348:13,15
350:14
**tear**   93:7
**tears**   307:10
**teasdale**   6:2
**tech**   240:8
**technical**   20:22
25:2 26:1
56:22 74:22
178:13,24
240:3
**technically**
36:20
**technologically**
42:6
**technologies**
54:19 102:22
183:22
**technology**
10:7 36:12
41:12 49:13
53:7 106:12
166:23 170:1
183:10,12
303:14 332:21
**tele**   41:15
**teleconference**
41:15 124:15
125:5,11
**teleconferences**
172:3
**teleconferenc...**
124:23

**telephone**
49:24
**tell**   9:4 11:24
11:24 12:11
17:6 25:10
26:6 36:16
54:19 60:9
64:6 89:12
106:25 131:10
140:9 141:12
141:16 146:4
161:13 163:1
175:21 182:15
187:5 188:21
201:10,18
209:20 223:25
236:7 239:11
246:5 273:10
280:17 298:4
308:5 311:3
312:2,7 314:6
335:22 337:12
353:23 354:4
356:12
**telling**   84:25
110:4 178:1
303:23
**temperature**
13:12
**ten**   23:9,10,12
**tend**   151:6
183:4
**term**   74:22
77:9 115:4,12
148:6 151:6

288:5 304:19
304:19 308:10
**terminate**
74:13 203:16
**terminated**
204:8
**termination**
203:17,18,20
203:25 204:16
204:24 205:5
**terms**   32:12
33:15 34:7
37:24 50:24
56:7 77:24
109:19 148:9
149:7 152:2
160:25 162:5
177:3 178:5
188:3 189:1,12
189:13 201:17
206:24 207:5
228:18 244:15
253:5,7 274:1
279:13 281:10
289:19 297:18
303:18 312:11
315:7 316:6
347:1
**terrible**   301:9
**terrika**   4:25
**territories**   22:6
22:7,12 23:7
24:12 25:6,6
43:12

**[territory - think]**

**territory** 19:9
22:14 23:3,4
23:21 24:6,14
24:23,24 25:2
45:13 46:14,21
47:16 63:24
93:17,19,25
96:16 97:5
98:1,25 240:4
258:7,9,24
262:6 269:14
270:8,14,15,17
270:20 271:3,6
271:11,12,13
271:19 272:1
**tested** 149:5
**testified** 48:9
50:3 56:24
58:25 96:3
156:4 183:8
187:13 205:6
285:1 332:4
**testify** 16:9
**testimony**
19:19 23:23
40:1,8 45:11
64:23 80:1,2
81:2,3,20
82:25 86:3,24
106:20 113:18
113:23 114:13
121:8 128:19
134:25 136:6
138:7,8,19
143:17 147:12

147:20,22
148:16 150:4
162:9 170:14
170:19 182:20
185:16 193:20
194:2,11
202:20 215:19
216:10 222:11
231:8 277:5,8
277:12 284:6,7
318:3 326:4,18
328:4,9,10,14
328:16,22
329:23 344:25
347:12 362:10
363:5,6 364:9
364:18 366:8
**texas** 1:1 4:14
5:25 23:6,8
24:8 27:13
28:2,6,8,10
47:22 48:3,4,5
95:24 113:13
210:5 271:4
364:4 365:1
366:1
**text** 35:15 37:6
42:7,11 55:15
79:5,6,11,23
80:9,17,22
81:4,22 82:21
83:2,14 86:25
141:17 171:21
171:21 232:6
291:19 292:1,1

326:18,23,25
327:5,12,24
328:5 331:22
332:9,18,23
340:7 345:1
346:13,13
360:16,19
**texted** 345:6
**texting** 33:16
34:9 78:18
80:1,4 84:2
124:13 160:21
163:12,18
164:11 185:23
312:7 332:10
333:10 334:8
345:23
**texts** 78:22
84:12
**thank** 7:4,14
8:19 11:3
14:24 27:23
195:9 235:10
348:21 357:20
358:3
**thanks** 254:12
**theory** 359:3,15
359:18,20,21
**therapy** 322:17
**thereto** 363:14
**thing** 34:25
36:2 51:13
60:19 66:6
73:4 84:12
98:24 117:10

150:10 187:15
194:21 243:12
246:11 258:12
279:2 292:23
314:9 336:23
**things** 12:22
31:8 32:3
39:15 40:18
41:21 51:20
53:15 55:8
62:17 65:9
72:16 80:24
82:4 83:8 84:8
86:11 88:15
90:7 91:17
98:9 100:2
103:9 106:17
107:9 109:18
112:10 115:24
133:10 140:3
144:2 151:5
158:12 159:10
164:17 185:14
195:7 204:14
211:10 232:8
257:2,17,24
258:17,22
292:8 294:18
294:21 302:2
314:13 315:22
319:23 322:19
322:23 340:23
347:11 352:20
**think** 12:19
13:4,6 15:19

**[think - think]**

| | | | |
|---|---|---|---|
| 19:23,23 20:2 | 119:14 121:5,7 | 182:19,24 | 271:10 272:9 |
| 21:14 23:11,16 | 121:20 122:11 | 183:8 187:23 | 272:12 273:10 |
| 23:21 27:13 | 122:13,18 | 187:24 188:11 | 275:16,24 |
| 28:2,3,17,24 | 124:10,24 | 191:12 192:4 | 276:6 277:12 |
| 31:10,22 32:21 | 125:1,21 126:9 | 192:21,21 | 277:13,17 |
| 33:8,8 36:17 | 127:7,17,20 | 194:14 196:5 | 278:14 279:8 |
| 40:1,13,20 | 129:24 130:1 | 196:25 200:18 | 279:14 282:6 |
| 41:20 42:8 | 131:18,24 | 205:6,21 | 282:18 283:4 |
| 43:25 44:19,22 | 132:10,18 | 206:22 209:6 | 284:5,18 285:1 |
| 44:23 45:2,2,3 | 134:14 135:16 | 209:21 211:1 | 286:8,9 287:8 |
| 45:17 46:25 | 136:17 137:6,7 | 211:17,24,24 | 288:20 289:20 |
| 47:19,20 49:7 | 140:20 141:4 | 212:24 213:1 | 290:11 292:9 |
| 49:10,15,21 | 141:10 142:12 | 215:4,5,14 | 294:16 295:5,6 |
| 52:8,16,19,20 | 143:12,13 | 217:22 218:5 | 297:8 298:16 |
| 53:6 54:12,18 | 147:7 148:3,13 | 218:12 219:25 | 298:23,25 |
| 55:1 57:12,13 | 150:23,24 | 220:2 222:12 | 299:23 305:10 |
| 57:14 59:7 | 151:1,6,14,18 | 223:21 226:12 | 306:4 308:2,15 |
| 68:10 73:4 | 151:23,24,25 | 226:22,24 | 309:17 310:12 |
| 74:21 80:10,23 | 152:4,19 153:1 | 228:3,8,10,13 | 310:23 311:10 |
| 80:25 81:10,15 | 154:3,17 | 228:13,19 | 312:14 318:12 |
| 82:12,18,20 | 155:20 156:4 | 229:25 230:17 | 318:16,19 |
| 83:5,6 84:18 | 158:1,10,17,18 | 233:2,21 234:9 | 319:3,11,17 |
| 84:21 86:8 | 158:19 159:17 | 236:25 238:9 | 320:14,14,17 |
| 87:12 88:20 | 160:12,19,22 | 241:5,8 243:23 | 321:7,18 323:2 |
| 89:2,3,4,8,14 | 161:19,22,25 | 245:4 246:17 | 323:25 324:11 |
| 90:8,10,22 | 163:1,3 164:18 | 247:8,12 | 324:11 325:1,3 |
| 91:8,17 95:6 | 164:20 166:1 | 248:12 249:5 | 325:10,12,16 |
| 96:12 98:25 | 167:1 169:21 | 252:1,20 253:4 | 325:24 327:11 |
| 99:10 100:18 | 169:24 170:3,3 | 254:3,9,16 | 328:17 333:15 |
| 101:1 107:16 | 170:9,16,16,17 | 256:24 257:14 | 334:14 337:15 |
| 107:23 109:5 | 170:20,25,25 | 257:22 258:11 | 338:11 347:23 |
| 111:7 112:3,11 | 174:16,21 | 259:7,10,11,19 | 347:24 350:11 |
| 115:15 117:14 | 175:15 177:4 | 259:23 262:13 | 352:2,16 |
| 117:16 118:8 | 180:7,11,14 | 264:2,7,10,22 | 353:18 354:22 |
| 118:14 119:12 | 181:1,8 182:4 | 265:2,4 270:22 | 355:2,5,19 |

Veritext Legal Solutions
800-336-4000

Appx_1656

**[think - today]**

356:20,23,25
361:13
**thinking**   30:3
56:8 72:15
85:11 135:10
159:7 189:5
212:3 321:10
321:11 349:15
**thinks**   83:1
141:3
**third**   254:4
276:4 324:8
**thirds**   262:19
**thompson**   4:4
**thoroughly**
289:4
**thought**   110:14
135:16 145:10
200:15 215:23
215:24 253:11
253:23,24
258:22 355:17
361:24
**thousands**
101:20
**three**   28:21
29:3 50:14
95:6,13 97:3
97:17 196:6
242:11,12,16
243:11,17
262:25 263:3
264:14,17
279:17 294:8
308:1 311:13

336:22 337:9
337:17 338:14
338:17,17
339:2,11
351:19
**threshold**
187:19 282:10
**throws**   117:14
**thursday**   5:14
**ticket**   67:7
186:22 187:5
220:20,22,25
221:4
**ticketed**   185:22
186:10,13
187:2
**tickets**   65:3
294:6,13
295:14,22
296:25
**tied**   37:3 44:2
96:16
**time**   5:15 6:13
17:15 19:10,11
19:23 20:3,7
21:6,6 27:21
34:25 47:6,6
48:13 51:21
55:5,16 60:3
60:10,13 69:2
71:2,5 73:9
75:11,12 81:14
81:14 82:18
84:4 85:13
87:11 93:22

99:23 100:21
101:7 106:4
115:18,18
125:13 128:8
130:20 133:16
133:16,18,18
135:9 140:2,3
141:10 145:16
149:19,23
155:6 167:6
172:7,7 174:2
174:11,19,20
174:22 175:2
176:4,20
177:13 178:16
178:20 182:5,6
187:9 192:12
200:4 207:24
210:7 212:23
213:3 231:11
231:14 232:17
232:21 233:19
238:25 241:7,9
247:6 249:5,9
258:5 268:20
269:2,9,20
270:1,5 271:19
271:19 272:6
278:21 289:23
290:20 292:6
294:23 305:19
308:23 314:16
314:17,19
315:13,17
322:1 323:16

324:20 327:15
327:18 342:23
345:16 346:23
347:10,10,18
348:19 351:17
352:1,19,21
353:18 361:3
362:9 364:19
**timeframe**
364:8
**timeliness**   88:9
**times**   28:17,25
29:20,23 32:5
35:11 51:17
56:17 73:6
87:6 95:13
119:1 151:25
198:7 200:2
238:22 297:18
**timing**   290:25
291:20 292:1,3
326:21,22
327:12,22
**tiptop**   10:15
**title**   8:21 9:6,23
17:6
**toast**   12:10,11
**today**   8:8 13:25
15:16,21 16:13
18:20 142:14
207:16 231:1
231:22 267:17
304:16 308:5
326:7

Veritext Legal Solutions
800-336-4000

Appx_1657

**[today's - training]**

| | | | |
|---|---|---|---|
| **today's** 32:2 | 205:18 260:3 | **touched** 33:25 | 295:2,22 |
| 362:10 | 262:10 265:1 | **touches** 124:11 | 296:24 337:8 |
| **together** 21:6 | 279:11 304:13 | **tough** 262:16 | 337:22 340:18 |
| 39:19 51:21 | 306:2 307:21 | **towards** 14:25 | 340:24 341:4 |
| 352:1 | 308:19 309:22 | 164:21 262:19 | 360:1 |
| **told** 7:24 11:9 | 317:20 327:7 | 272:11 | **train** 28:11 |
| 44:19 63:3 | 331:2 332:13 | **towns** 270:19 | 40:2 85:20,24 |
| 100:25 140:14 | 333:20 334:13 | **toyota** 146:5 | 89:24 90:3 |
| 140:17,21,22 | 336:3 338:2 | 328:1,6 339:19 | 128:13 168:13 |
| 140:25 141:1 | 340:11 341:9 | 340:5 345:1,7 | 178:8 243:1 |
| 198:2 206:14 | 342:8 343:19 | 345:24 346:11 | 350:14 |
| 207:2,4,6,9,12 | 350:8 359:10 | 347:5,6,14 | **trained** 45:1 |
| 208:8 229:24 | **topics** 7:21 8:5 | **track** 43:1 | 48:10 70:17 |
| 258:25 277:2 | 15:2,2,5,15 | 60:14,19,24 | 84:19 131:3 |
| 277:10 278:5 | 16:9 39:6,10 | 61:3 64:10,11 | 136:7 146:13 |
| 311:2 312:13 | 40:15 48:21,21 | 65:21,22 | 153:17 300:10 |
| 331:16 344:22 | 120:23 130:8 | 100:23 111:18 | 313:11 323:2,4 |
| 356:15 | 135:12 144:15 | 112:7 243:7 | **trainer** 239:23 |
| **took** 71:11 | 162:18 178:4 | 285:11 | 239:25 240:9 |
| 140:2 150:1 | 181:3 189:1,2 | **tracked** 65:17 | **trainers** 25:2 |
| 178:23 268:16 | 189:19,23 | 66:18,20 | 26:2 52:21 |
| 268:22 321:19 | 190:2,17 192:3 | **tracking** | 240:3 |
| 325:17 | 192:11 194:16 | 107:16 | **training** 35:18 |
| **tool** 56:20 | 260:11 284:12 | **tracks** 108:21 | 35:20 37:14 |
| **tools** 2:22 | 314:12 316:17 | **traditional** | 38:12,16,18,24 |
| 54:19 55:2 | 349:7,24 | 150:25 | 38:24 40:6 |
| **top** 26:21 157:9 | 361:23 | **traffic** 167:24 | 47:6 48:13 |
| 189:10 192:12 | **total** 227:10,14 | 168:4,19 169:8 | 49:4,10,16,18 |
| 222:18 | 264:17 362:12 | 176:16,19 | 49:21 52:2,6 |
| **topic** 37:22 | **totally** 49:19 | 184:10 206:15 | 62:1 69:5 |
| 39:4 41:10 | 67:1 204:18 | 213:21 219:22 | 76:15,22,24 |
| 89:4,12 120:11 | **touch** 34:12,13 | 220:8 255:12 | 77:6,9,20 |
| 120:15,22 | 80:21,24 81:4 | 276:1 277:17 | 84:22 85:16 |
| 121:10 130:22 | 84:19 85:25 | 283:17 293:5 | 86:4,10 87:3 |
| 193:11 200:15 | | 294:5,13 295:1 | 114:16,18,22 |

Veritext Legal Solutions
800-336-4000

Appx_1658

**[training - try]**

| | | | |
|---|---|---|---|
| 114:24 115:2,6 | 177:25 183:19 | **traumatic** | **troubleshoot** |
| 115:8,10,17,22 | 193:21 194:3 | 263:22 322:6 | 21:18 22:1 |
| 116:4,6,7,12 | 194:12 195:1 | 323:3,15 | **troubleshooti...** |
| 117:3,10 118:5 | 214:17,22 | **travel** 28:10,21 | 22:4 |
| 118:19,22 | 215:17 216:11 | 180:13 | **troublesome** |
| 119:4,6,15,18 | 217:12 278:11 | **traveled** 28:16 | 140:4 |
| 119:21 120:1,7 | 278:17 284:5,8 | 50:11 239:23 | **trucking** 101:3 |
| 128:10,13,17 | 284:19,22 | **traveling** 32:8 | 106:10 |
| 128:20 129:6 | 297:12,18,20 | 35:13 210:4,10 | **true** 366:8 |
| 129:13,18,21 | 297:20 298:4 | 249:21 257:6 | **truly** 24:18 |
| 129:25 130:1,5 | 298:13,22,23 | 259:22,24 | 250:2 |
| 130:13,17 | 299:2,5,6,8,10 | 314:18 333:6 | **try** 11:10 13:18 |
| 131:14,17,19 | 319:14 348:12 | 356:6,12,18,21 | 20:19 34:22 |
| 132:7,9 133:5 | 351:9 | 356:24 357:1 | 38:5 47:23 |
| 133:17,21,22 | **trainings** | **tree** 73:8 | 53:7 55:1,12 |
| 134:5,20,25 | 115:10 116:21 | **trick** 11:12 | 55:14 60:13 |
| 135:15,17 | 116:24 117:22 | 12:4 171:15 | 61:12 72:25 |
| 136:17,18 | 117:25 126:2 | 236:11 251:16 | 73:15 81:10 |
| 137:8,20 139:4 | 127:19 137:15 | 327:2 | 86:7 96:9 |
| 139:8,13 140:5 | 147:5 | **tried** 255:23 | 112:11 139:13 |
| 142:15 143:5 | **trains** 102:6 | 353:16 358:18 | 139:14 140:5 |
| 143:13,14 | **transcribe** | **tries** 125:1 | 158:15 159:9 |
| 144:18 145:6 | 209:3 | 286:19,21 | 159:13 163:2 |
| 146:13,19,19 | **transcribed** 5:6 | 288:1 | 163:24 165:5 |
| 147:6,10,17,21 | **transcript** 2:9 | **triggers** 59:12 | 168:13 183:4 |
| 148:4,4,8,14,14 | 11:15 76:2 | 134:13 | 184:8 191:25 |
| 148:16,17,18 | 364:6,20 366:5 | **trip** 51:24 | 201:16 203:24 |
| 148:23,24 | 366:8 | 321:24 333:16 | 209:2 219:21 |
| 149:2,10 | **transition** | 352:17 | 220:3 230:1 |
| 150:17,21,24 | 332:3 | **trips** 50:8 | 240:13 243:15 |
| 151:1,1,3,13 | **transportation** | **troopers** 325:7 | 244:8 248:24 |
| 152:7,20 153:4 | 72:9 101:5 | **trouble** 258:15 | 255:8 258:5 |
| 153:8,16,21 | **transporting** | 301:20,25 | 268:2 282:23 |
| 154:1,5,8,14,23 | 102:7 | 305:1 | 282:24,24 |
| 155:8 177:19 | | | 287:24 300:22 |

Appx_1659

**[try - understand]**

300:25 313:18
317:1 319:22
340:22,25
343:24 347:13
350:13 356:8
358:15,25
**trying**  47:9
55:5 57:22,23
62:13 66:7
72:12 74:17,18
82:25 86:16
95:9 96:11
118:11 132:4
132:16 138:1
145:3,11
155:22 157:21
158:11,17,18
159:25 163:15
163:17,20
168:6 171:16
175:24 178:8
192:6 198:18
204:17 226:23
248:10 250:19
255:17 257:17
258:12 263:22
263:24 264:3
264:10,11
270:13,24
272:7,9 282:14
303:16,22
314:8 340:21
355:6,7
**tuesday**  352:12

**turn**  38:13
174:13,23
176:20 191:7
234:22
**turning**  38:8
**tweet**  2:23,24
305:13,15,22
307:12
**tweets**  307:18
308:6 309:18
**twice**  50:12
195:24 198:1
198:21 199:11
**two**  28:20,20
29:3 50:14
60:13 95:6,12
104:4 125:7
175:11,16
191:8 198:7
199:11 221:7
227:10,14
242:11,12,15
242:19 243:17
244:2 262:19
275:9,10 282:5
290:14 292:8
293:19 295:14
307:4,25 308:1
330:12 337:1,7
340:17 341:5
359:23 361:17
**tx**  364:15
**type**  118:8
183:12 230:13
268:25

**typed**  332:19
**types**  293:23
**typewriting**  5:6
363:8
**typical**  25:11
25:24 45:14
**typically**  19:6
24:25 41:11
74:12,17
101:12 208:18
209:3

**u**

**u**  290:11
**u.s.**  294:19
**u1**  290:11
**u2**  290:12
**uh**  11:16 63:16
129:23 218:23
269:11 273:2
**ultimately**
245:3
**unavoidable**
69:3 73:11
74:20,22,23
75:10 103:15
260:14
**unaware**  156:8
229:8 343:8
360:8,13,16,21
**uncle**  353:13
**uncommon**
266:4 294:6
296:25
**unconsciously**
299:6,7

**under**  47:16
89:13 166:14
167:22 183:25
218:21 230:5
235:1,13
237:16 238:14
239:21 363:9
**underneath**
73:23 166:13
191:13 265:15
265:21
**underperfor...**
95:25
**understand**
11:25 12:14
16:12,19 20:23
28:15 46:25
47:4,7 48:15
48:16 60:8
61:12 64:24
70:13,15 73:19
80:7 86:17
93:18 105:8
107:11,18
110:24 113:19
114:12,15
121:7 129:22
134:24 138:3
145:11 151:19
152:6,19 153:6
153:16 170:14
170:18 185:20
193:4 195:19
215:19 216:10
230:1 236:12

**[understand - using]**

237:2 238:6
242:9,13
246:18 250:16
252:12 270:9
280:19 307:12
311:9 312:21
313:23 327:24
340:19 348:15
352:14
**understanding**
8:8 25:16,17
31:2 57:23
102:9 140:11
144:6 162:9
194:14 206:10
208:23 226:17
228:15 238:2,8
240:20,25
270:4 271:8
278:6 283:2
292:5 331:9
352:6 354:19
354:21 359:21
**understands**
153:3 162:14
235:5
**understood**
12:3,6 291:1
**undocumented**
205:11,12
**unfortunately**
294:3,4 306:4
**unique**   73:18
74:2 101:9
102:5 262:6,8

262:14,14
**unit**   5:18 9:12
333:7
**united**   1:1 5:23
23:1
**units**   362:13
**universe**
284:10
**unofficial**
198:24 199:1
199:13,20
**unrelated**
340:16
**unresolved**
362:2
**unsafe**   164:19
164:21,24
165:2,4,11
336:10
**unsafely**
103:21 104:1,4
105:4,5
**update**   106:17
109:9 351:9,10
**updated**   109:16
109:19
**updates**   109:8
109:10,13,13
316:22
**upside**   98:7
305:21 307:9
**upward**   195:25
**usage**   161:10
181:7 183:10
185:3 321:23

**usdc**   364:4
365:1 366:1
**use**   2:21 12:9
22:1 25:18
32:11,17 33:18
38:23 41:6
42:25 43:3,5,6
43:7,11,13
45:6 49:8
53:25 55:22,24
56:1,4,9,15
57:25 58:18
62:19 67:5
75:9 77:16
79:7 82:10
83:19,25 84:1
84:3,7,14
106:7,11,13
107:2 109:24
110:1,10,11,18
110:20,24
112:16 115:4
121:2 124:13
124:19 128:20
129:6 133:1,8
133:13 152:11
157:24 161:2,9
161:15,18,20
161:22,25
162:5,10,11
163:18 165:6
166:3,7,17
167:4,23 168:3
168:23,24
169:13 176:19

183:9,13,15
188:9 195:6
230:19 279:2
299:21 300:20
303:4 304:19
304:19 313:17
352:19 357:14
**used**   18:24
31:25 32:12
33:12,15 37:11
73:5 114:23
115:3 116:13
135:25 163:9
163:11 165:25
170:2 202:12
222:22,25
231:8,13
257:10 270:19
362:13 364:20
**useful**   44:4
**uses**   80:10,19
102:22 110:21
295:19
**using**   30:12,13
32:13 36:11
74:21 77:11
79:11 80:8
81:12 111:2
119:15 128:11
128:14 133:6
156:20,22
164:15,18,22
165:1,10,13,15
165:21 166:23
183:20 186:11

**[using - videographer]**

186:13,24
202:17 295:17
302:3 312:21
313:1,9,12
332:23
**usually**  28:20
41:3 66:5
105:21 109:15
199:4 234:16
240:13 267:5
280:18 320:5

**v**

**v**  364:4 365:1
366:1
**vacation**
110:25
**vague**  186:6
249:9
**valid**  85:5,5
103:8 122:6,21
**value**  86:17
303:15 348:12
348:15,16
**values**  26:24
88:13 302:4
**variable**  94:13
97:20 98:17
**variables**
265:18
**variety**  315:22
**various**  49:25
317:1
**vary**  118:24
**varying**  181:7

**vast**  185:10
**vehicle**  30:10
30:12,14,18,21
30:23 37:9
38:7,8 67:16
67:17 68:21
80:24,25 81:15
83:9 84:8 89:7
92:21,25 93:1
93:4,5,6,7
104:6 107:8
108:15,24
110:10,15,19
110:20 111:5
112:8 125:25
129:1 156:24
156:24 158:21
158:24 161:14
162:7 177:17
181:24 183:16
187:3,11,18
188:9,13
195:18 202:14
209:25 210:5,8
212:1,23 213:2
213:15 221:7
221:10,11
231:5 250:20
254:22,23,24
255:3,7 256:3
276:4,16,20
277:2,10
285:23 289:17
290:15 310:10
310:20 311:6

311:12,13,20
312:22 313:10
313:13 329:19
330:4,16 331:6
331:11 339:15
356:8,9 359:24
361:20
**vehicles**  75:1,5
100:17,22,24
101:2 106:5,8
106:23 107:2,6
109:12,24
110:1,5,8
111:20 112:16
132:15 133:6
134:3 160:7
183:11 186:24
285:13 289:3
337:9 339:6,7
339:14 340:17
**vendor**  192:17
**veracity**  343:12
344:7
**verbal**  11:18
199:4 284:15
**verbally**  48:13
84:12 208:19
332:3,5,10
**verify**  364:9
**veritext**  4:18,22
6:5,7 362:14
364:14,23
**veritext.com.**
364:15

**version**  183:5,7
210:17 212:11
239:8,10
**versions**  182:25
**versus**  5:22
16:21 20:4
31:4 42:21
56:6 62:4
64:24 74:24
98:1 140:17
320:13
**vice**  10:21
**video**  1:17 3:4
3:5 5:15,18
11:14 150:13
190:25 336:13
336:14,25
337:5,8 338:8
338:15,19,23
339:9,22 340:1
340:4,12 341:4
341:15 342:2,4
342:14,15,18
342:20 343:2,8
343:11,14,24
344:14 346:17
346:23
**videoconfere...**
49:24 127:18
**videoconfere...**
41:12 49:5,12
**videographer**
4:21 5:12 6:6
6:24 7:4 71:1,5
73:22,25

**[videographer - watched]**

149:16,19,23
178:12,16,20
232:17,21
315:9,13,17
348:18,20
362:6,8
**videos** 116:13
133:10,14,21
133:23 134:5
156:23
**view** 175:9
260:13
**viewed** 134:16
253:4,6
**violate** 81:3,6
81:25 173:3
174:3 231:16
231:22 304:23
**violated** 105:12
105:13 225:7
335:15 340:6
**violates** 336:8
**violating** 80:3
90:12 180:25
232:4 332:24
**violation** 67:6
87:2,10,14,16
100:1 107:13
111:20 139:17
139:23 171:5
173:14,23,24
174:14,14
175:1,17,25
176:12,21
177:3,6 185:8

188:14 204:13
205:5 217:1,1
221:12 224:5
232:7 251:19
252:2 255:12
261:15 293:15
322:8 341:1
347:1,3,15
360:5
**violations**
64:21 65:3,20
69:1 103:4
122:25 144:8
179:13,24
181:4 285:12
293:4
**viral** 301:9
**virginia** 4:9
**vision** 26:19
318:16
**visit** 314:16
352:19
**visiting** 20:4
55:3
**visits** 28:10,19
49:25 50:3,5,6
50:9 51:12
**voice** 79:7,11
80:8,19,21
124:19
**volume** 191:8
**vp** 10:17,20,21
**vs** 1:10

**w**

**waco** 24:6
**wait** 111:20
**walk** 79:10
98:4 104:25
**walking** 223:17
307:5
**want** 7:15
12:20 14:23
20:15 27:2
29:24 35:23
36:6 39:25
45:5 53:25
64:1,11 70:21
75:19 76:25,25
84:16 86:23
93:12 113:17
114:20 125:3,8
125:10 129:2,3
138:4,4,7,14,19
140:13,14
145:19 148:20
154:7 162:8
163:5,5,6
164:6,8 168:23
186:17 196:20
199:16 200:9
215:15 216:9
218:18 222:14
222:18,18
227:8 228:9
229:11 230:8
236:12 237:2
243:18 244:25
245:2,8 252:11

258:18 270:4
283:18 284:6
287:8 299:1,8
299:14,19
300:16 311:9
311:17,20
318:22 322:15
335:7,16
336:23 349:16
361:12,16,25
**wanted** 62:17
91:15,16 291:1
323:13 353:23
**wanting** 256:25
361:4,11
**wants** 31:4
244:24 266:14
**ward** 72:18
108:12,13,22
126:9,10 319:4
355:18,19
**warning** 99:17
99:20,21
104:18
**warnings** 99:25
100:3 205:7,10
205:14
**warrant** 279:15
283:5
**watch** 115:25
134:8 150:13
167:7 336:23
**watched**
338:18

Page 91

Appx_1663

**[watching - white]**

| | | | |
|---|---|---|---|
| **watching** | 304:15 354:14 | 175:7 | 162:21 164:5 |
| 156:23 341:15 | 360:23 361:6 | **when's** 155:6 | 169:4 171:15 |
| **way** 26:21 | 361:22 | **whichever** | 173:8 174:10 |
| 42:16 58:14 | **wear** 93:7 | 119:11 | 175:15,23 |
| 59:5 64:4 | 318:13 | **white** 2:2 4:3 | 176:5,9 177:11 |
| 70:18 77:3 | **weather** 167:25 | 6:18,18 7:7,20 | 178:11,12,14 |
| 78:12 82:16 | 168:5 169:9 | 8:15,19,20 | 178:22,22,25 |
| 86:20 96:8 | 176:17 337:24 | 14:5,7,10,17,22 | 181:5 186:7,8 |
| 105:3 117:2 | 338:3 | 14:25 16:6,10 | 191:6 193:2,4 |
| 121:19 123:19 | **web** 57:13,15 | 16:12 17:21,23 | 193:6,15 |
| 129:12 132:1 | **website** 57:1,4 | 23:18 27:20,23 | 194:17 205:2 |
| 134:11 138:4 | 57:9 59:9 | 27:24 38:20 | 207:12,17 |
| 148:6 152:3 | **wednesday** | 49:20 50:2 | 209:15 212:2 |
| 155:21 162:20 | 352:13 | 53:23 58:22,24 | 213:1 216:9 |
| 192:11 193:18 | **week** 48:20 | 58:25 66:19 | 217:17,21 |
| 201:7 206:15 | 60:13 307:7 | 70:23 71:8 | 220:6,21 |
| 221:13 257:1 | 352:13 | 74:1 76:1,8,9 | 228:21 230:24 |
| 262:20 280:12 | **weekend** | 77:18 78:13 | 232:11,14,25 |
| 298:25 301:11 | 352:21 | 86:22 89:2,8 | 232:25 233:2 |
| 301:15 307:6 | **weekends** | 89:14,19 90:17 | 236:3,7 242:24 |
| 314:11 315:5 | 110:24 | 90:23 100:15 | 246:1,5 252:9 |
| 316:7,12 | **weeks** 351:19 | 101:23 109:7,8 | 253:23 254:6 |
| **ways** 179:22 | **weighted** | 113:13,25 | 254:12,13 |
| 189:7 272:7 | 265:14,17,24 | 114:1 117:16 | 256:19,22 |
| 317:1 | 265:25 273:12 | 117:19,22 | 257:16 260:6 |
| **we've** 10:9 | **weights** 265:18 | 119:25 124:1 | 260:16 262:13 |
| 15:15 17:15 | **wellness** 61:17 | 128:4,9 132:3 | 263:15 264:13 |
| 19:18,18 46:11 | 61:18,24 144:9 | 135:6 137:18 | 265:7 267:9,12 |
| 70:24 164:9 | 250:3 | 138:6 143:12 | 269:5,6 277:6 |
| 204:1 217:22 | **went** 29:2 38:6 | 147:16 148:25 | 279:16 285:7 |
| 222:25 232:15 | 47:19 116:17 | 149:16,18,25 | 286:18 287:3 |
| 238:3 261:4 | 202:1 248:6 | 150:1,3 151:18 | 288:24 292:14 |
| 282:20 284:5 | 301:9 | 152:4,13,24 | 292:18 296:2,7 |
| 289:22 292:12 | **wheel** 82:8 84:4 | 153:14 154:6 | 296:9,12 297:8 |
| 295:5 297:17 | 166:19,23 | 155:15 156:17 | 300:12 302:6 |

Page 92

Appx_1664

**[white - written]**

| | | | |
|---|---|---|---|
| 304:14 305:3,8 | **wholly** 9:15,21 | **witnesses** | 263:23,24 |
| 306:7,16,21,23 | 53:10 | 324:22 325:3,4 | 264:1,8 272:8 |
| 308:5,15 309:3 | **why's** 70:8 | **wondered** | 274:17 294:17 |
| 309:25 310:5 | **wide** 191:16 | 155:18 | 302:22 303:3 |
| 311:2 313:3,23 | **williamson** | **wondering** | 313:10,13 |
| 315:11,19,19 | 319:1,8 | 47:14 | 323:13,17,23 |
| 315:21 318:2 | **willing** 14:2 | **woods** 4:8 | 324:6 350:16 |
| 324:25 325:5 | **win** 62:18 | **word** 21:24 | 352:17,18 |
| 327:14 329:16 | **window** 45:25 | 73:5 136:18,21 | **worked** 257:24 |
| 329:25 330:10 | 348:25 | 138:1 161:22 | **worker** 349:13 |
| 330:12,22 | **winston** 290:1 | 244:5 257:10 | **working** 19:21 |
| 331:4,12 | 336:13 | 313:25 | 81:12 102:3 |
| 332:16 333:23 | **winston's** | **wording** | 132:17 264:7 |
| 334:16,21 | 336:13 | 304:10 | 268:20 |
| 336:7,17,21 | **wish** 53:4,5 | **words** 36:11 | **world** 190:6 |
| 337:6,24 338:4 | 335:25 336:4,4 | 47:1 174:14 | 303:14 |
| 338:16 339:10 | 336:5 358:9 | 209:20 228:9 | **world's** 61:11 |
| 341:3,11,17,20 | **witness** 5:7 | 260:24 262:15 | **worries** 314:21 |
| 341:23 342:5 | 6:25 7:1 14:6 | 288:23 327:21 | **worth** 347:24 |
| 342:11,25 | 16:11 53:21 | 340:22 | **wow** 350:11 |
| 343:23 344:11 | 73:24 78:10 | **wore** 318:7 | **wreck** 67:17 |
| 344:15,21 | 101:19 113:10 | **work** 19:6,16 | 140:22 212:15 |
| 346:6,9 347:3 | 131:23 147:18 | 30:18 31:20,22 | 235:11,12 |
| 348:18,21,22 | 156:15 162:19 | 31:25 32:3,14 | 306:13 |
| 349:3 353:3,4 | 164:3 173:6 | 32:15 33:2,7 | **wrecked** |
| 353:7 354:13 | 205:1 242:22 | 33:12,12 42:21 | 305:17 306:10 |
| 355:25 356:11 | 285:6 286:16 | 42:22 46:10 | **wrecks** 73:11 |
| 356:19 357:9 | 305:7 306:22 | 57:18 58:6,7 | 281:21 289:2 |
| 358:23 359:2,6 | 309:23 310:4 | 58:13,16,20 | **write** 52:17 |
| 359:9,12,16 | 327:10 329:22 | 59:1,6,14,17 | 250:10 255:2 |
| 360:7,22 361:6 | 329:24 340:14 | 75:4 90:7 | **writing** 208:20 |
| 361:9,15,21 | 342:2 344:19 | 101:16,21,22 | 250:12 264:2 |
| 362:1 | 346:7 356:1,4 | 189:21,22 | **written** 52:9,11 |
| **whoever's** 61:2 | 363:4,7 364:8 | 230:1 237:24 | 52:22,25 105:3 |
| | 364:10,12,19 | 258:4 261:20 | 105:19 130:4 |

**[written - zoom]**

164:9 201:8
235:4 295:18
321:6,19
325:16
**wrong** 54:12
60:4,21 69:19
89:3 123:11
227:10 253:24
353:11
**wrote** 235:3
248:12,15
257:5 258:19
262:8 263:9,9
269:8

**x**

**x** 121:22
244:12

**y**

**y** 121:22
244:10
**y'all** 32:19
42:15 61:9
100:21 102:17
115:9,10 122:7
124:4 168:13
184:23 221:2
283:15 285:16
**y'all's** 37:14
42:19 319:8
**yeah** 10:22
17:19 21:25
22:18,18 28:15
36:19,22 51:10
68:12 70:23

78:10 103:23
103:23 105:13
109:4 123:6
145:21 149:18
151:17 153:23
161:15 163:9
163:16 164:25
165:3 166:12
167:20 179:18
181:4 193:12
194:1,8 202:15
205:20 207:8
207:17,17,18
210:9 214:10
216:9,9 219:25
222:25 224:11
230:17 231:19
238:22 244:8
248:3,9 249:11
254:9 257:14
263:1 266:3,16
269:3 270:2
279:12 284:18
285:14 286:16
293:9 296:2
300:2,6 302:25
309:23 310:17
312:18 313:6
326:15 328:13
333:1 345:22
345:22 349:5
356:15 357:16
359:21
**year** 46:19,20
61:16 62:5,10

62:11 63:22,23
63:25 98:19
99:10,11,12
116:25 124:6
195:24 196:13
198:2,7,21
199:11,23
214:12 233:22
234:10,15
235:19 236:18
236:19,22
237:23 240:22
246:7,12,14,15
248:22 249:23
251:3 252:21
261:23 262:6,8
262:14,16
265:23 268:2
269:1,2 270:10
273:19 274:10
316:9 317:7
**years** 72:20
73:13 182:12
275:9 282:22
293:10 294:7,8
295:14 305:17
307:3,25 308:1
308:11
**yep** 292:24

**z**

**z** 121:22
**zero** 135:13
237:16 241:19
272:14

**zone** 124:25
**zoom** 21:7,9,12
41:2,4,5 49:5,8
49:11,11,16
121:5 199:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

CHRISTINE YAGER  - December 11, 2023

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

```
ERICK RODERICO PIUARA      )
GONZALEZ, Individually     )
and as Special Administrator )
of the Estate of NEHEMIAS R. )
PIVARAL SANTOS, DECEASED,  )
ERICK SANTOS and EVELYN MORENO)
                           )
        Plaintiff,         )   Civil Action No. 3:22-CV-02714-K
                           )
VS.                        )
                           )
CAYLEE ERIN SMITH and EASTMAN )
CHEMICAL COMPANY,          )
                           )
        Defendants         )
```

-----------------------------------------

ORAL VIDEO DEPOSITION OF

CHRISTINE YAGER

DECEMBER 11, 2023

-----------------------------------------

ORAL DEPOSITION OF CHRISTINE YAGER produced

as a witness at the instance of the Defendants, and duly

sworn, was taken in the above-styled and numbered cause

on December 11, 2023, from 10:03 p.m. to 3:03 p.m.,

before Robin Cooksey, CSR, RMR, TCRR in and for the

State of Texas, reported by machine shorthand at the

offices of the J. Fred Bayliss, PC, 3000 Briarcrest Dr.,

Suite 211, Bryan, Texas 77802, pursuant to the Federal

Rules of Civil Procedure and the provisions stated on

the record hereto.

ASSOCIATED COURT REPORTERS
(254) 753-3330

EXHIBIT
S

Appx_1670

**CHRISTINE YAGER  - December 11, 2023**

```
 1              A P P E A R A N C E S

 2

 3  FOR THE PLAINTIFF:

 4  Mr. Jacob D. White
    Messrs. Taylor King & Associates, PA
 5  410 North Thompson Street, Suite B
    Springdale, AK 72764
 6  (479) 935-1761
    jacobwhite@taylorkinglaw.com
 7

 8  FOR THE DEFENDANTS:

 9  Mr. Gregory J. DuBoff
    Messrs. McGuire Woods, LLP
10  800 E. Canal street
    Richmond, VA 23219
11  (804) 775-1154
    gduboff@mcguirewoods.com
12

13  THE VIDEOGRAPHER:

14  Ms. Myra Thetford

15

16

17

18

19

20

21

22

23

24

25
```

Appx_1671

CHRISTINE YAGER  - December 11, 2023

```
1                    I N D E X

2                                              Page

3  CHRISTINE YAGER

4       Examination by Mr. DuBoff. . . . .        5
        Examination by Mr. White . . . . .      200
5       Examination by Mr. DuBoff. . . . .      215

6  Reporter's Certificate. . . . . . . .        223

7

8                  E X H I B I T S

9

10  NO.    DESCRIPTION                          Page

11   1     Christine Yager Expert Report         19

12   2     NHTSA Report - "Impact of Hand-held   44
           and Hands-free Cell Phone Use on
13         Driving Performance and Safety
           Critical Event Risk"
14
     3     Appendix A.8 - "Characterization of   49
15            Safety-Gritical Events"

16   4     September 2009 USDOT Report - "Driver 54
           Distraction In Commercial Vehicle
17         Operations"

18   5     SHRP2 Report - "Analysis of           62
           Naturalistic Driving Study Data
19         Safer Glances, Driver Inattention
           and Crash Risk"
20
     6     October 2015 Report - Researcher      64
21         Dictionary for Safety Critical
           Event Video Reduction Data
22
     7     Report by Christine Yager, et al -    85
23         "The Effects of Reading and Writing
           Text-Based Messages While Driving"
24

25
```

ASSOCIATED COURT REPORTERS
(254) 753-3330

Appx_1672

CHRISTINE YAGER  - December 11, 2023

```
1                    E X H I B I T S
                        (Continued)
2
    NO.     DESCRIPTION                            Page
3
     8      December 16, 2009 - Frank Drews         96
4           The Journal of the Human Factors
            and Ergonomics Society - "Text
5           Messaging During Simulated Driving"

6    9      Applied Ergonomics - Dana Monzer       104
            "Voice Messaging While Driving:
7           Effects on Driving Performance
            and Attention"
8
    10      2013 Annual Meeting Proceedings of     121
9           the Human Factors and Ergonomics
            Society - Christine Yager -
10          "Driver Safety Impacts of
            Voice-to-text Mobile Applications"
11
    11      2011 Edition - AASHTO - "A Policy      153
12          on Geometric Design of Highways
            and Streets"
13
    12      Christine Yager - Summary Report       199
14          Billable Hours

15  13      Christine Yager - 8/26/2023 to         200
            9/9/2023 - Notes on reviewing
16          Evidence and any follow-up questions

17

18

19

20

21

22

23

24

25
```

Appx_1673

**CHRISTINE YAGER  - December 11, 2023**

```
 1                    THE VIDEOGRAPHER:  Okay.  Today is Monday,
 2   December 11, 2023.  We're on the record at 10:03 A.M.
 3                    MR. DuBOFF:  Good morning, Mrs. Yager?
 4                    THE WITNESS:  Yes.
 5                    MR. DuBOFF:  Oh, sorry.  Go ahead.
 6                    (WITNESS SWORN)
 7                         CHRISTINE YAGER,
 8   having been first duly sworn, testified as follows:
 9                         EXAMINATION
10   BY MR. DuBOFF:
11        Q.  Is it okay if I call you Mrs. Yager?
12        A.  Yes.
13        Q.  And I -- am I pronouncing that correctly?
14        A.  That's right.
15        Q.  Okay.  Great.
16                    Mrs. Yager, have you ever had your
17   deposition taken before?
18        A.  No.
19        Q.  Okay.  So the only -- sometimes people give a
20   longer, sort of, intro on that.  The only thing I'm
21   going to remind you of or ask you to do is to try to let
22   me finish my questions before you give an answer, and
23   then in turn, I'll do my best to let you finish your
24   answer before I ask my next question.
25                    Is that okay?
```

CHRISTINE YAGER  - December 11, 2023

1    A.  Yes.

2    Q.  Okay.  And then the only other thing is,

3  because somebody is obviously writing down everything

4  you and I say, you need to give ver- -- verbal responses

5  to any questions I give, instead of nodding your head or

6  saying "uh-huh" or something like that.  Okay?

7    A.  Yes.

8    Q.  Okay.  Great.  So if I -- at any point I, kind

9  of, hold my hand up or anything like that, I'm not

10  trying to get you to stop talking or anything like that.

11  I'm just trying to make sure that the court reporter is

12  able to get everything you and I both say, because if

13  we're talking over each other, that makes her job a lot

14  more difficult.

15    A.  I understand.

16    Q.  Okay.  Great.

17         Can you please provide just your basic

18  educational and professional background.

19    A.  Yes.  I received a Bachelor's and Master's

20  degrees from Texas A&M University, studying industrial

21  and systems engineering.

22         (COURT REPORTER CLARIFICATION)

23    A.  Industrial and systems engineering.

24         And professional background, since 2007, I

25  have worked at the Texas A&M Transportation Institute.

**CHRISTINE YAGER  - December 11, 2023**

```
 1  I worked there from 2007 to 2015, and then I had a
 2  career sabbatical to raise children and then returned
 3  to -- TTI is the abbreviation for that -- returned to
 4  TTI in 2021, and I've been there since then.
 5      Q.  (BY MR. DuBOFF)  Okay.  Did you -- you got your
 6  Bachelor and -- Bachelor's and your Master's degrees,
 7  sort of, back-to-back?
 8      A.  Yes.
 9      Q.  There was no job history between those two?
10      A.  Just a summer.
11      Q.  Okay.  And then your first job after getting
12  your Master's degree was with TTI?
13      A.  Yes.  Although I actually worked at TTI during
14  getting my Master's, and towards the end of my
15  Bachelor's, I started there as a student worker.
16      Q.  Okay.
17      A.  And then a grad student worker and then full
18  time.
19      Q.  Great.  The -- what is your current job title
20  at TTI?
21      A.  Current job title is Project Specialist II.
22      Q.  Okay.  And I looked on TTI's website, and there
23  are a bunch of people there that have the word
24  "research" in their title; is that right?
25      A.  Yes.
```

CHRISTINE YAGER  - December 11, 2023

1    Q.  So you have people that are Associate Research
2  Engineer, Research Scientist, Senior Research Scientist,
3  things like that; is that right?
4    A.  That's right.
5    Q.  Okay.  And "research" is not in your title; is
6  that correct?
7    A.  Not currently.
8    Q.  Okay.  Do you have plans to transition into one
9  of those roles?
10    A.  Yes.  I -- I currently do research.  It's just
11  not in my title.  My boss and I are working on a
12  promotion to change my title and get that title back.
13    Q.  And what would -- what is the title that you're
14  hoping to get?
15    A.  I believe it's Associate Transportation
16  Researcher.
17    Q.  I saw some of the research studies that you
18  were either -- that you were involved in back in 2012
19  and 2013.  Do you know which ones I'm talking about?
20    A.  Yes.
21    Q.  Okay.  And on those, your -- following your
22  name, it had the initials "EIT."
23    A.  Yes.
24    Q.  Okay.  What is "EI" -- or what was "EIT" back
25  in 2012 and 2013?

CHRISTINE YAGER  - December 11, 2023

1      A.  It stands for engineer in training.

2      Q.  And what is an engineer in training?

3      A.  It's someone who has passed the fundamentals of

4  engineering exam but has not yet taken the professional

5  engineering exam --

6      Q.  Okay.

7      A.  -- to get their PE license.

8      Q.  And so typically does everyone -- prior to

9  becoming a professional engineer, does everyone have to

10 be an engineer in training?

11     A.  Yes.

12     Q.  At least in Texas?

13     A.  Yes.

14     Q.  Okay.  Did -- are you a professional engineer?

15     A.  No.

16     Q.  Okay.  So you never -- what else do you have to

17 do --

18     A.  To go from --

19     Q.  What do you have to do as an EIT to then become

20 a professional engineer?

21     A.  You have to, I believe, work for five years

22 under a current professional engineer, and then you have

23 to take and pass the professional engineering exam.

24     Q.  Okay.  And did you meet the, sort of, time and

25 service requirement?

Appx_1678

**CHRISTINE YAGER  - December 11, 2023**

```
 1        A.  I did work -- I did meet the time requirement.
 2   I just chose not to get that professional
 3   certification --
 4        Q.  Okay.
 5        A.  -- professional license.
 6        Q.  Are you currently an engineer in training?
 7        A.  I don't know if that credential has an
 8   expiration to it.  I would have to look that up.
 9        Q.  But you're definitely not a professional
10   engineer.
11        A.  I'm not a professional engineer.  That requires
12   passing the exam, and I did not attempt that.
13        Q.  Okay.
14        A.  I did not choose to take that.
15        Q.  Do you know what the, sort of -- I would say
16   when you get a bar license, it means you can practice
17   law.
18             What -- what capabilities does becoming a
19   professional engineer open up, if you know?
20        A.  So, typically professional engineers have the
21   authority to build structures or to sign their name off
22   of construction plans or things like that that require,
23   you know, an engineering professional license to --
24   yeah, to build things.
25             In my field at TTI, it doesn't really open
```

**CHRISTINE YAGER  - December 11, 2023**

1  you up to anything, which was one of the reasons that I

2  chose not to pursue that, because I am currently

3  planning to work at TTI in the long term, and all that

4  does is open you up to a different career track than the

5  one that I am currently on.  And so it's just a

6  salary -- different salary range.

7      Q.  Do you know at TTI whether being a professional

8  engineer is a prerequisite to particular positions?

9      A.  So it's my understanding at TTI that there --

10  there are the career tracks of engineering route and

11  then research scientist route.  And I am pursuing the

12  research scientist route that does not require a PE

13  license.

14      Q.  And do you know of research scientists at TTI

15  that are not professional engineers?

16      A.  Yes.

17      Q.  Okay.  Are some of them professional engineers?

18      A.  I don't believe so, because if you have the PE

19  license, you would be on the engineering title track,

20  career track.

21      Q.  Can you explain what your current job duties

22  entail?

23      A.  My current job duties entail supporting schools

24  that have enrolled in our Teens in the Driver Seat

25  Program.  I also write proposals for potential research,

CHRISTINE YAGER  - December 11, 2023

1  responding to RFPs, Requests for Proposals, related to

2  transportation research.

3                I also analyze data for our program that we

4  collect, and I -- I also -- I do a lot.  So I also

5  support our Smartphone application that we developed

6  that rewards young drivers with gift cards for driving

7  distraction free.

8     Q.  And I know that "research" can be a broad term.

9  In your current job, you analyze survey results; is that

10  right?

11    A.  That's part of what I do, yes.

12    Q.  And what other -- what else do you do in your

13  current job that you would -- you would classify as

14  research?

15    A.  We also have students collect data as part of

16  participating in our program.  It is a pre- and

17  post-observation activity that they do, where the

18  students look at seatbelt use on their school campus or

19  cell phone use while driving on their school campus, and

20  they fill out an observation form and count how many

21  cars, either -- where the driver is wearing a seatbelt

22  or the passengers are wearing seatbelts or not.  And

23  then they'll do the same activity for cell phone use

24  while driving and count how many cars are using cell

25  phones or not.  And then that data is reported back to

**CHRISTINE YAGER  - December 11, 2023**

```
1   us, and I will analyze it and report on it.

2              The Smartphone app that I mentioned also

3   involves research, where we have a lot of data that's

4   collected from that Smartphone app, and I research and

5   analyze it, and actually something I'm planning to work

6   on is to write papers on that.

7      Q.  And so I -- I realize it might be hard to --

8   I'm not sure the best way to phrase it.

9              There is a lot of human factors research

10  into how people respond to things on the road; response

11  times, things of that nature, and then -- tell me if

12  anything I'm saying here is wrong -- but it sounds like

13  what you're doing is more almost like demographic

14  information gathering.

15             Does that make sense what I'm asking?

16             MR. WHITE:  Objection; form.

17             Go ahead and answer it.

18     A.  It makes sense, but that's not accurate.

19     Q.  (BY MR. DuBOFF)  Okay.  What's not accurate

20  about it?

21     A.  The survey and data that we collect is not just

22  demographic.  It -- the survey that we ask young

23  drivers -- so these are students at schools who

24  participate in our program.  We have them complete

25  annual surveys, and some of the questions are
```

Appx_1682

CHRISTINE YAGER  - December 11, 2023

1  demographics, but a lot of the questions ask about

2  what -- how acceptable do they think certain driving

3  behaviors are.  And so -- such as, how acceptable do you

4  think it is to text and drive or to drink and drive?

5  And then it also asks them about how frequently they

6  have done these behaviors within the prior month.

7      Q.  Okay.  Yeah.  And demographic was -- was not

8  the word that I meant to use.

9           But ultimately what you're doing is

10 surveying young drivers about their attitudes or their

11 behaviors; is that fair?

12     A.  That's correct.

13     Q.  Okay.  And what -- do you do anything currently

14 that would be more in the realm of controlled

15 experiments?

16     A.  No.

17     Q.  Okay.  Gotcha.

18           And so when was the last time that you did

19 any research that would be something like a controlled

20 experiment or observational about what drivers do on the

21 road?

22     A.  2015.

23     Q.  As part of your -- is it within your current

24 job responsibilities to stay abreast of research in the

25 human factors field?

Appx_1683

CHRISTINE YAGER  - December 11, 2023

1      A.  In the human factors field, no, but in driver

2  distraction, yes.

3      Q.  Okay.  Tell me what you do currently to stay

4  abreast of research in that area.

5      A.  Each year we update statistics on our website

6  related to the risks for young drivers, and so I look

7  for new information, new statistics that we didn't

8  report on in the previous year, or I update outdated

9  ones.

10     Q.  Do you currently attend conferences or symposia

11 where researchers are presenting --

12     A.  Yes.

13     Q.  -- the results of their studies?

14     A.  Yes.

15     Q.  When was the last time that you went to an

16 event like that?

17     A.  August.

18     Q.  And what event was that?

19     A.  It was a pedestrian safety forum.

20     Q.  Okay.  And who was it put on by?

21     A.  I believe it was hosted by TTI, actually.

22     Q.  Okay.

23     A.  In partnership with TxDOT.

24     Q.  During your career sabbatical, did you stay

25 abreast of recent releases of academic papers on driver

Appx_1684

CHRISTINE YAGER  - December 11, 2023

1  distraction?

2       A.  Not as much, but a little bit.

3       Q.  A little bit?  Okay.  Was there any sort of

4  ramp-up that you had to do coming back into this field?

5       A.  No, not for my current position.

6       Q.  Would you agree that the field of human factors

7  and driver distraction is a constantly developing field

8  of study?

9            MR. WHITE:  Objection; form.

10      A.  In some ways, yes.  The technology is

11  constantly developing, but the principles of human

12  factors and the principles of understanding driver

13  distraction, those, I don't believe, changed.

14      Q.  (BY MR. DuBOFF)  And the technology is

15  developing, both in terms of the tools that are

16  available to researchers; right?

17      A.  Yes.

18      Q.  And also the technology that people have

19  available to them while they are driving; right?

20      A.  Yes.

21      Q.  Okay.  And one of the areas that you focused on

22  is the distractive effects of cell phones; right?

23      A.  Yes.

24      Q.  And you would agree that cell phone technology

25  changes fairly regularly?

Appx_1685

CHRISTINE YAGER  - December 11, 2023

1      A.  Yes.

2      Q.  Specifically things like -- using things like

3  Siri or voice-to-text?

4      A.  Yes.

5      Q.  Have you done any research on the use of --

6  strike that.

7           Have you done any research on the

8  distracting effect of cell phones while driving since

9  2013?

10     A.  Yes.  In 2015 was the latest time that I did

11  research on cell phone use.

12     Q.  Okay.  Since 2015, have you done any research

13  on the distracting effects of cell phones while driving?

14     A.  I would consider the Smartphone app that we use

15  research on cell phone use while driving; so, yes.

16     Q.  And that's what we talked before, where you're

17  surveying young drivers' attitudes and practices?

18     A.  No.  The Smartphone app is not a survey.

19     Q.  Tell me again what the Smartphone app is.

20     A.  It's an app that rewards young drivers for

21  driving distraction free, so the app collects their --

22  it monitors their route as they're driving, and it

23  detects phone use while driving.  So if their phone is

24  used at all while driving, that trip is marked as

25  unsafe, and so there is data associated with that.

Appx_1686

**CHRISTINE YAGER  - December 11, 2023**

1  Their speed, their trip length, their -- how many times

2  they interacted with their phone is all collected.

3      Q.  Is there any way, using that Smartphone app, to

4  evaluate the safety of their driving?

5      A.  Well, because it's shown in research that cell

6  phone use while driving is less safe, if their cell

7  phone is used while driving, then it's classified as an

8  unsafe trip.

9      Q.  But there is nothing like, they got into an

10  accident, they had a near miss, anything like that?

11      A.  The app is not able to determine that.  That's

12  not its purpose.

13      Q.  For your opinions that you're offering in this

14  case, are they based on the state of human factors

15  research and the relevant areas in 2015, or are they

16  based on the understanding within the human factors

17  discipline as of today?

18      A.  Once again, maybe you can clarify, but I don't

19  believe that the principles of human factors change.  I

20  think that those stay relatively constant, even as the

21  technology changes.

22      Q.  Okay.  The -- I think the most recent paper

23  that's cited in your expert report is your research,

24  which was -- the paper that you cited was published in

25  2013; is that correct?

Appx_1687

CHRISTINE YAGER  - December 11, 2023

1        A.  You're ask- -- ask that again, please.

2        Q.  Sure.  The most recent paper that -- research

3   paper that you cite in your expert report in this case

4   is from -- about cell phones and distracted driving is

5   from 2013; is that correct?

6        A.  The most recent paper that I cited about cell

7   phones -- well, let me check.

8        Q.  And just to make life easier, let me give

9   you -- let me have this marked as an exhibit.

10                 MR. DuBOFF:  This will be Exhibit 1.

11                 (Yager Exhibit 1 marked)

12       A.  It's the most recent paper, but there are also

13   more recent sources cited from organizations that are

14   citing research.

15                 So, for example, the National Highway

16   Traffic Safety Administration, the CDC, the National

17   Safety Council, those are cites -- citations that are

18   reporting on more recent research related to cell phone

19   use and driving.

20       Q.  (BY MR. DuBOFF)  Okay.  And I want you to make

21   sure I'm being accurate here, but I believe that to the

22   extent you cite those most -- more recent sources,

23   there's nothing -- you don't cite them for any

24   quantitative proposition, like, doing this causes an X

25   percent increase in reaction time.  Is that fair?

Appx_1688

**CHRISTINE YAGER  - December 11, 2023**

1    A.  Well, some of what I cited was talking about

2    the increased crash risk by using cell phones; so,

3    "Texting and driving causes a driver to be distracted in

4    all three ways, which has been shown to increase crash

5    risk by 23 times."  That was cited in a 2009 paper.

6              There's also a description about

7    visual-manual distractions increasing drivers' crash

8    risk by three times.  That was the 20- -- another 2013

9    paper.

10             "A driver is four times more likely to

11   crash when using a cell phone, regardless of whether

12   it's handheld or hands-free."  That's the National

13   Safety Council.

14             So, there are recent citations.

15     Q.  Okay.  But you just -- you just cited one from

16   2009 and 2013; correct?

17     A.  Yes.

18     Q.  Okay.  Did you do anything to -- in preparing

19   your expert report, did you consult more recent studies

20   on the effect of using a cell phone or text messaging

21   while driving on reaction times?

22     A.  I reviewed the citations here.  So part of

23   what -- like I said, the National Safety Council or

24   NHTSA -- National Highway Traffic Safety

25   Administration -- they have information pages about

CHRISTINE YAGER  - December 11, 2023

1  distracted driving, and they are citing recent research.
2              It's -- it's my understanding that they
3  fund research and then they report on it on their
4  informational pages, and so it's a nice place to go to
5  to get a collection of the most up-to-date information
6  in crash statistics.
7      Q.  Okay.  But, I mean, you would agree that you
8  cite a number of specific studies in your report; right?
9      A.  Yes.
10     Q.  Okay.  And those specific studies were from
11 controlled experiments; right?
12     A.  Some of them, yes.
13     Q.  Okay.  And that's where you got figures like,
14 doing this increases crash risk by 23 times or increases
15 crash risk by three times.  You pulled those
16 quantitative figures from those specific -- that
17 specific research; correct?
18     A.  Yes.
19     Q.  Okay.  And is it fair to say that the most
20 recent research that you cite for any proposition like
21 that is from 2013?
22     A.  Yes.  That is fair.
23     Q.  So in preparing your expert report, I
24 understand that it seems like you went to the National
25 Safety Council website.

**CHRISTINE YAGER  - December 11, 2023**

1          My question is, did you review any specific

2   research studies on these issues from any time more

3   recent than 2013?

4       A.   Just the general information.  So a lot of this

5   is knowledge that I've just gained over the years of

6   working in this field, and so part of what I did was try

7   to provide background about driver distraction, what it

8   is, the different types of distraction, and so I cite --

9   I source that from these information-type pages, just to

10  put a reference with it, but it's like I'm using my own

11  words to explain it.

12          Does that make sense?

13      Q.   Yeah.  I understand.  But so, for example, you

14  cite footnote -- Footnote 3 is a 2009 paper by Olson

15  that you cite for the proposition that texting and

16  driving increases crash risk by 23 times; correct?

17      A.   Yes.

18      Q.   Okay.  Have there been specific research

19  studies since 2013 looking at the same issue, do you

20  know?

21      A.   I don't believe that there has been.  I believe

22  that study was a -- what's called a naturalistic study,

23  where they put cameras inside vehicles, and that was a

24  very large, famous one that is still cited to this day.

25          So, in other words, I wouldn't get hung up

CHRISTINE YAGER  - December 11, 2023

1  on the dates of these.  The research is still just as

2  relevant today as it was in 2000- -- that was 2009.

3      Q.  Okay.  So -- but do you know -- do you know one

4  way or the other if there have been later studies to

5  look at the same issue?

6              MR. WHITE:  Objection --

7      A.  I'm not --

8              MR. WHITE:  Objection; form.

9      A.  I'm not aware of a more recent study looking at

10  that issue.  That is the most recent study looking at

11  that issue that I'm aware of.

12      Q.  (BY MR. DuBOFF)  Okay.  What did you do to --

13  what have you done to try to figure out if there is more

14  recent research in that -- in that subject -- on that

15  subject, excuse me?

16      A.  Searching Google Scholar.

17      Q.  And did you do that to prepare your expert

18  report in this case?

19      A.  Yes.

20      Q.  Okay.  And you couldn't find anything.

21      A.  No.  Nothing more recent.

22      Q.  And, Mrs. Yager, you've been retained as an

23  expert witness one time before; is that correct?

24      A.  That's correct.

25      Q.  And that was in a criminal case?

**CHRISTINE YAGER  - December 11, 2023**

```
 1        A.  Yes.

 2        Q.  Did you testify at trial?

 3        A.  Yes.

 4        Q.  When did you testify at trial?

 5        A.  I believe that was in August.

 6        Q.  August of this year, so --

 7        A.  Yes.

 8        Q.  -- four months ago?

 9        A.  Yes.

10        Q.  Where was the trial?

11        A.  Brazos County.

12        Q.  Is that where we are right now?

13        A.  Yes.

14        Q.  Okay.  Sorry.  I'm an out-of-towner.

15             And what was that case about?

16        A.  That case was about a man who was allegedly

17   using his cell phone while driving and it was at night

18   and it was on Highway 6 and he struck and killed two

19   pedestrians that were refilling a gas tank on the

20   shoulder of the highway.

21        Q.  And so was he charged with, like, vehicular

22   homicide?

23        A.  Manslaughter, I believe.  I -- I don't know the

24   exact charge --

25        Q.  Okay.
```

Appx_1693

**CHRISTINE YAGER  - December 11, 2023**

 1    A.  -- without looking at the case.

 2    Q.  What was the outcome of the case?

 3    A.  I believe he was found guilty.

 4    Q.  The people that he struck, were they -- did you

 5  write a report for that case?

 6    A.  No.  I was hired as an expert witness very

 7  late, just before the trial, essentially, about two

 8  weeks before.

 9    Q.  That must have been fun.

10        Did -- from what you understand about the

11  facts of that case, the people that were struck, they

12  were on the shoulder of the highway?

13    A.  I was not shown any of the evidence for that

14  trial.  I was just brought in to testify during the

15  trial, so I don't know the details of where they were

16  located.  I'm interested to know, but I was not shown

17  that.

18    Q.  Okay.  And from what you understand, what were

19  the allegations about how the defendant was using his

20  cell phone?

21    A.  I wasn't told much.  I read a report after the

22  outcome of the trial was found, and they said that he

23  had been, I believe, texting and posting videos and

24  playing games, but I'm not sure if I'm remembering that

25  correctly.

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  And what was the nature of your testimony in

2  the case?

3    A.  I was hired by the defense to basically speak

4  on how common distracted driving is and the dangers

5  associated with it.

6    Q.  Okay.  Do you know why the defense wanted you

7  to talk about that?

8    A.  Well, he told me that, you know, he's not

9  trying to argue that distracted driving is safe, and I

10 said, good, because I can't say that.  It's shown to be

11 dangerous.  And so he really focused his questions on

12 just how common that behavior is.

13   Q.  Did --

14   A.  So I don't know his purpose.  I can't speak to

15 that.

16   Q.  Did you give an opinion on whether the

17 defendant was distracted for this event?

18   A.  I -- I was asked that question, but, again,

19 having not seen the evidence, I don't think I could

20 answer that.  So they asked me hypotheticals of if

21 someone was doing this, would you consider that

22 distracted?

23   Q.  And do you recall what some of those

24 hypotheticals were?

25   A.  I don't.

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  Okay.  What was your testimony about the

2  prevalence of distracted driving?

3    A.  The lawyer showed a past report that a

4  colleague of mine had worked on that had -- I believe

5  she surveyed people in Texas, had a sample of people in

6  Texas, and asked them about self-reported behavior while

7  driving.  And so I looked at the charts and just, like,

8  spoke to the jury about what I was seeing on the charts,

9  and I also shared about what is distracted driving, what

10  are the different types.

11          I shared about my -- my studies that I have

12  done related to this, and I also talked about recent

13  statistics, like, such as in Texas, about 1 in 6 crashes

14  are related to distracted driving.

15    Q.  Okay.  Did they -- did they break it down into

16  different kinds or different sources of distraction,

17  like, talking on a cell phone or texting or things like

18  that?

19    A.  I don't recall, because it -- this was a study

20  that my colleague did, and I don't remember if she broke

21  that down or not.

22    Q.  Were you retained in your professional capacity

23  as an employee of TTI or were you --

24    A.  No.

25    Q.  -- retained in your individual capacity?

CHRISTINE YAGER  - December 11, 2023

1      A.   Individual capacity.

2      Q.   On page 1 of your expert report, which is

3   Exhibit 1, the head- -- the header says "Christine Yager

4   Consulting."

5      A.   Yes.

6      Q.   Is that -- what kind of -- is that a company?

7   Is that a limited liability company, do you know?

8      A.   I actually don't know how to answer that since

9   this is very new for me.

10      Q.   I guess, do you know if it is its own -- I'm

11   sorry.  This is going to be, like, stupid lawyer

12   question time.  I'm not trying to be difficult.  But is

13   it a separate legal entity?

14      A.   I don't think officially.

15      Q.   Have you filed anything with the State of Texas

16   to create Christine Yager Consulting?

17      A.   Not with the State of Texas.  I have filed with

18   TTI to do external employment, and so I have taken

19   vacation today to be here.

20      Q.   Okay.  And so is it fair to say that Christine

21   Yager Consulting is just, sort of, the label that you

22   give to things you do as an individual?

23      A.   Yes.

24      Q.   It's not, as far as you know, a separate --

25   it's not a company?

**CHRISTINE YAGER  - December 11, 2023**

1    A.  That's right.

2              MR. WHITE:  Objection; form.  She doesn't

3    know if it's a sole proprietorship or an LLC or not.

4    Q.  (BY MR. DuBOFF)  Okay.  Have you -- and this

5    probably hasn't come up yet, but are you planning to

6    file taxes for Christine Yager Consulting?

7    A.  I plan to report the income, along with my own

8    income, my other income.

9    Q.  On your -- on your individual tax return?

10   A.  On my individual tax return, yes.

11   Q.  Okay.  As far as you know, you don't have an

12   obligation to file a tax return for Christine Yager

13   Consulting.

14             MR. WHITE:  Objection; form.

15   A.  I don't --

16             MR. WHITE:  She's not a tax expert.

17   Q.  (BY MR. DuBOFF)  I'm just asking as far as you

18   know.

19   A.  As far as I know, it's like being

20   self-employed, and I just report it as additional

21   income.

22   Q.  Okay.  Is -- is this the first written product

23   that's ever had "Christine Yager Consulting" as the

24   header?

25   A.  Yes.

Appx_1698

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  And this is the first expert report that you've
2  ever written; correct?
3    A.  Correct.
4    Q.  Do you -- do you know how you were contacted --
5  well, let me back that up.
6            Do you recall when you were first contacted
7  by Mr. White?
8    A.  I believe it was in July of this year.
9    Q.  And if my timeline is correct, you were
10  contacted by Mr. White before you even knew you were
11  going to be involved in this criminal case; correct?
12    A.  Yes.
13    Q.  Do you recall the name of the defense attorney
14  in the criminal case?
15    A.  Craig Greaves.
16    Q.  And how do you spell his last name?
17    A.  G-R-E-A-V-E-S, I think.
18    Q.  Do you hold yourself out to the public as a
19  human factors expert witness?
20    A.  No.  I've done no advertising.  I've just been
21  contacted by Jacob and Mr. Greaves.
22    Q.  Before Jacob contacted you, did you even have
23  any intention of providing expert witness services?
24    A.  No.
25    Q.  And did Jacob tell you how he had found you?

CHRISTINE YAGER  - December 11, 2023

1    A.  He said he found the 2013 paper that I had
2  published.  That's how he found me.
3    Q.  And the 20- -- the 2013 paper and the 2012
4  paper that were published in the proceed- -- or they
5  were both published in the Proceedings of the Human
6  Factors and Ergonomics Society Annual Meeting Journal;
7  correct?
8    A.  Yes.
9    Q.  Were those papers peer reviewed?
10   A.  Yes.
11   Q.  Can you explain how that peer review process
12  works?
13   A.  I can't.
14   Q.  Were you not -- why not?
15   A.  Because I'm not familiar with how they -- what
16  the details are regarding that process.
17   Q.  Were you the one who was involved in submitting
18  those papers for peer review?
19   A.  Yes.
20   Q.  Did you receive any feedback --
21   A.  No.
22   Q.  -- from the reviewers?
23   A.  I did not.
24   Q.  So you, sort of, just submitted it and then you
25  at some point heard --

CHRISTINE YAGER  - December 11, 2023

1       A.  They told me that it was accepted.

2       Q.  Okay.

3       A.  Yes.

4       Q.  And did you present on that research at

5  in-person gatherings?

6       A.  Yes.

7       Q.  Were you con- -- are you considered the lead

8  author for both of those papers?

9       A.  Yes.

10      Q.  Okay.  So you had -- before this case, you had

11  never written an expert report; correct?

12      A.  Correct.

13      Q.  Is the report that's Exhibit 1, who wrote the

14  first draft of that report?

15      A.  I did.

16      Q.  Did anybody else have any meaningful

17  participation in drafting the report?

18      A.  No.

19      Q.  So all of -- these are all your words; is that

20  correct?

21      A.  Yes.

22      Q.  Did you look at any -- did you ask any

23  colleagues for examples of reports they've submitted or

24  anything like that?

25      A.  Not as an example report.  I asked about

**CHRISTINE YAGER  - December 11, 2023**

1  general experience of colleagues who had served as

2  expert witnesses before, but that was mainly related to

3  how did you do this while you worked at TTI, what rate

4  did you charge, but not about an expert opinion report.

5  For that, I just Googled how to write an expert opinion

6  report, and it gave me the general sections and items to

7  include, but they were vague and not specific, and so I

8  just made it my own, based on -- related to this case.

9       Q.  And does Exhibit 1, does that fully disclose

10 all the opinions that you intend to offer in this case?

11      A.  Yes.

12      Q.  Are there any opinions that you intend to offer

13 in the case that are not disclosed in Exhibit 1?

14      A.  No.

15      Q.  Do you have any -- Exhibit 1, I think, you

16 signed it on September 29 of 2023; is that correct?

17      A.  Yeah.

18      Q.  Do you have any changes to anything in the

19 report?

20      A.  No.

21      Q.  Have you reviewed any additional case materials

22 since you signed the report on September 29 of 2023?

23      A.  Yes.

24      Q.  What have you reviewed?

25      A.  Jacob sent the -- it was a long spreadsheet of

CHRISTINE YAGER  - December 11, 2023

1  the vehicular data that I had in a different form before

2  writing this paper, and so this was just a supplement to

3  that.

4        Q.  Have you reviewed any additional depositions in

5  the case?

6        A.  No, not since this paper.

7        Q.  Okay.  Are you -- have you been told about any

8  additional depositions that have been taken?

9        A.  No.

10       Q.  So you're not familiar with the deposition

11 testimony of Julio Bonilla?

12       A.  No.

13       Q.  And Appendix A of your report, which starts on

14 page 7 of the PDF, at least, Appendix A, the title is

15 "Appendix A:  List of Exhibits Reviewed."

16            Do you see that?

17       A.  Yes.

18       Q.  And is that a complete list of everything that

19 you reviewed to come up with the opinions in your

20 report?

21       A.  Yes.  Except for -- well, to come up with this

22 report, yes.  Because as I mentioned, the information

23 that was sent after this report, that's not listed here.

24       Q.  Okay.  If you look at Item 44, it lists the

25 deposition transcripts and exhibits for Caylee Smith,

**CHRISTINE YAGER  - December 11, 2023**

1  Erick Santos, Erik Gonzalez, Melvin Diaz and Dina Diaz.

2           Do you see that?

3      A.  Yeah.

4      Q.  And are those the depositions that you reviewed

5  for your report?

6      A.  Yes.

7      Q.  It doesn't say anything about the deposition of

8  Evelyn Moreno.

9           Do you know who Evelyn Moreno is?

10     A.  Yes.  And this was an oversight.  I did review

11  her deposition.

12     Q.  Okay.  And so her name should be added to --

13     A.  Yes.

14     Q.  -- Item 44?

15     A.  Yes.

16     Q.  Okay.  And you do actually cite her deposition

17  elsewhere in the report, so I just wanted to --

18     A.  Yeah.  A simple mistake.

19     Q.  Fair enough.

20           Have you reviewed the reports of any other

21  experts in this case?

22     A.  No, I have not.

23     Q.  Have you been told at all about what those

24  experts found?

25     A.  The only thing I was told was, I believe, you

CHRISTINE YAGER  - December 11, 2023

1  have a crash reconstructionist.

2            I had asked a question, if he could provide

3  me the measurements of the position of the Camry, the

4  width of the lane, and how wide Ms. Smith's vehicle was

5  so that I could determine how much tolerance she had or

6  how much clearance if she made an adjustment within her

7  lane.

8      Q.  And I don't mean this to be a trick question,

9  because sometimes lawyers do this.  Were you told by Mr.

10  White or any of his colleagues to make any assumptions

11  in the formulation of your opinions?

12      A.  No.

13      Q.  Were you told to assume any facts as being true

14  or false?

15      A.  No.  In fact, I made a point to listen to what

16  they said but then review the evidence and come to the

17  conclusions myself.

18      Q.  Okay.

19      A.  Based on the data available.

20      Q.  Okay.  And one of the things that's in your

21  report is that there were five people standing outside

22  the Camry on the shoulder; correct?

23      A.  Yes.

24      Q.  Okay.  And I'll just represent to you that the

25  gentleman I just referenced, Julio Bonilla, he was a

Appx_1705

CHRISTINE YAGER  - December 11, 2023

1  paramedic that responded to the scene.

2              Do you remember seeing him in the body

3  camera footage?

4      A.  It's possible, but I didn't know who was who in

5  the videos, at least by -- not by name.

6      Q.  And Mr. Bonilla is a native Spanish speaker,

7  and his testimony was that he spoke to everyone who was

8  in the Camry -- that had been in the Camry that day and

9  that he was told that other than Evelyn Moreno and Mr.

10  Santos, everyone else was actually in the Camry at the

11  time of the accident.

12              Now, I'm not asking you to tell me if you

13  think that's true or not, but you just weren't aware of

14  that testimony at all; correct?

15      A.  That's correct.

16      Q.  And you certainly -- he testified since you

17  submitted your expert report, but you weren't provided

18  with that information to make any changes that you

19  thought were appropriate to your expert report; correct?

20              MR. WHITE:  Objection.  And for the record,

21  the deposition occurred after this -- the report was

22  submitted.

23              Go ahead.

24              MR. DuBOFF:  Didn't I say that?  I thought

25  I said that.  I tried to say that.

CHRISTINE YAGER  - December 11, 2023

```
 1        Q.  (BY MR. DuBOFF)  Okay.
 2        A.  That's correct.
 3        Q.  So after submitting your export report, you
 4   were not provided with Mr. Bonilla's deposition, to the
 5   extent you thought anything he said was relevant to your
 6   conclusions; correct?
 7        A.  I was not provided that deposition.
 8        Q.  Did Jacob provide you with any research that --
 9   did he provide you with any research that's cited in
10   your report?
11        A.  No.  Just the evidence.
12        Q.  Understood.
13             Okay.  So if we could look at your
14   report -- and if I was going to write a Google tutorial
15   on writing an expert report, it would -- page numbers
16   are always helpful.  I understand that.
17        A.  I'm sorry.
18        Q.  That's okay.
19        A.  That wasn't one of the tips.
20        Q.  That's probably a lawyer's quibble.
21             But -- so it's on page 3 of the PDF -- or,
22   sorry -- starting at the bottom of page 2, there is a
23   section called "Background and Additional Research
24   Undertaken."
25             Do you see that?
```

Appx_1707

**CHRISTINE YAGER  - December 11, 2023**

1    A.  Yes.

2    Q.  Okay.  And then the first line on page 3 says,

3  "Visual-manual distractions, like dialing or texting on

4  a cell phone, increase a driver's crash risk by three

5  times."

6             Do you see that?

7    A.  Yes.

8    Q.  Okay.  And what do you -- does crash risk just

9  mean a collision of some kind?

10   A.  Yes.

11   Q.  Okay.  And this might seem like an obvious

12  question, but following that sentence is Footnote 2;

13  correct?

14   A.  Yes.

15   Q.  And it -- if a statement in your report is

16  followed by a footnote, what does that signify?

17   A.  Could you repeat that?

18   Q.  Sure.  If a statement in your expert report is

19  followed by a footnote, what does that signify?

20   A.  That that's the source of what -- the

21  information.

22   Q.  So you are -- you are citing Footnote 2 as the

23  support for your claim that "visual-manual distractions,

24  like dialing or texting on a cell phone, increase a

25  driver's crash risk by three times"; is that right?

CHRISTINE YAGER  - December 11, 2023

1    A.  Yes.

2    Q.  Okay.  And the report that you cite is Gregory

3  Fitch's 2013 report; correct?

4    A.  Yes.

5    Q.  Can you explain how Mr. -- can you explain Mr.

6  Fitch's research and how he derived that three times

7  figure?

8    A.  I believe that that was a naturalistic study,

9  but I would have to go and check that source.  It's been

10  a couple of months since I've written this report.

11    Q.  Okay.  And explain to me again what a

12  naturalistic driving study is.

13    A.  That is typically where they observe -- well,

14  it's where they observe real drivers in a natural

15  environment.  They just add equipment to try to monitor

16  and measure driver behaviors.

17    Q.  Okay.

18    A.  So they might put cameras inside the vehicle,

19  other measurement devices.  Sometimes it's an eye

20  tracker.  Sometimes it's just a camera.  It can vary

21  from experiment to experiment.

22    Q.  Okay.  And that's different than, like, a

23  closed-course study; right?

24    A.  That's right.

25    Q.  And it's different than a simulator study.

CHRISTINE YAGER  - December 11, 2023

1      A.  Yes.

2      Q.  In naturalistic studies, they just rig up

3 people's cars and then just tell them to go drive

4 normally; right?

5      A.  Yes.  For a period of time, they observe.

6 Uh-huh.

7      Q.  How are naturalistic driving studies, as far as

8 their reliability or usefulness, how are they regarded

9 within the human factors community?

10      A.  They are regarded as -- as very reliable

11 because it's a driver in a nat- -- as natural of a state

12 as they can be if they weren't observing.  That's, you

13 know --

14      Q.  If they what?

15      A.  It's -- it's like trying to observe a driver in

16 their most natural state.  It's just -- obviously, there

17 is cameras present, so it might have an impact on a

18 person's behavior if they are aware that they are being

19 watched, but the idea with a naturalistic study is to

20 try to observe them in the most natural state possible.

21      Q.  And is it -- what's the, I guess, naturalistic

22 driving study, what's that called?

23      A.  Well, the biggest one that I'm aware of is

24 abbreviated SHRP2.  I don't know what that stands for.

25      Q.  Okay.

Appx_1710

CHRISTINE YAGER  - December 11, 2023

1        A.  It's just what it's -- sometimes abbreviations
2    are used and then that becomes the word and I don't
3    remember what it stood for.
4        Q.  And is that because SHRP2 is pretty --
5        A.  It's pretty widely -- widely cited.
6        Q.  And relied upon?
7        A.  Yes.
8        Q.  Okay.  Would it be fair to call SHRP2, like,
9    the gold standard for naturalistic driving studies?
10       A.  As far as I know, it's the most -- it's the
11   largest that's been done, to my knowledge.
12       Q.  And SHRP2, I think, is run out of Virginia
13   Tech; correct?
14       A.  I believe so.
15       Q.  Do you know, does anybody at Texas A&M -- does
16   anybody at TTI work with SHRP2 or the SHRP2 data?
17       A.  I believe so, but I am not familiar with who or
18   to what degree.
19       Q.  And is it -- is it correct, to your knowledge,
20   that SHRP2 -- the data is available not to anyone, but
21   to -- it's widely available?
22       A.  I actually don't know.
23       Q.  Okay.  Do you know how the -- in a naturalistic
24   driving study, how do they go from cameras turned on --
25   and there are instruments in the car, too; right?

Appx_1711

CHRISTINE YAGER  - December 11, 2023

1      A.  I believe so.

2      Q.  Like accelerometers and whatever the g-force

3 meter would be?

4      A.  I think so.  I don't know what all --

5      Q.  Okay.

6      A.  -- what all equipment is used in them.

7      Q.  Do you know how stuff goes from whatever -- raw

8 data is captured in a naturalistic driving study, do you

9 know what's done to it as far as processing?

10      A.  No.

11      Q.  Okay.  So going back to Footnote 2 and Gregory

12 Fitch's report, and you said that he found an increase

13 in the driver's crash risk by three times.

14           Do you note three times compared to what?

15      A.  To baseline.

16      Q.  And what would baseline be?

17      A.  I -- baseline would be a driver who is not

18 distracted, what their risk of crash is, because driving

19 a vehicle is not risk free.  It's -- has some inherent

20 risk to it.

21      Q.  Okay.

22      A.  Even if the driver is fully paying attention.

23      Q.  Let me give this to you.

24           MR. DuBOFF:  This will be marked as Exhibit

25 2.

CHRISTINE YAGER  - December 11, 2023

```
 1            (Yager Exhibit 2 marked)
 2      Q.  (BY MR. DuBOFF)  Mrs. Yager, is Exhibit 2 the
 3 study that you cited as Footnote 2 in your report?
 4      A.  Looks like it, yes.
 5      Q.  Okay.  And if you could turn to -- and just
 6 full disclosure, I've given you the executive -- if you
 7 look at the Table of Contents, I think you can tell from
 8 there -- let's see.
 9            So if you look at Roman numeral -- lower
10 case Roman numeral page xi, do you see that?
11      A.  You said H?
12      Q.  Lower case Roman numeral xi.
13      A.  Oh, no.
14      Q.  It's Table of Contents.
15      A.  Oh, sorry.  Yes.
16      Q.  Okay.
17      A.  I was looking in the Table of Contents.
18      Q.  Got you.  Yeah.  That's -- so what I have given
19 you in this act- -- in the physical exhibit that I've
20 given you is everything in the Roman numerals, so,
21 basically, the executive summary.
22      A.  Okay.
23      Q.  Okay?  Just so -- because I think the actual --
24 the full thing is 240-some-odd pages, and I had to fly
25 with all of this stuff.
```

CHRISTINE YAGER  - December 11, 2023

```
 1              So, if you could turn to page 25, lower
 2   case Roman numeral xxv.
 3        A.  (Witness complied.)
 4        Q.  Are you there?
 5        A.  Yeah.
 6        Q.  And do you see that there is a Table 1 on that
 7   page?
 8        A.  Yeah.
 9        Q.  And in the -- in the table, there is a row that
10   has the heading "Visual-Manual" and then next to it, the
11   ratio is 2.93.
12              Do you see that?
13        A.  Yes.
14        Q.  Is that 2.93 what you were citing in -- for
15   your report as increasing a driver's crash risk by three
16   times?
17        A.  Yes.
18        Q.  Okay.  Without looking elsewhere in the report,
19   the heading of that table is -- it says "SCE Risk."
20              Do you see that?
21        A.  Yes.
22        Q.  Do you know what "SCE" is?
23        A.  I do not.
24        Q.  Okay.  You would agree that Table 1 doesn't say
25   anything about crash risk; right?
```

ASSOCIATED COURT REPORTERS
(254) 753-3330

CHRISTINE YAGER  - December 11, 2023

1      A.  I don't see the word "crash."

2      Q.  Okay.  If you turn back to page xxiv, and there

3 is a bold heading that says "Objective 2", do you see

4 that?

5      A.  Yes.

6      Q.  And then the paragraph below, can you read the

7 second sentence in that paragraph below out loud?

8      A.  "An SCE was defined as a crash where contact

9 was made with another object."

10     Q.  Keep going.

11     A.  "A near-crash, where a crash was avoided by a

12 rapid evasive maneuver, or a crash-relevant conflict,

13 where a crash avoidance response was performed that was

14 less severe than a rapid evasive maneuver, but greater

15 in severity than a normal maneuver."

16     Q.  Okay.  Do you recall ever reviewing that

17 definition for SCE, which is the acronym for Safety

18 Critical Event?

19     A.  I -- I believe so now.

20     Q.  Okay.

21     A.  Again, abbreviations sometimes are overused.

22     Q.  Sure.

23          So if you turn back to page xxv of Exhibit

24 2, and that 2.93 number that you said is what the three

25 times figure in your report is based on, you would agree

**CHRISTINE YAGER  - December 11, 2023**

```
 1  that is a measurement for safety-critical event risk,

 2  not crash risk; correct?

 3       A.  Yes.

 4       Q.  Okay.  Do you know -- and this study was

 5  looking at how cell phone use affected drivers' safety;

 6  is that right?

 7       A.  Yes.  Calls and texting.

 8       Q.  And the -- what you said in your report is that

 9  dialing or texting on a cell phone increases a driver's

10  crash risk by three times; correct?

11               MR. WHITE:  Objection; form.

12               I think it says "like dialing or texting on

13  a cell phone."

14       Q.  (BY MR. DuBOFF)  Okay.

15       A.  Yes.

16       Q.  But you cited Exhibit 2 to support that

17  proposition; right?

18       A.  Yes.

19       Q.  And the only thing that this study is looking

20  at is dialing or texting on a cell phone; isn't that

21  right?

22       A.  That's what it says.  Yes.

23       Q.  Okay.  So would you agree -- you would agree

24  that this study did not find that doing those things

25  increased a driver's crash risk by three times; right?
```

CHRISTINE YAGER  - December 11, 2023

1      A.  It increased their safety-critical event --

2   their risk of a safety-critical event, which can include

3   crashes.

4              Now, what this figure does not specify is

5   how -- what percentage of the number that they're

6   reporting was an actual crash or a near crash or a

7   crash-relevant conflict.

8      Q.  Right.  And do you know what those numbers are?

9      A.  No, I don't.

10      Q.  So do you know how many crashes this study

11   actually captured?

12      A.  I don't.

13      Q.  So do you have any basis -- but you know that

14   safety-critical event includes more than just crashes.

15      A.  Yes.

16      Q.  But your report just says "crashes"; isn't that

17   right?

18      A.  That's what my report says.

19      Q.  Okay.  And you would agree that that -- so your

20   report does not accurately reflect what this study

21   found; is that right?

22      A.  It does not say exactly what this report says.

23      Q.  Well, do you have any -- and this -- but this

24   is the only authority that you cite for that

25   proposition; is that right?

Appx_1717

CHRISTINE YAGER  - December 11, 2023

1    A.  Yes.

2    Q.  Okay.

3    A.  For that --

4    Q.  Do you have any --

5    A.  -- sentence.

6    Q.  Sorry?

7    A.  For that sentence, yes.

8    Q.  Okay.  So do you know how many crashes were

9   captured by this report?

10    A.  I do not.

11    Q.  Okay.  Do you know if this report captured even

12   a single crash involving the use of a cell phone?

13    A.  I do not know how many, if any.

14    Q.  Okay.

15         MR. DuBOFF:  I'll have this marked as

16   Exhibit 3.

17         (Yager Exhibit 3 marked)

18    Q.  (BY MR. DuBOFF)  Mrs. Yager, do you see Exhibit

19   3 that's been put in front of you?

20    A.  Yes.

21    Q.  Okay.  And I'll represent to you that this is

22   Appendix A.8 from that same study from Gregory Fitch.

23   Okay?

24    A.  Okay.

25    Q.  And do you see there this -- the title is

Appx_1718

**CHRISTINE YAGER  - December 11, 2023**

1  "Characterization of Safety-Critical Events"?

2       A.  I see.

3       Q.  And can you read out what the total number of

4  safety-critical events was?

5       A.  413.

6       Q.  And how many of those were crashes?

7       A.  I see "conflict with a lead vehicle, 153."  So

8  that is considered a crash.

9            "Conflict with vehicle in adjacent lane",

10 an additional 74.

11           "Conflict with animal", which I would

12 consider a crash, 20.

13           "Conflict with vehicle turning across

14 another vehicle path", an additional 15.

15      Q.  Well, let me -- let me stop you real quick.

16           So you said your understanding is that

17 conflict with a lead vehicle would always be a crash?

18      A.  That is my understanding.

19      Q.  Okay.  But do you see that it says, in the row

20 for "conflict with a lead vehicle", it says total

21 safety-critical events are 153?

22      A.  Yes.

23      Q.  And then it says of those, three were crashes?

24      A.  I see.  So -- and, again, this is not my

25 research.  I'm trying to familiarize myself.

CHRISTINE YAGER  - December 11, 2023

1              So the first column is the total of what
2    they're classifying as safety-critical events, yes.  I
3    do see the "crashes" column.  So there were a total of
4    four crashes -- what they are considering crashes.
5         Q.  Okay.  And so looking at this, is it your
6    understanding that Mr. Fitch's study looked at a total
7    of 413 safety-critical events?
8         A.  Yes.
9         Q.  Of which only four of those were actually
10   crashes?
11        A.  Yes.
12        Q.  And 72 were near crashes?
13        A.  Yes.  And two were curb strikes.
14        Q.  Two were curb strikes.  And 264 were what were
15   termed "crash-relevant conflicts"; right?
16        A.  Yes.
17        Q.  Which you understand it to mean, there wasn't
18   actually a crash; right?
19        A.  Yes.
20        Q.  So would you agree that of all the
21   safety-critical events that were analyzed in this study,
22   less than 1 percent were actual crashes?
23        A.  I see that.
24        Q.  Okay.  But you cited this study as support
25   for -- that "visual and manual distractions, like

ASSOCIATED COURT REPORTERS
(254) 753-3330

**CHRISTINE YAGER  - December 11, 2023**

1  dialing or texting on a cell phone, increase a driver's

2  crash risk by three times"; right?

3      A.  Yes.  That's what my report says.

4      Q.  Okay.  Having had this opportunity to look at

5  the research, do you agree that this research does not

6  report -- does not support what's in your report?

7      A.  I would reword it, and I would say "increase a

8  driver's risk of crash or near crash by three times."

9      Q.  Well, you would actually have to say "crash or

10  near crash or crash-relevant conflicts"; right?

11      A.  Yes.

12      Q.  Okay.  But as it's written now, do you agree

13  that it's not accurate to say that this report found

14  that dialing or texting on a cell phone increases a

15  driver's crash risk by three times?

16      A.  I agree that this -- this source does not say

17  increase crash risk by three times.

18      Q.  Right.  So it doesn't support what you wrote in

19  your report; correct?

20      A.  That's correct.

21      Q.  Okay.  And do you have any -- this is the only

22  authority that you cited in your report.

23      A.  For that sentence, yes.

24      Q.  Right.  So for that sentence, the only thing

25  you cited doesn't actually support what you wrote.  Is

CHRISTINE YAGER  - December 11, 2023

1  that fair?

2       A.  That's correct.

3       Q.  And, again, do you know if this study recorded

4  even a single crash involving cell phone use?

5       A.  I don't know.

6       Q.  Okay.  So then if we move to the next sentence,

7  which is "texting and driving causes a driver to be

8  distracted in all three ways, (visual, manual, and

9  cognitive), which has been shown to increase crash risk

10 by 23 times."

11              Did I read that correctly?

12      A.  Yes.

13      Q.  And you only cite one thing -- one study to

14 support that sentence; correct?

15      A.  Yes.

16      Q.  And it's -- I think it's Rebecca Olson's

17 research from 2009?

18      A.  Yes.

19      Q.  And what kind of study was -- was that?

20      A.  Looking at commercial vehicle operation.

21      Q.  Do you know if it was simulator, closed course,

22 naturalistic?

23      A.  I don't know.

24      Q.  Okay.  Do you know how Ms. Olson came up with

25 the 23 times figure?

**CHRISTINE YAGER  - December 11, 2023**

 1      A.  I do not.

 2      Q.  Did you know when you wrote your report?

 3      A.  No.  This -- this quote, or this statistic, is

 4  commonly cited as 23 times crash risk.  So I do not

 5  know.  I just found the source of where it came from,

 6  but I didn't read her full study.

 7      Q.  Okay.  So -- so is it fair to say that this

 8  sentence is not your opinion as an expert?  It's just

 9  you repeating what --

10      A.  What others have said, yes.

11      Q.  -- what others have said?  Okay.

12                MR. DuBOFF:  And this will be Exhibit 4.

13                (Yager Exhibit 4 marked)

14      Q.  (BY MR. DuBOFF)  Okay.  Mrs. Yager, is -- well,

15  do you know if Exhibit 4 is the research that you cited

16  as Footnote 3 in your expert report?

17      A.  Yes.

18      Q.  Okay.  And I'm pretty sure the same deal as

19  with Exhibit 3, I included the executive summary.  Does

20  that look -- look about right?

21      A.  Yes.

22      Q.  If you turn to Roman numeral page xviii -- oh,

23  no.  Never mind.  Sorry.  If you turn to Roman numeral

24  page xxi.

25                Do you see Table 3 on page xxi --

CHRISTINE YAGER  - December 11, 2023

1    A.  Yes.

2    Q.  -- of Exhibit 4?

3    A.  Yes.

4    Q.  And there is a -- there is a row that's -- that

5  has the heading "text message on cell phone."

6         Do you see that?

7    A.  Yes.

8    Q.  And then an odds ratio of 23.24.  Do you see

9  that?

10    A.  I do.

11    Q.  Is that the 23 times figure that you are

12  referencing in your expert report?

13    A.  Yes.

14    Q.  Do you think you even went into this report to

15  pull that number, or did you just take it from what

16  other people had said?

17    A.  I believe I took it from the National Highway

18  Traffic Safety Administration, which quotes this study.

19  So for this section, I was writing the background on the

20  dangers of distraction and what it is, and so I went to

21  those information pages that I mentioned where they

22  might have said this and then at the bottom provided the

23  source, and then I just went to that and added that

24  directly, instead of only linking to the information

25  page.

Appx_1724

CHRISTINE YAGER  - December 11, 2023

```
 1      Q.  Okay.  Unfortunately, at trial, I can't
 2  cross-examine the National Highway Safety
 3  Administration, so I need to ask you about -- about the
 4  information.
 5      A.  I understand.
 6      Q.  But is it your understanding -- so you did not
 7  look at this report when drafting -- sorry.  You did not
 8  look at this study when drafting your expert report, but
 9  is it your understanding that 23.24 number is what other
10  people have cited to support the claim that texting and
11  driving increases crash risk by 23 times?
12      A.  Yes.
13      Q.  And if you look at the title of Table 3 on page
14  xxi of Exhibit 4, it says "Odds Ratios and 95%
15  Confidence Intervals to Assess Likelihood of a
16  Safety-Critical Event while Engaging in Tertiary Tasks
17  for All Events."
18              Did I read that correctly?
19      A.  Yes.
20      Q.  And so we have that same term, "safety-critical
21  event"; right?
22      A.  I see that.
23      Q.  Now, if you go -- if you turn to page xvii of
24  the Exhibit 4.
25      A.  (Witness complied.)
```

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  And do you see that there is a section heading,

2  "Driver Distraction in CMV Safety-Critical Events"?

3    A.  Yes.

4    Q.  And then the second sentence there, can you

5  read that second sentence in full?

6    A.  "These events are defined as crashes,

7  near-crashes, crash-relevant conflicts, in parenthesis,

8  (less severe near-crashes), and unintentional lane

9  deviations."

10    Q.  So would you agree that in this study as well,

11  when they're looking at risk, they're not just looking

12  at the risk of a crash.  They're looking at the risk of

13  crashes, near crashes, crash-relevant conflicts, or

14  unintentional lane deviations?

15    A.  Yes.  That's what they mean.

16    Q.  And that's what that 23.24 number is based on;

17  correct?

18    A.  Yes.

19    Q.  So this report did not find that somebody is 23

20  times more likely to get in a crash if they text message

21  while driving; is that right?

22         MR. WHITE:  Objection; form.

23    A.  If you're going literally based on the

24  definition of crash, yes.

25         Now, I think the purpose behind these

Appx_1726

CHRISTINE YAGER  - December 11, 2023

1  statistics is -- and the reason why it's so widely

2  quoted as "crash risk" is because a near crash or an

3  unintentional lane deviation, those are still events

4  that could very well lead to a crash.

5            And so I think the term "crash risk" is

6  meant to be more broad and -- and is meant to be a more

7  broad term than defined as the actual risk of a crash.

8       Q.  (BY MR. DuBOFF)  Okay.  But I asked you before

9  what you meant by crash was a collision; right?

10      A.  Yes.  And after reviewing this, I would -- I

11  would alter that.

12      Q.  Okay.  So you agree that as written, the

13  statement in your report that texting and driving has

14  been shown to increase crash risk by 23 times is not

15  supported by this study; correct?

16      A.  I would -- I would agree that it's not being as

17  clear by using the word "crash risk."  I think that that

18  needs more specificity to it.  It's -- I would actually

19  just remove the word "crash" and just say "which has

20  been shown to increase risk by 23 times."

21      Q.  Okay.  So -- but do you agree that as written,

22  it's not accurate?

23      A.  I agree.

24      Q.  If you turn -- still in Exhibit 4.  I want to,

25  I guess, close the loop on this.  If you turn to page

CHRISTINE YAGER  - December 11, 2023

1  xviii on Exhibit 4, and do you see Table 1?

2      A.  Yes.

3      Q.  And Table 1 of the events that were analyzed in

4  this study, the safety-critical events, they looked at

5  4,452; correct?

6      A.  Yes.

7      Q.  And of those, only 21 were actually crashes.

8      A.  Yes.

9      Q.  So the -- of the data that was available to

10 these researchers, would you agree that one half of 1

11 percent actually involved crashes?

12     A.  Yes.  However, a significant number were risky

13 situations, so, you know, this is informative for me to

14 just use more careful language when writing future

15 reports, if there is an opportunity, and I think I would

16 edit this now to say "increased risk by 23 times."

17     Q.  Okay.

18     A.  Because a driver does not want to experience a

19 near crash.  We don't want to see people having

20 unintended lane -- you know, lane deviations or

21 near-crash events.  We want people to be driving safely

22 and paying attention, not having these safety-critical

23 events.

24     Q.  I -- I totally agree, but you also agree that

25 there is a huge difference between getting in a crash

CHRISTINE YAGER  - December 11, 2023

1  and getting in a crash-relevant conflict?

2            MR. WHITE:  Objection; form.

3      A.  Huge difference?  No.

4      Q.  (BY MR. DuBOFF)  Excuse me?

5      A.  Huge difference, no.

6      Q.  Which one would you rather be involved in?

7      A.  Well, I wouldn't want to be involved in any of

8  them.

9      Q.  If you had to choose.

10     A.  A crash -- an actual crash certainly does more

11 damage.

12     Q.  Well, it's the only thing that does damage;

13 right?

14     A.  Not necessarily.  An unintentional lane

15 deviation could damage the vehicle but not the people.

16     Q.  But if you hit something, it would then be

17 considered a crash; right?

18     A.  Yes.

19     Q.  Okay.  So just an unintentional lane -- I'm not

20 saying it's a good thing, but there is a big difference

21 between getting in a crash and having an unintentional

22 lane deviation; right?

23     A.  There is a difference.

24     Q.  If you look at page xviii, in the, sort of,

25 middle paragraph, and in the middle of that paragraph,

ASSOCIATED COURT REPORTERS
(254) 753-3330

Appx_1729

CHRISTINE YAGER  - December 11, 2023

```
 1  there is a sentence that says -- that starts "First, and
 2  perhaps most importantly"; do you see that?
 3      A.  Yes.
 4      Q.  Okay.  And it says, "First, and perhaps most
 5  importantly, the percentages in Table 1 include any task
 6  that was present within the 6-second interval;
 7  oftentimes, the task was driving-related, such as
 8  checking the side mirror."
 9              Do you know what that reference to the
10  6-second interval is?
11      A.  I would assume that it is the 6 seconds prior
12  to what they're observing as a safety-critical event,
13  but I am not sure if that's accurate.
14      Q.  Okay.  Do you know within this area of human
15  factors research, is there an established or accepted
16  time frame in which you look at events surrounding a
17  safety-critical event?
18      A.  I'm not sure if there's a standardized window
19  of time, but it -- it would make more sense to have a
20  closer window of time, but I don't know what -- I don't
21  know if there is a standardized time or not.  It
22  probably varies from study to study.
23      Q.  Okay.
24              MR. DuBOFF:  Let me have this marked as
25  Exhibit 5.
```

**CHRISTINE YAGER  - December 11, 2023**

1              (Yager Exhibit 5 marked)

2      Q.  (BY MR. DuBOFF)  Okay.  Mrs. Yager, do you

3  recognize Exhibit 5?

4      A.  I see SHRP2.

5      Q.  Okay.  And -- sorry.  It's a little bit blurry.

6  But it looks like Strategic Highway Research Program?

7      A.  That's what it seems, yes.

8      Q.  Okay.  Do you recognize that logo as, sort of,

9  the -- what you see with SHRP2 --

10     A.  Yes.

11     Q.  -- publications?

12     A.  Yes.

13     Q.  Okay.  And then if you turn -- and this is

14  admittedly an excerpt -- but if you turn to the next

15  page, which is page 42 of this publication, under the

16  heading, 4.2, "Distracting Activities"; do you see that?

17     A.  Yes.

18     Q.  Okay.  And can you read the second sentence in

19  that paragraph out loud?

20     A.  "In accordance with the SHRP2 data dictionary,

21  distracting activities were coded if present within the

22  6-second time window, including 5 seconds before and 1

23  second after the precipitating event (or a random point

24  for the baselines)."

25     Q.  Do you know if -- let me ask you this:  SHRP2

Appx_1731

**CHRISTINE YAGER  - December 11, 2023**

1   just collects a lot of data from its drivers; correct?

2        A.  I believe so, yes.

3        Q.  And then there are researchers on the back end

4   that apply coding to those different events, is that

5   your understanding?

6        A.  Yes.  And then there are additional researchers

7   that use that data to report on various aspects that

8   they're researching.

9        Q.  And SHRP2 makes its database, sort of, open to

10  other researchers, not necessarily the public; right?

11       A.  Again, I don't know.

12       Q.  Okay.  But is it your understanding, at least,

13  that if I had access, I could go into the SHRP2 database

14  and I could filter by every time there was a crash or a

15  near crash that was coded as involving a cell phone

16  distraction?

17       A.  I don't know.

18       Q.  Okay.  Have you -- prior to this, were you

19  aware -- or do you know what the SHRP2 data dictionary

20  is?

21       A.  No.

22       Q.  Prior to this, were you aware of the fact that

23  in SHRP2, distracting activities are coded from 5

24  seconds before a precipitating event until 1 second

25  after?

CHRISTINE YAGER  - December 11, 2023

1    A.  No.

2    Q.  But would you agree that for the Olson study

3  that you cited as Footnote 3, that would be consistent

4  with the 6-second interval that's used in that Olson

5  study?

6    A.  Well, they're both 6 seconds.  I would imagine

7  so, but without reading that in Olson's study and her

8  saying the same thing, I can't confirm that.

9    Q.  Okay.

10        MR. DuBOFF:  This will be Exhibit 6.

11        (Yager Exhibit 6 marked)

12    Q.  (BY MR. DuBOFF)  Okay.  Mrs. Yager, do you

13  recognize Exhibit 6?

14    A.  I do not.

15    Q.  Okay.  The -- the title of the document is

16  "Researcher Dictionary for Safety Critical Event Video

17  Reduction Data."

18        Do you see that?

19    A.  I do.

20    Q.  Okay.  And full disclosure, this is -- again, I

21  think this is, like, the first 22 pages of that data

22  dictionary, but if you turn to page 4.

23    A.  Okay.

24    Q.  And do you see the heading, "Related Reading"?

25    A.  Yes.

Appx_1733

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  Okay.  Or -- I'm sorry.  Let's start at page 3.

2  Under "Introduction & Contents", do you see where it

3  says, "The following data dictionary has been adapted

4  for use in the SHRP2 Naturalistic Driving Study"?

5    A.  Yes.

6    Q.  And then the last -- or a few sentences down,

7  it says, "This data dictionary describes the video

8  reduction variables available in the SHRP2 Naturalistic

9  Driving Study dataset for use by the research

10  community."

11             Do you see that?

12    A.  I do.

13    Q.  And if you turn to page 16 of Exhibit 6 --

14    A.  Okay.

15    Q.  -- and the variable -- under variable -- the

16  variable name column, there is a variable called

17  "Secondary Task 1, 2, 3, 4."

18             Do you see that?

19    A.  I do.

20    Q.  Okay.  And can you read that first sentence

21  under the "variable definition"?

22    A.  "Observable driver engagement in any of the

23  listed secondary tasks beginning at any point during the

24  5 seconds prior to the Precipitating Event Time

25  (conflict begin, Variable 2) through the end of the

**CHRISTINE YAGER  - December 11, 2023**

```
 1  conflict (conflict end)."
 2      Q.  Okay.  So looking at this, is it your
 3  understanding that the SHRP2 data is coded so that
 4  secondary tasks -- let me back up.
 5           A secondary task in your field would be
 6  something other than driving; correct?
 7      A.  Correct.
 8      Q.  Okay.  And is it your understanding that SHRP2
 9  codes certain events as whether or not they involved a
10  secondary task?
11      A.  Yes.
12      Q.  And after looking -- you've never seen this
13  before; correct?
14      A.  I have not.
15      Q.  Okay.  But I just -- you tell me if you're
16  reading it the same way as I am, which is that for
17  something -- in SHRP2 for something to be considered a
18  secondary task, it would have to be an observable driver
19  engagement beginning at any point during the 5 seconds
20  prior to a precipitating event.
21           Do you see that?
22      A.  Yes.  I see that how they are -- you know,
23  that's their range that they are looking at.  I see
24  that.
25      Q.  Okay.  And so, presumably, if there was a
```

Appx_1735

CHRISTINE YAGER  - December 11, 2023

1  secondary task that ended more than 5 seconds before the

2  precipitating event, it would not be considered a

3  secondary task, at least according to SHRP2?

4      A.  According to SHRP2; correct.

5              MR. WHITE:  Greg, we've been going about an

6  hour and a half.  Do you want to take a break, a short

7  one?

8              MR. DuBOFF:  Yeah.  Totally.

9              THE INTERPRETER:  Off the record at 11:21

10  A.M.

11              (SHORT RECESS)

12      Q.  (BY MR. DuBOFF)  Mrs. Yager -- oh, I'm sorry.

13              THE VIDEOGRAPHER:  Okay.  Back on the

14  record at 11:31 A.M.

15      Q.  (BY MR. DuBOFF)  Mrs. Yager, I apologize if I

16  already asked this, but just to close the loop on this,

17  for the study that you've cited to support your claim

18  that texting and driving increases crash risk by 23

19  times, do you know if that report captured even a single

20  crash involving texting and driving?

21      A.  I do not know.

22              But going back to that, it captured 21

23  crashes, but I don't know the types of crashes or the

24  causes of the crashes.

25      Q.  Moving on --

CHRISTINE YAGER  - December 11, 2023

1      A.  That's on Exhibit 4.

2      Q.  Moving on through your report, the next line is

3  "a driver" -- and this is on page 3 of Exhibit 1, where

4  you write, "A driver is four times more likely to crash

5  when using a cell phone while driving, regardless of

6  whether it's handheld or hands-free."

7              Do you see that?

8      A.  Yes, I do.

9      Q.  And you cite -- for that, you cite a report

10  published by the National Safety Council; is that right?

11      A.  Yes.

12      Q.  Is it your understanding -- the National Safety

13  Council is an advocacy organization; right?

14      A.  Yes.

15      Q.  Okay.  They're not objective researchers.

16  Would you agree with that?

17              MR. WHITE:  Objection; form.

18      A.  I don't know.

19      Q.  (BY MR. DuBOFF)  Okay.  But you cite them for

20  the claim that using a cell phone while driving, whether

21  it's handsheld -- handheld or hands free increases crash

22  risk by four times; is that right?

23      A.  That's what I quoted, yes.

24      Q.  Okay.  Did you -- did you actually look at the

25  report that you linked to?

Appx_1737

**CHRISTINE YAGER  - December 11, 2023**

1  A.  I believe I looked at that page.

2  Q.  Do --

3  A.  Do you have that printed out?

4  Q.  I don't think I do.

5  A.  Okay.

6  Q.  Do you recall if -- whether that report itself

7  cited any research?

8  A.  I don't recall.

9  Q.  If it did, do you recall looking at any

10 research that might have been cited?

11 A.  No.  Again, this is another one that's commonly

12 reported in my field.

13 Q.  Okay.  If you could pull up Exhibit 2 again.

14 A.  (Witness complied.)

15 Q.  And just to orient us, Exhibit 2 is the report

16 that you cited a footnote to of your report; correct?

17 A.  Yes.

18 Q.  Okay.  And if you can turn to page xxiv of that

19 report.

20 A.  Okay.

21 Q.  And under the heading "Objective 2:

22 Investigate SCE Risk Associated with Cell Phone Use"; do

23 you see that?

24 A.  Yes.

25 Q.  And then if you go down about two thirds of the

**CHRISTINE YAGER  - December 11, 2023**

1  way, do you see a sentence that says -- begins with

2  "Talking on a cell phone"?

3       A.  Yes.

4       Q.  Okay.  Can you read that sentence out loud.

5       A.  "Talking on a cell phone was not associated

6  with an increased safety-critical event risk -- SCE risk

7  for any of the cell phone types."

8       Q.  Okay.  And then do you see the sentence that

9  begins, "Pure PHF and IHF cell phone use"?

10      A.  Yes.

11      Q.  Can you read that as well as?

12      A.  "Pure PHF and IHF cell phone use -- where VM

13 HA" -- sorry -- "HH cell phone subtasks are excluded --

14 were not associated with an increased SCE risk."

15      Q.  Okay.  So would you agree that this other study

16 that you cited in your report, it found that there

17 wasn't actually any increased safety risk from just

18 talking on a cell phone?

19           MR. WHITE:  Objection; form.

20      A.  I agree that that's what -- yeah.  Exhibit 2

21 did not -- they did not find an increased --

22      Q.  (BY MR. DuBOFF)  Okay.

23      A.  -- SCE risk.

24      Q.  And then if you go to pull up Exhibit 4, and

25 this is the authority that you've cited in Footnote 3 of

**CHRISTINE YAGER  - December 11, 2023**

1  your expert report, and if you look at page xxii of that

2  report.

3      A.   Okay.

4      Q.   And can you just read the first three sentences

5  of the middle paragraph?

6      A.   "An interesting finding from the analyses was

7  the result for cell phone use.  As indicated, reaching

8  for or dialing a cell phone was indicated to be a

9  high-risk task.  However, talking or listening on a

10 handheld phone was found to have an odds ratio that was

11 not significantly different than 1.0.  Thus, it did not

12 elevate the likelihood of being involved in a

13 safety-critical event."

14     Q.   And go one more sentence.  Sorry.

15     A.   "Furthermore, talking or listening on a

16 hands-free phone (defined as the driver talking into a

17 headset when it was apparent he or she was not talking

18 to a passenger) provided a significant protective effect

19 (OR 0.4), as did Citizens Band or (CB) radio use,

20 (0.6.)"

21     Q.   Okay.  So you would agree that the conclusion

22 from this study was that talking or listening on a

23 handheld phone was not found to have a negative impact

24 on safety.

25              MR. WHITE:  Objection; form.

**ASSOCIATED COURT REPORTERS**
**(254) 753-3330**

Appx_1740

**CHRISTINE YAGER  - December 11, 2023**

1      A.  Yes.  That's what the study found.

2      Q.  (BY MR. DuBOFF)  And it actually found that

3  talking or listening on a hands-free phone made drivers

4  safer than they would be just driving.

5      A.  That is what they say.

6      Q.  Okay.  So --

7      A.  I will say that is not consistent with other

8  research.

9      Q.  You cited these two papers; right?

10      A.  Yes.

11      Q.  So are these papers --

12      A.  But not that part.

13      Q.  Well, do you just get to pick and choose which

14  part of the papers -- which conclusions you like from

15  the study?

16          MR. WHITE:  Objection; form.

17      A.  It's not about liking.  It's not about picking

18  and choosing what I like or don't like.  It's -- it's

19  reporting the findings.

20      Q.  (BY MR. DuBOFF)  Would you agree that the

21  studies that you've cited for Footnotes 2 and 3 are --

22  the conclusions of those studies is contradictory to

23  what you cite for Footnote 4?

24          MR. WHITE:  Objection; form.

25      A.  Yes.  Regarding talking on a cell phone, that

**CHRISTINE YAGER  - December 11, 2023**

1  is contradictory.  Cit- -- Citations Numbers 2 and 3, I

2  was looking for supporting the risk of using texting

3  while driving or visual-manual tasks.

4       Q.  (BY MR. DuBOFF)  I understand.  But they --

5  it's just one study; right?

6       A.  It's just one study.

7       Q.  For each of these is one study; right?

8       A.  Yes.

9       Q.  Okay.  So they used the same methodology to

10  evaluate the risk of texting while driving as they did

11  to evaluate the risk of talking on the cell phone while

12  driving; correct?

13              MR. WHITE:  Objection; form.  I'm not sure

14  she knows what the methodology of these are.

15       A.  It looks like they did.

16       Q.  (BY MR. DuBOFF)  Okay.  It would be kind of

17  weird to do anything else in the human factors study;

18  right?

19              MR. WHITE:  Objection; form.

20       A.  It's up to the researcher.  I don't know.

21       Q.  (BY MR. DuBOFF)  Typically when you're looking

22  at a number of variables or outputs, you try to keep as

23  much constant as possible; right?

24       A.  Yes.

25       Q.  Okay.  And so is it your understanding that for

**CHRISTINE YAGER  - December 11, 2023**

 1  the study cited in Footnotes 2 and 3, they evaluated the

 2  safety impact of talking on a cell phone, using the same

 3  methodology that they used to evaluate the safety impact

 4  of texting?

 5      A.  Yes.

 6      Q.  Okay.  And you relied on that methodology and

 7  those findings when it came to texting; correct?

 8      A.  Yes.

 9      Q.  But are you saying that you disagree with those

10  findings when it comes to talking on a cell phone?

11      A.  I do.  There have been other studies that have

12  looked at texting, as well as talking, that have found

13  that there is increased risk with all of those

14  behaviors, not just texting.

15      Q.  But you don't cite any of those studies in your

16  report; correct?

17      A.  Not in this study.  Because the focus of this

18  case was related to texting, not talking on a cell phone

19  or dialing.

20      Q.  Okay.  But you agree that the studies that

21  you've cited for Footnotes 2 and 3 contradict the claim

22  that you make in the sentence, "A driver is four times

23  more likely to crash when using a cell phone while

24  driving, regardless of whether it's handheld or

25  hands-free."

**CHRISTINE YAGER  - December 11, 2023**

1    A.  It does contradict that.

2          For example, there have been studies on

3  novice drivers that when a novice driver has peer

4  passengers in the vehicle, that increases their crash

5  risk.  And -- whereas, this study said it would have a

6  protective effect.  So there is inherent contradiction

7  within the field of research, and you have to look at

8  the preponderance of the evidence to come to

9  conclusions.

10    Q.  If we go to your -- what -- in your report

11  where it says "Expert Opinions", then the first one is

12  "Effects of Texting While Driving."  It is on page 3 of

13  Exhibit 1?

14    A.  Yes.

15    Q.  Okay.  You say, "Texting while driving includes

16  all three forms of distractions, visual, manual, and

17  cognitive, and is, therefore, considered the most

18  dangerous type of distracted driving."

19          Do you see that?

20    A.  Yes.

21    Q.  Okay.  Compared to what other distractions are

22  you saying it's the most dangerous?

23    A.  What I meant by that is, there are degrees of

24  distracting activities.  So I would agree that a -- just

25  having a conversation with passengers in your vehicle is

CHRISTINE YAGER  - December 11, 2023

1  less distracting than if you were looking and manually

2  texting on a cell phone, because at least in the case of

3  talking to other passengers, ideally your eyes are on

4  the road, your hands are on the wheel.  It's just you're

5  cognitively distracted.

6              So there have been lots of studies done to

7  try to look at all of these different types of secondary

8  tasks and trying to measure how risky they are or what

9  effect it has on a driver's ability.

10     Q.  Right.  So what I'm trying to understand is

11  when you say "texting is the most dangerous type of

12  distracted driving", what is the basis for that opinion?

13     A.  The studies that have looked at -- so, my

14  research, as well as other research, that -- has found

15  that texting typically involves visual, manual, and

16  cognitive distractions.  So when you start to combine

17  all the types of those distractions, it -- it increases

18  the risk to the driver.  The more distracted they are,

19  the higher the risk.

20     Q.  Okay.  And so just trying to clarify, it's not

21  your claim that texting while driving is the most

22  dangerous thing someone can do while driving; is that

23  right?

24     A.  That is not my claim.

25     Q.  Okay.  What you're saying is that because

CHRISTINE YAGER  - December 11, 2023

 1  texting involves visual, manual, and cognitive, the

 2  potential -- it sort of invokes all three areas of

 3  possible distraction; is that right?

 4      A.  Yes.

 5      Q.  Okay.  So you're not saying that texting while

 6  driving is more dangerous than drunk driving; right?

 7      A.  I -- that's not what I said.  I said texting

 8  while driving is considered the most dangerous type of

 9  distracted driving --

10      Q.  Okay.

11      A.  -- not the most dangerous thing you could do

12  while driving.

13      Q.  Okay.  And another form of distracted driving

14  would, like, be having a physical alter- -- altercation

15  with a passenger; right?

16      A.  That could be, yes.  And it's anything not

17  related to driving is a distraction.

18      Q.  And you're not saying texting is more dangerous

19  than that.

20      A.  Well, I think it's on a case-by-case basis --

21      Q.  Sure.

22      A.  -- what the activity is.

23      Q.  But no -- no study has said, We've looked at

24  everything that could possibly distract a driver, and

25  texting is the worst.

**CHRISTINE YAGER  - December 11, 2023**

1    A.  That's correct.  Because that would be

2  impossible.  There is so many things that a driver could

3  be doing.  There is no way to develop a study for

4  that.

5    Q.  That's -- that's why --

6    A.  So we have to look at study -- research studies

7  have had to look at common activities, and texting while

8  driving is a common activity.

9    Q.  Okay.

10    A.  I mean, you could come up with, you know, a

11  driver having a fight and there is a bee in the car and,

12  you know, I mean, that's like --

13    Q.  Right.  Well, I was -- that's why I was trying

14  to confirm -- the language here struck me as pretty

15  categorical, so that's why I was just trying to nail

16  that down, but that's helpful.

17        The next bullet is:  "Texting while driving

18  has been shown to increase crash risks by 23 times the

19  normal risk."

20        And we've already discussed that; right?

21    A.  Right.  I would edit -- edit that to say

22  "increased risk by 23 times the normal risk."

23    Q.  Okay.  Because to say "crash risk" is not

24  accurate.

25    A.  Correct.  It's not specific enough.

CHRISTINE YAGER  - December 11, 2023

```
1        Q.  And then the next bullet -- and this is on page
2   4 -- "Visual-manual subtasks (like dialing or texting on
3   a cell phone) increase the crash risk by three times."
4             We've discussed that as well; correct?
5        A.  Correct.
6        Q.  And the same thing as with your last answer.
7   You agree that that is not accurate as it relates to
8   crash risk?
9        A.  Correct.  I would edit to say "risk."
10       Q.  Okay.  And this might be a better question for
11  Jacob, which I will do later, but are you intending to
12  offer testimony about the total number of lives lost
13  from driver distraction?
14       A.  Yes.
15       Q.  Okay.  You would agree that that has -- that is
16  not an opinion tied to the facts of this case; correct?
17       A.  That's not an opinion.
18            Is that -- did I misunderstand your
19  question?
20       Q.  Okay.  Nothing in that bullet utilizes or
21  applies any expert methodology to the facts of this
22  case; correct?
23       A.  I don't understand your question.  I'm sorry.
24       Q.  Do you agree that's just a general statement?
25       A.  I'd say it's a statistic reporting crash data.
```

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  And in coming up with what you've written under

2  that bullet, you did not consider any of the facts of

3  this case.

4    A.  To write that bullet, I did not consider the

5  facts of this case.

6    Q.  Okay.  And then the next bullet is:  "Texting

7  while driving doubles a driver's reaction time, impairs

8  their ability to maintain the speed limit and lane

9  position, and significantly reduces the number of

10  glances to the forward roadway."

11              Did I read that correctly?

12    A.  Yes.

13    Q.  And for that proposition, you cite your

14  research from 2012; correct?

15    A.  Yes.

16    Q.  And that's the only authority that you cite for

17  that proposition; correct?

18    A.  Yes.

19    Q.  Would you agree that the language you used in

20  your report is unqualified?

21              MR. WHITE:  Objection; form.

22    A.  I don't agree.

23    Q.  (BY MR. DuBOFF)  Okay.  It's a pointblank --

24  your opinion, pointblank, is that texting while driving

25  will double a driver's reaction time; correct?

CHRISTINE YAGER  - December 11, 2023

1    A.  Yes.  You've asked if it's -- if I think that's

2  unqualified.  I think it's qualified by the research

3  that I did.

4    Q.  And I -- maybe I didn't mean it like that.

5  Sorry.  It's a categorical statement.

6    A.  What does that mean?

7    Q.  You don't say anything like "depending on

8  certain factors", you don't say "in certain situations",

9  you don't say "on average."  You just say, "Texting

10  while driving doubles a driver's reaction time."

11    A.  Right.  The study was looking at reading and

12  writing text-based messages, so --

13    Q.  Is it --

14    A.  -- texting while driving.

15    Q.  Is it your testimony that every driver's

16  reaction time will double if they are texting while

17  driving?

18    A.  That's too broad of a question.  There is no

19  way to know what every single driver would experience in

20  every situation.

21         You know, I looked at my research, my

22  experience -- or my experiment, and that is the result

23  that we found.

24    Q.  Okay.

25    A.  Is for all of our drivers in our experiment,

CHRISTINE YAGER  - December 11, 2023

1  their reaction time was doubled.

2      Q.  Maybe this is a better way for me to phrase it.

3  Would you agree that the statement there is generalized?

4      A.  Yes.

5      Q.  Okay.  Do you agree that the effect of texting

6  on a driver's reaction time will depend on the context?

7      A.  Ask that again.

8      Q.  Do you agree that the effect of texting on a

9  driver's reaction time will depend on the context?

10      A.  Yes.

11      Q.  It will depend on what they are writing?

12      A.  No.  I don't think it depends on what they're

13  writing.  I think it might depend on the context of any

14  number of factors.

15      Q.  Do you think it would depend on the length of

16  what they're writing?

17      A.  It could.

18      Q.  Okay.  Okay.  And your 2012 paper that you cite

19  did find a, roughly, two times' increase in reaction

20  time when reading or writing text messages; is that

21  right?

22      A.  That's right.

23      Q.  Would you agree that that -- that testing was

24  done in a very specific testing environment?

25      A.  It was in a closed-course environment for the

**CHRISTINE YAGER  - December 11, 2023**

```
 1  safety of the participants --
 2        Q.  Okay.
 3        A.  -- and researchers in the vehicle.
 4        Q.  Do you acknowledge that the findings from your
 5  2012 study are an outlier in the human factors
 6  literature?
 7        A.  No.
 8        Q.  Are you aware of any other study that has found
 9  100 percent increase in reaction time from text
10  messaging?
11        A.  No.
12        Q.  And doubling would be 100 percent increase;
13  right?
14        A.  But I'm not aware of others looking at reaction
15  time.
16        Q.  So you -- as far as you know, you're the only
17  one that's looked at the effect of text messaging on
18  reaction time?
19        A.  In -- in the way that we did, and our -- this
20  study was the first one to use a closed-course
21  experiment.  Prior to that, it was a driving simulator
22  that had looked at reaction time.
23        Q.  Okay.
24        A.  And I didn't cite that because, again, I was
25  just stating my research, not...
```

**CHRISTINE YAGER  - December 11, 2023**

 1    Q.  And do you think that your study is more
 2  reliable because it was on a closed course?
 3    A.  Yes.  I think as you get closer to a
 4  naturalistic or even, you know, just natural driving,
 5  that is going to be more accurate.  Not that driving
 6  simulators are worthless.  They definitely have their
 7  purpose.  You know, it's just about when you're
 8  designing an experiment, how much you need to control
 9  and what variables you're testing, and there is a number
10  of factors in setting up a research experiment.
11    Q.  Isn't it true that human factors researchers
12  have -- have compared results between simulators and
13  closed-course and naturalistic driving studies?
14    A.  Probably, but I'm not aware of anything where
15  they've looked at all of that.
16    Q.  Okay.  Is there -- are simulator studies
17  discounted in the human factors community as being less
18  reliable than on a closed course?
19    A.  No, they're not.
20    Q.  In some ways a simulator can be more realistic
21  than a closed course; right?
22            MR. WHITE:  Objection; form.
23    A.  I -- I wouldn't -- yeah.  I'm not really able
24  to answer that.  Again, it -- it's -- when a researcher
25  is trying to design an experiment, it's -- they're --

CHRISTINE YAGER  - December 11, 2023

 1  it's just so dependent on the goal of the researcher,

 2  what they're hypothesizing, to determine what is the

 3  best methodology to use.

 4           So -- and a driving simulator environment

 5  is highly controlled.  The participant is guaranteed to

 6  be safe because they're not operating an actual vehicle.

 7  But that's less realistic, and so a driver is known to

 8  not behave as naturally as they would be if they were

 9  operating a vehicle.

10           So a closed-course study is a little bit

11  more of a step in the natural direction.  Naturalistic

12  driving is -- is a step further.

13           MR. DuBOFF:  I think this will be 7.

14           (Yager Exhibit 7 marked)

15      Q.  (BY MR. DuBOFF)  Mrs. Yager, is Exhibit 7 a --

16  a research study -- a report of a research study that

17  you did?

18      A.  A paper on the research study, yes.

19      Q.  And this is the report that's cited in your

20  expert -- or, sorry.  This is the paper that's cited in

21  your expert report as Footnote 6; correct?

22      A.  Yes.

23      Q.  And this is the one that you cite on page 4 of

24  your expert report as supporting the proposition that

25  texting while driving doubles a driver's reaction time?

CHRISTINE YAGER  - December 11, 2023

1      A.  Yes.

2      Q.  Okay.  The top part -- so, on page 1 of Exhibit

3  7, that would be called the abstract; right?

4      A.  Yes.

5      Q.  And in the abstract, you wrote, summarizing

6  this research, "When reading or writing text-based

7  messages, drivers exhibited reductions in reaction time

8  that were nearly twice as great as previously thought";

9  is that right?

10     A.  Yes.

11     Q.  And that's a -- you would agree that's a pretty

12  dramatic increase?

13     A.  Yes.

14     Q.  Okay.  And so -- and, at least, what I take

15  from that sentence is that it was -- the -- the increase

16  in reaction time was twice as large as anything that any

17  other study had found; is that right?

18     A.  Yes.

19     Q.  Or nearly twice as large.

20     A.  Uh-huh.

21     Q.  And is it your testimony that these results

22  have been confirmed by subsequent studies, you don't

23  know, or they haven't been contradicted by subsequent

24  studies?

25     A.  I don't know.

CHRISTINE YAGER  - December 11, 2023

1    Q.  Okay.

2    A.  The study that is cited in the second one that

3  I did -- that I cited, Source Number 6, Footnote Number

4  6, that also found that driver reaction times were

5  doubled.

6    Q.  Okay.  Well, this is Footnote Number 6, I'm

7  pretty sure.  You -- Footnote Number 5?

8    A.  Yes.  I'm sorry.

9    Q.  No problem.

10    A.  I got the wrong -- Footnote Number 5.

11    Q.  Okay.  So can you cite any other study that has

12  found anything near a two times increase -- well, let

13  me -- let me back up.

14         Your study -- as to the subjects of your

15  study, you found that their reaction times while texting

16  were twice as long as their reaction times while just

17  driving.

18    A.  Yes.

19    Q.  Okay.  And that effect that you found was twice

20  as long as anything that previous research had found?

21    A.  Well, it says nearly twice as great as

22  previously thought.

23    Q.  Okay.  We just have -- there are a couple of

24  "twice as big" in there, so I just want to clarify.

25         Have you -- are you aware of any studies

ASSOCIATED COURT REPORTERS
(254) 753-3330

**CHRISTINE YAGER  - December 11, 2023**

 1  that have found anything near a doubling in reaction

 2  time as a result of text messaging?

 3       A.  Not to my knowledge.  Now, at the time of this

 4  study, the only prior research had been using a driving

 5  simulator, which, again, is less realistic.

 6       Q.  Okay.  Have you done research to see if later

 7  studies have either been consistent or inconsistent with

 8  what we're looking at here as Exhibit 7?

 9       A.  No.  Not -- not since.

10       Q.  Okay.  So to the extent you offer an opinion,

11  you agree that your opinion in your report is just based

12  on this, right, as far as the doubling of reaction time?

13       A.  Yes.

14       Q.  Okay.  But you can't tell me if anything that's

15  happened since 2012 has changed that.

16       A.  Well, 2013 was when the voice-to-text one was

17  done that confirmed that -- found the same thing.

18       Q.  Okay.  So can you tell me if anything since

19  2013 has confirmed or refuted --

20       A.  No.

21       Q.  -- these findings?

22       A.  I'm not aware either way.

23       Q.  Okay.  Would you agree that within the human

24  factors field, it is not an accepted practice just to

25  take an outlier study and present it as definitive on

Appx_1757

**CHRISTINE YAGER  - December 11, 2023**

1  the issue being researched?

2           MR. WHITE:  Objection; form.

3      A.  Repeat that, please.

4      Q.  (BY MR. DuBOFF)  Sure.  So in your report, you

5  say, "Texting while driving doubles a driver's reaction

6  time"; right?

7      A.  Yes.

8      Q.  That is based on Exhibit 7; correct?

9      A.  Yes.

10     Q.  That's the only source you cite for that

11  bullet.

12     A.  Yes.

13     Q.  But you agree with me that those results are an

14  outlier in the human factors literature; correct?

15           MR. WHITE:  Objection; form.

16     A.  I don't agree.  How would you define "outlier"?

17     Q.  (BY MR. DuBOFF)  Well, I mean, I'd rather not

18  quibble about that.  You would agree with me that

19  that -- that opinion that texting while driving doubles

20  a driver's reaction time, from a quantitative

21  perspective, is more than twice of what any other

22  research has found; correct?  Nearly twice of what any

23  other research has found?

24     A.  Up to that point, yes.

25     Q.  Okay.  And you don't --

CHRISTINE YAGER  - December 11, 2023

1          A.  But since then, I don't know.

2          Q.  So while I'm at it, but you -- but you

3  presented in your expert report as a definitive

4  statement about the effects of texting on reaction time;

5  correct?

6          A.  I presented what my research found.

7          Q.  Well, you didn't -- you didn't say, "My

8  research found."  You just say, "Texting while driving

9  doubles a driver's reaction time."

10         A.  But I cited my research.  So you're right.  I

11  didn't say the words "my research found."

12         Q.  Okay.  Are you -- are you offering an opinion

13  that your research can be applied to the facts of this

14  case?

15         A.  Yes.

16         Q.  Okay.  And that you're offering an opinion that

17  that doubling in reaction time can be applied to the

18  facts of this case.

19         A.  Yes.

20         Q.  Okay.  But you're just basing that on one

21  study; right?

22         A.  Two studies.

23         Q.  Okay.  Two studies from 2012 and 2013.

24         A.  Yes.

25         Q.  You acknowledge that those studies found a much

CHRISTINE YAGER  - December 11, 2023

1  larger impact on reaction time than any other studies

2  that preceded them?

3       A.  In a driving simulator context, yes.

4       Q.  And you don't know if subsequent research is

5  consistent with those findings or not.

6       A.  That's correct.

7       Q.  And so what I'm asking is, in the human factors

8  field, is it -- is it an accepted practice to take

9  findings like those, from your research in 2012 and

10  2013, and just apply those findings to a real-world

11  event?

12       A.  Again --

13             MR. WHITE:  Objection; form.

14       A.  -- you're trying to say that -- you're trying

15  to basically ask, are these two studies outliers, and

16  that's what I can't -- I can't say yes or no.  I don't

17  know if other studies subsequently have been done to

18  confirm or -- or deny these results.

19       Q.  (BY MR. DuBOFF)  Okay.  If you turn to page

20  2200 of Exhibit 7.

21       A.  Okay.

22       Q.  Do you see the paragraph that starts, "Like all

23  research"?

24       A.  Yes.

25       Q.  Okay.  Can you read that first sentence?

**CHRISTINE YAGER  - December 11, 2023**

1   A.  "Like all research, the specific design

2  features of this experiment should be carefully

3  considered when assessing the real-world

4  generalizability of our findings."

5   Q.  Okay.  And is it fair to say that you have, in

6  fact, generalized these findings to apply them to the

7  facts of this case?

8   A.  Yes.

9   Q.  Okay.  And did you consider the specific design

10  features of this experiment before doing so?

11   A.  Yes.

12   Q.  Based on your understanding of what Ms. Smith

13  was doing on the road, was it anything like what the

14  drivers were doing in your study?

15   A.  Potentially.

16   Q.  Okay.  The drivers in your study -- in this

17  study were told to continuously type out a fairy tale on

18  their phones; correct?

19   A.  Yes.  Or read messages that they received on

20  their phone.

21   Q.  So to -- to write a fairy tale or to read a

22  fairy tale?

23   A.  Yes.

24   Q.  So in that -- if they were writing, how long

25  were they continuously writing for?

Appx_1761

CHRISTINE YAGER  - December 11, 2023

1      A.  It varied from participant to participant.

2      Q.  You told them to only send -- they only sent

3  the text message four times; right?

4      A.  I believe so.

5      Q.  Okay.  And the amount of time they would drive

6  between sending text messages was, like, a mile; right?

7      A.  I believe so.

8      Q.  Okay.  And they were driving, like, 30 miles an

9  hour?

10      A.  Yes.

11      Q.  Okay.  So that would be, they a sent a text

12  message every two minutes; right?

13      A.  Yes.

14      Q.  And they were told to type on their phones the

15  entire time, for that two minutes; right?

16      A.  Yes.

17      Q.  Okay.  Do you think that's anything like most

18  people type text messages while they're driving?

19      A.  It could be for some.

20      Q.  To write non-stop for two minutes straight?

21      A.  Some people may.

22      Q.  Okay.  But you don't know -- do you have any

23  opinion on whether that's common at all?

24      A.  I don't know --

25      Q.  Okay.

**CHRISTINE YAGER  - December 11, 2023**

1    A.  -- how common that is.

2    Q.  You have no reason to think that Ms. Smith was

3  typing a fairy tale for two minutes at a time while

4  driving; correct?

5              MR. WHITE:  Objection; form.

6    A.  Correct.  She was not -- I don't believe she

7  was typing a fairy tale for two minutes at a time.

8    Q.  (BY MR. DuBOFF)  And you've reviewed her text

9  messages; right?

10    A.  Yes.

11    Q.  Okay.  I don't -- were any of them even

12  multi-sentence?

13    A.  I don't recall.  I'd have to review the

14  evidence.

15    Q.  Most of them were very short, you would agree

16  with that?

17              MR. WHITE:  Objection; form.

18    A.  What do you mean by "very short"?

19    Q.  (BY MR. DuBOFF)  A sentence or less?

20    A.  Again, I'd have to review.  I don't know if

21  hers were -- if any were more than a sentence.

22    Q.  But is -- is it your recollection, from

23  reviewing the evidence, that most of the text messages,

24  if not all, were about a sentence or shorter?

25    A.  Yes.  Approximately.

**ASSOCIATED COURT REPORTERS**
**(254) 753-3330**

Appx_1763

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  Okay.  So much shorter in length than what
2  somebody would type out if they were typing for two
3  minutes straight.
4    A.  Yes.
5    Q.  In your 2012 study -- so Exhibit 7, you cite a
6  2009 study by Frank Drews; is that right?
7    A.  Yes.
8    Q.  And Mr. Drews also studied the impact of text
9  messaging on driver performance and response time; is
10 that right?
11   A.  In a driving simulator.
12   Q.  Okay.  Are you giving the opinion that a
13 driving simulator study is inherently less reliable than
14 on a closed course?
15   A.  It's less realistic.
16   Q.  Okay.  How so?
17   A.  Because a driving simulator is not an actual
18 vehicle.  It's just a very experimental environment
19 compared to an automobile.
20   Q.  Okay.  But the surroundings can be made to be
21 more realistic than on a closed course; right?
22   A.  No.  I would disagree with that.
23   Q.  Your closed course was just a runway; right?
24   A.  Yes.  But it looks like a roadway.
25   Q.  I know it looks like a road, but are there

**CHRISTINE YAGER  - December 11, 2023**

1  buildings?

2       A.  In that area, no.  It was -- at the time it was

3  rural.

4       Q.  Are there pedestrians?

5       A.  No.  Not in this experiment.

6       Q.  Are there other cars?

7       A.  No.

8       Q.  Okay.  All those things you can do in a

9  simulator; right?

10      A.  Simulated pedestrian, simulated vehicles, and

11 simulated buildings.

12      Q.  Yes.

13      A.  It looks like a video game.

14      Q.  Right.  Do you recall -- in the Drews study

15 that you've cited, do you recall what the texting task

16 was for those subjects?

17      A.  No.

18      Q.  Okay.

19           MR. DuBOFF:  This will be 8, I think.

20           (Yager Exhibit 8 marked)

21      Q.  (BY MR. DuBOFF)  Mrs. Yager, is Exhibit 8 the

22 Drews study that is cited in your 2012 paper?

23      A.  Yes.

24      Q.  Okay.

25      A.  Although, actually some of the authors are

CHRISTINE YAGER  - December 11, 2023

1  missing, based on that citation.  So it may be a

2  different -- different paper.

3       Q.  Who is missing?

4       A.  Yazdani, H. Yazdani.

5       Q.  So that -- that's not on the cover, but it is

6  on --

7       A.  Okay.

8       Q.  It is on --

9       A.  I see now.

10      Q.  -- the header.

11           So do you think this is the paper that's

12  cited in your --

13      A.  Yes.  It looks like it.

14      Q.  Okay.  If you turn to page 4 of Exhibit 8,

15  under "Procedure."

16      A.  Okay.

17      Q.  Do you see in the second sentence that the task

18  that was given to the subjects of that study "consisted

19  of exchanging text messages with the goal to plan an

20  evening activity together"?

21      A.  Yes.

22      Q.  Do you agree that that is a far more realistic

23  way of using text messaging than what was analyzed in

24  your study?

25           MR. WHITE:  Objection; form.

ASSOCIATED COURT REPORTERS
(254) 753-3330

**CHRISTINE YAGER  - December 11, 2023**

1      A.  It's more realistic.

2      Q.  (BY MR. DuBOFF)  Okay.

3      A.  More natural.

4      Q.  Do you know people that have -- have you ever

5  texted with people while driving about evening plans?

6      A.  No.

7      Q.  Okay.  Have you ever texted with anyone,

8  written fairy tales to anyone while driving?

9      A.  No.

10      Q.  Okay.  If you look at page 5 of Exhibit 8, and

11  there is a Table 1.

12      A.  Yes.  I see.

13      Q.  Okay.  And if we're talking about reaction

14  time, it would be under the variable "brake onset time."

15  Do you agree with that?

16              MR. WHITE:  Objection; form.

17      A.  I don't know.

18      Q.  (BY MR. DuBOFF)  Okay.  Well, if you look under

19  just in the left column, "brake onset time"?

20      A.  I'm reading that.

21      Q.  Okay.

22      A.  Yes, I see.

23      Q.  So do you agree that "brake onset time" is --

24      A.  -- how they measure --

25      Q.  -- equivalent to what you termed "reaction

**CHRISTINE YAGER  - December 11, 2023**

1  time" in your study?

2      A.  I see that that's how these researchers

3  measured reaction time.

4      Q.  Okay.

5      A.  We did it in a different way in our experiment.

6      Q.  But at least with the way they did it, they

7  found that text messaging made drivers 0.2 seconds

8  slower in responding; right?

9      A.  0.2.  Yes.  Yes.  I see that.

10      Q.  Okay.  And then if you look in Table 1, it

11  says, "Means and Standard Deviation of Driving

12  Performance for Each Experimental Condition."

13          Do you see that?

14      A.  Yes.

15      Q.  Okay.  And then under "brake onset time", it

16  says "ms", which -- do you understand that to mean

17  milliseconds?

18      A.  Yes.

19      Q.  And so the difference between the control

20  condition and the text messaging condition was 881

21  milliseconds versus 1,077 milliseconds?

22      A.  Yes.  I see that.

23      Q.  And that's about equal to .2 seconds; right?

24      A.  Yes.

25      Q.  You also see that the standard deviation --

CHRISTINE YAGER  - December 11, 2023

1  would you agree that from this study, the standard

2  deviation -- or excuse me -- the two means are within

3  one standard deviation of another -- one another?

4      A.  Yes.

5      Q.  Okay.  And what does that mean in statistics

6  when --

7      A.  I am not a statistics expert.

8      Q.  Okay.  Judging by the standard -- the standard

9  deviation for the text messaging condition was 380

10 milliseconds; right?

11     A.  I don't believe that the unit -- I don't think

12 that's in milliseconds.

13     Q.  Why not?

14     A.  I -- I don't know.

15     Q.  Okay.

16     A.  I don't know if the standard deviation has a

17 unit.

18     Q.  Well, it has to be the same unit as what you're

19 measuring; right?

20     A.  Okay.

21     Q.  Yes?

22         MR. WHITE:  Objection.  I think it has the

23 unit in the table, so I think it speaks for itself.

24         MR. DuBOFF:  Right.  Milliseconds.

25         MR. WHITE:  It just says "M", doesn't it?

**CHRISTINE YAGER  - December 11, 2023**

1              THE WITNESS:  Well, you said within one --

2    you asked if the standard deviation is within one what

3    of the other?

4         Q.  (BY MR. DuBOFF)  So the -- the mean brake onset

5    time --

6         A.  Yes.

7         Q.  -- right, for texting was 1,077 milliseconds.

8         A.  Yes.

9         Q.  And the standard deviation for that measurement

10   was 380 milliseconds; right?

11        A.  I see it.

12        Q.  Okay.  And if you subtract 380 from 1,077, it's

13   actually a lower number than 881, isn't it?

14        A.  Yes.

15        Q.  Okay.

16        A.  But if you subtract 349 from 881.

17        Q.  Okay.  Would it be -- is it your understanding

18   of these results that some people who are sending text

19   messages, their response times were lower than some

20   people who were not sending text messages?

21        A.  Yes, from these results.

22        Q.  Okay.  And that's consistent with the results

23   of your study; correct?

24        A.  Ask that again.

25        Q.  Did some of the people in your study respond

CHRISTINE YAGER  - December 11, 2023

1  faster to the light when they were text messaging than

2  other people responded when they were not text

3  messaging?

4      A.  I would have to review the data --

5      Q.  Okay.  But you can't --

6      A.  -- from my -- my experiment.

7      Q.  You can't say one way or the other if that's

8  true or not?

9      A.  Right.  I would have to review.  We didn't

10 record it in this same fashion.

11     Q.  Would you agree that some of the increase in

12 reaction time between the Drews study and your study is

13 based on the kind of text messaging that you were asking

14 the drivers to do?

15     A.  Potentially.

16     Q.  Okay.  How much?

17     A.  I can't quantify that.

18     Q.  Okay.  But yet -- so some of that -- some of

19 that increase, some of that doubling of reaction time,

20 you would agree, was likely due to the fact that they

21 were asked to text out a fairy tale continuously; right?

22     A.  I said potentially.

23     Q.  Okay.  But you don't know.

24     A.  It could be the difference in it being a

25 driving simulator versus an actual vehicle.  There is no

ASSOCIATED COURT REPORTERS
(254) 753-3330

Appx_1771

CHRISTINE YAGER  - December 11, 2023

1  way to quantify that.

2      Q.  Is it your opinion that texting while driving

3  always doubles a driver's reaction time?

4      A.  I -- I think it depends on so many factors.

5      Q.  Okay.

6      A.  So, again, as we said, it is -- it is use

7  caution to generalize --

8      Q.  Right.

9      A.  -- for everybody.

10     Q.  So it -- it's not accurate to say, as a

11  categorical matter, that any driver who is texting will

12  have a twice as long reaction time.

13     A.  It would not be accurate to say that every

14  single driver experiences a double reaction time when

15  texting, but it has the potential to, based on our

16  findings.

17     Q.  Has the potential to if you are asked to

18  continuously text out a fairy tale.

19     A.  Or read --

20     Q.  Or read a fairy tale.

21     A.  -- electronic messages, yes.

22     Q.  Okay.  But you didn't text -- you didn't test

23  anyone who was sending text messages in a more everyday

24  manner.

25     A.  That's correct.  That -- this study was not

CHRISTINE YAGER  - December 11, 2023

1  looking at -- at more conversational-type text messages.

2  We were trying to isolate the variables of purely

3  reading and purely writing text-based messages.

4      Q.  So what you were texting [sic] was essentially

5  how -- the impact on someone's reaction time if they are

6  forced to commit their full attention to the task of

7  reading or writing a text message.

8      A.  Well, we weren't asking them to commit their

9  full attention because they were operating an

10  instrument, a vehicle, but we were asking them to

11  continuously write or continuously read in the

12  experiment.

13      Q.  Okay.  And is there a reason why you chose to

14  only rely on your study in your expert report and not

15  reference the Drews study?

16      A.  Well, I'm just most familiar with my research

17  instead of others.

18      Q.  Are you familiar with the study by Dana Monzer

19  that was published in 2022?

20      A.  No.

21      Q.  Have you heard of Dana Monzer?

22      A.  No.

23          MR. DuBOFF:  Okay.  I think this will be 9.

24          (Yager Exhibit 9 marked)

25      Q.  (BY MR. DuBOFF)  Okay.  Just give me one

CHRISTINE YAGER  - December 11, 2023

1  second.  Sorry.
2              Okay.  Mrs. Yager, do you see in the first
3  sentence of the abstract where it says, "The aim of this
4  study was to analyze the performance and attentional
5  effects of sending voice messages while driving as
6  compared to calling and texting"?
7      A.  Yes.
8      Q.  Okay.  And this was published in the journal,
9  "Applied Ergonomics."  Do you see that?
10      A.  Yes.
11      Q.  And would you agree that "Applied Ergonomics"
12  is the leading human factors academic journal?
13      A.  It's one of them, yes.
14      Q.  And if you turn to, sort of, the end of page 3.
15              So this was a high-fidelity simulator
16  study; right?  Can you see that?
17      A.  Yes.
18      Q.  And then do you see on page 3 at the end, it
19  says that the text messaging in this study involved
20  people being sent, I think, pretty simple math problems,
21  that they had to respond with the correct answer?
22      A.  Where on page 3 are you looking?
23      Q.  At the very end, "Before starting any of these
24  three scenarios."
25      A.  Yes.

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  Okay.  And if you look at Table 1, do you see

2  that the four scenarios that were being tested were a

3  control scenario, one where the subjects were texting,

4  one where they were sending voice messages, and one

5  where they were calling?

6    A.  Yeah.

7    Q.  Okay.  And then on page 5, under "results",

8  paragraph 3.1 is "driving performance results."

9        Do you see that?

10   A.  I do.

11   Q.  Okay.  And under paragraph 3.1.2 "reaction

12  time", it says, "There was no significant effect of the

13  scenario on the reaction times of the participants to

14  respond to the red light."

15       Do you see that?

16   A.  I do.

17   Q.  Okay.  And then just one sentence down, it

18  says, "There was no significant effect of the scenario

19  on the reaction times of the participants to respond to

20  the crossing pedestrians."

21       Do you see that?

22   A.  Yes.

23   Q.  And then, "There was no significant effect of

24  the scenario on the reaction times of the participants

25  to respond to the stopping car."

CHRISTINE YAGER  - December 11, 2023

1          Do you see that?

2     A.  Yes.

3     Q.  Okay.  Would you agree that these results are

4  inconsistent with the results of your study on the

5  effect of texting on reaction time?

6          MR. WHITE:  Objection; form.

7     A.  I wouldn't use the word "inconsistent."  I

8  would say "different."  They used a different way of

9  measuring reaction time than how our experiment did.

10          I think it's more difficult to operate an

11  actual vehicle than it is to drive a driving simulator,

12  and so it's difficult to com- -- we're not comparing

13  apples to apples, in other words.

14     Q.  Okay.

15     A.  When you use the phrase "reaction time", it's

16  just measured and set up differently in these

17  experiments.

18     Q.  But people in the human factors field do

19  high-fidelity simulator studies all the time; right?

20          MR. WHITE:  Objection; form.

21     A.  They do simulator studies but in different

22  ways.  Like this -- the way they measured reaction time

23  is different than the 2005 Drews one.

24     Q.  (BY MR. DuBOFF)  In what sense?

25     A.  Well, they did brake onset.  This one is -- was

**CHRISTINE YAGER  - December 11, 2023**

1    measuring to, what, a pedestrian and a crossing vehicle?

2        Q.  And the red light?

3        A.  A red light where?

4        Q.  In the stopping vehicle.

5        A.  Like a red -- like a signal -- signalized

6    intersection?

7        Q.  Correct.

8        A.  Okay.

9        Q.  So I'm just -- I'm a little bit confused

10   because you seem to be drawing a really sharp

11   distinction between a closed-course study and a

12   simulator study.

13            Are you offering the opinion that in the

14   human factors field, one of those results from one kind

15   of study are prioritized over the other?

16       A.  Not prioritized.  Just one is more -- in a more

17   realistic environment than the other.  There's --

18   there's pros and cons with each type of these

19   experimental designs.

20            So, yeah, in a driving simulator, they can

21   simulate a roadway and pedestrians and intersections and

22   other vehicles, but it -- it's just inherently different

23   for the driver's experience to be in that context versus

24   operating an actual vehicle.

25            So in a closed course, as you mentioned

**CHRISTINE YAGER  - December 11, 2023**

1  earlier, there were no surrounding vehicles or buildings

2  or pedestrians, again, for the safety of all of the

3  people and the participants and the researchers, but,

4  you know, then there is naturalistic studies, where it

5  is people in natural environments driving around real,

6  you know, situations.

7              And so there's just limitations with any of

8  these experimental designs, so to say that -- it's not

9  about prioritizing.  It is about, again, trying to

10 conduct research and going with what the preponderance

11 of the evidence shows.

12     Q.  Okay.  It is not the case that closed-course

13 studies are viewed as more reliable than simulator

14 studies; is that correct?

15     A.  I would not say that they're more reliable or

16 less reliable.

17     Q.  Okay.  You have to look at each study; right?

18     A.  Yes.

19     Q.  Okay.  And you said the preponderance of the

20 evidence; right?

21     A.  Yes.

22     Q.  Okay.  But your expert report only cites one

23 study to say that texting doubles reaction time.

24              Is it your claim that the preponderance of

25 the evidence in the human factors field supports that

CHRISTINE YAGER  - December 11, 2023

1  opinion?

2      A.  No.  That's not my claim.

3      Q.  Okay.  You can't say if the results of your

4  study are viewed as accurate within the human factors

5  field, can you?

6              MR. WHITE:  Objection; form.

7      A.  That's correct.  More research would need to be

8  done to confirm these results.

9      Q.  (BY MR. DuBOFF)  Okay.  And can you say if a

10  human factors researcher would rely on your result to

11  offer the conclusion and the opinion that texting while

12  driving doubles reaction time?

13              MR. WHITE:  Objection; form.

14      A.  I -- I would say that they would -- they could

15  cite this research and say that it has been shown.

16      Q.  (BY MR. DuBOFF)  But it would not -- it would

17  not be -- it would not be accurate for a human factors

18  researcher to say that, as a categorical matter, sending

19  text messages doubles the driver's reaction time.

20      A.  Again, we advise caution on generalizing any

21  research result.  So, generalizing these research

22  results, use caution.

23      Q.  Would you agree with me that it would not be

24  consistent with the established practices in the human

25  factors field to take your study and your study alone

CHRISTINE YAGER  - December 11, 2023

1  and to use that as the basis for a conclusion that text

2  messaging doubles a driver's reaction time?

3          MR. WHITE:  Objection; form.

4      A.  I would agree that more than one source should

5  be considered.

6      Q.  (BY MR. DuBOFF)  But you did not use more than

7  one source for your expert report; is that correct?

8          MR. WHITE:  Objection; form.

9      A.  I did use multiple sources, but not for that

10  statement.

11     Q.  (BY MR. DuBOFF)  Would you agree that --

12     A.  So, for example, in their finding, it says, you

13  know, "Some of the limitations of the experiment are

14  related to the instruments used to collect the data and

15  the scenarios and traffic events used in the

16  experimental design."

17          Farther down, it says, "Moreover, the

18  arithmetic tasks used in this experiment, while a good

19  stand-in for the cognitive load present when texting,

20  calling, or voice messaging, are not realistic and do

21  not contain any of the emotional components that could

22  be present in real life."

23          So, again, it's -- it's -- each experiment

24  has to be evaluated before applying it generally.

25     Q.  Okay.  Would you agree that before a human

CHRISTINE YAGER  - December 11, 2023

1  factors expert should offer the opinion that texting

2  doubles a driver's reaction time, they should look at

3  and cite more than a single study which found an effect

4  that was more than twice the effect found in any other

5  study?

6          MR. WHITE:  Objection; form.

7      A.  Yes.  I agree that it's better to look at more

8  than one source.  I did not -- and, again, I'm not aware

9  of any -- any other studies conducted on a closed course

10  since the two studies that I did.

11          So, again, it's difficult to say

12  apples-to-apples when they are just very different

13  designs.

14      Q.  (BY MR. DuBOFF)  But what we're doing here is

15  we're trying to -- what you want to do is present an

16  opinion to the jury; correct?

17      A.  Yes.

18      Q.  Okay.  And, obviously, that opinion only

19  matters if it can be applied to the facts of this case;

20  right?

21      A.  Yes.

22      Q.  Okay.  And so in -- based on your report, what

23  I understand from your report is that what you want to

24  tell the jury is that sending a text message, while

25  driving, doubles a driver's reaction time.

Appx_1781

**CHRISTINE YAGER  - December 11, 2023**

1    A.  Yes.  But that my -- my research has found that

2  it has doubled -- it doubled a driver's reaction time.

3    Q.  Okay.  You're adding a lot of caveats there;

4  right?

5              MR. WHITE:  Objection; form.

6    Q.  (BY MR. DuBOFF)  "My research has found", it's

7  not in your report, is it?

8    A.  I did not say the words "my research" --

9    Q.  Okay.

10    A.  -- but I cited my research.

11    Q.  So let me ask you this:  If you were just to

12  say to the jury, "sending text messages while driving

13  doubles a driver's reaction time", do you think that

14  statement standing alone is supported by the human

15  factors literature?

16              MR. WHITE:  Objection; form.

17    A.  I believe that it would -- it would need to be

18  more broad, like, "There have been several studies that

19  have shown just texting and driving to be dangerous or

20  inherently risky, and they have found that to vary in

21  degrees."

22    Q.  Okay.

23    A.  So my research has found that it doubled

24  reaction time.  Other research has found that it had --

25  had other risky results.

CHRISTINE YAGER  - December 11, 2023

```
 1      Q.  So it's -- I, kind of, need an answer to my
 2   question.  I appreciate your response.  But if you were
 3   to, on the witness stand, just tell the jury just this
 4   statement, "Texting while driving doubles a driver's
 5   reaction time, is that an accurate statement based on
 6   what the human factors research shows or is that an
 7   inaccurate statement?
 8      A.  Accurate based on what my research shows.
 9      Q.  Okay.  Is that -- is that statement
10   representative of the preponderance of the evidence in
11   the human factors field?
12               MR. WHITE:  Objection; asked and answered.
13      A.  I would say, no, given how you worded the
14   question.  But, again, you have to look at all of the
15   studies and how they are uniquely designed in order
16   to -- you're asking a very broad question that is
17   comprised of many differently set up experiments and
18   research studies.
19      Q.  (BY MR. DuBOFF)  Okay.  Looking at Exhibit 1 on
20   page 4, so the last -- the bolded bullet there, "Texting
21   while driving is a very dangerous behavior that can be
22   fatal to the driver and others on the roadway."
23               Does the term -- is the term "very
24   dangerous" one that has an established meaning in the
25   human factors field?
```

CHRISTINE YAGER  - December 11, 2023

1      A.  Ask that again, please.

2      Q.  Is the term "very dangerous" something that has

3  an established meaning in the human factors field?

4      A.  I would say no.  That's just my expert opinion

5  based on my years of experience and knowledge about this

6  topic.

7      Q.  Okay.  But -- there is a difference between

8  giving a quantifiable doubles and triples, whatever,

9  versus just very dangerous.

10          Is there any study that just says "texting

11  while driving is, quote, very dangerous"?

12     A.  I would have to search to find if other studies

13  say that, but it is very common knowledge that texting

14  while driving is dangerous, as evidenced by so many

15  traffic safety organizations and state DOTs that try to

16  make the public aware of this behavior and how risky it

17  is.

18     Q.  Okay.

19     A.  I don't think it's a stretch for me to use

20  that -- those words, "very dangerous."

21     Q.  Well, I understand generally we don't -- we

22  don't use experts to tell the jury things that they

23  already know or that the expert is not necessarily in a

24  better position than they are, so that's why I was

25  asking if there's a study -- is that a term that's used

**CHRISTINE YAGER  - December 11, 2023**

1  in the human factors field, and I think your answer was

2  "no"; correct?

3      A.  Correct.

4      Q.  Okay.  And then if we go to the next sub -- or

5  next heading, which is "Effects of Voice-to-Text", do

6  you see that?

7      A.  Yes.

8      Q.  Sorry.  This is on Exhibit 1.

9          That first bullet, you're just relating the

10  facts as you understand them; correct?

11      A.  Yes.

12      Q.  Okay.  And then the next main bullet is about

13  the research that you did comparing voice-to-text

14  messaging versus the manual typing of text messages;

15  correct?

16      A.  Yes.  The results of my study.

17      Q.  Okay.

18      A.  Uh-huh.

19      Q.  And you, again, say there that the research

20  found that the effect on reaction time was that reaction

21  time doubled when using voice-to-text or when manually

22  texting"; is that right?

23      A.  That's right.

24      Q.  Okay.  Can you explain how that study worked?

25      A.  So we had a -- a baseline condition and a

**CHRISTINE YAGER  - December 11, 2023**

1  manual texting condition and then two voice-to-text

2  conditions.  One of the voice-to-text apps that was

3  tested was Siri, and then the other one was Vlingo.

4              And so we had participants drive an

5  instrumented vehicle on a closed course, and we

6  measured -- we had an eye tracker, and we measured their

7  reaction time.

8              In that one, I believe it was more

9  conversational type of text messages that they were

10  asked to send and receive, and so we just measured

11  their -- their eye tracking and their response, their

12  reaction time and how long it took them to complete

13  those tasks in the different scenarios.

14     Q.  How did you measure reaction time?

15     A.  I believe we used a light mounted above the

16  drivers, like -- like right where the windshield meets

17  the vehicle ceiling.

18     Q.  Okay.

19     A.  And they were supposed to push a button when

20  they noticed that it was illuminated.

21     Q.  And how often would that become illuminated?

22     A.  I don't recall the exact specifics --

23     Q.  Okay.

24     A.  -- this long after.

25     Q.  Ballpark.

CHRISTINE YAGER  - December 11, 2023

```
 1        A.  I believe it was set to randomly turn on.
 2                  Did you ask how long it would stay
 3   illuminated?
 4        Q.  No.  But I'm -- sure, tell me that.
 5        A.  I mean, again, I'd have to check the details,
 6   but it probably remained on for at least 5 seconds, but
 7   I would have to --
 8        Q.  Okay.
 9        A.  -- go back and check those details.
10        Q.  But the gist of it is -- so would each of the
11   subjects in your study complete this course four times?
12        A.  Yes.
13        Q.  So they would do one time through the course,
14   doing nothing but driving; right?
15        A.  Yes.
16        Q.  And then one time through the course, typing
17   out text messages?
18        A.  Yes.
19        Q.  And this is using 2013 technology; correct?
20        A.  I believe this was done in 2012.
21        Q.  Okay.
22        A.  Just the -- you know, it takes awhile to
23   publish.
24        Q.  Sure.  And then they would do one run through
25   the course, using Siri?
```

CHRISTINE YAGER  - December 11, 2023

1    A.  Yes.

2    Q.  Was it -- was Siri -- could Siri at that point

3 actually send messages for you or could it just convert

4 your speech to text?

5    A.  I think at that time it was just converting

6 speech to text.  Also, the vehicle that we used was

7 not -- it didn't have a Bluetooth capability; so, you

8 know, it couldn't connect in that way.

9    Q.  Okay.  And then the fourth -- the fourth

10 condition was using, is it V- --

11    A.  Vlingo.

12    Q.  Vlingo, V-L-I-N-G-O.

13          Did every driver do those in the same

14 order, those four runs?

15    A.  I don't recall if we varied the order or not.

16    Q.  What was your role in the study?

17    A.  I was the principal investigator.

18    Q.  So what does that mean?

19    A.  The -- the lead of the project.

20    Q.  Did you design it?

21    A.  Yes.

22    Q.  Did you have anybody working under you?

23    A.  Yes.

24    Q.  Who worked under you?

25    A.  Undergraduate student workers.  I also

Appx_1788

CHRISTINE YAGER  - December 11, 2023

1  consulted with my -- with my boss at the time.

2       Q.  Who was that?

3       A.  I believe it was Sue Chrysler.

4       Q.  Who was responsible for -- so I assume somebody

5  pushes a button in the car.  That measures the response

6  time.  That got spit out to some spreadsheet?

7       A.  No.  I believe the light was programmed to turn

8  on randomly, and it would remain on for X number of

9  seconds.  I don't know the exact number.  And it would

10 remain on until the driver pressed a button, which if

11 they pressed the button -- and so if they noticed the

12 light and they pressed the button, it would turn the

13 light off.  If they failed to notice the light and never

14 pushed the button, it would remain on for X number of

15 seconds and then turn off until the next time it

16 illuminated.

17      Q.  So assuming they pushed the button to turn the

18 light off, how was that response time captured?

19      A.  From the time between the light turned on and

20 the time they pushed the button.

21      Q.  And then did you have to watch the video to see

22 when they clicked it, or was that automated?

23      A.  I think it was automated in -- into a

24 spreadsheet.

25      Q.  Did you -- were you the one who worked with

CHRISTINE YAGER  - December 11, 2023

1  those spreadsheets?

2       A.  I believe my student workers.

3       Q.  Okay.  But you were supervising them?

4       A.  Yes.

5       Q.  Would you have been the one to give them

6  instructions on anything they were doing?

7       A.  Yes.

8       Q.  Okay.

9             MR. DuBOFF:  Okay.  So this will be -- is

10  it 10?  I believe so.

11             (Yager Exhibit 10 marked)

12       Q.  (BY MR. DuBOFF)  Mrs. Yager, is Exhibit 10 the

13  article that was published in 2013, based on your

14  research comparing voice-to-text to manual text

15  messaging while driving?

16       A.  Yes.

17       Q.  And this is the paper that is Footnote 5 in

18  your expert report in this case; is that right?

19       A.  Yes.

20       Q.  Okay.  If you look at page 1871 --

21       A.  Yes.

22       Q.  -- there is a "results" heading and then a

23  "response times" heading.

24             Do you see that?

25       A.  Yes.

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  Okay.  And there we see the light was

2  "programmed to turn on at pseudo-random intervals

3  defined by normal distribution with a mean of 45 seconds

4  and a standard deviation of 5 seconds"; is that right?

5    A.  Yes.

6    Q.  Okay.  Can you read -- after that

7  parenthetical, can you read, starting with "the

8  intermittent" through the end of that sentence and the

9  next sentence?

10    A.  "And the intermittent nature of the driver's

11  text messaging task engagement (Figure 1), there were

12  occasions where the driver was responding to the light

13  onset even though they were not engaged in a texting

14  task."

15    Q.  And the next sentence?

16    A.  "In order to not skew the mean response time

17  data towards the baseline condition, only the response

18  events that took place while the driver was engaged in a

19  texting task were analyzed."

20    Q.  Okay.  So is it fair to say that other than

21  the -- do you recall that you told the subjects in this

22  study to either read or send a text at specified points

23  on the course?

24    A.  Yes.  I believe it was based on physical

25  locations along the course.

Appx_1791

CHRISTINE YAGER  - December 11, 2023

1    Q.  Okay.  So it was not like the other study of

2  yours that we looked at, where they were just supposed

3  to be texting continuously?

4    A.  That's correct.

5    Q.  Okay.  And so because of that, even when they

6  were doing, like, the text messaging runs, there were

7  times when they were not text messaging; right?

8    A.  That's right.

9    Q.  Okay.  And when you were analyzing the data,

10  you removed from the dataset their response times to the

11  light that they were not actually texting; correct?

12    A.  That's correct.

13    Q.  So even if they were -- even if it was not the

14  controlled condition, you didn't count all of their

15  light response times in your data.

16    A.  Right.  Because of the randomness of the light

17  turning on, we were wanting to compare baseline reaction

18  times to -- I mean, we could have compared within that

19  experiment the reaction times when engaging in the

20  texting tasks versus when they weren't, but we already

21  had a baseline condition, so...

22    Q.  And as the -- as the project lead, it was your

23  call to --

24    A.  Make those decisions, yes.

25    Q.  Okay.  Do you think you were the one who

ASSOCIATED COURT REPORTERS
(254) 753-3330

**CHRISTINE YAGER  - December 11, 2023**

1  actually went in and removed the -- the non-texting

2  responses?

3      A.  I don't recall if it was my -- if it was me or

4  I instructed my students to.

5      Q.  Do you recall if -- whether it was you or

6  whether you instructed your students -- do you recall

7  what instructions you gave them on which -- which events

8  to remove?

9      A.  Well, just what I stated here.  We -- because

10 we have the data on their GPS location and where -- when

11 they were engaged in the texting tasks, and so I would

12 have instructed them to only look at what happened

13 within those events.

14     Q.  How would you have defined "engaged in the

15 texting task"?

16     A.  I think it was -- it was based on GPS location

17 when they would be instructed to -- let's see.  Let me

18 familiarize myself here.

19         So "the participant was instructed to

20 complete the same five text messaging tasks:  a

21 send-only, three 'read and reply' tasks, and a read-only

22 task.  Each task was initiated at the same physical

23 location along the closed course."

24         And so I would have -- we would have had

25 those coordinates to know, like, these are the sections

**CHRISTINE YAGER  - December 11, 2023**

1  on the course to look at across all four experimental

2  scenarios.

3      Q.  Okay.  But if somebody had sent a text message

4  and then put their -- you -- you told the subjects that

5  once they were done reading or writing a text, they

6  should -- they were supposed to put their phone down;

7  correct?

8      A.  Yes.

9      Q.  Okay.  If somebody had picked up and -- was

10  there a speaker in the car where the --

11      A.  A researcher was in the vehicle at the time.

12      Q.  Okay.  So a researcher -- which seat were they

13  riding in?

14      A.  The backseat.

15      Q.  Okay.  So the researcher is riding in the

16  backseat and the driver would get to a certain landmark

17  and they would say, pick up your phone and text

18  so-and-so some message; right?

19      A.  Yes.

20      Q.  And they would tell them what to write?

21      A.  Yes.  I think so.

22      Q.  Okay.

23      A.  Yeah.  It's a scripted message.  Uh-huh.

24      Q.  And then they were told, send this message and

25  then put your phone down?

CHRISTINE YAGER  - December 11, 2023

1    A.  In the cup holder, yes.

2    Q.  Okay.  If someone had sent a text message and

3  put it back in the cup holder, you would not have

4  counted that in analyzing the data for the effects of

5  text messaging on reaction time; is that correct?

6    A.  Actually, no.  I believe that we would have

7  looked at the reaction times -- yeah.  "Took place while

8  the driver was engaged in the texting task."

9        I -- I'm not sure, but I -- I believe that

10  it would have been for -- between the coordinates of,

11  like, the start of the first task to the -- to the next

12  one or some -- some endpoint.  I just don't recall the

13  details.

14    Q.  Can you trust that your report -- or that this

15  paper is accurate?

16    A.  Yes.

17    Q.  Okay.  You -- you wrote in the report that only

18  the response events that took place while the driver was

19  engaged in a texting task were analyzed; right?

20    A.  Yes.

21    Q.  If -- if a cell phone is sitting in a cup

22  holder, that driver is not --

23    A.  -- is not engaged in a texting task.

24    Q.  So you would not have included that as -- when

25  analyzing the effect of sending or receiving a text

Appx_1795

CHRISTINE YAGER  - December 11, 2023

1  message on reaction time; correct?

2      A.  That may be -- that may be the case, that we

3  did not include those.

4      Q.  Okay.

5      A.  So it was meant to compare when they were

6  engaged in each of the texting methods compared to the

7  baseline.  So some of the texting methods took longer to

8  complete than others, and so we might have had more --

9  more instances where the light was on during -- during a

10  longer period of time, you know, if it took them longer

11  to complete the task.  So we might have had more data

12  points during that window.

13      Q.  Yeah.  See -- correct me if I'm wrong -- but it

14  seems hard to do it based on GPS data, because some of

15  the tasks were just pick up your phone and read the

16  message and then put the phone down; right?

17      A.  Well, I think the tasks -- the texting tasks

18  were all initiated at the same physical starting point,

19  but then how far they would travel before they finished

20  would -- would vary from person to person.

21      Q.  And also -- sorry.  Go ahead.

22      A.  Well, I was just going to say that we -- based

23  on my understanding of what I wrote in this paper years

24  ago, that we probably only looked at the response times

25  and -- and driving performance data within the time that

ASSOCIATED COURT REPORTERS
(254) 753-3330

**CHRISTINE YAGER  - December 11, 2023**

1  it took the person to complete each of the three methods

2  of texting, and then compare that to roughly the same

3  section of the baseline.

4      Q.  And so completion would be measured by the

5  point in which the phone was put back in the cup holder?

6      A.  That's correct.

7      Q.  And you -- in your report on Exhibit 10, you

8  say that that was done "in order not to skew the mean

9  response time data towards the baseline condition";

10  right?

11     A.  Yes.

12     Q.  Okay.  And the logic there is that once

13  somebody in your study put the cell phone back in the

14  cup holder, they're not really -- they are no

15  differently situated than the baseline condition;

16  correct?

17     A.  That's correct.

18     Q.  Okay.  So going back to Exhibit 1, your expert

19  report, you say that -- the, sort of, bolded conclusion

20  is, "Even if Ms. Smith used voice-to-text, it is as

21  distracting and impairing as manual texting"; correct?

22     A.  That's what I said.

23     Q.  And the only thing cited in that whole

24  subsection under "effects of voice-to-text" is what we

25  were just looking at, Exhibit 10, your 2013 paper;

CHRISTINE YAGER  - December 11, 2023

```
1   correct?

2        A.  Yes.

3        Q.  Okay.  So isn't it fair to say all that study

4   looked at was the effect of reaction time when somebody

5   is actively engaged in texting on their phone; correct?

6        A.  Yes.

7        Q.  Okay.  So when you say "Even if Ms. Smith used

8   voice-to-text, it is as distracting and impairing as

9   manual texting", you mean only during the time in which

10  she is actively sending or reading a text message;

11  correct?

12       A.  Correct.

13       Q.  There is no distracting effect once that task

14  is completed; correct?

15            MR. WHITE:  Objection; form.

16       A.  Correct.  Once a person is not engaged in a

17  texting task, then -- unless they're doing some other

18  secondary task.

19       Q.  (BY MR. DuBOFF)  Sure.  But, like, texting is a

20  lot different than alcohol; right --

21       A.  Yes.

22       Q.  -- in terms of lingering effects?

23       A.  That's correct.

24       Q.  Okay.  It's not as if once you send a text

25  message, your mind is still clouded with the text
```

ASSOCIATED COURT REPORTERS
(254) 753-3330

**CHRISTINE YAGER  - December 11, 2023**

1   message, as far as effect on reaction time; right?

2        A.  I agree with that.

3        Q.  Okay.  Moving on to the next opinion on page 4,

4   "Impact of Distractions on Hazard Perception", I think

5   I'd like to be quick here.

6             This is -- everything under this heading

7   is -- is just background; right?

8        A.  Yes.

9        Q.  There's -- there is nothing -- obviously, in

10  the one above it, you talk about, you know, what

11  Ms. Smith testified to and what she was doing, but in

12  this section, there is just nothing about the facts of

13  this case; right?

14       A.  Right.  That's right.

15       Q.  Okay.

16       A.  I think it's relevant to the facts of this

17  case, but there is nothing specifically about the facts

18  of the case mentioned in this section.

19       Q.  And nothing in here applies human factors

20  principles to the facts of this case.

21       A.  That's correct.  I do that later, in the next

22  section.

23       Q.  Yep.  I'm just trying to make sure we're on the

24  same page.

25             Okay.  I just want to ask you about these

**CHRISTINE YAGER  - December 11, 2023**

1  terms, "inattentional blindness" and "change blindness."

2              Inattentional blindness is when something

3  is within your field of vision, but you don't notice it

4  because you're focused on something else; correct?

5       A.  That's correct.

6       Q.  Okay.  And the classic example is the

7  basketball dribbling study; right?

8       A.  Oh, you've seen that.  Yes.

9       Q.  Okay.  For inattentional blindness to apply,

10  something has to be, as you say, within your foveal

11  vision; right?

12       A.  That's correct.

13       Q.  Okay.

14       A.  According to the definition, your foveal vision

15  is focused on something.  It's the "I looked but did not

16  see" --

17       Q.  Right.

18       A.  -- phenomenon.

19       Q.  Okay.  But that's a lot different than if

20  you're sitting there reading a book and not looking at

21  the road.  Inattentional blindness --

22       A.  -- would not be relevant, that's correct.

23       Q.  Okay.

24       A.  It would be considered change blindness.

25       Q.  Okay.  So then explain to me what you mean by

CHRISTINE YAGER  - December 11, 2023

1  "change blindness."

2       A.   That is where you are engaged in something.

3  Your foveal vision is away from the task at hand, from

4  driving, and something in the environment changes

5  between the time that you looked away to the time that

6  you looked back and then you have a hazardous situation.

7       Q.   Okay.  But where does the blindness come in?

8       A.   By refocusing your visual attention elsewhere.

9       Q.   Okay.  So my understanding of change blindness

10  is when there is a disruption in a scene, like it

11  flickers and you don't notice the change that occurs

12  during the flicker.

13            Is that your understanding or am I -- am I

14  describing something different?

15       A.   I -- that is inclusive of the definition, I

16  believe, yes.

17       Q.   Okay.  And so you can't -- it's -- it's even

18  once you look back at the image, you can't tell what

19  changed?

20       A.   Right.

21       Q.   Okay.

22       A.   Or you don't notice the change.

23       Q.   You don't notice the change.

24            If we're talking about somebody who takes

25  their eyes off the road and then looks back at the road

CHRISTINE YAGER  - December 11, 2023

```
 1  and there is a human there, are you aware of any
 2  research that says that people have any difficulty
 3  spotting the human in the road?
 4        A.  People --
 5                MR. WHITE:  Objection; form.
 6        A.  I don't understand your question.  I'm sorry.
 7        Q.  (BY MR. DuBOFF)  Okay.  So the classic change
 8  blindness examples would be image, it flashes, image
 9  pops back up, and a man in the image has, like,
10  different colored pants on; right?
11        A.  Uh-huh.
12        Q.  Is that your understanding of, kind of, what
13  the classic example would be?
14        A.  Yeah.  That's one of them.  Uh-huh.
15        Q.  Okay.  And you don't -- you can say to the
16  person, What changed in this image?  And they can say,
17  I -- I can't tell; right?
18        A.  Right.
19        Q.  Okay.  I'm trying to figure out how that
20  applies to driving, because if I'm driving down the road
21  and there is nobody in the road, right, and then I look
22  down at my radio or whatever, if I look back up and now
23  there is a pedestrian in the road, change blindness
24  would say you don't see the pedestrian because that's a
25  change that you don't detect; right?
```

CHRISTINE YAGER  - December 11, 2023

1      A.  That's correct.

2      Q.  Okay.

3      A.  In that scenario that you just described, where

4  there actually was no pedestrian and then there was.

5      Q.  Right.

6      A.  If you fail to notice the pedestrian and --

7  once the eyes were back, then that would be change

8  blindness.

9      Q.  Right.  But so are you familiar with any

10 driving research that suggests that people, even if

11 they're looking away from the road, that once they do

12 look back at the road, they can't detect pedestrians on

13 the roadway?

14     A.  I'm -- I'm not familiar with research like

15 that.

16     Q.  Okay.

17     A.  But it -- it is related.  If -- well, relevant

18 to this case, like, if there were pedestrians in an

19 environment and the driver were engaged in a secondary

20 task, their eyes were off the road or they're so

21 distracted that they don't notice the pedestrian until

22 it's too late, that -- that's how I think this would --

23 would -- you know, or if the pedestrian has moved more

24 into the direct lane of sight, then that would be a

25 change.

Appx_1803

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  Okay.  And so I -- I'm just trying to make sure

2    we're talking about the same thing.  Let me use this

3    example.

4    A.  Okay.

5    Q.  I'm driving behind a vehicle on the highway.

6    We're going the same speed.  Okay?  And then I drop my

7    cigarette and take my eyes off the road, and then when I

8    look back on the road, the person in front of me has

9    their brake lights on.

10   A.  Yes.

11   Q.  Okay.  My -- I'm just -- are you -- if I notice

12   right away that his brake lights are on, I'm going to

13   have a delayed response just because I wasn't looking.

14   But are you calling that change blindness?

15   A.  I believe that that would classify as -- yeah.

16   I believe that would fall in -- under that definition,

17   yes.

18   Q.  Of -- of what you're talking about with change

19   blindness?

20   A.  I think so.  But to answer your earlier

21   question, I'm not aware of a driving study that has

22   looked at that specifically.

23   Q.  Okay.  And then the last -- the bolded bullet

24   under that section is, "Drivers engaged in a distracting

25   task are significantly slower to detect and react to

CHRISTINE YAGER  - December 11, 2023

1  unexpected roadway hazards."

2      A.  Yes.

3      Q.  You would agree that that's not true for all

4  distracting tasks; right?

5      A.  I would agree, because there's such a spectrum

6  of distracting tasks.

7      Q.  I think we -- I think the Drews study was

8  referencing that.  Or, no, not the Drews study.  One of

9  the studies we looked at said that in a naturalistic

10 study, looking at side-view mirrors were classified as a

11 secondary task.

12     A.  Yeah, and I -- I would actually not classify

13 that as a secondary task, but, yes.  Again, there is --

14 there is a spectrum, and so, it depends on what the

15 distracting task is.

16     Q.  So, like, looking at the radio is a distracting

17 task; right?

18     A.  Yes.

19     Q.  Talking to a passenger is a distracting task?

20     A.  Yes.  Daydreaming.

21     Q.  Daydreaming is a distracting task.  Looking at

22 exit signs could be distracting?

23     A.  It could be.

24     Q.  Okay.  But you're not saying that doing any of

25 those activities automatically has a -- causes you to

**CHRISTINE YAGER  - December 11, 2023**

1  re- -- to detect and react to roadway hazards in a

2  significantly slower manner?

3      A.  It could or it could not.

4      Q.  Okay.

5          MR. DuBOFF:  I'm in, kind of, like, my last

6  major -- I don't know how long we've been going for.

7          MR. WHITE:  It's a quarter after 1:00.

8          We can take another break, Christine, if

9  you want one.

10          THE WITNESS:  Do you want to just finish

11  this section, or were you about to --

12          MR. DuBOFF:  I'm done with this section.

13          THE WITNESS:  Okay.  Then, sure.

14          THE VIDEOGRAPHER:  Off the record at 1:01

15  P.M.

16          (SHORT RECESS)

17          THE VIDEOGRAPHER:  All right.

18      Q.  (BY MR. DuBOFF)  Mrs. Yager, before -- I'm

19  sorry.

20          THE VIDEOGRAPHER:  Back on the record at

21  1:11 P.M.

22      Q.  (BY MR. DuBOFF)  Mrs. Yager, before we get into

23  your final opinion, can you tell me your understanding

24  of where Mr. Santos was standing when he was struck by

25  Ms. Smith's vehicle?

Appx_1806

**CHRISTINE YAGER  - December 11, 2023**

1      A.  I believe the data was under-determinative

2 [sic] on that.

3      Q.  Okay.

4      A.  You know, her testimony was that he was in the

5 middle of the lane, crouched down, changing a tire.  You

6 know, others said that he was at the trunk.  So it's

7 unclear.

8      Q.  Okay.  Are you making -- in formulating --

9 we're about to get into your opinions about what she was

10 doing in the -- on the approach to the collision;

11 correct?

12      A.  Yes.

13      Q.  Okay.  So are you making any assumptions about

14 where Mr. Santos was when he was hit?

15      A.  No, other than outside the vehicle.

16      Q.  Okay.  Are you -- you know, based on the

17 evidence, that Ms. Smith did not strike the disabled

18 Camry; correct?

19          MR. WHITE:  Objection; form.

20      A.  I remember reading that in the deposition.

21      Q.  (BY MR. DuBOFF)  Okay.  And I think that's in

22 your report --

23      A.  Yes.

24      Q.  -- somewhere.

25          Essentially, you criticize Ms. Smith for

CHRISTINE YAGER  - December 11, 2023

1  not seeing Mr. Santos; correct?

2       A.  Until it was too late, yes.

3       Q.  Right.  Doesn't that -- in order to criticize

4  her for that, don't you have to, at least, make some

5  assumption about whether he was in her path and for how

6  long?

7       A.  No.  I -- I don't know where he was or for how

8  long he was in her path.  At some point he was in her

9  path.  But where he was exactly standing, if it was to

10 the right of the Camry or behind the Camry some

11 distance, I -- I can't -- the data is unclear on that.

12      Q.  It would be -- it's much different for a driver

13 not to see a pedestrian in the middle of the lane, as

14 opposed to not observing a pedestrian on the shoulder;

15 right?

16      A.  Ask that again, please.

17      Q.  Sure.  Drivers are supposed to be looking,

18 keeping their eyes on the road, to the extent they can;

19 correct?

20      A.  Yes.

21      Q.  Okay.  Drivers are not obligated to look at the

22 shoulder of the roadway.  Would you agree with that?

23      A.  Well, I think that it -- it's included in what

24 they should be -- they should be scanning their

25 environment, and especially from a distance, the --

Appx_1808

**CHRISTINE YAGER  - December 11, 2023**

1  where the shoulder is to the middle of the lane, when

2  you're far away, is going to be a very small

3  difference --

4       Q.  Okay.

5       A.  -- in the visual field.

6       Q.  Let me just give you two scenarios and ask you

7  some questions about those.

8            If I'm driving through a neighborhood and

9  there's somebody standing in the middle of the road for

10  10 seconds and I hit them, that would be much more

11  indicative of me being distracted than if I'm driving

12  through a neighborhood and somebody darts in front of my

13  car and I hit them.  Would you agree?

14            MR. WHITE:  Objection; form.

15       A.  I would agree.  In the neighborhood, though,

16  you're not likely to be traveling between 85 and 90

17  miles per hour.

18       Q.  (BY MR. DuBOFF)  Okay.  So if I'm -- if I'm on

19  a highway driving 85 to 90 miles an hour and I hit

20  somebody who has been standing in the road for 30

21  seconds, would you agree that -- that would be strong

22  evidence of distraction?

23       A.  Yes.  I would agree.

24       Q.  Because most people, when they're driving down

25  the road, would observe a pedestrian in the middle of

Appx_1809

CHRISTINE YAGER  - December 11, 2023

1  the highway; right?

2      A.  Well in advance and make an adjustment or

3  change lanes to avoid striking the person.

4      Q.  Right.  But if somebody is driving down the

5  road -- and I know this sounds like the facts of this

6  case, but I really -- we'll get to those.

7          Let's say you're driving down the road --

8  and there is no disabled car or anything like that --

9  driving down the highway and somebody darts in front of

10 a vehicle and is hit, that driver might have been

11 distracted, but you would agree that there is much less

12 evidence of distraction there.

13     A.  Right.  That -- the environment would have

14 changed so much quicker that the driver may have or may

15 have not been distracted.

16     Q.  And so for those two scenarios, you would agree

17 that how long a pedestrian was in the roadway would be

18 highly relevant in assessing whether a driver exhibited

19 distraction.  Do you agree?

20         MR. WHITE:  Objection; form.

21     A.  It's one of the factors that -- that could be

22 used to determine whether there was a distraction or

23 not, yes.

24     Q.  (BY MR. DuBOFF)  Okay.  But in this scenar- --

25 in this case, you're not making any assumptions about

CHRISTINE YAGER  - December 11, 2023

1  how long Mr. Santos was actually in the roadway for

2  before he was hit.

3      A.   Other than based on their deposition, I believe

4  that they said for several minutes, they were outside

5  the vehicle, trying to change the tire prior to Mr.

6  Santos being struck.

7      Q.   Right.  But you're not making any assumptions

8  about how long Mr. Santos was standing in Ms. Smith's

9  path?

10     A.   That's correct.

11     Q.   Okay.  Even though you agree that in evaluating

12 whether Ms. Smith was distracted, knowing how long Mr.

13 Santos was standing in her path would be important;

14 correct?

15          MR. WHITE:  Objection, form.

16     A.   It's one of the factors.

17          Even if Mr. Santos were on the shoulder,

18 again, it's like she -- if she had not been distracted,

19 she would have noticed well in advance that there were

20 pedestrians outside the vehicle, on the edge or in the

21 middle of the lane, either -- either physical position

22 on a highway when traveling at that high speed, a

23 rational driver would have reduced their speed or --

24 and/or changed lanes to avoid potentially striking a

25 person.

ASSOCIATED COURT REPORTERS
(254) 753-3330

CHRISTINE YAGER  - December 11, 2023

1      Q.  (BY MR. DuBOFF)  Okay.

2      A.  When you add in the lane obstruction on top of

3  that, it's just inexplicable why she did not change

4  lanes or reduce her speed.

5      Q.  Okay.  So we'll -- we will talk about all of

6  that.

7           You -- so at some point Mr. Santos entered

8  Ms. Smith's path; correct?

9      A.  Or if she entered --

10          MR. WHITE:  Objection; form.

11     A.  -- or if she entered Mr. Santos' position.

12  It's unclear because we don't -- the data is

13  under-determinative on where he exactly was standing --

14     Q.  (BY MR. DuBOFF)  Okay.

15     A.  -- at the point of -- of collision.

16     Q.  You would agree that if the jury were to

17  find -- well, strike that.

18          Have you reviewed the expert report that

19  was produced by plaintiff in this case -- excuse me --

20  the accident reconstruction report --

21     A.  No, I have not.

22     Q.  -- produced by the plaintiff?

23          Okay.  And you have not reviewed the expert

24  report that was done by defendants' expert, Mr.

25  Montalbano?

Appx_1812

**CHRISTINE YAGER  - December 11, 2023**

1    A.  I have not.

2    Q.  Okay.  If the jury were to conclude that Mr.

3  Santos was hit further inside -- further to the middle

4  of the left lane than the edge of the Camry, then you

5  would agree that at some point, he would have had to

6  have entered into that space.

7    A.  Yes.

8    Q.  Okay.  And based on your review of the

9  evidence, would you agree with me that Evelyn Moreno

10  told police at the scene that as far as she was able to

11  perceive, Mr. Santos never left her side at the back of

12  the Camry?

13    A.  I believe that was her testimony, yes.

14    Q.  So if it's the case that Mr. Santos ended up

15  further out into the lane, it must have been that he was

16  there for a short enough amount of time that Ms.

17  Moreno didn't even notice; correct?

18        MR. WHITE:  Objection; form.

19    A.  That could be the case, yes.

20    Q.  (BY MR. DuBOFF)  It would have to be the case

21  if that's -- is what happened; right?

22        MR. WHITE:  Objection; form.

23    A.  Yes.  If what she said is accurate, then, yes.

24  He would have only been there for a brief moment in

25  time.

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  (BY MR. DuBOFF)  Okay.  Would you agree that

2  even with a perfectly attentive driver, some accidents

3  are unavoidable, from that driver's perspective?

4    A.  Yes.

5    Q.  And even if a driver is involved in an accident

6  while engaging in a distracting activity, that does not

7  mean necessarily that the distracting activity caused

8  the accident.  Do you agree with that?

9    A.  No.  I think it would be a factor.

10    Q.  Okay.  Would you agree that --

11    A.  A contrib- -- a contributing factor is what a

12  police officer would say.

13    Q.  Okay.  Always?

14    A.  I believe if a driver is distracted, it is a

15  contributing factor.  It may not be the sole

16  contributing factor.

17    Q.  Okay.  Would you agree that me -- if I'm

18  sitting at a red light and I'm reading my emails on my

19  phone, that's a distracting activity; correct?

20    A.  Yes.

21    Q.  Okay.  And if somebody comes up and plows into

22  me at the red light, me reading my emails didn't have

23  anything to do with that; right?

24    A.  It didn't have anything to do with being

25  struck, but had you not been distracted, perhaps you

CHRISTINE YAGER  - December 11, 2023

1  would have noticed the vehicle fastly approaching in the

2  rearview mirror and you could have done something or at

3  least honked or done something to try to avoid it.  It

4  doesn't mean it would have prevented it, but it's --

5  again, it's a factor.

6       Q.  So you think even in that situation, me reading

7  my emails would be a contributing factor to the

8  accident, if I just get rear-ended at a red light?

9       A.  It could be.  It probably wouldn't end up in

10  the crash report, the police report, but...

11       Q.  Okay.  Would you agree that if an accident

12  would have occurred, whether or not a driver was

13  distracted and that the distraction did not cause the

14  accident?

15       A.  Repeat that.  I'm confused --

16       Q.  Sure.

17       A.  -- by that question.

18       Q.  If an accident would have occurred -- so let's

19  say you agree that listening to the radio can be a

20  distracting activity; right?

21       A.  Yes.

22       Q.  Okay.  But if -- if you or the jury or whoever

23  were to determine that, okay, radio, that's a

24  distracting activity, but this accident would have

25  happened whether this person was listening to the radio

CHRISTINE YAGER  - December 11, 2023

1  or not listening to the radio.

2              In that situation, would you agree that it

3  would not be reasonable to say that the distracting

4  activity caused the accident?

5      A.  That's correct.

6      Q.  And are you familiar with the concept of

7  perception-reaction time?

8      A.  Perception-reaction time?

9      Q.  Yes.

10     A.  I haven't heard that phrase.

11     Q.  PRT?

12     A.  I haven't heard that phrase.

13     Q.  Okay.  It seemed like you were hung on me using

14  "perception", or do you -- is the whole thing foreign to

15  you?

16     A.  No.  When was I hung up?

17     Q.  What's that?

18     A.  I don't know when -- what you're referring to

19  being hung up on.

20     Q.  Okay.

21     A.  Perception-reaction time.

22     Q.  Do you know what perception-reaction time is?

23     A.  I would assume, based on just the words, that

24  it's reacting to or perceiving a hazard.

25     Q.  Okay.  And so maybe you don't know -- you can't

CHRISTINE YAGER  - December 11, 2023

1   answer this.  Would you agree that perception-reaction

2   time is a thoroughly studied area in the human factors

3   discipline?

4        A.  I'm unfamiliar.

5        Q.  Okay.  Would you agree that drivers do not

6   react instantaneously to hazards on the roadway?

7        A.  Correct.

8        Q.  There is a delay in time between when a hazard

9   is identifiable and when a driver is able to respond in

10  some way to the hazard; correct?

11       A.  Yes.  That's correct.

12       Q.  And that's because -- there are many reasons,

13  but one of the reasons is that it takes time for the

14  brain to process information; correct?

15       A.  Yes.  That's correct.  I believe the typical

16  reaction time for that -- you're using scientific

17  language -- is about three quarters of a second, give or

18  take.

19       Q.  Okay.  You're not offering that as an expert

20  opinion; right?

21       A.  This is just based on my -- my understanding of

22  reading.

23       Q.  What's that based on?

24       A.  Of when I researched about hazard perception.

25       Q.  Okay.  Did that research disclose that

ASSOCIATED COURT REPORTERS
(254) 753-3330

CHRISTINE YAGER  - December 11, 2023

1  perception-reaction time is highly context dependent?

2      A.  I think -- I think I just, like, searched what

3  is the typical, like, just like a baseline reaction

4  time.

5      Q.  Like in Google?

6      A.  Uh-huh.

7      Q.  Okay.  But you're not claiming to be an expert

8  on perception-reaction time --

9      A.  No.

10      Q.  -- I assume.

11          Okay.  In -- in the two studies that you

12  did that we've talked about here, the response times --

13  and maybe we can -- why don't we just look at them.

14          So if you look at -- let's start with

15  Exhibit 7.  And if you -- on Exhibit 7, if you turn to

16  page 2198.

17      A.  Uh-huh.

18      Q.  And there is a Table 2.  That's "Analysis of

19  Light Response Time in Seconds"?

20      A.  Yes.

21      Q.  Okay.  And then there is some statistical

22  analyses, but down at the bottom there, it says,

23  "Descriptive Statistics."

24      A.  Yes.  Mean reaction time for the control is

25  1.75.

Appx_1818

CHRISTINE YAGER  - December 11, 2023

1    Q.  Okay.  So --

2    A.  Seconds.

3    Q.  Right.  Which is more than three quarters of a

4  second; right?

5    A.  Yes.

6    Q.  Okay.  So in this -- in control there, 1.75

7  seconds, that's when all your subjects were told to do

8  is just drive; right?

9    A.  Yes.

10    Q.  Drive and look for a green light that was

11  within their field of vision?

12    A.  Yes.  Above.  Uh-huh.

13    Q.  And as soon as you see that green light, tap

14  this button?

15    A.  Yes.

16    Q.  You'd agree that's a pretty simple task?

17    A.  Yes.  The -- the difficulty is, it was -- it's

18  within their field of vision, but it's near the top, so

19  it's, kind of, borderline on being able to notice it as

20  if it were in the middle of the roadway.

21        So when I said three quarters of a second,

22  it's like -- again, it's kind of like there is a

23  tolerance there depending on what, you know, they're

24  reacting to.  So in my -- in this experiment, the mean

25  reaction time for the baseline was 1.75.

CHRISTINE YAGER  - December 11, 2023

1    Q.  And you would agree that that was react- --
2  that was response time to -- to something that was
3  expected; right?
4    A.  Yes.
5    Q.  All of your subjects knew that this light was
6  going to turn on at some point?
7    A.  Yes.  They were told that it would.  Uh-huh.
8    Q.  Okay.  And do you have an understanding of how
9  reaction times are affected by the expectancy of an
10  event?
11    A.  I -- I don't.
12    Q.  If you turn to Exhibit 10, which is your 2013
13  paper, page 1871, there for the -- just the baseline
14  condition, the response -- the mean response time was
15  1.3 seconds; correct?
16    A.  Yes.  I see that.
17    Q.  With a standard deviation of .4 seconds?
18    A.  Yes.
19    Q.  So that means -- I'm not trying to get you
20  tripped up, but were your response times, did they
21  follow a normal distribution?
22    A.  I don't know.
23    Q.  Okay.  Do you have an understanding of what the
24  standard deviation is communicating in an analysis like
25  this?

Appx_1820

CHRISTINE YAGER  - December 11, 2023

 1      A.  Yes.

 2      Q.  Okay.  What is that?

 3      A.  Just almost like -- like a give or take from

 4  the mean.

 5      Q.  It's how spread out the data is; right?

 6      A.  Uh-huh.

 7      Q.  So if pretty much everybody responded in 1.3

 8  seconds, the standard deviation would be pretty small --

 9      A.  Yes.

10      Q.  -- right?

11      A.  That's right.

12      Q.  But is it your understanding of human factors,

13  that someone that responds within the standard deviation

14  of the mean is considered kind of a normal response?

15      A.  Yes.

16      Q.  Okay.  So even --

17      A.  But I -- I also acknowledge that the -- the

18  baseline mean response times in the two studies that I

19  did was a little bit longer than the driving -- prior

20  driving simulator studies.

21      Q.  Okay.

22      A.  Which were using a different way of measuring

23  response times with brake onset.

24      Q.  Have you heard of AASHTO?

25      A.  Yes.

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  Okay.  Do you know what AASHTO stands for?

2    A.  No.  Another acronym.

3    Q.  I always need to look that one up.

4         MR. DuBOFF:  So this will be 11.

5         (Yager Exhibit 11 marked)

6    Q.  (BY MR. DuBOFF)  Is it your understanding,

7  Mrs. Yager, that AASHTO stands for the American

8  Association of State Highway and Transportation

9  Officials?

10   A.  Yes.

11   Q.  And do you have any sense of what this

12 organization does?

13   A.  I believe that they try to standardize things

14 related to traffic safety.

15   Q.  And as part of that, do they -- is it your

16 understanding that part of those design principles are

17 based on understandings of how drivers respond to

18 different things?

19   A.  I wasn't aware that they had information about

20 reaction time, but I am reading that section now.

21   Q.  Okay.  If you look on page 2-40 of Exhibit 11

22 under "reaction time", do you see where it says,

23 "Drivers' reaction times increase as a function of

24 decision complexity and the amount of information to be

25 processed"?

**CHRISTINE YAGER  - December 11, 2023**

1    A.  Yes.

2    Q.  And do you have any basis to dispute that?

3    A.  No.

4    Q.  And then if you go down a few lines, do you see

5  "With unexpected events, reaction times increase by 35

6  percent"?

7    A.  Yes.

8    Q.  Okay.  So do you have any -- any reason to

9  dispute that unexpected event, it takes drivers longer

10 to respond to unexpected events than to expected events?

11         MR. WHITE:  Objection; form.

12   A.  I don't dispute that.

13   Q.  (BY MR. DuBOFF)  And the sentence there that

14 says, "Thus, for a simple, unexpected decision and

15 action, some drivers may take as long as 2.7 seconds to

16 respond."

17         Do you see that?

18   A.  I do.

19   Q.  And do you have any -- is it within your area

20 of expertise to dispute that?

21   A.  No.  I don't dispute it.

22   Q.  And would you agree that on the -- some events

23 on the highway are expected, like the driver in front of

24 you slowing down?

25   A.  Yes.

Appx_1823

CHRISTINE YAGER  - December 11, 2023

1    Q.  Would you agree that other events are

2  unexpected?

3    A.  Yes.

4    Q.  If you're driving on an interstate highway, do

5  you think a pedestrian dashing into your lane of travel

6  would be considered unexpected?

7                MR. WHITE:  Objection; form.

8    A.  That would be considered unexpected.

9    Q.  (BY MR. DuBOFF)  Is it fair to say there are

10  lots of human factors studies on how drivers respond to

11  pedestrians?

12                MR. WHITE:  Objection; form.

13    A.  There likely are.

14    Q.  (BY MR. DuBOFF)  Okay.  But you're not familiar

15  with any?

16    A.  No.

17    Q.  Okay.  Then I don't need to ask you about that.

18                Understanding that you're not adopting this

19  as -- as your view, but if you just assume that at some

20  point Mr. Santos entered Ms. Smith's path, okay, would

21  you agree that the closer in time that he did that to

22  the collision, the less time she would have had to

23  respond?

24    A.  Yes.

25    Q.  Do you agree that it's possible that Mr. Santos

ASSOCIATED COURT REPORTERS
(254) 753-3330

CHRISTINE YAGER  - December 11, 2023

1  entered Ms. Smith's path with -- when she was too close

2  to avoid him?

3           MR. WHITE:  Objection; form.

4      A.  It's possible.

5      Q.  (BY MR. DuBOFF)  Do you acknowledge that it's

6  possible that Mr. Santos entered Ms. Smith's path when

7  there was too little time for any reasonable driver to

8  avoid him?

9      A.  It's --

10          MR. WHITE:  Objection; form.

11     A.  -- possible.

12     Q.  (BY MR. DuBOFF)  Okay.  If we look at your last

13  opinion in your report, Exhibit 1, you note in the fifth

14  bullet down that Ms. Smith was 1,021 feet away from the

15  Camry when she sent her final text message; correct?

16     A.  Yes.

17     Q.  And you don't -- and you describe that as the

18  final text message because you have no basis for

19  thinking that she sent any other text messages; correct?

20     A.  That's correct.

21     Q.  Once she sent that text message, any

22  distraction from text messaging ended; correct?

23     A.  That's correct.  If she was done texting, then

24  it would have ended.

25     Q.  Okay.  And at 1,021 feet away from the Camry,

**CHRISTINE YAGER  - December 11, 2023**

1  that was about 8 seconds before her collision with Mr.

2  Santos, do you agree?

3      A.  Yes.

4      Q.  Okay.

5      A.  That's what the data shows.

6      Q.  And so you would agree that within those 8

7  seconds, Ms. Smith was not distracted by text messages.

8      A.  I believe the data is unclear on that.  There's

9  no way to know exactly what happened during those 8

10 seconds.

11     Q.  Okay.  But assuming that she sent that text

12 message and stopped engaging in the text messaging task,

13 you would agree that she was no longer distracted by

14 text messaging.

15     A.  You're assuming that.  You're saying assuming

16 that she was not distracted, she was not distracted.

17 That's circular.

18     Q.  Okay.  But you have no basis to think she was

19 doing anything with her phone in those 8 seconds;

20 correct?

21          MR. WHITE:  Objection; form.

22     A.  I do have basis, because she struck a person.

23     Q.  (BY MR. DuBOFF)  Okay.

24     A.  When she had 1000 feet -- according to her

25 testimony, she sent the message and then noticed the

**ASSOCIATED COURT REPORTERS**
**(254) 753-3330**

**CHRISTINE YAGER  - December 11, 2023**

1  lane obstruction, and she chose not to change lanes.

2            That's inexplicable to me, why, if -- if

3  there were at least two pedestrians, even on the

4  shoulder, why she would not have changed lanes to avoid

5  potentially getting anywhere near pedestrians when

6  traveling 85 to 90 miles per hour on a highway.

7       Q.  Okay.  You would agree that there is no

8  evidence that she sent a text message within 8 seconds

9  of the accident; correct?

10      A.  Correct.  That's what the data shows.

11      Q.  There's no evidence that she received a text

12  message within 8 seconds of the accident; correct?

13      A.  Correct.

14      Q.  If this had been your study that you did in

15  2013, Ms. Smith would not have been considered to be

16  text messaging at the time of the accident; correct?

17            MR. WHITE:  Objection; form.

18      A.  There's no way to know unless there was someone

19  riding in the vehicle to witness or a camera observing

20  her actions.  It's possible that Ms. Smith was in the

21  middle of composing another message that she didn't

22  complete before she struck Mr. Santos and then deleted

23  it.

24      Q.  (BY MR. DuBOFF)  Okay.  But if the fact --

25  if -- if the evidence is -- if the evidence is that she

CHRISTINE YAGER  - December 11, 2023

1  sent that text message 8 seconds before the collision
2  and then was done using her phone, you would agree that
3  under the terms of your own research, she would not have
4  been considered to be engaged in texting at the time of
5  this accident.
6           MR. WHITE:  Objection; form.
7       A.  Again, yeah.  You're saying if she was not
8  texting, then she would not be texting.  I agree with
9  that statement.
10      Q.  (BY MR. DuBOFF)  Well, I guess my point is, the
11  amount of time, 8 seconds, is enough time that, under
12  the terms of your study, she would no longer be
13  considered to be engaged in texting.
14      A.  That's right.
15      Q.  Okay.  From what you've seen here, according to
16  the terms of the SHRP2 research, if she sends her last
17  text message 8 seconds before the accident, under SHRP2,
18  she would not be considered to be texting; correct?
19      A.  That's correct.  Because they looked at a
20  6-second window.
21      Q.  Right.  And so --
22           (COURT REPORTER CLARIFICATION)
23      A.  Six-second window.
24      Q.  (BY MR. DuBOFF)  And it was actually 5 seconds.
25      A.  Prior, and one second after.

ASSOCIATED COURT REPORTERS
(254) 753-3330

Appx_1828

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  Okay.  And I think you earlier described SHRP2

2    is sort of the gold standard in naturalistic driving

3    studies?

4    A.  Yes.  It's highly regarded.

5    Q.  Okay.  And so by those terms, based on what we

6    know, which is that she sent her last text message 8

7    seconds before, if this accident was being analyzed

8    under SHRP2 criteria, text messaging would not even be

9    listed as a secondary task; is that right?

10    A.  According to the data available, there was no

11    evidence that she was sending a text message after the 8

12    seconds.

13    Q.  So based on that, according to the SHRP2

14    criteria, text messaging would not even be listed as a

15    secondary task.

16    A.  In this case, that's correct.

17    Q.  In the seventh bullet down that starts with,

18    "Ms. Smith did not change lanes to avoid the lane

19    obstruction", do you see that?

20    A.  Yes.

21    Q.  Okay.  And then you write later on in that

22    paragraph, "Ms. Smith swerved to the right to try to

23    avoid hitting Mr. Santos, and since there was no damage

24    to the passenger side of the vehicle, this indicates

25    that there was no vehicle in the middle lane that would

Appx_1829

**CHRISTINE YAGER  - December 11, 2023**

1  have prevented her from changing lanes when she observed

2  the Camry and made the adjustment within the leftmost

3  lane."

4              Did I read that correctly?

5      A.  Yes.

6      Q.  Okay.  What methodology are you applying to

7  conclude from the fact that she didn't strike a vehicle

8  when she swerved to conclude that she could have changed

9  lanes sooner?

10     A.  Well, had a vehicle been there, she would have

11 hit it when she swerved.

12     Q.  Okay.  But I'm asking, are you -- is that

13 just --

14     A.  Observation.

15     Q.  Okay.  That's just your inference from the

16 evidence as you understand it?

17     A.  Yes.

18     Q.  And you're not --

19     A.  It leads to the best explanation.

20     Q.  You're not applying any sort of expert

21 knowledge?

22     A.  That's right.

23     Q.  Okay.  That's just your opinion.

24     A.  It's reviewing the data available.  That's

25 right.

Appx_1830

CHRISTINE YAGER  - December 11, 2023

1    Q.  Understood.  But you're not saying, Christine

2   Yager, as an expert, says that this is evidence that

3   there was no vehicle there.  You're saying Christine

4   Yager, as a person looking at this evidence, that's the

5   conclusion that you've come to?

6    A.  Well, I am claiming to be an expert.

7    Q.  Right.  And so I'm asking, if this is --

8   there's a difference between -- experts can still have

9   personal opinions; right?  So there is a difference

10  between what you, as an expert, might personally believe

11  versus an opinion that you derive from applying some

12  sort of expert knowledge that you have.

13           So is this opinion derived from any expert

14  methodology or expert knowledge, or is it just your

15  opinion based on your understanding of the facts?

16    A.  The latter.

17    Q.  Okay.  Would you agree that if you're looking

18  to change lanes on the highway, you need more than just

19  a bare minimum of space to insert -- insert your vehicle

20  into the adjacent lane?

21           MR. WHITE:  Objection; form.

22    A.  If they're -- repeat that.

23    Q.  (BY MR. DuBOFF)  Sure.

24           When you're driving and you're looking to

25  change lanes -- I don't know what -- what kind of car do

**CHRISTINE YAGER   -   December 11, 2023**

1  you drive?

2      A.  A van.

3      Q.  Okay.  So that probably has, like, an 8- or

4  9-foot length, something like that?

5      A.  I don't know.

6      Q.  Okay.  But when you're looking to change lanes,

7  do you say -- let's say your -- your van is 9 feet long.

8  Are you just looking and saying, oh, are there 9 feet

9  between the two vehicles next to me?

10     A.  No.  You want an additional buffer.

11     Q.  Because it's not safe to switch lanes if you're

12 too close to the vehicle that ends up in front of you;

13 correct?

14     A.  That's right.

15     Q.  And it's also not safe to change lanes if you'd

16 be cutting off somebody behind you; correct?

17     A.  Correct.

18     Q.  Okay.  So the fact that there was apparently at

19 the time of impact enough physical space to get over and

20 not hit another car, that does not mean that it was safe

21 to make that lane change earlier, does it?

22          MR. White:  Objection; form.

23     A.  I -- I believe it does.  If you're -- if you're

24 1000 feet away from this lane obstruction and at least

25 two pedestrians -- you know, that's -- I understand

**ASSOCIATED COURT REPORTERS**
**(254) 753-3330**

CHRISTINE YAGER  - December 11, 2023

1  there is some inconsistency there -- that's enough time

2  and distance away to have reduced her speed or changed

3  lanes in order to safely change lanes.

4         She testified that traffic was moderate,

5  and so it wasn't so dense that she could have -- she

6  couldn't have adjusted her speed.  I mean, she could

7  have come to a stop in that time.

8  Q.  (BY MR. DuBOFF)  And do you think coming to a

9  stop on an interstate highway is a safe thing to do?

10 A.  I don't, but she was approaching a potentially

11 life or death situation.  Had she not been distracted,

12 she would have noticed the pedestrians and the lane

13 obstruction.  She claims to have noticed the lane

14 obstruction, and her -- her choice was to remain in the

15 leftmost lane and not attempt to change lanes.  That's

16 the part that -- it's just inexplicable.

17 Q.  Okay.  But just to be clear, that's -- that's

18 you offering a personal opinion, not an expert opinion.

19 A.  Well, I am an expert in this topic, and --

20 Q.  You're an expert in lane change behavior?

21 A.  No.

22 Q.  Okay.  There are lots of human factors studies

23 that have been done about how someone reacts to roadside

24 hazards; correct?

25       MR. WHITE:  Objection; form.

ASSOCIATED COURT REPORTERS
(254) 753-3330

**CHRISTINE YAGER  - December 11, 2023**

1      A.  I presume so.

2      Q.  (BY MR. DuBOFF)  But you don't know?

3      A.  I don't know.

4      Q.  Okay.  So you don't know if those studies have

5   shown that the average reduction in speed, when passing

6   a roadside hazard, is about a mile and a half miles per

7   hour?

8      A.  Say that again.

9      Q.  You -- you think that human factors researchers

10  have analyzed how drivers react to roadside hazards;

11  correct?

12     A.  I presume so.

13     Q.  Okay.  But you have no knowledge of those

14  studies.

15     A.  That's right.

16     Q.  Okay.  So if those studies say that people

17  actually don't, as a rule, switch lanes, you just can't

18  say one way or the other?

19     A.  That's right.

20          MR. WHITE:  Objection; form.

21     Q.  (BY MR. DuBOFF)  Okay.  So when you're offering

22  an opinion that she should have changed lanes, that's

23  not based on any research you've done or any research

24  that you've reviewed; correct?

25     A.  That's correct.

CHRISTINE YAGER  - December 11, 2023

1    Q.  Okay.

2    A.  Other than this information about hazard

3  perception in the prior section.

4    Q.  Well, and that's just how long it takes you to

5  notice it; right?  Right?

6    A.  And it depends on where the driver's eyes are

7  focused.

8    Q.  Sure.  But that doesn't say anything about what

9  do people do once they notice it; correct?

10    A.  That's right.

11    Q.  Okay.  Do you see if you go down, there are a

12  number of bullets.

13          It's also a good -- for next time, a good

14  tip.

15          There's a bullet that starts, "Testimony of

16  the witnesses"?

17    A.  Yes.

18    Q.  Okay.  And then if you skip one, it says, "This

19  means" --

20    A.  Yes.

21    Q.  "-- that there were multiple pedestrians moving

22  around near the Camry for at least the 10 seconds

23  leading up to impact that Ms. Smith failed to notice

24  until immediately prior to striking the victim"?

25    A.  Yes.

Appx_1835

CHRISTINE YAGER  - December 11, 2023

1    Q.  Okay.  You would agree that that -- what you

2  say there is assuming that there were multiple

3  pedestrians moving around the Camry; correct?

4    A.  Yeah.

5    Q.  So you're assuming the truth of the testimony

6  from some of the people there, that they were outside

7  the vehicle at the time of the collision.

8    A.  Yes.

9    Q.  You do not -- you would agree that this opinion

10 does not say that Ms. Smith should have noticed those

11 people.

12   A.  I agree.  It does not say that, no.

13   Q.  You're not offering an opinion on whether

14 Ms. Smith should have been able to observe people

15 outside of the Camry; correct?

16   A.  Correct.  Not there, but I say that later.

17   Q.  Where do you say that?

18   A.  Sorry.  I've read a lot, so...

19        Okay.  Now repeat your question, please.

20   Q.  Sure.  Do you offer an opinion in your report

21 that Ms. Smith should have been able to observe

22 pedestrians standing on the shoulder?

23   A.  I do not.  I -- I -- in the prior bullet, she

24 testified to state what she testified, so...

25   Q.  Okay.

Appx_1836

CHRISTINE YAGER  - December 11, 2023

1      A.  She claimed to have not seen any pedestrians

2  until it was, you know, they suddenly appeared, quote,

3  "in the middle of the lane."

4      Q.  Well, not "they suddenly appeared."  One of

5  them suddenly appeared; right?

6      A.  Yeah.

7      Q.  Okay.  So is it accurate to say that you are

8  not offering an expert opinion on whether Ms. Smith

9  should have been able to identify pedestrians standing

10 on the shoulder?

11     A.  Correct.

12     Q.  And you -- have you heard the term

13 "conspicuity"?

14     A.  Yes.

15     Q.  Okay.  And what is that?

16     A.  Being conspicuous.

17     Q.  Okay.  There's a whole area of human factors

18 research on what folks can see; right?

19     A.  Yes.  Okay.  I'm not familiar with conspicuity

20 research.

21     Q.  Are you saying you're familiar with it under a

22 different term, or you're just not familiar with it?

23     A.  Just the definition of the word.

24     Q.  Okay.

25     A.  But not in the field of research.

CHRISTINE YAGER  - December 11, 2023

1      Q.  So you don't know if there is human factors
2  research on what drivers are able to observe on the
3  roadway?
4      A.  That's right.  I'm unfamiliar.
5      Q.  You're not familiar.
6      A.  Not familiar.
7      Q.  Okay.  Or what -- what a typical driver would
8  be expected to observe on the roadway?
9      A.  That's right.  I'm not familiar.
10     Q.  Does it make sense to you that the more
11  Ms. Smith was focused on the roadway itself, the harder
12  it would be for her to identify anyone that was standing
13  further off on to the shoulder?
14              MR. WHITE:  Objection; form.
15     A.  That does not make sense to me.
16     Q.  (BY MR. DuBOFF)  When you focus on one thing,
17  doesn't it affect your ability to perceive things in
18  your peripheral vision?
19     A.  I believe normal eye scanning behavior of the
20  environment is -- is, like, to a scanning motion, not
21  just fixated on a single location on the roadway.
22              I don't have a source to cite that, but
23  that's just general knowledge that I understood over the
24  years.
25     Q.  Okay.  I think it's the first bullet on -- it

Appx_1838

**CHRISTINE YAGER  - December 11, 2023**

1  kind of crosses over.  So the last bullet on page 5 of

2  your expert report, where you talk about the widths of

3  the lane and the vehicles and things like that.

4              Do you see that?

5      A.  Yes.

6      Q.  And then you -- can you read the last sentence

7  of that bullet, which is on page 6?

8      A.  "For Ms. Smith's adjustment to be enough to

9  avoid hitting the Camry but not enough to move partially

10  into the middle lane, it would require steering

11  precision and near constant visual attention to ensure

12  her course would continue to avoid hitting the Camry,

13  especially when traveling between 85 to 90 miles per

14  hour."

15      Q.  So is it your opinion that it was -- it would

16  be difficult for Ms. Smith or any driver to stay in the

17  left lane while avoiding the Camry?

18      A.  Yes.

19      Q.  Okay.  And -- but you would agree that

20  Ms. Smith did stay in the left lane and did avoid

21  hitting the Camry; right?

22      A.  Yes.

23      Q.  Okay.  So what -- based on what you've written

24  here, the only way she was able to do that was by

25  exercising steering precision and near-constant visual

Appx_1839

CHRISTINE YAGER  - December 11, 2023

```
 1  attention; isn't that right?
 2              MR. WHITE:  Objection; form.
 3      A.  The only way she was able to avoid hitting the
 4  Camry was by having her path not in line with the Camry.
 5      Q.  (BY MR. DuBOFF)  And --
 6      A.  She struck a person, so she -- there wasn't
 7  near-constant visual attention if she didn't notice the
 8  person.
 9      Q.  You don't say anything about a person in this
10  bullet; right?
11      A.  Not in this bullet --
12      Q.  Okay.
13      A.  -- that's correct.
14      Q.  You say that --
15      A.  The point of that sentence was just to point
16  out that if you're trying to avoid or -- like, imagine
17  that you're trying to pass through a gate that's only so
18  wide, and you only have 18 inches of clearance and
19  you're traveling 85 to 90 miles per hour, you're going
20  to have to really focus on your steering position and
21  your visual attention to make sure you clear that on
22  either side.
23      Q.  Which she did.
24              MR. WHITE:  Objection; form.
25      Q.  (BY MR. DuBOFF)  Right?
```

ASSOCIATED COURT REPORTERS
(254) 753-3330

CHRISTINE YAGER  - December 11, 2023

1        A.  She did not hit the Camry.

2        Q.  Right.  And your opinion in your report is that

3   in order for her to do that, it required steering

4   precision and near-constant visual attention; right?

5        A.  Yes.  To avoid hitting that -- in that

6   scenario.  It would normally require steering precision

7   and near-constant visual attention.

8        Q.  And you say "normally" in your report; correct?

9        A.  Yes.  That's correct.

10       Q.  Okay.  "It would require."  So you don't --

11   your opinion is that somebody could not stay in their

12   lane and avoid hitting the Camry unless they exercised

13   steering precision and near-constant visual attention;

14   is that correct?

15       A.  Correct.  It would be very difficult to.

16       Q.  And, therefore, the fact that she did that is

17   inconsistent with her being distracted; correct?

18            MR. WHITE:  Objection; form.

19       A.  I -- I disagree.  Because, again, I really

20   think the critical thing is that why would she -- why

21   would -- if there was a person -- even just one person

22   on the shoulder or in the middle of the lane, if she

23   noticed this hazard up ahead and had 1000 feet of

24   distance, why would she not have changed lanes or slowed

25   down?

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  (BY MR. DuBOFF)  Those are different things.

2              You would agree, regardless of what you

3    think she should have done, the fact that she did pass

4    the Camry without hitting it, the fact that she was able

5    to do that, is inconsistent with her being distracted.

6    Yes?

7    A.  I don't agree.

8    Q.  Okay.  But you just said that -- you just gave

9    an example that there was, like, a gate that someone had

10   to drive through with only 18 inches of clearance;

11   right?

12   A.  Yes.

13   Q.  Okay.  So let's say you had an experiment where

14   you tested people to see if they could do that, and if

15   somebody did that successfully, going 85 or 90 miles an

16   hour, you would be surprised to find out that that

17   person was looking at their phone, wouldn't you?

18   A.  Yes, I would be.

19   Q.  Because your opinion would be that you

20   couldn't -- you couldn't do that if you're looking at

21   your phone; correct?

22   A.  Correct.

23   Q.  Okay.  So the fact that Ms. Smith did that is

24   inconsistent with her being distracted by her phone,

25   isn't it?

Appx_1842

CHRISTINE YAGER  - December 11, 2023

1              MR. WHITE:  Objection.  Objection; form.

2      A.  It's -- it's not inconsistent because she

3  struck a person.

4      Q.  (BY MR. DuBOFF)  Okay.  Let's go back to your

5  example of just having to go through a gate.

6              Somebody could get through that gate,

7  staring at their phone; right?

8      A.  It's possible.

9      Q.  Okay.  But you would just be surprised.

10     A.  Very surprised.

11     Q.  And that's why you would say the fact that she

12  did it doesn't prove that she wasn't distracted, but

13  it's inconsistent with her being distracted.

14     A.  It's surprising that she didn't strike the

15  Camry.

16     Q.  Okay.  If somebody was looking at their phone

17  on the approach here, you would not expect them to be

18  able to avoid the Camry; correct?

19     A.  That's correct.  But it's possible.

20     Q.  It's certainly possible, but it would be

21  surprising; correct?

22     A.  Yes.

23     Q.  In your expert opinion.

24     A.  Yes.

25     Q.  Mrs. Yager, would you agree that multiple

CHRISTINE YAGER  - December 11, 2023

1   studies have found that text messaging negatively

2   affects a driver's ability to maintain lane position?

3        A.  Yes.

4        Q.  But for Ms. Smith to avoid hitting the Camry

5   while staying in her lane required very close lane

6   position; correct?

7                  MR. WHITE:  Objection; form.

8        A.  Yes.

9        Q.  (BY MR. DuBOFF)  And so, again, based on that

10  research that has looked at the effects of text

11  messaging on maintaining a lane position, you would

12  agree that her ability to maintain such a precise lane

13  position is inconsistent with her having been looking at

14  her phone.

15                 MR. WHITE:  Objection; form.

16       A.  Agreed.

17       Q.  (BY MR. DuBOFF)  Would you agree that

18  Ms. Smith's ability to maintain her lane position

19  without hitting the Camry is inconsistent with any use

20  of her phone?

21                 MR. WHITE:  Objection; form.

22       A.  In the facts of this case, I -- I don't think

23  that that is consistent.  Like, I don't -- I'm sorry.

24  I'm confused by your wording again.

25       Q.  (BY MR. DuBOFF)  Sure.

CHRISTINE YAGER  - December 11, 2023

1      A.  Say that again, please.

2      Q.  Would you agree that any use of -- any use of a

3  phone by a driver negatively impacts their ability to

4  maintain lane position?

5      A.  Yes.

6      Q.  So the fact --

7      A.  It can.  It potentially can.

8      Q.  So the fact that Ms. Smith was able to maintain

9  such a precise lane position is inconsistent with any

10  use of her phone.

11            MR. WHITE:  Objection; form.

12      A.  It's possible that it's possibly inconsistent.

13      Q.  (BY MR. DuBOFF)  Well, not possibly

14  inconsistent.  It's possible she was looking at her

15  phone, but it is, in fact, inconsistent; isn't that

16  right?

17            MR. WHITE:  Objection; form.

18      A.  It's possibly inconsistent.

19      Q.  (BY MR. DuBOFF)  You wouldn't expect anyone

20  doing anything with their phone to be able to pass the

21  Camry without hitting it; correct?

22            MR. WHITE:  Objection; form.

23      A.  It would be surprising.

24      Q.  (BY MR. DuBOFF)  Do you see the next bullet

25  where it says, "In road environments and conditions that

ASSOCIATED COURT REPORTERS
(254) 753-3330

Appx_1845

**CHRISTINE YAGER  - December 11, 2023**

1  are more complex, a reasonable, safe driver would

2  maintain visual attention on the roadway until the

3  conditions lighten or the road hazard is passed."

4      A.  I see that.

5      Q.  Okay.  Are you -- are you giving an opinion on

6  what a driver should do or what drivers do, in fact, do

7  in this type of situation?

8      A.  I believe it's both.

9      Q.  Okay.  So I'm not too interested in what you

10  think drivers should do.  No offense, okay?

11          To the extent you're saying what drivers

12  do, in fact, do, what are you basing that on?

13      A.  My expertise.

14      Q.  In what sense?

15      A.  It's common for people to focus more in more

16  complex environments.

17      Q.  But have you done any research yourself or

18  reviewed any research that looks at what drivers do as

19  they're passing hazards on the roadway?

20      A.  Not exactly.

21      Q.  Okay.  So do you have any -- do you have any

22  basis in any research that's been done to say that a

23  reasonable, safe driver would not glance at their GPS as

24  they're passing a hazard?

25      A.  I don't have a specific source to -- to cite

CHRISTINE YAGER  - December 11, 2023

1   here, but just based on the years -- my years of

2   experience, there -- I am aware generally of studies

3   that have looked at different types of workloads on

4   drivers, and they -- they measure, you know -- or they

5   look at how drivers interact in those situations.  And

6   the greater the workload, the more they -- you know,

7   either their attention is divided or they don't want to

8   engage in a secondary task because the environment is so

9   complex.  They don't feel like they have the margin to

10  engage in a secondary task.  This is just general

11  knowledge from my experience.

12      Q.  Okay.  But you're not -- you're not applying

13  any methodology to reach that opinion, is that fair?

14      A.  Not a specific methodology.  Just my expertise.

15      Q.  Okay.  You certainly can't tell me studies have

16  found that X percent of drivers would look -- or strike

17  that.

18              You can't tell me that any study has found

19  that X percent of drivers would maintain 100 percent

20  forward focus on the roadway when passing a roadside

21  hazard?

22      A.  No.  Usually in research nothing is 100

23  percent.

24      Q.  Well, just any percentage.  I mean, you can't

25  tell me any percentage; right?

Appx_1847

**CHRISTINE YAGER  - December 11, 2023**

1    A.  That's right.

2    Q.  Okay.  And you agree that in your report for

3  that paragraph, "In road environments and conditions

4  that are more complex", you don't cite anything to

5  support that opinion?

6    A.  That's correct.

7    Q.  Are you aware of any evidence suggesting that

8  Ms. Smith should have expected a person to enter the

9  path of her vehicle?

10    A.  Just based on her testimony.

11    Q.  Which is what?

12    A.  The fact that she noticed the Camry obstructing

13  her lane partially after sending that last text message.

14    Q.  But do you think it follows from seeing a car

15  that's broken down on the shoulder -- does it follow

16  that there is a risk of somebody running out into the

17  middle of the road?

18    A.  It's a logical inference, yes.

19    Q.  Does that -- I'm sure you've passed a number of

20  cars pulled over on the side of the highway --

21    A.  Yes.

22    Q.  -- right?

23         Has anyone ever run out into the road

24  behind that car?

25    A.  Thankfully --

**ASSOCIATED COURT REPORTERS**
**(254) 753-3330**

CHRISTINE YAGER  - December 11, 2023

1              MR. WHITE:  Objection; form.

2      A.  Thankfully, no.

3      Q.  (BY MR. DuBOFF)  Okay.

4      A.  But when I see a road -- a car on the side of

5  the road, it makes me cautious to pay more attention.

6      Q.  To pay more attention?

7      A.  Yes.

8      Q.  Okay.

9      A.  To look for potential hazards or people.

10     Q.  Okay.  And then a few bullets down, it's the

11  last one before the big bolded bullet, you write, "A

12  reasonable driver would not take their eyes off the road

13  to glance at their GPS as they imminently approached a

14  vehicle obstructing the lane of travel that left very

15  little room for error to avoid hitting said vehicle."

16              Did I read that correctly?

17     A.  Yes.

18     Q.  And, again, some of my questions are going to

19  be repetitive here.

20              Are you giving an opinion on just what you

21  think drivers should do, or are you giving an opinion

22  based on any research about what drivers do in

23  situations like this?

24     A.  It's -- it's both.

25     Q.  Okay.

Appx_1849

CHRISTINE YAGER  - December 11, 2023

 1      A.  It's what I think drivers should do, and it's
 2  based on my general knowledge.
 3      Q.  You would agree that you don't cite anything to
 4  support this opinion.
 5      A.  Agreed.
 6      Q.  And you can't identify for me any studies that
 7  look at eye glance behavior as you're passing a --
 8  approaching or passing a roadside obstacle; correct?
 9      A.  I'm not aware of an exact study at this time,
10  but I would imagine that there is something out there.
11      Q.  Okay.  But you're not aware of any study;
12  right?
13      A.  Not specifically, no.
14      Q.  What you're -- what you're saying here is
15  that -- correct me if I'm wrong -- but you're saying
16  that Ms. Smith should not have glanced at her GPS
17  because glancing at her GPS increased the risk of her
18  hitting the Camry; correct?
19      A.  That's correct.
20      Q.  Okay.  But you agree that she didn't hit the
21  Camry; right?
22      A.  I agree.
23      Q.  So whatever -- whatever risk she took on by
24  glancing at her GPS did not cause her to hit the Camry.
25           MR. WHITE:  Objection; form.

ASSOCIATED COURT REPORTERS
(254) 753-3330

CHRISTINE YAGER  - December 11, 2023

1      A.  I agree.

2      Q.  (BY MR. DuBOFF)  Okay.  Now, on the -- I'm

3  going to try to make this a little more efficient for

4  us.

5           On -- in this last paragraph, okay, if you

6  look down, there is a sentence that starts, "Based upon

7  all of these facts?"

8      A.  Yes.

9      Q.  Okay.  I think everything above that is just

10  your understanding of the evidence in the case.  Why

11  don't you read it and tell me if there is any opinions

12  in there that you want me to ask you about.

13           Does that make sense?

14      A.  Yes.  I understand.

15      Q.  And I'm sure you don't want me to ask you about

16  anything, but read that and let me know if there are any

17  opinions in there or if everything above, based upon all

18  of these facts, is just your understanding of the facts

19  in the case.

20      A.  (Witness complied.)

21           Yes.  I agree.

22      Q.  Okay.  So then starting at "Based upon all of

23  these facts", you write, "it is my expert opinion that

24  it is highly plausible that Ms. Smith was distracted by

25  electronic devices at the time that she hit Mr. Santos."

CHRISTINE YAGER  - December 11, 2023

```
 1       A.   Yes.
 2       Q.   And you would agree that you don't cite
 3  anything to support that opinion.
 4       A.   Correct.
 5       Q.   What do you mean by "highly plausible"?
 6       A.   The most plausible explanation, given the data
 7  available.
 8       Q.   Okay.  And what data is that?
 9       A.   The evidence.
10       Q.   Well, one piece of evidence is that she didn't
11  hit the Camry; right?
12       A.   That's one.
13       Q.   And you've told me that you're not making an
14  assumption one way or the other how long Mr. Santos was
15  in her path for; right?
16       A.   Correct.
17       Q.   So that's kind of -- you're not relying on --
18  you're not basing this opinion on any assumption about
19  how long he was standing there for; right?
20       A.   That's correct.
21       Q.   Okay.  So what -- what data are you -- what in
22  the evidence makes it more plausible -- highly plausible
23  to you that she was distracted?
24       A.   That she failed to change lanes or reduce her
25  speed.
```

CHRISTINE YAGER  - December 11, 2023

1    Q.  Okay.  So --

2    A.  When she first noticed the lane obstruction.

3    Q.  So just to be clear, the only evidence that

4  you're relying on to say that she was distracted is her

5  failure to change lanes or slow down.

6              MR. WHITE:  Objection; form.

7    A.  As well as her testimony that she glanced at

8  her GPS.

9    Q.  (BY MR. DuBOFF)  Okay.  With regard to the lane

10 change and the speed change, we've already talked about

11 how you have no basis for saying she did anything

12 different than a normal driver would do; right?

13             MR. WHITE:  Objection; form.

14   A.  Yeah.  That -- say that again.

15   Q.  (BY MR. DuBOFF)  We talked about how your

16 assumption is that human factors researchers have looked

17 into how drivers respond to roadside hazards; correct?

18   A.  Yes.  I assume they have.

19   Q.  But you're not familiar with any of that

20 research.

21   A.  That's right.

22   Q.  And you would have to be familiar with that

23 research to give an opinion on whether she should have

24 slowed down -- or excuse me.  Strike that.

25             You would have to be familiar with that

**CHRISTINE YAGER  - December 11, 2023**

1  research to give an opinion that a reasonable driver in

2  her situation would be expected to slow down or change

3  lanes.

4         MR. WHITE:  Objection; form.

5     A.  No.  I think my expertise qualifies me to give

6  an expert opinion on this.

7     Q.  (BY MR. DuBOFF)  Tell me what in your expertise

8  allows you to offer an opinion on how drivers respond to

9  roadside hazards.

10    A.  The fact that she was glancing at a GPS, that

11  is an electronic device, and she claims -- she testified

12  that she noticed the Camry obstructing her lane well in

13  advance, and she failed to change lanes and failed to

14  reduce her speed.  And it's unclear how many exactly

15  pedestrians were outside the vehicle, but it had to be

16  at least two, given the data available, and she didn't

17  notice them.  She testified that she didn't notice them

18  until they, quote, suddenly appeared.

19             And in my expertise, that is evidence of

20  distraction.  Either eyes not on the road or she was so

21  cognitively distracted that even if she was looking at

22  the road, she failed to notice them until she was

23  right -- right up on them.

24    Q.  But you -- you've never studied -- tell me if

25  I'm wrong, but you've never studied drivers' abilities

CHRISTINE YAGER  - December 11, 2023

1  to observe and perceive people standing on the road --

2  side of the road; right?

3      A.  That's correct.  I've never done an experiment

4  on that.

5      Q.  You've never done an experiment about a

6  driver's ability to perceive anything on the side of the

7  road; isn't that right?

8      A.  I've been involved in studies that have -- like

9  a driving simulator study that looked at unintended --

10  unanticipated events.  It was funded by Toyota.  I

11  wasn't the lead researcher on it, but I was -- I was

12  involved in the data collection.

13          I believe it had the simulated vehicle

14  unintendedly accelerate, and then there was a -- either

15  a vehicle or a pedestrian that suddenly came across the

16  roadway.

17      Q.  Okay.  But you're saying that -- if I

18  understood you correctly, you're saying that her failure

19  to slow down or change lanes 1000 feet back, that that's

20  evidence of distraction.

21      A.  Yes.  If she were not distracted and she

22  noticed -- if she were not distracted, she would have

23  noticed the pedestrians and she would have noticed the

24  vehicle.  She claims to have noticed the vehicle, and

25  so, to me, the fact that she did not notice the

Appx_1855

**CHRISTINE YAGER  - December 11, 2023**

1  pedestrians is evidence to me that she was not fully

2  paying attention.  That is evidence to me that there

3  is -- there was distraction of some form.

4      Q.  Okay.  The two people that we know were

5  standing out there were Mr. Santos and Ms. Moreno;

6  correct?

7      A.  Correct.

8      Q.  What color clothing were they wearing?

9      A.  I believe she was in a black shirt, and I don't

10  recall what the victim was wearing.

11      Q.  Okay.  Let's say he was wearing all black.

12  What color is the Camry?

13      A.  Black.

14      Q.  Okay.  We've already talked about how you're

15  not an expert on conspicuity or the ability to perceive

16  things of that nature; correct?

17      A.  That's correct.

18      Q.  So you can't offer an expert opinion that an

19  average or typical driver in Ms. Smith's position would

20  be able to pick out 1000 feet away two people standing

21  in black up against a black vehicle.

22      A.  I -- I think it's likely that she would have

23  noticed.

24      Q.  What's that based on?

25      A.  My -- my knowledge.

**ASSOCIATED COURT REPORTERS**
**(254) 753-3330**

CHRISTINE YAGER  - December 11, 2023

1    Q.  Just your intuition?

2    A.  Yes.

3    Q.  Okay.  Is it also highly plausible that

4  Ms. Smith observed the Camry, determined that she had

5  room to pass the Camry without switching lanes, and

6  decided to do so?

7    A.  I don't think that is highly plausible.

8    Q.  Even though that's what happened?

9    A.  I think it's possible.

10   Q.  Why don't you think --

11   A.  I think -- I think the most likely explanation

12 is that she did not notice the Camry or the pedestrian

13 until she was about to strike them.

14   Q.  And is that also just based on your intuition?

15   A.  Based on my review of the evidence available.

16   Q.  But your intuition from that evidence?

17   A.  My inference to the best explanation, given the

18 data available.

19   Q.  Okay.  But you're not relying on, like, a body

20 of research that says, you know -- and I don't mean to

21 make it this specific.  I understand it wouldn't be this

22 specific.  But you're not aware of any body of research

23 that says, oh, if a -- if a driver doesn't change lanes

24 when they see a hazard 1000 feet ahead, that is proof

25 that they were distracted?

CHRISTINE YAGER  - December 11, 2023

1     A.  Correct.  I'm not aware of research that says

2  that.

3     Q.  Is "highly plausible" even a term that's used

4  in the human factors field, as far as you know?

5     A.  Not as far as I know.

6     Q.  Okay.  Most of the time human factors research

7  comes up with things like reaction time increases by X

8  percent; right?

9     A.  Yes.

10     Q.  Or X percent of drivers respond in this way;

11  right?

12     A.  Yes.

13     Q.  Or the average time it takes a driver to make a

14  lane change is Y seconds; right?

15     A.  That's right.

16     Q.  It's not normal in the human factors field to

17  look at a bunch of facts and then say it's highly

18  plausible that this is what was going on?

19     A.  Correct.

20          MR. WHITE:  Objection; form.

21     A.  It's -- it's not common for a researcher -- the

22  goal of research is to remain objective, to conduct

23  experiments and report findings, not to provide opinion.

24          In this role, my -- my job is to serve as

25  an expert witness, to provide an expert opinion, given

Appx_1858

CHRISTINE YAGER  - December 11, 2023

1  the data available and my expertise.

2      Q.  (BY MR. DuBOFF)  And you would agree that a --

3  an important piece of evidence we have is that Ms. Smith

4  was able to avoid hitting the Camry.

5              MR. WHITE:  Objection; form.

6      A.  That is a piece of evidence.  I wouldn't say

7  that's an important piece of evidence.

8      Q.  (BY MR. DuBOFF)  Okay.  After that, you write,

9  "It is also my expert opinion that it is highly

10  plausible that Ms. Smith was distracted by electronic

11  devices to the point where her eyes were either not on

12  the roadway for the majority of the 10 seconds leading

13  up to the collision or she was experiencing

14  inattentional blindness (the 'look but did not see'

15  phenomenon) because her attention was so divided."

16              Did I read that correctly?

17      A.  Yes, you did.

18      Q.  Okay.  Do you really think that someone could

19  have their eyes off the road for the majority of the 10

20  seconds approaching this vehicle without hitting it?

21      A.  No.  It would be highly unlikely to have not

22  hit the vehicle if the person's eyes were not on the

23  road for the majority of 10 seconds.

24      Q.  So can we knock that one out as an option?

25              MR. WHITE:  Objection; form.

Appx_1859

CHRISTINE YAGER  - December 11, 2023

1      A.  No.  Again, because I provided the other

2  scenario, where she may have been looking but so

3  mentally distracted that even if she was staring at the

4  roadway, it didn't register with her.

5      Q.  (BY MR. DuBOFF)  Okay.  But this opinion is you

6  think it's highly plausible that A or B; right?

7      A.  Yes.  That's correct.

8      Q.  Okay.  And A is highly plausible that her eyes

9  were not on the roadway for the majority of the 10

10  seconds leading up to the collision.  You agree that

11  that is very unlikely to describe what happened here?

12      A.  Potentially.  It's --

13      Q.  I'm sorry, but "unlikely" already, sort of,

14  bakes the "potentially" into it.

15           You would be shocked for a driver to have

16  their eyes off the road for the majority of the 10

17  seconds approaching this vehicle and yet still manage to

18  avoid hitting the vehicle; correct?

19      A.  I would be shocked.

20      Q.  Okay.  So then now let's look at B.  "Or she

21  was experiencing inattentional blindness, (the 'look but

22  did not see' phenomenon), because her attention was so

23  divided."

24           For inattentional blindness to apply, she

25  has to be looking at the road; right?

CHRISTINE YAGER  - December 11, 2023

1      A.  That's -- by definition, that's correct.

2      Q.  Okay.  So in that scenario, she's staring at

3  the road; right?

4      A.  Yes.

5      Q.  And what is it that she didn't see?

6      A.  The pedestrians.

7      Q.  Okay.  But those would not be in her direct

8  foveal vision; isn't that correct?

9      A.  At the distance of 1000 feet, it would be.

10     Q.  Okay.  So, again, that gets back to her -- what

11  you say was her inability to identify the pedestrians;

12  right?

13     A.  Yes.

14     Q.  And we've already talked about how you're not

15  aware of any research that would inform your opinion

16  about whether or at what distance you would expect her

17  to be able to see to notice the pedestrians; correct?

18     A.  Not specifically, no.

19     Q.  Okay.  So to the extent we're relying on B,

20  inattentional blindness, you're not familiar with any

21  studies that have applied inattentional blindness to the

22  ability to detect things on the side of the road.

23     A.  Not specifically.

24     Q.  And is -- again, is the only evidence -- are

25  you aware of any other evidence supporting distraction

ASSOCIATED COURT REPORTERS
(254) 753-3330

**CHRISTINE YAGER  -  December 11, 2023**

1  here, other than her failure to slow down or change

2  lanes?

3       A.  Her testimony that she glanced at the GPS.

4       Q.  Just the very moment before she hit Mr. Santos.

5       A.  Same thing.  She testified that moments before,

6  she glanced at her GPS.

7       Q.  Okay.  But that wasn't 1000 feet back; right?

8  It was clear --

9       A.  That's correct.

10       Q.  -- that was much closer to the accident.  Okay.

11       A.  But she was unclear on exactly at what point

12  she glanced at the GPS.  She -- it was at some point

13  within the 1000 feet, but she was not specific on how

14  far back or how close.

15       Q.  Well, did you -- did you listen to her 9-1-1

16  call; right?

17       A.  Yes, I did.

18       Q.  Okay.  Did it strike you that she was in a

19  position to fabricate anything when she was calling

20  9-1-1?

21            MR. WHITE:  Objection; form.

22       A.  I can't speculate on her propensity to lie.

23  That's not my role.

24       Q.  (BY MR. DuBOFF)  She was hysterical; right?

25       A.  She did express a lot of emotion.

**ASSOCIATED COURT REPORTERS**
**(254) 753-3330**

**CHRISTINE YAGER  - December 11, 2023**

1    Q.  Okay.  And she told 9-1-1 in the immediate

2  aftermath of the accident, "I looked real quick at my

3  GPS, and when I looked up, he was there"; right?

4              MR. WHITE:  Objection; form.

5    A.  Yes.  She said that.

6    Q.  (BY MR. DuBOFF)  Okay.  So that doesn't sound

7  like she looked up and then 5 seconds later, she hit

8  him; right?

9    A.  It doesn't sound like she -- sorry -- that she

10  glanced and then looked up and then 5 seconds later hit

11  him?

12    Q.  Right.

13    A.  That's not what her testimony -- what her phone

14  call said, that's correct.

15    Q.  Okay.  Is there anything -- do you acknowledge

16  that -- strike that.

17              Would you agree it's plausible that she was

18  focused on the road, determined that she had enough

19  space to get past the Camry.  As -- as she was very near

20  to the Camry, she glanced at her GPS briefly, at which

21  point Mr. Santos bolted out into the roadway and she hit

22  him?

23              MR. WHITE:  Objection; form.

24    A.  I don't think it's plausible.  Even if there

25  were -- were no pedestrians, to barely give yourself any

**ASSOCIATED COURT REPORTERS**
**(254) 753-3330**

Appx_1863

CHRISTINE YAGER  - December 11, 2023

1  clearance to avoid striking a vehicle and then to glance

2  away as you're imminently approaching, potentially

3  hitting just a vehicle, that -- to me, that is not

4  plausible.

5      Q.  (BY MR. DuBOFF)  Okay.  Do you think -- do you

6  agree it's plausible that Mr. Santos didn't enter her

7  path until a very short time before he was hit?

8      A.  Again, the data is unclear on where he was

9  physically or at what point he -- where he was at the

10 point of impact.

11     Q.  Would you agree that in the human factors

12 field, distractions are measured by their effect on

13 driving performance?

14          MR. WHITE:  Objection; form.

15     A.  Say that again.  Distractions are measured by

16 their what?

17     Q.  (BY MR. DuBOFF)  By how they actually affect

18 driving performance.

19     A.  That's one way, I believe.  I believe measuring

20 them based on, like, workload is another method.

21     Q.  But let's say -- it's common in human factors

22 factor literature to acknowledge that the radio is a

23 potential distraction; right?

24     A.  Yes.

25     Q.  Okay.  And when you say it's a potential

CHRISTINE YAGER  - December 11, 2023

 1  distraction, you mean it's something that could affect

 2  driving performance?

 3       A.  Yes.

 4       Q.  If we were to do a million studies and every

 5  single one of them found that listening to the radio had

 6  no effect on driving performance, we would no longer say

 7  that the radio is a potential distraction; right?

 8       A.  We would say that the radio is potentially not

 9  a risk to driving, not -- it's always going to be a

10  distraction.  You just have to be clear with the --

11       Q.  But how does it distract -- how would it

12  distract you from driving if it doesn't affect how you

13  drive at all?

14       A.  A distraction is defined as a non-driving task

15  that a driver is engaged in.  That's different than the

16  risk a secondary task poses to the driver, potentially.

17       Q.  I understand what you've said about changing

18  lanes and slowing down, but if we just focus on the

19  evidence as it relates to her glancing at her GPS, do

20  you have any basis to say that had she not glanced at

21  her GPS at that point in time, that she would have

22  avoided hitting Mr. Santos?

23            MR. WHITE:  Objection; form.

24       A.  Repeat that one more time.

25       Q.  (BY MR. DuBOFF)  Sure.

CHRISTINE YAGER  - December 11, 2023

1      A.   I'm processing.

2      Q.   If we focus on the last second or two as she's

3   approaching the Camry, do you have any basis to say that

4   had she not glanced at her GPS, she could have avoided

5   hitting Mr. Santos?

6           MR. WHITE:  Objection; form.

7      A.   Yeah.  I don't know.  It's possible that had

8   she not glanced at her GPS, then she wouldn't have

9   struck the victim.

10      Q.   (BY MR. DuBOFF)  And that would depend on how

11   long he was in her path for; correct?

12      A.   Potentially, yeah.  Right.  That would be a

13   factor.

14      Q.   Do you have any knowledge about how stress

15   affects decision-making?

16      A.   A little bit.

17      Q.   What can you tell me about that?

18      A.   In that same study I mentioned that was funded

19   by Toyota, we looked at driver workload and what effect

20   it had on their driving performance in that driving

21   simulator context.

22           I have not reviewed that study in years, so

23   I can't say any of the results at this point, but we

24   applied different methods of increasing the driver's --

25   the participant's workload in -- in the experiment, so

Appx_1866

CHRISTINE YAGER  - December 11, 2023

1  we -- I think we might have used arithmetic questions as

2  one of them, as well as texting.  I don't recall if

3  we -- what other methods we did, but that -- that whole

4  study related to stress and what impact it had on the

5  driver.

6      Q.  Is it fair to say that the general relationship

7  is that the more stressed out someone is, the worse

8  decisions they make?

9      A.  I would -- I would agree with that.

10     Q.  And do you have any reason to think that only

11 applies to drivers?

12     A.  No.

13     Q.  Do you think that someone who is committing a

14 felony and has gotten a flat tire would perhaps be

15 stressed out about the need to avoid interacting with

16 law enforcement?

17             MR. WHITE:  Objection; form.

18     A.  Potentially, but that's not my area of

19 expertise.

20     Q.  (BY MR. DuBOFF)  How does fatigue affect

21 decision-making?

22     A.  I don't know.  I can only speak for myself.

23     Q.  Can you -- can I see just the stuff that you

24 brought?

25             MR. DuBOFF:  Maybe can we take ten?

Appx_1867

CHRISTINE YAGER  - December 11, 2023

```
 1                THE VIDEOGRAPHER:  Sure.
 2                MR. WHITE:  Sure.
 3                THE VIDEOGRAPHER:  Off the record at 2:27
 4   P.M.
 5                (SHORT RECESS)
 6                THE VIDEOGRAPHER:  Back on the record at
 7   2:37 P.M.
 8        Q.  (BY MR. DuBOFF)  Mrs. Yager, I'm just going to
 9   hand you what will be Exhibit 12.
10                (Yager Exhibit 12 marked)
11        Q.  (BY MR. DuBOFF)  Is -- does Exhibit 12 capture
12   the time that you've spent working on this case?
13        A.  With the exception of preliminary conversations
14   in July, yes.
15        Q.  This is all the time that you're going to bill
16   the plaintiff for; is that right?
17        A.  To -- before today, yeah.
18        Q.  Up to -- through yesterday?
19        A.  Yes.
20        Q.  Okay.  And what's your hourly rate that you're
21   charging?
22        A.  Two hundred and fifty.
23        Q.  Is there a different deposition rate or it's
24   all 250?
25        A.  All 250.
```

ASSOCIATED COURT REPORTERS
(254) 753-3330

**CHRISTINE YAGER  - December 11, 2023**

```
 1                   MR. DuBOFF:  And then this will be Exhibit
 2    13.
 3                   (Yager Exhibit 13 marked)
 4       Q.  (BY MR. DuBOFF)  Is Exhibit 13 just a
 5    collection of your notes on this case?
 6       A.  Yes.
 7       Q.  And were those notes generally just ones that
 8    you kept as you were going through the evidence?
 9       A.  Yes.
10       Q.  Okay.  Thank you.
11       A.  These were --
12       Q.  Those are -- go ahead.
13       A.  Oh, just in particular, the video and the
14    deposition, it was just so much, that I needed to take
15    notes while I was going through them.
16                   MR. DuBOFF:  Those are all the questions
17    that I have.  Thank you for your time today.
18                   THE WITNESS:  Okay.
19                        EXAMINATION
20    BY MR. WHITE:
21       Q.  All right.  This is Jacob White, plaintiff's
22    counsel.  I'll ask some questions.  It won't be terribly
23    long.  Okay?
24                   All right.  I want to turn your attention
25    to Defense Exhibit Number 6.
```

**CHRISTINE YAGER  - December 11, 2023**

1                    Okay.  Do you have it in front of you?  I

2  believe this is the SHRP Researcher Dictionary?

3       A.  Yes.

4       Q.  Okay.  Do you know if this -- well, let me ask

5  you this:  What date was this published?

6       A.  October 5, 2015.

7       Q.  Do you know if this data dictionary has been

8  amended or altered since October 5 of 2015?

9       A.  I do not know.

10       Q.  Do you know if this is a true and authentic

11  copy of the most up-to-date version of the SHRP2

12  dictionary data?

13       A.  I do not know.

14       Q.  Data dictionary, excuse me.

15       A.  I don't know.

16       Q.  Okay.  So if someone had issued or published a

17  study or experiment that contradicted your two

18  experimental studies that you published papers on, would

19  expect that you would have been contacted about that?

20       A.  Possibly.

21       Q.  How would that have occurred?

22       A.  Likely through email.

23       Q.  Okay.  From a colleague, just to let you know,

24  hey, you've been contradicted?

25       A.  Yes.

CHRISTINE YAGER  - December 11, 2023

```
 1        Q.  Has that ever occurred?

 2        A.  No.

 3        Q.  Are you aware of any studies that directly

 4   contradict the work you published in 2012 or 2013?

 5        A.  No.

 6        Q.  All right.  Let's go to Plaintiff's -- or

 7   excuse me -- Defense Exhibit 7.

 8        A.  (Witness complied.)

 9        Q.  Okay.  And if you'll turn to page 2200.

10        A.  Okay.

11        Q.  Okay.  So on the par- -- on the section --

12   excuse me -- the paragraph above the heading that says

13   "Further Discussion on Study Design", do you see the

14   last sentence of that paragraph that states, "Thus,

15   while not representative"?

16             Do you see where I'm at?

17        A.  Yes.

18        Q.  Can you read that last sentence for the record?

19        A.  "Thus, while not representative of most

20   text-based communications, the manipulations in this

21   research allow us to make very clear statements about

22   impairments associated with reading and writing

23   text-based messages while operating a vehicle."

24        Q.  And can you explain to us what you meant by

25   that sentence?
```

Appx_1871

CHRISTINE YAGER  - December 11, 2023

 1      A.  The context of the text-based communications,

 2  meaning the fairy tale script that they -- participants

 3  were following.

 4      Q.  So why do you think that those tasks, while not

 5  representative of most text-based communications, do

 6  allow you to make very clear statements about

 7  impairments?

 8      A.  Because they are still reading text-based

 9  messages and writing text-based messages.

10      Q.  And -- and you were aware, when you designed

11  the experiment, that most people are not going to be

12  writing fairy tales as text messages; correct?

13      A.  That's correct.

14      Q.  So can you explain why you chose writing fairy

15  tales as part of the -- one possible way to test writing

16  text messages while driving?

17      A.  I believe we were purposefully trying to get

18  the participants to constantly engage in text writing or

19  text reading.

20      Q.  And was that so you could then insert

21  distractions and then test their reactions --

22      A.  It was to --

23      Q.  -- while they're writing?

24      A.  -- force them to be distracted in those

25  different scenarios and then to measure their -- you

**CHRISTINE YAGER  - December 11, 2023**

1  know, measure their driving performance --

2      Q.  So you --

3      A.  -- and reaction time.

4      Q.  So you had to elicit a distraction.  That was

5  the point.

6      A.  That's correct.

7      Q.  Is one of the problems with naturalistic

8  studies, that it's hard to line up a hazard and a

9  distraction, ethically?

10     A.  Yes.

11     Q.  Okay.  Can you explain that for the record?

12     A.  Yes.  So, again, because a naturalistic study

13  is using real drivers on a roadway, with other drivers

14  on the roadway, you wouldn't want to purposefully

15  distract them because then you're introducing danger.

16  And so it's -- naturalistic is more so meant to just

17  observe drivers in their natural state, and, you know, I

18  believe that it's common for drivers to engage in a

19  distracting task and then stop and then engage in it

20  again and stop and then, you know -- to varying degrees.

21     Q.  Okay.  So let's go to Plaintiff -- Defendant's

22  Exhibit 8, if you don't mind.

23     A.  (Witness complied.)

24     Q.  Okay.  So -- and this is Frank Drews' study,

25  the one you cited in your 2012 paper; correct?

CHRISTINE YAGER  - December 11, 2023

1      A.  Yeah.

2      Q.  All right.  Do -- do you believe that this

3  study contradicts the conclusions of the studies that

4  you conducted in 2012 or 2013?

5      A.  No.

6      Q.  Okay.  Why not?

7      A.  It was differently designed.  I -- I think that

8  they were just very differently designed.

9      Q.  Okay.  So they -- they're testing different

10 things in different ways; is that right?

11     A.  Yes.  And in different environments.

12     Q.  And in different environments.

13          So if the only way -- let's take your 2012

14 study, for example.  If the only way to determine why

15 other studies show different reaction times, all right,

16 and then nail down if it's the type of text that was

17 written, wouldn't that be for them to recreate your

18 study exactly, except for the types of texts that are

19 sent?

20     A.  Yes.

21     Q.  Okay.  Has that ever been done?

22     A.  Not to my knowledge.

23     Q.  Okay.  Would you expect to be informed if that

24 had been done?

25     A.  Potentially.

CHRISTINE YAGER  - December 11, 2023

1      Q.  Okay.  Now, in your -- your 2012 and 2013

2   papers, they were peer reviewed; correct?

3      A.  Yes.  I believe so.

4      Q.  Did -- were any revisions asked for by the peer

5   review committee?

6      A.  Not to my knowledge.

7      Q.  Okay.  Would you -- if there had been revisions

8   requested, wouldn't you have been informed?

9      A.  Yes.

10     Q.  Okay.  Because you were the author?

11     A.  Correct.  It wouldn't have been accepted or --

12  until revision --

13     Q.  Okay.

14     A.  -- if that had been the case.

15     Q.  Okay.  And you've actually been asked to

16  present your paper, both for conferences -- excuse me --

17  strike that.

18          You've been asked to present your 2012 and

19  2013 papers at several conferences; correct?

20     A.  Yes.

21     Q.  Did anybody ever identify methodo- --

22  methodological errors in studies?

23     A.  There were some criticisms, but --

24     Q.  Like what?

25     A.  Well, like the fairy tale choice, and then in

CHRISTINE YAGER  - December 11, 2023

1  the voice-to-text criticism over, like, why didn't you

2  put Siri in driving mode.

3       Q.  Okay.  Okay.  And what were your responses to

4  those criticisms?

5       A.  That in research you have to make certain

6  decisions when designing an experiment, and there is

7  always limitations with them.

8       Q.  Okay.  Okay.  So we talked about how you used a

9  closed course for your study; right?

10      A.  Yes.

11      Q.  For both your 2012 and 2013 or just your 2013

12  study?

13      A.  For both.

14      Q.  For both.

15           And would you agree that one of the

16  problems with naturalistic studies is that while you can

17  identify when someone is distracted, you can't line up

18  the distraction and hazards occurring at the same time;

19  right?

20      A.  Right.  Because it's -- it's -- you're not

21  going to have as many observable data points in that

22  situation because it's natural.  You're just hope -- I

23  mean, not hoping.  You're not hoping for anything to

24  happen.  But in that context, you are -- the chances

25  that a distracting activity and, you know, a hazard will

Appx_1876

CHRISTINE YAGER  - December 11, 2023

1  line up.  It's just -- it's unknown what -- how common

2  that would be.

3      Q.  So, in your opinion, is the best way to test

4  how someone is going to react when they're -- when they

5  encounter a hazard is in a -- an experiment where you

6  can make sure the distraction and the hazard occur

7  simultaneously?

8      A.  If you wanted to measure that, yes.  The

9  more -- the more you can control for that and -- and

10  isolate variables, the -- the better.

11      Q.  And is that what you did in your studies?

12      A.  It's what we attempted to, yes.

13      Q.  And you think you successfully attempted to do

14  it.

15      A.  Yes.

16      Q.  At least that's what you hope; right?

17          So you were asked some questions about

18  change blindness.  Do you remember that?

19      A.  Yes.

20      Q.  So if we wanted to test how change blindness

21  works, vis-a-vis, a driver and a pedestrian, we couldn't

22  do a naturalistic study on that ethically, could we?

23      A.  I would not, yeah.  I would not.

24      Q.  Why not?

25      A.  So change blindness -- what I said in my

**CHRISTINE YAGER  - December 11, 2023**

1  report, Exhibit 1, "Change blindness occurs when a

2  driver engages in a distracting task, focusing their

3  vision on the distracting activity, resulting in a

4  failure to notice changes in the roadway environment."

5           And so given that description, I would not

6  feel ethically okay with putting a naturalistic

7  participant at risk by having them, you know, take her

8  focus off the roadway.

9       Q.  So even in a closed-course experiment, would

10  you feel ethically comfortable putting a live pedestrian

11  or add a distracted driver?

12      A.  Definitely not.

13      Q.  Why not?

14      A.  The liability is just too great for TTI.

15      Q.  Okay.  So is this the same theory on crash test

16  dummies?  You don't actually put a live person in the

17  vehicle you accelerate into a wall.  You put a dummy in

18  it; right?

19      A.  It's -- it's a similar concept, yes.  If, you

20  know, there's a known risk of a potential injury or --

21  or death, you don't want to put a person in that

22  situation.

23      Q.  Okay.  So you were asked some questions about

24  whether or not Evelyn -- excuse me -- whether or not

25  Caylee should have expected a hazard as she approached

CHRISTINE YAGER  - December 11, 2023

1  the Camry.

2           Do you remember that?

3     A.  Yes.

4     Q.  Okay.  So if she had seen the Camry, based on

5  your review of the evidence, as she testified that she

6  saw the Camry well in advance, should she have expected

7  additional hazards around the Camry?

8     A.  It's my opinion that it would be logical to

9  feel caution in that situation had she noticed it in

10 advance.

11    Q.  And would you agree that's because the hazard

12 lights were on, it was a clear day, the road was

13 straight, there were multiple pedestrians standing

14 around the vehicle, and there was clearly some sort of

15 mechanical defect that had occurred?

16    A.  Yes.

17    Q.  Okay.  Caylee did testify -- and I make no

18 aspertations [sic] about whether or not this is true;

19 right?  Caylee did testify that she looked at an

20 electronic device in the Ford Explorer immediately prior

21 to hitting Nehemias Santos; right?

22    A.  Yes.  That's what her testimony was.

23    Q.  Okay.  So if you see something ahead that

24 necessitates or -- where it would be prudent to -- to do

25 a lane change and you don't have enough space to do the

Appx_1879

CHRISTINE YAGER  - December 11, 2023

1  lane change, what else could you do to give yourself

2  more space to do the lane change?

3       A.  Reduce your speed.

4       Q.  Okay.  That -- you've reviewed the module data

5  from Caylee's Ford Explorer; correct?

6       A.  Yes.

7       Q.  Do you recall what her speed was on approach to

8  the Toyota?

9       A.  Yes.  It was between 85 and 90 miles per hour.

10      Q.  Do you remember what her speed was almost

11  immediately before hitting Nehemias Santos?

12      A.  It's in my notes.  Let me see.  I believe it

13  was 87.

14      Q.  Okay.  Thank you.

15           And it's -- it's your testimony that if

16  what she said was true, she should have changed lanes;

17  right?

18      A.  That is my opinion, yes.

19      Q.  Okay.  So you were given an analogy -- I think

20  you brought it up about a gate, about driving through a

21  gate.

22           Do you remember that?

23      A.  Yes.

24      Q.  All right.  And correct me if I'm wrong.  I

25  think your analogy was if you're driving through a gate

**CHRISTINE YAGER  - December 11, 2023**

1  and it's narrow, especially if you're driving through

2  that gate at 85 to 90 miles an hour, you're going to

3  want your hands 10 and 2, and you're going to be want to

4  be locked-on, focused?

5      A.  That's correct.

6      Q.  Particularly if touching the gate leads to

7  death to you or somebody else; right?

8      A.  Yes.

9      Q.  That's the analogy; right?

10     A.  Yes.

11     Q.  Now, of course, that's not the situation here;

12 right?  Because she didn't have to drive through the

13 gate.  She could have just gotten in the middle lane;

14 right?

15     A.  That's right.

16     Q.  Why do you think she could have gotten in the

17 middle lane?

18     A.  Because she could have reduced her speed.  She

19 noticed this in advance, with enough time and distance

20 to have either reduced her speed so that it was safe to

21 change lanes or to have just changed lanes if it was

22 clear at that time.

23     Q.  Okay.  So -- and I want to be 100 percent

24 clear.  You don't know if she didn't hit the Camry --

25 strike that.  I don't want to use double negatives.  All

CHRISTINE YAGER  - December 11, 2023

1  right?
2           You agree she didn't strike the Camry with
3  her Ford Explorer.
4      A.  Based on reviewing the data, I don't believe
5  that she struck the Camry.
6      Q.  But you don't know if that's because she made
7  an adjustment to the right or if it's because she was
8  going to hit it and then she swerved to the right as she
9  was striking Nehemias Santos?
10      A.  That is correct.
11      Q.  You don't know.
12      A.  I don't know.
13      Q.  The data is --
14      A.  The data --
15      Q.  -- the data you looked at --
16      A.  -- is unclear on whether -- which of those it
17  was.
18      Q.  Okay.  So let's look at the last bullet point
19  of your opinion.
20           So the bolded bullet point on the last page
21  of your report, do you see that?
22      A.  Yes.
23      Q.  Okay.  So you agree here, you use the language
24  that it's highly plausible that Ms. Smith was distracted
25  by electronic devices, and that it's highly plausible

**CHRISTINE YAGER  - December 11, 2023**

1  that she was distracted by electronic devices to the

2  point where her eyes were not on the roadway, yada,

3  yada, yada; correct?  That -- that's your language;

4  correct?

5      A.  That's correct.

6      Q.  Is that another way of saying you think it's

7  more likely than not that those things are true?

8      A.  Yes.

9      Q.  Okay.  And this conclusion of yours is based on

10 your expertise, your review of all the evidence, and

11 your -- the prior studies and experiments you've done;

12 correct?

13     A.  That's correct.

14     Q.  Okay.  Plus your -- what you know as a common

15 person walking around in the world; correct?

16     A.  That's correct.

17     Q.  Okay.

18     A.  As a driver myself.

19     Q.  Okay.  So you were asked some questions by

20 defense counsel about whether or not -- or how long

21 Nehemias was standing in the roadway, whether that could

22 be a factor in the collision.

23         Do you remember that?

24     A.  Yes.

25     Q.  Okay.  And you said it's possibly a

Appx_1883

CHRISTINE YAGER  - December 11, 2023

1   contributing factor; is that right?

2        A.  Yes.

3        Q.  Are there other contributing factors, such as

4   her speed, that would matter?

5        A.  Yes.

6        Q.  Are there other contributing factors, such as

7   whether she was paying attention to the roadway, that

8   would matter?

9        A.  Yes.

10       Q.  Okay.  All right.

11             MR. WHITE:  I reserve the rest of my

12   questions for trial.

13             MR. DuBOFF:  I just have a couple more.

14                     EXAMINATION

15   BY MR. DuBOFF:

16       Q.  The questions that Mr. White asked you about

17   anybody contradicting your study -- or your studies,

18   excuse me -- you just reported those studies as here is

19   what we found under these particular testing conditions;

20   correct?

21       A.  That's correct.

22       Q.  Nothing in your report -- there is no

23   conclusion in your report that says, therefore, this

24   experiment shows -- one second.

25             Nothing in your -- either of those papers

CHRISTINE YAGER  - December 11, 2023

1   says that based on this research, we can conclude that

2   texting while driving doubles a driver's reaction time;

3   correct?

4        A.  That's correct.

5        Q.  Okay.  So it's one thing to say, hey, when we

6   make people write a fairy tale, here is the effect it

7   had on distraction time.  That's a lot different than

8   saying, and, therefore, now we know that text messaging

9   itself doubles a driver's reaction time; right?

10                MR. WHITE:  Objection; form.

11       A.  That is different.

12       Q.  (BY MR. DuBOFF)  Okay.  And nobody else knows

13  that you're offering that opinion in this case, as they

14  would need to to contradict that; right?

15       A.  Say that again.

16       Q.  Nobody who would -- you haven't published your

17  opinion in this case to anyone outside this case; right?

18       A.  That's right.

19       Q.  Okay.  With the -- just to clear up on the

20  naturalistic driving study, in a naturalistic driving

21  study, you don't tell anyone to do anything; right?

22       A.  I don't know.  I've never conducted a

23  naturalistic study.

24       Q.  Okay.

25       A.  I don't know what basic instructions they're

CHRISTINE YAGER  - December 11, 2023

1  told, if any.

2      Q.  Is it your understanding that people are told

3  just to go about their normal lives?

4      A.  I -- I don't know.

5      Q.  Okay.  But you understand that the vehicles are

6  instrumented to detect crashes, near misses, and things

7  like that; right?

8      A.  Yes.  And likely other variables as well.

9      Q.  Right.  And so the whole point is that you're

10  not putting people in to dangerous situations.  You're

11  analyzing -- you're analyzing those dangerous situations

12  when they arise naturally; correct?

13      A.  Right.  The purpose is just to observe.

14      Q.  Okay.  So certainly -- do you know even just

15  generally how many miles SHRP2 has covered?

16      A.  I don't know.

17      Q.  Does 49.5 million miles sound like it's in the

18  ballpark?

19      A.  Sure.

20      Q.  Okay.  And so certainly what you could do is

21  look at accidents or near misses that are recorded in

22  SHRP2 and then analyze the effect of any variable you

23  want on those accidents; right?

24      A.  It's one way of, yes, measuring.

25      Q.  And you would agree that based on what you've

Appx_1886

CHRISTINE YAGER  - December 11, 2023

1  been presented here, based on the evidence available,

2  this would not be even considered a text messaging

3  accident, according to SHRP2.

4       A.  According to SHRP2, no.

5       Q.  Mr. White asked you about whether -- what she,

6  upon seeing that the Camry was pulled over, whether

7  she --

8       A.  Although, actually, can I go back to that last

9  question, please?

10           In SHRP2 there would have been a camera in

11  the vehicle, and so had there been a camera in the

12  vehicle to see what Ms. Smith was doing for those 5

13  seconds prior and one second after, that might reveal

14  that potentially there was texting behavior going on.

15  But given the data available, we don't know what exactly

16  took place after that last text message was sent.

17       Q.  Sure.  If Ms. Smith was the subject in SHRP2

18  and all that happened is what we know happened, which is

19  that she sent a text message 8 seconds before this

20  accident, if she had been a subject in SHRP2 and

21  somebody was categorizing this accident, they would

22  categorize it as not related to text messaging.

23           MR. WHITE:  Objection; form.

24       A.  Again, because there was no camera in the

25  vehicle -- she wasn't a subject in SHRP2.  Otherwise,

CHRISTINE YAGER  - December 11, 2023

1   there would be more information available to

2   definitively determine that or not.

3        Q.  (BY MR. DuBOFF)  Okay.  But if she was in

4   SHRP2, sends a text message 8 seconds before the

5   accident, and then put her phone away, you would agree

6   that, according to SHRP2 parameters, this would not be

7   considered a text messaging accident?

8        A.  I would agree with that, yes.

9        Q.  Mr. White asked you questions about if she had

10  seen the Camry, should she have expected other things to

11  happen.

12             Do you recall his questions about that?

13       A.  Yes.

14       Q.  Okay.  And I think you said -- well, do you

15  recall your response?  She should have expected what?

16       A.  That it should have elicited more caution.  If

17  you see hazard lights on and pedestrians, it should make

18  a person aware.

19       Q.  The point of haz- -- the point of hazard lights

20  is just to attract attention; right?

21       A.  That's one -- that's one reason.

22       Q.  Okay.  But based on her testimony, she saw the

23  Camry; right?

24       A.  Yes.

25       Q.  So at that point, hazard lights aren't

CHRISTINE YAGER  - December 11, 2023

1    providing any additional information; right?

2                MR. WHITE:  Objection; form.

3       A.   It -- it could provide additional information

4    that there's a situation that's ongoing rather than an

5    abandoned vehicle, for example, without hazard lights.

6       Q.   (BY MR. DuBOFF)  Okay.  Now, do you think -- do

7    you think it's -- the questions that you were asked

8    about what she should have expected, the answers that

9    you gave here is based on purely on your personal

10   opinion; right?

11      A.   And my background.

12      Q.   Well, what background tells you any better than

13   anyone else what a driver should expect when they see a

14   disabled vehicle with people around it?

15      A.   My famil- -- familiarity with my research and

16   others.

17      Q.   And what does that research show you?

18      A.   I just -- I have knowledge and expertise in

19   traffic safety research in general, and so I think more

20   than an average person, I am more sensitive and aware of

21   risky driving situations and how drivers should or

22   should not respond.

23      Q.   Fair enough.  But Ms. Smith is a normal person;

24   right?

25      A.   That's right.

ASSOCIATED COURT REPORTERS
(254) 753-3330

Appx_1889

CHRISTINE YAGER  - December 11, 2023

1    Q.  Right?  So you were offering an opinion on what
2    she should have expected?
3        A.  Yes.
4        Q.  Okay.  And can you point to any authority
5    outside of your own opinion to support the notion that
6    if you see people by a disabled vehicle on the side of
7    the highway, that you should expect that somebody is
8    going to run into your lane of travel?
9        A.  I -- I would say -- I would appeal to human
10   decency.  If you see a human being on the side -- on the
11   shoulder or in the lane of a highway and you're
12   traveling 85 to 90 miles per hour, the decent thing to
13   do is to do what you can reasonably to avoid striking a
14   person.
15       Q.  Right.  But --
16       A.  Which would involve reducing speed and/or
17   changing lanes to get away from the people.
18       Q.  What do you think is reasonable to expect
19   people standing on the side of the highway to do?
20       A.  To stay clear of traffic.
21       Q.  That would be priority number one; right?
22       A.  Yes.
23       Q.  It would be insane for someone to step into the
24   left lane of an interstate highway; right?
25       A.  It would be very dangerous.

ASSOCIATED COURT REPORTERS
(254) 753-3330

CHRISTINE YAGER  - December 11, 2023

```
 1        Q.  So a normal driver, it would not be reasonable
 2   for them to anticipate that an adult is going to run
 3   further into the highway.
 4               MR. WHITE:  Objection; form.
 5        A.  It would not be anticipated.
 6        Q.  (BY MR. DuBOFF)  Okay.  Because especially in
 7   human factors research, we don't just assume that people
 8   are going to do completely irrational and reckless
 9   things; right?
10        A.  We don't assume that people are going to do --
11        Q.  Completely irrational and reckless things?
12        A.  That's right.
13        Q.  Okay.  Okay.  Thank you.
14               MR. DuBOFF:  Those are all the questions I
15   have.
16               THE VIDEOGRAPHER:  Okay.  Off the record at
17   3:03 P.M.
18               (Deposition concluded at 3:03 P.M.)
19               (Signature waived)
20
21
22
23
24
25
```

ASSOCIATED COURT REPORTERS
(254) 753-3330

CHRISTINE YAGER  - December 11, 2023

```
 1              UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2

 3   ERICK RODERICO PIUARA          )
     GONZALEZ, Individually         )
 4   and as Special Administrator   )
     of the Estate of NEHEMIAS R.   )
 5   PIVARAL SANTOS, DECEASED,      )
     ERICK SANTOS and EVELYN MORENO)
 6                                  )
            Plaintiff,              )  Civil Action No. 3:22-CV-02714-K
 7                                  )
     VS.                            )
 8                                  )
     CAYLEE ERIN SMITH and EASTMAN )
 9   CHEMICAL COMPANY,              )
                                    )
10          Defendants              )

11   ---------------------------------------------------

12             REPORTER'S CERTIFICATION OF THE ORAL

13           VIDEO DEPOSITION OF CHRISTINE YAGER

14                  DECEMBER 11, 2023

15   ---------------------------------------------------

16       I, Robin Cooksey, CSR, RMR, TCRR, a Certified

17   Shorthand Reporter and Notary Public in and for the

18   State of Texas, hereby certify to the following:

19       That the witness, CHRISTINE YAGER, was duly sworn

20   by the officer and that the transcript of the oral

21   deposition is a true record of the testimony given by

22   the witness;

23       That the original deposition was delivered to MR.

24   GREGORY J. DuBOFF;

25       That a copy of this certificate was served on all
```

ASSOCIATED COURT REPORTERS
(254) 753-3330

Appx_1892

**CHRISTINE YAGER  - December 11, 2023**

```
 1  parties and/or the witness shown herein on _____.

 2      I further certify that pursuant to FRCP Rule

 3  30(f)(1) that the signature of the deponent:

 4      ____ was requested by the deponent or a party

 5  before the completion of the deposition and that the

 6  signature is to be before any notary public and returned

 7  within 30 days from date of receipt of the transcript.

 8  If returned, the attached Changes and Signature Page

 9  contains any changes and the reasons therefore;

10      __X__ was not requested by the deponent or a party

11  before the completion of the deposition.

12      I further certify that I am neither counsel for,

13  related to, nor employed by any of the parties or

14  attorneys in the action in which this proceeding was

15  taken, and further that I am not financially or

16  otherwise interested in the outcome of the action.

17      Certified to by me this 27th day of December, 2023.

18

19      _____
        Robin Cooksey, CSR, RMR, TCRR
20      Texas CSR #2807
        Expiration Date:  1-31-26
21      Associated Court Reporters
        Firm Registration No. 29
22      425 Austin Avenue, Suite 1206
        Waco, Texas 76701
23      (254) 753-3330

24

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2
 3  ERICK RODERICO PIUARA          )
    GONZALEZ, Individually and     )
 4  as Special Administrator of    )
    the Estate of NEHEMIAS R.      )
 5  PIVARAL SANTOS, DECEASED,      )
    ERICK SANTOS and EVELYN        )
 6  MORENO,                        ) CIVIL ACTION
                                   )
 7        Plaintiffs,              ) NO.: 3:22-CV-02714-K
                                   )
 8  VS.                            )
                                   )
 9  CAYLEE ERIN SMITH and          )
    EASTMAN CHEMICAL COMPANY,      )
10                                 )
          Defendants.              )
11  ---------------------------------------------------------
12             ORAL AND VIDEOTAPED DEPOSITION OF
13                    ORLANDO CARREON
14                   December 20, 2023
15  ---------------------------------------------------------
16
17     ORAL AND VIDEOTAPED DEPOSITION OF ORLANDO CARREON,
18  produced as a witness at the instance of the Defendants,
19  and duly sworn, was taken in the above-styled and
20  numbered cause on December 20, 2023, from 10:01 a.m. to
21  5:04 p.m., before CHARO L. DUNLAP, CSR, in and for the
22  State of Texas, reported by machine shorthand, at 205
23  South Alma Drive, Allen, Texas, pursuant to the Federal
24  Rules of Civil Procedure and the provisions stated on the
25  record and/or attached hereto.
```

EXHIBIT
T

ORLANDO CARREON, DECEMBER 20, 2023

Page 2

```
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
 3      JACOB D. WHITE
        Arkansas State Bar No. 2015239
 4      Taylor King & Associates, P.A.
        410 North Thompson Street
 5      Suite B
        Springdale, Arkansas 72764
 6      479-208-4780
        Jacobwhite@Taylorkinglaw.Com
 7
 8
 9  FOR THE DEFENDANTS:
10      GREG J. DUBOFF
        Virginia State Bar No. 82062
11      McGuire Woods LLP
        800 E. Canal Street
12      Richmond, Virginia 23219
        804-775-1154
13      804-698-2054
        GDuboff@mcguirewoods.com
14
15
16  ALSO PRESENT:
17      ALEXIS FRANK; Videographer
18
19
20
21
22
23
24
25
```

Appx_1895

```
1                    I N D E X
                                                    Page
2
     Appearances.....................................   2
3
                                                    Page
4  ORLANDO CARREON
5      DIRECT EXAMINATION BY MR. DUBOFF.............   4
6
                         EXHIBITS
7  No.   Description                              Page
     1    REPORT....................................  15
8
     2    CV........................................  15
9
     3    TRAFFIC CRASH RECONSTRUCTION, SECOND ......  41
10        EDITION, BY LYNN FRICKE
11   4    PHOTO.....................................  82
12   5    TWO IMAGES OF MS. MORENO..................  89
13   6    PICTURE OF MS. MORENO'S FRONT SIDE........ 106
14   7    DEPOSITION OF ERICK SANTOS................ 113
15   8    IMAGE OF ERICK SANTOS..................... 115
16   9    FOUR PHOTOS OF THE CAMRY.................. 119
17   10   TWO FIGURES FROM MR. MONTALBANO'S REPORT... 151
18   11   FIGURE 145 FROM MR. MONTALBANO'S REPORT.... 170
19   12   SAE PAPER WRITTEN BY DR. JEFFREY MUTTART... 181
20   13   MR. MONTALBANO'S OPINIONS AND ............ 229
          CONCLUSIONS
21
     14   PORTIONS OF A BOOK BY JEFFREY MUTTART ..... 238
22        CALLED DRIVERS RESPONSES IN EMERGENCY
          SITUATIONS
23
24  CHANGES AND SIGNATURE                          274
25  REPORTER'S CERTIFICATION                       276
```

Appx_1896

1                   P R O C E E D I N G S

2                   THE VIDEOGRAPHER:  Going on the record in

3   the videotaped deposition of Orlando Carreon.  Today's

4   date is December 20th, 2023, time 10:01 a.m.  This

5   deposition is being taken under the Federal Rules of

6   Civil Procedure in the United States District Court for

7   the Northern District of Texas, Civil Action

8   No. 3:22-CV-02714-K.

9                   For the record, Counsel will state their

10  appearances and then the court reporter will swear in the

11  witness.

12                  MR. WHITE:  Jacob White, counsel for

13  Plaintiffs.

14                  MR. DUBOFF:  Gregory Duboff, counsel for

15  Defendants.

16                  THE REPORTER:  Agreements or stipulations?

17                  MR. WHITE:  No.

18                  (Witness was sworn.)

19                      ORLANDO CARREON,

20  called as a witness on behalf of the Defendants, after

21  having been first duly sworn, testified as follows:

22                      DIRECT EXAMINATION

23  BY MR. DUBOFF:

24      Q.  Mr. Carreon, you received your Bachelor of

25  science from Texas A&M in 2018; correct?

Appx_1897

ORLANDO CARREON, DECEMBER 20, 2023

Page 5

1     A.  Correct.

2     Q.  And you -- your major was industrial

3 engineering?

4     A.  That's correct.

5     Q.  And you had a minor in engineering project

6 management?

7     A.  Correct.

8     Q.  Can you just briefly describe what coursework

9 you completed as an undergraduate that is sort of

10 relevant to accident reconstruction?

11    A.  Sure.  So the engine -- any engineering degree

12 is going to have the foundational work, the science, the

13 physics, the math that we'll end up utilizing in accident

14 reconstruction.  There is coursework that's not directly

15 related to accident reconstruction, but any engineering

16 degree is going to have that foundational work, and

17 certainly my degree had that.

18    Q.  Aside from the foundational sort of science

19 courses, did you, as an undergraduate, take any classes

20 focused on accident reconstruction as a discipline?

21    A.  Not -- besides the foundational work, no.

22    Q.  Right, yeah.  And so not -- no classes where

23 the specific focus of the class was how do we apply those

24 principles to car accidents?

25    A.  Correct.

Appx_1898

1    Q.   Okay.  And then you are currently -- and it --

2 so you graduated in December of 2018 from A&M; correct?

3    A.   That's correct.

4    Q.   And then it looks like you started working for

5 Axiom Reconstruction immediately after that?

6    A.   Shortly after that.  I graduated in December

7 and started work here in January 2019.

8    Q.   Okay.  No jobs in between I assume?

9    A.   No.

10    Q.   Okay.  And then you've been doing that from

11 then until now?

12    A.   Correct.

13    Q.   You are currently pursuing a Master of Science

14 degree from Purdue; is that correct?

15    A.   That's correct.

16    Q.   And when did you start that program?

17    A.   I don't recall off the top of my head.  It had

18 to be within the last couple of years.  There was a time

19 where I decided not to take classes depending on my

20 workload and what I have going on, but so far I have

21 taken several courses.

22    Q.   Okay.  Is there -- do you know how many credit

23 hours you need to receive your Master's?

24    A.   30.

25    Q.   And how many have you completed?

ORLANDO CARREON, DECEMBER 20, 2023

Page 7

1     A.  Nine.

2     Q.  Okay.  So you're almost a third of the way --

3     A.  Yeah.

4     Q.  -- there?

5     A.  At the moment, yeah.

6     Q.  Okay.  But you've been -- is it -- have you

7  been taking courses through Purdue for two years?

8     A.  Depending on when the courses are offered,

9  because it is online, so I'm not there at the university,

10 I have a limited amount of courses that I can take, so it

11 hasn't been continually.  There might be a gap of a

12 semester in between.  And I typically only take a course

13 per semester.  And regular fall, spring, right.

14    Q.  Okay.

15    A.  Summer is compressed and with a job can be, you

16 know, somewhat difficult.

17    Q.  Right.  You work for Axiom full-time; is that

18 right?

19    A.  That's correct.

20    Q.  Okay.  But can you recall, even if -- I don't

21 need exactly, but can you tell me what calendar year it

22 was that you took your first course through Purdue?

23    A.  Let's see.  So -- so February -- no.

24 January 2022 is whenever -- the first course that I took,

25 which was in my CV, Page 2.  CE597 would have been the

1 first course that I took.

2      Q.  Okay.  I see.

3      A.  Yeah.

4      Q.  And are these -- is your CV, Exhibit 2, is that

5 up to date as far as courses that you've completed?

6      A.  Well, I don't list all the coursework that I've

7 taken because every single course isn't going to apply to

8 what I do.  But in this case that -- those three courses

9 that you see on the CV, they're related to what we do in

10 some aspects, so they're placed there for that reason.

11      Q.  Okay.  But it's fair to say that you have --

12 it's been almost two full years since you started at

13 Purdue; correct?

14      A.  Yes.

15      Q.  And at this point you're about a third of the

16 way towards your degree?

17      A.  Correct.

18      Q.  So is it -- if you were to stay on this pace,

19 it would take another four years to complete your degree;

20 right?

21      A.  No.  I plan to ramp up how many credit hours I

22 take.  So I've chosen to take less than what is normal,

23 but my plan as I've laid it out with my grad advisor, you

24 know, includes all that; right.

25      Q.  Sure.  And it sort of sets what your plans are,

ORLANDO CARREON, DECEMBER 20, 2023

Page 9

1  if you were to stay at the pace you've maintained for the

2  past two years, you would not actually complete all your

3  coursework for another four years; isn't that right?

4      A.  If I continue at the pace that I have been at,

5  correct.

6      Q.  Okay.  And are all of the courses that you take

7  through Purdue online?

8      A.  Yes.

9      Q.  So there's no in-person component?

10     A.  No.

11     Q.  Are they -- the whole online school thing is a

12 little bit -- I'm too old.

13     A.  Sure.

14     Q.  But I know there are sort of -- let's see --

15 self-paced I think is a term that I've heard where, hey,

16 you know, the lectures are -- the videos are available

17 online, kind of watch them when you can.  Other online

18 courses are, you know, everybody's remote, but class is

19 at 9 o'clock on Wednesday; you've got to log in.

20         What -- can you explain how your courses work?

21     A.  So every class is going to be a little

22 different, but in the classes that I've taken at Purdue

23 they'll provide you with the material.  You review it on

24 your own time, and then we'll have sessions with the

25 professor where he goes over the material in a little

ORLANDO CARREON, DECEMBER 20, 2023

Page 10

1  more detail, answers any questions the students have.  So

2  we schedule a time that works for everybody or most

3  everybody, maybe there's sessions, right, that align with

4  people's schedule.  But that's how, kind of, it works.

5  And then we'll have exams or projects that we have to do

6  in a timely manner.

7           So the only difference that really is, is

8  there's not necessarily a scheduled time where class

9  happens.  It's more review the work, the material, and

10 then we'll have a conversation about it every so often;

11 right.  That's up to the professor to decide.

12      Q.  Okay.  And are there any sort of capstone

13 requirements to that Master's program or is it just once

14 you complete enough courses you get your Master's?

15      A.  There's different routes that you can take.

16 There's a non-thesis, there's a thesis.  I haven't gotten

17 along where I need to decide what I want to do, but

18 there's different options.

19      Q.  Okay.  You are not a professional engineer; is

20 that right?

21      A.  Correct.

22      Q.  Do you know -- or are you even eligible to sit

23 for the professional engineer exam in Texas?

24      A.  I am.

25      Q.  You are eligible?

Appx_1903

ORLANDO CARREON, DECEMBER 20, 2023

Page 11

1    A.  Yes.

2    Q.  Okay.  You just have chosen not to do that?

3    A.  I have not scheduled a time for the examination

4 so...

5    Q.  Do you intend to sit for that exam at some

6 point?

7    A.  Yes, I've thought about it, yeah.

8    Q.  Okay.  But no -- no current fixed plans on when

9 you would do that?

10    A.  Right.

11    Q.  For your ACTAR accreditation, the Accreditation

12 Commission for Traffic Accident Reconstruction, when did

13 you receive that accreditation?

14    A.  That was in July of this year.

15    Q.  Okay.  Can you explain the process for how you

16 receive that?

17    A.  Sure.  So the ACTAR is the Accreditation

18 Commission for Accident Reconstruction is you submit your

19 credentials, what classes you've taken particular to

20 accident reconstruction, if you have a degree, whatever

21 else might be relevant to -- to the committee, and you

22 submit all that material along with any references,

23 anything like that.

24          The company reviews it to see if you're

25 eligible to sit for an examination.  It's about an

Appx_1904

ORLANDO CARREON, DECEMBER 20, 2023

Page 12

1  eight-hour examination.  You take a multiple-choice

2  questions, a practical exam, and after you go through

3  that portion, then you will either become accredited or

4  not accredited.

5      Q.  Okay.  When did you sit for the exam, do you

6  recall?

7      A.  It was July -- July 2023.  They started the

8  accreditation as soon as the -- but you don't receive the

9  results for like 60 days.

10     Q.  Okay.  And have you -- but you've gotten the

11 results?

12     A.  Yeah.

13     Q.  Okay.  And you passed?

14     A.  Yes.

15     Q.  Okay.  Did you pass -- was that the first time

16 you had taken the exam?

17     A.  No.  I took the -- I took the other exam -- I

18 don't recall exactly when, but I had to take this --

19 there's two portions.  There's a multiple choice portion

20 and a practical portion, and I had to take the second

21 portion because it involves drawing vehicles.  And the

22 practical exam you have to be drawing the vehicles to

23 scale, and if you're off within certain degrees, then the

24 whole calculation can differ from what the tolerance that

25 they give you -- the tolerance that the exam gives for a

ORLANDO CARREON, DECEMBER 20, 2023

Page 13

1  correct answer.  It's not an exact, it's a range, and so

2  I have to take the examination again.

3      Q.  Okay.

4      A.  The second portion.

5      Q.  Okay.  So for ACTAR accreditation, there is a

6  written portion and a practical application portion?

7      A.  Right.  Not written portion, it's a multiple

8  choice.

9      Q.  Okay.

10     A.  Multiple choice, fill in the blank, that sort

11  of examination.

12     Q.  And that aspect you passed the first time you

13  took it?

14     A.  Uh-huh.

15     Q.  And the practical application portion of the

16  test, you failed that the first time you took it?

17     A.  Yes.

18     Q.  Okay.  And then you had to retake it?

19     A.  Uh-huh.

20     Q.  Did you pass the second time you retook it?

21     A.  Yes, I believe so.

22     Q.  Okay.  So you've only -- do you want to think

23  about that?

24     A.  I passed the third time, yeah.

25     Q.  The third time.  Okay.  So you failed once,

Appx_1906

 1 failed twice, and then you passed the third time?

 2     A.   Uh-huh.

 3     Q.   Okay.  How long -- is there a time that they

 4 make you wait between when you're allowed to -- if you

 5 fail how long until you can try again?

 6     A.   Not necessarily.  You have to sign up in time,

 7 but you can be registered for the exam, right, because

 8 they need to prepare all the coursework -- all the exams;

 9 right.

10     Q.   Okay.  Who assisted you in your work on this

11 case?

12     A.   So we have a person here who works as a diagram

13 person, brings in basically lots of shapes and that sort

14 of thing.  So that would be Mr. Herrera -- Pedro Herrera.

15     Q.   Is that Herrera --

16     A.   Yeah.

17     Q.   -- in -- in Gringo dialect?  Okay.

18     A.   Sure.

19     Q.   Gotcha.

20     A.   So he assisted with the basic layouts of the

21 diagram, the shapes of the vehicles, bringing all that

22 stuff and kind of a foundational basic work.  And the

23 rest, all the positions, all the analysis was done by me.

24     Q.   Okay.  Is it fair -- were you the senior person

25 working on the report?

Appx_1907

ORLANDO CARREON, DECEMBER 20, 2023

Page 15

```
 1      A.  Correct.

 2      Q.  So Mr. Herrera, he'll kind of grab stuff that

 3 you tell him to get?

 4      A.  Right.  He's a draftsman so he's bringing all

 5 the data that we have, compiling it.

 6      Q.  Okay.

 7      A.  And there's other people that, you know, will

 8 process field work, but to my knowledge he's the only one

 9 that worked on it.

10      Q.  And here, let me hand you Exhibit 1, which is

11 your report, and then Exhibit 2, which is your CV.

12              (Exhibits 1 and 2 were marked.)

13      Q.  (By Mr. DuBoff)  You -- on your CV it also

14 lists training that you've received at Northwestern

15 University; is that right?

16      A.  Yes.

17      Q.  And I assume these courses were offered through

18 the Northwestern Center for Public Safety?

19      A.  Correct.

20      Q.  And these are all specific to accident

21 reconstruction; right?

22      A.  Yes.

23      Q.  Can you explain how -- how did those courses

24 work?  Were those purely online?  Did you go to

25 Northwestern for any of them?
```

1    A.   Yes.  So for Traffic Crash Investigation 1 and

2  2, those were done online.  There's a period of two

3  months, three months where the class is from, right, so

4  we get the material, we do work on it and then, you know,

5  they check it, and then we'll take examinations online as

6  well for that one.

7         For Traffic Crash Reconstruction 1 and 2, those

8  were taken in residence and at Northwestern.  And that

9  comprised of -- the reconstruction class was 80 hours,

10  which is the equivalent of two weeks, and then the

11  third -- the second portion was about a week.

12    Q.   Okay.  And so for those, you physically went

13  from here and you stayed in Chicago for a week or two

14  weeks?

15    A.   Yes.

16    Q.   And then I assume you sort of went to class or

17  did -- did coursework all day every day for the most

18  part?

19    A.   Right.

20    Q.   Okay.  Are you -- in your -- on your CV that we

21  have from September, it lists Traffic Crash

22  Reconstruction 2 in November of 2020 as the most recent

23  course you've taken at Northwestern.

24         Is that still accurate?

25    A.   Can you repeat your question one more time?

Appx_1909

1    Q.  Sure.

2         Have you taken any courses at Northwestern that

3 aren't on your CV?

4    A.  No, they're all listed on there.

5    Q.  Are you registered to take any further courses

6 through Northwestern?

7    A.  Not at the moment.

8    Q.  Can you explain what the Northwestern Center

9 for Public Safety is?

10   A.  Sure.  So it's one of several institutions that

11 exist that teach accident reconstruction specific

12 classes.  There's other ones like IPTM.  There's one at

13 the Texas A&M Extension Service that teaches some

14 classes.  But this is one of the institutions that --

15 it's utilized the most for an accident reconstruction

16 career.  So that's kind of the gist of what it is.

17   Q.  From your perspective, what is the reputation

18 for the Northwestern Center for Public Safety within the

19 accident reconstruction community?

20              MR. WHITE:  Objection; form.

21   A.  It would be one of the most utilized

22 institutions, but like I said, there's other ones that

23 exist.

24   Q  (By Mr. DuBoff)  The -- so how many -- how many

25 times have you testified at trial as an expert witness?

Appx_1910

ORLANDO CARREON, DECEMBER 20, 2023

Page 18

```
 1      A.   None.

 2      Q.   None.  How many times have you given a

 3 deposition as an expert witness?

 4      A.   Counting this one, two.

 5      Q.   So this will be your second one?

 6      A.   Correct.

 7      Q.   When was your first one?

 8      A.   It was earlier this month.

 9      Q.   Okay.  Can you tell me what kind of case that

10 was?

11      A.   Generally involved a heavy truck and a

12 passenger vehicle that collided at -- in -- at an

13 intersection.

14      Q.   Okay.  And were you representing the truck or

15 the passenger vehicle?

16      A.   People from the passenger vehicle.  So we were

17 retained by the firm that represents them.

18      Q.   And they're the plaintiffs in the case, I

19 imagine?

20      A.   Correct.

21      Q.   Okay.  Was it a controlled intersection?

22      A.   Yes.

23      Q.   And is the allegation that someone ran a red

24 light or something like that?

25      A.   Correct.
```

Appx_1911

1    Q.  Okay.  I take it your opinions have never been

2  excluded by a court; correct?

3    A.  Correct.

4    Q.  Have you -- I know that you would have gotten

5  these after you submitted your report in this case, but

6  have you reviewed the expert reports that were done by

7  Defendants' experts?

8    A.  I have reviewed Mr. Paul Montalbano's report,

9  but that's the only report that I have -- that I have --

10 been produced that I have reviewed.

11    Q.  Okay.  Have you -- you have not reviewed

12 Ms. Dalley's report?

13    A.  No.

14    Q.  Are you -- are you familiar with the content of

15 her report at all?

16    A.  No.

17    Q.  Are you familiar even with what her expertise

18 is?

19    A.  No.

20    Q.  Okay.  So you're not even aware that

21 Defendants' retained a bloodstain pattern analyst to look

22 at this case?

23    A.  I believe that might have been mentioned but I

24 don't have that report.

25    Q.  Okay.  Have you reviewed the deposition of --

Appx_1912

ORLANDO CARREON, DECEMBER 20, 2023

Page 20

1  I'm going to butcher this.

2       A.  Sure.

3       Q.  Julio Bonilla?

4       A.  No.

5       Q.  Okay.  Have you been told anything about the

6  deposition of the paramedic who was on scene for the

7  accident?

8       A.  No.

9       Q.  Okay.  It's fair to say that a number of your

10 opinions in your report rely on the assumption or the

11 belief that all five of the passengers that were in the

12 Camry when it got the flat tire were standing outside the

13 Camry at the time of the accident; right?

14      A.  Repeat your question one more time.

15      Q.  Sure.

16          A number of the opinions in your report either

17 conclude or assume that all five of the Camry passengers

18 were standing outside the vehicle at the time that

19 Mr. Santos was hit; correct?

20      A.  Based on the testimony, yes.

21      Q.  Okay.  But have you heard that the paramedic on

22 the scene has testified in this case subsequent to your

23 report --

24      A.  Uh-huh.

25      Q.  -- but has testified that he spoke to those

Appx_1913

ORLANDO CARREON, DECEMBER 20, 2023

1 three individuals, Dina Regglado, Melvin Diaz and Erick

2 Santos at the scene, and that they told him at that time

3 that they were in the car when the accident happened?

4      A.  I don't have that deposition, so I don't have

5 information regarding that.

6           There is a body cam video where some gentleman,

7 I don't know if he's a paramedic, says that the

8 translation is that they were in the vehicle.  But other

9 than that, I don't have any information.  But their

10 testimony says that they weren't outside of -- inside the

11 vehicle.

12      Q.  Okay.  And we'll -- we can come back to that

13 later.

14      A.  Sure.

15      Q.  If you look at your report, Exhibit 1, if you

16 turn to Page 3.

17      A.  Yes.

18      Q.  And this would be under -- I take items -- if

19 you look from Page 2 to Page 3, items 1 through 22, are

20 these kind of the stuff you relied on to -- to do your

21 analysis?

22      A.  Yes.

23      Q.  Okay.  Number 17 on Page 3 of Exhibit 1 says,

24 "Review of the Interactive Driver Response Research

25 database by Crash Safety Solutions."

Appx_1914

ORLANDO CARREON, DECEMBER 20, 2023

Page 22

1           Do you see that?

2      A.   Yes.

3      Q.   Can you explain what -- what that is?

4      A.   Sure.  So it's a software that compiles

5 research that has been done as far as perception reaction

6 time, human factors as it relates to accident

7 reconstruction where you can input some parameters that

8 you have to be able to help you and guide you in your

9 conclusions or opinions within the limitations of what

10 you have.

11     Q.   Okay.  And did you use that for this report?

12     A.   I reviewed it but it wasn't primarily used to

13 come to a conclusion.

14     Q.   Okay.  How does -- how does this Interactive

15 Driver Response Research -- is it a computer program?

16     A.   It's a software, yeah.

17     Q.   It's a software.

18          How do you know if it's trustworthy?

19     A.   Well, the -- so the company is called Crash

20 Safety Solutions.  It's developed with other people

21 alongside Dr. Jeffrey Muttart.  I don't know everybody

22 that's involved in -- in the company, but he is one of --

23 one of the leading experts in human factors.

24     Q.   Okay.  So is it all his research that goes into

25 this software?

1      A.  No.  No.  He's compiling all the research that

2  exists and within the limitations of, you know, how the

3  data compares to each other, not every single research

4  has been done in the same manner.  So he's a -- he'll

5  adjust for that or based on what he knows to compile this

6  software and this database essentially.

7      Q.  Okay.  And then how does the -- it's software.

8  Do you have -- do you have it on your personal -- or

9  not -- do you have it on your computer?

10     A.  It's on one of the computers that we utilize.

11 It's not necessarily on my PC.

12     Q.  Okay.

13     A.  Yeah.

14     Q.  Did you run any analysis -- so you would agree

15 that your report does not include any analysis that you

16 did using this software?

17     A.  It utilized research or different items that --

18 for me to come to a conclusion, but there wasn't any

19 calculations, any number output that came about that.

20     Q.  Okay.  So sometimes the software will spit out

21 a number; right?

22     A.  Well, I mean, it will spit out a number if you

23 put something in it, right, just like --

24     Q.  Sure.

25     A.  -- any machine.

Appx_1916

1      Q.  Right.

2      A.  But I didn't utilize it in the sense of any

3 calculation that's within my report.

4      Q.  Right.

5      A.  I reviewed it because it -- in this case, you

6 know, we're dealing, to a certain degree, with human

7 factors, but I certainly didn't input a number and output

8 a number with the information that I had.

9      Q.  Okay.  And so just to be clear, I know that

10 there's -- from what I can tell, there's no numbers from

11 the IDRR software in your report?

12     A.  Correct.

13     Q.  Your testimony is that is because you never --

14 for this case, you never used IDRR to generate any

15 number?

16     A.  Right.  I reviewed it for the context of this

17 case, but I'll -- I'll review it in other cases to see

18 what the information or research tells me.  There are

19 citations that are under there that I'll utilize to --

20 certain guidelines in order how to measure the different

21 cases.  So that's why I put it in my basis of a report;

22 right.

23     Q.  Okay.  So I've had cases where people use the

24 IDRR, but then they didn't like the answers so they

25 didn't include it in their report.

1           You're saying that's not what happened here?

2      A.  Correct.

3      Q.  Okay.  And then you mentioned a Dr. Muttart;

4 right?

5      A.  Uh-huh.  Correct.

6      Q.  And he -- he's the same author for the

7 authority that you list under Item 10 on Page 2 of your

8 report; is that right?

9      A.  Yes.

10     Q.  Okay.  And you said he's considered a leading

11 expert?

12     A.  One of the leading experts.

13     Q.  One of the leading experts?

14     A.  Yeah.

15     Q.  Okay.

16     A.  He might be one of the more well-known, but

17 there's other people that work in the human factors

18 space, but his name is certainly out there.

19     Q.  Okay.  And so human factors is sort of a

20 specialized area of accident reconstruction; is that

21 fair?

22     A.  Yes.

23     Q.  And so oftentimes an accident reconstructionist

24 will use human factors to provide an opinion; right?

25     A.  Yes.

Appx_1918

ORLANDO CARREON, DECEMBER 20, 2023

Page 26

1      Q.  Do you consider yourself to be a human factors'
2  expert?

3      A.  So human factors encompasses a wide variety of
4  items; right?  It's not just related to accident
5  reconstruction, it can be used in ergonomics, how a
6  steering wheel -- how a device is placed how far from --
7  there's human factors in NASA, right, where they locate
8  certain buttons that is optimal for the people using
9  those items.

10         So I'm not a human factors' expert in the
11  entire aspect of human factors, but as it relates to
12  accident reconstruction, yes.

13      Q.  Okay.  So what's the difference between you and
14  Dr. Muttart?

15      A.  Well, he specializes in it.

16      Q.  He specializes in it.

17         And does he -- he does research in it?

18      A.  Yes.

19      Q.  Okay.  So is it fair to say he knows -- he has
20  a lot more specialized knowledge in human factors than
21  you do?

22      A.  Yes.

23      Q.  Okay.  Would you have any basis -- have you
24  ever read anything from Dr. Muttart that you thought was
25  wrong?

Appx_1919

ORLANDO CARREON, DECEMBER 20, 2023

Page 27

1     A.  Not necessarily.  I can't give you a blanket

2 answer for everything that I've read --

3     Q.  Okay.

4     A.  -- for me to recall exactly.  Certainly there

5 might be items that I don't necessarily agree with it

6 completely, but I can't tell you exactly a time that I

7 have.

8     Q.  Have -- have you used the IDRR software in past

9 cases?

10     A.  Yes.

11     Q.  And have you used calculations from IDRR in

12 past cases?

13     A.  Yes.

14     Q.  Can you explain how you've done that in the

15 past?

16     A.  Well, every case is going to be a little

17 different.  So I can tell you different times but --

18 particular to the case, so I don't know that I can give

19 you a blanket answer, like, how I have used it.  There's

20 different types of collisions, right?  So I don't know

21 that I can answer your question properly.

22     Q.  Have you ever, like, included in a report a

23 screenshot of IDRR?

24     A.  I might have included a calculation that comes

25 from IDRR.  I don't know that I've included a screenshot.

1 I don't recall exactly.

2      Q.  Have you ever put data into IDRR and disagreed

3 with the result that it gives you?

4      A.  Not necessarily.  I -- I handle a bunch of

5 different cases.  I don't recall an exact time when --

6 when I disagreed with the IDRR.  There might have been

7 certain aspects that weren't necessarily clear to me,

8 but -- at that time, but I can't --

9      Q.  Okay.

10      A.  -- give you a blanket answer for that.

11      Q.  If you look at your Exhibit 2, your CV.

12      A.  Sure.

13      Q.  On Page 2 of 3 it lists that you went to

14 Interactive Driver Response Research training workshop in

15 November of 2022.

16          Do you see that?

17      A.  Yes.

18      Q.  Can you explain what that workshop was about?

19      A.  Sure.  So in this workshop we're going over --

20 like I said, there's different collisions that we're

21 going to use human factors, and you've got to apply it in

22 the same way for the different types of collisions.  It's

23 not going to be exactly the same.

24          So we were training, reviewing, having

25 questions directly with the people from Crash Safety

Appx_1921

 1  Solutions, now the Driver Research Institute, having a

 2  dialogue with those people that specialize in that field

 3  to get more insight in different situations that we may

 4  encounter in the accident reconstruction field.

 5       Q.  Okay.  And was it also about how to use the

 6  software?

 7       A.  I mean, it included some part of that, yes.

 8       Q.  Okay.  But it had it -- it also was instruction

 9  on sort of the research that backs up the software?

10       A.  Right.  It's not a complete thing, but yes,

11  there's elements of that.

12       Q.  Do you recall where?  Was that remote or in

13  person?

14       A.  I believe that was remote.

15       Q.  Okay.  And did Dr. Muttart, did he participate?

16       A.  Yes.

17       Q.  Okay.  Do you have -- do you know -- how many

18  accident reconstructionists work for Axiom?

19       A.  Including me, five.

20       Q.  Five.  Do all of them, depending on the case,

21  use IDRR?

22       A.  If it calls for it.

23       Q.  Okay.

24       A.  Yes.

25       Q.  Do you have a -- do you have a sense of what

Appx_1922

ORLANDO CARREON, DECEMBER 20, 2023

Page 30

1  the reputation of that software is within the accident

2  reconstruction communities?  Is it viewed as a reliable

3  source?

4              MR. WHITE:  Objection; form.

5      A.  If it's used properly, generally, yes.

6      Q   (By Mr. DuBoff)  Mr. Carreon, with respect to

7  your report --

8      A.  Sure.

9      Q.  -- Exhibit 1, is it a complete statement of the

10  opinions that you intend to offer in this case?

11     A.  Yes.

12     Q.  Okay.  Does your report fully disclose the

13  basis for each opinion you offer?

14     A.  Yes.  It's outlined in the second and third

15  page that I was provided at the time.

16     Q.  Okay.  But is all of the analysis that you did,

17  is that included in the report?

18     A.  Yes.

19     Q.  Okay.  You handed me a thumb drive earlier.

20  Can you explain sort of what's -- I guess other than

21  materials that you received I assume from Mr. White;

22  right?

23     A.  Uh-huh.

24     Q.  Is there anything on this thumb drive that --

25  that you generated?

1     A.   So there is -- in the report there's a diagram

2 that I generate that kind of completes -- or gives an

3 idea of how the collision occurred; right.  There's other

4 diagrams that aren't necessarily included in here that

5 includes dimensions from -- that I measured from the road

6 that we're here to talk about.

7          So there's other items like that.  There's

8 photographs that I relied upon that had scene photos,

9 inspection photos, that are not necessarily, you know,

10 shown in its entirety here, but they're outlined.

11    Q.   Okay.  Do you have any changes to make to the

12 opinions in your report?

13    A.   No.

14    Q.   And you were hired by Mr. White; is that right?

15    A.   I was retained by Taylor King Law to render

16 opinions on this case.

17    Q.   Okay.  Now, how did that -- practically

18 speaking, how did that happen?  Were you contacted

19 directly, do you know?  Was Axiom contacted and you got

20 assigned?  How does that work?

21    A.   I believe we -- Axiom got contacted and the

22 case got assigned to me.

23    Q.   And how -- how does that assignment process

24 work, do you know?

25    A.   So depending on who is available, if there's a

Appx_1924

ORLANDO CARREON, DECEMBER 20, 2023

Page 32

1 client that we've worked with in the past that wants a

2 specific reconstructionist, then they'll say I want this

3 person to be my testifying expert, if it gets that far;

4 right.

5          But in this case, I took the inspection of the

6 vehicle, the Ford Explorer, and the case was assigned to

7 me.  There wasn't any specific outline that they wanted a

8 specific reconstructionist.  So I got assigned the case

9 and here we are.

10     Q.  Are -- where do you fit in?  You said there's

11 five reconstructionists here?

12     A.  Yes.

13     Q.  Where do you fit in as far as experience level?

14     A.  What do you mean by that?

15     Q.  Are you the accident reconstructionist at Axiom

16 with the most experience?

17     A.  No.

18     Q.  Okay.  Are you the reconstructionist with the

19 least experience?

20     A.  No.

21     Q.  Okay.  So who has more -- who has less

22 experience than you do?

23     A.  That might be one of the other people here,

24 Camden, Ryan, Matt, all joined after me.  I don't recall

25 exactly when they joined, but they all would have

ORLANDO CARREON, DECEMBER 20, 2023

Page 33

1  slightly less experience than I do.

2      Q.  Do you know for those folks, was this their

3  first accident reconstructionists job?

4      A.  To my knowledge, yes.

5      Q.  Okay.  And what -- what were you asked to do in

6  this case?

7      A.  I was retained by Taylor King Law to render

8  opinions on this case.  So a full investigation of -- of

9  the collision and from the investigation to render

10 opinions.

11     Q.  Were you asked to focus on any particular

12 areas?

13     A.  No.

14     Q.  Were you asked to determine Mr. Santos'

15 position on the road when he was hit?

16     A.  That wasn't something that was asked, but

17 that's certainly part of the investigation that we

18 conduct in any case, yeah.

19     Q.  Were you told to make any assumptions in your

20 analysis?

21     A.  No.  No.  My opinions are based on my

22 investigation of the case.

23     Q.  Okay.  You weren't told to assume that

24 Mr. Santos was standing in the shoulder?

25     A.  No.

Appx_1926

ORLANDO CARREON, DECEMBER 20, 2023

Page 34

1      Q.  Is it your understanding that you're meant to
2  be -- your role is to be an advocate for the Plaintiffs
3  in this case?
4      A.  My role is to render opinions based on my
5  investigation --
6      Q.  Okay.
7      A.  -- and analysis.
8      Q.  Do you think -- do you understand your role as
9  being impartial?
10     A.  Like I said, I'm here to render opinions based
11  on the investigation, the analysis I conducted.  I don't
12  necessarily -- wouldn't connotate it the way that you're
13  saying that.
14         The investigation is regardless of anybody's
15  assumptions or opinions about this.  These are my
16  opinions based on the investigation that I conducted.
17     Q.  So maybe this is a better way for me to ask it:
18         Do you agree that as an expert, your opinion
19  should be the same no matter which side retained you?
20     A.  Sure.
21     Q.  Do you agree with that?
22     A.  Yes.
23     Q.  Okay.  So even if -- whatever report I get,
24  that should be the same report you would have produced if
25  the Defendants hired you or if Plaintiff hired you?

Appx_1927

 1      A.   There might be different wording that I utilize
 2 but generally the opinions are going to be the same.
 3      Q.   How would the wording change?
 4      A.   Well, I mean, the -- the report is not going to
 5 offer -- let me back up.
 6           It wouldn't be addressed to Mr. White or
 7 whoever retained me to render opinions.  That's, you
 8 know, certain wording that would differ, but the opinions
 9 would remain the same.
10      Q.   Okay.  As an accident reconstructionist, how do
11 you handle when there's competing testimony on a given
12 point?
13      A.   So if there's testimony that doesn't all align,
14 I will take both -- or whichever -- however many people
15 there is, right, and evaluate that with the physical
16 evidence to see if it fits with it.  And so I will
17 utilize both or three, however claims there is, and see
18 if that is consistent with the physical evidence.
19      Q.   Okay.  So your report puts all five of the
20 Camry's passengers outside of the car at the moment of
21 impact; right?
22      A.   Based on their testimony.
23      Q.   Okay.  Is that based on any physical evidence?
24      A.   Some of it, yeah.
25      Q.   Which -- so taking Evelyn Moreno out.  So the

Appx_1928

1 other three, what physical evidence supports their

2 testimony that they were standing outside the car?

3     A.  There isn't any -- there isn't any exact

4 physical evidence that puts them outside the vehicle.

5 It's based on their testimony.

6     Q.  Okay.  So for any time you talk about people

7 being outside the vehicle, you didn't do any accident

8 reconstruction to --

9     A.  Well, there's no evidence that tells us whether

10 they were outside or inside.

11     Q.  Right.  So how -- so why did you decide to put

12 them outside the vehicle?

13     A.  That is based on their testimony.

14     Q.  Okay.  But you agree you've given certain

15 opinions that relies on the fact that they were outside

16 the vehicle; right?

17     A.  I have utilized both -- all the people's

18 testimony and see if they fit with the physical evidence,

19 and Ms. Caylee Smith doesn't fit with the physical

20 evidence.  The testimony of the other people involved

21 fits with the physical evidence.

22     Q.  Okay.  We're going to get to all that.  I'm

23 just talking about whether they were in the Camry at the

24 time that Mr. Santos was hit or whether they were

25 standing outside the Camry.

Appx_1929

ORLANDO CARREON, DECEMBER 20, 2023

Page 37

1        You already testified there's no physical
2  evidence that they were standing outside the Camry;
3  correct?
4        A.  That they were -- there's no physical evidence
5  that they were standing outside or inside.
6        Q.  Okay.  Right.
7            So -- and there's competing testimony on that?
8  There's competing evidence?
9        A.  I don't -- I don't recall Ms. Smith saying that
10 there is -- that they were inside the vehicle.
11       Q.  You saw in the body camera footage that the
12 paramedic told the cops that these people told him they
13 were inside the car; right?
14       A.  That -- I didn't see when -- I didn't hear --
15 see when the people that were at some point in the Camry
16 say that to the paramedic.  The translation was that they
17 were in the Camry.
18       Q.  Okay.  But one of your opinions is that
19 Ms. Smith should have been able to see five pedestrians
20 standing on the shoulder; right?
21       A.  My opinion is that that would have been one of
22 the cues.
23       Q.  Okay.  But whether that cue actually existed,
24 the only basis for that is the testimony of those
25 individuals; correct?

1      A.  Yes.

2      Q.  Okay.  So to the extent that that testimony was

3  wrong, then that opinion would also lack foundation.

4          Do you agree with that?

5      A.  I'm allowed to rely on testimonial evidence.

6  So based on the information that I have, I wouldn't

7  connotate that lacks foundation.

8      Q.  Right.  I'm saying if you assume that their

9  testimony was wrong, then your opinion that them being on

10 the shoulder should have been a cue to Ms. Smith, at that

11 point, that opinion would lack foundation; correct?

12               MR. WHITE:  Objection.  Calls for

13 speculation.

14     A.  I would -- I'm not going to make assumptions

15 based on what could have been.  I'm basing it off the

16 testimonial evidence that I have, and my opinion is based

17 on that.

18         Sure, in the realm of possibilities if that's

19 the case, but we're here to talk about what's more

20 probable than not.

21     Q   (By Mr. DuBoff)  Okay.  Are you familiar with

22 the term "Daubert"?

23     A.  Uh-huh.

24     Q.  And what is that?

25     A.  It's basically how experts are to be relied in

1 a court of law.

2      Q.   And it's the -- it's the basis that allows an

3 expert to be excluded by a court; right?

4      A.   Sure.

5      Q.   So you -- do you understand that any opinion

6 you offer in this case must be based on sufficient facts

7 or data?

8      A.   Must be based on evidence.

9      Q.   And sufficient facts or sufficient data to

10 render that opinion?

11           MR. WHITE:   Objection; form.

12      A.   Based on evidence.   My -- my opinion or answer

13 isn't going to change based on your question.

14      Q   (By Mr. DuBoff)   On what question?

15      A.   Well, you're trying to say "facts," I forget

16 what the second portion of --

17      Q.   I'm just reading from the Federal Rules.

18      A.   Sure.

19      Q.   It says an expert's opinion has to be based on

20 sufficient facts and data.

21           You disagree with that?

22      A.   No, I don't disagree that data is the evidence.

23      Q.   Okay.   You -- do you agree that for your

24 opinions to be admissible, they must be the product of

25 reliable principles and methods?

Appx_1932

1      A.  Yes.

2      Q.  Okay.  Do you agree that for your opinions to

3  be admissible, they must reflect a reliable application

4  of the principles and methods to the facts of the case?

5           MR. WHITE:  Objection; form.

6      A.  To the evidence of the case.

7      Q   (By Mr. DuBoff)  Okay.  Has anyone -- have you

8  received any training on Daubert or the consequences for

9  you as an expert of being excluded?

10     A.  Generally, yes.

11     Q.  And what have you been told?

12     A.  Well, basically what you went over, you know,

13 that if -- based on -- they can make a motion to exclude

14 certain parts of the testimony or entire testimony, if

15 the judge views that the opinions are not based on -- on

16 the evidence -- on scientifically found evidence from the

17 case.

18     Q.  And has anyone talked to you about the

19 reputational consequences for an expert if they are

20 excluded?

21     A.  Generally.

22     Q.  And what have you been told?

23     A.  I mean, it's something that will carry on in

24 your career as you go on, and you may be asked about it

25 later on.

ORLANDO CARREON, DECEMBER 20, 2023

Page 41

1    Q.  Do you agree that traffic reconstruction is the

2 effort to determine from whatever information is

3 available how a collision occurred?

4    A.  Generally, yes.

5    Q.  Do you agree that accident reconstruction is

6 not determining why a collision occurred?

7    A.  It is not necessarily -- that might be a

8 blanket answer.  The contributing factors, that might

9 explain things.  But to answer the totality of why, I

10 wouldn't connotate it that way.

11    Q.  Okay.

12         MR. DUBOFF:  Can I have this marked as

13 Exhibit 3.

14         (Exhibit 3 was marked.)

15         MR. DUBOFF:  You can go ahead and give it.

16    Q   (By Mr. DuBoff)  Mr. Carreon, do you recognize

17 this textbook?

18    A.  Yes.

19    Q.  Okay.  And this is Traffic Crash

20 Reconstruction, Second Edition, by Lynn Fricke"; correct?

21    A.  Correct.

22    Q.  And this is one of the authorities that you say

23 you relied on --

24    A.  Right.

25    Q.  -- to generate your report; right?

Appx_1934

 1          Okay.  Can you turn to Page Number 2 from the

 2 textbook?

 3      A.  Sure.

 4      Q.  And do you see the first sentence of Chapter 1

 5 says, "Traffic crash reconstruction is the effort to

 6 determine from whatever information is available how the

 7 collision occurred"?

 8      A.  Yes.

 9      Q.  And you agree with that?

10      A.  Yes.

11      Q.  Do you see in the very next sentence when it

12 says, "Reconstruction is not determining why a collision

13 occurred"?

14      A.  Yes.

15      Q.  Do you agree with that?

16      A.  Generally, yes.

17      Q.  Okay.  And in what way do you disagree with

18 that?

19      A.  There might be factors that might explain --

20 that might offer some explanation to a collision, but

21 ultimately what we're here to do is to figure out what

22 happened and how it happened.

23          So I -- I generally agree with the statement in

24 the sense of that's not our primary reason to be there,

25 but if we're asked, you know, if there were any

ORLANDO CARREON, DECEMBER 20, 2023

Page 43

1  contributing factors that might explain the collision, in

2  that sense, you know, to that degree, I might slightly

3  disagree.  But generally, yeah, we're here to evaluate

4  how a collision happened.

5      Q.  Okay.  This was the textbook you used?

6      A.  Yes.

7      Q.  You were given at Northwestern?

8      A.  Yeah.

9      Q.  Okay.

10     A.  One of them.

11     Q.  So you offer -- one of the opinions you offer

12  is that Ms. Smith was distracted; right?

13     A.  Yes.

14     Q.  Okay.  And that's saying why the accident

15  occurred; isn't it?

16     A.  That's not saying why, that's a contributing

17  factor.

18     Q.  Okay.  And do you -- you think that you're

19  qualified to offer an opinion that she was distracted?

20     A.  In the umbrella of accident reconstruction,

21  yes.

22     Q.  Okay.  We will talk about that.

23         Actually keep that, if you could.

24         On Page 2 -- just a second, I just need to find

25  it.

Appx_1936

1          Do you agree that the goal of an accident

2    reconstruction is to determine -- and I'm now quoting

3    from Page 2 -- "for each vehicle or pedestrian involved,

4    such particulars as position on the road and facing or

5    heading direction"?

6         A.   I'm sorry, where are you reading that from?

7         Q.   So if you look under "Objectives."

8         A.   Page 2?

9         Q.   On Page 2.

10        A.   Okay.

11        Q.   And do you see the sentence that begins "This

12   involves"?

13        A.   Yes.

14        Q.   "This involves attempting to determine for each

15   vehicle or pedestrian involved such particulars as" --

16   and then some of those are -- "position on the road," and

17   you also have "facing or heading direction"; right?

18        A.   Yes.

19        Q.   Okay.  And do you agree that those are -- are

20   the goals -- some of the goals of an accident

21   reconstruction?

22        A.   Sure.  Some of the goals, yes.

23        Q.   And are you familiar with the concept of

24   "contact matching"?

25        A.   Yes.

Appx_1937

ORLANDO CARREON, DECEMBER 20, 2023

Page 45

1    Q.  What is contact matching?

2    A.  It is where you take however many vehicles or

3  objects are involved in a collision and see what damage

4  was done to one object, what damage was done to the other

5  object, or the lack of contact, and put that in a manner

6  to figure out the puzzle how the collision occurred.  So

7  that's generally what it means.

8    Q.  It's fair to say that accident reconstruction

9  is often describe your job as putting together a puzzle;

10 right?

11   A.  If there's enough information available to come

12 to a conclusion about that, yes.

13   Q.  Okay.  And contact matching is sort of the key

14 tool for putting those puzzle pieces together?

15   A.  It is one tool, yeah.

16   Q.  Okay.  And so in this case, doing contact

17 matching would be matching the damage to the Explorer to

18 the injuries sustained by Mr. Santos; correct?

19   A.  To the degree that we have information about

20 the collision, yes.

21   Q.  Okay.  And you didn't do any contact matching

22 in this case; right?

23   A.  That's incorrect.

24   Q.  Okay.  Show me in your report where you did any

25 contact matching.

ORLANDO CARREON, DECEMBER 20, 2023

Page 46

1      A.   The basis of my opinions and conclusions are

2  based on looking at what damage was observed and then

3  relating that information and the description of where --

4  where the damage is on the Ford Explorer and the contact

5  with the body.

6      Q.   Okay.  Show me in your report where you talk

7  about contact matching.

8               MR. WHITE:  Objection.

9      A.   It is not -- it is not explicitly stated, but

10  the observations I've made and the calculation analysis

11  is done with that basis of looking at the damage from the

12  Ford Explorer and looking at the collision with

13  Mr. Nehemias Santos.

14      Q    (By Mr. DuBoff)  So it's not in your report?

15      A.   Not explicitly.

16      Q.   Okay.  Well, show me -- show me where I would

17  go in your report to understand -- now, contact matching

18  would be figuring out what part of Mr. Santos made

19  contact with what part of the Explorer; correct?

20      A.   Right.  In this case, the collision -- there's

21  different items that Mr. Santos comes in contact with.

22  He comes in contact with the Ford Explorer.  He comes in

23  contact with the rear of the Toyota, and the ground, the

24  road.

25               So there isn't enough evidence for me to come

ORLANDO CARREON, DECEMBER 20, 2023

Page 47

1  to a definitive conclusion of what exactly damage that

2  you see on the Ford was made by Mr. Santos.

3      Q.  Well, what else damaged the Ford other than

4  Mr. Santos?

5      A.  It was just Mr. Santos, but contact matching

6  you need to figure out clear things that you can put

7  together to be able to say that more probable than not

8  that comes from that item.  So related from A to B;

9  right.

10     Q.  Okay.  We agree that the only thing that

11 damaged the Ford was Mr. Santos; correct?

12     A.  Yes.

13     Q.  Okay.  And contact matching would be the -- the

14 attempt to determine how the Ford contacted Mr. Santos;

15 correct?

16     A.  Yes.

17     Q.  Okay.  And you did not do that?

18     A.  Because we don't have enough information to be

19 able to determine conclusively what damage was made from

20 Mr. Santos to the Ford Explorer because he had contact

21 with other items.

22     Q.  Okay.  He had a hole in his skull; right?

23     A.  I never saw an autopsy report to definitively

24 determine that.  There was some injuries to the head,

25 yes.

Appx_1940

ORLANDO CARREON, DECEMBER 20, 2023

Page 48

1    Q.  Okay.  Well, large parts of his brain came out
2  of his body; right?

3    A.  Yes.

4    Q.  Okay.  How else does that happen if you don't
5  have a hole in your skull?

6    A.  With contact with a Toyota, with contact with
7  the ground.  We don't have conclusive evidence that -- to
8  say that it came from the Ford Explorer.

9    Q.  Okay.  But did you even try?

10    A.  Yes.  I looked at it and -- as I have told you,
11  we don't have conclusive evidence because he makes
12  contact with three different items.

13    Q.  So you're saying that if a pedestrian makes
14  contact with multiple items, you can't do contact
15  matching on the first thing that struck them?

16         MR. WHITE:  Objection; Ford -- objection;
17  form.

18    A.  We don't have enough information to make a
19  conclusive -- well, I'll take a look at it to see if I
20  can make a determination, but in order to make a
21  determination, I have to have enough evidence to be able
22  to support that opinion.

23    Q   (By Mr. DuBoff)  Okay.  But you don't -- so you
24  say you tried?

25    A.  Yes.

WENDY WARD ROBERTS & ASSOCIATES, INC.
972.494.2000

Appx_1941

1    Q.  Right?  And you say it was inconclusive?

2    A.  Yes.

3    Q.  Okay.  But that's not in your report?

4    A.  It's not outlined explicitly, but no.

5    Q.  You say "explicitly," I'm just saying at all.

6 It's not in your report at all; correct?

7    A.  Well, I describe the damage that was observed

8 to the Ford Explorer, so I'm describing what damage I see

9 there.  Could I have described what injuries Mr. Nehemias

10 Santos' sustained from pictures?  The only thing that I

11 see is the brain.  I don't know if he sustained any other

12 injuries in order for me to do contact matching.

13    Q.  Okay.  But what was the shape of the damage to

14 the Ford?

15    A.  Which part?  There's multiple.

16    Q.  To the front headlight of the Ford.  What was

17 the damage on the front of the --

18    A.  The headlight was broken.

19    Q.  On the front of the Ford, what was the shape of

20 the damage?

21    A.  There was -- there was a dent in the front left

22 corner of the hood.  The headlight was broken.  There was

23 a crack on the bumper and there was indentation on the

24 front bumper cover.

25    Q.  The damage to the -- around the headlight, what

Appx_1942

ORLANDO CARREON, DECEMBER 20, 2023

Page 50

1  was its shape?

2      A.  It had some curve to it.

3      Q.  Like circular?

4      A.  Not necessarily.

5      Q.  Not necessarily?

6          Okay.  How would you describe the shape of it?

7      A.  It has -- it's pushed rearwards slightly to the

8  side and it has some curve to it.

9      Q.  If you could turn to Page 9 of Exhibit 3.

10         And do you see the -- the figure that's listed

11 as Exhibit 7?

12     A.  Sure.  Yes.

13     Q.  Okay.  Can you read the caption under

14 Exhibit 7?

15     A.  "If two different approaches to a

16 reconstruction issue are used and the same conclusions

17 are reached, this makes your conclusions more credible."

18     Q.  Okay.  Do you agree with that?

19     A.  Sure.

20     Q.  Okay.  So in accident reconstruction, there are

21 sometimes multiple methods to arrive at an answer; right?

22     A.  If they're applied correctly, yes.

23     Q.  Okay.  Like you could do -- to determine the

24 speed of a vehicle, you could do a crush analysis; right?

25     A.  That's one of the methods, yes.

ORLANDO CARREON, DECEMBER 20, 2023

Page 51

1      Q.   And then you could also do, like, an analysis

2  based on tread marks on the road and braking distance and

3  things like that; right?

4      A.   Based on skid marks, yes.

5      Q.   Okay.  And then if those two come to the same

6  answer, that kind of helps verify both answers; right?

7      A.   Yes, it would support your opinion further.

8      Q.   Okay.  So in the accident reconstruction

9  community, it's not considered redundant to try to solve

10 a problem using multiple methodologies.

11          Do you agree with that?

12     A.   Yes.

13     Q.   Okay.  And I guess you haven't seen

14 Ms. Dalley's report, but one way of doing that would be

15 to -- two possible methods to approach a case like this

16 would be to have someone like Mr. Montalbano do an

17 accident reconstruction; right?

18     A.   Yes.

19     Q.   And then you could also have a bloodstain

20 pattern analyst look at the bloodstain evidence and see

21 what conclusions they're able to draw from that; right?

22              MR. WHITE:  Objection; form.

23     A.   Not necessarily.  I'm not aware of what work

24 you said Ms. Dalley did in order to come to her

25 conclusions.  We're certainly not evaluating the same

Appx_1944

1 thing.  We're taking the totality of the physical

2 evidence that we have and she's looking at one item.

3     Q   (By Mr. DuBoff)  Right.  Yeah, I'm not asking

4 you to say whether you agree with her conclusion or not.

5 What I'm just trying to ask is, if she's able to -- so

6 one of Mr. Montalbano's conclusions was about where

7 Mr. Santos was standing when he was hit; right?

8     A.  Yes.

9     Q.  Okay.  And he disagrees with you on that;

10 right?

11     A.  Yes.

12     Q.  Okay.  So if another expert, using a different

13 methodology, like Ms. Graff, used her expertise to also

14 determine where Mr. Santos was standing when he was hit,

15 that would be an example of what's talked about in

16 Exhibit 7 on Page 9 of the Fricke book; right?

17           MR. WHITE:  Objection; form.

18     A.  Well, I don't think that.

19           This book is utilizing the totality of the

20 evidence of the physical evidence that we have, and it

21 refers to accident reconstruction specifically.

22           So if you take all that physical evidence and

23 have two methods using accident reconstruction, and both

24 of them arrive generally at the same conclusion, then

25 yes, this would apply.

ORLANDO CARREON, DECEMBER 20, 2023

Page 53

1          But what you're saying is taking a whole
2 different discipline that is not related to accident
3 reconstruction to apply to what they're stating here.
4      Q    (By Mr. DuBoff)  Okay.  So you consider
5 bloodstain pattern analysis to be completely outside
6 the -- the umbrella of accident reconstruction?
7      A.  Not necessarily.  I'm just saying that they're
8 looking at one aspect.  We're looking at the totality of
9 the physical evidence.
10      Q.  Right.  And sometimes the best approach is to
11 apply two different methodologies to the evidence to try
12 to reach a conclusion; right?
13      A.  Yes, but in this case you're taking two
14 different disciplines where one is looking at one
15 particular item of the physical evidence and the other
16 discipline is taking an account of the entirety of the
17 physical evidence.  So I guess you could say that if you
18 want to compare to that degree, but I don't know that
19 you're comparing exactly apples to apples.
20      Q.  Okay.  Do you agree that vehicle pedestrian
21 accidents are a specific area within accident
22 reconstruction?
23      A.  It is one of the areas, yes.
24      Q.  And when reconstructing a vehicle pedestrian
25 accident topics of particular concern are the first

Appx_1946

ORLANDO CARREON, DECEMBER 20, 2023

Page 54

1  contact position?

2      A.  Is one of the topics, yes.

3      Q.  And pedestrian kinematics; right?

4      A.  One of the topics, yes.

5      Q.  Pedestrian kinematics is like how a pedestrian

6  moves after he's hit; right?

7      A.  Yes.

8      Q.  Do you agree that it is important to have an

9  understanding of how the pedestrian was oriented to the

10  vehicle when hit?

11      A.  If we know that information.  If we have enough

12  information to determine that.

13      Q.  Do you agree that's an important aspect of an

14  accident reconstruction involving a pedestrian?

15      A.  Generally, yes, if we have the physical

16  evidence.

17      Q.  Okay.  Do you agree that important data for

18  determining how a pedestrian moved as a result of a

19  collision is the damage that was caused to the vehicle?

20      A.  Is one of the aspects.

21      Q.  Do you agree that for a pedestrian -- well, let

22  me -- you didn't give any opinion about how Mr. Santos

23  was oriented to the Explorer when he was hit; right?

24      A.  Right, because we don't have physical evidence

25  to support that.

Appx_1947

ORLANDO CARREON, DECEMBER 20, 2023

Page 55

1    Q.   You didn't give any opinion about that?

2    A.   Correct.

3    Q.   You didn't include any analysis in your report

4 about how he was oriented?

5    A.   Correct.

6    Q.   Okay.  Do you agree that for a pedestrian to be

7 thrown forward by impact with a vehicle, it requires a

8 certain kind of contact with the vehicle?

9              MR. WHITE:  Objection; form.

10             MR. DUBOFF:  Let me rephrase it.

11   Q    (By Mr. DuBoff)  Not every vehicle pedestrian

12 collision will result in the pedestrian being thrown

13 forward; correct?

14   A.   Sure.

15   Q.   Okay.  So for a pedestrian to be thrown forward

16 by a vehicle, the impact has to have certain

17 characteristics; right?

18   A.   Generally, yes.

19   Q.   And generally, the pedestrian has to be hit

20 flush by the vehicle; right?

21   A.   What do you mean by "flush"?

22   Q.   Like center mass?

23   A.   There's different types of pedestrian

24 collisions that could result in the pedestrian being

25 projected forward, if that's what you're asking.

Appx_1948

1    Q.  Right.  But those all require that the

2  pedestrian be hit sort of straight on; right?

3                  MR. WHITE:  Objection; form.

4    A.  You can have forward projection without

5  necessarily being head-on.

6    Q   (By Mr. DuBoff)  Okay.  How?

7    A.  Right.  When you say head-on, the way that I --

8  that I think people would characterize it, is the middle

9  of the vehicle.  You can hit a pedestrian towards your

10 right side and towards your left side.  So I think --

11 what you're saying is kind of a blanket statement that I

12 don't particularly agree to.

13   Q.  Okay.  Yeah, I mean not so much where on the

14 vehicle, I'm just talking about where on the pedestrian.

15 The vehicle -- some part of the vehicle has to hit the

16 middle of the pedestrian or around the middle of the

17 pedestrian to throw them forward; isn't that right?

18   A.  Some portion has to be, yeah.

19   Q.  Okay.  And so you give the opinion in this case

20 that Mr. Santos was propelled forward by the Explorer;

21 correct?

22   A.  Correct.

23   Q.  But you don't give any opinion that there was

24 impact with the Explorer that would cause that

25 reaction -- or you don't do any analysis to explain how

Appx_1949

ORLANDO CARREON, DECEMBER 20, 2023

Page 57

1  that would happen; is that right?

2      A.  The analysis based on the trajectory -- so I've

3  taken a look at both claims and the testimony, Ms. Caylee

4  Smith's testimony, and the testimony of the individuals

5  that were at some point in the Toyota Camry.  And I've

6  looked at the evidence, and the evidence aligns with the

7  trajectory from going left to right of a forward motion

8  of a pedestrian moved in that direction that fits all the

9  elements that we have.

10      Q.  Okay.  For a pedestrian to be propelled forward

11  by a vehicle; right?

12      A.  Yes.

13      Q.  The pedestrian has to be hit in a certain

14  location on the pedestrian's body; correct?

15      A.  I think -- I think you're -- you're giving a

16  blanket statement.  So if you want to --

17      Q.  Well, if I just stick my foot out into traffic

18  and a car hits it, I'm not going to be propelled forward;

19  right?

20      A.  It might move slightly forward.

21      Q.  Okay.  But I'm not going to be propelled

22  forward -- I'm going to spin; right?

23      A.  It's possible, yes.

24      Q.  Is it possible or is that what would happen?

25      A.  Well, it's possible you're going to have some

1 movement forward, some movement laterally.  I can't tell

2 you exactly, depending on what kind of vehicle it is --

3     Q.  Okay.

4     A.  -- how the contact was made.

5     Q.  But to give -- you give the opinion that

6 Mr. Santos was propelled forward?

7     A.  Yes.

8     Q.  Okay.  That has to have been caused -- I'm not

9 saying exactly what kind.  That has to have been caused

10 by a certain type of contact between Mr. Santos and the

11 Explorer; right?

12     A.  Yes.

13     Q.  Okay.  But you don't say anything about how the

14 Explorer contacted Mr. Santos?

15     A.  Right, because we don't have enough information

16 from the physical evidence that we all have available to

17 make a determination exactly how Mr. Nehemias Santos'

18 came in contact with the Ford Explorer.

19         He makes contact with several items, the Toyota

20 Camry, the ground.  So for me to make a determine -- an

21 exact determination of how they came in contact -- we

22 know that they came in contact, but an exact

23 determination, there's not enough physical evidence to

24 make a conclusive determination.

25     Q.  But you're saying there is enough physical

ORLANDO CARREON, DECEMBER 20, 2023

Page 59

1 evidence to conclude that he was propelled forward?

2     A.   Yes.

3     Q.   Okay.  But you're saying there's no evidence on

4 the Explorer that supports him being thrown forward?

5     A.   That's not what I'm saying.  I think you're

6 misrepresenting my statement.

7     Q.   You're saying the Explorer -- we don't have

8 evidence to show how the Explorer hit Mr. Santos; right?

9     A.   We know the general area where he hit.

10     Q.   But not how he was hit?

11          MR. WHITE:  Objection; form.

12     Q   (By Mr. DuBoff)  Like what part of the Explorer

13 hit what part of Mr. Santos.  You're saying that in your

14 opinion there is not evidence to make any determination

15 about that?

16     A.   I can make a determination that the Ford

17 Explorer hit the body of Mr. Santos, and based on the

18 other physical evidence and the trajectory we know he

19 took, that's how I'm making my conclusion of the forward

20 projection.

21          I'm not going to tell you limb for limb how he

22 made contact with the Ford Explorer, if that's what

23 you're asking, because the physical evidence isn't

24 sufficient to make that determination.

25     Q.   Okay.  So that's what -- in your opinion, just

ORLANDO CARREON, DECEMBER 20, 2023

Page 60

1 looking at the damage to the Explorer and looking at the

2 injuries that Mr. Santos suffered, your opinion is that

3 there is not enough evidence to determine what part of

4 Mr. Santos the Explorer hit?

5      A.  Right.  Conclusively, that's correct.

6      Q.  But there's nothing in the report explaining

7 why that's inconclusive; right?

8      A.  No.

9      Q.  You just leave it out?

10      A.  I don't leave that out.  My conclusions are

11 based on -- on the trajectory that Mr. Santos takes after

12 he's being hit.  I don't mention in my report...

13      Q.  Can you turn to Exhibit 3, Page 448.

14      A.  Say the page one more time.

15      Q.  448.

16      A.  Sure.

17      Q.  One second.

18          Okay.  So in the paragraph that starts

19 underneath the bolded list; do you see that?

20      A.  Okay.

21      Q.  And there's a -- do you see the sentence that

22 says, "In some cases it is also important to have an

23 understanding of how the pedestrian was oriented to the

24 vehicle when struck."

25          Do you see that?

Appx_1953

ORLANDO CARREON, DECEMBER 20, 2023

Page 61

1     A.  Yes.

2     Q.  Okay.  You're saying we don't know how he was

3 oriented to the vehicle when he was struck; right?

4     A.  Correct.

5     Q.  Okay.  But you didn't include that in your

6 report or explain why you feel the evidence is

7 insufficient to make that determination?

8     A.  Correct.

9     Q.  And if you look over in the right column under

10 the heading number two, the second sentence in that

11 paragraph says, "In addition, the injuries that result in

12 pedestrian collisions can also be quite helpful in

13 explaining how the collision happened."

14         Do you agree with that in general?

15     A.  Say that one more time.  I lost you.

16     Q.  Do you see the sentence that begins "In

17 addition"?

18     A.  Yes.

19     Q.  Okay.  And it says, "In addition, the injuries

20 that result in pedestrian collisions can also be quite

21 helpful in explaining how the collision happened."

22         Do you agree with that?

23     A.  Generally can --

24     Q.  Right.

25     A.  -- also, yeah.

ORLANDO CARREON, DECEMBER 20, 2023

Page 62

1    Q.  But you're saying that in this case the

2  injuries are not helpful in helping determine what

3  happened; right?

4    A.  Conclusively, yes, because of the different

5  items that Mr. Santos contacted.

6    Q.  But that's another area that you just don't

7  even address in your report; right?

8    A.  Correct.

9    Q.  You don't explain any reason why you think this

10  evidence is inconclusive?

11    A.  Correct.

12    Q.  You don't say -- you don't explain what you did

13  to try to figure it out?

14    A.  I -- I explained what I did to figure out how I

15  came to my opinions, but to say why that's inconclusive,

16  correct, I didn't state that.

17    Q.  But in a typical pedestrian accident

18  reconstruction, to figure out you would -- you would

19  agree that ideally you can figure out how the pedestrian

20  is oriented to the vehicle at contact; right?

21    A.  Repeat that one more time.

22    Q.  Ideally in a pedestrian accident, you would be

23  able to figure out how the pedestrian is oriented to the

24  vehicle at the time of impact?

25    A.  In a perfect world, yes.

ORLANDO CARREON, DECEMBER 20, 2023

Page 63

1    Q.  Okay.  And the -- typically the two most

2 helpful pieces of evidence for that would be the injuries

3 to the pedestrian; right?

4    A.  I wouldn't characterize it that -- that way.

5 It's one -- certainly one of the elements that we can

6 utilize for the reconstruction, but...

7    Q.  And one of the most commonly utilized elements;

8 right?

9         MR. WHITE:  Objection; form.

10    A.  If it's available, yes.

11    Q   (By Mr. DuBoff)  Okay.  And another commonly

12 utilized piece of evidence is damage to the vehicle;

13 right?

14    A.  Yes.

15    Q.  Okay.  So those are the places that an accident

16 reconstructionist would normally look at to try to figure

17 out the orientation of the pedestrian; right?

18    A.  If we have enough information to determine

19 that, yes.

20    Q.  Well, you would always look at it; right?

21    A.  Yes.

22    Q.  Okay.  But your report, you don't even say that

23 you looked at those things; right?

24    A.  It states that I looked at the damage, the

25 at-scene photos that's included in all that.  I don't say

Appx_1956

1 that in my report, but I state why I came to my

2 conclusions and opinions.

3     Q.  But you don't explain why -- these really

4 commonly used pieces of evidence, you don't explain in

5 your report why you found those to be unhelpful in this

6 case?

7     A.  Correct.

8     Q.  Okay.  Do you recall Mr. Montalbano's

9 conclusions?

10     A.  Generally, yes.  I don't know them word for

11 word, but yes.

12     Q.  Okay.  Does it sound familiar that he said that

13 the damage to the front of the Explorer was localized

14 circular contact damage to his left front headlight at an

15 elevation ranging from 3.0 to 3.5 feet from the ground,

16 and an inboard depth of approximately one foot?

17     A.  That sounds familiar, yes.

18     Q.  Do you disagree with that?

19     A.  Yes.

20     Q.  You disagree with that?

21     A.  Well, he states that the headlight -- there is

22 some -- the headlight is cracked, so I don't know how

23 he's making the determination that it's circular.

24          There is a dent on the front hood that from

25 some pictures may appear to be -- has some curvature,

1  some curves, but definitely not circular in -- in nature.

2      Q.  Okay.  But do you agree that the damage to the

3  headlight is at an elevation -- the damage to that part

4  of the vehicle is at an elevation from three feet to

5  three-and-a-half feet?

6      A.  Approximately.

7      Q.  Okay.  And there's no -- there's no damage

8  higher -- there's no, like, damage to the hood; right?

9      A.  Well, there's damage to the corner of the hood.

10     Q.  Right.  But further up above three-and-a-half

11 feet there's no damage; correct?

12     A.  Correct.

13     Q.  Okay.  And there is no damage below; right?

14     A.  Well, there is damage below.

15     Q.  Okay.  What's the damage below?

16     A.  There is a crack -- as I stated before, there

17 is a crack on the bumper.  There's an indentation on the

18 front bumper cover that can be seen in the inspection

19 photos that I took and the at-scene photos, that is

20 directly below where Mr. Montalbano states that there

21 isn't any damage.

22     Q.  Okay.  So that's all the way at the bottom on

23 the bottom of the trim; right?

24     A.  Right.  And he states that there isn't any

25 below.

ORLANDO CARREON, DECEMBER 20, 2023

Page 66

1    Q.  Okay.  Do you -- is there any damage between

2 those two?

3    A.  The crack.

4    Q.  Okay.  And do you think the crack could have

5 been caused by whatever hit the headlight?

6    A.  I mean, it's possible.  We know -- but there

7 is -- what we can observe is that there is damage --

8    Q.  Okay.

9    A.  -- at the -- on the bumper.  There's a crack.

10    Q.  Okay.  What else other than Mr. Santos' head

11 would make that damage to the Explorer's headlight?

12    A.  It could be a fist, an elbow, a shoulder a

13 knee.

14    Q.  A fist?

15    A.  Sure.

16    Q.  Was Mr. Santos -- but --

17    A.  A hand.

18    Q.  Okay.  But if he's sticking a hand out, then

19 the car is not hitting his body; right?

20    A.  Wait.

21        MR. WHITE:  Objection; form.

22    A.  I don't understand your question.

23    Q  (By Mr. DuBoff)  If he's -- if what the

24 Explorer hit was his fist, okay?

25    A.  Uh-huh.

ORLANDO CARREON, DECEMBER 20, 2023

Page 67

1    Q.  Then the Explorer would not have hit the center

2 of his body.  Do you agree with that?

3    A.  You're having it extended, he could -- he could

4 have it retracted.  He doesn't have to have it extended,

5 and that would still hit the center of his body.

6 You're -- you're explaining one scenario that may explain

7 that, but he doesn't have to have it extender --

8    Q.  And so you think that if somebody -- if a

9 pedestrian is standing with their fist in the middle of

10 their body?

11   A.  They could make that damage.  Something else

12 could make that damage, but it's not just particular to

13 the head.

14   Q.  You really -- okay.  So if he's standing here

15 with his fist in the middle of his body and the Explorer

16 collides with him --

17   A.  Uh-huh.

18   Q.  -- you think it's going to make damage that

19 looks like that on the Explorer?

20   A.  It could.

21   Q.  What are you basing that on?

22   A.  Based on the fact that we don't have patterns

23 for what kind of damage a headlight makes.  When a

24 headlight gets hit, it breaks into pieces.  So in the

25 sense -- it's in the realm of possibilities of, like,

Appx_1960

ORLANDO CARREON, DECEMBER 20, 2023

Page 68

1   what kind of damage could be expected.  I'm not saying

2   that is what made the damage.  I'm saying we don't know

3   what damage -- what damage was caused by which parts of

4   Mr. Nehemias Santos' body.

5       Q.  You would agree that there's no damage above

6   the headlight; right?

7       A.  There is damage to the hood of the vehicle

8   that's above the headlight.

9       Q.  Can you show me in your report where it shows

10  damage to the hood?

11      A.  Sure.  Let's take a look at Page 12 of my

12  report.  There is Figure 13 and Figure 4 -- yeah,

13  Figure 13.  On your left side there's a picture where

14  there's damage to the front left corner of the hood,

15  where there's a deformation rearwards that can also be

16  slightly seen on the second picture to the right.

17          In my inspection photo, Page 15, Figure 17, you

18  can see in the picture of the Ford Explorer that there is

19  deformation rearwards of the front left corner of the

20  hood.

21      Q.  Okay.  So I'm talking about the hood that

22  actually like lifts up.  The part of the hood that would

23  lift up.

24      A.  That is part of the --

25      Q.  This part that's peeled -- that's curled back

ORLANDO CARREON, DECEMBER 20, 2023

Page 69

1  in Figure 13 of your report?

2      A.  Well, sir, I said Figure 13 to the left side.

3      Q.  Okay.  So you're talking about the -- what you

4  described as a curve shape; right?

5      A.  That has -- yeah.

6      Q.  Okay.  And Mr. Montalbano measured the height

7  of that damage, and that's what, at three-and-a-half feet

8  above the ground; right?

9      A.  Yes, that's what he mentioned.

10     Q.  Okay.  So is there any damage of an elevation

11 higher than three-and-a-half feet from the ground?

12     A.  That's not what your question was.

13     Q.  Okay.  Well, then I'm asking that question now.

14 I disagree, but that's fine.

15     A.  Okay.

16     Q.  Is there any damage higher than

17 three-and-a-half feet from the ground?

18     A.  No.

19     Q.  Okay.  Now -- so do you think any conclusions

20 can be drawn from that, about how Mr. Santos was oriented

21 when he was hit?

22     A.  That he was possibly crouching down.  We don't

23 know his exact, position but that's one of the

24 conclusions that could be made about it.

25     Q.  Okay.  So you agree that it's possible that he

Appx_1962

ORLANDO CARREON, DECEMBER 20, 2023

Page 70

1  was crouching down?

2      A.  It's possible, yeah.

3      Q.  Okay.  Your conclusion that Mr. Santos' body

4  was propelled forward --

5      A.  Yes.

6      Q.  -- into the rear of the Toyota, and against

7  Ms. Moreno, can you explain the basis for that

8  conclusion?

9      A.  Sure.  So in the at-scene photos we have

10 pictures of the Toyota Camry.  We observe damage to the

11 rear bumper of the Toyota Camry.

12         Ms. Moreno states in the body cam video that

13 she gets hit on her torso part -- part of her back and

14 that she -- in -- in her testimony she indicates that she

15 was moved forward.  We also see concentration of blood

16 and her rear.

17         And we know based on where Mr. Santos came to

18 rest originally, right, he was moved by Mr. Erick to move

19 him out of the road, that's -- and if you take the

20 totality of that evidence, you can't come to that rest

21 position from a trajectory from the middle of the lane.

22         The only place that it could come from is

23 towards the left side of the shoulder -- left of the

24 solid yellow line, somewhere in that general area in

25 order for you to get that trajectory from left to right

WENDY WARD ROBERTS & ASSOCIATES, INC.
972.494.2000

1  to fit the physical evidence.

2      Q.  So the physical evidence is -- is that the

3  impact to Ms. Moreno; right?  That's one of the things

4  you listed?

5      A.  Yes.

6      Q.  Okay.  And then his final -- or his initial

7  rest position?

8      A.  Right.

9      Q.  Okay.

10     A.  From the collision, because he gets moved

11 afterwards.

12     Q.  Okay.  How far behind the Camry do you believe

13 Mr. Santos was standing when he was hit?

14     A.  We don't know -- we don't have enough

15 information from the physical evidence -- evidence to

16 determine that.  He was some distance away.  I can't tell

17 you exactly.

18     Q.  Okay.  If you turn -- on Exhibit 1, if you turn

19 to Page 20 -- or actually start with Page 19 of

20 Exhibit 1.

21     A.  Yes.

22     Q.  And that the heading for this section is

23 "Creation of Scaled Diagrams"; right?

24     A.  Yes.

25     Q.  Okay.  And then what follows is Figure 23,

Appx_1964

ORLANDO CARREON, DECEMBER 20, 2023

Page 72

1  which you represent to be a scaled diagram; right?

2       A.  Yes.

3       Q.  Okay.  And Mr. Santos is the figure on there.

4  This is a bird's eye view, and Mr. Santos is the one who

5  is about to be hit by the Explorer; is that right?

6       A.  Correct.

7       Q.  Okay.  In this scaled diagram you have him

8  standing a full car length behind the Camry; correct?

9       A.  Approximately.

10      Q.  Okay.  How long was the Camry?

11      A.  I can take a look at my case data binder.

12          It was approximately 189.5 inches.

13      Q.  That's, like, 16 feet; right?

14      A.  Approximately, yeah.

15      Q.  Okay.  So you think he was standing around

16  16 feet behind the Camry?

17      A.  The representation that is on the scene diagram

18  is a general area.  I never make an opinion exactly where

19  he's standing.  Based on the trajectory and the physical

20  evidence that we have, he was some distance away from --

21  directly behind the Toyota.  I can't tell you -- nobody

22  can tell you exactly where he was at when he was hit.  He

23  was some distance away.  This is a general representation

24  of the physical evidence that we have.

25      Q.  It's a general representation that you called a

ORLANDO CARREON, DECEMBER 20, 2023

Page 73

1  scaled diagram?

2       A.  Well, the items are scaled, yes.

3       Q.  Well, doesn't a scaled diagram mean that

4  everything is to scale?

5       A.  Right.  If you want to say that he's

6  approximately 16 feet, sure, but this is a general

7  representation of the reconstruction.

8       Q.  So you -- is it your opinion that he could have

9  been 16 feet behind the Camry?

10      A.  I don't know exactly what distance he was at.

11      Q.  I didn't ask that.

12          Could he have been 16 feet behind the Camry?

13      A.  He could have been 10, 15, 20.  I can't tell

14  you exactly -- yes, it's a possibility.  I don't know.

15      Q.  Okay.  And how is that consistent at all with

16  anything any witness said?

17      A.  All the witness -- the testimony that the

18  witness's state is that he's some distance away.  They --

19  during the testimony, they're provided a non-scaled

20  diagram of this vehicle that appears to be larger,

21  representing the Toyota, in a diagram of a highway of

22  three lanes -- or a road with three lanes, and they

23  approximately put where they remember people being.  They

24  don't make an exact determination where exactly he was

25  standing.  They say behind the Toyota, some distance.

1          This is a representation generally of the area
2 where he would have been.
3     Q.   Okay.  Ms. Moreno told police at the scene that
4 he was standing right next to her; right?
5     A.   To her -- yes.
6     Q.   Okay.  So that's wildly different than what's
7 in your diagram; right?
8               MR. WHITE:  Objection; form.
9     A.   From that, yes.  But her testimony is she
10 doesn't indicate where he was standing but...
11     Q   (By Mr. DuBoff)  But she says within an arm's
12 reach --
13     A.   Yes, she said --
14     Q.   -- in her deposition testimony?
15     A.   Yes, she states that.
16     Q.   Okay.  So, again, this is wildly inconsistent
17 with her deposition testimony as well; correct?
18               MR. WHITE:  Objection; form.
19     A.   I wouldn't connotate it as or wildly
20 inconsistent.  I'm using the testimony of all parties and
21 the physical evidence to come to a conclusion for this
22 general representation.
23     Q   (By Mr. DuBoff)  Okay.  But you think it is
24 possible he was 16 feet behind the Camry?
25     A.   Right.  I'm telling you it is possible.  I

Appx_1967

ORLANDO CARREON, DECEMBER 20, 2023

Page 75

1  can't tell you exactly what distance, so I'm not going to

2  put a number on exactly where he was at.  I'm telling you

3  he was some distance behind the Toyota.

4      Q.  Okay.  And if he was 16 feet behind the Camry,

5  your opinion would be that the Explorer propelled him

6  16 feet forward; right?

7      A.  Possibly.  I can't tell you exactly what

8  distance he was at.  You keep trying to pin down a

9  distance, and I'm going to repeat the same question

10 [sic].  I don't know exactly where he was.  This is a

11 general representation based on the testimony and the

12 physical evidence of where he was located.

13     Q.  Okay.  Let's say he was located there.  You say

14 he was directly behind the Camry; right?

15     A.  Yes.

16     Q.  Okay.  And then he gets hit with the front,

17 left corner of the Explorer?

18     A.  Right.

19     Q.  Right?  Okay.

20         Which direction you say that propelled him

21 forward; right?

22     A.  Forward and to the right, yeah.

23     Q.  Okay.  Explain to me from this Figure 23 on

24 Page 20 of your report how this is going to propel him

25 forward -- forward and to the right would be into the

Appx_1968

1  Explorer's path; wouldn't it?

2      A.  Well, he gets propelled forward.  There is some

3  contact with the Toyota Camry, some ricochet that ends up

4  landing him to the -- some distance to the right of the

5  Toyota.

6      Q.  Okay.  But explain to me how someone getting

7  hit with the front left corner of a car can cause them to

8  move forward and to the right.

9      A.  Well, Ms. Caylee Smith states in a statement to

10 one of the troopers that she tried to swerve, and we have

11 fluid marks of -- of a vehicle going through, and we have

12 some data that on average puts her to the right that

13 indicates that she had some motion to the right, which

14 would give you the trajectory of left to right.

15     Q.  It would give her car that trajectory?

16     A.  Right.

17     Q.  But if she hits him with the front left corner

18 of her car -- I'm just looking at your figure.

19     A.  Yeah.

20     Q.  Your figure has her driving straight; right?

21     A.  At that instance, yes.

22     Q.  Like at the instant when she hit him; right?

23     A.  It's -- it's one of the instances.  It's not --

24 this is not representing sequence by milliseconds.  Yes,

25 this is near impact -- or at impact.

ORLANDO CARREON, DECEMBER 20, 2023

Page 77

1    Q.   Okay.  At impact you have her driving straight;

2 right?

3    A.   Approximately, yeah.

4    Q.   Okay.  And you have her hitting Mr. Santos at

5 the very front left corner of the Explorer?

6    A.   Yeah, in the corner of the Ford Explorer.

7    Q.   Okay.  There's no way that kind of contact

8 would send somebody to the right, is there?

9         MR. WHITE:  Objection; form.

10    A.   You're taking a static image -- a static

11 diagram to connotate my opinions.  I'm telling you how

12 I'm arriving to my opinions based on the totality of the

13 evidence.  Yes, if you look at the single diagram, just

14 this, yeah, it's forward.

15         But what I'm telling you is that I'm utilizing

16 the entirety of the physical evidence, the entire

17 evidence to come to my determination of the trajectory

18 that Mr. Santos takes after he gets hit from left to

19 right.

20    Q   (By Mr. DuBoff)  Okay.  So we can agree that --

21 how many diagrams did you include in your report?

22    A.   This is the diagram -- the only diagram that I

23 include in my report, but there's other diagrams in my

24 case data binder.

25    Q.   How many diagrams did you include in your

Appx_1970

ORLANDO CARREON, DECEMBER 20, 2023

Page 78

1  report?

2      A.  One.

3      Q.  Okay.  And this is --

4      A.  A portion of it, yeah.

5      Q.  Okay.  So you would agree that as this diagram

6  is depicted, there's no way -- this diagram does not show

7  any possibility of Mr. Santos moving forward into the

8  right based on the contact that's shown in this diagram?

9      A.  Again, you're taking a static image.

10     Q.  I'm just asking you this diagram.  We're going

11 to be here until, like, all hours of the day if you don't

12 want to answer my questions.  You keep going right ahead.

13         According to this diagram, the impact that it

14 shows, it would not be possible for Mr. Santos to move

15 forward and to the right?

16     A.  Again, you're taking a static image to

17 represent my opinions.

18     Q.  Did I say anything about your opinions or am I

19 asking about this diagram?

20     A.  Well, you're trying to say that this diagram --

21     Q.  Your lawyer can take care of all this stuff and

22 say whatever he wants.  I'm asking you my questions.  You

23 answer my questions.  If you want to add commentary,

24 there'll be time to do that at trial or whatever.

25         I'm asking you this diagram.  This diagram, and

Appx_1971

1 the impact that this diagram shows, it would not be

2 possible for Mr. Santos to travel forward and to the

3 right; correct?

4              MR. WHITE:  Objection; form.

5     A.  Again, the question that you're asking you're

6 asking about a static image.  Respectfully, Counselor,

7 you can continue asking your question, but my answer

8 isn't going to change.  You get to ask the questions.  I

9 get to pick the answers, sir.

10     Q   (By Mr. DuBoff)  So you're just not going to

11 answer me with for what this diagram shows?  This shows

12 at impact; correct?

13     A.  At or near impact, yes.

14     Q.  Okay.  So if Ms. Smith hit him exactly as is

15 depicted in this diagram -- I don't care if that's your

16 actual opinion or not, if Ms. Smith hit him exactly as is

17 depicted in this diagram, he would not have traveled

18 forward and to the right; correct?

19              MR. WHITE:  Objection; form.

20     A.  Again, you're taking this static image.

21     Q   (By Mr. DuBoff)  So -- so what?  You're the one

22 who put the image in your report.

23     A.  Right.

24     Q.  Okay.  And so I'm asking you about this image.

25 You said it shows at contact; right?

ORLANDO CARREON, DECEMBER 20, 2023

Page 80

1    A.  At or near impact, yes.

2    Q.  Okay.  So if this is exactly how the impact

3 happened -- if this image depicts exactly how the impact

4 happened, do you agree that according to what this shows

5 Mr. Santos would not have moved forward and to the right?

6    A.  If you ignore the rest of the physical

7 evidence, yes.

8    Q.  Okay.  I'm going to keep asking until you

9 actually answer my question.

10    A.  I'm --

11    Q.  You can add in your little commentary all you

12 want to, and that's great.  Okay?  We'll be here all day.

13 I don't care.  I've got a late flight.  I'll stay here

14 tomorrow.

15        I'm not asking about other evidence, I'm asking

16 about what this diagram shows.  If this -- if the impact

17 happened exactly as this diagram shows, it would not be

18 possible for Mr. Santos to travel forward and to the

19 right; correct?

20    A.  Again, you're taking a static image to depict

21 the motion.

22            MR. WHITE:  Asked and answered, man.

23            MR. DUBOFF:  It's not answered.  It's been

24 asked, it hasn't been answered.

25    A.  You don't have to like my answer, sir.

Appx_1973

ORLANDO CARREON, DECEMBER 20, 2023

Page 81

1     Q    (By Mr. DuBoff)  I hate your answers.  I don't
2  care.

3     A.  That's your opinion.

4     Q.  I'm entitled to you actually answering my
5  question is the problem and not adding in all this
6  commentary, because you know exactly what I'm asking and
7  you're refusing to answer the question.

8          I'm not concerned with your other opinions, I'm
9  not concerned with whether you want to say about whether
10  this diagram is a good diagram or a bad diagram.  I'm
11  asking you a question.

12          Based on how this -- if the impact happened
13  exactly as this diagram shows, Mr. Santos would not have
14  been propelled forward and to the right; isn't that
15  correct?

16     A.  Again, you're taking a static image to depict
17  the motion of Mr. Santos after the collision.

18     Q.  What else -- if I'm looking at this diagram, it
19  shows at or near impact; right?

20     A.  Yes.

21     Q.  Okay.  So if the Explorer hit him just -- if
22  the Explorer's orientation was like this when Ms. Smith
23  hit Mr. Santos, if his orientation was as depicted in the
24  diagram, if everything was like the diagram shows, and we
25  just roll it forward, based exactly on how these images

Appx_1974

1  are -- this diagram is, Mr. Santos would not have

2  traveled forward and to the right?

3      A.  Again, you're taking a static image.  If you

4  roll it forward without -- ignoring the rest of what

5  happened, yes.

6              MR. DUBOFF:  May I have this marked as the

7  next exhibit?

8              (Exhibit 4 was marked.)

9              MR. DUBOFF:  Which should be 4; right?

10             THE REPORTER:  Yes.

11             MR. DUBOFF:  Go ahead and hand that to the

12 witness, please.

13             THE REPORTER:  (Complies.)

14             THE WITNESS:  Thank you.

15     Q   (By Mr. DuBoff)  Mr. Carreon, do you recognize

16 Exhibit 4 as a photo that was taken by police shortly

17 after the accident?

18     A.  Yes.

19     Q.  And this is a photo that's taken from the rear

20 of the Camry; correct?

21     A.  Correct.

22     Q.  And your claim is that Mr. Santos was standing

23 directly behind the Camry when he was hit by the

24 Explorer; correct?

25     A.  Some distance, yes.

ORLANDO CARREON, DECEMBER 20, 2023

Page 83

1    Q.   Okay.  Now, in this photograph, Exhibit 4,
2 there are very obvious signs of the collision even -- you
3 know, up at the Camry; do you agree with that?
4    A.   Sorry, repeat your question.
5    Q.   In this photograph you can see obvious signs of
6 the collision near the Camry?
7    A.   You can see some evidence around the Camry,
8 yes.
9    Q.   Okay.  Like blood?
10   A.   Some of it.  I mean, it's a picture that's some
11 distance away so...
12   Q.   Okay.  And there's debris from the Explorer
13 that you can see?
14   A.   In the distance, yes.
15   Q.   Okay.  Can you identify from this image any
16 physical evidence on the roadway that would support
17 Mr. Santos standing 16 feet behind the Camry?
18   A.   Again, you're trying to say a certain distance.
19 There isn't any evidence that would give us a way to
20 conclusively say exactly where he was standing.  So there
21 isn't any evidence to the rear of the Camry besides the
22 blood pool after Mr. Santos' body was moved.
23   Q.   Okay.  So other than the blood that was on the
24 ground from when Mr. Santos' body was moved, you would
25 agree there is no physical evidence further south

Appx_1976

ORLANDO CARREON, DECEMBER 20, 2023

Page 84

1 supporting your opinion that Mr. Santos was standing back

2 there when he was hit?

3          MR. WHITE:  Objection.  Are we basing it

4 off of this or...

5          MR. DUBOFF:  I'm just asking in general.

6          MR. WHITE:  In general.

7     A.  Well, there -- there isn't any evidence of

8 contact to the rear of the Toyota.

9     Q.  (By Mr. DuBoff)  Okay.  So when we're talking

10 about your opinion that he was standing back there, we

11 can exclude physical evidence that he was standing back

12 there?

13     A.  Physical evidence on the road.  There's

14 evidence of the trajectory that he takes.

15     Q.  We can -- when you're talking about your

16 opinion that he was standing directly behind the Camry,

17 you agree that there's no physical evidence from the road

18 that supports that opinion?

19     A.  Again, there's no evidence directly on the

20 road.  There's evidence from the trajectory we know he

21 takes.

22          MR. DUBOFF:  Jacob, do you want to take

23 five minutes?  Because if I'm asking a question that do

24 you agree there's no physical evidence on the road that

25 supports that opinion, and he wants to give me a

1  monologue every time and talk about the other evidence

2  that he thinks supports his opinion, you know that's --

3  you know that's not proper.

4            MR. WHITE:  Let's take a break.

5            MR. DUBOFF:  Let's take five.

6            THE VIDEOGRAPHER:  Off the record.  End of

7  Media 1.  The time is 11:44.

8            (A recess was taken.)

9            THE VIDEOGRAPHER:  Back on the record.

10 Start of Media No. 2.  Time 11:56.

11     Q   (By Mr. DuBoff)  Mr. Carreon, do you agree that

12 with -- with respect to evidence on the road itself

13 there's no evidence on the road itself behind the Camry

14 supporting your opinion that Mr. Santos was hit directly

15 behind the Camry?

16     A.   No, I don't agree.  There is physical evidence.

17 There's brain matter behind the Toyota Camry.  There's

18 blood behind there.  There's other fluids in that area

19 that do support my opinion.

20     Q.   That's where his body was dragged to; correct?

21     A.   Yes.

22     Q.   Okay.  How far back does that evidence go?

23     A.   I don't have an exact distance.

24     Q.   Is it fair to say it's all within very close

25 proximity to where his body was dragged to?

ORLANDO CARREON, DECEMBER 20, 2023

Page 86

1      A.   It's some near distance behind the Camry.

2      Q.   Okay.  So if you go back -- further back than

3  that, would you agree there's no evidence on the road

4  indicating that that's where the collision occurred?

5      A.   There's no physical evidence on the road behind

6  the area where there's bodily fluids and other items on

7  there.

8      Q.   Behind where his body was dragged to and where

9  his body was when police arrived; right?

10      A.   Correct.

11      Q.   Okay.  If you go back behind that, there's no

12  evidence on the road indicating that the -- that's where

13  the collision occurred?

14      A.   There's no marks or scars if that's what you're

15  asking.

16      Q.   Is there any evidence back there that supports

17  your opinion that he was standing directly behind the

18  Camry when he was hit?

19      A.   Yes, there is physical evidence based on the

20  damage of the vehicle, the fluids that we see around the

21  debris to support that opinion.

22      Q.   Again, you're referring to the evidence that's

23  around his body where it was dragged to?

24      A.   No, I'm referring to the evidence on the

25  vehicle to -- to the right of the vehicle, the damage

Appx_1979

1 that the Camry sustained, the hit that Ms. Evelyn Moreno

2 sustained.  That's all physical evidence.

3     Q.  Is there evidence on the Explorer that supports

4 your opinion that the impact happened on the shoulder

5 behind the Camry?

6     A.  Can you repeat the question one more time?

7     Q.  Is there any evidence from the Explorer that

8 supports your opinion that the initial impact happened on

9 the shoulder behind the Camry?

10     A.  If you take it solely by the Ford Explorer, no.

11     Q.  Okay.  If you look at Exhibit 4.

12     A.  Yeah.

13     Q.  You have Exhibit 4.  And you can see

14 Mr. Santos' body in the picture directly behind the

15 Camry; right?

16     A.  Yes.

17     Q.  Okay.  So what I'm asking is, from the

18 perspective of where this picture was taken --

19     A.  Sure.

20     Q.  Okay.  Up to the area where Mr. Santos' body

21 was dragged to, if you take that area --

22     A.  Uh-huh.

23     Q.  -- is there any evidence on the roadway, like

24 blood, brain material, debris from the Explorer, is there

25 any evidence on the roadway in that area indicating that

Appx_1980

1  that's where the collision occurred?

2      A.   Behind where -- the area of the bodily fluids

3  that are found directly to the rear of the Toyota past

4  that, there isn't any other bodily fluids, marks on the

5  road.

6      Q.   Okay.  And as support for your opinion that the

7  impact happened directly behind the Camry, you referenced

8  the blood and body material that ended up on Ms. Moreno;

9  correct?

10     A.   That's part of it, yes.

11     Q.   Okay.  And you agree that Ms. Moreno's

12 testimony is that at the time of impact she was looking

13 into the trunk; correct?

14     A.   Correct.

15     Q.   Okay.  So do you agree that if the impact

16 happened -- so if that's true, then the impact happened

17 directly behind Ms. Moreno; correct?

18     A.   State that again.

19     Q.   If Ms. Moreno was standing at the Camry's trunk

20 at impact, that's what you think; right?

21     A.   That's what she testified.

22     Q.   Okay.  Well, is that what you concluded

23 happened?

24     A.   I'm using testimonial evidence for the position

25 of Ms. Evelyn Moreno.

 1    Q.  Okay.  Standing at the trunk; right?

 2    A.  Yes.

 3    Q.  Looking into the trunk?

 4    A.  Yes.

 5    Q.  Okay.  So if that is where she was standing at

 6 impact, and if Mr. Santos was hit directly behind the

 7 Camry, then you would expect the debris from Mr. Santos'

 8 body to have hit Ms. Moreno in the back; correct?

 9    A.  Somewhere in the back, yes.

10    Q.  Okay.  Directly in the back; right?

11    A.  I don't know exactly how she's positioned.  So,

12 I mean, we know that she's looking into the rear of the

13 trunk.  Exactly if she's slightly turned this way,

14 slightly turned that way, we don't know.  It would be in

15 the back area of her.

16            MR. DUBOFF:  Can I have this marked as

17 Exhibit 5?

18            (Exhibit 5 was marked.)

19            MR. DUBOFF:  You can give that to the

20 witness.

21            THE REPORTER:  (Complies.)

22            THE WITNESS:  Thank you.

23    Q   (By Mr. DuBoff)  Mr. Carreon, do you recognize

24 Exhibit 5 as two images of Ms. Moreno taken from the

25 police officer's body camera?

1     A.   Yes.

2     Q.   Okay.  And these images both depict

3 Ms. Moreno's back; do you agree with that?

4     A.   Yes.

5     Q.   And her whole body -- her back all the way down

6 to the back of her legs; right?

7     A.   Yes.

8     Q.   Okay.  Can you see any body material directly

9 on Ms. Moreno's back?

10    A.   Well, this is a pixilated image.  I assume this

11 was taken -- a screenshot of and then put on a paper.  We

12 can go to my report.

13         So lighting is going to be a part of this, but

14 there on Page 14 of my report there's video frames from

15 Corporal Winston's camera at the scene, and she explains

16 that -- and she's pointing to her torso where she

17 indicates that she got hit, and there's some bodily

18 fluids around her.  And she -- in my report I indicate,

19 Ms. Moreno goes on to explain in the video that she --

20 Ms. Moreno was looking in the trunk with the emergency

21 flashers activated.  She also indicates that she was

22 turned around when she was struck from behind on her

23 torso.  Bodily fluids can be seen on Ms. Moreno's right

24 side torso, back, arms, face, consistent with this

25 statement.

Appx_1983

ORLANDO CARREON, DECEMBER 20, 2023

1    Q.  Is it fair to say that you didn't include any

2  images in your report directly of Ms. Moreno's back?

3    A.  Her torso is part of her back.

4    Q.  Did you include any images in your report

5  directly of Ms. Moreno's back?

6    A.  Not entire -- not the entire part of her back.

7    Q.  Directly of Ms. Moreno's back, did you include

8  any images in your report of directly looking at

9  Ms. Moreno's back?

10    A.  Not directly looking at Ms. Moreno's back.

11    Q.  Okay.

12    A.  Her torso is part of her back.

13    Q.  Okay.  You have included pictures of her -- of

14  the right side of her body and the front of her body;

15  isn't that right?

16    A.  I included -- yeah, there's some front-facing

17  views of her body, and on the bottom left corner she

18  indicates -- she's indicating to her back.

19    Q.  Do you agree that on the back -- her back

20  surface, directly on her back, there's no evidence of any

21  body material on her back?

22    A.  There is evidence on her torso, which is part

23  of her back.

24    Q.  Do you know what a profile is?

25    A.  Well, I mean, that can mean many things.

ORLANDO CARREON, DECEMBER 20, 2023

Page 92

1      Q.   Okay.   You would agree that there's lots of

2 evidence of body material on her right side; correct?

3      A.   Yes.

4      Q.   And there's lots of evidence of body material

5 on her front; correct?

6      A.   Yeah, there's evidence on either of those.

7      Q.   Okay.   So what the video shows is that if

8 you're looking directly at Ms. Moreno's back you can't

9 see any body material on the back surface of her body.

10           Do you agree with that?

11      A.   Her torso is part of her back, so there is body

12 material on her.   It doesn't cover the entire back if

13 that's what you're asking.

14      Q.   It doesn't really cover any meaningful portion

15 of her back; isn't that right?

16      A.   Define "meaningful."

17      Q.   The kind of -- what you would expect to see if

18 there was body material sprayed from directly behind her

19 and hitting her in the back, there's no evidence that

20 that happened; correct?

21      A.   There is evidence on her torso.

22      Q.   Right.   And that could have -- that -- the

23 evidence suggests that she was hit from body material

24 coming from her right side; correct?

25                MR. WHITE:   Objection; form -- form.

ORLANDO CARREON, DECEMBER 20, 2023

Page 93

1      A.   That's one of the ways that it could come from,
2 but we know based on the rest of the physical evidence
3 that that's not the case.

4      Q    (By Mr. DuBoff)  If you look at Page 14 of your
5 report, there is -- you can see significant body material
6 on Ms. Moreno's front side; correct?

7      A.   There is material on her front side, yes.

8      Q.   How would material get on her front side if her
9 back was facing Mr. Santos when he was hit by the
10 Explorer?

11      A.   Well, Ms. Moreno testifies that she checks the
12 pulse of Mr. Nehemias Santos.  I would be at this point
13 speculating where that body fluid came from, but that's
14 one of the areas where we see fluids.  But one of the
15 areas that we also see fluids is on her torso, which is
16 part of her back.  And she indicates in the body camera
17 video that...

18      Q.   She runs her hand down her right side; right?

19      A.   She's pointing at right here (indicating).  You
20 can see in the --

21      Q.   Okay.  And that's her right side.  That's her
22 right hip?

23      A.   She doesn't state that it's her -- part of
24 her --

25      Q.   That's what she's pointing to; right?

WENDY WARD ROBERTS & ASSOCIATES, INC.
972.494.2000

Appx_1986

1      A.   No.

2      Q.   Her right hip?

3      A.   She indicates that she got hit on her back and

4  she's indicating towards her back.  There's evidence on

5  the torso, which is part of her back.

6      Q.   Do you agree that the material on her front

7  appears to have been caused by some sort of, like,

8  spraying action?

9      A.   Could be.

10     Q.   You have no expertise in analyzing that; right?

11     A.   To say where -- like, whether it's sprayed or

12  not?

13     Q.   Do you really think that all that stuff on her

14  front side came from checking Mr. Santos' pulse?

15     A.   I don't know how he -- she interacted with him.

16  I'm not going to speculate where the fluids came from,

17  but what I can tell you is that there is fluids on her

18  torso.

19               MR. DUBOFF:  Could we take a break real

20  quick?

21               THE VIDEOGRAPHER:  Off the record.  The

22  time is 12:10.

23               (A recess was taken.)

24               THE VIDEOGRAPHER:  Back on the record.

25  Time 12:15.

Appx_1987

ORLANDO CARREON, DECEMBER 20, 2023

Page 95

1      Q    (By Mr. DuBoff)  Mr. Carreon, I projected onto

2  your screen the image that's on the right side of

3  Exhibit 5.

4           Can you see that?

5      A.   Yes.

6      Q.   Okay.  And does this show up clearer on your

7  computer than it did in the printout?

8      A.   Clearer, yes.

9      Q.   Okay.  And this shows Ms. Moreno's back;

10  correct?

11      A.   Part of her back, yes.

12      Q.   What part of her back does it not show?

13      A.   Well, there's a hand and --

14      Q.   Okay.

15      A.   -- part of an arm covering part of it.

16      Q.   Okay.  So for the part of her back that you can

17  see, can you identify any body material?

18      A.   Can you zoom in?

19      Q.   (Complies.)

20      A.   There's shadows being casted in that area that

21  I can't.

22      Q.   So that's not my question.  I'm just asking

23  based on this image -- I'm not saying this was, you know,

24  taken in a photo studio.  From this image, can you

25  identify any body material on Ms. Moreno's back?

Appx_1988

ORLANDO CARREON, DECEMBER 20, 2023

Page 96

1      A.   Based on this image there's shadows, and I
2 can't definitively determine that utilizing her [sic]
3 body cam video and where she's pointing at, where there's
4 body fluids on her torso, which is part of her back.

5      Q.   Okay.  You didn't include any images in your
6 report directly facing Ms. Moreno's back; correct?

7      A.   Correct.

8      Q.   Okay.  And I'm now projecting -- can you see
9 that?

10      A.   Yes.

11      Q.   Okay.  So this is now -- I'm projecting the
12 image that's on the left side of Exhibit 5; right?

13      A.   Yes.

14      Q.   Okay.  And here there's no arm covering
15 Ms. Moreno's back; right?

16      A.   Right.

17      Q.   Okay.  On this image, can you identify any body
18 material on Ms. Moreno's back?

19      A.   Well, the image is still pixilated.  As you
20 zoom in you're going to lose some of that resolution.
21 Her right side there appears to be some darker tone on
22 her blouse or shirt, whatever you want to call it, but
23 from this image I can't definitively say with an image
24 that is losing resolution as you zoom in.

25      Q.   Okay.  But in this image can you identify

ORLANDO CARREON, DECEMBER 20, 2023

Page 97

1  anything that you think shows body material on her back?

2     A.  Based on --

3           MR. WHITE:  Objection; asked and answered.

4     A.  Based on this image because there's

5  pixilated -- this is a pixilated picture, like I said,

6  there is some parts of her blouse or shirt that look

7  darker in tone material, but I can't definitively say

8  from this picture.

9     Q.  (By Mr. DuBoff)  If Ms. Moreno was looking into

10  the trunk and Mr. Santos was hit directly behind her, you

11  would expect the majority of any body material that came

12  from Mr. Santos to end up on Ms. Moreno's back side;

13  correct?

14           MR. WHITE:  Objection; form.

15     A.  Not necessarily.  We don't know how their

16  bodies interacted.

17     Q.  (By Mr. DuBoff)  From the material that would

18  have been let off from the -- the initial impact with the

19  Ford --

20     A.  Yes.

21     Q.  -- do you agree that that initial impact with

22  the Ford -- you -- in your report you say that the body

23  material on Ms. Moreno supports your conclusion?

24     A.  It's not just Ms. Moreno's fluids on her body.

25  It's the damage to the Camry.  There's fluids all over.

Appx_1990

ORLANDO CARREON, DECEMBER 20, 2023

Page 98

1  There's clear damage to the rear bumper of the Camry

2  towards the right side.  It's not the only physical

3  evidence.

4       Q.  I didn't say it was the only evidence.

5       A.  Right.

6       Q.  You cite as part of your support for your

7  opinion that Mr. Santos was standing directly behind the

8  Camry, you cite the body material that ended up on

9  Ms. Moreno; correct?

10               MR. WHITE:  Objection; form.

11       A.  Part of it, yes.

12       Q   (By Mr. DuBoff)  And so that must mean that

13  part of your opinion is that when Mr. Santos was hit by

14  the Explorer, that caused body material to be expelled

15  from him; correct?

16               MR. WHITE:  Objection; form.

17       A.  At some point in the collision sequence, yes.

18       Q   (By Mr. DuBoff)  Well, the initial impact;

19  right?

20       A.  Right.  There might be body fluids that could

21  exert, and we can see on the cover -- on the bumper cover

22  of the Toyota.

23       Q.  But if you're using the body material on

24  Ms. Moreno as part of your support for your opinion that

25  Mr. Santos was hit directly behind the Camry, that's --

Appx_1991

1 that's all accurate; right?

2      A.  Well, finish -- is that your entire question?

3      Q.  As part of the support for your opinion that

4 Mr. Santos was standing directly behind the Camry, as

5 part of the support you refer to the body material on

6 Ms. Moreno; correct?

7      A.  As part of it, yes.

8      Q.  Okay.  And so what that has to mean is that you

9 also believe that when Mr. Santos was hit initially that

10 caused body material to be thrown from his body; correct?

11            MR. WHITE:  Objection; form.

12      A.  It could have at some point in the collision

13 sequence.  We don't know to that degree.

14      Q   (By Mr. DuBoff)  You can't say at some point in

15 the collision sequence if you're using it as evidence for

16 the location of initial impact, can you?

17      A.  I'm not giving an exact location of impact.

18      Q.  I know you're not giving an exact location of

19 impact.  You're using the material on Ms. Moreno as

20 evidence of where Mr. Santos was standing when he was

21 first hit; correct?

22      A.  That's part of it, yes.

23      Q.  Okay.  That means that you have to also be

24 saying that when he was first hit, he let off body

25 material; correct?

Appx_1992

1              MR. WHITE:  Objection; form.

2        A.  It's possible, yes.

3        Q   (By Mr. DuBoff)  Not -- not possible.  That has

4   to be part of your conclusion.

5        A.  I -- I don't know exactly at what point.

6   The -- the collision sequence, we don't know the length

7   of it, but during that collision sequence, yes.

8        Q.  When he was initially hit by the Explorer?

9              MR. WHITE:  Objection; asked and answered.

10             MR. DUBOFF:  He hasn't answered anything.

11             THE WITNESS:  That -- well, that's your

12   opinion, sir.

13       A.  That's one of the points in the collision

14   sequence when bodily fluids would have been let out.

15       Q   (By Mr. DuBoff)  Okay.  Great.

16           At one -- one of the points in the collision

17   sequence that bodily fluids would have been let out was

18   when Mr. Santos was first hit by the Explorer; correct?

19       A.  At one of the points, yes.

20       Q.  Okay.  And you believe that some of the body

21   fluid from that initial impact hit Ms. Moreno; correct?

22       A.  That's not what I stated.

23       Q.  So you don't believe that?

24       A.  I'm saying that at some point in the collision

25   sequence Mr. Nehemias Santos' body hits the back of the

Appx_1993

1  Toyota Camry and partially hits Ms. Evelyn Moreno.  At

2  what point the bodily fluids got expelled, I can't tell

3  you exactly what point -- nobody can tell you that

4  information.  It hits multiple objects, so reasonably you

5  would expect that other bodily fluids would be expelled.

6       Q.  Okay.  So you don't have an opinion on when in

7  the collision sequence the bodily fluid got on

8  Ms. Moreno?

9       A.  No.

10      Q.  Okay.  And so if you don't have an opinion on

11 that, then you can't -- you can't say that the bodily

12 fluid on her is evidence that Mr. Santos was hit

13 initially when he was standing directly behind her;

14 correct?

15      A.  That's incorrect.  I'm taking the totality of

16 the evidence to come to that conclusion.  We have

17 evidence on the rear of the Toyota Camry.  We have

18 evidence on Ms. Moreno of bodily fluids.  We have

19 evidence of bodily fluids to the right side of the Camry.

20      I'm not here to tell you exactly at what time

21 those bodily fluids were expelled, but if you take the

22 totality of that evidence and the trajectory that the

23 body had to take in order to achieve that position,

24 that's how I'm coming to my conclusions.

25      Q.  Is it your opinion that at the time Mr. Santos

Appx_1994

1  was first hit by the Explorer, that Ms. Moreno was

2  looking into the trunk?

3      A.  That's what her testimony says.

4      Q.  Is that your opinion?

5      A.  I didn't give an opinion about that.

6      Q.  So you don't have an opinion about where

7  Ms. Moreno was standing?

8      A.  I indicate what her testimony is on my

9  report -- in my report.

10     Q.  And that's great.  I'm asking your opinions.  I

11 don't care what she said.

12         Is it your opinion that Ms. Moreno was standing

13 at the trunk when Mr. Santos was hit?

14     A.  That's a different question.  Let me take a

15 look at my opinion.

16         Yes.  One of my opinions is Ms. Moreno was

17 standing directly behind the Toyota while looking inside

18 the trunk, as stated on Page 23 of my report, Opinion 7.

19     Q.  And that's where she was standing when

20 Mr. Santos was first hit by the Explorer?

21     A.  According to testimony, yes.

22     Q.  I know what the testimony is.

23     A.  Okay.  Well, you keep --

24     Q.  The reason I came to Texas was to ask you about

25 what your opinions are.

ORLANDO CARREON, DECEMBER 20, 2023

Page 103

1      A.  Right.  And my opinion is stated -- I just told

2  you exactly page and opinion number and what I'm basing

3  it off.

4      Q.  Right.  But --

5      A.  Testimonial evidence, and based on the physical

6  evidence that we see in the Camry and on her.  So there's

7  three different areas.

8      Q.  So I'm asking you something -- you're -- your

9  Opinion No. 7 on Page 23 of your report doesn't say at

10  what time Ms. Moreno was standing directly behind the

11  Toyota while looking inside the trunk.

12          I would have thought common sense wise you were

13  saying at the time that Mr. Santos was hit by the

14  Explorer.  But it now sounds like you're not willing to

15  say that.  So that's what I'm trying to clarify.

16          Your opinion is that Ms. Moreno was standing

17  directly behind the Toyota while looking inside the

18  trunk; correct?

19      A.  Yes.

20      Q.  Okay.  Is that where she was standing when

21  Mr. Santos was hit by the Explorer?

22      A.  Yes, based on the testimonial evidence and

23  physical evidence found.

24      Q.  Is it your opinion that she was standing

25  there -- your opinion?

WENDY WARD ROBERTS & ASSOCIATES, INC.
972.494.2000

Appx_1996

ORLANDO CARREON, DECEMBER 20, 2023

Page 104

1     A.  Yes.  I'm giving you --

2     Q.  No, you're not.  You're waffling and you're

3 saying "well based on testimonial evidence."  I want your

4 opinion.  You're an expert.

5          Is it your opinion that at the time Mr. Santos

6 was hit by the Explorer, Ms. Moreno was standing directly

7 behind the Toyota while looking inside the trunk?

8     A.  Yes, my opinion is that Ms. Moreno was standing

9 directly behind the Toyota while looking inside the trunk

10 at the time of the collision.

11    Q.  Okay.

12    A.  Based on the physical evidence and the

13 testimonial evidence.

14    Q.  How much are you relying on the testimony

15 versus physical evidence?

16    A.  Well, I utilize the testimony to validate if

17 what is being said -- what is being said is consistent

18 with it.  So I utilize it as a starting point or part of

19 my investigation, but...

20    Q.  If we took out all of the testimonial evidence,

21 would the physical evidence be sufficient for you to

22 conclude that Ms. Moreno was standing directly behind the

23 Toyota while looking inside the trunk at the time that

24 Mr. Santos was hit?

25    A.  Yes, the physical evidence would be sufficient.

ORLANDO CARREON, DECEMBER 20, 2023

1    Q.   Okay.   And part of the physical evidence you're

2  relying on for that opinion is the body material that

3  ended up on Ms. Moreno; correct?

4    A.   As part of it, yes.

5    Q.   Okay.   If Ms. Moreno was looking in the trunk

6  at the time that Mr. Santos was hit, you would expect

7  that most of the body material that he let off at that

8  time would land on Ms. Moreno's back; correct?

9              MR. WHITE:   Objection; form.

10    A.   We don't know how the bodies interacted.   So I

11  don't -- I think your question has a blanket statement

12  that we would expect.   We don't know exactly how they

13  collided.   We know that they collided.   So I wouldn't

14  have that -- necessarily that expectation.

15              MR. DUBOFF:   Have this marked as Exhibit 6.

16              (Exhibit 6 was marked.)

17              MR. DUBOFF:   If you could hand that to the

18  witness, please.

19              THE REPORTER:   (Complies.)

20              THE WITNESS:   Thank you.

21    Q    (By Mr. DuBoff)   Mr. Carreon, do you recognize

22  Exhibit 6 as a collection of photos taken from Corporal

23  Winston's body camera of -- excuse me -- still shots from

24  the video of Corporal Winston's body camera of

25  Ms. Moreno?

Page 106

1      A.   Yes.

2      Q.   Okay.  And if you turn to Page 2 of Exhibit 6.

3 That's a picture of Ms. Moreno's front side; would you

4 agree with that?

5      A.   Yes.

6      Q.   Okay.  And can you now see that image on your

7 screen?

8      A.   I can.

9      Q.   Okay.  You would agree -- it's really easy in

10 this picture to see body material on her; correct?

11      A.   Yes.

12      Q.   Okay.  And this is taken from the same camera

13 that took the pictures of her back; right?

14      A.   The body cam -- camera from the -- Corporal

15 Winston, yes.

16      Q.   Okay.  And on this -- this image looking at her

17 front, clear as day there's a lot of body material;

18 right?

19      A.   Yeah, there is body material.

20      Q.   Okay.  The body material -- and the body

21 material goes even -- in some parts it goes all the way

22 up to, like, the center line of her front; would you

23 agree with that?

24      A.   Sure, there's some speckles that go towards

25 that area.

ORLANDO CARREON, DECEMBER 20, 2023

1    Q.   You can also see significant body material on

2    the front of her right thigh; correct?

3    A.   Yes.

4    Q.   Okay.  You can see body material sort of on the

5    inside part of her left thigh; correct?

6    A.   Can you point your mouse to it?

7    Q.   (Complies.)

8    A.   Okay.  Yeah, there is what it looks -- what

9    appears to be body material, yes.

10   Q.   Okay.  You're saying you don't know when those

11   got on her; correct?

12   A.   Correct.

13   Q.   Okay.  They could not have gotten on her from

14   an impact to Mr. Santos directly behind her; do you agree

15   with that?

16   A.   Depending on her orientation.

17   Q.   If she's looking in the trunk, which is your

18   opinion; right?

19   A.   Yes.

20   Q.   Okay.  I don't know why you're asking these

21   questions like we're on different planets right now.

22   A.   Well, you're asking questions you -- you want a

23   yes or no answer.  The reality, those are my answers

24   then.  Whether you like them or not, that's up to you,

25   but those are my answers.

ORLANDO CARREON, DECEMBER 20, 2023

Page 108

1    Q.  Okay.  Your opinion is that Mr. Santos was hit

2 from directly behind Ms. Moreno; correct?

3              MR. WHITE:  Objection; form.

4    A.  Can you repeat your question?

5    Q   (By Mr. DuBoff)  Your opinion is that

6 Mr. Santos was hit initially when he was standing

7 directly behind Ms. Moreno; correct?

8              MR. WHITE:  Same objection.

9    A.  My opinion is -- we can take a look at my

10 report.  Mr. Pivaral Santos was standing a short distance

11 directly behind the Toyota.

12    Q   (By Mr. DuBoff)  And so if Ms. Moreno was

13 looking into the Toyota's trunk, that would put him

14 directly behind Ms. Moreno; correct?

15    A.  It's in that general area.

16    Q.  Okay.  And do you believe that the initial

17 impact between Mr. Santos and the Explorer resulted in

18 body material being expelled from Mr. Santos?

19    A.  Yes.  There was body material expelled, yes.

20    Q.  Do you agree that that body material from that

21 impact could not have landed all up and down Ms. Moreno's

22 front?

23    A.  Like I said, I don't know how the -- the

24 initial contact and the body material that can be

25 expelled during the initial contact, I can't tell you

Appx_2001

ORLANDO CARREON, DECEMBER 20, 2023

Page 109

1  exactly which material, where it came -- like at what

2  point in the collision it came from.  The bodies interact

3  once he's propelled forward and there's body fluids

4  exchanged at that point.

5       Q.  I understand that what you're saying is that

6  maybe this stuff got on Ms. Moreno later in the accident

7  sequence; right?

8       A.  Yes.  Possibly, yes.

9       Q.  Okay.  I'm not asking that.

10          I'm asking you, is there any way that this

11  material could have gotten on these places on Ms. Moreno

12  from the initial impact between Mr. Santos and the

13  Explorer?

14      A.  It's not likely.

15      Q.  Is it possible?

16      A.  It's not likely.  Not likely possible.

17      Q.  Okay.  How would body material -- from

18  something that happened directly behind Ms. Moreno, get

19  on -- all up and down her front side and the front of her

20  thighs?  How would that happen if she's looking into the

21  trunk?

22      A.  Well, the testimony that we have is that she's

23  looking in the trunk.  She says she blacks out after she

24  gets hit.

25          During that collision sequence in that time

Appx_2002

ORLANDO CARREON, DECEMBER 20, 2023

1  frame, we don't know exactly what she does.  Her

2  orientation of the body could slightly change that could

3  produce that spatter on there.  We don't know for sure.

4  That's why I'm saying it's not likely, but I don't know

5  her exact orientation.  We know she's looking directly

6  into the trunk.

7          So is it possible?  Yes.

8          Is it likely?  Not necessarily.

9      Q.  Do you agree that this material on

10  Ms. Moreno's -- this picture, Page 2 of Exhibit 6, and

11  then if you look at the images that you include in your

12  report showing significant material going down

13  Ms. Moreno's right side --

14      A.  Her torso, yes.

15      Q.  Okay.  So we have a lot of material on her

16  front; right?

17      A.  We have material on her front, yes.

18      Q.  And we have a lot of material on her right

19  side; correct?

20      A.  Her right side and her torso, yes.

21      Q.  Okay.  And do you agree that's consistent with

22  Mr. Santos being hit somewhere to her right?

23      A.  No.

24      Q.  It's not consistent with that?

25      A.  To the right of Ms. Moreno?

Appx_2003

ORLANDO CARREON, DECEMBER 20, 2023

1    Q.  Yes.

2    A.  Some -- no.  To what degree do you want to say

3 to the right as depicted in the -- depending on where you

4 want to measure, there might be a slight difference

5 between the two bodies.  I'm not going to say that

6 he's -- that Mr. Santos is two feet to the right or any

7 amount.  It's generally in that area.

8    Q.  In what area?

9    A.  Directly behind the Toyota some near distance.

10    Q.  If someone has a ton of body material all up

11 and down their front and their right side, that's

12 consistent -- I'm not asking you to say you think this is

13 what happened -- that's consistent with someone being

14 struck by a vehicle to their right; yes?

15           MR. WHITE:  Objection; form.

16    A.  Not necessarily.

17    Q   (By Mr. DuBoff)  I'm asking you a consistent.

18 Is it consistent?  If I'm standing -- if someone is to my

19 right and they get hit by a car and expel a ton of body

20 material, you would expect -- it would be consistent with

21 those positions that that body material would end up on

22 my right side and my front; yes?

23    A.  There would be material on your front, your

24 right side, part of your rear.

25    Q.  Okay.  So do you agree that the body material

Appx_2004

1  that we see on Ms. Moreno, you say it came from an impact

2  behind her; correct?

3       A.  Yes.

4       Q.  But if we're just looking at the body material

5  on Ms. Moreno, do you also agree that it could also be

6  explained by an impact happening to her right?

7       A.  It could if you ignore the rest of the

8  evidence.

9       Q.  I just asked you to ignore the rest of the

10 evidence.

11      A.  Yeah, then I'm giving you the answer.

12      Q.  Okay.  So if we look at just the body material

13 on Ms. Moreno, would you agree that it's also consistent

14 with an impact happening to her right?

15      A.  If you ignore the rest of the evidence.

16              MR. WHITE:  Objection.

17      Q   (By Mr. DuBoff)  Okay.  You also -- in your

18 diagram, you place Erick Santos standing at the trunk of

19 the Camry; correct?

20      A.  Somewhere in that area, yes.

21      Q.  Well, you have him standing right next to

22 Ms. Moreno in Figure 23 of your report; don't you?

23      A.  Yes.

24      Q.  Which way was Erick Santos facing?

25      A.  I would have to double check his testimony, but

Appx_2005

 1 I believe he's looking to the Toyota -- towards the

 2 Toyota.

 3            MR. DUBOFF:  Can I have this marked as

 4 Exhibit 7.

 5            (Exhibit 7 was marked.)

 6            MR. DUBOFF:  Did I give you two?  Sorry,

 7 Jacob.

 8            MR. WHITE:  I can pull it up.

 9     Q   (By Mr. DuBoff)  Do you recognize --

10 Mr. Carreon, do you recognize Exhibit 7 as the deposition

11 of Erick Santos?

12     A.  Yes.

13     Q.  Okay.  And you reviewed this as part of

14 completing your report; correct?

15     A.  Yes.

16     Q.  Okay.  If you turn to Page 53, Line 6, do you

17 see that he was asked, "When did you realize that

18 Nehemias had been struck by a car?"

19            And he answered, "Because just for a second

20 when I turned around to see him, he already had that

21 vehicle behind him."

22            Do you see that?

23     A.  Yes.

24     Q.  And then if you turn to Page 54.

25     A.  Okay.

1    Q.  And he's asked, Page 12, "Mr. Santos, is it

2 your testimony that you saw Nehemias get struck by the

3 car?"

4         "Yes, when the vehicle was about a second away

5 from hitting him."

6         "Did you only see him just before he was hit or

7 did you see him at the time he was hit?"

8         And Mr. Erick Santos answered, "At the time

9 that he was hit."

10        So do you agree that Mr. Erick Santos'

11 testimony is that he was looking at Nehemias when he was

12 hit?

13    A.  Yes.

14    Q.  Okay.  And you have him placed standing next to

15 Ms. Moreno; correct?

16    A.  Yes, sir.

17    Q.  Okay.  Would you -- is there any body

18 material -- in all the evidence that you reviewed, is

19 there any body material visible on Mr. Erick Santos?

20    A.  Let me take a look at the -- give me one

21 second.

22        I don't recall a significant amount of body

23 material.  There might have been some blood.  I know he

24 tried getting down close to his brother after the

25 collision, but I don't remember.  I don't recall.

Appx_2007

1                    MR. DUBOFF:  Okay.  This will be Exhibit 8.

2                    (Exhibit 8 was marked.)

3        Q    (By Mr. DuBoff)  Mr. Carreon, do you recognize

4   Exhibit 8 as an image of Erick Santos taken from Corporal

5   Winston's body camera?

6        A.   Well, I don't think you're showing me the same

7   image that you're showing on the screen.  So which one?

8        Q.   Okay.  Let me see.

9             Okay.  How about that?

10       A.   Yes.

11       Q.   Okay.

12       A.   That is the same picture, yes.

13       Q.   So now Exhibit 8 is shown on your screen;

14   correct?

15       A.   Yes.

16       Q.   Okay.  And can you -- and if Mr. Erick Santos

17   was facing Nehemias when he was hit you would expect

18   there to be some body material on Erick Santos' front;

19   correct?

20       A.   Yes.

21       Q.   And can you see any body material on Erick

22   Santos' front?

23       A.   From this picture, again, there is some shadows

24   that don't show -- that don't show the entirety of

25   Mr. Erick Santos' front.

Appx_2008

1      Q.   Okay.  Part of accident reconstruction is

2  you're supposed to check your theory against the

3  evidence; right?

4      A.   Right.

5      Q.   Okay.  And your theory is that Mr. Nehemias

6  Santos was hit directly behind the Camry; correct?

7      A.   Some distance behind it, yes.

8      Q.   Okay.  And you also believe that Mr. Santos

9  when he was hit let off body material; correct?

10      A.   Yes.

11      Q.   Okay.  And you also have the opinion that there

12  were two people standing at the rear of the Camry;

13  correct?

14      A.   The position of Mr. Erick Santos is based on

15  the testimony that was given where people place the five

16  different people around or near the Toyota Camry.

17      Q.   And you adopted it in Figure 23; right?

18      A.   It was used as a general placement for the

19  diagram based on what -- the information that I have.

20      Q.   Okay.  Wouldn't -- according to basic accident

21  reconstruction principles, if you believe that Mr. Santos

22  was hit from behind the Camry and let off bodily fluid --

23      A.   Yes.

24      Q.   -- shouldn't you -- it's your obligation to

25  check to see if the evidence matches that; correct?

Appx_2009

ORLANDO CARREON, DECEMBER 20, 2023

1     A.   The physical evidence supports that

2 Mr. Santos -- Mr. Nehemias Santos was directly behind the

3 Toyota at some distance.   I'm using the physical evidence

4 that I see on the rear of the Toyota.

5     Q.   Let me stop you.

6          One way to check that would be to see if one of

7 the people who says they were standing back there had any

8 body material on them; right?

9     A.   Right.   I'm not relying on the --

10    Q.   Okay.

11    A.   -- on the testimony of Mr. Erick Santos.

12    Q.   So you agree that there's no physical evidence

13 that supports Erick Santos standing at the rear of the

14 Camry when Nehemias Santos was hit?

15    A.   Based on this picture with the shadows, I can't

16 appreciate any --

17    Q.   I'm not asking based on this pictures.   It is

18 actually your job to do the accident reconstruction.

19         Based on the evidence you reviewed, is there

20 any physical evidence to support Mr. Erick Santos

21 standing at the rear of the Camry?

22    A.   No.

23    Q.   And, in fact, we -- could you find any

24 picture -- did you review any evidence that showed Erick

25 Santos had body material on him?

ORLANDO CARREON, DECEMBER 20, 2023

Page 118

1       A.  I don't recall any.

2       Q.  Okay.  And so you would agree that that

3  evidence, the physical evidence is actually inconsistent

4  with Erick Santos standing at the back of the Camry?

5                 MR. WHITE:  Objection; form.

6       A.  Directly behind the Toyota, yeah, it would be

7  inconsistent.

8       Q   (By Mr. DuBoff)  And you have no -- so we have

9  that evidence is inconsistent; right?

10      A.  Yes.

11      Q.  And you have no evidence going the other --

12 going the other direction; right?

13      A.  Right.  But I'm not relying on his testimony to

14 come to my conclusions.

15      Q.  I didn't ask that.

16          The only evidence we have is inconsistent with

17 Erick Santos standing at the rear of the Camry; correct?

18      A.  Based on the pictures that I have and the

19 images that I have, yes.

20      Q.  Do you have any training in blood stain pattern

21 analysis?

22      A.  No.

23      Q.  Okay.  And you said before that you have not

24 reviewed Ms. Dalley's expert report in this case;

25 correct?

Appx_2011

ORLANDO CARREON, DECEMBER 20, 2023

Page 119

1    A.  No, I don't have her report.

2              MR. DUBOFF:  Okay.  Have this marked as

3  Exhibit 9.

4              (Exhibit 9 was marked.)

5              THE WITNESS:  Thank you.

6    Q.  (By Mr. DuBoff)  Mr. Carreon, do you recognize

7  Exhibit 9 as a series of four photos taken of the Camry

8  at the accident scene?

9    A.  Yes.

10   Q.  Okay.  If you look at the second page.

11   A.  Is this what you're referencing (indicating)?

12   Q.  Yes.  Do you see that there's a piece of body

13 material that appears to be stuck against the back edge

14 of the vertical bar that divides the rear passenger's

15 side window of the Camry?

16   A.  Can you point towards it?

17   Q.  Right there (indicating).

18   A.  Yes.

19   Q.  Okay.  Do you agree that when body material is

20 going through the air, it doesn't take sharp turns?

21             MR. WHITE:  Objection; form.

22   A.  State your question one more time.

23   Q   (By Mr. DuBoff)  When body material is

24 traveling through the air, it doesn't turn in the air?

25   A.  I'm not an expert in body material.

Appx_2012

ORLANDO CARREON, DECEMBER 20, 2023

Page 120

1    Q.  Okay.  If you take a look at the third picture

2 in Exhibit 9.

3    A.  Yes.

4    Q.  This is taken from behind the Camry; correct?

5    A.  Yes.

6    Q.  Okay.  Can you see the location on the Camry on

7 the rear passenger's side window where that body material

8 was stuck against the bar?

9    A.  Not from this distance, no.

10   Q.  Well, it's obstructed; right?

11   A.  You can see part of it.

12   Q.  You can see part of the window?

13   A.  No, you can't.

14   Q.  Okay.  So do you have any explanation for how

15 body material from Nehemias Santos would start behind the

16 Camry and then end up on a surface of the Camry that's

17 not even visible from the rear?

18   A.  We know from the physical evidence that

19 Mr. Nehemias Santos after he was hit is propelled forward

20 and to the rear of the Toyota and ends up to the right --

21 the right, rear of the Toyota.  At some point there could

22 have been some spillage from the bodily fluids that ended

23 up there.  That's one explanation.

24        But from -- just from the rear without taking

25 into account the trajectory that he takes to the right,

Appx_2013

ORLANDO CARREON, DECEMBER 20, 2023

1  yeah, no, but there is a trajectory to the right.

2       Q.  So you agree if you look at Page 2 of Exhibit 9

3  that a piece of body material that's stuck against the

4  bar separating the rear passenger window, you agree that

5  the source of that body material did not come from behind

6  the Camry?

7       A.  Right.  But that's not where the primary

8  contact damage is at.

9       Q.  I didn't ask anything about that explanation.

10      A.  All right.

11      Q.  Do you agree that the source of that material

12  is -- did not come from behind the Camry?

13      A.  Likely it didn't, but the primary contact

14  damage is to the rear of the Toyota.

15      Q.  Okay.  But if somebody -- so you think

16  Mr. Santos' body hit directly into the rear of the

17  Toyota?

18      A.  Not directly.  To some portion of it.

19      Q.  Okay.  So how would -- how would -- if he hit

20  the rear of the Toyota, how would material get from that

21  location around the side of the car?

22      A.  Well, there's a trajectory that goes to the

23  right.  I can't tell you exactly at what point those

24  bodily fluids contents got on that portion of the

25  vehicle, but we know where the primary contact damage is

ORLANDO CARREON, DECEMBER 20, 2023

Page 122

1  and the trajectory he takes after he hits the rear of the

2  Toyota.  I'm not going to speculate at what point, but

3  the primary contact damage and the primary bodily fluids

4  that we see is towards the rear of the Toyota.

5      Q.  Okay.  But you don't have an explanation for

6  how Mr. Santos' body went right into the rear of the

7  Toyota, how body material would end up on the right face

8  of the Camry?

9      A.  Well, we know he goes to the right side after

10 he collides with the rear of the Toyota.  So that could

11 be one explanation.

12         Like I said, I'm not going to speculate exactly

13 on how that -- those body contents got to that right side

14 of the Toyota.  We know he goes towards the right side

15 but the primary contact damage is to the rear of the

16 Toyota.

17     Q.  So how does he get to the right side of the

18 Toyota?  Your -- your opinion is that he's hit standing

19 directly behind the Toyota in the shoulder; correct?

20     A.  Right.

21     Q.  And then he's propelled forward into the back

22 of the Toyota?

23     A.  Right.  There's -- we know from Ms. Caylee

24 Smith's statement that she tried to swerve.  There is

25 some fluids -- I'll just reference it here.

Appx_2015

ORLANDO CARREON, DECEMBER 20, 2023

Page 123

1          There's some fluids and we have data, GPS data,
2   where we know that at or near impact she swerved to the
3   right.  So with that motion in mind, with the physical --
4   that the physical evidence supports, he would have been
5   propelled forward and slightly to the right.  And with
6   that motion, the ricochet puts him to the right side of
7   the Toyota, and not the way that Ms. Caylee Smith states
8   in the middle of the lane.  It's not -- it's inconsistent
9   with the physical evidence.
10      Q.   Okay.  So walk me through this.
11      A.   Sure.
12      Q.   He's hit directly behind the Camry; right?
13      A.   Some distance, yes.
14      Q.   Okay.  And that's where he's hit by the
15   Explorer?
16      A.   Correct.
17      Q.   What's the next thing that he hits?
18      A.   The Camry.
19      Q.   Where?
20      A.   Towards the rear of the Toyota.
21      Q.   Okay.  And so at that point for him to go from
22   behind the Camry in the shoulder to then being propelled
23   forward into the Camry --
24      A.   Propelled forward and to the right.
25      Q.   Okay.  How does he -- how does he end up all

Appx_2016

1  the way in the right lane?

2      A.  He's not all the way in the right lane.  He's

3  towards the middle.

4      Q.  Okay.  So how does he -- how does he wrap

5  around -- he hits the Toyota; right?

6      A.  Yes.

7      Q.  Okay.  In the trunk?

8      A.  Yes, part of the trunk, yes.

9      Q.  Okay.  So how does he get --

10     A.  Part of the rear bumper.

11     Q.  And the trunk's open?

12     A.  Correct.

13     Q.  But you're saying his body didn't go into the

14  trunk; right?

15     A.  No.

16     Q.  You're saying it -- it hit the Toyota.  You

17  agree that at that point his direction of force would be

18  going into the Toyota; right?

19     A.  Well, because we know the motion that

20  Ms. Caylee Smith took at or near impact, there's a

21  directionality from left to right -- there's some forward

22  motion and some motion to the right, because she

23  interacts with Mr. Santos' body.  So based on that

24  exchange of momentum, you would expect for him to have

25  some direction line to the right.  That's why you see to

Appx_2017

ORLANDO CARREON, DECEMBER 20, 2023

Page 125

1  the rear of the -- that's why you see damage to the

2  corner of the Toyota and the rear bumper of the Toyota

3  and for him -- and he ends up to the right rear of the

4  Toyota.

5       Q.  According to your theory, when Ms. Smith hit

6  him --

7       A.  Yes.

8       Q.  -- right, it exerted a force on his body?

9       A.  Yes.

10      Q.  Okay.  And so whatever direction she was going,

11  the net effect of that force was to propel his body into

12  the rear of the Toyota; right?

13      A.  Into the rear of the Toyota from left to right

14  because she's -- she says "I tried to swerve," and we

15  have data that supports that.

16      Q.  Okay.  But once he hits the Toyota, how does he

17  end up to the right of the Toyota?

18      A.  Well, like --

19      Q.  What force pushes him from the back of the

20  Toyota out into the lane of travel?

21      A.  Well, there's a mass right there.  The Toyota

22  is the mass.  So he's going to have -- he's not going to

23  bounce but he has some ricochet and ends up towards

24  the -- to the right rear of the Toyota.  There's a motion

25  from left to right based on the knowledge that we have

Appx_2018

ORLANDO CARREON, DECEMBER 20, 2023

1  that Ms. Caylee Smith swerved at or near impact.  And the

2  interaction that he had -- that Mr. Santos has with the

3  rear of the Toyota -- with the corner of the Toyota, we

4  know where he ends up.  The trajectory matches the

5  physical evidence.

6       Q.   You still haven't answered my question.

7            How -- when he hits the rear of the Toyota,

8  okay, he's hitting the back of the Toyota.

9       A.   Yes.

10      Q.   But you're saying that he ends up -- you would

11 agree that he ended up to the right of the Toyota?

12      A.   To the right rear of the Toyota, yes.

13      Q.   And forward of the rear edge of the Toyota;

14 right?

15      A.   One second.  The bodily fluids that you see,

16 I'm referencing the at-scene photos taken by Texas DPS on

17 the case data binder that I have provided you with.  It

18 is Page 6 of 6 of that case data binder.  The pool of

19 blood that we see is not forward of the Camry.  It's in

20 line with the rear.  So --

21      Q.   So what -- what did you -- what physical

22 principle are you relying on to say that when a body is

23 thrown into the rear of a vehicle it will wrap -- then

24 wrap around the vehicle and end up to its right?

25      A.   I'm not saying it's wrapping.  It's having some

Appx_2019

ORLANDO CARREON, DECEMBER 20, 2023

1  interaction.  We know the motion of Mr. Santos' body

2  because of the actions Ms. Caylee Smith took at or near

3  impact where she tried to swerve to the right.  We have

4  data that supports that.

5      Q.  But that would only impact his trajectory to

6  the Camry; correct?

7      A.  Right.  There's some motion that's going to get

8  him further into the right, and there's going to be some

9  interaction, some -- he's not going to bounce and end up

10  exactly -- because of that motion -- because of that

11  motion from left to right that Ms. Caylee Smith took.

12      Q.  But any motion from left to right by Ms. Smith

13  would only affect the direction that Mr. Santos was

14  propelled; right?

15      A.  Say that one more time.

16      Q.  Any left to right movement from Ms. Smith would

17  only affect the direction in which Mr. Santos was

18  propelled; right?

19      A.  Yes.

20      Q.  Okay.  And so once she hits him, any influence

21  from her vehicle is done; do you agree with that?

22      A.  Yes.

23      Q.  Okay.  And the net effect of her hitting him

24  was for him to be propelled into the back of the Toyota?

25      A.  To be propelled into the back of the Toyota

Appx_2020

ORLANDO CARREON, DECEMBER 20, 2023

Page 128

1 from a left to right motion, and the interaction that he

2 has with the Toyota places him to the right side.

3     Q.  But what was that interaction?  If he just hits

4 right into the back of the Toyota, even if he's at an

5 angle, how -- some force would have to -- objects don't

6 move without a force; right?

7     A.  Correct.

8     Q.  Okay.  The force from the Explorer you're

9 saying propelled him into the back of the Camry?

10    A.  Yes.

11    Q.  Correct?

12        Okay.  What force moved him into the left lane?

13    A.  Well, the force that the Toyota enacts by being

14 there.  It has a -- there's some ricochet with -- with

15 the Toyota where we have -- after we have that motion

16 from left to right.

17        If -- if there is no motion from left to right

18 from Ms. Smith that we do know exist, then I would expect

19 him to land mostly near the rear of the Toyota.  But

20 because we have that motion from left to right and that

21 interaction that it has with the Toyota ends up to --

22 towards the right of it -- towards the right rear of the

23 Toyota.

24    Q.  Okay.  So, like, if -- if Ms. Smith was

25 driving, like you show her in Figure 23, you would just

Appx_2021

1  expect Mr. Santos to land behind the Camry; is that

2  right?

3            MR. WHITE:  Objection; form.

4       A.  Again, that's a static.

5       Q   (By Mr. DuBoff)  You don't show any left to

6  right movement by Ms. Smith in Figure 23; right?

7       A.  Again, that's a static image depicted.

8       Q.  Do you show -- do you show her angle -- do you

9  show her car at any sort of an angle to Mr. Santos' body

10 in Figure 23?

11      A.  No.  Again, because that's a static image.

12      Q.  And so is it your claim that after what's seen

13 in Figure 23, after that she started moving right?

14      A.  At or near impact.  She said "I tried to

15 swerve."

16      Q.  She started moving right?

17           And so can you show me in your report where you

18 talk about this process of how he would have hit the

19 Camry and then ended up in the right lane -- or in the

20 left lane?  Excuse me.

21      A.  Sure.  So -- so there's different pieces that

22 bring the conclusion together.  So -- so on Page 13,

23 review of police body camera videos, a statement from

24 Ms. Smith, the driver of the East Chemical Company Ford,

25 indicates that she was driving home when she struck

Appx_2022

ORLANDO CARREON, DECEMBER 20, 2023

Page 130

1 Mr. Pivaral Santos.

2          Ms. Smith states, "I was driving and I looked

3 over at my GPS to see how far I was, and I was just going

4 to see my family.  And they were parked in the road

5 changing the tire, and I didn't see him in time.  I tried

6 to swerve.  I didn't -- I didn't see him."

7          We have --

8      Q.  Okay.  You would agree that none of that is

9 physical evidence; right?

10     A.  This is a statement given at the --

11     Q.  Okay.  So for -- just assume that when I'm

12 asking questions I'm asking about actual evidence at the

13 accident scene, okay?

14     A.  So the statement from her is evidence.

15     Q.  It's not physical evidence, is it?

16     A.  It's testimonial evidence.

17     Q.  Okay.  And you're supposed to just rely on

18 testimonial evidence?

19     A.  I'm not -- I'm not done.  You're interrupting

20 me.

21     Q.  Okay.  So I'm just telling you, I don't care

22 about what witnesses said.  I'm asking about physical

23 evidence that supports this theory that he was thrown

24 into the back of the trunk and then ended up in the left

25 lane.

Appx_2023

ORLANDO CARREON, DECEMBER 20, 2023

Page 131

1          Show me in your report where you explain how
2  the physical evidence shows that.
3      A.  I -- you need to take the totality of the
4  evidence.
5          Sir, you don't have to like my answers but...
6      Q.  Show me in your report where you explain how
7  the physical evidence shows that Mr. Santos' body was
8  propelled forward, hit the Camry and then ended up in the
9  left lane.
10         Is that explanation from the physical evidence
11 in your report?
12     A.  There's a satellite view of the Ford's track
13 log data that I placed within -- that I placed in the
14 report that is contained within the Berla software which
15 is we -- what was used to download the infotainment
16 module aboard the Ford.
17         So I utilized that data, the physical evidence
18 on the road, where we see fluid marks consistent with a
19 vehicle passing by and leaving those marks.
20     Q.  Where are you looking?
21     A.  Sure.  Page 10.  Page 10, Figure 10.
22     Q.  Okay.  That's just a photograph.
23     A.  Right.  That's physical evidence.
24     Q.  I'm asking you where you explain how you
25 reached your conclusion.

Appx_2024

1    A.   Page 21, I state, "However, the physical
2  evidence does not -- does show a general trajectory
3  consistent with Mr. Pivaral Santos being directly behind
4  the Toyota a short distance from the rear of the vehicle.
5  Bodily fluids and brain matter scattered on the rear of
6  the Toyota and on Ms. Moreno are consistent with
7  Mr. Pivaral Santos being struck directly behind the
8  Toyota and being propelled forward into Ms. Moreno and
9  the Toyota.
10        "His continued movement to the right indicates
11  that a trajectory movement from left to right prior to
12  impacting the Toyota.  Testimony from Ms. Moreno
13  indicates" -- sorry.
14    Q.   You say -- you say on Page 21 of your report,
15  "His continued movement to the right"?
16    A.   "From left to right."
17    Q.   That's just your conclusion that he did, in
18  fact, move from left to right?
19    A.   Based on the physical evidence that I have.
20    Q.   Right.  So what physical evidence shows that he
21  hit the Toyota and then came to rest in the left lane?
22    A.   The physical evidence that you see on Page 10,
23  Ms. -- testimonial evidence from Ms. Caylee Smith that
24  she tried to swerve at or near impact, and we have GPS
25  data that shows some motion -- average motion between the

Appx_2025

ORLANDO CARREON, DECEMBER 20, 2023

Page 133

1 two points of the collision that show trajectory from

2 left to right.

3      Q.  Okay.  That shows her trajectory?

4      A.  Yes.  And the -- the Ford collided with

5 Mr. Santos' body.

6      Q.  All right.  But he's not just going to adopt

7 her trajectory, is he?

8      A.  When two objects collide, you would expect,

9 based on momentum, that the trajectory of that body would

10 move in the direction of -- of the object exerting the

11 bigger force.

12      Q.  Okay.  But Ms. Smith didn't hit the Camry?

13      A.  Right.  You're taking one piece of evidence.

14      Q.  So you're saying if he would have adopted her

15 trajectory; right?  That's what you just said?

16      A.  From left to right.

17      Q.  Okay.  So he would have adopted her

18 trajectory --

19      A.  It is not the exact trajectory but the

20 trajectory from left to right.

21      Q.  Okay.  What principle of physics are you using

22 for this?

23      A.  Momentum.

24      Q.  Momentum.  And did you do any sort of modeling

25 or anything to show how this would even be possible?

Appx_2026

ORLANDO CARREON, DECEMBER 20, 2023

Page 134

1       A.   There wasn't a necessity.

2       Q.   Just because it's so obvious to you?

3       A.   No, because I understand that an exchange

4  between two objects where an object is moving from left

5  to right, and if those two objects collide and have an

6  interaction, that that other -- small object, compared to

7  the object that is exerting the bigger force, would adopt

8  in general that trajectory from left to right.

9       Q.   That his trajectory sent him directly into the

10 rear of the Camry; right?

11      A.   Part of it, yes.

12      Q.   Okay.  So what I'm asking is, that last step

13 from hitting the rear of the Camry to ending up in the

14 left lane, do you explain anywhere in here how that would

15 actually happen?

16      A.   No, but I'm stating here now on the record that

17 there is some interaction with the rear of the Toyota

18 that places him towards the right side from that motion

19 from left to right.

20      Q.   Some interaction?

21      A.   Right.

22      Q.   That wasn't in your report?

23      A.   Sure.

24      Q.   And that's the best you can give me is "some

25 interaction"?

Appx_2027

ORLANDO CARREON, DECEMBER 20, 2023

1    A.  Are you trying to quantify?

2    Q.  Well, I'm just wanting -- to if I'm looking at

3 traffic crash reconstruction, is "some interaction" going

4 to be a term that an accident reconstructionist would --

5 would use to explain the movement of a body in an

6 accident?

7    A.  How do I put it?  We can -- in -- the different

8 collisions that we have, there's two types, elastic and

9 elastic collisions.  We know that elastic collisions, if

10 you think of a rubber band, if you stretch it, after you

11 let it go and it goes back to the same position that it

12 was in.  In this case -- in an action like this would be

13 an elastic collision, not perfectly, but in that range.

14     If you have a small object that you throw at a

15 bigger object, you would expect not for it to bounce but

16 to have some interaction that lands it in the general

17 area that it was moved from, where the force was enacted.

18     So the best thing that I -- that I can -- I can

19 explain in normal terms, everybody's played pool or -- or

20 is at least familiar with it.  In order for -- for

21 Mr. Santos to end up towards the right rear of the

22 Toyota, if you play pool, you have to angle it in a way

23 that would create that motion.  In this case, the motion

24 that we have from left to right is Ms. Caylee Smith's

25 swerving.

Appx_2028

ORLANDO CARREON, DECEMBER 20, 2023

Page 136

1        The position where Mr. Santos ends up is not a
2  significant distance away if you consider the motion
3  between -- between Mr. Santos' body and the rear -- the
4  right rear of the Toyota.  I'm not going to -- I'm not
5  going to be able to quantify how that interaction
6  happened, but we know generally based on the trajectory
7  that after having some interaction with the Toyota he
8  would end up to the right rear.
9      Q.  Okay.  What -- what -- okay.  You agree that
10 nothing you just said is in your report at all; right?
11     A.  That's not true.  The trajectory from left to
12 right is in my report.
13     Q.  Okay.  But explaining what you -- whatever you
14 just said about we would expect that when he hits the
15 trunk he's going to end up to the right of the vehicle,
16 what would that principle be called?
17     A.  The -- the momentum.
18     Q.  Okay.  I always thought that every action has
19 an equal and opposite reaction; right?
20     A.  Right.
21     Q.  Okay.  So if he's hitting the back of the
22 Toyota being thrown to the right, it doesn't seem like
23 it's equal and opposite?
24     A.  It is because it has a motion from left to
25 right.  I don't have anything to -- the object, in this

Appx_2029

ORLANDO CARREON, DECEMBER 20, 2023

1 case the Toyota Camry, has a movement.  It is not going

2 to move based on the mass that it has, and so there's a

3 directionality from left to right.  That motion would

4 indicate that he would go towards the -- some -- in some

5 fashion towards the right.

6      Q.  And the best you can give me is principles of

7 momentum?

8      A.  Yes.

9      Q.  Okay.  So if I understand your opinion about

10 how this accident happened, Mr. Santos was hit on the --

11 by the front corner of the Explorer; correct?

12      A.  In that general area, yes.

13      Q.  Okay.  Was he definitely hit by the front of

14 the Explorer?

15      A.  Some portion of it, yes.

16      Q.  Okay.  And then that propelled him forward;

17 yes?

18      A.  Forward in a motion from left to right.

19      Q.  Okay.  And then he hit the Camry and ended up

20 somewhere in the left lane; correct?

21      A.  Correct.

22      Q.  Okay.  If that's what happened, how could there

23 possibly be damage all the way down to the rear of the

24 driver's side of the Explorer?

25      A.  I don't know what kind of interaction it had

Appx_2030

1 after Mr. -- excuse me, Ms. Smith swerved and went near

2 that area.

3     Q.   So you think she hit him twice?

4     A.   I don't think she -- I don't necessarily have

5 an opinion that she hit him twice, but she interacted

6 with some object that caused some damage to the rear.

7     Q.   What object?

8     A.   There isn't a definable -- identifiable

9 indentation or imprint that would tell us exactly what

10 object.

11     Q.   Okay.  But what are the options?  There's

12 Mr. Santos?

13     A.   Uh-huh.

14     Q.   Okay.  And there's the Camry; right?

15     A.   Right.

16     Q.   She didn't hit the Camry; right?

17     A.   Correct.

18     Q.   Okay.  So now we're left with Mr. Santos.  So

19 now to add to this incredible theory that you have, she's

20 propelling him forward into the Camry; right?

21     A.   From a motion from left to right.

22     Q.   Yep.  And then he bounces off the Camry -- or

23 sorry, I know you do not -- he hits the Camry and lands

24 in the left lane; right?

25     A.   Somewhere in the left lane, yes.

Appx_2031

ORLANDO CARREON, DECEMBER 20, 2023

Page 139

1    Q.  But at some point he has a subsequent
2  interaction with the rear driver's side of the Explorer?
3    A.  I'm not -- there was -- this is not necessarily
4  how you -- in a pedestrian collision how you think about
5  how the trajectory of a pedestrian was about, but there
6  is other items that come flying off, like his shoes.  I
7  don't know if any of those items interacted as he got
8  propelled into that, and she went towards the right.
9    Q.  Do any of your shoes bleed?
10             MR. WHITE:  Objection; form.
11   A.  No.
12   Q  (By Mr. DuBoff)  Do any of your shoes bleed?
13   A.  I don't understand your question.
14   Q.  Okay.  Well, there's a lot of blood on the rear
15  driver's side of the Explorer; right?
16   A.  There is body fluids, yes.
17   Q.  Red body fluids?
18   A.  Brain has some.
19   Q.  What?
20   A.  Brain has some red to it.
21   Q.  Okay.  Well, that didn't come from his shoe;
22  right?  Right?
23   A.  Sure.
24   Q.  Okay.  So your theory requires Mr. Santos to
25  have been propelled into the Camry and then for Ms. --

Appx_2032

1 the Explorer to have caught back up with him to have a

2 second contact with him nearer to the Camry; is that

3 right?

4      A.  I'm not saying that it was contact with him.

5      Q.  So you -- you're not willing to say that the

6 damage to the rear of the Explorer came from contact with

7 Mr. Santos?

8      A.  It is not conclusive.

9      Q.  Can you tell me what else it could have come

10 from?

11      A.  Well, I just explained --

12      Q.  His shoes?

13      A.  -- one of the items, yes.

14      Q.  And so you think his shoes --

15      A.  The debris from the headlight.

16      Q.  The debris from the headlight?  From the

17 Explorer's own headlight?

18      A.  Yeah.

19      Q.  Is going to cause brain matter on the --

20      A.  You said there was damage to the -- you're

21 going back and forth.  So if you want to ask primarily

22 one question, that would be great.

23      Q.  Okay.  Well, why don't you look at Page 12 of

24 your report, Figure 14.  Figure 14 and Figure 15.

25      A.  Yes.

Appx_2033

ORLANDO CARREON, DECEMBER 20, 2023

Page 141

1     Q.   Okay.   There is reddish bodily fluid going back
2 all the way near the gas tank cover; correct?
3     A.   Uh-huh.
4     Q.   Okay.   There's also a fender flare that got
5 ripped off; right?
6     A.   That is not there, yes.
7     Q.   Okay.   And there was also denting to that part
8 of the Explorer; correct?
9     A.   Where is the denting that you characterize?
10     Q.   Okay.   I know Mr. Montalbano talked about
11 denting.   But why don't we just -- we'll leave it at
12 there's red bodily fluid; right?
13     A.   Yes.
14     Q.   And there's body damage in the form of a fender
15 flare being ripped off?
16     A.   Well, you're characterizing it as body damage.
17 The fender flare that you characterize is not there; yes.
18     Q.   You wouldn't consider that damage?
19     A.   No, you said body damage.   So let's be
20 specific.
21     Q.   Okay.   The fender flare got ripped off?
22     A.   Yes, it's no longer there, yes.
23     Q.   Okay.   What do you call that?
24     A.   Damage.   Not necessarily body damage.
25     Q.   Just damage.   Okay.

Appx_2034

ORLANDO CARREON, DECEMBER 20, 2023

Page 142

1        But that would not have been caused by the

2 initial impact with Mr. Santos; correct?

3     A.  Correct, not likely.  No, excuse me.  No, it

4 wouldn't have been caused by the initial contact.

5     Q.  So it had to have been caused by Mr. Santos

6 after the initial contact?

7     A.  Not necessarily.  I have explained that there's

8 debris after the initial contact.

9     Q.  Do you think debris is going to rip a fender

10 flare off?

11    A.  Ms. Smith was driving 85 miles an hour.

12    Q.  But what debris is going to rip this fender

13 flare off?

14    A.  There's contact with the headlight.  There's

15 pieces that come off.  Again, it's possible that she had

16 some other interaction with him after the initial

17 collision.

18    Q.  Okay.  Now, who's going faster when Ms. Smith

19 hits Mr. Santos?

20    A.  Ms. Smith.

21    Q.  Okay.  And Ms. Smith stays going a lot faster

22 than Mr. Santos; right?

23    A.  Yes.

24    Q.  Okay.  So she's well past the Camry before

25 Mr. Santos would even get to the Camry; isn't that right?

Appx_2035

ORLANDO CARREON, DECEMBER 20, 2023

Page 143

1          MR. WHITE:  Objection; form.

2     A.  I haven't done that calculation.

3     Q   (By Mr. DuBoff)  Well, if she's going a lot

4 faster than his body would have been going, she would

5 have been past the Camry by the time you say he fell into

6 the left lane; right?

7     A.  Like I said, I haven't done that calculation.

8     Q.  Well, do you have a gut instinct as to what the

9 answer would be?

10    A.  Repeat your question one more time.

11    Q.  Ms. Smith would be past the Camry by the time

12 Mr. Santos was propelled into the Camry's trunk and then

13 fell into the left lane?

14    A.  I don't know that for sure without doing a

15 calculation.

16    Q.  And you can't even give an informed --

17    A.  I'm not going to speculate here unless I do a

18 calculation in order to properly answer your question.

19    Q.  Okay.  But just so we're clear, your -- your

20 opinion is that Mr. Santos was propelled forward into the

21 Camry and then as he was -- so you don't know if

22 Mr. Santos called -- caused this damage to the rear of

23 the Explorer?

24    A.  Well, there's bodily fluids from him, so that

25 at some point in the collision sequence, got onto the

Appx_2036

1  vehicle of the Ford Explorer.

2      Q.  Okay.  So just so I'm clear on the collision

3  sequence, Ms. Smith hits Mr. Santos on the shoulder and

4  propels him forward, and you say to the right into the

5  Camry; correct?

6      A.  From the -- with a motion from left to right.

7      Q.  Mr. Santos hits the Camry; right?

8      A.  The Camry and part of Ms. Moreno.

9      Q.  Okay.  And then his body from there somehow

10  gets into the left lane of travel; right?

11      A.  Right.  After the interaction with the Toyota

12  Camry.

13      Q.  And so some -- at some point between him

14  hitting the Camry and falling into the left lane, he then

15  contacted the Explorer again?

16      A.  I'm not saying that the damage that you see to

17  the fender flare as you characterize is coming from his

18  body.

19      Q.  Well, what about the bodily fluid?

20      A.  That could have been -- that could have been

21  produced by -- as she passes by, like you said, that

22  there's going to be expelment of bodily fluids.  So the

23  bodily fluids you see on the Ford Explorer could have

24  came from that as she traverses through that area.

25      Q.  Okay.  And tell me again what -- what rips off

Appx_2037

ORLANDO CARREON, DECEMBER 20, 2023

Page 145

1  the fender flare?  Debris from the headlight?

2      A.  I -- I haven't told you a specific thing.

3  You've asked what could have made the damage.  I'm

4  telling you there's not a specific indentation, mark,

5  that tells me exactly where the damage came from.  And

6  that's my answer.

7      Q.  But you agree that this damage was not caused

8  by the initial contact with Mr. Santos?

9      A.  Correct.

10          MR. DUBOFF:  Do you want to take 10?

11          MR. WHITE:  Yeah, I reckon so.  We've been

12  going about an hour and a half since the last break.

13          MR. DUBOFF:  Sure.

14          THE VIDEOGRAPHER:  Off the record.  End of

15  Media 2.  Time 1:32.

16          (A recess was taken.)

17          THE VIDEOGRAPHER:  Back on the record.

18  Start of Media No. 3.  Time 1:45.

19      Q   (By Mr. DuBoff)  Mr. Carreon, on Page 24 of

20  your report.

21      A.  Excuse me.

22      Q.  You give the Opinion No. 17 that Ms. Smith

23  allowed her Ford to drift onto the left shoulder prior to

24  impact; is that right?

25      A.  Correct.

Appx_2038

1    Q.   Okay.  Is that opinion based at all on GPS

2 data?

3    A.   No.

4    Q.   Okay.  What physical evidence is that opinion

5 based on?

6    A.   Based on the motion that Mr. Santos took from

7 left to right after the collision.  There's testimonial

8 evidence, which is not physical evidence -- testimonial

9 evidence of Ms. Smith swerving from left to right.  There

10 is GPS data that says that there's a motion from left to

11 right between the two data points that are near the area.

12 But the data that I'm basing it off is not -- how do I

13 explain this.

14         Scratch that.  Ask your question again, sir.

15    Q.   Is it fair to say that your opinion that

16 Ms. Smith was driving on the shoulder is sort of wrapped

17 up with your opinion about Mr. Santos' trajectory after

18 being hit?

19    A.   Wrapped up -- I don't know that I would

20 categorize it that way.  Certainly the totality of the

21 physical evidence that we have from the damage to the

22 rear of the Toyota where he comes to rest, Ms. Moreno

23 being impacted during the collision, looking at both

24 testimonies that are available and using that physical

25 evidence, indicates that there's a motion from left to

Appx_2039

1  right that would only be accomplished if Mr. Santos was

2  directly behind the Toyota left to the -- generally left

3  to the -- left to the solid yellow line that would allow

4  us to come to that conclusion.

5      Q.  Okay.  And so if I understand correctly,

6  you're -- you're looking at all the other evidence in the

7  case and sort of concluding that that evidence only makes

8  sense if -- if Ms. Smith was on the shoulder; is that

9  right?

10      A.  Partially, yes.

11      Q.  Okay.  But you don't -- GPS data, I would call

12  that, like, independent evidence of her being -- if the

13  GPS data showed her on the shoulder, I would call that

14  independent evidence of her being on the shoulder,

15  meaning you don't have to look at anything else, you can

16  just look at the GPS data.

17      A.  The GPS data has limitations.

18      Q.  I understand.  But -- all right.  So just to be

19  clear.

20      You don't identify any, like, tire marks from

21  the Explorer on the shoulder; correct?

22      A.  Correct.

23      Q.  Okay.  You don't identify -- there's no debris

24  from the Explorer on the shoulder; correct?

25      A.  Correct.

Appx_2040

ORLANDO CARREON, DECEMBER 20, 2023

Page 148

1     Q.  And you're not claiming that the GPS data

2  supports your opinion that she was driving on the

3  shoulder?

4     A.  It doesn't directly support it in a way that

5  indicates that her position at or near the time of the

6  collision is on the left shoulder.  There is some

7  movement that places her further to the right of the

8  highway that would indicate a movement from left to

9  right.  But there is no dynamic event in the GPS data

10 that indicates that she drifted into the shoulder.

11 That's not what I'm basing my opinion on.

12    Q.  Okay.  Now, in your report, Exhibit 1, on

13 Page 15, you discuss -- sorry.  I guess 15 and 16, you

14 discuss the GPS data that was taken from the Explorer;

15 correct?

16    A.  One second.  I discussed data that was acquired

17 from the infotainment system on the floor.  This data

18 contains elements of GPS data but there's other data

19 elements in there.

20    Q.  Okay.  You -- and on Page 17 of your report,

21 you sort of -- you include a screenshot, Figure 19,

22 that's -- looks like it -- it's plotting one GPS data

23 point; is that right?

24    A.  Yes.

25    Q.  Okay.

Appx_2041

1    A.   There's other data points to the left in that

2 other screen grab, but the one to your right is a single

3 point; correct.

4    Q.   Okay.  And I think if you look closely at

5 Figure 19, you can sort of see -- I think you can see

6 other dots that just don't have sort of a call-out box;

7 is that right?

8    A.   Correct.

9    Q.   And those are other GPS points?

10    A.   Correct.

11    Q.   So -- but you didn't include in your report any

12 sort of visualization of her GPS track points, right,

13 other than this one image?

14    A.   Let me verify that.

15    Yeah, that was the only visual -- those two

16 images are the only visualization in my report.  Her GPS

17 data, I think it's -- it's fairly long, to include every

18 single data point in there.

19    Q.   Okay.  Do you have any other visualization that

20 maps her GPS track points that overlays her track points

21 onto a map?

22    A.   There is some in my case data binder.

23    Q.   And so how do I find that?

24    A.   Do you have the flash drive?

25    Q.   Yes.

Appx_2042

ORLANDO CARREON, DECEMBER 20, 2023

Page 150

1      A.  All right.  I'll take you to -- if you go to

2  Section 8 on the Ford Explorer, there's a tab called "C,"

3  "Download Data."  If you click into that, there's other

4  bookmarks.

5      Q.  So -- okay.  8, C, download data.

6      A.  Yes.

7      Q.  Okay.  Sorry.  "8, C, Ford Explorer, download

8  data."

9      A.  Correct.  And then there's a -- more drop down.

10 It says, "Berla, (IVE) interface snapshots."

11      Q.  Is it in the Berla download folder?

12      A.  There's two items that says "Berla."  One that

13 says, "Berla vehicle case report."  One says, "Berla IVE

14 interface snapshots."  The one I'm referring to is the

15 last one.

16      Q.  The folders that I have, when I open the flash

17 drive, there's a large PDF folder?

18      A.  Yes.

19      Q.  Oh, you want me in the PDF?

20      A.  Yes.

21      Q.  Okay.  Sorry.

22      A.  Sorry.

23      Q.  Okay.  Okay.  Got it.

24          In the PDF, Section 8, and then I go to where?

25      A.  "C."

Appx_2043

ORLANDO CARREON, DECEMBER 20, 2023

Page 151

1    Q.  "C"?

2    A.  Drop.  Yeah.

3    Q.  "Interface snapshots"?

4    A.  Correct.

5    Q.  Okay.  So I see here some screenshots that

6 show -- okay.

7        Did you review the section in Mr. Montalbano's

8 report where he overlaid the GPS track points onto a map?

9    A.  I'm generally familiar with it, yes.

10   Q.  All right.

11        MR. DUBOFF:  All right.  So I will have

12 this marked as Exhibit 10.

13            (Exhibit 10 was marked.)

14   Q.  (By Mr. DuBoff)  Mr. Carreon, do you recognize

15 Exhibit 10 as two figures from Mr. Montalbano's report,

16 Figure 136 and Figure 137?

17   A.  Yes.

18   Q.  Okay.  Did -- do you have any disagreement just

19 with this, that Mr. Montalbano took the GPS data and he

20 overlaid it onto a map of the road?

21   A.  He overlaid some of the points, yes.

22   Q.  Right.  These are the points closest to the

23 accident; right?

24   A.  Well, there's more data points at the rest

25 position of Ms. Smith.  So he includes towards -- on

WENDY WARD ROBERTS & ASSOCIATES, INC.
972.494.2000

Appx_2044

ORLANDO CARREON, DECEMBER 20, 2023

Page 152

1 Exhibit 10, Figure 136, there's some points 31, 23, 0,

2 but the data shows there's more data points in that area

3 that are not depicted on here.

4     Q.  Okay.  How about on the -- on the a -- do you

5 see where he indicates where the rear end of the Toyota

6 was?

7     A.  Yes.

8     Q.  Okay.  And do you disagree with that location?

9     A.  One second.  No, it's in the general area.

10     Q.  Okay.  If you turn to Page 2 of Exhibit 10,

11 this shows the -- one, two, three...

12         This shows the seven GPS track points from

13 before when the collision happened; is that right?

14     A.  Yes.

15     Q.  And it -- it shows five or six next GPS track

16 points after the accident happened; correct?

17     A.  It shows approximately -- it shows about eight

18 points after the collision.

19     Q.  Is this something that you've done in the past,

20 taken GPS tract points and overlaid them onto a Google --

21 Google Earth image?

22     A.  Yes.

23     Q.  That's pretty typical in the accident

24 reconstruction community; right?

25     A.  I wouldn't say it's typical, it's something

ORLANDO CARREON, DECEMBER 20, 2023

Page 153

1 that is done.

2      Q.   Okay.  Would you agree that -- now, looking at

3 Page 2 of Exhibit 10, you agree that all the points to

4 the left of the rear end of the of Toyota, those are to

5 the south of where this accident occurred; right?

6      A.   Yes.

7      Q.   Okay.  Do you agree that all the points that

8 are on this page from south of where the accident

9 occurred, that all of those GPS track points are

10 essentially in line with the lane line between the left

11 and middle lanes of Highway 45?

12      A.   Repeat your question one more time.  Sorry.

13      Q.   Sure.  If you look at all the GPS track points

14 from before the rear end of the Toyota, do you agree that

15 all of those track points fall, according to this map,

16 directly on the lane line separating the left and center

17 lane of Highway 45?

18      A.   Yes, they are on the right edge of the left

19 lane.

20      Q.   And they're all consistent; right?

21      A.   Generally, yes.

22      Q.   Can you detect any difference in them?

23      A.   Sure.  It's on 87 to -- I'm sorry.  On --

24 backing up off to the left, there's 85; 87 shows a little

25 deviation, but the rest appear to be in line.

ORLANDO CARREON, DECEMBER 20, 2023

1    Q.  Okay.  So you'd agree that the GPS data from

2 Ms. Smith's car as she's approaching the Camry, the GPS

3 data did not show any drift to the west?

4    A.  Yes, but GPS data from Berla hasn't been

5 validated to pinpoint small path deviations according to

6 the research, the literature that we have.

7    Q.  I'm just asking you a question.  The GPS data

8 we can -- we'll talk about the accuracy of it, but the

9 GPS data that came from Ms. Smith's vehicle did not show

10 any westward drift as she approached the Camry; correct?

11   A.  Correct, without talking about the literature,

12 yes.

13   Q.  Okay.  And now there are -- and so just looking

14 at the GPS data, the GPS data is not consistent with

15 her -- she would have to drift to the west to get onto

16 the shoulder; correct?

17   A.  Yes.

18   Q.  And the GPS data does not show that?

19   A.  Correct.  Without reviewing the literature that

20 explains the limitations of the GPS data.

21   Q.  Okay.  Now, GPS data is not 100 percent

22 accurate; correct?

23   A.  Correct.

24   Q.  Do you agree that there's a difference between

25 absolute accuracy and relative accuracy?

ORLANDO CARREON, DECEMBER 20, 2023

Page 155

1                MR. WHITE:  Objection vague.

2        A.  Define those terms.

3        Q   (By Mr. DuBoff)  Well, have you heard those

4 terms before?

5        A.  Sure.  But I want to know exactly what you mean

6 so that I can properly answer your question.

7        Q.  Well, what do you think it means?  What does it

8 mean to you, absolute accuracy and relative accuracy?

9        A.  Absolute, meaning to the exact degree down to

10 the decimal this is where it's at.

11            Relative, meaning there's a range of where the

12 actual data point may lie between.

13        Q.  Okay.  Do you agree that with -- that every

14 point on the globe has a true -- true GPS location?

15        A.  There's a latitude and longitude that we use in

16 order to map out points in the world, yes.

17        Q.  But like, you know, right in this room, I don't

18 know what it is, but I have an exact GPS location; if you

19 went down to enough decimal points there would be an

20 answer for where I'm sitting right now; right?

21        A.  Sure.  If you get down to all the decimal

22 points possible, sure.

23        Q.  If I was holding a GPS device in my hand,

24 right, it might not give me the true answer of my GPS

25 location; do you agree with that?

Appx_2048

ORLANDO CARREON, DECEMBER 20, 2023

Page 156

1    A.  It would give you a location that might have

2 some error in it.

3    Q.  Okay.  And so whether or not the GPS device

4 tells me exactly where on the globe I am, do you agree

5 that's different than how sensitive a GPS device is?  And

6 by that I mean there might be some error in what the GPS

7 device gives me, but the sensitivity would be, like, if I

8 walked three feet to the left, would the GPS register a

9 difference?

10       Do you understand what I'm asking?

11    A.  Rephrase your question.

12    Q.  Do you agree that there's a difference between

13 accuracy and sensitivity?

14    A.  There is some difference, yes.

15    Q.  So when we were talking about GPS, accuracy

16 would be how accurately does it actually report my true

17 location on the face of the earth; right?

18    A.  Yes.

19    Q.  Sensitivity would be how much do I have to move

20 for the GPS device to register that movement; do you

21 agree with that?

22    A.  Generally, yes.

23    Q.  Okay.  And so a GPS coordinate might not --

24 might have a certain error as far as its accuracy, but

25 you agree that's distinct from how sensitive it is as to

Appx_2049

1  whether it can pick up changes in location?

2       A.  Well, the GPS coordinates -- there's a precise

3  point in the world how that gets registered into a device

4  is going to differ between the capabilities of each

5  device and what it's using.

6       Q.  Can you explain how GPS works?

7       A.  Sure.  So I think we need to go down the avenue

8  of explaining, you know, GPS points.  So in the world we

9  have latitude and longitude, it is used by cartographers;

10 people who map out the world; right?

11          So latitude refers to the horizontal line from

12 the equator, north to south.  So that gives you one

13 point.  Longitude is east or west of the Prime Meridian,

14 and there's a place where we call zero, and we measure

15 from that, right, just like the latitude.  That gives us

16 a location; right.

17          Devices will communicate with satellites in

18 order to pinpoint, using that information, communicate

19 where the device is from relative to the satellite to

20 give you a location; right?  Latitude and longitude,

21 that's generally how.

22      Q.  But do you know what the satellites are

23 actually communicating?

24      A.  Information about the position relative to each

25 other.  I'm not a GPS expert to go into the degree of

Appx_2050

ORLANDO CARREON, DECEMBER 20, 2023

Page 158

1  very small detail, but that's generally how.

2      Q.  But can you tell me how a particular GPS device

3  -- just in general how it actually calculates your

4  location?

5      A.  Based on the -- the signal timing relative to

6  the distance of the satellite.

7      Q.  Okay.  And then it triangulates?

8      A.  Right.

9      Q.  With as many satellites as it can get?

10     A.  Correct.

11     Q.  Okay.  What -- to what decimal point did the

12 Explorer report Ms. Smith's GPS location?

13     A.  One second.  Let me look.  Down to 6th decimal

14 point.

15     Q.  Okay.  And as far as sensitivity, do you know

16 what that corresponds to?  So it --

17     A.  Yeah, rephrase your question.

18     Q.  Do you agree that the 6th decimal point is the

19 millionth -- that's millionths; right?

20     A.  I don't know off the top of my head, but yeah,

21 somewhere.

22     Q.  Tens, hundreds, thousands, 10,000, hundred

23 thousand, millions; right?

24     A.  Sure.

25     Q.  Okay.  So a difference -- so if you look at

Appx_2051

ORLANDO CARREON, DECEMBER 20, 2023

1  your report, Figure 19 reports the latitude as 31.990749?

2     A.  Which page are you on?

3     Q.  Sorry.  Figure 19 on Page 17 of Exhibit 1.

4     A.  Figure 19.  Okay.

5     Q.  Do you see that latitude?

6     A.  Yes.

7     Q.  Okay.  So instead of it saying 31.990749, if

8  instead it said 31.990748, that would be a very small --

9  that would be one millionth of a degree adjustment in

10 latitude; right?

11    A.  Sure.

12    Q.  Okay.  Do you know what distance on the ground

13 that corresponds to?

14    A.  That's not a calculation I have made.

15    Q.  Okay.  Does, like, four inches sound right?

16    A.  You're asking me to do a calculation here at

17 this moment.  I'm not going to speculate what the

18 difference is without actually doing the calculation.

19    Q.  Could you do the calculation?

20    A.  Sure.  I could do it.  I'm not going to do it

21 here on the record.

22    Q.  How would you do the calculation?

23    A.  So depending on -- you would calculate the

24 distance between the two points, right, that you're

25 saying, and -- and take into account the time to figure

ORLANDO CARREON, DECEMBER 20, 2023

Page 160

1  out what the difference is.

2      Q.  Okay.

3      A.  But I'm -- like I said, I'm not going to do

4  this on the record.

5      Q.  But you would agree that the Explorer reported

6  Ms. Smith's location down to the millionth of a degree,

7  both latitude and longitude?

8      A.  According to the data, yes.

9      Q.  And so whatever that one millionth of a degree

10 corresponds to, that is the sensitivity of the GPS

11 coordinates; correct?

12     A.  No, because in order to look at GPS data, when

13 you have data from any source, electronic, you have raw

14 data.  And this raw data is -- in order for it to make

15 sense, it has to go through some type of filter.  All

16 right.  So there's different filters that GPS data can go

17 through or collision data, right, it can go through.

18          So it's -- in order to make sense of the data,

19 you have to kind of -- it will look like this, right, and

20 you have to dampen the noise and the data that you see is

21 an average of the total raw data.

22          So to state that that's to the degree of

23 sensitivity based on the average data, sure, yes.  But

24 you have to -- the data goes through a filter in order --

25 goes through a filter, and it's what you see here

ORLANDO CARREON, DECEMBER 20, 2023

Page 161

1 reported.

2      Q.  Well, her car just recorded her location at one

3 hertz; right?

4      A.  Correct.

5      Q.  That's once per second?

6      A.  Yes.

7      Q.  So this isn't an average.  This is just what

8 her location that was reported at this second that the

9 data was taken; correct?

10      A.  No, it is an average.

11      Q.  What is it averaging?

12      A.  So sensors calculate, obtain raw data, and like

13 I said, in order for it to make sense, it has to go

14 through a filter in order to give you an average data

15 point over time.  So what you see here is an average.  It

16 is not the raw data.  It has gone through a filter.

17      Q.  So is it your testimony that her -- her car was

18 recording her GPS location continuously and then would

19 only report it at one second intervals?

20      A.  Yes.

21      Q.  And what -- what's your basis for that?

22      A.  Well, I looked at other GPS data -- raw data,

23 collision impulse data.  Where this data -- in order for

24 it to make sense, has to go through a filter, because

25 otherwise it is not -- it doesn't make sense to the human

ORLANDO CARREON, DECEMBER 20, 2023

1  eye.  So it has to go through that filter, and you obtain

2  an average of the data points.

3      Q.  Okay.  But you agree that the Explorer at least

4  reported her latitude and longitude each down to the

5  millionth of a degree?

6      A.  Yes, after going through a noise filter.

7      Q.  And we know based on the GPS track points that

8  were recorded, we know that the -- it was sensitive

9  enough to pick up Ms. Smith's movement to the right after

10 hitting Mr. Santos; correct?

11     A.  It didn't pick up a dynamic event, it picked up

12 an average movement.

13     Q.  Do you agree that the impact with Mr. Santos --

14 if you look at Page 2 of Exhibit 10.

15     A.  Okay.

16     Q.  Do you agree that the impact with Mr. Santos

17 happened between the two track points to the left and to

18 the right of the rear end of the Toyota?

19     A.  Yes.

20     Q.  Okay.  The track point immediately south of the

21 rear end of the Toyota, you would agree is -- the center

22 of that bull's-eye is on the lane line separating the

23 left lane and the center lane?

24     A.  State your question one more time.  Sorry.

25     Q.  So the track point immediately to the south of

ORLANDO CARREON, DECEMBER 20, 2023

Page 163

1  the rear end of the Toyota.

2       A.   Okay.

3       Q.   Do you see that?

4       A.   Yes.

5       Q.   Do you agree -- and it's kind of a bull's-eye

6  shape; right?

7       A.   Sure.

8       Q.   Do you agree that the center of that bull's-eye

9  is on the lane line separating the left lane and the

10 center lane?

11      A.   Yes.

12      Q.   And then if you look at the next track point,

13 which you would agree this is after the accident; right?

14      A.   At some point after the accident, yes.

15      Q.   And you would agree that that bull's-eye is now

16 to the east of the lane line separating the left lane and

17 the middle lane?

18      A.   Slightly, yes.

19      Q.   Slightly; right?

20      A.   Yes.

21      Q.   Okay.  And that would be consistent with

22 Ms. Smith beginning to swerve; correct?

23      A.   Like I said, this is an average, so I wouldn't

24 connotate it as to beginning to swerve.  It was an

25 average between the two data points.  So it's calculated

Appx_2056

ORLANDO CARREON, DECEMBER 20, 2023

Page 164

1  in that trajectory between those two points.

2      Q.  But that -- that data point after north of the

3  rear end of the Toyota, that's consistent with Ms. Smith

4  swerving; correct?

5      A.  Yes.

6      Q.  And so we know that the GPS data was at least

7  sensitive enough to pick up that movement; correct?

8      A.  It picked up the average movement between the

9  two points.

10     Q.  And then it picked up additional movement to

11 the east with the next track point; correct?

12     A.  The data points that are shown on this

13 Figure 137 picked up some of the movements, yes.

14     Q.  Okay.

15     A.  But, again, there's limitations to this data.

16     Q.  Right.  But we know that the data -- at least

17 based on this, we know that the data is sensitive enough

18 to pick up her movements east and west; correct?

19     A.  The GPS data has been validated to show general

20 trajectory, but the research indicates that the GPS data

21 that you see here is not sufficient to show small path

22 deviations.

23     Q.  Okay.  But it doesn't show any movement to the

24 west; right?

25     A.  From this data, no.  The data points prior to

Appx_2057

1 it show that it's on the right edge -- prior to the rear

2 end of the Toyota location, on the right edge of the left

3 lane.

4      Q.  Okay.  Just for Ms. Smith to have drifted onto

5 the shoulder like you believe she did; right?

6      A.  Based on the physical evidence.

7      Q.  That would have required her to move westward

8 as she approached the Camry; correct?

9      A.  Yes.

10      Q.  And the GPS data does not show any westward

11 movement before she reaches the Camry; correct?

12      A.  Correct.  But my opinions aren't based on the

13 GPS data.

14      Q.  Obviously, because the GPS data doesn't support

15 your opinion; right?

16      A.  That's not why.  Because I know the limitations

17 of the GPS data based on the research and literature

18 that's available.

19      Q.  Is the GPS data more consistent with her

20 drifting onto the shoulder or not?

21      A.  Like I said, my opinion isn't based on the GPS

22 data.

23      Q.  I know.  And I said obviously not because the

24 GPS data doesn't support your opinion.

25      A.  No, it's not because of that.

Appx_2058

ORLANDO CARREON, DECEMBER 20, 2023

Page 166

1      Q.  So it does support your opinion?

2      A.  Well, it doesn't support, but I'm not using it

3 for my opinions.

4      Q.  If you assume a hypothetical with me, that

5 Ms. Smith never drifted onto the shoulder; correct?

6      A.  No, I'm not going to talk about hypotheticals.

7 We're here to talk about what --

8      Q.  You're actually -- you're an expert, so it's

9 actually completely appropriate for me to give you

10 hypothetical questions.

11         If you assume that Ms. Smith did not drift onto

12 the shoulder -- I know that's not what you're saying.

13 This is how expert depositions work.  If you assume that

14 Ms. Smith did not drift onto the shoulder, then you would

15 expect to see the GPS data that we got from her vehicle;

16 correct?

17      A.  I would expect to see -- your question is

18 incomplete.

19      Q.  If you assume that Ms. Smith did not drift

20 westward onto the shoulder of the highway, then you would

21 expect to see GPS data that looks like what was actually

22 recovered from her vehicle; correct?

23      A.  Not necessarily, because there's limitations to

24 the GPS data.  Doesn't show small path deviations.

25      Q.  Okay.  But this GPS data doesn't show any

Appx_2059

ORLANDO CARREON, DECEMBER 20, 2023

Page 167

1  deviation; right?

2       A.  Right.  It places the -- the point of

3  Ms. Smith's vehicle on the right edge of the left lane,

4  which is not where she indicates she's at.

5       Q.  Right.  And that's the difference between

6  global accuracy as opposed to relative accuracy; correct?

7       A.  No.  There's -- here.  There's ranges for what

8  the literature has validated that this GPS data is useful

9  for, and that offers a range of an error rate of how we

10 can use this data.  And so your global accuracy, relative

11 accuracy, we know what -- approximately what the error

12 rate is for the GPS data.

13      Q.  And what's that?

14      A.  3.5 feet to seven-and-a-half feet per the

15 literature.

16      Q.  Okay.  So you agree that these data points --

17 you said 3.5 to what?

18      A.  7.5.

19      Q.  So you agree that these data points are within

20 three-and-a-half to seven-and-a-half feet accurate?

21      A.  That's the range that it provides, but, like I

22 said, I'm not connotating any small path deviations from

23 the GPS data.

24      Q.  Do you agree that these data points are

25 accurate within three-and-a-half to seven-and-a-half

1  feet?

2      A.  Based on the literature, yes.

3      Q.  Okay.  And so for her to have drifted onto the

4  left shoulder -- you agree that this GPS data does not

5  pick up any drift onto the left shoulder; correct?

6      A.  Based on this data points, no, but there's

7  limitations to the GPS data.

8      Q.  Yeah, you just talked about that;

9  three-and-a-half to seven-and-a-half feet; right?

10     A.  Right.

11     Q.  Okay.  But that would mean that if it was -- if

12 it was actually the case that she drifted into the left

13 shoulder, then the error -- the error that you say,

14 three-and-a-half to seven-and-a-half feet, would

15 essentially have to compensate for that to show no

16 deviation on this path?

17     A.  I don't understand your question.

18     Q.  Okay.  I'm not going to -- we can move on from

19 that.

20         The infotainment system also captured bearing

21 data; correct?

22     A.  Yes.

23     Q.  Okay.  And does the bearing data support your

24 opinion that she drifted onto the left shoulder?

25     A.  My opinion is not based on the bearing data.

Appx_2061

ORLANDO CARREON, DECEMBER 20, 2023

1    Q.   Does the bearing data support -- is it
2 consistent with your opinion that she drifted onto the
3 left shoulder?

4    A.   No.  It's not consistent, and I haven't used it
5 in my opinions because I know the limitations of that
6 data.

7    Q.   Okay.  So you're saying that if the bearing
8 data showed that she had deviated to the left, you
9 wouldn't have used it either?

10    A.   Right, because it wouldn't be within the
11 limitations that we know from research and literature.

12    Q.   Okay.

13    A.   It's not the basis of my opinion.  I can point
14 you to the literature that indicates that this Berla data
15 isn't accurate enough to show small path deviations.

16    Q.   I'm -- I'm familiar with the research that
17 you're referencing.

18    A.   Okay.  Well, let's take a look at it.

19    Q.   No, we're not taking a look at it.

20    A.   Well, that's my answer to your --

21    Q.   I -- trust me, I have your testimony.  The jury
22 is going to understand very well what's happening.

23    A.   No, let's go down through it.

24    Q.   That's not actually how this works.  You don't
25 get to just open up stuff and talk about what you want to

ORLANDO CARREON, DECEMBER 20, 2023

Page 170

1 talk about.

2     A.  Okay.

3              MR. DUBOFF:  I will have this marked as

4 Exhibit 11.

5              (Exhibit 11 was marked.)

6     Q   (By Mr. DuBoff)  Mr. Carreon, do you recognize

7 this as Figure 145 from Mr. Montalbano's report?

8     A.  Yes.

9     Q.  Okay.  And this also shows the general area

10 where the accident occurred?

11     A.  Correct.

12     Q.  And here there -- Mr. Montalbano added boxes to

13 each of these track points to reflect Ms. Smith's

14 reported bearing direction at the time that the data was

15 taken; correct?

16     A.  Correct.

17     Q.  Okay.  Now, bearing -- a bearing of -- I don't

18 know if it's true north or magnetic north, but in any

19 event, a bearing of straight north would be zero degrees

20 or 360 degrees; right?

21     A.  Correct.

22     Q.  Okay.  And so this -- the first data points

23 reported here show her bearing was 340 degrees; correct?

24     A.  Correct.

25     Q.  If you're going -- if your bearing is

1 340 degrees, in order to drift to the west your bearing

2 would decrease; correct?

3      A.  Correct.

4      Q.  An increase in bearing would indicate movement

5 to the east; correct?

6      A.  Correct.

7      Q.  Okay.

8      A.  But there's limitations to this data that has

9 been included in research that says that you can't rely

10 on this data for small path deviations.

11      Q.  Okay.  Does the bearing data show that her

12 bearing ever went down from 340 degrees?

13      A.  No.  It doesn't show that it ever went from --

14 down from 340 degrees.  But, again, this bearing data

15 can't be used in reasonable -- not reasonable

16 reconstruction because of the limitations of this.

17      Q.  Excuse me one moment.

18           MR. DUBOFF:  Could you read back his last

19 answer.

20           (Read back as requested.)

21      Q.  (By Mr. DuBoff)  Okay.  One of the papers that

22 you cited in your report was William Bortles' 2017 SAE

23 technical paper; correct?

24      A.  Correct.

25      Q.  Okay.  Are you able to pull that up?

Appx_2064

ORLANDO CARREON, DECEMBER 20, 2023

Page 172

1      A.   Yes.

2      Q.   Can you go to page, I think -- they don't

3 number their pages.   It's Page 8 of the PDF that I have.

4      A.   Okay.   One second.   Okay.   I think I'm on the

5 right page but...

6      Q.   Do you see Figure 11, the map?

7      A.   I do.

8      Q.   Okay.   And you see the paragraph below that?

9      A.   Yes.

10     Q.   Okay.   You cited this paper; right?

11     A.   Correct.

12     Q.   And the second to last sentence of that

13 paragraph says, "Review of the data collected showed that

14 the track log data generally positioned the vehicle in

15 the area of its appropriate lane of travel."

16     A.   Yes.

17     Q.   Do you agree with that?

18     A.   That's what the paper states.

19     Q.   I didn't ask that.

20          Do you agree with that?

21     A.   Not necessarily, because we see that the GPS

22 data from the Berla places it on the right edge of the

23 left lane.

24     Q.   Okay.   So you disagree with that statement in

25 the paper that you cited?

ORLANDO CARREON, DECEMBER 20, 2023

Page 173

1      A.   On -- generally.  Generally, yes.

2      Q.   Okay.  Have you ever used GPS data from an

3  infotainment system to give an opinion about a vehicle's

4  location?

5      A.   For the general trajectory, yes.  Not for small

6  path deviations.

7           If you look at that same paper on the summary

8  page.  So if you go further down it states -- it states,

9  "The track logs recorded by the vehicle can accurately

10  record the general motion and speed of the vehicle.

11  However, the track log data does not contain the

12  precision or accuracy to pinpoint small path deviations

13  and may apply drifts within the lane of travel that did

14  not occur.  Overall, on average the filter calculated

15  vehicle speed for this case study was accurate within one

16  mile per hour but could contain anomalous spikes or drops

17  in the calculated vehicle speed."

18      Q.   Okay.  If you look at Exhibit 11.

19      A.   Yeah.

20      Q.   You would agree that on the approach to the

21  scene of the accident, most of the data points show a

22  bearing of 340 degrees?

23      A.   Yes.

24      Q.   And there are two seconds worth of data that

25  show a bearing of 341 degrees; correct?

Appx_2066

ORLANDO CARREON, DECEMBER 20, 2023

1    A.  Correct.

2    Q.  If one were to trust the bearing data, that

3 would be consistent with a slight adjustment to the east;

4 correct?

5    A.  If one was to trust the data knowing that there

6 is literature that contradicts that, sure.

7    Q.  The literature contradicts that?

8    A.  I just stated, it says, "However, the track log

9 data does not contain the precision or accuracy to

10 pinpoint small path deviations."

11    Q.  Right.

12    A.  So how does that not contradict that?

13    Q.  It can be used to evaluate how reliable it is,

14 but it doesn't contradict that a bearing change of one

15 degree over two seconds would be consistent with a slight

16 eastward adjustment; do you agree with that?

17    A.  I disagree with -- the data indicates

18 otherwise.  The literature indicates otherwise.

19    Q.  Okay.  On Page 20 of your report --

20    A.  Sure.

21    Q.  -- you calculate that the Toyota was

22 approximately 2.3 feet inside the left lane excluding the

23 right side mirror; correct?

24    A.  Correct.

25    Q.  How did you calculate that?

ORLANDO CARREON, DECEMBER 20, 2023

Page 175

1      A.   So we used the images from the at-scene

2  evidence placing a model using vehicle specs, utilizing

3  arrow data, scan data, all together, and referencing

4  different points of the at-scene photos and different

5  identifying parts of the Toyota to place it in a position

6  that best reflect what was shown at the time of the

7  collision.

8      Q.   Did you use photogrammetry?

9      A.   Photogrammetry can have different levels of --

10 of -- there's different variant levels of photogrammetry.

11 I used photogrammetry in the essence that I used

12 pictures, images, body cam, to locate, identifying parts

13 of the road of the vehicle to place the vehicle in my

14 diagram and in my calculations.

15     Q.   And it's your opinion that Mr. Santos was

16 standing completely within the shoulder of the highway

17 when he was hit?

18     A.   No.   My opinion is that Mr. Pivaral Santos was

19 standing a short distance directly behind the Toyota.   I

20 don't give an exact location as in that general area.

21          Could he be on the yellow line a little bit?

22 Could he be more towards the left of the yellow line?   I

23 don't give an exact location because we don't have -- the

24 physical evidence doesn't allow anyone to conclude to

25 that degree where he was located.

ORLANDO CARREON, DECEMBER 20, 2023

1          My opinion is that Mr. Pivaral Santos was

2    standing a short distance directly behind the Toyota.

3          Q.   Okay.  But Opinion 6 says, "The physical

4    evidence is consistent with Mr. Diaz's testimony that

5    Mr. Santos was standing in the left shoulder when he was

6    struck."

7          A.   Yeah, I don't say entirely in the left

8    shoulder.

9          Q.   So you think it's possible he was standing in

10   the left lane?

11         A.   It's possible that he was standing near the

12   yellow line, on the yellow line.  We don't have enough

13   information to make an exact determination.  This is a

14   general area.

15         Q.   Okay.  So let's say he was standing just --

16   let's say he was standing right up against the yellow

17   line; is that fair?

18         A.   Sure.

19         Q.   Okay.  Do you agree that the damage to the

20   Explorer went one foot inboard?

21         A.   Approximately in that amount, but I didn't

22   measure the entire damage to be one foot -- approximately

23   one foot.  There is damage in that general area from the

24   left front corner.

25         Q.   Okay.  Well, do you disagree with

ORLANDO CARREON, DECEMBER 20, 2023

1  Mr. Montalbano's laser scan analysis of that, that showed

2  that the damage went one foot inside the left edge of the

3  Explorer?

4      A.  It was approximately in that -- in that general

5  area, yes.

6      Q.  Okay.  And so if Mr. Santos was standing up

7  against the left line and he was -- the damage to the

8  Explorer goes in a foot from the left edge of the

9  Explorer, would you agree that that would require the

10 Explorer to be at least one foot over the -- that yellow

11 lane -- line?

12     A.  Approximately.

13     Q.  Okay.  So the Explorer is one foot to the left

14 of the lane line in this situation; right?

15     A.  In this hypothetical, yeah, approximately.

16     Q.  Okay.  And the Camry is extending 2.3 feet into

17 the left lane; correct?

18     A.  2.7 if you include the mirrors, yes.

19     Q.  Okay.  Let's not include the mirrors.

20     A.  Okay.

21     Q.  2.3 if you're including the mirrors; right?

22     A.  Okay.

23     Q.  And so that means that for the Explorer to have

24 hit Mr. Santos and then avoided the Camry, it would need

25 to swerve at least 3.3 feet; do you agree with that?

Appx_2070

ORLANDO CARREON, DECEMBER 20, 2023

Page 178

1    A.   Based on that information, yes.   Approximately.

2    Q.   Okay.   And this is the -- I mean, this is --

3 you're saying you don't believe that he was in the left

4 lane; correct?

5    A.   Who?

6    Q.   Mr. Santos.

7    A.   Based on the physical evidence, I believe he

8 was somewhere to the left of the shoulder.   Exactly if he

9 has partially some part of his body on the yellow line

10 that extends slightly into the left lane, I don't -- we

11 don't have the degree of accuracy or physical evidence to

12 pinpoint that.

13   Q.   Okay.   But is it fair to say that you -- that

14 you agree that the Explorer was at least one foot to the

15 left of the lane line?

16   A.   Approximately, yes.

17   Q.   Okay.   And so to avoid the Camry, the Explorer

18 must have swerved at least 3.3 feet?

19   A.   Approximately, yes.

20   Q.   That's why I didn't include the mirrors,

21 because if you're swerving you don't need -- you're going

22 to avoid the mirror; right?

23   A.   Right.

24   Q.   Okay.   Did you perform any kind of analysis to

25 see if it would be possible for the Explorer to swerve

Appx_2071

Page 179

1  3.3 feet?

2       A.  The physical evidence gives me the trajectory

3  and we know that there isn't any damage on the Toyota

4  coming from the Ford Explorer.

5       Q.  But you know that there's research in accident

6  reconstruction about the maximum swerving angle and

7  swerving distance of vehicles making emergency maneuvers;

8  correct?

9       A.  Correct.  But we don't -- I don't pinpoint

10  exactly how far Mr. Santos is, and you would need to know

11  that information in order to do that calculation.

12      Q.  Okay.  But you don't need that information to

13  know how long it takes someone to make an emergency

14  swerve of 3.3 feet; right?

15      A.  You do because you need to -- this is -- you

16  need the lateral distance and the longitudinal distance

17  to make that calculation.

18      Q.  Are you familiar with accident reconstruction

19  research about how long it takes drivers in emergency

20  situations to swerve a certain distance?

21      A.  Generally, but I don't have a specific number.

22      Q.  Okay.  So you could have done that analysis;

23  right?  We know based on your theory Ms. Smith would have

24  had to have swerved at least 3.3 feet; right?

25      A.  Based on the physical evidence, yes.

Page 180

1    Q.   Okay.  And you didn't do any analysis to see
2  how long it would take her to swerve 3.3 feet; is that
3  right?

4    A.   Correct.

5    Q.   Are you familiar with the research that
6  Dr. Muttart has done in that area?

7    A.   Generally, yes.

8    Q.   Okay.  And that's something that you can easily
9  calculate in IDRR; isn't it?

10   A.   It is one of the things you can calculate, yes.

11   Q.   You can calculate how long it takes a driver to
12 make an emergency swerve of 3.3 feet; right?

13   A.   Based on different parameters, yes.

14   Q.   What are the parameters you need to know?

15   A.   I don't know off the top of my head, but you
16 would need to know the distance that the person is from
17 the impending object, and the distance that you move to
18 the right, and approximate speed to what degree they
19 swerve.

20   Q.   Okay.  So -- but we know here how far she would
21 have had to have swerved; right?

22   A.   Approximately, yes.

23   Q.   Okay.

24        MR. DUBOFF:  I'll have this marked as
25 Exhibit 12.

1              (Exhibit 12 was marked.)

2      Q   (By Mr. DuBoff)  Mr. Carreon, do you recognize

3  Exhibit 12 as a SAE paper written by Dr. Jeffrey Muttart?

4      A.  Yes.

5      Q.  Okay.  Have you ever looked at this paper

6  before?

7      A.  It looks familiar but I can't recall exactly.

8      Q.  Okay.  If you look at Page 2 of Exhibit 12 and

9  at the top of the left column, do you see that it says,

10  "However, the focus in the current research was drivers

11  swerving when approaching an immediate hazard"?

12      A.  Which page, I'm sorry?

13      Q.  Page 2 in the top left corner.

14      A.  Yes.

15      Q.  Okay.  And you would agree that driving on the

16  shoulder towards a pedestrian that's in your path, that

17  would be considered an immediate hazard; right?

18      A.  Yes, at some point it would become an immediate

19  hazard.

20      Q.  Okay.  And then if you look at Table 2 on

21  Page 3 of Exhibit 12, can you read out the caption for

22  Table 2?

23      A.  Table 2?

24      Q.  Table 2.

25      A.  "Compilation of emergency server and research

Appx_2074

ORLANDO CARREON, DECEMBER 20, 2023

Page 182

1  showing the lateral displacement in the Columns 1 and 2

2  and the time for the maneuver in Column 3.  The lead

3  author is listed in the last column."

4      Q.  Okay.  So do you understand this to be

5  Dr. Muttart's compilation of past research into how long

6  it takes drivers to make emergency swerves of a given

7  distance?

8      A.  Yes.

9      Q.  And that would be called a meta analysis;

10  right?

11      A.  Sure.  That would be a name for it.

12      Q.  Okay.  And then if you look at Page 4, where it

13  says "methodology"?

14      A.  Yes.

15      Q.  Are you familiar with the Strategic Highway

16  Research Program?

17      A.  That sounds familiar.

18      Q.  SHRP 2 is what it's normally called?

19      A.  I don't know it as that but I've heard of the

20  saying before.

21      Q.  Okay.  But do you see here that, "In addition

22  to the past research, Dr. Muttart did his own research

23  using this data from the second Strategic Highway

24  Research Program naturalistic driving study dataset"?

25      A.  Which paragraph were you on?

Appx_2075

ORLANDO CARREON, DECEMBER 20, 2023

Page 183

1      Q.   Just the first -- the first paragraph under

2  "methodology."

3      A.   Sure.

4      Q.   Okay.  And then if you turn to Page 6, do you

5  see that there's a Figure 2 that's a chart?

6      A.   There's two.

7      Q.   The one that's Figure 2.

8      A.   Okay.

9      Q.   Do you see that's a chart?

10      A.   Yes.

11      Q.   And that chart shows what research has shown

12  how long it takes for drivers -- how long it takes

13  drivers to swerve a certain lateral distance; do you see

14  that?

15      A.   Yes.

16      Q.   And then do you see that there are two

17  equations under that chart?

18      A.   Yes.

19      Q.   Equation 1 and Equation 2.

20           I'm sorry, let me go up to above the chart --

21  the paragraph above the chart.  Do you see where it says

22  "including"?

23      A.   "Including the results"?

24      Q.   Right.

25      A.   Yeah.

1     Q.   And then so the next sentence says, "A power

2  function was the trend that showed the greatest

3  correlation, the resulting equation that models how

4  drivers steered is shown below."

5          Do you see that?

6     A.   Yes.

7     Q.   And it says, "The dotted line in Figure 2

8  represents the power function equation."

9     A.   Yes.

10    Q.   Do you see that?

11         And it says, "The results from this research

12 can be seen in Figure 2 with the black outline."

13         Do you see there are three dots with a black

14 outline?

15    A.   Yes.

16    Q.   And then it says, "The points without a black

17 outline represent the results from the research mentioned

18 in Table 1."

19         Do you see that?

20    A.   Yes.

21    Q.   Okay.  If you turn to Page 10, there's a

22 heading that says "Implications of this research"; right?

23    A.   Okay.

24    Q.   And then if you look in the right column, can

25 you read the first sentence of the paragraph that starts

Appx_2077

ORLANDO CARREON, DECEMBER 20, 2023

1  with "essentially"?  Out loud.

2      A.  You're on the right side?

3      Q.  On the right side right above "references."

4      A.  "Essentially during an investigation, the crash

5  reconstructionist may use Figure 2 or Equations 1 or 2 to

6  estimate a time to complete an emergency swerving action

7  for any given distance.  However, if swerving more than

8  five feet left or right is necessary for avoidance, the

9  crash reconstructionist must keep in mind that most

10 drivers were not willing to swerve that far."

11     Q.  That's fine.

12         Just looking at that first sentence what

13 Dr. Muttart is saying, is that during a crash

14 reconstruction you can use Figure 2 or Equations 1 or 2

15 to estimate the time to complete an emergency swerving

16 action for any given distance.

17         Do you see that?

18     A.  Yes.

19     Q.  Okay.  And you earlier described Dr. Muttart as

20 a leading figure in human factors and accident

21 reconstruction; right?

22     A.  One of the leading.

23     Q.  Okay.  And you --

24     A.  In --

25     Q.  You've used his software?

ORLANDO CARREON, DECEMBER 20, 2023

Page 186

1       A.   Yes.

2       Q.   You've gone to workshops where he teaches you

3 how to use his software?

4       A.   Correct.

5       Q.   And he teaches you about how to apply human

6 factors to an accident reconstruction; correct?

7       A.   Yes.

8       Q.   Okay.  So he says here that you can use

9 Equations 1 or 2 to estimate the time to complete an

10 emergency swerving action for any given distance; right?

11      A.   Yes.

12      Q.   And we know that the given distance that

13 Ms. Smith would have to swerve would be 3.3 feet

14 laterally; correct?

15      A.   We don't know exactly.  We know an

16 approximation.

17      Q.   Approximately -- actually a minimum of about

18 3.3 feet; right?

19      A.   Sure.

20      Q.   Because I think one of the witnesses said that

21 half of her vehicle was in the shoulder; right?

22      A.   I -- if you want to point it out, I can take a

23 look at that, but I don't particularly recall that.

24      Q.   Okay.  Well, for now -- we can do that later.

25 But for now we'll just say 3.3 feet is the minimum

Appx_2079

ORLANDO CARREON, DECEMBER 20, 2023

Page 187

1 lateral distance that Ms. Smith would have had to swerve

2 to avoid -- if she was in the shoulder by a foot, she

3 would have to swerve approximate 3.3 feet laterally to

4 avoid hitting the Camry?

5     A.  Approximately, yes.

6     Q.  And she did avoid hitting the Camry?

7     A.  Correct.

8     Q.  Okay.  So if you look at Equation 2.  Equations

9 1 and 2 are just -- the difference is just whether you're

10 using meters or feet; right?

11     A.  (No audible response.)

12     Q.  Okay.  So can you calculate -- can you do --

13 calculate the time it would have taken her to steer

14 3.3 feet?

15     A.  Yes, I could have.

16     Q.  What's that?

17     A.  I could have.

18     Q.  No, I'm asking you, can you do it now?

19     A.  I'm not going to do it on the record.

20     Q.  Why not?

21     A.  Because respectfully I was retained by Taylor

22 King Law to render opinions on this matter.  I'm not

23 going to do so on the record.

24     Q.  Okay.  I'll do it on the record.

25         Do you see my calculator?

Appx_2080

ORLANDO CARREON, DECEMBER 20, 2023

Page 188

1      A.   Where are you at?

2      Q.   On the screen.

3      A.   Yes.

4      Q.   Okay.  So we would take 3.3 feet; right?

5      A.   (No response.)

6      Q.   Correct?

7      A.   Sure.  I mean, finish your calculation so I

8  can --

9      Q.   No.  I want you to follow along to make sure

10 I'm complying with the formula.

11     A.   Okay.  3.3 feet.

12     Q.   3.3 feet.  And then we would raise that to the

13 0.6274 power; right?

14     A.   Okay.

15     Q.   Yes?

16     A.   Yes.

17     Q.   And that gives 2.115; right?

18     A.   Yes.  If you do it like that, yes.

19     Q.   Okay.  And then to complete the equation, we

20 would multiply that value by .5096; right?

21     A.   Yes.

22     Q.   Okay.  And so the results of that equation,

23 according to Dr. Muttart's research and all the research

24 he relied on, is that the time it would have taken for

25 Ms. Smith to complete a 3.3-foot lateral swerve would

ORLANDO CARREON, DECEMBER 20, 2023

Page 189

1  have been 1.078 seconds; right?

2       A.   Approximately, yes.

3       Q.   Okay.  And we can easily tell how many feet she

4  would have had to travel -- or how many feet she would

5  have traveled over the course of 1.078 seconds; right?

6       A.   If we know her speed.

7       Q.   We do know her speed; right?

8       A.   Well, we know a data point.

9       Q.   Okay.  Well, if you look at Exhibit 10, she was

10 reported as going 86 miles an hour, the data point before

11 the collision; correct?

12      A.   Right, that's a truncated value, but yes.

13      Q.   And she was reported as going 82 miles per hour

14 the data point immediately after; right?

15      A.   Yes.

16      Q.   Okay.  So to get feet per second in miles per

17 hour, you multiply by 1.46 repeating; right?

18      A.   Yes.

19      Q.   Okay.  Okay.  I'm going to make sure I don't

20 get myself messed up here.

21           Do you have a cal -- can you use your

22 calculator on your computer?

23      A.   I can, but, like I said, I'm not going to make

24 a calculation on the record.

25      Q.   You're refusing to do that.  Okay.

ORLANDO CARREON, DECEMBER 20, 2023

Page 190

1        Do you agree that if she was going -- okay.
2  I'm sorry.  Let's -- let's use the numbers that you
3  chose.  If you look at your Opinion 10, is that Ms. Smith
4  was traveling at speeds between 84.5 miles per hour and
5  90 miles per hour; right?
6        A.  On approach.
7        Q.  On approach.
8        Okay.  Well, which speed do you want me to use
9  to calculate?
10       A.  It's your question.  I've stated my opinion on
11 there.  I'm not sure where you're going with this but...
12       Q.  Okay.  But you agree that according to
13 Dr. Muttart's research, it would have taken her 1.078
14 seconds to make a 3.3-foot swerve?
15       A.  Approximately, yes.
16       Q.  Okay.  Do you agree that 84 and a half miles
17 per hour is roughly 123.93 feet per second?
18       A.  Sure.
19       Q.  Okay.  And so then to figure out how many feet
20 she would cover in 1.078 seconds, we would just multiply
21 this 123.93 times 1.078; right?
22       A.  Well, there's a movement from left to right.
23 So that distance is going to differ a little bit if you
24 just calculate it straight on.
25       Q.  Okay.  But at such a short distance it's pretty

Appx_2083

ORLANDO CARREON, DECEMBER 20, 2023

Page 191

1 close; right?

2     A.  Well, I mean the number is going to change

3 but...

4     Q.  Okay.  Well, if we multiply her feet per second

5 at 84 and a half miles an hour, if we multiply that times

6 1.077817, you would agree that would show that if she was

7 going 84 and a half miles per hour she -- it would take

8 her 133 and a half feet to swerve 3.3 lateral feet?

9     A.  Based on this calculations you have made,

10 assuming all the numbers that you've talked about, sure,

11 yes.

12     Q.  Okay.  Do you think there's any chance that

13 Mr. Santos was standing 133 feet behind the Camry?

14     A.  We don't know the exact distance where

15 Mr. Santos was standing.

16     Q.  Do you think he was standing 133 feet behind

17 the Camry?

18     A.  Again, I don't know the exact location where

19 Mr. Santos --

20     Q.  I didn't ask if you know the exact location.

21         Do you think he was standing a mile behind the

22 Camry?

23     A.  No, it's not likely that he was standing a mile

24 from the Camry.

25     Q.  It's not likely or he wasn't?

ORLANDO CARREON, DECEMBER 20, 2023

Page 192

1    A.   Based on the physical evidence Mr. Santos was a
2 short distance away from the Toyota Camry.
3    Q.   Okay.  And you would never describe 133 feet as
4 a short distance; right?
5    A.   Not particularly.
6    Q.   Okay.  And if Ms. Smith was going 90 miles an
7 hour, which is the other range that you have her at, she
8 would actually cover -- she would have to cover even more
9 ground to make a three-and-a-half -- a 3.3-foot lateral
10 swerve; correct?
11    A.   Right.  My opinion on there is on approach.
12 The last data point that we have prior to the crash is
13 approximately 86.7 miles per hour.
14    Q.   Okay.  So let's do 86.  If she was going
15 86 miles an hour when she, according to you, hit
16 Mr. Santos in the shoulder, 86 times -- do you agree that
17 86 miles an hour is about 126 feet per second?
18    A.   Sure.
19    Q.   And if we multiply that by 1.0 -- that shows
20 that she would have traveled about 136 feet in the time
21 it would have taken her to make a 3.3-foot lateral
22 swerve?
23    A.   Well, again, this is the simplistic way of
24 looking at the data because you have to account for the
25 movement to the right.  She's not going straight forward.

ORLANDO CARREON, DECEMBER 20, 2023

Page 193

1    Q.  Okay.  So do you agree that according to

2  Dr. Muttart's research, there's no way Ms. Smith hit

3  Mr. Santos on the shoulder and was able to swerve to

4  avoid the Camry?

5    A.  Repeat your question one more time.

6    Q.  Do you agree that according to Dr. Muttart's

7  research, there's no way that Ms. Smith could have hit

8  Mr. Santos a short distance behind the Camry and still

9  swerved 3.3 feet to avoid the Camry?

10   A.  Depends on what you specify as a short distance

11  away.

12       We don't know exactly where Mr. Santos is

13  standing.  So I'm not going to blanket agree to your

14  question.  But based on these calculations you've made,

15  we know that he's a short distance away based on the

16  physical evidence that we have, that aligns with the

17  trajectory from left to right.

18       I haven't made an opinion about where he's

19  located behind -- somewhere behind the rear of the Toyota

20  some distance away.  Some short distance away.

21   Q.  Okay.  So you say a short distance; right?

22   A.  (No audible response.)

23   Q.  In your diagram you put him about 16 feet

24  behind the Toyota?

25   A.  That's an approximation of --

Appx_2086

ORLANDO CARREON, DECEMBER 20, 2023

Page 194

1    Q.  In your diagram you put him 16 feet behind the
2 Toyota; correct?

3    A.  Correct.  That's -- approximately, based on the
4 diagram, that's where he was placed.  That's just a
5 representation of some near distance, some distance away
6 from the rear of the Toyota.

7    Q.  Okay.  And according to Dr. Muttart's research
8 whether she was going 86 miles an hour, 84 and a half
9 miles an hour, 90 miles an hour, it would have taken her
10 over a hundred feet to move laterally 3.3 feet to avoid
11 the Camry; correct?

12    A.  Based on the calculations you made, yes, but we
13 don't know exactly the location where he was at.

14    Q.  Okay.  But you -- okay.  But do you think it's
15 possible that he was a hundred feet behind the Camry?

16    A.  It's possible.  We don't know his exact
17 location.

18    Q.  So it's possible that Ms. Smith propelled him a
19 hundred feet into the Camry?

20    A.  Yes, it's possible.

21    Q.  You really think that's possible?

22    A.  Well, if she's going -- the last data point
23 that we have she's going 86.7 miles per hour, which is 10
24 over the speed limit.  You have a large -- a body of mass
25 with a high velocity and a person who is -- I don't know

Appx_2087

ORLANDO CARREON, DECEMBER 20, 2023

1  exactly how much he weighs, but let's say anywhere from

2  150 to 175, is a decent range.

3      Q.  And he's going to fly a hundred feet through

4  the air?

5      A.  It's possible.  I don't know exactly where the

6  location of where was at.

7      Q.  And you think it's really possible that he was

8  a hundred feet behind the Camry or more than a hundred

9  feet behind the Camry when Ms. Moreno told police minutes

10 after he died that he was standing right next to her?

11     A.  Repeat your question one more time.

12     Q.  You really think it's possible that he was

13 standing more than a hundred feet behind the Camry when

14 Ms. Moreno told police a few minutes after he died that

15 he was standing right next to her?

16     A.  I don't know exactly where he was standing.

17     Q.  Do you think it's at all reasonable to think

18 that he was more than a hundred feet behind the Camry?

19     A.  Again, I don't know exactly where he was

20 standing.

21     Q.  I didn't ask that question.  I realize that

22 you're probably not feeling good because this just

23 totally destroys your analysis --

24     A.  No, it doesn't.

25     Q.  -- but I'm just asking to answer my questions.

ORLANDO CARREON, DECEMBER 20, 2023

Page 196

1      A.  Go on.

2      Q.  Do you think it's reasonable to conclude that

3 he was standing more than a hundred feet behind the

4 Camry?

5      A.  It's possible that he was standing that

6 distance away.

7      Q.  Really?

8      A.  You have a large body of --

9      Q.  Is there any physical evidence a hundred feet

10 away from the Camry?

11      A.  There isn't any marks in that area.  We

12 don't -- we don't have any marks where his initial

13 contact was either way.

14      Q.  And there are people that claim to have

15 witnessed him being hit; right?

16      A.  Yes.

17      Q.  And you think they would say -- they testified

18 that he was a very short distance behind the Camry;

19 right?

20      A.  That he was some distance away from the rear of

21 the Camry.

22      Q.  And you think it's a reasonable interpretation

23 of their testimony that he was more than a hundred feet

24 behind the Camry?

25      A.  They don't specify how far they were.

Appx_2089

ORLANDO CARREON, DECEMBER 20, 2023

Page 197

1    Q.  I didn't ask you that.

2        Do you think it's a reasonable interpretation

3 to think that they meant that he was more than a hundred

4 feet behind the Camry?

5    A.  I'm not going to connotate what reasonable is

6 without them giving a figure approximately of where they

7 think he was --

8    Q.  And was there any --

9    A.  -- with that distance.

10   Q.  Was there any -- would the -- would the debris

11 from the Explorer, if Ms. Smith hit Mr. Santos more than

12 a hundred feet behind the Camry, is there some process

13 where the debris from the Explorer gets transported up to

14 the Camry?

15   A.  The debris can fly in any direction after a

16 collision.

17   Q.  So you think -- do you think the fender flares

18 are going to fly a hundred feet forward?

19   A.  Again, there isn't a specific distance that

20 debris is expected to fly or expected to move about.

21   Q.  Do you think it's a reasonable application of

22 accident reconstruction principles to conclude that an

23 accident where all of the damage is localized to a Camry

24 vehicle, to conclude that the accident and the collision

25 actually occurred more than a hundred feet to the south?

ORLANDO CARREON, DECEMBER 20, 2023

Page 198

1      A.  Again, we don't have any physical evidence

2 where the initial collision happened.  People say that

3 he's some distance away.  We don't have an exact location

4 for that.  So to say exactly what distance he was away

5 from the rear of the Toyota, I can't tell you exactly.

6 Nobody can tell you exactly where he was at.

7      Q.  Right.  But just because you can't say -- just

8 because you say you don't know exactly where he is

9 doesn't mean that you can't make reasonable judgments

10 about where he could have been; right?

11      A.  Well, the calculations that you made are based

12 on approximations of where he is laterally.  We don't

13 know that exactly.  We know general.

14      Q.  See, now you're just trying to wiggle.

15          You agreed 3.3 feet was the minimum distance

16 laterally that she would have to swerve.  Minimum; right?

17      A.  Generally, yes.

18      Q.  Generally the minimum?

19      A.  Right.  We don't know exactly.

20      Q.  Right.  That's what a minimum is.  She had to

21 swerve at least 3.3 feet laterally?

22      A.  Again, we don't know exactly the location where

23 he's at, so that's an approximation.

24      Q.  Do you agree that it would have been relevant

25 to your report to use the tool that you have available to

Appx_2091

ORLANDO CARREON, DECEMBER 20, 2023

Page 199

1  you in the form of IDRR to calculate the time it would

2  have even taken Ms. Smith to swerve laterally from the

3  shoulder to avoid the Camry?

4      A.  I used the physical evidence that was

5  available -- available to me to arrive to my conclusions.

6      Q.  That's fine.  I didn't ask you anything about

7  that.

8      A.  Okay.

9      Q.  You have a tool that's called IDRR; right?

10     A.  We have a lot of tools, yeah.

11     Q.  You have a tool that's called IDRR; right?

12     A.  Yes, that's one of the tools.

13     Q.  Okay.  And you use IDR -- IDRR to help with

14  your conclusions based on research that's been done in

15  accident reconstruction; correct?

16     A.  I use IDRR in other cases where IDRR may apply.

17     Q.  And in this case since you conclude that

18  Ms. Smith was driving on the shoulder when she hit

19  Mr. Santos; right?

20     A.  Partially, yes.

21     Q.  And you conclude that she swerved to avoid the

22  Camry; right?

23     A.  She swerved at or near impact; yes.

24     Q.  To avoid the Camry?

25     A.  Sure, if that was her intent, yes.

ORLANDO CARREON, DECEMBER 20, 2023

Page 200

1    Q.   And you have a tool in the form of IDRR which
2 would tell you whether research has shown it's even
3 possible that she could have completed that swerving
4 maneuver in the time and space that she had; right?
5    A.   Right.  The IDRR I can tell you approximately
6 -- how long that maneuver approximately would take.
7    Q.   And you didn't do that?
8    A.   I did not.
9    Q.   Or did you do it and you didn't like the
10 answer?
11    A.   I used the physical evidence to arrive to my
12 conclusions.
13    Q.   Okay.  You said you used IDRR in your report;
14 right?
15    A.   No.  I said I've reviewed it for other items
16 that I included in my report.
17    Q.   So is it your testimony that you never
18 attempted to calculate the time it would have taken her
19 to swerve?
20    A.   Because I didn't know the exact distance
21 where -- the exact location where Mr. Santos is located.
22    Q.   But you don't think it would have been relevant
23 to your report to say, by the way, for her to have
24 actually completed this swerving maneuver Mr. Santos
25 would have had to have been standing 135 feet behind the

Appx_2093

 1  Camry?

 2       A.  If I knew where Mr. Santos was located, but we

 3  don't know exactly where he was located.

 4       Q.  Okay.  So do you agree now that for Ms. Smith

 5  to have completed a 3.3-foot lateral swerve, she would

 6  have had to have begun that swerve about 135 feet behind

 7  the Camry?

 8       A.  I haven't made the calculations myself so I

 9  can't -- you've made them here on the record so I'm not

10  going to blanket --

11       Q.  I didn't -- from what you could tell, I didn't

12  calculate them wrong based on Dr. Muttart's equation;

13  right?

14       A.  I mean, I'm looking at the screen and what

15  you're inputting, but unless I do the calculation myself

16  I'm not going to testify that it was done correctly.

17       Q.  Okay.  So let's take 10 minutes.  You go ahead.

18  Let's take a break.

19       A.  I'm not going to do the calculations.

20               THE VIDEOGRAPHER:  We're going off the

21  record?

22               MR. DUBOFF:  Sure.

23               THE VIDEOGRAPHER:  Off the record.  End of

24  Media 3.  The time is 3:11.

25               (A recess was taken.)

Appx_2094

ORLANDO CARREON, DECEMBER 20, 2023

Page 202

1          THE VIDEOGRAPHER:  Back on the record.

2   Start of Media No. 4.  The time is 3:19.

3      Q   (By Mr. DuBoff)  Mr. Carreon, we took a break.

4          Just so I'm clear, you do have access to IDRR;

5   correct?

6      A.  Yes.

7      Q.  And it's your understanding that IDRR would

8   allow you to calculate what I just calculated on the

9   record, which is the time it would take -- it would have

10  taken Ms. Smith to execute an emergency steer of 3.3

11  lateral feet; right?

12     A.  Yes, but that doesn't take into account exactly

13  where he's at.  It's an approximation.  It doesn't

14  consider any other factors.

15     Q.  Does IDRR allow you to calculate the time it

16  would take a driver to execute a lateral swerve of 3.3

17  feet?

18     A.  If that's the only factor being considered,

19  sure.  But we don't know exactly at what point she

20  started to maneuver the steering maneuver.

21     Q.  Does IDRR allow you to calculate the time it

22  would take a driver to execute a lateral swerve of

23  3.3 feet?

24     A.  Yes, IDRR can allow you to calculate that

25  figure, yes.

ORLANDO CARREON, DECEMBER 20, 2023

Page 203

1    Q.  And you have IDRR available to you?

2    A.  Yes.

3    Q.  And during the break I invited you to go use

4  IDRR to calculate that figure; didn't I?

5    A.  Well, you were directing me to make a

6  calculation when I haven't been retained by you, sir.

7  So...

8    Q.  But I asked you to go check what I did in IDRR;

9  didn't I?

10    A.  Right.  But I'm not going to make calculations

11  on and off the record as we're taking testimony.

12    Q.  I didn't ask that.  I just asked -- I asked you

13  to go use IDRR to calculate what I just did on the

14  record.

15    A.  Yes, you directed me to make a calculation

16  while on the record and off the record today.

17    Q.  I didn't -- I didn't direct you to do anything

18  because you didn't do it; right?  I asked you to.

19    A.  Well, you can direct someone to do it.  They

20  don't have to do it either.

21    Q.  Did I direct you or did I ask you to do it?

22    A.  Ask, direct.

23    Q.  Okay.  And you've -- did you go use IDRR to do

24  that calculation?

25    A.  No, I went to the restroom.

ORLANDO CARREON, DECEMBER 20, 2023

Page 204

1    Q.   Okay.  And so you're refusing to use that tool
2    that's available to you to do this calculation; correct?
3    A.   I'm respectfully declining to make the
4    calculation that you've asked because I was not retained
5    by your law firm.
6    Q.   Okay.  But you don't disagree that it's
7    relevant to your accident reconstruction how long it
8    would take Ms. Smith to execute a lateral swerve of
9    3.3 feet; right?
10   A.   State your question one more time.
11   Q.   Do you dispute that it's relevant to your
12   accident reconstruction how long it would take Ms. Smith
13   to execute a lateral swerve of 3.3 feet?
14   A.   That can be one of the factors that can go into
15   a reconstruction in this case, but without knowing more
16   information exactly where he is located -- I didn't make
17   that calculation to come to my conclusions.  I used the
18   physical evidence that we have available.
19   Q.   And you keep saying we don't know where he is.
20   A.   Yeah, we don't know exactly where he's at.
21   Q.   Right.  If you look at Exhibit 12, does
22   Equation 2 ask you where the -- where the hazard is
23   located?
24   A.   Lateral.
25   Q.   Does Exhibit 2 ask you where the hazard is

Appx_2097

ORLANDO CARREON, DECEMBER 20, 2023

Page 205

1 located?

2      A.  Exhibit 2, what page?

3      Q.  Sorry.  Does Formula 2 in Exhibit 12 say

4 anything about where the hazard is located?

5      A.  I haven't read this paper in its entirety so I

6 don't know if it mentions that at any point.

7      Q.  So regardless of where Mr. Santos was standing,

8 you can use IDRR to at least calculate the minimum

9 distance that would be required or the minimum time that

10 we would be required to execute a swerve of 3.3 feet;

11 right?

12      A.  Again, I don't know the extent of what other

13 factors this research is considering or what isn't

14 considering.  So I'm not going to blanket agree to your

15 question.

16      Q.  Have you ever used the part of IDRR where you

17 calculate the time it takes to make a lateral swerve?

18      A.  At some point I'm sure I have.  I don't recall

19 an exact time.

20      Q.  I know for a fact you did it during the IDRR

21 workshop that you went to; right?

22      A.  That's your statement.

23      Q.  Is that true?

24      A.  I don't recall exact -- every exact calculation

25 that was made or reference that was made in that

Appx_2098

ORLANDO CARREON, DECEMBER 20, 2023

Page 206

1  workshop.

2      Q.  Do you have a calculator in your office?

3      A.  No, I don't.

4      Q.  Okay.  Is there a calculator somewhere here in

5  the office?

6      A.  I'm sure there is.  I don't know where it's at.

7      Q.  Okay.  And you've also chosen not to just to

8  check the calculations that I did on the record for

9  Equation 2; correct?

10     A.  You're presenting me with a research paper that

11 I haven't read in its entirety.  I'm generally familiar

12 with it.  I'm not going to blanket agree to your

13 questions without reviewing the material.

14     Q.  I didn't ask -- nothing that I asked you.

15         You're choosing not just to replicate the

16 simple calculation which is plugging 3.3 feet into

17 Equation 2; right?

18     A.  You want me to replicate an equation from a

19 paper that I haven't reviewed it in its entirety for you

20 to get your answer.  I'm not going to do so.

21     Q.  Right.  But you wouldn't even check my math;

22 right?

23     A.  Because I'm not going to make calculations on

24 the record.  I have stated my opinions in my report.

25     Q.  If you go to Page 12 of your report, Exhibit 1.

Appx_2099

ORLANDO CARREON, DECEMBER 20, 2023

Page 207

1      A.   Sure.

2      Q.   And, again, your theory is that Mr. Santos was

3 propelled forward when he was hit by some part, the front

4 of the Explorer, correct?

5      A.   Propelled forward with a motion -- with a

6 trajectory from left to right.

7      Q.   Okay.  You agree that part of the metal, I

8 guess fender -- I'm not sure what part you want to call

9 it, but there was a metal part of the Explorer that was

10 curled back by the impact with Mr. Santos; correct?

11      A.   Yes.  The fender that tapers around the left,

12 front wheel, there is some damage that is primarily to

13 the rear.

14      Q.   What's primarily to the rear?

15      A.   Well, that it has the majority of the damage in

16 the rearward deformation, but there is some lateral

17 movement.

18      Q.   Okay.  But that -- that piece of the fender as

19 it came, that piece comes to a pretty sharp point; right?

20      A.   I would have to look at -- one second.

21           Yes.  The -- there is a point when it's closest

22 to the hood of the corner -- the corner of the hood of

23 the Explorer that would be categorized as somewhat sharp,

24 yes.

25      Q.   Okay.  And that's the point that got curled

Appx_2100

ORLANDO CARREON, DECEMBER 20, 2023

Page 208

1 back; correct?

2      A.   That's -- yeah.   That's one of the points that

3 shows rearward deformation, yes.

4      Q.   Would you agree that it curled in a

5 counterclockwise direction?

6      A.   A deform to the rear with some lateral

7 movement, I -- I don't know that I would characterize it

8 that way.

9      Q.   Well, peeled back to the left; right?

10      A.   With some defamations to the left, yes.

11      Q.   Okay.   So it's a counterclockwise?

12      A.   Well, depending on which -- how you're facing,

13 sure.

14      Q.   Well, if you're facing the direction of the car

15 it's a counterclockwise?

16      A.   Are you looking at it from the top?   Front?   I

17 need you to --

18      Q.   It peeled back to the left; fair?

19      A.   Sure.

20      Q.   Okay.   And would you agree that it peeled back

21 almost 180 degrees?

22      A.   A portion of it, yes.   It appears that it's

23 pointing towards the rear of the vehicle.

24      Q.   Okay.   Now, for it to have peeled back like

25 that, there must have been some force acting on it;

Appx_2101

ORLANDO CARREON, DECEMBER 20, 2023

Page 209

1  correct?

2      A.  Some interaction, yes.

3      Q.  Okay.  So if just hitting Mr. Santos propelled

4  him forward, how did his body cause that piece of the

5  fender to peel back by 180 degrees?

6      A.  I'm not -- we don't know exactly how he

7  interacted with the Ford Explorer.  We know a general

8  location where he impacted.  How long that interaction

9  lasted, if there's any other limbs, what exactly hit what

10 from the Ford Explorer from Mr. Santos' body, I can't

11 tell you for sure.

12         We know -- from the -- from the pictures we

13 know that we observed some damage that is deforming to

14 the rear and slightly to the left.

15     Q.  Okay.  But do you agree that after -- once

16 Mr. Santos' body is no longer in contact with the Ford,

17 that piece of metal is not going to continue peeling

18 back?

19         Do you agree with that?

20     A.  Generally, yes.  Like I said, I don't know the

21 exact interaction of the two bodies.

22     Q.  Okay.  But if -- if -- can you think of

23 anything else that would have peeled back that fender

24 other than Mr. Santos' body?

25     A.  I don't have any physical evidence that would

ORLANDO CARREON, DECEMBER 20, 2023

Page 210

1 tell me that information.

2     Q.  So you think it's reasonable to conclude that

3 it was Mr. Santos' body that peeled that fender back?

4     A.  Yes, it's likely that was the source.

5     Q.  Okay.  And so once he's propelled forward and

6 is no longer contacting that piece of fender, it's not

7 going to continue peeling back; right?

8     A.  Sure.  Yes.

9     Q.  Okay.  So that means that that piece of fender

10 was in contact with Mr. Santos' body up until at least

11 the point that it reached this -- its final position,

12 which is pointing backwards; correct?

13     A.  I don't know how long -- so are you asking

14 specifically just that portion or the entire vehicle?

15     Q.  I'm just focused on this damage for right now.

16          Do you agree that Mr. Santos' body would have

17 had to have remained in contact with this piece of fender

18 at least up until the point that it reached the position

19 that is shown in Figure 13 of your report?

20     A.  Yes, generally.

21     Q.  Okay.  And do you agree that there was a

22 significant amount of blood and other material on that

23 piece of fender that peeled back?

24     A.  In that area there is some bodily fluids that

25 can be seen.

Appx_2103

ORLANDO CARREON, DECEMBER 20, 2023

1     Q.  Okay.  And are you aware of any other open

2  wounds on Mr. Santos other than his head?

3     A.  Well, we only have a few pictures -- or body

4  cam videos that show Mr. Santos' body.  We don't have an

5  autopsy report that indicates other wounds.  So without

6  that information, I can't make a determination if there

7  wasn't any other wounds.

8     Q.  Okay.  But what did every single witness

9  testify about his wounds?

10     A.  They testified that there was damage to his

11  head but didn't indicate whether there was other areas of

12  the body that bodily fluids were coming out.  Again,

13  without an autopsy report or something that I can take a

14  look at that outlines the injuries that Mr. Santos

15  sustained, I'm not going to opine on that.

16     Q.  Okay.  You testified before that given the

17  location of the damage to the front of the Ford, you

18  agree that it was consistent with Mr. Santos bending over

19  or kneeling over; correct?

20     A.  It's -- it's a possibility that he was -- but

21  we don't know exactly what he was doing.

22     Q.  And if that was the case, it's also at least

23  consistent with the evidence that this sharp piece of

24  fender would have been the object that pierced his head?

25     A.  Again, without an autopsy report or more

ORLANDO CARREON, DECEMBER 20, 2023

1  information, I am not going to opine exactly on how the

2  two -- Mr. Santos' body and the Ford Explorer interacted

3  during the collision.  We know a general area where he

4  collided with the Ford Explorer and we know the

5  trajectory afterwards based on the physical evidence.

6      Q.  Okay.  I'm asking you if it's consistent with

7  the evidence that you see here from this sharp piece of

8  fender and the fact that you've already said that it's

9  possible that he was kneeling down, is it therefore

10 consistent with the evidence or possible that this piece

11 of fender was what pierced Mr. Santos' head?

12     A.  It's one explanation.  Without more information

13 from an autopsy report outlining his injuries, I'm not

14 going to agree to that statement.

15     Q.  Do you agree that this piece of fender pierced

16 something on Mr. Santos' body?

17     A.  That piece of the fender interacted with

18 Mr. Santos' body.

19     Q.  Okay.  And so you say "interacted."  Do you

20 agree?

21     A.  Collided.

22     Q.  But do you agree that -- given the amount of

23 blood on it, do you agree that this piece of fender

24 pierced Mr. Santos' body?

25     A.  At some point on his body, sure, yes.

ORLANDO CARREON, DECEMBER 20, 2023

Page 213

1    Q.  Okay.  And then that would have created the
2  resistance to peel the fender back; correct?

3    A.  The entire collision, yes.  The entire
4  interaction of the collision, yes.

5    Q.  Okay.  So you agree that this pierced his body;
6  right?

7    A.  Some part of his body.

8    Q.  Some part of his body.

9        And then you agree that it would have had to
10 stay in contact with his body until it reached this final
11 position that we see in Figure 13?

12   A.  Again, I don't know exactly how the Ford
13 Explorer and Mr. Santos' body interacted during the
14 time -- the entire collision sequence.  We know a general
15 area based on the physical evidence seen on the Ford
16 Explorer and the trajectory that it takes afterwards.

17   Q.  Okay.  I thought you had already agreed with me
18 on this, but this thing is not -- this thing is not going
19 to keep bending once it no longer is in contact with
20 Mr. Santos' body; correct?

21   A.  I don't know exactly the interaction, but yes.
22 Generally, yes.

23   Q.  Okay.  So that means that Mr. Santos' body must
24 have still been in contact with this piece of fender when
25 it reached the curled back position that we see in

Appx_2106

ORLANDO CARREON, DECEMBER 20, 2023

1  Figure 13 of your report?

2      A.  Again, I don't know the exact collision

3  sequence between Mr. Santos' body and the Ford Explorer,

4  so I can't exactly say how the two objects interacted

5  during the entirety of it.

6      Q.  Okay.  If an object is going to pierce

7  something, right, it has to either -- if it's going to

8  pierce something and then -- so we agree that at some

9  point this pierced Mr. Santos' body; right?

10     A.  Somewhere on his body, yes.

11     Q.  And then at some point it left Mr. Santos'

12  body; right?

13     A.  Sure.  Yes.

14     Q.  Because he wasn't still connected to it at the

15  time?

16     A.  Correct.

17     Q.  Okay.  So for that to happen, it either has to

18  come out through the same opening or through a different

19  opening; right?

20     A.  Yes.

21     Q.  And it would make sense that it would come --

22  do you agree that it would make sense that it would come

23  out through the same opening, because as it curled back

24  this piece of fender it is essentially facing the

25  opposite direction of the Explorer's direction of travel;

ORLANDO CARREON, DECEMBER 20, 2023

Page 215

1 right?

2      A.   Yes.   The fender is deformed rearwards and
3 laterally to the left with the point on the fender
4 pointing approximately to the back of the Explorer.

5      Q.   So if it pierced Mr. Santos and then curled
6 back, right, we think that's what happened?

7      A.   There is rearward deformation to the fender.

8      Q.   Okay.   And then once it rotated 180 degrees,
9 now there's nothing keeping this piece of fender in
10 Mr. Santos' body because the Explorer is still driving
11 forward; do you agree with that?

12      A.   Again, I don't know the exact interaction
13 between the Ford Explorer and the -- Mr. Santos' body.
14 We know a general area.   So I'm not going to speak to
15 that degree exactly how the two objects interacted
16 without having more information because we don't have
17 enough information to go into that level of detail.

18      Q.   Would you agree that this piece of fender
19 peeled back to the side of the Explorer?

20      A.   Yes.   It has some lateral movement and to the
21 rear as well.

22      Q.   Okay.   So for Mr. Santos to have been in
23 contact with this piece of fender, up at least to the
24 point where it got bent back to this position, his body
25 also would have been on the side of the Explorer;

Appx_2108

ORLANDO CARREON, DECEMBER 20, 2023

Page 216

1 correct?

2      A.  Well, the -- the fender begins at the -- at

3 the -- meets the corner of the hood.  So he'll be to some

4 degree to the left side of the Ford Explorer, but there's

5 still going to be some portion of his body, we don't know

6 exactly, that would be in the front corner area.

7           Again, we don't know exactly the interaction

8 that he has with the Ford Explorer.  We know generally

9 how the two objects collide.

10      Q.  I understand.  But at some point -- at some

11 point this pierced his body and then curled backwards;

12 right?

13      A.  At -- at some point Mr. Santos came in contact

14 with that fender piece.  It deformed rearwards and

15 laterally to the left.

16      Q.  Okay.  And so can you explain how it would be

17 possible for Mr. Santos' body to be in contact still with

18 this piece of fender in this position and be anywhere

19 other than on the left side of the Explorer?

20      A.  Well, again, I don't know exactly how his

21 entire body is colliding with the Ford Explorer.  We know

22 a general area.  I don't know whether an arm, a leg, his

23 other limbs, right, how he's interacting with the Ford

24 Explorer.  So we don't know that information.  We don't

25 know that information to that degree of accuracy.

Appx_2109

ORLANDO CARREON, DECEMBER 20, 2023

1    Q.   I'm not asking you what you know.  I'm just
2  asking if you can even explain how it could possibly be
3  the case that Mr. Santos could be pierced by this piece
4  of fender, stay in contact with it as it curled backwards
5  and be anywhere else other than the left side of the
6  Explorer.  How is that possible?
7    A.   Some part of -- again, we don't know exactly
8  how they collided.  We know generally how they collided.
9  We don't know to -- exactly how Mr. Santos' body
10 interacted with the Ford Explorer.  He's going to be in
11 the front, corner area.  We don't know what limbs
12 interacted with what portions of the vehicle.  We just
13 know it generally.
14   Q.   Okay.  You understand from Mr. Montalbano's
15 report that his conclusion is that Mr. Santos was struck
16 in the head; correct?
17   A.   Yes.
18   Q.   Now, if Mr. Santos was -- did have his head
19 extended over his body -- over his center of gravity, and
20 was hit on the front of the Ford, you would expect his
21 body to rotate counterclockwise; correct?
22   A.   Repeat your question one more time.
23   Q.   If Mr. Santos' head was extended beyond his
24 body's center of gravity, and he was hit in the head by
25 the Explorer, you would expect that would cause him to

ORLANDO CARREON, DECEMBER 20, 2023

Page 218

1  rotate; correct?

2      A.  We don't know exactly how he's oriented.  So if

3  you want -- if you want to talk about a possible way that

4  he might have been positioned, sure, there's a way that

5  you can put it that would fit that evidence -- that would

6  fit the damage on the vehicle, but we know from the

7  physical evidence that he's not rotating that way.  We

8  know from the physical evidence that the trajectory that

9  Mr. Santos' body takes is in a motion from left to right.

10     Q.  If anyone was leaning out -- bending over and

11 leaning out and a car driving by hit them in the head on

12 the left corner of the car, you would expect that to

13 cause their body to rotate; correct?

14     A.  Let's assume for a second that what

15 Mr. Montalbano is saying is -- let's run with it.  The --

16 the motion that he would -- Mr. Santos would take is from

17 right to left.  So he would be projected onto -- because

18 we know that the primary contact damage is to the rear of

19 the Toyota.  We know that from the physical evidence that

20 he has some interaction with Ms. Evelyn Moreno.  The

21 momentum that he would experience as he's pushed in that

22 direction would likely cause Ms. Moreno to fall to her

23 left and end up near the concrete barrier.

24         So based on that information, if you -- if you

25 believe that he was rotated counterclockwise in the

Appx_2111

ORLANDO CARREON, DECEMBER 20, 2023

1 position that Mr. Montalbano -- sorry -- your expert

2 states, that's what would happen.

3      Q.  This has nothing to do with the question I

4 asked you.

5      A.  Well, you asked if it could be rotated.

6      Q.  I'm just asking you a simple question.  Your

7 attorney is going to miss his flight and that's going to

8 be because you won't answer my questions.

9           Do you agree that if someone is bending over

10 and extending their head out and gets hit in the head by

11 a passing vehicle, that would cause their body to rotate?

12 That was my question.

13      A.  It's possible if you isolate everything else,

14 the other physical evidence that we have, yes.

15      Q.  I didn't ask about the other physical evidence.

16      A.  I know, but you want --

17      Q.  No.  No, you clearly don't know.  I'm asking

18 you simple questions.  Okay?  It's not your job to argue

19 with me every step of the way about what the possible

20 implications of your answer might be.  Your job is to

21 answer my questions honestly and straightforwardly, and

22 not add in all the irrelevant points that you think are

23 relevant to my question, okay?  I'm asking you simple

24 questions.  You claim to have expert knowledge.  I'm

25 asking you simple questions.

ORLANDO CARREON, DECEMBER 20, 2023

Page 220

1          If any person, anywhere, on any road in the
2   world, extends their head out into a lane of traffic and
3   gets hit by an oncoming car, that would cause their body
4   to rotate; yes or no?
5       A.  Again, ignoring the rest of the physical
6   evidence, that's what you would get, yes.
7       Q.  And it would cause -- if someone extended their
8   head out and was hit by the left headlight of a car, you
9   would expect their body to rotate counterclockwise;
10  correct?
11      A.  Depending on the interaction between the two
12  objects and ignoring the rest of the physical evidence in
13  this case, yes, that's what you would obtain.
14      Q.  I just want to be clear about the evidence that
15  you keep saying "all the physical evidence."
16          What -- listen very carefully.
17          What physical evidence are you relying on to
18  support your theory of how the accident happened?
19      A.  We have physical evidence where Mr. Santos'
20  body came to rest.  We have physical evidence where
21  there's primary contact damage to the rear of the Toyota.
22  We have evidence on Ms. Moreno -- testimonial evidence
23  from Ms. Moreno.
24      Q.  No, not testimonial evidence.  I asked for
25  physical evidence.  So I have the initial rest position

Appx_2113

1 in the right lane; correct?

2      A.   Yes.

3      Q.   You have the evidence of impact to the rear of

4 the Toyota; yes?

5      A.   Yes.

6      Q.   Okay.  What other physical evidence are you

7 relying on to support your theory of how this accident

8 happened?

9      A.   The fluid marks that are at the scene indicate

10 that a vehicle traversed in a motion from left to right.

11      Q.   Well, the what marks?

12      A.   Fluid marks.

13      Q.   Indicate that which -- what vehicle traversed

14 from left to right?

15      A.   That a vehicle traversed from left to right.

16      Q.   Show me where that is in your report.

17      A.   Sure.  Well, I think -- so either on the cover

18 page or Page 9, there's some fluid that's been moved that

19 shows that there is -- a vehicle passed by with a motion

20 from left to right.

21      Q.   And you think that was caused by the Explorer?

22      A.   It's a possibility.  It's one of the items in

23 the physical evidence.

24      Q.   Show me where you say that in your report, that

25 you think the Explorer caused those marks.

Appx_2114

ORLANDO CARREON, DECEMBER 20, 2023

Page 222

```
 1      A.  I don't indicate that in my report because it
 2 is not the primary use of the physical -- it's not the
 3 primary physical evidence that I used for the conclusion.
 4      Q.  Okay.  But you're saying that now?
 5      A.  It's one of the items, but what's outlined in
 6 my report --
 7      Q.  And hold on one second.
 8          How did the fluid marks support your conclusion
 9 that this accident happened on the shoulder?
10      A.  That's not what I'm indicating.
11      Q.  Okay.  So what --
12      A.  It was the motion afterwards.
13      Q.  There's no fluid on the shoulder?
14      A.  I'm not indicating that it's on the shoulder.
15      Q.  Okay.  So tell me how the fluid marks in any
16 way support your theory of how this accident happened.
17      A.  Because it shows a trajectory from left to
18 right.  Some vehicle passing, you know, the left lane
19 going towards the right, indicated in this area
20 (indicating) -- I'm not saying that that's the --
21      Q.  Where are you pointing?  What figure are you
22 pointing at?
23      A.  Figure 8.
24      Q.  Is the fluid marks just as consistent with a
25 car swerving -- a car that started in the left lane
```

Appx_2115

ORLANDO CARREON, DECEMBER 20, 2023

Page 223

1 swerving?

2     A.  It's possible.  That's one piece of physical

3 evidence.

4     Q.  I realize it's a piece of physical evidence.

5     A.  Yes.

6     Q.  There's a difference between a piece of

7 physical evidence and one that actually supports what

8 you're saying.  That doesn't show anything about the car

9 being in the shoulder.

10     A.  The way that the fluid is displayed shows its

11 trajectory from left to right.  I'm not saying that

12 that's the piece of evidence that indicates that

13 Ms. Smith was on -- partially on the shoulder.

14          The physical evidence that I'm outlining is the

15 physical evidence to the rear of the Toyota and his rest

16 position.

17     Q.  What's the physical evidence to the rear of the

18 Toyota?

19     A.  The damage that you can see.

20     Q.  Okay.

21     A.  The body of fluids that you see on Figure 9.

22 The damage to the broken taillight on the right rear

23 side.  All that is physical evidence.

24          In order to obtain -- in order to have

25 Mr. Santos end up to the right rear of the Toyota and

1  make the damage to the -- to the rear bumper of the

2  Toyota, Mr. Santos had to be some distance from the rear

3  of the Toyota directly behind in order to achieve that

4  position.

5      Q.  Okay.  And what principles are you using to

6  reach that conclusion?

7              MR. WHITE:  Objection; asked and answered.

8      A.  We have covered that material.

9      Q   (By Mr. DuBoff)  Just momentum; right?

10     A.  Right.  Ms. Smith indicates that she swerves to

11 the right.  So there's a motion from left to right.  So

12 the trajectory that Mr. Santos' body would take would be

13 generally the same, from left to right.  After the

14 interaction with the rear of the Toyota, Mr. Santos ends

15 up to the right of it.

16     Q.  Do you have any basis for refuting what

17 Mr. Montalbano says -- well, actually what -- what kind

18 of -- what's -- what is the term for a vehicle-pedestrian

19 accident that occurs on the corner to the -- to the front

20 corner of the vehicle?

21     A.  There's general terms that accident

22 reconstruction books will categorize certain collisions,

23 but there's general guidance on how you can put that into

24 a bucket to say this is that, but I don't think this

25 particular collision falls under those categories because

Appx_2117

ORLANDO CARREON, DECEMBER 20, 2023

1 of the interaction that it has.

2      Q.   Do you agree under your theory that Mr. Santos

3 was struck by the corner of the Explorer?

4      A.   Was struck -- Mr. Santos was struck with the

5 front corner of the Ford Explorer, some interaction with

6 the front and some with the corner.

7      Q.   Okay.  Can you go back to Exhibit 3 and turn to

8 Page 457.

9      A.   Can you show me what Exhibit 3 looks like?

10      Q.   Exhibit 3 is Fricke.

11      A.   Okay.  What page?

12      Q.   458 -- or I'm sorry, 457.

13      A.   Okay.

14      Q.   Can you read the caption to Exhibit 25?

15      A.   "A fender vault trajectory typically has a

16 pedestrian contact at the corner of a vehicle.  The

17 pedestrian comes to rest to the side or -- to rest to the

18 side and/or to the rear of the striking car."

19      Q.   Okay.  So you agree that in the textbook you

20 were trained with, pedestrian contact at the corner of a

21 vehicle is termed a fender vault; correct?

22      A.   In general terms, yes.

23      Q.   Okay.  And with a fender vault, according to

24 that same textbook, the pedestrian is expected to rest to

25 the side or to the rear of the striking vehicle?

ORLANDO CARREON, DECEMBER 20, 2023

1    A.   That's a generalization.

2    Q.   Well, what does the textbook say?  The textbook

3 says that -- it says that a fender vault trajectory

4 typically has a pedestrian contact the corner of a

5 vehicle; right?

6    A.   Yes.

7    Q.   That's what we have here; right?

8    A.   That's what the book states, yes.

9    Q.   That's what we have in our accident.  Corner

10 contact.

11    A.   It has some front facing contact and some front

12 corner contact.

13    Q.   Okay.  Well, that's always going to be the case

14 with a corner contact; right?

15    A.   You can have more corner contact and to the

16 side.

17    Q.   Okay.  So do you agree that in a -- with a

18 fender vault trajectory the pedestrian comes to rest to

19 the side or to the rear of the striking vehicle?

20    A.   This is a generalization that the book has put

21 on fender vault trajectories or what they categorize as

22 that.

23    Q.   Okay.  Can you go through here, 454.  Do you

24 agree that 454 to 458 has a number of different vehicle

25 pedestrian accident scenarios?

ORLANDO CARREON, DECEMBER 20, 2023

Page 227

1    A.  Yes, different potential scenarios.

2    Q.  Okay.  Which one do you think approximates --
3  which one do you think matches your opinion in this case?

4    A.  Well, I've reviewed this part of the book at
5  some point, but I didn't think to put my -- to put the
6  collision that we have here today in one of those
7  categories.

8    Q.  Do you agree that it doesn't fall within any of
9  the categories; your theory of the case does not fit any
10 of the categories in the Fricke textbook?

11   A.  Well, this is ignoring any other collision with
12 another vehicle.  And the examples that you show here, it
13 doesn't show striking any other vehicle.  So that's
14 something that's not being considered here in these
15 trajectories.

16   Q.  I understand that these to show the initial
17 contact with the vehicle.  But as far as that initial
18 propelling action that you claim occurred that propelled
19 Mr. Santos forward, show me which type of accident here
20 actually matches up with that.

21   A.  The projection that Mr. Santos experienced was
22 forward, left to right, and here you have images or
23 exhibits that show vehicles without any other items
24 listed, such as steering.  So I'm not going to put the
25 collision in a category because those factors aren't

ORLANDO CARREON, DECEMBER 20, 2023

Page 228

1 being considered.

2      Q.  Okay.  So in your view, this accident does not

3 fit within any of these categories?

4      A.  Because these categories aren't taking into

5 account steering input at or near impact or impact with

6 another vehicle.

7      Q.  If you look at some of the -- I guess if you

8 look at the image on the cover of your report --

9      A.  Yes.

10      Q.  -- do you recall Mr. Montalbano's analysis of

11 the tire marks that were laid down in the immediate area

12 of the Camry?

13      A.  Yes, I'm generally familiar with that.

14      Q.  Do you agree with him that those tire marks

15 were not caused by the Explorer?

16      A.  Correct.

17      Q.  You agree?

18      A.  Well, can you point out which tire marks are --

19 which part of --

20      Q.  The one -- I mean, I can -- I can make his

21 report an exhibit if you would like.

22      A.  Well, I want to take a look and make sure that

23 what you're looking at before I agree to it or disagree

24 to it.

25                    MR. DUBOFF:  Okay.  So this will be --

1  Exhibit 13?

2            THE REPORTER:  Yes.

3            MR. DUBOFF:  Okay.

4            MR. WHITE:  Oh, I've got several of these.

5            (Exhibit 13 was marked.)

6    Q   (By Mr. DuBoff)  Okay.  If you look on Page 4

7  of Exhibit 13, it lists Mr. Montalbano's opinions and

8  conclusions; right?

9    A.  Correct.

10   Q.  Okay.  And then Opinion 8 says, "The two tire

11 marks photographed next to were swerving away from the

12 Toyota were not from the subject Ford Explorer, rather

13 from a vehicle with smaller, thinner tires."

14       Do you remember reviewing that in his report?

15   A.  Yes, I do remember that.

16   Q.  Okay.  And so do you agree with that?

17   A.  Which opinion is it again?

18   Q.  It's Opinion 8.

19   A.  I agree that there's two tire marks

20 photographed next to -- next to the Toyota were not from

21 the subject Ford Explorer.

22   Q.  Okay.  And if you look at -- if you look at

23 Page 50 -- Page 50, Figure 62 of Mr. Montalbano's report.

24   A.  Page?

25   Q.  Page 50.

1      A.  Okay.

2      Q.  In there he outlines the two tire marks that

3 he's talking about.

4      A.  Yes.

5      Q.  Okay.  So do you know which tire marks I'm

6 talking about now?

7      A.  Correct.

8      Q.  Okay.  If you go back to his Opinion No. 8, he

9 says, "The location and characteristics of these tire

10 marks were indicative of one or more vehicles making an

11 evasive swerving maneuver from left to right at the

12 location of the parked Toyota."

13        Do you agree with that?

14      A.  I -- no, I don't agree.

15      Q.  Why do you not agree with that?

16      A.  Where he says "were indicative of one or more

17 vehicles," I think this is indicative of one vehicle.

18        And he's saying -- making an evasive, sort of,

19 maneuver, there is two tire marks that are photographed

20 next to the Toyota, but I wouldn't characterize them as

21 swerving away.

22      Q.  How would you characterize them?

23      A.  Next to.

24      Q.  Okay.  But they're -- they're tire marks;

25 right?

ORLANDO CARREON, DECEMBER 20, 2023

Page 231

1    A.  Yes, they are tire marks.

2    Q.  Okay.  Tire marks require -- we don't just

3 leave tire marks all the time as we're driving around;

4 right?

5    A.  Correct.

6    Q.  Okay.  So something has to cause the tire

7 marks?

8    A.  Yes.  You would have to be -- there would have

9 to be some level of braking force to achieve some marks

10 on the road.

11    Q.  Okay.  Or swerving; right?

12    A.  Not necessarily.

13    Q.  Can swerving leave tire marks?

14    A.  It's less likely to cause a tire mark because

15 you're losing some of that braking force as you're making

16 a swerving maneuver.

17    Q.  Okay.  But -- so is it -- your opinion is that

18 these are tire marks; right?  Do you agree with that?

19    A.  I agree with that, yes.

20    Q.  Okay.  They were not caused just by normal

21 driving; right?

22    A.  Some -- those tire marks were made by someone

23 applying their brakes next to the Toyota.

24    Q.  Okay.  And how hard do you typically need to

25 apply your brakes to leave tread marks?

WENDY WARD ROBERTS & ASSOCIATES, INC.
972.494.2000

Appx_2124

ORLANDO CARREON, DECEMBER 20, 2023

Page 232

1      A.  It can -- depending on the vehicle pulling 4,

2  pulling 6 Gs, somewhere around there.

3      Q.  And that would be considered emergency braking;

4  right?

5      A.  Correct.

6      Q.  Okay.  So in your opinion, these are tire marks

7  that were created by a car emergency braking in the area

8  where we see the marks?

9      A.  The two tire marks that are seen next to the

10  Toyota have the characteristics of some -- of a vehicle

11  achieving a level of braking force where it would leave

12  marks, yes.  But I wouldn't characterize them as swerving

13  away.

14      Q.  Okay.  If we look at -- so on Page 15 of your

15  report.

16      A.  Yes.

17      Q.  You say a lot of things about like, the clock

18  being updated on the infotainment system.

19      A.  Yes.

20      Q.  Okay.  Are you going to offer any opinion that

21  that's relevant to this accident at all?

22      A.  Well, can you elaborate on your question?

23      Q.  All right.  Are you claiming that there was

24  any, like, manipulation of the data or anything like

25  that?

WENDY WARD ROBERTS & ASSOCIATES, INC.
972.494.2000

ORLANDO CARREON, DECEMBER 20, 2023

Page 233

1       A.  Well, what I state here in my report is an

2  observation that I'm making that the offset is -- here.

3           "The data indicates that the system was updated

4  to UTC offset negative five at the 30.052338, common

5  negative 5.434579 coordinates, which is the actual offset

6  between central daylight time and universal coordinate

7  time.  But these reported times however appear to be an

8  hour earlier than the actual time."

9       Q.  Okay.  Sorry.  I'm focused -- there's a

10 sentence that says, "It is unknown" -- this is on Page 15

11 of your report.  "It is unknown whether the system

12 commanded the time update or if Ms. Smith made the change

13 manually."

14      A.  Right.  We don't know -- we don't know whether

15 the system was updated by itself or if someone made the

16 change manually.

17      Q.  And I'm just asking, do you think that matters

18 which of those it is?

19      A.  No, I'm just making an observation.

20      Q.  Okay.  And any change that happened, happened

21 before the accident occurred; right?

22      A.  Let me take a look at -- yes, that would be

23 correct.

24      Q.  Okay.  You also report -- or put in your report

25 that about 20 miles away from the accident Ms. Smith was

1 driving close to a hundred miles per hour; right?

2      A.  Yes.  My statement is the drive speed of -- I'm

3 sorry.  "Further review of the track log data showed that

4 Ms. Smith reached a maximum speed of approximately 99

5 point miles per hour in the Fairfield, Texas area."  And

6 I give a description of the latitude and longitude

7 coordinates.

8      Q.  Okay.  And is that fact, her speed -- you would

9 agree that's her speed about 20 miles away from where the

10 accident happened?

11      A.  It's approximately 19.6 miles prior to the

12 collision.

13      Q.  Okay.  So do you think how fast she was driving

14 19.6 miles away from the accident is -- does that

15 contribute or form the basis for any of your opinions

16 about how this accident happened?

17      A.  It's an observation on the driver's behavior

18 that we see prior to the collision.

19      Q.  I understand.  Did it form -- does it in any

20 way support your opinions about how this accident

21 happened?

22      A.  The opinion that I give here is a standalone

23 opinion.  It doesn't -- I'm still looking at the physical

24 evidence to give my other opinions, so it's not built

25 upon that opinion.

ORLANDO CARREON, DECEMBER 20, 2023

Page 235

 1    Q.  Okay.  If you go to Page 21 of your report.

 2    A.  Yeah.

 3    Q.  And you discuss the fact that Ms. Smith did not

 4 change lanes --

 5    A.  Correct.

 6    Q.  -- upon -- before reaching the Camry; right?

 7    A.  Yes.

 8    Q.  Okay.  And you say, "This was clearly not safe

 9 even without the presence of pedestrians"; right?

10    A.  Yes.

11    Q.  Okay.  What accident reconstruction methodology

12 are you relying on to give an opinion on what's clearly

13 not safe?

14    A.  What portion are you referencing one more time?

15    Q.  Page 21.

16    A.  Yes.

17    Q.  The second paragraph down.  And the first half

18 of the paragraph you talk about how much space was

19 available for Ms. Smith to get past the Camry.  And then

20 you give an opinion that "this was clearly not safe even

21 without the presence of pedestrians."

22         Do you see that?

23    A.  Yes.  So this is -- taking a looking -- a look

24 at what most drivers would do in the presence of a

25 vehicle that appears to be disabled, as they are

1 approaching it, with his trunk up, emergency flashers on,

2 and multiple pedestrians there, we know because she made

3 a swerving move to the right that those other lanes

4 weren't occupied by other vehicles.

5          So she had the opportunity -- she testifies

6 that she sees a vehicle coming up front and makes some

7 adjustment to the right.

8          Even if she continued through the path and

9 never went right behind the Toyota Camry slightly into

10 the left shoulder, there's only approximately 1.6 feet

11 available, taking into account the width of her vehicle.

12 And with 85 miles per hour closure, this would be deemed

13 unsafe based on most driver behavior knowing that --

14 knowing that the evidence points that she had the other

15 lanes available to her.

16          MR. DUBOFF:  Jacob, will you stipulate that

17 he's not going to testify what is safe or not safe.

18          MR. WHITE:  Yes, you're right.  So he'll

19 testify about his independent conclusions based on the

20 physical evidence.

21          MR. DUBOFF:  About what happened?

22          MR. WHITE:  About what happened.

23          MR. DUBOFF:  Not about whether certain

24 behavior was safe or not?

25          MR. WHITE:  That's right.  Now, if the

Appx_2129

ORLANDO CARREON, DECEMBER 20, 2023

Page 237

1  Court allows him to issue a lay -- you know, to expand

2  out, but I agree that's not part of an expert opinion.

3              MR. DUBOFF:  Okay.  I like you when you're

4  trying to make a point.

5              MR. WHITE:  Yeah.

6      Q   (By Mr. DuBoff)  Okay.  You said that most --

7  that we know that other drivers when they see a car on

8  the side of the road with the trunk up, they would get

9  over?

10     A.  There's available cues, yes.

11     Q.  Okay.  But what are you -- so there's cues to

12 see the car?

13     A.  Right.

14     Q.  Okay.  What are you basing it on to say that

15 most drivers would get over?

16     A.  What driver behavior would be reasonable.

17     Q.  According to you?

18     A.  According to driving experience, yes.

19     Q.  Okay.  But are there studies about what drivers

20 actually do when they're driving by roadside hazards?

21     A.  I'm -- I don't know every single study that

22 there is.

23     Q.  Do you know any?

24     A.  Not off the top of my head.

25     Q.  Okay.

Appx_2130

ORLANDO CARREON, DECEMBER 20, 2023

Page 238

```
1              MR. DUBOFF:  What are we up to?  Is this
2  14?
3              THE REPORTER:  14.
4              (Exhibit 14 was marked.)
5     Q   (By Mr. DuBoff)  Do you recognize this book,
6  Mr. Carreon?
7     A.  I do.
8     Q.  You do?
9     A.  Yes.
10    Q.  Do you have a copy?
11    A.  Not this exact cover but I have a copy of it --
12    Q.  Okay.
13    A.  -- somewhere.
14    Q.  So this is -- Exhibit 14 is portions of a book
15  written by Jeffrey Muttart called "Drivers Responses in
16  Emergency Situations"; right?
17    A.  Yes.
18    Q.  Subtitle is "A Quick Reference Guide"; right?
19    A.  "A Quick Reference," yes.
20    Q.  "A Quick Reference."  Thank you.
21        Okay.  So if we turn to what's marked as Page 8
22  of Exhibit 14, this is Section 1.0 on "Potential hazards
23  whether drivers slowed or not"; right?
24    A.  Yes.
25    Q.  Okay.  And then Section 1.1 is "Roadside
```

ORLANDO CARREON, DECEMBER 20, 2023

Page 239

1  obstacles"?

2      A.  Yes.

3      Q.  Okay.  Read the first two sentences of that,

4  please.

5      A.  "A potential hazard is a situation that may

6  call for a driver response but not an emergency response.

7  The typical responses to a potential hazard are slow, one

8  to three miles per hour, less than five kilometers per

9  hour, or to move within one's lane.  So after a crash

10 investigator might be" --

11     Q.  Hold on.  That's fine.

12         Okay.  Do you -- do you agree with Dr. Muttart

13 that a potential hazard is a situation that may call for

14 a driver response but not an emergency response?

15     A.  A potential hazard at some point may become an

16 emergency hazard that needs a reaction to.  A potential

17 hazard is not necessarily something that a driver always

18 reacts to.

19     Q.  Okay.  But do you agree with the definition

20 that he gives here, which is "a potential hazard is a

21 situation that may call for a driver response but not an

22 emergency response"?

23     A.  May call for a driver response, yes.

24     Q.  Okay.  So do you agree that -- just the Camry

25 being parked mostly on the shoulder and partly in the

Appx_2132

ORLANDO CARREON, DECEMBER 20, 2023

Page 240

1 left lane, you would agree that there was space for

2 Ms. Smith to get by the Camry; correct?

3      A.   Approximately 1.6 feet total, accounting for

4 both sides, which is a small margin.

5      Q.   Do you agree that there was space for Ms. Smith

6 to get past the Camry while staying in her lane?

7      A.   I agree that there was approximately 1.6 feet

8 total on either side, which is a small margin.

9      Q.   Okay.  That was not an emergency hazard; do you

10 agree with that?

11     A.   If Ms. Smith continued on and passed without

12 striking the Camry in that small margin of 1.6 feet --

13 no, there's a potential hazard.

14     Q.   It's a potential hazard; right?

15     A.   Correct.

16     Q.   When she saw the Camry, she didn't have to slam

17 on her brakes; right?

18     A.   We don't have information about that.

19     Q.   No, I'm asking you.  When somebody sees -- when

20 someone sees a disabled vehicle, even if it's partly in

21 their lane, it doesn't require them to slam on their

22 brakes; right?

23     A.   Correct.  As a potential hazard, no.

24     Q.   Okay.  And it doesn't require them to execute

25 an emergency steer; right?

Appx_2133

ORLANDO CARREON, DECEMBER 20, 2023

Page 241

1     A.   An emergency steer maneuver would not be

2 necessary when it's a potential hazard.

3     Q.   Okay.  And then according to Dr. Muttart, the

4 typical responses to a potential hazard, which is what we

5 have here; right?

6     A.   Correct.

7     Q.   Are to slow down by one to three miles per

8 hour; right?

9     A.   Correct.

10    Q.   That's what Ms. Smith did; right?

11    A.   Correct.  According to her testimony, yes.

12    Q.   Not according to her testimony.  According to

13 the data, she slowed down by three to four miles per

14 hour; right?

15    A.   Correct.

16    Q.   Okay.  And Dr. Muttart says typical response of

17 a potential hazard are to slow one to three miles per

18 hour or to move within one's lane; right?

19    A.   Correct.

20    Q.   And according to Ms. Smith's testimony, she did

21 move within her lane; correct?

22    A.   That's what her testimony indicates.

23    Q.   Okay.  And, in fact, like 95 percent of drivers

24 drive within a foot of the center of the lane; correct?

25    A.   Where are you -- where are you pulling that

Appx_2134

ORLANDO CARREON, DECEMBER 20, 2023

1  reference from?

2       Q.  Dr. Muttart.

3       A.  Well, can you point me towards --

4       Q.  No, I just know that.  You've never heard that

5  figure before?

6       A.  I'm generally familiar with it but I need to

7  look at exactly where you're referencing at.  I don't

8  have all the literature.

9       Q.  Yeah, I didn't bring every paper, you know, on

10  earth, about human factors.  But if you don't know that,

11  that's fine.  Do you --

12       A.  I haven't said that.

13       Q.  Okay.  So is that true that 95 percent of

14  drivers drive within one foot of the center of the lane?

15       A.  I don't have the literature right here in front

16  of me to indicate that that's the case.

17       Q.  Okay.  So that's what I said.  So you don't

18  know if that's true.  That's fine.

19            What is your understanding of where drivers

20  drive within their lane?

21       A.  Approximately within the lane.  I don't have a

22  figure that indicates to me exactly --

23       Q.  Do you agree that if Ms. Smith had stayed in

24  the -- if she was driving in the middle of her lane and

25  had stayed in the middle of the lane, she likely would

1 have hit the Camry?

2     A.   Repeat that one more time.

3     Q.   If Ms. Smith was driving down the center of the

4 left lane, do you agree that she would have hit the

5 Camry?

6     A.   Yes, it's likely.

7     Q.   Okay.  So the fact that she didn't hit the

8 Camry, there's at least some evidence that she did move

9 over within her lane; do you agree?

10     A.   You're ignoring the other evidence that we

11 have.

12     Q.   Right.  If we just assume that she was not on

13 the shoulder of the road and hit Nehemias Santos 135 feet

14 behind the Camry, if we assume all that, she was driving

15 down her lane.  The fact that she didn't hit the Camry in

16 isolation is at least evidence that she did get over in

17 her lane; right?

18     A.   If you ignore the rest of the evidence, yes.

19     Q.   Okay.  And so according to Dr. Muttart, she did

20 both of the things that typical drivers do in response to

21 a potential hazard; do you agree?

22     A.   To a potential hazard, yes.

23     Q.   Okay.  So do you have anything else to support

24 your opinion that what she did -- that she -- that what

25 you said about most drivers would get over in that

ORLANDO CARREON, DECEMBER 20, 2023

Page 244

1  situation?

2      A.  Well, based on -- when drivers are coming up on

3  emergency vehicles such as a police officer on the side

4  of the road, it dictates that one either has to slow down

5  significantly or move over to the next lane.  So that's

6  generally my basis for that information.  And it would

7  allow for a margin of safety.

8      Q.  Okay.  But do you agree that that's not the

9  situation that we have here; right?

10     A.  Well, what we have disabled -- it's not exactly

11 the same, we have a disabled vehicle in the left

12 shoulder.

13     Q.  And that's what Dr. Muttart is looking at;

14 right?

15     A.  It doesn't say a disabled vehicle.

16     Q.  But you agree it's a potential hazard?

17     A.  At some point it's a potential hazard and later

18 on it becomes an emergency hazard.

19     Q.  Okay.  Are you aware of studies about what

20 people do when there's an emergency vehicle on the side

21 of the road with its flashing lights on?

22     A.  No, I'm aware of what is required of drivers as

23 they're approaching emergency vehicle on the side of the

24 road.

25     Q.  So you have no basis whatsoever to give an

ORLANDO CARREON, DECEMBER 20, 2023

Page 245

1 opinion on what drivers actually do in this situation

2 like Ms. Smith faced; correct?

3     A.  My basis of opinion is based on what drivers

4 encounter when seeing an emergency vehicle on the side of

5 the road and what they're dictated to do, either to slow

6 down or to move over to the left lane --

7     Q.  Because that's the law --

8     A.  -- or to move over to the -- to the other lane.

9     Q.  That's the law; right?

10    A.  Yes.

11    Q.  There's no law saying what you have to do if

12 there's a broken down vehicle on the side of the road;

13 right?

14    A.  No.  I believe there's guidance in the Texas

15 Drivers Handbook.

16    Q.  Okay.  So I'll ask my question again.

17        Do you have any research or any knowledge or

18 any basis for your opinion about what you said earlier,

19 most drivers would get over in this situation; I'm asking

20 you, what on earth are you basing that on?

21    A.  As I have stated before, it is based on the

22 emergency vehicles that you would encounter.

23    Q.  But you don't know what people -- you know what

24 you're saying what the law requires you to do if there's

25 an emergency vehicle; right?

Appx_2138

ORLANDO CARREON, DECEMBER 20, 2023

Page 246

 1      A.  Correct.

 2      Q.  You have no idea what people actually do when

 3 they are faced with a broken down vehicle on the side of

 4 the road; correct?

 5      A.  That's not true.  At some point the presence of

 6 the Toyota where Ms. Smith was located became an

 7 emergency hazard.  As a potential hazard, she -- it

 8 didn't necessitate an emergency response for Ms. Smith to

 9 take.

10      Q.  As a potential hazard?

11      A.  Correct.

12      Q.  Right.  And did you just say it became an

13 emergency hazard?

14      A.  Right.

15      Q.  When?

16      A.  Well, when she slightly drifted into the

17 shoulder.

18      Q.  Okay.  But let's assume that that didn't

19 happen.  If all you have is a broken down vehicle on the

20 shoulder that leaves enough space for her to get by, you

21 would agree that that -- that by itself would never

22 present a driver with an emergency hazard?

23              MR. WHITE:  Objection; form.

24      A.  It is a potential hazard.

25      Q   (By Mr. DuBoff)  Potential hazard.  And

Appx_2139

1 Dr. Muttart says that the response to potential hazards

2 is to slow down one to three miles per hour or to move

3 within your own lane; right?

4          A.   One second.

5               So later in -- sorry.

6          Q.   Go ahead.

7          A.   Later in the paragraph it says, "The

8 distinction here" -- and I'm reading from the paragraph

9 that you're -- "is that a hazard that presents itself to

10 a driver less than five seconds from impact will most

11 likely require an emergency response on behalf of the

12 driver.  When there are more than five seconds available,

13 a less remitigated response is usually called for."

14          Q.   So what?

15          A.   So it indicates as a potential hazard.  It

16 doesn't necessitate for an emergency response, but in the

17 situation that Ms. Smith was in, at some point that

18 became an emergency response.

19          Q.   But not if she had more than five seconds to

20 get to the car, right, to get to the Camry?

21          A.   At that stage, no.

22          Q.   Okay.  And if she moved over in her lane, then

23 it would never become an emergency hazard; right?

24          A.   If she moved over, but we know she drifted into

25 the left shoulder slightly.

ORLANDO CARREON, DECEMBER 20, 2023

Page 248

1    Q.  You also say on Page 21 that, "There is no

2 indication that there was any vehicle in the adjacent

3 lane and her ability to ultimately swerve into that lane

4 without any contact confirms the absence of any

5 conflicting traffic."

6        Do you see that?

7    A.  Yes.

8    Q.  Okay.  You have no idea what the other

9 vehicle -- what other vehicles were around Ms. Smith as

10 she approached the Camry; correct?

11   A.  There's -- there's a time as she's approaching

12 the vehicle at each stage, yes, we don't know exactly

13 where the other vehicles were.

14   Q.  Let me stop you.  You said "exactly."  You have

15 no idea anything about what other vehicles were around

16 her as she approached the Camry; correct?

17   A.  Part of the approach would be approximately one

18 second before impact.  So that's part of the approach.

19   Q.  Okay.  And what do you know about that?

20   A.  Well, at the time that she collides with

21 Mr. Santos, the fact that she's able to swerve, as I

22 state, "There is no indication that there was any vehicle

23 in the adjacent lane and her ability to ultimately swerve

24 into that lane without any contact confirms the absence

25 of any conflicting traffic at or near that point."

Appx_2141

ORLANDO CARREON, DECEMBER 20, 2023

Page 249

1    Q.  At or near that point?

2    A.  Yes.

3    Q.  Okay.  You would agree that you don't just

4 change lanes -- her vehicle was about 16 feet long;

5 right?

6    A.  Whose vehicle?

7    Q.  The Explorer?

8    A.  It was approximately 199 inches long, yes.

9    Q.  Okay.  So the fact that when she swerved into

10 the other lane she didn't hit anybody, all that shows is

11 that at that moment in time there was nobody immediate --

12 within 199 inches of that lane immediately to her right;

13 correct?

14    A.  At least.

15    Q.  Okay.  It doesn't show that it would have been

16 safe to make a lane change there; does it?

17    A.  The fact that she's able to swerve to the right

18 indicates that at least the length of the vehicle of --

19 the length of the Ford Explorer indicates that there was

20 that much space to the lane adjacent to her.  Whether

21 there was any vehicles further back, we don't know

22 exactly.  But we at least know that she was at some

23 point -- assuming -- knowing the data -- the information

24 that we have for the speed of the vehicle, we know that

25 there wasn't any vehicles adjacent to her at that stage.

ORLANDO CARREON, DECEMBER 20, 2023

Page 250

1      Q.   Immediately adjacent to her; right?

2      A.   Yes.

3      Q.   Okay.  But just because there's not someone

4  immediately adjacent to you, doesn't mean that it's safe

5  to change lanes; does it?

6      A.   Right.  You have to gauge how -- where the

7  other vehicles are.

8      Q.   Because you don't pull over into the next lane

9  if you'll be right on the bumper of the car in front of

10 you; right?

11     A.   Correct.

12     Q.   You don't change lanes if doing so you would

13 cut off somebody next to you; right?

14     A.   Right.  That would not be good practice.

15     Q.   Okay.  So you have no idea if it would have

16 been safe for her to change lanes on her approach to the

17 Camry; correct?

18     A.   I don't -- I don't indicate that, whether it

19 was safe or not.

20     Q.   So are you saying you don't have an opinion --

21 are you agreeing that you have no opinion on whether it

22 would have been -- she had the opportunity to safely

23 change lanes before reaching the Camry?

24     A.   My opinion is that, that there was no

25 indication at or near the time of impact there was any

ORLANDO CARREON, DECEMBER 20, 2023

Page 251

1 vehicle in the adjacent lane, and her ability to

2 ultimately swerve into that lane without any contact

3 confirms the absence of any conflicting traffic at that

4 time period.

5      Q.   In that exact location?

6      A.   At or near that time.

7      Q.   Okay.  So just, this will be a lot easier if

8 you just tell me that I'm -- I have the right idea.

9           You do not have an opinion on whether she --

10 Ms. Smith had the opportunity to safely change lanes on

11 her approach to the Camry?

12      A.   Again, approach can be different levels of

13 timing.  But I don't know in the entirety of the approach

14 that she had her right lane -- her adjacent lane vacated

15 enough to make a change.

16      Q.   You don't know if at any point she had enough

17 space in the lane next to her to make a safe lane change?

18      A.   Well, I know she had space adjacent to her

19 because of her ultimate ability to swerve to the right.

20      Q.   Yeah, we just talked about that.

21      A.   Yeah.

22      Q.   And that doesn't prove that it would have been

23 safe to make a lane change; does it?

24      A.   I'm not making an opinion whether it was safe

25 or not.

ORLANDO CARREON, DECEMBER 20, 2023

Page 252

1    Q.  Do you agree that you have no basis for any
2 opinion on whether she had the opportunity to safely
3 change lanes at any point on the approach to the Camry?

4    A.  My basis of the opinion is based on her ability
5 to ultimately swerve into that lane without any contact.
6 I don't make an opinion about whether at that time it was
7 safe.  I'm just indicating that there was the absence of
8 any contact confirms the absence of any conflicting
9 traffic at or near that time.

10    Q.  All right.  So I don't know why you just won't
11 answer my question.  You're saying --

12    A.  I'm answering your question.

13    Q.  No, you're not answering my question at all.

14    A.  I am.

15    Q.  You just keep rambling on.

16        I'm asking you a clear question:  Do you have
17 an opinion on whether at any point on the approach to the
18 Camry she could have -- she had the opportunity to safely
19 change lanes?

20    A.  On approach, I don't have any opinions, but at
21 or near; this is my opinion that I have stated.

22    Q.  You're still not answering my question.

23    A.  I have answered it.

24    Q.  Because you just divert to "well, this is what
25 I stated."  I'm not asking what you stated.  I'm asking

ORLANDO CARREON, DECEMBER 20, 2023

Page 253

1  what opinions you have.  Okay?  So let's go round and

2  round the merry go round if you don't want to answer my

3  questions.

4       A.  Okay.

5       Q.  I'm not asking what you've stated.  I've read

6  the paper.  I understand.  I'm trying to clarify

7  something.

8            You agree that the fact that (a), the fact that

9  she -- whatever is shown by the fact that she didn't

10 collide with the car in the middle lane, that's nothing

11 that you need an expert to explain to you; right?

12 Anybody can understand.  Okay.  If she went in the middle

13 lane and didn't hit someone, it means there wasn't a car

14 there.

15           Do you agree with that?

16      A.  Yes.

17      Q.  That's not expert testimony.  Do you agree with

18 that?

19                MR. WHITE:  Objection; form.

20      A.  I believe that it is, because it's taking the

21 information that we have from the collision to arrive to

22 that conclusion.

23      Q   (By Mr. DuBoff)  Okay.  But do you -- you agree

24 that the fact that she was able to swerve into the lane

25 without hitting someone does not form a basis for saying

WENDY WARD ROBERTS & ASSOCIATES, INC.
972.494.2000

1 that even at that time she had -- she could have -- it

2 was safe to move into that lane?

3     A.  Right.  My opinion doesn't indicate that it was

4 safe, just that there was -- that the absence of contact

5 confirms the absence of any conflicting traffic at that

6 stage.

7     Q.  In that immediate area that she then occupied?

8     A.  At least, yes.

9     Q.  You don't know anything more than that; right?

10     A.  Well, I'm saying at least.

11     Q.  When you say that, "Clearly Ms. Smith should

12 have vacated the left lane well in advance to allow for a

13 margin of safety," again, what are you basing that on?

14     A.  Where are you indicating that?

15     Q.  It's just -- same page.  Page 21.  It's the

16 last sentence of the second paragraph.  "Clearly

17 Ms. Smith should have vacated the left lane well in

18 advance to allow for a margin of safety."

19     A.  Again, my -- the basis of that is based on the

20 emergency vehicle mandate -- the mandate of a person

21 approaching an emergency vehicle on the side of the road.

22 Knowing the information that we have that she would have

23 approximately 1.6 feet of the available space total on

24 either side is a small margin of safety.  So to -- to

25 allow for a greater margin of safety, I mean...

ORLANDO CARREON, DECEMBER 20, 2023

Page 255

1     Q.  Well, what expert -- I'm -- I really appreciate
2 your opinion, but what expert knowledge are you using to
3 come up with that opinion about what she should have
4 done?

5     A.  Well, again, based on -- on the available space
6 that she has a small margin.

7     Q.  What -- that's -- what about -- what
8 knowledge -- is this physics?  Is this kinetics?

9     A.  No, this is --

10    Q.  What is this based on?

11    A.  -- looking at the available space --

12    Q.  What training do you have on -- that leads you
13 to form that opinion?  Isn't it up to the jury to decide
14 what's safe and what's not safe?

15              MR. WHITE:  Objection; form.

16              MR. DUBOFF:  I'm trying to figure it out.
17 Trust me, if I could drill through and avoid this.  I'm
18 not having fun.

19    A.  Yes, ultimately the jury will utilize all
20 available evidence to indicate -- to figure out what --
21 what was safe at the time.  I'm just indicating that the
22 available space, taking into account the intrusion of the
23 Toyota and the width of the Ford Explorer, was a small
24 margin.  And in order to allow for a greater margin of
25 safety, Ms. Smith should have vacated the left lane in

ORLANDO CARREON, DECEMBER 20, 2023

Page 256

1  order to allow that.

2      Q    (By Mr. DuBoff)  Okay.  So the part about how

3  much physical space she had, that's accident

4  reconstruction; right?

5      A.  Yes.

6      Q.  Because you are basing that on measurements?

7      A.  Yes.

8      Q.  Okay.  The part where you then go on to say

9  what she should have done is not accident reconstruction;

10  correct?

11      A.  That's driver behavior.

12      Q.  That is just your opinion?

13      A.  Yes.

14      Q.  And it's not even driver behavior in the sense

15  of what drivers do do, it's just your opinion on what

16  they should do; right?

17      A.  Based on the available dis- -- the available

18  space, yes.

19      Q.  Your opinion on what they should do?

20      A.  Yes.

21      Q.  Not at all based on any research about what

22  drivers, in fact, do do in response to this type of

23  situation?

24      A.  Based on driver experience.

25      Q.  Your driver experience?

Appx_2149

ORLANDO CARREON, DECEMBER 20, 2023

Page 257

1      A.  Yes.

2      Q.  Personal?

3      A.  Sure.  And, again, looking at emergency

4 vehicles -- when people approach emergency vehicles, what

5 is mandated, I would utilize that as useful driver

6 behavior.

7      Q.  Are you an expert on the law about what's

8 required when you see an emergency vehicle on the side of

9 the road?

10     A.  No, I'm not an expert.  I'm aware of.

11     Q.  You're aware of it?

12     A.  Yes.

13     Q.  Just like anybody else could be aware of it?

14     A.  Yes.

15     Q.  So that's not an application of any expert

16 experience or knowledge that you have; do you agree?

17     A.  Correct, not necessarily.

18     Q.  Not necessarily or no?

19     A.  No.

20     Q.  Your Opinion 12 is that Ms. Smith was using a

21 cellular device on approach?

22     A.  Yes.

23     Q.  Correct?

24     A.  Yes.

25     Q.  Okay.  And that's just based on the tech -- the

ORLANDO CARREON, DECEMBER 20, 2023

Page 258

1  last text message that she sent before the accident?

2       A.   Yes.

3       Q.   Okay.  And you agree that was eight to

4  nine seconds before the accident?

5       A.   Approximately, yes.

6       Q.   Okay.  So you're not claiming any evidence of

7  any other cellular device use after she sent that text

8  message?

9       A.   Right.  We don't have any physical evidence for

10 that.

11      Q.   Ms. Smith checked her GPS on approach, Opinion

12 No. 13.

13      A.   Yes.

14      Q.   You would agree that's not in any way based

15 on -- that's not an application of accident

16 reconstruction, is it?

17      A.   Elaborate on your question.

18      Q.   That's based entirely on Ms. Smith's deposition

19 testimony and her statement to police; right?

20      A.   Right.  The fact that I indicate that Ms. Smith

21 checked her GPS on approach is based on her testimony

22 that she gives.

23      Q.   Right.  It's not an expert opinion?

24      A.   I disagree.

25      Q.   Really?  It takes an expert to read what

ORLANDO CARREON, DECEMBER 20, 2023

Page 259

1 somebody testified to and then just repeat it?

2     A.  Well, I'm allowed to rely on testimonial

3 evidence.

4     Q.  I know you're allowed to rely on testimonial

5 evidence.  You're not allowed just to repeat it.

6         So I'm asking you, did you -- aside from what

7 she said, her words, did you apply any expert methodology

8 to come up with your opinion that she checked her GPS on

9 approach?

10     A.  Again, I'm allowed to rely on testimonial

11 evidence.  I don't have any physical evidence that would

12 indicate that she was or she wasn't.

13     Q.  So is that an expert opinion -- is that the

14 application of any expert knowledge that you possess that

15 she checked her GPS on approach?

16     A.  Again, I'm allowed to rely on testimonial

17 evidence.

18     Q.  You know you're supposed to rely on testimonial

19 evidence to, like, get to a further opinion that actually

20 involves the application of expert knowledge, okay.

21 You're not just supposed to rely on testimony just so you

22 can put it stand-alone in your report.

23         So please answer my question.

24         Did you apply any expert methodology to come up

25 with Opinion 13 that Ms. Smith checked her GPS on

ORLANDO CARREON, DECEMBER 20, 2023

Page 260

1 approach?

2      A.  No, it was based on testimonial evidence.

3      Q.  Opinion 14 is that Ms. Smith had a clear line

4 of sight for approximately 1,400 feet prior to the crash?

5      A.  Yes.

6      Q.  Okay.  You agree that traffic at 1,400 feet,

7 other traffic on the road between her and the Camry would

8 have -- could have obstructed her view of the Camry?

9      A.  It could have, yes.

10      Q.  Okay.  And you have no idea what the traffic

11 conditions were?

12      A.  The testimonial evidence indicates that there

13 was light traffic.  I don't know of the exact positions

14 of other vehicles at the time on approach.

15      Q.  All the -- okay.  Did you watch the body camera

16 video where all the police officers say that it was heavy

17 traffic?

18      A.  Well, the police officer at the time -- they

19 arrived to the location -- to the collision after the

20 accident has taken place.

21      Q.  Okay.  Do you agree that you cannot determine

22 when Ms. Smith -- when it would have been physically

23 possible for Ms. Smith to observe the Camry?

24      A.  Repeat your question one more time.

25      Q.  Do you agree that you cannot say when it would

ORLANDO CARREON, DECEMBER 20, 2023

Page 261

1 have become possible for Ms. Smith to observe the Camry?

2      A.   I can state what -- I can't state exactly what

3 she would have seen or perceived, but I can state what

4 was available to be seen as far as line of sight based on

5 the geometry of the road.

6      Q.   Okay.  Do you agree that you do not know when

7 Ms. Smith would have first been able to see the Camry?

8      A.   Again, I don't know exactly when she would have

9 seen or perceived the Toyota Camry.  What I do know is

10 based on the geometry what was available to be seen,

11 which was approximately 1,400 feet prior to the

12 collision.

13      Q.   But you don't know if the Camry was available

14 to be seen at 1,400 feet; right?

15      A.   The geometry -- right, the geometry would allow

16 for a clear line of sight if there's no other vehicles in

17 between.

18      Q.   So Opinion 14 is assuming that there's no other

19 vehicles obstructing her view of the Camry; correct?

20      A.   Correct.  Testimonial evidence doesn't indicate

21 whether there is any other vehicles in between.

22      Q.   But you agree that if there were vehicles ahead

23 of her in her lane, there was -- there would be a

24 potential of them obstructing her view of the Camry;

25 correct?

1      A.   Partially.

2      Q.   What do you mean "partially"?

3      A.   Well, the Toyota is off to the left shoulder.

4  If there's vehicles in the left lane, part of the vehicle

5  won't be visible.

6      Q.   So you don't think that an object that's much

7  closer to her than 1,400 feet away would obstruct her

8  having a direct line of sight to the -- to the Camry

9  even --

10      A.   It could -- go ahead.

11      Q.   -- in the shoulder?

12      A.   It could depending on how close it is.

13      Q.   Right.  So another vehicle in her lane ahead of

14  her could completely obstruct her view of the Camry;

15  correct?

16      A.   It's a possibility but we don't have any

17  evidence of that.

18      Q.   If you look at Opinion 19 you say, "After

19  impact, Mr. Pivaral Santos' body was propelled forward

20  into the rear of the Toyota and against Ms. Moreno";

21  correct?

22      A.   Correct.

23      Q.   Okay.  You don't give any opinion here about

24  explaining or even saying how he ended up in the left

25  lane; right?

ORLANDO CARREON, DECEMBER 20, 2023

Page 263

1      A.   Correct.  It does not explain on this

2 particular opinion.

3      Q.   Opinion 15 is, "There is no evidence that

4 Ms. Smith slowed down prior to the collision."

5           Do you agree that's wrong?

6      A.   The last data point indicates a slight decrease

7 in speed from 92 to 86.7 miles per hour.  So there is a

8 small -- there's a slight reduction in speed from the

9 last track point.

10      Q.   And that's actually a greater reduction in

11 speed than Dr. Muttart said is typical, right, in

12 Exhibit 14?

13      A.   For a potential hazard, yes.

14      Q.   Okay.  Do you agree that Opinion 15 in your

15 report is wrong?

16      A.   There is some evidence that Ms. Smith

17 potentially slowed down prior to the collision.  But how

18 the GPS data is presented is an average of raw data.  So

19 in this case, there is some evidence that show some

20 decrease in speed prior to the collision.

21      Q.   Opinion 15 of yours is wrong; yes?

22      A.   There is a reduction in speed that would

23 indicate that there is -- that Ms. Smith slowed down

24 prior to the collision.

25      Q.   Your Opinion No. 15 is wrong; correct?

Appx_2156

ORLANDO CARREON, DECEMBER 20, 2023

Page 264

1      A.   Based on the available evidence, yes.

2      Q.   Opinion 22, I think we've been over this, but

3 you say, "Ms. Smith could have easily avoided a collision

4 simply by changing lanes in response to the disabled

5 vehicle."

6           I guess -- first of all, Ms. Smith did not

7 collide with the disabled vehicle; right?

8      A.   Right.

9      Q.   Okay.  And as far as whether she easily could

10 have avoided the collision by changing lanes, you've

11 already said that you do not know whether she had the

12 opportunity to make a safe lane change on her approach to

13 the Camry; correct?

14     A.   Right.  We don't know for sure.  She may have

15 had the opportunity, she may have not.

16     Q.   Okay.  So you can't say that she easily could

17 have changed lanes; right?

18     A.   She could have easily avoid -- easily changed

19 lanes if there's no impending traffic to her adjacent

20 lane.

21     Q.   But you just said we don't know if there was.

22     A.   Right.  There's no evidence that --

23     Q.   You -- you say, Opinion 22, she easily could

24 have avoided the collision by simply changing lanes.

25     A.   Yes.

1    Q.  Doesn't that imply that she easily could have
2  changed lanes?

3    A.  Yes.

4    Q.  But you don't know if she could have easily
5  changed lanes?

6    A.  Right.  We don't have any evidence that she had
7  vehicles to her adjacent lane at any point, but...

8    Q.  So -- so you can't say that Opinion 22 is
9  correct, because you don't know if she could have easily
10  changed lanes?

11    A.  Based on the information that I have, there's
12  no indication that there was any vehicles to her right.

13    Q.  But there's no indication that there weren't
14  any vehicles to her right.  There's no evidence about
15  what vehicles were to her right?

16    A.  If I was presented with information that
17  indicates that there was a vehicle to the right, then
18  that opinion would differ.  But as it stands, I don't
19  have information that indicates that there were vehicles
20  to her right.

21    Q.  You just don't have evidence one way or the
22  other; correct?

23    A.  On approach at or near impact based on the
24  change of maneuver -- on the swerving maneuver indicates
25  that she had enough space -- she didn't have a vehicle to

Appx_2158

1 her right side.

2          MR. DUBOFF:  Jacob, are you going to have

3 him give an opinion on whether she easily could have

4 changed lanes?

5          MR. WHITE:  Well, I suspect there will be a

6 motion about it; right.  But, you know, I think that his

7 testimony will be about whether or not a lane change is

8 possible at or near impact.  Not -- because like he said

9 on the record, we don't know what was going on in the

10 middle lane earlier.

11          MR. DUBOFF:  Sorry, I can't take that.

12     Q    (By Mr. DuBoff)  You agree that to make an easy

13 lane change requires a certain amount of clearance for

14 the car ahead of you in the lane over and a certain

15 amount of clearance with the car behind you in the

16 adjacent lane; correct?

17     A.   Correct.

18     Q.   Okay.  And you have no idea as she's

19 approaching -- as Ms. Smith is approaching the Camry, you

20 have no idea for that entire time period whether at any

21 point in time she had sufficient clearance with the car

22 ahead of her in the adjacent lane and sufficient

23 clearance for the car behind her in the adjacent lane to

24 make a safe lane change; correct?

25     A.   We don't know whether she had vehicles adjacent

Appx_2159

ORLANDO CARREON, DECEMBER 20, 2023

Page 267

1 to her in the middle lane either way.  But at or near

2 impact her ability to swerve to the right would indicate

3 that there wasn't any vehicles to -- adjacent to her.

4     Q.  But it doesn't say anything about whether there

5 was a safe enough distance for the vehicle ahead of her

6 in the adjacent lane; correct?

7     A.  Right.  We don't know if there was a vehicle.

8     Q.  Right.  And it doesn't say anything about

9 whether there was a safe enough distance behind her to

10 the vehicle in the adjacent lane; correct?

11     A.  Correct; yes.

12     Q.  Opinion 23 is, "Had Ms. Smith been operating

13 her vehicle at the speed limit, it would have provided

14 her more time to assess and respond to the presence of

15 Mr. Pivaral Santos."

16     A.  Yes.

17     Q.  Okay.  Is the basis of that opinion just that

18 the slower someone is going, the more time it gives them

19 to respond to a hazard?

20     A.  Yes.

21     Q.  Okay.  You agree that's a pretty common sense

22 point; right?

23     A.  It has some element of common sense, but

24 there's a calculation of distance taking into account

25 speed and time.

1      Q.  But you didn't do any of that calculation here,

2 you're just giving the generic opinion that if she had

3 been going slower at the speed limit it would have given

4 her more time to assess and respond to the presence of

5 Mr. Santos?

6      A.  Right.  I don't make a calculation of what the

7 difference is, but I've made the calculation where I know

8 that there is a difference that would lead me to this

9 opinion.

10     Q.  Okay.  But the fact that she -- if she was

11 going slower she would have had more time to respond,

12 that's just common sense; right?

13     A.  It has some element of that.  But, again, doing

14 a calculation --

15     Q.  But you're not doing a calculation.

16     A.  I did a calculation to come to this conclusion.

17 It is not reported here.

18     Q.  What calculation did you do to come to this

19 conclusion?

20     A.  Well, we know approximately what speed she's

21 going --

22     Q.  Well, I understand --

23     A.  -- on approach.

24     Q.  I know you can say what speed she's going.

25     A.  Right.

ORLANDO CARREON, DECEMBER 20, 2023

Page 269

1    Q.  But you didn't do anything to calculate how

2 much time she had to respond to Mr. Santos; right?

3    A.  I don't indicate a calculation that I've made

4 here, but I've made the calculation.  I know there's a

5 difference in speed that would allow for more time for --

6 for Ms. Smith to be provided with more time to assess and

7 respond to the presence of Mr. Santos.

8    Q.  Okay.  Opinion 25.  I'm sorry.

9        You say -- Opinion 24 you say, "Ms. Smith

10 should have slowed in response to the disabled vehicle";

11 right?

12    A.  Yes.

13    Q.  You agree that she did slow down in response to

14 the disabled vehicle; right?

15    A.  There was a speed reduction in the last data

16 point prior to the location of where the collision

17 happened.

18    Q.  You agree that she did slow down in response to

19 the disabled vehicle; correct?

20    A.  Yes.

21    Q.  Okay.  And you agree that she slowed down

22 her -- her reduction in speed was equal to or greater

23 than what the human factors research says is typical for

24 an average driver in this situation; correct?

25    A.  Of a potential hazard, yes.

ORLANDO CARREON, DECEMBER 20, 2023

Page 270

1    Q.  You say that, "Ms. Smith's distracted driving
2  and failure to react in a safe manner were causal to the
3  crash."

4        What -- what part of accident reconstruction
5  allows you to conclude that she was distracted?

6    A.  Her testimonial evidence indicates that she was
7  looking at her GPS as she approached the vehicle.  And
8  the Texas Driver Handbook states --

9    Q.  Well, hold on a second.  So you just -- you
10  just cited her testimony, okay?

11    A.  Yes.

12    Q.  That's not expert analysis; right?

13    A.  In this case I'm relying on testimonial
14  evidence.

15    Q.  Okay.  And then you are about to bring up the
16  Texas Handbook.  You're not an expert on the Texas
17  Drivers Handbook; right?  It's up to the jury to decide
18  whether how her behavior lines up with the Texas Drivers
19  Handbook; right?

20    A.  Yes.  But I'm providing an observation of
21  what's included here in the Texas Driver Handbook about
22  distracted driving.

23    Q.  Well, that's great.  But you're not an
24  observation witness, you're an expert witness.

25        So what expert methodology, physics,

Appx_2163

ORLANDO CARREON, DECEMBER 20, 2023

Page 271

1  kinematics, anything like that allows you to conclude

2  that she was distracted driving?

3      A.  Based on testimonial evidence.

4      Q.  Testimonial evidence, and that's it; right?

5      A.  Yes.

6      Q.  Okay.  Would you agree that opinions 22, 23,

7  24, and 25 are all critical of Ms. Smith's driving

8  behavior?

9      A.  I don't know that I would connotate it exactly

10 that way.

11     Q.  Okay.  Well, you say she should have changed

12 lanes; right?

13     A.  (No audible response.)

14     Q.  Yes?

15     A.  Yes.

16     Q.  You say that she should have been driving

17 slower; right?

18     A.  Ms. Smith should have slowed -- sorry.  Repeat.

19     Q.  You say she should have been driving slower;

20 right?

21     A.  Yes.

22     Q.  Okay.  And you say she was distracted driving;

23 right?

24     A.  Yes.

25     Q.  Okay.  But in these opinions, you don't

Appx_2164

ORLANDO CARREON, DECEMBER 20, 2023

1 actually criticize her for what you say is that she was

2 driving on the shoulder of the highway; right?

3     A.  Opinion 17, "Ms. Smith allowed her Ford to

4 drift onto the left shoulder prior to impact."

5     Q.  I know, but what I'm saying is you didn't

6 include it in your opinion that she shouldn't have driven

7 on the shoulder; right?

8     A.  No, that's not an opinion I state.

9     Q.  Okay.  Which is kind of weird; right?  You

10 would think that out of all her driving, what you say,

11 her actually driving on the shoulder of the highway is

12 the part that would jump out the most; don't you think?

13     A.  Well, I think that's stated in Opinion 17.

14     Q.  Right.  But you don't actually put it in these

15 sort of concluding opinions about what she should have

16 done differently; right?

17     A.  They're not solely in a specific order.

18     Q.  Okay.  Did -- did you write this entire report

19 yourself?

20     A.  Yes.

21     Q.  Okay.  Did Mr. White or anybody at his firm

22 have any part in drafting your report?

23     A.  No.  All the opinions that are listed here were

24 opinions that were concluded based on the investigation I

25 conducted.

ORLANDO CARREON, DECEMBER 20, 2023

Page 273

```
1      Q.  I didn't ask that.

2          Did Mr. White or anyone at his firm have any

3  part in writing your report?

4      A.  No.

5          I don't mean to interrupt you, but I don't know

6  how much longer you have.  I just -- if we can take a

7  quick break so I can let my people know that --

8      Q.  I was about to be -- I was about to say I'm

9  done.

10             MR. WHITE:  Yeah, let's give him just a

11 second.  I think we're done.

12             THE WITNESS:  Okay.  All right.  Sorry.

13             MR. DUBOFF:  Yeah.  I'm all set.

14             MR. WHITE:  You're done?

15             MR. DUBOFF:  Yeah, I'm done.

16             MR. WHITE:  All right.  No questions.

17 Reserve the remainder for trial.

18             MR. DUBOFF:  Great.

19             THE VIDEOGRAPHER:  This concludes the

20 deposition and Media 4.  We are off the record at

21 5:03 p.m.

22             (A recess was taken.)

23             MR. WHITE:  We would like to read and sign.

24             (Proceedings adjourned at 5:04 p.m.)

25
```

Appx_2166

1  CHANGES AND SIGNATURE

2  WITNESS NAME:  ORLANDO CARREON

3  DATE OF DEPOSITION: December 20, 2023

4  PAGE     LINE     CHANGE          REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

ORLANDO CARREON, DECEMBER 20, 2023

Page 275

1 _____

2 _____

3 _____

4 _____

5 _____

6 _____

7       I, ORLANDO CARREON, have read the foregoing
deposition and hereby affix my signature that the same is
8 true and correct, except as noted above.

9

10

                  _____

11                ORLANDO CARREON

12

13 THE STATE OF _____)

14 COUNTY OF _____)

15

       Before me, _____, on this
16 day personally appeared ORLANDO CARREON, known to me (or
proved to me under oath or through
17 _____) (description of identity
card or other document) to be the person whose name is
18 subscribed to the foregoing instrument and acknowledged
to me that they executed the same for the purposes and
19 consideration therein expressed.
       Given under my hand and seal of office this
20 _____ day of _____, _____.

21

22

                  _____

23                NOTARY PUBLIC IN AND FOR

24                THE STATE OF _____

25                COMMISSION EXPIRES: _____

Appx_2168

ORLANDO CARREON, DECEMBER 20, 2023

Page 276

1  THE STATE OF TEXAS     )

2  COUNTY OF COLLIN       )

3

4

                    REPORTER'S CERTIFICATION

5            DEPOSITION OF ORLANDO CARREON

                    December 20, 2023

6

7           I, Charo Dunlap, Certified Shorthand Reporter

8  duly commissioned and qualified in and for the State of

9  Texas, do hereby certify that pursuant to the agreement

10 hereinbefore set forth there came before me on

11 12/20/2023, the following named person, to wit, ORLANDO

12 CARREON, who was by me duly sworn to testify the truth

13 and nothing but the truth of his knowledge and concerning

14 the matters in controversy in this cause; and that he was

15 thereupon carefully examined upon his oath and his

16 examination reduced to writing under my supervision; that

17 to the best of my ability the deposition is a true record

18 of the testimony given by the witness, same to be sworn

19 to and subscribed by said witness before any notary

20 public, pursuant to the agreement of the parties.

21          That the amount of time used by each party at the

22 deposition is as follows:

23     JACOB D. WHITE:  0 Hours 00 Minutes

24     GREG J. DUBOFF:  6 Hours 23 Minutes

25          That pursuant to information given to the

ORLANDO CARREON, DECEMBER 20, 2023

Page 277

1  deposition officer at the time said testimony was taken,
2  the following includes counsel for all parties of record:
3      JACOB D. WHITE; Attorney for Plaintiffs
4      GREG J. DUBOFF; Attorney for Defendants
5          I further certify that I am neither counsel for,
6  related to, nor employed by any of the parties or
7  attorneys in the action in which this proceeding was
8  taken, and further that I am not financially or otherwise
9  interested in the outcome of the action.
10     Certified to by me this 5th day of January, 2024.
11
12
13
                   _____
14                 CHARO L. DUNLAP, CSR No. 6733
                   Expiration Date:  03/31/2024
15                 Wendy Ward Roberts
                   1205 Main Street
16                 Garland, Texas 75040
                   Firm Registration No. 216
17                 Office:  866-487-3376
18
19  Taxable cost:  $_____
20  Due from Greg J. Duboff, Counsel for Defendants.
21
22
23
24
25

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                     NORTHERN DISTRICT OF TEXAS
 2
                                                    COPY
 3              Civil Action No. 3:22-CV-02714-K

 4    ERICK RODERICO PIVARAL
      GONZALEZ, Individually and as Special
 5    Administrator of the Estate of
      NEHEMIAS R. PIVARAL SANTOS,
 6    DECEASED, ERICK SANTOS, and
      EVELYN MORENO,
 7
              Plaintiffs,
 8
      vs.
 9
      CAYLEE ERIN SMITH &
10    EASTMAN CHEMICAL COMPANY,

11            Defendants.

12    _____/

13
                        VOLUME I
14

15    DEPOSITION OF:   PAUL J. MONTALBANO

16
      DATE TAKEN:      Tuesday, December 19, 2023
17

18    TIME:           10:12 a.m.

19
      PLACE:          Wingate by Wyndham
20                    5750 Hazeltine National Drive
                      Orlando, Florida 32822
21

22    TAKEN BY:       Plaintiffs

23
      REPORTED BY:    Jennifer Prohaska
24                    Court Reporter and Notary Public

25
```

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE


EXHIBIT
U

Appx_2171

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2176 of 2460  PageID 2468

```
 1              A P P E A R A N C E S:

 2  JACOB WHITE, ESQUIRE
    OF:  Taylor King Law
 3       410 North Thompson Street
         Suite B
 4       Springdale, Arkansas 72764
             (479) 935-1761
 5       Jacobwhite@taylorkinglaw.com
         APPEARING ON BEHALF OF THE PLAINTIFFS
 6

 7

 8  GREGORY J. DUBOFF, ESQUIRE
    OF:  McGuireWoods
 9       Gateway Plaza
         800 East Canal Street
10       Richmond, Virginia 23219
             (804) 775-1154
11       Gduboff@mcguirewoods.com
         APPEARING ON BEHALF OF THE DEFENDANTS
12

13

14  ALSO APPEARING:

15  VANESSA McCORMICK, Videographer

16

17

18

19

20

21

22

23

24

25
```


MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2172

```
 1              C O N T E N T S

 2   TESTIMONY OF PAUL J. MONTALBANO
          Direct Examination by Mr. White.................5
 3        Cross-Examination by Mr. DuBoff..............208

 4   CERTIFICATE OF OATH AND REPORTER...................218

 5   ERRATA SHEET......................................219

 6   NOTIFICATION LETTER...............................220

 7

 8

 9

10

11

12              E X H I B I T S

13   Exhibit                                         Page
     Plaintiffs'
14        1   Mr. Montalbano's Report....................5
          2   Mr. Montalbano's CV........................5
15        3   Mr. Montalbano's Case List.................5

16

17

18

19

20

21              - - - - -
               S T I P U L A T I O N S
22

23       It is hereby stipulated by and between counsel for

24   the respective parties that the reading and signing of

25   the deposition be reserved.
```



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2173

```
 1              P R O C E E D I N G S

 2                    * * * * *

 3          THE VIDEOGRAPHER:  On record.  My name is

 4     Vanessa, and Jennifer is the court reporter.  Today

 5     is the 19th day of December, 2023.  The current

 6     time is 10:12 a.m.  We are here to take the

 7     deposition of Paul J. Montalbano in the matter of

 8     Erick Roderico Pivaral Gonzalez, individually and

 9     as special administrator of the estate of

10     Nehemias R. Piveral Santos, deceased, Erick Santos,

11     and Evelyn Moreno versus Caylee Erin Smith and

12     Eastman Chemical Company, pending in the District

13     Court of the Northern District of Texas, Civil

14     Action No. 3:22-CV-02714-K as in kilo.

15          Will Counsels please introduce themselves for

16     the record, starting with the plaintiff's counsel.

17          MR. WHITE:  This is Jacob White.  I'm

18     representing plaintiffs.

19          MR. DUBOFF:  Gregory DuBoff representing

20     Defendants Caylee Erin Smith and Eastman Chemical

21     Company.

22          THE VIDEOGRAPHER:  Thank you.

23          And for the deponent, can you please state

24     your full name for the record?

25          THE WITNESS:  Paul Joseph Montalbano.
```



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2174

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2179 of 2460   PageID 2471

1        THE VIDEOGRAPHER:  Thank you.  And can you

2    please raise your right hand to be sworn in by the

3    court reporter?

4        THE REPORTER:  Do you solemnly swear or

5    affirm that the testimony you shall give will be

6    the truth, the whole truth, and nothing but the

7    truth?

8        THE WITNESS:  I do.

9              PAUL J. MONTALBANO,

10  having first been duly sworn, testified as follows:

11             DIRECT EXAMINATION

12  BY MR. WHITE:

13      Q.   All right.  We will begin.  Will you state

14  your full name for the record?

15      A.   Paul Joseph Montalbano.

16      Q.   Okay.  Where are you employed?

17      A.   Focus Forensics.

18           (Exhibits 1, 2, and 3 were marked for

19      identification.)

20           MR. WHITE:  And just for the record, we've

21      already premarked them, the report as Exhibit 1,

22      his CV as Exhibit 2, and --

23           MR. DUBOFF:  Right.

24           MR. WHITE:  -- his case list as Exhibit 3.

25      We try and do this paper-light, you know.  His



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MY-DEPOS

Appx_2175

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2180 of 2460   PageID 2472

1        report already has most of the photos in it.

2              MR. DUBOFF:  Sure.

3   BY MR. WHITE:

4        Q.    Okay.  When were you engaged by Defense

5   Counsel in this matter?  And would you identify for the

6   record when you look at your laptop?  If you have to

7   consult a document to answer a question, it's fine if you

8   do; just tell us what you consulted to answer a question.

9        A.    Sure.  So I'm looking at our retention

10  agreement, which is dated April 26, 2023.  So on or about

11  that date is when we were retained.

12       Q.    So just to make sure I got that:  April 6th,

13  2023, on or about?

14       A.    April 26th.

15       Q.    26th.  Okay.

16             So I take it you've been deposed before,

17  right?

18       A.    Yes, sir.

19       Q.    So you know the general ground rules.  Oral

20  answers, no uh-huhs or -- head shaking is fine, but

21  accompany it with an oral answer.

22             So I'll skip sort of my general litany of

23  rules, except for, can we agree that if I ask a question

24  and you answer it, that that means that you understood my

25  question?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2181 of 2460   PageID 2473

1          A.    Yes, sir.

2          Q.    And if you don't understand one of my

3    questions, just stop me and say, "Hey, man, I didn't

4    understand that question.  Try again."

5          A.    Sounds good.

6          Q.    Okay, perfect.

7                So this is also just for the record:  You

8    received a subpoena for this deposition, correct?

9          A.    Yes, sir.

10         Q.    And that subpoena asked you to produce

11   certain documents, right?

12         A.    Yes.

13         Q.    And you have, before we went on the record,

14   you've given me a USB drive with your entire file?

15         A.    Yes.

16         Q.    And you believe that that is responsive

17   entirely to the document request that I sent you?

18         A.    Yes.  That is my entire file front to back.

19         Q.    Okay, perfect, perfect.

20               And it includes a transcript either of your

21   deposition and your trial testimony, or one or the other

22   from the estate of Sari Marcus, correct?

23         A.    Yes.  It includes my deposition transcript.

24   I was never provided my trial transcript, so I don't have

25   that in my possession.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2177

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2182 of 2460   PageID 2474

1      Q.    Very good, very good.

2            MR. DUBOFF:  And, Jake, if I could, so in

3      talking with Paul, I think one interpretation of

4      your subpoena would have required him to produce

5      communications with Counsel.

6            MR. WHITE:  Obviously, right.

7            MR. DUBOFF:  Yeah, and so -- but I know -- I

8      don't think there was anything, but my instructions

9      are Paul to produce any communications to the

10     extent they were relevant to any of his opinions in

11     this case.

12           MR. WHITE:  Right, right.  And that's -- I

13     think we agree there are certain communications

14     with Counsel that are relevant.  Some are --

15           MR. DUBOFF:  Yes.

16           MR. WHITE:  -- semi-privileged, and I take it

17     your instruction was, "Provide the ones that are

18     relevant and unprivileged"?

19           MR. DUBOFF:  Correct.

20           MR. WHITE:  Okay.  Got it, got it.  All

21     right.

22  BY MR. WHITE:

23     Q.    So let's take a look at your CV here for a

24  second.  Can you tell us what degrees you hold and from

25  what institutions?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2183 of 2460   PageID 2475

1       A.     I hold a bachelor of science in mechanical

2   engineering and a master of science in mechanical

3   engineering from the University of South Florida.

4       Q.     Okay.  And when did you receive those

5   degrees?

6       A.     It was received simultaneously in 2013.  I

7   attended what they called an accelerated master's program

8   where you could skip the bachelor's graduation and

9   receive both degrees at the same time.

10      Q.     So was that a four-year program, or was it,

11  like, a combined six-year program?

12      A.     A five-year program.

13      Q.     Five-year program.  Okay.

14             And can you tell us in general what you

15  studied to receive that degree -- those degrees?

16      A.     So my discipline was mechanical engineering.

17  My specialties within mechanical engineering during my

18  graduate research and graduate coursework were kinetics,

19  kinematics, dynamics, and physics, which are all

20  disciplines and studies of the motion of objects, how

21  objects behave during impacts, predicting motion of

22  objects based on impacts.  Anything with movement,

23  basically, was what I specialized in in my graduate

24  studies.

25      Q.     Okay.  And do people get that degree, the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2179

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2184 of 2460   PageID 2476

1  degree that you received and the training you received

2  for your master's, in order to become accident

3  reconstructionists?  Or are there other professions that

4  people get that training for?

5      A.    Accident reconstruction has a broad range of

6  foundational education.  The core foundation is

7  mathematics and physics, so anything that really provides

8  you a great foundation of mathematics and physics is

9  typically sufficient to go into the field of accident

10  reconstruction analysis.

11          Since graduating with my graduate degree in

12  2013, I have taken 45 courses directly in the field of

13  accident reconstruction and human factors, which directly

14  applies the engineering principles and foundations from

15  my college degrees directly to the field of accident

16  reconstruction and human factors analysis.

17      Q.    So have you referred to yourself before as a

18  forensic engineer?

19      A.    We have many titles:  consultant, forensic

20  engineer.  I still am a mechanical engineer by trade.

21  Forensic just means that I'm reverse engineering

22  something that happened in the past.

23      Q.    Okay.  Is any one of those titles more

24  accurate than another -- accident reconstructionist,

25  mechanical engineer, forensic engineer -- as applied to



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2180

1  yourself?

2       A.    I have no preference of which title I am.  It

3  all applies engineering principles to something that's

4  happened in the past.  We are reverse engineering

5  something using math and science.

6       Q.    Okay.

7       A.    So all of those titles, I think, categorize

8  that sufficiently.

9       Q.    And I've seen -- and tell me -- this is sort

10  of a mouthful.  Have you ever called yourself an accident

11  reconstruction forensic engineer?

12       A.    I think so, yeah.  Maybe not together, but

13  yeah, accident reconstructionist --

14       Q.    Okay.

15       A.    -- human factors analyst, expert, a lot of

16  different titles.

17       Q.    So what -- and tell me if this question is

18  based on a faulty premise.  What are the three tiers of

19  accident reconstruction?

20       A.    What I think you're referring to is the HVE,

21  is what we categorize it in an acronym.  It's the human

22  aspect, the vehicular aspect, and the environmental

23  aspect.  Those are kind of the three tiers that we

24  analyze independently in an accident reconstruction

25  analysis.  You obviously have the vehicle, which is what



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

Appx_2181

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2186 of 2460   PageID 2478

1  is engaging in the physics; you have the human component,

2  which is applying the input to that vehicle; and then the

3  environment, which affects how those objects behave

4  during and after collisions.

5      Q.    Okay.  So -- and I think you've already

6  summarized those for me.  Do you look at both -- all

7  three -- H, V, and E -- when creating an accident

8  reconstruction report?

9      A.    Typically, yes.  It depends on the amount of

10  available evidence.  Sometimes I am able to provide more

11  information on some cases versus other cases.  It just

12  depends on the available evidence that I have to me.

13      Q.    So of the -- and I may be butchering the

14  acronym -- of the HVE boxes, you don't look at each one

15  of those boxes necessarily; just depends on what evidence

16  you get in a given case?

17      A.    I don't know if I would say that I really

18  delineate the boxes versus just encompass them as a whole

19  in my analysis.

20      Q.    Okay, okay.  So when did you receive your PE

21  license?

22      A.    2016, I believe, the end of 2016.

23      Q.    And which states do you have PE licenses in?

24      A.    Florida, Georgia, Mississippi, and Alabama.

25      Q.    Is the process for getting a PE license in



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2187 of 2460   PageID 2479

1 each one of those states the same?

2     A.    Yes.  It's simply paying the state the fees

3 for reciprocity.

4     Q.    So how many times did you have to take the PE

5 test?

6     A.    Just once.

7     Q.    Can you describe the PE test?

8     A.    The PE test is an eight-hour examination that

9 fully encompasses all of the disciplines of the

10 particular category that you choose to take.  In my case,

11 I chose mechanical systems, which includes, obviously,

12 the physics that I use in accident reconstruction

13 analysis, but it also includes heat transfer, HVAC, other

14 various components of mechanical engineering.  So it's a

15 very broad encompassing test, but it just generally

16 proves competency in the field of engineering.

17     Q.    So do you -- well, can you describe your

18 education involving fluid dynamics?

19     A.    Fluid dynamics was a pretty extensive part of

20 my coursework.  I don't have any graduate experience in

21 fluid dynamics.  It is similar to aerodynamics, which

22 could arguably be a part of accident reconstruction

23 analysis.  So in part, it does rely on the same generic

24 physics principles, forces and motion, because you are

25 talking about aerodynamic or fluid dynamic drag forces,



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    Toll Free 855-MYDEPOS

Appx_2183

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2188 of 2460   PageID 2480

1  things like that.  So the principles are all the same

2  foundational principles; they're just applying it to a

3  very specific aspect.

4      Q.   Okay.  And I mean, fluid dynamics can get

5  pretty complex in the details of it, right?  I mean,

6  it's -- I know you said you've got coursework on it.

7  Would you describe yourself as an expert in fluid

8  dynamics?

9      A.   Well, specifically how we think of it in

10 layman's terms, fluid dynamics is anything in the water.

11 Technically, I don't have specialized expertise analyzing

12 submarines or boats, things like that.  But again, the

13 foundational principles of fluid dynamics is just the

14 same core principles of physics and engineering.

15     Q.   And I'm not trying to trick you.  I take it

16 you didn't rely on fluid dynamics when generating your

17 conclusions in this report, did you?

18     A.   Not in the way I think you're referring to

19 it.  Now, certainly, there are trajectories of things

20 like fluids in an accident that I have considered.  But

21 what I think you're referring to is more mechanical

22 design of systems that operate in water.  No.

23     Q.   Well, what I'm trying to get at is, did you

24 rely on fluid dynamics when -- to the extent you did

25 this -- when you calculated how, like, say, blood or bone



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

Appx_2184

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2189 of 2460   PageID 2481

1  or brain matter was thrown?  Did you do anything like

2  that?

3       A.    Not in regards to what I would say is fluid

4  dynamics versus physics:  trajectories, impacts, speeds,

5  times, distances, angles, vectors.

6       Q.    Okay, okay.  Do you think that you need a

7  background in physics in order to reach the conclusions

8  that you drew in your report regarding, say, the fluids

9  that were thrown, or the way Mr. Santos's body was thrown

10  around?

11            MR. DUBOFF:  Object -- object as ambiguous.

12       A.    I don't think so.  I've seen many

13  reconstruction experts have backgrounds in civil

14  engineering that are able to generally understand the

15  concepts of physics.  It's a basic principle,

16  mathematical principle, that any mathematical discipline

17  encompasses.

18       Q.    So I take it -- and correct me if I'm wrong.

19  Do you think that you need a background in mathematics in

20  order to be an accident reconstructionist?

21       A.    No.  There are a lot of law enforcement that

22  do not have any educational background that are able to

23  perform accident reconstruction analyses based on direct

24  education with regards to accident reconstruction.

25       Q.    Okay.  Can you describe your education



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2185

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2190 of 2460   PageID 2482

 1  involving material sciences?

 2       A.    Same answer as fluid dynamics.  I took

 3  extensive courses in material sciences in regards to,

 4  really, the macro level of the material components.  So

 5  material science is very broad; I'm talking down to the

 6  finite material element components versus simple

 7  structural force calculations.

 8            So you could certainly be a metallurgist that

 9  analyzes more on a chemical scale the structure of

10  material; or on a more physics standpoint, the failure

11  points of materials based on the force applications, the

12  deformation of those materials based on force

13  applications.  So again, that question kind of can take

14  you many different ways; just depends on which way you're

15  actually asking.

16       Q.    Well, I guess, do you consider yourself an

17  expert in any of those types of material sciences?

18       A.    Well, you certainly need to know material

19  properties when you are doing any force equations applied

20  to an object.  So in a sense, yes, of course.  Any

21  engineering discipline relies on material properties.

22       Q.    Okay.  And did you do any calculations like

23  that to generate your report in this case?

24       A.    In this particular one, I don't believe the

25  material characteristics came into any of the equations.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2186

1  Typically, you'll find that in a crash analysis, is what

2  we like to call it, when we factor in the force of an

3  impact based on how much damage we see to a vehicle.

4  Those types of methodologies don't necessarily apply to

5  pedestrian impacts.

6          So in this particular case, I don't believe

7  there were really any specific material engineering

8  principles involved other than observations of how the

9  damage transpired in doing a damage match, which is a

10 foundational principle of accident reconstruction.

11      Q.    Okay.  So can you tell us -- for those of us

12 that aren't engineers -- what the study of kinetics is?

13      A.    Kinetics is the study of the motion of

14 objects, how objects behave in the environment, speeds,

15 times, distances, things like that.

16      Q.    So again, for the nonengineers amongst us, I

17 take it if I showed you how a billiard ball hit one other

18 billiard ball, the study of kinetics would tell you how

19 the billiard balls are going to move after impact?

20      A.    Did you say "kinetics" or "kinematics"?

21      Q.    I said "kinetics."

22      A.    Okay.  So I'm sorry.  Kinetics is -- you're

23 right:  billiard balls is a great example of kinetics.

24      Q.    Okay.

25      A.    Kinematics is more of the motion of objects.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2187

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2192 of 2460   PageID 2484

1 Kinetics analyzes the impacts.

2      Q.    So -- so can you repeat that answer?  I'm

3 sorry.  Let's go off the record.

4           THE VIDEOGRAPHER:  The time is 10:28 a.m.,

5      and we're off record.

6           (Break was taken from 10:28 p.m. to

7      10:28 a.m.)

8           THE VIDEOGRAPHER:  The time is 10:28 a.m.,

9      and we are on record.

10 BY MR. WHITE:

11      Q.    Okay.  So sorry, we had a brief interruption.

12 Let's -- can you describe the difference between kinetics

13 and kinematics?

14      A.    In the most simple terms, kinetics is the

15 study of impacts.  Kinematics is the study of the motion

16 of objects in time and space.

17      Q.    Okay.  So just let's go back to my billiard

18 ball analogy.  Kinetics is the study of how, when two

19 billiard balls hit each other, what happens, right?

20      A.    Yes.

21      Q.    And kinematics is the study of, as a billiard

22 ball rolls, I guess, how it's rolling or, like, what you

23 can expect it to do?

24      A.    Well said.

25      Q.    Okay.  All right.  Just I don't know, right?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2188

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2193 of 2460   PageID 2485

1  I just want to make sure.

2           So can you describe your education on

3  kinetics and kinematics?

4       A.    My education starts in my bachelor's degree.

5  Kinematics and kinetics is a core principle of mechanical

6  engineering.  So there were courses titled kinetics;

7  there were courses titled kinematics; there were courses

8  titled dynamics, which is the combination of kinetics and

9  kinematics.  So those were very large foundational

10 principles learned early on in almost any engineering

11 degree.

12          In addition to that, my graduate research

13 involved the exclusive study of the motion of objects and

14 forces in my graduate research.

15      Q.    Okay.  And just to bring it into this case,

16 have you studied, trained, or had work experience in the

17 kinetics/kinematics of pedestrian interactions with motor

18 vehicles?

19      A.    In my professional experience, yes.

20 Throughout my 45 courses taken directly in the field of

21 accident reconstruction, pedestrian impacts are a large

22 portion of what we analyze; so therefore, it's a large

23 portion of the curriculum in any accident reconstruction

24 course.  And the foundational principles are kinetics and

25 kinematics, but then they are applied directly to



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

Appx_2189

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2194 of 2460   PageID 2486

1  pedestrian impacts with vehicles and also comparing that

2  or using empirical test data.

3      Q.    Okay.  So can you describe -- so your

4  postcollege and grad school experience with kinematics

5  and kinetics as applied to pedestrian impacts?

6      A.    Really, any pedestrian is going to rely on

7  those foundational principles.  Whether you know you're

8  relying on it or not when you use the equations, you are.

9  So the accident reconstruction curriculum gives you these

10 equations established from empirical test data and

11 studies that help us predict pedestrian movement based on

12 various forms of impact configurations.  And again, it's

13 just going back to the foundational engineering

14 principles of kinetics and kinematics, whether you know

15 it or not.

16     Q.    So what are those equations that you're

17 referring to?

18          THE VIDEOGRAPHER:  Can you move your mic a

19     little bit?  It's rubbing your tie.  Pardon me.

20     Thank you.  Sorry.

21 BY MR. WHITE:

22     Q.    Let me see -- let me see if I can remember my

23 last question.

24     A.    I think you said, What are those equations?

25     Q.    What are those equations?  Yes, thank you.


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2190

1      A.      Typically, the most-used pedestrian impact

2  equations are predicting vehicle speed based upon

3  pedestrian throw.  There are various types of equations

4  used based on the type of impact configuration, whether

5  it is a full-frontal impact, whether it is a low-fronted

6  vehicle versus a high-fronted vehicle, whether it's a

7  corner clip, or what we call a fender-vault-type

8  orientation.  There are various empirical equations that

9  we can use based on the throw distance of a pedestrian to

10 predict the speed of the vehicle.

11      Q.      Now, did you have to do any of the

12 calculations in this case?

13      A.      Not in this case.  The pedestrian actually

14 subsequently collided with the parked Toyota and then

15 back into the subject Ford, so pedestrian throw distance

16 wasn't a variable available to us in this analysis.

17      Q.      And you didn't need it, right, because we had

18 electronic data on Caylee Smith's speed, right?

19      A.      That is true.

20      Q.      Okay.  So when did you start working

21 professionally as an accident reconstructionist?

22      A.      January 2nd, 2013.

23      Q.      Okay.  And how many accident reconstruction

24 reports have you generated since then?

25      A.      Reports or analyses?  I don't generate



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2191

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2196 of 2460   PageID 2488

1  reports for every case.

2      Q.    Okay.  Well, first, tell us the difference

3  between a report versus an analysis.

4      A.    So typically in Florida, we actually rarely

5  physically write reports.  Our analysis is typically

6  communicated through a deposition or a trial.  So I know

7  it may be different in other states, so I just want to

8  delineate when you ask the question with reports.

9           To give you a full comprehensive answer, I

10  have performed thousands of accident reconstruction human

11  factors analyses.  Certainly, a fraction of those make it

12  to a deposition or a trial where I'm communicating on

13  record.  But almost all of them result in at least

14  communicating my findings to retaining counsel that hired

15  me.  All of them involve actually performing an

16  engineering analysis based on the evidence collected.

17      Q.    So -- but you don't always -- strike that.

18           How many reports have you generated like the

19  reports in this case, if you know?

20      A.    I don't have that teed up.  Certainly,

21  federal cases require reports, so there's been a handful

22  of those that I've written.  Sometimes clients want a

23  report to put my findings on paper.  I don't have an

24  exact answer for you.

25      Q.    Okay.  All right.  That's fine.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MYDEPOS

Appx_2192

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2197 of 2460   PageID 2489

1            What -- roughly, what percentage of -- and

2    we'll -- when I say "reports" or "analyses," let's just

3    say let's take the whole universe of both here.  So what

4    percentage of the analyses and reports that you've

5    written have been for defense versus plaintiff, if you

6    know?

7         A.    We don't track that other than on my

8    testimony history list, which the last I counted was a

9    good 50-50 split on my actual testimony.  My estimation

10   based on just overall being retained to perform an

11   analysis is also a good 50-50 split between plaintiff and

12   defense.

13        Q.    And of the reports and analyses that you

14   generated, any idea, roughly, what percentage of it

15   involved pedestrian interaction with a motor vehicle?

16        A.    That's a good question.  I would say, could

17   be up to 10 percent.  There are various types of

18   vehicular accidents we involve -- that we are involved

19   in:  commercial vehicle collisions, passenger vehicle

20   collisions, pedestrian collisions, daytime, nighttime;

21   there's so many different variables to every case.  I

22   would say a large portion of that would be pedestrian.

23        Q.    Okay.  Any of the reports or analyses that

24   you're thinking of involving motor vehicles going over 80

25   miles an hour interacting with a pedestrian?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2193

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2198 of 2460  PageID 2490

```
 1        A.    I can think of one off the top of my head,

 2  but I don't have the others teed up.  But that's

 3  certainly happened.

 4        Q.    Okay.  Well, the one that you're thinking of,

 5  can you tell us what you recall about that case?

 6        A.    It was a Mustang traveling, I think, almost

 7  100 miles per hour when it struck a pedestrian crossing

 8  the road.

 9        Q.    Okay.  Do you remember what your conclusions

10  were in that case?

11        A.    I have no idea.  That was many years ago.

12        Q.    Do you recall if you were retained on behalf

13  of the pedestrian or the Mustang driver?

14        A.    I couldn't even tell you that.

15        Q.    Okay.  So you don't remember anything else

16  other than it was a Mustang going about 100 and a

17  pedestrian?

18        A.    That's all I can remember on that one.  I'm

19  just trying to think of high-speed pedestrian collisions.

20  Certainly, I know there's others of the thousands I've

21  analyzed generally in cases.  But I just can't think of

22  all of them.  There's so many.

23        Q.    Okay, okay.  Has your expert testimony ever

24  been limited by a court, that you're aware of?

25        A.    No, it has not.
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2194

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2199 of 2460   PageID 2491

```
 1        Q.    Okay.  So no Daubert rulings or anything like

 2  that?

 3        A.    No.  Certainly, there's been attempts or

 4  motions attempted to be filed, but none have made it

 5  through --

 6        Q.    Okay.

 7        A.    -- even to be processed by a judge.

 8        Q.    How many times have you testified at trial,

 9  if you remember?

10        A.    I want to say somewhere in the teens, maybe

11  15 to 20.

12        Q.    Okay.  Over, I guess, the last ten years?

13        A.    Yes.

14        Q.    Okay.  Mostly in Florida, or all over the

15  country?

16        A.    Mostly in Florida.  I have testified

17  throughout the country, but most of it is Florida.

18        Q.    Okay.  So do you recall the case of the

19  Estate of Sari Lynn Marcus versus -- there's some

20  entities, but it's basically FedEx.

21        A.    Vaguely, yes.  I didn't spend any time

22  reviewing that transcript you requested, but I vaguely

23  remember the case.

24        Q.    So -- and tell me if what I'm about to

25  describe is inaccurate to your recollection, okay?
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2195

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2200 of 2460   PageID 2492

1        A.    Sure.

2        Q.    That was a case where there was a FedEx truck

3   stopped on a two-lane residential road, and somebody

4   passed the FedEx behind it, basically, trying to go

5   around the FedEx truck.  Does that sound right?

6        A.    Yes.

7        Q.    And then there was someone coming in oncoming

8   traffic, or -- excuse me.  I guess there was somebody

9   coming in the other lane, basically, going to pass the

10  FedEx truck, right?

11       A.    Yes, in the opposite direction.

12       Q.    In the opposite direction, thank you.

13             And that person lost control of their

14  vehicle, striking some sort of utility pole, and they

15  died, right?

16       A.    Correct.

17       Q.    Okay.  So do you remember what your

18  conclusions were about that case?

19       A.    I had many conclusions; I don't know if I can

20  summarize them in one sentence.  But I do recall there

21  being speed involved with that vehicle; I recall there

22  being wet roadways; I recall there being an

23  overcorrection of her vehicle, and that's all I can

24  really recall.

25       Q.    So was -- do you recall doing a calculation,



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2196

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2201 of 2460   PageID 2493

1  calculating that the driver that died was actually

2  traveling 70 miles an hour on a residential road?

3       A.    That sounds about right.

4       Q.    Okay.  And do you recall that the speed limit

5  was about 45 miles per hour?

6       A.    I don't have an independent recollection of

7  that, but I'll take your word for it.

8       Q.    Okay.  So do you do what is called an

9  avoidance opinion, I guess?  Like, you basically provide

10 analysis about what would have avoided an accident,

11 right?

12      A.    Depending on the facts of the case, yes.

13 Sometimes I will analyze -- let me back up.  I will

14 independently change certain variables like speed to see

15 how that would affect the outcome of the case.

16      Q.    So do you remember opining that Ms. Marcus,

17 the one that died, if she'd been traveling the speed

18 limit, she could have reduced her speed when she saw the

19 other vehicle get into her lane of traffic?

20      A.    I do believe there was an opinion about that,

21 whether she would have been able to stop before the pole

22 impact, or maybe even be able to stop entirely before

23 crossing the FedEx truck's path, I vaguely recall.

24      Q.    Okay.  So just to break that down, do you

25 remember doing an analysis of whether or not, if the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2197

1 driver that died had been going the speed limit, she

2 would have been able to react in time to avoid losing

3 control of the vehicle?

4        A.    Well, I'll dissect that a little bit.  It's

5 not necessarily whether she would be able to react in

6 time, but how much distance and time would she have had

7 available to her to come to a complete stop.

8        Q.    Okay, okay.  So do you remember that your

9 testimony there was that she had -- well, strike that.

10            Do you recall how far away Ms. Marcus, the

11 one that died, was when she saw the SUV move into her

12 path in that case?

13        A.    I don't.

14        Q.    Does it sound right if I tell you you

15 testified that it was 309 feet?

16        A.    I'll take your word for it.

17        Q.    Okay.  Do you agree that your testimony in

18 that case was that 309 feet was sufficient to spot and

19 avoid a hazard?

20        A.    I vaguely recall that.  However, that was an

21 imminent identifiable hazard.  So every hazard is

22 different and needs to be analyzed differently in each

23 particular case.  And I would not compare apples to

24 apples to the visual presentation of the hazard in that

25 case to the visual presentation of the hazard in this



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2198

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2203 of 2460   PageID 2495

1  case.

2       Q.    It was raining in that case, wasn't it?

3       A.    It was.

4       Q.    Okay.  And that was a two-lane residential

5  road?

6       A.    Yes.

7       Q.    Okay.  So in that case, Ms. Marcus's speed

8  was an important factor, right?

9       A.    I wouldn't classify it as important or not.

10 It was a factor.

11      Q.    But it was -- you did testify that if her

12 speed had been at the speed limit, that she would have

13 had time to brake to avoid the hazard?

14      A.    Yes.

15      Q.    Okay.  And that, according to your

16 calculation, she would have had 309 feet in order to

17 conduct that braking?

18      A.    I don't know if it was to simply conduct the

19 braking, or if that included perception response time and

20 distance.  I don't know the answer to that.  But

21 generally, that is what we try to look at is the

22 available distance based on when the known visual hazard

23 presented itself and analyze the time and distance based

24 on that known.

25      Q.    Okay.  So you did calculate there how long it



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2199

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2204 of 2460  PageID 2496

1  would have taken -- strike that.

2           You did calculate in that case the distance

3  required for the driver that died to come to a complete

4  stop if they applied their brakes, right?

5       A.    Yes, in response to the known imminent

6  hazard.

7       Q.    Okay.  So what is that analysis called?  Is

8  that a braking analysis?  I mean, that's just my little

9  phrase for it.

10      A.    You can call it a braking analysis, an

11  avoidance analysis.

12      Q.    Okay.  Did you conduct a braking analysis in

13  this case?

14      A.    No, because I didn't have enough knowns.  We

15  don't know exactly when the imminent hazard presented

16  itself, so I have nothing to base my analysis off of.  In

17  that case, the Marx case you're referring to, we had the

18  hazard on video; we knew exactly when it presented itself

19  and within the reconstruction timeline.  So of course, if

20  I have a known, I can reverse engineer from that known.

21  When I don't have that known of when a hazard presents

22  itself, I can't base my analysis off of anything.

23      Q.    So when you say the hazard presenting itself

24  in this case, are you talking about the -- Caylee seeing

25  the Toyota or Caylee seeing Nehemias?



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2200

1    A.    So there was actually two separate hazards

2  that were presented to Caylee in this case.  The first

3  was the presence of the Toyota partially on the shoulder,

4  partially in the travel lane.  She responded to that by

5  shifting over into her travel lane.  We classify that as

6  something called a potential hazard.

7          It's not something that requires an emergency

8  response, but does likely require some form of a

9  response, maybe a correction of speed or a lateral

10  position, and that's what she said she did.  She adjusted

11  her lateral position to the right side of her lane.

12          Then a secondary imminent hazard presented

13  itself, which is the decedent actively bending over into

14  her path with his head directly into her path where it

15  wasn't there before.  That is the hazard I don't have any

16  information on to quantify, so I am unable to perform an

17  avoidance analysis on that, because I don't know when he

18  bent over.  What I can tell you is that the timing of

19  that movement was likely short, and the available time

20  and distance required to avoid that was likely greater.

21    Q.    So I guess my question is, You didn't perform

22  an analysis on how long it would have taken Caylee to

23  brake to either come to a complete stop or significantly

24  reduce her speed once she saw the Toyota, did you?

25    A.    That is not a relevant analysis, because we



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2201

1  don't see people doing that in the literature.  We don't

2  see people locking up their brakes due to the presence of

3  a roadside vehicle.

4           A good example I always like to ask is when

5  is the last time you locked up your brakes and said,

6  "Oops, never mind"?  We don't respond in an emergency

7  fashion unless the hazard is certain and imminent.

8  Anything else, we classify as a potential hazard that

9  just requires some form of an adjustment.

10     Q.    So now, in this case, the car wasn't on the

11  shoulder entirely, right?  I mean, the car was partially

12  in the lane of travel she was in.

13     A.    About 2 feet.

14     Q.    Okay.  So you didn't think it was necessary

15  to perform an analysis of how long it would take her to

16  slow down when she saw a lane -- when she saw a car

17  parked in her lane of traffic on the interstate?

18     A.    Well, you say "parked."  It's not parked in

19  her lane.  So it is partially obstructing her lane.

20  There is a totally different analysis, totally different

21  visual stimulus if a vehicle is obstructing her entire

22  lane versus partially obstructing her lane where she can

23  physically navigate through the gap.

24           We don't have an imminent hazard here that

25  requires an emergency response.  Again, we reserve



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2202

1  emergency responses for emergency imminent hazards,

2  because there's risks associated to implementing a

3  response.  Locking up your brakes on a freeway is risky

4  due to traffic behind you, so you're going to reserve

5  that for the absolute necessary.

6          In a potential hazard where your lane may

7  just be minimizing width by a couple feet, that doesn't

8  require locking up the brakes.  That just requires

9  adjusting your lateral position to navigate successfully

10 around that vehicle.  And that's exactly what she did.

11      Q.    So because you're categorizing the parked

12 Toyota in the lane as a potential hazard and not an

13 imminent hazard, that's why you didn't perform a braking

14 analysis for Caylee?

15      A.    Well, it's -- there's a couple explanations.

16 So yes, number one, it was not an imminent hazard; it

17 didn't require an imminent response.  We don't see

18 drivers locking up their brakes for roadside hazards.

19 That's just not something drivers have been shown to do.

20 So applying that analysis would be unfair because we are

21 comparing what the literature and the studies actually

22 show drivers doing versus what actually happened.  And

23 that's not what the studies show that drivers do.

24          Number two, we do see drivers adjusting their

25 lateral position to that type of hazard, and that's what



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2203

1  Caylee did.  So she is consistent with what the

2  literature shows of what an attentive typical driver

3  does, not only in her actual movement, but the magnitude

4  of her movement to -- when facing this particular

5  potential hazard.

6      Q.    Well, so my question is, Because of the

7  literature that you reviewed and the way you categorize

8  the hazard created by the Camry, that's why you didn't

9  conduct a braking analysis, right?

10     A.    I think that's fair, because it's not

11 applicable.  That would be like performing a braking

12 analysis to a threat that is not consistent with the

13 research.  We have to compare apples to apples.  So if

14 I'm going to apply a perception response time to a

15 driver, I have to compare that perception response time

16 to a similar hazard, because perception response times

17 change drastically based on the visual hazard.

18         They can be very short, or they can be very

19 long based on the characteristics of the visual hazard.

20 So we really need to compare apples to apples to properly

21 apply a perception response and avoidance analysis to our

22 subject driver.

23         And that's what I did here was I compared

24 apples to apples of what the actual hazard was to what

25 the research shows drivers doing to that actual hazard.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2204

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2209 of 2460   PageID 2501

 1  If I applied any other avoidance analysis, it would be

 2  improperly applying the facts of the case to this

 3  particular case, because that's not what we have.

 4       Q.    So it's your expert opinion that a driver in

 5  Caylee's position would not apply the brakes or slow down

 6  when they -- as they approached a vehicle partially

 7  stopped in their lane?

 8       A.    Well, that question is a little different.

 9  You said "slow down."  We were talking about emergency

10  braking, coming to a complete stop before.

11       Q.    I think you were talking about emergency

12  braking.  So let's talk about slowing down, all right?

13       A.    Okay.

14       Q.    So is it your expert opinion that a driver

15  will not slow down as they approach a vehicle partially

16  stopped in their lane?

17       A.    That is not my opinion.  My opinion on this

18  particular hazard is that studies show drivers will

19  typically slow down by 1 to 3 miles per hour, is what the

20  cumulative studies show that drivers will reduce their

21  speed by a few miles per hour, and possibly adjust their

22  lateral lane position if necessary.

23            We see Caylee reducing her speed by at least

24  4 miles per hour.  We had her speed at 90, then at 86,

25  and then there was a gap before impact, so there very



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2205

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2210 of 2460   PageID 2502

 1  well could have been additional speed reduction below 86.

 2          So she did a speed reduction of at least

 3  4 miles per hour and moved laterally by over 2 1/2 feet

 4  in her lane, which the studies show the average driver

 5  will move about 1.7 feet laterally in their lane to a

 6  roadside vehicle and pedestrian in one.  So we see she

 7  did exactly what the literature says the average

 8  attentive driver does:  They slow down and they move

 9  over.

10      Q.    So did you cite the papers that you're

11  referring to in your report?

12      A.    The papers, I believe, are actually cited in

13  there.  I also included them on your thumb drive.

14      Q.    Okay.  Now, Caylee's speed reduction

15  occurred -- and don't let me put words in your mouth --

16  one to two seconds before she struck Nehemias?

17      A.    I don't know the exact timing, but I think

18  two seconds would be fair.

19      Q.    And is that -- does the literature support

20  that about two seconds before you strike someone is when

21  a driver will conduct the speed reduction that you're

22  referring to?

23          MR. DUBOFF:  Objection to the form.

24      A.    It is consistent, because what the research

25  shows is that drivers typically will take their foot off



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2206

1  the gas pedal.  And so that speed reduction is as a

2  result of the timing of releasing the gas and slowing

3  down by 1 to 3 miles per hour.  So arguably, she actually

4  implemented her response sooner than the average driver

5  in the research, because she reduced by 4 miles per hour

6  by simply letting go of the gas.

7       Q.    So you didn't -- did you offer an opinion

8  about Caylee's speed in this case?

9       A.    I provided an opinion of what her speeds

10  were, of course.

11      Q.    Okay.  Do you think that her speed was a

12  relevant contributing factor to the collision?

13      A.    On an avoidance standpoint, no, because speed

14  is a contributing variable when we can establish a

15  baseline of when the hazard presented itself and compare

16  that distance to the required distance to avoid at both

17  the subject speed versus the speed limit.  I don't have

18  the time at which the hazard presented itself.

19      Q.    So would it be fair to say that since you

20  don't know when what you're calling the hazard presented

21  itself, you don't know if her speed was a relevant

22  factor?

23      A.    I certainly cannot make a calculation in this

24  particular case, because I don't have enough information.

25      Q.    Okay.  So do you agree that, all the other



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2207

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2212 of 2460   PageID 2504

1  facts unchanged that -- that you're aware of, the crash

2  would not have occurred if Caylee Smith was traveling the

3  speed limit?

4       A.    Can you repeat that question?

5       Q.    Do you agree that, all other facts unchanged,

6  that if you had -- if Caylee Smith had been traveling the

7  speed limit, this crash would not have occurred?

8       A.    I cannot say that.

9       Q.    Have you published any papers?

10      A.    I have.

11      Q.    Okay.  What are they about?

12      A.    It's been a while.  I know the first couple

13 of papers I published were based on my academia graduate

14 research.  I have published a paper in accident

15 reconstruction about video analysis, analyzing pedestrian

16 impacts to vehicles using photogrammetry analysis to

17 calculate distances from those videos and from

18 photographs.  I believe that's probably the most relevant

19 literature that I've published.  I'd have to go back to

20 my CV and see all the other --

21      Q.    Sure.

22      A.    -- literature.

23      Q.    My understanding is you've published on the

24 reconstruction of accidents using video evidence, right?

25      A.    Yes.  And photogrammetry, really.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2208

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2213 of 2460   PageID 2505

1    Q.    Photogrammetry, which -- and can you tell us

2  what photogrammetry is?

3    A.    Photogrammetry is a scientific method for

4  calculating distances from either photographs or videos

5  using known values within the photograph or video

6  establishing vectors or lines from a camera to those

7  known objects in the environment which fixes the camera

8  in space, and then doing that same process to establish

9  and calculate the unknowns in the video like final rest

10  positions or fluid stains, volatile evidence using that

11  same ray-vector analysis to then reverse engineer the

12  positions of other objects.

13    Q.    So just to use a simple example, if, like,

14  there was a pitcher of water on the road that's going to

15  evaporate, a volatile substance, right?

16    A.    Correct.

17    Q.    And you could measure some things in that

18  photo by going to the scene, like two trees, right, you

19  calculate that distance and then using some engineering

20  magic, you can then figure out exactly where the water

21  was located?

22    A.    Yeah.  I don't refer to it as "engineering

23  magic," but I do like that now that --

24    Q.    Sure, sure.

25    A.    -- you've said that.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

Appx_2209

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2214 of 2460   PageID 2506

1          But it's like triangulation of satellites.

2   It's the same concept.  You're triangulating known points

3   to establish positions.

4       Q.    Okay.

5       A.    When you have enough known points, you can

6   fix the camera in the environment and extract other

7   unknowns.

8       Q.    Now, photogrammetry is not perfect, right?  I

9   mean, it's not as perfect as, say, laser scanning a scene

10  immediately after it happened, right?

11      A.    It depends.  Every project has different

12  tolerances based on the available data you're working

13  with, the resolution of the photographs, the amount of

14  photographs, the amount of knowns that you're working

15  with.  So it depends; every project is different.

16          In this particular case, I did establish my

17  error rate or tolerance to these measurements.  That is

18  one large process of photogrammetry is understanding how

19  accurate these points are.

20      Q.    And is the error rate uniform for every

21  photogrammetry calculation you make, or is it actually

22  different for every particular photogrammetry calculation

23  that you do?

24      A.    It will be based on the area in the photo

25  that you are analyzing.



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2210

1     Q.    Okay.  So every photo could be different?

2     A.    It could.

3     Q.    Okay.  Do you have -- can you just tell us

4  for the record what the error rate is on the

5  photogrammetry that you did in this report?

6     A.    Yes.  Let me reference my report.  So my

7  computer turned off.

8          THE WITNESS:  Can we go off the record?

9          THE VIDEOGRAPHER:  The time is 10:56 a.m.,

10     and we are off record.

11          (Break was taken from 10:56 a.m. to

12     11:02 a.m.)

13          THE VIDEOGRAPHER:  The time is 11:02 a.m.,

14     and we are on record.

15  BY MR. WHITE:

16     Q.    So we just took a little break.  I think we

17  were in the middle of talking about your error rate on

18  your report, and you were looking it up.

19     A.    Yes.  So you are correct:  The error rate

20  will be different based on what measurement I'm taking

21  within the photo.  What I like to do is establish the

22  maximum error in all of the photos and all of the

23  measurements so I know that everything is less than that.

24  In this particular case, my maximum error or tolerance or

25  accuracy was plus or minus a quarter of an inch on all of



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2211

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2216 of 2460   PageID 2508

1  my measurements.

2        Q.    Okay.  All right.  So -- and I'm not an

3  engineer.  Would you call that a half-inch error rate, or

4  would you call it a quarter-inch error rate?  Because it

5  could be a quarter inch in either way, so summed up, it's

6  a half inch.  Well, what would you call it?

7        A.    Plus or minus a quarter of an inch.  So it

8  could be a quarter of an inch less than what I'm

9  reporting or a quarter of an inch more than what I'm

10  reporting.

11        Q.    Okay.  Got it.  Thank you.

12              So do you speak on the issues of accident

13  reconstruction at, say, industry conferences?

14        A.    I have presented at a few, yes.

15        Q.    Okay.  Can you tell us about those

16  presentations?

17        A.    May I reference my CV?

18        Q.    Yes.

19        A.    So it looks like I have presented at various

20  seminars about eight times over the last ten years.  My

21  most recent was back in 2021.

22        Q.    Okay.  So and the 2021 presentation was

23  called "Evidence Collection Technology and Digital Data

24  Sources in Forensic Engineering Reconstruction"; is that

25  right?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2212

1        A.    Yes.

2        Q.    Okay.  Do you remember what the topic of --

3   or do you remember the substance of that presentation?

4        A.    Oh, goodness.  I don't know with certainty;

5   but vaguely, I believe that was demonstrating all of our

6   available tools that we have to collect evidence:  laser

7   scanners, cameras, drones, photo scanning, all the latest

8   and greatest technology that we use in the industry.

9        Q.    Okay.  And if you can go down, it looks like

10  you gave a presentation -- or sorry.  Strike that.

11            It looks like you gave a presentation in 2016

12  titled "Maintenance of Traffic and Roadway Design

13  Analysis"; am I correct?

14        A.    Yes.

15        Q.    Do you remember what that presentation was

16  about?

17        A.    That was more of an exhibit with my

18  colleagues on -- more a transportation engineering aspect

19  of the environmental aspect about the case, the roadway

20  design, curvatures, radiuses, elevation changes, widths,

21  things like that.

22        Q.    Okay.  So can I assume that you're familiar

23  with, like, federal DOT or rules regarding traffic

24  maintenance, or is that not your expertise?

25        A.    That starts to go outside of my expertise as



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2213

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2218 of 2460   PageID 2510

1  far as Department of Transportation standards for roadway

2  design.

3      Q.    Okay.  You are a human factors expert,

4  though, right?

5      A.    Yes, as it involves the driver and human

6  aspect of an accident reconstruction.  It's always worth

7  mentioning, human factors is a very large field which

8  includes things like designing the ergonomics of this

9  chair that I'm sitting in, designing the location of

10  buttons in your vehicle.  It's a very broad field.

11          And the expertise that I hold is under the

12  accident reconstruction/transportation umbrella, which is

13  driver performance -- and I should say, really, human

14  performance, because that includes pedestrians and

15  passengers -- in response to hazards in the

16  transportation environment.  So not only what have

17  drivers done, but quantifying the performance of those

18  avoidance movements.

19      Q.    So would you agree that traffic maintenance

20  involves analyzing how humans interact with traffic?

21      A.    I would imagine there is some human factors

22  component to transportation engineering design, certainly

23  with understanding how drivers respond to various

24  signage, the locations of the signs.  I think I can agree

25  with that, yeah.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2214

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2219 of 2460   PageID 2511

1     Q.    Okay.  So do you take continuing education

2   classes?

3     A.    Yes.  They require a certain amount of

4   continuing education to maintain my professional

5   engineering license as well as my accident reconstruction

6   accreditation from the ACTAR committee.

7     Q.    How often do you have to take continuing

8   education?

9     A.    I don't remember the standards, because I end

10   up taking way more than I need.  I typically -- I take at

11   least two courses a year.

12     Q.    Okay.  Since you graduated with your master's

13   degree, have you always worked for Focus Forensics?

14     A.    I've always worked in the accident

15   reconstruction realm for the same boss.  But Focus

16   Forensics established in 2014.  It branched off of

17   Armstrong Forensic Engineers, which is the company I

18   started with in 2013.  So I've had the same boss for

19   11 years; it's just now a different company name.

20     Q.    Okay.  So have you or folks -- excuse me.

21   Have you or Focus Forensics ever worked previously,

22   before this case, for the law firm of Freeman Mills or

23   McGuireWoods?

24     A.    That sounds familiar, McGuireWoods, yes.  I

25   am very bad with names, so I apologize if I don't



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2213

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2220 of 2460   PageID 2512

1  remember something.

2      Q.    So let's take them one at a time.  Have you

3  or your -- or your firm that you work for, have you ever

4  previously been retained by Freeman Mills, the law firm?

5      A.    Is that the same law firm as McGuire?

6      Q.    No.  It's different.  That's the law firm in

7  Texas in this case.

8      A.    Okay.  And then I guess my answer is, I don't

9  know.

10     Q.    Okay.  But you do think that your firm or you

11 have been retained previously by McGuireWoods?

12     A.    Yes.

13     Q.    Okay.  Do you know how many times?

14     A.    I don't have that readily available or even

15 if it's documented anywhere, but I would guess less than

16 five.  I don't know.

17     Q.    Do you recall which cases those five were?

18     A.    I'm so bad at remembering this, I don't.

19     Q.    Okay.  Do you remember if those were defense

20 cases, plaintiff cases?

21     A.    I think they're a defense law firm, so

22 presumably defense.

23     Q.    Okay.  Have you ever -- or Focus Forensics,

24 to your knowledge -- ever done work for Eastman Chemical

25 Company before?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2216

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2221 of 2460   PageID 2513

 1      A.    That's the underlying carrier underneath?

 2 Yeah, I don't know.  It's more so I don't know for that

 3 question because we don't always know the underlying

 4 carriers.  We are retained typically by counsel,

 5 sometimes the insurance companies, so I don't always know

 6 the hierarchy of involved entities.

 7      Q.    Okay, okay.  What hourly rate are you billed

 8 out at?

 9      A.    2023, Focus Forensics is charging $280 per

10 hour for my standard time and I believe $400 per hour for

11 my testimony, but let me double-check that.  Yes, I was

12 correct:  $280 per hour for standard time, which is

13 engineering analysis, inspections, travel to and from

14 locations; and then active testimony like depositions or

15 trial testimony is billed at $400 per hour.

16      Q.    Okay.  But you actually are not paid by the

17 hour; you receive a salary?

18      A.    Correct.  I'm a salaried employee by the

19 engineering firm.

20      Q.    Okay.  And what is your salary with Focus

21 Forensics?

22      A.    I am not able to disclose that information.

23      Q.    Are you refusing to give that answer?

24      A.    Yes, I am.

25      Q.    On what basis?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2217

1     A.     That is confidential.  It has no basis for

2  the engineering work performed in this case.  It has no

3  relevancy to the facts of the case or my engineering

4  analysis.  My income is irrelevant of anything related to

5  this legal case, regardless of the outcome of the case,

6  regardless of my findings.  My salary has no basis for

7  anything involving my work performed on this particular

8  case.  It is also confidential.  I am instructed by my

9  employer to not disclose that.

10          MR. WHITE:  So are you instructing him, Greg,

11      not to answer that question?

12          MR. DUBOFF:  I mean, it's not privileged, but

13      I'm not going to tell him to answer it.  And if

14      he -- I guess I'm not going to tell him to

15      disregard what his employer has told him.  If you

16      want to have a fight about it with the judge, then

17      we can do that.

18          MR. WHITE:  Okay.  So fair enough.  Right.

19  BY MR. WHITE:

20     Q.     Just for the record, you're not going to

21  answer that question based on your opinion that it's not

22  relevant and your employer's instruction?

23     A.     That's correct.

24     Q.     Okay.  How much has Focus Forensics billed

25  the defense in this case as of today?


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2218

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2223 of 2460  PageID 2515

 1        A.    The last I looked when I added all the

 2  invoices, it was just under $15,000.

 3        Q.    Okay.  Did Defense Counsel give you any

 4  assumptions to use --

 5            MR. DUBOFF:  And again, Jacob -- I mean, I

 6        can do it at the end.  But if you just want to

 7        clarify, I know he -- I know Mr. Montalbano just

 8        said it, but if you want to ask -- if we're going

 9        to have a fight about this, I'd rather just have a

10        complete record if you want to ask him about

11        whether there's any contingency to any -- if his

12        salary is based in any way on anything having to do

13        with this case.

14            MR. WHITE:  Okay, yeah, let's get that out of

15        the way just so we don't have to revisit it down

16        the road.

17  BY MR. WHITE:

18        Q.    Is your salary with Focus Forensics

19  contingent on any outcomes of any of the cases that you

20  work on?

21        A.    Absolutely not.  And that's why it's not

22  relevant, and that's why I'm instructed not to provide

23  it, because it has absolutely no relevancy to the

24  engineering work I perform.  I'm a salaried employee.  We

25  charge hourly.  Even Focus Forensics' income is



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2219

1  irrelevant of the outcome of the case, whether it's good

2  or bad for the retaining counsel that retained us.

3          We charge hourly for the time it takes us to

4  perform the work.  So the outcome of cases, the type of

5  analysis that I'm performing is entirely irrelevant to

6  not only Focus Forensics' income but my personal salary

7  with the employer I work for.

8      Q.    So do you receive -- and I'm not asking you

9  an amount.  Do you receive a bonus at any point?

10     A.    There is a bonus structure based on

11 efficiency.

12     Q.    Okay.  Do -- and otherwise, you're generally

13 paid as a salaried employee, which I take it means you

14 receive the same amount every month or whatever the pay

15 schedule is?

16     A.    Correct.

17     Q.    Okay.  Do you own equity in Focus Forensics?

18     A.    No.

19     Q.    Do you own equity in any entity that owns a

20 portion of Focus Forensics?

21     A.    No.

22     Q.    Okay.  Did Defense Counsel give you any

23 assumptions to use in your report in this case?

24     A.    Not that I can think of.  If there were

25 assumptions that I relied upon, I would have presented



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2220

1  them in my report.

2       Q.   Okay.  And we'll go through your report here

3  in a little bit.

4            Do you remember any assumptions that you

5  made?

6       A.   Everything I do typically relies on the

7  physical evidence and mathematical calculations.

8  Certainly, there is conflicting testimony that I'm aware

9  of that I have considered, so technically, those can be

10 regarded as assumptions that I've considered.  But I

11 certainly try my best to establish -- if I'm relying on

12 testimony or an assumption, then I will say it.

13      Q.   Have you made any credibility determinations

14 when reviewing witness statements to determine which set

15 of facts you're applying to this accident?

16      A.   Fortunately, that's not my job.  I'm not

17 allowed to do that.  I consider all testimony entirely

18 and compare it directly and objectively to the physical

19 evidence and the physics involved.  It's up to the jury

20 to determine credibility.

21      Q.   What do you do when one witness provides

22 contradictory or inconsistent statements when generating

23 a report?

24      A.   I will mention it that their testimony or

25 statement is inconsistent with the evidence or the



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2221

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2226 of 2460   PageID 2518

1 calculation, whatever engineering foundation that I have

2 to compete against their testimony.

3      Q.    Okay.  Do you recall in this report ever

4 mentioning whether some -- whether the one witness

5 provided different inconsistent statements?

6      A.    I believe there's a lot of inconsistent

7 statements.  I think you'll need to be more specific on

8 that.

9      Q.    Well, yeah.  I'm talking about when one

10 witness -- like, the same person -- says one different --

11 different things at different times, contradicting

12 themselves.

13      A.    I would need an example.  I know that, just

14 on my experience, particularly when witnesses are deposed

15 by attorneys that ask questions in varying types of way,

16 and in varying types of way, sometimes the answer could

17 be slightly different depending on how it's asked.

18 You'll have to be more specific; I'm not sure.

19      Q.    Okay.  But you don't recall mentioning

20 inconsistent statements where someone contradicted

21 themselves in your report?

22      A.    Yeah.  It's not something that I need to

23 bring forth to the jury.  They are capable of finding

24 those inconsistencies.  What my job is is to analyze

25 everything as a whole and compare it to the evidence.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2222

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2227 of 2460   PageID 2519

1    Q.    And as far as you know, you haven't picked

2   amongst any individual witnesses' inconsistent statements

3   and chosen which statement you relied on?

4    A.    Correct.  I don't choose what I rely on in

5   regards to testimony, because it's obviously in dispute.

6   Now, what I can establish is whether it's consistent with

7   the science or not.  And that's really how I can assist

8   the jury in helping them resolve that dispute in any

9   inconsistencies, not only in the same witness but also

10   between other witnesses.

11    Q.    Okay.  Thank you.

12          So you said earlier you were retained on --

13   or Focus Forensics was retained on August 26, 2023,

14   right?

15    A.    I thought it was April, but let me

16   double-check.

17    Q.    Oh, I'm sorry.  I may have my A months mixed

18   up.

19    A.    April 26, 2023.

20    Q.    Okay, perfect.  Thank you.

21          When did you start engaging in work in this

22   case?

23    A.    Let me reference the first invoice.  Looks

24   like I charged a half hour for intake of case materials

25   on April 26, 2023.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Appx_2223

1    Q.    Okay.  And can you describe -- well, strike

2 that.

3          Did you or anyone at your firm physically

4 inspect the Ford Explorer in this case?

5    A.    No.  We -- or I should say I relied on the

6 inspections that were performed by others.

7    Q.    Okay.  And do you know who performed the

8 inspections that you relied upon?

9    A.    There were two companies.  One company had a

10 name change.  So CAC is now Aperture, I believe; and then

11 there's Axiom Engineering.

12   Q.    And fair enough.  Axiom is the accident

13 reconstruction company that Plaintiffs' side has hired.

14         So you relied upon the photos and everything

15 else that Axiom took of the Ford Explorer as well as --

16 let's call it CAC for now.  Those are what you relied

17 upon, right?

18   A.    Yes.  I relied on their inspection materials,

19 the same as I rely on the inspection materials of my

20 colleagues that assist me in inspections that are more

21 local to the physical location of the inspections.  It's

22 a very common thing in our industry to have assistance

23 with inspections to keep costs down so that way we're not

24 traveling so far.  We're scattered throughout the state

25 on purpose, so that way we can be efficient in collecting

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2224

1  evidence.

2       Q.    And can we agree, if I say "CAC" or

3  "Aperture," we agree that's the same thing?

4       A.    Yes.

5       Q.    Okay.  So do you know when CAC performed the

6  physical inspection of the Ford Explorer?

7       A.    I do have the date in my report, if I can

8  reference that.  And I'm sorry.  That was the inspection

9  of the Ford, you asked?

10      Q.    Yes.  And if you don't know, I mean, that's a

11 perfectly --

12      A.    I don't know off the top of my head.  I can

13 certainly search the report.  I do believe it's in there

14 though.

15      Q.    Okay.  Does -- if I tell you that it happened

16 sometime in September of 2022, do you have any reason to

17 contradict that?

18      A.    No.  I actually just found it:  September 6,

19 2022.

20      Q.    Okay.  And do you know what CAC did to

21 inspect the Ford Explorer?

22      A.    They photographed it, laser scanned it, and

23 performed an ACM download and an infotainment system

24 download.

25      Q.    Okay.  So you're relying -- and correct me if



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2223

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2230 of 2460   PageID 2522

1  I'm wrong.  Are you relying on the photos and scans done

2  by CAC?

3      A.    In part, yes.  That is part of the puzzle

4  pieces I was provided to paint the picture of what

5  happened.

6      Q.    Okay.  So how did you verify the accuracy of

7  CAC's photographs and laser scanning?

8      A.    The photographs appear to not be tampered

9  with; they were consistent with both companies'

10  inspection photographs of the Ford, Axiom and CAC.  The

11  accuracy of the laser scanning, actually, I relied on

12  what's called their photo scans, which is a series of

13  photographs that they take walking around the vehicle,

14  and I can stitch those photographs together to establish

15  a 3D model and generate those error rates myself so I can

16  know the accuracy of that model on my own.  So I

17  processed their photographs in a 3D model of the Ford

18  myself.

19      Q.    So what software did you use to generate the

20  3D model?

21      A.    Pix4D.

22      Q.    Okay.  So you did the Pix4D analysis; you did

23  not receive one from CAC?

24      A.    That is correct.

25      Q.    Okay.  So when someone else -- well, strike



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

Appx_2226

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2231 of 2460   PageID 2523

 1  that.

 2          Is it your practice to typically allow

 3  someone else to do the vehicle inspection and then rely

 4  upon those photos?

 5      A.    Quite common.

 6      Q.    Okay.  Is it your regular practice to allow,

 7  like, a totally unrelated entity unrelated to Focus

 8  Forensics to do the initial inspection?

 9      A.    Actually quite common, yes.  We subcontract

10  other engineering companies out often that are closer to

11  the inspection locations.

12      Q.    Okay.  Have you or your firm or anyone from

13  your firm done a site visit on Interstate 45 where this

14  collision occurred?

15      A.    Not personally.  Certainly, by the time we're

16  retained, all the evidence is gone.  The site was

17  thoroughly documented, both photographically and by drone

18  mapping shortly after the crash.  I believe it was six

19  months after.

20      Q.    Do you -- do you know who did the drone

21  mapping?

22      A.    I believe that was CAC.

23      Q.    Okay.  So just to -- just to be certain, no

24  one from Focus Forensics has been to the scene of this

25  accident?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2227

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2232 of 2460   PageID 2524

1      A.    Correct.

2      Q.    Okay.  Now, you said that there was an ACM

3  download and an infotainment download done by CAC --

4      A.    Yes.

5      Q.    -- right?

6      A.    Let me rephrase that.  I think there was some

7  cooperation between Axiom and CAC with the downloads, so

8  I don't know specifically who plugged into it, but there

9  was -- it was teamwork.

10     Q.    Fair enough, right?  That's not a trick

11 question, right?

12           Have you reviewed -- well, I guess I

13 should -- let me back that up.

14           What have you reviewed from ACM in the

15 infotainment center download?

16     A.    All of it.

17     Q.    Okay.  So when you say "all of it," with

18 respect to the infotainment module, what do you mean?

19     A.    There was various types of data.  There was,

20 most notably, the breadcrumb trail of the Ford and the

21 40 miles, I believe, leading up to the collision location

22 at one-second intervals providing speed, bearing, and GPS

23 coordinates.  There was also text and call records that

24 were recorded through the Bluetooth connection of

25 Caylee's phone to the infotainment system.  There was



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2228

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2233 of 2460   PageID 2525

1  some other GPS reported information such as vehicle

2  starting points and synchronized clock points, but those

3  were part of the peripheral information.

4      Q.    Who provided you with the infotainment center

5  download?

6      A.    I believe it came from my client.

7      Q.    Okay.  So when you say "from the client," you

8  mean Defense Counsel?

9      A.    Yes.

10     Q.    Fair enough.

11           So the infotainment module data that you

12 reviewed, does it only include, like, say, two hours

13 before the collision?  Is that what -- that's the version

14 you've looked at?

15     A.    I believe two hours sounds right.  It

16 certainly has limited memory, so I believe that was all

17 it had was two hours or 40 miles.  I'd have to reference

18 the report for the exact numbers.

19     Q.    So -- and just to get super specific, it was

20 a report that you reviewed, and it's a PDF that, like,

21 has rows showing each track log point?  Is that what

22 you've looked at?

23     A.    That is one of the files that was provided,

24 yes.

25     Q.    Were there other files that you were



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2229

1 provided?

2          A.     I think there was a .CSV file, which is an

3 Excel table --

4          Q.     Okay.

5          A.     -- on those data points.

6          Q.     Do you know if that was generated from the

7 infotainment module, or if that was something separate?

8          A.     That was from the infotainment system.

9          Q.     Okay.  Any other files that you reviewed from

10 the infotainment center?

11          A.     Since you're getting specific, let me go

12 ahead and open up that folder just to correctly answer

13 this question.  So yes, there are two files related to

14 the infotainment system data.  There was a PDF titled

15 "Berla Report"; and then there was a .CSV file titled

16 "Berla Download Track Points."

17          Q.     And is this -- is this part of what you've

18 given me on this thumb drive?

19          A.     It is on there.

20          Q.     Can you just kind of walk me through -- I can

21 get there.  Is that in the download data folder?

22          A.     Yes.  So under "Materials Received," then

23 under "Download Data," then under "Ford Explorer," then

24 under "Infotainment Data."

25          Q.     Got it, got it.  Okay.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2230

1              So do you know, from your review of the

2    infotainment center, infotainment center module --

3    whatever we're calling it -- do you know where

4    Caylee Smith went the morning of April 30, 2022?

5          A.    I do recall mapping that on a map.  I don't

6    have that teed up off the top of my head, so I'd have to

7    go back and look at those GPS coordinates.  But it -- I

8    vaguely remember it was some type of plaza with shopping

9    plazas and restaurants maybe.  I'm not sure.

10         Q.    Okay.  So do you recall that she -- she

11   started the Ford Explorer that morning in -- at her home

12   in Livingston?

13         A.    I recall seeing it started at an address,

14   then it went to some commercial property parking lot, and

15   then on its way to the crash location.

16         Q.    So do you recall that one of the locations

17   she went to was a hotel in Houston?

18         A.    I didn't get that detailed to know if it was

19   a hotel.  I'd have to recheck those GPS points.  I was

20   more focused on the actual crash.

21         Q.    Okay, okay.  So how do you derive speed data

22   from the infotainment center module that you were given?

23         A.    How do I, or how does it do that?

24         Q.    Well, let's start with you.  Tell me how you

25   derive speed data.  And I ask that question because it



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2231

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2236 of 2460   PageID 2528

1  looks like from the PDF and -- the PDF and the Excel that

2  it doesn't explicitly have the speed data.

3      A.    So the PDF and Excel file were -- did provide

4  various types of data.  The PDF only provided the GPS

5  coordinates with actions, then that was under the events.

6  Then under Track Points, it provided GPS coordinates with

7  bearing data, which is the orientation of the vehicle

8  relative to north.  Then the .CSV file is what contained

9  the speed data.

10     Q.    Okay.

11     A.    So I had to actually combine the two.

12     Q.    Okay.  So now, from the PDF file, which was

13  all Plaintiffs' Counsel was originally provided, for

14  every track point, it tells you the distance that she

15  went in a second, right?

16     A.    Yes.

17     Q.    And if you know how many feet someone

18  traveled in a second, you can derive their speed as a

19  mile per hour, right?

20     A.    Yes.  That is all GPS-based though.  It's

21  just the point at two positions when the GPS pinged it.

22  The speed data in the CSV file, my understanding is it's

23  pulling it from the CAN bus, and that's the actual

24  network from the vehicle reporting the speed.

25     Q.    Okay.  All right.  So then -- and that's the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2232

1  information we need.

2             So the speed column on the .CSV file is not a

3  GPS derived speed; it is directly pulled from, I guess,

4  the altimeter on the Ford Explorer?

5       A.    That is my understanding of infotainment

6  system data is that it is pulling the data from the

7  vehicle.

8       Q.    Okay, okay.  Thank you.

9             So have you ever done a -- or strike that.

10            Have you ever used Berla to pull data and run

11 a report off of an infotainment center?

12      A.    Yes.  It's costly, so it's not as frequent as

13 your traditional black box download.  But yes, it is a

14 rather large part of our industry now with this

15 technology in these vehicles.

16      Q.    Okay.  So can you walk me through -- say a

17 client asks you, "Hey, we want to download the data from

18 the infotainment center.  Use Berla and run a report."

19 Have you done that?

20      A.    So we actually outsource the physical

21 downloading process.  The software and equipment is

22 rather expensive, and the times when we actually need the

23 data is far and few between, because we typically will

24 rely on the standard black box download --

25      Q.    Okay.



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2233

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2238 of 2460  PageID 2530

1    A.    -- that gives us a much higher resolution

2    around the crash time, which is what we're actually

3    focused on.  So anytime that we want to get Berla data, I

4    will outsource it to a company to download for me and

5    then provide me the data.

6    Q.    So you don't have any personal experience

7    running a report using Berla?

8    A.    Not the physical extraction.  It does require

9    training through Berla to be able to do that with their

10   equipment.

11   Q.    So separate from the physical extraction,

12   have you ever used Berla to generate a report based on a

13   download from an infotainment center?

14   A.    So not to be nitpicky, but you used the word

15   "report" again.

16   Q.    Yeah.

17   A.    Yes, I have -- well, I've used infotainment

18   system data many times in accident reconstruction

19   analyses.  I don't know if it's ever made it to a

20   physical hard paper report.

21   Q.    Okay.  Well --

22   A.    It's like I said --

23   Q.    Yeah, yeah, fair enough, right?  And I don't

24   care if it was physical hard copy or not.

25            What I'm trying to figure out is, Have you



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2234

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2239 of 2460   PageID 2531

1  ever used Berla to interpret the data that's pulled off

2  of a module in order to figure out, for example, GPS

3  coordinates or speed?

4          A.    Yeah.

5          Q.    Okay.  Can you walk me through what that

6  process looks like?

7          A.    Yeah.  It's the same process I utilized in

8  this case.  It's I look at the data.  In this case, it

9  was provided in two different formats, an Excel file and

10 a PDF, both containing various types of information.  The

11 Excel file has speed --

12         Q.    Well, sorry.  That's actually not what I'm

13 asking.  I'm not -- I don't think you're being

14 disingenuous; I think we're just misunderstanding each

15 other.

16              Before you get the PDF and the Excel, have

17 you ever been part of the process to generate the PDF and

18 the Excel report using Berla?

19         A.    Oh, no.  That's part of the extraction

20 process.

21         Q.    Okay.

22         A.    That's what we outsource.

23         Q.    Okay.  You outsource that bit.  Okay.  Sorry.

24 That's -- we were just a little confused there.

25              So I just want to make sure:  So physical



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2235

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2240 of 2460   PageID 2532

1 extraction of the data and the creation of the PDF or the

2 Excel, whatever file interprets the data, that all

3 happens at the same time?

4       A.    My understanding, yes.

5       Q.    Okay.

6       A.    I believe it's a very lengthy process, or it

7 could be.

8       Q.    Okay.

9       A.    Some of these downloads can take 24 hours of

10 straight downloading, so they'll often run them

11 overnight.

12      Q.    And your understanding is that either CAC or

13 Axiom did the extraction in this case?

14      A.    Yes.

15      Q.    So you were provided -- you actually got the

16 PDF and the Excel from the infotainment center from

17 Defense Counsel in this case, right, not from CAC?

18      A.    Yes, I believe everything went through

19 Defense Counsel.  I have not had any direct communication

20 with other engineering firms.

21      Q.    Okay.  So what information can you get off of

22 a SYNC Generation 3 infotainment module?

23      A.    So that's a very specific question with a

24 very specific generation that will have a different

25 answer versus other manufacturers and other generations



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MYDEPOS

Appx_2236

1  of those manufactures.  So that's not something I have

2  teed up off the top of my head.  I'd have to go reference

3  the Berla reports that tell you the manufacturer and

4  generation, what to expect.  They're all different, just

5  like black box data.

6          It's hard to answer a blanket question of

7  what type of black box data you would get from an air bag

8  control module, because it's different for every year,

9  make, and model.  Same thing for Berla:  It's going to be

10 different for every year, make, and model.  I would have

11 to go reference the reports.

12     Q.     So I -- so the data that gets pulled is

13 different by make, model, and generation of the

14 infotainment center, if I understand your answer right?

15     A.     Could be, yes.

16     Q.     Okay.  So have you studied the specific

17 accuracy of the data pulled from this type of

18 infotainment module from this Ford Explorer?

19          MR. DUBOFF:  Objection to the form.

20     A.     Yes.  There is actually a paper specifically

21 to this generation of the module validating the accuracy

22 of the data.

23     Q.     Okay.  So when you -- and do you remember who

24 authored that paper?

25     A.     I'd have to reference it in my file.  I don't



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2242 of 2460   PageID 2534

1  have that teed up.

2        Q.    Was it Wes Vandiver?

3        A.    Again, I'd have to -- can I reference it?

4        Q.    Sure, sure.

5        A.    Yes.  I have three papers.  Two of those are

6  from Wesley Vandiver.  One is from William Bortles.

7        Q.    Okay.  So do you recall what the error rates

8  are on the GPS data from a SYNC Generation 3 infotainment

9  module?

10        A.    Are you talking about the speed data or the

11  GPS coordinate accuracy?

12        Q.    The GPS coordinate accuracy.

13        A.    Looks like plus or minus 5 meters.

14        Q.    So I guess, let's use your engineering magic

15  for an American audience.  Plus or minus 5 meters, how

16  many feet is that?

17        A.    So I referenced this in my report.  What I

18  ended up doing was actually combining all three of these

19  papers and their reported accuracy of these GPS points to

20  give a range.  This range is going to heavily rely on

21  various environmental components like number of satellite

22  dishes that are connected, any environmental physical

23  obstructions like buildings or trees.  Even speed of the

24  object can affect that.

25                My report, I believe, indicated a 3- to



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2238

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2243 of 2460   PageID 2535

1  7-foot accuracy, but let me double-check that.  Yes, 3.5

2  to 7.5 range in accuracy of the global position of the

3  GPS coordinate.  Now, that is the global position based

4  on the general environment that you're in at the time of

5  the evidence or sample collection.

6          What you can do is establish more certainty

7  within that data by doing a relativity analysis, where if

8  we know a sample of points were taken in the same

9  environment, the global offset of all of those points are

10  generally going to be the same and have the same error

11  rate relative to global positioning.

12          And what we can do is track the difference

13  between those individual sample points that were taken

14  very close in time together within the same environment,

15  within the same speed, within the same settings that were

16  individually collected to further analyze whether there's

17  any change in the subsequent events or points to see if

18  we can track trends, and we can more heavily rely on the

19  accuracy of those trends versus the global accuracy of

20  the points.

21      Q.    So -- and tell me if I'm wrong about this.

22  If I convert that into layman's terms, are you saying

23  that you look at the different GPS track points, and

24  if -- as long as they look more or less like they're --

25  like, there's not one that's weirdly, like, you know,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2239

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2244 of 2460   PageID 2536

1 20 feet off or something in what is otherwise a straight

2 row, you -- you would understand that to mean that the

3 track points are generally accurate?

4       A.    Yes.  If they are collected in the same

5 environment and generally the same conditions, you could

6 form trends from a cluster of GPS points to establish the

7 accuracy relative to the prior points, so the theory of

8 relativity.  The global accuracy, yes, 3 to 7 feet, 3 to

9 8 feet.  But the theory of relativity says that if you

10 take a sample point close in time to the prior sample

11 point, you can assume the same accuracy within each of

12 those subsequent points and rely --

13       Q.    Relative to the prior one?

14       A.    Yes.

15       Q.    So for example, if you see a bunch of GPS

16 track points from this infotainment module and they're

17 all in a straight line, you take that to mean the vehicle

18 was going in a straight line?

19       A.    Generally, yes, right.

20       Q.    But you would not say that precisely where

21 each one of those GPS points is precisely where the Ford

22 Explorer was at that time, right?

23       A.    Correct, because then you could also have

24 some error based on how it overlaid onto the Google Map,

25 certainly.  Different Google Map dates have some offsets



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2240

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2245 of 2460   PageID 2537

1  in the global position of the road width, so that's

2  really where that 3- to 8-foot margin comes into play is

3  the global positioning of these points.  But Newton, with

4  the theory of relativity, helps us establish more

5  accuracy based on taking smaller time samples.

6      Q.    So how did we get from 3- to 8-feet versus

7  Wes Vandiver's paper which says that the accuracy is plus

8  or minus 5 meters?

9      A.    So that is the worst case.  That is taking

10  the -- I guess I can call it the 95th percentile

11  accuracy.  That is the worst that's ever been reported

12  based on various environmental changes.  So when

13  considering GPS coordinates as a whole, you do need to

14  consider how the GPS coordinates are taken.  That paper

15  is a more conservative estimate of plus or minus 5 meters

16  of the position as a whole, which is going to be 15 feet

17  or so.

18      Q.    Okay.  So did Wes Vandiver provide percentile

19  accuracies in his paper?

20      A.    Yes.  95th percentile.

21      Q.    Okay.  So what did he say the 95th percentile

22  is?

23      A.    Plus or minus 5 meters.

24      Q.    Okay.  So what are the -- can you give us the

25  50th percentile?  Did he report that?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2241

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2246 of 2460   PageID 2538

1      A.    I'd have to double-check the paper.

2      Q.    And just to -- are you checking the 2021

3 paper?

4      A.    Yes, 2021-010903.  And I apologize; I was

5 actually reading the wrong values before.  Plus or minus

6 5 meters was for the VBOX Sport performance meter that

7 they used to validate the data.  I do need to dig deeper

8 to see what the results were of this generation module,

9 which I am doing now.

10      Q.    Well, and I don't want -- I don't mean to

11 make you read the paper.  You can do that on a break.

12            Would you agree that this paper is the most

13 thorough discussion of the GPS tracking done by the Gen 3

14 SYNC module that you have cited in your report?

15      A.    I think that's fair.

16      Q.    Do you think it's fair to rely on this paper

17 as good science as far as the accuracy of the Gen 3 SYNC

18 module?

19      A.    Yeah, I think it's fair to rely on any

20 peer-reviewed published literature, but it also needs to

21 be considered as a whole.  And considering the specific

22 test conditions that they were under, I'm actually

23 starting to see that this report was more based on the

24 variance of distance between points versus the global

25 position of the points.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2242

1              So it's not necessarily comparing apples to

2     apples of what I reported as the 3 1/2-to-7 1/2-foot

3     error.  So my reference is based on the combination of

4     all the typical GPS accuracy peer-reviewed literature.

5     This one does seem to have a specific goal in mind of

6     providing a value of distance between points.

7         Q.    Okay.  So when you provided the 3-to-7-foot

8     error rate, that's based on your general knowledge and

9     expertise of the accuracy of GPS systems?

10        A.    Along with my other cited literature on GPS

11    accuracy.

12        Q.    Okay.  So which other cited papers support

13    your 3-to-7-foot error rate conclusion?

14        A.    So I referenced three papers.  One was SAE

15    2017-01-1437.  That was by William Bortles in 2017.  I

16    then referenced the Wesley Vandiver paper in 2018 and the

17    Wesley Vandiver paper in 2021.

18        Q.    Okay.  So I think we agree that the 2021

19    paper is, at least at first glance, not entirely helpful

20    on the question of the GPS error rate, right?

21        A.    Well, it's reporting a different value than

22    what we're talking about.  It's reporting the error

23    between a distance of two known points.

24        Q.    Okay.  So in Wes's 2018 paper, what does it

25    say the error rate is for the GPS tracking?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY DEPOS

Appx_2243

1      A.     I'm going to have to read this paper through.

2  I know when I wrote this report, it was a combination of

3  all of these papers.  But if you give me a second, I can

4  certainly read through this paper again.

5      Q.     Sure.

6      A.     I believe this paper is more so discussing

7  the error of speed.

8      Q.     So I think that's correct.

9             So then, I take it what you're really relying

10 on is the Bortles paper, which does say that the GPS unit

11 data error ranges from 3.5 to 7.5 feet.  Am I incorrect

12 about that?

13     A.     I'm not sure.  I'd have to reread the papers

14 to see.

15     Q.     If you go to Page 2 of that paper, I think

16 it's about bottom of the first full paragraph.

17     A.     Oh, yes, there you go, the coordinate

18 location accuracy.

19     Q.     Okay.  So do you remember what module was

20 being tested in the Bortles paper?

21     A.     I'd have to review it again.  So that one, I

22 believe, was a Garmin GPS unit.

23     Q.     Okay.  Do you see anywhere in that paper

24 where a SYNC Generation 3 module was tested?  And I'm

25 talking about the 2017 Bortles paper.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2244

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2249 of 2460   PageID 2541

 1     A.     Looks like -- looks like it did a

 2 Generation 1, 2, and 9, and 10.  So there's a -- looks

 3 like a large sample of generations.

 4     Q.     But there's no Generation 3 SYNC module

 5 included in the paper, right?

 6     A.     No.  It spanned Generation 3.  It's 1 to 10.

 7     Q.     Okay.  So but not -- it didn't include Gen 3?

 8     A.     I'd agree with that specific.

 9     Q.     Okay.  So did any of the papers that you cite

10 test the GPS accuracy as an actual locational value from

11 a Gen 3 SYNC module?

12     A.     There's so many papers out there that I'd

13 have to go back and reread them.  I don't have that teed

14 up off the top of my head to know about the specific GPS

15 accuracy.  What I can say is that general GPS accuracy is

16 a very heavily-studied science, and it is well understood

17 that the accuracy is going to be heavily dependent on the

18 environmental conditions.

19            And generally, an accuracy of 3 to 8 feet is

20 accepted within the industry of general GPS devices,

21 whether it be a handheld Garmin or a SYNC module.  The

22 values reported in these papers may not be apples to

23 apples.  They're talking about various different types of

24 variables they're assessing.

25            But in general, overall global GPS accuracy



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MY DEPOS

Appx_2243

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2250 of 2460  PageID 2542

1  is very well-known and studied, and that's -- the typical

2  value we accept in the accident reconstruction community

3  is somewhere in that 3-to-8-foot range, which is enough

4  to establish the position of the vehicle on the roadway,

5  but the exact lane position is not something with enough

6  precision to rely on.  But again, we go back to that

7  theory of relativity where we're analyzing the small time

8  change between data points.

9      So in this particular case, I can see that

10  the overall accuracy of the GPS data is unreliable as far

11  as its global position.  But again, the theory of

12  relativity is what I'm relying on.

13      Q.    So just, you know, for the jury, what are

14  you -- when you say the "global position," is that -- in

15  layman's terms, does that mean, like, actually where the

16  car was, or does it mean something different?

17      A.    Yeah, on the Earth.

18      Q.    Okay.

19      A.    The global position of this vehicle on the

20  Earth can only be guaranteed within this range.  There

21  are actually federal standards that require GPS systems

22  to adhere to accuracies -- I believe that was established

23  back under Clinton -- was that it required GPS systems of

24  all kinds, any kinds -- whether it's an Apple Watch,

25  iPhone or a SYNC module -- to adhere to these standard



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY DEPOS

Appx_2246

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2251 of 2460   PageID 2543

1  accuracies.

2           And again, that's the global accuracy that

3  anywhere on the planet, it needs to pinpoint you within

4  that range.  You do then need to consider open roadway,

5  relative theory between points to help establish trends.

6           So yes, in general, GPS is difficult to help

7  us establish lateral lane position, but we can rely on

8  the trend of those points.  And that's what I was trying

9  to express in my report.

10      Q.   Okay.  So just to sort of sum that up, you're

11 not saying that the GPS track points help you pinpoint

12 precisely where Caylee's vehicle was at every second,

13 right?

14      A.   Right, I never did.

15      Q.   Okay, perfect, right?

16           What about the bearing data?  What is your

17 understanding of the accuracy of the bearing data from

18 the Gen 3 SYNC module?

19      A.   I'd have to go back into the paper to see the

20 global accuracy of the bearing data.  But it falls back

21 on -- I'm analyzing a trend.  And so I don't have an

22 answer teed up, because I didn't rely on it, because that

23 wasn't part of my analysis.

24           What was part of my analysis was theory of

25 relativity, analyzing the trend, the consistency in the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2247

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2252 of 2460   PageID 2544

1  bearing data on the straight segment of road, the

2  consistency of the bearing data in the actual curve of

3  the road and measuring the curve of the road to see the

4  accuracy of that bearing data.

5            So you can say I independently validated the

6  bearing data on the approach around the curve and on the

7  straightaway, and all of those points were consistent

8  with the parallel orientation of the roadway itself.  So

9  the bearing data, again, I don't know, necessarily --

10 teed up off the top of my head -- the global accuracy.

11 But when you analyze it on a case-by-case basis, you can

12 determine the validity of the data for this particular

13 case, which was very reliable.

14      Q.    So just to break that down, you measured not

15 using the bearing data, but using engineer magic, the

16 curve of Interstate 45 on approach?

17      A.    Yes.  You can measure the curve.

18      Q.    Okay.  And so then you can figure out --

19 again, using engineering magic and your expertise -- what

20 the bearing changes are of that curve?

21      A.    Yes.

22      Q.    And then you compared that, your analysis,

23 against the bearing data from the Gen 3 module?

24      A.    Exactly.

25      Q.    And it validated, in your opinion, the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY DEPOS

Appx_2248

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2253 of 2460   PageID 2545

1  accuracy of the bearing data from the Gen 3 SYNC module?

2       A.     You got it.

3       Q.     Okay.  All right.  Perfect, perfect.  Just

4  want to make sure.  Okay.

5              So have you -- you did collect the -- well,

6  strike that.

7              You reviewed the collection of the air bag

8  control module as well, right?

9       A.     Of the Ford, right?

10      Q.     Of the Ford, yes.

11      A.     Yes, mm-hmm.

12      Q.     Did you review the ACM download from the

13  Toyota?

14      A.     I did.

15      Q.     Did either of those vehicles record an event

16  on April 30, 2022?

17      A.     Not on that particular date.  The Toyota did

18  have two events that were unrelated to the facts of this

19  case, either some prior or subsequent event not

20  consistent with the facts of this case.

21      Q.     Okay.

22      A.     The Ford had nothing on it.

23      Q.     Okay.  So what is your understanding of what

24  it takes to trigger the ACM module in the Ford Explorer?

25      A.     Typically, it's a 5 mile per hour change in



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2249

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2254 of 2460  PageID 2546

1   speed over a 150-millisecond time sample.  However, every

2   manufacturer -- that's the federal standard.  But many

3   manufacturers will go underneath that standard.  So for

4   instance, Toyotas can pick up changes in speed of less

5   than a mile per hour.  We'll see a lot of events on

6   Toyotas.  So all I can tell you is what the standard is.

7   It's less than 5.

8        Q.   Okay.  So the lack of an event on the Ford

9   Explorer ACM tells you that there was at least -- strike

10  that.

11            The lack of an event on the Ford Explorer ACM

12  tells you that there was no reduction of speed of 5 miles

13  per hour or less within a 150-millisecond event?

14       A.   Or more.

15       Q.   Or more, okay.

16            But that's what you're able to derive from

17  that?

18       A.   Yes.

19       Q.   Okay.  So would you typically expect to see

20  an ACM event in a pedestrian motor vehicle accident?

21       A.   I have only seen an ACM event for a

22  pedestrian impact, I think, twice in my career.

23       Q.   Okay.  Describe those situations, if you

24  would.

25       A.   One was actually the Mustang that we talked



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2250

1 about earlier going 100 miles per hour. Given the speed

2 difference, that was a -- provided a significant enough

3 change in speed of the Mustang. I don't remember the

4 exact change in speed recorded by the Mustang, whether it

5 was three or four or five or six. But it is rare to get

6 pedestrian impacts recorded on the air bag control

7 modules.

8 Q. Why is that?

9 A. The weight disparity between the vehicle and

10 the pedestrian is such that the vehicle does not change

11 as much speed as the pedestrian does, especially when you

12 have offset collisions, like this particular one where it

13 is just the mass of the pedestrian's head versus the

14 vehicle versus the entire mass of the body versus the

15 vehicle. So the likelihood of having that impact the

16 momentum of the Ford is even less.

17 Q. Okay. Can -- in your experience, are ACM

18 events normally triggered by hitting another object,

19 braking, or a combination of the two? Or is braking too

20 slow to trigger an ACM event?

21 A. Braking is typically too slow. Some of the

22 newer manufacturers are now having event-based triggers

23 like braking. And certainly, braking can be picked up on

24 the sensors during a collision, but typically, they don't

25 trigger an event.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2251

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2256 of 2460   PageID 2548

1      Q.    So on the Ford Explorer's ACM, did it pick up

2  a braking event?

3      A.    That generation does not pick up braking

4  events.  It doesn't trigger based on the braking events.

5      Q.    Okay, okay.  And you have reviewed the photos

6  from the scene taken by the Texas Department of Safety

7  Troopers, right?

8      A.    Yes.

9      Q.    Okay.  And you've reviewed Caylee's cell

10 phone records?

11     A.    Yeah.

12     Q.    When I say "records," I mean the download of

13 her personal iPhone, right?

14     A.    Mm-hmm, yes.

15     Q.    You've not reviewed any other cell phone

16 records of hers, have you?

17     A.    There were some exhibits with screenshots of

18 her texts.  But the -- I think it's Cellebrite --

19     Q.    Yes.

20     A.    -- published the report for her cell phone

21 records.

22     Q.    But nothing, like, from a carrier, like, from

23 AT&T or something directly like that, right?

24     A.    No.  I think it was all from Cellebrite.

25     Q.    Okay, okay.  What else did you review, if you



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2252

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2257 of 2460   PageID 2549

1   remember?

2        A.      Regarding cell phone?

3        Q.      Oh, sorry.  Just evidence in this case,

4   which, you know, strike that.  That's too broad, and I

5   guess it would be a wild goose chase.

6                You cited the Aperture report dated July 10,

7   2023.  Do you recall reviewing that?

8        A.      Was that the one that discussed the lack of

9   data on the Ford?

10       Q.      I'm not sure, right?

11               Do you know if you included that in the file

12  that you've provided me?

13       A.      If it was part of my file, it would be in the

14  file that I provided you.

15       Q.      So let's see.  Would that be in the expert --

16  or excuse me, in the Materials Received folder?

17       A.      Yes, somewhere in there.

18       Q.      Okay.  Can you tell me where in there?

19       A.      Okay.  So I think this is the report you're

20  referring to from Aperture, July 10, 2023.

21       Q.      But you tell me.  Like, just tell me where

22  it's at in this file that you provided me.

23       A.      This is located with the Toyota download

24  data.  So it would be under Materials Received, Download

25  Data, Toyota Camry, and there's a file titled Toyota



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MY-DEPOS

Appx_2253

 1  Report.

 2       Q.    Okay.  Very good, very good.  Thank you.

 3             So would you agree that the quality of your

 4  accident reconstruction in this case would have been

 5  improved if you were able to get on scene to the crash as

 6  soon as possible after the crash occurred?

 7       A.    No, I disagree with that.  The photogrammetry

 8  process provided me accuracies within a quarter of an

 9  inch, which is going to be within the general accuracies

10  of drone mapping, laser scanning.  You know, at the end

11  of the day, the analysis I do typically has a range of

12  even plus or minus a couple feet, because these distances

13  aren't that sensitive.  So we're actually using quite

14  high tech equipment to measure things that we don't need

15  that much accuracy on.

16             So no, I don't think the quality would have

17  been better.  I think the quality of my reconstruction is

18  consistent with the quality that I would expect if I was

19  out there myself.

20       Q.    Okay.  Do you ever get called personally to

21  go to crash scenes?

22       A.    I do.

23       Q.    Recently?

24       A.    Yes.

25       Q.    Like, how -- how close in time do you



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2254

1 normally go to a crash scene?

2      A.    So we call it quick response.  We are

3 typically called by the insurance company or the

4 retaining counsel for the insurance company, sometimes

5 quick enough to get to the scene while the vehicles are

6 still on scene before they're towed.  It varies; it comes

7 in waves.  I would say I get a handful of those a year.

8      Q.    Okay.  Do you think that's overkill when they

9 do that, since you can do a lot of this with photographs?

10      A.    It depends on who is documenting.  If nobody

11 takes pictures, then yes, it is helpful for me to be on

12 the scene.  If the police are doing a thorough

13 documentation with photographs, it's obviously not

14 necessary.  As long as somebody documents

15 photographically, that is sufficient.

16      Q.    Okay.  What sort of resolution on the

17 photographs do you need to conduct accurate

18 photogrammetry?

19      A.    Well, again, it's going to base -- or I'm

20 sorry.  It's going to depend on the photographic quality

21 itself.  I don't have a standard that needs to be met for

22 the photographs in their quality versus just generally

23 documenting the evidence.  And what I can do is then

24 calculate the resolution or the accuracy of that data

25 once I start performing that photogrammetry process.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2253

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2260 of 2460   PageID 2552

1            So in this particular case, like I said, it

2   was -- at worst, plus or minus a quarter of an inch was

3   the worst accuracy I had on the worst point.  Everything

4   falls within that "plus or minus quarter of an inch"

5   resolution based on the photos that I've been provided in

6   this particular case.

7        Q.   So we talked earlier about photogrammetry

8   basically being this analysis of photos to figure out

9   distances.  And I think I understand your testimony

10  earlier that you need -- you need something that you're

11  sure about.  You need a distance or -- that you -- in the

12  photos that you are 100 percent or close enough sure

13  about; is that right?

14       A.   Yes.  You need known 3-dimensional points.

15       Q.   Okay.  What were the known 3-dimensional

16  points you used in your photogrammetry analysis in this

17  case?

18       A.   So CAC performed a drone mapping of the

19  scene.  I personally took those photographs and processed

20  them in Pix4D to generate a scaled orthomosaic in

21  3-dimensional point cloud.  It is the standard for

22  collecting scene evidence with drones.  That is how we

23  document our scenes now is drones.

24            We use the series of photographs collected,

25  and essentially stitches each pixel together from



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2256

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2261 of 2460   PageID 2553

1  subsequent photos and establishes 3-dimensional points of

2  those photos.  The same process of photogrammetry, but

3  millions of times, using every pixel instead of chosen

4  points.

5          So it's called photo scanning because it uses

6  more than just points.  Again, another heavily-validated,

7  peer-reviewed, well-established methodology that we've

8  been using for decades in the industry.

9          And so I use their drone photographs to

10 create my own 3-dimensional diagram of the scene, and was

11 able to use the roadway features that were permanent,

12 like lane lines and roadway cracks and raised pavement

13 markers, barrier wall cracks, anything that I could see

14 between the two and correlate the 3D point for my model

15 and establish that 3D point in the photograph.

16     Q.    When was the drone mapping conducted at the

17 scene?

18     A.    I believe that was the six months after, and

19 I independently validated that there were no changes to

20 the roadway within those six months based on historical

21 documentation and aerial imagery, flyover imagery, and

22 Google Street View imagery.

23     Q.    Now, so how -- do you have to put the

24 photogrammetry of te Toyota that was taken, or those

25 photos that were taken at the scene and at the tow yard,



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2257

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2262 of 2460   PageID 2554

1 wherever that was, and put them together with the scene

2 map that you made of the crash scene to figure out where

3 the Toyota was on the road?

4      A.    Just to simplify it, no.  It wasn't needing

5 to put the Toyota together.  It was a photogrammetry

6 analysis of the scene that established the 3D points of

7 the Toyota in the scene.

8      Q.    Okay.

9      A.    And then, obviously, I can place a 3D model

10 on top of those points from a diagram.

11      Q.    Yeah.

12      A.    But the position of the Toyota was

13 established from all of the photographs taken on scene.

14      Q.    So specifically, what were the fixed points

15 that you used to validate your 3D model?

16      A.    That is going to be quite an extensive

17 response.  I'm happy to go through it.  There are a lot

18 of points.  We can go through it one by one.  After this

19 question, can we take a lunch break though?  Because this

20 will be a long answer.

21      Q.    Well, I guess, is the answer to that question

22 recorded somewhere in your report that --

23      A.    Yes --

24      Q.    -- we can -- rather than have you give an --

25      A.    -- there is.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2258

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2263 of 2460   PageID 2555

1       Q.      -- extensive answer.

2               So where is that in your report?

3       A.      Page 69, Figure 99, through Page 76,

4   Figure 113.  And then in addition to that, I have the

5   full PDF report outlining all of the 3-dimensional

6   points, the X, Y, and Z coordinates, of all of those

7   points that were used and are visible in these

8   photographs.

9       Q.      So I guess -- and just, you know, glancing

10  through the figures that you just identified, I want to

11  make sure:  Are these figures identifying the fixed

12  points that were then used to create the model, or are

13  these figures identifying measurements based on the 3D

14  model?

15      A.      Both.

16      Q.      Okay.  So I guess my question is, Which of

17  these fixed points were unchanged since the accident, the

18  drone picked them up, and then they were used to generate

19  the 3D model?

20      A.      So starting with Figure 98, what I used was

21  the road lines, the raised pavement markers; and in this

22  particular case, this roadway was sectioned in squares,

23  and so I was able to use the seams of the roadway, the

24  intersections of those seams as known 3-dimensional

25  points in addition to the rumble strips on the shoulder.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2259

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2264 of 2460   PageID 2556

1            So I had a lot of really good reference

2    points.  Normally, we just have road lines like the skip

3    lines and the raised pavement markers.  This one, I had

4    the road lines plus all of these cracks and seams in

5    between, which was more than I usually have.

6        Q.    So to measure all of this, is that what the

7    drone did?  It's, like, the drone measures the distance

8    between road lines and rumble strips, and that's how you

9    can then apply that to these photos and then create the

10   3D model?

11       A.    Yeah.  Essentially, the drone takes enough

12   photos overhead to establish a 3D model of the scene

13   where every pixel is now a 3-dimensional point.  And so I

14   then look at that 3-dimensional point of a crack from the

15   drone scanning and import that into a photogrammetry

16   software enough times on that photo where eventually the

17   camera can be fixed in space, and then I can reverse

18   engineer the unknowns from that photo.

19       Q.    Okay, okay.  What's the photogrammetry

20   software that you use?

21       A.    PhotoModeler.

22       Q.    Okay.  Is that the one you typically use?

23       A.    That's -- there are a couple of others, but

24   yeah, we have PhotoModeler, so that's what we extensively

25   use.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2260

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2265 of 2460   PageID 2557

1      Q.    Okay.  Is that widely used in your

2  profession?

3      A.    Probably the most popular, I would say.

4      Q.    Okay.  So would you agree that a scene is a

5  little bit like a puzzle?

6      A.    I would say that accident reconstruction is

7  like a puzzle, yeah.  We're putting puzzle pieces on a

8  puzzle board, and you can say the scene is this puzzle

9  board, and we try to put enough pieces on the puzzle

10 board to try to paint a picture of what happened.

11     Q.    Okay.  So have you spoken to any of the

12 individuals that inspected the Ford Explorer or the

13 Toyota Camry?

14     A.    No.  I'm just relying on the photographs and

15 documentation.

16     Q.    Okay.  Have you relied on any interviews with

17 anyone that you or someone at Focus Forensics took to

18 generate this report?

19     A.    No.

20     Q.    Okay.  So let's go to Page 6 of your report.

21 So on Page 6, you described the immediate approach to the

22 crash, right?  And you can use a paper copy if it's

23 faster.  Either way is fine.

24     A.    What line are you on?

25     Q.    So let's go down to the last paragraph on



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2261

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2266 of 2460   PageID 2558

 1 | Page 6.

 2 |      A.    Okay.

 3 |      Q.    Okay.  So you say that -- well, I guess, can

 4 | we agree that Caylee was northbound on Interstate 45 on

 5 | April 30, 2022, right?

 6 |      A.    Yes.

 7 |      Q.    Okay.  So you said that Northbound Interstate

 8 | 45, in the area of the incident, was level and flat?

 9 |      A.    Yes.

10 |      Q.    Okay.  You said the northbound approach was

11 | straight for approximately 0.33 miles prior to the

12 | incident?

13 |      A.    Yes.

14 |      Q.    Okay.  So tell us about the curve on

15 | Interstate 45 that Caylee went around before she impacted

16 | Nehemias.

17 |      A.    Yeah.  It curved to the left by about 13

18 | degrees over the course of .17 miles, and then it is in a

19 | complete straightaway for that one-third of a mile, or

20 | about 1,500 feet.

21 |      Q.    Okay.  And you provide a little more accuracy

22 | later on in the report.  It's about 1,742 feet that it's

23 | straight, right?

24 |      A.    No.  That's the unobstructed sight line to

25 | the northbound travel.  It is perfectly straight for





MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2262

1  1,500 feet, but as you round the end of the curve, you

2  can start seeing the northbound lane.

3       Q.    Okay, okay.  Fair enough.

4             So your car can still be turning left, right,

5  but you can -- as a driver, you can look about 1,700 feet

6  forward?

7       A.    Yes.  The barrier wall was the physical

8  obstruction that we're looking around.

9       Q.    Okay.  Got it.

10            So you say the speed limit was 75 miles for

11 the area of the collision?

12      A.    Yes.

13      Q.    And how are you getting that?

14      A.    A speed limit sign.

15      Q.    Okay.  So are you aware of any county rules

16 where the incident occurred that would have lowered the

17 speed limit?

18      A.    Not that I've been provided.

19      Q.    Okay.  So you're just going off, what, the

20 speed limit sign that you saw?

21      A.    Yes.

22      Q.    Okay.  You agree it was clear and sunny on

23 April 30, 2022?

24      A.    Yes.

25      Q.    How did you reach that conclusion?


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Appx_2263

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2268 of 2460   PageID 2560

1    A.    The weather reports for the nearest airport

2  provided sun and weather data.  The body cam videos, the

3  dashcam videos, and photographs provided environmental

4  documentation shortly after the crash.

5    Q.    And I saw you provided the azimuth of the

6  sun.  So can you agree that the sun was not in

7  Caylee Smith's eyes as she was going straight on

8  Interstate 45 towards Nehemias?

9    A.    Correct.  It was to the southwest, so it

10 would be behind her and to the left.

11   Q.    Okay.  So would that mean that, if you're

12 northbound on I-45 towards where the Toyota Camry was

13 stationed, the sun was shining on it?  It would -- you

14 would not have been looking at the sun and the Toyota

15 Camry?

16   A.    From the pedestrian's perspective?

17   Q.    Sorry, yeah.  That's a bad question.

18        From the perspective of Caylee Smith

19 approaching the Toyota Camry, she would have seen the

20 Toyota Camry and not seen the sun at the same time?

21   A.    Correct.

22   Q.    Okay.  Any reason to think the sun was not

23 illuminating the Toyota Camry or any of the pedestrians

24 around it?

25   A.    No.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2264

1      Q.    Okay.  So we agree that weather and glare

2  were not contributing factors to this crash?

3      A.    I agree.

4      Q.    Okay.  So 1,742 feet, that's the unobstructed

5  sight line, right?

6      A.    Yes.

7      Q.    What is that, about a third of a mile, a

8  little over?

9      A.    It's over a third, because a third is

10  1,500 feet.

11      Q.    Okay.  So you testified, or you included in

12  your report on Page 7, first paragraph, that from the

13  beginning of the unobstructed sight line, if Caylee had

14  been going the speed limit of 75 miles an hour, how long

15  would it have taken her to get to the crash site?

16      A.    16 seconds, approximately.

17      Q.    Okay.  And I think your report tells us how

18  long, as she comes into that uninhibited sight line, she

19  would have had to get to the crash site if she was going

20  90 miles an hour?

21      A.    Yes.  13 seconds, approximately.

22      Q.    Okay.  So the difference between going the

23  speed limit and going 90 miles an hour as far as time to

24  see the accident or to get to the scene is three seconds?

25      A.    Over that distance, yes.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2265

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2270 of 2460   PageID 2562

1     Q.    Over that distance.  Okay.

2          So can we agree that as Caylee Smith came

3 around the curve, she had at least 13 seconds to spot

4 Nehemias Santos and the Camry?

5     A.    So I can't actually tell you what she saw or

6 what she could see.  All I can tell you is what was

7 available based on an unpopulated environment.  I don't

8 know.  Nobody knows what the traffic conditions were.  So

9 I don't know how close she was behind a vehicle in front

10 of her; I don't know the status of that vehicle, whether

11 it was a car, a truck, a box truck, a tractor-trailer.

12 All I can say is an unpopulated value would give these

13 values.  I can't say what she actually was provided,

14 because I can't replicate the traffic.

15     Q.    Okay.  Fair enough.  Right.

16          Do you have any evidence that indicates to

17 you what the traffic was like?  Was it heavy, medium,

18 light?

19     A.    I try to avoid subjective terms like that.  I

20 know, certainly, the testimony has varying levels of

21 opinion of what the traffic was like.  Everyone's opinion

22 is going to be different on what "heavy" is and what

23 "light" is.  All I can reference is the photographs, the

24 body cam videos to give a good idea of the backup of

25 traffic.  There was traffic, and that's -- I'm going to



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Appx_2266

1  stay objective on that.  I can't really quantify the

2  traffic.

3      Q.    Okay.  Are there any objective measurements

4  of traffic flow that you're aware of?

5      A.    Annual values, yes, average annual values,

6  but not a specific time frame that we are looking at.

7      Q.    So are there any -- in your line of work, are

8  there any descriptions about, like, how many cars are

9  traveling past a certain point in a certain amount of

10  time, like, in an hour or a minute?  Are those figures

11  that are normal in your profession?

12      A.    Yes.  Like I said, the average annual traffic

13  counts.  Those are basically just an overall average, an

14  annual average of traffic in that area.

15      Q.    Are there any metrics that are more pointed

16  in time, like in an hour or in a day or anything like

17  that?

18      A.    Not unless there's, like, a specific traffic

19  study that was requested.  I'm not aware of any specific

20  level of data that gives you that level of precision.

21      Q.    Okay.  Fair enough.

22      A.    Can we -- can we stop for lunch?

23          MR. WHITE:  Sounds good to me.

24          MR. DUBOFF:  Yeah.

25          THE VIDEOGRAPHER:  The time is 12:18 p.m.  We



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2267

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2272 of 2460   PageID 2564

1       are off record.

2               (Break was taken from 12:18 p.m. to

3       12:58 p.m.)

4               THE VIDEOGRAPHER:  The time is 12:58 p.m.  We

5       are on record.

6   BY MR. WHITE:

7       Q.   Okay.  This is Jacob White.  We just took a

8   little lunch break.  So we're coming back on the record.

9               I think we were talking about the line of

10  sight that Caylee had as she was approaching the Toyota

11  Camry.  Sound right to you?

12      A.   Yes.

13      Q.   Okay.  Now, you are not offering an opinion

14  about whether Caylee should have seen Nehemias or the

15  Camry as she came around the curve, right?

16      A.   I don't think I can as worded.  I don't know

17  if she could.  What I can say is what fixed environmental

18  objects there were that would have prevented her and the

19  timing of that obstruction.  But I can't say anything

20  other than that, because I don't know what traffic was

21  like.

22      Q.   Okay.  So just to put a point on it, as -- as

23  she came around the curve at a point 1,742 feet south on

24  the road, that's when -- assuming no other obstacles, all

25  the fixed obstacles had been removed between her and the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MYDEPOS

Appx_2268

 1  Toyota Camry?

 2        A.    You got it.

 3        Q.    Okay, perfect.

 4              Now, are you aware of any evidence -- I think

 5  you already answered this, but just let me get this

 6  straight.  Are you aware of any evidence that Caylee

 7  could not have seen the Toyota Camry as she came around

 8  the curve other than the fixed median barrier?

 9        A.    And other than potential traffic, I'm not

10  aware of anything else.

11        Q.    Okay.  But you don't know about the traffic.

12  Like you said, like, that's just an unknown for you?

13        A.    Correct.

14        Q.    It's possible that there was traffic between

15  her and the Toyota Camry; you do not know?

16        A.    Correct.

17        Q.    Okay.  So you can agree that Caylee had the

18  capacity to see the Toyota Camry, 1,700 feet -- for

19  1,742 feet away from the Toyota Camry?

20        A.    It's possible.

21        Q.    Well, it's possible that -- I'm asking, Did

22  she have the capacity, not whether or not she did.

23        A.    To me, "capacity" means that there was no

24  traffic, so I can't answer that.

25        Q.    Okay.  So, well, assuming there was no



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2269

1  traffic, right -- which maybe, maybe not.  If there was

2  no traffic, she would have seen the Toyota Camry 1,400 --

3  1,742 feet down the road?

4       A.    I agree.  If there's no traffic, it was there

5  to be seen, albeit rather small in your field of view,

6  because 1,700 feet is very far away.  But yes.

7       Q.    Okay, okay.  So do you agree that the Toyota

8  Camry was conspicuous to oncoming drivers?

9       A.    Depending on traffic.

10       Q.    Okay.  So if there was no traffic, was the

11  Toyota Camry conspicuous to oncoming -- or to

12  Caylee Smith?

13       A.    Yes.

14       Q.    Okay.  Why do you say that it was

15  conspicuous?

16       A.    Because it was there to be seen.

17       Q.    Okay.  So is there any factors about the

18  Toyota Camry that made it more conspicuous than any other

19  objects on the road?

20       A.    I don't know if I understand that question.

21       Q.    Okay.  So you said that it was conspicuous

22  because it was there to be seen, right?

23       A.    Right.

24       Q.    So did you study the conspicuity of the

25  Toyota Camry?



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2270

1        A.      Conspicuity is really only a factor for

2   nighttime detection.  That's not really a variable we

3   analyze in the daytime analysis.

4        Q.      Okay.  So how do you analyze in a daytime

5   analysis whether or not an object in the roadway is

6   easily seen by oncoming traffic or hard to see?

7        A.      It depends on the factors of the case.  So

8   visibility is not the critical variable that we're

9   analyzing here.  It is identification of an imminent

10  hazard.  So visibility has no bearing on the analysis of

11  avoidability.  It's when did the hazard become imminent?

12       Q.      Okay.  And your testimony, I believe, earlier

13  was that it's your expert opinion that the Toyota Camry

14  by itself was never an imminent hazard, right?

15       A.      Correct.  It was a potential hazard, is what

16  the literature references it as, which does require some

17  form of input but not an emergency input.

18       Q.      So where in your report did you differentiate

19  between potential hazards and imminent hazards?

20       A.      Well, these aren't necessarily things I was

21  planning on bringing forth, but you've certainly been

22  asking a lot of questions about it, which I have the

23  expertise to answer.  So I've been answering your

24  questions.

25       Q.      Sure, sure.  Would you -- if you had the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2271

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2276 of 2460   PageID 2568

1   opportunity, would you like to amend your report to

2   include those conclusions?

3        A.    I guess it depends on the issues at hand.  If

4   the opposing expert is going to opine differently than

5   that, then yes, I will need to amend my report to rebut

6   his or her opinions.  At this point, I didn't know if

7   this was going to even be an issue or not.

8        Q.    Okay.  So do you agree, based on your view of

9   the evidence, that the Toyota Camry was black?

10       A.    Yes.

11       Q.    Okay.  And the roadway was, I'm going to say,

12  light-colored?

13       A.    Sure.

14       Q.    Is that fair?

15       A.    Sure.

16       Q.    Okay.  The median was light-colored?

17       A.    Yeah.

18       Q.    Okay.  The median barrier was light-colored?

19       A.    Right.

20       Q.    And then on the right-hand side of the road

21  was a grassy ditch, right?

22       A.    Right.

23       Q.    Not dark-colored, right?

24       A.    Right.

25       Q.    Okay.  So can we agree that, on approach from



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

Appx_2272

1  Caylee Smith's perspective, the trunk of the Toyota Camry

2  was open?

3      A.   It was.

4      Q.   Okay.  And now, I think we all agree that it

5  was, but, like, technically, we don't know, right?

6      A.   I believe there was body fluid inside the

7  trunk lid --

8      Q.   Okay.

9      A.   -- which would indicate it was open at the

10 time.

11     Q.   Fair enough, fair enough.

12          Do you know if the emergency flashers were

13 on?

14     A.   I know they were on in the body camera

15 videos, so I think it's safe to say that they were on at

16 the time of the impact.

17     Q.   Okay.  Do you know how many pedestrians were

18 around the Toyota Camry as Caylee Smith approached?

19     A.   It's either two to five depending on who you

20 believe.

21     Q.   Okay.  So if it was just two, it was

22 Nehemias Santos and Evelyn Moreno, right?

23     A.   Yes.

24     Q.   And if you believe Evelyn Moreno and

25 Erick Santos, it was all five of the passengers in the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  car?

2      A.    Correct.

3      Q.    Okay.  So do you agree that a reasonably

4  prudent driver would have vacated the leftmost lane or

5  slowed down after they saw the Toyota Camry?

6      A.    Not based on the literature.  In part, I do

7  want to say a reasonable driver does slow down.  We know

8  that Caylee slowed down.  She slowed down and moved over

9  to her right.  That is what the literature shows the

10  average driver does.

11      Q.    So does the literature tell us when someone

12  would slow down and move to the right if they saw a

13  hazard in their lane?

14      A.    They indicate 1 to 3 miles per hour of speed

15  loss from a reduction of accelerator pedal application,

16  which, on a timeline, is actually after Caylee started

17  reducing her speed.  So Caylee started reducing her speed

18  first, before, or quicker than the average.

19      Q.    So does the -- does the literature indicate

20  how far away from the hazard or how soon after the hazard

21  gets identified that someone would reduce their speed and

22  move to the right?

23      A.    I'd have to double-check that in the form of

24  distance.  But again, we can figure that out from speed

25  loss and the magnitude of the speed loss.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MYDEPOS

1    Q.    Okay.  So do you have an opinion of, as far

2  as the literature goes, when most drivers, how far away

3  they are from a hazard when they, you know, get over to

4  the right and start slowing down?

5    A.    Well, it's going to depend on their original

6  speed.  So I don't think there's a standard I can answer

7  that with, because it's going to be based on the original

8  speed of travel.  What I can say on a time and speed

9  standpoint, 1 to 3 miles an hour has been the speed

10 reduction; Caylee reduced her speed by at least four.  So

11 she started reducing her speed sooner, and she reduced

12 her speed more than the average driver.

13   Q.    So you say, "She started reducing her speed

14 sooner."  What do you mean by that?

15   A.    Well, she indicated that she just let go of

16 the gas, and that is the typical response that we see in

17 the literature is releasing the gas.  So the deceleration

18 rate's going to be very similar, which is releasing the

19 gas pedal with no brake application.

20   Q.    Can you tell from the infotainment module

21 whether she took her foot off the gas before she hit

22 Nehemias or as she's in the process of hitting Nehemias?

23   A.    100 percent before.

24   Q.    Okay.  How far before?

25   A.    Let me get that distance for you.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY DEPOS

Appx_2273

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2280 of 2460   PageID 2572

1  Approximately 250 feet away.

2      Q.    Okay.  So what -- what data are you looking

3  at to conclude that she was 250 feet away from hitting

4  Nehemias Santos when she began to slow down?

5      A.    This is looking at the track point data,

6  which gives us data every one second.  And in my

7  engineering calculations, I calculate the distance

8  traveled between those points based on the speed values

9  reported.

10     Q.    So looking at the track log, at what

11  second -- now, you say this in your report, so this isn't

12  a trick question.  But at what second do you believe the

13  collision occurred?

14     A.    The time stamp that I have here is sometime

15  between 2:48:51 and 2:48:52.

16     Q.    Okay.  So when you're calculating the

17  reduction in speed, are you looking at her speed -- well,

18  tell me at what point you see her speed begin to decrease

19  on the track log seconds.

20     A.    250 feet away.

21     Q.    Okay.  What second is that in the track log?

22     A.    2:48:50.

23     Q.    Okay.  So at -- you're saying at 2:48:50 is

24  when she begins to start slowing down?

25     A.    Yes.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2281 of 2460   PageID 2573

 1       Q.    What is her speed at 2:48:50?

 2       A.    90 miles per hour.

 3       Q.    Okay.  And that's kind of a rounding, right?

 4  Or is it precisely 90 miles an hour?

 5       A.    It's pretty spot-on to 90, yes.

 6       Q.    Okay.  All right, yeah, it's 89.97.

 7             So again, the next second, what is her speed,

 8  2:48:51?

 9       A.    87.

10       Q.    Okay, 87.

11             And so, then, what is her speed at the next

12  second, 2:48:52?

13       A.    82.

14       Q.    Well --

15       A.    83.

16       Q.    83, okay.

17             So between 2:51 and 2:52 -- strike that.

18             Between 2:48:51 and 2:48:52, do we know which

19  of those seconds the collision occurred at?  Or I know

20  your report says it's one of those two or between.

21       A.    Somewhere between.

22       Q.    Okay.  So you say that her speed began to

23  reduce two seconds before she collided with

24  Nehemias Santos, right?

25       A.    One and a half, yeah, about one and a half.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2277

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2282 of 2460   PageID 2574

1  It could be up to two.

2      Q.    Okay.  So one and a half to two seconds

3  before she collides is when she begins reducing her

4  speed?

5      A.    Right.

6      Q.    Okay.  Can you tell from the evidence that

7  you've got if the speed reduction is the result of taking

8  a foot off the gas or tapping the brake?

9      A.    Well, the subtleties between when you say

10 "tapping," it's consistent with a speed loss of letting

11 go of the gas.  Now, if she touched the brake, could be

12 consistent with that too.

13     Q.    Okay.

14     A.    But it's not consistent with hard brake

15 application.

16     Q.    Okay.  And you've reviewed the police report,

17 right?

18     A.    Yes.

19     Q.    And you agree that the police report says

20 there are no brake marks created by the Ford Explorer?

21     A.    I think that's what it says, yes.

22     Q.    Okay.  Did you see any brake marks created by

23 the Ford Explorer?

24     A.    No.

25     Q.    Okay.  So to the best of your knowledge,



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2278

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2283 of 2460   PageID 2575

1  right, there's no affirmative evidence that Caylee

2  applied the brakes in the two to three seconds before she

3  hit Nehemias Santos, right?

4       A.    Well, you don't necessarily have to have tire

5  marks to apply the brakes, especially with modern ABS.

6  We actually rarely see tire marks.

7       Q.    Well, I'm not asking if it's possible she

8  applied the brakes.  I'm asking, Do you see any evidence

9  that affirmatively shows that she applied the brakes in

10 the two to three seconds before collision?

11      A.    Not one way or the other.  She certainly

12 could have; she may not have.

13      Q.    You just can't tell?

14      A.    No.  But it is consistent with a speed loss

15 rather greater than the average speed loss of the average

16 driver faced with this situation.

17      Q.    Okay.  So you think that she maybe did hit

18 her brakes?

19      A.    No, I never said that.  I said she reduced

20 her speed greater than the average driver does in this

21 particular situation.

22      Q.    So just to put a pin on it, you're saying

23 that the speed change from 90 miles an hour to somewhere

24 between 87 and 86 miles an hour, two seconds to one and a

25 half seconds before hitting a pedestrian, that's normal



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

Appx_2279

1  for a reasonable driver?

2          MR. DUBOFF:  Objection to the form.

3      A.    The speed loss is what the typical driver

4  does to a roadside vehicle and pedestrian.

5      Q.    Okay.  When you say "a roadside pedestrian

6  and vehicle," are you talking about a vehicle stopped in

7  the lane?

8      A.    I am.

9      Q.    Okay.  Have you reviewed literature that

10 discusses driver reactions to vehicles stopped within the

11 lane?

12     A.    It's typically either entirely within the

13 lane or entirely out of the lane.  I'm not aware of any

14 studies that show 2 feet into the lane.  So the best I

15 can do is look at this as a vehicle parked on the

16 shoulder and look at what drivers typically respond to to

17 a vehicle parked on the shoulder.  Since this was mostly

18 on the shoulder, it's the closest we have to compare to.

19     Q.    So you didn't compare this situation to the

20 literature examining motor vehicle drivers reacting to a

21 vehicle parked entirely in the lane?

22     A.    No.  This is not anywhere near that type of

23 scenario.  That is a totally different visual stimulus,

24 totally different set of equations that factor in the

25 capability of drivers to appreciate relative closing



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2280

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2285 of 2460  PageID 2577

1  speed.  The presence of the vehicle mostly on the

2  shoulder gives the cue that this vehicle is slow or

3  stopped, particularly with the pedestrians standing

4  outside the vehicle and the trunk lid open.  If the

5  vehicle was entirely in the lane, that would be a whole

6  different ball game on a driver's ability to appreciate

7  that it's traveling slow versus at normal highway speeds.

8      Q.    Okay.  So how do drivers react when they see

9  a vehicle stopped entirely in the lane?

10     A.    So just to be clear, that's not what we have.

11     Q.    That's fine, that's fine.

12     A.    But based on that, drivers' abilities to

13  avoid a vehicle on a highway -- a straight, flat level

14  segment of highway -- stopped in their travel lane is

15  virtually impossible to avoid.  The rate of closure,

16  anything greater than 45, 50 miles per hour of a closing

17  speed becomes rather difficult, if not impossible, to

18  avoid.

19          Because by the time the human eye can

20  appreciate the relative closing speed between them and

21  the vehicle ahead of them, it's too late to fix that

22  relative speed in the form of braking or steering.  So a

23  closing speed of 90 or even 70 or 75 would be unavoidable

24  entirely if the Toyota was stopped in the travel lane.

25     Q.    Okay.  So I mean, facts matter, right?  I



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2281

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2286 of 2460   PageID 2578

1  mean, there could be things going on around the car; say

2  it was a police car or an emergency vehicle with its

3  lights on, right?

4        A.    Well, now you're talking a completely

5  different visual stimulus, yes.

6        Q.    Sure, sure.  So it depends on what's

7  happening at the scene to determine the visual stimulus

8  that oncoming drivers are reacting to?

9        A.    Right, and that's why I didn't model this as

10  a stock vehicle in the travel lane, because that's not

11  the visual stimulus we have here.

12        Q.    Okay.  So why is it just one option?  Like,

13  why model it as a car parked entirely on the shoulder or

14  a car parked entirely in the lane?  Like, why not model

15  it as a car parked 2 feet into the lane and however many

16  feet on the shoulder?

17        A.    As far as I'm aware of, there are no human

18  factor studies that divide the two.  It's studies that

19  show what drivers do when a vehicle is parked on the

20  shoulder and studies that show what drivers do when a

21  vehicle is stopped in an active travel lane.  In this

22  particular case, there was enough context to visually

23  indicate that this vehicle was stopped on the shoulder.

24  There was no question about that.

25        Q.    Okay.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2282

1       A.    So the modeling of this visual stimulus as a

2  vehicle parked on the shoulder is entirely consistent

3  with that literature.  There is no question of "valid."

4       Q.    So in your view, the literature leads you to

5  believe that an oncoming driver would have seen the

6  Toyota and understood that it was stopped?

7       A.    Yes.

8       Q.    Okay.  There wouldn't have been this

9  phenomenon of, "Is it stopped or isn't it?" in closing

10  too fast?

11       A.    No.

12       Q.    Okay.  So can you agree that if a driver saw

13  a vehicle partially in the lane of travel on an

14  interstate highway that a reasonable driver would pay

15  attention to that vehicle and evaluate its risk?

16       A.    I can't talk about what a reasonable driver

17  would do.  Again, all I can tell you is what the studies

18  show the average driver does and let the jury decide

19  what's reasonable.  And what I can tell you is the

20  studies show that the average driver simply shifts over

21  in their lane.

22       Q.    Okay.  And they do that why, according to the

23  studies?

24       A.    I don't know if the studies particularly say

25  why.  But obviously, I think the assumption is to provide



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1 additional space.

2        Q.    Okay.  So did you -- I think we talked about

3 this earlier.  Did you calculate whether Caylee had

4 sufficient time to brake to avoid the Toyota Camry?

5        A.    So that is a calculation we can't do, because

6 we don't know when the stimulus started as far as the

7 pedestrian bending over into her travel lane.  She had

8 already responded to the car.

9        Q.    So let me just ask a very specific question:

10 You believe she did have time to brake to avoid hitting

11 the Toyota, right?

12             MR. DUBOFF:  Objection to the form.

13        A.    I don't agree that braking would be a good

14 avoidance option, because now you're creating hazards for

15 traffic behind you.  The Solomon curves indicate that if

16 you go slow on a highway, your crash risk exponentially

17 increases.  So you certainly want to reserve braking for

18 absolutely necessary circumstances.

19        Q.    Fair enough.

20        A.    So that is not a good avoidance option.

21        Q.    Fair enough.

22             I'm asking, Was it an avoidance option that

23 she could have utilized, given the amount of time that

24 she had approaching the Toyota Camry?

25             MR. DUBOFF:  Objection to the form.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONE**REPORTING.com        Toll Free 855-MYDEPOS

Appx_2284

1        A.     It is not an appropriate response.  It would

2   have likely resulted in possibly some other conflicts.

3   And the average driver would not apply the brakes to

4   something that is not an imminent hazard.  Again, we

5   don't lock up our brakes and then say, "Oops, I guess I

6   didn't need to lock up my brakes."  We reserve it for

7   absolutely necessary hazards.  Locking up the brakes for

8   a car 2 feet into your travel lane is not a viable

9   option.

10            MR. WHITE:  So I'm going to object to the

11        nonresponsive form of the answer.

12        Q.     My question is whether or not she had time to

13   apply the brakes as she approached the Toyota Camry.

14            MR. DUBOFF:  Objection to the form.

15        A.     So the Toyota Camry was never an imminent

16   hazard; it was a potential hazard.  So that calculation

17   cannot be done, because perception response times and

18   braking distances apply to imminent hazards.  So you're

19   asking me to completely disregard the instructions of

20   human factors, which is only applied in the literature to

21   imminent hazards.  I would be violating the first rule of

22   human factors analyses in applying an imminent emergency

23   response to a potential hazard.  That is not appropriate.

24        Q.     So you won't tell me whether or not she had

25   time to apply the brakes as she approached the Toyota


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2285

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2290 of 2460   PageID 2582

 1  Camry?

 2           MR. DUBOFF:  Objection to the form.

 3      A.    What I'm telling you is nothing indicated to

 4  her that she needed to slam on the brakes.

 5      Q.    I didn't ask about slamming on the brakes.  I

 6  asked, Are you refusing to tell me whether or not she

 7  could have applied her brakes as she approached the

 8  Toyota Camry?

 9      A.    Well, everybody is capable of applying

10  brakes.  But the question is, Was there any visual

11  stimulus that would require a driver to do so?  So the

12  question you're asking is irrelevant of the facts of the

13  case.  Can you apply brakes?  Yeah, you can apply brakes

14  anytime you want.

15      Q.    Could she have -- did she have time to apply

16  her brakes to reduce her speed as she approached the

17  Toyota Camry?

18      A.    Again, the time has to be relative to the

19  imminent hazard.  You're asking me to measure something

20  that doesn't exist.

21      Q.    Okay.  I'm asking you, After she saw the

22  Toyota Camry, did she have time to apply the brakes to

23  reduce her speed?

24      A.    I don't know when she saw the Camry.

25      Q.    Okay.  You saw that she -- you've read her



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Appx_2286

```
 1  deposition, right?

 2       A.    Yes.

 3       Q.    What do you understand her testimony is about

 4  when she saw the Toyota Camry?

 5       A.    I don't know.

 6       Q.    So you don't remember?

 7       A.    She can't give a distance, and that's what I

 8  would need is a distance.

 9       Q.    So tell me if what I'm about to tell you is

10  inconsistent with what you understand.  You agree that

11  she testified that she sent a text message to Gracie

12  saying the tattoo shop didn't do walk-ins?

13       A.    Yes.

14       Q.    And your opinion is she sent that text

15  message eight to nine seconds before the collision

16  occurred?

17       A.    Yes.

18       Q.    And you agree that her testimony is that she

19  then looked up, saw the Toyota Camry in the road?

20       A.    Yes.

21       Q.    Okay.  And as a result, her testimony is that

22  she adjusted rightward while remaining in the leftmost

23  lane?

24       A.    Right.  She responded to the Toyota.

25       Q.    Okay.  So my question is, when -- sorry.  You
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2287

1  understand that her testimony is, then, that she looked

2  at her GPS as she was approaching the Camry?

3       A.    Yes.  She understood that her corrective

4  action was complete; there was no more risk or no more --

5  I don't want to say "risk."  There was no more required

6  response, because she implemented her response to the

7  potential hazard.  She looked at her GPS, then another

8  hazard unfolded in front of her.

9       Q.    So in the eight to nine seconds after she

10 sent the text message to Gracie, was that enough time for

11 Caylee to apply her brakes?

12            MR. DUBOFF:  Objection to the form.

13      A.    Again, you can certainly apply your brakes

14 anytime you want.  The question is, What is going to tell

15 you to do so?  And the average driver would not be

16 provoked to apply the brakes at that point, again,

17 because the literature says drivers don't respond until

18 the threat is imminent and certain.

19            And applying the brakes at that point would

20 increase the risk of additional conflicts, because now

21 you're creating a speed differential on a highway, the

22 exact same thing the Toyota created, was this drastic

23 speed difference between travel speed, traffic, and their

24 parked position on the shoulder.

25      Q.    Do you know the relative speed of Caylee and



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2288

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2293 of 2460  PageID 2585

 1 | any other vehicles that were traveling on the roadway

 2 | that day, other than the Toyota Camry?

 3 |      A.    The testimony said just typical speed of

 4 | travel.

 5 |      Q.    Okay.  What was the speed limit?

 6 |      A.    75.

 7 |      Q.    Okay.  And Caylee was going how fast on

 8 | approach?

 9 |      A.    90.

10 |      Q.    Okay.  So do you know what an advanced

11 | warning area is?

12 |      A.    You need to be more specific.  That's a

13 | pretty broad term.

14 |      Q.    Do you know how the Federal Department of

15 | Transportation defines an advanced warning area?

16 |      A.    Are we talking maintenance of traffic

17 | signage?

18 |      Q.    Yes.

19 |      A.    As far as construction zones?

20 |      Q.    Construction zones or any lane closure.

21 |      A.    Yes.

22 |      Q.    Okay.  What is an advanced warning area?

23 |      A.    It's signage that indicates that there is

24 | some -- something ahead that's going to either require

25 | additional attention or your response in the form of a



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2289

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2294 of 2460   PageID 2586

1  lane change or speed reduction if there's a speed

2  reduction sign.

3      Q.    So I know we talked earlier about how traffic

4  maintenance kind of starts going out of your area of

5  expertise, correct?

6      A.    Correct.

7      Q.    But do you know what the Department of

8  Transportation recommends as the minimum distance at

9  which a driver should be warned of an upcoming hazard on

10  an interstate highway?

11      A.    I know I have read it, but that involves

12  significant safety factors.  And as far as work zones go,

13  that has no relevancy to this case, so I haven't made

14  that comparison because it has nothing to do with this

15  case.

16      Q.    Well, undoubtedly, there's a bunch of detail,

17  you know, on additional warnings.  But do you know the

18  minimum warning that the Department of Transportation

19  says must be given to a driver if there's a hazard on the

20  road ahead?

21      A.    Define "hazard."

22      Q.    Some sort of obstruction like a lane closure

23  or repairs being made.

24      A.    Yeah, that is a whole different ball game.  I

25  don't know the definite number.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2290

1    Q.    Okay.  If it's -- if I told you it's at least

2  1,000 feet, does that sound wrong to you?

3    A.    No.  I know it's in the order of fractions of

4  a mile, maybe, if not more, up to a mile.  But again,

5  we're talking apples and oranges here.  This has no

6  bearing on this particular case.

7    Q.    So do you think 1,000 feet is sufficient for

8  a driver to become aware of an upcoming lane closure?

9    A.    If you provide enough clear information, yes.

10  The signs are designed to be very clear in their

11  instruction of what is occurring or what to do, typically

12  in the form of arrow boards telling you to get over.

13    Q.    So 1,000 feet of warning can be sufficient to

14  warn a driver of an upcoming hazard, right?

15    A.    If you give them enough information.  Looking

16  at a Toyota obstructing 2 feet of a travel lane

17  1,000 feet away is going to be so small in your field of

18  view that you're not going to appreciate how much of that

19  travel lane, if at all, they're obstructing.

20          Arrow boards are designed where you pass

21  arrow boards thousands of feet before the lane closure,

22  so you're physically passing the information.  The

23  information is bright, it is big, and it is clear.  It is

24  giving you an arrow telling you which direction to go and

25  which direction to change.  Signage tells you things.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2291

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2296 of 2460  PageID 2588

 1           The small field of view of a vehicle parked

 2  on a shoulder with maybe a little bit into the travel

 3  lane is not clear at 1,000 feet away.

 4       Q.   Okay.  So now, are pedestrians clear at

 5  1,000 feet away on an interstate highway?

 6       A.   No.

 7       Q.   You can't see pedestrians at 1,000 feet away?

 8       A.   They're very small in the field of view.

 9       Q.   Are emergency lights visible at 1,000 feet

10  away on an interstate highway?

11       A.   Yes, lights are designed to be visible from

12  great distances away.  They're big, and they typically

13  convey a message, an understandable message.

14       Q.   Well, what is the understandable message

15  conveyed by an emergency light on a normal passenger car?

16       A.   Oh, you're talking about the four-way

17  hazards?

18       Q.   Well, yeah, I'm not an expert.  I mean the

19  lights that come on when you press the red triangle on

20  your dashboard.

21       A.   It can mean many different things.  A lot of

22  drivers accidentally leave those hazard lights on while

23  they drive.  But I think in general, the general

24  understanding is that the vehicle is stopped or disabled.

25       Q.   Okay.  Well, would you agree or disagree with



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2292

 1  me when I say that they're designed to convey that

 2  there's an emergency?

 3       A.    No.

 4       Q.    Okay.  You agree that emergency lights

 5  convey, "Hey, there's an emergency"?

 6       A.    What kind of emergency lights?

 7       Q.    A passenger -- a car --

 8       A.    No, I don't think --

 9       Q.    -- emergency lights.

10       A.    -- they respond -- I don't think they're

11  saying "emergency."  They're hazard lights; they're

12  indicating a potential hazard.

13       Q.    Okay.  Now, like you said, you've reviewed

14  the infotainment module and cell phone records, correct?

15       A.    Yes, mm-mm.

16       Q.    So -- and you concluded that Caylee sent her

17  last text message to Gracie eight to nine seconds prior

18  to the collision, right, on Page 13 of your report?

19       A.    Yes.

20       Q.    So you also concluded that at that time she

21  sent that text message, how far away was she from impact?

22       A.    Over 1,000 feet.

23       Q.    You say specifically here, and can you just

24  say it for the record?  It's on Page 13 of your report.

25       A.    1,022 to 1,146 feet away.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2293

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2298 of 2460   PageID 2590

1      Q.    And that depends on whether or not she sent

2  the text message at eight seconds or nine seconds

3  before --

4      A.    Exactly.

5      Q.    -- right?

6            And we just don't know, right?

7      A.    Somewhere in that range.

8      Q.    Somewhere in that range, right.

9            So -- and I take it you're getting -- you did

10 what I did, which is you lined up the time stamps on her

11 text messages with the time stamps on the track log,

12 right?

13     A.    Correct.

14     Q.    And the hours are different, right?

15     A.    There is a difference on when it's reporting

16 Central Daylight Time versus Central Standard Time, so

17 there's a factor of daylight savings time.

18     Q.    Okay.  But you concluded that the hour

19 differential was -- is irrelevant; that, in fact, those

20 time stamps should line up?

21     A.    Well, they do.  It's clearly indicating

22 Central Daylight versus Central Standard.  Those are

23 always an hour apart.

24     Q.    Okay.

25     A.    So it's just they report it in different



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2294

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2299 of 2460   PageID 2591

1  units, essentially.

2      Q.    Okay.  So you don't have a problem with

3  lining up the track logs from the infotainment center

4  with the time stamps from the cell phone records?

5      A.    Correct.

6      Q.    Okay.  So if she had 1,742 feet of

7  unobstructed sight line, how many of those feet did she

8  go before she sent the text message?

9      A.    It would be 1,700 minus the 1,022 to 1,146.

10     Q.    So rather than us whip out our calculators,

11 say it's approximately 700 feet?

12     A.    Yeah, sure.

13     Q.    Okay.  So just to get a clear record, the

14 difference between when she had an uninhibited sight line

15 to the Toyota Camry and when she sent the text message,

16 she had driven about 700 feet?

17     A.    True.  But again, the relative size of the

18 Camry at 700 -- 1,700 feet away is rather small.

19     Q.    Okay.  But you agree with that math

20 calculation that she used up about 700 feet of her

21 uninhibited sight line before she sent the text message?

22     A.    In the most simplest terms, yes, if you want

23 to take out the factor of visual size of the hazard.

24 It's much more complex than just a simple subtraction

25 calculation like we just did.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2295

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2300 of 2460   PageID 2592

 1      Q.    Are you aware that Caylee Smith says,

 2  sometimes, that Nehemias Santos suddenly appeared in

 3  front of her vehicle?

 4      A.    I know she used a couple different ways of

 5  expressing that he suddenly breached her travel.

 6      Q.    Okay.  Do you agree that, to a distracted

 7  driver, an obstacle that has been in the roadway for a --

 8  for a long period of time may seem to have suddenly

 9  appeared once the driver notices the obstacle?

10      A.    Not in this case.  So Mr. Nehemias was within

11  the envelope of the Toyota for the time leading up to

12  impact.  Caylee had responded to that already.  He then

13  became a secondary hazard by breaching her travel path

14  and sticking his head outside of the envelope of the

15  Toyota.

16      Q.    Okay.

17      A.    So the timing of that is well within the

18  eight seconds, so your question has no application to

19  this case.

20      Q.    So I just want an answer to my question.  My

21  question is, Do you agree that, to a distracted driver,

22  an obstacle that's been in the roadway may seem to have

23  suddenly appeared when the driver finally notices the

24  obstacle?

25      A.    I can only answer to the facts of this case,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2296

1 and that question does not apply to the facts of this

2 case, so I can't answer that generally.  I'm here to

3 apply the science to this particular case, and that

4 doesn't apply.

5      Q.    So you're not an expert on distracted

6 driving?

7      A.    What I'm saying is the way you worded that

8 question doesn't apply to the facts of this case, so

9 answering that question would be providing something

10 outside of the facts of this case.

11     Q.    Okay.  So you could answer that question, you

12 just don't think that's what happened in this case?

13     A.    It's not relevant to the facts of this case.

14     Q.    Okay.  So -- and we'll get into why you think

15 you know what happened.

16          But I'm asking, Do you think that a

17 distracted driver could think that an obstacle suddenly

18 appeared, even though the obstacle had been in their lane

19 of traffic?

20          MR. DUBOFF:  Objection to the form; calls for

21      speculation.

22     A.    The best answer I can give you is, It

23 depends.  I can't give you a blanket answer like that

24 because it doesn't apply to every scenario.  I have to --

25 I have to analyze each individual scenario individually,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2297

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2302 of 2460   PageID 2594

1  and that doesn't apply to every scenario.  So my answer

2  is, It depends.  It's not a yes-or-no answer.

3     Q.   Okay.  So it's possible that someone that's

4  distracted could think than an obstacle suddenly

5  appeared, even though it hadn't?

6     A.   It depends.

7     Q.   So is that a yes, it's possible?

8     A.   Sure, it's possible, based on the facts of

9  the case, sure.

10     Q.   Okay.  Is there any electronic data that

11  you've reviewed other than Caylee's testimony that proves

12  what she was doing in the driver's seat of the Ford

13  Explorer after she sent the text message to Gracie?

14     A.   I think I understand your question, which is,

15  Is there any physical or digital evidence that tells us

16  what she did after?  Well, we know she swerved, based on

17  the physical evidence, so we know she responded.  So

18  yeah, my answer is yes, the physical evidence indicates

19  that she responded in that time.

20     Q.   Okay.  So other than her speed and her

21  swerving, right, do we know what else she was doing in

22  the cab of the Ford Explorer after she sent the text

23  message?

24     A.   Other than responding to the hazard.

25     Q.   Okay.  So do you have -- do you see any



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2298

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2303 of 2460   PageID 2595

1 physical evidence or electronic data that indicates that

2 she checked her GPS after she sent the text message?

3       A.    No.  I don't think there's electronic data to

4 tell us where her eyes were looking.

5       Q.    Okay.  Is there any electronic data or

6 physical evidence you've reviewed that tells us whether

7 or not she was looking at her phone or dictating or

8 writing a text message after she sent a text message to

9 Gracie?

10       A.    No.  What I can say is she did respond in

11 those eight seconds.  So at some point, she did identify

12 the hazard.

13       Q.    Okay.  All right.  I just -- you know, I just

14 want to make sure I got the universe of your opinions

15 right, that you're not going to go to trial and say,

16 "Hey, I know she was actually, you know, looking at her

17 GPS as she approached the -- or after she sent the text

18 message."  You don't know that, right?

19       A.    She says she did.

20       Q.    She says she did.

21             But other than that, is there any other

22 corroborating evidence that you've reviewed?

23       A.    No.

24       Q.    Okay.  So is there -- all right.  Let's go to

25 Page 4.  So on Page 4, your second opinion is that,



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2299

1  quote, While a flat tire reduces the handling

2  characteristics of a vehicle, it does not eliminate the

3  ability to steer the vehicle off the roadway, as

4  evidenced by Ms. Evelyn Moreno's ability to come to a

5  controlled final rest on the left side of the roadway.

6  Steering to the right was equally possible."

7          I got that right?

8      A.   Yes, sir.

9      Q.   Very good.

10          So did you see the groove created in the

11  asphalt, presumably by the rim of the Toyota touching the

12  asphalt?

13      A.   Yeah.  I really saw it more as a flat tire

14  mark.  When a tire goes flat, the center of the tire

15  folds in, creating two outboard contact points of the

16  rubber, and which rubs and leaves that black outboard

17  marking on each side of the tire.

18          That tire mark, at least from where the

19  officers photographed it, started about centered, just to

20  the left of center of the left travel lane, which means

21  that at that point, which may or may not be the beginning

22  of the flat tire, the Toyota was hugging the right side

23  of the lane.

24      Q.   Okay.  So but you don't know if that's

25  because previously she'd been in the middle lane and she



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2300

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2305 of 2460   PageID 2597

1  was going into the left lane --

2        A.    Exactly.

3        Q.    -- or -- so you don't know, correct?

4        A.    I don't know.  But if she was in the left

5  lane, she was hugging the right side of the lane when the

6  flat tire happened.  Or if you believe the other

7  testimony that she indeed was in the middle lane and that

8  is just simply her changing lanes to the shoulder.

9        Q.    Okay.  So -- but it's just hard to tell from

10 that groove or that tire mark, right?

11       A.    I can't tell definitively.  But what I can

12 tell the jury is that at the start of that tire mark that

13 was photographed, she is on the right side of her lane.

14 So I'll let the jury decide what they want to take of

15 that, whether that is just simply her driving on the

16 right side of the left lane when the flat happens, or if

17 she actually did indeed make a lane change from the

18 center lane to the left lane to the left median.

19       Q.    Okay.  Do you have any idea whether or not

20 the tire mark was created the moment that the flat

21 occurred, or is it possible that the flat began earlier

22 and then progressed to a point where it began leaving the

23 mark?

24       A.    I would say it's probably more likely that it

25 progressed -- or it started earlier than what was



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2301

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2306 of 2460   PageID 2598

1  photographed.

2      Q.     Why do you say that?

3      A.     Well, the cops didn't necessarily show the

4  start of the tire mark very well.  I still think there's

5  a little bit more tire mark to be seen.  So it's

6  sometimes very hard to identify.  And I'm not blaming

7  them; it's sometimes hard to identify the beginning of a

8  tire mark.  And so I don't know if it would be

9  instantaneous.  I think it would likely take some time to

10  generate the heat from the rubber rubbing incorrectly

11  against the asphalt to start leaving that mark.

12      Q.     Okay.  So do you -- so what you've described,

13  that the rubber deforms around the rim as -- you know, as

14  a flat tire progresses; is that right?

15      A.     Yeah.  The rubber is fixed at each outboard

16  side by the rim, by the rim flange.  So when you get rid

17  of the pressure, there's nothing supporting the center of

18  the tire, so that's what folds first.  And then the

19  outside rim flanges keep the rubber rigid more.

20      Q.     What happens as that pressure deflates and

21  the rim begins touching the rubber?

22      A.     The rim will either roll on the rubber and

23  start eating into the rubber, or the rubber can fold out

24  underneath one of the rim flanges, and the rim can start

25  digging into the asphalt.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2302

1     Q.   Could you tell from what you reviewed here

2  whether or not the rim ate into the rubber but the

3  rubber -- but didn't puncture it, or if it did puncture

4  it and began touching the asphalt?

5     A.   I don't know if I would agree that it

6  punctured it.  Sometimes it rolls or folds out underneath

7  the rim flange.  I'd have to go back and look at the

8  pictures to answer that question.

9     Q.   Okay, okay.  So what -- what is your

10  expertise of how a vehicle handles when a flat tire

11  occurs?

12     A.   Depending on the type of failure will define

13  the magnitude of the dynamics.  Generally, it's going to

14  create resistance, and it's going to pull, so the left

15  side tire will pull to the left a little bit.  The

16  magnitude of that pull will depend on the type of

17  failure.

18        A tread separation will give the greatest

19  resistance.  That is when the tread of the tire separates

20  from the carcass of the tire and it's flapping in the

21  wheel well, creating the most resistance.  A flat tire is

22  just simply creating resistance because of some increased

23  friction.  So that would be least resistive type of

24  failure.

25     Q.   Do you know what kind of failure happened



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Appx_2303

1  here?

2       A.     This appeared to be a blowout.  It looked

3  like the side wall ruptured.

4              So I guess you can classify a tire failure

5  into three failures.  One would be a very slow air leak.

6  We all get that when we get a nail in our tire and we

7  maybe hear a hissing noise, but we still have some time

8  to get to a shop.

9              Then there's a sudden failure, which is

10 either the side wall or the tread ruptures, either from

11 inconsistent wear or just failure within the structural

12 integrity of the tire.  That is a sudden loss of air, but

13 you still have the tire underneath.

14             And then you get the tread separation where

15 the tread separates from the carcass, the air escapes

16 from the separation, and then the carcass is flapping in

17 the wheel well.

18      Q.     Okay.  So you would -- would you agree that

19 the Toyota, after the blowout here, would have been

20 pulling to the left?

21      A.     Slightly.

22      Q.     Okay.  So you can't tell from the groove or

23 the tire mark where the blowout happened though, can you?

24      A.     No.  What I can say is what was documented.

25 She was on the right half of the left lane.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2304

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2309 of 2460   PageID 2601

1       Q.    Okay.  At some point?

2       A.    At some point during or after the tire

3  failure.

4       Q.    Okay.

5       A.    Which again, if we extrapolate that -- I'll

6  let the jury do that extrapolation.

7            Is she simply riding the right side of the

8  left lane the entire time, or did she indeed come from

9  the center lane.

10      Q.    Or it's possible she was centered in the left

11 lane, tries to go to the right, and then decides to pull

12 over to the left?

13      A.    I suppose that's a possibility.

14      Q.    Okay.  Would you agree that if the Toyota had

15 been in the leftmost lane after -- when the blowout

16 occurred, Evelyn would have had to cross two lanes of

17 traffic to get to the right shoulder?

18      A.    Yes.

19      Q.    Okay.  So your opinion here is that steering

20 to the right was equally possible.  All right.

21            What engineering methods did you use to reach

22 that conclusion?

23      A.    So that is a vehicle dynamics opinion.  It's

24 not alluding to traffic.  It is simply vehicle dynamic

25 driver input handling.  With a slight pull to your left,



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2305

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2310 of 2460   PageID 2602

1  you can still steer to the right.

2      Q.    So when -- you say it was possible, right,

3  for her to get over to the right?

4      A.    Mm-hmm.

5      Q.    Okay.  But you'd say it's equally possible

6  for her to get over to the right as opposed to the left

7  shoulder?

8      A.    Yeah.  Maybe the word "equally" is misleading

9  in regards to the amount of steering input.  I'm

10  certainly not alluding to that amount of steering input;

11  I just mean that both are possibilities that you could

12  do.

13      Q.    So, you know, I'm not going to ask you to

14  amend the report here.  You agree that it would take more

15  steering input to turn the Toyota to the right after the

16  blowout than to turn it to the left?

17      A.    A little bit.

18      Q.    How much is "a little"?

19      A.    I can't quantify that.  Just qualitatively,

20  it would be a little bit more.

21      Q.    Okay.  So did you conduct a mechanical

22  inspection of the Toyota Camry?

23      A.    There was an inspection done of the Toyota,

24  but it had been repaired at that point, so I'm relying on

25  the photographs of the Camry on the side of the road.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2306

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2311 of 2460   PageID 2603

1        Q.     Okay.  Have you conducted any experiments to

2   determine how a vehicle steers after a blowout?

3        A.     No, and that's why I can't quantify this

4   particular vehicle.  The literature does indicate there's

5   going to be a slight pull to the left, but it also

6   indicates that you can countersteer that pull.

7        Q.     Okay.  So let's go to your fourth opinion on

8   Page 4, or fourth and fifth.  Can you read those for the

9   record?

10        A.     "Rather, Ms. Evelyn Moreno parked the Toyota

11   still partially within the left travel lane, occupying

12   approximately 2.1 feet, not accounting for the side

13   mirror of the 11.6-foot-wide inside northbound travel

14   lane, providing approximately 9.5 feet of remaining

15   available space for northbound traffic to pass the

16   Toyota."

17        Q.     Okay.  Go to five as well.

18        A.     Then five is, "Given the Ford's width of

19   approximately 6.6 feet, there was sufficient room for the

20   Ford to pass the Toyota within the remaining available

21   9.5-foot width of that left lane.  It was not necessary

22   for the Ford to change lanes in order to pass the parked

23   Toyota."

24        Q.     So -- and we'll focus on the last sentence

25   where you say, "It was not necessary for the Ford to



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2307

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2312 of 2460   PageID 2604

1  change lanes."  Do you mean it was not physically

2  necessary?

3        A.    Correct.

4        Q.    So in other words, there was enough room for

5  Caylee to remain in the leftmost lane and not directly

6  strike the Toyota?

7        A.    Correct.

8        Q.    Okay.  You're not saying with this sentence

9  that it was prudent or reasonable for her to remain in

10  the leftmost lane?

11        A.    No.  That's for the jury.

12        Q.    Okay.  What is the error rate on the

13  measurements that you provided in these conclusions?  Is

14  this -- if it's just a quarter inch...

15        A.    I -- it's either a quarter of an inch, or

16  maybe even better, an eighth of an inch, but let me

17  double-check.  It's certainly going to be within that

18  quarter of an inch.

19        Q.    Okay.  That's fine.

20              Why didn't you account for the side mirrors?

21        A.    So in this case, side mirrors, number one,

22  are not often accounted for in an accident

23  reconstruction, number one, because they simply fold out

24  of the way.  So the consequences of side mirror contact

25  typically are not -- are negligible, I should say.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2308

1              Number two, in this particular case, the side

2  mirrors actually did not align on an elevation

3  standpoint.  There's actually at least a two-inch gap

4  between the bottom of the Ford Explorer's side mirror and

5  the top of the Toyota -- Toyota Camry's side mirror, so

6  they wouldn't cross paths.  So it was negated, because it

7  didn't affect the measurements in this case.

8       Q.    Okay.  Do you agree that the crash would not

9  have occurred if Caylee Smith had gotten into the middle

10  lane when she first saw the Toyota Camry?

11      A.    Of course.  If the two parties didn't exist

12  at the same time at the same place, yeah, of course, the

13  crash would not occur.

14      Q.    Okay.  Do you agree that there's no evidence

15  that Caylee Smith was unable to get into the middle lane

16  as she approached the Toyota Camry?

17      A.    I can't say one way or the other.

18      Q.    Well, I'm just asking you, Have you reviewed

19  any evidence that says that it was -- she could not have

20  gotten into the middle lane as she approached the Toyota

21  Camry?

22      A.    I haven't reviewed any evidence that tells me

23  one way or the other.

24      Q.    Well, I -- I guess what I'm asking is, Have

25  you seen any evidence that shows you one way, which is



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2309

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2314 of 2460   PageID 2606

1  that she could not have gotten into the middle lane as

2  she approached the Toyota Camry?

3      A.    Correct, no, just like I hadn't seen evidence

4  of the other way.

5      Q.    Okay.  So you did conclude that the Ford

6  Explorer did not strike the Toyota Camry?

7      A.    Correct.

8      Q.    Okay.  Is that partially because there's no

9  paint transfer?

10     A.    Paint transfer is certainly one thing we look

11 for.  Matching damage, damage characteristics is another

12 thing we look for.  There was no matching damage to the

13 two vehicles.

14     Q.    Okay.  You did conclude that there was some

15 forward motion applied to the Toyota Camry though, right?

16     A.    Yes.

17     Q.    And is that because you saw that the jack

18 stand had been moved?

19     A.    The jack stand had been tilted forward.  And

20 my understanding is that was as a result of Nehemias's

21 being thrown into the back of the Toyota and also Evelyn

22 getting pushed into the back of the Toyota.

23     Q.    So and I should have asked a predicate

24 question.  Your understanding is that the jack stand had

25 been placed on the left side of the vehicle by the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2310

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2315 of 2460  PageID 2607

 1  blown-out tire on the driver's side --

 2       A.    Yes.

 3       Q.    -- before the accident?

 4       A.    Correctly.

 5       Q.    And so presumably, it was correctly seated

 6  before the accident?

 7       A.    Presumably.

 8       Q.    Okay.  And then you saw via the pictures that

 9  the jack stand -- basically, can you describe how it had

10  moved that allowed you to conclude that forward motion

11  had been applied to the Toyota Camry?

12       A.    It tilted forward a little bit.

13       Q.    Okay.  As opposed to tilting laterally?

14       A.    Correct, or backward.

15       Q.    Or backward, right.

16       A.    Mm-hmm.

17       Q.    So if lateral force was applied to the

18  Toyota, how would the jack stand have moved?

19       A.    It would have either slid or tilted.

20       Q.    Okay.  Tilted the same way it did in the

21  pictures you reviewed, or tilted to the side?

22       A.    Well, it would tilt to the side that it was

23  pushed at.

24       Q.    Okay.  So the jack stand is sort of a good

25  barometer for the direction of the force applied to the



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2311

1  Toyota, right?

2       A.    Not the total direction of the force, because

3  you're certainly going to have resistive lateral force

4  from the tires themselves.  A little bit of longitudinal

5  resistance from the right front axle, which is locked by

6  the transmission.

7       Q.    Mm-hmm.

8       A.    So you're going to have varying levels of

9  counteractive forces.  So the net movement of the Toyota

10 doesn't tell you the total direction of the contact

11 force.  It just tells you what the summation of the

12 forces resulted in.

13      Q.    Okay.  So you could -- do you have any idea

14 of the resistance of tires versus the resistance of the

15 front axle, which one -- which resistance is greater?

16      A.    The lateral resistance is going to be

17 greater.

18      Q.    The lateral resistance will be greater.

19 Okay.  Got it.

20            So I think in your opinion -- this is on

21 Page 7 -- you said that the Toyota appeared to have

22 lunged forward by a few inches; is that right?

23      A.    Yes.

24      Q.    And you concluded there was no lateral

25 movement of the Toyota, correct?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2312

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2317 of 2460   PageID 2609

1         A.    Correct.

2         Q.    Now, is that the same as concluding that

3    there was no lateral force applied to the Toyota?

4         A.    No.

5         Q.    Okay.  So it's possible there was lateral

6    force applied to the Toyota?

7         A.    I do think there was a slight angle from

8    Nehemias's body probably coming from, I would say, the

9    5:00 or 4:00 direction, if 12:00 is straight ahead.

10        Q.    Okay.  So you think that his body was thrown,

11   if 12:00 is straight ahead, his body is thrown to the

12   4:00 to 5:00?

13        A.    It came from the 4:00 to 5:00 direction.

14        Q.    Okay.  So if the middle of the Toyota has a

15   clock on it, you're talking the 4:00 to 5:00 point on the

16   Toyota is where Nehemias hit it?

17        A.    Exactly.

18        Q.    Okay.  And you stated, I think it's later,

19   that, based on the tire marks created by the flat tire,

20   it didn't appear that there was a lateral movement,

21   right?

22        A.    Correct.

23        Q.    So meaning that the Toyota remained in that

24   groove or tire mark?

25        A.    Right.  Meaning the -- there were no forces



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY DEPOS

Appx_2313

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2318 of 2460   PageID 2610

1  applied to the Toyota that exceeded the lateral

2  resistance of the tires.

3       Q.    Okay.  So let's see.  On Page 8, yeah,

4  that's -- your opinion is the Toyota did not move -- it

5  did move front to back but not laterally?

6       A.    Correct.

7       Q.    Okay.  What damage occurred to the Toyota

8  Camry, to your knowledge?

9       A.    The back right tail lamp housing, the plastic

10  housing was cracked; there was body matter transfer on

11  the back bumper inside of the trunk lid and on the right

12  quarter panel and also on the right rear door.

13       Q.    Okay, okay.  Were you aware that the trunk

14  would not close after the accident?

15       A.    I was.

16       Q.    Do you know how that damage occurred or why

17  it wouldn't close?

18       A.    Likely due to contact forces applied to the

19  trunk lid itself from Nehemias's body being thrown into

20  the Toyota.

21       Q.    Okay.  Into the trunk lid?

22       A.    Yes.

23       Q.    Okay.  So on Page 9, you say that the damage

24  to the Toyota is, quote, Consistent with post-impact

25  contact with the body of Mr. Nehemias Pivaral Santos's



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY DEPOS

Appx_2314

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2319 of 2460   PageID 2611

1  body; is that right?

2      A.    That's right.

3      Q.    All right.  Can you explain how you reached

4  that conclusion?

5      A.    So the contact with the Ford, we're starting

6  there, because that's what occurred first, and that's

7  what projected Mr. Nehemias into the Toyota.  That

8  contact occurred at the left front corner with only his

9  head, which his head at that point was bent over, bent

10 down at an elevation of 3 to 3 1/2 feet from the ground

11 and extending beyond his center of gravity.

12          Any offset collisions outside of the center

13 of gravity is going to cause a rotation and also a

14 diagonal trajectory.  We typically call this a fender

15 bolt, so it will throw you forward and to the side,

16 creating --

17     Q.    Away from the force?

18     A.    Away from the car.

19     Q.    Okay.

20     A.    So almost like a wedging effect is the best I

21 can say, so a diagonal throw.  And that's really what

22 happened here was the offset contact with his head offset

23 from his center of mass and contact with the left front

24 corner of the Ford caused his body to rotate

25 counterclockwise and was thrown diagonally towards the



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MY-DEPOS

Appx_2315

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2320 of 2460   PageID 2612

1  Toyota at that 4:00 or 5:00 direction.

2          That then caused -- the contact between his

3  body and the Toyota occurred.  His body essentially

4  bounced off of the Toyota back into the travel lane,

5  towards the Ford again.  At that point, the Ford had

6  already progressed about 9, 10 feet.  And then we see

7  this -- I guess it would be the third contact with

8  Mr. Nehemias's body against the left quarter panel of the

9  Ford as Mr. Nehemias bounced back into the Ford.

10      Q.    Okay.  So is any of the damage to the Toyota

11  circular in nature?

12      A.    Not that I saw.

13      Q.    Okay.  Would you describe it as any other

14  shape, damage to the Toyota?

15      A.    The damage to the Toyota looked consistent

16  with damage to blunt soft tissue versus any rigid, hard

17  objects.

18      Q.    Okay.  So you're saying you don't think his

19  head hit the Toyota?

20      A.    I didn't see any evidence of that.  It

21  certainly could have; it just didn't damage the Toyota.

22      Q.    So I mean, there's brain matter and skull

23  fragments on the Toyota Camry, right?

24      A.    Yes.

25      Q.    So it's possible his head hit, but you're



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MY-DEPOS

Appx_2316

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2321 of 2460   PageID 2613

1  saying there's no damage to the Toyota consistent with a

2  head hit?

3       A.    Right.  The primary contact was to his head

4  from the Ford, which I think is what opened the skull.

5  Any secondary contact is going to be significantly less

6  in magnitude, because he's not picking up the entire

7  momentum of the Ford since it's that offset hit.  So any

8  secondary or tertiary impact is going to be significantly

9  less in magnitude and may not cause physical damage.

10       Q.    Okay.  Do you have any opinion as to what

11  part of Nehemias Santos's body did hit the Toyota?

12       A.    I don't have it refined to that specific

13  level.

14       Q.    Okay.  Any opinion on what part of

15  Nehemias Santos hit the taillight?

16       A.    No.  I don't have it refined to that specific

17  level.

18       Q.    Okay.  That's fine.

19             Any opinion on which part of Nehemias Santos

20  hit Evelyn Moreno?

21       A.    No.  I don't have it refined that much.

22       Q.    Okay.  Do you disagree or do you -- do you

23  believe that Evelyn Moreno's story that she was hit by

24  the body is inconsistent with the evidence?

25       A.    No.  I think it works.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2317

1    Q.    Okay.  How?

2    A.    Well, she is standing in the trunk lid

3  opening.  When you project a body after impact, the --

4  especially when you have an offset impact that causes

5  rotation, limbs are going to extend laterally

6  significantly due to that rotation.  So the envelope at

7  which Mr. Nehemias's body was occupying post impact was

8  pretty wide.  His body is going to occupy quite a --

9  quite a big distance from side to side.  So it certainly

10  could have been his legs, could have been his arms, could

11  have been one leg, one arm, could have been his torso;

12  could be anything.

13    Q.    And it's hard to tell, given the forces

14  applied and the fact that the human being is not

15  homogenous -- or, it is homogenous, right?

16    A.    Well, it's articulated.  So there's a lot of

17  articulation points that's going to cause it to flail and

18  flip and exist in a lot of different configurations.

19    Q.    Okay.  Your conclusion on Page 4 and

20  throughout is that the Ford Explorer struck

21  Nehemias Santos on the right side of his head, correct?

22    A.    Yes.

23    Q.    Okay.  So on Page 11, you talk about contact

24  matching, right?

25    A.    Yes.  Sorry.  You're flipping back and forth



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2318

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2323 of 2460   PageID 2615

1  a lot.

2       Q.    Sorry, sorry.

3       A.    Yes.

4       Q.    Okay.  So is contact matching how you

5  concluded that Nehemias Santos's head was struck, that

6  the initial impact to Nehemias Santos was at the front

7  left panel or the front left part of the Ford Explorer?

8       A.    Yes.  You look at damage to one object versus

9  damage to the other, and it's simply putting the two

10  puzzle pieces back together.

11       Q.    Okay.  So -- and I believe you used the

12  phrase "circular contact damage" on the Ford Explorer?

13       A.    Yes.

14       Q.    All right.  What does that phrase mean?

15       A.    It is the shape of the damage profile to the

16  Ford.

17       Q.    Okay.  So if you'll flip to Page 54 of your

18  report -- the paper copy, actually.  I'm going to ask you

19  to draw something.  Can you draw for us on Figure 70

20  where the circular area of damage is?

21       A.    You can't see it in that photo, but you can

22  see it quite well in Figure 70.  And Figure 68 and 67 are

23  really good pictures as well.

24       Q.    So let's -- let's do it on -- let's start

25  with 60- -- let's do 67 through 70, right?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2319

 1       A.    Actually, it goes back as far as -- 65 is

 2   where you can start seeing the circular nature.  65 is a

 3   good one.

 4       Q.    Okay.  All right.  Well, let's do 65 through

 5   70.  If you'll just take a pen --

 6       A.    Sure.

 7       Q.    -- and draw and put your initials.

 8            MR. DUBOFF:  Do we want to -- do you just

 9        want to use red?

10            MR. WHITE:  Yeah, red is probably better.

11            THE WITNESS:  I don't have a red pen.

12            MR. WHITE:  I might have a black pen.

13            MR. DUBOFF:  I have about 14 red pens.

14            MR. WHITE:  Oh, look at that.  All right.

15            MR. DUBOFF:  I like writing in red.

16            THE WITNESS:  He's an angry writer.

17            MR. DUBOFF:  It's these associates.

18            MR. WHITE:  Yeah.

19   BY MR. WHITE:

20       Q.    I just -- put your initials by it so they

21   don't think that, you know, sneaky opposing counsel put

22   it on there.

23       A.    I think that's good.  I marked Figures 65

24   through 70.

25       Q.    Okay, perfect.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2320

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2325 of 2460   PageID 2617

1                What was the contact radius?

2        A.    Consistent with the size of the head.  I

3  didn't get a precise measurement.

4        Q.    Okay.  Could you measure the contact radius?

5        A.    I suppose if I put enough analysis into that,

6  sure.

7        Q.    Okay.  You need at least half a circle to

8  calculate a radius, right?

9        A.    Oh, I meant in the form of doing a

10 photogrammetry analysis.

11       Q.    Okay.  But you didn't here?

12       A.    No.  It was consistent enough.

13       Q.    Okay.  So you said it's consistent with the

14 size of a head?

15       A.    Correct.

16       Q.    How large was Nehemias Santos's head?

17       A.    The general size of his head -- I was

18 provided some photographs of him before the incident.

19       Q.    Okay.  Do you have any measurements of

20 Nehemias Santos's head?

21       A.    Not specifically.  I can certainly estimate

22 it, just as I estimated this damage.  They're both

23 consistent in nature and -- and rigidity.  It was the

24 only thing that matched the characteristics of this

25 damage.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2321

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2326 of 2460   PageID 2618

1    Q.    Okay.  So are you saying that the damage is

2  not consistent with hitting his shoulder?

3    A.    No, it's not, because you actually see the

4  brain matter on the end of the fender.  The tip of the

5  fender was pointed, and he had a large hole in the right

6  side of his head, I guess you could say by the temple.

7  That fender, you can see the brain matter on the fender,

8  meaning that fender physically intruded into his skull.

9    Q.    So can you point to which figure shows the

10  brain matter?

11    A.    I'm going to look at my computer, because

12  these pictures are hard to see when they print.  I need

13  to -- so I'm just cycling through the police photographs,

14  just to point out the chip of the skull was on Page 11 of

15  the police photographs.

16    Q.    Did you include that photo in the report?

17    A.    I don't know.  Let me check.  I may not have

18  just because of the intensity of the photograph.  I don't

19  think I did.

20    Q.    So just in the file that you sent me, can you

21  point me to the photo that has the skull chip that you're

22  referring to?

23    A.    So if you go to Materials Received, Photos

24  and Videos, Police Photographs, Scene Photos, and then

25  it's going to be Page 11.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2322

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2327 of 2460   PageID 2619

1      Q.     Now, I think we might be looking at something

2  different.  Do you know the file name you're looking at?

3      A.     2200089-Photos, Part 1, Page 11.

4      Q.     Got it, got it.

5             So the picture you're referring to, isn't

6  that a picture -- that's a piece of skull on the ground,

7  right?

8      A.     Yes.  I was just making a side comment as I

9  passed by it that I believe that is the puncture from the

10 fender.

11     Q.     Okay.  Well, I guess my question is, What

12 photo do you have that shows brain matter on the Ford

13 Explorer?

14     A.     Yes, sorry.  I'm going there.  I just got

15 sidetracked while cycling through the photographs.

16     Q.     And while you're looking, I'll point out on

17 Page 11, you say that, quote, There was blood and body

18 fluid/matter within the round contact damage,

19 specifically to the pointed leading edge of the left

20 front fender of the Ford," correct?

21     A.     Yes.

22     Q.     The next sentence says, "There were pieces of

23 skull and brain matter found on the roadway."  So do you

24 think maybe -- I mean, I'm going off of your report,

25 right?  Do you think the brain and skull is found on the



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2323

1  road?

2       A.    I think that the fluids in the damage with

3  the consistency of the peeled-back metal fender were all

4  consistent in size.

5            So damage match is generally looking at

6  multiple different configurations or --

7       Q.    Sure.

8       A.    -- match points, right?  Like, a puzzle has

9  multiple jagged edges, that other puzzle's jagged edge.

10           So in this particular case, we had the

11 circular nature of the damage to the hood and the

12 headlight; we had the peeled-back fender with the body

13 matter on the inside and outside of the fender,

14 suggesting a puncture; we had the punctured skull on the

15 ground with the brain matter; we have all of the body

16 fluid within the circular contact that all of the jagged

17 edges lined up to establish that that was the point of

18 contact.

19      Q.    Well, just to be specific, you don't see any

20 skull fragments on the Ford Explorer, do you?

21      A.    No, no, I don't think I saw skull fragments

22 on the Ford.

23      Q.    You don't -- you don't see obvious brain

24 matter on the Ford Explorer?

25      A.    Yeah, I would just call it body matter.  I



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2324

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2329 of 2460  PageID 2621

1  don't know how much delineation we can do of that spray.

2  Certainly, there are chunks of brain on the ground that

3  are easier to identify.  But within the fluid spray of

4  the contact damage, it's hard to identify, is that brain

5  fluid, blood?  There's certainly --

6       Q.    Okay.

7       A.    -- a combination of fluids in there.

8       Q.    Okay.  So would you agree that it's possible

9  that the damage to the Ford Explorer by the headlight

10 that you've identified as circular damage could have been

11 caused by a shoulder?

12      A.    I disagree, because now you are completely

13 missing what contacted his head.

14      Q.    Okay.  How do you mean?

15      A.    We need to find a match.  And if you put his

16 shoulder in place of where the head contact actually

17 occurred, now no head contact happens.

18      Q.    To the Ford Explorer?

19      A.    To Mr. Nehemias.

20      Q.    Well, isn't it possible that Mr. Nehemias hit

21 his head on the Toyota or on the pavement?

22      A.    Not based on the damage matching we see.

23 There is a nice fit.  And suggesting otherwise would just

24 be purely speculative and ignoring the amount of match we

25 have here.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MY-DEPOS

Appx_2325

1      Q.    So let's talk about just matching on the Ford

2  Explorer, right?  Is the contact on the Ford Explorer

3  inconsistent with a hit to Nehemias's shoulder, either

4  right or left?

5      A.    It is.  It's not as circular as his head.

6      Q.    Okay.  So is it possible -- is the contact

7  damage on the Ford Explorer consistent or inconsistent

8  with hitting Nehemias Santos's elbow?

9      A.    Inconsistent.

10     Q.    Okay.  How come?

11     A.    In size.

12     Q.    Okay.  What about a fist?

13     A.    Inconsistent.

14     Q.    Okay.  And this is all based on -- you think

15  only a head stuck in front of the Ford Explorer could

16  have caused the damage to the Ford Explorer?

17     A.    What I'm saying is the size, the shape, and

18  the magnitude of the damage is consistent with hitting

19  the size of a skull that is hard and would create a

20  circular imprint like we see in the Ford.  There is no

21  other explanation for that damage other than your

22  speculation.  What I do see here is a nice damage match

23  between his skull and the left front corner of the Ford.

24  There is nothing else that would cause the relative

25  contacts to both objects.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2326

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2331 of 2460   PageID 2623

 1      Q.    So are you saying that the contact damage on

 2   the Ford Explorer could never be caused by impact with a

 3   shoulder, a fist, or an elbow?

 4      A.    What I'm saying is it's not consistent with

 5   that.  I don't ever like to use the word "never" or

 6   "always."  We don't speak in absolutes.

 7      Q.    So it is possible?

 8      A.    What I'm saying is, to a reasonable of

 9   engineering certainty, Mr. Nehemias's head contacted the

10   left front headlight of the Ford.  That is the only

11   reasonable explanation for both characteristics to each

12   point of contact.

13      Q.    I guess my question is, Is it possible that

14   the contact damage to the Ford Explorer was caused by

15   contact to a shoulder, an elbow, or a fist?

16      A.    I don't think it is.

17      Q.    So it's not possible?

18      A.    I don't think it is.  It does not exhibit the

19   characteristics of those other shapes.

20      Q.    Okay.  So what testimonial evidence -- so not

21   physical evidence, but depositions that you reviewed --

22   indicates that the initial impact to Nehemias Santos was

23   to the right side of his head?

24      A.    Oh, everybody, I believe.  They said he was

25   bending over picking something up, into the travel lane.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2327

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2332 of 2460   PageID 2624

 1      Q.    So did anyone testify that the initial impact

 2 was to Nehemias Santos's head?

 3      A.    Well, to be fair, I don't know how much these

 4 witnesses actually saw, despite what they said they saw.

 5 But what I can say is their testimony indicated that he

 6 was bending over, in the process of picking something up,

 7 which is identical to the damage matching we see here.

 8      Q.    Okay.  So you agree that -- can we agree that

 9 no witness has testified that the initial impact was to

10 the right side of Nehemias Santos's head?  That's just

11 not something someone said?  You're inferring it, but

12 that's not been said by anybody?

13      A.    Well, I'm not inferring it; I'm concluding it

14 based on the damage matching.

15      Q.    Okay.  But there's no separate testimony from

16 somebody that says, Nehemias Santos, I saw his head get

17 hit by the Ford Explorer"?

18      A.    I'd have to reread it, but I'll take your

19 word for it.  Certainly, this analysis is based on

20 objective evidence --

21      Q.    Okay.

22      A.    -- not testimony, so I simply just make

23 comparisons.

24      Q.    Okay.  So can we agree that your opinion in

25 this report is that there's no damage to the Ford



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MYDEPOS

Appx_2328

1  Explorer below the 3-foot mark?

2       A.     Correct, on the front face.

3       Q.     On the front, you're right.

4              We agree that there is damage on the side of

5  the Ford Explorer below the 3-foot mark?

6       A.     Correct.

7       Q.     Okay.  So is that an important part of your

8  opinion, not an important part?  I -- I'm just -- I want

9  us to nail it down.

10      A.     Well, everything is important.  I don't want

11 to give anything more merit than another, but that is

12 certainly a key component in that there is no existence

13 of Mr. Nehemias below that contact point.

14      Q.     So are you able to infer -- from the contact

15 matching and the lack of damage below the 3-foot mark,

16 that's how you've reached the conclusion that is shown in

17 some of your figures that Nehemias was leaning forward

18 with his head out from his body, and only his head was

19 struck initially, right?

20      A.     Exactly.  It's quite a smoking gun with --

21 when you put all of the jagged edges together of the

22 puzzle piece, it's the only puzzle piece that fits.

23      Q.     Okay.  Now, there's no damage to the Ford

24 Explorer that you've been told about from one of

25 Caylee Smith's prior accidents, right?


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2329

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2334 of 2460   PageID 2626

1      A.     My understanding was there was no damage to

2  the left front corner prior to.

3      Q.     Okay.  At all?  Like, I mean, I just -- I

4  want to make sure, you know --

5      A.     Well, certainly not to this extent.

6      Q.     Okay.  So -- but you were never told that

7  there was some damage on the Ford Explorer, but that was

8  caused by one of Caylee Smith's prior accidents in the

9  Ford Explorer?

10     A.     I was never told that.  But again, this

11 damage has Mr. Nehemias's blood in it, so I don't know if

12 I necessarily needed to be told that.

13     Q.     Fair enough.

14            I just -- I want to make sure that, coming

15 into this investigation, your assumption or what you

16 concluded was that the Ford Explorer was in -- I don't

17 want to say perfect condition, but there was no body

18 damage or mechanical damage to it prior to impacting

19 Nehemias Santos?

20     A.     I think that assumption may be more important

21 when you don't have a lot of damage to work with.  But in

22 this particular case, we have such strong matching

23 evidence that there is no question of if it was

24 preexisting.

25     Q.     So -- and it's not just not matching evidence



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2330

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2335 of 2460   PageID 2627

1 that you're relying on; it's the lack of other damage

2 that would -- you know, that kind of -- that's how you're

3 able to infer where the damage happened to

4 Nehemias Santos, right?

5       A.    Well, it's everything, all of it together.

6 It's the elevation of the damage, the size of the damage,

7 the exact location of the damage inboard, the

8 characteristics of the damage itself consistent with the

9 characteristics and rigidity of a skull, the body matter

10 in the damage itself, the brain matter on the road, the

11 skull piece on the road consistent with the fender tip.

12 Everything is so overwhelmingly consistent that there is

13 no way, to a reasonable degree of engineering certainty,

14 that we can conclude anything else.

15       Q.    Fair enough.  All right.

16            Would you agree that any evidence of damage

17 to the front of the Ford Explorer below 3 feet would

18 require you to revisit your conclusions?

19       A.    No.  Because in addition to that, if

20 Mr. Nehemias's body existed below that damage, now you're

21 applying the force closer to his center of mass.  He is

22 now going to be projected more forward than lateral, and

23 he's going to be subsequently run over because of the

24 trajectory of the Ford.  He's going to essentially

25 inherit the trajectory of the Ford because of all the



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2331

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2336 of 2460   PageID 2628

1  momentum transfer if his body was struck by the front

2  bumper.

3        Q.    Okay.  So you think -- so if there was damage

4  below the 3-foot mark on the front, that would imply that

5  Nehemias Santos had moved more forward than laterally?

6        A.    Yes, which would not result in the subsequent

7  damage we see on the Toyota, would not result in the

8  subsequent damage we see to the left quarter panel of the

9  Ford.  There is no other solution that matches all of the

10  evidence.  There's one unique solution that matches every

11  piece of evidence.  We can't ignore evidence; we have to

12  consider it all.

13        Q.    Sure, sure.

14              So one of the pieces of evidence is the lack

15  of damage to the front end of the Ford Explorer below the

16  3-foot mark, right?

17        A.    One of the many is the lack of damage that

18  would be generated from impacting a center of mass of a

19  body.

20        Q.    Fair enough.  All right.

21              So go to Figure 70 of your report.

22        A.    Okay.

23        Q.    I think that's page -- well, you beat me

24  there.  All right.  So if you look down, you see the

25  tire, right?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2332

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2337 of 2460   PageID 2629

1          A.     I do.

2          Q.     Now, you see that there's sort of a -- the

3    plastic piece that's kind of been ripped off a little

4    bit?

5          A.     I do.

6          Q.     Go down to that -- it's not the bumper, but

7    it's the plastic bit below the white bumper on the front,

8    right?  Do you see any deformation of that part of the

9    plastic bumper?

10         A.     Let me just see it on my computer.  Okay.  I,

11   do.

12         Q.     Okay.  So go to Page 14 of the Richland

13   police officer's photos.  I actually don't see it in your

14   file.  Recall that?

15         A.     No, I don't have a Page 14.

16         Q.     Well, I'll show you mine.  So this is -- and

17   this is the 14th page of --

18         A.     Oh, that's in a different folder.  That's

19   why.

20         Q.     Oh, okay.  Which folder is it in on yours?

21         A.     That would be under the Ford Explorer folder.

22         Q.     Okay.  Let's go back to the Ford Explorer

23   photo, then.  Ah, yes, there it is, Page 14.

24         A.     Okay.

25                THE VIDEOGRAPHER:  I'm sorry.  Is your mic



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2333

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2338 of 2460   PageID 2630

1       still clipped?

2                THE WITNESS:  Oh, I walked away.  Sorry.

3                THE VIDEOGRAPHER:  That's okay.  Thank you.

4                THE WITNESS:  You're welcome.

5    BY MR. WHITE:

6       Q.    Okay.  Do you see the dent in the lower part

7    of the front plastic bumper?

8       A.    I do.

9       Q.    Okay.  So did you miss that dent in your

10   analysis?

11      A.    No.  That's just not a dent from impacting

12   the center of mass of a pedestrian.

13      Q.    So -- but that is damage below the 3-foot

14   mark on the front part of the Ford Explorer, isn't it?

15      A.    Yeah, I guess you're right.  Maybe I should

16   have been more specific in my words.  But that damage is

17   not from impacting the center of mass of a pedestrian.

18   That also could have been generated by his shoes or

19   debris or even the bending of the black plastic trim.  So

20   whatever caused that damage was not Mr. Nehemias's

21   physical body in front or existing in front of the Ford,

22   because we would see damage between that and the

23   headlight, but we do not.

24      Q.    So on the bottom of Page 8, you say, quote,

25   "There was no front face contact damage below 3 feet from



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MYDEPOS

Appx_2334

1  the ground."  Would you want to revise that statement?

2       A.    No.  That's really on the left-side corner.

3  It's a plastic damage that, again, could have been as a

4  result of the bending of the plastic fender.

5       Q.    So you think that the bending of that bumper

6  was caused by the bending of the fender?

7       A.    Well, I'm suggesting that could be an

8  explanation.  His shoe being thrown off could be an

9  explanation, a tool he was holding could be an

10  explanation.  That is not contact with a body, and that's

11  what we're talking about.

12       Q.    Okay.  So how -- if, in your theory, he

13  sticks his head out into the road to get hit by the Ford

14  Explorer and then gets hit by the Ford Explorer, and

15  then, as you say, he doesn't get into contact with the

16  Ford Explorer again until it's kind of at 9 feet, how do

17  his shoes create that damage to the front bumper?

18       A.    When you are hit offset from your center of

19  mass, your limbs will flail outward significantly.  So we

20  are articulated.  Our elbows, shoulders, that could be

21  any of the articulation points as he's rotating or

22  spinning.  It could be his legs; it could be his shoes,

23  his feet, his hands; it could be a multitude of things.

24  But what it is not is his physical center of mass.

25       Q.    Okay.  So if, as you said, he gets hit in the



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2340 of 2460   PageID 2632

1  head, in your estimation of what happened, he spins

2  counterclockwise, right?

3        A.    Yes.

4        Q.    So the front bumper would have been past his

5  body at that point when the spin begins, right?

6        A.    Yes.  But again, your limbs --

7        Q.    But how does he get in front of the car after

8  he's been hit to cause that damage?

9        A.    Right.  So if you actually look at the

10  demonstrative I have of him bending over, the diagram,

11  you can see his hands hanging in that general area.  That

12  could certainly be an explanation for that dent.  That

13  could be preexisting.

14              What I am saying -- and I think you're

15  missing the point -- this is not contact with the center

16  of mass of his body.  And that is the point I'm making is

17  that the only way to exhibit this elevated contact to the

18  headlight without significant body damage to the bumper

19  itself means the lack of existence of his body in between

20  or below the headlight.  Now, what this dent in a piece

21  of plastic is, I don't know.  But it doesn't matter.

22        Q.    Because you didn't mention it your report,

23  did you?

24        A.    No.  And again, it doesn't matter, because

25  what I'm saying is there is no body -- center of mass



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2336

 1  body contact.

 2          Q.    Okay.  So let's go to Page 14 --

 3              MR. WHITE:  Oh, I'm sorry.  Let's take a

 4          break.

 5              THE VIDEOGRAPHER:  The time is 2:18 p.m.  We

 6          are off record.

 7              (Break was taken from 2:18 p.m. to 2:24 p.m.)

 8              THE VIDEOGRAPHER:  The time is 2:24 p.m., and

 9          we are on record.

10  BY MR. WHITE:

11          Q.    Okay.  I want to jump to Page 14, right?  On

12  Page 14, you say, quote, had Mr. Santos not bent over

13  into the travel lane outboard the parked position of the

14  Toyota, the collision would not have occurred, correct?

15          A.    Correct.

16          Q.    Okay.  Now, are you offering the opinion that

17  Mr. Santos bent forward immediately before being hit by

18  the Ford Explorer?

19          A.    I can't offer that opinion.  I don't know.

20          Q.    But you say, right, you don't know -- you --

21  your opinion is he was bent over when he got hit?

22          A.    Correct.

23          Q.    But you don't know when he began bending over

24  or how long he'd been in that position?

25          A.    Correct.  Another reason I can't do an



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2337

1 avoidance analysis, because I don't know when that

2 stimulus began.

3      Q.    Okay.  So do you -- I take it you don't know

4 how long he was in the bent position before he was hit by

5 Caylee Smith?

6      A.    I don't.

7      Q.    Okay.  Did you take body measurements of

8 Mr. Santos in this case?

9      A.    No.  I had pictures of him to establish that

10 he was a generic, 50th percentile male.

11      Q.    Okay.  So did you use 50th percentile male

12 proportions when creating your demonstratives?

13      A.    I did.

14      Q.    Where are those percentiles found out?

15      A.    Did I publish that in my file?  Let me see.

16 If not, I can add it in there really quick.  Yeah, I

17 apologize.  I don't think I added that in there.  But the

18 CDC publishes the Anthropometric Reference Data Manual,

19 last dated January 2021.

20      Q.    Do you believe the CDC?  I'm joking.

21           Okay.  Why -- why didn't you also say that

22 this collision would not have occurred if Caylee Smith

23 had vacated the leftmost lane when she first saw the

24 Camry?

25      A.    Well, I did concede that, had she been able



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2338

1  to move over by another foot, there was no crash.  But I

2  can't say whether she was capable of vacating that lane.

3       Q.    Okay.  So your eighth opinion on Page 4,

4  right, you're talking about some tire marks that were

5  photographed to the right of the Toyota?

6       A.    Yes.

7       Q.    Okay.  So your conclusion was, quote, The

8  location and characteristic of these tire marks were

9  indicative of one or more vehicles making an invasive

10 swerving maneuver from left to right at the location of

11 the parked Toyota.

12      A.    Yes.

13      Q.    Okay.  So -- and you made that determination

14 by comparing the grooves in the tire marks with the

15 grooves on the tread of the Ford Explorer?

16      A.    Well, that opinion wasn't based on the

17 grooves.

18      Q.    Okay.

19      A.    The grooves were what was able to indicate

20 that those were not the Ford Explorer's tires.

21      Q.    So -- and just so we're both looking at the

22 same picture here, Figure 88, right?  So you identified

23 two patterns in Figure 88, right?

24      A.    Yes.

25      Q.    So the leftmost of those patterns, you have



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2339

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2344 of 2460   PageID 2636

1  on Figure 88 only as three tread grooves, right?

2          A.    Yes.

3          Q.    So that groove or that tire mark, you've

4  excluded as being caused by the Ford Explorer, because it

5  has fewer grooves than are on the Ford's tread?

6          A.    Exactly.

7          Q.    Okay.  Now, there's another tire mark to the

8  right of the one with three tread grooves.  And the

9  tread -- the tire mark to the right, you couldn't count

10 the number of grooves in it, could you?

11         A.    I could not.

12         Q.    All right.  And you excluded that one based

13 on the width of it?

14         A.    Yes.

15         Q.    Okay.  So how did you measure the width of

16 that tire mark?

17         A.    That was done with a photogrammetry analysis.

18         Q.    Okay.  So if you look at the tire mark that's

19 to the right, the one that you couldn't count the grooves

20 on, does it look like it displaced -- or that the tire

21 that made that mark also displaced some fluid?

22         A.    It's hard to say whether that fluid is on top

23 of the tire mark.  What I would expect if it displaced

24 fluid is we would be able to see the tread grooves

25 better.  The reason I don't think we can see the tread



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2340

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2345 of 2460   PageID 2637

 1  grooves is because I think there's a little bit of

 2  lateral slippage that just misaligns the grooves ever so

 3  slightly.

 4          And when you look ahead at the tire mark more

 5  towards the top of the picture, that gives more of the

 6  textbook outboard characteristics of a loaded tire.  When

 7  you swerve, you are causing a weight shift to one side of

 8  the vehicle, which is going to load that side's tires.

 9  Anytime you overload a tire, it's going to give that

10  characteristic textbook tire mark.

11      Q.    So on Figure 88, for the tire mark to the

12  right, you've actually added some black lines, right, to

13  kind of show us where the boundary of the --

14      A.    At the bottom of it, yes.

15      Q.    Right.

16      A.    Mm-hmm.

17      Q.    Can you say definitively that that tire mark,

18  the one where you couldn't count the grooves, that that

19  tire mark is actually caused by rubber being put on the

20  road or displaced fluid that, like, track the tire?

21      A.    That's what I'm saying.  If it was displaced

22  fluid of a tracking tire, which means it's free rolling

23  in line with its angle, you would be able to see more of

24  the tread grooves from going through fluid.

25      Q.    But you would agree that it looks like some



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2341

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2346 of 2460   PageID 2638

1  of that fluid has been displaced by a tire in line with

2  the tire mark that you've identified where you can't

3  count the grooves, right?

4       A.    I would argue it looks more of, like, a

5  classic tire mark with some fluid on top of it by the

6  black lines.

7       Q.    Okay.  So if there's fluid on -- you don't

8  think that that fluid that's on top of it was caused by a

9  tire rolling through the fluid?

10      A.    I don't think so.  That, I'm not going to

11 fight hard on.  It's certainly possible, but I don't

12 think so.

13      Q.    Okay.  Because if that tire mark was caused

14 after the fluid was on the ground, then that tire mark

15 happened after the accident --

16      A.    Right.

17      Q.    -- right?

18            And it's possible that both, or one of, at

19 least -- and we don't know that these tire marks were

20 caused before the accident, right?

21      A.    I can't say exactly when they were generated.

22 What I can tell you is the characteristics of them and

23 the exact location and size of them.  That's what I

24 figured out.

25      Q.    So you said that it appeared that they



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2342

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2347 of 2460   PageID 2639

 1 were -- let's see here -- indicative of one or more

 2 vehicles making an evasive swerving maneuver, right?  So

 3 where did you get that those tire marks were caused by a

 4 vehicle making a swerving evasive maneuver?

 5      A.   So they arc to the right at angles consistent

 6 with emergency swerving with loading patterns consistent

 7 with the weight shift.  During an emergency swerve, the

 8 weight is going to get thrown to the left side of the

 9 vehicle, overload those tires, generating that textbook

10 outboard dark line patch along with the curvature of the

11 mark.

12           When you actually put this on a diagram, you

13 can appreciate the curvature of the mark, because this is

14 a very zoomed-in photo.  You're only segmenting a small

15 portion of a curve.  It's hard to see, kind of like

16 flat-earthers, I should say.  But this -- when you look

17 at a diagram, you can appreciate the swerving nature of

18 the tire mark.

19      Q.   So -- but you don't know if those tire marks

20 in your -- well, strike that.

21           Your opinion is that these tire marks were

22 caused by someone swerving?

23      A.   Yes.

24      Q.   Okay.  But you don't know if these swerves

25 were made as a result of someone trying to avoid the

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY DEPOS

Appx_2343

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2348 of 2460  PageID 2640

1  Camry, or if those swerve marks were put there before the

2  Toyota Camry was there?

3      A.    You are right.

4      Q.    Okay.  All right.  And can we agree that it's

5  possible those track marks were made after

6  Nehemias Santos was killed?

7      A.    I would probably fight harder on the left

8  tire mark than I would on the right tire mark.  I do

9  think that left tire mark is prior to.  I think that has

10 more classic characteristics of a real tire mark versus a

11 tire traveling through fluid.

12     Q.    Okay.  So your ninth conclusion on Page 4 is

13 that there was no physical evidence or indication in the

14 GPS data or the bearing data that the Ford was traveling

15 or steered on or towards the left shoulder leading up to

16 the incident location, as suggested by the plaintiff?

17     A.    Yes.

18     Q.    Okay.  So one of the reasons you reached that

19 conclusion is based on the bearing data from the

20 infotainment center, right?

21     A.    That's correct.

22     Q.    Okay.  And let's see here.  So if you can

23 flip to Page 12 of your report.

24     A.    Okay.

25     Q.    All right.  So just -- I won't make you read



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2344

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2349 of 2460   PageID 2641

1 all this.  But just to summarize your opinion here, you

2 say that the bearing data shows that she was traveling

3 with a -- quote, consistent with the parallel orientation

4 with the roadway leading up to the collision location.

5     A.    Exactly.

6     Q.    So is that -- you know, I don't -- we'll go

7 back to our questions about GPS and whatnot.  But you're

8 not swearing that the GPS data is 100 percent precise as

9 to global position, but you do think that looking at all

10 the GPS positions in a line shows that she was moving

11 along the roadway in a straight fashion?

12     A.    Yes.  I believe you can establish trends from

13 data points that all have the same tolerance.

14     Q.    Okay.  And you say there's no documented

15 positional deviation from the left northbound travel lane

16 towards the left shoulder in Caylee's track points?

17     A.    Yes.

18     Q.    So what you're saying is there's nothing in

19 the electronic data that shows that she went left on the

20 leftmost lane, like, towards the left shoulder?

21     A.    Correct.  She never deviated to the left, nor

22 did the bearing data or the bearing angle indicate that

23 she moved left.

24     Q.    Okay.  So are you relying on the bearing data

25 there?  Do you trust the bearing data?



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MY DEPOS

Appx_2345

1     A.     Well, what I'm saying is when you combine all

2  of this, that's the likely conclusion.

3     Q.     You've validated the bearing data; the

4  bearing data lines up with everything else, is what

5  you're saying?

6     A.     When measured, the bearing data matches the

7  roadway orientation --

8     Q.     Okay, okay.

9     A.     -- until her final swerve.

10    Q.     Okay, right, right, right.

11           So -- and you admit there's a little bit of

12 wiggle room here on the GPS coordinates, because they've

13 been validated to only 3 1/2 to 7 1/2 feet?  That's your

14 position?

15    A.     The global position.  But again, we're using

16 the theory of relativity, and we're taking a rather small

17 time sample and analyzing the change between points and

18 tracking any trends or changes in those points to help us

19 establish any relative movement.  Since we know all of

20 these points have relatively the same error rate, because

21 they're collected in the same time frame at the same

22 environmental location with the same number of satellite

23 signals, we can conclude that, if there was any deviation

24 in lateral position or bearing, we should see it.

25    Q.     Okay.  All right.  So I take it what you mean



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MY-DEPOS

Appx_2346

1 is we don't know exactly where she's at on the road from

2 the GPS data within 3 1/2 to 7 1/2 feet, but we can tell

3 that she was going straight, wherever she was in that --

4 on the roadway, right?

5      A.    Right.  It's kind of like the difference

6 between accuracy and precision.  Accuracy is where on the

7 road you are; precision is the consistency of the data.

8      Q.    Okay, okay.  So your conclusion is that the

9 3 degrees -- well, strike that.

10           Let's -- just for the jury, can you explain

11 the bearing data?  Like, how does bearing work, like, if

12 you're looking at a quadrant compass?

13      A.    So there's 360 degrees in one full circle,

14 90 degrees in a quarter circle.  So if you rotate

15 90 degrees to your right, you rotate a quarter of the way

16 around; 180 is one-half the way around.  So 3 degrees is

17 just a slight steer to the right relative to the whole

18 360.

19           But what the vehicle dynamic principles show

20 is that, at highway speeds, particularly at 90 miles per

21 hour, when we apply the emergency swerving equations to a

22 vehicle traveling at these speeds, the maximum bearing

23 angle during that swerve is about 3.1 degrees, which

24 precisely matches the bearing angle change that we see

25 around the location of impact.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY DEPOS

Appx_2347

1          So we know that data is capable of picking up

2    these changes in lateral position and bearing angle.  We

3    see the lateral position deviate to the right, and we see

4    the bearing angle deviate clockwise.  So we know it's

5    picking up changes, and we see no changes before then.

6          Q.   Okay.  So you're saying the literature shows

7    that an emergency swerve to the right would normally, at

8    most, be 3 degrees to the right?

9          A.   At the speed.

10         Q.   At the speed, right.

11         So the fact that the infotainment bearing

12   data showed a 3-degree swerve to the right helps you

13   validate the data from the bearing?

14         A.   One of the many validations, yes.

15         Q.   Okay.  But I -- you trust the bearing data?

16   That's where you're at?

17         A.   Yeah.  I mean, certainly, I admit that there

18   are tolerances and errors.  But what I can say is I've

19   independently analyzed it, and it appears to be accurate

20   in this case.  We always try to independently validate

21   digital data --

22         Q.   Sure.

23         A.   -- to see its accuracy, and it matches very

24   well with the environmental evidence and the vehicle

25   dynamic principles.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MY-DEPOS

Appx_2348

1       Q.    So there was a swerve -- well, I'll take a

2  step back.  At the 2:48:51 mark, her bearing is 340

3  degrees, right?

4       A.    Yes.

5       Q.    And then the next second, her bearing is 343?

6       A.    Yes.

7       Q.    And so that's where we're getting the

8  3-degree change, right?

9       A.    You got it.

10      Q.    How many feet in lateral change does that

11 correspond to, and how do you calculate that?

12      A.    Lateral feet over the course of -- looks like

13 anywhere between 130 and 250 feet of longitudinal

14 distance --

15      Q.    Well, just -- and I'll interrupt you.

16            It's a right-hand -- it's a right angle

17 triangle, right?  So all you're doing is once you know

18 the degree change, right, you can figure out what the

19 distance is between the track that she would have been on

20 without the bearing change versus the longitudinal

21 distance that she travels, and then you can -- you can

22 calculate the change, right?

23      A.    It's not that simple, because you don't

24 instantly change angles like the corner of a triangle

25 does.  It's a quadrantic curve --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY



CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2349

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2354 of 2460   PageID 2646

1      Q.     Okay.

2      A.     -- that you gradually quadratically increase

3  your heading angle.  So it's more complicated than just a

4  triangle.  But what I can do is look at the empirical

5  equations to calculate the lateral movement.

6      Q.     So what is the lateral movement of a 3-degree

7  swerve to the right like the one that she conducted?

8      A.     Let me see.

9      Q.     And tell the jury; sort of walk us through

10  how you figure it out.

11      A.     So what I'm doing is I'm using the equations

12  where the inputs are speed and lateral steering distance

13  side to side, and it establishes what the average lateral

14  acceleration -- the rate at which you are changing

15  laterally -- that's what defines the curve.  It's not an

16  instantaneous change like a triangle, it's a curve, and

17  then also the lateral movement during that time of that

18  distance segment.  And so I don't have that teed up, so

19  I'm having to do this iterative process to answer your

20  question.  It's about 5 feet.

21      Q.     Okay.  All right.  That's -- and I'm not an

22  engineer.  I just used a triangle, and I came up with

23  about 6 feet, so --

24      A.     All right.

25      Q.     -- I'm close enough, right?  I have nothing



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2350

1  better than the Pythagorean theorem to use, so you have

2  better tools, okay?

3          So what was Caylee's bearing when she sent

4  the text message to Gracie?

5      A.    I don't have that teed up, but I can

6  certainly try to go look for that.

7      Q.    And just -- I think we agree that the text

8  message happened at the 2:48:43 mark.

9      A.    Okay.  Her bearing at 2:48:43 was

10  340 degrees.

11      Q.    And we agree that's her bearing when she sent

12  the text message?

13      A.    Yes.

14      Q.    Okay.  So how fast was she going when she

15  sent that text message to Gracie?

16      A.    87.8 miles per hour.

17      Q.    Okay.  And round it up to 88?

18      A.    Sounds good.

19      Q.    Okay.  So she was on the 340 bearing for

20  about three seconds, right?

21      A.    Until when?

22      Q.    Well, about three seconds later, does she

23  change her bearing?

24      A.    There's a 341, 340, there's some rounding.

25  It rounds to the nearest whole number.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2351

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2356 of 2460   PageID 2648

1    Q.    So at what second did her -- so she's on the

2  340 bearing after sending the text message.  At what

3  second does she change her bearing to 341?

4    A.    Like, about five and a half seconds before

5  impact.

6    Q.    So it's about three seconds after sending the

7  text message, right?

8    A.    Sure.

9    Q.    Okay.  So a change from 341 to -- excuse me,

10 a change from 340 to 341 is, what, a rightward shift?

11   A.    Yes.

12   Q.    Of about how many feet using the calculation

13 you used earlier?

14   A.    Well, the problem is you're rounding.  That

15 very well could have been a 340.4 at one moment and then

16 a 340.5 at the next one, and it's going to round to the

17 next whole number.  So --

18   Q.    How do you know that it's rounding to the

19 whole number?

20   A.    Because the precision -- they only give us

21 whole numbers.

22   Q.    Okay.  So you don't know which way it's

23 rounding, right?

24   A.    Well, it depends on which side of the half

25 it's on.



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1    Q.    Well, you don't know how close it is - --

2    A.    No.

3    Q.    -- when they round up, right?

4    A.    Right.  And that's why this hypothetical

5    question is tough, because I don't know where within that

6    range it actually was.

7    Q.    Let's say it's a full degree.  Let's just

8    take the data as it shows, right?  It's a full degree

9    change from 340 to 341, right, traveling at the speed at

10   which she is at when she makes the bearing change, so

11   that's 85 miles an hour.  How many lateral feet to the

12   right has she moved?

13   A.    It's going to be about less than a quarter of

14   a foot, so 3 inches.

15   Q.    Okay.  So she's gone right.

16         Now, does she change her bearing back to 340

17   in the next second?

18   A.    Well, the data either rounds to 340 in the

19   next second, but I don't know if it's necessarily her

20   changing it back to 340.  But certainly, as you drive,

21   you are going to be putting adjustments into your

22   steering, but very slightly, to maintain a straight

23   heading.  So anything less than 1 degree, you're just

24   getting way too precise.

25   Q.    Okay.  But the bearing does change in the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2353

1  next second back to 340, right?

2      A.    It could round back, yeah.  I mean, if it --

3      Q.    Well --

4      A.    -- if it was at --

5      Q.    -- I'm just saying just look at it.

6      A.    Yeah, yeah.  The physical data goes 340, 341,

7  because, again, we're rounding.

8      Q.    Okay.  So at the 2:48:47, she's got a bearing

9  of 340; and then the next second, she goes to 341 again,

10 right?

11     A.    Okay, yes.

12     Q.    Okay.  And so then she goes back to 340 in

13 the next second, right?

14     A.    Or it rounds down to 340, yeah.

15     Q.    Okay.  And then she's on 340 until the

16 collision occurs and she moves 3 degrees to the right?

17     A.    Right.

18     Q.    Okay.  So do you think the 3-degree move is

19 the result of -- could it be -- could it be closer to

20 2 degrees?

21     A.    You're right.  It's possible.  It could be 2

22 to 4, really.

23     Q.    Okay.  We just don't know?

24     A.    Yeah, I mean, because of rounding.  It's

25 going to be anywhere between that 2 to 4, but the 3 is



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2354

1 the central value.

2     Q.   Right.  And you don't know, like, from your

3 expertise and from reviewing the literature, how accurate

4 the bearing data is on these Gen 3 SYNC devices, right?

5     A.   Right.  And again, I'm not establishing her

6 trajectory based on the bearing data.  What I'm saying is

7 I've independently calculated what the maximum bearing

8 angle change would be using an emergency swerve at her

9 speeds, and it equates to 3.1.

10     Q.   Okay.

11     A.   And I look at the bearing data on the GPS

12 data, and it shows 3 degrees.  So I'm saying it's

13 consistent.

14     Q.   Okay, okay.  So you've read Caylee's

15 deposition, right?

16     A.   Yes.

17     Q.   So your testimony -- or her testimony is that

18 she never left the left lane as she approached the Toyota

19 Camry, right?

20     A.   Yeah.  It was a little vague on whether she

21 actually breached the middle lane or not.  But I think at

22 the end of the day, my consensus or my understanding of

23 her testimony was that she didn't actually breach the

24 center travel lane --

25     Q.   Well, she --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.**MILESTONEREPORTING**.com    Toll Free 855-MYDEPOS

Appx_2353

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2360 of 2460   PageID 2652

1        A.      -- until after.

2        Q.      She thinks she didn't breach the center

3   travel lane --

4        A.      Right.

5        Q.      -- right?  That's her testimony, right?

6        A.      Mm-hmm.

7        Q.      So -- and did you assume that was the case

8   while you were generating your report?

9        A.      Well, I was presented two versions, right?  I

10  don't know the exact lateral position of anyone at

11  impact.  So what I did was analyze the two versions that

12  are in dispute, Plaintiffs' version and Defense's

13  version, and I'm presenting both of those for the jury,

14  and they can choose.

15       Q.      Okay.  So now, if she -- if we assume that

16  she's in the left lane -- and that is her testimony,

17  right?

18       A.      Right.

19       Q.      If she -- that 3 degrees swerve to the right

20  would have put her in the middle lane, right?

21       A.      Yeah.

22       Q.      Okay.  How far in the middle lane?

23       A.      Well, we said what, 5 feet?

24       Q.      Mm-hmm.

25       A.      Mm-hmm.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2356

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2361 of 2460   PageID 2653

 1        Q.    So about -- was it about halfway in the

 2   middle lane?

 3        A.    Depends where she started from.

 4        Q.    Well, taking her testimony as true, right?

 5        A.    Mm-hmm.

 6        Q.    You know, that she's trying to avoid the

 7   Toyota Camry but not be in the middle lane --

 8        A.    Right.

 9        Q.    -- about how far -- how far away is she from

10   the middle lane at that point?

11        A.    Yeah.  I mean, she's about 5 feet into the

12   middle lane, which is quite consistent with the GPS

13   position --

14        Q.    Okay.

15        A.    -- that we see.

16        Q.    So you would agree that when she swerved to

17   the right, according to the GPS and the bearing, she went

18   about 5 feet in the middle lane?

19        A.    Yeah, I think she at least breached the

20   middle lane after her swerve for sure.

21        Q.    Sure, sure.

22              How wide is the middle lane?

23        A.    I think it's also about 11 to 12 feet wide.

24        Q.    Okay.  So she, at -- at maybe the maximum

25   point of her swerves, she's taking up half of the middle



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2357

1  lane, right?

2          A.      Sure.

3          Q.      Okay.  So how much damage was on the right

4  side of the Ford Explorer?

5          A.      None.

6          Q.      Okay.  So you'd agree that means that she

7  didn't hit anybody on her right when she swerved at the

8  collision point?

9          A.      That's true.

10          Q.      Okay.  So why didn't you include in your

11  report, "The middle lane was empty to Caylee Smith's

12  right at the point of impact"?

13          A.      All I can tell you is the point of impact

14  what the status of that middle lane is.  We all know lane

15  status can change within seconds.  I have no idea what

16  her lane status was five, ten seconds prior, which is the

17  timing of when somebody would start implementing a lane

18  change.  Nobody can attest to what the status of that

19  lane was five to ten seconds out.  All we can attest to

20  is at the point of impact, she was able to exist in that

21  center lane.  That tells us nothing about her ability to

22  be able to change lanes back in time.

23          Q.      Okay.  And you would agree, Caylee Smith

24  doesn't remember if there was anybody in the middle lane?

25          A.      Yeah.  Her -- she couldn't remember



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2358

 1  specifically.  I think there was -- yeah, I'll just agree

 2  with that.

 3       Q.    Okay.  So your conclusion is that

 4  Mr. Santos's head must have been 1.1 feet east of the

 5  outward or the rightmost point of the Toyota Camry?

 6       A.    Yes.

 7       Q.    And that's due to your equations saying that

 8  the maximum degree swerve that Caylee Smith could have

 9  conducted was 3.3 degrees?

10       A.    I thought it was 3.1, but you might be right.

11       Q.    I'll take your word for it.

12       A.    I'm not sure.

13       Q.    What is your equation that you're using?

14       A.    That is, again, based on the steering

15  amplitude from Muttart's 2015 paper, 2015-01-1417.

16            UNIDENTIFIED SPEAKER:  I'm sorry.  I couldn't

17       see you from the --

18            THE VIDEOGRAPHER:  One moment.

19            MR. WHITE:  I thought it was locked.

20            MR. DUBOFF:  Yeah, I thought it was a dead

21       bolt.

22  BY MR. WHITE:

23       Q.    Okay.  So in -- I take it that equation is

24  based on the speed at which someone is traveling, right?

25       A.    That is a variable, yes.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2359

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2364 of 2460   PageID 2656

1       Q.    Okay.  So you can swerve more the -- your

2  degree of swerve can be greater if you're going slower,

3  right?

4       A.    True.

5       Q.    Okay.  How much greater?  Like, is it a

6  sliding scale?

7       A.    It's a quadratic.  I don't have an answer to

8  that.

9       Q.    Okay, okay.  So that paper says that the

10  maximum that Caylee Smith could have swerved to the right

11  was 3.1 degrees?

12       A.    With these set of facts, yes.

13       Q.    Okay.

14       A.    Her speed and the emergency swerve distance

15  she traveled during that speed.

16       Q.    What speed did you put into that equation

17  when calculating her max swerve?

18       A.    90 miles per hour.

19       Q.    Okay.  Did you test that equation at the

20  lower speed, right, that didn't mean closer to 87 miles

21  an hour?

22       A.    I didn't, no.  It would increase it by a

23  tenth of a degree.

24       Q.    Okay.  Which would -- would that change your

25  conclusion at all?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MY DEPOS

Appx_2360

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2365 of 2460   PageID 2657

1    A.    No.  Again, we're rounding to the nearest

2  degree, so a tenth of a degree is just too precise to

3  make any opinions from.

4    Q.    Okay.  So do you know how many feet behind

5  the Toyota Nehemias was standing?

6    A.    I certainly modeled it at a given distance,

7  but the testimony seems to indicate within arm's reach.

8  Pretty close.

9    Q.    Okay.  So does the physical evidence give you

10 any basis to conclude how far back from the Toyota he was

11 standing?  Not lateral; let's just set lateral to the

12 side.  But just how far back from the trunk?

13   A.    No.  There's really no -- let me rephrase

14 that.  Within 10 feet, yes.

15   Q.    Okay.

16   A.    But we can't really get any more precise --

17   Q.    Yeah.

18   A.    -- than that.

19   Q.    You know he's not 50 feet back?

20   A.    Right.

21   Q.    And you know -- I mean, would you say you

22 know he's not, like, 1 foot away from the trunk?

23   A.    I would say it's possible, but I don't know.

24 5 feet seems reasonable.  So I don't have a specific

25 answer for you.  But I know it wasn't 30; I know it



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2361

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2366 of 2460   PageID 2658

1  wasn't 40; I know it wasn't 250 feet, which is the

2  distance that she would have had to start her swerve from

3  on the shoulder.  So for what it's worth, when the

4  witnesses said they saw her driving on the shoulder, they

5  would have had to have seen her driving 250 feet away at

6  that point.

7        Q.    Okay.  All right.  So on Page 12, you

8  describe in detail the steps needed to remove the Camry's

9  spare tire?

10       A.    Yes.

11       Q.    Okay.  So do you believe that most of these

12  steps had been concluded by the time the collision

13  occurred?

14       A.    There's certainly conflicting testimony about

15 what step they were on.  I know there was some testimony

16 about either the spare tire was in the process of being

17 picked up out of the trunk, or it was already out of the

18 trunk.  The jack, obviously, with the jack arm was

19 already out of the trunk and underneath the car, and they

20 went looking for the -- the tool to take the lug nuts

21 off.

22       Q.    And do you make any conclusions based upon

23 the status of the tire change other than the jack stand?

24       A.    No.  I think I just wanted to understand the

25 configuration of the spare tire a little bit better --



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2362

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2367 of 2460   PageID 2659

1        Q.     Okay.

2        A.     -- to help understand or at least educate the

3   jury, you know, where the parts are supposed to be, maybe

4   what step they were on, just helping the jury understand.

5        Q.     Okay.  But you don't know which step they

6   were on, based on the physical evidence you reviewed?

7        A.     Well, I know the tire was out after the

8   incident, and I know the jack and the crank was out.  So

9   it can certainly help the jury at least know that that

10  was taken out.

11       Q.     Okay.  So what other steps remain if the

12  tire -- if the jack's set and the tire is out of the back

13  of the car, what part remains?

14       A.     The only other step that would be next would

15  be to start taking off the lug nuts, which the tool for

16  the lug nuts should have been with the jack and the

17  crank.

18       Q.     Okay.  Do you have any opinion about where

19  the tool to remove the lug nuts -- now, are we talking

20  about that tire iron, or are we talking about something

21  different?

22       A.     Yeah, just the standard stock tire iron tool

23  to take off lug nuts.

24       Q.     Okay.  Are there any other tools that you're

25  aware of that were needed?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2363

```
 1       A.    No.

 2       Q.    Okay.  Do you believe that Nehemias was doing

 3  something unrelated to changing the tire when he was

 4  struck by Caylee Smith?

 5       A.    I don't -- I can't answer that.

 6       Q.    Okay.  So you don't know what he was doing?

 7       A.    No.

 8       Q.    Okay.

 9       A.    Other than bending over.

10       Q.    Which is based on your analysis --

11       A.    Yes.

12       Q.    -- right?  Okay.

13       A.    Mm-hmm.

14       Q.    So how did you take into account

15  Caylee Smith's testimony at her deposition that

16  Nehemias Santos stepped out in front of the Ford Explorer

17  at the last minute?

18       A.    Well, remember, I'm performing an objective

19  analysis and comparing it to the testimony.  If I would

20  just simply recite testimony, then what good am I?  So

21  I'm using science and objective evidence to figure out

22  what I can determine based on that, and then we can make

23  comparisons.

24             So it is what it is.  It's just direct

25  comparison.  Caylee had mentioned something about bending
```



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2364

1  over, stepping out.  I think it's just a game of

2  semantics at that point.  But what I can say is the

3  evidence shows that he was bending over.

4        Q.    Okay.  What did you -- how do you take into

5  account Caylee Smith's deposition testimony at her

6  deposition that Nehemias Santos was facing the Toyota,

7  like, the side of the Toyota when she hit him?

8        A.    I don't remember that testimony.

9        Q.    Okay.  Do you remember her testifying that it

10 was her belief that he's standing in the roadway looking

11 at the back right passenger tire?

12       A.    I didn't interpret it that way.  I understood

13 it to be that he was at the back right tire or near the

14 back right tire.  I don't recall there being enough

15 detail in the testimony to say exactly what he's looking

16 at.  What I will say is this all happened rather quickly,

17 and there were various versions of what she thought she

18 saw.  Again, I'm just reciting what the testimony says.

19 That has no bearing on my analysis.  I'm relying on the

20 objective evidence and data.  I present that to the jury,

21 and they can do with it what they want.

22       Q.    So did you take into account Caylee Smith's

23 written statement to the police where she said that

24 Nehemias was kneeling down to change a tire?

25       A.    So again, you keep using the word "take into



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2365

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2370 of 2460   PageID 2662

1   account."  I'm relying on objective evidence.  So it's

2   not that I'm dismissing or using specific points of

3   testimony.  I'm doing my own independent analysis, and I

4   read the testimony.  So I'm not necessarily relying on

5   the testimony here.  So you're welcome to make a

6   comparison to the jury, but that has no relevancy to what

7   I've done.

8         Q.    But based on your analysis, you do not

9   believe it's true that Nehemias Santos was looking at

10  the -- standing in the roadway looking at the back right

11  tire of the Toyota, right?

12        A.    At least not at the point of impact.

13  Certainly, he could be doing a multitude of things

14  leading up to impact or within a half second or second

15  before impact, which, quite frankly, is when Ms. Caylee

16  would see him.  She's not going to see his head at

17  impact; the hood is blocking her view of his head.  So I

18  wouldn't expect her to know his exact orientation at

19  impact.  She can't see that.

20        Q.    Okay.  Now, on Page 14 of your report, you

21  say that, "Therefore, had the Ford driver swerved a foot

22  further to the right, the collision would have been

23  avoided.  However, it was indeterminate as to how much

24  advanced notice Ms. Smith was provided of

25  Mr. Nehemias Roderico Pivaral Santos actively bending



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MY-DEPOS

Appx_2366

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2371 of 2460   PageID 2663

1  over into her path."

2          A.      Correct.

3          Q.      So you modeled out the maximum swerve that

4  she could do at 90 miles an hour, right?

5          A.      What do you mean, the maximum swerve she

6  could do?

7          Q.      Well, you testified earlier that you -- you

8  have an equation that shows that she can only make a

9  rightward emergency swerve of 3.1 degrees when she's

10 traveling at 90 miles an hour, right?

11         A.      Yes, given -- yeah, given the lateral

12 movement, yes.

13         Q.      Okay.  So if she'd been going slower, she

14 would have been able to make a greater swerve to the

15 right, correct, mathematically?

16         A.      I suppose I can agree with that.

17         Q.      Okay.  So --

18         A.      Again, we're talking a tenth of a degree, so

19 qualitatively, I think I can agree with you.

20         Q.      Well, I'm not telling you how much slower she

21 could have been.  If she'd been going the speed limit,

22 right, then it would have been an even greater ability to

23 make a turn to the right?

24         A.      Maybe two-tenths of a degree, because we saw

25 that 10-mile-per-hour difference with a tenth of a



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2367

1  degree.

2        Q.    Okay.  I mean, it's quadratic, right?  So it

3  might be different if -- you know, exponentially, right?

4        A.    Well, all I'm saying is when you

5  hypothetically asked me the question before, I changed

6  the input from 90 to 80, and it changed the orientation

7  by one-tenth of a degree.

8        Q.    So if you change it to 75, how many tenths of

9  a degree does it change it?

10       A.    I can certainly do that.  .35 degrees.

11       Q.    Okay.  So if she'd been going the speed

12  limit, she'd have been able to increase her turn to,

13  what, three point -- let's call it 3.5 degrees?

14       A.    3.45.

15       Q.    3.45, okay.

16             And if she'd been going the speed limit and

17  then decreased her speed more, obviously, she'd have been

18  able to turn even more, right?

19       A.    Maybe.

20       Q.    Okay.  I mean, mathematically, yes, right?

21       A.    Yes.

22       Q.    Okay.  Do you believe that if Caylee had not

23  been texting Gracie, she would have seen the Camry sooner

24  than she did?

25       A.    I can't say that.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

Appx_2368

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2373 of 2460   PageID 2665

1       Q.    Why not?

2       A.    I don't know what traffic conditions were

3  like; I don't know when she was presented the visual

4  sight line to the Camry.  What I do know is that she

5  responded to the Camry successfully.

6       Q.    Two seconds before?

7       A.    Whenever she did, she responded like the

8  average driver does to a roadside parked vehicle with a

9  pedestrian --

10       Q.    Well, when --

11       A.    -- so she successfully responded to the

12  Camry.  The issue was the secondary imminent hazard that

13  presented itself with Mr. Nehemias bending over.

14       Q.    But she didn't reduce her speed until two

15  seconds before she passed the Camry, right?

16       A.    She reduced her speed by 4 miles per hour,

17  which is --

18       Q.    Two seconds before?

19       A.    Right, which is greater than what the average

20  driver does.

21                    CONTINUED IN VOLUME II

22                        *  *  *  *  *

23

24

25



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2369

| $ |
| --- |
| **$15,000** 49:2 |
| **$280** 47:9,12 |
| **$400** 47:10,15 |

| 0 |
| --- |
| **0.33** 92:11 |

| 1 |
| --- |

**1** 3:14 5:18,21
35:19 37:3
75:2,6 104:14
105:9 153:3
183:23 191:22

**1,000**
121:2,7,13,17
122:3,5,7,9
123:22

**1,022** 123:25
125:9

**1,146** 123:25
125:9

**1,400** 100:2

**1,500** 92:20
93:1 95:10

**1,700** 93:5
99:18 100:6
125:9,18

**1,742** 92:22
95:4 98:23
99:19 100:3
125:6

**1.1** 189:4

**1.7** 36:5

**1/2** 36:3 145:10
176:13 177:2

**1/2-foot** 73:2

**1/2-to-7** 73:2

**10** 23:17 75:2,6
83:6,20 146:6
191:14

**10:12** 1:18 4:6

**10:28**
18:4,6,7,8

**10:56** 41:9,11

**100** 24:7,16
81:1 86:12
105:23 175:8

**10-mile-per-
hour** 197:25

**11** 45:19 148:23
152:14,25
153:3,17
187:23

**11.6-foot-wide**
137:13

**11:02** 41:12,13

**113** 89:4

**12** 174:23
187:23 192:7

**12:00** 143:9,11

**12:18** 97:25
98:2

**12:58** 98:3,4

**13** 92:17 95:21
96:3 123:18,24

**130** 179:13

**14** 150:13
163:12,15,23
167:2,11,12
196:20

**14th** 163:17

**15** 25:11 71:16

**150-millisecond**
80:1,13

**16** 95:16

**17** 92:18

**180** 177:16

**19** 1:16

**19th** 4:5

| 2 |
| --- |

**2** 3:14 5:18,22
32:13 36:3
74:15 75:2
110:14 112:15
115:8 121:16
184:20,21,25

**2.1** 137:12

**2:18** 167:5,7

**2:24** 167:7,8

**2:48:43** 181:8,9

**2:48:47** 184:8

**2:48:50**
106:22,23
107:1

**2:48:51** 106:15
107:8,18 179:2

**2:48:52** 106:15
107:12,18

**2:51** 107:17

**2:52** 107:17

**20** 25:11 70:1

**2013** 9:6 10:12
21:22 45:18

**2014** 45:16

**2015** 189:15

**2015-01-1417**
189:15

**2016** 12:22
43:11

**2017** 73:15
74:25

**2017-01-1437**
73:15

**2018** 73:16,24

**2021** 42:21,22
72:2 73:17,18
168:19

**2021-010903**
72:4

**2022** 55:16,19
61:4 79:16
92:5 93:23

**2023** 1:16 4:5
6:10,13 47:9
53:13,19,25
83:7,20

**2200089-Photos**
153:3

**23219** 2:10

**24** 66:9

**250** 106:1,3,20
179:13 192:1,5

**26** 6:10
53:13,19,25

**26th** 6:14,15

**2nd** 21:22

| 3 |
| --- |



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

407.423.9900      www.**MILESTONEREPORTING**.com      Toll Free 855-MYDEPOS

Appx_2370

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2375 of 2460   PageID 2667

**3** 3:15 5:18,24
35:19 37:3
66:22 68:8,25
70:8 71:2,6
72:13,17 73:2
74:24
75:4,6,7,11,19
77:18 78:23
79:1 104:14
105:9 145:10
161:17 164:25
176:13
177:2,9,16
178:8 183:14
184:16,25
185:4,12
186:19

**3.1** 177:23
185:9 189:10
190:11 197:9

**3.3** 189:9

**3.45** 198:14,15

**3.5** 69:1 74:11
198:13

**3:22-CV-02714-K**
1:3 4:14

**30** 61:4 79:16
92:5 93:23
191:25

**309** 28:15,18
29:16

**32822** 1:20

**340** 179:2
181:10,19,24
182:2,10
183:9,16,18,20
184:1,6,9,12,1
4,15

**340.4** 182:15

**340.5** 182:16

**341** 181:24
182:3,9,10
183:9 184:6,9

**343** 179:5

**35** 198:10

**360** 177:13,18

**3D** 56:15,17,20
87:14,15
88:6,9,15
89:13,19
90:10,12

**3-degree** 178:12
179:8 180:6
184:18

**3-dimensional**
86:14,15,21
87:1,10
89:5,24
90:13,14

**3-foot**
159:1,5,15
162:4,16
164:13

**3-to-7-foot**
73:7,13

**3-to-8-foot**
76:3

---
**4**
---

**4** 35:24 36:3
37:5 129:25
137:8 148:19
169:3 174:12
184:22,25
199:16

**4:00**
143:9,12,13,15
146:1

**40** 58:21 59:17
192:1

**410** 2:3

**45** 10:12 19:20
27:5 57:13
78:16
92:4,8,15 94:8
111:16

**479** 2:4

---
**5**
---

**5** 68:13,15
71:8,15,23
72:6 79:25
80:7,12 180:20
186:23
187:11,18
191:24

**5:00**
143:9,12,13,15
146:1

**50** 111:16
191:19

**50-50** 23:9,11

**50th** 71:25
168:10,11

**54** 149:17

**5750** 1:20

---
**6**
---

**6** 55:18
91:20,21 92:1
180:23

**6.6** 137:19

**60** 149:25

**65** 150:1,2,4,23

**67** 149:22,25

**68** 149:22

**69** 89:3

**6th** 6:12

---
**7**
---

**7** 70:8 95:12
142:21 176:13
177:2

**7.5** 69:2 74:11

**70** 27:2 111:23
149:19,22,25
150:5,24
162:21

**700**
125:11,16,18,2
0

**72764** 2:4

**75** 93:10 95:14
111:23 119:6
198:8

**76** 89:3

**775-1154** 2:10

**7-foot** 69:1

---
**8**
---

**8** 70:9 75:19
144:3 164:24

**80** 23:24 198:6

**800** 2:9

**804** 2:10

**82** 107:13

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2371

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2376 of 2460   PageID 2668

**83** 107:15,16

**85** 183:11

**86** 35:24 36:1
109:24

**87** 107:9,10
109:24 190:20

**87.8** 181:16

**88** 169:22,23
170:1 171:11
181:17

**89.97** 107:6

**8-feet** 71:6

**8-foot** 71:2

---

9

**9** 75:2 144:23
146:6 165:16

**9.5** 137:14

**9.5-foot** 137:21

**90** 35:24
95:20,23
107:2,4,5
109:23 111:23
119:9
177:14,15,20
190:18
197:4,10 198:6

**935-1761** 2:4

**95th**
71:10,20,21

**98** 89:20

**99** 89:3

---

A

**a.m** 1:18 4:6
18:4,7,8

41:9,11,12,13

**abilities**
111:12

**ability** 111:6
130:3,4 188:21
197:22

**able** 12:10
15:14,22
27:21,22
28:2,5 47:22
64:9 80:16
84:5 87:11
89:23 159:14
161:3 168:25
169:19 170:24
171:23
188:20,22
197:14
198:12,18

**ABS** 109:5

**absolute** 33:5

**absolutely**
49:21,23
114:18 115:7

**absolutes** 157:6

**academia** 38:13

**accelerated** 9:7

**acceleration**
180:14

**accelerator**
104:15

**accept** 76:2

**accepted** 75:20

**accident**
10:2,5,9,13,15
,24

11:10,13,19,24
12:7 13:12,22
14:20
15:20,23,24
17:10 19:21,23
20:9 21:21,23
22:10 27:10
38:14 42:12
44:6,12
45:5,14 51:15
54:12 57:25
64:18 76:2
80:20 84:4
89:17 91:6
95:24 138:22
141:3,6 144:14
172:15,20

**accidentally**
122:22

**accidents** 23:18
38:24 159:25
160:8

**accompany** 6:21

**according** 29:15
113:22 187:17

**account** 138:20
194:14
195:5,22 196:1

**accounted**
138:22

**accounting**
137:12

**accreditation**
45:6

**accuracies**
71:19 76:22
77:1 84:8,9

**accuracy** 41:25

56:6,11,16
67:17,21
68:11,12,19
69:1,2,19
70:7,8,11
71:5,7,11
72:17
73:4,9,11
74:18
75:10,15,17,19
,25 76:10
77:2,17,20
78:4,10 79:1
84:15 85:24
86:3 92:21
177:6 178:23

**accurate** 10:24
40:19 70:3
85:17 178:19
185:3

**ACM** 55:23
58:2,14
79:12,24
80:9,11,20,21
81:17,20 82:1

**acronym** 11:21
12:14

**ACTAR** 45:6

**action** 1:3 4:14
118:4

**actions** 62:5

**active** 47:14
112:21

**actively** 31:13
196:25

**actual** 23:9
34:3,24,25
61:20 62:23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    www.**MILESTONEREPORTING**.com    Toll Free 855-MYDEPOS

Appx_2372

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2377 of 2460   PageID 2669

75:10 78:2

**actually** 16:15
21:13 22:4,15
27:1 31:1
33:21,22 36:12
37:3 40:21
47:16 55:18
56:11 57:9
62:11 63:20,22
64:2 65:12
66:15 67:20
68:18 72:5,22
76:15,21 80:25
84:13 96:5,13
104:16 109:6
129:16 131:17
139:2,3 149:18
150:1 152:3
155:16 158:4
163:13 166:9
171:12,19
173:12 183:6
185:21,23

**add** 168:16

**added** 49:1
168:17 171:12

**addition** 19:12
89:4,25 161:19

**additional** 36:1
114:1 118:20
119:25 120:17

**address** 61:13

**adhere** 76:22,25

**adjust** 35:21

**adjusted** 31:10
117:22

**adjusting**
33:9,24

**adjustment** 32:9

**adjustments**
183:21

**administrator**
1:5 4:9

**admit** 176:11
178:17

**advanced**
119:10,15,22
196:24

**aerial** 87:21

**aerodynamic**
13:25

**aerodynamics**
13:21

**affect** 27:15
68:24 139:7

**affects** 12:3

**affirm** 5:5

**affirmative**
109:1

**affirmatively**
109:9

**against** 52:2
78:23 132:11
146:8

**ago** 24:11

**agreement** 6:10

**Ah** 163:23

**ahead** 60:12
111:21 119:24
120:20
143:9,11 171:4

**air** 67:7 79:7
81:6

134:5,12,15

**airport** 94:1

**Alabama** 12:24

**albeit** 100:5

**align** 139:2

**allow** 57:2,6

**allowed** 51:17
141:10

**alluding** 135:24
136:10

**already** 5:21
6:1 12:5 99:5
114:8 126:12
146:6
192:17,19

**altimeter** 63:4

**am** 10:20 11:2
12:10 31:16
43:13 45:25
47:22,24 48:8
72:9 74:11
110:8 166:14
194:20

**ambiguous** 15:11

**amend** 102:1,5
136:14

**American** 68:15

**amongst** 17:16
53:2

**amount** 12:9
40:13,14 45:3
50:9,14 97:9
114:23
136:9,10
155:24

**amplitude**

189:15

**analogy** 18:18

**analyses** 15:23
21:25 22:11
23:2,4,13,21
64:19 115:22

**analysis**
10:10,16 11:25
12:19 13:13,23
17:1 21:16
22:3,5,16
23:11 27:10,25
30:7,8,10,11,1
2,16,22
31:17,22,25
32:15,20
33:14,20
34:9,12,21
35:1 38:15,16
39:11 43:13
47:13 48:4
50:5 56:22
69:7 77:23,24
78:22 84:11
86:8,16 88:6
101:3,5,10
151:5,10
158:19 164:10
168:1 170:17
194:10,19
195:19 196:3,8

**analyst** 11:15

**analyze** 11:24
19:22 27:13
29:23 52:24
69:16 78:11
101:3,4 127:25
186:11

**analyzed** 24:21



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

Appx_2373

28:22 178:19

**analyzes** 16:9
18:1

**analyzing** 14:11
38:15 40:25
44:20 76:7
77:21,25 101:9
176:17

**angle** 143:7
171:23 175:22
177:23,24
178:2,4 179:16
180:3 185:8

**angles** 15:5
173:5 179:24

**angry** 150:16

**annual**
97:5,12,14

**answer**
6:7,8,21,24
16:2 18:2
22:9,24 29:20
46:8 47:23
48:11,13,21
52:16 60:12
66:25 67:6,14
77:22 88:20,21
89:1 99:24
101:23 105:6
115:11
126:20,25
127:2,11,22,23
128:1,2,18
133:8 180:19
190:7 191:25
194:5

**answered** 99:5

**answering**

101:23 127:9

**answers** 6:20

**Anthropometric**
168:18

**anybody** 158:12
188:7,24

**anyone** 54:3
57:12 91:17
158:1 186:10

**anything** 8:8
9:22 10:7
14:10 15:1
24:15 25:1
30:22 32:8
48:4,7 49:12
87:13 97:16
98:19 99:10
111:16 148:12
159:11 161:14
183:23

**anytime** 64:3
116:14 118:14
171:9

**anywhere** 46:15
74:23 77:3
110:22 179:13
184:25

**apart** 124:23

**Aperture** 54:10
55:3 83:6,20

**apologize** 45:25
72:4 168:17

**appear** 56:8
143:20

**appeared**
126:2,9,23
127:18 128:5

134:2 142:21
172:25

**APPEARING**
2:5,11,14

**appears** 178:19

**Apple** 76:24

**apples** 28:23,24
34:13,20,24
73:1,2
75:22,23 121:5

**applicable**
34:11

**application**
104:15 105:19
108:15 126:18

**applications**
16:11,13

**applied** 10:25
16:19 19:25
20:5 30:4 35:1
109:2,8,9
115:20 116:7
140:15
141:11,17,25
143:3,6
144:1,18
148:14

**applies** 10:14
11:3

**apply** 17:4
34:14,21 35:5
90:9 109:5
115:3,13,18,25
116:13,15,22
118:11,13,16
127:1,3,4,8,24
128:1 177:21

**applying** 12:2

14:2 33:20
35:2 51:15
115:22 116:9
118:19 161:21

**appreciate**
110:25
111:6,20
121:18
173:13,17

**approach** 35:15
78:6,16 91:21
92:10 102:25
119:8

**approached** 35:6
103:18
115:13,25
116:7,16
129:17
139:16,20
140:2 185:18

**approaching**
94:19 98:10
114:24 118:2

**appropriate**
115:1,23

**approximately**
92:11 95:16,21
106:1 125:11
137:12,14,19

**April**
6:10,12,14
53:15,19,25
61:4 79:16
92:5 93:23

**arc** 173:5

**area** 40:24 92:8
93:11 97:14
119:11,15,22

**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS


Appx_2374

120:4 149:20
166:11

**aren't** 17:12
84:13 101:20

**arguably** 13:22
37:3

**argue** 172:4

**Arkansas** 2:4

**arm** 148:11
192:18

**arms** 148:10

**arm's** 191:7

**Armstrong** 45:17

**arrow**
121:12,20,21,2
4

**articulated**
148:16 165:20

**articulation**
148:17 165:21

**aspect** 11:22,23
14:3 43:18,19
44:6

**asphalt**
130:11,12
132:11,25
133:4

**assessing** 75:24

**assist** 53:7
54:20

**assistance**
54:22

**associated** 33:2

**associates**
150:17

**assume** 43:22
70:11 186:7,15

**assuming** 98:24
99:25

**assumption**
51:12 113:25
160:15,20

**assumptions**
49:4 50:23,25
51:4,10

**AT&T** 82:23

**ate** 133:2

**attempted** 25:4

**attempts** 25:3

**attended** 9:7

**attention**
113:15 119:25

**attentive** 34:2
36:8

**attest**
188:18,19

**attorneys** 52:15

**audience** 68:15

**August** 53:13

**authored** 67:24

**available**
12:10,12 21:16
28:7 29:22
31:19 40:12
43:6 46:14
96:7 137:15,20

**average** 36:4,7
37:4
97:5,12,13,14
104:10,18

105:12
109:15,20
113:18,20
115:3 118:15
180:13
199:8,19

**avoid** 28:2,19
29:13 31:20
37:16 96:19
111:13,15,18
114:4,10
173:25 187:6

**avoidability**
101:11

**avoidance** 27:9
30:11 31:17
34:21 35:1
37:13 44:18
114:14,20,22
168:1

**avoided** 27:10
196:23

**aware** 24:24
38:1 51:8
93:15 97:4,19
99:4,6,10
110:13 112:17
121:8 126:1
144:13 193:25

**away** 28:10
99:19 100:6
104:20 105:2
106:1,3,20
121:17
122:3,5,7,10,1
2 123:21,25
125:18
145:17,18
164:2 187:9

191:22 192:5

**Axiom**
54:11,12,15
56:10 58:7
66:13

**axle** 142:5,15

**azimuth** 94:5

---

B

**bachelor** 9:1

**bachelor's** 9:8
19:4

**background**
15:7,19,22

**backgrounds**
15:13

**backup** 96:24

**backward**
141:14,15

**bad** 45:25 46:18
50:2 94:17

**bag** 67:7 79:7
81:6

**ball** 17:17,18
18:18,22 111:6
120:24

**balls** 17:19,23
18:19

**barometer**
141:25

**barrier** 87:13
93:7 99:8
102:18

**base** 30:16,22
85:19

**based** 9:22



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Appx_2375

11:18 15:23
16:11,12 17:3
20:11 21:2,4,9
22:16 23:10
29:22,23
34:17,19 38:13
40:12,24 41:20
48:21 49:12
50:10 64:12
69:3 70:24
71:5,12 72:23
73:3,8 82:4
86:5 87:20
89:13 96:7
102:8 104:6
105:7 106:8
111:12
128:8,16
143:19 155:22
156:14
158:14,19
169:16 170:12
174:19 185:6
189:14,24
192:22 193:6
194:10,22
196:8

**baseline** 37:15

**basic** 15:15

**basically** 9:23
25:20 26:4,9
27:9 86:8
97:13 141:9

**basis** 47:25
48:1,6 78:11
191:10

**bearing** 58:22
62:7
77:16,17,20
78:1,2,4,6,9,1

5,20,23 79:1
101:10 121:6
174:14,19
175:2,22,24,25
176:3,4,6,24
177:11,22,24
178:2,4,11,13,
15 179:2,5,20
181:3,9,11,19,
23 182:2,3
183:10,16,25
184:8
185:4,6,7,11
187:17 195:19

**beat** 162:23

**became** 126:13

**become** 10:2
101:11 121:8

**becomes** 111:17

**begin** 5:13
106:18

**beginning** 95:13
130:21 132:7

**begins** 106:24
108:3 132:21
166:5

**behalf** 2:5,11
24:12

**behave** 9:21
12:3 17:14

**behind** 26:4
33:4 94:10
96:9 114:15
191:4

**belief** 195:10

**believe** 7:16
12:22 16:24

17:6 27:20
36:12 38:18
43:5 47:10
52:6 54:10
55:13 57:18,22
58:21
59:6,15,16
66:6,18 68:25
74:6,22 76:22
87:18 101:12
103:6,20,24
106:12 113:5
114:10 131:6
147:23 149:11
153:9 157:24
168:20 175:12
192:11 194:2
196:9 198:22

**bending** 31:13
114:7 157:25
158:6 164:19
165:4,5,6
166:10 167:23
194:9,25 195:3
196:25 199:13

**bent** 31:18
145:9
167:12,17,21
168:4

**Berla** 60:15,16
63:10,18
64:3,7,9,12
65:1,18 67:3,9

**best** 51:11
108:25 110:14
127:22 145:20

**better** 84:17
138:16 150:10
170:25 181:1,2

192:25

**beyond** 145:11

**billed** 47:7,15
48:24

**billiard**
17:17,18,19,23
18:17,19,21

**bit** 20:19 28:4
51:3 65:23
91:5 122:2
132:5 133:15
136:17,20
141:12 142:4
163:4,7 171:1
176:11 192:25

**black** 63:13,24
67:5,7 102:9
130:16 150:12
164:19 171:12
172:6

**blaming** 132:6

**blanket** 67:6
127:23

**blocking** 196:17

**blood** 14:25
153:17 155:5
160:11

**blown-out** 141:1

**blowout**
134:2,19,23
135:15 136:16
137:2

**Bluetooth** 58:24

**blunt** 146:16

**board** 91:8,9,10

**boards**



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2381 of 2460   PageID 2673

121:12,20,21

**boats** 14:12

**body** 15:9 81:14
94:2 96:24
103:6,14
143:8,10,11
144:10,19,25
145:1,24
146:3,8
147:11,24
148:3,7,8
153:17
154:12,15,25
159:18 160:17
161:9,20
162:1,19
164:21 165:10
166:5,16,18,19
,25 167:1
168:7

**bolt** 145:15
189:21

**bone** 14:25

**bonus** 50:9,10

**Bortles** 68:6
73:15
74:10,20,25

**boss** 45:15,18

**bottom** 74:16
139:4 164:24
171:14

**bounced** 146:4,9

**boundary** 171:13

**box** 63:13,24
67:5,7 96:11

**boxes**
12:14,15,18

**brain** 15:1
146:22
152:4,7,10
153:12,23,25
154:15,23
155:2,4 161:10

**brake** 29:13
31:23 105:19
108:8,11,14,20
,22 114:4,10

**brakes** 30:4
32:2,5
33:3,8,18 35:5
109:2,5,8,9,18
115:3,5,6,7,13
,25
116:4,5,7,10,1
3,16,22
118:11,13,16,1
9

**braking**
29:17,19
30:8,10,12
33:13 34:9,11
35:10,12
81:19,21,23
82:2,3,4
111:22
114:13,17
115:18

**branched** 45:16

**breach** 185:23
186:2

**breached** 126:5
185:21 187:19

**breaching**
126:13

**breadcrumb**

58:20

**break** 18:6
27:24 41:11,16
72:11 78:14
88:19 98:2,8
167:4,7

**brief** 18:11

**bright** 121:23

**bring** 19:15
52:23

**bringing** 101:21

**broad** 10:5
13:15 16:5
44:10 83:4
119:13

**buildings** 68:23

**bumper** 144:11
162:2
163:6,7,9
164:7 165:5,17
166:4,18

**bunch** 70:15
120:16

**bus** 62:23

**butchering**
12:13

**buttons** 44:10

----------------
C
----------------

**cab** 128:22

**CAC** 54:10,16
55:2,5,20
56:2,10,23
57:22 58:3,7
66:12,17 86:18

**CAC's** 56:7

**calculate** 29:25
30:2 38:17
39:9,19 85:24
106:7 114:3
151:8
179:11,22
180:5

**calculated**
14:25 185:7

**calculating**
27:1 39:4
106:16 190:17

**calculation**
26:25 29:16
37:23 40:21,22
52:1 114:5
115:16
125:20,25
182:12

**calculations**
16:7,22 21:12
51:7 106:7

**calculators**
125:10

**cam** 94:2 96:23

**camera** 39:6,7,
40:6 90:17
103:14

**cameras** 43:7

**Camry** 34:8
83:25 91:13
94:12,15,19,20
,23 96:4
98:11,15
99:1,7,15,18,1
9
100:2,8,11,18,
25 101:13

**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2377

102:9 103:1,18
104:5 114:4,24
115:13,15
116:1,8,17,22,
24 117:4,19
118:2 119:2
125:15,18
136:22,25
139:10,16,21
140:2,6,15
141:11 144:8
146:23 168:24
174:1,2 185:19
187:7 189:5
198:23
199:4,5,12,15

**Camry's** 139:5
192:8

**Canal** 2:9

**capability**
110:25

**capable** 52:23
116:9 169:2
178:1

**capacity**
99:18,22,23

**car** 32:10,11,16
76:16 93:4
96:11 104:1
112:1,2,13,14,
15 114:8 115:8
122:15 123:7
145:18 166:7
192:19 193:13

**carcass** 133:20
134:15,16

**care** 64:24

**career** 80:22

**carrier** 47:1
82:22

**carriers** 47:4

**cars** 97:8

**case** 3:15 5:24
8:11 12:16
13:10 16:23
17:6 19:15
21:12,13
22:1,19 23:21
24:5,10
25:18,23
26:2,18
27:12,15
28:12,18,23,25
29:1,2,7
30:2,13,17,24
31:2 32:10
35:2,3 37:8,24
40:16 41:24
43:19 45:22
46:7
48:2,3,5,8,25
49:13 50:1,23
53:22,24 54:4
65:8 66:13,17
71:9 76:9
78:13 79:19,20
83:3 84:4
86:1,6,17
89:22 101:7
112:22 116:13
120:13,15
121:6
126:10,19,25
127:2,3,8,10,1
2,13 128:9
138:21 139:1,7
154:10 160:22
168:8 178:20

186:7

**case-by-case**
78:11

**cases** 12:11
22:21 24:21
46:17,20 49:19
50:4

**categorize**
11:7,21 34:7

**categorizing**
33:11

**category** 13:10

**cause** 145:13
147:9 148:17
156:24 166:8

**caused** 145:24
146:2 155:11
156:16
157:2,14 160:8
164:20 165:6
170:4 171:19
172:8,13,20
173:3,22

**causes** 148:4

**causing** 171:7

**Caylee** 1:9
4:11,20 21:18
30:24,25
31:2,22 33:14
34:1 35:23
38:2,6 61:4
92:4,15
94:7,18 95:13
96:2 98:10,14
99:6,17 100:12
103:1,18
104:8,16,17
105:10 109:1

114:3
118:11,25
119:7 123:16
126:1,12 138:5
139:9,15
159:25 160:6
168:5,22
188:11,23
189:8 190:10
194:4,15,25
195:5,22
196:15 198:22

**Caylee's** 35:5
36:14 37:8
58:25 77:12
82:9 128:11
175:16 181:3
185:14

**CDC** 168:18,20

**cell** 82:9,15,20
83:2 123:14
125:4

**Cellebrite**
82:18,24

**center** 58:15
59:4 60:10
61:2,22
63:11,18 64:13
66:16 67:14
125:3
130:14,20
131:18 132:17
135:9
145:11,12,23
161:21 162:18
164:12,17
165:18,24
166:15,25
174:20 185:24



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

186:2 188:21

**centered** 130:19
135:10

**central**
124:16,22
185:1

**certain** 7:11
8:13 27:14
32:7 45:3
57:23 97:9
118:18

**certainly** 14:19
16:8,18
22:11,20
24:3,20 25:3
37:23 44:22
51:8,11 55:13
57:15 59:16
70:25 74:4
81:23 96:20
101:21 109:11
114:17 118:13
136:10 138:17
140:10 142:3
146:21 148:9
151:21 155:2,5
158:19 159:12
160:5 166:12
172:11 178:17
181:6 183:20
191:6 192:14
193:9 196:13
198:10

**certainty** 43:4
69:6 157:9
161:13

**CERTIFICATE** 3:4

**chair** 44:9

**change** 27:14

34:17 54:10
69:17 76:8
79:25
81:3,4,10
109:23 120:1
121:25 131:17
137:22 138:1
176:17 177:24
179:8,10,18,20
,22,24 180:16
181:23
182:3,9,10
183:9,10,16,25
185:8
188:15,18,22
190:24 192:23
195:24 198:8,9

**changed** 198:5,6

**changes** 43:20
71:12 78:20
80:4 87:19
176:18 178:2,5

**changing** 131:8
180:14 183:20
194:3

**characteristic**
169:8 171:10

**characteristics**
16:25 34:19
130:2 140:11
151:24
157:11,19
161:8,9 171:6
172:22 174:10

**charge** 49:25
50:3

**charged** 53:24

**charging** 47:9

**chase** 83:5

**check** 152:17

**checked** 129:2

**checking** 72:2

**chemical** 1:10
4:12,20 16:9
46:24

**chip** 152:14,21

**choose** 13:10
53:4 186:14

**chose** 13:11

**chosen** 53:3
87:3

**chunks** 155:2

**circle** 151:7
177:13,14

**circular** 146:11
149:12,20
150:2
154:11,16
155:10
156:5,20

**circumstances**
114:18

**cite** 36:10 75:9

**cited** 36:12
72:14 73:10,12
83:6

**civil** 1:3 4:13
15:13

**clarify** 49:7

**classes** 45:2

**classic** 172:5
174:10

**classify** 29:9

31:5 32:8
134:4

**clear** 93:22
111:10
121:9,10,23
122:3,4 125:13

**clearly** 124:21

**client** 59:6,7
63:17

**clients** 22:22

**Clinton** 76:23

**clip** 21:7

**clipped** 164:1

**clock** 59:2
143:15

**clockwise** 178:4

**close** 69:14
70:10 84:25
86:12 96:9
144:14,17
180:25 183:1
191:8

**closer** 57:10
161:21 184:19
190:20

**closest** 110:18

**closing** 110:25
111:16,20,23
113:9

**closure** 111:15
119:20 120:22
121:8,21

**cloud** 86:21

**cluster** 70:6

**colleagues**



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.**MILESTONEREPORTING**.com      Toll Free 855-**MY**DEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2384 of 2460   PageID 2676

43:18 54:20

**collect** 43:6
79:5

**collected** 22:16
69:16 70:4
86:24 176:21

**collecting**
54:25 86:22

**collection**
42:23 69:5
79:7

**college** 10:15

**collided** 21:14
107:23

**collides** 108:3

**collision** 37:12
57:14 58:21
59:13 81:24
93:11 106:13
107:19 109:10
117:15 123:18
167:14 168:22
175:4 184:16
188:8 192:12
196:22

**collisions** 12:4
23:19,20 24:19
81:12 145:12

**column** 63:2

**combination**
19:8 73:3 74:2
81:19 155:7

**combine** 62:11
176:1

**combined** 9:11

**combining** 68:18

**comes** 71:2 85:6
95:18

**coming** 26:7,9
35:10 98:8
143:8 160:14

**comment** 153:8

**commercial**
23:19 61:14

**committee** 45:6

**common** 54:22
57:5,9

**communicated**
22:6

**communicating**
22:12,14

**communication**
66:19

**communications**
8:5,9,13

**community** 76:2

**companies** 47:5
54:9 56:9
57:10

**company** 1:10
4:12,21
45:17,19 46:25
54:9,13 64:4
85:3,4

**compare** 28:23
34:13,15,20
37:15 51:18
52:25
110:18,19

**compared** 34:23
78:22

**comparing** 20:1

33:21 73:1
169:14 194:19

**comparison**
120:14 194:25
196:6

**comparisons**
158:23 194:23

**compass** 177:12

**compete** 52:2

**competency**
13:16

**complete** 28:7
30:3 31:23
35:10 49:10
92:19 118:4

**completely**
112:4 115:19
155:12

**complex** 14:5
125:24

**complicated**
180:3

**component** 12:1
44:22 159:12

**components**
13:14 16:4,6
68:21

**comprehensive**
22:9

**computer** 41:7
152:11 163:10

**concede** 168:25

**concept** 40:2

**concepts** 15:15

**conclude** 106:3

140:5,14
141:10 161:14
176:23 191:10

**concluded**
123:16,20
124:18 142:24
149:5 160:16
192:12

**concluding**
143:2 158:13

**conclusion**
73:13 93:25
135:22 145:4
148:19 159:16
169:7
174:12,19
176:2 177:8
189:3 190:25

**conclusions**
14:17 15:7
24:9 26:18,19
102:2 138:13
161:18 192:22

**condition**
160:17

**conditions** 70:5
72:22 75:18
96:8 199:2

**conduct**
29:17,18 30:12
34:9 36:21
85:17 136:21

**conducted** 87:16
137:1 180:7
189:9

**conferences**
42:13

**confidential**



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       www.**MILESTONEREPORTING**.com       Toll Free 855-MYDEPOS

Appx_2380

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2385 of 2460   PageID 2677

48:1,8

**configuration**
21:4 192:25

**configurations**
20:12 148:18
154:6

**conflicting**
51:8 192:14

**conflicts** 115:2
118:20

**confused** 65:24

**connected** 68:22

**connection**
58:24

**consensus**
185:22

**consequences**
138:24

**conservative**
71:15

**consider** 16:16
51:17 71:14
77:4 162:12

**considered**
14:20 51:9,10
72:21

**considering**
71:13 72:21

**consistency**
77:25 78:2
154:3 177:7

**consistent**
34:1,12 36:24
53:6 56:9 78:7
79:20 84:18
108:10,12,14

109:14 113:2
144:24 146:15
147:1
151:2,12,13,23
152:2 154:4
156:7,18 157:4
161:8,11,12
173:5,6 175:3
185:13 187:12

**conspicuity**
100:24 101:1

**conspicuous**
100:8,11,15,18
,21

**construction**
119:19,20

**consult** 6:7

**consultant**
10:19

**consulted** 6:8

**contact** 130:15
138:24 142:10
144:18,25
145:5,8,22,23
146:2,7
147:3,5 148:23
149:4,12
151:1,4 153:18
154:16,18
155:4,16,17
156:2,6
157:1,12,14,15
159:13,14
164:25
165:10,15
166:15,17
167:1

**contacted**

155:13 157:9

**contacts** 156:25

**contained** 62:8

**containing**
65:10

**context** 112:22

**contingency**
49:11

**contingent**
49:19

**CONTINUED**
199:21

**continuing**
45:1,4,7

**contradict**
55:17

**contradicted**
52:20

**contradicting**
52:11

**contradictory**
51:22

**contributing**
37:12,14 95:2

**control** 26:13
28:3 67:8 79:8
81:6

**controlled**
130:5

**convert** 69:22

**convey** 122:13
123:1,5

**conveyed** 122:15

**cooperation**

58:7

**coordinate**
68:11,12 69:3
74:17

**coordinates**
58:23 61:7
62:5,6 65:3
71:13,14 89:6
176:12

**cops** 132:3

**copy** 64:24
91:22 149:18

**core** 10:6 14:14
19:5

**corner** 21:7
145:8,24
156:23 160:2
165:2 179:24

**correct** 7:8,22
8:19 15:18
26:16 39:16
41:19 43:13
47:12,18 48:23
50:16 53:4
55:25 56:24
58:1 70:23
74:8 94:9,21
99:13,16
101:15 104:2
120:5,6 123:14
124:13 125:5
131:3 138:3,7
140:3,7 141:14
142:25
143:1,22 144:6
148:21 151:15
153:20 159:2,6
167:14,15,22,2
5 174:21



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       www.**MILESTONEREPORTING**.com       Toll Free 855-MYDEPOS

Appx_2381

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2386 of 2460   PageID 2678

175:21
197:2,15

**correction** 31:9

**corrective**
118:3

**correctly** 60:12
141:4,5

**correlate** 87:14

**correspond**
179:11

**corroborating**
129:22

**costly** 63:12

**costs** 54:23

**counsel** 3:23
4:16 6:5
8:5,14 22:14
47:4 49:3
50:2,22 59:8
62:13 66:17,19
85:4 150:21

**Counsels** 4:15

**count** 170:9,19
171:18 172:3

**counted** 23:8

**counteractive**
142:9

**counterclockwis
e** 145:25 166:2

**countersteer**
137:6

**country**
25:15,17

**counts** 97:13

**county** 93:15

**couple** 33:7,15
38:12 84:12
90:23 126:4

**course** 16:20
19:24 30:19
37:10 92:18
139:11,12
179:12

**courses** 10:12
16:3 19:6,7,20
45:11

**coursework** 9:18
13:20 14:6

**court** 1:1,24
4:4,13 5:3
24:24

**crack** 90:14

**cracked** 144:10

**cracks** 87:12,13
90:4

**crank** 193:8,17

**crash** 17:1
38:1,7 57:18
61:15,20 64:2
84:5,6,21 85:1
88:2 91:22
94:4
95:2,15,19
114:16
139:8,13 169:1

**create** 87:10
89:12 90:9
133:14 156:19
165:17

**created** 34:8
108:20,22
118:22 130:10

131:20 143:19

**creating** 12:7
114:14 118:21
130:15
133:21,22
145:16 168:12

**creation** 66:1

**credibility**
51:13,20

**critical** 101:8

**cross** 135:16
139:6

**Cross-
Examination**
3:3

**crossing** 24:7
27:23

**CSV** 60:2,15
62:8,22 63:2

**cue** 111:2

**cumulative**
35:20

**current** 4:5

**curriculum**
19:23 20:9

**curvature**
173:10,13

**curvatures**
43:20

**curve**
78:2,3,6,16,17
,20 92:14 93:1
96:3 98:15,23
99:8 173:15
179:25
180:15,16

**curved** 92:17

**curves** 114:15

**CV** 5:22 8:23
38:20 42:17

**CV.............
...........5**
3:14

**cycling** 152:13
153:15

---

D

**damage** 17:3,9
140:11,12
144:7,16,23
146:10,14,15,1
6,21 147:1,9
149:8,9,12,15,
20 151:22,25
152:1 153:18
154:2,5,11
155:4,9,10,22
156:7,16,18,21
,22 157:1,14
158:7,14,25
159:4,15,23
160:1,7,11,18,
21
161:1,3,6,7,8,
10,16,20
162:3,7,8,15,1
7
164:13,16,20,2
2,25 165:3,17
166:8,18 188:3

**dark** 173:10

**dark-colored**
102:23

**dashboard**



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2382

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2387 of 2460   PageID 2679

122:20

dashcam 94:3

data 20:2,10
 21:18 40:12
 42:23 58:19
 59:11
 60:5,14,21,23,
 24 61:21,25
 62:2,4,7,9,22
 63:6,10,17,23
 64:3,5,18
 65:1,8 66:1,2
 67:5,7,12,17,2
 2 68:8,10 69:7
 72:7 74:11
 76:8,10
 77:16,17,20
 78:1,2,4,6,9,1
 2,15,23 79:1
 83:9,24,25
 85:24 94:2
 97:20
 106:2,5,6
 128:10
 129:1,3,5
 168:18
 174:14,19
 175:2,8,13,19,
 22,24,25
 176:3,4,6
 177:2,7,11
 178:1,12,13,15
 ,21 183:8,18
 184:6
 185:4,6,11,12
 195:20

date 1:16 6:11
 55:7 79:17

dated 6:10 83:6
 168:19

dates 70:25

Daubert 25:1

day 4:5 84:11
 97:16 119:2
 185:22

daylight
 124:16,17,22

daytime 23:20
 101:3,4

dead 189:20

debris 164:19

decades 87:8

deceased 1:6
 4:10

decedent 31:13

deceleration
 105:17

December 1:16
 4:5

decide 113:18
 131:14

decides 135:11

decrease 106:18

decreased
 198:17

deeper 72:7

Defendants 1:11
 2:11 4:20

defense 6:4
 23:5,12
 46:19,21,22
 48:25 49:3
 50:22 59:8
 66:17,19

Defense's

186:12

define 120:21
 133:12

defines 119:15
 180:15

definite 120:25

definitively
 131:11 171:17

deflates 132:20

deformation
 16:12 163:8

deforms 132:13

degree 9:15,25
 10:1,11
 19:4,11 45:13
 161:13 179:18
 183:7,8,23
 189:8 190:2,23
 191:2
 197:18,24
 198:1,7,9

degrees 8:24
 9:5,9,15 10:15
 92:18
 177:9,13,14,15
 ,16,23 178:8
 179:3 181:10
 184:16,20
 185:12 186:19
 189:9 190:11
 197:9
 198:10,13

delineate 12:18
 22:8

delineation
 155:1

demonstrating

43:5

demonstrative
 166:10

demonstratives
 168:12

dent 164:6,9,11
 166:12,20

Department 44:1
 82:6 119:14
 120:7,18

depend 85:20
 105:5 133:16

dependent 75:17

depending 27:12
 52:17 100:9
 103:19 133:12

depends
 12:9,12,15
 16:14 40:11,15
 85:10 101:7
 102:3 112:6
 124:1 127:23
 128:2,6 182:24
 187:3

deponent 4:23

deposed 6:16
 52:14

deposition 1:15
 3:25 4:7
 7:8,21,23
 22:6,12 117:1
 185:15 194:15
 195:5,6

depositions
 47:14 157:21

derive 61:21,25
 62:18 80:16



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MY-DEPOS

Appx_2383

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2388 of 2460   PageID 2680

**derived** 63:3

**describe**
13:7,17 14:7
15:25 18:12
19:2 20:3
25:25 54:1
80:23 141:9
146:13 192:8

**described** 91:21
132:12

**descriptions**
97:8

**design** 14:22
43:12,20
44:2,22

**designed**
121:10,20
122:11 123:1

**designing**
44:8,9

**despite** 158:4

**detail** 120:16
192:8 195:15

**detailed** 61:18

**details** 14:5

**detection** 101:2

**determination**
169:13

**determinations**
51:13

**determine**
51:14,20 78:12
112:7 137:2
194:22

**deviate** 178:3,4

**deviated** 175:21

**deviation**
175:15 176:23

**devices** 75:20
185:4

**diagonal**
145:14,21

**diagonally**
145:25

**diagram** 87:10
88:10 166:10
173:12,17

**dictating** 129:7

**died** 26:15
27:1,17
28:1,11 30:3

**difference**
18:12 22:2
69:12 81:2
95:22 118:23
124:15 125:14
177:5 197:25

**different** 11:16
16:14 22:7
23:21 28:22
32:20 35:8
40:11,15,22
41:1,20 45:19
46:6
52:5,10,11,17
65:9 66:24
67:4,8,10,13
69:23 70:25
73:21 75:23
76:16 96:22
110:23,24
111:6 112:5
120:24 122:21

124:14,25
126:4 148:18
153:2 154:6
163:18 193:21
198:3

**differential**
118:21 124:19

**differentiate**
101:18

**differently**
28:22 102:4

**difficult** 77:6
111:17

**dig** 72:7

**digging** 132:25

**digital** 42:23
128:15 178:21

**direct** 3:2 5:11
15:23 66:19
194:24

**direction**
26:11,12
121:24,25
141:25
142:2,10
143:9,13 146:1

**directly**
10:12,13,15
19:20,25 31:14
51:18 63:3
82:23 138:5

**disabled** 122:24

**disagree** 84:7
122:25 147:22
155:12

**discipline** 9:16
15:16 16:21

**disciplines**
9:20 13:9

**disclose** 47:22
48:9

**discussed** 83:8

**discusses**
110:10

**discussing** 74:6

**discussion**
72:13

**dishes** 68:22

**disingenuous**
65:14

**dismissing**
196:2

**disparity** 81:9

**displaced**
170:20,21,23
171:20,21
172:1

**dispute** 53:5,8
186:12

**disregard** 48:15
115:19

**dissect** 28:4

**distance**
21:9,15 28:6
29:20,22,23
30:2 31:20
37:16 39:19
62:14 72:24
73:6,23 86:11
90:7 95:25
96:1 104:24
105:25 106:7
117:7,8 120:8



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

148:9
179:14,19,21
180:12,18
190:14 191:6
192:2

**distances** 15:5
17:15 38:17
39:4 84:12
86:9 115:18
122:12

**distracted**
126:6,21
127:5,17 128:4

**District** 1:1
4:12,13

**ditch** 102:21

**divide** 112:18

**document** 6:7
7:17 86:23

**documentation**
85:13 87:21
91:15 94:4

**documented**
46:15 57:17
134:24 175:14

**documenting**
85:10,23

**documents** 7:11
85:14

**done** 44:17
46:24 56:1
57:13 58:3
63:9,19 72:13
115:17 136:23
170:17 196:7

**door** 144:12

**DOT** 43:23

**double-check**
47:11 53:16
69:1 72:1
104:23 138:17

**download**
55:23,24
58:3,15 59:5
60:16,21,23
63:13,17,24
64:4,13 79:12
82:12 83:23,24

**downloading**
63:21 66:10

**downloads** 58:7
66:9

**drag** 13:25

**drastic** 118:22

**drastically**
34:17

**draw** 149:19
150:7

**drew** 15:8

**drive** 1:20 7:14
36:13 60:18
122:23 183:20

**driven** 125:16

**driver** 24:13
27:1 28:1 30:3
34:2,15,22
35:4,14
36:4,8,21 37:4
44:5,13 93:5
104:4,7,10
105:12
109:16,20
110:1,3,10
113:5,12,14,16

,18,20 115:3
116:11 118:15
120:9,19
121:8,14
126:7,9,21,23
127:17 135:25
196:21
199:8,20

**drivers**
33:18,19,22,23
,24 34:25
35:18,20 36:25
44:17,23 100:8
105:2
110:16,20,25
111:8,12
112:8,19,20
118:17 122:22

**driver's** 111:6
128:12 141:1

**driving** 127:6
131:15 192:4,5

**drone** 57:17,20
84:10 86:18
87:9,16 89:18
90:7,11,15

**drones** 43:7
86:22,23

**DuBoff** 2:8 4:19
5:23 6:2
8:2,7,15,19
15:11 36:23
48:12 49:5
67:19 97:24
110:2
114:12,25
115:14 116:2
118:12 127:20
150:8,13,15,17

189:20

**DuBoff.........
......208** 3:3

**due** 32:2 33:4
144:18 148:6
189:7

**duly** 5:10

**during** 9:17,21
12:4 81:24
135:2 173:7
177:23 180:17
190:15

**dynamic** 13:25
135:24 177:19
178:25

**dynamics** 9:19
13:18,19,21
14:4,8,10,13,1
6,24 15:4 16:2
19:8 133:13
135:23

---
E
---

**earlier** 53:12
81:1 86:7,10
101:12 114:3
120:3
131:21,25
182:13 197:7

**early** 19:10

**Earth** 76:17,20

**easier** 155:3

**easily** 101:6

**east** 2:9 189:4

**Eastman** 1:10
4:12,20 46:24



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2385

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2390 of 2460   PageID 2682

**eating** 132:23

**edge** 153:19
154:9

**edges** 154:9,17
159:21

**educate** 193:2

**education** 10:6
13:18 15:24,25
19:2,4
45:1,4,8

**educational**
15:22

**effect** 145:20

**efficiency**
50:11

**efficient** 54:25

**eight** 42:20
117:15 118:9
123:17 124:2
126:18 129:11

**eighth** 138:16
169:3

**eight-hour** 13:8

**either** 7:20
31:23 39:4
42:5 66:12
79:15,19 91:23
103:19 110:12
119:24 132:22
134:10 138:15
141:19 156:3
183:18 192:16

**elbow** 156:8
157:3,15

**elbows** 165:20

**electronic**

21:18 128:10
129:1,3,5
175:19

**element** 16:6

**elevated** 166:17

**elevation** 43:20
139:2 145:10
161:6

**eliminate** 130:2

**else** 24:15 32:8
54:15 56:25
57:3 82:25
99:10 128:21
156:24 161:14
176:4

**emergency** 31:7
32:6,25 33:1
35:9,11 101:17
103:12 112:2
115:22
122:9,15
123:2,4,5,6,9,
11 173:6,7
177:21 178:7
185:8 190:14
197:9

**empirical**
20:2,10 21:8
180:4

**employed** 5:16

**employee** 47:18
49:24 50:13

**employer**
48:9,15 50:7

**employer's**
48:22

**empty** 188:11

**encompass** 12:18

**encompasses**
13:9 15:17

**encompassing**
13:15

**enforcement**
15:21

**engaged** 6:4

**engaging** 12:1
53:21

**engineer**
10:18,20,25
11:11 30:20
39:11 42:3
78:15 90:18
180:22

**engineering**
9:2,3,16,17
10:14,21
11:3,4
13:14,16 14:14
15:14 16:21
17:7 19:6,10
20:13 22:16
39:19,22 42:24
43:18 44:22
45:5 47:13,19
48:2,3 49:24
52:1 54:11
57:10 66:20
68:14 78:19
106:7 135:21
157:9 161:13

**engineers** 17:12
45:17

**entire** 7:14,18
32:21 81:14
135:8 147:6

**encompass** 12:18

**entirely** 7:17
27:22 32:11
50:5 51:17
73:19
110:12,13,21
111:5,9,24
112:13,14
113:2

**entities** 25:20
47:6

**entity** 50:19
57:7

**envelope**
126:11,14
148:6

**environment**
12:3 17:14
39:7 40:6
44:16
69:4,9,14 70:5
96:7

**environmental**
11:22 43:19
68:21,22 71:12
75:18 94:3
98:17 176:22
178:24

**equally** 130:6
135:20 136:5,8

**equates** 185:9

**equation**
189:13,23
190:16,19
197:8

**equations**
16:19,25
20:8,10,16,24,
25 21:2,3,8



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Appx_2386

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2391 of 2460   PageID 2683

110:24 177:21
180:5,11 189:7

**equipment** 63:21
64:10 84:14

**equity** 50:17,19

**ergonomics** 44:8

**Erick** 1:4,6
4:8,10 103:25

**Erin** 1:9
4:11,20

**ERRATA** 3:5

**error** 40:17,20
41:4,17,19,22,
24 42:3,4
56:15 68:7
69:10 70:24
73:3,8,13,20,2
2,25 74:7,11
138:12 176:20

**errors** 178:18

**escapes** 134:15

**especially**
81:11 109:5
148:4

**ESQUIRE** 2:2,8

**essentially**
86:25 90:11
125:1 146:3
161:24

**establish** 37:14
39:8 40:3,16
41:21 51:11
53:6 56:14
69:6 70:6 71:4
76:4 77:5,7
87:15 90:12
154:17 168:9

175:12 176:19

**established**
20:10 45:16
76:22 88:6,13

**establishes**
87:1 180:13

**establishing**
39:6 185:5

**estate** 1:5 4:9
7:22 25:19

**estimate** 71:15
151:21

**estimated**
151:22

**estimation** 23:9
166:1

**evaluate** 113:15

**evaporate** 39:15

**evasive** 173:2,4

**Evelyn** 1:6 4:11
103:22,24
130:4 135:16
137:10 140:21
147:20,23

**event** 79:15,19
80:8,11,13,20,
21 81:20,25
82:2

**event-based**
81:22

**events** 62:5
69:17 79:18
80:5 81:18
82:4

**eventually**
90:16

**everybody** 116:9
157:24

**Everyone's**
96:21

**everything**
41:23 51:6
52:25 54:14
66:18 86:3
159:10
161:5,12 176:4

**evidence**
12:10,12,15
22:16 38:24
39:10 42:23
43:6
51:7,19,25
52:25 55:1
57:16 69:5
83:3 85:23
86:22 96:16
99:4,6 102:9
108:6 109:1,8
128:15,17,18
129:1,6,22
139:14,19,22,2
5 140:3 146:20
147:24
157:20,21
158:20
160:23,25
161:16
162:10,11,14
174:13 178:24
191:9 193:6
194:21
195:3,20 196:1

**evidenced** 130:4

**exact** 22:24
36:17 59:18
76:5 81:4

118:22 161:7
172:23 186:10
196:18

**exactly**
30:15,18 33:10
36:7 39:20
78:24 124:4
131:2 143:17
159:20 170:6
172:21 175:5
177:1 195:15

**examination** 3:2
5:11 13:8

**examining**
110:20

**example** 17:23
32:4 39:13
52:13 65:2
70:15

**exceeded** 144:1

**Excel** 60:3
62:1,3
65:9,11,16,18
66:2,16

**except** 6:23

**excluded**
170:4,12

**exclusive** 19:13

**excuse** 26:8
45:20 83:16
182:9

**exhibit** 3:13
5:21,22,24
43:17 157:18
166:17

**exhibits** 5:18
82:17



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

**exist** 116:20
  139:11 148:18
  188:20

**existed** 161:20

**existence**
  159:12 166:19

**existing** 164:21

**expect** 18:23
  67:4 80:19
  84:18 170:23
  196:18

**expensive** 63:22

**experience**
  13:20 19:16,19
  20:4 52:14
  64:6 81:17

**experiments**
  137:1

**expert** 11:15
  14:7 16:17
  24:23 35:4,14
  44:3 83:15
  101:13 102:4
  122:18 127:5

**expertise** 14:11
  43:24,25 44:11
  73:9 78:19
  101:23 120:5
  133:10 185:3

**experts** 15:13

**explain** 145:3
  177:10

**explanation**
  156:21 157:11
  165:8,9,10
  166:12

**explanations**

33:15

**explicitly** 62:2

**Explorer**
  54:4,15
  55:6,21 60:23
  61:11 63:4
  67:18 70:22
  79:24 80:9,11
  91:12
  108:20,23
  128:13,22
  140:6 148:20
  149:7,12
  153:13
  154:20,24
  155:9,18
  156:2,7,15,16
  157:2,14
  158:17
  159:1,5,24
  160:7,9,16
  161:17 162:15
  163:21,22
  164:14
  165:14,16
  167:18 169:15
  170:4 188:4
  194:16

**Explorer's** 82:1
  139:4 169:20

**exponentially**
  114:16 198:3

**express** 77:9

**expressing**
  126:5

**extend** 148:5

**extending**
  145:11

**extensive** 13:19
  16:3 88:16
  89:1

**extensively**
  90:24

**extent** 8:10
  14:24 160:5

**extract** 40:6

**extraction**
  64:8,11 65:19
  66:1,13

**extrapolate**
  135:5

**extrapolation**
  135:6

**eye** 111:19

**eyes** 94:7 129:4

---
F
---

**face** 159:2
  164:25

**faced** 109:16

**facing** 34:4
  195:6

**fact** 124:19
  148:14 178:11

**factor** 17:2
  29:8,10
  37:12,22 101:1
  110:24 112:18
  124:17 125:23

**factors**
  10:13,16 11:15
  22:11
  44:3,7,21 95:2
  100:17 101:7
  115:20,22

120:12

**facts** 27:12
  35:2 38:1,5
  48:3 51:15
  79:18,20
  111:25 116:12
  126:25
  127:1,8,10,13
  128:8 190:12

**failure** 16:10
  133:12,17,24,2
  5 134:4,9,11
  135:3

**failures** 134:5

**fair** 34:10
  36:18 37:19
  48:18 54:12
  58:10 59:10
  64:23
  72:15,16,19
  93:3 96:15
  97:21 102:14
  103:11
  114:19,21
  158:3 160:13
  161:15 162:20

**falls** 77:20
  86:4

**familiar** 43:22
  45:24

**fashion** 32:7
  175:11

**fast** 113:10
  119:7 181:14

**faster** 91:23

**faulty** 11:18

**features** 87:11



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2393 of 2460   PageID 2685

**federal** 22:21
43:23 76:21
80:2 119:14

**FedEx** 25:20
26:2,4,5,10
27:23

**fees** 13:2

**feet** 28:15,18
29:16 32:13
33:7 36:3,5
62:17 68:16
70:1,8,9 71:16
74:11 75:19
84:12 92:20,22
93:1,5 95:4,10
98:23 99:18,19
100:3,6
106:1,3,20
110:14
112:15,16
115:8
121:2,7,13,16,
17,21
122:3,5,7,9
123:22,25
125:6,7,11,16,
18,20
137:12,14,19
145:10 146:6
161:17 164:25
165:16,23
176:13 177:2
179:10,12,13
180:20,23
182:12 183:11
186:23
187:11,18,23
189:4
191:4,14,19,24
192:1,5

**fender** 145:14
152:4,5,7,8
153:10,20
154:3,12,13
161:11 165:4,6

**fender-vault-**
**type** 21:7

**fewer** 170:5

**field**
10:9,12,15
13:16 19:20
44:7,10 100:5
121:17 122:1,8

**fifth** 137:8

**fight** 48:16
49:9 172:11
174:7

**figure** 39:20
64:25 65:2
78:18 86:8
88:2 89:3,4,20
104:24
149:19,22
152:9 162:21
169:22,23
170:1 171:11
179:18 180:10
194:21

**figured** 172:24

**figures**
89:10,11,13
97:10 150:23
159:17

**file** 7:14,18
60:2,15
62:3,8,12,22
63:2 65:9,11
66:2 67:25

83:11,13,14,22
,25 152:20
153:2 163:14
168:15

**filed** 25:4

**files** 59:23,25
60:9,13

**final** 39:9
130:5 176:9

**finally** 126:23

**finding** 52:23

**findings**
22:14,23 48:6

**fine** 6:7,20
22:25 91:23
111:11 138:19
147:18

**finite** 16:6

**firm** 45:22
46:3,4,5,6,10,
21 47:19 54:3
57:12,13

**firms** 66:20

**first** 5:10 22:2
31:2 38:12
53:23 73:19
74:16 95:12
104:18 115:21
132:18 139:10
145:6 168:23

**fist** 156:12
157:3,15

**fit** 155:23

**fits** 159:22

**five** 46:16,17
81:5 103:19,25

137:17,18
182:4
188:16,19

**five-year**
9:12,13

**fix** 40:6 111:21

**fixed** 88:14
89:11,17 90:17
98:17,25 99:8
132:15

**fixes** 39:7

**flail** 148:17
165:19

**flange** 132:16
133:7

**flanges**
132:19,24

**flapping** 133:20
134:16

**flashers** 103:12

**flat** 92:8
111:13
130:1,13,14,22
131:6,16,20,21
132:14
133:10,21
143:19

**flat-earthers**
173:16

**flip** 148:18
149:17 174:23

**flipping** 148:25

**Florida** 1:20
9:3 12:24 22:4
25:14,16,17

**flow** 97:4



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2394 of 2460   PageID 2686

**fluid**
13:18,19,21,25
14:4,7,10,13,1
6,24 15:3 16:2
39:10 103:6
154:16 155:3,5
170:21,22,24
171:20,22,24
172:1,5,7,8,9,
14 174:11

**fluid/matter**
153:18

**fluids** 14:20
15:8 154:2
155:7

**flyover** 87:21

**focus** 5:17
45:13,15,21
46:23 47:9,20
48:24 49:18,25
50:6,17,20
53:13 57:7,24
91:17 137:24

**focused** 61:20
64:3

**fold** 132:23
138:23

**folder** 60:12,21
83:16
163:18,20,21

**folds** 130:15
132:18 133:6

**folks** 45:20

**foot** 36:25
105:21 108:8
169:1 183:14
191:22 196:21

**force**
16:7,11,12,19
17:2 141:17,25
142:2,3,11
143:3,6 145:17
161:21

**forces** 13:24,25
19:14 142:9,12
143:25 144:18
148:13

**Ford** 21:15
54:4,15
55:6,9,21
56:10,17 58:20
60:23 61:11
63:4 67:18
70:21
79:9,10,22,24
80:8,11 81:16
82:1 83:9
91:12
108:20,23
128:12,22
137:20,22,25
139:4 140:5
145:5,24
146:5,9
147:4,7 148:20
149:7,12,16
153:12,20
154:20,22,24
155:9,18
156:1,2,7,15,1
6,20,23
157:2,10,14
158:17,25
159:5,23
160:7,9,16
161:17,24,25
162:9,15
163:21,22

164:14,21
165:13,14,16
167:18
169:15,20
170:4 174:14
188:4 194:16
196:21

**Ford's** 137:18
170:5

**forensic**
10:18,19,21,25
11:11 42:24
45:17

**Forensics** 5:17
45:13,16,21
46:23 47:9,21
48:24 49:18,25
50:6,17,20
53:13 57:8,24
91:17

**form** 31:8 32:9
36:23 67:19
70:6 101:17
104:23 110:2
111:22
114:12,25
115:11,14
116:2 118:12
119:25 121:12
127:20 151:9

**formats** 65:9

**forms** 20:12

**forth** 52:23
101:21 148:25

**Fortunately**
51:16

**forward** 93:6
140:15,19

141:10,12
142:22 145:15
159:17 161:22
162:5 167:17

**foundation**
10:6,8 52:1

**foundational**
10:6 14:2,13
17:10 19:9,24
20:7,13

**foundations**
10:14

**fourth** 137:7,8

**four-way** 122:16

**four-year** 9:12

**fraction** 22:11

**fractions** 121:3

**fragments**
146:23
154:20,21

**frame** 97:6
176:21

**frankly** 196:15

**free** 171:22

**Freeman** 45:22
46:4

**freeway** 33:3

**frequent** 63:12

**friction** 133:23

**front** 7:18 96:9
118:8 126:3
142:5,15 144:5
145:8,23
149:6,7 153:20
156:15,23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      www.**MILESTONEREPORTING**.com      Toll Free 855-MYDEPOS

Appx_2390

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2395 of 2460   PageID 2687

157:10 159:2,3
160:2 161:17
162:1,4,15
163:7
164:7,14,21,25
165:17 166:4,7
194:16

**full** 4:24 5:14
22:9 74:16
89:5 177:13
183:7,8

**full-frontal**
21:5

**fully** 13:9

---

G

**game** 111:6
120:24 195:1

**gap** 32:23 35:25
139:3

**Garmin** 74:22
75:21

**gas** 37:1,2,6
105:16,17,19,2
1 108:8,11

**Gateway** 2:9

**Gduboff@mcguire
woods.com** 2:11

**Gen** 72:13,17
75:7,11 77:18
78:23 79:1
185:4

**general** 6:19,22
9:14 69:4 73:8
75:15,20,25
77:6 84:9
122:23 151:17

166:11

**generally** 13:15
15:14 24:21
29:21 50:12
69:10
70:3,5,19
75:19 85:22
127:2 133:13
154:5

**generate** 16:23
21:25 56:15,19
64:12 65:17
86:20 89:18
91:18 132:10

**generated** 21:24
22:18 23:14
60:6 162:18
164:18 172:21

**generating**
14:16 51:22
173:9 186:8

**generation**
66:22,24
67:4,13,21
68:8 72:8
74:24 75:2,4,6
82:3

**generations**
66:25 75:3

**generic** 13:23
168:10

**Georgia** 12:24

**gets** 67:12
104:21
165:14,25

**getting** 12:25
60:11 93:13
124:9 140:22

179:7 183:24

**given** 7:14
12:16 60:18
61:22 81:1
114:23 120:19
137:18 148:13
191:6 197:11

**gives** 20:9 64:1
97:20 106:6
111:2 171:5

**giving** 121:24

**glance** 73:19

**glancing** 89:9

**glare** 95:1

**global**
69:2,3,9,11,19
70:8 71:1,3
72:24 75:25
76:11,14,19
77:2,20 78:10
175:9 176:15

**goal** 73:5

**gone** 57:16
183:15

**Gonzalez** 1:4
4:8

**goodness** 43:4

**Google** 70:24,25
87:22

**goose** 83:5

**gotten** 139:9,20
140:1

**GPS** 58:22 59:1
61:7,19
62:4,6,21 63:3
65:2

68:8,11,12,19
69:3,23
70:6,15,21
71:13,14 72:13
73:4,9,10,20,2
5 74:10,22
75:10,14,15,20
,25
76:10,21,23
77:6,11
118:2,7
129:2,17
174:14
175:7,8,10
176:12 177:2
185:11
187:12,17

**GPS-based** 62:20

**Gracie** 117:11
118:10 123:17
128:13 129:9
181:4,15
198:23

**grad** 20:4

**gradually** 180:2

**graduate**
9:18,23 10:11
13:20 19:12,14
38:13

**graduated** 45:12

**graduating**
10:11

**graduation** 9:8

**grassy** 102:21

**gravity**
145:11,13

**great** 10:8



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2396 of 2460   PageID 2688

17:23 122:12

**greater** 31:20
109:15,20
111:16
142:15,17,18
190:2,5
197:14,22
199:19

**greatest** 43:8
133:18

**Greg** 48:10

**Gregory** 2:8
4:19

**groove** 130:10
131:10 134:22
143:24 170:3

**grooves**
169:14,15,17,1
9
170:1,5,8,10,1
9,24
171:1,2,18,24
172:3

**ground** 6:19
145:10 153:6
154:15 155:2
165:1 172:14

**guaranteed**
76:20

**guess** 16:16
18:22 25:12
26:8 27:9
31:21 46:8,15
48:14 58:12
63:3 68:14
71:10 83:5
88:21 89:9,16
92:3 102:3

115:5 134:4
139:24 146:7
152:6 153:11
157:13 164:15

**gun** 159:20

---

### H

**half** 42:6 53:24
107:25 108:2
109:25 134:25
151:7 182:4,24
187:25 196:14

**half-inch** 42:3

**halfway** 187:1

**hand** 5:2 102:3

**handful** 22:21
85:7

**handheld** 75:21

**handles** 133:10

**handling** 130:1
135:25

**hands** 165:23
166:11

**hanging** 166:11

**happened** 10:22
11:4 24:3
33:22 40:10
55:15 56:5
91:10
127:12,15
131:6 133:25
134:23 145:22
161:3 166:1
172:15 181:8
195:16

**happens** 18:19
66:3 131:16

132:20 155:17

**happy** 88:17

**hard** 64:20,24
67:6 101:6
108:14 131:9
132:6,7 146:16
148:13 152:12
155:4 156:19
170:22 172:11
173:15

**harder** 174:7

**haven't** 53:1
120:13 139:22

**having** 5:10
49:12 81:15,22
180:19

**hazard**
28:19,21,24,25
29:13,22
30:6,15,18,21,
23 31:6,12,15
32:7,8,24
33:6,12,13,16,
25
34:5,8,16,17,1
9,24,25 35:18
37:15,18,20
101:10,11,14,1
5 104:13,20
105:3
115:4,16,23
116:19 118:7,8
120:9,19,21
121:14 122:22
123:11,12
125:23 126:13
128:24 129:12
199:12

**hazards** 31:1

33:1,18 44:15
101:19 114:14
115:7,18,21
122:17

**Hazeltine** 1:20

**head** 6:20 24:1
31:14 55:12
61:6 67:2
75:14 78:10
81:13 126:16
145:9,22
146:19,25
147:2,3 148:21
149:5
151:2,14,16,17
,20 152:6
155:13,16,17,2
1 156:5,15
157:9,23
158:2,10,16
159:18 165:13
166:1 189:4
196:16,17

**heading** 180:3
183:23

**headlight**
154:12 155:9
157:10 164:23
166:18,20

**hear** 134:7

**heat** 13:13
132:10

**heavily** 68:20
69:18 75:17

**heavily-studied**
75:16

**heavily-validated** 87:6



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2397 of 2460   PageID 2689

**heavy** 96:17,22

**he'd** 167:24

**help** 20:11
77:5,6,11
176:18 193:2,9

**helpful** 73:19
85:11

**helping** 53:8
193:4

**helps** 71:4
178:12

**hereby** 3:23

**hers** 82:16

**he's** 147:6
150:16
161:23,24
165:21 166:8
191:19,22
195:10,15

**Hey** 7:3 63:17
123:5 129:16

**hierarchy** 47:6

**high** 84:14

**higher** 64:1

**high-fronted**
21:6

**high-speed**
24:19

**highway**
111:7,13,14
113:14 114:16
118:21 120:10
122:5,10
177:20

**hired** 22:14

54:13

**hissing** 134:7

**historical**
87:20

**history** 23:8

**hit** 17:17 18:19
105:21
109:3,17
143:16
146:19,25
147:2,7,11,15,
20,23 155:20
156:3 158:17
165:13,14,18,2
5 166:8
167:17,21
168:4 188:7
195:7

**hitting** 81:18
105:22 106:3
109:25 114:10
152:2 156:8,18

**hold** 8:24 9:1
44:11

**holding** 165:9

**hole** 152:5

**home** 61:11

**homogenous**
148:15

**hood** 154:11
196:17

**hotel** 61:17,19

**hour** 23:25 24:7
27:2,5
35:19,21,24
36:3 37:3,5
47:10,12,15,17

53:24 62:19
79:25 80:5,13
81:1
95:14,20,23
97:10,16
104:14 105:9
107:2,4
109:23,24
111:16
124:18,23
177:21 181:16
183:11
190:18,21
197:4,10
199:16

**hourly** 47:7
49:25 50:3

**hours**
59:12,15,17
66:9 124:14

**housing**
144:9,10

**Houston** 61:17

**hugging** 130:22
131:5

**human** 10:13,16
11:15,21 12:1
22:10
44:3,5,7,13,21
111:19 112:17
115:20,22
148:14

**humans** 44:20

**HVAC** 13:13

**HVE** 11:20 12:14

**hypothetical**
183:4

**hypothetically**

198:5

---

I

**I-45** 94:12

**I'd** 38:19 49:9
59:17 61:6,19
67:2,25 68:3
72:1 74:13,21
75:8,12 77:19
104:23 133:7
158:18

**idea** 23:14
24:11 96:24
131:19 142:13
188:15

**identical** 158:7

**identifiable**
28:21

**identification**
5:19 101:9

**identified**
89:10 104:21
155:10 169:22
172:2

**identify** 6:5
129:11 132:6,7
155:3,4

**identifying**
89:11,13

**ignore** 162:11

**ignoring** 155:24

**II** 199:21

**I'll** 6:22 27:7
28:4,16 131:14
135:5 153:16
158:18 163:16
179:1,15



**MILESTONE** | **REPORTING** **COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     Toll Free 855-MYDEPOS

Appx_2393

189:1,11

**illuminating**
94:23

**I'm** 4:17 6:9
10:21 14:15,23
15:18 16:5
17:22 18:2
22:12 24:18
25:24 34:14
41:20 42:2,8,9
44:9 46:18
47:18 48:13,14
49:22,24
50:5,8
51:8,11,16
52:9,18 53:17
55:8 56:1 61:9
64:25 65:12,13
69:21 72:22
74:1,13,24
76:12 77:21
83:10 85:19
88:17 91:14
96:25 97:19
99:9,21 102:11
109:7,8 110:13
112:17 114:22
115:10
116:3,21 117:9
122:18
127:2,7,16
132:6
136:9,13,24
139:18,24
149:18
152:11,13
153:14,24
156:17 157:4,8
158:13 159:8
163:25 165:7
166:16,25

167:3 168:20
171:21 172:10
176:1
180:11,19,21,2
5 184:5
185:5,6,12
186:13
189:12,16
194:18,21
195:18,19
196:1,2,3,4
197:20 198:4

**imagery**
87:21,22

**imagine** 44:21

**immediate** 91:21

**immediately**
40:10 167:17

**imminent** 28:21
30:5,15 31:12
32:7,24
33:1,13,16,17
101:9,11,14,19
115:4,15,18,21
,22 116:19
118:18 199:12

**impact** 17:3,19
20:12 21:1,4,5
27:22 35:25
80:22 81:15
103:16 123:21
126:12 147:8
148:3,4,7
149:6 157:2,22
158:1,9 177:25
182:5 186:11
188:12,13,20
196:12,14,15,1
7,19

**impacted** 92:15

**impacting**
160:18 162:18
164:11,17

**impacts** 9:21,22
15:4 17:5
18:1,15 19:21
20:1,5 38:16
81:6

**implemented**
37:4 118:6

**implementing**
33:2 188:17

**imply** 162:4

**import** 90:15

**important**
29:8,9
159:7,8,10
160:20

**impossible**
111:15,17

**imprint** 156:20

**improperly** 35:2

**improved** 84:5

**inaccurate**
25:25

**inboard** 161:7

**inch** 41:25
42:5,6,7,8,9
84:9 86:2,4
138:14,15,16,1
8

**inches** 142:22
183:14

**incident**
92:8,12 93:16

**impacted** 92:15

151:18 174:16
193:8

**include** 59:12
75:7 102:2
152:16 188:10

**included** 29:19
36:13 75:5
83:11 95:11

**includes**
7:20,23
13:11,13
44:8,14

**income** 48:4
49:25 50:6

**inconsistencies**
52:24 53:9

**inconsistent**
51:22,25
52:5,6,20 53:2
117:10 134:11
147:24
156:3,7,9,13

**incorrect** 74:11

**incorrectly**
132:10

**increase** 118:20
180:2 190:22
198:12

**increased**
133:22

**increases**
114:17

**indeed** 131:7,17
135:8

**independent**
27:6 196:3



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K Document 49 Filed 01/29/24 Page 2399 of 2460 PageID 2691

**independently**
11:24 27:14
78:5 87:19
178:19,20
185:7

**indeterminate**
196:23

**indicate** 103:9
104:14,19
112:23 114:15
137:4 169:19
175:22 191:7

**indicated** 68:25
105:15 116:3
158:5

**indicates** 96:16
119:23 128:18
129:1 137:6
157:22

**indicating**
123:12 124:21

**indication**
174:13

**indicative**
169:9 173:1

**individual** 53:2
69:13 127:25

**individually**
1:4 4:8 69:16
127:25

**individuals**
91:12

**industry** 42:13
43:8 54:22
63:14 75:20
87:8

**infer** 159:14

161:3

**inferring**
158:11,13

**information**
12:11 31:16
37:24 47:22
59:1,3 63:1
65:10 66:21
121:9,15,22,23

**infotainment**
55:23
58:3,15,18,25
59:4,11
60:7,8,10,14,2
4 61:2,22
63:5,11,18
64:13,17
66:16,22
67:14,18 68:8
70:16 105:20
123:14 125:3
174:20 178:11

**inherit** 161:25

**initial** 57:8
149:6 157:22
158:1,9

**initially**
159:19

**initials**
150:7,20

**input** 12:2
101:17 135:25
136:9,10,15
198:6

**inputs** 180:12

**inside** 103:6
137:13 144:11
154:13

**inspect** 54:4
55:21

**inspected** 91:12

**inspection**
54:18,19
55:6,8 56:10
57:3,8,11
136:22,23

**inspections**
47:13
54:6,8,20,21,2
3

**instance** 80:4

**instantaneous**
132:9 180:16

**instantly**
179:24

**instead** 87:3

**institutions**
8:25

**instructed** 48:8
49:22

**instructing**
48:10

**instruction**
8:17 48:22
121:11

**instructions**
8:8 115:19

**insurance** 47:5
85:3,4

**intake** 53:24

**integrity**
134:12

**intensity**

152:18

**interact** 44:20

**interacting**
23:25

**interaction**
23:15

**interactions**
19:17

**interpret** 65:1
195:12

**interpretation**
8:3

**interprets** 66:2

**interrupt**
179:15

**interruption**
18:11

**intersections**
89:24

**interstate**
32:17 57:13
78:16
92:4,7,15 94:8
113:14 120:10
122:5,10

**intervals** 58:22

**interviews**
91:16

**introduce** 4:15

**intruded** 152:8

**invasive** 169:9

**investigation**
160:15

**invoice** 53:23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

Appx_2395

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2400 of 2460   PageID 2692

**invoices** 49:2

**involve** 22:15
23:18

**involved** 17:8
19:13 23:15,18
26:21 47:6
51:19

**involves**
44:5,20 120:11

**involving** 13:18
16:1 23:24
48:7

**iPhone** 76:25
82:13

**iron** 193:20,22

**irrelevant** 48:4
50:1,5 116:12
124:19

**isn't** 106:11
113:9 153:5
155:20 164:14

**issue** 102:7
199:12

**issues** 42:12
102:3

**iterative**
180:19

**I've** 11:9 15:12
22:22 24:20
38:19 45:14,18
51:10 64:17
86:5 93:18
101:23 178:18
185:7 196:7

---

J

---

**jack**

140:17,19,24
141:9,18,24
192:18,23
193:8,16

**jack's** 193:12

**Jacob** 2:2 4:17
49:5 98:7

**Jacobwhite@tayl
orkinglaw.com**
2:5

**jagged** 154:9,16
159:21

**Jake** 8:2

**January** 21:22
168:19

**Jennifer** 1:23
4:4

**job** 51:16 52:24

**joking** 168:20

**Joseph** 4:25
5:15

**judge** 25:7
48:16

**July** 83:6,20

**jump** 167:11

**jury** 51:19
52:23 53:8
76:13 113:18
131:12,14
135:6 138:11
177:10 180:9
186:13
193:3,4,9
195:20 196:6

---

K

---

**key** 159:12

**killed** 174:6

**kilo** 4:14

**kinds** 76:24

**kinematics** 9:19
17:20,25
18:13,15,21
19:3,5,7,9,25
20:4,14

**kinetics** 9:18
17:12,13,18,20
,21,22,23
18:1,12,14,18
19:3,5,6,8,24
20:5,14

**kinetics/
kinematics**
19:17

**King** 2:2

**kneeling** 195:24

**knew** 30:18

**knowledge** 46:24
73:8 108:25
144:8

**known** 29:22,24
30:5,20,21
39:5,7 40:2,5
73:23 86:14,15
89:24

**knowns** 30:14
40:14

---

L

---

**lack** 80:8,11
83:8 159:15
161:1
162:14,17

166:19

**lamp** 144:9

**lane** 26:9 27:19
31:4,5,11
32:12,16,17,19
,22 33:6,12
35:7,16,22
36:4,5 76:5
77:7 87:12
93:2 104:4,13
110:7,11,13,14
,21
111:5,9,14,24
112:10,14,15,2
1 113:13,21
114:7 115:8
117:23 119:20
120:1,22
121:8,16,19,21
122:3 127:18
130:20,23,25
131:1,5,7,13,1
6,17,18 134:25
135:8,9,11,15
137:11,14,21
138:5,10
139:10,15,20
140:1 146:4
157:25 167:13
168:23 169:2
175:15,20
185:18,21,24
186:3,16,20,22
187:2,7,10,12,
18,20,22
188:1,11,14,16
,17,19,21,24

**lanes** 131:8
135:16 137:22
138:1 188:22



**MILESTONE | REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

**laptop** 6:6

**large**
19:9,21,22
23:22 40:18
44:7 63:14
75:3 151:16
152:5

**laser** 40:9 43:6
55:22 56:7,11
84:10

**last** 20:23 23:8
25:12 32:5
42:20 49:1
91:25 123:17
137:24 168:19
194:17

**late** 111:21

**later** 92:22
143:18 181:22

**lateral** 31:9,11
33:9,25 35:22
77:7 141:17
142:3,16,18,24
143:3,5,20
144:1 161:22
171:2 176:24
178:2,3
179:10,12
180:5,6,12,13,
17 183:11
186:10 191:11
197:11

**laterally**
36:3,5 141:13
144:5 148:5
162:5 180:15

**latest** 43:7

**law** 2:2 15:21

45:22
46:4,5,6,21

**layman's** 14:10
69:22 76:15

**leading** 58:21
126:11 153:19
174:15 175:4
196:14

**leads** 113:4

**leak** 134:5

**leaning** 159:17

**learned** 19:10

**least** 22:13
35:23 36:2
45:11 73:19
80:9 96:3
105:10 121:1
130:18 133:23
139:3 151:7
172:19 187:19
193:2,9 196:12

**leave** 122:22

**leaves** 130:16

**leaving** 131:22
132:11

**leftmost** 104:4
117:22 135:15
138:5,10
168:23 169:25
175:20

**left-side** 165:2

**leg** 148:11

**legal** 48:5

**legs** 148:10
165:22

**lengthy** 66:6

**less** 41:23 42:8
46:15 69:24
80:4,7,13
81:16 147:5,9
183:13,23

**let's** 8:23
18:3,12,17
23:2,3 35:12
46:2 49:14
54:16 61:24
68:14 83:15
91:20,25
129:24 137:7
144:3
149:24,25
150:4 156:1
163:22 167:2,3
173:1 174:22
177:10 183:7
191:11 198:13

**LETTER.........
..............
..........220**
3:6

**letting** 37:6
108:10

**level** 16:4 92:8
97:20 111:13
147:13,17

**levels** 96:20
142:8

**license**
12:21,25 45:5

**licenses** 12:23

**lid** 103:7 111:4
144:11,19,21
148:2

**lengthy** 66:6

**light** 96:18,23
122:15

**light-colored**
102:12,16,18

**lights** 112:3
122:9,11,19,22
123:4,6,9,11

**likelihood**
81:15

**likely**
31:8,19,20
115:2 131:24
132:9 144:18
176:2

**limbs** 148:5
165:19 166:6

**limit** 27:4,18
28:1 29:12
37:17 38:3,7
93:10,14,17,20
95:14,23 119:5
197:21
198:12,16

**limited** 24:24
59:16

**line** 70:17,18
91:24 92:24
95:5,13,18
97:7 98:9
124:20
125:7,14,21
171:23 172:1
173:10 175:10
199:4

**lined** 124:10
154:17

**lines** 39:6
87:12 89:21



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2397

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2402 of 2460   PageID 2694

90:2,3,4,8
171:12 172:6
176:4

**lining** 125:3

**list** 5:24 23:8

**List...........
.......5** 3:15

**litany** 6:22

**literature** 32:1
33:21 34:2,7
36:7,19
38:19,22 72:20
73:4,10 101:16
104:6,9,11,19
105:2,17
110:9,20
113:3,4 115:20
118:17 137:4
178:6 185:3

**little** 20:19
28:4 30:8 35:8
41:16 51:3
65:24 91:5
92:21 95:8
98:8 122:2
132:5 133:15
136:17,18,20
141:12 142:4
163:3 171:1
176:11 185:20
192:25

**Livingston**
61:12

**load** 171:8

**loaded** 171:6

**loading** 173:6

**local** 54:21

**located** 39:21
83:23

**location** 44:9
54:21 58:21
61:15 74:18
161:7 169:8,10
172:23 174:16
175:4 176:22
177:25

**locational**
75:10

**locations** 44:24
47:14 57:11
61:16

**lock** 115:5,6

**locked** 32:5
142:5 189:19

**locking** 32:2
33:3,8,18
115:7

**log** 59:21
106:10,19,21
124:11

**logs** 125:3

**long** 29:25
31:22 32:15
34:19 69:24
85:14 88:20
95:14,18 126:8
167:24 168:4

**longitudinal**
142:4
179:13,20

**losing** 28:2

**loss** 104:15,25
108:10
109:14,15

110:3 134:12

**lost** 26:13

**lot** 11:15 15:21
52:6 61:14
80:5 85:9
88:17 90:1
101:22 122:21
148:16,18
149:1 160:21

**lower** 164:6
190:20

**lowered** 93:16

**low-fronted**
21:5

**lug** 192:20
193:15,16,19,2
3

**lunch** 88:19
97:22 98:8

**lunged** 142:22

**Lynn** 25:19

---

M

**macro** 16:4

**magic** 39:20,23
68:14 78:15,19

**magnitude** 34:3
104:25
133:13,16
147:6,9 156:18

**maintain** 45:4
183:22

**maintenance**
43:12,24 44:19
119:16 120:4

**male** 168:10,11

**man** 7:3

**maneuver** 169:10
173:2,4

**Manual** 168:18

**manufacturer**
67:3 80:2

**manufacturers**
66:25 80:3
81:22

**manufactures**
67:1

**map** 61:5
70:24,25 88:2

**mapping**
57:18,21 61:5
84:10 86:18
87:16

**Marcus** 7:22
25:19 27:16
28:10

**Marcus's** 29:7

**margin** 71:2

**mark** 130:14,18
131:10,12,20,2
3 132:4,5,8,11
134:23 143:24
159:1,5,15
162:4,16
164:14
170:3,7,9,16,1
8,21,23
171:4,10,11,17
,19
172:2,5,13,14
173:11,13,18
174:8,9,10
179:2 181:8



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2403 of 2460   PageID 2695

**marked** 5:18
150:23

**markers** 87:13
89:21 90:3

**marking** 130:17

**marks** 108:20,22
109:5,6 143:19
169:4,8,14
172:19
173:3,19,21
174:1,5

**Marx** 30:17

**mass** 81:13,14
145:23 161:21
162:18
164:12,17
165:19,24
166:16,25

**master** 9:2

**master's** 9:7
10:2 45:12

**match** 17:9
154:5,8
155:15,24
156:22

**matched** 151:24

**matches**
162:9,10 176:6
177:24 178:23

**matching**
140:11,12
148:24 149:4
155:22 156:1
158:7,14
159:15
160:22,25

**material**

16:1,3,4,5,6,1
0,17,18,21,25
17:7

**materials**
16:11,12 53:24
54:18,19 60:22
83:16,24
152:23

**math** 11:5
125:19

**mathematical**
15:16 51:7

**mathematically**
197:15 198:20

**mathematics**
10:7,8 15:19

**matter** 4:7 6:5
15:1 111:25
144:10 146:22
152:4,7,10
153:12,23
154:13,15,24,2
5 161:9,10
166:21,24

**max** 190:17

**maximum**
41:22,24
177:22 185:7
187:24 189:8
190:10 197:3,5

**may** 12:13 22:7
33:6 42:17
53:17 75:22
109:12
126:8,22
130:21 147:9
152:17 160:20

**maybe** 11:12

25:10 27:22
31:9 61:9
100:1 109:17
121:4 122:2
134:7 136:8
138:16 153:24
164:15 187:24
193:3 197:24
198:19

**McCORMICK** 2:15

**McGuire** 46:5

**McGuireWoods**
2:8 45:23,24
46:11

**mean** 14:4,5
30:8 32:11
40:9 48:12
49:5 55:10
58:18 59:8
70:2,17 72:10
76:15,16 82:12
94:11 105:14
111:25 112:1
122:18,21
136:11 138:1
146:22 149:14
153:24 155:14
160:3 176:25
178:17
184:2,24
187:11 190:20
191:21 197:5
198:2,20

**meaning**
143:23,25
152:8

**means** 6:24
10:21 50:13
99:23 130:20

166:19 171:22
188:6

**meant** 151:9

**measure** 39:17
78:17 84:14
90:6 116:19
151:4 170:15

**measured** 78:14
176:6

**measurement**
41:20 151:3

**measurements**
40:17 41:23
42:1 89:13
97:3 138:13
139:7 151:19
168:7

**measures** 90:7

**measuring** 78:3

**mechanical**
9:1,2,16,17
10:20,25
13:11,14 14:21
19:5 136:21
160:18

**median** 99:8
102:16,18
131:18

**medium** 96:17

**memory** 59:16

**mention** 51:24
166:22

**mentioned**
194:25

**mentioning** 44:7
52:4,19



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2404 of 2460   PageID 2696

**merit** 159:11

**message**
117:11,15
118:10
122:13,14
123:17,21
124:2
125:8,15,21
128:13,23
129:2,8,18
181:4,8,12,15
182:2,7

**messages** 124:11

**met** 85:21

**metal** 154:3

**metallurgist**
16:8

**meter** 72:6

**meters** 68:13,15
71:8,15,23
72:6

**method** 39:3

**methodologies**
17:4

**methodology**
87:7

**methods** 135:21

**metrics** 97:15

**mic** 20:18
163:25

**middle** 41:17
130:25 131:7
139:9,15,20
140:1 143:14
185:21
186:20,22

187:2,7,10,12,
18,20,22,25
188:11,14,24

**mile** 62:19
79:25 80:5
92:19 95:7
121:4

**miles** 23:25
24:7 27:2,5
35:19,21,24
36:3 37:3,5
58:21 59:17
80:12 81:1
92:11,18 93:10
95:14,20,23
104:14 105:9
107:2,4
109:23,24
111:16 177:20
181:16 183:11
190:18,20
197:4,10
199:16

**millions** 87:3

**Mills** 45:22
46:4

**mind** 32:6 73:5

**mine** 163:16

**minimizing** 33:7

**minimum**
120:8,18

**minus** 41:25
42:7 68:13,15
71:8,15,23
72:5 84:12
86:2,4 125:9

**minute** 97:10
194:17

**mirror** 137:13
138:24 139:4,5

**mirrors**
138:20,21
139:2

**misaligns** 171:2

**misleading**
136:8

**miss** 164:9

**missing** 155:13
166:15

**Mississippi**
12:24

**misunderstandin
g** 65:14

**mixed** 53:17

**mm-hmm** 79:11
82:14 136:4
141:16 142:7
171:16
186:6,24,25
187:5 194:13

**mm-mm** 123:15

**model**
56:15,16,17,20
67:9,10,13
87:14 88:9,15
89:12,14,19
90:10,12
112:9,13,14

**modeled** 191:6
197:3

**modeling** 113:1

**modern** 109:5

**module** 58:18
59:11 60:7

61:2,22 65:2
66:22
67:8,18,21
68:9 70:16
72:8,14,18
74:19,24
75:4,11,21
76:25 77:18
78:23
79:1,8,24
105:20 123:14

**modules** 81:7

**moment** 131:20
182:15 189:18

**momentum** 81:16
147:7 162:1

**Montalbano** 1:15
3:2 4:7,25
5:9,15 49:7

**Montalbano's**
3:14,15

**month** 50:14

**months** 53:17
57:19 87:18,20

**Moreno** 1:6 4:11
103:22,24
137:10 147:20

**Moreno's** 130:4
147:23

**morning** 61:4,11

**mostly** 25:14,16
110:17 111:1

**most-used** 21:1

**motion** 9:20,21
13:24 17:13,25
18:15 19:13
140:15 141:10



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2405 of 2460   PageID 2697

**motions** 25:4

**motor** 19:17
23:15,24 80:20
110:20

**mouth** 36:15

**mouthful** 11:10

**move** 17:19
20:18 28:11
36:5,8
104:12,22
144:4,5 169:1
184:18

**moved** 36:3
104:8 140:18
141:10,18
162:5 175:23
183:12

**movement** 9:22
20:11 31:19
34:3,4
142:9,25
143:20 176:19
180:5,6,17
197:12

**movements** 44:18

**moves** 184:16

**moving** 175:10

**multiple**
154:6,9

**multitude**
165:23 196:13

**Mustang**
24:6,13,16
80:25 81:3,4

**Muttart's**
189:15

**myself** 56:15,18
84:19

―――――――――
N
―――――――――

**nail** 134:6
159:9

**National** 1:20

**nature** 146:11
150:2 151:23
154:11 173:17

**navigate** 32:23
33:9

**nearest** 94:1
181:25 191:1

**necessarily**
12:15 17:4
28:5 73:1 78:9
101:20 109:4
132:3 160:12
183:19 196:4

**necessary** 32:14
33:5 35:22
85:14 114:18
115:7
137:21,25
138:2

**negated** 139:6

**negligible**
138:25

**Nehemias** 1:5
4:10 30:25
36:16 92:16
94:8 96:4
98:14 103:22
105:22 106:4
107:24 109:3
126:2,10
143:16 144:25

145:7 146:9
147:11,15,19
148:21 149:5,6
151:16,20
155:19,20
156:8 157:22
158:2,10,16
159:13,17
160:19 161:4
162:5 174:6
191:5 194:2,16
195:6,24
196:9,25
199:13

**Nehemias's**
140:20 143:8
144:19 146:8
148:7 156:3
157:9 160:11
161:20 164:20

**net** 142:9

**network** 62:24

**newer** 81:22

**Newton** 71:3

**nice** 155:23
156:22

**nighttime** 23:20
101:2

**nine** 117:15
118:9 123:17
124:2

**ninth** 174:12

**nitpicky** 64:14

**nobody** 85:10
96:8 188:18

**noise** 134:7

**none** 25:4 188:5

**nonengineers**
17:16

**nonresponsive**
115:11

**nor** 175:21

**normal** 97:11
109:25 111:7
122:15

**normally** 81:18
85:1 90:2
178:7

**north** 2:3 62:8

**northbound**
92:4,7,10,25
93:2 94:12
137:13,15
175:15

**Northern** 1:1
4:13

**notably** 58:20

**Notary** 1:24

**nothing** 5:6
30:16 79:22
82:22 116:3
120:14 132:17
156:24 175:18
180:25 188:21

**notice** 196:24

**notices**
126:9,23

**NOTIFICATION**
3:6

**nuts** 192:20
193:15,16,19,23



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2401

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2406 of 2460   PageID 2698

O

**OATH** 3:4

**object** 15:11
16:20 68:24
81:18 101:5
115:10 149:8

**Objection** 36:23
67:19 110:2
114:12,25
115:14 116:2
118:12 127:20

**objective**
97:1,3 158:20
194:18,21
195:20 196:1

**objectively**
51:18

**objects**
9:20,21,22
12:3 17:14,25
18:16 19:13
39:7,12 98:18
100:19 146:17
156:25

**observations**
17:8

**obstacle**
126:7,9,22,24
127:17,18
128:4

**obstacles**
98:24,25

**obstructing**
32:19,21,22
121:16,19

**obstruction**
93:8 98:19

120:22

**obstructions**
68:23

**obvious** 154:23

**obviously** 8:6
11:25 13:11
53:5 85:13
88:9 113:25
192:18 198:17

**occupy** 148:8

**occupying**
137:11 148:7

**occur** 139:13

**occurred** 36:15
38:2,7 57:14
84:6 93:16
106:13 107:19
117:16 131:21
135:16 139:9
144:7,16
145:6,8 146:3
155:17 167:14
168:22 192:13

**occurring**
121:11

**occurs** 133:11
184:16

**offer** 37:7
167:19

**offering** 98:13
167:16

**officers** 130:19

**officer's**
163:13

**offset** 69:9
81:12

145:12,22
147:7 148:4
165:18

**offsets** 70:25

**Oh** 43:4 53:17
65:19 74:17
83:3 122:16
150:14 151:9
157:24
163:18,20
164:2 167:3

**okay** 5:16
6:4,15 7:6,19
8:20 9:4,13,25
10:23 11:6,14
12:5,20 14:4
15:6,25 16:22
17:11,22,24
18:11,17,25
19:15 20:3
21:20,23
22:2,25 23:23
24:4,9,15,23
25:1,6,12,14,1
8,25 26:17
27:4,8,24
28:8,17
29:4,7,15,25
30:7,12 32:14
35:13 36:14
37:11,25 38:11
40:4 41:1,3
42:2,11,15,22
43:2,9,22 44:3
45:1,12,20
46:8,10,13,19,
23 47:7,16,20
48:18,24
49:3,14
50:12,17,22

51:2 52:3,19
53:11,20
54:1,7
55:5,15,20,25
56:6,22,25
57:6,12,23
58:2,17 59:7
60:4,9,25
61:10,21
62:10,12,25
63:8,16,25
64:21
65:5,21,23
66:5,8,21
67:16,23 68:7
71:18,21,24
73:7,12,18,24
74:19,23
75:7,9 76:18
77:10,15 78:18
79:3,4,21,23
80:8,15,19,23
81:17
82:5,9,25
83:18,19
84:2,20
85:8,16 86:15
88:8 89:16
90:19,22
91:1,4,11,16,2
0
92:2,3,7,10,14
,21
93:3,9,15,19,2
2 94:11,22
95:1,4,11,17,2
2 96:1,15
97:3,21
98:7,13,22
99:3,11,17,25
100:7,10,14,17



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.**MILESTONEREPORTING**.com      Toll Free 855-MYDEPOS

Appx_2402

,21 101:4,12
102:8,11,16,18
,25
103:4,8,17,21
104:3 105:1,24
106:2,16,21,23
107:3,6,10,16,
22
108:2,6,13,16,
22,25 109:17
110:5,9
111:8,25
112:12,25
113:8,12,22
114:2
116:21,25
117:21,25
119:5,7,10,22
121:1 122:4,25
123:4,13
124:18,24
125:2,6,13,19
126:6,16
127:11,14
128:3,10,20,25
129:5,13,24
130:24
131:9,19
132:12 133:9
134:18,22
135:1,4,14,19
136:5,21
137:1,7,17
138:8,12,19
139:8,14
140:5,8,14
141:8,13,20,24
142:13,19
143:5,10,14,18
144:3,7,13,21,
23 145:19

146:10,13,18
147:10,14,18,2
2 148:1,19,23
149:4,11,17
150:4,25
151:4,7,11,13,
19 152:1
153:11
155:6,8,14
156:6,10,12,14
157:20
158:8,15,21,24
159:7,23
160:3,6
162:3,22
163:10,12,20,2
2,24 164:3,6,9
165:12,25
167:2,11,16
168:3,7,11,21
169:3,7,13,18
170:7,15,18
172:7,13
173:24
174:4,12,18,22
,24 175:14,24
176:8,10,25
177:8 178:6,15
180:1,21
181:2,9,14,17,
19 182:9,22
183:15,25
184:8,11,12,15
,18,23
185:10,14
186:15,22
187:14,24
188:3,6,10,23
189:3,23
190:1,5,9,13,1
9,24

191:4,9,15
192:7,11
193:1,5,11,18,
24
194:2,6,8,12
195:4,9 196:20
197:13,17
198:2,11,15,20
,22

**oncoming** 26:7
100:8,11 101:6
112:8 113:5

**one-half** 177:16

**ones** 8:17

**one-second**
58:22

**one-tenth** 198:7

**one-third** 92:19

**onto** 70:24

**Oops** 32:6 115:5

**open** 60:12 77:4
103:2,9 111:4

**opened** 147:4

**opening** 148:3

**operate** 14:22

**opine** 102:4

**opining** 27:16

**opinion** 27:9,20
35:4,14,17
37:7,9 48:21
78:25 96:21
98:13 101:13
105:1 117:14
129:25
135:19,23
137:7 142:20

144:4
147:10,14,19
158:24 159:8
167:16,19,21
169:3,16
173:21 175:1
193:18

**opinions** 8:10
102:6 129:14
191:3

**opportunity**
102:1

**opposed** 136:6
141:13

**opposing** 102:4
150:21

**opposite**
26:11,12

**option** 112:12
114:14,20,22
115:9

**oral** 6:19,21

**oranges** 121:5

**order** 10:2
15:7,20 29:16
65:2 121:3
137:22

**orientation**
21:8 62:7 78:8
175:3 176:7
196:18 198:6

**original**
105:5,7

**originally**
62:13

**Orlando** 1:20



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      www.**MILESTONEREPORTING**.com      Toll Free 855-MYDEPOS

Appx_2403

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2408 of 2460   PageID 2700

**orthomosaic**
86:20

**others** 24:2,20
54:6 90:23

**otherwise** 50:12
70:1 155:23

**outboard**
130:15,16
132:15 167:13
171:6 173:10

**outcome** 27:15
48:5 50:1,4

**outcomes** 49:19

**outlining** 89:5

**outside** 43:25
111:4 126:14
127:10 132:19
145:12 154:13

**outsource** 63:20
64:4 65:22,23

**outward** 165:19
189:5

**overall** 23:10
75:25 76:10
97:13

**overcorrection**
26:23

**overhead** 90:12

**overkill** 85:8

**overlaid** 70:24

**overload** 171:9
173:9

**overnight** 66:11

**overwhelmingly**
161:12

**owns** 50:19

---

### P

**p.m** 18:6 97:25
98:2,3,4
167:5,7,8

**page** 3:13 74:15
89:3 91:20,21
92:1 95:12
123:18,24
129:25 137:8
142:21
144:3,23
148:19,23
149:17
152:14,25
153:3,17
162:23
163:12,15,17,2
3 164:24
167:2,11,12
169:3
174:12,23
192:7 196:20

**paid** 47:16
50:13

**paint** 56:4
91:10 140:9,10

**panel** 144:12
146:8 149:7
162:8

**paper** 22:23
38:14 64:20
67:20,24
71:7,14,19
72:1,3,11,12,1
6
73:16,17,19,24
74:1,4,6,10,15

,20,23,25 75:5
77:19 91:22
149:18 189:15
190:9

**paper-light**
5:25

**papers** 36:10,12
38:9,13
68:5,19
73:12,14
74:3,13
75:9,12,22

**paragraph** 74:16
91:25 95:12

**parallel** 78:8
175:3

**Pardon** 20:19

**parked** 21:14
32:17,18 33:11
110:15,17,21
112:13,14,15,1
9 113:2 118:24
122:1
137:10,22
167:13 169:11
199:8

**parking** 61:14

**partially**
31:3,4
32:11,19,22
35:6,15 113:13
137:11 140:8

**particular**
13:10 16:24
17:6 28:23
34:4 35:3,18
37:24 40:16,22
41:24 48:7

76:9 78:12
79:17 81:12
86:1,6 89:22
109:21 112:22
121:6 127:3
137:4 139:1
154:10 160:22

**particularly**
52:14 111:3
113:24 177:20

**parties** 3:24
139:11

**pass** 26:9
121:20
137:15,20,22

**passed** 26:4
153:9 199:15

**passenger** 23:19
122:15 123:7
195:11

**passengers**
44:15 103:25

**passing** 121:22

**past** 10:22 11:4
97:9 166:4

**patch** 173:10

**path** 27:23
28:12 31:14
126:13 197:1

**paths** 139:6

**patterns**
169:23,25
173:6

**Paul** 1:15 3:2
4:7,25 5:9,15
8:3,9

---



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2409 of 2460   PageID 2701

**pavement** 87:12
89:21 90:3
155:21

**pay** 50:14
113:14

**paying** 13:2

**PDF** 59:20 60:14
62:1,3,4,12
65:10,16,17
66:1,16 89:5

**PE** 12:20,23,25
13:4,7,8

**pedal** 37:1
104:15 105:19

**pedestrian** 17:5
19:17,21
20:1,5,6,11
21:1,3,9,13,15
23:15,20,22,25
24:7,13,17,19
36:6 38:15
80:20,22
81:6,10,11
109:25 110:4,5
114:7
164:12,17
199:9

**pedestrians**
44:14 94:23
103:17 111:3
122:4,7

**pedestrian's**
81:13 94:16

**peeled-back**
154:3,12

**peer-reviewed**
72:20 73:4
87:7

**pen** 150:5,11,12

**pending** 4:12

**pens** 150:13

**people** 9:25
10:4 32:1,2

**per** 24:7 27:5
35:19,21,24
36:3 37:3,5
47:9,10,12,15
62:19 79:25
80:5,13 81:1
104:14 107:2
111:16 177:20
181:16 190:18
199:16

**percent** 23:17
86:12 105:23
175:8

**percentage**
23:1,4,14

**percentile**
71:10,18,20,21
,25 168:10,11

**percentiles**
168:14

**perception**
29:19
34:14,15,16,21
115:17

**perfect** 7:6,19
40:8,9 53:20
77:15 79:3
99:3 150:25
160:17

**perfectly** 55:11
92:25

**perform** 15:23

23:10 31:16,21
32:15 33:13
49:24 50:4

**performance**
44:13,14,17
72:6

**performed** 22:10
48:2,7 54:6,7
55:5,23 86:18

**performing**
22:15 34:11
50:5 85:25
194:18

**period** 126:8

**peripheral** 59:3

**permanent** 87:11

**person** 26:13
52:10

**personal** 50:6
64:6 82:13

**personally**
57:15 84:20
86:19

**perspective**
94:16,18 103:1

**phenomenon**
113:9

**phone** 58:25
82:10,15,20
83:2 123:14
125:4 129:7

**photo** 39:18
40:24 41:1,21
43:7 56:12
87:5 90:16,18
149:21
152:16,21

153:12 163:23
173:14

**photogrammetry**
38:16,25
39:1,2,3
40:8,18,21,22
41:5 84:7
85:18,25
86:7,16
87:2,24 88:5
90:15,19
151:10 170:17

**photograph** 39:5
87:15 152:18

**photographed**
55:22 130:19
131:13 132:1
169:5

**photographic**
85:20

**photographicall
y** 57:17 85:15

**photographs**
38:18 39:4
40:13,14
56:7,8,10,13,1
4,17
85:9,13,17,22
86:19,24 87:9
88:13 89:8
91:14 94:3
96:23 136:25
151:18
152:13,15,24
153:15

**PhotoModeler**
90:21,24

**photos** 6:1
41:22 54:14



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

56:1 57:4 82:5
86:5,8,12
87:1,2,25
90:9,12
152:23,24
163:13

**phrase** 30:9
149:12,14

**physical**
51:7,18 54:21
55:6 63:20
64:8,11,20,24
65:25 68:22
93:7
128:15,17,18
129:1,6 147:9
157:21 164:21
165:24 174:13
184:6 191:9
193:6

**physically** 22:5
32:23 54:3
121:22 138:1
152:8

**physics** 9:19
10:7,8 12:1
13:12,24 14:14
15:4,7,15
16:10 51:19

**pick** 80:4
82:1,3

**picked** 53:1
81:23 89:18
192:17

**picking** 147:6
157:25 158:6
178:1,5

**picture** 56:4
91:10 153:5,6

169:22 171:5

**pictures** 85:11
133:8 141:8,21
149:23 152:12
168:9

**piece** 153:6
159:22 161:11
162:11 163:3
166:20

**pieces** 56:4
91:7,9 149:10
153:22 162:14

**pin** 109:22

**pinged** 62:21

**pinpoint**
77:3,11

**pitcher** 39:14

**Pivaral** 1:4,5
4:8 144:25
196:25

**Piveral** 4:10

**Pix4D** 56:21,22
86:20

**pixel** 86:25
87:3 90:13

**placed** 140:25

**plaintiff**
23:5,11 46:20
174:16

**plaintiffs** 4:18

**plaintiff's**
4:16

**Plaintiffs**
1:7,22 2:5
3:13 54:13

62:13 186:12

**planet** 77:3

**planning** 101:21

**plastic** 144:9
163:3,7,9
164:7,19
165:3,4 166:21

**play** 71:2

**plaza** 2:9 61:8

**plazas** 61:9

**please** 4:15,23
5:2

**plugged** 58:8

**plus** 41:25 42:7
68:13,15
71:7,15,23
72:5 84:12
86:2,4 90:4

**point** 50:9
59:21 62:14,21
70:10,11
86:3,21
87:14,15
90:13,14 97:9
98:22,23 102:6
106:5,18
118:16,19
129:11 130:21
131:22 135:1,2
136:24 143:15
145:9 146:5
152:9,14,21
153:16 154:17
157:12 159:13
166:5,15,16
187:10,25
188:8,12,13,20
189:5 192:6

195:2 196:12
198:13

**pointed** 97:15
152:5 153:19

**points** 16:11
40:2,5,19 59:2
60:5,16 61:19
62:6 68:19
69:8,9,13,17,2
0,23
70:3,6,7,12,16
,21 71:3
72:24,25
73:6,23 76:8
77:5,8,11 78:7
86:14,16
87:1,4,6
88:6,10,14,18
89:6,7,12,17,2
5 90:2 106:8
130:15 148:17
154:8 165:21
175:13,16
176:17,18,20
196:2

**pole** 26:14
27:21

**police** 85:12
108:16,19
112:2
152:13,15,24
163:13 195:23

**popular** 91:3

**portion**
19:22,23 23:22
50:20 173:15

**position**
31:10,11
33:9,25



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Appx_2406

35:5,22 69:2,3
71:1,16 72:25
76:4,5,11,14,1
9 77:7 88:12
118:24
167:13,24
168:4 175:9
176:14,15,24
178:2,3 186:10
187:13

**positional**
175:15

**positioning**
69:11 71:3

**positions**
39:10,12 40:3
62:21 175:10

**possession** 7:25

**possibilities**
136:11

**possibility**
135:13

**possible** 84:6
99:14,20,21
109:7
128:3,7,8
130:6 131:21
135:10,20
136:2,5 143:5
146:25
155:8,20 156:6
157:7,13,17
172:11,18
174:5 184:21
191:23

**possibly** 35:21
115:2

**post** 148:7

**postcollege**
20:4

**post-impact**
144:24

**potential** 31:6
32:8 33:6,12
34:5 99:9
101:15,19
115:16,23
118:7 123:12

**practice** 57:2,6

**precise** 151:3
175:8 183:24
191:2,16

**precisely**
70:20,21 77:12
107:4 177:24

**precision** 76:6
97:20 177:6,7
182:20

**predicate**
140:23

**predict** 20:11
21:10

**predicting** 9:21
21:2

**preexisting**
160:24 166:13

**preference** 11:2

**premarked** 5:21

**premise** 11:18

**presence** 31:3
32:2 111:1

**present** 195:20

**presentation**
28:24,25 42:22

43:3,10,11,15

**presentations**
42:16

**presented** 29:23
30:15,18
31:2,12
37:15,18,20
42:14,19 50:25
186:9 199:3,13

**presenting**
30:23 186:13

**presents** 30:21

**press** 122:19

**pressure**
132:17,20

**presumably**
46:22 130:11
141:5,7

**pretty** 13:19
14:5 107:5
119:13 148:8
191:8

**prevented** 98:18

**previously**
45:21 46:4,11
130:25

**primary** 147:3

**principle**
15:15,16 17:10
19:5

**principles**
10:14 11:3
13:24
14:1,2,13,14
17:8 19:10,24
20:7,14 177:19
178:25

**print** 152:12

**prior**
70:7,10,13
79:19 92:11
123:17 159:25
160:2,8,18
174:9 188:16

**privileged**
48:12

**probably** 38:18
91:3 131:24
143:8 150:10
174:7

**problem** 125:2
182:14

**process** 12:25
39:8 40:18
63:21
65:6,7,17,20
66:6 84:8
85:25 87:2
105:22 158:6
180:19 192:16

**processed** 25:7
56:17 86:19

**produce** 7:10
8:4,9

**profession** 91:2
97:11

**professional**
19:19 45:4

**professionally**
21:21

**professions**
10:3

**profile** 149:15

**program**


MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K Document 49 Filed 01/29/24 Page 2412 of 2460 PageID 2704

9:7,10,11,12,1
3

**progressed**
131:22,25
146:6

**progresses**
132:14

**Prohaska** 1:23

**project**
40:11,15 148:3

**projected** 145:7
161:22

**properly** 34:20

**properties**
16:19,21

**property** 61:14

**proportions**
168:12

**proves** 13:16
128:11

**provide** 8:17
12:10 27:9
49:22 62:3
64:5 71:18
92:21 113:25
121:9

**provided** 7:24
37:9 52:5 56:4
59:4,23 60:1
62:4,6,13 65:9
66:15 73:7
81:2
83:12,14,22
84:8 86:5
93:18 94:2,3,5
96:13 138:13
151:18 196:24

**provides** 10:7
51:21

**providing** 58:22
73:6 127:9
137:14

**provoked** 118:16

**prudent** 104:4
138:9

**Public** 1:24

**publish** 168:15

**published**
38:9,13,14,19,
23 72:20 82:20

**publishes**
168:18

**pull** 63:10
133:14,15,16
135:11,25
137:5,6

**pulled** 63:3
65:1 67:12,17

**pulling** 62:23
63:6 134:20

**puncture** 133:3
153:9 154:14

**punctured** 133:6
154:14

**purely** 155:24

**purpose** 54:25

**pushed** 140:22
141:23

**putting** 91:7
149:9 183:21

**puzzle** 56:3
91:5,7,8,9

149:10 154:8
159:22

**puzzle's** 154:9

**Pythagorean**
181:1

_____

_____
Q
_____

**quadrant** 177:12

**quadrantic**
179:25

**quadratic** 190:7
198:2

**quadratically**
180:2

**qualitatively**
136:19 197:19

**quality**
84:3,16,17,18
85:20,22

**quantify** 31:16
97:1 136:19
137:3

**quantifying**
44:17

**quarter** 41:25
42:5,7,8,9
84:8 86:2,4
138:14,15,18
144:12 146:8
162:8
177:14,15
183:13

**quarter-inch**
42:4

**question**
6:7,8,23,25
7:4 11:17

16:13 20:23
22:8 23:16
31:21 34:6
35:8 38:4 47:3
48:11,21 58:11
60:13 61:25
66:23 67:6
73:20 88:19,21
89:16 94:17
100:20 106:12
112:24 113:3
114:9 115:12
116:10,12
117:25 118:14
126:18,20,21
127:1,8,9,11
128:14 133:8
140:24 153:11
157:13 160:23
180:20 183:5
198:5

**questions** 7:3
52:15
101:22,24
175:7

**quick** 85:2,5
168:16

**quicker** 104:18

**quickly** 195:16

**quite** 57:5,9
84:13 88:16
148:8,9 149:22
159:20 187:12
196:15

**quote** 130:1
144:24 153:17
164:24 167:12
169:7 175:3



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     Toll Free 855-MYDEPOS

Appx_2408

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2413 of 2460   PageID 2705

---

### R

**radius**
 151:1,4,8

**radiuses** 43:20

**raining** 29:2

**raise** 5:2

**raised** 87:12
 89:21 90:3

**range** 10:5
 68:20 69:2
 76:3,20 77:4
 84:11 124:7,8
 183:6

**ranges** 74:11

**rare** 81:5

**rarely** 22:4
 109:6

**rate** 40:17,20
 41:4,17,19
 42:3,4 47:7
 69:11
 73:8,13,20,25
 111:15 138:12
 176:20 180:14

**rates** 56:15
 68:7

**rate's** 105:18

**rather** 49:9
 63:14,22 88:24
 100:5 109:15
 111:17
 125:10,18
 137:10 176:16
 195:16

**ray-vector**
 39:11

**reach** 15:7
 93:25 135:21
 191:7

**reached** 145:3
 159:16 174:18

**react** 28:2,5
 111:8

**reacting** 110:20
 112:8

**reactions**
 110:10

**readily** 46:14

**reading** 3:24
 72:5

**real** 174:10

**really** 10:7
 12:17 16:4
 17:7 20:6
 26:24 34:20
 38:25 44:13
 53:7 71:2 74:9
 90:1 97:1
 101:1,2 130:13
 145:21 149:23
 165:2 168:16
 184:22
 191:13,16

**realm** 45:15

**rear** 144:12

**reason** 55:16
 94:22 167:25
 170:25

**reasonable**
 104:7 110:1
 113:14,16,19
 138:9 157:8,11
 161:13 191:24

**reasonably**
 104:3

**reasons** 174:18

**rebut** 102:5

**recall** 24:5,12
 25:18
 26:20,21,22,24
 ,25 27:4,23
 28:10,20 46:17
 52:3,19
 61:5,10,13,16
 68:7 83:7
 163:14 195:14

**receive**
 9:4,9,15 12:20
 47:17
 50:8,9,14
 56:23

**received** 7:8
 9:6 10:1 60:22
 83:16,24
 152:23

**recent** 42:21

**Recently** 84:23

**recheck** 61:19

**reciprocity**
 13:3

**recite** 194:20

**reciting** 195:18

**recollection**
 25:25 27:6

**recommends**
 120:8

**reconstruction**
 10:5,10,13,16
 11:11,19,24

 12:8 13:12,22
 15:13,23,24
 17:10 19:21,23
 20:9 21:23
 22:10 30:19
 38:15,24
 42:13,24 44:6
 45:5,15 54:13
 64:18 76:2
 84:4,17 91:7
 138:23

**reconstruction/
 transportation**
 44:12

**reconstructioni
 st** 10:24 11:13
 15:20 21:21

**reconstructioni
 sts** 10:3

**record**
 4:3,16,24
 5:14,20 6:6
 7:7,13
 18:3,5,9 22:13
 41:4,8,10,14
 48:20 49:10
 79:15 98:1,5,8
 123:24 125:13
 137:9 167:6,9

**recorded** 58:24
 81:4,6 88:22

**records** 58:23
 82:10,12,16,21
 123:14 125:4

**red** 122:19
 150:9,10,11,13
 ,15

**reduce** 31:24



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2409

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2414 of 2460   PageID 2706

35:20 104:21
107:23
116:16,23
199:14

**reduced** 27:18
37:5 105:10,11
109:19 199:16

**reduces** 130:1

**reducing** 35:23
104:17
105:11,13
108:3

**reduction**
36:1,2,14,21
37:1 80:12
104:15 105:10
106:17 108:7
120:1,2

**refer** 39:22

**reference** 41:6
42:17 53:23
55:8 59:17
67:2,11,25
68:3 73:3 90:1
96:23 168:18

**referenced**
68:17 73:14,16

**references**
101:16

**referred** 10:17

**referring** 11:20
14:18,21 20:17
30:17 36:11,22
83:20 152:22
153:5

**refined**
147:12,16,21

**refusing** 47:23
116:6

**regarded** 51:10

**regarding** 15:8
43:23 83:2

**regardless**
48:5,6

**regards** 15:3,24
16:3 53:5
136:9

**regular** 57:6

**related** 48:4
60:13

**relative** 62:8
69:11 70:7,13
77:5 110:25
111:20,22
116:18 118:25
125:17 156:24
176:19 177:17

**relatively**
176:20

**relativity** 69:7
70:8,9 71:4
76:7,12 77:25
176:16

**releasing** 37:2
105:17,18

**relevancy** 48:3
49:23 120:13
196:6

**relevant**
8:10,14,18
31:25 37:12,21
38:18 48:22
49:22 127:13

**reliable** 78:13

**relied** 50:25
53:3
54:5,8,14,16,1
8 56:11 91:16

**relies** 16:21
51:6

**rely** 13:23
14:16,24 20:6
53:4 54:19
57:3 63:24
68:20 69:18
70:12 72:16,19
76:6 77:7,22

**relying** 20:8
51:11 55:25
56:1 74:9
76:12 91:14
136:24 161:1
175:24 195:19
196:1,4

**remain** 138:5,9
193:11

**remained** 143:23

**remaining**
117:22
137:14,20

**remains** 193:13

**remember** 20:22
24:9,15,18
25:9,23 26:17
27:16,25 28:8
43:2,3,15 45:9
46:1,19 51:4
61:8 67:23
74:19 81:3
83:1 117:6
188:24,25

194:18 195:8,9

**remembering**
46:18

**remove** 192:8
193:19

**removed** 98:25

**repaired** 136:24

**repairs** 120:23

**repeat** 18:2
38:4

**rephrase** 58:6
191:13

**replicate** 96:14

**report** 5:21 6:1
12:8 14:17
15:8 16:23
22:3,23 36:11
41:5,6,18
50:23
51:1,2,23
52:3,21
55:7,13
59:18,20 60:15
63:11,18
64:7,12,15,20
65:18 68:17,25
71:25 72:14,23
74:2 77:9
82:20 83:6,19
84:1 88:22
89:2,5
91:18,20 92:22
95:12,17
101:18 102:1,5
106:11 107:20
108:16,19
123:18,24
124:25 136:14



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      www.**MILESTONEREPORTING**.com      Toll Free 855-**MYDEPOS**

Appx_2410

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2415 of 2460   PageID 2707

149:18 152:16
153:24 158:25
162:21 166:22
174:23 186:8
188:11 196:20

**Report.........**
**...........5**
3:14

**reported** 1:23
59:1 68:19
71:11 73:2
75:22 106:9

**reporter** 1:24
4:4 5:3,4

**REPORTER.......**
**...........2**
**18** 3:4

**reporting**
42:9,10 62:24
73:21,22
124:15

**reports**
21:24,25
22:1,5,8,18,19
,21
23:2,4,13,23
67:3,11 94:1

**representing**
4:18,19

**request** 7:17

**requested** 25:22
97:19

**require** 22:21
31:8 33:8,17
45:3 64:8
76:21 101:16
116:11 119:24

161:18

**required** 8:4
30:3 31:20
37:16 76:23
118:5

**requires** 31:7
32:9,25 33:8

**reread** 74:13
75:13 158:18

**research** 9:18
19:12,14
34:13,25 36:24
37:5 38:14

**reserve** 32:25
33:4 114:17
115:6

**reserved** 3:25

**residential**
26:3 27:2 29:4

**resistance**
133:14,19,21,2
2
142:5,14,15,16
,18 144:2

**resistive**
133:23 142:3

**resolution**
40:13 64:1
85:16,24 86:5

**resolve** 53:8

**respect** 58:18

**respective** 3:24

**respond** 32:6
44:23 110:16
118:17 123:10
129:10

**responded** 31:4
114:8 117:24
126:12
128:17,19
199:5,7,11

**responding**
128:24

**response** 29:19
30:5 31:8,9
32:25 33:3,17
34:14,15,16,21
37:4 44:15
85:2 88:17
105:16
115:1,17,23
118:6 119:25

**responses** 33:1

**responsive** 7:16

**rest** 39:9 130:5

**restaurants**
61:9

**result** 22:13
37:2 108:7
117:21 140:20
162:6,7 165:4
173:25 184:19

**resulted** 115:2
142:12

**results** 72:8

**retained** 6:11
23:10 24:12
46:4,11 47:4
50:2 53:12,13
57:16

**retaining** 22:14
50:2 85:4

**retention** 6:9

**reverse** 10:21
11:4 30:20
39:11 90:17

**review** 61:1
74:21 79:12
82:25

**reviewed** 34:7
58:12,14
59:12,20 60:9
79:7 82:5,9,15
108:16 110:9
123:13 128:11
129:6,22 133:1
139:18,22
141:21 157:21
193:6

**reviewing** 25:22
51:14 83:7
185:3

**revise** 165:1

**revisit** 49:15
161:18

**Richland** 163:12

**Richmond** 2:10

**rid** 132:16

**riding** 135:7

**right-hand**
102:20 179:16

**rightmost** 189:5

**rightward**
117:22 182:10
197:9

**rigid** 132:19
146:16

**rigidity** 151:23
161:9



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Appx_2411

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2416 of 2460   PageID 2708

**rim** 130:11
132:13,16,19,2
1,22,24
133:2,7

**ripped** 163:3

**risk** 113:15
114:16
118:4,5,20

**risks** 33:2

**risky** 33:3

**road** 24:8 26:3
27:2 29:5
39:14 49:16
71:1 78:1,3
88:3 89:21
90:2,4,8 98:24
100:3,19
102:20 117:19
120:20 136:25
154:1
161:10,11
165:13 171:20
177:1,7

**roadside** 32:3
33:18 36:6
110:4,5 199:8

**roadway**
43:12,19 44:1
76:4 77:4 78:8
87:11,12,20
89:22,23 101:5
102:11 119:1
126:7,22
130:3,5 153:23
175:4,11 176:7
177:4 195:10
196:10

**roadways** 26:22

**Roderico** 1:4
4:8 196:25

**roll** 132:22

**rolling** 18:22
171:22 172:9

**rolls** 18:22
133:6

**room** 137:19
138:4 176:12

**rotate** 145:24
177:14,15

**rotating** 165:21

**rotation** 145:13
148:5,6

**roughly** 23:1,14

**round** 93:1
153:18 181:17
182:16 183:3
184:2

**rounding** 107:3
181:24
182:14,18,23
184:7,24 191:1

**rounds** 181:25
183:18 184:14

**row** 70:2

**rows** 59:21

**rubber** 130:16
132:10,13,15,1
9,21,22,23
133:2,3 171:19

**rubbing** 20:19
132:10

**rubs** 130:16

**rule** 115:21

**rules** 6:19,23
43:23 93:15

**rulings** 25:1

**rumble** 89:25
90:8

**run** 63:10,18
66:10 161:23

**running** 64:7

**ruptured** 134:3

**ruptures** 134:10

---

S

**SAE** 73:14

**safe** 103:15

**safety** 82:6
120:12

**salaried** 47:18
49:24 50:13

**salary** 47:17,20
48:6 49:12,18
50:6

**sample**
69:5,8,13
70:10 75:3
80:1 176:17

**samples** 71:5

**Santos** 1:5,6
4:10 96:4
103:22,25
106:4 107:24
109:3 126:2
147:15,19
148:21 149:6
157:22 158:16
160:19 161:4
162:5
167:12,17

**Santos's** 15:9
144:25 147:11
149:5
151:16,20
156:8 158:2,10
189:4

**Sari** 7:22 25:19

**satellite** 68:21
176:22

**satellites** 40:1

**savings** 124:17

**saw** 27:18 28:11
31:24 32:16
93:20 94:5
96:5 104:5,12
113:12
116:21,24,25
117:4,19
130:13 139:10
140:17 141:8
146:12 154:21
158:4,16
168:23 192:4
195:18 197:24

**scale** 16:9
190:6

**scaled** 86:20

**scanned** 55:22

**scanners** 43:7

**scanning** 40:9
43:7 56:7,11
84:10 87:5
90:15

**scans** 56:1,12



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2417 of 2460   PageID 2709

**scattered** 54:24

**scenario** 110:23
  127:24,25
  128:1

**scene** 39:18
  40:9 57:24
  82:6 84:5
  85:1,5,6,12
  86:19,22
  87:10,17,25
  88:1,2,6,7,13
  90:12 91:4,8
  95:24 112:7
  152:24

**scenes** 84:21
  86:23

**schedule** 50:15

**school** 20:4

**science** 9:1,2
  11:5 16:5 53:7
  72:17 75:16
  127:3 194:21

**sciences**
  16:1,3,17

**scientific** 39:3

**screenshots**
  82:17

**seams** 89:23,24
  90:4

**search** 55:13

**seat** 128:12

**seated** 141:5

**second** 8:24
  62:15,18 74:3
  77:12
  106:6,11,12,21

107:7,12
129:25 179:5
182:1,3
183:17,19
184:1,9,13
196:14

**secondary** 31:12
  126:13 147:5,8
  199:12

**seconds**
  36:16,18,20
  95:16,21,24
  96:3 106:19
  107:19,23
  108:2
  109:2,10,24,25
  117:15 118:9
  123:17 124:2
  126:18 129:11
  181:20,22
  182:4,6
  188:15,16,19
  199:6,15,18

**sectioned** 89:22

**seeing** 30:24,25
  61:13 93:2
  150:2

**seem** 73:5
  126:8,22

**seems** 191:7,24

**seen** 11:9 15:12
  80:21 94:19,20
  98:14 99:7
  100:2,5,16,22
  101:6 113:5
  132:5 139:25
  140:3 192:5
  198:23

**segment** 78:1

111:14 180:18

**segmenting**
  173:14

**semantics** 195:2

**seminars** 42:20

**semi-privileged**
  8:16

**sending** 182:2,6

**sense** 16:20

**sensitive** 84:13

**sensors** 81:24

**sent** 7:17
  117:11,14
  118:10
  123:16,21
  124:1
  125:8,15,21
  128:13,22
  129:2,8,17
  152:20
  181:3,11,15

**sentence** 26:20
  137:24 138:8
  153:22

**separate** 31:1
  60:7 64:11
  158:15

**separates**
  133:19 134:15

**separation**
  133:18
  134:14,16

**September**
  55:16,18

**series** 56:12
  86:24

**settings** 69:15

**shaking** 6:20

**shape** 146:14
  149:15 156:17

**shapes** 157:19

**she'd** 27:17
  130:25
  197:13,21
  198:11,12,16,17

**SHEET**..........
  .............
  .............
  ..**219** 3:5

**she's** 105:22
  177:1 182:1
  183:15
  184:8,15
  186:16
  187:6,11,25
  196:16 197:9

**shift** 171:7
  173:7 182:10

**shifting** 31:5

**shifts** 113:20

**shining** 94:13

**shoe** 165:8

**shoes** 164:18
  165:17,22

**shop** 117:12
  134:8

**shopping** 61:8

**short** 31:19
  34:18

**shortly** 57:18



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    www.**MILESTONEREPORTING**.com    Toll Free 855-MYDEPOS

94:4

**shoulder** 31:3
32:11 89:25
110:16,17,18
111:2
112:13,16,20,2
3 113:2 118:24
122:2 131:8
135:17 136:7
152:2
155:11,16
156:3 157:3,15
174:15
175:16,20
192:3,4

**shoulders**
165:20

**showed** 17:17
178:12

**showing** 59:21

**shown** 33:19
159:16

**shows** 34:2,25
36:25 104:9
109:9 139:25
152:9 153:12
175:2,10,19
178:6 183:8
185:12 195:3
197:8

**side's** 171:8

**sidetracked**
153:15

**sight** 92:24
95:5,13,18
98:10
125:7,14,21
199:4

**sign** 93:14,20
120:2

**signage** 44:24
119:17,23
121:25

**signals** 176:23

**significant**
81:2 120:12
166:18

**significantly**
31:23 147:5,8
148:6 165:19

**signing** 3:24

**signs** 44:24
121:10

**similar** 13:21
34:16 105:18

**simple** 16:6
18:14 39:13
125:24 179:23

**simplest** 125:22

**simplify** 88:4

**simply** 13:2
29:18 37:6
113:20
131:8,15
133:22
135:7,24
138:23 149:9
158:22 194:20

**simultaneously**
9:6

**sir** 6:18 7:1,9
130:8

**site** 57:13,16
95:15,19

**sitting** 44:9

**situation**
109:16,21
110:19

**situations**
80:23

**six** 57:18 81:5
87:18,20

**six-year** 9:11

**size** 125:17,23
151:2,14,17
154:4
156:11,17,19
161:6 172:23

**skip** 6:22 9:8
90:2

**skull** 146:22
147:4
152:8,14,21
153:6,23,25
154:14,20,21
156:19,23
161:9,11

**slam** 116:4

**slamming** 116:5

**slid** 141:19

**sliding** 190:6

**slight** 135:25
137:5 143:7
177:17

**slightly** 52:17
134:21 171:3
183:22

**slippage** 171:2

**slow** 32:16
35:5,9,15,19

36:8 81:20,21
104:7,12 106:4
111:2,7 114:16
134:5

**slowed** 104:5,8

**slower** 190:2
197:13,20

**slowing** 35:12
37:2 105:4
106:24

**small** 76:7
100:5 121:17
122:1,8 125:18
173:14 176:16

**smaller** 71:5

**Smith** 1:9
4:11,20 38:2,6
61:4 94:18
96:2 100:12
103:18 126:1
139:9,15
168:5,22
188:23 189:8
190:10 194:4
196:24

**Smith's** 21:18
94:7 103:1
159:25 160:8
188:11 194:15
195:5,22

**smoking** 159:20

**sneaky** 150:21

**soft** 146:16

**software** 56:19
63:21 90:16,20

**solemnly** 5:4

**Solomon** 114:15



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

Appx_2414

solution
  162:9,10

somebody 26:3,8
  85:14 158:16
  188:17

someone 26:7
  36:20 52:20
  56:25 57:3
  62:17 91:17
  104:11,21
  128:3 158:11
  173:22,25
  189:24

sometime 55:16
  106:14

somewhere 25:10
  76:3 83:17
  88:22 107:21
  109:23 124:7,8

sooner 37:4
  105:11,14
  198:23

sorry 17:22
  18:3,11 20:20
  43:10 53:17
  55:8 65:12,23
  83:3 85:20
  94:17 117:25
  148:25 149:2
  153:14 163:25
  164:2 167:3
  189:16

sort 6:22 11:9
  26:14 77:10
  85:16 120:22
  141:24 163:2
  180:9

sound 26:5
  28:14 98:11

121:2

sounds 7:5 27:3
  45:24 59:15
  97:23 181:18

Sources 42:24

south 9:3 98:23

southwest 94:9

space 18:16
  39:8 90:17
  114:1 137:15

spanned 75:6

spare
  192:9,16,25

speak 42:12
  157:6

SPEAKER 189:16

special 1:4 4:9

specialized
  9:23 14:11

specialties
  9:17

specific 14:3
  17:7 52:7,18
  59:19 60:11
  66:23,24 67:16
  72:21 73:5
  75:8,14
  97:6,18,19
  114:9 119:12
  147:12,16
  154:19 164:16
  191:24 196:2

specifically
  14:9 58:8
  67:20 88:14
  123:23 151:21

153:19 189:1

speculation
  127:21 156:22

speculative
  155:24

speed
  21:2,10,18
  26:21
  27:4,14,17,18
  28:1 29:7,12
  31:9,24
  35:21,23,24
  36:1,2,14,21
  37:1,8,11,13,1
  7,21 38:3,7
  58:22 61:21,25
  62:2,9,18,22,2
  4 63:2,3
  65:3,11
  68:10,23 69:15
  74:7 80:1,4,12
  81:1,3,4,11
  93:10,14,17,20
  95:14,23
  104:14,17,21,2
  4,25
  105:6,8,9,10,1
  1,12,13
  106:8,17,18
  107:1,7,11,22
  108:4,7,10
  109:14,15,20,2
  3 110:3
  111:1,17,20,22
  ,23 116:16,23
  118:21,23,25
  119:3,5 120:1
  128:20
  178:9,10
  180:12 183:9

189:24
  190:14,15,16,2
  0 197:21
  198:11,16,17
  199:14,16

speeds 15:4
  17:14 37:9
  111:7
  177:20,22
  185:9

spend 25:21

spin 166:5

spinning 165:22

spins 166:1

split 23:9,11

spoken 91:11

Sport 72:6

spot 28:18 96:3

spot-on 107:5

spray 155:1,3

Springdale 2:4

squares 89:22

stains 39:10

stamp 106:14

stamps
  124:10,11,20
  125:4

stand
  140:18,19,24
  141:9,18,24
  192:23

standard
  47:10,12 63:24
  76:25 80:2,3,6
  85:21 86:21



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

Appx_2415

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2420 of 2460   PageID 2712

105:6
124:16,22
193:22

**standards** 44:1
45:9 76:21

**standing** 111:3
148:2 191:5,11
195:10 196:10

**standpoint**
16:10 37:13
105:9 139:3

**start** 21:20
53:21 61:24
85:25 93:2
105:4 106:24
131:12
132:4,11,23,24
149:24 150:2
188:17 192:2
193:15

**started** 45:18
61:11,13
104:16,17
105:11,13
114:6 130:19
131:25 187:3

**starting** 4:16
59:2 72:23
89:20 145:5

**starts** 19:4
43:25 120:4

**state** 4:23 5:13
13:2 54:24

**stated** 143:18

**statement** 51:25
53:3 165:1
195:23

**statements**

51:14,22
52:5,7,20 53:2

**states** 1:1
12:23 13:1
22:7

**stationed** 94:13

**status** 96:10
188:14,15,16,1
8 192:23

**stay** 97:1

**steer** 130:3
136:1 177:17

**steered** 174:15

**steering** 111:22
130:6 135:19
136:9,10,15
180:12 183:22
189:14

**steers** 137:2

**step** 179:2
192:15
193:4,5,14

**stepped** 194:16

**stepping** 195:1

**steps** 192:8,12
193:11

**sticking** 126:14

**sticks** 165:13

**stimulus** 32:21
110:23
112:5,7,11
113:1 114:6
116:11 168:2

**stipulated** 3:23

**stitch** 56:14

**stitches** 86:25

**stock** 112:10
193:22

**stop** 7:3
27:21,22 28:7
30:4 31:23
35:10 97:22

**stopped** 26:3
35:7,16
110:6,10
111:3,9,14,24
112:21,23
113:6,9 122:24

**story** 147:23

**straight** 66:10
70:1,17,18
78:1
92:11,23,25
94:7 99:6
111:13
143:9,11
175:11 177:3
183:22

**straightaway**
78:7 92:19

**Street** 2:3,9
87:22

**strike** 22:17
28:9 30:1
36:20 43:10
54:1 56:25
63:9 79:6 80:9
83:4 107:17
138:6 140:6
173:20 177:9

**striking** 26:14

**strips** 89:25
90:8

**stitches** 86:25

**strong** 160:22

**struck** 24:7
36:16 148:20
149:5 159:19
162:1 194:4

**structural** 16:7
134:11

**structure** 16:9
50:10

**stuck** 156:15

**studied** 9:15
19:16 67:16
76:1

**studies** 9:20,24
20:11 33:21,23
35:18,20 36:4
110:14
112:18,20
113:17,20,23,2
4

**subcontract**
57:9

**subject** 21:15
34:22 37:17

**subjective**
96:19

**submarines**
14:12

**subpoena** 7:8,10
8:4

**subsequent**
69:17 70:12
79:19 87:1
162:6,8

**subsequently**
21:14 161:23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       www.**MILESTONEREPORTING**.com       Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2421 of 2460   PageID 2713

substance 39:15
43:3

subtleties
108:9

subtraction
125:24

successfully
33:9 199:5,11

sudden 134:9,12

suddenly
126:2,5,8,23
127:17 128:4

sufficient 10:9
28:18 85:15
114:4 121:7,13
137:19

sufficiently
11:8

suggested
174:16

suggesting
154:14 155:23
165:7

Suite 2:3

sum 77:10

summarize 26:20
175:1

summarized 12:6

summation
142:11

summed 42:5

sun
94:2,6,13,14,2
0,22

sunny 93:22

super 59:19

support 36:19
73:12

supporting
132:17

suppose 135:13
151:5 197:16

supposed 193:3

sure 6:2,9,12
19:1 26:1
38:21 39:24
52:18 61:9
65:25 68:4
74:5,13 79:4
83:10 86:11,12
89:11 101:25
102:13,15
112:6 125:12
128:8,9 129:14
150:6 151:6
154:7 160:4,14
162:13 178:22
182:8
187:20,21
188:2 189:12

SUV 28:11

swear 5:4

swearing 175:8

swerve 171:7
173:7 174:1
176:9 177:23
178:7,12 179:1
180:7 185:8
186:19 187:20
189:8
190:1,2,14,17
192:2
197:3,5,9,14

swerved 128:16
187:16 188:7
190:10 196:21

swerves 173:24
187:25

swerving 128:21
169:10
173:2,4,6,17,2
2 177:21

sworn 5:2,10

SYNC 66:22 68:8
72:14,17 74:24
75:4,11,21
76:25 77:18
79:1 185:4

synchronized
59:2

system 55:23
58:25 60:8,14
63:6 64:18

systems 13:11
14:22 73:9
76:21,23

———————

T

table 60:3

tail 144:9

taillight
147:15

taking 41:20
45:10 71:5,9
108:7 176:16
187:4,25
193:15

talk 35:12
113:16 148:23
156:1

talked 80:25
86:7 114:2
120:3

talking 8:3
13:25 16:5
30:24 35:9,11
41:17 52:9
68:10 73:22
74:25 75:23
98:9 110:6
112:4 119:16
121:5 122:16
143:15 165:11
169:4
193:19,20
197:18

tampered 56:8

tapping
108:8,10

tattoo 117:12

Taylor 2:2

te 87:24

teamwork 58:9

tech 84:14

technically
14:11 51:9
103:5

technology
42:23 43:8
63:15

teed 22:20 24:2
61:6 67:2 68:1
75:13 77:22
78:10 180:18
181:5

teens 25:10



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Appx_2417

**temple** 152:6

**ten** 25:12 42:20
 188:16,19

**tenth** 190:23
 191:2
 197:18,25

**tenths** 198:8

**term** 119:13

**terms** 14:10
 18:14 69:22
 76:15 96:19
 125:22

**tertiary** 147:8

**test**
 13:5,7,8,15
 20:2,10 72:22
 75:10 190:19

**tested** 74:20,24

**testified** 5:10
 25:8,16 28:15
 95:11 117:11
 158:9 197:7

**testify** 29:11
 158:1

**testifying**
 195:9

**testimonial**
 157:20

**testimony** 3:2
 5:5 7:21
 23:8,9 24:23
 28:9,17
 47:11,14,15
 51:8,12,17,24
 52:2 53:5 86:9
 96:20 101:12
 117:3,18,21

 118:1 119:3
 128:11 131:7
 158:5,15,22
 185:17,23
 186:5,16 187:4
 191:7
 192:14,15
 194:15,19,20
 195:5,8,15,18
 196:3,4,5

**Texas** 1:1 4:13
 46:7 82:6

**text** 58:23
 117:11,14
 118:10
 123:17,21
 124:2,11
 125:8,15,21
 128:13,22
 129:2,8,17
 181:4,7,12,15
 182:2,7

**textbook**
 171:6,10 173:9

**texting** 198:23

**texts** 82:18

**thank** 4:22 5:1
 20:20,25 26:12
 42:11 53:11,20
 63:8 84:2
 164:3

**themselves** 4:15
 52:12,21 142:4

**theorem** 181:1

**theory** 70:7,9
 71:4 76:7,11
 77:5,24 165:12
 176:16

**therefore** 19:22
 196:21

**there's** 22:21
 23:21 24:20,22
 25:3,19
 33:2,15 49:11
 52:6 54:11
 69:16,25
 75:2,4,12
 83:25 97:18
 100:4 105:6
 109:1
 120:1,16,19
 123:2,5 124:17
 129:3 132:4,17
 134:9 137:4
 139:3,14 140:8
 146:22 147:1
 148:16 155:5
 158:15,25
 159:23 162:10
 163:2 170:7
 171:1 172:7
 175:14,18
 176:11 177:13
 181:24 191:13
 192:14

**they'll** 66:10

**they're** 14:2
 46:21 67:4
 69:24 70:16
 75:23,24 85:6
 121:19
 122:8,12
 123:1,10,11
 151:22 176:21

**they've** 176:12

**third** 95:7,9
 146:7

**Thompson** 2:3

**thorough** 72:13
 85:12

**thoroughly**
 57:17

**thousands** 22:10
 24:20 121:21

**threat** 34:12
 118:18

**throughout**
 19:20 25:17
 54:24 148:20

**throw** 21:3,9,15
 145:15,21

**thrown** 15:1,9
 140:21
 143:10,11
 144:19 145:25
 165:8 173:8

**thumb** 36:13
 60:18

**tie** 20:19

**tiers** 11:18,23

**tilt** 141:22

**tilted** 140:19
 141:12,19,20,2
 1

**tilting** 141:13

**timeline** 30:19
 104:16

**tip** 152:4
 161:11

**tire** 109:4,6
 130:1,13,14,17
 ,18,22
 131:6,10,12,20

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2423 of 2460   PageID 2715

132:4,5,8,14,18
133:10,15,19,20,21
134:4,6,12,13,23 135:2 141:1
143:19,24
162:25
169:4,8,14
170:3,7,9,16,18,20,23
171:4,6,9,10,11,17,19,20,22
172:1,2,5,9,13,14,19
173:3,18,19,21
174:8,9,10,11
192:9,16,23,25
193:7,12,20,22
194:3
195:11,13,14,24 196:11

**tires** 142:4,14
144:2 169:20
171:8 173:9

**tissue** 146:16

**title** 11:2

**titled** 19:6,7,8
43:12 60:14,15
83:25

**titles** 10:19,23
11:7,16

**today** 4:4 48:25

**tolerance** 40:17
41:24 175:13

**tolerances**
40:12 178:18

**tool** 165:9

192:20
193:15,19,22

**tools** 43:6
181:2 193:24

**top** 24:1 55:12
61:6 67:2
75:14 78:10
88:10 139:5
170:22 171:5
172:5,8

**topic** 43:2

**torso** 148:11

**total** 142:2,10

**totally** 32:20
57:7 110:23,24

**touched** 108:11

**touching** 130:11
132:21 133:4

**tough** 183:5

**tow** 87:25

**towards** 94:8,12
145:25 146:5
171:5 174:15
175:16,20

**towed** 85:6

**Toyota** 21:14
30:25 31:3,24
33:12 79:13,17
83:23,25 87:24
88:3,5,7,12
91:13
94:12,14,19,20,23 98:10
99:1,7,15,18,19
100:2,7,11,18,25 101:13

102:9 103:1,18
104:5 111:24
113:6
114:4,11,24
115:13,15,25
116:8,17,22
117:4,19,24
118:22 119:2
121:16 125:15
126:11,15
130:11,22
134:19 135:14
136:15,22,23
137:10,16,20,23 138:6
139:5,10,16,20
140:2,6,15,21,22 141:11,18
142:1,9,21,25
143:3,6,14,16,23
144:1,4,7,20,24 145:7
146:1,3,4,10,14,15,19,21,23
147:1,11
155:21 162:7
167:14
169:5,11 174:2
185:18 187:7
189:5 191:5,10
195:6,7 196:11

**Toyotas** 80:4,6

**track** 23:7
59:21 60:16
62:6,14
69:12,18,23
70:3,16 77:11
106:5,10,19,21
124:11 125:3
171:20 174:5

175:16 179:19

**tracking** 72:13
73:25 171:22
176:18

**tractor-trailer**
96:11

**trade** 10:20

**traditional**
63:13

**traffic** 26:8
27:19 32:17
33:4 43:12,23
44:19,20
96:8,14,17,21,25
97:2,4,12,14,18 98:20
99:9,11,14,24
100:1,2,4,9,10
101:6 114:15
118:23 119:16
120:3 127:19
135:17,24
137:15 199:2

**trail** 58:20

**trained** 19:16

**training** 10:1,4
64:9

**trajectories**
14:19 15:4

**trajectory**
145:14
161:24,25
185:6

**transcript**
7:20,23,24
25:22



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      www.**MILESTONEREPORTING**.com      Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2424 of 2460   PageID 2716

**transfer** 13:13
140:9,10
144:10 162:1

**transmission**
142:6

**transpired** 17:9

**transportation**
43:18
44:1,16,22
119:15
120:8,18

**travel** 31:4,5
32:12 47:13
92:25 105:8
111:14,24
112:10,21
113:13 114:7
115:8 118:23
119:4
121:16,19
122:2 126:5,13
130:20
137:11,13
146:4 157:25
167:13 175:15
185:24 186:3

**traveled** 62:18
106:8 190:15

**traveling** 24:6
27:2,17 38:2,6
54:24 97:9
111:7 119:1
174:11,14
175:2 177:22
183:9 189:24
197:10

**travels** 179:21

**tread** 133:18,19
134:10,14,15

169:15
170:1,5,8,9,24
,25 171:24

**trees** 39:18
68:23

**trend**
77:8,21,25

**trends** 69:18,19
70:6 77:5
175:12 176:18

**trial** 7:21,24
22:6,12 25:8
47:15 129:15

**triangle** 122:19
179:17,24
180:4,16,22

**triangulating**
40:2

**triangulation**
40:1

**trick** 14:15
58:10 106:12

**tries** 135:11

**trigger** 79:24
81:20,25 82:4

**triggered** 81:18

**triggers** 81:22

**trim** 164:19

**Troopers** 82:7

**truck** 26:2,5,10
96:11

**truck's** 27:23

**true** 21:19
125:17 187:4
188:9 190:4

196:9

**trunk** 103:1,7
111:4
144:11,13,19,2
1 148:2
191:12,22
192:17,18,19

**trust** 175:25
178:15

**truth** 5:6,7

**try** 5:25 7:4
29:21 51:11
91:9,10 96:19
178:20 181:6

**trying** 14:15,23
24:19 26:4
64:25 77:8
173:25 187:6

**Tuesday** 1:16

**turn** 136:15,16
197:23
198:12,18

**turned** 41:7

**turning** 93:4

**twice** 80:22

**two-inch** 139:3

**two-lane** 26:3
29:4

**two-tenths**
197:24

**type** 21:4 33:25
50:4 61:8
67:7,17 110:22
133:12,16,23

**types** 16:17
17:4 21:3

23:17 52:15,16
58:19 62:4
65:10 75:23

**typical** 34:2
73:4 76:1
105:16 110:3
119:3

**typically** 10:9
12:9 17:1 21:1
22:4,5 35:19
36:25 45:10
47:4 51:6 57:2
63:23 79:25
80:19 81:21,24
84:11 85:3
90:22
110:12,16
121:11 122:12
138:25 145:14

---

U

**uh-huhs** 6:20

**umbrella** 44:12

**unable** 31:16
139:15

**unavoidable**
111:23

**unchanged**
38:1,5 89:17

**underlying**
47:1,3

**underneath** 47:1
80:3 132:24
133:6 134:13
192:19

**understand**
7:2,4 15:14
67:14 70:2



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2420

**86**:9 **100**:20
**117**:3,10 **118**:1
**128**:14 **192**:24
**193**:2,4

**understandable**
**122**:13,14

**understanding**
**38**:23 **40**:18
**44**:23 **62**:22
**63**:5 **66**:4,12
**77**:17 **79**:23
**122**:24
**140**:20,24
**160**:1 **185**:22

**understood** **6**:24
**75**:16 **113**:6
**118**:3 **195**:12

**undoubtedly**
**120**:16

**unfair** **33**:20

**unfolded** **118**:8

**UNIDENTIFIED**
**189**:16

**uniform** **40**:20

**uninhibited**
**95**:18
**125**:14,21

**unique** **162**:10

**unit** **74**:10,22

**UNITED** **1**:1

**units** **125**:1

**universe** **23**:3
**129**:14

**University** **9**:3

**unknown** **99**:12

**unknowns** **39**:9
**40**:7 **90**:18

**unless** **32**:7
**97**:18

**unobstructed**
**92**:24 **95**:4,13
**125**:7

**unpopulated**
**96**:7,12

**unprivileged**
**8**:18

**unrelated** **57**:7
**79**:18 **194**:3

**unreliable**
**76**:10

**upcoming** **120**:9
**121**:8,14

**upon** **21**:2 **50**:25
**54**:8,14,17
**57**:4 **192**:22

**USB** **7**:14

**usually** **90**:5

**utility** **26**:14

**utilized** **65**:7
**114**:23

———————
V
———————

**vacated** **104**:4
**168**:23

**vacating** **169**:2

**vague** **185**:20

**vaguely**
**25**:21,22 **27**:23
**28**:20 **43**:5
**61**:8

**valid** **113**:3

**validate** **72**:7
**88**:15
**178**:13,20

**validated**
**78**:5,25 **87**:19
**176**:3,13

**validating**
**67**:21

**validations**
**178**:14

**validity** **78**:12

**value** **73**:6,21
**75**:10 **76**:2
**96**:12 **185**:1

**values** **39**:5
**72**:5 **75**:22
**96**:13 **97**:5
**106**:8

**Vandiver** **68**:2,6
**71**:18 **73**:16,17

**Vandiver's** **71**:7

**Vanessa** **2**:15
**4**:4

**variable** **21**:16
**37**:14 **101**:2,8
**189**:25

**variables** **23**:21
**27**:14 **75**:24

**variance** **72**:24

**varies** **85**:6

**various** **13**:14
**20**:12 **21**:3,8
**23**:17 **42**:19
**44**:23 **58**:19
**62**:4 **65**:10

**68**:21 **71**:12
**75**:23 **195**:17

**varying**
**52**:15,16 **96**:20
**142**:8

**VBOX** **72**:6

**vectors** **15**:5
**39**:6

**vehicle** **11**:25
**12**:2 **17**:3
**21**:2,6,10
**23**:15,19
**26**:14,21,23
**27**:19 **28**:3
**32**:3,21 **33**:10
**35**:6,15 **36**:6
**44**:10 **56**:13
**57**:3 **59**:1
**62**:7,24 **63**:7
**70**:17 **76**:4,19
**77**:12 **80**:20
**81**:9,10,14,15
**96**:9,10
**110**:4,6,15,17,
20,21
**111**:1,2,4,5,9,
13,21
**112**:2,10,19,21
,23
**113**:2,13,15
**122**:1,24 **126**:3
**130**:2,3 **133**:10
**135**:23,24
**137**:2,4 **140**:25
**171**:8 **173**:4,9
**177**:19,22
**178**:24 **199**:8

**vehicles** **19**:18
**20**:1 **23**:24
**38**:16 **63**:15

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2421

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2426 of 2460   PageID 2718

79:15 85:5
110:10 119:1
140:13 169:9
173:2

**vehicular** 11:22
23:18

**verify** 56:6

**version** 59:13
186:12,13

**versions**
186:9,11
195:17

**versus** 4:11
12:11,18 15:4
16:6 21:6 22:3
23:5 25:19
32:22 33:22
37:17 66:25
69:19 71:6
72:24 81:13,14
85:22 111:7
124:16,22
142:14 146:16
149:8 174:10
179:20

**via** 141:8

**viable** 115:8

**video** 30:18
38:15,24
39:5,9

**Videographer**
2:15 4:3,22
5:1 18:4,8
20:18 41:9,13
97:25 98:4
163:25 164:3
167:5,8 189:18

**videos** 38:17

**view** 87:7
100:5 102:8
113:4 121:18
122:1,8 196:17

**violating**
115:21

**Virginia** 2:10

**virtually**
111:15

**visibility**
101:8,10

**visible** 89:7
122:9,11

**visit** 57:13

**visual** 28:24,25
29:22 32:21
34:17,19
110:23
112:5,7,11
113:1 116:10
125:23 199:3

**visually** 112:22

**volatile**
39:10,15

**VOLUME** 1:13
199:21

**vs** 1:8

_____
        W
_____

**walk** 60:20
63:16 65:5
180:9

**walked** 164:2

**walking** 56:13

**walk-ins** 117:12

**wall** 87:13 93:7
134:3,10

**warn** 121:14

**warned** 120:9

**warning**
119:11,15,22
120:18 121:13

**warnings** 120:17

**wasn't** 21:16
29:2 31:15
32:10 77:23
88:4 169:16
191:25 192:1

**Watch** 76:24

**water** 14:10,22
39:14,20

**waves** 85:7

**ways** 16:14
126:4

**wear** 134:11

**weather** 94:1,2
95:1

**wedging** 145:20

**weight** 81:9
171:7 173:7,8

**weirdly** 69:25

**welcome** 164:4
196:5

**we'll** 23:2 51:2
80:5 127:14
137:24 175:6

**well-
established**

**well** 87:7

**well-known** 76:1

**we're** 18:5 49:8
54:23,24 57:15
61:3 64:2
65:14 73:22
76:7 84:13
91:7 93:8 98:8
101:8 121:5
145:5 165:11
169:21
176:15,16
179:7 184:7
191:1 197:18

**Wes** 68:2
71:7,18

**Wesley** 68:6
73:16,17

**Wes's** 73:24

**wet** 26:22

**we've** 5:20 87:7

**whatever** 50:14
52:1 61:3 66:2
164:20

**whatnot** 175:7

**wheel** 133:21
134:17

**Whenever** 199:7

**wherever** 88:1
177:3

**whether** 20:7,14
21:4,5,6
27:21,25 28:5
49:11 50:1
52:4 53:6
69:16 75:21
76:24 81:4

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Appx_2422

96:10 98:14
99:22 101:5
105:21 114:3
115:12,24
116:6 124:1
129:6
131:15,19
133:2 169:2
170:22 185:20

**whip** 125:10

**white** 2:2 4:17
5:12,20,24 6:3
8:6,12,16,20,2
2 18:10 20:21
41:15
48:10,18,19
49:14,17 97:23
98:6,7 115:10
150:10,12,14,1
8,19 163:7
164:5 167:3,10
189:19,22

**White..........**
**.......5** 3:2

**whole** 5:6 12:18
23:3 52:25
71:13,16 72:21
111:5 120:24
177:17 181:25
182:17,19,21

**wide** 148:8
187:22,23

**widely** 91:1

**width** 33:7 71:1
137:18,21
170:13,15

**widths** 43:20

**wiggle** 176:12

**wild** 83:5

**William** 68:6
73:15

**Wingate** 1:19

**witness** 4:25
5:8 41:8
51:14,21
52:4,10 53:9
150:11,16
158:9 164:2,4

**witnesses** 52:14
53:2,10 158:4
192:4

**worded** 98:16
127:7

**work** 19:16
46:3,24 48:2,7
49:20,24
50:4,7 53:21
97:7 120:12
160:21 177:11

**worked**
45:13,14,21

**working** 21:20
40:12,14

**works** 147:25

**worst** 71:9,11
86:2,3

**worth** 44:6
192:3

**write** 22:5

**writer** 150:16

**writing** 129:8
150:15

**written** 22:22
23:5 195:23

**wrong** 15:18
56:1 69:21
72:5 121:2

**wrote** 74:2

**Wyndham** 1:19

---

Y

**yard** 87:25

**yes-or-no** 128:2

**you'll** 17:1
52:7,18 149:17
150:5

**yours** 163:20

**yourself** 10:17
11:1,10 14:7
16:16

**you've** 6:16
7:14 12:5 14:6
23:4 38:23
39:25 59:14,22
60:17 82:9,15
83:12 101:21
108:7,16
116:25 123:13
128:11
129:6,22
132:12 155:10
159:16,24
170:3 171:12
172:2 176:3
185:14

---

Z

**zones** 119:19,20
120:12

**zoomed-in**
173:14

---



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2423

1             IN THE UNITED STATES DISTRICT COURT FOR THE
                  NORTHERN DISTRICT OF TEXAS
2
                                              **COPY**
3              Civil Action No. 3:22-CV-02714-K

4    ERICK RODERICO PIVARAL
     GONZALEZ, Individually and as Special
5    Administrator of the Estate of
     NEHEMIAS R. PIVARAL SANTOS,
6    DECEASED, ERICK SANTOS, and
     EVELYN MORENO,
7
            Plaintiffs,
8
     vs.
9
     CAYLEE ERIN SMITH &
10   EASTMAN CHEMICAL COMPANY,

11          Defendants.

12   _____/

13
                         VOLUME II
14

15   DEPOSITION OF:   PAUL J. MONTALBANO

16
     DATE TAKEN:      Tuesday, December 19, 2023
17

18   TIME:            3:01 p.m.

19
     PLACE:           Wingate by Wyndham
20                    5750 Hazeltine National Drive
                      Orlando, Florida 32822
21

22   TAKEN BY:        Plaintiffs

23
     REPORTED BY:     Jennifer Prohaska
24                    Court Reporter and Notary Public

25

**407.423.9900**
**Fax 407.841.2779**
**Toll Free 855-MYDEPOS**

**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE



EXHIBIT
V

Appx_2424

```
 1              A P P E A R A N C E S:

 2   JACOB WHITE, ESQUIRE
     OF:  Taylor King Law
 3         410 North Thompson Street
           Suite B
 4         Springdale, Arkansas 72764
              (479) 935-1761
 5         Jacobwhite@taylorkinglaw.com
           APPEARING ON BEHALF OF THE PLAINTIFFS
 6

 7

 8   GREGORY J. DUBOFF, ESQUIRE
     OF:  McGuireWoods
 9         Gateway Plaza
           800 East Canal Street
10         Richmond, Virginia 23219
              (804) 775-1154
11         Gduboff@mcguirewoods.com
           APPEARING ON BEHALF OF THE DEFENDANTS
12

13

14   ALSO APPEARING:

15   VANESSA McCORMICK, Videographer

16

17

18

19

20

21

22

23

24

25
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2425

```
 1                    C O N T E N T S

 2  TESTIMONY OF PAUL J. MONTALBANO
           Direct Examination by Mr. White.................5
 3         Cross-Examination by Mr. DuBoff..............208

 4  CERTIFICATE OF OATH AND REPORTER....................218

 5  ERRATA SHEET.......................................219

 6  NOTIFICATION LETTER................................220

 7

 8

 9

10

11

12                    E X H I B I T S

13  Exhibit                                          Page
    Plaintiffs'
14       1   Mr. Montalbano's Report.....................5
         2   Mr. Montalbano's CV.........................5
15       3   Mr. Montalbano's Case List..................5

16

17

18

19

20

21                    - - - - -
                   S T I P U L A T I O N S
22

23       It is hereby stipulated by and between counsel for

24  the respective parties that the reading and signing of

25  the deposition be reserved.
```



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2426

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2431 of 2460   PageID 2723

```
 1                          *  *  *  *  *

 2                   (CONTINUED FROM VOLUME I)

 3  BY MR. WHITE:

 4       Q.    Okay.  Do you agree that, when going over

 5  85 miles an hour, it's needlessly dangerous to text and

 6  drive?

 7       A.    Yeah, you are asking jury questions.  I can't

 8  answer those.

 9       Q.    You don't have an opinion on whether or not

10  it's needlessly dangerous to text and drive going over 85

11  miles an hour?

12       A.    "Needlessly dangerous" is such a subjective

13  term.  I'm here to analyze the objective science.  You're

14  welcome to present these words on closing.  That is not

15  my job.

16       Q.    I'm just asking, you know, you're an accident

17  reconstructionist and you do this for a living, right?

18       A.    Yes.

19       Q.    Do you think it's dangerous to text and

20  drive?

21       A.    It depends.

22       Q.    Okay.  Do you think it's dangerous to text

23  and drive when you're going over 85 miles an hour?

24       A.    It just -- it all depends.  You've got to

25  analyze every case.
```



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2427

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2432 of 2460   PageID 2724

1      Q.     So it might not always be dangerous to text

2  and drive when going over 85 miles an hour?

3      A.     It might not.

4      Q.     Okay.  You think it's wrong to text and drive

5  when you're going over 85 miles an hour?

6      A.     You're asking jury questions.  I can't answer

7  that.

8      Q.     You don't have an opinion?

9      A.     No.  I'm here to apply accident

10  reconstruction analysis.  I can't -- I'm not here to say

11  what's right and wrong.  That's a jury question.  I can't

12  invade the province of the jury.

13      Q.     So you just don't have -- you don't have an

14  opinion about it?

15      A.     I'm not allowed to give layperson opinions.

16  Experts have been stricken for that, so I'm going to stay

17  in my lane.  I'm giving you the science.  You're welcome

18  to, again, make your attorney arguments.  I can't bolster

19  your attorney arguments.

20      Q.     So we go to Figure 89 on Page 64.  Can you

21  take that red pen on page -- on Figure 89 and draw where

22  you think Nehemias Santos was standing?

23            MR. DUBOFF:  Object as vague.

24      A.     Oh, my goodness, no, I can't do this.

25      Q.     No, no, sorry.  Figure 89.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2428

1      A.     Oh, Figure 89.  No, I can't do this.  I have

2  a diagram that shows you this.  I can't replicate a view

3  with a pen.  I've already done this graphically.

4      Q.     So when you say you made a diagram, you're

5  talking about Figures 119 and 120?

6      A.     Yeah.  Again, if you recall, I'm not telling

7  the jury where he was.  I'm presenting the two provided

8  versions.

9      Q.     I mean, I think you provided some opinions

10  about where -- where he wasn't standing, right?  But you

11  don't have an opinion on where he was standing?

12      A.     It's a range, remember?  So we have one end

13  of the range is the plaintiff version, the other end of

14  the range is the defendant version.  So I'm offering

15  those two versions.

16      Q.     But you've concluded one is consistent with

17  the evidence and one is not, right?

18      A.     What evidence?  What do you mean?

19      Q.     You've concluded that the defense version of

20  events is consistent with the evidence, correct?

21      A.     Well, with his final rest, yes.  Because he

22  bounces off the Toyota and then back to the Ford so -- in

23  Plaintiffs' version, the Ford is physically occupying his

24  original final rest.  Since we know he hits the Ford, he

25  can't occupy the same space at the same time.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2429

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2434 of 2460   PageID 2726

1      Q.    Okay.  So you don't have an opinion as to

2  where he was standing when he was struck by the Ford

3  Explorer?

4      A.    I don't have a specific opinion.  I do have a

5  range that I'm presenting.

6      Q.    Okay.  Describe the range for us.

7      A.    The range is anywhere between -- anywhere

8  between 3.2 feet into the travel lane up to about -- I

9  think that's 6.  Let me double-check.  5, I'm sorry.

10  5 feet to the travel lane.  So anywhere between 3 and 5

11  feet.

12      Q.    In the travel lane or outboard of the Toyota?

13      A.    Into the travel lane.

14      Q.    Okay.  And -- but you don't have an opinion

15  about how far back he was from the Toyota?

16      A.    I modeled him a couple feet.  But again, you

17  know, plus or minus 5 feet.  There's no reason to take a

18  hard stance on that, because it doesn't affect any of the

19  analysis.

20      Q.    Okay.

21      A.    Certainly, if it was 250 feet, that would

22  affect things.  But that variable is not that sensitive.

23      Q.    But then, so if I ask you to draw an X marks

24  the dot where Nehemias Santos was standing when he was

25  struck by Caylee Smith, you cannot draw that X?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2430

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2435 of 2460  PageID 2727

```
 1        A.    Well, remember, I'm giving you a range, so I
 2   would have to draw a series of X's --
 3        Q.    Right, right.
 4        A.    -- within that range.
 5        Q.    But you can't -- but you can't draw one X and
 6   say that's where he was standing?
 7        A.    No, no.  I'm giving you a range, so I
 8   can't -- I can't establish a range with one point.
 9        Q.    Okay.  So if you go to Figure 121 on Page
10   180 -- let me know when you're there.
11        A.    Okay.
12        Q.    All right.  So you see where you've got an
13   arrow pointing to his body, it says "initial rest"?
14        A.    Yes.
15        Q.    Okay.  So how did you conclude that his feet
16   were in the middle lane as opposed to his feet being
17   pointed towards the Toyota?
18        A.    Yeah, that certainly has room for -- oops --
19   that is not drawn specifically.  What the evidence shows
20   is that he was dragged.
21        Q.    So your opinion is his head was at the point
22   where y'all drew the head on Figure 121, right?
23        A.    In his initial rest?
24        Q.    In his initial rest, yes.
25        A.    That seems to be where the blood is coming
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2431

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2436 of 2460   PageID 2728

1  from, so it just makes the most sense, especially with

2  him being dragged backward towards the shoulder.  It's

3  just what made the most sense.

4       Q.    But you don't have an opinion about which

5  direction his legs were facing, either towards the Toyota

6  or towards the middle lane?

7       A.    No.  And I indicated that in the report.  I

8  don't have a specific final rest, or I should say initial

9  rest of him.  I just know it was on the initial path of

10 the travel lane.

11      Q.    So if Figure 121 was replicated, but with his

12 head where it is in the initial rest position, but his

13 feet pointing towards the Toyota, you wouldn't have any

14 problem with that?

15      A.    No.

16            MR. WHITE:  Okay.  All right.  I reserve the

17       rest of my questions for trial.

18            MR. DUBOFF:  Okay.  Let me just -- I just

19       have a couple.

20                     CROSS-EXAMINATION

21 BY MR. DUBOFF:

22      Q.    I think that this might have just been a word

23 mix-up, but, Mr. Montalbano, correct me if I'm wrong.

24 This was earlier in your testimony.  But do you recall

25 Mr. White asking you questions about how average drivers



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2432

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2437 of 2460   PageID 2729

1  have responded to roadside obstacles?

2       A.    I think so.

3       Q.    And I think there was a phrasing for a few of

4  the questions that was something like, "So people slow

5  down a few miles per hour before they hit a pedestrian."

6  Can you just -- are those studies that you were

7  referencing, were those about pedestrian strikes or about

8  roadside obstacles or both?

9       A.    Oh, I -- did I say "before hitting the

10 pedestrian"?

11      Q.    I think the question was phrased in that way.

12      A.    Oh, yes.  So these were roadside hazards that

13 weren't imminent hazards.  It was determining what

14 drivers did in response to the presence of a potential

15 hazard.  And the studies show that drivers typically will

16 slow down 1 to 3 miles per hour for a roadside hazard

17 prior to crossing that roadside hazard, so prior to

18 arriving at the roadside hazard.

19      Q.    Okay.  And so those studies were not about

20 how far before hitting a pedestrian people brake?

21      A.    No, those were not imminent hazard studies.

22 Those were potential hazard studies, which is what we

23 have in this particular case.

24      Q.    With regard to -- if you could turn to

25 Page 61 of your report in Figure 83.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2433

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2438 of 2460   PageID 2730

1          A.     Okay.

2          Q.     And this is going back to the questions that

3  you were asked about whether one of those tire marks was

4  made by somebody driving through that fluid.  Is it your

5  understanding that those photos were taken when

6  Mr. Santos was at his final point of rest?

7          A.     Yes.

8          Q.     And in the course of your analysis, did you

9  review all of the body camera and dash camera video that

10  was available?

11          A.     Yes.

12          Q.     During any of that video, did you see a

13  car -- well, let me back up.

14          No one -- a car could not have made those

15  tire marks driving through the fluid when Mr. Santos was

16  at his initial point of rest without driving over

17  Mr. Santos, correct?

18          A.     Yeah, I would agree with that.  In particular

19  in this picture, we see some brain matter also in line

20  with that tire track, so I would imagine the brain matter

21  would have been flattened in conjunction with driving

22  over the fluid if this was post impact.

23          Q.     And so for -- for a tire to have driven

24  through the fluid, it would have had to have been after

25  Mr. Santos's body was dragged onto the shoulder, correct?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2434

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2439 of 2460   PageID 2731

1        A.     Right.

2        Q.     Did you see anything in any of the video that

3   you reviewed that would indicate that a vehicle did drive

4   through the fluid?

5        A.     No.

6        Q.     And did that -- does that contribute in any

7   way to your opinion that those are actual tire marks from

8   an -- from an emergency maneuver as opposed to driving

9   through fluid?

10        A.     Yeah.  I mean, I think it goes back to the

11   consistency of the curvature of the marks, and the

12   characteristics of the marks tell me that it has all of

13   the classic details of a swerving maneuver versus

14   traveling through some fluid.  And then, obviously, when

15   you factor in the other components that would have had to

16   have been driven over if that was a post impact, I think

17   that certainly compounds [sic] to my interpretation of

18   the characteristics of those marks as swerving marks

19   prior to.

20        Q.     With regard to the questions about GPS

21   precision, just to try to maybe put it in simpler terms,

22   I suppose it's true that every point on the Earth has a

23   true GPS location?

24        A.     Yes.

25        Q.     Okay.  And so when we're talking about --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2435

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2440 of 2460   PageID 2732

1  when you use the phrase "global accuracy," tell me if

2  this is what you mean by that.  If I were to go out to a

3  point in the middle of the woods, get my true GPS

4  location, and, like, plant a flag there, would accuracy

5  be the ability of a GPS device to locate that exact spot?

6       A.    Yes.

7       Q.    Okay.  And that -- that has a certain

8  tolerance or error factor to it?

9       A.    Right.

10      Q.    Okay.  When you were speaking about

11 relativity and things of that nature, am I understanding

12 correctly that wherever Ms. Smith was on the globe, you

13 would expect the GPS data to pick up if, from one second

14 to another, she was moving east or west or north or

15 south?

16      A.    Yeah.  When you're in the same environment,

17 when you take that sample of your GPS data into very

18 small increments -- where we're not talking differences

19 between having 24 satellites in your reception versus 22

20 satellites -- a couple miles away, either due to the

21 position of the satellites and the differential distance

22 on the Earth, you're talking about a very small subsample

23 where all the points in that subsample are going to have

24 the same satellite numbers.  It's going to have the same

25 signal, or reception, you can say, to those satellites.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2436

1        The things that really affect GPS signal is,

2 again, number of satellites that you have available to

3 you depending on the constellations, what path they're

4 in, the reception to those satellites:  Are there

5 buildings or trees obstructing the reception or

6 interfering with the reception where the signal could

7 bounce off of objects and cause some errors?  Those are

8 really the big factors that affect your accuracy.

9        So when you take a small subsample that has

10 the same environment and variables that go into accuracy,

11 the accuracy is the same on every subsample.  And so any

12 deviation between subsamples is going to be accurate.  I

13 like to call it the theory of relativity.

14      Q.    Under -- understood.

15        You used a phrase towards the end, and I just

16 want to make sure we're clear on that.  Towards the end

17 of your testimony, you spoke about comparing Plaintiffs'

18 version of events to the defense version of events; is

19 that right?

20      A.    Right.

21      Q.    And just so we're clear, when you use those

22 terms, the defendants' version of events is Ms. Smith is

23 driving sort of as far right in the left lane as she can

24 without intruding into the middle lane?

25      A.    Correct.  Like, she scooted over in the right



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

Case 3:22-cv-02714-K  Document 49  Filed 01/29/24  Page 2442 of 2460  PageID 2734

1  lane, similar to what the human factor studies show

2  drivers do in response to a roadside potential hazard

3  like a vehicle with a pedestrian.

4       Q.    And you understood from Ms. Moreno's

5  statements to police at the scene where she said that

6  Mr. Santos never went further into the lane than the

7  Camry, correct?

8       A.    Correct.  I think she was confused at how it

9  happened, since she didn't see him go into the lane.

10      Q.    Is it fair to say that the range of values

11 that you calculated were sort of based on what the

12 evidence shows the minimum and maximum distances that

13 Mr. Santos could have been laterally in the left lane?

14      A.    It was a fully encompassing range accounting

15 for both versions.  At the end of the day, it's -- it

16 is -- there's no smoking gun evidence to tell us where

17 within that range this happened.  What I can say is the

18 range closer to Defendants' version does make more sense

19 based on Mr. Nehemias's final rest versus Plaintiffs'

20 version.

21           But what I can objectively say is these are

22 the two versions that were provided to me.  When you

23 factor in the overlap established from the damage

24 matching, this is the range that it lies within.  I'll

25 let the jury decide what side of the range or what end of



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2438

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2443 of 2460   PageID 2735

1  the range or whether they want to pick the middle of the

2  range where they think he was standing, but it's going to

3  be somewhere in that range, based on what I've been

4  provided.

5      Q.    And just -- can you explain what you mean by

6  "Plaintiffs' version of events"?

7      A.    Plaintiffs' version was that she, being

8  Caylee, drove onto the shoulder and made an emergency

9  swerve from the shoulder to her right, striking

10  Mr. Nehemias, which we know she didn't strike the Toyota,

11  and we know the vehicle dynamic properties of an

12  emergency swerve.  And that emergency swerve would have

13  had to start 250 feet away in order for her to displace

14  herself laterally from the shoulder and not strike the

15  Toyota.

16          And so I think that number is valuable to the

17  jury, because when they're listening about the testimony

18  of these witnesses that observed her on the shoulder, my

19  understanding was they looked up at impact.  And I did

20  not hear anybody testify that she was 250 feet away when

21  she was on the shoulder, because it's physically

22  impossible for her to exist on the shoulder any closer

23  than 250 feet away, because she cannot get out of the way

24  in time or she would have ran into the Toyota, and we

25  know she did not run into the Toyota.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2439

1          So I know on a vehicle dynamics standpoint,

2  she cannot exist on the shoulder any closer than

3  250 feet.  So if she ever did exist on the shoulder, it

4  was beyond 250 feet away, and again, we don't have any

5  corroborative digital evidence to indicate that based on

6  her GPS coordinates and her bearing data.

7       Q.    And I think just to clarify, there have been

8  several versions from Plaintiffs or witnesses on the

9  Plaintiffs' side, one of which is that she actually hit

10  Mr. Santos when he was standing fully on the shoulder?

11       A.    Right, which is physically impossible.

12       Q.    Okay.  So that's not included in your range

13  of his possible locations, correct?

14       A.    Not at all.  That was physically impossible.

15       Q.    Okay.  So when you say you took into account

16  Plaintiffs' version, you had to in some way align

17  Plaintiffs' version with what would be physically

18  possible?

19       A.    Right.  What I did was I took the testimony

20  that she was on the shoulder and aligned it with the fact

21  that she did not hit the Toyota and tried to give them

22  the Plaintiffs' version as much as I could.

23          MR. DUBOFF:  Okay.  Those are all the

24       questions that I have.

25          MR. WHITE:  Reserve the remainder for trial.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MY DEPOS

Appx_2440

```
 1            THE VIDEOGRAPHER:  Two questions before we go

 2       off:  Would you like the video, to order the video

 3       at this time?

 4            MR. WHITE:  Yes, please.

 5            THE VIDEOGRAPHER:  Would you like it synced

 6       with the transcript?

 7            MR. WHITE:  Yes.

 8            THE VIDEOGRAPHER:  Would you?

 9            MR. DUBOFF:  Yes, ma'am.

10            THE VIDEOGRAPHER:  The time is 3:19 p.m., and

11       we are off record.

12            THE REPORTER:  So you're ordering the

13       original; standard turnaround time?

14            MR. WHITE:  Yes, ma'am.

15            (The deposition was concluded at 3:19 p.m.)

16

17

18

19

20

21

22

23

24

25
```



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONE**REPORTING.com          Toll Free 855-MYDEPOS

Appx_2441

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2446 of 2460   PageID 2738

```
1                    CERTIFICATE OF OATH

2  STATE OF FLORIDA:
   COUNTY OF ORANGE:
3
        I, Jennifer Prohaska, Stenograph Shorthand
4  Reporter, certify that PAUL J. MONTALBANO personally
   appeared before me and was duly sworn.
5       WITNESS my hand and official seal this 19th day of
   December, 2023.
6
                          _____
7                         Jennifer Prohaska
                          Notary Public - State of Florida
8                         My commission No.:  GG987188

9
                    CERTIFICATE OF REPORTER
10
   STATE OF FLORIDA:
11 COUNTY OF ORANGE:

12      I, Jennifer Prohaska, Stenograph Shorthand
   Reporter, certify that I was authorized to and did
13 stenographically report the foregoing deposition of
   PAUL J. MONTALBANO; that the review of the transcript was
14 requested; and that the foregoing Pages 4 through 217,
   inclusive, are a true and complete record of my
15 stenograph notes.

16      I further certify that I am not a relative or
   employee of any of the parties, nor am I a relative or
17 counsel connected with the parties' attorneys or counsel
   connected with the action, nor am I financially
18 interested in the outcome of the action.

19      DATED this 2nd day of January, 2024.

20
                          _____
21                        Jennifer Prohaska,
                          Stenograph Shorthand Reporter
22

23

24

25
```



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855.MYDEPOS

Appx_2442

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2447 of 2460   PageID 2739

```
 1                          ERRATA SHEET
          DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
 2
    IN RE:              Erick Roderico Pivaral Gonzalez,
 3                      Individually and as Special
                        Administrator of the Estate of
 4                      Nehemias R. Pivaral Santos, Deceased,
                        Erick Santos, and Evelyn Moreno vs.
 5                      Caylee Erin Smith & Eastman Chemical
                        Company
 6  CASE NO.:           3:22-CV-02714-K

 7  DATE:               December 19, 2023

 8  DEPONENT:           PAUL J. MONTALBANO

 9  PAGE #    LINE #      CORRECTION           REASON

10  ----------------------------------------------------------

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22          Under penalties of perjury, I have read my
    deposition in this matter and that it is true and
23  correct, subject to any changes in form or substance as
    reflected above.
24
    Dated:_____Signed:_____
25
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2443

1          (Insert Read & Sign Page Here)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2444

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2449 of 2460   PageID 2741

---

**1**

**1** 3:14 10:16

**119** 6:5

**120** 6:5

**121** 8:9,22 9:11

**180** 8:10

**19** 1:16 20:7

**19th** 19:5

---

**2**

**2** 3:14

**2023** 1:16 19:5
  20:7

**2024** 19:19

**217** 19:14

**22** 13:19

**23219** 2:10

**24** 13:19

**250** 7:21
  16:13,20,23
  17:3,4

**2nd** 19:19

---

**3**

**3** 3:15 7:10
  10:16

**3.2** 7:8

**3:01** 1:18

**3:19** 18:10,15

**3:22-CV-02714-K**
  1:3 20:6

**32822** 1:20

---

**4**

---

**4** 19:14

**410** 2:3

**479** 2:4

---

**5**

**5** 7:9,10,17

**5750** 1:20

---

**6**

**6** 7:9

**61** 10:25

**64** 5:20

---

**7**

**72764** 2:4

**775-1154** 2:10

---

**8**

**800** 2:9

**804** 2:10

**83** 10:25

**85** 4:5,10,23
  5:2,5

**89** 5:20,21,25
  6:1

---

**9**

**935-1761** 2:4

---

**A**

**ability** 13:5

**accident** 4:16
  5:9

**account** 17:15

**accounting**
  15:14

**accuracy** 13:1,4
  14:8,10,11

**accurate** 14:12

**action** 1:3
  19:17,18

**actual** 12:7

**actually** 17:9

**Administrator**
  1:5 20:3

**affect** 7:18,22
  14:1,8

**align** 17:16

**aligned** 17:20

**allowed** 5:15

**already** 6:3

**am** 13:11
  19:16,17

**analysis** 5:10
  7:19 11:8

**analyze** 4:13,25

**answer** 4:8 5:6

**anybody** 16:20

**anything** 12:2

**anywhere** 7:7,10

**appeared** 19:4

**APPEARING**
  2:5,11,14

**apply** 5:9

**arguments**
  5:18,19

**Arkansas** 2:4

**arriving** 10:18

---

**arrow** 8:13

**attorney**
  5:18,19

**attorneys** 19:17

**authorized**
  19:12

**available** 11:10
  14:2

**average** 9:25

**away** 13:20
  16:13,20,23
  17:4

---

**B**

**backward** 9:2

**based** 15:11,19
  16:3 17:5

**bearing** 17:6

**BEHALF** 2:5,11

**beyond** 17:4

**blood** 8:25

**body** 8:13
  11:9,25

**bolster** 5:18

**bounce** 14:7

**bounces** 6:22

**brain** 11:19,20

**brake** 10:20

**buildings** 14:5

---

**C**

**calculated**
  15:11

**camera** 11:9

---



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2450 of 2460   PageID 2742

Camry 15:7

Canal 2:9

car 11:13,14

case 3:15 4:25
  10:23 20:6

cause 14:7

Caylee 1:9 7:25
  16:8 20:5

certain 13:7

certainly 7:21
  8:18 12:17

CERTIFICATE 3:4
  19:1,9

certify
  19:4,12,16

changes 20:1,23

characteristics
  12:12,18

Chemical 1:10
  20:5

Civil 1:3

clarify 17:7

classic 12:13

clear 14:16,21

closer 15:18
  16:22 17:2

closing 4:14

coming 8:25

commission 19:8

Company 1:10
  20:5

comparing 14:17

complete 19:14

components
  12:15

compounds 12:17

conclude 8:15

concluded
  6:16,19 18:15

confused 15:8

conjunction
  11:21

connected 19:17

consistency
  12:11

consistent
  6:16,20

constellations
  14:3

CONTINUED 4:2

contribute 12:6

coordinates
  17:6

correct 6:20
  9:23 11:17,25
  14:25 15:7,8
  17:13 20:23

CORRECTION 20:9

correctly 13:12

corroborative
  17:5

counsel 3:23
  19:17

COUNTY 19:2,11

couple 7:16
  9:19 13:20

course 11:8

Court 1:1,24

Cross-
  Examination
  3:3 9:20

crossing 10:17

curvature 12:11

CV............
  ...........5
  3:14

———————————
D
———————————

damage 15:23

dangerous
  4:5,10,12,19,2
  2 5:1

dash 11:9

data 13:13,17
  17:6

DATE 1:16 20:7

DATED 19:19

Dated:_____
  _____Signed
  20:24

day 15:15
  19:5,19

Deceased 1:6
  20:4

December 1:16
  19:5 20:7

decide 15:25

defendant 6:14

defendants 1:11
  2:11 14:22
  15:18

defense 6:19

14:18

depending 14:3

depends 4:21,24

DEPONENT 20:8

deposition 1:15
  3:25 18:15
  19:13 20:22

Describe 7:6

details 12:13

determining
  10:13

deviation 14:12

device 13:5

diagram 6:2,4

differences
  13:18

differential
  13:21

digital 17:5

Direct 3:2

direction 9:5

displace 16:13

distance 13:21

distances 15:12

DISTRICT 1:1

done 6:3

dot 7:24

double-check
  7:9

dragged 8:20
  9:2 11:25

draw 5:21
  7:23,25 8:2,5



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2451 of 2460   PageID 2743

**drawn** 8:19

**drew** 8:22

**drive** 1:20
4:6,10,20,23
5:2,4 12:3

**driven** 11:23
12:16

**drivers** 9:25
10:14,15 15:2

**driving**
11:4,15,16,21
12:8 14:23

**drove** 16:8

**DUBOFF** 2:8 5:23
9:18,21 17:23
18:9

**DuBoff.........
......208** 3:3

**due** 13:20

**duly** 19:4

**During** 11:12

**dynamic** 16:11

**dynamics** 17:1

---
E
---

**earlier** 9:24

**Earth** 12:22
13:22

**east** 2:9 13:14

**Eastman** 1:10
20:5

**either** 9:5
13:20

**emergency** 12:8

**16:8,12**

**employee** 19:16

**encompassing**
15:14

**ENTER** 20:1

**environment**
13:16 14:10

**Erick** 1:4,6
20:2,4

**Erin** 1:9 20:5

**ERRATA** 3:5 20:1

**error** 13:8

**errors** 14:7

**especially** 9:1

**ESQUIRE** 2:2,8

**establish** 8:8

**established**
15:23

**Estate** 1:5 20:3

**Evelyn** 1:6 20:4

**events** 6:20
14:18,22 16:6

**evidence**
6:17,18,20
8:19 15:12,16
17:5

**exact** 13:5

**Examination** 3:2

**Exhibit** 3:13

**exist** 16:22
17:2,3

**expect** 13:13

**Experts** 5:16

**explain** 16:5

**Explorer** 7:3

---
F
---

**facing** 9:5

**fact** 17:20

**factor** 12:15
13:8 15:1,23

**factors** 14:8

**fair** 15:10

**feet**
7:8,10,11,16,1
7,21 8:15,16
9:13
16:13,20,23
17:3,4

**Figure**
5:20,21,25 6:1
8:9,22 9:11
10:25

**Figures** 6:5

**final** 6:21,24
9:8 11:6 15:19

**financially**
19:17

**flag** 13:4

**flattened** 11:21

**Florida** 1:20
19:2,7,10

**fluid**
11:4,15,22,24
12:4,9,14

**Ford** 6:22,23,24
7:2

**foregoing**

**19:13,14**

**form** 20:23

**fully** 15:14
17:10

---
G
---

**Gateway** 2:9

**Gduboff@mcguire
woods.com** 2:11

**GG987188** 19:8

**giving** 5:17
8:1,7

**global** 13:1

**globe** 13:12

**Gonzalez** 1:4
20:2

**goodness** 5:24

**GPS** 12:20,23
13:3,5,13,17
14:1 17:6

**graphically** 6:3

**GREGORY** 2:8

**gun** 15:16

---
H
---

**hand** 19:5

**happened**
15:9,17

**hard** 7:18

**having** 13:19

**hazard**
10:15,16,17,18
,21,22 15:2

**hazards**



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Appx_2447

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2452 of 2460   PageID 2744

10:12,13

**Hazeltine** 1:20

**head** 8:21,22
9:12

**hear** 16:20

**hereby** 3:23

**herself** 16:14

**hit** 10:5
17:9,21

**hits** 6:24

**hitting** 10:9,20

**hour** 4:5,11,23
5:2,5 10:5,16

**human** 15:1

——————
I
——————

**II** 1:13

**I'll** 15:24

**I'm** 4:13,16
5:9,10,15,16,1
7 6:6,7,14
7:5,9 8:1,7
9:23

**imagine** 11:20

**imminent**
10:13,21

**impact** 11:22
12:16 16:19

**impossible**
16:22 17:11,14

**included** 17:12

**inclusive** 19:14

**increments**
13:18

**indicate** 12:3
17:5

**indicated** 9:7

**Individually**
1:4 20:3

**initial**
8:13,23,24
9:8,9,12 11:16

**Insert** 21:1

**interested**
19:18

**interfering**
14:6

**interpretation**
12:17

**intruding** 14:24

**invade** 5:12

**I've** 6:3 16:3

——————
J
——————

**JACOB** 2:2

**Jacobwhite@tayl
orkinglaw.com**
2:5

**January** 19:19

**Jennifer** 1:23
19:3,7,12,21

**job** 4:15

**jury** 4:7
5:6,11,12 6:7
15:25 16:17

——————
K
——————

**King** 2:2

——————
L
——————

**lane** 5:17
7:8,10,12,13
8:16 9:6,10
14:23,24
15:1,6,9,13

**laterally** 15:13
16:14

**Law** 2:2

**layperson** 5:15

**legs** 9:5

**LETTER.........
..............
..........220**
3:6

**lies** 15:24

**line** 11:19 20:9

**List...........
.......5** 3:15

**listening** 16:17

**living** 4:17

**locate** 13:5

**location** 12:23
13:4

**locations** 17:13

——————
M
——————

**ma'am** 18:9,14

**maneuver**
12:8,13

**marks** 7:23
11:3,15
12:7,11,12,18

**matching** 15:24

**matter** 11:19,20
20:22

**maximum** 15:12

**maybe** 12:21

**McCORMICK** 2:15

**McGuireWoods**
2:8

**mean** 6:9,18
12:10 13:2
16:5

**middle** 8:16 9:6
13:3 14:24
16:1

**miles** 4:5,11,23
5:2,5 10:5,16
13:20

**minimum** 15:12

**minus** 7:17

**mix-up** 9:23

**modeled** 7:16

**Montalbano** 1:15
3:2 9:23
19:4,13 20:8

**Montalbano's**
3:14,15

**Moreno** 1:6 20:4

**Moreno's** 15:4

**moving** 13:14

——————
N
——————

**National** 1:20

**nature** 13:11

**needlessly**
4:5,10,12



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2453 of 2460   PageID 2745

**Nehemias** 1:5
  5:22 7:24
  16:10 20:4

**Nehemias's**
  15:19

**nor** 19:16,17

**north** 2:3 13:14

**NORTHERN** 1:1

**Notary** 1:24
  19:7

**notes** 19:15

**NOTIFICATION**
  3:6

---
O
---

**OATH** 3:4 19:1

**Object** 5:23

**objective** 4:13

**objectively**
  15:21

**objects** 14:7

**obstacles**
  10:1,8

**obstructing**
  14:5

**obviously** 12:14

**occupy** 6:25

**occupying** 6:23

**offering** 6:14

**official** 19:5

**Oh** 5:24 6:1
  10:9,12

**Okay** 4:4,22 5:4
  7:1,6,14,20

8:9,11,15
  9:16,18 10:19
  11:1 12:25
  13:7,10
  17:12,15,23

**onto** 11:25 16:8

**oops** 8:18

**opinion** 4:9
  5:8,14 6:11
  7:1,4,14 8:21
  9:4 12:7

**opinions** 5:15
  6:9

**opposed** 8:16
  12:8

**ORANGE** 19:2,11

**order** 16:13
  18:2

**ordering** 18:12

**original** 6:24
  18:13

**Orlando** 1:20

**outboard** 7:12

**outcome** 19:18

**overlap** 15:23

---
P
---

**p.m** 1:18
  18:10,15

**page** 3:13
  5:20,21 8:9
  10:25 20:9
  21:1

**Pages** 19:14

**particular**

10:23 11:18

**parties** 3:24
  19:16,17

**path** 9:9 14:3

**PAUL** 1:15 3:2
  19:4,13 20:8

**pedestrian**
  10:5,7,10,20
  15:3

**pen** 5:21 6:3

**penalties** 20:22

**people** 10:4,20

**per** 10:5,16

**perjury** 20:22

**personally** 19:4

**photos** 11:5

**phrase** 13:1
  14:15

**phrased** 10:11

**phrasing** 10:3

**physically** 6:23
  16:21
  17:11,14,17

**pick** 13:13 16:1

**picture** 11:19

**Pivaral** 1:4,5
  20:2,4

**plaintiff** 6:13

**Plaintiffs**
  1:7,22 2:5
  3:13 6:23
  14:17 15:19
  16:6,7
  17:8,9,16,17,2

2

**plant** 13:4

**Plaza** 2:9

**please** 18:4

**plus** 7:17

**point** 8:8,21
  11:6,16 12:22
  13:3

**pointed** 8:17

**pointing** 8:13
  9:13

**points** 13:23

**police** 15:5

**position** 9:12
  13:21

**possible**
  17:13,18

**post** 11:22
  12:16

**potential**
  10:14,22 15:2

**precision** 12:21

**presence** 10:14

**present** 4:14

**presenting** 6:7
  7:5

**prior** 10:17
  12:19

**problem** 9:14

**Prohaska** 1:23
  19:3,7,12,21

**properties**
  16:11

**provided** 6:7,9



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2454 of 2460   PageID 2746

15:22 16:4

**province** 5:12

**Public** 1:24
19:7

---

Q

**question** 5:11
10:11

**questions** 4:7
5:6 9:17,25
10:4 11:2
12:20 17:24
18:1

---

R

**ran** 16:24

**range**
6:12,13,14
7:5,6,7
8:1,4,7,8
15:10,14,17,18
,24,25
16:1,2,3 17:12

**RE** 20:2

**reading** 3:24

**really** 14:1,8

**reason** 7:17
20:9

**recall** 6:6 9:24

**reception**
13:19,25
14:4,5,6

**reconstruction**
5:10

**reconstructioni
st** 4:17

**record** 18:11
19:14

**red** 5:21

**referencing**
10:7

**reflected** 20:23

**regard** 10:24
12:20

**relative** 19:16

**relativity**
13:11 14:13

**remainder** 17:25

**remember** 6:12
8:1

**replicate** 6:2

**replicated** 9:11

**report** 9:7
10:25 19:13

**Report.........
...........5**
3:14

**REPORTED** 1:23

**Reporter** 1:24
18:12
19:4,9,12,21

**REPORTER.......
...........2
18** 3:4

**requested** 19:14

**reserve** 9:16
17:25

**reserved** 3:25

**respective** 3:24

**responded** 10:1

**response** 10:14
15:2

**rest** 6:21,24
8:13,23,24
9:8,9,12,17
11:6,16 15:19

**review** 11:9
19:13

**reviewed** 12:3

**Richmond** 2:10

**roadside**
10:1,8,12,16,1
7,18 15:2

**Roderico** 1:4
20:2

**room** 8:18

**run** 16:25

---

S

**sample** 13:17

**Santos** 1:5,6
5:22 7:24
11:6,15,17
15:6,13 17:10
20:4

**Santos's** 11:25

**satellite** 13:24

**satellites**
13:19,20,21,25
14:2,4

**scene** 15:5

**science** 4:13
5:17

**scooted** 14:25

**seal** 19:5

**second** 13:13

**seems** 8:25

**sense** 9:1,3
15:18

**sensitive** 7:22

**series** 8:2

**several** 17:8

**SHEET** 20:1

**SHEET.........
.............
.............
..219** 3:5

**Shorthand**
19:3,12,21

**shoulder** 9:2
11:25
16:8,9,14,18,2
1,22
17:2,3,10,20

**shows** 6:2 8:19
15:12

**sic** 12:17

**Sign** 21:1

**signal** 13:25
14:1,6

**signing** 3:24

**similar** 15:1

**simpler** 12:21

**slow** 10:4,16

**small** 13:18,22
14:9

**Smith** 1:9 7:25
13:12 14:22
20:5



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

smoking 15:16

somebody 11:4

somewhere 16:3

sorry 5:25 7:9

sort 14:23
  15:11

south 13:15

space 6:25

speaking 13:10

Special 1:4
  20:3

specific 7:4
  9:8

specifically
  8:19

spoke 14:17

spot 13:5

Springdale 2:4

stance 7:18

standard 18:13

standing 5:22
  6:10,11 7:2,24
  8:6 16:2 17:10

standpoint 17:1

start 16:13

State 19:2,7,10

statements 15:5

STATES 1:1

stay 5:16

stenograph
  19:3,12,15,21

stenographicall
  y 19:13

stipulated 3:23

Street 2:3,9

stricken 5:16

strike 16:10,14

strikes 10:7

striking 16:9

struck 7:2,25

studies
  10:6,15,19,21,
  22 15:1

subject 20:23

subjective 4:12

subsample
  13:22,23
  14:9,11

subsamples
  14:12

substance 20:23

Suite 2:3

suppose 12:22

sure 14:16

swerve 16:9,12

swerving
  12:13,18

sworn 19:4

synced 18:5

_____

T

_____

talking 6:5
  12:25 13:18,22

Taylor 2:2

term 4:13

terms 12:21

14:22

testify 16:20

testimony 3:2
  9:24 14:17
  16:17 17:19

TEXAS 1:1

text
  4:5,10,19,22
  5:1,4

theory 14:13

there's 7:17
  15:16

they're 14:3
  16:17

Thompson 2:3

tire
  11:3,15,20,23
  12:7

tolerance 13:8

towards 8:17
  9:2,5,6,13
  14:15,16

Toyota 6:22
  7:12,15 8:17
  9:5,13
  16:10,15,24,25
  17:21

track 11:20

transcript 18:6
  19:13 20:1

travel
  7:8,10,12,13
  9:10

traveling 12:14

trees 14:5

trial 9:17
  17:25

tried 17:21

true 12:22,23
  13:3 19:14
  20:22

try 12:21

Tuesday 1:16

turn 10:24

turnaround
  18:13

typically 10:15

_____

U

_____

understanding
  11:5 13:11
  16:19

understood
  14:14 15:4

UNITED 1:1

_____

V

_____

vague 5:23

valuable 16:16

values 15:10

VANESSA 2:15

variable 7:22

variables 14:10

vehicle 12:3
  15:3 16:11
  17:1

version
  6:13,14,19,23
  14:18,22
  15:18,20



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Case 3:22-cv-02714-K   Document 49   Filed 01/29/24   Page 2456 of 2460   PageID 2748

16:6,7
17:16,17,22

**versions** 6:8,15
15:15,22 17:8

**versus** 12:13
13:19 15:19

**video** 11:9,12
12:2 18:2

**Videographer**
2:15
18:1,5,8,10

**view** 6:2

**Virginia** 2:10

**VOLUME** 1:13 4:2

**vs** 1:8 20:4

---
W
---
**wasn't** 6:10

**welcome** 4:14
5:17

**we're** 12:25
13:18 14:16,21

**west** 13:14

**wherever** 13:12

**whether** 4:9
11:3 16:1

**White** 2:2 4:3
9:16,25 17:25
18:4,7,14

**White..........
.......5** 3:2

**Wingate** 1:19

**WITNESS** 19:5

**witnesses** 16:18
17:8

**woods** 13:3

**WRITE** 20:1

**wrong** 5:4,11
9:23

**Wyndham** 1:19

---
X
---
**X's** 8:2

---
Y
---
**y'all** 8:22

**you've** 4:24
6:16,19 8:12



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**   www.**MILESTONEREPORTING**.com   Toll Free 855-MYDEPOS

Appx_2452

# Exhibit W

911 Tape

**[Video File – Produced in Native Format]**

# Exhibit X

Otis White Bodycam Footage

**[Video File – Produced in Native Format]**

# Exhibit Y

Danielle Lee-Winston Bodycam Footage
161348

**[Video File – Produced in Native Format]**

# Exhibit Z

Danielle Lee-Winston Bodycam Footage
162348

**[Video File – Produced in Native Format]**