## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **ERICK RODERICO PIVARAL** | § | |
| **GONZALEZ, Individually and as Special** | § | |
| **Administrator of the Estate of NEHEMIAS** | § | |
| **R. PIVARAL SANTOS, DECEASED,** | § | |
| **ERICK SANTOS and EVELYN MORENO** | § | **Civil Action No. 3:22-CV-02714-K** |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **V.** | § | |
| | § | |
| **CAYLEE ERIN SMITH &** | § | |
| **EASTMAN CHEMICAL COMPANY** | § | |
| | § | |
| **Defendants.** | § | |

## APPENDIX TO PLAINTIFFS' MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY AND BRIEF IN SUPPORT

Plaintiffs, Erick Roderico Pivaral Gonzalez, Erick Santos and Evelyn Moreno (collectively "Plaintiffs") files this Appendix to its motion to exclude certain expert testimony. Attached hereto are true and correct copies which are incorporated herein by reference for all purposes as follows:

| Exhibit No. | Description | Appendix Number(s) |
|---|---|---|
| Exhibit A | Collision Reconstruction Engineering Report, by Paul Montalbano, dated 9/28/23. | App. 000001 – App. 000094 |
| Exhibit B | Deposition Transcripts Volume 1 and Volume 2 of Paul Montalbano | App. 000095 – App. 000369 |
| Exhibit C | True and Correct copy of circled and signed damage by Paul Montalbano | App. 000370 – App. 000371 |
| Exhibit D | Deposition Transcript of Iris Dalley Graff, dated 12/14/23 | App. 000372 – App. 000488 |
| Exhibit E | Curriculum Vitae of Iris Dalley Graff | App. 000489 – App. 000498 |
| Exhibit F | Scene Reconstruction Analysis Report by Iris Dalley | App. 000499 – App. 000545 |
| Exhibit G | Photographs | App. 000546 – App. 000548 |

Dated: January 29, 2024        Respectfully submitted,

By:   /s/ *Grant K. Schmidt*
       Grant K. Schmidt
       Texas Bar No. 24084579
       HILGERS GRABEN PLLC
       7859 Walnut Hill Lane, Suite 335
       Dallas, TX 75230
       Telephone: 469.751.2819
       Fax: 402.413.1880
       Email: gschmidt@hilgersgraben.com

       Jacob Dylan White
       *Pro Hac Vice*
       TAYLOR KING & ASSOCIATES, P.A.
       410 N. Thompson St., Suite B
       Springdale, AR 72764
       Phone: (479)-208-4780
       Fax: (479)-334-5069
       Email: jacobwhite@taylorkinglaw.com

       *Counsel for Plaintiff Erick Rodericko*
       *Pivaral Gonzalez*

## <u>CERTIFICATE OF SERVICE</u>

I, Grant K. Schmidt, do hereby certify that as an attorney of record for the Plaintiffs herein, that I have on this 29th day of January 2024, duly served the above and foregoing by electronic filing upon the following:

/s/ <u>*Grant K. Schmidt*</u>
Grant K. Schmidt

Brian L. Bunt, State Bar No. 03350025
Freeman Mills, P.C.
2020 Bill Owens Parkway, Suite 200
Longview, TX 75604
Telephone: (903)-295-7200
Facsimile: (903)-295-7201
bbunt@freemanmillsspc.com

Graham K. Simms, State Bar No. 24060610
Freeman Mills, P.C.
2020 Bill Owens Parkway, Suite 200
Longview, TX 75604
Telephone: (682)-316-1677
Facsimilie: (682)-3161676
gsimms@freemanmillspc.com

Roger W. Anderson, State Bar No. 01213500
Freeman Mills, P.C.
2020 Bill Owens Parkway, Suite 200

# EXHIBIT A



# COLLISION RECONSTRUCTION
# ENGINEERING REPORT

Regarding:

The Estate of Nehemias Roderico Pivaral Santos v. Caylee Erin Smith and Eastman Chemical
Company
In United States District Court for the Northern District of Texas
Case No.: 3:22-CV-02714-K
Our File Number: 36-13811

Prepared for:
Eastman Chemical Company and Caylee Erin Smith

Prepared by:
Paul J. Montalbano, P.E.
Focus Forensics, LLC
1826 Henley Street
St. Cloud, FL 34771

September 28th, 2023

_____
Paul J. Montalbano, P.E.
ACTAR #2727
Certified Accident Reconstructionist - SAE



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 3

OPINIONS AND CONCLUSIONS ........................................................................... 4

DISCUSSION....................................................................................................... 6
　　Police Report.............................................................................................. 6
　　Location...................................................................................................... 6
　　Scene Evidence.......................................................................................... 7
　　2021 Ford Explorer ................................................................................... 8
　　2011 Toyota Camry ................................................................................... 9

ANALYSIS ........................................................................................................... 9
　　Flat Tire Response ..................................................................................... 9
　　Tire Mark Analysis ..................................................................................... 9
　　Photogrammetric Analysis ......................................................................... 10
　　Relevancy of Tire Marks ............................................................................ 10
　　Diagrams.................................................................................................... 10
　　Impact Alignment ...................................................................................... 11
　　Toyota Camry Tire Replacement ................................................................ 12
　　Ford Digital Data ....................................................................................... 12
　　Cell Phone Data ........................................................................................ 13
　　Lateral Impact Location ............................................................................. 13
　　Plaintiff Theory of Impact Location ........................................................... 13
　　Defense Theory of Impact Location ........................................................... 14
　　Avoidance.................................................................................................. 14

CITATIONS.......................................................................................................... 15

BASIS OF REPORT .............................................................................................. 17

ATTACHMENTS................................................................................................... 19

00476-118002194

App. 000003



## INTRODUCTION

On Saturday, April 30th, 2022, at approximately 3:48 p.m., a single vehicle versus pedestrian collision occurred on northbound Interstate 45, just south of Bonner Avenue, in Angus, Navarro County, Texas. A 2011 Toyota Camry was parked, partially in the inside travel lane of northbound Interstate 45 due to a left front flat tire. The Toyota occupants were Ms. Evelyn Moreno (age 19), Mr. Nehemias Pivaral Santos (age 19), Ms. Dina Yamileth Regalado Soto (age 23), Mr. Melvin Alexander Diaz Fuentes (age 21), and Mr. Erick Jeremias Pivaral Santos (age 21). A 2021 Ford Explorer, driven by Ms. Caylee Erin Smith (age 23), was traveling northbound on Interstate 45 when it struck Mr. Nehemias Pivaral Santos, resulting in fatal injuries.

Paul J. Montalbano, P.E. of Focus Forensics was retained by Eastman Chemical Company on April 26th, 2023, to perform an independent collision reconstruction engineering analysis. This report will express the opinions and conclusions reached during the course of the collision reconstruction analysis, and the basis for these opinions and conclusions.

All opinions are expressed to a reasonable degree of engineering certainty based on the evidence in this case and the relevant application of reliable methods accepted within the collision reconstruction engineering community.  This report is based on the information available to us at this time, as described in the Basis of Report section.  Should additional information become available, we reserve the right to determine the impact, if any, of the new information on our opinions and conclusions.

00476-118002195



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

## OPINIONS AND CONCLUSIONS

1. The subject Toyota, originally driven by Ms. Evelyn Moreno, experienced a left front tire failure while traveling northbound on Interstate 45.

2. While a flat tire reduces the handling characteristics of a vehicle, it does not eliminate the ability to steer the vehicle off of the roadway, as evidenced by Ms. Evelyn Moreno's ability to come to a controlled final rest on the left side of the roadway. Steering to the right was equally possible.

3. There was more than sufficient space to fully vacate the travel lanes and park the 6-foot-wide Toyota either on the 7 to 8-foot wide inside paved shoulder, the 10 to 11 foot-wide outside paved shoulder, or the 50-foot-wide traversable grass shoulder.

4. Rather, Ms. Evelyn Moreno parked the Toyota still partially within the left travel lane, occupying approximately 2.1 feet (not accounting for the side mirror) of the 11.6-foot-wide inside northbound travel lane, providing approximately 9.5 feet of remaining available space for northbound traffic to pass the Toyota.

5. Given the Ford's width of approximately 6.6 feet, there was sufficient room for the Ford to pass the Toyota within the remaining available 9.5-foot width of the left lane. It was not necessary for the Ford to change lanes in order to pass the parked Toyota.

6. The Ford did not contact the Toyota.

7. The Ford contacted Mr. Nehemias Roderico Pivaral Santos's head while he was actively bending over, with his head extending beyond the parked Toyota, and into the inside northbound travel lane, approximately 1 foot into the path of the Ford.

8. The two tire marks photographed next to, or swerving away from the Toyota were *not* from the subject Ford Explorer, rather from a vehicle with smaller, thinner tires. The location and characteristics of these tire marks were indicative of one or more vehicles making an evasive swerving maneuver from left to right at the location of the parked Toyota.

9. There was no physical evidence or indication in the GPS data or the bearing data that the Ford was traveling or steered on or towards the left shoulder leading up to the incident location, as suggested by the plaintiff.

10. Regardless of the lateral position of the Ford at impact, Mr. Santos's head was extending *at least* 3.2 feet into the 11.6-foot-wide inside northbound travel lane, or *at least* 1.1 feet outboard of the right face of the parked Toyota, and directly into the path of northbound traffic; had Mr. Santos simply not bent over into the northbound travel lane, the incident would not have occurred.

00476-118003196

App. 000005



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

11. Impact occurred between 3:48:51 to 3:48:52 p.m. Central Daylight Time (CDT). The last text message Ms. Smith sent was at 3:48:43 CDT, or approximately 8 to 9 seconds prior to the collision. At that point in time, Ms. Smith was between 1,022 to 1,146 feet from impact.

00476-118002197

App. 000006



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

## DISCUSSION

### Police Report

According to the Texas Traffic Crash Report prepared by Officer Danielle Lee-Winston of the Richland Police Department, the collision occurred on northbound Interstate 45 near mile marker 223, in Angus, Navarro County, Texas, on April 30th, 2022, at approximately 3:51 p.m. Conditions were reported as daylight, clear and dry. The posted speed limit was listed as 75 mph. There was no construction or workers in the area at the time of the crash and the roadway was described as straight and level.

The VIN number for the 2021 Ford Explorer was listed as 1FMSK7DH7MGB01430 and was operated by Ms. Caylee Erin Smith (age 23). The VIN number for the 2011 Toyota Camry was listed as 4T4BF3EK8BR212323, with the following listed occupants:

1. Mr. Nehemías Roderico Pivaral Santos (age 19) – listed as pedestrian
2. Ms. Dina Yamileth Regalado Soto (age 23) – listed as back left seat occupant
3. Mr. Melvin Alexander Diaz Fuentes (age 21) – listed as back center seat occupant
4. Mr. Erick Jeremias Pivaral Santos (age 21) – listed as back right seat occupant

A not-to-scale police diagram generally documented the collision location (Figure 1).

### Location

Astronomical records indicated that the sun was in the southwestern sky at an altitude of approximately 52 degrees, and an azimuth angle of approximately 252 degrees clockwise from due north (Figure 2). Historical weather reports indicated that there was no precipitation around the time of the collision, clear skies and approximately 86 degrees Fahrenheit. Sun and weather were not contributing factors to this collision event.

Interstate 45 in the area of the crash was a 6-lane divided highway generally running north and south, serving as a major thoroughfare between Houston and Dallas (Figure 3 to Figure 16). The incident occurred approximately 1.1 miles south of exit 225 (Bonner Avenue). Northbound Interstate 45 in the area of the incident was flat and level. The northbound approach was straight for approximately 0.33 miles prior to the incident. Approximately 0.5 miles prior to the incident, the northbound direction curved to the left by approximately 13 degrees over the course of approximately 0.17 miles (Figure 17), providing a straightaway to the accident location for approximately 1/3rd of a mile, or over 1500 feet. The speed limit was 75 mph for the area of the collision (Figure 18).

00476-118002198



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

CAC Forensics, LLC photographed, measured and drone-mapped the scene of the collision on April 26, 2023, or approximately 1 year after the crash (Figure 19 to Figure 21). Based on historical Google aerials (Figure 22 to Figure 23), historical aerial flyover images (Figure 24) and historical Google Street View images (Figure 25 to Figure 41), the roadway was unchanged from the time of the collision to CAC's site inspection and mapping. Each direction consisted of three 11 to 12-foot-wide travel lanes, one 7 to 8-foot wide inside paved shoulder, and one 10 to 11-foot-wide outside paved shoulder with 50-foot-wide traversable grass shoulders. Each direction was separated by a 3.5-foot-tall median barrier wall. Because of the median barrier wall and curvature of the roadway to the left on the northbound approach, an unlimited sightline was not established for the inside northbound travel lane approach until approximately 1742 ft, or 0.33 miles prior to the incident location, or approximately 16 seconds at the speed limit of 75 mph, or approximately 13 seconds at a speed of approximately 90 mph.

**Scene Evidence**

Roadway physical evidence, final rest positions and body fluid was extensively documented from photographs taken on scene, body camera videos, post-incident investigation and historical aerial and street view documentation.

- At final rest, Mr. Nehemias Roderico Pivaral Santos's body was on top of the solid yellow line dividing the inside northbound through lane and left shoulder, with his head and torso on the inside shoulder, and his legs from the knees down within the inside northbound travel lane (Figure 42 to Figure 43). A blood trail from the right side of the inside northbound travel lane leading towards the shoulder and Mr. Nehemias Roderico Pivaral Santos's final rest indicated that Mr. Nehemias Roderico Pivaral Santos was moved from an initial rest position from within the inside northbound travel lane towards the shoulder, consistent with witness testimony. It was uncertain as to the exact orientation or position of Mr. Nehemias Roderico Pivaral Santos's initial rest position within the inside travel lane prior to being moved, however, it was generally located on the right half of the inside northbound travel lane, directly adjacent to the rear axle of the Toyota, or on top of the most northeastern blood mark.

- The Toyota had a flat left front tire, with the factory jack extended and located underneath the driver's door rocker panel (Figure 44 to Figure 45). The Toyota appeared to have been lunged forward by a few inches, tilting the extended jack forward. There was no lateral movement of the Toyota based on this evidence.

00476-118002199



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

- A tire marking, consistent with rolling on a flat tire, was seen leading up to the Toyota's left front tire and was photographed to have originated from the inside northbound travel lane (Figure 46 to Figure 51). The tire mark continued from the inside northbound travel lane to the Toyota's rest position, with the Toyota partially on the shoulder and partially within the northbound travel lane. There was no lateral offset from the final rest position of the Toyota and the flat tire mark, indicating no lateral movement of the Toyota from impact.

- A faint swerving mark was visible, starting in the inside northbound travel lane, swerving to the right prior to the Toyota's rest position (Figure 52 to Figure 55).

- A secondary parallel swerving tire mark appeared, starting at the Toyota's right rear, located approximately 1 foot to the shoulder-side of the previously discussed swerve mark (Figure 56 to Figure 63).

- The tire mark closest to the shoulder consisted of *three* distinct tread grooves within the marking (Figure 64).

- The tire mark to the right of the 3-groove tire mark did not display distinct tread groove patterns within the mark but was of similar width.

- The Ford came to a controlled final rest approximately 520 feet north of the Toyota's parked position.

**2021 Ford Explorer**

Manufacturer specifications for the 2021 Ford Explorer (VIN: 1FMSK7DH7MGB01430) indicated an XLT trim with four doors, a 4-cylinder turbo-boosted gasoline engine and rear wheel drive. The overall length was 16.6 feet, overall width was 6.6 feet, overall height was 5.8 feet and wheelbase was 9.9 feet. The Ford's door-jam sticker indicated the standard tire size was 255/65R18, indicating 10-inch-wide tires. All four of the Ford's installed tires were 265/65R18, indicating the actual tire widths were approximately10.4-inches wide.

The Ford Explorer had localized and distinct contact damage to its left front corner and left side. All contact damage to the Ford was less than 4 feet in elevation.

- The only damage to the front face of the Ford was at the Ford's left front headlight, spanning in height from 3 to 3.5 feet from the ground (Figure 65). There was no front-face contact damage below 3 feet from the ground.

00476 118002200



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

- There was a small, localized, and circular contact area to the left front corner of the hood of the Ford, just at and above the left front headlight (Figure 66 to Figure 69). The direct contact damage extended approximately 1 foot inboard from the left side of the Ford.

- The left front sheet metal fender was peeled out and crumpled rearward with visible blood and body matter on the inside and outside of the fender (Figure 70 to Figure 72).

- There was a gap of approximately 9.0 feet in contact evidence from the left front corner of the Ford to the left rear quarter panel of the Ford (Figure 73 to Figure 74). The left rear quarter panel of the Ford exhibited direct contact in the form of dents, scuffing and body matter transfer (Figure 75 to Figure 81).

- All tires of the Ford Explorer had *four* tread grooves within their tread width (Figure 82).

**2011 Toyota Camry**

Manufacturer specifications for the 2011 Toyota Camry indicated a base model, four-door, 4-cylinder gasoline engine and front wheel drive. The overall length was 15.8 feet, overall width was 6.0 feet, overall height was 4.8 feet and wheelbase was 9.1 feet.

The Toyota Camry had damage and body matter transfer on the rear bumper, rear trunk lid, right rear taillight, right rear quarter panel and right C-pillar, consistent with post-impact contact with from Mr. Nehemias Pivaral Santos's body (Figure 83 to Figure 87).

**ANALYSIS**

**Flat Tire Response**

The subject Toyota, originally driven by Ms. Evelyn Moreno, experienced a left front tire failure while traveling northbound on Interstate 45. While a flat tire reduces the handling characteristics of a vehicle, it does not eliminate the ability to steer the vehicle off of the roadway, as evidenced by Ms. Evelyn Moreno's ability to come to a controlled final rest on the left side of the roadway. Steering to the right was equally possible. There was more than sufficient space to fully vacate the travel lanes and park the 6-foot-wide Toyota either on the 7 to 8-foot wide inside paved shoulder, the 10 to 11 foot-wide outside paved shoulder, or the 50-foot-wide traversable grass shoulder.

**Tire Mark Analysis**

The subject Ford Explorer's tires consisted of *four* tread grooves (Figure 88), conclusively indicating the tire mark closest to the shoulder with *three* tread grooves was unrelated to the Ford's

00476-118002201
App. 000010



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

movements. However, the tire mark to the right of the 3-groove tire mark did not display distinct tread groove patterns within the mark, requiring further analysis of its relevancy to the Ford's movements.

### Photogrammetric Analysis

Photogrammetry is a well-known, peer-reviewed, highly validated engineering methodology used to reconstruct positional and measurement data from photographs and videos. There are various types of photogrammetric analysis, including graphical methods, scaling methods, photo-overlay or reverse projection, rectification and standard or traditional photogrammetry [1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17].

Based on four different types of photogrammetric analysis performed (Figure 89 to Figure 113):

- The Toyota was occupying approximately 2.1 feet (not accounting for the side mirror) of the 11.6-foot-wide inside northbound travel lane, providing approximately 9.5 feet of remaining available space for northbound traffic to pass the Toyota.
- The tire mark with no discernable tread grooves was approximately 6.7 inches wide, with a known tolerance / accuracy of plus or minus 0.25 inches.

### Relevancy of Tire Marks

The Ford was photo-scanned by CAC, LLC, providing a 3-dimensional point cloud with an average residual, or accuracy, of plus or minus 1/8th of an inch [18,19,20,21,22,23]. The width of the tread patch of the left side tires that physically contact the ground was measured to be approximately 8.4 inches wide (Figure 114 to Figure 117), or approximately 1.7 inches *wider* than the physical tire marks on the roadway. Therefore, the two tire marks photographed next to, or swerving away from, the Toyota were *not* from the subject Ford Explorer, rather from a vehicle with smaller, thinner tires. The location and characteristics of these tire marks were indicative of one or more vehicles making an evasive swerving maneuver from left to right at the location of the parked Toyota.

### Diagrams

2-dimensional overhead diagrams were constructed, demonstrating the final rest positions and relevant physical evidence on the roadway reconstructed from Photogrammetry analysis (Figure 118 to Figure 121).

00476-118002202



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

**Impact Alignment**

Contact matching is a critical component of accident reconstruction, whether it is aligning the damage of two vehicles, or aligning the damage between a vehicle and a human body, in order to determine the relative positions and/or orientations of the two objects at impact.  The Ford exhibited localized circular contact damage to its left front headlight at elevation ranging from 3.0 to 3.5 feet from the ground and an inboard depth of approximately 1 foot, with no underlying elevated contact damage directly below it. The contact damage was circular in nature, with a contact radius consistent with the size of a head. There was blood and body fluids / matter within the round contact damage, specifically to the pointed leading edge of the left front fender of the Ford. There were pieces of skull and brain matter found on the roadway from Mr. Nehemias Roderico Pivaral Santos, consistent with the testimonial evidence that Mr. Nehemias Roderico Pivaral Santos was struck on the right side of the head by the Ford. Because all frontal contact damage to the Ford was exclusive to an elevation between 3.0 to 3.5 feet from the ground, with a lateral intrusion of approximately 1 foot, with no underlying damage to the front bumper below 3 feet in elevation, and because of the corresponding transfer onto the Ford's contact area, it was concluded that Mr. Nehemias Roderico Pivaral Santos was actively bending over at the time of impact, with *only* his head sticking out in front of the approaching Ford, with the right side of his head exposed to the oncoming Ford, and his body, torso and legs outside of the Ford's path. Had Mr. Nehemias Roderico Pivaral Santos been kneeling with his head vertically in line with his body, there would have been body to front bumper contact and resulting contact damage to the front bumper of the Ford below 3 feet in elevation. Additionally, Mr. Nehemias Roderico Pivaral Santos would have been thrown forward and likely been run over by the left side tires of the Ford if his body was inboard of the Ford's path. Instead, Mr. Nehemias Roderico Pivaral Santos was rotated and thrown diagonally away from the Ford, and subsequently struck the back right corner of the parked Toyota. Therefore, at impact, Mr. Nehemias Roderico Pivaral Santos was actively bending over with his head extended beyond his center of gravity, and his head extending outward of the parked Toyota, into the northbound travel lane, breaching the path of the Ford by approximately 1 foot. (Figure 122 to Figure 132). This was consistent with the testimony of Caylee Erin Smith and Erick Jeremias Pivaral Santos, both stating that Mr. Nehemias Roderico Pivaral Santos was in the process of bending over or picking something up at the time of impact.

00476-118002203

App. 000012



**Toyota Camry Tire Replacement**

The owner's manual of the Toyota Camry indicated the removal of 3 items before getting access to the spare tire (Figure 133 to Figure 134):

1. Loosen and remove the retaining nut holding down the spare tire cover (carpeted pad).
2. Remove spare tire cover (carpeted pad covering spare tire).
    a. The jack handle and wheel nut wrench are located on the underside of the spare tire cover.
    b. The jack is located on the right side of the spare tire.
3. Loosen and remove bolt and spacer holding down spare tire.
4. Lift and remove spare tire.

**Ford Digital Data**

The airbag control module (ACM) of the Ford was imaged, however, because the contact with Mr. Nehemias Roderico Pivaral Santos did not meet the minimum change in speed requirement of 5 mph within a 150 millisecond time frame, it did not record any data, further corroborating that there was no contact with the Toyota.

The infotainment system of the Ford was imaged, providing gear shift data, call log data, track points and speed data for the day of the collision. The track point data contained GPS position and speed data at 1-second intervals, providing data for just shy of 40 miles of travel prior to impact (Figure 135 to Figure 139). The data indicated that the Ford was traveling up to approximately 90 mph leading up to impact, with a recorded speed reduction down to approximately 86 mph just prior to impact. Impact occurred between 2:48:51 to 2:48:52 p.m. Central Standard Time (CST) (Figure 140 to Figure 141), or between 3:48:51 to 3:48:52 p.m. Central Daylight Time (CDT).

The track point data from the infotainment system consisted of bearing data, providing the relative angle counterclockwise from due north in degrees (Figure 142 to Figure 146). The data was consistent with a parallel orientation with the roadway leading up to the collision location, followed by a 3-degree swerve to the right around the location of impact. There was no indication within the bearing data that the Ford drifted to the left shoulder prior to the incident. Additionally, there was no documented positional deviation from the left northbound travel lane towards the left shoulder in the GPS track point coordinates. While infotainment GPS data has been validated to be accurate within 3.5 to 7.5 feet [24,25,26], there was no observed lateral deviation in any of the data points prior to the incident location.

00476 118002204



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

There was no physical evidence or indication in the GPS data or the bearing data that the Ford was traveling or steered on or towards the left shoulder leading up to the incident location, as suggested by the plaintiff.

**Cell Phone Data**

Ms. Smith's cell phone data was imaged, providing text records for the time leading up to the collision. The last text message Ms. Smith sent was at 3:48:43 CDT, or approximately 8 to 9 seconds prior to the collision. At that point in time, Ms. Smith was between 1,022 to 1,146 feet from impact.

**Lateral Impact Location**

Because the two visible swerve tire marks photographed were concluded to be unrelated to the subject Ford's movements, and because GPS track point data can have a tolerance of 3.5 to 7.5 feet, it was indeterminate as to the *precise* lateral location of the Ford and Mr. Santos at the time of impact. However, two versions were presented within the testimony and both were incorporated into the analysis framework to assist the jury in determining which version was more probable.

**Plaintiff Theory of Impact Location**

Plaintiff's theory indicated that the Ford drifted onto the left shoulder leading up to the impact location and implemented a swerve to the right, missing the Toyota by approximately "15 to 20 centimeters" [testimony of Mr. Erick Jeremias Pivaral Santos] or approximately 6 to 8 inches. Therefore, because the Toyota was approximately 2.1 feet into the travel lane, the left side of the Ford was no closer than approximately 2.6 feet from the yellow line when factoring in a 6-inch clearance, and Mr. Santos's head was at least 3.6 feet from the yellow line (given the 1-foot contact overlap). However, to be the most conservative and in favor for the plaintiff, the swerve angle away from the Toyota was accounted for when determining Mr. Santos's lateral head position at impact in order to allow for a 6-inch clearance between the Ford and the Toyota by the time the Ford reached the Toyota's position, after striking Mr. Santos's head, and accounting for the continued lateral movement of the Ford from its swerving movement from left to right. Implementing an emergency swerve from the left side shoulder at 86 to 90 mph would result in a maximum clockwise heading angle change of approximately 3.1 degrees clockwise from straight for the Ford [27,28]. When factoring in a 3.1-degree heading angle for the Ford from Mr. Santos's head contact to the right rear corner of the Toyota, the left front corner of the Ford could have been no closer than

00476-118003205



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

approximately 2.2 feet from the solid yellow line at impact in order to provide at least 6 inches of clearance by the time in reached the parked position of the Toyota (accounting for its 3.1-degree swerve to the right). Therefore, Mr. Santos's head was *at least* 3.2 feet into the northbound travel lane (Figure 147), or *at least* 1.1 feet outboard of the right face of the parked Toyota at impact, based on plaintiff's theory of impact location. Even under plaintiff's theory, had Mr. Santos not bent over into the travel lanes outboard of the parked position of the Toyota, the collision would not have occurred.

## Defense Theory of Impact Location

Ms. Smith testified, "…I scooted over enough in my own lane to miss the vehicle", but she did not think she entered the middle travel lane. Modeling her lateral position to the right side of her travel lane, consistent with the GPS-indicated lateral position of the Ford, placed the left side of the Ford approximately 4.0 feet away from the yellow line (Figure 148). Because Mr. Santos's head was located approximately 1 foot inboard from the left side of the Ford at contact, then under this scenario, Mr. Santos's head was located approximately 5.0 feet into the 11.6-foot wide inside travel lane at impact, or approximately 2.9 feet beyond the right side of the parked Toyota. Had Mr. Santos not bent over into the travel lanes outboard of the parked position of the Toyota, the collision would not have occurred.

## Avoidance

Contact overlap was only approximately 1 foot inboard of the Ford's path, so had either party moved laterally away from one another by 1 foot, the collision would have been avoided. Therefore, had the Ford driver swerved a foot farther to the right, the collision would have been avoided, however, it was indeterminate as to how much advanced notice Ms. Smith was provided of Mr. Nehemias Roderico Pivaral Santos actively bending over into her path. Conversely, had Mr. Nehemias Roderico Pivaral Santos simply not bent over with his head outboard of the parked Toyota's right side, then the collision would not have occurred, regardless of where the Ford was. In other words, regardless of the lateral position of the Ford at impact, had Mr. Santos simply not bent over into the northbound travel lane, the incident would not have occurred.

00476 118003206



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

## CITATIONS

1) Kerkhoff, J., "Photographic Techniques for Accident Reconstruction," SAE Technical Paper #850248, 1985.

2) Smith, G., Allsop, D., "A Case Comparison of Single-Image Photogrammetry Methods," SAE Technical Paper Series # 890737, 1989.

3) Cliff, W., MacInnis, D., and Switzer, D., "An Evaluation of Rectified Bitmap 2D Photogrammetry with PC-Rect," SAE Technical Paper 970952, 1997

4) Fenton S., Kerr, R., "Accident Scene Diagramming Using New Photogrammetric Technique," SAE Technical Series #970944, 1997.

5) Hovey, C. and Toglia, A., "Four-Point Planar Homography Algorithm for Rectification Photogrammetry: Development and Applications," SAE Technical Paper 2013-01-0780, 201

6) Neale, W., Marr, J., and Hessel, D., "Video Projection Mapping Photogrammetry through Video Tracking," SAE Technical Paper 2013-01-0788, 2013

7) Pepe, M., Grayson, E., and McClary, A., "Digital Rectification of Reconstruction Photographs," SAE Technical Paper 961049, 1996

8) Breen, K.C., Anderson, C.E., "The Application of Photogrammetry to Accident Reconstruction," SAE Technical Series #861422, 1986.

9) Callahan, M., LeBlanc, B., Vreeland, R., and Bretting, G., "Close-Range Photogrammetry with Laser Scan Point Clouds," SAE Technical Paper 2012-01-0607, 2012

10) Fenton S., Kerr, R., "Accident Scene Diagramming Using New Photogrammetric Technique," SAE Technical Series #970944, 1997.

11) Manuel, E., Mink, R., and Kruger, D., "Videogrammetry in Vehicle Crash Reconstruction with a Moving Video Camera," SAE Technical Paper 2018-01-0532, 2018

12) Melcher, D., Rush, T., Przybyla, J., Keller, R., Montalbano, P. "Photogrammetric Reconstruction Methodology and Engineering Validation for Video-Captured Pedestrian Collisions," Proceedings of the 24th Annual Congress of the European Association for Accident Research and Analysis (EVU), 2015.

13) Pepe, M.D., et al., "Three Dimensional Computerized Photogrammetry and its Application to Accident Reconstruction," SAE Technical Series #890739, 1989.

14) Switzer, D. and Candrlic, T., "Factors Affecting the Accuracy of Non-Metric Analytical 3-D Photogrammetry, Using PhotoModeler," SAE Technical Paper 1999-01-0451, 1999.

15) Terpstra, T., Voitel, T., and Hashemian, A., "A Survey of Multi-View Photogrammetry Software for Documenting Vehicle Crush," SAE Technical Paper 2016-01-1475, 2016

16) Tumbas, N.S., et al., "Photogrammetry and Accident Reconstruction: Experimental Results," SAE Technical Series #940925, 1994.

17) Woolley, R.L., et al., "Determination of a Vehicle Crush from Two Photographs and the Use of 3D Displacement Vectors in Accident Reconstruction," SAE Technical Series #910118, 1991.

18) Carter, N., Hashemian, A., Rose, N., and Neale, W., "Evaluation of the Accuracy of Image Based Scanning as a Basis for Photogrammetric Reconstruction of Physical Evidence," SAE Technical Paper 2016-01-1467, 2016.

00476-118002207

App. 000016



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

19) Grimes, C., Roescher, T., Suway, J., Welcher, J., "Comparing the Accuracy of Image Based Scanning Techniques to Laser Scanners," SAE Technical Paper 2018-01-0525, 2018.

20) Miller, S., Hashemian, A., Gillihan, R., Helms, E., "A Comparison of Mobile Phone LiDAR Capture and Established Ground based 3D Scanning Methodologies," SAE Technical Paper 2022-01-0832, 2022.

21) Miller, S., Hashemian, A., Gillihan, R., Benes, S., "Accuracy and Repeatability of Mobile Phone LiDAR Capture," SAE Technical Paper 2023-01-0614, 2023.

22) Terpstra, T., Voitel, T., and Hashemian, A., "A Survey of Multi-View Photogrammetry Software for Documenting Vehicle Crush," SAE Technical Paper 2016-01-1475, 2016

23) Vinje, M., "Evaluating Apple's Integrated LiDAR devise for Indoor 3D Modelling," Master's Thesis in Ingeniørvitenskap & IKT, 2021.

24) Bortles, W., McDonough, S., Smith, C., Stogsdill, M., "An Introduction to the Forensic Acquisition of Passenger Vehicle Infotainment and Telematics Systems Data." SAE Technical Paper 2017-01-1437, 2017.

25) Vandiver, W., Anderson, R., "Analysis of Berla iVe Acquisitions of Vehicle Speed Data from Ford Sync Systems," SAE Technical Paper 2018-01-1442, 2018.

26) Vandiver, W., Anderson, R., "Analysis of Vehicle GPS and Derived Speed Data from Ford Sync Generation 3, Version 2 Systems Acquired with Berla iVe," SAE Technical Paper 2021-01-0903, 2021.

27) Muttart, J., "Influence of Age, Secondary Task and Other Factors on Drivers' Swerving Responses before Crash or Near-Crash Events," SAE Technical Paper 2015-01-1417, 2015.

28) Leakkaw, P., Panichpapiboon, S., "Real-Time Vehicle Maneuvering Detection with Digital Compass," IEEE Access 2021.3097752, 2021.

29) Muttart, J., "Development and Evaluation of Driver Response Time Predictors Based upon Meta Analysis," SAE Technical Paper 2003-01-0885, 2003.

30) Muttart, J., "Quantifying Driver Response Times Based Upon Research and Real Life Data," Proceedings in the Third International Driving Symposium on Human Factors in Driver Assessment, Training and Vehicle Design, 2005.

31) Toxopeus, R., Atalla, S., Kodsi, S., Oliver, M., "Driver Response Time to Midblock Crossing Pedestrians," SAE Technical Paper 2018-01-0514, 2018.

00476-118003208

App. 000017



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

## BASIS OF REPORT

1. Texas Crash Report 2200089, Texas Incident Report 2200089, emailed witness statement from Caylee Smith to Corporal Lee-Winston and five 911 calls.

2. Police photographs and videos
    a. 57 scene photographs
    b. 10 Ford Explorer photographs
    c. 18 body camera / dash camera videos of first responders

3. Inspection photographs and videos
    a. 297 Ford Explorer photographs from Axiom taken on 09/06/2022
    b. 401 Ford Explorer photographs from CAC taken on 09/06/2022
    c. 461 site inspection photographs and 4 drive through videos from CAC taken on 04/26/2023
    d. 476 Toyota Camry photographs from CAC taken on 06/22/2023

4. Miscellaneous photographs
    a. 13 photographs of Mr. Nehemias Pivaral Santos.

5. CDR and Infotainment system download data for the Ford Explorer.

6. Ms. Smith cell phone text records.

7. CDR download data for the Toyota Camry.

8. Aperture report dated July 10th, 2023.

9. Deposition transcripts:
    a. Dina Yamileth Regalado Soto
    b. Erick Jeremias Pivaral Santos
    c. Erick Jeremias Pivaral Santos
    d. Evelyn Moreno
    e. Melvin Alexander Diaz Fuentes
    f. Caylee Erin Smith

10. Published historical maps, satellite aerial, flyover aerial and street view images of the incident location.

11. Published astronomical and meteorological data for the day of the crash.

12. Manufacturer specifications and dimensional data for the 2021 Ford Explorer and 2011 Toyota Camry.

00476-118002209
App. 000018



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023

13. Owner's manual for the 2011 Toyota Camry.

14. Publications listed under Citation section of this report.

00476 118002210
App. 000019



## ATTACHMENTS

1. Police Diagram, not-to-scale (Figure 1)

2. Scene / Location Images (Figure 2 to Figure 64)

3. Ford Explorer (Figure 65 to Figure 82).

4. Toyota Camry (Figure 83 to Figure 87).

5. Analysis and diagrams (Figure 88 to Figure 148).

6. Curriculum Vitae and Testimony History List for Paul J. Montalbano. P.E.

00476-118002211



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 1: Not-to-scale police diagram.



Figure 2: Sun position at time of collision.

00476-118003212

App. 000021



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 3: Google map.



Figure 4: Google map.

00476-118002213

App. 000022



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 5: Google map.



Figure 6: Google map.

Page 22 of 93



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 7: Google map.



Figure 8: Google map.

00476-118003215

App. 000024



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 9: Google map.



Figure 10: Google aerial.

Page 24 of 93



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 11: Google aerial.



Figure 12: Google aerial.

Page 25 of 93

00476-118002217

App. 000026



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 13: Google aerial.



Figure 14: Google aerial.

00476 118003218
App. 000027



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 15: Google aerial.



Figure 16: Google aerial.

00476-118002319

App. 000028



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 17: Roadway curvature.



Figure 18: Speed limit 75 mph.

00476-118002220

App. 000029



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 19: CAC site inspection photograph taken on 04/26/2023.



Figure 20: CAC site inspection photograph taken on 04/26/2023.

00476-118002221

App. 000030



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 21: CAC site inspection drone mapping performed on 04/26/2023.



Figure 22: Historical Google Aerial dated January of 2022.

00476 118002222

App. 000031



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 23: Historical Google Aerial dated June of 2022.



Figure 24: Historical aerial flyover image taken on 11/28/2022.

00476-118002323

App. 000032



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 25: Historical Google Street View taken 1 month after crash.



Figure 26: Historical Google Street View taken 1 month after crash.

Page 32 of 93

00476.118003224

App. 000033



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 27: Historical Google Street View taken 1 month after crash.



Figure 28: Historical Google Street View taken 1 month after crash.

Page 33 of 93

00476-118002225

App. 000034



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 29: Historical Google Street View taken 1 month after crash.



Figure 30: Historical Google Street View taken 1 month after crash.

00476-118002226

App. 000035



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 31: Historical Google Street View taken 1 month after crash.



Figure 32: Historical Google Street View taken 1 month after crash.

00476-118003227

App. 000036



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 33: Historical Google Street View taken 1 month after crash.



Figure 34: Historical Google Street View taken 1 month after crash.

00476-118002228

App. 000037



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 35: Historical Google Street View taken 1 month after crash.



Figure 36: Historical Google Street View taken 1 month after crash.

Page 37 of 93

00476-118003229

App. 000038



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 37: Historical Google Street View taken 1 month after crash.



Figure 38: Historical Google Street View taken 1 month after crash.

00476-118002230

App. 000039



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 39: Historical Google Street View taken 1 month after crash.



Figure 40: Historical Google Street View taken 1 month after crash.

Page 39 of 93

App. 000040



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 41: Historical Google Street View taken 1 month after crash.



Figure 42: Body camera snips.

00476.118003232

App. 000041



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 43: Body camera snips.



Figure 44: Police photographs.

00476 118002233
App. 000042



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 45: Police photographs.



Figure 46: Police photographs.

00476 118002234

App. 000043



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 47: Police photographs.



Figure 48: Police photographs.

Page 43 of 93



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 49: Start of officer marked Toyota left front tire mark.



Figure 50: Police photographs.

00476-118002236

App. 000045



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 51: Police photographs.



Figure 52: Police photographs.

00476-118002237

App. 000046



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 53: Police photographs.



Figure 54: Police photographs.

00476 118002238

App. 000047



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 55: Police photographs.



Figure 56: Police photographs.

00476-118003239

App. 000048



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 57: Police photographs.



Figure 58: Police photographs.

00476-118002340



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 59: Police photographs.



Figure 60: Police photographs.

00476-118002341

App. 000050



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 61: Police photographs.



Figure 62: Police photographs.

00476-118003242

App. 000051



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 63: Police photographs – enhanced contrast.



Figure 64: Police photographs.

Page 51 of 93

00476-118002243

App. 000052



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 65: Ford damage.



Figure 66: Ford damage.

00476-118002244

App. 000053





Figure 67: Ford damage.



Figure 68: Contact depth = 1 foot from the left side of the Ford.

Page 53 of 93



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 69: Ford damage.



Figure 70: Ford damage.

00476 118002346
App. 000055



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 71: Ford damage.



Figure 72: Ford damage.

Page 55 of 93



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 73: Ford damage.



Figure 74: Ford damage – Gap in damage of approximately 9.0 feet.

00476-118002348

App. 000057



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 75: Ford damage.



Figure 76: Ford damage.

App. 000058



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 77: Ford damage.



Figure 78: Ford damage.

00476-118002250

App. 000059



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 79: Ford damage.



Figure 80: Ford damage.

00476-118003251

App. 000060



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 81: Ford damage.



Figure 82: Ford tread pattern.

00476-118002252

App. 000061



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 83: Body material onto Toyota.



Figure 84: Body material onto Toyota.

Page 61 of 93

App. 000062



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 85: Body material onto Toyota.



Figure 86: Body material onto Toyota.

00476-118003254

App. 000063



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 87: Body material onto Toyota.



Figure 88: Police photographs comparing tread pattern.

00476-118002255

App. 000064



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 89: Graphical Photogrammetry.



Figure 90: Scalar Photogrammetry.

00476-119003256

App. 000065



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 91: Tire mark width with scalar photogrammetry.



Figure 92: Rectification Photogrammetry.

00476-118003257
App. 000066



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 93: Rectification Photogrammetry.



Figure 94: Rectification Photogrammetry.

00476-118002358

App. 000067



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 95: Rectification Photogrammetry.



Figure 96: Tire mark width with rectification photogrammetry.

00476 118003259

App. 000068



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 97: Tire mark width with rectification photogrammetry.



Figure 98: Traditional Photogrammetry.

Page 68 of 93

00476-118002360

App. 000069



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 99: Traditional Photogrammetry.



Figure 100: Traditional Photogrammetry.

00476-118003261

App. 000070



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 101: Traditional Photogrammetry.



Figure 102: Traditional Photogrammetry.

00476 118002262

App. 000071



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 103: Traditional Photogrammetry.



Figure 104: Traditional Photogrammetry.

00476-118003263

App. 000072



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 105: Traditional Photogrammetry.



Figure 106: Traditional Photogrammetry.

00476-118002264
App. 000073



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 107: Traditional Photogrammetry.



Figure 108: Traditional Photogrammetry.

00476 118002265

App. 000074



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 109: Traditional Photogrammetry.



Figure 110: Traditional Photogrammetry.

00476-118003266

App. 000075



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 111: Tire mark width with traditional photogrammetry.



Figure 112: Tire mark width with traditional photogrammetry.

00476 118003267

App. 000076



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 113: Tire mark width with traditional photogrammetry.



Figure 114: 3D scan of Ford and tread width.

00476-118002268
App. 000077





Figure 115: 3D scan of Ford and tread width.



Figure 116: 3D scan of Ford and tread width.

00476-118003269
App. 000078



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 117: 3D scan of Ford and tread width.



Figure 118: Scene evidence diagram.

00476-118002270
App. 000079



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 119: Scene evidence diagram.



Figure 120: Scene evidence diagram measurements.

00476-118002271

App. 000080



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 121: Approximate initial rest of Mr. Santos.



Figure 122: Impact model match.

Page 80 of 93

00476 118002272



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 123: Impact model match.



Figure 124: Impact model match.

00476-118002273
App. 000082



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 125: Impact model match.



Figure 126: Impact model match.

00476 118002274



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 127: Impact model match.



Figure 128: Impact model match.

00476-118003275



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 129: Impact model match.



Figure 130: Impact model match.

00476-118003276.

App. 000085



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 131: Impact model match.



1.00'

Figure 132: Impact model match.

00476-118003277

App. 000086



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 133: Toyota owner's manual instructions on replacing spare tire.



(1) Loosen and remove the nut.
(2) Remove the spare tire cover.
(3) Loosen and remove the bolt.
(4) Remove the spacer (with aluminum wheels).

Refer to the *Owner's Manual* for tire changing and jack positioning procedures.

Figure 134: Toyota owner's manual instructions on replacing spare tire.

00476-118003278

App. 000087



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 135: Berla track point data.



Figure 136: Berla track point data.

00476-118003279

App. 000088



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 137: Berla track point data.



Figure 138: Berla track point data.

00476-118002280

App. 000089



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 139: Berla track point data.



Figure 140: Time stamp just before collision.

00476-118002281
App. 000090



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 141: Time stamp just after collision.



Figure 142: Ford bearing data in degrees CCW from due north.

Page 90 of 93



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 143: Ford bearing data in degrees CCW from due north.



Figure 144: Ford bearing data in degrees CCW from due north.

00476-118003283

App. 000092



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 145: Ford bearing data in degrees CCW from due north.



Figure 146: Ford bearing data in degrees CCW from due north.

00476-118002284

App. 000093



Nehemias Pivaral Santos v. Smith and Eastman
Focus Forensics File No. 36-13811
September 28th, 2023



Figure 147: Plaintiff version.



Figure 148: Defendant version.

00476 118002285

App. 000094

# EXHIBIT B

App. 000095



```
                  IN THE UNITED STATES DISTRICT COURT FOR THE
                           NORTHERN DISTRICT OF TEXAS


                     Civil Action No. 3:22-CV-02714-K

ERICK RODERICO PIVARAL
GONZALEZ, Individually and as Special
Administrator of the Estate of
NEHEMIAS R. PIVARAL SANTOS,
DECEASED, ERICK SANTOS, and
EVELYN MORENO,

          Plaintiffs,

vs.

CAYLEE ERIN SMITH &
EASTMAN CHEMICAL COMPANY,

          Defendants.

_____/


                              VOLUME I


DEPOSITION OF:    PAUL J. MONTALBANO


DATE TAKEN:       Tuesday, December 19, 2023


TIME:             10:12 a.m.


PLACE:            Wingate by Wyndham
                  5750 Hazeltine National Drive
                  Orlando, Florida 32822


TAKEN BY:         Plaintiffs


REPORTED BY:      Jennifer Prohaska
                  Court Reporter and Notary Public
```

CONDENSED

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE I REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

```
 1                  A P P E A R A N C E S:

 2   JACOB WHITE, ESQUIRE
     OF:  Taylor King Law
 3        410 North Thompson Street
          Suite B
 4        Springdale, Arkansas 72764
            (479) 935-1761
 5        Jacobwhite@taylorkinglaw.com
          APPEARING ON BEHALF OF THE PLAINTIFFS
 6

 7

 8   GREGORY J. DUBOFF, ESQUIRE
     OF:  McGuireWoods
 9        Gateway Plaza
          800 East Canal Street
10        Richmond, Virginia 23219
            (804) 775-1154
11        Gduboff@mcguirewoods.com
          APPEARING ON BEHALF OF THE DEFENDANTS
12

13

14   ALSO APPEARING:

15   VANESSA McCORMICK, Videographer

16

17

18

19

20

21

22

23

24

25
```



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

App. 000097

1                    C O N T E N T S

2  TESTIMONY OF PAUL J. MONTALBANO
        Direct Examination by Mr. White.................5
3       Cross-Examination by Mr. DuBoff...............208

4  CERTIFICATE OF OATH AND REPORTER...................218

5  ERRATA SHEET......................................219

6  NOTIFICATION LETTER...............................220

7

8

9

10

11

12                    E X H I B I T S

13 Exhibit                                       Page
   Plaintiffs'
14      1   Mr. Montalbano's Report....................5
        2   Mr. Montalbano's CV........................5
15      3   Mr. Montalbano's Case List.................5

16

17

18

19

20

21                      - - - - -
                  S T I P U L A T I O N S
22

23      It is hereby stipulated by and between counsel for

24 the respective parties that the reading and signing of

25 the deposition be reserved.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000098

```
 1                 P R O C E E D I N G S

 2                    * * * * *

 3          THE VIDEOGRAPHER:  On record.  My name is

 4     Vanessa, and Jennifer is the court reporter.  Today

 5     is the 19th day of December, 2023.  The current

 6     time is 10:12 a.m.  We are here to take the

 7     deposition of Paul J. Montalbano in the matter of

 8     Erick Roderico Pivaral Gonzalez, individually and

 9     as special administrator of the estate of

10     Nehemias R. Piveral Santos, deceased, Erick Santos,

11     and Evelyn Moreno versus Caylee Erin Smith and

12     Eastman Chemical Company, pending in the District

13     Court of the Northern District of Texas, Civil

14     Action No. 3:22-CV-02714-K as in kilo.

15          Will Counsels please introduce themselves for

16     the record, starting with the plaintiff's counsel.

17          MR. WHITE:  This is Jacob White.  I'm

18     representing plaintiffs.

19          MR. DUBOFF:  Gregory DuBoff representing

20     Defendants Caylee Erin Smith and Eastman Chemical

21     Company.

22          THE VIDEOGRAPHER:  Thank you.

23          And for the deponent, can you please state

24     your full name for the record?

25          THE WITNESS:  Paul Joseph Montalbano.
```



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000099

300977 Montalbano Paul J. 01-04-2024 - VOL. I         Page 5

```
 1              THE VIDEOGRAPHER:  Thank you.  And can you
 2         please raise your right hand to be sworn in by the
 3         court reporter?
 4              THE REPORTER:  Do you solemnly swear or
 5         affirm that the testimony you shall give will be
 6         the truth, the whole truth, and nothing but the
 7         truth?
 8              THE WITNESS:  I do.
 9                   PAUL J. MONTALBANO,
10  having first been duly sworn, testified as follows:
11                   DIRECT EXAMINATION
12  BY MR. WHITE:
13         Q.   All right.  We will begin.  Will you state
14  your full name for the record?
15         A.   Paul Joseph Montalbano.
16         Q.   Okay.  Where are you employed?
17         A.   Focus Forensics.
18              (Exhibits 1, 2, and 3 were marked for
19         identification.)
20              MR. WHITE:  And just for the record, we've
21         already premarked them, the report as Exhibit 1,
22         his CV as Exhibit 2, and --
23              MR. DUBOFF:  Right.
24              MR. WHITE:  -- his case list as Exhibit 3.
25         We try and do this paper-light, you know.  His
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000100

 1        report already has most of the photos in it.

 2             MR. DUBOFF:  Sure.

 3   BY MR. WHITE:

 4        Q.   Okay.  When were you engaged by Defense

 5   Counsel in this matter?  And would you identify for the

 6   record when you look at your laptop?  If you have to

 7   consult a document to answer a question, it's fine if you

 8   do; just tell us what you consulted to answer a question.

 9        A.   Sure.  So I'm looking at our retention

10   agreement, which is dated April 26, 2023.  So on or about

11   that date is when we were retained.

12        Q.   So just to make sure I got that:  April 6th,

13   2023, on or about?

14        A.   April 26th.

15        Q.   26th.  Okay.

16             So I take it you've been deposed before,

17   right?

18        A.   Yes, sir.

19        Q.   So you know the general ground rules.  Oral

20   answers, no uh-huhs or -- head shaking is fine, but

21   accompany it with an oral answer.

22             So I'll skip sort of my general litany of

23   rules, except for, can we agree that if I ask a question

24   and you answer it, that that means that you understood my

25   question?



**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1          A.     Yes, sir.

2          Q.     And if you don't understand one of my

3     questions, just stop me and say, "Hey, man, I didn't

4     understand that question.  Try again."

5          A.     Sounds good.

6          Q.     Okay, perfect.

7                 So this is also just for the record:  You

8     received a subpoena for this deposition, correct?

9          A.     Yes, sir.

10         Q.     And that subpoena asked you to produce

11    certain documents, right?

12         A.     Yes.

13         Q.     And you have, before we went on the record,

14    you've given me a USB drive with your entire file?

15         A.     Yes.

16         Q.     And you believe that that is responsive

17    entirely to the document request that I sent you?

18         A.     Yes.  That is my entire file front to back.

19         Q.     Okay, perfect, perfect.

20                And it includes a transcript either of your

21    deposition and your trial testimony, or one or the other

22    from the estate of Sari Marcus, correct?

23         A.     Yes.  It includes my deposition transcript.

24    I was never provided my trial transcript, so I don't have

25    that in my possession.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000102

```
 1        Q.    Very good, very good.

 2            MR. DUBOFF:  And, Jake, if I could, so in

 3        talking with Paul, I think one interpretation of

 4        your subpoena would have required him to produce

 5        communications with Counsel.

 6            MR. WHITE:  Obviously, right.

 7            MR. DUBOFF:  Yeah, and so -- but I know -- I

 8        don't think there was anything, but my instructions

 9        are Paul to produce any communications to the

10        extent they were relevant to any of his opinions in

11        this case.

12            MR. WHITE:  Right, right.  And that's -- I

13        think we agree there are certain communications

14        with Counsel that are relevant.  Some are --

15            MR. DUBOFF:  Yes.

16            MR. WHITE:  -- semi-privileged, and I take it

17        your instruction was, "Provide the ones that are

18        relevant and unprivileged"?

19            MR. DUBOFF:  Correct.

20            MR. WHITE:  Okay.  Got it, got it.  All

21        right.

22   BY MR. WHITE:

23        Q.    So let's take a look at your CV here for a

24   second.  Can you tell us what degrees you hold and from

25   what institutions?
```



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

App. 000103

 1      A.    I hold a bachelor of science in mechanical

 2 engineering and a master of science in mechanical

 3 engineering from the University of South Florida.

 4      Q.    Okay.  And when did you receive those

 5 degrees?

 6      A.    It was received simultaneously in 2013.  I

 7 attended what they called an accelerated master's program

 8 where you could skip the bachelor's graduation and

 9 receive both degrees at the same time.

10      Q.    So was that a four-year program, or was it,

11 like, a combined six-year program?

12      A.    A five-year program.

13      Q.    Five-year program.  Okay.

14            And can you tell us in general what you

15 studied to receive that degree -- those degrees?

16      A.    So my discipline was mechanical engineering.

17 My specialties within mechanical engineering during my

18 graduate research and graduate coursework were kinetics,

19 kinematics, dynamics, and physics, which are all

20 disciplines and studies of the motion of objects, how

21 objects behave during impacts, predicting motion of

22 objects based on impacts.  Anything with movement,

23 basically, was what I specialized in in my graduate

24 studies.

25      Q.    Okay.  And do people get that degree, the



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000104

 1  degree that you received and the training you received

 2  for your master's, in order to become accident

 3  reconstructionists?  Or are there other professions that

 4  people get that training for?

 5      A.   Accident reconstruction has a broad range of

 6  foundational education.  The core foundation is

 7  mathematics and physics, so anything that really provides

 8  you a great foundation of mathematics and physics is

 9  typically sufficient to go into the field of accident

10  reconstruction analysis.

11           Since graduating with my graduate degree in

12  2013, I have taken 45 courses directly in the field of

13  accident reconstruction and human factors, which directly

14  applies the engineering principles and foundations from

15  my college degrees directly to the field of accident

16  reconstruction and human factors analysis.

17      Q.   So have you referred to yourself before as a

18  forensic engineer?

19      A.   We have many titles:  consultant, forensic

20  engineer.  I still am a mechanical engineer by trade.

21  Forensic just means that I'm reverse engineering

22  something that happened in the past.

23      Q.   Okay.  Is any one of those titles more

24  accurate than another -- accident reconstructionist,

25  mechanical engineer, forensic engineer -- as applied to



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  yourself?

2       A.    I have no preference of which title I am.  It

3  all applies engineering principles to something that's

4  happened in the past.  We are reverse engineering

5  something using math and science.

6       Q.    Okay.

7       A.    So all of those titles, I think, categorize

8  that sufficiently.

9       Q.    And I've seen -- and tell me -- this is sort

10  of a mouthful.  Have you ever called yourself an accident

11  reconstruction forensic engineer?

12       A.    I think so, yeah.  Maybe not together, but

13  yeah, accident reconstructionist --

14       Q.    Okay.

15       A.    -- human factors analyst, expert, a lot of

16  different titles.

17       Q.    So what -- and tell me if this question is

18  based on a faulty premise.  What are the three tiers of

19  accident reconstruction?

20       A.    What I think you're referring to is the HVE,

21  is what we categorize it in an acronym.  It's the human

22  aspect, the vehicular aspect, and the environmental

23  aspect.  Those are kind of the three tiers that we

24  analyze independently in an accident reconstruction

25  analysis.  You obviously have the vehicle, which is what



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000106

1  is engaging in the physics; you have the human component,

2  which is applying the input to that vehicle; and then the

3  environment, which affects how those objects behave

4  during and after collisions.

5      Q.    Okay.  So -- and I think you've already

6  summarized those for me.  Do you look at both -- all

7  three -- H, V, and E -- when creating an accident

8  reconstruction report?

9      A.    Typically, yes.  It depends on the amount of

10  available evidence.  Sometimes I am able to provide more

11  information on some cases versus other cases.  It just

12  depends on the available evidence that I have to me.

13      Q.    So of the -- and I may be butchering the

14  acronym -- of the HVE boxes, you don't look at each one

15  of those boxes necessarily; just depends on what evidence

16  you get in a given case?

17      A.    I don't know if I would say that I really

18  delineate the boxes versus just encompass them as a whole

19  in my analysis.

20      Q.    Okay, okay.  So when did you receive your PE

21  license?

22      A.    2016, I believe, the end of 2016.

23      Q.    And which states do you have PE licenses in?

24      A.    Florida, Georgia, Mississippi, and Alabama.

25      Q.    Is the process for getting a PE license in



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000107

1  each one of those states the same?

2      A.    Yes.  It's simply paying the state the fees

3  for reciprocity.

4      Q.    So how many times did you have to take the PE

5  test?

6      A.    Just once.

7      Q.    Can you describe the PE test?

8      A.    The PE test is an eight-hour examination that

9  fully encompasses all of the disciplines of the

10 particular category that you choose to take.  In my case,

11 I chose mechanical systems, which includes, obviously,

12 the physics that I use in accident reconstruction

13 analysis, but it also includes heat transfer, HVAC, other

14 various components of mechanical engineering.  So it's a

15 very broad encompassing test, but it just generally

16 proves competency in the field of engineering.

17     Q.    So do you -- well, can you describe your

18 education involving fluid dynamics?

19     A.    Fluid dynamics was a pretty extensive part of

20 my coursework.  I don't have any graduate experience in

21 fluid dynamics.  It is similar to aerodynamics, which

22 could arguably be a part of accident reconstruction

23 analysis.  So in part, it does rely on the same generic

24 physics principles, forces and motion, because you are

25 talking about aerodynamic or fluid dynamic drag forces,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

App. 000108

1   things like that.  So the principles are all the same

2   foundational principles; they're just applying it to a

3   very specific aspect.

4        Q.    Okay.  And I mean, fluid dynamics can get

5   pretty complex in the details of it, right?  I mean,

6   it's -- I know you said you've got coursework on it.

7   Would you describe yourself as an expert in fluid

8   dynamics?

9        A.    Well, specifically how we think of it in

10  layman's terms, fluid dynamics is anything in the water.

11  Technically, I don't have specialized expertise analyzing

12  submarines or boats, things like that.  But again, the

13  foundational principles of fluid dynamics is just the

14  same core principles of physics and engineering.

15       Q.    And I'm not trying to trick you.  I take it

16  you didn't rely on fluid dynamics when generating your

17  conclusions in this report, did you?

18       A.    Not in the way I think you're referring to

19  it.  Now, certainly, there are trajectories of things

20  like fluids in an accident that I have considered.  But

21  what I think you're referring to is more mechanical

22  design of systems that operate in water.  No.

23       Q.    Well, what I'm trying to get at is, did you

24  rely on fluid dynamics when -- to the extent you did

25  this -- when you calculated how, like, say, blood or bone



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  or brain matter was thrown?  Did you do anything like

2  that?

3      A.    Not in regards to what I would say is fluid

4  dynamics versus physics:  trajectories, impacts, speeds,

5  times, distances, angles, vectors.

6      Q.    Okay, okay.  Do you think that you need a

7  background in physics in order to reach the conclusions

8  that you drew in your report regarding, say, the fluids

9  that were thrown, or the way Mr. Santos's body was thrown

10  around?

11          MR. DUBOFF:  Object -- object as ambiguous.

12      A.    I don't think so.  I've seen many

13  reconstruction experts have backgrounds in civil

14  engineering that are able to generally understand the

15  concepts of physics.  It's a basic principle,

16  mathematical principle, that any mathematical discipline

17  encompasses.

18      Q.    So I take it -- and correct me if I'm wrong.

19  Do you think that you need a background in mathematics in

20  order to be an accident reconstructionist?

21      A.    No.  There are a lot of law enforcement that

22  do not have any educational background that are able to

23  perform accident reconstruction analyses based on direct

24  education with regards to accident reconstruction.

25      Q.    Okay.  Can you describe your education



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          Toll Free 855-MYDEPOS

App. 000110

 1  involving material sciences?

 2      A.    Same answer as fluid dynamics.  I took

 3  extensive courses in material sciences in regards to,

 4  really, the macro level of the material components.  So

 5  material science is very broad; I'm talking down to the

 6  finite material element components versus simple

 7  structural force calculations.

 8            So you could certainly be a metallurgist that

 9  analyzes more on a chemical scale the structure of

10  material; or on a more physics standpoint, the failure

11  points of materials based on the force applications, the

12  deformation of those materials based on force

13  applications.  So again, that question kind of can take

14  you many different ways; just depends on which way you're

15  actually asking.

16      Q.    Well, I guess, do you consider yourself an

17  expert in any of those types of material sciences?

18      A.    Well, you certainly need to know material

19  properties when you are doing any force equations applied

20  to an object.  So in a sense, yes, of course.  Any

21  engineering discipline relies on material properties.

22      Q.    Okay.  And did you do any calculations like

23  that to generate your report in this case?

24      A.    In this particular one, I don't believe the

25  material characteristics came into any of the equations.


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  Typically, you'll find that in a crash analysis, is what

2  we like to call it, when we factor in the force of an

3  impact based on how much damage we see to a vehicle.

4  Those types of methodologies don't necessarily apply to

5  pedestrian impacts.

6           So in this particular case, I don't believe

7  there were really any specific material engineering

8  principles involved other than observations of how the

9  damage transpired in doing a damage match, which is a

10 foundational principle of accident reconstruction.

11      Q.    Okay.  So can you tell us -- for those of us

12 that aren't engineers -- what the study of kinetics is?

13      A.    Kinetics is the study of the motion of

14 objects, how objects behave in the environment, speeds,

15 times, distances, things like that.

16      Q.    So again, for the nonengineers amongst us, I

17 take it if I showed you how a billiard ball hit one other

18 billiard ball, the study of kinetics would tell you how

19 the billiard balls are going to move after impact?

20      A.    Did you say "kinetics" or "kinematics"?

21      Q.    I said "kinetics."

22      A.    Okay.  So I'm sorry.  Kinetics is -- you're

23 right:  billiard balls is a great example of kinetics.

24      Q.    Okay.

25      A.    Kinematics is more of the motion of objects.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  Kinetics analyzes the impacts.

2       Q.   So -- so can you repeat that answer?  I'm

3  sorry.  Let's go off the record.

4            THE VIDEOGRAPHER:  The time is 10:28 a.m.,

5       and we're off record.

6            (Break was taken from 10:28 p.m. to

7       10:28 a.m.)

8            THE VIDEOGRAPHER:  The time is 10:28 a.m.,

9       and we are on record.

10 BY MR. WHITE:

11      Q.   Okay.  So sorry, we had a brief interruption.

12 Let's -- can you describe the difference between kinetics

13 and kinematics?

14      A.    In the most simple terms, kinetics is the

15 study of impacts.  Kinematics is the study of the motion

16 of objects in time and space.

17      Q.   Okay.  So just let's go back to my billiard

18 ball analogy.  Kinetics is the study of how, when two

19 billiard balls hit each other, what happens, right?

20      A.    Yes.

21      Q.   And kinematics is the study of, as a billiard

22 ball rolls, I guess, how it's rolling or, like, what you

23 can expect it to do?

24      A.    Well said.

25      Q.   Okay.  All right.  Just I don't know, right?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

App. 000113

1  I just want to make sure.

2          So can you describe your education on

3  kinetics and kinematics?

4      A.    My education starts in my bachelor's degree.

5  Kinematics and kinetics is a core principle of mechanical

6  engineering.  So there were courses titled kinetics;

7  there were courses titled kinematics; there were courses

8  titled dynamics, which is the combination of kinetics and

9  kinematics.  So those were very large foundational

10  principles learned early on in almost any engineering

11  degree.

12          In addition to that, my graduate research

13  involved the exclusive study of the motion of objects and

14  forces in my graduate research.

15      Q.    Okay.  And just to bring it into this case,

16  have you studied, trained, or had work experience in the

17  kinetics/kinematics of pedestrian interactions with motor

18  vehicles?

19      A.    In my professional experience, yes.

20  Throughout my 45 courses taken directly in the field of

21  accident reconstruction, pedestrian impacts are a large

22  portion of what we analyze; so therefore, it's a large

23  portion of the curriculum in any accident reconstruction

24  course.  And the foundational principles are kinetics and

25  kinematics, but then they are applied directly to



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  pedestrian impacts with vehicles and also comparing that

2  or using empirical test data.

3          Q.    Okay.  So can you describe -- so your

4  postcollege and grad school experience with kinematics

5  and kinetics as applied to pedestrian impacts?

6          A.    Really, any pedestrian is going to rely on

7  those foundational principles.  Whether you know you're

8  relying on it or not when you use the equations, you are.

9  So the accident reconstruction curriculum gives you these

10 equations established from empirical test data and

11 studies that help us predict pedestrian movement based on

12 various forms of impact configurations.  And again, it's

13 just going back to the foundational engineering

14 principles of kinetics and kinematics, whether you know

15 it or not.

16         Q.    So what are those equations that you're

17 referring to?

18              THE VIDEOGRAPHER:  Can you move your mic a

19         little bit?  It's rubbing your tie.  Pardon me.

20         Thank you.  Sorry.

21 BY MR. WHITE:

22         Q.    Let me see -- let me see if I can remember my

23 last question.

24         A.    I think you said, What are those equations?

25         Q.    What are those equations?  Yes, thank you.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000115

1        A.    Typically, the most-used pedestrian impact

2   equations are predicting vehicle speed based upon

3   pedestrian throw.  There are various types of equations

4   used based on the type of impact configuration, whether

5   it is a full-frontal impact, whether it is a low-fronted

6   vehicle versus a high-fronted vehicle, whether it's a

7   corner clip, or what we call a fender-vault-type

8   orientation.  There are various empirical equations that

9   we can use based on the throw distance of a pedestrian to

10  predict the speed of the vehicle.

11       Q.    Now, did you have to do any of the

12  calculations in this case?

13       A.    Not in this case.  The pedestrian actually

14  subsequently collided with the parked Toyota and then

15  back into the subject Ford, so pedestrian throw distance

16  wasn't a variable available to us in this analysis.

17       Q.    And you didn't need it, right, because we had

18  electronic data on Caylee Smith's speed, right?

19       A.    That is true.

20       Q.    Okay.  So when did you start working

21  professionally as an accident reconstructionist?

22       A.    January 2nd, 2013.

23       Q.    Okay.  And how many accident reconstruction

24  reports have you generated since then?

25       A.    Reports or analyses?  I don't generate



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000116

1   reports for every case.

2       Q.    Okay.  Well, first, tell us the difference

3   between a report versus an analysis.

4       A.    So typically in Florida, we actually rarely

5   physically write reports.  Our analysis is typically

6   communicated through a deposition or a trial.  So I know

7   it may be different in other states, so I just want to

8   delineate when you ask the question with reports.

9            To give you a full comprehensive answer, I

10  have performed thousands of accident reconstruction human

11  factors analyses.  Certainly, a fraction of those make it

12  to a deposition or a trial where I'm communicating on

13  record.  But almost all of them result in at least

14  communicating my findings to retaining counsel that hired

15  me.  All of them involve actually performing an

16  engineering analysis based on the evidence collected.

17      Q.    So -- but you don't always -- strike that.

18            How many reports have you generated like the

19  reports in this case, if you know?

20      A.    I don't have that teed up.  Certainly,

21  federal cases require reports, so there's been a handful

22  of those that I've written.  Sometimes clients want a

23  report to put my findings on paper.  I don't have an

24  exact answer for you.

25      Q.    Okay.  All right.  That's fine.



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000117

 1              What -- roughly, what percentage of -- and

 2    we'll -- when I say "reports" or "analyses," let's just

 3    say let's take the whole universe of both here.  So what

 4    percentage of the analyses and reports that you've

 5    written have been for defense versus plaintiff, if you

 6    know?

 7         A.    We don't track that other than on my

 8    testimony history list, which the last I counted was a

 9    good 50-50 split on my actual testimony.  My estimation

10    based on just overall being retained to perform an

11    analysis is also a good 50-50 split between plaintiff and

12    defense.

13         Q.    And of the reports and analyses that you

14    generated, any idea, roughly, what percentage of it

15    involved pedestrian interaction with a motor vehicle?

16         A.    That's a good question.  I would say, could

17    be up to 10 percent.  There are various types of

18    vehicular accidents we involve -- that we are involved

19    in:  commercial vehicle collisions, passenger vehicle

20    collisions, pedestrian collisions, daytime, nighttime;

21    there's so many different variables to every case.  I

22    would say a large portion of that would be pedestrian.

23         Q.    Okay.  Any of the reports or analyses that

24    you're thinking of involving motor vehicles going over 80

25    miles an hour interacting with a pedestrian?

 MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000118

 1        A.    I can think of one off the top of my head,

 2  but I don't have the others teed up.  But that's

 3  certainly happened.

 4        Q.    Okay.  Well, the one that you're thinking of,

 5  can you tell us what you recall about that case?

 6        A.    It was a Mustang traveling, I think, almost

 7  100 miles per hour when it struck a pedestrian crossing

 8  the road.

 9        Q.    Okay.  Do you remember what your conclusions

10  were in that case?

11        A.    I have no idea.  That was many years ago.

12        Q.    Do you recall if you were retained on behalf

13  of the pedestrian or the Mustang driver?

14        A.    I couldn't even tell you that.

15        Q.    Okay.  So you don't remember anything else

16  other than it was a Mustang going about 100 and a

17  pedestrian?

18        A.    That's all I can remember on that one.  I'm

19  just trying to think of high-speed pedestrian collisions.

20  Certainly, I know there's others of the thousands I've

21  analyzed generally in cases.  But I just can't think of

22  all of them.  There's so many.

23        Q.    Okay, okay.  Has your expert testimony ever

24  been limited by a court, that you're aware of?

25        A.    No, it has not.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000119

300977 Montalbano Paul J. 01-04-2024 - VOL. I       Page 25

1       Q.    Okay.  So no Daubert rulings or anything like

2  that?

3       A.    No.  Certainly, there's been attempts or

4  motions attempted to be filed, but none have made it

5  through --

6       Q.    Okay.

7       A.    -- even to be processed by a judge.

8       Q.    How many times have you testified at trial,

9  if you remember?

10      A.    I want to say somewhere in the teens, maybe

11  15 to 20.

12      Q.    Okay.  Over, I guess, the last ten years?

13      A.    Yes.

14      Q.    Okay.  Mostly in Florida, or all over the

15  country?

16      A.    Mostly in Florida.  I have testified

17  throughout the country, but most of it is Florida.

18      Q.    Okay.  So do you recall the case of the

19  Estate of Sari Lynn Marcus versus -- there's some

20  entities, but it's basically FedEx.

21      A.    Vaguely, yes.  I didn't spend any time

22  reviewing that transcript you requested, but I vaguely

23  remember the case.

24      Q.    So -- and tell me if what I'm about to

25  describe is inaccurate to your recollection, okay?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000120

```
 1        A.     Sure.

 2        Q.     That was a case where there was a FedEx truck

 3   stopped on a two-lane residential road, and somebody

 4   passed the FedEx behind it, basically, trying to go

 5   around the FedEx truck.  Does that sound right?

 6        A.     Yes.

 7        Q.     And then there was someone coming in oncoming

 8   traffic, or -- excuse me.  I guess there was somebody

 9   coming in the other lane, basically, going to pass the

10   FedEx truck, right?

11        A.     Yes, in the opposite direction.

12        Q.     In the opposite direction, thank you.

13               And that person lost control of their

14   vehicle, striking some sort of utility pole, and they

15   died, right?

16        A.     Correct.

17        Q.     Okay.  So do you remember what your

18   conclusions were about that case?

19        A.     I had many conclusions; I don't know if I can

20   summarize them in one sentence.  But I do recall there

21   being speed involved with that vehicle; I recall there

22   being wet roadways; I recall there being an

23   overcorrection of her vehicle, and that's all I can

24   really recall.

25        Q.     So was -- do you recall doing a calculation,
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000121

1  calculating that the driver that died was actually

2  traveling 70 miles an hour on a residential road?

3      A.   That sounds about right.

4      Q.   Okay.  And do you recall that the speed limit

5  was about 45 miles per hour?

6      A.   I don't have an independent recollection of

7  that, but I'll take your word for it.

8      Q.   Okay.  So do you do what is called an

9  avoidance opinion, I guess?  Like, you basically provide

10 analysis about what would have avoided an accident,

11 right?

12     A.   Depending on the facts of the case, yes.

13 Sometimes I will analyze -- let me back up.  I will

14 independently change certain variables like speed to see

15 how that would affect the outcome of the case.

16     Q.   So do you remember opining that Ms. Marcus,

17 the one that died, if she'd been traveling the speed

18 limit, she could have reduced her speed when she saw the

19 other vehicle get into her lane of traffic?

20     A.   I do believe there was an opinion about that,

21 whether she would have been able to stop before the pole

22 impact, or maybe even be able to stop entirely before

23 crossing the FedEx truck's path, I vaguely recall.

24     Q.   Okay.  So just to break that down, do you

25 remember doing an analysis of whether or not, if the



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1  driver that died had been going the speed limit, she

2  would have been able to react in time to avoid losing

3  control of the vehicle?

4       A.   Well, I'll dissect that a little bit.  It's

5  not necessarily whether she would be able to react in

6  time, but how much distance and time would she have had

7  available to her to come to a complete stop.

8       Q.   Okay, okay.  So do you remember that your

9  testimony there was that she had -- well, strike that.

10            Do you recall how far away Ms. Marcus, the

11  one that died, was when she saw the SUV move into her

12  path in that case?

13       A.   I don't.

14       Q.   Does it sound right if I tell you you

15  testified that it was 309 feet?

16       A.   I'll take your word for it.

17       Q.   Okay.  Do you agree that your testimony in

18  that case was that 309 feet was sufficient to spot and

19  avoid a hazard?

20       A.   I vaguely recall that.  However, that was an

21  imminent identifiable hazard.  So every hazard is

22  different and needs to be analyzed differently in each

23  particular case.  And I would not compare apples to

24  apples to the visual presentation of the hazard in that

25  case to the visual presentation of the hazard in this



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000123

 1  case.

 2       Q.    It was raining in that case, wasn't it?

 3       A.    It was.

 4       Q.    Okay.  And that was a two-lane residential

 5  road?

 6       A.    Yes.

 7       Q.    Okay.  So in that case, Ms. Marcus's speed

 8  was an important factor, right?

 9       A.    I wouldn't classify it as important or not.

10  It was a factor.

11       Q.    But it was -- you did testify that if her

12  speed had been at the speed limit, that she would have

13  had time to brake to avoid the hazard?

14       A.    Yes.

15       Q.    Okay.  And that, according to your

16  calculation, she would have had 309 feet in order to

17  conduct that braking?

18       A.    I don't know if it was to simply conduct the

19  braking, or if that included perception response time and

20  distance.  I don't know the answer to that.  But

21  generally, that is what we try to look at is the

22  available distance based on when the known visual hazard

23  presented itself and analyze the time and distance based

24  on that known.

25       Q.    Okay.  So you did calculate there how long it



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000124

1    would have taken -- strike that.

2          You did calculate in that case the distance

3    required for the driver that died to come to a complete

4    stop if they applied their brakes, right?

5          A.   Yes, in response to the known imminent

6    hazard.

7          Q.   Okay.  So what is that analysis called?  Is

8    that a braking analysis?  I mean, that's just my little

9    phrase for it.

10         A.   You can call it a braking analysis, an

11   avoidance analysis.

12         Q.   Okay.  Did you conduct a braking analysis in

13   this case?

14         A.   No, because I didn't have enough knowns.  We

15   don't know exactly when the imminent hazard presented

16   itself, so I have nothing to base my analysis off of.  In

17   that case, the Marx case you're referring to, we had the

18   hazard on video; we knew exactly when it presented itself

19   and within the reconstruction timeline.  So of course, if

20   I have a known, I can reverse engineer from that known.

21   When I don't have that known of when a hazard presents

22   itself, I can't base my analysis off of anything.

23         Q.   So when you say the hazard presenting itself

24   in this case, are you talking about the -- Caylee seeing

25   the Toyota or Caylee seeing Nehemias?



MILESTONE **|** REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000125

1   A.    So there was actually two separate hazards

2  that were presented to Caylee in this case.  The first

3  was the presence of the Toyota partially on the shoulder,

4  partially in the travel lane.  She responded to that by

5  shifting over into her travel lane.  We classify that as

6  something called a potential hazard.

7         It's not something that requires an emergency

8  response, but does likely require some form of a

9  response, maybe a correction of speed or a lateral

10 position, and that's what she said she did.  She adjusted

11 her lateral position to the right side of her lane.

12        Then a secondary imminent hazard presented

13 itself, which is the decedent actively bending over into

14 her path with his head directly into her path where it

15 wasn't there before.  That is the hazard I don't have any

16 information on to quantify, so I am unable to perform an

17 avoidance analysis on that, because I don't know when he

18 bent over.  What I can tell you is that the timing of

19 that movement was likely short, and the available time

20 and distance required to avoid that was likely greater.

21   Q.    So I guess my question is, You didn't perform

22 an analysis on how long it would have taken Caylee to

23 brake to either come to a complete stop or significantly

24 reduce her speed once she saw the Toyota, did you?

25        A.    That is not a relevant analysis, because we



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000126

```
 1   don't see people doing that in the literature.  We don't
 2   see people locking up their brakes due to the presence of
 3   a roadside vehicle.
 4            A good example I always like to ask is when
 5   is the last time you locked up your brakes and said,
 6   "Oops, never mind"?  We don't respond in an emergency
 7   fashion unless the hazard is certain and imminent.
 8   Anything else, we classify as a potential hazard that
 9   just requires some form of an adjustment.
10       Q.    So now, in this case, the car wasn't on the
11   shoulder entirely, right?  I mean, the car was partially
12   in the lane of travel she was in.
13       A.    About 2 feet.
14       Q.    Okay.  So you didn't think it was necessary
15   to perform an analysis of how long it would take her to
16   slow down when she saw a lane -- when she saw a car
17   parked in her lane of traffic on the interstate?
18       A.    Well, you say "parked."  It's not parked in
19   her lane.  So it is partially obstructing her lane.
20   There is a totally different analysis, totally different
21   visual stimulus if a vehicle is obstructing her entire
22   lane versus partially obstructing her lane where she can
23   physically navigate through the gap.
24            We don't have an imminent hazard here that
25   requires an emergency response.  Again, we reserve
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

App. 000127

 1  emergency responses for emergency imminent hazards,

 2  because there's risks associated to implementing a

 3  response.  Locking up your brakes on a freeway is risky

 4  due to traffic behind you, so you're going to reserve

 5  that for the absolute necessary.

 6            In a potential hazard where your lane may

 7  just be minimizing width by a couple feet, that doesn't

 8  require locking up the brakes.  That just requires

 9  adjusting your lateral position to navigate successfully

10  around that vehicle.  And that's exactly what she did.

11      Q.    So because you're categorizing the parked

12  Toyota in the lane as a potential hazard and not an

13  imminent hazard, that's why you didn't perform a braking

14  analysis for Caylee?

15      A.    Well, it's -- there's a couple explanations.

16  So yes, number one, it was not an imminent hazard; it

17  didn't require an imminent response.  We don't see

18  drivers locking up their brakes for roadside hazards.

19  That's just not something drivers have been shown to do.

20  So applying that analysis would be unfair because we are

21  comparing what the literature and the studies actually

22  show drivers doing versus what actually happened.  And

23  that's not what the studies show that drivers do.

24            Number two, we do see drivers adjusting their

25  lateral position to that type of hazard, and that's what



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000128

1  Caylee did.  So she is consistent with what the

2  literature shows of what an attentive typical driver

3  does, not only in her actual movement, but the magnitude

4  of her movement to -- when facing this particular

5  potential hazard.

6      Q.    Well, so my question is, Because of the

7  literature that you reviewed and the way you categorize

8  the hazard created by the Camry, that's why you didn't

9  conduct a braking analysis, right?

10     A.    I think that's fair, because it's not

11 applicable.  That would be like performing a braking

12 analysis to a threat that is not consistent with the

13 research.  We have to compare apples to apples.  So if

14 I'm going to apply a perception response time to a

15 driver, I have to compare that perception response time

16 to a similar hazard, because perception response times

17 change drastically based on the visual hazard.

18          They can be very short, or they can be very

19 long based on the characteristics of the visual hazard.

20 So we really need to compare apples to apples to properly

21 apply a perception response and avoidance analysis to our

22 subject driver.

23          And that's what I did here was I compared

24 apples to apples of what the actual hazard was to what

25 the research shows drivers doing to that actual hazard.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000129

1  If I applied any other avoidance analysis, it would be

2  improperly applying the facts of the case to this

3  particular case, because that's not what we have.

4      Q.   So it's your expert opinion that a driver in

5  Caylee's position would not apply the brakes or slow down

6  when they -- as they approached a vehicle partially

7  stopped in their lane?

8      A.   Well, that question is a little different.

9  You said "slow down." We were talking about emergency

10  braking, coming to a complete stop before.

11     Q.   I think you were talking about emergency

12  braking. So let's talk about slowing down, all right?

13     A.   Okay.

14     Q.   So is it your expert opinion that a driver

15  will not slow down as they approach a vehicle partially

16  stopped in their lane?

17     A.   That is not my opinion. My opinion on this

18  particular hazard is that studies show drivers will

19  typically slow down by 1 to 3 miles per hour, is what the

20  cumulative studies show that drivers will reduce their

21  speed by a few miles per hour, and possibly adjust their

22  lateral lane position if necessary.

23          We see Caylee reducing her speed by at least

24  4 miles per hour. We had her speed at 90, then at 86,

25  and then there was a gap before impact, so there very



**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000130

 1  well could have been additional speed reduction below 86.

 2          So she did a speed reduction of at least

 3  4 miles per hour and moved laterally by over 2 1/2 feet

 4  in her lane, which the studies show the average driver

 5  will move about 1.7 feet laterally in their lane to a

 6  roadside vehicle and pedestrian in one.  So we see she

 7  did exactly what the literature says the average

 8  attentive driver does:  They slow down and they move

 9  over.

10      Q.   So did you cite the papers that you're

11  referring to in your report?

12      A.   The papers, I believe, are actually cited in

13  there.  I also included them on your thumb drive.

14      Q.   Okay.  Now, Caylee's speed reduction

15  occurred -- and don't let me put words in your mouth --

16  one to two seconds before she struck Nehemias?

17      A.   I don't know the exact timing, but I think

18  two seconds would be fair.

19      Q.   And is that -- does the literature support

20  that about two seconds before you strike someone is when

21  a driver will conduct the speed reduction that you're

22  referring to?

23          MR. DUBOFF:  Objection to the form.

24      A.   It is consistent, because what the research

25  shows is that drivers typically will take their foot off



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

App. 000131

1  the gas pedal.  And so that speed reduction is as a

2  result of the timing of releasing the gas and slowing

3  down by 1 to 3 miles per hour.  So arguably, she actually

4  implemented her response sooner than the average driver

5  in the research, because she reduced by 4 miles per hour

6  by simply letting go of the gas.

7      Q.    So you didn't -- did you offer an opinion

8  about Caylee's speed in this case?

9      A.    I provided an opinion of what her speeds

10 were, of course.

11     Q.    Okay.  Do you think that her speed was a

12 relevant contributing factor to the collision?

13     A.    On an avoidance standpoint, no, because speed

14 is a contributing variable when we can establish a

15 baseline of when the hazard presented itself and compare

16 that distance to the required distance to avoid at both

17 the subject speed versus the speed limit.  I don't have

18 the time at which the hazard presented itself.

19     Q.    So would it be fair to say that since you

20 don't know when what you're calling the hazard presented

21 itself, you don't know if her speed was a relevant

22 factor?

23     A.    I certainly cannot make a calculation in this

24 particular case, because I don't have enough information.

25     Q.    Okay.  So do you agree that, all the other



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

App. 000132

 1  facts unchanged that -- that you're aware of, the crash

 2  would not have occurred if Caylee Smith was traveling the

 3  speed limit?

 4       A.    Can you repeat that question?

 5       Q.    Do you agree that, all other facts unchanged,

 6  that if you had -- if Caylee Smith had been traveling the

 7  speed limit, this crash would not have occurred?

 8       A.    I cannot say that.

 9       Q.    Have you published any papers?

10       A.    I have.

11       Q.    Okay.  What are they about?

12       A.    It's been a while.  I know the first couple

13  of papers I published were based on my academia graduate

14  research.  I have published a paper in accident

15  reconstruction about video analysis, analyzing pedestrian

16  impacts to vehicles using photogrammetry analysis to

17  calculate distances from those videos and from

18  photographs.  I believe that's probably the most relevant

19  literature that I've published.  I'd have to go back to

20  my CV and see all the other --

21       Q.    Sure.

22       A.    -- literature.

23       Q.    My understanding is you've published on the

24  reconstruction of accidents using video evidence, right?

25       A.    Yes.  And photogrammetry, really.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

 1      Q.    Photogrammetry, which -- and can you tell us

 2 what photogrammetry is?

 3      A.    Photogrammetry is a scientific method for

 4 calculating distances from either photographs or videos

 5 using known values within the photograph or video

 6 establishing vectors or lines from a camera to those

 7 known objects in the environment which fixes the camera

 8 in space, and then doing that same process to establish

 9 and calculate the unknowns in the video like final rest

10 positions or fluid stains, volatile evidence using that

11 same ray-vector analysis to then reverse engineer the

12 positions of other objects.

13      Q.    So just to use a simple example, if, like,

14 there was a pitcher of water on the road that's going to

15 evaporate, a volatile substance, right?

16      A.    Correct.

17      Q.    And you could measure some things in that

18 photo by going to the scene, like two trees, right, you

19 calculate that distance and then using some engineering

20 magic, you can then figure out exactly where the water

21 was located?

22      A.    Yeah.  I don't refer to it as "engineering

23 magic," but I do like that now that --

24      Q.    Sure, sure.

25      A.    -- you've said that.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

App. 000134

```
 1            But it's like triangulation of satellites.
 2  It's the same concept.  You're triangulating known points
 3  to establish positions.
 4       Q.    Okay.
 5       A.    When you have enough known points, you can
 6  fix the camera in the environment and extract other
 7  unknowns.
 8       Q.    Now, photogrammetry is not perfect, right?  I
 9  mean, it's not as perfect as, say, laser scanning a scene
10  immediately after it happened, right?
11       A.    It depends.  Every project has different
12  tolerances based on the available data you're working
13  with, the resolution of the photographs, the amount of
14  photographs, the amount of knowns that you're working
15  with.  So it depends; every project is different.
16            In this particular case, I did establish my
17  error rate or tolerance to these measurements.  That is
18  one large process of photogrammetry is understanding how
19  accurate these points are.
20       Q.    And is the error rate uniform for every
21  photogrammetry calculation you make, or is it actually
22  different for every particular photogrammetry calculation
23  that you do?
24       A.    It will be based on the area in the photo
25  that you are analyzing.
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1        Q.    Okay.  So every photo could be different?

 2        A.    It could.

 3        Q.    Okay.  Do you have -- can you just tell us

 4  for the record what the error rate is on the

 5  photogrammetry that you did in this report?

 6        A.    Yes.  Let me reference my report.  So my

 7  computer turned off.

 8              THE WITNESS:  Can we go off the record?

 9              THE VIDEOGRAPHER:  The time is 10:56 a.m.,

10        and we are off record.

11              (Break was taken from 10:56 a.m. to

12        11:02 a.m.)

13              THE VIDEOGRAPHER:  The time is 11:02 a.m.,

14        and we are on record.

15  BY MR. WHITE:

16        Q.    So we just took a little break.  I think we

17  were in the middle of talking about your error rate on

18  your report, and you were looking it up.

19        A.    Yes.  So you are correct:  The error rate

20  will be different based on what measurement I'm taking

21  within the photo.  What I like to do is establish the

22  maximum error in all of the photos and all of the

23  measurements so I know that everything is less than that.

24  In this particular case, my maximum error or tolerance or

25  accuracy was plus or minus a quarter of an inch on all of



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

App. 000136

```
 1  my measurements.

 2       Q.    Okay.  All right.  So -- and I'm not an

 3  engineer.  Would you call that a half-inch error rate, or

 4  would you call it a quarter-inch error rate?  Because it

 5  could be a quarter inch in either way, so summed up, it's

 6  a half inch.  Well, what would you call it?

 7       A.    Plus or minus a quarter of an inch.  So it

 8  could be a quarter of an inch less than what I'm

 9  reporting or a quarter of an inch more than what I'm

10  reporting.

11       Q.    Okay.  Got it.  Thank you.

12            So do you speak on the issues of accident

13  reconstruction at, say, industry conferences?

14       A.    I have presented at a few, yes.

15       Q.    Okay.  Can you tell us about those

16  presentations?

17       A.    May I reference my CV?

18       Q.    Yes.

19       A.    So it looks like I have presented at various

20  seminars about eight times over the last ten years.  My

21  most recent was back in 2021.

22       Q.    Okay.  So and the 2021 presentation was

23  called "Evidence Collection Technology and Digital Data

24  Sources in Forensic Engineering Reconstruction"; is that

25  right?
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000137

1       A.    Yes.

2       Q.    Okay.  Do you remember what the topic of --

3  or do you remember the substance of that presentation?

4       A.    Oh, goodness.  I don't know with certainty;

5  but vaguely, I believe that was demonstrating all of our

6  available tools that we have to collect evidence:  laser

7  scanners, cameras, drones, photo scanning, all the latest

8  and greatest technology that we use in the industry.

9       Q.    Okay.  And if you can go down, it looks like

10  you gave a presentation -- or sorry.  Strike that.

11            It looks like you gave a presentation in 2016

12  titled "Maintenance of Traffic and Roadway Design

13  Analysis"; am I correct?

14       A.    Yes.

15       Q.    Do you remember what that presentation was

16  about?

17       A.    That was more of an exhibit with my

18  colleagues on -- more a transportation engineering aspect

19  of the environmental aspect about the case, the roadway

20  design, curvatures, radiuses, elevation changes, widths,

21  things like that.

22       Q.    Okay.  So can I assume that you're familiar

23  with, like, federal DOT or rules regarding traffic

24  maintenance, or is that not your expertise?

25       A.    That starts to go outside of my expertise as



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          Toll Free 855-MYDEPOS

App. 000138

 1  far as Department of Transportation standards for roadway

 2  design.

 3       Q.    Okay.  You are a human factors expert,

 4  though, right?

 5       A.    Yes, as it involves the driver and human

 6  aspect of an accident reconstruction.  It's always worth

 7  mentioning, human factors is a very large field which

 8  includes things like designing the ergonomics of this

 9  chair that I'm sitting in, designing the location of

10  buttons in your vehicle.  It's a very broad field.

11           And the expertise that I hold is under the

12  accident reconstruction/transportation umbrella, which is

13  driver performance -- and I should say, really, human

14  performance, because that includes pedestrians and

15  passengers -- in response to hazards in the

16  transportation environment.  So not only what have

17  drivers done, but quantifying the performance of those

18  avoidance movements.

19       Q.   So would you agree that traffic maintenance

20  involves analyzing how humans interact with traffic?

21       A.   I would imagine there is some human factors

22  component to transportation engineering design, certainly

23  with understanding how drivers respond to various

24  signage, the locations of the signs.  I think I can agree

25  with that, yeah.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        Q.    Okay.  So do you take continuing education

 2   classes?

 3        A.    Yes.  They require a certain amount of

 4   continuing education to maintain my professional

 5   engineering license as well as my accident reconstruction

 6   accreditation from the ACTAR committee.

 7        Q.    How often do you have to take continuing

 8   education?

 9        A.    I don't remember the standards, because I end

10   up taking way more than I need.  I typically -- I take at

11   least two courses a year.

12        Q.    Okay.  Since you graduated with your master's

13   degree, have you always worked for Focus Forensics?

14        A.    I've always worked in the accident

15   reconstruction realm for the same boss.  But Focus

16   Forensics established in 2014.  It branched off of

17   Armstrong Forensic Engineers, which is the company I

18   started with in 2013.  So I've had the same boss for

19   11 years; it's just now a different company name.

20        Q.    Okay.  So have you or folks -- excuse me.

21   Have you or Focus Forensics ever worked previously,

22   before this case, for the law firm of Freeman Mills or

23   McGuireWoods?

24        A.    That sounds familiar, McGuireWoods, yes.  I

25   am very bad with names, so I apologize if I don't
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000140

1  remember something.

2       Q.   So let's take them one at a time.  Have you

3  or your -- or your firm that you work for, have you ever

4  previously been retained by Freeman Mills, the law firm?

5       A.   Is that the same law firm as McGuire?

6       Q.   No.  It's different.  That's the law firm in

7  Texas in this case.

8       A.   Okay.  And then I guess my answer is, I don't

9  know.

10      Q.   Okay.  But you do think that your firm or you

11 have been retained previously by McGuireWoods?

12      A.   Yes.

13      Q.   Okay.  Do you know how many times?

14      A.   I don't have that readily available or even

15 if it's documented anywhere, but I would guess less than

16 five.  I don't know.

17      Q.   Do you recall which cases those five were?

18      A.   I'm so bad at remembering this, I don't.

19      Q.   Okay.  Do you remember if those were defense

20 cases, plaintiff cases?

21      A.   I think they're a defense law firm, so

22 presumably defense.

23      Q.   Okay.  Have you ever -- or Focus Forensics,

24 to your knowledge -- ever done work for Eastman Chemical

25 Company before?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000141

 1      A.    That's the underlying carrier underneath?

 2 Yeah, I don't know.  It's more so I don't know for that

 3 question because we don't always know the underlying

 4 carriers.  We are retained typically by counsel,

 5 sometimes the insurance companies, so I don't always know

 6 the hierarchy of involved entities.

 7      Q.    Okay, okay.  What hourly rate are you billed

 8 out at?

 9      A.    2023, Focus Forensics is charging $280 per

10 hour for my standard time and I believe $400 per hour for

11 my testimony, but let me double-check that.  Yes, I was

12 correct:  $280 per hour for standard time, which is

13 engineering analysis, inspections, travel to and from

14 locations; and then active testimony like depositions or

15 trial testimony is billed at $400 per hour.

16      Q.    Okay.  But you actually are not paid by the

17 hour; you receive a salary?

18      A.    Correct.  I'm a salaried employee by the

19 engineering firm.

20      Q.    Okay.  And what is your salary with Focus

21 Forensics?

22      A.    I am not able to disclose that information.

23      Q.    Are you refusing to give that answer?

24      A.    Yes, I am.

25      Q.    On what basis?



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000142

```
 1        A.     That is confidential.  It has no basis for

 2  the engineering work performed in this case.  It has no

 3  relevancy to the facts of the case or my engineering

 4  analysis.  My income is irrelevant of anything related to

 5  this legal case, regardless of the outcome of the case,

 6  regardless of my findings.  My salary has no basis for

 7  anything involving my work performed on this particular

 8  case.  It is also confidential.  I am instructed by my

 9  employer to not disclose that.

10             MR. WHITE:  So are you instructing him, Greg,

11        not to answer that question?

12             MR. DUBOFF:  I mean, it's not privileged, but

13        I'm not going to tell him to answer it.  And if

14        he -- I guess I'm not going to tell him to

15        disregard what his employer has told him.  If you

16        want to have a fight about it with the judge, then

17        we can do that.

18             MR. WHITE:  Okay.  So fair enough.  Right.

19  BY MR. WHITE:

20        Q.     Just for the record, you're not going to

21  answer that question based on your opinion that it's not

22  relevant and your employer's instruction?

23        A.     That's correct.

24        Q.     Okay.  How much has Focus Forensics billed

25  the defense in this case as of today?
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000143

```
 1        A.    The last I looked when I added all the

 2  invoices, it was just under $15,000.

 3        Q.    Okay.  Did Defense Counsel give you any

 4  assumptions to use --

 5              MR. DUBOFF:  And again, Jacob -- I mean, I

 6        can do it at the end.  But if you just want to

 7        clarify, I know he -- I know Mr. Montalbano just

 8        said it, but if you want to ask -- if we're going

 9        to have a fight about this, I'd rather just have a

10        complete record if you want to ask him about

11        whether there's any contingency to any -- if his

12        salary is based in any way on anything having to do

13        with this case.

14              MR. WHITE:  Okay, yeah, let's get that out of

15        the way just so we don't have to revisit it down

16        the road.

17  BY MR. WHITE:

18        Q.    Is your salary with Focus Forensics

19  contingent on any outcomes of any of the cases that you

20  work on?

21        A.    Absolutely not.  And that's why it's not

22  relevant, and that's why I'm instructed not to provide

23  it, because it has absolutely no relevancy to the

24  engineering work I perform.  I'm a salaried employee.  We

25  charge hourly.  Even Focus Forensics' income is
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000144

 1    irrelevant of the outcome of the case, whether it's good

 2    or bad for the retaining counsel that retained us.

 3              We charge hourly for the time it takes us to

 4    perform the work.  So the outcome of cases, the type of

 5    analysis that I'm performing is entirely irrelevant to

 6    not only Focus Forensics' income but my personal salary

 7    with the employer I work for.

 8        Q.    So do you receive -- and I'm not asking you

 9    an amount.  Do you receive a bonus at any point?

10        A.    There is a bonus structure based on

11    efficiency.

12        Q.    Okay.  Do -- and otherwise, you're generally

13    paid as a salaried employee, which I take it means you

14    receive the same amount every month or whatever the pay

15    schedule is?

16        A.    Correct.

17        Q.    Okay.  Do you own equity in Focus Forensics?

18        A.    No.

19        Q.    Do you own equity in any entity that owns a

20    portion of Focus Forensics?

21        A.    No.

22        Q.    Okay.  Did Defense Counsel give you any

23    assumptions to use in your report in this case?

24        A.    Not that I can think of.  If there were

25    assumptions that I relied upon, I would have presented



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000145

1  them in my report.

2      Q.    Okay.  And we'll go through your report here

3  in a little bit.

4          Do you remember any assumptions that you

5  made?

6      A.    Everything I do typically relies on the

7  physical evidence and mathematical calculations.

8  Certainly, there is conflicting testimony that I'm aware

9  of that I have considered, so technically, those can be

10 regarded as assumptions that I've considered.  But I

11 certainly try my best to establish -- if I'm relying on

12 testimony or an assumption, then I will say it.

13     Q.    Have you made any credibility determinations

14 when reviewing witness statements to determine which set

15 of facts you're applying to this accident?

16     A.    Fortunately, that's not my job.  I'm not

17 allowed to do that.  I consider all testimony entirely

18 and compare it directly and objectively to the physical

19 evidence and the physics involved.  It's up to the jury

20 to determine credibility.

21     Q.    What do you do when one witness provides

22 contradictory or inconsistent statements when generating

23 a report?

24     A.    I will mention it that their testimony or

25 statement is inconsistent with the evidence or the



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000146

1  calculation, whatever engineering foundation that I have

2  to compete against their testimony.

3      Q.    Okay.  Do you recall in this report ever

4  mentioning whether some -- whether the one witness

5  provided different inconsistent statements?

6      A.    I believe there's a lot of inconsistent

7  statements.  I think you'll need to be more specific on

8  that.

9      Q.    Well, yeah.  I'm talking about when one

10  witness -- like, the same person -- says one different --

11  different things at different times, contradicting

12  themselves.

13      A.    I would need an example.  I know that, just

14  on my experience, particularly when witnesses are deposed

15  by attorneys that ask questions in varying types of way,

16  and in varying types of way, sometimes the answer could

17  be slightly different depending on how it's asked.

18  You'll have to be more specific; I'm not sure.

19      Q.    Okay.  But you don't recall mentioning

20  inconsistent statements where someone contradicted

21  themselves in your report?

22      A.    Yeah.  It's not something that I need to

23  bring forth to the jury.  They are capable of finding

24  those inconsistencies.  What my job is is to analyze

25  everything as a whole and compare it to the evidence.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000147

300977 Montalbano Paul J. 01-04-2024 - VOL. I       Page 53

1    Q.    And as far as you know, you haven't picked

2  amongst any individual witnesses' inconsistent statements

3  and chosen which statement you relied on?

4    A.    Correct.  I don't choose what I rely on in

5  regards to testimony, because it's obviously in dispute.

6  Now, what I can establish is whether it's consistent with

7  the science or not.  And that's really how I can assist

8  the jury in helping them resolve that dispute in any

9  inconsistencies, not only in the same witness but also

10 between other witnesses.

11   Q.    Okay.  Thank you.

12         So you said earlier you were retained on --

13 or Focus Forensics was retained on August 26, 2023,

14 right?

15   A.    I thought it was April, but let me

16 double-check.

17   Q.    Oh, I'm sorry.  I may have my A months mixed

18 up.

19   A.    April 26, 2023.

20   Q.    Okay, perfect.  Thank you.

21         When did you start engaging in work in this

22 case?

23   A.    Let me reference the first invoice.  Looks

24 like I charged a half hour for intake of case materials

25 on April 26, 2023.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000148

 1      Q.    Okay.  And can you describe -- well, strike

 2 that.

 3            Did you or anyone at your firm physically

 4 inspect the Ford Explorer in this case?

 5      A.    No.  We -- or I should say I relied on the

 6 inspections that were performed by others.

 7      Q.    Okay.  And do you know who performed the

 8 inspections that you relied upon?

 9      A.    There were two companies.  One company had a

10 name change.  So CAC is now Aperture, I believe; and then

11 there's Axiom Engineering.

12      Q.    And fair enough.  Axiom is the accident

13 reconstruction company that Plaintiffs' side has hired.

14            So you relied upon the photos and everything

15 else that Axiom took of the Ford Explorer as well as --

16 let's call it CAC for now.  Those are what you relied

17 upon, right?

18      A.    Yes.  I relied on their inspection materials,

19 the same as I rely on the inspection materials of my

20 colleagues that assist me in inspections that are more

21 local to the physical location of the inspections.  It's

22 a very common thing in our industry to have assistance

23 with inspections to keep costs down so that way we're not

24 traveling so far.  We're scattered throughout the state

25 on purpose, so that way we can be efficient in collecting



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000149

1  evidence.

2        Q.    And can we agree, if I say "CAC" or

3  "Aperture," we agree that's the same thing?

4        A.    Yes.

5        Q.    Okay.  So do you know when CAC performed the

6  physical inspection of the Ford Explorer?

7        A.    I do have the date in my report, if I can

8  reference that.  And I'm sorry.  That was the inspection

9  of the Ford, you asked?

10        Q.    Yes.  And if you don't know, I mean, that's a

11  perfectly --

12        A.    I don't know off the top of my head.  I can

13  certainly search the report.  I do believe it's in there

14  though.

15        Q.    Okay.  Does -- if I tell you that it happened

16  sometime in September of 2022, do you have any reason to

17  contradict that?

18        A.    No.  I actually just found it:  September 6,

19  2022.

20        Q.    Okay.  And do you know what CAC did to

21  inspect the Ford Explorer?

22        A.    They photographed it, laser scanned it, and

23  performed an ACM download and an infotainment system

24  download.

25        Q.    Okay.  So you're relying -- and correct me if



MILESTONE **|** REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          **Toll Free 855-MYDEPOS**

App. 000150

 1  I'm wrong.  Are you relying on the photos and scans done

 2  by CAC?

 3       A.    In part, yes.  That is part of the puzzle

 4  pieces I was provided to paint the picture of what

 5  happened.

 6       Q.    Okay.  So how did you verify the accuracy of

 7  CAC's photographs and laser scanning?

 8       A.    The photographs appear to not be tampered

 9  with; they were consistent with both companies'

10  inspection photographs of the Ford, Axiom and CAC.  The

11  accuracy of the laser scanning, actually, I relied on

12  what's called their photo scans, which is a series of

13  photographs that they take walking around the vehicle,

14  and I can stitch those photographs together to establish

15  a 3D model and generate those error rates myself so I can

16  know the accuracy of that model on my own.  So I

17  processed their photographs in a 3D model of the Ford

18  myself.

19       Q.    So what software did you use to generate the

20  3D model?

21       A.    Pix4D.

22       Q.    Okay.  So you did the Pix4D analysis; you did

23  not receive one from CAC?

24       A.    That is correct.

25       Q.    Okay.  So when someone else -- well, strike



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000151

 1  that.

 2          Is it your practice to typically allow

 3  someone else to do the vehicle inspection and then rely

 4  upon those photos?

 5      A.    Quite common.

 6      Q.    Okay.  Is it your regular practice to allow,

 7  like, a totally unrelated entity unrelated to Focus

 8  Forensics to do the initial inspection?

 9      A.    Actually quite common, yes.  We subcontract

10  other engineering companies out often that are closer to

11  the inspection locations.

12      Q.    Okay.  Have you or your firm or anyone from

13  your firm done a site visit on Interstate 45 where this

14  collision occurred?

15      A.    Not personally.  Certainly, by the time we're

16  retained, all the evidence is gone.  The site was

17  thoroughly documented, both photographically and by drone

18  mapping shortly after the crash.  I believe it was six

19  months after.

20      Q.    Do you -- do you know who did the drone

21  mapping?

22      A.    I believe that was CAC.

23      Q.    Okay.  So just to -- just to be certain, no

24  one from Focus Forensics has been to the scene of this

25  accident?



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000152

```
 1        A.     Correct.

 2        Q.     Okay.  Now, you said that there was an ACM

 3  download and an infotainment download done by CAC --

 4        A.     Yes.

 5        Q.     -- right?

 6        A.     Let me rephrase that.  I think there was some

 7  cooperation between Axiom and CAC with the downloads, so

 8  I don't know specifically who plugged into it, but there

 9  was -- it was teamwork.

10        Q.     Fair enough, right?  That's not a trick

11  question, right?

12               Have you reviewed -- well, I guess I

13  should -- let me back that up.

14               What have you reviewed from ACM in the

15  infotainment center download?

16        A.     All of it.

17        Q.     Okay.  So when you say "all of it," with

18  respect to the infotainment module, what do you mean?

19        A.     There was various types of data.  There was,

20  most notably, the breadcrumb trail of the Ford and the

21  40 miles, I believe, leading up to the collision location

22  at one-second intervals providing speed, bearing, and GPS

23  coordinates.  There was also text and call records that

24  were recorded through the Bluetooth connection of

25  Caylee's phone to the infotainment system.  There was
```

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000153

1  some other GPS reported information such as vehicle

2  starting points and synchronized clock points, but those

3  were part of the peripheral information.

4       Q.    Who provided you with the infotainment center

5  download?

6       A.    I believe it came from my client.

7       Q.    Okay.  So when you say "from the client," you

8  mean Defense Counsel?

9       A.    Yes.

10      Q.    Fair enough.

11            So the infotainment module data that you

12 reviewed, does it only include, like, say, two hours

13 before the collision?  Is that what -- that's the version

14 you've looked at?

15      A.    I believe two hours sounds right.  It

16 certainly has limited memory, so I believe that was all

17 it had was two hours or 40 miles.  I'd have to reference

18 the report for the exact numbers.

19      Q.    So -- and just to get super specific, it was

20 a report that you reviewed, and it's a PDF that, like,

21 has rows showing each track log point?  Is that what

22 you've looked at?

23      A.    That is one of the files that was provided,

24 yes.

25      Q.    Were there other files that you were



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000154

1  provided?

2        A.    I think there was a .CSV file, which is an

3  Excel table --

4        Q.    Okay.

5        A.    -- on those data points.

6        Q.    Do you know if that was generated from the

7  infotainment module, or if that was something separate?

8        A.    That was from the infotainment system.

9        Q.    Okay.  Any other files that you reviewed from

10  the infotainment center?

11        A.    Since you're getting specific, let me go

12  ahead and open up that folder just to correctly answer

13  this question.  So yes, there are two files related to

14  the infotainment system data.  There was a PDF titled

15  "Berla Report"; and then there was a .CSV file titled

16  "Berla Download Track Points."

17        Q.    And is this -- is this part of what you've

18  given me on this thumb drive?

19        A.    It is on there.

20        Q.    Can you just kind of walk me through -- I can

21  get there.  Is that in the download data folder?

22        A.    Yes.  So under "Materials Received," then

23  under "Download Data," then under "Ford Explorer," then

24  under "Infotainment Data."

25        Q.    Got it, got it.  Okay.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1          So do you know, from your review of the

2  infotainment center, infotainment center module --

3  whatever we're calling it -- do you know where

4  Caylee Smith went the morning of April 30, 2022?

5      A.    I do recall mapping that on a map.  I don't

6  have that teed up off the top of my head, so I'd have to

7  go back and look at those GPS coordinates.  But it -- I

8  vaguely remember it was some type of plaza with shopping

9  plazas and restaurants maybe.  I'm not sure.

10     Q.    Okay.  So do you recall that she -- she

11 started the Ford Explorer that morning in -- at her home

12 in Livingston?

13     A.    I recall seeing it started at an address,

14 then it went to some commercial property parking lot, and

15 then on its way to the crash location.

16     Q.    So do you recall that one of the locations

17 she went to was a hotel in Houston?

18     A.    I didn't get that detailed to know if it was

19 a hotel.  I'd have to recheck those GPS points.  I was

20 more focused on the actual crash.

21     Q.    Okay, okay.  So how do you derive speed data

22 from the infotainment center module that you were given?

23     A.    How do I, or how does it do that?

24     Q.    Well, let's start with you.  Tell me how you

25 derive speed data.  And I ask that question because it



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000156

1  looks like from the PDF and -- the PDF and the Excel that

2  it doesn't explicitly have the speed data.

3      A.    So the PDF and Excel file were -- did provide

4  various types of data.  The PDF only provided the GPS

5  coordinates with actions, then that was under the events.

6  Then under Track Points, it provided GPS coordinates with

7  bearing data, which is the orientation of the vehicle

8  relative to north.  Then the .CSV file is what contained

9  the speed data.

10      Q.    Okay.

11      A.    So I had to actually combine the two.

12      Q.    Okay.  So now, from the PDF file, which was

13  all Plaintiffs' Counsel was originally provided, for

14  every track point, it tells you the distance that she

15  went in a second, right?

16      A.    Yes.

17      Q.    And if you know how many feet someone

18  traveled in a second, you can derive their speed as a

19  mile per hour, right?

20      A.    Yes.  That is all GPS-based though.  It's

21  just the point at two positions when the GPS pinged it.

22  The speed data in the CSV file, my understanding is it's

23  pulling it from the CAN bus, and that's the actual

24  network from the vehicle reporting the speed.

25      Q.    Okay.  All right.  So then -- and that's the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000157

 1  information we need.

 2          So the speed column on the .CSV file is not a

 3  GPS derived speed; it is directly pulled from, I guess,

 4  the altimeter on the Ford Explorer?

 5      A.    That is my understanding of infotainment

 6  system data is that it is pulling the data from the

 7  vehicle.

 8      Q.    Okay, okay.  Thank you.

 9          So have you ever done a -- or strike that.

10          Have you ever used Berla to pull data and run

11  a report off of an infotainment center?

12      A.    Yes.  It's costly, so it's not as frequent as

13  your traditional black box download.  But yes, it is a

14  rather large part of our industry now with this

15  technology in these vehicles.

16      Q.    Okay.  So can you walk me through -- say a

17  client asks you, "Hey, we want to download the data from

18  the infotainment center.  Use Berla and run a report."

19  Have you done that?

20      A.    So we actually outsource the physical

21  downloading process.  The software and equipment is

22  rather expensive, and the times when we actually need the

23  data is far and few between, because we typically will

24  rely on the standard black box download --

25      Q.    Okay.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000158

1      A.    -- that gives us a much higher resolution

2   around the crash time, which is what we're actually

3   focused on.  So anytime that we want to get Berla data, I

4   will outsource it to a company to download for me and

5   then provide me the data.

6      Q.    So you don't have any personal experience

7   running a report using Berla?

8      A.    Not the physical extraction.  It does require

9   training through Berla to be able to do that with their

10  equipment.

11     Q.    So separate from the physical extraction,

12  have you ever used Berla to generate a report based on a

13  download from an infotainment center?

14     A.    So not to be nitpicky, but you used the word

15  "report" again.

16     Q.    Yeah.

17     A.    Yes, I have -- well, I've used infotainment

18  system data many times in accident reconstruction

19  analyses.  I don't know if it's ever made it to a

20  physical hard paper report.

21     Q.    Okay.  Well --

22     A.    It's like I said --

23     Q.    Yeah, yeah, fair enough, right?  And I don't

24  care if it was physical hard copy or not.

25            What I'm trying to figure out is, Have you



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000159

1  ever used Berla to interpret the data that's pulled off

2  of a module in order to figure out, for example, GPS

3  coordinates or speed?

4       A.    Yeah.

5       Q.    Okay.  Can you walk me through what that

6  process looks like?

7       A.    Yeah.  It's the same process I utilized in

8  this case.  It's I look at the data.  In this case, it

9  was provided in two different formats, an Excel file and

10 a PDF, both containing various types of information.  The

11 Excel file has speed --

12      Q.    Well, sorry.  That's actually not what I'm

13 asking.  I'm not -- I don't think you're being

14 disingenuous; I think we're just misunderstanding each

15 other.

16            Before you get the PDF and the Excel, have

17 you ever been part of the process to generate the PDF and

18 the Excel report using Berla?

19      A.    Oh, no.  That's part of the extraction

20 process.

21      Q.    Okay.

22      A.    That's what we outsource.

23      Q.    Okay.  You outsource that bit.  Okay.  Sorry.

24 That's -- we were just a little confused there.

25            So I just want to make sure:  So physical



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000160

1    extraction of the data and the creation of the PDF or the

2    Excel, whatever file interprets the data, that all

3    happens at the same time?

4         A.    My understanding, yes.

5         Q.    Okay.

6         A.    I believe it's a very lengthy process, or it

7    could be.

8         Q.    Okay.

9         A.    Some of these downloads can take 24 hours of

10   straight downloading, so they'll often run them

11   overnight.

12        Q.    And your understanding is that either CAC or

13   Axiom did the extraction in this case?

14        A.    Yes.

15        Q.    So you were provided -- you actually got the

16   PDF and the Excel from the infotainment center from

17   Defense Counsel in this case, right, not from CAC?

18        A.    Yes, I believe everything went through

19   Defense Counsel.  I have not had any direct communication

20   with other engineering firms.

21        Q.    Okay.  So what information can you get off of

22   a SYNC Generation 3 infotainment module?

23        A.    So that's a very specific question with a

24   very specific generation that will have a different

25   answer versus other manufacturers and other generations



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

App. 000161

 1  of those manufactures.  So that's not something I have

 2  teed up off the top of my head.  I'd have to go reference

 3  the Berla reports that tell you the manufacturer and

 4  generation, what to expect.  They're all different, just

 5  like black box data.

 6          It's hard to answer a blanket question of

 7  what type of black box data you would get from an air bag

 8  control module, because it's different for every year,

 9  make, and model.  Same thing for Berla:  It's going to be

10  different for every year, make, and model.  I would have

11  to go reference the reports.

12      Q.   So I -- so the data that gets pulled is

13  different by make, model, and generation of the

14  infotainment center, if I understand your answer right?

15      A.   Could be, yes.

16      Q.   Okay.  So have you studied the specific

17  accuracy of the data pulled from this type of

18  infotainment module from this Ford Explorer?

19          MR. DUBOFF:  Objection to the form.

20      A.   Yes.  There is actually a paper specifically

21  to this generation of the module validating the accuracy

22  of the data.

23      Q.   Okay.  So when you -- and do you remember who

24  authored that paper?

25      A.   I'd have to reference it in my file.  I don't



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          Toll Free 855-MYDEPOS

1   have that teed up.

2         Q.    Was it Wes Vandiver?

3         A.    Again, I'd have to -- can I reference it?

4         Q.    Sure, sure.

5         A.    Yes.  I have three papers.  Two of those are

6   from Wesley Vandiver.  One is from William Bortles.

7         Q.    Okay.  So do you recall what the error rates

8   are on the GPS data from a SYNC Generation 3 infotainment

9   module?

10        A.    Are you talking about the speed data or the

11  GPS coordinate accuracy?

12        Q.    The GPS coordinate accuracy.

13        A.    Looks like plus or minus 5 meters.

14        Q.    So I guess, let's use your engineering magic

15  for an American audience.  Plus or minus 5 meters, how

16  many feet is that?

17        A.    So I referenced this in my report.  What I

18  ended up doing was actually combining all three of these

19  papers and their reported accuracy of these GPS points to

20  give a range.  This range is going to heavily rely on

21  various environmental components like number of satellite

22  dishes that are connected, any environmental physical

23  obstructions like buildings or trees.  Even speed of the

24  object can affect that.

25              My report, I believe, indicated a 3- to



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000163

1  7-foot accuracy, but let me double-check that.  Yes, 3.5

2  to 7.5 range in accuracy of the global position of the

3  GPS coordinate.  Now, that is the global position based

4  on the general environment that you're in at the time of

5  the evidence or sample collection.

6          What you can do is establish more certainty

7  within that data by doing a relativity analysis, where if

8  we know a sample of points were taken in the same

9  environment, the global offset of all of those points are

10  generally going to be the same and have the same error

11  rate relative to global positioning.

12          And what we can do is track the difference

13  between those individual sample points that were taken

14  very close in time together within the same environment,

15  within the same speed, within the same settings that were

16  individually collected to further analyze whether there's

17  any change in the subsequent events or points to see if

18  we can track trends, and we can more heavily rely on the

19  accuracy of those trends versus the global accuracy of

20  the points.

21      Q.    So -- and tell me if I'm wrong about this.

22  If I convert that into layman's terms, are you saying

23  that you look at the different GPS track points, and

24  if -- as long as they look more or less like they're --

25  like, there's not one that's weirdly, like, you know,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000164

 1  20 feet off or something in what is otherwise a straight

 2  row, you -- you would understand that to mean that the

 3  track points are generally accurate?

 4       A.    Yes.  If they are collected in the same

 5  environment and generally the same conditions, you could

 6  form trends from a cluster of GPS points to establish the

 7  accuracy relative to the prior points, so the theory of

 8  relativity.  The global accuracy, yes, 3 to 7 feet, 3 to

 9  8 feet.  But the theory of relativity says that if you

10  take a sample point close in time to the prior sample

11  point, you can assume the same accuracy within each of

12  those subsequent points and rely --

13       Q.    Relative to the prior one?

14       A.    Yes.

15       Q.    So for example, if you see a bunch of GPS

16  track points from this infotainment module and they're

17  all in a straight line, you take that to mean the vehicle

18  was going in a straight line?

19       A.    Generally, yes, right.

20       Q.    But you would not say that precisely where

21  each one of those GPS points is precisely where the Ford

22  Explorer was at that time, right?

23       A.    Correct, because then you could also have

24  some error based on how it overlaid onto the Google Map,

25  certainly.  Different Google Map dates have some offsets



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000165

```
 1  in the global position of the road width, so that's

 2  really where that 3- to 8-foot margin comes into play is

 3  the global positioning of these points.  But Newton, with

 4  the theory of relativity, helps us establish more

 5  accuracy based on taking smaller time samples.

 6       Q.   So how did we get from 3- to 8-feet versus

 7  Wes Vandiver's paper which says that the accuracy is plus

 8  or minus 5 meters?

 9       A.   So that is the worst case.  That is taking

10  the -- I guess I can call it the 95th percentile

11  accuracy.  That is the worst that's ever been reported

12  based on various environmental changes.  So when

13  considering GPS coordinates as a whole, you do need to

14  consider how the GPS coordinates are taken.  That paper

15  is a more conservative estimate of plus or minus 5 meters

16  of the position as a whole, which is going to be 15 feet

17  or so.

18       Q.   Okay.  So did Wes Vandiver provide percentile

19  accuracies in his paper?

20       A.   Yes.  95th percentile.

21       Q.   Okay.  So what did he say the 95th percentile

22  is?

23       A.   Plus or minus 5 meters.

24       Q.   Okay.  So what are the -- can you give us the

25  50th percentile?  Did he report that?
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000166

 1       A.    I'd have to double-check the paper.

 2       Q.    And just to -- are you checking the 2021

 3  paper?

 4       A.    Yes, 2021-010903.  And I apologize; I was

 5  actually reading the wrong values before.  Plus or minus

 6  5 meters was for the VBOX Sport performance meter that

 7  they used to validate the data.  I do need to dig deeper

 8  to see what the results were of this generation module,

 9  which I am doing now.

10       Q.    Well, and I don't want -- I don't mean to

11  make you read the paper.  You can do that on a break.

12             Would you agree that this paper is the most

13  thorough discussion of the GPS tracking done by the Gen 3

14  SYNC module that you have cited in your report?

15       A.    I think that's fair.

16       Q.    Do you think it's fair to rely on this paper

17  as good science as far as the accuracy of the Gen 3 SYNC

18  module?

19       A.    Yeah, I think it's fair to rely on any

20  peer-reviewed published literature, but it also needs to

21  be considered as a whole.  And considering the specific

22  test conditions that they were under, I'm actually

23  starting to see that this report was more based on the

24  variance of distance between points versus the global

25  position of the points.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000167

 1              So it's not necessarily comparing apples to

 2    apples of what I reported as the 3 1/2-to-7 1/2-foot

 3    error.  So my reference is based on the combination of

 4    all the typical GPS accuracy peer-reviewed literature.

 5    This one does seem to have a specific goal in mind of

 6    providing a value of distance between points.

 7         Q.   Okay.  So when you provided the 3-to-7-foot

 8    error rate, that's based on your general knowledge and

 9    expertise of the accuracy of GPS systems?

10         A.   Along with my other cited literature on GPS

11    accuracy.

12         Q.   Okay.  So which other cited papers support

13    your 3-to-7-foot error rate conclusion?

14         A.   So I referenced three papers.  One was SAE

15    2017-01-1437.  That was by William Bortles in 2017.  I

16    then referenced the Wesley Vandiver paper in 2018 and the

17    Wesley Vandiver paper in 2021.

18         Q.   Okay.  So I think we agree that the 2021

19    paper is, at least at first glance, not entirely helpful

20    on the question of the GPS error rate, right?

21         A.    Well, it's reporting a different value than

22    what we're talking about.  It's reporting the error

23    between a distance of two known points.

24         Q.   Okay.  So in Wes's 2018 paper, what does it

25    say the error rate is for the GPS tracking?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1        A.    I'm going to have to read this paper through.

2  I know when I wrote this report, it was a combination of

3  all of these papers.  But if you give me a second, I can

4  certainly read through this paper again.

5        Q.    Sure.

6        A.    I believe this paper is more so discussing

7  the error of speed.

8        Q.    So I think that's correct.

9              So then, I take it what you're really relying

10 on is the Bortles paper, which does say that the GPS unit

11 data error ranges from 3.5 to 7.5 feet.  Am I incorrect

12 about that?

13       A.    I'm not sure.  I'd have to reread the papers

14 to see.

15       Q.    If you go to Page 2 of that paper, I think

16 it's about bottom of the first full paragraph.

17       A.    Oh, yes, there you go, the coordinate

18 location accuracy.

19       Q.    Okay.  So do you remember what module was

20 being tested in the Bortles paper?

21       A.    I'd have to review it again.  So that one, I

22 believe, was a Garmin GPS unit.

23       Q.    Okay.  Do you see anywhere in that paper

24 where a SYNC Generation 3 module was tested?  And I'm

25 talking about the 2017 Bortles paper.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000169

1       A.    Looks like -- looks like it did a

2   Generation 1, 2, and 9, and 10.  So there's a -- looks

3   like a large sample of generations.

4       Q.    But there's no Generation 3 SYNC module

5   included in the paper, right?

6       A.    No.  It spanned Generation 3.  It's 1 to 10.

7       Q.    Okay.  So but not -- it didn't include Gen 3?

8       A.    I'd agree with that specific.

9       Q.    Okay.  So did any of the papers that you cite

10  test the GPS accuracy as an actual locational value from

11  a Gen 3 SYNC module?

12      A.    There's so many papers out there that I'd

13  have to go back and reread them.  I don't have that teed

14  up off the top of my head to know about the specific GPS

15  accuracy.  What I can say is that general GPS accuracy is

16  a very heavily-studied science, and it is well understood

17  that the accuracy is going to be heavily dependent on the

18  environmental conditions.

19              And generally, an accuracy of 3 to 8 feet is

20  accepted within the industry of general GPS devices,

21  whether it be a handheld Garmin or a SYNC module.  The

22  values reported in these papers may not be apples to

23  apples.  They're talking about various different types of

24  variables they're assessing.

25              But in general, overall global GPS accuracy



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000170

1   is very well-known and studied, and that's -- the typical

2   value we accept in the accident reconstruction community

3   is somewhere in that 3-to-8-foot range, which is enough

4   to establish the position of the vehicle on the roadway,

5   but the exact lane position is not something with enough

6   precision to rely on.  But again, we go back to that

7   theory of relativity where we're analyzing the small time

8   change between data points.

9           So in this particular case, I can see that

10  the overall accuracy of the GPS data is unreliable as far

11  as its global position.  But again, the theory of

12  relativity is what I'm relying on.

13      Q.    So just, you know, for the jury, what are

14  you -- when you say the "global position," is that -- in

15  layman's terms, does that mean, like, actually where the

16  car was, or does it mean something different?

17      A.    Yeah, on the Earth.

18      Q.    Okay.

19      A.    The global position of this vehicle on the

20  Earth can only be guaranteed within this range.  There

21  are actually federal standards that require GPS systems

22  to adhere to accuracies -- I believe that was established

23  back under Clinton -- was that it required GPS systems of

24  all kinds, any kinds -- whether it's an Apple Watch,

25  iPhone or a SYNC module -- to adhere to these standard



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000171

 1   accuracies.

 2           And again, that's the global accuracy that

 3   anywhere on the planet, it needs to pinpoint you within

 4   that range.  You do then need to consider open roadway,

 5   relative theory between points to help establish trends.

 6           So yes, in general, GPS is difficult to help

 7   us establish lateral lane position, but we can rely on

 8   the trend of those points.  And that's what I was trying

 9   to express in my report.

10       Q.   Okay.  So just to sort of sum that up, you're

11   not saying that the GPS track points help you pinpoint

12   precisely where Caylee's vehicle was at every second,

13   right?

14       A.   Right, I never did.

15       Q.   Okay, perfect, right?

16           What about the bearing data?  What is your

17   understanding of the accuracy of the bearing data from

18   the Gen 3 SYNC module?

19       A.   I'd have to go back into the paper to see the

20   global accuracy of the bearing data.  But it falls back

21   on -- I'm analyzing a trend.  And so I don't have an

22   answer teed up, because I didn't rely on it, because that

23   wasn't part of my analysis.

24           What was part of my analysis was theory of

25   relativity, analyzing the trend, the consistency in the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000172

```
 1  bearing data on the straight segment of road, the

 2  consistency of the bearing data in the actual curve of

 3  the road and measuring the curve of the road to see the

 4  accuracy of that bearing data.

 5          So you can say I independently validated the

 6  bearing data on the approach around the curve and on the

 7  straightaway, and all of those points were consistent

 8  with the parallel orientation of the roadway itself.  So

 9  the bearing data, again, I don't know, necessarily --

10  teed up off the top of my head -- the global accuracy.

11  But when you analyze it on a case-by-case basis, you can

12  determine the validity of the data for this particular

13  case, which was very reliable.

14     Q.    So just to break that down, you measured not

15  using the bearing data, but using engineer magic, the

16  curve of Interstate 45 on approach?

17     A.    Yes.  You can measure the curve.

18     Q.    Okay.  And so then you can figure out --

19  again, using engineering magic and your expertise -- what

20  the bearing changes are of that curve?

21     A.    Yes.

22     Q.    And then you compared that, your analysis,

23  against the bearing data from the Gen 3 module?

24     A.    Exactly.

25     Q.    And it validated, in your opinion, the
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000173

```
 1   accuracy of the bearing data from the Gen 3 SYNC module?

 2        A.    You got it.

 3        Q.    Okay.  All right.  Perfect, perfect.  Just

 4   want to make sure.  Okay.

 5              So have you -- you did collect the -- well,

 6   strike that.

 7              You reviewed the collection of the air bag

 8   control module as well, right?

 9        A.    Of the Ford, right?

10        Q.    Of the Ford, yes.

11        A.    Yes, mm-hmm.

12        Q.    Did you review the ACM download from the

13   Toyota?

14        A.    I did.

15        Q.    Did either of those vehicles record an event

16   on April 30, 2022?

17        A.    Not on that particular date.  The Toyota did

18   have two events that were unrelated to the facts of this

19   case, either some prior or subsequent event not

20   consistent with the facts of this case.

21        Q.    Okay.

22        A.    The Ford had nothing on it.

23        Q.    Okay.  So what is your understanding of what

24   it takes to trigger the ACM module in the Ford Explorer?

25        A.    Typically, it's a 5 mile per hour change in
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000174

 1  speed over a 150-millisecond time sample.  However, every

 2  manufacturer -- that's the federal standard.  But many

 3  manufacturers will go underneath that standard.  So for

 4  instance, Toyotas can pick up changes in speed of less

 5  than a mile per hour.  We'll see a lot of events on

 6  Toyotas.  So all I can tell you is what the standard is.

 7  It's less than 5.

 8       Q.    Okay.  So the lack of an event on the Ford

 9  Explorer ACM tells you that there was at least -- strike

10  that.

11            The lack of an event on the Ford Explorer ACM

12  tells you that there was no reduction of speed of 5 miles

13  per hour or less within a 150-millisecond event?

14       A.    Or more.

15       Q.    Or more, okay.

16            But that's what you're able to derive from

17  that?

18       A.    Yes.

19       Q.    Okay.  So would you typically expect to see

20  an ACM event in a pedestrian motor vehicle accident?

21       A.    I have only seen an ACM event for a

22  pedestrian impact, I think, twice in my career.

23       Q.    Okay.  Describe those situations, if you

24  would.

25       A.    One was actually the Mustang that we talked



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

 1  about earlier going 100 miles per hour.  Given the speed

 2  difference, that was a -- provided a significant enough

 3  change in speed of the Mustang.  I don't remember the

 4  exact change in speed recorded by the Mustang, whether it

 5  was three or four or five or six.  But it is rare to get

 6  pedestrian impacts recorded on the air bag control

 7  modules.

 8      Q.    Why is that?

 9      A.    The weight disparity between the vehicle and

10  the pedestrian is such that the vehicle does not change

11  as much speed as the pedestrian does, especially when you

12  have offset collisions, like this particular one where it

13  is just the mass of the pedestrian's head versus the

14  vehicle versus the entire mass of the body versus the

15  vehicle.  So the likelihood of having that impact the

16  momentum of the Ford is even less.

17      Q.    Okay.  Can -- in your experience, are ACM

18  events normally triggered by hitting another object,

19  braking, or a combination of the two?  Or is braking too

20  slow to trigger an ACM event?

21      A.    Braking is typically too slow.  Some of the

22  newer manufacturers are now having event-based triggers

23  like braking.  And certainly, braking can be picked up on

24  the sensors during a collision, but typically, they don't

25  trigger an event.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

1      Q.    So on the Ford Explorer's ACM, did it pick up

2  a braking event?

3      A.    That generation does not pick up braking

4  events.  It doesn't trigger based on the braking events.

5      Q.    Okay, okay.  And you have reviewed the photos

6  from the scene taken by the Texas Department of Safety

7  Troopers, right?

8      A.    Yes.

9      Q.    Okay.  And you've reviewed Caylee's cell

10  phone records?

11      A.    Yeah.

12      Q.    When I say "records," I mean the download of

13  her personal iPhone, right?

14      A.    Mm-hmm, yes.

15      Q.    You've not reviewed any other cell phone

16  records of hers, have you?

17      A.    There were some exhibits with screenshots of

18  her texts.  But the -- I think it's Cellebrite --

19      Q.    Yes.

20      A.    -- published the report for her cell phone

21  records.

22      Q.    But nothing, like, from a carrier, like, from

23  AT&T or something directly like that, right?

24      A.    No.  I think it was all from Cellebrite.

25      Q.    Okay, okay.  What else did you review, if you



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000177

 1  remember?

 2          A.    Regarding cell phone?

 3          Q.    Oh, sorry.  Just evidence in this case,

 4  which, you know, strike that.  That's too broad, and I

 5  guess it would be a wild goose chase.

 6                You cited the Aperture report dated July 10,

 7  2023.  Do you recall reviewing that?

 8          A.    Was that the one that discussed the lack of

 9  data on the Ford?

10          Q.    I'm not sure, right?

11                Do you know if you included that in the file

12  that you've provided me?

13          A.    If it was part of my file, it would be in the

14  file that I provided you.

15          Q.    So let's see.  Would that be in the expert --

16  or excuse me, in the Materials Received folder?

17          A.    Yes, somewhere in there.

18          Q.    Okay.  Can you tell me where in there?

19          A.    Okay.  So I think this is the report you're

20  referring to from Aperture, July 10, 2023.

21          Q.    But you tell me.  Like, just tell me where

22  it's at in this file that you provided me.

23          A.    This is located with the Toyota download

24  data.  So it would be under Materials Received, Download

25  Data, Toyota Camry, and there's a file titled Toyota



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

App. 000178

1  Report.

2      Q.    Okay.  Very good, very good.  Thank you.

3            So would you agree that the quality of your

4  accident reconstruction in this case would have been

5  improved if you were able to get on scene to the crash as

6  soon as possible after the crash occurred?

7      A.    No, I disagree with that.  The photogrammetry

8  process provided me accuracies within a quarter of an

9  inch, which is going to be within the general accuracies

10 of drone mapping, laser scanning.  You know, at the end

11 of the day, the analysis I do typically has a range of

12 even plus or minus a couple feet, because these distances

13 aren't that sensitive.  So we're actually using quite

14 high tech equipment to measure things that we don't need

15 that much accuracy on.

16           So no, I don't think the quality would have

17 been better.  I think the quality of my reconstruction is

18 consistent with the quality that I would expect if I was

19 out there myself.

20     Q.    Okay.  Do you ever get called personally to

21 go to crash scenes?

22     A.    I do.

23     Q.    Recently?

24     A.    Yes.

25     Q.    Like, how -- how close in time do you



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000179

 1  normally go to a crash scene?

 2       A.    So we call it quick response.  We are

 3  typically called by the insurance company or the

 4  retaining counsel for the insurance company, sometimes

 5  quick enough to get to the scene while the vehicles are

 6  still on scene before they're towed.  It varies; it comes

 7  in waves.  I would say I get a handful of those a year.

 8       Q.    Okay.  Do you think that's overkill when they

 9  do that, since you can do a lot of this with photographs?

10       A.    It depends on who is documenting.  If nobody

11  takes pictures, then yes, it is helpful for me to be on

12  the scene.  If the police are doing a thorough

13  documentation with photographs, it's obviously not

14  necessary.  As long as somebody documents

15  photographically, that is sufficient.

16       Q.    Okay.  What sort of resolution on the

17  photographs do you need to conduct accurate

18  photogrammetry?

19       A.    Well, again, it's going to base -- or I'm

20  sorry.  It's going to depend on the photographic quality

21  itself.  I don't have a standard that needs to be met for

22  the photographs in their quality versus just generally

23  documenting the evidence.  And what I can do is then

24  calculate the resolution or the accuracy of that data

25  once I start performing that photogrammetry process.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

App. 000180

1            So in this particular case, like I said, it

2   was -- at worst, plus or minus a quarter of an inch was

3   the worst accuracy I had on the worst point.  Everything

4   falls within that "plus or minus quarter of an inch"

5   resolution based on the photos that I've been provided in

6   this particular case.

7        Q.   So we talked earlier about photogrammetry

8   basically being this analysis of photos to figure out

9   distances.  And I think I understand your testimony

10  earlier that you need -- you need something that you're

11  sure about.  You need a distance or -- that you -- in the

12  photos that you are 100 percent or close enough sure

13  about; is that right?

14       A.   Yes.  You need known 3-dimensional points.

15       Q.   Okay.  What were the known 3-dimensional

16  points you used in your photogrammetry analysis in this

17  case?

18       A.   So CAC performed a drone mapping of the

19  scene.  I personally took those photographs and processed

20  them in Pix4D to generate a scaled orthomosaic in

21  3-dimensional point cloud.  It is the standard for

22  collecting scene evidence with drones.  That is how we

23  document our scenes now is drones.

24            We use the series of photographs collected,

25  and essentially stitches each pixel together from



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

App. 000181

1   subsequent photos and establishes 3-dimensional points of

2   those photos.  The same process of photogrammetry, but

3   millions of times, using every pixel instead of chosen

4   points.

5            So it's called photo scanning because it uses

6   more than just points.  Again, another heavily-validated,

7   peer-reviewed, well-established methodology that we've

8   been using for decades in the industry.

9            And so I use their drone photographs to

10  create my own 3-dimensional diagram of the scene, and was

11  able to use the roadway features that were permanent,

12  like lane lines and roadway cracks and raised pavement

13  markers, barrier wall cracks, anything that I could see

14  between the two and correlate the 3D point for my model

15  and establish that 3D point in the photograph.

16      Q.    When was the drone mapping conducted at the

17  scene?

18      A.    I believe that was the six months after, and

19  I independently validated that there were no changes to

20  the roadway within those six months based on historical

21  documentation and aerial imagery, flyover imagery, and

22  Google Street View imagery.

23      Q.    Now, so how -- do you have to put the

24  photogrammetry of te Toyota that was taken, or those

25  photos that were taken at the scene and at the tow yard,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000182

 1  wherever that was, and put them together with the scene

 2  map that you made of the crash scene to figure out where

 3  the Toyota was on the road?

 4      A.    Just to simplify it, no.  It wasn't needing

 5  to put the Toyota together.  It was a photogrammetry

 6  analysis of the scene that established the 3D points of

 7  the Toyota in the scene.

 8      Q.    Okay.

 9      A.    And then, obviously, I can place a 3D model

10  on top of those points from a diagram.

11      Q.    Yeah.

12      A.    But the position of the Toyota was

13  established from all of the photographs taken on scene.

14      Q.    So specifically, what were the fixed points

15  that you used to validate your 3D model?

16      A.    That is going to be quite an extensive

17  response.  I'm happy to go through it.  There are a lot

18  of points.  We can go through it one by one.  After this

19  question, can we take a lunch break though?  Because this

20  will be a long answer.

21      Q.    Well, I guess, is the answer to that question

22  recorded somewhere in your report that --

23      A.    Yes --

24      Q.    -- we can -- rather than have you give an --

25      A.    -- there is.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      Q.    -- extensive answer.

2            So where is that in your report?

3      A.    Page 69, Figure 99, through Page 76,

4   Figure 113.  And then in addition to that, I have the

5   full PDF report outlining all of the 3-dimensional

6   points, the X, Y, and Z coordinates, of all of those

7   points that were used and are visible in these

8   photographs.

9      Q.    So I guess -- and just, you know, glancing

10  through the figures that you just identified, I want to

11  make sure:  Are these figures identifying the fixed

12  points that were then used to create the model, or are

13  these figures identifying measurements based on the 3D

14  model?

15     A.    Both.

16     Q.    Okay.  So I guess my question is, Which of

17  these fixed points were unchanged since the accident, the

18  drone picked them up, and then they were used to generate

19  the 3D model?

20     A.    So starting with Figure 98, what I used was

21  the road lines, the raised pavement markers; and in this

22  particular case, this roadway was sectioned in squares,

23  and so I was able to use the seams of the roadway, the

24  intersections of those seams as known 3-dimensional

25  points in addition to the rumble strips on the shoulder.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000184

 1          So I had a lot of really good reference

 2   points.  Normally, we just have road lines like the skip

 3   lines and the raised pavement markers.  This one, I had

 4   the road lines plus all of these cracks and seams in

 5   between, which was more than I usually have.

 6          Q.    So to measure all of this, is that what the

 7   drone did?  It's, like, the drone measures the distance

 8   between road lines and rumble strips, and that's how you

 9   can then apply that to these photos and then create the

10   3D model?

11          A.    Yeah.  Essentially, the drone takes enough

12   photos overhead to establish a 3D model of the scene

13   where every pixel is now a 3-dimensional point.  And so I

14   then look at that 3-dimensional point of a crack from the

15   drone scanning and import that into a photogrammetry

16   software enough times on that photo where eventually the

17   camera can be fixed in space, and then I can reverse

18   engineer the unknowns from that photo.

19          Q.    Okay, okay.  What's the photogrammetry

20   software that you use?

21          A.    PhotoModeler.

22          Q.    Okay.  Is that the one you typically use?

23          A.    That's -- there are a couple of others, but

24   yeah, we have PhotoModeler, so that's what we extensively

25   use.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000185

1      Q.    Okay.  Is that widely used in your

2  profession?

3      A.    Probably the most popular, I would say.

4      Q.    Okay.  So would you agree that a scene is a

5  little bit like a puzzle?

6      A.    I would say that accident reconstruction is

7  like a puzzle, yeah.  We're putting puzzle pieces on a

8  puzzle board, and you can say the scene is this puzzle

9  board, and we try to put enough pieces on the puzzle

10  board to try to paint a picture of what happened.

11      Q.    Okay.  So have you spoken to any of the

12  individuals that inspected the Ford Explorer or the

13  Toyota Camry?

14      A.    No.  I'm just relying on the photographs and

15  documentation.

16      Q.    Okay.  Have you relied on any interviews with

17  anyone that you or someone at Focus Forensics took to

18  generate this report?

19      A.    No.

20      Q.    Okay.  So let's go to Page 6 of your report.

21  So on Page 6, you described the immediate approach to the

22  crash, right?  And you can use a paper copy if it's

23  faster.  Either way is fine.

24      A.    What line are you on?

25      Q.    So let's go down to the last paragraph on



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000186

```
 1  Page 6.

 2       A.    Okay.

 3       Q.    Okay.  So you say that -- well, I guess, can

 4  we agree that Caylee was northbound on Interstate 45 on

 5  April 30, 2022, right?

 6       A.    Yes.

 7       Q.    Okay.  So you said that Northbound Interstate

 8  45, in the area of the incident, was level and flat?

 9       A.    Yes.

10       Q.    Okay.  You said the northbound approach was

11  straight for approximately 0.33 miles prior to the

12  incident?

13       A.    Yes.

14       Q.    Okay.  So tell us about the curve on

15  Interstate 45 that Caylee went around before she impacted

16  Nehemias.

17       A.    Yeah.  It curved to the left by about 13

18  degrees over the course of .17 miles, and then it is in a

19  complete straightaway for that one-third of a mile, or

20  about 1,500 feet.

21       Q.    Okay.  And you provide a little more accuracy

22  later on in the report.  It's about 1,742 feet that it's

23  straight, right?

24       A.    No.  That's the unobstructed sight line to

25  the northbound travel.  It is perfectly straight for
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

App. 000187

 1  1,500 feet, but as you round the end of the curve, you

 2  can start seeing the northbound lane.

 3          Q.   Okay, okay.  Fair enough.

 4               So your car can still be turning left, right,

 5  but you can -- as a driver, you can look about 1,700 feet

 6  forward?

 7          A.   Yes.  The barrier wall was the physical

 8  obstruction that we're looking around.

 9          Q.   Okay.  Got it.

10               So you say the speed limit was 75 miles for

11  the area of the collision?

12          A.   Yes.

13          Q.   And how are you getting that?

14          A.   A speed limit sign.

15          Q.   Okay.  So are you aware of any county rules

16  where the incident occurred that would have lowered the

17  speed limit?

18          A.   Not that I've been provided.

19          Q.   Okay.  So you're just going off, what, the

20  speed limit sign that you saw?

21          A.   Yes.

22          Q.   Okay.  You agree it was clear and sunny on

23  April 30, 2022?

24          A.   Yes.

25          Q.   How did you reach that conclusion?



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000188

 1        A.    The weather reports for the nearest airport

 2   provided sun and weather data.  The body cam videos, the

 3   dashcam videos, and photographs provided environmental

 4   documentation shortly after the crash.

 5        Q.    And I saw you provided the azimuth of the

 6   sun.  So can you agree that the sun was not in

 7   Caylee Smith's eyes as she was going straight on

 8   Interstate 45 towards Nehemias?

 9        A.    Correct.  It was to the southwest, so it

10   would be behind her and to the left.

11        Q.    Okay.  So would that mean that, if you're

12   northbound on I-45 towards where the Toyota Camry was

13   stationed, the sun was shining on it?  It would -- you

14   would not have been looking at the sun and the Toyota

15   Camry?

16        A.    From the pedestrian's perspective?

17        Q.    Sorry, yeah.  That's a bad question.

18              From the perspective of Caylee Smith

19   approaching the Toyota Camry, she would have seen the

20   Toyota Camry and not seen the sun at the same time?

21        A.    Correct.

22        Q.    Okay.  Any reason to think the sun was not

23   illuminating the Toyota Camry or any of the pedestrians

24   around it?

25        A.    No.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000189

1      Q.    Okay.  So we agree that weather and glare

2  were not contributing factors to this crash?

3      A.    I agree.

4      Q.    Okay.  So 1,742 feet, that's the unobstructed

5  sight line, right?

6      A.    Yes.

7      Q.    What is that, about a third of a mile, a

8  little over?

9      A.    It's over a third, because a third is

10 1,500 feet.

11     Q.    Okay.  So you testified, or you included in

12 your report on Page 7, first paragraph, that from the

13 beginning of the unobstructed sight line, if Caylee had

14 been going the speed limit of 75 miles an hour, how long

15 would it have taken her to get to the crash site?

16     A.    16 seconds, approximately.

17     Q.    Okay.  And I think your report tells us how

18 long, as she comes into that uninhibited sight line, she

19 would have had to get to the crash site if she was going

20 90 miles an hour?

21     A.    Yes.  13 seconds, approximately.

22     Q.    Okay.  So the difference between going the

23 speed limit and going 90 miles an hour as far as time to

24 see the accident or to get to the scene is three seconds?

25     A.    Over that distance, yes.



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

App. 000190

1      Q.    Over that distance.  Okay.

2           So can we agree that as Caylee Smith came

3  around the curve, she had at least 13 seconds to spot

4  Nehemias Santos and the Camry?

5      A.    So I can't actually tell you what she saw or

6  what she could see.  All I can tell you is what was

7  available based on an unpopulated environment.  I don't

8  know.  Nobody knows what the traffic conditions were.  So

9  I don't know how close she was behind a vehicle in front

10 of her; I don't know the status of that vehicle, whether

11 it was a car, a truck, a box truck, a tractor-trailer.

12 All I can say is an unpopulated value would give these

13 values.  I can't say what she actually was provided,

14 because I can't replicate the traffic.

15     Q.    Okay.  Fair enough.  Right.

16          Do you have any evidence that indicates to

17 you what the traffic was like?  Was it heavy, medium,

18 light?

19     A.    I try to avoid subjective terms like that.  I

20 know, certainly, the testimony has varying levels of

21 opinion of what the traffic was like.  Everyone's opinion

22 is going to be different on what "heavy" is and what

23 "light" is.  All I can reference is the photographs, the

24 body cam videos to give a good idea of the backup of

25 traffic.  There was traffic, and that's -- I'm going to



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

1  stay objective on that.  I can't really quantify the

2  traffic.

3       Q.   Okay.  Are there any objective measurements

4  of traffic flow that you're aware of?

5       A.   Annual values, yes, average annual values,

6  but not a specific time frame that we are looking at.

7       Q.   So are there any -- in your line of work, are

8  there any descriptions about, like, how many cars are

9  traveling past a certain point in a certain amount of

10 time, like, in an hour or a minute?  Are those figures

11 that are normal in your profession?

12      A.   Yes.  Like I said, the average annual traffic

13 counts.  Those are basically just an overall average, an

14 annual average of traffic in that area.

15      Q.   Are there any metrics that are more pointed

16 in time, like in an hour or in a day or anything like

17 that?

18      A.   Not unless there's, like, a specific traffic

19 study that was requested.  I'm not aware of any specific

20 level of data that gives you that level of precision.

21      Q.   Okay.  Fair enough.

22      A.   Can we -- can we stop for lunch?

23           MR. WHITE:  Sounds good to me.

24           MR. DUBOFF:  Yeah.

25           THE VIDEOGRAPHER:  The time is 12:18 p.m.  We



MILESTONE **|** REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000192

```
 1        are off record.
 2              (Break was taken from 12:18 p.m. to
 3        12:58 p.m.)
 4              THE VIDEOGRAPHER:  The time is 12:58 p.m.  We
 5        are on record.
 6  BY MR. WHITE:
 7        Q.   Okay.  This is Jacob White.  We just took a
 8  little lunch break.  So we're coming back on the record.
 9              I think we were talking about the line of
10  sight that Caylee had as she was approaching the Toyota
11  Camry.  Sound right to you?
12        A.   Yes.
13        Q.   Okay.  Now, you are not offering an opinion
14  about whether Caylee should have seen Nehemias or the
15  Camry as she came around the curve, right?
16        A.   I don't think I can as worded.  I don't know
17  if she could.  What I can say is what fixed environmental
18  objects there were that would have prevented her and the
19  timing of that obstruction.  But I can't say anything
20  other than that, because I don't know what traffic was
21  like.
22        Q.   Okay.  So just to put a point on it, as -- as
23  she came around the curve at a point 1,742 feet south on
24  the road, that's when -- assuming no other obstacles, all
25  the fixed obstacles had been removed between her and the
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000193

1  Toyota Camry?

2       A.    You got it.

3       Q.    Okay, perfect.

4            Now, are you aware of any evidence -- I think

5  you already answered this, but just let me get this

6  straight.  Are you aware of any evidence that Caylee

7  could not have seen the Toyota Camry as she came around

8  the curve other than the fixed median barrier?

9       A.    And other than potential traffic, I'm not

10 aware of anything else.

11      Q.    Okay.  But you don't know about the traffic.

12 Like you said, like, that's just an unknown for you?

13      A.    Correct.

14      Q.    It's possible that there was traffic between

15 her and the Toyota Camry; you do not know?

16      A.    Correct.

17      Q.    Okay.  So you can agree that Caylee had the

18 capacity to see the Toyota Camry, 1,700 feet -- for

19 1,742 feet away from the Toyota Camry?

20      A.    It's possible.

21      Q.    Well, it's possible that -- I'm asking, Did

22 she have the capacity, not whether or not she did.

23      A.    To me, "capacity" means that there was no

24 traffic, so I can't answer that.

25      Q.    Okay.  So, well, assuming there was no



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000194

1  traffic, right -- which maybe, maybe not.  If there was

2  no traffic, she would have seen the Toyota Camry 1,400 --

3  1,742 feet down the road?

4       A.    I agree.  If there's no traffic, it was there

5  to be seen, albeit rather small in your field of view,

6  because 1,700 feet is very far away.  But yes.

7       Q.    Okay, okay.  So do you agree that the Toyota

8  Camry was conspicuous to oncoming drivers?

9       A.    Depending on traffic.

10      Q.    Okay.  So if there was no traffic, was the

11  Toyota Camry conspicuous to oncoming -- or to

12  Caylee Smith?

13      A.    Yes.

14      Q.    Okay.  Why do you say that it was

15  conspicuous?

16      A.    Because it was there to be seen.

17      Q.    Okay.  So is there any factors about the

18  Toyota Camry that made it more conspicuous than any other

19  objects on the road?

20      A.    I don't know if I understand that question.

21      Q.    Okay.  So you said that it was conspicuous

22  because it was there to be seen, right?

23      A.    Right.

24      Q.    So did you study the conspicuity of the

25  Toyota Camry?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000195

1    A.    Conspicuity is really only a factor for

2  nighttime detection.  That's not really a variable we

3  analyze in the daytime analysis.

4    Q.    Okay.  So how do you analyze in a daytime

5  analysis whether or not an object in the roadway is

6  easily seen by oncoming traffic or hard to see?

7    A.    It depends on the factors of the case.  So

8  visibility is not the critical variable that we're

9  analyzing here.  It is identification of an imminent

10 hazard.  So visibility has no bearing on the analysis of

11 avoidability.  It's when did the hazard become imminent?

12   Q.    Okay.  And your testimony, I believe, earlier

13 was that it's your expert opinion that the Toyota Camry

14 by itself was never an imminent hazard, right?

15   A.    Correct.  It was a potential hazard, is what

16 the literature references it as, which does require some

17 form of input but not an emergency input.

18   Q.    So where in your report did you differentiate

19 between potential hazards and imminent hazards?

20   A.    Well, these aren't necessarily things I was

21 planning on bringing forth, but you've certainly been

22 asking a lot of questions about it, which I have the

23 expertise to answer.  So I've been answering your

24 questions.

25   Q.    Sure, sure.  Would you -- if you had the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1   opportunity, would you like to amend your report to
 2   include those conclusions?
 3        A.    I guess it depends on the issues at hand.  If
 4   the opposing expert is going to opine differently than
 5   that, then yes, I will need to amend my report to rebut
 6   his or her opinions.  At this point, I didn't know if
 7   this was going to even be an issue or not.
 8        Q.    Okay.  So do you agree, based on your view of
 9   the evidence, that the Toyota Camry was black?
10        A.    Yes.
11        Q.    Okay.  And the roadway was, I'm going to say,
12   light-colored?
13        A.    Sure.
14        Q.    Is that fair?
15        A.    Sure.
16        Q.    Okay.  The median was light-colored?
17        A.    Yeah.
18        Q.    Okay.  The median barrier was light-colored?
19        A.    Right.
20        Q.    And then on the right-hand side of the road
21   was a grassy ditch, right?
22        A.    Right.
23        Q.    Not dark-colored, right?
24        A.    Right.
25        Q.    Okay.  So can we agree that, on approach from
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000197

 1  Caylee Smith's perspective, the trunk of the Toyota Camry

 2  was open?

 3       A.    It was.

 4       Q.    Okay.  And now, I think we all agree that it

 5  was, but, like, technically, we don't know, right?

 6       A.    I believe there was body fluid inside the

 7  trunk lid --

 8       Q.    Okay.

 9       A.    -- which would indicate it was open at the

10  time.

11       Q.    Fair enough, fair enough.

12             Do you know if the emergency flashers were

13  on?

14       A.    I know they were on in the body camera

15  videos, so I think it's safe to say that they were on at

16  the time of the impact.

17       Q.    Okay.  Do you know how many pedestrians were

18  around the Toyota Camry as Caylee Smith approached?

19       A.    It's either two to five depending on who you

20  believe.

21       Q.    Okay.  So if it was just two, it was

22  Nehemias Santos and Evelyn Moreno, right?

23       A.    Yes.

24       Q.    And if you believe Evelyn Moreno and

25  Erick Santos, it was all five of the passengers in the



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000198

1  car?

2      A.    Correct.

3      Q.    Okay.  So do you agree that a reasonably

4  prudent driver would have vacated the leftmost lane or

5  slowed down after they saw the Toyota Camry?

6      A.    Not based on the literature.  In part, I do

7  want to say a reasonable driver does slow down.  We know

8  that Caylee slowed down.  She slowed down and moved over

9  to her right.  That is what the literature shows the

10 average driver does.

11     Q.    So does the literature tell us when someone

12 would slow down and move to the right if they saw a

13 hazard in their lane?

14     A.    They indicate 1 to 3 miles per hour of speed

15 loss from a reduction of accelerator pedal application,

16 which, on a timeline, is actually after Caylee started

17 reducing her speed.  So Caylee started reducing her speed

18 first, before, or quicker than the average.

19     Q.    So does the -- does the literature indicate

20 how far away from the hazard or how soon after the hazard

21 gets identified that someone would reduce their speed and

22 move to the right?

23     A.    I'd have to double-check that in the form of

24 distance.  But again, we can figure that out from speed

25 loss and the magnitude of the speed loss.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000199

1    Q.    Okay.  So do you have an opinion of, as far

2  as the literature goes, when most drivers, how far away

3  they are from a hazard when they, you know, get over to

4  the right and start slowing down?

5    A.    Well, it's going to depend on their original

6  speed.  So I don't think there's a standard I can answer

7  that with, because it's going to be based on the original

8  speed of travel.  What I can say on a time and speed

9  standpoint, 1 to 3 miles an hour has been the speed

10  reduction; Caylee reduced her speed by at least four.  So

11  she started reducing her speed sooner, and she reduced

12  her speed more than the average driver.

13    Q.    So you say, "She started reducing her speed

14  sooner."  What do you mean by that?

15    A.    Well, she indicated that she just let go of

16  the gas, and that is the typical response that we see in

17  the literature is releasing the gas.  So the deceleration

18  rate's going to be very similar, which is releasing the

19  gas pedal with no brake application.

20    Q.    Can you tell from the infotainment module

21  whether she took her foot off the gas before she hit

22  Nehemias or as she's in the process of hitting Nehemias?

23    A.    100 percent before.

24    Q.    Okay.  How far before?

25    A.    Let me get that distance for you.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000200

1  Approximately 250 feet away.

2      Q.    Okay.  So what -- what data are you looking

3  at to conclude that she was 250 feet away from hitting

4  Nehemias Santos when she began to slow down?

5      A.    This is looking at the track point data,

6  which gives us data every one second.  And in my

7  engineering calculations, I calculate the distance

8  traveled between those points based on the speed values

9  reported.

10     Q.    So looking at the track log, at what

11  second -- now, you say this in your report, so this isn't

12  a trick question.  But at what second do you believe the

13  collision occurred?

14     A.    The time stamp that I have here is sometime

15  between 2:48:51 and 2:48:52.

16     Q.    Okay.  So when you're calculating the

17  reduction in speed, are you looking at her speed -- well,

18  tell me at what point you see her speed begin to decrease

19  on the track log seconds.

20     A.    250 feet away.

21     Q.    Okay.  What second is that in the track log?

22     A.    2:48:50.

23     Q.    Okay.  So at -- you're saying at 2:48:50 is

24  when she begins to start slowing down?

25     A.    Yes.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

```
 1        Q.    What is her speed at 2:48:50?

 2        A.    90 miles per hour.

 3        Q.    Okay.  And that's kind of a rounding, right?

 4  Or is it precisely 90 miles an hour?

 5        A.    It's pretty spot-on to 90, yes.

 6        Q.    Okay.  All right, yeah, it's 89.97.

 7              So again, the next second, what is her speed,

 8  2:48:51?

 9        A.    87.

10        Q.    Okay, 87.

11              And so, then, what is her speed at the next

12  second, 2:48:52?

13        A.    82.

14        Q.    Well --

15        A.    83.

16        Q.    83, okay.

17              So between 2:51 and 2:52 -- strike that.

18              Between 2:48:51 and 2:48:52, do we know which

19  of those seconds the collision occurred at?  Or I know

20  your report says it's one of those two or between.

21        A.    Somewhere between.

22        Q.    Okay.  So you say that her speed began to

23  reduce two seconds before she collided with

24  Nehemias Santos, right?

25        A.    One and a half, yeah, about one and a half.
```



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000202

```
 1  It could be up to two.

 2        Q.    Okay.  So one and a half to two seconds

 3  before she collides is when she begins reducing her

 4  speed?

 5        A.    Right.

 6        Q.    Okay.  Can you tell from the evidence that

 7  you've got if the speed reduction is the result of taking

 8  a foot off the gas or tapping the brake?

 9        A.    Well, the subtleties between when you say

10  "tapping," it's consistent with a speed loss of letting

11  go of the gas.  Now, if she touched the brake, could be

12  consistent with that too.

13        Q.    Okay.

14        A.    But it's not consistent with hard brake

15  application.

16        Q.    Okay.  And you've reviewed the police report,

17  right?

18        A.    Yes.

19        Q.    And you agree that the police report says

20  there are no brake marks created by the Ford Explorer?

21        A.    I think that's what it says, yes.

22        Q.    Okay.  Did you see any brake marks created by

23  the Ford Explorer?

24        A.    No.

25        Q.    Okay.  So to the best of your knowledge,
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1  right, there's no affirmative evidence that Caylee

 2  applied the brakes in the two to three seconds before she

 3  hit Nehemias Santos, right?

 4      A.    Well, you don't necessarily have to have tire

 5  marks to apply the brakes, especially with modern ABS.

 6  We actually rarely see tire marks.

 7      Q.    Well, I'm not asking if it's possible she

 8  applied the brakes.  I'm asking, Do you see any evidence

 9  that affirmatively shows that she applied the brakes in

10  the two to three seconds before collision?

11      A.    Not one way or the other.  She certainly

12  could have; she may not have.

13      Q.    You just can't tell?

14      A.    No.  But it is consistent with a speed loss

15  rather greater than the average speed loss of the average

16  driver faced with this situation.

17      Q.    Okay.  So you think that she maybe did hit

18  her brakes?

19      A.    No, I never said that.  I said she reduced

20  her speed greater than the average driver does in this

21  particular situation.

22      Q.    So just to put a pin on it, you're saying

23  that the speed change from 90 miles an hour to somewhere

24  between 87 and 86 miles an hour, two seconds to one and a

25  half seconds before hitting a pedestrian, that's normal



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000204

1  for a reasonable driver?

2           MR. DUBOFF:  Objection to the form.

3      A.    The speed loss is what the typical driver

4  does to a roadside vehicle and pedestrian.

5      Q.    Okay.  When you say "a roadside pedestrian

6  and vehicle," are you talking about a vehicle stopped in

7  the lane?

8      A.    I am.

9      Q.    Okay.  Have you reviewed literature that

10 discusses driver reactions to vehicles stopped within the

11 lane?

12     A.     It's typically either entirely within the

13 lane or entirely out of the lane.  I'm not aware of any

14 studies that show 2 feet into the lane.  So the best I

15 can do is look at this as a vehicle parked on the

16 shoulder and look at what drivers typically respond to to

17 a vehicle parked on the shoulder.  Since this was mostly

18 on the shoulder, it's the closest we have to compare to.

19     Q.    So you didn't compare this situation to the

20 literature examining motor vehicle drivers reacting to a

21 vehicle parked entirely in the lane?

22     A.     No.  This is not anywhere near that type of

23 scenario.  That is a totally different visual stimulus,

24 totally different set of equations that factor in the

25 capability of drivers to appreciate relative closing



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

App. 000205

 1  speed.  The presence of the vehicle mostly on the

 2  shoulder gives the cue that this vehicle is slow or

 3  stopped, particularly with the pedestrians standing

 4  outside the vehicle and the trunk lid open.  If the

 5  vehicle was entirely in the lane, that would be a whole

 6  different ball game on a driver's ability to appreciate

 7  that it's traveling slow versus at normal highway speeds.

 8       Q.    Okay.  So how do drivers react when they see

 9  a vehicle stopped entirely in the lane?

10       A.    So just to be clear, that's not what we have.

11       Q.    That's fine, that's fine.

12       A.    But based on that, drivers' abilities to

13  avoid a vehicle on a highway -- a straight, flat level

14  segment of highway -- stopped in their travel lane is

15  virtually impossible to avoid.  The rate of closure,

16  anything greater than 45, 50 miles per hour of a closing

17  speed becomes rather difficult, if not impossible, to

18  avoid.

19            Because by the time the human eye can

20  appreciate the relative closing speed between them and

21  the vehicle ahead of them, it's too late to fix that

22  relative speed in the form of braking or steering.  So a

23  closing speed of 90 or even 70 or 75 would be unavoidable

24  entirely if the Toyota was stopped in the travel lane.

25       Q.    Okay.  So I mean, facts matter, right?  I



MILESTONE │ REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  mean, there could be things going on around the car; say

2  it was a police car or an emergency vehicle with its

3  lights on, right?

4       A.    Well, now you're talking a completely

5  different visual stimulus, yes.

6       Q.    Sure, sure.  So it depends on what's

7  happening at the scene to determine the visual stimulus

8  that oncoming drivers are reacting to?

9       A.    Right, and that's why I didn't model this as

10 a stock vehicle in the travel lane, because that's not

11 the visual stimulus we have here.

12      Q.    Okay.  So why is it just one option?  Like,

13 why model it as a car parked entirely on the shoulder or

14 a car parked entirely in the lane?  Like, why not model

15 it as a car parked 2 feet into the lane and however many

16 feet on the shoulder?

17      A.    As far as I'm aware of, there are no human

18 factor studies that divide the two.  It's studies that

19 show what drivers do when a vehicle is parked on the

20 shoulder and studies that show what drivers do when a

21 vehicle is stopped in an active travel lane.  In this

22 particular case, there was enough context to visually

23 indicate that this vehicle was stopped on the shoulder.

24 There was no question about that.

25      Q.    Okay.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

1      A.    So the modeling of this visual stimulus as a

2   vehicle parked on the shoulder is entirely consistent

3   with that literature.  There is no question of "valid."

4      Q.    So in your view, the literature leads you to

5   believe that an oncoming driver would have seen the

6   Toyota and understood that it was stopped?

7      A.    Yes.

8      Q.    Okay.  There wouldn't have been this

9   phenomenon of, "Is it stopped or isn't it?" in closing

10  too fast?

11     A.    No.

12     Q.    Okay.  So can you agree that if a driver saw

13  a vehicle partially in the lane of travel on an

14  interstate highway that a reasonable driver would pay

15  attention to that vehicle and evaluate its risk?

16     A.    I can't talk about what a reasonable driver

17  would do.  Again, all I can tell you is what the studies

18  show the average driver does and let the jury decide

19  what's reasonable.  And what I can tell you is the

20  studies show that the average driver simply shifts over

21  in their lane.

22     Q.    Okay.  And they do that why, according to the

23  studies?

24     A.    I don't know if the studies particularly say

25  why.  But obviously, I think the assumption is to provide



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          Toll Free 855-MYDEPOS

App. 000208

300977 Montalbano Paul  J. 01-04-2024 - VOL. I          Page 114

1    additional space.

2         Q.    Okay.  So did you -- I think we talked about

3    this earlier.  Did you calculate whether Caylee had

4    sufficient time to brake to avoid the Toyota Camry?

5         A.    So that is a calculation we can't do, because

6    we don't know when the stimulus started as far as the

7    pedestrian bending over into her travel lane.  She had

8    already responded to the car.

9         Q.    So let me just ask a very specific question:

10   You believe she did have time to brake to avoid hitting

11   the Toyota, right?

12            MR. DUBOFF:  Objection to the form.

13        A.    I don't agree that braking would be a good

14   avoidance option, because now you're creating hazards for

15   traffic behind you.  The Solomon curves indicate that if

16   you go slow on a highway, your crash risk exponentially

17   increases.  So you certainly want to reserve braking for

18   absolutely necessary circumstances.

19        Q.    Fair enough.

20        A.    So that is not a good avoidance option.

21        Q.    Fair enough.

22            I'm asking, Was it an avoidance option that

23   she could have utilized, given the amount of time that

24   she had approaching the Toyota Camry?

25            MR. DUBOFF:  Objection to the form.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000209

```
 1       A.   It is not an appropriate response.  It would

 2  have likely resulted in possibly some other conflicts.

 3  And the average driver would not apply the brakes to

 4  something that is not an imminent hazard.  Again, we

 5  don't lock up our brakes and then say, "Oops, I guess I

 6  didn't need to lock up my brakes."  We reserve it for

 7  absolutely necessary hazards.  Locking up the brakes for

 8  a car 2 feet into your travel lane is not a viable

 9  option.

10            MR. WHITE:  So I'm going to object to the

11       nonresponsive form of the answer.

12       Q.   My question is whether or not she had time to

13  apply the brakes as she approached the Toyota Camry.

14            MR. DUBOFF:  Objection to the form.

15       A.   So the Toyota Camry was never an imminent

16  hazard; it was a potential hazard.  So that calculation

17  cannot be done, because perception response times and

18  braking distances apply to imminent hazards.  So you're

19  asking me to completely disregard the instructions of

20  human factors, which is only applied in the literature to

21  imminent hazards.  I would be violating the first rule of

22  human factors analyses in applying an imminent emergency

23  response to a potential hazard.  That is not appropriate.

24       Q.   So you won't tell me whether or not she had

25  time to apply the brakes as she approached the Toyota
```



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000210

 1  Camry?

 2          MR. DUBOFF:  Objection to the form.

 3      A.    What I'm telling you is nothing indicated to

 4  her that she needed to slam on the brakes.

 5      Q.    I didn't ask about slamming on the brakes.  I

 6  asked, Are you refusing to tell me whether or not she

 7  could have applied her brakes as she approached the

 8  Toyota Camry?

 9      A.    Well, everybody is capable of applying

10  brakes.  But the question is, Was there any visual

11  stimulus that would require a driver to do so?  So the

12  question you're asking is irrelevant of the facts of the

13  case.  Can you apply brakes?  Yeah, you can apply brakes

14  anytime you want.

15      Q.    Could she have -- did she have time to apply

16  her brakes to reduce her speed as she approached the

17  Toyota Camry?

18      A.    Again, the time has to be relative to the

19  imminent hazard.  You're asking me to measure something

20  that doesn't exist.

21      Q.    Okay.  I'm asking you, After she saw the

22  Toyota Camry, did she have time to apply the brakes to

23  reduce her speed?

24      A.    I don't know when she saw the Camry.

25      Q.    Okay.  You saw that she -- you've read her



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000211

```
 1  deposition, right?

 2       A.    Yes.

 3       Q.    What do you understand her testimony is about

 4  when she saw the Toyota Camry?

 5       A.    I don't know.

 6       Q.    So you don't remember?

 7       A.    She can't give a distance, and that's what I

 8  would need is a distance.

 9       Q.    So tell me if what I'm about to tell you is

10  inconsistent with what you understand.  You agree that

11  she testified that she sent a text message to Gracie

12  saying the tattoo shop didn't do walk-ins?

13       A.    Yes.

14       Q.    And your opinion is she sent that text

15  message eight to nine seconds before the collision

16  occurred?

17       A.    Yes.

18       Q.    And you agree that her testimony is that she

19  then looked up, saw the Toyota Camry in the road?

20       A.    Yes.

21       Q.    Okay.  And as a result, her testimony is that

22  she adjusted rightward while remaining in the leftmost

23  lane?

24       A.    Right.  She responded to the Toyota.

25       Q.    Okay.  So my question is, when -- sorry.  You
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000212

1   understand that her testimony is, then, that she looked

2   at her GPS as she was approaching the Camry?

3        A.   Yes.  She understood that her corrective

4   action was complete; there was no more risk or no more --

5   I don't want to say "risk."  There was no more required

6   response, because she implemented her response to the

7   potential hazard.  She looked at her GPS, then another

8   hazard unfolded in front of her.

9        Q.   So in the eight to nine seconds after she

10  sent the text message to Gracie, was that enough time for

11  Caylee to apply her brakes?

12            MR. DUBOFF:  Objection to the form.

13       A.   Again, you can certainly apply your brakes

14  anytime you want.  The question is, What is going to tell

15  you to do so?  And the average driver would not be

16  provoked to apply the brakes at that point, again,

17  because the literature says drivers don't respond until

18  the threat is imminent and certain.

19            And applying the brakes at that point would

20  increase the risk of additional conflicts, because now

21  you're creating a speed differential on a highway, the

22  exact same thing the Toyota created, was this drastic

23  speed difference between travel speed, traffic, and their

24  parked position on the shoulder.

25       Q.   Do you know the relative speed of Caylee and



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

1  any other vehicles that were traveling on the roadway

2  that day, other than the Toyota Camry?

3       A.    The testimony said just typical speed of

4  travel.

5       Q.    Okay.  What was the speed limit?

6       A.    75.

7       Q.    Okay.  And Caylee was going how fast on

8  approach?

9       A.    90.

10      Q.    Okay.  So do you know what an advanced

11  warning area is?

12      A.    You need to be more specific.  That's a

13  pretty broad term.

14      Q.    Do you know how the Federal Department of

15  Transportation defines an advanced warning area?

16      A.    Are we talking maintenance of traffic

17  signage?

18      Q.    Yes.

19      A.    As far as construction zones?

20      Q.    Construction zones or any lane closure.

21      A.    Yes.

22      Q.    Okay.  What is an advanced warning area?

23      A.    It's signage that indicates that there is

24  some -- something ahead that's going to either require

25  additional attention or your response in the form of a



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000214

1  lane change or speed reduction if there's a speed

2  reduction sign.

3       Q.   So I know we talked earlier about how traffic

4  maintenance kind of starts going out of your area of

5  expertise, correct?

6       A.   Correct.

7       Q.   But do you know what the Department of

8  Transportation recommends as the minimum distance at

9  which a driver should be warned of an upcoming hazard on

10 an interstate highway?

11      A.   I know I have read it, but that involves

12 significant safety factors.  And as far as work zones go,

13 that has no relevancy to this case, so I haven't made

14 that comparison because it has nothing to do with this

15 case.

16      Q.   Well, undoubtedly, there's a bunch of detail,

17 you know, on additional warnings.  But do you know the

18 minimum warning that the Department of Transportation

19 says must be given to a driver if there's a hazard on the

20 road ahead?

21      A.   Define "hazard."

22      Q.   Some sort of obstruction like a lane closure

23 or repairs being made.

24      A.   Yeah, that is a whole different ball game.  I

25 don't know the definite number.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000215

1        Q.    Okay.  If it's -- if I told you it's at least

2    1,000 feet, does that sound wrong to you?

3        A.    No.  I know it's in the order of fractions of

4    a mile, maybe, if not more, up to a mile.  But again,

5    we're talking apples and oranges here.  This has no

6    bearing on this particular case.

7        Q.    So do you think 1,000 feet is sufficient for

8    a driver to become aware of an upcoming lane closure?

9        A.    If you provide enough clear information, yes.

10    The signs are designed to be very clear in their

11    instruction of what is occurring or what to do, typically

12    in the form of arrow boards telling you to get over.

13        Q.    So 1,000 feet of warning can be sufficient to

14    warn a driver of an upcoming hazard, right?

15        A.    If you give them enough information.  Looking

16    at a Toyota obstructing 2 feet of a travel lane

17    1,000 feet away is going to be so small in your field of

18    view that you're not going to appreciate how much of that

19    travel lane, if at all, they're obstructing.

20            Arrow boards are designed where you pass

21    arrow boards thousands of feet before the lane closure,

22    so you're physically passing the information.  The

23    information is bright, it is big, and it is clear.  It is

24    giving you an arrow telling you which direction to go and

25    which direction to change.  Signage tells you things.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900          www.MILESTONEREPORTING.com

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

Toll Free 855-MYDEPOS

App. 000216

1            The small field of view of a vehicle parked

2   on a shoulder with maybe a little bit into the travel

3   lane is not clear at 1,000 feet away.

4        Q.   Okay.  So now, are pedestrians clear at

5   1,000 feet away on an interstate highway?

6        A.   No.

7        Q.   You can't see pedestrians at 1,000 feet away?

8        A.   They're very small in the field of view.

9        Q.   Are emergency lights visible at 1,000 feet

10  away on an interstate highway?

11       A.   Yes, lights are designed to be visible from

12  great distances away.  They're big, and they typically

13  convey a message, an understandable message.

14       Q.   Well, what is the understandable message

15  conveyed by an emergency light on a normal passenger car?

16       A.   Oh, you're talking about the four-way

17  hazards?

18       Q.   Well, yeah, I'm not an expert.  I mean the

19  lights that come on when you press the red triangle on

20  your dashboard.

21       A.   It can mean many different things.  A lot of

22  drivers accidentally leave those hazard lights on while

23  they drive.  But I think in general, the general

24  understanding is that the vehicle is stopped or disabled.

25       Q.   Okay.  Well, would you agree or disagree with



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000217

300977 Montalbano Paul J. 01-04-2024 - VOL. I      Page 123

1  me when I say that they're designed to convey that

2  there's an emergency?

3       A.    No.

4       Q.    Okay.  You agree that emergency lights

5  convey, "Hey, there's an emergency"?

6       A.    What kind of emergency lights?

7       Q.    A passenger -- a car --

8       A.    No, I don't think --

9       Q.    -- emergency lights.

10      A.    -- they respond -- I don't think they're

11  saying "emergency."  They're hazard lights; they're

12  indicating a potential hazard.

13      Q.    Okay.  Now, like you said, you've reviewed

14  the infotainment module and cell phone records, correct?

15      A.    Yes, mm-mm.

16      Q.    So -- and you concluded that Caylee sent her

17  last text message to Gracie eight to nine seconds prior

18  to the collision, right, on Page 13 of your report?

19      A.    Yes.

20      Q.    So you also concluded that at that time she

21  sent that text message, how far away was she from impact?

22      A.    Over 1,000 feet.

23      Q.    You say specifically here, and can you just

24  say it for the record?  It's on Page 13 of your report.

25      A.    1,022 to 1,146 feet away.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000218

```
 1        Q.    And that depends on whether or not she sent

 2   the text message at eight seconds or nine seconds

 3   before --

 4        A.    Exactly.

 5        Q.    -- right?

 6              And we just don't know, right?

 7        A.    Somewhere in that range.

 8        Q.    Somewhere in that range, right.

 9              So -- and I take it you're getting -- you did

10   what I did, which is you lined up the time stamps on her

11   text messages with the time stamps on the track log,

12   right?

13        A.    Correct.

14        Q.    And the hours are different, right?

15        A.    There is a difference on when it's reporting

16   Central Daylight Time versus Central Standard Time, so

17   there's a factor of daylight savings time.

18        Q.    Okay.  But you concluded that the hour

19   differential was -- is irrelevant; that, in fact, those

20   time stamps should line up?

21        A.    Well, they do.  It's clearly indicating

22   Central Daylight versus Central Standard.  Those are

23   always an hour apart.

24        Q.    Okay.

25        A.    So it's just they report it in different
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000219

1  units, essentially.

2      Q.    Okay.  So you don't have a problem with

3  lining up the track logs from the infotainment center

4  with the time stamps from the cell phone records?

5      A.    Correct.

6      Q.    Okay.  So if she had 1,742 feet of

7  unobstructed sight line, how many of those feet did she

8  go before she sent the text message?

9      A.    It would be 1,700 minus the 1,022 to 1,146.

10      Q.    So rather than us whip out our calculators,

11  say it's approximately 700 feet?

12      A.    Yeah, sure.

13      Q.    Okay.  So just to get a clear record, the

14  difference between when she had an uninhibited sight line

15  to the Toyota Camry and when she sent the text message,

16  she had driven about 700 feet?

17      A.    True.  But again, the relative size of the

18  Camry at 700 -- 1,700 feet away is rather small.

19      Q.    Okay.  But you agree with that math

20  calculation that she used up about 700 feet of her

21  uninhibited sight line before she sent the text message?

22      A.    In the most simplest terms, yes, if you want

23  to take out the factor of visual size of the hazard.

24  It's much more complex than just a simple subtraction

25  calculation like we just did.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000220

1      Q.    Are you aware that Caylee Smith says,

2  sometimes, that Nehemias Santos suddenly appeared in

3  front of her vehicle?

4      A.    I know she used a couple different ways of

5  expressing that he suddenly breached her travel.

6      Q.    Okay.  Do you agree that, to a distracted

7  driver, an obstacle that has been in the roadway for a --

8  for a long period of time may seem to have suddenly

9  appeared once the driver notices the obstacle?

10     A.    Not in this case.  So Mr. Nehemias was within

11  the envelope of the Toyota for the time leading up to

12  impact.  Caylee had responded to that already.  He then

13  became a secondary hazard by breaching her travel path

14  and sticking his head outside of the envelope of the

15  Toyota.

16     Q.    Okay.

17     A.    So the timing of that is well within the

18  eight seconds, so your question has no application to

19  this case.

20     Q.    So I just want an answer to my question.  My

21  question is, Do you agree that, to a distracted driver,

22  an obstacle that's been in the roadway may seem to have

23  suddenly appeared when the driver finally notices the

24  obstacle?

25     A.    I can only answer to the facts of this case,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000221

 1  and that question does not apply to the facts of this

 2  case, so I can't answer that generally.  I'm here to

 3  apply the science to this particular case, and that

 4  doesn't apply.

 5      Q.    So you're not an expert on distracted

 6  driving?

 7      A.    What I'm saying is the way you worded that

 8  question doesn't apply to the facts of this case, so

 9  answering that question would be providing something

10  outside of the facts of this case.

11      Q.    Okay.  So you could answer that question, you

12  just don't think that's what happened in this case?

13      A.    It's not relevant to the facts of this case.

14      Q.    Okay.  So -- and we'll get into why you think

15  you know what happened.

16            But I'm asking, Do you think that a

17  distracted driver could think that an obstacle suddenly

18  appeared, even though the obstacle had been in their lane

19  of traffic?

20            MR. DUBOFF:  Objection to the form; calls for

21      speculation.

22      A.    The best answer I can give you is, It

23  depends.  I can't give you a blanket answer like that

24  because it doesn't apply to every scenario.  I have to --

25  I have to analyze each individual scenario individually,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000222

300977 Montalbano Paul  J. 01-04-2024 - VOL. I        Page 128

1  and that doesn't apply to every scenario.  So my answer

2  is, It depends.  It's not a yes-or-no answer.

3     Q.   Okay.  So it's possible that someone that's

4  distracted could think than an obstacle suddenly

5  appeared, even though it hadn't?

6     A.   It depends.

7     Q.   So is that a yes, it's possible?

8     A.   Sure, it's possible, based on the facts of

9  the case, sure.

10     Q.   Okay.  Is there any electronic data that

11  you've reviewed other than Caylee's testimony that proves

12  what she was doing in the driver's seat of the Ford

13  Explorer after she sent the text message to Gracie?

14     A.   I think I understand your question, which is,

15  Is there any physical or digital evidence that tells us

16  what she did after?  Well, we know she swerved, based on

17  the physical evidence, so we know she responded.  So

18  yeah, my answer is yes, the physical evidence indicates

19  that she responded in that time.

20     Q.   Okay.  So other than her speed and her

21  swerving, right, do we know what else she was doing in

22  the cab of the Ford Explorer after she sent the text

23  message?

24     A.   Other than responding to the hazard.

25     Q.   Okay.  So do you have -- do you see any



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000223

1  physical evidence or electronic data that indicates that

2  she checked her GPS after she sent the text message?

3      A.    No.  I don't think there's electronic data to

4  tell us where her eyes were looking.

5      Q.    Okay.  Is there any electronic data or

6  physical evidence you've reviewed that tells us whether

7  or not she was looking at her phone or dictating or

8  writing a text message after she sent a text message to

9  Gracie?

10     A.    No.  What I can say is she did respond in

11 those eight seconds.  So at some point, she did identify

12 the hazard.

13     Q.    Okay.  All right.  I just -- you know, I just

14 want to make sure I got the universe of your opinions

15 right, that you're not going to go to trial and say,

16 "Hey, I know she was actually, you know, looking at her

17 GPS as she approached the -- or after she sent the text

18 message."  You don't know that, right?

19     A.    She says she did.

20     Q.    She says she did.

21           But other than that, is there any other

22 corroborating evidence that you've reviewed?

23     A.    No.

24     Q.    Okay.  So is there -- all right.  Let's go to

25 Page 4.  So on Page 4, your second opinion is that,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000224

```
 1  quote, While a flat tire reduces the handling

 2  characteristics of a vehicle, it does not eliminate the

 3  ability to steer the vehicle off the roadway, as

 4  evidenced by Ms. Evelyn Moreno's ability to come to a

 5  controlled final rest on the left side of the roadway.

 6  Steering to the right was equally possible."

 7           I got that right?

 8      A.   Yes, sir.

 9      Q.   Very good.

10           So did you see the groove created in the

11  asphalt, presumably by the rim of the Toyota touching the

12  asphalt?

13      A.   Yeah.  I really saw it more as a flat tire

14  mark.  When a tire goes flat, the center of the tire

15  folds in, creating two outboard contact points of the

16  rubber, and which rubs and leaves that black outboard

17  marking on each side of the tire.

18           That tire mark, at least from where the

19  officers photographed it, started about centered, just to

20  the left of center of the left travel lane, which means

21  that at that point, which may or may not be the beginning

22  of the flat tire, the Toyota was hugging the right side

23  of the lane.

24      Q.   Okay.  So but you don't know if that's

25  because previously she'd been in the middle lane and she
```



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000225

```
1  was going into the left lane --

2       A.    Exactly.

3       Q.    -- or -- so you don't know, correct?

4       A.    I don't know.  But if she was in the left

5  lane, she was hugging the right side of the lane when the

6  flat tire happened.  Or if you believe the other

7  testimony that she indeed was in the middle lane and that

8  is just simply her changing lanes to the shoulder.

9       Q.    Okay.  So -- but it's just hard to tell from

10 that groove or that tire mark, right?

11      A.    I can't tell definitively.  But what I can

12 tell the jury is that at the start of that tire mark that

13 was photographed, she is on the right side of her lane.

14 So I'll let the jury decide what they want to take of

15 that, whether that is just simply her driving on the

16 right side of the left lane when the flat happens, or if

17 she actually did indeed make a lane change from the

18 center lane to the left lane to the left median.

19      Q.    Okay.  Do you have any idea whether or not

20 the tire mark was created the moment that the flat

21 occurred, or is it possible that the flat began earlier

22 and then progressed to a point where it began leaving the

23 mark?

24      A.    I would say it's probably more likely that it

25 progressed -- or it started earlier than what was
```



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

```
 1   photographed.

 2        Q.    Why do you say that?

 3        A.    Well, the cops didn't necessarily show the

 4   start of the tire mark very well.  I still think there's

 5   a little bit more tire mark to be seen.  So it's

 6   sometimes very hard to identify.  And I'm not blaming

 7   them; it's sometimes hard to identify the beginning of a

 8   tire mark.  And so I don't know if it would be

 9   instantaneous.  I think it would likely take some time to

10   generate the heat from the rubber rubbing incorrectly

11   against the asphalt to start leaving that mark.

12        Q.    Okay.  So do you -- so what you've described,

13   that the rubber deforms around the rim as -- you know, as

14   a flat tire progresses; is that right?

15        A.    Yeah.  The rubber is fixed at each outboard

16   side by the rim, by the rim flange.  So when you get rid

17   of the pressure, there's nothing supporting the center of

18   the tire, so that's what folds first.  And then the

19   outside rim flanges keep the rubber rigid more.

20        Q.    What happens as that pressure deflates and

21   the rim begins touching the rubber?

22        A.    The rim will either roll on the rubber and

23   start eating into the rubber, or the rubber can fold out

24   underneath one of the rim flanges, and the rim can start

25   digging into the asphalt.
```



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000227

1      Q.    Could you tell from what you reviewed here

2   whether or not the rim ate into the rubber but the

3   rubber -- but didn't puncture it, or if it did puncture

4   it and began touching the asphalt?

5      A.    I don't know if I would agree that it

6   punctured it.  Sometimes it rolls or folds out underneath

7   the rim flange.  I'd have to go back and look at the

8   pictures to answer that question.

9      Q.    Okay, okay.  So what -- what is your

10  expertise of how a vehicle handles when a flat tire

11  occurs?

12     A.    Depending on the type of failure will define

13  the magnitude of the dynamics.  Generally, it's going to

14  create resistance, and it's going to pull, so the left

15  side tire will pull to the left a little bit.  The

16  magnitude of that pull will depend on the type of

17  failure.

18          A tread separation will give the greatest

19  resistance.  That is when the tread of the tire separates

20  from the carcass of the tire and it's flapping in the

21  wheel well, creating the most resistance.  A flat tire is

22  just simply creating resistance because of some increased

23  friction.  So that would be least resistive type of

24  failure.

25     Q.    Do you know what kind of failure happened

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000228

 1  here?

 2       A.    This appeared to be a blowout.  It looked

 3  like the side wall ruptured.

 4            So I guess you can classify a tire failure

 5  into three failures.  One would be a very slow air leak.

 6  We all get that when we get a nail in our tire and we

 7  maybe hear a hissing noise, but we still have some time

 8  to get to a shop.

 9            Then there's a sudden failure, which is

10  either the side wall or the tread ruptures, either from

11  inconsistent wear or just failure within the structural

12  integrity of the tire.  That is a sudden loss of air, but

13  you still have the tire underneath.

14            And then you get the tread separation where

15  the tread separates from the carcass, the air escapes

16  from the separation, and then the carcass is flapping in

17  the wheel well.

18       Q.    Okay.  So you would -- would you agree that

19  the Toyota, after the blowout here, would have been

20  pulling to the left?

21       A.    Slightly.

22       Q.    Okay.  So you can't tell from the groove or

23  the tire mark where the blowout happened though, can you?

24       A.    No.  What I can say is what was documented.

25  She was on the right half of the left lane.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000229

```
 1        Q.    Okay.  At some point?

 2        A.    At some point during or after the tire

 3   failure.

 4        Q.    Okay.

 5        A.    Which again, if we extrapolate that -- I'll

 6   let the jury do that extrapolation.

 7              Is she simply riding the right side of the

 8   left lane the entire time, or did she indeed come from

 9   the center lane.

10        Q.    Or it's possible she was centered in the left

11   lane, tries to go to the right, and then decides to pull

12   over to the left?

13        A.    I suppose that's a possibility.

14        Q.    Okay.  Would you agree that if the Toyota had

15   been in the leftmost lane after -- when the blowout

16   occurred, Evelyn would have had to cross two lanes of

17   traffic to get to the right shoulder?

18        A.    Yes.

19        Q.    Okay.  So your opinion here is that steering

20   to the right was equally possible.  All right.

21              What engineering methods did you use to reach

22   that conclusion?

23        A.    So that is a vehicle dynamics opinion.  It's

24   not alluding to traffic.  It is simply vehicle dynamic

25   driver input handling.  With a slight pull to your left,
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000230

1  you can still steer to the right.

2       Q.    So when -- you say it was possible, right,

3  for her to get over to the right?

4       A.    Mm-hmm.

5       Q.    Okay.  But you'd say it's equally possible

6  for her to get over to the right as opposed to the left

7  shoulder?

8       A.    Yeah.  Maybe the word "equally" is misleading

9  in regards to the amount of steering input.  I'm

10 certainly not alluding to that amount of steering input;

11 I just mean that both are possibilities that you could

12 do.

13      Q.    So, you know, I'm not going to ask you to

14 amend the report here.  You agree that it would take more

15 steering input to turn the Toyota to the right after the

16 blowout than to turn it to the left?

17      A.    A little bit.

18      Q.    How much is "a little"?

19      A.    I can't quantify that.  Just qualitatively,

20 it would be a little bit more.

21      Q.    Okay.  So did you conduct a mechanical

22 inspection of the Toyota Camry?

23      A.    There was an inspection done of the Toyota,

24 but it had been repaired at that point, so I'm relying on

25 the photographs of the Camry on the side of the road.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000231

 1       Q.    Okay.  Have you conducted any experiments to

 2  determine how a vehicle steers after a blowout?

 3       A.    No, and that's why I can't quantify this

 4  particular vehicle.  The literature does indicate there's

 5  going to be a slight pull to the left, but it also

 6  indicates that you can countersteer that pull.

 7       Q.    Okay.  So let's go to your fourth opinion on

 8  Page 4, or fourth and fifth.  Can you read those for the

 9  record?

10       A.    "Rather, Ms. Evelyn Moreno parked the Toyota

11  still partially within the left travel lane, occupying

12  approximately 2.1 feet, not accounting for the side

13  mirror of the 11.6-foot-wide inside northbound travel

14  lane, providing approximately 9.5 feet of remaining

15  available space for northbound traffic to pass the

16  Toyota."

17       Q.    Okay.  Go to five as well.

18       A.    Then five is, "Given the Ford's width of

19  approximately 6.6 feet, there was sufficient room for the

20  Ford to pass the Toyota within the remaining available

21  9.5-foot width of that left lane.  It was not necessary

22  for the Ford to change lanes in order to pass the parked

23  Toyota."

24       Q.    So -- and we'll focus on the last sentence

25  where you say, "It was not necessary for the Ford to



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900          www.MILESTONEREPORTING.com

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

Toll Free 855-MYDEPOS

App. 000232

 1  change lanes."  Do you mean it was not physically

 2  necessary?

 3        A.    Correct.

 4        Q.    So in other words, there was enough room for

 5  Caylee to remain in the leftmost lane and not directly

 6  strike the Toyota?

 7        A.    Correct.

 8        Q.    Okay.  You're not saying with this sentence

 9  that it was prudent or reasonable for her to remain in

10  the leftmost lane?

11        A.    No.  That's for the jury.

12        Q.    Okay.  What is the error rate on the

13  measurements that you provided in these conclusions?  Is

14  this -- if it's just a quarter inch...

15        A.    I -- it's either a quarter of an inch, or

16  maybe even better, an eighth of an inch, but let me

17  double-check.  It's certainly going to be within that

18  quarter of an inch.

19        Q.    Okay.  That's fine.

20              Why didn't you account for the side mirrors?

21        A.    So in this case, side mirrors, number one,

22  are not often accounted for in an accident

23  reconstruction, number one, because they simply fold out

24  of the way.  So the consequences of side mirror contact

25  typically are not -- are negligible, I should say.



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        **www.MILESTONEREPORTING.com**        Toll Free 855-MYDEPOS

App. 000233

1          Number two, in this particular case, the side

2   mirrors actually did not align on an elevation

3   standpoint.  There's actually at least a two-inch gap

4   between the bottom of the Ford Explorer's side mirror and

5   the top of the Toyota -- Toyota Camry's side mirror, so

6   they wouldn't cross paths.  So it was negated, because it

7   didn't affect the measurements in this case.

8        Q.   Okay.  Do you agree that the crash would not

9   have occurred if Caylee Smith had gotten into the middle

10  lane when she first saw the Toyota Camry?

11       A.   Of course.  If the two parties didn't exist

12  at the same time at the same place, yeah, of course, the

13  crash would not occur.

14       Q.   Okay.  Do you agree that there's no evidence

15  that Caylee Smith was unable to get into the middle lane

16  as she approached the Toyota Camry?

17       A.   I can't say one way or the other.

18       Q.   Well, I'm just asking you, Have you reviewed

19  any evidence that says that it was -- she could not have

20  gotten into the middle lane as she approached the Toyota

21  Camry?

22       A.   I haven't reviewed any evidence that tells me

23  one way or the other.

24       Q.   Well, I -- I guess what I'm asking is, Have

25  you seen any evidence that shows you one way, which is



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  that she could not have gotten into the middle lane as

2  she approached the Toyota Camry?

3      A.   Correct, no, just like I hadn't seen evidence

4  of the other way.

5      Q.   Okay.  So you did conclude that the Ford

6  Explorer did not strike the Toyota Camry?

7      A.   Correct.

8      Q.   Okay.  Is that partially because there's no

9  paint transfer?

10      A.   Paint transfer is certainly one thing we look

11  for.  Matching damage, damage characteristics is another

12  thing we look for.  There was no matching damage to the

13  two vehicles.

14      Q.   Okay.  You did conclude that there was some

15  forward motion applied to the Toyota Camry though, right?

16      A.   Yes.

17      Q.   And is that because you saw that the jack

18  stand had been moved?

19      A.   The jack stand had been tilted forward.  And

20  my understanding is that was as a result of Nehemias's

21  being thrown into the back of the Toyota and also Evelyn

22  getting pushed into the back of the Toyota.

23      Q.   So and I should have asked a predicate

24  question.  Your understanding is that the jack stand had

25  been placed on the left side of the vehicle by the



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

App. 000235

 1  blown-out tire on the driver's side --

 2       A.    Yes.

 3       Q.    -- before the accident?

 4       A.    Correctly.

 5       Q.    And so presumably, it was correctly seated

 6  before the accident?

 7       A.    Presumably.

 8       Q.    Okay.  And then you saw via the pictures that

 9  the jack stand -- basically, can you describe how it had

10  moved that allowed you to conclude that forward motion

11  had been applied to the Toyota Camry?

12       A.    It tilted forward a little bit.

13       Q.    Okay.  As opposed to tilting laterally?

14       A.    Correct, or backward.

15       Q.    Or backward, right.

16       A.    Mm-hmm.

17       Q.    So if lateral force was applied to the

18  Toyota, how would the jack stand have moved?

19       A.    It would have either slid or tilted.

20       Q.    Okay.  Tilted the same way it did in the

21  pictures you reviewed, or tilted to the side?

22       A.    Well, it would tilt to the side that it was

23  pushed at.

24       Q.    Okay.  So the jack stand is sort of a good

25  barometer for the direction of the force applied to the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        Toll Free **855-MYDEPOS**

App. 000236

300977 Montalbano Paul J. 01-04-2024 - VOL. I      Page 142

1  Toyota, right?

2      A.    Not the total direction of the force, because

3  you're certainly going to have resistive lateral force

4  from the tires themselves.  A little bit of longitudinal

5  resistance from the right front axle, which is locked by

6  the transmission.

7      Q.    Mm-hmm.

8      A.    So you're going to have varying levels of

9  counteractive forces.  So the net movement of the Toyota

10  doesn't tell you the total direction of the contact

11  force.  It just tells you what the summation of the

12  forces resulted in.

13      Q.    Okay.  So you could -- do you have any idea

14  of the resistance of tires versus the resistance of the

15  front axle, which one -- which resistance is greater?

16      A.    The lateral resistance is going to be

17  greater.

18      Q.    The lateral resistance will be greater.

19  Okay.  Got it.

20          So I think in your opinion -- this is on

21  Page 7 -- you said that the Toyota appeared to have

22  lunged forward by a few inches; is that right?

23      A.    Yes.

24      Q.    And you concluded there was no lateral

25  movement of the Toyota, correct?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

App. 000237

 1        A.    Correct.

 2        Q.    Now, is that the same as concluding that

 3   there was no lateral force applied to the Toyota?

 4        A.    No.

 5        Q.    Okay.  So it's possible there was lateral

 6   force applied to the Toyota?

 7        A.    I do think there was a slight angle from

 8   Nehemias's body probably coming from, I would say, the

 9   5:00 or 4:00 direction, if 12:00 is straight ahead.

10        Q.    Okay.  So you think that his body was thrown,

11   if 12:00 is straight ahead, his body is thrown to the

12   4:00 to 5:00?

13        A.    It came from the 4:00 to 5:00 direction.

14        Q.    Okay.  So if the middle of the Toyota has a

15   clock on it, you're talking the 4:00 to 5:00 point on the

16   Toyota is where Nehemias hit it?

17        A.    Exactly.

18        Q.    Okay.  And you stated, I think it's later,

19   that, based on the tire marks created by the flat tire,

20   it didn't appear that there was a lateral movement,

21   right?

22        A.    Correct.

23        Q.    So meaning that the Toyota remained in that

24   groove or tire mark?

25        A.    Right.  Meaning the -- there were no forces



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000238

 1  applied to the Toyota that exceeded the lateral

 2  resistance of the tires.

 3      Q.    Okay.  So let's see.  On Page 8, yeah,

 4  that's -- your opinion is the Toyota did not move -- it

 5  did move front to back but not laterally?

 6      A.    Correct.

 7      Q.    Okay.  What damage occurred to the Toyota

 8  Camry, to your knowledge?

 9      A.    The back right tail lamp housing, the plastic

10  housing was cracked; there was body matter transfer on

11  the back bumper inside of the trunk lid and on the right

12  quarter panel and also on the right rear door.

13      Q.    Okay, okay.  Were you aware that the trunk

14  would not close after the accident?

15      A.    I was.

16      Q.    Do you know how that damage occurred or why

17  it wouldn't close?

18      A.    Likely due to contact forces applied to the

19  trunk lid itself from Nehemias's body being thrown into

20  the Toyota.

21      Q.    Okay.  Into the trunk lid?

22      A.    Yes.

23      Q.    Okay.  So on Page 9, you say that the damage

24  to the Toyota is, quote, Consistent with post-impact

25  contact with the body of Mr. Nehemias Pivaral Santos's



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000239

 1  body; is that right?

 2       A.    That's right.

 3       Q.    All right.  Can you explain how you reached

 4  that conclusion?

 5       A.    So the contact with the Ford, we're starting

 6  there, because that's what occurred first, and that's

 7  what projected Mr. Nehemias into the Toyota.  That

 8  contact occurred at the left front corner with only his

 9  head, which his head at that point was bent over, bent

10  down at an elevation of 3 to 3 1/2 feet from the ground

11  and extending beyond his center of gravity.

12            Any offset collisions outside of the center

13  of gravity is going to cause a rotation and also a

14  diagonal trajectory.  We typically call this a fender

15  bolt, so it will throw you forward and to the side,

16  creating --

17       Q.    Away from the force?

18       A.    Away from the car.

19       Q.    Okay.

20       A.    So almost like a wedging effect is the best I

21  can say, so a diagonal throw.  And that's really what

22  happened here was the offset contact with his head offset

23  from his center of mass and contact with the left front

24  corner of the Ford caused his body to rotate

25  counterclockwise and was thrown diagonally towards the



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000240

 1  Toyota at that 4:00 or 5:00 direction.

 2          That then caused -- the contact between his

 3  body and the Toyota occurred.  His body essentially

 4  bounced off of the Toyota back into the travel lane,

 5  towards the Ford again.  At that point, the Ford had

 6  already progressed about 9, 10 feet.  And then we see

 7  this -- I guess it would be the third contact with

 8  Mr. Nehemias's body against the left quarter panel of the

 9  Ford as Mr. Nehemias bounced back into the Ford.

10      Q.    Okay.  So is any of the damage to the Toyota

11  circular in nature?

12      A.    Not that I saw.

13      Q.    Okay.  Would you describe it as any other

14  shape, damage to the Toyota?

15      A.    The damage to the Toyota looked consistent

16  with damage to blunt soft tissue versus any rigid, hard

17  objects.

18      Q.    Okay.  So you're saying you don't think his

19  head hit the Toyota?

20      A.    I didn't see any evidence of that.  It

21  certainly could have; it just didn't damage the Toyota.

22      Q.    So I mean, there's brain matter and skull

23  fragments on the Toyota Camry, right?

24      A.    Yes.

25      Q.    So it's possible his head hit, but you're



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000241

300977 Montalbano Paul  J. 01-04-2024 - VOL. I        Page 147

```
 1  saying there's no damage to the Toyota consistent with a

 2  head hit?

 3       A.   Right.  The primary contact was to his head

 4  from the Ford, which I think is what opened the skull.

 5  Any secondary contact is going to be significantly less

 6  in magnitude, because he's not picking up the entire

 7  momentum of the Ford since it's that offset hit.  So any

 8  secondary or tertiary impact is going to be significantly

 9  less in magnitude and may not cause physical damage.

10       Q.   Okay.  Do you have any opinion as to what

11  part of Nehemias Santos's body did hit the Toyota?

12       A.   I don't have it refined to that specific

13  level.

14       Q.   Okay.  Any opinion on what part of

15  Nehemias Santos hit the taillight?

16       A.   No.  I don't have it refined to that specific

17  level.

18       Q.   Okay.  That's fine.

19            Any opinion on which part of Nehemias Santos

20  hit Evelyn Moreno?

21       A.   No.  I don't have it refined that much.

22       Q.   Okay.  Do you disagree or do you -- do you

23  believe that Evelyn Moreno's story that she was hit by

24  the body is inconsistent with the evidence?

25       A.   No.  I think it works.
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.    Okay.  How?

2      A.    Well, she is standing in the trunk lid

3  opening.  When you project a body after impact, the --

4  especially when you have an offset impact that causes

5  rotation, limbs are going to extend laterally

6  significantly due to that rotation.  So the envelope at

7  which Mr. Nehemias's body was occupying post impact was

8  pretty wide.  His body is going to occupy quite a --

9  quite a big distance from side to side.  So it certainly

10 could have been his legs, could have been his arms, could

11 have been one leg, one arm, could have been his torso;

12 could be anything.

13     Q.    And it's hard to tell, given the forces

14 applied and the fact that the human being is not

15 homogenous -- or, it is homogenous, right?

16     A.    Well, it's articulated.  So there's a lot of

17 articulation points that's going to cause it to flail and

18 flip and exist in a lot of different configurations.

19     Q.    Okay.  Your conclusion on Page 4 and

20 throughout is that the Ford Explorer struck

21 Nehemias Santos on the right side of his head, correct?

22     A.    Yes.

23     Q.    Okay.  So on Page 11, you talk about contact

24 matching, right?

25     A.    Yes.  Sorry.  You're flipping back and forth



**MILESTONE** | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING**.com          Toll Free **855-MYDEPOS**

App. 000243

1  a lot.

2      Q.   Sorry, sorry.

3      A.   Yes.

4      Q.   Okay.  So is contact matching how you

5  concluded that Nehemias Santos's head was struck, that

6  the initial impact to Nehemias Santos was at the front

7  left panel or the front left part of the Ford Explorer?

8      A.   Yes.  You look at damage to one object versus

9  damage to the other, and it's simply putting the two

10 puzzle pieces back together.

11     Q.   Okay.  So -- and I believe you used the

12 phrase "circular contact damage" on the Ford Explorer?

13     A.   Yes.

14     Q.   All right.  What does that phrase mean?

15     A.   It is the shape of the damage profile to the

16 Ford.

17     Q.   Okay.  So if you'll flip to Page 54 of your

18 report -- the paper copy, actually.  I'm going to ask you

19 to draw something.  Can you draw for us on Figure 70

20 where the circular area of damage is?

21     A.   You can't see it in that photo, but you can

22 see it quite well in Figure 70.  And Figure 68 and 67 are

23 really good pictures as well.

24     Q.   So let's -- let's do it on -- let's start

25 with 60- -- let's do 67 through 70, right?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

```
 1        A.    Actually, it goes back as far as -- 65 is
 2  where you can start seeing the circular nature.  65 is a
 3  good one.
 4        Q.    Okay.  All right.  Well, let's do 65 through
 5  70.  If you'll just take a pen --
 6        A.    Sure.
 7        Q.    -- and draw and put your initials.
 8              MR. DUBOFF:  Do we want to -- do you just
 9        want to use red?
10              MR. WHITE:  Yeah, red is probably better.
11              THE WITNESS:  I don't have a red pen.
12              MR. WHITE:  I might have a black pen.
13              MR. DUBOFF:  I have about 14 red pens.
14              MR. WHITE:  Oh, look at that.  All right.
15              MR. DUBOFF:  I like writing in red.
16              THE WITNESS:  He's an angry writer.
17              MR. DUBOFF:  It's these associates.
18              MR. WHITE:  Yeah.
19  BY MR. WHITE:
20        Q.    I just -- put your initials by it so they
21  don't think that, you know, sneaky opposing counsel put
22  it on there.
23        A.    I think that's good.  I marked Figures 65
24  through 70.
25        Q.    Okay, perfect.
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000245

1            What was the contact radius?

2       A.    Consistent with the size of the head.  I

3  didn't get a precise measurement.

4       Q.    Okay.  Could you measure the contact radius?

5       A.    I suppose if I put enough analysis into that,

6  sure.

7       Q.    Okay.  You need at least half a circle to

8  calculate a radius, right?

9       A.    Oh, I meant in the form of doing a

10 photogrammetry analysis.

11      Q.    Okay.  But you didn't here?

12      A.    No.  It was consistent enough.

13      Q.    Okay.  So you said it's consistent with the

14 size of a head?

15      A.    Correct.

16      Q.    How large was Nehemias Santos's head?

17      A.    The general size of his head -- I was

18 provided some photographs of him before the incident.

19      Q.    Okay.  Do you have any measurements of

20 Nehemias Santos's head?

21      A.    Not specifically.  I can certainly estimate

22 it, just as I estimated this damage.  They're both

23 consistent in nature and -- and rigidity.  It was the

24 only thing that matched the characteristics of this

25 damage.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

App. 000246

1    Q.    Okay.  So are you saying that the damage is

2  not consistent with hitting his shoulder?

3    A.    No, it's not, because you actually see the

4  brain matter on the end of the fender.  The tip of the

5  fender was pointed, and he had a large hole in the right

6  side of his head, I guess you could say by the temple.

7  That fender, you can see the brain matter on the fender,

8  meaning that fender physically intruded into his skull.

9    Q.    So can you point to which figure shows the

10  brain matter?

11    A.    I'm going to look at my computer, because

12  these pictures are hard to see when they print.  I need

13  to -- so I'm just cycling through the police photographs,

14  just to point out the chip of the skull was on Page 11 of

15  the police photographs.

16    Q.    Did you include that photo in the report?

17    A.    I don't know.  Let me check.  I may not have

18  just because of the intensity of the photograph.  I don't

19  think I did.

20    Q.    So just in the file that you sent me, can you

21  point me to the photo that has the skull chip that you're

22  referring to?

23    A.    So if you go to Materials Received, Photos

24  and Videos, Police Photographs, Scene Photos, and then

25  it's going to be Page 11.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000247

1    Q.    Now, I think we might be looking at something

2  different.  Do you know the file name you're looking at?

3    A.    2200089-Photos, Part 1, Page 11.

4    Q.    Got it, got it.

5          So the picture you're referring to, isn't

6  that a picture -- that's a piece of skull on the ground,

7  right?

8    A.    Yes.  I was just making a side comment as I

9  passed by it that I believe that is the puncture from the

10 fender.

11   Q.    Okay.  Well, I guess my question is, What

12 photo do you have that shows brain matter on the Ford

13 Explorer?

14   A.    Yes, sorry.  I'm going there.  I just got

15 sidetracked while cycling through the photographs.

16   Q.    And while you're looking, I'll point out on

17 Page 11, you say that, quote, There was blood and body

18 fluid/matter within the round contact damage,

19 specifically to the pointed leading edge of the left

20 front fender of the Ford," correct?

21   A.    Yes.

22   Q.    The next sentence says, "There were pieces of

23 skull and brain matter found on the roadway."  So do you

24 think maybe -- I mean, I'm going off of your report,

25 right?  Do you think the brain and skull is found on the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000248

```
 1  road?
 2      A.    I think that the fluids in the damage with
 3  the consistency of the peeled-back metal fender were all
 4  consistent in size.
 5            So damage match is generally looking at
 6  multiple different configurations or --
 7      Q.    Sure.
 8      A.    -- match points, right?  Like, a puzzle has
 9  multiple jagged edges, that other puzzle's jagged edge.
10            So in this particular case, we had the
11  circular nature of the damage to the hood and the
12  headlight; we had the peeled-back fender with the body
13  matter on the inside and outside of the fender,
14  suggesting a puncture; we had the punctured skull on the
15  ground with the brain matter; we have all of the body
16  fluid within the circular contact that all of the jagged
17  edges lined up to establish that that was the point of
18  contact.
19      Q.    Well, just to be specific, you don't see any
20  skull fragments on the Ford Explorer, do you?
21      A.    No, no, I don't think I saw skull fragments
22  on the Ford.
23      Q.    You don't -- you don't see obvious brain
24  matter on the Ford Explorer?
25      A.    Yeah, I would just call it body matter.  I
```



MILESTONE **|** REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

 1  don't know how much delineation we can do of that spray.

 2  Certainly, there are chunks of brain on the ground that

 3  are easier to identify.  But within the fluid spray of

 4  the contact damage, it's hard to identify, is that brain

 5  fluid, blood?  There's certainly --

 6       Q.    Okay.

 7       A.    -- a combination of fluids in there.

 8       Q.    Okay.  So would you agree that it's possible

 9  that the damage to the Ford Explorer by the headlight

10  that you've identified as circular damage could have been

11  caused by a shoulder?

12       A.    I disagree, because now you are completely

13  missing what contacted his head.

14       Q.    Okay.  How do you mean?

15       A.    We need to find a match.  And if you put his

16  shoulder in place of where the head contact actually

17  occurred, now no head contact happens.

18       Q.    To the Ford Explorer?

19       A.    To Mr. Nehemias.

20       Q.    Well, isn't it possible that Mr. Nehemias hit

21  his head on the Toyota or on the pavement?

22       A.    Not based on the damage matching we see.

23  There is a nice fit.  And suggesting otherwise would just

24  be purely speculative and ignoring the amount of match we

25  have here.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000250

1      Q.   So let's talk about just matching on the Ford

2   Explorer, right?  Is the contact on the Ford Explorer

3   inconsistent with a hit to Nehemias's shoulder, either

4   right or left?

5      A.   It is.  It's not as circular as his head.

6      Q.   Okay.  So is it possible -- is the contact

7   damage on the Ford Explorer consistent or inconsistent

8   with hitting Nehemias Santos's elbow?

9      A.   Inconsistent.

10      Q.   Okay.  How come?

11      A.   In size.

12      Q.   Okay.  What about a fist?

13      A.   Inconsistent.

14      Q.   Okay.  And this is all based on -- you think

15   only a head stuck in front of the Ford Explorer could

16   have caused the damage to the Ford Explorer?

17      A.   What I'm saying is the size, the shape, and

18   the magnitude of the damage is consistent with hitting

19   the size of a skull that is hard and would create a

20   circular imprint like we see in the Ford.  There is no

21   other explanation for that damage other than your

22   speculation.  What I do see here is a nice damage match

23   between his skull and the left front corner of the Ford.

24   There is nothing else that would cause the relative

25   contacts to both objects.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000251

1    Q.    So are you saying that the contact damage on

2 the Ford Explorer could never be caused by impact with a

3 shoulder, a fist, or an elbow?

4    A.    What I'm saying is it's not consistent with

5 that.  I don't ever like to use the word "never" or

6 "always."  We don't speak in absolutes.

7    Q.    So it is possible?

8    A.    What I'm saying is, to a reasonable of

9 engineering certainty, Mr. Nehemias's head contacted the

10 left front headlight of the Ford.  That is the only

11 reasonable explanation for both characteristics to each

12 point of contact.

13    Q.    I guess my question is, Is it possible that

14 the contact damage to the Ford Explorer was caused by

15 contact to a shoulder, an elbow, or a fist?

16    A.    I don't think it is.

17    Q.    So it's not possible?

18    A.    I don't think it is.  It does not exhibit the

19 characteristics of those other shapes.

20    Q.    Okay.  So what testimonial evidence -- so not

21 physical evidence, but depositions that you reviewed --

22 indicates that the initial impact to Nehemias Santos was

23 to the right side of his head?

24    A.    Oh, everybody, I believe.  They said he was

25 bending over picking something up, into the travel lane.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1      Q.    So did anyone testify that the initial impact
 2  was to Nehemias Santos's head?

 3      A.    Well, to be fair, I don't know how much these
 4  witnesses actually saw, despite what they said they saw.
 5  But what I can say is their testimony indicated that he
 6  was bending over, in the process of picking something up,
 7  which is identical to the damage matching we see here.

 8      Q.    Okay.  So you agree that -- can we agree that
 9  no witness has testified that the initial impact was to
10  the right side of Nehemias Santos's head?  That's just
11  not something someone said?  You're inferring it, but
12  that's not been said by anybody?

13      A.    Well, I'm not inferring it; I'm concluding it
14  based on the damage matching.

15      Q.    Okay.  But there's no separate testimony from
16  somebody that says, Nehemias Santos, I saw his head get
17  hit by the Ford Explorer"?

18      A.    I'd have to reread it, but I'll take your
19  word for it.  Certainly, this analysis is based on
20  objective evidence --

21      Q.    Okay.

22      A.    -- not testimony, so I simply just make
23  comparisons.

24      Q.    Okay.  So can we agree that your opinion in
25  this report is that there's no damage to the Ford



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000253

1  Explorer below the 3-foot mark?

2      A.    Correct, on the front face.

3      Q.    On the front, you're right.

4            We agree that there is damage on the side of

5  the Ford Explorer below the 3-foot mark?

6      A.    Correct.

7      Q.    Okay.  So is that an important part of your

8  opinion, not an important part?  I -- I'm just -- I want

9  us to nail it down.

10     A.    Well, everything is important.  I don't want

11 to give anything more merit than another, but that is

12 certainly a key component in that there is no existence

13 of Mr. Nehemias below that contact point.

14     Q.    So are you able to infer -- from the contact

15 matching and the lack of damage below the 3-foot mark,

16 that's how you've reached the conclusion that is shown in

17 some of your figures that Nehemias was leaning forward

18 with his head out from his body, and only his head was

19 struck initially, right?

20     A.    Exactly.  It's quite a smoking gun with --

21 when you put all of the jagged edges together of the

22 puzzle piece, it's the only puzzle piece that fits.

23     Q.    Okay.  Now, there's no damage to the Ford

24 Explorer that you've been told about from one of

25 Caylee Smith's prior accidents, right?



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

1    A.   My understanding was there was no damage to

2  the left front corner prior to.

3    Q.   Okay.  At all?  Like, I mean, I just -- I

4  want to make sure, you know --

5    A.   Well, certainly not to this extent.

6    Q.   Okay.  So -- but you were never told that

7  there was some damage on the Ford Explorer, but that was

8  caused by one of Caylee Smith's prior accidents in the

9  Ford Explorer?

10    A.   I was never told that.  But again, this

11  damage has Mr. Nehemias's blood in it, so I don't know if

12  I necessarily needed to be told that.

13    Q.   Fair enough.

14         I just -- I want to make sure that, coming

15  into this investigation, your assumption or what you

16  concluded was that the Ford Explorer was in -- I don't

17  want to say perfect condition, but there was no body

18  damage or mechanical damage to it prior to impacting

19  Nehemias Santos?

20    A.   I think that assumption may be more important

21  when you don't have a lot of damage to work with.  But in

22  this particular case, we have such strong matching

23  evidence that there is no question of if it was

24  preexisting.

25    Q.   So -- and it's not just not matching evidence



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000255

1   that you're relying on; it's the lack of other damage

2   that would -- you know, that kind of -- that's how you're

3   able to infer where the damage happened to

4   Nehemias Santos, right?

5        A.   Well, it's everything, all of it together.

6   It's the elevation of the damage, the size of the damage,

7   the exact location of the damage inboard, the

8   characteristics of the damage itself consistent with the

9   characteristics and rigidity of a skull, the body matter

10  in the damage itself, the brain matter on the road, the

11  skull piece on the road consistent with the fender tip.

12  Everything is so overwhelmingly consistent that there is

13  no way, to a reasonable degree of engineering certainty,

14  that we can conclude anything else.

15       Q.   Fair enough.  All right.

16            Would you agree that any evidence of damage

17  to the front of the Ford Explorer below 3 feet would

18  require you to revisit your conclusions?

19       A.   No.  Because in addition to that, if

20  Mr. Nehemias's body existed below that damage, now you're

21  applying the force closer to his center of mass.  He is

22  now going to be projected more forward than lateral, and

23  he's going to be subsequently run over because of the

24  trajectory of the Ford.  He's going to essentially

25  inherit the trajectory of the Ford because of all the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

App. 000256

 1  momentum transfer if his body was struck by the front

 2  bumper.

 3       Q.    Okay.  So you think -- so if there was damage

 4  below the 3-foot mark on the front, that would imply that

 5  Nehemiah Santos had moved more forward than laterally?

 6       A.    Yes, which would not result in the subsequent

 7  damage we see on the Toyota, would not result in the

 8  subsequent damage we see to the left quarter panel of the

 9  Ford.  There is no other solution that matches all of the

10  evidence.  There's one unique solution that matches every

11  piece of evidence.  We can't ignore evidence; we have to

12  consider it all.

13       Q.    Sure, sure.

14             So one of the pieces of evidence is the lack

15  of damage to the front end of the Ford Explorer below the

16  3-foot mark, right?

17       A.    One of the many is the lack of damage that

18  would be generated from impacting a center of mass of a

19  body.

20       Q.    Fair enough.  All right.

21             So go to Figure 70 of your report.

22       A.    Okay.

23       Q.    I think that's page -- well, you beat me

24  there.  All right.  So if you look down, you see the

25  tire, right?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000257

 1      A.    I do.

 2      Q.    Now, you see that there's sort of a -- the

 3  plastic piece that's kind of been ripped off a little

 4  bit?

 5      A.    I do.

 6      Q.    Go down to that -- it's not the bumper, but

 7  it's the plastic bit below the white bumper on the front,

 8  right?  Do you see any deformation of that part of the

 9  plastic bumper?

10      A.    Let me just see it on my computer.  Okay.  I,

11  do.

12      Q.    Okay.  So go to Page 14 of the Richland

13  police officer's photos.  I actually don't see it in your

14  file.  Recall that?

15      A.    No, I don't have a Page 14.

16      Q.    Well, I'll show you mine.  So this is -- and

17  this is the 14th page of --

18      A.    Oh, that's in a different folder.  That's

19  why.

20      Q.    Oh, okay.  Which folder is it in on yours?

21      A.    That would be under the Ford Explorer folder.

22      Q.    Okay.  Let's go back to the Ford Explorer

23  photo, then.  Ah, yes, there it is, Page 14.

24      A.    Okay.

25            THE VIDEOGRAPHER:  I'm sorry.  Is your mic



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000258

1        still clipped?

2               THE WITNESS:  Oh, I walked away.  Sorry.

3               THE VIDEOGRAPHER:  That's okay.  Thank you.

4               THE WITNESS:  You're welcome.

5   BY MR. WHITE:

6        Q.    Okay.  Do you see the dent in the lower part

7   of the front plastic bumper?

8        A.    I do.

9        Q.    Okay.  So did you miss that dent in your

10  analysis?

11       A.    No.  That's just not a dent from impacting

12  the center of mass of a pedestrian.

13       Q.    So -- but that is damage below the 3-foot

14  mark on the front part of the Ford Explorer, isn't it?

15       A.    Yeah, I guess you're right.  Maybe I should

16  have been more specific in my words.  But that damage is

17  not from impacting the center of mass of a pedestrian.

18  That also could have been generated by his shoes or

19  debris or even the bending of the black plastic trim.  So

20  whatever caused that damage was not Mr. Nehemias's

21  physical body in front or existing in front of the Ford,

22  because we would see damage between that and the

23  headlight, but we do not.

24       Q.    So on the bottom of Page 8, you say, quote,

25  "There was no front face contact damage below 3 feet from



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000259

1  the ground." Would you want to revise that statement?

2       A.    No.   That's really on the left-side corner.

3  It's a plastic damage that, again, could have been as a

4  result of the bending of the plastic fender.

5       Q.    So you think that the bending of that bumper

6  was caused by the bending of the fender?

7       A.    Well, I'm suggesting that could be an

8  explanation.  His shoe being thrown off could be an

9  explanation, a tool he was holding could be an

10  explanation.  That is not contact with a body, and that's

11  what we're talking about.

12       Q.    Okay.  So how -- if, in your theory, he

13  sticks his head out into the road to get hit by the Ford

14  Explorer and then gets hit by the Ford Explorer, and

15  then, as you say, he doesn't get into contact with the

16  Ford Explorer again until it's kind of at 9 feet, how do

17  his shoes create that damage to the front bumper?

18       A.    When you are hit offset from your center of

19  mass, your limbs will flail outward significantly.  So we

20  are articulated.  Our elbows, shoulders, that could be

21  any of the articulation points as he's rotating or

22  spinning.  It could be his legs; it could be his shoes,

23  his feet, his hands; it could be a multitude of things.

24  But what it is not is his physical center of mass.

25       Q.    Okay.  So if, as you said, he gets hit in the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000260

1  head, in your estimation of what happened, he spins

2  counterclockwise, right?

3        A.    Yes.

4        Q.    So the front bumper would have been past his

5  body at that point when the spin begins, right?

6        A.    Yes.  But again, your limbs --

7        Q.    But how does he get in front of the car after

8  he's been hit to cause that damage?

9        A.    Right.  So if you actually look at the

10  demonstrative I have of him bending over, the diagram,

11  you can see his hands hanging in that general area.  That

12  could certainly be an explanation for that dent.  That

13  could be preexisting.

14            What I am saying -- and I think you're

15  missing the point -- this is not contact with the center

16  of mass of his body.  And that is the point I'm making is

17  that the only way to exhibit this elevated contact to the

18  headlight without significant body damage to the bumper

19  itself means the lack of existence of his body in between

20  or below the headlight.  Now, what this dent in a piece

21  of plastic is, I don't know.  But it doesn't matter.

22        Q.    Because you didn't mention it your report,

23  did you?

24        A.    No.  And again, it doesn't matter, because

25  what I'm saying is there is no body -- center of mass



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000261

1  body contact.

2      Q.   Okay.  So let's go to Page 14 --

3           MR. WHITE:  Oh, I'm sorry.  Let's take a

4      break.

5           THE VIDEOGRAPHER:  The time is 2:18 p.m.  We

6      are off record.

7           (Break was taken from 2:18 p.m. to 2:24 p.m.)

8           THE VIDEOGRAPHER:  The time is 2:24 p.m., and

9      we are on record.

10 BY MR. WHITE:

11      Q.   Okay.  I want to jump to Page 14, right?  On

12 Page 14, you say, quote, had Mr. Santos not bent over

13 into the travel lane outboard the parked position of the

14 Toyota, the collision would not have occurred, correct?

15      A.   Correct.

16      Q.   Okay.  Now, are you offering the opinion that

17 Mr. Santos bent forward immediately before being hit by

18 the Ford Explorer?

19      A.   I can't offer that opinion.  I don't know.

20      Q.   But you say, right, you don't know -- you --

21 your opinion is he was bent over when he got hit?

22      A.   Correct.

23      Q.   But you don't know when he began bending over

24 or how long he'd been in that position?

25      A.   Correct.  Another reason I can't do an


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

App. 000262

 1  avoidance analysis, because I don't know when that

 2  stimulus began.

 3      Q.    Okay.  So do you -- I take it you don't know

 4  how long he was in the bent position before he was hit by

 5  Caylee Smith?

 6      A.    I don't.

 7      Q.    Okay.  Did you take body measurements of

 8  Mr. Santos in this case?

 9      A.    No.  I had pictures of him to establish that

10  he was a generic, 50th percentile male.

11      Q.    Okay.  So did you use 50th percentile male

12  proportions when creating your demonstratives?

13      A.    I did.

14      Q.    Where are those percentiles found out?

15      A.    Did I publish that in my file?  Let me see.

16  If not, I can add it in there really quick.  Yeah, I

17  apologize.  I don't think I added that in there.  But the

18  CDC publishes the Anthropometric Reference Data Manual,

19  last dated January 2021.

20      Q.    Do you believe the CDC?  I'm joking.

21            Okay.  Why -- why didn't you also say that

22  this collision would not have occurred if Caylee Smith

23  had vacated the leftmost lane when she first saw the

24  Camry?

25      A.    Well, I did concede that, had she been able



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1   to move over by another foot, there was no crash.  But I

2   can't say whether she was capable of vacating that lane.

3        Q.    Okay.  So your eighth opinion on Page 4,

4   right, you're talking about some tire marks that were

5   photographed to the right of the Toyota?

6        A.    Yes.

7        Q.    Okay.  So your conclusion was, quote, The

8   location and characteristic of these tire marks were

9   indicative of one or more vehicles making an invasive

10  swerving maneuver from left to right at the location of

11  the parked Toyota.

12       A.    Yes.

13       Q.    Okay.  So -- and you made that determination

14  by comparing the grooves in the tire marks with the

15  grooves on the tread of the Ford Explorer?

16       A.    Well, that opinion wasn't based on the

17  grooves.

18       Q.    Okay.

19       A.    The grooves were what was able to indicate

20  that those were not the Ford Explorer's tires.

21       Q.    So -- and just so we're both looking at the

22  same picture here, Figure 88, right?  So you identified

23  two patterns in Figure 88, right?

24       A.    Yes.

25       Q.    So the leftmost of those patterns, you have



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000264

1  on Figure 88 only as three tread grooves, right?

2       A.    Yes.

3       Q.    So that groove or that tire mark, you've

4  excluded as being caused by the Ford Explorer, because it

5  has fewer grooves than are on the Ford's tread?

6       A.    Exactly.

7       Q.    Okay.  Now, there's another tire mark to the

8  right of the one with three tread grooves.  And the

9  tread -- the tire mark to the right, you couldn't count

10 the number of grooves in it, could you?

11      A.    I could not.

12      Q.    All right.  And you excluded that one based

13 on the width of it?

14      A.    Yes.

15      Q.    Okay.  So how did you measure the width of

16 that tire mark?

17      A.    That was done with a photogrammetry analysis.

18      Q.    Okay.  So if you look at the tire mark that's

19 to the right, the one that you couldn't count the grooves

20 on, does it look like it displaced -- or that the tire

21 that made that mark also displaced some fluid?

22      A.    It's hard to say whether that fluid is on top

23 of the tire mark.  What I would expect if it displaced

24 fluid is we would be able to see the tread grooves

25 better.  The reason I don't think we can see the tread



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000265

1  grooves is because I think there's a little bit of

2  lateral slippage that just misaligns the grooves ever so

3  slightly.

4          And when you look ahead at the tire mark more

5  towards the top of the picture, that gives more of the

6  textbook outboard characteristics of a loaded tire.  When

7  you swerve, you are causing a weight shift to one side of

8  the vehicle, which is going to load that side's tires.

9  Anytime you overload a tire, it's going to give that

10 characteristic textbook tire mark.

11     Q.    So on Figure 88, for the tire mark to the

12 right, you've actually added some black lines, right, to

13 kind of show us where the boundary of the --

14     A.    At the bottom of it, yes.

15     Q.    Right.

16     A.    Mm-hmm.

17     Q.    Can you say definitively that that tire mark,

18 the one where you couldn't count the grooves, that that

19 tire mark is actually caused by rubber being put on the

20 road or displaced fluid that, like, track the tire?

21     A.    That's what I'm saying.  If it was displaced

22 fluid of a tracking tire, which means it's free rolling

23 in line with its angle, you would be able to see more of

24 the tread grooves from going through fluid.

25     Q.    But you would agree that it looks like some



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000266

1  of that fluid has been displaced by a tire in line with

2  the tire mark that you've identified where you can't

3  count the grooves, right?

4       A.   I would argue it looks more of, like, a

5  classic tire mark with some fluid on top of it by the

6  black lines.

7       Q.   Okay.  So if there's fluid on -- you don't

8  think that that fluid that's on top of it was caused by a

9  tire rolling through the fluid?

10      A.   I don't think so.  That, I'm not going to

11 fight hard on.  It's certainly possible, but I don't

12 think so.

13      Q.   Okay.  Because if that tire mark was caused

14 after the fluid was on the ground, then that tire mark

15 happened after the accident --

16      A.   Right.

17      Q.   -- right?

18           And it's possible that both, or one of, at

19 least -- and we don't know that these tire marks were

20 caused before the accident, right?

21      A.   I can't say exactly when they were generated.

22 What I can tell you is the characteristics of them and

23 the exact location and size of them.  That's what I

24 figured out.

25      Q.   So you said that it appeared that they



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  were -- let's see here -- indicative of one or more

2  vehicles making an evasive swerving maneuver, right?  So

3  where did you get that those tire marks were caused by a

4  vehicle making a swerving evasive maneuver?

5       A.   So they arc to the right at angles consistent

6  with emergency swerving with loading patterns consistent

7  with the weight shift.  During an emergency swerve, the

8  weight is going to get thrown to the left side of the

9  vehicle, overload those tires, generating that textbook

10 outboard dark line patch along with the curvature of the

11 mark.

12            When you actually put this on a diagram, you

13 can appreciate the curvature of the mark, because this is

14 a very zoomed-in photo.  You're only segmenting a small

15 portion of a curve.  It's hard to see, kind of like

16 flat-earthers, I should say.  But this -- when you look

17 at a diagram, you can appreciate the swerving nature of

18 the tire mark.

19      Q.   So -- but you don't know if those tire marks

20 in your -- well, strike that.

21            Your opinion is that these tire marks were

22 caused by someone swerving?

23      A.   Yes.

24      Q.   Okay.  But you don't know if these swerves

25 were made as a result of someone trying to avoid the



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

300977 Montalbano Paul  J. 01-04-2024 - VOL. I        Page 174

1   Camry, or if those swerve marks were put there before the

2   Toyota Camry was there?

3        A.    You are right.

4        Q.    Okay.  All right.  And can we agree that it's

5   possible those track marks were made after

6   Nehemias Santos was killed?

7        A.    I would probably fight harder on the left

8   tire mark than I would on the right tire mark.  I do

9   think that left tire mark is prior to.  I think that has

10  more classic characteristics of a real tire mark versus a

11  tire traveling through fluid.

12       Q.    Okay.  So your ninth conclusion on Page 4 is

13  that there was no physical evidence or indication in the

14  GPS data or the bearing data that the Ford was traveling

15  or steered on or towards the left shoulder leading up to

16  the incident location, as suggested by the plaintiff?

17       A.    Yes.

18       Q.    Okay.  So one of the reasons you reached that

19  conclusion is based on the bearing data from the

20  infotainment center, right?

21       A.    That's correct.

22       Q.    Okay.  And let's see here.  So if you can

23  flip to Page 12 of your report.

24       A.    Okay.

25       Q.    All right.  So just -- I won't make you read



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000269

 1  all this.  But just to summarize your opinion here, you

 2  say that the bearing data shows that she was traveling

 3  with a -- quote, consistent with the parallel orientation

 4  with the roadway leading up to the collision location.

 5       A.    Exactly.

 6       Q.    So is that -- you know, I don't -- we'll go

 7  back to our questions about GPS and whatnot.  But you're

 8  not swearing that the GPS data is 100 percent precise as

 9  to global position, but you do think that looking at all

10  the GPS positions in a line shows that she was moving

11  along the roadway in a straight fashion?

12       A.    Yes.  I believe you can establish trends from

13  data points that all have the same tolerance.

14       Q.    Okay.  And you say there's no documented

15  positional deviation from the left northbound travel lane

16  towards the left shoulder in Caylee's track points?

17       A.    Yes.

18       Q.    So what you're saying is there's nothing in

19  the electronic data that shows that she went left on the

20  leftmost lane, like, towards the left shoulder?

21       A.    Correct.  She never deviated to the left, nor

22  did the bearing data or the bearing angle indicate that

23  she moved left.

24       Q.    Okay.  So are you relying on the bearing data

25  there?  Do you trust the bearing data?



**MILESTONE** | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000270

 1      A.    Well, what I'm saying is when you combine all

 2  of this, that's the likely conclusion.

 3      Q.    You've validated the bearing data; the

 4  bearing data lines up with everything else, is what

 5  you're saying?

 6      A.    When measured, the bearing data matches the

 7  roadway orientation --

 8      Q.    Okay, okay.

 9      A.    -- until her final swerve.

10      Q.    Okay, right, right, right.

11            So -- and you admit there's a little bit of

12  wiggle room here on the GPS coordinates, because they've

13  been validated to only 3 1/2 to 7 1/2 feet?  That's your

14  position?

15      A.    The global position.  But again, we're using

16  the theory of relativity, and we're taking a rather small

17  time sample and analyzing the change between points and

18  tracking any trends or changes in those points to help us

19  establish any relative movement.  Since we know all of

20  these points have relatively the same error rate, because

21  they're collected in the same time frame at the same

22  environmental location with the same number of satellite

23  signals, we can conclude that, if there was any deviation

24  in lateral position or bearing, we should see it.

25      Q.    Okay.  All right.  So I take it what you mean



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

App. 000271

1  is we don't know exactly where she's at on the road from

2  the GPS data within 3 1/2 to 7 1/2 feet, but we can tell

3  that she was going straight, wherever she was in that --

4  on the roadway, right?

5       A.   Right.  It's kind of like the difference

6  between accuracy and precision.  Accuracy is where on the

7  road you are; precision is the consistency of the data.

8       Q.   Okay, okay.  So your conclusion is that the

9  3 degrees -- well, strike that.

10            Let's -- just for the jury, can you explain

11 the bearing data?  Like, how does bearing work, like, if

12 you're looking at a quadrant compass?

13      A.   So there's 360 degrees in one full circle,

14 90 degrees in a quarter circle.  So if you rotate

15 90 degrees to your right, you rotate a quarter of the way

16 around; 180 is one-half the way around.  So 3 degrees is

17 just a slight steer to the right relative to the whole

18 360.

19            But what the vehicle dynamic principles show

20 is that, at highway speeds, particularly at 90 miles per

21 hour, when we apply the emergency swerving equations to a

22 vehicle traveling at these speeds, the maximum bearing

23 angle during that swerve is about 3.1 degrees, which

24 precisely matches the bearing angle change that we see

25 around the location of impact.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000272

1         So we know that data is capable of picking up

2    these changes in lateral position and bearing angle.  We

3    see the lateral position deviate to the right, and we see

4    the bearing angle deviate clockwise.  So we know it's

5    picking up changes, and we see no changes before then.

6         Q.    Okay.  So you're saying the literature shows

7    that an emergency swerve to the right would normally, at

8    most, be 3 degrees to the right?

9         A.    At the speed.

10         Q.    At the speed, right.

11         So the fact that the infotainment bearing

12    data showed a 3-degree swerve to the right helps you

13    validate the data from the bearing?

14         A.    One of the many validations, yes.

15         Q.    Okay.  But I -- you trust the bearing data?

16    That's where you're at?

17         A.    Yeah.  I mean, certainly, I admit that there

18    are tolerances and errors.  But what I can say is I've

19    independently analyzed it, and it appears to be accurate

20    in this case.  We always try to independently validate

21    digital data --

22         Q.    Sure.

23         A.    -- to see its accuracy, and it matches very

24    well with the environmental evidence and the vehicle

25    dynamic principles.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000273

1      Q.     So there was a swerve -- well, I'll take a

2 step back.  At the 2:48:51 mark, her bearing is 340

3 degrees, right?

4      A.     Yes.

5      Q.     And then the next second, her bearing is 343?

6      A.     Yes.

7      Q.     And so that's where we're getting the

8 3-degree change, right?

9      A.     You got it.

10      Q.     How many feet in lateral change does that

11 correspond to, and how do you calculate that?

12      A.     Lateral feet over the course of -- looks like

13 anywhere between 130 and 250 feet of longitudinal

14 distance --

15      Q.     Well, just -- and I'll interrupt you.

16            It's a right-hand -- it's a right angle

17 triangle, right?  So all you're doing is once you know

18 the degree change, right, you can figure out what the

19 distance is between the track that she would have been on

20 without the bearing change versus the longitudinal

21 distance that she travels, and then you can -- you can

22 calculate the change, right?

23      A.     It's not that simple, because you don't

24 instantly change angles like the corner of a triangle

25 does.  It's a quadrantic curve --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000274

 1        Q.     Okay.

 2        A.     -- that you gradually quadratically increase

 3   your heading angle.  So it's more complicated than just a

 4   triangle.  But what I can do is look at the empirical

 5   equations to calculate the lateral movement.

 6        Q.     So what is the lateral movement of a 3-degree

 7   swerve to the right like the one that she conducted?

 8        A.     Let me see.

 9        Q.     And tell the jury; sort of walk us through

10   how you figure it out.

11        A.     So what I'm doing is I'm using the equations

12   where the inputs are speed and lateral steering distance

13   side to side, and it establishes what the average lateral

14   acceleration -- the rate at which you are changing

15   laterally -- that's what defines the curve.  It's not an

16   instantaneous change like a triangle, it's a curve, and

17   then also the lateral movement during that time of that

18   distance segment.  And so I don't have that teed up, so

19   I'm having to do this iterative process to answer your

20   question.  It's about 5 feet.

21        Q.     Okay.  All right.  That's -- and I'm not an

22   engineer.  I just used a triangle, and I came up with

23   about 6 feet, so --

24        A.     All right.

25        Q.     -- I'm close enough, right?  I have nothing



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000275

 1  better than the Pythagorean theorem to use, so you have

 2  better tools, okay?

 3          So what was Caylee's bearing when she sent

 4  the text message to Gracie?

 5     A.   I don't have that teed up, but I can

 6  certainly try to go look for that.

 7     Q.   And just -- I think we agree that the text

 8  message happened at the 2:48:43 mark.

 9     A.   Okay.  Her bearing at 2:48:43 was

10  340 degrees.

11     Q.   And we agree that's her bearing when she sent

12  the text message?

13     A.   Yes.

14     Q.   Okay.  So how fast was she going when she

15  sent that text message to Gracie?

16     A.   87.8 miles per hour.

17     Q.   Okay.  And round it up to 88?

18     A.   Sounds good.

19     Q.   Okay.  So she was on the 340 bearing for

20  about three seconds, right?

21     A.   Until when?

22     Q.   Well, about three seconds later, does she

23  change her bearing?

24     A.   There's a 341, 340, there's some rounding.

25  It rounds to the nearest whole number.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000276

300977 Montalbano Paul J. 01-04-2024 - VOL. I       Page 182

1    Q.   So at what second did her -- so she's on the

2 340 bearing after sending the text message.  At what

3 second does she change her bearing to 341?

4    A.   Like, about five and a half seconds before

5 impact.

6    Q.   So it's about three seconds after sending the

7 text message, right?

8    A.   Sure.

9    Q.   Okay.  So a change from 341 to -- excuse me,

10 a change from 340 to 341 is, what, a rightward shift?

11    A.   Yes.

12    Q.   Of about how many feet using the calculation

13 you used earlier?

14    A.   Well, the problem is you're rounding.  That

15 very well could have been a 340.4 at one moment and then

16 a 340.5 at the next one, and it's going to round to the

17 next whole number.  So --

18    Q.   How do you know that it's rounding to the

19 whole number?

20    A.   Because the precision -- they only give us

21 whole numbers.

22    Q.   Okay.  So you don't know which way it's

23 rounding, right?

24    A.   Well, it depends on which side of the half

25 it's on.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900        www.MILESTONEREPORTING.com

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

Toll Free 855-MYDEPOS

App. 000277

1     Q.     Well, you don't know how close it is - --

2     A.     No.

3     Q.     -- when they round up, right?

4     A.     Right.  And that's why this hypothetical

5  question is tough, because I don't know where within that

6  range it actually was.

7     Q.     Let's say it's a full degree.  Let's just

8  take the data as it shows, right?  It's a full degree

9  change from 340 to 341, right, traveling at the speed at

10  which she is at when she makes the bearing change, so

11  that's 85 miles an hour.  How many lateral feet to the

12  right has she moved?

13     A.     It's going to be about less than a quarter of

14  a foot, so 3 inches.

15     Q.     Okay.  So she's gone right.

16            Now, does she change her bearing back to 340

17  in the next second?

18     A.     Well, the data either rounds to 340 in the

19  next second, but I don't know if it's necessarily her

20  changing it back to 340.  But certainly, as you drive,

21  you are going to be putting adjustments into your

22  steering, but very slightly, to maintain a straight

23  heading.  So anything less than 1 degree, you're just

24  getting way too precise.

25     Q.     Okay.  But the bearing does change in the



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000278

1  next second back to 340, right?

2       A.    It could round back, yeah.  I mean, if it --

3       Q.    Well --

4       A.    -- if it was at --

5       Q.    -- I'm just saying just look at it.

6       A.    Yeah, yeah.  The physical data goes 340, 341,

7  because, again, we're rounding.

8       Q.    Okay.  So at the 2:48:47, she's got a bearing

9  of 340; and then the next second, she goes to 341 again,

10 right?

11      A.    Okay, yes.

12      Q.    Okay.  And so then she goes back to 340 in

13 the next second, right?

14      A.    Or it rounds down to 340, yeah.

15      Q.    Okay.  And then she's on 340 until the

16 collision occurs and she moves 3 degrees to the right?

17      A.    Right.

18      Q.    Okay.  So do you think the 3-degree move is

19 the result of -- could it be -- could it be closer to

20 2 degrees?

21      A.    You're right.  It's possible.  It could be 2

22 to 4, really.

23      Q.    Okay.  We just don't know?

24      A.    Yeah, I mean, because of rounding.  It's

25 going to be anywhere between that 2 to 4, but the 3 is



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000279

1    the central value.

2        Q.    Right.  And you don't know, like, from your

3    expertise and from reviewing the literature, how accurate

4    the bearing data is on these Gen 3 SYNC devices, right?

5        A.    Right.  And again, I'm not establishing her

6    trajectory based on the bearing data.  What I'm saying is

7    I've independently calculated what the maximum bearing

8    angle change would be using an emergency swerve at her

9    speeds, and it equates to 3.1.

10       Q.    Okay.

11       A.    And I look at the bearing data on the GPS

12   data, and it shows 3 degrees.  So I'm saying it's

13   consistent.

14       Q.    Okay, okay.  So you've read Caylee's

15   deposition, right?

16       A.    Yes.

17       Q.    So your testimony -- or her testimony is that

18   she never left the left lane as she approached the Toyota

19   Camry, right?

20       A.    Yeah.  It was a little vague on whether she

21   actually breached the middle lane or not.  But I think at

22   the end of the day, my consensus or my understanding of

23   her testimony was that she didn't actually breach the

24   center travel lane --

25       Q.    Well, she --



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000280

1    A.    -- until after.

2    Q.    She thinks she didn't breach the center

3  travel lane --

4    A.    Right.

5    Q.    -- right?  That's her testimony, right?

6    A.    Mm-hmm.

7    Q.    So -- and did you assume that was the case

8  while you were generating your report?

9    A.    Well, I was presented two versions, right?  I

10 don't know the exact lateral position of anyone at

11 impact.  So what I did was analyze the two versions that

12 are in dispute, Plaintiffs' version and Defense's

13 version, and I'm presenting both of those for the jury,

14 and they can choose.

15   Q.    Okay.  So now, if she -- if we assume that

16 she's in the left lane -- and that is her testimony,

17 right?

18   A.    Right.

19   Q.    If she -- that 3 degrees swerve to the right

20 would have put her in the middle lane, right?

21   A.    Yeah.

22   Q.    Okay.  How far in the middle lane?

23   A.    Well, we said what, 5 feet?

24   Q.    Mm-hmm.

25   A.    Mm-hmm.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000281

1      Q.    So about -- was it about halfway in the

2  middle lane?

3      A.    Depends where she started from.

4      Q.    Well, taking her testimony as true, right?

5      A.    Mm-hmm.

6      Q.    You know, that she's trying to avoid the

7  Toyota Camry but not be in the middle lane --

8      A.    Right.

9      Q.    -- about how far -- how far away is she from

10 the middle lane at that point?

11     A.    Yeah.  I mean, she's about 5 feet into the

12 middle lane, which is quite consistent with the GPS

13 position --

14     Q.    Okay.

15     A.    -- that we see.

16     Q.    So you would agree that when she swerved to

17 the right, according to the GPS and the bearing, she went

18 about 5 feet in the middle lane?

19     A.    Yeah, I think she at least breached the

20 middle lane after her swerve for sure.

21     Q.    Sure, sure.

22           How wide is the middle lane?

23     A.    I think it's also about 11 to 12 feet wide.

24     Q.    Okay.  So she, at -- at maybe the maximum

25 point of her swerves, she's taking up half of the middle



**MILESTONE │ REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000282

 1  lane, right?

 2       A.    Sure.

 3       Q.    Okay.  So how much damage was on the right

 4  side of the Ford Explorer?

 5       A.    None.

 6       Q.    Okay.  So you'd agree that means that she

 7  didn't hit anybody on her right when she swerved at the

 8  collision point?

 9       A.    That's true.

10       Q.    Okay.  So why didn't you include in your

11  report, "The middle lane was empty to Caylee Smith's

12  right at the point of impact"?

13       A.    All I can tell you is the point of impact

14  what the status of that middle lane is.  We all know lane

15  status can change within seconds.  I have no idea what

16  her lane status was five, ten seconds prior, which is the

17  timing of when somebody would start implementing a lane

18  change.  Nobody can attest to what the status of that

19  lane was five to ten seconds out.  All we can attest to

20  is at the point of impact, she was able to exist in that

21  center lane.  That tells us nothing about her ability to

22  be able to change lanes back in time.

23       Q.    Okay.  And you would agree, Caylee Smith

24  doesn't remember if there was anybody in the middle lane?

25       A.    Yeah.  Her -- she couldn't remember



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  specifically.  I think there was -- yeah, I'll just agree

2  with that.

3      Q.    Okay.  So your conclusion is that

4  Mr. Santos's head must have been 1.1 feet east of the

5  outward or the rightmost point of the Toyota Camry?

6      A.    Yes.

7      Q.    And that's due to your equations saying that

8  the maximum degree swerve that Caylee Smith could have

9  conducted was 3.3 degrees?

10     A.    I thought it was 3.1, but you might be right.

11     Q.    I'll take your word for it.

12     A.    I'm not sure.

13     Q.    What is your equation that you're using?

14     A.    That is, again, based on the steering

15  amplitude from Muttart's 2015 paper, 2015-01-1417.

16          UNIDENTIFIED SPEAKER:  I'm sorry.  I couldn't

17      see you from the --

18          THE VIDEOGRAPHER:  One moment.

19          MR. WHITE:  I thought it was locked.

20          MR. DUBOFF:  Yeah, I thought it was a dead

21      bolt.

22  BY MR. WHITE:

23     Q.    Okay.  So in -- I take it that equation is

24  based on the speed at which someone is traveling, right?

25     A.    That is a variable, yes.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

 1      Q.    Okay.  So you can swerve more the -- your

 2   degree of swerve can be greater if you're going slower,

 3   right?

 4      A.    True.

 5      Q.    Okay.  How much greater?  Like, is it a

 6   sliding scale?

 7      A.    It's a quadratic.  I don't have an answer to

 8   that.

 9      Q.    Okay, okay.  So that paper says that the

10   maximum that Caylee Smith could have swerved to the right

11   was 3.1 degrees?

12      A.    With these set of facts, yes.

13      Q.    Okay.

14      A.    Her speed and the emergency swerve distance

15   she traveled during that speed.

16      Q.    What speed did you put into that equation

17   when calculating her max swerve?

18      A.    90 miles per hour.

19      Q.    Okay.  Did you test that equation at the

20   lower speed, right, that didn't mean closer to 87 miles

21   an hour?

22      A.    I didn't, no.  It would increase it by a

23   tenth of a degree.

24      Q.    Okay.  Which would -- would that change your

25   conclusion at all?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000285

1       A.    No.  Again, we're rounding to the nearest

2   degree, so a tenth of a degree is just too precise to

3   make any opinions from.

4       Q.    Okay.  So do you know how many feet behind

5   the Toyota Nehemias was standing?

6       A.    I certainly modeled it at a given distance,

7   but the testimony seems to indicate within arm's reach.

8   Pretty close.

9       Q.    Okay.  So does the physical evidence give you

10  any basis to conclude how far back from the Toyota he was

11  standing?  Not lateral; let's just set lateral to the

12  side.  But just how far back from the trunk?

13      A.    No.  There's really no -- let me rephrase

14  that.  Within 10 feet, yes.

15      Q.    Okay.

16      A.    But we can't really get any more precise --

17      Q.    Yeah.

18      A.    -- than that.

19      Q.    You know he's not 50 feet back?

20      A.    Right.

21      Q.    And you know -- I mean, would you say you

22  know he's not, like, 1 foot away from the trunk?

23      A.    I would say it's possible, but I don't know.

24  5 feet seems reasonable.  So I don't have a specific

25  answer for you.  But I know it wasn't 30; I know it


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000286

1  wasn't 40; I know it wasn't 250 feet, which is the

2  distance that she would have had to start her swerve from

3  on the shoulder.  So for what it's worth, when the

4  witnesses said they saw her driving on the shoulder, they

5  would have had to have seen her driving 250 feet away at

6  that point.

7       Q.    Okay.  All right.  So on Page 12, you

8  describe in detail the steps needed to remove the Camry's

9  spare tire?

10      A.    Yes.

11      Q.    Okay.  So do you believe that most of these

12 steps had been concluded by the time the collision

13 occurred?

14      A.    There's certainly conflicting testimony about

15 what step they were on.  I know there was some testimony

16 about either the spare tire was in the process of being

17 picked up out of the trunk, or it was already out of the

18 trunk.  The jack, obviously, with the jack arm was

19 already out of the trunk and underneath the car, and they

20 went looking for the -- the tool to take the lug nuts

21 off.

22      Q.    And do you make any conclusions based upon

23 the status of the tire change other than the jack stand?

24      A.    No.  I think I just wanted to understand the

25 configuration of the spare tire a little bit better --



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000287

```
 1        Q.    Okay.
 2        A.    -- to help understand or at least educate the
 3   jury, you know, where the parts are supposed to be, maybe
 4   what step they were on, just helping the jury understand.
 5        Q.    Okay.  But you don't know which step they
 6   were on, based on the physical evidence you reviewed?
 7        A.    Well, I know the tire was out after the
 8   incident, and I know the jack and the crank was out.  So
 9   it can certainly help the jury at least know that that
10   was taken out.
11        Q.    Okay.  So what other steps remain if the
12   tire -- if the jack's set and the tire is out of the back
13   of the car, what part remains?
14        A.    The only other step that would be next would
15   be to start taking off the lug nuts, which the tool for
16   the lug nuts should have been with the jack and the
17   crank.
18        Q.    Okay.  Do you have any opinion about where
19   the tool to remove the lug nuts -- now, are we talking
20   about that tire iron, or are we talking about something
21   different?
22        A.    Yeah, just the standard stock tire iron tool
23   to take off lug nuts.
24        Q.    Okay.  Are there any other tools that you're
25   aware of that were needed?
```



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

```
 1        A.    No.

 2        Q.    Okay.  Do you believe that Nehemias was doing

 3   something unrelated to changing the tire when he was

 4   struck by Caylee Smith?

 5        A.    I don't -- I can't answer that.

 6        Q.    Okay.  So you don't know what he was doing?

 7        A.    No.

 8        Q.    Okay.

 9        A.    Other than bending over.

10        Q.    Which is based on your analysis --

11        A.    Yes.

12        Q.    -- right?  Okay.

13        A.    Mm-hmm.

14        Q.    So how did you take into account

15   Caylee Smith's testimony at her deposition that

16   Nehemias Santos stepped out in front of the Ford Explorer

17   at the last minute?

18        A.    Well, remember, I'm performing an objective

19   analysis and comparing it to the testimony.  If I would

20   just simply recite testimony, then what good am I?  So

21   I'm using science and objective evidence to figure out

22   what I can determine based on that, and then we can make

23   comparisons.

24            So it is what it is.  It's just direct

25   comparison.  Caylee had mentioned something about bending
```



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

1  over, stepping out.  I think it's just a game of

2  semantics at that point.  But what I can say is the

3  evidence shows that he was bending over.

4       Q.   Okay.  What did you -- how do you take into

5  account Caylee Smith's deposition testimony at her

6  deposition that Nehemias Santos was facing the Toyota,

7  like, the side of the Toyota when she hit him?

8       A.   I don't remember that testimony.

9       Q.   Okay.  Do you remember her testifying that it

10 was her belief that he's standing in the roadway looking

11 at the back right passenger tire?

12       A.   I didn't interpret it that way.  I understood

13 it to be that he was at the back right tire or near the

14 back right tire.  I don't recall there being enough

15 detail in the testimony to say exactly what he's looking

16 at.  What I will say is this all happened rather quickly,

17 and there were various versions of what she thought she

18 saw.  Again, I'm just reciting what the testimony says.

19 That has no bearing on my analysis.  I'm relying on the

20 objective evidence and data.  I present that to the jury,

21 and they can do with it what they want.

22       Q.   So did you take into account Caylee Smith's

23 written statement to the police where she said that

24 Nehemias was kneeling down to change a tire?

25       A.   So again, you keep using the word "take into



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1  account."  I'm relying on objective evidence.  So it's

2  not that I'm dismissing or using specific points of

3  testimony.  I'm doing my own independent analysis, and I

4  read the testimony.  So I'm not necessarily relying on

5  the testimony here.  So you're welcome to make a

6  comparison to the jury, but that has no relevancy to what

7  I've done.

8        Q.    But based on your analysis, you do not

9  believe it's true that Nehemias Santos was looking at

10  the -- standing in the roadway looking at the back right

11  tire of the Toyota, right?

12        A.    At least not at the point of impact.

13  Certainly, he could be doing a multitude of things

14  leading up to impact or within a half second or second

15  before impact, which, quite frankly, is when Ms. Caylee

16  would see him.  She's not going to see his head at

17  impact; the hood is blocking her view of his head.  So I

18  wouldn't expect her to know his exact orientation at

19  impact.  She can't see that.

20        Q.    Okay.  Now, on Page 14 of your report, you

21  say that, "Therefore, had the Ford driver swerved a foot

22  further to the right, the collision would have been

23  avoided.  However, it was indeterminate as to how much

24  advanced notice Ms. Smith was provided of

25  Mr. Nehemias Roderico Pivaral Santos actively bending



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

 1  over into her path."

 2       A.    Correct.

 3       Q.    So you modeled out the maximum swerve that

 4  she could do at 90 miles an hour, right?

 5       A.    What do you mean, the maximum swerve she

 6  could do?

 7       Q.    Well, you testified earlier that you -- you

 8  have an equation that shows that she can only make a

 9  rightward emergency swerve of 3.1 degrees when she's

10  traveling at 90 miles an hour, right?

11       A.    Yes, given -- yeah, given the lateral

12  movement, yes.

13       Q.    Okay.  So if she'd been going slower, she

14  would have been able to make a greater swerve to the

15  right, correct, mathematically?

16       A.    I suppose I can agree with that.

17       Q.    Okay.  So --

18       A.    Again, we're talking a tenth of a degree, so

19  qualitatively, I think I can agree with you.

20       Q.    Well, I'm not telling you how much slower she

21  could have been.  If she'd been going the speed limit,

22  right, then it would have been an even greater ability to

23  make a turn to the right?

24       A.    Maybe two-tenths of a degree, because we saw

25  that 10-mile-per-hour difference with a tenth of a



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

1  degree.

2        Q.    Okay.  I mean, it's quadratic, right?  So it

3  might be different if -- you know, exponentially, right?

4        A.    Well, all I'm saying is when you

5  hypothetically asked me the question before, I changed

6  the input from 90 to 80, and it changed the orientation

7  by one-tenth of a degree.

8        Q.    So if you change it to 75, how many tenths of

9  a degree does it change it?

10       A.    I can certainly do that.  .35 degrees.

11       Q.    Okay.  So if she'd been going the speed

12 limit, she'd have been able to increase her turn to,

13 what, three point -- let's call it 3.5 degrees?

14       A.    3.45.

15       Q.    3.45, okay.

16             And if she'd been going the speed limit and

17 then decreased her speed more, obviously, she'd have been

18 able to turn even more, right?

19       A.    Maybe.

20       Q.    Okay.  I mean, mathematically, yes, right?

21       A.    Yes.

22       Q.    Okay.  Do you believe that if Caylee had not

23 been texting Gracie, she would have seen the Camry sooner

24 than she did?

25       A.    I can't say that.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

1      Q.    Why not?

2      A.    I don't know what traffic conditions were

3   like; I don't know when she was presented the visual

4   sight line to the Camry.  What I do know is that she

5   responded to the Camry successfully.

6      Q.    Two seconds before?

7      A.    Whenever she did, she responded like the

8   average driver does to a roadside parked vehicle with a

9   pedestrian --

10     Q.    Well, when --

11     A.    -- so she successfully responded to the

12  Camry.  The issue was the secondary imminent hazard that

13  presented itself with Mr. Nehemias bending over.

14     Q.    But she didn't reduce her speed until two

15  seconds before she passed the Camry, right?

16     A.    She reduced her speed by 4 miles per hour,

17  which is --

18     Q.    Two seconds before?

19     A.    Right, which is greater than what the average

20  driver does.

21                    CONTINUED IN VOLUME II

22                         * * * * *

23

24

25



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

**$**

**$15,000** 49:2

**$280** 47:9,12

**$400** 47:10,15

**0**

**0.33** 92:11

**1**

**1** 3:14 5:18,21
35:19 37:3
75:2,6 104:14
105:9 153:3
183:23 191:22

**1,000**
121:2,7,13,17
122:3,5,7,9
123:22

**1,022** 123:25
125:9

**1,146** 123:25
125:9

**1,400** 100:2

**1,500** 92:20
93:1 95:10

**1,700** 93:5
99:18 100:6
125:9,18

**1,742** 92:22
95:4 98:23
99:19 100:3
125:6

**1.1** 189:4

**1.7** 36:5

**1/2** 36:3 145:10
176:13 177:2

**1/2-foot** 73:2

**1/2-to-7** 73:2

**10** 23:17 75:2,6
83:6,20 146:6
191:14

**10:12** 1:18 4:6

**10:28**
18:4,6,7,8

**10:56** 41:9,11

**100** 24:7,16
81:1 86:12
105:23 175:8

**10-mile-per-**
**hour** 197:25

**11** 45:19 148:23
152:14,25
153:3,17
187:23

**11.6-foot-wide**
137:13

**11:02** 41:12,13

**113** 89:4

**12** 174:23
187:23 192:7

**12:00** 143:9,11

**12:18** 97:25
98:2

**12:58** 98:3,4

**13** 92:17 95:21
96:3 123:18,24

**130** 179:13

**14** 150:13
163:12,15,23
167:2,11,12
196:20

**14th** 163:17

**15** 25:11 71:16

**150-millisecond**
80:1,13

**16** 95:16

**17** 92:18

**180** 177:16

**19** 1:16

**19th** 4:5

**2**

**2** 3:14 5:18,22
32:13 36:3
74:15 75:2
110:14 112:15
115:8 121:16
184:20,21,25

**2.1** 137:12

**2:18** 167:5,7

**2:24** 167:7,8

**2:48:43** 181:8,9

**2:48:47** 184:8

**2:48:50**
106:22,23
107:1

**2:48:51** 106:15
107:8,18 179:2

**2:48:52** 106:15
107:12,18

**2:51** 107:17

**2:52** 107:17

**20** 25:11 70:1

**2013** 9:6 10:12
21:22 45:18

**2014** 45:16

**2015** 189:15

**2015-01-1417**
189:15

**2016** 12:22
43:11

**2017** 73:15
74:25

**2017-01-1437**
73:15

**2018** 73:16,24

**2021** 42:21,22
72:2 73:17,18
168:19

**2021-010903**
72:4

**2022** 55:16,19
61:4 79:16
92:5 93:23

**2023** 1:16 4:5
6:10,13 47:9
53:13,19,25
83:7,20

**2200089-Photos**
153:3

**23219** 2:10

**24** 66:9

**250** 106:1,3,20
179:13 192:1,5

**26** 6:10
53:13,19,25

**26th** 6:14,15

**2nd** 21:22

**3**



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

**3** 3:15 5:18,24
35:19 37:3
66:22 68:8,25
70:8 71:2,6
72:13,17 73:2
74:24
75:4,6,7,11,19
77:18 78:23
79:1 104:14
105:9 145:10
161:17 164:25
176:13
177:2,9,16
178:8 183:14
184:16,25
185:4,12
186:19

**3.1** 177:23
185:9 189:10
190:11 197:9

**3.3** 189:9

**3.45** 198:14,15

**3.5** 69:1 74:11
198:13

**3:22-CV-02714-K**
1:3 4:14

**30** 61:4 79:16
92:5 93:23
191:25

**309** 28:15,18
29:16

**32822** 1:20

**340** 179:2
181:10,19,24
182:2,10
183:9,16,18,20
184:1,6,9,12,1
4,15

**340.4** 182:15

**340.5** 182:16

**341** 181:24
182:3,9,10
183:9 184:6,9

**343** 179:5

**35** 198:10

**360** 177:13,18

**3D** 56:15,17,20
87:14,15
88:6,9,15
89:13,19
90:10,12

**3-degree** 178:12
179:8 180:6
184:18

**3-dimensional**
86:14,15,21
87:1,10
89:5,24
90:13,14

**3-foot**
159:1,5,15
162:4,16
164:13

**3-to-7-foot**
73:7,13

**3-to-8-foot**
76:3

---
**4**

**4** 35:24 36:3
37:5 129:25
137:8 148:19
169:3 174:12
184:22,25
199:16

**4:00**
143:9,12,13,15
146:1

**40** 58:21 59:17
192:1

**410** 2:3

**45** 10:12 19:20
27:5 57:13
78:16
92:4,8,15 94:8
111:16

**479** 2:4

---
**5**

**5** 68:13,15
71:8,15,23
72:6 79:25
80:7,12 180:20
186:23
187:11,18
191:24

**5:00**
143:9,12,13,15
146:1

**50** 111:16
191:19

**50-50** 23:9,11

**50th** 71:25
168:10,11

**54** 149:17

**5750** 1:20

---
**6**

**6** 55:18
91:20,21 92:1
180:23

**6.6** 137:19

**60** 149:25

**65** 150:1,2,4,23

**67** 149:22,25

**68** 149:22

**69** 89:3

**6th** 6:12

---
**7**

**7** 70:8 95:12
142:21 176:13
177:2

**7.5** 69:2 74:11

**70** 27:2 111:23
149:19,22,25
150:5,24
162:21

**700**
125:11,16,18,2
0

**72764** 2:4

**75** 93:10 95:14
111:23 119:6
198:8

**76** 89:3

**775-1154** 2:10

**7-foot** 69:1

---
**8**

**8** 70:9 75:19
144:3 164:24

**80** 23:24 198:6

**800** 2:9

**804** 2:10

**82** 107:13


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

App. 000296

**83** 107:15,16

**85** 183:11

**86** 35:24 36:1
109:24

**87** 107:9,10
109:24 190:20

**87.8** 181:16

**88** 169:22,23
170:1 171:11
181:17

**89.97** 107:6

**8-feet** 71:6

**8-foot** 71:2

---
9
---

**9** 75:2 144:23
146:6 165:16

**9.5** 137:14

**9.5-foot** 137:21

**90** 35:24
95:20,23
107:2,4,5
109:23 111:23
119:9
177:14,15,20
190:18
197:4,10 198:6

**935-1761** 2:4

**95th**
71:10,20,21

**98** 89:20

**99** 89:3

---
A
---

**a.m** 1:18 4:6
18:4,7,8

41:9,11,12,13

**abilities**
111:12

**ability** 111:6
130:3,4 188:21
197:22

**able** 12:10
15:14,22
27:21,22
28:2,5 47:22
64:9 80:16
84:5 87:11
89:23 159:14
161:3 168:25
169:19 170:24
171:23
188:20,22
197:14
198:12,18

**ABS** 109:5

**absolute** 33:5

**absolutely**
49:21,23
114:18 115:7

**absolutes** 157:6

**academia** 38:13

**accelerated** 9:7

**acceleration**
180:14

**accelerator**
104:15

**accept** 76:2

**accepted** 75:20

**accident**
10:2,5,9,13,15
,24

11:10,13,19,24
12:7 13:12,22
14:20
15:20,23,24
17:10 19:21,23
20:9 21:21,23
22:10 27:10
38:14 42:12
44:6,12
45:5,14 51:15
54:12 57:25
64:18 76:2
80:20 84:4
89:17 91:6
95:24 138:22
141:3,6 144:14
172:15,20

**accidentally**
122:22

**accidents** 23:18
38:24 159:25
160:8

**accompany** 6:21

**according** 29:15
113:22 187:17

**account** 138:20
194:14
195:5,22 196:1

**accounted**
138:22

**accounting**
137:12

**accreditation**
45:6

**accuracies**
71:19 76:22
77:1 84:8,9

**accuracy** 41:25

56:6,11,16
67:17,21
68:11,12,19
69:1,2,19
70:7,8,11
71:5,7,11
72:17
73:4,9,11
74:18
75:10,15,17,19
,25 76:10
77:2,17,20
78:4,10 79:1
84:15 85:24
86:3 92:21
177:6 178:23

**accurate** 10:24
40:19 70:3
85:17 178:19
185:3

**ACM** 55:23
58:2,14
79:12,24
80:9,11,20,21
81:17,20 82:1

**acronym** 11:21
12:14

**ACTAR** 45:6

**action** 1:3 4:14
118:4

**actions** 62:5

**active** 47:14
112:21

**actively** 31:13
196:25

**actual** 23:9
34:3,24,25
61:20 62:23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

75:10 78:2

**actually** 16:15
21:13 22:4,15
27:1 31:1
33:21,22 36:12
37:3 40:21
47:16 55:18
56:11 57:9
62:11 63:20,22
64:2 65:12
66:15 67:20
68:18 72:5,22
76:15,21 80:25
84:13 96:5,13
104:16 109:6
129:16 131:17
139:2,3 149:18
150:1 152:3
155:16 158:4
163:13 166:9
171:12,19
173:12 183:6
185:21,23

**add** 168:16

**added** 49:1
168:17 171:12

**addition** 19:12
89:4,25 161:19

**additional** 36:1
114:1 118:20
119:25 120:17

**address** 61:13

**adhere** 76:22,25

**adjust** 35:21

**adjusted** 31:10
117:22

**adjusting**
33:9,24

**adjustment** 32:9

**adjustments**
183:21

**administrator**
1:5 4:9

**admit** 176:11
178:17

**advanced**
119:10,15,22
196:24

**aerial** 87:21

**aerodynamic**
13:25

**aerodynamics**
13:21

**affect** 27:15
68:24 139:7

**affects** 12:3

**affirm** 5:5

**affirmative**
109:1

**affirmatively**
109:9

**against** 52:2
78:23 132:11
146:8

**ago** 24:11

**agreement** 6:10

**Ah** 163:23

**ahead** 60:12
111:21 119:24
120:20
143:9,11 171:4

**air** 67:7 79:7
81:6

134:5,12,15

**airport** 94:1

**Alabama** 12:24

**albeit** 100:5

**align** 139:2

**allow** 57:2,6

**allowed** 51:17
141:10

**alluding** 135:24
136:10

**already** 5:21
6:1 12:5 99:5
114:8 126:12
146:6
192:17,19

**altimeter** 63:4

**am** 10:20 11:2
12:10 31:16
43:13 45:25
47:22,24 48:8
72:9 74:11
110:8 166:14
194:20

**ambiguous** 15:11

**amend** 102:1,5
136:14

**American** 68:15

**amongst** 17:16
53:2

**amount** 12:9
40:13,14 45:3
50:9,14 97:9
114:23
136:9,10
155:24

**amplitude**

189:15

**analogy** 18:18

**analyses** 15:23
21:25 22:11
23:2,4,13,23
64:19 115:22

**analysis**
10:10,16 11:25
12:19 13:13,23
17:1 21:16
22:3,5,16
23:11 27:10,25
30:7,8,10,11,1
2,16,22
31:17,22,25
32:15,20
33:14,20
34:9,12,21
35:1 38:15,16
39:11 43:13
47:13 48:4
50:5 56:22
69:7 77:23,24
78:22 84:11
86:8,16 88:6
101:3,5,10
151:5,10
158:19 164:10
168:1 170:17
194:10,19
195:19 196:3,8

**analyst** 11:15

**analyze** 11:24
19:22 27:13
29:23 52:24
69:16 78:11
101:3,4 127:25
186:11

**analyzed** 24:21



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

28:22 178:19

**analyzes** 16:9
18:1

**analyzing** 14:11
38:15 40:25
44:20 76:7
77:21,25 101:9
176:17

**angle** 143:7
171:23 175:22
177:23,24
178:2,4 179:16
180:3 185:8

**angles** 15:5
173:5 179:24

**angry** 150:16

**annual**
97:5,12,14

**answer**
6:7,8,21,24
16:2 18:2
22:9,24 29:20
46:8 47:23
48:11,13,21
52:16 60:12
66:25 67:6,14
77:22 88:20,21
89:1 99:24
101:23 105:6
115:11
126:20,25
127:2,11,22,23
128:1,2,18
133:8 180:19
190:7 191:25
194:5

**answered** 99:5

**answering**

101:23 127:9

**answers** 6:20

**Anthropometric**
168:18

**anybody** 158:12
188:7,24

**anyone** 54:3
57:12 91:17
158:1 186:10

**anything** 8:8
9:22 10:7
14:10 15:1
24:15 25:1
30:22 32:8
48:4,7 49:12
87:13 97:16
98:19 99:10
111:16 148:12
159:11 161:14
183:23

**anytime** 64:3
116:14 118:14
171:9

**anywhere** 46:15
74:23 77:3
110:22 179:13
184:25

**apart** 124:23

**Aperture** 54:10
55:3 83:6,20

**apologize** 45:25
72:4 168:17

**appear** 56:8
143:20

**appeared**
126:2,9,23
127:18 128:5

134:2 142:21
172:25

**APPEARING**
2:5,11,14

**appears** 178:19

**Apple** 76:24

**apples** 28:23,24
34:13,20,24
73:1,2
75:22,23 121:5

**applicable**
34:11

**application**
104:15 105:19
108:15 126:18

**applications**
16:11,13

**applied** 10:25
16:19 19:25
20:5 30:4 35:1
109:2,8,9
115:20 116:7
140:15
141:11,17,25
143:3,6
144:1,18
148:14

**applies** 10:14
11:3

**apply** 17:4
34:14,21 35:5
90:9 109:5
115:3,13,18,25
116:13,15,22
118:11,13,16
127:1,3,4,8,24
128:1 177:21

**applying** 12:2

14:2 33:20
35:2 51:15
115:22 116:9
118:19 161:21

**appreciate**
110:25
111:6,20
121:18
173:13,17

**approach** 35:15
78:6,16 91:21
92:10 102:25
119:8

**approached** 35:6
103:18
115:13,25
116:7,16
129:17
139:16,20
140:2 185:18

**approaching**
94:19 98:10
114:24 118:2

**appropriate**
115:1,23

**approximately**
92:11 95:16,21
106:1 125:11
137:12,14,19

**April**
6:10,12,14
53:15,19,25
61:4 79:16
92:5 93:23

**arc** 173:5

**area** 40:24 92:8
93:11 97:14
119:11,15,22



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

**CORPORATE ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

120:4 149:20
166:11

**aren't** 17:12
84:13 101:20

**arguably** 13:22
37:3

**argue** 172:4

**Arkansas** 2:4

**arm** 148:11
192:18

**arms** 148:10

**arm's** 191:7

**Armstrong** 45:17

**arrow**
121:12,20,21,2
4

**articulated**
148:16 165:20

**articulation**
148:17 165:21

**aspect** 11:22,23
14:3 43:18,19
44:6

**asphalt**
130:11,12
132:11,25
133:4

**assessing** 75:24

**assist** 53:7
54:20

**assistance**
54:22

**associated** 33:2

**associates**
150:17

**assume** 43:22
70:11 186:7,15

**assuming** 98:24
99:25

**assumption**
51:12 113:25
160:15,20

**assumptions**
49:4 50:23,25
51:4,10

**AT&T** 82:23

**ate** 133:2

**attempted** 25:4

**attempts** 25:3

**attended** 9:7

**attention**
113:15 119:25

**attentive** 34:2
36:8

**attest**
188:18,19

**attorneys** 52:15

**audience** 68:15

**August** 53:13

**authored** 67:24

**available**
12:10,12 21:16
28:7 29:22
31:19 40:12
43:6 46:14
96:7 137:15,20

**average** 36:4,7
37:4
97:5,12,13,14
104:10,18

105:12
109:15,20
113:18,20
115:3 118:15
180:13
199:8,19

**avoid** 28:2,19
29:13 31:20
37:16 96:19
111:13,15,18
114:4,10
173:25 187:6

**avoidability**
101:11

**avoidance** 27:9
30:11 31:17
34:21 35:1
37:13 44:18
114:14,20,22
168:1

**avoided** 27:10
196:23

**aware** 24:24
38:1 51:8
93:15 97:4,19
99:4,6,10
110:13 112:17
121:8 126:1
144:13 193:25

**away** 28:10
99:19 100:6
104:20 105:2
106:1,3,20
121:17
122:3,5,7,10,1
2 123:21,25
125:18
145:17,18
164:2 187:9

191:22 192:5

**Axiom**
54:11,12,15
56:10 58:7
66:13

**axle** 142:5,15

**azimuth** 94:5

---

B

**bachelor** 9:1

**bachelor's** 9:8
19:4

**background**
15:7,19,22

**backgrounds**
15:13

**backup** 96:24

**backward**
141:14,15

**bad** 45:25 46:18
50:2 94:17

**bag** 67:7 79:7
81:6

**ball** 17:17,18
18:18,22 111:6
120:24

**balls** 17:19,23
18:19

**barometer**
141:25

**barrier** 87:13
93:7 99:8
102:18

**base** 30:16,22
85:19

**based** 9:22



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**   **www.MILESTONEREPORTING.com**   **Toll Free 855-MYDEPOS**

11:18 15:23
16:11,12 17:3
20:11 21:2,4,9
22:16 23:10
29:22,23
34:17,19 38:13
40:12,24 41:20
48:21 49:12
50:10 64:12
69:3 70:24
71:5,12 72:23
73:3,8 82:4
86:5 87:20
89:13 96:7
102:8 104:6
105:7 106:8
111:12
128:8,16
143:19 155:22
156:14
158:14,19
169:16 170:12
174:19 185:6
189:14,24
192:22 193:6
194:10,22
196:8

**baseline** 37:15

**basic** 15:15

**basically** 9:23
25:20 26:4,9
27:9 86:8
97:13 141:9

**basis** 47:25
48:1,6 78:11
191:10

**bearing** 58:22
62:7
77:16,17,20
78:1,2,4,6,9,1

5,20,23 79:1
101:10 121:6
174:14,19
175:2,22,24,25
176:3,4,6,24
177:11,22,24
178:2,4,11,13,
15 179:2,5,20
181:3,9,11,19,
23 182:2,3
183:10,16,25
184:8
185:4,6,7,11
187:17 195:19

**beat** 162:23

**became** 126:13

**become** 10:2
101:11 121:8

**becomes** 111:17

**begin** 5:13
106:18

**beginning** 95:13
130:21 132:7

**begins** 106:24
108:3 132:21
166:5

**behalf** 2:5,11
24:12

**behave** 9:21
12:3 17:14

**behind** 26:4
33:4 94:10
96:9 114:15
191:4

**belief** 195:10

**believe** 7:16
12:22 16:24

17:6 27:20
36:12 38:18
43:5 47:10
52:6 54:10
55:13 57:18,22
58:21
59:6,15,16
66:6,18 68:25
74:6,22 76:22
87:18 101:12
103:6,20,24
106:12 113:5
114:10 131:6
147:23 149:11
153:9 157:24
168:20 175:12
192:11 194:2
196:9 198:22

**bending** 31:13
114:7 157:25
158:6 164:19
165:4,5,6
166:10 167:23
194:9,25 195:3
196:25 199:13

**bent** 31:18
145:9
167:12,17,21
168:4

**Berla** 60:15,16
63:10,18
64:3,7,9,12
65:1,18 67:3,9

**best** 51:11
108:25 110:14
127:22 145:20

**better** 84:17
138:16 150:10
170:25 181:1,2

192:25

**beyond** 145:11

**billed** 47:7,15
48:24

**billiard**
17:17,18,19,23
18:17,19,21

**bit** 20:19 28:4
51:3 65:23
91:5 122:2
132:5 133:15
136:17,20
141:12 142:4
163:4,7 171:1
176:11 192:25

**black** 63:13,24
67:5,7 102:9
130:16 150:12
164:19 171:12
172:6

**blaming** 132:6

**blanket** 67:6
127:23

**blocking** 196:17

**blood** 14:25
153:17 155:5
160:11

**blown-out** 141:1

**blowout**
134:2,19,23
135:15 136:16
137:2

**Bluetooth** 58:24

**blunt** 146:16

**board** 91:8,9,10

**boards**



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**   **www.MILESTONEREPORTING.com**   **Toll Free 855-MYDEPOS**

App. 000301

121:12,20,21

**boats** 14:12

**body** 15:9 81:14
94:2 96:24
103:6,14
143:8,10,11
144:10,19,25
145:1,24
146:3,8
147:11,24
148:3,7,8
153:17
154:12,15,25
159:18 160:17
161:9,20
162:1,19
164:21 165:10
166:5,16,18,19
,25 167:1
168:7

**bolt** 145:15
189:21

**bone** 14:25

**bonus** 50:9,10

**Bortles** 68:6
73:15
74:10,20,25

**boss** 45:15,18

**bottom** 74:16
139:4 164:24
171:14

**bounced** 146:4,9

**boundary** 171:13

**box** 63:13,24
67:5,7 96:11

**boxes**
12:14,15,18

**brain** 15:1
146:22
152:4,7,10
153:12,23,25
154:15,23
155:2,4 161:10

**brake** 29:13
31:23 105:19
108:8,11,14,20
,22 114:4,10

**brakes** 30:4
32:2,5
33:3,8,18 35:5
109:2,5,8,9,18
115:3,5,6,7,13
,25
116:4,5,7,10,1
3,16,22
118:11,13,16,1
9

**braking**
29:17,19
30:8,10,12
33:13 34:9,11
35:10,12
81:19,21,23
82:2,3,4
111:22
114:13,17
115:18

**branched** 45:16

**breach** 185:23
186:2

**breached** 126:5
185:21 187:19

**breaching**
126:13

**breadcrumb**

58:20

**break** 18:6
27:24 41:11,16
72:11 78:14
88:19 98:2,8
167:4,7

**brief** 18:11

**bright** 121:23

**bring** 19:15
52:23

**bringing** 101:21

**broad** 10:5
13:15 16:5
44:10 83:4
119:13

**buildings** 68:23

**bumper** 144:11
162:2
163:6,7,9
164:7 165:5,17
166:4,18

**bunch** 70:15
120:16

**bus** 62:23

**butchering**
12:13

**buttons** 44:10

───────────
C
───────────
**cab** 128:22

**CAC** 54:10,16
55:2,5,20
56:2,10,23
57:22 58:3,7
66:12,17 86:18

**CAC's** 56:7

**calculate** 29:25
30:2 38:17
39:9,19 85:24
106:7 114:3
151:8
179:11,22
180:5

**calculated**
14:25 185:7

**calculating**
27:1 39:4
106:16 190:17

**calculation**
26:25 29:16
37:23 40:21,22
52:1 114:5
115:16
125:20,25
182:12

**calculations**
16:7,22 21:12
51:7 106:7

**calculators**
125:10

**cam** 94:2 96:24

**camera** 39:6,7
40:6 90:17
103:14

**cameras** 43:7

**Camry** 34:8
83:25 91:13
94:12,15,19,20
,23 96:4
98:11,15
99:1,7,15,18,1
9
100:2,8,11,18,
25 101:13



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

App. 000302

102:9 103:1,18
104:5 114:4,24
115:13,15
116:1,8,17,22,
24 117:4,19
118:2 119:2
125:15,18
136:22,25
139:10,16,21
140:2,6,15
141:11 144:8
146:23 168:24
174:1,2 185:19
187:7 189:5
198:23
199:4,5,12,15

**Camry's** 139:5
192:8

**Canal** 2:9

**capability**
110:25

**capable** 52:23
116:9 169:2
178:1

**capacity**
99:18,22,23

**car** 32:10,11,16
76:16 93:4
96:11 104:1
112:1,2,13,14,
15 114:8 115:8
122:15 123:7
145:18 166:7
192:19 193:13

**carcass** 133:20
134:15,16

**care** 64:24

**career** 80:22

**carrier** 47:1
82:22

**carriers** 47:4

**cars** 97:8

**case** 3:15 5:24
8:11 12:16
13:10 16:23
17:6 19:15
21:12,13
22:1,19 23:21
24:5,10
25:18,23
26:2,18
27:12,15
28:12,18,23,25
29:1,2,7
30:2,13,17,24
31:2 32:10
35:2,3 37:8,24
40:16 41:24
43:19 45:22
46:7
48:2,3,5,8,25
49:13 50:1,23
53:22,24 54:4
65:8 66:13,17
71:9 76:9
78:13 79:19,20
83:3 84:4
86:1,6,17
89:22 101:7
112:22 116:13
120:13,15
121:6
126:10,19,25
127:2,3,8,10,1
2,13 128:9
138:21 139:1,7
154:10 160:22
168:8 178:20

186:7

**case-by-case**
78:11

**cases** 12:11
22:21 24:21
46:17,20 49:19
50:4

**categorize**
11:7,21 34:7

**categorizing**
33:11

**category** 13:10

**cause** 145:13
147:9 148:17
156:24 166:8

**caused** 145:24
146:2 155:11
156:16
157:2,14 160:8
164:20 165:6
170:4 171:19
172:8,13,20
173:3,22

**causes** 148:4

**causing** 171:7

**Caylee** 1:9
4:11,20 21:18
30:24,25
31:2,22 33:14
34:1 35:23
38:2,6 61:4
92:4,15
94:7,18 95:13
96:2 98:10,14
99:6,17 100:12
103:1,18
104:8,16,17
105:10 109:1

114:3
118:11,25
119:7 123:16
126:1,12 138:5
139:9,15
159:25 160:8
168:5,22
188:11,23
189:8 190:10
194:4,15,25
195:5,22
196:15 198:22

**Caylee's** 35:5
36:14 37:8
58:25 77:12
82:9 128:11
175:16 181:3
185:14

**CDC** 168:18,20

**cell** 82:9,15,20
83:2 123:14
125:4

**Cellebrite**
82:18,24

**center** 58:15
59:4 60:10
61:2,22
63:11,18 64:13
66:16 67:14
125:3
130:14,20
131:18 132:17
135:9
145:11,12,23
161:21 162:18
164:12,17
165:18,24
166:15,25
174:20 185:24



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

**CORPORATE** **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000303

186:2 188:21

**centered** 130:19
135:10

**central**
124:16,22
185:1

**certain** 7:11
8:13 27:14
32:7 45:3
57:23 97:9
118:18

**certainly** 14:19
16:8,18
22:11,20
24:3,20 25:3
37:23 44:22
51:8,11 55:13
57:15 59:16
70:25 74:4
81:23 96:20
101:21 109:11
114:17 118:13
136:10 138:17
140:10 142:3
146:21 148:9
151:21 155:2,5
158:19 159:12
160:5 166:12
172:11 178:17
181:6 183:20
191:6 192:14
193:9 196:13
198:10

**certainty** 43:4
69:6 157:9
161:13

**CERTIFICATE** 3:4

**chair** 44:9

**change** 27:14

34:17 54:10
69:17 76:8
79:25
81:3,4,10
109:23 120:1
121:25 131:17
137:22 138:1
176:17 177:24
179:8,10,18,20
,22,24 180:16
181:23
182:3,9,10
183:9,10,16,25
185:8
188:15,18,22
190:24 192:23
195:24 198:8,9

**changed** 198:5,6

**changes** 43:20
71:12 78:20
80:4 87:19
176:18 178:2,5

**changing** 131:8
180:14 183:20
194:3

**characteristic**
169:8 171:10

**characteristics**
16:25 34:19
130:2 140:11
151:24
157:11,19
161:8,9 171:6
172:22 174:10

**charge** 49:25
50:3

**charged** 53:24

**charging** 47:9

**chase** 83:5

**check** 152:17

**checked** 129:2

**checking** 72:2

**chemical** 1:10
4:12,20 16:9
46:24

**chip** 152:14,21

**choose** 13:10
53:4 186:14

**chose** 13:11

**chosen** 53:3
87:3

**chunks** 155:2

**circle** 151:7
177:13,14

**circular** 146:11
149:12,20
150:2
154:11,16
155:10
156:5,20

**circumstances**
114:18

**cite** 36:10 75:9

**cited** 36:12
72:14 73:10,12
83:6

**civil** 1:3 4:13
15:13

**clarify** 49:7

**classes** 45:2

**classic** 172:5
174:10

**classify** 29:9

31:5 32:8
134:4

**clear** 93:22
111:10
121:9,10,23
122:3,4 125:13

**clearly** 124:21

**client** 59:6,7
63:17

**clients** 22:22

**Clinton** 76:23

**clip** 21:7

**clipped** 164:1

**clock** 59:2
143:15

**clockwise** 178:4

**close** 69:14
70:10 84:25
86:12 96:9
144:14,17
180:25 183:1
191:8

**closer** 57:10
161:21 184:19
190:20

**closest** 110:18

**closing** 110:25
111:16,20,23
113:9

**closure** 111:15
119:20 120:22
121:8,21

**cloud** 86:21

**cluster** 70:6

**colleagues**


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

App. 000304

43:18 54:20

**collect** 43:6
79:5

**collected** 22:16
69:16 70:4
86:24 176:21

**collecting**
54:25 86:22

**collection**
42:23 69:5
79:7

**college** 10:15

**collided** 21:14
107:23

**collides** 108:3

**collision** 37:12
57:14 58:21
59:13 81:24
93:11 106:13
107:19 109:10
117:15 123:18
167:14 168:22
175:4 184:16
188:8 192:12
196:22

**collisions** 12:4
23:19,20 24:19
81:12 145:12

**column** 63:2

**combination**
19:8 73:3 74:2
81:19 155:7

**combine** 62:11
176:1

**combined** 9:11

**combining** 68:18

**comes** 71:2 85:6
95:18

**coming** 26:7,9
35:10 98:8
143:8 160:14

**comment** 153:8

**commercial**
23:19 61:14

**committee** 45:6

**common** 54:22
57:5,9

**communicated**
22:6

**communicating**
22:12,14

**communication**
66:19

**communications**
8:5,9,13

**community** 76:2

**companies** 47:5
54:9 56:9
57:10

**company** 1:10
4:12,21
45:17,19 46:25
54:9,13 64:4
85:3,4

**compare** 28:23
34:13,15,20
37:15 51:18
52:25
110:18,19

**compared** 34:23
78:22

**comparing** 20:1

33:21 73:1
169:14 194:19

**comparison**
120:14 194:25
196:6

**comparisons**
158:23 194:23

**compass** 177:12

**compete** 52:2

**competency**
13:16

**complete** 28:7
30:3 31:23
35:10 49:10
92:19 118:4

**completely**
112:4 115:19
155:12

**complex** 14:5
125:24

**complicated**
180:3

**component** 12:1
44:22 159:12

**components**
13:14 16:4,6
68:21

**comprehensive**
22:9

**computer** 41:7
152:11 163:10

**concede** 168:25

**concept** 40:2

**concepts** 15:15

**conclude** 106:3

140:5,14
141:10 161:14
176:23 191:10

**concluded**
123:16,20
124:18 142:24
149:5 160:16
192:12

**concluding**
143:2 158:13

**conclusion**
73:13 93:25
135:22 145:4
148:19 159:16
169:7
174:12,19
176:2 177:8
189:3 190:25

**conclusions**
14:17 15:7
24:9 26:18,19
102:2 138:13
161:18 192:22

**condition**
160:17

**conditions** 70:5
72:22 75:18
96:8 199:2

**conduct**
29:17,18 30:12
34:9 36:21
85:17 136:21

**conducted** 87:16
137:1 180:7
189:9

**conferences**
42:13

**confidential**



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000305

48:1,8

**configuration**
21:4 192:25

**configurations**
20:12 148:18
154:6

**conflicting**
51:8 192:14

**conflicts** 115:2
118:20

**confused** 65:24

**connected** 68:22

**connection**
58:24

**consensus**
185:22

**consequences**
138:24

**conservative**
71:15

**consider** 16:16
51:17 71:14
77:4 162:12

**considered**
14:20 51:9,10
72:21

**considering**
71:13 72:21

**consistency**
77:25 78:2
154:3 177:7

**consistent**
34:1,12 36:24
53:6 56:9 78:7
79:20 84:18
108:10,12,14

109:14 113:2
144:24 146:15
147:1
151:2,12,13,23
152:2 154:4
156:7,18 157:4
161:8,11,12
173:5,6 175:3
185:13 187:12

**conspicuity**
100:24 101:1

**conspicuous**
100:8,11,15,18
,21

**construction**
119:19,20

**consult** 6:7

**consultant**
10:19

**consulted** 6:8

**contact** 130:15
138:24 142:10
144:18,25
145:5,8,22,23
146:2,7
147:3,5 148:23
149:4,12
151:1,4 153:18
154:16,18
155:4,16,17
156:2,6
157:1,12,14,15
159:13,14
164:25
165:10,15
166:15,17
167:1

**contacted**

155:13 157:9

**contacts** 156:25

**contained** 62:8

**containing**
65:10

**context** 112:22

**contingency**
49:11

**contingent**
49:19

**CONTINUED**
199:21

**continuing**
45:1,4,7

**contradict**
55:17

**contradicted**
52:20

**contradicting**
52:11

**contradictory**
51:22

**contributing**
37:12,14 95:2

**control** 26:13
28:3 67:8 79:8
81:6

**controlled**
130:5

**convert** 69:22

**convey** 122:13
123:1,5

**conveyed** 122:15

**cooperation**

58:7

**coordinate**
68:11,12 69:3
74:17

**coordinates**
58:23 61:7
62:5,6 65:3
71:13,14 89:6
176:12

**cops** 132:3

**copy** 64:24
91:22 149:18

**core** 10:6 14:14
19:5

**corner** 21:7
145:8,24
156:23 160:2
165:2 179:24

**correct** 7:8,22
8:19 15:18
26:16 39:16
41:19 43:13
47:12,18 48:23
50:16 53:4
55:25 56:24
58:1 70:23
74:8 94:9,21
99:13,16
101:15 104:2
120:5,6 123:14
124:13 125:5
131:3 138:3,7
140:3,7 141:14
142:25
143:1,22 144:6
148:21 151:15
153:20 159:2,6
167:14,15,22,2
5 174:21



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

App. 000306

175:21
197:2,15

**correction** 31:9

**corrective**
118:3

**correctly** 60:12
141:4,5

**correlate** 87:14

**correspond**
179:11

**corroborating**
129:22

**costly** 63:12

**costs** 54:23

**counsel** 3:23
4:16 6:5
8:5,14 22:14
47:4 49:3
50:2,22 59:8
62:13 66:17,19
85:4 150:21

**Counsels** 4:15

**count** 170:9,19
171:18 172:3

**counted** 23:8

**counteractive**
142:9

**counterclockwis**
**e** 145:25 166:2

**countersteer**
137:6

**country**
25:15,17

**counts** 97:13

**county** 93:15

**couple** 33:7,15
38:12 84:12
90:23 126:4

**course** 16:20
19:24 30:19
37:10 92:18
139:11,12
179:12

**courses** 10:12
16:3 19:6,7,20
45:11

**coursework** 9:18
13:20 14:6

**court** 1:1,24
4:4,13 5:3
24:24

**crack** 90:14

**cracked** 144:10

**cracks** 87:12,13
90:4

**crank** 193:8,17

**crash** 17:1
38:1,7 57:18
61:15,20 64:2
84:5,6,21 85:1
88:2 91:22
94:4
95:2,15,19
114:16
139:8,13 169:1

**create** 87:10
89:12 90:9
133:14 156:19
165:17

**created** 34:8
108:20,22
118:22 130:10

131:20 143:19

**creating** 12:7
114:14 118:21
130:15
133:21,22
145:16 168:12

**creation** 66:1

**credibility**
51:13,20

**critical** 101:8

**cross** 135:16
139:6

**Cross-**
**Examination**
3:3

**crossing** 24:7
27:23

**CSV** 60:2,15
62:8,22 63:2

**cue** 111:2

**cumulative**
35:20

**current** 4:5

**curriculum**
19:23 20:9

**curvature**
173:10,13

**curvatures**
43:20

**curve**
78:2,3,6,16,17
,20 92:14 93:1
96:3 98:15,23
99:8 173:15
179:25
180:15,16

**curved** 92:17

**curves** 114:15

**CV** 5:22 8:23
38:20 42:17

**CV............**
**...........5**
3:14

**cycling** 152:13
153:15

---

D

**damage** 17:3,9
140:11,12
144:7,16,23
146:10,14,15,1
6,21 147:1,9
149:8,9,12,15,
20 151:22,25
152:1 153:18
154:2,5,11
155:4,9,10,22
156:7,16,18,21
,22 157:1,14
158:7,14,25
159:4,15,23
160:1,7,11,18,
21
161:1,3,6,7,8,
10,16,20
162:3,7,8,15,1
7
164:13,16,20,2
2,25 165:3,17
166:8,18 188:3

**dark** 173:10

**dark-colored**
102:23

**dashboard**



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       **www.MILESTONEREPORTING.com**       **Toll Free 855-MYDEPOS**

122:20

**dashcam** 94:3

**data** 20:2,10
21:18 40:12
42:23 58:19
59:11
60:5,14,21,23,
24 61:21,25
62:2,4,7,9,22
63:6,10,17,23
64:3,5,18
65:1,8 66:1,2
67:5,7,12,17,2
2 68:8,10 69:7
72:7 74:11
76:8,10
77:16,17,20
78:1,2,4,6,9,1
2,15,23 79:1
83:9,24,25
85:24 94:2
97:20
106:2,5,6
128:10
129:1,3,5
168:18
174:14,19
175:2,8,13,19,
22,24,25
176:3,4,6
177:2,7,11
178:1,12,13,15
,21 183:8,18
184:6
185:4,6,11,12
195:20

**date** 1:16 6:11
55:7 79:17

**dated** 6:10 83:6
168:19

**dates** 70:25

**Daubert** 25:1

**day** 4:5 84:11
97:16 119:2
185:22

**daylight**
124:16,17,22

**daytime** 23:20
101:3,4

**dead** 189:20

**debris** 164:19

**decades** 87:8

**deceased** 1:6
4:10

**decedent** 31:13

**deceleration**
105:17

**December** 1:16
4:5

**decide** 113:18
131:14

**decides** 135:11

**decrease** 106:18

**decreased**
198:17

**deeper** 72:7

**Defendants** 1:11
2:11 4:20

**defense** 6:4
23:5,12
46:19,21,22
48:25 49:3
50:22 59:8
66:17,19

**Defense's**

186:12

**define** 120:21
133:12

**defines** 119:15
180:15

**definite** 120:25

**definitively**
131:11 171:17

**deflates** 132:20

**deformation**
16:12 163:8

**deforms** 132:13

**degree** 9:15,25
10:1,11
19:4,11 45:13
161:13 179:18
183:7,8,23
189:8 190:2,23
191:2
197:18,24
198:1,7,9

**degrees** 8:24
9:5,9,15 10:15
92:18
177:9,13,14,15
,16,23 178:8
179:3 181:10
184:16,20
185:12 186:19
189:9 190:11
197:9
198:10,13

**delineate** 12:18
22:8

**delineation**
155:1

**demonstrating**

43:5

**demonstrative**
166:10

**demonstratives**
168:12

**dent** 164:6,9,11
166:12,20

**Department** 44:1
82:6 119:14
120:7,18

**depend** 85:20
105:5 133:16

**dependent** 75:17

**depending** 27:12
52:17 100:9
103:19 133:12

**depends**
12:9,12,15
16:14 40:11,15
85:10 101:7
102:3 112:6
124:1 127:23
128:2,6 182:24
187:3

**deponent** 4:23

**deposed** 6:16
52:14

**deposition** 1:15
3:25 4:7
7:8,21,23
22:6,12 117:1
185:15 194:15
195:5,6

**depositions**
47:14 157:21

**derive** 61:21,25
62:18 80:16



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

App. 000308

derived 63:3

describe
13:7,17  14:7
15:25  18:12
19:2  20:3
25:25  54:1
80:23  141:9
146:13  192:8

described 91:21
132:12

descriptions
97:8

design 14:22
43:12,20
44:2,22

designed
121:10,20
122:11  123:1

designing
44:8,9

despite 158:4

detail 120:16
192:8  195:15

detailed 61:18

details 14:5

detection 101:2

determination
169:13

determinations
51:13

determine
51:14,20  78:12
112:7  137:2
194:22

deviate 178:3,4

deviated 175:21

deviation
175:15  176:23

devices 75:20
185:4

diagonal
145:14,21

diagonally
145:25

diagram 87:10
88:10  166:10
173:12,17

dictating 129:7

died 26:15
27:1,17
28:1,11  30:3

difference
18:12  22:2
69:12  81:2
95:22  118:23
124:15  125:14
177:5  197:25

different 11:16
16:14  22:7
23:21  28:22
32:20  35:8
40:11,15,22
41:1,20  45:19
46:6
52:5,10,11,17
65:9  66:24
67:4,8,10,13
69:23  70:25
73:21  75:23
76:16  96:22
110:23,24
111:6  112:5
120:24  122:21

124:14,25
126:4  148:18
153:2  154:6
163:18  193:21
198:3

differential
118:21  124:19

differentiate
101:18

differently
28:22  102:4

difficult 77:6
111:17

dig 72:7

digging 132:25

digital 42:23
128:15  178:21

direct 3:2  5:11
15:23  66:19
194:24

direction
26:11,12
121:24,25
141:25
142:2,10
143:9,13  146:1

directly
10:12,13,15
19:20,25  31:14
51:18  63:3
82:23  138:5

disabled 122:24

disagree 84:7
122:25  147:22
155:12

discipline 9:16
15:16  16:21

disciplines
9:20  13:9

disclose 47:22
48:9

discussed 83:8

discusses
110:10

discussing 74:6

discussion
72:13

dishes 68:22

disingenuous
65:14

dismissing
196:2

disparity 81:9

displaced
170:20,21,23
171:20,21
172:1

dispute 53:5,8
186:12

disregard 48:15
115:19

dissect 28:4

distance
21:9,15  28:6
29:20,22,23
30:2  31:20
37:16  39:19
62:14  72:24
73:6,23  86:11
90:7  95:25
96:1  104:24
105:25  106:7
117:7,8  120:8



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

148:9
179:14,19,21
180:12,18
190:14 191:6
192:2

**distances** 15:5
17:15 38:17
39:4 84:12
86:9 115:18
122:12

**distracted**
126:6,21
127:5,17 128:4

**District** 1:1
4:12,13

**ditch** 102:21

**divide** 112:18

**document** 6:7
7:17 86:23

**documentation**
85:13 87:21
91:15 94:4

**documented**
46:15 57:17
134:24 175:14

**documenting**
85:10,23

**documents** 7:11
85:14

**done** 44:17
46:24 56:1
57:13 58:3
63:9,19 72:13
115:17 136:23
170:17 196:7

**door** 144:12

**DOT** 43:23

**double-check**
47:11 53:16
69:1 72:1
104:23 138:17

**download**
55:23,24
58:3,15 59:5
60:16,21,23
63:13,17,24
64:4,13 79:12
82:12 83:23,24

**downloading**
63:21 66:10

**downloads** 58:7
66:9

**drag** 13:25

**drastic** 118:22

**drastically**
34:17

**draw** 149:19
150:7

**drew** 15:8

**drive** 1:20 7:14
36:13 60:18
122:23 183:20

**driven** 125:16

**driver** 24:13
27:1 28:1 30:3
34:2,15,22
35:4,14
36:4,8,21 37:4
44:5,13 93:5
104:4,7,10
105:12
109:16,20
110:1,3,10
113:5,12,14,16

,18,20 115:3
116:11 118:15
120:9,19
121:8,14
126:7,9,21,23
127:17 135:25
196:21
199:8,20

**drivers**
33:18,19,22,23
,24 34:25
35:18,20 36:25
44:17,23 100:8
105:2
110:16,20,25
111:8,12
112:8,19,20
118:17 122:22

**driver's** 111:6
128:12 141:1

**driving** 127:6
131:15 192:4,5

**drone** 57:17,20
84:10 86:18
87:9,16 89:18
90:7,11,15

**drones** 43:7
86:22,23

**DuBoff** 2:8 4:19
5:23 6:2
8:2,7,15,19
15:11 36:23
48:12 49:5
67:19 97:24
110:2
114:12,25
115:14 116:2
118:12 127:20
150:8,13,15,17

189:20

**DuBoff.........
......208** 3:3

**due** 32:2 33:4
144:18 148:6
189:7

**duly** 5:10

**during** 9:17,21
12:4 81:24
135:2 173:7
177:23 180:17
190:15

**dynamic** 13:25
135:24 177:19
178:25

**dynamics** 9:19
13:18,19,21
14:4,8,10,13,1
6,24 15:4 16:2
19:8 133:13
135:23

---

| E |
|---|

**earlier** 53:12
81:1 86:7,10
101:12 114:3
120:3
131:21,25
182:13 197:7

**early** 19:10

**Earth** 76:17,20

**easier** 155:3

**easily** 101:6

**east** 2:9 189:4

**Eastman** 1:10
4:12,20 46:24



**MILESTONE │ REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

**eating** 132:23

**edge** 153:19
  154:9

**edges** 154:9,17
  159:21

**educate** 193:2

**education** 10:6
  13:18 15:24,25
  19:2,4
  45:1,4,8

**educational**
  15:22

**effect** 145:20

**efficiency**
  50:11

**efficient** 54:25

**eight** 42:20
  117:15 118:9
  123:17 124:2
  126:18 129:11

**eighth** 138:16
  169:3

**eight-hour** 13:8

**either** 7:20
  31:23 39:4
  42:5 66:12
  79:15,19 91:23
  103:19 110:12
  119:24 132:22
  134:10 138:15
  141:19 156:3
  183:18 192:16

**elbow** 156:8
  157:3,15

**elbows** 165:20

**electronic**

21:18 128:10
  129:1,3,5
  175:19

**element** 16:6

**elevated** 166:17

**elevation** 43:20
  139:2 145:10
  161:6

**eliminate** 130:2

**else** 24:15 32:8
  54:15 56:25
  57:3 82:25
  99:10 128:21
  156:24 161:14
  176:4

**emergency** 31:7
  32:6,25 33:1
  35:9,11 101:17
  103:12 112:2
  115:22
  122:9,15
  123:2,4,5,6,9,
  11 173:6,7
  177:21 178:7
  185:8 190:14
  197:9

**empirical**
  20:2,10 21:8
  180:4

**employed** 5:16

**employee** 47:18
  49:24 50:13

**employer**
  48:9,15 50:7

**employer's**
  48:22

**empty** 188:11

**encompass** 12:18

**encompasses**
  13:9 15:17

**encompassing**
  13:15

**enforcement**
  15:21

**engaged** 6:4

**engaging** 12:1
  53:21

**engineer**
  10:18,20,25
  11:11 30:20
  39:11 42:3
  78:15 90:18
  180:22

**engineering**
  9:2,3,16,17
  10:14,21
  11:3,4
  13:14,16 14:14
  15:14 16:21
  17:7 19:6,10
  20:13 22:16
  39:19,22 42:24
  43:18 44:22
  45:5 47:13,19
  48:2,3 49:24
  52:1 54:11
  57:10 66:20
  68:14 78:19
  106:7 135:21
  157:9 161:13

**engineers** 17:12
  45:17

**entire** 7:14,18
  32:21 81:14
  135:8 147:6

**entirely** 7:17
  27:22 32:11
  50:5 51:17
  73:19
  110:12,13,21
  111:5,9,24
  112:13,14
  113:2

**entities** 25:20
  47:6

**entity** 50:19
  57:7

**envelope**
  126:11,14
  148:6

**environment**
  12:3 17:14
  39:7 40:6
  44:16
  69:4,9,14 70:5
  96:7

**environmental**
  11:22 43:19
  68:21,22 71:12
  75:18 94:3
  98:17 176:22
  178:24

**equally** 130:6
  135:20 136:5,8

**equates** 185:9

**equation**
  189:13,23
  190:16,19
  197:8

**equations**
  16:19,25
  20:8,10,16,24,
  25 21:2,3,8



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

110:24 177:21
180:5,11 189:7

**equipment** 63:21
64:10 84:14

**equity** 50:17,19

**ergonomics** 44:8

**Erick** 1:4,6
4:8,10 103:25

**Erin** 1:9
4:11,20

**ERRATA** 3:5

**error** 40:17,20
41:4,17,19,22,
24 42:3,4
56:15 68:7
69:10 70:24
73:3,8,13,20,2
2,25 74:7,11
138:12 176:20

**errors** 178:18

**escapes** 134:15

**especially**
81:11 109:5
148:4

**ESQUIRE** 2:2,8

**essentially**
86:25 90:11
125:1 146:3
161:24

**establish** 37:14
39:8 40:3,16
41:21 51:11
53:6 56:14
69:6 70:6 71:4
76:4 77:5,7
87:15 90:12
154:17 168:9

175:12 176:19

**established**
20:10 45:16
76:22 88:6,13

**establishes**
87:1 180:13

**establishing**
39:6 185:5

**estate** 1:5 4:9
7:22 25:19

**estimate** 71:15
151:21

**estimated**
151:22

**estimation** 23:9
166:1

**evaluate** 113:15

**evaporate** 39:15

**evasive** 173:2,4

**Evelyn** 1:6 4:11
103:22,24
130:4 135:16
137:10 140:21
147:20,23

**event** 79:15,19
80:8,11,13,20,
21 81:20,25
82:2

**event-based**
81:22

**events** 62:5
69:17 79:18
80:5 81:18
82:4

**eventually**
90:16

**everybody** 116:9
157:24

**Everyone's**
96:21

**everything**
41:23 51:6
52:25 54:14
66:18 86:3
159:10
161:5,12 176:4

**evidence**
12:10,12,15
22:16 38:24
39:10 42:23
43:6
51:7,19,25
52:25 55:1
57:16 69:5
83:3 85:23
86:22 96:16
99:4,6 102:9
108:6 109:1,8
128:15,17,18
129:1,6,22
139:14,19,22,2
5 140:3 146:20
147:24
157:20,21
158:20
160:23,25
161:16
162:10,11,14
174:13 178:24
191:9 193:6
194:21
195:3,20 196:1

**evidenced** 130:4

**exact** 22:24
36:17 59:18
76:5 81:4

118:22 161:7
172:23 186:10
196:18

**exactly**
30:15,18 33:10
36:7 39:20
78:24 124:4
131:2 143:17
159:20 170:6
172:21 175:5
177:1 195:15

**examination** 3:2
5:11 13:8

**examining**
110:20

**example** 17:23
32:4 39:13
52:13 65:2
70:15

**exceeded** 144:1

**Excel** 60:3
62:1,3
65:9,11,16,18
66:2,16

**except** 6:23

**excluded**
170:4,12

**exclusive** 19:13

**excuse** 26:8
45:20 83:16
182:9

**exhibit** 3:13
5:21,22,24
43:17 157:18
166:17

**exhibits** 5:18
82:17



**MILESTONE** | **REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       **www.MILESTONEREPORTING.com**       **Toll Free 855-MYDEPOS**

**exist** 116:20
139:11 148:18
188:20

**existed** 161:20

**existence**
159:12 166:19

**existing** 164:21

**expect** 18:23
67:4 80:19
84:18 170:23
196:18

**expensive** 63:22

**experience**
13:20 19:16,19
20:4 52:14
64:6 81:17

**experiments**
137:1

**expert** 11:15
14:7 16:17
24:23 35:4,14
44:3 83:15
101:13 102:4
122:18 127:5

**expertise** 14:11
43:24,25 44:11
73:9 78:19
101:23 120:5
133:10 185:3

**experts** 15:13

**explain** 145:3
177:10

**explanation**
156:21 157:11
165:8,9,10
166:12

**explanations**

33:15

**explicitly** 62:2

**Explorer**
54:4,15
55:6,21 60:23
61:11 63:4
67:18 70:22
79:24 80:9,11
91:12
108:20,23
128:13,22
140:6 148:20
149:7,12
153:13
154:20,24
155:9,18
156:2,7,15,16
157:2,14
158:17
159:1,5,24
160:7,9,16
161:17 162:15
163:21,22
164:14
165:14,16
167:18 169:15
170:4 188:4
194:16

**Explorer's** 82:1
139:4 169:20

**exponentially**
114:16 198:3

**express** 77:9

**expressing**
126:5

**extend** 148:5

**extending**
145:11

**extensive** 13:19
16:3 88:16
89:1

**extensively**
90:24

**extent** 8:10
14:24 160:5

**extract** 40:6

**extraction**
64:8,11 65:19
66:1,13

**extrapolate**
135:5

**extrapolation**
135:6

**eye** 111:19

**eyes** 94:7 129:4

---
F
---
**face** 159:2
164:25

**faced** 109:16

**facing** 34:4
195:6

**fact** 124:19
148:14 178:11

**factor** 17:2
29:8,10
37:12,22 101:1
110:24 112:18
124:17 125:23

**factors**
10:13,16 11:15
22:11
44:3,7,21 95:2
100:17 101:7
115:20,22

120:12

**facts** 27:12
35:2 38:1,5
48:3 51:15
79:18,20
111:25 116:12
126:25
127:1,8,10,13
128:8 190:12

**failure** 16:10
133:12,17,24,2
5 134:4,9,11
135:3

**failures** 134:5

**fair** 34:10
36:18 37:19
48:18 54:12
58:10 59:10
64:23
72:15,16,19
93:3 96:15
97:21 102:14
103:11
114:19,21
158:3 160:13
161:15 162:20

**falls** 77:20
86:4

**familiar** 43:22
45:24

**fashion** 32:7
175:11

**fast** 113:10
119:7 181:14

**faster** 91:23

**faulty** 11:18

**features** 87:11

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

App. 000313

**federal** 22:21
43:23 76:21
80:2 119:14

**FedEx** 25:20
26:2,4,5,10
27:23

**fees** 13:2

**feet** 28:15,18
29:16 32:13
33:7 36:3,5
62:17 68:16
70:1,8,9 71:16
74:11 75:19
84:12 92:20,22
93:1,5 95:4,10
98:23 99:18,19
100:3,6
106:1,3,20
110:14
112:15,16
115:8
121:2,7,13,16,
17,21
122:3,5,7,9
123:22,25
125:6,7,11,16,
18,20
137:12,14,19
145:10 146:6
161:17 164:25
165:16,23
176:13 177:2
179:10,12,13
180:20,23
182:12 183:11
186:23
187:11,18,23
189:4
191:4,14,19,24
192:1,5

**fender** 145:14
152:4,5,7,8
153:10,20
154:3,12,13
161:11 165:4,6

**fender-vault-
type** 21:7

**fewer** 170:5

**field**
10:9,12,15
13:16 19:20
44:7,10 100:5
121:17 122:1,8

**fifth** 137:8

**fight** 48:16
49:9 172:11
174:7

**figure** 39:20
64:25 65:2
78:18 86:8
88:2 89:3,4,20
104:24
149:19,22
152:9 162:21
169:22,23
170:1 171:11
179:18 180:10
194:21

**figured** 172:24

**figures**
89:10,11,13
97:10 150:23
159:17

**file** 7:14,18
60:2,15
62:3,8,12,22
63:2 65:9,11
66:2 67:25

83:11,13,14,22
,25 152:20
153:2 163:14
168:15

**filed** 25:4

**files** 59:23,25
60:9,13

**final** 39:9
130:5 176:9

**finally** 126:23

**finding** 52:23

**findings**
22:14,23 48:6

**fine** 6:7,20
22:25 91:23
111:11 138:19
147:18

**finite** 16:6

**firm** 45:22
46:3,4,5,6,10,
21 47:19 54:3
57:12,13

**firms** 66:20

**first** 5:10 22:2
31:2 38:12
53:23 73:19
74:16 95:12
104:18 115:21
132:18 139:10
145:6 168:23

**fist** 156:12
157:3,15

**fit** 155:23

**fits** 159:22

**five** 46:16,17
81:5 103:19,25

137:17,18
182:4
188:16,19

**five-year**
9:12,13

**fix** 40:6 111:21

**fixed** 88:14
89:11,17 90:17
98:17,25 99:8
132:15

**fixes** 39:7

**flail** 148:17
165:19

**flange** 132:16
133:7

**flanges**
132:19,24

**flapping** 133:20
134:16

**flashers** 103:12

**flat** 92:8
111:13
130:1,13,14,22
131:6,16,20,21
132:14
133:10,21
143:19

**flat-earthers**
173:16

**flip** 148:18
149:17 174:23

**flipping** 148:25

**Florida** 1:20
9:3 12:24 22:4
25:14,16,17

**flow** 97:4



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

**fluid**
13:18,19,21,25
14:4,7,10,13,1
6,24 15:3 16:2
39:10 103:6
154:16 155:3,5
170:21,22,24
171:20,22,24
172:1,5,7,8,9,
14 174:11

**fluid/matter**
153:18

**fluids** 14:20
15:8 154:2
155:7

**flyover** 87:21

**focus** 5:17
45:13,15,21
46:23 47:9,20
48:24 49:18,25
50:6,17,20
53:13 57:7,24
91:17 137:24

**focused** 61:20
64:3

**fold** 132:23
138:23

**folder** 60:12,21
83:16
163:18,20,21

**folds** 130:15
132:18 133:6

**folks** 45:20

**foot** 36:25
105:21 108:8
169:1 183:14
191:22 196:21

**force**
16:7,11,12,19
17:2 141:17,25
142:2,3,11
143:3,6 145:17
161:21

**forces** 13:24,25
19:14 142:9,12
143:25 144:18
148:13

**Ford** 21:15
54:4,15
55:6,9,21
56:10,17 58:20
60:23 61:11
63:4 67:18
70:21
79:9,10,22,24
80:8,11 81:16
82:1 83:9
91:12
108:20,23
128:12,22
137:20,22,25
139:4 140:5
145:5,24
146:5,9
147:4,7 148:20
149:7,12,16
153:12,20
154:20,22,24
155:9,18
156:1,2,7,15,1
6,20,23
157:2,10,14
158:17,25
159:5,23
160:7,9,16
161:17,24,25
162:9,15
163:21,22

164:14,21
165:13,14,16
167:18
169:15,20
170:4 174:14
188:4 194:16
196:21

**Ford's** 137:18
170:5

**forensic**
10:18,19,21,25
11:11 42:24
45:17

**Forensics** 5:17
45:13,16,21
46:23 47:9,21
48:24 49:18,25
50:6,17,20
53:13 57:8,24
91:17

**form** 31:8 32:9
36:23 67:19
70:6 101:17
104:23 110:2
111:22
114:12,25
115:11,14
116:2 118:12
119:25 121:12
127:20 151:9

**formats** 65:9

**forms** 20:12

**forth** 52:23
101:21 148:25

**Fortunately**
51:16

**forward** 93:6
140:15,19

141:10,12
142:22 145:15
159:17 161:22
162:5 167:17

**foundation**
10:6,8 52:1

**foundational**
10:6 14:2,13
17:10 19:9,24
20:7,13

**foundations**
10:14

**fourth** 137:7,8

**four-way** 122:16

**four-year** 9:10

**fraction** 22:11

**fractions** 121:3

**fragments**
146:23
154:20,21

**frame** 97:6
176:21

**frankly** 196:15

**free** 171:22

**Freeman** 45:22
46:4

**freeway** 33:3

**frequent** 63:12

**friction** 133:23

**front** 7:18 96:9
118:8 126:3
142:5,15 144:5
145:8,23
149:6,7 153:20
156:15,23



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

157:10 159:2,3
160:2 161:17
162:1,4,15
163:7
164:7,14,21,25
165:17 166:4,7
194:16

**full** 4:24 5:14
22:9 74:16
89:5 177:13
183:7,8

**full-frontal**
21:5

**fully** 13:9

---

### G

**game** 111:6
120:24 195:1

**gap** 32:23 35:25
139:3

**Garmin** 74:22
75:21

**gas** 37:1,2,6
105:16,17,19,2
1 108:8,11

**Gateway** 2:9

**Gduboff@mcguire
woods.com** 2:11

**Gen** 72:13,17
75:7,11 77:18
78:23 79:1
185:4

**general** 6:19,22
9:14 69:4 73:8
75:15,20,25
77:6 84:9
122:23 151:17

166:11

**generally** 13:15
15:14 24:21
29:21 50:12
69:10
70:3,5,19
75:19 85:22
127:2 133:13
154:5

**generate** 16:23
21:25 56:15,19
64:12 65:17
86:20 89:18
91:18 132:10

**generated** 21:24
22:18 23:14
60:6 162:18
164:18 172:21

**generating**
14:16 51:22
173:9 186:8

**generation**
66:22,24
67:4,13,21
68:8 72:8
74:24 75:2,4,6
82:3

**generations**
66:25 75:3

**generic** 13:23
168:10

**Georgia** 12:24

**gets** 67:12
104:21
165:14,25

**getting** 12:25
60:11 93:13
124:9 140:22

179:7 183:24

**given** 7:14
12:16 60:18
61:22 81:1
114:23 120:19
137:18 148:13
191:6 197:11

**gives** 20:9 64:1
97:20 106:6
111:2 171:5

**giving** 121:24

**glance** 73:19

**glancing** 89:9

**glare** 95:1

**global**
69:2,3,9,11,19
70:8 71:1,3
72:24 75:25
76:11,14,19
77:2,20 78:10
175:9 176:15

**goal** 73:5

**gone** 57:16
183:15

**Gonzalez** 1:4
4:8

**goodness** 43:4

**Google** 70:24,25
87:22

**goose** 83:5

**gotten** 139:9,20
140:1

**GPS** 58:22 59:1
61:7,19
62:4,6,21 63:3
65:2

68:8,11,12,19
69:3,23
70:6,15,21
71:13,14 72:13
73:4,9,10,20,2
5 74:10,22
75:10,14,15,20
,25
76:10,21,23
77:6,11
118:2,7
129:2,17
174:14
175:7,8,10
176:12 177:2
185:11
187:12,17

**GPS-based** 62:20

**Gracie** 117:11
118:10 123:17
128:13 129:9
181:4,15
198:23

**grad** 20:4

**gradually** 180:2

**graduate**
9:18,23 10:11
13:20 19:12,14
38:13

**graduated** 45:12

**graduating**
10:11

**graduation** 9:8

**grassy** 102:21

**gravity**
145:11,13

**great** 10:8



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

17:23 122:12

**greater** 31:20
109:15,20
111:16
142:15,17,18
190:2,5
197:14,22
199:19

**greatest** 43:8
133:18

**Greg** 48:10

**Gregory** 2:8
4:19

**groove** 130:10
131:10 134:22
143:24 170:3

**grooves**
169:14,15,17,1
9
170:1,5,8,10,1
9,24
171:1,2,18,24
172:3

**ground** 6:19
145:10 153:6
154:15 155:2
165:1 172:14

**guaranteed**
76:20

**guess** 16:16
18:22 25:12
26:8 27:9
31:21 46:8,15
48:14 58:12
63:3 68:14
71:10 83:5
88:21 89:9,16
92:3 102:3

115:5 134:4
139:24 146:7
152:6 153:11
157:13 164:15

**gun** 159:20

---

H

**half** 42:6 53:24
107:25 108:2
109:25 134:25
151:7 182:4,24
187:25 196:14

**half-inch** 42:3

**halfway** 187:1

**hand** 5:2 102:3

**handful** 22:21
85:7

**handheld** 75:21

**handles** 133:10

**handling** 130:1
135:25

**hands** 165:23
166:11

**hanging** 166:11

**happened** 10:22
11:4 24:3
33:22 40:10
55:15 56:5
91:10
127:12,15
131:6 133:25
134:23 145:22
161:3 166:1
172:15 181:8
195:16

**happens** 18:19
66:3 131:16

132:20 155:17

**happy** 88:17

**hard** 64:20,24
67:6 101:6
108:14 131:9
132:6,7 146:16
148:13 152:12
155:4 156:19
170:22 172:11
173:15

**harder** 174:7

**haven't** 53:1
120:13 139:22

**having** 5:10
49:12 81:15,22
180:19

**hazard**
28:19,21,24,25
29:13,22
30:6,15,18,21,
23 31:6,12,15
32:7,8,24
33:6,12,13,16,
25
34:5,8,16,17,1
9,24,25 35:18
37:15,18,20
101:10,11,14,1
5 104:13,20
105:3
115:4,16,23
116:19 118:7,8
120:9,19,21
121:14 122:22
123:11,12
125:23 126:13
128:24 129:12
199:12

**hazards** 31:1

33:1,18 44:15
101:19 114:14
115:7,18,21
122:17

**Hazeltine** 1:20

**head** 6:20 24:1
31:14 55:12
61:6 67:2
75:14 78:10
81:13 126:14
145:9,22
146:19,25
147:2,3 148:21
149:5
151:2,14,16,17
,20 152:6
155:13,16,17,2
1 156:5,15
157:9,23
158:2,10,16
159:18 165:13
166:1 189:4
196:16,17

**heading** 180:3
183:23

**headlight**
154:12 155:9
157:10 164:23
166:18,20

**hear** 134:7

**heat** 13:13
132:10

**heavily** 68:20
69:18 75:17

**heavily-studied**
75:16

**heavily-**
**validated** 87:6



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     Toll Free 855-MYDEPOS

App. 000317

**heavy** 96:17,22

**he'd** 167:24

**help** 20:11
77:5,6,11
176:18 193:2,9

**helpful** 73:19
85:11

**helping** 53:8
193:4

**helps** 71:4
178:12

**hereby** 3:23

**hers** 82:16

**he's** 147:6
150:16
161:23,24
165:21 166:8
191:19,22
195:10,15

**Hey** 7:3 63:17
123:5 129:16

**hierarchy** 47:6

**high** 84:14

**higher** 64:1

**high-fronted**
21:6

**high-speed**
24:19

**highway**
111:7,13,14
113:14 114:16
118:21 120:10
122:5,10
177:20

**hired** 22:14

54:13

**hissing** 134:7

**historical**
87:20

**history** 23:8

**hit** 17:17 18:19
105:21
109:3,17
143:16
146:19,25
147:2,7,11,15,
20,23 155:20
156:3 158:17
165:13,14,18,2
5 166:8
167:17,21
168:4 188:7
195:7

**hitting** 81:18
105:22 106:3
109:25 114:10
152:2 156:8,18

**hold** 8:24 9:1
44:11

**holding** 165:9

**hole** 152:5

**home** 61:11

**homogenous**
148:15

**hood** 154:11
196:17

**hotel** 61:17,19

**hour** 23:25 24:7
27:2,5
35:19,21,24
36:3 37:3,5
47:10,12,15,17

53:24 62:19
79:25 80:5,13
81:1
95:14,20,23
97:10,16
104:14 105:9
107:2,4
109:23,24
111:16
124:18,23
177:21 181:16
183:11
190:18,21
197:4,10
199:16

**hourly** 47:7
49:25 50:3

**hours**
59:12,15,17
66:9 124:14

**housing**
144:9,10

**Houston** 61:17

**hugging** 130:22
131:5

**human** 10:13,16
11:15,21 12:1
22:10
44:3,5,7,13,21
111:19 112:17
115:20,22
148:14

**humans** 44:20

**HVAC** 13:13

**HVE** 11:20 12:14

**hypothetical**
183:4

**hypothetically**

198:5

---

**I**

**I-45** 94:12

**I'd** 38:19 49:9
59:17 61:6,19
67:2,25 68:3
72:1 74:13,21
75:8,12 77:19
104:23 133:7
158:18

**idea** 23:14
24:11 96:24
131:19 142:13
188:15

**identical** 158:7

**identifiable**
28:21

**identification**
5:19 101:9

**identified**
89:10 104:21
155:10 169:22
172:2

**identify** 6:5
129:11 132:6,7
155:3,4

**identifying**
89:11,13

**ignore** 162:11

**ignoring** 155:24

**II** 199:21

**I'll** 6:22 27:7
28:4,16 131:14
135:5 153:16
158:18 163:16
179:1,15



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

189:1,11

**illuminating**
94:23

**I'm** 4:17 6:9
10:21 14:15,23
15:18 16:5
17:22 18:2
22:12 24:18
25:24 34:14
41:20 42:2,8,9
44:9 46:18
47:18 48:13,14
49:22,24
50:5,8
51:8,11,16
52:9,18 53:17
55:8 56:1 61:9
64:25 65:12,13
69:21 72:22
74:1,13,24
76:12 77:21
83:10 85:19
88:17 91:14
96:25 97:19
99:9,21 102:11
109:7,8 110:13
112:17 114:22
115:10
116:3,21 117:9
122:18
127:2,7,16
132:6
136:9,13,24
139:18,24
149:18
152:11,13
153:14,24
156:17 157:4,8
158:13 159:8
163:25 165:7
166:16,25

167:3 168:20
171:21 172:10
176:1
180:11,19,21,2
5 184:5
185:5,6,12
186:13
189:12,16
194:18,21
195:18,19
196:1,2,3,4
197:20 198:4

**imagery**
87:21,22

**imagine** 44:21

**immediate** 91:21

**immediately**
40:10 167:17

**imminent** 28:21
30:5,15 31:12
32:7,24
33:1,13,16,17
101:9,11,14,19
115:4,15,18,21
,22 116:19
118:18 199:12

**impact** 17:3,19
20:12 21:1,4,5
27:22 35:25
80:22 81:15
103:16 123:21
126:12 147:8
148:3,4,7
149:6 157:2,22
158:1,9 177:25
182:5 186:11
188:12,13,20
196:12,14,15,1
7,19

**impacted** 92:15

**impacting**
160:18 162:18
164:11,17

**impacts** 9:21,22
15:4 17:5
18:1,15 19:21
20:1,5 38:16
81:6

**implemented**
37:4 118:6

**implementing**
33:2 188:17

**imply** 162:4

**import** 90:15

**important**
29:8,9
159:7,8,10
160:20

**impossible**
111:15,17

**imprint** 156:20

**improperly** 35:2

**improved** 84:5

**inaccurate**
25:25

**inboard** 161:7

**inch** 41:25
42:5,6,7,8,9
84:9 86:2,4
138:14,15,16,1
8

**inches** 142:22
183:14

**incident**
92:8,12 93:16

151:18 174:16
193:8

**include** 59:12
75:7 102:2
152:16 188:10

**included** 29:19
36:13 75:5
83:11 95:11

**includes**
7:20,23
13:11,13
44:8,14

**income** 48:4
49:25 50:6

**inconsistencies**
52:24 53:9

**inconsistent**
51:22,25
52:5,6,20 53:2
117:10 134:11
147:24
156:3,7,9,13

**incorrect** 74:11

**incorrectly**
132:10

**increase** 118:20
180:2 190:22
198:12

**increased**
133:22

**increases**
114:17

**indeed** 131:7,17
135:8

**independent**
27:6 196:3



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

independently
  11:24 27:14
  78:5 87:19
  178:19,20
  185:7

indeterminate
  196:23

indicate 103:9
  104:14,19
  112:23 114:15
  137:4 169:19
  175:22 191:7

indicated 68:25
  105:15 116:3
  158:5

indicates 96:16
  119:23 128:18
  129:1 137:6
  157:22

indicating
  123:12 124:21

indication
  174:13

indicative
  169:9 173:1

individual 53:2
  69:13 127:25

individually
  1:4 4:8 69:16
  127:25

individuals
  91:12

industry 42:13
  43:8 54:22
  63:14 75:20
  87:8

infer 159:14

161:3

inferring
  158:11,13

information
  12:11 31:16
  37:24 47:22
  59:1,3 63:1
  65:10 66:21
  121:9,15,22,23

infotainment
  55:23
  58:3,15,18,25
  59:4,11
  60:7,8,10,14,2
  4 61:2,22
  63:5,11,18
  64:13,17
  66:16,22
  67:14,18 68:8
  70:16 105:20
  123:14 125:3
  174:20 178:11

inherit 161:25

initial 57:8
  149:6 157:22
  158:1,9

initially
  159:19

initials
  150:7,20

input 12:2
  101:17 135:25
  136:9,10,15
  198:6

inputs 180:12

inside 103:6
  137:13 144:11
  154:13

inspect 54:4
  55:21

inspected 91:12

inspection
  54:18,19
  55:6,8 56:10
  57:3,8,11
  136:22,23

inspections
  47:13
  54:6,8,20,21,2
  3

instance 80:4

instantaneous
  132:9 180:16

instantly
  179:24

instead 87:3

institutions
  8:25

instructed 48:8
  49:22

instructing
  48:10

instruction
  8:17 48:22
  121:11

instructions
  8:8 115:19

insurance 47:5
  85:3,4

intake 53:24

integrity
  134:12

intensity

152:18

interact 44:20

interacting
  23:25

interaction
  23:15

interactions
  19:17

interpret 65:1
  195:12

interpretation
  8:3

interprets 66:2

interrupt
  179:15

interruption
  18:11

intersections
  89:24

interstate
  32:17 57:13
  78:16
  92:4,7,15 94:8
  113:14 120:10
  122:5,10

intervals 58:22

interviews
  91:16

introduce 4:15

intruded 152:8

invasive 169:9

investigation
  160:15

invoice 53:23



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

invoices 49:2

involve 22:15
    23:18

involved 17:8
    19:13 23:15,18
    26:21 47:6
    51:19

involves
    44:5,20 120:11

involving 13:18
    16:1 23:24
    48:7

iPhone 76:25
    82:13

iron 193:20,22

irrelevant 48:4
    50:1,5 116:12
    124:19

isn't 106:11
    113:9 153:5
    155:20 164:14

issue 102:7
    199:12

issues 42:12
    102:3

iterative
    180:19

I've 11:9 15:12
    22:22 24:20
    38:19 45:14,18
    51:10 64:17
    86:5 93:18
    101:23 178:18
    185:7 196:7

—————
            J
—————
jack

140:17,19,24
141:9,18,24
192:18,23
193:8,16

jack's 193:12

Jacob 2:2 4:17
    49:5 98:7

Jacobwhite@tayl
    orkinglaw.com
    2:5

jagged 154:9,16
    159:21

Jake 8:2

January 21:22
    168:19

Jennifer 1:23
    4:4

job 51:16 52:24

joking 168:20

Joseph 4:25
    5:15

judge 25:7
    48:16

July 83:6,20

jump 167:11

jury 51:19
    52:23 53:8
    76:13 113:18
    131:12,14
    135:6 138:11
    177:10 180:9
    186:13
    193:3,4,9
    195:20 196:6

—————
            K
—————

key 159:12

killed 174:6

kilo 4:14

kinds 76:24

kinematics 9:19
    17:20,25
    18:13,15,21
    19:3,5,7,9,25
    20:4,14

kinetics 9:18
    17:12,13,18,20
    ,21,22,23
    18:1,12,14,18
    19:3,5,6,8,24
    20:5,14

kinetics/
    kinematics
    19:17

King 2:2

kneeling 195:24

knew 30:18

knowledge 46:24
    73:8 108:25
    144:8

known 29:22,24
    30:5,20,21
    39:5,7 40:2,5
    73:23 86:14,15
    89:24

knowns 30:14
    40:14

—————
            L
—————
lack 80:8,11
    83:8 159:15
    161:1
    162:14,17

166:19

lamp 144:9

lane 26:9 27:19
    31:4,5,11
    32:12,16,17,19
    ,22 33:6,12
    35:7,16,22
    36:4,5 76:5
    77:7 87:12
    93:2 104:4,13
    110:7,11,13,14
    ,21
    111:5,9,14,24
    112:10,14,15,2
    1 113:13,21
    114:7 115:8
    117:23 119:20
    120:1,22
    121:8,16,19,21
    122:3 127:18
    130:20,23,25
    131:1,5,7,13,1
    6,17,18 134:25
    135:8,9,11,15
    137:11,14,21
    138:5,10
    139:10,15,20
    140:1 146:4
    157:25 167:13
    168:23 169:2
    175:15,20
    185:18,21,24
    186:3,16,20,22
    187:2,7,10,12,
    18,20,22
    188:1,11,14,16
    ,17,19,21,24

lanes 131:8
    135:16 137:22
    138:1 188:22



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000321

**laptop** 6:6

**large**
19:9,21,22
23:22 40:18
44:7 63:14
75:3 151:16
152:5

**laser** 40:9 43:6
55:22 56:7,11
84:10

**last** 20:23 23:8
25:12 32:5
42:20 49:1
91:25 123:17
137:24 168:19
194:17

**late** 111:21

**later** 92:22
143:18 181:22

**lateral** 31:9,11
33:9,25 35:22
77:7 141:17
142:3,16,18,24
143:3,5,20
144:1 161:22
171:2 176:24
178:2,3
179:10,12
180:5,6,12,13,
17 183:11
186:10 191:11
197:11

**laterally**
36:3,5 141:13
144:5 148:5
162:5 180:15

**latest** 43:7

**law** 2:2 15:21

45:22
46:4,5,6,21

**layman's** 14:10
69:22 76:15

**leading** 58:21
126:11 153:19
174:15 175:4
196:14

**leads** 113:4

**leak** 134:5

**leaning** 159:17

**learned** 19:10

**least** 22:13
35:23 36:2
45:11 73:19
80:9 96:3
105:10 121:1
130:18 133:23
139:3 151:7
172:19 187:19
193:2,9 196:12

**leave** 122:22

**leaves** 130:16

**leaving** 131:22
132:11

**leftmost** 104:4
117:22 135:15
138:5,10
168:23 169:25
175:20

**left-side** 165:2

**leg** 148:11

**legal** 48:5

**legs** 148:10
165:22

**lengthy** 66:6

**less** 41:23 42:8
46:15 69:24
80:4,7,13
81:16 147:5,9
183:13,23

**let's** 8:23
18:3,12,17
23:2,3 35:12
46:2 49:14
54:16 61:24
68:14 83:15
91:20,25
129:24 137:7
144:3
149:24,25
150:4 156:1
163:22 167:2,3
173:1 174:22
177:10 183:7
191:11 198:13

**LETTER.........
..............
..........220**
3:6

**letting** 37:6
108:10

**level** 16:4 92:8
97:20 111:13
147:13,17

**levels** 96:20
142:8

**license**
12:21,25 45:5

**licenses** 12:23

**lid** 103:7 111:4
144:11,19,21
148:2

**light** 96:18,23
122:15

**light-colored**
102:12,16,18

**lights** 112:3
122:9,11,19,22
123:4,6,9,11

**likelihood**
81:15

**likely**
31:8,19,20
115:2 131:24
132:9 144:18
176:2

**limbs** 148:5
165:19 166:6

**limit** 27:4,18
28:1 29:12
37:17 38:3,7
93:10,14,17,20
95:14,23 119:5
197:21
198:12,16

**limited** 24:24
59:16

**line** 70:17,18
91:24 92:24
95:5,13,18
97:7 98:9
124:20
125:7,14,21
171:23 172:1
173:10 175:10
199:4

**lined** 124:10
154:17

**lines** 39:6
87:12 89:21



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

90:2,3,4,8
171:12 172:6
176:4

**lining** 125:3

**list** 5:24 23:8

**List...........**
**......5** 3:15

**litany** 6:22

**literature** 32:1
33:21 34:2,7
36:7,19
38:19,22 72:20
73:4,10 101:16
104:6,9,11,19
105:2,17
110:9,20
113:3,4 115:20
118:17 137:4
178:6 185:3

**little** 20:19
28:4 30:8 35:8
41:16 51:3
65:24 91:5
92:21 95:8
98:8 122:2
132:5 133:15
136:17,18,20
141:12 142:4
163:3 171:1
176:11 185:20
192:25

**Livingston**
61:12

**load** 171:8

**loaded** 171:6

**loading** 173:6

**local** 54:21

**located** 39:21
83:23

**location** 44:9
54:21 58:21
61:15 74:18
161:7 169:8,10
172:23 174:16
175:4 176:22
177:25

**locational**
75:10

**locations** 44:24
47:14 57:11
61:16

**lock** 115:5,6

**locked** 32:5
142:5 189:19

**locking** 32:2
33:3,8,18
115:7

**log** 59:21
106:10,19,21
124:11

**logs** 125:3

**long** 29:25
31:22 32:15
34:19 69:24
85:14 88:20
95:14,18 126:8
167:24 168:4

**longitudinal**
142:4
179:13,20

**losing** 28:2

**loss** 104:15,25
108:10
109:14,15

110:3 134:12

**lost** 26:13

**lot** 11:15 15:21
52:6 61:14
80:5 85:9
88:17 90:1
101:22 122:21
148:16,18
149:1 160:21

**lower** 164:6
190:20

**lowered** 93:16

**low-fronted**
21:5

**lug** 192:20
193:15,16,19,2
3

**lunch** 88:19
97:22 98:8

**lunged** 142:22

**Lynn** 25:19

————————
M
————————

**macro** 16:4

**magic** 39:20,23
68:14 78:15,19

**magnitude** 34:3
104:25
133:13,16
147:6,9 156:18

**maintain** 45:4
183:22

**maintenance**
43:12,24 44:19
119:16 120:4

**male** 168:10,11

**man** 7:3

**maneuver** 169:10
173:2,4

**Manual** 168:18

**manufacturer**
67:3 80:2

**manufacturers**
66:25 80:3
81:22

**manufactures**
67:1

**map** 61:5
70:24,25 88:2

**mapping**
57:18,21 61:5
84:10 86:18
87:16

**Marcus** 7:22
25:19 27:16
28:10

**Marcus's** 29:7

**margin** 71:2

**mark** 130:14,18
131:10,12,20,2
3 132:4,5,8,11
134:23 143:24
159:1,5,15
162:4,16
164:14
170:3,7,9,16,1
8,21,23
171:4,10,11,17
,19
172:2,5,13,14
173:11,13,18
174:8,9,10
179:2 181:8



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**marked** 5:18
  150:23

**markers** 87:13
  89:21 90:3

**marking** 130:17

**marks** 108:20,22
  109:5,6 143:19
  169:4,8,14
  172:19
  173:3,19,21
  174:1,5

**Marx** 30:17

**mass** 81:13,14
  145:23 161:21
  162:18
  164:12,17
  165:19,24
  166:16,25

**master** 9:2

**master's** 9:7
  10:2 45:12

**match** 17:9
  154:5,8
  155:15,24
  156:22

**matched** 151:24

**matches**
  162:9,10 176:6
  177:24 178:23

**matching**
  140:11,12
  148:24 149:4
  155:22 156:1
  158:7,14
  159:15
  160:22,25

**material**

16:1,3,4,5,6,1
0,17,18,21,25
17:7

**materials**
  16:11,12 53:24
  54:18,19 60:22
  83:16,24
  152:23

**math** 11:5
  125:19

**mathematical**
  15:16 51:7

**mathematically**
  197:15 198:20

**mathematics**
  10:7,8 15:19

**matter** 4:7 6:5
  15:1 111:25
  144:10 146:22
  152:4,7,10
  153:12,23
  154:13,15,24,2
  5 161:9,10
  166:21,24

**max** 190:17

**maximum**
  41:22,24
  177:22 185:7
  187:24 189:8
  190:10 197:3,5

**may** 12:13 22:7
  33:6 42:17
  53:17 75:22
  109:12
  126:8,22
  130:21 147:9
  152:17 160:20

**maybe** 11:12

25:10 27:22
31:9 61:9
100:1 109:17
121:4 122:2
134:7 136:8
138:16 153:24
164:15 187:24
193:3 197:24
198:19

**McCORMICK** 2:15

**McGuire** 46:5

**McGuireWoods**
  2:8 45:23,24
  46:11

**mean** 14:4,5
  30:8 32:11
  40:9 48:12
  49:5 55:10
  58:18 59:8
  70:2,17 72:10
  76:15,16 82:12
  94:11 105:14
  111:25 112:1
  122:18,21
  136:11 138:1
  146:22 149:14
  153:24 155:14
  160:3 176:25
  178:17
  184:2,24
  187:11 190:20
  191:21 197:5
  198:2,20

**meaning**
  143:23,25
  152:8

**means** 6:24
  10:21 50:13
  99:23 130:20

166:19 171:22
188:6

**meant** 151:9

**measure** 39:17
  78:17 84:14
  90:6 116:19
  151:4 170:15

**measured** 78:14
  176:6

**measurement**
  41:20 151:3

**measurements**
  40:17 41:23
  42:1 89:13
  97:3 138:13
  139:7 151:19
  168:7

**measures** 90:7

**measuring** 78:3

**mechanical**
  9:1,2,16,17
  10:20,25
  13:11,14 14:21
  19:5 136:21
  160:18

**median** 99:8
  102:16,18
  131:18

**medium** 96:17

**memory** 59:16

**mention** 51:24
  166:22

**mentioned**
  194:25

**mentioning** 44:7
  52:4,19



**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

merit 159:11

message
117:11,15
118:10
122:13,14
123:17,21
124:2
125:8,15,21
128:13,23
129:2,8,18
181:4,8,12,15
182:2,7

messages 124:11

met 85:21

metal 154:3

metallurgist
16:8

meter 72:6

meters 68:13,15
71:8,15,23
72:6

method 39:3

methodologies
17:4

methodology
87:7

methods 135:21

metrics 97:15

mic 20:18
163:25

middle 41:17
130:25 131:7
139:9,15,20
140:1 143:14
185:21
186:20,22

187:2,7,10,12,
18,20,22,25
188:11,14,24

mile 62:19
79:25 80:5
92:19 95:7
121:4

miles 23:25
24:7 27:2,5
35:19,21,24
36:3 37:3,5
58:21 59:17
80:12 81:1
92:11,18 93:10
95:14,20,23
104:14 105:9
107:2,4
109:23,24
111:16 177:20
181:16 183:11
190:18,20
197:4,10
199:16

millions 87:3

Mills 45:22
46:4

mind 32:6 73:5

mine 163:16

minimizing 33:7

minimum
120:8,18

minus 41:25
42:7 68:13,15
71:8,15,23
72:5 84:12
86:2,4 125:9

minute 97:10
194:17

mirror 137:13
138:24 139:4,5

mirrors
138:20,21
139:2

misaligns 171:2

misleading
136:8

miss 164:9

missing 155:13
166:15

Mississippi
12:24

misunderstandin
g 65:14

mixed 53:17

mm-hmm 79:11
82:14 136:4
141:16 142:7
171:16
186:6,24,25
187:5 194:13

mm-mm 123:15

model
56:15,16,17,20
67:9,10,13
87:14 88:9,15
89:12,14,19
90:10,12
112:9,13,14

modeled 191:6
197:3

modeling 113:1

modern 109:5

module 58:18
59:11 60:7

61:2,22 65:2
66:22
67:8,18,21
68:9 70:16
72:8,14,18
74:19,24
75:4,11,21
76:25 77:18
78:23
79:1,8,24
105:20 123:14

modules 81:7

moment 131:20
182:15 189:18

momentum 81:16
147:7 162:1

Montalbano 1:15
3:2 4:7,25
5:9,15 49:7

Montalbano's
3:14,15

month 50:14

months 53:17
57:19 87:18,20

Moreno 1:6 4:11
103:22,24
137:10 147:20

Moreno's 130:4
147:23

morning 61:4,11

mostly 25:14,16
110:17 111:1

most-used 21:1

motion 9:20,21
13:24 17:13,25
18:15 19:13
140:15 141:10



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

motions 25:4

motor 19:17
  23:15,24 80:20
  110:20

mouth 36:15

mouthful 11:10

move 17:19
  20:18 28:11
  36:5,8
  104:12,22
  144:4,5 169:1
  184:18

moved 36:3
  104:8 140:18
  141:10,18
  162:5 175:23
  183:12

movement 9:22
  20:11 31:19
  34:3,4
  142:9,25
  143:20 176:19
  180:5,6,17
  197:12

movements 44:18

moves 184:16

moving 175:10

multiple
  154:6,9

multitude
  165:23 196:13

Mustang
  24:6,13,16
  80:25 81:3,4

Muttart's
  189:15

myself 56:15,18
  84:19

---

### N

nail 134:6
  159:9

National 1:20

nature 146:11
  150:2 151:23
  154:11 173:17

navigate 32:23
  33:9

nearest 94:1
  181:25 191:1

necessarily
  12:15 17:4
  28:5 73:1 78:9
  101:20 109:4
  132:3 160:12
  183:19 196:4

necessary 32:14
  33:5 35:22
  85:14 114:18
  115:7
  137:21,25
  138:2

negated 139:6

negligible
  138:25

Nehemias 1:5
  4:10 30:25
  36:16 92:16
  94:8 96:4
  98:14 103:22
  105:22 106:4
  107:24 109:3
  126:2,10
  143:16 144:25

145:7 146:9
147:11,15,19
148:21 149:5,6
151:16,20
155:19,20
156:8 157:22
158:2,10,16
159:13,17
160:19 161:4
162:5 174:6
191:5 194:2,16
195:6,24
196:9,25
199:13

Nehemias's
  140:20 143:8
  144:19 146:8
  148:7 156:3
  157:9 160:11
  161:20 164:20

net 142:9

network 62:24

newer 81:22

Newton 71:3

nice 155:23
  156:22

nighttime 23:20
  101:2

nine 117:15
  118:9 123:17
  124:2

ninth 174:12

nitpicky 64:14

nobody 85:10
  96:8 188:18

noise 134:7

none 25:4 188:5

nonengineers
  17:16

nonresponsive
  115:11

nor 175:21

normal 97:11
  109:25 111:7
  122:15

normally 81:18
  85:1 90:2
  178:7

north 2:3 62:8

northbound
  92:4,7,10,25
  93:2 94:12
  137:13,15
  175:15

Northern 1:1
  4:13

notably 58:20

Notary 1:24

nothing 5:6
  30:16 79:22
  82:22 116:3
  120:14 132:17
  156:24 175:18
  180:25 188:21

notice 196:24

notices
  126:9,23

NOTIFICATION
  3:6

nuts 192:20
  193:15,16,19,2
  3



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

App. 000326

O

**OATH** 3:4

**object** 15:11
16:20 68:24
81:18 101:5
115:10 149:8

**Objection** 36:23
67:19 110:2
114:12,25
115:14 116:2
118:12 127:20

**objective**
97:1,3 158:20
194:18,21
195:20 196:1

**objectively**
51:18

**objects**
9:20,21,22
12:3 17:14,25
18:16 19:13
39:7,12 98:18
100:19 146:17
156:25

**observations**
17:8

**obstacle**
126:7,9,22,24
127:17,18
128:4

**obstacles**
98:24,25

**obstructing**
32:19,21,22
121:16,19

**obstruction**
93:8 98:19

120:22

**obstructions**
68:23

**obvious** 154:23

**obviously** 8:6
11:25 13:11
53:5 85:13
88:9 113:25
192:18 198:17

**occupy** 148:8

**occupying**
137:11 148:7

**occur** 139:13

**occurred** 36:15
38:2,7 57:14
84:6 93:16
106:13 107:19
117:16 131:21
135:16 139:9
144:7,16
145:6,8 146:3
155:17 167:14
168:22 192:13

**occurring**
121:11

**occurs** 133:11
184:16

**offer** 37:7
167:19

**offering** 98:13
167:16

**officers** 130:19

**officer's**
163:13

**offset** 69:9
81:12

145:12,22
147:7 148:4
165:18

**offsets** 70:25

**Oh** 43:4 53:17
65:19 74:17
83:3 122:16
150:14 151:9
157:24
163:18,20
164:2 167:3

**okay** 5:16
6:4,15 7:6,19
8:20 9:4,13,25
10:23 11:6,14
12:5,20 14:4
15:6,25 16:22
17:11,22,24
18:11,17,25
19:15 20:3
21:20,23
22:2,25 23:23
24:4,9,15,23
25:1,6,12,14,1
8,25 26:17
27:4,8,24
28:8,17
29:4,7,15,25
30:7,12 32:14
35:13 36:14
37:11,25 38:11
40:4 41:1,3
42:2,11,15,22
43:2,9,22 44:3
45:1,12,20
46:8,10,13,19,
23 47:7,16,20
48:18,24
49:3,14
50:12,17,22

51:2 52:3,19
53:11,20
54:1,7
55:5,15,20,25
56:6,22,25
57:6,12,23
58:2,17 59:7
60:4,9,25
61:10,21
62:10,12,25
63:8,16,25
64:21
65:5,21,23
66:5,8,21
67:16,23 68:7
71:18,21,24
73:7,12,18,24
74:19,23
75:7,9 76:18
77:10,15 78:18
79:3,4,21,23
80:8,15,19,23
81:17
82:5,9,25
83:18,19
84:2,20
85:8,16 86:15
88:8 89:16
90:19,22
91:1,4,11,16,2
0
92:2,3,7,10,14
,21
93:3,9,15,19,2
2 94:11,22
95:1,4,11,17,2
2 96:1,15
97:3,21
98:7,13,22
99:3,11,17,25
100:7,10,14,17



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

App. 000327

,21 101:4,12
102:8,11,16,18
,25
103:4,8,17,21
104:3 105:1,24
106:2,16,21,23
107:3,6,10,16,
22
108:2,6,13,16,
22,25 109:17
110:5,9
111:8,25
112:12,25
113:8,12,22
114:2
116:21,25
117:21,25
119:5,7,10,22
121:1 122:4,25
123:4,13
124:18,24
125:2,6,13,19
126:6,16
127:11,14
128:3,10,20,25
129:5,13,24
130:24
131:9,19
132:12 133:9
134:18,22
135:1,4,14,19
136:5,21
137:1,7,17
138:8,12,19
139:8,14
140:5,8,14
141:8,13,20,24
142:13,19
143:5,10,14,18
144:3,7,13,21,
23 145:19

146:10,13,18
147:10,14,18,2
2 148:1,19,23
149:4,11,17
150:4,25
151:4,7,11,13,
19 152:1
153:11
155:6,8,14
156:6,10,12,14
157:20
158:8,15,21,24
159:7,23
160:3,6
162:3,22
163:10,12,20,2
2,24 164:3,6,9
165:12,25
167:2,11,16
168:3,7,11,21
169:3,7,13,18
170:7,15,18
172:7,13
173:24
174:4,12,18,22
,24 175:14,24
176:8,10,25
177:8 178:6,15
180:1,21
181:2,9,14,17,
19 182:9,22
183:15,25
184:8,11,12,15
,18,23
185:10,14
186:15,22
187:14,24
188:3,6,10,23
189:3,23
190:1,5,9,13,1
9,24

191:4,9,15
192:7,11
193:1,5,11,18,
24
194:2,6,8,12
195:4,9 196:20
197:13,17
198:2,11,15,20
,22
**oncoming** 26:7
100:8,11 101:6
112:8 113:5
**one-half** 177:16
**ones** 8:17
**one-second**
58:22
**one-tenth** 198:7
**one-third** 92:19
**onto** 70:24
**Oops** 32:6 115:5
**open** 60:12 77:4
103:2,9 111:4
**opened** 147:4
**opening** 148:3
**operate** 14:22
**opine** 102:4
**opining** 27:16
**opinion** 27:9,20
35:4,14,17
37:7,9 48:21
78:25 96:21
98:13 101:13
105:1 117:14
129:25
135:19,23
137:7 142:20

144:4
147:10,14,19
158:24 159:8
167:16,19,21
169:3,16
173:21 175:1
193:18
**opinions** 8:10
102:6 129:14
191:3
**opportunity**
102:1
**opposed** 136:6
141:13
**opposing** 102:4
150:21
**opposite**
26:11,12
**option** 112:12
114:14,20,22
115:9
**oral** 6:19,21
**oranges** 121:5
**order** 10:2
15:7,20 29:16
65:2 121:3
137:22
**orientation**
21:8 62:7 78:8
175:3 176:7
196:18 198:6
**original**
105:5,7
**originally**
62:13
**Orlando** 1:20



**MILESTONE** | **REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900         www.MILESTONEREPORTING.com         Toll Free 855-MYDEPOS

**orthomosaic**
86:20

**others** 24:2,20
54:6 90:23

**otherwise** 50:12
70:1 155:23

**outboard**
130:15,16
132:15 167:13
171:6 173:10

**outcome** 27:15
48:5 50:1,4

**outcomes** 49:19

**outlining** 89:5

**outside** 43:25
111:4 126:14
127:10 132:19
145:12 154:13

**outsource** 63:20
64:4 65:22,23

**outward** 165:19
189:5

**overall** 23:10
75:25 76:10
97:13

**overcorrection**
26:23

**overhead** 90:12

**overkill** 85:8

**overlaid** 70:24

**overload** 171:9
173:9

**overnight** 66:11

**overwhelmingly**
161:12

**owns** 50:19

---

P

**p.m** 18:6 97:25
98:2,3,4
167:5,7,8

**page** 3:13 74:15
89:3 91:20,21
92:1 95:12
123:18,24
129:25 137:8
142:21
144:3,23
148:19,23
149:17
152:14,25
153:3,17
162:23
163:12,15,17,2
3 164:24
167:2,11,12
169:3
174:12,23
192:7 196:20

**paid** 47:16
50:13

**paint** 56:4
91:10 140:9,10

**panel** 144:12
146:8 149:7
162:8

**paper** 22:23
38:14 64:20
67:20,24
71:7,14,19
72:1,3,11,12,1
6
73:16,17,19,24
74:1,4,6,10,15

,20,23,25 75:5
77:19 91:22
149:18 189:15
190:9

**paper-light**
5:25

**papers** 36:10,12
38:9,13
68:5,19
73:12,14
74:3,13
75:9,12,22

**paragraph** 74:16
91:25 95:12

**parallel** 78:8
175:3

**Pardon** 20:19

**parked** 21:14
32:17,18 33:11
110:15,17,21
112:13,14,15,1
9 113:2 118:24
122:1
137:10,22
167:13 169:11
199:8

**parking** 61:14

**partially**
31:3,4
32:11,19,22
35:6,15 113:13
137:11 140:8

**particular**
13:10 16:24
17:6 28:23
34:4 35:3,18
37:24 40:16,22
41:24 48:7

76:9 78:12
79:17 81:12
86:1,6 89:22
109:21 112:22
121:6 127:3
137:4 139:1
154:10 160:22

**particularly**
52:14 111:3
113:24 177:20

**parties** 3:24
139:11

**pass** 26:9
121:20
137:15,20,22

**passed** 26:4
153:9 199:15

**passenger** 23:19
122:15 123:7
195:11

**passengers**
44:15 103:25

**passing** 121:22

**past** 10:22 11:4
97:9 166:4

**patch** 173:10

**path** 27:23
28:12 31:14
126:13 197:1

**paths** 139:6

**patterns**
169:23,25
173:6

**Paul** 1:15 3:2
4:7,25 5:9,15
8:3,9



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

**pavement** 87:12
89:21 90:3
155:21

**pay** 50:14
113:14

**paying** 13:2

**PDF** 59:20 60:14
62:1,3,4,12
65:10,16,17
66:1,16 89:5

**PE** 12:20,23,25
13:4,7,8

**pedal** 37:1
104:15 105:19

**pedestrian** 17:5
19:17,21
20:1,5,6,11
21:1,3,9,13,15
23:15,20,22,25
24:7,13,17,19
36:6 38:15
80:20,22
81:6,10,11
109:25 110:4,5
114:7
164:12,17
199:9

**pedestrians**
44:14 94:23
103:17 111:3
122:4,7

**pedestrian's**
81:13 94:16

**peeled-back**
154:3,12

**peer-reviewed**
72:20 73:4
87:7

**pen** 150:5,11,12

**pending** 4:12

**pens** 150:13

**people** 9:25
10:4 32:1,2

**per** 24:7 27:5
35:19,21,24
36:3 37:3,5
47:9,10,12,15
62:19 79:25
80:5,13 81:1
104:14 107:2
111:16 177:20
181:16 190:18
199:16

**percent** 23:17
86:12 105:23
175:8

**percentage**
23:1,4,14

**percentile**
71:10,18,20,21
,25 168:10,11

**percentiles**
168:14

**perception**
29:19
34:14,15,16,21
115:17

**perfect** 7:6,19
40:8,9 53:20
77:15 79:3
99:3 150:25
160:17

**perfectly** 55:11
92:25

**perform** 15:23

23:10 31:16,21
32:15 33:13
49:24 50:4

**performance**
44:13,14,17
72:6

**performed** 22:10
48:2,7 54:6,7
55:5,23 86:18

**performing**
22:15 34:11
50:5 85:25
194:18

**period** 126:8

**peripheral** 59:3

**permanent** 87:11

**person** 26:13
52:10

**personal** 50:6
64:6 82:13

**personally**
57:15 84:20
86:19

**perspective**
94:16,18 103:1

**phenomenon**
113:9

**phone** 58:25
82:10,15,20
83:2 123:14
125:4 129:7

**photo** 39:18
40:24 41:1,21
43:7 56:12
87:5 90:16,18
149:21
152:16,21

153:12 163:23
173:14

**photogrammetry**
38:16,25
39:1,2,3
40:8,18,21,22
41:5 84:7
85:18,25
86:7,16
87:2,24 88:5
90:15,19
151:10 170:17

**photograph** 39:5
87:15 152:18

**photographed**
55:22 130:19
131:13 132:1
169:5

**photographic**
85:20

**photographicall
y** 57:17 85:15

**photographs**
38:18 39:4
40:13,14
56:7,8,10,13,1
4,17
85:9,13,17,22
86:19,24 87:9
88:13 89:8
91:14 94:3
96:23 136:25
151:18
152:13,15,24
153:15

**PhotoModeler**
90:21,24

**photos** 6:1
41:22 54:14



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

56:1 57:4 82:5
86:5,8,12
87:1,2,25
90:9,12
152:23,24
163:13

**phrase** 30:9
149:12,14

**physical**
51:7,18 54:21
55:6 63:20
64:8,11,20,24
65:25 68:22
93:7
128:15,17,18
129:1,6 147:9
157:21 164:21
165:24 174:13
184:6 191:9
193:6

**physically** 22:5
32:23 54:3
121:22 138:1
152:8

**physics** 9:19
10:7,8 12:1
13:12,24 14:14
15:4,7,15
16:10 51:19

**pick** 80:4
82:1,3

**picked** 53:1
81:23 89:18
192:17

**picking** 147:6
157:25 158:6
178:1,5

**picture** 56:4
91:10 153:5,6

169:22 171:5

**pictures** 85:11
133:8 141:8,21
149:23 152:12
168:9

**piece** 153:6
159:22 161:11
162:11 163:3
166:20

**pieces** 56:4
91:7,9 149:10
153:22 162:14

**pin** 109:22

**pinged** 62:21

**pinpoint**
77:3,11

**pitcher** 39:14

**Pivaral** 1:4,5
4:8 144:25
196:25

**Piveral** 4:10

**Pix4D** 56:21,22
86:20

**pixel** 86:25
87:3 90:13

**placed** 140:25

**plaintiff**
23:5,11 46:20
174:16

**plaintiffs** 4:18

**plaintiff's**
4:16

**Plaintiffs**
1:7,22 2:5
3:13 54:13

62:13 186:12

**planet** 77:3

**planning** 101:21

**plastic** 144:9
163:3,7,9
164:7,19
165:3,4 166:21

**play** 71:2

**plaza** 2:9 61:8

**plazas** 61:9

**please** 4:15,23
5:2

**plugged** 58:8

**plus** 41:25 42:7
68:13,15
71:7,15,23
72:5 84:12
86:2,4 90:4

**point** 50:9
59:21 62:14,21
70:10,11
86:3,21
87:14,15
90:13,14 97:9
98:22,23 102:6
106:5,18
118:16,19
129:11 130:21
131:22 135:1,2
136:24 143:15
145:9 146:5
152:9,14,21
153:16 154:17
157:12 159:13
166:5,15,16
187:10,25
188:8,12,13,20
189:5 192:6

195:2 196:12
198:13

**pointed** 97:15
152:5 153:19

**points** 16:11
40:2,5,19 59:2
60:5,16 61:19
62:6 68:19
69:8,9,13,17,2
0,23
70:3,6,7,12,16
,21 71:3
72:24,25
73:6,23 76:8
77:5,8,11 78:7
86:14,16
87:1,4,6
88:6,10,14,18
89:6,7,12,17,2
5 90:2 106:8
130:15 148:17
154:8 165:21
175:13,16
176:17,18,20
196:2

**pole** 26:14
27:21

**police** 85:12
108:16,19
112:2
152:13,15,24
163:13 195:23

**popular** 91:3

**portion**
19:22,23 23:22
50:20 173:15

**position**
31:10,11
33:9,25



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

35:5,22 69:2,3
71:1,16 72:25
76:4,5,11,14,1
9 77:7 88:12
118:24
167:13,24
168:4 175:9
176:14,15,24
178:2,3 186:10
187:13

**positional**
175:15

**positioning**
69:11 71:3

**positions**
39:10,12 40:3
62:21 175:10

**possession** 7:25

**possibilities**
136:11

**possibility**
135:13

**possible** 84:6
99:14,20,21
109:7
128:3,7,8
130:6 131:21
135:10,20
136:2,5 143:5
146:25
155:8,20 156:6
157:7,13,17
172:11,18
174:5 184:21
191:23

**possibly** 35:21
115:2

**post** 148:7

**postcollege**
20:4

**post-impact**
144:24

**potential** 31:6
32:8 33:6,12
34:5 99:9
101:15,19
115:16,23
118:7 123:12

**practice** 57:2,6

**precise** 151:3
175:8 183:24
191:2,16

**precisely**
70:20,21 77:12
107:4 177:24

**precision** 76:6
97:20 177:6,7
182:20

**predicate**
140:23

**predict** 20:11
21:10

**predicting** 9:21
21:2

**preexisting**
160:24 166:13

**preference** 11:2

**premarked** 5:21

**premise** 11:18

**presence** 31:3
32:2 111:1

**present** 195:20

**presentation**
28:24,25 42:22

43:3,10,11,15

**presentations**
42:16

**presented** 29:23
30:15,18
31:2,12
37:15,18,20
42:14,19 50:25
186:9 199:3,13

**presenting**
30:23 186:13

**presents** 30:21

**press** 122:19

**pressure**
132:17,20

**presumably**
46:22 130:11
141:5,7

**pretty** 13:19
14:5 107:5
119:13 148:8
191:8

**prevented** 98:18

**previously**
45:21 46:4,11
130:25

**primary** 147:3

**principle**
15:15,16 17:10
19:5

**principles**
10:14 11:3
13:24
14:1,2,13,14
17:8 19:10,24
20:7,14 177:19
178:25

**print** 152:12

**prior**
70:7,10,13
79:19 92:11
123:17 159:25
160:2,8,18
174:9 188:16

**privileged**
48:12

**probably** 38:18
91:3 131:24
143:8 150:10
174:7

**problem** 125:2
182:14

**process** 12:25
39:8 40:18
63:21
65:6,7,17,20
66:6 84:8
85:25 87:2
105:22 158:6
180:19 192:16

**processed** 25:7
56:17 86:19

**produce** 7:10
8:4,9

**profession** 91:2
97:11

**professional**
19:19 45:4

**professionally**
21:21

**professions**
10:3

**profile** 149:15

**program**



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

9:7,10,11,12,1
3

**progressed**
131:22,25
146:6

**progresses**
132:14

**Prohaska** 1:23

**project**
40:11,15 148:3

**projected** 145:7
161:22

**properly** 34:20

**properties**
16:19,21

**property** 61:14

**proportions**
168:12

**proves** 13:16
128:11

**provide** 8:17
12:10 27:9
49:22 62:3
64:5 71:18
92:21 113:25
121:9

**provided** 7:24
37:9 52:5 56:4
59:4,23 60:1
62:4,6,13 65:9
66:15 73:7
81:2
83:12,14,22
84:8 86:5
93:18 94:2,3,5
96:13 138:13
151:18 196:24

**provides** 10:7
51:21

**providing** 58:22
73:6 127:9
137:14

**provoked** 118:16

**prudent** 104:4
138:9

**Public** 1:24

**publish** 168:15

**published**
38:9,13,14,19,
23 72:20 82:20

**publishes**
168:18

**pull** 63:10
133:14,15,16
135:11,25
137:5,6

**pulled** 63:3
65:1 67:12,17

**pulling** 62:23
63:6 134:20

**puncture** 133:3
153:9 154:14

**punctured** 133:6
154:14

**purely** 155:24

**purpose** 54:25

**pushed** 140:22
141:23

**putting** 91:7
149:9 183:21

**puzzle** 56:3
91:5,7,8,9

149:10 154:8
159:22

**puzzle's** 154:9

**Pythagorean**
181:1

---

Q

**quadrant** 177:12

**quadrantic**
179:25

**quadratic** 190:7
198:2

**quadratically**
180:2

**qualitatively**
136:19 197:19

**quality**
84:3,16,17,18
85:20,22

**quantify** 31:16
97:1 136:19
137:3

**quantifying**
44:17

**quarter** 41:25
42:5,7,8,9
84:8 86:2,4
138:14,15,18
144:12 146:8
162:8
177:14,15
183:13

**quarter-inch**
42:4

**question**
6:7,8,23,25
7:4 11:17

16:13 20:23
22:8 23:16
31:21 34:6
35:8 38:4 47:3
48:11,21 58:11
60:13 61:25
66:23 67:6
73:20 88:19,21
89:16 94:17
100:20 106:12
112:24 113:3
114:9 115:12
116:10,12
117:25 118:14
126:18,20,21
127:1,8,9,11
128:14 133:8
140:24 153:11
157:13 160:23
180:20 183:5
198:5

**questions** 7:3
52:15
101:22,24
175:7

**quick** 85:2,5
168:16

**quicker** 104:18

**quickly** 195:16

**quite** 57:5,9
84:13 88:16
148:8,9 149:22
159:20 187:12
196:15

**quote** 130:1
144:24 153:17
164:24 167:12
169:7 175:3



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

---

R

radius
151:1,4,8

radiuses 43:20

raining 29:2

raise 5:2

raised 87:12
89:21 90:3

range 10:5
68:20 69:2
76:3,20 77:4
84:11 124:7,8
183:6

ranges 74:11

rare 81:5

rarely 22:4
109:6

rate 40:17,20
41:4,17,19
42:3,4 47:7
69:11
73:8,13,20,25
111:15 138:12
176:20 180:14

rates 56:15
68:7

rate's 105:18

rather 49:9
63:14,22 88:24
100:5 109:15
111:17
125:10,18
137:10 176:16
195:16

ray-vector
39:11

reach 15:7
93:25 135:21
191:7

reached 145:3
159:16 174:18

react 28:2,5
111:8

reacting 110:20
112:8

reactions
110:10

readily 46:14

reading 3:24
72:5

real 174:10

really 10:7
12:17 16:4
17:7 20:6
26:24 34:20
38:25 44:13
53:7 71:2 74:9
90:1 97:1
101:1,2 130:13
145:21 149:23
165:2 168:16
184:22
191:13,16

realm 45:15

rear 144:12

reason 55:16
94:22 167:25
170:25

reasonable
104:7 110:1
113:14,16,19
138:9 157:8,11
161:13 191:24

reasonably
104:3

reasons 174:18

rebut 102:5

recall 24:5,12
25:18
26:20,21,22,24
,25 27:4,23
28:10,20 46:17
52:3,19
61:5,10,13,16
68:7 83:7
163:14 195:14

receive
9:4,9,15 12:20
47:17
50:8,9,14
56:23

received 7:8
9:6 10:1 60:22
83:16,24
152:23

recent 42:21

Recently 84:23

recheck 61:19

reciprocity
13:3

recite 194:20

reciting 195:18

recollection
25:25 27:6

recommends
120:8

reconstruction
10:5,10,13,16
11:11,19,24

12:8 13:12,22
15:13,23,24
17:10 19:21,23
20:9 21:23
22:10 30:19
38:15,24
42:13,24 44:6
45:5,15 54:13
64:18 76:2
84:4,17 91:6
138:23

reconstruction/
transportation
44:12

reconstructioni
st 10:24 11:13
15:20 21:21

reconstructioni
sts 10:3

record
4:3,16,24
5:14,20 6:6
7:7,13
18:3,5,9 22:13
41:4,8,10,14
48:20 49:10
79:15 98:1,5,8
123:24 125:13
137:9 167:6,9

recorded 58:24
81:4,6 88:22

records 58:23
82:10,12,16,21
123:14 125:4

red 122:19
150:9,10,11,13
,15

reduce 31:24



MILESTONE REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

35:20 104:21
107:23
116:16,23
199:14

**reduced** 27:18
37:5 105:10,11
109:19 199:16

**reduces** 130:1

**reducing** 35:23
104:17
105:11,13
108:3

**reduction**
36:1,2,14,21
37:1 80:12
104:15 105:10
106:17 108:7
120:1,2

**refer** 39:22

**reference** 41:6
42:17 53:23
55:8 59:17
67:2,11,25
68:3 73:3 90:1
96:23 168:18

**referenced**
68:17 73:14,16

**references**
101:16

**referred** 10:17

**referring** 11:20
14:18,21 20:17
30:17 36:11,22
83:20 152:22
153:5

**refined**
147:12,16,21

**refusing** 47:23
116:6

**regarded** 51:10

**regarding** 15:8
43:23 83:2

**regardless**
48:5,6

**regards** 15:3,24
16:3 53:5
136:9

**regular** 57:6

**related** 48:4
60:13

**relative** 62:8
69:11 70:7,13
77:5 110:25
111:20,22
116:18 118:25
125:17 156:24
176:19 177:17

**relatively**
176:20

**relativity** 69:7
70:8,9 71:4
76:7,12 77:25
176:16

**releasing** 37:2
105:17,18

**relevancy** 48:3
49:23 120:13
196:6

**relevant**
8:10,14,18
31:25 37:12,21
38:18 48:22
49:22 127:13

**reliable** 78:13

**relied** 50:25
53:3
54:5,8,14,16,1
8 56:11 91:16

**relies** 16:21
51:6

**rely** 13:23
14:16,24 20:6
53:4 54:19
57:3 63:24
68:20 69:18
70:12 72:16,19
76:6 77:7,22

**relying** 20:8
51:11 55:25
56:1 74:9
76:12 91:14
136:24 161:1
175:24 195:19
196:1,4

**remain** 138:5,9
193:11

**remained** 143:23

**remaining**
117:22
137:14,20

**remains** 193:13

**remember** 20:22
24:9,15,18
25:9,23 26:17
27:16,25 28:8
43:2,3,15 45:9
46:1,19 51:4
61:8 67:23
74:19 81:3
83:1 117:6
188:24,25

194:18 195:8,9

**remembering**
46:18

**remove** 192:8
193:19

**removed** 98:25

**repaired** 136:24

**repairs** 120:23

**repeat** 18:2
38:4

**rephrase** 58:6
191:13

**replicate** 96:14

**report** 5:21 6:1
12:8 14:17
15:8 16:23
22:3,23 36:11
41:5,6,18
50:23
51:1,2,23
52:3,21
55:7,13
59:18,20 60:15
63:11,18
64:7,12,15,20
65:18 68:17,25
71:25 72:14,23
74:2 77:9
82:20 83:6,19
84:1 88:22
89:2,5
91:18,20 92:22
95:12,17
101:18 102:1,5
106:11 107:20
108:16,19
123:18,24
124:25 136:14



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000335

149:18 152:16
153:24 158:25
162:21 166:22
174:23 186:8
188:11 196:20

**Report.........**
**............5**
3:14

**reported** 1:23
59:1 68:19
71:11 73:2
75:22 106:9

**reporter** 1:24
4:4 5:3,4

**REPORTER.......**
**.............2**
**18** 3:4

**reporting**
42:9,10 62:24
73:21,22
124:15

**reports**
21:24,25
22:1,5,8,18,19
,21
23:2,4,13,23
67:3,11 94:1

**representing**
4:18,19

**request** 7:17

**requested** 25:22
97:19

**require** 22:21
31:8 33:8,17
45:3 64:8
76:21 101:16
116:11 119:24

161:18

**required** 8:4
30:3 31:20
37:16 76:23
118:5

**requires** 31:7
32:9,25 33:8

**reread** 74:13
75:13 158:18

**research** 9:18
19:12,14
34:13,25 36:24
37:5 38:14

**reserve** 32:25
33:4 114:17
115:6

**reserved** 3:25

**residential**
26:3 27:2 29:4

**resistance**
133:14,19,21,2
2
142:5,14,15,16
,18 144:2

**resistive**
133:23 142:3

**resolution**
40:13 64:1
85:16,24 86:5

**resolve** 53:8

**respect** 58:18

**respective** 3:24

**respond** 32:6
44:23 110:16
118:17 123:10
129:10

**responded** 31:4
114:8 117:24
126:12
128:17,19
199:5,7,11

**responding**
128:24

**response** 29:19
30:5 31:8,9
32:25 33:3,17
34:14,15,16,21
37:4 44:15
85:2 88:17
105:16
115:1,17,23
118:6 119:25

**responses** 33:1

**responsive** 7:16

**rest** 39:9 130:5

**restaurants**
61:9

**result** 22:13
37:2 108:7
117:21 140:20
162:6,7 165:4
173:25 184:19

**resulted** 115:2
142:12

**results** 72:8

**retained** 6:11
23:10 24:12
46:4,11 47:4
50:2 53:12,13
57:16

**retaining** 22:14
50:2 85:4

**retention** 6:9

**reverse** 10:21
11:4 30:20
39:11 90:17

**review** 61:1
74:21 79:12
82:25

**reviewed** 34:7
58:12,14
59:12,20 60:9
79:7 82:5,9,15
108:16 110:9
123:13 128:11
129:6,22 133:1
139:18,22
141:21 157:21
193:6

**reviewing** 25:22
51:14 83:7
185:3

**revise** 165:1

**revisit** 49:15
161:18

**Richland** 163:12

**Richmond** 2:10

**rid** 132:16

**riding** 135:7

**right-hand**
102:20 179:16

**rightmost** 189:5

**rightward**
117:22 182:10
197:9

**rigid** 132:19
146:16

**rigidity** 151:23
161:9



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

**rim** 130:11
132:13,16,19,2
1,22,24
133:2,7

**ripped** 163:3

**risk** 113:15
114:16
118:4,5,20

**risks** 33:2

**risky** 33:3

**road** 24:8 26:3
27:2 29:5
39:14 49:16
71:1 78:1,3
88:3 89:21
90:2,4,8 98:24
100:3,19
102:20 117:19
120:20 136:25
154:1
161:10,11
165:13 171:20
177:1,7

**roadside** 32:3
33:18 36:6
110:4,5 199:8

**roadway**
43:12,19 44:1
76:4 77:4 78:8
87:11,12,20
89:22,23 101:5
102:11 119:1
126:7,22
130:3,5 153:23
175:4,11 176:7
177:4 195:10
196:10

**roadways** 26:22

**Roderico** 1:4
4:8 196:25

**roll** 132:22

**rolling** 18:22
171:22 172:9

**rolls** 18:22
133:6

**room** 137:19
138:4 176:12

**rotate** 145:24
177:14,15

**rotating** 165:21

**rotation** 145:13
148:5,6

**roughly** 23:1,14

**round** 93:1
153:18 181:17
182:16 183:3
184:2

**rounding** 107:3
181:24
182:14,18,23
184:7,24 191:1

**rounds** 181:25
183:18 184:14

**row** 70:2

**rows** 59:21

**rubber** 130:16
132:10,13,15,1
9,21,22,23
133:2,3 171:19

**rubbing** 20:19
132:10

**rubs** 130:16

**rule** 115:21

**rules** 6:19,23
43:23 93:15

**rulings** 25:1

**rumble** 89:25
90:8

**run** 63:10,18
66:10 161:23

**running** 64:7

**ruptured** 134:3

**ruptures** 134:10

---

S

**SAE** 73:14

**safe** 103:15

**safety** 82:6
120:12

**salaried** 47:18
49:24 50:13

**salary** 47:17,20
48:6 49:12,18
50:6

**sample**
69:5,8,13
70:10 75:3
80:1 176:17

**samples** 71:5

**Santos** 1:5,6
4:10 96:4
103:22,25
106:4 107:24
109:3 126:2
147:15,19
148:21 149:6
157:22 158:16
160:19 161:4
162:5
167:12,17

168:8 174:6
194:16 195:6
196:9,25

**Santos's** 15:9
144:25 147:11
149:5
151:16,20
156:8 158:2,10
189:4

**Sari** 7:22 25:19

**satellite** 68:21
176:22

**satellites** 40:1

**savings** 124:17

**saw** 27:18 28:11
31:24 32:16
93:20 94:5
96:5 104:5,12
113:12
116:21,24,25
117:4,19
130:13 139:10
140:17 141:8
146:12 154:21
158:4,16
168:23 192:4
195:18 197:24

**scale** 16:9
190:6

**scaled** 86:20

**scanned** 55:22

**scanners** 43:7

**scanning** 40:9
43:7 56:7,11
84:10 87:5
90:15

**scans** 56:1,12



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

scattered 54:24

scenario 110:23
127:24,25
128:1

scene 39:18
40:9 57:24
82:6 84:5
85:1,5,6,12
86:19,22
87:10,17,25
88:1,2,6,7,13
90:12 91:4,8
95:24 112:7
152:24

scenes 84:21
86:23

schedule 50:15

school 20:4

science 9:1,2
11:5 16:5 53:7
72:17 75:16
127:3 194:21

sciences
16:1,3,17

scientific 39:3

screenshots
82:17

seams 89:23,24
90:4

search 55:13

seat 128:12

seated 141:5

second 8:24
62:15,18 74:3
77:12
106:6,11,12,21

107:7,12
129:25 179:5
182:1,3
183:17,19
184:1,9,13
196:14

secondary 31:12
126:13 147:5,8
199:12

seconds
36:16,18,20
95:16,21,24
96:3 106:19
107:19,23
108:2
109:2,10,24,25
117:15 118:9
123:17 124:2
126:18 129:11
181:20,22
182:4,6
188:15,16,19
199:6,15,18

sectioned 89:22

seeing 30:24,25
61:13 93:2
150:2

seem 73:5
126:8,22

seems 191:7,24

seen 11:9 15:12
80:21 94:19,20
98:14 99:7
100:2,5,16,22
101:6 113:5
132:5 139:25
140:3 192:5
198:23

segment 78:1

111:14 180:18

segmenting
173:14

semantics 195:2

seminars 42:20

semi-privileged
8:16

sending 182:2,6

sense 16:20

sensitive 84:13

sensors 81:24

sent 7:17
117:11,14
118:10
123:16,21
124:1
125:8,15,21
128:13,22
129:2,8,17
152:20
181:3,11,15

sentence 26:20
137:24 138:8
153:22

separate 31:1
60:7 64:11
158:15

separates
133:19 134:15

separation
133:18
134:14,16

September
55:16,18

series 56:12
86:24

settings 69:15

shaking 6:20

shape 146:14
149:15 156:17

shapes 157:19

she'd 27:17
130:25
197:13,21
198:11,12,16,1
7

SHEET..........
..............
..............
..219 3:5

she's 105:22
177:1 182:1
183:15
184:8,15
186:16
187:6,11,25
196:16 197:9

shift 171:7
173:7 182:10

shifting 31:5

shifts 113:20

shining 94:13

shoe 165:8

shoes 164:18
165:17,22

shop 117:12
134:8

shopping 61:8

short 31:19
34:18

shortly 57:18



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

94:4

**shoulder** 31:3
32:11 89:25
110:16,17,18
111:2
112:13,16,20,2
3 113:2 118:24
122:2 131:8
135:17 136:7
152:2
155:11,16
156:3 157:3,15
174:15
175:16,20
192:3,4

**shoulders**
165:20

**showed** 17:17
178:12

**showing** 59:21

**shown** 33:19
159:16

**shows** 34:2,25
36:25 104:9
109:9 139:25
152:9 153:12
175:2,10,19
178:6 183:8
185:12 195:3
197:8

**side's** 171:8

**sidetracked**
153:15

**sight** 92:24
95:5,13,18
98:10
125:7,14,21
199:4

**sign** 93:14,20
120:2

**signage** 44:24
119:17,23
121:25

**signals** 176:23

**significant**
81:2 120:12
166:18

**significantly**
31:23 147:5,8
148:6 165:19

**signing** 3:24

**signs** 44:24
121:10

**similar** 13:21
34:16 105:18

**simple** 16:6
18:14 39:13
125:24 179:23

**simplest** 125:22

**simplify** 88:4

**simply** 13:2
29:18 37:6
113:20
131:8,15
133:22
135:7,24
138:23 149:9
158:22 194:20

**simultaneously**
9:6

**sir** 6:18 7:1,9
130:8

**site** 57:13,16
95:15,19

**sitting** 44:9

**situation**
109:16,21
110:19

**situations**
80:23

**six** 57:18 81:5
87:18,20

**six-year** 9:11

**size** 125:17,23
151:2,14,17
154:4
156:11,17,19
161:6 172:23

**skip** 6:22 9:8
90:2

**skull** 146:22
147:4
152:8,14,21
153:6,23,25
154:14,20,21
156:19,23
161:9,11

**slam** 116:4

**slamming** 116:5

**slid** 141:19

**sliding** 190:6

**slight** 135:25
137:5 143:7
177:17

**slightly** 52:17
134:21 171:3
183:22

**slippage** 171:2

**slow** 32:16
35:5,9,15,19

36:8 81:20,21
104:7,12 106:4
111:2,7 114:16
134:5

**slowed** 104:5,8

**slower** 190:2
197:13,20

**slowing** 35:12
37:2 105:4
106:24

**small** 76:7
100:5 121:17
122:1,8 125:18
173:14 176:16

**smaller** 71:5

**Smith** 1:9
4:11,20 38:2,6
61:4 94:18
96:2 100:12
103:18 126:1
139:9,15
168:5,22
188:23 189:8
190:10 194:4
196:24

**Smith's** 21:18
94:7 103:1
159:25 160:8
188:11 194:15
195:5,22

**smoking** 159:20

**sneaky** 150:21

**soft** 146:16

**software** 56:19
63:21 90:16,20

**solemnly** 5:4

**Solomon** 114:15



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

solution
162:9,10

somebody 26:3,8
85:14 158:16
188:17

someone 26:7
36:20 52:20
56:25 57:3
62:17 91:17
104:11,21
128:3 158:11
173:22,25
189:24

sometime 55:16
106:14

somewhere 25:10
76:3 83:17
88:22 107:21
109:23 124:7,8

sooner 37:4
105:11,14
198:23

sorry 17:22
18:3,11 20:20
43:10 53:17
55:8 65:12,23
83:3 85:20
94:17 117:25
148:25 149:2
153:14 163:25
164:2 167:3
189:16

sort 6:22 11:9
26:14 77:10
85:16 120:22
141:24 163:2
180:9

sound 26:5
28:14 98:11

121:2

sounds 7:5 27:3
45:24 59:15
97:23 181:18

Sources 42:24

south 9:3 98:23

southwest 94:9

space 18:16
39:8 90:17
114:1 137:15

spanned 75:6

spare
192:9,16,25

speak 42:12
157:6

SPEAKER 189:16

special 1:4 4:9

specialized
9:23 14:11

specialties
9:17

specific 14:3
17:7 52:7,18
59:19 60:11
66:23,24 67:16
72:21 73:5
75:8,14
97:6,18,19
114:9 119:12
147:12,16
154:19 164:16
191:24 196:2

specifically
14:9 58:8
67:20 88:14
123:23 151:21

153:19 189:1

speculation
127:21 156:22

speculative
155:24

speed
21:2,10,18
26:21
27:4,14,17,18
28:1 29:7,12
31:9,24
35:21,23,24
36:1,2,14,21
37:1,8,11,13,1
7,21 38:3,7
58:22 61:21,25
62:2,9,18,22,2
4 63:2,3
65:3,11
68:10,23 69:15
74:7 80:1,4,12
81:1,3,4,11
93:10,14,17,20
95:14,23
104:14,17,21,2
4,25
105:6,8,9,10,1
1,12,13
106:8,17,18
107:1,7,11,22
108:4,7,10
109:14,15,20,2
3 110:3
111:1,17,20,22
,23 116:16,23
118:21,23,25
119:3,5 120:1
128:20
178:9,10
180:12 183:9

189:24
190:14,15,16,2
0 197:21
198:11,16,17
199:14,16

speeds 15:4
17:14 37:9
111:7
177:20,22
185:9

spend 25:21

spin 166:5

spinning 165:22

spins 166:1

split 23:9,11

spoken 91:11

Sport 72:6

spot 28:18 96:3

spot-on 107:5

spray 155:1,3

Springdale 2:4

squares 89:22

stains 39:10

stamp 106:14

stamps
124:10,11,20
125:4

stand
140:18,19,24
141:9,18,24
192:23

standard
47:10,12 63:24
76:25 80:2,3,6
85:21 86:21



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

App. 000340

105:6
124:16,22
193:22

**standards** 44:1
45:9 76:21

**standing** 111:3
148:2 191:5,11
195:10 196:10

**standpoint**
16:10 37:13
105:9 139:3

**start** 21:20
53:21 61:24
85:25 93:2
105:4 106:24
131:12
132:4,11,23,24
149:24 150:2
188:17 192:2
193:15

**started** 45:18
61:11,13
104:16,17
105:11,13
114:6 130:19
131:25 187:3

**starting** 4:16
59:2 72:23
89:20 145:5

**starts** 19:4
43:25 120:4

**state** 4:23 5:13
13:2 54:24

**stated** 143:18

**statement** 51:25
53:3 165:1
195:23

**statements**

51:14,22
52:5,7,20 53:2

**states** 1:1
12:23 13:1
22:7

**stationed** 94:13

**status** 96:10
188:14,15,16,1
8 192:23

**stay** 97:1

**steer** 130:3
136:1 177:17

**steered** 174:15

**steering** 111:22
130:6 135:19
136:9,10,15
180:12 183:22
189:14

**steers** 137:2

**step** 179:2
192:15
193:4,5,14

**stepped** 194:16

**stepping** 195:1

**steps** 192:8,12
193:11

**sticking** 126:14

**sticks** 165:13

**stimulus** 32:21
110:23
112:5,7,11
113:1 114:6
116:11 168:2

**stipulated** 3:23

**stitch** 56:14

**stitches** 86:25

**stock** 112:10
193:22

**stop** 7:3
27:21,22 28:7
30:4 31:23
35:10 97:22

**stopped** 26:3
35:7,16
110:6,10
111:3,9,14,24
112:21,23
113:6,9 122:24

**story** 147:23

**straight** 66:10
70:1,17,18
78:1
92:11,23,25
94:7 99:6
111:13
143:9,11
175:11 177:3
183:22

**straightaway**
78:7 92:19

**Street** 2:3,9
87:22

**strike** 22:17
28:9 30:1
36:20 43:10
54:1 56:25
63:9 79:6 80:9
83:4 107:17
138:6 140:6
173:20 177:9

**striking** 26:14

**strips** 89:25
90:8

**strong** 160:22

**struck** 24:7
36:16 148:20
149:5 159:19
162:1 194:4

**structural** 16:7
134:11

**structure** 16:9
50:10

**stuck** 156:15

**studied** 9:15
19:16 67:16
76:1

**studies** 9:20,24
20:11 33:21,23
35:18,20 36:4
110:14
112:18,20
113:17,20,23,2
4

**subcontract**
57:9

**subject** 21:15
34:22 37:17

**subjective**
96:19

**submarines**
14:12

**subpoena** 7:8,10
8:4

**subsequent**
69:17 70:12
79:19 87:1
162:6,8

**subsequently**
21:14 161:23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

substance 39:15
  43:3
subtleties
  108:9
subtraction
  125:24
successfully
  33:9 199:5,11
sudden 134:9,12
suddenly
  126:2,5,8,23
  127:17 128:4
sufficient 10:9
  28:18 85:15
  114:4 121:7,13
  137:19
sufficiently
  11:8
suggested
  174:16
suggesting
  154:14 155:23
  165:7
Suite 2:3
sum 77:10
summarize 26:20
  175:1
summarized 12:6
summation
  142:11
summed 42:5
sun
  94:2,6,13,14,2
  0,22
sunny 93:22

super 59:19
support 36:19
  73:12
supporting
  132:17
suppose 135:13
  151:5 197:16
supposed 193:3
sure 6:2,9,12
  19:1 26:1
  38:21 39:24
  52:18 61:9
  65:25 68:4
  74:5,13 79:4
  83:10 86:11,12
  89:11 101:25
  102:13,15
  112:6 125:12
  128:8,9 129:14
  150:6 151:6
  154:7 160:4,14
  162:13 178:22
  182:8
  187:20,21
  188:2 189:12
SUV 28:11
swear 5:4
swearing 175:8
swerve 171:7
  173:7 174:1
  176:9 177:23
  178:7,12 179:1
  180:7 185:8
  186:19 187:20
  189:8
  190:1,2,14,17
  192:2
  197:3,5,9,14

swerved 128:16
  187:16 188:7
  190:10 196:21
swerves 173:24
  187:25
swerving 128:21
  169:10
  173:2,4,6,17,2
  2 177:21
sworn 5:2,10
SYNC 66:22 68:8
  72:14,17 74:24
  75:4,11,21
  76:25 77:18
  79:1 185:4
synchronized
  59:2
system 55:23
  58:25 60:8,14
  63:6 64:18
systems 13:11
  14:22 73:9
  76:21,23

─────────────
        T
─────────────
table 60:3
tail 144:9
taillight
  147:15
taking 41:20
  45:10 71:5,9
  108:7 176:16
  187:4,25
  193:15
talk 35:12
  113:16 148:23
  156:1

talked 80:25
  86:7 114:2
  120:3
talking 8:3
  13:25 16:5
  30:24 35:9,11
  41:17 52:9
  68:10 73:22
  74:25 75:23
  98:9 110:6
  112:4 119:16
  121:5 122:16
  143:15 165:11
  169:4
  193:19,20
  197:18
tampered 56:8
tapping
  108:8,10
tattoo 117:12
Taylor 2:2
te 87:24
teamwork 58:9
tech 84:14
technically
  14:11 51:9
  103:5
technology
  42:23 43:8
  63:15
teed 22:20 24:2
  61:6 67:2 68:1
  75:13 77:22
  78:10 180:18
  181:5
teens 25:10



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

App. 000342

temple 152:6

ten 25:12 42:20
188:16,19

tenth 190:23
191:2
197:18,25

tenths 198:8

term 119:13

terms 14:10
18:14 69:22
76:15 96:19
125:22

tertiary 147:8

test
13:5,7,8,15
20:2,10 72:22
75:10 190:19

tested 74:20,24

testified 5:10
25:8,16 28:15
95:11 117:11
158:9 197:7

testify 29:11
158:1

testifying
195:9

testimonial
157:20

testimony 3:2
5:5 7:21
23:8,9 24:23
28:9,17
47:11,14,15
51:8,12,17,24
52:2 53:5 86:9
96:20 101:12
117:3,18,21

118:1 119:3
128:11 131:7
158:5,15,22
185:17,23
186:5,16 187:4
191:7
192:14,15
194:15,19,20
195:5,8,15,18
196:3,4,5

Texas 1:1 4:13
46:7 82:6

text 58:23
117:11,14
118:10
123:17,21
124:2,11
125:8,15,21
128:13,22
129:2,8,17
181:4,7,12,15
182:2,7

textbook
171:6,10 173:9

texting 198:23

texts 82:18

thank 4:22 5:1
20:20,25 26:12
42:11 53:11,20
63:8 84:2
164:3

themselves 4:15
52:12,21 142:4

theorem 181:1

theory 70:7,9
71:4 76:7,11
77:5,24 165:12
176:16

therefore 19:22
196:21

there's 22:21
23:21 24:20,22
25:3,19
33:2,15 49:11
52:6 54:11
69:16,25
75:2,4,12
83:25 97:18
100:4 105:6
109:1
120:1,16,19
123:2,5 124:17
129:3 132:4,17
134:9 137:4
139:3,14 140:8
146:22 147:1
148:16 155:5
158:15,25
159:23 162:10
163:2 170:7
171:1 172:7
175:14,18
176:11 177:13
181:24 191:13
192:14

they'll 66:10

they're 14:2
46:21 67:4
69:24 70:16
75:23,24 85:6
121:19
122:8,12
123:1,10,11
151:22 176:21

they've 176:12

third 95:7,9
146:7

Thompson 2:3

thorough 72:13
85:12

thoroughly
57:17

thousands 22:10
24:20 121:21

threat 34:12
118:18

throughout
19:20 25:17
54:24 148:20

throw 21:3,9,15
145:15,21

thrown 15:1,9
140:21
143:10,11
144:19 145:25
165:8 173:8

thumb 36:13
60:18

tie 20:19

tiers 11:18,23

tilt 141:22

tilted 140:19
141:12,19,20,2
1

tilting 141:13

timeline 30:19
104:16

tip 152:4
161:11

tire 109:4,6
130:1,13,14,17
,18,22
131:6,10,12,20



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

132:4,5,8,14,18
133:10,15,19,20,21
134:4,6,12,13,23 135:2 141:1
143:19,24
162:25
169:4,8,14
170:3,7,9,16,18,20,23
171:4,6,9,10,11,17,19,20,22
172:1,2,5,9,13,14,19
173:3,18,19,21
174:8,9,10,11
192:9,16,23,25
193:7,12,20,22
194:3
195:11,13,14,24 196:11

**tires** 142:4,14
144:2 169:20
171:8 173:9

**tissue** 146:16

**title** 11:2

**titled** 19:6,7,8
43:12 60:14,15
83:25

**titles** 10:19,23
11:7,16

**today** 4:4 48:25

**tolerance** 40:17
41:24 175:13

**tolerances**
40:12 178:18

**tool** 165:9

192:20
193:15,19,22

**tools** 43:6
181:2 193:24

**top** 24:1 55:12
61:6 67:2
75:14 78:10
88:10 139:5
170:22 171:5
172:5,8

**topic** 43:2

**torso** 148:11

**total** 142:2,10

**totally** 32:20
57:7 110:23,24

**touched** 108:11

**touching** 130:11
132:21 133:4

**tough** 183:5

**tow** 87:25

**towards** 94:8,12
145:25 146:5
171:5 174:15
175:16,20

**towed** 85:6

**Toyota** 21:14
30:25 31:3,24
33:12 79:13,17
83:23,25 87:24
88:3,5,7,12
91:13
94:12,14,19,20,23 98:10
99:1,7,15,18,19
100:2,7,11,18,25 101:13

102:9 103:1,18
104:5 111:24
113:6
114:4,11,24
115:13,15,25
116:8,17,22
117:4,19,24
118:22 119:2
121:16 125:15
126:11,15
130:11,22
134:19 135:14
136:15,22,23
137:10,16,20,23 138:6
139:5,10,16,20
140:2,6,15,21,22 141:11,18
142:1,9,21,25
143:3,6,14,16,23
144:1,4,7,20,24 145:7
146:1,3,4,10,14,15,19,21,23
147:1,11
155:21 162:7
167:14
169:5,11 174:2
185:18 187:7
189:5 191:5,10
195:6,7 196:11

**Toyotas** 80:4,6

**track** 23:7
59:21 60:16
62:6,14
69:12,18,23
70:3,16 77:11
106:5,10,19,21
124:11 125:3
171:20 174:5

175:16 179:19

**tracking** 72:13
73:25 171:22
176:18

**tractor-trailer**
96:11

**trade** 10:20

**traditional**
63:13

**traffic** 26:8
27:19 32:17
33:4 43:12,23
44:19,20
96:8,14,17,21,25
97:2,4,12,14,18 98:20
99:9,11,14,24
100:1,2,4,9,10
101:6 114:15
118:23 119:16
120:3 127:19
135:17,24
137:15 199:2

**trail** 58:20

**trained** 19:16

**training** 10:1,4
64:9

**trajectories**
14:19 15:4

**trajectory**
145:14
161:24,25
185:6

**transcript**
7:20,23,24
25:22



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     Toll Free 855-MYDEPOS

App. 000344

**transfer** 13:13
140:9,10
144:10 162:1

**transmission**
142:6

**transpired** 17:9

**transportation**
43:18
44:1,16,22
119:15
120:8,18

**travel** 31:4,5
32:12 47:13
92:25 105:8
111:14,24
112:10,21
113:13 114:7
115:8 118:23
119:4
121:16,19
122:2 126:5,13
130:20
137:11,13
146:4 157:25
167:13 175:15
185:24 186:3

**traveled** 62:18
106:8 190:15

**traveling** 24:6
27:2,17 38:2,6
54:24 97:9
111:7 119:1
174:11,14
175:2 177:22
183:9 189:24
197:10

**travels** 179:21

**tread** 133:18,19
134:10,14,15

**169:15
170:1,5,8,9,24
,25 171:24

**trees** 39:18
68:23

**trend**
77:8,21,25

**trends** 69:18,19
70:6 77:5
175:12 176:18

**trial** 7:21,24
22:6,12 25:8
47:15 129:15

**triangle** 122:19
179:17,24
180:4,16,22

**triangulating**
40:2

**triangulation**
40:1

**trick** 14:15
58:10 106:12

**tries** 135:11

**trigger** 79:24
81:20,25 82:4

**triggered** 81:18

**triggers** 81:22

**trim** 164:19

**Troopers** 82:7

**truck** 26:2,5,10
96:11

**truck's** 27:23

**true** 21:19
125:17 187:4
188:9 190:4

196:9

**trunk** 103:1,7
111:4
144:11,13,19,2
1 148:2
191:12,22
192:17,18,19

**trust** 175:25
178:15

**truth** 5:6,7

**try** 5:25 7:4
29:21 51:11
91:9,10 96:19
178:20 181:6

**trying** 14:15,23
24:19 26:4
64:25 77:8
173:25 187:6

**Tuesday** 1:16

**turn** 136:15,16
197:23
198:12,18

**turned** 41:7

**turning** 93:4

**twice** 80:22

**two-inch** 139:3

**two-lane** 26:3
29:4

**two-tenths**
197:24

**type** 21:4 33:25
50:4 61:8
67:7,17 110:22
133:12,16,23

**types** 16:17
17:4 21:3

23:17 52:15,16
58:19 62:4
65:10 75:23

**typical** 34:2
73:4 76:1
105:16 110:3
119:3

**typically** 10:9
12:9 17:1 21:1
22:4,5 35:19
36:25 45:10
47:4 51:6 57:2
63:23 79:25
80:19 81:21,24
84:11 85:3
90:22
110:12,16
121:11 122:12
138:25 145:14

_____
U
_____

**uh-huhs** 6:20

**umbrella** 44:12

**unable** 31:16
139:15

**unavoidable**
111:23

**unchanged**
38:1,5 89:17

**underlying**
47:1,3

**underneath** 47:1
80:3 132:24
133:6 134:13
192:19

**understand**
7:2,4 15:14
67:14 70:2


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

App. 000345

86:9 100:20
117:3,10 118:1
128:14 192:24
193:2,4

**understandable**
122:13,14

**understanding**
38:23 40:18
44:23 62:22
63:5 66:4,12
77:17 79:23
122:24
140:20,24
160:1 185:22

**understood** 6:24
75:16 113:6
118:3 195:12

**undoubtedly**
120:16

**unfair** 33:20

**unfolded** 118:8

**UNIDENTIFIED**
189:16

**uniform** 40:20

**uninhibited**
95:18
125:14,21

**unique** 162:10

**unit** 74:10,22

**UNITED** 1:1

**units** 125:1

**universe** 23:3
129:14

**University** 9:3

**unknown** 99:12

**unknowns** 39:9
40:7 90:18

**unless** 32:7
97:18

**unobstructed**
92:24 95:4,13
125:7

**unpopulated**
96:7,12

**unprivileged**
8:18

**unrelated** 57:7
79:18 194:3

**unreliable**
76:10

**upcoming** 120:9
121:8,14

**upon** 21:2 50:25
54:8,14,17
57:4 192:22

**USB** 7:14

**usually** 90:5

**utility** 26:14

**utilized** 65:7
114:23

———————
V
———————

**vacated** 104:4
168:23

**vacating** 169:2

**vague** 185:20

**vaguely**
25:21,22 27:23
28:20 43:5
61:8

**valid** 113:3

**validate** 72:7
88:15
178:13,20

**validated**
78:5,25 87:19
176:3,13

**validating**
67:21

**validations**
178:14

**validity** 78:12

**value** 73:6,21
75:10 76:2
96:12 185:1

**values** 39:5
72:5 75:22
96:13 97:5
106:8

**Vandiver** 68:2,6
71:18 73:16,17

**Vandiver's** 71:7

**Vanessa** 2:15
4:4

**variable** 21:16
37:14 101:2,8
189:25

**variables** 23:21
27:14 75:24

**variance** 72:24

**varies** 85:6

**various** 13:14
20:12 21:3,8
23:17 42:19
44:23 58:19
62:4 65:10

68:21 71:12
75:23 195:17

**varying**
52:15,16 96:20
142:8

**VBOX** 72:6

**vectors** 15:5
39:6

**vehicle** 11:25
12:2 17:3
21:2,6,10
23:15,19
26:14,21,23
27:19 28:3
32:3,21 33:10
35:6,15 36:6
44:10 56:13
57:3 59:1
62:7,24 63:7
70:17 76:4,19
77:12 80:20
81:9,10,14,15
96:9,10
110:4,6,15,17,
20,21
111:1,2,4,5,9,
13,21
112:2,10,19,21
,23
113:2,13,15
122:1,24 126:3
130:2,3 133:10
135:23,24
137:2,4 140:25
171:8 173:4,9
177:19,22
178:24 199:8

**vehicles** 19:18
20:1 23:24
38:16 63:15



**MILESTONE** | **REPORTING  COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

79:15 85:5
110:10 119:1
140:13 169:9
173:2

**vehicular** 11:22
23:18

**verify** 56:6

**version** 59:13
186:12,13

**versions**
186:9,11
195:17

**versus** 4:11
12:11,18 15:4
16:6 21:6 22:3
23:5 25:19
32:22 33:22
37:17 66:25
69:19 71:6
72:24 81:13,14
85:22 111:7
124:16,22
142:14 146:16
149:8 174:10
179:20

**via** 141:8

**viable** 115:8

**video** 30:18
38:15,24
39:5,9

**Videographer**
2:15 4:3,22
5:1 18:4,8
20:18 41:9,13
97:25 98:4
163:25 164:3
167:5,8 189:18

**videos** 38:17

39:4 94:2,3
96:24 103:15
152:24

**view** 87:22
100:5 102:8
113:4 121:18
122:1,8 196:17

**violating**
115:21

**Virginia** 2:10

**virtually**
111:15

**visibility**
101:8,10

**visible** 89:7
122:9,11

**visit** 57:13

**visual** 28:24,25
29:22 32:21
34:17,19
110:23
112:5,7,11
113:1 116:10
125:23 199:3

**visually** 112:22

**volatile**
39:10,15

**VOLUME** 1:13
199:21

**vs** 1:8

———————
W
———————

**walk** 60:20
63:16 65:5
180:9

**walked** 164:2

**walking** 56:13

**walk-ins** 117:12

**wall** 87:13 93:7
134:3,10

**warn** 121:14

**warned** 120:9

**warning**
119:11,15,22
120:18 121:13

**warnings** 120:17

**wasn't** 21:16
29:2 31:15
32:10 77:23
88:4 169:16
191:25 192:1

**Watch** 76:24

**water** 14:10,22
39:14,20

**waves** 85:7

**ways** 16:14
126:4

**wear** 134:11

**weather** 94:1,2
95:1

**wedging** 145:20

**weight** 81:9
171:7 173:7,8

**weirdly** 69:25

**welcome** 164:4
196:5

**we'll** 23:2 51:2
80:5 127:14
137:24 175:6

**well-
established**

87:7

**well-known** 76:1

**we're** 18:5 49:8
54:23,24 57:15
61:3 64:2
65:14 73:22
76:7 84:13
91:7 93:8 98:8
101:8 121:5
145:5 165:11
169:21
176:15,16
179:7 184:7
191:1 197:18

**Wes** 68:2
71:7,18

**Wesley** 68:6
73:16,17

**Wes's** 73:24

**wet** 26:22

**we've** 5:20 87:7

**whatever** 50:14
52:1 61:3 66:2
164:20

**whatnot** 175:7

**wheel** 133:21
134:17

**Whenever** 199:7

**wherever** 88:1
177:3

**whether** 20:7,14
21:4,5,6
27:21,25 28:5
49:11 50:1
52:4 53:6
69:16 75:21
76:24 81:4



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

96:10 98:14
99:22 101:5
105:21 114:3
115:12,24
116:6 124:1
129:6
131:15,19
133:2 169:2
170:22 185:20

**whip** 125:10

**white** 2:2 4:17
5:12,20,24 6:3
8:6,12,16,20,2
2 18:10 20:21
41:15
48:10,18,19
49:14,17 97:23
98:6,7 115:10
150:10,12,14,1
8,19 163:7
164:5 167:3,10
189:19,22

**White**..........
.......**5** 3:2

**whole** 5:6 12:18
23:3 52:25
71:13,16 72:21
111:5 120:24
177:17 181:25
182:17,19,21

**wide** 148:8
187:22,23

**widely** 91:1

**width** 33:7 71:1
137:18,21
170:13,15

**widths** 43:20

**wiggle** 176:12

**wild** 83:5

**William** 68:6
73:15

**Wingate** 1:19

**witness** 4:25
5:8 41:8
51:14,21
52:4,10 53:9
150:11,16
158:9 164:2,4

**witnesses** 52:14
53:2,10 158:4
192:4

**worded** 98:16
127:7

**work** 19:16
46:3,24 48:2,7
49:20,24
50:4,7 53:21
97:7 120:12
160:21 177:11

**worked**
45:13,14,21

**working** 21:20
40:12,14

**works** 147:25

**worst** 71:9,11
86:2,3

**worth** 44:6
192:3

**write** 22:5

**writer** 150:16

**writing** 129:8
150:15

**written** 22:22
23:5 195:23

**wrong** 15:18
56:1 69:21
72:5 121:2

**wrote** 74:2

**Wyndham** 1:19

_____
Y
**yard** 87:25

**yes-or-no** 128:2

**you'll** 17:1
52:7,18 149:17
150:5

**yours** 163:20

**yourself** 10:17
11:1,10 14:7
16:16

**you've** 6:16
7:14 12:5 14:6
23:4 38:23
39:25 59:14,22
60:17 82:9,15
83:12 101:21
108:7,16
116:25 123:13
128:11
129:6,22
132:12 155:10
159:16,24
170:3 171:12
172:2 176:3
185:14

_____
Z
**zones** 119:19,20
120:12

**zoomed-in**
173:14



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

App. 000348



IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS

Civil Action No. 3:22-CV-02714-K

ERICK RODERICO PIVARAL
GONZALEZ, Individually and as Special
Administrator of the Estate of
NEHEMIAS R. PIVARAL SANTOS,
DECEASED, ERICK SANTOS, and
EVELYN MORENO,

     Plaintiffs,

vs.

CAYLEE ERIN SMITH &
EASTMAN CHEMICAL COMPANY,

     Defendants.

_____/

**ORIGINAL**

VOLUME II

DEPOSITION OF:   PAUL J. MONTALBANO

DATE TAKEN:      Tuesday, December 19, 2023

TIME:            3:01 p.m.

PLACE:           Wingate by Wyndham
                 5750 Hazeltine National Drive
                 Orlando, Florida 32822

TAKEN BY:        Plaintiffs

REPORTED BY:     Jennifer Prohaska
                 Court Reporter and Notary Public

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

App. 000349

```
 1                    A P P E A R A N C E S:

 2   JACOB WHITE, ESQUIRE
     OF:  Taylor King Law
 3        410 North Thompson Street
          Suite B
 4        Springdale, Arkansas 72764
           (479) 935-1761
 5        Jacobwhite@taylorkinglaw.com
          APPEARING ON BEHALF OF THE PLAINTIFFS
 6

 7

 8   GREGORY J. DUBOFF, ESQUIRE
     OF:  McGuireWoods
 9        Gateway Plaza
          800 East Canal Street
10        Richmond, Virginia 23219
           (804) 775-1154
11        Gduboff@mcguirewoods.com
          APPEARING ON BEHALF OF THE DEFENDANTS
12

13

14   ALSO APPEARING:

15   VANESSA McCORMICK, Videographer

16

17

18

19

20

21

22

23

24

25
```


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000350

1                    C O N T E N T S

2   TESTIMONY OF PAUL J. MONTALBANO
           Direct Examination by Mr. White.................5
3          Cross-Examination by Mr. DuBoff...............208

4   CERTIFICATE OF OATH AND REPORTER....................218

5   ERRATA SHEET........................................219

6   NOTIFICATION LETTER.................................220

7

8

9

10

11

12                    E X H I B I T S

13  Exhibit                                         Page
    Plaintiffs'
14        1   Mr. Montalbano's Report.....................5
          2   Mr. Montalbano's CV.........................5
15        3   Mr. Montalbano's Case List..................5

16

17

18

19

20

21                    - - - - -
                   S T I P U L A T I O N S
22

23      It is hereby stipulated by and between counsel for

24  the respective parties that the reading and signing of

25  the deposition be reserved.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000351

```
 1                          * * * * *

 2                (CONTINUED FROM VOLUME I)

 3  BY MR. WHITE:

 4       Q.    Okay.  Do you agree that, when going over

 5  85 miles an hour, it's needlessly dangerous to text and

 6  drive?

 7       A.    Yeah, you are asking jury questions.  I can't

 8  answer those.

 9       Q.    You don't have an opinion on whether or not

10  it's needlessly dangerous to text and drive going over 85

11  miles an hour?

12       A.    "Needlessly dangerous" is such a subjective

13  term.  I'm here to analyze the objective science.  You're

14  welcome to present these words on closing.  That is not

15  my job.

16       Q.    I'm just asking, you know, you're an accident

17  reconstructionist and you do this for a living, right?

18       A.    Yes.

19       Q.    Do you think it's dangerous to text and

20  drive?

21       A.    It depends.

22       Q.    Okay.  Do you think it's dangerous to text

23  and drive when you're going over 85 miles an hour?

24       A.    It just -- it all depends.  You've got to

25  analyze every case.
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000352

 1      Q.    So it might not always be dangerous to text

 2 and drive when going over 85 miles an hour?

 3      A.    It might not.

 4      Q.    Okay.  You think it's wrong to text and drive

 5 when you're going over 85 miles an hour?

 6      A.    You're asking jury questions.  I can't answer

 7 that.

 8      Q.    You don't have an opinion?

 9      A.    No.  I'm here to apply accident

10 reconstruction analysis.  I can't -- I'm not here to say

11 what's right and wrong.  That's a jury question.  I can't

12 invade the province of the jury.

13      Q.    So you just don't have -- you don't have an

14 opinion about it?

15      A.    I'm not allowed to give layperson opinions.

16 Experts have been stricken for that, so I'm going to stay

17 in my lane.  I'm giving you the science.  You're welcome

18 to, again, make your attorney arguments.  I can't bolster

19 your attorney arguments.

20      Q.    So we go to Figure 89 on Page 64.  Can you

21 take that red pen on page -- on Figure 89 and draw where

22 you think Nehemias Santos was standing?

23            MR. DUBOFF:  Object as vague.

24      A.    Oh, my goodness, no, I can't do this.

25      Q.    No, no, sorry.  Figure 89.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000353

1       A.    Oh, Figure 89.  No, I can't do this.  I have

2  a diagram that shows you this.  I can't replicate a view

3  with a pen.  I've already done this graphically.

4       Q.    So when you say you made a diagram, you're

5  talking about Figures 119 and 120?

6       A.    Yeah.  Again, if you recall, I'm not telling

7  the jury where he was.  I'm presenting the two provided

8  versions.

9       Q.    I mean, I think you provided some opinions

10  about where -- where he wasn't standing, right?  But you

11  don't have an opinion on where he was standing?

12       A.    It's a range, remember?  So we have one end

13  of the range is the plaintiff version, the other end of

14  the range is the defendant version.  So I'm offering

15  those two versions.

16       Q.    But you've concluded one is consistent with

17  the evidence and one is not, right?

18       A.    What evidence?  What do you mean?

19       Q.    You've concluded that the defense version of

20  events is consistent with the evidence, correct?

21       A.    Well, with his final rest, yes.  Because he

22  bounces off the Toyota and then back to the Ford so -- in

23  Plaintiffs' version, the Ford is physically occupying his

24  original final rest.  Since we know he hits the Ford, he

25  can't occupy the same space at the same time.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000354

1        Q.    Okay.  So you don't have an opinion as to

2   where he was standing when he was struck by the Ford

3   Explorer?

4        A.    I don't have a specific opinion.  I do have a

5   range that I'm presenting.

6        Q.    Okay.  Describe the range for us.

7        A.    The range is anywhere between -- anywhere

8   between 3.2 feet into the travel lane up to about -- I

9   think that's 6.  Let me double-check.  5, I'm sorry.

10  5 feet to the travel lane.  So anywhere between 3 and 5

11  feet.

12       Q.    In the travel lane or outboard of the Toyota?

13       A.    Into the travel lane.

14       Q.    Okay.  And -- but you don't have an opinion

15  about how far back he was from the Toyota?

16       A.    I modeled him a couple feet.  But again, you

17  know, plus or minus 5 feet.  There's no reason to take a

18  hard stance on that, because it doesn't affect any of the

19  analysis.

20       Q.    Okay.

21       A.    Certainly, if it was 250 feet, that would

22  affect things.  But that variable is not that sensitive.

23       Q.    But then, so if I ask you to draw an X marks

24  the dot where Nehemias Santos was standing when he was

25  struck by Caylee Smith, you cannot draw that X?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000355

 1       A.    Well, remember, I'm giving you a range, so I

 2  would have to draw a series of X's --

 3       Q.    Right, right.

 4       A.     -- within that range.

 5       Q.    But you can't -- but you can't draw one X and

 6  say that's where he was standing?

 7       A.    No, no.  I'm giving you a range, so I

 8  can't -- I can't establish a range with one point.

 9       Q.    Okay.  So if you go to Figure 121 on Page

10  180 -- let me know when you're there.

11       A.    Okay.

12       Q.    All right.  So you see where you've got an

13  arrow pointing to his body, it says "initial rest"?

14       A.    Yes.

15       Q.    Okay.  So how did you conclude that his feet

16  were in the middle lane as opposed to his feet being

17  pointed towards the Toyota?

18       A.    Yeah, that certainly has room for -- oops --

19  that is not drawn specifically.  What the evidence shows

20  is that he was dragged.

21       Q.    So your opinion is his head was at the point

22  where y'all drew the head on Figure 121, right?

23       A.    In his initial rest?

24       Q.    In his initial rest, yes.

25       A.    That seems to be where the blood is coming

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000356

1  from, so it just makes the most sense, especially with

2  him being dragged backward towards the shoulder.  It's

3  just what made the most sense.

4      Q.   But you don't have an opinion about which

5  direction his legs were facing, either towards the Toyota

6  or towards the middle lane?

7      A.   No.  And I indicated that in the report.  I

8  don't have a specific final rest, or I should say initial

9  rest of him.  I just know it was on the initial path of

10 the travel lane.

11     Q.   So if Figure 121 was replicated, but with his

12 head where it is in the initial rest position, but his

13 feet pointing towards the Toyota, you wouldn't have any

14 problem with that?

15     A.   No.

16         MR. WHITE:  Okay.  All right.  I reserve the

17     rest of my questions for trial.

18         MR. DUBOFF:  Okay.  Let me just -- I just

19     have a couple.

20              CROSS-EXAMINATION

21 BY MR. DUBOFF:

22     Q.   I think that this might have just been a word

23 mix-up, but, Mr. Montalbano, correct me if I'm wrong.

24 This was earlier in your testimony.  But do you recall

25 Mr. White asking you questions about how average drivers



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000357

```
 1  have responded to roadside obstacles?

 2       A.    I think so.

 3       Q.    And I think there was a phrasing for a few of

 4  the questions that was something like, "So people slow

 5  down a few miles per hour before they hit a pedestrian."

 6  Can you just -- are those studies that you were

 7  referencing, were those about pedestrian strikes or about

 8  roadside obstacles or both?

 9       A.    Oh, I -- did I say "before hitting the

10  pedestrian"?

11       Q.    I think the question was phrased in that way.

12       A.    Oh, yes.  So these were roadside hazards that

13  weren't imminent hazards.  It was determining what

14  drivers did in response to the presence of a potential

15  hazard.  And the studies show that drivers typically will

16  slow down 1 to 3 miles per hour for a roadside hazard

17  prior to crossing that roadside hazard, so prior to

18  arriving at the roadside hazard.

19       Q.    Okay.  And so those studies were not about

20  how far before hitting a pedestrian people brake?

21       A.    No, those were not imminent hazard studies.

22  Those were potential hazard studies, which is what we

23  have in this particular case.

24       Q.    With regard to -- if you could turn to

25  Page 61 of your report in Figure 83.
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000358

1        A.      Okay.

2        Q.      And this is going back to the questions that

3    you were asked about whether one of those tire marks was

4    made by somebody driving through that fluid.  Is it your

5    understanding that those photos were taken when

6    Mr. Santos was at his final point of rest?

7        A.      Yes.

8        Q.      And in the course of your analysis, did you

9    review all of the body camera and dash camera video that

10   was available?

11       A.      Yes.

12       Q.      During any of that video, did you see a

13   car -- well, let me back up.

14               No one -- a car could not have made those

15   tire marks driving through the fluid when Mr. Santos was

16   at his initial point of rest without driving over

17   Mr. Santos, correct?

18       A.      Yeah, I would agree with that.  In particular

19   in this picture, we see some brain matter also in line

20   with that tire track, so I would imagine the brain matter

21   would have been flattened in conjunction with driving

22   over the fluid if this was post impact.

23       Q.      And so for -- for a tire to have driven

24   through the fluid, it would have had to have been after

25   Mr. Santos's body was dragged onto the shoulder, correct?



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000359

 1      A.     Right.

 2      Q.     Did you see anything in any of the video that

 3 you reviewed that would indicate that a vehicle did drive

 4 through the fluid?

 5      A.     No.

 6      Q.     And did that -- does that contribute in any

 7 way to your opinion that those are actual tire marks from

 8 an -- from an emergency maneuver as opposed to driving

 9 through fluid?

10      A.     Yeah.  I mean, I think it goes back to the

11 consistency of the curvature of the marks, and the

12 characteristics of the marks tell me that it has all of

13 the classic details of a swerving maneuver versus

14 traveling through some fluid.  And then, obviously, when

15 you factor in the other components that would have had to

16 have been driven over if that was a post impact, I think

17 that certainly compounds [sic] to my interpretation of

18 the characteristics of those marks as swerving marks

19 prior to.

20      Q.     With regard to the questions about GPS

21 precision, just to try to maybe put it in simpler terms,

22 I suppose it's true that every point on the Earth has a

23 true GPS location?

24      A.     Yes.

25      Q.     Okay.  And so when we're talking about --



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000360

1  when you use the phrase "global accuracy," tell me if

2  this is what you mean by that.  If I were to go out to a

3  point in the middle of the woods, get my true GPS

4  location, and, like, plant a flag there, would accuracy

5  be the ability of a GPS device to locate that exact spot?

6       A.   Yes.

7       Q.   Okay.  And that -- that has a certain

8  tolerance or error factor to it?

9       A.   Right.

10      Q.   Okay.  When you were speaking about

11 relativity and things of that nature, am I understanding

12 correctly that wherever Ms. Smith was on the globe, you

13 would expect the GPS data to pick up if, from one second

14 to another, she was moving east or west or north or

15 south?

16      A.   Yeah.  When you're in the same environment,

17 when you take that sample of your GPS data into very

18 small increments -- where we're not talking differences

19 between having 24 satellites in your reception versus 22

20 satellites -- a couple miles away, either due to the

21 position of the satellites and the differential distance

22 on the Earth, you're talking about a very small subsample

23 where all the points in that subsample are going to have

24 the same satellite numbers.  It's going to have the same

25 signal, or reception, you can say, to those satellites.



**MILESTONE | REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000361

1        The things that really affect GPS signal is,

2   again, number of satellites that you have available to

3   you depending on the constellations, what path they're

4   in, the reception to those satellites:  Are there

5   buildings or trees obstructing the reception or

6   interfering with the reception where the signal could

7   bounce off of objects and cause some errors?  Those are

8   really the big factors that affect your accuracy.

9        So when you take a small subsample that has

10  the same environment and variables that go into accuracy,

11  the accuracy is the same on every subsample.  And so any

12  deviation between subsamples is going to be accurate.  I

13  like to call it the theory of relativity.

14       Q.    Under -- understood.

15       You used a phrase towards the end, and I just

16  want to make sure we're clear on that.  Towards the end

17  of your testimony, you spoke about comparing Plaintiffs'

18  version of events to the defense version of events; is

19  that right?

20       A.    Right.

21       Q.    And just so we're clear, when you use those

22  terms, the defendants' version of events is Ms. Smith is

23  driving sort of as far right in the left lane as she can

24  without intruding into the middle lane?

25       A.    Correct.  Like, she scooted over in the right



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

App. 000362

 1  lane, similar to what the human factor studies show

 2  drivers do in response to a roadside potential hazard

 3  like a vehicle with a pedestrian.

 4      Q.    And you understood from Ms. Moreno's

 5  statements to police at the scene where she said that

 6  Mr. Santos never went further into the lane than the

 7  Camry, correct?

 8      A.    Correct.  I think she was confused at how it

 9  happened, since she didn't see him go into the lane.

10      Q.    Is it fair to say that the range of values

11  that you calculated were sort of based on what the

12  evidence shows the minimum and maximum distances that

13  Mr. Santos could have been laterally in the left lane?

14      A.    It was a fully encompassing range accounting

15  for both versions.  At the end of the day, it's -- it

16  is -- there's no smoking gun evidence to tell us where

17  within that range this happened.  What I can say is the

18  range closer to Defendants' version does make more sense

19  based on Mr. Nehemias's final rest versus Plaintiffs'

20  version.

21          But what I can objectively say is these are

22  the two versions that were provided to me.  When you

23  factor in the overlap established from the damage

24  matching, this is the range that it lies within.  I'll

25  let the jury decide what side of the range or what end of



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000363

1   the range or whether they want to pick the middle of the

2   range where they think he was standing, but it's going to

3   be somewhere in that range, based on what I've been

4   provided.

5       Q.    And just -- can you explain what you mean by

6   "Plaintiffs' version of events"?

7       A.    Plaintiffs' version was that she, being

8   Caylee, drove onto the shoulder and made an emergency

9   swerve from the shoulder to her right, striking

10  Mr. Nehemias, which we know she didn't strike the Toyota,

11  and we know the vehicle dynamic properties of an

12  emergency swerve.  And that emergency swerve would have

13  had to start 250 feet away in order for her to displace

14  herself laterally from the shoulder and not strike the

15  Toyota.

16          And so I think that number is valuable to the

17  jury, because when they're listening about the testimony

18  of these witnesses that observed her on the shoulder, my

19  understanding was they looked up at impact.  And I did

20  not hear anybody testify that she was 250 feet away when

21  she was on the shoulder, because it's physically

22  impossible for her to exist on the shoulder any closer

23  than 250 feet away, because she cannot get out of the way

24  in time or she would have ran into the Toyota, and we

25  know she did not run into the Toyota.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

 1              So I know on a vehicle dynamics standpoint,
 2   she cannot exist on the shoulder any closer than
 3   250 feet.  So if she ever did exist on the shoulder, it
 4   was beyond 250 feet away, and again, we don't have any
 5   corroborative digital evidence to indicate that based on
 6   her GPS coordinates and her bearing data.
 7        Q.    And I think just to clarify, there have been
 8   several versions from Plaintiffs or witnesses on the
 9   Plaintiffs' side, one of which is that she actually hit
10   Mr. Santos when he was standing fully on the shoulder?
11        A.    Right, which is physically impossible.
12        Q.    Okay.  So that's not included in your range
13   of his possible locations, correct?
14        A.    Not at all.  That was physically impossible.
15        Q.    Okay.  So when you say you took into account
16   Plaintiffs' version, you had to in some way align
17   Plaintiffs' version with what would be physically
18   possible?
19        A.    Right.  What I did was I took the testimony
20   that she was on the shoulder and aligned it with the fact
21   that she did not hit the Toyota and tried to give them
22   the Plaintiffs' version as much as I could.
23              MR. DUBOFF:  Okay.  Those are all the
24         questions that I have.
25              MR. WHITE:  Reserve the remainder for trial.



**MILESTONE** | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000365

```
 1              THE VIDEOGRAPHER:  Two questions before we go
 2         off:  Would you like the video, to order the video
 3         at this time?
 4              MR. WHITE:  Yes, please.
 5              THE VIDEOGRAPHER:  Would you like it synced
 6         with the transcript?
 7              MR. WHITE:  Yes.
 8              THE VIDEOGRAPHER:  Would you?
 9              MR. DUBOFF:  Yes, ma'am.
10              THE VIDEOGRAPHER:  The time is 3:19 p.m., and
11         we are off record.
12              THE REPORTER:  So you're ordering the
13         original; standard turnaround time?
14              MR. WHITE:  Yes, ma'am.
15              (The deposition was concluded at 3:19 p.m.)
16
17
18
19
20
21
22
23
24
25
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

App. 000366

```
 1                     CERTIFICATE OF OATH

 2   STATE OF FLORIDA:
     COUNTY OF ORANGE:
 3
          I, Jennifer Prohaska, Stenograph Shorthand
 4   Reporter, certify that PAUL J. MONTALBANO personally
     appeared before me and was duly sworn.
 5        WITNESS my hand and official seal this 19th day of
     December, 2023.
 6
                         _____
 7                       Jennifer Prohaska
                         Notary Public - State of Florida
 8                       My commission No.:  GG987188

 9                     CERTIFICATE OF REPORTER

10
     STATE OF FLORIDA:
11   COUNTY OF ORANGE:

12        I, Jennifer Prohaska, Stenograph Shorthand
     Reporter, certify that I was authorized to and did
13   stenographically report the foregoing deposition of
     PAUL J. MONTALBANO; that the review of the transcript was
14   requested; and that the foregoing Pages 4 through 217,
     inclusive, are a true and complete record of my
15   stenograph notes.

16        I further certify that I am not a relative or
     employee of any of the parties, nor am I a relative or
17   counsel connected with the parties' attorneys or counsel
     connected with the action, nor am I financially
18   interested in the outcome of the action.

19        DATED this 2nd day of January, 2024.

20
                         _____
21                       Jennifer Prohaska,
                         Stenograph Shorthand Reporter
22

23

24

25
```



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

App. 000367

```
 1                          ERRATA SHEET
            DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
 2
    IN RE:              Erick Roderico Pivaral Gonzalez,
 3                      Individually and as Special
                        Administrator of the Estate of
 4                      Nehemias R. Pivaral Santos, Deceased,
                        Erick Santos, and Evelyn Moreno vs.
 5                      Caylee Erin Smith & Eastman Chemical
                        Company
 6  CASE NO.:           3:22-CV-02714-K

 7  DATE:               December 19, 2023

 8  DEPONENT:           PAUL J. MONTALBANO

 9  PAGE #    LINE #       CORRECTION              REASON

10  --------------------------------------------------------

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22          Under penalties of perjury, I have read my
    deposition in this matter and that it is true and
23  correct, subject to any changes in form or substance as
    reflected above.
24
    Dated:_____Signed:_____
25
```



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

App. 000368



**407.423.9900**
**Fax 407.841.2779**
**Toll Free 855-MYDEPOS**

**January 04, 2024**

**Paul J. Montalbano**

RE:     Deposition of **Paul J. Montalbano** taken on 12/19/2023
**Erick Roderico Pivaral Gonzalez v. Smith & Eastman Chemical Company**

Dear ,

## IMPORTANT NOTICE FOR DEPOSITION TRANSCRIPT READ AND SIGN
It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under Federal Rules*.

  X      **Attorney - Copy of Transcript Enclosed:**  Signature of the Deponent is required.  Please have the deponent make any corrections/changes necessary on the Errata Sheet ONLY, sign name on the form where indicated.  Please return ONLY the original signed Errata Sheet to our offices within 30 days from the date of this memorandum.  If you have any questions, please call our offices.

___     **Attorney - No Copy Ordered:**  Since you did not request a copy of the transcript, it will be necessary for the Deponent to call our offices to arrange for an appointment to read and sign the transcript of the Deposition within 30 days of this memorandum.

___     **Deponent:**  At the time of your deposition, you did not waive your right to read and sign the transcript of your testimony, therefore, attached please find a copy of the transcript and Errata Sheet.  Please read the transcript, make any corrections necessary on the Errata Sheet ONLY, sign the bottom of the Errata Sheet, and return it within 30 days from the date of this memorandum.  Please call our offices if you have any questions.

___     **Deponent:**  At the time of your deposition, you did not waive your right to read and sign the transcript of your testimony, therefore, it is necessary for you to come to our offices to read and sign same.  Please call Milestone Reporting Company to arrange for an appointment at your earliest convenience.

___     The attached executed copies of the Errata Sheet(s) are sent to you for your files.  If you have any questions, please call our offices.

Thank you for your attention to this matter.

No. 300977

cc:

Waiver:
I, Paul J. Montalbano, hereby waive the reading and signing of my deposition transcript.

_____          – – – – – – – – – – – – – – – – – –
Deponent Signature                                                         Date

*Federal Civil Procedure Rule 30 (e) / Florida Civil Procedure Role 1.310 (e)

400 North Ashley Drive, Suite 2600          315 East Robinson Street , Suite 510          4651 Salisbury Road, 4th Floor
**TAMPA, FL 33602**                                    **ORLANDO, FL 32801**                              **JACKSONVILLE, FL 32256**
                                                            **CORPORATE**
                                          **WWW.MILESTONEREPORTINGCOMPANY.COM**

**App. 000369**

# EXHIBIT C

App. 000370



Figure 70: Ford damage.

# EXHIBIT D

App. 000372

ORIGINAL
TRANSCRIPT

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF TEXAS

Erick Roderico Privaral     )
Gonzalez, et al.            )
                            )
          Plaintiff,        ) Civil Action No.:
v.                          ) 3:22-CV-02714-K
                            )
                            )
Caylee Erin Smith &         )
Eastman Chemical Company,   )
                            )
          Defendant.        )
_____)

DATE: December 14, 2023
      Kingston, New York
TIME: 11:31 a.m.-1:33 p.m.

Jaiden Hernandez, Reporter

DEPOSITION

OF

IRIS DALLEY GRAFF

(Appearing on behalf of the Defendants)

2

1     APPEARANCES:

2

3          TAYLOR KING
           Attorneys for the Plaintiff
4          410 North Thompson Street, Suite B
           Springdale, Arkansas 72764
5          BY:   JACOB WHITE, ESQ.
           EMAIL: jacobwhite@taylorkinglaw.com

6

7

8          FREEMAN MILLS
           Attorneys for the Defendant
9          2020 Bill Owens Parkway, Suite 200
           Longview, Texas 75604
10         BY:   BRIAN L. BUNT, ESQ.
           EMAIL: Bbunt@freemanmillspc.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                Mary T. Babiarz Court Reporting Service, Inc.
                        Phone: (845) 471-2511

App. 000374

3

STIPULATIONS

1
2      IT IS HEREBY STIPULATED AND AGREED by and between
3  the attorneys for the respective parties hereto, that
4  the sealing and filing of the witness' deposition are
5  hereby waived.
6      IT IS FURTHER STIPULATED AND AGREED by and between
7  the attorneys for the respective parties hereto that all
8  objections, except as to the form of the question, are
9  reserved to the time of trial.
10      IT IS FURTHER STIPULATED AND AGREED by and between
11  the attorneys for the respective parties hereto that
12  they may sign this deposition before any duly qualified
13  Notary Public.
14                         * * * * *
15
16
17
18
19
20
21
22
23
24
25

Mary T. Babiarz Court Reporting Service, Inc.
Phone: (845) 471-2511

4

1               Dalley Graff

2                 * * * * *

3     Iris Dalley Graff, a appearing on behalf of the

4          Defendants herein, having been first duly sworn

5          by a Notary Public within and for the State of

6          New York, was examined and testified as follows:

7                 * * * * *

8               MR. WHITE:  This is Jacob White,

9          counsel for plaintiff Nehemias Santos, the

10         Estate of Nehemias Santos, his father Erick

11         Gonzalez, his brother Erick Santos, and Evelyn

12         Moreno.

13              We're here for a deposition on

14         December 14, 2023.  We're starting at

15         approximately 11:32 a.m. Eastern Time, and I

16         understand we've got a 1:00 p.m. hard stop; is

17         that correct?

18              MR. BUNT:  Yes.

19              MR. WHITE:  And in the room with us

20         are Brian Bunt, counsel for --

21              MR. BUNT:  I'll just -- I'm Brian

22         Bunt, counsel for Defendants Eastman Chemical

23         Company and Caylee Erin Smith.  Also present

24         is my paralegal Stacy Bunt.

25              And I'm just going to state for

Mary T. Babiarz Court Reporting Service, Inc.
Phone: (845) 471-2511

5

1               Dalley Graff

2          purposes of the record, not throwing stones,

3          the deposition was scheduled to begin at 9:00

4          a.m., and so we're starting very late.

5                    MR. WHITE:  Correct.  Correct.  No

6          objection from me there.

7          Q       All right could you, the deponent,

8     state your name for the record.

9          A       Iris Dalley Graff.

10         Q       And are you a Dr. Graff?  I just want

11    to make sure I address you correctly.  Is

12    Ms. Graff, Mrs. Graff or Iris, or what do you

13    prefer?

14         A       I'm not a doctor.

15         Q       Okay.  Is it okay if I call you Iris,

16    or do you prefer Mrs. Graff?

17         A       Iris is fine.

18         Q       Okay.  Perfect, perfect.  I take it

19    you've been deposed before.

20         A       I have.

21         Q       Okay.  So there's normally an initial

22    litany of statements and agreements I would read

23    for you, but in the -- due to the exigencies of

24    time, I'm going to not do most of those.  But I do

25    want to ask that you agree that if I ask you a

App. 000377

6

Dalley Graff

1                                         
2 question and you answer it, you agree that means
3 that you understand the question.  Do you agree
4 with that?
5        A      Could you restate that, please?
6        Q      Sure.  If I ask you a question and you
7 answer it, can you agree that that means that you
8 understood the question?
9        A      That I'll only answer questions that I
10 understand.
11        Q      Okay.  That's fine.  That's perfect.
12 If you don't understand a question I ask, just let
13 me know; okay?
14        A      Okay.
15              MR. WHITE:  So let's introduce a
16        couple of exhibits.  We'll mark these
17        as Exhibits 1, 2, and 3.
18             Let's mark your report in this case as
19        Plaintiff's Exhibit 1.  You already have a
20        copy.  Let's mark your CV as Plaintiff's
21        Exhibit 2.  And the list of cases that you
22        have testified in in the past, I believe,
23        five years as Plaintiff's Exhibit 3.
24     (SCENE RECONSTRUCTION REPORT, BATES-STAMPED
25 00476.118002323 to 68 RECEIVED AND MARKED AS PLAINTIFF'S

7

1                       Dalley Graff

2                 EXHIBIT 1 FOR IDENTIFICATION.)

3      (CURRICULUM VITAE OF IRIS DALLEY GRAFF, BATES-STAMPED

4     00476.118002313 to 21 RECEIVED AND MARKED AS PLAINTIFF'S

5                 EXHIBIT 2 FOR IDENTIFICATION.)

6       (SPREADSHEET OF CASES, BATES-STAMPED 00476.118002322

7         RECEIVED AND MARKED AS PLAINTIFF'S EXHIBIT 3 FOR

8                       IDENTIFICATION.)

9     BY MR. WHITE:

10             Q       Do you recognize these exhibits?

11             A       I -- I recognize what appears to be a

12        copy my CV, and I recognize what appears to be a

13        copy of my report with an attachment of separately

14        printed figures from the report.

15             Q       Okay.

16             A       I have not before seen the spreadsheet

17        listing these cases.

18             Q       Well, take a look at that list of

19        cases.  Does that appear to be correct and

20        complete?

21             A       I do recall testifying in each of the

22        listed cases.

23             Q       Have you testified in any other cases

24        that are not listed on this list since February of

25        2018?

App. 000379

8

Dalley Graff

1

2          A        Not that I recall at the moment.

3          Q        Okay.  And just to confirm, all of

4    these are criminal matters that are listed on

5    Exhibit 3?

6          A        There's one that I'm not certain if it

7    falls under a criminal or not.

8          Q        And is that the row where -- in column

9    C, where it says it was a grand jury?

10         A        Yes.

11         Q        I take it Madison County vs Dreasjon

12    Reed, you were testifying in front of a grand jury;

13    is that right?

14         A        Yes.

15         Q        Okay.  And just for the record, I

16    think that probably means it was leading to a

17    criminal indictment, but do you know otherwise?

18         A        I know there was not a criminal

19    indictment.

20         Q        There wasn't one issued in that case?

21         A        That's correct.

22         Q        Okay.  Do you remember what your

23    testimony was in that case?

24         A        Yes.

25         Q        Can you describe it for me?

9

1                          Dalley Graff
2           A       It was an officer-involved shooting.
3           Q       Okay.  And were you testifying on --
4    did the prosecutor call you as a blood spatter or a
5    blood pattern analyst?
6           A       I think I was actually contacted
7    originally by the Indiana State Police, but that
8    was -- I don't know if they were speaking on behalf
9    of the prosecutor.  I don't know what their
10   relationship was.
11          Q       Okay.  So did any of these cases that
12   are listed here involve a pedestrian struck by an
13   automobile?
14          A       No.
15          Q       Okay.  How many of the cases listed
16   here involved shootings with a firearm?
17          A       Seven.
18          Q       Okay.  Which ones did not involve a
19   shooting with a fireman?
20          A       US vs Tyler Mullins.
21          Q       And what did that case involve?
22          A       It was a death investigation.
23          Q       Okay.  How was the death caused to the
24   best of your knowledge?
25          A       It was a multitude of injuries.

App. 000381

                         Dalley Graff

1

2       Q       Do you know what the cause of those

3    injuries were?

4       A       There was blunt force trauma.  There

5    was exposure to carbon monoxide.  There was

6    shooting.  That was affixation.

7       Q       So Tyler Mollins, that case did

8    involve the use of a firearm as a potential

9    contributing cause to death?

10      A       I think it was.  I don't recall if it

11   was listed as the primary cause of death, but it

12   would have been one of the primary causes.

13      Q       Do you know what the causes of the

14   blunt force trauma were in that case?

15      A       I don't know specifically.  I know

16   generally what was presented as potential weapons.

17      Q       Okay.  And so can you summarize for us

18   your conclusions in that case?  The Tyler Mollin's

19   case.

20      A       The conclusions involved the

21   clandestine burial and acts that had to have

22   occurred prior to that clandestine burial and the

23   sequencing of those acts.

24      Q       And did you -- so I see here that that

25   case is marked "Subject Matter, Crime Scene

11

1          Dalley Graff

2    Reconstruction."  Did you not conduct a bloodstain

3    pattern analysis on the case?

4          A          Bloodstain pattern analysis was a part

5    of the crime scene reconstruction.

6          Q          Okay.  And what were your conclusions

7    from your bloodstain pattern analysis in that case?

8          A          In that case that the blunt force

9    trauma occurred at a different location and

10   involved a vehicle and the sequencing of events at

11   the gravesite.

12         Q          So a vehicle was involved in that

13   case?

14         A          Yes, it was.

15         Q          Okay.  Can you describe your

16   conclusions regarding how a vehicle was involved in

17   that case?

18         A          That the victim was concealed and

19   contained within the trunk of the car while the car

20   was in motion, while the engine was running.

21         Q          And how did you reach that conclusion?

22         A          Carbon monoxide in her blood and

23   bloodstains inside the vehicle.

24         Q          Okay.  Now, are you an expert on

25   what's in someone's bloodstream, or are you just a

                              Dalley Graff

1  blood pattern analyst expert?

2       A       I do crime scene reconstruction, which

3  means I can use the conclusions of other experts,

4  such as toxicologists issuing a report.

5       Q       So in that case did you rely on a

6  toxicology report?

7       A       I did.

8       Q       Okay.  Did you rely on a pathology

9  report or an autopsy in that case?

10      A       I did.

11      Q       How many of the cases listed here did

12 you rely on another technical expert's report, such

13 as a pathologist or a coroner or some other

14 forensic analyst?

15      A       I'm sorry.  I don't think it would be

16 correct to say that I relied on the report, but

17 they provided information that I used in

18 conjunction with my analysis.

19      Q       Okay.  So, but, for example, if you're

20 trying to figure out what's in someone's

21 bloodstream, you have got to get that information

22 from a different forensic expert; correct?

23      A       If it's a toxicology, then, yes, it

24 would have to be done by someone who does

App. 000384

13

                    Dalley Graff

1

2    toxicology or...

3        Q       And why wouldn't it be done by you?

4        A       I'm not a toxicologist.

5        Q       Okay.  Which means you can't run

6    toxicology reports, correct?

7        A       That's correct.

8        Q       All right.  You can't conduct

9    autopsies, correct?

10       A       I don't personally do the autopsies.

11   I have attended autopsies.  I've provided

12   information to the person doing the autopsies, have

13   discussed results of the autopsies in context of

14   the scene in which it occurred, but I don't do the

15   autopsy itself.

16       Q       And you can't sign an autopsy report,

17   right?

18       A       That's correct.  I don't sign an

19   autopsy report.

20       Q       Okay.  So in -- did -- you've already

21   testified that US vs Tyler Mullin's case did not

22   involve a shooting, right, as a primary cause of

23   death.  Are there any other cases on there that

24   didn't involve shooting as a primary cause of

25   death?

14

1                       Dalley Graff

2         A        Okay.  I think you misstated what I

3    said --

4         Q        Okay.

5         A        -- that, in fact, in the U.S. v. Tyler

6    Mollins, I believe that the autopsy did list

7    gunshot wound as a prime causes of death.

8         Q        Okay.

9         A        But these other injuries were also

10   involved in leading to the death.

11        Q        Okay.  So then I guess I misunderstood

12   earlier, because I thought you said US vs Tyler

13   Mullins did not involve a firearm shooting.

14               Are there any cases on this list

15   that's Exhibit 3 that do not involve a firearm or

16   an injury caused by a firearm?

17        A        I'm sorry.  I misstated earlier.  I

18   believe they all involve some firearm at some

19   point.

20        Q        Okay.  Do any of these cases on

21   Exhibit 3 involve blunt force trauma caused by a

22   moving vehicle?

23        A        Well, as I said in the US vs Tyler

24   Mullins case, there was blunt force trauma.  And I

25   don't know the exact tools or implements that were

15

                    Dalley Graff

1

2   used.  I don't have direct evidence that they were

3   caused by a moving vehicle.

4        Q       Fair enough.  But, again, my question

5   was: do any of these cases that are on Exhibit 3 --

6   to your knowledge, do any of them involve blunt

7   force trauma caused by a moving automobile?

8        A       With the possible exception of the car

9   being used in the unidentified weapons of the blunt

10  force trauma in that one case, none of the others

11  that I know of involve moving vehicles at the time

12  of death.

13       Q       So how many cases -- not just the ones

14  listed on Exhibit 3 -- how many cases have you

15  participated in an investigation of that have

16  involved blunt force trauma caused by a moving

17  vehicle?

18       A       Several.  I don't have a number.

19       Q       Can you, I mean, give us your best

20  guess?

21       A       I really don't have a number.

22       Q       Is it less than a dozen?  More than a

23  dozen?

24       A       It would just be a guess that's around

25  a dozen, but that's just a guess.

16

```
 1              Dalley Graff
 2      Q      So it could be less than a dozen?  It
 3  could be more than a dozen?
 4      A      Could be.  I don't recall.
 5      Q      Okay.  Do you remember the last time
 6  when you investigated a case that involved blunt
 7  force trauma caused by a vehicle?
 8      A      I do not remember the last one.  The
 9  last one before this one?
10      Q      Sure.
11      A      I only have this one at the present.
12      Q      Okay.
13      A      But I've been in a number over the
14  years.
15      Q      Okay.  Do you think, before this case,
16  the last one was in the last decade?
17      A      I would say probably yes, but I don't
18  specifically recall one -- any one particular case
19  at the moment.
20      Q      Okay.  Have you ever dealt with a
21  case -- have you ever worked on a case involving a
22  pedestrian struck by a motor vehicle going over
23  70 miles an hour?
24      A      Well, I have worked on cases that
25  involved pedestrians hit by a vehicle.  I don't
```

17

1                           Dalley Graff

2       know the speed.

3               Q       Okay.  Can you describe the cases

4       where you did work on -- strike that.

5                       Can you describe cases that you worked

6       on that involved a pedestrian struck by a motor

7       vehicle?

8               A       I'm sorry.  You want -- could you

9       restate that question?  I don't understand the

10      question.

11              Q       Sure, sure.  Can you describe the

12      facts in this cases that you have worked on that

13      involved a pedestrian struck by a motor vehicle?

14              A       I -- couple of them come to mind.  Of

15      course there's been a lot of cases over the years.

16      But one was a teenage girl walking on the road, and

17      a car struck her, and that was a hit-and-run.

18      There was a -- a young man walking on the side of

19      the road hit by a pickup.  There have been several

20      where people were apparently laying on the roadway

21      and run over.  There was an RV where a man said

22      that his wife got out to urinate behind the vehicle

23      and said he went to turn around and accidentally

24      ran over her.  There was a case of an apparently

25      romantic relationship gone bad where he actually

18

Dalley Graff

1
2      said that he took her out there and ran over her
3      multiple times on a road.
4          Q       So in any of the cases that you just
5      listed, did any of those cases involve someone
6      struck while -- strike that.
7                  Did any of the cases that you just
8      listed involve an impact between a motor vehicle
9      and a pedestrian on an interstate highway?
10         A       I don't recall the roadways.
11         Q       Okay.  So let's talk about the first
12     one that you mentioned, a hit-and-run.  Do you
13     remember how you conducted your analysis in the
14     hit-and-run case where a teenage girl was involved
15     in a hit-and-run?
16         A       Yes.  I looked at, for one thing, the
17     car when it was found.  And I examined the car to
18     determine, if possible, whether or not this was, in
19     fact, the same car because it was a hit-and-run.
20     But I would have also looked at the autopsy
21     results, the clothing worn by the victim, and those
22     kind of things.
23         Q       So in that case did you physically --
24     like you in person examined the car that was
25     involved in the hit-and-run?

Dalley Graff

1

2          A       I did.

3          Q       Did you physically review the body, or

4     did you just review the autopsy afterwards?

5          A       I don't recall if that was one of the

6     cases that I went to the autopsy or not.

7          Q       Okay.  Did any of the cases that you

8     told me about involving a pedestrian and a motor

9     vehicle, did you review the vehicle involved

10    physically in each one of those cases?

11         A       Most of them I did, but without going

12    through case by case, I'd have to look at my notes

13    for exactly what I did in each case.

14         Q       Okay.  Did -- well, why -- is it

15    preferred to do a scene visit or to review the

16    evidence in person as a blood pattern analyst?

17         A       It really depends on what the evidence

18    is.  Sometimes that can be done from the

19    documentation done at the scene.  Sometimes being

20    at the scene is helpful.  It doesn't change what is

21    documented.

22         Q       Okay.  What sort of documentation

23    would allow you to conduct an investigation without

24    seeing the scene or the vehicle in person?

25         A       What was the first part of your

App. 000391

Dalley Graff

1    question?

2        Q       What sort of documentation would you

3    like to have in order for you to conclude that it's

4    not necessary for you to visit the scene or, for

5    example, see the vehicle in person?

6        A       Well, in doing the analysis, I want to

7    see things like images, whether they're still

8    images or video-recorded images.  If a sketch or

9    drawing is done by someone on the scene, then I

10   would want to see that.  Any descriptions that are

11   given.  Any reports -- especially official reports,

12   autopsy reports, or medical reports, if the person

13   is not dead.  All of those things can contribute.

14   So the more information that I have, the more

15   detailed the reconstruction can be.

16       Q       Okay.  So when you're doing a blood

17   pattern analysis -- and am I saying that correctly?

18   I know there's different phraseology.  Some people

19   call it blood spatter analysis.  I take it you call

20   it bloodstain pattern analysis; is that right?

21       A       It's bloodstain pattern analysis.

22       Q       Okay.  So when you're conducting a

23   bloodstain pattern analysis, are there any reports

24   or information that are necessarily required in

App. 000392

21

Dalley Graff

1

2      order for you to do your investigation without

3      visiting a scene or seeing evidence in person?

4          A       The extent of the analysis -- and the

5      bloodstain pattern analysis is just one part of the

6      overall reconstruction.  So the better the

7      documentation, the more specific, the more detailed

8      information that can be included in the

9      reconstruction.  So the analysis is limited by the

10     availability of the evidence.

11         Q       I guess what I'm asking is: is there a

12     minimum threshold at which if the evidence that you

13     have is not above that minimum threshold where you

14     cannot conduct a bloodstain pattern analysis?

15         A       But in doing the bloodstain pattern

16     analysis, I will see what is available and, again,

17     that will determine how far the analysis will go.

18             If all I -- for example, if there's

19     only one bloodstain by itself, one bloodstain by

20     itself does not make a pattern and doesn't -- is

21     not alone something that can identify the action,

22     other than the fact that there was blood shed.

23         Q       So how do you conclude that blood has

24     been shed from photographs?

25         A       If the blood is outside of the body,

22

Dalley Graff

1

2 then there has to have been bloodshed, because the

3 blood is made inside the body.

4      Q      Okay.  So how do you know that what

5 you're looking at is blood?

6      A      I do that based on my own education,

7 training, and experience and the number of years

8 that I actually attended scenes looking at blood.

9      Q      Okay.  So I want to ask you about

10 that.  Can you summarize your education for us?

11      A      My education is that I have a

12 bachelor's in science and biology.  I have a

13 master's in secondary sciences.  I have a --

14      Q      Let's -- what is a master's in

15 secondary sciences?

16      A      It's a graduate degree specifically

17 for teaching in the areas of science.  And I

18 specifically taught in the physical sciences,

19 biology, general physical science, botany, anatomy,

20 physiology, all of that was included -- zoology.

21      Q      Where did you teach those topics?

22      A      I taught in primarily -- McAlester

23 High School was the longest.  But I also taught as

24 an adjunct to local colleges.

25      Q      Which local colleges did you teach at?

Mary T. Babiarz Court Reporting Service, Inc.
Phone: (845) 471-2511

23

Dalley Graff

1         A      It would be -- I forgot the name of
2  the college.  It's in Wilburton, Oklahoma.

         Q      Okay.

         A      As an adjunct there.  I think I also
taught some for the East Central University of Ada.
It's been a number of years ago.

         Q      But you said primarily you taught
these science topic at McAlester High School?

         A      Correct.  Yeah.  I taught -- the first
year I taught math, and then I taught general
physical science.  And I taught physics one year
and then advanced placement biology, which was a
course where they could get more the credit than in
the other science courses.

         Q      And which grades did you teach in
McAlester High School?

         A      9 through 12.  But primarily the high
school juniors and seniors for the most part.

         Q      And how long did you teach at
McAlester High School?

         A      It was eight or nine years.  I don't
recall exactly.

         Q      Do you remember just -- and it's not a
trick question but -- the time frame?  Like, what

App. 000395

24

                          Dalley Graff

1
2    years to which years?  It's okay if you don't know
3    exactly.
4         A     I left that position in -- I think it
5    was '88.
6         Q     So maybe approximately from '78 or --
7    excuse me.  From 1980 to 1988?
8         A     Approximately.
9         Q     And what has your -- what's your
10   professional experience been since you taught at
11   McAlester High School?
12        A     In 1989, I joined the Oklahoma State
13   Bureau of Investigation, and I attended thousands
14   of hours of training through my career; and I
15   worked primarily in forensic biology, forensic
16   zoology.  And I also did crime scene investigation
17   throughout my career.
18        Q     Okay.  So do you have a degree in
19   engineering?
20        A     No, I do not.
21        Q     Okay.  Do you have a degree in
22   physics?
23        A     No, I do not.
24        Q     Okay.  What engineering training have
25   you received?

25

Dalley Graff

1

2      A      I received some training in
3   engineering back when I was studying physics, but I
4   did not major or minor in engineering.

5      Q      So you mean you took just maybe some
6   college classes on engineering?

7      A      It was included in the physics
8   courses.

9      Q      Okay.  So did you study fluid dynamics
10  at any point in your professional training?

11      A      Yes.

12      Q      Do you have a degree in fluid
13  dynamics?

14      A      No, I do not have a degree specific to
15  fluid dynamics.

16      Q      Okay.  Do you consider yourself an
17  expert in fluid dynamics?

18      A      Only as it relates to bloodstains and
19  how bloodstains are formed.

20      Q      Okay.  So you have a particular
21  expertise in blood fluid dynamics.  Do I understand
22  you correctly?

23      A      I have some general training in fluid
24  dynamics, which I attended a workshop in 2016,
25  2017.  I don't remember which year.  It was

26

Dalley Graff

1    presented by Mark Germaine [proper noun subject to

2    change] from the University of Otogo in the South

3    Island of New Zealand.

4    Q       New Zealand is great.

5    A       Yes.  I did some teaching there myself

6    for a couple of years.

7    Q       In Dunedin I take it?

8    A       Yes, in Dunedin.

9    Q       So is that the extent of your fluid

10   dynamics training is the workshop in New Zealand?

11   A       No.  The workshop actually was

12   presented at the gendarmarie headquarters just

13   outside Paris, France, but it was focused on fluid

14   dynamics and particularly as it relates to the

15   formation of bloodstain patterns.

16   Q       Well, you said earlier you do have

17   some general training in fluid dynamics.  I'm

18   trying to figure what's the extent of your

19   understanding of fluid dynamics separate from your

20   understanding with fluid dynamics with relation to

21   blood.  So setting aside your understanding of

22   fluid dynamics with relation to blood, what is your

23   general understanding of fluid dynamics?

24   A       Well, in terms of formal education,

27

Dalley Graff

1
2       there were units in fluid dynamics included in the
3       physics courses in college, and then I studied the
4       formation of bloodstains through various texts over
5       the years and doing my own experiments through the
6       years and then eventually attending Mark
7       Germanine's class.
8              Q       How do you determine the viscosity of
9       a fluid?
10             A       I haven't done this in a number of
11      years.  I'm trying to remember the name of the
12      device.  I worked for a couple years at a food
13      processing plant where I had to determine the
14      viscosity of several of the products there.  I
15      remember doing it.  You check specific gravity and
16      things like that.  I don't recall now.  I do recall
17      making reports about the viscosity of a number of
18      liquids.
19             Q       So you have some experience
20      determining the viscosity of fluids, but I
21      understand your testimony is that you did that at a
22      food processing facility, and you had some machine
23      that helped you do that?
24             A       I had various tools at the time.  The
25      tools at the time were much more primitive than the

App. 000399

28

1                         Dalley Graff

2       electronics that we use today.

3               Q       Okay.

4               A       But at that time, I did it on a daily

5       basis, and it would be very simple to -- to name

6       those implements, but that has been a number of

7       years ago.

8               Q       Okay.  So it's been some time since

9       you determined the viscosity of a fluid?

10              A       Since I personally measured the

11      viscosity of a fluid has been a number of years.

12              Q       Okay.  Do you think you could

13      determine the viscosity of a fluid from a photo of

14      a fluid?

15              A       It would depend on the fluid.

16              Q       Can you?

17              A       Well, there are certain types of

18      fluid, if you kind of know what it is, then you can

19      look it up.  There are certain limits, and blood

20      would be an example.

21              Q       But you would have to know what the

22      fluid was before you could determine the viscosity

23      from the photo, right?

24              A       Well, I don't determine viscosity as

25      such from a photo, but I look at viscosity in terms

29

Dalley Graff

1

2      of the physical characteristics, as part of the

3      physical characteristics of blood that helps to

4      determine how the bloodstain patterns were formed.

5          Q       But you would have to know it was

6      blood before you could determine the viscosity,

7      correct?

8          A       I don't have to determine the

9      viscosity to see what the patterns are, but I use

10     the explanation of viscosity to help explain how

11     the patterns are formed.

12         Q       So if you know it's blood, you

13     understand it's viscosity, and then you can

14     therefore determine the bloodstain pattern

15     analysis.  Do I understand you correctly?

16         A       No.

17         Q       Okay.  Please correct me.

18         A       When we look at bloodstain patterns,

19     one of the considerations that helps to explain how

20     patterns are formed is the viscosity of blood.  We

21     also know that blood has adhesive and cohesive

22     properties that help to explain how blood moves,

23     how blood collects, how bloodstain patterns are

24     actually formed.  I don't need to know the numbers

25     to know this.  Here's the physical effect.

30

1                        Dalley Graff

2         Q       Sure, sure.  Because you already know

3    the viscosity of blood; right?

4         A       We know how the viscosity of blood

5    effects the formation of the patterns.  I don't

6    have to know the exact number.

7         Q       Sure.  I guess what I'm wondering is:

8    as a prerequisite to determining what you

9    understand from a bloodstain pattern, you have to

10   know you're looking at blood; right?

11        A       If I'm looking at a pattern, I can

12   determine the pattern without knowing the

13   viscosity, and I can look at patterns and because

14   blood is a fluid, it acts as other fluids.  So if

15   there is some other fluid with a similar viscosity,

16   it will form generally the same kinds of patterns.

17   I don't rely just on viscosity to determine whether

18   or not I think the fluid is blood.

19        Q       So do you think all fluids have the

20   same viscosity?

21        A       I know they are not.

22        Q       Okay.  So my question is: if you're

23   looking at a pattern, right, do you need to know

24   that it was caused by blood -- Excuse me.  Sorry.

25   Strike that.

31

Dalley Graff

1
2          If you're looking at a pattern on a
3   photo, before you do the bloodstain pattern
4   analysis, you need to know you're looking at a
5   pattern created by blood, right?
6      A      If I look at a photo of a pattern, I
7   can see that there's a pattern, period, full stop.
8   If you look at everything together, I can make
9   judgments about whether or not this looks to me
10  like blood based on my experience.
11     Q      And if it wasn't blood, would your
12  pattern analysis be the same; or are you qualified
13  to do a pattern analysis on fluids that are not
14  blood?
15     A      I could still describe what I see in a
16  pattern as far as identifying it's characteristics,
17  what's the shape of individual stains within a
18  pattern, what are the margins of that particular
19  shape, if there's a movement of fluid within that
20  shape, what that looks like.  You could still
21  describe the pattern.
22     Q      But can you derive conclusions from a
23  pattern of a fluid that is not blood?
24     A      I'm not sure if I understand the
25  question.

App. 000403

32

Dalley Graff

1
2      Q        So the purpose of bloodstain pattern
3      analysis is not just to identify patterns, right?
4      A        The purpose of bloodstain pattern
5      analysis is to try to determine -- based on the
6      pattern that we see -- what movement of blood, what
7      potential causes, what forces may have been acting
8      to result in the final pattern.
9      Q        Perfect.  So the purpose of bloodstain
10     pattern analysis is not just to say this is an
11     impact pattern.  It is to say what caused the
12     impact pattern, correct?  For example --
13     A        The purpose of reconstruction using
14     bloodstain pattern analysis is to identify actions
15     that occurred.  So you don't use just the pattern
16     by itself to identify any other or specific actions
17     that occurred.
18     Q        But because you are an expert in the
19     fluid dynamics of blood, according to you, you are
20     able to determine the causes of bloodstain
21     patterns, right, by looking at the patterns?
22     That's your expertise?
23     A        It's looking at the patterns in the
24     context of the scene.  Identifying what are
25     possible sources within the context of the scene.

33

1          Dalley Graff

2     Excluding what's not possible within the context of

3     the scene.

4          Q        Okay.  But you have a particular

5     expertise on how blood, for example, flies through

6     the air; right?

7          A        I do know how blood travels through

8     the air.

9          Q        Okay.  Do you know how, as compared to

10    blood, brain tissue flies through the air?

11         A        I do.

12         Q        Okay.  So what is -- let's stick with

13    blood for a second.  What experiments have you

14    conducted in a controlled environment to confirm

15    how blood travel throughs the air?

16         A        I've done a number of experiments

17    through the years since we teach bloodstain pattern

18    analysis and do these repeatedly.

19         Q        Can you describe those experiments?

20         A        Well, we do a number of them beginning

21    with simple blood falling to capture images of

22    blood as it falls, particularly when we have had

23    the advantage of having the equipment available.

24                  When we were in France, we did high

25    speed photography so that you can see it from the

App. 000405

34

Dalley Graff

1

2          very beginning as the drop forms and as it falls

3          and the resulting pattern.

4                  Q        Okay.

5                  A        And I have looked at the work that

6          other people have produced looking at those high

7          speed to look at what happens as blood drops form,

8          what happens when they impact a surface.  We look

9          at what happens when you have different surfaces.

10                 Q        So did you cite any of those

11         experiments that you either conducted or reviewed

12         in your report?

13                 A        I didn't list training materials or

14         training exercises or specific experiments in the

15         report.

16                 Q        Have you ever published any papers

17         regarding the experiments you conducted about how

18         blood flies through the air and how bloodstain

19         patterns are created?

20                 A        Not outside the training materials

21         that I make for my classes.

22                 Q        Okay.  So have any of the training

23         materials that you've presented to your classes,

24         have they been peer reviewed by any scientific

25         journals?

App. 000406

35

Dalley Graff

1
2       A       I did not submit them to a scientific
3   journal.
4       Q       Have you ever submitted anything to a
5   scientific journal?
6       A       I think the only one was one for a
7   Association for Crime Scene Reconstruction.
8       Q       Okay.  What was the topic of that
9   paper?
10      A       That was a reconstruction of a death
11  investigation.
12      Q       And was that paper published?
13      A       It was published in the journal for
14  that professional organization.
15      Q       Okay.  But have you ever conducted an
16  experiment determining the cause of particular
17  bloodstain patterns and published the results of
18  that experiment in a peer-reviewed scientific
19  journal?
20      A       First, I've done numerous experiments
21  to determine the cause of a particular pattern and
22  what forces may or may not be applied to that.  I
23  have not published, other than the ones stated, in
24  a scientific journal.
25      Q       Why do you think peer reviewing a

36

Dalley Graff

1  scientific journal is important, or do you not

2  think it's important?

3  A      Well, I think you're asking two

4  different questions.  Do I think peer review is

5  important, yes, I do.

6  Q      I think my question is: for a

7  scientific journal to get published -- to get

8  published in a scientific journal, why do you think

9  it's important that you peer reviewed before you

10 get published in a scientific journal?

11 A      Well, I think peer review is

12 important.  Whether or not it's published, peer

13 review of the work is important.

14 Q      Okay.

15 A      And by extension if -- if you're

16 pushing a theory to other scientists, there needs

17 to be review whether before or after it's

18 published.

19 Q      Okay.  And why is that important?

20 A      Because we're looking at a scientific

21 discipline and to try to be sure that we learn as

22 much as we can, and primarily to make sure that we

23 actually understand what is actually happening

24 within the blood as the patterns form.  And then as

App. 000408

37

Dalley Graff

1
2      we -- if you go into reconstruction, to be sure
3      that your finding -- your conclusions are supported
4      in the scientific principles and not to overstate
5      or understate the conclusions.
6          Q      And who peer reviewed your report in
7      this case that is marked at Exhibit 1 in this
8      deposition?
9          A      In this case my husband did the review
10     of the report.
11         Q      And do you think it's appropriate to
12     have your husband conduct a review of your
13     bloodstain pattern analysis?
14         A      I think it's important that I had
15     someone who's certified as a bloodstain pattern
16     analyst to review it.
17         Q      Do you live with your husband?
18         A      I do.
19         Q      Do you guys share expenses?
20         A      We do.
21         Q      Okay.  Did you ask anybody else that
22     wasn't your husband to review your report in this
23     case?
24         A      I did not.
25         Q      Okay.  Why not?

38

Dalley Graff

1

2          A          In part because we're, you know --

3   he's my business partner, and my business partner

4   is reviewing my report.

5          Q          Okay.  So he has -- he shares in the

6   profits from your bloodstain pattern analysis

7   consultancy, correct?

8          A          Well, I'm not sure I have a bloodstain

9   pattern analysis consultancy.  We occasionally work

10  cases upon request.

11         Q          But he's --

12         A          But that's not the focus -- the main

13  focus our business; so I'm not sure about that.

14  The other thing is --

15         Q          But he is your partner in that

16  business?

17         A          He is my partner in the business,

18  correct.

19         Q          You mean business partner as in

20  sharing profits, right?

21         A          I mean primarily business partners in

22  that we do the work together, and that he has the

23  qualifications for doing the review as opposed to

24  going outside the company and hiring someone

25  outside the company to do the review.

App. 000410

39

Dalley Graff

1

2  Q      Okay.  I'll ask the question directly:

3  does your husband share in the profits of your

4  consultancy?

5  A      Yes.

6  Q      Okay.  All right.  Do you know who Tom

7  Bevel?

8  A      Yes, I do.

9  Q      Do you know who Ross Gardner is?

10  A      Yes, I do.

11  Q      Have you ever worked with them?

12  A      I have.

13  Q      Have you ever partnered with them?

14  A      I was.

15  Q      Okay.  Are they considered authorities

16  in the field of bloodstain pattern analysis?

17  A      Some people may consider them

18  authorities.

19  Q      Do you?

20  A      In some areas, I do.

21  Q      Which areas did you consider them

22  authorities in bloodstain pattern analysis?

23  A      In those areas which they state things

24  that are in agreement with the basic principles of

25  the fluid dynamics of blood.

40

Dalley Graff

1

2      Q        Have you ever published a criticism of
3      their findings or any papers or textbooks that they
4      have written?

5      A        No.

6      Q        Have you ever reviewed any papers or
7      textbooks written by Tom Bevel or Ross Gardner?

8      A        Yes, I have.

9      Q        Are you in agreement with those
10     documents or disagreement?

11     A        I would have to see in context any
12     particular portion.  I agree with some of what is
13     published, and I may not agree in some points.

14     Q        Okay.  Is there some third-party
15     organization that would determine whether you're
16     right or they're right if there's a point of
17     disagreement, or is there not?

18     A        Is there a -- there's not an
19     adjudication body that says you're right and you're
20     wrong.  There's other scientists in the field that
21     examine both sides and agree or disagree on various
22     points or have different views.

23     Q        Okay.  So is there a credential for
24     becoming a bloodstain pattern analyst, or can
25     anyone become a bloodstain pattern analyst?

App. 000412

41

1                          Dalley Graff

2          A        I'm not sure what you mean by a

3     "credential."

4          Q        Well, let me ask it a different way.

5     If someone holds themselves out as a bloodstain

6     pattern analyst, is there any credential that they

7     could get in trouble for not having if they were

8     doing that work?  For example, as a lawyer, if I

9     got caught practicing law without a bar license, I

10    get in trouble.  Is there an equivalent sort of

11    credential for bloodstain pattern analysts?

12         A        There's not a bar as such, but I

13    believe there are various bars in various states

14    for attorneys; so you have to be on the bar of a

15    certain state.  There are various jurisdictions

16    that hold different requirements for anyone doing

17    any type of forensic analysis and particularly for

18    presenting that in court and that varies for

19    different jurisdictions.

20         Q        But I guess my question is: is there

21    any required credential for someone to hold

22    themselves out as a bloodstain pattern analyst?

23         A        Again, I'm not really sure what you're

24    referring to as a credential.  If someone...

25         Q        You don't know what a credential is?

1           Dalley Graff

2       A       I know what credentials are.   If

3    you're asking about a required credential, I don't

4    know what is required.   It varies in various

5    jurisdictions.   Some jurisdictions you simply --

6    someone can just present themselves as such and

7    write a report, which may or may not be accepted by

8    the Court.   Others require a certain -- a certain

9    level of degree before you're allowed to testify as

10   an expert.   So it varies in various jurisdictions.

11      Q       I'm not asking about admissibility in

12   court or credentials required for that.   I'm asking

13   are there credentials required by any bloodstain

14   pattern analyst organizations that must -- that

15   someone must have before they can issue an opinion

16   on bloodstain patterns?   Are you aware of any such

17   credentials?

18      A       There are various credentials that

19   are -- that a person can get if they so choose, but

20   generally you have to, if you're accepted as a

21   bloodstain pattern analyst accepted by other

22   analysts or by the Courts, which is typically where

23   the -- the direction where those reports would go,

24   that varies.

25              MR. WHITE:   Okay.   I object to the

43

Dalley Graff

1    nonresponsive answer.

2        Q        So what are the techniques used in

3    bloodstain pattern analysis?

4        A        In bloodstain pattern analysis, you

5    want to examine as much as possible the bloodstain.

6    Look for the physical characteristics.  Identify

7    those, again, things like the size and shape of the

8    overall pattern, size and shape of the individual

9    bloodstains within the pattern.

10            Look for the margins of particular

11   stains.  Look for any variations across the

12   pattern.  Look for volume.  You look at the surface

13   that the bloodstain is on.  Is it absorbent?  Is it

14   nonabsorbent?  We look at -- if you're looking at

15   something that is, for example, an impact spatter,

16   what are the size and shape and the distance

17   between individual stains?  What's the destiny of

18   the pattern?  And if you're doing reconstruction,

19   what within the context of the scene could provide

20   the blood and any forces that would create those

21   pattern.

22       Q        So what are the models that predict

23   how bloodstain patterns are created?

24       A        I don't know what you mean by models

Dalley Graff

1        

in that sense.

3      Q    Well, I guess, do you have any
scientific models that you use to predict how
bloodstain patterns are created?

6      A    Again, I don't know how you're using
the word "models."

8      Q    Was there any data that you used to
predict how bloodstain patterns are created?

10      A    I look at the physical characteristics
that we know about blood.  We look at how that --
how the patterns are formed.  We actually do
experiments ourselves.  If I think a bloodstain
could have happened this way, then I'd be sure that
I have at some point tried to duplicate that and
look at other possibilities.

In the context of the scene, is there
another possibility that could create the same or
similar pattern to see what can be excluded.  Which
things do I know could not have done this?  See
what -- what, in the context of the scene, could
have contributed to this pattern.

23      Q    So I guess my question -- and maybe if
I give an analogy my question will make a little
more sense.

App. 000416

45

1          Dalley Graff

2                    A meteorologist has reams of data from

3          the past that they have looked at or put into a

4          computer, and they have certain models or

5          algorithms that they have derived from the data,

6          and that allows them to analyze present information

7          and make predictions in the future.

8                    So in your field of study, as sort of

9          a meteorologist of bloodstains, what prior data do

10         you look at when thinking about how the bloodstain

11         you're looking at in a particular investigation was

12         created?

13         A          Well, metrology is quite different

14         from fluid dynamics; so it's a little hard to draw

15         that comparison.

16         Q          You don't think meteorology involves

17         fluid dynamics?

18         A          Not the same way that we look at the

19         blood as a fluid, if you I understand your use of

20         the term meteorology.

21         Q          So I guess my question is: what data

22         do you look at to help create your analysis of a

23         bloodstain that you're analyzing?

24         A          Again, I look at the size, shape,

25         margins, volume.

46

Dalley Graff

1

2      Q      I'm not asking what you look at via

3   the pattern that you're analyzing and doing an

4   investigation.  I'm asking about what prior data

5   informs your analysis.

6      A      Well, prior data would be those

7   experiments that I have personally done with blood

8   and how I know I personally produced patterns that

9   look like this or that I have attended scenes where

10   certain types of injuries will always produce

11   certain types of patterns.  How is this the same or

12   different from all of those where I have something

13   that gives me a known, if you will, for comparison?

14   And compare that to what I see here, in addition to

15   to this being blood and blood comes from the body

16   from what I know about anatomy and physiology and

17   what from that could result in the type of

18   bloodstain patterns that I see.

19      Q      So you just described your prior

20   experiments that you personally conducted, right?

21   That's one set of data that you use; is that right?

22      A      That's correct.

23      Q      And those are experiments you've not

24   published the results of in any scientific journal,

25   correct?

47

Dalley Graff

1     A       That's correct.

2     Q       And you described your other

3  investigations of injuries and bloodstain patterns,

4  correct?

5     A       That's correct.

6     Q       And in all of those cases, your prior

7  investigations, did you always know what caused the

8  bloodstains?

9     A       If I could add, I also do review what

10 is published by other experts in the field or

11 people who may be experts in the field and look at

12 their data and look at, for example, the high speed

13 videos particularly.  For example, those that were

14 created by Michael Taylor and Epstein and -- forgot

15 the third one's name now.

16    Q       Did you cite any of those in your

17 report?

18    A       I did not list those in the report,

19 but those, again, are going back to high speed

20 videos and looking at known sources of blood, known

21 causes of bloodstains and how the bloodstains were

22 formed and what the result looked like.  So not

23 just on the experiments that I have personally done

24 but what I have observed in others and what has

App. 000419

48

1                          Dalley Graff

2     been published by others.

3         Q      So in the cases where you knew the

4     cause of the bloodstain, could you tell us how you

5     knew the cause of the bloodstain?

6         A      For example, a massive head trauma and

7     I can see the fragmentation and the cause of the

8     massive injury is present, such as self-inflicted

9     shotgun wound to the head and the shotgun is there.

10    So you know the source.  And in the context of the

11    scene, there are no other sources available.  So

12    this was the cause.

13        Q      So do you have any known-cause

14    investigations in your past involving pedestrians

15    and motor vehicles?

16        A      Yes.

17        Q      Okay.  Like what?

18        A      Well, for example, the girl is run

19    over, and she's got a tire impression; and she has

20    an injury; and that matches to the bloodstain under

21    the vehicle that ran over her.

22        Q      So the case -- what you just described

23    is a case where you concluded that -- from a

24    bloodstain, that a certain thing caused the

25    bloodstain; right?

App. 000420

Dalley Graff

1

2          I'm asking: are there any situations

3     that you've reviewed where you're looking at a

4     bloodstain and you know with no doubt what caused

5     it, either because you were there when it got

6     caused or there's a videos of it getting caused, as

7     opposed to a situation where you've reviewed a

8     bloodstain and use your analysis and concluded what

9     caused it?

10         A       That I have reviewed direct

11    information such as a video of the act in progress

12    that led to the bloodstain, I have had situations

13    where that has happened.  Like I said, one where

14    there is, obviously, in the context of the scene,

15    one and only one possibility.

16         Q       Have --

17         A       I also include DNA analysis and such

18    where other evidence, in conjunction with the blood

19    together, excludes outside or other causes.

20         Q       Okay.  Well, I guess what mathematical

21    models do you use to explain how bloodstain pattern

22    analysis is created -- strike that.

23              What mathematical models do you use to

24    determine how bloodstains pattern are created?

25         A       If by mathematical model if you mean

50

Dalley Graff

1    like a specific algorithm that you just plug in and

2    here's what the result is, there's not one -- any

3    such thing that I'm aware of.

4        Q       Okay.  So what models, maybe they are

5    not mathematical, but what scientific models do you

6    use to explain how bloodstain patterns are created?

7        A       Well, for some patterns you can see

8    that blood drops are projected toward a surface

9    based on the bloodstains that are on the surface

10   and then knowing how blood moves through the air.

11   And knowing that it's a parabola, we can

12   approximate the area of where it would have

13   originated.

14       Q       So you said knowing how blood moves

15   through the air.  What is -- is there a scientific

16   model for how blood moves through the air?

17       A       Again, I'm not sure of how you're

18   using the term "scientific model."  We know by

19   things like high speed photography watching these

20   what -- these events as they occur and watching

21   what blood does, and then testing what we think is

22   causing the blood to do that in the air and

23   actually reproducing those results in various

24   circumstances in controlled experiments.

App. 000422

51

Dalley Graff

1    Q        So you think controlled, reproducible

2    experiments are important to establishing the

3    veracity of bloodstain pattern analysis?

4    A        I think that you should have some type

5    of controlled experiments if you are going to say

6    this action caused this bloodstain, that you can do

7    that same action and create that same bloodstain.

8    Q        Okay.  Is there -- you just said blood

9    travels through the air as a parabola, right?

10   A        The overall -- it's path is a parabola

11   through the air.

12   Q        Okay.  So can you describe

13   mathematically what a parabola is?

14   A        I can describe -- depending on the

15   blood traveling, a parabola is something that has a

16   portion of its flight path is almost flat or

17   straight, but at some point it curves.

18   Q        Okay.  So are you aware that parabolic

19   flights, I mean that's a theoretical thing; right?

20   A        It's an observable act.

21   Q        So do you think -- are parabolic arcs

22   for projectiles produced in vacuum circumstances or

23   non-vacuum circumstances?

24   A        It's been a long time since I studied

52

                     Dalley Graff

1
2    vacuums.

3        Q        But you did say that your
4    understanding is that blood moves in a parabolic
5    fashion through the air?

6        A        Yes.

7        Q        Okay.  But you don't know if that's
8    true whether it's in a vacuum or not in a vacuum?

9        A        I've never done experiments with blood
10   in a vacuum.

11       Q        Okay.  Do you know if blood is a
12   Newtonian or a Non-Newtonian fluid?

13       A        The issue of Newtonian and
14   Non-Newtonian was examined by Anita Wonder from
15   California a number of years ago, and I don't think
16   there is a single answer to that.  In some -- it
17   has some characteristics of both depending on its
18   environment at the time.

19       Q        So "it just depends" is your answer?

20       A        I'm saying it's not a simple "yes" or
21   "no" answer.

22       Q        Okay.  So what would determine whether
23   or not it's a "yes" or "no" answer in a given
24   circumstances?

25       A        That the characteristics of blood that

App. 000424

53

Dalley Graff

1
2      is under different forces when inside the body
3      versus outside the body.  And the research that I
4      did -- the studies that I did a number of years
5      ago, particularly when Anita Wonder published her
6      book, was that it's not relevant to the bloodstain
7      patterns themselves.
8          Q      Okay.  So whether or not -- your
9      testimony is the characteristic of the blood,
10     whether it's Newtonian or Non-Newtonian, does not
11     effect bloodstain pattern analysis; right?
12         A      I'm saying that blood has -- at least
13     at the time that I studied that, that it has some
14     of the properties of both.
15         Q      Okay.  So do you know whether
16     cerebrospinal fluid is a Newtonian or Non-Newtonian
17     fluid?
18         A      I don't recall studying it in terms of
19     Newtonian or Non-Newtonian.
20         Q      Okay.  Have you studied or ever
21     published anything regarding how spinal fluid or
22     basically non-blood body fluids, the patterns they
23     make when they're spilled?
24         A      To some degree, yes.
25         Q      Not as much as bloodstain patterns, I

App. 000425

54

                              Dalley Graff

1       take it?

3           A       Well, cerebrospinal fluid has some

4       properties that are different from blood and have

5       some differences.  So, for example, I believe it

6       has a much lower viscosity, and so then we don't

7       see the same type of patterns that we see in blood.

8       That is it's much more difficult to look at it and

9       say, "Well, this was a single droplet in air that

10      was spherical in air."  I don't know that that's

11      true of cerebrospinal fluid as much as it is of,

12      say, blood.

13          Q       What about brain tissue?  What have

14      you studied about brain tissue?

15          A       Well, brain tissue is not a homogenous

16      substance.  Blood is much closer to being

17      homogenous than brain tissue is.  When we look at

18      cerebral tissue, you're looking at quite often some

19      connective tissue.  You're looking at a lot of very

20      soft tissue, a lot of fluid in the blood.

21      Something that is very fragile.  Something that

22      tends to break apart so...

23          Q       So brain tissue is not a fluid per se?

24          A       No, it's not.

25          Q       Okay.  So have you studied the flight

App. 000426

55

                              Dalley Graff

1

2    dynamics of brain tissue?

3         A       Well, to my knowledge there's not a

4    specific flight dynamic for -- of, say, brain

5    tissue because, again, you're not talking about a

6    single homogenous substance.  You're talking about

7    various types of cells grouped together, and then

8    some portions of brain tissue are going to have a

9    sort of a connective tissue type of covering, the

10   meninges.

11        Q       But you have studied the flight

12   dynamics of blood?

13        A       Yes.

14        Q       Okay.  And you've studied the patterns

15   that blood makes when it hits a solid surface,

16   right?

17        A       Yes.

18        Q       Okay.  Now, you may not have published

19   on those, but you've studied those at length;

20   correct?

21        A       Yes.

22        Q       Okay.  But on brain tissue, you

23   haven't studied the flight dynamics.  And if I

24   understand your testimony correctly, it's sort of

25   impossible to guess at the flight dynamics of brain

56

1                          Dalley Graff

2        tissue because it is not homogenous; correct?

3                    MR. BUNT:  Objection to form.

4    BY MR. WHITE:

5           Q        You still have to answer.

6           A        Well, I'm sorry.  I'm not sure I

7        understand the question.  As I said, I don't think

8        there's a single flight dynamic of brain tissue

9        because you're looking at different combinations of

10       tissues together.  So if some of that -- like I

11       said, some of it is going to be more fluid than

12       others.  Some is going to have some connective

13       tissue with it.  Some brain tissue may have bits of

14       meninges that is adhered too; some maybe not.

15          Q        All right.  Just a second.  Okay.  So

16       let's look at -- I'm going to mark this as Exhibit

17       No. 4.

18    (INVESTIGATIVE ANALYSIS & CRIME SCENE RECONSTRUCTION

19     COURSE INFORMATION RECEIVED AND MARKED AS PLAINTIFF'S

20             EXHIBIT 4 FOR IDENTIFICATION.)

21    BY MR. WHITE:

22          Q        Do you recognize that document?

23          A        I have not seen it before now.  I

24       recognize the logos and such.

25                   MR. WHITE:  Let's go ahead and get it

App. 000428

57

Dalley Graff

1           marked.  If you hand it back to me, I'll put a

2           sticker on it.

3               Q       Is that a marketing flier for one of

4       your trainings?

5               A       It appears to be.

6               Q       Okay.  So on there, do you see where

7       it says that you have a five-step process for

8       accident reconstruc -- I'm sorry -- or crime scene

9       reconstruction?  I believe it's the fourth bullet

10      point down on the second page.

11              A       Yes, I see that.

12              Q       What is your five-step process for

13      correlating evidentiary relationships between scene

14      evidence?

15              A       The five steps as we list them would

16      be to begin with review so you know what materials

17      you have available.

18                      Organization, to have a system to

19      organizes all the information that you have so that

20      you can locate it as you need it for quick

21      reference and for later review and audit of the

22      information.

23                      Then preparing for analysis, which

24      would be things like looking at images, looking at

App. 000429

1                         Dalley Graff

2      them at 100 percent, adjusting the histograms to

3      see what you can see in dark places depending on,

4      again, things like the quality of the image,

5      whether it's in the correct format and those kinds

6      of things to possibly -- depending on what kind of

7      reconstruction possibly even do a three-dimensional

8      model, virtual models to help understand the

9      three-dimensional dynamics.

10                 So preparation and then analysis would

11     be actually looking at specific, for example,

12     bloodstain patterns.  What are the characteristics

13     of those patterns?  Describing those

14     characteristics.  See how that relates to other

15     evidence, such as wounds, potential forces, such as

16     weapons what's available in the context of the

17     scene.  Consider all -- all scenarios presented by

18     the evidence and scenarios that others might

19     present and to analyze those.

20                 And then I think the last step is

21     conclusions and reports to do things like flowchart

22     and see what items of evidence relate to each other

23     where you can and cannot establish connections

24     whether you can or cannot establish sequence of

25     events so identifying actions that must have

59

1               Dalley Graff

2       occurred to produce the evidence as it's available

3       and then try to sequence those actions if possible.

4               Q       Okay.  So let's jump to the report

5       here.  I'm trying to move through this quick

6       because I know we're short on time.  So if you'll

7       go to page 1 of your report.  Do you see Footnote

8       No. 1?

9               A       Okay.

10              Q       What do you mean when you say "A

11      bloodstain pattern is one or more related

12      bloodstains created by a single action"?

13              A       I mean that a bloodstain pattern is

14      made up of one or more bloodstains that are all

15      created by a single action.

16              Q       What do you mean by a "single action"?

17              A       For example, if you're looking at a

18      pattern that you say that's a castoff, which would

19      be -- would indicate that something that had wet

20      blood on the object was in motion so that it

21      separated from a ligament of blood, which then

22      separated into individual droplets, which then

23      struck a surface and would have specific

24      characteristics, such as a fairly linear

25      distribution on the surface and a progressive

60

Dalley Graff

1

2       change in shape within the individual stains within

3       that pattern.  So a single action that would have

4       produced them is the movement of a bloodied object.

5            Q       Okay.  So in this investigation of the

6       case at hand here from April 30, 2022, are you

7       assuming or do you conclude that Nehemias was

8       initially hit and then struck the Toyota Camry?

9            A       Based on the bloodstain, there is an

10      impact pattern.  And from the impact pattern, we

11      can approximate the area of impact, and then there

12      is another pattern of blood and tissue that's in a

13      different place and different orientation and

14      therefore two different impacts.

15           Q       So would it be fair to say then that

16      you're looking at all the patterns of blood and

17      various other things in this accident and concluded

18      that there were two actions?

19           A       Well, there are two related actions

20      because the one kind of caused the next, but

21      they're still separate actions, even though they

22      happened very, very short in time; but they're

23      actually separate actions.

24           Q       Okay.  So -- but you're -- just to

25      make sure I got it 100 percent right, your thinking

61

Dalley Graff

1    or conclusions are that there are two impacts that

2    caused the various bloodstain patterns on the scene

3    in this case?

4         A        That there are at least two, yes.

5         Q        Do you think it's possible there are

6    three?

7         A        Certainly.  There can be more than

8    that.

9         Q        Well, I'm trying to figure out what

10   your opinion is.  Do you think it is two, or is it

11   at least two?  And if it's at least two, how many?

12        A        There's at least two.  One that makes

13   the impact pattern on the central barrier that's a

14   separate pattern from what's on the right side and

15   toward the front of the car.

16        Q        And so do you think that the impact

17   pattern or the impact pattern on the barrier, using

18   your words, was that from the initial impact?

19        A        In my opinion, that would have to be

20   from the initial impact.

21        Q        Okay.  So you think of at least three

22   actions that caused bloodstain patterns in this

23   case.  The first one was the impact with the Ford

24   Explorer that caused the impact barrier on the

App. 000433

62

Dalley Graff

1    median barrier?

2        A        I think there was an impact to the

3    blood source -- which in this case, from the

4    information that I have, would be something that

5    caused an open head wound and therefore would

6    project blood.  And we see just the blood going

7    towards that wall.

8        Q        So your conclusion is that the impact

9    pattern on the median barrier is blood from

10   Nehemias' head?

11       A        Based on the available information, I

12   see evidence looking at the overall scene that is

13   consistent with an open head trauma, and that would

14   be consistent with an impact to the head causing

15   the bloodstains on the barrier.

16       Q        But there -- you haven't reviewed an

17   autopsy of Nehemias Santos' body, right?

18       A        No.

19       Q        Okay.  Have you reviewed a pathology

20   report on Nehemias Santos' body?

21       A        No.

22       Q        What have you reviewed to determine

23   the injuries on Nehemias Santos' body from April 30

24   of 2022?

App. 000434

63

                        Dalley Graff

1
2        A       There's evidence at scene that would
3    be consistent with an open head wound.
4        Q       Okay.  Is there evidence at the scene
5    of other injuries caused to Nehemias Santos?
6        A       I don't have anything I could point to
7    other than the evidence that is consistent with an
8    open head wound.  He may have had other injuries.
9    I don't know.
10       Q       So it's possible?
11       A       He could have had other injuries.
12   That's possible.  I don't know.
13       Q       Okay.
14       A       It doesn't change the part that I do
15   know.
16       Q       Okay.  But were you -- in a perfect
17   world, would you have preferred to have gotten an
18   autopsy report on Nehemias Santos?
19       A       I could have done more with the
20   analysis had I had a thorough examination of his
21   wounds, such as what would be presented from an
22   autopsy.
23       Q       And there's no pathology report that
24   you've reviewed that shows what the droplets that
25   you've analyzed consisted of, is there?

App. 000435

64

Dalley Graff

1     A      I'm sorry.  I'm not sure if I

2  understand the terms you're using.  Nobody

4  collected droplets in the air.  There's the stains

5  on the surface.

6     Q      So is it common practice for

7  bloodstain pattern analyst to use reagents -- I

8  think that's how you pronounce it -- to determine

9  where blood is at a scene?

10     A      The term is reagents.

11     Q      Reagents.

12     A      And various reagents are used to

13  identify, if possible, what is suspected as blood.

14  It's not always required.  But if it's

15  questionable -- if you're not certain, then there

16  are tests to do.

17              So you may have a stain that's sort of

18  a brownish color that could possibly be dried

19  blood, then I would use the reagent -- personally I

20  prefer the Kastle Meyer test.  And if that's

21  positive, then you move forward with the analysis.

22     Q      Were reagents for the Kastle Meyer

23  test used on this scene involving Nehemias Santos?

24     A      Not that was reported to me.

25     Q      Okay.  So let's go to page 3 of your

65

Dalley Graff

1    report.  So at the first sentence at the top of

2    this page says: "A wide path of blood/fluid was on

3    the pavement approximately parallel to Nehemias

4    Santos' left side."  Do you see that?

5         A       Yes.

6         Q       Okay.  Is blood/fluid a term of art

7    for bloodstain pattern analysts?

8         A       I don't know that it's a -- you say a

9    form of art.

10        Q       A term of art.  Sorry.

11        A       A term of art.  It's a simple way in

12   the English language that sometimes if you have two

13   things together that it could be either/or, and/or,

14   or both.

15        Q       So you don't know if what you're

16   looking at is just blood or fluid or maybe both?

17        A       It does appear to be primarily blood;

18   however, there are some characteristics there that

19   appears that there is a mixture of other fluid.

20        Q       You don't know what those other fluids

21   are, right?

22        A       Well, I think in the context of the

23   scene, given that everything is consistent with a

24   massive -- or an open head wound, the cerebrospinal

66

                              Dalley Graff

1
2         fluid would, in fact, in an open head wound would
3         be mixed with the blood.
4              Q       So is it possible if there's -- if
5         fluids related to a vehicle mixed in?
6              A       I don't see any evidence of
7         petroleum-like fluid.
8              Q       What about, like, a transmission
9         fluid?
10             A       Again, it's a petroleum-type fluid.
11             Q       Well, what about -- sorry -- fluid for
12        a radiator?
13             A       I think you're referring to water.
14             Q       No.  I think there's, you know, you
15        can put non-water substances in a radiator.  But, I
16        mean, do you see any automobile fluid -- besides on
17        this (indicating) -- in the materials you reviewed
18        for this case?
19             A       I don't see anything that looks like
20        it's a petroleum based mixed with the bloodstains
21        that I see.
22             Q       Okay.  So now you see in Footnote
23        No. 6 here, you see: "For purposes of this report
24        'tissue' refers to masses that appear to be
25        comprised of cerebral material, body fat, and body

App. 000438

Dalley Graff

1    fluid"?

2    A       Yes.

3    Q       Okay.  So is it normal for bloodstain

4    pattern analysts to discuss how tissue is cast via

5    an impact?

6             MR. BUNT:  Objection to form.

7    BY THE WITNESS:

8    A       I think it would not be unusual for

9    someone in a bloodstain report to refer to tissue

10   and bits of tissue being present.  That's not the

11   same as saying specifically the pattern as such,

12   other than, say, the distribution of those of the

13   bits.

14   BY MR. WHITE:

15   Q       And are you trained on analyzing the

16   patterns created by tissue?

17   A       I certainly can describe what I see.

18   Q       But can you draw conclusions from

19   patterns of tissue that you see?

20   A       To some extent, yes.

21   Q       Based on what experiments?

22   A       Well, it's not.  It's based on

23   observation.  But looking at brains over the years

24   and how the brain tissue holds together or doesn't

68

Dalley Graff

1    and seeing the pulverized pieces basically where

2    the pieces come apart and land on the surface, I

3    know they didn't start on the surface.  So they had

4    to have come from the body.

5         Q       So you don't have any experiments you

6    conducted with tissue or brain matter or skull

7    fragments, right?

8         A       With -- with tissue from a body, that

9    would be unethical if you're talking about doing

10   experiments on a person's brain to see what the

11   brain tissue would be.  But I have done experiments

12   with tissue, say, animal tissue to see what happens

13   in certain -- in certain circumstances.

14        Q       Have you published the results of

15   those experiments?

16        A       Not outside of casework.

17        Q       Okay.  So those experiments and your

18   publications have not been peer reviewed?

19        A       Not other than presentations I've made

20   at various professional organizations.

21        Q       Okay.  So on page 3 you say "a

22   drag-like mark on the pavement extended from

23   Nehemias Santos' right foot."  What does a

24   drag-like mark on the pavement mean?

App. 000440

69

Dalley Graff

1

2        A        It was a mark on the pavement that

3   went from -- extended from his foot to the blood

4   pool out on the roadway, and it looked like

5   something had been dragged to create that.

6        Q        Okay.  So can you point out where that

7   drag-like mark is on Figure 4 of your report?

8        A        I don't think it's quite visible or

9   certainly not the whole pattern visible in

10  Figure 4.

11       Q        Okay.  So you say in your report that

12  Nehemias Santos' injury or his cause of death was

13  blunt force trauma, right?

14       A        I said that?

15       Q        So on page 3 you say: "The cause of

16  death was reported as blunt force trauma."  Do you

17  see that?

18       A        Yes.  I see that I cited the State of

19  Texas Certificate of death.

20       Q        Okay.  But there was no medical report

21  that you reviewed, right, to reach an independent

22  conclusions that he died of blunt force trauma?

23       A        It's not an independent conclusion.

24  It's the conclusion stated on the State of Texas

25  Certificate of Death.

70

1                         Dalley Graff
2         Q         Okay.  Now, if you look at Figure 3,
3    can you identify all of the possible injuries to
4    Nehemias Santos?
5         A         No.
6         Q         Okay.  Do you see -- I mean, do you
7    see what appears to be something on his head,
8    right?
9         A         Yes.
10        Q         Okay.  Do you see where his right
11   shoulder -- his shirt is torn?
12        A         Yes.
13        Q         Do you see blood on his right arm?
14        A         It appears to be blood all along the
15   surface of his arm.
16        Q         Does it appear that his pants and most
17   of his clothing are soaked with blood?
18        A         It appears that way.
19        Q         Okay.  Is that incorrect?  I mean,
20   would you conclude from what you see that his
21   clothes are soaked with blood?
22        A         It's hard to determine from just this
23   picture.  It appear that they very well may be
24   saturated.
25        Q         Okay.  What about his right leg?  Does

App. 000442

71

Dalley Graff

1  his right leg appear to be injured?

2       A       I cannot tell from this picture.

3       Q       So if you see in your Footnote No. 8,

4  do you see where you cited a police report saying

5  that the right leg was obviously broken?

6       A       Yes.

7       Q       Do you agree that, looking at

8  Figure 3, it looks like his right leg is broken?

9       A       I cited that the officer said right

10 leg was obviously broken.  However, she didn't

11 detail why she said it was obviously broken.  And I

12 cannot -- looking at this picture, I cannot tell

13 you what the state of his leg is.

14      Q       Just because it's not a good enough

15 photo, I guess?

16      A       It's not from the right angle to tell.

17      Q       Okay.

18      A       The right leg may or may not be in a

19 position that looks broken.

20      Q       Okay.  So, right.  For you to know if

21 he had a broken right leg -- a fracture in his

22 right leg, you'd probably have to look at a report

23 done by some sort of forensic examiner; right?

24      A       Well, for me to say whether or not I

72

Dalley Graff

1  thought it was broken, I would need to see

2  something that was an obvious dislocation or a

3  position that the leg could not be in if the bones

4  were in tact.

5  Q       And -- and you have --

6  A       Or something like that.  Or a

7  medical -- some medical examination that actually

8  says, "Yes, the bone is broken."

9  Q       And you haven't been seen anything

10  like that in this case?  So you just don't know if

11  his right leg is broken?

12  A       I don't know.

13  Q       Okay.  So in Figure 4, here you've

14  highlighted an area and captioned it as

15  "Bloodstains on barrier."  What was your basis for

16  doing that?

17  A       The basis for doing that is looking

18  closely at this image that is not whole image but

19  zooming into this area and referring to other

20  images of the same area.

21  Q       Okay.  How do you know that the stains

22  on the median barrier are blood?

23  A       They appear to be blood to me

24  primarily.  But, again, looking at all the images

73

                          Dalley Graff

1

2      together and in particular comparing those

3      different ones.  One of them I could see what

4      appears to be extensions from the original

5      impact -- the leading edge of that stain and tails,

6      if you will, where the blood would have collected

7      toward the termination or the ends of those trails,

8      and I have seen that same thing numerous times in

9      bloodstains.

10          Q       Okay.  So you've said you've seen it

11     numerous times in bloodstains, but that seems a

12     little circular.  How do you know that that is

13     blood on the barrier?

14          A       Again, that's based on my observation

15     and my experience over the year.

16          Q       Okay.  How do you know it's not other

17     body fluid?

18          A       Other body fluid doesn't act quite

19     like that.

20          Q       Okay.  What experiments have you

21     conducted with non-blood body fluids that tell you

22     how -- what sort of patterns those fluids make, for

23     example, on a barrier?

24          A       Well, I've looked at the difference

25     between blood and other fluids.  So body fluids, it

App. 000445

74

Dalley Graff

1    depends on what specifically you're talking about.

2    But those with much lower viscosity, for example,

3    urine, would do about what water does or similar.

4    That's not what blood does.

5    Q       Okay.  I mean, there's obviously

6    different kinds of body fluids other than blood and

7    urine.  How do you know that the marks on the

8    median barrier there are not blood mixed with some

9    other body fluid?

10    A       There may be traces of cerebrospinal

11    fluid or --

12    Q       It's possible?

13    A       It would be traces because if you had

14    very much of the other in it, then it would not

15    have this appearance.

16    Q       Because your testimony is you know how

17    all body fluids act when they are cast onto a

18    barrier?

19    A       Not all body fluids.  There are some

20    body fluids I have not tested for the same

21    patterns.

22    Q       So -- so then how do you know what

23    made those patterns on the barrier, if you haven't

24    tested all body fluids?

App. 000446

75

Dalley Graff

1

2          A          Well, the other body fluids I can

3     think of that I have not tested are definitely not

4     that color.

5          Q          Okay.  So what is the resolution of

6     the photos you reviewed in your report.

7          A          I think I'd have to go back and

8     recheck.  I think the resolution of this one -- I

9     think it was 300 by 300.

10         Q          Okay.  So -- and your opinion is you

11    can reach an expert opinion by reviewing

12    photographs of that resolution and doing a

13    bloodstain pattern analysis; is that right?

14         A          By looking at everything in the scene

15    and by looking at the various images and comparing

16    them to be sure that what I'm seeing in one is

17    present in the other in some degree.

18         Q          Okay.  So you said that the stains on

19    the median barrier are quote, mostly circular.

20    What does that mean?

21         A          That they're more round than

22    elliptical.

23         Q          Okay.  So when you say more round than

24    elliptical, I mean you can measure any elliptical

25    stain; right?

76

Dalley Graff

1    A       Yes.

2    Q       And you do that by measuring the minor

3 and the major axis of the elliptical stain?

4    A       Depending on the target surface, yes.

5    Q       Did you do that here?

6    A       No.

7    Q       Why not?

8    A       Because the stains are more circular

9 and measuring individual stains doesn't really give

10 you any more information.  It's still fairly

11 circular, and there's a lot of potential error in

12 measurements the more circular that the stain is.

13 So there's no point in doing any specific

14 measurements to say, "Well, this is between 70 to

15 90 degrees."

16    Q       So when you said that the stains on

17 the barrier are mostly elliptical -- or are mostly

18 circular, do you mean that most of the stains are

19 circular and there's a couple that are elliptical,

20 or are you saying that all of the stains are

21 circular?

22    A       That, basically, all of the stains

23 that I could identify had a rounded leading edge;

24 so they originated as spheres before they impacted

77

Dalley Graff

1     and then formed the stains on the wall.  That --

2     and that the angle of most of them, based on that

3     shape, was somewhat perpendicular being anywhere

4     from -- well, it could be directly 90 degrees to

5     about the center.  Some of them look very, very

6     circular.  When you move to the north end of the

7     pattern, some of them have a little bit more of an

8     elliptical shape, not quite as rounded on the west

9     end of the pattern.

10          Q      Well, that median barrier runs north

11    to south, right?  So are you saying --

12          A      Okay.  I'm sorry.  From the north to

13    the south end.  So the north end, they seem to be

14    more circular than more to the south end.  The

15    south end, you tend to see a little bit more

16    directionality to the individual stains.

17          Q      And that -- and I appreciate that

18    detail.  That's not in the report here, right?

19    That the elliptical nature changes on the barrier,

20    is it?

21          A      There still mostly circular and

22    elliptical.

23          Q      Okay.  But you've added some detail,

24    right?

Dalley Graff

1

2      A        Some of those.  And, again, you have

3  to look at them individually by going back to all

4  of the pictures.

5      Q        And have you reviewed each drop

6  individually?

7      A        As many of them as I could focus on.

8      Q        Okay.  If you could go back, would you

9  maybe change this part of your report where you

10  said it's mostly circular and maybe say they're

11  circular on the north part of the barrier but more

12  elliptical as you head south on the barrier?

13      A        I don't think that it's a significant

14  change to say that.  They're still mostly circular

15  to elliptical.

16      Q        Okay.  But do you agree that

17  explaining which direction on the barrier they're

18  circular versus where they're elliptical would add

19  some detail here, right?

20      A        I don't -- I don't necessarily agree

21  that changing those words changes the meaning at

22  all.

23      Q        Okay.  So in, I believe we're on

24  page 4, Figures 8 and 9, you've identified some

25  stains.  Do you see those?

Dalley Graff

1

2       A       Yes.

3       Q       Okay.  So is it your expert opinion

4    that these are bloodstains?

5       A       They are not all bloodstains.

6       Q       Okay.  How do you tell which ones are

7    blood and which ones are not?

8       A       Well, looking at Figure 8, some of

9    those stains don't have very much color -- the

10   color that blood would be.  And some of those that

11   that are very elliptical don't have tails, which

12   would be where the concentration of cells would be.

13   Then it would be darker in the tails.  That happens

14   with blood.  That does not happen with other

15   fluids.  So some of them appear to be possibly

16   blood-tinged, so some fluid that's not specifically

17   blood.

18      Q       Okay.  So you think those -- at least

19   some of the patterns shown in Figures 8 and 9 are

20   not bloodstains?

21      A       That they are not primarily blood.

22   They're blood-tinged, but they appear to be some

23   other fluid in connection with blood.

24      Q       And can you explain the difference or

25   how are patterns different when it's not blood

App. 000451

80

Dalley Graff

1  primarily creating the stain?

2

3       A       When it's something of a significantly

4  different viscosity, such as water will make a

5  different pattern -- have a different pattern.  Be

6  more dispersed.  Breaks up more than blood does.

7  It's closer to blood.  So you can still have

8  whatever the fluid is having its viscosity to it

9  that it holds together so you still get an

10  elliptical stain with the fluid continuing to form

11  the tail for directionality, if you would.

12       Q       So by looking at a stain what you're

13  saying is you can guess whether or not the

14  viscosity of the fluid was close to blood or not

15  like blood, right?

16       A       I'm not guessing the viscosity.  I'm

17  saying that as a result of the stain that if you

18  compare it to other fluids, that whatever this is,

19  if it has the same characteristics or similar to a

20  bloodstain, then it must have had similarities as a

21  fluid to blood and therefore be, for example,

22  closer in viscosity to blood than water.

23       Q       So if you saw a pattern that it looked

24  like it had a similar viscosity to blood, that

25  doesn't tell you whether or not it's blood or not;

81

Dalley Graff

1

2          it just tells you that you're looking at a fluid

3          that has a viscosity similar to blood; right?

4              A        I'm sorry.  I don't follow.

5              Q        So if you see a pattern, what you're

6          saying is you can analyze the viscosity of the

7          liquid that created that pattern; right?

8              A        I'm not measuring the viscosity from a

9          stain.  I'm simply saying that stains with --

10         fluids with similar viscosity can have similar

11         characteristics in the stains that are formed.

12             Q        So if I -- so if you know the

13         viscosity of a fluid, you can predict what the

14         patterns made by that fluid will look like?

15             A        Not from viscosity alone.

16             Q        Okay.  So what else would you need to

17         know?

18             A        Well, what is the fluid?  Is it a very

19         homogenous fluid, or is it a mixture?

20             Q        Okay.  So you have to know what the

21         fluid is before you can predict what patterns that

22         fluid would make?

23                     MR. BUNT:  Objection to form.

24    BY MR. WHITE:

25             Q        I mean, that's what you just said,

Mary T. Babiarz Court Reporting Service, Inc.
Phone: (845) 471-2511

App. 000453

                          Dalley Graff

1

2      right?

3          A       I don't know what you just said.

4                  MR. BUNT:  Same objection.

5  BY MR. WHITE:

6          Q       So you have to know what a fluid is

7      before you can predict what patterns that fluid

8      will make, right?

9          A       I'm not predicting what patterns it

10     will make.  I'm looking at the patterns that were

11     made.  And if the patterns that were made have

12     this -- some similarities to what we see in blood,

13     then, by extension, that means that there are some

14     similarities in those fluids.  But I'm not saying

15     what the viscosity was, and I'm not predicting what

16     some other fluid, not blood, would do that.

17         Q       So you understand that a prediction is

18     just another word for a hypothesis about what

19     happens, right?

20         A       No.

21         Q       So you don't think hypotheses are

22     predictions?

23         A       I don't think the two terms are

24     synonymous.

25         Q       Okay.  So have you ever made

83

Dalley Graff

1  hypotheses about how patterns will form based on an

2  ejected fluid?

4      A      A hypothesis is based on the evidence

5  at hand.  A hypothesis is, if you will, an educated

6  guess.  Here's what I think could have made this.

7  That's a hypothesis.  Then you test the hypothesis

8  to see if, in fact, this could create that.  That's

9  hypothesis.

10          Prediction says I know this will

11  happen.  And those are two different things.

12      Q      Okay.  So when you look at the

13  elliptical stains on, say, Figure 8, based on what

14  you're looking at there, can you determine whether

15  or not -- like you said, that's a blood-tinged

16  fluid?  Do you know what kind of fluid it is?

17      A      I don't specifically know in the

18  context of the scene.  I look at what's available

19  in context of the scene.  Given that there appears

20  to be some cerebral matter in the scene, then

21  cerebrospinal fluid I know is associated with that.

22  I know that the tissue gets there because it had to

23  be in flight coming from a source.  So therefore

24  the fluid along with it would come from the source.

25      Q      Well, how do you know that these

App. 000455

84

1                        Dalley Graff

2       elliptical stains were created by a fluid

3       associated with this accident?

4           A       I just look at the entire car to see

5       if there's anything similar because I also look at

6       what's across the glass and what's on the trunk lid

7       and what's on the other side of the vehicle.

8           Q       Well, I mean, is it possible that

9       those are just streaks from some sort of, like, a

10      prior car wash on Figure 8?

11          A       They're not consistent with a car

12      wash, which is primarily water.

13          Q       What about soap?

14          A       That would be a very strange way to

15      put soap on a car.

16          Q       So are you an expert on how soap dries

17      on cars?

18          A       I wouldn't say I'm an expert.

19          Q       So how do you know that those streaks

20      in Figure 8 or even Figure 9 aren't organic matter

21      from bugs or soap or anything not related to this

22      accident?

23          A       Well, we have two different things

24      between Figure 8 and Figure 9.

25          Q       Well, take them both one at a time.

85

Dalley Graff

1

2      A       Well, Figure 9, there's an overall

3   pattern.  There's very similar stains in the same

4   orientation over the same part of the car.  There

5   appears to be a single source to have those

6   similarities.

7      Q       So you're concluding that because you

8   see patterns that seem to have the same source,

9   then they must be related to the accident?  That's

10  your expert conclusion?

11     A       In the context of the scene and

12  looking at all of the images of the car.  I don't

13  see for example these things on the front end of

14  the car.  So I looked at all of the images of this

15  car looking for anything similar to this.  I don't

16  find it anywhere other than here in this and

17  comparing this to pictures of the other side of the

18  trunk.

19     Q       Okay.  So how do you know the things

20  that you circled in Figure 9 are, in fact, fluid

21  stains?

22     A       That's just my observation.  That's

23  what they appear to be.

24     Q       Okay.  But you didn't test them in

25  person or anything like that, right?

App. 000457

86

                        Dalley Graff

1
2          A        No.

3          Q        Okay.  So they just look like black

4     flecks, right?  I mean, is that a fair description?

5          A        No.  I wouldn't describe them as black

6     flecks.

7          Q        So there's some black flecks, like,

8     immediately to the right of the light that you

9     didn't circle.  Do you see those on Figure 9?

10         A        I'm sorry.  Figure 9?

11         Q        Uh-huh.

12         A        Figure 9, I outlined just a few, not

13    all of them.  There was no attempt to outline every

14    single stain.

15         Q        So do you think that every black mark

16    on Figure 9 is a bloodstain?

17         A        I don't know.

18         Q        Okay.  Why don't you know?

19         A        Well, one thing because I can't see it

20    printed in this small print, but at the time I just

21    highlighting certain stains that I could

22    identify -- that if I felt I could identify.

23         Q        So you're saying that those other

24    stains in Figure 9 might not be related to the

25    accident or might not be bloodstains?

Dalley Graff

1
2     A       They appear to be bloodstains.  They
3  appear to be related to these, but I don't recall
4  now what all I looked at there.  But I would just,
5  again, highlighting a sample of what I see and what
6  I could identify as stains.
7     Q       Well, so your expert -- is your expert
8  conclusion that all those black stains in Figure
9  9 -- sort of in the light area, by the light --
10  that those are all bloodstains?
11            MR. BUNT:  Objection to form.
12  BY THE WITNESS:
13     A       Without looking at it in a view where
14  I can actually see them, I can't tell if there are
15  any that I would exclude as being bloodstains.
16  BY MR. WHITE:
17     Q       Okay.
18            MR. BUNT:  It's 10 after 1:00 so...
19            MR. WHITE:  All right.  So I guess
20        that's as much as I'm going to get today,
21        unless you want to give me a little latitude.
22            MR. BUNT:  I can give you about five
23        more minutes.
24            MR. WHITE:  Okay.  All right.  Let me
25        get to the fun stuff.

88

                              Dalley Graff

1

2        Q        Let's go to page 7.  Just let me know

3    when you're there.  So you see Figure 19 of your

4    report?

5        A        Yes.

6        Q        Okay.  So you say "In the context of

7    this scene, if the Explorer damage was caused by an

8    impact with Nehemias Santos' head, then Nehemias

9    Santos' head was lower to the level of Explorer

10   headlight."  Do you see that?

11       A        Yes.

12       Q        Okay.  So is it your conclusion or

13   your assumption that Nehemias Santos had his head

14   struck on the right side by the Ford Explorer?

15       A        I would say it's neither.

16       Q        Okay.  What would you say it is?

17       A        That if his head, wherever the wound

18   is, was injured in this impact, then his head has

19   to be in the area of damage to the Ford Explorer.

20   So if it's -- so if the initial wound is to the

21   right side, then this would be an approximation for

22   where his head would be and then by extension the

23   posture of where his head would be.  It's simply an

24   approximation.

25       Q        So do you know that the initial impact

App. 000460

89

                              Dalley Graff

1

2       was to the right of Nehemias Santos' head?

3              A        I don't know that.

4              Q        Have you concluded that from reviewing

5       the evidence?  Is your expert opinion that the

6       initial impact was to the right of Nehemias Santos'

7       head?

8              A        It's only based on the fact that there

9       is a towel or something that's pressed to the right

10      side of his head.

11             Q        Is it possible that something else was

12      the initial -- a different part of his body was

13      struck by the Ford Explorer as part of the initial

14      impact?

15             A        I saw evidence in the scene of an open

16      head wound, regardless of whether the initial

17      impact is to the side or the top or even the left

18      side, I don't know because there's not a

19      documentation specifically of the wound, other than

20      the image I captured where they had put something

21      to the right side of the head.

22             Q        Okay.  All right.  It's not a trick

23      question.  I take that to mean you do not have an

24      expert conclusion about how the impact to the right

25      side of his head occurred, right?

90

Dalley Graff

1        MR. BUNT:  Objection to form.

2  BY THE WITNESS:

3        A        I see evidence in the scene that he

4     had an open head wound; therefore, if -- as I say,

5     if the damage to the vehicle was associated with

6     that wound, then his head has to be at the level of

7     that damage.

8  BY MR. WHITE:

9        Q        And you're saying "if" because you

10    don't know if his head was what caused the damage

11    to the headlight area of the Ford Explorer?

12       A        Other than in the context of the

13    scene, I didn't find any other.  Because it's not

14    caused by an impact with the Camry.  So what else

15    in the scene?  There's nothing else in the context

16    of this scene that provides a source of that

17    damage.

18       Q        But you don't know if maybe Nehemias'

19    shoulder hit the headlight area or if some other

20    part of his body hit the headlight area and then

21    the head injury occurred subsequently?  You just

22    don't know, right?

23       A        Well, I know that something has to hit

24    the head, and I don't see any evidence of a

91

1                       Dalley Graff

2      catastrophic injury to either of the shoulders.

3           Q       But, I mean, you don't know if there's

4      an injury to his shoulder?  You've already

5      testified to that, right?

6           A       Well, there could be an injury.  I

7      said catastrophic.  Something that could produce --

8      that an impact would produce the bloodstains that

9      we see on the barrier.

10          Q       Okay.  But you don't know if his head

11     hit the road or his head hit the Camry or his head

12     hit the Ford Explorer, right?  You just don't know

13     between those possibilities, right?

14          A       Well, I don't think there's evidence

15     that his head could have hit something after the

16     wound was opened.

17          Q       Okay.  But you don't know what opened

18     the wound in his head, right?

19          A       In the context of the scene, the only

20     source that I find in the scene context is the

21     Explorer.

22          Q       So if his head hit the road, right, is

23     it possible that any evidence of that got covered

24     up after his body got moved behind the Camry?

25          A       The head just hitting the road, say,

App. 000463

Dalley Graff

1

2      from a fall is not going to produce the open head

3      injury that would then lead to the evacuation of

4      the Calvarium, which is what the evidence appears

5      to show.

6           Q      So in you're saying if -- in your

7      opinion, if Nehemias Santos' head was slapped down

8      on the pavement, it wouldn't have produced an open

9      head wound?

10          A      Well.  It wouldn't produce --

11     depending how it impacted.

12          Q      So it's possible?

13          A      It's possible that a hard impact to a

14     roadway can certainly cause a skull fracture,

15     possibly cause an open head wound.  However, it

16     would have to somehow bring that head back up to a

17     place where cerebral tissue could be expelled or

18     projected along the right side of the car, the roof

19     of the car, towards the trunk, the open lid of the

20     trunk, and to leave and to go down and be on the

21     pavement behind the car.

22               So that's not consistent with falling

23     to the ground and having that kind of injury or to

24     have that injury caused by the pavement.  It

25     wouldn't be able to get up from there.

App. 000464

93

Dalley Graff

1     Q      But you're not an expert on the flight
2     dynamics of brain tissue, correct?  You already
3     told us that, right?
4     A      Again, there's not such a thing as a
5     simple flight dynamics of brain tissue.  We can see
6     what happens when tissue is moving through the air
7     and some of the characteristics and how that's
8     different from, say, a fluid going through the air
9     because now you have these pieces that are not
10    homogenous, don't always stay together, may come
11    apart.  There's various things that happen to a
12    mass of tissue that would not happen with blood.
13    Q      So it's hard to predict how tissue
14    moves through the air because it's not homogenous,
15    right?
16    A      And I'm not predicting.  I'm simply
17    stating the conclusions that I've observed in the
18    result.
19    Q      So you've never performed
20    hypothetical -- you've never performed experiments
21    on how tissue moves through the air, right?
22    MR. BUNT:  Objection to form.
23 BY THE WITNESS:
24    A      I have observed and studied videos of

App. 000465

94

Dalley Graff

1    actual woundings at the time they have occurred.  I

2    have done some experiments myself to simulate, for

3    example, what might happen with, say, brain tissue

4    by shooting into animal tissue, not living animals,

5    to simulate and see if this action would produce a

6    result similar to what's seen in the scene.

7  BY MR. WHITE:

8        Q       What is a dispersion cone?

9        A       A dispersion cone is when some force

10   causes, for example, blood, to be projected from a

11   source, and as it moves away from the source

12   individual droplets move father away from each

13   other, and the three-dimensional result in the air

14   is called a dispersion cone.

15              It's not a physical cone.  It's not an

16   exact location.  It's a general area.  So if it

17   hits a target surface, the farther away from the

18   source it is, generally the less dense the

19   individual stains in the pattern will be.

20       Q       So can a dispersion cone be as large

21   as 360 degrees and as small as, say, 10 degrees?

22       A       It really depends on the scene in

23   which this happens.

24       Q       But it could be 360 degrees and as

App. 000466

95

Dalley Graff

1    small as 10 degrees?

3         A        Certainly.  If you have a -- if we're

4    talking about head injuries in particular.

5    Something like a rifle or shotgun to the head where

6    there's nothing blocking anywhere around, then that

7    could actually send tissue 360 degrees around the

8    source.

9         Q        What about back splatter?  What is

10   that?

11        A        Back splatter is when, upon impact of

12   something to a blood source, some of the blood may,

13   in fact, travel back towards the source of the

14   force.

15        Q        Did you see any back splatter on the

16   Ford Explorer?

17        A        I couldn't say that it was back

18   spatter, but I did see some splatter in the Ford

19   Explorer.

20        Q        Now, I think in your report you

21   described the spatter in the Ford Explorer as being

22   I think you said it was consistent with arterial

23   blood; is that right?

24        A        I'd have to see where it says that.

25        Q        It's Footnote 14.  You called it

96

1                        Dalley Graff

2          consistent with a projected pattern, such as a

3          breached artery.

4               A        I'm not saying it was a breached

5          artery.  I'm just saying it's a projected pattern,

6          and one place that you see that type of pattern is

7          when there's a breached artery.  There are other

8          circumstances that can produce similar stain.

9               Q        Like a back splatter?

10              A        No.

11              Q        Okay.  So --

12                       MR. BUNT:  It's 1:20.

13                       MR. WHITE:  You calling it?

14                       MR. BUNT:  I'm calling it.

15                       MR. WHITE:  Okay.

16                       MR. BUNT:  Just a few very quick

17         questions.

18    EXAMINATION BY MR. BUNT:

19              Q        Just first of all, if the vehicles

20         involved in an accident have already been repaired

21         and they have already been cleaned such that any

22         blood spatter, tissue spatter, bloodstains, et

23         cetera, are no longer present, is it common in --

24         is it common for someone such as yourself to rely

25         upon whatever photographic or video evidence there

97

Dalley Graff

1  is of those stains and spatter to make an analysis?

2  

3      A      I would say it's common in the

4  bloodstain community to rely on documentation of

5  the original stains, regardless of what happened to

6  the surface afterwards.

7      Q      And if the surfaces afterwards just no

8  longer contain those stains and all you have is

9  photographs and videos, is that what you have to

10  rely upon are the photographs and videos?

11      A      Yes.  I would always rely on the

12  photographs -- photographic or video recordings

13  from the original, even if I were to look at the

14  vehicle itself later.

15      Q      But the reason you haven't looked at

16  the vehicles here is because those vehicles have

17  been repaired and cleaned of any stains, correct?

18      A      Well, I -- I didn't really consider

19  looking at the vehicles.  I haven't had the

20  opportunity to do that other than through the

21  photographic evidence.

22      Q      Okay.  But sometimes photographs and

23  videos are all you have, correct?

24      A      Yes.

25      Q      The photographs and videos that you

Mary T. Babiarz Court Reporting Service, Inc.
Phone: (845) 471-2511

App. 000469

98

Dalley Graff

1
2   had here, do you believe that they were of
3   sufficient quality so that when you blew them up --
4   when you enlarged them and put them through your
5   processes with the imaging software you have, you
6   believe they are adequate to support whatever
7   opinions and conclusions you had formed in this
8   case?
9       A       Yes.  I think they were adequate for
10  the parameters that I used in my conclusions.
11      Q       All right.  And as to why you haven't
12  reviewed an autopsy report or a pathology report,
13  to your knowledge, was any autopsy report performed
14  on Mr. Santos?
15      A       I did request such reports and was
16  advised that they were not available.
17      Q       Okay.  And as far as any other type of
18  pathology report, something confirming exactly what
19  caused his death, you're not aware that any such
20  reports exists, are you?
21      A       I'm still not aware of any.  It has
22  not been provided me you.
23      Q       As far as you know, what we have are
24  the -- is the testimony of the witnesses that were
25  at the scene, which I guess would include the

App. 000470

99

Dalley Graff

1    police officers and the paramedics, as well as

2    photographs and videos?

3    A       I'm not sure I understand the

4    question.  My conclusions are based on my

5    observations of what I see in the scene, not

6    relying on anyone -- on any one statement of what

7    they said the injuries were.

8    Q       Okay.  But when you say "the scene,"

9    you mean the photographs of the scene; correct?

10    A       Yes.

11                 MR. BUNT:  All right.  That's all.

12                 THE REPORTER:  Mr. White, will you be

13           purchasing the original and one?

14                 MR. WHITE:  Yes.

15                 THE REPORTER:  And, Mr. Bunt, will you

16           be purchasing a copy?

17                 MR. BUNT:  Yes, we want a copy.  And

18           can you also just give us kind of a rough copy

19           as quickly as you can?

20                 THE REPORTER:  Yes.

21                          *  *  *  *  *

22

23

24

25

App. 000471

100

```
 1   STATE OF NEW YORK      )

 2                          )SS:

 3   COUNTY OF ORANGE       )

 4

 5          I, JAIDEN HERNANDEZ, a Court Reporter and

 6   Notary Public within and for the State of New York, do

 7   hereby certify:

 8

 9          That IRIS DALLEY GRAFF, the witness whose

10   deposition is hereinbefore set forth, was duly sworn by

11   me and that such deposition is a true record of the

12   testimony given by the witness.

13

14          I further certify that I am not related to any

15   of the parties to this action by blood or marriage and I

16   am in no way interested in the outcome of this matter.

17

18          IN WITNESS WHEREOF, I have hereunto set my

19   hand this 27th day of December, 2023.

20

21                        _Jaiden Hernandez_

22                        _____

23                            JAIDEN HERNANDEZ

24

25
```

Mary T. Babiarz Court Reporting Service, Inc.
Phone: (845) 471-2511

App. 000472

101

1                          I N D E X

2

3   EXAMINATION BY                                    PAGE

4   Mr. White...........................................4

5   Mr. Bunt...........................................96

6

7                   PLAINTIFF'S EXHIBITS

8                 MARKED FOR IDENTIFICATION

9

10        NUMBER        DESCRIPTION              PAGE

11

          Exhibit 1     Scene Reconstruction Report,     6
12                      Bates-stamped 00476.118002323
                        to 68
13

          Exhibit 2     Curriculum Vitae of Iris         7
14                      Dalley Graff, Bates-stamped
                        00476.118002313 to 21
15

          Exhibit 3     Spreadsheet of cases,            7
16                      Bates-stamped 00476.118002322

17        Exhibit 4     Investigative Analysis & Crime   56
                        Scene Reconstruction Course
18                      Information

19

20                   DEFENDANT'S EXHIBITS

21                 MARKED FOR IDENTIFICATION

22                          None

23

24

25

          Mary T. Babiarz Court Reporting Service, Inc.
                    Phone: (845) 471-2511

102

1                    ACKNOWLEDGMENT OF DEPONENT

2

3      I, IRIS DALLEY GRAFF, do hereby acknowledge I have read

4      and examined the foregoing pages of testimony, and the

5      same is a true, correct and complete transcription of

6      the testimony given by me, and any changes or

7      corrections, if any, appear in the attached errata sheet

8      signed by me.

9

10

11     _____          _____

12       IRIS DALLEY GRAFF                      DATE

13

14     Sworn to before me this _____

15     day of _____, 2023.

16

17     X_____

18              Notary Public

19

20

21

22

23

24

25

App. 000474

103

ERRATA SHEET

FOR THE TRANSCRIPT OF:
IRIS DALLEY GRAFF
DECEMBER 14, 2023

PAGE LINE  FROM                        TO

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

____ ____  _____  _____

_____        _____
  IRIS DALLEY GRAFF                  DATE

Mary T. Babiarz Court Reporting Service, Inc.
Phone: (845) 471-2511

App. 000475

**[**

**[proper (1)**
26:2

**A**

**able (2)**
32:20;92:25
**above (1)**
21:13
**absorbent (1)**
43:14
**accepted (3)**
42:7,20,21
**accident (7)**
57:9;60:17;84:3,
22;85:9;86:25;96:20
**accidentally (1)**
17:23
**according (1)**
32:19
**across (2)**
43:12;84:6
**act (4)**
49:11;51:21;73:18;
74:18
**acting (1)**
32:7
**action (8)**
21:21;51:7,8;
59:12,15,16;60:3;
94:6
**actions (9)**
32:14,16;58:25;
59:3;60:18,19,21,23;
61:23
**acts (3)**
10:21,23;30:14
**actual (1)**
94:2
**actually (14)**
9:6;17:25;22:8;
26:12;29:24;36:24,
24;44:12;50:24;
58:11;60:23;72:8;
87:14;95:7
**Ada (1)**
23:6
**add (2)**
47:10;78:18
**added (1)**
77:24
**addition (1)**
46:14
**address (1)**
5:11
**adequate (2)**
98:6,9
**adhered (1)**
56:14
**adhesive (1)**

29:21
**adjudication (1)**
40:19
**adjunct (2)**
22:24;23:5
**adjusting (1)**
58:2
**admissibility (1)**
42:11
**advanced (1)**
23:13
**advantage (1)**
33:23
**advised (1)**
98:16
**affixation (1)**
10:6
**afterwards (3)**
19:4;97:6,7
**again (16)**
15:4;21:16;41:23;
43:8;44:6;45:24;
47:20;50:18;55:5;
58:4;66:10;72:25;
73:14;78:2;87:5;93:5
**ago (4)**
23:7;28:7;52:15;
53:5
**agree (10)**
5:25;6:2,3,7;40:12,
13,21;71:8;78:16,20
**AGREED (3)**
3:2,6,10
**agreement (2)**
39:24;40:9
**agreements (1)**
5:22
**ahead (1)**
56:25
**air (20)**
33:6,8,10,15;
34:18;50:11,16,17,
23;51:10,12;52:5;
54:9,10;64:4;93:7,9,
15,22;94:14
**algorithm (1)**
50:2
**algorithms (1)**
45:5
**allow (1)**
19:23
**allowed (1)**
42:9
**allows (1)**
45:6
**almost (1)**
51:17
**alone (2)**
21:21;81:15
**along (3)**
70:14;83:24;92:18
**always (5)**
46:10;47:8;64:14;

93:11;97:11
**analogy (1)**
44:24
**analysis (48)**
11:3,4,7;12:19;
18:13;20:7,18,20,21,
22,24;21:4,5,9,14,16,
17;29:15;31:4,12,13;
32:3,5,10,14;33:18;
37:13;38:6,9;39:16,
22;41:17;43:4,5;
45:22;46:5;49:8,17,
22;51:4;53:11;56:18;
57:24;58:10;63:20;
64:21;75:13;97:2
**analyst (12)**
9:5;12:2,15;19:16;
37:16;40:24,25;41:6,
22;42:14,21;64:7
**analysts (4)**
41:11;42:22;65:8;
67:5
**analyze (3)**
45:6;58:19;81:6
**analyzed (1)**
63:25
**analyzing (3)**
45:23;46:3;67:16
**anatomy (2)**
22:19;46:16
**and/or (1)**
65:14
**angle (2)**
71:17;77:3
**animal (2)**
68:13;94:5
**animals (1)**
94:5
**Anita (2)**
52:14;53:5
**apart (1)**
54:22;68:3;93:12
**apparently (2)**
17:20,24
**appear (12)**
7:19;65:18;66:24;
70:16,23;71:2;72:24;
79:15,22;85:23;87:2,
3
**appearance (1)**
74:16
**appearing (1)**
4:3
**appears (11)**
7:11,12;57:6;
65:20;70:7,14,18;
73:4;83:19;85:5;92:4
**applied (1)**
35:22
**appreciate (1)**
77:18
**appropriate (1)**
37:11

**approximate (2)**
50:13;60:11
**approximately (4)**
4:15;24:6,8;65:4
**approximation (2)**
88:21,24
**April (2)**
60:6;62:24
**arcs (1)**
51:22
**area (11)**
50:13;60:11;72:15,
20,21;87:9;88:19;
90:12,20,21;94:17
**areas (4)**
22:17;39:20,21,23
**arm (2)**
70:13,15
**around (4)**
15:24;17:23;95:6,7
**art (4)**
65:7,10,11,12
**arterial (1)**
95:22
**artery (3)**
96:3,5,7
**aside (1)**
26:22
**associated (3)**
83:21;84:3;90:6
**Association (1)**
35:7
**assuming (1)**
60:7
**assumption (1)**
88:13
**attachment (1)**
7:13
**attempt (1)**
86:13
**attended (5)**
13:11;22:8;24:13;
25:24;46:9
**attending (1)**
27:6
**attorneys (4)**
3:3,7,11;41:14
**audit (1)**
57:22
**authorities (3)**
39:15,18,22
**automobile (3)**
9:13;15:7;66:16
**autopsies (5)**
13:9,10,11,12,13
**autopsy (14)**
12:10;13:15,16,19;
14:6;18:20;19:4,6;
20:13;62:18;63:18,
22;98:12,13
**availability (1)**
21:10
**available (9)**

21:16;33:23;48:11;
57:18;58:16;59:2;
62:12;83:18;98:16
**aware (5)**
42:16;50:4;51:19;
98:19,21
**away (3)**
94:12,13,18
**axis (1)**
76:4

**B**

**bachelor's (1)**
22:12
**back (13)**
25:3;47:20;57:2;
75:7;78:3,8;92:16;
95:9,11,13,15,17;
96:9
**bad (1)**
17:25
**bar (3)**
41:9,12,14
**barrier (21)**
61:14,18,25;62:2,
10,16;72:16,23;
73:13,23;74:9,19,24;
75:19;76:18;77:11,
20;78:11,12,17;91:9
**bars (1)**
41:13
**based (16)**
22:6;31:10;32:5;
50:10;60:9;62:12;
66:20;67:22,23;
73:14;77:3;83:2,4,
13;89:8;99:5
**basic (1)**
39:24
**basically (3)**
53:22;68:2;76:23
**basis (3)**
28:5;72:16,18
**BATES-STAMPED (3)**
6:24;7:3,6
**become (1)**
40:25
**becoming (1)**
40:24
**begin (2)**
5:3;57:17
**beginning (2)**
33:20;34:2
**behalf (2)**
4:3;9:8
**behind (3)**
17:22;91:24;92:21
**besides (1)**
66:16
**best (2)**
9:24;15:19
**better (1)**

21:6
**Bevel (2)**
 39:7;40:7
**biology (4)**
 22:12,19;23:13;
 24:15
**bit (2)**
 77:8,16
**bits (3)**
 56:13;67:11,14
**black (5)**
 86:3,5,7,15;87:8
**blew (1)**
 98:3
**blocking (1)**
 95:6
**blood (128)**
 9:4,5;11:22;12:2;
 19:16;20:17,20;
 21:22,23,25;22:3,5,8;
 25:21;26:22,23;
 28:19;29:3,6,12,20,
 21,22,23;30:3,4,10,
 14,18,24;31:5,10,11,
 14,23;32:6,19;33:5,7,
 10,13,15,21,22;34:7,
 18;36:25;39:25;
 43:21;44:11;45:19;
 46:7,15,15;47:21;
 49:18;50:9,11,15,17,
 22,23;51:9,16;52:4,9,
 11,25;53:9,12;54:4,7,
 12,16,20;55:12,15;
 59:20,21;60:12,16;
 62:4,7,7,10;64:9,13,
 19;65:17,18;66:3;
 69:3;70:13,14,17,21;
 72:23,24;73:6,13,25;
 74:5,7,9;79:7,10,14,
 17,21,23,25;80:6,7,
 14,15,21,22,24,25;
 81:3;82:12,16;93:13;
 94:11;95:12,12,23;
 96:22
**blood/fluid (2)**
 65:3,7
**bloodied (1)**
 60:4
**bloodshed (1)**
 22:2
**bloodstain (82)**
 11:2,4,7;20:21,22,
 24;21:5,14,15,19,19;
 26:16;29:4,14,18,23;
 30:9;31:3;32:2,4,9,
 14,20;33:17;34:18;
 35:17;37:13,15;38:6,
 8;39:16,22;40:24,25;
 41:5,11,22;42:13,16,
 21;43:4,5,6,14,24;
 44:5,9,13;45:10,23;
 46:18;47:4;48:4,5,20,
 24,25;49:4,8,12,21;

50:7;51:4,7,8;53:6,
 11,25;58:12;59:11,
 13;60:9;61:3,23;
 64:7;65:8;67:4,10;
 75:13;80:20;86:16;
 97:4
**bloodstains (27)**
 11:23;25:18,19;
 27:4;43:10;45:9;
 47:9,22,22;49:24;
 50:10;59:12,14;
 62:16;66:20;72:16;
 73:9,11;79:4,5,20;
 86:25;87:2,10,15;
 91:8;96:22
**bloodstream (2)**
 11:25;12:22
**blood-tinged (3)**
 79:16,22;83:15
**blunt (12)**
 10:4,14;11:8;
 14:21,24;15:6,9,16;
 16:6;69:13,16,22
**body (29)**
 19:3;21:25;22:3;
 40:19;46:15;53:2,3,
 22;62:18,21,24;
 66:25,25;68:5,9;
 73:17,18,21,25;74:7,
 10,18,20,21,25;75:2;
 89:12;90:21;91:24
**bone (1)**
 72:9
**bones (1)**
 72:4
**book (1)**
 53:6
**botany (1)**
 22:19
**both (6)**
 40:21;52:17;53:14;
 65:15,17;84:25
**brain (20)**
 33:10;54:13,14,15,
 17,23;55:2,4,8,22,25;
 56:8,13;67:25;68:7,
 11,12;93:3,6;94:4
**brains (1)**
 67:24
**breached (3)**
 96:3,4,7
**break (1)**
 54:22
**Breaks (1)**
 80:6
**Brian (2)**
 4:20,21
**bring (1)**
 92:16
**broken (9)**
 71:6,9,11,12,20,22;
 72:2,9,12
**brother (1)**

4:11
**brownish (1)**
 64:18
**bugs (1)**
 84:21
**bullet (1)**
 57:10
**BUNT (21)**
 4:18,20,21,22,24;
 56:3;67:7;81:23;
 82:4;87:11,18,22;
 90:2;93:23;96:12,14,
 16,18;99:12,16,18
**Bureau (1)**
 24:13
**burial (2)**
 10:21,22
**business (7)**
 38:3,3,13,16,17,19,
 21

**C**

**California (1)**
 52:15
**call (4)**
 5:15;9:4;20:20,20
**called (2)**
 94:15;95:25
**calling (2)**
 96:13,14
**Calvarium (1)**
 92:4
**Camry (4)**
 60:8;90:15;91:11,
 24
**can (68)**
 6:7;8:25;10:17;
 11:15;12:4;15:19;
 17:3,5,11;19:18;
 20:14,16;21:8,21;
 22:10;28:16,18;
 29:13;30:11,13;31:7,
 8,22;33:19,25;36:23;
 40:24;42:6,15,19;
 44:19;48:7;50:8,12;
 51:7,13,15;57:21;
 58:3,23,24;60:11;
 61:8;66:15;67:18,19;
 69:6;70:3;75:2,11,
 24;79:24;80:7,13;
 81:6,10,13,21;82:7;
 83:14;87:14,22;
 92:14;93:6;94:21;
 96:8;99:19,20
**captioned (1)**
 72:15
**capture (1)**
 33:21
**captured (1)**
 89:20
**car (20)**
 11:19,19;15:8;

17:17;18:17,17,19,
 24;61:16;84:4,10,11,
 15;85:4,12,14,15;
 92:18,19,21
**carbon (2)**
 10:5;11:22
**career (2)**
 24:14,17
**cars (1)**
 84:17
**case (42)**
 6:18;8:20,23;9:21;
 10:7,14,18,19,25;
 11:3,7,8,13,17;12:6,
 10;13:21;14:24;
 15:10;16:6,15,18,21,
 21;17:24;18:14,23;
 19:12,12,13;37:7,9,
 23;48:22,23;60:6;
 61:4,24;62:4;66:18;
 72:11;98:8
**cases (29)**
 6:21;7:6,17,19,22,
 23;9:11,15;12:12;
 13:23;14:14,20;15:5,
 13,14;16:24;17:3,5,
 12,15;18:4,5,7;19:6,
 7,10;38:10;47:7;48:3
**casework (1)**
 68:17
**cast (2)**
 67:5;74:18
**castoff (1)**
 59:18
**catastrophic (2)**
 91:2,7
**caught (1)**
 41:9
**cause (15)**
 10:2,9,11;13:22,
 24;35:16,21;48:4,5,7,
 12;69:12,15;92:14,15
**caused (27)**
 9:23;14:16,21;
 15:3,7,16,16:7;
 30:24;32:11;47:8;
 48:24;49:4,6,6,9;
 51:7;60:20;61:3,23,
 25;62:6;63:5;88:7;
 90:11,15;92:24;
 98:19
**causes (8)**
 10:12,13;14:7;
 32:7,20;47:22;49:19;
 94:11
**causing (2)**
 50:23;62:15
**Caylee (1)**
 4:23
**cells (2)**
 55:7;79:12
**center (1)**
 77:6

**Central (2)**
 23:6;61:14
**cerebral (4)**
 54:18;66:25;83:20;
 92:17
**cerebrospinal (6)**
 53:16;54:3,11;
 65:25;74:11;83:21
**certain (14)**
 8:6;28:17,19;
 41:15;42:8,8;45:4;
 46:10,11;48:24;
 64:15;68:14,14;
 86:21
**Certainly (5)**
 61:8;67:18;69:9;
 92:14;95:3
**Certificate (2)**
 69:19,25
**certified (1)**
 37:15
**cetera (1)**
 96:23
**change (5)**
 19:20;60:2;63:14;
 78:9,14
**change] (1)**
 26:3
**changes (2)**
 77:20;78:21
**changing (1)**
 78:21
**characteristic (1)**
 53:9
**characteristics (14)**
 29:2,3;31:16;43:7;
 44:10;52:17,25;
 58:12,14;59:24;
 65:19;80:19;81:11;
 93:8
**check (1)**
 27:15
**Chemical (1)**
 4:22
**choose (1)**
 42:19
**circle (1)**
 86:9
**circled (1)**
 85:20
**circular (15)**
 73:12;75:19;76:9,
 12,13,19,20,22;77:7,
 15,22;78:10,11,14,18
**circumstances (6)**
 50:25;51:23,24;
 52:24;68:14;96:8
**cite (2)**
 34:10;47:17
**cited (3)**
 69:18;71:5,10
**clandestine (2)**
 10:21,22

**class (1)**
27:7
**classes (3)**
25:6;34:21,23
**cleaned (2)**
96:21;97:17
**close (1)**
80:14
**closely (1)**
72:19
**closer (3)**
54:16;80:7,22
**clothes (1)**
70:21
**clothing (2)**
18:21;70:17
**cohesive (1)**
29:21
**collected (2)**
64:4;73:6
**collects (1)**
29:23
**college (3)**
23:3;25:6;27:3
**colleges (2)**
22:24,25
**color (4)**
64:18;75:4;79:9,10
**column (1)**
8:8
**combinations (1)**
56:9
**coming (1)**
83:23
**common (4)**
64:6;96:23,24;97:3
**community (1)**
97:4
**Company (3)**
4:23;38:24,25
**compare (2)**
46:14;80:18
**compared (1)**
33:9
**comparing (3)**
73:2;75:15;85:17
**comparison (2)**
45:15;46:13
**complete (1)**
7:20
**comprised (1)**
66:25
**computer (1)**
45:4
**concealed (1)**
11:18
**concentration (1)**
79:12
**conclude (4)**
20:4;21:23;60:7;
70:20
**concluded (4)**
48:23;49:8;60:17;

**89:4**
**concluding (1)**
85:7
**conclusion (8)**
11:21;62:9;69:23,
24;85:10;87:8;88:12;
89:24
**conclusions (16)**
10:18,20;11:6,16;
12:4;31:22;37:3,5;
58:21;61:2;67:19;
69:22;93:18;98:7,10;
99:5
**conduct (5)**
11:2;13:8;19:23;
21:14;37:12
**conducted (8)**
18:13;33:14;34:11,
17;35:15;46:20;68:7;
73:21
**conducting (1)**
20:23
**cone (5)**
94:9,10,15,16,21
**confirm (2)**
8:3;33:14
**confirming (1)**
98:18
**conjunction (2)**
12:19;49:18
**connection (1)**
79:23
**connections (1)**
58:23
**connective (3)**
54:19;55:9;56:12
**consider (5)**
25:16;39:17,21;
58:17;97:18
**considerations (1)**
29:19
**considered (1)**
39:15
**consisted (1)**
63:25
**consistent (9)**
62:14,15;63:3,7;
65:24;84:11;92:22;
95:22;96:2
**consultancy (3)**
38:7,9;39:4
**contacted (1)**
9:6
**contain (1)**
97:8
**contained (1)**
11:19
**context (20)**
13:13;32:24,25;
33:2;40:11;43:20;
44:17,21;48:10;
49:14;58:16;65:23;
83:18,19;85:11;88:6;

**90:13,16;91:19,20**
**continuing (1)**
80:10
**contribute (1)**
20:14
**contributed (1)**
44:22
**contributing (1)**
10:9
**controlled (4)**
33:14;50:25;51:2,6
**copy (6)**
6:20;7:12,13;
99:17,18,19
**coroner (1)**
12:14
**correct (29)**
4:17;5:5,5;7:19;
8:21;12:17,23;13:6,7,
9,18;23:10;29:7,17;
32:12;38:7,18;46:22,
25;47:2,5,6;55:20;
56:2;58:5;93:3;
97:17,23;99:10
**correctly (5)**
5:11;20:18;25:22;
29:15;55:24
**correlating (1)**
57:14
**counsel (3)**
4:9,20,22
**County (1)**
8:11
**couple (5)**
6:16;17:14;26:7;
27:12;76:20
**course (3)**
17:15;23:14;56:19
**courses (3)**
23:15;25:8;27:3
**court (3)**
41:18;42:8,12
**Courts (1)**
42:22
**covered (1)**
91:23
**covering (1)**
55:9
**create (6)**
43:21;44:18;45:22;
51:8;69:5;83:8
**created (15)**
31:5;34:19;43:24;
44:5,9;45:12;47:15;
49:22,24;50:7;59:12,
15;67:17;81:7;84:2
**creating (1)**
80:2
**credential (8)**
40:23;41:3,6,11,21,
24,25;42:3
**credentials (5)**
42:2,12,13,17,18

**credit (1)**
23:14
**Crime (7)**
10:25;11:5;12:3;
24:16;35:7;56:18;
57:9
**criminal (4)**
8:4,7,17,18
**criticism (1)**
40:2
**CURRICULUM (1)**
7:3
**curves (1)**
51:18
**CV (2)**
6:20;7:12

**D**

**daily (1)**
28:4
**Dalley (99)**
4:1,3;5:1,9;6:1;7:1,
3;8:1;9:1;10:1;11:1;
12:1;13:1;14:1;15:1;
16:1;17:1;18:1;19:1;
20:1;21:1;22:1;23:1;
24:1;25:1;26:1;27:1;
28:1;29:1;30:1;31:1;
32:1;33:1;34:1;35:1;
36:1;37:1;38:1;39:1;
40:1;41:1;42:1;43:1;
44:1;45:1;46:1;47:1;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1;
56:1;57:1;58:1;59:1;
60:1;61:1;62:1;63:1;
64:1;65:1;66:1;67:1;
68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1;
76:1;77:1;78:1;79:1;
80:1;81:1;82:1;83:1;
84:1;85:1;86:1;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1;95:1;
96:1;97:1;98:1;99:1
**damage (6)**
88:7,19;90:6,8,11,
18
**dark (1)**
58:3
**darker (1)**
79:13
**data (9)**
44:8;45:2,5,9,21;
46:4,6,21;47:13
**dead (1)**
20:14
**dealt (1)**
16:20
**death (15)**
9:22,23;10:9,11;
13:23,25;14:7,10;

**15:12;35:10;69:12,**
16,19,25;98:19
**decade (1)**
16:16
**December (1)**
4:14
**Defendants (2)**
4:4,22
**definitely (1)**
75:3
**degree (8)**
22:16;24:18,21;
25:12,14;42:9;53:24;
75:17
**degrees (7)**
76:16;77:5;94:22,
22,25;95:2,7
**dense (1)**
94:19
**depend (1)**
28:15
**depending (6)**
51:15;52:17;58:3,
6;76:5;92:11
**depends (4)**
19:17;52:19;74:2;
94:23
**deponent (1)**
5:7
**deposed (1)**
5:19
**deposition (5)**
3:4,12;4:13;5:3;
37:8
**derive (1)**
31:22
**derived (1)**
45:5
**describe (12)**
8:25;11:15;17:3,5,
11;31:15,21;33:19;
51:13,15;67:18;86:5
**described (4)**
46:19;47:3;48:22;
95:21
**Describing (1)**
58:13
**description (1)**
86:4
**descriptions (1)**
20:11
**destiny (1)**
43:18
**detail (4)**
71:12;77:19,24;
78:19
**detailed (2)**
20:16;21:7
**determine (23)**
18:18;21:17;27:8,
13;28:13,22,24;29:4,
6,8,14;30:12,17;32:5,
20;35:21;40:15;

49:24;52:22;62:23;
64:8;70:22;83:14
**determined (1)**
    28:9
**determining (3)**
    27:20;30:8;35:16
**device (1)**
    27:12
**died (1)**
    69:22
**difference (2)**
    73:24;79:24
**differences (1)**
    54:5
**different (27)**
    11:9;12:23;20:19;
    34:9;36:5;40:22;
    41:4,16,19;45:13;
    46:12;53:2;54:4;
    56:9;60:13,13,14;
    73:3;74:7;79:25;
    80:4,5,5;83:11;
    84:23;89:12;93:9
**difficult (1)**
    54:8
**direct (2)**
    15:2;49:10
**direction (2)**
    42:23;78:17
**directionality (2)**
    77:17;80:11
**directly (2)**
    39:2;77:5
**disagree (1)**
    40:21
**disagreement (2)**
    40:10,17
**discipline (1)**
    36:22
**discuss (1)**
    67:5
**discussed (1)**
    13:13
**dislocation (1)**
    72:3
**dispersed (1)**
    80:6
**dispersion (4)**
    94:9,10,15,21
**distance (1)**
    43:17
**distribution (2)**
    59:25;67:13
**DNA (1)**
    49:17
**doctor (1)**
    5:14
**document (1)**
    56:22
**documentation (6)**
    19:19,22;20:3;
    21:7;89:19;97:4
**documented (1)**

19:21
**documents (1)**
    40:10
**done (16)**
    12:25;13:3;19:18,
    19;20:10;27:10;
    33:16;35:20;44:20;
    46:7;47:24;52:9;
    63:19;68:12;71:24;
    94:3
**doubt (1)**
    49:4
**down (3)**
    57:11;92:7,20
**dozen (1)**
    15:22,23,25;16:2,3
**Dr (1)**
    5:10
**dragged (1)**
    69:5
**drag-like (3)**
    68:23,25;69:7
**draw (2)**
    45:14;67:19
**drawing (1)**
    20:10
**Dreasjon (1)**
    8:11
**dried (1)**
    64:18
**dries (1)**
    84:16
**drop (2)**
    34:2;78:5
**droplet (1)**
    54:9
**droplets (4)**
    59:22;63:24;64:4;
    94:13
**drops (2)**
    34:7;50:9
**due (1)**
    5:23
**duly (2)**
    3:12;4:4
**Dunedin (2)**
    26:8,9
**duplicate (1)**
    44:15
**dynamic (2)**
    55:4;56:8
**dynamics (25)**
    25:9,13,15,17,21,
    24;26:11,15,18,20,
    21,23,24;27:2;32:19;
    39:25;45:14,17;55:2,
    12,23,25;58:9;93:3,6

──────── **E** ────────

**earlier (3)**
    14:12,17;26:17
**East (1)**

23:6
**Eastern (1)**
    4:15
**Eastman (1)**
    4:22
**edge (2)**
    73:5;76:24
**educated (1)**
    83:5
**education (4)**
    22:6,10,11;26:25
**effect (2)**
    29:25;53:11
**effects (1)**
    30:5
**eight (1)**
    23:22
**either (3)**
    34:11;49:5;91:2
**either/or (1)**
    65:14
**ejected (1)**
    83:3
**electronics (1)**
    28:2
**elliptical (16)**
    75:22,24,24;76:4,
    18,20;77:9,20,23;
    78:12,15,18;79:11;
    80:10;83:13;84:2
**else (5)**
    37:21;81:16;89:11;
    90:15,16
**end (7)**
    77:7,10,14,14,15,
    16;85:13
**ends (1)**
    73:7
**engine (1)**
    11:20
**engineering (5)**
    24:19,24;25:3,4,6
**English (1)**
    65:13
**enlarged (1)**
    98:4
**enough (2)**
    15:4;71:15
**entire (1)**
    84:4
**environment (2)**
    33:14;52:18
**Epstein (1)**
    47:15
**equipment (1)**
    33:23
**equivalent (1)**
    41:10
**Erick (2)**
    4:10,11
**Erin (1)**
    4:23
**error (1)**

76:12
**especially (1)**
    20:12
**establish (2)**
    58:23,24
**establishing (1)**
    51:3
**Estate (1)**
    4:10
**et (1)**
    96:22
**evacuation (1)**
    92:3
**Evelyn (1)**
    4:11
**even (5)**
    58:7;60:21;84:20;
    89:17;97:13
**events (3)**
    11:10;50:21;58:25
**eventually (1)**
    27:6
**evidence (27)**
    15:2;19:16,17;
    21:3,10,12;49:18;
    57:15;58:15,18,22;
    59:2;62:13;63:2,4,7;
    66:6;83:4;89:5,15;
    90:4,25;91:14,23;
    92:4;96:25;97:21
**evidentiary (1)**
    57:14
**exact (3)**
    14:25;30:6;94:17
**exactly (4)**
    19:13;23:23;24:3;
    98:18
**examination (3)**
    63:20;72:8;96:18
**examine (2)**
    40:21;43:6
**examined (4)**
    4:6;18:17,24;52:14
**examiner (1)**
    71:24
**example (21)**
    12:20;20:6;21:18;
    28:20;32:12;33:5;
    41:8;43:16;47:13,14;
    48:6,18;54:5;58:11;
    59:17;73:23;74:3;
    80:21;85:13;94:4,11
**except (1)**
    3:8
**exception (1)**
    15:8
**exclude (1)**
    87:15
**excluded (1)**
    44:19
**excludes (1)**
    49:19
**Excluding (1)**

33:2
**excuse (2)**
    24:7;30:24
**exercises (1)**
    34:14
**Exhibit (14)**
    6:19,21,23;7:2,5,7;
    8:5;14:15,21;15:5,
    14;37:7;56:16,20
**exhibits (3)**
    6:16,17;7:10
**exigencies (1)**
    5:23
**exists (1)**
    98:20
**expelled (1)**
    92:17
**expenses (1)**
    37:19
**experience (5)**
    22:7;24:10;27:19;
    31:10;73:15
**experiment (2)**
    35:16,18
**experiments (26)**
    27:5;33:13,16,19;
    34:11,14,17;35:20;
    44:13;46:7,20,23;
    47:24;50:25;51:3,6;
    52:9;67:22;68:6,11,
    12,16,18;73:20;
    93:21;94:3
**expert (16)**
    11:24;12:2,23;
    25:17;32:18;42:10;
    75:11;79:3;84:16,18;
    85:10;87:7,7;89:5,
    24;93:2
**expertise (3)**
    25:21;32:22;33:5
**experts (3)**
    12:4;47:11,12
**expert's (1)**
    12:13
**explain (6)**
    29:10,19,22;49:21;
    50:7;79:24
**explaining (1)**
    78:17
**explanation (1)**
    29:10
**Explorer (12)**
    61:25;88:7,9,14,
    19;89:13;90:12;
    91:12,21;95:16,19,21
**exposure (1)**
    10:5
**extended (2)**
    68:23;69:3
**extension (3)**
    36:16;82:13;88:22
**extensions (1)**
    73:4

**extent (4)**
  21:4;26:10,19;
  67:21

**F**

**facility (1)**
  27:22
**fact (8)**
  14:5;18:19;21:22;
  66:2;83:8;85:20;
  89:8;95:13
**facts (1)**
  17:12
**Fair (3)**
  15:4;60:15;86:4
**fairly (2)**
  59:24;76:11
**fall (1)**
  92:2
**falling (2)**
  33:21;92:22
**falls (3)**
  8:7;33:22;34:2
**far (4)**
  21:17;31:16;98:17,
  23
**farther (1)**
  94:18
**fashion (1)**
  52:5
**fat (1)**
  66:25
**father (2)**
  4:10;94:13
**February (1)**
  7:24
**felt (1)**
  86:22
**few (2)**
  86:12;96:16
**field (5)**
  39:16;40:20;45:8;
  47:11,12
**figure (24)**
  12:21;26:19;61:10;
  69:7,10;70:2;71:9;
  72:14;79:8;83:13;
  84:10,20,20,24,24;
  85:2,20;86:9,10,12,
  16,24;87:8;88:3
**figures (3)**
  7:14;78:24;79:19
**filing (1)**
  3:4
**final (1)**
  32:8
**find (3)**
  85:16;90:14;91:20
**finding (1)**
  37:3
**findings (1)**
  40:3

**fine (2)**
  5:17;6:11
**firearm (6)**
  9:16;10:8;14:13,
  15,16,18
**fireman (1)**
  9:19
**first (8)**
  4:4;18:11;19:25;
  23:10;35:20;61:24;
  65:2;96:19
**five (3)**
  6:23;57:16;87:22
**five-step (2)**
  57:8,13
**flat (1)**
  51:17
**flecks (3)**
  86:4,6,7
**flier (1)**
  57:4
**flies (3)**
  33:5,10;34:18
**flight (10)**
  51:17;54:25;55:4,
  11,23,25;56:8;83:23;
  93:2,6
**flights (1)**
  51:20
**flowchart (1)**
  58:21
**fluid (78)**
  25:9,12,15,17,21,
  23;26:10,14,18,20,
  21,23,24;27:2,9;28:9,
  11,13,14,15,18,22;
  30:14,15,18;31:19,
  23;32:19;39:25;
  45:14,17,19;52:12;
  53:16,17,21;54:3,11,
  20,23;56:11;65:17,
  20;66:2,7,9,10,11,16;
  67:2;73:17,18;74:10,
  12;79:16,23;80:8,10,
  14,21;81:2,13,14,18,
  19,21,22;82:6,7,16;
  83:3,16,16,21,24;
  84:2;85:20;93:9
**fluids (21)**
  27:20;30:14,19;
  31:13;53:22;65:21;
  66:5;73:21,22,25,25;
  74:7,18,20,21,25;
  75:2;79:15;80:18;
  81:10;82:14
**focus (3)**
  38:12,13;78:7
**focused (1)**
  26:14
**follow (1)**
  81:4
**follows (1)**
  4:6

**food (2)**
  27:12,22
**foot (2)**
  68:24;69:3
**Footnote (4)**
  59:7;66:22;71:4;
  95:25
**force (14)**
  10:4,14;11:8;
  14:21,24;15:7,10,16;
  16:7;69:13,16,22;
  94:10;95:14
**forces (5)**
  32:7;35:22;43:21;
  53:2;58:15
**Ford (9)**
  61:24;88:14,19;
  89:13;90:12;91:12;
  95:16,18,21
**forensic (6)**
  12:15,23;24:15,15;
  41:17;71:24
**forgot (2)**
  23:2;47:15
**form (13)**
  3:8;30:16;34:7;
  36:25;56:3;65:10;
  67:7;80:10;81:23;
  83:2;87:11;90:2;
  93:23
**formal (1)**
  26:25
**format (1)**
  58:5
**formation (3)**
  26:16;27:4;30:5
**formed (10)**
  25:19;29:4,11,20,
  24;44:12;47:23;77:2;
  81:11;98:7
**forms (1)**
  34:2
**forward (1)**
  64:21
**found (1)**
  18:17
**fourth (1)**
  57:10
**fracture (2)**
  71:22;92:14
**fragile (1)**
  54:21
**fragmentation (1)**
  48:7
**fragments (1)**
  68:8
**frame (1)**
  23:25
**France (2)**
  26:14;33:24
**front (3)**
  8:12;61:16;85:13
**full (1)**

31:7
**fun (1)**
  87:25
**FURTHER (2)**
  3:6,10
**future (1)**
  45:7

**G**

**Gardner (2)**
  39:9;40:7
**gendarmarie (1)**
  26:13
**general (6)**
  22:19;23:11;25:23;
  26:18,24;94:17
**generally (4)**
  10:16;30:16;42:20;
  94:19
**Germaine (1)**
  26:2
**Germaine's (1)**
  27:7
**gets (1)**
  83:22
**girl (3)**
  17:16;18:14;48:18
**given (4)**
  20:12;52:23;65:24;
  83:19
**gives (1)**
  46:13
**glass (1)**
  84:6
**Gonzalez (1)**
  4:11
**good (1)**
  71:15
**grades (1)**
  23:16
**graduate (1)**
  22:16
**Graff (103)**
  4:1,3;5:1,9,10,12,
  12,16;6:1;7:1,3;8:1;
  9:1;10:1;11:1;12:1;
  13:1;14:1;15:1;16:1;
  17:1;18:1;19:1;20:1;
  21:1;22:1;23:1;24:1;
  25:1;26:1;27:1;28:1;
  29:1;30:1;31:1;32:1;
  33:1;34:1;35:1;36:1;
  37:1;38:1;39:1;40:1;
  41:1;42:1;43:1;44:1;
  45:1;46:1;47:1;48:1;
  49:1;50:1;51:1;52:1;
  53:1;54:1;55:1;56:1;
  57:1;58:1;59:1;60:1;
  61:1;62:1;63:1;64:1;
  65:1;66:1;67:1;68:1;
  69:1;70:1;71:1;72:1;
  73:1;74:1;75:1;76:1;

77:1;78:1;79:1;80:1;
  81:1;82:1;83:1;84:1;
  85:1;86:1;87:1;88:1;
  89:1;90:1;91:1;92:1;
  93:1;94:1;95:1;96:1;
  97:1;98:1;99:1
**grand (2)**
  8:9,12
**gravesite (1)**
  11:11
**gravity (1)**
  27:15
**great (1)**
  26:5
**ground (1)**
  92:23
**grouped (1)**
  55:7
**guess (17)**
  14:11;15:20,24,25;
  21:11;30:7;41:20;
  44:3,23;45:21;49:20;
  55:25;71:16;80:13;
  83:6;87:19;98:25
**guessing (1)**
  80:16
**gunshot (1)**
  14:7
**guys (1)**
  37:19

**H**

**hand (3)**
  57:2;60:6;83:5
**happen (5)**
  79:14;83:11;93:12,
  13;94:4
**happened (4)**
  44:14;49:13;60:22;
  97:5
**happening (1)**
  36:24
**happens (8)**
  34:7,8,9;68:13;
  79:13;82:19;93:7;
  94:24
**hard (5)**
  4:16;45:14;70:22;
  92:13;93:14
**head (44)**
  48:6,9;62:6,11,14,
  15;63:3,8;65:25;
  66:2;70:7;78:12;
  88:8,9,13,17,18,22,
  23;89:2,7,10,16,21,
  25;90:5,7,11,22,25;
  91:10,11,11,15,18,22,
  25;92:2,7,9,15,16;
  95:4,5
**headlight (4)**
  88:10;90:12,20,21
**headquarters (1)**

26:13
**help (4)**
29:10,22;45:22;
58:8
**helped (1)**
27:23
**helpful (1)**
19:20
**helps (2)**
29:3,19
**HEREBY (2)**
3:2,5
**herein (1)**
4:4
**Here's (3)**
29:25;50:3;83:6
**hereto (3)**
3:3,7,11
**High (11)**
22:23;23:9,17,18,
21;24:11;33:24;34:6;
47:13,20;50:20
**highlighted (1)**
72:15
**highlighting (2)**
86:21;87:5
**highway (1)**
18:9
**hiring (1)**
38:24
**histograms (1)**
58:2
**hit (11)**
16:25;17:19;60:8;
90:20,21,24;91:11,
11,12,15,22
**hit-and-run (6)**
17:17;18:12,14,15,
19,25
**hits (2)**
55:15;94:18
**hitting (1)**
91:25
**hold (2)**
41:16,21
**holds (3)**
41:5;67:25;80:9
**homogenous (7)**
54:15,17;55:6;
56:2;81:19;93:11,15
**hour (1)**
16:23
**hours (1)**
24:14
**husband (5)**
37:9,12,17,22;39:3
**hypotheses (2)**
82:21;83:2
**hypothesis (6)**
82:18;83:4,5,7,7,9
**hypothetical (1)**
93:21

# I

**IDENTIFICATION (4)**
7:2,5,8;56:20
**identified (1)**
78:24
**identify (11)**
21:21;32:3,14,16;
43:7;64:13;70:3;
76:24;86:22,22;87:6
**identifying (3)**
31:16;32:24;58:25
**image (4)**
58:4;72:19,19;
89:20
**images (10)**
20:8,9,9;33:21;
57:25;72:21,25;
75:15;85:12,14
**imaging (1)**
98:5
**immediately (1)**
86:8
**impact (31)**
18:8;32:11,12;
34:8;43:16;60:10,10,
11;61:14,17,18,19,
21,24,25;62:3,9,15;
67:6;73:5;88:8,18,
25;89:6,14,17,24;
90:15;91:8;92:13;
95:11
**impacted (2)**
76:25;92:11
**impacts (2)**
60:14;61:2
**implements (2)**
14:25;28:6
**important (9)**
36:2,3,6,10,13,14,
20;37:14;51:3
**impossible (1)**
55:25
**impression (1)**
48:19
**include (2)**
49:17;98:25
**included (4)**
21:8;22:20;25:7;
27:2
**incorrect (1)**
70:19
**independent (2)**
69:21,23
**Indiana (1)**
9:7
**indicate (1)**
59:19
**indicating (1)**
66:17
**indictment (2)**
8:17,19

**individual (9)**
31:17;43:9,18;
59:22;60:2;76:10;
77:17;94:13,20
**individually (2)**
78:3,6
**information (14)**
12:18,22;13:12;
20:15,25;21:8;45:6;
49:11;56:19;57:20,
23;62:5,12;76:11
**informs (1)**
46:5
**initial (9)**
5:21;61:19,21;
88:20,25;89:6,12,13,
16
**initially (1)**
60:8
**injured (2)**
71:2;88:18
**injuries (12)**
9:25;10:3;14:9;
46:10;47:4;62:24;
63:5,8,11;70:3;95:4;
99:8
**injury (11)**
14:16;48:8,20;
69:12;90:22;91:2,4,
6;92:3,23,24
**inside (3)**
11:23;22:3;53:2
**interstate (1)**
18:9
**into (5)**
37:2;45:3;59:22;
72:20;94:5
**introduce (1)**
6:15
**investigated (1)**
16:6
**investigation (10)**
9:22;15:15;19:23;
21:2;24:13,16;35:11;
45:11;46:4;60:5
**investigations (3)**
47:4,8;48:14
**INVESTIGATIVE (1)**
56:18
**involve (14)**
9:12,18,21;10:8;
13:22,24;14:13,15,
18,21;15:6,11;18:5,8
**involved (15)**
9:16;10:20;11:10,
12,16;14:10;15:16;
16:6,25;17:6,13;
18:14,25;19:9;96:20
**involves (1)**
45:16
**involving (4)**
16:21;19:8;48:14;
64:23

**Iris (6)**
4:3;5:9,12,15,17;
7:3
**Island (1)**
26:4
**issue (2)**
42:15;52:13
**issued (1)**
8:20
**issuing (1)**
12:5
**items (1)**
58:22

# J

**Jacob (1)**
4:8
**joined (1)**
24:12
**journal (10)**
35:3,5,13,19,24;
36:2,8,9,11;46:24
**journals (1)**
34:25
**judgments (1)**
31:9
**jump (1)**
59:4
**juniors (1)**
23:19
**jurisdictions (5)**
41:15,19;42:5,5,10
**jury (2)**
8:9,12

# K

**Kastle (2)**
64:20,22
**kind (7)**
18:22;28:18;58:6;
60:20;83:16;92:23;
99:19
**kinds (3)**
30:16;58:5;74:7
**knew (2)**
48:3,5
**knowing (4)**
30:12;50:11,12,15
**knowledge (4)**
9:24;15:6;55:3;
98:13
**known (3)**
46:13;47:21,21
**known-cause (1)**
48:13

# L

**land (1)**
68:3
**language (1)**

**65:13**
**large (1)**
94:21
**last (6)**
16:5;8,9,16,16;
58:20
**late (1)**
5:4
**later (2)**
57:22;97:14
**latitude (1)**
87:21
**law (1)**
41:9
**lawyer (1)**
41:8
**laying (1)**
17:20
**lead (1)**
92:3
**leading (4)**
8:16;14:10;73:5;
76:24
**learn (1)**
36:22
**least (7)**
53:12;61:5,12,12,
13,22;79:18
**leave (1)**
92:20
**led (1)**
49:12
**left (3)**
24:4;65:5;89:17
**leg (11)**
70:25;71:2,6,9,11,
14,19,22,23;72:4,12
**length (1)**
55:19
**less (3)**
15:22;16:2;94:19
**level (3)**
42:9;88:9;90:7
**license (1)**
41:9
**lid (2)**
84:6;92:19
**ligament (1)**
59:21
**light (3)**
86:8;87:9,9
**limited (1)**
21:9
**limits (1)**
28:19
**linear (1)**
59:24
**liquid (1)**
81:7
**liquids (1)**
27:18
**list (8)**
6:21;7:18,24;14:6,

14;34:13;47:19;
57:16
**listed (10)**
7:22,24;8:4;9:12,
15;10:11;12:12;
15:14;18:5,8
**listing (1)**
7:17
**litany (1)**
5:22
**little (6)**
44:24;45:14;73:12;
77:8,16;87:21
**live (1)**
37:17
**living (1)**
94:5
**local (2)**
22:24,25
**locate (1)**
57:21
**location (2)**
11:9;94:17
**logos (1)**
56:24
**long (2)**
23:20;51:25
**longer (2)**
96:23;97:8
**longest (1)**
22:23
**look (41)**
7:18;19:12;28:19,
25;29:18;30:13;31:6,
8;34:7,8;43:7,11,12,
13,13,15;44:10,11,
16;45:10,18,22,24;
46:2;9;47:12,13;54:8,
17;56:16;70:2;71:23;
77:6;78:3;81:14;
83:12,18;84:4,5;
86:3;97:13
**looked (11)**
18:16,20;34:5;
45:3;47:23;69:4;
73:24;80:23;85:14;
87:4;97:15
**looking (41)**
22:5,8;30:10,11,
23;31:2,4;32:21,23;
34:6;36:21;43:15;
45:11;47:21;49:3;
54:18,19;56:9;57:25,
25;58:11;59:17;
60:16;62:13;65:17;
67:24;71:8,13;72:18,
25;75:14,15;79:8;
80:12;81:2;82:10;
83:14;85:12,15;
87:13;97:19
**looks (5)**
31:9,20;66:19;
71:9,20

**lot (4)**
17:15;54:19,20;
76:12
**lower (3)**
54:6;74:3;88:9

**M**

**machine (1)**
27:22
**Madison (1)**
8:11
**main (1)**
38:12
**major (2)**
25:4;76:4
**makes (2)**
55:15;61:13
**making (1)**
27:17
**man (2)**
17:18,21
**many (6)**
9:15;12:12;15:13,
14;61:12;78:7
**margins (3)**
31:18;43:11;45:25
**mark (11)**
6:16,18,20;26:2;
27:6;56:16;68:23,25;
69:2,7;86:15
**MARKED (7)**
6:25;7:4,7;10:25;
37:7;56:19;57:2
**marketing (1)**
57:4
**marks (1)**
74:8
**mass (1)**
93:13
**masses (1)**
66:24
**massive (3)**
48:6,8;65:25
**master's (2)**
22:13,14
**matches (1)**
48:20
**material (1)**
66:25
**materials (5)**
34:13,20,23;57:17;
66:17
**math (1)**
23:11
**mathematical (4)**
49:20,23,25;50:6
**mathematically (1)**
51:14
**Matter (4)**
10:25;68:7;83:20;
84:20
**matters (1)**

8:4
**may (19)**
3:12;32:7;35:22,
22;39:17;40:13;42:7,
7;47:12;55:18;56:13;
63:8;64:17;70:23;
71:19,19;74:11;
93:11;95:12
**maybe (9)**
24:6;25:5;44:23;
50:5;56:14;65:17;
78:9,10;90:19
**McAlester (5)**
22:22;23:9,17,21;
24:11
**mean (25)**
15:19;25:5;38:19,
21;41:2;43:25;49:25;
51:20;59:10,13,16;
66:16;68:25;70:6,19;
74:6;75:20,24;76:19;
81:25;84:8;86:4;
89:23;91:3;99:10
**meaning (1)**
78:21
**means (6)**
6:2,7;8:16;12:4;
13:5;82:13
**measure (1)**
75:24
**measured (1)**
28:10
**measurements (2)**
76:13,15
**measuring (3)**
76:3;10:81:8
**median (6)**
62:2,10;72:23;
74:9;75:19;77:11
**medical (4)**
20:13;69:20;72:8,8
**meninges (2)**
55:10;56:14
**mentioned (1)**
18:12
**meteorologist (2)**
45:2,9
**meteorology (2)**
45:16,20
**metrology (1)**
45:13
**Meyer (2)**
64:20,22
**Michael (1)**
47:15
**might (4)**
58:18;86:24,25;
94:4
**miles (1)**
16:23
**mind (1)**
17:14
**minimum (2)**

21:12,13
**minor (2)**
25:4;76:3
**minutes (1)**
87:23
**misstated (2)**
14:2,17
**misunderstood (1)**
14:11
**mixed (4)**
66:3,5,20;74:9
**mixture (2)**
65:20;81:19
**model (4)**
49:25;50:17,19;
58:8
**models (10)**
43:23,25;44:4,7;
45:4;49:21,23;50:5,
6;58:8
**Mollins (2)**
10:7;14:6
**Mollin's (1)**
10:18
**moment (2)**
8:2;16:19
**monoxide (2)**
10:5;11:22
**More (28)**
15:22;16:3;20:15,
15;21:7,7;23:14;
27:25;44:25;54:8;
56:11;59:11,14;61:8;
63:19;75:21,23;76:9,
11,13;77:8,15,15,16;
78:11;80:6,6;87:23
**Moreno (1)**
4:12
**most (6)**
5:24;19:11;23:19;
70:16;76:19;77:3
**mostly (6)**
75:19;76:18,18;
77:22;78:10,14
**motion (2)**
11:20;59:20
**motor (6)**
16:22;17:6,13;
18:8;19:8;48:15
**move (4)**
59:5;64:21;77:7;
94:13
**moved (1)**
91:24
**movement (3)**
31:19;32:6;60:4
**moves (8)**
29:22;50:11,15,17;
52:4;93:15,22;94:12
**moving (6)**
14:22;15:3,7,11,
16;93:7
**Mrs (1)**

5:12,16
**much (12)**
27:25;36:23;43:6;
53:25;54:6,8,11,16;
74:3,15;79:9;87:20
**Mullins (3)**
9:20;14:13,24
**Mullin's (1)**
13:21
**multiple (1)**
18:3
**multitude (1)**
9:25
**must (5)**
42:14,15;58:25;
80:20;85:9
**myself (2)**
26:6;94:3

**N**

**name (5)**
5:8;23:2;27:11;
28:5;47:16
**nature (1)**
77:20
**necessarily (2)**
20:25;78:20
**necessary (1)**
20:5
**need (6)**
29:24;30:23;31:4;
57:21;72:2;81:16
**needs (1)**
36:17
**Nehemias (19)**
4:9,10;60:7;62:18,
21,24;63:5,18;64:23;
65:4;68:24;69:12;
70:4;88:8,8,13;89:2,
6;92:7
**Nehemias' (2)**
62:11;90:19
**neither (1)**
88:15
**New (4)**
4:6;26:4,5,11
**Newtonian (5)**
52:12,13;53:10,16,
19
**next (1)**
60:20
**nine (1)**
23:22
**Nobody (1)**
64:3
**nonabsorbent (1)**
43:15
**non-blood (2)**
53:22;73:21
**none (1)**
15:10
**Non-Newtonian (5)**

52:12,14;53:10,16,
  19
nonresponsive (1)
  43:2
non-vacuum (1)
  51:24
non-water (1)
  66:15
normal (1)
  67:4
normally (1)
  5:21
north (5)
  77:7,11,13,14;
  78:11
Notary (2)
  3:13;4:5
notes (1)
  19:12
noun (1)
  26:2
number (14)
  15:18,21;16:13;
  22:7;23:7;27:10,17;
  28:6,11;30:6;33:16,
  20;52:15;53:4
numbers (1)
  29:24
numerous (3)
  35:20;73:8,11

O

object (3)
  42:25;59:20;60:4
objection (8)
  5:6;56:3;67:7;
  81:23;82:4;87:11;
  90:2;93:23
objections (1)
  3:8
observable (1)
  51:21
observation (3)
  67:24;73:14;85:22
observations (1)
  99:6
observed (3)
  47:25;93:18,25
obvious (1)
  72:3
obviously (5)
  49:14;71:6,11,12;
  74:6
occasionally (1)
  38:9
occur (1)
  50:21
occurred (9)
  10:22;11:9;13:14;
  32:15,17;59:2;89:25;
  90:22;94:2
officer (1)

71:10
officer-involved (1)
  9:2
officers (1)
  99:2
official (1)
  20:12
often (1)
  54:18
Oklahoma (1)
  23:3;24:12
one (42)
  8:6,20;10:12;
  15:10;16:8,9,9,11,16,
  18,18;17:16;18:12,
  16;19:5,10;21:5,19,
  19;23:12;29:19;35:6,
  6;46:21;49:13,15,15;
  50:3;57:4;59:11,14;
  60:20;61:13,24;73:3;
  75:8,16;84:25;86:19;
  96:6;99:7,14
ones (6)
  9:18;15:13;35:23;
  73:3;79:6,7
one's (1)
  47:16
only (8)
  6:9;16:11;21:19;
  25:18;35:6;49:15;
  89:8;91:19
onto (1)
  74:18
open (12)
  62:6,14;63:3,8;
  65:25;66:2;89:15;
  90:5;92:2,8,15,19
opened (2)
  91:16,17
opinion (8)
  42:15;61:11,20;
  75:10,11;79:3;89:5;
  92:7
opinions (1)
  98:7
opportunity (1)
  97:20
opposed (2)
  38:23;49:7
order (2)
  20:4;21:2
organic (1)
  84:20
organization (3)
  35:14;40:15;57:19
organizations (2)
  42:14;68:21
organizes (1)
  57:20
orientation (2)
  60:13;85:4
original (4)
  73:4;97:5,13;99:14

originally (1)
  9:7
originated (2)
  50:14;76:25
others (6)
  15:10;42:8;47:25;
  48:2;56:12;58:18
otherwise (1)
  8:17
Otogo (1)
  26:3
ourselves (1)
  44:13
out (8)
  12:21;17:22;18:2;
  41:5,22;61:10;69:4,6
outline (1)
  86:13
outlined (1)
  86:12
outside (8)
  21:25;26:14;34:20;
  38:24,25;49:19;53:3;
  68:17
over (12)
  16:13,22;17:15,21,
  24;18:2;27:4;48:19,
  21;67:24;73:15;85:4
overall (5)
  21:6;43:9;51:11;
  62:13;85:2
overstate (1)
  37:4
own (2)
  22:6;27:5

P

page (8)
  57:11;59:7;64:25;
  65:3;68:22;69:15;
  78:24;88:2
pants (1)
  70:16
paper (2)
  35:9,12
papers (3)
  34:16;40:3,6
parabola (5)
  50:12;51:10,11,14,
  16
parabolic (3)
  51:19,22;52:4
paralegal (1)
  4:24
parallel (1)
  65:4
paramedics (1)
  99:2
parameters (1)
  98:10
Paris (1)
  26:14

part (13)
  11:4;19:25;21:5;
  23:19;29:2;38:2;
  63:14;78:9,11;85:4;
  89:12,13;90:21
participated (1)
  15:15
particular (11)
  16:18;25:20;31:18;
  33:4;35:16,21;40:12;
  43:11;45:11;73:2;
  95:4
particularly (5)
  26:15;33:22;41:17;
  47:14;53:5
parties (3)
  3:3,7,11
partner (5)
  38:3,3,15,17,19
partnered (1)
  39:13
partners (1)
  38:21
past (3)
  6:22;45:3;48:14
path (3)
  51:11,17;65:3
pathologist (1)
  12:14
pathology (5)
  12:9;62:20;63:23;
  98:12,18
pattern (99)
  9:5;11:3,4,7;12:2;
  19:16;20:18,21,22,
  24;21:5,14,15,20;
  29:14;30:9,11,12,23;
  31:2,3,5,6,7,12,13,16,
  18,21,23;32:2,4,6,8,
  10,11,12,14,15;
  33:17;34:3;35:21;
  37:13,15;38:6,9;
  39:16,22;40:24,25;
  41:6,11,22;42:14,21;
  43:4,5,9,10,13,19,22;
  44:19,22;46:3;49:21,
  24;51:4;53:11;59:11,
  13,18;60:3,10,10,12;
  61:14,15,18,18;
  62:10;64:7;65:8;
  67:5,12;69:9;75:13;
  77:8,10;80:5,5,23;
  81:5,7;85:3;94:20;
  96:2,5,6
patterns (53)
  26:16;29:4,9,11,18,
  20,23;30:5,13,16;
  32:3,21,21,23;34:19;
  35:17;36:25;42:16;
  43:24;44:5,9,12;46:8,
  11,18;47:4;50:7,8;
  53:7,22,25;54:7;
  55:14;58:12,13;

60:16;61:3,23;67:17,
  20;73:22;74:22,24;
  79:19,25;81:14,21;
  82:7,9,10,11;83:2;
  85:8
pavement (7)
  65:4;68:23,25;
  69:2;92:8,21,24
pedestrian (6)
  9:12;16:22;17:6,
  13;18:9;19:8
pedestrians (2)
  16:25;48:14
peer (8)
  34:24;35:25;36:5,
  10,12,13;37:6;68:19
peer-reviewed (1)
  35:18
people (5)
  17:20;20:19;34:6;
  39:17;47:12
per (1)
  54:23
percent (2)
  58:2;60:25
perfect (5)
  5:18,18;6:11;32:9;
  63:16
performed (1)
  93:20,21;98:13
period (1)
  31:7
perpendicular (1)
  77:4
person (9)
  13:12;18:24;19:16,
  24;20:6,13;21:3;
  42:19;85:25
personally (7)
  13:10;28:10;46:7,
  8,20;47:24;64:19
person's (1)
  68:11
petroleum (1)
  66:20
petroleum-like (1)
  66:7
petroleum-type (1)
  66:10
photo (6)
  28:13,23,25;31:3,
  6;71:16
photographic (3)
  96:25;97:12,21
photographs (9)
  21:24;75:12;97:9,
  10,12,22,25;99:3,10
photography (2)
  33:25;50:20
photos (1)
  75:6
phraseology (1)
  20:19

**physical (9)**
22:18,19;23:12;
29:2,3,25;43:7;
44:10;94:16
**physically (2)**
18:23;19:3,10
**physics (5)**
23:12;24:22;25:3,
7;27:3
**physiology (2)**
22:20;46:16
**pickup (1)**
17:19
**picture (3)**
70:23;71:3,13
**pictures (2)**
78:4;85:17
**pieces (3)**
68:2,3;93:10
**place (3)**
60:13;92:17;96:6
**placement (1)**
23:13
**places (1)**
58:3
**plaintiff (1)**
4:9
**Plaintiff's (7)**
6:19,20,23,25;7:4,
7;56:19
**plant (1)**
27:13
**please (2)**
6:5;29:17
**plug (1)**
50:2
**pm (1)**
4:16
**point (9)**
14:19;25:10;40:16;
44:15;51:18;57:11;
63:6;69:6;76:14
**points (2)**
40:13,22
**Police (3)**
9:7;71:5;99:2
**pool (1)**
69:4
**portion (2)**
40:12;51:17
**portions (1)**
55:8
**position (3)**
24:4;71:20;72:4
**positive (1)**
64:21
**possibilities (2)**
44:16;91:13
**possibility (2)**
44:18;49:15
**possible (18)**
15:8;18:18;32:25;
33:2;43:6;59:3;61:6;

63:10,12;64:13;66:4;
70:3;74:13;84:8;
89:11;91:23;92:12,
13
**possibly (5)**
58:6,7;64:18;
79:15;92:15
**posture (1)**
88:23
**potential (5)**
10:8,16;32:7;
58:15;76:12
**practice (1)**
64:6
**practicing (1)**
41:9
**predict (7)**
43:23;44:4,9;
81:13,21;82:7;93:14
**predicting (3)**
82:9,15;93:17
**prediction (2)**
82:17;83:10
**predictions (2)**
45:7;82:22
**prefer (3)**
5:13,16;64:20
**preferred (2)**
19:15;63:17
**preparation (1)**
58:10
**preparing (1)**
57:24
**prerequisite (1)**
30:8
**present (9)**
4:23;16:11;42:6;
45:6;48:8;58:19;
67:11;75:17;96:23
**presentations (1)**
68:20
**presented (6)**
10:16;26:2,13;
34:23;58:17;63:21
**presenting (1)**
41:18
**pressed (1)**
89:9
**primarily (11)**
22:22;23:8,18;
24:15;36:23;38:21;
65:18;72:25;79:21;
80:2;84:12
**primary (4)**
10:11,12;13:22,24
**prime (1)**
14:7
**primitive (1)**
27:25
**principles (2)**
37:4;39:24
**print (1)**
86:20

**printed (2)**
7:14;86:20
**prior (7)**
10:22;45:9;46:4,6,
19;47:7;84:10
**probably (3)**
8:16;16:17;71:23
**process (2)**
57:8,13
**processes (1)**
98:5
**processing (2)**
27:13,22
**produce (8)**
46:10;59:2;91:7,8;
92:2,10;94:6;96:8
**produced (5)**
34:6;46:8;51:23;
60:4;92:8
**products (1)**
27:14
**professional (4)**
24:10;25:10;35:14;
68:21
**profits (3)**
38:6,20;39:3
**progress (1)**
49:11
**progressive (1)**
59:25
**project (1)**
62:7
**projected (5)**
50:9;92:18;94:11;
96:2,5
**projectiles (1)**
51:23
**pronounce (1)**
64:8
**properties (3)**
29:22;53:14;54:4
**prosecutor (2)**
9:4,9
**provide (1)**
43:20
**provided (3)**
12:18;13:11;98:22
**provides (1)**
90:17
**Public (2)**
3:13;4:5
**publications (1)**
68:19
**published (19)**
34:16;35:12,13,17,
23;36:8,9,11,13,19;
40:2,13;46:24;47:11;
48:2;53:5,21;55:18;
68:15
**pulverized (1)**
68:2
**purchasing (2)**
99:14,17

**purpose (4)**
32:2,4,9,13
**purposes (2)**
5:2;66:23
**pushing (1)**
36:17
**put (6)**
45:3;57:2;66:15;
84:15;89:20;98:4

**Q**

**qualifications (1)**
38:23
**qualified (2)**
3:12;31:12
**quality (2)**
58:4;98:3
**question (22)**
3:8;6:2,3,6,8,12;
15:4;17:9,10;20:2;
23:25;30:22;31:25;
36:7;39:2;41:20;
44:23,24;45:21;56:7;
89:23;99:5
**questionable (1)**
64:15
**quick (3)**
57:21;59:5;96:16
**quickly (1)**
99:20
**quite (5)**
45:13;54:18;69:8;
73:18;77:9
**quote (1)**
75:19

**R**

**radiator (2)**
66:12,15
**ran (3)**
17:24;18:2;48:21
**reach (3)**
11:21;69:21;75:11
**read (1)**
5:22
**reagent (1)**
64:19
**reagents (5)**
64:7,10,11,12,22
**really (6)**
15:21;19:17;41:23;
76:10;94:23;97:18
**reams (1)**
45:2
**reason (1)**
97:15
**recall (12)**
7:21;8:2;10:10;
16:4,18;18:10;19:5;
23:23;27:16,16;
53:18;87:3

**RECEIVED (6)**
6:25;7:4,7;24:25;
25:2;56:19
**recheck (1)**
75:8
**recognize (5)**
7:10,11,12;56:22,
24
**reconstruc (1)**
57:9
**RECONSTRUCTION (15)**
6:24;11:2,5;12:3;
20:16;21:6,9;32:13;
35:7,10;37:2;43:19;
56:18;57:10;58:7
**record (3)**
5:2,8;8:15
**recordings (1)**
97:12
**Reed (1)**
8:12
**refer (1)**
67:10
**reference (1)**
57:22
**referring (3)**
41:24;66:13;72:20
**refers (1)**
66:24
**regarding (3)**
11:16;34:17;53:21
**regardless (2)**
89:16;97:5
**relate (1)**
58:22
**related (7)**
59:11;60:19;66:5;
84:21;85:9;86:24;
87:3
**relates (3)**
25:18;26:15;58:14
**relation (2)**
26:21,23
**relationship (2)**
9:10;17:25
**relationships (1)**
57:14
**relevant (1)**
53:6
**relied (1)**
12:17
**rely (8)**
12:6,9,13;30:17;
96:24;97:4,10,11
**relying (1)**
99:7
**remember (8)**
8:22;16:5,8;18:13;
23:24;25:25;27:11,
15
**repaired (2)**
96:20;97:17
**repeatedly (1)**

33:18
**report (42)**
6:18,24;7:13,14;
12:5,7,10,13,17;
13:16,19;34:12,15;
37:6,10,22;38:4;
42:7;47:18,19;59:4,
7;62:21;63:18,23;
65:2;66:23;67:10;
69:7,11,20;71:5,23;
75:6;77:19;78:9;
88:4;95:20;98:12,12,
13,18
**reported (2)**
64:24;69:16
**REPORTER (3)**
99:13,16,21
**reports (11)**
13:6;20:12,12,13,
13,24;27:17;42:23;
58:21;98:15,20
**reproducible (1)**
51:2
**reproducing (1)**
50:24
**request (2)**
38:10;98:15
**require (1)**
42:8
**required (7)**
20:25;41:21;42:3,
4,12,13;64:14
**requirements (1)**
41:16
**research (1)**
53:3
**reserved (1)**
3:9
**resolution (3)**
75:5,8,12
**respective (3)**
3:3,7,11
**restate (2)**
6:5;17:9
**result (8)**
32:8;46:17;47:23;
50:3;80:17;93:19;
94:7,14
**resulting (1)**
34:3
**results (6)**
13:13;18:21;35:17;
46:24;50:24;68:15
**review (17)**
19:3,4,9,15;36:5,
12,14,18;37:9,12,16,
22;38:23,25;47:10;
57:17,22
**reviewed (18)**
34:11,24;36:10;
37:6;40:6;49:3,7,10;
62:17,20,23;63:24;
66:17;68:19;69:21;

75:6;78:5;98:12
**reviewing (4)**
35:25;38:4;75:11;
89:4
**rifle (1)**
95:5
**right (89)**
5:7;8:13;13:8,17,
22;20:21;28:23;30:3,
10,23;31:5;32:3,21;
33:6;38:20;39:6;
40:16,16,19;46:20,
21;48:25;51:10,20;
53:11;55:16;56:15;
60:25;61:15;62:18;
65:22;68:8,24;69:13,
21;70:8,10,13,25;
71:2,6,9,10,17,19,21,
22,23,24;72:12;
75:13,25;77:12,19,
25;78:19;80:15;81:3,
7;82:2,8,19;85:25;
86:4,8;87:19,24;
88:14,21;89:2,6,9,21,
22,24,25;90:23;91:5,
12,13,18,22;92:18;
93:4,16,22;95:23;
98:11;99:12
**road (6)**
17:16,19;18:3;
91:11,22,25
**roadway (3)**
17:20;69:4;92:14
**roadways (1)**
18:10
**romantic (1)**
17:25
**roof (1)**
92:18
**room (1)**
4:19
**Ross (2)**
39:9;40:7
**rough (1)**
99:19
**round (2)**
75:21,23
**rounded (2)**
76:24;77:9
**row (1)**
8:8
**run (3)**
13:5;17:21;48:18
**running (1)**
11:20
**runs (1)**
77:11
**RV (1)**
17:21

**S**

**same (19)**

18:19;30:16,20;
31:12;44:18;45:18;
46:11;51:8,8;54:7;
67:12;72:21;73:8;
74:21;80:19;82:4;
85:3,4,8
**sample (1)**
87:5
**Santos (9)**
4:9,10,11;63:5,18;
64:23;70:4;88:13;
98:14
**Santos' (11)**
62:18,21,24;65:5;
68:24;69:12;88:8,9;
89:2,6;92:7
**saturated (1)**
70:24
**saw (2)**
80:23;89:15
**saying (17)**
20:18;52:20;53:12;
67:12;71:5;76:21;
77:12;80:13,17;81:6,
9;82:14;86:23;90:10;
92:6;96:4,5
**scenarios (2)**
58:17,18
**SCENE (52)**
6:24;10:25;11:5;
12:3;13:14;19:15,19,
20,24;20:5,10;21:3;
24:16;32:24,25;33:3;
35:7;43:20;44:17,21;
48:11;49:14;56:18;
57:9,14;58:17;61:3;
62:13;63:2,4;64:9,
23;65:24;75:14;
83:18,19,20;85:11;
88:7;89:15;90:4,14,
16,17;91:19,20;94:7,
23;98:25;99:6,9,10
**scenes (2)**
22:8;46:9
**scheduled (1)**
5:3
**School (6)**
22:23;23:9,17,19,
21;24:11
**science (6)**
22:12,17,19;23:9,
12,15
**sciences (3)**
22:13,15,18
**scientific (16)**
34:24;35:2,5,18,
24;36:2,8,9,11,21;
37:4;44:4;46:24;
50:6,16,19
**scientists (2)**
36:17;40:20
**se (1)**
54:23

**sealing (1)**
3:4
**second (3)**
33:13;56:15;57:11
**secondary (2)**
22:13,15
**seeing (4)**
19:24;21:3;68:2;
75:16
**seem (2)**
77:14;85:8
**seems (1)**
73:11
**self-inflicted (1)**
48:8
**send (1)**
95:7
**seniors (1)**
23:19
**sense (2)**
44:2,25
**sentence (1)**
65:2
**separate (4)**
26:20;60:21,23;
61:15
**separated (2)**
59:21,22
**separately (1)**
7:13
**sequence (2)**
58:24;59:3
**sequencing (2)**
10:23;11:10
**set (1)**
46:21
**setting (1)**
26:22
**Seven (1)**
9:17
**Several (3)**
15:18;17:19;27:14
**shape (10)**
31:17,19,20;43:8,9,
17;45:24;60:2;77:4,9
**share (2)**
37:19;39:3
**shares (1)**
38:5
**sharing (1)**
38:20
**shed (2)**
21:22,24
**shirt (1)**
70:11
**shooting (7)**
9:2,19;10:6;13:22,
24;14:13;94:5
**shootings (1)**
9:16
**short (2)**
59:6;60:22
**shotgun (3)**

48:9,9;95:5
**shoulder (3)**
70:11;90:20;91:4
**shoulders (1)**
91:2
**show (1)**
92:5
**shown (1)**
79:19
**shows (1)**
63:24
**side (13)**
17:18;61:15;65:5;
84:7;85:17;88:14,21;
89:10,17,18,21,25;
92:18
**sides (1)**
40:21
**sign (3)**
3:12;13:16,18
**significant (1)**
78:13
**significantly (1)**
80:3
**similar (13)**
30:15;44:19;74:4;
80:19,24;81:3,10,10;
84:5;85:3,15;94:7;
96:8
**similarities (4)**
80:20;82:12,14;
85:6
**simple (5)**
28:5;33:21;52:20;
65:12;93:6
**simply (4)**
42:5;81:9;88:23;
93:17
**simulate (2)**
94:3,6
**single (10)**
52:16;54:9;55:6;
56:8;59:12,15,16;
60:3;85:5;86:14
**situation (1)**
49:7
**situations (2)**
49:2,12
**size (4)**
43:8,9,17;45:24
**sketch (1)**
20:9
**skull (2)**
68:7;92:14
**slapped (1)**
92:7
**small (3)**
86:20;94:22;95:2
**Smith (1)**
4:23
**soaked (2)**
70:17,21
**soap (4)**

84:13,15,16,21
soft (1)
  54:20
software (1)
  98:5
solid (1)
  55:15
somehow (1)
  92:16
someone (12)
  12:25;18:5;20:10;
  37:15;38:24;41:5,21,
  24;42:6,15;67:10;
  96:24
someone's (2)
  11:25;12:21
Sometimes (4)
  19:18,19;65:13;
  97:22
somewhat (1)
  77:4
sorry (12)
  12:16;14:17;17:8;
  30:24;56:6;57:9;
  64:2;65:11;66:11;
  77:13;81:4;86:10
sort (11)
  19:22;20:3;41:10;
  45:8;55:9,24;64:17;
  71:24;73:22;84:9;
  87:9
source (14)
  48:10;62:4;83:23,
  24;85:5,8;90:17;
  91:20;94:12,12,19;
  95:8,12,13
sources (3)
  32:25;47:21;48:11
South (6)
  26:3;77:12,14,15,
  16;78:12
spatter (8)
  9:4;20:20;43:16;
  95:18,21;96:22,22;
  97:2
speaking (1)
  9:8
specific (10)
  21:7;25:14;27:15;
  32:16;34:14;50:2;
  55:4;58:11;59:23;
  76:14
specifically (9)
  10:15;16:18;22:16,
  18;67:12;74:2;79:16;
  83:17;89:19
speed (6)
  17:2;33:25;34:7;
  47:13,20;50:20
spheres (1)
  76:25
spherical (1)
  54:10

spilled (1)
  53:23
spinal (1)
  53:21
splatter (5)
  95:9,11,15,18;96:9
SPREADSHEET (2)
  7:6,16
Stacy (1)
  4:24
stain (12)
  64:17;73:5;75:25;
  76:4,13;80:2,10,12,
  17;81:9;86:14;96:8
stains (32)
  31:17;43:12,18;
  60:2;64:4;72:22;
  75:18;76:9,10,17,19,
  21,23;77:2,17;78:25;
  79:9;81:9,11;83:13;
  84:2;85:3,21;86:21,
  24;87:6,8;94:20;
  97:2,5,8,17
start (1)
  68:4
starting (2)
  4:14;5:4
State (10)
  4:5,25;5:8;9:7;
  24:12;39:23;41:15;
  69:18,24;71:14
stated (2)
  35:23;69:24
statement (1)
  99:7
statements (1)
  5:22
states (1)
  41:13
stating (1)
  93:18
stay (1)
  93:11
step (1)
  58:20
steps (1)
  57:16
stick (1)
  33:12
sticker (1)
  57:3
still (11)
  20:8;31:15,20;
  56:5;60:21;76:11;
  77:22;78:14;80:7,9;
  98:21
STIPULATED (3)
  3:2,6,10
STIPULATIONS (1)
  3:1
stones (1)
  5:2
stop (2)

4:16;31:7
straight (1)
  51:18
strange (1)
  84:14
streaks (2)
  84:9,19
strike (4)
  17:4;18:6;30:25;
  49:22
struck (10)
  9:12;16:22;17:6,
  13,17;18:6;59:23;
  60:8;88:14;89:13
studied (11)
  27:3;51:25;53:13,
  20;54:14,25;55:11,
  14,19,23;93:25
studies (1)
  53:4
study (2)
  25:9;45:8
studying (2)
  25:3;53:18
stuff (1)
  87:25
Subject (2)
  10:25;26:2
submit (1)
  35:2
submitted (1)
  35:4
subsequently (1)
  90:22
substance (2)
  54:16;55:6
substances (1)
  66:15
sufficient (1)
  98:3
summarize (2)
  10:17;22:10
support (1)
  98:6
supported (1)
  37:3
sure (23)
  5:11;6:6;16:10;
  17:11,11;30:2,2,7;
  31:24;36:22,23;37:2;
  38:8,13;41:2,23;
  44:14;50:18;56:6;
  60:25;64:2;75:16;
  99:4
surface (14)
  34:8;43:13;50:9,
  10;55:15;59:23,25;
  64:5;68:3,4;70:15;
  76:5;94:18;97:6
surfaces (2)
  34:9;97:7
suspected (1)
  64:13

sworn (1)
  4:4
synonymous (1)
  82:24
system (1)
  57:19

T

tact (1)
  72:5
tail (1)
  80:11
tails (3)
  73:5;79:11,13
talk (1)
  18:11
talking (5)
  55:5,6;68:10;74:2;
  95:4
target (2)
  76:5;94:18
taught (10)
  22:18,22,23;23:6,8,
  10,11,11,12;24:10
Taylor (1)
  47:15
teach (5)
  22:21,25;23:16,20;
  33:17
teaching (2)
  22:17;26:6
technical (1)
  12:13
techniques (1)
  43:3
teenage (2)
  17:16;18:14
tells (1)
  81:2
tend (1)
  77:16
tends (1)
  54:22
term (6)
  45:20;50:19;64:10;
  65:7,11,12
termination (1)
  73:7
terms (5)
  26:25;28:25;53:18;
  64:3;82:23
test (4)
  64:20,23;83:7;
  85:24
tested (3)
  74:21,25;75:3
testified (5)
  4:6;6:22;7:23;
  13:21;91:5
testify (1)
  42:9
testifying (3)

7:21;8:12;9:3
testimony (6)
  8:23;27:21;53:9;
  55:24;74:17;98:24
testing (1)
  50:22
tests (1)
  64:16
Texas (2)
  69:19,24
textbooks (1)
  40:3,7
texts (1)
  27:4
theoretical (1)
  51:20
theory (1)
  36:17
therefore (6)
  29:14;60:14;62:6;
  80:21;83:23;90:5
thinking (2)
  45:10;60:25
third (1)
  47:16
third-party (1)
  40:14
thorough (1)
  63:20
though (1)
  60:21
thought (2)
  14:12;72:2
thousands (1)
  24:13
three (2)
  61:7,22
three-dimensional (3)
  58:7,9;94:14
threshold (2)
  21:12,13
throughout (1)
  24:17
throughs (1)
  33:15
throwing (1)
  5:2
times (3)
  18:3;73:8,11
tire (1)
  48:19
tissue (42)
  33:10;54:13,14,15,
  17,18,19,20,23;55:2,
  5,8,9,22;56:2,8,13,
  13;60:12;67:5,10,11,
  17,20,25;68:7,9,12,
  13,13;83:22;92:17;
  93:3,6,7,13,14,22;
  94:4,5;95:7;96:22
tissue' (1)
  66:24
tissues (1)

56:10
**today (2)**
28:2;87:20
**together (10)**
31:8;38:22;49:19;
55:7;56:10;65:14;
67:25;73:2;80:9;
93:11
**told (2)**
19:8;93:4
**Tom (2)**
39:6;40:7
**took (2)**
18:2;25:5
**tools (3)**
14:25;27:24,25
**top (2)**
65:2;89:17
**topic (2)**
23:9;35:8
**topics (1)**
22:21
**torn (1)**
70:11
**toward (3)**
50:9;61:16;73:7
**towards (3)**
62:8;92:19;95:13
**towel (1)**
89:9
**toxicologist (1)**
13:4
**toxicologists (1)**
12:5
**toxicology (4)**
12:7,24;13:2,6
**Toyota (1)**
60:8
**traces (2)**
74:11,14
**trails (1)**
73:7
**trained (1)**
67:16
**training (12)**
22:7;24:14,24;
25:2,10,23;26:11,18;
34:13,14,20,22
**trainings (1)**
57:5
**transmission (1)**
66:8
**trauma (14)**
10:4,14;11:9;
14:21,24;15:7,10,16;
16:7;48:6;62:14;
69:13,16,22
**travel (2)**
33:15;95:13
**traveling (1)**
51:16
**travels (2)**
33:7;51:10

**trial (1)**
3:9
**trick (2)**
23:25;89:22
**tried (1)**
44:15
**trouble (2)**
41:7,10
**true (2)**
52:8;54:11
**trunk (5)**
11:19;84:6;85:18;
92:19,20
**try (3)**
32:5;36:22;59:3
**trying (5)**
12:21;26:19;27:11;
59:5;61:10
**turn (1)**
17:23
**two (14)**
36:4;60:14,18,19;
61:2,5,11,12,12,13;
65:13;82:23;83:11;
84:23
**Tyler (7)**
9:20;10:7,18;
13:21;14:5,12,23
**type (7)**
41:17;46:17;51:5;
54:7;55:9;96:6;98:17
**types (4)**
28:17;46:10,11;
55:7
**typically (1)**
42:22

**U**

**under (3)**
8:7;48:20;53:2
**understand (19)**
4:16;6:3,10,12;
17:9;25:21;27:21;
29:13,15;30:9;31:24;
36:24;45:19;55:24;
56:7;58:8;64:3;
82:17;99:4
**understanding (5)**
26:20,21,22,24;
52:4
**understate (1)**
37:5
**understood (2)**
6:8
**unethical (1)**
68:10
**unidentified (1)**
15:9
**units (1)**
27:2
**University (2)**
23:6;26:3

**unless (1)**
87:21
**unusual (1)**
67:9
**up (5)**
28:19;59:14;80:6;
91:24;92:16,25;98:3
**upon (4)**
38:10;95:11;96:25;
97:10
**urinate (1)**
17:22
**urine (2)**
74:4,8
**use (14)**
10:8;12:4;28:2;
29:9;32:15;44:4;
45:19;46:21;49:8,21,
23;50:7;64:7,19
**used (8)**
12:18;15:2,9;43:3;
44:8;64:12,23;98:10
**using (5)**
32:13;44:6;50:19;
61:18;64:3

**V**

**vacuum (4)**
51:23;52:8,8,10
**vacuums (1)**
52:2
**variations (1)**
43:12
**varies (4)**
41:18;42:4,10,24
**various (17)**
27:4,24;40:21;
41:13,13,15;42:4,10,
18;50:24;55:7;60:17;
61:3;64:12;68:21;
75:15;93:12
**vehicle (23)**
11:10,12,16,23;
14:22;15:3,17;16:7,
22,25;17:7,13,22;
18:8;19:9,24;20:6;
48:21;66:5;84:7;
90:6;97:14
**vehicles (6)**
15:11;48:15;96:19;
97:16,16,19
**veracity (1)**
51:4
**versus (2)**
53:3;78:18
**via (2)**
46:2;67:5
**victim (2)**
11:18;18:21
**video (3)**
49:11;96:25;97:12
**video-recorded (1)**

20:9
**videos (9)**
47:14,21;49:6;
93:25;97:9,10,23,25;
99:3
**view (1)**
87:13
**views (1)**
40:22
**virtual (1)**
58:8
**viscosity (36)**
27:8,14,17,20;28:9,
11,13,22,24,25;29:6,
9,10,13,20;30:3,4,13,
15,17,20;54:6;74:3;
80:4,8,14,16,22,24;
81:3,6,8,10,13,15;
82:15
**visible (2)**
69:8,9
**visit (2)**
19:15;20:5
**visiting (1)**
21:3
**VITAE (1)**
7:3
**volume (2)**
43:13;45:25
**vs (5)**
8:11;9:20;13:21;
14:12,23

**W**

**waived (1)**
3:5
**walking (2)**
17:16,18
**wall (2)**
62:8;77:2
**wash (2)**
84:10,12
**watching (2)**
50:20,21
**water (5)**
66:13;74:4;80:4,
22;84:12
**way (6)**
41:4;44:14;45:18;
65:12;70:18;84:14
**weapons (2)**
10:16;15:9;58:16
**west (1)**
77:9
**wet (1)**
59:19
**what's (14)**
11:25;12:21;24:9;
26:19;31:17;33:2;
43:18;58:16;61:15;
83:18;84:6,6,7;94:7
**wherever (1)**

88:17
**WHITE (22)**
4:8,8,19;5:5;6:15;
7:9;42:25;56:4,21,
25;67:15;81:24;82:5;
87:16,19,24;90:9;
94:8;96:13,15;99:13,
15
**whole (2)**
69:9;72:19
**who's (1)**
37:15
**wide (1)**
65:3
**wife (1)**
17:22
**Wilburton (1)**
23:3
**within (11)**
4:5;11:19;31:17,
19;32:25;33:2;36:25;
43:10,20;60:2,2
**without (6)**
19:11,23;21:2;
30:12;41:9;87:13
**WITNESS (4)**
67:8;87:12;90:3;
93:24
**witness' (1)**
3:4
**witnesses (1)**
98:24
**Wonder (2)**
52:14;53:5
**wondering (1)**
30:7
**word (2)**
44:7;82:18
**words (2)**
61:19;78:21
**work (6)**
17:4;34:5;36:14;
38:9;22;41:8
**worked (7)**
16:21,24;17:5,12;
24:15;27:12;39:11
**workshop (3)**
25:24;26:11,12
**world (1)**
63:17
**worn (1)**
18:21
**wound (17)**
14:7;48:9;62:6;
63:3,8;65:25;66:2;
88:17,20;89:16,19;
90:5,7;91:16,18;92:9,
15
**woundings (1)**
94:2
**wounds (2)**
58:15;63:21
**write (1)**

42:7
**written (2)**
40:4,7
**wrong (1)**
40:20

### Y

**year (4)**
23:11,12;25:25;
73:15
**years (19)**
6:23;16:14;17:15;
22:7;23:7,22;24:2,2;
26:7;27:5,6,11,12;
28:7,11;33:17;52:15;
53:4;67:24
**York (1)**
4:6
**young (1)**
17:18

### Z

**Zealand (3)**
26:4,5,11
**zoology (2)**
22:20;24:16
**zooming (1)**
72:20

### 0

**00476.118002313 (1)**
7:4
**00476.118002322 (1)**
7:6
**00476.118002323 (1)**
6:25

### 1

**1 (6)**
6:17,19;7:2;37:7;
59:7,8
**1:00 (2)**
4:16;87:18
**1:20 (1)**
96:12
**10 (3)**
87:18;94:22;95:2
**100 (2)**
58:2;60:25
**11:32 (1)**
4:15
**12 (1)**
23:18
**14 (2)**
4:14;95:25
**19 (1)**
88:3
**1980 (1)**
24:7

**1988 (1)**
24:7
**1989 (1)**
24:12

### 2

**2 (3)**
6:17,21;7:5
**2016 (1)**
25:24
**2017 (1)**
25:25
**2018 (1)**
7:25
**2022 (2)**
60:6;62:25
**2023 (1)**
4:14
**21 (1)**
7:4

### 3

**3 (13)**
6:17,23;7:7;8:5;
14:15,21;15:5,14;
64:25;68:22;69:15;
70:2;71:9
**30 (2)**
60:6;62:24
**300 (2)**
75:9,9
**360 (3)**
94:22,25;95:7

### 4

**4 (6)**
56:17,20;69:7,10;
72:14;78:24

### 6

**6 (1)**
66:23
**68 (1)**
6:25

### 7

**7 (1)**
88:2
**70 (2)**
16:23;76:15
**78 (1)**
24:6

### 8

**8 (8)**
71:4;78:24;79:8,
19;83:13;84:10,20,24

**88 (1)**
24:5

### 9

**9 (13)**
23:18;78:24;79:19;
84:20,24;85:2,20;
86:9,10,12,16,24;
87:9
**9:00 (1)**
5:3
**90 (2)**
76:16;77:5

# EXHIBIT E

App. 000489

# IRIS DALLEY GRAFF

Forensic Analyst
Phone 918-470-7876
graff.training@gmail.com



## SUMMARY

Over 30 years experience in crime scene investigations and forensic biology.

Court-qualified as an expert in crime scene investigation and reconstruction, including bloodstain pattern analysis and shooting incident reconstruction, in U.S District Courts in Oklahoma and Texas, and in State District Courts in Arkansas, California, Colorado, Idaho, Indiana, Kentucky, Virginia, Oklahoma and Texas, and Republic of Kazakhstan

Provided instruction and training in United States, Portugal, France, New Zealand, South Africa and Canada. Also provided remote instruction for Argentina.

## EMPLOYMENT

Partner in Graff Investigative and Forensic Training 2016 to present.
Partner in the forensic education and consulting company Bevel, Gardner & Associates, 2008 to 2016.
Oklahoma State Bureau of Investigation 1989 to 2009

Prior to my career in forensic science and law enforcement I was a high school instructor and adjunct professor teaching biology, advanced placement biology, physics and general physical science courses, mathematics, and American Sign Language.

## EDUCATION

Master of Arts in Secondary Sciences, 1984, East Central University, Ada. Oklahoma
Bachelor of Science/Biology, 1972, Oklahoma Baptist University

## EXPERIENCE

Forensic examination and analysis of crime scenes and items of evidence collected in criminal investigations, particularly crimes of violence and death investigations. Experience includes laboratory analysis, crime scene investigation with emphasis on bloodstain pattern analysis, shooting incident reconstruction, crime scene documentation, evidence identification and collection, forensic animation, and preparation of court exhibits, and training federal, state, and local officers. Laboratory analysis experience includes forensic identification of body fluids, microscopic comparisons, and DNA analysis.

## PROFESSIONAL AFFILIATIONS

Scientific Working Group on Bloodstains Pattern Analysis (SWGSTAIN)
Member Spring 2006 to 2012
Ex-Officio 2004-2005

**00476.118002313**

**App. 000490**

Association for Crime Scene Reconstruction (ACSR)
Charter Member, Fellow and Distinguished Member
Secretary 1995 to 2009
Board Member 1992-1994

International Association of Bloodstain Pattern Analysts (IABPA)
President 2009-2010
Regional Vice-President 2003 to 2009
Member 1992 to present

International Association of Identification (IAI)
Member, Crime Scene Certification Board 2012-1213
Member, Sub-Committee for Bloodstain Pattern Identification Training, 2007 to 2012
Member 2003 to present

Oklahoma Division of the IAI
Vice-President 2008-2010
Executive Board 2004 to 2008

PROFESSIONAL CERTIFICATIONS

Certified Crime Scene Reconstructionist, IAI, 2011 to 2016
Senior Crime Scene Analyst, IAI, 2003 to 2013
Advanced Law Enforcement Certification, Oklahoma Council on Law Enforcement
Education and Training (CLEET), 1996 to 2009
Basic Law Enforcement Certification, CLEET, 1989 to 1996

PROFESSIONAL PRESENTATIONS

| | |
|---|---|
| Water Closet Drama: Suicide or Homicide | |
| 2019 IABPA European Conference, Pontoise, France | June 20, 2019 |
| Bloodstain Voices From the Field | |
| 2018 IABPA Annual Training Conference, Ottawa, Ontario | Oct 2018 |
| Contextual Bias | |
| Northeast Division of the International Association of Identification | Dec 2017 |
| Case Study: Crime Scene Reconstruction: Terror in the Night | |
| Northeast Division of the International Association of Identification | Dec 2017 |
| A Bumpy Road to Justice: Context bias, documentation, and case management | |
| International Association of Bloodstain Pattern Analysts | Sep 2017 |
| International Association of Identification Annual Conference | Aug 2017 |
| Report Writing for Crime Scene Reconstruction | |
| Annual ACSR Training Conference, Blackhawk, CO | February 2017 |
| Graphic Investigative Tools in Reconstruction Analysis | |
| Annual ACSR Training Conference, Nashville, TN | February 2019 |
| IAI 103nd International Training Conference, San Antonio, TX | July 2018 |
| Annual ACSR Training Conference, Blackhawk, CO | February 2017 |
| Posing the Scene: Animation of Bloodstain Evidence | |
| Midwest Forensic Science Center Bloodstain Symposium, Ames, Iowa, August 2009 | |
| Homicide or Suicide: Am I My Brother's Keeper | |
| Oklahoma Division of the IAI, Edmond, Oklahoma, | May 2011 |
| IABPA European Conference, Zurich, Switzerland, | July 2008 |
| Kidnapping by Caesarian-Section | |
| OK-IAI 2007 Training Conference, Edmond, Oklahoma, | May 23, 2007 |
| 2006 IABPA Annual Conference, Corning, New York, | October 19, 2006 |
| Terror in the Woods: The Homicides of Charles and Shirley Chick | |
| IAI 103nd International Training Conference, San Antonio, TX | July 2018 |
| IABPA European Conference, Middelburg, Netherlands, | February 2006 |
| 2005 IABPA Training Conference, Santa Barbara, California, | October 2005 |

00476.118002314

App. 000491

Sex, Lies, and Cyberspace: The David Howard Homicide
    15th Annual International ACSR Training Conference, Albuquerque, NM, February 2006
Lest We Forget: Reconstruction of the Homicide of Oklahoma State Trooper "Rocky" Eales
    Annual Training Conference of the Oklahoma Division of the IAI,    September 2005
    14th Annual International ACSR Training Conference, San Jose,    February 2005
Crime Scene Reconstruction
    Oklahoma Sheriff's Association Conference, Oklahoma City,    2004
    Oklahoma Chiefs of Police Association Conference, Tulsa,    2004
Make My Day: A Reconstruction of the Homicides of Mary Holt and Floyd Roberts
    13th Annual International ACSR Training Conference, Oklahoma City,  October 2003
    2003 IABPA Training Conference, Odessa, Texas,    October 2003
A Bite Out of Crime: A Home Invasion and Assault, a Reconstruction
    12th Annual International ACSR Training Conference, Denver, Colorado, October 2002
    2002 IABPA Training Conference, Harrisburg, Pennsylvania,    October 2002.
A Three-Year-Old Hanging Death: A Reconstruction
    Annual International ACSR Training Conference, Atlanta, Georgia,    2000


<u>TRAINING INSTRUCTED</u>
40-hour Courses
Advanced Documentation (Bloodstains & Shooting Incidents)

| | |
|---|---|
| El Cajon, CA | March 9-13, 2020 |
| Chandler, AZ | January 6-10, 2020 |
| Hillsboro, OR | March 11-15, 2019 |
| Bellevue, WA | March 4-8, 2019 |
| Loveland, CO | January 28-February 1, 2019 |
| Houston, TX | January 7-11, 2019 |
| Houston Forensic Resource Center | May 2018, Sept 2018 |

Death Investigation

| | |
|---|---|
| Tacoma WA | June 12-16, 2023 |
| Chattanooga, TN | December 5-9, 2022 |
| Minnetonka, MN | October 18-22, 2021 |
| Nashua, NH | January 4-8, 2021 |
| Sanford, FL | December 7-11, 2020 |
| Chattanooga, TN | February 2-7, 2020 |
| Houston, Tx, | April 29-May 3, 2019 |
| Pottawattamie County, IA, | February 11-15, 2019 |
| Houston, TX | January 14-18, 2019 |
| Melbourne, FL | November 26-30, 2018 |
| Fairfax County Police Department | Feb 2018 |

Shooting Incident Reconstruction

| | |
|---|---|
| Richlands, WA | June 5-9, 2023 |
| Maysville, NY | October 17-21, 2022 |
| Chubbuck, ID | September 12-16, 2022 |
| Nokesville, VA | April 25-29, 2022 |
| Tacoma, WA | May 16-20, 2022 |
| Littleton, CO | June 6-10, 2022 |
| Clearwater, FL | December 6-10, 2021 |
| Chubbock, ID | June 21-26, 2021 |
| Andover, MN | May 3-7, 2021 |
| Chattanooga, TN | April 12-16, 2021 |
| Pueblo, CO | March 15-19, 2021 |
| Santa Clara, CA | October 19-23, 2020 |
| Grand Junction, CO | October 5-9, 2020 |
| North Las Vegas, NV | January 13-17, 2020 |

| | |
|---|---|
| Windsor, Ontario | October 7-11, 2019 |
| Dover, NH | September 23-27, 2019 |
| O'Fallon, MO | Sept 9-13, 2019 |
| Boynton Beach, FL | June 3-7, 2019 |
| Appleton WI | May 6-10, 2019 |
| Johnson County, KS | April 1-5, 2019 |
| Everette, WA | March 18-22, 2019 |
| Edinburgh, IN | October 29-November 2, 2018 |
| O'Fallon, MO | October 15-19. 2018 |
| Madison, WI | June 2018 |
| Ottawa, Ontario Canada | April 2018 |
| Lander, WY | May 2017 |
| Wauwatosa, WI | May 2017 |
| New York City, NY, | May 2016 |
| Long Beach, California, | April 2016 |
| Madison, Wisconsin, | August 2015 |
| Waco, Texas, | July 2015 |
| Grand Junction, Colorado, | November 2014 |
| Greenfield, Indiana, | August 2014 |
| Austin, Texas | July 2014 |
| Farmington, New Mexico | June 2014 |
| Austin, Texas | May 2014 |
| Pueblo, Colorado, | October 2013 |
| Omaha, Nebraska, | June 2013 |
| Loveland, Colorado, | August 2012 |
| Grand Junction, Colorado, | June 2012 |
| Norman, Oklahoma, | October 2011 |
| Phoenix, Arizona, | October 2010 |
| Pueblo Colorado, | July 2009 |

## Advanced Crime Scene Reconstruction

| | |
|---|---|
| Conroe, Texas, | June 2016 |
| Grand Junction, Colorado, | August 2015 |
| Fort Collins, Colorado, | August 2011 |
| Flower Mounds, Texas, | August 2012 |
| San Diego, California, | May 2012 |
| Phoenix, Arizona, | September 2011 |
| Denver, Colorado, | June 2011 |
| Crockett, Texas, | December 2010 |
| Norman, Oklahoma, | October 2009 |
| Eugene, Oregon, | February 2009 |

## Crime Scene Reconstruction

| | |
|---|---|
| Charlotte, TN | March 20-24, 2023 |
| O'Fallon, MO | March 13-17, 2023 |
| Andover, MN | February 6-12, 2023 |
| Vancouver, WA | May 23-27, 2022 |
| Centennial, CO | January 10-14, 2022 |
| St Louis, MO | October 14-18, 2019 |
| Fairfax, VA | September 16-20, 2019 |
| Madison, WI | May 13-17, 2019 |
| Nashville, TN | April 8-12, 2019 |
| Clearwater, FL | December 3-7, 2018 |
| St Louis, MO | July 2018 |
| Dover, NH | May 2018 |
| St Louis, MO | August 2017 |
| Beaver County, PA | March 2017 |

| | |
|---|---|
| Lauderhill, Florida, | November 2016 |
| St Louis, Missouri, | August 2016 |
| Boston MA | July 2016 |
| San Diego, California, | June 2016 |
| Conroe, Texas, | February 2013,    February 2015 |
| Austin, Texas, | July 2013 |
| Plano, Texas, | September 2012 |
| Wichita Falls, Texas, | August 2011 |
| Lansing, Michigan, | June 2011 |
| Phoenix, Arizona, | August 2011,    May 2010 |

## Advanced Bloodstain Pattern Analysis                    (40 hour)

| | |
|---|---|
| Silverton, South Africa, | July 2015 |
| Baton Rouge, Louisiana | October 2014 |
| Baton Rouge, Louisiana | April 2014 |
| Midwest City, Oklahoma, | July 2013 |
| Galveston, Texas, | January 2011 |
| Conroe, Texas, | November 2009 |

## Basic Bloodstain Pattern Analysis                    (40 hour/course)

| | |
|---|---|
| Arlington, VA | April 17-21, 2023 |
| Charlotte, TN | February 28 - March 4, 2022 |
| Nashua, NH | October 4-8, 2021 |
| Centennial, CO | June 14-18, 2021 |
| Grand Junction, CO | March 30-April 3, 2020 |
| St Louis, MO | October21-25, 2019 |
| Edinburgh, IN | November 5-9, 2018 |
| St Louis, MO | October 22-26, 2018 |
| Alexandria, VA | June 2018 |
| San Diego, California, | May 2016 |
| New York City, NY, | April 2016 |
| Denton, Texas, | February 2016 |
| Wichita, Kansas, | November & December 2015 |
| Silverton, South Africa, | July 2015 |
| Denton, Texas, | April 2015 |
| Fort Gillem, Georgia | January 2015 |
| Baton Rouge, Louisiana | August 2014 |
| Baton Rouge, Louisiana | February 2014 |
| Austin, Texas, | May 2013 |
| Amarillo, Texas, | April 2012 |
| Houston, Texas, | March 2011 |
| El Paso, Texas. | January 2011 |
| Broken Arrow, Oklahoma, | April 2010 |
| Lubbock, Texas, | January 2010 |
| Wichita Falls, Texas. | April 2009 |
| Grand Junction Colorado, | December 2008 |
| Phoenix, Arizona, | November 2008 |

## 16-32 hour Courses:

### Essentials of Criminal Investigations          (24 hr/course)

| | |
|---|---|
| St Louis, Missouri | August 2017 |
| Chickasaw Lighthorse Police, Ada, OK | May 2017 and June 1017 |
| Broken Arrow, Oklahoma, | January 2017 |
| St Louis, Missouri | August 2016 |
| Broken Arrow, Oklahoma, | August 2016 |
| St Paul, Minnesota, | April 2015 |
| Marshalltown, Iowa, | December 2014 |
| Austin, Texas | June 2014 and July 2014 |

|  |  |  |
|---|---|---|
| St Paul, Minnesota, | June 2014 | |
| Shawnee, Oklahoma | March 2014 | |
| Ada, Oklahoma, | 2013 | |

Forensic Biology (guest lecturer)
    Otago University Summer School (Dunedin, New Zealand)  February 2013 and January 2012

Documenting Bloodstain Pattern Evidence                (32 hour)
    Sirchie, Raleigh, NC,            May 2011

Homicide Investigation     Southern Police Institute         (16 hour)
    Rockford, Illinois            November 2013
    St Paul, Minnesota           October 2013
    Sioux Falls, South Dakota     April 2013
    Colorado Springs,           June 2012
    Havanna, Florida,          May 2012
    Cedar Rapids, Iowa,        October 2011
    Mundelien, Illinois,        September 2011
    Louisville, Kentucky,       January 2013, June 2013, June 2012, February 2011

Bloodstain Pattern Analysis and Stain Selection for DNA Analysts (24 hour)
    Colorado Bureau of Investigation,     March 2010


Workshops
    Shooting Incident Reconstruction Workshop          (8 hour)
        Annual ACSR Training Conference, Blackhawk, CO    February 2017

    Crime Scene Documentation: Scene Mapping         (8 hour)
        Norman Police Department,     October 26, 2007

Introduction to Bloodstain Pattern Analysis          (8 hour/course)
    CLEET Criminal Investigation Academy
        Tulsa Police Academy          May 2006
        McAlester, Oklahoma         2005
        Lawton, Oklahoma           2004

Search Warrants: Acquisition & Execution           (8 hour/course)
    Sponsored by Federal Bureau of Investigation and Oklahoma State Bureau of Investigation
    Hugo, Oklahoma          November 2005
    Poteau, Oklahoma        November 2001

Crime Scene Reconstruction                 (8 hour)
    Federal Bureau of Investigation and Bureau of Indian Affairs, Phoenix, AZ   January 2004

Major Crime, Securing the Scene and Crime Scene Processing   (8 hour)
    Tribal/BIA Uniformed Police Officer In-Service Training Program, July 1996

Crime Scene Processing/Evidence Collection          (8 hour)
    C.L.E.E.T. Basic Academy,        1993

Bloodstain Pattern Recognition Workshop         (4 hour/conf)
        IAI 103nd International Training Conference, San Antonio, TX July 2018
        IAI 102nd International Training Conference, Atlanta, GA Aug 2017
        IAI  98th International Training Conference, Providence Rhode Island
        IAI  97th International Training Conference, Phoenix, Arizona, July 2012
        IAI  96th International Training Conference, Milwaukee, Wisconsin, August, 2011
        IAI  95th International Training Conference, Spokane, Washington, July 2010
        IAI  94th International Training Conference, Tampa, Florida, August 2009
        IAI  93rd International Training Conference, Louisville, Kentucky, July 2008
        IAI  92nd International Training Conference, San Diego, California, July 2007

Bloodstain Reconstruction Workshop            (4 hr)
        Annual ACSR Training Conference, Nashville, TN     February 2019
        2018 IABPA Annual Training Conference, Ottawa, Ontario    Oct 2018
        IAI 103nd International Training Conference, San Antonio, TX July    2018

**00476.118002318**

**App. 000495**

Trajectory Analysis Workshop                                                (4 hr/course)
    Northeast Division of the IAI                                    Dec 2017
Bloodstain Pattern Identification Workshop                          (4 hr/course)
    Northeast Division of the IAI                                    Dec 2017
Posing the Scene: Forensic Animation Workshops              (4 hour/conf)
    2015 ACSR Annual Training Conference
    2011 IAI 96th International Training Conference, Milwaukee, Wisconsin
    2010 European IABPA Conference, Lisbon, Portugal
    2009 IABPA Conference, Portland, Oregon
    2009 18th Annual International ACSR Training Conference, Tulsa, Oklahoma
    2008 17th Annual International ACSR Training Conference, Tulsa, Oklahoma
Bloody Bones and Butcher Knives: Bloodstain Pattern Recognition      (4 hour)
    Annual Training Conference of the Oklahoma Division of the IAI      September 2005
Crime Scene Documentation Workshop: Measurements to Courtroom Exhibits      (4 hour)
    Oklahoma Division of the IAI Annual Training Conference, Edmond, Oklahoma, September 2005
Evidence Collection and Preservation Workshop (4 hour)
    Oklahoma Division of the IAI Annual Training Conference, Edmond, Oklahoma  September 2005
Building a Case Presentation: PowerPoint for Courtroom Presentation Workshop      (4 hour)
    14th Annual International ACSR Training Conference, San Jose, February 2005
Crime Scene Diagramming                                                    (4 hour)
    OSBI Academy,                                                September 2002
After the Report: Bloodstain Models for Training and Testimony      (2 hour/conf)
    IAI 98th International Training Conference, Providence Rhode Island
    IAI 94th International Training Conference, Tampa, Florida, August 2009
Animations in Reconstruction                                          (2 hour/course)
    Advanced Crime Scene Reconstruction, sponsored by TBI, LLC
        Norman, Oklahoma,                    2008
        Norman, Oklahoma,                    2007
        Norman, Oklahoma,                    2005


<u>SPECIALIZED TRAINING ATTENDED</u>
Fluid Dynamics of Bloodstain Pattern Formation, Pontoise, France  June 2019
                                          (40 Hrs)
International Association of Identification, Annual Conference, August, 2016
    Trajectories, Rods and lasers                                  (4 hrs)
    Bloodstains on Fabrics and the use of an ALS                  (3 hrs)
    Analysis of Complex patterns and BPA scenarios                (4 hrs)
    Applying Bloodstain Pattern Analysis Methodology to Casework  (3 hrs)
    Distinguishing Human from Non-Human Skeletal Remains          (3 hrs)
    Examination of Bloodstains and Bloodstain Patterns on Clothing (4.5 hrs)
    The Basics of Bone Trauma
    Wipes, Swipes and Transfer Impressions
    Recognizing Voids and How To Use Them In Bloodstain Pattern Analysis
    Criminal Profiling from an Investigator's Perspective
Bloodstain Symposium, Midwest Forensic Science Center, August 2010      20 hours
IABPA European Training Conference                                    24 hours/year
    2006, 2008, 2010, 2019
IABPA Annual Training Conferences                                    24 hours/year
    1992, 1994, 1995, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009,
    2010, 2015, 2017, 2018
ACSR Annual Training Conference
    1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003,

**00476.118002319**

**App. 000496**

2004, 2005, 2006, 207, 2008, 2009, 2010, 2011, 2015, 2016, 2017, 2019, 2020

Bloodstain Pattern Analysis Level III                                    50 hours
   Henderson Forensics, instructor Bob Henderson, Canyon, Texas        November 2005

Forensic Shooting Scene Reconstruction                          40 hours
   Instructors Joe Foster and Mike Haag, Los Lumas, New Mexico      June 2004

Homicide Investigations                                          80 hours/course
   Southern Police Institute/OSBI Oklahoma City               September 2002
   Southern Police Institute/OSBI, Oklahoma City              May 1991

OSBI 12th Investigative Academy, Oklahoma City             February 2002

Microscopic Hair Analysis        OSBI, Oklahoma City, January 2000    40 hours

Crime Scene Reconstruction
   Oklahoma City, 1994                                           16 hours
   Oklahoma City, 1993                                           16 hours

Oklahoma Sheriff's and Peace Officer's Association (OSPOA), 1995    4 hours

Biochemistry        East Central University, Ada, Oklahoma, 1998

Photography        OSBI, December 1997

Advanced Bloodstain Pattern Analysis                            40 hours
   Kansas Bureau of Investigation, October 1996

Basic Molecular Biology  University of Oklahoma, 1995

DNA Analysis

OSBI & District Attorney's Council, Fort Worth, November 1995    16 hours

Forensic PCR Amplification & Typing

OSBI and Perkin-Elmer, November 1995                            54 hours

DNA: Proving the Truth  OSBI  1995                              16 hours

Oklahoma Women in Law Enforcement Training Conference, 1995    8 hours

Forensic Pathology        OSBI, 1994                            4 hours

Investigations of Crime: Crime Scenes, Computers, and Children,    20 hours
   Center for Medicolegal Research, Albuquerque, New Mexico May 1994

Child Sexual Abuse, Infant & Child Fatalities                   16 hours
   Oklahoma Department of Health, 1994

Southwestern Association of Forensic Science/Southern Association of Forensic
Science Joint Conference
   Little Rock, AR, 1994                                         24 hours
      Crime Scene Photography, SWAFS    1994               4 hours
   Shreveport, Louisiana, 1992                                  24 hours
      Advanced Crime Scene Processing                       8 hours

Investigating Child Fatalities        Tulsa, 1994              16 hours

Forensic Serology FBI, Quantico, Virginia, June 1993          40 hours

CLEET Criminal Investigation Academy                          124 hours
   Wilburton, Oklahoma. February-March 1993

Southwestern Association of Forensic Science/Southern Association of Forensic
Science Joint Conference, Shreveport, LA, 1992
      Advanced Crime Scene Processing                       8 hours
      Basic Serology, SWAFS   1992                          8 hours

Southwestern Association of Forensic Science Annual Training Conference 1991
                                                                16 hours

Advanced Bloodstain Pattern Analysis                          40 hours
   OSBI, Oklahoma City, January 1992

Semi-Automatic Pistol Transition School, Oklahoma Highway Patrol, 1992  24 hours

**00476.118002320**

OSBI 9th Academy           Oklahoma City, 1991                    300 hours
Basic Bloodstain Pattern Analysis    OSBI, Oklahoma City, April 1991    40 hours
Luminol, OSBI   1991                                             16 hours
CLEET Basic Academy, Broken Arrow, Oklahoma, 1989               300 hours

MEDIA
48 Hours: *Death Hits Home*                          2022
Forensics: You Decide: *Blood Brothers*
Investigation Discovery, a Sirens Media production,    2009
Swift Justice with Nancy Grace   CBS Studios, Inc.,    2010

PUBLICATION
*Developing and Using Demonstrative Exhibits in Support of the Crime Scene Analysis*
Practical Crime Scene Analysis and Reconstruction, CRC Press, Boca Raton, Florida, p. 249-271

AWARDS
Oklahoma Division of the IAI Lifetime Membership      2016
Distinguished Fellow of the ASCR                      2011
Fellow of the ACSR                                    2003
Oklahoma State Bureau of Investigation Criminalist of the Year      1995

# EXHIBIT F

App. 000499

RE: United States Civil Action No. 3:22-CV-02714-K

# SCENE RECONSTRUCTION ANALYSIS REPORT

Iris Dalley

Graff Investigative & Forensic Training

**00476.118002323**

App. 000500

# GRAFF  Investigative & Forensic Training

Re:  United States Civil Action No. 3:22-CV-02714-K
   Estate of Nehemias R. Pivaral Santos v. Caylee Erin Smith and Eastman Chemical Company

An analysis and reconstruction were conducted to determine the sequence of actions that occurred in the death of Nehemias R. Pivaral Santos. This analysis used a structured methodology of bloodstain pattern analysis and scene reconstruction.  Bloodstain pattern[1] analysis is the application of fluid dynamics as it relates to bloodstain characteristics, accomplished by in-depth examination of documentation such as images.  Reconstruction identifies relationships between various types of evidence in the context of the scene to identify actions that occurred to produce the evidence, to sequence those actions, and to include or exclude scenarios consistent with the evidence.

The analyst's opinions are based on the analyst's experience, education, and training.  The explained events are based on the available evidence.  The analyst will consider additional evidence that becomes available, and the analyst may revise portions of the analysis based on the relevance of additional evidence.

The following information was provided to the analyst:
- Richland PD Photos – 3 pdf documents containing 57 scene images.
- TX DPS Photos – 43 jpg files (DSC_0001 thru DSC_0033 and IMG_1397 thru IMG_1406)
- Bodycam Richland PD Corp. Winston mp4 video files RPD003_8L005577_160346, RPD003_8L005577_161348, RPD003_8L005577_162348, and RPD003_8L005577_164348
- TX DPS Troop. Sherman video file JosephSherman_20220430_03_59_WFC1-067751_Traffic Crash_188473525.ts
- Richland Police Department Incident Report #2200089
- Richland PD Caylee Smith Statement
- Richland PD Evelyn Moreno Statement
- Texas Department of Transportation Peace Officer's Crash Report 2200089
- State of Texas Certificate of Death Nehemias R Pivaral Santos
- Excerpt of Deposition of Caylee Erin Smith, August 8, 2023
- Excerpt of Deposition Evelyn Moreno, August 2, 2023
- Excerpt of Deposition Erick Jeremias Pivaral Santos, August 1, 2023
- Excerpt of Deposition Melvin Alexander Diaz Fuentes, August 2, 2023

## HISTORY[2]
On April 30, 2022, Richland police were dispatched to a reported traffic accident with fatality. The scene location was "near the 223-224 North Interstate 45"[3].  Reports at the scene indicated

---

[1] A bloodstain pattern is one or more related bloodstains created by a single action.

[2] Richland Police Department Incident Report #2200089.

[3] Ibid p2

**00476.118002324**

Nehemias Santos and Evelyn Morena were outside their 2011 Toyota Camry, parked partially in the roadway, when Nehemias was struck by a passing vehicle driven by Caylee Smith.

**SCENE**

The scene was the left northbound lane of Interstate 45 about 1 mile south of Exit 225.[4]

*Figure 1.* A black 2011 Toyota Camry was parked astride the left boundary of the northbound lane.  The trunk lid was fully open.  A tire was standing against the left barrier near the left front of the Camry.  *Figure 2.*[5]





**FIGURE 1.**  TX DPS DSC_0014

**FIGURE 2.**  Richland PD Photos 2200089 - Photos_Part2_17

Nehemias Santos' body was lying supine on the pavement behind the Camry. His head was to the west and his legs to the east.  Nehemias was dressed in a dark short-sleeved shirt, dark long pants, and dark socks.  A light-colored cloth was against the right side of Nehemias' head.  *Figure 3.*

---

[4] Satellite view of google.com/maps for I-45 Exit 225 area was used as the base of the scene model.

[5] Richland Police Department Incident Report #2200089 p.2, the family covered the body after Richland PD Officer Winston's arrival.



A wide path of blood/fluid staining was on the pavement approximately parallel to Nehemias Santos' left side and extended to the east side of the northbound lane, east of the Camry. Apparent body tissue[6] and debris of varying sizes was on the pavement and Camry. A drag-like mark on the pavement extended from Nehemias Santos' right foot to the east end of the blood/fluid staining.

*FIGURE 3.* Bodycam RPD003_8L00577_160346 00.04

The cause of death was reported as blunt force trauma[7]. No medical evaluation of Nehemias Santos' injuries were provided to the analyst. Bloodstains near the head and the tissue debris indicated open head trauma. The right leg appeared bent in an unnatural position, possibly indicative of a broken leg.[8]



*FIGURE 4.* TX DPS DSC_0012 Bloodstains on barrier.



*FIGURE 5.* TX DPS DSC_0012 Circular and elliptical bloodstains on barrier.

A pattern of circular and elliptical bloodstains was on the east side of the center concrete barrier west of the body and rear portion of the Camry. *Figure 4.* The bloodstains were mostly circular[9], indicating the blood drops were moving east-to-west, approximately perpendicular to the

---

[6] For purposes of this report "tissue" refers to masses that appear to be comprised of cerebral material, body fat, and body fluid.

[7] State of Texas Certificate of Death Nehemias R. Pivaral Santos

[8] Richland Police Department Incident Report #2200089 p.2 stated the "right leg was obviously broken" without explanation. The body was only documented by the Richland PD bodycam from a distant obtuse angle for about 6 seconds.

[9] Blood in flight forms spherical drops that produce circular to elliptical stains. The shape of individual stains is related to the angle of impact to the target surface. The direction of flight can be determined by the direction of the movement of blood after impact, or the 'tails' of the stain.

barrier. The overall distribution of stains radiated slightly to the south with no void areas within the broad pattern on the barrier.[10] No obstacles were between the blood source and the barrier pattern area. *Figure 5 and Figure 6.* The pattern on the barrier continued west of the open Camry trunk. *Figure 7.*




**FIGURE 6.** Two views of bloodstains on barrier.

**FIGURE 7.** TX DPS DSC_0023. Blood on barrier west of car.

Elliptical stains, some with associated flow, were along the west side of the Camry, from the trunk opening downward. Directionality of these stains was east-to-west. Blood could be seen in some of those stains. Elliptical stains and tissue debris were across rear window. *Figure 8.* The shape and location of these stains indicated a source east of the trunk.




**FIGURE 8.** TX DPS DSC_0017. Stains on west side of Camry.

**FIGURE 9.** TX DPS DSC_0023. Stains on rear of Camry.

---

[10] Void in a bloodstain pattern occurs when a portion of a pattern is removed. For example, if an obstacle had obstructed the path of the blood to the barrier, then the pattern would have an absence of blood within the pattern area that reflected the obstacle shape. That portion of the bloodstain pattern would be on the obstacle's surface.

Elliptical bloodstains were on the vertical surface of the left rear taillight housing.  The outline of blood stains originated from a source east of the taillight housing and were travelling downward when they contacted the taillight housing[11]. *Figure 9.*

Tissue debris, consistent with cerebral matter, was concentrated around the east side of the rear bumper, east edges of the trunk, and across the rear glass. *Figure 10.*  Similar debris was notably absent from the trunk interior.[12] *Figure 11.*

Tissue debris marked.



**FIGURE 10.** TX DPS DSC_0017. Tissue debris around trunk.



**FIGURE 11.** TX DPS DSC_00. Rear of Camry.

Tissue masses were on the pavement below the right side of the Camry and forward of the right rear tire.  *Figure 12.*



**FIGURE 12.** TX DPS DSC_0023. Rear of Camry.



**FIGURE 13.** TX DPS DSC_0011. Right side of Camry.

The right rear taillight lens cover was broken.  Pieces of the lens cover were on the pavement behind the Camry and east of the Camry.  *Figure 12.*  The right end of the rear bumper had a

---

[11] Blood drop flights are parabolic.  At some point gravity will cause the flight path to turn downward.
[12] TX DPS DSC_0023 trunk interior trunk color adjusted to enhance view.

downward and backward depression.  The bumper was separated from the right rear quarter panel at the back end of the quarter panel. The right side of the taillight assembly was dislocated backward. *Figure 13.*

Tissue spatter was dispersed across the right side of the Camry from the rear to the right front window, and across the right roof of the Camry.  One tissue mass was adhered to the back edge of the rear side window frame (yellow outlined arrow in figure). *Figure 14.* This dispersion pattern was consistent with a source south and east of the Camry right side.



**FIGURE 14.** TX DPS DSC_0023. Right side of Camry.

A white 2021 Ford Explorer was parked in the left emergency lane north of the Camry.[13]  The left front headlight was broken.  The top front of the left quarter panel was bent backward, exposing the left front side of the engine compartment. *Figure 15.*




**FIGURE 15.** TX DPS IMG_1406 Ford Explorer.     **FIGURE 16.** TX DPS IMG_1406 Ford Explorer.

---

[13] Richland Police Department Incident Report #2200089 p.2 and bodycam video RPD003_8L00577_162348 0.335

Circular and elliptical bloodstains were inside the defect area[14]. *Figure 16.* Elliptical stains[15] were on the bent metal and above the right front tire.  Swipe-like bloodstains were along the left side rear door.  The left front fender trim was separated from the fender.  The front of the left rear fender trim was dislodged.  *Figure 17.*





**FIGURE 17.** Richland PD 2200089 - Photos_Part1_9          **FIGURE 18.** TX DPS IMG_1405 Ford Explorer.

The driver's side mirror was not damaged.  *Figure 18.*  Nehemias Santos was not struck by the Explorer side mirror.

No bloodstains, dents or pressure marks were on the Explorer hood, indicating that Nehemias Santos was not carried forward on the Explorer hood.



In the context of this scene, if the Explorer damage was caused by an impact with Nehemias Santos' head, then Nehemias Santos' head was lowered to the level of the Explorer headlight.[16] The exact posture cannot be determined but requires flexing of the lower joints (hips and/or knees). The posture depicted is an approximation to lower the head to the impact level. *Figure 19.*

**FIGURE 19.** Approximation of Nehemias Santos' posture.

---

[14] The volume in stains within the defect area was consistent with a projected pattern, such as a breached artery.

[15] Elliptical bloodstains immediately behind the metal defect appear to be a complex pattern of impact spatter and projected blood.  A complex bloodstain pattern occurs when bloodstain patterns overlap.

[16] Vehicles in scene model dimensioned to manufacturer's specifications.  Generic male model for demonstrative purposes only.

**00476.118002330**                    7 of 12

At impact, an opening was created behind the Explorer's left headlight, and blood was projected into the engine compartment. *Figure 16.*

The impact spattered blood from Nehemias Santos to the east side of the barrier. *Figures 4-8.* The bloodstain impact spatter pattern[17] extended north of the back end of the Camry.
No physical contact between the two vehicles was evidenced. Therefore, the initial impact occurred east of the Camry right rear, in the northbound driving lane, near the Camry right rear. *Figure 20, Figure 21.*



**FIGURE 20.** Cone indicating blood impact spatter to barrier.



Blood drops travelled unobstructed from impact site to east side of center barrier.



**FIGURE 21.** Cone indicating blood impact spatter to barrier.



**FIGURE 22.** Body hit Camry, cone area of blood/tissue.

Blood was swiped from a bloodied surface to the Explorer above the left front tire.

Nehemias Santos impacted the area of the Camry right-side bumper, displacing the bumper and breaking the taillight lens cover. This impact ejected blood and tissue across the trunk, rear window, roof, and right side of the Camry. *Figures 9-15, Figure 22.*

Nehemias Santos body moved, or rebounded, from the Camry to the left side of the Explorer such that his body was in hard contact with the left side of the Explorer as the Explorer continued moving north. This

---

[17] A bloodstain impact pattern occurs when a force is applied to a blood source. Blood is propelled from the source in an approximate cone area from the source to the target surface, creating a radiating distribution of circular to elliptical stains. With sufficient documentation the area of origin of the bloodstains can be calculated to identify the approximate location of the blood source. In this case, the source can be approximated by the overall barrier pattern and its relationship to other evidence in the scene.



contact created blood swipes[18] along the left side of the Explorer, along the left rear door. The movement of the Explorer against Nehemias Santos body displaced the front trim of the left rear fender. *Figure 17, Figure 23.*

Nehemias Santos' body fell to the pavement in the northbound traffic lane. A pool of blood on the pavement was consistent with originating from Nehemias Santos' head trauma. *Figure 24, Figure 25.*

**FIGURE 23.** Body hit Explorer, blood swipe on Explorer.



**FIGURE 24.** TX DPS DSC_0011. Blood pool on roadway.



**FIGURE 25.** Body fell to pavement, blood pooled from head.



**FIGURE 26.** Body dragged behind Camry.

---

[18] Blood swipe stains occur when a bloodied object moves against a surface, leaving a portion of the blood on that surface.

Some person(s) dragged Nehemias Santos' body from the roadway to the pavement behind the Camry.[19]  *Figure 26.*



***FIGURE 27.*** RPD003_8L00577_164348 8.38.

Evelyn Moreno, Erick Pivaral, Melvin Diaz, and Dina Regalado were at the scene.[20] *Figure 27-28.*

Bodycam images of Evelyn Moreno showed that she had blood spatter and tissue spatter on her right arm and on her right side.  *Figure 28.*  Evelyn Moreno's right side was exposed to blood and tissue as it traveled through the air from the source to her.  In the context of the scene, an area of possible spatter void was identified in the Camry trunk.  Moreno could have been positioned behind the Camry at the left side of the trunk, leaning into the trunk, when the impact occurred. *Figure 29.*



Blood and tissue spatter on Moreno's right arm and right side.

***FIGURE 28.*** Bodycam images of Evelyn Moreno at scene.



Shaded area indicating approximate path of spatter.

***FIGURE 29.*** Scenarios with Moreno in Camry trunk at impact.

---

[19] The position of the body on the pavement behind the Camry suggests he may have been dragged by his right arm, causing his left arm and legs to be extended.  Then his right arm was placed across his body.
[20] Richland Police Department Incident Report #2200089.

**00476.118002333**



**FIGURE 30.** Bodycam images of Eric Pivaral at scene.



Contact bloodstains below knees
from kneeling on bloody pavement.

**FIGURE 31.** Bodycam images of Eric Pivaral at scene.

Bodycam images of Erick Pivaral showed no indications of bloodspatter or tissue debris on his shirt, arms, or pants.[21]  *Figure 30, Figure 31.*  Erick Pivaral was not in the path of blood and tissue spatter at impact.  Erick Pivaral was not standing at the Camry trunk or east of the barrier bloodstain pattern area at the time of impact.



**FIGURE 32.** Bodycam images of Melvin Diaz at scene.



**FIGURE 33.** Bodycam images of Dina Regalado at scene.

Bodycam images of Melvin Diaz showed no indications of bloodspatter or tissue debris on his shirt or arms.  *Figure 32.*  Melvin Diaz was not in the path of blood and tissue spatter at impact.  Melvin Diaz was not standing at the Camry trunk or east of the barrier bloodstain pattern area at the time of impact.

---

[21] A possible transfer stain was on Erick Pivaral's left lower pant leg, below the left knee.  This pattern could occur from kneeling on the stained pavement as depicted in the bodycam video RPD003_8L00577_160346 02.52.  This stain is not consistent with being in the path of blood in flight such as the impact pattern on the barrier.

Bodycam images of Dina Regalado showed no indications of bloodspatter or tissue debris on her shirt or arms. *Figure 33.* Dina Regalado was not in the path of blood and tissue spatter at impact. Dina Regalado was not standing at the Camry trunk or east of the barrier bloodstain pattern area at the time of impact.

**CONCLUSIONS**

Based on analysis of the documents, images, and video, the following sequence of actions was identified:

Nehemias Santos was in the left northbound traffic lane, near the right rear of the Camry and east of the Camry, when he was struck by the front left of the Explorer which was travelling in the northbound travel lane.

The force of impact with the Explorer caused blood to be projected from Nehemias Santos to the center barrier, creating a large spatter pattern on the barrier. No intervening objects or persons were in the path of the blood as it travelled from Nehemias Santos to the barrier.

The force of impact with the Explorer propelled Nehemias Santos' body against the right side of the Camry rear bumper, damaging the right taillight and bumper, and projecting blood and tissue from Nehemias Santos across the Camry open trunk and right side.

Nehemias Santos' body rebounded from the rear of the Camry and came in hard contact with the Explorer left side, leaving blood swipes on the Explorer left rear door and dislodging the front section of the left rear fender trim.

Nehemias Santos' body fell to the pavement east of the Camry, in the northbound traffic lane. Blood from Nehemias Santos' head trauma pooled on the pavement.

During these events, Evelyn Moreno was behind the Camry at the left side of the open trunk. Nehemias Santos' blood and tissue struck Evelyn Moreno's right side.

Someone dragged Nehemias Santos' body from the northbound traffic land to the pavement behind the Camry.

Respectfully submitted,

Iris Dalley Graff
28 September 2023

Reviewed by Gary Graff.



**FIGURE 1.** TX DPS DSC_0014



**FIGURE 2.**  Richland PD Photos 2200089 - Photos_Part2_17



**_FIGURE 3._**  Bodycam RPD003_8L00577_160346 00.04



***FIGURE 4.*** TX DPS DSC_0012 Bloodstains on barrier.



**FIGURE 5.** TX DPS DSC_0012
Circular and elliptical bloodstains on barrier.



**FIGURE 6.** Two views of bloodstains on barrier.

00476.118002341

App. 000518



**FIGURE 7.** TX DPS DSC_0023. Blood on barrier west of car.



**FIGURE 8.** TX DPS DSC_0017. Stains on west side of Camry.

00476.118002343

App. 000520



**FIGURE 9.** TX DPS DSC_0023. Stains on rear of Camry.



**FIGURE 10.** TX DPS DSC_0017. Tissue debris around trunk.

Tissue debris marked.



***FIGURE 11.*** TX DPS DSC_00. Rear of Camry.

00476.118002346

App. 000523



**FIGURE 12.** TX DPS DSC_0023. Rear of Camry.

00476.118002347

App. 000524



**FIGURE 13.** TX DPS DSC_0011. Right side of Camry.

00476.118002348

App. 000525



**FIGURE 14.** TX DPS DSC_0023. Right side of Camry.



**FIGURE 15.** TX DPS IMG_1406 Ford Explorer.



**FIGURE 16.** TX DPS IMG_1406 Ford Explorer.

00476.118002351

App. 000528



**FIGURE 17.** Richland PD 2200089 - Photos_Part1_9



**FIGURE 18.** TX DPS IMG_1405 Ford Explorer.

00476.118002353

App. 000530



**FIGURE 19.** Approximation of Nehemias Santos' posture.

00476.118002354

App. 000531



**FIGURE 20.** Cone indicating blood impact spatter to barrier.



Blood drops travelled unobstructed from impact site to east side of center barrier.



**FIGURE 21.** Cone indicating blood impact spatter to barrier.



**FIGURE 22.** Body hit Camry, cone area of blood/tissue.



**FIGURE 23.** Body hit Explorer, blood swipe on Explorer.

00476.118002358

App. 000535



**FIGURE 24.** TX DPS DSC_0011. Blood pool on roadway.



**FIGURE 25.** Body fell to pavement, blood pooled from head.



**FIGURE 26.** Body dragged behind Camry.



**FIGURE 27.** RPD003_8L00577_164348 8.38.



Blood and tissue spatter on Moreno's right arm and right side.

**FIGURE 28.** Bodycam images of Evelyn Moreno at scene.

00476.118002363

App. 000540



Shaded area indicating approximate path of spatter.

**FIGURE 29.** Scenarios with Moreno in Camry trunk at impact.

00476.118002364

App. 000541



**FIGURE 30.** Bodycam images of Eric Pivaral at scene.

00476.118002365

App. 000542



RPD003_8L00577_164348 8.37

RPD003_8L00577_160346 02.52

RPD003_8L00577_163348 6.08

Contact bloodstains below knees
from kneeling on bloody pavement.

**FIGURE 31.** Bodycam images of Eric Pivaral at scene.

00476.118002366

App. 000543



**FIGURE 32.** Bodycam images of Melvin Diaz at scene.

00476.118002367

App. 000544



**FIGURE 33.** Bodycam images of Dina Regalado at scene.

00476.118002368

App. 000545

# EXHIBIT G

App. 000546



