IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ERICK RODERICO PIVARAL GONZALEZ, Individually and as Special Administrator of the Estate of NEHEMIAS R. PIVARAL SANTOS, DECEASED, ERICK SANTOS and EVELYN MORENO | §<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:22-CV-02714-K |
| Plaintiffs | §<br>§<br>§ | |
| v. | §<br>§ | |
| CAYLEE ERIN SMITH & EASTMAN CHEMICAL COMPANY | §<br>§<br>§<br>§ | |
| Defendants. | §<br>§<br>§ | |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.    Factual Background ........................................................................................... 1

   A.   Caylee Smith and Eastman Chemical Company ................................................ 1

   B.   April 30, 2022 ................................................................................................. 10

   C.   Ms. Smith's Communications ......................................................................... 11

   D.   Nehemias Is Helping Evelyn Change a Tire. ................................................. 20

   E.   Ms. Smith's Final Approach and Crash ......................................................... 22

II.   Legal Standard ................................................................................................ 27

III.  Argument ........................................................................................................ 28

   A.   Eastman is not entitled to summary judgment on Plaintiffs' negligent hiring claim. ....... 28

   B.   Eastman is not entitled to summary judgment on Plaintiffs' negligent supervision claim ...
..................................................................................................................... 31

   C.   Eastman is not entitled to summary judgment on Plaintiffs' negligent training claim. .... 33

   D.   Eastman is not entitled to summary judgment on Plaintiffs' negligent retention claim. .. 37

   E.   Eastman is not entitled to summary judgment on Plaintiffs' claim for gross negligence
against Caylee Smith ....................................................................................... 37

      i.    Viewed objectively, Ms. Smith's actions on April 30, 2022, were grossly negligent ... 38

      ii.   Viewed subjectively, Ms. Smith's actions on April 30, 2022, were grossly negligent.  47

   F.   Eastman is not entitled to summary judgment on Plaintiffs' claim for gross negligence
against Eastman. ............................................................................................. 48

   G.   Texas law allows Erick Gonzalez to assert exemplary damages. .................................. 49

   H.   Texas law allows Erick Gonzalez to recover for Nehemias' physical pain and suffering.
..................................................................................................................... 50

V.    Conclusion ...................................................................................................... 50

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpizar v. John Christner Trucking, LLC*,
  2019 WL 1643743 (W.D. Tex. Apr. 16, 2019)...............................................................38, 39

*Appleton v. Con. Crain and Rigging, LLC*,
  2022 WL 17843993 (Tex. App.—Beaumont Dec. 22, 2022, no pet.)....................................33

*Boerjan v. Rodriguez*,
  436 S.W.3d 307 (Tex. 2014)...................................................................................................47

*Boudreaux v. Swift Transp. Co., Inc.*,
  402 F.3d 536 (5th Cir. 2005) .................................................................................................28

*Braun v. Clean Harbors Envtl. Servs., Inc.*,
  2016 WL 7551118 (E.D. Tex. Jan. 25, 2016).........................................................................38

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................................27

*Cobos v. Bluefin Water Sols., LLC*,
  2022 WL 847235 (W.D. Tex. Mar. 22, 2022) ........................................................................29

*Denham v. Bark River Transit, Inc.*,
  2019 WL 4887256 (S.D. Tex. Oct. 3, 2019)......................................................................38, 47

*DeYoung v. Dillon Logistics, Inc.*,
  2021 WL 414536 (E.D. Tex. Feb. 5, 2021) ...........................................................................39

*Doe v. YUM! Brands, Inc.*,
  639 S.W.3d 214 (Tex. App.—Houston [1st Dist.] 2021, no pet.).........................................30

*Ellison v. Messerschmitt-Bolkow-Blohm*,
  807 F. Supp. 39 (E.D. Tex. 1992)...........................................................................................50

*Finley v. Vermeer Mfg. Co.*,
  2019 WL 5058901 (W.D. Tex. July 11, 2019) .......................................................................38

*Gen. Chem. Corp. v. De La Lastra*,
  852 S.W.2d 916 S.W.2d 916, 923 (Tex. 1993)......................................................................49

*Goldfarb v. Elite Serv. Recovery & Towing, LLC*,
  2018 WL 4677817 (E.D. Tex. Aug. 17, 2018) .......................................................................31

*Jezek v. R.E. Garrison Trucking, Inc.*,
    637 F. Supp. 3d 445 (N.D. Tex. Oct. 28, 2022)................................................................48, 49

*Johnson v. Cox*,
    2024 WL 331631 (N.D. Tex. Jan. 29, 2024) ........................................................................30

*Martinez v. Valdez*,
    2023 WL 1928870 (S.D. Tex. Feb. 10, 2023) ......................................................................31

*MDK S.R.L. v. Proplant Inc.*,
    25 F.4th 360 (5th Cir. 2022) ................................................................................................28

*Mendoza v. PGT Trucking Inc.*,
    2020 WL 1902562 (W.D. Tex. Jan. 27, 2020) .....................................................................33

*Moerbe v. Adcock*,
    2022 WL 5568119 (W.D. Tex. Aug. 3, 2022) ................................................................29, 30

*Nabors Drilling, U.S.A., Inc. v. Escoto*,
    288 S.W3d 401, 411 (Tex. 2009).........................................................................................34

*Nat'l Convenience Stores Inc. v. Matherne*,
    987 S.W.2d 145 (Tex.App.—Houston [14th Dist.] 1999, no pet.)........................................34

*Onofre v. C.R. England, Inc.*,
    2016 WL 3406196 (W.D. Tex. June 17, 2016) .....................................................................30

*Phillips v. Super Servs. Holdings, LLC*,
    189 F. Supp. 3d 640 (S.D. Tex. 2016) .................................................................................38

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)..............................................................................................................28

*Sanchez v. Young County*,
    956 F.3d 785 (5th Cir. 2020) ................................................................................................28

*Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*,
    33 F.4th 747 (5th Cir. 2022) ................................................................................................27

*Steigerwald v. Wal-Mart Stores Texas, LLC*,
    2020 WL 1879231 (S.D. Tex. Mar. 31, 2020)......................................................................28

*Terral River Serv., Inc. v. SCF Marine Inc.*,
    20 F.4th 1015 (5th Cir. 2021) ..............................................................................................28

*Thompson v. Microsoft Corp.*,
    2 F.4th 460 (5th Cir. 2021) ..................................................................................................27

*Villegas v. M.G. Dyess, Inc.*,
  2021 WL 2593633 (W.D. Tex. June 23, 2021) ...............................................................33, 34

**Statutes**

Tex. Civ. Prac. & Rem. Code § 41.001(11)..................................................................................38

Tex. Civ. Prac. & Rem. Code § 71.021 ......................................................................................49

**Other Authorities**

Texas Constitution ....................................................................................................................49

Plaintiffs Erick Roderico Pivaral Gonzalez, Evelyn Moreno, and Erick Santos (collectively "Plaintiffs) file their Brief in Support of Their Opposition to Defendants Eastman Chemical Company ("Eastman") and Caylee Erin Smith's Motion for Partial Summary Judgment.

## I.     Factual Background

This case revolves around the death of Nehemias Santos.  Eastman's employee, Caylee Smith, killed Nehemias Santos on April 30, 2022, when she crashed into him with her Eastman-provided Ford Explorer.

### A.     Caylee Smith and Eastman Chemical Company

Eastman is a multinational corporation headquartered in Tennessee that manufactures and distributes a wide range of chemical and products.  Currently, Eastman's market capitalization is approximately $10.2 billion, and Eastman employs over 14,000 people globally.

Eastman hires sales representatives to visit its customers throughout the globe.  Eastman refers to this sales representative position as an "outside sales representative."  Plaintiffs' Appendix at 22–23.  These outside sales representatives have a home office, and they then drive to existing and potential customer locations within their territories to work with those customers. Eastman has stated that outside sales representatives need to meet with existing and potential customers in person, not telephonically or via video conferencing.  Pl. App. at 25.  Eastman typically has only one outside sales representative per territory, and each territory typically covers multiple major metropolitan areas.  Pl. App. at 27–28.

Eastman hired Caylee Smith in March of 2021 as an "outside sales representative."  Her territory covered from "Waco to Brownsville."  Pl. App. at 543.  Her job description includes a requirement that she will be willing "to travel up to 50% of the time o[n] short notice to ensure customer satisfaction . . . ."  Pl. App. at 949.  Other public job listings for outside sales

representatives state that travel is "50-75%" of the job.  Pl. App. at 953.  Ms. Smith admits that she spent at least 20 hours a week on the road, "[s]ometimes more."  Pl. App. at 541.  She conceded that "for the most part," she spent four days a week on the road.  Pl. App. at 583.

Eastman hired Ms. Smith as a salaried employee, but her compensation includes a performance bonus as well.  When she was hired in 2021, her salary was $70,000, plus a bonus based upon a meeting her sales goals.  Pl. App. at 561.  Ms. Smith's role with Eastman required her to travel to her customers; as explained by Eastman's corporate designee, Ms. Smith needed to meet with customers throughout her territory, face-to-face, to build relationships.  Pl. App. at 24.

To facilitate Ms. Smith's extensive travel requirements, Eastman provided her with a 2021 Ford Explorer shortly after she was hired.  Pl. App. at 563.  Ms. Smith testified that, after receiving the Ford Explorer from Eastman, she used it almost exclusively for work and personal purposes.  Pl. App. at 614.  Eastman gave Ms. Smith a gas card, and she exclusively used that card to pay for gas in the Ford Explorer. Pl. App. at 612.  Eastman also provided her with a cell phone and an iPad.  Pl. App. at 713.

As part of the hiring process for the outside sales representative position, Eastman conducted a background check on Ms. Smith.  That background check revealed that Ms. Smith had pleaded guilty to going 80 in a 65 and a failure to appear, both in 2017.  Pl. App. at 960.  Eastman, through its corporate representative, admits that it is "pretty common" for its background checks to reveal traffic tickets.  Pl. App. at 298.  Eastman also admits that it has no written policy on what, if any, prior crimes would prevent an individual from being hired as an outside sales representative.  Pl. App. at 296.

In spite of this history and Eastman's policies cautioning employees regarding their social media posts, Eastman did not review Ms. Smith's public social media posts before hiring her.  Ms.

Smith's social media posts reveal that she has a history of distracted driving and near-misses with pedestrians:



Pl. App. at 970–71.  .

Eastman, through its corporate representative, Erin Bernhardt, acknowledges that "[d]riving is certainly a common risk."  Pl. App. at 194.  Once she was hired by Eastman, Ms. Smith does not remember the specifics of any driving training she received.  Pl. App. at 566, 575–76.  She remembers doing training "modules" at home, but she does not remember their content.  Pl. App. at 566.  She does not remember if any of those modules dealt with driver safety.  Pl. App. at 567.  Ms. Smith does believe that she never specifically did a module on driver safety.  Pl. App. at 567.  Ms. Smith does not remember if she ever did any training on distracted driving.  Pl. App. at 570, 575.  In fact, the only specific training Ms. Smith recalls is cybersecurity training.  Pl. App. at 570, 581.

Ms. Smith testified that, as part of her initial training, she accompanied two more experienced outside sales representatives for a week each.  Pl. App. at 639.  Ms. Smith testified that she could not remember how often her supervisor visited her between when she was hired and April 30, 2022, other than that it was less than six times.  Pl. App. at 637–38.  Other than shadowing the two more experienced outside sales representatives and a few visits from her supervisor, Ms. Smith could not remember any other in-person training she received before the crash.  Pl. App. at 644-45.

Ms. Smith admits that she takes work calls while driving Eastman's Ford Explorer. Pl. App. at 598. She also admits to responding to text messages while driving Eastman's Ford Explorer. Pl. App. at 604.

Officially, Eastman disapproves of distracted driving. Eastman issued a standard operating procedure in 2013 which identifies potential distractions, including "using mobile devices, computers, eating, drinking, talking with passengers, . . . reading, [and] using a navigation system . . . ." Pl. App. at 973. Eastman's distracted driving policy states that using a hand-held cell phone to conduct business while driving a motor vehicle is prohibited. Pl. App. at 973. Eastman does, however, allow its employees to use "voice-activated, hands-free devices" only if "[u]se allows the driver to keep hands on the steering wheel and eyes on the road" and "[u]se is limited to necessary calls and the duration of necessary calls is minimized." Pl. App. at 974. Eastman's policy does emphasize that its employees "should use sound judgment to make distraction-free, safe driving a priority at all times." Pl. App. at 974. Ms. Bernhardt confirmed that Ms. Smith would not have signed a copy of the distracted driving SOP. Pl. App. at 130. Ms. Bernhardt does believe Ms. Smith would have seen parts of the distracted driving SOP during team meetings. Pl. App. at 130. Ms. Smith does not remember being trained on this SOP. Pl. App. at 624, 683.

Ms. Bernhardt emphasized at her deposition that Eastman focuses on discouraging cell phone use while driving "because of the broad use or the broad usage of cell phones these days . . . ." Pl. App. at 629. Ms. Bernhardt explained that Eastman is aware that if it does not provide employees "clear guidance," cell phones may be used inappropriately while driving. Pl. App. at 631. Ms. Bernhardt agrees that "using a cell phone in your hands while driving" is "presumably unsafe." Pl. App. at 632. As for the use of other electronic devices or hands-free devices, Ms. Bernhardt stated that, "[W]e expect that the use of a device should not be something that, you

know, draws attention away for a long period of time or that creates – you know, create the inability to watch the road."  Pl. App. at 635.  But when asked if there was an amount of time that an Eastman employee could take their eyes of the road and thereby violate Eastman's policies, Ms. Bernhardt answered, "I prefer not to speculate on that."  Pl. App. at 642.  Later, she clarified that, in her personal opinion, Eastman's drivers should not take their eyes of the road for more than "a second, two seconds."  Pl. App. at 643.  But then, when asked if looking at a navigation system in heavy traffic or adverse weather would violate Eastman's policies, Ms. Bernhardt answered, "Not necessarily."  Pl. App. at 180.

Eastman has previously sponsored anti-distracted driving initiatives.  A video published to social media shows that Eastman sponsored an anti-distracted driving event, which included virtual-reality demonstrations and shirts bearing the phrase "Distracted Driving is the New DUI."



Eastman also has an extensive standard operating procedure governing the use of Eastman-provided vehicles.  This SOP does not reference distracted driving, but it does state that a violation of the "Eastman Cell Phone policy" may result in disciplinary actions, including up to termination.  Pl. App. at 989.  It also says that "[a]ll drivers are expected to observe speed limits and to drive within the law."  Pl. App. at 984.  Ms. Bernhardt testified that Ms. Smith should have received a copy of this SOP, but she conceded that there was no way to verify that Ms. Smith had reviewed

it.  Pl. App. at 130.  Ms. Smith claims to have signed this SOP at some point, but no signature page has been disclosed in discovery.  Pl. App. at 624.

Eastman admits it keeps no record of whether its employees, including Ms. Smith, reviewed and understood the distracted driving policy.  Pl. App. at 130.  For her part, Ms. Smith has no recollection of Eastman ever training her on distracted driving.  Pl. App. at 679–80.  Ms. Smith testified that she didn't know if there would be any consequences if Eastman caught her engaging in distracted driving.  Pl. App. at 682.  Ms. Smith testified that she did not know if her supervisors would care if she was texting and driving.  Pl. App. at 682.  In fact, as of her deposition, Ms. Smith testified that she "just ha[sn't] thought about" distracted driving.  Pl. App. at 680.  Ms. Smith does not remember if Eastman ever trained her on whether she can use her personal phone while driving her Eastman-provided vehicle.  Pl. App. at 686.  Ms. Smith testified that she does not know who at Eastman is responsible for ensuring that she is not engaging in distracted driving. Pl. App. at 687.

Eastman asserts that it is "not in the driving business."  Pl. App. at 76.  Eastman does not actively monitor the driving records of its employees.  Pl. App. at 76.  Unless a supervisor does a manual review of an employee's file, Eastman has no idea how many crashes that employee has been in before or after the employee started working for Eastman.  Pl. App. at 76.  Eastman claims to provide a distracted driving policy to its outside representatives, but it does not verify that its employees review those policies.  Pl. App. at 112.  Ms. Bernhardt testified that Eastman does not actively make sure that its employees are complying with the driving SOPs; instead, they rely on "reminders, interaction from the supervision with the sales team on, you know, more just general kind of safety and expectations."  Pl. App. at 116.  To be clear, she clarified that "we don't try to monitor and control that."  Pl. App. at 116.  Instead, Eastman simply reminds its employees about

the policies it has regarding safe driving.  Pl. App. at 116.  Moreover, while Eastman does require outside sales representatives to have a valid drivers' license when hired and annually checks to make sure the license remains valid, Eastman does not check whether its drivers have had any additional moving violations or crashes.  Pl. App. at 126–27.  Eastman also does not have a formal process for ensuring that outside sales representatives retain and recall their training.  Pl. App. at 153.

When asked about Ms. Smith never receiving training on driver safety, Ms. Bernhardt acknowledged, "That's possible."  Pl. App. at 120.  She explained that while Eastman may have training governing driver safety, such training is "not required."  Pl. App. at 120.  She confirmed that Ms. Smith never completed any training on distracted driving.  Pl. App. at 123.  In fact, Ms. Bernhardt confirmed that there is no required distracted driving training for *any* outside sales representative.  Pl. App. at 124.  Ms. Bernhardt testified that Ms. Smith's team discusses safety at the beginning of each team meeting, but she did know how many times, if any, driving safety was a topic at those meetings.  Pl. App. at 125.  Ms. Bernhardt also confirmed that Eastman did not provide specific training about cell phone use while driving.  Pl. App. at 132.  Ms. Bernhardt does believe it is possible Ms. Smith received training on distracted driving when she was in-person with her supervisors.  Pl. App. at 133.  When asked why Ms. Smith testified that she could not recall receiving distracted driving training from Eastman, Ms. Bernhardt said Ms. Smith's answer "surprises me."  Pl. App. at 139.

Furthermore, Ms. Bernhardt acknowledged that she knew of no instances where *any* outsides sales representative has been disciplined for violating Eastman's distracted driving policy. Pl. App. at 184.  Ms. Bernhardt confirmed that Eastman does not have a documented procedure

that governs how to investigate whether its employees engaged in distracted driving following a motor vehicle crash.  Pl. App. at 191.

Indeed, Eastman had no active methods of monitoring the driving of its outside sales representatives.  Ms. Bernhardt testified that Eastman utilized no electronic methods to monitor the driving of outside sales representatives.  Pl. App. at 110.  She also testified that Eastman relies upon its drivers to alert Eastman of any driving violations or incidents; Eastman does not independently track such incidents.  Pl. App. at 107.  Ms. Bernhardt confirmed that if an Eastman employee gets a ticket of any sort, Eastman has no way of learning about that ticket unless the employee voluntarily reports it.  Pl. App. at 225.

Even if Eastman knows that one of its outside sales representatives has been in an avoidable accident, Eastman has no policy for increasing monitoring of that outside sales representative's driving.  Pl. App. at 107.  Ms. Bernhardt explained that Eastman does not actively track driving incidents because "we're not in the business for driving."  Pl. App. at 108.  In the event that Eastman did become aware of a driving event that qualified as a violation of Eastman's policies, Eastman would have a "documented discussion that would go then into the person's personnel file."  Pl. App. at 109.  Ms. Bernhardt confirmed that no such discussions exist in Ms. Smith's personnel file.  Pl. App. at 110.

Generally speaking, Ms. Smith did not have in-person supervision.  When she was first employed, her direct supervisor was Alan Davis, and in early 2022 her direct supervisor became Chris Ierardi.  Neither Mr. Davis nor Mr. Ierardi resided in Texas.  Pl. App. at 31–32.  Ms. Bernhardt testified that Mr. Davis travelled with Ms. Smith "four to five times" in the first six months of her employment with Eastman.  Pl. App. at 32–33.  According to Ms. Bernhardt, Mr. Davis observed Ms. Smith "using her phone mount," and he "didn't observe any concerns with - -

with distractions." Pl. App. at 206. Ms. Smith could not remember how often she met with Mr. Davis. Pl. App. at 637–38. Ms. Smith said that her supervisor would call "frequently." Pl. App. at 637. Ms. Smith does receive mid-year reviews, but those are not conducted in person. Ms. Smith testified that, at those reviews, she was encouraged by her supervisors "to stay safe on the job," but she could not recall any more specifics regarding how safety was discussed at those reviews. Pl. App. at 652.

Ms. Smith admits that in June 2021, she rear-ended another driver in Austin, Texas. She was driving her Eastman-provided Ford Explorer during this crash. Ms. Smith does not remember if any of her supervisors discussed this crash with her. Pl. App. at 653. Ms. Smith does not remember if she suffered any adverse employment consequences as a result of the 2021 crash that she caused. Pl. App. at 653. Ms. Smith does not remember if she received any additional training following this crash. Pl. App. at 620. Ms. Bernhardt confirms that "there was no specific additional training or supervision provided" as a result of the June 2021 crash. Pl. App. at 685. Ms. Bernhardt also stated that Eastman relied upon Ms. Smith's description of the June 2021 crash and did not conduct any independent investigation regarding that crash. Pl. App. at 697.

Ms. Smith's first recorded performance review, signed by Alan Davis and dated April 4, 2022, makes no mention of the crash in Austin. Pl. App. at 994–98. But in her July 2021 review document, Ms. Smith's supervisor commented, "Needs improvement based on previous events that have already occurred this year. Pl. App. at 1000. Ms. Smith wrote a comment in that review document acknowledging that she needed to "avoid potential accidents by staying aware of my surroundings while driving." Pl. App. at 1000. Ms. Bernhardt admitted that the June 2021 accident qualified as an "avoidable accident" under the Auto Lease SOP, but she acknowledged that Eastman does not require a management response after one avoidable accident. Pl. App. at 231.

When asked at her deposition if she had been in any motor vehicle incidents since April 30, 2022, Ms. Smith responded, "I don't remember." Pl. App. at 689. Upon further questioning, she confirmed that she was in a third crash in her Eastman-provided vehicle, where she "t-boned" another vehicle. Pl. App. at 692.

### B.    April 30, 2022

Saturday, April 30, 2022, was a bright, clear day seemingly without a cloud in the sky. That day, Ms. Smith planned to drive from Houston to Dallas on Interstate 45 to attend an Eastman conference on Monday in Fort Worth. She was driving her Eastman-provided Ford Explorer, and she was scheduled to pick up other sales representatives from the airport before attending the conference. Eastman has stipulated that Ms. Smith's trip on April 30, 2022, was within the scope of her employment.

While there are many factual disputes in this case, all parties agree that the electronic data from Ms. Smith's personal iPhone and the infotainment module within her Ford Explorer are key to understanding what transpired on April 30, 2022. The infotainment module in the Ford Explorer contains data from Ms. Smith's trip on April 30, 2022; specifically, for each second of her trip, the module recorded her GPS location, the number of feet traveled, bearing, and speed.[1] By comparing Ms. Smith's iPhone data to the infotainment module data, the parties have been able to pinpoint

---

[1]   Eastman's accident reconstructionist, Shannon Burgess, took possession of the infotainment module and conducted the data extraction. Initially, he turned over a PDF file that did not disclose the speed data for each recorded second of travel time. But because Mr. Burgess's initial disclosure did reveal the number of feet Ms. Smith traveled per second, counsel was able to algebraically determine Ms. Smith's speed in miles per hour. Mr. Burgess eventually turned over the full data file, verifying counsel's equations.

precisely where and at what speed Ms. Smith was traveling when she sent and received electronic communications throughout April 30, 2022.[2]

C.     **Ms. Smith's Communications**

Because Ms. Smith was headed to the Dallas area a day before her conference, she planned to go to a Justin Bieber concert with her friend, Gracie Roberts.  Pl. App. at 728.  On Ms. Smith's drive from Houston to Dallas on April 30, 2022, she sent and received approximately 60 text messages, including photographs, movies, and geolocation pins, with her friend Gracie Roberts.  Ms. Smith also sent a text to her brother, called her brother, called a tattoo shop, sent a text to a tattoo shop, and received a text from a tattoo shop.  The below-referenced texts were all sent and received while Ms. Smith was driving her Ford Explorer on April 30, 2022.  Ms. Smith's texts are in blue, Ms. Robert's texts are gray.

Ms. Smith's conversation with Ms. Roberts begins with Ms. Smith complaining that she has not prepared an outfit for the Justin Bieber concert:

---

[2]  The Court will notice that the time stamps from the infotainment module are one hour behind the time stamps from Ms. Smith's iPhone.  Both parties' experts agree that the infotainment module time stamps are an hour behind the iPhone timestamps due to a time change update.

 

Pl. App. at 1180–81.  At first, Ms. Smith and Ms. Roberts text about their clothing selections, food, and Ms. Smith's estimated time of arrival in Dallas. The forensic download of Ms. Smith's iPhone reveals that the gray bubble circled above was a .mov[3] file sent by Ms. Roberts to Ms. Smith:

---

[3] A .mov file is an Apple QuickTime Movie file.



Pl. App. at 1060.  Presumably, Ms. Smith watched this video as she traveled down Interstate 45, as she responded to this message with "CUTE."   The corresponding time stamp from the infotainment module shows that Ms. Smith was going 92.8 mph when she watched the video sent by Ms. Roberts.

| 66262 | 4/30/2022 2:07:13 PM | Local | 31.260777 | -95.987689 | 136.1 ft | 92.8 mph (149.3 kph) | 4° |
|---|---|---|---|---|---|---|---|

Ms. Smith and Ms. Roberts then begin discussing their spontaneous plans to get new tattoos before the Justin Bieber concert on Sunday:



Pl. App. at 1182–84.

It is clear that Ms. Roberts brought up the idea of getting tattoos, and then Ms. Smith suggested they get tattoos that Saturday night "[a]nd then go out after." Pl. App. at 1063. Ms. Roberts notes that the tattoo shop she tried the day prior "only have a [sic] walkins," so Ms. Smith said, "[f]ind somewhere else." Pl. App. at 1064. They then discussed what tattoos they planned to get, and Ms. Smith urged Ms. Roberts to find a tattoo shop. Pl. App. at 1065. Ms. Roberts responded by asking Ms. Smith's "eta," or estimated time of arrival. Pl. App. at 1068. Ms. Smith responded by asking if she should go to Ms. Roberts' house or Ms. Roberts' mom's house, and Ms. Roberts responded by sending Ms. Smith a .loc[4] file:

---

[4] A file with a .loc extension is a GPS location file that contains geospatial locations as waypoints. Colloquially, sending someone a .loc file is referred to as "dropping a pin."



Pl. App. at 1069.  Ms. Smith responded by stating that she was "about two hours out."[5]  In order to reach this conclusion, Ms. Smith must have physically clicked on the pin twice; in her deposition, she testified that she would have to click on a pin twice in order to see the estimated time of arrival.  Pl. App. at 756–57.  Two minutes later, Ms. Roberts sent Ms. Smith a photo of her child with the comment, "Look at my nugget." [6]

---

[5]  Ms. Smith was driving 87.6 miles per hour when she sent this text to Ms. Roberts.  Pl. App. at 1020.

[6]  Ms. Smith was driving 96.3 miles per hour when she reviewed this photo from Ms. Roberts.  Pl. App. at 1021.



After viewing this photo, Ms. Smith responded, "He's getting so big [emoji]."[7]  Ms. Smith and

Ms. Roberts then continued to discuss which tattoo shop they should patronize:



---

[7]  Ms. Smith was driving 76.5 miles per hour when she sent this text message to Ms. Roberts.  Pl. App. at 1022.

Ms. Smith next calls her brother Christian, but he does not answer.[8]  Pl. App. at 1019.  Ms. Smith

tells Ms. Roberts that she is going to ask for her brother's tattoo shop recommendation.  Ms. Smith

then texts her brother Trevor to ask if he has "any tattoo place recommendations near Mckinney?"[9]



Ms. Smith also texts her brother Christian and asks him to "[c]all me asap . . . ."[10]

---

[8]  Ms. Smith was driving 82.7 miles per hour when she called Christian.  Pl. App. at 1023.
[9]  Ms. Smith was driving 83.2 miles per hour when she sent this text message to her brother.  Pl. App. at 1025.
[10]  Ms. Smith was driving 93 miles per hour when she sent this text message to her brother.  Pl. App. at 1026.



Christian called Ms. Smith back approximately 10 minutes later, and they spoke for approximately three (3) minutes.[11]  Pl. App. at 1019.

| Call Log | Incoming call with Da Brother (+14698150901) | Incoming | 4/30/2022 2:33:37 PM | Local | 31.761121 | -96.209787 |
| Call Log | Ended call with Da Brother (+14698150901) | Ended | 4/30/2022 2:36:30 PM | Local | 31.805227 | -96.262829 |

Approximately 26 seconds after ending her phone call with Christian, Ms. Smith read a text message from Ms. Roberts where Ms. Roberts recommends a tattoo shop called "Boss Frog."[12] Ten seconds after reading that text message, Ms. Smith responds to Ms. Roberts by saying, "My brother said to go to saints and sinners in Carrollton."[13]  Twenty seconds later, Ms. Smith calls the tattoo shop called Saints and Sinners, and this phone call lasts approximately 40 seconds.[14]  Pl. App. at 1019.

---

[11]  Ms. Smith's average speed during this phone call was approximately 91 miles per hour.  Pl. App. at 1027–31.

[12]  Ms. Smith was driving 87.5 miles per hour when she read this text message from Ms. Roberts. Pl. App. at 1033.

[13]  Ms. Smith was driving 84.5 miles per hour when she sent this text message to Ms. Roberts.  Pl. App. at 1033.

[14]  Ms. Smith was driving 89.1 miles per hour when she called Saints and Sinners.  Pl. App. at 1033.

| Call Log | Outgoing call with +1 (972) 939-6034 (+19729396034) | Outgoing | 4/30/2022 2:37:26 PM | Local | 31.820278 | -96.278004 |
| Call Log | Ended call with +1 (972) 939-6034 (+19729396034) | Ended | 4/30/2022 2:38:09 PM | Local | 31.834333 | -96.285534 |

During this call, Saints and Sinners sent Ms. Smith a text message, which she read four (4) seconds after ending the phone call with Saints and Sinners.[15]  Pl. App. at 1096.  Approximately a minute later, Ms. Smith texts Saints and Sinners, asking if she could get a last-minute tattoo "today."[16]



Pl. App. at 1097.

Ms. Smith's last text exchange with Ms. Roberts occurred only seconds before Ms. Smith collided with Nehemias Santos.  Approximately 15-14 seconds prior to the collision, Ms. Roberts sent—and Ms. Smith read—a text message saying, "Ok cool we can do that," presumably in response to Ms. Smith's suggestion that they get tattoos at Saints and Sinners.[17]  Pl. App. at 1092. Six seconds after reading Ms. Roberts' text message, Ms. Smith texted her back, "They don't do

---

[15]  Ms. Smith was driving 89.5 miles per hour when she read this text message from Saints and Sinners. Pl. App. at 1034.
[16]  Ms. Smith was driving 80 miles per hour when she sent this text message to Saints and Sinners. Pl. App. at 1035.
[17]  Ms. Smith was driving 88.4 miles per hour when she read this text message from Gracie.  Pl. App. at 1036.

walkins though."[18] Pl. App. at 1092.  Approximately eight (8) seconds after sending that text message, Ms. Smith struck and killed Nehemias Santos with her Ford Explorer while going between 85 and 90 miles per hour.

### D.   Nehemias Is Helping Evelyn Change a Tire.

That same day, Evelyn Moreno, Nehemias Santos, Erick Santos, Melvin Diaz, and Dina Relgado were headed north on Interstate 45 to return to Arkansas from Houston.  Evelyn was the driver, and her vehicle, a black Toyota Camry, was her mother's vehicle.  Nehemias, Evelyn's long-term boyfriend, was in the passenger seat, and Erick, Melvin, and Dina were in the back seat.  Evelyn was in the left-most lane when she experienced what she later realized was a blow-out of the front-left tire.[19]

Evelyn pulled the Toyota over on the left-hand shoulder, leaving enough room to the left so that there was room to change the blown-out tire.  The Toyota was parked partially in the left-most lane; Plaintiffs' expert estimates that the Toyota protruded 2.3 feet into the left-most lane, which measures 11.8 feet wide.  Pl. App. at 1205, 1297.  Evelyn activated the emergency flashers, and everyone exited the Toyota to stand on the left-hand shoulder.[20]

Evelyn testified that she and Nehemias opened the trunk to remove the spare tire, jack, and other tools needed to change the spare tire.  Pl. App. at 1413.  She testified that they had set the jack and were in the process of removing the spare tire and finding the other necessary tools.  Pl.

---

[18]  Ms. Smith was driving 87.8 miles per hour when she sent this text message to Ms. Roberts.  Pl. App. at 1036.

[19]  In their Motion, Defendants imply that Evelyn could have been in the middle lane when the blowout occurred.  There is no testimonial or documentary evidence to demonstrating that she was in any lane but the left-most lane.

[20]  There is considerable disagreement as to whether all of the passengers exited the Toyota.  Evelyn, Melvin, Dina, and Erick all testified that they all exited the vehicle.  Pl. App. at 1466.  Julio Bonilla, the responding paramedic, testified that Evelyn told him that only she and Nehemias exited the vehicle.  Pl. App. at 1216.

App. at 1413.  She testified that she was standing behind the trunk, facing into the trunk, and that Nehemias was to her immediate right.  Pl. App. at 1418.  Erick Santos testified that he (Erick Santos) was to Evelyn's left.  Melvin and Dina were sitting against the median barrier to the left of the Toyota.

Evelyn testified that they had been stopped on the shoulder for a while, and she averred that no one else came close to hitting the Toyota.  Pl. App. at 1414.  Defendants' expert, Paul Montalbano, points to the following tire tracks as proof that there were other close calls:



Figure 88: Police photographs comparing tread pattern.

Pl. App. at 1280.  But the tread mark to the right was clearly made *after* Nehemias' blood was spilled, as it tracked blood going forward.  As for the track to the left, there is no proof that this track is related at all to the crash; it is equally possible that it was made prior to April 30, 2022.

21

### E.    Ms. Smith's Final Approach and Crash

Most of the facts surrounding Ms. Smith's final approach are contested.   The general physical layout is undisputed.  It is undisputed that Ms. Smith was headed northbound in the left-most lane of Interstate 45 near the 223-mile marker.   Both experts agree that a driver coming northbound would have had a considerable sightline to see the Toyota in advance.   Defendants' expert states that because of the median wall and curvature of the road, "an unlimited sightline was not established for the inside northbound travel lane until approximately 1,742 ft, or .33 miles prior to  the  incident  location,  or  approximately  16  seconds  at  the  speed  limit  of  75  mph,  or approximately 13 seconds at a speed of approximately 90 mph."  Pl. App. at 1224.



Figure 17: Roadway curvature.

Pl. App. at 1245.  Plaintiffs' expert states that Ms. Smith would have been able to see the Toyota at least 1,400 feet in advance as she traveled northbound.  Pl. App. at 1205.  Additionally, the parties all agree that Ms. Smith sent a text message to Ms. Roberts approximately 8 to 9 seconds before crashing into Nehemias.  Moreover, the infotainment module shows that Ms. Smith's speed upon approach was between 84 and 90 miles per hour, with her going approximately 90 miles an hour immediately before killing Nehemias.



Figure 137: Berla track point data.

Pl. App. at 1305.  The infotainment module also contains incontrovertible bearing data from the

Ford Explorer:



Figure 144: Ford bearing data in degrees CCW from due north.

Pl. App. at 1308.  Beyond these basic facts, the rest of the facts regarding Ms. Smith's final

approach and the crash are disputed.

At her deposition, Ms. Smith testified that, 8-9 seconds before the collision, she allegedly dictated her final text message to Ms. Roberts and then looked up and saw the Toyota.  Her story is that she then made an "adjustment" to the right that allowed her to miss the Toyota but still remain entirely within the left-most lane.  Pl. App. at 780.  Ms. Smith testified that she does not remember precisely when she made the rightward adjustment, other than that it was after her last text message to Ms. Roberts and before she hit Nehemias.  Pl. App. at 794–95.  Given the Toyota's intrusion into the lane, Plaintiffs' expert calculated that Ms. Smith would have had a margin of error of 1.6 feet in order to pass the Toyota without leaving the left-most lane.  Pl. App. at 1208.

Ms. Smith testified that, after she made her rightward adjustment and as she approached the Toyota, she decided to look at her GPS to check the estimated time of arrival to get to Gracie's mom's house.  Pl. App. at 781.  Ms. Smith testified that she did not remember seeing anyone standing around the Toyota or any emergency lights.  Pl. App. at 782.  Ms. Smith then testified at her deposition that Nehemias "appeared suddenly" and stated "I don't know what he did before." Pl. App. at 799.  Ms. Smith then contradicted herself, testifying "I was close to the vehicle when he suddenly stepped out."  Pl. App. at 802.  This latter testimony implies that Ms. Smith did see Nehemias prior to striking him.  Ms. Smith admitted that her reaction time was diminished, so she was unable to avoid colliding with Nehemias.  Pl. App. at 799.  For her part, Ms. Smith testified that she did not remember how fast she was going when she hit Nehemias.  Pl. App. at 801.  When asked if she thought it was prudent to look at her GPS as she approached a vehicle partially in her lane, Ms. Smith responded, "Maybe not."  Pl. App. at 801.

Ms. Smith testified that immediately after hitting Nehemias, she "jerked the steering wheel to the right."  Pl. App. at 806.  The bearing and GPS data corroborate her testimony, demonstrating that she swerved into the middle lane at or immediately after the impact site.  Her Ford Explorer

24

was undamaged on the right side, indicating that she did not make contact with any vehicles in the middle lane when she swerved to the right.  After swerving to the right, Ms. Smith then continued forward, pulling over onto the left-hand shoulder where she called 911 and texted Ms. Roberts.

At this point, Ms. Smith begins to tell a variety of stories regarding what happened. Immediately after the crash, she called 911 and told dispatch that she "hit someone on the side of the road."  Pl. App. at 1314–15.  Less than 20 minutes after the crash, Ms. Smith told Ms. Roberts that she hit someone on the side of the road:



Pl. App. at 1093.  When questioned by Officer Danielle Lee-Winston, Ms. Smith said, "I didn't see him."  Pl. App. at 1316–17.  Later, in a written statement provided by Ms. Smith to Officer Lee-Winston, Ms. Smith said that, "I saw that there was a person half way in the lane knelt down at the tire, I tried to swerve to avoid hitting them but it was too late."  Pl. App. at 1319.  At her deposition, she testified: "I believe [Nehemias] was in front of the – by the back right tire looking at the tire."  Pl. App. at 817.  In her statement to the lessor of her Ford Explorer, Donlen Corporation, Ms. Smith said, "I was traveling north on I45 when a pedestrian halfway on the left lane of the highway, stepped out of their vehicle and I swerved to try to avoid the pedestrian . . . ."

Pl. App. at 1322.  In that same statement to Donlen Corporation, Ms. Smith said that she was going 70 miles per hour when the crash occurred, she was not using her cell phone, and that "hands free cell phone" use was "N/A," or not applicable.  Pl. App. at 1322.

The other witnesses tell a different story.  Evelyn testified that she was struck from behind by Nehemias' body as he was thrown from the impact, causing her to black out and to be thrown into the trunk.  Pl. App. at 1421.  She testified that Nehemias would never have stood in the middle of the lane.  Pl. App. at 1423.  Erick, Nehemias' brother, testified that he saw Nehemias standing on the shoulder when Ms. Smith ran into him with the Ford Explorer.  Pl. App. at 1524.  Melvin also testified that he saw Nehemias standing on the shoulder when he was struck by Ms. Smith. Pl. App. at 1569.

Texas State Police did not run the crash investigation; instead, the Richland Police Department took over the investigation, led by Officer Lee-Winston.  In her police report, she identified the following as contributing factors to the crash:  distracted driving, speeding, the placement of the Toyota partially in the lane, and Nehemias' location.  Pl. App. at 1495.  At the time, Officer Lee-Winston did not believe that there was enough evidence to prove that a crime had been committed by Ms. Smith.  Pl. App. at 1495.  However, after being provided with the infotainment module data, iPhone data, and Ms. Smith's deposition transcript, Officer Lee-Winston now concludes that, had she been aware of this information on April 30, 2022, "it could potentially have provided sufficient probable cause for the basis of the filing of a criminal charge or charges against Caylee Smith for her actions causing the death of Nehemias Santos."  Pl. App. at 1498.

Even Eastman's own corporate representative is seemingly unsure if Ms. Smith acted reasonably on April 30, 2022. Ms. Bernhardt testified: "I don't know whether reasonable care was

taken or not, to be honest with you. I believe -- I believe there was. But I don't know all the incidents of the situation itself." Pl. App. at 234. She also said, "I can't make a statement of whether [Caylee] used sufficient reasonable care at that time." Pl. App. at 235. As for whether Ms. Smith violated Eastman's policies on April 30, 2022, Ms. Bernhardt responded:

> So as I've engaged with -- now, you know, I can't say that she was -- that she was violating that. What I saw, from what I heard a reference was that she was activating with her finger maybe a text or activating. So I've not seen definitive violation. But there's certainly things that, you know -- that -- that might have -- I just don't know if she was or not.

Bernhardt Pl. App. at 236. .

When asked what she would do anything differently on April 30, 2022, Ms. Smith responded, "I don't know. I may try to avoid distractions." Pl. App. at 851.

## II.    Legal Standard

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it might affect the outcome of the suit and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021) (quoting reference omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion[ ] and identifying" the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When 'the non-movant bears the burden of proof at trial,' a party moving for summary judgment 'may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is [a dispute] of

material fact warranting trial." *MDK S.R.L. v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022) (alteration in original) (quoting reference omitted). "However[,] the movant 'need not negate the elements of the nonmovant's case.' " *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). "If 'reasonable minds could differ' on 'the import of the evidence,' a court must deny the motion." *Sanchez v. Young County*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).  A court may not make credibility determinations or weigh the evidence and must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

## III.    Argument

### A.    Eastman is not entitled to summary judgment on Plaintiffs' negligent hiring claim.

To establish a claim for negligent hiring, "a plaintiff must prove the following elements: (1) a duty to hire . . . competent employees; (2) an employer's breach of the duty; and (3) the employer's breach of the duty proximately caused the damages sued for." *Steigerwald v. Wal-Mart Stores Texas, LLC*, 2020 WL 1879231, at *3 (S.D. Tex. Mar. 31, 2020), *report and recommendation adopted*, 2020 WL 1876057 (S.D. Tex. Apr. 15, 2020).  Defendants argue that the Court should grant summary judgment on the negligent hiring claim for two reasons: (1) there is little evidence that Ms. Smith was an incompetent driver at the time she was hired; and (2) Eastman did not know that Ms. Smith was an incompetent driver at the time they hired her.

On the first point, there is sufficient record evidence for a reasonable jury to conclude that Ms. Smith was an incompetent driver.  Eastman hired Ms. Smith for a role (1) requiring her to

drive *at least half of her working hours*, and (2) Eastman gave her a company vehicle.   Practically, Ms. Smith was on the road four days out of the week, and her territory stretched from "Waco to Brownsville."   Pl. App. at 543.   At the time of her hiring, Ms. Smith had prior citations for speeding, had a failure to appear, and made multiple public statements on social media regarding her past history of dangerous and distracted driving.   Pl. App. at 960, 970, 971.   She also admitted at her deposition that she had a prior citation for following too closely.   Pl. App. at 499.   Based upon these facts, a reasonable juror could conclude that Eastman knew or should have known that Ms. Smith was not competent to serve in a position that prioritized the operation of a company vehicle.

Turning to the second argument— that there was no way Eastman could have known that Ms. Smith was an incompetent driver at the time she was hired—Eastman cites cases that purportedly hold that employers have no duty to review a driver's competence if they have a valid driver's license.   *See Moerbe v. Adcock*, 2022 WL 5568119, at *5 (W.D. Tex. Aug. 3, 2022); *Cobos v. Bluefin Water Sols., LLC*, 2022 WL 847235, at *4 (W.D. Tex. Mar. 22, 2022).   And yet, that is not what those cases say.   In *Cobos*—which is an opinion on a Rule 12(b)(6) motion—the plaintiff did not allege *any facts* regarding the defendant's incompetence.   2022 WL 847235, at *7.   In *Moerbe*, the Magistrate Judge recommended summary judgment on a negligent hiring claim involving a position requiring significant amounts of driving, noting that there was evidence that the employer "checked his employment record with his prior employers, performed a background motor vehicle record check, PSP detailed report check, and tested Adcock for drugs and alcohol." 2022 WL 5568119, at *3.   The background check showed that the prospective employee "had not received any violations or been involved in any accidents or failed any drug tests within the 3 years prior . . . ."   *Id*.   Furthermore, because the employee had received a speeding ticket while driving

29

his personal vehicle in 2018, the employer provided the employee with counseling on speeding. *Id.*

As already discussed above, there were several red flags that Eastman should have discovered when they initially screened Ms. Smith's application. The prior failure to appear and speeding tickets, which Eastman did find, should have triggered additional scrutiny by Eastman. Eastman argues that it has no duty to do *anything* to check that its sales representatives are competent drivers, other than check to ensure they have valid driver's licenses. But other cases make it clear that other employers hiring for driving positions frequently require driving tests and background checks into prior crashes. *See Johnson v. Cox*, 2024 WL 331631, at *4–5 (N.D. Tex. Jan. 29, 2024) (employer confirmed the applicant had a driver's license, performed a background check, confirmed the applicant's insurance was approved, performed a safety test with the application, and reviewed the applicant's motor vehicle record); *Onofre v. C.R. England, Inc.*, 2016 WL 3406196, at *3–4 (W.D. Tex. June 17, 2016) (employer ran a motor vehicle report and conducted a driving test before hiring a driver).

Like the employer in *Moerbe*, Eastman could have provided Ms. Smith with counseling regarding speeding. Alternatively, Eastman could have reviewed other public records, such as Ms. Smith's public social media posts, which would have revealed Ms. Smith's history of prior crashes and near misses. Eastman cites *Doe v. YUM! Brands, Inc.*, 639 S.W.3d 214, 228 (Tex. App.— Houston [1st Dist.] 2021, no pet.) for the proposition that it had no duty to check Ms. Smith's social media, yet that case dealt with social media comments that were unrelated to the sexual assault at issue in that case, which is why the appellate court found that those comments did not put the employer on notice that the defendant had a propensity for sexual assault. Here, however, the

social media posts made by Ms. Smith are of a nature that would have made it foreseeable that she would engage in dangerous distracted driving in the future.

If Eastman had conducted a proper check of Ms. Smith's public record, they would have discovered her history of dangerous distracted driving. Accordingly, there is enough record evidence for a reasonable jury to conclude that Eastman negligently hired Caylee Smith, and summary judgment on this claim is not appropriate.

**B.    Eastman is not entitled to summary judgment on Plaintiffs' negligent supervision claim.**

Eastman asserts—without putting forth any evidence—that it had no duty to supervise Ms. Smith's driving. Dkt. No. 48, p. 25. The only case cited by Eastman to support its contention that it had no duty to supervise Ms. Smith, *Martinez v. Valdez*, 2023 WL 1928870, at *4 (S.D. Tex. Feb. 10, 2023), has no discussion of when a duty to supervise arises. Texas law is clear: "Employers have a duty to investigate, screen, and supervise employees, and a breach of this duty creates liability for injuries caused from a breach of that duty." *Goldfarb v. Elite Serv. Recovery & Towing, LLC*, 2018 WL 4677817, at *2 (E.D. Tex. Aug. 17, 2018) (citing *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 240–41 (Tex. 2010)).

Not only did Eastman have a duty to supervise Ms. Smith, the record evidence establishes that Eastman employs a "head in the sand" approach to supervising its traveling sales representatives. Eastman justifies this approach on the basis that it is "not in the business for driving," despite the fact that it employs traveling sales representatives throughout the United States. Pl. App. at 108. At her deposition, Ms. Bernhardt admits that Eastman makes no attempts to actively supervise the driving habits of its traveling sales representatives, including Ms. Smith. Pl. App. at 128. Eastman does not utilize electronic monitoring or any other form of real-time monitoring. Pl. App. at 110. Eastman does not monitor its outside sales representatives' driving

records.  Pl. App. at 128.  Eastman does not perform annual background checks.  Pl. App. at 127.  If a traveling sales representative gets into a wreck or a receives a driving citation, Eastman will only find out about it if the sales representative voluntarily reports the crash or citation.  Pl. App. at 192.

Ms. Smith's supervision illustrates Eastman's lackluster supervision.  Ms. Bernhardt testified—and Ms. Smith confirmed—that Ms. Smith was physically present with her supervisors "four or five times" in the first year she was employed by Eastman.  Pl. App. at 54, 637.  Ms. Smith could not remember if she ever spoke to her supervisor about the June 2021 crash.  Pl. App. at 653.  In fact, her mid-year review refers to this crash as a "minor incident," even though Eastman made no effort to independently verify what occurred in that crash.  Pl. App. at 1004.  Based upon Ms. Smith's testimony at her deposition, she was at-fault in that crash.  Pl. App. at 620.  Ms. Smith admits that there was no police report generated as a result of that crash, Pl. App. at 622, so to the extent Eastman learned anything about the June 2021 crash, it was entirely based upon Ms. Smith's recall of events.  Ms. Smith does not recall any adverse employment consequences as a result of the June 2021 crash.  Pl. App. at 653.  Ms. Bernhardt acknowledged that Ms. Smith's June 2021 crash should have qualified as an "avoidable accident" under the Auto Lease SOP, but Ms. Smith's file did not include any documented management response, such as a performance improvement plan.  Pl. App. at 231.

Eastman argues that Plaintiffs have not demonstrated "how much supervision is typical" of someone in Ms. Smith's position, and thus the negligent supervision claim must fail.  Dkt. No. 48, p. 26.  Yet Eastman's supervision of Ms. Smith was essentially non-existent, and Eastman's failure to react to Ms. Smith's June 2021 crash raises a material question about whether Nehemias Santos would be alive if Eastman had reacted appropriately.  Other than refer to it as a "minor

incident" in an otherwise positive review, Eastman *did nothing* substantive after Ms. Smith reported the June 2021 crash. This failure, coupled with Eastman's admitted "head in the sand" approach to supervising sales representatives, establishes a genuine issue of material fact as to the negligent supervision claim.

### C.   Eastman is not entitled to summary judgment on Plaintiffs' negligent training claim.

Eastman argues that it neither has a duty to provide Ms. Smith with training and that, even if it did, its training was sufficient. As will be shown below, Eastman did have a duty to train Ms. Smith on the dangers of distracted driving, Eastman acknowledged that duty, and then wholly failed to satisfy that duty.

First, whether an employer has a duty to train an employee is a fact-intensive, case-specific inquiry. "Whether a legal duty exists for an employer is a matter of law and depends on balancing the risk, foreseeability, and likelihood of injury . . . versus the burdens on and consequences to employers, and the social utility of the realities of the workplace." *Appleton v. Con. Crain and Rigging, LLC*, 2022 WL 17843993 at *7 (Tex. App.—Beaumont Dec. 22, 2022, no pet.) (internal quotations and citations omitted). Applying this framework to employed drivers, Texas courts have held that employers do not have a duty to train "an employee already experienced with respect to the work assigned." *Mendoza v. PGT Trucking Inc.*, 2020 WL 1902562, at *4 (W.D. Tex. Jan. 27, 2020) (citations omitted). This has resulted in the common sense holding by many courts, such as the ones cited by Eastman, that "an employer doesn't have a duty to train an experienced employee regarding commonly known dangers of driving, such as obeying speed limits and stop signs or not driving while under the influence of intoxicants." *Villegas v. M.G. Dyess, Inc.*, 2021

WL 2593633, at *7 (W.D. Tex. June 23, 2021).[21]  Similarly, in *Nat'l Convenience Stores Inc. v. Matherne*, 987 S.W.2d 145, 149 (Tex.App.—Houston [14th Dist.] 1999, no pet.), the appellate court found that "an employer's duty to instruct applies to an inexperienced employee but not to one who is experienced in the work he is assigned . . . ."  Importantly, the Texas Supreme Court has acknowledged that the employer *does* have a duty in situations where the employer creates the risk, such as where "supervisors put clearly intoxicated workers on the road."  *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W3d 401, 411 (Tex. 2009).

Here, Eastman furnished the means and methods of Ms. Smith's distraction.  Eastman provided her with a Ford Explorer, a cell phone, and an iPad.  She was encouraged to be in frequent communication with her team.  Pl. App. at 647.  She testified that she did take work calls and send work-related text messages while driving.  Pl. App. at 598, 604, 608.  Eastman's background check did reveal prior speeding tickets and failures to appear, which should have put them on notice to do a more thorough background check and to provide remedial training to Ms. Smith.  Pl. App. at 960.  If Eastman had conducted a more competent background check, they would have discovered Ms. Smith's public social media statements that announced her history of reckless and distracted driving.

Moreover, while Eastman apparently does not provide any driving training, it does instruct its sales representatives on the dangers of distracted driving, which shows that Eastman *does not believe* that its drivers are already aware of the dangers of distracted driving.  In her deposition, Ms. Bernhardt explained why Eastman believes additional training is necessary:

> Q:   So why focus on cell phone caused distractions and eliminating those or minimizing those?

---

[21]   In their brief, Defendants cite *Villegas* for the proposition that "avoiding distractions" is a commonly known rule of the road.  The Court in *Villegas* never discusses or mentions distracted driving, and citing *Villegas* for that proposition is misleading.

A:    Maybe because of the broad use or the broad usage of cell phones these days that require some of the - - for us to believe that we need to set expectations for the employees.  The more and more - - like we don't tell them how they need to operate the fund of their vehicle.  But, yeah, so it's the broad use and that there's not really a standard on how, you know, people use cell phones.

. . .

A.    I think the nature of cell phone use in public is - - it's become every day, every frequency.  And people operate their lives with it.  So, yes, we felt that it was incumbent upon us to make sure that we are setting some expectations, setting some very clear dos and don'ts in terms of the use of those while they're doing company business or while they're operating, you know, a leased vehicle.

. . .

A:    I'll tell you, I don't -- I don't think we have a belief about society. I mean, I try not to have necessarily corporate beliefs. I think what we know is there's practices in the absence of some guidance. But we want our -- we want our team members and we hope those -- we want our team members to have some clear guidance on what they should and shouldn't do with cell phones. Because in the absence, yeah, they can be used inappropriately or they can cause -- you know, just be used inappropriately.

Pl. App. at 165–67.  Eastman clearly *does not believe* that the risks of distracted driving are fully understood by its employees, which is why Eastman claims to offer additional training on distracted driving.  Thus, Eastman did have a duty to train Ms. Smith on distracted driving.

To meet satisfy their duty to train employees on the dangers of distracted driving, Eastman wrote a Distracted/Defensive Driving SOP that governs their employees.  Pl. App. at 972–74. Eastman's distracted driving policy identifies a host of possible distractions, including using mobile devices, computers, and using navigations systems.  Pl. App. at 973.  The Distracted/Defensive Driving SOP bars Eastman's drivers from using a hand-held cell phone to conduct business while driving.  Pl. App. at 973.  The Distracted/Defensive Driving SOP also provides specific guidance as to the limited use of "voice-activated, hands-free devices" while driving.  Pl. App. at 974.

35

And yet, the record evidence demonstrates that Eastman failed to train Ms. Smith on the dangers of distracted driving.  Ms. Smith testified that she could not remember ever seeing the distracted driving SOP, and Ms. Bernhardt confirmed that Ms. Smith would never have signed a copy of the SOP.  Pl. App. at 130.  In fact, Ms. Bernhardt suggests that Ms. Smith may have seen the distracted driving SOP because it is cross-referenced in the Auto Lease SOP Pl. App. at 199.  The Auto Lease SOP is 15 single-spaced pages, and the distracted driving SOP is referenced *once* on page 12, where it is obliquely referred to as the "Eastman Cell Phone policy."  Pl. App. at 989.  Indeed, Ms. Smith testified that she has no recollection whatsoever of Eastman ever training her on distracted driving.  Pl. App. at 679–80.  Ms. Smith stated that she did not know if her supervisors would care if she was engaging in distracted driving.  Pl. App. at 682.  Ms. Smith did not know if she would suffer any consequences if Eastman caught her engaging in distracted driving, even though the Auto Lease SOP states that distracted driving may lead to termination.  Pl. App. at 682.

Eventually, Ms. Bernhardt admitted that, despite being aware of the necessity of training its drivers on the dangers of distracted driving, Eastman does not require such training.  Pl. App. at 32, 120.  Which is why, in Ms. Bernhardt's words, it is possible that Ms. Smith never received training on safe driving, including distracted driving.  Pl. App. at 120.  Ms. Bernhardt later confirmed that she was certain Caylee never completed any formal training on distracted driving.  Pl. App. at 123.  Ms. Bernhardt thought it was possible that Ms. Smith's supervisors may have provided her with informal coaching regarding distracted driving.  Pl. App. at 133.  When confronted with Ms. Smith's testimony that she could not recall receiving any distracted driving training from Eastman, Ms. Bernhardt acknowledged that Caylee's answer "surprises me."  Pl. App. at 139.

Finally, there is no evidence that Ms. Smith received any additional training following her first crash in Eastman's vehicle in June 2021.  Ms. Smith does not remember any of her supervisors discussing this crash with her.  Pl. App. at 653.  Nor does she recall receiving any additional training following this crash.  Pl. App. at 620.  Indeed, Ms. Smith does not remember experiencing *any* consequences from Eastman as a result of the June 2021 crash.  Pl. App. at 653.  Ms. Bernhart even confirms that Eastman did not provide Ms. Smith with any additional training or supervision following the June 2021 crash.  Pl. App. at 685.

In short, there is copious evidence in the record that Eastman knew and acknowledged its duty to train its drivers on the dangers of distracted driving and that Eastman failed to do so with respect to Caylee Smith both before and after the June 2021 crash.  Ms. Smith acknowledges that she was distracted at the time she struck Nehemias Santos.  Thus, a reasonable jury could find that Eastman's failure to provide adequate training to Caylee Smith was a proximate cause of Nehemias Santos' death, and summary judgment is not appropriate on the negligent training claim.

### D.     Eastman is not entitled to summary judgment on Plaintiffs' negligent retention claim.

Defendants seek summary judgment upon Plaintiffs' negligent retention claim based upon the theory that there is no evidence that Ms. Smith was an incompetent driver.  Dkt. 48, p. 23.  As discussed in detail above, there is sufficient record evidence to demonstrate that Caylee was an incompetent driver, particularly following her June 2021 crash in Eastman's vehicle.  Since Defendants put forth no other basis for the summary dismissal of the negligent retention claim, if the Court concludes that Ms. Smith's competence as a driver is an issue for the jury, the Court should deny summary judgment on Plaintiffs' negligent retention claim.

### E.     Eastman is not entitled to summary judgment on Plaintiffs' claim for gross negligence against Caylee Smith.

Summary judgment is not appropriate on Plaintiffs' gross negligence claims against Caylee Smith. To grant summary judgment on Ms. Smith's gross negligence would force the Court to impermissibly weigh evidence, choose between competing versions of what happened on April 30, 2022, and make credibility determinations reserved for the jury.

There are two elements to a gross negligence claim: one objective and one subjective. First, Plaintiffs must prove that, viewed objectively from the standpoint of Ms. Smith at the time of the events underlying this action, her acts or omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Second, Plaintiffs must prove that Ms. Smith had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. *See* Tex. Civ. Prac. & Rem. Code § 41.001(11); *Alpizar v. John Christner Trucking, LLC*, 2019 WL 1643743, at *3 (W.D. Tex. Apr. 16, 2019). "Texas courts have repeatedly made clear that whether a driver is operating a car or truck, acts that support a finding of ordinary negligence, such as a party's failure to obey traffic laws, will not support a finding of gross negligence." *Phillips v. Super Servs. Holdings, LLC*, 189 F. Supp. 3d 640, 656 (S.D. Tex. 2016) (collecting cases).

> i. **Viewed objectively, Ms. Smith's actions on April 30, 2022, were grossly negligent.**

Texas courts have repeatedly found that using a cell phone at the time of a motor vehicle accident creates an extreme degree of risk that could support a claim of gross negligence. *See Denham v. Bark River Transit, Inc.*, 2019 WL 4887256, at *4 (S.D. Tex. Oct. 3, 2019); *Finley v. Vermeer Mfg. Co.*, 2019 WL 5058901, at *3 (W.D. Tex. July 11, 2019); *Braun v. Clean Harbors Envtl. Servs., Inc.*, 2016 WL 7551118 (E.D. Tex. Jan. 25, 2016). In *Alpizar*, the district court denied summary judgment on the question of gross negligence where there was electronic evidence that the defendant had been making multiple phone calls from his cell phone prior to the crash.

2019 WL 1643743, at *5.  The district court also found that it was up to the jury to decide "whether it believes [defendant's] testimony that he always uses a hands-free device when using his cell phone while driving."  *Id*.  In *DeYoung v. Dillon Logistics, Inc.*, the district court denied summary judgment because "[e]vidence of cell phone usage while driving 'could lead a jury to conclude objectively that Molitor's conduct created an extreme degree of risk and subjectively that Molitor knew of the risk involved but engage[d] in the behavior nonetheless'" and finding that evidence of employer's driver training "lead a reasonable jury to conclude objectively that Hines's conduct created an extreme degree of risk and subjectively that Hines knew of the risk involved but nonetheless engaged in the behavior."  *DeYoung v. Dillon Logistics, Inc.*, 2021 WL 414536, at *5 (E.D. Tex. Feb. 5, 2021)

There is record evidence that Ms. Smith was using electronic devices in the cabin of Eastman's Ford Explorer when she was within 10 seconds of Nehemias and his friends.  Moreover, Ms. Smith was using her personal cell phone to send and receive over 40 text messages in the hour before she killed Nehemias.  According to Defendants' expert, she averaged "some form of cell phone interaction approximately every 52.3 seconds during this time period."  Pl. App. at 1204.  Those text messages included videos and photos sent to Ms. Smith by her friend Ms. Roberts, which Ms. Smith reviewed while driving.  Pl. App. at 1060, 1071.  When Ms. Smith was within eight seconds of killing Nehemias, she sent a text message to Ms. Roberts, "[t]hey don't do walkins though," in reference to a potential tattoo shop.  Pl. App. at 1075.  Christine Yager, Plaintiffs' distracted driving expert, opined that "it is highly plausible that Ms. Smith was distracted by electronic devices at the time that she hit Mr. Santos."  Pl. App. at 1508.  She also opined that, in her expert opinion, Ms. Smith "was distracted to the point where her eyes were either not on the roadway for the majority of the 10 seconds leading up the collision or she was experiencing

inattentional blindness (the 'look but did not see' phenomenon because her attention was so divided." Pl. App. at 1508.[22]

     The entire time Ms. Smith was texting Ms. Roberts and approaching Nehemias, Ms. Smith was driving far over the 75 mile per hour speed limit.  In sequential order, the infotainment module tells us that Ms. Smith was going the following speeds on approach towards Nehemias:

| Time | Speed (mph) | Event |
|---|---|---|
| 2:48:41 | 89.7 | |
| 2:48:42 | 86.1 | |
| 2:48:43 | 87.8 | Ms. Smith texts Gracie about tattoo shop. Pl. App. at 1075. |
| 2:48:44 | 84.5 | Ms. Smith says she spots the Toyota.  Pl. App. at 776. |
| 2:48:45 | 87.9 | Ms. Smith says she adjusts right. Pl. App. at 312. |
| 2:48:46 | 85.1 | |
| 2:48:47 | 87.2 | |
| 2:48:48 | 90 | Ms. Smith says she checks GPS. Pl. App. at 313. |
| 2:48:49 | 86.7 | Ms. Smith hits Nehemias. |
| 2:48:50 | 82.8 | |

---

[22] In Defendants' brief, Eastman misrepresents Ms. Yager's testimony.  At Ms. Yager's deposition, counsel for Eastman asked her if she would agree that Ms. Smith's "ability to maintain such a precise lane position is inconsistent with her having been looking at her phone," and Ms. Yager agreed.  Pl. App. at 1514.  This question is based upon a hypothetical scenario where Ms. Smith did maintain her precise lane position, so Ms. Yager's agreement to a hypothetical means nothing unless Ms. Smith did in fact maintain her precise lane position, which is significantly disputed by the parties.  To the extent Defendants are trying to represent to the Court that Ms. Yager agreed that Ms. Smith was not distracted upon the final approach towards Nehemias, that is simply not true as outlined by the presented testimony.

Pl. App. at 1017–36.  The electronic data tells a very clear story:  Ms. Smith was driving 87.8 mph and sent Ms. Roberts a text message about a tattoo shop 8-9 seconds before hitting Nehemias. Then, she *accelerates* up to 90 miles per hour, and approximately a second after reaching that top speed, she hits Nehemias.

Additionally, at the time Ms. Smith sent Ms. Roberts the last text message, Ms. Smith was well within visual distance of the Toyota, which had its emergency flashers on, the trunk raised, and five (or at least two, in Defendants' telling) pedestrians standing around it.  Moreover, given the weather that day, the Toyota and any pedestrians around it would have been remarkably conspicuous.  A screenshot from Office Lee-Winston's dash camera illustrates this point:



Pl. App. at 1518–19.  As Ms. Smith got closer, the Toyota (and its emergency flashers and surrounding pedestrians) would have been obvious to any driver with their eyes on the road.  Below is a screen shot from Officer Lee-Winston's dash camera as she gets closer to the stopped Toyota:



Pl. App. at 1518–19.  All of this evidence creates a genuine issue of material fact as to whether Ms. Smith was grossly negligent as she approached Nehemias on Interstate 45.

Even Ms. Smith's most recent story about what she was doing in the last 10 seconds of her approach raises a genuine question of whether she was grossly negligent.  Ms. Smith concedes that she sent the text message to Ms. Roberts 8-9 seconds before hitting Nehemias.  Pl. App. at 789.  She claims to have dictated that text message, Pl. App. at 789, but admits that even if she dictated the text, she would have had to manually manipulate her phone to send the text to Ms. Roberts.  Pl. App. at 605.  Ms. Smith says that after sending that final text message to Ms. Roberts, she looked up and saw the Toyota, though she claims not to remember seeing emergency flashers or any pedestrians.  Pl. App. at 791.  She says she then adjusted the Ford Explorer's course to the right so that she would not collide with the Ford Explorer, but not so much that she would be in the middle lane.  Pl. App. at 780.  Plaintiff's expert says this would have given her at most 1.6 feet

to avoid the Toyota, and Defendant's expert's calculations say she would have had at most 2.9 feet of clearance.  Pl. App. at 1208, 1221.

Ms. Smith's sworn testimony is that after she made this rightward adjustment and prepared to thread the needle by passing the Toyota, she decided to check her GPS to determine her estimated time of arrival in Dallas.  Pl. App. at 781.  The infotainment module shows that during this period Ms. Smith was accelerating the Ford Explorer up to 90 miles per hour.  Pl. App. at 1036.  Then, after reaching 90 miles per hour, Ms. Smith testifies that Nehemias "suddenly appeared" in front of her.  Pl. App. at 799.  At her deposition, she also said that he stepped out in front of her right before she hit him.  Pl. App. at 802.  This story—if true—raises grave and genuine concerns about Ms. Smith's gross negligence.  If Ms. Smith did indeed accelerate up to 90 miles per hour during an attempt to pass a stopped car with pedestrians around it, and then, mere seconds from executing that maneuver, she decided to look at her GPS, she undoubtedly was grossly negligent, *regardless of where Nehemias was standing*.

There is also evidence that Ms. Smith drifted onto the left-hand shoulder, which would be indicative of gross negligence.  Erick and Melvin testified that they saw Ms. Smith's Ford Explorer over the solid yellow line when she hit Nehemias.  Pl. App. at 1524, 1569  Ms. Smith's first statements following the crash were that she hit a man "on the side of the road," not "in the middle of the road."  Pl. App. at 1314–15; 1093.  Defendant repeatedly say that Nehemias "lunged" into the left-most lane, but no one has testified that Nehemias moved quickly into the path of Ms. Smith's Ford Explorer.  For Ms. Smith's part, to capture her shifting testimony about Nehemias' position, a chart is necessary:

| Ms. Smith's Statement | Source |
|---|---|
| "I hit someone on the side of the road." | 911 Call. Pl. App. at 1314–15. |
| "I just got in a wreck and hit a person on the side of the road." | Text Message from Ms. Smith to Ms. Roberts. Pl. App. at 1093. |
| "The guy was partially in the road, but I didn't see him." | Ms. Smith's oral statement to Officer Winston-Lee. Pl. App. at 1316–17. |
| "I was traveling north on 45 in the left lane to go home and visit friends and family. I glanced over at my gps to see how much longer I had of my drive, and then I quickly approached a black vehicle partially in the left lane. By the time I saw that there was a person half way in the lane knelt down at the tire, I tried to swerve to avoid hitting them but it was too late." | Ms. Smith's written statement to Officer Winston-Lee. Pl. App. at 1318–19. |
| "I was traveling north on I45 when a pedestrian halfway on the left lane of the highway, stepped out of their vehicle and I swerved to try to avoid the pedestrian and hit them with the vehicle causing damage." | Ms. Smith's Statement to Donlen. Pl. App. at 1321–22. |
| "I don't know how he got in front of my vehicle. It was suddenly. | Pl. App. at 796. |
| "He appeared suddenly . . . I don't know what he did before." | Pl. App. at 799. |
| "He suddenly appeared in the lane." | Pl. App. at 799. . |
| "I was close to the vehicle when he suddenly stepped out." | Pl. App. at 802. |
| "He was at that back tire, yes.  Looking at it." | Pl. App. at 819. |

In sum, Ms. Smith has said that (1) Nehemias was on the side of the road, (2) she did not

see him, (3) he was kneeling down to change (the wrong) tire, (4) he stepped out of the vehicle in

front of her, (5) he appeared suddenly, (6) he stepped out suddenly, and (7) he was looking at the

back right tire when she hit him.  A jury should be allowed to sift through Ms. Smith's shifting and inconsistent statements and weigh her credibility against the other witnesses to determine precisely where Nehemias was standing when he was struck by Ms. Smith.

Defendants argue that the bearing data from the infotainment module is not consistent with Ms. Smith crossing onto the left shoulder.[23]  But Defendant's expert Paul Montalbano argued that the bearing data might be the result of rounding, so he refused to provide precise calculations as to how much lateral movement each bearing change reflected.  Pl. App. at 1599.  In other words, Defendant's expert did not believe the bearing data could be relied upon at all to measure precise movements.  More importantly, while the bearing data may not be consistent with Ms. Smith crossing onto the left shoulder, the bearing data for the last 10 seconds of Ms. Smith's approach towards Nehemias completely contradicts her "rightward adjustment" story.  Here is a chart of Ms. Smith's bearing changes as she approached Nehemias, with the right-most column showing whether the bearing change means she was moving left or right from her perspective:

| Time | Speed (mph) | Event | Bearing | Left or Right Change? |
|---|---|---|---|---|
| 2:48:41 | 89.7 | | 341 | n/a |
| 2:48:42 | 86.1 | | 339 | Left |
| 2:48:43 | 87.8 | Ms. Smith texts Gracie about tattoo shop. Pl. App. at 1075. | 340 | Right |
| 2:48:44 | 84.5 | Ms. Smith says she spots the Toyota.  Pl. App. at 776. | 340 | n/a |

---

[23]  Furthermore, Defendants attempt to nail down Nehemias' location by pointing to a formula cited by Paul Montalbano that purports to explain how quickly a typical driver can execute an emergency swerve.  All of the electronic evidence in this case demonstrates that Ms. Smith was *not* a typical, attentive driver on April 30, 2022, so the applicability of this formula is questionable, to say the least.

| 2:48:45 | 87.9 | Ms. Smith says she adjusts right. Pl. App. at 312. | 340 | n/a |
|---|---|---|---|---|
| 2:48:46 | 85.1 | | 341 | Right |
| 2:48:47 | 87.2 | | 340 | Left |
| 2:48:48 | 90 | Ms. Smith says she checks GPS. Pl. App. at 313. | 341 | Right |
| 2:48:49 | 86.7 | Ms. Smith hits Nehemias. | 340 | Left |
| 2:48:50 | 82.8 | | 340 | Left |

Pl. App. at 1017–36.  As the Court can see, the bearing changes are not consistent with Ms. Smith making a consistent rightward adjustment after texting Ms. Roberts.  Instead, the bearing data shows that while Ms. Smith did shift to the right after texting Ms. Roberts, she then shifted back to the left, and then back to the right, and then back to the left as she struck Nehemias, all the while going nearly 90 miles per hour.  A reasonable jury could review this data and conclude that Ms. Smith's story about a "rightward adjustment" is fiction and that Ms. Smith was instead weaving back and forth, consistent with distracted driving.

In sum, the record evidence shows that, on approach, Ms. Smith was texting her friend, speeding at nearly 90 miles per hour, and weaving in and out of traffic.  She has given both inculpatory and exculpatory statements depending on the listener and the context of the statement. And she has concocted a story about what happened on approach that is, on its face, grossly negligent.  Defendants would have the Court chase the red herring that is Nehemias' position, but that is a significantly contested issue that can only be resolved by weighing evidence and making credibility determinations.  Based upon all of this evidence, and the myriad discrepancies and credibility determinations needed to resolve them all, the Court should conclude that there is a

genuine issue of material fact as to whether, from an objective point of view, Ms. Smith was grossly negligent on April 30, 2022.

**ii.    Viewed subjectively, Ms. Smith's actions on April 30, 2022, were grossly negligent.**

Turning to the subjective component of the gross negligence analysis, there is clear and convincing evidence that Ms. Smith "knew about the peril, but [her] acts or omissions demonstrated that [she] did not care." *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014). "Circumstantial evidence may prove" the subjective prong of the gross negligence analysis. *Denham*, 2019 WL 4887256, at *3 (citing *Boerjan*, 436 S.W.3d at 311).   Defendants argue that Ms. Smith could not have subjectively predicted that someone would run out into the roadway, so Plaintiffs cannot satisfy this prong of the analysis.   As to this argument, there is *no evidence* that Nehemias "ran out" or "lunged" into the roadway.   Regardless of precisely where Nehemias was standing as he was changing the flat tire, there is considerable evidence showing that Ms. Smith was using her cell phone in the 40 minutes leading up to the crash, and there is no dispute that she sent her last text message about a tattoo shop when Nehemias was in visual range.   There is no dispute that she was driving approximately 90 miles an hour within two (2) seconds of hitting Nehemias.   Moreover, at her deposition, Ms. Smith admitted that she knew texting and driving "can be dangerous."   Pl. App. at 695.   She admitted that texting and driving "could be a distraction."   Pl. App. at 696.   She said she tries to avoid texting and driving because she "think[s] it's unsafe or it could be deemed unsafe."   Pl. App. at 697.   Ms. Smith agreed that it "could be" needlessly dangerous to travel over the speed limit.   Pl. App. at 699.   And when asked if it is needlessly dangerous to text and drive while going over 85 miles per hour, Ms. Smith said, "Yes," and "I agree that it could be dangerous, yes."   Pl. App. at 702–03.   These statements reveal that Ms. Smith subjectively understood that distracted driving and speeding are extremely dangerous.

Given the full evidence in the record, there is a genuine issue of material fact as to whether, from Ms. Smith's subjective point of view, she was grossly negligent.

### F.   Eastman is not entitled to summary judgment on Plaintiffs' claim for gross negligence against Eastman.

As an initial matter, Plaintiffs concede that they are not entitled to exemplary damages based upon their *respondeat superior* claims.   Plaintiffs agree that summary judgment is appropriate on this particular issue.

Separate from that issue, the Court should deny Eastman's request for summary judgment on Plaintiffs' claims against it for gross negligence.   In the corporate context, injured motorists defending against motions for summary judgment on gross negligence claims must supply rebuttal evidence sufficient to establish that (1) the actions of the involved corporation created an extreme risk of harm, and that (2) the corporation was also consciously indifferent to such extreme risk. "In short, at the summary judgment stage, an injured motorist must establish that a reasonable jury could find that the [corporation] both knew of the risk-of-harm which qualified as 'extreme,' and that trucking firm also did not care."  *Jezek v. R.E. Garrison Trucking, Inc.*, 637 F. Supp. 3d 445, 451 (N.D. Tex. Oct. 28, 2022) (citations omitted).

Other courts in the Northern District of Texas have denied summary judgment on gross negligence claims where an employer has failed to train and supervise an employee driver.   In *Jezek*, Judge O'Connor found that summary judgment was not appropriate on a gross negligence claim against a trucking company.   In that case, there was evidence that the trucking company knew of the employee's "previous speeding and following-too-closely violations . . . ." *Jezek*, 637 F. Supp. 3d at 453.  Also, though the trucking firm flagged the employee as a potential risk and planned to give him additional training, no such training occurred.  *Id*.  There was also evidence that remedial measures were feasible, yet the trucking company failed to train the offending

employee on those measures.  *Id.*  Ultimately, based upon this evidence, the Court found that summary judgment was not appropriate on the claim for gross negligence against the trucking company.  *Id.*

Much like *Jezek*, Eastman was aware of Ms. Smith's prior traffic citations, and yet failed to provide her with any remedial training or supervision.  As discussed in more detail in the above sections, Eastman was thoroughly aware of the risks posed by texting and driving and other forms of electronic distractions, yet the failed to provide Ms. Smith with any training or supervision to combat her distracted driving.  Pl. App. at 679–80.  Then, after Ms. Smith caused a wreck three (3) months after getting hired, in Eastman's vehicle, Eastman did no independent investigation and failed to provide Ms. Smith with any additional training or supervision.  Pl. App. at 221.  These facts, which are not even contested, indicate that Eastman was objectively and subjectively aware of the risks posed by putting Ms. Smith behind the wheel, and yet Eastman consciously disregarded that risk.  Accordingly, there is a genuine issue of material fact regarding whether Eastman was grossly negligent, and summary judgment on this claim is inappropriate.

### G.     Texas law allows Erick Gonzalez to assert exemplary damages.

Defendants argue that Plaintiff Gonzalez, Nehemias' father, cannot recover exemplary damages **via his wrongful death claim**.  Technically, Defendants are correct on this point.  *See Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916 S.W.2d 916, 923 (Tex. 1993) ("[P]arents of the deceased, while they are not entitled to maintain an action **under the Wrongful Death statute**, are not included in Texas Constitution article XVI, § 26 and are therefore unable to recover punitive damages.") (emphasis added).

Plaintiff Gonzalez may, however, recover exemplary damages via his action **under the Texas survival statute**.  Under Texas law, the death of an injured party does not bar the recovery of exemplary damages, since the survival statute, Tex. Civ. Prac. & Rem. Code § 71.021, preserves

all the causes of action that the deceased would have had in favor of his heirs and legal representatives. *See Ellison v. Messerschmitt-Bolkow-Blohm*, 807 F. Supp. 39, 41 (E.D. Tex. 1992) (citations omitted). Plaintiff Gonzalez, in the operative Complaint, brings his claims against Defendants via Texas' survival statute, *see* Dkt. No. 34, ¶ 11, and, accordingly, Plaintiff Gonzalez is entitled to recover exemplary damages.

### H. Texas law allows Erick Gonzalez to recover for Nehemias' physical pain and suffering.

Remarkably, Defendants argue that Plaintiffs have admitted that Nehemias did not suffer any pain and suffering. Defendants make this argument by pointing to the operative Complaint, which states that Nehemias was killed "immediately" by the crash. As a matter of grammar, "immediately" and "instantaneously" are not equivalent. As a pleading matter, Plaintiffs knew that Nehemias was announced dead on the scene, but his exact time of death was uncertain. There is uncontroverted record evidence that Nehemias was still alive following the impact. Erick Santos testified: "I thought he was still alive." Pl. App. at 1528. Defendants bear the burden of showing that there is no genuine issue of material fact, and they have failed to meet that burden here. Plaintiffs should be allowed to proceed to trial on the question of Nehemias' physical pain and suffering.

### V.     Conclusion

For the reasons stated above, and based on the full record as presented in this Response, Plaintiffs Erick Roderico Pivaral Gonzalez, Evelyn Moreno, and Erick Santos respectfully request that the Court deny Defendants' Partial Motion for Summary Judgment.

Date: February 20, 2024      Respectfully submitted,


          */s/ Grant K. Schmidt*    
          Grant K. Schmidt
          Texas Bar No. 24084579
          HILGERS GRABEN PLLC
          7859 Walnut Hill Lane, Suite 335
          Dallas, TX 75230
          Telephone: 469.751.2819
          Fax: 402.413.1880
          Email:  gschmidt@hilgersgraben.com


          Jacob White
          *Pro Hac Vice*
          Taylor King Law
          410 N. Thompson St., Suite B
          Springdale, AR 72764
          Telephone: 479.935.1761
          Fax: 479.334.5069
          Email: jacobwhite@taylorkinglaw.com


          *Counsel for Plaintiff Erick Rodericko*
          *Pivaral Gonzalez*

## CERTIFICATE OF SERVICE

I, Grant Kojis Schmidt, do hereby certify that as an attorney of record for the Plaintiffs herein, that I have on this 20th day of January 2024, duly served the above and foregoing by electronic filing upon the following:

Brian L. Bunt, State Bar No. 03350025
Freeman Mills, P.C.
2020 Bill Owens Parkway, Suite 200
Longview, TX 75604
Telephone: (903)-295-7200
Facsimile: (903)-295-7201
bbunt@freemanmillsspc.com

Graham K. Simms, State Bar No. 24060610
Freeman Mills, P.C.
2020 Bill Owens Parkway, Suite 200
Longview, TX 75604
Telephone: (682)-316-1677
Facsimilie: (682)-3161676
gsimms@freemanmillspc.com

Roger W. Anderson, State Bar No. 01213500
Freeman Mills, P.C.
2020 Bill Owens Parkway, Suite 200

_/s/ Grant K. Schmidt_
Grant K. Schmidt