# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| ERICK RODERICO PIVARAL GONZALEZ, individually and as Special Administrator of the Estate of NEHEMIAS R. PIVARAL SANTOS, ERICK SANTOS, and EVELYN MORENO, | §<br>§<br>§<br>§<br>§<br>§<br>§ | Civil No. 3:22-CV-02714-K |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | |
| CAYLEE ERIN SMITH and EASTMAN CHEMICAL COMPANY, | §<br>§<br>§ | |
| Defendants. | §<br>§ | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants Caylee Erin Smith and Eastman Chemical Company's ("Eastman") Motion for Partial Summary Judgment (the "Motion for Summary Judgment") and Brief and Appendix in support thereof, Doc. Nos. 47–49, Plaintiffs Erick Roderico Pivaral Gonzalez, Erick Santos, and Evelyn Moreno's Opposition to Defendants' Motion for Partial Summary Judgment and Brief and Appendix in support thereof, Doc. Nos. 54–56, Defendants' Reply in Support of Motion for Partial Summary Judgment, Doc. No. 58, Defendants' Joint Motion to Dismiss the Second Amended Complaint for Failure to State a Claim (the "Motion to Dismiss"), Doc. No. 37, Plaintiffs' Response to Defendants' Partial Motion to Dismiss for Failure to State a Claim, Doc. No. 38, Defendants' Reply in Support of Joint Motion to Dismiss

the Second Amended Complaint for Failure to State a Claim, Doc. No. 41, Plaintiffs'
Motion to Exclude Certain Expert Testimony (the "Motion to Exclude") and Appendix
in support thereof, Doc. Nos. 50–51, Defendants' Response to Plaintiffs' Motion to
Exclude Certain Expert Testimony, Doc. No. 53, and Plaintiffs' Reply in Support of
the Motion to Exclude Certain Expert Testimony and Appendix in support thereof.
Doc. Nos. 59–60.

Upon consideration of the parties' submissions, the Court **GRANTS** Defend-
ants' Motion for Summary Judgment in part and **DENIES** it in part.  On April 30,
2022, twenty-three-year-old Caylee Erin Smith struck nineteen-year-old Nehemias
Pivaral Santos with her employer-issued Ford Explorer while he was trying to help his
brother, girlfriend, and acquaintances fix a flat tire on the side of Interstate 45.  Mr.
Pivaral Santos died on impact.  His father, Erick Roderico Pivaral Gonzalez, then sued
Ms. Smith and her employer, Eastman.  Mr. Pivaral Santos's brother, Erick Santos,
and his girlfriend, Evelyn Moreno, later joined the suit as Plaintiffs.  This order does
not address Plaintiffs' claim that Ms. Smith negligently killed Mr. Pivaral Santos or
their claim that Eastman is vicariously liable for her conduct.  Ms. Smith and Eastman
have moved for summary judgment only on Plaintiffs' direct negligence claims against
Eastman, their theories of gross negligence, and several of Plaintiffs' damages requests.
Starting with the first part of the motion the Court concludes that Eastman is not
directly liable in negligence for Mr. Pivaral Santos's death.  Eastman has stipulated that
Ms. Smith was acting in the course and scope of her employment while driving on the

interstate, so, under Texas law, Plaintiffs must show that Eastman's wrongdoing rose to the level of gross negligence to prevail on their direct negligence claims. On review of the record, the Court finds insufficient evidence that Eastman was grossly negligent in hiring, retaining, training, or supervising Ms. Smith. The Court reaches a different result with respect to Ms. Smith's alleged gross negligence. Although the Court rejects one of Plaintiffs' gross negligence theories, there is sufficient record support for their theory that Ms. Smith was consciously and dangerously distracted while approaching Mr. Pivaral Santos at high speed and trying to swerve around his girlfriend's car. As to damages, the only theory currently in dispute following concessions by Plaintiffs is Plaintiffs' theory based on Mr. Pivaral Santos's pain and suffering. The Court cannot accept this theory because it finds no evidence Mr. Pivaral Santos was conscious to experience pain or suffering after his collision with Ms. Smith's Explorer.

In addition to their Motion for Summary Judgment, Defendants have filed an overlapping Motion to Dismiss Plaintiffs' claims. The Motion to Dismiss is broader than the Motion for Summary Judgment insofar as Defendants seek the dismissal of the direct claims against Ms. Smith filed by Mr. Santos and Ms. Moreno. To the extent that the Defendants seek the same relief in their Motion to Dismiss that the Court has granted in its summary judgment ruling, the Court **DENIES** the Motion to Dismiss as moot. The Court **GRANTS** the remainder of the Motion to Dismiss in part without prejudice and **DENIES** it in part. The Court **DISMISSES** Ms. Moreno's claim without prejudice because Plaintiffs' complaint does not identify the harm she suffered for

which she seeks relief.  In her briefing, she has since explained that the momentum of Ms. Smith's car threw Mr. Pivaral Santos's body into her, so the Court will permit her to replead her claim to describe this harm.  The Court will not dismiss Mr. Santos's claim because he has sufficiently pled that he has a right to recover as a bystander to his brother's death.

The Court lastly **DENIES** Plaintiffs' Motion to Exclude expert testimony offered by Defendants, in part without prejudice.  For the most part, Plaintiffs' objections to this testimony consist of criticisms that are better made through cross-examination and argument.  Plaintiffs have raised a weightier question concerning the qualifications of Defendants' forensic analyst to testify about the source of body tissue dispersion patterns, but the Court believes that the analyst may be qualified and that Defendants should have the opportunity to qualify her at trial.

### I.   BACKGROUND

#### A. Ms. Smith's Employment with Eastman

In early 2021, Caylee Erin Smith applied for a sales job with Eastman.  Doc. No. 49 at 609–10.  She was just twenty-one years old and a couple of years out of college.  *Id.* at 540, 550, 568.  Eastman ran a background check on her.  *Id.* at 1498–99.  The check revealed that, in 2017, she had been found guilty of driving eighty miles per hour in a sixty-five mile per hour zone and violating a promise to appear.  *Id.* at 39.  In about 2019, she had also received a citation for following another vehicle too closely, but the check did not identify this incident.  *Id.* at 561.  At some point the citation had

4

been dismissed.  *Id.* at 617.  The check also did not identify Ms. Smith's posts on social media about her driving history.  *Id.* at 39–51, 1513.  In 2018, she had tweeted that she "just almost hit two girls while they were walking across the road to the point where they had to jump out of the way" and added, "if you see this, [I'm] sorry."  *Id.* at 5, 729.  In 2019, she had tweeted that she "just almost wrecked ordering @ChickfilA on my phone while driving . . . but the grace of God stopped my car just in time."  *Id.* at 6.

Eastman ultimately hired Ms. Smith as an outside sales representative. *Id.* at 540.  Her job was to sell window film and other film products to dealerships from Waco to Brownsville, with occasional stops to fix film cutting and software problems. *Id.* at 653–56, 663–64.  This required her to spend about twenty hours per week, four days a week, on the road.  *Id.* at 607, 649.  Eastman gave her a 2021 Ford Explorer to use for her work, and for personal trips if she desired.  *Id.* at 625, 679.  Ms. Smith became subject to a "Defensive/Distracted Driving Policy," and, because she would be using a company car, she also signed and became subject to a standard operating procedure for leased automobiles.  *Id.* at 3; 690–91, 1313–15, 1361–62.

Beyond the policy and the standard operating procedure, it is unclear to what extent Eastman provided Ms. Smith instruction concerning safe or distracted driving. Eastman does not require online driver safety training.  *Id.* at 1326.  Although it does hold meetings for sales staff that often touch on driver safety, precise records of the meetings do not exist.  *Id.* at 1330–32.  Two of Ms. Smith's supervisors joined her on the road several times for multiday "ride-alongs," but only general descriptions of these

ride-alongs are in the record. *Id.* at 703–04, 1238, 1259–60. Eastman's corporate representative offers hearsay evidence, to which Plaintiffs make no objection, that the supervisors found nothing concerning about Ms. Smith's driving and that at least one of them discussed her driving with her. *Id.* at 1260–61; *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 F. App'x 899, 907–08 (5th Cir. 2010) (per curiam) (holding that hearsay offered by the proponent's own corporate representative is inadmissible); *HCB Fin. Corp. v. Kennedy*, 570 F. App'x 396, 401 n.5 (5th Cir. 2014) (per curiam) (holding that a court may consider unobjected-to hearsay).

### B. Ms. Smith's June 2021 Traffic Accident

On June 1, 2021, Ms. Smith was in a minor traffic accident in her company-issued car. Doc. No. 49 at 686. While Ms. Smith was stuck in bumper-to-bumper traffic, the driver in front of her "slammed on the brakes," and she "[b]umped" into the driver's car. *Id.* at 686–89. Ms. Smith testified that she was not using her phone at the time. *Id.* at 689. She called the police, but they declined to respond to the scene or prepare a report on the collision. *Id.* at 688.

Ms. Smith notified Eastman of the incident and referenced it in a self-evaluation. *Id.* at 22, 1415–16, 1424. She does not recall discussing the matter with her supervisors or receiving any additional training or punishment after it was over. *Id.* at 686–87, 719. Eastman confirmed that she received "no specific additional training or supervision." *Id.* at 1427.

**C. Ms. Smith's Collision with Mr. Pivaral Santos**

In the afternoon of Saturday, April 30, 2022, Ms. Smith was involved in a second, more serious, traffic accident. *Id.* at 868–69. The events leading to the accident began the night before, when Nehemias R. Pivaral Santos, then nineteen, his girlfriend Evelyn Moreno, also nineteen, and his friend Dina Soto, then twenty-two, got in Ms. Moreno's Toyota Camry in Springdale, Arkansas and began a drive to Houston. *Id.* at 71, 329–32, 339. Their goal was to pick up Mr. Pivaral Santos's brother, Erick Santos, then twenty-one, and Dina's boyfriend, Melvin Diaz, also twenty-one, and transport them back to Springdale. *Id.* at 80, 330–36, 483–85. Ms. Moreno drove the entire way to Houston, rested briefly, and began the return trip. *Id.* at 337. By this point, it was already Saturday. *Id.* at 215, 343, 482.

While Ms. Moreno was driving on Interstate 45, around Angus in Navarro County, a tire on the Camry blew out. *Id.* at 81, 225–26, 351–53, 491, 1116. She pulled the car onto the lefthand shoulder of the interstate. *Id.* at 82, 226, 357. Part of the car remained jutting into the lefthand travel lane when it stopped. *Id.* at 235–36, 359–60, 499. Ms. Moreno and Mr. Pivaral Santos got out of the vehicle, and other passengers may have exited with them. *Id.* at 88–89, 236, 360–62, 495–96. Some combination of the vehicle's occupants then began trying to replace the Camry's damaged tire. *Id.* at 89, 238, 370, 500.

Ms. Smith was also traveling on Interstate 45. *Id.* at 698. She had a work conference in Fort Worth scheduled for Monday and decided to drive her Ford Explorer

to the Dallas area beforehand to see her family and go to a concert with a friend.  *Id.* at 808–14.  On the road, she struck up a lengthy text message conversation with her friend during which she discussed getting a tattoo, commented on a photograph and a video, and made calls to a tattoo shop and to her brother.  *Id.* at 823–42; Doc. No. 56 at 1105–17.  A little before 4:00 PM, she texted her friend that the tattoo artists at a shop her brother recommended "don't do walkins."  Doc. No. 56 at 1117; Doc. No. 49 at 837.  She dictated this message, which required her to push buttons on her phone to record the message and transmit it.  Doc. No. 49 at 839–41.

Over the course of the next eight or nine seconds, Ms. Smith, who was traveling at eighty-five to ninety miles per hour, noticed Ms. Moreno's Camry sticking into her lane, attempted to move rightward, and, as she approached the vehicle, looked at her GPS.  *Id.* at 846–47.  At the end of the eight or nine seconds, Ms. Smith's Explorer struck and killed Mr. Pivaral Santos.  *Id.* at 872–73.  Something—identified by Plaintiffs as Mr. Pivaral Santos's body—also struck Ms. Moreno and apparently knocked her unconscious.  *Id.* at 383–85; Doc. No. 38 at 4 n.1.  There was no contact between the Explorer and the Camry.  Doc. No. 49 at 254.

Many of the remaining facts surrounding Mr. Pivaral Santos's death are in dispute.  The hottest dispute concerns the path Ms. Smith took leading up to her collision with Mr. Pivaral Santos.  Two of the passengers who traveled with Mr. Pivaral Santos testified that Ms. Smith swerved into the shoulder of the interstate, struck him, and then made her rightward adjustment to avoid hitting Ms. Moreno's car.  *Id.* at 252–54,

508.  There is contrary expert testimony explaining that this path was "physically im-
possible" because Ms. Smith could not have avoided Ms. Moreno's car if she moved to
the left before making her adjustment to the right.  *Id.* at 2443–44.

### D. Procedural History

Mr. Pivaral Santos's father, Erick Roderico Pivaral Gonzalez, sued Ms. Smith
and Eastman in this Court.  Doc. No. 1.  He subsequently amended his Complaint
twice.  Doc. Nos. 8, 34.  The Second Amended Complaint added Mr. Pivaral Santos's
brother, Mr. Santos, and his girlfriend, Ms. Moreno, as Plaintiffs.  Doc. No. 34.  It sets
forth eight claims.  *Id.* ¶¶ 38–89.  Four are direct negligence claims against Eastman.
These comprise claims for negligent hiring, negligent retention, negligent training, and
negligent supervision.  *Id.* ¶¶ 45–85.  The remaining claims are a simple negligence
claim against Ms. Smith, wrongful death claims against both Ms. Smith and Eastman,
and a claim for recovery from Eastman under *respondeat superior* principles.  *Id.* ¶¶ 38–
44, 86–89.  The simple negligence claim has three variations.  Mr. Pivaral Gonzalez
asserts the claim as Mr. Pivaral Santos's surviving father, and Mr. Santos asserts the
claim as a bystander to the accident that caused Mr. Pivaral Santos's death.  *Id.* ¶¶ 38–
44, 93, 95.  It is unclear from the face of the Seconded Amended Complaint on what
basis Ms. Moreno asserts the claim.  *Id.* ¶¶ 38–43; *see also* Doc. No. 38 at 4 n.1.  Plain-
tiffs seek both compensatory and exemplary damages, including damages for
Mr. Pivaral Santos's alleged pain and suffering and exemplary damages based on
Ms. Smith's and Eastman's alleged gross negligence.  Doc. No. 34 ¶¶ 86–98.

Defendants filed a Motion to Dismiss the direct negligence claims against East-
man and the simple negligence claims asserted by Ms. Moreno and Mr. Santos.  Doc.
No. 37.  Defendants later filed a Motion for Summary Judgment on the direct negli-
gence claims, the gross negligence theories, the request for damages related to pain and
suffering, and, insofar as Plaintiffs based it on Mr. Pivaral Gonzalez's wrongful death
claim, the request for exemplary damages.  Doc. No. 47.  As part of the latter motion,
Eastman stipulated that Ms. Smith was acting within the course and scope of her em-
ployment when she was driving at the time of Mr. Pivaral Santos's death.  Doc. No. 48
at 43–44.  Plaintiffs in turn stipulated that they could not recover exemplary damages
based solely on the fact that she was acting in that capacity.  Doc. No. 55 at 53.  They
also conceded that Mr. Pivaral Gonzalez could not recover exemplary damages under
Texas's wrongful death statute.  *Id.* at 54.  The Court will grant summary judgment on
these exemplary damages theories without further discussion in this order.

Plaintiffs subsequently filed a Motion to Exclude portions of the testimony of-
fered by Defendants' expert witnesses.  Doc. No. 50.  One portion is the opinion of
Defendants' accident reconstructionist, Paul Montalbano, that Mr. Pivaral Santos
leaned down and stuck his head into Ms. Smith's travel lane leading up to the collision
with her car.  *Id.*  The other portions comprise opinions given by Defendants' forensic
analyst, Iris Dalley Graff, about the sources of body matter patterns at the scene of
Mr. Pivaral Santos's death.  *Id.*  In addition to these opinions, Plaintiffs initially moved
to exclude illustrations prepared by Ms. Graff, but they appear to have abandoned this

request by failing to defend it in their reply briefing.  *Id.* at 24–26; Doc. No. 59.  The Court will not consider the request further in this order.  *See Mosley-Lovings v. AT&T Servs., Inc.*, 2020 WL 6588743, at *2 (N.D. Tex. Oct. 2, 2020) (Starr, J.).  Plaintiffs may renew their request at trial.

## II.   DISCUSSION

The Court begins by addressing Defendants' Motion for Summary Judgment rather than Defendants' Motion to Dismiss because its decision to grant the Motion for Summary Judgment in part moots most of the Motion to Dismiss.  The Court then addresses the surviving part of the Motion to Dismiss.  It discusses Plaintiffs' Motion to Exclude expert testimony last since its merits rulings do not turn on the challenged testimony.

### A. Motion for Summary Judgment

The Court breaks Defendants' summary judgment issues into three groups.  The Court first discusses Plaintiffs' direct negligence claims against Eastman and grants Eastman summary judgment on those claims, including Plaintiffs' related theory that Eastman was grossly negligent.  The Court next discusses Plaintiffs' theories of Ms. Smith's gross negligence.  The Court grants Ms. Smith summary judgment on the theory that she was grossly negligent because she drove on the shoulder of Interstate 45 before hitting Mr. Pivaral Santos, but it denies Ms. Smith summary judgment on Plaintiffs' alternative theory that Ms. Smith was grossly negligent because she was dangerously distracted at the time of the accident.  The Court concludes its discussion of the

11

Motion for Summary Judgment by considering Plaintiffs' request for damages based on Mr. Pivaral Santos's pain and suffering.  It grants Defendants summary judgment on that request.

### 1. Legal Standard

The Court grants motions for summary judgment when there is no genuine dispute between the parties about any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if a reasonable jury could resolve the parties' factual disagreement in favor of either party and the resolution could affect the outcome of their litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).  In evaluating what a reasonable jury could find, the Court applies the same standard of proof that would apply at trial.  *Id.* at 252.

### 2. Direct Negligence Claims Against Eastman

The Court starts its summary judgment analysis with a review of Plaintiffs' negligent hiring, retention, training, and supervision claims against Eastman.  In assessing these direct negligence claims, the Court applies a gross negligence standard rather than an ordinary negligence standard.  Eastman has stipulated that Ms. Smith was acting within the course and scope of her employment when she hit Mr. Pivaral Santos with her car, and the ordinary negligence standard does not apply when an employer makes a stipulation like Eastman's.  Doc. No. 48 at 43–44.  The reason is that the employer opens itself to vicarious, *respondeat superior* liability for the negligence of its employee, which is mutually exclusive with direct liability for negligent hiring, retention, training,

or supervision.  *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 654 (Tex. App.—

Dallas 2002, pet. denied); *Robinson v. Melton Truck Lines, Inc.*, 2022 WL 174520, at *7

(W.D. Tex. Jan. 18, 2022); *see also Graham v. Lewis*, 2023 WL 138923, at *2 & n.4

(N.D. Tex. Jan. 9, 2023) (Fitzwater, J.) (noting that the Texas legislature has recently

codified this rule), *reconsideration denied*, 2023 WL 2429484 (N.D. Tex. Mar. 9, 2023).

This rule of mutual exclusivity promotes efficiency.  Under *respondeat superior* principles,

an employer is liable for the wrongdoing of its employee within the course and scope

of her employment, so allowing separate claims based on the employer's failure to pre-

vent the wrongdoing would only serve to clutter pleadings.  *See Ordonez v. Ausby*, 2023

WL 310442, at *2–4 (W.D. Tex. Jan. 18, 2023).

     Under the mutual exclusivity rule, the Court still must determine whether East-

man was grossly negligent in hiring, retaining, training, or supervising Ms. Smith be-

cause *respondeat superior* liability is not mutually exclusive with liability for punitive

damages, which may result when an employer is grossly negligent.  *See Malone v. Spence*,

2023 WL 5022680, at *11 (N.D. Tex. Aug. 7, 2023) (Ramirez, M.J.); *Perez v. U.S.

Xpress, Inc.*, 2023 WL 3681714, at *5–6 (W.D. Tex. Mar. 10, 2023), *aff'd*, 2023 WL

6393899 (5th Cir. Oct. 2, 2023).  Gross negligence refers to acts or omissions meeting

objective and subjective standards of wrongfulness.  The acts or omissions must be ones

involving "an extreme degree of risk," and the responsible party must act or fail to act

"with conscious indifference to the rights, safety, or welfare of others" despite "actual,

subjective awareness" of the risk.  Tex. Civ. Prac. & Rem. Code §§ 41.001(11)(A)–(B).

A "corporation may be liable for gross negligence under Texas law, but only for its own conduct." *Trinh v. Hunter*, 2022 WL 6813293, at *4 (W.D. Tex. Oct. 11, 2022); *Rayner v. Claxton*, 659 S.W.3d 223, 257 (Tex. App.—El Paso 2022, no pet.).  Proof of gross negligence must be by clear and convincing evidence.  *Cornejo v. EMJB, Inc.*, 2021 WL 4526703, at *7 (W.D. Tex. Oct. 4, 2021).  In the next four subsections, the Court explains why it finds no gross negligence in Eastman's hiring, retention, training, or supervision of Ms. Smith.

### i. Negligent Hiring

Eastman was not grossly negligent in hiring a person with Ms. Smith's driving history as a traveling salesperson.  Negligent hiring occurs only when an employer creates an unreasonable risk of harm to others by hiring an employee it knows or reasonably should know is incompetent to perform her duties.  *Mejia-Rosa v. John Moore Servs., Inc.*, 2019 WL 3330972, at *10 (Tex. App.—Houston [1st Dist.] July 25, 2019, no pet.) (mem. op.).  Although Ms. Smith did not have a pristine driving record when Eastman hired her, the evidence does not suggest she was so incompetent that she was an extreme danger to others while doing the driving her job required.

The sum of Plaintiffs' evidence of incompetence amounts to a few traffic incidents involving Ms. Smith.  The most clearcut incident is a speeding violation Ms. Smith committed in 2017, which resulted in a fine.  Doc. No. 49 at 43.  Beyond this, one of the incidents, a failure to appear and pay a fine, was a purely administrative matter that Ms. Smith later resolved.  Doc. No. 49 at 43, 566.  It says little, if anything,

14

about Ms. Smith's driving skills.  *See Freyer v. Lyft, Inc.*, 639 S.W.3d 772, 786 (Tex. App.—Dallas 2021, no pet.) (giving little weight to administrative violation that did not evidence reckless or incompetent driving); *Phillips v. Super Servs. Holdings, LLC*, 189 F. Supp. 3d 640, 651 (S.D. Tex. 2016) (similar).

Another incident, a citation for following a vehicle too closely, ended with the dismissal of the citation.  Doc. No. 49 at 561, 617.  Although Defendants' assertion that this incident is "irrelevant" finds no support in the case they cite, they are correct that courts have been more skeptical of citations that do not lead to a finding of fault. Doc. No. 48 at 23 n.3 (citing *Sanchez v. Swift Transp. Co. of Ariz., LLC*, 2016 WL 10587126, at *8 (W.D. Tex. June 14, 2016)).  Courts have held that a record of citations, unaccompanied by supporting evidence, cannot show that a driver is incompetent.  *Sanchez*, 2016 WL 10587126, at *8; *Phillips*, 189 F. Supp. 3d at 652 n.10; *cf. also Freyer*, 639 S.W.3d at 786–88 (applying the usual rule but adding dictum characterizing a negligent entrustment case as one in which the court gave no weight to a citation without a resulting conviction).  At minimum, Ms. Smith's citation for following too closely has diminished probative value as evidence of her driving abilities because there is no corroboration that she was at fault in the cited incident.

This leaves two traffic incidents Ms. Smith discussed in 2018 and 2019 tweets. Across six different briefs, all focused on dicta in a single case concerning a pizza delivery driver who allegedly sexually assaulted a customer, the parties have expounded their disagreement about whether Eastman should have found these tweets before hiring

Ms. Smith.  Doc. No. 37 at 11 (citing *Doe v. YUM! Brands, Inc.*, 639 S.W.3d 214 (Tex. App.—Houston [1st Dist.] 2021, no pet.)); Doc. No. 38 at 10 (same); Doc. No. 41 at 7 (same); Doc. No. 48 at 24–25 (same); Doc. No. 55 at 35–36 (same); Doc. No. 58 at 12 (same).

Because the Court is applying a gross negligence standard, this lengthy back and forth is moot.  Plaintiffs cite no evidence that Eastman knew of the tweets when it hired Ms. Smith or even learned of them before this litigation.  Doc. No. 49 at 1517. Without knowledge of the tweets, Eastman could not have a subjective awareness that they revealed Ms. Smith to be a dangerous driver, and without subjective awareness of any additional risks involved in putting Ms. Smith on the road, Eastman could not have been grossly negligent in ignoring those risks.  *See Lara v. Power of Grace Trucking, LLC*, 2022 WL 576581, at *3 (W.D. Tex. Jan. 4, 2022); *Sanchez*, 2016 WL 10587126, at *11; *Stalter v. RWI Transp., LLC*, 2017 WL 1682571, at *1 (E.D. Tex. Apr. 14, 2017), *rep. & rec. adopted*, 2017 WL 1541993 (E.D. Tex. Apr. 27, 2017).

Even if Eastman had known of Ms. Smith's tweets, the discovery would not have alerted Eastman that Ms. Smith was an extremely dangerous driver.  Both tweets describe situations in which Ms. Smith avoided traffic accidents.  The earlier tweet reads, "just almost hit two girls while they were walking across the road to the point where they had to jump out of the way."  Doc. No. 49 at 5.  It is unclear whether this close call was the result of any dangerous driving choices by Ms. Smith, but she did add that she was "sorry."  *Id.*  The later tweet, which appears to address a different incident, is

more explicit about what Ms. Smith was doing behind the wheel.  It describes a situation in which Ms. Smith "almost wrecked" ordering food "on [her] phone while driving" but managed to stop "just in time." *Id.* at 6.

Assuming Eastman reviewed Ms. Smith's tweets together with the other driving-related incidents noted by Plaintiffs, Eastman was not grossly negligent in hiring her. Her driving history was mostly unremarkable.  She had one old speeding conviction, an administrative conviction unrelated to her performance as a driver, and a citation for following too closely for which she was not convicted.  *Id.* at 43, 561, 566, 617. She also had a couple of experiences in college narrowly avoiding traffic accidents, one of which arose in largely unknown circumstances and the other of which involved a poor decision to use her phone while driving. *Id.* at 5–6.  Courts applying an ordinary negligence standard have declined to hold employers liable for hiring employees with records of dangerous driving not much less troubling than Ms. Smith's.  *See, e.g., Ruelas v. W. Truck & Trailer Maint. Inc.*, 2019 WL 4060891, at *4 (W.D. Tex. June 6, 2019) (speeding citation and two accidents); *Mejia-Rosa*, 2019 WL 3330972, at *11 (speeding citation and an accident); *Brown v. McClure*, 2021 WL 6119990, at *7 (Tex. App.— Houston [1st Dist.] Dec. 28, 2021, no pet.) (mem. op.) (three moving violations and two unspecified driver safety courses in a negligent entrustment case).

### ii.  Negligent Retention

Little in Ms. Smith's driving record changed between her hiring and her collision with Mr. Pivaral Santos, so the Court finds that Eastman was not grossly negligent in

retaining her as an employee over that span.  Negligent retention is a cousin of negligent hiring.  Instead of showing that Ms. Smith was an incompetent driver when Eastman hired her, Plaintiffs must show that she was incompetent at some point during her employment.  *See Ruelas*, 2019 WL 4060891, at *6; *Moerbe v. Adcock*, 2022 WL 5568119, at *3–4 (W.D. Tex. Aug. 3, 2022).  They point to a traffic accident involving Ms. Smith that occurred a few months after Eastman hired her.  Doc. No. 55 at 42.  Having reviewed the circumstances of the accident, the Court finds that Ms. Smith's driving record does not bespeak serious incompetence even with its addition.

The undisputed evidence shows that the accident was a minor affair.  In June 2021, Ms. Smith was driving her company car in "bumper to bumper" traffic, the driver in front of her "slammed on the brakes," and she "[b]umped" into the driver's car.  Doc. No. 49 at 686–89.  Nobody got injured, and the police refused to write a report on the collision.  *Id.* at 689.  Ms. Smith was not using her phone at the time of the accident.  *Id.*  Plaintiffs make the conclusory assertion that Ms. Smith was at fault, but, based on these facts, that is far from clear.  Doc. No. 55 at 37.

Assuming the accident did in some way reflect negatively on Ms. Smith's driving abilities, the Court concludes that it was not so serious as to show that Eastman was grossly negligent retaining her.  Her driving record comprised a minor accident precipitated by another driver who braked abruptly, a speeding violation, a failure to appear, a dismissed citation for following too closely, and two successfully avoided near-accidents about which Eastman was unaware.  From this type of record, Eastman could

18

fairly believe that Ms. Smith was not an extreme risk to others as a driver.  *See supra* Section II.A.2.i (collecting cases); *Connell W. Trucking Co. v. Estes Express Lines*, 2022 WL 5568428, at *4 (W.D. Tex. June 28, 2022) (finding that three post-hiring accidents did not show incompetence under an ordinary negligence standard); *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 758 (Tex. 2007) (per curiam) (finding that a speeding violation, a rear-end collision, and a citation for driving without liability insurance did not show incompetence in a negligent entrustment case).

### iii.  Negligent Training

The Court grants Eastman summary judgment on Plaintiffs' negligent training claim because Eastman had no duty to provide the training Plaintiffs say it should have given Ms. Smith.  The training at issue is instruction about the dangers of distracted driving.  Doc. No. 55 at 38–42.  Because Ms. Smith used her cell phone while driving at high speed shortly before she hit Mr. Pivaral Santos with her car, Plaintiffs believe that such instruction might have prevented the collision.  *Id.* at 42.  Although this training might have been desirable, it was unnecessary.

As the parties recognize, the obvious obstacle to Plaintiffs' negligent training claim is the general rule that an employer need not train an employee to avoid risks that should be familiar to her because of their ubiquity or her experience.  *See, e.g.*, *Raines v. GT Express, Inc.*, 2024 WL 233494, at *9 (W.D. Tex. Jan. 2, 2024), *rep. & rec. adopted*, 2024 WL 233242 (W.D. Tex. Jan. 22, 2024); *Duron v. Pittman Trucking, Inc.*, 2021 WL 3741457, at *3 (S.D. Tex. Aug. 24, 2021).  The parties nonetheless spar

over the application of this rule to their dispute, no doubt in part because neither Plain-tiffs nor Defendants were able to find a case applying the rule when the employer's alleged wrongdoing was failing to provide training concerning distracted driving.  Doc. No. 48 at 27–28; Doc. No. 55 at 38–42; Doc. No. 58 at 15–17.

After Defendants filed their opening brief but before Plaintiffs filed their re-sponse, the Third Court of Appeals addressed this situation and interpreted the rule in Defendants' favor.  *Cook v. Tex. Highway Walls, LLC*, 2024 WL 647655, at *5 (Tex. App.—Austin Feb. 16, 2024, no pet.) (mem. op.).  In *Cook*, the Court of Appeals held that an employer had no duty to train its employee to avoid driving distractions be-cause it had no reason to think that the employee "was unaware that driving as alleged while conducting business on a cell phone and looking away from traffic was danger-ous."  *Id.*  Though *Cook* is not binding, the Court agrees with its reasoning.  Courts have found no duty to train drivers with respect to a wide range of common driving hazards. *See, e.g.*, *Raines*, 2024 WL 233494, at *9 (driving quickly on a wet and winding road); *Ochoa v. Mercer Transp. Co.*, 2018 WL 7505640, at *3 (W.D. Tex. Dec. 10, 2018) (changing lanes); *Machado v. Dyer*, 2021 WL 1840916, at *3 (W.D. Tex. May 7, 2021) (driving in heavy fog), *rep. & rec. adopted*, 2021 WL 5195815 (W.D. Tex. May 27, 2021); *Villegas v. M.G. Dyess, Inc.*, 2021 WL 2593633, at *7 (W.D. Tex. June 23, 2021) (obeying speed limits, stopping at stop signs, and refraining from driving while intoxi-cated), *rep. & rec. adopted*, 2021 WL 5194901 (W.D. Tex. July 15, 2021).  The hazards

of distracted driving, particularly those created by the all-too-common practice of using electronic devices on the road, fit comfortably in this class of well-known risks.

The Court concludes that Eastman had no duty to train Ms. Smith about the dangers of distracted driving. Plaintiffs do not show that Ms. Smith failed to understand the risks of distracted riving, much less that Eastman had any reason to suspect that she did. Ms. Smith even testified that texting while driving at high speed is dangerous. Doc. No. 49 at 770. Eastman could rely on Ms. Smith to appreciate the risks of her allegedly distracted driving and was not grossly negligent in failing to give her training on the same.

### iv. Negligent Supervision

Turning to Plaintiffs' last direct negligence claim against Eastman, the Court finds that Eastman was not grossly negligent in its supervision of Ms. Smith. Eastman sent supervisors to accompany Ms. Smith on her drives and observe her on several occasions. Doc. No. 49 at 703–04, 1260. To show that Eastman's supervision of Ms. Smith was negligent, Plaintiffs must offer evidence that Eastman should have known she needed additional supervision and failed to provide it. *See Almanzar v. Eaglestar*, 2021 WL 7184209, at *10–11 (W.D. Tex. Dec. 21, 2021); *Baird v. Shagdarsuren*, 2020 WL 208815, at *10 (N.D. Tex. Jan. 14, 2020) (Boyle, J.). This evidence is lacking.

Plaintiffs rely on Eastman's muted response to Ms. Smith's June 2021 traffic accident, which she self-reported and noted on a self-evaluation. Doc. No. 49 at 22, 1415–16, 1424. They complain that Eastman treated the accident as a "minor

incident," failed to have supervisors give Ms. Smith any advice that she could remember, and declined to put her on a performance improvement plan or subject her to "adverse employment consequences."  Doc. No. 55 at 37.

The problem with this argument is the undisputed evidence showing that that the accident actually was a minor incident.  Ms. Smith "[b]umped" into another car in stop-and-start traffic.  Doc. No. 49 at 686–89.  Nobody got hurt.  *Id.* at 688.  Ms. Smith was not using her phone, and there is no evidence that she engaged in any other particularly dangerous conduct while driving.  *Id.* at 689.  The driver in front of her simply "slammed on the brakes."  *Id.* at 687.  After learning of collision, the police declined to respond to the scene or make a report.  *Id.* at 688.

Whether viewed in the context of Ms. Smith's prior driving record—a perspective Plaintiffs do not urge—or viewed in isolation, this incident did not give Eastman any reason to think that Ms. Smith was an extreme risk to others on the road.  Even if Eastman believed Ms. Smith was at fault in the accident, it could have believed that Ms. Smith made a small, unexceptional error that was dissimilar from most of the errors in her driving record and did not call her abilities as a driver into question.

The Court also finds it doubtful that Eastman could have prevented Ms. Smith's later collision with Mr. Pivaral Santos if it had been alarmed by Ms. Smith's earlier accident and taken the supervisory actions advocated by Plaintiffs. *See Finley v. Vermeer Mfg. Co.*, 2019 WL 5058901, at *5 (W.D. Tex. July 11, 2019).  A response to the earlier accident might have ensured that Ms. Smith knew how to avoid a similar

accident—one in which she tapped a car in stop-and-start traffic despite not using her phone.  It is less clear why a response tailored to that situation would have kept her from using a phone at high speed on the interstate and striking a pedestrian.

The Court concludes that Eastman's supervision of Ms. Smith was not grossly negligent.  That exhausts all of Plaintiffs' direct negligence claims against Eastman, whether alleged under ordinary negligence or gross negligence theories.

### 3.  Theories of Ms. Smith's Gross Negligence

The Court now reviews Plaintiffs' claim that Ms. Smith was grossly negligent when she struck Mr. Pivaral Santos with her car.  Plaintiffs offer two theories of gross negligence.  The Court grants Ms. Smith summary judgment on the theory that she veered onto the shoulder of the interstate before hitting Mr. Pivaral Santos.  While there is evidence from which a jury could conclude that she drove onto the shoulder, there is no evidence that she was aware she did so.  The Court denies Ms. Smith summary judgment on the theory that she distracted herself by using electronic devices while driving at high speed and attempting to maneuver around Ms. Moreno's stalled vehicle.  A jury could find Ms. Smith grossly negligent on those facts.

#### i.    Driving Onto the Shoulder

Looking first at Plaintiffs' theory that Ms. Smith was grossly negligent because she drove onto the shoulder of the interstate when she struck Mr. Pivaral Santos, the Court finds a genuine dispute of material fact as to the objective component of the

gross negligence test—the degree of danger—but not the subjective component—Ms. Smith's awareness of and attitude toward the danger.

From an objective standpoint, there is evidence that Ms. Smith drove onto the shoulder where Mr. Pivaral Santos had exited Ms. Moreno's Toyota Camry. Two of Mr. Pivaral Santos's fellow passengers, Mr. Diaz and Mr. Santos, testified that Ms. Smith crossed into the shoulder and struck Mr. Pivaral Santos before she corrected course and swerved around the Camry. Doc. No. 49 at 252–54, 508. Defendants do not dispute that driving at high speed down an occupied shoulder of the interstate involves "an extreme degree of risk." Tex. Civ. Prac. & Rem. Code § 41.001(11)(A).

Defendants instead ask the Court to reject the passengers' testimony because they believe it is false and therefore not the type of clear and convincing evidence necessary to prove gross negligence. Doc. No. 58 at 19–22. It is true that the clear and convincing standard of proof applies at summary judgment here because it would apply at trial, but Defendants misunderstand the scope of this rule. *Anderson*, 477 U.S. at 252. As the Supreme Court stated in adopting the rule, its "holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions . . . . by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. The Court is not free to decide in place of a jury that Mr. Diaz and Mr. Santos are untrustworthy simply because Defendants offer contrary evidence. *Jezek v. R.E. Garrison Trucking, Inc.*, 637 F.

24

Supp. 3d 445, 451 (N.D. Tex. 2022) (O'Connor, J.).  The jury could just as well believe Mr. Diaz and Mr. Santos and distrust Defendants' witnesses.  In that case, the jury could properly find that the evidence Ms. Smith drove onto the shoulder of the interstate is clear, convincing, and direct.

Defendants try to impeach Mr. Diaz and Mr. Santos, but that makes no difference in the Court's analysis.  They point to some evidence that Mr. Diaz and Mr. Santos admitted to remaining in Ms. Moreno's Camry until Ms. Smith hit Mr. Pivaral Santos, apparently believing that Mr. Diaz and Mr. Santos could not have seen where Ms. Smith drove without exiting the Camry.  Doc. No. 48 at 36.  Assuming Defendants are correct in their belief, the Court still cannot preempt the jury by deciding that Mr. Diaz and Mr. Santos were telling the truth when they admitted to staying in the vehicle and not when they gave their later account of Ms. Smith driving on the shoulder of the interstate.  *See Quad Six Inc. v. Hall*, 1987 WL 125078, at *11 (S.D. Tex. Oct. 22, 1987) ("Honeywell's argument is that unexplained inconsistent testimony is inherently so unworthy of belief as to amount to a merely colorable claim or at best testimony that can never satisfy Hall's clear and convincing burden.  However, it is precisely this weighing of testimony that is the special province of the finder of fact.").  The Fifth Circuit reached a similar result in *Firemen's Mutual Insurance Co. v. Aponaug Manufacturing Co.*, a case in which three principals in an alleged insurance fraud scheme contradicted themselves by each admitting and then denying that he separately helped to burn a mill, while a fourth witness was the subject of "impeaching affidavits" attacking

both his "character and mentality." 149 F.2d 359, 362–63 (5th Cir. 1945). The Court of Appeals reversed a summary judgment that the evidence of fraud was not clear and convincing and held that the lower court had erred in disregarding impeached testimony. *Id.*

The real obstacle to Plaintiffs' first gross negligence theory is not whether there is evidence that she was on the shoulder but whether she was aware that she crossed onto the shoulder and consciously disregarded the resulting risks. Unless she had such awareness, she was not grossly negligent. Tex. Civ. Prac. & Rem. Code § 41.001(11)(B).

Plaintiffs identify no evidence that Ms. Smith realized she was driving on the shoulder when she allegedly did so. Doc. No. 55 at 52–53. In this respect, Plaintiffs' case resembles *TXI Transportation Co. v. Hughes*, which reached a judgment that the Texas Supreme Court reversed on other grounds because the lower courts allowed the prejudicial admission of evidence that the defendant lacked immigration status. 224 S.W.3d 870, 919 (Tex. App.—Fort Worth 2007), *rev'd on other grounds*, 306 S.W.3d 230 (Tex. 2010). In *Hughes*, the jury permissibly chose to believe the plaintiffs' evidence that the defendant drifted into the wrong lane despite contrary and impeaching evidence, but its finding of gross negligence could not be sustained because there was no evidence that the defendant was aware of the risk that resulted from the drifting. *Id.* at 908–10, 919. The defendant "repeatedly testified that he steered right"—away from plaintiffs' lane—"in an effort to avoid the collision." *Id.* at 919; *see also Robinson*,

2022 WL 174520, at *3 (finding no gross negligence where defendant swerved into plaintiff's lane without realizing that plaintiff was in the way).  The facts here are similar.  Although Plaintiffs attempt to show that Ms. Smith drifted onto the shoulder of the interstate and even that she realized this after she struck Mr. Pivaral Santos, Ms. Smith affirmatively testified that she did not leave her lane, and Plaintiffs have not succeeded in showing that she thought anything else up to the moment of the collision.  Doc. No. 55 at 48–51; Doc. No. 49 at 846.  The Court concludes that Ms. Smith is entitled to summary judgment on Plaintiffs' first gross negligence theory.

### ii.  Using Electronic Devices While Driving

The Court denies Ms. Smith summary judgment on Plaintiffs' theory that she was grossly negligent because she used electronic devices while driving in the lead-up to the accident that killed Mr. Pivaral Santos.  A jury could find that Ms. Smith was objectively and subjectively grossly negligent.

Objectively, there is evidence that Ms. Smith's driving was extremely dangerous. She repeatedly texted her friend until about eight or nine seconds before she struck Mr. Pivaral Santos with her car.  Doc. No. 56 at 1105–17.  While she may have dictated some of the messages, this still required her to touch her phone to record and send them.  Doc. No. 49 at 839–41.  After sending the last message, Ms. Smith noticed Ms. Moreno's car sticking into her lane and tried to maneuver around it.  *Id.* at 846. As she was about to pass the car, she looked at her GPS.  *Id.* at 847.  During this whole

period, and up until she hit Mr. Pivaral Santos, Ms. Smith was speeding at about eighty-five to ninety miles per hour.  *Id.* at 800–01; Doc. No. 56 at 1036.

Subjectively, there is evidence that Ms. Smith appreciated that her conduct was risky.  Although she was cagey in her deposition, she acknowledged that texting while driving at high speed is a dangerous distraction and, more generally, that taking her eyes off the road could be dangerous.  Doc. No. 49 at 761–70.  Taking this evidence together with the evidence of her dangerous driving, a jury could conclude that Ms. Smith was grossly negligent.

This conclusion accords with the growing body of case law holding that the use of electronic devices while driving may be grossly negligent when the driver has a history of safety violations, engages in a maneuver requiring her focus, or confronts driving conditions from which it would be dangerous for her to divert her attention.  *E.g.*, *Olivarez v. Get Cargo, Inc.*, 2014 WL 12588337, at *7 (W.D. Tex. Sept. 25, 2014), *rep. & rec. adopted sub nom. Olivarez v. Bozhinov*, 2014 WL 12588338 (W.D. Tex. Oct. 21, 2014); *Braun v. Clean Harbors Env't Servs., Inc.*, 2016 WL 7551118, at *5 (E.D. Tex. Jan. 25, 2016); *Alpizar v. John Christner Trucking, LLC*, 2019 WL 1643743, at *5 (W.D. Tex. Apr. 16, 2019), *rep. & rec. adopted*, 2019 WL 4087445 (W.D. Tex. May 17, 2019); *Finley*, 2019 WL 5058901 at *3; *Denham v. Bark River Transit, Inc.*, 2019 WL 4887256, at *4 (S.D. Tex. Oct. 3, 2019); *DeYoung v. Dillon Logistics, Inc.*, 2021 WL 414536, at *5 (E.D. Tex. Feb. 5, 2021); *Kuss v. Ulmer*, 2021 WL 1433062, at *4 (W.D. Tex. Mar. 17, 2021).

The Court need not and does not accept Plaintiffs' argument that Ms. Smith's use of electronic devices alone supports a finding of gross negligence under these authorities. Doc. No. 55 at 43. Although one court has offered dictum in support of this position, *Greene v. W&W Energy Servs., Inc.*, 2021 WL 5155675, at *3 (S.D. Tex. Feb. 5, 2021), a per se rule of this sort is insufficiently sensitive to the factual circumstances that may elevate or mitigate the risk of using electronic devices while driving. It would also create unnecessary tension with cases like *Williams v. Crawford*, in which the Third Court of Appeals held that a driver who took his eyes off the road was not grossly negligent because he did not engage in any additional dangerous conduct. 2018 WL 1124306, at *15 (Tex. App.—Austin Mar. 2, 2018, no pet.) (mem. op.). The Court agrees with the holding in *Kuss* that a plaintiff must show something more than the defendant's mere use of electronic devices to prove gross negligence. 2021 WL 1433062 at *4; *see Olivarez*, 2014 WL 12588337, at *7 (speeding); *Braun*, 2016 WL 7551118, at *5 (prior safety violations); *Alpizar*, 2019 WL 1643743, at *5 (unsafe driving history); *Finley*, 2019 WL 5058901 at *1 (speeding through intersection); *Denham*, 2019 WL 4887256, at *4 (use of flip phone in heavy rain in violation of federal regulations); *DeYoung*, 2021 WL 414536, at *1 (sudden deceleration); *Greene*, 2021 WL 5155675, at *3 (turning in front of oncoming highway traffic). Plaintiffs have done so here by pointing to Ms. Smith's high speed and attempt to swerve around Ms. Moreno's vehicle.

The Court rejects Defendants' attempt to distinguish the uniform case law on the basis that Ms. Smith was not using her phone at the instant her car impacted Mr. Pivaral Santos. This distinction does not explain all of the cases even in the subset Plaintiffs cited. *See DeYoung*, 2021 WL 414536, at *5 (defendant was using his phone at or "near" the time of the accident). It also makes little sense. So far as Defendants have shown, the risk involved in using an electronic device just before an accident is no different than the risk involved in using an electronic device during the accident. In both cases, the risk is the possibility that the driver will collide with a person or property because she is distracted. It is only hindsight—a luxury not permitted in assessing gross negligence—that makes the usage of an electronic device at the time of an accident appear more dangerous than the usage of the device in similar conditions before a potential accident. *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994).

Defendants' proposed distinction is better conceptualized an unsuccessful challenge to the causal link between any distraction Ms. Smith experienced and her collision with Mr. Pivaral Santos. *See Wells v. Red Banner Transp., LLC*, 2023 WL 438802, at *9 (W.D. Tex. Jan. 26, 2023) (noting that a causal connection is a prerequisite to a finding of gross negligence), *rep. & rec. adopted*, 2023 WL 5322446 (W.D. Tex. Feb. 28, 2023). Defendants duly present a causation argument in the alternative. Doc. No. 48 at 34. They submit evidence that Ms. Smith's texting had nothing to do with the collision. *Id.*; Doc. No. 58 at 24–26. In response, Plaintiffs point out that they submitted expert testimony to the contrary. Doc. No. 56 at 1508. While Defendants are

30

free to ask the jury to accept their evidence, the Court cannot do so at summary judgment on the conflicting record.

Defendants' efforts to minimize the parties' factual dispute are unpersuasive. Defendants rely on a study of distracted driving to argue that Ms. Smith's last text message came too far in advance of her collision with Mr. Pivaral Santos to cause the accident, but the scholars who prepared the study simply did not consider text messages sent eight or nine seconds before a crash, so they had nothing to say about messages like Ms. Smith's. Doc. No. 58 at 25; Doc. No. 49 at 1832. Defendants also try to squeeze too much out of Plaintiffs' expert's admission that a driver confronted with Ms. Moreno's Camry sticking into her lane would normally need to be attentive to avoid hitting the car. Doc. No. 58 at 26. A jury could find that this is a normal case and conclude that Ms. Smith was attentive when she avoided the Camry, but it could also credit the expert's testimony that Ms. Smith demonstrated a lack of attentiveness by striking Mr. Pivaral Santos with her car. Doc. No. 49 at 1845.

Since there are genuine disputes of fact material to Plaintiffs' theory that Ms. Smith was grossly negligent when she used electronic devices while driving around Ms. Moreno's car, the Court denies Ms. Smith summary judgment on this theory.

### 4. Request for Damages Based on Mr. Pivaral Santos's Pain and Suffering

Moving to the final issue presented by Defendants' Motion for Summary Judgment, the Court concludes that Plaintiffs' cannot recover damages based on Mr. Pivaral Santos's pain and suffering before his death. Plaintiffs have the burden to show that

Mr. Pivaral Santos suffered conscious pain if they want to recover such damages. *Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1156 (5th Cir. 1981). Their Seconded Amended Complaint cast serious doubt on their ability to make the required showing. In that pleading, they acknowledged that Mr. Pivaral Santos died "immediately" upon contact with Ms. Smith's Ford Explorer. Doc. No. 34 ¶ 17. Plaintiffs' present briefing confirms that they lack evidence Mr. Pivaral Santos endured conscious pain. They rely exclusively on Mr. Santos's testimony that he "thought" his brother, Mr. Pivaral Santos, was still alive in the aftermath of Mr. Pivaral Santos's collision with the Explorer. Doc. No. 49 at 257. It is unclear from this testimony whether Mr. Pivaral Santos was alive, much less whether he was conscious to feel pain. In the absence of evidence of Mr. Pivaral Santos's consciousness, the Court must enter judgment for Defendants on Plaintiffs' pain and suffering theory. *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 643 (Tex. 2023); *Carlisle v. Duncan*, 461 S.W.2d 254, 256 (Tex. Civ. App.—Dallas 1970, no writ).

## B. Motion to Dismiss

The Court now considers Defendants' Motion to Dismiss. Because the Court has already granted summary judgment on several of Plaintiffs' claims, the Court denies the Motion to Dismiss as moot to the extent Defendants seek dismissal of the same claims. *Aubone v. H-E-B, LP*, 2021 WL 5968416, at *2 (W.D. Tex. Dec. 16, 2021). In the live portion of the Motion to Dismiss, Defendants make two arguments. They first assert that Ms. Moreno has not stated a viable negligence claim because she has not

32

alleged that she suffered an injury. Doc. No. 37 at 5–7. They then assert that Mr. San-
tos has not stated a viable bystander claim because he has not alleged that he experi-
enced shock at Mr. Pivaral Santos's death. *Id.* at 7–8. The Court agrees with respect
to Ms. Moreno's claim but not with respect to Mr. Santos's claim. After reviewing the
applicable legal standard, the Court will discuss each claim separately.

### 1. Legal Standard

The Court will dismiss a claim pursuant to Federal Rule of Civil Proce-
dure 12(b)(6) if it is unsupported by factual allegations sufficient to make the claim
plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing the plausibility of
a claim, the Court assumes that the Plaintiffs' factual allegations are true but does not
assume that their legal conclusions are true. *Id.* at 678–79.

### 2. Ms. Moreno's Negligence Claim

The Court dismisses Ms. Moreno's simple negligence claim without prejudice
because she has not identified the injury for which she seeks damages. No recovery is
possible if she does not tie Defendants' alleged negligence to some harm she suffered.
*See Saldana v. Williams*, 2020 WL 1880954, at *4 (Tex. App.—Amarillo Apr. 15, 2020,
no pet.) (mem. op.). Plaintiffs' Second Amended Complaint reveals only that she "suf-
fered great pain, suffering, and mental anguish." Doc. No. 34 ¶ 41. From this, the
Court does not learn how Ms. Moreno was hurt. There is only the conclusion that she
suffered an injury unaccompanied by factual allegations that support it. Ms. Moreno
must provide the missing factual background to make her claim plausible. *Cf. Barry v.*

*United States*, 667 F. Supp. 3d 495, 505 (S.D. Tex. 2023) (discussing a similar allegation in a different context).

The Court believes she can and will permit her to replead her claim.  In their briefing, Plaintiffs clarify that Ms. Moreno suffered an injury because Ms. Smith's car struck Mr. Pivaral Santos's body and sent it flying into Ms. Moreno, causing Ms. Moreno to "black out."  Doc. No. 38 at 4 n.1; Doc. No. 55 at 31.  There is at least some testimony consistent with this account.  Doc. No. 49 at 383–85.  Ms. Moreno may add detail to the story in a Third Amended Complaint.

### 3. Mr. Santos's Bystander Claim

The Court will not dismiss Mr. Santos's bystander claim.  To recover as a bystander to a car accident, a plaintiff must show that he (1) was near the scene of the accident, (2) suffered shock "as a result of a direct emotional impact . . . from a sensory and contemporaneous observance of the accident," and (3) shared a close relationship with a victim of the accident.  *United Servs. Auto. Ass'n v. Keith*, 970 S.W.2d 540, 542 (Tex. 1998) (per curiam) (citation omitted).  Defendants contend that Mr. Santos has not sufficiently alleged his shock at the death of his brother, Mr. Pivaral Santos.  Doc. No. 37 at 7–8.  The Court disagrees.  Mr. Santos's allegations are brief, but they explain that he directly and contemporaneously watched his brother die and experienced deep anguish as a result.  Doc. No. 34 ¶¶ 41, 95.  Those factual allegations support each element of his bystander claim and are sufficient at the pleading stage.  *Cf. Prescott v. Bexar Cnty.*, 2021 WL 812115, at *3 (W.D. Tex. Mar. 3, 2021).

### C. Motion to Exclude

The Court lastly considers Plaintiffs' Motion to Exclude some of the expert testimony submitted by Defendants.  In the Motion to Exclude, Plaintiffs seek the partial exclusion of testimony from Defendants' accident reconstructionist, Paul Montalbano, and Defendants' forensic analyst, Iris Dalley Graff.  Doc. No. 50 at 1.  Although this testimony was not material to the Court's rulings on Defendants' Motion for Summary Judgment or Motion to Dismiss, it may be material at trial.  The Court denies the motion with respect to Mr. Montalbano and denies it, in part without prejudice, with respect to Ms. Graff.  The Court summarizes the relevant legal standard and then explains the reasons for this decision.

### 1. Legal Standard

Under Federal Rule of Evidence 702, the Court will allow a qualified expert witness to testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

A witness may qualify as an expert through knowledge, skill, experience, training, or education.  *Galvez v. KLLM Transp. Servs., LLC*, 575 F. Supp. 3d 748, 759 (N.D. Tex. 2021) (Fitzwater, J.).  In assessing the reliability of a qualified expert's opinion, the Court takes a flexible approach with the goal of determining whether the expert's

testimony has a sound basis in the expert's discipline. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). The proponent of expert testimony has the burden of showing its admissibility by a preponderance of the evidence. *Cantu v. Wayne Wilkens Trucking, LLC*, 487 F. Supp. 3d 578, 581 (W.D. Tex. 2020).

### 2. Mr. Montalbano's Opinions

The Court denies Plaintiffs' Motion to Exclude portions of Mr. Montalbano's testimony. The target of Plaintiffs' attack is Mr. Montalbano's opinion that Mr. Pivaral Santos was bending over with only his head projecting in front of Ms. Smith's Ford Explorer when the Explorer collided with him. Doc. No. 51 at 15. According to Plaintiffs, Mr. Montalbano's opinion is faulty for two reasons. First, Plaintiffs assert that Mr. Montalbano reached his opinion about Mr. Pivaral Santos sticking out only his head in part because he mistakenly believed there was no damage to the front of the Explorer less than three feet off the ground. Doc. No. 50 at 7–15. There is evidence of a dent on the Explorer's low-lying front bumper. Doc. No. 51 at 550–51. Second, Plaintiffs say Mr. Montalbano wrongly concluded that Mr. Pivaral Santos's head created the damage sustained by the Explorer near its left headlight. Doc. No. 50 at 15–18. Plaintiffs believe Mr. Montalbano has not supported this conclusion, which is part of the reasoning by which he reached his opinion, with a sufficient explanation. *Id.* at 15–18. While Plaintiffs may present both criticisms to the jury, they do not warrant exclusion of Mr. Montalbano's testimony.

  **i.**  **The Dent**

  Plaintiffs' argument that Mr. Montalbano ignored the dent on the Ford Explorer's front bumper lacks bite because Mr. Montalbano expressly stated that the dent did not alter his analysis.  At his deposition, Mr. Montalbano testified that there are multiple, "overwhelmingly consistent" circumstances supporting his opinion that Mr. Pivaral Santos leaned his head in front of the Explorer.  Doc. No. 51 at 259–60. The circumstances he cited include the size and shape of the impact site near the Explorer's left headlight, which he says are consistent with a collision with an object having the shape and rigidity of a skull, the presence of body matter in the impact site, and the lack of damage between the impact site and the bumper dent.  *Id.* at 259–62. They also include the fact that the Explorer did not roll over Mr. Pivaral Santos, which Mr. Montalbano says would likely have occurred if the Explorer struck a part of Mr. Pivaral Santos's body closer to his center of mass than his head.  *Id.* at 259–60.  As an explanation for the dent on the bumper, Mr. Montalbano suggested that Mr. Pivaral Santos's limbs might have "flail[ed] outward" and struck the bumper during the accident.  *Id.* at 263.

  Mr. Montalbano's testimony provides a reasoned basis for believing that the existence of the dent does not undermine his opinion about Mr. Pivaral Santos sticking his head in front of the Explorer.  Mr. Montalbano may have been wrong to ignore the dent, but he was not so gravely mistaken that the Court will take that decision away from the jury.  *Bryan v. Swisher*, 2023 WL 6542757, at *5 (M.D. Ga. Oct. 6, 2023)

(denying motion to exclude accident reconstructionist's testimony about plaintiff's position based on his disregard of evidence because he deposed that the evidence was immaterial to his analysis); *see also Kehler v. Bridgestone Americas Tire Operations, LLC*, 2016 WL 8316772, at \*6 (D. Wyo. Dec. 1, 2016); *Sandlin v. Urbina*, 2022 WL 636677, at \*3 (M.D. La. Mar. 4, 2022); *cf. Head v. Thrash*, 2023 WL 3664442, at \*8 (N.D. Ga. Mar. 31, 2023) (excluding accident reconstructionist's testimony because he ignored evidence inconsistent with his opinions); *Hopper v. M/V UBC SINGAPORE*, 2010 WL 2787806, at \*6 (S.D. Tex. July 14, 2010) (similar).

### ii. Mr. Montalbano's Reasoning

The Court similarly concludes that a jury should decide whether to accept Mr. Montalbano's assessment that Mr. Pivaral Santos's head caused the damage near the left headlight of Ms. Smith's Ford Explorer. Plaintiffs' objection to the reliability of this assessment is somewhat unclear. They appear to believe that Mr. Montalbano merely observed an impact site near the Explorer's left headlight and some unidentified body matter in it, guessed that a skull would cause a similar impact, and leaped to the conclusion that Mr. Pivaral Santos's skull must have caused the impact. Doc. No. 50 at 18; *cf. Thomas v. Chambers*, 2019 WL 1670745, at \*6 (E.D. La. Apr. 17, 2019) (excluding testimony based on a facile comparison of photographs with the proponent's testimony because a jury could make the same straightforward comparison). As the Court indicated in the previous subsection, Mr. Montalbano's analysis was not so simplistic.

38

Using photographs, Mr. Montalbano estimated the size of Mr. Pivaral Santos's skull and the size of impact site near the Explorer's headlight.  Doc. No. 51 at 249.  He confirmed that the size, shape, and location of the impact site were consistent with a collision with an object with the rigidity of a skull of the estimated size.  *Id.* at 259.  He then ruled out the alternative possibility that impact occurred at a point closer to Mr. Pivaral Santos's center of mass.  *Id.* at 15, 259–60.  Bringing to bear his expertise as a licensed mechanical engineer, he determined that a collision in the alternative scenario was unlikely to produce the observed facts because it would have resulted in Mr. Pivaral Santos flying in a more forward than diagonal direction.  *Id.* at 15, 110–11, 259–60.  He explained that the Explorer likely would have rolled over Mr. Pivaral Santos in that case, which does not appear to fit the facts.  *Id.* at 15, 259–60.  Mr. Montalbano did not rule out the possibility that the Explorer initially struck Mr. Pivaral Santos away from his center of mass at a point opposite his head—that is, somewhere around his feet—but the parties have not addressed that issue or whether the facts fairly present it.

Plaintiffs' criticisms of Mr. Montalbano's chain of reasoning are matter for cross-examination rather than reasons for exclusion of his testimony.  Mr. Montalbano reasonably applied his engineering expertise to photographic evidence to determine Mr. Pivaral Santos's position at the time of impact with the Explorer from the forces at play in the accident.  The jury can consider the resulting opinion.  *See Hernandez v. Groendyke Transp., Inc.*, 2022 WL 2872493, at *5 (N.D. Tex. July 21, 2022)

(Fitzwater, J.) (permitting qualified accident reconstructionist to opine on accident dy-
namics based on post-accident evidence); *Sandlin*, 2022 WL 636677, at *4–5 (same).

### 3.  Ms. Graff's Opinions

The Court denies Plaintiffs' Motion to Exclude portions of Ms. Graff's testi-
mony, though it will permit them to renew their objection to her qualifications at trial.
Ms. Graff attempted to reconstruct the collision between Ms. Smith's Ford Explorer
and Mr. Pivaral Santos by analyzing blood, body fluid, and tissue patterns in photo-
graphs of the accident scene.  Doc. No. 51 at 504.  By observing the locations of these
patterns and estimating from where body matter originated, she inferred that
Mr. Pivaral Santos's body flew off the Explorer, struck Ms. Moreno's Toyota Camry,
rebounded off the Camry, and hit the Explorer again.  *Id.* at 515.  Plaintiffs object to
the building blocks leading to this conclusion.  They contend that Ms. Graff is unqual-
ified to analyze any body matter other than blood.  Doc. No. 50 at 19–20.  They also
assert that Ms. Graff improperly treated some of the wet marks photographed at the
scene as blood marks without sufficiently verifying that they actually consisted of
blood.  *Id.* at 20–24.  The Court finds the first argument weightier than the second but
will not exclude any of Ms. Graff's testimony in this order.

### i.    Ms. Graff's Qualifications

The need to question Ms. Graff's qualifications is something of a surprise.  She
has a degree in biology, spent twenty years with the Oklahoma State Bureau of Inves-
tigation, and has a curriculum vitae full of professional certifications, memberships,

and awards related to crime scene reconstruction and bloodstain pattern analysis.  Doc. No. 51 at 493–501.  Once Plaintiffs questioned Ms. Graff's competence to analyze non-blood body matter, one would have expected Defendants to answer that some part of her professional experience required her to conduct similar analyses.  Whether because this answer is false or for strategic reasons that remain opaque, Defendants have not taken this course.  They instead ask the Court to assume Ms. Graff is an expert in the analysis of non-blood body matter because analyzing bloodstain patterns—something she is undisputedly qualified to do—is purportedly a task "related" to analyzing other body matter patterns.  Doc. No. 53.  The evidence on this point is not wholly persuasive, but because of Ms. Graff's experience, the Court believes that Defendants should have the opportunity to develop the record of her qualifications at trial.

The summary judgment record shows that blood and non-blood body matter do not present the same problems to the analyst who wants to determine their trajectory in flight.  Ms. Graff testified that some types of non-blood body matter present at the scene of Ms. Pivaral Santos's death do not share the same flight dynamics that make it possible to estimate the origin of blood droplets.  She stated that she can infer the source of a bloodstain because a blood droplet travels in a known parabolic trajectory from its source to its landing spot.  Doc. No. 51 at 425.  This inference no longer holds for brain tissue or cerebrospinal fluid.  She explained that brain tissue is not "a single homogenous substance," so it has no "specific flight dynamic."  *Id.* at 429–31.  As to cerebrospinal fluid, she testified that it does not produce the "same types of patterns

41

that we see in blood" and that it is "much more difficult to look at it and say, 'Well, this was a single droplet in air that was spherical in air.'" *Id.* at 429.

The differences between blood and non-blood body matter do not mean that Ms. Graff's expertise analyzing the former is irrelevant to analyzing the latter. While the general rule is that even an expert with impressive credentials may not testify outside the scope of her expertise, there is a qualification to this rule. *Macy v. Whirlpool Corp.*, 613 F. App'x 340, 345 (5th Cir. 2015) (per curiam); *see also Merritt v. Arizona*, 2020 WL 4921987, at *4 (D. Ariz. Aug. 21, 2020) (excluding the testimony of a forensic scientist because his expertise in firearms analysis did not extend to the particular problems of bullets striking tires). Defendants correctly note that an expert may testify beyond her area of specialty. They cite cases indicating that an expert may do so when her background would give her an advantage over the jury in understanding an area outside of, but related to, her area of specialization. *See United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013) (chemical engineer could testify about equipment that was similar to the equipment he previously used); *Huss v. Gayden*, 571 F.3d 442, 455 (5th Cir. 2009) (internist could assess medical studies about the link between a drug and cardiomyopathy); *Holcombe v. United States*, 516 F. Supp. 3d 660, 686 (W.D. Tex. 2021) (gun violence expert could testify about the likely consequences of a background check on a particular individual). The Court adds that the advantage must extend beyond a general background in science. *Smith v. Goodyear Tire & Rubber Co.*,

495 F.3d 224, 227 (5th Cir. 2007); *Wilson v. Woods*, 163 F.3d 935, 938 (5th Cir. 1999); *Lee v. City of Richmond*, 2014 WL 5092715, at *9 (E.D. Va. Sept. 30, 2014).

Ms. Graff's extensive experience as forensic analyst leads the Court to believe that she may have knowledge that enables her to analyze non-blood body matter patterns more effectively than a jury. There is some evidence that Ms. Graff has analyzed non-blood body matter in the past, and it is plausible that someone with Ms. Graff's professional history learned the customary methods of such analysis or developed intellectual tools that are useful in such analysis. Doc. No. 51 at 442–43, 493–501. Plaintiffs are nonetheless correct that the record on this point is thin and mostly vague. Doc. No. 50 at 19–20. Despite its prominent place in Defendants' briefing, the fact that Ms. Graff attended two training on serology, the study of body fluids, in 1992 and 1993 is not especially compelling. Doc. No. 51 at 500; *see Est. of Logan v. City of S. Bend*, 564 F. Supp. 3d 719, 735 (N.D. Ind. 2021), *aff'd*, 50 F.4th 614 (7th Cir. 2022).

Rather than excluding Ms. Graff's testimony about non-blood body matter patterns based on the limited record before it, the Court will permit Defendants to try to qualify her at trial. If they cannot show more concretely that Ms. Graff has expertise in the analysis of such patterns or has specific knowledge that would enable her to understand such patterns better than a jury, Plaintiffs may renew their Motion to Exclude her testimony.

The Court notes that the practical significance of its decision is small. Having reviewed the three opinions that Plaintiffs seek to exclude, the Court finds that only

one depends on a potentially inadmissible analysis.  In that opinion, Ms. Graff states that body tissue "was dispersed across the right side of [Ms. Moreno's] Camry. . . . This dispersion pattern was consistent with a source south and east of the Camry['s] right side."  Doc. No. 51 at 509.  This opinion depends on a tissue pattern analysis.

The other two challenged opinions are the product of bloodstain pattern analyses Ms. Graff is undisputedly qualified to conduct.  In the first, Ms. Graff notes that Mr. Santos and Mr. Diaz did not have blood or tissue spatter on them at the scene of Mr. Pivaral Santos's death and infers that they were not in the path of the spatter.  *Id.* at 514.  She then concludes that they were "not standing at the Camry trunk or east of the [interstate median] barrier bloodstain pattern area."  *Id.*  Although Ms. Graff mentions non-blood patterns, her conclusion does not appear to depend on them.  Her opinion seems to have sufficient support in her comparison of the bloodstain pattern on the median barrier and the lack of blood on Messrs. Santos and Diaz.  That comparison is a bloodstain pattern analysis.  If Defendants fail to qualify Ms. Graff as an expert on non-blood body matter patterns and Ms. Graff attempts to base her opinion on tissue patterns at trial, Plaintiffs may object at that time.

In the second challenged opinion, Ms. Graff estimates Mr. Pivaral Santos's position based on a bloodstain pattern on the median barrier.  *Id.* at 511.  As Plaintiffs note, Ms. Graff could not categorically exclude the possibility that there was cerebrospinal fluid mixed in pattern, but she affirmatively testified that it was at most a "trace[]" amount.  *Id.* at 449.  If this trace amount creates a possibility of error in her

bloodstain pattern analysis, Plaintiffs may bring that out on cross-examination of Ms. Graff.

### ii. Verification of Bloodstains

The Court denies Plaintiffs' Motion to Exclude Ms. Graff's bloodstain pattern analysis.  Plaintiffs do not question her qualifications to do this analysis but fault her for relying on photographs of what appear to be bloodstain patterns without testing the chemical composition of the patterns to confirm they consist of blood.  Doc. No. 50 at 20–34.  The Court finds that the factual basis for her analysis is sufficient.

There is evidence that Ms. Graff can identify bloodstains from photographs without the need for chemical testing.  Ms. Graff testified that it is common for blood-stain pattern analysts to rely on "documentation" such as photographic or similar evidence.  *Id.* at 471–72.  She explained that bloodstains have distinctive visual features, including their color, their shape, and the concentration of blood cells in darker "tails."  *Id.* at 454.  According to Ms. Graff, she has developed her ability to distinguish the characteristic appearance bloodstains from the appearance of other fluids through observation and experience.  *Id.* at 397, 448.  Against this evidence, Plaintiffs quote a treatise to the effect that a bloodstain pattern analyst "may" need to chemically test stains to identify blood.  Doc. No. 50 at 21.  There is no inconsistency between the quoted material and Ms. Graff's testimony.

On the record before it, the Court concludes that Ms. Graff can reliably base her bloodstain pattern analyses on photographs of marks she identifies as blood.  *Compare*

*Bratt v. Genovese*, 2017 WL 6344449, at *4 (M.D. Fla. Dec. 12, 2017) (reaching a similar result), *with Logan*, 564 F. Supp. 3d at 736 (reaching a different result where witness admitted he could not distinguish blood in photographs).  Plaintiffs remain free to cross-examine Ms. Graff about mistakes or limitations in her identification.  *See id.* at 461 (noting that there were some marks Ms. Graff admittedly could not identify).

## III.   CONCLUSION

The Court **GRANTS** Defendants' Motion for Summary Judgment in part and **DENIES** it in part.  Doc. No. 47.  The Court **DISMISSES** with prejudice the following claims, theories, and requests for relief: (1) Plaintiffs' negligent hiring, negligent retention, negligent training, and negligent supervision claims against Eastman, (2) Plaintiffs' theories of Eastman's gross negligence, (3) Plaintiffs' theories of Ms. Smith's gross negligence insofar as Plaintiffs claim that her grossly negligent conduct was driving on the shoulder of Interstate 45, (4) Plaintiffs' request for damages based on Mr. Pivaral Santos's pain and suffering, (5) Plaintiffs' request for exemplary damages based on a *respondeat superior* theory, and (6) Mr. Pivaral Gonzalez's request for exemplary damages insofar as he bases it on Texas's wrongful death statute.

The Court **GRANTS** Defendants' Motion to Dismiss in part without prejudice, **DENIES** it in part, and **DENIES** it in part as moot.  Doc. No. 37.  The Court **DISMISSES** Ms. Moreno's simple negligence claim without prejudice.  Plaintiffs **MAY FILE** an amended complaint no later than seven days after the entry of this order.  If Plaintiffs file an amended complaint, they shall omit all claims dismissed with

prejudice, shall otherwise confine any additions and modifications to Ms. Moreno's simple negligence claim, and shall file a redline as an attachment to the amended complaint that shows the differences between the new complaint and their Second Amended Complaint.  Doc. No. 34.

The Court **DENIES** Plaintiffs' Motion to Exclude, in part without prejudice. Doc. No. 50.  Plaintiffs may renew their objection to Ms. Graff's qualifications at trial.

**SO ORDERED.**

Signed April 19th, 2024.

_Ed Kinkeade_
ED KINKEADE
UNITED STATES DISTRICT JUDGE